# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

|  |  |
|---|---|
| HOUSTON JUSTICE, HOUSTON AREA URBAN LEAGUE, DELTA SIGMA THETA SORORITY, INC., THE ARC OF TEXAS, and JEFFREY LAMAR CLEMMONS<br><br>*Plaintiffs*,<br><br>v.<br><br>GREGORY WAYNE ABBOTT, in his official capacity as Governor of Texas; JOSE ESPARZA, in his official capacity as Deputy Secretary of State of Texas; WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of Texas; JACQUE CALLANEN, in her official capacity as Elections Administrator of Bexar County; and ISABEL LONGORIA, in her official capacity as Elections Administrator of Harris County.<br><br>*Defendants*. | Civil Case No. <u>5:21-cv-00848</u> |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority, Inc., the Arc of Texas, and Jeffrey Lamar Clemmons (collectively, "Plaintiffs") file this Complaint for Declaratory and Injunctive Relief to challenge the constitutionality and legality of Texas Senate Bill 1, and allege as follows:

### NATURE OF THE CASE

1.      As President Ronald Reagan once said, "[f]or this nation to remain true to its principles, we cannot allow any American's vote to be denied, diluted or defiled. The right to vote is the crown jewel of American liberties, and we will not see its luster diminished." In the effort

1

to protect the crown jewel of American liberties, this lawsuit challenges certain amendments to the Texas Election Code enacted through Senate Bill 1 ("S.B. 1").

2.     The United States Supreme Court has explained that the right to vote is "a fundamental matter in a free and democratic society." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). "No right," the Court has held, "is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (voting is "preservative of all rights.").

3.     For the past 150 years, the State of Texas has had a long track record of excluding and discouraging Black and Latino residents of the State from exercising this precious and fundamental right. *See infra* Section A. Voters with disabilities, including Black and Latino voters with disabilities, have also persistently experienced barriers in accessing their right to vote in Texas. *See infra* Section D. The State's policies of exclusion and restrictive voting laws have resulted in chronically low voter turnout.[1]

4.     While the State has seen recent gains in turnout, including in the 2018 midterm election, even those gains left the State woefully behind the national average and ranked eleventh lowest in the country.[2]

---

[1] *See*, *e.g.*, Fernando Ramirez, *Voter Turnout in Texas is Dead Last in America, Study Finds*, Houston Chronicle (Sept. 19, 2018, 3:34 PM), https://www.houstonchronicle.com/news/houston-texas/texas/article/Voter-turnout-in-Texas-is-dead-last-in-America-13241845.php; Scot Schraufnagel, Michael J. Pomante II, & Quan Li, *Cost of Voting in the American States: 2020*, 19 Election L. J. (Issue 4) 503, 506-507 (2020); Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state*, Texas Tribune, (Oct. 19, 2020, 4:00 AM), https://www.texastribune.org/2020/10/19/texas-voting-elections/.

[2] Elbert Wang, *Texas Saw the Nation's Sixth-Highest Voter Turnout Increase, But Still Lagged Behind Most Other States*, Texas Tribune (Dec. 7, 2018, 12:00 AM), https://www.texastribune.org/2018/12/07/texas-voter-turnout-sixth-highest-increase-2018-midterms/.

5.    The recent 2020 elections, conducted in the midst of a global pandemic, were a push-and-pull between efforts to expand access to the franchise and backlash aimed toward preserving the exclusionary status quo.

6.    During the March 2020 primary, voters were particularly motivated to vote, but encountered serious obstacles to doing so, in part because the infrastructure was insufficient to accommodate increased participation.

7.    For example, in one location in Harris County, voters waited as long as six hours to vote.[3] Early estimates indicated that there was a 45% increase in Democratic participation in Harris County alone, which left these voters in particularly long lines as the political parties held separate primaries, requiring separate voting booths and ballots within a single polling location.  At Texas Southern University ("TSU"), a historically Black University that served as a polling location, one voter waited until after 1:00 am to cast a ballot.[4]

8.    In response, Harris County took several measures to ensure voting access for the 2020 general election, including (1) increasing the county's election budget for the 2020 general

---

[3] Matt Harab & Andrew Schneider, *Who's to Blame for Long Lines on Super Tuesday? Depends on who You Ask*, Houston Public Media (March 5, 2020, 4:09 PM), https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/03/04/362662/local-officals-explain-long-lines-on-super-tuesday/; Jen Rice, *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says it Won't Happen Again*, Houston Public Media (Oct. 30, 2020, 5:29 AM), https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/10/29/384985/voting-problems/.

[4] Jen Rice, *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says it Won't Happen Again*, Houston Public Media (Oct. 30, 2020, 5:29 AM), https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/10/29/384985/voting-problems/.

election by $29 million (from $4 million in 2016 to $33 million in 2020);[5] (2) moving the county clerk's election headquarters to a 100,000 square foot arena; (3) tripling the number of early and Election Day polling locations, including twelve mail-in ballot drop-off locations, drive-thru voting centers, and six 24-hour polling locations;[6] (4) increasing the number of voting machines by 50% at polling places in the county; and (5), in direct response to the issue of long lines at TSU, tripling the number of voting machines available at the University.

9.      Other localities in Texas also sought to expand access to the ballot. San Antonio, Dallas, Houston, and Austin, all cities with high populations of Black and Latino residents, made voting mega-centers available, in an effort to ease the burden of long lines.[7] Tarrant County added eight polling locations throughout the county to keep up with high early voting turnout.[8]  And Travis County set up four mail-in ballot drop-off locations.[9]

---

[5] Karen Brooks Harper & Emma Platoff, *Harris County tried to make voting easier during the pandemic.  Texas Republicans fought every step of the way.*, Texas Tribune, (Oct. 15, 2020, 11:00 AM), https://www.texastribune.org/2020/10/15/harris-county-texas-voting/.

[6] *Id.*

[7] *Here's Where You Can Vote Early in Austin and Central Texas*, Statesmen News Network (Feb. 17, 2020, 4:14 PM), https://www.statesman.com/news/20200217/herersquos-where-you-can-vote-early-in-austin-and-central-texas; RJ Marquez, *How AT&T Center Will Transform to Become Mega Voting Site in Bexar County*, KSAT (Sept. 11, 2020, 12:21 PM), https://www.ksat.com/news/local/2020/09/08/how-att-center-will-transform-to-become-mega-voting-site-in-bexar-county/.

[8] Brian Lopez, *Tarrant County will add 8 election sites amid high early voting turnout*, Star Telegram, (Oct. 20, 2020, 7:00 AM), https://www.star-telegram.com/news/politics-government/election/article246592083.html.

[9] Ashley Lopez, *Texas Governor Limits Ballot Drop-Off Locations, Local Officials Vow to Fight Back*, NPR (Oct. 1, 2020, 6:29 PM), https://www.npr.org/2020/10/01/919283793/texas-governor-limits-ballot-drop-off-locations-local-officials-vow-to-fight-bac.

10.     Higher voter turnout by Blacks and Latinos was not good news for everyone. The State responded by attempting to re-erect barriers to voting.[10]  Governor Abbott issued an Executive Order restricting each county to maintain only one ballot drop-off location, irrespective of the county's size or population forcing some voters to have to drive twenty or thirty miles to vote.[11]

11.     Some private individuals also responded in kind. Private plaintiffs tried (and ultimately failed) to have over 120,000 votes cast using drive-thru voting in Harris County—a county with a high Black and Latino population—discarded.[12]

12.     Black and Latino voters faced a significant increase in voter intimidation, harassment, and threats, including by armed groups.[13]  In the 2020 presidential election alone, the

---

[10]    *See Proclamation by the Governor of the State of Texas* (Oct. 1, 2020), https://gov.texas.gov/uploads/files/press/PROC_COVID-19 Nov 3 general election IMAGE 10-01-2020.pdf., and Ashley Lopez, *Texas Voters are Caught in the Middle of a Battle over Mail-in Voting*, NPR, (May 29, 2020, 5:00 AM), https://www.npr.org/2020/05/29/864143739/texas-voters-are-caught-in-the-middle-of-a-battle-over-mail-in-voting; *State v. Hollins,* No. 20-0729, 2020 WL 5919729 (Tex. Oct. 7, 2020) (State of Texas sued Harris County Clerk after he proposed mailing unsolicited ballot applications to all registered voters under 65 years of age, only a fraction of whom were eligible to vote by mail according to the State and Texas Supreme Court held Clerk lacked implied authority under the Election Code to mail unsolicited ballot applications).

[11] *See Tex. League of United Latin American Citizens v. Hughs*, 978 F.3d 136 (5th Cir. 2020).

[12] *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, \*7-12 (S.D. Tex. Nov. 2, 2020) (denying plaintiffs standing to sue to prohibit the use of drive-thru voting centers and to prevent counting ballots cast using drive-thru voting).

[13]  *See*, *e.g.*, Kevin Krause & Charles Scudder, *Far-right Extremists Pose Rising Threat in North Texas around Election, FBI's Dallas Office Says*, The Dallas Morning News (Oct. 1, 2020, 8:16 PM), https://www.dallasnews.com/news/crime/2020/10/01/far-right-extremists-pose-rising-threat-in-north-texas-around-election-fbi-dallas-office-says/;  Angela Kocherga, *Racism, Hate Crimes Weigh On Latino Voters' Minds In El Paso*, Texas Standard (Oct. 22, 2020, 10:05 AM), https://www.texasstandard.org/stories/racism-hate-crimes-weigh-on-Latino-voters-minds-in-el-paso/; *Coalition Urges US to Protect Voters from White Supremacist Threats*, Human Rights Watch (Oct. 7, 2020, 6:00PM), https://www.hrw.org/news/2020/10/07/coalition-urges-us-protect-voters-white-supremacist-threats#.

non-partisan Election Protection coalition received some 267 reports of voter intimidation in Texas, many of which were reports of intimidation by armed citizens or organized demonstrators close to polling locations.[14]  And on Election Day, voters in Hidalgo County reported two men with visible firearms freely walking around a polling location speaking with voters, despite clear signs at the location that no firearms were allowed.[15]

13.     Despite these barriers, Texas's voter turnout for the 2020 general election broke records as the highest in almost thirty years, up 6.6 percentage points from voter turnout from the last general election in 2016.[16]  Importantly, early voting, both in person and through the mail, was a key factor in this increase in turnout, accounting for over 9.7 million of the 11.3 million votes cast (over 85%).[17]

14.     Harris County in particular, which includes most of the city of Houston, saw its highest voter turnout since 1992, accounting for more than 1.6 million of the votes cast in the 2020

---

[14] Judy Bao, *Voter Intimidation in Texas During the 2020 General Election*, Tex. C.R. Project (Feb. 2021), https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.

[15] *Id.*

[16] Shannon Najmabadi & Mandi Cai, *Democrats hoped high turnout would usher in a blue wave across Texas. It didn't.*, Texas Tribune (Nov. 4, 2020, 7:00 PM), https://www.texastribune.org/2020/11/04/texas-voter-turnout-democrats/.

[17] *See* Jeremy Schwartz & Mandi Cai, *Texas is on track for record turnout in this election after breaking early voting records*, KSAT (Oct. 31, 2020, 12:02 PM), https://www.ksat.com/news/texas/2020/10/31/texas-is-on-track-for-record-turnout-in-this-election-after-breaking-early-voting-records/, and *Texas Presidential Election Results 2020*, NBC News, https://www.nbcnews.com/politics/2020-elections/texas-president-results (last updated Mar. 31, 2021).

general election.[18] Dallas County also broke turnout records in the 2020 general election, surpassing its early voting record set in 2016.[19]

15. Voters of color demonstrated a motivation to vote in the 2020 general election and overcame substantial barriers to account for 40% of the overall Texas votes in the 2020 general election.[20]

16. Black and Latino voters, including voters with disabilities, benefited in particular from counties' efforts to expand access to the ballot. In Harris County, Black and Latino voters cast more than half the ballots at both drive-thru voting centers and at the extended-hour locations.[21]

17. Instead of building on the progress of increased voter turnout by Latinos and Blacks, now, through certain provisions of an omnibus elections bill—S.B. 1—the State again seeks to further burden the right to vote and curtail the participation of Black and Latino voters by targeting the methods and opportunities to vote that these voters availed themselves of in droves

---

[18] *See* Jake Lahut, *Massive turnout in Houston is making Texas a top state to watch*, Business Insider, (Nov. 3, 2020, 5:38 PM), https://www.businessinsider.com/harris-county-turnout-numbers-texas-flip-2020-11, and *Texas Presidential Election Results 2020*, NBC News, https://www.nbcnews.com/politics/2020-elections/texas-president-results (last updated Mar. 31, 2021).

[19] Jozelyn Escobedo, *How the four major counties in North Texas voted during the 2020 election*, WFAA (Nov. 4, 2020, 12:06 PM), https://www.wfaa.com/article/news/politics/elections/voter-turnout-2020-presidential-election-north-texas/287-64a24012-a038-49d7-8db3-26d0923994c5 (last updated Nov. 4, 2020, 8:51 PM).

[20] *Texas Presidential Election Results 2020*, NBC News, https://www.nbcnews.com/politics/2020-elections/texas-president-results (last updated Mar. 31, 2021).

[21] Alexa Ura, *Restrictions on Texas Voting could tighten under Republican bill advanced by Senate Committee*, Texas Tribune, (Mar. 26, 2021, 11:00 PM), https://www.texastribune.org/2021/03/26/texas-voting-access-republican-legislature/.

during the November 2020 election—an election in which voters of color participated in record numbers.[22]

18.     S.B. 1, which was proffered as a measure to ensure election integrity in Texas, passed on a party-line vote, was signed into law by Governor Abbott on September 1, 2021, and becomes effective 91 days after the second special legislative session ends.

19.     The legislative process leading up to S.B. 1's passage was unprecedented. During the regular legislative session, when called for a final vote on S.B. 7, the predecessor to S.B. 1, lawmakers in the House staged a walkout to avoid passage. In response, Governor Abbott vetoed a bill funding the legislature to pressure lawmakers by withholding pay. The Governor then called a special legislative session in part to pass an election integrity bill, prompting lawmakers in the House to leave the state for several weeks to again avoid passing the bill. House Republicans issued civil arrest warrants to force lawmakers back to the chamber to consider the bill. Despite principled opposition from many affected individuals and civil rights organizations, S.B. 1 was ultimately passed in a second special session, once again called in part to accomplish Governor Abbott's goal of promoting so-called election integrity. Its provisions make voting harder for Latinos and Blacks. Its provisions discourage rather than encourage what President Reagan called the crown jewel of American liberties.

---

[22] *See, e.g.*, Matt Goodman, *Election Day Arrives on the Heels of Historic Early Voting Turnout in North Texas*, DMagazine (Nov. 2, 2020, 11:22 AM), https://www.dmagazine.com/frontburner/2020/11/election-day-2020-dallas-county-north-texas/; John Engel, *Travis County Finalizing Plan for Five Mega Voting Centers*, KXAN (Aug. 31, 2020, 9:59PM), https://www.kxan.com/news/your-local-election-hq/travis-county-finalizing-plan-for-five-mega-voting-centers/; Garrett Brnger & Misael Gomez, *Mega Voting Centers a Go For November Election, County Commissioners Looking at More Voting Options*, KSAT (Aug. 14, 2020, 8:13PM), https://www.ksat.com/news/local/2020/08/15/mega-voting-centers-a-go-for-november-election-county-commissioners-looking-at-more-voting-options/.

20.     Instead of making the election process safer or more secure, S.B. 1 eliminates methods and opportunities of voting disproportionately used by Black and Latino voters, burdening or effectively disenfranchising these voters by raising the time, cost, and risk associated with exercising their constitutional right to vote.  The law also erects barriers to voting that will disproportionately and unlawfully deny equal access to individuals with disabilities.

21.     Plaintiffs bring this lawsuit to protect their constitutional and federal rights, as well as the rights of their members and constituencies, and to ensure that the State does not continue to erect barriers to the franchise that have the intent and effect of denying the vote on account of race or color.  Individually and cumulatively, the challenged provisions of S.B. 1 are intended to, and will have the effect of, burdening and restricting Black and Latino Texans' right to vote and the rights of voters with disabilities.   Specifically, Plaintiffs are challenging the following unconstitutional and discriminatory provisions of S.B. 1:

a.     S.B. 1 §§ 3.04, 3.12-3.13, which eliminate drive-thru voting centers;

b.     S.B. 1 §§ 3.09-3.10, which restricts the scheduling of early voting hours and eliminates 24-hour voting;

c.     S.B. 1 § 3.15, which fully eliminates straight-ticket voting;

d.     S.B. 1 §§ 4.01-4.04, 4.06, 4.09, which reduce regulations on poll watchers, allowing them to roam freely around polling locations and subjecting election officials to a class A misdemeanor for knowingly obstructing a poll watcher's view;

e.      S.B. 1 § 4.12 which creates a prohibition on vote-by-mail drop boxes;

f.     S.B. 1 § 5.02 which imposes voter identification requirements on early voting ballot applications.

g.  S.B. 1 § 7.04, which prohibit election officials from soliciting eligible voters to complete an application for a mail-in ballot and distributing unsolicited mail-in ballot applications, and prohibits the use of public funds to facilitate third-party distribution of such applications;

h.  S.B. 1 § 6.01, which requires a person who "simultaneously" provides seven or more voters with transportation to the polls to complete and sign a form reporting their name, address, and whether they are only providing transportation or also serving as an assistant to the voters and notes that "a poll watcher is entitled to observe any activity conducted under this section";

i.  S.B. 1 §§ 6.03, 6.05, which require an assistor to disclose and document their name, address, relationship to the voter, and whether the assistor received compensation; and makes failure by the assistant to complete the form correctly a state jail felony; and

j.  S.B. 1 § 6.04, which limits the type of assistance that can be provided in voting, requiring an assistor to make the following affirmation: "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance . . . I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot."

22.  These provisions will harm all Texas voters, but consistent with Jim Crow era tradition, the burdens will be disproportionately borne by Black and Latino voters and voters with disabilities. S.B. 1 intentionally targets and burdens methods and opportunities of voting used by and responsive to the needs of voters of color, particularly Black and Latino voters, and other

vulnerable voters, as evidenced by the 2020 elections.  Through S.B. 1 §§ 3.04, 3.09-3.10, 3.12-3.13, 3.15, 4.01-4.04, 4.06, 4.09, 4.12, 5.02, 6.01-6.05, and 7.04 (collectively, the "Challenged Provisions"), the State increases the time and cost of voting or simply puts the ballot out of reach for hundreds of thousands of registered voters, in violation of the First, Fourteenth, and Fifteenth Amendments of the United States Constitution, Sections 2 and 208 of the Voting Rights Act of 1965, Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

23.    For the reasons described below, this Court should declare that the Challenged Provisions of S.B. 1 are unconstitutional and in violation of Sections 2 and 208 of the Voting Rights Act, Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and immediately and permanently enjoin Defendants from implementing or enforcing the Challenged Provisions of S.B. 1 amending the Texas Election Code.

## JURISDICTION AND VENUE

24.    This is a civil rights action arising under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, and federal law in the Voting Rights Act of 1965, the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

25.    This Court has personal jurisdiction over the named Defendants, who are elected or appointed officials of the State of Texas, and are residents of the State of Texas.

26.    This Court has jurisdiction pursuant to 28 U.S.C. § 1343 to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act, 52 U.S.C. § 10301, and pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States.

27. This Court has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 to grant both declaratory and injunctive relief.

28. Venue is proper in the United States District Court for the Western District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

29. Plaintiff HOUSTON JUSTICE is a nonpartisan, nonprofit organization that advocates to eradicate homelessness, recidivism, inequality, and injustice in the Houston community and the state of Texas at large. Part of Houston Justice's mission is to ensure that Texas residents can exercise their right to vote. In particular, Houston Justice has worked to provide access to the ballot to eligible voters in the Harris County Jail.

30. Houston Justice has several initiatives in support of this goal. First, Houston Justice and its trained volunteers regularly register voters at the Harris County Jail. As of August 2020, Houston Justice and its volunteers had registered 2,500 eligible inmates at the Harris County Jail to vote. Second, Houston Justice provides applications to vote by mail to eligible individuals in the Harris County Jail and assists those individuals in filling out and returning their applications.

31. By prohibiting public officials from authorizing or approving the expenditure of funds to facilitate a third party's distribution of applications to vote by mail, S.B. 1 will impede or frustrate altogether Houston Justice's work delivering applications to vote by mail to eligible voters in the Harris County Jail. At the very least, S.B. 1 will force Houston Justice to divert time, money, and resources from its other activities, such as its advocacy on behalf of police reform and its community COVID outreach program, to navigating this new barrier to the service it provides to eligible voters at the Harris County Jail.

32.     Plaintiff HOUSTON AREA URBAN LEAGUE ("HAUL") is a nonpartisan, nonprofit corporation with its principal office in Houston, Texas.  The National Urban League, of which HAUL is an affiliate, is the nation's oldest and largest community-based movement devoted to empowering African Americans to enter the economic and social mainstream.  Today, the National Urban League, headquartered in New York City, spearheads the non-partisan efforts of its local affiliates. HAUL was organized in June of 1968 as a nonprofit 501(c)(3) agency.  HAUL advocates for and provides social services to disadvantaged people of all races, gender, age groups and or disabilities.  HAUL works to achieve economic and social justice for its constituents by providing community voter/political participation education and supporting and offering third party voter registration, including through its two auxiliary, age-specific, volunteer groups.

33.     Through its president, contract employees, and clients, HAUL engages in voter registration, voter education, and other activities and programs aimed at increasing voter turnout among vulnerable members of the Houston community. These efforts are key to HAUL's mission of advocating for and providing social services to disadvantaged people.

34.     HAUL, through its contract employees and volunteers, as well as its president, dedicates time and resources to conduct voter engagement and public education so that HAUL's clients, namely Black and Latino voters, veterans, and people with disabilities, can have a voice in the political process.  HAUL provides community members in the Houston area with training on voter registration and voting opportunities, and, through its contractors and volunteers, provides or helps provide voter assistance and voter registration, such as by delivering applications to vote by mail to HAUL clients.  This has included responding to the voting needs of its membership during the COVID-19 pandemic, which has disproportionately affected Black Texans.

35.    S.B. 1 will hinder HAUL's ability to enable its Black and Latino membership base, and vulnerable residents of Houston more broadly, to vote. In light of S.B. 1's significantly more burdensome vote by mail requirements, prohibition on drive-thru voting, limited early voting and curbside voting, lack of ready access to vote by mail applications, and presence of newly empowered poll workers and poll challengers, HAUL will be forced to divert time and resources from the other critical social services it provides to disadvantaged persons in Houston to ensuring their clients— HAUL's constituents, including Black and Latino voters, voters with disabilities, constituents of its two auxiliary age-based volunteer groups, and veterans who disproportionately used these means and methods of voting employed in the 2020 elections—are able to vote in upcoming elections without being subjected to civil and criminal offenses and penalties.  This will require HAUL to retrain and educate their large constituencies on the new voting restrictions, procedures, and violations so their constituents are able to cast a ballot that will count, without any repercussions. Additionally, HAUL will have to increase its Get Out The Vote ("GOTV") work to respond to the lack of means and methods to vote resulting from the passage of S.B. 1.

36.    Plaintiff DELTA SIGMA THETA SORORITY, INC. ("Delta Sigma Theta" or "the Deltas") is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women that was founded in 1913 on the campus of Howard University and incorporated under the laws of the District of Columbia. Six weeks after the organization was initially formed in 1913, several of its founding members marched in the historic Suffragist March under the Delta Sigma Theta Sorority, Inc. banner—the Deltas' first public act. The Deltas members participating in the march took on personal risk and indignity, as they were not welcomed by some white suffragists, who insisted that the Black women march at the end of the procession.

37.     Civic engagement has remained a core tenet of the Deltas' mission since its founding, as democracy and justice can only be achieved through voting. Thus, voter registration and voter education programs, as well as combatting voter suppression, are some of the organization's top social action priorities. In light of the upcoming post-Census redistricting cycle, the Deltas have and will continue to provide public education and training about the importance of the decennial Census and its impact on redistricting, the allocation of funding, and policy-making. The organization has 75 chapters that include alumnae and college chapters and approximately 20,445 members in Texas, most of whom are registered voters in Texas.

38.     Since its inception, Delta Sigma Theta has organized Delta Days in Washington, D.C. as an opportunity for members of Delta Sigma Theta Sorority, Inc. to participate in the nation's public policy-making process. This annual conference includes legislative briefings, issue forums and advocacy skills development. Featured speakers include key policy makers, members of the United States Congress, Congressional staff members and national issue experts.  The 32nd Annual event was held in 2021.  Delta Sigma Theta had more than 380 sorors from Texas who registered and participated in the virtual event.  For the 2021 Delta Days, Delta Sigma Theta's 2021 legislative priorities included seeking the support of U.S. Senator Cruz and U.S. Senator Cornyn for H.R. 1 and the John Lewis Voting Rights Act.  In past years, more than 150 members from Texas have gone to Washington, D.C. to engage with members of Congress on voting issues, including increasing voter access and eliminating voter suppression.

39.     The Houston Alumnae chapter of Delta Sigma Theta has, in the last four years, registered over 1800 voters, trained around 100 Voter Deputy Registrars, provided caravans to the polls at general, special, and runoff elections, educated the public on vote-by-mail options, and supported state legislation that would create county-wide polling places, among other voting

related work. The North Harris County Alumnae chapter also conducts high school voter registration drives, trains Volunteer Deputy Voter Registrars, and partners with the League of Women Voters to conduct registration drives.

40.     The Dallas Alumnae Chapter organizes Delta Days for the City of Dallas and for the State of Texas to allow alumnae to work with public officials to ensure all voters, but particularly women and voters of color, are able to participate in the political process and elect representatives of their choice. The Dallas Alumnae Chapter also registers hundreds of students and others across the Dallas area, and provides voter education and training. The Fort Worth Alumnae Chapter has held numerous voter registration drives at locations accessible and convenient to voters of color, as well as conducted candidate forums for political office and virtual forums on preparedness to vote.

41.     The Austin Alumnae chapter of Delta Sigma Theta has presented information to nursing homes and senior living facilities on absentee voting, registered voters there and assisted these voters with changing their addresses. The Chapter also held curbside voter registration in East and North Austin, conducts Voter Deputy Registrar training, regularly registers voters on holidays like Martin Luther King, Jr. Day, and has participated in campaigns alongside the League of Women Voters to register eligible high school students who would-be first-time voters in Austin, Manor, Pflugerville and Round Rock independent school districts

42.     With the enactment of S.B. 1, the right to vote of the organization's members across Texas will be severely burdened or outright denied. By severely restricting the ability of third parties to distribute or "solicit" vote by mail ballot applications, limiting early voting, eliminating drive-thru voting, burdening individuals who provide assistance to other voters and curbside voting S.B. 1 makes it substantially more difficult for the Deltas to engage in their civic

engagement mission. These burdens will force the Deltas, both nationally and particularly their chapters in Harris, Bexar, Travis and Dallas counties, to divert time, money, and resources from other activities, such as their voter registration and voter education efforts, including related to the post-Census redistricting cycle, to assist Texas sorors in providing public education regarding the changes in voting law and procedure, and responding to how these changes in law will affect their members' ability to engage in voter registration and voter assistance.

43.     Plaintiff THE ARC OF TEXAS has promoted, protected, and advocated for the human rights and self-determination of Texans with intellectual and developmental disabilities ("IDD") since its founding in 1953.  The Arc of Texas is a statewide advocacy and membership organization—with 6,000 individual members and 27 local member chapters throughout the state—that supports and advocates for these rights on behalf of the IDD community.  The Arc of Texas works with and alongside individuals with IDD and their families to identify barriers and solutions to inclusive education, competitive integrated employment, quality community-based services and supports, and access to civil rights and justice. Both chapter and individual members of The Arc of Texas inform the organization's policies.

44.     The Arc of Texas provides support and training so that members can speak out for their rights in advocacy with state agencies and with the Texas Legislature. The Arc of Texas has been instrumental in the creation of virtually every program, service, right, and benefit that is now available to more than half a million Texans with IDD. Today, The Arc of Texas continues to advocate for including people with intellectual and developmental disabilities in all aspects of society.

45.     Voting rights has always been a central priority in advocacy work of The Arc of Texas. In partnership with other state and local disability groups, The Arc of Texas has

participated in Register, Educate, Vote—Use your Power ("REV UP") Texas program, a statewide volunteer coalition of advocacy organizations seeking to foster civic engagement and protect the voting rights of Texans with disabilities. The Arc of Texas helped organize and participated in multiple disability forums with candidates. In 2020, The Arc of Texas provided trainings and social media outreach to its members and the general public on how to register to vote, learn how to access disability accommodations when voting, how to receive assistance when voting, and how to access the election protection hotline. Many local affiliates, member chapters of The Arc of Texas, directly assisted people with disabilities in registering to vote, educating their members on where and how to vote, and providing transportation to polling places and other assistance. The Arc has historically volunteered as deputy voter registrars and hosted a press conference to kick off voter registration month.

46.     In 2021, The Arc of Texas worked to remove or amend provisions in prior iterations of S.B. 1 that are harmful to the disability community. The Arc of Texas has sent out multiple action alerts to its constituents urging them to oppose S.B. 1, its prior iterations, and other voting legislation suppressing the disability vote. The Arc of Texas has engaged in other public education and outreach to inform its members of the ways in which the law would deny equal access to the disability community, and met with legislative offices to share these concerns. Though The Arc of Texas submitted written testimony in opposition to the bills, several constituents of The Arc of Texas sought to testify in opposition to these bills, but were unable to do so given that the Texas legislature did not allow for remote testimony during COVID-19 (further disadvantaging the disability community who are at higher risk of contracting and experiencing fatal complications from the virus). Neither H.B. 6 nor S.B. 7 had second hearings in the opposite chamber of origin,

creating further complication for the disability community or members of the public to testify about how the bills would impact them.

47.     During the special session, a member of The Arc of Texas who lives with paralysis, Courtney Pugh, provided virtual testimony before the House in opposition to S.B. 1. The Senate would not allow her to testify virtually as a disability accommodation, but her written testimony was read on the Senate floor during Senator Alvaro's filibuster.  The Arc of Texas Manager of Public Policy and Advocacy, Alex Cogan, also provided testimony in opposition to the bill before the Senate.

48.     In 2019, The Arc of Texas worked to successfully oppose S.B. 9—another bill restricting the voting rights of people with disabilities—and several members testified in opposition to the bill at that time.

49.     The voting rights of people with disabilities remains a central priority for The Arc of Texas. Voter education is included in every training The Arc of Texas does, regardless of the topic, and voting is the core of public policy and advocacy, therefore, voting rights are intertwined with all of the organization's advocacy efforts.

50.     By imposing barriers to early voting and receiving assistance with voting, S.B. 1 will deny access to and interfere with the right to vote for many members of The Arc of Texas and the voters that it supports.

51.     Moreover, S.B. 1 makes it substantially more difficult for The Arc of Texas to carry out its civic engagement mission. In order to combat the suppressive effect of S.B. 1, including informing itself about S.B. 1 and its scope to be able to assist people with disabilities to comply with the many changes; helping people with disabilities to better understand the changes; and developing new, costly training materials and public education documents to educate people with

disabilities about the changes, The Arc of Texas will have to expend more time, money, and resources on its efforts to educate and assist voters as described above. These burdens will force The Arc of Texas to divert resources from its other core activities described above. As a result, due to S.B. 1, The Arc of Texas is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

52.     Plaintiff JEFFREY LAMAR CLEMMONS is a resident of Austin, Texas, and a senior at Huston-Tillotson University.  He serves as president of the Huston-Tillotson University's NAACP.  Plaintiff Clemmons also serves as Chair of the Austin College Student Commission. Plaintiff Clemmons served as an election judge in Travis County for the July 14, 2020 primary election in Texas.  Plaintiff Clemmons received training as an election judge on July 9, 2020.   He was assigned to the polling location at the Turner Roberts Recreation Center, where he served throughout the day of July 14, 2020.  On April 1, 2021, Plaintiff Clemmons testified in opposition to H.B. 6 during the regular legislative session, explaining that if passed, he would have grave concerns about continuing to serve as an election judge in future elections, because he could face criminal penalties for simply doing his job.  As a community activist and a dedicated member of the NAACP, Plaintiff Clemmons wants to continue to serve as an election judge in upcoming elections.   With the passage of S.B. 1, Plaintiff Clemmons could face devastating criminal penalties from fulfilling his responsibilities as an election judge.

53.     Defendant, GREGORY WAYNE ABBOTT, is sued in his official capacity as the Governor of Texas, and pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas.

54.     Defendant JOSE ESPARZA, is sued in his official capacity as the Deputy Secretary of State of Texas, and because the Office of the Secretary of State is currently vacant, Defendant

Esparza, pursuant to Texas Election Code § 31.001(a), is the chief election officer of the State. In this capacity, Defendant Esparza is responsible for the administration and implementation of election laws in Texas, including "ensuring the uniform application and interpretation of election laws throughout Texas." Tex. Elec. Code § 31.001(a). Defendant Esparza must issue guidance to the county registrars of all 254 Texas counties on various election statutes and procedures.

55.    Defendant WARREN KENNETH PAXTON, JR., is sued in his official capacity as the Attorney General of Texas. In this capacity, Defendant Paxton has statutory authority to investigate and prosecute election offenses statewide. Tex. Elec. Code §§ 273.001, 273.021.

56.    Defendant JACQUE CALLANEN, is sued in her official capacity as Elections Administrator of Bexar County. In this capacity, Defendant Callanen is responsible for implementing the Texas Election Code at the direction of the Texas Secretary of State.

57.    Defendant ISABEL LONGORIA, in her official capacity as Elections Administrator of Harris County. In this capacity, Defendant Longoria is responsible for implementing the Texas Election Code at the direction of the Texas Secretary of State.

## FACTUAL ALLEGATIONS

**A. Texas has a Long-Standing, Judicially-Recognized History of Official Discrimination in Voting.**

58.    S.B. 1 is the latest entry in Texas's pervasive and judicially-recognized record of racially discriminatory voting practices, which date back to the "early days of Texas." *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014). In 2014, a federal court found that Texas has a "history of impairments that have plagued the right to vote," including "racially discriminatory motivations and [] burdensome qualifications." *Id*. According to the court, "[t]his uncontroverted and shameful history was perhaps summed up best by" longtime civil rights advocate Reverend Peter Johnson, who said "'[t]hey had no civil rights towns or cities in the State of Texas because

of the brutal, violent intimidation and terrorism that still exists in the State of Texas; not as overt as it was yesterday. But east Texas is Mississippi 40 years ago.'" *Id.*

59.     Texas's Black and Latino voters have historically been disenfranchised through a variety of discriminatory voting-related laws, including all-white primaries, literacy tests, poll taxes, voter-purging, and racially discriminatory districting.  *Id.* at 633-37.

60.     Texas's use of intentionally discriminatory voting schemes has repeatedly required federal intervention.  *See*, *e.g.*, *Veasey v. Abbott*, 249 F. Supp. 3d 868, 876 (S.D. Tex. 2017) (holding that Texas enacted photo-ID law with a discriminatory purpose); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (noting state's redistricting plan bore the "mark of intentional discrimination that could give rise to an equal protection violation"); *Texas v. United States*, 887 F. Supp. 2d 133, 159, 166 (D.D.C. 2012), vacated and remanded in light of *Shelby County v. Holder*, 570 U.S. 529 (2013) (finding Texas enacted redistricting plans with discriminatory purpose); *White v. Regester*, 412 U.S.  755 (1973) (invalidating multimember electoral districts in Dallas and Bexar Counties based on findings that the reapportionment plans effectively removed Black and Mexican-American voters from the political processes in these counties); *Terry v. Adams*, 345 U.S. 461 (1953) (holding that Texas county's private primary deprived Black petitioners of their right to vote based on race and color and therefore violated the Fifteenth Amendment); *Smith v. Allwright*, 321 U.S. 649 (1944) (invalidating Democratic Party's exclusion of minorities from primary elections); *Nixon v. Herndon*, 273 U.S. 536 (1927) (invalidating on Fourteenth Amendment grounds state law excluding Black citizens from voting in primary elections).  Texas has remained undeterred, however, often enacting new exclusionary restrictions on the heels of federal intervention.

61.     The examples set forth below are a sampling of Texas's pervasive and invidious race-based voter suppression including tactics such as poll taxes, voter purges, white primaries, literacy tests, efforts to disenfranchise students, and racially discriminatory districting. These tactics draw a clear line of continuing discrimination beginning in the early 20th century and continuing through the present day.  This widespread and pervasive discrimination has infected the process at both the state and local level.

62.     ***Poll Tax and Voter Purges.***  In 1902, Texas adopted a poll tax that required would-be voters to pay $1.50 in order to vote.  The poll tax remained in effect as to federal elections until 1964, when the 24th Amendment to the United States Constitution banned the practice.  The poll tax remained in effect as to state elections until 1966, when the practice was held unconstitutional. *See Veasey*, 71 F. Supp. 3d at 634; *United States v. State of Tex.*, 252 F. Supp. 234, 255 (W.D. Tex. 1966) (holding poll tax for elections involving only state issues and campaigns unconstitutional as disenfranchising Black voters), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966) (extending the ban on poll taxes to state elections).

63.     In response to having its poll tax declared unconstitutional, Texas amended its constitution to require voters to register annually during a four-month period ending January 31 of each election year.  The law was described as a "direct descendant of the poll tax" and was held unconstitutional.  *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971).

64.     Texas then enacted a "purge law," requiring all voters in the state to reregister.  The Department of Justice objected to the law pursuant to section 5 of the Voting Rights Act and the law was enjoined by a three-judge court.  *Veasey*, 71 F. Supp. 3d at 635.

65.     ***All-White Primaries***.  In 1923, Texas enacted a law excluding Black voters from participating in Democratic Party primary elections.  Because of the political dominance of the Democratic Party in Texas at that time, the law excluded Black voters from the only election that mattered, essentially disenfranchising them.  In striking down the law, the Supreme Court of the United States said it would be "hard to imagine a more direct and obvious infringement of the Fourteenth" Amendment.  *Nixon v. Herndon*, 273 U.S. 536, 541 (1927).

66.     The same year that the all-white primary law was struck down, Texas enacted a law allowing political parties to determine voter qualifications for their primaries.  The Democratic Party adopted a rule limiting participation to white citizens.  The Supreme Court held this practice unconstitutional in 1944.  *Smith v. Allwright*, 321 U.S. 649 (1944); *see also Terry v. Adams*, 345 U.S. 461, 469 (1953) (invalidating scheme in which Texas county adopted results of all-white primary).

67.     ***Literacy Tests***.  For much of the 20th century, Texas law prohibited providing assistance to illiterate voters in marking or preparing their ballots.  The practice disproportionately excluded Mexican-American and Black voters from political participation.  The practice was held to violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in 1970.  *Garza v. Smith*, 320 F. Supp. 131, 135, 138 (W.D. Tex. 1970), *vacated and remanded on procedural grounds*, 401 U.S. 1006 (1971).

68.     ***Efforts to Disenfranchise Black Students***.  From the ratification of the 26th Amendment in 1971, which lowered the voting age from 21 to 18, until 2008, Waller County, Texas enacted restrictive voting rules and threatened students with baseless prosecutions in an effort to disenfranchise students of the historically Black Prairie View A&M University.  *Veasey*, 71 F. Supp. 3d at 635. In 2004, for example, the Waller County District Attorney threatened to

arrest student voters based upon the false allegation that students could not legally vote using their university addresses.[23]

69.     ***Racially Discriminatory Districting.***   In every redistricting cycle from 1970 to 2010, Texas adopted racially discriminatory districts meant to disadvantage Black and Mexican-American voters, in violation of the Voting Rights Act.  *Veasey*, 71 F. Supp. 3d at 636 & n.23 (collecting cases).

70.     Beginning in 1975, when Congress expanded the Voting Rights Act of 1965 (VRA) to cover jurisdictions in which persons speaking Asian, American Indian, Alaska Native, and Spanish languages made up more than five percent of the voting age population, but in which less than 50 percent of eligible voters had registered to vote or voted in the 1972 election, Texas was a covered jurisdiction under the VRA, meaning it was required to obtain federal approval or preclearance to make changes to any of its voting related laws and procedures.  Congress found that the expansion was necessary in part to address Texas's extensive record of restrictive measures geared toward excluding Black and Latino citizens from the political process.[24]

71.     Between 1975 and 1982, the Department of Justice lodged more objections to voting changes in Texas than in any other state.  *Seamon v. Upham*, 536 F. Supp. 931, 989 (E.D. Tex. 1982), vacated on other grounds, 456 U.S. 37 (1982); *see also Veasey v. Abbott*, 830 F.3d 216, 240 & n.29 (5th Cir. 2016).

---

[23] Terry Kliewer, *Waller County DA apologizes in vote flap*, Hous. Chron., Feb. 25, 2004, at A1, available at http://www.chron.com/news/houstontexas/article/Waller-County-DA-apologizes-in-vote-flap-1957246.php.

[24] Legislative History of the Voting Rights Act Amendments of 1975, P.L. 94-73 at 25-30 (1975).

72.     Between the 1982 and the 2006 reauthorizations of the VRA, Texas had the second-highest number of objections interposed by the Department of Justice under Section 5 of the VRA, including at least 107 objections, 10 of which were for statewide voting changes.[25]

73.     In 2013, the Supreme Court in *Shelby County v. Holder* invalidated § 4 of the VRA, which set forth the coverage formula provision that determined which jurisdictions were subject to the VRA's preclearance requirement.   570 U.S. 529.   Within hours of the *Shelby County* decision, Texas began to enforce a photo ID law that it passed in 2011 but that had been denied preclearance under the VRA. The photo ID law was the strictest in the country, requiring that voters present either a state-issued photo ID or a photo ID from a limited list of acceptable sources. *See Veasey*, 71 F. Supp. 3d at 642-45. Texas opted to enforce this law, despite the fact that the U.S. District Court for the District of Columbia had found that the law would likely have a retrogressive effect on "the position of racial minorities with respect to their effective exercise of the electoral franchise." *Texas v. Holder*, 888 F. Supp. 2d 113, 115 (D.D.C. 2012), vacated and remanded in light of *Shelby County*, 570 U.S. 928 (2013).   The photo ID law was later held to violate Section 2 of the Voting Rights Act.  *See Veasey v. Abbott*, 249 F. Supp. 3d 868 (S.D. Tex. 2017).

74.     At odds with Texas's exploding population growth, between 2012 and 2018, Texas closed 750 polling locations. It was no accident that the closures were concentrated in counties experiencing rapid Black and Latino population growth: "the 50 counties that gained the most

---

[25] *Reauthorization of the Voting Rights Act: Policy Perspectives and View from the Field Before the U.S. S. Judiciary Subcomm. on the Const., C.R., and Prop. Rts.*, 109th Cong. 2 (2006) (Statement of Debo Adegbile, Associate Director of Litigation, NAACP Legal Defense and Educational Fund, Inc.), at https://www.naacpldf.org/wp-content/uploads/VRA-Adegbile-Senate-Testimony.pdf.

Black and Latinx residents between 2012 and 2018 closed 542 polling sites, compared to just 34 closures in the 50 counties that have gained the fewest black and Latinx residents. This is despite the fact that the population in the former group of counties has risen by 2.5 million people, whereas in the latter category the total population has fallen by over 13,000."[26]

75.    In early 2019, after historic turnout among Latino voters in Texas in the 2018 midterm election,[27] the Texas Secretary of State issued Election Advisory No. 2019-02, which threatened to purge approximately 98,000 voters from the voter rolls on the basis that they might not be U.S. citizens.  The Advisory was based on outdated information, was inaccurate as to the vast majority of individuals it proposed to purge, and was enjoined by a federal court.[28]  *See Texas LULAC v. Whitley*, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019).

76.    This effort to target and disenfranchise newly naturalized citizens disproportionately impacted individuals of Mexican origin, who make up a large share of newly naturalized U.S. citizens who reside in Texas.[29]

---

[26] Richard Salame, *Texas closes hundreds of polling sites, making it harder for minorities to vote*, The Guardian (Mar. 2, 2020, 6:00 AM), https://www.theguardian.com/us-news/2020/mar/02/texas-polling-sites-closures-voting.

[27] Suzanne Gamboa & Nicole Acevedo, *Youth, Latino mobilization paid off in the midterms. Now groups gear up for 2020.*, NBC News (Nov. 12, 2018, 3:30 PM), https://www.nbcnews.com/news/latino/youth-latino-mobilization-paid-midterms-now-groups-gear-2020-n934516.

[28] Settlement Agreement, *Tex. League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-FB, (W.D. Tex.), at https://static.texastribune.org/media/files/411cff760b0b2b79a159b2390ef3f939/Voter_rolls_settlement_agreement.pdf?_ga=2.52669679.637990502.1618250800-1075633374.1617978724.

[29] Letter from Mark P. Gaber, Director, Trial Litigation, Campaign Legal Center, and Danielle M. Lang, Co-Director, Voting Rights and Redistricting, Campaign Legal Center to David Whitley, Secretary of State (Feb. 1, 2019), https://campaignlegal.org/sites/default/files/2019-02/D.%20Whitley%202.1.19.pdf.

77.     In concert with this effort to purge the voter rolls, Attorney General Paxton falsely claimed that there was widespread voter fraud perpetrated by non-citizen residents of Texas in the 2018 midterms.   On January 25, 2019, Paxton tweeted: "VOTER FRAUD ALERT: The @TXsecofstate discovered approx 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in TX, approx 58,000 of whom have voted in TX elections. Any illegal vote deprives Americans of their voice."[30]   Governor Abbott praised Paxton for "uncovering and investigating" this illegal voter registration. In reality, only 80 of the 98,000 voters on the purge list were ineligible to vote. *See Texas LULAC v. Whitley*, 2019 WL 7938511 at *1.

78.     Throughout its history of racially discriminatory voting practices, Texas has often relied on the purported justification that its exclusionary measures are necessary to combat voter fraud, creating a "clear and disturbing pattern of discrimination in the name of combatting voter fraud in Texas." *Veasey*, 71 F. Supp. 3d at 636 & n.24.

**B.  The Extent to Which Black and Latino Voters Bear the Effects of Discrimination in Education, Employment, and Health**

79.     Texas's history of racial discrimination transcends the political process and infects all aspects of public and private life for Black and Latino voters in the state. As a federal court recently found, Texan "African–Americans and Latinos are less educated because of discrimination, suffer poorer health because of discrimination, are less successful in employment because of discrimination, and are likewise impoverished in greater numbers because of discrimination." *Veasey*, 71 F. Supp. 3d at 667.

---

[30] Alexa Ura, *"Someone did not do their due diligence": How an attempt to review Texas' voter rolls turned into a debacle*, Texas Tribune (Feb. 1, 2019, 10:00 AM), https://www.texastribune.org/2019/02/01/texas-citizenship-voter-roll-review-how-it-turned-boondoggle/.

80.     Beginning with the 1876 Texas Constitution, which explicitly required separate schools for Black and white students, and continuing through much of the 20th century, Texas law mandated a segregated school system.[31]  Even after the Supreme Court held that segregated schools were unlawful, Texas continued to maintain a system of segregation in education. In 1970, a federal court found that Texas had failed to comply with the mandate of *Brown v. Board of Education*, 347 U.S. 483 (1954), by its continued maintenance of nine all-black school districts with "inferior educational facilities and personnel."[32] *United States v. Texas*, 321 F. Supp. 1043, 1048 (E.D. Tex. 1970). The court placed the entire state under a desegregation order. Today, twenty-nine districts remain under open desegregation orders. Educational achievement gaps continue to plague Texas, attributable at least in part to continued discriminatory treatment of Black and Latino students in public education. *See* Veasey, 71 F. Supp. 3d at 666. In 2017-2018, Texas's high school graduation rate was 94% among white Texans, but only 87% among Black Texans.[33]

81.     Black and Latino people in Texas are "substantially more likely than Anglos to live in poverty throughout Texas because they continue to bear the socioeconomic effects caused by decades of discrimination." *Veasey*, 71 F. Supp. 3d at 665. The poverty rate among white Texans is 7.9%, while the rate for Black and Latino Texans is 18.4% and 18.7%, respectively.[34]

---

[31] Nina Perales, Luis Figueroa, and Criselda G. Rivas, *Voting Rights in Texas 1982-2006*, at 10-13 (June 2006) http://www.maldef.org/wp-content/uploads/2019/01/texasvra.pdf.

[32] Yue Qiu and Nikole Hannah-Jones, *A National Survey of School Desegregation Orders*, ProPublica (Dec. 23, 2014), https://projects.propublica.org/graphics/desegregation-orders.

[33] National Center for Education Statistics, Public High School Graduation Rates (updated May 2021), https://nces.ed.gov/programs/coe/indicator_coi.asp.

[34] KFF, Poverty Rate By Race/Ethnicity (2019), https://www.kff.org/other/state-indicator/poverty-rate-by-

82.    "The harmful effects of discrimination can also be seen in the field of health."
*Veasey*, 71 F. Supp. 3d at 666.[35] The global COVID-19 pandemic has very recently laid bare the
unequal access to healthcare and the disparate health outcomes that Black and Latino Texans face-
-and the enhanced danger that a pandemic poses to Black and Latino Texans.  Less than two years
before the COVID-19 pandemic hit Texas, Texas's Office of Minority Health Statistics and
Engagement, which focused on disparities in health care, closed after being defunded by the
legislature.[36] Between March and October of 2020, Latino and Black Texans had the highest
COVID-19 death rates per 100,000.  Latino Texans were hit particularly hard, comprising 40%[37]
of the state's population, but 58% of COVID-19 deaths during that period.  Life-saving COVID-
19 vaccines are less available to Black and Latino Texans, who live farther away from vaccine

---

raceethnicity/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort
%22:%22asc%22%7D.

[35] KFF, *Adults Who Report Fair or Poor Health Status by Race/Ethnicity* (2019),
https://www.kff.org/other/state-indicator/percent-of-adults-reporting-fair-or-poor-health-status-
by-
raceethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22texas%22:%7
B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%
7D;  KFF,  Uninsured  Rates  for  the  Nonelderly  by  Race/Ethnicity,
https://www.kff.org/uninsured/state-indicator/nonelderly-uninsured-rate-by-
raceethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22texas%22:%7
B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%
7D

[36] Erin Cargile, *Lawmakers defunded an office that could be helping Texas minorities in the fight
against COVID-19*, KXAN (Nov. 18, 2020), https://www.kxan.com/investigations/lawmakers-
defunded-an-office-that-could-be-helping-texas-minorities-in-the-fight-against-covid-19/.

[37] Texas Health and Human Services Commission, *Impact of COVID-19 on Vulnerable
Populations   in   Texas*,   at   25   (Jan.   2021),
https://hhs.texas.gov/sites/default/files/documents/services/health/coronavirus-covid-19/impact-
covid-19-vulnerable-populations-texas.pdf.

providers like hospitals and pharmacies.[38]  According to state data, white Texans are receiving the COVID-19 vaccine at twice the rate of Latino Texans and six times the rate of Black Texans.[39] When Dallas County tried to rectify this disparity and prioritize vaccine allocation to people of color, the state threatened to withhold vaccines from the County.[40]

83.     The effect of this historic discrimination is to hinder Black and Latino Texans' ability to participate in the political process, which will only be exacerbated by the proposed voting changes in S.B. 1. Black and Latino Texans are more likely to have inflexible job schedules,[41] lack adequate childcare, lack access to transportation,[42] and have disproportionate health outcomes, meaning that they disproportionately suffer from longer lines at the polls and reduced opportunities to vote outside of normal business hours. Disproportionate poverty rates also mean that Black and Latino Texans are less likely to have ready access to the tools required––*i.e.*, computers and printers—to download and submit applications for mail-in ballots.

## C.  Racially Polarized Voting in Texas

84.     Following the last round of redistricting, during litigation in 2014, the state of Texas admitted there was racially polarized voting in 252 of 254 counties in the state.  *Veasey*, 71 F.

---

[38] Marisa Martinez and Sami Sparber, *As Texas expands COVID-19 vaccination eligibility, racial disparities persist among Black, Hispanic residents*, Texas Tribune (Mar. 19, 2021), https://www.texastribune.org/2021/03/19/texas-vaccine-race-disparities/.

[39] *Id*.

[40] Emma Platoff and Juan Pablo Garnham, *Dallas County axes plan to prioritize vaccinating communities of color after state threatens to slash allocation*, Texas Tribune (Jan. 20, 2021), https://www.texastribune.org/2021/01/20/dallas-vaccine-plan-communities-of-color/.

[41] *See*, *e.g.*, *Veasey*, 71 F. Supp. 3d at 664 (lower income Texans are less likely to have access to paid leave).

[42] *Id.* at 665 (Black and Latino Texans significantly more likely to lack vehicles for their own transportation); *see also* City of San Antonio, *Status of Poverty in San Antonio*, *https://www.sanantonio.gov/Portals/0/Files/HumanServices/FaithBased/2019PovertyReport.pdf* at 24 (noting same trend within San Antonio).

Supp. 3d at 637-38 ("Racially polarized voting exists when the race or ethnicity of a voter correlates with the voter's candidate preference."). The U.S. Supreme Court has likewise confirmed the presence of racially polarized voting in Texas on multiple occasions throughout the last decade. *See id.*

85.  According to the American Community Survey's 2019 5-Year Estimates, the state of Texas is currently 42.1% white, 11.8% Black and 39.3% Latino.

86.  Racially polarized voting in Texas continues to exist today. The presence of racially polarized voting is also relevant to this court's analysis of the known impact of S.B. 1, which seeks to curb voter participation in counties where a majority of the voters voted for the Democratic candidate for office and whose populations were disproportionately Black and Latino.

**D. Voters with disabilities**

87.  Voters with disabilities, including Black and Latino voters with disabilities, have also persistently experienced barriers in accessing their right to vote in Texas.[43] Barriers include Governor Abbott's proclamation in 2020 (during the COVID-19 pandemic) ordering counties to limit ballot drop-off locations to one per county, disproportionately impacting voters with disabilities who already faced significant obstacles to voting and are particularly vulnerable to COVID-19.[44] Other common problems for voters with disabilities include accessing curbside

---

[43] Maggie Astor, *G.O.P Bills Rattle Disabled Voters: 'We Don't Have a Voice Anymore,'* the New York Times (June 14, 2021), https://www.nytimes.com/2021/06/14/us/politics/disability-voting-rights.html; Alexa Ura, *Texans with disabilities fear voting will get harder for them as special session on GOP restrictions nears*, the Texas Tribune (July 5, 2021) https://www.texastribune.org/2021/07/05/texas-voting-disability/; Trinady Joslin, *For nearly 3 million disabled Texans, voting this year is even harder*, the Texas Tribune, (Oct. 30, 2020) https://www.texastribune.org/2020/10/30/texas-voting-disability/.

[44] Trinady Joslin, *For nearly 3 million disabled Texans, voting this year is even harder*, the Texas Tribune, (Oct. 30, 2020) https://www.texastribune.org/2020/10/30/texas-voting-disability/.

voting, barriers in reading or seeing the ballot, requiring assistance in filling out the ballot, understanding how to vote or use the voting equipment, long lines at polling places, and finding or getting to the polling place.[45] The inaccessibility of county election websites also imposes barriers on the ability of voters with disabilities to access their fundamental right to vote.[46] A 2020 report on the turnout of voters with disabilities notes that voter turnout among disabled voters in Texas was 59.4% versus 64.5% of voters without disabilities.[47]

88.     In 2020, about one in nine voters with disabilities nationally encountered difficulties voting. This is double the rate of people without disabilities. Nationwide, people with disabilities voted at a 7% lower rate than people without disabilities of the same age.[48] It is well established that "[c]itizens with disabilities are less likely to vote than their non-disabled peers, and are more likely to experience difficulties when they do vote."[49] For many voters with

---

[45] *Id.*; Lisa Schur, Meera Adya, and Mason Ameri, *Accessible Democracy: Reducing Voting Obstacles for People with Disabilities*, 14 Election L. J. 1, 3-4 (2015); Wajiha Rizvi, *Curbside Voting and Disability Access in the 2020 General Election*, Texas Civil Rights Project (Jan. 2021) https://txcivilrights.org/wp-content/uploads/2021/01/Curbside-Voting-Report.pdf.

[46] *U.S. Department of Justice, Civil Right Division ADA Title II Complaint*, Disability Rights Texas and REV UP (Sept. 3, 2020) https://media.disabilityrightstx.org/wp-content/uploads/2020/09/08211016/20200903-DRTx-DOJ-Complaint-Inaccessible-County-Election-Websites.pdf.

[47] Lisa Schur and Douglas Kruse, *Fact Sheet: Disability and Voter Turnout in the 2020 Elections*, Election Assistance Commission (last visited Sept. 1, 2021) https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact Sheet_Disability_Voter_Turnout_2020.pdf.

[48] Lisa Schur and Douglas Kruse, *Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results Submitted to the Election Assistance Commission*, Election Assistance Commission (Feb. 16, 2021) https://www.eac.gov/sites/default/files/voters/Disability_and_voting_accessibility_in_the_2020_elections_final_report_on_survey_results.pdf.

[49] Schur, *supra*, note 45, at 1.

disabilities, these barriers are not just significant and burdensome, but discriminatory, denying equal access to the electoral process.

**E.  The 2020 Elections in Texas**

89.    The 2020 presidential election was safe and secure, and registered Texas voters overwhelmingly chose to participate.  Indeed, on November 12, 2020, the Elections Infrastructure Government Coordinating Council and Election Infrastructure Sector Coordinating Executive Committees of the Cybersecurity and Infrastructure Security Agency released a joint statement that the "November 3rd election was the most secure in American history."[50] Further, on November 30, 2020, former Texas Secretary of State Ruth Hughs issued a statement that "[d]espite the challenges presented by COVID-19, this election was a resounding success, and turnout among registered voters was the highest in 28 years as Texans exercised their right to vote."

90.    But Texas's 2020 primary election in March was characterized by extremely long lines at the polls and limited voting machines, disenfranchising countless voters who simply could not wait, particularly amid the onset of the deadly COVID-19 pandemic.[51] Voters across Harris County in particular experienced hours long waits to vote, with one voting location in Harris County requiring voters to wait as long as six hours until after polls closed to cast a ballot.[52]  The

---

[50] Cybersecurity & Infrastructure Sec. Agency, *Joint Statement from Elections Infrastructure Government Coordinating Council and Election Infrastructure Sector Coordinating Executive Committees* (2020).

[51] Alexa Ura, *Texas Lawmakers to Hold Hearing Into Excessive Super Tuesday Voting Lines*, The Texas Tribune (Mar. 5, 2020), https://www.texastribune.org/2020/03/05/texas-lawmakers-excessive-voting-lines-primary/.

[52] Matt Harab & Andrew Schneider, *Who's to Blame for Long Lines on Super Tuesday? Depends on Who You Ask*, Houston Public Media (March 5, 2020), https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/03/04/362662/local-officals-explain-long-lines-on-super-tuesday/; Jen Rice, *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says It Won't Happen Again*, Houston Public Media (Oct. 30, 2020),

March primary witnessed an estimated 45% increase in Democratic participation in Harris County alone, which left these voters in particularly long lines as the political parties held separate primaries, requiring separate voting booths and ballots within a single polling location.  At TSU, one of several historically Black Universities that serves as a polling location in Harris County, one voter waited until after 1:00 am to cast a ballot.[53]

91.    And across Texas, primary voters faced slowdowns and lines at the polls resulting from a shortage of voting machines and faulty ballot printers; in at least one instance, a voting site was shut down temporarily as a result of technical issues with voting equipment.  The Secretary of State's elections portal, where voters can look up their registrations, also went down on the morning of the primary as a result of heavy traffic.

92.    State lawmakers were well aware of these issues.  The Mexican American Legislative Caucus, the Texas Legislative Black Caucus and the Texas Legislative Study Group, a nonpartisan caucus, held a joint meeting to speak directly with election officials, experts, and voters who were affected by long lines and other issues at the polls in March of 2020.[54]  The issue was also widely publicized in Texas newspapers and public media.

93.    In response, the Harris County Clerk and the election administrator of the county, Chris Hollins, tripled the number of early voting sites, expanded the sites' hours, offered 24-hour

---

https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/10/29/384985/voting-problems/.

[53] Jen Rice, *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says It Won't Happen Again*, Houston Public Media (Oct. 30, 2020), https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/10/29/384985/voting-problems/

[54] Alexa Ura, *Texas Lawmakers to Hold Hearing Into Excessive Super Tuesday Voting Lines*, The Texas Tribune (Mar. 5, 2020), https://www.texastribune.org/2020/03/05/texas-lawmakers-excessive-voting-lines-primary/.

early voting, and allowed voters to vote safely from their vehicle using what was called drive-thru voting.

94.     Texas offers early voting by personal appearance and by mail.  Early voting by personal appearance is available to any qualified voter.  Tex. Election Code § 82.005.  Texas law currently requires a minimum of twelve hours of early voting during the early voting period.  Tex. Election Code § 85.005.  Thus, Texas law clearly allows 24-hour voting, because the language of the statute makes clear that twelve hours is the minimum required number of hours; the law does not prescribe a maximum and does not dictate which hours of the day an early voting site may be open.  As a result, during the 2020 presidential election, Hollins offered eight 24-hour polling places in and around Houston.

95.     Under Texas law, drive thru voting was permissible but had not previously been used in the state.  As discussed by a federal court considering whether ballots cast in a drive-thru voting center could be counted, the Texas Election Code provides for "temporary branch polling places" during early voting and authorizes county election officials to use "movable structure[s]" as polling places, which together allow drive-thru voting.  Tex. Elec. Code § 85.062(b).

96.     On June 15, 2020, Harris County Clerk Chris Hollins announced the S.A.F.E. Elections Plan, a set of 23 initiatives to ensure that the July and November 2020 elections were safe, secure, accessible, fair, and efficient. The framework was created not only to respond to the challenges of administering elections amid the COVID-19 pandemic, but also to ensure voting was convenient, fair, safe, and more accessible to Harris County voters more broadly. Mr. Hollins' decision to implement the S.A.F.E. Plan was also informed by Harris County's experience during previous elections like the March 2020 presidential primary, when Harris County made national news because of severely long wait times at polling locations across the county.

97. The S.A.F.E. Plan aimed to make voting more accessible in Harris County by using data to increase the number and optimize the locations of polling sites, procure sufficient additional machines from other jurisdictions and provide them with technical support, allocate voting machines across polling sites based on known traffic patterns and expected turnout, accurately report wait times across the County during the early voting period and on Election Day, and provide increased voting hours during the early voting period.

98. The Harris County Clerk's Office used this data analysis to determine the number and placement of voting machines in Harris County thereby ensuring shorter lines at polling places across the county in the 2020 general election. Among other increases in safety, awareness, and convenience, this reduced wait times at the polls and increased voter participation in Harris County in the November 2020 presidential election.

99. The Harris County S.A.F.E. Plan also aimed to make voting more accessible in Harris County by ensuring the accessibility required by the Americans with Disabilities Act across county polling sites, by improving curbside voting, and by introducing drive-thru voting.

100. Harris County Clerk Chris Hollins worked to implement drive-thru voting in Harris County because drive-thru voting creates a safe and convenient way for voters to cast a ballot, especially during the COVID-19 pandemic. Drive-thru voting is more convenient for many voters than waiting in line at a traditional walk-in polling place, and it is safer and more secure than traditional in-person voting. People can vote with their children in the car and without being forced to bring themselves or their kids into a heavily populated polling place. Moreover, voters do not have to stand up while waiting in line, which is important for voters with disabilities and elderly voters, and importantly in Houston, voters can wait in line to vote in an air-conditioned vehicle.

101.    As implemented in Harris County, drive-thru voting included all the traditional safety and security protocols of walk-in voting.  Indeed, drive-thru voting in Harris County entailed even more security features than walk-in voting because there was one election worker assigned to monitor each drive-thru voting machine (*e.g.*, each car and voter), whereas in a traditional polling place, a few election officials monitor dozens of voting machines.

102.    During the November 2020 presidential election, as part of the S.A.F.E. Plan, Harris County offered voting mega centers at Toyota Center, NRG Arena, BBVA Stadium, and Rice Stadium, among others. These centers were convenient because they allowed dozens of voters to cast their ballots simultaneously in a socially distanced manner.

103.    During the November 2020 presidential election, as part of the S.A.F.E. Plan, Harris County offered eight 24-hour voting locations during the early voting period.  24-hour early voting was especially important to shift workers and first responders, who often do not maintain "traditional" working or waking hours.

104.    Another part of Harris County's S.A.F.E. Plan involved helping eligible voters understand and avail themselves of alternative, safe voting methods.  Because one of the reasons under Texas law for allowing a voter to vote by mail is that the voter is over 65 years old, the Harris County Clerk sent two rounds of vote-by-mail applications to all registered voters in the county over the age of 65 and who resided in the county who had not already applied to vote by mail in June and August of 2020, respectively.

105.    In July 2020, the Harris County Clerk announced he intended to send vote-by-mail applications to all registered voters in Harris County.  The package that was mailed to voters contained detailed instructions regarding the limited voter eligibility categories that entitle a voter

to vote by mail under Texas law. It also contained a personalized vote-by-mail application so that eligible voters could readily apply.

106.    The Harris County Clerk determined that sending a vote-by-mail application to all registered voters in the County was important as part of the S.A.F.E. Plan because many voters qualified for a mail ballot under Texas law, it was undoubtedly the safest way to vote during the pandemic, and many voters simply did not know they were eligible.  Voters qualify as disabled if they are sick, pregnant, or if voting in person will create a likelihood of injury to the voter's health. A voter's lack of immunity to COVID-19 could be considered along with other health factors to inform the voter's own determination of eligibility. Because most voters in Harris County had no idea that they might qualify to vote by mail as a result of this provision of the law, the Harris County Clerk determined it was critical to provide voters with the education on their potential eligibility and ready access to the application.

### F.  Texas's 2021 Legislative Sessions

107.    In spite of the success of the 2020 general election in Texas, and even though state officials found no irregularities or fraud in that election,[55] the Texas legislature devoted much of its attention to changing the election laws during the 2021 legislative session and two special sessions called during 2021.

108.    During the regular 2021 legislative session, predecessor bills to S.B. 1--S.B. 7 and a companion bill, House Bill 6 ("H.B. 6")--were presented to the elections committees in the Texas

---

[55] *See* Alison Durkee, *Texas Senate Passes GOP-Led Bill that Restricts Voting*, Forbes, (Apr. 1, 2021), https://www.forbes.com/sites/alisondurkee/2021/04/01/texas-senate-passes-gop-led-bill-that-restricts-voting/?sh=48e87c9f3e18.

House of Representatives and the Texas Senate,[56] according to sponsor Senator Bryan Hughes, for "Texans [to] feel confident that their elections are fair, honest, and open."[57]

109.    The House Election Committee was scheduled to hear H.B. 6 for the first time on March 25, 2021. The Texas Senate State Affairs Committee held the first hearing on S.B. 7 on March 26, 2021. Neither the House Elections Committee nor the Senate State Affairs Committee allowed virtual testimony from the general public, forcing Texans who wanted to testify in support or opposition to these bills to appear in person at the state capitol, despite the ongoing COVID-19 pandemic.

110.    As originally drafted, H.B. 6's stated purpose was "to exercise the legislature's constitutional authority under Section 4, Article VI, Texas Constitution, to make all laws necessary to detect and punish fraud and preserve the purity of the ballot box."

111.    On March 25, 2021, the NAACP Legal Defense Fund ("LDF") (counsel of record in this action) submitted testimony in opposition to H.B. 6. In that testimony, LDF discussed the racist origins of the phrase, "preserve the purity of the ballot box."[58]

112.    That phrase first appeared in Article 6, Section 4 of the Texas Constitution, which was added in 1876 and was responsive to calls by white legislators in the State to ensure the "purity of the Anglo-Saxon race" by, among other tactics, disenfranchising Black Texans.[59] The same

---

[56] The committee charged with first review of elections related legislation is the House Elections Committee in the Texas House of Representatives. In the Texas Senate, it is the State Affairs Committee that has first review of elections legislation.

[57] Alexa Ura, *Texas Senate advances bill limiting how and when voters can cast ballots, receive mail-in voting applications*, The Texas Tribune, (Apr. 1, 2021), https://www.texastribune.org/2021/04/01/texas-voting-restrictions-legislature/.

[58] NAACP LDF, *LDF Opposition to House Bill 6* (Mar. 25, 2021), https://www.naacpldf.org/wp-content/uploads/20210324_LDF-Opposition-TX-H.B.-6-v02.pdf.

[59] *Id*. at 4.

year the Texas Constitution was amended to require the Legislature to "preserve the purity of the ballot box," over two dozen Black Texans were lynched.[60]

113.    On May 7, 2021, when the author of H.B. 6, House Elections Committee Chairman Briscoe Cain, was confronted by fellow Representative Rafael Anchia regarding the phrase's racist history, the Chairman claimed he was not aware of the phrase's meaning or history.[61]

114.    As further explained in LDF's testimony, preventing voter fraud has long been used in Texas as a pretext to justify restrictive voting measures and has deep ties to Texas's history of racially motivated voter suppression, including (1) all-White primaries; (2) poll taxes; and (3) re-registration and voter purges.[62]

115.    H.B. 6 was characterized by numerous departures from the ordinary legislative process in Texas as well. Shortly after the initial hearing on H.B. 6 began on March 25, members of the House Elections Committee questioned Chairman Cain about his bill, Chairman Cain cut off the chair of the House Criminal Jurisprudence Committee, Nicole Collier, when she attempted to raise questions about H.B. 6's likely impact on Black voters, refusing to recognize her because she was not a member of the Committee.  However, it is common practice for legislators who are not members of a committee to sit in on and participate in hearings for committees.[63]

---

[60] *Id.*

[61] Dave Montgomery & Nick Corasaniti, *Exchange Over 'Purity' of Vote Puts Texas G.O.P. Firebrand in Spotlight*, N.Y. Times (May 12, 2021), https://www.nytimes.com/2021/05/12/us/politics/briscoe-cain-texas-voting-laws.html.

[62] *Id.*

[63] *See* Drew Knight, *Texas activist groups slam SB 7 and HB 6 as 'voter suppression' bills*, CBS8 (April 5, 2021) https://www.cbs8.com/article/news/politics/texas-activist-groups-slam-sb-7-and-hb-6-as-voter-suppression-bills/269-848e65d3-2575-44a0-93e5-b40860c9bba1.

116.     Representative Collier posed several questions to Chairman Cain, including whether the Chairman asked the Department of Justice or NAACP whether the bill would violate voter's rights on account of race, color, or language.[64]   Cutting off Representative Collier, Chairman Cain stated that the Committee needed to recess, but failed to specify a time certain for the Committee to readjourn, a procedure required in the House.[65]

117.     Upon returning from lunch, Chairman Cain used the excuse of his own procedural error—having called for a recess without specifying the time when the committee would return from that recess—to claim he was being forced to end the hearing before any public testimony could be heard.[66]  Almost 200 people from across the State were registered to testify at the hearing and present at the Texas State Capitol that day, including former Secretary of State Hughs, Attorney General Paxton, and former Congressman Beto O'Rourke.[67]

118.     The hearing on H.B. 6 was rescheduled for April 1, 2021, when the House Elections Committee conducted a twenty-two-hour hearing during which hundreds testified, continuing through the night, before adjourning at 6:00 the morning of April 2, 2021.[68]

---

[64]     April 1 Hearing on H.B. 6, Part 1, at 1:06.55-1:22.51, https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=20025.

[65] Acacia Coronado, *Bungled Hearing Delays GOP Voting Restriction Bill in Texas*, AP News (March 25, 2021), https://apnews.com/article/donald-trump-texas-house-elections-voting-government-and-politics-d13bb0a173528ab7417f737718447a12.

[66] *Id.*

[67] Reform Austin Staff, *Cain Prematurely Ends HB 6 Hearing, Blocks Collier from Asking Questions*, RA News (Mar. 25, 2021), https://www.reformaustin.org/elections/cain-prematurely-ends-hb-6-hearing-blocks-collier-from-asking-questions/; Acacia Coronado, *Bungled hearing delays GOP voting restriction bill in Texas*, AP News (Mar. 25, 2021), https://apnews.com/article/donald-trump-texas-house-elections-voting-government-and-politics-d13bb0a173528ab7417f737718447a12.

[68] Nicholas Reimann, *Texas Moving Forward with Voter Restriction Bill After 22-Hour Hearing— Over 350 Similar Bills Filed Across U.S.*, Forbes, (Apr. 2, 2021)

119.    The majority of public testimony was in opposition of H.B. 6.  Among those who testified in opposition was Harris County Elections Administrator Isabel Longoria.  Ms. Longoria explained that, among other things, H.B. 6's restrictions on the provision of mail-in ballot applications and elimination of the majority of mail-in ballot drop-off locations would discriminatorily impact Black and Latino voters, as these methods were predominantly used by voters of color in the 2020 election.  Ms. Longoria emphasized that nothing in H.B. 6 protected the integrity of elections or would make voting more accessible or more secure.

120.    Lauren Sullivan, Young County Elections Administrator, also testified, urging the House Committee to reconsider H.B. 6.  Ms. Sullivan reminded the Committee that legislation targeted at large, urban counties makes conditions more difficult for voters in rural counties as well due to lack of funding and other resources.

121.    David Stout, El Paso County Commissioner for Precinct 2, testified in opposition to the bill, stating that El Paso County in the 2020 election had the highest voter turnout ever at 55%.  El Paso County is 82.9% Latino.[69]  Mr. Stout attributed this increase to the voting measures the county implemented to increase voter turnout, including sending mail-in ballot applications to voters over age 65, extending hours at polling locations, and implementing curbside and drive-thru voting.

122.    Linda Jann Lewis, a volunteer for a Texas voter protection hotline, testified to numerous phone calls she has received at the hotline from poll workers who will not work the next election if H.B. 6 passes for fear of prosecution if a mistake is made.

---

https://www.forbes.com/sites/nicholasreimann/2021/04/02/texas-moving-forward-with-voter-restriction-bill-after-22-hour-hearing-over-350-similar-bills-filed-across-us/?sh=4fb551562a36.

[69]    U.S.    Dep't    of    Com.,    U.S.    Census    Bureau    (2019), https://www.census.gov/quickfacts/elpasocountytexas.

123.    On April 8, 2021, the House Elections Committee advanced H.B. 6 to the House Calendars Committee to be scheduled for a full Texas House vote, but no more movement occurred on the bill until April 29, when the text of H.B. 6 was substituted for the text of S.B. 7 during the House Elections Committee hearing on S.B. 7.

124.    S.B. 7 was similarly characterized by procedural irregularities from its introduction. On March 26, 2021, public testimony was heard on S.B. 7 in the Senate State Affairs Committee. Ms. Longoria also testified in front of the Senate Committee and explained how S.B. 7 would discriminatorily impact voting, voter registration, and voters in Harris County through (1) forbidding local elections officers from educating their constituents about mail-in ballots, (2) prohibiting voting options such as drive-thru centers – an option specifically requested by Harris County constituents, and (3) by limiting hours for early voting and prohibiting twenty-four hour voting centers.

125.    After several more hours of public testimony overwhelmingly in opposition to S.B. 7, the bill passed out of the Senate State Affairs Committee and advanced to the full Texas Senate.

126.    During the Texas Senate's debate on S.B. 7, on March 30, 2021, senators from across the state, but particularly from urban counties, expressed concern and opposition to the bill, questioning Senator Hughes, the bill's author, about specific provisions of S.B. 7 which would disproportionately impact large, urban counties and Black and Latino voters. For example, Senator Carol Alvarado representing District 6, which encompasses parts of Houston, noted that the bill appeared to target Harris County, and would disproportionately impact Black and Latino voters, as 56% of the Harris County voters who took advantage of extended voting hours and 53% of Harris County voters who used drive-thru voting centers were Black, Latino, and other voters of

color. Senator Alvarado also expressed concerns that representatives of larger, urban counties like Harris County were not consulted in drafting the legislation.

127.     Senator Borris Miles, representing Harris County District 13, expressed his opposition to the bill because it was grounded on baseless claims of election fraud.  He cited a 2020 *Houston Chronicle* article noting the Texas Attorney General prosecuted only sixteen people for voter fraud due to incorrect addresses on voter registration forms, none of which resulted in jail time.[70] Senator Miles further stated that according to another 2021 *Houston Chronicle* article citing an analysis by the American Civil Liberties Union, 72% of all voter fraud prosecutions brought by Texas Attorney General Paxton since he took office in 2015 were against Black and Latino voters,[71] arguing that S.B. 7 "is a clear case of suppression." This same *Houston Chronicle* article as cited by Senator Miles also reported that 86% of the voter fraud prosecutions involved offenses that allegedly occurred in majority non-white and Latino counties and only four of the ninety-three total prosecutions were against white defendants.[72]

128.     The Texas Senate passed S.B. 7 early in the morning of April 1, 2021 after a seven-hour, overnight debate.  From the Senate, S.B. 7 moved to the House.

129.     On April 29, 2021, the House Elections Committee approved a committee substitute for S.B. 7 that replaced the text of S.B. 7, in its entirety, with the text of H.B. 6.

---

[70] Taylor Goldenstein & Austin Bureau, *Ken Paxton's beefed-up 2020 voter fraud unit closed 16 minor cases, all in Harris County*, Houston Chronicle (Dec. 27, 2020), https://www.houstonchronicle.com/politics/texas/article/politics/texas/article/Ken-Paxton-s-beefed-up-2020-voter-fraud-unit-15820210.php.

[71] Taylor Goldenstein & Austin Bureau, *At least 72% of AG Ken Paxton's voter fraud prosecutions target people of color, analysis shows*, Houston Chronicle, (Mar. 24, 2021), https://www.houstonchronicle.com/politics/texas/article/Ken-Paxton-voter-fraud-minorities-target-election-16049496.php.

[72] *Id.*

Chairman Cain called S.B. 7 right before the committee had to recess for a floor session, even though the bill was not on that meeting's agenda and even though committee members were unsure of the bill's contents. The bill eventually was voted on and approved by the committee later that day, after the committee reconvened.

130.    S.B. 7 was scheduled to be heard on the House floor on May 6, 2021, with over 130 proposed amendments offered to its text.[73] The vote on S.B. 7 was delayed through the day of May 6, repeatedly, including for the last time at 10:30 pm.[74]

131.    When the Texas Representatives returned to the floor to vote on S.B. 7's final approval, several Representatives opposing the legislation provided closing remarks on the bill's discriminatory intent. Representative Jasmine Crockett, representing Dallas County District 100, spoke to the bill's clear intent to suppress voters, asserting that "[s]uppression looks like Black, brown and disabled people telling you to your face that this policy will affect them in a negative way and allowing them to fall on deaf ears.[75] Representative Rafael Anchía, representing Dallas County District 103, echoed Representative Crockett's sentiments, calling particular attention to S.B. 7's ties to white supremacy as clearly indicated by its designated purpose to "[76] purity of the ballot box."  Later, this language was removed.

---

[73] Alexa Ura, *Texas GOP's voting restrictions bill could be rewritten behind closed doors after final House passage*, Texas Tribune, (May 7, 2021), https://www.texastribune.org/2021/05/07/texas-voting-restrictions/.

[74] House Journal, 87th Leg. Regular Session Minutes, May 6, 2021.

[75] Alexa Ura, *Texas voting restrictions bill could be rewritten behind closed doors after final House passage*, Texas Tribune (May 7, 2021), https://www.texastribune.org/2021/05/07/texas-voting-restrictions/.

[76] *Id.* (Representative Anchía asserted that "SB 7 rode into the Texas House cloaked in that longstanding pretext 'purity of the ballot box' that has denied full participation of African Americans and Latinos for generations.").

46

132.    On May 7, 2021, at 3:00 am, the House heard and voted on S.B. 7, passing the bill on a 78-64 party-line vote.[77]  Ultimately, members of the House were able to secure amendments that curtailed some of the most onerous provisions of the House version of S.B. 7, including bans on drive-thru voting and 24-hour voting, new rules for voting machine allocation, and allowing partisan poll-watchers to record or photograph voters.

133.    Because the version of S.B. 7 that passed the Senate was amended after engrossment in both the Texas Senate and House of Representatives, a conference committee was called by the Texas Senate.  In Texas, a conference committee is called to "work out differences between the house version and the senate version of a bill that has been amended after engrossment."[78]  A conference committee's charge is limited to reconciling differences between the two chambers, and the committee may not change, alter, amend, or omit text that is not in disagreement without the adoption of an "out of bounds" resolution by both chambers.[79]

134.    On May 18, 2021, the Senate appointed the following conferees: Senators Paul Bettencourt, Dawn Buckingham, Lois Kolkhorst and Beverly Powell.[80] The House granted the Senate's request for the appointment of a conference committee and appointed Representatives

---

[77] *Id.*

[78] Tx. Legislative Reference Library, *Conference committee reports*, lrl.texas.gov (last accessed May 21, 2021), https://lrl.texas.gov/legis/conferencecommitteereports.cfm#:~:text=A%20conference%20committee%20is%20called,from%20the%20Texas%20Legislature%20Online..

[79]  Texas Legislative Council, *The Legislative Process in Texas* 6 (Feb. 2021), https://tlc.texas.gov/docs/legref/legislativeprocess.pdf#page=12.

[80]  House Journal at 3317, 87th Leg., Reg. Sess. (2021), https://journals.house.texas.gov/hjrnl/87r/pdf/87RDAY49CFINAL.PDF#page=15.

Briscoe Cain as the Chair, Terry Canales, Travis Clardy, Nicole Collier and Jacey Jetton on May 19, 2021.[81]

135.    The Texas State NAACP Conference and the League of United Latin American Citizens sent a letter to Lt. Governor Dan Patrick, the presiding chair of the Senate, and Senator Bryan Hughes, the author of S.B. 7, expressed their disappointment that the Senate did not appoint any Black or Latino conferees. The "seemingly intentional oversight," they wrote, was disappointing given that S.B. 7 "will have a far greater and negative impact on the Black and Brown communities" in Texas.[82]

136.    With the end of the legislative session just three days away, on May 28, the Chairs of the House and Senate Elections Committees tweeted they "reached an agreement" on the contents of the Conference Committee Report, and the content of Senate Bill 7, stating that "[e]ven as the national media minimizes the importance of election integrity, the Texas Legislature has not bent to headlines or corporate virtue signaling."[83]  Yet at the time of this statement by the Chairs, the several Democratic members of the Conference Committee, and the only people of color on the Committee, had not seen the Conference Committee Report, nor the contents of the bill the Chairs claimed the Texas Legislature had recommended.[84]

---

[81]    Senate    Journal    at    1603,    87th    Leg.,    Reg.    Sess.    (2021), https://journals.senate.texas.gov/sjrnl/87r/pdf/87RSJ05-19-F.PDF#page=17.

[82] *Texas NAACP and LULAC blast GOP maneuvers over SB 7*, North Dallas Gazette (May 20, 2021),    https://northdallasgazette.com/2021/05/20/texas-naacp-and-lulac-blast-gop-maneuvers-over-sb7/.

[83] Press Release, *Chairmen Agree on SB 7, The Texas Election Integrity Bill by Senator Hughes and Representative Cain* (May 28, 2021), https://pbs.twimg.com/media/E2g3amsWQAMpco3?format=jpg.

[84] Lauren McGaughy, *GOP Announces Deal on Divisive Elections Bill, Democrats Say They Were Locked Out Of Process*, Dallas News (May 28, 2021 7:49PM),

137.    The text of the Committee Report itself, ultimately released on May 29, revealed additional procedural departures and new burdens on voting. The Committee Report was 180 pages long. It included a 67-page bill, roughly 12 pages of which contained additional provisions that were not included in either version of S.B. 7 that had passed the House or Senate.[85] Among these changes was Section 3.10, which added the provision that in a county with a population of 30,000 or more, voting by personal appearance on the "last Sunday of the early voting period … may not be conducted earlier than 1 p.m. or later than 9 p.m."[86] This provision would have provided for a shorter period of voting on the Sunday before election day than on other early-voting days. It was widely known that many Black voters participate in "souls to the polls" voting on the Sunday morning before an election.[87]

138.    The Committee Report contained new provisions from other election-related bills that failed to pass both houses of the Legislature, including identification requirements for mail ballots and applications.[88]  It also created a provision which, in conjunction with other provisions of S.B. 7 that make it easier to declare votes invalid, would lower the evidentiary standard necessary for a court to declare an election void.[89]

---

https://www.dallasnews.com/news/politics/2021/05/28/gop-announces-deal-on-divisive-elections-bill-democrats-say-they-were-locked-out-of-process/.

[85] Alexa Ura, *After drastic changes made behind closed doors, and an overnight debate, Texas Senate approves voting bill*, Texas Tribune (May 30, 2021), https://www.texastribune.org/2021/05/30/texas-voting-restrictions-senate/.

[86] S.B. 7 § 3.10 (amending Tex. Elect. Code § 85.006(e)).

[87] LDF Opposition Senate Bill 7 Conference Committee Report at 3-4 (May 29, 2021), https://www.naacpldf.org/wp-content/uploads/LDF-Conference-Committee-Report-Opposition-Senate-20210529-1.pdf.

[88] S.B. 7 §5.04.

[89] S.B. 7, § 8.05 (amending Tex. Election Code to add §§ 232.062, 232.063 such that if a contestant can prove an allegation of election fraud by a preponderance of the evidence and that "[i]f the

139.    Some of the amendments that House Democrats had made to S.B. 7 were eliminated, meaning that the bill reverted to eliminating drive-thru voting and banning 24-hour voting.

140.    After releasing the committee report on Saturday morning, the Senate suspended the chamber's rule that would have required giving senators 24 hours to review the Committee Report. Instead, the Senate began debating the bill around 10:00pm on Saturday evening and voted 18-13 to pass the bill shortly after 6:00am on Sunday, May 30, 2021.

141.    For S.B. 7 to make it to Governor Abbott during the regular legislative session, the bill had to pass the House by midnight that same day. A quorum of two-thirds is required to take a vote in the House.[90] However, with about an hour left until the end of the legislative session, the Texas House Democrats staged a walkout, breaking quorum to prevent a vote on the legislation.[91]

142.    In the immediate aftermath of the walkout, Governor Abbott made clear he not only would call for a special legislative session,[92] but gravely tweeted "[n]o pay for those who abandon their responsibilities . . . Stay tuned."[93]

---

number of votes illegally cast in the election is equal to or greater than the number of votes necessary to change the outcome of an election, the court may declare the election void without attempting to determine how individual voters voted.")

[90] Rules of the House of Representatives of the State of Texas 87th Legislature, Rule 5, Chapter A, Section 1.

[91] Alexa Ura, *Texas Democrats abandon House floor, blocking passage of voting bill before final deadline*, the Texas Tribune, May 30, 2021, https://www.texastribune.org/2021/05/30/texas-voting-restrictions-house/.

[92] *Id.*

[93] Patrick Svitek, *Texas Gov. Greg Abbott vows to defund state Legislature after voting restrictions bill fails, threatening salaries*, the Texas Tribune, May 31, 2021, https://www.texastribune.org/2021/05/31/texas-greg-abbott-funding-legislature/.

143. Governor Abbott's threats became reality on June 18, 2021 when he vetoed funding of the Texas Legislature as punishment for the House Democrats breaking quorum, impacting 2,100 Texas workers including Senators, House members, staffers, and employees of several legislative agencies.[94] Shortly after, Governor Abbott set a thirty-day special legislative session for July 8, 2021, confirming the agenda would include "[l]egislation strengthening the integrity of elections in Texas."[95]

144. With the special session looming, House Speaker Dade Phelan brought in a new author for the elections bill—Republican Representative Andrew Murr.[96] Representative Murr formed the House Select Committee on Constitutional Rights and Remedies—a select, Republican-majority committee where the election bills would be referred.[97]

145. Both the Senate and House election bills, now deemed S.B. 1 and H.B. 3, respectively, were set for hearings to start on Saturday, July 10, 2021.[98] In the House hearings, "Democrats repeatedly asked whether Murr had conducted a disparate impact study to assess if

---

[94] Cassandra Pollock, *Gov. Greg Abbott vetoes funding for Texas Legislature and its staff as punishment for Democrats' walkout on elections bill*, the Texas Tribune, June 18, 2021, https://www.texastribune.org/2021/06/18/greg-abbott-veto-legislature-democrats/.

[95] Proclamation by the Governor of the State of Texas, July 7, 2021, https://gov.texas.gov/uploads/files/press/PROC_first_called_session_87th_legislature_IMAGE_07-07-21.pdf.

[96] Patrick Svitek & Cassandra Pollock, *Texas House attempting to reset on contentious elections bill with new author, new committee in special session*, the Texas Tribune, July 8, 2021, https://www.texastribune.org/2021/07/08/texas-house-reset-election-bill/.

[97] *Id.*

[98] *Id.*

the new voting rules would disproportionately affect voters of color. He indicated he had not."[99] Approximately 300 people signed up to testify on S.B. 1 and 484 people signed up to testify on H.B. 3.[100] While the hearing for H.B. 3 began at 8:00 A.M. Saturday morning, it lasted more than seventeen hours so that public testimony on H.B. 3 did not begin until almost 2:00 A.M. Sunday morning.[101] For the hearing on S.B. 1, public testimony began early afternoon on Saturday, but the testimony still ran into the early hours of Sunday morning.[102] At the completion of both hearings and public testimony, the House and Senate committees voted to advance the legislation in party-line votes.[103]

146.    With twenty-six days left in the special session and S.B. 1 and H.B. 3 set to hit the Senate and House floors the following Monday, July 12, 2021, fifty-one of the sixty-seven House Democrats left Texas for Washington D.C. to break quorum and again, stop the vote.[104]

147.    In response, the House Republicans voted and passed a "call of the House" to regain quorum by asking that ""the sergeant at arms, or officers appointed by him, send for all absentees

---

[99] Alexa Ura & Cassandra Pollock, *GOP voting bills advance in Texas House and Senate after overnight committee hearings*, The Texas Tribune, July 10, 2021, https://www.texastribune.org/2021/07/10/voting-bill-texas/.

[100] Alexa Ura, *Texans testifying on GOP voting bill faced a 17 hour-wait to be heard by lawmakers in the dead of night*, The Texas Tribune, July 11, 2021, https://www.texastribune.org/2021/07/10/texas-legislature-gop-voting-bill/.

[101] *Id.*

[102] *Id.*

[103] Alexa Ura & Cassandra Pollock, *Texas House Democrats flee the state in move that could block voting restrictions bill, bring Legislature to a halt*, The Texas Tribune, July 12, 2021, https://www.texastribune.org/2021/07/12/texas-democrats-voting-bill-quorum/.

[104] *Id.*

. . . under warrant of arrest if necessary," effectively making the missing Democrats legislative fugitives."[105] House Speaker Phelan even signed dozens of civil arrest warrants.

148.   Despite many of the House Democrats still out-of-state or pledging to not return to the Capitol, Governor Abbott announced the second special legislative session would begin August 11, 2021 at 12:00 P.M.[106] The second special session kicked off without a quorum in the House and House Speaker Phelan signing dozens of civil arrest warrants.[107] Although a Travis County judge issued Temporary Restraining Orders to block the civil arrests, the Texas Constitution gives the House of Representatives authority to physically compel the attendance of, i.e., arrest, absent members.[108]

149.   For its part, the Senate moved forward on S.B. 1.[109] In a statement regarding S.B. 1, Senator Judith Zaffirini highlighted how the provisions of S.B. 1 "would make voting easier for some Texans, [but] it simultaneously would make it harder for historically disenfranchised communities of color to participate in elections."[110] Specifically, Senator Zaffirini stated that

---

[105] Patrick Svitek & Cassandra Pollock, *Texas House Republicans vote to track down absent Democrats and arrest them if necessary*, The Texas Tribune, July 13, 2021, https://www.texastribune.org/2021/07/13/texas-democrats-walkout-voting-bill-arrest/.

[106] Patrick Svitek, *Gov. Greg Abbott announces special legislative session starting Saturday, covering elections, federal COVID-19 funding, quorum rules*, The Texas Tribune, Aug. 5, 2021, https://www.texastribune.org/2021/08/02/greg-abbott-texas-special-legislative-session/.

[107] Joshua Fechter, *Texas Supreme Court says House Democrats can be arrested and brought to the Capitol, siding with Republicans trying to secure a quorum*, The Texas Tribune, Aug. 17, 2021, https://www.texastribune.org/2021/08/17/texas-house-democrats-arrest-quorum/.

[108]  Svitek, *supra* at 99; Fechter, *supra* at 100;

[109] Cassandra Pollock, Alexa Ura, & James Barragan, *Another special session to pass a GOP voting bill started without a quorum. This time it's unclear if Democrats will stay away*, The Texas Tribune, Aug. 7, 2021, https://www.texastribune.org/2021/08/07/texas-democrats-special-session/.

[110] S.J. of Tex., 87th Leg., 2d C.S. 5 (2021) (statement of S. Judith Zaffirini).

while S.B. 1 "reduces the number of early voting hours in only four counties[,] [a]pproximately one of three Black Texans, one of three Latino Texans, and one of three Asian Texans, . . . live in one of these four counties."[111] The Senator again recounted how few instances of voting fraud there truly were, with only "44 voting fraud cases pending—of 11.2 million votes cast in Texas in 2020. As witness Julie Oliver testified before the State Affairs Committee, since 2004 there have been 839 complaints of fraud in Texas—of more than 100 million votes cast."[112] Despite Senator Zaffirini's statement and a fifteen-hour filibuster by Democratic Senator Carol Alvarado, S.B. 1 passed the Senate August 12, 2021[113]

150.    The Texas House regained quorum with the return of many House Democrats and hours of public testimony in front of the House Committee on Constitutional Rights and Remedies on S.B. 1 were again heard on August 23, 2021.[114] Following public testimony, the Committee passed S.B. 1 in a 9-5 party-line vote.[115] However, the Committee replaced S.B. 1 with language from its own bill, H.B. 3.[116]

---

[111] *Id.*

[112] *Id.*

[113] Alexa Ura, *Texas Senate outlasts 15-hour filibuster by Sen. Carol Alvarado to pass GOP voting-restrictions bill*, The Texas Tribune, Aug. 11, 2021, https://www.texastribune.org/2021/08/11/texas-voting-bill-filibuster/.

[114] Adam Bennett, *Houstonians testify on election bill as Texas House reaches quorum*, KHOU 11, Aug. 23, 2021, https://www.khou.com/article/news/politics/election-bill-testimony-texas-house-quorum/285-bf407074-182d-49a9-ae9d-674a46ca990f.

[115] Alexa Ura, *Texas House committee again passes the voting restrictions bill that instigated Democratic quorum break*, the Texas Tribune, Aug. 23, 2021, https://www.texastribune.org/2021/08/23/texas-voting-bill-legislature/.

[116] *Id.*

151.    On August 26, 2021, the House debated S.B. 1 for over twelve hours. During the debate, as members attempted to discuss the bill's racial impact, Speaker Dade Phelan banned use of the word "racism" in the debate.[117]

152.    At 1:00 A.M. on Friday, August 27, 2021, after sixty-four amendments were read and debated, the Texas House voted 79-37 to pass S.B. 1.

153.    The Senate requested a conference committee to reconcile the differences between the version of S.B. 1 that the Senate passed and the version that the House passed. Specifically, the Senate's author, Senator Bryan Hughes, disapproved of the "Mason" Amendment added by Republican House Representative Briscoe Cain in a bipartisan effort to address the controversial conviction of Crystal Mason by preventing voter mistakes from being prosecuted as fraud.[118] Ms. Mason was a Texas voter sentenced to five-years for casting a provisional ballot she did not know she was ineligible to cast due to her being on "federal supervised release," a preliminary period of freedom for individuals who have served their full time of incarceration in federal prison.[119] Ultimately, the Mason Amendment was not included.[120] The conference committee report was released Monday, August 30, 2021.

---

[117] Nick Natario, *Texas House speaker Dade Phelan bans word 'racism' during debate over elections bill*, ABC 13 (Aug. 27, 2021), https://abc13.com/texas-legislature-election-bill-house-speaker-dade-phelan/10978475/.

[118] Alexa Ura, *Republican bill tightening Texas election laws is headed to Gov. Greg Abbott's desk*, the Texas Tribune (Aug. 31, 2021), https://www.texastribune.org/2021/08/31/texas-voting-restrictions-bill/.

[119] *Id.*

[120] *Id.*

154.    The Texas House passed S.B. 1 on August 31, 2021 with an 80-41 vote.[121] That same day, the Texas Senate then passed S.B. 1 18-13 in a party-line vote.[122]

155.    On September 7, 2021, Governor Abbott signed S.B. 1 into law, which will officially go into effect three months prior to the 2022 primary elections.[123]

### G. The Effects of S.B. 1

156.    Approximately 1.6 million registered voters in Harris County voted in the November 3, 2020 General and Special Election.  Approximately 1.3 million voted early in person; over 177, 000 voted by mail; and over 200,000 voted on Election Day.[124]

157.    S.B. 1 targets the various voting channels previously available under the Texas election code before the passing of S.B. 1 that voters of color, particularly in Harris County, used to cast a ballot in the 2020 election.  Black and Latino voters are more likely to vote by mail and more likely to vote early than non-Black and non-Latino Harris County, Texas voters.  Black voters in Harris County are also more likely to vote early, by drive-thru, and at curbside polling locations.

158.    The effect of S.B. 1 is to eliminate the methods and means of voting disproportionately used by voters of color, particularly Black and Latino voters, in the 2020 general election. Black and Latino voters are more likely to work multiple jobs and odd hours than white Texans. Moreover, Black and Latino voters in Harris County are more likely to exhibit

---

[121] Shawna M. Reding, *Texas elections bill, Senate Bill 1, heads to governor's desk for signature*, KVUE, (Aug. 31, 2021), https://www.kvue.com/article/news/politics/special-session/election-bill-texas-senate-bill-1-house-vote/269-a3173f81-36eb-4185-8ed5-152fe5038233.

[122] *Id.*

[123] *See id.*

[124] Harris County Elections, Election Results Archive, November 3, 2020 General and Special Elections Canvass Report, (Nov. 16, 2020), https://www.harrisvotes.com/HISTORY/20201103/Official%20Canvass.pdf.

lower socio-economic factors than white voters in Harris County, and more likely to "(1) live in poverty, (2) have less flexible work schedules, (3) lack access to transportation, and (4) lack access to childcare assistance" to cast a ballot in person. *See*, *e.g.*, *Campos v. Baytown,* 696 F. Supp 1128, 1132 (S.D. Tex. 1987); *see also N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 218 (4th Cir. 2016). S.B. 1 serves to make voting more burdensome for Black and Latino voters and sends a message to people of color more broadly that their participation in the democratic process is not welcome.

159.    S.B. 1 also discourages and dissuades voters of color from voting in future elections by increasing the costs of voting. S.B. 1 restricts the scheduling of early voting hours; limits the distribution of applications for early voting ballots and eliminates straight-ticket voting, thereby ensuring longer wait times at the polls. Shorter lines at the polls and flexible voting hours, outside of traditional business hours or on Election Day, overwhelmingly benefit Black, Latino, as well as disabled and other vulnerable or marginalized voters, including disabled voters. Because the costs associated with voting are hardest for Black and Latino voters to shoulder, these voters are also more likely to be discouraged from voting by long wait times at the polls.

160.    S.B. 1 not only eliminates methods and means of voting that are convenient, safe, and popular, it also hinders county elections administrators' flexibility to administer elections according to the needs of their electorate and discourages administrators from zealously serving their electorate by creating criminal penalties for a wide array of conduct that is associated with enfranchisement.

161.    S.B. 1 restricts the scheduling of Texas' early voting period, and the limitations will disproportionately harm Black and Latino Texans.   S.B. 1 limits early voting to the hours of 6:00 a.m. until 10:00 p.m.  This limits early voting hours that are most accessible and convenient for

individuals who work non-traditional work hours, who are disproportionately people of color, and eliminates the option of offering 24-hour early voting entirely.[125]

162.    In the 2020 presidential election, over 120,000 voters in Harris County voted by drive-thru.  Drive-thru voting makes voting by personal appearance easier, safer, and more accessible, and overwhelmingly benefits Black, Latino, elderly, and disabled voters who are less able to wait in long lines to vote.  S.B. 1 Sections 3.04, 3.11, and 3.12, eliminate drive-thru voting. S.B. 1 permits voting only inside a building and prohibits temporary voting locations such as tents, moveable structures or any facility primarily designed for motor vehicles.    Because Black and Latino voters are less likely to have flexible work schedules, and thus can hardly afford to wait in long lines, S.B. 1 makes it burdensome for Black and Latino voters.

163.    During the 2020 presidential election, most Bexar County voters cast their ballots during the early voting period, either in person or by mail.  Of the 773,796 votes cast in the County in the 2020 presidential election, 689,550 voters voted during the early voting period, 92,589 of whom voted by absentee ballot, and a mere 84,246 voters voted in person on November 3, 2020, Election Day.[126]    Bexar County's population is 60.7 percent Latino, with a sizable Black population of 8.6 percent.[127] The methods and means of voting targeted by S.B. 1 will severely curtail the primary forms of participation for Black and Latino voters in Bexar County.

---

[126] Bexar Cnty. Elections Dept., Historical Election Results: November 3, 2020 General Election Media Report, https://www.bexar.org/DocumentCenter/View/28532/November-3-2020-General-Election-Media-Report (last visited Sept. 1, 2021)

[127] Census Bureau, Quick Facts, https://www.census.gov/quickfacts/bexarcountytexas (last visited Sept. 1, 2021).

164.    Another provision of S.B. 1 that will operate to increase wait times at the polls in conjunction with the other provisions of S.B. 1 is Section 3.15, which eliminates straight-ticket voting.  Texans have relied on the ability to cast their votes for all candidates of their preferred party with a single click of a box at the top of their ballot because in Texas, ballots often include as many as 95 races in a single county.[128]  As Texas State Senator Judith Zaffirini has explained, "[l]ines and ballot fatigue can exhaust voters' patience, and eliminating the straight-party option would only make things worse and cause many either to skip down-ballot races altogether or not go to the polls at all".[129]

165.    The elimination of straight-ticket voting–which will inevitably increase the amount of time it takes an individual voter to complete their ballot–ensures longer lines at the polls in all future elections, making it more difficult for voters of color, particularly Black and Latino voters, and voters with disabilities, from casting a ballot in person, where lines to vote are already long. *See infra* Section [*148].

166.    S.B. 1's prohibition on ballot drop boxes will also contribute to longer lines at the polls by reducing yet another opportunity to vote outside of Election Day. Drop boxes allow voters to submit their absentee ballots in advance of Election Day, avoiding the risk that the ballot might be delayed or lost in the mail. Without this drop box option, voters will be forced to choose between relying on the mail and returning their ballot well in advance of the election or showing up on Election Day to cast their vote.

---

[128] *Tex. All. for Retired Ams v. Hughs,* 489 F.Supp. 3d 667, 677 (S.D. Tex. 2020) ("Texans' reliance on [straight-ticket voting] likely stems from Texas' exceptionally lengthy ballots, which sometimes list as many as 95 races in a single county").

[129] Tex. S.J., 8th Leg., Reg. Sess., Sen. Zaffirini (May 18, 2017).

167.    S.B. 1 also places onerous requirements on individuals applying to vote by mail and outlaws any election official from distributing an early vote-by-mail application to anyone who has not requested one; prevents public officials from using public funds to allow another person to distribute early vote-by-mail applications to anyone who has not requested one; and prevents early voting clerks from making any attempt to solicit a person to complete an application for an early vote-by-mail ballot, whether directly or through a third party.[130] Moreover, any offense under this section is a state jail felony.[131]

168.    Plaintiff organizations often receive applications free of charge from county officials, and often work in concert with county election officials to serve historically disenfranchised and underserved communities, including Black and Latino communities. For example, public officials in Harris County sent pre-filled vote-by-mail applications to residents over 65 years of age, including Plaintiffs, in Harris County.  Plaintiffs Delta Sigma Theta Sorority, Inc., HAUL, Houston Justice, and other non-partisan non-profit grassroots organizations[132] engage in efforts to facilitate voters' applications to vote by mail in underrepresented communities. S.B. 1 prohibits or burdens Plaintiffs, and similar organizations, in their efforts to serve disenfranchised communities of color and prevents or unnecessarily impedes these organizations from providing critical services that Black and Latino Texans have relied upon to participate in the political process. For example, because vote-by-mail applications will not be available from county election officials, Plaintiffs Houston Justice and HAUL will either have to

---

[130] S.B. 1, 87th Leg., 2nd Special Sess. (Tex. 2021) (Section 7.04  amending Tex. Elec. Code § 276.016); ).

[131] Id.  § 7.04.

[132] MOVE Texas https://movetexas.org/about/ (last visited May 1, 2021). MOVE Texas is not a party to this suit.

discontinue the provision of vote-by-mail applications and assistance in completing those applications to its clients and community members they serve--a key component of Houston Justice's and HAUL's programming--or undertake unnecessary expenses and expend additional staff time and other scarce resources to procure sufficient copies of vote-by-mail applications.

169.    S.B. 1 §§ 4.06, 4.07, 4.09 also impose new criminal penalties on election officials, including election judges like Plaintiff Clemmons, who take action, seemingly including action currently required by law, to protect voters from interference and intimidation by poll watchers. S.B. 1, Section 4.07 gives poll watchers a right of "free movement" at a polling location and makes it a criminal offense for any election official to knowingly refuse to accept a poll watcher for service or to take any action "to [133] Yet the Texas Election Code, §§ 33.057, 33.058, also make clear that "[a] watcher may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice" and that "[w]hile on duty, a watcher may not (1) converse with an election officer regarding the election … (2) converse with a voter; or (3) communicate in any manner with a voter regarding the election."  Sections 33.057 and 33.058 are designed to protect voters from undue interference, harassment and intimidation at the polls by poll watchers specifically and are in fact necessary to ensure that end.  In the November general election alone, Harris County election judges were forced to intervene in response to numerous violations of § 33.058 by poll watchers. S.B. 1 imposes criminal penalties on election officials for taking steps to protect voters from poll watchers, including, it seems, action elsewhere required by the Texas Election Code. S.B. 1's poll watcher provisions serve to undermine these existing protections.

---

[133]    S.B. 1, §§ 4.06, 4.07, 4.09 (amending Tex. Elec. Code § 33.051, § 33.056, and § 33.061(a), respectively).

170.    S.B. 1's harmful provisions that eliminate drive-thru voting, restrict early voting hours, eliminate straight-ticket voting, subject election officials to multiple criminal penalties for advancing access to voting while empowering partisan poll watchers, and restrict the ability of public officials and third-party organizations to distribute vote-by-mail ballot applications to voters, have a known, predictable and disproportionate impact on Black and Latino voters. Because S.B. 1 was also enacted with the intent to achieve this result, the Challenged Provisions violate the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, and the Voting Rights Act of 1965.

171.    S.B. 1 also imposes significant barriers on voters with disabilities in violation of the American with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973, and Section 208 of the Voting Rights Act.

172.    S.B. 1 Section 5.02 requires an early voting ballot application to either include specific identification (driver's license, election identification certificate, personal identification card, or last four digits of Social Security number) or a statement by the applicant that the voter has not been issued one of the forms of identification. However, many with disabilities may possess the identification but not be able to access it—such as individuals with disabilities in congregate settings--or require assistance in determining whether they have the necessary identification. Section 5.02 thereby imposes eligibility criteria that tends to screen out people with disabilities and denies people with disabilities equal access to the early voting ballot application process.

173.    S.B. 1 Sections 6.01, 6.03 and 6.05 impose barriers on voters with disabilities by requiring an individual who provides voting assistance, either with voting in-person or with a mail-in ballot, to fill out a form reporting his or her name, address, relationship to the voter, and

whether he or she received any form of compensation. The assistor would have to fill out such a form for every voter he or she assists, adding time and paperwork, and also subjecting the assistor to criminal liability for any incorrect form filled out on behalf of a voter. These provisions also allow poll watchers to observe any activity conducted under this section. Poll watchers—who may be unfamiliar with federal disability rights laws—may misconstrue and misunderstand lawful and necessary assistance being provided to voters with disabilities as violating S.B. 1. All of these provisions may have a chilling effect on individuals providing assistance to voters with disabilities and prevent them from providing such assistance, thereby interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights and denying voters with disabilities equal access to voting.

174.    Under Section 6.04 of S.B. 1, an individual providing a voter with assistance must also take an oath, under penalty of perjury, administered by an election officer at the polling place that includes the statement: "I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." This oath unlawfully limits the scope of assistance the assistor can provide to the voter with a disability who may need other forms of assistance and thereby denies the voter with a disability equal access to voting. The assistor also must take the oath "under penalty of perjury," potentially chilling individuals from providing critical assistance at the polls for fear of their assistance being misconstrued by those who are unfamiliar with the protections guaranteed by federal disability rights laws, thereby interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights and denying voters with disabilities equal access to voting.

## CLAIMS FOR RELIEF

### Count One

Violation of Section 2 of the Voting Rights Act
52 U.S.C. §10301, et seq.
(Intentional Racial Discrimination & Vote Denial)

175.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-174, as if fully set forth herein.

176.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group].

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

177.   A violation of Section 2 of the Voting Rights Act may be based on: (1) a finding of a discriminatory purpose behind the challenged governmental action; (2) a finding of a discriminatory result from the challenged governmental action; or (3) under the totality of the circumstances, the act results in the denial or abridgment of the right to vote "on account of," or based on, race or color. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986

F.2d 728, 738 (5th Cir. 1993) (citing *Chisom v. Roemer,* 501 U.S. 380 (1991)); *Thornburg v. Gingles,* 478 U.S. 30, 46 (1986).

178.    The essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequity in the opportunities of Black, Latino, and people of color to participate in the election process to elect their preferred representative. *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986); *see also Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2341 (2021) (section 2 "commands: consideration of 'the totality of circumstances' that have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote").

179.    Voters of color in Texas, including those served by Plaintiffs Houston Justice, HAUL, Delta Sigma Theta Sorority, Inc., and The Arc of Texas, bear the effects of discrimination in education, employment, and health that hinder their ability to participate in the political process under the provisions set forth in S.B. 1.

180.    Texas's history of official discrimination and lingering socioeconomic effects of discrimination will interact with the persisting legacy of discrimination in education, employment, and health to impose a discriminatory burden on Black and Latino voters, and to create unequal opportunities for Black, Latino and other people of color to participate in the election process. *League of United Latin Am. Citizens,* 986 F.2d at 755.

181.    The disproportionate impact of S.B. 1 is caused by present and past discrimination on account of race and ethnicity by the state of Texas, as shown by the totality of the circumstances, including factors deemed relevant by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).

182.    As a result of S.B. 1's provisions and prohibitions described above, individually and collectively, under the totality of the circumstances, the political process in Texas is not equally open to participation by Black, Latino, and other voters of color in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

183.    The burdens of S.B. 1 are intended to, and under the totality of the circumstances do, disproportionately burden and erect barriers to Black and Latino voters' ability to participate in the political process.  The burdens include but are not limited to:

a.    Impeding grassroots organizations' efforts to assist voters of color to vote by mail, in particular Black and Latino voters, by prohibiting the distribution of early voting applications to third parties for the purpose of "solicit[ing]" persons to apply for an early voting ballot.[134]

b.    Eliminating and severely limiting the tools and methods of voting disproportionately used by Black and Latino voters and thereby increasing the amount of time it takes to vote for Black and Latino voters by making early voting and voting-by-mail less convenient and accessible, burdening curbside voting, and by eliminating 24-hour voting, straight-ticket voting and drive-thru voting.

c.    Creating an environment where Black and Latino voters, who historically are targets of voter intimidation, harassment, and threats, will feel less safe at polling locations because S.B. 1 allows "watchers" to roam freely.

---

[134] S.B.  1, § 7.04 (amending Tex. Elec. Code § 276.016).

184.     These actions will have the effect of disproportionately burdening voters of color, particularly Black and Latino voters, including in Harris County, served by Plaintiffs Houston Justice, HAUL, The Arc of Texas, and Delta Sigma Theta, Inc.

185.     Multiple factors also support an inference that race was a motivating factor behind the enactment of S.B. 1.

186.     S.B. 1 was enacted at a time when Black and Latino voters and other voters of color were making increasing use of means of voting that are restricted or eliminated under S.B. 1.

187.     S.B. 1 was enacted following the elections in which Texas's Black and Latino voting age populations and registered voters are increasing compared to non-Black and non-Latino voting age population and registered voters.

188.     The purported justification for S.B. 1 was pretextual. Overwhelmingly, the 2020 election has been lauded as secure, and none of the many legal challenges to the validity of the election based on allegations of purported voter fraud were even remotely successful.  The pretext of preventing voter fraud to justify disenfranchisement has ties to Texas's longstanding history of racially motivated voter suppression, including (1) all-white primaries; (2) secret ballots; (3) poll taxes; and (4) re-registration and voter purges.[135]

189.     The provisions of S.B. 1 described herein constitute the denial or abridgment of the right of Black, Latino, and other people of color in Texas to vote on account of race or color within the meaning of Section 2 of the Voting Rights Act.

---

[135] *Veasey v. Abbott*, 830 F.3d 216, 336 (5th Cir. 2016) (rehearing en banc) (Dr. Burton, testifying to Texas's history of official discrimination in voting and the Fifth Circuit Court of Appeals finding that, with respect to the state's photo ID law which the State justified as a measure to prevent voter fraud, that the "Legislature had access to data from the 2008 and 2010 elections when considering SB 14, which showed that 'of the millions of votes cast in both of those elections, there were perhaps four referrals for in person voter impersonation' and that 'one, if not two individuals... had been officially charged and may have accepted responsibility for impersonation.'").

190.    Absent relief from this court, Defendants will continue to violate Plaintiffs' rights under Section 2 of the Voting Rights Act.

### Count Two

Violation of the Fourteenth Amendment
U.S. Const. amend., XIV; 42 U.S.C §1983
(Intentional Race Discrimination in Voting)

191.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-190, as if fully set forth herein.

192.    42 U.S.C. § 1983 authorizes suits resulting from the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

193.    Section 1 of the Fourteenth Amendment to the United States Constitution provides that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

194.    The right to vote is a fundamental constitutional right protected by the due process and equal protection clauses of the Fourteenth Amendment. *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

195.    A law or policy is unconstitutional under the equal protection clause when race was a motivating factor in the decision-making process that led to the law or policy. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

196.   S.B. 1 violates the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voters on account of race or color.

197.   The facts alleged herein reveal that S.B. 1 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black, Latino, and other voters of color in violation of the United States Constitution.

198.   S.B. 1 was enacted a time when Black, Latino, and other voters of color were making increasing use of means of voting that are now being eliminated and restricted by S.B. 1.

199.   S.B. 1 was enacted in response to an election in which the size of the population of Black, Latino, and other voters of color had increased in statewide elections.

200.   The supporters of S.B. 1 were on notice of the foreseeability of the disparate impact of S.B. 1.

201.   The purported justification for S.B.1 was pretextual.

202.   The legislative process leading up to the enactment of S.B. 1 included multiple departures from normal procedures.

203.   There are less discriminatory alternatives to every aspect of S.B. 1, including simply maintaining the status quo, particularly given the complete lack of evidence of significant voter fraud.

204.   Implementing and enforcing S.B. 1 will irreparably harm Plaintiffs, as well as Black, Latino, and other voters of color, and voters with disabilities by denying or abridging their right to vote.

205.   Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of S.B. 1, the sequence of

events and substantive departures from the normal legislative process which resulted in the enactment of S.B. 1, and the tenuousness of the stated justifications for S.B. 1, raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

### Count Three

Violation of the Fifteenth Amendment
U.S. Const. amend., XV; 42 U.S.C §1983
(Intentional Race Discrimination in Voting)

206.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-205, as if fully set forth herein.

207.    The Fifteenth Amendment prohibits intentional racial discrimination by state actors.

208.    Specifically, Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

209.    The Fifteenth Amendment therefore prohibits voting laws that "handicap exercise of the franchise" on account of race because the Amendment "nullifies sophisticated as well as simple-minded modes of [racial] discrimination." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 184 (5th Cir. 2020) (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)).

210.    These amendments to Texas's Election Code, S.B. 1, violate the Fifteenth Amendment to the Constitution of the United States because Defendants intentionally enacted and administer, enforce, and implement the laws to deny, abridge, or suppress the right to vote to Plaintiffs and other of Texas's Black and Latino voters on account of race and ethnic origin.

### Count Four

Violation of the First and Fourteenth Amendments
U.S. Const. amend., I and XIV; 42 U.S.C §1983

(Undue Burden on the Right to Vote)

211.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-210, as if fully set forth herein.

212.   The provisions of S.B. 1 place an undue burden on the ability of the Plaintiffs, as well as Texas's Black and Latino voters more generally, to participate in elections and cast a ballot that will count, in violation of the First and Fourteenth Amendments.

213.   "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

214.   State election administration practices may not burden the right to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burden imposed.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (holding "[h]owever slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.") (citation omitted) (internal quotation marks omitted).  The more a challenged law burdens the right to vote, the more strictly it must be scrutinized.  Even slight burdens must be justified by valid state interests of sufficient weight. *Veasey v. Perry*, 71 F. Supp. 3d 627, 691 (S.D. Tex. 2014).

215. When a state election law severely burdens the right to vote or is discriminatory, a court must find that it is "narrowly drawn to advance a state interest of compelling importance" in order to survive constitutional muster. *Burdick*, 504 U.S. at 434 (citation omitted).

216. S.B. 1's provisions erect substantial burdens and barriers on Texas voters of color both through the law's individual restrictions, as well as collectively through the combined effect of all the restrictions and barriers created by the legislation.

217. S.B. 1's restrictions on the distribution of absentee ballot applications, by election officials and third parties, imposes a substantial burden on voters desiring to apply for and vote absentee that is not outweighed by any purported state interest.

218. S.B. 1's prohibition on voting drop boxes imposes a substantial burden on voters desiring to vote absentee that is not outweighed by any purported state interest.

219. S.B. 1's restrictions on early voting and drive-thru voting will make it harder for Black and Latino voters in Texas, who are more likely to not have flexible work schedules or the luxury to take time off, thereby imposing an unnecessary burden that is not outweighed by any purported State interest.

220. The burdens imposed by these provisions, individually and collectively, are serious and substantial, and will likely result in the disenfranchisement of voters of color.

221. The purported goals of these restrictions to ensure a secure election is pretextual at best. To the contrary, the restrictions of S.B. 1 harm the election process.

222. S.B. 1 undermines confidence in Texas elections, and does so at the expense of imposing undue burdens on Black and Latino voters.

223.    S.B. 1 imposes a substantial burden on the fundamental right to vote for Texas voters of color, and are neither justified by, nor necessary to promote, any legitimate interest put forward by the State that was not already adequately protected by preexisting election procedures.

224.    S.B. 1 irreparably harms Texas Black, Latino, and other voters of color.

225.    The challenged provisions of S.B. 1 collectively and individually impose severe and, at a minimum, significant burdens on eligible Texas voters' right to vote, including on Plaintiffs and members of Plaintiffs' organizations.

226.    None of the burdens imposed by the challenged provisions of S.B. 1 are necessary to achieve, let alone reasonably related to, any sufficiently weighty, legitimate state interest.  The burdens imposed by the challenged provisions of S.B. 1 accordingly lacks any constitutionally adequate justification and must be enjoined.

### Count Five

Violation of the Fourteenth Amendment
U.S. Const. Amend. XIV, 42 U.S.C §1983
(Void for Vagueness, Denial of Due Process)

227.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-226, as if fully set forth herein.

228.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the State of Texas from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. Amend. XIV, § 1.

229.    A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 590, 595 (2015). Vague laws that invite arbitrary enforcement also violate the

Due Process clause because "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis ..." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

230.    Sections 33.051, 33.056, and 33.061 of the Election Code, as amended by S.B. 1, are impermissibly vague because they fail to provide a person of ordinary intelligence with fair notice of what is prohibited and are so standardless that they authorize or encourage arbitrary enforcement.

231.    Section 33.051 of the Texas Election Code, as amended by S.B. 1, creates criminal penalties for an election official, including an election judge, who intentionally or knowingly refuses to accept a poll watcher for service whose acceptance is required by the Election Code. This new provision of law creates a criminal penalty; the statute specifies that a violation results in a Class A misdemeanor. Section 33.051 as amended by S.B. 1 is impermissibly vague because it does not provide an election official, including an election judge, with notice of whether they can knowingly refuse to accept a poll watcher for behavior elsewhere prohibited in the Texas Election Code.  Although this provision sets out a *mens rea* of intentionally or knowingly, the scienter requirement does not lessen the vagueness of Section 33.051, as amended, because other areas of the Texas Election Code provide reasons to exclude a poll watcher that could reasonably be interpreted as inconsistent with the broad language of this new provision.

232.    Section 33.056 of the Texas Election Code, amended by S.B. 1, sets out that a poll watcher may not be denied free movement within the location at which the poll watcher is serving. This provision of law is impermissibly vague because it does not give a person of ordinary intelligence fair notice of what conduct is prohibited.  Specifically, this provision of law does not define "free movement," nor does the Texas Election Code. S.B. 1's definition of a poll watcher's

right to "observe" as "sit[ting] or stand[ing] near enough to see and hear" the activity does not cure this vagueness problem because the definition of "observe" is subjective and depends on context. A poll watcher's unfettered "free movement" and ability to "see and hear" is required in the context of polling places and other vote counting locations, which are crowded and full of other election officials trying, and indeed often legally obligated, to carry out their duties. If, for example, an election official is required to stand in a particular location that a poll watcher seeks to occupy, is the election official required in all instances to move, to prevent a poll watcher from being denied free movement?

233. Moreover, this provision does not make clear how it relates to other sections of the Texas Election Code that prevent poll watchers from speaking directly to a voter or election official, or observing a voter's ballot. The Texas Election Code, Section 33.057 explains that "[a] watcher may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice." The Texas Election Code also specifies at section 33.058 that "[w]hile on duty, a watcher may not (1) converse with an election officer regarding the election … (2) converse with a voter; or (3) communicate in any manner with a voter regarding the election."

234. Section 33.061 of the Texas Election Code, also amended by S.B. 1, makes it a criminal offense for any election official, including an election judge, to take any action "to obstruct the view of a watcher or distance the watcher from the activity . . . in a manner that would make observation not reasonably effective."[136] An offense under this section of the Texas Election Code amended by S.B. 1 is a Class A misdemeanor. This section's text fails to define the conduct it prohibits with sufficient specificity to apprise an ordinary person of its requirements. For

---

[136] S.B. 1 § 4.09.

example, it is not clear from the text from whose perspective the "observation not reasonably effective" standard applies. The provision is also impermissibly vague because it is in conflict with other areas of the Texas Election Code, described above.  And by proscribing conduct that makes someone else's "observation not reasonably effective," Section 33.061, as amended by S.B. 1, is so standardless that it invites arbitrary and disparate enforcement by parties not entrusted with policymaking authority.

235.    Plaintiff Jeffrey Clemmons served as an election judge in the 2020 primary election in Texas, and would have continued to serve as an election judge in upcoming elections.  Plaintiff Clemmons is unable to ascertain whether his duties as an election judge, requiring him to take action where necessary to prevent poll watchers from speaking to voters, viewing voters' ballots, or otherwise being disorderly in the polling place, will require him to violate the Texas Election Code as amended by S.B. 1.

236.    Taken together, these provisions could expose Plaintiff Clemmons to criminal liability for taking action also required by the Texas Election Code in future elections.  Plaintiff Clemmons has been and will be discouraged from serving as an election judge in the future for fear that he may be subjected to arbitrary enforcement and criminal penalties under these new provisions of law.

237.    Implementation of S.B. 1 will irreparably harm Plaintiff Clemmons, and other individuals who have and will serve as public officials in elections in the State.

### Count Six

Violation of Section 208 of the Voting Rights Act
52 U.S.C. §10508
(Right to Assistor of Choice)

238. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-237, as if fully set forth herein.

239. Section 208 of the Voting Rights Act, 52 U.S.C. § 10508 provides that: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice other than the voter's employer or agent of that employer or officer or agent of the voter's union." The right to an assistor of choice when voting, under Section 208, "plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (quoting 52 U.S.C. §10310(c)(1)). Moreover, the only restrictions on who can act as an assistor are set forth in the plain text of Section 208: "[t]he assistor cannot be the voter's employer, an agent of the voter's employer, or an agent of the voter's labor union." *Id.* at 608.

240. S.B. 1, sections 6.01, 6.03, 6.04, 6.05, and 6.07, amending Texas Elec. Code §§ 64.009, 64.0322, 64.034, 86.010, 86.013, will prevent voters with disabilities from receiving assistance from a person of their choosing by requiring assistors to take several additional burdensome steps and subjecting them to criminal penalties.

## Count Seven

Against All Defendants
Title II of the Americans with Disabilities Act
(42 U.S.C. § 12131, et seq.)
(Discrimination on the basis of disability; Failure to Provide Reasonable Accommodations)

241. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-240, as if fully set forth herein.

242.     Voting is a fundamental right. Yet individuals with disabilities have historically been excluded from voting both de jure and de facto on the basis of their disability.  *See* U.S. Dep't of Justice, The Americans With Disabilities Act and Other Federal Laws Protecting the Rights of Voters With Disabilities 1, https://www.justice.gov/file/69411/download (last visited May 11, 2021).

243.     Congress enacted the ADA, 42 U.S.C. § 12101 et seq., to provide a clear and comprehensive mandate for the elimination of discrimination against people with disabilities and to provide strong and consistent standards for identifying and addressing such discrimination. 42 U.S.C. § 12101(b)(1) & (2).  "The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (internal citations omitted).

244.     The ADA is based on Congress's findings that, *inter alia*:

a.     "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2);

b.     "[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," 42 U.S.C. § 12101(a)(5); and

c.     "[D]iscrimination against individuals with disabilities persists in such critical areas as . . . voting." 42 U.S.C. § 12101(a)(3). *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("Voting is a quintessential public activity[,]"

and "[e]nsuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others helps ensure that those individuals are never relegated to a position of political powerlessness.") (citations omitted).

245. Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

246. The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The members and/or constituents of Plaintiffs' organizations include individuals with disabilities within the meaning of the ADA and are entitled to the protections of the ADA. These individuals have impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). These individuals are qualified for the programs, services, and activities being challenged herein in that they are registered voters or otherwise eligible to request and cast a ballot, in Texas elections, and are qualified to participate in Defendants' programs and activities related to voting. 42 U.S.C. § 12131(2).

247. Title II of the ADA applies to all services, programs, and activities of public entities, including voting. 42 U.S.C. § 12132. All state and local Defendants are public entities as defined by Title II of the ADA, and individual Defendants are the public officials responsible for running these public entities and supervising their operations and must comply with Title II of the ADA. 42 U.S.C. § 12131(1).

248.   The ADA directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and provide guidance on their content. 42 U.S.C. § 12134. The regulations that the Attorney General promulgated require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7). The regulations also specify that it is unlawful discrimination for a public entity to:

    a.    "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

    b.    "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

    c.    "[U]tilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii).

    d.    "[I]mpose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments." 28 C.F.R. § 35.130(b)(8).

249.   The ADA further states that it is unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of...or on account of his or her having

aided or encouraged any other individual in the exercise or enjoyment of" any right protected by the ADA. 42 U.S.C. § 12203.

250. Congress specifically authorized individuals who believe their Title II ADA rights are being violated to bring an action in a United States District Court. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

251. The challenged provisions of S.B. 1 collectively and individually discriminate against people with disabilities in exercising their right to vote, including on members and/or constituents of Plaintiffs' organizations. As described above:

a. S.B. 1 Section 5.02, in requiring specific identification numbers or a statement that the voter has not been issued such identification in order to apply for early voting, imposes eligibility criteria that tends to screen out people with disabilities and denies voters with disabilities equal access to the early voting ballot application process.

b. S.B. 1 Sections 6.01, 6.03 and 6.05, in requiring those assisting voters with disabilities to fill out onerous forms, subjecting assistors to criminal liability for submitting incorrect forms, and allowing poll watcher observations, interfere with the legal rights of voters with disabilities and those who assist them in exercising their rights and deny voters with disabilities equal access to voting.

c. S.B. 1 Section 6.04, in requiring those who assist voters to take an oath regarding the nature of their assistance under penalty of perjury, denies voters with disabilities equal access to voting by unlawfully limiting the scope of assistance the assistor can provide and interfering with the legal rights of voters with disabilities and those

who assist them in exercising their rights and deny voters with disabilities equal access to voting.

252. Through the acts and omissions described above, Defendants have discriminated against Plaintiffs on the basis of disability in violation of Title II of the ADA and its implementing regulations by:

    a.    (1) denying constituents of Plaintiffs with disabilities the opportunity to participate in and benefit from voting in a way that is equal to those afforded to those without disabilities;

    b.    (2) denying constituents of Plaintiffs with disabilities services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other voters;

    c.    (3) imposing eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying the state's voting program;

    d.    (4) failing to reasonably modify the state's voting system to provide the services the constituents of Plaintiffs with disabilities need to avoid discrimination;

    e.    (5) utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishments of the objectives of Defendants' voting programs with respects to the constituents of Plaintiffs with disabilities; and

    f.    (6) interfering with the ability of voters with disabilities and those who assist them to exercise their rights under the ADA

253. The relief sought by Plaintiffs would not require a fundamental alteration to Defendants' programs, services, or activities.

254.    Sections 64.009, 64.0322, 64.034, 86.010, 86.013 of the Texas Election Code, as amended by S.B. 1, discriminate against qualified Texas voters with disabilities in violation of Title II of the Americans with Disabilities Act of 1990.

255.    The acts and omissions of Defendants have caused and will continue to cause Plaintiffs irreparable harm.

### Count Eight

Against All Defendants
Section 504 of the Rehabilitation Act of 1973
29 U.S.C. § 794
(Discrimination on the Basis of Disability by Recipients of Federal Financial Assistance)

256.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-255, as if fully set forth herein.

257.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance.  29 U.S.C. § 794.  Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a).  A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

258.    Section 504 prohibits covered entities from imposing or applying eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying the benefits of the programs or activities of a covered entity.

259.    Section 504 also prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise

limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

260.    A covered entity is required by Section 504 to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

261.    An "individual with a disability" who is "otherwise qualified" is eligible for relief under Section 504. An individual with a disability is any person who has a disability as defined in § 12102 of the ADA, as described above. 29 U.S.C § 705.

262.    Defendants' programs, services, and activities receive Federal financial assistance. Accordingly, Defendants are subject to the nondiscrimination requirements of Section 504. The operations of Defendants are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B).

263.    Section 504 and the ADA are largely identical and courts interpret them in tandem. *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) ("The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance.").

264.    As described in Count Seven, constituents and members of Plaintiff organizations with disabilities are "otherwise qualified individuals with a disability." By reason of their disabilities, they are being excluded from participation in and being denied the benefits of voting that is equal to that afforded other voters, and they are subjected to discrimination by Defendants. Defendants are recipients of Federal financial assistance and thus are subject to the requirements of the Rehabilitation Act, 29 U.S.C. § 794. Defendants' actions and inactions constitute violations of Section 504. The challenged provisions of S.B. 1 collectively and individually discriminate

against people with disabilities in exercising their right to vote, including members and constituents of Plaintiffs' organizations, and constitute violations of Section 504

265.    Sections 64.009, 64.0322, 64.034, 86.010, 86.013 of the Texas Election Code, as amended by S.B. 1, deny qualified individuals with disabilities a full and equal opportunity to participate in the State's voting programs, in violation of Section 504.

266.    The acts and omissions of Defendants have caused and will continue to cause Plaintiffs irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

267.    Issue a judgment declaring that the Challenged Provisions are illegal and unconstitutional as described above, in violation of Sections 2 and 208 of the Voting Rights Act, 52 U.S.C. §§ 10301, 10508; the First, Fourteenth, and Fifteenth Amendments to the United States Constitution; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

268.    Enjoin Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from taking any action to enforce or implement the Challenged Provisions of S.B. 1.

269.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by Voting Rights Act, 52 U.S.C. § 10310(e), and the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988; the Americans with Disabilities Act, 42 U.S.C. § 12205; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a.

270.   Grant such other equitable and further relief as the Court deems just and proper, and as may be necessary to afford Plaintiffs the full relief to which they are entitled under the United States Constitution, the Voting Rights Act, and other applicable federal law.

Respectfully submitted September 7, 2021.

REED SMITH LLP & NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.

/s/ _____

Kenneth E. Broughton
Texas Bar No. 03087250
kbroughton@reedsmith.com

Lora Spencer
Texas Bar No. 24085597
lspencer@reedsmith.com

J. Keely Dulaney*
Texas Bar No. 24116306
kdulaney@reedsmith.com

Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899

Sarah M. Cummings
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
scummings@reedsmith.com

Natasha Merle
Texas Bar No. 24070263
Kathryn Sadasivan*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor

New York, NY 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
nmerle@naacpldf.org
ksadasivan@naacpldf.org


Georgina Yeomans*
Jennifer A. Holmes*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, 6th Floor
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
gyeomans@naacpldf.org
jholmes@naacpldf.org


Shira Wakschlag  *
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

*Pro Hac Vice Admission Pending*


*Counsel for Plaintiffs*