IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,

  Plaintiffs,

  v.

GREGORY W. ABBOTT, et al.,

  Defendants.

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

**STATEMENT OF INTEREST OF THE UNITED STATES**

## Table of Contents

Introduction ..................................................................................................................... 1

Procedural Background ..................................................................................................... 2

Legal Standard ................................................................................................................. 3

Statutory Background ....................................................................................................... 4

Argument .......................................................................................................................... 6

   I.   Private Plaintiffs May Enforce Section 2 of the Voting Rights Act. .................................. 6

   II.   Plaintiffs Have Alleged Plausible Discriminatory Intent Claims ................................ 10

      A.   State Defendants Fail to Apply *Arlington Heights*. ................................................. 11

      B.   Defendant Torres Fails to Engage with the Complete Allegations and Cannot Inject Factual Disputes in a Motion to Dismiss. ....................................... 12

   III.   The LUPE Plaintiffs Have Alleged a Plausible Section 2 Results Claim. ..................... 16

Conclusion ...................................................................................................................... 19

## Table of Authorities

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ................................................................. 14

*Alexander v. Sandoval*, 532 U.S. 275 (2001)............................................................ 10

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) ........................................ 7, 9, 12

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007) ......................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).......................................................... 3, 4, 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................ 17, 18

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)............................ passim

*Chisom v. Roemer*, 501 U.S. 380 (1991) ............................................................... 4, 5

*City of Mobile v. Bolden*, 446 U.S. 55 (1980).............................................................. 7

*Clingman v. Beaver*, 544 U.S. 581 (2005)................................................................ 18

*Conceal City, LLC v. Looper Law Enf't, LLC*, 917 F. Supp. 2d 611 (N.D. Tex. 2013).............. 18

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) .................................................... 4, 5

*Garza v. Cnty. of Los Angeles*, 918 F.2d 763 (9th Cir. 1990)...................................... 15

*Holder v. Hall*, 512 U.S. 874 (1994)........................................................................ 8

*Houston Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419 (1991) ........................................ 6

*Hunter v. Underwood*, 471 U.S. 222 (1985)............................................................... 5

*Keyes v. Sch. Dist. No. 1*, 413 U.S. 189 (1973) ....................................................... 14

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984) ............................... 15

*Lane v. Wilson*, 307 U.S. 268 (1939)...................................................................... 14

*Lorillard v. Pons*, 434 U.S. 575 (1978) .................................................................... 8

*LULAC v. Perry*, 548 U.S. 399 (2006) ...................................................................... 6

*McMillan v. Escambia Cnty.*, 748 F.2d 1037 (Former 5th Cir. 1984)...................... 4, 13

*Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195 (W.D. Tex. 2020) ............................... 9

*Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991) ............. 6

*Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999) ............................................................. 9

*Morse v. Republican Party of Va.*, 517 U.S. 186 (1996)............................................ 7, 9

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ............... passim

*Newman v. Piggie Park Enters.*, 390 U.S. 400 (1968) ................................................ 8

*Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348 (E.D. Va. 2009) .............................. 9

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997)........................................... 8, 13

*Rogers v. Lodge*, 458 U.S. 613 (1982).................................................................... 12

*Scanlan v. Tex. A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) ......................................... 3

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ......................................................... 4, 9

*Shelby Cnty. v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015).............................................. 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ......................... 3, 15

*Terrazas v. Clements*, 581 F. Supp. 1329 (N.D. Tex. 1984) (three-judge court) ............ 6

*Tex. All. for Retired Ams. v. Hughs*, 489 F. Supp. 3d 667 (S.D. Tex. 2020) ................. 9

*Tex. Dep't of Hous. & Cmty. Affairs. v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015).......................................................................................... 9

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ....................................................... 4, 6, 8, 18

*United States v. Bd. of Cnty. Comm'rs*, 184 F. Supp. 3d 1097 (D.N.M. 2015)............... 3

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc)................................... passim

*Veasey v. Perry*, 29 F. Supp. 3d 896 (S.D. Tex. 2014)............................................. 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .............. 5, 12, 13, 16

*WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208 (D. Or. 2019) ........................................ 3

*World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747
   (5th Cir. 2009) ........................................................................................................................... 3

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ................................................................................... 10

**Statutes**

28 U.S.C. § 517 ................................................................................................................................ 1

52 U.S.C. § 10101 ........................................................................................................................... 2

52 U.S.C. § 10301 ......................................................................................................... 1, 4, 5, 10

52 U.S.C. § 10302 ...................................................................................................................... 7, 10

52 U.S.C. § 10303 ........................................................................................................................... 4

52 U.S.C. § 10308 ........................................................................................................................... 1

52 U.S.C. § 10310 ...................................................................................................................... 4, 7

52 U.S.C. § 10508 ........................................................................................................................... 2

**Legislation**

Election Integrity Protection Act of 2021, S.B. 1, 87th Legis., 2d Spec. Sess.
   (Tex. 2021) ................................................................................................................................. 2

**Legislative History**

H.R. Rep. No. 109-478 (2006) ...................................................................................................... 15

H.R. Rep. No. 97-227 (1981) ................................................................................................... 8, 10

S. Rep. No. 94-295 (1975) .............................................................................................................. 7

S. Rep. No. 97-417 (1982) ....................................................................................................... 8, 10

**Federal Rules**

Fed. R. Civ. P. 12 .......................................................................................................................... 18

Fed. R. Civ. P. 8 ............................................................................................................................ 18

**INTRODUCTION**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." These consolidated cases present important questions regarding enforcement of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 (Section 2). Congress has vested the Attorney General with authority to enforce Section 2 on behalf of the United States. *See* 52 U.S.C. § 10308(d). Accordingly, the United States has a substantial interest in ensuring proper interpretation of this provision. The United States submits this Statement of Interest to address the availability of a private cause of action to enforce Section 2 and the allegations necessary to state discriminatory intent and discriminatory results claims.

Private plaintiffs may enforce Section 2, both as a statutory cause of action prohibiting intentional discrimination in voting and as a bar on voting practices that result in denial or abridgment of the right to vote on account of race or membership in a language minority group. The La Unión del Pueblo Entero (LUPE) Plaintiffs and Mi Familia Vota Plaintiffs have stated plausible claims of intentional discrimination. State Defendants' motion to dismiss sketches only a superficial analysis of intentional discrimination and fails to grapple with the full range of relevant allegations. Similarly, Defendant Torres cannot demand "evidence" at the pleadings stage or rebut allegations of intentional discrimination by mere speculation. The LUPE Plaintiffs have also stated a plausible Section 2 discriminatory results claim, and Defendant Torres's

motion provides no basis for dismissal.[1]  The United States expresses no view here on jurisdictional questions or the merits of any claim.[2]

## PROCEDURAL BACKGROUND

On September 1, 2021, Governor Greg Abbott signed Senate Bill 1 ("SB 1"), omnibus legislation that restricts eligible voters' ability to cast a ballot and have that ballot counted in various respects and also criminalizes several aspects of election administration.  *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Legis., 2d Spec. Sess. (Tex. 2021).  Five groups of private plaintiffs have since challenged the law in federal court, and those complaints have been consolidated before this Court.  *See* Order, ECF No. 31.[3]  Relevant here, four groups of private plaintiffs have brought intentional discrimination or discriminatory results claims under Section 2.  *See* LUPE Compl. ¶¶ 198-212; LULAC Compl. ¶¶ 243-262; HJ Compl. ¶¶ 175-210; MFV Compl. ¶¶ 105-119.  Those plaintiffs seek to enjoin numerous provisions of SB 1, including restrictions on voter assistance, ballot drop boxes, and 24-hour voting.  *See, e.g.*, HJ Compl. ¶¶ 183, 216-219.

---

[1] State Defendants do not address the merits of the racial discrimination claims advanced by the LUPE Plaintiffs, LULAC Plaintiffs, or Houston Justice Plaintiffs.  *See* Mot. to Dismiss LUPE; Mot. to Dismiss LULAC; Mot. to Dismiss HJ.  The remaining Defendants also do not challenge the substance of these claims.

[2] The United States has brought independent litigation to enforce Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101, with respect to SB 1.  *See* Compl., *United States v. Texas*, No. 5:21-cv-1085 (W.D. Tex. filed Nov. 4, 2021), ECF No. 1.  The United States will address those provisions in its own lawsuit.

[3] *See* LUPE Compl., ECF No. 1; OCA Compl., *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. Sept. 3, 2021), ECF No. 1; LULAC Compl., *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. Sept. 7, 2021), ECF No. 1; HJ Compl., *Houston Justice v. Abbott*, No. 5:21-cv-848 (W.D. Tex. Sept. 7, 2021), ECF No. 1; MFV Compl., *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. Sept. 27, 2021), ECF No. 1.

Governor Abbott and other state officials ("State Defendants") have moved to dismiss all five complaints filed by private plaintiffs.[4]  As relevant here, State Defendants argue that Section 2 does not create a private cause of action, *see, e.g.*, Mot. to Dismiss LUPE 27-29, and that the Mi Familia Vota Plaintiffs have not plausibly alleged intentional discrimination, *see* Mot. to Dismiss MFV 15-16.  Medina County Election Administrator Lupe Torres, named as a defendant in the LUPE Complaint, has also moved to dismiss the allegations against him, arguing in part that the LUPE Plaintiffs have not plausibly alleged intentional discrimination.  *See* Torres Mot. 6-11, ECF No. 68.[5]

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted); *see also Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (directing district courts to "accept all well-pleaded facts as true, viewing those facts most favorably to the plaintiff").  Consideration of information outside the face of the complaint is limited to "documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  So long as these materials allow a court

---

[4] *See* Mot. to Dismiss LUPE, ECF No. 53; Mot. to Dismiss LULAC, ECF No. 54; Mot. to Dismiss OCA, ECF No. 55; Mot. to Dismiss HJ, ECF No. 64; Mot. to Dismiss MFV, ECF No. 67.

[5]  The Foundation for Government Accountability also challenges the substance of Section 2 results claims brought by the Houston Justice Plaintiffs and Mi Familia Vota Plaintiffs.  *See* FGA Amicus 7-11, ECF No. 78-1.  However, an amicus cannot raise this issue in the first instance.  Rather, "[t]he role of amicus' briefing is to inform the Court and provide perspective on the issues the parties themselves raise."  *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1228 n.2 (D. Or. 2019); *see also, e.g.*, *United States v. Bd. of Cnty. Comm'rs*, 184 F. Supp. 3d 1097, 1117 (D.N.M. 2015) ("[A]n amicus may not introduce an issue into a case . . . that is not raised or requested by the parties."); *cf., e.g.*, *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 n.3 (5th Cir. 2009) ("It is well-settled in this circuit that an amicus curiae generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal." (internal citation and quotation marks omitted)).

to "draw the reasonable inference that the defendant is liable," the motion must be denied. *Iqbal*, 556 U.S. at 678.

**STATUTORY BACKGROUND**

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). Section 2(a) prohibits any state or political subdivision from imposing or applying a "voting qualification," a "prerequisite to voting," or a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 52 U.S.C. § 10301(a); *see also* 52 U.S.C. § 10303(f)(2) (applying protections to language minority groups). For purposes of the Act, "vote" and "voting" include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast." 52 U.S.C. § 10310(c)(1). Thus, "Section 2 prohibits all forms of voting discrimination," including practices that impair the ability of minority voters to cast a ballot and have it counted on an equal basis with other voters. *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 (2021).

Like the Fourteenth and Fifteenth Amendments, Section 2 prohibits voting laws and practices adopted with a discriminatory purpose. *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991); *see also Brnovich*, 141 S. Ct. at 2330. Thus, a showing of intent "sufficient to constitute a violation of the [F]ourteenth [A]mendment" also suffices "to constitute a violation of [S]ection 2." *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984); *see also Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020). Section 2 purpose claims also rely on the

assessment of "circumstantial and direct evidence of intent" relevant to constitutional cases. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977); *see also, e.g.*, *Brnovich*, 141 S. Ct. at 2349 (applying *Arlington Heights*); *Veasey v. Abbott* (*Veasey II*), 830 F.3d 216, 229-30 (5th Cir. 2016) (en banc).  Categories of relevant evidence regarding the purpose of a challenged practice include (1) the impact of the decision; (2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; (3) the sequence of events leading up to the decision; (4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and (5) contemporaneous statements and viewpoints held by decisionmakers.  *See Arlington Heights*, 429 U.S. at 266-68; *Fusilier*, 963 F.3d at 463; *Veasey II*, 830 F.3d at 230-31.  "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

But a violation of Section 2 can also "be established by proof of discriminatory results alone." *Chisom*, 501 U.S. at 404; *see also Veasey II*, 830 F.3d at 243.  Section 2(b) lays out the standard for a "results" claim.  A violation "is established if, based on the totality of circumstances, . . . the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).  The essence of a results claim "'is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities' of minority and non-minority voters to elect their preferred representatives.'" *Brnovich*, 141 S. Ct.

at 2333 (quoting *Gingles*, 478 U.S. at 47).  Section 2 results claims focus on whether voting in a jurisdiction is "equally open," in that it provides an "equal opportunity" for all eligible citizens to participate.  *Id.* at 2336-38.  Courts must consider the totality of circumstances, including "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity.'"  *Id.*  Openness denotes elections "without restrictions as to who may participate" or "requiring no special status, identification, or permit for entry or participation," *id.* at 2337 (internal citations and quotation marks omitted), and use of the term "equal opportunity" indicates that this analysis "include[s] consideration of a person's ability to *use* the means that are equally open," *id.* at 2338.  Section 2 results claims may address a combination of challenged practices, *see Gingles*, 478 U.S. at 45 (considering "practices or procedures that tend to enhance the opportunity for discrimination" in a challenge to multimember districts); *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 409 (5th Cir. 1991), and must consider a jurisdiction's "entire system of voting," *Brnovich*, 141 S. Ct. at 2339.

**ARGUMENT**

## I.     Private Plaintiffs May Enforce Section 2 of the Voting Rights Act.

Section 2 of the Voting Rights Act provides a private right of action.  Throughout decades of Section 2 litigation challenging Texas redistricting plans and voting restrictions, courts have never denied a private plaintiff the ability to bring Section 2 claims.  *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399 (2006); *Houston Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419 (1991); *Veasey II*, 830 F.3d at 216; *Terrazas v. Clements*, 581 F. Supp. 1329 (N.D. Tex. 1984) (three-judge court).  And for good reason.  "[T]he existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965," and the Supreme Court, in turn, has "entertained cases brought by private litigants to enforce § 2."  *Morse v. Republican Party of*

*Va.*, 517 U.S. 186, 232 (1996) (internal citations and quotation marks omitted); *see also*

*Brnovich*, 141 S. Ct. at 2333 & n.5 (collecting the "steady stream" of private Section 2 cases

heard by the Court).  In fact, the Supreme Court held that a private cause of action exists to

enforce Section 10 of the Voting Rights Act in part because "[i]t would be anomalous . . . to hold

that both § 2 and § 5 are enforceable by private action but § 10 is not."  *Morse*, 517 U.S. at 232;

*see also Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969) (holding that an "individual

citizen" may bring suit "to insure that his city or county government complies with" Section 5).

Thus, although the Supreme Court has not addressed an express challenge to private Section 2

enforcement, the Court's precedent permits no other holding.  *See also Morse*, 517 U.S. at 232-

33 (establishing that voters may bring litigation to secure "a right" guaranteed by the Act).

To be sure, the Voting Rights Act does not expressly provide for private enforcement of

Section 2.  But the structure of the Act makes clear that private plaintiffs may secure their own

rights.  For example, Section 3 provides for certain remedies in actions brought by "the Attorney

General *or an aggrieved person* . . . under any statute to enforce the voting guarantees of the

fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a), (c) (emphasis added); *see also* S.

Rep. No. 94-295, at 40 (1975) ("An 'aggrieved person' . . . may be an individual or an

organization representing the interests of injured persons.").  It would be passing strange for

Section 3 to provide a remedy for aggrieved persons to enforce the voting guarantees of the

Reconstruction Amendments if such persons could not bring enforcement actions under Section

2, whose original language "elaborates upon that of the Fifteenth Amendment."  *City of Mobile*

*v. Bolden*, 446 U.S. 55, 60 (1980).  Similarly, Section 14(e) allows for "the prevailing party,

*other than the United States*" to seek attorney's fees "[i]n any action or proceeding to enforce the

voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. § 10310(e) (emphasis

added).  The availability of fees presupposes that a private cause of action is available to enforce

the core provisions of the Voting Rights Act, including Section 2.  *See Shelby Cnty. v. Lynch*,

799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the

[Voting Rights Act] . . . when prevailing parties helped secure compliance with the statute."); *see*

*also Newman v. Piggie Park Enters.*, 390 U.S. 400, 401 (1968) ("Congress therefore enacted the

provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek

judicial relief.").

Legislative history confirms the existence of a private cause of action to enforce Section

2.  The Report of the Senate Judiciary Committee accompanying the 1982 Voting Rights Act

Amendments expressly "reiterate[s] the existence of the private right of action under Section 2,

as has been clearly intended by Congress since 1965."  S. Rep. No. 97-417, at 30 (1982).  The

Senate Report is the "authoritative source for legislative intent" behind Section 2 of the Voting

Rights Act, as amended, *Gingles*, 478 U.S. at 43 & n.7, and the Supreme Court routinely relies

on this "oft-cited Report," *Brnovich*, 141 S. Ct. at 2332-33.  *See also, e.g.*, *Reno v. Bossier*

*Parish Sch. Bd.*, 520 U.S. 471, 476-77, 479 (1997); *Holder v. Hall*, 512 U.S. 874, 884 (1994);

*Gingles*, 478 U.S. at 43-46, 48, 55-56, 62-63, 65-66, 69, 71, 73, 75, 79.  The House Committee

Report accompanying the 1982 Amendments similarly recognizes the existence of a private

cause of action under Section 2.  H.R. Rep. No. 97-227, at 32 (1981); *see also, e.g.*, *Brnovich*,

141 S. Ct. at 2332 (relying on the 1981 House Report).

These statements of congressional intent not only stand on their own, but also must be

understood taking into account the Supreme Court's guidance that "Congress is presumed to be

aware of an administrative or judicial interpretation of a statute and to adopt that interpretation

when it re-enacts a statute without change."  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  There

is no case before (or after) 1982 denying private plaintiffs a right of action under Section 2, and when Congress amended the Voting Rights Act in 1982 it is presumed to have been "aware of this unanimous precedent." *Tex. Dep't of Hous. & Cmty. Affairs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015). And, thus, it was "with that understanding [that Congress] made a considered judgment to retain the relevant statutory text." *Id.*

The limited federal resources available for Voting Rights Act enforcement reinforce the need for a private cause of action. As the Supreme Court has noted, "[t]he Attorney General has a limited staff" who may not always be able "to uncover quickly new regulations and enactments passed at the varying levels of state government." *Allen*, 393 U.S. at 556. This is particularly true now that the formula in Section 4(b) of the Voting Rights Act "can no longer be used as a basis" for requiring states and local jurisdictions to submit voting changes for preclearance. *Shelby Cnty.*, 570 U.S. at 557. Thus, "[t]he achievement of the Act's laudable goal [would] be severely hampered, . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Allen*, 393 U.S. at 556; *see also Morse*, 517 U.S. at 231-32 (attaching "significance to the fact that the Attorney General had urged us to find that private litigants may enforce the Act").

Texas cites no cases concluding that Section 2 lacks a private cause of action. And it fails to acknowledge that another judge of this Court recently declared that this argument "has no merit." *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 223 (W.D. Tex. 2020).[6] Instead, Texas

---

[6] For the last 25 years, other courts have unanimously reached this same conclusion. *See, e.g.*, *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999); *Tex. All. for Retired Ams. v. Hughs*, 489 F. Supp. 3d 667, 689 n.4 (S.D. Tex. 2020); *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009). Although Justice Gorsuch recently suggested that "[l]ower courts have treated this as an open question," his concurring opinion relied solely on a case from 1981 and did not account for the clarity of Congressional intent following the 1982 Voting Rights Act Amendments. *Brnovich*, 141 S. Ct. at 2350 (citing *Washington v. Finlay*, 664 F.2d 913, 926 (4th Cir. 1981)).

trains a myopic eye on the text of Section 2, while ignoring the structure of the statute as a whole, the broader enforcement provisions of the Voting Rights Act, and authoritative sources of Congressional intent.  *E.g.*, Mot. to Dismiss LUPE 28.  It is of course true that Section 2 establishes prohibitions on official racial discrimination in voting.  *See* 52 U.S.C. § 10301.  But as described above, other provisions of the Voting Rights Act establish rights and remedies to eliminate such discrimination.  Moreover, contrary to the State's claim, *e.g.*, Mot. to Dismiss LUPE 28, the Voting Rights Act creates private remedies for any "aggrieved person," not merely for the federal government, 52 U.S.C. § 10302(a), (c).  Finally, *Alexander v. Sandoval*, 532 U.S. 275 (2001), and its progeny do not neatly eliminate implied causes of action.  *But see* Mot. to Dismiss LUPE 24-25, 28-29.  *Sandoval* acknowledges that the Supreme Court has "sworn off the habit of venturing beyond Congress's intent" and indicates that the "search for Congress's intent" may begin with statutory "text and structure," 532 U.S. at 287-88, but the decision does not require this Court to ignore Congress's stated intent entirely.  *See also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (rejecting abstract inquiries concerning the best means to effectuate legislative purpose).  With respect to Section 2, Congressional intent is clear.  "It is intended that citizens have a private cause of action to enforce their rights under Section 2."  H.R. Rep. No. 97-227, at 30; *see also* S. Rep. No. 97-417, at 30.  And that intent is reflected by the Voting Rights Act's text and structure.

## II.     Plaintiffs Have Alleged Plausible Discriminatory Intent Claims.

The Mi Familia Vota Plaintiffs and LUPE Plaintiffs plausibly allege intentional discrimination under the *Arlington Heights* framework.  The Mi Familia Vota Complaint, proceeding under the Constitution and the Voting Rights Act, contains sufficient allegations to plead discriminatory intent.  *See* MFV Compl. ¶¶ 2-3, 6-8, 29-40, 42-44, 47-48, 51, 53-55, 75-

76, 79-85.  The LUPE Complaint, proceeding under the Fourteenth and Fifteenth Amendments, is likewise adequate to raise a plausible claim that Texas enacted SB 1, at least in part, because it would have adverse effects on minority voters.  *See* LUPE Compl. ¶¶ 2-4, 30-65, 67-79, 88, 93, 109, 113-116, 118, 122-126.  State Defendants fail to address the relevant legal framework, and Defendant Torres improperly challenges the relevance and veracity of *Arlington Heights* allegations.  Their motions should be denied with respect to the sufficiency of the intent claims.

### A.      State Defendants Fail to Apply *Arlington Heights*.

The Mi Familia Plaintiffs plausibly allege that SB 1 "was adopted for the purpose of denying non-Anglo voters—including Latino, Black, and other voters of color—full and equal access to the political process."  MFV Compl. ¶ 109; *see also* MFV Compl. ¶¶ 3, 41.  Their pleadings properly lay out allegations under the *Arlington Heights* framework, *see* MFV Compl. ¶¶ 3, 43-44, 47, 51, 54-55, 75-76 (foreseeable impact); MFV Compl. ¶¶ 2-3, 6-8, 29-40, 47-48 (background); MFV Compl. ¶¶ 53-55, 79-85 (sequence of events); MFV Compl. ¶¶ 42, 79, 81-82 (contemporaneous statements), that together yield a plausible claim that SB 1 has a discriminatory purpose and therefore violates Section 2 and the Fourteenth and Fifteenth Amendments, *see Veasey II*, 830 F.3d at 234-43.  *See also, e.g.*, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223-33 (4th Cir. 2016).

State Defendants' truncated intent analysis simply ignores *Arlington Heights*.  Rather, State Defendants argue that Mi Familia Vota Plaintiffs' intent claim fails because SB 1 applies "equally to everyone" and that Plaintiffs have not alleged "that anyone will enforce this facially neutral statute in a discriminatory way."  Mot. to Dismiss MFV 15 (citing *Washington v. Davis*, 426 U.S. 229, 241 (1976)).  It is true that SB 1 does not single out minority groups by name and that Plaintiffs have not alleged that election administrators will selectively apply SB 1, but these points are also largely irrelevant.  A law may have a discriminatory purpose "even when the

governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266.

Therefore, prohibitions on discrimination in voting must take aim "at the subtle, as well as the

obvious," *Allen*, 393 U.S. at 565, and "discriminatory intent need not be proved by direct

evidence," *Rogers v. Lodge*, 458 U.S. 613, 618 (1982).  Rather, courts must engage in a

"sensitive inquiry into such circumstantial and direct evidence of intent as may be available."

*Veasey II*, 830 F.3d at 230-31, 235.  So too must litigants grapple with the totality of relevant

allegations.  State Defendants have not.  *See* Mot. to Dismiss MFV 16 (addressing only a single

paragraph summarizing a cause of action); *see also* FGA Amicus 5-7 (failing to engage with

supporting allegations).  Because State Defendants do not challenge the adequacy of the Mi

Familia Vota Plaintiffs' complete allegations under the correct legal framework, their motion to

dismiss should be denied in relevant part.

> ### B.     Defendant Torres Fails to Engage with the Complete Allegations and Cannot Inject Factual Disputes in a Motion to Dismiss.

The LUPE Plaintiffs also allege that a purpose of SB 1 "is to make it harder for citizens

of color . . . to cast their votes."  LUPE Compl. ¶ 66; *see also* LUPE Compl. ¶¶ 5, 201-202, 207-

208.  Their pleadings address several categories of evidence under the *Arlington Heights*

framework.  *See* LUPE Compl. ¶¶ 2, 4, 68-79, 88, 93, 109, 113-116, 118, 122-126 (foreseeable

impact); LUPE Compl. ¶¶ 30-41 (background); LUPE Compl. ¶¶ 3, 40-58 (sequence of events);

LUPE Compl. ¶¶ 59-65 (procedural departures); LUPE Compl. ¶¶ 3, 55-56, 67

(contemporaneous statements).  Once again, these allegations together yield a plausible claim

that SB 1 has a discriminatory purpose and therefore violates the Fourteenth and Fifteenth

Amendments.  *See Veasey II*, 830 F.3d at 234-243.

Although Defendant Torres's motion to dismiss the LUPE Complaint recites the

appropriate framework, *see* Torres Mot. 7, his subsequent analysis misapplies *Arlington Heights*

and improperly demands "evidence" at the motion to dismiss phase.  Contrary to his argument,

Torres Mot. 8-11, *Arlington Heights* does not provide a list of elements subject to specific

pleading requirements.  Rather, *Arlington Heights* offers a non-exhaustive list of "subjects of

proper inquiry in determining whether racially discriminatory intent existed." 429 U.S. at 268.

In a motion to dismiss, Torres may not dispute "the truth or significance" of *Arlington Heights*

allegations or "their weight with respect to the policy behind" SB 1.  *Veasey v. Perry* (*Veasey I*),

29 F. Supp. 3d 896, 921 (S.D. Tex. 2014).

     With respect to the impact of SB 1, Defendant Torres contends that the LUPE Plaintiffs

"do not provide any facts to show that SB 1 has or will have racially discriminatory impact," but

Torres fails to assess the relevant allegations.  Torres Mot. 8.  For instance, the LUPE Plaintiffs

have alleged that SB 1 prohibits or undermines "important accommodations that local officials in

large, diverse counties adopted to ensure safe, secure voting during the 2020 Election."  LUPE

Compl. ¶ 94.  Similarly, the LUPE Plaintiffs have alleged that provisions expanding poll watcher

access and restricting election officials' authority vis-à-vis poll watchers will "have a chilling

and intimidating effect on Texas voters, particularly voters in historically marginalized groups."

LUPE Compl. ¶ 88; *see also, e.g.*, LUPE Compl. ¶ 68 (impact of voter assistance restrictions).

These allegations matter because "people usually intend the natural consequences of their

actions." *Bossier Parish*, 520 U.S. at 487.  The LUPE Plaintiffs' complaint sufficiently supports

"normal inferences to be drawn from the foreseeability" of alleged racial impacts.  *McMillan*,

748 F.2d at 1047 (quoting S. Rep. No. 97- 417, at 27 n.108).  That is all that is required at this

stage.

     Torres also improperly restricts the relevant "historical background" to Texas's history of

enacting bills "like SB 1."  Torres Mot. 8.  Under *Arlington Heights*, however, any "series of

13

official actions taken for invidious purposes" lends credence to allegations that a new enactment intentionally harms minority voters as well.  429 U.S. at 267; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (recognizing the validity of this "evidentiary source").  In other words, history matters because "the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 207 (1973).[7]  To be sure, "the most relevant 'historical' evidence is relatively recent history, not long-past history."  *Veasey II*, 830 F.3d at 232. Nonetheless, Texas has both an extensive and recent history of attempting to justify discriminatory voting laws based on a purported need "to prevent voter fraud."  *Veasey II*, 830 F.3d at 237; *see also* LUPE Compl. ¶¶ 31-38.  This buttresses allegations that pretextual justifications for SB 1 masked an alternative, invidious intent.  *See* LUPE Compl. ¶¶ 3, 56-58, 66-67, 96, 112, 196-197.

Torres again discards logical inferences from the relevant allegations when claiming that the alleged sequence of events leading to the passage of SB 1 cannot provide a "*reason* why the Legislature would seek to reverse" gains in minority turnout.  Torres Mot. 9 (emphasis in original).  The LUPE Plaintiffs have alleged that "SB 1 is a reaction to Texas's changing electorate," LUPE Compl. ¶ 4, and a "demographic shift" provides "support" for a discriminatory purpose finding because it may threaten the electoral fortunes of incumbents, particularly in the presence of racially polarized voting.  *Veasey II*, 830 F.3d at 241 & n.30; *see also McCrory*, 831 F.3d at 222 ("Racially polarized voting is not, in and of itself, evidence of

---

[7] Laws that are not discriminatory on their face may also deliberately build on historical discrimination. *See, e.g.*, *Lane v. Wilson*, 307 U.S. 268, 275-77 (1939) (striking down registration law that perpetuated the impact of a "grandfather clause," which had benefited descendants of individuals eligible to vote before ratification of the Fifteenth Amendment); *see also Veasey II*, 830 F.3d at 232 ("[H]istory provides context and . . . historical discrimination (for example, in education) can have effects for many years.").

racial discrimination.  But it does provide an incentive for intentional discrimination in the regulation of elections."); H.R. Rep. No. 109-478, at 35 (2006) ("The potential for discrimination in environments characterized by racially polarized voting is great.").  "[R]acially polarized voting exists throughout Texas." *Veasey II*, 830 F.3d at 258.  Moreover, Torres cannot rebut allegations regarding the pretextual nature of a legislative emergency concerning "election integrity," LUPE Compl. ¶¶ 55-58, by declaring that "[o]bviously, the legislature felt differently," Torres Mot. 9.  *See also* FGA Amicus 7 (suggesting that a statutory statement of purpose defines the full scope of legislative intent).  Even explicit legislative findings cannot rebut allegations at the motion to dismiss stage.  *See Tellabs, Inc.*, 551 U.S. at 322; *Korematsu v. United States*, 584 F. Supp. 1406, 1414-16 (N.D. Cal. 1984).

Furthermore, despite Torres's suggestion, the LUPE Plaintiffs are not required to also prove "why" the Legislature would act with a discriminatory purpose.  Torres Mot. 9.  "'[R]acial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey II*, 830 F.3d at 230 (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)).  There is no further requirement to prove "animus . . . dislike, mistrust, hatred, or bigotry." *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part).  As the Fifth Circuit has declared, "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory." *Veasey II*, 830 F.3d at 241 n.30; *see also McCrory*, 831 F.3d at 222 ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose.").

Torres also improperly tries to constrain the analysis of procedural deviations under *Arlington Heights* by suggesting that any bill introduced, debated, and passed is fully within "the

normal legislative process." Torres Mot. 9-10; *see also* FGA Amicus 6. Not so. A "legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228. Departure "from usual procedures in its consideration or enactment of the bill" may support a discriminatory purpose claim. *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir. 2007). The LUPE Plaintiffs have alleged that the Texas Senate passed the complex bill on a highly expedited schedule, that the Texas House was inconsistent with respect to permitting remote testimony, and that the House convened a "Select Committee" to hear a bill that would normally fall within the jurisdiction of the Elections Committee. LUPE Compl. ¶¶ 59-65. These allegations support a discriminatory intent claim.

Finally, Torres's response to the contemporaneous statements of state actors included in the LUPE Plaintiffs' complaint is mere sleight-of-hand. Torres attempts to sidestep these allegations by emphasizing state officials' ostensible intent to combat fraud that was purportedly unaddressed by Texas law prior to SB 1—itself an issue of factual dispute. Torres Mot. 10-11. The crux of the allegation that the "Texas Secretary of State's office reassured the public that Texas had a 'smooth and secure' election in 2020," LUPE Compl. ¶ 55, is that Texas's purported "voter fraud" rationale was pretextual or incomplete. Torres cannot overcome that allegation on a motion to dismiss merely by reasserting the alleged pretext. Moreover, under *Arlington Heights*, individual allegations cannot be "insufficient," Torres Mot. 10, because they establish a cumulative basis to state an intentional discrimination claim, *see* 429 U.S. at 266. The LUPE Plaintiffs have met this burden for purposes of a motion to dismiss.

### III.    The LUPE Plaintiffs Have Alleged a Plausible Section 2 Results Claim.

The LUPE Plaintiffs also plausibly allege that SB 1 violates Section 2 because the results of "the burdens and restrictions of SB 1 on voters individually—and even more so collectively—

abridge the opportunity of minority voters to participate in the political process and to exercise

their right to vote." LUPE Compl. ¶ 211-212. Specifically, their Complaint alleges several ways

that SB 1 disproportionately burdens minority voters and links these burdens to "'social and

historical conditions to cause an inequality in the opportunities' of minority and non-minority

voters." *Brnovich*, 141 S. Ct. at 2333 (quoting *Gingles*, 478 U.S. at 47). For example, the LUPE

Plaintiffs allege that Asian-American and Latino voters, including voters with limited English

proficiency, will be disproportionately harmed by SB 1's voter assistance provisions, *see* LUPE

Compl. ¶¶ 68-69, 109, and that provisions affecting voters with disabilities will

disproportionately impact African-American voters, *see* LUPE Compl. ¶ 70. The LUPE

Plaintiffs also allege that SB 1's poll-watching provisions, LUPE Compl. ¶¶ 82, 88, 93, criminal

provisions regarding voter registration, LUPE Compl. ¶¶ 113-114, and procedures for purging

voters from the rolls, LUPE Compl. ¶ 116, will impinge on the opportunity for minority citizens

to cast a vote. In total, the LUPE Plaintiffs assert that challenged provisions of SB 1, viewed

together, shift Texas's election rules so that the "combination of circumstances" are no longer

equally "favorable for a particular activity"—casting a ballot that will be counted. *Brnovich*, 141

S. Ct. at 2338. These allegations state a Section 2 results claim.

Defendant Torres does not meaningfully engage with these allegations. Instead, he

suggests that the LUPE Complaint does "not present sufficient information to allow Defendants

to reasonably respond" to the Section 2 results claim. Torres Mot. 11. This is wrong twice over.

First, Defendant Torres's cursory argument offers no reason why Plaintiffs' allegations are not

clear enough to allow him to respond. Plaintiffs' plausible allegations have given Defendants

"fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) (ellipses in original) (internal citation omitted). Rule 8

requires nothing more.  *See* Fed. R. Civ. P. 8(a)(2); *see also Iqbal*, 556 U.S. at 677-78.  And

second, Defendant Torres's claim that he does not know "which burdens and restrictions are at

issue," Torres Mot. 11, ignores the gravamen of the LUPE Complaint: that the challenged

provisions of SB 1 "collectively" abridge the rights of minority voters, LUPE Compl. ¶ 212; *see

also McCrory*, 831 F.3d at 214 (requiring consideration of a complete set of challenged

restrictions to avoid "miss[ing] the forest in carefully surveying the many trees").  As Justice

O'Connor once explained, "[a] panoply of regulations, each apparently defensible when

considered alone, may nevertheless have the combined effect of severely restricting participation

and competition." *Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring).

A fair reading of the LUPE Plaintiffs' allegations is that the burdens SB 1 imposes on minority

voters are compounding, resulting in an overall abridgment of their right to vote on account of

race.  *See Brnovich*, 141 S. Ct. at 2339; *Gingles*, 478 U.S. at 45.  Torres provides neither a basis

for dismissal nor for his alternative request for a more definite statement.  *See* Fed. R. Civ. P.

12(e) (allowing orders for a more definite statement only when a complaint "is so vague or

ambiguous that the party cannot reasonably prepare a response"); *see also, e.g.*, *Conceal City,

LLC v. Looper Law Enf't, LLC*, 917 F. Supp. 2d 611, 621 (N.D. Tex. 2013) ("Motions for a more

definite statement are generally disfavored." (internal citation and quotation marks omitted)).[8]

---

[8] The Foundation for Government Accountability similarly fails to engage with the entirely of the LUPE
Plaintiffs' complaint and provides no basis to dismiss their Section 2 results claim.  FGA Amicus 7-11.
Rather, the Foundation disputes whether the burdens imposed by SB 1 are "nothing more than the usual
burdens of voting" and whether "legitimate state interests justify" each of those burdens.  FGA Amicus
10.  These weighty factual issues cannot be resolved on a motion to dismiss.  *See, e.g.*, *Twombly*, 550
U.S. at 555.  In any event, Defendants have not sought dismissal of the LUPE Plaintiffs' Section 2 results
claim for failing to meet the *Brnovich* standard, and so an amicus cannot independently raise this issue.
*See supra* n.5.

**CONCLUSION**

Private plaintiffs have a cause of action under Section 2 of the Voting Rights Act. The

LUPE Plaintiffs and Mi Familia Vota Plaintiffs have also pleaded serious allegations against SB

1, sufficient to state plausible claims of intentional discrimination. LUPE Plaintiffs have also

alleged a plausible Section 2 results claim. For the reasons set out above, Defendants' motions

to dismiss should be denied with respect to these issues and claims.

Date: November 4, 2021

<div style="margin-left:40%">

KRISTEN CLARKE
Assistant Attorney General

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division


*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
DANA PAIKOWSKY
MICHAEL E. STEWART
JENNIFER YUN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
daniel.freeman@usdoj.gov

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2021, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-4355
daniel.freeman@usdoj.gov