### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | Consolidated Case No. 5:21-cv-844-XR |
| v. | § | |
| | § | |
| GREGORY W. ABBOTT, *et al.*, | § | |
| *Defendants*. | § | |

## Documents Produced with State Defendants' Initial Disclosures
## November 5, 2021


## Copy Filed with the Court November 15, 2021 (ECF 112)

## Senate Bill 1
## Legislative Session: 87
## Second Special Session

## Part VII

Date: November 15, 2021                    Respectfully submitted.

KEN PAXTON                                 /s/ Patrick K. Sweeten
Attorney General of Texas                  PATRICK K. SWEETEN
                                           Deputy Attorney General for Special Litigation
BRENT WEBSTER                              patrick.sweeten@oag.texas.gov
First Assistant Attorney General           Tex. State Bar No. 00798537

                                           WILLIAM T. THOMPSON
OFFICE OF THE ATTORNEY GENERAL             Deputy Chief, Special Litigation Unit
P.O. Box 12548 (MC-009)                    will.thompson@oag.texas.gov
Austin, Texas 78711-2548                   Tex. State Bar No. 24088531
Tel.: (512) 463-2100
Fax: (512) 457-4410                        ERIC A. HUDSON
                                           Senior Special Counsel
                                           eric.hudson@oag.texas.gov
                                           Tex. Bar No. 24059977

                                           KATHLEEN T. HUNKER
                                           Special Counsel
                                           kathleen.hunker@oag.texas.gov
                                           Tex. State Bar No. 24118415
                                           *Application for Admission Pending

                                           LEIF A. OLSON
                                           Special Counsel
                                           leif.olson@oag.texas.gov
                                           Tex. State Bar No. 24032801

                                           JEFFREY M. WHITE
                                           Special Counsel
                                           jeff.white@oag.texas.gov
                                           Tex. State Bar No. 24064380

                                           **COUNSEL FOR DEFENDANTS**


**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 15, 2021, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN

S.B.  No.  1

1   (e)  A registrar  shall  correct  a violation  within  30 days  of

2   a notice  under  Subsection  (b).  If a registrar  fails  to correct  the

3   violation  within  30 days  of a notice  under  Subsection  (b), the

4   secretary  of state  shall:

5   (1)  correct  the violation  on behalf  of the registrar;

6   and

7   (2)  notify  the attorney  general  that  the registrar

8   failed  to correct  a violation  under  this  subsection.

9   (f)  A county  served  by a registrar  who fails  to correct  a

10  violation  under  Subsection  (e) is liable  to this  state  for a civil

11  penalty  of $1,000  for each  violation  corrected  by the secretary  of

12  state  under  that  subsection.  The attorney  general  may bring  an

13  action  to recover  a civil  penalty  imposed  under  this  section.

14  (g)  A civil  penalty  collected  by the attorney  general  under

15  this  section  shall  be deposited  in the state  treasury  to the credit

16  of the general  revenue  fund.

17  SECTION  7.02.  Subchapter  E, Chapter  31, Election  Code,  is

18  amended  by adding  Sections  31.128  and 31.129  to read  as follows:

19  Sec.  31.128.  RESTRICTION  ON  ELIGIBILITY.  (a)  In this

20  section,  "election  official"  means:

21  (1)  a county  clerk;

22  (2)  a permanent  or temporary  deputy  county  clerk;

23  (3)  an elections  administrator;

24  (4)  a permanent  or temporary  employee  of an elections

25  administrator;

26  (5)  an election  judge;

27  (6)  an alternate  election  judge;

S.B.   No.   1

1          (7)   an early  voting  clerk;

2          (8)   a deputy  early  voting  clerk;

3          (9)   an election   clerk;

4          (10)  the presiding   judge  of an  early  voting  ballot

5  board;

6          (11)  the alternate   presiding   judge  of an  early  voting

7  ballot   board;

8          (12)  a member  of an early  voting  ballot  board;

9          (13)  the chair  of a signature   verification   committee;

10         (14)  the  vice   chair  of  a  signature   verification

11  committee;

12         (15)  a member  of a signature   verification   committee;

13         (16)  the  presiding   judge  of  a  central   counting

14  station;

15         (17)  the  alternate   presiding   judge  of  a  central

16  counting   station;

17         (18)  a central   counting   station   manager;

18         (19)  a central   counting   station   clerk;

19         (20)  a tabulation   supervisor;   and

20         (21)  an assistant   to a tabulation   supervisor.

21    (b)   A person   may  not  serve  as an election   official   if  the

22  person  has been finally   convicted   of an offense   under  this  code.

23    Sec.  31.129.   CIVIL  PENALTY.   (a)   In this  section,   "election

24  official"  has the meaning   assigned   by Section   31.128.

25    (b)   An election   official   may  be liable  to this  state  for  a

26  civil   penalty  if the official:

27         (1)   is employed   by or is an officer   of this  state  or a

S.B.   No.   1

1   political   subdivision   of this state;   and

2          (2)   violates   a provision   of this  code.

3       (c)   A civil  penalty   imposed   under   this  section   may  include

4   termination   of   the  person 's employment   and  loss   of  the  person 's

5   employment   benefits.

6       SECTION   7.03.   Subchapter   E, Chapter   31 , Election   Code,   is

7   amended  by adding  Section  31.130  to read  as follows:

8       Sec.  31.130.   SUIT  AGAINST   ELECTION   OFFICER.   An  action,

9   including   an  action   for  a  writ  of  mandamus,   alleging  that  an

10  election   officer   violated   a provision   of this code  while  acting  in

11  the  officer 's official   capacity   may  only  be brought   against   the

12  officer   in the officer 's official   capacity.

13      SECTION   7.04.   Section   232.006  (a), Election   Code,  is amended

14  to read  as follows:

15      (a)   The  venue  of an election   contest   for a statewide   office

16  is in Travis   County  or any county   where  a contestee   resided   at the

17  time  of the election.   For  purposes   of this section,   a contestee 's

18  residence   is determined   under  Section  411.0257 , Government   Code.

19      SECTION   7.05.   Sections   232.008  (b),  (c),  and  (d),   Election

20  Code,  are amended   to read  as follows:

21      (b)   Except   as provided   by Subsection   (c), a contestant   must

22  file  the petition   not  later  than  the  later  of  the  45th  [30th]  day

23  after  the date  the election   records   are publicly   available   under

24  Section   1.012  or the official   result   of the contested   election   is

25  determined.

26      (c)   A contestant   must  file  the petition   not later   than  the

27  later  of the 15th  [10th]  day after  the date  the election   records   are

S.B.  No.  1

1    publicly   available   under   Section   1.012   or   the   official   result   is

2    determined   in  a  contest   of:

3                    (1)   a  primary   or  runoff   primary   election;   or

4                    (2)   a  general   or  special   election   for  which  a  runoff   is

5    necessary   according   to  the  official   result   or  will  be  necessary   if

6    the  contestant   prevails.

7         (d)   A  contestant   must   deliver,  <u>electronically</u>   <u>or  otherwise,</u>

8    a  copy  of  the  petition   to  the  secretary   of  state  by  the  same

9    deadline   prescribed   for  the  filing   of  the  petition.

10        SECTION   7.06.   The   heading   to  Title   14,  Election   Code,   is

11    amended   to  read  as  follows:

12       TITLE  14.   ELECTION   CONTESTS   <u>AND  OTHER   ELECTION   LAWSUITS</u>

13        SECTION   7.07.   Title   14,  Election   Code,   is  amended   by  adding

14    Subtitle   D  to  read  as  follows:

15                    <u>SUBTITLE   D.  OTHER   ELECTION   LAWSUITS</u>

16     <u>CHAPTER   247.   LAWSUIT   ALLEGING   IMPROPER   ELECTION   ACTIVITIES</u>

17        <u>Sec.  247.001.   PETITION   ALLEGING   FRAUD.   This   chapter</u>

18    <u>applies   to  a  civil   suit   in  which   a  candidate   in  an  election   alleges</u>

19    <u>in  the  petition   that  an  opposing   candidate,   an  agent  of  the  opposing</u>

20    <u>candidate,   or  a  person   acting   on  behalf   of  the  opposing   candidate</u>

21    <u>with   the   candidate   's  knowledge   violated   any   of  the   following</u>

22    <u>sections   of  this   code:</u>

23                    <u>(1)   Section   13.007 ;</u>

24                    <u>(2)   Section   64.012 ;</u>

25                    <u>(3)   Section   64.036 ;</u>

26                    <u>(4)   Section   84.003 ;</u>

27                    <u>(5)   Section   84.0041 ;</u>

S.B.   No.   1

1    (6)    Section   86.0051  ;

2    (7)    Section   86.006  ;

3    (8)    Section   86.010  ; or

4    (9)    Section   276.013  .

5    Sec.  247.002.    PROCEDURE.    A  candidate    in  an  election    may

6    file  a  petition    for  an  action   under  this  chapter   in  any  county  where

7    a  defendant    resided   at  the  time  of  the  election.    If  the  election   is

8    for  a  statewide    office,   the  candidate    may  also  file  the  petition    in

9    a  district   court  in  Travis  County.

10   Sec.  247.003.    FILING   PERIOD   FOR  PETITION.    A  candidate    in  an

11   election   may  file  a  petition   for  an  action   under   this  chapter   not

12   earlier   than  the  day  after   the  date  the  election   is  certified   and

13   not  later  than  the  45th  day  after  the  later  of  that  date  or  the  date

14   election   records  are  made  publicly   available   under  Section   1.012 .

15   Sec.  247.004.    DAMAGES.    (a)   If   it   is   shown   by   a

16   preponderance    of  the  evidence    that  a  defendant,   an  agent  of  the

17   defendant,   or  a  person   acting   on  behalf  of  the  defendant   with  the

18   defendant  's knowledge   committed   one  or  more  violations   of  a  section

19   described   by  Section   247.001,   the  defendant   is  liable   to  the

20   plaintiff   for  damages   in  an  amount  of  $1,000  for  each  violation.

21   (b)   Notwithstanding    Section   41.004 ,  Civil   Practice   and

22   Remedies   Code,  a  court   shall   award  damages   under  Subsection    (a)  to

23   the  plaintiff   irrespective   of  whether   the  plaintiff   is  awarded

24   actual   damages.

25   Sec.  247.005.    ATTORNEY  'S  FEES.    In  an  action   under   this

26   chapter,   the  court   may  award  reasonable   attorney  's fees  to  the

27   prevailing   party.

S.B.  No.  1

1          SECTION  7.08.    Section  273.061 , Election  Code,  is  amended  to

2    read  as  follows:

3          Sec.  273.061.    JURISDICTION.    (a)    The  supreme    court  or  a

4    court  of  appeals   may  issue  a  writ  of  mandamus  to  compel  the

5    performance   of  any  duty  imposed  by  law  in  connection   with  the

6    holding  of  an  election   or  a  political   party  convention,   regardless

7    of  whether   the  person   responsible    for  performing    the  duty  is  a

8    public   officer.

9          (b)    The   court  of  criminal    appeals    may  issue  a  writ  of

10   mandamus    to  compel   the  performance    of  any  duty  imposed   by  law  in

11   connection     with  the  provision,    sequestration,     transfer,    or

12   impoundment    of  evidence    in  or  records    relating    to  a  criminal

13   investigation    conducted    under  this  code  or  conducted    in  connection

14   with  the  conduct   of  an  election   or  political    party  convention.    If  a

15   writ  of  mandamus   is  issued   under  this  subsection,    it  shall   include

16   an  order   requiring    the  provision,    sequestration,    transfer,    or

17   impoundment    of  the  evidence   or  record.

18          SECTION   7.09.    Subchapter   D , Chapter   22 , Government    Code,  is

19   amended   by  adding   Section  22.304  to  read  as  follows:

20          Sec.  22.304.    PRIORITY   OF  CERTAIN    ELECTION    PROCEEDINGS.     (a)

21   The  supreme    court,   the  court  of  criminal    appeals,   or  a  court  of

22   appeals   shall   prioritize    over  any  other  proceeding    pending   or  filed

23   in  the  court   a  proceeding    for  injunctive    relief   or  for  a  writ  of

24   mandamus   under  Chapter   273 , Election   Code,  pending   or  filed   in  the

25   court   on  or  after   the  120th   day  before   a  general   or  special

26   election.

27          (b)   If  granted,   oral  argument    for  a  proceeding    described   by

S.B.   No.   1

1  <u>Subsection   (a) may  be  given   in person   or through   electronic   means.</u>

2      SECTION   7.10.   Section   23.101 , Government   Code,  is amended

3  by amending   Subsection   (a) and adding   Subsection   (b-1) to read as

4  follows:

5      (a)  <u>Except   as provided   by Subsection   (b-1), the</u> [The] trial

6  courts  of this state   shall  regularly   and frequently   set hearings

7  and trials   of pending   matters,   giving   preference   to hearings   and

8  trials  of the following:

9      (1)  temporary   injunctions;

10      (2)  criminal   actions,   with the following   actions   given

11  preference   over other   criminal   actions:

12      (A)  criminal   actions   against   defendants   who are

13  detained   in jail pending   trial;

14      (B)  criminal   actions   involving   a charge   that a

15  person   committed   an act of family   violence,   as defined   by Section

16  71.004 , Family   Code;

17      (C)  an offense   under:

18      (i)  Section   21.02  or 21.11 , Penal   Code;

19      (ii)  Chapter   22 , Penal   Code,  if the victim

20  of the alleged   offense   is younger   than 17 years   of age;

21      (iii)  Section   25.02 , Penal   Code,  if the

22  victim  of the alleged   offense   is younger   than 17 years   of age;

23      (iv)  Section   25.06 , Penal   Code;

24      (v)  Section   43.25 , Penal   Code; or

25      (vi)  Section   20A.02 (a)(7),   20A.02 (a)(8),

26  or 20A.03 , Penal   Code;

27      (D)  an offense   described   by Article   62.001 (6)(C)

56

S.B.   No.   1

1  or (D),  Code  of Criminal   Procedure;   and

2                    (E)   criminal    actions    against    persons    who   are

3  detained   as  provided   by Section   51.12 , Family   Code,  after   transfer

4  for  prosecution   in  criminal   court   under   Section   54.02 , Family   Code;

5                    (3)   election   contests   and  suits   under   the  Election

6  Code;

7                    (4)   orders   for  the  protection   of  the  family   under

8  Subtitle   B,  Title   4,  Family   Code;

9                    (5)   appeals   of  final   rulings   and  decisions   of  the

10  division   of  workers ' compensation   of  the  Texas   Department   of

11  Insurance   regarding   workers ' compensation   claims   and  claims   under

12  the  Federal   Employers ' Liability   Act  and  the  Jones   Act;

13                    (6)   appeals   of  final   orders   of  the  commissioner   of  the

14  General   Land  Office   under   Section   51.3021 , Natural   Resources   Code;

15                    (7)   actions   in  which   the  claimant   has  been   diagnosed

16  with  malignant   mesothelioma,   other   malignant   asbestos-related

17  cancer,  malignant   silica-related   cancer,  or acute   silicosis;   and

18                    (8)   appeals   brought   under   Section   42.01 or 42.015 , Tax

19  Code,  of orders   of appraisal   review   boards   of appraisal   districts

20  established   for  counties   with  a population   of less   than  175,000.

21       (b-1)   Except   for a criminal   case   in  which   the  death   penalty

22  has  been   or may  be assessed   or when   it would   otherwise   interfere

23  with  a constitutional   right,  the  trial   courts   of this   state   shall

24  prioritize   over  any  other   proceeding   pending   or filed   in  the  court   a

25  proceeding   for injunctive   relief   under   Chapter   273 , Election   Code,

26  pending   or filed   in  the  court   on or after   the  120th   day  before   a

27  general   or special   election.

S.B.  No.  1

1   ARTICLE  8.  INELIGIBLE  VOTERS  AND RELATED  REFORMS

2   SECTION  8.01.  Chapter  42 ,  Code  of  Criminal  Procedure,  is

3   amended  by adding  Article  42.0194  to read  as follows:

4   Art.  42.0194.  FINDING  REGARDING  FELONY  CONVICTION.  In  the

5   trial  of a felony  offense,  if the defendant  is 18 years  of age or

6   older  and is adjudged  guilty  of the offense,  the court  shall:

7   (1)  make  an affirmative  finding  that the person  has

8   been  found  guilty  of a felony  and enter  the affirmative  finding  in

9   the judgment  of the case; and

10   (2)  instruct  the defendant  regarding  how the felony

11   conviction  will impact  the defendant  's right  to vote  in this state.

12   SECTION  8.02.  Article  42.01 ,  Code  of Criminal  Procedure,  as

13   effective  September  1, 2021,  is amended  by adding  Section  16 to read

14   as follows:

15   Sec.  16.  In  addition  to  the  information  described  by

16   Section  1, the judgment  should  reflect  the affirmative  finding  and

17   instruction  entered  pursuant  to Article  42.0194.

18   ARTICLE  9.  REPEALER;  SEVERABILITY;  TRANSITION;  EFFECTIVE  DATE

19   SECTION  9.01.  The following  provisions  of the Election  Code

20   are repealed:

21   (1)  Section  85.062  (e); and

22   (2)  Section  127.201  (f).

23   SECTION  9.02.  If  any  provision  of  this  Act  or  its

24   application  to any person  or circumstance  is held  invalid,  the

25   invalidity  does not affect  other  provisions  or applications  of this

26   Act that  can be given  effect  without  the invalid  provision  or

27   application,  and to this end the provisions  of this Act are declared

58

S.B.  No.  1

1   to be severable.

2          SECTION  9.03.  (a)  Except  as otherwise  provided  by this  Act,

3   the  changes  in  law  made  by  this  Act  apply  only  to  an  offense

4   committed  on or after  the  effective  date  of this Act.  An offense

5   committed  before  the  effective  date  of this Act  is governed  by the

6   law in effect  when  the offense  was committed,  and  the  former  law is

7   continued  in effect  for  that  purpose.   For  purposes  of this section,

8   an offense  was committed  before  the  effective  date  of this Act  if

9   any element  of the offense  occurred  before  that  date.

10         (b)  The  changes  in  law  made  by  this  Act  apply  only  to  an

11  election  ordered  on or after  the  effective  date  of this Act.  An

12  election  ordered  before  the  effective  date  of this Act  is governed

13  by  the  law in effect  when  the election  was ordered,  and  the  former

14  law is continued  in effect  for  that  purpose.

15         (c)  The  changes  in  law  made  by  this  Act  apply  only  to  an

16  election  contest  for which  the  associated  election  occurred  after

17  the  effective  date  of this Act.

18         (d)  The  changes  in  law  made  by  this  Act  apply  only  to  an

19  application  to vote  an early  voting  ballot  by mail  submitted  on or

20  after  the  effective  date  of this Act.  An application  to vote  an

21  early  voting  ballot  by mail  submitted  before  the  effective  date  of

22  this Act  is governed  by  the  law in effect  when  the application  was

23  submitted,  and  the  former  law  is continued  in effect  for  that

24  purpose.

25         (e)  The  changes  in  law  made  by  this  Act  apply  only  to  an

26  application  for  voter  registration  submitted  on or  after  the

27  effective  date  of this Act.

59

S.B.  No.  1

1          SECTION   9.04.    This  Act  takes  effect   on  the  91st  day  after

2    the  last  day  of  the  legislative     session.

S.B.  No.  1

1                       AN  ACT

2   relating     to   election     integrity    and    security,     including     by

3   preventing     fraud   in   the   conduct   of   elections    in   this   state;

4   increasing   criminal   penalties;   creating   criminal   offenses.

5           BE  IT  ENACTED  BY  THE  LEGISLATURE  OF  THE  STATE  OF  TEXAS:

6                   ARTICLE   1.   GENERAL    PROVISIONS

7           SECTION   1.01.   SHORT   TITLE.   This  Act  may  be  cited  as  the

8   Election    Integrity    Protection    Act  of  2021.

9           SECTION   1.02.   PURPOSE.    The   purpose   of   this   Act   is   to

10  exercise    the   legislature    's constitutional     authority    under   Section

11  4 , Article   VI,   Texas   Constitution,    to  make   all   laws   necessary   to

12  detect   and  punish   fraud.

13          SECTION   1.03.   FINDINGS.    The   legislature    finds   that:

14              (1)   full,    free,    and   fair    elections    are    the

15  underpinnings   of a stable   constitutional    democracy;

16              (2)   fraud  in  elections   threatens    the   stability   of  a

17  constitutional    democracy   by  undermining    public   confidence    in   the

18  legitimacy   of public   officers   chosen   by election;

19              (3)   reforms   are   needed   to  the  election   laws  of  this

20  state  to ensure   that  fraud  does  not  undermine   the  public   confidence

21  in the electoral    process;

22              (4)   the  reforms   to  the  election   laws  of  this  state  made

23  by this  Act  are  not  intended   to impair   the  right  of free  suffrage

24  guaranteed    to the  people   of  Texas   by  the  United   States   and  Texas

1

S.B.   No.   1

1    Constitutions,        but    are    enacted    solely    to    prevent    fraud    in    the

2    electoral    process    and    ensure    that    all    legally    cast    ballots    are

3    counted.    Integral    to    the    right    to    vote    is    the    assurance    of    voter

4    access    and    the    right    for    all    votes    legally    cast    to    be    counted;

5                      (5)    additionally,    preventing    a    valid    vote    from    being

6    counted    violates    the    basic    constitutional    rights    guaranteed    to    each

7    citizen    by    the    United    States    Constitution;    and

8                      (6)    providing    for    voter    access    and    increasing    the

9    stability    of    a    constitutional    democracy    ensures    public    confidence

10   in    the    legitimacy    of    public    officers    chosen    by    election.

11         SECTION   1.04.    Chapter   1,    Election    Code,    is    amended    by

12   adding    Section   1.0015    to    read    as    follows:

13         Sec.   1.0015.    LEGISLATIVE    INTENT.    It    is    the    intent    of    the

14   legislature    that    the    application    of    this    code    and    the    conduct    of

15   elections    be    uniform    and    consistent    throughout    this    state    to    reduce

16   the    likelihood    of    fraud    in    the    conduct    of    elections,    protect    the

17   secrecy    of    the    ballot,    promote    voter    access,    and    ensure    that    all

18   legally    cast    ballots    are    counted.

19         SECTION   1.05.    Section   1.003,    Election    Code,    is    amended    by

20   adding    Subsection    (a-1)    to    read    as    follows:

21         (a-1)    Election    officials    and    other    public    officials    shall

22   strictly    construe    the    provisions    of    this    code    to    effect    the    intent

23   of    the    legislature    under    Section   1.0015.

24         SECTION   1.06.    Section   1.005,    Election    Code,    is    amended    by

25   amending    Subdivision    (4-a)    and    adding    Subdivision    (4-b)    to    read    as

26   follows:

27                      (4-a)    "Election    official"    means:

2

S.B.   No.   1

1               (A)   a county   clerk;

2               (B)   a permanent   or temporary   deputy   county   clerk;

3               (C)   an elections   administrator;

4               (D)   a   permanent    or   temporary    employee    of   an

5   elections   administrator;

6               (E)   an election   judge;

7               (F)   an alternate   election   judge;

8               (G)   an early   voting   clerk;

9               (H)   a deputy   early   voting   clerk;

10              (I)   an election   clerk;

11              (J)   the presiding   judge   of an early   voting   ballot

12   board;

13              (K)   the   alternate   presiding   judge   of   an   early

14   voting   ballot   board;

15              (L)   a member   of an early   voting   ballot   board;

16              (M)   the   chair   of   a   signature   verification

17   committee;

18              (N)   the   vice   chair   of   a signature   verification

19   committee;

20              (O)   a   member   of   a   signature   verification

21   committee;

22              (P)   the   presiding   judge   of   a   central   counting

23   station;

24              (Q)   the   alternate   presiding   judge   of   a   central

25   counting   station;

26              (R)   a central   counting   station   manager;

27              (S)   a central   counting   station   clerk;

3

S.B.  No.  1

1          (T)  a tabulation  supervisor;

2          (U)  an assistant  to a tabulation  supervisor;  and

3          (V)  a chair  of a county  political  party  holding  a

4    primary  election  or a runoff  primary  election.

5          (4-b)  "Federal  judge"  means:

6               (A)  a judge,  former  judge,  or retired  judge  of a

7    United  States  court  of appeals;

8               (B)  a judge,  former  judge,  or retired  judge  of a

9    United  States  district  court;

10              (C)  a judge,  former  judge,  or retired  judge  of a

11   United  States  bankruptcy  court;  or

12              (D)  a magistrate  judge,  former  magistrate  judge,

13   or retired  magistrate  judge  of a United  States  district  court.

14         SECTION  1.07.   Section  1.018 , Election  Code,  is amended  to

15   read  as follows:

16         Sec.  1.018.   APPLICABILITY  OF PENAL  CODE.   In addition  to

17   Section  1.03 , Penal  Code,  and to other  titles  of the Penal  Code  that

18   may apply  to this  code,  Titles  2 and  [Title]  4, Penal  Code,  apply

19   [applies]  to offenses  prescribed  by this  code.

20         SECTION  1.08.   Chapter  1, Election  Code,  is amended  by

21   adding  Section  1.022  to read  as follows:

22         Sec.  1.022.   REASONABLE  ACCOMMODATION  OR MODIFICATION.   A

23   provision  of this  code  may not  be interpreted  to prohibit  or limit

24   the  right  of a qualified  individual  with  a disability  from

25   requesting  a reasonable  accommodation  or modification  to any

26   election  standard,  practice,  or procedure  mandated  by law or rule

27   that  the individual  is entitled  to request  under  federal  or state

4

S.B.  No.  1

1  law.

2                    ARTICLE  2.  REGISTRATION  OF VOTERS

3            SECTION  2.01.   Section  13.002 , Election  Code,  is  amended  by

4  adding  Subsection  (c-1)  to  read  as  follows:

5            (c-1)   The  information  required  under  Subsections  (c)(3),

6  (4),  (5),  (6),  and  (8)  must  be  supplied  by  the  person  desiring  to

7  register  to vote.

8            SECTION  2.02.   Section  13.007 , Election  Code,  is  amended  to

9  read  as  follows:

10           Sec.  13.007.   FALSE  STATEMENT  ON APPLICATION.   (a)   A person

11  commits  an offense  if  the  person  knowingly  or intentionally:

12                   (1)   makes  a false  statement;   or

13                   (2)   requests,  commands,  coerces,  or attempts  to induce

14  another  person  to  make  a  false  statement  on  a  registration

15  application.

16           (b)   An  offense  under  this  section  is  a  Class  A  [B]

17  misdemeanor,   except  that  an offense  under  this  section  is  a state

18  jail  felony  if  the  person:

19                   (1)   directly  or  through  a  third  party  offers  or

20  provides  compensation  or  other  benefit  to a person  for  activity

21  described  by Subsection  (a); or

22                   (2)   solicits,  receives,  or  accepts  compensation  or

23  other  benefit  for an activity  described  by Subsection  (a).

24           (c)   If  conduct  that  constitutes  an  offense  under  this

25  section  also  constitutes  an  offense  under  another  law,  the  actor

26  may  be  prosecuted  under  this  section,  the  other  law,  or both.  [For

27  purposes  of this  code,  an offense  under  this  section  is  considered

5

S.B.  No.  1

1    ~~to be perjury,  but may be prosecuted   only under  this section.]~~

2         SECTION   2.03.   Section   15.021 , Election   Code, is amended  by

3    amending  Subsections  (b)  and  (d)  and  adding  Subsections   (d-1)  and

4    (d-2)  to read  as follows:

5         (b)   Except   as provided   by Subsection   (d), the  [~~The~~]  voter

6    shall  use  the  registration    certificate   or  a  registration

7    application   form  as the notice,   indicating   the correct  information

8    in  the  appropriate   space  on  the  certificate   or application   form

9    unless  the  voter  does  not  have  possession   of the certificate   or an

10   application   form  at the time  of giving  the  notice.

11        (d)   A voter  [~~who  continues  to reside  in the county   in which~~

12   ~~the  voter  is registered]~~   may correct   information   under  this  section

13   by  digital   transmission   of  the  information   under  a  program

14   administered    by  the  secretary   of  state  and  the  Department   of

15   Information   Resources.

16        (d-1)   If the notice   indicates   that a voter  no longer  resides

17   in the county   in which  the voter  is registered,   the registrar   shall

18   forward   the notice   and the voter 's application   for registration   to

19   the  registrar   of  the  county   in  which   the  voter  resides.   The

20   registrars   shall   coordinate   to  ensure   that  the  voter 's existing

21   registration   is canceled   immediately   after  the  voter  is registered

22   in  the  county   in  which   the  voter  resides   in  accordance   with

23   Subsection   (d-2).

24        (d-2)   A registrar   who  receives   a  voter 's notice   and

25   application   from  another   registrar   under  Subsection   (d-1)  shall

26   treat  it as an original   application   for registration   under  Section

27   13.002 , and shall  register   the voter  if the voter  resides   in the

6

S.B. No. 1

1  county and is otherwise eligible under Section <u>13.001</u> .

2       SECTION 2.04. Section 15.028 , Election Code, is amended to

3  read as follows:

4       Sec. 15.028. NOTICE OF UNLAWFUL VOTING <u>OR REGISTRATION</u> [TO

5  PROSECUTOR]. [(a)] If the registrar determines that a person who

6  is not <u>eligible to vote registered to vote or</u> [a registered voter]

7  voted in an election, the registrar shall, <u>within 72 hours not</u>

8  <u>including weekends after making the determination,</u> execute and

9  deliver to the <u>attorney general, the secretary of state, and the</u>

10  county or district attorney having jurisdiction in the territory

11  covered by the election an affidavit stating the relevant facts.

12       [(b) If the election covers territory in more than one

13  county, the registrar shall also deliver an affidavit to the

14  attorney general.]

15       SECTION 2.05. Section 16.0332 , Election Code, is amended

16  by amending Subsection (a) and adding Subsections (a-1), (d), and

17  (e) to read as follows:

18       (a) After the registrar receives <u>notification</u> [a list]

19  under <u>Subsection (a-1) of this section,</u> Section 18.068 of this

20  code,<u>_</u> or Section 62.113 , Government Code, of persons excused or

21  disqualified from jury service because of citizenship status <u>or</u>

22  <u>notification of persons who indicate a lack of citizenship status</u>

23  <u>in connection with a motor vehicle or Department of Public Safety</u>

24  <u>record as provided by Subsection (a-1),</u> the registrar shall deliver

25  to each registered voter whose name appears on the list a written

26  notice requiring the voter to submit to the registrar proof of

27  United States citizenship in the form of a certified copy of the

S.B. No. 1

1  voter 's birth certificate, United States passport, or certificate

2  of naturalization or any other form prescribed by the secretary of

3  state. The notice shall be delivered by forwardable mail to the

4  mailing address on the voter 's registration application and to any

5  new address of the voter known to the registrar.

6      (a-1) The secretary of state shall enter into an agreement

7  with the Department of Public Safety under which information in the

8  existing statewide computerized voter registration list is

9  compared against information in the database of the Department of

10  Public Safety on a monthly basis to verify the accuracy of

11  citizenship status information previously provided on voter

12  registration applications. In comparing information under this

13  subsection, the secretary of state shall consider only a voter 's

14  information in the database of the Department of Public Safety that

15  was derived from documents presented by the voter to the department

16  after the person 's current voter registration became effective, and

17  may not consider information derived from documents presented by

18  the voter to the department before the person 's current voter

19  registration became effective.

20      (d) The secretary of state shall prescribe rules for the

21  administration of this section.

22      (e) Not later than December 31 of each year, the secretary

23  of state shall provide a report to the legislature of the number of

24  voter registrations canceled under this section during the calendar

25  year.

26      SECTION 2.06. Section 18.065 , Election Code, is amended by

27  adding Subsections (e), (f), (g), (h), and (i) to read as follows:

1       (e)   If   the   secretary   of   state   determines   that   a   voter

2   registrar   is   not   in   substantial   compliance   with   a   requirement

3   imposed   on   the   registrar   by   a   provision   or   rule   described   in

4   Subsection   (a),   the   secretary   of   state   shall:

5       (1)   for   the   first   violation,   require   the   registrar   to

6   attend   a   training   course   under   Subsection   (h);

7       (2)   for   the   second   violation,   audit   the   voter

8   registration   list   for   the   county   in   which   the   registrar   serves   to

9   determine   the   actions   needed   to   achieve   substantial   compliance

10  under   Subsection   (a)   and   provide   the   results   of   the   audit   to   the

11  registrar;   or

12      (3)   for   a   third   or   subsequent   violation,   if   the

13  secretary   of   state   determines   that   the   registrar   has   not   performed

14  any   overt   actions   in   pursuance   of   compliance   with   the   actions

15  identified   under   Subdivision   (2)   as   necessary   for   the   registrar   to

16  achieve   substantial   compliance   under   Subsection   (a)   within   14   days

17  of   receiving   the   results   of   the   audit   conducted   under   that

18  subsection,   inform   the   attorney   general   that   the   county   which   the

19  registrar   serves   may   be   subject   to   a   civil   penalty   under   Subsection

20  (f).

21     (f)   A   county   is   liable   to   this   state   for   a   civil   penalty   of

22  $1,000   for   each   day   after   the   14th   day   following   the   receipt   of   the

23  results   of   the   audit   conducted   under   Subsection   (e)(2)   that   the

24  county 's   voter   registrar   fails   to   take   overt   action   to   comply   with

25  the   actions   identified   under   that   subsection   as   necessary   for   the

26  registrar   to   achieve   substantial   compliance   under   Subsection   (a).

27  The   attorney   general   may   bring   an   action   to   recover   a   civil   penalty

S.B.   No.   1

1    imposed   under   this   section.

2        (g)   A  civil   penalty   collected   by  the  attorney   general   under

3    this  section   shall   be  deposited   in the state   treasury   to the credit

4    of the general   revenue   fund.

5        (h)   The  secretary   of  state   shall   develop   and  implement   a

6    training   course   for   registrars   on  substantial   compliance   with

7    Sections   15.083 , 16.032 , and  18.061   and with rules   implementing   the

8    statewide   computerized   voter   registration   list.

9        (i)   The  secretary   of  state   shall   adopt   rules   and  prescribe

10   procedures   for the implementation   of this section.

11       SECTION   2.07.   Section   18.068 , Election   Code,  is amended   by

12   amending   Subsection   (a)  and  adding   Subsection   (a-1)  to read  as

13   follows:

14       (a)   The  secretary   of  state   shall   quarterly   compare   the

15   information   received   under  Section   16.001  of this code  and  Sections

16   [Section]   62.113   and  62.114 , Government   Code,  to the  statewide

17   computerized   voter   registration   list.   If the secretary   determines

18   that  a voter  on the  registration   list  is deceased   or has  been

19   excused   or disqualified   from  jury  service   because   the voter   is not a

20   citizen   or a resident   of the county   in which   the voter   is registered

21   to vote,   the  secretary   shall   send  notice   of the determination

22   to the voter   registrar   of  the  counties   considered   appropriate   by

23   the secretary.

24       (a-1)   The  secretary   of state   is not required   to send  notice

25   under  Subsection   (a) for a voter   who is subject   to an exemption   from

26   jury   service   under   Section   62.106 , Government   Code,  if that

27   exemption   is the only  reason   the voter   is excused   from  jury  service.

S.B.  No.  1

1    SECTION  2.08.  Section  31.006 , Election  Code,  is  amended  to

2  read  as  follows:

3    Sec.  31.006.  REFERRAL  [OF  COMPLAINT]  TO  ATTORNEY  GENERAL.

4  (a)  If,  after  receiving  or discovering  information  indicating  that

5  [a  complaint  alleging]  criminal  conduct  in  connection  with  an

6  election  has occurred,  the  secretary  of  state  determines  that  there

7  is  reasonable  cause  to  suspect  that  [the  alleged]  criminal  conduct

8  occurred,  the  secretary  shall  promptly  refer  the  information

9  [complaint]  to  the  attorney  general.  The  secretary  shall  deliver

10  to  the  attorney  general  all  pertinent  documents  and information  in

11  the  secretary  's  possession.

12    (b)  The  documents  and  information  submitted  under

13  Subsection  (a)  are  not  considered  public  information  until:

14    (1)  the  secretary  of  state  makes  a  determination  that

15  the  information  [complaint]  received  does  not  warrant  an

16  investigation;  or

17    (2)  if  referred  to  the  attorney  general,  the  attorney

18  general  has  completed  the  investigation  or  has  made  a  determination

19  that  the  information  [complaint]  referred  does  not  warrant  an

20  investigation.

21    SECTION  2.09.  Subchapter  B , Chapter  87 , Election  Code,  is

22  amended  by  adding  Section  87.028  to  read  as  follows:

23    Sec.  87.028.  ACCESS  TO  INFORMATION.  (a)  On  request,  a

24  county  election  official  shall  provide  to  a  member  of  an  early

25  voting  ballot  board  all  available  information  necessary  to

26  fulfilling  the  functions  of  the  board,  including  any  information

27  from  the  statewide  computerized  voter  registration  list  under

11

S.B.  No.  1

1   Section   18.061  .

2         (b)   On  request,   a  county  election   official   shall   provide   to

3   a  member   of  a  signature   verification   committee   all  available

4   information   necessary   to  fulfilling   the  functions   of the  committee,

5   including   any  information   from  the  statewide   computerized   voter

6   registration   list  under  Section   18.061  .

7         (c)   The  secretary   of state  shall  adopt  rules  as necessary   to

8   prevent   a  member   of  an  early   voting   ballot   board   or  signature

9   verification   committee   from  retaining   or  sharing   personally

10  identifiable   information   from  the  statewide   computerized   voter

11  registration   list  under  Section   18.061  obtained   under  this  section

12  for  any  reason   unrelated   to the  official   's official   duties.

13        SECTION   2.10.   Section   62.113  (b),   Government   Code,   is

14  amended   to read  as follows:

15        (b)   On  the  third  business   day  of each  month,   the  clerk  shall

16  send  a  copy  of the  list  of persons   excused   or  disqualified   because

17  of citizenship   in  the  previous   month   to:

18              (1)   the  voter  registrar   of the  county;

19              (2)   the  secretary   of state;   and

20              (3)   the  county   or  district   attorney[,   ~~as  applicable,]~~

21  for  an  investigation   of whether   the  person   committed   an  offense

22  under  Section   13.007  , Election   Code,   or other   law.

23        SECTION   2.11.   Sections   62.114  (b)  and  (c),   Government   Code,

24  are  amended   to read  as follows:

25        (b)   On  the  third  business   day  of each  month,   the  clerk  shall

26  send  [~~to  the  voter   registrar   of the  county]~~  a  copy  of  the  list  of

27  persons   excused   or  disqualified   in  the  previous   month   because   the

12

S.B.  No.  1

1   persons   do  not  reside   in  the  county   <u>to:</u>

2                    (1)    the  voter  registrar   of  the  county;   and

3                    (2)    the  secretary   of  state.

4          (c)   A  list  compiled   under  this  section   may  not  be  used  for  a

5   purpose   other  than  a  purpose   described   by  Subsection   (b)  or  Section

6   15.081   <u>or  18.068</u> ,  Election   Code.

7                ARTICLE   3.   CONDUCT   AND  SECURITY   OF  ELECTIONS

8          SECTION   3.01.   Section   2.053  (a),  Election   Code,   is  amended

9   to  read  as  follows:

10         (a)   On  receipt   of  the  certification,    the  governing   body  of

11  the  political   subdivision   by  order  or  ordinance   <u>shall</u>  [<s>may</s>]  declare

12  each  unopposed   candidate   elected   to  the  office.   If  no  election   is

13  to  be  held  on  election   day  by  the  political   subdivision,   a  copy  of

14  the  order  or  ordinance   shall  be  posted   on  election   day  at  each

15  polling   place  used  or  that  would  have  been  used  in  the  election.

16         SECTION   3.02.   Section   2.056  (c),  Election   Code,   is  amended

17  to  read  as  follows:

18         (c)   A  certifying    authority   <u>shall</u>  [<s>may</s>]  declare  a  candidate

19  elected   to  an  office   of  the  state  or  county   government   if,  were  the

20  election   held,   only  the  votes  cast  for  that  candidate   in  the

21  election   for  that  office   may  be  counted.

22         SECTION   3.03.   Sections   43.007  (c)  and  (d),  Election   Code,

23  are  amended   to  read  as  follows:

24         (c)   In  conducting   the  program,   the  secretary   of  state  shall

25  provide   for  an  audit   of  the  <u>voting   system   equipment</u>   [<s>direct</s>

26  <s>recording   electronic   voting   units</s>]  before   and  after   the  election,

27  and  during   the  election   to  the  extent   such  an  audit   is  practicable.

13

S.B.  No.  1

1          (d)  The  secretary  of  state  shall  select  to  participate  in

2    the  program  each  county  that:

3                    (1)  has  held  a  public  hearing  under  Subsection  (b);

4                    (2)  has  submitted  documentation  listing  the  steps

5    taken  to  solicit  input  on  participating  in  the  program  by

6    organizations  or  persons  who  represent  the  interests  of  voters;

7                    (3)  has  implemented  a  computerized  voter  registration

8    list  that  allows  an  election  officer  at  the  polling  place  to  verify

9    that  a  voter  has  not  previously  voted  in  the  election;

10                   (4)  uses  direct  recording  electronic  voting  machines,  _

11   ballot  marking  devices,  or hand-marked  scannable  paper  ballots  that

12   are  printed  and  scanned  at  the  polling  place  or  any  other  type  of

13   voting  system  equipment  that  the  secretary  of  state  determines  is

14   capable  of  processing  votes  for  each  type  of  ballot  to  be  voted  in

15   the  county;  and

16                   (5)  is  determined  by  the  secretary  of  state  to  have  the

17   appropriate  technological  capabilities.

18          SECTION  3.04.  Section  43.031  (b),  Election  Code,  is  amended

19   to  read  as  follows:

20          (b)  Each  polling  place  shall  be  located  inside  a  building.

21   No  voter  may  cast  a  vote  from  inside  a  motor  vehicle  unless  the

22   voter  meets  the  requirements  of Section  64.009 .

23          SECTION  3.05.  Section  52.092  (a),  Election  Code,  is  amended

24   to  read  as  follows:

25          (a)  Except  as  provided  by Section  2.053 (c)  or  2.056 (e),  for

26   [For]  an  election  at  which  offices  regularly  filled  at  the  general

27   election  for  state  and  county  officers  are  to  appear  on  the  ballot,

14

S.B.  No.  1

1    the offices  shall  be listed  in the following  order:

2            (1)   offices  of  the federal  government;

3            (2)   offices  of  the state  government:

4                  (A)   statewide  offices;

5                  (B)   district  offices;

6            (3)   offices  of  the county  government:

7                  (A)   county  offices;

8                  (B)   precinct  offices.

9       SECTION  3.06.   Section  61.002 , Election  Code,  is amended  to

10   read  as follows:

11       Sec.  61.002.   OPENING  AND CLOSING  POLLING  PLACE  FOR  VOTING.

12   (a)   Immediately   before   opening   the  polls  for  voting   on  the  first

13   day  of  early  voting  and  on  election  day,  the  presiding   election

14   judge  or  alternate   election   judge   shall   confirm   that  each  voting

15   machine   has  any  public   counter   reset   to  zero  and  shall  print  the

16   tape  that  shows  the  counter   was  set  to  zero  for  each  candidate   or

17   measure  on  the  ballot.

18       (b)   At  the  official   time  for  opening   the  polls  for  voting,

19   an election  officer  shall  open  the  polling  place  entrance  and  admit

20   the  voters.

21       (c)   Immediately   after   closing   the  polls   for  voting   on

22   election   day,  the  presiding   election   judge  or  alternate   election

23   judge  shall  print  the  tape  to  show  the  number  of  votes  cast  for  each

24   candidate   or ballot  measure  for  each  voting  machine.

25       (d)   Each  election   judge  or  alternate   election   judge  present

26   shall  sign  a tape  printed  under  this  section.

27       SECTION  3.07.   Section  64.007 (c),  Election  Code,  is  amended

15

S.B.  No.  1

1  to read  as follows:

2         (c)   An election   officer    shall   maintain   a register   of spoiled

3  ballots   at  the  polling    place.    An election   officer    shall  enter   on

4  the  register   the  name  of each  voter   who returns   a spoiled   ballot   and

5  the  spoiled    ballot  's number.    <u>The  secretary   of  state   shall   create</u>

6  <u>and  promulgate   a form  to be used  for  this  purpose.</u>

7         SECTION   3.08.    Subchapter    A , Chapter   66 , Election   Code,  is

8  amended   by adding   Section   66.004   to read  as follows:

9         <u>Sec.  66.004.   POLLING    PLACE    CHECKLISTS.    The  secretary   of</u>

10 <u>state    shall    adopt    rules    and    create    a  checklist    or   similar</u>

11 <u>guidelines    to assist    the  presiding    judge  of a polling    place   in</u>

12 <u>processing    forms   and conducting    procedures    required   by this  code  at</u>

13 <u>the  opening    and closing   of the  polling    place.</u>

14        SECTION   3.09.   Section    85.005 , Election    Code,  is amended    to

15 read  as follows:

16        Sec.  85.005.   REGULAR   DAYS  AND HOURS   FOR VOTING.   (a)  Except

17 as  provided   by Subsection    (c),  in  an election    in which   a county

18 clerk   [or city  secretary]   is the  early  voting    clerk   under   Section

19 83.002   [or 83.005 ], early   voting   by personal    appearance    at the  main

20 early   voting   polling    place   shall   be conducted    on  <u>each  weekday   of</u>

21 [the weekdays  of]  the  early  voting   period   <u>that  is not  a legal   state</u>

22 <u>holiday</u>  and  <u>for  a period   of at least  nine  hours,   except   that  voting</u>

23 <u>may  not  be conducted    earlier   than  6 a.m.  or later   than  10 p.m.</u>

24 [during   the hours   that  the county   clerk  's or city  secretary  's main

25 business   office   is regularly   open  for business.]

26        (b)   In an election   to which   Subsection    (a)  does  not  apply,

27 early   voting   by personal    appearance    at  the  main  early   voting

16

S.B.   No.   1

1   polling   place   shall   be   conducted   at   least   <u>nine</u>   [eight]   hours   each

2   weekday   of   the   early   voting   period   that   is   not   a   legal   state   holiday

3   unless   the   territory   covered   by   the   election   has   fewer   than   1,000

4   registered   voters.   In   that   case,   the   voting   shall   be   conducted   at

5   least   <u>four</u>   [three]   hours   each   day.   The   authority   ordering   the

6   election,   or   the   county   clerk   if   that   person   is   the   early   voting

7   clerk,   shall   determine   which   hours   the   voting   is   to   be   conducted.

8          (c)   In   a   county   with   a   population   of   <u>55,000</u>   [100,000]   or

9   more,   the   voting   in   a   primary   election   or   the   general   election   for

10   state   and   county   officers   shall   be   conducted   at   the   main   early

11   voting   polling   place   for   at   least   12   hours   on   each   weekday   of   the

12   last   week   of   the   early   voting   period,   and   the   voting   in   a   special

13   election   ordered   by   the   governor   shall   be   conducted   at   the   main

14   early   voting   polling   place   for   at   least   12   hours   on   each   of   the   last

15   two   days   of   the   early   voting   period.   <u>Voting   under   this   subsection</u>

16   <u>may   not   be   conducted   earlier   than   6   a.m.   or   later   than   10   p.m.</u>

17   Voting   shall   be   conducted   in   accordance   with   this   subsection   in

18   those   elections   in   a   county   with   a   population   under   <u>55,000</u>

19   [100,000]   on   receipt   by   the   early   voting   clerk   of   a   written   request

20   for   the   extended   hours   submitted   by   at   least   15   registered   voters   of

21   the   county.   The   request   must   be   submitted   in   time   to   enable

22   compliance   with   Section   85.067   .

23          (d)   <u>A   voter   who   has   not   voted   before   the   scheduled   time   for</u>

24   <u>closing   a   polling   place   is   entitled   to   vote   after   that   time   if   the</u>

25   <u>voter   is   in   line   at   the   polling   place   by   closing   time.   The</u>

26   <u>secretary   of   state   shall   promulgate   any   materials   and   provide   any</u>

27   <u>training   to   presiding   judges   necessary   to   properly   process   voters</u>

17

S.B.  No.  1

1   under  this  subsection   [~~In  an  election  ordered  by  a  city,  early~~

2   ~~voting  by  personal  appearance  at  the  main  early  voting  polling~~

3   ~~place  shall  be  conducted  for  at  least  12  hours:~~

4            [~~(1)  on  one  weekday,  if  the  early  voting  period~~

5   ~~consists  of  less  than  six  weekdays;  or~~

6            [~~(2)  on  two  weekdays,  if  the  early  voting  period~~

7   ~~consists  of  six  or  more  weekdays].~~

8        SECTION  3.10.   Sections  85.006 (b)  and  (e),  Election  Code,

9   are  amended  to  read  as  follows:

10        (b)   In  an  election  in  which  a  county  clerk  [~~or  city~~

11   ~~secretary~~]  is  the  early  voting  clerk  under  Section  83.002  [~~or~~

12   ~~83.005~~],  only  the  early  voting  clerk  may  order  voting  on  a  Saturday

13   or  Sunday.   The  clerk  must  do  so  by  written  order.

14        (e)   In  a  primary  election  or  the  general  election  for  state

15   and  county  officers  in  a  county  with  a  population  of  55,000

16   [~~100,000~~]  or  more,  the  early  voting  clerk  shall  order  voting  by

17   personal  appearance  [~~voting~~]  at  the  main  early  voting  polling  place

18   to  be  conducted  on  the  last  Saturday  of  the  early  voting  period  for

19   at  least  12  hours,  except  that  voting  may  not  be  conducted  earlier

20   than  6 a.m.  or  later  than  10 p.m.,  [~~on  the  last  Saturday~~]  and  on  the

21   last  Sunday  of  the  early  voting  period  for  at  least  six  [~~five~~]

22   hours,  except  that  voting  may  not  be  conducted  earlier  than  9 a.m.

23   or  later  than  10 p.m  [~~on  the  last  Sunday  of  the  early  voting~~

24   ~~period~~].   The  early  voting  clerk  shall  order  voting  to  be  conducted

25   at  those  times  in  those  elections  in  a  county  with  a  population

26   under  55,000  [~~100,000~~]  on  receipt  of  a  written  request  for  those

27   hours  submitted  by  at  least  15  registered  voters  of  the  county.   The

S.B.  No.  1

1   request   must  be  submitted   in  time  to  enable   compliance   with  Section

2   85.007 .   This   subsection   supersedes   any   provision   of  this

3   subchapter   to the  extent  of any  conflict.

4          SECTION   3.11.   Section   85.010 (a-1),   Election   Code,   is

5   amended  to read  as follows:

6          (a-1)   In  this  section,   "eligible   county   polling   place"

7   means   an  early  voting  polling  place[, ~~other  than  a  polling  place~~

8   ~~established   under  Section   85.062  (e),~~] established   by  a county.

9          SECTION   3.12.   Section   85.061 (a),  Election   Code,  is amended

10  to read  as follows:

11         (a)   In  a countywide   election   in  which  the  county  clerk  is

12  the  early  voting  clerk  under  Section   83.002 ,  an  early  voting

13  polling  place  shall  be located   <u>inside</u>   [~~at~~] each  branch  office  that

14  is regularly   maintained   for  conducting   general  clerical   functions

15  of  the  county  clerk,  except   as provided   by  Subsection   (b).   <u>If a</u>

16  <u>suitable   room  is unavailable   inside   the  branch  office,   the  polling</u>

17  <u>place  may be located   in another   room  inside   the  same  building   as the</u>

18  <u>branch  office.</u>

19         SECTION   3.13.   Section   85.062 ,  Election   Code,  is amended  by

20  amending   Subsection   (b)  and  adding   Subsection   (f-1)  to read  as

21  follows:

22         (b)   A  polling  place  established   under  this  section   may  be

23  located,   subject   to Subsection   (d),  at any  place  in the  territory

24  served   by the  early  voting  clerk  and  may  be located   <u>inside</u>   [~~in~~] any

25  <u>building</u>   [~~stationary   structure~~]   as directed   by  the  authority

26  establishing   the  branch  office.   The  polling  place  may  <u>not</u>   be

27  located   in a movable   structure   in the  general   election   for state  and

S.B.  No.  1

1  county  officers,  general  primary  election,  or  runoff  primary

2  election.      Ropes  or  other  suitable  objects  may  be  used  at  the

3  polling  place  to  ensure  compliance  with  Section  62.004 .  Persons

4  who  are  not  expressly  permitted  by  law  to  be  in  a  polling  place

5  shall  be  excluded  from  the  polling  place  to  the  extent  practicable.

6      (f-1)  Notwithstanding  any  other  provision  of  this  section

7  concerning  the  location  of  temporary  branch  polling  places,  in  an

8  election  in  which  countywide  polling  places  are  used,  the

9  commissioners  court  of  a  county  shall  employ  the  same  methodology

10  it  uses  to  determine  the  location  of  countywide  polling  places  to

11  determine  the  location  of  temporary  branch  polling  places.

12      SECTION  3.14.  Section  87.002 ,  Election  Code,  is  amended  to

13  read  as  follows:

14      Sec.  87.002.  COMPOSITION  OF  BOARD.  (a)  The  early  voting

15  ballot  board  consists  of  a  presiding  judge,  an  alternate  presiding

16  judge,  and  at  least  one  [two]  other  member  [members].

17      (b)  Except  as  provided  by  Subsection  (d),  the  presiding

18  judge  and  the  alternate  presiding  judge  are  [is]  appointed  in  the

19  same  manner  as  a  presiding  election  judge  and  alternate  presiding

20  election  judge,  respectively.  Except  as  provided  by  Subsection

21  (c),  each  [the]  other  member  is  [members  are]  appointed  by  the

22  presiding  judge  in  the  same  manner  as  the  precinct  election  clerks.

23      (c)  In  the  general  election  for  state  and  county  officers,

24  each  county  chair  of  a  political  party  with  nominees  on  the  general

25  election  ballot  shall  submit  to  the  county  election  board  a  list  of

26  names  of  persons  eligible  to  serve  on  the  early  voting  ballot  board

27  in  order  of  the  county  chair 's  preference.  The  county  election

20

S.B.   No.   1

1   board   shall   appoint   at   least   one   person   from   each   list   to   serve   as   a

2   member   of   the   early   voting   ballot   board.   The   same   number   of   members

3   must   be   appointed   from   each   list.   The county   election   board   shall

4   appoint   persons   as   members   of   the   early   voting   ballot   board   in   the

5   order   of   preference   indicated   on   each   list.

6        (d)   In   addition   to   the   members   appointed   under   Subsection

7   (c),   the   county   election   board   shall   appoint   as   the   presiding   judge

8   the   highest-ranked   person   on   [from]   the   list   provided   under   that

9   subsection   by   the   political   party   whose   nominee   for   governor

10   received   the   most   votes   in   the   county   in   the   most   recent

11   gubernatorial   general   election   and as the alternate   presiding   judge

12   the   highest-ranked   person   on   the   list   provided   under   that

13   subsection   by   the   political   party   whose   nominee   for   governor

14   received   the   second   most   votes   in   the   county   in   the   most   recent

15   gubernatorial   general   election.

16        SECTION   3.15.   Section   124.002 ,   Election   Code,   is   amended   by

17   adding   Subsection   (c)   to   read   as   follows:

18        (c)   Voting   system   ballots   may   not   be   arranged   in   a   manner

19   that   allows   a   political   party 's   candidates   to   be   selected   in   one

20   motion   or   gesture.

21        SECTION   3.16.   Sections   127.006 (a)   and   (c),   Election   Code,

22   are   amended   to   read   as   follows:

23        (a)   The   [Both   the]   manager,   _   [and]   the   presiding   judge,   and

24   the   alternate   presiding   judge   may   appoint   clerks   to   serve   at   the

25   central   counting   station.

26        (c)   A   clerk   appointed   by   the   manager   serves   under   the

27   manager   and   shall   perform   the   functions   directed   by   the   manager.   A

S.B.  No.  1

1  clerk  appointed   by  the  presiding   judge  <u>or the alternate   presiding</u>

2  <u>judge</u>  serves  under  the  presiding  judge  and  shall  perform  the

3  functions  directed  by the presiding  judge.

4         SECTION  3.17.   Subchapter  A, Chapter  127 , Election  Code, is

5  amended  by adding  Section  127.009  to read as follows:

6         Sec.  127.009.   ELECTRONIC    DEVICES    IN   CENTRAL    <u>COUNTING</u>

7  <u>STATION.   (a)  A counting  station  manager  and the presiding  judge of</u>

8  <u>the counting  station  shall  develop  a protocol  under  which  any</u>

9  <u>electronic  device  inside  a central  counting  station  that  is</u>

10  <u>necessary  to count  votes  is equipped  with software  that tracks  all</u>

11  <u>input  and activity  on the electronic  device.</u>

12         <u>(b)  The counting  station  manager  and the presiding  judge of</u>

13  <u>the counting  station  shall  ensure  that  the input  and activity</u>

14  <u>tracked  by the software  is delivered  to the secretary  of state not</u>

15  <u>later than the fifth day after vote counting  is complete.</u>

16         <u>(c)  This section  applies  only to a central  counting  station</u>

17  <u>located  in a county  with a population  of 250,000  or more.</u>

18         SECTION  3.18.   Section  127.1232  , Election  Code, is amended

19  to read as follows:

20         Sec.  127.1232.   SECURITY  OF VOTED  BALLOTS.  <u>(a)</u>  The general

21  custodian  of election  records  shall  post  a <u>licensed  peace  officer</u>

22  [<s>guard</s>]  to ensure  the security  of ballot  boxes  containing  voted

23  ballots  throughout  the period  of tabulation  at the central  counting

24  station.

25         <u>(b)  The general  custodian  of election  records  in a county</u>

26  <u>with a population  of 100,000  or more shall  implement  a video</u>

27  <u>surveillance  system  that retains  a record  of all areas  containing</u>

22

S.B.  No.  1

1   voted  ballots:

2          (1)   from  the  time  the  voted  ballots  are  delivered  to

3   the  central  counting  station  until  the  canvass  of precinct  election

4   returns;  and

5          (2)   from  the  time  the  voted  ballots  are  delivered  to

6   the  signature  verification  committee  or  early  voting  ballot  board

7   until  the  canvass  of precinct  election  returns.

8       (c)   A  video  from  a  system  implemented  under  Subsection  (b)

9   shall  be  made  available  to the public  by a livestream.

10      (d)   The  video  recorded  is an election  record  under  Section

11  1.012  and  shall  be  retained  by  the  general  custodian  of election

12  records  until  the  end  of  the  calendar  year  in  which  an  election  is

13  held  or  until  an  election  contest  filed  in  the  county  has  been

14  resolved,  whichever  is later.

15      SECTION  3.19.  Chapter  127 , Election  Code,  as  effective

16  September  1,  2021,  is  amended  by  adding  Subchapter  J  to  read  as

17  follows:

18          SUBCHAPTER  J.  RANDOMIZED  AUDITS

19      Sec.  127.351.   RANDOMIZED  COUNTY  AUDITS.   (a)   Immediately

20  after  the  uniform  election  date  in  November  of  an  even-numbered

21  year,  the  secretary  of state  shall  conduct  an audit  of the elections

22  held  in four  counties  during  the previous  two years.

23      (b)   The  secretary  of state  shall  select  the  counties  to be

24  audited  under  Subsection  (a) at random,  except  that:

25          (1)   two  of  the  counties  selected  must  have  a  total

26  population  of less  than  300,000;

27          (2)   two  of  the  counties  selected  must  have  a  total

23

S.B.  No.  1

1   population    of 300,000   or more;   and

2   (3)   a county   selected   in   the   most   recent   audit   cycle

3   may not be selected   in the current   audit   cycle.

4   (c)   A county   selected   to be audited   may not   pay   the   cost   of

5   performing   an audit   under   this   section.

6   (d)   The secretary   of state   shall   adopt   rules   as necessary   to

7   implement   this   section.

8   ARTICLE   4.   ELECTION   OFFICERS   AND OBSERVERS

9   SECTION   4.01.   Section   32.075 , Election   Code,   is amended   by

10   adding   Subsections   (g)   and (h)   to read   as follows:

11   (g)   A presiding   judge   may   not   have   a watcher   duly   accepted

12   for   service   under   Subchapter   A,   Chapter   33 ,   removed   from   the

13   polling   place   for violating   a provision   of this   code   or any   other

14   provision   of law relating   to the conduct   of elections,   other   than   a

15   violation   of the Penal   Code,   unless   the violation   was observed   by an

16   election   judge   or clerk.

17   (h)   Notwithstanding   Subsection   (g),   a presiding   judge   may

18   call   a law enforcement   officer   to request   that   a poll   watcher   be

19   removed   if the poll   watcher   commits   a breach   of the peace   or a

20   violation   of law.

21   SECTION   4.02.   Subchapter   A,   Chapter   33 , Election   Code,   is

22   amended   by adding   Section   33.0015   to read   as follows:

23   Sec.   33.0015.   CHAPTER   PURPOSE   AND   WATCHER   DUTY.   The

24   purpose   of this   chapter   is to preserve   the integrity   of the ballot

25   box   in accordance   with   Section   4, Article   VI,   Texas   Constitution,

26   by providing   for   the appointment   of watchers.   It is the intent   of

27   the legislature   that   watchers   duly   accepted   for service   under   this

S.B.  No.  1

1   chapter   be  allowed   to  observe   and  report   on  irregularities   in  the

2   conduct   of  any  election,   but  may  not  interfere   in  the  orderly

3   conduct   of  an  election.   To effect   that  purpose,   a watcher   appointed

4   under  this  chapter   shall  observe   without   obstructing   the conduct   of

5   an  election   and  call  to  the  attention   of  an  election   officer   any

6   observed   or  suspected   irregularity   or  violation   of  law  in  the

7   conduct   of  the  election.

8          SECTION   4.03.   Subchapter   A , Chapter   33 , Election   Code,  is

9   amended   by  adding  Section  33.0016   to read  as follows:

10          Sec.  33.0016.   REFERENCES   TO  EARLY  VOTING   BALLOT   BOARD   IN

11  THIS  CHAPTER.   A reference   in this  chapter   to an  early  voting  ballot

12  board   includes   a signature   verification   committee.

13         SECTION   4.04.   Subchapter   A , Chapter   33 , Election   Code,  is

14  amended   by  adding  Section  33.008  to read  as follows:

15          Sec.  33.008.   TRAINING   PROGRAM.   The  secretary   of  state

16  shall  develop   and  maintain   a training   program   for  watchers.   The

17  training   program   must:

18              (1)  be available:

19                  (A)  entirely   via the  Internet;   and

20                  (B)  at  any  time,   without   a requirement   for  prior

21  registration;   and

22              (2)  provide   a watcher   who  completes   the training   with

23  a certificate   of completion.

24         SECTION   4.05.   Section  33.031 , Election   Code,  is  amended   by

25  adding  Subsection   (b)  to read  as follows:

26              (b)  In addition   to the  requirements   of Subsection   (a),  to be

27  eligible   to serve  as a watcher,   a person   must  complete   training

25

S.B.  No.  1

1   under  Section  33.008.

2          SECTION  4.06.  Section  33.051 , Election  Code,  is  amended  by

3   amending  Subsections  (a),  (b),  (d),  and  (e)  and  adding  Subsections

4   (a-1),  (g),  and  (h)  to  read  as  follows:

5          (a)  A  watcher  appointed  to  serve  at  a  precinct  polling

6   place,  a  meeting  place  for  an  early  voting  ballot  board,  or  a

7   central  counting  station  must  deliver  the  following  materials  [a

8   certificate  of  appointment]  to  the  presiding  judge  at  the  time  the

9   watcher  reports  for  service:

10          (1)  a certificate  of appointment;  and

11          (2)  a  certificate  of  completion  from  training

12   completed  by  the  watcher  under  Section  33.008.

13      (a-1)  A  watcher  appointed  to  serve  at  an  early  voting

14   polling  place  must  deliver  the  certificates  under  Subsection  (a) [a

15   certificate  of  appointment]  to  the  early  voting  clerk  or  deputy

16   clerk  in  charge  of  the  polling  place  when  the  watcher  first  reports

17   for  service.

18          (b)  The  officer  presented  with  a  watcher 's  certificates

19   [certificate  of  appointment]  shall  require  the  watcher  to

20   countersign  the  certificate  of appointment  to  ensure  that  the

21   watcher  is  the  same  person  who  signed  the  certificate  of

22   appointment.  Except  as  provided  by Subsection  (c),  a  watcher  who

23   presents  himself  or  herself  at  the  proper  time  with  the

24   certificates  required  under  Subsection  (a) [a  certificate  of

25   appointment]  shall  be  accepted  for  service  unless  the  person  is

26   ineligible  to  serve  or  the  number  of  appointees  to  which  the

27   appointing  authority  is  entitled  have  already  been  accepted.

S.B.  No.  1

1       (d)  The <u>certificates</u>  [~~certificate~~]  of a watcher  serving  at

2  an early  voting  polling  place  shall  be retained  at the polling  place

3  until  voting  at the polling  place  is concluded.    At each  subsequent

4  time  that  the watcher  reports  for service,  the watcher  shall  inform

5  the clerk  or deputy  in charge.    The officer  may require  the watcher

6  to sign the watcher 's name  in the officer 's presence,  for comparison

7  with  the  signature  on  the  certificate  <u>of  appointment,</u>  if  the

8  officer  is uncertain  of the watcher 's identity.

9       (e)  If  a  watcher  is  not  accepted  for  service,  the

10  <u>certificates</u>  [~~certificate  of  appointment~~]  shall  be returned  to the

11  watcher  with a signed  statement  of the reason  for the rejection.

12      <u>(g)  An election  officer  commits  an offense  if  the  officer</u>

13  <u>intentionally  or knowingly  refuses  to accept  a watcher  for service</u>

14  <u>when  acceptance  of  the  watcher  is  required  by  this  section.   An</u>

15  <u>offense  under  this  subsection  is a Class  A misdemeanor.</u>

16      <u>(h)  Before  accepting  a watcher,  the officer  presented  with a</u>

17  <u>watcher 's certificate  of appointment  shall  require  the watcher  to</u>

18  <u>take  the  following  oath, administered  by the  officer:  "I swear  (or</u>

19  <u>affirm)  that I will  not disrupt  the voting  process  or harass  voters</u>

20  <u>in the  discharge  of my duties."</u>

21      SECTION  4.07.    Section  33.056 , Election  Code,  is amended  by

22  amending  Subsection  (a) and adding  Subsections  (e) and (f) to read

23  as follows:

24      (a)  Except  as provided  by Section  33.057 , a  watcher  is

25  entitled  to observe  any activity  conducted  at the location  at which

26  the watcher  is serving.    A watcher  is entitled  to sit or stand

27  [~~conveniently~~]  near  <u>enough  to see and hear</u>  the election  officers

27

S.B.  No.  1

1  conducting    the  observed    activity,    except   as  otherwise    prohibited    by

2  this  chapter.

3      (e)    Except   as  provided    by  Section    33.057  (b),  a  watcher    may

4  not  be  denied    free  movement    where  election    activity    is  occurring

5  within    the  location    at  which  the  watcher    is  serving.

6      (f)    In  this  code,  a  watcher   who  is  entitled    to  "observe"    an

7  election    activity    is  entitled    to  sit  or  stand  near  enough  to  see  and

8  hear  the  activity.

9      SECTION   4.08.    Subchapter    C,  Chapter   33 ,  Election    Code,  is

10  amended    by  adding  Section   33.0605   to  read  as  follows:

11      Sec.  33.0605.    OBSERVING    DATA  STORAGE    SEALING    AND  TRANSFER.

12  (a)  A  watcher   appointed    to  serve  at  a  polling    place  in  an  election

13  who  is  available    at  the  time  of  the  action  may  observe   all  election

14  activities    relating    to  closing    the  polling    place,   including    the

15  sealing    and  transfer    of  a  memory  card,  flash  drive,   hard  drive,  data

16  storage    device,   or  other  medium    now  existing    or  later  developed

17  used  by  the  voting  system    equipment.

18      (b)    Notwithstanding    any  other  provision    of  this  code,  a

19  watcher   duly  accepted    for  service    at  a  polling    location    is  entitled

20  to  follow    the  transfer    of  election    materials    from  the  polling   place

21  at  which  the  watcher    was  accepted    to  a  regional    tabulating    center,

22  the  central    counting    station,    or  any  other  location    designated    to

23  process    election    materials.    The  authority    responsible    for

24  administering    a  regional    tabulating    center  or  another    location

25  where  election    materials    are  processed    must  accept   duly  appointed

26  watchers    for  service   in  the  same  manner  a  watcher   is  accepted    for

27  service    under  Section   33.051   and  must  accept  the  same  number  of

S.B.  No.  1

1  watchers   that  may  serve  under  Section  33.007  (a).

2       SECTION  4.09.   Section  33.061  (a), Election  Code,  is  amended

3  to read  as follows:

4       (a)  A person  commits  an offense  if  the  person  serves  in  an

5  official  capacity  at a location  at which  the  presence  of watchers  is

6  authorized   and  knowingly  prevents  a  watcher  from  observing  an

7  activity  or procedure  the  person  knows  the  watcher  is entitled  to

8  observe,  including  by taking  any  action  to obstruct  the  view  of a

9  watcher  or distance  the  watcher  from  the  activity  or procedure  to be

10  observed  in a manner  that  would  make  observation  not  reasonably

11  effective.

12       SECTION  4.10.   Subchapter  C, Chapter  33 , Election  Code,  is

13  amended  by adding  Section  33.063  to read  as follows:

14       Sec.  33.063.   RELIEF.   The  appointing  authority  for  a

15  watcher  who believes  that  the  watcher  was  unlawfully  prevented  or

16  obstructed  from  the performance  of the  watcher  's duties  may  seek:

17            (1)  injunctive  relief  under  Section  273.081 ,

18  including  issuance  of temporary  orders;

19            (2)  a  writ  of  mandamus  under  Section  161.009  or

20  273.061  ; and

21            (3)  any  other  remedy  available  under  law.

22       SECTION  4.11.   Section  34.005 , Election  Code,  is amended  to

23  read  as follows:

24       Sec.  34.005.   ACTION  BY  SECRETARY  OF  STATE.  (a)  The

25  secretary  of state  may  refer  a reported  violation  of law  for

26  appropriate  action  to the  attorney  general,  if the  attorney  general

27  has jurisdiction,  or to a prosecuting  attorney  having  jurisdiction.

S.B.   No.   1

1    (b)   If   the   secretary   of   state   believes   that   a   state

2   inspector   was   unlawfully   prevented   or   obstructed   from   the

3   performance   of the   inspector   's duties,   the   secretary   of   state   may

4   seek:

5    (1)   injunctive   relief   under   Section   273.081 ,

6   including   issuance   of temporary   orders;

7    (2)   a   writ   of   mandamus   under   Section   161.009   or

8   273.061  ; and

9    (3)   any   other   remedy   available   under   law.

10    SECTION   4.12.   Section   86.006 , Election   Code,   is   amended   by

11   amending   Subsection   (a)   and   adding   Subsection   (a-2)   to   read   as

12   follows:

13    (a)   A   marked   ballot   voted   under   this   chapter   must   be

14   returned   to   the   early   voting   clerk   in   the   official   carrier

15   envelope.   The   carrier   envelope   may   be   delivered   in   another

16   envelope   and must   be transported   and delivered   only   by:

17    (1)   mail;

18    (2)   common   or contract   carrier;   or

19    (3)   subject   to   Subsections   [Subsection]   (a-1)   and

20   (a-2),   in-person   delivery   by the   voter   who   voted   the   ballot.

21    (a-2)   An   in-person   delivery   of   a marked   ballot   voted   under

22   this   chapter   must   be received   by an election   official   at the   time   of

23   delivery.   The   receiving   official   shall   record   the   voter 's name,

24   signature,   and   type   of   identification   provided   under   Section

25   63.0101   on a roster   prescribed   by the   secretary   of   state.   The

26   receiving   official   shall   attest   on   the   roster   that   the   delivery

27   complies   with this   section.

30

S.B.  No.  1

1        SECTION   4.13.   Chapter   121 , Election   Code,  is  amended   by

2   adding  Section   121.004  to read  as follows:

3        Sec.  121.004.   COMMUNICATIONS    WITH   VOTING   SYSTEMS   VENDOR

4   PUBLIC   INFORMATION.    (a)  Except   as  provided   by  Subsection   (b),  a

5   written   letter,   e-mail,   or  other   communication,   including   a

6   communication    made  confidential   by  other  law,  between   a  public

7   official   and a voting   systems   vendor:

8              (1)   is not  confidential;

9              (2)   is public   information   for  purposes  of  Chapter  552 ,

10   Government   Code;  and

11             (3)   is  not  subject   to  an  exception   to  disclosure

12   provided   by  Chapter   552 , Government   Code,  other   than  Sections

13   552.110  and  552.1101 , Government   Code.

14        (b)   A  written   letter,   e-mail,   or  other   communication

15   between   a  public   official   and a voting   systems   vendor  is  excepted

16   from   disclosure   under   Chapter   552 , Government   Code,   if   the

17   communication   discloses   information,   data,  or records   relating  to

18   the security   of elections   critical   infrastructure.

19        SECTION  4.14.   Section   127.1301 , Election   Code,  is  amended

20   to read as follows:

21        Sec.  127.1301.   [TALLYING,   TABULATING,   AND   REPORTING]

22   CENTRALLY   COUNTED   OPTICAL   SCAN  BALLOTS   [BALLOT   UNDERVOTES   AND

23   OVERVOTES].   (a)  In  an election   using  centrally   counted   optical

24   scan ballots,   the undervotes   and overvotes   on those  ballots   shall

25   be  tallied,   tabulated,   and reported   by  race  and  by  election

26   precinct   in  the  form  and manner   prescribed   by  the  secretary   of

27   state.

31

1          (b)   An  authority   operating   a  central   counting   station   under

2    this   chapter   may   not   purchase   or  use  a  centrally   counted   optical

3    ballot   scan   system   that   uses   a   data   storage   disc   on   which

4    information,   once  written,   is  capable   of  being   modified.

5          (c)   An  authority   that  purchases   system   components   in  order

6    to  comply   with  this  section   is  eligible   to  have  100  percent   of  the

7    cost  of  those  system   components   reimbursed.

8          (d)   Subsection   (b)  applies   starting   on  the  earlier   of:

9              (1)   the  date  on  which  the  state  certifies   the  first

10   centrally   counted   optical   ballot   scan  system   under  this  section;   or

11             (2)   September   1,  2026.

12         (e)   This   subsection   and  Subsection   (d)  expire   October   1,

13   2026.

14         SECTION   4.15.   Section   127.131  , Election   Code,   is  amended   by

15   adding   Subsection   (f)  to  read  as  follows:

16         (f)   The  presiding   judge  of  the  central   counting   station

17   shall   provide   and  attest   to  a  written   reconciliation   of  votes   and

18   voters   at  the  close  of  tabulation   for  election   day  and  again   after

19   the  central   counting   station   meets   for  the  last   time  to  process

20   late-arriving   ballots   by   mail   and   provisional   ballots.   The

21   secretary   of  state  shall   create   and  promulgate   rules  and  a  form  to

22   facilitate   compliance   with   this  subsection.   The   form   shall   be

23   posted   on  a  website   maintained   by  the  county   along  with  election

24   returns   and  results.

25         SECTION   4.16.   Section   129.023  , Election   Code,   is  amended   by

26   adding   Subsections   (b-2)  and  (c-1)  to  read  as  follows:

27         (b-2)   If  the  test  is  being   conducted   for  an  election   in

S.B.  No.  1

1  which  a  county  election  board  has  been  established  under  Section

2  51.002 , the  general  custodian  of election  records  shall  notify  each

3  member  of  the  board  of  the  test  at  least  48  hours  before  the  date  of

4  the  test.  If  the  county  election  board  chooses  to  witness  the  test,

5  each  member  shall  sign  the  statement  required  by  Subsection  (e)(1).

6     (c-1)  A  test  conducted  under  this  section  must  also  require

7  the  general  custodian  of election  records  to demonstrate,  using  a

8  representative  sample  of  voting  system  equipment,  that  the  source

9  code  of  the  equipment  has  not  been  altered.

10                ARTICLE  5.  VOTING  BY  MAIL

11     SECTION  5.01.  Section  84.001  (b),  Election  Code,  is  amended

12  to  read  as  follows:

13     (b)  Subject  to  Section  1.011 , an  [An]  application  must  be

14  submitted  in  writing  and  signed  by  the  applicant  using  ink  on  paper.

15  An  electronic  signature  or  photocopied  signature  is  not  permitted.

16     SECTION  5.02.  Section  84.002 , Election  Code,  as  effective

17  September  1,  2021,  is  amended  by  amending  Subsection  (a)  and  adding

18  Subsection  (b-1)  to  read  as  follows:

19     (a)  An  early  voting  ballot  application  must  include:

20        (1)  the  applicant  's  name  and  the  address  at  which  the

21  applicant  is  registered  to  vote;

22        (1-a)  the  following  information:

23           (A)  the  number  of  the  applicant  's  driver  's

24  license,  election  identification  certificate,  or  personal

25  identification  card  issued  by  the  Department  of  Public  Safety;

26           (B)  if  the  applicant  has  not  been  issued  a  number

27  described  by  Paragraph  (A),  the  last  four  digits  of  the  applicant  's

S.B.  No.  1

1   social   security   number;   or

2                            (C)   a   statement   by   the   applicant   that   the

3   applicant   has   not   been   issued   a   number   described   by Paragraph   (A)   or

4   (B);

5                    (2)   for an application   for a ballot   to be voted   by mail

6   on the   ground   of absence   from   the   county   of residence,   the   address

7   outside   the applicant   's county   of residence   to which   the ballot   is

8   to be mailed;

9                    (3)   for an application   for a ballot   to be voted   by mail

10  on the   ground   of age   or disability,   the   address   of the   hospital,

11  nursing   home   or other   long-term   care   facility,   or   retirement

12  center,   or of a person   related   to the applicant   within   the   second

13  degree   by   affinity   or   the   third   degree   by   consanguinity,   as

14  determined   under   Chapter   573 , Government   Code,   if the applicant   is

15  living   at that   address   and   that   address   is   different   from   the

16  address   at which   the applicant   is registered   to vote;

17                   (4)   for an application   for a ballot   to be voted   by mail

18  on the   ground   of confinement   in jail, the address   of the jail or of a

19  person   related   to the applicant   within   the   degree   described   by

20  Subdivision   (3);

21                   (5)   for an application   for a ballot   to be voted   by mail

22  on   any   ground,   an   indication   of each   election   for   which   the

23  applicant   is applying   for a ballot;

24                   (6)   an   indication   of   the   ground   of eligibility   for

25  early   voting;   and

26                   (7)   for an application   for a ballot   to be voted   by mail

27  on the   ground   of involuntary   civil   commitment,   the   address   of the

34

S.B.   No.   1

1   facility    operated    by    or    under    contract    with    the    Texas    Civil

2   Commitment    Office    or of a person    related    to the    applicant    within    the

3   degree    of consanguinity    described    by Subdivision    (3).

4         (b-1)    A person    may    use    the    number    of    a    driver 's   license,

5   election    identification    certificate,    or   personal    identification

6   card    that    has    expired    for    the    purpose    of fulfilling    the    requirement

7   under    Subsection    (a)(1-a)    if    the    license    or    identification    is

8   otherwise    valid.

9         SECTION    5.03.    Section    84.011 (a),    Election    Code,    as

10  effective    September    1, 2021,    is amended    to read    as follows:

11       (a)    The officially    prescribed    application    form    for    an    early

12  voting    ballot    must    include:

13          (1)    immediately    preceding    the    signature    space    the

14  statement:    "I    certify    that    the    information    given    in    this

15  application    is true,    and I understand    that giving    false    information

16  in this    application    is a crime.";

17          (2)    a    statement    informing    the    applicant    of    the

18  offenses    prescribed    by Sections    84.003    and    84.004 ;

19          (3)    spaces    for    entering    an    applicant 's    voter

20  registration    number    and    county    election    precinct    of registration,

21  with    a statement    informing    the    applicant    that    failure    to furnish

22  that    information    does    not invalidate    the    application;

23          (3-a)    a    space    for    entering    the    information    required

24  under    Section    84.002 (a)(1-a);    and

25          (4)    on an application    for    a ballot    to be voted    by mail:

26          (A)    a    space    for    an    applicant    applying    on    the

27  ground    of absence    from    the    county    of residence    to indicate    the    date

35

S.B.  No.  1

1    on  or  after   which   the  applicant   can  receive   mail  at  the  address

2    outside   the  county;

3                    (B)  a  space   for  indicating   the  fact  that  an

4    applicant   whose  application   is  signed   by  a  witness   cannot   make  the

5    applicant   's  mark  and  a  space   for  indicating   the  relationship   or

6    lack  of  relationship   of  the  witness   to  the  applicant;

7                    (C)  a  space  for  entering   an  applicant   's  telephone

8    number,   with  a  statement   informing   the  applicant   that  failure   to

9    furnish   that  information   does  not  invalidate   the  application;

10                   (D)  a  space   or  box  for  an  applicant   applying   on

11   the  ground   of  age  or  disability   to  indicate   that  the  address   to

12   which   the  ballot   is  to  be  mailed   is  the  address   of  a  facility   or

13   relative   described   by  Section   84.002  (a)(3),   if  applicable;

14                   (E)  a  space   or  box  for  an  applicant   applying   on

15   the  ground   of  confinement   in  jail  or  involuntary   civil   commitment

16   to  indicate   that  the  address   to  which   the  ballot   is  to  be  mailed   is

17   the  address   of  a  relative   described   by  Section   84.002  (a)(4)  or  (7),

18   if  applicable;

19                   (F)  a  space   for  an  applicant   applying   on  the

20   ground   of  age  or  disability   to  indicate   if  the  application   is  an

21   application   under  Section   86.0015 ;

22                   (G)  spaces   for  entering   the  signature,   printed

23   name,  and  residence   address   of  any  person   assisting   the  applicant;

24                   (H)  a  statement   informing   the  applicant   of  the

25   condition   prescribed   by  Section   81.005 ; and

26                   (I)  a  statement   informing   the  applicant   of  the

27   requirement   prescribed   by  Section   86.003  (c).

36

S.B.  No.  1

1       SECTION   5.04.   Subchapter   A, Chapter   84 , Election   Code,   is

2    amended   by adding   Section   84.0111   to read   as follows:

3       Sec.   84.0111.   DISTRIBUTION   OF   APPLICATION   FORM.   (a)

4    Except   as provided   by Subsection   (c) or as otherwise   authorized   by

5    this   code,   an officer   or employee   of this state   or of a political

6    subdivision   of this state   may not   distribute   an application   form

7    for   an early   voting   ballot   to a person   who did not request   an

8    application   under   Section   84.001 .

9       (b)   An officer   or employee   of this state   or of a political

10   subdivision   of this state   may not use public   funds   to facilitate   the

11   distribution   by another   person   of an application   form for an early

12   voting   ballot   to a person   who did not request   an application   under

13   Section   84.001 .

14      (c)   A political   party   or a candidate   for office   may

15   distribute   an application   form for an early   voting   ballot   to a

16   person   who did not request   an application   under Section   84.001 .

17      SECTION   5.05.   Section   84.032 (c), Election   Code,   is amended

18   to read   as follows:

19      (c)   An applicant   may submit   a request   after   the close   of

20   early   voting   by personal   appearance   by appearing   in person   and:

21        (1)   returning   the ballot   to be voted   by mail to the

22   early   voting   clerk;   or

23        (2)   executing   an affidavit   that the applicant:

24          (A)   has not received   the ballot   to be voted   by

25   mail;   [or]

26          (B)   never   requested   a ballot   to be voted   by mail;

27   or

S.B.  No.  1

1          (C)   received   notice   of  a  defect   under   Section

2  87.0271(b)   or  (c) or 87.0411(b)    or  (c).

3          SECTION  5.06.   Section  84.035  , Election  Code,  is  amended  to

4  read  as follows:

5          Sec.  84.035.   BALLOT  SENT  TO APPLICANT.    (a)   If  the  early

6  voting  clerk  cancels  an application  by  an applicant  to whom  an early

7  voting  ballot  has  been  sent,  the  clerk  shall:

8              (1)   remove   the  applicant   's name  from  the  early  voting

9  roster;  and

10             (2)   make  any  other  entries  in  the  records  and  take  any

11  other  action  necessary  to prevent  the  ballot  from  being  counted  if

12  returned.

13         (b)   An  election  judge  may  permit  a person  to whom  an early

14  voting  ballot  has  been  sent  who  cancels  the  person 's application

15  for  a ballot  to be  voted  by mail  in accordance   with  Section  84.032

16  but  fails  to return  the  ballot  to be  voted  by mail  to the  early

17  voting  clerk,  deputy  early  voting  clerk,  or  presiding  judge  as

18  provided   by that  section  to vote  only  a provisional   ballot  under

19  Section   63.011 .

20         SECTION  5.07.   Section  86.001  , Election  Code,  is  amended  by

21  adding  Subsections   (f),  (f-1),  and  (f-2)  to read  as follows:

22         (f)   If  the   information   required   under   Section

23  84.002 (a)(1-a)   included   on the  application   does  not  identify   the

24  same   voter  identified   on  the  applicant   's application   for  voter

25  registration   under  Section   13.002 (c)(8),  the  clerk  shall  reject  the

26  application.

27         (f-1)   If  an application   is rejected   under  Subsection   (f),

38

S.B.  No.  1

1  the clerk shall provide notice of the rejection in accordance with

2  Subsection (c). The notice must include information regarding the

3  ability to correct or add information required under Section

4  84.002 (a)(1-a) through the online tool described by Section

5  86.015 (c).

6      (f-2) If an applicant corrects an application for a ballot

7  to be voted by mail online and that application subsequently

8  identifies the same voter identified on the applicant 's application

9  for voter registration, the clerk shall provide a ballot to the

10  applicant as provided by this chapter.

11      SECTION 5.08. Section 86.002 , Election Code, is amended by

12  adding Subsections (g), (h), and (i) to read as follows:

13      (g) The carrier envelope must include a space that is hidden

14  from view when the envelope is sealed for the voter to enter the

15  following information:

16        (1) the number of the voter 's driver 's license,

17  election identification certificate, or personal identification

18  card issued by the Department of Public Safety;

19        (2) if the voter has not been issued a number described

20  by Subdivision (1), the last four digits of the voter 's social

21  security number; or

22        (3) a statement by the applicant that the applicant

23  has not been issued a number described by Subdivision (1) or (2).

24      (h) A person may use the number of a driver 's license,

25  election identification certificate, or personal identification

26  card that has expired for purposes of Subsection (g) if the license

27  or identification is otherwise valid.

1        (i)   No  record   associating   an  individual   voter  with  a  ballot

2  may  be  created.

3        SECTION   5.09.   Section   86.011  (c),  Election   Code,   is  amended

4  to  read  as  follows:

5        (c)   If  the  return   is  not  timely,   the  clerk   shall   enter   the

6  time  of  receipt   on  the  carrier   envelope   and  retain   it  in  a  locked

7  container    for   the   period   for   preserving    the   precinct    election

8  records.    The  clerk   shall   destroy   the  unopened   envelope   and  its

9  contents   after   the  preservation   period.

10       SECTION   5.10.   Section   86.015  (c),   Election   Code,   as

11  effective   September   1,  2021,  is  amended   to  read  as  follows:

12       (c)   An  online   tool  used  under   this  section   must:

13            (1)   for  each  election,   record:

14                 (A)   each  application   for  a  ballot   to  be  voted   by

15  mail  received   by  the  clerk;   and

16                 (B)   each  carrier   envelope   sent  to  a  voter   by  the

17  clerk;

18            (2)   for  each  carrier   envelope,   record   or  assign   a

19  serially   numbered   and  sequentially   issued   barcode   or  tracking

20  number   that  is  unique   to  each  envelope;   [and]

21            (3)   update   the  applicable   Internet   website   as  soon  as

22  practicable   after   each  of  the  following   events   occurs:

23                 (A)   receipt   by  the  early   voting   clerk   of  the

24  person  's  application   for  a  ballot   to  be  voted   by  mail;

25                 (B)   acceptance   or  rejection   by  the  early   voting

26  clerk  of  the  person  's  application   for  a  ballot   to  be  voted   by  mail;

27                 (C)   placement   in  the  mail  by  the  early   voting

40

S.B.  No.  1

1   clerk  of  the  person 's  official   ballot;

2                 (D)   receipt   by  the  early  voting   clerk   of  the

3   person 's  marked  ballot;  and

4                 (E)   acceptance   or  rejection   by  the  early  voting

5   ballot  board  of  a  person 's  marked  ballot;  and

6                 (4)   allow   a  voter   to  add   or  correct    information

7   required   under  Section   84.002  (a)(1-a)   or  Section   86.002  (g).

8       SECTION  5.11.   Sections   87.027  (d),  (e),  and  (i),  Election

9   Code,  are  amended  to  read  as  follows:

10      (d)   The  early  voting   clerk   shall   determine   the  number  of

11  members  who  are  to  compose   the  signature   verification   committee  and

12  shall  state  that  number   in  the  order   calling   for  the  committee 's

13  appointment.    A  committee   must  consist   of  not  fewer   than  five

14  members.   In  an  election   in  which  party  alignment   is  indicated  on

15  the  ballot,  each  county  chair  of  a  political   party  with  a  nominee  or

16  aligned   candidate   on  the  ballot   shall   submit   to  the  appointing

17  authority   a  list  of  names  of  persons   eligible   to  serve  on  the

18  signature   verification   committee  in  order  of  the  county  chair 's

19  preference.    The  authority   shall  appoint   at  least  two  persons  from

20  each  list  in  the  order  of  preference   indicated  on  each  list  to  serve

21  as  members  of  the  committee.   The  same  number  of  members  must  be

22  appointed   from  each  list.   The  authority   shall  appoint   as  [the]

23  chair  of  the  committee   the  highest-ranked    person  on  [from]  the  list

24  provided   by  the  political   party  whose  nominee  for  governor   received

25  the  most  votes  in  the  county   in  the  most  recent   gubernatorial

26  general  election.    The  authority   shall  appoint   as  vice  chair  of  the

27  committee   the  highest-ranked    person  on  the  list  provided   by  the

41

S.B.  No.  1

1   political  party  whose  nominee  for  governor  received  the  second  most

2   votes  in  the  county  in  the  most  recent  gubernatorial  general

3   election.   A vacancy  on the committee  shall  be filled  by appointment

4   from  the  original  list  or  from  a  new  list  submitted  by  the

5   appropriate  county  chair.

6        (e)   To  be  eligible  to  serve  on  a  signature  verification

7   committee,  a person  must  be eligible  under  Subchapter  C, Chapter

8   32 , for  service  as  a presiding  election  judge,  except  that  the

9   person  must  be a qualified  voter:

10          (1)   of the  county,  in a countywide  election  ordered  by

11   the governor  or a county  authority  or in a primary  election;

12          (2)   of the  part  of the  county  in which  the election  is

13   held,  for an election  ordered  by the  governor  or a county  authority

14   that does not cover  the entire  county  of the person  's residence;  or

15          (3)   of  the  political  subdivision,  in  an  election

16   ordered  by an authority  of a political  subdivision  other  than  a

17   county.

18        (i)   The signature  verification  committee  shall  compare  the

19   signature  on each carrier  envelope  certificate,  except  those  signed

20   for a voter  by a witness,  with  the signature  on the voter  's ballot

21   application  to determine  whether  the signatures  are those  of the

22   voter.   The committee  may also  compare  the signatures  with  any

23   known  signature  [two or more signatures]  of the voter  [made within

24   the preceding  six years  and]  on file  with  the county  clerk  or voter

25   registrar  to determine  whether  the signatures  are those  of the

26   voter.   Except  as provided  by Subsection  (l),  a determination  under

27   this subsection  that  the signatures  are not those  of the voter  must

S.B.   No.   1

1  be made by a majority vote of the committee 's membership. The

2  committee shall place the jacket envelopes, carrier envelopes, and

3  applications of voters whose signatures are not those of the voter

4  in separate containers from those of voters whose signatures are

5  those of the voter. The committee chair shall deliver the sorted

6  materials to the early voting ballot board at the time specified by

7  the board 's presiding judge.

8      SECTION 5.12. Subchapter B, Chapter 87, Election Code, is

9  amended by adding Section 87.0271 to read as follows:

10     Sec. 87.0271. OPPORTUNITY TO CORRECT DEFECT: SIGNATURE

11  VERIFICATION COMMITTEE. (a) This section applies to an early

12  voting ballot voted by mail:

13        (1) for which the voter did not sign the carrier

14  envelope certificate;

15        (2) for which it cannot immediately be determined

16  whether the signature on the carrier envelope certificate is that

17  of the voter;

18        (3) missing any required statement of residence;

19        (4) missing information or containing incorrect

20  information required under Section 84.002 (a)(1-a) or Section

21  86.002 ; or

22        (5) containing incomplete information with respect to

23  a witness.

24     (b) Not later than the second business day after a signature

25  verification committee discovers a defect described by Subsection

26  (a) and before the committee decides whether to accept or reject a

27  timely delivered ballot under Section 87.027 , the committee shall:

S.B.  No.  1

1          (1)   determine   if it would  be possible   for the voter to

2   correct   the defect   and return   the carrier   envelope   before   the time

3   the polls  are required   to close  on election   day;  and

4          (2)   return   the carrier   envelope   to the voter   by mail,

5   if the committee   determines   that it would  be possible   for the voter

6   to correct   the defect   and return   the carrier   envelope   before   the

7   time the polls  are required   to close  on election   day.

8      (c)   If   the   signature   verification   committee   determines

9   under  Subsection   (b)(1)   that  it would  not be possible   for the voter

10  to correct   the defect   and return   the carrier   envelope   before   the

11  time the polls  are required   to close  on election   day,  the committee

12  may notify  the voter  of the defect  by telephone   or e-mail   and inform

13  the voter  that  the voter  may request   to have  the voter 's application

14  to vote  by mail  canceled   in the manner   described   by Section   84.032

15  or come  to the early  voting   clerk 's office   in person  not later  than

16  the sixth  day after  election   day to correct   the defect.

17      (d)   If the signature   verification   committee   takes  an action

18  described   by Subsection   (b)  or (c),  the committee   must  take  either

19  action   described   by that  subsection   with respect   to each  ballot  in

20  the election   to which  this  section   applies.

21      (e)   A poll  watcher   is entitled   to observe   an action   taken

22  under  Subsection   (b)  or (c).

23      (f)   The   secretary   of state   may  prescribe   any  procedures

24  necessary   to implement   this  section.

25      (g)   Notwithstanding   any  other  law,  a ballot   may  not  be

26  finally   rejected   for a reason   listed   in Section   87.041  (b)(1),  (2),

27  or (6) before   the seventh   day after  election   day.

S.B.  No.  1

1        SECTION  5.13.   Section  87.041 , Election  Code,  is  amended  by

2   amending  Subsections  (b)  and  (e)  and  adding  Subsection  (d-1)  to

3   read  as  follows:

4        (b)  A ballot  may  be  accepted  only  if:

5             (1)  the  carrier  envelope  certificate  is  properly

6   executed;

7             (2)  neither  the  voter 's  signature  on  the  ballot

8   application  nor  the  signature  on  the  carrier  envelope  certificate

9   is  determined  to  have  been  executed  by  a person  other  than  the

10  voter,  unless  signed  by  a witness;

11            (3)  the  voter 's  ballot  application  states  a  legal

12  ground  for  early  voting  by  mail;

13            (4)  the  voter  is  registered  to  vote,  if  registration

14  is  required  by  law;

15            (5)  the  address  to  which  the  ballot  was  mailed  to  the

16  voter,  as  indicated  by  the  application,  was  outside  the  voter 's

17  county  of  residence,  if  the  ground  for  early  voting  is  absence  from

18  the  county  of  residence;

19            (6)  for  a voter  to  whom  a statement  of  residence  form

20  was  required  to  be  sent  under  Section  86.002 (a),  the  statement  of

21  residence  is  returned  in  the  carrier  envelope  and  indicates  that

22  the  voter  satisfies  the  residence  requirements  prescribed  by

23  Section  63.0011  ; [and]

24            (7)  the  address  to  which  the  ballot  was  mailed  to  the

25  voter  is  an  address  that  is  otherwise  required  by  Sections  84.002

26  and  86.003  ; and

27            (8)  the  information  required  under  Section  86.002  (g)

45

1   provided  by the voter  identifies  the same  voter  identified  on the

2   voter 's  application   for  voter  registration  under  Section

3   13.002 (c)(8).

4        (d-1)  If  a voter  provides  the information  required  under

5   Section  86.002 (g)  and it identifies  the same  voter  identified  on

6   the  voter 's  application   for  voter  registration  under  Section

7   13.002 (c)(8),  the  signature  on the ballot  application  and on the

8   carrier  envelope  certificate   shall  be rebuttably  presumed  to be

9   the signatures  of the voter.

10       (e)   In making  the determination  under  Subsection  (b)(2),  to

11  determine  whether  the signatures  are those  of the voter,  the board

12  may  also  compare  the  signatures  with  any  known  signature  [two or

13  more signatures]  of  the voter  [made within  the preceding  six years

14  and]  on  file  with  the county  clerk  or voter  registrar  [to determine

15  whether  the signatures  are those  of the voter].

16       SECTION  5.14.  Subchapter  C, Chapter  87, Election  Code,  is

17  amended  by adding  Section  87.0411  to read  as follows:

18       Sec.  87.0411.  OPPORTUNITY  TO CORRECT  DEFECT:  EARLY  VOTING

19  BALLOT  BOARD.  (a)  This  section  applies  to an early  voting  ballot

20  voted  by mail:

21            (1)  for  which  the  voter  did  not  sign  the  carrier

22  envelope  certificate;

23            (2)  for  which  it cannot  immediately  be determined

24  whether  the signature  on the carrier  envelope  certificate  is that

25  of the voter;

26            (3)  missing  any required  statement  of residence;

27            (4)  missing  information  or containing  incorrect

46

S.B.   No.   1

1    information       required       under       Section       84.002  (a)(1-a)     or   Section

2    86.002  ; or

3              (5)    containing    incomplete    information    with  respect  to

4    a witness.

5         (b)    Not  later  than  the  second  business  day  after  an  early

6    voting  ballot  board  discovers  a defect  described  by Subsection  (a)

7    and  before  the  board  decides  whether  to accept  or reject  a timely

8    delivered  ballot  under  Section  87.041 , the  board  shall:

9              (1)    determine  if it would  be possible  for the  voter  to

10   correct  the defect  and return  the carrier  envelope  before  the time

11   the  polls  are  required  to close  on election  day; and

12              (2)    return  the carrier  envelope  to the voter  by mail,

13   if the  board  determines  that  it would  be possible  for the  voter  to

14   correct  the defect  and return  the carrier  envelope  before  the time

15   the  polls  are  required  to close  on election  day.

16         (c)    If  the  early  voting  ballot  board  determines  under

17   Subsection  (b)(1)  that  it would  not  be possible  for the  voter  to

18   correct  the defect  and return  the carrier  envelope  before  the time

19   the  polls  are  required  to close  on election  day, the  board  may

20   notify  the voter  of the defect  by telephone  or e-mail  and inform  the

21   voter  that  the voter  may request  to have  the voter 's application  to

22   vote  by mail  canceled  in the manner  described  by Section  84.032  or

23   come  to the early  voting  clerk 's office  in person  not later  than  the

24   sixth  day after  election  day to correct  the defect.

25         (d)    If  the  early  voting  ballot  board  takes  an  action

26   described  by Subsection  (b)  or (c),  the  board  must  take  either

27   action  described  by that subsection  with respect  to each  ballot  in

47

S.B.  No.  1

1   the election   to which  this  section   applies.

2        (e)   A poll  watcher   is entitled   to observe   an action   taken

3   under  Subsection   (b) or (c).

4        (f)   The  secretary   of  state   may  prescribe   any  procedures

5   necessary   to implement   this  section.

6        (g)   Notwithstanding   any  other   law, a ballot   may  not  be

7   finally   rejected   for a reason   listed   in Section   87.041  (b)(1),  (2),

8   or (6) before   the seventh   day after  election   day.

9        SECTION   5.15.   Section   87.0431  (b), Election   Code,  is amended

10  to read  as follows:

11        (b)   The  early  voting   clerk   shall,  not later   than  the 30th

12  day after  election   day,  deliver   notice   to the  attorney   general,

13  including   certified   copies   of  the  carrier   envelope   and

14  corresponding   ballot  application,   of any ballot  rejected   because:

15             (1)  the voter  was deceased;

16             (2)  the  voter   already   voted   in person   in the  same

17  election;

18             (3)  the  signatures   on the carrier   envelope   and ballot

19  application   were not executed   by the  same  person;

20             (4)  the  carrier   envelope   certificate   lacked   a witness

21  signature;   [or]

22             (5)  the  carrier   envelope   certificate   was  improperly

23  executed   by an assistant;   or

24             (6)  the  early  voting   ballot  board   or the  signature

25  verification   committee   determined   that  another   violation   of the

26  Election   Code  occurred.

27        SECTION   5.16.   Sections   87.062 (a)  and  (c),  Election   Code,

48

S.B.  No.  1

1    are  amended   to  read  as  follows:

2         (a)   On  the  direction   of  the  presiding   judge,   the  early

3    voting  ballot  board,   in  accordance   with  Section  85.032  (b),  shall

4    open  the  containers   [container]   for  the  early  voting  ballots  that

5    are  to  be  counted   by  the  board,  remove  the  contents  from  each  [the]

6    container,   and  remove  any  ballots  enclosed  in  ballot  envelopes  from

7    their  envelopes.

8         (c)   Ballots   voted   by  mail  shall   be  tabulated   and  stored

9    separately   from  the  ballots  voted  by personal   appearance   and  shall

10   be  separately   reported   on  the  returns   [The  results   of  all  early

11   voting  ballots  counted  by  the  board  under  this  subchapter   shall  be

12   included   in  the  same  return].

13        SECTION   5.17.   Section  87.103  ,  Election  Code,  is  amended  to

14   read  as  follows:

15        Sec.  87.103.   COUNTING   BALLOTS  AND  PREPARING   RETURNS.   (a)

16   The  early  voting  electronic   system  ballots  counted  at  a  central

17   counting   station,   the  ballots   cast  at  precinct   polling  places,   and

18   the  ballots  voted  by  mail  shall  be  tabulated  separately   [from  the

19   ballots  cast  at  precinct   polling  places]  and  shall  be  separately

20   reported   on  the  returns.

21        (b)   The  early  voting  returns   prepared   at  the  central

22   counting   station  must  include   any  early  voting  results  obtained  by

23   the  early  voting  ballot  board  under  Subchapter   [Subchapters]   D  [and

24   E].

25        SECTION   5.18.   Section  87.126  ,  Election  Code,  is  amended  by

26   adding  Subsection   (a-1)  to  read  as  follows:

27        (a-1)   Electronic   records  made  under  this  section  shall

49

1   record  both  sides  of  any  application,    envelope,    or ballot  recorded,

2   and  all  such  records    shall  be  provided   to the  early  voting  ballot

3   board,  the  signature   verification    committee,   or  both.

4          SECTION   5.19.   Subchapter   G , Chapter   87 , Election   Code,   is

5   amended  by  adding  Section  87.128  to read  as follows:

6          Sec.  87.128.   NOTES.   (a)   Each  member  of  an  early  voting

7   ballot  board  and  each  member   of a signature    verification    committee

8   is entitled   to take  any  notes  reasonably   necessary   to perform   the

9   member 's duties   under   this  chapter.

10         (b)   Notes   taken   under   this   section   may   not   contain

11  personally    identifiable   information.

12         (c)   Each  member  who  takes  notes  under  this  section  shall

13  sign  the notes  and  deliver  them  to the  presiding   judge  or committee

14  chair,  as  applicable,   for  delivery   to the  custodian   of election

15  records.

16         (d)   Notes  collected   under  this  section  shall  be preserved   in

17  the  same  manner   as precinct   election   records   under  Section   66.058 .

18                   ARTICLE   6.   ASSISTANCE   OF VOTERS

19         SECTION   6.01.   Section   64.009 , Election   Code,  is amended  by

20  amending   Subsection   (b)  and  adding   Subsections   (e),  (f),  (f-1),

21  (g),  and  (h)  to read  as follows:

22         (b)   The   regular   voting   procedures,   except   those   in

23  Subchapter   B, may  be modified   by  the  election   officer   to the  extent

24  necessary   to conduct   voting  under  this  section.

25         (e)   Except  as provided   by  Section   33.057 , a poll  watcher  is

26  entitled   to observe   any activity   conducted   under  this  section.

27         (f)   A person  who  simultaneously    assists   seven  or more  voters

S.B.  No.  1

1  voting    under    this    section    by    providing    the    voters    with

2  transportation    to the  polling    place    must    complete    and  sign  a form,

3  provided    by an election    officer,    that  contains    the  person 's name

4  and  address    and  whether    the  person    is providing    assistance    solely

5  under  this  section    or under  both  this  section    and  Subchapter    B.

6       (f-1)    Subsection    (f)  does  not  apply  if the  person    is related

7  to  each  voter    within    the  second    degree    by  affinity    or  the  third

8  degree    by consanguinity,    as determined    under  Subchapter    B, Chapter

9  573 , Government    Code.

10      (g)   A form  completed    under  Subsection    (f)  shall  be delivered

11  to  the  secretary    of state  as  soon  as practicable.    The  secretary

12  shall    retain    a form  delivered    under  this  section    for  the  period    for

13  preserving    the  precinct    election    records    and  shall  make  the  form

14  available    to the attorney    general    for  inspection    upon  request.

15      (h)   The  secretary    of state    shall    prescribe    the  form

16  described    by Subsection    (f).

17      SECTION    6.02.    Section    64.031 , Election    Code,  is amended    to

18  read  as follows:

19      Sec.  64.031.    ELIGIBILITY    FOR  ASSISTANCE.    A  voter  is

20  eligible    to receive    assistance    in marking    or reading    the  ballot,  as

21  provided    by this  subchapter,    if the  voter  cannot    prepare    or read  the

22  ballot    because    of:

23        (1)  a physical    disability    that  renders    the  voter

24  unable    to write  or see;  or

25        (2)   an inability    to read  the  language    in which  the

26  ballot    is written.

27      SECTION    6.03.    Subchapter    B, Chapter    64 , Election    Code,  is

51

S.B.  No.  1

1    amended   by  adding   Section   64.0322   to  read   as  follows:

2          Sec.   64.0322.    SUBMISSION    OF   FORM   BY   ASSISTANT.    (a)   A

3    person,   other   than   an  election   officer,   who   assists   a  voter   in

4    accordance   with   this   chapter   is  required   to  complete   a  form

5    stating:

6              (1)   the   name   and  address   of  the  person   assisting   the

7    voter;

8              (2)   the   relationship   to  the   voter   of  the   person

9    assisting   the  voter;   and

10             (3)   whether   the  person   assisting   the  voter   received   or

11   accepted   any   form   of  compensation   or   other   benefit   from   a

12   candidate,   campaign,   or  political   committee.

13        (b)   The  secretary   of  state  shall  prescribe   the  form  required

14   by  this   section.    The   form   must   be  incorporated   into  the  official

15   carrier   envelope   if  the  voter   is  voting   an  early   voting   ballot   by

16   mail   and  receives   assistance   under   Section   86.010 ,  or  must   be

17   submitted   to  an  election   officer   at  the   time   the  voter   casts   a

18   ballot   if  the  voter   is  voting   at  a  polling   place   or  under   Section

19   64.009 .

20        SECTION   6.04.   Section   64.034 ,  Election   Code,  is  amended   to

21   read   as  follows:

22        Sec.   64.034.   OATH.   A  person,   other   than   an  election

23   officer,   selected   to  provide   assistance   to  a  voter   must   take   the

24   following   oath,  administered   by  an  election   officer   at  the  polling

25   place,   before   providing   assistance:

26        "I  swear   (or  affirm)   under  penalty   of  perjury   that   the  voter  I

27   am  assisting   represented   to  me  they   are  eligible   to  receive

52

S.B.  No.  1

1  assistance;   I will not suggest,  by word,  sign,  or gesture,  how  the

2  voter   should   vote;   I  will   confine   my  assistance   to  reading   the

3  ballot  to the voter,  directing   the voter  to read  the ballot,  marking

4  the  voter 's ballot,  or directing   the voter  to mark  the ballot;

5  [answering   the  voter 's questions,   to stating  propositions   on  the

6  ballot,  and to naming  candidates  and,  if listed,  their  political

7  parties;]  I will prepare  the voter 's ballot as the voter directs;  I

8  did not  pressure  or coerce  the voter  into  choosing  me to provide

9  assistance;   [and]  I am not  the voter 's employer,  an agent  of the

10  voter 's employer,  or an officer  or agent  of a labor  union  to which

11  the  voter  belongs;  I will  not communicate  information  about  how the

12  voter  has  voted  to another  person;  and  I understand  that  if

13  assistance  is provided  to a voter  who  is not  eligible  for

14  assistance,  the voter 's ballot  may not be counted."

15         SECTION  6.05.   Sections  86.010 (e),  (h),  and  (i),  Election

16  Code,  are amended  to read  as follows:

17         (e)  A person  who assists  a voter  to prepare  a ballot  to be

18  voted  by mail  shall  enter  on the official  carrier  envelope  of the

19  voter:

20              (1)  the  person 's  signature,  printed  name,  and

21  residence  address;  _

22              (2)  the relationship  of the person  providing  the

23  assistance  to the voter;  and

24              (3)  whether  the person  received  or accepted  any form

25  of compensation  or other  benefit  from a candidate,  campaign,  or

26  political  committee  in exchange  for providing  assistance  [on the

27  official  carrier  envelope  of the voter].

53

S.B.  No.  1

1    (h)  Subsection  (f)  does  not  apply: _

2         (1)  to a violation  of  Subsection  (c),  if  the  person  is

3  related  to  the  voter  within  the  second  degree  by  affinity  or  the

4  third  degree  by  consanguinity,  as  determined  under  Subchapter  B,

5  Chapter  573 ,  Government  Code,  or  was  physically  living  in  the  same

6  dwelling  as the  voter  at  the  time  of  the  event; _or

7         (2)  to a violation  of  Subsection  (e),  if  the  person  is

8  related  to  the  voter  within  the  second  degree  by  affinity  or  the

9  third  degree  by  consanguinity,  as  determined  under  Subchapter  B,

10  Chapter  573 ,  Government  Code.

11    (i)  An  offense  under  this  section  for  a  violation  of

12  Subsection  (c)  is  increased  to  the  next  higher  category  of  offense

13  if  it  is  shown  on  the  trial  of  an  offense  under  this  section  that:

14         (1)  the  defendant  was  previously  convicted  of  an

15  offense  under  this  code;

16         (2)  the  offense  involved  a  voter  65  years  of  age  or

17  older;  or

18         (3)  the  defendant  committed  another  offense  under  this

19  section  in  the  same  election.

20    SECTION  6.06.  Section  86.0105 ,  Election  Code,  is  amended  by

21  amending  Subsections  (a),  (c),  and  (e)  and  adding  Subsection  (f)  to

22  read  as  follows:

23    (a)  A  person  commits  an  offense  if  the  person:

24         (1)  compensates  or offers  to compensate  another  person

25  for  assisting  voters  as  provided  by  Section  86.010  [, as part of any

26  performance-based  compensation  scheme  based  on  the  number  of  voters

27  assisted  or  in  which  another  person  is  presented  with  a  quota  of

54

S.B.  No.  1

1   ~~voters   to be assisted   as provided   by Section   86.010~~ ]; <u>or</u>

2                (2)  <u>solicits,      receives,     or</u>  [~~engages    in   another~~

3   ~~practice     that    causes    another     person 's   compensation     from   or~~

4   ~~employment    status    with   the   person   to be dependent   on  the  number   of~~

5   ~~voters   assisted   as provided   by Section   86.010 ; or~~

6             [~~(3)   with   knowledge   that   accepting   compensation   for~~

7   ~~such   activity   is   illegal,~~]  accepts   compensation   for  an  activity

8   described   by Subdivision   (1)  [~~or  (2)~~].

9        (c)  An offense   under   this  section   is a state   jail  felony  [~~if~~

10  ~~it is shown   on the   trial   of an   offense   under   this   section   that   the~~

11  ~~defendant    was  previously    convicted   two   or   more   times   under   this~~

12  ~~section~~].

13       (e)  For   purposes   of  this   section,   compensation   means   <u>an</u>

14  <u>economic   benefit   as defined   by Section   38.01 , Penal   Code</u> [~~any   form~~

15  ~~of   monetary   payment,   goods,   services,   benefits,   or   promises   or~~

16  ~~offers   of employment,   or any   other   form   of consideration   offered   to~~

17  ~~another   person   in exchange   for assisting   voters~~].

18       <u>(f)  This   section   does   not   apply   if  the  person   assisting   a</u>

19  <u>voter   is an attendant   or caregiver   previously   known   to the voter.</u>

20       SECTION   6.07.   Section   86.013 (b),  Election   Code,  is amended

21  to read  as follows:

22       (b)   Spaces   must   appear   on the   reverse   side   of the  official

23  carrier   envelope   for:

24           (1)  indicating   the   identity   and date  of the  election;

25  [~~and~~]

26           (2)  entering   the   signature,   printed   name,   and

27  residence   address   of a person   other   than   the  voter  who  deposits   the

55

S.B.   No.   1

1  carrier    envelope    in   the   mail   or   with   a   common   or   contract    carrier; <u>

2  and</u>

3                (3)   indicating    the   relationship    <u>of   that   person   to   the</u>

4  <u>voter.</u>

5           SECTION    6.08.    (a)   The   secretary    of   state   shall   conduct    a

6  study   regarding    the   implementation    of   educational    programs,

7  including    the   production    and   publication    on   the   secretary    of

8  state 's   Internet    website    of   instructional    videos,   to   help   voters

9  with   disabilities    understand    how   to   use   voting   systems    used   in   this

10  state.

11           (b)   Not   later   than   December    1,   2022,   the   secretary    of   state

12  shall   submit    to   the   standing    committees    of   the   legislature    with

13  jurisdiction    over   elections    a   report   on   the   study   required    by   this

14  section.

15           (c)   The   secretary    of   state,   using   existing    resources,    may

16  contract    with   a   qualified    vendor   to   conduct    the   study   required    by

17  this   section.

18           (d)   This   section    expires   December    1,   2023.

19                ARTICLE   7.   FRAUD   AND   OTHER   UNLAWFUL    PRACTICES

20           SECTION    7.01.    Chapter    63 ,   Election    Code,   is   amended    by

21  adding   Section   63.0111   to   read   as   follows:

22           <u>Sec.   63.0111.    OFFENSES    RELATED    TO   PROVISIONAL    VOTING.    (a)</u>

23  <u>An   election    judge   commits    an   offense    if   the   judge   knowingly</u>

24  <u>provides    a   voter   with   a   form   for   an   affidavit    required    by   Section</u>

25  <u>63.001   if   the   form   contains    information    that   the   judge   entered    on</u>

26  <u>the   form   knowing    it   was   false.</u>

27           <u>(b)   An   offense    under   this   section    is   a   state   jail   felony.</u>

56

S.B.  No.  1

1        SECTION   7.02.   Sections   276.004   (a)   and   (b),   Election   Code,

2   are amended   to read   as follows:

3        (a)   A person   commits   an offense   if, with   respect   to another

4   person   over   whom   the   person   has   authority   in   the   scope   of

5   employment,   the person   knowingly:

6             (1)   refuses   to permit   the   other   person   to   be   absent

7   from work   on election   day   or while   early   voting   is in progress   for

8   the purpose   of attending   the polls   to vote; or

9             (2)   subjects   or threatens   to subject   the other   person

10   to a penalty   for attending   the polls   on election   day   or while   early

11   voting   is in progress   to vote.

12        (b)   It is an exception   to the application   of this   section

13   that   the person 's conduct   occurs   in connection   with an election   in

14   which   the polls   are open   on election   day   or while   early   voting   is in

15   progress   for   voting   for   two   consecutive   hours   outside   of   the

16   voter 's working   hours.

17        SECTION   7.03.   Sections   276.013   (a)   and   (b),   Election   Code,

18   are amended   to read   as follows:

19        (a)   A person   commits   an offense   if the person   knowingly   or

20   intentionally   makes   any effort   to:

21             (1)   influence   the independent   exercise   of the vote   of

22   another   in the presence   of the ballot   or during   the voting   process,

23   including   by altering   the ballot   of another   or by otherwise   causing

24   a ballot   to not reflect   the intent   of the voter;

25             (2)   cause   a voter   to become   registered,   a ballot   to be

26   obtained,   or a vote   to be cast   under   false pretenses;   [or]

27             (3)   cause   any   false   or   intentionally   misleading

57

S.B.  No.  1

1    statement,    representation,    or information    to be provided:

2                        (A)    to an election   official;   or

3                        (B)    on an application   for ballot  by mail,  carrier

4    envelope,   or any other  official   election-related   form or document;  __

5                        (4)    prevent   a voter  from casting  a legal  ballot  in an

6    election   in which  the voter  is eligible   to vote;

7                        (5)    provide   false   information   to a voter  with  the

8    intent  of preventing   the voter from voting  in an election   in which

9    the voter  is eligible   to vote;

10                       (6)    cause   the ballot   not to reflect   the intent  of the

11   voter;

12                       (7)    cause  a ballot   to be voted  for another   person   that

13   the person   knows   to be deceased   or otherwise   knows  not to be a

14   qualified   or registered   voter;

15                       (8)    cause   or enable  a vote  to be cast  more  than once  in

16   the same  election;   or

17                       (9)    discard   or destroy   a voter 's completed   ballot

18   without   the voter 's consent.

19        (b)    An offense   under  this  section   is a Class  A misdemeanor,

20   unless:

21                       (1)    the person   committed   the offense   while  acting  in

22   the person 's capacity   as an elected   official,   in which   case   the

23   offense  is a state  jail felony;  or

24                       (2)    the person   is convicted   of an attempt,   in which

25   case  the offense  is a Class  B [A] misdemeanor.

26        SECTION   7.04.   Chapter   276 , Election   Code,   is amended   by

27   adding   Sections   276.015,   276.016,   276.017,   276.018,   and 276.019  to

58

S.B.  No.  1

1  read  as  follows:

2        Sec.  276.015.    VOTE  HARVESTING.    (a)   In  this  section:

3             (1)   "Benefit"   means   anything   reasonably   regarded   as  a

4  gain  or  advantage,   including   a  promise   or  offer   of  employment,   a

5  political   favor,   or  an  official   act  of  discretion,   whether   to  a

6  person  or  another   party  whose  welfare   is  of  interest   to  the  person.

7             (2)   "Vote   harvesting   services"   means   in-person

8  interaction   with  one  or  more  voters,   in  the  physical   presence   of  an

9  official   ballot   or  a  ballot   voted  by  mail,   intended   to  deliver   votes

10  for  a  specific   candidate   or  measure.

11      (b)   A  person   commits   an  offense   if  the  person,   directly   or

12  through   a  third  party,   knowingly   provides   or  offers   to  provide   vote

13  harvesting   services   in  exchange   for  compensation   or  other  benefit.

14      (c)   A  person   commits   an  offense   if  the  person,   directly   or

15  through   a  third  party,   knowingly   provides   or  offers   to  provide

16  compensation   or  other  benefit   to  another   person   in  exchange   for

17  vote  harvesting   services.

18      (d)   A  person   commits   an  offense   if  the  person   knowingly

19  collects   or  possesses   a  mail  ballot   or  official   carrier   envelope   in

20  connection   with  vote  harvesting   services.

21      (e)   This  section   does  not  apply  to:

22             (1)   an  activity   not  performed   in  exchange   for

23  compensation   or  a  benefit;

24             (2)   interactions   that  do  not  occur  in  the  presence   of

25  the  ballot   or  during   the  voting   process;

26             (3)   interactions   that  do  not  directly   involve   an

27  official   ballot   or  ballot   by  mail;

S.B.   No.   1

1            (4)    interactions    that  are  not  conducted    in-person   with

2   a voter;   or

3            (5)    activity    that  is  not  designed    to  deliver    votes   for

4   or against   a specific    candidate    or measure.

5        (f)   An offense   under   this   section   is a felony   of the third

6   degree.

7        (g)   If   conduct    that   constitutes    an  offense    under    this

8   section   also   constitutes    an offense   under   any  other   law,   the actor

9   may be prosecuted    under   this   section,   the other   law,   or both.

10       (h)   Records   necessary    to investigate    an offense    under    this

11  section   or any   other   section   of this   code   shall   be provided    by an

12  election    officer   in an unredacted    form to a law enforcement    officer

13  upon    request.    Records    obtained    under    this   subsection    are   not

14  subject   to public   disclosure.

15       Sec.   276.016.    UNLAWFUL    SOLICITATION    AND    DISTRIBUTION    OF

16  APPLICATION    TO  VOTE   BY  MAIL.    (a)    A public   official    or election

17  official    commits    an offense   if  the  official,    while   acting    in  an

18  official   capacity,   knowingly:

19           (1)    solicits   the  submission    of an application    to  vote

20  by mail  from  a person   who  did  not  request    an application;

21           (2)    distributes    an  application    to vote  by mail   to  a

22  person    who  did  not  request    the application    unless   the distribution

23  is expressly   authorized    by another   provision   of this  code;

24           (3)    authorizes    or  approves    the  expenditure    of  public

25  funds   to facilitate    third-party    distribution    of an application    to

26  vote  by mail  to a person   who  did  not  request    the application;   or

27           (4)    completes    any portion   of an application    to vote  by

60

S.B.  No.  1

1   mail  and  distributes    the  application    to  an  applicant.

2          (b)    An  offense   under  this  section  is  a  state  jail  felony.

3          (c)    Subsection   (a)(2)  does  not  apply  if  the  public  official

4   or  election   official   engaged   in  the  conduct   described   by  Subsection

5   (a)(2)  by  providing    access  to  an  application    to  vote  by  mail  from  a

6   publicly   accessible    Internet   website.

7          (d)    Subsection   (a)(4)  does  not  apply  if  the  public  official

8   or  election   official   engaged   in  the  conduct   described   by  Subsection

9   (a)(4)  while  lawfully   assisting    the  applicant   under  Section   84.003  .

10         (e)    Subsection   (a)  does  not  apply  if  the  public  official   or

11  election   official:

12                (1)   provided   general   information   about  voting   by  mail,

13  the  vote  by  mail  process,   or  the  timelines   associated   with  voting  to

14  a  person   or  the  public;  or

15                (2)   engaged   in  the  conduct   described   by  Subsection   (a)

16  while  acting   in  the  official  's  capacity   as  a  candidate   for  a  public

17  elective   office.

18         (f)    The  remedy   provided   under  this  chapter   is  cumulative,

19  and  does  not  restrict   any  other  remedies   provided   by  this  code  or  by

20  law.  A  violation   of  this  section   is  subject   to  injunctive   relief  or

21  mandamus   as  provided   by  this  code.

22         Sec.  276.017.   UNLAWFUL   DISTRIBUTION   OF  EARLY  VOTING   BALLOTS

23  AND  BALLOTING   MATERIALS.   (a)   The  early  voting  clerk   or  other

24  election   official   commits   an  offense   if  the  clerk   or  official

25  knowingly   mails  or  otherwise   provides   an  early  voting   ballot   by

26  mail  or  other  early  voting   by  mail  ballot   materials   to  a  person   who

27  the  clerk   or  official   knows  did  not  submit   an  application   for  a

61

S.B.  No.  1

1    ballot  to be voted  by mail  under  Section  84.001  .

2         (b)   An offense  under  this  section  is a Class  A misdemeanor.

3         Sec.  276.018.    PERJURY   IN  CONNECTION   WITH   CERTAIN   ELECTION

4    PROCEDURES.    (a) A person  commits  an offense  if, with the intent  to

5    deceive,   the  person  knowingly  or  intentionally   makes  a false

6    statement   or swears  to the truth  of a false  statement:

7              (1)   on a voter  registration   application;   or

8              (2)   previously   made  while  making  an oath,  declaration,

9    or affidavit   described   by this  code.

10        (b)   An offense  under  this  section  is a state  jail felony.

11        Sec.  276.019.    UNLAWFUL    ALTERING   OF ELECTION   PROCEDURES.    A

12   public   official  or election   official  may not create,  alter,  modify,

13   waive,  or suspend   any election   standard,   practice,   or procedure

14   mandated   by law or rule  in a manner  not expressly   authorized   by this

15   code.

16                    ARTICLE  8.   ENFORCEMENT

17        SECTION  8.01.    Subchapter   E, Chapter  31 , Election   Code,  is

18   amended   by adding  Sections  31.128,   31.129,   and 31.130  to read  as

19   follows:

20        Sec.  31.128.    RESTRICTION    ON  ELIGIBILITY.    (a)   In  this

21   section,  "election   official"  does not include  a chair  of a county

22   political   party  holding  a primary  election   or a runoff   primary

23   election.

24        (b)   A person  may not serve  as an election   official  if the

25   person  has been  finally  convicted   of an offense  under  this  code.

26        Sec.  31.129.    CIVIL  PENALTY.    (a)   In this  section,  "election

27   official"  has the meaning  assigned  by Section  31.128.

62

S.B.   No.   1

1          (b)   An election   official   may be liable   to this state   for a

2    civil   penalty   if the official:

3                (1)   is employed   by or is an officer   of this state   or a

4    political   subdivision   of this state;   and

5                (2)   violates   a provision   of this code.

6          (c)   A civil   penalty   imposed   under   this section   may include

7    termination   of the person 's employment   and loss of the person 's

8    employment   benefits.

9          Sec.   31.130.   SUIT   AGAINST   ELECTION   OFFICER.   An   action,

10   including   an action   for a writ   of mandamus,   alleging   that   an

11   election   officer   violated   a provision   of this code while acting   in

12   the officer 's official   capacity   may only be brought   against   the

13   officer   in the officer 's official   capacity.

14          SECTION   8.02.   Sections   232.008   (b),   (c),   and   (d),   Election

15   Code,   are amended   to read   as follows:

16          (b)   Except   as provided   by Subsection   (c),   a contestant   must

17   file   the petition   not later   than the later   of the   45th   [30th]   day

18   after   the date   the election   records   are publicly   available   under

19   Section   1.012   or the official   result   of the contested   election   is

20   determined.

21          (c)   A contestant   must file   the petition   not later   than the

22   later   of the   15th   [10th]   day after   the date   the election   records   are

23   publicly   available   under   Section   1.012   or the official   result   is

24   determined   in a contest   of:

25                (1)   a primary   or runoff   primary   election;   or

26                (2)   a general   or special   election   for which   a runoff   is

27   necessary   according   to the official   result   or will be necessary   if

1    the contestant    prevails.

2         (d)    A contestant   must  deliver, <u>electronically    or otherwise,</u>

3    a  copy  of  the  petition   to  the  secretary   of  state  by  the  same

4    deadline  prescribed   for  the  filing  of  the petition.

5         SECTION   8.03.   Title  14, Election   Code,  is amended   by adding

6    Subtitle  D to read  as follows:

7              <u>SUBTITLE   D.   OTHER   ELECTION   LAWSUITS</u>

8       <u>CHAPTER   247.  LAWSUIT   ALLEGING   IMPROPER   ELECTION   ACTIVITIES</u>

9         Sec.  247.001.    PETITION    ALLEGING    FRAUD.    <u>This   chapter</u>

10   <u>applies   to a civil  suit  in which  a candidate   in an election   alleges</u>

11   <u>in the petition   that  an opposing   candidate,   an agent  of the opposing</u>

12   <u>candidate,   or a person   acting   on behalf  of  the opposing   candidate</u>

13   <u>with   the  candidate  's knowledge   violated   any  of  the  following</u>

14   <u>sections   of this  code:</u>

15              (1)   Section   <u>13.007  ;</u>

16              (2)   Section   <u>64.012  ;</u>

17              (3)   Section   <u>64.036  ;</u>

18              (4)   Section   <u>84.003  ;</u>

19              (5)   Section   <u>84.0041  ;</u>

20              (6)   Section   <u>86.0051  ;</u>

21              (7)   Section   <u>86.006  ;</u>

22              (8)   Section   <u>86.010  ;</u>

23              (9)   Section   <u>276.013  ; and</u>

24              (10)   Section   <u>276.015.</u>

25        Sec.  247.002.   PROCEDURE.   A candidate   in an election   may

26   <u>file  a petition   for  an action   under   this chapter   in any county  where</u>

27   <u>a defendant   resided   at the time  of the election.    If the election   is</u>

S.B.  No.  1

1   for a statewide   office,   the candidate   may also  file  the petition   in

2   a district   court  in Travis   County.

3        Sec.  247.003.    FILING   PERIOD   FOR  PETITION.   A candidate   in an

4   election   may  file  a petition   for  an action   under  this  chapter   not

5   earlier  than  the  day  after  the  date  the  election   is certified   and

6   not later  than  the  45th  day  after  the  later  of that  date  or the  date

7   election   records   are  made  publicly   available   under  Section   1.012 .

8        Sec.  247.004.   DAMAGES.    (a)    If  it  is  shown   by  a

9   preponderance   of the  evidence   that  a defendant,   an  agent   of  the

10   defendant,   or a person   acting   on behalf  of  the  defendant   with  the

11   defendant   's knowledge   committed   one or more  violations   of a section

12   described   by  Section   247.001,   the  defendant   is  liable   to  the

13   plaintiff   for damages   in an amount   of $1,000   for each  violation.

14        (b)   Notwithstanding   Section   41.004 , Civil   Practice   and

15   Remedies   Code,  a court   shall   award  damages   under  Subsection   (a) to

16   the  plaintiff   irrespective   of  whether   the  plaintiff   is awarded

17   actual   damages.

18        Sec.  247.005.   ATTORNEY  'S FEES.   In  an  action   under   this

19   chapter,   the  court   may  award  reasonable   attorney  's fees  to  the

20   prevailing   party.

21        SECTION  8.04.   Section   273.061 , Election   Code,  is amended   to

22   read  as follows:

23        Sec.  273.061.   JURISDICTION.   (a)   The  supreme   court   or a

24   court  of  appeals   may  issue   a writ  of  mandamus   to  compel   the

25   performance   of  any  duty   imposed   by  law  in  connection   with  the

26   holding   of an election   or a political   party  convention,   regardless

27   of  whether   the  person   responsible   for  performing   the  duty  is  a

S.B.  No.  1

1  public  officer.

2      (b)  The  court  of  criminal  appeals  may  issue  a  writ  of

3  mandamus  to  compel  the  performance  of  any  duty  imposed  by  law  in

4  connection  with  the  provision,  sequestration,  transfer,  or

5  impoundment  of  evidence  in  or  records  relating  to  a  criminal

6  investigation  conducted  under  this  code  or  conducted  in  connection

7  with  the  conduct  of  an  election  or  political  party  convention.  If  a

8  writ  of  mandamus  is  issued  under  this  subsection,  it  shall  include

9  an  order  requiring  the  provision,  sequestration,  transfer,  or

10  impoundment  of  the  evidence  or  record.

11      SECTION  8.05.  Subchapter  D, Chapter  22 , Government  Code,  is

12  amended  by  adding  Sections  22.304  and  22.305  to  read  as  follows:

13      Sec.  22.304.  COURT  SITTING  IN  PANELS  FOR  CERTAIN  ELECTION

14  PROCEEDINGS;  CRIMINAL  OFFENSE.  (a)  In  this  section,  "public

15  official"  means  any  person  elected,  selected,  appointed,  employed,

16  or  otherwise  designated  as  an  officer,  employee,  or  agent  of  this

17  state,  a  government  agency,  a  political  subdivision,  or  any  other

18  public  body  established  by  state  law.

19      (b)  Notwithstanding  any  other  law  or  rule,  a  court

20  proceeding  entitled  to  priority  under  Section  22.305  and  filed  in  a

21  court  of  appeals  shall  be  docketed  by  the  clerk  of  the  court  and

22  assigned  to a panel  of  three  justices  determined  using  an  automated

23  assignment  system.

24      (c)  A  person,  including  a  public  official,  commits  an

25  offense  if  the  person  communicates  with  a  court  clerk  with  the

26  intention  of  influencing  or  attempting  to  influence  the  composition

27  of  a  three-justice  panel  assigned  a  specific  proceeding  under  this

S.B.  No.  1

1   section.

2        (d)   An offense  under  this  section  is a Class  A misdemeanor.

3        Sec.  22.305.   PRIORITY  OF CERTAIN  ELECTION  PROCEEDINGS.   (a)

4   The  supreme   court  or a court  of appeals  shall  prioritize   over  any

5   other  proceeding   pending   or filed  in the court  a proceeding   for

6   injunctive   relief  or for a writ  of mandamus   under  Chapter  273 ,

7   Election   Code,  pending  or filed  in the court  on or after  the 70th

8   day before  a general   or special   election.

9        (b)   If granted,  oral  argument   for a proceeding   described  by

10  Subsection   (a) may be given  in person  or through  electronic   means.

11       SECTION  8.06.   Section  23.101 , Government  Code,  is amended

12  by amending   Subsection   (a) and adding  Subsections   (b-1)  and (b-2)

13  to read  as follows:

14       (a)   Except  as provided   by Subsection   (b-1), the [The]  trial

15  courts  of this state  shall  regularly   and frequently   set hearings

16  and trials  of pending  matters,   giving   preference   to hearings  and

17  trials  of the following:

18            (1)   temporary   injunctions;

19            (2)   criminal   actions,  with the following  actions  given

20  preference   over  other  criminal  actions:

21                 (A)   criminal   actions   against   defendants   who are

22  detained  in jail pending   trial;

23                 (B)   criminal   actions  involving   a charge  that a

24  person  committed   an act of family  violence,   as defined  by Section

25  71.004 , Family  Code;

26                 (C)   an offense  under:

27                      (i)   Section  21.02  or 21.11 , Penal  Code;

67

S.B.  No.  1

1                        (ii)   Chapter   22 , Penal   Code,  if  the  victim

2   of  the  alleged   offense   is  younger   than  17  years  of  age;

3                        (iii)  Section   25.02 ,  Penal   Code,  if  the

4   victim  of  the  alleged   offense  is  younger   than  17  years  of  age;

5                        (iv)   Section   25.06 ,  Penal  Code;

6                        (v)   Section   43.25 ,  Penal  Code;  or

7                        (vi)   Section   20A.02 (a)(7),   20A.02 (a)(8),

8   or  20A.03 , Penal   Code;

9                 (D)   an  offense   described   by  Article   62.001 (6)(C)

10  or  (D),  Code  of  Criminal   Procedure;   and

11                 (E)   criminal   actions   against   persons   who  are

12  detained   as  provided   by  Section   51.12 , Family   Code,  after  transfer

13  for  prosecution   in  criminal   court  under  Section   54.02 , Family   Code;

14           (3)   election   contests   and  suits   under  the  Election

15  Code;

16           (4)   orders   for  the  protection   of  the  family   under

17  Subtitle   B, Title   4, Family   Code;

18           (5)   appeals   of  final   rulings   and  decisions   of  the

19  division   of  workers ' compensation   of  the  Texas   Department   of

20  Insurance   regarding   workers ' compensation   claims   and  claims   under

21  the  Federal   Employers ' Liability   Act  and  the  Jones   Act;

22           (6)   appeals   of  final   orders   of  the  commissioner   of  the

23  General   Land  Office   under  Section   51.3021 , Natural   Resources   Code;

24           (7)   actions   in  which   the  claimant   has  been   diagnosed

25  with   malignant   mesothelioma,   other   malignant   asbestos-related

26  cancer,   malignant   silica-related   cancer,   or  acute   silicosis;   and

27           (8)   appeals   brought   under  Section   42.01   or  42.015 , Tax

68

S.B.   No.   1

1    Code,   of   orders   of   appraisal   review   boards   of   appraisal   districts

2    established   for   counties   with   a   population   of   less   than   175,000.

3         (b-1)   Except   for   a   criminal   case   in   which   the   death   penalty

4    has   been   or   may   be   assessed   or   when   it   would   otherwise   interfere

5    with   a   constitutional   right,   the   trial   courts   of   this   state   shall

6    prioritize   over   any   other   proceeding   pending   or   filed   in   the   court   a

7    proceeding   for   injunctive   relief   under   Chapter   273 ,   Election   Code,

8    pending   or   filed   in   the   court   on   or   after   the   70th   day   before   a

9    general   or   special   election.

10        (b-2)   A   hearing   in   a   proceeding   described   by   Subsection

11   (b-1)   may   be   held   in   person   or   through   electronic   means,   as

12   determined   by   the   court.

13        SECTION   8.07.   Chapter   23 ,   Government   Code,   is   amended   by

14   adding   Subchapter   D   to   read   as   follows:

15              SUBCHAPTER   D.   GENERAL   PROVISIONS

16        Sec.   23.301.   ASSIGNMENT   OF   CERTAIN   ELECTION   PROCEEDINGS;

17   CRIMINAL   OFFENSE.   (a)   Notwithstanding   any   other   law   or   rule,   the

18   clerk   of   a   district   court   in   which   a   proceeding   entitled   to   priority

19   under   Section   23.101   (b-1)   is   filed   shall   docket   the   proceeding   and,

20   if   more   than   one   district   court   in   the   county   has   jurisdiction   over

21   the   proceeding,   randomly   assign   the   proceeding   to   a   district   court

22   using   an   automated   assignment   system.

23        (b)   Notwithstanding   any   other   law   or   rule,   the   clerk   of   a

24   county   court   or   statutory   county   court   in   which   a   proceeding

25   entitled   to   priority   under   Section   23.101   (b-1)   is   filed   shall

26   docket   the   proceeding   and,   if   more   than   one   court   in   the   county   has

27   jurisdiction   over   the   proceeding,   randomly   assign   the   proceeding   to

S.B.  No.  1

1    a court  using  an automated   assignment    system.

2         (c)   A  person,   including   a  public   official,   commits   an

3    offense  if the person  communicates   with a county  or district   clerk

4    with  the intention   of influencing   or attempting   to influence   the

5    court  or judge  assigned   to a proceeding   under  this  section.

6         (d)   An offense   under  this  section  is a Class  A misdemeanor,

7    except   that the offense  is a state  jail  felony  if it is shown  on the

8    trial  of the offense   that  the person   committed   the offense   while

9    acting  in the person 's official   capacity   as an election   official.

10        (e)   If a district   or county  clerk  does  not comply  with this

11   section,   a person  may  seek  from  the supreme   court  or a court  of

12   appeals  a writ of mandamus  as provided  by Section  273.061 , Election

13   Code,  to compel  compliance   with this  section.

14        Sec.  23.302.   DEADLINES   IN  CERTAIN   ELECTION   PROCEEDINGS.

15   (a)   Not  later  than  24 hours  after  the proceeding   is filed,  a judge

16   to whom  a case  is assigned   under  Section  23.301(b)   who  wishes  to be

17   recused   from  the proceeding   must,  before  recusal:

18             (1)   hear  an application   for  any emergency   temporary

19   relief  sought;

20             (2)   grant  or deny  any emergency   temporary   relief

21   sought;  and

22             (3)   set a scheduling   order  that provides:

23                  (A)   a date  for a hearing  on any injunction   sought

24   not later  than  five days  after  the date  on which  the proceeding   was

25   filed;  and

26                  (B)   discovery   and  deposition   deadlines   before

27   the expiration   of any emergency   relief  order  entered.

S.B.  No.  1

1      (b)   The  presiding   judge  of  an  administrative   region   shall

2  assign  a  new  judge  to  a  proceeding   assigned   under  Section  23.301(b)

3  not  later  than  12  hours  after  the  original   judge  assigned   to  the

4  proceeding   is  recused  under  Subsection   (a).

5      (c)   A  final   order   in  a  proceeding   filed   under   Section

6  273.081 ,  Election   Code,   shall  be  submitted   in  writing   to  the

7  parties   not  later  than  24  hours  after  the  judge  makes  a  final

8  determination   in  the  proceeding.

9      (d)   If  a  district   judge  does  not  comply  with  this  section,  a

10  person  may  seek  from  the  supreme   court,  the  court  of  criminal

11  appeals,   or  a  court  of  appeals  a  writ  of  mandamus  as  provided  by

12  Section   273.061 ,  Election   Code,  to  compel  compliance  with  this

13  section.

14      (e)   Notwithstanding   Section   23.101 (b-1),  a  proceeding

15  relating  to  a  permanent   injunction   being  sought  in  connection  to  a

16  challenge  under  Section  141.034 ,  Election   Code,  may  be  heard  after

17  the  primary  election  has  been  canvassed.

18      ARTICLE  9.   INELIGIBLE   VOTERS  AND  RELATED  REFORMS

19      SECTION  9.01.   Chapter  42 ,  Code  of  Criminal   Procedure,   is

20  amended  by  adding  Article  42.0194  to  read  as  follows:

21      Art.  42.0194.   FINDING  REGARDING  FELONY  CONVICTION.   In  the

22  trial  of  a  felony  offense,   if  the  defendant   is  adjudged  guilty  of

23  the  offense,   the  court  shall:

24      (1)   make  an  affirmative   finding  that  the  person  has

25  been  found  guilty  of  a  felony  and  enter  the  affirmative   finding  in

26  the  judgment  of  the  case;  and

27      (2)   instruct  the  defendant   regarding  how  the  felony

71

2be44725ef9c28d4

S.B.  No.  1

1   conviction   will  impact   the  defendant   's right   to vote   in this state.

2   SECTION   9.02.   Article   42.01 , Code  of Criminal   Procedure,   as

3   effective   September   1, 2021,  is amended   by adding   Section   16 to read

4   as follows:

5   Sec.  16.   In   addition   to  the   information   described   by

6   Section   1, the  judgment   should   reflect   the affirmative   finding   and

7   instruction   entered   pursuant   to Article   42.0194.

8   SECTION   9.03.   Section   64.012 , Election   Code,  is amended   by

9   amending   Subsections   (a)  and  (b)  and  adding   Subsections   (c)  and  (d)

10  to read  as follows:

11  (a)   A person   commits   an offense   if the person   knowingly   or

12  intentionally:

13  (1)   votes  or attempts   to vote  in an election   in which

14  the person   knows  the person   is not  eligible   to vote;

15  (2)   [knowingly]   votes  or attempts   to vote  more   than

16  once  in an election;

17  (3)   [knowingly]   votes  or attempts   to vote  a ballot

18  belonging   to another   person,  or by impersonating   another   person;

19  [or]

20  (4)   [knowingly]   marks  or attempts   to mark  any portion

21  of another   person  's ballot   without   the consent   of that  person,  or

22  without   specific   direction   from  that  person   how  to mark  the ballot;

23  or

24  (5)   votes  or attempts   to vote  in an election   in this

25  state   after   voting   in another   state   in an election   in  which  a

26  federal   office   appears   on the ballot   and  the election   day  for both

27  states   is the same  day.

S.B.   No.   1

1        (b)   An   offense   under   this   section   is   a   Class   A   misdemeanor

2   [felony   of   the   second   degree   unless   the   person   is   convicted   of   an

3   attempt.      In   that   case,   the   offense   is   a   state   jail   felony].

4        (c)   A   person   may   not   be   convicted   solely   upon   the   fact   that

5   the   person   signed   a   provisional   ballot   affidavit   under   Section

6   63.011   unless   corroborated   by   other   evidence   that   the   person

7   knowingly   committed   the   offense.

8        (d)   If   conduct   that   constitutes   an   offense   under   this

9   section   also   constitutes   an   offense   under   any   other   law,   the   actor

10   may   be   prosecuted   under   this   section,   the   other   law,   or   both.

11        SECTION   9.04.   The   change   in   law   made   by   this   article   in

12   adding   Section   64.012   (c),   Election   Code,   applies   to   an   offense

13   committed   before,   on,   or   after   the   effective   date   of   this   Act,

14   except   that   a   final   conviction   for   an   offense   under   that   section

15   that   exists   on   the   effective   date   of   this   Act   remains   unaffected   by

16   this   article.

17    ARTICLE   10.   REPEALER;   SEVERABILITY;   TRANSITION;   EFFECTIVE   DATE

18        SECTION   10.01.   The   following   provisions   of   the   Election

19   Code   are   repealed:

20              (1)   Section   85.062   (e);

21              (2)   Section   86.0105   (b);   and

22              (3)   Section   127.201   (f).

23        SECTION   10.02.   If   any   provision   of   this   Act   or   its

24   application   to   any   person   or   circumstance   is   held   invalid,   the

25   invalidity   does   not   affect   other   provisions   or   applications   of   this

26   Act   that   can   be   given   effect   without   the   invalid   provision   or

27   application,   and   to   this   end   the   provisions   of   this   Act   are   declared

73

S.B.  No.  1

1    to be severable.

2        SECTION   10.03.   (a)   Except  as  otherwise   provided   by  this

3    Act,  the  changes  in  law  made  by  this  Act  apply  only  to  an  offense

4    committed   on  or  after   the  effective   date  of  this  Act.   An  offense

5    committed   before   the  effective   date  of  this  Act  is  governed   by  the

6    law  in  effect   when  the  offense   was  committed,   and  the  former   law  is

7    continued   in  effect  for  that  purpose.   For  purposes   of  this  section,

8    an  offense   was  committed   before   the  effective   date  of  this  Act  if

9    any  element   of  the  offense   occurred   before   that  date.

10        (b)   The  changes   in  law  made  by  this  Act  apply  only  to  an

11   election  ordered   on  or  after   the  effective   date  of  this  Act.   An

12   election  ordered   before   the  effective   date  of  this  Act  is  governed

13   by  the  law  in  effect   when  the  election   was  ordered,   and  the  former

14   law  is  continued   in  effect  for  that  purpose.

15        (c)   The  changes   in  law  made  by  this  Act  apply  only  to  an

16   application   to  vote  an  early  voting   ballot  by  mail  submitted   on  or

17   after  the  effective   date  of  this  Act.   An  application   to  vote  an

18   early  voting  ballot  by  mail  submitted   before   the  effective   date  of

19   this  Act  is  governed   by  the  law  in  effect   when  the  application   was

20   submitted,   and  the  former   law  is  continued   in  effect  for  that

21   purpose.

22        (d)   The  changes   in  law  made  by  this  Act  apply  only  to  an

23   application   for  voter   registration   submitted   on  or  after   the

24   effective   date  of  this  Act.

25        (e)   Chapter   247,  Election   Code,  as  added   by  this  Act,

26   applies   only  to  a  cause  of  action  for  which  the  associated   election

27   occurred   after  the  effective   date  of  this  Act.

74

S.B.  No.  1

1        SECTION   10.04.    This   Act   takes   effect   on   the   91st   day   after

2   the  last  day  of  the  legislative     session.

S.B.  No.  1

_____          _____
    President   of the  Senate                    Speaker  of the  House

    I  hereby  certify  that  S.B.  No.  1  passed  the  Senate  on August  12,  2021,  by  the  following  vote:  Yeas  18,  Nays  11; August  27,  2021,  Senate  refused  to  concur  in  House  amendments  and requested  appointment  of  Conference  Committee;  August  29,  2021, House  granted  request  of  the  Senate;  August  31,  2021,  Senate adopted  Conference  Committee  Report  by  the  following vote:  Yeas  18,  Nays  13.

                                      _____
                                        Secretary  of the  Senate

    I  hereby  certify  that  S.B.  No.  1  passed  the  House,  with amendments,  on  August  27,  2021,  by  the  following  vote:  Yeas  80, Nays  41,  one  present  not  voting;  August  29,  2021,  House  granted request  of  the  Senate  for  appointment  of  Conference  Committee; August  31,  2021,  House  adopted  Conference  Committee  Report  by  the following  vote:  Yeas  80,  Nays  41,  one  present  not  voting.

                                        _____
                                    Chief  Clerk  of the  House

Approved:

_____
                    Date

_____
                  Governor

**LEGISLATIVE BUDGET BOARD**
**Austin, Texas**

**FISCAL NOTE, 87TH LEGISLATURE 2nd CALLED SESSION 2021**

**August 8, 2021**

**TO:** Honorable Bryan Hughes, Chair, Senate Committee on State Affairs

**FROM:** Jerry McGinty, Director, Legislative Budget Board

**IN RE: SB1** by Hughes (Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses; providing civil penalties.), **As Introduced**

---

**No significant fiscal implication to the State is anticipated.**

---

The bill would amend the Election Code relating to voter registration, poll watchers, certain procedural requirements for state and county election officers, and voting by mail. It would increase criminal penalties for certain election offenses and establish certain civil penalties. It would require a voter registrar to provide notice of unlawful voting or registration to the Office of the Attorney General (OAG) and the Secretary of State (SOS) and would also require the SOS to obtain citizenship information from the Department of Public Safety (DPS) to compare on a monthly basis to voter registration records.

According to the OAG, the office does not anticipate that the legislation would give rise to civil enforcement actions as it is likely that most county registrars would take action to correct notices of noncompliance and that any instances of county registrar disobedience would not be difficult to litigate. The OAG anticipates an increase in cases as a result of the passage of the bill; however, the office assumes that any legal work resulting from the passage of this bill could be reasonably absorbed with current resources.

According to the Office of Court Administration, the bill would impose criminal penalties upon conduct which is not currently illegal and would enhance penalties on pre-existing crimes which may increase criminal caseloads before the courts. However, due to the deterrent effect of the new laws, it is not anticipated caseloads would increase significantly. Therefore, no significant fiscal impact to the state court system is anticipated.

According to the Comptroller of Public Accounts, although creating a new civil penalty or expanding liability related to a civil penalty could result in an increase to state revenue, this amount cannot be estimated.

According to DPS, no significant fiscal impact to the state is anticipated.

According to SOS, no significant fiscal impact to the state is anticipated.

This analysis assumes implementing the provisions of the bill addressing felony sanctions for criminal offenses would not result in a significant impact on state correctional agencies.

## Local Government Impact

According to the Texas Association of Counties, the bill would have a significant fiscal impact on counties.

According to the Fort Bend County Election Administrator, the estimated fiscal impact of the bill would be between $200,000 and $12.0 million. The county states that the most significant component of this cost would be the replacement of voting systems to comply with the requirements of the bill at an estimated $9.0 to $12.0 million.

According to the Bexar County Election Administrator, the bill would result in an estimated fiscal impact of $350,000 to $13.0 million. The most significant component of this estimate would be due to the required replacement of voting systems. The county states that the provisions of the bill related to video surveillance, live streaming, and records retention would have significant costs that would vary by the number of elections held over the course of a year. According to the county, there would also be additional costs for reprinting new forms and envelopes, outreach for new mail ballot requirements, and providing processing for rejected voter applications.

According to the Cameron County Election Administrator, the bill would have an estimated annual fiscal impact of at least $250,000 and an additional cost of over $5.0 million for new equipment, the acquisition of surveillance equipment, and streaming and data storage.

A Class A misdemeanor is punishable by a fine of not more than $4,000, confinement in jail for a term not to exceed one year, or both. Costs associated with enforcement, prosecution and confinement could likely be absorbed within existing resources. Revenue gain from fines imposed and collected is not anticipated to have a significant fiscal implication.


**Source Agencies:** 212 Office of Court Admin, 302 Office of the Attorney General, 304 Comptroller of Public Accounts, 307 Secretary of State, 405 Department of Public Safety

**LBB Staff:** JMc, LBO, LCO, GP, CMA

**LEGISLATIVE BUDGET BOARD**
**Austin, Texas**

**FISCAL NOTE, 87TH LEGISLATURE 2nd CALLED SESSION 2021**

**August 9, 2021**

**TO:** Honorable Bryan Hughes, Chair, Senate Committee on State Affairs

**FROM:** Jerry McGinty, Director, Legislative Budget Board

**IN RE:** **SB1** by Hughes (relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses; providing civil penalties.), **Committee Report 1st House, Substituted**

---

**No significant fiscal implication to the State is anticipated.**

---

The bill would amend the Election Code relating to voter registration, poll watchers, certain procedural requirements for state and county election officers, and voting by mail. It would increase criminal penalties for certain election offenses and establish certain civil penalties. It would require a voter registrar to provide notice of unlawful voting or registration to the Office of the Attorney General (OAG) and the Secretary of State (SOS) and would also require the SOS to obtain citizenship information from the Department of Public Safety (DPS) to compare on a monthly basis to voter registration records.

According to the OAG, the office does not anticipate that the legislation would give rise to civil enforcement actions as it is likely that most county registrars would take action to correct notices of noncompliance and that any instances of county registrar disobedience would not be difficult to litigate. The OAG anticipates an increase in cases as a result of the passage of the bill; however, the office assumes that any legal work resulting from the passage of this bill could be reasonably absorbed with current resources.

According to the Office of Court Administration, the bill would impose criminal penalties upon conduct which is not currently illegal and would enhance penalties on pre-existing crimes which may increase criminal caseloads before the courts. However, due to the deterrent effect of the new laws, it is not anticipated caseloads would increase significantly. Therefore, no significant fiscal impact to the state court system is anticipated.

According to the Comptroller of Public Accounts, although creating a new civil penalty or expanding liability related to a civil penalty could result in an increase to state revenue, this amount cannot be estimated.

According to DPS, no significant fiscal impact to the state is anticipated.

According to SOS, no significant fiscal impact to the state is anticipated.

This analysis assumes implementing the provisions of the bill addressing felony sanctions for criminal offenses would not result in a significant impact on state correctional agencies.

**Local Government Impact**

According to the Texas Association of Counties, the bill would have a significant fiscal impact on counties.

According to the Fort Bend County Election Administrator, the estimated fiscal impact of the bill would be between $200,000 and $12.0 million. The county states that the most significant component of this cost would be the replacement of voting systems to comply with the requirements of the bill at an estimated $9.0 to $12.0 million.

According to the Bexar County Election Administrator, the bill would result in an estimated fiscal impact of $350,000 to $13.0 million. The most significant component of this estimate would be due to the required replacement of voting systems. The county states that the provisions of the bill related to video surveillance, live streaming, and records retention would have significant costs that would vary by the number of elections held over the course of a year. According to the county, there would also be additional costs for reprinting new forms and envelopes, outreach for new mail ballot requirements, and providing processing for rejected voter applications.

According to the Cameron County Election Administrator, the bill would have an estimated annual fiscal impact of at least $250,000 and an additional cost of over $5.0 million for new equipment, the acquisition of surveillance equipment, and streaming and data storage.

A Class A misdemeanor is punishable by a fine of not more than $4,000, confinement in jail for a term not to exceed one year, or both. Costs associated with enforcement, prosecution and confinement could likely be absorbed within existing resources. Revenue gain from fines imposed and collected is not anticipated to have a significant fiscal implication.

**Source Agencies:** 212 Office of Court Admin, 302 Office of the Attorney General, 304 Comptroller of Public Accounts, 307 Secretary of State, 405 Department of Public Safety

**LBB Staff:** JMc, LBO, CMA, LCO, GP

**LEGISLATIVE BUDGET BOARD**
**Austin, Texas**

**FISCAL NOTE, 87TH LEGISLATURE 2nd CALLED SESSION 2021**

**August 21, 2021**

**TO:** Honorable Trent Ashby, Chair, House Committee on Constitutional Rights & Remedies, Select

**FROM:** Jerry McGinty, Director, Legislative Budget Board

**IN RE: SB1** by Hughes (Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses; providing civil penalties.), **As Engrossed**

---

**No significant fiscal implication to the State is anticipated.**

---

The bill would amend the Election Code relating to voter registration, poll watchers, certain procedural requirements for state and county election officers, and voting by mail. It would increase criminal penalties for certain election offenses and establish certain civil penalties. It would require a voter registrar to provide notice of unlawful voting or registration to the Office of the Attorney General (OAG) and the Secretary of State (SOS) and would also require the SOS to obtain citizenship information from the Department of Public Safety (DPS) to compare on a monthly basis to voter registration records.

According to the OAG, the office does not anticipate that the legislation would give rise to civil enforcement actions as it is likely that most county registrars would take action to correct notices of noncompliance and that any instances of county registrar disobedience would not be difficult to litigate. The OAG anticipates an increase in cases as a result of the passage of the bill; however, the office assumes that any legal work resulting from the passage of this bill could be reasonably absorbed with current resources.

According to the Office of Court Administration, the bill would impose criminal penalties upon conduct which is not currently illegal and would enhance penalties on pre-existing crimes which may increase criminal caseloads before the courts. However, due to the deterrent effect of the new laws, it is not anticipated caseloads would increase significantly. Therefore, no significant fiscal impact to the state court system is anticipated.

According to the Comptroller of Public Accounts, although creating a new civil penalty or expanding liability related to a civil penalty could result in an increase to state revenue, this amount cannot be estimated.

According to DPS, no significant fiscal impact to the state is anticipated.

According to the SOS, the provisions of the bill related to implementation of procedures within the statewide voter registration system to correct certain defects in mail ballots would impose costs for additional programming; however, these costs could be absorbed with existing resources.

This analysis assumes implementing the provisions of the bill addressing felony sanctions for criminal offenses would not result in a significant impact on state correctional agencies.

**Local Government Impact**

According to the Texas Association of Counties, the bill would have a significant fiscal impact on counties.

According to the Fort Bend County Election Administrator, the estimated fiscal impact of the bill would be between $200,000 and $12.0 million. The county states that the most significant component of this cost would be the replacement of voting systems to comply with the requirements of the bill at an estimated $9.0 to $12.0

million.

According to the Bexar County Election Administrator, the bill would result in an estimated fiscal impact of $350,000 to $13.0 million. The most significant component of this estimate would be due to the required replacement of voting systems. The county states that the provisions of the bill related to video surveillance, live streaming, and records retention would have significant costs that would vary by the number of elections held over the course of a year. According to the county, there would also be additional costs for reprinting new forms and envelopes, outreach for new mail ballot requirements, and providing processing for rejected voter applications.

According to the Cameron County Election Administrator, the bill would have an estimated annual fiscal impact of at least $250,000 and an additional cost of over $5.0 million for new equipment, the acquisition of surveillance equipment, and streaming and data storage

According to the Williamson County Election Administrator, the bill would have an estimated annual financial impact of between $500,000 and $5.0 million. The most significant component of this estimate would be due to the required replacement of voting systems. In addition, provisions of the bill related to video surveillance, live streaming, and records retention would have significant costs that would vary by the number of elections held over the course of a year. There would also be additional costs for reprinting new forms and envelopes, outreach for new mail ballot requirements, and providing processing for rejected voter applications.

A Class A misdemeanor is punishable by a fine of not more than $4,000, confinement in jail for a term not to exceed one year, or both. Costs associated with enforcement, prosecution and confinement could likely be absorbed within existing resources. Revenue gain from fines imposed and collected is not anticipated to have a significant fiscal implication.


**Source Agencies:** 212 Office of Court Admin, 302 Office of the Attorney General, 304 Comptroller of Public Accounts, 307 Secretary of State, 405 Department of Public Safety

**LBB Staff:** JMc, LBO, LCO, GP, CMA

**LEGISLATIVE BUDGET BOARD**
**Austin, Texas**

**FISCAL NOTE, 87TH LEGISLATURE 2nd CALLED SESSION 2021**

**August 24, 2021**

**TO:** Honorable Trent Ashby, Chair, House Committee on Constitutional Rights & Remedies, Select

**FROM:** Jerry McGinty, Director, Legislative Budget Board

**IN RE:** **SB1** by Hughes (relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses.), **Committee Report 2nd House, Substituted**

---

**No significant fiscal implication to the State is anticipated.**

---

This bill would amend the Election Code relating to voter registration, poll watchers, certain procedural requirements for state and county election officers, and voting by mail. It would increase criminal penalties for certain election offenses. It would require a voter registrar to provide notice of unlawful voting or registration to the Office of the Attorney General (OAG) and the Secretary of State (SOS).

According to the Office of Court Administration, the bill imposes criminal penalties upon conduct which is not currently illegal and enhances penalties on pre-existing crimes which may increase criminal caseloads before the courts. However, due to the deterrent effect of the new laws, it is not anticipated caseloads will increase significantly and no significant fiscal impact to the state court system is anticipated.

According to the OAG, the office anticipates an increase in cases as a result of the passage of this bill; however, the office assumes that any legal work resulting from the passage of this bill could be reasonably absorbed with current resources.

According to the Comptroller of Public Accounts, the extent to which creating a new offense or expanding an existing offense would impact state revenue cannot be estimated.

According to SOS, no significant fiscal impact to the state is anticipated.

This analysis assumes implementing the provisions of the bill addressing felony sanctions for criminal offenses would not result in a significant impact on state correctional agencies.

**Local Government Impact**

According to the Texas Association of Counties, the bill is not anticipated to have a significant fiscal impact on county election officials and election administrators.

According to the Election Administrators for Williamson and Chambers counties, the estimated fiscal impact of the bill would be $10,000 and $1,000, respectively, for the cost of replacing ballot-by-mail applications and carrier envelopes.

A Class B misdemeanor is punishable by a fine of not more than $2,000, confinement in jail for a term not to exceed 180 days, or both. A Class A misdemeanor is punishable by a fine of not more than $4,000, confinement in jail for a term not to exceed one year, or both. Costs associated with enforcement, prosecution and confinement could likely be absorbed within existing resources. Revenue gain from fines imposed and collected is not anticipated to have a significant fiscal implication.

**Source Agencies:** 212 Office of Court Admin, 302 Office of the Attorney General, 304 Comptroller of Public Accounts, 307 Secretary of State

**LBB Staff:** JMc, LBO, LCO, GP

**LEGISLATIVE BUDGET BOARD**
**Austin, Texas**

**FISCAL NOTE, 87TH LEGISLATURE 2nd CALLED SESSION 2021**

**August 30, 2021**

**TO:** Honorable Dan Patrick, Lieutenant Governor, Senate
Honorable Dade Phelan, Speaker of the House, House of Representatives

**FROM:** Jerry McGinty, Director, Legislative Budget Board

**IN RE: SB1** by Hughes (relating to election integrity and security, including by preventing fraud in the
conduct of elections in this state; increasing criminal penalties; creating criminal offenses.),
**Conference Committee Report**

---

**Estimated Two-year Net Impact to General Revenue Related Funds** for SB1, Conference Committee
Report : an impact of $0 through the biennium ending August 31, 2023.

The bill would make no appropriation but could provide the legal basis for an appropriation of funds to
implement the provisions of the bill.

---

**General Revenue-Related Funds, Five- Year Impact:**

| Fiscal Year | Probable Net Positive/(Negative) Impact to General Revenue Related Funds |
|---|---|
| 2022 | $0 |
| 2023 | $0 |
| 2024 | $0 |
| 2025 | $0 |
| 2026 | ($154,179,370) |

**All Funds, Five-Year Impact:**

| Fiscal Year | Probable Savings/(Cost) from General Revenue Fund 1 | Change in Number of State Employees from FY 2021 |
|---|---|---|
| 2022 | $0 | 0.0 |
| 2023 | $0 | 0.0 |
| 2024 | $0 | 0.0 |
| 2025 | $0 | 0.0 |
| 2026 | ($154,179,370) | 0.0 |

**Fiscal Analysis**

This bill would amend the Election Code relating to voter registration, poll watchers, procedural requirements
for state and county election officers, modifications of Election Day procedures, and voting by mail. It would
increase criminal penalties for certain election offenses. It would require a voter registrar to provide notice of
unlawful voting or registration to the Office of the Attorney General (OAG) and the Secretary of State (SOS).

According to the SOS, the agency would be required: 1) to develop a training course for voter registrars not in

compliance with certain requirements and, in certain instances, inform the OAG of failure to achieve substantial compliance following attendance at these courses; 2) to conduct periodic audits of elections in certain counties; 3) to develop and maintain a poll watcher training program; and 4) to make certain modifications to the Texas Election Administration Management (TEAM) mail ballot tracking system in order to allow voters to correct certain defects related to those ballots. It is anticipated that the cost of these provisions could be absorbed within existing resources of the agency. Additionally, the bill would require the SOS to reimburse certain changes to county voting counting systems that would be eligible for 100 percent reimbursement by the state.

According to the Office of Court Administration, the bill would impose criminal penalties upon conduct which is not currently illegal and would enhance penalties on preexisting crimes which could increase criminal caseloads before the courts. However, due to the deterrent effect of the new laws, it is not anticipated caseloads will increase significantly and no significant fiscal impact to the state court system is anticipated. This analysis assumes any increase in costs related to new civil penalties could be addressed with existing resources. It is assumed that any additional costs imposed on the Court of Criminal Appeals related to an authorization to issue a writ of mandamus in certain situations could be addressed with existing resources.

According to the OAG, the office anticipates an increase in cases as a result of the passage of this bill; however, the office assumes that any legal work resulting from the passage of this bill could be reasonably absorbed with current resources.

According to the Comptroller of Public Accounts, the extent to which creating a new offense or expanding an existing offense would impact state revenue cannot be estimated.

This analysis assumes implementing the provisions of the bill addressing felony sanctions for criminal offenses would not result in a significant impact on state correctional agencies.

## Methodology

To address the provision of the bill related to reimbursement of local jurisdiction costs to convert scanners and central count computers to a configuration that utilizes write-once media, the SOS anticipates that all existing devices subject to the provisions of the bill would be required to be replaced. The cost of replacing hardware components, including new write-once media for every device in every election, is estimated by currently certified voting system vendors to be $116,209,750. In addition, these vendors have estimated that the cost of replacing write-once removable media for all elections occurring in a biennium would result in a reimbursable cost of $37,969,620. This cost would reoccur in each biennium thereafter. Because the write-only requirement would be required as of September 1, 2026, it is assumed that these costs would be incurred in fiscal year 2026.

## Local Government Impact

According to the Texas Association of Counties, the bill would have a significant fiscal impact on counties.

According to the Fort Bend County Election Administrator, the estimated fiscal impact of the bill would be between $200,000 and $12.0 million. The county states that the most significant component of this cost would be the replacement of voting systems to comply with the requirements of the bill at an estimated $9.0 to $12.0 million.

According to the Bexar County Election Administrator, the bill would result in an estimated fiscal impact of $350,000 to $13.0 million. The most significant component of this estimate would be due to the required replacement of voting systems. The county states that the provisions of the bill related to video surveillance, live streaming, and records retention would have significant costs that would vary by the number of elections held over the course of a year. According to the county, there would also be additional costs for reprinting new forms and envelopes, outreach for new mail ballot requirements, and providing processing for rejected voter applications.

According to the Cameron County Election Administrator, the bill would have an estimated annual fiscal impact

of at least $250,000 and an additional cost of over $5.0 million for new equipment, the acquisition of surveillance equipment, and streaming and data storage

According to the Williamson County Election Administrator, the bill would have an estimated annual financial impact of between $500,000 and $5.0 million. The most significant component of this estimate would be due to the required replacement of voting systems. In addition, provisions of the bill related to video surveillance, live streaming, and records retention would have significant costs that would vary by the number of elections held over the course of a year. There would also be additional costs for reprinting new forms and envelopes, outreach for new mail ballot requirements, and providing processing for rejected voter applications.

A Class A misdemeanor is punishable by a fine of not more than $4,000, confinement in jail for a term not to exceed one year, or both. Costs associated with enforcement, prosecution and confinement could likely be absorbed within existing resources. Revenue gain from fines imposed and collected is not anticipated to have a significant fiscal implication.

**Source Agencies:** 212 Office of Court Admin, 302 Office of the Attorney General, 304 Comptroller of Public Accounts, 307 Secretary of State, 405 Department of Public Safety

**LBB Staff:** JMc, LCO, GP, LBO, CMA



MALDEF Written Testimony Before House Select Committee on Constitutional Rights
and Remedies Against Senate Bill 1

August 23, 2021

Chairman Ashby, Vice-Chairman Thompson, and members of the Committee,

My name is Fatima Menendez and I am a Legislative Staff Attorney with MALDEF, the Mexican American Legal Defense and Educational Fund, Inc.  Founded in 1968, MALDEF is the nation's leading organization that litigates civil rights cases on behalf of Latinos in the United States.

MALDEF opposes Senate Bill 1.  My testimony today will focus on specific provisions of this bill, but we oppose the bill in its entirety.

Overall, SB1 ignores the election security measures already contained in the Texas Election Code, lacks justification for its further restrictions on voting, and violates federal law with several provisions that limit voting rights guaranteed by federal statutes.

Article 5 deprives voters of lawful assistance

Article 5 of the bill interferes with voter assistance and will have a disparate, negative impact on Latino and Asian American voters.  Assistors are relied upon by limited English proficient voters in order to cast their ballots.  For example, one in ten U.S. born Latino adults does not speak English well.[1]  Slightly more than half of naturalized U.S. citizens who are Latino do not speak English well.[2]  Texas is home to close to two million naturalized U.S. citizens.[3]  These individuals, who are eligible to vote, are also eligible to receive language assistance when casting their ballots.

Article 5 places unnecessary obstacles in the way of voter assistance in the polling place.  Section 5.04 requires the assistor to swear an oath under penalty of perjury stating that the assistor secured a statement of eligibility from the voter.  The oath further requires

---

[1] Pew Research Center, "English Proficiency on the Rise Among Latinos," May 12, 2015, available at https://www.pewresearch.org/hispanic/2015/05/12/english-proficiency-on-the-rise-among-latinos.

[2] U.S. Department of Commerce, "Language Use in the United States: 2011," August 2013, available at https://www2.census.gov/library/publications/2013/acs/acs-22/acs-22.pdf.

[3] Migration Policy Institute, "2019 State Immigration Data Profiles (Texas)," available at https://www.migrationpolicy.org/data/state-profiles/state/demographics/TX.

the assistor to swear that the assistor did not "encourage" the voter to choose them. Section 5.03 requires the assistor to complete a form stating the assistor's name and address and relationship of the assistor to the voter. Section 5.01 requires persons who assist voters by simultaneously transporting three or more voters to a polling place to submit a form that contains the assistor's name and address and whether the person is solely providing transportation or additional assistance.

Article 5 will deter individuals from providing assistance to voters and deny voters the assistance to which they are legally entitled. Assistors who are concerned about providing personal information to polling place officials, as well as those who are concerned about making an error in providing assistance, will simply refuse to provide assistance even when a voter requests it of them. Voters who need assistance will forgo it if they don't want to reveal private information when explaining their eligibility for assistance. None of these new requirements are in the federal voter assistance law, and SB1 will result in voters who need assistance going without it.

Article 5 will also slow down the voting process and increase wait times at polling places in predominantly Latino neighborhoods. Requiring assistors to fill out new forms, and take longer oaths, will take time even when the assistors are willing to comply with these new requirements. At polling places where there are more voters who need language assistance, the lines will slow down, voters will be forced to wait longer to vote, and some will leave before voting in order to meet work and family commitments.

Sections 5.01, 5.03, 5.04, not only have a disparate, negative impact on Latino and Asian American voters, the provisions violate Section 208 of the federal Voting Rights Act.[4] For example, section 5.04 adds language to the assistor's oath that conflicts with Section 208 of the federal Voting Rights Act because federal law does not require that the voter declare eligibility for assistance.

Section 5.04 also requires the assistor to swear that they "did not encourage" the voter to choose them to provide assistance. This language violates the First Amendment to the U.S. Constitution and Section 208 of the federal Voting Rights Act because individuals have the right to encourage a voter to rely on them for assistance and voters have the right to choose an assistor who encourages the voter to use them. Finally, the oath includes language that "if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." This language will cause assistors to inquire into the voter's need for assistance in order to make sure the ballot is counted later; this invades the voter's privacy and interferes with the right to vote with assistance.

None of these new requirements are based on any evidence that voters who need assistance because of limited English proficiency or disability are involved in fraud.

<u>Article 1 improperly targets voters for investigation</u>

Sections 1.05 and 1.08 impose unnecessary obligations on the Secretary of State and the Office of the Attorney General. In Texas, it is a routine occurrence for individuals

---

[4] *See* 52 U.S.C. § 10508.

to live temporarily away from the address where they are registered to vote. These provisions force the Secretary of State and the Attorney General into quarterly analysis of lists of individuals excused from jury duty simply because they are temporarily living away from their registered voter address.

The fact that someone is living away from his or her voter registration address is not evidence of voter fraud. It is not an offense to move away from the address at which you are registered to vote and it is a common circumstance.  Young adults move away from their parents' homes to attend college or serve in the military.  Other adults move away from their voter registration address for a new job or for a host of other reasons.  When any of these individuals respond to a jury summons questionnaire and truthfully state that they are not residing at their voter registration address, there is no evidence of an "offense under Section 13.007 or other law."  There is no requirement in Texas law to cancel your voter registration when you reside elsewhere, and the decision whether to register to vote at a new address depends on whether the individual considers herself to have changed domicile.

Requiring the Secretary of State and Office of the Attorney General to compare lists of people excused from jury duty for non-residence in the county to lists of registered voters, and having the county or district attorney or Attorney General investigate whether a person committed an offense under Section 13.007, are wastes of resources and do not advance any interest in combatting fraud.  The relevant offense under the Election Code -- making a false statement when registering to vote – is simply not implicated months or years later when a registered voter is excused from jury duty because that voter is living out of the county at the time he or she is summoned.

Section 1.03 requires a voter registrar to refer to the Attorney General, Secretary of State and local prosecutor any person who the registrar determines is not eligible to vote and registered to vote or voted in an election. This provision creates a requirement to refer voters to law enforcement who in reality may or may not have registered while ineligible.

For example, Section 1.03 is not tied to a time period so it sweeps in voters who are eligible at the time they register but who become ineligible at a later point in time.  There are many voters in this situation.  For example, a young person who registers to vote at her home address with her parents, but then moves away permanently to another county, remains on the voter rolls as a registered voter at her parents' address but at that point is ineligible to vote in that county.  That voter can be referred to law enforcement by the registrar as, "a person who is not eligible to vote registered to vote."  However, it's not a crime to remain on the voter rolls after becoming ineligible and thus all of these referrals would be inappropriate harassment of voters and possibly unconstitutional.

Section 1.03 provides no standards and will lead to improper targeting of voters on the rolls who share a name or other information with an ineligible individual.  For example, a father and son with the same name can reside at the same address.  The father could be excused from jury duty for non-U.S. citizenship and the son could be a U.S. citizen properly registered to vote.

3

If registrars refer voters to law enforcement based on "weak" matching criteria, such as in the previous example, this would unconstitutionally infringe on the right to vote.

Sections 1.03 will result in properly registered and qualified voters, particularly Latinos, being challenged for lack of U.S. citizenship when there is no evidence of wrongdoing. Falsely accused of illegal conduct, many of these voters will be improperly purged from the rolls or deterred from voting even though they have every right to vote.

<u>SB1 invites voter intimidation by poll watchers</u>

Sections 3.03, 3.04, and 3.06 strip voters of the protections of privacy and security in the polling place and invite vigilantism by poll watchers who would be allowed to remain in the polling place even if they were intimidating voters and interfering with the voting process. Section 3.04 provides that poll watchers should be able to "sit or stand near enough to see and hear the activity or procedure" they are observing, which effectively removes the requirement that watchers maintain their distance from voters who are marking their ballots. Section 3.04 also prohibits a watcher from being denied "free movement where election activity is occurring." Allowing poll watchers to roam around the inside of a polling place and stand close to voters and election workers is entirely unnecessary.  In addition to these sections, Section 5.01 allows poll watchers to get close to voters receiving assistance from elected officials and watch them vote by allowing poll watchers to "observe any activity conducted under this section."

The only effect of allowing poll watchers to roam around, stand near voters, and even disrupt the activities inside a polling place is to make voters uncomfortable and less likely to remain in the polling place and vote.  Section 3.06 creates an offense for election officers who knowingly prevent a watcher from observing an action or procedure the person knows the watcher is entitled to observe. This includes any action to obstruct the view of a watcher or action to position a watcher at a distance from the activity or procedure the watcher wishes to observe but is not reasonably able to do so from that position.  Section 3.03 makes it a crime for an election officer to refuse to accept a poll watcher for service.  This crime is punishable by up to one year in jail, a fine of as much as $4,000, or both.  This provision ensures that not only will voters be intimidated by unrestrained poll watchers, but election officials will also be intimidated by the threat of severe penalties for trying to protect voters from poll watcher interference.

Latino voters in Texas have borne the brunt of more than a century of voter intimidation by vigilantes as well as official law enforcement.  In just one example, in 1928, the Weslaco barrio election box was assailed by the local "Good Government League." According to a federal report, a crowd of 3,000 to 4,000 Anglos at the polling place shouted "Don't let those Mexicans in to vote. Throw them out." while men with shotguns protected the crowd. An estimated 200 to 300 regular Mexican American voters "did not show up at all."[5]  In another example, a South Texas lawyer, Marshall Hicks, testified in a Texas Senate investigation that his client's opponent, D.W. Glasscock had the Texas Rangers selectively "investigate" Mexican American voters, and spread "a spirit of

---

[5] Anders, Evan. *Boss Rule in South Texas: The Progressive Era*. Austin: University of Texas, 1982, p. 224-6, 239, 269; Montejano, David. *Anglos and Mexicans in the Making of Texas, 1836-1886*. Austin: University of Texas Press, 1987, p. 147.

terrorism among those Mexican people." Historian Evan Anders noted in his book that "the mere presence of armed Rangers at the polling stations had an intimidating effect on the Hispanic population" in Cameron, Duval, Nueces, Hidalgo, and Starr Counties.[6]

Before you dismiss these examples of racially-motivated voter intimidation as relics of the past, note that as recently as January 2021, the U.S. Capitol invaders displayed racist messages and flaunted nooses in their effort to stop certification of an election they claimed was infected by voter fraud.[7]  There is every reason to believe that removing security measures inside polling places will result in more intimidation of Latino voters.  Now is not the time for the Texas Legislature to rescind laws that guarantee a safe and secure environment for voters inside the polling place and to strip polling place officials of the authority to remove poll watchers who disrupt voting.

<u>SB1 makes voting more difficult without justification</u>

Other provisions in Articles 2, 4, and 6 make voting more difficult for no reason at all.  Limiting the types of buildings that can serve as polling places, limiting the hours of operation of polling places, prohibiting the solicitation and affirmative distribution of mail ballot applications, and criminalizing community-based voter outreach when organizations pay their outreach workers to assist elderly and home-bound voters who vote by mail, will unnecessarily impede voter participation and reduce the number of votes cast by eligible voters.

MALDEF urges the Committee to take into consideration the many flaws in Senate Bill 1 and reject this bill.

Thank you for your time.

---

[6] Anders, Evan. *Boss Rule in South Texas: The Progressive Era*. Austin: University of Texas, 1982, p. 252, 257, 263; Montejano, David. *Anglos and Mexicans in the Making of Texas, 1836-1886*. Austin: University of Texas Press, 1987, p. 145-7.

[7] Associated Press, *Years of white supremacy threats culminated in Capitol riots*, available at https://apnews.com/article/white-supremacy-threats-capitol-riots-2d4ba4d1a3d55197489d773b3e0b0f32.

RE: Luis Testimony in Opposition to SB 1: Related to Election Integrity and Security

Dear Chair Ashby and Members of the House Committee on Constitutional Rights and Remedies:

Every Texan (formerly Center for Public Policy Priorities), appreciates the opportunity to submit testimony related to HB 3: Election Integrity and Security

Every Texas opposes Senate Bill 1 for the following reasons:

As the 87th Legislative Session begins its first special session on July 8 to address voting legislation that failed in the regular session, it is important for the public and the legislative members to consider the context of this proposal. Electoral reform proposals do not happen in a vacuum, there is history in Texas of using false allegations of voter fraud or election integrity as a proxy for voter suppression. So much so that for years, Texas had to get prior approval from the U.S. Department of Justice for any electoral change according to Section 5 of the Voting Rights Act.

As the demographic makeup of the state has evolved, voter discrimination efforts have intensified. Texas is home to the second-largest Latino population in the United States, and demographic projections show that by 2040, Latinos will constitute the majority of citizens in the state. Texas also has a Black population of more than two million and a consistently growing Asian American population. This makes Texas an ethnic minority majority state in total population but not in voting strength. The increasing number of racial and ethnic groups in Texas highlights the need to vigilantly protect the voice and electoral rights of the state's Latino, Black, and Asian American electorate.

Section 5 of the Voting Rights Act, the preclearance requirement, was enacted to prevent changes in election practices or procedures in covered jurisdictions until the new procedures were determined to have neither discriminatory purpose or effect. Changes such as removing polling locations, adding new identity documentation, or the procedures for mail in ballots would have to been approved to ensure Latinos, Blacks and Asian voting power was not retrogressed.   It was considered the heart of the Voting Rights Act because it stopped voter discrimination before it happened and placed the burden on the state to prove that electoral changes on the state or local level would not put Latino, Black or Asian American voters in a worse position in terms of electoral power. It was extended to Texas in 1975 due to the state's history of excluding Mexican Americans from the political process. At the time, Texas led the nation in several categories of voting discrimination, including then-recent Section 5 violations and Section 2 challenges.

Since 1982, there have been at least 30 successful Section 5 enforcement actions in which the Department of Justice has participated prior to the *Shelby County v. Holder* 570 U.S. 529 (2013) U.S. Supreme Court decision that struck down the coverage formula for Section 5 of the Voting Rights Act. When the Supreme Court struck down the formula that Congress enacted on which states and jurisdictions section 5 could be applied to, it effectively gutted the enforcement of the act.  Without Section 5 protection, Texas officials are free to discriminate and enact voting changes that will reduce the voting power of ethnic and racial minorities until these communities bring a lawsuit and prove the discrimination often after the impact.

With or without Section 5, local county election officials are on the front lines to make sure voting is secure and accessible to all. Traditionally, county election officials are given a fair amount of leeway

to implement and conduct elections with guidance from the Secretary of State. Even with Section 5, Texas consistently ranks at the bottom in voting turnout – usually around 11th from the bottom of all states.[1]  During the pandemic, counties like Harris County Bexar, and Travis County, attempted to make voting safer by instituting more mobile voting sites, drive-thru voting procedures, expanded hours for polling locations, and mail-in ballot access for eligible voters. These procedures did not alter any state law requirements. In fact, Secretary of State Ruth Hughs confirmed that Texas had a smooth and secure election in 2020.

Texas has a longstanding history of secure elections and efforts by Attorney General Paxton and Governor Abbott to ferret out voter fraud over the years has remarkably shown just the opposite.  Despite Texas having a longstanding history of secure elections, conservative legislators ramrodded Senate Bill 7 was through the legislative process in the regular session. Committee hearings were cancelled unceremoniously with witnesses unable to give testimony, questions from legislators went unanswered, and large sections of the bill were redrafted and changed at the last minute with little to no transparency. Advocates expressed concerns that the effects of SB 7 will almost certainly make voting even harder for groups that Texas voting rules have long marginalized — voters of color, voters with disabilities, low-income voters, and voters with limited English proficiency — and who are the most likely to be shut out when voting procedures are tightened.

Passing legislation in this manner diminishes the faith of the electorate in the voting process and contributes to the false narrative that elections are rigged. In the end, the institution of Democracy itself is diminished.

This can have lasting impacts. Youth who reported having been either encouraged to vote or taught how to register to vote in high school are more likely to vote and participate in other civic activities, more knowledgeable about voting processes, and more invested in and attentive to the 2020 election than other youth, but two out of every three white students (67%) remember having being encouraged to vote in high school compared with one in two Black students (54%).[2]  According to Barry Burden, a professor of political science and director of the Elections Research Center at UW-Madison, "research shows that the healthier you are, the more likely you are to cast a ballot." Research also shows that voting can actually make people healthier. "When a person is involved with civic life, they are social, efficacious, and participating," says Burden.[3]

The shared prosperity from having a strong electoral presence from every walk of life in Texas explains why the Perryman Group implemented an extensive modeling process to measure economic effects of restricting voter access stemming from several primary sources and found that hundreds of thousands of Texas jobs are at stake. [4]  The Perryman Research has shown that, controlling for other factors, increases (decreases) in voting access leads to higher (lower) earning over time. Lower earnings also impact workforce participation and employment. In addition, reduced earnings negatively affect household budgets and therefore consumer spending. The Perryman Group estimates that measures restricting voter access would lead to a total decrease in business activity from lower earnings & employment losses and reduced household purchasing power in the state by 2025 of an estimated - $14.7 billion in annual gross product and a loss of -73,249 jobs including multiplier effects.

For this reasons, Every Texan respectfully asks the members of this committee to oppose Senate Bill 1.



**COALITION OF TEXANS WITH DISABILITIES**

1716 San Antonio St.
Austin, TX 78701
Ph 512. 478.3366
www.TXDisabilities.org

Texans with disabilities deserve the same protections and access to private, lawful voting that other Texans have — even if the way we do that might look a little different. We believe that all Texans with disabilities should have the ability to cast the most secure and private ballot as independently as possible. No matter if they cast their vote on an accessible voting machine at a polling location or through a Mail-In-Ballot in their home.

**The way to securing the ballots of Texans with disabilities is by limiting the amount of assistance a person needs or their need to rely on a witness to complete their ballot and sign them.**

While we're talking integrity and security, there are bills this past regular session that gave legislators opportunities to continue that arc of inclusion and a more secure ballot: **Allowing voters to cure mail-in ballots disqualified through signature verification immediately, rather than waiting 10 days after an election to notify the voter and making mail-in ballots accessible to voters with blindness with Accessible (ADA) Compliant Absentee/Mail in Ballot Solutions, something we already provide to overseas active military personnel. We recommend these issues be included in any upcoming special session.**

Texas Secretary of State's Director of Elections acknowledged- *"that the existing signature-comparison procedures may result in certain mail-in ballots being improperly rejected.*

*And as a result of the implemented procedures, the record demonstrates that **Texas counties rejected at least 3,746 mail in ballots during the 2018 general election and at least 1,567 mail-in ballots during the 2016 general election** solely on the basis of mismatching signatures."*

Election integrity and improved voter access are important goals with strong support across Texas. But election measures lose any semblance of integrity if they cross the line into interfering with the reasonable, necessary and legally protected accommodations the millions of Texans living with disabilities need to make their voices heard in our democracy.

As a leading voice in the disability community **we strongly support the recommendations below to ensure integrity and security in our election process.**

- *Providing voters, the opportunity to cure the issue.*

Legislation during the regular and special session proposed provisions that would require clerks to notify voters of minor issues with their mail ballots (missing/mismatched voter signatures, missing witness/assistant information etc.) and provide them an opportunity to correct the issue by returning a statement with their identifying information and the missing information. The current SB 1 cure language is missing vital corrections to make it functional and effective. We urge this committee to take this opportunity to strengthen election integrity by making the following improvements to the cure provisions in SB 1:

1. Notice of ballot errors to voters and cure should be mandatory, not discretionary. HB3 currently has this requirement.

2. Give voters until six days after Election Day to complete cure. HB3 currently includes this provision.

3. Require DPS to transmit ID numbers in its possession to the Secretary of State to update voter registration records. SB1 already requires DPS to transmit voter signatures so adding ID numbers would not be burdensome.

4. Give voters notice of ID number errors on ballot applications so they can use the remote system to cure.

5. Allow voters to cure other issues, such as missing statements of residence, remotely via the online tracking tool.

- ***Unequal access to absentee mail voting for Texans with disabilities:***

Texas still does not offer an accessible alternative to mail in ballot forcing voters to disclose their voting selections to a person assisting them to vote a paper absentee or mail ballot. **Voters with disabilities are the only group of eligible absentee mail voters that must go to a polling location if they wish to vote independently.** Non-disabled voters can vote independently from home, whereas voters with disabilities often cannot.

*Governor Abbott's Committee on Disabilities in its 2020-2021 Biennium Policy Recommendations emphasized the importance of ensuring access to accessible ADA compliant mail in ballots.*

"As in many areas of life, the use of technology in voting is increasingly more common. Compliance with accessibility standards in voting machine technologies has resulted in a secret ballot for voters with disabilities who had previously not enjoyed this valued right. Stakeholders from local jurisdictions describe barriers to independently casting a secret ballot using an inaccessible paper absentee ballot form. The market place of elections systems has responded to the need for accessible absentee ballot and provided solutions to address the need for accessibility at all phases of the elections process.

Additionally, in a Report to the 85th Legislature on Section 105.004 of the Texas Election Code Relating to a Program Allowing Certain Military Voters on Active Duty Overseas to Cast a Ballot Electronically the Secretary of State's Elections Division demonstrated in a pilot program that it is possible to allow voters to cast an absentee independent secret ballot in a secure manner using an information technology solution. These same solutions that benefit overseas members of the military may also benefit many Texas voters with disabilities who have a need to vote absentee. As technology expands into other voting-related practices, the Texas Election Code should be updated to require that all aspects of voting - voter registration, early voting, absentee voting and Election Day voting - be secure and accessible to people with disabilities.

***Solution:*** In order to remedy these violations, states have begun to deploy accessible (ADA) compliant absentee vote by mail solutions. Over the last seven years, the availability of proven, secure and

accessible absentee mail balloting has enabled voters with disabilities to access and mark mail ballots in a secure, private and independent matter. Similar to UOCAVA MOVE Act ballot delivery systems, these solutions deliver a fully accessible, audio-enabled, secure ballot and ballot materials in a fully ADA-compliant manner. Equal access to voting does not stop at the polls. It also extends to absentee mail balloting."

## Florida Legislation AVBM

*101.662   Accessibility of vote-by-mail ballots.—It is the intent of the Legislature that voting by vote-by-mail ballot be by methods that are fully accessible to all voters, including voters having a disability. The Department of State shall work with the supervisors of elections and the disability community to develop and implement procedures and technologies, as possible, which will include procedures for providing vote-by-mail ballots, upon request, in alternative formats that will allow all voters to cast a secret, independent, and verifiable vote-by-mail ballot without the assistance of another person.*

- **_Accommodation for certain Texans with disabilities to use a signature stamp vs. a witness_**:

Many in the disability community, especially those with limited arm function or hand dexterity, use a signature stamp to legally sign all of their documents, and this is how they have signed their voter registration forms, mail-in ballot applications in the past. Statute must acknowledge that this widely-accepted practice is extended into voting law. The way to securing the ballots of Texans with disabilities is by limiting the amount of assistance a person needs or their need to rely on a witness to complete their forms and sign them.

The use of a signature stamp is a reasonable accommodation to allow for a private, independent, and secure voting experience. We believe the SOS's current opinion that a person who cannot sign their name do to a disability be required to use a witness instead of their stamp does nothing to ensure a secure and private ballot.

By disallowing someone the use of a signature stamp *"simply because it can be stolen and used outside of somebody's knowledge,"* as the state is on record of saying does nothing to stop a person who is wishing to commit fraud from committing fraud. Under Sec. 1.011, all a person would need to do if they were dead set on committing voter fraud is place any mark or an "X" on a person's mail-in-ballot, then sign someone else's name on the witness line and add an address. By doing so under [Sec. 87.041(b)(2)] of the election code, it would be accepted by the Signature Verification Board, pending all other qualifications were met.

Texas elections will be safer and more equitable if our state lawmakers create processes that ensure voters with disabilities can exercise their constitutional right to vote independently, privately, and in the security of their own homes if they cannot access their local polling place.

**For A Barrier Free Texas,**

Chase Bearden
Deputy Director, Coalition of Texans with Disabilities
Cell 512-415-9699 - cbearden@txdisabilities.org

FLOOR AMENDMENT NO. _____                     BY: _____

Amend H.B. No. 3 (committee report) as follows:

    (1) On page 17, line 3, between "license" and "or", by inserting ", election identification certificate,".

    (2) On page 18, line 10, between "license" and "or", by inserting ", election identification certificate,".

    (3) On page 20, lines 22-23, by striking "match the information" and replacing it with "identify the same voter identified".

    (4) On page 20, between lines 24-25, by inserting:
" (g) In making the determination under Subsection (f), to determine whether the information provided by the voter pursuant to Section 84.002(a)(1-a) identifies the same voter identified on the voter's application for voter registration under Section 13.002(c)(8), the clerk shall request from the Department of Public Safety any driver's license, election identification certificate, or personal identification card number belonging to the voter on file with that department and compare the number on the ballot application with any number provided.

(h) Prior to rejecting an application pursuant to Subsection (f), the clerk shall attempt to notify the voter of the basis for possible rejection of the application by any means reasonably calculated to make contact with the voter and to inform the voter that they may come to the early voting clerk's office in person or use the online tool described by Section 86.015 to correct the information required by Section 84.002(a)(1-a) not later than four business days after the clerk attempts to provide notice."

    (5) On page 21, line 3, between "license" and "or", by inserting ", election identification certificate,".

    (6) On page 21, line 11, between "license" and "or", by inserting ", election identification certificate,".

    (7) On page 22, lines 19-20, between "mail:" and "(1)", by inserting:
"(1) for which the voter failed to provide the information required by Section 86.002(g); (2) for which the information required by Section 86.002(g) provided by the voter does not identify the same voter identified in the voter's application for registration under Section 13.002(c)(8);" and renumbering the remaining subsections of Section 87.0271 accordingly.

    (8) On page 23, line 13, between "person" and "not", by inserting "or use the online tool described by Section 86.015".

(9) Strike lines 15-18 on page 23 and renumber the remaining sections of proposed Section 87.0271 accordingly.

(10)   On page 24, line 26, by striking "matches the information" and replacing it with "identifies the same voter identified".

(11)   On page 25, line 2, by striking "matches the information" and replacing it with "identifies the same voter identified".

(12)   On page 25, between lines 17-18, by inserting:
" (f) In making the determination under Subsection (b)(8), to determine whether the information provided by the voter pursuant to Section 86.002(g) identifies the same voter identified on the voter's application for voter registration under Section 13.002(c)(8), the board shall request from the Department of Public Safety any driver's license, election identification certificate, or personal identification card number belonging to the voter on file with that department and compare the numbers on the ballot application and the carrier envelope certificate with any number provided."

(13)   On page 25, lines 22-23, between "mail;" and "(1)", by inserting:
"(1) for which the voter failed to provide the information required by Section 86.002(g); (2) for which the information required by Section 86.002(g) provided by the voter does not identify the same voter identified in the voter's application for registration under Section 13.002(c)(8);" and renumbering the remaining subsections of Section 87.0411 accordingly.

(14)   On page 26, line 16, between "person" and "not", by inserting "or use the online tool described by Section 86.015".

(15)   Strike lines 18-21 on page 26 and renumber the remaining sections of proposed Section 87.0271 accordingly.

(16)   In Article 5, by adding a section to read as follows:

"SECTION 5.___. Section 86.015(c), Election Code, as effective September 1, 2021, is amended to read as follows:

(c) An online tool used under this section must:

(1) for each election, record:

(A) each application for a ballot to be voted by mail received by the clerk; and

(B) each carrier envelope sent to a voter by the clerk;

(2) for each carrier envelope, record or assign a serially numbered and sequentially issued barcode or tracking number that is unique to each envelope; ~~and~~

(3) update the applicable Internet website as soon as practicable after each of the following events occurs:

(A) receipt by the early voting clerk of the person's application for a ballot to be voted by mail;

(B) acceptance or rejection by the early voting clerk of the person's application for a ballot to be voted by mail;

(C) placement in the mail by the early voting clerk of the person's official ballot;

(D) receipt by the early voting clerk of the person's marked ballot; and

(E) acceptance or rejection by the early voting ballot board of a person's marked ballot; and

(4) allow a voter to add or correct information required under Section 84.002(a)(1-a), Section 86.002(g), or a statement of residence required under Section 87.041(b)(6)."

(17)    Renumbering the remaining sections of Article 5 accordingly.



**The Arc.**

Texas

*Achieve with us.*

**Constitutional Rights & Remedies, Select Committee**
**Regarding SB1**
**August 23, 2021**

**Testimony by Alex Cogan, LMSW, Manager of Public Policy and Advocacy, The Arc of Texas**

Thank you for the opportunity to provide input on SB1, a bill The Arc of Texas opposes, as it puts voting rights for people with disabilities in jeopardy. My name is Alex Cogan, and I am Manager of Public Policy and Advocacy for The Arc of Texas. The Arc of Texas promotes, protects, and advocates for the human rights and self-determination of Texans with intellectual and developmental disabilities (IDD), and this includes ensuring Texans with disabilities can vote privately and independently with proper access, accommodations, and support.

There are multiple provisions in SB1 that specifically interfere with the ability of Texans with disabilities to participate in the democratic process, a direct counter to the election integrity and security bill that authors claim is the purpose of the legislation. Access to the electoral process for all eligible Texas voters, which includes people with IDD, is something every Texan, and specifically every elected legislator, should seek. We know that public confidence in our democratic system requires that *all* eligible voters can participate in the process and have their vote counted. But that public confidence is waning when bills like SB1 are fast-tracked through the process with little to no opportunity for the public, and most importantly people with disabilities, to provide virtual comments.

**The Arc of Texas opposes the below provisions in SB1 because they infringe on the civil rights of Texans with disabilities and their ability to vote. The added requirements and enhanced penalties to people with disabilities and the supporters they select to assist them fundamentally discourages the participation of those with disabilities to vote with accommodations and supports. This is not only immoral, but it is also illegal.**

- **Section 4.11, Inhibits Texans without a consistent signature from voting**

    This section penalizes individuals with neurological disabilities. Allowing a signature verification committee to use any known signature as comparison for a voter by mail does not consider the reality of some Texans with disabilities, whose signature can change due to their disability. For example, people with cerebral palsy, visual impairments, and/or other disabilities frequently do not sign their name consistently because it is physically an impossible request to fulfill.

- **Section 4.01, Limits the use of signature accommodations**

    This section requires a signature to be "ink on paper," which does not allow Texans with disabilities to utilize a reasonable accommodation through the Americans with Disabilities Act. Again, this provision does not consider the reality of voters with disabilities' actual support needs. For example, some individuals may not have the ability to hold a pen or the dexterity to traditionally sign so they may require the use of a signature stamp.

- **Sections 5.03 and 5.04, Adds unnecessary and excessive requirements for individuals who assist voters with disabilities**

    These sections require people who assist voters with a disability to complete a form affirming that they "did not encourage [...] the voter into choosing" the assistant. It is not uncommon for a friend or colleague

**Testimony of Robert L. Green to Sen. Brian Hughes and all members the House Select Committee on Constitutional Rights and Remedies on 8/23/21:**

My name is Robert L Green.  I am the Chair of the Travis County Republican Party Election Integrity Committee.  I have been a precinct chair and an election judge for over 10 years now; and I'm here today, as previously this year, representing my committee members whose efforts are backed by my county party.  I am also here representing myself as a constituent of House District 49 and Senate District 14.

I support C.S.S.B. 1 and the provisions therein that make it easier for an identified and eligible individual to vote legally in an election, but harder for any individual, group and/or election official to cheat and not get caught.  And finally, I want to keep my elected officials, Rep. Gina Hinojosa and Sen. Sarah Eckhardt, accountable to me and to the people of this state.  I'm calling them out here because they and others have NOT been doing the job that they were elected to do…that is, to debate Bills that are placed before them, offer amendments that will improve the effectiveness of the legislation, and then make an up or down vote on passage.

The questions that I would have for anyone who opposes C.S.S.B. 1 are these:

1) Why would you object to a person who registers to vote; applies for a mail-in/absentee ballot; votes by mail or votes in person from being required to provide a government issued photo ID to do so?

2) Why would you object to the coordination between state agencies to facilitate the frequent scrubbing of voter rolls to remove the deceased, those who have moved out of the county, non-citizens and felons who have not completed all tasks necessary to have their voting rights restored?

3) Why would you object to punishing individuals or election officials who knowingly violate provisions of our Texas Election Code with the intent to manipulate the outcome of an election?

4) Why would you object to a transparent election process that includes effective observation (by watchers) of the chain of custody for flash drives and paper ballots at all stages…from every polling place to the central counting location, to the secure storage of paper ballots to the actual counting of votes in a counting machine that has been tested for accuracy, security sealed before use after testing, is not programable, and cannot be, in any way, connected to the internet.

5) Why would you object to having uniform voting rules like these for all counties in Texas?

Despite the repeated public regurgitation of "talking points" by the Democrats who have repeatedly obstructed passage of this legislation to the point of deserting their duty station at the Capitol, fleeing the state to prevent a quorum and a vote by the full House, NO proposed provision in CSSB 1 is "racist," discriminatory to any minority group, to anyone with a disability, or an any way constitutes "voter suppression."

Thank you for your kind attention; now please pass this bill out to the full House with a recommendation that it do pass.



309 East 11th St., Suite 2 • Austin, Texas 78701 • 512.477.1155 • www.citizen.org

To the members of the House Select Committee on Constitutional Rights & Remedies.
*Via hand delivery.*

August 23, 2021

**Re: SB 1, "election integrity" - Opposition Testimony by Public Citizen**

Dear Chairman Ashby and members of the committee:

Public Citizen appreciates the opportunity to testify against SB, relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses; providing civil penalties.

**The Human Cost of Voter Suppression.**

We oppose this legislation because we believe that it will have the effect—intended or not—of suppressing votes. This effect will fall disproportionately on black and brown people, Native Americans, voters with disabilities, veterans and members of the military, non-native English speakers, rural voters and low-income Texans — communities who for generations have been the victims of systematic disenfranchisement.

Right now in Texas and across the nation there is a systematic effort to undermine confidence in elections. It has played out in state legislatures ever since key portions of the Voting Rights Act were overturned by the Supreme Court in *Shelby County v. Holder*. It plays a role in the perpetuation of the "Big Lie" by former president Donald Trump. It is part of a deliberate, concentrated effort to subvert democracy by controlling who has access to the polls. This trend must be reversed in Texas and across the United States. To that end we are also advocating in Congress passage of HR 1 the For the People Act, and HR 4, the John R. Lewis Voting Rights Advancement Act.

There are real human costs to voter suppression. Crystal Mason and Hervis Rogers—both of whom are black—were convicted and charged, respectively, with violating elections laws. They face penalties that are disproportionate to their crimes, which occurred without intent. We can't help but see them as victims of a propaganda effort to undermine democracy. Their treatment is shameful. Their prosecution by the office of Attorney General Ken Paxton is emblematic of the two-tiered justice system at work in America.[1]

---

[1] See my recent commentary in the San Antonio Express News, "Paxton exemplifies two-tiered justice system" *available at https://www.expressnews.com/opinion/commentary/article/Commentary-Paxton-exemplifies-two-tiered-justice-16340789.php.*



309 East 11th St., Suite 2 • Austin, Texas 78701 • 512.477.1155 • www.citizen.org

We urge you not to pass this legislation. Testimony by the AG's office in previous hearings on this legislation has presented the numbers. Voter fraud is vanishingly rare. The examples of voter fraud being prosecuted by the AG's office in the last decade number in the few hundreds, the individuals being prosecuted in the tens. *There has never been a conviction of an intentional case of voter fraud in Texas.* More than 11 million Texans voted in the 2020 election. Even unintentional examples of voter fraud are miniscule in comparison to the number of votes cast. The best was to ensure a free and fair election is to increase access to the polls. The more people vote, the more confidence we can have that our election upheld the principles of democracy.

Instead, we have a bill that dabbles in the minutiae of procedure with obscure aims. In that spirit we offer the following substantive suggestions.

**Improvements to Vote by Mail.**

During the floor debate, the Senate made some positive changed to the vote by mail process. These include the opportunity to discover and cure certain defects via the online VBM tracker. However, there are still issues with vote by mail. Specifically:

- The opportunity to cure issue with vote by mail ballots is not mandatory for all counties. Legislators have stated their intent that this bill provide for consistent administration of elections across the state. But under SB 1 as written counties will get to choose whether voter have notice or opportunity to cure problems with signatures, ID numbers, or other issues.
- Counties do not have a proactive method to notify people who applied to vote by mail when there are issues with their ID number—either that it was not included or that it cannot be used to successfully identify them. The online VBM tracker will post voter ID errors online, and voters do have the ability to correct their ID numbers online. But there is no mechanism for the county to notify the voter of the problem in the first place. There is a process to notify voters when the marked ballot itself has an ID number issue, but there is no such process for VBM applications.
- During the Senate floor debate, lawmakers unanimously supported Floor Amendment 6, which gives voters the opportunity to "add or correct" their ID numbers via the online VBM tracker. This was a good amendment and an indication of the value placed on giving voters the ability to remotely cured defects. Unfortunately no such remote option is available when the defect is related to the signature on the VBM ballot. An overwhelming number of mail-in ballots that are subject to rejection are due to issues with the signature. And yet voters have no remote option to cure this issue such as via the online VBM tracker, by email, fax, or phone.



309 East 11th St., Suite 2 • Austin, Texas 78701 • 512.477.1155 • www.citizen.org

**The Varying Treatment of Election Officers and Poll Watchers.**

Generally speaking, the effect of SB 1 is to lard election officers with procedure and penalties while expanding the opportunity for poll watchers to interfere in elections. There are other advocacy organizations, such as the Texas Civil Rights Project, that have gone into more detail about these provisions in SB 1. We will make one comment on their overall effect.

In previous hearings on similar legislation, we have heard testimony from people who say that they do not feel intimidated by poll watchers and cannot imagine why anyone would. This testimony invariably comes from older, white voters.

On the other hand, we have heard testimony from the Dean of the House, Rep. Senfronia Thompson, who shared a specific example in which she was the victim of intimidation by a poll watcher. Rep. Thompson plainly understands election administration as well as nearly anyone in Texas—she has participated as a candidate for fifty years. Her experience shows something that many proponents of this bill cannot see: its effect on minority voters.

Rep. Thompson is not one to shrink in the face of intimidation. But how many voters might? Are we aware of the effect that emboldened poll watchers (and chastened elections officers) will have on them?

**The Pandemic as Context for Voter Access.**

The 2020 election occurred under unprecedented circumstances—the COVID-19 pandemic. As the pandemic continues with renewed ferocity, we must take extreme care to provide everyone with safe access to the polls. This includes people who are ill, people who are contagious, people who are immunocompromised, and those such as the disabled who face other health-related obstacles to voting. We should also take lessons from the pandemic about how ballot access can be expanded, not restricted.

Drive-through voting proved a safe and popular option for voters in Harris County. A federal judge has already ruled that the 127,000 ballots cast by drive-through voters were valid.[2] And yet SB 1 has inexplicably banned drive-through voting. Extended voting hours were also a popular option. And though proponents of this legislation claim that is has not restricted voting hours, in fact the law never previously limited voting hours. SB 1 limits voting hours during early voting and bans overnight voting.

Both drive through voting and overnight voting were disproportionately used by minority voters. Targeting these methods disproportionately impacts minority voters. Unintended or not, these are the fact. As to the question of intent, the history of the disenfranchisement of minority voters provides a guide.

---

[2] *See* https://www.texastribune.org/2020/11/02/texas-drive-thru-votes-harris-county/.



309 East IIth St., Suite 2 • Austin, Texas 78701 • 512.477.1155 • www.citizen.org

Both this context and the measures necessary to conduct elections safely during the pandemic weigh in favor of expanding access to the polls. Furthermore, it is the stated intent of proponents of this legislation that everyone in Texas have an equal opportunity to vote. There are millions of voters in Harris County. Some counties have only a few thousand voters. Equal access will necessarily mean more opportunities to vote in more populous counties—more polling locations, more hours, and more access to methods such as early voting, vote by mail, and drive through voting.

**Conclusion: despite a few positive measures, on balance we oppose SB 1.**

There are a few things in this legislation we can support. These include:
- Allowing voters to update their voter registration electronically when they move counties.
- Recent amendments to provide for notice and opportunity to cure defects in vote by mail ballots.
- Explicitly extending to early voting the Election Day rule that voters who are in line at closing time can vote

Still, the overwhelming impact of this bill will be to suppress votes. That effect will disproportionately fall on poor and minority voters who have been the target of disenfranchisement for generations.

For these reasons we oppose SB 1 and urge you not to pass it.

Thank you for the opportunity to provide this testimony, if you wish to discuss our position further, I can be reached by email at ashelley@citizen.org or by phone at 512-477-1155.

Respectfully,

Adrian Shelley
Texas Office Director

CC: Rep. Senfronia Thompson, Rep. John H. Bucy III, Rep. Travis Clardy, Rep. Charlie Geren, Rep. Jacey Jetton, Rep. Ann Johnson, Rep. Stephanie Klick, Rep. Brooks Landgraf, Rep. Oscar Longoria, Rep. J. M. Lozano, Rep. Joe Moody, Rep. Victoria Neave, Rep. Matt Shaheen, Rep. James White



*The Arc.*
Texas

*Achieve with us.*

**Constitutional Rights & Remedies, Select Committee**
**Regarding SB1**
**August 23, 2021**

**Testimony by Alex Cogan, LMSW, Manager of Public Policy and Advocacy, The Arc of Texas**

Thank you for the opportunity to provide input on SB1, a bill The Arc of Texas opposes, as it puts voting rights for people with disabilities in jeopardy. My name is Alex Cogan, and I am Manager of Public Policy and Advocacy for The Arc of Texas. The Arc of Texas promotes, protects, and advocates for the human rights and self-determination of Texans with intellectual and developmental disabilities (IDD), and this includes ensuring Texans with disabilities can vote privately and independently with proper access, accommodations, and support.

There are multiple provisions in SB1 that specifically interfere with the ability of Texans with disabilities to participate in the democratic process, a direct counter to the election integrity and security bill that authors claim is the purpose of the legislation. Access to the electoral process for all eligible Texas voters, which includes people with IDD, is something every Texan, and specifically every elected legislator, should seek. We know that public confidence in our democratic system requires that *all* eligible voters can participate in the process and have their vote counted. But that public confidence is waning when bills like SB1 are fast-tracked through the process with little to no opportunity for the public, and most importantly people with disabilities, to provide virtual comments.

**The Arc of Texas opposes the below provisions in SB1 because they infringe on the civil rights of Texans with disabilities and their ability to vote. The added requirements and enhanced penalties to people with disabilities and the supporters they select to assist them fundamentally discourages the participation of those with disabilities to vote with accommodations and supports. This is not only immoral, but it is also illegal.**

- **Section 4.11, Inhibits Texans without a consistent signature from voting**

  This section penalizes individuals with neurological disabilities. Allowing a signature verification committee to use any known signature as comparison for a voter by mail does not consider the reality of some Texans with disabilities, whose signature can change due to their disability. For example, people with cerebral palsy, visual impairments, and/or other disabilities frequently do not sign their name consistently because it is physically an impossible request to fulfill.

- **Section 4.01, Limits the use of signature accommodations**

  This section requires a signature to be "ink on paper," which does not allow Texans with disabilities to utilize a reasonable accommodation through the Americans with Disabilities Act. Again, this provision does not consider the reality of voters with disabilities' actual support needs. For example, some individuals may not have the ability to hold a pen or the dexterity to traditionally sign so they may require the use of a signature stamp.

- **Sections 5.03 and 5.04, Adds unnecessary and excessive requirements for individuals who assist voters with disabilities**

  These sections require people who assist voters with a disability to complete a form affirming that they "did not encourage [...] the voter into choosing" the assistant. It is not uncommon for a friend or colleague



*Achieve with us.*

Texas

to remind someone that an election is approaching and encourage civic participation and/or remind the individual that they are allowed to have an assistant, if needed, by law. In the case of people with disabilities who require assistance, the individual who is providing assistance may also be the individual who encouraged participation. We can all agree that the democratic process only works when those eligible to vote are able to participate.

These changes in oath complicate the voting process and lead to unnecessary confusion and the potential inability of Texans with disabilities to participate in the democratic process. People with support needs deserve the federal accommodation to exercise their civil right, but the added requirements foster a false narrative that those who volunteer to help their fellow voters are to be suspected of fraud instead of celebrated for creating a more representative democracy.

- **Section 5.05, Increases penalties for assisting voters**

  This section requires an assistant of a person voting by mail to fill out a new form with additional information about themselves and their assistance and will make any mistake in filling out the new form a state jail felony (unless the assistant is related to the voter).

  These new provisions will create a chilling effect that decreases the needed support for Texans with disabilities to vote.

The above provisions do not consider the lived experiences of people with disabilities and the reasons voting accommodations exist. We urge the committee to recognize that all Texans have the right to vote as privately and independently as possible. People with disabilities already face barriers and discrimination daily, from public school inclusion to securing employment. We must not add voting to that list. As American citizens and Texans, voting is our fundamental right and must be maintained, but SB1 falls short in maintaining our existing election integrity and security. At best, SB1 creates significant barriers to the voting process and at worst, it is discriminatory against Texans with disabilities.

Please note that this testimony is a stand-in for representation of people with disabilities. The Fourth wave of Covid-19 in Central Texas created barriers for many to speak on their behalf. We can all agree that people with disabilities should be included in developing policy that directly impacts them; they deserve a seat at the table to share their powerful stories. SB1 has failed to do that. So, on behalf of 3 million Texans with disabilities, we urge the committee to consider the detrimental impact this bill will have on maintaining a system of democracy.

Thank you for the opportunity to provide these comments on behalf of The Arc of Texas. We are open to continuing to work with the author to ensure Texans with disabilities maintain their civil right to vote.

Alex Cogan, LMSW
acogan@thearcoftexas.org
(512) 485-9737

The following news articles (pages 17-50 of this document) are included as meeting handouts pursuant to Rep. Lozano's request during the committee's public hearing on SB 1.


 On Air Now
PLAYLIST

 **npr**       **DONATE**

NATIONAL

# In Rio Grande Valley, Some Campaign Workers Are Paid To Harvest Votes

July 7, 2015 · 5:00 AM ET
Heard on Morning Edition

7/7/15

JOHN BURNETT     MARISA PEÑALOZA

**6-Minute Listen**      PLAYLIST   Download

Transcript



Herminia Becerra is a *politiquera* in Brownsville, Texas. She has worked political campaigns for nearly 60 years in the Rio Grande Valley. Becerra says she has never been indicted for election fraud, has nothing to hide, and supports candidates without compensation.

*John Burnett/NPR*



*This week, NPR examines public corruption in South Texas. The FBI has launched a task force to clean up entrenched wrongdoing by public servants in the Rio Grande Valley. In the final part of this series, we examine vote-stealing and election fraud.*

A new FBI anti-corruption task force is trying to clean up the Rio Grande Valley of Texas. According to the Justice Department, in 2013, more public officials were

convicted for corruption in South Texas than in any other region of the country. One of the practices the task force is looking at is vote-stealing.

They're called *politiqueras* — a word unique to the border that means campaign worker. It's a time-honored tradition down in the land of grapefruit orchards and Border Patrol checkpoints. If a local candidate needs dependable votes, he or she goes to a *politiquera*.

In recent years, losing candidates in local elections began to challenge vote harvesting by *politiqueras* in the Rio Grande Valley, and they shared their investigations with authorities. After the 2012 election cycle, the Justice Department and the Texas attorney general's office filed charges.

Article continues after sponsor message

## Corruption in the Valley: Dirty Cash, Drugs And Vote Buying



**U.S.**
Texas Corruption: Dismantling Organized Crime In The Rio Grande Valley



**U.S.**
With Corruption Rampant, Good Cops Go Bad In Texas' Rio Grande Valley

"Yes, there is a concern in which the *politiqueras* are being paid to then go and essentially round up voters and have them vote a certain way," says James Sturgis, assistant U.S. attorney in McAllen.

In the town of Donna, five *politiqueras* pleaded guilty to election fraud. Voters were bribed with cigarettes, beer or dime bags of cocaine. In neighboring Cameron County, nine *politiqueras* were charged with manipulating mail-in ballots.

The self-anointed queen of *politiqueras* in Cameron County is 86-year-old Herminia Becerra. She says she's been working in campaigns for nearly 60 years.

Becerra has short, white hair and quick, flashing eyes. She throws back her head and belts out an original campaign song in a husky voice: *"Y ganamos y ganamos, con Cesar de Leon. Y votamos y votamos, por Cesar de Leon. Para comisionado de ciudad de Brownsville."*

"We win with Cesar de Leon. We vote for Cesar de Leon, for city commissioner of Brownsville," the song goes.

Becerra is one of few *politiqueras* in the Valley willing to interview with a reporter. She says she has never been indicted for election fraud and has nothing to hide. She says

all she does is talk to voters, hold political signs and shout into a bullhorn.

If a candidate needed 200 votes — which in these small precincts can win a race — could she help?

"Oh, yes. I know it can be done because I've done it," she says without hesitation. "I know lots of people, and people know me. If I do a favor for you, you're grateful and your whole family is grateful. And you're going to tell your whole family, 'Help Herminia.' "

Hustling votes has a rich political history in America. Chicagoans have been known to vote from beyond the grave. Democratic machines from New Orleans to New York City have hauled voters to the polls. In the Valley, it's all about mail-in ballots. A *politiquera* has a friendly relationship with a group of elderly voters, who are eligible to use mail-in ballots. They may be nursing home residents, neighbors or clients at activity centers for seniors.

A grass-roots organization called Citizens Against Voter Abuse (CAVA) organized after the 2010 elections conducted hundreds of interviews with elderly Mexican-American women who CAVA believes had their mail-in ballots manipulated. The founder, Mary Helen Flores, gives a typical story.

"[The voter] has been cultivated by this particular *politiquera* who works that building to give up her vote every election," Flores says. "And the [*politiquera*] will, under the guise of helping her, will come and take her ballot from her and say: 'Well, I'm going to go mail it for you.' "

In the Cameron County indictments, *politiqueras* are alleged to have charged local political candidates $10 to $20 for every mail-in ballot they delivered. Under Texas election law, an elderly or disabled voter can use a helper, but that person — the *politiquera* — cannot collect the voter's ballot and then fill it out and mail it later.

Mary Helen Flores (center) is the founder of Citizens Against Voter Abuse.
*John Burnett/NPR*

Longtime Valley political strategist Mike Carrera says he's glad that prosecutors are weeding out unscrupulous *politiqueras.* But that doesn't mean they're all bad. Carrera says the ones he hires are paid to know their precinct's voting habits, nothing more.

"In every profession, you have extremists. Ninety-five percent of the *politiqueras* who operate in Hidalgo County don't operate like that, paying for votes," he says.

A former campaign manager in Brownsville agreed to talk if his name was withheld, because *politiqueras* are under criminal investigation. He said a few years ago the campaign he was running paid $3,000 a week for 15 *politiqueras* to work the mail-in ballots in a local race. He said the campaign did not ask them to break the law, just deliver votes. And he states flatly that Herminia Becerra was one of the *politiqueras* they hired, a claim she vehemently denies.

"Don't ask me if people pay me to get them votes," Becerra says, her voice rising. "Ask God! He'd say, 'No, Herminia didn't get paid. She helps the people.' I'm only interested in helping the poor because I come from poverty."

CAVA founder Mary Helen Flores says it's important to clean up Valley elections because residents need honest leaders to address the rates of high poverty and low educational achievement in the region, not office-holders who feather their nests.

"In Brownsville, some of these candidates do hire *politiqueras,* get in office and immediately begin to get their friends jobs, get contracts to their friends and family members," Flores says. "We don't have any enforcement of conflict-of-interest laws here."

The indictments of *politiqueras* in the Rio Grande Valley may be having an effect. In the Democratic primaries in Cameron County for three justice of the peace offices, between elections in 2012 and 2014, the number of mail-in ballots dropped 97 percent.

voter fraud    rio grande valley    corruption    texas

# Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

| What's your email? | SUBSCRIBE |

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See

Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

EDUCATION
**New York City, The Country's Largest School System, Mandates Teacher Vaccinations**

INVESTIGATIONS
**The Taliban's Rise Is Complicating Biden's Efforts To Close Guantánamo's Prison**

EDUCATION
**States Blocking School Mask Mandates Could Face Civil Rights Probes, Official Says**

WEATHER
**This Is The Devastation The Deadly Flooding Wrought In Tennessee**

HEALTH
**Pfizer's COVID Vaccine Gets Full Approval From The FDA**

LAW
**ICE Deported Him After His Movie Came Out. Now He's Testing The Limits Of Free Speech**

# Popular on NPR.org

GLOBAL HEALTH
**Highly Vaccinated Israel Is Seeing A Dramatic Surge In New COVID Cases. Here's Why**

WORLD
**How Valuable Are The U.S. Weapons The Taliban Just Captured?**

ECONOMY
**Home Prices Are Now Higher Than The Peak Of The 2000s Housing Bubble. What Gives?**

TECHNOLOGY
**Facebook's Most Viewed Article In Early 2021 Raised Doubt About COVID Vaccine**

MUSIC FEATURES
**Why Do We Need Dolly To Be A Saint?**

WEATHER
**Storm Henri Drenches The Northeast As It Moves Inland**

# NPR Editors' Picks

LIFE KIT
**5 Tips To Help You Give Good Feedback**

TELEVISION
**R. Kelly And Britney TV Docs Tap Into 'Consequence Culture,' Not Cancel Culture**

HEALTH
**Breakthrough COVID Infections Add Even More Chaos To School's Start In 2021**

POP CULTURE

**Beyoncé Just Became The First Black Woman To Wear The Iconic Tiffany Diamond**

EUROPE
**Josephine Baker Is The First Black Woman Who Will Be Buried At The Pantheon In Paris**

BUSINESS
**It's Called The Bond Taper. Yes, It's Geeky. But This Is Why You Should Know About It**

| READ & LISTEN | CONNECT |
|---|---|
| Home | Newsletters |
| News | Facebook |
| Arts & Life | Twitter |
| Music | Instagram |
| Podcasts | Press |
| Programs | Contact & Help |

| ABOUT NPR | GET INVOLVED |
|---|---|
| Overview | Support Public Radio |
| Diversity | Sponsor NPR |
| Ethics | NPR Careers |
| Finances | NPR Shop |
| Public Editor | NPR Events |
| Corrections | NPR Extra |

terms of use

privacy

your privacy choices

text only

© 2021 npr



≡                  **The Dallas Morning News**                  Sign In

SUBSCRIBE NOW **99¢/week**

| How Dallas' escalating home prices only add to the city's homelessness | U.S. gives full approval to Pfizer's COVID-19 vaccine | Texas Gov. Greg Abbott announces negative COVID-19 test, four days after testing positive |

‹                                                                                                          ›

NEWS                    4/21/17

# Reports of voter fraud in West Dallas have 'deeply troubled' Mike Rawlings, Rep. Eric Johnson

In a letter to Dallas County's elections administrator, the mayor and state legislator asked her to "take whatever steps necessary to restore voter confidence in West Dallas."



Dallas Mayor Mike Rawlings answers questions from high school students participating in "Storytellers Without Borders" program conducted by The Dallas Morning News and the Dallas Public Library at the J. Erik Jonsson Central Library on Wednesday, March 29, 2017, in Dallas. (Smiley N. Pool/The Dallas Morning News) (Staff Photographer)

   

By Tristan Hallman
8:17 AM on Apr 21, 2017

8/23/2021  Case 5:21-cv-00844-XR Reports of voter fraud in West Dallas have deeply troubled Mike Rawlings, Rep. Eric Johnson Filed 11/52/21 Page 130 of 182

# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

troubled" by reports of potential voter fraud in West Dallas.

Some West Dallas residents have said they received mail-in ballots they didn't request, raising the possibility that someone else might be trying to cast their ballots for them.



Advertisement

Rawlings and Johnson sent a letter late Thursday to Dallas County Elections Administrator Toni Pippins-Poole, asking her to "take whatever steps necessary to restore voter confidence in West Dallas."

At a news conference Friday, Rawlings said Pippins-Poole has added staff to review mail-in ballots. The county will also allow voters to cast provisional ballots at the polls if they discover a ballot had already been cast for them by mail, Rawlings said.

Pippins-Poole said in a statement that the county's elections department "has met with the proper authorities, and they are assisting with the investigation."

"I will make sure everybody's actual vote counts," she said. "Fraudulent ballots will be identified, and the perpetrators prosecuted."



SPONSORED CONTENT

## French Press ⬀

BY ⓒ LE CREUSET

☰

# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

ADVERTISING



If a voter fits one of those descriptions, he or she can submit an application and receive a ballot. The application requires the signature of the voter, as well as the signature and home address of anyone who might have helped secure that paperwork. The county also does not require a formal application as long as the request is in writing.

The process leaves opportunities for manipulation, such as people impersonating others or obtaining a vulnerable voter's signature under false pretenses.

Rawlings and Johnson, a Dallas Democrat, said they had been startled by the recent reports of possible fraud. The allegations followed reports that some voters showed up in November to find that votes had already been cast in their name by mail-in ballot.

Johnson, who was raised in West Dallas and Oak Cliff by his grandparents, said he worries people are using elderly voters to try to steal votes. He said he considered "any kind of taking advantage of the elderly to be a form of elder abuse."

Johnson said the fears of voter fraud are nothing new: he has long heard rumors about vote-stealing in West Dallas and other parts of the city.

"I've had enough," Johnson said. "At this point, I'd like to see something done about it."

Reports of voter fraud in West Dallas have 'deeply troubled' Mike Rawlings, Rep. Eric Johnson

# The Dallas Morning News

☰            Sign In

SUBSCRIBE NOW 99¢/week

voters living in a West Dallas housing project into handing over blank, unsigned absentee ballots. A precinct chair echoed that allegations, which Garcia denied.

That April, *The Dallas Morning News* interviewed 32 mail-in absentee voters in that race. Several said they were simply doing what had always been done: getting campaign workers to register them to vote, pick up and mail their ballots and even mark their ballots if they were unable to read them. *The News* referred to it as a "time-honored practice."

In 2001, in one City Council race, Maxine Thornton-Reese defeated Larry Duncan by only 16 votes. Duncan contended that 21 mail-in ballots had been improperly submitted; a state district judge concurred and voided the results of the election. Thornton-Reese eventually won the council seat.

Two years after that, in yet another Dallas City Council race, eight voters told *The News* they didn't sign the applications then-council candidate Clair C. Woertendyke sent to the council elections department. Woertendyke's excuse was that voters' relatives might have requested the mail-in ballots — or, perhaps, they were simply too old to remember they'd asked for one.

At the time, Bruce Sherbet was running the Dallas County Elections office, and he submitted each case to the Dallas County district attorney's office. But, he said Friday, he couldn't recall anyone ever being prosecuted.

"Over the years, this has been a very, very difficult area to determine if the law has been broken, because it requires witnesses and being able to bring solid evidence forward," said Sherbet, who's now the elections administrator in Collin County. "If someone says, 'I didn't sign this, someone fraudulently signed this,' finding the perpetrator has proven very difficult over the years. It's a very challenging area."

Rawlings hopes the district attorney will sort out the problems this time.

"There has been a lot of smoke on this issue for a long time," Rawlings said. "I just want to ask the DA, Dallas County, is there any fire. And if so, hopefully it's a small fire, and we'll put it out and we'll move on."

{"type":"video","title":"Dallas News Video","author_name":"Dallas News","_id":"xiM2V2YTE6vT3JRH34OqoS_ex9py1nSj","provider_name":"Ooyal

# The Dallas Morning News

SUBSCRIBE NOW 99¢/week

Sign In

","raw":"{\"type\":\"video\",\"title\":\"Dallas News
Video\",\"author_name\":\"Dallas
News\",\"_id\":\"xiM2V2YTE6vT3JRH34OqoS_ex9py1nSj\",\"provider_name\"
class=\\\"oo-vid-container\\\" data-oo-content-
id=\\\"xiM2V2YTE6vT3JRH34OqoS_ex9py1nSj\\\"\\u003E\\u003C\\/div\\u0
defer
src=\\\"https:\\/\\/www.dallasnews.com\\/resources\\/motif\\/dist\\/js\\/ooy

The May 6 election will feature a hotly contested City Council race in West Dallas among Mayor Pro Tem Monica Alonzo, Dallas County Schools board member Omar Narvaez, Alex Dickey, Linus Spiller, Tony Carrillo and former Dallas police Sgt. Gil Cerda.

Alonzo and Narvaez, who lead the race in fundraising, both said the idea that the idea of people preying upon the elderly was unacceptable.

"It's wrong. It's so wrong," Alonzo said. "And it's unfair."

Narvaez said he doesn't know what is going on and hopes the potential voter fraud "is a very limited thing."



# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

"As a candidate it is disappointing to know that this happens," he said. "Not only are we facing odds against an incumbent — but there are parties that are messing, that are playing with our democracy."

*Staff writers Robert Wilonsky and Naomi Martin contributed to this report.*

4-20-17 -- Rawlings, Johnson Re Mail Ballots by Tristan Hallman on Scribd




# The Dallas Morning News

**Sign In**

## SUBSCRIBE NOW 99¢/week

Millions of books, audiobooks, magazines, documents, sheet music, and more for free.



DALLAS COUNTY ELECTIONS DEP

From: Dallas County Elections D
Toni Pippins-Poole, Elections Administra

FOR IMMEDIATE RELEASE: TUESDAY

**DALLAS COUNTY ELECTIONS DEPARTMENT'S
CONCERNS REGARDING BALLC**

**PLEASE DISPERSE AS MANY TIME**

The Dallas County Elections Department (DCED) h;
elected officials and citizens regarding Voters receiv
had not requested these ballots. "We take these alleg
integrity of the voting process is our utmost concern
been referred to the District Attorney's Office. The
fully with the District Attorney's office and due to tl
investigation we are not able to comment any furthei

**WHAT THE ELECTIONS DEPARTMENT IS DOING:**

1 of 2





**In This Story**

**Eric Johnson**
VIEW MORE INFORMATION >

Tristan Hallman

✉ thallman@dallasnews.com  f /DallasCityHallman  🐦 tristanhallman

# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

| How Dallas' escalating home prices only add to the city's homelessness | U.S. gives full approval to Pfizer's COVID-19 vaccine | Texas Gov. Greg Abbott announces negative COVID-19 test, four days after testing positive |

OPINION

4/26/17

# Texas needs tougher laws to reel in mail-in vote fraud

Texas needs tougher laws needed to curb abuse of mail-in ballot programs.



Volunteer Roman Gonzalez paces among an array of political signs covering the parking area outside the Dallas County Government Center, a voting location in Oak Cliff, Tuesday, May 27, 2014. (Tom Fox/The Dallas Morning News) election voting

(f) (y) (✉) (🖶)

By Gromer Jeffers Jr.
10:47 AM on Apr 26, 2017

 **Listen to this article now**
05:10 🌐 Powered by **Trinity Audio**

Let's face it. Mail-in ballot voting, a necessary and noble process, is vulnerable to fraud.

# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week



Decades after closure of lead smelter, voices rise against other West Dallas...

**FEATURED ON DALLAS NEWS**

**Decades after closure of lead smelter, voices rise against other**

"We ask that you devote additional resources to verify the integrity of each mail-in ballot in Dallas," Mayor Mike Rawlings and state Rep. Eric Johnson said in a joint letter to the Dallas County Elections Department. "We look forward to hearing from you soon regarding your plan."

A plan is what's needed to root out possible crimes, as well as encourage more voter participation. Lawmakers, elections experts and law enforcement officials, as they did 14 years ago, should develop new policies to stamp out corruption, even if it costs money and resources.

Voter fraud, even with mail-in ballots, does not occur on a large scale. But in low-turnout elections, stealing just a few votes can be the difference between winning and losing.



SPONSORED CONTENT

## French Press ⬈

BY (€ LE CREUSET )

"You have to have a conversation in order to prevent coercion and fraud," said former state Rep. Steve Wolens, who in 2003 sponsored legislation to overhaul the state's mail-in ballot system. "Then you tailor-make a new law that deals with abuse and opens up voting."

Texas needs tougher laws to reel in mail-in vote fraud

# The Dallas Morning News

SUBSCRIBE NOW 99¢/week



He infuriated some members of his party by working with then-Elections Commissioner Bruce Sherbet, Dallas County prosecutor Ben Stool and others to develop a law to curb mail-in ballot abuse.

The law defined how a voter could receive a mail-in ballot application, set regulations for operatives helping voters and created penalties for offenders. The law also devised ways to track mail-in vote operatives, called "*politiqueros*," in Hispanic neighborhoods where absentee campaigns are aggressive. Agents now have to sign for mail-in ballot applications and when they assist voters.

"It put regulations in place where there were none," said Sherbet, now Collin County's elections administrator.

The 2003 law was an excellent first step, but more action is needed to weed out the shysters and protect the electoral process.

As Sherbet points out, the law forbids an agent from tampering with or improperly marking someone's absentee ballot. But most of the charges associated with violating the 2003 law are misdemeanors. Law enforcement officials have told lawmakers that they are unlikely to invest critical time and resources to chase mail-in vote abusers when they will essentially get off with a stern look and the shake of a head.

Former state Sen. Florence Shapiro, R-Plano, tried to assist Wolens' effort from her perch in the Senate. She offered companion legislation that would have made felony penalties for an array of mail-in voter fraud. But the bill died in committee. Shapiro knew then that the law needed to be tougher in order to deter criminal activity.

The Dallas Morning News     Sign In

SUBSCRIBE NOW 99¢/week

There are other ways to strengthen mail-in ballot regulations. They include the Dallas County model of putting return postage with mailed ballots to encourage the actual voter to send it back. There's also a need for a standardized ballot application and regulation of those assisting voters, much like a person who registers new voters.

More early voting locations and mobile election centers could help as well.

What's perplexing about mail-in ballot fraud is that it's so unnecessary. Absentee ballot laws are so liberal that they are hard to break, and they encourage aggressive campaigning. An operative can legally help a person get a ballot, drop that ballot in the mail and even tell the person how to vote, as long as it's not while that person is marking the ballot.

It's like giving a voter a ride to the polls and a barbecue sandwich. Just before the voter gets out the van, you remind them how to vote.

It's not illegal. It's politics.

"You don't have to break the law to be effective," Sherbet said.

The biggest problem in local elections is not fraud, but low voter turnout.

Along with protecting the integrity of the absentee vote, lawmakers should consider expanding voter options by allowing everyone the chance to vote by mail.

Oregon, Washington and Colorado have successful mail-in ballot election systems that have boosted overall turnout and not been smeared by fraud. If the goal is higher participation, that system is worth a look in Texas, as well as allowing a person to register and vote on the same day.

As states with progressive election policies have shown, the more people participating in an electoral contest, the less the impact of fraud.

Even with the potential problems in West Dallas, mail-in ballot fraud doesn't reflect the mindset of most of the participants. After making sure our election laws are adequate, all that's left is trust.

"We can control polling places," Sherbet said. "But when a ballot goes in the mail, you don't know for sure what will happen to it."

   

Gromer Jeffers Jr. political writer. The Howard University graduate and Chicago



# The Dallas Morning News

Sign In

SUBSCRIBE NOW **99¢/week**

‹

| How Dallas' escalating home prices only add to the city's homelessness | U.S. gives full approval to Pfizer's COVID-19 vaccine | Texas Gov. Greg Abbott announces negative COVID-19 test, four days after testing positive |

›

NEWS    5/4/17

# 'I feel violated': Senior citizens rattled by voter fraud in West Dallas, Grand Prairie

More than 100 voters of retirement age have filed fraud complaints in recent weeks, the largest number Dallas County has ever received.



Pat Stephens, 67, poses for a portrait in her home on Thursday, April 27, 2017 in Dallas, Texas. She is among dozens of potential victims of voter fraud this election cycle in West Dallas and Grand Prairie. A suspicious man came to her door claiming to work for Dallas County and asking for her mail-in ballot. She instead demanded to see his driver's license and she took a photo of it. (David Woo/The Dallas Morning News) (David Woo / Staff Photographer)

   

By Naomi Martin

8/23/2021   I feel violated: Senior citizens rattled by voter fraud in West Dallas, Grand Prairie

# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

If he exists, a man named Jose Rodriguez has been a busy campaign worker lately — and potentially a criminal one, too.

In the past few weeks, dozens of ballots in bright green envelopes showed up at homes in West Dallas and Grand Prairie. The residents — all of retirement age — were confused. They hadn't requested mail-in ballots for the May 6 municipal elections, but yet, here they were.



FEATURED ON DALLAS NEWS

Decades after closure of lead smelter, voices rise against other

When those same voters called the Dallas County Elections Department, one by one, many were told the same thing: Your signature appears on the mail-in ballot application. And a guy named Jose Rodriguez signed it, too, saying he helped you.

Only people who are 65 and older or disabled are eligible to request annual ballots to vote by mail. It's not illegal for campaigns to help someone fill out an application to vote by mail, though it is illegal to try to influence the person's vote.

But the residents in these cases say their signatures on those ballot applications were forged.

"I don't know a Jose Rodriguez," said Mary Milam, 67, who lives in West Dallas. "I'm angry. How are you just going to forge my name? That's wrong."



SPONSORED CONTENT

## CEO Says This Is Worth 35 Amazons ⤴

# The Dallas Morning News

Sign In

SUBSCRIBE NOW 99¢/week

have reported complaints to the county in recent weeks. It's the largest number of fraud complaints the county has ever received, said Elections Administrator Toni Pippins-Poole.



This is a mail-in ballot envelope received by a Grand Prairie voter in recent weeks that the resident did not request. (Courtesy)

The residents fear someone could tamper with their votes, either by taking their ballots off their doorstep or pulling them from their mailboxes. They also fear they won't be able to vote at the polls now.

In early April, a man started **knocking on doors** in West Dallas and Grand Prairie, saying he was collecting the mail-in ballots. The county does not collect ballots and warns residents not to give theirs to anyone they don't know.

One afternoon, Carrie Chatman, 72, answered a knock at her front door in West Dallas, where a contentious race for Dallas City Council's District 6 is unfolding. At the time, she had already received a ballot in the mail, which she hadn't ordered. She'd learned from her neighbors that something fishy was going on.

That day, a stocky Hispanic man, around 5 foot 7, stood on her porch, holding a green ballot envelope in one hand, and a list of typed names in the other. The senior citizens' names on the list were highlighted.

# The Dallas Morning News

SUBSCRIBE NOW 99¢/week

Sign In

agitated. He told Chatman that he had worked to get City Council member Monica Alonzo elected in past years, but now he was working to help her opponent, Omar Narvaez.

"He kept going on about how Alonzo did not do her job," Chatman said. "He was saying Omar was who I should be voting for."

Chatman refused to hand over her ballot. Eventually, the man got in his car — a small, older-model red sedan — and drove away. Chatman tried to glimpse the license plate, but it was a temporary tag, and the letters were too small.

"That's so ugly, to try to take advantage of the seniors," Chatman said. "It's really deplorable that you're going to steal my vote. That's precious — that's my right to vote."

Around the corner from Chatman's home, Pat Stephens, 67, answered a knock at her door around 6 p.m. on April 8. A man — whom she described as Latino, about 5 feet 7 inches tall and driving a small red car — told her he was there to pick up her ballot.

"I didn't request no mail-in ballot," she recalled telling him. "Who are you with?"

# The Dallas Morning News

≡    Sign In

SUBSCRIBE NOW 99¢/week



1/2  Pat Stephens, 67, is among dozens of potential victims of voter fraud this election cycle in West Dallas ar man came to her door claiming to work for Dallas County and asking for her mail-in ballot. She instead deman license, and she took a photo of it.  (David Woo / Staff Photographer)

The man said he worked for Dallas County and showed her a typed list in his hand with her and her husband's names highlighted. "I have your names right here," he said.

"Where's your ID?" she asked.

Why? he said.

"I just want to make sure you are who you say you are," she told him.

The man handed over his driver's license. Stephens took a photo of the license on her cellphone. The photo showed the man's portrait, name, address and that he was 27 years old, 5 foot 7.

The man left, and Stephens called her neighbor Debra Moore. "We need to report this because this is something fraudulent," Stephens recalled telling her.

"I feel violated," Stephens said.

The Dallas Morning News

Sign In

≡

SUBSCRIBE NOW 99¢/week

Moore, who is active in the Westmoreland Heights neighborhood group, was worried. Then the next day, a 66-year-old neighbor called Moore in tears, saying a man had just shown up at her home and was persistent in trying to get her mail-in ballot, which she hadn't ordered. He was also driving a little red car.

Moore called the police.

An officer arrived and spotted a vehicle that matched the suspect vehicle. But when he confronted the two men inside, their appearances didn't match the complainant's description, said Sgt. Warren Mitchell, a police spokesman. Because of that discrepancy, and the fact that the officer saw no evidence that a crime had occurred, he found no reason to detain the man, Mitchell said.

The incident was reported to the county elections department, which turned over all its evidence to criminal investigators with the Dallas County district attorney's office.

So far, no one's been arrested.

No one answered the door last week at the address listed for the man on his driver's license, or at another address listed for him in public records.



# The Dallas Morning News

Sign In

SUBSCRIBE NOW **99¢/week**

Gloria Annette Perkins and her husband, Steve, both 70, received mail-in ballots they hadn't requested at their home in Grand Prairie. She called the elections department and found out that "Jose Rodriguez" was noted as having helped her apply for her mail ballot.



Gloria Annette Perkins and her husband, Steve, both 70, received mail-in ballots that they hadn't requested at their home in Grand Prairie. (David Woo / Staff Photographer)

"It angers you that somebody's arbitrarily picking your name out and using it," she said. "Nobody likes to be taken advantage of."

In municipal races, voter turnout is notoriously low without a big national election to draw crowds to the polls. As a result, council members are elected with tiny margins; sometimes 10 votes can mean the difference between victory and loss.

"The problem with absentee or mail-in ballot fraud is that it works," Tim Dickey, the father of District 6 candidate Alex Dickey, told the Dallas County Commissioners Court this week. "The people that are best at it end up sitting in the seats and being in a position to do, or not do, something about it."

As of Wednesday, 622 people have voted by mail and 807 have voted in person in West Dallas' District 6 race, county data shows. That means mail-in ballots make up 44 percent of all the votes cast so far, a higher share than any other Dallas City Council race.

A whopping 448 mail-in ballots were requested in District 6 on a single day— March 14, records show.

Both Dickey and Linus Spiller, another candidate in District 6, told the county commissioners that they hoped the authorities would take the issue seriously.

8/23/2021　　　　Case 5:21-cv-00844-XR Document 77-18 Filed 05/02/23 in West Dallas Page 148 of 182

mail-in ballot requests for authenticity.

"I will make sure that everyone's actual vote counts," Pippins-Poole said. "Fraudulent ballots will be identified, and the perpetrators prosecuted."

Candidate Narvaez voiced concern about the apparent fraud.

"I hope nothing's going on that's fraudulent, because we don't play like that," Narvaez said.

Narvaez provided *The Dallas Morning News* with the names of six senior citizens who he said had told his campaign about suspicious ballot activity by Alonzo. Five of those voters denied the allegations to *The News*. One initially said he and his wife received two ballots each, but then he changed his story.

Alonzo, the council member, said she is concerned about voter fraud and is sure that it was committed by "one of our opponents' people."

The fraudulent activity could undermine the public's trust in the election's outcome.

"You say so-and-so won, but did he do it legally?" said Milam, of West Dallas. "Did he do it fair and square, or did he manipulate the system?"

**Correction:** An earlier version of this story incorrectly described who is eligible to vote by mail. To be eligible to vote by mail in Texas, you must be 65 years or older; be disabled; be out of the county on election day and during the period for early voting by personal appearance; or be confined in jail, but otherwise eligible.

   

Naomi Martin. Naomi is an enterprise/ investigative reporter who has covered Dallas County government, Parkland Memorial Hospital, juvenile detention and the county jail.  Before that, Naomi was a criminal justice reporter in Dallas, New Orleans and Baton Rouge. She received The Dallas Morning News' Reporter of the Year award in 2016 and 2017. She has a degree in political economy from Tulane University.

✉ nmartin@dallasnews.com  **f** /NaomiMartinJournalist  🐦 @NaomiMartin

# DALLAS Observer

6/21/18

| CRIME |

# Dallas Man Pleads Guilty in 2017 West Dallas Voter Fraud Investigation

**STEPHEN YOUNG** | **JUNE 21, 2018** | **4:00AM**



Investigators believe Miguel Hernandez is responsible for at least one of the tainted ballots turned in to to the Dallas County Elections Department. **Stephen Young**

    

As of Wednesday afternoon, Dallas County District Attorney Faith Johnson and Texas Attorney General Ken Paxton have racked up exactly one conviction **in their quest to root out voter fraud in Dallas County**. Miguel Hernandez, 28,


Meals for 100 people.    

**"We must protect the process so that all citizens may have confidence**

tweet this 🐦

"This is the first of many milestones in the ongoing investigation into voter fraud in Dallas County," Johnson says. "We must protect the process so that all citizens may have confidence in the system."

A Dallas County grand jury indicted Hernandez last spring as part of an investigation into potential voter fraud in Dallas' May 2017 municipal election. Investigators in the case believed Hernandez was responsible for at least one tainted ballot turned in to to the Dallas County Elections Department during the District 6 City Council election between Omar Narvaez and Monica Alonzo. The ballot was signed "Jose Rodriguez," the alias attached to more than 700 ballots sequestered by a Dallas County judge in the days after the May 6 election.

According to an arrest warrant affidavit, prosecutors got in touch with one of the voters for whom one of the dubious ballots was cast. The woman, who is not named in the affidavit, told investigators that she placed a blank ballot in a white envelope and the official carrier envelop and gave it to someone she believed was going to mail it back to the Dallas County Elections Department. She did not sign the back of the envelope, as is required.



Miguel Hernandez **Dallas County**

## RELATED STORIES

**Texas AG Gets in on Dallas County Voter Fraud Investigation**
**Suspect in West Dallas Voter Fraud Arrested**
**Dallas County Does Its Least to Curtail Mail-In Ballot Fraud**



When the ballot showed up at elections headquarters, both the voter's signature and the "assisted by" line on the form had been filled out. The woman identified Hernandez from a lineup as the person to whom she'd given the ballot.

Hernandez's sentence is far lighter than those given out to two Tarrant County women charged with illegal voting in 2017 and 2018. In February 2017, a Tarrant County jury sentenced Rose Maria Ortega, a permanent U.S. resident, to eight years in prison for voting in several elections without being a U.S. citizen. In April, Crystal Mason, out on parole from federal prison on tax charges, got five years from state District Judge Ruben Gonzalez for casting a provisional ballot during the 2016 presidential election. Despite the disparity in the sentences, Johnson says she believes Hernandez's conviction will deter future voter fraud.

"It is my hope, with this conviction, that we will send a message to anyone who dares to threaten the integrity of the voting process. We will not tolerate it, and you will be brought to justice," Johnson says.

**KEEP THE DALLAS OBSERVER FREE...** Since we started the *Dallas Observer*, it has been defined as the free, independent voice of Dallas, and we'd like to keep it that way. With local media under siege, it's more important than ever for us to rally support behind funding our local journalism. You can help by participating in our "I Support" program, allowing us to keep offering readers access to our incisive coverage of local news, food and culture with no paywalls.

**Make a one-time donation today for as little as $1.**

**CONTACT:** Stephen Young

## TRENDING NEWS

**Flyers Threatening White HP Parents Who Send Their Kids to the Ivy League Reek of Fakeness**

**North Texas Realtor Jenna Ryan Pleads Guilty over U.S. Capitol Riot**

**South Dallas Car Wash Owner Sues Dallas, Claims City Targeted Him for a Shakedown**

**Accused of Allowing Cocaine Sales, DFW Club Owner Will Go on Trial in October**

*Presented by: lecreuset.com*
**French Press**









**DON'T MISS OUT**

**SIGN UP** for the latest news, free stuff and more!

**JOIN TODAY ▸**

*advertisement*

| CITY HALL |

# Convicted of Bribing City Council Members, Developer Ruel Hamilton Wants a Retrial

**JACOB VAUGHN** | **AUGUST 23, 2021** | **4:00AM**

After his conviction in June, Dallas developer Ruel Hamilton maintains his innocence. **Getty Images**

    

**Ruel Hamilton**, the developer who was convicted in June on charges he bribed ⊗ two former Dallas City Council members, wants the charges against him dropped.

In court filings last week, he and his attorney, Abbe David Lowell, argue the court made several mistaken evidentiary rulings that unfairly influenced the outcome of the trial.

Hamilton and Lowell say that certain damning testimony against the developer was inadmissible hearsay that shouldn't have been admitted. They also say one of the council members who allegedly took the bribes, the late Carolyn Davis, recanted statements against Hamilton before her death and that this should have been stated in the trial, but it wasn't.

Lowell didn't respond to requests for comment.

## RELATED STORIES

**Did the FBI Meddle in Dallas Politics to Catch Corrupt Politicians?**
**South Dallas Car Wash Owner Sues Dallas, Claims City Targeted Him for a Shakedown**
**Another Dallas Developer Is Accused of Bribing City Council Members**

Originally indicted in February 2019, Hamilton is accused of paying Davis and former Mayor Pro Tem Dwaine Caraway for help on the City Council with his real estate developments.

Prosecutors claim Davis received $40,000 from Hamilton in "illegal campaign donations for candidates of her choice," which constituted an illegal quid pro quo.

They also assert that Davis was supposed to be established as a political consultant after her council term. Prosecutors believe the plan was to have Davis lobby for Hamilton and others. She was chair of the council's Housing Committee at the time. In 2019, she pleaded guilty to accepting bribes from Hamilton and agreed to cooperate with prosecutors in their case against him. Four months later, Davis and her daughter died in a traffic accident.

Hamilton's lawyer says his client's dealings with Davis were legal and he was just helping Davis raise money for the candidates to "help her preserve goodwill with those candidates once she left office." Hamilton later hired Davis as a consultant, paying her $20,000 in fees from 2015-2018.

Hamilton and Davis also allegedly used the nonprofit Hip Hop Government as a middleman for bribes and to bypass the $1,000 limit on campaign contributions.

⊗

Jeremy Scroggins, the owner of the nonprofit, admitted in July 2019 that he was using his nonprofit to funnel bribes between the two. Charges against him included embezzlement from the charity he ran and tax violations.

But because of a plea agreement with the FBI, Scroggins only had to plea guilty to misprision — knowing about a crime but not reporting it — the most minor of his

charges. He ended up on the prosecution's witness list against Hamilton in the trial.

### **"These rulings amounted to denying Mr. Hamilton a fair trial." – court filing**

tweet this 🐦

Hamilton allegedly paid Caraway $7,000 in 2018 for help with a proposed real estate development in Caraway's district. The developer also needed help from Davis with his Royal Crest Apartment Complex so it could receive over $2.5 million in public subsidies through City Council, prosecutors say. Hamilton's attorney claims the $7,000 check he gave to Caraway was actually to pay for medical expenses for the council member and his mother.

The court allowed Scroggins to testify about and speculate on statements Davis made about her dealings with Hamilton before her death. Scroggins previously testified that he had never met Hamilton or had any telephone conversations with him. Additionally, he "was not present when Davis got money from Hamilton," and he "did not know that Hamilton sought Low Income Housing Tax Credits," according to court documents.

Because of this, Lowell moved to have this testimony excluded, but the court allowed it.

On one occasion, Davis told Scroggins she in fact wasn't receiving bribes from Hamilton. On the stand, Scroggins speculated about the conversation, saying he believed Davis was lying. The court wouldn't allow Hamilton's team to call witnesses that refuted this testimony.

"Davis told numerous people that Mr. Hamilton had never bribed her and they believed her (as Scroggins had until he became a government witness), but the Court barred this testimony," Hamilton's legal team said in court filings. Additionally, the government was allowed to suggest in testimony that Hamilton violated local campaign finance laws, even though the court ruled in pretrial that this would be inadmissible.

"These rulings amounted to denying Mr. Hamilton a fair trial," his lawyer said, according to court records. "A new trial is warranted." ⊗

Last week, prosecutors asked the court to deny the developer's request for acquittal or a retrial.

Hamilton faces up to 25 years in federal prison.

PDF — Ruel_Hamilton_wants_a_new_trial.pdf

Page:

Automatic

✕

**KEEP THE DALLAS OBSERVER FREE...** Since we started the *Dallas Observer*, it has been defined as the free, independent voice of Dallas, and we'd like to keep it that way. With local media under siege, it's more important than ever for us to rally support behind funding our local journalism. You can help by participating in our "I Support" program, allowing us to keep offering readers access to our incisive coverage of local news, food and culture with no paywalls.

**Make a one-time donation today for as little as $1.**

---

**CONTACT:** Jacob Vaughn
**FOLLOW:** Twitter: @@officialjacobv

---

# TRENDING NEWS

**Flyers Threatening White HP Parents Who Send Their Kids to the Ivy League Reek of Fakeness**

**North Texas Realtor Jenna Ryan Pleads Guilty over U.S. Capitol Riot**

**South Dallas Car Wash Owner Sues Dallas, Claims City Targeted Him for a Shakedown**

**Accused of Allowing Cocaine Sales, DFW Club Owner Will Go on Trial in October**



*Presented by: lecreuset.com*
**French Press**





READ MORE



## DON'T MISS OUT

**SIGN UP** for the latest news, free stuff and more!

JOIN TODAY ▶

*advertisement*

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy The Dallas Observer may earn a portion of sales from products & services purchased through links on our site from our affiliate partners. ©2021 Dallas Observer, LP. All rights reserved.

Powered by **Foundation**



# SB 1

**Texas House Select Committee
on Constitutional Rights & Remedies
Special Legislative Session 87(2)**

August 23, 2021

Bryan Sunderland
Opportunity Solutions Project

Chairman Ashby, Vice Chair Thompson, and honorable members of the House Select Committee on Constitutional Rights and Remedies, my name is Bryan Sunderland, and I am speaking on behalf of the Opportunity Solutions Project, a non-partisan, non-profit public policy organization that has worked with lawmakers across the country on election reform.

I'm speaking today in support of SB 1, which offers measured, commonsense solutions to safeguard Texas elections. America stands for the idea that anyone can create their own success and shape the future—and that starts with being able to cast a ballot that counts. As lawmakers, you know that there is much at stake in the details of carrying out elections. This bill addresses concerns that many Texans and Americans around the country have regarding security, fairness, and transparency in the election process.

I'd like to highlight a few key provisions of the bill.

First, this bill strengthens the integrity of mail voting by requiring a government-issued ID or Social Security number on both mail ballot applications and mail ballots. This impactful reform will ensure that voting by mail has the same ID requirements as in-person voting, creating process uniformity and decreasing the potential for fraud.

Second, the bill permits video surveillance of areas where ballots are submitted if the county population is under 100,000 and requires surveillance for counties over 100,000. The bill could further strengthen transparency by requiring surveillance at all locations. Drop boxes can be located at a staffed government office or early voting location where surveillance is already in place.

Third, the bill ensures that poll watchers can see and hear election activities, which is the core function of observers. Across the country, poll watchers were denied access to vote counting centers in 2020, causing mistrust and preventing transparency.[1][2]

Fourth, by increasing penalties for election law violations, the bill will ensure that election officials follow the law and are held accountable if they don't. This will help to deter bad actors and increase voter confidence.

Fifth, the bill bans the practice of vote harvesting and makes a violation a felony. This will prohibit people from being paid to harvest large quantities of ballots. This accountability reform will both deter fraud and increase the security in the chain of custody for mail ballots. To strengthen this reform even further, the bill could limit the number of ballots to two that any person, paid or volunteer, can handle.

Sixth, under this bill early voting clerks are prohibited from soliciting mail ballot applications. The bill could be strengthened by extending the prohibition to public officials and including mail ballots. This will prevent voters from receiving unsolicited applications and mail ballots who didn't request them. This is a problem because it causes confusion for voters who do not want to vote by mail, and it can open the door to fraud. As you are aware, Harris County sent applications to all 2.4 million registered voters in 2020. This was an issue across the country. In Michigan, the Secretary of State mailed out applications for ballots to all 7.7 million registered voters in 2020.[3] This provision would ensure that this never happens again in Texas.

Seventh, the bill prohibits public officials from creating, modifying, or suspending any election procedure mandated by law. This will guarantee that officials don't unilaterally change election procedures in the months or weeks leading up to Election Day.

---

[1] Joseph Simonson, "Pennsylvania Republican poll watchers allege fraud," Washington Examiner (2020), https://www.washingtonexaminer.com/news/trump-campaign-preparing-lawsuits-alleging-fraud-in-pennsylvania.
[2] Spencer Neale, "'Stop the count': Group of poll watchers demand access to Detroit polling site," Washington Examiner (2020), https://www.washingtonexaminer.com/news/stop-the-count-group-of-poll-watchers-demand-access-to-detroit-polling-site.
[3] https://www.michigan.gov/sos/0,4670,7-127-93094-529536--,00.html

Finally, the bill adds voter roll protections, including a monthly review to confirm citizenship. Frequent voter roll maintenance is crucial in maintaining the integrity of voter eligibility in Texas.

I have one additional suggestion that would prevent courts from changing election law without you, the legislature, having an opportunity to weigh in. The bill could give the legislature the ability to intervene in election lawsuits and to approve consent decrees. This will prevent the practice of friendly lawsuits where litigants and judges re-write election rules.

SB 1 is an excellent bill that will give Texas voters confidence that their vote counts—by making it easy to vote, but hard to cheat. Thank you for the opportunity to testify today and I'm happy to answer any questions.

Constitutional Rights & Remedies, Select Committee
August 23, 2021
Written Testimony for SB 1


Page 45; Line 24; Bill Section 6.03 – TEC 276.015 and 276.016.


The language in SB1 defines ballot harvesting services as *"IN-PERSON INTERACTION WITH A VOTER"*.

But in the research we have been doing in Harris County, we are finding ballot harvesting which involves forgery of voters' signatures, NOT in-person interaction with voters.

The ballot harvesting (state jail felony) charges we have before the A.G. at this time involve harvesters stealing the identities of voters for mail ballot applications. In none of these cases did the harvester have any in-person interaction with any of these voters. Four of the voters involved had been deceased for years. Other living voters have signed declarations attesting that they did NOT give the person (harvester) permission to request a mail ballot for them. In most cases, the voters said they did not even know the person who had submitted the application in their name.

SB 1 does not repeal any of the other sections of the code that deal with mail ballot fraud. However, I am concerned that this new bill will pre-empt older sections of code. By re-defining the offense as requiring in-person interaction with the voter, are we giving perpetrators an "out" for their felony trials?

The solution could be as simple as adding a line that states that *"this definition does not alter any other existing provisions in the code regarding ballot harvesting."*

We need to avoid unintended consequences of this ballot harvesting definition in an otherwise good election bill.

I have attached three samples of "harvested" ballot by mail applications from the voters deceased long before the 2020 as well as three samples of living voters who claim they did not request a ballot by mail.


Colleen Vera
colleenmvera@yahoo.com

Vera - 1



Vera -2







Liberty, equality, and truth in America

August 20th, 2021

Chairman: Rep. Trent Ashby

Rep. Senfronia Thompson

Rep. John H. Bucy III

Rep. Travis Clardy

Rep. Charlie Geren

Rep. Jacey Jetton

Rep. Ann Johnson

Rep. Stephanie Klick

Rep. Brooks Landgraf

Rep. Oscar Longoria

Rep. J. M. Lozano

Rep. Joe Moody

Rep. Victoria Neave

Rep. Matt Shaheen

Rep. James White

Via email

Re: Senate Bill 1

Dear Honorable Representatives:

Stand Up Republic is a cross-partisan, grassroots organization dedicated to defending and strengthening our constitutional form of government.

Senate Bill 1 and House Bill 3 were introduced during the 87th Legislative regular session, and now in the 87th Legislative-second special session. These bills have been filed with the sole intent of making it harder for all Texans to vote.  It is hard to believe that any Texas elected official would support legislation to undermine our sacred right to vote.


STAND
UP
REPUBLIC

Liberty, equality, and truth in America

The fact is that the Texas Secretary of State declared that the 2020 election was legal, fair, and well conducted. After 22,000 hours of investigation, the Texas State Attorney General found only 16 cases of fraud, which are being prosecuted. There is no actual evidence of widespread voter fraud. These are the facts, and they are undisputed.

Our fellow neighbors have spoken. Ragnar Research conduct a poll of 1000 likely voters with a margin of error of +/- 3%. The following is data from the poll.

1. 90% of Texans believe state lawmakers should take steps to protect elections from partisan interference.
2. 93% of voters believing that poll watchers should have proper training.
3. 86% of voters said election workers shouldn't worry about risking jail time for doing their jobs.
4. 86% oppose felony charges for assisting voters with disabilities, or voters with other unique needs, at polling locations.
5. 74% of voters want to expand early voting by one week.
6. Texas Republicans made significant gains among diverse demographics in last year's elections, and they did so by attracting new voters and registering more voters.

We do not support Senate Bill 1 in its entirety, but we find grievous fault with the following sections.

1. **Section 2.13** creates two tiers of election standards for voted ballots and live streaming standards for Texas counties (above and below 100,000 population)
2. **Section 3.01 and 3.02** – This section does not provide remedies, nor legal ramifications, for poll watchers who interfere with the election process, or who violate state election law but does penalize election officials for removing a poll watcher that has violated the state election law. This section also requires the poll watcher to receive a copy of the training, but no mandatory is training required.
3. **Section 3.03** – This section is very vague and requires further legal definition of "sit or stand near enough". For a real-world example, it is very possible for a partisan poll watcher to greet a voter at the polling location door and follow that person within the polling location.
4. **Section 3.05** – criminalizes simple human mistakes by election officials of both parties.
5. **Section 3.09** - Would prohibit counties with populations of less than 250,000 from providing a printed copy of the software activities to the Secretary of State. Why the double standard?
6. **Section 4.01** – Prohibits the use of a legal signature stamp for disabled citizens.
7. **Section 6.03** - Under this article a person does not have to prove that Vote Harvesting would change the outcome of the election, but just needs to infer it would to recover damages. If a candidate is eligible to recover damages under this section, they will recover unlimited campaign expenditures with no limits. This could encourage frivolous lawsuits for losing candidates.



Liberty, equality, and truth in America

Thank you for your service to our state. Please vote NO on Senate Bill 1. Let's keep Texas a democracy.

In Service to our republic,

Stand Up Republic (SUR)                              Stand Up Republic – Texas

Bryan Jones                                          Trenton Newell
Chairman – SUR                                       Sandra Weinstein
                                                     Jeffery Brooks
                                                     Kristina Lindstrom
                                                     David Billings

**David Weinberg**
**Brennan Center for Justice**
**Testimony before the Texas House Select Committee**
**on Constitutional Rights and Remedies on Senate Bill 1**
**Monday, August 23rd**

Chairman Ashby and Members of the Committee, thank you for the opportunity to testify before you here today. My name is David Weinberg, and I am a voting rights advisor for the Brennan Center for Justice. The Brennan Center is a non-profit, non-partisan law and policy center, focused on the twin pillars of democracy and justice. Related to my testimony here today, the Brennan Center does research into policies that make voting more accessible while improving the integrity of our elections.

All Texans deserve a free, fair, and accessible elections system. Texans registered and voted in record numbers in 2020. And they voted in an elections system that was safe and secure.

The idea that there is widespread voter fraud or problems in Texas elections is dangerous, racist, and moreover, it is devoid of evidentiary support. In 2020, Texas Attorney General Ken Paxton's office spent 22,000 hours looking for voter fraud and uncovered just 16 cases of false addresses on registration forms, out of nearly 17 million registered voters according to news reports. Looking back, in the ten years preceding the enactment of Texas's voter-ID requirements, only two cases of in-person voter impersonation fraud were prosecuted to a conviction. Again, to put it plainly and simply: the 2020 Texas election, and past Texas elections, were accurate and secure. This sentiment has been stated by Keith Ingram, Director of the Elections Division for the Texas Secretary of State, who testified in the Texas House Elections Committee that, "In spite of all the circumstances, Texas had an election that was smooth and secure. Texans can be justifiably proud of the hard work and creativity shown by local county elections officials."

The clear and present threat to Texas voters of all political affiliations is not voter fraud, but rather voter suppression.

An analysis of state voting laws by Northern Illinois University and Jacksonville University concluded that it is harder to cast a ballot in Texas than in any other state across the country. Texas already severely limits those who may vote by mail, makes voters pay their own postage if voting by mail, and limits online voter registration to a limited category of voters. It currently also imposes onerous requirements on any citizen who wishes to register voters and requires voters to register 30 days before the election in which they want to vote, tied for earliest in the country. But while participation should be welcome in a democracy, this committee is today considering a bill that would erect obstacles to the vote, Senate Bill 1. If the facts tell us anything, Texas politicians would do best to act reasonably instead: stop the alarmism and respect Texans' access to the ballot.

Many Texas elected officials have been saying that Texas needs an elections bill that would make it, quote, "easier to vote and harder to cheat." But the measures contained in this bill appear to be not a reaction to real incidences of cheating, but rather a fairly obvious reaction to and retaliation against successful efforts by local officials to make it safer for individuals to vote during a deadly pandemic, and by others to encourage voter participation. Senate Bill 1 makes voting and voter participation more arduous in a plethora of ways.

Senate Bill 1 would, among other measures, ban drive-thru and 24-hour voting; curb early voting; make it more difficult for voters with disabilities or language access needs to receive assistance with voting; prohibit election officials from sending mail ballot applications to eligible voters; require mail ballot applications to be hand-signed and to include ID information; make it harder for election officials and election judges to protect voters from poll watcher harassment; create a vague criminal penalty against "vote harvesting" that could capture ordinary interactions between campaigns and voters; and make it more difficult for Texas judges to accommodate voters in the event of a natural disaster or pandemic by restricting their ability to modify or suspend election procedures.

While Senate Bill 1 would impose restrictions on all Texans voter's access to the ballot, the bill would appear to particularly impact voters of color. Limitations on voter assistance for people with limited English proficiency will have an outsized effect on communities of color. So will provisions that give great leeway to poll watchers to intimidate voters. And the apparent retaliation in Senate Bill 1 against election officials trying to make voting easier in large, diverse populations such as Harris County could not be more obvious. This coincides with new data from the United States Census Bureau showing Texas continuing to grow into a more racially and ethnically diverse state.

Given the calamitous state of Covid in Texas, with hospital systems stretched to their limits, certain portions of Senate Bill 1 that may require an individual to vote indoors or discourage an individual from engaging in contactless voting appear not only unnecessary but also grossly irresponsible. The entirety of Senate Bill 1 is unnecessary given the many false justifications for the bill – enacting provisions now to discourage voters from using drive through voting, vote by mail, or drop boxes seems beyond the pale and a dark stain on this institution.

Senate Bill 1 is a roadmap for making it more onerous for Texans to vote. It is a solution in search of a problem that exists only in the harmful rhetoric of those who continue to spread misinformation about the 2020 election and other elections.

In Texas, it is past time for lawmakers to leave divisive falsehoods behind and turn their attention to ensuring all Texas voters have fair, free, and equal access to the ballot box moving forward. We encourage this committee not to pass Senate Bill 1.



**Testimony on SB 1**

**By: James Slattery, Senior Staff Attorney, Texas Civil Rights Project**

**Texas House Select Committee on Constitutional Rights & Remedies, August 23, 2021**

Chair Ashby, Vice Chair Thompson, and Members of the House Select Committee,

Thank you for the opportunity to testify today regarding SB 1. During my testimony, I will highlight some of the gravest threats that this bill poses to Texas voters:

- Eliminating drive thru voting and extended early voting hours, even though these are vital COVID-19 safety measures and are used disproportionately by voters of color;
- The granting of expansive new powers to partisan poll watchers while diminishing vital safeguards against the abuse of such powers;
- An unnecessary requirement for voters to provide their ID/Social Security Number with their vote by mail materials that lacks sufficient safeguards to protect voters;
- An insufficient process to allow voters to cure signature problems on their vote by mail ballots;
- Problematic changes to procedures for curbside voting and the oath that voter assistants take.

But as the Committee considers these and other provisions in SB 1, it should bear in mind two important facts. First, during the March 4, 2021 hearing of the House Elections Committee, the Director of the Elections Division of the Texas Secretary of State reported to the Committee the official position of the Government of the State of Texas: that the most recent state elections, in 2020 election, were "a success" and that our elections were "smooth and secure."

Second, Texas is already the hardest state to vote in the entire country. That is not an opinion. That is an objective fact. According to a landmark study published in 2020 by Northern Illinois University, which measured the burdens imposed on voters when trying to register and cast a ballot via a "Cost of Voting Index," Texas ranked 50 out of 50 among US states.[1] Among other problems, we have no online voter registration, only a few discrete groups of Texans can vote by mail, and 750 polling places were closed between 2013 and 2019, predominantly in communities of color.[2] Indeed, TCRP has documented the systemic barriers voters routinely face in Texas in a number of reports in recent years.[3]

---

[1] *See* Scot Schraufnagel et al., *Cost of Voting in the American States: 2020*, 19 Election Law Journal 503, 508 (2020), available at https://www.liebertpub.com/doi/pdf/10.1089/elj.2020.0666.

[2] Leadership Conference Education Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* at 17 (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.

[3] *See, e.g.,* Beth Stevens et al., *Texas Election Protection 2016: An Overview of the Challenges Faced by Texas Voters in the Presidential Election* (2017), https://texascivilrightsproject.org/wp-content/uploads/2018/09/EP-Report.pdf; Beth Stevens & Emily Eby, *Texas Election Protection 2018: How Election Administration Issues Impacted Hundreds of Thousands of*



SB 1 does nearly nothing to make our elections more secure. But it will advance the Big Lie about the 2020 election, and enshrine the Big Lie further into the laws of the State of Texas.

**Banning drive thru voting and extended early voting hours will make voting more dangerous during the pandemic, and disproportionately affect voters of color**

We oppose the bans on drive thru voting in Sections 2.01, 2.09, and 2.10, and the bans on extended early voting hours in Sections 2.06 and 2.07. Drive thru voting and extended early voting hours have been vital measures keeping voters from being infected with COVID-19 while voting. Instead of going inside a crowded polling place where some people were not wearing masks, voters can cast a ballot from the safety of their car. By spreading out voting over a longer period of time, extended early voting hours reduce the number of in-person voters present at any given moment in a polling place, making it less likely that polling places would become super spreader events.

As the recent surge of COVID-19 cases in Texas makes clear, the pandemic is far from over. As you can see in the chart below from yesterday's New York Times, the 7-day average of COVID-19 cases in Texas is near a record high. There will almost certainly be new variants and new waves of the virus before it is finally crushed. When even the Governor of the State of Texas is not safe from COVID-19 infection, it would be madness to make it even more dangerous to vote during the pandemic. Simply put, eliminating drive thru voting and extended early voting hours means that some number of voters will be infected and die if this bill passes.



New reported cases

*Voters* (2019), available at
https://texascivilrightsproject.org/wp-content/uploads/2019/03/2019-Election-Protection-Report.pdf;
Wajiha Rizvi, *Curbside Voting and Disability Access in the 2020 General Election* (2021), available at
https://txcivilrights.org/wp-content/uploads/2021/01/Curbside-Voting-Report.pdf; Judy Bao, *Voter Intimidation in Texas During the 2020 General Election* (2021), available at
https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.



Further, the burden of taking away drive through voting won't fall on all voters equally. Attached to my testimony is an analysis that TCRP conducted with Targetsmart of the voters who used drive through voting and extended early voting hours, and found that they were more likely to be used by people of color than early voters as a whole. This is unsurprising, given that people of color have been disproportionately more likely to be infected with the coronavirus and die from it than white Texans, and they tend to have less flexible work schedules.

TCRP and other organizations have repeatedly pointed out the disparate impact of both of these provisions when testifying on them during the recent regular session. If the Legislature still chooses to enact these provisions after having received such data from multiple sources on a number of different occasions, the only reasonable conclusion is that these provisions in fact reflect a discriminatory intent by the Legislature to eliminate forms of voting because they are used by voters of color. That this disparate impact is not merely an unfortunate side effect of SB 1, but is in fact the primary and intended purpose of the Legislature of these provisions.

Moreover, imposing early voting only after 6am and before 9pm takes away from local officials the authority to set early voting times that fit the needs of their communities. Indeed, local officials often allow polls to remain open past 9pm because extended hours voting is vital for shift workers, first responders, folks with irregular schedules, and voters with substantial family responsibilities that make voting during "regular" hours exceptionally difficult.

When *Texas Monthly* interviewed voters in Harris County who were participating in its 24 hour voting program, they found a number of voters overjoyed to have this option because they would've found it nearly impossible to vote otherwise, including: an engineer who works in the Houston Ship Channel for an oil field services company; an employee of Metro, Harris County's public transportation agency; a construction project manager; "[a]n overworked Amazon delivery driver"; "[a] middle-aged teacher, still wearing her business-casual work attire"; and an H-E-B employee.[4]

We therefore urge the Committee to remove these provisions, so that counties can continue to work to make voting safe and accessible by offering drive thru voting and extended early voting hours.

---

[4] Peter Holley, *Meet the Harris County Voters Who Showed Up After Midnight to Cast a Ballot*, Texas Monthly (Oct. 30, 2020), https://www.texasmonthly.com/news-politics/harris-county-24-hour-voting/.



## SB 1 will empower partisan poll watchers to wreak havoc in polling places and intimidate voters

I wish to raise serious concerns with Sections 3.03, 3.04, 3.05, 3.06, 3.07, 4.13, and 4.15, which would expand the powers and rights of partisan poll watchers while removing vital safeguards that prevent them from wreaking havoc in the voting process.

Partisan poll watchers are appointed by political campaigns to be their agents inside the polling place. The Election Code is very explicit in Section 33.001 that watchers are appointed "on behalf of a candidate, a political party, or the proponents or opponents of a measure." Partisan poll watchers serve at the pleasure of the campaigns that have appointed them and represent the interests of those campaigns, not the public at large.

To be a partisan poll watcher, you are not required under Texas law to complete any kind of training or examination in election law or procedures. To the extent that political parties voluntarily train poll watchers in Texas's election laws, the content and accuracy of such training is entirely at their discretion, and may vary highly in quality from one county to the next. They don't take an oath to observe Texas's election laws, swearing only that they either do not have a recording device or have disabled one.

These are not just theoretical dangers to voting posed by partisan watchers. As TCRP has documented in a report I have attached to this testimony,[5] from which I am drawing the following material, partisan watchers have been deployed throughout American history -- from Reconstruction to the present day -- to harass, intimidate, and violently attack voters of color and voters of the opposing partisan affiliation. For instance, in the lead-up up to the 1964 presidential election, the Republican National Committee launched the so-called "anti-fraud" campaign known as Operation Eagle Eye. They recruited tens of thousands of volunteers to show up at polling places in communities of color and challenge voters' eligibility, take unwelcome photographs, loudly describe voters on two-way radios, and summon Republican-friendly police officers. Operation Eagle Eye deployed 10,000 volunteers in Texas alone.

Such efforts didn't end then. In 1981, the RNC organized a partisan poll watching group called the National Ballot Security Task Force. This group included armed off-duty police officers who patrolled polling places, occasionally removing voters in Latinx and Black neighborhoods. Evidence in litigation that followed included the party's plans to discourage voting by placing intimidating poll watchers in communities of color in Harris County, Texas. Party representatives made overt racial remarks across the country, such as "If it's a close race . . . which I'm assuming it is, this could keep the black vote down considerably." The parties signed a consent decree allowing a

---

[5] Emily Eby and Joaquin Gonzalez, Texas Civil Rights Project, *Opening the Floodgates for Racial Intimidation, Disenfranchisement, and Violence by Expanding Poll Worker Authority*, available at https://txcivilrights.org/wp-content/uploads/2021/05/TCRP-Poll-Watcher-Report.pdf.



federal court to review any proposed "ballot security" activities of the RNC, particularly in minority areas--a consent decree that lapsed only in recent years.

Poll watchers in Texas have also been known to call Border Patrol in an attempt to curtail Latinx turnout. In the 1980s in the Río Grande Valley, poll watchers were known for intimidating non-English speaking voters by trying to kick them out of the polls and photographing them.

This is not ancient history. In 2018, Dallas poll watchers had to be escorted out for looking over voters' shoulders. In 2010 and in 2020, Houston poll watchers were reported for being too close to voters. The latter was especially intimidating to voters who were susceptible to COVID-19 and forced to vote in person by Texas's draconian vote-by-mail requirements.

And Common Cause Texas recently obtained video footage of a Harris County Republican Party presentation recruiting and training poll watchers for the 2020 General Election. Throughout the video, the presenter uses dog whistles to target exclusively minority neighborhoods and rile up potential volunteers to form an aggressive poll watching "brigade." The presenter states that the predominantly white suburban areas of Harris County are "safe," therefore "courageous" watchers from the suburbs need to venture into Harris County's predominantly Black and Brown urban core, highlighting particular areas on a map. Wheeler Baptist Church, a historic Black church with storied ties to the civil rights movement, is singled out as a particularly problematic example, despite the fact that no evidence is cited or exists indicating that fraud has occurred at this polling place.

SB 1 would give these partisan campaign volunteers a de facto license to run roughshod over election workers trying to conduct voting, and impose criminal penalties on efforts by poll workers to keep partisan watchers from interfering with voting. Section 3.04 requires that partisan watchers "may not be denied free movement where election activity is occurring within the location at which the watcher is serving" and Section 3.05 grants partisan watchers the power to observe "all election activities relating to closing the polling place."

At the same time that SB 1 grants partisan watchers such expansive new rights in polling places, Sections 3.03, 3.06, and 3.07 create an incentive structure for election workers to refrain from regulating the use of these new powers. If a poll worker believes that a partisan watcher has become too disruptive and should therefore leave the polling place, that partisan watcher can now threaten poll workers with a new Class A misdemeanor of refusing to accept their service. And if a poll worker asks a partisan watcher to move a few steps in any one direction, the watcher can now threaten poll workers with a new Class A misdemeanor for "taking any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective." If a watcher disagrees with anything a poll worker asks them to do, the watcher can threaten the poll worker with a new cause of action for injunctive relief.

Changes made to this bill during the first special session do not provide sufficient safeguards against abusive behavior by partisan poll watchers. Although Section 3.02 requires parties to provide



partisan watchers with a training manual published by SOS, SB 1 does not affirmatively require that partisan watchers actually be trained on the contents of the manual, nor require them to affirm that they will abide by the procedures contained therein.

Expanding watchers' authority would allow the candidates and parties they represent to intimidate voters up until the last moment of the process, even as they cast their ballots, building on a racist history of vigilante poll watchers dating back to Reconstruction. These provisions open the flood gates for voter intimidation by granting actors with a well documented history of political vigilantism expansive new powers and rights while also diminishing the ability of poll workers to protect voters from them.

**An unnecessary new requirement for voters to provide their ID/Social Security Number with their vote by mail materials lacks sufficient safeguards to protect voters**

When applying to vote by mail or submitting their vote by mail ballot, Article 4 would require voters to supply their Texas driver's license/election identification/personal ID card number with their application or ballot. If they do not have such a number, then they would have to supply the last four digits of their Social Security number. And if they have neither, a statement to that effect. The number supplied must "identify" the same voter identified on the voter's application for voter registration, or else their vote by mail application/ballot will be rejected.

It is easy to see the needless chaos and mass disenfranchisement this irrational new process will create. First, vote by mail applications and carrier envelopes are already complicated enough for voters to navigate, with a bewildering array of fields they must fill out after reading instructions in small and dense type. Adding another required field makes it all too likely that voters will miss this or another required field, and have their right to vote needlessly taken away from them.

Further, voters must handwrite those numbers on the form. The quality of people's handwriting varies wildly, as does the ability to interpret others' handwriting. If a voter driver's license number ends in a "9," they should not lose their right to vote because an election worker mistakenly interprets it as a "4" and therefore concludes that the numbers don't match or identify the relevant voter.

It is also not clear at all what it means to require that the number provided by the voter "identify" the same voter identified on the voter's registration application. For instance, it is not clear how this would protect a voter who put one kind of number on their voter registration application (such as a Social Security Number) and a different kind of number on their mail ballot materials (such as driver's license number). If this refers to some safeguard to ensure that voters' ballots are not needlessly rejected, that process needs to be explicitly spelled out in the bill itself.

Although SB 1 was amended by the Senate to include a rudimentary cure process for voters at risk of having their mail ballot materials rejected under this new requirement, these changes aren't sufficient. First, the Senate did not create a process for counties to proactively provide notice to mail



ballot <u>applicants</u> before rejection. SB 1 now sets up a process for potentially proactively notifying the voter when the voter returns a <u>marked ballot</u>, but that is much later in the process than when the voter turns in a VBM <u>application</u>. Further, under SB 1, the opportunity to cure any issues with a VBM ballot -- whether a signature problem, an ID number problem, or some other problem -- is not mandatory on counties. Whether you receive notice/opportunity to cure will still depend on whether your county chooses to do so.

## The opportunity to cure vote by mail ballots provisions should include an option to cure other than just in-person

Every major election, Texas counties reject thousands of mail-in ballots solely on the basis of mismatched signatures — including at least 1,873 mail-in ballots rejected during the 2018 General Election. The current process for signature verification under Texas law authorizes untrained local election officials to arbitrarily and subjectively reject mail-in ballots if officials believe, based on their own layman analysis, that the signature on a ballot is not the voter's signature. No advance notice is given to voters before their vote is rejected, and the decision to reject a mail-in ballot is final.

To make matters worse, once a ballot is rejected, there is no way for a voter to save themself from disenfranchisement even if they somehow find out about the rejection before Election Day and can vote in-person. According to the SOS, they are not allowed to cancel that rejected ballot and cast a ballot that counts at the polls. My organization is currently engaged in litigation challenging this arbitrary process as a violation of the Equal Protection and Due Process Clauses of the U.S. Constitution, as well as the Americans with Disabilities Act and the Rehabilitation Act of 1973.

This bill would improve the situation these voters face by potentially providing some mechanism for voters to be informed of a problem with the signature on their mail-in ballot and correct it. It however doesn't go far enough to truly solve this problem. First, this bill fails to make mail-in ballot curing mandatory for counties. This omission will result in uneven enforcement from county to county. Some properly registered Texans will get a chance to vote, while other identically positioned Texans across the county line will not.

Further, the current version of SB 1 allows voters to cure for the most part only in person, since most mail-in ballots are reviewed close to, on, or even after Election Day. All mail-in voters should be able to choose whether to cure their ballot by mail, phone, email, fax, or in person, regardless of when their mail-in ballot is reviewed. A large subset of mail-in voters are away from home and can't return in person to correct the error. Also, many voters can't cure in-person because of age, disability, or confinement in jail.



**SB 1 includes problematic changes to procedures for curbside voting and the oath that voter assistants take**

Section 5.01 would discourage people from assisting voters with disabilities by imposing an unnecessary new form they must fill out if they drive three or more curbside voters to the polls, and at least one of them is not a relative of the driver.

Section 5.04 would change the voter assistant's oath, making the assistant swear that they did not "encourage" the voter to choose them as an assistant. This would mean, for instance, that people could not encourage their family members or friends to go vote and use them as an assistant--making it harder and scarier for people to vote with no benefit to election security.

**There are many proposals the Committee should adopt instead that would make elections more secure and accessible**

If the Committee wants to use SB 1 to make Texas's elections more secure while making the ballot more accessible to voters, there are a number of policies that it could consider instead. Most urgently, the state could enact online voter registration -- used today by 40 other states. OVR would make our voter rolls far more accurate by allowing for real time updates from voters and avoiding mistakes that happen when election officials misinterpret voters' handwriting. Texas could also allow voters to register closer in time than 30 days before the election. It could make all Texas voters eligible to vote by mail, as 34 other states do, so that Texas voters could choose the voting option that works best for them. It could allow Texans to vote with a student or tribal ID. It could codify Governor Abbott's Covid order allowing early voting to start three weeks before election day.

During the interim charge process in advance of the 87th Legislative Session, TCRP submitted a number of these positive election reform proposals that would bolster election security while making it easier for people in Texas to vote.[6]

In our country, the government belongs to the people. Elections are the most important mechanism by which the government holds itself accountable and makes itself responsive to the people. It is the most basic duty of government to ensure that its citizens can vote in free and fair elections. And the most important component of that duty is to clear away any and all unnecessary obstacles standing between the voter and the ballot box. Every Texas voter should be able to cast a ballot that is fairly and accurately counted, but SB 1 would be a giant step backward from that vision of full democracy in Texas.

---

[6] See Written Testimony of Alesandra (Ali) Lozano, MSW on Interim Charge #1, Sept. 18, 2020, available at https://drive.google.com/file/d/18qWb4eWPC_rFNLmfnIZZLTkdNKJhzdWK/view; Written Testimony of Joaquin Gonzalez on Interim Charge #2, Sept. 18, 2020, available at https://drive.google.com/file/d/1nqYV9P1UbZomGDPQSSNwL2GsTU8aAwz3/view; Written Testimony of James Slattery on Interim Charge #3, Sept. 18, 2020, available at https://drive.google.com/file/d/18KTrpTrDLTdsq_50AZAlm9JBVE2RkM4L/view.



**Chart 1 of 3**



Estimated Demographics of All Harris County Early Voters

Other 0%
African-American 14%
Asian 4%
Hispanic 20%
Caucasian 62%

■ African-American   ■ Asian   ■ Caucasian   ■ Hispanic   ■ Other



**Chart 2 of 3**





**Chart 3 of 3**



Estimated Demographics of Harris County Drive-thru Early Voters

# Opening the Floodgates for Racial Intimidation, Disenfranchisement, and Violence by Expanding Poll Watcher Authority

## "If We Can Disqualify Enough Blacks and Enough Mexican Americans..."

*- Arizona Poll Watcher*

By
**Emily Eby, Esq.**
**and Joaquin Gonzalez, Esq.**



TEXAS
★
CIVIL RIGHTS
PROJECT

# Table of Contents

INTRODUCTION                                                    1

I. THE PAST: RACIAL INTIMIDATION BY POLL WATCHERS               2

II. THE VERY RECENT PAST: POLL WATCHER INTIMIDATION            7
    IN 2020  ELECTION

    A. Reports to Election Protection Hotline               7
    B. Other Notable Incidents                              8

III. The Present: Legislation Moving in Texas Today            9

# Introduction

The Texas Secretary of State's Poll Watcher's Guide opens with a charge: regardless of their political affiliation, the poll watcher's "main interest is in the conduct of a fair and honest election."[1] It goes on to say that a watcher's duty is to "observe the conduct of the election at the location where the watcher has been appointed."[2] They can point out "an observed irregularity or violation of the Texas Election Code" to a poll worker, but they are not allowed to talk to voters or be in the "polling station" when someone votes.[3] The current guidance ends by reminding poll watchers that election judges are the ones ultimately responsible for maintaining an orderly polling place, so watchers "should establish a cooperative relationship with these presiding officers and work with them to ensure that the voting process works smoothly."[4]

The Texas Legislature is looking to change that.

The two "election integrity" omnibus bills of the 2021 legislative session are HB 6 and SB 7. Though both bills have mutated many times over the last few months, one thing remains constant: both bills give partisan poll watchers free rein to disrupt the voting process. These, and other smaller bills, grant new protections and new rights to watchers. Expanding watchers' authority would allow the candidates and parties they represent to intimidate voters up until the last moment of the process, even as they cast their ballots, building on a racist history of vigilante poll watchers dating back to Reconstruction. These bills open the gate for voter intimidation, as well as disruption of the entire democratic process.

In this short paper, we'll dive into the reasons that it is such a bad idea to bestow poll watchers with unlimited power in the polling place. We'll look back into the past to see how poll watching has invited disenfranchisement, intimidation, and violence into the voting booth. We'll take a peek into the recent past to see how poll watchers used even their current power to intimidate voters in the 2020 General Election. Finally, we'll look at the poll watcher bills moving through the Texas legislature at present, and talk about why they must not become our future.

---

[1] **Poll Watcher's Guide**, page 2. TX SOS.

[2] **Poll Watcher's Guide**, page 9. TX SOS.

[3] **Poll Watcher's Guide**, page 9-11. TX SOS.

[4] **Poll Watcher's Guide**, page 21. TX SOS.