```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 2                         SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO ENTERO,      .
 4  ET AL,                           .
                                     .
 5            PLAINTIFFS,            .
          vs.                        .  DOCKET NO. 5:21-CV-844-XR
 6                                   .
    GREGORY W. ABBOTT, ET AL,        .
 7                                   .
              DEFENDANTS.            .
 8

 9

10          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
             BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                UNITED STATES DISTRICT JUDGE
                      NOVEMBER 16, 2021
12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFFS:     SEAN MORALES DOYLE, ESQUIRE
17                          BRENNAN CENTER FOR JUSTICE
                            120 BROADWAY
18                          SUITE 1750
                            NEW YORK, NY 10271
19

20                          UZOMA NKWONTA, ESQUIRE
                            ELIAS LAW GROUP LLP
21                          10 G STREET NE, SUITE 600
                            WASHINGTON DC 20002
22

23

24

25
```

```
 1                               JENNIFER HOLMES, ESQUIRE
                                 NAACP LEGAL DEFENSE & EDUCATIONAL
 2                               FUND INC
                                 40 RECTOR STREET, FIFTH FLOOR
 3                               NEW YORK NY 10006

 4

 5                               RYAN V. COX, ESQUIRE
                                 TEXAS CIVIL RIGHTS PROJECT
 6                               2911 N. MAIN AVENUE
                                 SAN ANTONIO TX 78212
 7

 8                               WENDY J. OLSON, ESQUIRE
                                 STOEL RIVES LLP
 9                               101 S. CAPITOL BLVD, SUITE 1900
                                 BOISE ID 83702
10

11                               DANIEL JOSHUA FREEMAN, ESQUIRE
                                 U.S. DEPARTMENT OF JUSTICE
12                               950 PENNSYLVANIA AVENUE
                                 4CON 8.143
13                               WASHINGTON DC 20530

14

15                               LIA SIFUENTES DAVIS, ESQUIRE
                                 DISABILITY RIGHTS TEXAS
16                               2222 WEST BRAKER LANE
                                 AUSTIN TX 78758
17

18
     FOR THE DEFENDANTS:         PATRICK SWEETEN, ESQUIRE
19                               WILLIAM THOMAS THOMPSON, ESQUIRE
                                 TEXAS ATTORNEY GENERAL
20                               P.O. BOX 12548
                                 MC 009
21                               AUSTIN TX 78711

22

23                               CHAD ENNIS, ESQUIRE
                                 TEXAS PUBLIC POLICY FOUNDATION
24                               901 CONGRESS AVENUE
                                 AUSTIN TX 78701
25
```

```
 1

 2   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                              OFFICIAL COURT REPORTER
 3                            UNITED STATES DISTRICT COURT
                              SAN ANTONIO, TEXAS
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (San Antonio, Texas; November 16, 2021, at 1:30 p.m., in
 2   open court.)
 3             THE COURT:  With that, let's turn to the civil case.
 4             21-844, La Union Del Pueblo versus Gregg Abbott and
 5   others.
 6             Let's take a roll call here.
 7             For La Union, or LUPE, who do we have?
 8             MR. MORALES DOYLE:  Good afternoon, Your Honor.
 9             Shawn Morales Doyle from the Brennan Center for
10   Justice on behalf of La Union Del Pueblo Entero.  I have with
11   me a number of attorneys.  I'm not sure if I can run through
12   the list, or you want to get —
13             THE COURT:  No, that's all right.  One per party will
14   do for now, and if I have to recognize anybody else who
15   speaks, let's just try to be clear for the court reporter.
16             The other case was LULAC.  Who do we have for LULAC?
17             MR. NKWONTA:  Good afternoon, Your Honor.
18             Uzoma Nkwonta on behalf of LULAC.  And I'll also
19   introduce my colleagues, Kassie Yukevich and Graham White.
20             THE COURT:  Thank you.
21             For Houston Justice?
22             MS. HOLMES:  Good afternoon, Your Honor.
23             Jennifer Holmes on behalf of the Houston Justice
24   plaintiffs, and I also have a number of colleagues joining us
25   today.
```

```
 1              THE COURT:  Thank you.
 2              For OCA-Greater Houston?
 3              MR. COX:  Hi, Judge.  Ryan Cox on behalf of the
 4   OCA-Greater Houston plaintiff group, along with several other
 5   cocounsel as well.
 6              THE COURT:  Thank you.
 7              Mi Familia Vota?
 8              MS. OLSON:  Good afternoon, Your Honor.
 9              Wendy Olson with Stoel Rives in Boise, for the Mi
10   Familia Vota plaintiffs.  We have several counsel -- cocounsel
11   on the line, including Sean Lyons, who is our local counsel
12   from Lyons & Lyons.
13              THE COURT:  Thank you.
14              And for the State defendants?
15              MR. SWEETEN:  Your Honor, Patrick Sweeten and
16   Will Thompson on behalf of the State defendants.
17              THE COURT:  Thank you.
18              And for the United States?
19              MR. FREEMAN:  Good afternoon, Your Honor.
20              Dan Freeman on behalf of the United States.  With me
21   on the line are Richard Dellheim, Dana Paikowsky, Mike
22   Stewart, and Jennifer Yun.
23              THE COURT:  Thank you.
24              So I apologize for the criminal docket.  I don't know
25   how that got snuck into the calendar, but it did.  So I
```

1   apologize for that.

2          Let's work through some of the issues here in this

3   case.  First, let's take care of housekeeping.

4          We have a motion for leave to file an amicus brief by

5   Donna G. Davidson.  That's Docket Number 78.  That's opposed

6   by Mi Familia Vota.

7          It's just an amicus brief.  I'm just going to --

8   that's going to be granted.  I'll read and consider the

9   arguments made in there, but the foundation for government

10  accountability, just because of the sheer number of the

11  lawyers I have in this, will be denied speaking time.

12         Number 2.  Motion to appear pro hac vice by Stewart

13  Whitson.  Docket Number 76.  That's granted.

14         Motion to appear pro hac vice for Chase Martin.

15  Docket Number 77.  That's granted.

16         Motion to appear pro hac vice Stewart Whitson.

17         Mr. Whitson, I think you wanted to pay us twice.

18  I'll take your money, but that's moot.  So that's denied.

19         Next.  Public Interest Legal Foundation's motion to

20  intervene.  Docket Number 43.

21         Let me turn to you, Mr. Sweeten.  What's the State of

22  Texas' position on that?

23         MR. SWEETEN:  Your Honor, can you read that again,

24  please?

25         THE COURT:  Yeah.  This is a motion to intervene

1  filed by the Public Interest Legal Foundation.

2          MR. SWEETEN:  Your Honor, the State does not object

3  to the intervention.

4          THE COURT:  So now, that's kind of interesting to me,

5  because if that's your position how does Public Interest Legal

6  Foundation have standing when you're contending that the other

7  defendants don't have standing?

8          MR. SWEETEN:  Well, Your Honor, I'm not conceding

9  that they have standing or not.  I'm just suggesting that the

10  State's position is that, you know, we're not actively

11  objecting to the request.

12          I feel like that's up to those parties to make the

13  case for their intervention.  I'm certainly not, you know,

14  suggesting that they have it or don't.  We're just not

15  objecting to that request.

16          And we haven't objected to amicus requests that we've

17  seen also.

18          THE COURT:  Well, that's not the same as

19  intervention.

20          MR. SWEETEN:  No, that's true.

21          THE COURT:  So that's denied.

22          Public Interest Legal Foundation, to the extent that

23  you want to file any amicus briefs, I'll consider that

24  whenever you decide you want to do that.  But with regard to

25  intervention, the State is ably defended and they can argue

1  any positions they feel they need to argue on their own.

2          Next.  Motion to intervene by Dallas County

3  Republican Party and others.  Docket Number 57.

4          What's the State of Texas' position on that,

5  Mr. Sweeten?

6          MR. SWEETEN:  Same position, Your Honor.

7          No objection.

8          THE COURT:  Same ruling.  Denied.

9          So again, the Dallas County Republican Party can file

10  any amicus briefs it wishes to file in this case.  But again,

11  the State is more than ably represented and their positions

12  are ably represented by the Attorney General's Office.

13          Motion to appear pro hac vice by E. Stewart Crosland.

14  That's denied since I denied the intervention.

15          That was Docket 71.

16          Docket 72.  A motion to appear by Stephen Kenny.

17  That's denied because I denied the intervention.

18          So I think that takes care of housekeeping.

19          Let's move to the motions to dismiss, and I guess let

20  me start with asking a background question.  And I'm not sure

21  who wants to speak to this here from the plaintiffs' groups.

22          Why are you opposing filing an omnibus complaint?

23          I'll start with LUPE first.

24          MR. MORALES DOYLE:  Sure, Your Honor.  Sean Morales

25  again.

1    We are opposing to filing this omnibus complaint I
2  think for a few reasons.  One of them is that we don't have
3  all the same interests or claims represented, i.e., the
4  various plaintiffs to this case.
5    Our complaint, for instance, is bringing not only
6  different theories and different claims than some of the other
7  plaintiffs' groups, but on behalf of different interests we
8  represent a number of organizational plaintiffs in addition to
9  an election judge and an election administrator, and so I
10  think that we are, while our interests are aligned with all of
11  them, we have different theories and different claims that
12  we're bringing.
13    And though I can understand the potential expediency
14  of having one omnibus complaint, there's also a whole lot of
15  work that will go into coming up with omnibus pleadings for
16  all these various groups and interests, and I do not believe
17  that the resources that will go into figuring out a way to
18  coordinate all of those pleadings actually provide -- are
19  worth the benefit that is provided by an omnibus complaint.
20    THE COURT:  So I can't force you-all to do that.  I
21  believe you're making a mistake by doing that.  And I think
22  you're also putting a lot more work on the State by having to
23  respond to these individual complaints, and a lot more work on
24  the Court.
25    But again, technically and procedurally I can't

1   require this.  I would highly advise you-all to reconsider

2   that position in the future because this doesn't make much

3   sense to me.  But that's where we're at apparently.

4           So on the motion to dismiss, some of the plaintiffs

5   have failed to allege which specific provisions of SB 1 they

6   are complaining of.  So why doesn't this failure require a

7   dismissal and an amended complaint?

8           So for example, on 21-844, no specific provisions of

9   SB 1 are cited for your Fourteenth equal protection claim,

10  your Fifteenth Amendment right to vote claim, your Section 2

11  Voting Rights Act claim, your Section 208 Voting Rights Act

12  claim, and your ADA claim.

13          In 21-848, there were no specific provisions of SB 1

14  cited regarding the Fifteenth Amendment right to vote claim.

15          In 21-920, no specific provisions of SB 1 are cited

16  regarding the First and Fourteenth Amendment right to vote

17  claims, the Fourteenth Amendment equal protection claims, the

18  Fifteenth Amendment right to vote claims, and the Section 2

19  Voting Rights Act claim.

20          So why shouldn't I grant the motion to dismiss

21  regarding those failures and require an amended complaint?

22          LUPE.

23          MR. MORALES DOYLE:  Your Honor, I think we did

24  specify the provisions of SB 1, but I understand you may be

25  saying that in the actual language of the count it is not made

1  clear.  I think that in our response to the motions to dismiss

2  it will be — we will make very clear which of the provisions

3  we are challenging and each of our theories.

4         I think in the body of the facts of the complaint we

5  tried to make that clear.  I apologize if in the language of

6  the count itself we haven't done — again, specified each of

7  those things.

8         We will address that in our response to the motions

9  to dismiss.  And I don't think filing an amended pleading is

10  the best way to handle that.

11         THE COURT:  Well, I'm not sure responding to your

12  motion to dismiss is going to necessarily cure that.

13         I was hoping in the initial order that I sent out —

14  I was trying to avoid the motions fights that I knew was

15  coming, and so I tried to advise you-all to limit the burden

16  on you-all, the burden on the State, and the burden on the

17  Court on having to litigate over items that we shouldn't have

18  to litigate.  And so I'm real disappointed my advice was not

19  taken.

20         I'll, of course, wait for your response on that, but

21  I can — I'm already warning you guys.  I don't see how if

22  it's not in the complaint in the body of the causes of action

23  how doing a response is going to cure that.

24         So be forewarned.  If you don't file an amended

25  complaint, you sort of know which way this is headed.

1     So regarding those plaintiffs alleging a violation of
2  the ADA, these entity plaintiffs haven't specifically alleged
3  what disabilities the members have, or how the disability
4  limits any major life activity.  Doesn't this require an
5  amended complaint?
6     Who wants to tackle that one from the plaintiffs'
7  group?  Whoever has got the ADA claims.
8     Don't everybody speak at once.
9     MS. DAVIS:  Your Honor, this is Lia Sifuentes Davis
10 with the OCA plaintiffs.
11    We have included ADA claims in our pleadings, and at
12 this stage of the pleading we just have an organizational
13 plaintiff.  And our motions to dismiss will address how the
14 organizational plaintiff has standing to bring these claims.
15    THE COURT:  Yeah.  Again, just you-all can waste time
16 drafting responses to motions to dismiss, but I don't think
17 you-all are hearing me.  So you know, it's a whole lot easier
18 just to forego the response to dismiss and file an amended
19 complaint to cure these deficiencies, but, you know, you-all
20 do what you think is best.
21    The State is arguing that all claims are barred by
22 sovereign immunity and so what exception is going to apply?
23 And here, with regard to the State defendants, the Governor,
24 the Secretary of State, and the Attorney General, and I guess
25 I'm more curious about the claims against the Governor.

1          For those plaintiff groups who have claims against

2   the Governor, how does the Governor have any enforcement

3   authority in this legislation?

4          I'll start with LUPE.

5          MR. MORALES DOYLE:  Thank you, Your Honor.

6          I'm trying to make sure I give my colleagues an

7   opportunity as well here.

8          We think that the Governor plays a practical role in

9   the enforcement of the election code in reality, but we

10  understand the argument that the State is making with regard

11  to the way that the ex-parte en doctrine has been interpreted

12  in the Fifth Circuit and we are taking seriously those

13  arguments, but we do think that the — and contemplating, as

14  we are with all these things, that the possibility of whether

15  an amended complaint would make sense, or whether adjusting

16  our claims makes sense, but I do want to say that we do

17  believe that the Governor in the State of Texas, as a

18  practical matter, does play a role in both shaking hand and

19  enforcing the election code, whether or not that is made clear

20  in every instance in the language of the election code itself.

21         But I don't mean to speak on behalf of any of the

22  plaintiff groups besides the LUPE group.

23         THE COURT:  So I'm not making any rulings, but in

24  light of the Fifth Circuit's requirements about how I'm

25  supposed to look at the Governor's role in enforcement on a

1  specific provision by provision basis, this is not a ruling,

2  but I don't see it, and so you-all might as well start looking

3  at doing amended complaints here because I don't think you're

4  going to pass muster.

5       Now, Mr. Sweeten, before I do all your work for you,

6  the Secretary of State and the Attorney General, I mean, how

7  is it that you are arguing they have no enforcement?  I mean,

8  if you look at all these sections of SB 1 their names are

9  everywhere.

10       MR. SWEETEN:  Your Honor, I'm going to let

11  Mr. Thompson address the motion to dismiss, if I may.

12       MR. THOMPSON:  Thank you, Your Honor.  Will Thompson

13  for the State defendants.

14       We think that the main point referring to the

15  Secretary of State and Attorney General that although they may

16  have some roles in some circumstances, this is as Your Honor

17  pointed out, a provision by provision question.

18       And so what we have in a lot of these complaints are

19  kind of general allegations that the secretary does something

20  with regard to SB 1, which isn't really sufficient.

21       What we need to know is what do the plaintiffs think

22  that the secretary does with regard to each provision that's

23  being challenged.  How allegedly does the secretary cause the

24  injury that's at issue in each claim?

25       And that's what we're missing in these complaints.

1        It's what we tried to confer about before we filed

2  motions to dismiss.  And we think that if we were to go

3  provision by provision with more specific allegations, we

4  would find out that many of the individual claims truly have

5  no connection to the secretary and are, instead, probably, at

6  best, connected to the local election codes.

7        THE COURT:  So you anticipated my question,

8  Mr. Thompson.  So if not the Governor, and not the Secretary

9  of State, and not the Attorney General, well, then, who is the

10  proper defendant in this case?

11        MR. THOMPSON:  Your Honor, it's a difficult question

12  to answer in the abstract because the Fifth Circuit requires a

13  provision by provision and claim by claim analysis.  So it is

14  possible that the proper defendant will differ based on which

15  claim is at issue, but for some things it will certainly be

16  local election officials.

17        THE COURT:  But let me press you on the Secretary of

18  State and the Attorney General.  I mean, you're not arguing

19  that they have no role whatsoever in investigation and

20  enforcement, are you?

21        MR. THOMPSON:  Your Honor, we are not saying that

22  they have no role under SB 1 at all.  They certainly have some

23  role and I didn't mean to suggest the opposite.

24        What I am saying is that we can't really analyze

25  whether they're a proper defendant for any case under SB 1.

1   It really just depends on what injury is at issue.  And for

2   some of these plaintiffs at the very least we don't think it's

3   met.

4           It's not clear whether it's met with regard to any of

5   them because the plaintiffs haven't met their burden of

6   specific allegations about what conduct from the defendants

7   they are complaining of.

8           THE COURT:  Again, I'm not making any rulings here

9   but this ought to be clear signals to all the plaintiff

10  groups, you need to further amend your complaints here to

11  address these challenges because otherwise you're just wasting

12  everybody's time with responses to motions to dismiss, making

13  me rule on the motions, in all likelihood giving you adverse

14  rulings, and then forcing you to amend.

15          I don't understand why we just can't go to amending

16  now.  This makes no sense to me whatsoever.

17          Okay.  Now, with regard to what the plaintiffs are

18  alleging, I want to understand this.  Are plaintiffs asserting

19  only organizational standing, or are any plaintiffs asserting

20  associational standing?

21          Is there any plaintiff asserting associational

22  standing?  Please speak up now or forever hold your peace.

23          MR. COX:  Judge, for the OCA plaintiffs all of our

24  individual clients allege both associational and

25  organizational standing.  All five.

1    THE COURT:  Okay.  The OCA.

2    Anyone else besides OCA?

3    MR. NKWONTA:  Your Honor —

4    MS. HOLMES:  Your Honor, the Houston Justice

5  plaintiffs, two of our clients, the Delta Sigma Theta Sorority

6  and The Arc of Texas are asserting associational standing.

7    THE COURT:  Remind me again who the frat/sorority

8  group is.

9    MS. HOLMES:  The Delta Sigma Theta Sorority.

10    THE COURT:  Thank you.

11    I'm sorry.  I cut someone else off.

12    MR. NKWONTA:  Your Honor, for the LULAC plaintiffs,

13  three of our organizational plaintiffs are asserting

14  associational standing.  That would be LULAC Texas, the Texas

15  Alliance for Retired Americans, and Texas AFT.

16    THE COURT:  Thank you.

17    Anyone else?

18    MR. MORALES DOYLE:  Yes, Your Honor.

19    On behalf of LUPE plaintiffs, a number of our members

20  — or a number of our plaintiffs are members of organizations

21  asserting associational standing, but not all of them.

22    And one of our plaintiff organizations, Texas Impact,

23  is, in fact, an organization of other organizations, and so in

24  some sense its members may be a little bit more complicated,

25  in other words, Your Honor, but we are alleging both

1  associational and organizational standing.

2           THE COURT:  So did I cut off anybody?  Anybody else?

3           Okay.  So for all those groups who are asserting

4  associational standing, I haven't seen where you are

5  identifying specific members of those associations who would

6  themselves have standing to sue.

7           Again, on the amended complaint here, that I hope is

8  forthcoming, or amended complaints, plural, you—all need to

9  flush that out because I don't see where many of you have

10  articulated those individuals sufficient to withstand any

11  challenge.

12          Next one.  Regarding WCVI and ADL.  I'm unsure by

13  reading the complaints currently how these organizations

14  establish an injury.

15          MR. MORALES DOYLE:  I just want to make sure I got it

16  right.  ADL, and what was the other group you named, Your

17  Honor?

18          THE COURT:  WCVI.

19          MR. MORALES DOYLE:  Yes.  Okay.  Those are not —— I

20  want to make sure I'm getting our groups correct here, but

21  those are not groups for which we are making associational

22  standing claims.  We are making organizational standing claims

23  in terms of diversion of resources and the impact on the

24  mission of those organizations to do their work to educate and

25  engage voters in Texas.

1          THE COURT:  So let me stop you there, Mr. Morales.

2          So there I thought you argued — check me on the

3   complaint language, because my notes may very well be wrong —

4   but I thought you said those entities were really research

5   organizations.

6          And so when you said "research organizations," I

7   thought, well, I mean, how is their research being — how are

8   they being injured in their research capacities?  But when you

9   file these amended complaints, which again I hope are

10  forthcoming, I hope you articulate with more clarity how

11  there's injury to those two organizations.

12         MR. MORALES DOYLE:  Understood, Your Honor.

13         I will just say I don't think that ADL is primarily a

14  research organization.  WCVI is, in part, a research

15  organization.

16         But I think both of these organizations are — do

17  certain educational functions and work with constituent and

18  community members, and that is where the standing comes from.

19         But I understand your point about the specificity of

20  allegations there.

21         THE COURT:  Thank you.

22         So now, Mr. Sweeten, the organizational standing.

23         Is the State arguing on association — pardon me.  I

24  just said it wrong.  On organizational standing, haven't the

25  plaintiffs sufficiently alleged injuries to establish

1  organizational standing?  Why is that deficient there?

2          MR. SWEETEN:  Mr. Thompson will address that.

3          THE COURT:  You're ducking all the hard questions to

4  Mr. Thompson.

5          MR. SWEETEN:  I am, Your Honor.  I've got a really

6  good help here today, so I know to lean on it when I need it.

7          Thank you.

8          THE COURT:  Mr. Thompson.

9          MR. THOMPSON:  Thank you, Your Honor.

10         We do think that the organizational standing

11 allegations are deficient.  One large reason, I think, cuts

12 across many of the plaintiffs groups is that they want a

13 diversion of resources theory.

14         A diversion of resources can be a sufficient injury

15 but it is not a sufficient injury in and of itself.  It has to

16 be a diversion that is used to avoid some other underlying

17 injury in fact.

18         THE COURT:  So, I mean, have you read *OCA—Greater*

19 *Houston*, Fifth Circuit, 2017, 867 F.3d, 604?

20         MR. THOMPSON:  It's been probably a few weeks, but

21 I've read it, Your Honor.

22         THE COURT:  Yeah, because you didn't cite it when you

23 were briefing your standing.

24         MR. THOMPSON:  I don't think that this issue was

25 raised properly in *OCA—Greater Houston*.  The Court decided a

1  number of things in that case without kind of briefing on the

2  topic, and our position would be that the Court did not fully

3  consider and therefore did not rule upon, by virtue of stare

4  decisis, a number of issues that we've raised.

5       THE COURT:  Well, I'm bound — whether you think the

6  Fifth Circuit was well-informed or not, I'm bound by what they

7  said.

8       MR. THOMPSON:  I think that's almost right, Your

9  Honor.  When an issue is not briefed before the Court, we

10  therefore often don't understand the court to be implicitly

11  deciding it.

12       If the court had said, you know, "Despite the lack of

13  briefing, we have independently researched the question and

14  concluded the following," that would be one thing.  We think

15  we're not in that situation, Your Honor.

16       I suppose we could read *OCA-Greater Houston* to create

17  a circuit split, but as a general rule we try to avoid reading

18  Fifth Circuit precedent to split with the D.C. Circuit and

19  things like that.

20       THE COURT:  So I'm trying to get this case to the

21  merits.  So how do you think the plaintiffs, in their amended

22  complaint, fix the deficiencies for the injury?

23       MR. THOMPSON:  Sure, Your Honor.

24       I think what we need are allegations that explain

25  what this law does to them in the absence of a diversion of

1    resources.  Does it injure them as groups in some way that

2    they then try to avoid through the diversion of resources.

3          I'll give an example, Your Honor.  If, for example, a

4    plaintiff in a hypothetical case said, you know, what I like

5    to do on the weekend is I hand out pamphlets.  And, you know,

6    the city government has enacted some kind of ordinance that

7    requires me to go get a license in order to hand out

8    pamphlets, and if I don't get the license I'll be prosecuted.

9          Well, what that individual could do is allege that

10   either he has paid the fee to get the license, and that is an

11   injury in fact, that caused an injury or he would have broken

12   the law, or that he's not going to pay the fee and he faces a

13   threat of prosecution for trying to hand out pamphlets without

14   a license.

15         So kind of flip side to the same point.  You're

16   either injured because when you don't comply the law is going

17   to do something to you, or you incur some kind of cost to

18   avoid that underlying injury.

19         That's not what we have here.  What we have here are

20   a lot of organizations that seem to be relying on kind of

21   general allegations that they don't like the consequences of

22   this law for third parties.  And because they don't like the

23   social consequences, the alleged social consequences of the

24   law, they spend money to try and change those consequences.  I

25   don't think that's a sufficient injury in fact.

1          THE COURT:  So all the plaintiffs have heard that,

2     whether you want to try to amend in light of that.  I'm not

3     saying you have to, but again, I'm trying to get us to the

4     merits without more motion to dismiss diversions.

5          And so if you want to rely just on your existing

6     allegations, that may or may not meet the Fifth Circuit.  I'll

7     hear the State's — or I'll see whether or not the State's

8     arguments about how the Fifth Circuit was not well-informed,

9     but this is easily curable by you-all just adding more

10    sentences to your amended complaint is what I'm trying to

11    emphasize.

12         Next one.  In the motion to dismiss the defense are

13    asserting that there's no private cause of action under

14    Section 2 of the Voting Rights Act.

15         So I'm assuming this is another hard one for

16    Mr. Thompson?

17         MR. SWEETEN:  Your Honor, anything on the motions to

18    dismiss is Mr. Thompson today.  Thank you.

19         THE COURT:  So, Mr. Thompson, so in Shelby County the

20    chief justice talked about injunctive relief is available in

21    appropriate places to block voting laws from going into

22    effect.  And the chief justice said both the federal

23    government and individuals have sued to enforce Section 2.

24         It sure appears that the chief justice believes

25    there's a private cause of action.

1          MR. THOMPSON:  I have to respectfully disagree, Your

2     Honor.  I think the chief justice was actually very careful to

3     say that they "have" sued, not that it was "proper" for them

4     to have sued.

5          Just a few months ago Justice Gorsuch flagged ──

6          THE COURT:  We're not talking about Justice Gorsuch

7     and his ── that's all ── we're not going there.

8          We're talking about what a majority opinion held.

9          MR. THOMPSON:  Well, then, Your Honor, I'll point out

10    that in the majority opinion from the Supreme Court they have

11    consistently said things like, "We assume without deciding

12    that Section 2 creates a private cause of action," which they

13    are able to do because it's not a jurisdictional requirement.

14         There is no holding from the majority of the United

15    States Supreme Court saying that there is, in fact, a private

16    cause of action under Section 2.

17         THE COURT:  I disagree.  That part of the motion to

18    dismiss is denied.

19         With regard to defendants asserting there's no

20    private cause of action under Section 208 of the Voting Rights

21    Act.  So, Mr. Thompson, 52 U.S.C., Section 10302 says,

22    "Whenever the Attorney General or an aggrieved person

23    institutes a proceeding," so how is there no private cause of

24    action?

25         MR. THOMPSON:  Sure.

1        The provision Your Honor quoted does not actually

2   create a cause of action.  It recognizes that causes of

3   actions exist under other sources of law.  It is of course not

4   limited to Section 2 or Section 208.

5        So we believe that it refers to, for example, 1983

6   suits regarding constitutional claims, but certainly included

7   within that even we if sought VRA claims were themselves

8   included in that provision, it would presumably be the implied

9   cause of action under Section 5 of the Supreme Court

10  recognizing *Allen*.  That was the explanation that Justice

11  Thomas gave in *Morris*.

12        THE COURT:  That part of the motion to dismiss is

13  denied.  The statute is clear about an aggrieved person is

14  able to institute a proceeding.

15        Next one.  No private cause of action under the

16  materiality provision of the Civil Rights Act.  So now that

17  the United States has joined this case, does this make this

18  issue all moot or not?

19        MR. THOMPSON:  I don't think so, Your Honor.  It may

20  reduce its practical import.  We will of course address the

21  United States' claims in our pleadings regarding their claim

22  which has not yet been filed.

23        But it is certainly true that if, for example, Your

24  Honor held that the United States had the cause of action but

25  the private plaintiffs do not, it would then be improper to

1  grant any relief to the private plaintiffs.  They wouldn't be

2  prevailing parties that represent attorneys fees.  They are

3  not going to affect this kind of ruling even if the Court is

4  able to reach the merits under a different party's claim.

5       THE COURT:  So, well then, OCA plaintiffs, I mean, do

6  you want to amend your complaint and drop this or not?  The

7  government is saying even if the United States is successful

8  then you're getting zero.

9       MR. COX:  It may have that kind of practical impact,

10 but I think to get the relief of our client, that our clients

11 are seeking, we plan to continue to seek that relief and we

12 believe that there is a private cause of -- private right of

13 action under 208 generally and we'll be -- expect to be

14 briefing that for the Court on Thursday.

15      THE COURT:  Okay.  I won't make any ruling on that.

16      Where are we at?

17      Help me understand this.  In your motion to dismiss

18 LUPE's complaint, the defendants seem to assert that SB --

19 well, I can't even make your argument.  I don't seem to

20 understand it.

21      What are you arguing with regard to LUPE's complaint

22 and the Supremacy Clause?

23      MR. MORALES DOYLE:  I'm sorry, Your Honor.

24      I'm trying to refresh my recollection.  I believe

25 you're referring to Count 10 of the complaint, and we said

1   that Count 10 is redundant and therefore should be dismissed
2   or stricken because Count 10 just says that SB 1 violates the
3   Supremacy Clause.  That's not really a claim.  I'm not sure
4   how else to put it.
5         The Supremacy Clause is a rule of decision for when
6   there is a conflict of federal and state law.  So if the
7   plaintiffs had established some other violation of federal
8   law, then the Supremacy Clause would tell us that federal law
9   trumps state law.  But there is no independent cause of action
10   that says you have somehow violated the Supremacy Clause
11   standing alone.
12         THE COURT:  Okay.  Now I understand it.
13         So again, in the amended complaints that are coming
14   down you may want to clear that language up as to whether or
15   not you are trying to assert an independent cause of action,
16   or are you just throwing surplusage in there about the
17   Supremacy Clause.
18         Okay.  Let's try to figure out now where do we go
19   forward on discovery, a scheduling order, and a trial date.
20         So you-all were good enough to send me the initial
21   disclosures this morning.  My law clerks quickly tabulated
22   this.  The plaintiffs have identified 165 individuals.  And
23   the defendants have identified 132.  That's ridiculous.
24         So what appears to have happened is that I think one
25   or both sides, or I guess there's multiple sides here, some of

1  you included like every member of the Texas legislature who
2  voted in favor of SB 1, is what it looks like.
3        Now, we all know most of these legislators didn't
4  have anything to do with the drafting.  They probably didn't
5  even know what they were voting on, except what they were told
6  by leadership to vote on.  A lot of them probably didn't even
7  read it.  So how they become persons with knowledge of
8  relevant facts perplexes me.
9        Mr. Thompson, since you get all the hard questions,
10 how do you respond?
11        MR. THOMPSON:  I'll be happy to respond, Your Honor.
12        I think I can safely say on behalf of all the parties
13 that we didn't mean to suggest all of those people would be
14 witnesses or anything like that.
15        Under the Supreme Court's latest opinion in *Brnovich*
16 which addressed an intentional discrimination claim and Voting
17 Rights Act, it rejected the Cat's Paw Theory, which Your Honor
18 may be familiar with from employment cases for determining
19 kind of the intent of the legislature.
20        And so at least from my personal perspective, I think
21 what we were trying to say there is to the extent there are
22 intentional discrimination claims one can't just establish it
23 by the alleged intent of a bill sponsor or a leader, or
24 something like that.
25        THE COURT:  So we need to get reasonable about how

1   many people need to be deposed.  So you-all are to file

2   amended initial disclosures and clearly delineate the Tier 1,

3   Tier 2 individuals, for lack of a better phrase, and Tier 2

4   being just mere legislators who voted who didn't have anything

5   to do with the drafting of this bill or any amendments, or

6   anything like that.

7          And so those people need to be listed, if you want to

8   list them, as a Tier 2 group so we have a better understanding

9   of who the Tier 1 group is, because by listing everybody, and

10  I'm not saying anybody is doing this, but somebody could be

11  hiding a person with great knowledge of relevant facts in this

12  laundry list of 165 or 132.  So we'll have none of that.

13         So let's file amended initial disclosures within ten

14  days.  Exchange with each other.  And then I want to see also,

15  so file those with the court.  And so —

16         MR. ENNIS:  Your Honor, may I add one thing on that?

17  This is Chad Ennis for Medina County.

18         Another thing, your clerks may have missed it in the

19  big pile of initial disclosures they received, but there are

20  several designations for things like "All of the witnesses

21  that testified at the hearings for these bills."

22         And that is literally hundreds of people without any

23  designation of who they are.  You know, if there are specific

24  people who testified that they are interested in calling as

25  witnesses, I think they should just identify the people.  And

1  we'd ask that that go into the exchange in ten days as well.

2            THE COURT:  So, thank you, Mr. Ennis.

3            So let's figure out for Rule 26(a)(1) disclosure

4  purposes the mere public speakers who attempted or did

5  actually speak at any committee hearings for this legislation,

6  to the extent that they are aggrieved individuals, or

7  individuals injured by any, and who are claiming to be part of

8  the associational standing, I could see where those have

9  knowledge of relevant facts.

10           So Mr. Ennis raises a good point.  Asterisk who those

11  people are.  But, yeah, a broad designation like that is —

12  let's even put those like into the third tier group.  Put Tier

13  1 — Tier 1, what I'm really interested in, is who really

14  needs to be deposed first, because we're going to have to

15  phase discovery here, given the large amount of folks at issue

16  here.

17           And so if — to the extent you are relying on some

18  broad categories like that, let's put names and then better

19  descriptors as Mr. Ennis is suggesting.

20           Anybody else with a good suggestion on that?

21           MR. MORALES DOYLE:  Your Honor, I would just — this

22  is Sean Morales Doyle on behalf of LUPE plaintiffs.

23           I would just say that we did not make a broad

24  disclosure like that, but that there are, we believe, folks

25  who offered testimony in committee hearings on Senate Bill 1

1  outside of our clients and folks who would be aggrieved by the

2  law that have relevant information, especially to the extent

3  that the legislators, who are proponents of Senate Bill 1

4  relied upon or cited to facts that were put to them by folks

5  in committee hearings in justifying their passage of this

6  bill.

7          I think — so I just want to say that I don't

8  think — I think that there are folks who testified at those

9  hearings who have information relevant to the claims in our

10 case outside of the type of information that you mentioned

11 there.

12         THE COURT:  And that's fair.  And so those are — you

13 know, properly should be disclosed as 26(a)(1), but let's at

14 least put some descriptors here so we know who we are talking

15 about and what they said and where they said it, so we all

16 know why they are there.

17         Okay.  Now —

18         MS. OLSON:  Your Honor, this is Wendy Olson on behalf

19 of Mi Familia Vota plaintiffs.

20         Your direction was to do this in ten days.  I'm

21 wondering if we could have until that Monday, November 29th,

22 because ten days is Friday, the 26th, which is the day after

23 Thanksgiving and I know people have travel plans, but I would

24 just make that request.

25         THE COURT:  That's fair.  The 29th it is.

1              Okay.  With that said, I guess I was initially under

2    the impression that we were going to be under a much more

3    expedited schedule, but it seems that the plaintiffs are going

4    to want to have the March primary come and go with no

5    injunctive relief requested from this Court.

6              Am I correct in that understanding?

7              MR. SWEETEN:  Your Honor, this is Patrick Sweeten

8    with the State defendants.

9              I want to just say that that was an assumption upon

10   which this schedule that we outlined, which I think is a

11   compressed final trial schedule that we based it on, and we

12   had discussions both — we had two discussions I believe with

13   all of the plaintiffs and they said as much.

14             And we had a discussion with the Department of

15   Justice and they indicated it was not their intention to bring

16   forward a preliminary injunction.

17             So, you know, the negotiations that took place back

18   and forth on those issues are predicated upon that assumption.

19   So I think I can answer that for the group because that's

20   certainly what we were told and what we affirmed.

21             THE COURT:  And so that's why I want to confirm this.

22             So again, some plaintiff groups speak up.  Is that

23   the understanding or not?

24             MR. MORALES DOYLE:  On behalf of LUPE plaintiffs, it

25   is correct that we are not planning to pursue preliminary

1   injunctive relief prior to the March primary.

2          I do just want to say that it is not that we would

3   like to see the March primary come and go without relief in

4   this case, but for a variety of reasons we think it's

5   important that the Court have a full trial record before it is

6   deciding these claims, and given the time frame that we're

7   working on in this case and the amount of evidence that we've

8   already discussed we're going to need to be compiling, that's

9   the decision that we've made at this point.

10         THE COURT:  So then in terms of a scheduling order,

11   if the plaintiff groups want to develop facts about what takes

12   place in the March primary and what issues take place with

13   regard to the ability of your constituents to vote, I mean,

14   that's going to be yet another round of discovery that the

15   State defendants are going to be entitled to discover on.

16         And so how is it that you see a March primary, fact

17   discovery now on the March primary, dispositive motions being

18   filed, and then a trial date, as you're suggesting in July.

19   How does all that happen?

20         MR. MORALES DOYLE:  Well, Your Honor, I think it will

21   be a whole lot of work.  I think all of us have — we have set

22   the — we have proposed a discovery close deadline that is

23   after the March primary in order to allow for discovery to

24   continue, but we have also proposed an expert discovery time

25   line that contemplates the majority of expert discovery

1  happening prior to that March primary in order to not have all

2  of this happening at the very end of the case.

3          I think the evidence that comes out of the March

4  primary, of course none of us knows what it's going to be at

5  this point, but I think we also know that how -- the evidence

6  that comes out of the March primary is not going to be all the

7  evidence in this case.

8          There's going to be probative on some points,

9  certainly not on others, as primaries are, you know, different

10 than general elections, so we are trying to build a plan that

11 allows for a great deal of hopefully the majority of discovery

12 to happen early in this case but also allows for the parties

13 to take into account what does in fact happen in the first set

14 of elections under SB 1 in March.

15         We understand that will make things very difficult

16 for all of us, including Your Honor, after the March primary,

17 but we think it is incredibly important that the final

18 resolution of this case before Your Honor happens with enough

19 time for any appeal and any further proceedings after the

20 trial to be resolved in time for the November primary.

21         And in light of Supreme Court precedent about changes

22 to elections in advance of an election -- excuse me -- the

23 November general election, we think it is crucial that the

24 trial happen earlier in the year so that we have time to sort

25 everything out and come to a final resolution of this case

1  before November to make sure that voters in the State of Texas

2  have their rights protected and that it's a fair election.

3          THE COURT:  Does any other plaintiff group wish to

4  speak in addition to the comments Mr. Morales already made?

5          Mr. Sweeten.

6          MR. SWEETEN:  Yes, Your Honor.

7          THE COURT:  So I mean, the plaintiffs are asking me

8  to do a heck of a — and everybody, to do a heck of a lot of

9  work in a short period of time.  I'm willing to put the effort

10 in.

11         I mean, is there any dispositive motions you see that

12 could be filed without the benefit of discovery that's just a

13 strictly legal issue that at least we don't have everything

14 having to be decided, argued, briefed, and ruled upon at the

15 end?

16         MR. SWEETEN:  Your Honor, I think so.

17         I think there could be some motions for summary

18 judgment.

19         Let me address the overall schedule which is, you

20 know, they have indicated and we have indicated to the Court,

21 and this is the very reason why we don't agree to set a trial

22 date on July 5th at this point, which is that we have agreed

23 to a very truncated discovery process.

24         We think that, you know, we're going to give it our

25 best shot.  We — you know, if we start getting a bunch of

1  late disclosures of fact witnesses, you know, that could

2  change that.

3          I can tell you, and this is likely an issue that

4  you're going to want to — you know, you may want to talk to

5  us about later, but certainly my recent discussions with the

6  DOJ have certainly brought to question, you know, whether or

7  not we are going to be able to make this schedule go.  But

8  that's the very reason.

9          We are planning to — there is an awful lot of work.

10 The first step is the motions to dismiss.  And as the Court is

11 saying, you know, get these complaints.  Tell us what is the

12 complaint.  Well, what is the specific statutory problem?

13         They're apparently not going to agree to a uniformed

14 complaint, which I think would really, you know, make this,

15 you know, be a lot easier and increase the potential to meet

16 this schedule.

17         But we think that, you know, we're hopeful we can

18 meet this schedule.  We do think that there will be some

19 issues that may be subject to judgment as this goes along.

20 But that's, you know, one of the reasons that we think that

21 maybe we wait until, you know, we wait to set the trial date

22 to see if we're actually going to be able to work through this

23 schedule.

24         But you know, we're giving our best shot, based on

25 their, you know, representation to us.  There's not a

1  preliminary injunction, you know, proceeding.  We're trying to

2  make this work.  And I think this Court is doing — I think

3  this is great — a great service.

4         As the Court knows in our redistricting challenges,

5  when you have multiple ——

6         THE COURT:  Let's not bring that up.

7         MR. SWEETEN:  I was just thinking, it's been four

8  years, I think, since I've seen you, Your Honor.

9         Anyway, I think strictures.  I think making them

10 plead what is their claim.  Tell us what that is.  And then I

11 think, you know, following the orderly process of this case.

12        We'll attempt to, you know, give best efforts to that

13 discovery schedule that we have laid out, but we do think that

14 we may want to see how that's going to make a determination as

15 to whether the trial date is — you know, when that should be

16 set.

17        THE COURT:  Does the U.S. want to chime in on this?

18        MR. FREEMAN:  Yes, Your Honor.  Dan Freeman for the

19 United States.

20        The United States agrees that this is an extremely

21 aggressive schedule.  In particular, the schedule anticipates

22 that experts would be disclosed at the beginning of February.

23        Now, we stand ready to work to meet this schedule,

24 however, this schedule is only possible if the parties agree

25 to participate in discovery and not engage in dilatory

1   tactics.

2           And Mr. Sweeten has advised the Court, and we advised

3   the Court in our 26(f) report that we filed last night, that

4   the United States has already issued a request for production

5   to the State.  The State informed us at our 26(f) conference

6   that it did not intend to produce any documents in response to

7   that request or database extracts as the case may be.

8           But they at the same time refused to stipulate to an

9   early written formal response to that request and would allow

10  the United States to get them out of the court and to bring a

11  motion to compel.

12          And those type of delays are going to prevent the

13  parties from being able to meet the schedule and are going to

14  prevent the parties from being able to vindicate the rights of

15  Texas voters, as Mr. Morales Doyle represented before.

16          We believe this is a separate issue that is best

17  addressed at the -- toward the conclusion of this pretrial

18  conference, but I'm happy to address it now.

19          MR. SWEETEN:  Well, Your Honor, if the DOJ is going

20  to accuse me of dilatory tactics, I'd like to address that

21  right now.  May I, Your Honor?

22          THE COURT:  No.  One sec.

23          I think most people on the screen know me.  I don't

24  want to dwell on fights.  I want to move the thing forward.

25          So I know you don't like the moniker, and I would

1  take offense if someone said that to me too, but let's just

2  move forward.

3        So just like I'm trying to tell the plaintiffs, file

4  an amended complaint, and I'm telling them, and I'm telling

5  everybody, file amended 26(a)(1) disclosures, motions to

6  compel, none of us have time to fight over motions to compel.

7        Now, if the government is going to assert -- the

8  government -- the State defendants are going to assert

9  legislative privilege or some other privilege, let's talk

10  privilege logs.  Have you-all talked about how you're going to

11  do a privilege log?

12        MR. SWEETEN:  Your Honor, to my knowledge, there's

13  been no discussion about a privilege log with any of the

14  parties, that I know of.

15        THE COURT:  Is that the basis of where you think

16  you're not going to be able to cooperate on the U.S.'s request

17  for documents?  Is that --

18        MR. SWEETEN:  Your Honor, I thought you didn't want

19  me to address that, but I think I need to because counsel, you

20  know, seems to be indicating that we're saying, "We're not

21  giving you any documents."  That's not what we're saying.

22        What happened, Your Honor, is that on

23  November 4th the DOJ filed a lawsuit.  We received last Friday

24  a request, not for just documents, we received a request for

25  an entire database from the DPS, which has 29 million people

1   that are on there.  They also asked for the —

2          THE COURT:  One second.

3          The DPS, Texas Department of Public Safety?

4          MR. SWEETEN:  Yeah.  They asked for the entirety —

5   well, I shouldn't say the entirety.  They asked for a number

6   of data fields from DPS.  They asked for the 17 million entry

7   TEAM's database from SOS.

8          They have asked for two databases because — and

9   we're still — we're going to have a lot of discussions about

10  this with opposing counsel because this is a breathtaking

11  request.  The only time in the history of DPS that they have

12  given this up was when Mr. Freeman and DOJ sued us under

13  Section 5, which would have been the spring of 2012, and then

14  the carryover litigation was the Section 2 litigation.

15         So what we're going to address, Mr. Freeman's

16  request, which he sent last Friday, we've basically had all

17  of — you know, it was Friday evening.  We've had all of two

18  business days.

19         We've been trying to get information about those

20  databases but it is a sweeping request made in the eleventh —

21  you know, after we have had multiple discussions with these

22  plaintiffs to get a large amount of data, including data from

23  senators, you know, politicians, federal judges, state judges.

24  That's all on the DPS voter databases.

25         So we have got a lot of issues to work through, but

1  this was sprung upon us in a call last week when he said,

2  "We're going to ask for the databases."  And I said "No."

3          And, you know, we're looking and evaluating the

4  request that we got on Friday.  It is going to take experts

5  from both of those agencies to come in and explain what would

6  be, you know, possible, what would be, you know, a really hard

7  lift, but that by itself, asking for database extracts, which

8  has a long process, which I can go through --

9          THE COURT:  No.  That's okay.  One second.  One

10 second.

11          So let me go back to the United States.  What's the

12 relevance of the data?

13          MR. FREEMAN:  Sure, Your Honor.

14          SB 1 requires individuals who wish to cast a mail

15 ballot to list their identification number on their mail

16 ballot request, as well as their mail ballot carrier envelope.

17          And SB 1 requires that early voting clerks shall

18 reject any mail ballot application that doesn't include an

19 identification number, if that individual has been issued an

20 identification number that does not identify the same voter

21 identified in the applicant's application for voter

22 registration.

23          Now, the problem with this is that TEAM does not

24 necessarily contain every voter's up-to-date driver's license

25 number.  There are voters who --

1          THE COURT:  Let's —

2          MR. FREEMAN:  TEAM.  Excuse me, Your Honor.  TEAM is

3    the state's voter registration database.

4          THE COURT:  Thank you.

5          MR. FREEMAN:  Now, the problem, Your Honor, is that

6    in some cases the voter may have registered to vote soon after

7    moving to Texas while they still had an out-of-state driver's

8    license and listed a social security number on their voter

9    registration application.

10          They then obtain a Texas driver's license.  They list

11    their Texas driver's license number on their mail ballot

12    application as instructed, and then their application for a

13    mail ballot will be rejected because it doesn't match what was

14    on their voter registration application.

15          Now, what the United States seeks to — and that

16    rejection violates Section 101 of the Civil Rights Act of

17    1964, the materiality provision.

18          Now, what the United States intends to do is quite

19    similar to what the United States did in *Texas v Holder* when

20    the State of Texas sued the United States under Section 5 of

21    the Voting Rights Act, and in *Veasey v Abbott*, where United

22    States, among several private plaintiff groups sued the State

23    under Section 2 of the Voting Rights Act.

24          The State has produced these database extracts twice

25    before, in terms of DPS.  In terms of voter registration

1    database, the State has produced that database to the United
2    States previously outside of litigation, as it's subject to
3    production upon demand by the Attorney General under Title 3
4    of the Civil Rights Act of 1964.

5           The State has also produced voter registration
6    database to the United States in both of those cases.

7           Experts are then able to compare those two databases
8    to determine where there are voters on the voter registration
9    database who do not have their proper driver's license listed.

10          It is my understanding that there are also voters in
11   the DPS databases who have multiple driver's license numbers
12   listed, because it's possible to have an identification card
13   and a driver's license over the course of your life.  They
14   will not know which one of those numbers is in the voter
15   registration database and will be disenfranchised as a result.

16          It is possible that individuals who have surrendered
17   their driver's license and no longer have that document to be
18   able to provide that number as SB 1 requires, and they will be
19   disenfranchised as a result.

20          And so the United States is asking the State to do
21   exactly what it did twice before in litigation, once where it
22   sued the United States, and once where the United States sued
23   the State.  Both times where the State enacted legislation
24   that put these driver's license numbers at issue in a
25   restriction on the right to vote.

1          THE COURT:  So let me suggest this here.

2          Let me — can the government achieve what it's

3    attempting to achieve by merely sending out requests for

4    admission, asking the State to admit that there are these

5    following discrepancies that you just identified, and then

6    sending out an interrogatory by asking them to identify how

7    many times these kind of occurrences have occurred?

8          And then in the event that they refuse to do so or

9    claim it's unduly burdensome or whatever, then you come back

10   and asking to do — to get the databases and do the work

11   yourself.

12         Go ahead.

13         MR. FREEMAN:  Your Honor, I'm not certain that the

14   State would be willing or able to conduct this analysis with

15   the sort of degree of accuracy and expertise that the experts

16   that the United States has retained have been able to do in

17   the past.

18         Courts have relied on experts retained by the United

19   States when conducting this sort of match during a *Veasey*

20   litigation, a voter right litigation.  The State opposed an

21   alternative algorithm for matching the voter file to DPS

22   files.  The State ultimately abandoned that algorithm, as it

23   determined — well, I won't speak for the State.

24         The State abandoned the algorithm that it had

25   proposed, and the United States, and ultimately the court

1   moved forward with the analysis that the United States was

2   able to provide.

3        The various claims that the State has made about the

4   burden of this production, in fact, the State has done this

5   before.  The code has been written before.

6        I personally at the State's request flew down to

7   Texas to pick up a copy of the database extract in the *Texas v*

8   *Holder* litigation so that we could address security concerns

9   the State had.  The United States is happy to agree to the

10  same types of protective orders to address the State's

11  concerns.

12       We see this as critical to the United States' claims

13  under the Civil Rights Act of 1964 and we believe that the

14  State's immediate assertion, the burden of the request

15  outweighs the benefit.

16       One, it's contrary to the spirit of Rule 26, and the

17  committee notes to the 2015 amendment specifically said that

18  these type of default assertions — I mean, immediate

19  assertions that no discovery in response to a particular

20  request is possible because of the burden should not be

21  allowed.

22       THE COURT:  Okay.

23       MR. FREEMAN:  And we're not asking the State to

24  produce immediately.  We're simply asking them to allow us to

25  tee this up.

1          THE COURT:  Thank you.

2          So at this point there's not a motion to compel

3   before me to rule on.  You-all continue to meet and confer.

4          I will say this, Mr. Sweeten, in light of the

5   representations that are being made that this has happened

6   before, any arguments of unduly burdensomeness, you're going

7   to have a steep hill to climb to overcome that, but I'm not

8   making any rulings.

9          And so, again, to the extent that you can enter into

10  protective orders to protect the sensitivity of this

11  information, but again this is premature for me to make any

12  rulings.  I'm not making any rulings.

13         MR. SWEETEN:  Your Honor, let me just say.  I won't

14  argue the motion because I hear the Court.

15         I agree.  I think right now what's happening is this

16  issue, we're jumping the gun on this.  We will have

17  discussions with DOJ regarding this issue.  I wanted to raise

18  these concerns to the extent that they impact scheduling.

19         But, you know, we also just — I want the Court to

20  know that there is going to be a lot of interfacing with our

21  team and experts at both of these agencies about, you know —

22  about these issues, and these things take time.

23         So we will address their discovery requests.  We'll

24  be happy to talk to DOJ about this.  But overall, I think, you

25  know, I think this is something we can deal with as this goes

1  along, but I wanted to flag this issue to the Court.

2          THE COURT:  No, thank you.

3          So now, we still — we walked away from privilege.

4          To the extent that the State is not — is going to

5  claim privilege to any documents, I want a privilege log.  And

6  so it's going to have to articulate clearly the authors,

7  author, or authors, plural, the recipient, or recipients,

8  plural.

9          And if the author or the recipient wasn't a

10  legislative — a legislator, or a legislative aid, it seems

11  highly improbable that you can in good faith articulate

12  legislative privilege in those kind of scenarios.

13          To the extent that you think you can in good faith

14  articulate legislative privilege, I want a log, and the Bates

15  stamp, and I will review, in camera if need be, any documents

16  subject to any privilege.

17          Okay.  We've covered a lot today.  Hopefully we're

18  going to move things along.  I'll be very disappointed if I

19  don't get amended complaints, folks.  I don't know how to make

20  that point anymore clear.

21          MR. MORALES DOYLE:  Your Honor.

22          THE COURT:  Yes.

23          MR. MORALES DOYLE:  I do not want to necessarily

24  represent that I'm speaking on behalf of all the plaintiffs

25  here, although I think I may be.  We hear you.  We are dealing

1   right now with a response deadline on the motions to dismiss

2   of this Thursday.

3           And so —

4           THE COURT:  That deadline is extended for 15 days.

5           Hopefully that deadline will never be met and we see

6   amended complaints well before that.

7           MR. MORALES DOYLE:  Thank you, Your Honor.

8           MR. SWEETEN:  Your Honor, may I get a reciprocal

9   extension on any replies?

10          THE COURT:  Yes.

11          MR. SWEETEN:  Thank you, Your Honor.

12          I do think there was one issue that I don't know that

13  we addressed to the Court, and that is the order with the

14  deposition limitations.  I don't know if the Court wants to

15  entertain that at this point.

16          THE COURT:  Let me backtrack here because I didn't

17  finish off on trial now.

18          What I'm contemplating is setting the trial date for

19  July right now, just so for purposes of my calendaring I can

20  hold something as a placeholder that we can all try to aspire

21  to.

22          But I will tell everybody that, you know, I will be

23  reasonable to all parties in the event that circumstances

24  don't allow us to meet that.  But for a placeholder, that's

25  what I'm going to set for now.

1    Now, with regard to numbers of depositions, until I
2  see the amended initial disclosures I really can't say right
3  now what I think is an appropriate first tier of discovery
4  depositions.  So once I get the initial disclosures, the
5  amended initial disclosures then I will set a first round of
6  deposition — number of depositions to be had for the first
7  tier of discovery.
8    MR. SWEETEN:  Thank you, Your Honor.
9    And Your Honor, if I may just say, the one issue I
10 think that we are — you know, we want to be — you know,
11 alert the Court to, is the number of plaintiffs that are in
12 this case.
13    There are — I think the count — it's in our filing,
14 but there's something like 30 organizational plaintiffs and
15 six individual plaintiffs.  I think that's right.
16    We don't need — you know, some are making ADA
17 claims.  Some are making others.  We don't need a full seven
18 hours for those folks, but we need the number that might be
19 necessary to take those plaintiffs.
20    And so that was our concern with, you know, just
21 picking a fixed number, because I think that judicial economy,
22 you know, can be increased by, you know, taking a shorter
23 deposition but not being constrained by, you know, this hard
24 number, particularly when we're faced, you know, with
25 basically the number of plaintiffs that they are asking to

1  limit us to.  So we're more for hours than limitations but we

2  can certainly address that down the road if the Court prefers.

3          THE COURT:  Yeah.  Continue to meet and confer on

4  this.

5          I mean, I'll tell you this, plaintiff groups, I've

6  just completed a very difficult trial on the Sutherland

7  Springs mass shooting case.  It was at least four dozen, five

8  dozen plaintiffs with at least two dozen plaintiffs'

9  attorneys, and they all managed to have a unified front, and

10  so I don't understand your reluctance to an amended complaint

11  and you-all going forward on that basis.

12          Mr. Morales was very articulate about why he thought

13  that was not feasible.  It sounded real great.

14          But honestly, Mr. Morales, as I heard it, I mean, it

15  sounded great, you delivered it great, but it really wasn't

16  persuasive to me about why you-all can't join together.

17          I think an amended omnibus complaint will make this

18  case go much smoother for everyone involved.  And so I highly

19  recommend that after this call you-all try to get together and

20  try to figure that out.

21          MR. FREEMAN:  Your Honor, may I --

22          MR. MORALES DOYLE:  Excuse me.

23          THE COURT:  Mr. Freeman.

24          MR. FREEMAN:  Your Honor, I was just going to ask, do

25  you include the United States in that request, because it

1 would be exceedingly difficult for us to be able to confer

2 with private plaintiffs.

3          THE COURT:  I see that.  You have a different

4 representation to this.  So I exclude the U.S. from that

5 discussion.

6          MR. FREEMAN:  Thank you, Your Honor.

7          THE COURT:  Who else wanted to chime in?

8          MR. COX:  Judge, it also implicates the issue that we

9 do have one party, Isabel Longoria, who is both a plaintiff

10 and a defendant in the case, and how we would manage to have a

11 unified omnibus complaint in that respect; I'm not sure.

12          THE COURT:  Yeah.  So I'm not making any rulings.  I

13 can't force you to do that.  You-all continue to talk among

14 yourselves and see what's best.

15          Even if you don't do an omnibus complaint, you-all

16 really need to treat this almost as an MDL.  You need to have

17 one or two of your group serve as the lead lawyer to speak on

18 behalf of discovery issues and so forth.  We've got to make

19 this case more manageable, and an MDL analogy makes most sense

20 to me.

21          MR. MORALES DOYLE:  We will absolutely discuss with

22 one another.  I want to assure you, Your Honor, that all of

23 plaintiffs' counsel have been in touch with one another.  We

24 are not trying to make this more complicated than it needs to

25 be and we will discuss what you proposed.

```
 1              THE COURT:  Okay.  What have I forgotten?  Anybody
 2     want to speak up?
 3              MR. SWEETEN:  Nothing from the State, Your Honor.
 4              MR. FREEMAN:  Nothing from the United States, Your
 5     Honor.
 6              THE COURT:  So I didn't give a deadline for amended
 7     complaints.
 8              So I guess the deadline needs to be whatever date I
 9     gave you to file the response to motion to dismiss.  So you
10     either file a response to a motion to dismiss, or you file an
11     amended complaint, by the —
12              Did I say the 29th?  Did I give you a date or not?  I
13     don't remember.
14              MR. MORALES DOYLE:  You said 15 days, Your Honor,
15     which I believe would put us at December 1st.  Unless that is
16     15 days from today, or 15 days from the deadline.
17              THE COURT:  Let's just make this simple.
18              Amended initial disclosures by everybody due by
19     December 1.
20              Responses to motion to dismiss or amended complaints
21     due by December 1st.
22              If there's responses to motions to dismiss, then the
23     State has 14 days thereafter to file any reply briefs.
24              Was that clear enough?
25              MR. MORALES DOYLE:  Yes, Your Honor.
```

1          MR. ENNIS:  May I raise one more thing, from Medina

2     County?  This is Chad Ennis.

3          THE COURT:  Yes.

4          MR. ENNIS:  You mentioned, and I think we got

5     sidetracked, was, is there a way to get rid of some of these

6     claims, or at least deal with some of these claims that are

7     purely legal claims?

8          And I think it may make sense for Your Honor to order

9     us or get us to meet and confer on are there any of these

10    claims that present purely legal issues that we can agree that

11    we can brief early and get them to Your Honor and get them

12    disposed of without the need for discovery or back and forth,

13    and really kind of focus the case.

14         Obviously, we think omnibus pleadings would help a

15    ton, but if we don't get that, at least we could try to focus

16    this down on what are factual issues that we have to fight

17    about and how do we get this thing ready for trial in July.

18         THE COURT:  So I already ordered you-all to do that

19    in my first order.  It was in there in the laundry list.

20         Meet and confers are not a one-time occasion, so they

21    can be continuing.  And so continue to meet and confer on that

22    and all the other issues.  It would benefit us all, if we're

23    going to be in this push to July, if we can take up some

24    strictly legal matter.

25         Now, Mr. Sweeten, I'm not saying your side is being

1  unreasonable, but if you start arguing that, you know,

2  everything can be disposed of by summary judgment, well, you

3  know, that's not going to help me either.

4          And so, I mean, for example intentional

5  discrimination.  You can't tee that up by summary judgment

6  without discovery, just as an example.

7          And so you-all continue to meet and confer to figure

8  out what, if any, discrete issues are solely legal issues and

9  that I can take up earlier rather than later.

10         MR. SWEETEN:  Yes, Your Honor.

11         THE COURT:  Anybody else?

12         Okay.  We'll meet again.

13         Thank you.

14         (Concludes proceedings.)

15                         -o0o-

16    I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.  I

18  further certify that the transcript fees and format comply

19  with those prescribed by the Court and the Judicial Conference

20  of the United States.

21

22  Date:  11/19/2021          /s/  Gigi Simcox
                                United States Court Reporter
23                              655 East Cesar E. Chavez Boulevard
                                San Antonio TX 78206
24                              Telephone:  (210)244-5037

25