**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, *et al.*<br><br>Defendants.<br><br>―――――――――――――<br><br>MI FAMILIA VOTA, *et al.*<br><br>Plaintiffs,<br><br>vs.<br><br>GREG ABBOTT, *et al.*<br><br>Defendants.<br><br>―――――――――――――<br><br>HOUSTON JUSTICE, *et al.*<br><br>Plaintiffs,<br><br>vs.<br><br>GREGORY WAYNE ABBOTT, *et al.*<br><br>Defendants. | Civil Action No. 5:21-cv-844(XR)<br>(Consolidated Case) |

**PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority,

Inc., The Arc of Texas, Mi Familia Vota, Marla López, Marlon López, Paul Rutledge, and

Jeffrey Lamar Clemmons (collectively, "Plaintiffs") file this Complaint for Declaratory and Injunctive Relief to challenge the constitutionality and legality of Texas Senate Bill 1, and allege as follows:

## INTRODUCTION

1.      As President Ronald Reagan once said, "[f]or this nation to remain true to its principles, we cannot allow any American's vote to be denied, diluted or defiled. The right to vote is the crown jewel of American liberties, and we will not see its luster diminished." In an effort to protect the crown jewel of American liberties, this lawsuit challenges certain amendments to the Texas Election Code enacted through Senate Bill 1 ("SB 1").

2.      The United States Supreme Court has explained that the right to vote is "a fundamental matter in a free and democratic society." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).  "No right," the Court has held, "is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (voting is "preservative of all rights.").

3.      For the past 150 years, the State of Texas has had a long track record of excluding and discouraging Black and Latino residents of the State from exercising this precious and fundamental right. *See infra* Section I. Voters with disabilities, including Black and Latino voters with disabilities, have also persistently experienced barriers in accessing their right to vote in Texas. *See infra* Section IV. The State's policies of exclusion and restrictive voting laws have resulted in chronically low voter turnout.[1]

---

[1]  *See, e.g.*, Fernando Ramirez, *Voter Turnout in Texas is Dead Last in America, Study Finds*, Houston Chronicle (Sept. 19, 2018, 3:34 PM), https://www.houstonchronicle.com/news/houston-

4.      While the State has seen recent gains in turnout, including in the 2018 midterm

election, even those gains left the State woefully behind the national average and ranked eleventh

lowest in the country.[2]

5.      The recent 2020 elections, conducted in the midst of a global pandemic, were a

push-and-pull between efforts to expand access to the franchise and backlash aimed toward

preserving the exclusionary status quo.

6.      During the March 2020 primary, voters were particularly motivated to vote, but

encountered serious obstacles to doing so, in part because the infrastructure was insufficient to

accommodate increased participation.

7.      For example, in one location in Harris County, voters waited as long as six hours

to vote.[3]  Early estimates indicated that there was a 45% increase in Democratic participation in

Harris County alone, which left these voters in particularly long lines as the political parties held

separate primaries, requiring separate voting booths and ballots within a single polling

---

texts/texas/article/Voter-turnout-in-Texas-is-dead-last-in-America-13241845.php; Scot
Schraufnagel, Michael J. Pomante II, & Quan Li, *Cost of Voting in the American States: 2020*,
19 Election L. J. (Issue 4) 503, 506-507 (2020); Ross Ramsey, *Analysis: It's harder to vote in
Texas than in any other state*, Texas Tribune, (Oct. 19, 2020, 4:00 AM),
https://www.texastribune.org/2020/10/19/texas-voting-elections/.
[2] Elbert Wang, *Texas Saw the Nation's Sixth-Highest Voter Turnout Increase, But Still Lagged
Behind Most Other States*, Texas Tribune (Dec. 7, 2018, 12:00 AM),
https://www.texastribune.org/2018/12/07/texas-voter-turnout-sixth-highest-increase-2018-
midterms/.
[3] Matt Harab & Andrew Schneider, *Who's to Blame for Long Lines on Super Tuesday? Depends
on who You Ask*, Houston Public Media (March 5, 2020, 4:09 PM),
https://www.houstonpublicmedia.org/articles/news/politics/election-
2020/2020/03/04/362662/local-officals-explain-long-lines-on-super-tuesday/; Jen Rice, *TSU
Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says it Won't Happen
Again*, Houston Public Media (Oct. 30, 2020, 5:29 AM),
https://www.houstonpublicmedia.org/articles/news/politics/election-
2020/2020/10/29/384985/voting-problems/.

113288597.2 0099831-00001

location.  At Texas Southern University ("TSU"), a historically Black University that served as a polling location, one voter waited until after 1:00 am to cast a ballot.[4]

8.      In response, Harris County took several measures to ensure voting access for the 2020 general election, including (1) increasing the county's election budget for the 2020 general election by $29 million (from $4 million in 2016 to $33 million in 2020);[5] (2) moving the county clerk's election headquarters to a 100,000 square foot arena; (3) tripling the number of early and Election Day polling locations, including twelve mail-in ballot drop-off locations, drive-thru voting centers, and six 24-hour polling locations;[6] (4) increasing the number of voting machines by 50% at polling places in the county; and (5), in direct response to the issue of long lines at TSU, tripling the number of voting machines available at the University.

9.      Other localities in Texas also sought to expand access to the ballot. Bexar, Dallas, Harris, and Travis Counties, all counties with high populations of Black and Latino residents, made voting mega-centers available, in an effort to ease the burden of long lines.[7] Tarrant

---

[4] Jen Rice, *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says it Won't Happen Again*, Houston Public Media (Oct. 30, 2020, 5:29 AM), https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/10/29/384985/voting-problems/.

[5] Karen Brooks Harper & Emma Platoff, *Harris County tried to make voting easier during the pandemic.  Texas Republicans fought every step of the way.*, Texas Tribune, (Oct. 15, 2020, 11:00 AM), https://www.texastribune.org/2020/10/15/harris-county-texas-voting/.

[6] *Id*.

[7] *Here's Where You Can Vote Early in Austin and Central Texas*, Statesmen News Network (Feb. 17, 2020, 4:14 PM), https://www.statesman.com/news/20200217/herersquos-where-you-can-vote-early-in-austin-and-central-texas; RJ Marquez, *How AT&T Center Will Transform to Become Mega Voting Site in Bexar County*, KSAT (Sept. 11, 2020, 12:21 PM), https://www.ksat.com/news/local/2020/09/08/how-att-center-will-transform-to-become-mega-voting-site-in-bexar-county/.

County added eight polling locations throughout the county to keep up with high early voting turnout.[8]  And Travis County set up four mail-in ballot drop-off locations.[9]

10.     The State responded by attempting to re-erect barriers to voting.[10]  Governor Abbott issued an Executive Order restricting each county to maintain only one ballot drop-off location, irrespective of the county's size or population, forcing some voters to have to drive twenty or thirty miles to vote.[11]

11.     Some private individuals also responded in kind. Private plaintiffs tried (and ultimately failed) to have over 120,000 votes cast using drive-thru voting in Harris County—a county with a high Black and Latino population—discarded.[12]

12.     Black and Latino voters faced a significant increase in voter intimidation, harassment, and threats, including by armed groups.[13]  In the 2020 presidential election alone,

---

[8] Brian Lopez, *Tarrant County will add 8 election sites amid high early voting turnout*, Star Telegram, (Oct. 20, 2020, 7:00 AM), https://www.star-telegram.com/news/politics-government/election/article246592083.html.

[9] Ashley Lopez, *Texas Governor Limits Ballot Drop-Off Locations, Local Officials Vow to Fight Back*, NPR (Oct. 1, 2020, 6:29 PM), https://www.npr.org/2020/10/01/919283793/texas-governor-limits-ballot-drop-off-locations-local-officials-vow-to-fight-bac.

[10] *See Proclamation by the Governor of the State of Texas* (Oct. 1, 2020), https://gov.texas.gov/uploads/files/press/PROC_COVID-19_Nov_3_general_election_IMAGE_10-01-2020.pdf., and Ashley Lopez, *Texas Voters are Caught in the Middle of a Battle over Mail-in Voting*, NPR, (May 29, 2020, 5:00 AM), https://www.npr.org/2020/05/29/864143739/texas-voters-are-caught-in-the-middle-of-a-battle-over-mail-in-voting; *State v. Hollins,* No. 20-0729, 2020 WL 5919729 (Tex. Oct. 7, 2020) (State of Texas sued Harris County Clerk after he proposed mailing unsolicited ballot applications to all registered voters under 65 years of age, only a fraction of whom were eligible to vote by mail according to the State and Texas Supreme Court held Clerk lacked implied authority under the Election Code to mail unsolicited ballot applications).

[11] *See Tex. League of United Latin American Citizens v. Hughs*, 978 F.3d 136 (5th Cir. 2020).

[12] *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, *7-12 (S.D. Tex. Nov. 2, 2020) (denying plaintiffs standing to sue to prohibit the use of drive-thru voting centers and to prevent counting ballots cast using drive-thru voting).

[13] *See, e.g.*, Kevin Krause & Charles Scudder, *Far-right Extremists Pose Rising Threat in North Texas around Election, FBI's Dallas Office Says*, The Dallas Morning News (Oct. 1, 2020, 8:16

- 5 -

the non-partisan Election Protection coalition received some 267 reports of voter intimidation in Texas, many of which were reports of intimidation by armed citizens or organized demonstrators close to polling locations.[14]  And on Election Day, voters in Hidalgo County reported two men with visible firearms freely walking around a polling location speaking with voters, despite clear signs at the location that no firearms were allowed.[15]

13.    Despite these barriers, Texas's voter turnout for the 2020 general election broke records as the highest in almost thirty years, up 6.6 percentage points from voter turnout from the last general election in 2016.[16]  Importantly, early voting, both in person and through the mail, was a key factor in this increase in turnout, accounting for over 9.7 million of the 11.3 million votes cast (over 85%).[17]

14.    Harris County in particular, which includes most of the city of Houston, saw its highest voter turnout since 1992, accounting for more than 1.6 million of the votes cast in the

---

PM), https://www.dallasnews.com/news/crime/2020/10/01/far-right-extremists-pose-rising-threat-in-north-texas-around-election-fbis-dallas-office-says/; Angela Kocherga, *Racism, Hate Crimes Weigh On Latino Voters' Minds In El Paso*, Texas Standard (Oct. 22, 2020, 10:05 AM), https://www.texasstandard.org/stories/racism-hate-crimes-weigh-on-Latino-voters-minds-in-el-paso/; *Coalition Urges US to Protect Voters from White Supremacist Threats*, Human Rights Watch (Oct. 7, 2020, 6:00PM), https://www.hrw.org/news/2020/10/07/coalition-urges-us-protect-voters-white-supremacist-threats#.

[14] Judy Bao, *Voter Intimidation in Texas During the 2020 General Election*, Tex. C.R. Project (Feb. 2021), https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.

[15] *Id*.

[16] Shannon Najmabadi & Mandi Cai, *Democrats hoped high turnout would usher in a blue wave across Texas.  It didn't.*, Texas Tribune (Nov. 4, 2020, 7:00 PM), https://www.texastribune.org/2020/11/04/texas-voter-turnout-democrats/.

[17] *See* Jeremy Schwartz & Mandi Cai, *Texas is on track for record turnout in this election after breaking early voting records*, KSAT (Oct. 31, 2020, 12:02 PM), https://www.ksat.com/news/texas/2020/10/31/texas-is-on-track-for-record-turnout-in-this-election-after-breaking-early-voting-records/, and *Texas Presidential Election Results 2020*, NBC News, https://www.nbcnews.com/politics/2020-elections/texas-president-results (last updated Mar. 31, 2021).

2020 general election.[18]  Dallas County also broke turnout records in the 2020 general election, surpassing its early voting record set in 2016.[19]

15.     Voters of color demonstrated a motivation to vote in the 2020 general election and overcame substantial barriers to account for 40% of the overall Texas votes in the 2020 general election.[20]

16.     Black and Latino voters, including voters with disabilities, benefited in particular from counties' efforts to expand access to the ballot. In Harris County, Black and Latino voters cast more than half the ballots at both drive-thru voting centers and at the extended-hour locations.

17.     Instead of building on the progress of increased voter turnout by Latinos and Blacks, now, through certain provisions of an omnibus elections bill—2021 Texas Senate Bill No. 1, 87th Legislature ("SB 1")—the State again seeks to further burden the right to vote and curtail the participation of Black, Latino, and disabled voters. SB 1 is a calculated effort to disenfranchise voters. If allowed to stand, the bill will unconstitutionally burden qualified voters and inevitably prevent many voters from lawfully casting their ballots in future elections. The undue burdens imposed by SB 1 will be greatest for Black and Latino voters, just as the Texas

---

[18] *See* Jake Lahut, *Massive turnout in Houston is making Texas a top state to watch*, Business Insider, (Nov. 3, 2020, 5:38 PM), https://www.businessinsider.com/harris-county-turnout-numbers-texas-flip-2020-11, and *Texas Presidential Election Results 2020*, NBC News, https://www.nbcnews.com/politics/2020-elections/texas-president-results (last updated Mar. 31, 2021).

[19] Jozelyn Escobedo, *How the four major counties in North Texas voted during the 2020 election*, WFAA (Nov. 4, 2020, 12:06 PM), https://www.wfaa.com/article/news/politics/elections/voter-turnout-2020-presidential-election-north-texas/287-64a24012-a038-49d7-8db3-26d0923994c5 (last updated Nov. 4, 2020, 8:51 PM).

[20] *Texas Presidential Election Results 2020*, NBC News, https://www.nbcnews.com/politics/2020-elections/texas-president-results (last updated Mar. 31, 2021).

113288597.2 0099831-00001

Legislature intended, as SB 1 targets the methods and opportunities to vote that these voters availed themselves of in droves during the November 2020 election—an election in which voters of color participated in record numbers.[21] SB 1 is riddled with purposefully confusing and deceptive rules, unfair processes, cumbersome and potentially expensive verifications, and traps that can only be interpreted as intentional, unfair, and unnecessary obstacles to the fundamental right to vote.

18.     SB 1 places additional heavy burdens on voters in Texas, a state that consistently limited voter access to the polls. In the last decade alone, Texas closed hundreds of polling locations, nearly doubling the number of voters who use each polling site. Texas has maintained excuse-only mail-in voting even during the COVID-19 pandemic, and stringent voter identification laws. While voters across the state already face closed polling locations, extended travel time to polling sites, and wait time that exceed four hours, SB 1 prohibits counties from making voting accessible and safe for lawfully registered voters.

19.     The burdens of SB 1—like other Texas laws that limit access to the polls—singly and together fall disproportionately on Black and Latino voters. For example, H.B. 1888, 86th Legislature, Reg. Sess. (Tex. 2019) amending Tex. Elec. Code ELEC §85.064, prohibited counties from establishing mobile early voting locations, which targeted and burdened counties with growing Black and Latino voting populations. SB 1 will burden those same voters who have

---

[21] *See*, *e.g.*, Matt Goodman, *Election Day Arrives on the Heels of Historic Early Voting Turnout in North Texas*, DMagazine (Nov. 2, 2020, 11:22 AM), https://www.dmagazine.com/frontburner/2020/11/election-day-2020-dallas-county-north-texas/; John Engel, *Travis County Finalizing Plan for Five Mega Voting Centers*, KXAN (Aug. 31, 2020, 9:59PM), https://www.kxan.com/news/your-local-election-hq/travis-county-finalizing-plan-for-five-mega-voting-centers/; Garrett Brnger & Misael Gomez, *Mega Voting Centers a Go For November Election, County Commissioners Looking at More Voting Options*, KSAT (Aug. 14, 2020, 8:13PM), https://www.ksat.com/news/local/2020/08/15/mega-voting-centers-a-go-for-november-election-county-commissioners-looking-at-more-voting-options/.

been historically and repeatedly disenfranchised. From all-white primaries to poll taxes, from literacy tests to annual re-registration requirements, Texas has repeatedly adopted one law after another, for the purpose and with the effect of making it harder for voters of color to vote.  SB 1 is yet another attempt to continue that tradition of discrimination.

20.     The Texas Legislature engineered SB 1 to cancel or discourage the activities used successfully by Black and Latino voters in 2020. The law prohibits counties from using drive-through voting, expanding voting hours, and automatically mailing eligible voters mail-in ballot applications. At the same time, the law creates rigid new requirements for mail-in ballots by requiring voters to provide the same identification number on their ballot as on their registration, allowing ballot signatures to be compared against signatures more than six years old, and allowing two different committees to analyze each ballot and reject allegedly defective ballots without notice to the voter of the alleged defect. SB 1 also requires a monthly purging of voter rolls, coupled with rigid requirements that burden eligible voters who are wrongly purged.

21.     The law also burdens and limits people who provide necessary physical and language assistance to voters, which in turn will unduly burden voters who cannot vote without such assistance. SB 1 impedes assistance like transportation to the polls, navigation within a polling place, translation of a ballot printed in a language unfamiliar to the voter, or physical help to complete a ballot. These provisions burden registered voters who need help to vote and who are most likely to be Black and Latino.

22.     Finally, the law provides enormous (and disproportionate) protections and power to poll watchers at the expense of voters who face the threat of unencumbered intimidation while exercising their Constitutional right to vote. This in the face of Texas's sad history of armed militias and extreme partisans intimidating voters of color.

113288597.2 0099831-00001

23.     Despite record turnout in 2020 and the then Secretary of State's own analysis that the 2020 election was safe and secure, the Texas Legislature enacted SB 1 without adequate facts or reasonable basis to support the need to change the law. The problem that SB 1 purportedly set out to fix, voter fraud, simply does not exist.

24.     The provisions in SB 1 challenged by Plaintiffs do nothing to immunize Texas voting against fraud.  Instead, they impede access to Texas voting by prohibiting the voting activities that produced record turnout, particularly among Latino and Black voters, in 2020. The Texas Legislature's intent to discriminate against voters of color is clear.

25.     SB 1 passed after a prolonged and divisive process and was signed into law by Governor Abbott on September 7, 2021. SB 1 becomes effective 91 days after the second special legislative session ends.

26.     Plaintiffs bring this lawsuit to protect their constitutional and federal rights, as well as the rights of their members and constituencies, and to ensure that the State does not continue to erect barriers to the franchise that have the intent and effect of denying the vote on account of race or color.  Individually and cumulatively, the challenged provisions of SB 1 are intended to, and will have the effect of, burdening and restricting Black and Latino Texans' right to vote and the rights of voters with disabilities.  Specifically, Plaintiffs are challenging the following unconstitutional and discriminatory provisions of SB 1 (collectively, the "Challenged Provisions"):

   a.     SB 1 § 2.05, which mandates monthly and quarterly purges of the voter rolls by the Texas Secretary of State's office, ostensibly to identify noncitizens;

   b.     SB 1 §§ 3.04, 3.12-3.13, which eliminate drive-thru voting centers;

- 10 -

c.    SB 1 §§ 3.09-3.10, which restricts the scheduling of early voting hours and eliminates 24-hour voting;

d.    SB 1 § 3.15, which fully eliminates straight-ticket voting;

e.    SB 1 §§ 4.01, 4.06, 4.07, 4.09, which reduce regulations on poll watchers, allowing them to roam freely around polling locations and subjecting election officials to a class A misdemeanor for knowingly obstructing a poll watcher's view;

f.     SB 1 § 4.12, which restricts vote-by-mail drop boxes;

g.    SB 1 §§ 5.02, 5.03, 5.07, 5.08, which imposes voter identification requirements on early voting ballot applications and require that such applications be rejected if they don't comply;

h.    SB 1 § 5.04, which prohibits distribution of applications to anyone who didn't request it;

i.     SB 1 §§ 5.12-5.14, which provides procedures for rejecting ballots for alleged deficient signatures without sufficient procedures to ensure a voter can cure;

j.     SB 1 § 6.01, which requires a person who "simultaneously" provides seven or more voters with transportation to the polls to complete and sign a form reporting their name, address, and whether they are only providing transportation or also serving as an assistant to the voters and notes that "a poll watcher is entitled to observe any activity conducted under this section";

- 11 -

k.   SB 1 §§ 6.03, 6.05, and 6.07 which require an assistor to disclose and document their name, address, relationship to the voter, and whether the assistor received compensation; and makes failure by the assistant to complete the form correctly a state jail felony;

l.   SB 1 § 6.04, which limits the type of assistance that can be provided in voting, requiring an assistor to make the following affirmation: "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance . . . I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot.";

m.   SB 1 § 7.02, which limits the amount of time an employer must provide an employee with time off to vote; and

n.   SB 1 § 7.04, which prohibit election officials from soliciting eligible voters to complete an application for a mail-in ballot and distributing unsolicited mail-in ballot applications, and prohibits the use of public funds to facilitate third-party distribution of such applications.

27.   The Challenged Provisions will harm all Texas voters, but consistent with Jim Crow era tradition, the burdens will be disproportionately borne by Black and Latino voters and voters with disabilities. SB 1 unlawfully discriminates against voters of color and burdens voters with disabilities, in violation of the First, Fourteenth, and Fifteen Amendments to the Constitution, Sections 2 and 208 of the Voting Rights Act of 1965, Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

28.     Plaintiffs bring this action to (1) obtain a judgment declaring that the challenged provisions of SB 1 are illegal and unenforceable, and (2) prevent Defendants from implementing and enforcing those provisions of SB 1.

## JURISDICTION AND VENUE

29.     Plaintiffs bring this civil rights action under 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, Sections 2 and 208 of the Voting Rights Act of 1965, 52 U.S.C. §§ 10301 and 10508, the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973.

30.     This Court has personal jurisdiction over the named Defendants, who are elected or appointed officials of the State of Texas, and are residents of the State of Texas.

31.     This Court has jurisdiction under Article III, § 2 of the U.S. Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1357.

32.     This Court has authority to enter declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

33.     Venue is proper in this district under 28 U.S.C. § 1391 because the Defendants engage in their official duties in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

I.      **PLAINTIFFS**

34.     Plaintiff HOUSTON JUSTICE challenges sections 5.02 and 7.04 of SB 1. Houston Justice is a nonpartisan, nonprofit organization that advocates to eradicate homelessness, recidivism, inequality, and injustice in the Houston community and the state of Texas at large. Part of Houston Justice's mission is to ensure that Texas residents can exercise

- 13 -

their right to vote. In particular, Houston Justice has worked to provide access to the ballot to eligible voters in the Harris County Jail.

35.     Houston Justice has several initiatives in support of this goal. First, Houston Justice and its trained volunteers regularly register voters at the Harris County Jail. As of August 2020, Houston Justice and its volunteers had registered 2,500 eligible voters incarcerated at the Harris County Jail. Second, Houston Justice provides applications to vote by mail to eligible individuals in the Harris County Jail and assists those individuals in filling out and returning their applications. For past elections, Houston Justice has received blank applications from the Harris County elections administrator's office to distribute in the Jail.

36.     By prohibiting public officials from authorizing or approving the expenditure of funds to facilitate a third party's distribution of applications to vote by mail, section 7.04 of SB 1 will impede or frustrate altogether Houston Justice's work delivering applications to vote by mail to eligible voters in the Harris County Jail. Because the Harris County elections administrator is prohibited from using public funds to facilitate Houston Justice's efforts to distribute applications for mail ballots to individuals incarcerated in the Jail, and thus may be unable to provide blank applications to vote by mail to Houston Justice, the organization will have to either forgo distributing these applications at the Jail or print the applications itself, forcing Houston Justice to divert time, money, and resources from its other activities, such as its advocacy on behalf of police reform and its community COVID outreach program, to navigating this new barrier to the service it provides to eligible voters at the Harris County Jail.

37.     Section 5.02 of SB 1 will also impede Houston Justice's mission to facilitate access to the franchise to eligible voters at the Harris County Jail by erecting an additional hurdle to applying for a mail ballot. Many if not all of the individuals that Houston Justice serves do not

have access to the identification required by section 5.02. Even if the identification were available, Houston Justice would have to retrain its volunteers on how to collect this information, once again requiring the organization to divert resources from its other initiatives.

38.     Plaintiff HOUSTON AREA URBAN LEAGUE ("HAUL") challenges sections 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, and 4.12 of SB 1. HAUL is a nonpartisan, nonprofit corporation with its principal office in Houston, Texas.  The National Urban League, of which HAUL is an affiliate, is the nation's oldest and largest community-based movement devoted to empowering African Americans to enter the economic and social mainstream.  Today, the National Urban League, headquartered in New York City, spearheads the non-partisan efforts of its local affiliates. HAUL was organized in June of 1968 as a nonprofit 501(c)(3) agency.  HAUL advocates for and provides social services to disadvantaged people of all races, gender, age groups and or disabilities.  HAUL works to achieve economic and social justice for its constituents by providing community voter/political participation education and supporting and offering third party voter registration, including through its two auxiliary, age-specific, volunteer groups.

39.     Through its president, contract employees, and clients, HAUL engages in voter registration, voter education, and other activities and programs aimed at increasing voter turnout among vulnerable members of the Houston community. These efforts are key to HAUL's mission of advocating for and providing social services to disadvantaged people.

40.     HAUL, through its contract employees and volunteers, as well as its president, dedicates time and resources to conduct voter engagement and public education so that HAUL's clients, namely Black and Latino voters, veterans, and people with disabilities, can have a voice in the political process.  HAUL provides community members in the Houston area with training

on voter registration and voting opportunities, and, through its contractors and volunteers, provides or helps provide voter assistance and voter registration, such as by delivering applications to vote by mail to HAUL clients. This has included responding to the voting needs of its membership during the COVID-19 pandemic, which has disproportionately affected Black Texans.

41.     SB 1 will hinder HAUL's ability to enable its Black and Latino membership base, and vulnerable residents of Houston more broadly, to vote. In light of SB 1's significantly more burdensome vote by mail requirements, prohibition on drive-thru voting, limited early voting and curbside voting, lack of ready access to vote by mail applications, and presence of newly empowered poll workers and poll challengers, HAUL will be forced to divert time and resources from the other critical social services it provides to disadvantaged persons in Houston to ensuring their clients—HAUL's constituents, including Black and Latino voters, voters with disabilities, constituents of its two auxiliary age-based volunteer groups, and veterans who disproportionately used these means and methods of voting employed in the 2020 elections—are able to vote in upcoming elections without being subjected to civil and criminal offenses and penalties. This will require HAUL to retrain and educate their large constituencies on the new voting restrictions, procedures, and violations so their constituents are able to cast a ballot that will count, without any repercussions. Additionally, HAUL will have to increase its Get Out The Vote ("GOTV") work to respond to the lack of means and methods to vote resulting from the passage of SB 1.

42.     Plaintiff DELTA SIGMA THETA SORORITY, INC. ("Delta Sigma Theta" or "the Deltas") challenges sections 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.12, 6.01, 6.03, and 6.05 of SB 1. Delta Sigma Theta is a national, nonpartisan, not-for-profit membership service

organization, comprised predominately of Black women that was founded in 1913 on the campus

of Howard University and incorporated under the laws of the District of Columbia. Six weeks

after the organization was initially formed in 1913, several of its founding members marched in

the historic Suffragist March under the Delta Sigma Theta Sorority, Inc. banner—the Deltas'

first public act. The Deltas members participating in the march took on personal risk and

indignity, as they were not welcomed by some white suffragists, who insisted that the Black

women march at the end of the procession.

43.     Civic engagement has remained a core tenet of the Deltas' mission since its

founding, as democracy and justice can only be achieved through voting. Thus, voter registration

and voter education programs, as well as combatting voter suppression, are some of the

organization's top social action priorities. In light of the upcoming post-Census redistricting

cycle, the Deltas have and will continue to provide public education and training about the

importance of the decennial Census and its impact on redistricting, the allocation of funding, and

policy-making. The organization has 75 chapters that include alumnae and college chapters and

approximately 20,445 members in Texas, most of whom are registered voters in Texas.

44.     Since its inception, Delta Sigma Theta has organized Delta Days in Washington,

D.C. as an opportunity for members of Delta Sigma Theta Sorority, Inc. to participate in the

nation's public policy-making process. This annual conference includes legislative briefings,

issue forums and advocacy skills development. Featured speakers include key policy makers,

members of the United States Congress, Congressional staff members and national issue experts.

The 32nd Annual event was held in 2021.  Delta Sigma Theta had more than 380 sorors from

Texas who registered and participated in the virtual event.  For the 2021 Delta Days, Delta

Sigma Theta's 2021 legislative priorities included seeking the support of U.S. Senator Cruz and

U.S. Senator Cornyn for H.R. 1 and the John Lewis Voting Rights Act.  In past years, more than 150 members from Texas have gone to Washington, D.C. to engage with members of Congress on voting issues, including increasing voter access and eliminating voter suppression.

45.     The Houston Alumnae chapter of Delta Sigma Theta has, in the last four years, registered over 1800 voters, trained around 100 Voter Deputy Registrars, provided caravans to the polls at general, special, and runoff elections, educated the public on vote-by-mail options, and supported state legislation that would create county-wide polling places, among other voting related work.  The North Harris County Alumnae chapter also conducts high school voter registration drives, trains Volunteer Deputy Voter Registrars, and partners with the League of Women Voters to conduct registration drives.

46.     The Dallas Alumnae Chapter organizes Delta Days for the City of Dallas and for the State of Texas to allow alumnae to work with public officials to ensure all voters, but particularly women and voters of color, are able to participate in the political process and elect representatives of their choice.  The Dallas Alumnae Chapter also registers hundreds of students and others across the Dallas area, and provides voter education and training.  The Fort Worth Alumnae Chapter has held numerous voter registration drives at locations accessible and convenient to voters of color, as well as conducted candidate forums for political office and virtual forums on preparedness to vote.

47.     The Austin Alumnae chapter of Delta Sigma Theta has presented information to nursing homes and senior living facilities on absentee voting, registered voters there and assisted these voters with changing their addresses. The Chapter also held curbside voter registration in East and North Austin, conducts Voter Deputy Registrar training, regularly registers voters on holidays like Martin Luther King, Jr. Day, and has participated in campaigns alongside the

- 18 -

League of Women Voters to register eligible high school students who would-be first-time voters in Austin, Manor, Pflugerville and Round Rock independent school districts.

48.     With the enactment of SB 1, the right to vote of the organization's members across Texas will be severely burdened or outright denied. By severely restricting the ability of third parties to distribute or "solicit" vote by mail ballot applications, limiting early voting, eliminating drive-thru voting, burdening individuals who provide assistance to other voters, and limiting curbside voting, SB 1 makes it substantially more difficult for the Deltas to engage in their civic engagement mission. These burdens will force the Deltas, both nationally and particularly their chapters in Harris, Bexar, Travis and Dallas counties, to divert time, money, and resources from other activities, such as their voter registration and voter education efforts, including related to the post-Census redistricting cycle, to assist Texas sorors in providing public education regarding the changes in voting law and procedure, and responding to how these changes in law will affect their members' ability to engage in voter registration and voter assistance.

49.     Plaintiff THE ARC OF TEXAS[22] challenges sections 5.02, 6.03, 6.04, 6.05, and 6.07 of SB 1. The Arc of Texas has promoted, protected, and advocated for the human rights and

---

[22] Federal courts, including the Fifth Circuit, routinely find that advocacy organizations representing individuals with disabilities, including chapters of The Arc, have associational standing to challenge violations of federal laws protecting individuals with disabilities in cases seeking systemic, injunctive relief without the participation of individual members. *See, e.g.*, *Steward v. Abbott*, 189 F. Supp. 3d 620, 631-32 (W.D. Tex. 2016) (The Arc Texas); *G.T. by Michelle T. v. Kanawha Cty. Sch.*, No. 2:20-CV-00057, 2020 WL 4018285, at *7 (S.D.W. Va. July 16, 2020) (The Arc West Virginia); *New Jersey Protection & Advocacy, Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 483 (D.N.J. 2008) (The Arc New Jersey). *See also McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407 (5th Cir. 2004) (no standing challenge to The Arc Texas); *Georgia Advoc. Off. v. Georgia*, 447 F. Supp. 3d1311, 1328 (N.D. Ga. 2020) (same for The Arc Georgia); *ARC of Iowa v. Reynolds*, No. 4:21-CV-00264, 2021 WL 4166728, at *12 (S.D. Iowa Sept. 13, 2021) (same for The Arc Iowa).

113288597.2 0099831-00001

self-determination of Texans with intellectual and developmental disabilities ("IDD") since its

founding in 1953.  The Arc of Texas is a statewide advocacy and membership organization—

with 6,000 individual members and 27 local member chapters throughout the state—that

supports and advocates for these rights on behalf of the IDD community.  The Arc of Texas

works with and alongside individuals with IDD and their families to identify barriers and

solutions to inclusive education, competitive integrated employment, quality community-based

services and supports, and access to civil rights and justice. Both chapter and individual members

of The Arc of Texas inform the organization's policies.

50.     The Arc of Texas provides support and training so that members can speak out for

their rights in advocacy with state agencies and with the Texas Legislature. The Arc of Texas has

been instrumental in the creation of virtually every program, service, right, and benefit that is

now available to more than half a million Texans with IDD. Today, The Arc of Texas continues

to advocate for including people with intellectual and developmental disabilities in all aspects of

society.

51.     Voting rights has always been a central priority in advocacy work of The Arc of

Texas. In partnership with other state and local disability groups, The Arc of Texas has

participated in Register, Educate, Vote—Use your Power ("REV UP") Texas program, a

statewide volunteer coalition of advocacy organizations seeking to foster civic engagement and

protect the voting rights of Texans with disabilities. The Arc of Texas helped organize and

participated in multiple disability forums with candidates. In 2020, The Arc of Texas provided

trainings and social media outreach to its members and the general public on how to register to

vote, learn how to access disability accommodations when voting, how to receive assistance

when voting, and how to access the election protection hotline. Many local affiliates, member

chapters of The Arc of Texas, directly assisted people with disabilities in registering to vote, educating their members on where and how to vote, and providing transportation to polling places and other assistance. The Arc has historically volunteered as deputy voter registrars and hosted a press conference to kick off voter registration month.

52.     In 2021, The Arc of Texas worked to remove or amend provisions in prior iterations of SB 1 that are harmful to the disability community. The Arc of Texas has sent out multiple action alerts to its constituents urging them to oppose SB 1, its prior iterations, and other voting legislation suppressing the disability vote. The Arc of Texas has engaged in other public education and outreach to inform its members of the ways in which the law would deny equal access to the disability community, and met with legislative offices to share these concerns. Though The Arc of Texas submitted written testimony in opposition to the bills, several constituents of The Arc of Texas sought to testify in opposition to these bills, but were unable to do so given that the Texas legislature did not allow for remote testimony during COVID-19 (further disadvantaging the disability community who are at higher risk of contracting and experiencing fatal complications from the virus). Neither HB 6 nor SB 7—predecessor bills to SB 1—had second hearings in the opposite chamber of origin, creating further complication for the disability community or members of the public to testify about how the bills would impact them.

53.     During the special session, a member of The Arc of Texas who lives with paralysis, Courtney Pugh, provided virtual testimony before the House in opposition to SB 1. The Senate would not allow her to testify virtually as a disability accommodation, but her written testimony was read on the Senate floor during Senator Alvaro's filibuster.  The Arc of Texas

113288597.2 0099831-00001

Manager of Public Policy and Advocacy, Alex Cogan, also provided testimony in opposition to the bill before the Senate.

54.     In 2019, The Arc of Texas worked to successfully oppose SB 9—another bill restricting the voting rights of people with disabilities—and several members testified in opposition to the bill at that time.

55.     The voting rights of people with disabilities remains a central priority for The Arc of Texas. Voter education is included in every training The Arc of Texas does, regardless of the topic, and voting is the core of public policy and advocacy, therefore, voting rights are intertwined with all of the organization's advocacy efforts.

56.     By imposing barriers to early voting and receiving assistance with voting, SB 1 will deny access to and interfere with the right to vote for many members of The Arc of Texas and the voters that it supports.

57.     Moreover, SB 1 makes it substantially more difficult for The Arc of Texas to carry out its civic engagement mission. In order to combat the suppressive effect of SB 1, including informing itself about SB 1 and its scope to be able to assist people with disabilities to comply with the many changes; helping people with disabilities to better understand the changes; and developing new, costly training materials and public education documents to educate people with disabilities about the changes, The Arc of Texas will have to expend more time, money, and resources on its efforts to educate and assist voters as described above. These burdens will force The Arc of Texas to divert resources from its other core activities described above. As a result, due to SB 1, The Arc of Texas is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

58.     The Arc of Texas member Amy Litzinger is harmed by sections 6.03, 6.04, 6.05, and 6.07 of SB 1. Ms. Litzinger is a registered voter and a resident of Austin, Texas. Ms. Litzinger lives with quadriplegic cerebral palsy. She uses a power wheelchair and receives direct support staff assistance thirteen hours per day through the CLASS Medicaid Waiver program. Ms. Litzinger requires assistance to get in and out of her wheelchair, uses speech to text programs to write, and relies on her direct support workers to transport her from place to place. Her disability substantially limits several major life activities, including caring for herself, performing manual tasks, walking, standing, and lifting. 42 U.S.C. § 12102(2)(A). As such, Ms. Litzinger is a qualified individual with a disability. 42 U.S.C. § 12131(2). Ms. Litzinger has previously voted in person and absentee and requires assistance in accessing both of these programs. For example, when voting in person at a polling place, Ms. Litzinger requires assistance putting the ballot in the Scantron machine since she lacks the dexterity to do this independently. She also has had to ask her assistors to move physical barriers impeding her access to the voting booth, physically hold and transfer materials from her backpack to her lap for use while voting, such as her ID and voter guides, assist her with drinking from her water bottle when needed, and correct the language of the ballot when needed. When Ms. Litzinger votes absentee, she requires assistance with stuffing the envelope and properly aligning the signature. She also requires assistance marking the paper ballot and getting in and out of positions required for marking the ballot. Ms. Litzinger has routinely received this sort of assistance to access in person and absentee voting in prior elections, but SB 1 would limit the assistance she could receive to assistance with only reading or marking the ballot. Ms. Litzinger's direct support professionals who assist her with activities of daily living also assist her with voting. SB 1 will prevent at least some of the forms of assistance she requires to access

- 23 -

in person and absentee voting and future assistance needs she may have. Some of Ms. Litzinger's direct support professionals have stated that they can no longer assist her in the manner they did previously given the new restrictions imposed by SB 1, including the oath unduly limiting the type of assistance they can provide as well as the onerous forms assistors must now complete and the threat of criminal liability for incorrectly filling out forms. Ms. Litzinger testified in opposition to SB 1 (and the related HB 3) before the Senate and House on July 10, 2021.

59.     The Arc of Texas member, Laura Halvorson, is harmed by sections 6.03, 6.04, 6.05, and 6.07 of SB 1. Ms. Halvorson is a registered voter, a resident of San Antonio and lives with muscular dystrophy, quadriplegia, and chronic neuromuscular respiratory failure. Ms. Halvorson lacks muscle function and uses a ventilator twenty-four hours per day. Ms. Halvorson's disability substantially impacts the major life activities of caring for herself, performing manual tasks, walking, standing, lifting, breathing, and working. 42 U.S.C. § 12102(2)(A). As such, Ms. Halvorson is a qualified individual with a disability.  42 U.S.C. § 12131(2). Due to her disability, Ms. Halvorson is not able to mark or submit the ballot herself and requires assistance putting the ballot into the Scantron machine and marking the ballot on the touch screen. At times, Ms. Halvorson has to ask her assistor to explain the wording of the lengthy amendments, which are not in plain language. Ms. Halvorson also brings information about candidates to the polling place to inform her vote and has been required to transfer this information to a paper sample ballot rather than bring her phone – something for which she must use an assistant. Ms. Halvorson's personal care attendants have stated they may be unwilling to assist her with voting in the future for fear of prosecution.

60.     The Arc of Texas member Ruben Fernandez is harmed by sections 6.03, 6.04, 6.05, and 6.07 of SB 1. Mr. Fernandez is a registered voter and a resident of El Paso, Texas. Mr.

Fernandez lives with cerebral palsy and has a label of Intellectual/Developmental Disability. His disability substantially limits several major life activities, including performing manual tasks, walking, standing, lifting, and caring for himself. 42 U.S.C. § 12102(2)(A). As such, Mr. Fernandez is a qualified individual with a disability. 42 U.S.C. § 12131(2). Mr. Fernandez has previously voted in person and requires assistance in accessing in person voting. For example, once at the polling site, Mr. Fernandez's assistant reminds him of the photo ID requirements, assists him in obtaining his ballot, and assists him in physically navigating the polling site in his manual wheelchair. At the voting booth, in order to be able to understand what is on the ballot, he relies on an assistant to read what is on the screen for him. If he does not understand what is read to him, he often needs to ask his chosen assistant questions about the information or words on the ballot. He also may need his chosen assistant to explain how the voting machine works, which includes answering questions about the machine's features and functionality. In addition, he needs assistance removing his printed paper ballot from the voting machine and placing it in the ballot counter. Mr. Fernandez has routinely received this sort of assistance to access in person in prior elections, but under SB 1 Mr. Fernandez will be directly prohibited from exercising his right to vote as the type of assistance he needs is not permissible under SB 1.

61.     The Arc of Texas member, Courtney Pugh, is harmed by sections 6.03, 6.04, 6.05, and 6.07 of SB 1. Ms. Pugh is a registered voter and resident of Carrolton, Texas who lives with Ullrich Congenital Muscular Dystrophy. Ms. Pugh lives with quadriplegia and is a wheelchair and daily-ventilator user who requires significant support with activities of daily living. Ms. Pugh's disability substantially limits several major life activities including caring for herself, performing manual tasks, walking, standing, lifting, breathing, and working. 42 U.S.C. § 12102(2)(A). As such. Ms. Pugh is a qualified individual with a disability. 42 U.S.C. § 12131(2).

While Ms. Pugh can currently vote independently, her condition is degenerative and she will require extensive assistance to vote in the future as her condition progresses. SB 1 unduly limits the type of assistance she can receive and deters individuals who might assist her from doing so.

62.     Plaintiff MI FAMILIA VOTA challenges sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.07, 4.12, 5.02, 5.03, 5.04, 5.07, 5.08, 5.11, 5.12, 5.13, 5.14, 6.01, 6.03, 6.05, 6.07, and 7.02 of SB 1. Mi Familia Vota is a national, non-profit civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice. Through increasing awareness and education, Mi Familia Vota encourages voter registration and participation, and challenges voter suppression around the nation. Mi Familia Vota operates in six states, including Texas.

63.     In preparation for the election in Texas in 2020, Mi Familia Vota helped Black, Latino, and Asian-American Pacific Islander ("AAPI") voters throughout Texas develop plans to vote. The organization educated these voters about changes made in Harris County, including 24-hour voting and drive-through voting; educated voters about who was eligible to vote by mail, and who was not; and provided training to voters and to poll workers regarding the lawful activities of poll watchers, and how to de-escalate any confrontation that could be intimidating to voters. For example, during the 2020 general election, Mi Familia Vota responded to 1,200 calls for assistance with voter registration.

64.     With the adoption of SB 1, Mi Familia Vota must divert personnel, time, and resources away from its routine community activities to respond to SB 1. Specifically, Mi Familia Vota must now spend money, time, and other resources to (1) increase voter awareness, education, and support to comply with the expansive new rules of SB 1; (2) increase voter awareness and education about new voting restrictions that may result in rejected mail-in ballot

applications or rejected ballots completed by lawfully registered voters; (3) increase awareness and education about the elimination of voting methods used in 2020 that will no longer be available to voters, including 24-hour voting and drive-through voting; (4) increase awareness and education about new restrictions on people who provide transportation and other physical and language assistance at the polls to ensure that the elderly, disabled, or non-English-speaking voters who Mi Familia Vota supports are able to vote in compliance with SB 1; (5) increase awareness and education about the new requirements to apply for mail-in ballots; (6) increase awareness and education about the new limitations on the time off workers may rely upon to be able to vote; and (7) increase awareness and education of voters and poll workers about the expanded rights of poll watchers and the potential for intimidation of voters and poll workers under the new law. Mi Familia Vota will also have to expend resources to help lawfully registered voters monitor voter rolls to ensure that voters are not incorrectly purged from the voter rolls and assist with the costly and complicated system of reestablishing lawful registration status. Under SB 1, Mi Familia Vota resources are also required to support voters who, under burdensome time constraints, must cure mail-in ballots for alleged deficiencies -- if election officials choose to provide notice.

65.     Mi Familia Vota will have to spend finite resources on these activities so long as the challenged provisions of SB 1 are in effect. Given the dramatic changes in SB 1 that directly affect the voting methods used by Black, Latino, and AAPI voters in 2020, the demand on Mi Familia Vota's finite resources is significant, and Mi Familia Vota will be forced to choose among or eliminate some of the services it provides to Texas voters.

113288597.2 0099831-00001

66.     In addition to the impacts on the Mi Familia Vota organization, SB 1 will negatively affect the people who Mi Familia Vota serves, many of whom are Black, Latino, and AAPI.

67.     Plaintiff MARLA LÓPEZ challenges sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, and 4.07 of SB 1. Marla López, who is a Latina, is a registered Texas voter residing in Harris County, Texas, who intends to vote in the next election. Ms. López voted early in the November 2020 election at a drive-through location in Harris County. Ms. López voted in the evening. Voting early, in the evening, and at a drive-through location was the only time and manner that allowed both her and her father to vote due to their work obligations. Ms. López experienced voter intimidation in past elections, and the prospect of increased voter intimidation by the poll watchers allowed by SB 1 makes her more hesitant to vote in the future. Ms. López will be impacted by the new provisions in SB 1.

68.     Plaintiff MARLON LÓPEZ challenges sections 3.04, 3.09, 3.10, 3.12, 3.13, and 4.07 of SB1.   Marlon López, who is a Latino, is a registered Texas voter residing in Harris County, Texas, who intends to vote in the next election. Mr. López works long hours and travels for work, often requiring him to be out-of-state during election periods, or requiring him to work through the period during which polling places are open. In 2020, he was able to vote with his daughter via drive-through voting, taking advantage of the extended voting hours that were offered to voters during the early voting period. Due to his long work hours, this was the only time and manner that allowed him to vote. In previous elections, Mr. López's work schedule and travel conflicted with limited voting hours, and long lines kept him from voting. Mr. López will be impacted by regulations in SB 1.

69.     Plaintiff PAUL RUTLEDGE challenges sections 3.04, 3.09, 3.10, and 7.02 of SB 1. Paul Rutledge, who is White, is a registered Texas voter and a resident of Montgomery County, Texas, who intends to vote in the next election. Mr. Rutledge works in Harris County, Texas, as a billing/inventory clerk. He commutes one hour each way. He is diabetic and asthmatic, and lives with mother. In person voting in 2020 during the COVID-19 pandemic jeopardized Mr. Rutledge's safety because the polling location lacked enforcement of social distancing or mask wearing, and people were crowded together. Voting hours often conflicted with Mr. Rutledge's work hours and his long commute, keeping him from voting in the past. For these reasons, he votes during early voting periods and on the weekend. SB 1 will reduce early voting hours and eliminate safe alternative voting options for Mr. Rutledge, increasing his burden to exercise his right to vote.

70.     Plaintiff JEFFREY LAMAR CLEMMONS challenges sections 4.06, 4.07, and 4.09 of SB 1. Clemmons is a resident of Austin, Texas, and a senior at Huston-Tillotson University.  He serves as president of the Huston-Tillotson University's NAACP.  Plaintiff Clemmons also serves as Chair of the Austin College Student Commission.  Plaintiff Clemmons served as an election judge in Travis County for the July 14, 2020 primary election in Texas. Plaintiff Clemmons received training as an election judge on July 9, 2020.  He was assigned to the polling location at the Turner Roberts Recreation Center, where he served throughout the day of July 14, 2020.  On April 1, 2021, Plaintiff Clemmons testified in opposition to HB 6 during the regular legislative session, explaining that if passed, he would have grave concerns about continuing to serve as an election judge in future elections, because he could face criminal penalties for simply doing his job.  As a community activist and a dedicated member of the NAACP, Plaintiff Clemmons wants to continue to serve as an election judge in upcoming

elections.  With the passage of SB 1, Plaintiff Clemmons could face devastating criminal

penalties from fulfilling his responsibilities as an election judge. Plaintiff Clemmons thus has to

choose between forgoing future service and facing criminal prosecution under the vague law.

## II.    **DEFENDANTS**

71.    Defendant GREG ABBOTT is the Governor of Texas and is sued in his official

capacity. Pursuant to Article IV, Section I of the Texas Constitution, is the chief executive

officer of the State of Texas.

72.    Defendant JOHN B. SCOTT is the Texas Secretary of State and is sued in his

official capacity. The Office of the Secretary of State is charged with enforcing the new statutory

provisions that place an undue burden on voters of color.

73.    As "chief election officer of the state," *see* Tex. Elec. Code § 31.001(a), the

Secretary of State maintains a significant role in enforcing SB 1 as part of the Texas Election

Code. *See, e.g.*, Tex. Elec. Code § 31.003 (Secretary is charged with "obtain[ing] and

maintain[ing] uniformity in the application, operation, and interpretation of this code and of the

election laws outside this code."); Tex. Elec Code § 31.005(b) ("the secretary may order the

person [violating voter rights] to correct the offending conduct."). That authority is reiterated

throughout the Texas Election Code, as amended by SB 1.

74.    SB 1 tasks the Secretary of State with amending mail-in ballot applications, and

creating forms to be completed by voter assistants. *See* SB 1, Sec. 5.01 (amending Tex. Elec.

Code 84.001(b), requiring amendment of the state's mail-in ballot application); SB 1, Sec. 6.01

(amending Sec. 64.009 to add subsection (f)); Sec. 6.03 (adding Sec. 64.0322(b) governing

forms to be completed by voter assistants). SB 1 also tasks the Secretary with creating and

implementing voter purges. SB 1, Sec. 2.05 (amending Sec. 16.0332(a-1) (providing the

- 30 -

Secretary of State authority to enforce county registrars' compliance with SB 1; Sec. 2.07

(amending 18.068(a)).  The Secretary also refers alleged misconduct to the attorney general for

further enforcement. Sec. 2.08.

75.     SB 1 also expands the Secretary's role in creating procedures for, and enforcing

compliance by local registrars with, key provisions of SB 1. *See* SB 1, Sec. 2.06 (amending Sec.

18.065(e)); Sec. 3.08 (amending Sec. 66.044, and tasking the Secretary with adopting rules

regarding the opening and closure of polling places); Sec. 4.12 (amending Sec. 86.006)

(requiring Secretary to prescribe a roster to record delivery of all marked ballots to enforce

elimination of ballot drop boxes); Sec. 5.12 (adding Sec. 87.0271(f)) (Secretary of State has

authority to proscribe procedures for the implementation of signature verification committees);

Sec. 5.14 (adding Sec. 87.0411(f)) (Secretary of State has authority to proscribe procedures for

the implementation of early voting ballot boards). And the Secretary is tasked under section 4.04

with training poll watchers on their expanded authorities under SB 1, Texas Elec. Code § 33.008,

and referring for prosecution any reported violation of law under section 4.11. Texas Elec. Code

§ 34.005.

76.     The Secretary of State is likely to carry out his duties under the law, including

enforcement of SB 1. Defendant Scott has already expressed a commitment to broad exercise of

his authority to oversee the electoral process, including by undertaking a so-called "forensic

audit" of Collin, Dallas, Harris, and Tarrant counties, despite no indication of any irregularities.[23]

77.     Defendant WARREN "KEN" PAXTON is the Attorney General of Texas. Along

with the office of the Secretary of State, the Attorney General is charged with enforcing the new

---

[23] *See* Neelam Bohra, *Texas secretary of state's office auditing four counties' 2020 elections months after an official called the statewide process "smooth and secure,"* Texas Tribune (Sept. 23, 2021).

statutory provisions that place undue burdens on voters of color and that govern the activities of poll watchers.

78.     The Attorney General has authority to investigate and prosecute alleged violations of the Election Code, including those provisions introduced in SB 1. Tex. Elec. Code Sec. 273.001, 273.021. Under SB 1, among other things, the Attorney General is tasked with enforcing Tex. Elec. Code 18.065 against the counties—including provisions that require counties to maintain "suspense lists" of voters—and is empowered to collect civil fines against counties who do not comply. *See* SB 1, Sec. 2.06 (adding Tex. Elec. Code 18.065(f)-(g)); Tex. Elec. Code 18.065(a); Tex. Elec. Code 15.083. SB 1 also explicitly holds election officials liable to the state for violations of any provision of the Texas Election Code, including those created or amended by SB 1—such as offering extended hour or drive-through voting. SB 1, Sec. 8.01 (adding Sec. 31.128, 31.129). All alleged violations are referred specifically to the attorney general for enforcement. SB 1, Sec. 4.11 (amending Sec. 34.005); SB 1, 2.08 (amending Sec. 31.006). The Attorney General is tasked with enforcing criminal penalties against election judges, SB 1, Sec. 4.06 (amending Sec. 33.051); against assistors for failing to comply with assistance provisions, SB 1, Sec. 6.04-6.05 (amending Sec. 64.034, 86.010); and against election officials for using public funds to facilitate third-party distribution of applications to vote by mail, SB 1, Sec. 7.04 (adding Sec. 276.016).

79.     SB 1 also requires that information be shared with the Attorney General to support its enforcement authority. Early voting clerks are obligated to deliver notice to the attorney general of rejected mail-in ballots. SB 1, Sec. 5.15 (amending Sec. 87.0431). Registrars are obligated to report any ineligible person alleged to have voted or registered to vote to the secretary of state and the attorney general, explicitly expanding the registrar's reporting

requirement to these named Defendants. Sec. 2.04 (amending Sec. 15.028). The Attorney

General is granted unfettered access to forms signed by Texans providing transportation

assistance to voters. SB 1, Sec. 6.01 (amending Sec. 64.009(f)-(f-1)). The purpose of the

reporting requirements is so that the Attorney General can enforce SB 1.

80.     In word and deed, the Attorney General has demonstrated a willingness to enforce

the election code, and there is no indication that he will make an exception for SB 1. According

to the Attorney General's website, "[s]ince taking office in 2015, the Attorney General has

resolved 286 prosecutions of Texas Election Code criminal offenses against 76 defendants. . .

. [and] is currently prosecuting over 500 felony election fraud offenses in Texas courts." Press

Release, Office of the Attorney General, *AG Paxton Announces Formation of 2021 Texas

Election Integrity Unit* (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-

paxton-announces-formation-2021-texas-election-integrity-unit.  The Attorney General recently

announced the formation of the 2021 Texas Election Integrity Unit to "continue to pursue

prosecutions for criminals willing to commit election crimes." *Id*. And he has devoted additional

staff and resources to focus on prosecuting election fraud cases. *Id*.

81.     Defendant JACQUE CALLANEN, is sued in her official capacity as Elections

Administrator of Bexar County.  In this capacity, Defendant Callanen is responsible for

implementing the Texas Election Code at the direction of the Texas Secretary of State.

82.     Defendant ISABEL LONGORIA, in her official capacity as Elections

Administrator of Harris County.  In this capacity, Defendant Longoria is responsible for

implementing the Texas Election Code at the direction of the Texas Secretary of State.

113288597.2 0099831-00001

## GENERAL ALLEGATIONS

## I.    TEXAS HAS A LONG HISTORY OF DISCRIMINATING AGAINST AND BURDENING VOTERS OF COLOR

83.     SB 1 is the latest entry in Texas's pervasive and judicially recognized record of racially discriminatory voting practices. Texas history is replete with both explicit and subtle intentional efforts to suppress or restrict voting of eligible Texas residents who are members of racial and language minority groups, like those that Mi Familia Vota, Houston Justice, HAUL and the Deltas serve. These tactics were rampant against Latinos and Blacks as far back as Texas statehood in 1845 and persist into the 21st century.[24]

84.     In 2014, a federal court found that Texas has a "history of impairments that have plagued the right to vote," including "racially discriminatory motivations and [] burdensome qualifications." *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014). According to the court, "[t]his uncontroverted and shameful history was perhaps summed up best by" longtime civil rights advocate Reverend Peter Johnson, who said "'[t]hey had no civil rights towns or cities in the State of Texas because of the brutal, violent intimidation and terrorism that still exists in the State of Texas; not as overt as it was yesterday. But east Texas is Mississippi 40 years ago.'" *Id.*

85.     Texas's Black and Latino voters have historically been disenfranchised through a variety of discriminatory voting-related laws, including all-white primaries, literacy tests, poll taxes, voter-purging, and racially discriminatory districting. *Id.* at 633-37.

86.     Texas's use of intentionally discriminatory voting schemes has repeatedly required federal intervention. *See*, *e.g.*, *Veasey v. Abbott*, 249 F. Supp. 3d 868, 876 (S.D. Tex.

---

[24] Robert Brischetto et al., *Texas*, in QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990 (Chandler Davidson & Bernard Grofman eds., 1994).

2017) (holding that Texas enacted photo-ID law with a discriminatory purpose); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (noting state's redistricting plan bore the "mark of intentional discrimination that could give rise to an equal protection violation"); *Texas v. United States*, 887 F. Supp. 2d 133, 159, 166 (D.D.C. 2012), vacated and remanded in light of *Shelby County v. Holder*, 570 U.S. 529 (2013) (finding Texas enacted redistricting plans with discriminatory purpose); *White v. Regester*, 412 U.S. 755 (1973) (invalidating multimember electoral districts in Dallas and Bexar Counties based on findings that the reapportionment plans effectively removed Black and Mexican-American voters from the political processes in these counties); *Terry v. Adams*, 345 U.S. 461 (1953) (holding that Texas county's private primary deprived Black petitioners of their right to vote based on race and color and therefore violated the Fifteenth Amendment); *Smith v. Allwright*, 321 U.S. 649 (1944) (invalidating Democratic Party's exclusion of minorities from primary elections); *Nixon v. Herndon*, 273 U.S. 536 (1927) (invalidating on Fourteenth Amendment grounds state law excluding Black citizens from voting in primary elections).  Texas has remained undeterred, however, often enacting new exclusionary restrictions on the heels of federal intervention.

87.    The examples set forth below are a sampling of Texas's pervasive and invidious race-based voter suppression including tactics such as poll taxes, voter purges, white primaries, literacy tests, efforts to disenfranchise students, and racially discriminatory districting. These tactics draw a clear line of continuing discrimination beginning in the early 20th century and continuing through the present day.  This widespread and pervasive discrimination has infected the process at both the state and local level.

88.    ***Poll Tax and Voter Purges.***  In 1902, Texas adopted a poll tax that required would-be voters to pay $1.50 in order to vote.  The poll tax remained in effect as to federal

elections until 1964, when the 24th Amendment to the United States Constitution banned the practice.  The poll tax remained in effect as to state elections until 1966, when the practice was held unconstitutional.  *See Veasey*, 71 F. Supp. 3d at 634; *United States v. Texas.*, 252 F. Supp. 234, 255 (W.D. Tex. 1966) (holding poll tax for elections involving only state issues and campaigns unconstitutional as disenfranchising Black voters), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966) (extending the ban on poll taxes to state elections).

89.     In response to having its poll tax declared unconstitutional, Texas amended its constitution to require voters to register annually during a four-month period ending January 31 of each election year.  The law was described as a "direct descendant of the poll tax" and was held unconstitutional.  *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971).

90.     Texas then enacted a "purge law," requiring all voters in the state to reregister. The Department of Justice objected to the law pursuant to section 5 of the Voting Rights Act and the law was enjoined by a three-judge court.  *Veasey*, 71 F. Supp. 3d at 635.

91.     ***All-White Primaries.***  In 1923, Texas enacted a law excluding Black voters from participating in Democratic Party primary elections.  Because of the political dominance of the Democratic Party in Texas at that time, the law excluded Black voters from the only election that mattered, essentially disenfranchising them.  In striking down the law, the Supreme Court of the United States said it would be "hard to imagine a more direct and obvious infringement of the Fourteenth" Amendment.  *Nixon v. Herndon*, 273 U.S. 536, 541 (1927).

92.     The same year that the all-white primary law was struck down, Texas enacted a law allowing political parties to determine voter qualifications for their primaries.  The Democratic Party adopted a rule limiting participation to white citizens.  The Supreme Court

held this practice unconstitutional in 1944.  *Smith v. Allwright*, 321 U.S. 649 (1944); *see also*

*Terry v. Adams*, 345 U.S. 461, 469 (1953) (invalidating scheme in which Texas county adopted

results of all-white primary).

93.     ***Literacy Tests.***  For much of the 20th century, Texas law prohibited providing

assistance to illiterate voters in marking or preparing their ballots.  The practice

disproportionately excluded Mexican-American and Black voters from political participation.

The practice was held to violate the Equal Protection Clause of the Fourteenth Amendment to the

United States Constitution in 1970.  *Garza v. Smith*, 320 F. Supp. 131, 135, 138 (W.D. Tex.

1970), *vacated and remanded on procedural grounds*, 401 U.S. 1006 (1971).

94.     ***Efforts to Disenfranchise Black Students.***  From the ratification of the 26th

Amendment in 1971, which lowered the voting age from 21 to 18, until 2008, Waller County,

Texas enacted restrictive voting rules and threatened students with baseless prosecutions in an

effort to disenfranchise students of the historically Black Prairie View A&M University.  *Veasey*,

71 F. Supp. 3d at 635. In 2004, for example, the Waller County District Attorney threatened to

arrest student voters based upon the false allegation that students could not legally vote using

their university addresses.[25]

95.     ***Racially Discriminatory Districting.***  In every redistricting cycle from 1970 to

2010, Texas adopted racially discriminatory districts meant to disadvantage Black and Mexican-

American voters, in violation of the Voting Rights Act.  *Veasey*, 71 F. Supp. 3d at 636 & n.23

(collecting cases).

---

[25] Terry Kliewer, *Waller County DA apologizes in vote flap*, Hous. Chron., Feb. 25, 2004, at A1,
available at http://www.chron.com/news/houstontexas/article/Waller-County-DA-apologizes-in-
vote-flap-1957246.php.

96.     ***Voting Rights Act Enforcement.*** Beginning in 1975, when Congress expanded

the Voting Rights Act of 1965 (VRA) to cover jurisdictions in which persons speaking Asian,

American Indian, Alaska Native, and Spanish languages made up more than five percent of the

voting age population, but in which less than 50 percent of eligible voters had registered to vote

or voted in the 1972 election, Texas was a covered jurisdiction under the VRA, meaning it was

required to obtain federal approval or preclearance to make changes to any of its voting related

laws and procedures.  Congress found that the expansion was necessary in part to address

Texas's extensive record of restrictive measures geared toward excluding Black and Latino

citizens from the political process.[26]

97.     Even after imposition of the pre-clearance requirements of Section 5 of the VRA,

Texas passed multiple laws that unlawfully burdened Black and Latino voters.[27] Between 1975

and 1982, the Department of Justice lodged more objections to voting changes in Texas than in

any other state.  *Seamon v. Upham*, 536 F. Supp. 931, 989 (E.D. Tex. 1982), vacated on other

grounds, 456 U.S. 37 (1982); *see also Veasey v. Abbott*, 830 F.3d 216, 240 & n.29 (5th Cir.

2016).

98.     Between the 1982 and the 2006 reauthorizations of the VRA, Texas had the

second-highest number of objections interposed by the Department of Justice under Section 5 of

---

[26] Legislative History of the Voting Rights Act Amendments of 1975, P.L. 94-73 at 25-30 (1975).
[27] Nina Perales et al., *Voting Rights in Texas: 1982-2006*, 17 Univ. S. Cal. Rev. L. & Soc. Just.
713, 728-43 (2008) (describing in detail the basis for various objections and denials from voting
procedures to election methods, to redistricting and annexations). The U.S. Department of Justice
objected or denied preclearance to voting changes in Texas under Sections 3 and 5 of the Voting
Rights Act more than 107 times, 23 of which occurred between 1995 and 2013. *See* Nat'l
Comm'n on Voting Rights, State Profiles: Texas at 8-10(hereinafter "NCVR Report"), Voting
Landscape: State-by-State Profiles (votingrightstoday.org) (last visited Sept. 16, 2021).

the VRA, including at least 107 objections, 10 of which were for statewide voting changes.[28]

Between 1982 and 2013, more challenges to discriminatory voting procedures under Section 2 of

the Voting Rights Act were decided or settled in favor of minority plaintiffs in Texas than in any

other state.[29]

99.     In 2013, the Supreme Court in *Shelby County v. Holder* invalidated Section 4 of

the VRA, which set forth the coverage formula provision that determined which jurisdictions

were subject to the VRA's preclearance requirement.  570 U.S. 529 (2013).  Within hours of the

*Shelby County* decision, Texas began to enforce a photo ID law that it passed in 2011 but that

had been denied preclearance under the VRA. The photo ID law was the strictest in the country,

requiring that voters present either a state-issued photo ID or a photo ID from a limited list of

acceptable sources. *See Veasey*, 71 F. Supp. 3d at 642-45. Texas opted to enforce this law,

despite the fact that the U.S. District Court for the District of Columbia had found that the law

would likely have a retrogressive effect on "the position of racial minorities with respect to their

effective exercise of the electoral franchise." *Texas v. Holder*, 888 F. Supp. 2d 113, 115 (D.D.C.

2012), *vacated and remanded in light of Shelby County*, 570 U.S. 928 (2013).  The photo ID law

was later held to violate Section 2 of the Voting Rights Act.  *See Veasey v. Abbott*, 249 F. Supp.

3d 868 (S.D. Tex. 2017).

100.    ***Polling Place Closures.*** At odds with Texas's exploding population growth, in

recent years Texas has closed as many as 50% of all polling places in counties across the state.

---

[28] *Reauthorization of the Voting Rights Act: Policy Perspectives and View from the Field Before the U.S. S. Judiciary Subcomm. on the Const., C.R., and Prop. Rts.*, 109th Cong. 2 (2006) (Statement of Debo Adegbile, Associate Director of Litigation, NAACP Legal Defense and Educational Fund, Inc.), at https://www.naacpldf.org/wp-content/uploads/VRA-Adegbile-Senate-Testimony.pdf.

[29] Between 1995 and 2014, 75 Section 2 cases were decided or settled in favor of minority voter plaintiffs. *See* NCVR Report at 2-6.

Between 2012 and 2018, Texas closed 750 polling locations. It was no accident that the closures were concentrated in counties experiencing rapid Black and Latino population growth: "the 50 counties that gained the most Black and Latinx residents between 2012 and 2018 closed 542 polling sites, compared to just 34 closures in the 50 counties that have gained the fewest black and Latinx residents. This is despite the fact that the population in the former group of counties has risen by 2.5 million people, whereas in the latter category the total population has fallen by over 13,000."[30] Closures resulted in a near doubling of the average number of eligible voters served by each polling place.[31] With the majority of closures affecting Black and Latino neighborhoods,[32] compared to white voters, voters of color in Texas must travel much longer distances and endure significantly longer wait times to vote.

101.    Polling place closure, particularly in majority Black or Latino counties, continued past 2018, resulting in fewer polling places even as the state's population increases—and even as voters demonstrated an increasing interest in voting.

102.    Incidents of voter intimidation by police officers and election officials, abrupt closure, or relocation of early voting locations in precincts of predominantly voters of color

---

[30] Richard Salame, *Texas closes hundreds of polling sites, making it harder for minorities to vote*, The Guardian (Mar. 2, 2020, 6:00 AM), https://www.theguardian.com/us-news/2020/mar/02/texas-polling-sites-closures-voting.

[31] Texas had one polling place per 4,000 voters in 2012 as compared with one per 7,700 voters in 2018. *See* Univ. of Texas at Austin, Notley Scholars Voting Rights Project, an Exploration of Voting Rights in Travis County, *Modern Day Voter Suppression* (utexas.edu) (last visited Sept. 16, 2021).

[32] *See id.*; *see also* Benjamin Wermund, *Texas Has Closed More Polling Places Than Any Other State, Report Shows*, Houston Chronicle (Sept. 10, 2019), https://www.houstonchronicle.com/politics/texas/article/Texas-has-closed-more-polling-places-than-any-14429443.php.

immediately before an election,[33] and understaffing of polling locations in predominantly non-white precincts further evidence relentless efforts to disenfranchise voters of color in Texas.[34]

103.    As recently as 2016, Texas was required to rewrite its voter identification law because it was found to unlawfully burden voters of color, in violation of the Voting Rights Act.[35]

104.    ***Spanish Language Access.*** Latino voters also are subject to distinct forms of discrimination and voter suppression. Texas jurisdictions have repeatedly failed to make Spanish language voting materials available to Latino voters, flouting compliance with Section 203 of the Voting Rights Act. More than 10 cases brought under Section 203 of the Voting Rights Act in Texas have been resolved in favor of Latino voter plaintiffs since 2000.[36]

105.    ***Voter Purges.*** In early 2019, after historic turnout among Latino voters in Texas in the 2018 midterm election,[37] the Texas Secretary of State issued Election Advisory No. 2019-02, which threatened to purge approximately 98,000 voters from the voter rolls on the basis that they might not be U.S. citizens.  The Advisory was based on outdated information, was

---

[33] United States Comm'n on Civil Rights, Texas Advisory Comm., VOTING RIGHTS IN TEXAS, AN ADVISORY MEMORANDUM at 9-11 (July 2018) (describing voter intimidation, discriminatory impact of polling place relocations, and adverse impact of closing polling locations on voters of color during 2016 election); *accord* Perales, *supra* note 2 at 741-43.

[34] Perales, *supra* note 2, at 748 (citing Election Protection Comm'n, SHATTERING THE MYTH:  AN INITIAL SNAPSHOT OF VOTER DISENFRANCHISEMENT IN THE 2004 ELECTIONS (2004)).

[35] *Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016).

[36] *See* NCVR Report at 7.

[37] Suzanne Gamboa & Nicole Acevedo, *Youth, Latino mobilization paid off in the midterms. Now groups gear up for 2020.*, NBC News (Nov. 12, 2018, 3:30 PM), https://www.nbcnews.com/news/latino/youth-latino-mobilization-paid-midterms-now-groups-gear-2020-n934516.

113288597.2 0099831-00001

inaccurate as to the vast majority of individuals it proposed to purge, and was enjoined by a federal court.[38]  *See Texas LULAC v. Whitley*, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019).

106.    This effort to target and disenfranchise newly naturalized citizens disproportionately impacted individuals of Mexican origin, who make up a large share of newly naturalized U.S. citizens who reside in Texas.[39]

107.    In concert with this effort to purge the voter rolls, Attorney General Paxton falsely claimed that there was widespread voter fraud perpetrated by non-citizen residents of Texas in the 2018 midterms.  On January 25, 2019, Paxton tweeted: "VOTER FRAUD ALERT: The @TXsecofstate discovered approx 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in TX, approx 58,000 of whom have voted in TX elections.  Any illegal vote deprives Americans of their voice."[40] Governor Abbott praised Paxton for "uncovering and investigating" this illegal voter registration. In reality, only 80 of the 98,000 voters on the purge list were ineligible to vote. *See Texas LULAC v. Whitley*, 2019 WL 7938511 at *1. Texas officials later admit that the vast majority of voters on the purge list all naturalized U.S. citizens.[41]

---

[38] Settlement Agreement, *Tex. League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-FB, (W.D. Tex.), at https://static.texastribune.org/media/files/411cff760b0b2b79a159b2390ef3f939/Voter_rolls_settlement_agreement.pdf?_ga=2.52669679.637990502.1618250800-1075633374.1617978724.

[39] Letter from Mark P. Gaber, Director, Trial Litigation, Campaign Legal Center, and Danielle M. Lang, Co-Director, Voting Rights and Redistricting, Campaign Legal Center to David Whitley, Secretary of State (Feb. 1, 2019), https://campaignlegal.org/sites/default/files/2019-02/D.%20Whitley%202.1.19.pdf.

[40] Alexa Ura, *"Someone did not do their due diligence": How an attempt to review Texas' voter rolls turned into a debacle*, Texas Tribune (Feb. 1, 2019, 10:00 AM), https://www.texastribune.org/2019/02/01/texas-citizenship-voter-roll-review-how-it-turned-boondoggle/.

[41] *See* Texas Secretary of State, Election Advisory No. 2019-02; Settlement Agreement, *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB  (W.D. Tex., case filed

108.     Throughout its history of racially discriminatory voting practices, Texas has often relied on the purported justification that its exclusionary measures are necessary to combat voter fraud, creating a "clear and disturbing pattern of discrimination in the name of combatting voter fraud in Texas." *Veasey*, 71 F. Supp. 3d at 636 & n.24.

109.     SB 1 boldly builds on and extends Texas's long legacy of impeding, burdening, and discriminating against voters of color.

## II.   THE EXTENT TO WHICH BLACK AND LATINO VOTERS BEAR THE EFFECTS OF DISCRIMINATION IN EDUCATION, EMPLOYMENT, AND HEALTH

110.     Texas's history of racial discrimination transcends the political process and infects all aspects of public and private life for Black and Latino voters in the state. As a federal court recently found, Texan "African–Americans and Latinos are less educated because of discrimination, suffer poorer health because of discrimination, are less successful in employment because of discrimination, and are likewise impoverished in greater numbers because of discrimination." *Veasey*, 71 F. Supp. 3d at 667.

111.     Beginning with the 1876 Texas Constitution, which explicitly required separate schools for Black and white students, and continuing through much of the 20th century, Texas law mandated a segregated school system.[42]  Even after the Supreme Court held that segregated schools were unlawful, Texas continued to maintain a system of segregation in education. In 1970, a federal court found that Texas had failed to comply with the mandate of *Brown v. Board*

---

Jan. 20, 2019), https://campaignlegal.org/sites/default/files/2019-04/Agrmt%20all%20signatures.pdf; *see also*, National Public Radio, *Texas Officials Begin Walking Back Allegations About Noncitizen Voters* (Jan. 30, 2019), https://www.cpr.org/2019/01/30/texas-officials-begin-walking-back-allegations-about-noncitizen-voters/.

[42] Nina Perales, Luis Figueroa, and Criselda G. Rivas, *Voting Rights in Texas 1982-2006*, at 10-13 (June 2006) http://www.maldef.org/wp-content/uploads/2019/01/texasvra.pdf.

*of Education*, 347 U.S. 483 (1954), by its continued maintenance of nine all-black school

districts with "inferior educational facilities and personnel."[43] *United States v. Texas*, 321 F.

Supp. 1043, 1048 (E.D. Tex. 1970). The court placed the entire state under a desegregation

order. Today, twenty-nine districts remain under open desegregation orders. Educational

achievement gaps continue to plague Texas, attributable at least in part to continued

discriminatory treatment of Black and Latino students in public education. *See Veasey*, 71 F.

Supp. 3d at 666. In 2017-2018, Texas's high school graduation rate was 94% among white

Texans, but only 87% among Black Texans.[44]

112.    Black and Latino people in Texas are "substantially more likely than Anglos to

live in poverty throughout Texas because they continue to bear the socioeconomic effects caused

by decades of discrimination." *Veasey*, 71 F. Supp. 3d at 665. The poverty rate among white

Texans is 7.9%, while the rate for Black and Latino Texans is 18.4% and 18.7%, respectively.[45]

113.    "The harmful effects of discrimination can also be seen in the field of health."

*Veasey*, 71 F. Supp. 3d at 666.[46] The global COVID-19 pandemic has very recently laid bare the

---

[43]Yue Qiu and Nikole Hannah-Jones, *A National Survey of School Desegregation Orders*, ProPublica (Dec. 23, 2014), https://projects.propublica.org/graphics/desegregation-orders.
[44] National Center for Education Statistics, Public High School Graduation Rates (updated May 2021), https://nces.ed.gov/programs/coe/indicator_coi.asp.
[45] KFF, Poverty Rate By Race/Ethnicity (2019), https://www.kff.org/other/state-indicator/poverty-rate-by-raceethnicity/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[46] KFF, Adults Who Report Fair or Poor Health Status by Race/Ethnicity (2019), https://www.kff.org/other/state-indicator/percent-of-adults-reporting-fair-or-poor-health-status-by-raceethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22texas%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D; KFF, Uninsured Rates for the Nonelderly by Race/Ethnicity, https://www.kff.org/uninsured/state-indicator/nonelderly-uninsured-rate-by-raceethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22texas%22:%7

113288597.2 0099831-00001

unequal access to healthcare and the disparate health outcomes that Black and Latino Texans face—and the enhanced danger that a pandemic poses to Black and Latino Texans.  Less than two years before the COVID-19 pandemic hit Texas, Texas's Office of Minority Health Statistics and Engagement, which focused on disparities in health care, closed after being defunded by the legislature.[47] Between March and October of 2020, Latino and Black Texans had the highest COVID-19 death rates per 100,000.  Latino Texans were hit particularly hard, comprising 40%[48] of the state's population, but 58% of COVID-19 deaths during that period.  Life-saving COVID-19 vaccines are less available to Black and Latino Texans, who live farther away from vaccine providers like hospitals and pharmacies.[49]  According to state data, white Texans are receiving the COVID-19 vaccine at twice the rate of Latino Texans and six times the rate of Black Texans.[50]  When Dallas County tried to rectify this disparity and prioritize vaccine allocation to people of color, the state threatened to withhold vaccines from the County.[51]

114.    The effect of this historic discrimination is to hinder Black and Latino Texans' ability to participate in the political process, which will only be exacerbated by the proposed

---

B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

[47] Erin Cargile, *Lawmakers defunded an office that could be helping Texas minorities in the fight against COVID-19*, KXAN (Nov. 18, 2020), https://www.kxan.com/investigations/lawmakers-defunded-an-office-that-could-be-helping-texas-minorities-in-the-fight-against-covid-19/.

[48] Texas Health and Human Services Commission, *Impact of COVID-19 on Vulnerable Populations in Texas*, at 25 (Jan. 2021), https://hhs.texas.gov/sites/default/files/documents/services/health/coronavirus-covid-19/impact-covid-19-vulnerable-populations-texas.pdf.

[49] Marisa Martinez and Sami Sparber, *As Texas expands COVID-19 vaccination eligibility, racial disparities persist among Black, Hispanic residents*, Texas Tribune (Mar. 19, 2021), https://www.texastribune.org/2021/03/19/texas-vaccine-race-disparities/.

[50] *Id*.

[51] Emma Platoff and Juan Pablo Garnham, *Dallas County axes plan to prioritize vaccinating communities of color after state threatens to slash allocation*, Texas Tribune (Jan. 20, 2021), https://www.texastribune.org/2021/01/20/dallas-vaccine-plan-communities-of-color/.

voting changes in SB 1. Black and Latino Texans are more likely to have inflexible job schedules,[52] lack adequate childcare, lack access to transportation,[53] and have disproportionate health outcomes, meaning that they disproportionately suffer from longer lines at the polls and reduced opportunities to vote outside of normal business hours. Disproportionate poverty rates also mean that Black and Latino Texans are less likely to have ready access to the tools required—i.e., computers and printers—to download and submit applications for mail-in ballots.

## III.    **RACIALLY POLARIZED VOTING IN TEXAS**

115.    Following the last round of redistricting, during litigation in 2014, the state of Texas admitted there was racially polarized voting in 252 of 254 counties in the state. *Veasey*, 71 F. Supp. 3d at 637-38 ("Racially polarized voting exists when the race or ethnicity of a voter correlates with the voter's candidate preference."). The U.S. Supreme Court has likewise confirmed the presence of racially polarized voting in Texas on multiple occasions throughout the last decade. *See id*.

116.    According to the American Community Survey's 2019 5-Year Estimates, the state of Texas is currently 42.1% white, 11.8% Black and 39.3% Latino.

117.    Racially polarized voting in Texas continues to exist today. The presence of racially polarized voting is also relevant to this court's analysis of the known impact of SB 1, which seeks to curb voter participation in counties where a majority of the voters voted for the Democratic candidate for office and whose populations were disproportionately Black and Latino.

---

[52] *See*, *e.g.*, *Veasey*, 71 F. Supp. 3d at 664 (lower income Texans are less likely to have access to paid leave).
[53] *Id.* at 665 (Black and Latino Texans significantly more likely to lack vehicles for their own transportation); *see also* City of San Antonio, *Status of Poverty in San Antonio*, *https://www.sanantonio.gov/Portals/0/Files/HumanServices/FaithBased/2019PovertyReport.pdf* at 24 (noting same trend within San Antonio).

## IV.    <u>TEXAS DENIES VOTERS WITH DISABILITIES EQUAL ACCESS TO VOTING</u>

118.    Voters with disabilities, including Black and Latino voters with disabilities, have also persistently experienced barriers in accessing their right to vote in Texas.[54] Barriers include Governor Abbott's proclamation in 2020 (during the COVID-19 pandemic) ordering counties to limit ballot drop-off locations to one per county, disproportionately impacting voters with disabilities who already faced significant obstacles to voting and are particularly vulnerable to COVID-19.[55]   Other common problems for voters with disabilities include accessing curbside voting, barriers in reading or seeing the ballot, requiring assistance in filling out the ballot, understanding how to vote or use the voting equipment, long lines at polling places, and finding or getting to the polling place.[56] The inaccessibility of county election websites also imposes barriers on the ability of voters with disabilities to access their fundamental right to vote.[57] A 2020 report on the turnout of voters with disabilities notes that voter turnout among disabled voters in Texas was 59.4% versus 64.5% of voters without disabilities.[58]

---

[54] Maggie Astor, *G.O.P Bills Rattle Disabled Voters: 'We Don't Have a Voice Anymore,'* the New York Times (June 14, 2021), https://www.nytimes.com/2021/06/14/us/politics/disability-voting-rights.html; Alexa Ura, *Texans with disabilities fear voting will get harder for them as special session on GOP restrictions nears*, the Texas Tribune (July 5, 2021) https://www.texastribune.org/2021/07/05/texas-voting-disability/; Trinady Joslin, *For nearly 3 million disabled Texans, voting this year is even harder*, the Texas Tribune, (Oct. 30, 2020) https://www.texastribune.org/2020/10/30/texas-voting-disability/.

[55] Trinady Joslin, *For nearly 3 million disabled Texans, voting this year is even harder*, the Texas Tribune, (Oct. 30, 2020) https://www.texastribune.org/2020/10/30/texas-voting-disability/.

[56] *Id.*; Lisa Schur, Meera Adya, and Mason Ameri, *Accessible Democracy: Reducing Voting Obstacles for People with Disabilities*, 14 Election L. J. 1, 3-4 (2015); Wajiha Rizvi, *Curbside Voting and Disability Access in the 2020 General Election*, Texas Civil Rights Project (Jan. 2021) https://txcivilrights.org/wp-content/uploads/2021/01/Curbside-Voting-Report.pdf.

[57] *U.S. Department of Justice, Civil Right Division ADA Title II Complaint*, Disability Rights Texas and REV UP (Sept. 3, 2020) https://media.disabilityrightstx.org/wp-content/uploads/2020/09/08211016/20200903-DRTx-DOJ-Complaint-Inaccessible-County-Election-Websites.pdf.

[58] Lisa Schur and Douglas Kruse, *Fact Sheet: Disability and Voter Turnout in the 2020 Elections*, Election Assistance Commission (last visited Sept. 1, 2021)

119.     In 2020, about one in nine voters with disabilities nationally encountered difficulties voting. This is double the rate of people without disabilities. Nationwide, people with disabilities voted at a 7% lower rate than people without disabilities of the same age.[59] It is well established that "[c]itizens with disabilities are less likely to vote than their non-disabled peers, and are more likely to experience difficulties when they do vote."[60] For many voters with disabilities, these barriers are not just significant and burdensome, but discriminatory, denying equal access to the electoral process.

## V.     THE 2020 ELECTIONS IN TEXAS

120.     Before SB 1, voting in Texas was already harder than in other states. According to a "cost of voting index" study by political scientists at Northern Illinois University and Jacksonville University, it is harder to vote in Texas than in any other state. At the time of the study, prior to the 2020 election, Texas also had one of the lowest voter turnout rates.[61]

121.     In 2020, voter turnout rates surpassed recent records due in large part to counties that took proactive steps to make voting safe and accessible to all voters. In response to the 2020 record participation and voter access success, the Texas Legislature again enacted barriers making it harder to vote. The SB 1 prohibitions sweepingly cancel the very measures that successfully served voters of color in recent elections.

---

https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact
Sheet_Disability_Voter_Turnout_2020.pdf.
[59] Lisa Schur and Douglas Kruse, *Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results Submitted to the Election Assistance Commission*, Election Assistance Commission (Feb. 16, 2021)
https://www.eac.gov/sites/default/files/voters/Disability_and_voting_accessibility_in_the_2020_
elections_final_report_on_survey_results.pdf.
[60] Schur, *supra*, note 45, at 1.
[61] *See* Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state*, TEX. TRIBUNE, Oct. 19, 2020, https://www.texastribune.org/2020/10/19/texas-voting-elections/.

113288597.2 0099831-00001

122.    The 2020 presidential election was safe and secure, and registered Texas voters overwhelmingly chose to participate.  Indeed, on November 12, 2020, the Elections Infrastructure Government Coordinating Council and Election Infrastructure Sector Coordinating Executive Committees of the Cybersecurity and Infrastructure Security Agency released a joint statement that the "November 3rd election was the most secure in American history."[62] Further, on November 30, 2020, former Texas Secretary of State Ruth Hughs issued a statement that "[d]espite the challenges presented by COVID-19, this election was a resounding success, and turnout among registered voters was the highest in 28 years as Texans exercised their right to vote."

123.    But Texas's 2020 primary election in March was characterized by extremely long lines at the polls and limited voting machines, disenfranchising countless voters who simply could not wait, particularly amid the onset of the deadly COVID-19 pandemic.[63] Voters across Harris County in particular experienced hours long waits to vote. *See supra* ¶ 7.

124.    And across Texas, primary voters faced slowdowns and lines at the polls resulting from a shortage of voting machines and faulty ballot printers; in at least one instance, a voting site was shut down temporarily as a result of technical issues with voting equipment.  The Secretary of State's elections portal, where voters can look up their registrations, also went down on the morning of the primary as a result of heavy traffic.

---

[62] Cybersecurity & Infrastructure Sec. Agency, Joint Statement from Elections Infrastructure Government Coordinating Council and Election Infrastructure Sector Coordinating Executive Committees (2020).
[63] Alexa Ura, *Texas Lawmakers to Hold Hearing Into Excessive Super Tuesday Voting Lines*, The Texas Tribune (Mar. 5, 2020), https://www.texastribune.org/2020/03/05/texas-lawmakers-excessive-voting-lines-primary/.

- 49 -

125.    State lawmakers were well aware of these issues.  The Mexican American Legislative Caucus, the Texas Legislative Black Caucus and the Texas Legislative Study Group, a nonpartisan caucus, held a joint meeting to speak directly with election officials, experts, and voters who were affected by long lines and other issues at the polls in March of 2020.[64]  The issue was also widely publicized in Texas newspapers and public media.

126.    In response, the Harris County Clerk and the election administrator of the county, Chris Hollins, tripled the number of early voting sites, expanded the sites' hours, offered 24-hour early voting, and allowed voters to vote safely from their vehicle using what was called drive-thru voting.

127.    Texas offers early voting by personal appearance and by mail.  Early voting by personal appearance is available to any qualified voter. Tex. Election Code § 82.005.  Prior to SB 1, Texas law required a minimum of twelve hours of early voting during the early voting period. Tex. Election Code § 85.005.  Thus, Texas law clearly allowed 24-hour voting. As a result, during the 2020 presidential election, Hollins offered eight 24-hour polling places in and around Houston.

128.    Prior to SB 1, drive thru voting was permissible but had not previously been used in the state.

129.    On June 15, 2020, Harris County Clerk Chris Hollins announced the S.A.F.E. Elections Plan, a set of 23 initiatives to ensure that the July and November 2020 elections were safe, secure, accessible, fair, and efficient. The framework was created not only to respond to the challenges of administering elections amid the COVID-19 pandemic, but also to ensure voting

---

[64] Alexa Ura, *Texas Lawmakers to Hold Hearing Into Excessive Super Tuesday Voting Lines*, The Texas Tribune (Mar. 5, 2020), https://www.texastribune.org/2020/03/05/texas-lawmakers-excessive-voting-lines-primary/.

113288597.2 0099831-00001

was convenient, fair, safe, and more accessible to Harris County voters more broadly. Mr. Hollins' decision to implement the S.A.F.E. Plan was also informed by Harris County's experience during previous elections like the March 2020 presidential primary, when Harris County made national news because of severely long wait times at polling locations across the county.

130.    The S.A.F.E. Plan aimed to make voting more accessible in Harris County by using data to increase the number and optimize the locations of polling sites, procure sufficient additional machines from other jurisdictions and provide them with technical support, allocate voting machines across polling sites based on known traffic patterns and expected turnout, accurately report wait times across the County during the early voting period and on Election Day, and provide increased voting hours during the early voting period.

131.    The Harris County Clerk's Office used this data analysis to determine the number and placement of voting machines in Harris County thereby ensuring shorter lines at polling places across the county in the 2020 general election.  Among other increases in safety, awareness, and convenience, this reduced wait times at the polls and increased voter participation in Harris County in the November 2020 presidential election.

132.    The Harris County S.A.F.E. Plan also aimed to make voting more accessible in Harris County by ensuring the accessibility required by the Americans with Disabilities Act across county polling sites, by improving curbside voting, and by introducing drive-thru voting.

133.    Harris County Clerk Chris Hollins worked to implement drive-thru voting in Harris County because drive-thru voting creates a safe and convenient way for voters to cast a ballot, especially during the COVID-19 pandemic. Drive-thru voting is more convenient for many voters than waiting in line at a traditional walk-in polling place, and it is safer and more

secure than traditional in-person voting. People can vote with their children in the car and

without being forced to bring themselves or their kids into a heavily populated polling place.

Moreover, voters do not have to stand up while waiting in line, which is important for voters

with disabilities and elderly voters, and importantly in Houston, voters can wait in line to vote in

an air-conditioned vehicle.

134.    As implemented in Harris County, drive-thru voting included all the traditional

safety and security protocols of walk-in voting.  Indeed, drive-thru voting in Harris County

entailed even more security features than walk-in voting because there was one election worker

assigned to monitor each drive-thru voting machine (*e.g.*, each car and voter), whereas in a

traditional polling place, a few election officials monitor dozens of voting machines.

135.    During the November 2020 presidential election, as part of the S.A.F.E. Plan,

Harris County offered voting mega centers at Toyota Center, NRG Arena, BBVA Stadium, and

Rice Stadium, among others. These centers were convenient because they allowed dozens of

voters to cast their ballots simultaneously in a socially distanced manner.

136.    During the November 2020 presidential election, as part of the S.A.F.E. Plan,

Harris County offered eight 24-hour voting locations during the early voting period.  24-hour

early voting was especially important to shift workers and first responders, who often do not

maintain "traditional" working or waking hours.

137.    Another part of Harris County's S.A.F.E. Plan involved helping eligible voters

understand and avail themselves of alternative, safe voting methods.  Because one of the reasons

under Texas law for allowing a voter to vote by mail is that the voter is over 65 years old, the

Harris County Clerk sent two rounds of vote-by-mail applications to all registered voters in the

county over the age of 65 and who resided in the county who had not already applied to vote by mail in June and August of 2020, respectively.

138.     In July 2020, the Harris County Clerk announced he intended to send vote-by-mail applications to all registered voters in Harris County.  The package that was mailed to voters contained detailed instructions regarding the limited voter eligibility categories that entitle a voter to vote by mail under Texas law. It also contained a personalized vote-by-mail application so that eligible voters could readily apply.

139.     The Harris County Clerk determined that sending a vote-by-mail application to all registered voters in the County was important as part of the S.A.F.E. Plan because many voters qualified for a mail ballot under Texas law, it was undoubtedly the safest way to vote during the pandemic, and many voters simply did not know they were eligible.  Voters qualify as disabled if they are sick, pregnant, or if voting in person will create a likelihood of injury to the voter's health.  A voter's lack of immunity to COVID-19 could be considered along with other health factors to inform the voter's own determination of eligibility. Because most voters in Harris County had no idea that they might qualify to vote by mail as a result of this provision of the law, the Harris County Clerk determined it was critical to provide voters with the education on their potential eligibility and ready access to the application.

## VI.     SB 1 IS MOTIVATED BY A DISCRIMINATORY PURPOSE

140.     SB 1 was enacted with the purpose of denying or abridging the right of Black and Latino Texans to vote on account of race or color.

- 53 -

141.    In spite of the success of the 2020 general election in Texas, and even though state officials found no irregularities or fraud in that election,[65] the Texas legislature devoted much of its attention to changing the election laws during the 2021 legislative session and two special sessions called during 2021.

142.    During floor debates, legislators made clear that concerns about "fraud" were pretextual, and that concerns about a voter's race was paramount in legislators' minds. During the Texas House debate on the legislation, when House members raised concern about the impacts of the bill on voters of color, House Speaker Dade Phelan specifically cautioned members not to use the word "racism" while debating the legislation.

143.    During the regular 2021 legislative session, predecessor bills to SB 1—SB 7 and a companion bill, House Bill 6 ("HB 6")—were presented to the elections committees in the Texas House of Representatives and the Texas Senate,[66] according to sponsor Senator Bryan Hughes, for "Texans [to] feel confident that their elections are fair, honest, and open."[67]

144.    The House Election Committee was scheduled to hear HB 6 for the first time on March 25, 2021.  The Texas Senate State Affairs Committee held the first hearing on SB 7 on March 26, 2021.  Neither the House Elections Committee nor the Senate State Affairs Committee allowed virtual testimony from the general public, forcing Texans who wanted to

---

[65] *See* Alison Durkee, *Texas Senate Passes GOP-Led Bill that Restricts Voting*, Forbes, (Apr. 1, 2021), https://www.forbes.com/sites/alisondurkee/2021/04/01/texas-senate-passes-gop-led-bill-that-restricts-voting/?sh=48e87c9f3e18.

[66] The committee charged with first review of elections related legislation is the House Elections Committee in the Texas House of Representatives. In the Texas Senate, it is the State Affairs Committee that has first review of elections legislation.

[67] Alexa Ura, *Texas Senate advances bill limiting how and when voters can cast ballots, receive mail-in voting applications*, The Texas Tribune, (Apr. 1, 2021), https://www.texastribune.org/2021/04/01/texas-voting-restrictions-legislature/.

testify in support or opposition to these bills to appear in person at the state capitol, despite the ongoing COVID-19 pandemic.

145.    As originally drafted, HB 6's stated purpose was "to exercise the legislature's constitutional authority under Section 4, Article VI, Texas Constitution, to make all laws necessary to detect and punish fraud and preserve the purity of the ballot box."

146.    On March 25, 2021, the NAACP Legal Defense Fund ("LDF") (counsel of record in this action) submitted testimony in opposition to HB 6. In that testimony, LDF discussed the racist origins of the phrase, "preserve the purity of the ballot box."[68]

147.    That phrase first appeared in Article 6, Section 4 of the Texas Constitution, which was added in 1876 and was responsive to calls by white legislators in the State to ensure the "purity of the Anglo-Saxon race" by, among other tactics, disenfranchising Black Texans.[69] The same year the Texas Constitution was amended to require the Legislature to "preserve the purity of the ballot box," over two dozen Black Texans were lynched.[70]

148.    On May 7, 2021, when the author of HB 6, House Elections Committee Chairman Briscoe Cain, was confronted by fellow Representative Rafael Anchia regarding the phrase's racist history, the Chairman claimed he was not aware of the phrase's meaning or history.[71]

149.    As further explained in LDF's testimony, preventing voter fraud has long been used in Texas as a pretext to justify restrictive voting measures and has deep ties to Texas's

---

[68]     NAACP LDF, *LDF Opposition to House Bill 6* (Mar. 25, 2021), https://www.naacpldf.org/wp-content/uploads/20210324_LDF-Opposition-TX-H.B.-6-v02.pdf.
[69] *Id*. at 4.
[70] *Id*.

[71] Dave Montgomery & Nick Corasaniti, *Exchange Over 'Purity' of Vote Puts Texas G.O.P. Firebrand in Spotlight*, N.Y. Times (May 12, 2021), https://www.nytimes.com/2021/05/12/us/politics/briscoe-cain-texas-voting-laws.html.

history of racially motivated voter suppression, including (1) all-White primaries; (2) poll taxes; and (3) re-registration and voter purges.[72]

150.    HB 6 was characterized by numerous departures from the ordinary legislative process in Texas as well. Shortly after the initial hearing on HB 6 began on March 25, members of the House Elections Committee questioned Chairman Cain about his bill, Chairman Cain cut off the chair of the House Criminal Jurisprudence Committee, Nicole Collier, when she attempted to raise questions about HB 6's likely impact on Black voters, refusing to recognize her because she was not a member of the Committee.  However, it is common practice for legislators who are not members of a committee to sit in on and participate in hearings for committees.[73]

151.    Representative Collier posed several questions to Chairman Cain, including whether the Chairman asked the Department of Justice or NAACP whether the bill would violate voter's rights on account of race, color, or language.[74]  Cutting off Representative Collier, Chairman Cain stated that the Committee needed to recess, but failed to specify a time certain for the Committee to readjourn, a procedure required in the House.[75]

152.    Upon returning from lunch, Chairman Cain used the excuse of his own procedural error—having called for a recess without specifying the time when the committee would return from that recess—to claim he was being forced to end the hearing before any public testimony

---

[72] *Id.*

[73] *See* Drew Knight, *Texas activist groups slam SB 7 and HB 6 as 'voter suppression' bills*, CBS8 (April 5, 2021) https://www.cbs8.com/article/news/politics/texas-activist-groups-slam-sb-7-and-hb-6-as-voter-suppression-bills/269-848e65d3-2575-44a0-93e5-b40860c9bba1.

[74] April 1 Hearing on HB 6, Part 1, at 1:06.55-1:22.51, https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=20025.

[75] Acacia Coronado, *Bungled Hearing Delays GOP Voting Restriction Bill in Texas*, AP News (March 25, 2021), https://apnews.com/article/donald-trump-texas-house-elections-voting-government-and-politics-d13bb0a173528ab7417f737718447a12.

could be heard.[76]  Almost 200 people from across the State were registered to testify at the

hearing and present at the Texas State Capitol that day, including former Secretary of State

Hughs, Attorney General Paxton, and former Congressman Beto O'Rourke.[77]

      153.    The hearing on HB 6 was rescheduled for April 1, 2021, when the House

Elections Committee conducted a twenty-two-hour hearing during which hundreds testified,

continuing through the night, before adjourning at 6:00 the morning of April 2, 2021.[78]

      154.    The majority of public testimony was in opposition of HB 6.  Among those who

testified in opposition was Harris County Elections Administrator Isabel Longoria.  Ms.

Longoria explained that, among other things, HB 6's restrictions on the provision of mail-in

ballot applications and elimination of the majority of mail-in ballot drop-off locations would

discriminatorily impact Black and Latino voters, as these methods were predominantly used by

voters of color in the 2020 election.  Ms. Longoria emphasized that nothing in HB 6 protected

the integrity of elections or would make voting more accessible or more secure.

      155.    Lauren Sullivan, Young County Elections Administrator, also testified, urging the

House Committee to reconsider HB 6.  Ms. Sullivan reminded the Committee that legislation

targeted at large, urban counties makes conditions more difficult for voters in rural counties as

well due to lack of funding and other resources.

---

[76] *Id.*

[77] Reform Austin Staff, *Cain Prematurely Ends HB 6 Hearing, Blocks Collier from Asking Questions*, RA News (Mar. 25, 2021), https://www.reformaustin.org/elections/cain-prematurely-ends-hb-6-hearing-blocks-collier-from-asking-questions/; Acacia Coronado, *Bungled hearing delays GOP voting restriction bill in Texas*, AP News (Mar. 25, 2021), https://apnews.com/article/donald-trump-texas-house-elections-voting-government-and-politics-d13bb0a173528ab7417f737718447a12.

[78] Nicholas Reimann, *Texas Moving Forward with Voter Restriction Bill After 22-Hour Hearing—Over 350 Similar Bills Filed Across U.S.*, Forbes, (Apr. 2, 2021) https://www.forbes.com/sites/nicholasreimann/2021/04/02/texas-moving-forward-with-voter-restriction-bill-after-22-hour-hearing-over-350-similar-bills-filed-across-us/?sh=4fb551562a36.

156.    David Stout, El Paso County Commissioner for Precinct 2, testified in opposition to the bill, stating that El Paso County in the 2020 election had the highest voter turnout ever at 55%. El Paso County is 82.9% Latino.[79]  Mr. Stout attributed this increase to the voting measures the county implemented to increase voter turnout, including sending mail-in ballot applications to voters over age 65, extending hours at polling locations, and implementing curbside and drive-thru voting.

157.    Linda Jann Lewis, a volunteer for a Texas voter protection hotline, testified to numerous phone calls she has received at the hotline from poll workers who will not work the next election if HB 6 passes for fear of prosecution if a mistake is made.

158.    On April 8, 2021, the House Elections Committee advanced HB 6 to the House Calendars Committee to be scheduled for a full Texas House vote, but no more movement occurred on the bill until April 29, when the text of HB 6 was substituted for the text of SB 7 during the House Elections Committee hearing on SB 7.

159.    SB 7 was similarly characterized by procedural irregularities from its introduction.  On March 26, 2021, public testimony was heard on SB 7 in the Senate State Affairs Committee.  Ms. Longoria also testified in front of the Senate Committee and explained how SB 7 would discriminatorily impact voting, voter registration, and voters in Harris County through (1) forbidding local elections officers from educating their constituents about mail-in ballots, (2) prohibiting voting options such as drive-thru centers – an option specifically requested by Harris County constituents, and (3) by limiting hours for early voting and prohibiting twenty-four hour voting centers.

---

[79]U.S. Dep't of Com., U.S. Census Bureau (2019),
https://www.census.gov/quickfacts/elpasocountytexas.

160.    After several more hours of public testimony overwhelmingly in opposition to SB 7, the bill passed out of the Senate State Affairs Committee and advanced to the full Texas Senate.

161.    During the Texas Senate's debate on SB 7, on March 30, 2021, senators from across the state, but particularly from urban counties, expressed concern and opposition to the bill, questioning Senator Hughes, the bill's author, about specific provisions of SB 7 which would disproportionately impact large, urban counties and Black and Latino voters. For example, Senator Carol Alvarado representing District 6, which encompasses parts of Houston, noted that the bill appeared to target Harris County, and would disproportionately impact Black and Latino voters, as 56% of the Harris County voters who took advantage of extended voting hours and 53% of Harris County voters who used drive-thru voting centers were Black, Latino, and other voters of color. Senator Alvarado also expressed concerns that representatives of larger, urban counties like Harris County were not consulted in drafting the legislation.

162.    Senator Borris Miles, representing Harris County District 13, expressed his opposition to the bill because it was grounded on baseless claims of election fraud.  He cited a 2020 *Houston Chronicle* article noting the Texas Attorney General prosecuted only sixteen people for voter fraud due to incorrect addresses on voter registration forms, none of which resulted in jail time.[80] Senator Miles further stated that according to another 2021 *Houston Chronicle* article citing an analysis by the American Civil Liberties Union, 72% of all voter fraud prosecutions brought by Texas Attorney General Paxton since he took office in 2015 were

---

[80] Taylor Goldenstein & Austin Bureau, *Ken Paxton's beefed-up 2020 voter fraud unit closed 16 minor cases, all in Harris County*, Houston Chronicle (Dec. 27, 2020), https://www.houstonchronicle.com/politics/texas/article/politics/texas/article/Ken-Paxton-s-beefed-up-2020-voter-fraud-unit-15820210.php.

- 59 -

against Black and Latino voters,[81] arguing that SB 7 "is a clear case of suppression." This same *Houston Chronicle* article as cited by Senator Miles also reported that 86% of the voter fraud prosecutions involved offenses that allegedly occurred in majority non-white and Latino counties and only four of the ninety-three total prosecutions were against white defendants.[82]

163.   The Texas Senate passed SB 7 early in the morning of April 1, 2021 after a seven-hour, overnight debate.  From the Senate, SB 7 moved to the House.

164.   On April 29, 2021, the House Elections Committee approved a committee substitute for SB 7 that replaced the text of SB 7, in its entirety, with the text of HB 6. Chairman Cain called SB 7 right before the committee had to recess for a floor session, even though the bill was not on that meeting's agenda and even though committee members were unsure of the bill's contents. The bill eventually was voted on and approved by the committee later that day, after the committee reconvened.

165.   SB 7 was scheduled to be heard on the House floor on May 6, 2021, with over 130 proposed amendments offered to its text.[83] The vote on SB 7 was delayed through the day of May 6, repeatedly, including for the last time at 10:30 pm.[84]

166.   When the Texas Representatives returned to the floor to vote on SB 7's final approval, several Representatives opposing the legislation provided closing remarks on the bill's discriminatory intent. Representative Jasmine Crockett, representing Dallas County District 100,

---

[81] Taylor Goldenstein & Austin Bureau, *At least 72% of AG Ken Paxton's voter fraud prosecutions target people of color, analysis shows*, Houston Chronicle, (Mar. 24, 2021), https://www.houstonchronicle.com/politics/texas/article/Ken-Paxton-voter-fraud-minorities-target-election-16049496.php.
[82] *Id.*
[83] Alexa Ura, *Texas GOP's voting restrictions bill could be rewritten behind closed doors after final House passage*, Texas Tribune, (May 7, 2021), https://www.texastribune.org/2021/05/07/texas-voting-restrictions/.
[84] House Journal, 87th Leg. Regular Session Minutes, May 6, 2021.

113288597.2 0099831-00001

spoke to the bill's clear intent to suppress voters, asserting that "[s]uppression looks like Black, brown and disabled people telling you to your face that this policy will affect them in a negative way and allowing them to fall on deaf ears.[85] Representative Rafael Anchía, representing Dallas County District 103, echoed Representative Crockett's sentiments, calling particular attention to SB 7's ties to white supremacy as clearly indicated by its designated purpose to "purity of the ballot box."[86]  Later, this language was removed.

167.    On May 7, 2021, at 3:00 am, the House heard and voted on SB 7, passing the bill on a 78-64 party-line vote.[87]  Ultimately, members of the House were able to secure amendments that curtailed some of the most onerous provisions of the House version of SB 7, including bans on drive-thru voting and 24-hour voting, new rules for voting machine allocation, and allowing partisan poll-watchers to record or photograph voters.

168.    Because the version of SB 7 that passed the Senate was amended after engrossment in both the Texas Senate and House of Representatives, a conference committee was called by the Texas Senate.  In Texas, a conference committee is called to "work out differences between the house version and the senate version of a bill that has been amended after engrossment."[88]  A conference committee's charge is limited to reconciling differences

---

[85] Alexa Ura, *Texas voting restrictions bill could be rewritten behind closed doors after final House passage*, Texas Tribune (May 7, 2021), https://www.texastribune.org/2021/05/07/texas-voting-restrictions/.

[86] *Id.* (Representative Anchía asserted that "SB 7 rode into the Texas House cloaked in that longstanding pretext 'purity of the ballot box' that has denied full participation of African Americans and Latinos for generations.").

[87] *Id.*

[88] Tx. Legislative Reference Library, *Conference committee reports*, lrl.texas.gov (last accessed May 21, 2021), https://lrl.texas.gov/legis/conferencecommitteereports.cfm#:~:text=A%20conference%20committee%20is%20called,from%20the%20Texas%20Legislature%20Online..

between the two chambers, and the committee may not change, alter, amend, or omit text that is not in disagreement without the adoption of an "out of bounds" resolution by both chambers.[89]

169.    On May 18, 2021, the Senate appointed the following conferees: Senators Paul Bettencourt, Dawn Buckingham, Lois Kolkhorst and Beverly Powell.[90] The House granted the Senate's request for the appointment of a conference committee and appointed Representatives Briscoe Cain as the Chair, Terry Canales, Travis Clardy, Nicole Collier and Jacey Jetton on May 19, 2021.[91]

170.    The Texas State NAACP Conference and the League of United Latin American Citizens sent a letter to Lt. Governor Dan Patrick, the presiding chair of the Senate, and Senator Bryan Hughes, the author of SB 7, expressed their disappointment that the Senate did not appoint any Black or Latino conferees. The "seemingly intentional oversight," they wrote, was disappointing given that SB 7 "will have a far greater and negative impact on the Black and Brown communities" in Texas.[92]

171.    With the end of the legislative session just three days away, on May 28, the Chairs of the House and Senate Elections Committees tweeted they "reached an agreement" on the contents of the Conference Committee Report, and the content of Senate Bill 7, stating that "[e]ven as the national media minimizes the importance of election integrity, the Texas

---

[89] Texas Legislative Council, *The Legislative Process in Texas* 6 (Feb. 2021), https://tlc.texas.gov/docs/legref/legislativeprocess.pdf#page=12.
[90] House Journal at 3317, 87th Leg., Reg. Sess. (2021), https://journals.house.texas.gov/hjrnl/87r/pdf/87RDAY49CFINAL.PDF#page=15.
[91] Senate Journal at 1603, 87th Leg., Reg. Sess. (2021), https://journals.senate.texas.gov/sjrnl/87r/pdf/87RSJ05-19-F.PDF#page=17.
[92] *Texas NAACP and LULAC blast GOP maneuvers over SB 7*, North Dallas Gazette (May 20, 2021), https://northdallasgazette.com/2021/05/20/texas-naacp-and-lulac-blast-gop-maneuvers-over-sb7/.

113288597.2 0099831-00001

Legislature has not bent to headlines or corporate virtue signaling."[93]   Yet at the time of this statement by the Chairs, the several Democratic members of the Conference Committee, and the only people of color on the Committee, had not seen the Conference Committee Report, nor the contents of the bill the Chairs claimed the Texas Legislature had recommended.[94]

172.    The text of the Committee Report itself, ultimately released on May 29, revealed additional procedural departures and new burdens on voting. The Committee Report was 180 pages long. It included a 67-page bill, roughly 12 pages of which contained additional provisions that were not included in either version of SB 7 that had passed the House or Senate.[95] Among these changes was Section 3.10, which added the provision that in a county with a population of 30,000 or more, voting by personal appearance on the "last Sunday of the early voting period … may not be conducted earlier than 1 p.m. or later than 9 p.m."[96] This provision would have provided for a shorter period of voting on the Sunday before election day than on other early-voting days. It was widely known that many Black voters participate in "souls to the polls" voting on the Sunday morning before an election.[97]

---

[93] Press Release, *Chairmen Agree on SB 7, The Texas Election Integrity Bill by Senator Hughes and Representative Cain* (May 28, 2021),
https://pbs.twimg.com/media/E2g3amsWQAMpco3?format=jpg.
[94] Lauren McGaughy, *GOP Announces Deal on Divisive Elections Bill, Democrats Say They Were Locked Out Of Proces*s, Dallas News (May 28, 2021 7:49PM),
https://www.dallasnews.com/news/politics/2021/05/28/gop-announces-deal-on-divisive-elections-bill-democrats-say-they-were-locked-out-of-process/.
[95] Alexa Ura, *After drastic changes made behind closed doors, and an overnight debate, Texas Senate approves voting bill*, Texas Tribune (May 30, 2021),
https://www.texastribune.org/2021/05/30/texas-voting-restrictions-senate/.
[96] S.B. 7 § 3.10 (amending Tex. Elect. Code § 85.006(e)).
[97] LDF Opposition Senate Bill 7 Conference Committee Report at 3-4 (May 29, 2021),
https://www.naacpldf.org/wp-content/uploads/LDF-Conference-Committee-Report-Opposition-Senate-20210529-1.pdf.

173.    The Committee Report contained new provisions from other election-related bills that failed to pass both houses of the Legislature, including identification requirements for mail ballots and applications.[98]  It also created a provision which, in conjunction with other provisions of SB 7 that make it easier to declare votes invalid, would lower the evidentiary standard necessary for a court to declare an election void.[99]

174.    Some of the amendments that House Democrats had made to SB 7 were eliminated, meaning that the bill reverted to eliminating drive-thru voting and banning 24-hour voting.

175.    After releasing the committee report on Saturday morning, the Senate suspended the chamber's rule that would have required giving senators 24 hours to review the Committee Report. Instead, the Senate began debating the bill around 10:00pm on Saturday evening and voted 18-13 to pass the bill shortly after 6:00am on Sunday, May 30, 2021.

176.    For SB 7 to make it to Governor Abbott during the regular legislative session, the bill had to pass the House by midnight that same day. A quorum of two-thirds is required to take a vote in the House.[100] However, with about an hour left until the end of the legislative session, the Texas House Democrats staged a walkout, breaking quorum to prevent a vote on the legislation.[101]

---

[98] S.B. 7 §5.04.
[99] S.B. 7, § 8.05 (amending Tex. Election Code to add §§ 232.062, 232.063 such that if a contestant can prove an allegation of election fraud by a preponderance of the evidence and that "[i]f the number of votes illegally cast in the election is equal to or greater than the number of votes necessary to change the outcome of an election, the court may declare the election void without attempting to determine how individual voters voted.")
[100] Rules of the House of Representatives of the State of Texas 87th Legislature, Rule 5, Chapter A, Section 1.
[101] Alexa Ura, *Texas Democrats abandon House floor, blocking passage of voting bill before final deadline*, the Texas Tribune, May 30, 2021, https://www.texastribune.org/2021/05/30/texas-voting-restrictions-house/.

113288597.2 0099831-00001

177.    In the immediate aftermath of the walkout, Governor Abbott made clear he not only would call for a special legislative session,[102] but gravely tweeted "[n]o pay for those who abandon their responsibilities . . . Stay tuned."[103]

178.    Governor Abbott's threats became reality on June 18, 2021 when he vetoed funding of the Texas Legislature as punishment for the House Democrats breaking quorum, impacting 2,100 Texas workers including Senators, House members, staffers, and employees of several legislative agencies.[104] Shortly after, Governor Abbott set a thirty-day special legislative session for July 8, 2021, confirming the agenda would include "[l]egislation strengthening the integrity of elections in Texas."[105]

179.    With the special session looming, House Speaker Dade Phelan brought in a new author for the elections bill—Republican Representative Andrew Murr.[106] Representative Murr formed the House Select Committee on Constitutional Rights and Remedies—a select, Republican-majority committee where the election bills would be referred.[107]

180.    Both the Senate and House election bills, now deemed SB 1 and HB 3, respectively, were set for hearings to start on Saturday, July 10, 2021.[108] In the House hearings,

---

[102] *Id.*

[103] Patrick Svitek, *Texas Gov. Greg Abbott vows to defund state Legislature after voting restrictions bill fails, threatening salaries*, the Texas Tribune, May 31, 2021, https://www.texastribune.org/2021/05/31/texas-greg-abbott-funding-legislature/.

[104] Cassandra Pollock, *Gov. Greg Abbott vetoes funding for Texas Legislature and its staff as punishment for Democrats' walkout on elections bill*, the Texas Tribune, June 18, 2021, https://www.texastribune.org/2021/06/18/greg-abbott-veto-legislature-democrats/.

[105] Proclamation by the Governor of the State of Texas, July 7, 2021, https://gov.texas.gov/uploads/files/press/PROC_first_called_session_87th_legislature_IMAGE_07-07-21.pdf.

[106] Patrick Svitek & Cassandra Pollock, *Texas House attempting to reset on contentious elections bill with new author, new committee in special session*, the Texas Tribune, July 8, 2021, https://www.texastribune.org/2021/07/08/texas-house-reset-election-bill/.

[107] *Id.*

[108] *Id.*

"Democrats repeatedly asked whether Murr had conducted a disparate impact study to assess if the new voting rules would disproportionately affect voters of color. He indicated he had not."[109] Approximately 300 people signed up to testify on SB 1 and 484 people signed up to testify on HB 3.[110] While the hearing for HB 3 began at 8:00 A.M. Saturday morning, it lasted more than seventeen hours so that public testimony on HB 3 did not begin until almost 2:00 A.M. Sunday morning.[111] For the hearing on SB 1, public testimony began early afternoon on Saturday, but the testimony still ran into the early hours of Sunday morning.[112] At the completion of both hearings and public testimony, the House and Senate committees voted to advance the legislation in party-line votes.[113]

181.    With twenty-six days left in the special session and SB 1 and HB 3 set to hit the Senate and House floors the following Monday, July 12, 2021, fifty-one of the sixty-seven House Democrats left Texas for Washington D.C. to break quorum and again, stop the vote.[114]

182.    In response, the House Republicans voted and passed a "call of the House" to regain quorum by asking that "'the sergeant at arms, or officers appointed by him, send for all

---

[109] Alexa Ura & Cassandra Pollock, *GOP voting bills advance in Texas House and Senate after overnight committee hearings*, The Texas Tribune, July 10, 2021, https://www.texastribune.org/2021/07/10/voting-bill-texas/.
[110] Alexa Ura, *Texans testifying on GOP voting bill faced a 17 hour-wait to be heard by lawmakers in the dead of night*, The Texas Tribune, July 11, 2021, https://www.texastribune.org/2021/07/10/texas-legislature-gop-voting-bill/.
[111] *Id.*
[112] *Id.*
[113] Alexa Ura & Cassandra Pollock, *Texas House Democrats flee the state in move that could block voting restrictions bill, bring Legislature to a halt*, The Texas Tribune, July 12, 2021, https://www.texastribune.org/2021/07/12/texas-democrats-voting-bill-quorum/.
[114] *Id.*

113288597.2 0099831-00001

absentees . . . under warrant of arrest if necessary,' effectively making the missing Democrats legislative fugitives."[115] House Speaker Phelan even signed dozens of civil arrest warrants.

183.    Despite many of the House Democrats still out-of-state or pledging to not return to the Capitol, Governor Abbott announced the second special legislative session would begin August 7, 2021 at 12:00 P.M.[116] The second special session kicked off without a quorum in the House and House Speaker Phelan signing dozens of civil arrest warrants.[117] Although a Travis County judge issued Temporary Restraining Orders to block the civil arrests, the Texas Constitution gives the House of Representatives authority to physically compel the attendance of, i.e., arrest, absent members.[118]

184.    For its part, the Senate moved forward on SB 1.[119] In a statement regarding SB 1, Senator Judith Zaffirini highlighted how the provisions of SB 1 "would make voting easier for some Texans, [but] it simultaneously would make it harder for historically disenfranchised communities of color to participate in elections."[120] Specifically, Senator Zaffirini stated that while SB 1 "reduces the number of early voting hours in only four counties[,] [a]pproximately one of three Black Texans, one of three Latino Texans, and one of three Asian Texans, . . . live in

---

[115] Patrick Svitek & Cassandra Pollock, *Texas House Republicans vote to track down absent Democrats and arrest them if necessary*, The Texas Tribune, July 13, 2021, https://www.texastribune.org/2021/07/13/texas-democrats-walkout-voting-bill-arrest/.

[116] Patrick Svitek, *Gov. Greg Abbott announces special legislative session starting Saturday, covering elections, federal COVID-19 funding, quorum rules*, The Texas Tribune, Aug. 5, 2021, https://www.texastribune.org/2021/08/02/greg-abbott-texas-special-legislative-session/.

[117] Joshua Fechter, *Texas Supreme Court says House Democrats can be arrested and brought to the Capitol, siding with Republicans trying to secure a quorum*, The Texas Tribune, Aug. 17, 2021, https://www.texastribune.org/2021/08/17/texas-house-democrats-arrest-quorum/.

[118] Svitek, *supra* at 99; Fechter, *supra* at 100;

[119] Cassandra Pollock, Alexa Ura, & James Barragán, *Another special session to pass a GOP voting bill started without a quorum. This time it's unclear if Democrats will stay away*, The Texas Tribune, Aug. 7, 2021, https://www.texastribune.org/2021/08/07/texas-democrats-special-session/.

[120] S.J. of Tex., 87th Leg., 2d C.S. 5 (2021) (statement of S. Judith Zaffirini).

one of these four counties."[121] The Senator again recounted how few instances of voting fraud there truly were, with only "44 voting fraud cases pending—of 11.2 million votes cast in Texas in 2020. As witness Julie Oliver testified before the State Affairs Committee, since 2004 there have been 839 complaints of fraud in Texas—of more than 100 million votes cast."[122] Despite Senator Zaffirini's statement and a fifteen-hour filibuster by Democratic Senator Carol Alvarado, SB 1 passed the Senate August 12, 2021[123].

185.    The Texas House regained quorum with the return of many House Democrats and hours of public testimony in front of the House Committee on Constitutional Rights and Remedies on SB 1 were again heard on August 23, 2021.[124] Following public testimony, the Committee passed SB 1 in a 9-5 party-line vote.[125] However, the Committee replaced SB 1 with language from its own bill, HB 3.[126]

186.    On August 26, 2021, the House debated SB 1 for over twelve hours. During the debate, as members attempted to discuss the bill's racial impact, Speaker Dade Phelan banned use of the word "racism" in the debate.[127]

---

[121] *Id.*

[122] *Id.*

[123] Alexa Ura, *Texas Senate outlasts 15-hour filibuster by Sen. Carol Alvarado to pass GOP voting-restrictions bill*, The Texas Tribune, Aug. 11, 2021, https://www.texastribune.org/2021/08/11/texas-voting-bill-filibuster/.

[124] Adam Bennett, *Houstonians testify on election bill as Texas House reaches quorum*, KHOU 11, Aug. 23, 2021, https://www.khou.com/article/news/politics/election-bill-testimony-texas-house-quorum/285-bf407074-182d-49a9-ae9d-674a46ca990f.

[125] Alexa Ura, *Texas House committee again passes the voting restrictions bill that instigated Democratic quorum break*, the Texas Tribune, Aug. 23, 2021, https://www.texastribune.org/2021/08/23/texas-voting-bill-legislature/.

[126] *Id.*

[127] Nick Natario, *Texas House speaker Dade Phelan bans word 'racism' during debate over elections bill*, ABC 13 (Aug. 27, 2021), https://abc13.com/texas-legislature-election-bill-house-speaker-dade-phelan/10978475/.

187.    At 1:00 A.M. on Friday, August 27, 2021, after sixty-four amendments were read and debated, the Texas House voted 79-37 to pass SB 1.

188.    The Senate requested a conference committee to reconcile the differences between the version of SB 1 that the Senate passed and the version that the House passed. Specifically, the Senate's author, Senator Bryan Hughes, disapproved of the "Mason" Amendment added by Republican House Representative Briscoe Cain in a bipartisan effort to address the controversial conviction of Crystal Mason by preventing voter mistakes from being prosecuted as fraud.[128] Ms. Mason was a Black Texas voter sentenced to five-years for casting a provisional ballot she did not know she was ineligible to cast due to her being on "federal supervised release," a preliminary period of freedom for individuals who have served their full time of incarceration in federal prison.[129] Ultimately, the Mason Amendment was not included.[130] The conference committee report was released Monday, August 30, 2021.

189.    The Texas House passed SB 1 on August 31, 2021 with an 80-41 vote.[131] That same day, the Texas Senate then passed SB 1 18-13.[132]

190.    On September 7, 2021, Governor Abbott signed SB 1 into law, which will officially go into effect three months prior to the 2022 primary elections.[133]

---

[128] Alexa Ura, *Republican bill tightening Texas election laws is headed to Gov. Greg Abbott's desk*, the Texas Tribune (Aug. 31, 2021), https://www.texastribune.org/2021/08/31/texas-voting-restrictions-bill/.

[129] *Id.*

[130] *Id.*

[131] Shawna M. Reding, *Texas elections bill, Senate Bill 1, heads to governor's desk for signature*, KVUE, (Aug. 31, 2021), https://www.kvue.com/article/news/politics/special-session/election-bill-texas-senate-bill-1-house-vote/269-a3173f81-36eb-4185-8ed5-152fe5038233.

[132] *Id.*

[133] *See id.*

191.    Against the history of voting discrimination in Texas, the demographic shifts in the Texas voting population, the record-breaking increases in voter turnout among Black and Latino voters in the 2020 election, and the lack of any evidence of wide-spread fraud, it is clear that suppressing the voting power of Black and Latino voters was the motive behind the passage of SB 1.

## VII.  SB 1 RESTRICTS VOTING RIGHTS AND DISPROPORTIONATELY BURDENS VOTERS OF COLOR AND VOTERS WITH DISABILITIES

192.    SB 1 contains provisions that impede voters' access to the polls, that create new hurdles for voters who are lawfully registered to vote, that create new hurdles for voters who lawfully cast their mail-in ballots, and that expose voters and election officials to intimidation. SB 1 targets the various voting methods previously available under the Texas election code before the passing of SB 1 that voters of color, particularly in Harris County, used to cast a ballot in the 2020 election.  The burdens fall most heavily on voters of color and on voters who require physical or language assistance to vote, the same voters who participated in record turn-out in 2020, who safely and successfully used the voting options canceled by SB 1, and who are the most susceptible to suppression and intimidation.  These changes impact Plaintiffs.

### A.      Purge Provisions Based on Citizenship Burden Lawfully Registered Voters and Place an Undue Burden on Latino Voters

193.    Section 2.05, of SB 1 amends Tex. Elec. Code § 16.0332 and mandates both monthly and quarterly purges of the voter rolls by the Texas Secretary of State's office, ostensibly to identify noncitizens. The Secretary of State "shall prescribe rules for the administration of this section," 20.05(d), and the Attorney General "shall" investigate and enforce any violations of this section if allegations arise in two or more counties. Tex. Elec. Code Sec. 273.001; *see also* 273.021. Voters removed during a monthly purge must provide additional proof of citizenship to retain their voter registration.

- 70 -

194.     Voters subject to purge include those excused from jury duty based on lack of citizenship and any person who indicated a lack of citizenship on their Department of Motor Vehicle form. Such purges burden voters of color who are naturalized and lawfully registered, requiring them to provide costly proof of citizenship, like passport or birth certificate, documentation that naturalized voters may not possess. Providing the required proof of citizenship is costly and time-consuming.  If proof of citizenship is not received on or before the 30th day after the county registrar issues a notice, a voter's registration is canceled.[134]

195.     Purges targeting Latino voters are not new. After Latino voters turned out to vote in record numbers during the 2018 election, Texas officials conducted a flawed review of the state's voter rolls and wrongly claimed that nearly 100,000 voters were not citizens. Subsequent investigation confirmed that the identified voters were all naturalized U.S. citizens.[135]

196.     Under the new law, however, the onus is on the voter to provide additional proof of citizenship—proof not required by anyone else registered to vote in the state.

### B.   Prohibitions on Voting Options Impose a Disproportionate and Undue Burden on Voters of Color

197.     Under SB 1, counties cannot expand curbside voting options, offer drive-through voting, or otherwise offer voting in ways that support voters within their communities. SB 1, § 3.04 (amending Tex. Elec. Code § 43.031(b)), § 3.12 (amending Tex. Elec. Code § 85.061(a)), and § 3.13 (amending Tex. Elec. Code § 85.062). And voting must occur between the hours of 6 a.m. and 10 p.m. Counties will no longer be able to offer extended hours or 24-hour voting.

---

[134] Texas Election Code Section 16.0332 addresses cancellation of registration due to citizenship status.
[135] *See* Texas Secretary of State, Election Advisory No. 2019-02, *supra* note 10; Settlement Agreement, *Tex. League of United Latin Am. Citizens*, *supra* note 10; *see also*, National Public Radio, *supra* note 10.

SB 1, § 3.09 (amending Tex. Elec. Code § 85.005); *id.*, § 3.10 (amending Tex. Elec. Code § 85.006(b)).

198.    The Secretary of State "shall" implement these provisions of SB 1, and the Attorney General "shall" enforce these provisions of SB 1 through investigation and prosecution. Tex. Elec. Code Sec. 31.001; 31.003; 273.001; 273.021.

199.    Expanded early voting, drive-through voting, and 24-hour voting facilitated record higher voter participation in 2020, particularly for urban voters of color. Approximately 1.6 million registered voters in Harris County voted in the November 3, 2020 General and Special Elections.  Approximately 1.3 million voted early in person; over 177, 000 voted by mail; and over 200,000 voted on Election Day.[136]

200.    Black and Latino Harris County voters are more likely to vote by mail and more likely to vote early than non-Black and non-Latino Harris County voters.  Black voters in Harris County are also more likely to vote early, by drive-thru, and at curbside polling locations. Black and Latino voters are more likely to work multiple jobs and odd hours than white Texans. Moreover, Black and Latino voters in Harris County are more likely to exhibit lower socio-economic factors than white voters in Harris County, and more likely to "(1) live in poverty, (2) have less flexible work schedules, (3) lack access to transportation, and (4) lack access to childcare assistance" to cast a ballot in person.  *See*, *e.g.*, *Campos v. Baytown,* 696 F. Supp 1128, 1132 (S.D. Tex. 1987); *see also N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 218 (4th Cir. 2016).  Fewer options for voting will increase the already substantial burdens of

---

[136] Harris County Elections, Election Results Archive, November 3, 2020 General and Special Elections Canvass Report, (Nov. 16, 2020), https://www.harrisvotes.com/HISTORY/20201103/Official%20Canvass.pdf.

distance, time, and safety on voters who already confront a high number of voters per polling location.

201.    For example, in prior elections wait times exceeded two hours. During the March 2020 primary, voters remained in line hours after the polls were closed. At Texas Southern University in Houston, voters were casting ballots almost six hours after polls closed.[137] Black and Latino voters were most likely to have to wait in long lines to vote.[138]

202.    SB 1 also discourages and dissuades voters of color from voting in future elections by increasing the costs of voting.  SB 1 restricts the scheduling of early voting hours; limits the distribution of applications for early voting ballots and eliminates straight-ticket voting, thereby ensuring longer wait times at the polls. Shorter lines at the polls and flexible voting hours, outside of traditional business hours or on Election Day, overwhelmingly benefit Black, Latino, as well as disabled and other vulnerable or marginalized voters, including disabled voters. Because the costs associated with voting are hardest for Black and Latino voters to shoulder, these voters are also more likely to be discouraged from voting by long wait times at the polls.

203.    The elimination of straight-ticket voting–which will inevitably increase the amount of time it takes an individual voter to complete their ballot–ensures longer lines at the

---

[137] Alexa Ura, *Texas voting lines last hours after polls close on Super Tuesday*, TEX. TRIBUNE, Mar. 3, 2020, https://www.texastribune.org/2020/03/03/texas-voting-lines-extend-hours-past-polls-closing-super-tuesday/.

[138] *See* Connor Perrett, *Young black and Latino voters spent hours waiting to vote in Texas and the state can't even say how it will fix the problem before November*, INSIDER, Mar. 4, 2020, https://www.businessinsider.com/texas-voting-lines-super-tuesday-worse-in-november-2020-3. National studies also show that long wait times at the polls are correlated with precincts with a higher percentage of voters of color. Jonathan Coopersmith, *It Takes a Long Time to Vote*, TEXAS A&M TODAY, July 9, 2020, https://today.tamu.edu/2020/07/09/it-takes-a-long-time-to-vote/.

polls in all future elections, making it more difficult for voters of color, particularly Black and Latino voters, and voters with disabilities, from casting a ballot in person, where lines to vote are already long.  SB 1 restricts the scheduling of Texas' early voting period, and the limitations will disproportionately harm Black and Latino Texans.  SB 1 limits early voting to the hours of 6:00 a.m. until 10:00 p.m.  This limits early voting hours that are most accessible and convenient for individuals who work non-traditional work hours, who are disproportionately people of color, and eliminates the option of offering 24-hour early voting entirely.[139]

204.    In the 2020 presidential election, over 120,000 voters in Harris County voted by drive-thru.  Drive-thru voting makes voting by personal appearance easier, safer, and more accessible, and overwhelmingly benefits Black, Latino, elderly, and disabled voters who are less able to wait in long lines to vote.  SB 1 Sections 3.04, 3.11, and 3.12, eliminate drive-thru voting.  SB 1 permits voting only inside a building and prohibits temporary voting locations such as tents, moveable structures or any facility primarily designed for motor vehicles.   Because Black and Latino voters are less likely to have flexible work schedules, and thus can hardly afford to wait in long lines, SB 1 makes it burdensome for Black and Latino voters.

205.    During the 2020 presidential election, most Bexar County voters cast their ballots during the early voting period, either in person or by mail.  Of the 773,796 votes cast in the County in the 2020 presidential election, 689,550 voters voted during the early voting period, 92,589 of whom voted by absentee ballot, and a mere 84,246 voters voted in person on November 3, 2020, Election Day.[140]  Bexar County's population is 60.7 percent Latino, with a

[140] Bexar Cnty. Elections Dept., Historical Election Results: November 3, 2020 General Election Media Report, https://www.bexar.org/DocumentCenter/View/28532/November-3-2020-General-Election-Media-Report (last visited Sept. 1, 2021)

- 74 -

sizable Black population of 8.6 percent.[141] The methods and means of voting targeted by SB 1 will severely curtail the primary forms of participation for Black and Latino voters in Bexar County.

206.    Prohibitions on voting options in SB 1 directly target specific measures Harris County implemented in the 2020 general election. In 2020, the measures in Harris County, one of the most diverse population areas in Texas, increased access for all voters, particularly Black, Latino, and other voters of color, during the global pandemic.

207.    For the 2020 general election, Harris County instituted longer voting hours and one day of 24-hour voting in eight locations.[142] Harris County and Bee County also implemented drive-through voting. These changes reduced wait times and increased voter access, particularly for voters who historically have been disproportionately affected by long voting lines.[143] Over 140,000 Harris County voters took advantage of early voting, including 10,000 individuals who voted in a single night of 24-hour voting.[144] Overall, early in-person voting in the 2020 general election increased 9% over early voting in the 2016 general election. In the two largest counties, Harris and Dallas, the increase was over 11%.[145]

---

[141] Census Bureau, Quick Facts, https://www.census.gov/quickfacts/bexarcountytexas (last visited Sept. 1, 2021).

[142] Abigail Rosenthal, Harris County early voting hours extended to 10 p.m. until Thursday, CHRON, Oct. 27, 2020, https://www.chron.com/news/election2020/article/Harris-County-early-voting-hours-extended-to-10-15677986.php.

[143] "The new alternatives, tailored to a diverse work force struggling amid a pandemic in Texas' largest county, helped increase turnout by nearly 10 percent compared with 2016; nearly 70 percent of registered voters cast ballots." Nick Corasaniti, *Republicans Target Voter Access in Texas Cities, but Not Rural Areas*, N.Y. TIMES, updated May 30, 2021, https://www.nytimes.com/2021/04/24/us/politics/texas-republicans-voting.html?action=click&module=RelatedLinks&pgtype=Article.

[144] *Id.*

[145] *See* Texas Secretary of State, Election Information & Turnout Data, 2020 Nov. 3rd General Election, https://earlyvoting.texas-election.com/Elections/getElectionDetails.do; *id.*, Early Voting – Nov. 4, 2016, https://www.sos.texas.gov/elections/earlyvoting/2016/nov4.shtml.

113288597.2 0099831-00001

208.    An analysis by the Texas Civil Rights project shows that 53% of the voters who used the Harris County drive-through option and 56% of the voters who voted during extended voting hours were Black, Hispanic, or Asian.[146]

209.    SB 1 cancels these measures, burdening Harris County voters and countless others throughout Texas. The experience in 2020 in Harris County demonstrated the benefits of voting options to expand access and stimulate voter engagement. And the record turnout was achieved without any evidence that these measures resulted in voter fraud or that these measures created opportunity for fraud. Late-night and drive-through voters, for example, were subject to the same requirements as voters during the day, and each polling location was staffed by election officials and poll workers who received the same training as officials and workers who staffed the polling places during daytime hours.[147]  Canceling these successful measures does not immunize the Texas voting system from fraud, it only impedes and burdens voters, particularly Latino and Black ones.

C.    **Curtailed Access to Mail-In Ballots and Disqualification of Mail-In Ballots Increase the Burdens on Voters**

210.    SB 1 places new burdens on voters who wish to vote by mail under Texas's limited, excuse-only mail-in voting system.

211.    SB 1 prohibits election officials from distributing an early vote-by-mail application to anyone who has not requested one; prevents public officials from using public funds to allow another person to distribute early vote-by-mail applications to anyone who has not

---

[146] Texas Civil Rights Project (@TXCivilRights), Twitter (Mar 27, 2021, 10:56 a.m.), https://twitter.com/txcivilrights/status/1375869409919700997?s=21.
[147] *See* Harris County Elections, Drive Thru Voting, https://harrisvotes.com/drivethruvoting (last visited Sept. 16, 2021) (drive-through voting uses the same voting machines and procedures as walk-in voting; video on the website shows individual staff member going up to a voter's car to check identification, hand the voter a voting device).

requested one; and prevents early voting clerks from making any attempt to solicit a person to complete an application for an early vote-by-mail ballot, whether directly or through a third party. Any offense under this section is a state jail felony. *See* SB 1, Section 5.04 (adding Tex. Elec. Code § 84.0111); *id.*, Section 7.04 (adding Tex. Elec. Code § 276.016). This will severely curtail voters' ability to obtain information from election officials about mail-in voting options, increasing burdens on voters who already face a lengthy process to apply for and obtain a mail-in ballot.

212.    Plaintiff organizations often receive applications free of charge from county officials, and often work in concert with county election officials to serve historically disenfranchised and underserved communities, including Black and Latino communities. For example, public officials in Harris County sent pre-filled vote-by-mail applications to residents over 65 years of age, including Plaintiffs, in Harris County.  Plaintiffs Delta Sigma Theta Sorority, Inc., HAUL, Houston Justice, and other non-partisan non-profit grassroots organizations[148] engage in efforts to facilitate voters' applications to vote by mail in underrepresented communities. SB 1 prohibits or burdens Plaintiffs, and similar organizations, in their efforts to serve disenfranchised communities of color and prevents or unnecessarily impedes these organizations from providing critical services that Black and Latino Texans have relied upon to participate in the political process. For example, because vote-by-mail applications may not be available from county election officials, who are prohibited from using public funds to facilitate third-party distribution, Plaintiffs Houston Justice and HAUL will either have to discontinue the provision of vote-by-mail applications and assistance in completing those

---

[148] MOVE Texas https://movetexas.org/about/ (last visited May 1, 2021). MOVE Texas is not a party to this suit.

applications to its clients and community members they serve—a key component of Houston Justice's and HAUL's programming—or undertake unnecessary expenses and expend additional staff time and other scarce resources to procure sufficient copies of vote-by-mail applications.

213.    The Secretary of State "shall" implement these provisions of SB 1, and the Attorney General "shall" enforce these provisions of SB 1 through investigation and prosecution. Tex. Elec. Code Sec. 31.001; 31.003; 273.001; 273.021.

214.    Onerous identification requirements in SB 1 for mail-in ballots impede voting by mail and enable disqualification of more ballots. Under SB 1, requests for mail-in ballots must include the voter's driver's license number, election identification certification, Department of Public Safety personal identification card, or social security number; and these numbers must match the number provided on the voter's initial voter registration. Mismatched numbers—even if they are from two different identification cards—are grounds to reject the application. SB 1, Section 5.02 (amending Tex. Elec. Code § 84.002); *id.*, Section 5.03 (amending § 84.011(a), and effective September 1, 2021); *id.*, Section 5.07 (amending Tex. Elec. Code § 86.001).

215.    Many voters with disabilities may possess the identification but not be able to access it—such as individuals with disabilities in congregate settings—or require assistance in determining whether they have the necessary identification. Section 5.02 thereby imposes eligibility criteria that tends to screen out people with disabilities and denies people with disabilities equal access to the early voting ballot application process.

216.    Voters must provide the same identification information on the ballot itself.  A mismatch at this stage results in rejection of the ballot. And the vote is not counted. SB 1, Section 5.08 (amending Tex. Elec. Code § 86.002). Voters who do not understand this catch or

- 78 -

who cannot recall which identification number they relied on initially will have their application or ballot tossed aside, canceling their vote.

217.    Voters who elect to drop off their mail-in ballots rather than mailing them face an extra step, too. These voters must provide their name, signature, and matching identification at drop off, all of which is recorded by the election official. SB 1, Section 4.12 (amending Tex. Elec. Code § 86.006). SB 1 prohibits counties from offering drop boxes that are not staffed by an election official to collect this information from voters at the time they drop off their ballot.

218.    SB 1's restrictions on ballot drop boxes will also contribute to longer lines at the polls by reducing yet another opportunity to vote outside of Election Day. Drop boxes allow voters to submit their absentee ballots in advance of Election Day, avoiding the risk that the ballot might be delayed or lost in the mail. Without this drop box option, voters will be forced to choose between relying on the mail and returning their ballot well in advance of the election or showing up on Election Day to cast their vote.

219.    SB 1 authorizes two groups to review mail-in ballots—the early voting ballot board and the signature verification committee.  These groups are separate, but they look for the same defects. This overkill approach to mail-in ballot review is not justified by any evidence of fraud occurring with the existing, and already limited, mail-in ballot system.

220.    Among other defects, the two groups compare ballot envelope signatures with any known signature on file for discrepancies, no matter how long ago the voter supplied that first signature. Reviewers are not required to have training in handwriting examination, which is an inaccurate science. This aspect of SB 1 will particularly burden people who by reason of age or disability change their signature over time.

221.    SB 1 also creates arbitrary mechanisms for providing notice to voters of such defects and gives both the signature verification committee and early ballot committees authority to reject ballots without providing any notice to voters. If either group finds an alleged defect, they determine if there is time to return the ballot by mail and for the voter to return the corrected ballot prior to the election. SB 1, Section 5.12 (adding Tex. Elec. Code § 87.0271); *id.*, SB 1, Section 5.13 (amending Tex. Elec. Code 87.041); Section 5.14 (adding Tex. Elec. Code § 87.0411). If there is not enough time to complete this sluggish mail-based process, then they may, but are *not required to*, give notice by telephone or email.  In this random scheme and on the whim of the reviewer, some voters may receive notice of a defect, others may not.

222.    Again, both the Secretary of State and the Attorney General are charged with enforcing these provisions of SB 1.  Tex. Elec. Code Sec. 31.001; 31.003; 273.001; 273.021.

223.    SB 1 impedes early mail-in voting and burdens voters who utilize this method. The mail-in ballot application identification requirements contort the mail-in voting process and increase the likelihood that a minor or inadvertent discrepancy will disqualify an application or a ballot. The new identification, review groups, random notice practices, and drop off chore create a tricky and complicated process for voters. Plaintiff Mi Familia Vota will be forced to divert resources to assist voters with these changes and will spend significant time educating voters on these new rules and on trying to support voters who may or may not receive notice of alleged defects.

**D.      Poll Watchers Can Subject Voters of Color to Harassment and Intimidation, Impeding the Fundamental Right to Vote and Exposing Election Judges to Criminal Penalties**

224.    Texas's history of voter intimidation is well documented. In Harris County, for example, groups of white volunteers traveled to polling places in Black and Latino neighborhoods to interfere with voting, demanded that voters of color identify themselves, told

- 80 -

voters of color they will go to prison for voting if they have ever gone to jail, and donned law enforcement-style clothing for an intimidating effect.[149]

225.    SB 1, Section 4.01 (amending Tex. Elec. Code § 32.075), Section 4.07 (amending Tex. Elec. Code § 33.056), and Section 4.09 (amending Tex. Elec. Code § 33.061(a) will increase voter and election official intimidation from poll watchers, curtailing the ability of election officials to protect voters and volunteers and ensure secrecy of voters' ballots. Poll watchers, under SB 1, have nearly unlimited authority to move freely about polling places and counting locations, and to be in proximity of voters.

226.    Sections 4.06, 4.07, 4.09 also impose new criminal penalties on election officials, including election judges like Plaintiff Clemmons, who take action, seemingly including action currently required by law, to protect voters from interference and intimidation by poll watchers. SB 1, Section 4.07 gives poll watchers a right of "free movement" at a polling location and section 4.09 makes it a criminal offense for any election official to knowingly refuse to accept a poll watcher for service or to take any action "to obstruct the view of a watcher or distance a watcher from the activity or procedure to be observed."  Yet the Texas Election Code, §§ 33.057, 33.058, also make clear that "[a] watcher may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice" and that "[w]hile on duty, a watcher may not (1) converse with an election officer regarding the election … (2) converse with a voter; or (3) communicate in any manner with a voter regarding the election."  Sections 33.057 and 33.058 are designed to protect voters from undue interference,

---

[149] U.S. Comm'n on Civ. Rights, *An Assessment of Minority Voting Rights Access in the United States*, 2018 Statutory Report at 77 (Sept. 12, 2018) (citing *Veasey v. Perry*, 71 F. Supp. 3d 627, 636-37 (S.D. Tex. 2014)); Judy Bao, *Voter Intimidation in Texas During the 2020 General Election*, Texas Civil Rights Project (Feb. 2021), https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.

harassment and intimidation at the polls by poll watchers specifically and are in fact necessary to ensure that end.  In the November general election alone, Harris County election judges were forced to intervene in response to numerous violations of § 33.058 by poll watchers. SB 1 imposes criminal penalties on election officials for taking steps to protect voters from poll watchers, including, it seems, action elsewhere required by the Texas Election Code. SB 1's poll watcher provisions serve to undermine these existing protections.

227.    Election officials are not able to remove poll watchers except under limited circumstances that are personally witnessed by the election official. Even where poll watchers are accused of violating the penal code, only the presiding judge may request that law enforcement remove the offending poll watchers. Protecting the voting precinct from disruption will depend on police response and discretion.

228.    Under SB 1, Section 6.01 (amending Tex. Elec. Code § 64.009) poll watchers can also watch persons assisting voters, including those who provide transportation or language assistance, and consequently intimidate the assistants and the voters who need assistance. These enhanced provisions place an undue burden on voters of color, who will lose valuable and necessary assistance if their assistants are deterred or reluctant to provide aid.

229.    The Secretary of State "shall" implement these provisions of SB 1, and the Attorney General "shall" enforce these provisions of SB 1 through investigation and prosecution. Tex. Elec. Code Sec. 31.001; 31.003; 273.001; 273.021.

230.    Increased authority for poll watchers poses serious threats to ballot secrecy and allows for intimidation of voters and their assistants waiting in line or voting, inside and outside polling places.

E.   **Voter Assistance Is Severely Impaired, Placing an Undue Burden on Voters and Denying Voters with Disabilities Equal Access to Voting**

231.   SB 1 significantly increases the burden on people who assist voters, which in turn burdens and denies equal access to voters who need assistance to exercise their right to vote.

232.   Anyone who transports more than seven (7) voters to the polls must complete a form, providing personal information, and identifying the authority to provide assistance. SB 1, Section 6.01 (amending Tex. Elec. Code § 64.009).

233.   Anyone who assists a voter with a ballot (in person or mail-in) must complete a form providing name and address; relationship to the voter; and whether they have accepted compensation or benefit from a candidate, campaign, or political committee, and sign an oath. SB 1, Section 6.03 (amending Tex. Elec. Code § 64.0322); *id.*, Section 6.04 (amending Tex. Elec Code § 63.034). These provisions impose barriers on voters with disabilities by requiring an individual who provides voting assistance, either with voting in-person or with a mail-in ballot, to fill out a form reporting his or her name, address, relationship to the voter, and whether he or she received any form of compensation. The assistor would have to fill out such a form for every voter he or she assists, adding time and paperwork, and also subjecting the assistor to criminal liability for any incorrect form filled out on behalf of a voter. All of these provisions may have a chilling effect on individuals providing assistance to voters with disabilities and prevent them from providing such assistance, thereby interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights and denying voters with disabilities equal access to voting.

234.   Anyone who assists with filling out a mail-in ballot must provide the same information on the official carrier envelope as required for providing in-person assistance as in SB 1, Section 6.03 (above), SB 1, Section 6.05 (amending Tex. Elec. Code § 86.010), and SB 1,

Section 6.07 (amending Tex. Elec. Code § 86.013). Assistants who are not related to or live with the voter must sign an oath, under penalty of perjury, that other assistants are not required to sign. SB 1, Section 6.05 (amending Tex. Elec. Code 86.010). This oath, administered by an election officer at the polling place that includes the statement: "I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." This oath unlawfully limits the scope of assistance the assistor can provide to the voter with a disability who may need other forms of assistance and thereby denies the voter with a disability equal access to voting. The assistor also must take the oath "under penalty of perjury," potentially chilling individuals from providing critical assistance at the polls for fear of their assistance being misconstrued by those who are unfamiliar with the protections guaranteed by federal disability rights laws, thereby interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights and denying voters with disabilities equal access to voting.

235.    If an assistant declines to complete these burdensome tasks, then the voter will be deprived of the voter's chosen assistant, violating Section 208 of the Voting Rights Act, the American with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973, and posing an undue burden on those most likely to need assistance, including those with English-language deficiencies and persons with disabilities.

236.    The Secretary of state "shall prescribe the form described," is tasked with keeping track of those filling out the forms (*i.e.*, the voter assistants), and reports violations to the Attorney General for enforcement through investigation and prosecution. SB 1 Sec. 6.01(g), (h); Tex. Elec. Code Sec. 273.001; 273.021.

- 84 -

F.      **Voting for Employees Who Need Time off to Vote Is Jeopardized**

237.    Employers need not grant time off to employees to vote, if any early voting location is open for two (2) hours before or after an employee's work hours, SB 1, Section 7.02 (amending Tex. Elec. Code § 276.004), jeopardizing the likelihood that some workers will vote.

238.    Under this employer-focused provision of SB 1 workers confront compounding circumstances created by the law, such as fewer voting locations forcing more travel and longer wait times, no mobile or temporary voting sites that added convenience to voting, and the inability to access drive-thru voting locations in groups. SB 1 ignores the realities many workers face of public transportation, carpooling, long commutes, multiple jobs, school, childcare, or eldercare, and jeopardizes the rights of working voters to vote.

239.    The Secretary of State "shall" implement these provisions of SB 1, and the Attorney General "shall" enforce these provisions of SB 1 through investigation and prosecution. Tex. Elec. Code Sec. 31.001; 31.003; 273.001; 273.021.

G.      **Authority to Respond to Emergencies Is Curtailed, Disproportionately Affecting and Burdening Voters of Color.**

240.    Section 7.04 (amending Tex. Elec. Code § 276.017) of SB 1 prohibits county election officials from creating, altering, modifying, waiving, or suspending any election standard in the code. There is no exemption for natural disasters, public health crises, other emergencies, or needs of the community.

241.    During the COVID-19 pandemic, counties scrambled to create safe, effective methods of voting while protecting communities struggling with COVID-19. Counties must move quickly to support voters during crises or natural disasters. SB 1 strips this authority from counties, which in turn will unconstitutionally burden the right of voters to vote during emergencies.

- 85 -

242.     As with the other challenged portions of SB 1, the Secretary of State "shall"

implement these provisions of SB 1, and the Attorney General "shall" enforce these provisions

of SB 1 through investigation and prosecution.  Tex. Elec. Code Sec. 31.001; 31.003; 273.001;

273.021.

## VIII.   ALLEGATIONS OF VOTER FRAUD IN THE 2020 ELECTION ARE UNSUPPORTED BY THE FACTS AND CONTRADICTED BY COMMENTS OF THE TEXAS SECRETARY OF STATE

243.     Governor Abbott and the supporters of SB 1 claim that actions in the 2020 general

election compromised the integrity of Texas elections.[150] In a press conference on the integrity of

the 2020 election, Governor Abbott specifically criticized actions taken in Harris County to

ensure access to safe voting during the COVID-19 pandemic, including expanded hours, drive-

through voting, and 24-hour voting.[151] Governor Abbott and the legislators supporting SB 1

presented no evidence of widespread voter fraud in Texas or in any county, nor provided any

evidence that the activities outlawed by SB 1 increased opportunities to commit fraud.

244.     As of April 2021, with over 11.3 million total ballots cast in the state in the

November 2020 election, only 0.000379%[152] (or just 43) of those ballots were allegedly

implicated in voter fraud charges in Texas.[153]

---

[150] Press Release, Office of the Texas Governor, Governor Abbott Holds Press Conference On Election Integrity Legislation (Mar. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-holds-press-conference-on-election-integrity-legislation; Taylor Goldenstein, *Fact checking Texas lawmaker's claim of 400 voter fraud 'cases'*, HOUSTON CHRONICLE, Apr. 12, 2021, https://www.houstonchronicle.com/politics/texas/article/Fact-checking-Texas-lawmaker-s-claim-of-400-16095858.php.
[151] Press Release, *supra* note 24.
[152] Nonprofit Vote and U.S. Elections Project, America Goes to the Polls 2020 at 31 (updated Mar. 18, 2021), https://www.nonprofitvote.org/wp-content/uploads/2021/03/america-goes-polls-2020-7.pdf.
[153] Goldenstein, *supra* note 24.

- 86 -

245.    The claims of 2020 voter fraud are further undermined by contemporaneous statements from former Texas Secretary of State Ruth R. Hughs, who issued a press release commending Texas voters on the historic voter turnout and praising election officials on conducting a "free and fair election."[154] The Secretary of State's 2020 Texas Election Security Update further provides: "There is no evidence that any voting or voter registration systems in Texas were compromised before the 2016 Election or in any subsequent elections."[155] And in comments opening the 87th Texas Legislature on January 12, 2021, former Secretary Hughs stated that the 2020 election was "smooth and secure."[156]

246.    The Election Security Task Force for Harris County—home to a 43.7% Latino and 20% Black population[157]—found no evidence of fraud there, stating "[d]espite claims, our thorough investigations found no proof any election tampering, ballot harvesting, voter suppression, intimidation or any other type of foul play that might have impacted the legitimate cast or count of a ballot."[158]

---

[154] News Release, Texas Secretary of State, Secretary Hughs Commends Texas Voters Following November 3rd General Election (Nov. 30, 2020), https://www.sos.state.tx.us/about/newsreleases/2020/113020.shtml.
[155] Texas Secretary of State, 2020 Texas Election Security Update, https://www.sos.state.tx.us/elections/conducting/security-update.shtml (last visited Sept. 16, 2021).
[156] Taylor Goldenstein and Jeremy Blackman, Did a 'smooth and secure' 2020 election cost the Texas secretary of state her job?, HOUSTON CHRONICLE, May 21, 2021, https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php.  Democrats in opposition to SB 7, the initial iteration of Texas's voter suppression bill, focused on those statements, which may have cost Secretary Hughs her job; she resigned after the GOP failed to confirm her appointment by Governor Abbott in May 2021.
[157] United States Census Bureau, QuickFacts Harris County, Texas, https://www.census.gov/quickfacts/fact/table/harriscountytexas/POP010220#POP010220 (last visited Sept. 16, 2021).
[158] Constable Alan Rosen et al., Final Productivity Report, Harris County Election Security Task Force at 8 (Dec. 17, 2020),

- 87 -

247.   The 2020 election was a historic sea change for voting in Texas, particularly among underrepresented Black and Latino populations. Despite taking place in the midst of the COVID-19 pandemic, nearly 60.4% of the eligible voting population turned out in Texas; over 11 million Texans exercised their right to vote.[159] The historic 2020 turnout represented a 9% increase over the 2016 numbers—the eighth highest voter turnout growth rate in the nation.[160] Latino, Asian, and Black voter turnout all increased from 2016 to 2020.[161] Latino voter turnout increased by more than 10 percent compared to 2016 numbers.[162]

248.   None of the activities outlawed by SB 1 were linked to fraud or risk of fraud in the Texas voting system. SB 1 simply attacks and cancels the activities that supported the historic voter engagement in Texas in 2020 without any evidence that one or all of the activities exposed the Texas voting system to fraud.

---

https://www.dropbox.com/s/7mzy6aws7fnzvy9/Elections%20Security%20Task%20Force%20fin al%20report%20PUBLC%20FINAL%2012-17-20%20442p.pdf?dl=0. Such glowing praise of Texas' 2020 election system is consistent with the findings of the Secretary of State after the 2018 election, where it was reported that "Our Office believes the elections system in the State of Texas to be extremely resilient, due in no small part to the hard work and dedication of local election officials in maintaining proper security protocols," and "Our Office is confident that Texas voters can trust the election systems" Report to the Texas Legislature on Election Cybersecurity Preparedness (Nov. 30, 2018), https://www.sos.state.tx.us/elections/forms/1-hb-8-report-public-summary.pdf.

[159] United States Election Project, 2020 November General Election Turnout Rates (last updated Dec. 7, 2020), http//www.electproject.org/2020g; https://www.nonprofitvote.org/resource/https-nonprfvote-wpengine-com-wp-content-uploads-2021-03-america-goes-polls-2020-7-pdf/.

[160] America Goes to the Polls 2020, *supra* note 26.

[161] United States Census Bureau, Voting and Registration in the Election of November 2020, Table 4b, Reported Voting and Registration by Sex, Race and Hispanic Origin, for States (Apr. 2021), https://www.census.gov/topics/public-sector/voting/data/tables.html; *id.*, Voting and Registration in the Election of November 2016, Table 4b, Reported Voting and Registration by Sex, Race and Hispanic Origin, for States (May 2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

[162] Voting and Registration in the Election of November 2016, Table 4b, s*upra* note 39; Voting and Registration in the Election of November 2020, Table 4b, *supra* note 39.

249.    While the Texas Legislature need not wait for prevalent election fraud before drafting prophylactic laws, the virtual absence of voter fraud in 2020 lays bare the pretextual nature of the Texas Legislature's true intentions.  SB 1 continues Texas' history of disenfranchising Black and Latino voters. The provisions challenged by this action are unlawful and implementation of SB 1 should be stopped.

## CLAIMS FOR RELIEF

## COUNT ONE

**Violation of the First and Fourteenth Amendments**
**U.S. Const. amend., I and XIV; 42 U.S.C §1983**
**(Undue Burden on the Right to Vote)**
Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority against Defendants
Paxton, Scott, Longoria, and Callanen
Mi Familia Vota, Marla López, Marlon López, and Paul Rutledge Against Defendants Paxton,
Scott, Longoria, and Callanen

250.    Plaintiffs repeat and re-allege each and every allegation contained in all preceding paragraphs, as if fully set forth herein.

251.    The provisions of SB 1 place an undue burden on the ability of the Plaintiffs, as well as Texas's Black and Latino voters more generally, to participate in elections and cast a ballot that will count, in violation of the First and Fourteenth Amendments.

252.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

253.    The First Amendment of the U.S. Constitution, which is applicable to the States through the Fourteenth Amendment prohibits "abridging the freedom of speech." The First Amendment protects the right of Texans to vote for the candidate of their choosing.

254.    The "political franchise of voting" has long been held to be a "fundamental

political right, because [it is] preservative of all rights." *Harper v. Va. Bd. of Elections*, 383 U.S.

663, 667 (1966) (citation omitted).

255.    "A court considering a challenge to a state election law must weigh 'the character

and magnitude of the asserted injury to the rights protected by the First and Fourteenth

Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by

the State as justifications for the burden imposed by its rule,' taking into consideration 'the

extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick v.*

*Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

256.    State election administration practices may not burden the right to vote unless

relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and

character of the burden imposed. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191

(2008) (Stevens, J., controlling op.). (holding "[h]owever slight th[e] burden may appear, . . . it

must be justified by relevant and legitimate state interests sufficiently weighty to justify the

limitation.") (citation omitted) (internal quotation marks omitted).  The more a challenged law

burdens the right to vote, the more strictly it must be scrutinized.  Even slight burdens must be

justified by valid state interests of sufficient weight. *Veasey v. Perry*, 71 F. Supp. 3d 627, 691

(S.D. Tex. 2014).

257.    When a state election law severely burdens the right to vote or is discriminatory, a

court must find that it is "narrowly drawn to advance a state interest of compelling importance"

in order to survive constitutional muster. *Burdick*, 504 U.S. at 434 (citation omitted); *see also*

*Norman v. Reed*, 502 U.S. 279, 280 (1992).

- 90 -

258.     Importantly, "laws that govern the political process surrounding elections—and,

in particular, election-related speech and association—go beyond merely the intersection

between voting rights and election administration, veering instead into the area where 'the First

Amendment has its fullest and most urgent application.'" *League of Women Voters v. Hargett*,

400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) (quoting *Eu v. S.F. Cnty. Democratic Cent.*

*Comm.*, 489 U.S. 214, 223 (1989)).

259.     SB 1's challenged provisions erect substantial burdens and barriers on Texas

voters and particularly on voters of color, both through the law's individual restrictions, as well

as collectively through the combined effect of all the restrictions and barriers created by the

legislation, in violation of the First and Fourteenth Amendments.

260.     Mi Familia Vota challenges the following provisions of SB 1 as establishing an

undue burden on the right to vote in violation of the First and Fourteenth Amendment to the U.S.

Constitution:

- SB 1 §§ 2.05-2.07 (establishing additional voter roll purges, focusing
  primarily on allegations of noncitizenship, requiring targeted voters to
  satisfy onerous requirements to defeat erroneous removal from the voter
  rolls, and penalizing voter registrars alleged to be noncompliant with the
  purging requirements)
- SB 1 § 4.12 (eliminating drop boxes)
- SB 1 § 5.04, 7.04 (restricting the distribution of absentee ballot
  applications by election officials and third parties)
- SB 1 §§ 5.01-5.03, 5.07-5.08 (requiring early voting ballot applications to
  include specific identification numbers and the rejection of applications
  that contain mismatched identification numbers even where both numbers
  are accurate and merely obtained from different identification documents;
  and prohibiting the use of electronic or photocopied signatures)
- SB 1 §§ 5.11-5.14 (allowing for the rejection of ballots without notice by
  either the signature verification committee or early ballot committee if
  either committee determines that the signature allegedly does not match
  any known signature of the voter without regard to the age of the
  comparison signature).
- SB 1 § 6.03 (requiring assistants to fill out forms, disclose whether they
  received compensation for providing assistance, and take an oath

- 91 -

affirming that the voter qualified for assistance);

- SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature)
- SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation)
- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 7.02 (eliminating employers' obligation to provide employees with leave to vote where the employee has any two-hour block outside that job's working hours during the voting period)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

261.    Individual plaintiffs Marla López, Marlon López, and Paul Rutledge, challenge the following provisions of SB 1 as establishing an undue burden on the right to vote in violation of the First and Fourteenth Amendment to the U.S. Constitution:

- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 7.02 (eliminating employers' obligation to provide employees with leave to vote where the employee has any two-hour block outside that job's working hours during the voting period)
- SB 1 §§ 4.01, 4.07 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

262.    Plaintiffs Houston Justice, HAUL, and Delta Sigma Theta Sorority, Inc., challenge the following provisions of SB 1 as establishing an undue burden on the right to vote in violation of the First and Fourteenth Amendment to the U.S. Constitution:

- SB 1 § 5.04, 7.04 (restricting the distribution of absentee ballot applications by election officials and third parties)

- 92 -

- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 1 § 4.12 (eliminating drop boxes)

263.    These provisions will make voting harder for Black and Latino voters, who are more likely to have inflexible work schedules, imposing an unnecessary burden that is not outweighed by any purported State interest. The provisions will also unnecessarily burden access to absentee ballots for eligible individuals without any correspondingly important justification.

264.    The burdens imposed by the challenged provisions of SB 1 individually and collectively on eligible Texas voters' fundamental right to vote, including on Plaintiffs and members of Plaintiffs' organizations, are severe and neither justified by, nor necessary to promote, any legitimate interest of the State that was not already adequately protected by preexisting election procedures.  Indeed, the Legislature's justifications for SB 1—prevention of voter fraud—is pretextual and pales in comparison to Plaintiff's right to associate and engage in the political process. *Cf. Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (rejecting the argument that regulating an election "process" raises no First Amendment concerns).

265.    Even if reducing voter fraud were the true motivation for SB 1, and it is not, there is no evidence that SB 1 will cure a true risk of voter fraud, or that the activities utilized in 2020 contributed to any alleged fraud within the Texas system. Indeed, the Texas Secretary of State has confirmed the integrity of Texas's elections, as has every court asked to address challenges to the 2020 election.

266.    Further, Texas's interest in the restrictions enacted by SB 1 is neither narrowly tailored nor sufficiently compelling to justify the severe burdens imposed on the rights of the

Plaintiff organizations or the individual voter Plaintiffs. The restrictions imposed by this law are arbitrary, lack rational justification, and violate the First Amendment.

267.    The challenged provisions of SB 1 irreparably harm Texas voters particularly Black, Latino, and other voters of color.

268.    They also irreparably harm the Plaintiff organizations by forcing them to divert finite resources from their typical activities to educate Black and Latino voters about the new and onerous requirements of SB 1.

269.    Defendants, acting under color of state law, have deprived and, absent an injunction, will continue to deprive Plaintiffs their rights secured by the First and Fourteenth Amendments to the U.S. Constitution and protected by 42 U.S.C. § 1983, and Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

<u>**COUNT TWO**</u>

**Violation of the Fourteenth Amendment**
**U.S. Const. amend., XIV; 42 U.S.C §1983**
**(Intentional Race Discrimination in Voting)**
Plaintiffs Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority, against
Defendants Paxton, Scott, Longoria, and Callanen
Plaintiffs Mi Familia Vota, Marla Lopez and Marlon Lopez Against Defendants Paxton, Scott,
Longoria and Callanen

270.    Plaintiffs repeat and re-allege each and every allegation contained in all preceding paragraphs, as if fully set forth herein.

271.    42 U.S.C. § 1983 authorizes suits resulting from the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

272.    Section 1 of the Fourteenth Amendment to the United States Constitution provides that:

No state shall make or enforce any law which shall abridge the privileges

- 94 -

> or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

273. The right to vote is a fundamental constitutional right protected by the due process and equal protection clauses of the Fourteenth Amendment. *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

274. A law or policy is unconstitutional under the equal protection clause when race was a motivating factor in the decision-making process that led to the law or policy. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

275. SB 1, through the challenged provisions, violates the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voters on account of race or color.

276. Under the Count, Plaintiffs Houston Justice, Houston Area Urban League, and Delta Sigma Theta Sorority challenge:

- SB 1 §§ 3.04, 3.12-3.13 (eliminating drive-thru voting centers);
- SB 1 §§ 3.09-3.10 (restricting the scheduling of early voting hours and eliminating 24-hour voting);
- SB 1 § 3.15 (eliminating straight-ticket voting);
- SB 1 §§ 4.01, 4.06, 4.07, 4.09 (reducing regulations on poll watchers, allowing them to roam freely around polling locations and subjecting election officials to a class A misdemeanor for knowingly obstructing a poll watcher's view);
- SB 1 § 4.12 (restricting vote-by-mail drop boxes);
- SB 1 § 5.02 (imposing voter identification requirements on early voting ballot applications);
- SB 1 § 7.04 (prohibiting election officials from soliciting eligible voters to complete an application for a mail-in ballot and distributing unsolicited mail-in ballot applications, and prohibits the use of public funds to facilitate third-party distribution of such applications);
- SB 1 § 6.01 (requiring a person who transports seven or more voters to the

polls to complete and sign a form reporting their personal information and subjecting them to surveillance by a poll watcher);

- SB 1 §§ 6.03, 6.05, and 6.07 (requiring an assistor to disclose and document their name, address, relationship to the voter, and whether the assistor received compensation; and making failure by the assistant to complete the form correctly a state jail felony);
- SB 1 § 6.04 (limiting the type of assistance that can be provided in voting, and requiring an assistor to swear an oath under penalty of perjury).

277. Under this Count, Plaintiff Mi Familia Vota challenges:

- SB 1 §§ 2.05-2.07 (establishing additional voter roll purges, focusing primarily on allegations of noncitizenship, requiring targeted voters to satisfy onerous requirements to defeat erroneous removal from the voter rolls, and penalizing voter registrars alleged to be noncompliant with the purging requirements)
- SB 1 § 4.12 (eliminating drop boxes)
- SB 1 § 5.04, 7.04 (restricting the distribution of absentee ballot applications by election officials and third parties)
- SB 1 §§ 5.01-5.03, 5.07-5.08 (requiring early voting ballot applications to include specific identification numbers and the rejection of applications that contain mismatched identification numbers even where both numbers are accurate and merely obtained from different identification documents; and prohibiting the use of electronic or photocopied signatures)
- SB 1 §§ 5.11-5.14 (allowing for the rejection of ballots without notice by either the signature verification committee or early ballot committee if either committee determines that the signature allegedly does not match any known signature of the voter without regard to the age of the comparison signature).
- SB 1 § 6.03 (requiring assistants to fill out forms, disclose whether they received compensation for providing assistance, and take an oath affirming that the voter qualified for assistance);
- SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature)
- SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation)
- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB § 7.02 (eliminating employers' obligation to provide employees with leave to vote where the employee has any two-hour block outside that job's working hours during the voting period)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded

access to voters and election workers in polling places and counting
locations, limiting election worker'' ability to remove poll watchers who
intimidate voters or otherwise interfere with the voting and counting
processes)

278.    Under this Count, Plaintiffs Marla López and Marlon López challenge:

- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

279.    The challenged provisions were adopted, individually and collectively, for the purpose of denying Latino, Black, and other voters of color full and equal access to the political process.

280.    The facts alleged herein reveal that SB 1 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black, Latino, and other voters of color in violation of the United States Constitution.

281.    SB 1 was enacted a time when Black, Latino, and other voters of color were making increasing use of means of voting that are now being eliminated and restricted by SB 1.

282.    SB 1 was enacted in response to an election in which the size of the population of Black, Latino, and other voters of color had increased in statewide elections.

283.    The supporters of S.B. 1 were on notice of the foreseeability of the disparate impact of S.B. 1.

284.    The purported justification for SB1 was pretextual.

285.    The legislative process leading up to the enactment of SB 1 included multiple departures from normal procedures.

- 97 -

286.    There are less discriminatory alternatives to the challenged provisions of S.B. 1, including simply maintaining the status quo, particularly given the complete lack of evidence of significant voter fraud.

287.    Implementing and enforcing SB 1 will irreparably harm Plaintiffs, as well as Black, Latino, and other voters of color, and voters with disabilities by denying or abridging their right to vote.

288.    Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 1, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB 1, and the tenuousness of the stated justifications for SB 1, raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

289.    Defendants, acting under color of state law, have deprived and, absent an injunction, will continue to deprive Plaintiffs their rights secured by the Fourteenth Amendment to the U.S. Constitution and protected by 42 U.S.C. § 1983, and Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

## COUNT THREE

**Violation of the Fifteenth Amendment**
**U.S. Const. amend., XV; 42 U.S.C §1983**
**(Intentional Race Discrimination in Voting)**
Plaintiffs Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority, against
Defendants Paxton, Scott, Longoria, and Callanen
Plaintiffs Mi Familia Vota, Marla Lopez and Marlon Lopez Against Defendants Paxton, Scott,
Longoria, and Callanen

290.    Plaintiffs repeat and re-allege each and every allegation contained in all preceding paragraphs, as if fully set forth herein.

291.    The Fifteenth Amendment prohibits intentional racial discrimination by state actors.

- 98 -

292.    Specifically, Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from "abridg[ing]" the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

293.    The Fifteenth Amendment therefore prohibits voting laws that "handicap exercise of the franchise" on account of race because the Amendment "nullifies sophisticated as well as simple-minded modes of [racial] discrimination." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 184 (5th Cir. 2020) (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)).

294.    The challenged provisions of SB 1 violate the Fifteenth Amendment to the Constitution of the United States because Defendants intentionally enacted and administer, enforce, and implement the laws to deny, abridge, or suppress the right to vote to Plaintiffs and other of Texas's Black and Latino voters on account of race and ethnic origin.

295.    Under the Count, Plaintiffs Houston Justice, Houston Area Urban League, and Delta Sigma Theta Sorority challenge:

- SB 1 §§ 3.04, 3.12-3.13 (eliminating drive-thru voting centers);
- SB 1 §§ 3.09-3.10 (restricting the scheduling of early voting hours and eliminating 24-hour voting);
- SB 1 § 3.15 (eliminating straight-ticket voting);
- SB 1 §§ 4.01, 4.06, 4.07, 4.09 (reducing regulations on poll watchers, allowing them to roam freely around polling locations and subjecting election officials to a class A misdemeanor for knowingly obstructing a poll watcher's view);
- SB 1 § 4.12 (restricting vote-by-mail drop boxes);
- SB 1 § 5.02 (imposing voter identification requirements on early voting ballot applications);
- SB 1 § 7.04 (prohibiting election officials from soliciting eligible voters to complete an application for a mail-in ballot and distributing unsolicited mail-in ballot applications, and prohibits the use of public funds to facilitate third-party distribution of such applications);
- SB 1 § 6.01 (requiring a person who transports seven or more voters to the polls to complete and sign a form reporting their personal information and subjecting them to surveillance by a poll watcher);
- SB 1 §§ 6.03, 6.05, and 6.07 (requiring an assistor to disclose and document their name, address, relationship to the voter, and whether the

- 99 -

assistor received compensation; and making failure by the assistant to complete the form correctly a state jail felony);

- SB 1 § 6.04 (limiting the type of assistance that can be provided in voting, and requiring an assistor to swear an oath under penalty of perjury).

296.   Under this Count, Plaintiff Mi Familia Vota challenges:

- SB 1 §§ 2.05-2.07 (establishing additional voter roll purges, focusing primarily on allegations of noncitizenship, requiring targeted voters to satisfy onerous requirements to defeat erroneous removal from the voter rolls, and penalizing voter registrars alleged to be noncompliant with the purging requirements)
- SB 1 § 4.12 (eliminating drop boxes)
- SB 1 § 5.04, 7.04 (restricting the distribution of absentee ballot applications by election officials and third parties)
- SB 1 §§ 5.01-5.03, 5.07-5.08 (requiring early voting ballot applications to include specific identification numbers and the rejection of applications that contain mismatched identification numbers even where both numbers are accurate and merely obtained from different identification documents; and prohibiting the use of electronic or photocopied signatures)
- SB 1 §§ 5.11-5.14 (allowing for the rejection of ballots without notice by either the signature verification committee or early ballot committee if either committee determines that the signature allegedly does not match any known signature of the voter without regard to the age of the comparison signature).
- SB 1 § 6.03 (requiring assistants to fill out forms, disclose whether they received compensation for providing assistance, and take an oath affirming that the voter qualified for assistance);
- SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature)
- SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation)
- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB § 7.02 (eliminating employers' obligation to provide employees with leave to vote where the employee has any two-hour block outside that job's working hours during the voting period)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

- 100 -

297.   Under this Count, Plaintiffs Marla López and Marlon López challenge:

- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

298.   The challenged provisions were adopted, individually and collectively, to intentionally deny, abridge, or suppress the right to vote to Plaintiffs and other of Texas's Black and Latino voters on account of race and ethnic origin.

299.   The facts alleged herein reveal that SB 1 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black, Latino, and other voters of color in violation of the United States Constitution.

300.   Defendants, acting under color of state law, have deprived and, absent an injunction, will continue to deprive Plaintiffs their rights secured by the Fifteenth Amendment to the U.S. Constitution and protected by 42 U.S.C. § 1983, and Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

## COUNT FOUR

**Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. §10301, et seq.**
**(Intentional Racial Discrimination & Vote Denial)**
Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority against all
Defendants
Plaintiffs Mi Familia Vota, Marla López, and Marlon López Against all Defendants

301.    Plaintiffs repeat and re-allege each and every allegation contained in the

preceding paragraphs, as if fully set forth herein.

302.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part,

provides:

> (a)    No voting qualification or prerequisite to voting or standard, practice, or
>
> procedure shall be imposed or applied by any State or political
>
> subdivision in a manner which results in a denial or abridgment of the
>
> right of any citizen of the United States to vote on account of race or
>
> color, or [membership in a language minority group].
>
> (b)    A violation of subsection (a) of this section is established if, based on the
>
> totality of circumstances, it is shown that the political processes leading to
>
> nomination or election in the State or political subdivision are not equally
>
> open to participation by members of a class of citizens protected by
>
> subsection (a) of this section in that its members have less opportunity
>
> than other members of the electorate to participate in the political process
>
> and to elect representatives of their choice.

303.    A violation of Section 2 of the Voting Rights Act may be based on: (1) a finding

of a discriminatory purpose behind the challenged governmental action; (2) a finding of a

discriminatory result from the challenged governmental action; or (3) under the totality of the

- 102 -

circumstances, the act results in the denial or abridgment of the right to vote "on account of," or based on, race or color.  *League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 986 F.2d 728, 738 (5th Cir. 1993) (citing *Chisom v. Roemer,* 501 U.S. 380 (1991)); *Thornburg v. Gingles,* 478 U.S. 30, 46 (1986).

304.     The essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequity in the opportunities of Black, Latino, and people of color to participate in the election process to elect their preferred representative.  *Thornburg v. Gingles,* 478 U.S. at 47; *see also Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2341 (2021) (section 2 "commands: consideration of 'the totality of circumstances' that have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote").

305.     Texas's history of official discrimination and lingering socioeconomic effects of discrimination will interact with the persisting legacy of discrimination in education, employment, and health to impose a discriminatory burden on Black and Latino voters, and to create unequal opportunities for Black, Latino and other people of color to participate in the election process, including voters served by Plaintiffs Houston Justice, HAUL, Delta Sigma Theta Sorority, Inc., and Mi Familia Vota.  *League of United Latin Am. Citizens,* 986 F.2d at 755.

306.     The disproportionate impact of SB 1 is caused by present and past discrimination on account of race and ethnicity by the state of Texas, as shown by the totality of the circumstances, including factors deemed relevant by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).

307.    As a result of SB 1's provisions and prohibitions described above, individually and collectively, under the totality of the circumstances, the political process in Texas is not equally open to participation by Black, Latino, and other voters of color in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

308.    The challenged provisions of SB 1 are intended to, and under the totality of the circumstances do, disproportionately burden and erect barriers to Black and Latino voters' ability to participate in the political process.

309.    Under this Count, Plaintiff Mi Familia Vota challenges the following provisions:

- SB 1 §§ 2.05-2.07 (establishing additional voter roll purges, focusing primarily on allegations of noncitizenship, requiring targeted voters to satisfy onerous requirements to defeat erroneous removal from the voter rolls, and penalizing voter registrars alleged to be noncompliant with the purging requirements)
- SB 1 § 4.12 (eliminating drop boxes)
- SB 1 § 5.04, 7.04 (restricting the distribution of absentee ballot applications by election officials and third parties)
- SB 1 §§ 5.01-5.03, 5.07-5.08 (requiring early voting ballot applications to include specific identification numbers and the rejection of applications that contain mismatched identification numbers even where both numbers are accurate and merely obtained from different identification documents; and prohibiting the use of electronic or photocopied signatures)
- SB 1 §§ 5.11-5.14 (allowing for the rejection of ballots without notice by either the signature verification committee or early ballot committee if either committee determines that the signature allegedly does not match any known signature of the voter without regard to the age of the comparison signature).
- SB 1 § 6.03 (requiring assistants to fill out forms, disclose whether they received compensation for providing assistance, and take an oath affirming that the voter qualified for assistance);
- SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature)
- SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation)
- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)

- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 7.02 (eliminating employers' obligation to provide employees with leave to vote where the employee has any two-hour block outside that job's working hours during the voting period)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

310.   Under this Count, Plaintiffs Marla López, and Marlon López challenge the

following provisions:

- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 1 §§ 4.01, 4.07, (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)

311.   Under this Count, Plaintiffs Houston Justice; Delta Sigma Theta Sorority, Inc.;

and HAUL challenge the following provisions:

- SB 1 § 5.04, 7.04 (restricting the distribution of absentee ballot applications by election officials and third parties)
- SB 1 §§ 3.09, 3.10 (limiting voting hours and prohibiting 24-hour voting)
- SB 1 §§ 3.04, 3.12, 3.13 (prohibiting most voters from voting from a motor vehicle and requiring polling places to be located inside a building, effectively banning drive-through voting)
- SB 1 § 3.15 (eliminating straight-ticket voting)
- SB 1 §§ 4.01, 4.07, 6.01 (providing partisan poll watchers expanded access to voters and election workers in polling places and counting locations, limiting election worker'' ability to remove poll watchers who intimidate voters or otherwise interfere with the voting and counting processes)
- SB 1 § 6.03 (requiring assistants to fill out forms and disclose whether they received compensation for providing assistance);
- SB 1 § 6.04 (requiring assistants to take an oath affirming that the voter qualified for assistance);
- SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to

- 105 -

provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature);

- SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation)

312.   The burdens created by these challenged provisions include but are not limited to:

(a)   Impeding grassroots organizations' efforts to assist voters of color to vote by mail, in particular Black and Latino voters, by prohibiting the distribution of early voting applications to third parties for the purpose of "solicit[ing]" persons to apply for an early voting ballot.

(b)   Eliminating and severely limiting the tools and methods of voting disproportionately used by Black and Latino voters and thereby increasing the amount of time it takes to vote for Black and Latino voters by making early voting and voting-by-mail less convenient and accessible, burdening curbside voting, making it difficult to obtain physical and language assistance to vote, and by eliminating 24-hour voting, straight-ticket voting and drive-thru voting.

(c)   Subjecting voters to monthly and quarterly voter purges that target individuals alleged to be "noncitizens"—which will overwhelmingly affect Latino voters—and require only those voters to obtain and provide costly documents in order to retain their right to vote.

(d)   Creating an environment where Black and Latino voters, who historically are targets of voter intimidation, harassment, and threats, will feel less safe at polling locations because SB 1 allows "watchers" to roam freely.

313.    The challenged provisions of SB 1 specifically target voting methods that Latino, Black, and other voters of color used in record numbers in the most recent election and will disproportionately burden voters of color, particularly Black and Latino voters, including in Harris County, served by Plaintiffs Houston Justice; HAUL; The Arc of Texas; Delta Sigma Theta, Inc.; and Mi Familia Vota.

314.    The challenged provisions of SB 1 will place unjustifiable burdens to Marla López and Marlon López's ability to vote.

315.    Multiple factors support an inference that race was a motivating factor behind the enactment of SB 1, including, but not limited to:

(a)    SB 1 was enacted at a time when Black and Latino voters and other voters of color were making increasing use of means of voting that are restricted or eliminated under S.B. 1.

(b)    SB 1 was enacted following the elections in which Texas's Black and Latino voting age populations and registered voters are increasing compared to non-Black and non-Latino voting age population and registered voters.

(c)    The purported justification for SB 1 was pretextual. Overwhelmingly, the 2020 election has been lauded as secure, and none of the many legal challenges to the validity of the election based on allegations of purported voter fraud were even remotely successful.  The pretext of preventing voter fraud to justify disenfranchisement has ties to Texas's longstanding history of racially motivated voter suppression, including (1) all-white

primaries; (2) secret ballots; (3) poll taxes; and (4) re-registration and voter purges.[163]

316.    The provisions of SB 1 described herein constitute the denial or abridgment of the right of Black, Latino, and other people of color in Texas to vote on account of race or color within the meaning of Section 2 of the Voting Rights Act.

317.    Absent relief from this court, Defendants will continue to violate Plaintiffs' rights under Section 2 of the Voting Rights Act, and Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

## COUNT FIVE

**Violation of Section 208 of the Voting Rights Act**
**52 U.S.C. §10508**
**(Right to Assistor of Choice)**
Plaintiff Mi Familia Vota Against All Defendants
Plaintiffs Delta Sigma Theta and The Arc of Texas against all Defendants

318.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

319.    Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" in English for any reason "may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

---

[163] *Veasey v. Abbott*, 830 F.3d 216, 336 (5th Cir. 2016) (rehearing en banc) (Dr. Burton, testifying to Texas's history of official discrimination in voting and the Fifth Circuit Court of Appeals finding that, with respect to the state's photo ID law which the State justified as a measure to prevent voter fraud, that the "Legislature had access to data from the 2008 and 2010 elections when considering SB 14, which showed that 'of the millions of votes cast in both of those elections, there were perhaps four referrals for in person voter impersonation' and that 'one, if not two individuals... had been officially charged and may have accepted responsibility for impersonation.'").

- 108 -

320.     Section 208 establishes the right of a voter with a disability or a voter with limited English proficiency or limited literacy to an assistor of the voter's choosing to assist the voter with the voting process, including physically navigating the polling place, interacting with poll workers, reading, and interpreting the ballot, and marking the ballot.

321.     The right to an assistor of choice when voting, under Section 208, "plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (quoting 52 U.S.C. §10310(c)(1)) (holding that Texas law limiting who can provide assistance to non-English speaking voters violated Section 208). Moreover, the only restrictions on who can act as an assistor are set forth in the plain text of Section 208: "[t]he assistor cannot be the voter's employer, an agent of the voter's employer, or an agent of the voter's labor union." *Id*. at 608.

322.     Although Texas election law provides voters who need assistance with the right to receive such assistance from a person of their choice as required by Section 208, SB 1's new restrictions render that provision meaningless by impeding the voter's practical ability to get assistance.

323.     Under this Count, Plaintiff Mi Familia Vota challenges the following provisions:

- SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation);
- SB 1 § 6.03 (requiring assistants to fill out forms, disclose whether they received compensation for providing assistance, and take an oath affirming that the voter qualified for assistance);
- SB 1 § 6.04 (requiring those who assist voters to take an oath regarding the nature of their assistance under penalty of perjury, denies voters with disabilities equal access to voting by unlawfully limiting the scope of assistance the assistor can provide and interfering with the legal rights of

> voters with disabilities and those who assist them in exercising their rights);
> - SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature).

324.     Under this Count, Plaintiffs Delta Sigma Theta and The Arc of Texas challenge the following provisions:

> - SB 1 § 6.01 (requiring anyone who provides transportation to more than seven voters to submit a form with their personal information and authorization for providing transportation);
> - SB 1 § 6.03 (requiring assistants to fill out forms, disclose whether they received compensation for providing assistance, and take an oath affirming that the voter qualified for assistance);
> - SB 1 § 6.04 (requiring those who assist voters to take an oath regarding the nature of their assistance under penalty of perjury, denies voters with disabilities equal access to voting by unlawfully limiting the scope of assistance the assistor can provide and interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights);
> - SB 1 §§ 6.05, 6.07 (requiring assistants to people voting by mail to provide on the ballot envelop their relationship to the voter, whether they received compensation, their contact information, and their signature).

325.     SB 1 §§ 6.01, 6.03, 6.04, 6.05, and 6.07, amending Texas Elec. Code §§ 64.009, 64.0322, 64.034, 86.010, 86.013, will prevent voters with disabilities and voters with limited English proficiency or limited literacy from receiving assistance from a person of their choosing by requiring assistors to take several additional burdensome steps and subjecting them to criminal penalties. The challenged provisions thus violate Section 208 of the Voting Rights Act.

326.     Defendants, acting under color of state law, have deprived Plaintiffs of their rights secured by Section 208 of the Voting Rights Act. Absent an injunction, Plaintiffs will each suffer irreparable injuries for which there is no adequate remedy at law.

## COUNT SIX

**Violation of the Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C §1983**
**(Void for Vagueness, Denial of Due Process)**
Plaintiff Jeffrey Clemmons against Defendants Scott, Paxton, Longoria, and Callanen

327.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-226, as if fully set forth herein.

328.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the State of Texas from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1.

> A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 590, 595 (2015). Vague laws that invite arbitrary enforcement also violate the Due Process clause because "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis ..." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

329.    As to Count X, Plaintiff Jeffrey Clemmons, through Houston Justice Counsel, challenges the unconstitutionally vague provisions of SB 1:

- SB 1 § 4.06 (creating criminal penalties for an election official, including an election judge, who intentionally or knowingly refuses to accept a poll watcher for service whose acceptance is required by the Election Code, creating a criminal penalty that is unconstitutionally vague, as codified in Texas Election Code Section 33.051);
- SB 1 §  4.07 (preventing any election official from denying a poll watcher free movement within the location at which the poll watcher is serving, as codified in Texas Election Code Section 33.056); and
- SB 1 § 4.09 (creating a criminal penalty for an election official, including an election judge, to take any action "to obstruct the view of a watcher or distance the watcher from the activity . . . in a manner that would make observation not reasonably effective," as codified in Texas Election Code Section 33.051).

- 111 -

330.     Section 33.051 of the Texas Election Code, as amended by SB 1 section 4.06, creates criminal penalties for an election official, including an election judge, who intentionally or knowingly refuses to accept a poll watcher for service whose acceptance is required by the Election Code. This new provision of law creates a criminal penalty; the statute specifies that a violation results in a Class A misdemeanor. Section 33.051 as amended by SB 1 is impermissibly vague because it does not provide an election official, including an election judge, with notice of whether they can knowingly refuse to accept a poll watcher for behavior elsewhere prohibited in the Texas Election Code.  Although this provision sets out a mens rea of intentionally or knowingly, the scienter requirement does not lessen the vagueness of Section 33.051, as amended, because other areas of the Texas Election Code provide reasons to exclude a poll watcher that could reasonably be interpreted as inconsistent with the broad language of this new provision.

331.     Section 33.056 of the Texas Election Code, amended by SB 1 section 4.07, sets out that a poll watcher may not be denied free movement within the location at which the poll watcher is serving.  This provision of law is impermissibly vague because it does not give a person of ordinary intelligence fair notice of what conduct is prohibited.  Specifically, this provision of law does not define "free movement," nor does the Texas Election Code. SB 1's definition of a poll watcher's right to "observe" as "sit[ting] or stand[ing] near enough to see and hear" the activity does not cure this vagueness problem because the definition of "observe" is subjective and depends on context.  A poll watcher's unfettered "free movement" and ability to "see and hear" is required in the context of polling places and other vote counting locations, which are crowded and full of other election officials trying, and indeed often legally obligated, to carry out their duties.  If, for example, an election official is required to stand in a particular

location that a poll watcher seeks to occupy, is the election official required in all instances to move, to prevent a poll watcher from being denied free movement?

332.    Moreover, this provision does not make clear how it relates to other sections of the Texas Election Code that prevent poll watchers from speaking directly to a voter or election official, or observing a voter's ballot.  The Texas Election Code, Section 33.057 explains that "[a] watcher may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice."  The Texas Election Code also specifies at section 33.058 that "[w]hile on duty, a watcher may not (1) converse with an election officer regarding the election … (2) converse with a voter; or (3) communicate in any manner with a voter regarding the election."

333.    Section 33.061 of the Texas Election Code, also amended by SB 1 section 4.09, makes it a criminal offense for any election official, including an election judge, to take any action "to obstruct the view of a watcher or distance the watcher from the activity . . . in a manner that would make observation not reasonably effective."[164]  An offense under this section of the Texas Election Code amended by SB 1 is a Class A misdemeanor. This section's text fails to define the conduct it prohibits with sufficient specificity to apprise an ordinary person of its requirements.  For example, it is not clear from the text from whose perspective the "observation not reasonably effective" standard applies. The provision is also impermissibly vague because it is in conflict with other areas of the Texas Election Code, described above.  And by proscribing conduct that makes someone else's "observation not reasonably effective," Section 33.061, as amended by SB 1, is so standardless that it invites arbitrary and disparate enforcement by parties not entrusted with policymaking authority.

---

[164] SB 1 § 4.09.

113288597.2 0099831-00001

334.     Plaintiff Jeffrey Clemmons served as an election judge in the 2020 primary election in Texas, and would have continued to serve as an election judge in upcoming elections. Plaintiff Clemmons is unable to ascertain whether his duties as an election judge, requiring him to take action where necessary to prevent poll watchers from speaking to voters, viewing voters' ballots, or otherwise being disorderly in the polling place, will require him to violate the Texas Election Code as amended by SB 1.

335.     Taken together, these provisions could expose Plaintiff Clemmons to criminal liability for taking action also required by the Texas Election Code in future elections.  Plaintiff Clemmons now has to choose between refraining from serving as an election judge in the future and serving as an election judge while being subjected to arbitrary enforcement and criminal penalties under these new provisions of law.

336.     Implementation of SB 1 will harm Plaintiff Clemmons, and other individuals who have and will serve as public officials in elections in the State. *See Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018) (changing plans "in response to allegedly injurious law can itself be a sufficient injury" when done "in response to a reasonably certain injury imposed by the challenged law").

## COUNT SEVEN

### Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131, et seq.
### (Discrimination on the basis of disability; Failure to Provide Reasonable Accommodations)
Plaintiffs The Arc of Texas Against Defendants Scott, Paxton, Longoria, Callanen

337.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-240, as if fully set forth herein.

338.    Voting is a fundamental right. Yet individuals with disabilities have historically been excluded from voting both de jure and de facto on the basis of their disability. *See* U.S. Dep't of Justice, The Americans With Disabilities Act and Other Federal Laws Protecting the Rights of Voters With Disabilities 1, https://www.justice.gov/file/69411/download (last visited May 11, 2021).

339.    The challenged provisions of SB 1 discriminate against voters with disabilities. Plaintiffs challenge the following provisions:

- SB 1 § 5.02 (imposing voter identification requirements on early voting ballot applications);
- SB 1 §§ 6.03, 6.05, and 6.07 (requiring an assistor to disclose and document their name, address, relationship to the voter, and whether the assistor received compensation; and makes failure by the assistant to complete the form correctly a state jail felony);
- SB 1 § 6.04 (limiting the type of assistance that can be provided in voting, requiring an assistor to make the following affirmation: "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance . . . I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot.")

340.    Congress enacted the ADA, 42 U.S.C. § 12101 et seq., to provide a clear and comprehensive mandate for the elimination of discrimination against people with disabilities and to provide strong and consistent standards for identifying and addressing such discrimination. 42 U.S.C. § 12101(b)(1) & (2).  "The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (internal citations omitted).

341.    The ADA is based on Congress's findings that, *inter alia*:

a.    "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination

- 115 -

against individuals with disabilities continue to be a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2);

b.   "[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," 42 U.S.C. § 12101(a)(5); and

c.   "[D]iscrimination against individuals with disabilities persists in such critical areas as . . . voting." 42 U.S.C. § 12101(a)(3). *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("Voting is a quintessential public activity[,]" and "[e]nsuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others helps ensure that those individuals are never relegated to a position of political powerlessness.") (citations omitted).

342.   Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130. Title II of the ADA applies to all services, programs, and activities of public entities, including voting. 42 U.S.C. § 12132.

343.   The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The Arc of Texas members Amy Litzinger, Laura Halvorson, Ruben Fernandez, and Courtney Pugh are qualified individuals with disabilities and the members and/or constituents of The Arc of Texas include individuals with disabilities within the meaning of the ADA and are entitled to the

- 116 -

protections of the ADA. As individuals with intellectual and developmental disabilities, The Arc's members have impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

344.    Plaintiff The Arc of Texas and has members who are qualified for the programs, services, and activities offered by Defendants—including vote by mail and in-person voting on Election Day and during early voting—because they are registered to vote in Texas, are otherwise eligible, and intend to vote in the next election, and accordingly are qualified individuals with disabilities entitled to the protections of the ADA. 42 U.S.C. § 12131(2).

345.    Defendants Scott and Paxton, representing state agencies, and Defendants Longoria and Callanen, representing Harris and Bexar counties, are public entities pursuant to the ADA. 42 U.S.C. § 12131(1)(a),(b); 45 C.F.R. § 1232.3(d). The administration of elections and voting, including vote-by-mail and in-person voting on Election Day and during early voting, are each a service, program, or activity provided by the agencies of Defendants Scott, Paxton, Callanen, and Longoria, and other political subdivision agencies.

346.    The ADA directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and provide guidance on their content. 42 U.S.C. § 12134. The regulations that the Attorney General promulgated require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7). The regulations also specify that it is unlawful discrimination for a public entity to:

a.  "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

b.  "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

c.  "[U]tilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii).

d.  "[I]mpose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments." 28 C.F.R. § 35.130(b)(8).

347.  The ADA further states that it is unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of...or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of" any right protected by the ADA. 42 U.S.C. § 12203.

348.  Congress specifically authorized individuals who believe their Title II ADA rights are being violated to bring an action in a United States District Court. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

349.    The challenged provisions of SB 1 collectively and individually discriminate against people with disabilities in exercising their right to vote, including on members and/or constituents of Plaintiffs' organizations. As described above:

      a.    SB 1 § 5.02, in requiring specific identification numbers or a statement that the voter has not been issued such identification in order to apply for early voting, imposes eligibility criteria that tends to screen out people with disabilities who may lack access to such IDs or other numbers by reason of their disabilities and denies voters with disabilities equal access to the early voting ballot application process by prohibiting Plaintiffs' members and other qualified voters with disabilities from voting even if they meet all other qualifications to vote by  mail and denying them reasonable modifications to access the State's voting program.

      b.    SB 1 §§ 6.03, 6.05, and 6.07 in requiring those assisting voters with disabilities to fill out onerous forms and subjecting assistors to criminal liability for submitting incorrect forms interfere with the legal rights of voters with disabilities and those who assist them in exercising their rights and deny voters with disabilities equal access to voting.

      c.    SB 1 § 6.04, in requiring those who assist voters to take an oath regarding the nature of their assistance under penalty of perjury, denies voters with disabilities equal access to voting by unlawfully limiting the scope of assistance the assistor can provide and interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights and deny voters with disabilities equal access to voting.

350.     Through the acts and omissions described above, Defendants have discriminated against Plaintiffs on the basis of disability in violation of Title II of the ADA and its implementing regulations by:

a.     denying members and constituents of Plaintiffs with disabilities the opportunity to participate in and benefit from voting in a way that is equal to those afforded to those without disabilities;

b.     denying members and constituents of Plaintiffs with disabilities services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other voters;

c.     imposing eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying the state's voting program;

d.     failing to reasonably modify the state's voting system to provide the services the members and constituents of Plaintiffs with disabilities need to avoid discrimination;

e.     utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishments of the objectives of Defendants' voting programs with respects to the members and constituents of Plaintiffs with disabilities; and

f.     interfering with the ability of voters with disabilities and those who assist them to exercise their rights under the ADA

351.     The relief sought by Plaintiffs would not require a fundamental alteration to Defendants' programs, services, or activities.

352.     Sections 84.002, 64.0322, 64.034, 86.010, 86.013 of the Texas Election Code, as amended by SB 1, discriminate against qualified Texas voters with disabilities in violation of Title II of the Americans with Disabilities Act of 1990.

353.     The acts and omissions of Defendants have caused and will continue to cause Plaintiffs irreparable harm.

<div align="center">

**COUNT EIGHT**

**Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. § 794**
**(Discrimination on the Basis of Disability by Recipients of Federal Financial Assistance)**
Plaintiff The Arc of Texas against Defendants Scott, Paxton, Longoria, Callanen

</div>

354.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-255, as if fully set forth herein.

355.     The challenged provisions of SB 1 discriminate against voters with disabilities. Plaintiffs challenge the following provisions:

- SB 1 § 5.02 (imposing voter identification requirements on early voting ballot applications);
- SB 1 §§ 6.03, 6.05, and 6.07 (requiring an assistor to disclose and document their name, address, relationship to the voter, and whether the assistor received compensation; and makes failure by the assistant to complete the form correctly a state jail felony);
- SB 1 § 6.04 (limiting the type of assistance that can be provided in voting, requiring an assistor to make the following affirmation: "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance . . . I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot.")

356.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by any program or activity receiving federal

<div align="center">

- 121 -

</div>

financial assistance.  29 U.S.C. § 794.  Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a).  A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

357.   Section 504 prohibits covered entities from imposing or applying eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying the benefits of the programs or activities of a covered entity.

358.   Section 504 also prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

359.   A covered entity is required by Section 504 to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

360.   An "individual with a disability" who is "otherwise qualified" is eligible for relief under Section 504. An individual with a disability is any person who has a disability as defined in § 12102 of the ADA, as described above. 29 U.S.C § 705.

361.   Defendants' programs, services, and activities receive Federal financial assistance. Texas has a significant pool of federal funds earmarked for making elections accessible and secure. The Texas Secretary of State's Election Funds Management Division receives and administers federal funding throughout the state. In 2020, Texas received

- 122 -

$26,064,574 in funding through the Help American Vote Act ("HAVA"). In addition, Texas received $24,546,840 million pursuant to the CARES Act in 2020.  Accordingly, Defendants are subject to the nondiscrimination requirements of Section 504 and sovereign immunity is waived. The operations of Defendants are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B).

362.    Section 504 and the ADA are largely identical and courts interpret them in tandem. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris Cty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020).

363.    As described in Count Seven, constituents and members of Plaintiff organizations with disabilities are "otherwise qualified individuals with a disability." By reason of their disabilities, they are being excluded from participation in and being denied the benefits of voting that is equal to that afforded other voters, and they are subjected to discrimination by Defendants. Defendants are recipients of Federal financial assistance and thus are subject to the requirements of the Rehabilitation Act, 29 U.S.C. § 794. Defendants' actions and inactions constitute violations of Section 504. The challenged provisions of SB 1 collectively and individually discriminate against people with disabilities in exercising their right to vote, including members and constituents of Plaintiffs' organizations, and constitute violations of Section 504

364.    Sections 84.002, 64.0322, 64.034, 86.010, 86.013 of the Texas Election Code, as amended by SB 1, deny qualified individuals with disabilities a full and equal opportunity to participate in the State's voting programs, in violation of Section 504.

365.    The acts and omissions of Defendants have caused and will continue to cause Plaintiffs irreparable harm.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully requests that this Court:

a.      Declare that the Challenged Provisions of SB 1 violate the First, Fourteenth, and Fifteenth Amendments of the United States Constitution and Sections 2 and 208 of the Voting Rights Act, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

b.      Preliminarily and permanently enjoin Defendants, along with their respective agents, officers, employees, and successors, from enforcing the challenged provisions of SB 1 set forth above;

c.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to the Voting Rights Act, 52 U.S.C. § 10310(e), and the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988; the Americans with Disabilities Act, 42 U.S.C. § 12205; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a;

d.      Retain jurisdiction to ensure ongoing compliance with the foregoing orders; and

e.      Grant such other equitable and further relief that this Court deems just and proper.

113288597.2 0099831-00001

DATED:  December 1, 2021

Respectfully submitted,

STOEL RIVES LLP

By:  /s/ Wendy J. Olson
Wendy J. Olson (admitted *Pro hac vice*)
Laura E. Rosenbaum (admitted *Pro hac vice*)
Marc Rasich (admitted *Pro hac vice*)
Elijah Watkins (admitted *Pro hac vice*)ng
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480


Sean Lyons
State Bar No. 00792280
Sean@lyonsandlyons.com
Clem Lyons
State Bar No. 12742000
Clem@lyonsandlyons.com
LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
Telefax: (210) 225-6545

Courtney Hostetler (admitted *Pro hac vice*)
Ron Fein (admitted *Pro hac vice*)
John Bonifaz (admitted *Pro hac vice*)
Ben Clements (admitted *Pro hac vice*)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
rfein@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

*Attorneys for Plaintiffs Mi Familia Vota, Marla
López, Marlon López, and Paul Rutledge*

- 125 -

REED SMITH LLP, NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC., THE ARC OF THE
UNITED STATES, INC.

 /s/ Kenneth E. Broughton
Kenneth E. Broughton
Texas Bar No. 03087250
kbroughton@reedsmith.com

Lora Spencer
Texas Bar No. 24085597
lspencer@reedsmith.com

J. Keely Dulaney*
Texas Bar No. 24116306
kdulaney@reedsmith.com

Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899

Sarah M. Cummings
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
scummings@reedsmith.com

Kathryn Sadasivan*
Amir Badat*
NAACP Legal Defense and Educational Fund,
Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
ksadasivan@naacpldf.org
abadat@naacpldf.org

- 126 -

Jennifer A. Holmes*
Georgina Yeomans*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org
gyeomans@naacpldf.org

Shira Wakschlag*
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

*Admitted Pro Hac Vice*

*Counsel for Plaintiffs Houston Justice; Houston Area Urban League; Delta Sigma Theta Sorority, Inc.; The Arc of Texas; and Jeffrey Lamar Clemmons*

- 127 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2021, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

 /s/ Wendy J. Olson
Stoel Rives LLP
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
wendy.olson@stoel.com

- 128 -

113288597.2 0099831-00001