# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Case No. 5:21-cv-844-XR |
| v. | § | [Lead Case] |
| | § | |
| THE STATE OF TEXAS and JOHN SCOTT, in | § | |
| his official capacity as Texas Secretary of | § | Case No. 5:21-cv-1085-XR |
| State, | § | [Consolidated Case] |
| | § | |
| *Defendants.* | § | |

## MOTION TO DISMISS THE FEDERAL GOVERNMENT'S CLAIMS

**TABLE OF CONTENTS**

Table of Contents .................................................................................................................2

Table of Authorities.............................................................................................................3

Introduction..........................................................................................................................1

Argument ..............................................................................................................................2

    I.   The Challenge to Section 6.04 Fails....................................................................2

        A.  The Federal Government Does Not Have Standing ......................................2

           1.   The Secretary Does Not Enforce Section 6.04, and an Injunction Against the Secretary Would Not Redress Any Injury ................................................3

           2.   The Federal Government Cannot Sue the State of Texas Either...........................5

        B.  Section 208 Does Not Preempt SB1 ...............................................................5

           1.   The Federal Government's Burden to Show Conflict Preemption Is High...........5

           2.   SB1 Does Not Conflict with Section 208 ................................................6

        C.  Congress Did Not Authorize the Attorney General to Bring This Claim....................7

           1.   Neither Title I Nor Title II of the Voting Rights Act Give the Federal Government a Cause of Action...........................................................................7

           2.   Having Denied the Federal Government a Cause of Action, Congress Did Not Create a Roundabout Path for the Federal Government to Discover a Cause of Action................................................................................................8

    II.  The Challenge to Sections 5.07 and 5.13 Also Fails...............................................10

        A.  SB1 Does Not Violate the Materiality Provision...........................................10

        B.  The Federal Government Cannot Sue the Secretary......................................14

        C.  The Federal Government Cannot Sue the State .............................................15

Conclusion ..........................................................................................................................16

Certificate of Service..........................................................................................................17

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldridge v. Mississippi Dept. of Corrections,*
  990 F.3d 868 (5th Cir. 2021)................................................................................5

*Barrett v. United States,*
  423 U.S. 212 (1976)..........................................................................................16

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993)............................................................................................4

*Bullock v. Calvert,*
  480 S.W.2d 367 (Tex. 1972)...............................................................................4

*Carr v. United States,*
  560 U.S. 438 (2010)..........................................................................................16

*Elam v. Kansas City Southern Ry. Co.,*
  635 F3d 796 (5th Cir. 2011)...............................................................................5

*Florida State Conf. of NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) ..........................................................................6

*In re Hotze,*
  627 S.W.3d 642 (Tex. 2020)...............................................................................4

*Jacobson v. Florida Secretary of State,*
  974 F.3d 1236 (11th Cir. 2020) ..........................................................................3

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992).......................................................................................2, 3

*McDonald v. Board of Election Commissioners of Chicago,*
  394 U.S. 802 (1969)..........................................................................................12

*In re Methyl Tertiary Butyl Ether (MTBE) Prodcts Liability Litig.,*
  725 F.3d 65 (2d Cir. 2013) ..................................................................................5

*Muskrat v. United States,*
  219 U.S. 346 (1911)............................................................................................5

*OCA-Greater Houston v. Texas,*
  867 F.3d 604 (5th Cir. 2017)...............................................................................4

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) (en banc) ..........................................................3, 15

*Return Mail, Inc. v. United States Postal Serv.*,
    139 S. Ct. 1853 (2019) ............................................................................................15

*In re State*,
    602 S.W.3d 549 (Tex. 2020) ....................................................................................12

*Teltech Systems, Inc. v. Bryant*,
    702 F.3d 232 (5th Cir. 2012) .....................................................................................5

*Texas Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ....................................................................................12

*Texas Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ..............................................................................11, 12

*Texas Democratic Party v. Hughs*,
    974 F.3d 570 (5th Cir. 2020) (per curiam) ................................................................4

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .....................................................................................................9

*United States v. Salerno*,
    481 U.S. 739 (1987) ...................................................................................................4

*United States v. Wilson*,
    503 U.S. 329 (1992) .................................................................................................16

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) .................................................................................................15

*Will v. Michigan Dept. of State Police*,
    491 U.S. 58 (1989) ...................................................................................................15

*Williams v. Marinelli*,
    987 F.3d 188 (2d Cir. 2021) ......................................................................................5

*Wilson v. Omaha Indian Tribe*,
    442 U.S. 653 (1979) .................................................................................................15

*Wilson v. Taylor*,
    658 F.2d 1021 (5th Cir. 1981) ...................................................................................4

**Statutes**

1 U.S.C. § 1 ......................................................................................................................15

42 U.S.C. § 1983................................................................................................................15

52 U.S.C. § 10101 ......................................................................................................*passim*

52 U.S.C. § 10307(a) ........................................................................................ 8, 9, 10

52 U.S.C. § 10308 ........................................................................................ 2, 8, 9, 10

52 U.S.C. § 10501 ........................................................................................ 7

52 U.S.C. § 10502 ........................................................................................ 7

52 U.S.C. § 10503 ........................................................................................ 7

52 U.S.C. § 10504 ........................................................................................ 7, 9

52 U.S.C. § 10505 ........................................................................................ 7

52 U.S.C. § 10508 ........................................................................................ *passim*

52 U.S.C. § 10701 ........................................................................................ 9

Tex. Elec. Code § 11.002 ................................................................................ 13

Tex. Elec. Code § 32.071 ................................................................................ 3

Tex. Elec. Code § 32.074 ................................................................................ 3

Tex. Elec. Code § 64.032 ................................................................................ 1, 6

Tex. Elec. Code § 64.034 ................................................................................ *passim*

Tex. Elec. Code § 82.005 ................................................................................ 12

Tex. Elec. Code § 84.032 ................................................................................ 12

Tex. Elec. Code § 86.001 ................................................................................ *passim*

Tex. Elec. Code § 86.015 ................................................................................ *passim*

Tex. Elec. Code § 87.002 ................................................................................ 14

Tex. Elec. Code § 87.041 ................................................................................ 13, 14

Tex. Elec. Code § 87.0411 .............................................................................. 11

Tex. Elec. Code § 276.014 .............................................................................. 13

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law* 174 (2012) ...................................... 9

## INTRODUCTION

The Election Protection and Integrity Act of 2021, also referred to as SB1, amended, among other things, the oath to which assistors must swear before helping a voter with a ballot and the procedures for approving a request for a mail ballot and accepting the mailed ballot itself. *See* 87th Tex. Leg., 2d C.S., Ch. 1, §§ 5.07, 5.13, 6.04 (2021). The federal government challenges the amended oath under Section 208 of the Voting Rights Act ("VRA"). *See* ECF 131 ¶ 68 (citing 52 U.S.C. § 10508). It challenges the amended mail-ballot procedures under the Materiality Provision of the Civil Rights Act ("CRA"). *See id.* ¶ 75 (citing 52 U.S.C. § 10101(a)(2)(B)).

Those claims fail because SB1 is fully consistent with federal law. First, Texas law does not violate Section 208 because it incorporates Section 208's requirements. *Compare* 52 U.S.C. § 10508 (allowing "assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union"), *with* Tex. Elec. Code § 64.032(c) (allowing assistance "by any person selected by the voter other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"). The federal government complains that the revised oath allegedly limits the types of assistance that can be provided, but Section 208 does not specify the types of assistance that must be permitted, much less do so with the clarity required to preempt Texas law.

Second, Texas law does not violate the Materiality Provision. The federal government challenges commonsense provisions that require anyone voting by mail to provide certain identifying information, which helps local election officials ensure that those casting mail-in ballots are who they claim to be. To the extent there are any problems, SB1 provides a cure process. If that does not work, eligible voters can always vote in person. SB1 does not "deny the right of any individual to vote in any election," much less for a reason "not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B).

In any event, Congress has not empowered the Attorney General to sue these Defendants under these statutes. Congress specifically authorizes the Attorney General to enforce enumerated

provisions of the VRA, but Section 208 is not among them. *See* 52 U.S.C. §§ 10308(d); 10504. Similarly, the CRA authorizes the Attorney General to sue States and their officials for violations of the Materiality Provision in some circumstances, but that authority does not apply here, where the federal government complains only of anticipated future acts by local officials. *See* 52 U.S.C. § 10101.

The Court should grant Defendants' motion and dismiss the federal government's claims.

ARGUMENT

## I.   The Challenge to Section 6.04 Fails

Section 6.04 of SB1 amends the oath that assistors take before assisting a voter. That oath now reads:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to **reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot;** [answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties;] I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.**

*See* Tex. Elec. Code § 64.034 (deletions struck through; additions in bold). The federal government claims that Section 208 of the VRA preempts this oath and its requirements. It is wrong; those two laws do not conflict because they address different issues. But the Court need not reach that issue because the federal government has not plausibly alleged that it has standing, and Congress has not authorized—and has in fact precluded—the federal government's suit.

### A.   The Federal Government Does Not Have Standing

Standing to sue requires (1) an injury-in-fact (2) fairly traceable to a defendant's action (3) that can be redressed by a judgment against that defendant. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561

(1992). Traceability requires that the plaintiff's injury be "fairly . . . trace[able] to the challenged action *of the defendant*," not merely the challenged law. *Lujan*, 504 U.S. at 560 (emphasis added) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Similarly, redressability is not satisfied unless "the court's judgment on the defendant—not an absent third party—[] redresses the plaintiff's injury" *Jacobson v. Fla. Secy. of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (quoting *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc)) (emphasis omitted).

Here, the federal government can establish neither traceability nor redressability because the Secretary is "powerless to enforce" Section 6.04. *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc). Allowing the federal government to sue the Secretary would violate "the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute." *Id.* (citing *Muskrat v. United States*, 219 U.S. 346 (1911)).

### 1. The Secretary Does Not Enforce Section 6.04, and an Injunction Against the Secretary Would Not Redress Any Injury

The federal government's complaint about Section 6.04 is that "requiring [assistors] to take the revised oath" prohibits them from "providing [] forms of voting assistance that some qualified voters require to cast an informed and effective vote." ECF ¶¶ 44–45. But the Secretary of State does not require assistors to take the oath, nor is the Secretary charged with enforcing that requirement. That duty, rather, falls to the presiding election judge in each election precinct, who is "in charge of and responsible for the management and conduct of the election at the polling place . . . that the judge serves." Tex. Elec. Code § 32.071. The election judge, and the clerks serving that judge, are additionally empowered to "administer any oath required or authorized to be made at a polling place." *Id.* § 32.074.

It is those officials, not the Secretary, who are responsible for seeing that the oath is administered and obeyed. *Id.* § 64.034. The Secretary is not responsible for whether assistors take the modified oath, much less whether they adhere to it. An injunction against the Secretary would not redress the federal government's claimed injury because "[e]njoining" the Secretary "from enforcing the requirements of Section 6.04" would not change anything. ECF 131 at 18.

To be sure, *OCA-Greater Houston v. Texas* wrongly found standing in an earlier suit based on the Secretary's position as "the 'chief election officer of the state.'" 867 F.3d 604, 613 (5th Cir. 2017). The federal government also relies on the Secretary's status as "the State's chief election officer." ECF 131 ¶ 13. But *OCA* "involved a *facial* challenge," not "an as-applied challenge to a law enforced by local officials." *Tex. Democratic Party v. Hughs*, 974 F.3d 570, 571 (5th Cir. 2020) (per curiam) (distinguishing *OCA*). Its reasoning is limited to cases considering "[t]he facial validity of a Texas election statute." *OCA*, 867 F.3d at 613.

This suit, however, involves an as-applied claim, not a facial one. The federal government does not claim "that no set of circumstances exists under which [Section 6.04] would be valid," as it would have to do in a facial challenge. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Rather, it alleges that Section 6.04 will sometimes prevent "eligible voters' assistors of choice from providing necessary and effective forms of assistance." ECF 131 ¶ 69. It does not, for example, complain about applications of Section 6.04 that prevent *unnecessary* and *ineffective* forms of assistance. Thus, it cannot benefit from *OCA*'s limited holding.

In any event, *OCA* is inconsistent with Texas authorities, which control on the underlying question of Texas law: Does being the "chief election officer" empower the Secretary to enforce Section 6.04? No, because the "Secretary's title 'chief election officer' is not a delegation of authority to care for any breakdown in the election process." *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020) (Blacklock, J., concurring) (describing *Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972)). *OCA* did not consider these precedents, or any other opinions from Texas courts. Justice Blacklock's *In re Hotze* concurrence post-dated *OCA*, so the *OCA* court did not have a chance to consider that opinion. And the *OCA* court appears to have been unaware of *Calvert*, which was not cited in the parties' briefs. Because *OCA* did not "squarely address[]" Texas cases interpreting the Secretary's role as chief election officer, it is not binding "by way of *stare decisis*." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see Wilson v. Taylor*, 658 F.2d 1021, 1034–35 (5th Cir. 1981) (refusing to follow a Fifth Circuit opinion that conflicted with a previous Supreme Court opinion that "was not called to the attention of the [first Fifth Circuit] panel").

### 2. The Federal Government Cannot Sue the State of Texas Either

The federal government also lacks standing to sue the State of Texas. The amended complaint does not explain any theory for making Texas a defendant, and it does not plausibly allege that any state official enforces the oath requirement. On the contrary, the federal government appears to name Texas as a defendant "in its sovereign capacity" for the purpose of "settl[ing] the [allegedly] doubtful character of the legislation in question." *Muskrat*, 219 U.S. at 361–62. But that is not enough to support standing. Even when a sovereign's legislature enacted the challenged law, that is not enough to give the sovereign an "interest adverse" to the challenger. *Id.* at 361. This Court should dismiss the claim against Texas as well.

## B. Section 208 Does Not Preempt SB1

### 1. The Federal Government's Burden to Show Conflict Preemption Is High

Conflict preemption "is present when (1) 'compliance with both state and federal law is impossible,' or (2) state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Aldridge v. Miss. Dept. of Corrections*, 990 F.3d 868, 875 (5th Cir. 2021) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989)). The "inquiry begins with the presumption that federal statutes do not supersede States' historic police powers, unless Congress clearly and manifestly intended to do so." *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012). "This assumption applies with 'particular force'" in a field "traditionally occupied by State law." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 804 (5th Cir. 2011) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).

Preemption requires not mere "tension between federal and state law," but a "sharp conflict between state law and federal policy." *Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (quotations omitted). "Indeed, federal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013) (quotation omitted).

### 2.  SB1 Does Not Conflict with Section 208

Section 6.04's modifications to the assistor oath do not conflict with Section 208. Section 208 says that certain voters "may be given assistance by" certain assistants. 52 U.S.C. § 10508. SB1 is not to the contrary. Texas law expressly allows those voters to receive assistance from those assistants. The oath that Section 6.04 modified is simply one way of ensuring that voters receive appropriate assistance and are not coerced or unduly influenced.

The federal government's challenge to Section 6.04 is more limited than the challenges lodged by some of the private plaintiffs. The federal government, for example, does not claim that SB1 improperly limits a voter's choice of assistant. *See* ECF 131 ¶¶ 66–70. That makes sense. Texas law parrots the language of Section 208. *Compare* Tex. Elec. Code § 64.032(c) (allowing assistance "by any person selected by the voter other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"), *with* 52 U.S.C. § 10508 (allowing "assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union").

Instead, the federal government claims that Section 6.04 "limit[s] permissible actions to 'reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot.'" ECF 131 ¶ 68. This theory fails for two reasons.

First, Section 6.04 does not conflict with Section 208 because Section 208 does not specify that States must allow assistance beyond that allowed by Texas law. By its text, Section 208 does not purport to require particular types of assistance. It leaves States with discretion to determine what constitutes appropriate assistance and what constitutes inappropriate coercion. Because Section 208 does not completely displace State law, "[i]t is certainly possible to comply with both [Section 208] and [Section 6.04]." *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008).

Second, Section 6.04 is consistent with Section 208's purpose. According to the Senate Judiciary Committee, voters who need assistance "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." S. Rep. 97-417, 62, 1982 U.S.C.C.A.N. 177, 240 (May 25, 1982) (Senate Report). The House Judiciary Committee decried not only "failure to provide

. . . assistance" but also "abusive manipulation of assistance." H. Rep. 92-227, 14 (Sept. 15, 1981). Thus, Congress left room for States to protect voters from intimidation and coercion. It did not interfere with "the legitimate right of any State to establish necessary election procedures" so long as those procedures are "designed to protect the rights of voters." Senate Report at 63. Congress did not create a uniform standard for what assistance is appropriate in various circumstances. The Senate Judiciary Committee recognized that States did not provide the same types of assistance across the country, and it did not do anything to displace that status quo. *See id.* ("all States now provide some form of voting assistance for handicapped voters").

### C. Congress Did Not Authorize the Attorney General to Bring This Claim

#### 1. Neither Title I Nor Title II of the Voting Rights Act Give the Federal Government a Cause of Action

Even if the federal government could establish traceability and redressability, it still would not be able to bring this suit. The federal government does not have a general power to enforce the VRA. Rather, Congress has authorized it to sue to enforce particular sections of that Act—and Section 208 is not among them.

Section 208 is part of Title II of the VRA, created as part of the 1970 amendments to that Act. *See* Pub. L. 91-285, 84 Stat. 314, § 6 (1970). Among the additions created by those amendments were Section 201, which prohibits literacy and related tests as voting qualifications; Section 202, which eliminates residency requirements for voting for President and Vice President; and now-Sections 204 and 205, which empower the Attorney General to sue to enforce Sections 201 and 202. *See* 52 U.S.C. §§ 10501–02, 10504–05. A few years later, Congress against amended the Act, adding Section 203, which establishes bilingual election requirements. Pub. L. 94-73, 89 Stat. 400, § 301 (1975) (codified at 52 U.S.C. § 10503). At the same time, it amended Sections 204 and 205, granting the Attorney General the same power to sue to enforce Section 203 as he enjoys for Sections 201 and 202. *Id.* §§ 302–303 (codified at 52 U.S.C. §§ 10503–05).

Section 208, however, stands alone. When Congress added Section 208 to Title II, it granted certain voters who require it permission to be "given assistance" in casting their ballots. Pub. L. 97-

205, 96 Stat. 131, § 5 (1982) (codified at 52 U.S.C. § 10508). But it did *not* expand the Attorney General's enforcement authority to include Section 208. And there the Attorney General's enforcement power for Title II has sat, untouched and not covering Section 208, for the last forty years. Congress knows how to create an enforcement power in Title II; it did so in 1970. It knows how to expand an enforcement power in Title II; it did so in 1975. Having done neither in 1982—or at any time since—the only conclusion is that Congress in Title II withheld from the Attorney General authority to enforce Section 208.

The story is similar—and the conclusion is the same—for the more-familiar prohibitions and enforcement authority in Title I of the VRA. Section 12 of the VRA has, since the Act's inception, authorized the Attorney General to enforce the terms of Sections 2, 3, 4, 5, 10, and 11(a)–(b) through both civil and criminal proceedings. Voting Rights Act of 1965, Pub. L. 89-110, 79 Stat. 437, § 12. But that enforcement authority, while broad, has never been expanded to include either Title II in general or Section 208 in particular. *See* 52 U.S.C. § 10308.

## 2. Having Denied the Federal Government a Cause of Action, Congress Did Not Create a Roundabout Path for the Federal Government to Discover a Cause of Action

The federal government is therefore left to assert that Congress, rather than deny it a cause of action, instead buried a cause of action within the Statutes at Large whence a sufficiently clever Attorney General could excavate it. According to the federal government, Section 11(a), which the Attorney General does have the power to enforce, encompasses Section 208, which the Attorney General does not. *See* ECF 131 ¶ 6. Even if Section 208 preempted SB1—it does not, *see* Argument § I.B—that would not make the enforcement of SB1 a violation of Section 11(a). A local election official implementing the amended oath requirement is not "fail[ing] or refus[ing] to permit any person to vote." 52 U.S.C. § 10307(a).

The federal government does not allege that any local officials administering oaths to assistors will "fail or refuse to permit any person to vote." *Id.* Nor could it. The purpose of SB1 is to protect

the right to vote, including from undue influence. There is no reason to think that local officials will undermine SB1's purpose by preventing eligible voters from voting.

The federal government's theory seems to be that the administration of the revised oath will prevent some assistors from providing some assistance that some voters would appreciate. *See* ECF 131 ¶¶ 41–45. Even if that were true, and even if it were inconsistent with Section 208, it would not mean that the local officials administering those oaths had revoked voters' right to vote.

The federal government appears to read Section 11(a) more broadly so that any violation of the VRA is a violation of Section 11(a). *See* ECF 131 ¶ 6. In addition to being inconsistent with the ordinary meaning of Section 11(a)'s text, that interpretation would render portions of Section 12(d) superfluous. If the federal government were right that Section 12(d) incorporates Section 11(a) and that Section 11(a) incorporates everything in the VRA, then there would be no reason for Section 12(d) to authorize federal-government lawsuits to enforce several specific sections of the VRA. There would similarly be no reason for Section 204 to separately authorize lawsuits regarding violations of listed sections in Title II, or for Section 301 to separately authorize suits to enforce Title III. The Court should reject the federal government's surplusage-creating interpretation of the VRA. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (statutes should be construed so that "no clause, sentence, or work shall be superfluous, void, or insignificant"). *See also* Antonin Scalia & Bryan A. Garner, *Reading Law* 174 (2012) (surplusage canon).

Even if the federal government had a cause of action to enforce Section 208, it would not apply against the Secretary. The complaint does not allege that the Secretary "will fail or refuse to permit any person to vote" or "willfully fail or refuse to tabulate, count, and report" anyone's vote. 52 U.S.C. § 10307(a); *cf.* ECF 131 ¶ 13. As discussed above, Section 6.04 does not have that effect. It merely modifies an oath administered by local officials and taken by assistors. But even if the Court concluded that administering that oath to assistors affected a voter's permission to vote, the cause of action would presumably lie against local officials administering the oaths, not the Secretary.

The federal government also cannot sue the State of Texas for an alleged violation of Section 208. Even if the Attorney General otherwise had authority to bring a civil action to enforce that

provision through Section 11(a)—he does not—it would not apply to a suit against the State itself. Section 11(a) regulates only "person[s]," not States. 52 U.S.C. § 10307(a). As explained in more detail below, courts presume that federal statutes applicable to "persons" do not apply to sovereigns. *See* Argument § II.C. To be sure, in limited circumstances, Section 12(d) allows an order directing the State to (1) permit qualified persons to vote and (2) to count such votes, 52 U.S.C. § 10308(d), but that does not apply here. Texas already permits all such individuals to vote and directs local officials to count those votes. The federal government does not allege otherwise.

## II.  The Challenge to Sections 5.07 and 5.13 Also Fails

The federal government also challenges sections 5.07 and 5.13 under the Materiality Provision because they require mail-in voters to provide certain identifying information. *See* ECF 131 ¶¶ 71–76. This challenge fails for two reasons. First, SB1 does not "deny the right of any individual to vote" because it does not affect eligibility to vote in person and contains cure provisions to ensure that those who want to vote by mail can. 52 U.S.C. § 10101(a)(2)(B). Second, SB1 turns on facts "material in determining whether" individuals are "qualified under State law to vote" because they allow election officials to identify the individuals attempting to cast a ballot. *Id.* In any event, the Attorney General lacks statutory authority to sue either the Secretary or the State itself in these circumstances.

### A.  SB1 Does Not Violate the Materiality Provision

SB1 cannot violate the Materiality Provision because the challenged sections do not lead to anyone being denied the right to vote. The federal government complains about two aspects of SB1, but both leave Texans with opportunities to cast a ballot.

First, the federal government points to applications to vote by mail. It worries that, under Section 5.07, "early voting clerks 'shall reject' a mail ballot application that includes an identification document number or social security number that 'does not identify the same voter identified on the applicant's application for voter registration.'" ECF 131 ¶ 60 (quoting Tex. Elec. Code § 86.001). But the rejection of an application is not the end of the process. It is the beginning of an elaborate cure process that allows an applicant to fix any problems. "If an application is rejected . . . , the clerk shall

provide notice of the rejection" to the applicant. Tex. Elec. Code § 86.001(f-1); *see also id.* § 86.001(c) (requirements for notice). That notice provides "information regarding the ability to correct or add information . . . through [an] online tool." *Id.* § 86.001(f-1); *see also id.* § 86.015(c) (requirements for the online tool). If the applicant takes advantage of the online tool and "corrects [the] application," "the clerk shall provide a ballot to the applicant." *Id.* § 86.001(f-2).

Second, the federal government focuses on mail ballots themselves. It is concerned that, under Section 5.13, "a mail ballot 'may be accepted only if' the identification document number or social security number provided on the carrier envelope 'identifies the same voter identified on the voter's application for voter registration.'" ECF 131 ¶ 61 (quoting Tex. Elec. Code § 87.041). If a mail ballot does not have that information, however, there is a cure process. *See* Tex. Elec. Code § 87.0411(a)(4). The details of the cure process depend on when the ballot is submitted and when the defect is discovered relative to Election Day. If there is sufficient time, the early voting ballot board will "return the carrier envelope to the voter by mail" so that the voter can "correct the defect and return the carrier envelope before the time the polls are required to close on election day." *Id.* § 87.0411(b)(2). If there is not sufficient time for that process, then "the board may notify the voter of the defect by telephone or e-mail and inform the voter" about the option to cancel "the voter's application to vote by mail," which would allow for in-person voting, and the option to "come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect" preventing counting of the mail ballot. *Id.* § 87.0411(c).

SB1 thus allows Texans to cure any defect that would otherwise prevent them from voting by mail. That forecloses any claim that Sections 5.07 and 5.13 "deny" anyone the right to vote by mail. 52 U.S.C. § 10101(a)(2)(B). The Fifth Circuit recently held that whether a right to vote has been "denied" depends on whether the would-be voter has been "in fact absolutely prohibited from voting." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 188 (5th Cir. 2020) (quoting *McDonald v. Bd. of Election Commrs. of Chi.*, 394 U.S. 802, 807–08 & n.7 (1969)). Under SB1, the ability to vote by mail has not been "absolutely prohibited;" at most, it may require a cure process for some voters. Thus, Sections 5.07 and 5.13 do not violate the Materiality Provision.

Even if SB1 absolutely prohibited voting by mail—it does not—it still would not violate the Materiality Provision. That provision prohibits election officials from "deny[ing] the right of any individual to vote" on certain grounds. 52 U.S.C. § 10101(a)(2)(B). It therefore protects "the right to vote," not the "claimed right" to vote by mail. *McDonald*, 394 U.S. at 807. In 1964, when the Materiality Provision was passed, the right to vote did not include a right vote by mail. As the Fifth Circuit recently held, "the right to vote . . . did not include a right to vote by mail" even as late as 1971. *Tex. Democratic Party*, 978 F.3d at 188 (interpreting the Twenty-Sixth Amendment).

As discussed above, SB1 leaves Texans with the option to vote in person, either during the extensive early voting period or on Election Day. *See* Tex. Elec. Code § 82.005 ("Any qualified voter is eligible for early voting by personal appearance."); *id.* § 84.032 (procedures for cancelling an application to vote by mail). The federal government does not allege that any voters "are in fact absolutely prohibited from voting by the State." *McDonald*, 394 U.S. at 808 n.7. As a result, SB1 cannot deny the right to vote. "Texas permits the [voters in question] to vote in person; that is the exact opposite of 'absolutely prohibit[ing]' them from doing so." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald*, 394 U.S. at 808 n.7); *accord Tex. Democratic Party*, 978 F.3d at 188 (holding that the right to vote is "not denied where" a voter is not "in fact absolutely prohibited from voting" (quotations omitted)).

If courts interpreted the Materiality Provision as applying to the claimed right to vote by mail, absurd results would follow. Like many States, Texas allows some voters, but not all voters, to vote by mail. *See In re State*, 602 S.W.3d 549, 559 (Tex. 2020). Thus, it prevents some voters from voting by mail (instead permitting them to vote in person) despite their being "qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). If the Materiality Provision applied to the ability to vote by mail (rather than the right to vote), then it would appear to prohibit that common approach. But courts have routinely upheld laws limiting eligibility to vote by mail, despite the well-known existence of the Materiality Provision. *See, e.g.*, *McDonald*, 394 U.S. at 810–11; *Tex. Democratic Party*, 978 F.3d at 194. Notably, the federal government appears to concede that this would be a problem by

distinguishing "whether a voter meets State law qualifications to vote" from "whether a voter meets State law qualifications . . . to cast a mail ballot." ECF 131 ¶ 74.

Finally, even if SB1 denied someone the right to vote—it does not—it still would not violate the Materiality Provision. The operation of SB1 depends on facts "material in determining whether [a would-be voter] is qualified under State law to vote in [the relevant] election." 52 U.S.C. § 10101(a)(2)(B). The information required by Sections 5.07 and 5.13 is used to determine the identity of the person attempting to cast a mail ballot. *See* Tex. Elec. Code § 86.001(f) (requiring rejection of an application to vote by mail if "the application does not identify the same voter identified on the applicant's application for voter registration"); *id.* § 87.041(b)(8) (conditioning acceptance of a mail ballot on whether the information "identifies the same voter identified on the voter's application for voter registration").

Without knowing the identity of the individual attempting to cast a ballot, one cannot determine whether that individual is in fact qualified to vote. Under Texas law, whether a person is a "qualified voter" depends on age, citizenship, mental competence, criminal history, residence, and registration. Tex. Elec. Code § 11.002(a). Each of those qualifications necessarily depends on the identity of the would-be voter. Thus, the information required by Sections 5.07 and 5.13 is "material in determining whether [a would-be voter] is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B).

The federal government seems to believe that Texas law requires officials to prevent individuals from voting despite being qualified to vote under Texas law. That is not true. Even in the context of mail ballots, Texas law expressly requires local officials to "provide an official ballot" if "the applicant is entitled to vote an early voting ballot by mail." Tex. Elec. Code § 86.001(b). And Texas law makes it a felony to "knowingly or intentionally . . . refuse to count votes the person knows are valid." *Id.* § 276.014. Texas is statutorily committed to counting all valid votes. The federal government does not plausibly allege otherwise.

## B.  The Federal Government Cannot Sue the Secretary

The Secretary is not a proper defendant because none of his alleged actions "deny the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). The enforcement of SB1 never leads to denying anyone's right to vote, *see* Argument § II.A, but even if it did, that enforcement would be undertaken by local officials, not the Secretary. The Secretary is not a proper defendant.

According to the amended complaint, SB1 "den[ies] the right to vote" "by requiring rejection of mail ballot materials." ECF 131 ¶ 74. As the federal government concedes, any rejection of "mail ballot materials" is done by the "election officials" who review individual submissions. *Id.* ¶ 73. The Secretary does not accept or reject any mail ballot materials because he is not responsible for reviewing those materials.

The challenged provisions make that obvious. Section 5.07 requires "the clerk" to take various actions. *See* Tex. Elec. Code § 86.001(f)–(f-2). The title "clerk" refers to "the early voting clerk," a local official, not the Secretary. *See id.* § 86.001(a); ECF 131 ¶ 60 (complaining about the actions of "early voting clerks"). Section 5.13 likewise regulates the acceptance of mail ballots by local officials, not the Secretary. The federal government complains about Section 5.13 because it adds a requirement to a provision addressing the actions of "[t]he early voting ballot board." Tex. Elec. Code § 87.041(a); *see* ECF 131 ¶ 61. The Secretary does not serve on any early voting ballot board. *See* Tex. Elec. Code § 87.002 (composition of board).

The federal government has not identified any acts that the Secretary could or would take "to reject mail ballot materials." ECF 131 ¶ 73. Because that is the only alleged denial of the right to vote at issue in this case, *see id.* ¶ 74, the Secretary is not a proper defendant.

The closest the federal government comes to addressing this statutory requirement is the conclusory assertion that "Defendants"—not the Secretary in particular—will "implement[] and enforc[e] Section 5.07 and Section 5.13 of SB 1, including through issuance of written or verbal directives, orders, and instructions to local election officials, and other actions to obtain and maintain uniformity in the application, operation, and interpretation of Sections 5.07 and 5.13 of SB 1." *Id.* ¶ 76. But the amended complaint does not allege that any of these acts would lead to the rejection of

14

mail ballot materials. On the contrary, the federal government concedes that it is "Section 5.07 and Section 5.13 of SB 1," not any actions of the Secretary, that "require election officials to reject mail ballot materials." *Id.* ¶ 73. To the extent SB1 requires local officials to reject any mail ballot materials, it does so independently of any actions the Secretary does or does not take.

The federal government thus "confuses the *statute*'s immediate coercive effect on [local election officials] with any coercive effect that might be applied by the *defendants*." *Okpalobi*, 244 F.3d at 426. The Secretary does not and cannot coerce local election officials into rejecting any given set of mail ballot materials. But even if he did, he still would not be taking the only action underlying the federal government's complaining: "rejecti[ng] . . . mail ballot materials—thereby [supposedly] denying the right to vote." ECF 131 ¶ 75.

### C. The Federal Government Cannot Sue the State

The State is also not a proper defendant. The Materiality Provision regulates "persons," not States. It provides that "[n]o *person* acting under color of law shall" take various actions. 52 U.S.C. § 10101(a)(2) (emphasis added). The Dictionary Act clarifies that the word "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals," 1 U.S.C. § 1, but "[n]otably absent from the list of 'person[s]'" are States. *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1862 (2019) (noting that "the Federal Government" is not included). This follows ordinary meaning. "[I]n common usage, the term 'person' does not include the sovereign, [and] statutes employing the phrase are ordinarily construed to exclude it." *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979). Thus, courts apply the "longstanding interpretive presumption that 'person' does not include the sovereign," including States. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000). The Supreme Court has held, for example, that States are not "persons" under 42 U.S.C. § 1983. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).

Confirming that Section 10101(a)(2) does not generally authorize suits against States, Section 10101(c) allows States to be sued in only limited circumstances that do not apply here. The Attorney

General can sue other defendants regardless of whether he is challenging a past act or an anticipated future act. His authority is triggered "[w]henever any person *has engaged* or there are reasonable grounds to believe that any person *is about to engage* in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b)." 52 U.S.C. § 10101(c) (emphases added). But the Attorney General's authority to name a State as a defendant is more limited. It applies only when the Attorney General is challenging a past act. It is triggered "[w]henever" the official sued "is alleged to *have committed* any act or practice constituting a deprivation of any right or privilege secured by subsection (a)." *Id.* (emphasis added).

"Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). "Have committed" in Section 10101(c) "denot[es]" an act that has been completed" just as "has been shipped" did in *Barrett v. United States*, 423 U.S. 212, 216 (1976); *see also Carr v. United States*, 560 U.S. 438, 447–48 (2010) (distinguishing "the present tense ('travels')" from "the past or present perfect 'traveled' or 'has traveled'").

In this case, the federal government cannot sue the State because it is not challenging any past act of the Secretary. The amended complaint does not allege that the Secretary has already completed any past act in violation of the Materiality Provision. *Cf.* ECF 131 ¶ 13 (alleging the Secretary has authority to take various actions without alleging he has taken any such actions). That failure is independently sufficient to warrant dismissal of the State as a defendant.

Moreover, even when the Attorney General is otherwise authorized to name a State as a defendant, the State can only "be joined as a party defendant" along with the official, unless "such official has resigned or has been relieved of his office and no successor has assumed such office," in which case "the proceeding may be instituted against the State." *Id.* Here, the Secretary is not a proper defendant for the reasons explained above, *see* Argument § II.B, so the State cannot "be joined as a party defendant."

## CONCLUSION

State Defendants respectfully request that the Court dismiss the federal government's claims.

Date: December 14, 2021

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Patrick K. Sweeten*

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF on December 14, 2021, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN