UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

STATE OF TEXAS, *et al.*,

     Defendants.

No. 5:21CV844-XR (Lead Case)

No. 5:21CV1085-XR (Consolidated Case)

---

## BRIEF OF MISSOURI SECRETARY OF STATE JOHN R. ASHCROFT AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

---

MARK F. (THOR) HEARNE, II (*pro hac motion pending*)
STEPHEN S. DAVIS (*pro hac motion pending*)
True North Law, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
(314) 296-4001 (fax)
thor@truenorthlawgroup.com
sdavis@truenorthlawgroup.com

*Counsel for Amicus Curiae Missouri Secretary of State John R. Ashcroft*

JOHN R. ASHCROFT (*pro hac motion pending*)
Secretary of State
State of Missouri
600 West Main Street
Jefferson City, MO 65101
(573) 751-4936

*Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ................................................................. 1

SUMMARY OF ARGUMENT .......................................................................... 2

ARGUMENT ..................................................................................................... 3

    I.    Texas and other states have a compelling interest in protecting the integrity of elections ................................................................................................ 3

        A.  The Help America Vote Act enabled states, like Texas, to implement further election integrity reform measures .............................................. 4

        B.  The Carter-Baker Commission made additional recommendations to protect the integrity of elections ......................................................................... 8

        C.  States have a compelling interest in protecting the integrity of elections ............. 10

    II.   Documented occurrences of vote fraud confirm states' compelling interest in adopting reasonable, non-discriminatory rules to protect the integrity of elections ... 15

    III.  Texas' election reform legislation will increase public confidence and increase voter participation ......................................................................................... 19

CONCLUSION ................................................................................................. 20

CERTIFICATE OF COMPLIANCE ................................................................ 21

CERTIFICATE OF SERVICE ......................................................................... 22

APPENDIX ....................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ......................................................................................................................... 11

*Brnovich v. Democratic Nat'l Comm.*,
141 S.Ct. 2321 (2021) .............................................................................................................. *passim*

*Burdick v. Takushi*,
504 U.S. 428 (1992) ...................................................................................................... 2, 11, 12, 14

*Bush v. Gore*,
531 U.S. 98 (2000) ............................................................................................................................. 4

*Clingman v. Beaver*,
544 U.S. 581 (2005) ....................................................................................................................... 13

*Crawford v. Marion County Election Board*,
553 U.S. 181 (2008) ................................................................................................................ *passim*

*Eu v. San Francisco County Democratic Central Comm.*,
489 U.S. 214 (1989) ........................................................................................................................... 4

*Ex Parte Yarbrough*,
110 U.S. 651 (1884) ........................................................................................................................... 4

*Franks v. Hubbard*,
498 S.W.3d 862 (Mo. Ct. App. 2016) ........................................................................................... 17

*Lassiter v. Northampton County Board of Elections*,
360 U.S. 45 (1959) ......................................................................................................................... 12

*Lee v. Virginia State Board of Elections*,
188 F. Supp.3d 577 (E.D. Va. 2016) ............................................................................................. 20

*Lee v. Virginia State Board of Elections*,
843 F.3d 592 (4th Cir. 2016) ............................................................................................ 14, 15, 16

*Mason v. Missouri*,
179 U.S. 328 (1900) ....................................................................................................................... 14

*McConnell v. Federal Election Comm'n*,
540 U.S. 93 (2003) ......................................................................................................................... 19

*Munro v. Socialist Workers Party*,
   479 U.S. 189 (1986) ............................................................................................... 13

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ............................................................................................... 12

*Personnel Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ............................................................................................... 12

*Priorities USA v. State of Missouri*,
   591 S.W.3d 448 (Mo. 2020) ..................................................................................... 1

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ............................................................................................... 9, 10

*Railway Express Agency, Inc. v. New York*,
   336 U.S. 106 (1949) ............................................................................................... 12

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997) ............................................................................................... 12

*United States v. Classic*,
   313 U.S. 299 (1941) ................................................................................................. 4

*United States v. Saylor*,
   322 U.S. 385 (1944) ................................................................................................. 9

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) .................................................................................................... 9

## Constitutional Provision and Statutes

52 U.S.C. §20901 ................................................................................................... 4, 5

52 U.S.C. §21083 ...................................................................................................... 8

52 U.S.C. §21084 ...................................................................................................... 7

87th Tex. Leg., 2nd C.S., Ch. 1 (2021) ...................................................................... 2

Mo. Const. Art. VIII, §11 .......................................................................................... 1

Mo. Rev. Stat. §28.035 .............................................................................................. 1

Mo. Rev. Stat. §115.427 ............................................................................................ 1

Tex. Elec. Code §63.0101 ............................................................................................................14

**Other Authorities**

John Fund & Hans von Spakovsky, OUR BROKEN ELECTIONS: HOW THE LEFT CHANGED THE
WAY YOU VOTE (2021) ............................................................................................................18

Andrew Gumbel, STEAL THIS VOTE: DIRTY ELECTIONS AND THE ROTTEN HISTORY OF
DEMOCRACY IN AMERICA (2005) ............................................................................................16

Dave Helling, *Missouri Rep. John Joseph Rizzo's Relatives Admit to Voter Fraud*,
KANSAS CITY STAR (June 28, 2013) ........................................................................................17

North Carolina State Board of Elections, *In the Matter of Investigation of Election
Irregularities Affecting Counties within the 9th Congressional District, Before the
State Board of Elections*, State of North Carolina, Order (March 13, 2019) ............................19

Richard A. Posner, BREAKING THE DEADLOCK: THE 2000 ELECTION, THE CONSTITUTION, AND
THE COURTS (2001) ..................................................................................................................16

Secretary of State Rebecca McDowell Cook, *Analysis and General Recommendation Report
Regarding the November 2000 General Election in the City of St. Louis* (Jan. 4, 2001) ..........17

St. Louis Post-Dispatch Editorial Board, *Miserable Tradition*,
ST. LOUIS POST-DISPATCH (Dec. 11, 2000).............................................................................17

Stephanie Simon, *In St. Louis, Dead Are Causing Lively Debate with Their Votes*,
LOS ANGELES TIMES (Feb. 28, 2001) ......................................................................................17

Peter Tapsak, *Voter Fraud Is Real. Here Are 4 More Cases*, DAILY SIGNAL (Aug. 18, 2016) ...18

U.S. Commission on Civil Rights, *Hearing before the U.S. Comm'n on Civil Rights*
(Oct. 13, 2006) .........................................................................................................................15

U.S. Commission on Federal Election Reform, REPORT OF THE COMMISSION ON
FEDERAL ELECTION REFORM, BUILDING CONFIDENCE IN U.S. ELECTIONS (Sept. 2005) ... *passim*

U.S. Congress, CONGRESSIONAL RECORD ....................................................................4, 5, 6, 7, 8

U.S. House Committee on the Judiciary, *Hearing on H.R. 3295 Before the H. Comm. on the
Judiciary*, 107th Cong. (2001) ..................................................................................................7

White House, Remarks at Signing of H.R. 3295, 2002 WL 31415995 (Oct. 29, 2002).................5

Kenneth H. Winn, *It All Adds Up: Reform and the Erosion of Representative Government in
Missouri, 1900-2000*, OFFICIAL MANUAL: STATE OF MISSOURI (1999-2000) ..........................17

## INTEREST OF *AMICUS CURIAE*[1]

John R. Ashcroft was elected as Missouri's 40th Secretary of State in November 2016 and reelected in November 2020. Secretary Ashcroft is Missouri's "chief state election official," supervises an Elections Division of his office, including an Election Integrity Unit, and is authorized to receive and investigate election-related complaints under the Help America Vote Act and complaints of violations of Missouri's election law. Mo. Rev. Stat. §28.035. Like Texas, Missouri's election statutes have undergone recent reform, resulting in changes to election administration in Missouri. See MO. CONST. ART. VIII, §11; Mo. Rev. Stat. §115.427. Missouri's voter identification statute was challenged, and Secretary Ashcroft defended the law. See *Priorities USA v. State of Missouri*, 591 S.W.3d 448 (Mo. 2020). Thus, Secretary Ashcroft has particular experience and expertise that would be helpful to this Court in enforcing state election integrity reform legislation.

This brief is desirable and the matters asserted herein are relevant to the disposition of this case. Secretary Ashcroft has additional specialized expertise in election administration. Secretary of State Ashcroft supports the recommendations of the bipartisan Carter-Baker Commission's REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, BUILDING CONFIDENCE IN U.S. ELECTIONS (Sept. 2005).[2] As Secretary Ashcroft stated when he testified before Congress in 2018, he believes the integrity of elections is of the utmost importance. The rule of law depends upon citizens' confidence that our elections are conducted fairly, openly, and honestly, and that every eligible citizen has an equal opportunity to participate.

---

[1] Defendants State of Texas and Texas Secretary of State John Scott consent to the filing of this brief. Plaintiff United States has stated that it takes no position regarding the filing of this brief. No person, other than *amicus curiae* or his counsel, authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief.

[2] "Carter-Baker Commission Report" (available at: truenorthlawgroup.com/constitutional-law).

## SUMMARY OF ARGUMENT

The Texas Election Protection and Integrity Act of 2021[3] provides commonsense election-integrity protections that, *inter alia*, require voters casting a ballot by mail to provide identifying information and to prohibit a person who assists a voter filling out a ballot from influencing the voter regarding how to vote.  The United States Supreme Court has repeatedly recognized that states have a compelling interest in assuring the integrity of elections and must be allowed to combat potential fraud and corruption in the electoral process while protecting the right of every eligible citizen to participate.  Preventing vote fraud must be balanced against the desire to provide every eligible citizen access to the ballot box.  States may enact laws regulating the administration of elections, even if these laws may impose some burden on voters, because "if [elections] are to be fair and honest and [conducted with] some sort of order rather than chaos" such rules are necessary.[4]  And the Supreme Court has repeatedly relied upon the findings and recommendations of the seminal, bipartisan report of the Carter-Baker Commission on Federal Election Reform.

Texas and its citizens have a legitimate interest in reasonable, non-discriminatory safeguards that protect the integrity of Texas elections.  States may require a person to validate the person's eligibility to cast a ballot by providing a government-issued identification with the person's photograph to election officials.  See *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008); *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2340 (2021).  In enacting the Help America Vote Act of 2002 (HAVA), Congress adopted measures for protecting the integrity of elections. The Carter-Baker Commission, whose recommendations have been adopted by the Supreme Court, proposed a number of recommendations, including voter identification

---

[3] 87th Tex. Leg., 2nd C.S., Ch. 1, §§5.07, 5.13, 6.04 (2021).

[4] *Burdick v. Takushi*, 504 U.S. 428, 432 (1992).

requirements and provisions to prevent absentee vote fraud. Texas' election integrity reforms are constitutional and will improve confidence in elections and increase voter participation.

## ARGUMENT

### I.     Texas and other states have a compelling interest in protecting the integrity of elections.

Requiring a person establish their identity before casting a ballot has, rather surprisingly, become a controversial and heavily-litigated proposition.[5] Those opposing voter identification requirements contend such laws are racially-motivated (or at least partisan-motivated) effort to suppress the vote of minorities who tend to favor Democratic Party candidates more than Republican Party candidates. Others, including former President Jimmy Carter, Juan Williams, civil rights leader Andrew Young, and other Democrats, believe that election reforms, such as those recommended by the Carter-Baker Commission, prevent vote fraud, increase public confidence in the integrity of elections, and enjoy broad public support, including the support of majorities of Democratic and minority voters.[6]

The Supreme Court has recognized that states have a compelling interest to ensure a free, honest, and trustworthy election process. The Supreme Court also recognizes that states may act preemptively to prevent corruption of elections. A century ago, the Supreme Court observed,

---

[5] Providing photo-ID is a routine feature of everyday life necessary to cash a check, board an aircraft, enter a government building (including a federal courthouse), or buy a bottle of wine or over-the-counter cold medicine. In fact, the City of St. Louis requires residents to provide a "Valid State ID/Driver's License" in order to apply for its COVID-relief Direct Cash Assistance Program. See https://www.stlouis-mo.gov/government/departments/human-services/emergency-assistance/direct-cash.cfm.

[6] According to a March 2021 Rasmussen survey, "75% of Likely U.S. Voters believe voters should be required to show photo identification such as a driver's license before being allowed to vote" and that support for voter ID laws has actually increased since 2018. "Eighty-nine percent (89%) of Republicans support voter ID requirements, as do 60% of Democrats and 77% of voters not affiliated with either major party." See https://bit.ly/32MtRGo.

> In a republican government, like ours, where political power is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, the temptations to control these elections by violence and by corruption is a constant source of danger.... Such has been the history of all republics, and, though ours has been comparatively free from both these evils in the past, no lover of his country can shut his eyes to the fear of future danger from both sources.

*Ex Parte Yarbrough*, 110 U.S. 651, 666 (1884).

"Free and honest elections are the very foundation of our republican form of government. Hence any attempt to defile the sanctity of the ballot cannot be viewed with equanimity." *United States v. Classic*, 313 U.S. 299, 329 (1941). "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989).

### A. The Help America Vote Act enabled states, like Texas, to implement further election integrity reform measures.

The 2000 presidential election resulting in the *Bush v. Gore* decision[7] spurred Congress to take a comprehensive look at the nation's election system. Beginning in early 2001, Congress examined all facets of the nation's election system, including voting technology, voter registration, and election integrity. Former Presidents Gerald Ford and Jimmy Carter co-chaired a bi-partisan commission that investigated the conduct of federal elections and issued a report recommending ways to improve the conduct of elections. These efforts culminated in the passage of the Help America Vote Act of 2002, which was passed by overwhelming bi-partisan majorities.[8]

The Help America Vote Act was intended to "change the system to make it easier to vote and tougher to cheat." 148 CONG. REC. S10488 (2002) (statement of Sen. Kit Bond). The

---

[7] 531 U.S. 98 (2000).

[8] Pub. L. No. 107-252, 116 Stat. 1666, 52 U.S.C. §20901, *et seq*. The House passed HAVA by a vote of 357-48 on October 10, 2002. 148 CONG. REC. H7853-54 (2002). Then on October 16, 2002, the Senate approved HAVA by a margin of 92-2. *Id.* at S10515.

4

legislation's "one central goal [ ] was to make it easier to vote in America and much harder to corrupt our Federal election system." *Id.* at S2527 (statement of Sen. Chris Dodd).[9]  "Every American citizen – appropriate age, appropriate qualifications, properly registered – ought to be able to cast a ballot without difficulty.  They also ought to be able to do that only once."[10]

Congress recognized that any comprehensive election reform legislation had to include strong and effective measures to prevent vote fraud because "illegal votes dilute the value of legally cast votes – a kind of disenfranchisement no less serious than not being able to cast a ballot."[11]  Congress included in HAVA provisions designed to prevent vote fraud.[12]  HAVA includes measures to prevent voter registration fraud by requiring a person submitting a new mail-in voter registration form to confirm their eligibility to vote with a current valid photo identification, or, in the alternative, "a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." *Id.* §15483(b)(2)(A)(ii).  According to Senator McConnell, HAVA

> ensure[s] that dogs...will no longer be able to register and vote.  These provisions
> will ensure that our dearly departed will finally achieve everlasting peace and will

---

[9] President Bush noted that the Carter-Ford Commission's recommendations "helped inspire this legislation," stating, "our nation is grateful for their work on election reform and for all they have given to America."  Remarks at Signing of H.R. 3295, 2002 WL 31415995 (Oct. 29, 2002).

[10] *Id.* at S710 (statement of Sen. Bond).  See also *id.* at S2527 (statement of Sen. Dodd) ("All of us worked many months to develop legislation that would try to meet one central goal; that was to make it easier to vote in America and much harder to corrupt our Federal election system.").

[11] 148 CONG. REC. S10488 (2002) (statement of Sen. Bond).  See also *Hearing on H.R. 3295 "Help America Vote Act of 2001" Before the House Judiciary Comm.*, 107th Cong. (Dec. 5, 2001), available at 2001 WL 1552086 (F.D.C.H.) (statement of Rep. Sensenbrenner) ("The basic principle of 'one person, one vote,' one that crosses party lines for voting, is not a partisan issue, it is an American issue.  All Americans want to know that the vote they cast, for the candidate of their choice, will be counted fairly and accurately.  But, it is also the concern of a great many Americans that widespread voter fraud is discounting or 'canceling' out the value of their legally cast vote.").

[12] See *id.* at S10419 (2002) (statement of Sen. McConnell) ("To protect the integrity of every election, this conference report makes significant advancements in rooting out vote fraud. Congress has acted properly to curtail fraudulent voting and reduce duplicate registrations....").

not be troubled with exercising their franchise every two years.  And importantly, the provisions will ensure that voter rolls will be cleansed and protected against fraudulent and duplicate registrations.[13]

Senator Bond observed that, "[b]y passage of this legislation, Congress has made a statement that vote fraud exists in this country."[14]

Congress included in HAVA the requirement for first-time voters who register by mail to provide proof of identity before voting to remedy the problem of inflated and inaccurate voter lists – a problem significantly exacerbated by "the abuse of mail registration cards."[15]  Senator Bond, the primary author of the voter identification provision, explained why this requirement is so important:

> [T]he identification provision...[is] necessary to guarantee the integrity of our public elections and to protect the vote of individual citizens from being devalued by fraud.  Every false registration and every fraudulent ballot cast harms the system by canceling votes cast by legitimate voters.  It undermines the confidence of the public that their vote counts and therefore undermines public confidence in the integrity of the electoral process.[16]

The problem that voter identification provisions are designed to resolve is not a theoretical one.  Senator Bond urged Congress to consider the experience of Missouri, where

> there is abundant evidence of [mail registration] cards being used for the purpose of getting phony names, the names of the deceased and even the names of pets on voter rolls.  Someone even registered the deceased mother of the prosecuting attorney of the City of St. Louis.  Names have been registered to drop-houses,

---

[13] 148 CONG. REC. S10419 (2002).

[14] *Id.* at S10489.

[15] 148 CONG. REC. S10489 (2002) (statement of Sen. Bond).  See also 148 CONG. REC. S10419 (statement of Sen. McConnell) ("[F]irst-time voters who register by mail will have to confirm their identity at some point in the process by photo identification or other permissible identification. This provision was championed by Senator Bond.").  See also *id.* at S10501 (statement of Sen. Dodd) ("We also include provisions which Senator Bond insisted on in terms of responsibility. We are going to make sure we do our best to see to it that people who register to vote are who they say they are, so we don't have people registering fictitious people and casting ballots for them.  To Senator Bond's credit, we worked very hard on that.").

[16] 148 CONG. REC. S10489 (2002).

businesses, union halls, Mailbox Etc. and vacant lots. From there the people behind the fraud can request an absentee ballot in the name of the voter or attempt to go to the polls and cast a vote under the assumed name.[17]

To further underscore the seriousness of the problem, Senator Bond listed the names of a select few voters who had registered via mail-in card:

> Barnabas Miller of California, Parker Carroll of North Carolina, Packie Lamont of Washington, DC, Cocoa Fernandez of Florida, Holly Briscoe of Maryland, Maria Princess Salas of Texas and Ritzy Mekler of Missouri. They are a new breed of American voter. Barnabas and Cocoa are poodles. Parker is a Labrador. Maria Princess is a Chihuahua, Holly is a Jack Russell Terrier, and Ritzy is a Springer-Spaniel.[18]

Senator Bond concluded, "Now, I like dogs...but I don't think we should allow them to vote.... If your vote is canceled by the vote of a dog...it is as if you did not have a right to vote." *Id.*

Among other things, HAVA §21083(b)(2)(A)(ii) was specifically included to address vote fraud and provides minimum requirements for identification of voters who register by mail, including presentation of photographic identification.[19]  Although HAVA requires photographic identification for persons casting a ballot for the first time following a mail-in registration, §21083(b)(2)(A)(ii) also provides non-photo ID alternatives, including "a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter."  These identification standards are a "floor," not a "ceiling."  HAVA explicitly provides that these provisions "are minimum requirements," and that it does not "prevent a State from establishing election technology and administration requirements that are more strict" so long as they are not inconsistent with its provisions.  52 U.S.C. §21084.

---

[17] *Id.*

[18] 148 CONG. REC. S10488 (2002).

[19] See *Hearing on H.R. 3295 Before the H. Comm. on the Judiciary*, 107th Cong. (2001), available at 2001 WL 552086 (F.D.C.H.) (statement of Rep. F. James Sensenbrenner, Jr.) (identifying vote fraud as a significant motive behind HAVA's anti-fraud provisions).

Furthermore, HAVA's legislative history makes entirely clear that Congress contemplated and approved of state anti-fraud measures that are more robust than those in HAVA. With regard to the voter identification provision, Senator Bond stated,

> The conferees recognize that many States have taken steps to address fraud. ... *It is the agreement of the conferees that this bill in no way limits the ability of the states from taking steps beyond those required in this bill.* For instance, several States require those who register by mail to vote in person the first time they vote. This bill does not limit a State from taking this additional step to address fraud. *Each of the steps taken in this bill to address fraud shall be considered to be a minimum standard.*[20]

Congress's understanding that HAVA established minimum requirements that the States may exceed is spelled out with respect to other anti-fraud provisions in HAVA as well. For example, states may require more information on a voter registration form than is required under HAVA (requiring a voter registration form to require either a driver's license number or, if the registrant does not have one, the last four digits of a Social Security number).[21] Senator Bond explained,

> It is important to note that states that utilize full social security numbers for voter registration applicants can continue to do so after passage of this legislation. This new registration requirement is a minimum standard. *If a state requires applicants to provide more information* – such as their entire nine-digit social security number – *this legislation will not override that state requirement*.... We have seen that States that require additional identifying information from registrants have substantially fewer duplicate and fraudulent registrations on their voter rolls.[22]

## B.     The Carter-Baker Commission made additional recommendations to protect the integrity of elections.

A commission co-chaired by former President Jimmy Carter and former Secretary of State James Baker was convened after the 2004 presidential election. This commission was the successor to the Carter-Ford Commission and included many of the same members. The Carter-

---

[20] 148 CONG. REC. S10490 (2002) (emphasis added).

[21] 52 U.S.C. §21083(a)(5)(A)(i).

[22] 148 CONG. REC. S10490, S10492-93 (2002) (emphasis added).

Baker Commission proposed a number of recommendations states should consider, including voter identification requirements. The Carter-Baker Commission is a highwater mark in the development of national, bipartisan, consensus for election reform.

In *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), the Supreme Court held that a citizen's right to cast a ballot can be diluted by malapportionment of representation, just as they can be diluted by election tampering, stating, "[n]ot only can this right to vote not be denied outright, it cannot...be destroyed by alteration of ballots, or diluted by stuffing of the ballot box."[23] In *Crawford*, the Supreme Court explained that Indiana's election integrity statute protected citizens' votes from being diluted or impaired as endorsed by the Carter-Baker Commission.

> [HAVA and the National Voter Registration Act of 1993] indicate that Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology. That conclusion is also supported by a report issued shortly after the enactment of [Indiana's law] by the Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which is a part of the record in these cases.[24]

In *Brnovich*, the Democratic National Committee challenged Arizona's election integrity law, and specifically, protections against mail-in vote fraud and ballot harvesting. The Court held, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." 141 S.Ct. at 2347 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).[25] The Court explained that

---

[23] Citations omitted; citing *United States v. Saylor*, 322 U.S. 385, 387 (1944) (whether statute "embraces a conspiracy by election officers to stuff a ballot box in an election at which a member of the Congress of the United States is to be elected"). See also statement of Rep. Sensenbrenner, *supra*, note 11, regarding the importance of "one person, one vote" principle establish in *Wesberry*.

[24] 553 U.S. at 193 (extensive quotation of the Carter-Baker Commission report omitted).

[25] In *Purcell*, the Court explained that vote fraud disenfranchises citizens who lawfully cast ballots, stating, "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." 549 U.S. at 4.

regulating the absentee voting process justifiably "deters potential fraud and improves voter confidence," again looking to the recommendations of the Carter-Baker Commission. *Id.*

> That was the view of the bipartisan Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James Baker.   The Carter-Baker Commission noted that "[a]bsentee balloting is vulnerable to abuse in several ways: ... Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation.[26]

In *Brnovich*, the Court upheld Arizona's election reform law, explaining that "[t]he Commission warned that '[v]ote buying schemes are far more difficult to detect when citizens vote by mail,' and it recommended that 'States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations, candidates, and political party activists from handling absentee ballots.'"  141 S.Ct. at 2347.

> Among its other recommendations, the Carter-Baker Commission wrote that

> [t]o ensure that persons presenting themselves at the polling place are the ones on the registration list, the Commission recommends that states require voters to use the REAL ID card.... The card includes a person's full legal name, date of birth, a signature (captured as a digital image), a photograph, and the person's Social Security number.  This card should be modestly adapted for voting purposes to indicate on the front or back whether the individual is a U.S. citizen.  States should provide an EAC-template ID with a photo to nondrivers free of charge.[27]

Vote fraud is an existential threat to the legitimacy of our Republic.  Stuffing the ballot box or rigging the outcome of elections denies all citizens their constitutional right to have their votes counted equally and to be confident in the outcome of an election.

### C.      States have a compelling interest in protecting the integrity of elections.

The *Anderson-Burdick* standard of review is deferential to state rules regulating the conduct of elections.  *Anderson* held, "The inquiry is whether the challenged restriction unfairly

---

[26] *Id.* (quoting Carter-Baker Commission Report, p. 46).

[27] Carter-Baker Commission Report, pp. 18-21.

or unnecessarily burdens the 'availability of political opportunity.'" *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). *Burdick v. Takushi* instructed it was an "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold." 504 U.S. at 432. The Supreme Court explained,

> Election laws will inevitably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends." ... Accordingly, the mere fact that a State's system "creates barriers...does not itself compel close scrutiny."[28]

The Court's decisions also recognize that, to assure the integrity of elections, states must be allowed to adopt measures to protect the integrity of the conduct of elections, provided of course, that these measures are not discriminatory and are facially neutral and applied equally to all eligible voters. Thus, in holding that election regulations are subject only to a "flexible standard" of review, *Burdick* emphasized that state regulation is essential to assuring honest elections, and that states must have flexibility to establish the specific procedures under which local elections will be administered:

> [T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest...would tie the hands of States seeking to assure that elections are operated equitably and efficiently. ... The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, §4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of

---

[28] *Id.* at 433.

voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote...."[29]

The task of balancing the competing considerations and policies governing the conduct of elections is to be decided by the state – not the federal judiciary.   It is "obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections...." *Oregon v. Mitchell*, 400 U.S. 112, 125 (1970).[30]

Those seeking to invalidate state laws under a rational basis standard must show the only purpose of the legislation was arbitrary, irrational or invidiously discriminatory.  See *Railway Express Agency, Inc. v. New York*, 336 U.S. 106 (1949).  The Supreme Court later explained, "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.  The calculus of the effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979).

This year the Supreme Court held,

> One strong and entirely legitimate state interest is the prevention of fraud.  Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight.  Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome. ... Section 2 [of the Voting Rights Act] does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives.

*Brnovich*, 141 S.Ct. at 2340, 2345-46.

---

[29] 504 U.S. 428, 433-34 (1992) (citations omitted).

[30] See also *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45, 50 (1959) ("States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised"); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulation of parties, elections, and ballots to reduce election – and campaign-related disorder.").

Similarly, the Court emphasized that "it is beyond question that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (citation omitted). States need not wait until after they have been robbed before locking the door. They may address potential problems preemptively, and need not wait until they mature into a full-fledged crisis. "Legislatures...should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986). While laws requiring a person to establish his or her identity and eligibility before casting a ballot have become politically controversial, Texas demonstrates how a state may constitutionally and lawfully adopt and implement a voter identification requirement consistent with the Carter-Baker Commission's recommendations and consistent with the Supreme Court's holding in *Crawford*, 553 U.S. at 193. The Supreme Court held,

> Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology. That conclusion is also supported by...the Commission on Federal Election Reform, chaired by former President Jimmy Carter and the former Secretary of State James A. Baker III.

The Carter-Baker Commission recommended that states adopt photo-ID laws to prevent vote fraud and restore public confidence in the election process:

> [Even though there] is no evidence of extensive fraud in U.S. elections or of multiple voting...*both occur, and it could affect the outcome of a close election....*

> While the Commission is divided on the magnitude of voter fraud – with some believing the problem is widespread and others believing that it is minor – there is no doubt that it occurs. The problem, however, is not the magnitude of the fraud. In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference.

And second, the perception of possible fraud contributes to low confidence in the system. A good ID system could deter, detect, or eliminate several potential avenues of fraud – such as multiple voting or voting by individuals using the identities of others or those who are deceased – and thus it can enhance confidence.[31]

In *Crawford*, the Supreme Court held that inconveniences incident to voting, like obtaining a photo ID, do not "raise any question about the constitutionality" of an election integrity law. 553 U.S. at 197. "For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Id.* at 197-98, 199-200.[32] Under Texas' law, like Virginia's voter ID law upheld in *Lee v. Virginia State Board of Elections*, 843 F.3d 592, 600 (4th Cir. 2016), the requirement is extraordinarily lenient.[33] In *Crawford* the Supreme Court held that a state's interest in preventing vote fraud (even in the absence of a documented history of specific vote fraud) to be a legislative fact which lower courts are bound to respect. Thus, as a matter of law states have a compelling interest in preventing vote fraud. This is not an adjudicative fact but a settled issue of

---

[31] Carter-Baker Commission Report §2.5 (emphasis added). The Commission's photo-ID recommendation was supported by a number of Democrats, including civil rights leader and former Atlanta mayor Andrew Young.

[32] The Supreme Court directs the supposed "burden" must be something more than the "usual burdens of voting." *Id.* at 198. "Usual burdens of voting" include, registering to vote (*Mason v. Missouri*, 179 U.S. 328, 335 (1900)), having to vote for a named candidate not a write-in candidate (*Burdick*, 504 U.S. at 441-42), or driving or walking to the polling place on the first Tuesday in November. See also *Brnovich*, 141 S.Ct. at 2346.

[33] Any person who cannot reasonably obtain an acceptable photo-ID in Texas can vote in-person with many of the same forms of identification accepted under HAVA (utility bill, bank statement, government check, etc.) by filling out a declaration that the person doesn't have a photo ID. See Tex. Elec. Code §63.0101. To vote by mail, a person need only provide a driver's license number, election identification certificate number, or Texas Department of Public Safety ID card number; or if the person hasn't been issued one of these forms of identification, the person may provide the last four digits of his or her Social Security number. *Id.* §84.002(a)(1-a). The number of an expired ID is acceptable, so long as the ID is otherwise valid. *Id.* §84.002(b-1).

14

law even without a record "of any such fraud actually occurring in Indiana at any time in its history." *Crawford*, 553 U.S. at 194.  See also *Brnovich*, 141 S.Ct. at 2345-46.

Texas' voter identification requirements will not prevent any eligible voter from casting a ballot.  And those challenging Texas' law have not identified any eligible voter who will be denied access to the ballot due to these safeguards.  Texas' requirement is less burdensome than the identification the Carter-Baker Commission recommended and is less burdensome than the voter identification requirement other courts have upheld.  See, *e.g.*, *Lee*, 843 F.3d at 600.

## II. Documented occurrences of vote fraud confirm states' compelling interest in adopting reasonable, non-discriminatory rules to protect the integrity of elections.

Political power is, unfortunately, a proven inducement to corruption.  As James Madison noted in FEDERALIST NO. 51, men are not angels and sound government must be premised upon this understanding of human nature.  Elections provide the means to acquire political power, and history teaches that some people (even if only a small percentage) are willing to violate the law to achieve political power.  If men were angels, there would be no need of any rules to govern elections.  Nor, for that matter, would there be need of locks on our doors, police officers, or passwords for our computers.

Regrettably, vote fraud is not a myth.  The Carter-Baker Commission concluded that "there is no doubt" that in-person voting fraud occurs; "[i]n close or disputed elections...a small amount of fraud could make the margin of difference."[34]  America has an unfortunate history of vote fraud, and much of this fraud is conducted at the polling place.[35]  William Marcy "Boss" Tweed famously

---

[34] Carter-Baker Commission Report, *supra*, p. 1, at 18.

[35] President Carter's book TURNING POINT (1995) recounts the massive vote fraud he experienced in his first run for the Georgia State Senate.  Professor Robert Pastor, a Carter-Baker Commission member and former Carter Administration official, has testified to his own disenfranchisement when he was informed someone had voted in his name before he appeared at the polls.  See *Hearing before the U.S. Comm'n on Civil Rights* (Oct. 13, 2006), pp. 111-18.

said, "I don't think there was ever a fair or honest election in the City of New York."[36]  The fact

that vote fraud is less prevalent today than in the days of Boss Tweed is the result of reforms that

have improved our election process.

But election reforms (such as those proposed by the Carter-Baker Commission and adopted

by Congress in the Help America Vote Act) is a continuing process.  Vote fraud is not,

unfortunately, merely of historical interest. Vote fraud, including voter registration fraud, remains

a feature of American elections.  The Carter-Baker Commission provided several examples:

> The November 2004 elections [ ] showed that irregularities and fraud still occur.
> In Washington, for example, where Christine Gregoire was elected governor by a
> 129-vote margin, the elections superintendent of King County testified during a
> subsequent unsuccessful election challenge that ineligible ex-felons had voted and
> that votes had been cast in the names of the dead. ... In Milwaukee, Wisconsin,
> investigators said they found clear evidence of fraud, including more than 200 cases
> of felons voting illegally and more than 100 people who voted twice, used fake
> names or false addresses, or voted in the name of a dead person. ... By one estimate,
> for example, there were over 181,000 dead people listed on the voter rolls in six
> swing states in the November 2004 elections, including almost 65,000 dead people
> listed on the voter rolls in Florida.[37]

When Indiana enacted its voter identification statute at issue in *Crawford*, the Indiana

legislature considered Missouri's experience with vote fraud.  That experience is instructive.  The

---

[36] Andrew Gumbel, STEAL THIS VOTE: DIRTY ELECTIONS AND THE ROTTEN HISTORY OF
DEMOCRACY IN AMERICA (2005), pp. 74-75.  Voter impersonation was a device favored by Boss
Tweed's machine: "[r]epeaters," often felons, were "given five dollars, as much liquor as they
could hold, and a list of the recently deceased whose names they were to use to cast as many ballots
as possible.  Vote early and often' was Tammany's much vaunted maxim, and that was exactly
what these men intended to do." *Id.*  See also Richard A. Posner, BREAKING THE DEADLOCK: THE
2000 ELECTION, THE CONSTITUTION, AND THE COURTS (2001), pp. 39-40. "Because of extensive
vote fraud by Democrats as well as Republicans, it is uncertain whether Tilden really did win the
popular vote [in the 1876 presidential election]." *Id.* at 39.  In other elections the suspected vote
fraud may not have been sufficient to change the outcome, but nevertheless undermined public
confidence in the honesty of the election process. *Id.* at 40 (noting that "[t]here were serious
allegations of fraud by Democrat election officials in Illinois and Texas" in John F. Kennedy's
1960 election).

[37] Carter-Baker Commission Report, *supra*, p. 1, at 4.

"Pendergast Machine" in Kansas City so institutionalized vote fraud in Missouri that the Official Manual of the State of Missouri (published by the Missouri Secretary of State's Office) described its practices in detail.

> Pendergast's ability to turn out the vote was phenomenal. Not only did many of the poorest people in Kansas City vote regularly, but did so frequently at each election. Indeed, in some wards voter turnout often approached one hundred percent, when it did not exceed it. Even more miraculously, the dead would rise at each election in numbers that would astonish an expectant Christian.[38]

Missouri's other major city, St. Louis, likewise has a "miserable tradition" of vote fraud.[39] The 2000 presidential election in St. Louis became a matter of national attention (and local embarrassment). The LOS ANGELES TIMES reported,

> The dearly departed seem to have quite a constituency around here. At least three dead aldermen registered to vote in Tuesday's mayoral primary. So did one alderman's deceased mother. And, a dead man was listed as the chief plaintiff in a lawsuit filed on election day last November. He was having trouble voting, the suit said, due to long lines at his polling station. So he petitioned a judge – successfully – to keep city ballot boxes open late.[40]

---

[38] Kenneth H. Winn, *It All Adds Up: Reform and the Erosion of Representative Government in Missouri, 1900-2000*, OFFICIAL MANUAL: STATE OF MISSOURI (1999-2000), pp. 28, 36-39, available at: https://www.sos.mo.gov/archives/pubs/article/article.asp. See also Appendix, which includes a copy of the ST. LOUIS POST-DISPATCH Sept. 22, 1934, political cartoon featured in this article, titled, "Dead Men and Vacant Lots."

[39] Editorial, *Miserable Tradition*, ST. LOUIS POST-DISPATCH (Dec. 11, 2000), p. B2.

[40] Stephanie Simon, *In St. Louis, Dead Are Causing Lively Debate with Their Votes*, LOS ANGELES TIMES (Feb. 28, 2001), p. A1. Both Democrat Secretary of State Cook and her Republican successor, Matt Blunt, investigated the election; both found significant instances of vote fraud and irregularities. See Secretary of State Rebecca McDowell Cook, *Analysis and General Recommendation Report Regarding the November 2000 General Election in the City of St. Louis* (Jan. 4, 2001), pp. 8-9.

Unfortunately, vote fraud in Missouri has continued. In 2010, John Rizzo won his primary election in Missouri's heavily-Democratic 40th State House of Representatives District by a single vote. After the election, Rizzo's aunt and uncle "pleaded guilty in Jackson County court to voter fraud...admitt[ing] they illegally claimed a Kansas City address in order to vote in their nephew's 40th district Democratic primary in August 2010." Dave Helling, *Missouri Rep. John Joseph Rizzo's Relatives Admit to Voter Fraud*, KANSAS CITY STAR (June 28, 2013).

Then, in 2016, the Missouri Court of Appeals affirmed a trial court's decision overturning a state legislature primary election in St. Louis due to absentee vote fraud. *Franks v. Hubbard*, 498

Absentee-ballot "[v]ote trafficking is such a common practice in some states that traffickers (or ballot brokers) are paid by campaigns to collect absentee ballots from voters and 'even have their own region-specific names. ... In Texas, they're called 'politiqueras.'"[41]   The Heritage Foundation's Election Fraud Database catalogs ninety-eight documented cases of vote fraud in Texas from 2005 to 2019, including eight criminal convictions or deferred adjudications for voter impersonation at the polls, and thirty-eight convictions or deferred adjudications for fraudulent use of absentee ballots.[42]  It is important to note that a single vote fraud conviction may have involved multiple fraudulent ballots, as was the case in Weslaco, Texas, in 2016.[43]

---

S.W.3d 862, 873 (Mo. Ct. App. 2016).  The challenger to the Democratic state representative in Missouri's 78th District lost the election despite receiving 53% of the in-person vote when the incumbent received 79% of all absentee votes.  See *id.* at 865.  The trial court was "firmly convinced" that "the irregularities in the collection and acceptance of absentee ballots 'affected the outcome of the election,' and the irregularities were more than 'petty procedural infirmities' that violate election law." *Id.* at 866.  The court ordered a new election.

In August 2021, the Missouri Secretary of State's Office released the findings from an investigation concerning individuals who allegedly voted more than once in the 2020 general election.  Based on probable cause statements issued by the Secretary of State's Office, two persons voted at least twice using mail-in ballots sent to Florida, and then voted in-person in Missouri.  These statements were referred for prosecution.

[41] John Fund & Hans von Spakovsky, OUR BROKEN ELECTIONS: HOW THE LEFT CHANGED THE WAY YOU VOTE (2021), p. 66 (quoting Eric Eggers, *Ballot Fraud, American Style...and Its Bitter Harvests*, RealClearInvestigations (Dec. 13, 2018)).

[42] Available at: https://www.heritage.org/voterfraud.  The Texas Attorney General's Office reports that it has "resolved 286 prosecutions of Texas Election Code criminal offenses against 76 defendants" since 2015 and "is currently prosecuting over 500 felony election fraud offenses in Texas courts."  See Press Release, *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit* (Oct. 18, 2021), available at: https://bit.ly/3pCl2I4.

[43] See Peter Tapsak, *Voter Fraud Is Real. Here Are 4 More Cases*, DAILY SIGNAL (Aug. 18, 2016) ("Guadalupe Rivera and Graciela Sanchez illegally 'assisted' absentee voters in Rivera's 2013 re-election bid for [Weslaco, Texas] city commissioner.  Rivera won the election by 16 votes, but the result was invalidated after a judge determined that 30 absentee ballots had been submitted illegally.").  See also Fund, OUR BROKEN ELECTIONS, *supra*, note 41, pp. 79-83 (following extensive investigation, North Carolina election board "concluded that the election 'was corrupted by fraud, improprieties, and irregularities so pervasive that its results are tainted as the fruit of an operation manifestly unfair to the voters and corrosive to our system of representative

While perhaps not as widespread as in the past, regrettably the types of vote fraud practiced by Boss Tweed and the Pendergast Machine are still a very real and troubling feature of our nation's electoral landscape. Requiring a person to provide reliable identification to confirm he or she is, in fact, the eligible voter listed on the roll, is a commonsense safeguard against vote fraud schemes that disenfranchise lawful voters and undermine public confidence in elections results.

### III.   Texas' election reform legislation will increase public confidence and increase voter participation.

The Texas Election Protection and Integrity Act of 2021 will increase voter confidence and participation. The Supreme Court has held that "the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits," a direct restriction on political expression. *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 143 (2003). The Court recognized that "the appearance of undue influence...'could jeopardize the willingness of voters to take part in democratic governance.'" *Id.* at 144 (citation omitted).

Texas' election integrity reforms will increase public confidence in the integrity of the outcome of Texas elections. Increasing public confidence in the election process. The Carter-Baker Commission's noted,

> Elections are the heart of democracy. They are the instrument for the people to choose leaders and hold them accountable. At the same time, elections are a core public function upon which all other government responsibilities depend. If elections are defective, the entire democratic system is at risk. Americans are losing confidence in the fairness of elections, and...we need to address the problems of our electoral system. Our Commission on Federal Election Reform was formed to recommend ways to raise confidence in the electoral system.[44]

---

government.'") (quoting *In the Matter of Investigation of Election Irregularities Affecting Counties within the 9th Congressional District, Before the State Board of Elections*, State of North Carolina, Order (March 13, 2019), p. 2).

[44] Carter-Baker Commission Report, *supra*, p. 1, at ii.

Texas has adopted reforms the Carter-Baker Commission that will make it easier to vote and harder to cheat, and in so doing, increase public confidence in Texas elections.

## CONCLUSION

Texas enacted reforms to assure the integrity of Texas elections. The reforms Texas adopted were consistent with the recommendations of the Carter-Baker Commission. The Supreme Court looked to the Carter-Baker Commission as providing a bipartisan standard for election reform. See *Crawford*, 553 U.S. at 193, and *Brnovich*, 141 S.Ct. at 2347.

The test of our nation's election system is not found in landslides, but when the outcome turns upon a handful of votes. Vote fraud need not be massive to undermine an election's outcome. And people are more likely to vote if they believe their ballot will be fairly counted.

The Justice Department's challenge to Texas' election reform and to Texas' requirement that a person provide identification before casting an absentee ballot is no different than the challenge to Virginia's voter identification requirement in *Lee v. Virginia State Board of Elections*, 188 F. Supp.3d 577, 610 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016). U.S. District Judge Hudson's decision in *Lee*, which was unanimously upheld by the Fourth Circuit, provides a helpful guide to resolving this challenge to Texas' similar law. Accordingly, this Court should grant the State of Texas' and Texas Secretary of State John Scott's motion to dismiss the United States' amended complaint.

Respectfully submitted,

*/s/ Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II (*pro hac motion pending*)
STEPHEN S. DAVIS (*pro hac motion pending*)
True North Law, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
(314) 296-4001 (fax)
thor@truenorthlawgroup.com
sdavis@truenorthlawgroup.com

*Counsel for Amicus Curiae Missouri Secretary of State John R. Ashcroft*

JOHN R. ASHCROFT (*pro hac motion pending*)
Secretary of State
State of Missouri
600 West Main Street
Jefferson City, MO 65101
(573) 751-4936

*Amicus Curiae*


## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief has been prepared in Times New Roman 12-point font, double-spaced, and otherwise in compliance with this Court's Local Rules CV-7 and CV-10.

*/s/ Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II
*Counsel for Amicus Curiae*
*Missouri Secretary of State John R. Ashcroft*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing Brief of Missouri Secretary of State

John R. Ashcroft as *Amicus Curiae* was sent on December 29, 2021, via Federal Express next day

delivery to the following:

> Clerk of Court
> U.S. District Clerk's Office
> U.S. District Court, W.D. Texas
> 655 E. Cesar E. Chavez Blvd., Room G65
> San Antonio, Texas 78206
> (210) 472-6550
>
>
> Michael E. Stewart
> Trial Attorney
> Civil Rights Division, Voting Section
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530
> (202) 598-7233
>
> *Counsel for Plaintiff United States*
>
>
> Will Thompson
> Deputy Chief, Special Litigation Unit
> Office of the Attorney General
> 300 W. 15th Street
> Austin, Texas 78701
> (512) 936-2567
>
> *Counsel for Defendants State of Texas
> and Secretary of State John Scott*

*/s/ Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II
*Counsel for Amicus Curiae
Missouri Secretary of State John R. Ashcroft*

# APPENDIX



**"Dead Men and Vacant Lots"**
St. Louis Post-Dispatch (Sept. 22, 1934)
From Kenneth H. Winn, *It All Adds Up: Reform and the Erosion of Representative Government in Missouri, 1900-2000*, Official Manual: State of Missouri (1999-2000), p. 37

24