UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF TEXAS, REVUP–TEXAS, TEXAS ORGANIZING PROJECT, and WORKERS DEFENSE ACTION FUND, | § § § § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | Civil Case No. 1:21-CV-0780-XR |
| TEXAS SECRETARY OF STATE JOHN SCOTT, *in his official capacity*, TEXAS ATTORNEY GENERAL KEN PAXTON, *in his official capacity*, HARRIS COUNTY ELECTIONS ADMINISTRATOR ISABEL LONGORIA, *in her official capacity*, TRAVIS COUNTY CLERK DANA DEBEAUVOIR, *in her official capacity*, HARRIS COUNTY DISTRICT ATTORNEY KIM OGG, *in her official capacity*, TRAVIS COUNTY DISTRICT ATTORNEY JOSÉ GARZA, *in his official capacity*; | § § § § § § § § § § § § § § § § | [Consolidated Lead Case No. 5:21-CV-0844-XR] |
| *Defendants.* | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

COME NOW Plaintiffs, OCA-Greater Houston, League of Women Voters of Texas, REVUP-Texas, Texas Organizing Project, and Workers Defense Action Fund, and file this Second Amended Complaint seeking declaratory and injunctive relief pursuant to the Voting Rights Act of 1965, the Civil Rights Act of 1964, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 42 U.S.C. § 1983 and the First and Fourteenth

Amendments to the United States Constitution. In support of such relief, Plaintiffs respectfully show the Court as follows:

**I.**
**INTRODUCTION**

1.    This suit challenges several illegal provisions of Texas's voter suppression bill that make it harder for Texans to vote. The November 2020 Election in Texas saw record turnout. Despite facing a global pandemic, engaged voters from both parties made their voices heard, and the Texas Secretary of State's Director of Elections indicated that the election was "smooth and secure."

2.    In response to this increase in civic participation, the Texas Legislature passed an omnibus elections bill targeting many of the precise methods that local election authorities and community groups used to make voting easier and more accessible to traditionally marginalized voters, such as voters with disabilities and voters with limited English proficiency. In their determination to push this omnibus legislation through the legislative process, lawmakers ignored widespread opposition by diverse groups of Texans—including business executives, faith leaders, community organizers, local elected officials, and countless everyday people—and refused to conduct any serious study of how this new law would impact voters.

3.    The new law, Senate Bill 1 ("SB 1"), drastically rewrites the Texas Election Code to make it more burdensome and potentially impossible for many Texas voters and community organizations to participate in the democratic process. SB 1 erects a litany of needless hurdles to voting and couples those hurdles with ill-defined criminal and civil penalties.

4.    Egregiously, SB 1 takes particular aim at voters with disabilities, voters with limited English proficiency—who, in Texas, are also overwhelmingly voters of color—and the organizations (including Plaintiffs here) that represent, assist, and support these voters. The law

2

does so by imposing new hurdles to voting by mail and voting with an assistant, two processes that are open only to limited subsets of voters, including persons with disabilities and with limited English proficiency. SB 1 additionally sets forth vague restrictions on expressive conduct and voter engagement that will burden the First Amendment rights of community organizations and will chill their efforts to educate, engage, and assist voters in their communities.

5.      Under SB 1, a voter who needs assistance to cast their ballot will not be able to ask their assistant questions without risking that their assistant be criminally prosecuted; a blind voter cannot receive assistance navigating the polling place; a voter who inadvertently transposes two digits of their driver's license number will have their ballot thrown out; and community organizers are left to guess whether something they say at their neighbors' doors could land them in jail.

6.      The right to vote is a precious and fundamental political right that is preservative of all other rights. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). This maxim applies in equal measure to the rights of voters with disabilities and voters with limited English proficiency, and it extends as well to the organizations that support those voters. Plaintiffs seek judicial relief to prevent the enforcement of certain of these provisions that, on their face, violate the Voting Rights Act, the Civil Rights Act, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the First and Fourteenth Amendments to the United States Constitution. SB 1's cruel targeting of vulnerable voters and community organizations is illegal and must be enjoined.

## II.
## JURISDICTION AND VENUE

7.      This is a civil and constitutional rights action arising under 42 U.S.C. § 1983, the First and Fourteenth Amendment to the United States Constitution, Title II of the ADA, Section 504 of the Rehabilitation Act, the Civil Rights Act of 1964, and the Voting Rights Act of 1965.

This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343 and 52 U.S.C. § 10101(d).

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because some of the parties, including at least one of the Defendants, reside in this District, and a substantial part of the events giving rise to the claims in this case occurred in this District.

**III.**
**PARTIES**

**A.      Plaintiffs**

9.      Each of the Plaintiffs named below has members—including REVUP members like Ruben Fernandez, Amy Litzsinger, and Laura Halvorson—who are qualified individuals with disabilities within the meaning of the ADA because they have physical and/or mental impairments that substantially limit one or more of their major life activities, including but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and/or working." 42 U.S.C. § 12102(2)(A).

10.     Each of the Plaintiffs named below has members—including REVUP members like Ruben Fernandez, Amy Litzsinger, and Laura Halvorson—who are qualified individuals with disabilities within the meaning of Section 504 because they have physical and/or mental impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and/or working." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(A).

11.     Each of the Plaintiffs named below has members—including REVUP members like Ruben Fernandez, Amy Litzsinger, and Laura Halvorson—who are qualified for the programs,

services, and activities offered by certain defendants—including vote by mail and in-person voting on Election Day and during early voting—because they are registered to vote in Texas, are otherwise eligible, and intend to vote in the next election and future elections, and accordingly are qualified individuals with disabilities entitled to the protections of the ADA and Section 504. 42 U.S.C. § 12131(2); 29 U.S.C. § 794(a).

12.    Each of the Plaintiffs named below has members who are entitled to assistance in voting under Section 208 of the Voting Rights Act either because they have a disability or because they have limited English proficiency.

13.    Each of the Plaintiffs named below engages in "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988). Plaintiffs' expressive activities go to the heart of the First Amendment, which "protects [their] right not only to advocate their cause but also to select what they believe to be the most effective means for doing so." *Id.*

<u>OCA-Greater Houston</u>

14.    OCA-Greater Houston ("OCA-GH") files this lawsuit on its own behalf and on behalf of its members.[1] OCA is a national membership-driven civil rights organization of community advocates dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ("AAPIs"). Established in 1979, OCA-GH is one of more than 100 OCA chapters and college affiliates around the country, with a long track record of launching programs and initiatives that advance the four main goals of OCA's mission: (1) to advocate for social justice, equal opportunity, and fair treatment; (2) to promote civic participation,

---

[1] Case law in this district and circuit is clear that plaintiffs are not required to specifically identify members at the pleading stage in order to adequately plead associational standing. Plaintiffs are prepared to brief this issue to the Court at the proper time.

education, and leadership; (3) to advance coalitions and community building; and (4) to foster cultural heritage.

15.     OCA-GH is a volunteer-driven organization of community advocates that strives to meet the current and evolving needs of a diverse population through a comprehensive continuum of programs targeting different life stages of AAPIs with a focus on developing advocacy, leadership, and civic engagement participation among AAPIs. OCA-GH's board members, along with key community volunteer members, work to fundraise and implement OCA-GH's programs to empower the AAPI community through leadership training; education workshops; arts and cultural events; advocacy campaigns, including creating and distributing fliers in multiple languages; facilitating voting, including by providing rides to the polls and hosting candidate forums; legal clinics; internships; scholarships; mentoring and civic engagement; and monitoring of and advocacy for national and local public policy.

16.     A significant portion of OCA-GH's members and the community it serves lack the ability to read English-language election materials, including mail-in ballots, in-person ballots, and other voting instructions and materials. These individuals require assistance to vote in person or by mail-in ballot, if eligible to do so. OCA-GH serves its members and the AAPI community by facilitating and providing assistants who read and speak languages other than English to assist voters with reading and understanding election materials, including mail-in and in-person ballots. OCA-GH provides some of these assistants with benefits or compensation both as part of its broader activities, and to encourage more individuals to serve as assistants for voters in need.

17.     In addition to harming OCA-GH's members (as described more fully below), the provisions of SB 1 at issue in this case directly harm OCA-GH as an organization. In particular, those provisions will work to frustrate OCA-GH's mission of promoting civic participation among

the AAPI community, including expanding voter registration and increasing voter turnout among AAPI voters, and forcing OCA-GH to expend its resources counteracting SB 1's various unlawful effects. OCA-GH traditionally expends resources to educate its members and community about voter registration, voting, and aiding those eligible for assistance with mail-in or in-person ballots In light of Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, and Sections 6.04 and 6.06 of SB 1, OCA-GH will be forced to divert resources away from those activities and instead direct resources toward educating and helping volunteers and voters navigate those provisions' new burdensome restrictions on mail-in voting and assistance for non-English speakers, and the criminal and civil penalties associated with those provisions. This will make participating in the electoral process more difficult and dangerous for OCA-GH's members and the communities that OCA-GH serves. Spending time and resources on these countermeasures (which are described below in even further detail) will mean that OCA-GH will spend less time and money on its normal programming efforts, *see* ¶ 15, and will reach fewer voters overall. OCA-GH would not have to conduct this type of public education in the absence of SB 1.

18.      Other provisions of SB 1, specifically, Section 7.04, which purports to criminalize certain voter interactions (as discussed further below), will also directly harm OCA-GH by infringing on the organization's right to engage in political speech and expression. In light of these new, overbroad criminal provisions, OCA-GH will need to curtail its activities, including canvassing voters' homes, providing volunteers with food, water, or gifts that may be construed as "compensation," hosting candidate and issues forums, and other in-person interactive activities meant to promote democratic engagement and grassroots political change, or else risk incurring and exposing members to criminal and civil penalties.

<u>League of Women Voters of Texas</u>

19.     Plaintiff League of Women Voters of Texas ("LWVTX") sues Defendants on its own behalf and on behalf of its members. LWVTX is a non-partisan, non-profit member organization dedicated to empowering voters and defending democracy. LWVTX members pay membership dues and help guide the direction of the organization's efforts. LWVTX strives for a democracy where every person has the desire, the right, the knowledge, and the confidence to participate in the democratic process. LWVTX actively works to register eligible people to vote and ensure that they cast a ballot that actually counts, including by helping voters obtain and vote using a mail ballot or obtain language assistance when they are eligible to do so. In doing so, LWVTX operates across Texas, registering and helping thousands of voters every year.

20.     Around the time of an election, LWVTX members or volunteers also interact with voters directly, for example, in get out the vote ("GOTV") events and by canvassing or "door-knocking." Depending on the election, LWVTX informs voters statewide about the voting process, voter registration, receiving assistance, and applying for absentee ballots. Additionally, numerous LWVTX members serve as election workers in each major election in the State. LWVTX members also regularly serve as assistants to voters. LWVTX and its members also occasionally support or oppose specific ballot measures, proposals, or initiatives of a non-partisan nature through candidate and issues forums that advance the interests and mission of the organization.

21.     In addition to harming LWVTX's members (as described more fully below), the provisions of SB 1 at issue in this case would frustrate LWVTX's mission of empowering voters and defending democracy by expanding voter registration and increasing voter turnout. LWVTX expends resources to educate Texans about registration, voting, and volunteering to work the polls, including education related to the availability of mail-in voting for those eligible and the

availability of assistance with mail-in or in-person ballots for those eligible to have assistance. In light of Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, and Sections 6.04 and 6.06 of SB 1, LWVTX will be forced to divert resources away from those activities and instead direct resources toward educating and helping volunteers and voters navigate those provisions' new burdensome restrictions on mail-in voting and assistance for non-English speakers, and the criminal and civil penalties associated with those provisions. This will make participating in the electoral process more difficult and dangerous for LWVTX's members and the public and the voters that LWVTX serves. Spending time and resources on these countermeasures (which are described below in even further detail) will mean that LWVTX will spend less time and money on its normal programming efforts, listed above, and will reach fewer voters overall. LWVTX would not have to conduct this type of public education in the absence of SB 1.

22.     Other provisions of SB 1, specifically, Section 7.04, which purports to criminalize certain voter interactions (as discussed further below), will also directly harm LWVTX by impinging on the organization's right to engage in political speech and expression. In light of those new, overbroad criminal provisions, LWVTX will need to curtail its activities, including canvassing voters' homes; providing food, water, and other gifts to volunteers and members; hosting candidate and voter forums; and other interactive activities meant to advance its mission of promoting civic participation, or else risk incurring or exposing members to criminal and civil penalties.

<u>REVUP Texas</u>

23.     REVUP-Texas ("REVUP") sues Defendants on its own behalf and on behalf of its members. REVUP is a grassroots organization seeking to empower people with disabilities through voter education and assistance, issue advocacy, mobilization and organizing. REVUP is a

member-based organization whose members are primarily individuals with disabilities. "REVUP" is an acronym that stands for "Register, Educate, Vote, Use Power."

24.     REVUP's members and the communities it serves include voters who are eligible to vote by mail and to have assistance while voting. REVUP also has members who serve as assistants to persons needing assistance to vote due to a disability. REVUP members with disabilities participate in and help guide the direction of the organization's efforts.

25.     REVUP spends considerable resources to educate its members regarding the requirements to vote by mail or in-person, the availability of assistance, and to connect members and other voters with the assistance they need. SB 1 forces REVUP to divert resources away from its established voter engagement programs and toward new initiatives to educate voters and volunteers about how to comply with certain provisions of SB 1, such as Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, and Sections 6.04 and 6.06, that place new burdens on the process for obtaining a mail-in ballot and other forms of voter assistance and seek to enforce these onerous new restrictions with civil and criminal penalties, making it more difficult and dangerous to participate in the electoral process. Spending time and resources on these countermeasures (which are described below in even further detail) will mean that REVUP will spend less time and money on its normal programming efforts, including canvassing and voter education, and will reach fewer voters overall. REVUP would not have to conduct this type of public education in the absence of SB 1.

26.     Other provisions of SB 1, specifically, Section 7.04, which purports to criminalize certain voter interactions (as discussed further below), will also frustrate REVUP's missions to increase voter turnout in the disability community and advance political change by curtailing REVUP's ability to engage in activities that involve voters, such as its candidate and issues forums,

and by preventing REVUP from recruiting and training individuals willing to serve as assistants. Accordingly, these provisions stymie REVUP's ability to spread its message widely and connect voters with disabilities with needed assistance.

27.     REVUP also engages in a variety of advocacy efforts on behalf of its members including support for certain policies and proposals at state and local legislative bodies, and outreach to members to support these policies. This advocacy involves outreach to its own members and others in the disability community through in-person events, trainings, and other events.

Texas Organizing Project

28.     Plaintiff Texas Organizing Project ("TOP") sues Defendants on its own behalf and on behalf of its members. TOP is a Texas non-profit corporation, organized under section 501(c)(4) of the Internal Revenue Code, with its principal place of business in San Antonio, Texas. TOP is a membership-based organization that empowers low and moderate-income neighborhoods to build political power and stronger communities through issue advocacy, lobbying efforts, and electoral organizing. Founded in 2009, TOP has dozens of employees and hundreds of regular volunteers working in three offices across the state. TOP's membership is comprised of thousands of low- to moderate-income people, with a particular focus on serving the needs of Black and Latino communities.

29.     TOP's members and the communities it serves include voters who speak English as a second language, have physical or intellectual disabilities, and require assistance to vote. TOP engages in a variety of electoral activities, including advocating for public policy change, GOTV efforts, assistance with transportation to the polls, voter assistance for those who qualify, and other community outreach and education activities that include direct contact with voters.

30.     TOP expends significant resources to educate Texans about voting and civic participation, including by engaging in door-to-door contact with voters, holding rallies, and hosting parties and events with voters focused on phone and text banking and voter education. SB 1 forces TOP to divert resources away from the above-listed established voter engagement programs and toward new initiatives to educate voters and volunteers about how to comply with certain provisions of SB 1, such as Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, and Sections 6.04 and 6.06, that place new burdens on the process for obtaining a mail-in ballot and other forms of voter assistance and seek to enforce these onerous new restrictions with civil and criminal penalties, making it more difficult and dangerous to participate in the electoral process. Spending time and resources on these countermeasures (which are described below in even further detail) will mean that TOP will spend less time and money on its normal programming efforts and will reach fewer voters overall. TOP would not have to conduct this type of public education in the absence of SB 1.

31.     Other provisions of SB 1, specifically, Section 7.04, which criminalizes certain voter interactions (as discussed further below), will also frustrate TOP's mission of expanding voter participation in low-income communities and advancing political change—for example, by disincentivizing individuals from working with TOP out of fear of being subject to criminal penalties and thereby reducing the number of Texans that TOP is able to reach with its message. TOP has tens (and often hundreds) of thousands of direct conversations with voters each election cycle, including in-person interactions at voters' homes where mail-in ballots may be present. TOP will be forced to forgo many of its activities due to the provisions at issue in this case, and divert resources away from some of its programming to reeducate voters and members regarding the new requirements imposed by these provisions. It will undertake these countermeasures to mitigate the

real-world effects of SB 1 on TOP members and the public. TOP would not have to conduct this type of public education in the absence of SB 1. Accordingly, these provisions stymie TOP's ability to spread its message widely and connect with voters in need of assistance.

Workers Defense Action Fund

32.      Workers Defense Action Fund ("WDAF") sues Defendants on its own behalf and on behalf of its members. WDAF is a Texas non-profit corporation, organized under section 501(c)(4) of the Internal Revenue Code, with its principal place of business in Austin, Texas. WDAF is a membership-based organization whose mission is to empower underrepresented communities to participate in advocacy and electoral activities that win fair employment conditions and a better quality of life for working families through legislative advocacy, voter education, and voter engagement. In working toward these goals, WDAF engages in campaigns to register voters, interview and endorse candidates, canvass door-to-door, and conduct GOTV efforts. Since its founding in 2002, WDAF has grown to nearly 4,000 members statewide. In Austin alone, more than 1,200 workers have joined WDAF since 2015.

33.      WDAF's membership includes low-income individuals, primarily in communities of color. A significant portion of WDAF's members are non-native English language speakers or have only limited English language proficiency, and therefore require and qualify for assistance to vote. WDAF's members and the communities it serves include voters who are eligible to vote by mail and to have assistance while voting. WDAF also has members who serve as assistants to persons needing assistance to vote due to a disability. In addition to harming WDAF's members by making it harder for them to vote, the provisions at issue in this case would frustrate WDAF's mission of expanding voter registration, increasing voter turnout, and advancing political change by forcing it to limit its efforts to canvass, circulate petitions, and in other ways engage with voters.

SB 1 forces WDAF to divert resources away from its established voter engagement programs and toward new initiatives to educate voters and volunteers about how to comply with certain provisions of SB 1, such as Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, and Sections 6.04 and 6.06, that place new burdens on the process for obtaining a mail-in ballot and other forms of voter assistance and seek to enforce these onerous new restrictions with civil and criminal penalties, making it more difficult and dangerous to participate in the electoral process. Spending time and resources on these countermeasures (which are described below in even further detail) will mean that WDAF will spend less time and money on its normal programming efforts and will reach fewer voters overall. Instead, it will divert resources away from increasing voter turnout in order to retrain employees and volunteers on SB 1's changes. These measures are undertaken to mitigate the real-world effects of SB 1 on WDAF members and the public; its work to retrain members, employees, and volunteers and to conduct new public education campaigns would not be necessary in the absence of SB 1.

34.     Other provisions of SB 1, specifically, Section 7.04, which purports to criminalize certain voter interactions (as discussed further below), will also frustrate WDAF's missions to increase voter turnout in the immigrant community and advance political change. WDAF expends considerable resources conducting in-person GOTV efforts, including educating voters in person about their voting options. WDAF will be forced to curtail its voter-interactive activities, such as its canvassing efforts, and prevent WDAF from recruiting and training individuals willing to serve as assistants. Accordingly, these provisions stymie WDAF's ability to spread its message widely and will force it to  divert resources away from expanding voter registration and increasing voter turnout in order to retrain employees and volunteers on changes due to SB 1. This retraining would

not be necessary in the absence of SB 1. These measures are undertaken to mitigate the real-world effects of SB 1 on WDAF members and the public.

**B.    Defendants**

35.    Defendant John Scott is the Texas Secretary of State ("SOS") and is sued in his official capacity. The SOS is the Chief Election Officer of the State of Texas. TEX. ELEC. CODE § 31.001(a). The SOS routinely issues guidance to the county registrars of all 254 Texas counties on various elections procedures.

36.    The SOS has explicit statutory duties, found within SB 1 and the rest of the Texas Election Code, to enforce the particular provisions of SB 1 that are challenged by Plaintiffs in this lawsuit. Pursuant to his specific statutory duties, the SOS has or imminently will be issuing guidance to all counties regarding their compliance obligations with SB 1. Indeed, the SOS has also explicitly vowed to take a proactive role in overseeing counties' administration of elections.

37.    The SOS is singularly and specifically charged with implementing the provisions challenged here in multiple ways.  For example, as the SOS itself acknowledges, *see Constitutional Duties, Texas Secretary of State*,  https://www.sos.state.tx.us/about/duties.shtml  ("The [SOS] Elections Division is responsible for administering the Texas Election Code, the 'law of the land' for Texas voters, elections, voting systems, candidates, and political parties."), the SOS is solely responsible for prescribing the design and content of all forms necessary for administration of the Texas Election Code—including forms related to SB 1's mail-in voter identification and assistance provisions (Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12) and its voter assistance provisions (Sections 6.04 and 6.06). TEX. ELEC. CODE § 31.002. Specifically, under Section 31.002 of the Code, the SOS is required to prescribe the design and content of the Application for Ballot by Mail (ABBM) and mail-in carrier envelope, both of which SB 1 requires the SOS to modify in order to

incorporate the onerous new mail-in voter identification and assistance requirements set forth in Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.04, 6.05 and 6.06 of SB 1. Election authorities are then required by law to use the forms the SOS provides. *Id.* The SOS is also statutorily required to modify the voter assistant oath forms to incorporate changes made in SB 1 Section 6.04. TEX. ELEC. CODE § 31.002.

38.     In addition to all that, the SOS is empowered to order election authorities to correct conduct that impedes the free exercise of a citizen's voting rights. *Id.* §31.005. If an election authority fails to comply with an order from the SOS under Section 31.005, the SOS has authority to seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the Attorney General. *Id.*

39.     The SOS also routinely collaborates with the Texas Attorney General to enforce election laws. The majority of criminal prosecutions under the election code originate as complaints made to the SOS, which then decides whether to refer the complaints to the Texas Attorney General. Keith Ingram, the director of the SOS's Election Division, testified before the Texas legislature that when the SOS receives complaints under Section 31.006 of the election code, "if the complaint on its face has a reasonable cause to suspect a crime has occurred, we refer that to the Attorney General."[2] He also stated the SOS gets complaints "all the time," and estimated that the SOS had referred 40 cases from the November 2020 general election.[3] He testified that many of the complaints the SOS refers to the Attorney General are related to voter assistance, mail

---

[2] Jonathan White, Chief of Election Fraud for the Texas Attorney General, similarly testified before the legislature that complaints made to the SOS are examined for whether there is reason to credibly believe an offense occurred before referring the complaint to the AG's office.

[3] Jonathan White testified that 70% of the Attorney General's election cases have historically come from the SOS, and that it is their "preference for referrals to come from a neutral source," such as the SOS.

in ballots, and vote harvesting. More recently, the Texas legislature approved $4 million dollars for the creation of an Election Audit Division in the SOS's office, and the SOS stated that it will use the division to "ensure any cases of illegal voting or election crimes are investigated by the proper law enforcement authorities, including the Texas Attorney General's Office."[4]

40.     Defendant Ken Paxton is the Texas Attorney General ("AG") and is sued in his official capacity. The AG is the chief law enforcement officer of the State of Texas and is empowered to enforce Texas laws, including criminal and civil provisions in the Texas Election Code at issue in this case.

41.     Plaintiffs bring claims against the AG regarding SB 1 Sections 6.06 and 7.04, which include felony offenses, and Section 6.04, which modifies the oath that voters' assistants must take to include an affirmation "under penalty of perjury," subjecting the assistants to criminal liability. Additionally, failing to sign the affirmation required by Section 6.04 is a felony under Election Code § 86.010(g).

42.     The AG regularly investigates and prosecutes violations of the Texas Election Code, such as the challenged provisions of SB 1, in two ways. First, the AG prosecutes election code violations at the requests of district or county attorneys. *See* TEX. GOV'T CODE § 402.028. Second, Chapter 273 of the Texas Election Code also purports to give the AG authority to investigate and prosecute election code violations anywhere in Texas. The AG has regularly relied on Section 273.021 of the Texas Election Code as a basis for independently prosecuting purported criminal offenses arising out of the Election Code.[5]

---

[4] ICYMI: SECRETARY JOHN SCOTT: FULL FORENSIC AUDIT WILL RESTORE FAITH IN TEXAS ELECTIONS (Nov. 22, 2021), https://www.sos.state.tx.us/about/newsreleases/2021/112221.shtml.

[5] Representatives from the AG's office repeatedly testified before the Texas legislature in 2021 that the AG has direct prosecutorial authority under Section 273.021 of the Election Code and that SB 1 creates new offenses that the AG has the authority to prosecute.

43.     On December 15, 2021, the Texas Court of Criminal Appeals issued a decision holding that Section 273.021 was an unconstitutional delegation of judicial powers to the executive branch and "[a]bsent the consent and deputization order of a local prosecutor or the request of a district or county attorney for assistance, the Attorney General has no authority to independently prosecute criminal cases in trial courts," such as prosecuting criminal violations of the Election Code. *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198, at \*10 (Tex. Crim. App. Dec. 15, 2021) (not released for publication). As of the filing of Plaintiffs' Second Amended Complaint, however, the AG had filed a motion for rehearing in that case, which remains pending. In the event that the Court of Criminal Appeals denies the AG's motion for rehearing and affirms that Section 273.021 is unconstitutional, the AG will still retain his ability to prosecute election code violations at the request of a district or county attorney, which the AG regularly does. *See* TEX. GOV'T CODE § 402.028; *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198, at \*10 (Tex. Crim. App. Dec. 15, 2021)

44.     The AG is likely to seek out such requests and to continue to threaten and bring election-related prosecutions notwithstanding the ruling in *Stephens*. There can be little doubt as to the AG's interest in enforcing the criminal provisions in the Election Code. The AG has previously prosecuted, including pursuant to requests under Section 402.028, alleged offenses related to assisting voters, voting by mail, and campaigning and has threatened third parties with criminal sanctions for disseminating information to voters. Specifically, the AG has prosecuted individuals for allegedly providing unlawful assistance, election-related perjury, "vote harvesting," failure to comply with provisions related to mail ballot assistance, and mail ballot fraud.

45.     Representatives from the AG's office repeatedly testified before Texas House and Senate committees in 2021 about proposed changes to the election code, indicating that the AG would prosecute new offenses under the changes. For example, Jonathan White, Chief of Election Fraud for the AG, testified before the House Elections Committee that proposed changes to the election code would help the AG address vote harvesting, help "do what [they're] already doing" such as prosecuting "unlawful assistance offenses [and] ballot handling offenses," and potentially make prosecutions easier. As part of their testimony, representatives from the AG's office repeatedly answered hypotheticals from legislators about what the AG would or would not prosecute under the proposed changes to the election code.

46.     In addition, the AG also regularly posts on Twitter about his commitment to enforcing the Election Code and bringing criminal prosecutions against those who allegedly violate it. For instance, after passage of SB 1, the AG tweeted that "Between pending cases & investigations — we're working more voter fraud cases than #Texas has ever seen."[6] He has also specifically claimed "I prosecute voter fraud everywhere we find it."[7] He also makes statements and public appearances touting his prosecutions and specifically the need for SB 1 and its criminal penalty provisions.[8]

---

[6]     Attorney General Ken Paxton (@KenPaxtonTX), TWITTER (Oct 2, 2021), https://twitter.com/KenPaxtonTX/status/1444318941132869633; Attorney General Ken Paxton (@KenPaxtonTX), TWITTER (July 21, 2021), https://twitter.com/KenPaxtonTX/status/1417976955522138112?s=20; Eric Anderson (@TrueTexasTea), TWITTER (July 11, 2021), https://twitter.com/TrueTexasTea/status/1414258902552752129.

[7]     Attorney General Ken Paxton (@KenPaxtonTX), TWITTER (July 9, 2021), https://twitter.com/KenPaxtonTX/status/1413642254598688774.

[8]     Natalie Harp (@NatalieJHarp), TWITTER (July 21, 2021), https://twitter.com/NatalieJHarp/status/1417964851498938371 Natalie Harp (@NatalieJHarp), TWITTER (July 21, 2021), https://twitter.com/NatalieJHarp/status/1417964851498938371; *see also* Attorney General Ken Paxton (KenPaxtonTX), TWITTER (July 13, 2021), https://twitter.com/KenPaxtonTX/status/1414988148791205889?s=20 ("…Election integrity

47.     The AG has also created, maintains, and continuously seeks increased funding for an "Election Fraud Unit" housed within his office and under his control, with the express purpose of investigating and prosecuting violations of criminal provisions in the Texas Election Code such as those at issue in this case. This unit regularly issues press and public facing statements about its current prosecutions and actively seeks to pursue additional prosecutions of such offenses.[9] The AG and the Election Fraud unit have touted their prosecutions of individuals for criminal offenses under the Election Code related to unlawful assistance, vote harvesting, failure to comply with provisions related to mail ballot assistance, and mail ballot fraud. The AG has also created an "Election Integrity Unit" purportedly to investigate claims of lack of compliance with the Election Code during elections.[10] That announcement trumpets that "Attorney General Paxton continues to pursue prosecutions for criminals willing to commit election crimes." In relation to the formation of the Election Integrity Unity, the Attorney General has actively encouraged the public to submit to him information concerning alleged unlawful in person and mail ballot assistance and issues concerning "vote harvester[s]."[11]

48.     Defendant Kim Ogg is the Harris County District Attorney ("Harris DA") and is sued in her official capacity. The Harris DA represents the State of Texas in all criminal cases in Harris County, unless conflicts exist. TEX. CONST. art. 5, § 21; Tex. Code Crim. P. Art. 2.01.

---

measures have…everything to do with making it easier to vote and harder to cheat. Democrats know this. We must have fair & ethical elections. We must NEVER federalize elections. Not on my watch!"); Attorney General Ken Paxton (KenPaxtonTX), TWITTER (July 14, 2021), https://twitter.com/TXAG/status/1415416709956132872.

[9] *See* https://www.texasattorneygeneral.gov/news/releases/edinburg-mayor-wife-arrested-organized-illegal-voting-scheme (Apr. 25, 2019) (noting over 100 prosecutions related to supposed Election Code violations since 2015).

[10] AG PAXTON ANNOUNCES FORMATION OF 2021 TEXAS ELECTION INTEGRITY UNIT, https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.

[11] https://www.texasattorneygeneral.gov/sites/default/files/global/images/Paxton%20Election%20Integrity%20PSA%20-%20One%20Pager.pdf.

Further, under Section 273.001 of the Election Code, "[i]f two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations." Plaintiffs bring claims against the Harris DA regarding SB 1 Sections 6.06 and 7.04, which include felony offenses, and Section 6.04, which modifies the oath that voters' assistants must take to include an affirmation "under penalty of perjury," subjecting the assistants to criminal liability. Additionally, failing to sign the affirmation required by Section 6.04 is a felony under Election Code § 86.010(g).

49.     Defendant José Garza is the Travis County District Attorney ("Travis DA") and is sued in his official capacity. The Travis DA represents the State of Texas in all criminal cases in Travis County, unless conflicts exist. TEX. CONST. art. 5, § 21; Tex. Code Crim. P. Art. 2.01. Further, under Section 273.001 of the Election Code, "[i]f two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations." Plaintiffs bring claims against the Travis DA regarding SB 1 Sections 6.06 and 7.04, which include felony offenses, and Section 6.04, which modifies the oath that voters' assistants must take to include an affirmation "under penalty of perjury," subjecting the assistants to criminal liability. Additionally, failing to sign the affirmation required by Section 6.04 is a felony under Election Code § 86.010(g).

50.     Defendant Harris County Elections Administrator Isabel Longoria ("Harris Elections") is sued in her official capacity. She is sued for the manner in which she implements the policies, customs, or practices at issue in this action.

21

51.     Defendant Travis County Clerk Dana DeBeauvoir ("Travis Elections") is sued in her official capacity. She is sued for the manner in which she implements the policies, customs, or practices at issue in this action.

52.     Defendants SOS and AG, as state agencies, and Defendants Harris DA, Travis DA, Harris Elections, and Travis Elections, as county agencies, are public entities pursuant to the ADA and Section 504. 42 U.S.C. § 12131(1)(a),(b); 45 C.F.R. § 1232.3(d), and 29 U.S.C. § 794. The administration of elections and voting, including vote-by-mail and in-person voting on Election Day and during early voting, are each a service, program, or activity provided by Defendants SOS, county agencies, and other political subdivision agencies. Voting is a program or activity provided by Defendants within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B).

53.     Defendants are state or local government agencies or political subdivisions that receive federal financial assistance or funding, and therefore are subject to the requirements of Section 504. 29 U.S.C. § 794(a). Indeed, according to the SOS's own website, Texas has a significant pool of federal funds earmarked for making elections accessible and secure. In 2020, Texas received approximately $26,064,574 in funding through the Help America Vote Act ("HAVA"). In addition, Texas received $24,546,840 million pursuant to the CARES Act in 2020.

## IV.
## FACTUAL BACKGROUND

54.     During the 2021 regular legislative session and two subsequently called special sessions, the Texas Legislature authored a new chapter in its long history trying to make it harder for Texans to vote. The Legislature did so in active defiance of well-established federal voting rights laws and principles. The Legislature's latest efforts to curtail Texans' voting rights began just months after local election authorities used innovative strategies to increase access to the ballot

box during the 2020 elections, boosting turnout in traditionally underrepresented communities. And the Legislature only stepped up those efforts following the release of Census data revealing that Texas's demographics are rapidly and dramatically changing and that historically disenfranchised voters have begun to participate in the electoral process with increasing frequency.

55.     The 2021 legislative sessions were marked by a disregard for procedural rules and a proclaimed ignorance of or indifference to the potential discrimination resulting from proposed voter suppression legislation Against that backdrop, the Legislature's second special session culminated in the passage of an omnibus elections bill, SB 1, that will illegally disenfranchise voters with disabilities and voters with limited English proficiency—who, in Texas, are also overwhelmingly voters of color—while making it harder for community groups to continue the outreach that has led to the growing participation among these communities of voters in recent years.

A.      **Texas's Long History of Voter Suppression**

56.     SB 1 is only the latest in a long series of bills aimed at impairing the right to vote for historically marginalized individuals. Indeed, as one court found, Texas has "a penchant for discrimination . . . with respect to voting," and "exhibits a recalcitrance that has persisted over generations despite the repeated intervention of the federal government and its courts." *Veasey v. Perry*, 71 F. Supp. 3d 627, 636 (S.D. Tex. 2014) (*Veasey I*), *aff'd in part, vacated in part, remanded sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part, rev'd in part sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (*Veasey II*).

1.      **Intentional Discrimination**

57.     Texas's history of discrimination in the electoral process is as old as the state itself. From its origins as a slave-holding state that excluded people of color from all electoral activities

to the present day, lawmakers have purposefully sought to disenfranchise certain voters. *See* Expert Report of Dr. Allan J. Lichtman at 18, *Perez v. Abbott*, No. 5:11-cv-00360-OLG (W.D. Tex. May 26, 2017) ("Lichtman Report").

58.     Examples of this intentional discrimination abound. After the Civil War, an all-white constitutional convention prohibited freed slaves from voting, holding office, or serving on juries. *Id.* at 18. After Reconstruction, the poll tax, racial gerrymandering, restrictive voter registration laws, and the all-white Democratic primary further excluded voters of color from the political process. *Id.* The U.S. Supreme Court subsequently invalidated Texas's white primaries as violations of the Fifteenth Amendment in *Nixon v. Herndon*, 273 U.S. 536 (1927), and *Smith v. Allwright*, 321 U.S. 649 (1944).

59.     After Texas's poll tax was deemed unconstitutional in 1966, Texas enacted a new law requiring voters to re-register every year. While purportedly neutral on its face, the law had such a substantial disenfranchising effect on minority voters that it was struck down as unconstitutional in 1971. *See Veasey I*, 71 F. Supp. 3d at 635. However, Texas continued "to suppress minority voting through purging the voter rolls." *Veasey II*, 830 F.3d at 239-40 (plurality opinion) (citing *Veasey I*, 71 F. Supp. 3d at 635). Indeed, as 2019, the SOS attempted to purge nearly 100,000 registered voters from the voter rolls despite being made aware that the process for identifying voters for removal targeted naturalized citizens who were eligible voters. *See Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *2 (W.D. Tex. Feb. 27, 2019).

60.     Texas has also racially gerrymandered districts in every redistricting cycle since 1970, in violation of the Voting Rights Act for five consecutive decades. *Veasey II*, 830 F.3d at 240; *see Veasey I*, 71 F. Supp. 3d at 636 & n.23 (collecting cases); Lichtman Report at 19. In 2006,

for instance, the U.S. Supreme Court held that Texas had violated the Voting Rights Act by attempting to redraw a congressional district in order to reduce the voting strength of Latino voters. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006). And then in 2018, the U.S. Supreme Court found that the Texas Legislature had racially gerrymandered a Texas House district. *See Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

61.     On top of all this, certain voters "continue to have to overcome fear and intimidation when they vote," including in-person harassment at the polls in an attempt to suppress minority participation. *Id*.; *see also Rodriguez v. Harris Cnty*., 964 F. Supp. 2d 686, 783 (S.D. Tex. 2013) (describing poll workers being hostile to Latinos, depriving them of the opportunity to bring an assistant with them, and requiring them to show driver's licenses to vote even before it was a legal requirement).

62.     Many of these discriminatory voting restrictions were enacted pursuant to a purported state interest in preserving the "purity" of the ballot box, a concept that was part of the Reconstruction-era Texas Constitution of 1876. *See Dunn v. Blumstein*, 405 U.S. 330, 345 (1972). This language has been used in Texas and throughout the South to justify numerous official state actions, including bans on interracial marriage, the disenfranchisement of voters of color through poll taxes and all-white primaries, and the lynching of Black Texans. It also pervaded unofficial actions, such as the creation of the "Ballot Purification League" that aimed to disqualify voters of color throughout south Texas in the early 1900s. *See, e.g.*, Brief of Gerald C. Mann, Attorney General of Texas as Amicus Curiae, *Smith v. Allwright*, 321 U.S. 649 (1944) (No. 51), 1943 WL 54366 (defending the all-white primary, contending that it "is of such importance to the citizenship of Texas and to the preservation of the purity of the ballot box in primary elections, that as Attorney General of Texas, he feels that it is his duty to file this brief."); *Dillenburg v. Kramer*, 469 F.2d

1222, 1224 (9th Cir. 1972) (explaining that a "[s]earch for modern reasons to sustain the old governmental disenfranchisement prerogative" often ends with "a quasi-metaphysical invocation that the interest is preservation of the 'purity of the ballot box'"). This concept of "purity of the ballot box" also part of the 2021 legislative debate that culminated in SB 1.

63.     Texas legislators and officials have also repeatedly claimed a purported need to prevent voter fraud as a pretext to justify their discriminatory laws. *See Veasey II* at 636. But time and again, it is clear that this is mere pretense. The courts have recognized such artifice as a facially neutral proxy for discrimination, stating, "There has been a clear and disturbing pattern of discrimination in the name of combatting voter fraud in Texas." *Id.*

### 2.     Violations of the Voting Rights Act

64.     Texas is a serial offender under the Voting Rights Act. In 1975, Congress applied the preclearance provisions in Section 5 of the Voting Rights Act to Texas. It did so on the basis of extensive legislative testimony about Texas's long history of voting discrimination. *See Veasey II*, 830 F.3d at 240 n.29 (quoting *Seamon v. Upham*, 536 F. Supp. 931, 989 (E.D. Tex.) (citations omitted), *vacated on other grounds*, 456 U.S. 37, 102 (1982)).

65.     In Texas's first five years under preclearance, the U.S. Department of Justice ("DOJ") lodged far more objections against Texas than against any other state. *Id.*

66.     Between 1976 and 2006, DOJ issued over 200 objections to changes in voting laws under Section 5, including 107 after Congress reauthorized Section 5 in 1982. Ten of those objections related to statewide voting practices. The remainder involved voting practices across approximately 30% of Texas counties, in which 71.8% of the non-white voting population resided. *See* DOJ, Determination Letters for Texas, https://www.justice.gov/crt/voting-determination-

letters-texas; Nina Perales et al., *Voting Rights in Texas: 1982-2006*, at 15-16 (June 2006), http://www.protectcivilrights.org/pdf/voting/TexasVRA.pdf.

67.    40.    Additionally, between 1982 and 2005, litigants brought 206 successful lawsuits in Texas under Section 2 of the Voting Rights Act. *Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary*, 109th Cong. 251 tbl. 5 (Mar. 8, 2006), https://babel.hathitrust.org/cgi/pt?id=pur1.32754076773724&view=1up&seq=259.

68.    Texas counties also have history of discrimination against voters with disabilities. In 2017, Hidalgo County and Harris County entered into settlement agreements with the Department of Justice regarding the accessibility of polling places. *See Settlement Agreement Between the United States of American and Hidalgo County*, https://www.ada.gov/hidalgo_sa.html and Settlement Agreement between the United States of America and Harris County, https://www.ada.gov/harris_co_sa.html. Likewise, in 2020, Bexar County entered into a settlement agreement for alleged violations of the ADA arising out of a failure to provide proper instructions to voters with disabilities who needed to vote at the curbside.

### 3.    Continued Voter Suppression under Texas Law

69.    Today, Texas has *the* most restrictive voting laws in the country. The state has imposed barriers at every step of the voting process—from registering to vote to curing improperly rejected ballots. Texas continues to make voting as difficult as possible, and often in defiance of clearly established federal law. History shows that the burdens of these laws always weigh most heavily on voters of color, voters with disabilities, voters with limited English proficiency, and young and first-time voters.

70.     *Voter Registration:* Texas is one of only nine states that do not allow online voter registration. It is also one of only ten states that require voters to register to vote 30 days before an election—the maximum length of time allowed under the National Voter Registration Act ("NVRA"). *See* Benjamin Wermund, *'Leading the Way on Voter Suppression.' Texas's Ground Zero in Voting Rights War*, Houston Chronicle (Sept. 18, 2020), https://www.houstonchronicle.com/politics/texas/article/Leading-the-way-on-voter-suppression-Texas-15578236.php; *see also* Nat'l Conf. of State Legislatures, *Online Voter Registration* (Apr. 6, 2021), https://www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-registration.aspx; Nat'l Conf. of State Legislatures, *Voter Registration Deadlines* (Oct. 2, 2020), https://www.ncsl.org/research/elections-and-campaigns/voter-registration-deadlines.aspx.  For  at least a decade, Texas stubbornly resisted compliance with the NVRA by failing to allow residents to register to vote when they updated their driver's license information online. *See id.* In August 2020, a federal court preliminarily enjoined this aspect of Texas's voter registration system, holding that it likely violated the NVRA. *See Stringer v. Hughs*, No. SA-16-CV-257-OG, 2020 WL 6875182, at *28 (W.D. Tex. Aug. 28, 2020). Texas had been on notice of these violations since at least 2016 but refused to comply with federal law absent a federal court order. The state finally settled that matter in 2021 after more than five years of litigation.

71.     *Third-party voter registration:* Even before SB 1, Texas imposed stricter limits than other states on third-party organizations' ability to help register voters. Volunteers for these organizations must register individually with each of Texas's 254 counties in which they plan to register voters. *See Wermund*, *supra*.

72.     *Polling locations:* Likewise, even before SB 1, Texas limited access to polling locations. Between 2012 and 2019, Texas closed over 750 polling places. In 2019, the Texas State

Legislature prohibited temporary polling locations. Texas counties often used such temporary polling locations during primary elections, particularly on or near college campuses. *Id.*

73.     *Voter ID:* A Court previously found that Texas's voter ID law was enacted with racially discriminatory intent. *See Veasey I*, 71 F. Supp. 3d at 702–03; *Veasey v. Abbott*, 249 F. Supp. 3d 868, 875–76 (S.D. Tex. 2017) (*Veasey III*). That voter ID law, even with its later court-ordered amendments is still considered the most restrictive voter ID law in the country. *See* Ross Ramsey, *"Analysis: It's Harder to Vote in Texas Than in Any Other State*, https://www.texastribune.org/2020/10/19/texas-voting-elections.

74.     *Voter Assistance*: In 2017, the Fifth Circuit affirmed a district court ruling that Texas Election Code 61.033, which required that interpreters be registered to vote in the county where assistance was being sought, violated Section 208 of the Voting Rights Act. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 614–15 (5th Cir. 2017). The court concluded that "the limitation on voter choice expressed in Tex. Elec. Code § 61.033 impermissibly narrows the right guaranteed by Section 208 of the VRA." *Id.* at 615. The court warned the State that "[a] state cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." *Id.*

## B.     Demographic Changes in Texas

75.     Texas's continuous attempts to make voting as difficult as possible come just as Texas is undergoing a massive demographic shift that has rendered whites residents a minority in the state.

76.     Voters of color were responsible for the vast majority of Texas's population growth between 2010 and 2019. Hispanics and African-Americans accounted for 68.3% of Texas's total population growth" in that time. U.S. Census, *ACS Demographic and Housing Estimates:*

*Texas*, https://data.census.gov/cedsci/table?tid=ACSDP5Y2019.DP05&g=0400000US48.

Combined, all non-white residents accounted for 85.6% of Texas's total population growth

between 2010 and 2019. *Id.*

      77.    Of all racial groups in Texas, the Asian-American population grew at the fastest

rate over the last decade. The growth of Asian-American communities in Texas outpaced that of

white residents by a factor of nearly 4 to 1, with the Asian-American population of the state

increasing from 3.8% to 5.4% of the Texas population from 2010 to 2019, including localized

increases in population by as much as 83.7% in certain counties (for example, in Fort Bend County

where the total population is more than 22% Asian-American). By the time of the 2020 census,

the Asian-American population in Texas increased by nearly two-thirds over the decade to over

1.5 million. *See* Alexa Ura et al., *People of color make up 95% of Texas' population growth, and*

*cities and suburbs are booming, 2020 census shows*, Texas Tribune (Aug. 12,

2021) https://www.texastribune.org/2021/08/12/texas-2020-census. The City of Austin noted that

the Asian-American population nearly doubled in the past 10 years from 49,159 to 85,853 persons.

According to a report filed by the city, one in every five people in the last decade who moved to

Austin were of Asian descent. Press Release, City of Austin, Austin's Population Continues

Another Decade of Growth According to US Census Bureau (Aug. 13, 2021).

      78.    "Texas first became a majority-minority state" between 2000 and 2010, "with

Anglos no longer comprising a majority of the state's population." *Veasey I*, 71 F. Supp. 3d at 700.

By 2019, white non-Hispanic Texans accounted for only 41.2% of the state's population, with

Hispanic residents accounting for 39.7%, Black Texans for 12.9%, and Asian residents for 5.2%.

U.S. Census, *Quick Facts: Texas* (July 1, 2019), https://www.census.gov/quickfacts/TX. In 2020,

white non-Hispanic Texas comprised only 39.8% of the total population in Texas, a mere .5%

more than the Hispanic population, which saw an increase of nearly 2 million persons over the past decade. *See* Alexa Ura et al., *People of color make up 95% of Texas' population growth, and cities and suburbs are booming, 2020 census shows*, Texas Tribune (Aug. 12, 2021), https://www.texastribune.org/2021/08/12/texas-2020-census.

79.    Black and Hispanic residents also accounted for 68.1% of the growth in Texas's voting age population between 2010 and 2019. *See* U.S. Census Bureau, Citizen Voting Age Population by Race and Ethnicity (Feb. 19, 2021), https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html (select "CVAP 2015-2019 5 Year ACS Data - CSV Format"). As a result, in 2019, Black and Hispanic voters made up 43.0% of Texas's voting age population and voters of color accounted for 48.4% of that population. *Id.*

80.    In 2019, Hispanic citizens made up 29.9% of Texas's citizen voting age population ("CVAP"), Black citizens made up 13.1% of Texas's CVAP, and Asian-American citizens made up 3.7% of Texas's CVAP. *Id.*

**C.    Increased Turnout and Local Innovation in the 2020 General Election**

81.    The 2020 General Election saw unprecedented turnout, especially among historically marginalized communities.

82.    This increase in voter participation was due in part to the expansion of access to the polls in certain counties, like Harris County, including the extension of early voting hours, access to drive-through voting, and education about and easier access to forms for voters eligible to vote by mail. Each of these types of expanded access are made illegal by provisions of SB 1.

**D.    Texas's 2021 Legislative Sessions and Passage of SB 1**

83.    SB 1, including the provisions of that bill at issue in this lawsuit, was passed through the legislative process in an opaque and procedurally irregular manner that limited public

input, ignored testimony and evidence of the bill's disenfranchising impact on voters, and amended and considered provisions in closed-door proceedings in which the bill's authors often could not determine how or when certain provisions of the bill were added, or who had written those provisions.

84.     SB 1, which was passed in the second special session of 2021, began as two separate bills in the regular legislative session: Senate Bill 7 ("SB 7") on the Senate side and House Bill 6 ("HB 6") on the House side.

85.     On March 4, 2021, prior to the introduction of either SB 7 or HB 6, the House Elections Committee held a formal meeting with invited testimony from relevant government agencies. At the March 4 House Elections Committee meeting, Keith Ingram, Director of the SOS Elections Division testified that he was "happy to report that Texas Elections are in good shape." Director Ingram explained: "[t]he Elections in Texas last year were a success. . . . Texas had an election that was smooth and secure." Among the reasons for this success, Ingram highlighted the extension of early voting hours and the hard work and creativity of county election officials.

86.     Nevertheless, Senator Bryan Hughes introduced SB 7 on March 11, 2021, two days before the bill-filing deadline. SB 7 included most of the provisions that would eventually pass as part of SB 1 in special session and that are at issue in this case. Senator Hughes did not seek input from communities of color regarding the bill. Of those invited to testify on the bill, all but one individual was white. None were disabled voters or voters with limited English proficiency.  And invited witnesses had no time constraints placed on the length of their testimony, while public testimony was limited two minutes of testimony on all of the election-related bills combined. This was a departure from the norm and had the effect of silencing dissent and minimizing community input.

87.     In the House, Representative Briscoe Cain introduced HB 6 on March 12, 2021, the eve of the bill-filing deadline, with no advance public notice of what the bill would contain. As originally filed, HB 6 was not drafted by or with assistance from the Texas Legislative Council, the agency that is tasked with providing legal guidance to legislators about drafting new statutes. By all accounts, the bill was drafted by national lobbyist groups aiming to curb voter participation in several states, including in Texas. After 22 hours of testimony, which included testimony from scores of individuals and organizations in opposition to the bill, the House Elections Committee passed HB 6 on April 8, 2021. Then, on April 29, the House Elections Committee took up and passed SB 7 with no advance notice to either the public or all of the Committee members. With no public comment permitted, the Committee Chair substituted the entirety of SB 7 with the text of HB 6. After a failed vote and various other procedural problems, the Committee passed the bill.

88.     On May 6, the full House voted on the House's version of SB 7. Again, the vote occurred in the middle of the night, denying the public an opportunity to witness and understand the substance of the bill that sought to criminalize a wide range of electoral activities and programs and discourage participation in the democratic process. In defending the bill, Representative Cain testified that he did not consult with historically marginalized communities to discern how the bill might affect them, nor did he request, order or perform any empirical research on the subject. Instead, he relied on his "gut" to determine whether a provision of the bill would be "bad."

89.     By substituting the entire contents of SB 7, the House Elections Committee permitted the contents of its HB 6 to be considered in Conference Committee with the Senate, behind closed doors, without the bill ever being heard in Senate Committee. The Conference Committee subsequently released the negotiated version of SB 7, which incorporated provisions of both bills, and added numerous provisions that were not in either version every presented in a

committee or to the public. The combined committee report included provisions from both SB 7 and HB 6, comprised 52 pages, and amended or added 82 sections of code.

90.     One of the provisions that was added in that process would have limited early voting on Sundays to after 1 p.m. This was an apparent attack on the ability of Black churches to conduct their long-standing "Souls to the Polls" events on Sunday mornings prior to church services. Members of that conference committee would later contend that they did not know who drafted this provision or that it was a "typo." *See* Aaron Blake, "Texas GOP now claims its bill limiting Black churches' 'souls to the polls' was a typo," Wash. Post (June 2, 2021), https://www.washingtonpost.com/politics/2021/06/01/what-texas-voting-bill-reveals-about-gop. Notwithstanding that "typo," the conference committee report was voted out of the Senate in the middle of the night on Saturday, May 29, 2021, and set for hearing on the House Floor on Sunday, May 30, 2021. The bill's authors defended the "typo" and other provisions of the bill.

91.     Prior to final passage in the House, however, numerous members left the floor, breaking quorum. The House adjourned without passing the bill, ending the regular legislative session. In response, Governor Abbott vetoed funding for the Legislature and called a special session including on the issue of the voting bill. Quorum was never reached during that special session, and the Governor immediately called a second special session.

92.     The law at issue in this case was introduced as SB 1 in the second special session of 2021. SB 1 included the vast majority of the provisions contained in the earlier HB 6 and SB 7, including nearly identical language on the majority of provisions that ultimately passed into law. On numerous occasions, members of the House and Senate invoked testimony and evidence that had been offered during the regular session in connection with HB 6 and SB 7. It is clear from the legislative record that SB 1 was considered a companion to its predecessors in the regular session.

93.     As the new bill was being considered, the Speaker of the House appointed a hand-selected Special Committee on Constitutional Issues to hear and shepherd SB 1 to passage, bypassing the House Elections Committee entirely. Upon consideration of the bill, the committee chair limited the layout of the bill to a mere 45 minutes—a sharp departure from normal procedure. Witnesses were required to testify on short notice. The House ultimately completely substituted their version of an elections bill in place of SB 1 and passed it out of committee, as they had done in the regular session.

94.     When the bill reached the House floor, the Speaker began consideration of the bill by warning members not to use the word "racism" and admonished one member, a woman of color, for questioning the impact of SB 1 on voters of color. More than 60 amendments were proposed on the House floor, including at least 17 that passed, nearly re-writing the bill with no opportunity for public testimony or input, no ability to consult experts on the changes, no fiscal notes, and almost no debate. The House nevertheless passed its version of SB 1 on August 26, 2021. The Senate declined to concur, a conference committee was appointed, and a final version of the bill—which included the provisions at issue in this case—was passed out of both chambers shortly thereafter on August 31, 2021 and sent to the governor.

95.     By its terms, SB 1 becomes effective 91 days after the end of the legislative session in which it passed—December 2, 2021.

## V.
## ILLEGAL PROVISIONS OF SB 1 AND PLAINTIFFS' CLAIMS FOR RELIEF

96.     Plaintiffs challenge certain specific sections of SB 1, each based on several different provisions of federal law as described below:

   A.     First, Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 impose a brand new, restrictive ID requirement on mail-in ballot voters in violation of the Civil Rights Act's materiality provision, the ADA, and Section 504;

B.   Second, Sections 6.04 and 6.06 impose new burdens on the rights of voters with disabilities and language minorities to have assistance in all aspects of voting and to have the assistant of their choice, in violation of the Voting Rights Act, the ADA, and Section 504; and

C.   Third, Section 7.04 makes it illegal to engage in paid ballot collection programs and services (pejoratively described as "vote harvesting"), which violates the First Amendment Right to Free Speech, and imposes penalties for actions that are too vague to comply with the Due Process Clause of the Fourteenth Amendment.

Each of the challenged provisions is discussed in turn in the sections below, followed by the claims brought by Plaintiffs as to that specific provision.

A.   **SB 1 imposes illegally restrictive new ID requirements on mail-in ballot voters.**

97.   Texas law limits who is eligible to vote by mail. Only voters over the age of 65, voters with a disability, voters confined in jail but otherwise eligible to vote, and voters who are outside of their county of residence during the early voting period and on Election Day are permitted to vote by mail. Tex. Elec. Code §§ 82.001–82.004. Of these, only voters with a disability or over the age of 65 are permitted to apply for an annual ballot by mail, which allows them to receive a mail-in ballot in multiple consecutive elections. Tex. Elec. Code § 86.0015.

98.   Critically, to successfully apply to vote by mail, a voter must fill out a robust application that includes identifying information such as name, address, and date of birth. The voters must certify that the information given in the application is true and affirm their understanding that giving false information is a crime. To receive a vote-by-mail application, a voter must also have previously registered to vote, which again requires the voter to provide a robust amount of personal information that county voter registrars use to determine the voter's eligibility.

99.     SB 1 needlessly adds immaterial burdens to the process of applying to and actually voting by mail. Pursuant to Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 of SB 1, voters must additionally provide the number on either their Texas driver's license, Texas election identification certificate, or Texas personal ID card on their mail-in ballot applications and on the ballot carrier envelopes used to return their voted ballot. SB 1 provides that if the voter has not been issued one of these numbers by the State of Texas, the voter may instead provide the last four digits of their Social Security number. If the voter has not been issued any of these numbers by the State of Texas or the Social Security Administration, the voter may sign a statement indicating that they have *never* been issued one of these numbers.

100.     Under SB 1, a voter cannot provide a statement or any other form of identification other than those specifically named above if the voter has been issued one of these numbers by the State of Texas or the Social Security Administration at some point in the past, even if the voter does not know, remember, or have access to that number.

101.     SB 1 provides that if the information the voter provides does not "identify the same voter identified" on the voter's registration application, then the mail-in ballot application and/or ballot contained in the voter's carrier envelope must be rejected. Thus, if a number is not provided by the voter, or if there is an error in entry of that number, a rejection is automatic.

102.     Each of the Plaintiffs has members who are eligible to and choose to vote by mail. For example, one member of Plaintiff REVUP is a 51-year-old registered voter in Travis County with Cerebral Palsy. This individual voter frequently votes by mail in local, state, and federal elections in Travis County, but he is completely unable to use his hands and communicates using a communication device that he controls with a mouth stick. As another example, Plaintiff

LWVTX surveyed its members in 2020 and determined that hundreds of its members chose to vote by mail due to age or disability.

103.    Each of the Plaintiffs' members include voters who have been issued driver's license numbers and/or Social Security numbers, but who do not have access to those documents, have lost the relevant documents, or otherwise do not know the numbers required to comply with the new mail-in ballot ID requirement.

104.    Any application to vote by mail by a voter who does not know or have access to these numbers will necessarily lack the number required by SB 1.

105.    SB 1 allows no alternatives to these ID requirements similar to the various acceptable forms of identification for voting in person (described below); nor does it permit the voter to indicate a "reasonable impediment" to having access to the numbers required.

106.    In other words, while SB 1 permits a voter to "make a statement" that they have not been issued any of the permissible identification numbers, a voter cannot make a similar statement indicating that they *have* been issued one or more of these numbers, but do not know the number, do not have reasonable access to it, or have some other reasonable impediment to being able to provide the number on the applicable forms.

107.    Because of these sections' mandatory rejection provision, any errors or omissions in entering the required number on a form will necessarily result in the rejection of applications and ballots cast by qualified voters.

108.    Unlike the limited options imposed on mail-in ballot voters, the Texas Election Code provides that there are several forms of identification that are acceptable for voting in person, including "(1) a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no

earlier than four years before the date of presentation; (2) a United States military identification card that contains the person's photograph that has not expired or that expired no earlier than four years before the date of presentation; (3) a United States citizenship certificate issued to the person that contains the person's photograph; (4) a United States passport book or card issued to the person that has not expired or that expired no earlier than four years before the date of presentation; or (5) a license to carry a handgun issued to the person by the Department of Public Safety that has not expired or that expired no earlier than four years before the date of presentation." Tex. Elec. Code 63.0101(a).

109.    Additionally, a voter who seeks to vote in person but cannot produce any of these forms of identification, is permitted to sign "a declaration declaring the voter has a reasonable impediment to meeting the requirement for identification," Tex. Elec. Code 63.001, and the voter can provide in the alternative: "(1) a government document that shows the name and address of the voter, including the voter's voter registration certificate; [or] (2) one of the following documents that shows the name and address of the voter: (A) a copy of a current utility bill; (B) a bank statement; (C) a government check; or (D) a paycheck; or (3) a certified copy of a domestic birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity." Tex. Elec. Code 63.0101(b). Notably, these alternatives are not contingent on the fact that the voter has never been issued an acceptable form of identification, but only that the voter cannot produce that identification at the polling place.

110.    SB 1 makes no similar accommodation for voters who cannot produce their ID number or Social Security number at the time of voting.

111.    SB 1 also fails to provide an adequate cure to this provision. SB 1 provides that a voter may be notified by telephone or e-mail of the defect and that the voter may request to have

the voter's application to vote by mail canceled or go to the voting clerk's office in-person to correct the defect. If a voter does not know these numbers it will be impossible to cure the defect. Moreover, voters who need to vote by mail due to disability may be unable to go in person to vote or cure the defect. SB 1 does purport to provide an additional type of "online" curing process, but similarly, a voter without access to their information cannot cure that fact, and in any event, the bill limits that curing only to mail-ballot applications, permitting only the in-person cure option for cast ballots pursuant to Section 5.12, and only if the error is found in time.

112.    While each of the Plaintiffs has a significant number of members who vote by mail and are at significant risk of rejection through errors or omissions in entering information on ballots and other election forms, certain Plaintiffs, including OCA-GH and REVUP, have members at exceptional risk of this rejection.

113.    OCA-GH has a significant number of members who are eligible to vote by mail and especially likely to make errors entering information on ballots and other election forms due to the inability to read election materials in the language in which they are provided. This includes members with native languages that do not use Arabic numerals (1,2,3, etc.) and Roman letters (A, B, C, etc.), which makes the process of replicating these characters particularly error prone. These voters are at a heightened risk of a rejection of their applications and ballots in violation of federal law.

114.    REVUP also has a significant number of members who are eligible to vote by mail and who are especially likely to be unable to remember their ID numbers or Social Security numbers due to cognitive disability, as well as members who do not have access to these documents due to living conditions necessitated by physical or cognitive disability. These

members are especially likely to use mail-in ballots to vote due to disability, making it very likely that these voters will have their applications and/or ballots rejected in violation of federal law.

115.    Each of the Plaintiffs will need to divert time and resources away from their usual programs (as described above) in order to educate their members, their constituents, and the public about the new burdensome and immaterial requirements for voting by mail set forth in SB 1 Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 in order to ensure these individuals will not be denied the opportunity to successfully vote by mail. Plaintiffs will need to produce materials that educate voters who vote by mail about the complex decision tree regarding when they can provide which identification number. Plaintiffs will also need to divert staffing to answer questions from voters who do not understand the new requirements. Additionally, each of the Plaintiffs will need to divert resources to informing individuals who have a driver's license number or Social Security number but are unable to access it, that unless they can find that number they will be unable to vote by mail, and helping individuals to either recall or locate their identification numbers. The diversion of resources required to guide members through complying with and having their mail ballot counted pursuant to the burdensome new identification requirements will decrease the amount of time and resources that Plaintiffs can spend conducting educational outreach to and answering questions from other voters about participating in the voting process and advancing their other organizational goals. This diversion of resources would not be necessary in the absence of SB 1.

116.    OCA-GH will need to reallocate its already limited resources to inform and educate mail voters about the complicated set of rules regarding when they can provide which particular acceptable identification number in order to comply with SB 1 Section 5.02. Moreover, in order to prevent rejection of their ballots, OCA-GH will need to provide additional education to ensure

that members and the community are especially careful when writing down numbers to be sure not to invert or omit any particular digit. This will require significant efforts because (as already mentioned) a significant portion of the community that OCA-GH serves does not use Arabic numerals, making replication of these characters error prone. The time, staffing, and money that OCA-GH will need to account for this new rule will take away from OCA-GH's resources to engage with more voters who it would otherwise have been able to engage but for these additional burdens put in place by SB 1.

117.    LWVTX will need to divert resources in order to educate members, constituents, and the public about the new burdensome and immaterial requirements for voting by mail. LWVTX will need to create materials to educate mail voters on the complicated decision tree of when they can provide which number under Section 5.02. LWVTX will also need to reassign members of its limited staff to answer questions from voters who do not understand SB 1's new, complicated requirements. In the absence of SB 1, these staff members would be focusing on programs that advance LWVTX's organizational mission. Additionally, LWVTX will need to divert resources from its political power-building programming (e.g., canvassing, circulating petitions, GOTV efforts, distributing flyers, holding town halls, giving voters rides to the polls, and gathering petition signatures), to explaining to individuals who have either a driver's license number or Social Security number but are unable to access it, that unless they can find that number they will be unable to vote by mail, and then subsequently helping individuals try to either recall or locate their identification numbers. LWVTX's investment in these countermeasures will prevent it from using staffing, time, and money on its regular activities of educating and encouraging its members and the general public on not only voting rights, voter registration, and upcoming elections but also other issues, such as health and the environment.

118.    LWVTX also has members who are eligible to vote by mail and likely to either make a mistake in entering their numbers or be unable to remember their ID number or Social Security number.

119.    REVUP will need to divert resources away from its usual programming, such as voter registration, GOTV efforts, distributing flyers, and hosting issues and candidate forums, in order to educate its members, constituents, and the public about SB 1's new, burdensome and immaterial requirements for voting by mail. REVUP will need to produce educational materials that inform mail voters of the complicated decision tree of when they can provide which number. REVUP will also need to reassign members of its limited staff to answer questions from voters who do not understand SB 1's new, complicated requirements. Additionally, REVUP will need to divert resources from creating materials of vital importance to its members, such as on Medicaid expansion and home- and community-based healthcare, to explaining to individuals who have either a driver's license number or Social Security number but are unable to access it, that unless they can find that number they will be unable to vote by mail, and then subsequently helping individuals try to either recall or locate their identification numbers.  REVUP's investment in these countermeasures will prevent it from using staffing, time, and money on other program priorities, such as engaging these same mail-ballot voters on policy positions, or reaching out to additional voters with disabilities that they would have been able to engage but for SB 1's additional burdens.

120.    TOP will need to divert resources away from its usual GOTV and other voter engagement activities in order to educate its members, constituents, and the public about the new burdensome and immaterial requirements for voting by mail. TOP will need to produce educational materials that inform mail voters of when they can provide which requisite number to remain in compliance with the law. TOP will also need to divert staffing to answer questions from

voters who do not understand the new, complicated requirements. Additionally, TOP will need to divert resources to explaining to individuals who have either a driver's license number or Social Security number but are unable to access it, that unless they can find that number they will be unable to vote by mail, and then subsequently helping individuals try to either recall or locate their identification numbers. TOP's use of resources will prevent it from using staffing, time, and money on its other programmatic priorities, such as engaging in door-to-door, voter-interactive activities and spending time with mail-ballot voters advocating for other policy goals. These hurdles and troubleshooting with voters will shrink the size and scale of TOP's voter engagement operations because it will have to spend more time with fewer voters.

121. TOP also has members who are eligible to vote by mail and likely to either make a mistake in entering their numbers or be unable to remember their ID number or Social Security number, and are thus individually at risk of being disenfranchised.

122. WDAF will need to divert resources away from its project priorities and policy goals, such as creating and disbursing educational materials on upcoming elections, organizationally endorsed candidates, or organizationally endorsed initiatives, in order to instead educate its members, constituents, and the public about the new burdensome and immaterial requirements for voting by mail. WDAF will need to produce educational materials that inform mail voters of the complicated decision tree of when they can provide which number. WDAF will also need to divert staffing to answer questions from voters who do not understand the new complicated requirements.  Additionally, WDAF will need to divert resources to explaining to individuals who have either a driver's license number or Social Security number but are unable to access it, that unless they can find that number they will be unable to vote by mail, and then subsequently helping individuals try to either recall or locate their identification numbers.

WDAF's use of resources will prevent it from using staffing, time, and money on its other project priorities and policy goals, such as using that same time to canvas voters that do not vote by mail.

123.    WDAF also has members who are eligible to vote by mail and likely to either make a mistake in entering their numbers or be unable to remember their ID number or Social Security number, and are thus individually at risk of being disenfranchised by these provisions.

**COUNT 1**
**52 U.S.C. § 10101 (previously 42 U.S.C. § 1971); 42 U.S.C. § 1983**
**Violation of Section 101 of the Civil Rights Act of 1964**
**(All Plaintiffs against Defendants SOS, Harris Elections, and Travis Elections)**

124.    Section 101 of the Civil Right Act of 1964 provides that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2).

125.    SB 1's provisions (Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12) requiring an application for ballot by mail or a mail-in ballot to be automatically rejected when a voter omits their ID number or makes a mistake in entering their ID number, violates the materiality provision of the Civil Rights Act because the omission or error on the application or carrier envelope is not material in determining whether the individual named on that application or carrier envelope is an eligible voter.

126.    While the State may legally request this information from voters (for example, as an optional data point that would prevent the need for a signature review), the Civil Rights Act makes clear that an eligible voter's applications, registrations, ballots, and other documents necessary to vote cannot be rejected for failing to provide this information or making an error in entering it.

127.     Accordingly, Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 of SB 1 are preempted by federal law and unenforceable insofar as they require a rejection of an application or ballot due to such error or omission.

128.     Plaintiffs are entitled to injunctive relief against the SOS as the State Official explicitly tasked with enforcing those sections of SB 1, against the county defendants to the extent that they are obligated to follow the SOS's directives enforcing those challenged provisions or to use materials the SOS created in his implementation of those challenged provisions, as well as reasonable attorneys' fees and costs.[12]

## COUNT 2
### Violation of Title II of the Americans with Disabilities Act
### (All Plaintiffs against Defendants SOS, Harris Elections, and Travis Elections)

129.     Title II of the ADA and its implementing regulations mandate that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

130.     In providing aids, benefits, or services, public entities may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal

---

[12] Section 101 creates a private right of action enforceable by the Plaintiffs in this case. The Eleventh Circuit most-recently held as much, noting that the legislative history demonstrates that private plaintiffs have enforced this provision since the Section's enactment in 1871. *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).  That court's ruling in *Schwier* was also recently analyzed at length and adopted by a court in this district in *Tex. Dem. Party v. Hughs*, 474 F. Supp. 3d 849, 858–59 (W.D. Tex. 2020), *rev'd on other grounds*, 860 Fed. Appx. 874 (5th Cir. 2021), with the court noting that "Congress did not intend to foreclose private causes of action by also granting the Attorney General enforcement authority."

opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others"; nor may public entities provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. And public entities must not "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. 28 C.F.R. § 35.130(b)(1)(i)-(iv), (vii).

131.    Public entities must also make reasonable modifications to their policies, practices, and procedures when necessary to avoid discrimination against individuals with disabilities. 28 C.F.R. § 35.130(b)(7)(i). SB 1 does not allow for any modification to the ID requirement and does not provide any way for Plaintiffs' members and other voters with disabilities who may not know or have access to their ID numbers to vote by mail. Additionally, SB 1 does not provide a modification to its cure provision as to rejected ballots, other than voting in person, which is not possible for many voters with disabilities.

132.    Public entities shall not "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 28 C.F.R. § 35.134(b). By denying voters with disabilities a reasonable modification to the ID requirement, SB 1 interferes with Plaintiffs' rights under Title II of the ADA to receive a reasonable modification.

133.    Public entities may not "impose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments." 28 C.F.R. § 35.130(b)(8). SB 1 imposes on voters an

eligibility requirement of having and knowing specific ID numbers. This eligibility requirement will screen out voters with disabilities who may not know or have access to the numbers by reason of disability and consequently will prevent Plaintiffs' members and other voters with disabilities from fully and equally enjoying access to voting.

134.    Further, public entities may not "[U]tilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii). SB 1 uses voter ID criteria that will subject Plaintiffs' members and other qualified voters with disabilities to discrimination by prohibiting them from voting even if they meet all other qualifications to vote by mail.

135.    The challenged provisions of SB 1 (5.02, 5.03, 5.06, 5.07, 5.10, and 5.12) discriminate against Plaintiffs' members and other voters with disabilities because they do not allow equal access to mail-in voting and exclude people with disabilities from participation in the services, programs, or activities of Defendants, namely, the State's mail-in voting program.

136.    By enforcing and implementing those challenged provisions of SB 1, the AG, the SOS and county officials acting pursuant to SOS directives and using materials he created will exclude Plaintiffs' members and other voters with disabilities from participation in, and deny them the benefits of, or otherwise discriminate against them in, their service, program, or activity of voting via the State's mail-in voting program.

137.    Congress specifically authorized individuals who believe their Title II ADA rights are being violated to bring an action in a United States District Court. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

138.     As a result of Defendants' actions, Plaintiffs and their members have suffered and will continue to suffer irreparable harm. They have suffered and continue to suffer from discrimination and unequal access to Defendants' programs, services, or activities. And in the absence of injunctive relief, Plaintiffs and their members will be denied full and equal opportunity to participate in Defendants' voting programs.

139.     The ADA authorizes injunctive relief and Plaintiffs are entitled to injunctive relief, as well as reasonable attorney's fees and costs.

**COUNT 3**
**Violation of Section 504 of the Rehabilitation Act of 1973 29 U.S.C. § 794 et seq.**
**(All Plaintiffs against Defendants SOS, Harris Elections, and Travis Elections)**

140.     Section 504 of the Rehabilitation Act of 1973 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

141.     Section 504 defines "program or activity" to include "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government" or "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]" 29 U.S.C. § 794(b)(1).

142.     Pursuant to Section 504, federally funded entities may not, in providing aids, benefits, or services, "[d]eny a qualified handicapped person the opportunity accorded others to participate in the program or activity receiving Federal financial assistance." 28 C.F.R. § 42.503(b)(1)(i).

143.    Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 of SB 1 subject Plaintiffs' members and other qualified voters with disabilities to discrimination under Section 504 by imposing voter ID requirements, denying reasonable modifications to both the ID requirements and the cure process following improper rejections, and excluding voters with disabilities from the vote-by-mail service.

144.    Accordingly, by enforcing and implementing those challenged provisions of SB 1, the AG, SOS, and county officials acting pursuant to SOS directives and using materials he created will discriminate against Plaintiffs and their members by denying them a full and equal opportunity to participate in their voting programs.

145.    As a result of Defendants' actions, Plaintiffs' members have suffered and will continue to suffer irreparable harm; they have suffered and continue to suffer from discrimination and unequal access to Defendants' programs, services, or activities of voting.

146.    Unless the requested relief is granted, Plaintiffs and their members will suffer irreparable harm in that they will be discriminated against and denied equal access to the fundamental right to vote.

147.    Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

**B.    SB 1 places drastic, illegal restrictions on the right to assistance while voting.**

148.    Sections 6.04 and 6.06 of SB 1 individually and collectively violate Plaintiffs' rights to select an assistant of their choice and to have assistance in all aspects of the voting process, free of encumbrance by state laws that impose restrictions on the selection of those assistants or the specific types of assistance that may be provided by them. Each of these sections is considered here in turn.

Section 6.04

149.    Prior to SB 1, pursuant to Section 64.034 of the Election Code, all assistants were required by the Texas Election Code to take the following oath:

> I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs.

Tex. Elec. Code 64.034.

150.    SB 1 substantially modified the oath that assistants must take as follows:

> "I swear (or affirm) <u>under penalty of perjury</u> that <u>the voter I am assisting represented to me they are eligible to receive assistance</u>; I will not suggest, by word, sign, or gesture, how the voter should vote; <u>I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot</u>; [~~answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties;~~] I will prepare the voter's ballot as the voter directs; <u>I did not pressure or coerce the voter into choosing me to provide assistance</u>; [~~and~~] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; <u>I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.</u>"

Section 6.04 of SB 1 (the "Oath").

151.    Additionally, SB 1 now specifies that the Oath is taken under penalty of perjury—threatening assistants with criminal liability for violating the Oath.

152.    The new Oath provisions unlawfully restrict the sort of assistance that a voter may receive. The new Oath provisions require the assistant to swear under penalty of perjury that "<u>I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot</u>" and no longer allows assistants to answer a voter's questions. This drastic limitation on the sort of assistance that can be provided

51

and the threat of felony prosecution for perjury will prevent voters from receiving the assistance they need to vote.

153.    Individuals with disabilities are those with physical and/or mental impairments that substantially limit one or more of their major life activities, including but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and/or working." 42 U.S.C. § 12102(1), (2); 45 C.F.R. § 1232.3(h).

154.    In general, individuals with disabilities need a wide range of options for assistance based on their wide range of unique needs.

155.    The Oath's narrow view of the types of assistance voters might need will prevent voters with disabilities and voters with limited English proficiency from receiving the type of assistance they need even if they manage to secure assistants.

156.    The Oath prohibits an assistant from answering a voter's questions, helping the voter navigate the polling place, or providing any other type of necessary—but unspecified—assistance. The ban on assistants answering a voter's questions will severely restrict the ability of assistants to help voters. Individuals may need to ask a question about how to operate the voting machine, what a particular instruction means, whether a translation is correct, or for whom the individual had previously stated they wanted to vote. Voters, including voters with visual impairments, also need help navigating the polling place. But pursuant to SB 1, if an assistant provides such help, they could be subject to felony prosecution for violating the Oath.

157.    Other voters need even more assistance than this. Voters with disabilities often rely on their chosen assistants in helping the voter identify the candidate or issue for which the voter had previously stated they wanted to vote. Such assistance is also barred by SB 1.

158.    Beyond asking questions, voters may need additional sorts of assistance prohibited by the Oath. They may need assistance to physically navigate the polling place, remember the voting process, communicate with poll workers, stay on task, or set up adaptive devices—all of which are not permitted and subject a potential assistant to criminal prosecution.

159.    Additionally, voters with limited English proficiency are likely to need all sorts of language assistance that would be barred by Section 6.04.  Examples include language assistance in locating their correct precinct at polling places with multiple precincts (where they cannot read the signage in the language in which it is provided); in registering their names when linguistic and cultural norms reverse the first and last names and present challenges in locating voters' names in poll books; in using voting machines when the voters are unable to read the voting machine instructions in the language in which they are provided; and in navigating within a polling place regarding where to bring their completed paper ballot to be counted when they are unable to communicate with poll workers or read the directional signage in the language in which the poll workers speak or the signage is provided. These are just a few examples of the "nonexhaustive list of activities that qualify as voting" that the Fifth Circuit gave in rejecting Texas's earlier effort to limit voter assistance to reading and marking the ballot inside the booth. *OCA-Greater Houston v. Tex.*, 867 F.3d 604, 615 (5th Cir. 2017).

160.    Section 6.04 has a particularly detrimental effect on AAPI voters with limited English proficiency who are assisted by OCA-GH volunteers in the language spoken by the voter. Often such voters will ask these volunteers questions about the voting process outside of the polling place before entering, and invite the volunteer into the polling place to provide language assistance for navigating the polling place, communicate with poll workers at the registration table, assist with the machine mechanics, and to help with returning the ballot to be counted. All of these

types of assistance are prohibited under Section 6.04. In addition, AAPI voters with limited English language proficiency may find it difficult, if not impossible, to obtain necessary assistance from OCA-GH volunteers if the volunteers are at risk of a charge of perjury for not adhering to the restrictions in the Oath.

161.    The prohibition on various types of voting assistance, combined with the potential criminal liability for violating the Oath, will deter many of Plaintiffs' members from exercising their Section 208 and ADA rights. It will also prevent voters from selecting their preferred assistant because many assistants will be unwilling to risk criminal prosecution for inadvertently violating the Oath's restrictions, but would serve as an assistant but for those penalties.

<u>Section 6.06</u>

162.    Section 6.06 of SB 1 severely limits the universe of potential assistants that a mail-in ballot voter can choose from, by creating a strict liability, state jail felony that criminalizes the provision of assistance by anyone who "solicits, receives, or accepts compensation" for assisting a voter with their mail-in ballot.

163.    Section 6.06 denies voters assistance from the person of their choice if any form of compensation or benefits were provided to that assistant, even if that person is a close family member or friend. For example, SB 1 could prohibit a child from assisting a parent with voting by mail if the parent gives the child a monthly allowance, or "compensation." In addition, a person who asks a friend to assist them with voting and buys the friend a coffee as a token of appreciation for providing their assistance could be subjecting the friend to criminal prosecution for accepting a "benefit" in exchange for providing assistance.

164.    Section 6.05 in turn requires assistants to list on the carrier envelope whether they received any compensation for providing assistance and makes failure by the assistant to complete

the form correctly a state jail felony. *See also* TEX. ELEC. CODE § 86.010. The SOS is responsible for drafting this form that is necessary to monitor compliance with Section 6.06. The threat of criminal penalties for violations of SB 1's new restrictions on assistance will chill voters' ability to select the assistant of a person's choice when voting, in violation of the voter's rights under Section 208 and the ADA. Further, SB 1's overbroad terms "compensation" and "benefit," threaten those who even unknowingly and unintentionally violate the provision with a state jail felony.

165.    By criminalizing voting assistance in this way, SB 1 disproportionately burdens, discriminates against, and denies access to voters in need of language assistance who are specifically afforded the right to assistance under federal law. This includes Plaintiffs' members and their chosen assistants.

<u>Sections 6.04 and 6.06's Effects on Plaintiffs</u>

166.    "[A] substantial portion of OCA's membership consists of people with limited English proficiency." *OCA-Greater Houston v. Tex.*, 867 F.3d 604, 610 (5th Cir. 2017). OCA-GH recruits from a limited pool of bilingual or multilingual volunteers to provide assistance to voters who cannot speak English. OCA-GH will have to divert resources away from its usual GOTV and assistance programming and spend time and money trying to hire more people to do voter education work to explain the expansion of the Oath to voters and potential assistants. OCA-GH will have to spend money to create new training materials for volunteers, independent contractors, and employees about how the expanded language of the Oath limits the type of help assistants can provide to voters, and the new requirements and prohibitions for assisting mail voters. OCA-GH volunteers routinely receive benefits from OCA-GH in the form of meals, beverages, snacks, academic credit, shirts, and other nominal gifts OCA-GH also pays between $12-20 per hour to independent contractors for literature-drop canvassing. Limited English-speaking voters often ask

OCA-GH volunteers and canvassers voting-related questions and seek their assistance. SB 1's criminalization threatens voters using assistance and volunteers and canvassers providing assistance because those individuals may be construed as receiving "benefits" or "compensation" for assisting a voter. OCA-GH's members who need voting assistance due to limited English proficiency or disabilities will be limited in the scope of assistance they can receive, will face greater barriers to finding an assistant, and in many cases are likely to be prevented from voting due to these limitations.

167.   LWVTX volunteers make themselves available to assist voters by informing communities about their volunteer work as assistants and by offering assistance to voters outside polling places. LWVTX has also produced numerous educational videos about voting procedures in Texas that would need to be edited or re-made if this provision goes into effect. LWVTX's diversion of resources to educating assistants and voters about the new law will necessarily prevent it from using staffing, time, and money on its regular activities of educating and encouraging its members and the general public on not only voting rights, voter registration, and upcoming elections, but also other issues, such as health and the environment.

168.   LWVTX members also include voters who need assistance themselves to vote due to a qualifying disability, and will be prevented from accessing an assistant of their choice and receiving the full range of assistance to which they are entitled.

169.   A significant number of REVUP members are people with disabilities who have community attendants who are paid for support attendant services and who have assisted voters in the past. There is currently a shortage of community attendants, and voters with disabilities have struggled to find community attendants available to help them with voting. These members of REVUP will be disenfranchised by the new assistance provisions in SB 1. Moreover, imposition

of these rules will frustrate REVUP's mission to assist its members and other voters with disabilities by providing access to assistants, and will require REVUP to institute massive education campaigns to inform voters with disabilities about these rules and to avoid criminal penalties for its members and those who assist its members in the voting process. REVUP's diversion of resources to educating assistants and voters about the new law will necessarily cause it to reduce the resources it can use to conduct additional outreach to voters, or in other words, it will be required to spend more time with fewer voters as a result of SB 1's new rules around assistance.

170.    Examples of REVUP members impacted by these provisions of SB 1 include Ruben Fernandez, a registered voter and a resident of El Paso, Texas. Mr. Fernandez lives with cerebral palsy and has a label of Intellectual/Developmental Disability. His disability substantially limits several major life activities, including performing manual tasks, walking, standing, lifting, and caring for himself. 42 U.S.C. § 12102(2)(A). As such, Mr. Fernandez is a qualified individual with a disability. 42 U.S.C. § 12131(2). Mr. Fernandez has previously voted in person and requires assistance in accessing in person voting. For example, once at the polling site, Mr. Fernandez's assistant reminds him of the photo ID requirements, assists him in obtaining his ballot, and assists him in physically navigating the polling site in his manual wheelchair. At the voting booth, in order to be able to understand what is on the ballot, he relies on an assistant to read what is on the screen for him. If he does not understand what is read to him, he often needs to ask his chosen assistant questions about the information or words on the ballot. He also may need his chosen assistant to explain how the voting machine works, which includes answering questions about the machine's features and functionality. In addition, he needs assistance removing his printed paper ballot from the voting machine and placing it in the ballot counter. Mr. Fernandez has routinely

received this sort of assistance to access in person in prior elections, but under SB 1 Mr. Fernandez will be directly prohibited from exercising his right to vote as the type of assistance he needs is not permissible under SB 1.

171.    Another example is REVUP member Amy Litzinger. Ms. Litzinger is a registered voter and a resident of Austin, Texas. Ms. Litzinger lives with quadriplegic cerebral palsy. She uses a power wheelchair and receives direct support staff assistance thirteen hours per day through the CLASS Medicaid Waiver program. Ms. Litzinger requires assistance to get in and out of her wheelchair, uses speech to text programs to write, and relies on her direct support workers to transport her from place to place. Her disability substantially limits several major life activities, including caring for herself, performing manual tasks, walking, standing, and lifting. 42 U.S.C. § 12102(2)(A). As such, Ms. Litzinger is a qualified individual with a disability. 42 U.S.C. § 12131(2). Ms. Litzinger has previously voted in person and absentee and requires assistance in accessing both of these programs. For example, when voting in person at a polling place, Ms. Litzinger requires assistance putting the ballot in the "Scantron" machine since she lacks the dexterity to do this independently. She also has had to ask her assistors to move physical barriers impeding her access to the voting booth, physically hold and transfer materials from her backpack to her lap for use while voting, such as her ID and voter guides, assist her with drinking from her water bottle when needed, and correct the language of the ballot when needed. When Ms. Litzinger votes absentee, she requires assistance with stuffing the envelope and properly aligning the signature. She also requires assistance marking the paper ballot and getting in and out of positions required for marking the ballot. Ms. Litzinger has routinely received this sort of assistance to access in person and absentee voting in prior elections, but SB 1 would limit the assistance she could receive to assistance with only reading or marking the ballot. Ms. Litzinger's direct support

professionals who assist her with activities of daily living also assist her with voting. SB 1 will prevent at least some of the forms of assistance she requires to access in person and absentee voting and future assistance needs she may have. Some of Ms. Litzinger's direct support professionals have stated that they can no longer assist her in the manner they did previously given the new restrictions imposed by SB 1, including the oath unduly limiting the type of assistance they can provide as well as the onerous forms assistors must now complete and the threat of criminal liability for incorrectly filling out forms. Ms. Litzinger testified in opposition to SB 1 (and the related HB3) before the Senate and House on July 10, 2021.

172.     Another example is REVUP member, Laura Halvorson. Ms. Halvorson is a registered voter, a resident of San Antonio and lives with muscular dystrophy, quadriplegia, and chronic neuromuscular respiratory failure. Ms. Halvorson lacks muscle function and uses a ventilator twenty-four hours per day. Ms. Halvorson's disability substantially impacts the major life activities of caring for herself, performing manual tasks, walking, standing, lifting, breathing, and working. 42 U.S.C. § 12102(2)(A). As such, Ms. Halvorson is a qualified individual with a disability. 42 U.S.C. § 12131(2). Due to her disability, Ms. Halvorson is not able to mark or submit the ballot herself and requires assistance putting the ballot into the "Scantron" machine and marking the ballot on the touch screen. At times, Ms. Halvorson has to ask her assistor to explain the wording of the lengthy amendments, which are not in plain language. Ms. Halvorson also brings information about candidates to the polling place to inform her vote and has been required to transfer this information to a paper sample ballot rather than being her phone – something for which she must use an assistant. Ms. Halvorson is also concerned about the increased presence of poll workers who may be unfamiliar with the ADA and interpret even permissible assistance under

SB 1 as unlawful. Ms. Halvorson's personal care attendants have stated they may be unwilling to assist her with voting in the future for fear of prosecution.

173.     Each of the examples of REVUP members above indicate that voters with a variety of disabilities are harmed in the same way by SB 1's new assistance restrictions, and each harm would be redressed by identical injunctive relief. These examples are non-exhaustive.

174.     TOP volunteers provide assistance to voters on a case-by-case basis as needs arise. In the past, volunteers who have given voters rides to the polls have learned during the drive that the voter needs assistance to vote. Volunteers have been able to offer and provide this assistance to voters who have expressed their need for an assistant. TOP runs a large-scale voting program and provides situation-specific assistance to voters. This means TOP will need to provide training to their entire team about the changes to the Oath, particularly what sort of assistance is or is not permitted, and the new requirements and prohibitions for assisting mail voters. TOP estimates that as a result of this new requirement, it could cost them tens of thousands of additional dollars to do the same scale of work as they were doing before. TOP's diversion of resources will necessarily cause it to shrink its year-round issue organizing and policy advocacy work, and TOP anticipates that it will lose volunteers because of the overly burdensome new training it will have to implement to ensure compliance with the law, further shrinking its programs and voter outreach. Additionally, numerous TOP members who are not proficient in English or who have a disability are themselves at substantial risk of being denied all the assistance that they need to vote under these provisions.

175.     WDAF educates its members and community about the voting process and works to connect voters, especially voters who do not speak or read English, with assistants who may help them in voting. WDAF will need to spend additional time and resources locating assistants because of the chilling effect of the SB 1's provisions. Additionally, WDAF will need to spend

additional staff time fielding questions about what sort of assistance is or is not permitted under the Oath, what needs to be put on the assistance forms, and warning assistants not to accept any tokens of appreciation lest they be prosecuted for being compensated while assisting voters. WDAF's diversion of resources to educating assistants and voters about the new law will necessarily cause it to reduce the boots on the ground as part of its year-round advocacy work, as staff and other resources are diverted to countering the negative effects of SB 1's provisions.

### COUNT 4
### Violation of Section 208 of Voting Rights Act
### (All Plaintiffs against all Defendants)

176.    Under Section 208 of the Voting Rights Act "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

177.    The Voting Rights Act provides that the phrase "to vote" is to be broadly interpreted. 52 U.S.C. § 10310(c)(1) specifies that "[t]he terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 52 U.S.C.A. § 10310(c)(1). Accordingly, a voter is entitled to receive assistance throughout the voting process and is entitled to all assistance necessary to allow the voter to make their vote effective.

178.    SB 1 Sections 6.04 and 6.06 conflict with Section 208 because they prevent voters from receiving assistance necessary to engage in the voting process. Under SB 1, an assistant may

only "read[] the ballot to the voter, direct[] the voter to read the ballot, mark[] the voter's ballot, or direct[] the voter to mark the ballot." If an assistant does anything else, including answering the voter's questions or helping the voter navigate the polling place, the assistant will have violated the Oath and be subject to criminal penalty. However, as the Fifth Circuit has held, Section 208's guarantee of assistance in voting is broad: "'To vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.' . . . '[C]asting a ballot' [is] only one example in a nonexhaustive list of actions that qualify as voting.'" *OCA-Greater Houston*, 867 F.3d at 615. The Oath therefore violates Section 208 by limiting the sort of assistance that may be provided to voters.

179.    Additionally, Section 208 preempts any additional restriction in state law as to who may serve as an assistant for a voter, beyond those prohibited persons named in Section 208. "[T]he VRA promises freedom of choice for voters with disabilities or who lack literacy." *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020). Accordingly, Section 6.06's attempt to bar assistants who have received compensation for assisting a single voter, or for assisting voters in general as the need may arise, including a provision making such assistance a crime, is preempted by federal law and unenforceable.

180.    Moreover, the State of Texas, including Defendant SOS is currently under injunction by this court to instruct local election authorities that "an eligible voter is entitled to receive assistance from a person of their choosing . . . so long as that person is eligible to provide assistance under Section 208." *OCA-Greater Houston v. Texas*, No. 1:15-CV-679-RP at 8 (W.D. Tex. May 5, 2018) (Order at Doc. #84).

181.    Plaintiffs are entitled to injunctive relief against the SOS, who as set forth already is expressly charged with implementing the Oath and related provisions set forth in Sections 6.04, 6.05, and 6.06 of SB 1; the AG, Harris DA, and Travis DA, who as set forth already are charged with enforcing the criminal law penalties in Sections 6.04 and 6.06, and other county officials to whatever extent they are required to comply with directives from the SOS and the AG regarding the enforcement of the challenged provisions , as well as reasonable attorney's fees and costs.

### COUNT 5
### Violation of Title II of the Americans with Disabilities Act
### (All Plaintiffs against All Defendants)

182.    Plaintiffs incorporate by reference the allegations as to the duties and responsibilities of Defendants, and the associated rights of Plaintiffs, under the ADA as explained fully in Count 2, *supra*.

183.    By restricting the type of assistance a person with a disability can receive, SB 1 denies a reasonable modification that may be necessary to avoid discrimination against Plaintiffs' members and other voters with disabilities.

184.    By restricting the type of assistance a person with a disability can receive, SB 1 interferes with, intimidates, and threatens Plaintiffs' members and other voters with disabilities' rights, including the right to a reasonable modification under Title II of the ADA. Further, public entities may not "utilize criteria or methods of administration that . . . subject qualified individuals to discrimination" or "defeat or substantially impair accomplishment" of the program's objectives. 28 C.F.R. § 35.130(b)(3). SB 1 requires the administration of an oath in order to vote that will subject Plaintiffs' members and other qualified voters with disabilities to discrimination by prohibiting them from receiving the type of assistance they need in order to vote. As a result of this method of administering voting for people who require assistance, Plaintiffs' members and

other voters with disabilities who require assistance beyond what the oath allows will be unable to vote.

185.    Defendants (namely, the SOS, who as set forth already is expressly charged with implementing the Oath under section 6.04 of SB 1; the AG, Harris DA, and Travis DA, who as set forth already are charged with enforcing the criminal law penalties in Sections 6.04; and other county officials to whatever extent they are required to comply with directives from the SOS and the AG regarding the enforcement of the challenged provisions), have excluded and continue to exclude Plaintiffs' members and other voters with disabilities from participation in, and denied them the benefits of, or otherwise discriminated against them in, their service, program, or activity of voting, and excludes people with disabilities from participation in the services, programs, or activities of Defendants.

186.    As a result of Defendants' actions, Plaintiffs and their members have suffered and will continue to suffer irreparable harm. They have suffered and continue to suffer from discrimination and unequal access to Defendants' programs, services, or activities. And in the absence of injunctive relief, Plaintiffs and those similarly situated will be denied full and equal opportunity to participate in Defendants' voting programs.

187.    The ADA authorizes injunctive relief and Plaintiffs are entitled to injunctive relief, as well as reasonable attorney's fees and costs.

**COUNT 6**
**Violation of Section 504 of the Rehabilitation Act of 1973 29 U.S.C. § 794 et seq.**
**(All Plaintiffs against All Defendants)**

188.    Plaintiffs incorporate by reference the allegations as to the duties and responsibilities of Defendants, and the associated rights of Plaintiffs, under the Section 504 as explained fully in Count 3, *supra*.

189.    SB 1 denies Plaintiffs' members and other voters with disabilities the type of assistance they require in order to be able to vote, and this denial is in violation of Section 504.

190.    By restricting the type of assistance a person with a disability can receive, Defendants have failed and continue to fail to meet their obligations to provide Plaintiffs' members and other voters with disabilities an opportunity to vote that is equal to the opportunity provided to voters without disabilities.

191.    Accordingly, Defendants (namely, the SOS, who as set forth already is expressly charged with implementing the Oath under section 6.04 of SB 1; the AG, Harris DA, and Travis DA, who as set forth already are charged with enforcing the criminal law penalties in Sections 6.04, and other county officials to whatever extent they are required to comply with directives from the SOS and the AG regarding the enforcement of the challenged provisions) have discriminated and continue to discriminate against Plaintiffs and their members by denying them a full and equal opportunity to participate in their voting programs.

192.    As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm; they have suffered and continue to suffer from discrimination and unequal access to Defendants' program, service, or activity of voting.

193.    Unless the requested relief is granted, Plaintiffs will suffer irreparable harm in that they will be discriminated against and denied equal access to the fundamental right to vote.

194.    Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

**C.**    **SB 1 violates Plaintiffs' First Amendment rights.**

195.    Section 7.04 of SB 1 makes paid ballot collection services and paid interactions with voters in the presence of an official ballot, which the bill derogatorily labels as "vote

harvesting," a third-degree felony. SB 1 broadly defines "vote harvesting services" to encompass all "in-person interaction[s] with one or more voters, in the physical presence of an official ballot, a ballot voted by mail, intended to deliver votes for a specific candidate or measure."

196.    Section 7.04 imposes criminal and civil penalties on any person who gives or receives some "compensation or other benefit" for "knowingly provid[ing] or offer[ing] to provide vote harvesting services," defined as any "in-person interaction with one or more voters, in the physical presence of"" and "directly involving" any " official ballot or a ballot voted by mail," which are "intended" "to deliver votes for [or against] a specific candidate or measure." This provision is substantially overbroad and vague, infringing on Plaintiffs' core political speech and subjecting the Plaintiffs advancing claims as to these provisions to potential arbitrary and/or selective prosecution without prior notice of precisely what activities are illegal.

197.    The law's prohibition on certain "in-person interaction[s]" is broad, sweeping in verbal and non-verbal expressive conduct supporting political engagement that goes to the heart of the First Amendment, such as handing a flyer to a voter or addressing a voter while wearing a campaign shirt.

198.    The law's reference to interactions "in the physical presence of an official ballot or a ballot voted by mail" appears to extend to situations where an individual even references a physically present ballot while in conversation with a voter about a candidate or measure.

199.    The law does not indicate how an "inten[t]" "to deliver votes for a specific candidate or measure" is evaluated.

200.    Under the law, a prohibited compensation or benefit for proscribed ballot collection services may be direct or "through a third party." Thus, for example, if a student is compensated by a third-party university for her work as a summer intern with the LWVTX, TOP, or WDAF—

each of which advocates on ballot measures—she may be subject to criminal prosecution for her interactions with voters.

201.     Further, the law provides that compensation "in exchange for the vote harvesting services *is inferred* if a person who performed vote harvesting services for a candidate or campaign solicits, receives, or is offered compensation from the candidate or campaign, directly or through a third party, *for services other than the vote harvesting services provided*." (emphasis added.) Thus, if a paid employee or compensated volunteer of any Plaintiff organization advocates for or against a candidate or measure while interacting with voters in their individual capacity or while providing some separate service to the voter, the law allows prosecutors to infer at their own discretion that they accepted compensation for that voter interaction, in violation of the law.

202.     The law defines "benefit" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." This broad definition of "benefit" threatens to subject organizations like TOP, WDAF, OCA-GH and LWVTX to prosecution for providing volunteers with food, beverages, gift cards, social gatherings, academic credit, and other tokens of appreciation.

203.     Existing provisions in the Texas Election Code prohibit improper influencing or electioneering—the very conduct Section 7.04 presumably targets. Section 276.013 of the Texas Election Code, for example, prohibits individuals from "influenc[ing] the independent exercise of the vote of another in the presence of the ballot or during the voting process." Section 61.003 of the Texas Election Code meanwhile prohibits political speech that takes place within 100 feet of a polling place during the voting period.

204.   Section 7.04 sweeps well beyond these restrictions. Unlike Section 276.013, Section 7.04 provides no distance and time limitations, rendering it unclear how proximate a ballot must be to count as "in the physical presence" of an advocate and voter. An individual may be prosecuted under Section 7.04 for in-person interactions with voters at any time and at any place.

205.   A purported offense under this new provision is a third-degree felony, subjecting individuals to imprisonment for a term of 2 to 10 years.

206.   Compounding the penalties, if an organization or individual's challenged conduct violates both this provision and "any other law, the actor may be prosecuted under this section, the other law, or both."

207.   A purported offense under this provision also gives rise to a new civil claim for damages to candidates purportedly harmed according to the bill. Recovery may be "in an amount including any or all of: (1) the amount of compensation paid to or received by a party in exchange for vote harvesting services; (2) the fair market value of any benefit given or received in exchange for vote harvesting services; (3) a penalty in the amount of $35,000; or (4) reasonable and necessary attorney's fees, court costs, witness fees, and discovery costs." Additionally, a party or candidate may recover damages in an amount including "the party's campaign expenditures . . . in connection with the election" and "any fees and expenses incurred by the party in filing and securing a place on the ballot."

208.   Taken together, the law's substantial penal and financial penalties threaten the Plaintiffs, their members, their volunteers, and their employees with substantial liability, which will chill their speech and activities once the law goes into effect. Plaintiffs advancing claims as to these provisions will be forced to provide further education and training to members, volunteers, and employees engaged in voter engagement—or else severely limit or end their in-person voter

engagement work altogether to avoid the risk of potential prosecution and substantially burdensome civil penalties.

209.    Even after those expenditures to train employees and volunteers on the limits of their ability to speak with voters under this new law, the law will continue to limit the scope of contact that Plaintiffs are permitted to have with their members and the communities they serve and will limit their ability to achieve their respective organizational missions, such as increasing voter turnout, providing education to voters, providing proper assistance to voters when needed, and advancing social and political change, to name a few.

210.    OCA-GH will be significantly limited in its ability to recruit volunteers and employees who are willing to engage in in-person voter outreach, such as door-to-door flyer distribution on policies directly affecting the AAPI community. OCA-GH will likely cease providing volunteers with food, student stipends, and other incentives that could be construed as illegal "compensation," thereby chilling it and its members' speech and civic engagement and frustrating its organizational mission. OCA-GH will be forced to divert resources away from its usual GOTV programming and toward training its volunteers about Section 7.04 and developing entirely new programs to engage with voters that are less likely to trigger the civil and criminal penalties imposed by Section 7.04.

211.    LWVTX will likely instruct its members and supporters not to provide direct, in-person voting assistance, and LWVTX members are likely to refrain from volunteering to engage directly with voters about candidates and measures as a precaution. LWVTX will need to revise all relevant videos, trainings, and website information to reflect how Section 7.04 affects its work and interaction with voters at significant expense of organizational resources. This will frustrate LWVTX's organizational mission by preventing it from spending time and resources on educating

and informing its members and the general public not only on voting rights and elections but also on other emerging issues such as health and the environment.

212.    TOP and its members will be significantly deterred from or cease engaging in in-person voter-interactive activities, such as knocking on doors in support of or opposition to measures pertaining to TOP's organizational mission. TOP will be significantly limited in its ability to recruit and retain volunteers, thereby inhibiting speech and civic engagement, as it will likely cease providing volunteers with food, gift cards, raffle tickets, and other incentives that could be construed as illegal "compensation." TOP will be forced to divert resources away from its usual GOTV efforts and toward developing trainings to educate volunteers about the new criminal and civil penalties created by Section 7.04.

213.    WDAF and its members will be significantly deterred from or cease engaging in voter-interactive activities, such as circulating petitions and canvassing in support of or opposition to measures pertaining to WDAF's organizational mission to expand voter participation among Latino and Black voters in Texas. WDF will be significantly limited in its ability to recruit and retain volunteers, thereby inhibiting speech and civic engagement, as it will likely cease providing volunteers with food, gift cards, student stipends, and other incentives that could be construed as illegal "compensation." WDAF will be forced to divert time and resources away from getting out the vote among Latino and Black voters in Texas and toward training its volunteers to avoid the criminal and civil penalties imposed by SB 1.

**COUNT 7**
**Violation of the Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983**
**(Plaintiffs OCA-GH, LWVTX, TOP & WDAF against Defendant Attorney General Ken Paxton, in his official capacity, Defendant Harris County DA Kim Ogg, in her official capacity, and Defendant Travis County DA José Garza, in his official capacity)**

214.    The First Amendment to the United States Constitution prohibits abridgment of freedom of speech through the enactment of substantially overbroad laws. *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) ("According to our First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech.") (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)).

215.    The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

216.    Section 7.04's anti-"vote harvesting" provision is unconstitutionally overbroad because it regulates a sweeping amount of noncommercial political speech and constitutionally protected expressive conduct.

217.    The threat of penalties for violations of SB 1's overbroad ban on paid direct interactions with voters, including ballot collection services, will impermissibly chill or present the substantial risk of chilling Plaintiffs' protected speech, such as Plaintiffs' canvassing, petition circulation, voter education, flyer distribution, candidate forums, town halls, GOTV efforts, and other voter mobilization activities.

218.    The anti-"vote harvesting" provision's expansive and open-ended language is unconstitutionally overbroad because it lacks any reasonable bounds on its application. It subjects individuals to prosecution at any time and in any place for interacting in person with voters in the presence of a ballot about a measure while receiving some form of "compensation or benefit" directly or through a third party.

219.    To the extent that SB 1 purports to reach any compensated "in-person interaction" with a voter "in the physical presence of" an official ballot "intended to deliver votes for a specific

candidate or measure," it regulates a substantial amount of constitutionally protected expression and is unconstitutionally overbroad.

220.     Plaintiffs' activities like the circulation of an initiative petition for signatures, canvassing, and flyer distribution are "the type[s] of interactive communication concerning political change that [are] appropriately described as 'core political speech,' for which First Amendment protection is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988) (citing U.S. Const., amend. 1). Whether and how a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Id.* at 421; *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186–87 (1990) (quoting *Meyer*, 486 U.S. at 422).

221.     The overbroad ban on in-person voter interactive activities at which ballots may be present directly restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government. Advocating for that belief through endeavors such as educating and assisting others in completing and submitting ballots and learning more about candidates or measures is core political speech.

222.     SB 1 also implicates Plaintiffs' First Amendment associational rights to join together to participate in town halls, educational forums, "parties at the polls," training events, and other such in-person events where Plaintiffs' members encounter and interact with each other and other voters, and at which many voters may bring their ballots.

223.     The State has no compelling interest or rational basis for imposing such overbroad restrictions that inhibit Plaintiffs' free speech and associational rights. The bill's carve-out for activities "not performed in exchange for compensation or a benefit" shows that the bill on its face

advances no state interest, as there is no evidence that organizations like the Plaintiffs need to be more regulated than other organizations that do not give or receive benefits, but nevertheless perform the exact same activities. Nor is there any evidence that compensated activities, such as canvassing and education forums attached to academic stipends and pizza parties, need to be regulated to a greater degree than they would be if they were uncompensated. If these regulations were necessary to prevent voter fraud, there is no rational reason why only those *paid* or provided some benefit to canvass, distribute flyers, and educate voters would need to be regulated.

224.    The threat of criminal prosecution inhibits Plaintiffs' and their members' full exercise of their First Amendment freedoms.

225.    Plaintiffs are entitled to injunctive relief against the AG, Harris DA, and Travis DA, who are statutorily authorized to enforce the criminal penalties set forth in Section 7.04 of SB 1, as well as reasonable attorneys' fees and costs.

## COUNT 8
**Violation of Plaintiffs' Fourteenth Am. Due Process Rights Pursuant to 42 U.S.C. § 1983 (Plaintiffs OCA-GH, LWVTX, TOP, & WDAF against Defendant Attorney General Ken Paxton, in his official capacity, Defendant Harris County DA Kim Ogg, in her official capacity, and Defendant Travis County DA José Garza, in his official capacity)**

226.    The First Amendment to the United States Constitution prohibits the government from limiting the right of free speech if the restriction purporting to limit such speech is too vague to be enforced. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987).  A statute violates the Due Process Clause if it commands compliance in terms "so vague and indefinite as really to be no rule or standard at all, or [if] substantially incomprehensible." *Jones v. City of Lubbock*, 727 F.2d 364, 373 (5th Cir. 1984) (internal citations and quotations omitted).  "[T]he purpose of the vagueness doctrine is to prevent the government from chilling substantial amounts of speech and facilitating discriminatory and arbitrary

enforcement. That is, the vagueness doctrine addresses laws where citizens cannot predict which actions are prohibited and where discriminatory and arbitrary enforcement is possible." *Bode v. Kenner City*, No. CV 17-5483, 2017 WL 3189290, at *17 (E.D. La. July 26, 2017) (internal citations and quotations omitted).

227.    The applicability of the void for vagueness doctrine is heightened both when criminal sanctions are attached to a vague law and whenever the First Amendment is implicated; both of which are implicated in Section 7.04 of SB 1.

228.    The provision banning ballot collection services is substantially vague and violates Plaintiffs' rights under the First and Fourteenth Amendments.

229.    The provision banning ballot collection is substantially vague because it fails to sufficiently define any of its terms, including "in-person interaction," "in the physical presence of [a ballot]," "in connection with [vote harvesting services]," "other benefit," and "inten[t] to deliver votes."

230.    It is unclear what types of "in-person interaction" with voters—whether verbal or non-verbal or whether limited by time and place—are prohibited.

231.    It is unclear how physically proximate a ballot must be to a volunteer or employee to fall under Section 7.04, and given the vagaries of the definition of so-called "vote harvesting" itself, it is unclear what an action conducted "in connection with" it entails.

232.    It is unclear whether providing volunteers with, for example, food, water, or academic credit counts as illegally providing them with "compensation or other benefit" for their advocacy work.

233.    The provision banning ballot collection services provides no guidance regarding the standard imposed to evaluate an "inten[t] to deliver votes for a specific candidate or measure."

234.    Many non-partisan expressive activities—from knocking on doors for a nonprofit about a bill or measure while wearing a campaign shirt to interacting with voters at  candidate forums where voters may bring ballots with them—are subject to the threat of prosecution under this law.

235.    Due to these vague provisions, the so-called anti-"vote harvesting" provision does not give reasonable notice of what constitutes prohibited conduct, including to the Plaintiffs and their members who regularly engage in such activities protected under the First Amendment as part of their organizational missions.

236.    This overbroad provision risks arbitrary and capricious enforcement that will make it impossible for Plaintiffs to understand in advance what is and is not prohibited by the law.

237.    There is no compelling state interest or rational basis for requiring such confusing restrictions that inhibit Plaintiffs' ability to speak and dissuade voters from casting ballots.

238.    Section 7.04 is therefore unconstitutionally vague under the Due Process Clause and the First Amendment.

239.    Plaintiffs are entitled to injunctive relief, against the AG, Harris DA, and Travis DA, who are statutorily authorized to enforce the criminal penalties set forth in Section 7.04 of SB 1, as well as reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, considering the law and facts alleged herein, Plaintiffs pray the Court grant the following relief:

1.    Enter declaratory judgment that the State of Texas's statutory scheme as described with specificity herein violates the United States Constitution, the Voting Rights Act, the Civil Rights Act, the ADA and Section 504;

2.    Permanently enjoin the State of Texas, the Texas Secretary of State, the Texas Attorney General, the Harris County District Attorney, the Travis County District

Attorney, and other appropriate county agencies administering elections from enforcing the specific provisions of the Texas Election Code as amended by 2021 Senate Bill 1, as named herein, and from prosecuting any individual pursuant to the criminal offenses defined in these provisions, if any;

3.  Award attorneys' fees to Plaintiffs in accordance with 42 U.S.C. § 1988, 29 U.S.C. § 794a, 42 U.S.C. §12205, and/or any other applicable provision;

4.  Order that all costs of this action be taxed against Defendants; and

5.  Grant any additional or alternative relief to which the Plaintiffs may be entitled.

Respectfully submitted, as Amended, this 14th day of January, 2022.

/s/   *Ryan V. Cox*   _____
Mimi M.D. Marziani
Texas Bar No. 24091906
Ryan V. Cox
Texas Bar No. 24074087
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
mimi@texascivilrightsproject.org
ryan@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
Andre Segura
Texas Bar No. 24107112
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752

tbuser-clancy@aclutx.org
skumar@aclutx.org
aharris@aclutx.org
asegura@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Samantha Osaki*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
sosaki@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

LIA SIFUENTES DAVIS
Texas State Bar No. 24071411
LUCIA ROMANO
Texas State Bar No. 24033013
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
ldavis@drtx.org
lromano@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013

(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Urja Mittal*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
umittal@jenner.com

***COUNSEL FOR PLAINTIFFS***

*admitted *pro hac vice*