IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 5:21-cv-844 (XR) (consolidated cases) |
| GREGORY W. ABBOTT, et al., | |
| Defendants. | |

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 1

STATUTORY BACKGROUND............................................................................. 3

LEGAL STANDARD........................................................................................... 4

ARGUMENT ..................................................................................................... 5

   I.   The United States Has Standing to Enforce the Voting Rights Act and
       the Civil Rights Act Against Texas and Its Secretary of State............................ 5

   II.  The United States Has Stated a Claim that SB 1 Violates Section 208 of
       the Voting Rights Act........................................................................................ 8

      A.   The Attorney General May Enforce Section 208. ....................................... 8

      B.   SB 1 Prohibits Federally Guaranteed Assistance to Eligible Voters........................ 12

   III. The United States Has Stated a Claim that SB 1 Violates Section 101 of
       the Civil Rights Act. ......................................................................................... 14

      A.   The Attorney General May Enforce Section 101 Against States
          and State Officials. .................................................................................... 15

      B.   The Amended Complaint Sufficiently Alleges That SB 1 Violates Section
          101 Because SB 1 Denies the Right to Vote Based on Errors or Omissions
          Not Material to Voter Qualifications. ......................................................... 19

CONCLUSION.................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*, 567 U.S. 387 (2012)...................................................................... 5

*Ark. United v. Thurston*, 517 F. Supp. 3d 777 (W.D. Ark. 2021)..................................................... 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ 4

*Bankamerica Corp. v. United States*, 462 U.S. 122 (1983) .......................................................... 9

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ........................................................................ 7

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)...................................................... 13

*Burleson v. Liggett Grp.*, 111 F. Supp. 2d 825 (E.D. Tex. 2000) ................................................... 7

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995)................................................................... 4

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)................................................................ 10

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ...................................................... 14

*Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018) ............................... 24

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) ............................................................. 19

*Georgia v. Evans*, 316 U.S. 159 (1942)............................................................................ 17

*Gill v. Whitford*, 138 S. Ct. 1916 (2018).......................................................................... 4

*Hale Cnty. v. United States*, 496 F. Supp. 1206 (D.D.C. 1980) .................................................... 13

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) .......................................................................... 10

*Louisiana v. United States*, 380 U.S. 145 (1965)................................................................... 5

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018)................................................... 19, 21

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018)...................................................... 24, 25, 26

*McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969).................................................... 23, 24

*Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195 (W.D. Tex. 2020) ................................................. 17

*Morse v. Republican Party of Va.*, 517 U.S. 186 (1996) ........................................................... 12

*Muskrat v. United States*, 219 U.S. 346 (1911) ................................................................. 6, 7

*NiGen Biotech, LLC v. Paxton*, 804 F.3d 389 (5th Cir. 2015)....................................................... 8

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) ...................................................... 26

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017).................................................. passim

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)............................................................... 14

*Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017) ........................................................... 7

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970) .... 7

*Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990).............................. 26

*Scanlan v. Tex. A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) .......................................................... 4

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ................................................................. 21

*Schwier v. Cox*, 439 F.3d 1285 (11th Cir. 2006) ................................................................. 21

*Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039 (D.N.D. 2020)............................................ 26

*Sturgeon v. Strachan Shipping Co.*, 698 F.2d 798 (5th Cir. 1983).................................................. 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)............................................. 5, 25

*Tex. Democratic Party v. Abbott* (*TDP I*), 961 F.3d 389 (5th Cir. 2020)..................... 6, 7, 18, 23

*Tex. Democratic Party v. Abbott* (*TDP II*), 978 F.3d 168 (5th Cir. 2020)................................... 23

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015)...... 12

*Texas Democratic Party v. Hughes*, 974 F.3d 570 (5th Cir. 2020) ................................................. 8

*United States v. Alabama*, 362 U.S. 602 (1960)............................................................ 15, 16, 17

*United States v. Berks Cnty.*, 277 F. Supp. 2d 570 (E.D. Pa. 2003) ............................................... 9

*United States v. City of Springfield*, No. 06-30123 (D. Mass. Aug. 2, 2006)...................................... 9

*United States v. Cooper Corp.*, 312 U.S. 600 (1941) .............................................................. 17

*United States v. Crawford*, 229 F. Supp. 898 (W.D. La. 1964)....................................................... 4

*United States v. Miami-Dade Cnty.*, No. 02-21698 (S.D. Fla. June 7, 2002) ................................ 9

*United States v. Mississippi*, 380 U.S. 128 (1965) ............................................................. 5, 15, 16

*United States v. Texas*, 252 F. Supp. 234 (W.D. Tex.) ................................................................. 1

*United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978) ....................................................... 1

*United States v. Ward*, 345 F.2d 857 (5th Cir. 1965) ................................................................ 15

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) ......................................................... 1

*Veasey v. Perry*, 29 F. Supp. 3d 896 (S.D. Tex. 2014) ............................................................... 9

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000)........................ 5, 17

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................................ 4

*Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006)................. 19, 20, 21

*West Virginia v. United States*, 479 U.S. 305 (1987) .................................................................. 5

*Will v. Michigan Department of State Police*, 491 U.S. 58 (1989)............................................. 18

*Zessar v. Helander*, No. 05-cv-1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006)..................... 26

**Statutes**

52 U.S.C. § 10101.................................................................................................................. passim

52 U.S.C. § 10307.................................................................................................... 8, 9, 10, 13

52 U.S.C. § 10308.......................................................................................................... 9, 10, 11

52 U.S.C. § 10310.......................................................................................................... 3, 8, 9, 12

52 U.S.C. § 10501.......................................................................................................................... 3

52 U.S.C. § 10504......................................................................................................................... 10

52 U.S.C. § 10508.................................................................................................................. passim

52 U.S.C. § 20302......................................................................................................................... 23

An Act to Amend the Voting Rights Act of 1965, Pub. L. No. 97-205, 96 Stat. 131

   (1982) ...................................................................................................................................... 9

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 (1957) ........................................... 16

Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 (1960) ............................................ 16

Election Integrity Protection Act of 2021, S.B. 1, 87th Legis., 2d Spec. Sess.

   (Tex. 2021)........................................................................................................................ passim

Tex. Elec. Code § 11.002 ................................................................................................... 14, 20

Tex. Elec. Code § 31.003 ................................................................................................... 11, 18

Tex. Elec. Code § 64.034 ..................................................................................................... 2, 13

Tex. Elec. Code § 84.002 .......................................................................................................... 2

Tex. Elec. Code § 86.001 ............................................................................................... 2, 20, 24

Tex. Elec. Code § 86.002 ........................................................................................................... 2

Tex. Elec. Code § 87.027 .......................................................................................................... 20

Tex. Elec. Code § 87.041 ..................................................................................................... 2, 20

Tex. Elec. Code § 87.0411 ........................................................................................................ 25

Tex. Elec. Code §§ 105.001-.004 ............................................................................................. 26

Tex. Elec. Code §§ 82.001-.004 ................................................................................... 14, 20, 26

Tex. Elec. Code §§ 82.007-.008 ......................................................................................... 14, 20

**Other Authorities**

155 Cong. Rec. S4514-15 (May 27, 2010) (Statement of Sen. Charles Schumer)..................... 23

*Civil Rights Act of 1960: Hearing on H.R. 8601 Before the S. Comm. on the Judiciary*,

   86th Cong. (Statement of Att'y Gen. William P. Rogers) (1960). .......................................... 16

H.R. Rep. No. 85-291 (1957)...................................................................................................... 16

S. Rep. No. 94-295 (1975) ........................................................................................................ 12

S. Rep. No. 97-417 (1982) .......................................................................................................... 3

The United States respectfully submits this opposition to the Defendants' Motion to Dismiss the United States' Complaint, ECF 145.

## INTRODUCTION

The United States has repeatedly sued the State of Texas to enforce various provisions of the Voting Rights Act of 1965.  *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (consolidated with *United States v. Texas*, No. 2:13-cv-263 (S.D. Tex.)); *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978) (three-judge court), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (mem.); *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex.) (three-judge court), *aff'd*, 384 U.S. 155 (1966) (per curiam).  After fifty-five years of such enforcement, Defendants now assert that Texas should be immune from such suits in "its sovereign capacity."  Defs.' Mot. 5, ECF No. 145.  This remarkable and meritless claim—along with Defendants' other defenses—must be rejected.  The United States may sue the State and its chief election official to enforce federal election laws, including Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).  The United States' Amended Complaint sufficiently alleges that Texas Senate Bill 1 unlawfully restricts the scope of voter assistance guaranteed by Section 208 by limiting assistance to mechanistic reading and marking of a ballot.  It also sufficiently alleges that Senate Bill 1 requires rejection of mail ballot materials if a voter fails to correctly recite identification numbers that are not material to determining that voter's qualification to vote or vote by mail, in violation of Section 101.  Defendants' motion to dismiss should therefore be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Texas Senate Bill 1 ("SB 1") is an omnibus election law that restricts eligible voters' ability to cast a ballot and have that ballot counted and criminalizes several aspects of election

administration.  *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Legis., 2d Spec. Sess.
(Tex. 2021).

Relevant here, Section 6.04 of SB 1 requires persons who assist a voter ("voter assistors")
to swear or affirm under penalty of perjury that they will confine assistance "to reading the ballot
to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the
voter to mark the ballot."  Tex. Elec. Code § 64.034.  The law permits no other forms of
assistance inside the voting booth.

In addition, Sections 5.02 and 5.08 require voters to provide "the number of the
applicant's [Texas] driver's license, election identification certificate, or a personal identification
card issued by the Department of Public Safety" on both mail ballot applications and ballot
carrier envelopes, even if the underlying identification is no longer valid.  *Id.* § 84.002(1-a)(A),
(b-1); *id.* § 86.002(g)(1), (h).  Voters who have never been issued such a number must either
provide the last four digits of their social security number or state that they have never been
issued a Texas identification document or social security number.  *See id.* § 84.002(1-a)(B)-(C);
*id.* § 86.002(g)(2)-(3).  Sections 5.07 and 5.13 of SB 1 require rejection of mail ballot materials if
a voter does not record an identification number that identifies "the same voter identified on the
applicant's application for voter registration."  *Id.* §§ 86.001(f) (application), 87.041(b)(8)
(ballot).

The United States brought this litigation against the State of Texas and Texas Secretary
of State John Scott to enforce the Voting Rights Act and the Civil Rights Act.  *See* Compl.,
*United States v. Texas*, No. 5:21-cv-1085 (W.D. Tex.), ECF No. 1.  The United States' Amended
Complaint alleges that Section 6.04 of SB 1 violates Section 208 of the Voting Rights Act by
prohibiting a voter's assistor of choice from providing necessary and effective forms of

assistance.  U.S. Am. Compl. ¶¶ 41-45, 66-70, ECF No. 131.  The Amended Complaint also

alleges that Sections 5.07 and 5.13 of SB 1 violate Section 101 of the Civil Rights Act by

requiring rejection of mail ballot materials based on errors or omissions that are not material to

determining whether a voter meets state-law qualifications to vote or to cast a mail ballot.  U.S.

Am. Compl. ¶¶ 58-65, 71-76.  The Amended Complaint specifically alleges that the rights of

some qualified voters will be denied because they no longer possess a required identification

document or because the accurate identification number they provide is not in the State's voter

registration database.  U.S. Am. Compl. ¶¶ 64-65.

Texas and Secretary Scott have moved to dismiss the Amended Complaint in full.  Defs.'

Mot., ECF No. 145.

## STATUTORY BACKGROUND

Section 208 of the Voting Rights Act states that "[a]ny voter who requires assistance to

vote by reason of blindness, disability, or inability to read or write may be given assistance by a

person of the voter's choice, other than the voter's employer or agent of that employer or officer

or agent of the voter's union." 52 U.S.C. § 10508.  The Act defines the terms "vote" and

"voting" to encompass "all action necessary to make a vote effective," including "casting a

ballot[] and having such ballot counted properly." *Id.* § 10310(c)(1).  In passing Section 208,

Congress sought to reinforce the nationwide ban on literacy tests and "to assure meaningful

voting assistance." S. Rep. No. 97-417, at 62 (1982); *see also* 52 U.S.C. § 10501(b)(1).

Section 101 of the Civil Rights Act of 1964, as amended, prohibits persons acting under

color of law from denying "the right of any individual to vote in any election because of an error

or omission on any record or paper relating to any application, registration, or other act requisite

to voting, if such error or omission is not material in determining whether such individual is

qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). As with the Voting Rights Act, the term "vote" here "includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." *Id.* § 10101(e); *see also id.* § 10101(a)(3)(A). This provision was "necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995); *see also, e.g.*, *United States v. Crawford*, 229 F. Supp. 898, 901-02 (W.D. La. 1964), *rev'd on other grounds sub nom. United States v. Clement*, 358 F.2d 89 (5th Cir. 1966).

## LEGAL STANDARD

Defendants' motion to dismiss raises arguments concerning standing and sufficiency of the complaint to state a claim on which relief can be granted.

To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal citation and quotation marks omitted). For "purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted); *see also Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (directing district courts to "accept all well-

pleaded facts as true, viewing those facts most favorably to the plaintiff").  Consideration of

information outside the face of the complaint is limited to "documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  So long as these materials allow a court

to "draw the reasonable inference that the defendant is liable," the motion must be denied.  *Iqbal*,

556 U.S. at 678.

## ARGUMENT

**I.    The United States Has Standing to Enforce the Voting Rights Act and the
       Civil Rights Act Against Texas and Its Secretary of State.**

Defendants' argument that the United States lacks standing to enforce the Voting Rights

Act is incorrect.  "[T]he Attorney General has power to bring suit against a State and its officials

to protect . . . voting rights" guaranteed by federal law.  *Louisiana v. United States*, 380 U.S.

145, 151 (1965); *see also United States v. Mississippi*, 380 U.S. 128, 136 (1965) (affirming "the

power of the United States to bring [a voting rights] action" against the State of Mississippi

based on "express congressional authorization for the United States to file a suit precisely of this

kind" under the Civil Rights Act of 1964); *cf. Arizona v. United States*, 567 U.S. 387, 394

(2012).[1]  Defendants have not challenged the existence of an injury-in-fact to the United States,

and for good reason: the United States may suffer "injury to its sovereignty arising from

violation of its laws."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771

(2000).  The United States' injury is also fairly traceable to Texas, which enacted and codified

---

[1] Despite challenging the United States' authority to bring this suit, Defendants repeatedly
acknowledged in their motions to dismiss the private plaintiffs' amended complaints that the
Attorney General may sue states under the Voting Rights Act.  *See* Mot. to Dismiss OCA-
Greater Houston 12, ECF No. 175; Mot. to Dismiss LUPE 9, ECF No. 176; Mot. to Dismiss
LULAC 9-10, ECF No. 177; Mot. to Dismiss Houston Justice 17, ECF No. 182 (citing *West
Virginia v. United States*, 479 U.S. 305, 312 n.4 (1987), and *United States v. Mississippi*, 380
U.S. 128, 140 (1965)).

SB 1 and implements SB 1 through state officials and entities, and to Secretary Scott, who is "the 'chief election officer of the state' and is instructed by statute to 'obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613-14 (5th Cir. 2017) (quoting Tex. Elec. Code §§ 31.001(a), 31.003); *see also Tex. Democratic Party v. Abbott* (*TDP I*), 961 F.3d 389, 399 (5th Cir. 2020).   Thus, the United States' injury is likely to be redressed by an injunction barring the State and Secretary Scott from implementing or enforcing the challenged provisions of SB 1.   The United States has standing to enforce the Voting Rights Act and the Civil Rights Act in this case.

With respect to the State, Defendants' argument that the United States lacks standing rests exclusively on a few words plucked from *Muskrat v. United States*, 219 U.S. 346 (1911). Defs.' Mot. 5.   But that case provides no support for Defendants' argument.   In 1907, Congress enacted a statute that specifically named four individuals and authorized them to sue the United States to determine the validity of earlier acts that had altered distributions of lands and funds of the Cherokee nation.   In *Muskrat*, the Supreme Court refused to allow suits under the 1907 act to proceed because the United States had "no interest adverse to" the designated plaintiffs.   *Id.* at 361.   Instead, the real dispute was among the "private parties" who laid claim to the allotted lands.   *Id.* at 362.   Without those parties, there would be no judgment to be "executed," and any decision would "amount[] in fact to no more than an expression of opinion upon the validity of the acts in question."   *Id.*   In other words, *Muskrat* stands only for the unremarkable proposition that federal courts will not issue advisory opinions.

To describe the context of *Muskrat* is enough to show why it provides no support for Defendants.   The United States is not attempting to proceed under a statute cobbled together to

provide the opportunity for an advisory opinion. Quite the contrary. The United States seeks to

have Texas enjoined from implementing a statute that violates provisions of the Voting Rights

Act of 1965 and the Civil Rights Act of 1964.[2] The interests of the United States and Texas are

manifestly adverse. Nor does this case involve only the rights of absent private parties. The

United States relies on its own sovereign interest in seeing federal law enforced.

With respect to the Secretary, binding circuit precedent fatally undercuts Defendants'

argument. Defendants concede that in *OCA-Greater Houston*, the Fifth Circuit "found standing

in an earlier suit" challenging a Texas law under Section 208. Defs.' Mot. 4 (citing *OCA-*

*Greater Houston*, 867 F.3d at 613). *TDP I* similarly held that plaintiffs could challenge "Texas's

vote-by-mail statutes" by suing the Secretary. 961 F.3d at 399. Those appellate decisions are

binding on this Court. *See, e.g.*, *Sturgeon v. Strachan Shipping Co.*, 698 F.2d 798, 800 (5th Cir.

1983); *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (three-judge court). Both

*OCA-Greater Houston* and *TDP I* "squarely addressed the issue" Defendants resurrect here. Nor

can a subsequent concurrence in the Texas Supreme Court, *see* Defs.' Mot. 4, somehow disturb

that precedent. *Cf. Burleson v. Liggett Grp.*, 111 F. Supp. 2d 825, 827 (E.D. Tex. 2000) ("This

court is bound by the Fifth Circuit's interpretation of Texas law unless a subsequent state court

decision or statutory amendment renders the Fifth Circuit's prior decision clearly wrong.").[3]

---

[2] *Muskrat*'s separate concern about the propriety of issuing a judgment "to settle the doubtful
character of the legislation in question," 219 U.S. at 361-62, "has the hollow ring of another era,"
before enactment of the Declaratory Judgment Act, *Port of Bos. Marine Terminal Ass'n v.
Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 & n.20 (1970).

[3] Defendants' nonetheless argue that because "OCA did not 'squarely address[]' Texas cases
interpreting the Secretary's role as chief election officer, it is not binding 'by way of stare
decisis.'" Defs.' Mot. 4 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)) (alteration in
original). But they omit the operative text from *Brecht*, which simply states that stare decisis
does not apply to prior cases that merely assumed but did not "squarely address[] the issue." 507
U.S. at 631. Defendants also incorrectly assert that the United States presents only "an as-

**II.    The United States Has Stated a Claim that SB 1 Violates Section 208 of the Voting Rights Act.**

Defendants' argument that Congress "precluded" the United States from bringing suits to enforce Section 208 is incorrect.  Defs.' Mot. 2.  The Voting Rights Act grants the Attorney General ample authority to enforce Section 208 against Texas and Secretary Scott.  Because SB 1 conflicts with Section 208's mandate that voters who require assistance due to disability or inability to read must be able to obtain the assistance they need, this Court should deny Defendants' motion to dismiss the United States' Section 208 claim.[4]

**A.    The Attorney General May Enforce Section 208.**

The Voting Rights Act authorizes the Attorney General to enforce Section 208 through Section 11(a) of the Act.  Section 11(a) prohibits state actors from "refus[ing] to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107" of Title 52.  52 U.S.C. § 10307(a).  The Act defines "vote" broadly to include "all action necessary to make a vote effective."  *Id.* § 10310(c)(1); *see also OCA-Greater Houston*, 867 F.3d at 615 ("'To vote' [under the Voting Rights Act] . . . plainly contemplates more than the mechanical act of filling out the ballot sheet.").  In other words, Section 11(a) reaches state laws that limit voters' ability to take any action necessary to make their votes effective when they are entitled to do so under provisions in Chapters 103 to 107 of Title 52.  Section 208, codified in Chapter 105 of Title 52,

---

applied claim, not a facial one," in an attempt to distinguish *OCA-Greater Houston*.  Defs.' Mot. 4.  Not so.  The Amended Complaint presents a facial challenge to provisions of SB 1 and seeks to enjoin all implementation and enforcement.  U.S. Am. Compl. ¶¶ 69-70, 75-76.  Even in the context of an as-applied challenge, Defendants' reliance on *Texas Democratic Party v. Hughes*, 974 F.3d 570 (5th Cir. 2020) (per curiam), is unavailing.  That decision addressed the *Ex parte Young* doctrine, not the minimum requirements for standing.  *See id.* at 570-71.  The analyses are "not identical."  *NiGen Biotech, LLC v. Paxton*, 804 F.3d 389, 394 n.5 (5th Cir. 2015).

[4] This Court has already rejected Defendants' argument that no private cause of action exists under Section 208 and denied Defendants' motions to dismiss the private plaintiffs' Section 208 claims.  *See* Transcript of Nov. 16, 2021 Status Conference at 24:19-25:14, ECF No. 126.

governs one such action: receiving needed assistance in voting due to blindness, disability, or inability to read or write.  *See* 52 U.S.C. § 10508.  Hence, by prohibiting necessary forms of assistance, Defendants "refuse to permit" voters to "tak[e] all action necessary to make [their] vote effective," in violation of Section 11(a).  *Id.* §§ 10307(a), 10310(c)(1).  In turn, Section 12(d) of the Act empowers the Attorney General to "institute for the United States . . .  an action for preventive relief" against "the State and State or local election officials" who have "engaged . . . in any act or practice prohibited" by Section 11.  *Id.* § 10308(d); *see also, e.g.*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014).  Taken together, the plain language of these statutory provisions authorizes this enforcement action.

It thus makes no difference that when Congress added Section 208 to the Voting Rights Act in 1982, it relied on the preexisting enforcement mechanism established by Sections 11(a) and 12(d), rather than amending Section 12(d) to list Section 208 explicitly.  *See* An Act to Amend the Voting Rights Act of 1965, Pub. L. No. 97-205, 96 Stat. 131 (1982).  By codifying Section 208 in Title II of the Act—now Chapter 105 of Title 52—Congress integrated Section 208's substantive requirements into Section 11(a), which broadly prohibits refusal to allow an eligible voter to take all actions necessary to make one's vote effective under "any provision of Chapters 103 to 107" of Title 52.  52 U.S.C. § 10307(a).[5]

---

[5] Consistent with the authority Congress conferred, the Attorney General has brought numerous actions to enforce Section 208 using Section 11(a) and Section 12(d).  *See, e.g.*, *United States v. City of Springfield*, No. 06-30123 (D. Mass. Aug. 2, 2006); *United States v. Berks Cnty.*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003); *United States v. Miami-Dade Cnty.*, No. 02-21698 (S.D. Fla. June 7, 2002); *see also Ark. United v. Thurston*, 517 F. Supp. 3d 777, 787 (W.D. Ark. 2021) (describing litigation under Section 208).  "[E]stablished practice may shed light on the extent of power conveyed by general statutory language."  *Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)).

Defendants' contrary arguments fail.  First, Defendants contend that interpreting Section 12(d) to encompass enforcement authority for Section 208 through Section 11(a) creates surplusage because Section 12(d) directly references several sections of the Voting Rights Act that might also implicate Section 11(a).  *See* Defs.' Mot. 9.  But "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (rejecting a surplusage-based argument when two statutes "do not pose an either-or proposition," even though they "do overlap") (internal quotation marks and citation omitted).  Although Congress chose to provide specific enforcement authority regarding original provisions of the Voting Rights Act of 1965, 52 U.S.C. § 10308(d), Congress also created an express catchall in Section 11(a) to combat other restrictions on the right "to vote," as broadly defined under the Act, *id.* § 10307(a).  Because ample enforcement authority already existed under Section 11(a), Congress had no need to craft or amend an enforcement provision when enacting Section 208.[6] That Congress has used different tools from its enforcement mechanism toolbox—thereby creating some overlap but no "positive repugnancy" between different enforcement provisions— is nothing unusual and cannot override the statute's plain meaning.  *Conn. Nat'l Bank*, 503 U.S. at 253-54; *see also Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (explaining that "our preference for avoiding surplusage constructions is not absolute" and that relying on the plain meaning of the statute, even with potential surplusage, "respects the words of Congress").

Second, Defendants argue that any cause of action under Section 208 cannot apply to state officials who do not operate local polling places.  *See* Defs.' Mot. 9.  But the Fifth Circuit

---

[6] Congress separately crafted a three-judge court enforcement mechanism for specific provisions enacted as part of the Voting Rights Act Amendments of 1970 and the Voting Rights Act Amendments of 1975.  *See* 52 U.S.C. § 10504.  That mechanism is not implicated here.

already rejected this argument in *OCA-Greater Houston*.  *See* 867 F.3d at 613-14.  Moreover, as in *OCA-Greater Houston*, Defendants' violation of Section 208 arises out of their statewide regulation of voter assistance, not local administration of the voter assistor oath, and the Secretary is responsible for "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation" of such regulations.  Tex. Elec. Code § 31.003.  Section 12(d) specifically authorizes suits to obtain relief against "State . . . election officials," 52 U.S.C. § 10308(d), for enforcing laws that impermissibly "restrict [a] federally guaranteed right" under Section 208, *OCA-Greater Houston*, 867 F.3d at 615.  That is what this lawsuit seeks to do.

Finally, Defendants' argument that Section 12(d) authorizes suits only against "persons," and not states, *see* Defs.' Mot. 9-10, ignores the text of Section 12(d) and the Act's definition of "vote."  As Defendants acknowledge, Defs.' Mot. 10, Section 12(d) authorizes the Attorney General to institute litigation seeking preventive relief, including "an order directed to the State and State . . . officials to require them (1) to permit persons listed under chapters 103 to 107 of this title to vote and (2) to count such votes."  52 U.S.C. § 10308(d).  Defendants would discard that clear text because, they posit, the State "already permits all such individuals to vote and directs local officials to count those votes."  Defs.' Mot. 10.  Such choplogic is not merely incorrect, it also assumes the outcome of a core merits question that must be decided another day:  Does SB 1 prevent voters who require assistance from making their votes effective?  Because the Voting Rights Act's text clearly authorizes the Attorney General to enforce Section 208, this Court should reject Defendants' arguments that the United States lacks a cause of action under Section 208.[7]

---

[7] Should the Court conclude that Section 12(d) does not provide an express cause of action to enforce Section 208, it should still find an implied cause of action for enforcement by the

**B.**     **SB 1 Prohibits Federally Guaranteed Assistance to Eligible Voters.**

The United States' factual allegations, which must be accepted as true and construed in the light most favorable to the United States at this stage, state a claim under Section 208 of the Voting Rights Act.

Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.  Incorporating the definition of "vote" under the Voting Rights Act, "assistance to vote" in Section 208 refers to any assistance required to complete "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to," registering to vote or taking any "other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly." *Id.* § 10310(c)(1).  Although Defendants minimize the impact of SB 1 as "prevent[ing] some assistors from providing some assistance that some voters would appreciate," Defs.' Mot. 9, states may not prevent "*any* voter who requires assistance" due to disability or inability to read, 52 U.S.C. § 10508 (emphasis added), from taking actions that are "necessary to make a vote effective," *id.* § 10310(c)(1).  As

---

Attorney General.  A contrary conclusion would leave Section 208 uniquely unenforceable by the United States.  Analysis "must take into account [the] contemporary legal context" in which Congress enacted Section 208, including "a 'backdrop' of decisions in which implied causes of action were regularly found." *Morse v. Republican Party of Va.*, 517 U.S. 186, 231 (1996) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 & nn. 22-23(1979)).  When previously amending the Voting Rights Act, Congress acknowledged that it had "regularly established a dual enforcement mechanism . . . [that gives] enforcement responsibility to a governmental agency, and . . . has also provided remedies to private persons acting as a class or on their own behalf."  S. Rep. No. 94-295, at 40 (1975).  Congress would have been "aware of . . . unanimous precedent" permitting both federal and private enforcement when it added Section 208 to the Act.  *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015).

the Fifth Circuit held regarding Section 208, "a state cannot restrict this federally guaranteed right by enacting a statute . . . [that] defin[es] terms more restrictively than as federally defined." *OCA-Greater Houston*, 867 F.3d at 615.

Here, SB 1 requires all assistors to swear or affirm that they "will confine [their] assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot."  SB 1 § 6.04 (codified at Tex. Elec. Code § 64.034).  SB 1 thereby bars eligible voters' assistors from helping voters in ways that were expressly allowed before SB 1, such as answering questions and explaining ballot choices in language that the voter understands.  *See* U.S. Am. Compl. ¶¶ 38-39.  For voters with disabilities and voters with limited English proficiency, obtaining assistance in the form of answering questions about translations, explaining the voting process, or paraphrasing complex language constitutes necessary actions to make their votes effective.  *See id.* ¶ 45.  Prohibiting forms of assistance that "any voter who requires assistance" may need therefore conflicts with Section 208's plain language.  52 U.S.C. § 10508.[8]  Because "compliance with both [SB 1] and [Section

---

[8] The conflict between SB 1 and Section 208's purpose underscores this interpretation.  While both the United States and Defendants have an interest in protecting voters from intimidation and coercion, *see* Defs.' Mot. 7; *see also, e.g.*, 52 U.S.C. § 10307(b), this interest does not override Section 208's objective of enabling voters with disabilities or limited English proficiency to obtain the assistance they need to make their votes effective.  *See* S. Rep. No. 97-417 at 62.  Rather, Congress chose to protect vulnerable voters from intimidation in two ways.  *First*, Section 208 generally permits a voter to receive "assistance by a person of the voter's choice," 52 U.S.C. § 10508, which the Senate Report deemed "the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter," S. Rep. 97-417, at 62; *see also, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021) (relying on the "oft-cited Report of the Senate Judiciary Committee accompanying the 1982 Amendment[s]" to the Voting Rights Act).  *Second*, Section 208 excludes "the voter's employer or agent of that employer or officer or agent of the voter's union" from the set of permissible assistors, even if a voter purports to choose such an individual, thereby preventing systematic economic intimidation.  52 U.S.C. § 10508; *see also, e.g.*, *Hale Cnty. v. United States*, 496 F. Supp. 1206, 1214 (D.D.C. 1980) (three-judge court) (describing employer intimidation).  Defendants may not supplement these protections by curbing the core right to necessary assistance.

208] is impossible," federal law "must prevail."  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377

(2015) (internal quotation marks omitted); *see also Crosby v. Nat'l Foreign Trade Council*, 530

U.S. 363, 372 (2000) ("[S]tate law is naturally preempted to the extent of any conflict with a

federal statute.").  And while Defendants may quibble with the United States' allegations that

forms of assistance barred by SB 1 are necessary to make votes effective and thus are protected

by Section 208, Defs.' Mot. 6-7, their contrary contentions may not be considered at the motion

to dismiss stage.  The Court should therefore deny Defendants' motion to dismiss the United

States' Section 208 claim.

### III.   The United States Has Stated a Claim that SB 1 Violates Section 101 of the Civil Rights Act.

Contrary to Defendants' argument, the United States has stated a plausible claim that

SB 1 violates Section 101.  The Amended Complaint alleges that SB 1 violates Section 101 of

the Civil Rights Act by requiring that mail ballot applications and mail ballot carrier envelopes

be rejected if those materials lack an identification document number that matches the number in

Texas's voter registration database records.  But whether a voter accurately recites a matching

identification document number is not material to an official's ability to determine whether that

voter meets state-law qualifications to vote or to cast a mail ballot.  *See* Tex. Elec. Code

§§ 11.002, 82.001-.004, 82.007-.008.  And some vote-by-mail voters unable to vote in person

will be fully disenfranchised by the rejection of their mail ballot carrier envelopes, despite

providing accurate identification document information, because of omissions, errors, and

incomplete records in the State's database.  Moreover, Defendants' argument that the Attorney

General's power to sue states and their officials for Section 101 violations "does not apply here"

also must be rejected.  Defs.' Mot. 2.  The United States has explicit statutory authority to sue

Texas and Secretary Scott to enjoin them from denying rights guaranteed by Section 101.

## A.    The Attorney General May Enforce Section 101 Against States and State Officials.

The United States can sue Texas to enjoin the State from enforcing the mail ballot provisions of SB 1.  In addition to authorizing the Attorney General to bring suit to enforce the substantive protections of Section 101, federal law establishes that states are proper defendants "whenever . . . any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by" that provision.  52 U.S.C. § 10101(c).  Thus, it is long settled that Section 131(c) of the Civil Rights Act of 1957, as amended, 52 U.S.C. § 10101(c), expressly authorizes the United States to sue a state.  *See United States v. Alabama*, 362 U.S. 602, 604 (1960); *United States v. Mississippi*, 380 U.S. 128, 139 (1965); *United States v. Ward*, 345 F.2d 857, 860 (5th Cir. 1965).  And the United States need not wait for a state or official to finish depriving a person of rights under Section 101 before naming the state as a defendant.  Section 131(c) authorizes suit "[w]henever any person has engaged or there are reasonable grounds to believe that any person *is about to engage* in any act or practice which would deprive any other person of any right or privilege secured by" Section 101.  52 U.S.C. § 10101(c) (emphasis added).  It follows that when the person about to deprive an individual of the right to vote is an official of a state or subdivision thereof, the United States may also name the state.

Defendants' argument that Congress somehow furtively excluded states—and only states—as proper defendants for claims based on "reasonable grounds to believe that any person is about to engage" in a violation of Section 101 ignores the structure, history, and intent of Section 131(c).  Defs.' Mot. 15-16.  By amending Section 131(c) to allow the United States to name states as defendants, Congress ensured that state officials could not evade Section 101 by vacating their positions before suit or judgment.  *See* Civil Rights Act of 1960, Pub. L. No. 86-

449, § 601, 74 Stat. 86, 92 (1960); *see also Mississippi*, 380 U.S. at 139 (describing officials'

resignations to attempt to avoid enforcement in *United States v. Alabama*, 362 U.S. 602 (1960)).

Far from barring Section 101 enforcement until a voter's rights are irreparably denied, Congress

included the state-defendant provision of Section 131(c) to ensure that there is always an

available defendant in Section 101 suits and to preserve such suits against procedural

gamesmanship.  That always-available defendant is the state.

      The statutory and legislative history confirm Congress's intent.  Congress enacted

Section 131(c) to authorize the United States to seek preventive relief to protect voting rights,

where "the important question is to permit the right to be exercised and, therefore, the harm

should be prevented before it occurs."  H.R. Rep. No. 85-291, at 11 (1957).  As originally

enacted, Section 131(c) did not expressly address naming a state as a defendant.  *See* Civil Rights

Act of 1957, Pub. L. No. 85-315, § 131(c), 71 Stat. 634, 637 (1957).  Congress amended Section

131(c) in 1960 to add this express statement.  Responding to arguments made in *United States v.*

*Alabama*, 362 U.S. 602 (1960), Congress clarified that "if the suit has been instituted [under

Section 101(a)] the State may be joined as a party, or if the local official has resigned and no

successor has been appointed the suit may be instituted against the state itself."  *Civil Rights Act*

*of 1960: Hearing on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. at 8

(Statement of Att'y Gen. William P. Rogers) (1960).  "This provision merely reaffirms in

explicit terms the authority granted by the 1957 act."  *Id.*  Congress could hardly have

"reaffirmed" a limitation on state-defendant suits absent from the original text of Section 131(c).

      Faced with the statutory language, history, and purpose, Defendants offer no meaningful

reason to believe Congress intended surreptitiously to unwind the United States' ability to seek

prospective relief against a state to secure the fundamental right to vote, nor any rationale why

Congress would have done so.  "The right to vote and have one's vote counted is undeniably a fundamental constitutional right, the violation of which cannot be adequately remedied at law or after the violation occurred."  *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 219 (W.D. Tex. 2020) (citing *Reynolds v. Sims*, 377 U.S. 533, 554 (1964)).  Perversely, Defendants' interpretation suggests Congress meant to ensure voters had been denied this irremediable right to vote before they could seek to safeguard that right against a state.  That Congress would do this through an amendment to ensure the availability of relief is implausible at best.

Congress' express authorization for the United States to name states as defendants in lawsuits to enforce Section 101 defeats the motion to dismiss with respect to the Attorney General's enforcement authority.  Separately and independently, Defendants' argument fails because states can be "persons" under Section 101, contrary to Defendants' claim.  Defs.' Mot. 15.  Defendants rehash arguments made by recalcitrant states soon after enactment of the Civil Rights Act of 1957.  *See United States v. Alabama*, 267 F.2d 808, 810 (5th Cir. 1959), *vacated*, 362 U.S. 602 (1960).  These arguments should be put to rest at long last.

Relying largely on case law interpreting whether the federal government is a "person," Defendants ignore that any presumption that the statutory term "person" does not include "the sovereign" is not a "hard and fast rule of exclusion," *United States v. Cooper Corp.*, 312 U.S. 600, 604-05 (1941), and must give way when there is an "affirmative showing of statutory intent to the contrary," *Vt. Agency of Nat. Res.*, 529 U.S. at 781.  Whether a government is a "person" must also be interpreted in light of the statute's "legislative environment," including "[t]he purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute."  *Georgia v. Evans*, 316 U.S. 159, 161 (1942).  One need not look far to determine Congress's intent here: as long as an "official of a State or subdivision thereof" is involved in a

violation of Section 101, Congress expressly subjected states to suit.  52 U.S.C. § 10101(c).

Thus, the term "person" in Section 101 must encompass states.

Far from supporting Defendants' argument, *Will v. Michigan Department of State Police*,

491 U.S. 58 (1989), a case interpreting 42 U.S.C. § 1983, underscores the distinction.  When

construing the scope of the term "person" in § 1983, *Will* relied heavily on the fact that Congress

"had no intention" for § 1983 to abrogate state sovereign immunity under the Eleventh

Amendment.  491 U.S. at 66 (citing *Quern v. Jordan*, 440 U.S. 332 (1979)).  But not so here.

Congress expressly *included* states as proper defendants under Section 131(c), and it would be

incongruous to read Section 101 to *exclude* states from the substantive provisions that Section

131(c) gives the Attorney General the power to enforce.  Construing Section 101 to include

States as "persons" effectuates Congress' intent.

The United States also has statutory authority to sue Secretary Scott for violations of

Section 101.  Defendants essentially repeat the causation and redressability arguments already

addressed above, *see* Section I, *supra*, to contend that the Secretary does nothing to "deny" the

right to vote for purposes of Section 101, Defs.' Mot. 14-15.  But that argument is foreclosed by

*OCA-Greater Houston* and *TDP I*, which have established that the Secretary's mandate to

"obtain and maintain uniformity in the application, operation, and interpretation of [the Texas

Election] code," Tex. Elec. Code § 31.003, means that an injury caused by enforcement of the

Texas Election Code is "fairly traceable to and redressable by" the Secretary, *OCA-Greater

Houston*, 867 F.3d at 614.  Because the United States has plausibly alleged that enforcement of

SB 1 will impermissibly deny the right to vote on account of errors or omissions not material to

voter qualifications, in violation of the Civil Rights Act, *see infra* Section III.B, Secretary Scott

is an appropriate defendant.

**B.** **The Amended Complaint Sufficiently Alleges That SB 1 Violates Section 101 Because SB 1 Denies the Right to Vote Based on Errors or Omissions Not Material to Voter Qualifications.**

The Amended Complaint adequately alleges that providing an identification document number that matches Texas's voter registration database records is not material to determining whether a voter is qualified to vote.  Section 101 prohibits any person acting under color of law from denying the right to vote based on an "error or omission on any record or paper relating to any application, registration or other act requisite to voting" that "is not material in determining whether such individual is qualified under State law to vote."  52 U.S.C. § 10101(a)(2)(B).  As alleged, many voters who rely on mail voting will have their mail ballot materials rejected based on SB 1's identification document number matching provisions, despite the identification document numbers having no material relation to voting qualifications.[9]

An identification document number is not material to determining whether a voter is qualified to vote.  To determine whether an error or omission is material, the information required must be compared to state law qualifications to vote.  *See Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006); *see also Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (describing as not material "failure to provide information, such as race or social security number, that is not directly relevant to the question of eligibility.").  Under Texas law, an individual is qualified to vote based on six discrete factors: age, U.S. citizenship, mental capacity, felony conviction status, residency in the state, and registration status.  Tex. Elec. Code § 11.002.  Texas law authorizes six categories of qualified voters to cast ballots by mail: those

---

[9] Defendants do not dispute that mail ballot applications and ballot carrier envelopes are "record[s] or paper[s] relating to any application, registration, or act requisite to voting" under Section 101.  52 U.S.C. § 10101(a)(2)(B).

who expect to be absent during the entire voting period (including the period for in-person early voting), those with a disability, those who will be 65 or older on Election Day, those confined in jail, those who are involuntarily committed, and certified participants in Texas's address confidentiality program. *See id.* §§ 82.001-.004, 82.007-.008. The number on a voter's identification document or the last four digits of a voter's social security number is not material to determining any of these qualifications.

The required identification document number is also not "material" to determining a voter's identity. Defendants were able to determine a mail voter's identity, and determine his or her qualifications to vote, long before enacting the new identification document number requirement. *See* U.S. Am. Compl. ¶ 51. Nor do Defendants claim that an identification document number is necessary to locate a voter in the Texas Election Administration Management (TEAM) database. *Cf. Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1270-71 (rejecting the argument that the information the state uses for matching purposes was material). Indeed, to compare the identification document number on a voter's mail ballot materials with that voter's TEAM record, officials must have *already* discerned the applicant's identity sufficiently to know the voter "identified on the applicant's application for voter registration" or "the voter's application for voter registration." Tex. Elec. Code §§ 86.001(f), 87.041(b)(8). Moreover, Defendants already employ other means to verify a voter's identity, including by use of signature matching. *See* Tex. Elec. Code § 87.027; U.S. Am. Compl. ¶ 57.

To the extent Defendants argue that they may require voters to recite compounding layers of additional information that confirm a known identity, they describe precisely the type of harm Congress enacted Section 101 to prevent: "the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or

omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). Once a voter's identity is determined, stacking additional requirements that could also tie to their "identity" is not material to determining whether they are qualified to vote and compounds the chance for error. Court have found all sorts of information—such as a driver's license number matching state records, *Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1266, 1270; a social security number, *Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (mem. op.); or a birth year on an absentee ballot envelope, *Martin v. Crittenden*, 347 F. Supp. 3d at 1308-09—not to be material to determining a voter's qualifications, even though this information could conceivably confirm a voter's "identity." So too here: requiring identification document numbers merely increases the chances that mail ballot materials will be rejected over inadvertent or technical errors. U.S. Am. Compl. ¶¶ 5, 63-65.

Moreover, even if identification document numbers were used to establish rather than confirm a voter's identity, the Amended Complaint alleges that the requirement is not material because it fails to identify voters accurately. Because of inaccuracies, omissions, and incomplete records in the TEAM database, for some voters the requirement to provide an identification document number on mail ballot materials that will match the number in the database will *undermine* an otherwise accurate identification of the voter. *See* U.S. Am. Compl. ¶ 65. For example, some voters who registered to vote before Texas allowed registrants to provide identification document numbers could provide accurate identification document numbers on mail ballot materials but still have those materials rejected because the identification document number will not "identify the same voter" as their application for voter registration. *Id.* Some voters who obtained their identification card after registering to vote may likewise have their

mail ballot materials rejected, despite providing accurate identification document numbers, when those numbers do not appear in TEAM.  *Id*.  In those circumstances, the identification document number requirement will cause voters' mail ballot materials to be rejected not just despite voters providing accurate identification card information, but *because* an otherwise accurately identified voter was required to provide an identification document number.  An identification document number cannot be "material" to identifying a registered voter if accurately providing that number cannot and will not identify that voter.

That Defendants provide procedures to "cure" some rejected mail ballot materials does not cure SB1's infirmity.  Section 101 bars any person acting under color of law from "deny[ing] the right of any individual to vote" based on an error or omission not material to vote qualifications.  52 U.S.C. § 10101(a)(2)(B).  The statutory language addresses denial of the right to vote based on a particular paper or record "relating to any application, registration, or other act requisite to voting," *id.*, and it does not require proof of complete foreclosure of a voter's access to the franchise.  Moreover, the relevant provision defines "vote" broadly to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."  52 U.S.C. § 10101(e).  SB 1 provides that an official "shall reject" mail ballot applications that do not satisfy the identification document number requirement, U.S. Am. Compl. ¶ 60 (quoting SB 1 § 5.07), and that mail ballot carrier envelopes "may be accepted only if" they satisfy the requirement, U.S. Am. Compl. ¶ 61 (quoting SB 1 § 5.13).  In both cases, SB 1 provides that the applicant's ability to cast a mail ballot or have that ballot counted must be denied if the identification document number does not match their TEAM record.  The existence of additional, more onerous procedures that voters

could use to try to overcome the rejection of their materials does not cleanse the original denial

of the right to vote based on papers or records already submitted.[10]  And nothing in Section 101

allows election officials to reject mail ballot materials based on errors or omissions not material

to vote qualifications unless and until voters successfully provide the requested information.[11]

Defendants' argument that Section 101 applies only where a voter has been "absolutely

prohibited from voting" incorrectly tries to graft an unrelated Equal Protection standard onto

Section 101's statutory language.  *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809

(1969); *TDP I*, 961 F.3d at 402; *see also Tex. Democratic Party v. Abbott* (*TDP II*), 978 F.3d

168, 186-88 (5th Cir. 2020) (applying similar standard under the Twenty-Sixth Amendment).

Each of those cases involved claims that the Constitution required extending voting by mail to

classes of individuals beyond those permitted to do so by state law.  *See McDonald*, 394 U.S. at

806; *TDP I*, 961 F.3d at 404-05; *TDP II*, 978 F.3d at 174.  Those cases did not involve the

rejection of individual mail ballot applications or ballot carrier envelopes; contrary to

Defendants' suggestion, they did not interpret or involve Section 101 at all.  *See* Defs.' Mot. at

12.[12]

---

[10] This is particularly vital with respect to uniformed services voters and overseas voters, who
Congress has afforded a "prudent" and "absolutely necessary" 45-day period between ballot
transmittal and election day to eliminate "rampant disenfranchisement among our military and
overseas voters."  155 Cong. Rec. S4514-15 (May 27, 2010) (Statement of Sen. Charles
Schumer); *see also* 52 U.S.C. § 20302(a)(8).  Some such voters will not have additional time to
learn that their ballots have been rejected and to complete a cure process.

[11] For example, it would have been absurd to interpret Section 101 to allow election officials in
the mid-1960s to reject the voter registration applications of black citizens based on errors not
material to voter qualifications, so long as such officials then permitted applicants to try again
the next day.  Yet, this is precisely what Defendants' cure argument would contemplate.

[12] Defendants' indication that *McDonald* and *TDP II* were decided "despite the well-known
existence of the [Section 101] Materiality Provision," Defs.' Mot. 12, is particularly inapt given
that neither case involved allegations related to any type of potential errors or omissions on

And unlike the cases on which Defendants rely, the Amended Complaint does not allege that absentee ballots must be provided to any additional category of voters; nor does it purport to state a claim under the Equal Protection Clause.  The United States has alleged that recitation of an identification document number that matches a voter's record in the TEAM database is not material to determining a voter's qualification to vote in Texas, and that denying the right to vote—as defined by 52 U.S.C. § 10101(e)—based on an error or omission in that recitation violates Section 101.  *See* U.S. Am. Compl. ¶¶ 63-65.  The allegations of the Amended Complaint state a claim under the correct legal standard.

Moreover, the Amended Complaint would state a claim under Section 101 even if Section 101 required showing voters were "absolutely prohibited from voting" by the identification document number provisions of SB 1.  Cure procedures do not protect the franchise when voters cannot effectively use them to ensure their valid ballot is counted.  *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030-31 (N.D. Fla. 2018) (finding cure provisions inadequate when "the opportunity to cure has proven illusory"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018).  As Defendants acknowledge, the cure process for mail ballot applications provides a means for voters only to "correct[] an application for a ballot."  Tex. Elec. Code § 86.001(f-2); Defs.' Mot. 11.  Similarly, if a mail ballot is rejected with sufficient time before Election Day to allow it to be returned to the voter, the voter may only "cure the defect and return the carrier envelope before the time the polls are required to close on election day."  Tex. Elec. Code § 87.0411(b)(2); Defs.' Mot. 11.  The state-law cure process will not enable voters who provide accurate identification number information that is not

---

materials related to voting, let alone claims under Section 101.  Those courts had no reason to consider or construe Section 101.

reflected in the TEAM database, or who do not have access to their identification card information, to have their mail ballots counted.  Some voters will repeatedly provide the same response, accurately describing the identification number information they possess, but never satisfy SB 1.  U.S. Am. Compl. ¶¶ 63-65; *cf. Martin v. Kemp*, 341 F. Supp. 3d at 1339.  More broadly, the Amended Complaint plausibly alleges that the mail ballot provisions will disenfranchise eligible voters.  U.S. Am. Compl. ¶¶ 63, 75.  Even if Section 101 permitted rejection of mail ballot materials based on errors or omissions not material to voter qualifications so long as a cure process effectively safeguards the franchise for all impacted voters, Defendants' contention that the SB 1 cure process will provide such safeguards injects factual contentions that cannot be addressed on a motion to dismiss.  *See Tellabs, Inc.*, 551 U.S. at 322.

Defendants further mischaracterize the Amended Complaint as alleging a "claimed right to vote by mail" and incorrectly suggest that state officials may reject any vote-by-mail application or ballot carrier envelope on any grounds because of the existence of in-person voting.  *See* Defs.' Mot. 12 (arguing that because voters have "the option to vote in person . . . SB 1 cannot deny the right to vote").  However, the existence of in-person voting is irrelevant to the United States' Section 101 claim.  SB 1 operates to reject mail ballot materials based on errors or omissions in reciting their identification document numbers.  *See* U.S. Am. Compl. ¶¶ 60-65, 73-75; 52 U.S.C. § 10101(e) (defining "vote" to include "all action necessary to make a vote effective, including . . . having such ballot counted").  Having created vote-by-mail procedures, Defendants must operate them in accord with federal law and may not disenfranchise voters who rely on them.  *Cf. Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020) ("[A] state that creates a system for absentee voting must administer it in accordance with the Constitution.") (internal quotation marks omitted); *Martin v. Kemp*, 341 F.

Supp. 3d at 1338; *Zessar v. Helander*, No. 05-cv-1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

In any event, Defendants cannot justify rejecting voters' mail ballot materials based on errors or omissions not material to voter qualifications just because Texas also provides in-person voting that many mail voters cannot in fact access. *See Martin v. Kemp*, 341 F. Supp. 3d at 1339 (finding in-person cure "illusory, particularly for the category of voters who cannot vote in person due to physical infirmity"); *cf. Obama for America v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (finding equal protection violation where plaintiffs presented evidence that elimination of early voting days would preclude voters from voting).  Unlike states with more expansive opportunities to vote by mail, Texas law limits early voting by mail primarily to individuals for whom in-person voting would often be physically impossible or unduly burdensome, including voters away from their home counties for the entire in-person early voting and election day period (such as members of the military deployed away from home and American citizens residing outside of the country), voters with an illness or disability that "prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health," voters who are due to give birth within three weeks of election day, and voters over age sixty-five.  Tex. Elec. Code §§ 82.001-.004, 105.001-.004; *see also* U.S. Am. Compl. ¶¶ 5, 47.  These categories of voters may find it essential to rely on the vote-by-mail provisions Texas has enacted, and the Amended Complaint plausibly alleges that some of these voters will be disenfranchised entirely if their mail ballot materials are rejected based on errors or omissions not material to voter qualifications.  *See* U.S. Am. Compl. ¶¶ 5, 63-65, 75.

Because the Amended Complaint plausibly alleges that SB 1 will deny the right to vote based on errors or omissions not material to voter qualifications, the motion to dismiss the Section 101 claim should be denied.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss the United States' Complaint, ECF No. 145, should be denied.

Date:  January 18, 2022

KRISTEN CLARKE
Assistant Attorney General

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
DANA PAIKOWSKY
MICHAEL E. STEWART
JENNIFER YUN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
daniel.freeman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2021, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-4355
daniel.freeman@usdoj.gov