# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
|      Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-CV-0844-XR |
| | § | [Consolidated Lead Case] |
| GREGORY W. ABBOTT, et al., | § | |
|      Defendants. | § | |

| | | |
|---|---|---|
| | § | |
| OCA-GREATER HOUSTON, et al., | § | |
|      Plaintiffs, | § | |
| v. | § | Case No. 1:21-CV-0780-XR |
| | § | |
| JOSE A. ESPARZA, et al., | § | |
|      Defendants. | § | |

| | | |
|---|---|---|
| | § | |
| HOUSTON JUSTICE, et al., | § | |
|      Plaintiffs, | § | |
| v. | § | Case No. 5:21-CV-0848-XR |
| | § | |
| GREGORY WAYNE ABBOTT, et al., | § | |
|      Defendants. | § | |

| | | |
|---|---|---|
| | § | |
| LULAC TEXAS, et al., | § | |
|      Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:21-CV-0786-XR |
| | § | |
| JOSE ESPARZA, et al., | § | |
|      Defendants. | § | |

| | | |
|---|---|---|
| | § | |
| MI FAMILIA VOTA, et al., | § | |
|      Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-CV-0920-XR |
| | § | |
| GREG ABBOTT, et al., | § | |
|      Defendants. | § | |

UNITED STATES OF AMERICA,       §
          Plaintiff,            §
                                §
v.                              §          Case No. 5:21-CV-01085-XR
                                §
STATE OF TEXAS, et al.,         §
          Defendants.           §

## OCA-GREATER HOUSTON, ET AL., PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION TO DISMISS

Plaintiffs' Complaint[1] involves challenges to a collection of unlawful new State statutes, otherwise known as 2021 Texas Senate Bill 1 ("SB1") that each violate multiple provisions of federal law—the Voting Rights Act, the Civil Rights Act, the Americans with Disabilities Act, the Rehabilitation Act, and/or the First & Fourteenth Amendments to the United States Constitution. These violations are apparent in the burdens that SB1 imposes on the right to vote for persons with disabilities and those who require language assistance, and the infringement it inflicts on core First Amendment rights.

The State Defendants' motion to dismiss (Dkt 175) does not purport to seek dismissal on the merits of Plaintiffs' claims at all, but instead relies upon novel, unsupported legal arguments that courts have previously rejected. The State Defendants are state officials who are charged with enforcing the challenged state statutes, and, pursuant to clearly established law, are not immune from a suit challenging the new statutes as preempted by federal law. Plaintiffs have standing to sue on their own behalf and on behalf of their members, and Plaintiffs have more than sufficiently

---

[1] At the time of the State Defendants' filing of their Motion to Dismiss (Dkt 175), Plaintiffs' operative complaint was the First Amended Complaint filed on December 1, 2021 (Dkt 137). Since that time, Plaintiffs have filed a Second Amended Complaint (Dkt 192-1) that adds two additional defendants and clarifies claims against the Texas Attorney General in light of a recent decision by the Texas Court of Criminal Appeals. The Court granted leave to file that Second Amended Complaint on January 18, 2021. Because Plaintiffs' amendments to their complaint do not substantively affect their claims against the State Defendants or the State Defendants' remaining arguments for dismissal, in this Response, Plaintiffs respond to the arguments in the State Defendants' Motion to Dismiss.

pleaded facts to support their claims. Accordingly, Plaintiffs request that the State Defendants'

Motion to Dismiss (Dkt 175) should be denied.

## ARGUMENT[2]

### I.  SOVEREIGN IMMUNITY DOES NOT BAR PLAINTIFFS' CLAIMS

Texas's sovereign immunity is "not absolute," *AT&T Commc'ns v. BellSouth Telecomms.*

*Inc.*, 238 F.3d 636, 643 (5th Cir. 2001), and does not apply in an action, like this one, seeking

prospective relief from violations of federal law. *Ex parte Young*, 209 U.S. 123, 159–60 (1908).[3]

The *Ex parte Young* exception to sovereign immunity applies when state officials "have

'some connection' to the state law's enforcement," such that the state official has "the particular

duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Texas*

*Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). In the Fifth Circuit, "the precise

scope of the 'some connection' requirement is still unsettled." *Texas Democratic Party v. Abbott*,

961 F.3d 389, 400 (5th Cir. 2020). Generally, the Fifth Circuit court has recognized that a "scintilla

of enforcement by the relevant state official with respect to the challenged law will do." *City of*

---

[2] In the State Defendants' first Motion to Dismiss (Dkt 55), they contended that the Plaintiffs lacked standing generally as organizations or associations bringing claims on behalf of their members. Those arguments appear to be mostly abandoned in their current Motion to Dismiss (Dkt 175), with the exception of standing under the ADA as argued below, but nevertheless, they argue that "Plaintiffs' claims also fail for reasons not addressed in this Motion. . . . [and Defendants] reserve the right to raise additional arguments at a later juncture." Dkt 175 at n.2. Such arguments are wholly without merit and should be rejected by the Court.

In any event, Plaintiffs' allegations of harm from the challenged portions of SB1 easily satisfy the "minimal showing" necessary to demonstrate a justiciable case-or-controversy at this stage of the litigation. *Texas All. for Retired Americans v. Hughs*, 976 F.3d 564, 568 n.1 (5th Cir. 2020); *see also, e.g.*, *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 208–09 (W.D. Tex. 2020). Plaintiffs also have associational standing on behalf of their members. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Plaintiffs more than meet the requirements for demonstrating associational standing as to each of their claims at the pleading stage.

[3] Defendants' sovereign immunity has also been abrogated or waived for most if not all of Plaintiffs' claims as explained further below. Accordingly, even if this Court finds that the *Ex parte Young* exception is not met in whole or in part, Plaintiffs' claims survive.

*Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quotations omitted). Although some decisions suggest that there must be a "special relationship" between the state actor and the challenged statute, *Texas Democratic Party v. Hughs*, 860 F. App'x 874, 877 (5th Cir. 2021), this purportedly heightened standard originates from a plurality opinion in *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (en banc) (plurality op.), which subsequent decisions have acknowledged is "no[t] controlling precedent," *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). Regardless, the Secretary of State (SOS) and Attorney General (AG) have a sufficient connection to the enforcement of the SB1 provisions at issue in this case, as explained in turn, below. [4]

## A. The Secretary of State Is Not Immune from Suit.

The SOS is not immune from suit. To the contrary, he is imbued with power to enforce SB1 in Election Code Sections 31.001 to 31.005 and has taken actions to do so. He is the state's chief elections officer under Texas law, and the Election Code tasks him with "prescrib[ing] the design and content" of forms that local officials must use—including forms related to SB1's mail-in voter identification and assistance provisions and its voter assistance oath provision. Tex. Elec. Code §§ 31.001–31.002. The SOS is also charged with assisting and advising in the application, operation, and interpretation of election laws, including the challenged provisions of SB1. *Id.* §§ 31.003–31.005; Am. Compl. ¶ 35–39. Those responsibilities are more than just a "*general* duty to see that the laws of the state are implemented," as the State suggests. Dkt 175 at 7 (quoting *Abbott*,

---

[4] Defendants separately argue that Plaintiffs lack Article III standing because their injuries are not traceable or redressable with respect to Defendants. (Dkt 175 at 12–13). As Defendants admit, this argument only rehashes their sovereign immunity arguments. As set forth here, Plaintiffs' injuries are traceable to the State Defendants and redressable by the requested relief, because the State Defendants enforce the provisions in SB1 and declaratory or injunctive relief against the State Defendants would provide relief to Plaintiffs and their members. No more is required. On a motion to dismiss for lack of standing, the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim.'" *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996) (quoting *Lujan*, 504 U.S. at 561)); *accord OCA-Greater Hous.*, 867 F.3d at 610.

961 F.3d at 400–01). Rather, they involve enforcing each of the challenged SB1 provisions in particular. *Cf.* Dkt 175 at 5 (citing *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 877 (5th Cir. 2021)).

For example, Section 31.002 directs the SOS to prescribe the design and content of the Application for Ballot by Mail (ABBM) and mail-in carrier envelope, both of which the SOS will change to adopt SB1's new mail-in voter identification and assistance requirements (at Sections 5.02, 5.03, 5.06, 5.10, 5.12, and 6.06). *See* Am. Compl. ¶¶ 35–38, 94, 96, 120. Section 31.002 also instructs the SOS to prescribe the assistance oath form's design and content, which the SOS will update to incorporate the changes required by SB1 Section 6.04. *See* Am. Compl. ¶¶ 144–47. Section 31.002 then requires local election officials to use these forms.

The Fifth Circuit has unequivocally found that similar facts are sufficient to invoke the *Ex parte Young* exception to sovereign immunity with respect to the SOS. In *Abbott*, the Fifth Circuit held that the Secretary of State's duty to design and issue mail ballots was a sufficient enforcement connection under *Ex parte Young*. *Abbott*, 978 F.3d at 179–80. The Fifth Circuit specifically rejected the argument Defendants make here: that the SOS's forms do not constrain anybody else, holding that the SOS has the "authority to compel or constrain local officials based on actions [he] takes" as to these forms, and that this is the kind of "enforcement" authority that makes *Ex parte Young* applicable. *Id.* at 180; *City of Austin*, 943 F.3d at 1000; *Cf.* Dkt 175 at 7.

The State Defendants suggest that *Abbott* is distinguishable because relief against the SOS would not provide relief for Plaintiffs' claims. Dkt 175 at 8–9. Not so. Clearly, relief that prevents the use of the form that requires Plaintiffs to provide their drivers' license number or social security

number, or relief that prevents the issuance of the offending Oath, would provide precisely the relief Plaintiffs request.[5]

The SOS has also shown a willingness to exercise his authority to enforce the mail-in voter identification and assistance oath provisions. *Abbott*, 978 F.3d at 179. As alleged, the SOS plans to issue binding advisories and directives, pursuant to Sections 31.001 and 31.003 to 31.005, requiring local election officials to use SB1-updated ABBMs, carrier envelopes, and oath forms. Am. Compl. ¶ 35–39. Indeed, as counties have struggled to roll out SB1, including its new provisions concerning vote-by-mail applications, the SOS has taken on an active enforcement role, including advising counties that their actions are not proper and urging counties to "seek advice and assistance" from the SOS.[6] Contrary to Defendants' assertion, this ongoing enforcement demonstrates that the SOS is using the process outlined in Election Code § 31.005 to enforce SB1. *Cf.* Dkt 175 at 9. This is far more than a "scintilla of enforcement," and Plaintiffs have sufficiently alleged that the SOS is involved in the enforcement of each challenged provision. *City of Austin*, 943 F.3d at 1002; *Abbott*, 978 F.3d at 180. Further, although local officials may also have duties to enforce parts of SB1, a "division of responsibilities" with local officials does not obviate the SOS's connection to the enforcement of Texas' election laws. *Abbott*, 978 F.3d at 180.

Defendants' arguments to the contrary lack merit. *Mi Familia Vota v. Abbott*, on which Defendants rely, is inapposite. Dkt 175 at 3 (citing 977 F.3d 461, 465 (5th Cir. 2020)). That case involved an electronic-voting-equipment requirement for certain counties in some circumstances. Plaintiffs sued to allow some counties to use paper ballots, which were prepared entirely by local

---

[5] Defendants also attempt to distinguish *Abbott* as related only to "discrimination that allegedly occurs on the form itself." Dkt 175 at 8 (citing *Abbott,* 978 F.3d at 180). However, just as the plaintiffs in *Abbott* challenged the contents of vote by mail forms and their impact on voters under the age of 65, Plaintiffs here challenge the lawfulness of the contents of vote by mail forms and voter assistance forms and their impact on voters.

[6] Press Release, SOS, Secretary Scott Calls on Travis County to Correct Erroneous Mail Ballot Application Rejections, (Jan. 14, 2022), *available at* https://www.sos.state.tx.us/about/newsreleases/2022/011422.shtml.

officials under state law. 977 F.3d at 465, 468. Here, though, the Election Code directs the SOS (not local officials) to draft mail-in voter identification forms and assistance procedures. *Compare* Tex. Elec. Code § 31.002 *with* § 52.002; *see Abbott* 978 F.3d at 179–80; *OCA-Greater Houston*, 867 F.3d at 613–14 (rejecting argument that the SOS had no enforcement connection to assistance provisions).[7]

The State Defendants also argue that the SOS's referral of complaints to the AG for prosecution is not enforcement. Dkt 175 at 9. But this argument hardly withstands scrutiny. Under the AG's authority to prosecute election code violations,[8] the SOS plays an integral gatekeeping role in determining when there is "reasonable cause to suspect a crime has occurred" for many of the cases that the AG prosecutes. Am. Compl., ¶ 39. The SOS Election Audit Division was also created to "ensure any cases of illegal voting or election crimes are investigated by the proper law enforcement authorities, including the Texas Attorney General's Office." *Id.* The SOS plainly plays a significant enforcement role in the prosecutions that the AG pursues.

**B. The Attorney General Is Not Immune from Suit.**

The Texas AG is similarly not immune from suit regarding sections 6.04, 6.06, and 7.04 of SB1. Plaintiffs' claims against the AG involve provisions in SB1 that specifically threaten criminal prosecution. Am. Compl. ¶ 171 (Claim 4), ¶ 209 (Claim 7), ¶ 221(Claim 8). For instance, Plaintiffs challenge Section 7.04 of SB1, the anti-"vote harvesting" provision, which specifically provides that an offense constitutes a third-degree felony. *Id.* at ¶ 190. Likewise, Section 6.06 of

---

[7] The State goes to great lengths to distinguish *OCA* with respect to the SOS; however, the State is wrong to suggest that *OCA* is distinguishable because it was a facial challenge under the VRA. This case too is a facial challenge under, *inter alia*, the VRA. The State also seems to suggest that *OCA* is not controlling case law because it did not take into account a non-binding concurrence that came out three years after *OCA*. Dkt 175 at 7. The State's strained logic speaks for itself. *OCA* is unquestionably controlling Fifth Circuit law, no matter how the State might disagree with it.

[8] As discussed below, and in light of *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021) (not released for publication), Plaintiffs also note that the AG also regularly prosecutes election code violations at the request of district and county attorneys.

SB1 creates a felony offense. *Id.* at ¶ 157. And Section 6.04 requires voters' assistants to take an oath "under penalty of perjury," subjecting the assistants to criminal liability. *Id.* at ¶ 146.

The AG regularly investigates and prosecutes violations of the Texas Election Code in two ways. First, the AG prosecutes Election Code violations at the request of district or county attorneys. *See* Tex. Gov't Code § 402.028. Second, the Election Code vests the AG with independent statutory enforcement authority to prosecute violations. *See* Election Code 273.021 ("The attorney general may prosecute a criminal offense prescribed by the election laws of this state.").[9] The AG has regularly prosecuted voters and assistants for alleged offenses to the election code related to assisting voters, voting by mail, and campaigning. He has also threatened third parties with criminal sanctions for disseminating information to voters. *See* Am. Compl. ¶¶ 40–41.

Although the State Defendants argue that the AG has discretion in whether to prosecute election violations, (Dkt 175 at 10), the AG has demonstrated a continuing willingness to prosecute Election Code violations, either independently or at the request of district or county attorneys. The AG maintains and continuously seeks increased funding for an "Election Fraud Unit" housed within the AG's office with the express purpose of investigating and prosecuting violations of the

---

[9] While the Texas Court of Criminal Appeals recently held unconstitutional the legislature's assignment of independent authority to the AG to criminally prosecute violations of the election code in trial courts, *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198, at *10 (Tex. Crim. App. Dec. 15, 2021) (not released for publication), the AG has filed a motion urging that court to reconsider its ruling and vacate its judgment. *See* Press Release, OAG, Paxton Asks Court of Criminal Appeals to Reverse Its Decision Stripping OAG of Authority to Stop Election Fraud (Jan. 3, 2022), https://www.texasattorneygeneral.gov/news/releases/paxton-asks-court-criminal-appeals-reverse-its-decision-stripping-oag-authority-stop-election-fraud. Given that pending motion and the AG's view that *Stephens* is "wrong on legal grounds" (*id.*), the AG remains a proper party to this suit. Furthermore, even if the Court of Criminal Appeals denies the AG's motion, the AG will retain his ability to prosecute election code violations at the request of a district or county attorney, which the AG regularly does. *See* TEX. GOV'T CODE § 402.028; *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198, at *10 (Tex. Crim. App. Dec. 15, 2021).

Texas Election Code's criminal provisions, such as those at issue in this case.[10] Am. Compl. ¶ 44. The unit regularly issues public-facing statements about its current cases and its goal to aggressively pursue new prosecutions.[11] *Id.* In 2021, representatives from the AG's office testified before the Texas Legislature that SB1 creates new offenses that the AG has the authority to prosecute. *Id.* ¶ 42. Indeed, the AG has already charged individuals for the exact sort of activities that would be prohibited under SB1 related to the bill's new "vote harvesting" provisions, and has publicly announced that he intends to continue to prosecute such "offenses."[12] Those direct actions more than sufficiently connect the AG to the enforcement of Sections 6.04, 6.06, and 7.04. When "an official can act, and there's a significant possibility that he or she will act to harm a plaintiff, the official has engaged in enough 'compulsion or constraint' to apply the *Young* exception." *See City of Austin*, 943 F.3d at 1002.

---

[10] *See* Press Release, OAG, Edinburg Mayor, Wife Arrested in Organized Illegal Voting Scheme (Apr. 25, 2019), https://www.texasattorneygeneral.gov/news/releases/edinburg-mayor-wife-arrested-organized-illegal-voting-scheme (noting over 100 prosecutions related to supposed Election Code violations since 2015). At the motion to dismiss stage, a court may take judicial notice of matters of the public record under Federal Rule of Evidence 201. *E.g.*, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

[11] To hold that more is required to bring suit against the AG would violate the maxim that "[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Just. v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Ostrewich v. Hudspeth*, No. 4:19-CV-00715, 2021 WL 4170135, at *11 (S.D. Tex. Sept. 14, 2021), *report and recommendation adopted*, No. 4:19-CV-00715, 2021 WL 4480750 (S.D. Tex. Sept. 30, 2021) (finding exception to sovereign immunity where AG's threat of prosecution under election code chilled political speech).

[12] *See* Press Release, OAG, San Antonio Election Fraudster Arrested for Widespread Vote Harvesting and Fraud (Jan. 13, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-san-antonio-election-fraudster-arrested-widespread-vote-harvesting-and-fraud ("...my office is prepared to assist any Texas county in combating this insidious, un-American form of fraud."); Press Release, OAG, AG Paxton Announces Formation of 2021 Texas Election Integrity Unit (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit ("Furthermore, Attorney General Paxton continues to pursue prosecutions for criminals willing to commit election crimes. Since taking office in 2015, the Attorney General has resolved 286 prosecutions of Texas Election Code criminal offenses against 76 defendants. Attorney General Paxton is currently prosecuting over 500 felony election fraud offenses in Texas courts."); Press Release, OAG, Work of AG Paxton's Election Fraud Unit Results in Arrests of 4 Members of Organized Voter Fraud Ring in North Fort Worth (Oct. 12, 2018), https://www.texasattorneygeneral.gov/news/releases/work-ag-paxtons-election-fraud-unit-results-arrests-4-members-organized-voter-fraud-ring-north-fort ("My office is committed to ensuring that paid vote harvesters who fraudulently generate mail ballots, stealing votes from seniors, are held accountable ....").

*City of Austin*, on which the State Defendants rely, is distinguishable. There, the AG had only indirect enforcement authority to intervene in separate suits to assert the supremacy of a state housing statute over city ordinances. *Id.* at 1000 & n.1. The court held that the City had not shown the AG was likely to enforce the state statute against the city's ordinance, where it had shown only that the AG had "intervene[d] to defend *different* statutes under *different* circumstances" and where the City "face[d] no consequences if it attempts to enforce its Ordinance." *Id.* at 1002–03. Here, however, the AG has the clear authority to criminally prosecute violations of the provisions at issue (whether independently or concurrently with local officials) and has not only shown a willingness to bring those prosecutions, but has trumpeted them and fundraises to bring more of the same.[13]

### C. The State Defendants Are Not Immune from VRA and Civil Rights Act Claims.

The State Defendants also try to suggest that Congress did not abrogate states' sovereign immunity in passing the Voting Rights Act, but concede that the Fifth Circuit has expressly ruled to the contrary. Dkt 175 at 7. In *OCA-Greater Houston*, the Fifth Circuit expressly held that "[t]he VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity." 867 F.3d 604, 614 (5th Cir. 2007). And the Fifth Circuit has repeatedly reaffirmed that holding. *E.g.*, *Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020).

Defendants' arguments with respect to Section 1983 are likewise misplaced. As already explained, under *Ex parte Young*, state sovereign immunity does not bar plaintiffs from seeking

---

[13] The State also relies on *Abbott*, 978 F.3d 168, but that case was decided at the preliminary injunction stage and does not purport to set a pleading standard with respect to *Ex parte Young*. Regardless, its analysis with respect to the AG is distinguishable. There, the Court relied on the AG's purported "general duty" to enforce the law, but did not analyze the AG's unique and specific statutory duty to bring criminal prosecutions under the Election Code. Nor did that case analyze similar facts as here, where the AG routinely brought prosecutions relating to the same or similar offenses.

prospective *injunctive* relief against state officials who violate federal law. The rule is the same for claims brought under Section 1983, which expressly authorizes private causes of action against state officials who violate federal law or the Constitution while acting "under color of" state law. There is no categorical bar against private causes of action seeking injunctive relief against state officials under Section 1983 and the State Defendants' cited authority does not suggest otherwise. In *Raj v. LSU*, 714 F.3d 322 (5th Cir. 2013), the Fifth Circuit did *not* rule that the plaintiff was categorically barred from bringing claims under Section 1983 on the basis of sovereign immunity. Rather, the court held that Congress had not abrogated sovereign immunity under the Age Discrimination in Employment Act (a separate statute) and that *Ex parte Young* did not apply because the plaintiff had only brought claims against the state agencies instead of state officials. *Id.* at 328; *see also Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020). The State Defendants' citation to *Texas Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021) misses the mark as well. There, the Fifth Circuit expressly recognized that *Ex parte Young* permits private suits for injunctive relief against state officials in their official capacity in federal court so long as the state official has some connection with the enforcement of the act in question. *Id.* at 877.

**D.  The State Defendants are Not Immune from ADA or Section 504 Claims.**

The State Defendants are similarly wrong in arguing that Texas is not subject to claims under the Americans with Disabilities Act (ADA) or Section 504 of the Rehabilitation Act. Title II of the ADA clearly states Congress's intent to abrogate sovereign immunity. 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court . . . for a violation of" the ADA); *see Tennessee v. Lane*, 541 U.S. 509, 518 (2004).

The State Defendants' assertion of sovereign immunity with respect to Plaintiffs' ADA claims boils down to and is coextensive with their argument that Plaintiffs have not pleaded a violation of Title II. *See* Dkt 175 at 7 (citing *Block v. Tex. Bd. of Law* Examiners, 952 F.3d 613, 617 (5th Cir. 2020)). However, as explained *infra*, Plaintiffs have sufficiently pleaded that SB1's onerous new rules regarding mail-in ballots and voter assistance violate Title II of the ADA, and therefore the State Defendants' sovereign immunity argument fails.

With respect to Section 504 claims, a state waives its Eleventh Amendment immunity by accepting federal funds. *See* 42 U.S.C. § 2000d-7(a); *Pace v. Bogalusa City Sch. Bd*., 403 F.3d 272, 287 (5th Cir. 2005) (en banc) (Louisiana education agencies waived immunity from Section 504 claims by accepting federal funding); *Danny R. ex rel. Ilan R. v. Spring Branch Indep. Sch. Dist*., 124 F. App'x 289, 289–90 (5th Cir. 2005) (citing *Pace* in holding that TEA is not immune from suit under Section 504). Because the SOS's office receives federal funding for elections, it has waived any immunity from suit under Section 504.[14]

## II. PLAINTIFFS HAVE STATED A CLAIM UNDER THE ADA AND SECTION 504 AND SECTION 208 OF THE VOTING RIGHTS ACT

The State Defendants do not challenge that Plaintiffs have stated claims pursuant to the Civil Rights Act or Plaintiffs' claim that SB1's "vote harvesting" provisions violates the First Amendment by criminalizing core political speech; and the State Defendants reference the contours of Plaintiffs' Section 208 claims only in passing.[15] The State Defendants instead focus—unsuccessfully—on arguing that Plaintiffs failed to state a claim under the ADA and Section 504.

---

[14] According to public records, Texas has a significant pool of federal funds earmarked for making elections accessible and secure. The Texas Secretary of State's Election Funds Management Division receives and administers federal funding throughout the state. In 2020, Texas received $26,064,574 in funding through the Help American Vote Act ("HAVA"). In addition, Texas received $24,546,840 million pursuant to the CARES Act in 2020. https://www.sos.state.tx.us/elections/funds/index.shtml.

[15] Defendants assert, but make no specific argument, that Plaintiffs' Section 208 claims cannot be brought by organizations and must also be evaluated on an individualized basis, as they argue for ADA/504 claims. However,

### A.  Courts Routinely Uphold Associational Standing Without Individual Participation in ADA Cases.

Defendants argue that Plaintiffs have failed to state a claim under the ADA and Section 504[16] because "[n]one of the Plaintiffs has a qualifying disability . . . each of them is an artificial entity that is incapable of being disabled" and that "[d]isability claims require individual participation." Dkt 175 at 14, 15.[17] The thrust of Defendants' argument is that an organization could never represent the interests of multiple members in a lawsuit under the ADA because of the inherently individualized nature of disability claims. This argument fundamentally misunderstands the concept of associational standing and the nature of disability law and flies in the face of decades of precedent. Defendants seem to suggest that Plaintiffs must prove that to bring an ADA challenge, the plaintiff organization itself is an individual with a disability. Dkt 75 at 13.

these arguments are foreclosed by *OCA-Greater Houston*, 867 F.3d 604, which upheld an organization's standing to challenge a provision of the Texas Election Code under Section 208, and which further relied on the experience of a single voter and assistant in upholding the facial challenge under Section 208. *Id*. at 610-613. The only case Defendants cite, *Ray v. Texas*, No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008), does not hold or even hint that Section 208 claims can only be resolved on a case-by-case basis. Indeed, in *Ray*, the court considered the effect of the challenged law on "elderly and disabled voters" generally. *Id*. at *5.

Nor is there any logic behind Defendants' assertion. Plaintiffs are not seeking damages but rather injunctive relief. Accordingly, individualized participation of every person injured by SB1 is not required. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc*., 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members) (citation omitted); *Ass'n of Am. Physicians*, 627 F.3d at 551 (observing that an "association's action for damages running solely to its members would be barred" but plaintiff that sought only declaratory and injunctive relief had standing).

For example, to demonstrate that Section 6.04 of SB1 violates Section 208 of the Voting Rights Act and should be enjoined, Plaintiffs can provide evidence that one or several members need a form of assistance to vote that is prohibited by Section 6.04's Oath. This could include a member's need for an assistant to navigate the polling site, explain the functionality of a voting machine, or to answer the voter's questions. Evidence is not needed from every member who is entitled to assistance while voting.

[16] Hereafter, references to Plaintiffs' ADA claims also encompass Plaintiffs' Section 504 claims. Section 504 and the ADA are interpreted in tandem. *See, e.g., Fry v. Napoleon Cmty. Sch*., 137 S. Ct. 743, 749 (2017); *Smith v. Harris Cty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020).

[17] The cases cited by Defendants are inapposite. *Sims v. Texas Dep't of Hous. & Cmty. Affs.*, No. CIV.A. H-05-2842, 2005 WL 3132184 (S.D. Tex. Nov. 21, 2005) and *Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009, 1014 (N.D. Ill. 2002) address third party standing, which is not the basis on which Plaintiffs assert they have standing. Defendants' arguments conflating associational standing with third party standing fail because "the successful assertion of associational standing (both organizational and representational) fulfills prudential standing concerns and obviates the need to apply concepts of third-party standing as to the associations." *Veasey v. Perry*, 29 F. Supp. 3d 896, 905 (S.D. Tex. 2014) (finding NAACP had associational and organizational standing for Section 1983 and Section 2 claims).

Alternatively, Defendants suggest that Plaintiffs bring individual claims on behalf of third parties. Dkt 175 at 14. Both arguments mischaracterize Plaintiffs' pleadings and are contrary to the concept of associational standing.

An association has standing to sue on behalf of its members when (i) its members would otherwise have standing to sue in their own right, (ii) the interests at stake are germane to the organization's purpose, and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Whether the claim asserted or the relief requested requires the participation of individual members is a "prudential" matter that focuses on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *New Jersey Prot. & Advocacy, Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 483 (D.N.J. 2008) (citing *United Food*, 517 U.S. at 554–57). *See also, Ass'n of Am. Physicians & Surgs. v. Tex. Med. Bd. (TMB)*, 627 F.3d 547, 551 (5th Cir. 2010); *Nat'l Ass'n for Advancement of Colored People v. Ameriquest Mortg. Co.*, 635 F. Supp. 2d 1096, 1102 (C.D. Cal. 2009), as amended (Jan. 13, 2009) ("once an association has satisfied *Hunt's* first and second prongs…it is difficult to see a constitutional necessity for anything more."); *Disabled Patriots of Am., Inc., Michael Miles v. Lane Toledo, Inc.*, 325 F. Supp. 2d 837, 839 (N.D. Ohio 2004). Courts have taken a broad view of standing in civil rights cases, including those involving disability claims. *See, e.g., Chapman v. Pier 1 Imps. (U.S.), Inc.,* 631 F.3d 939, 946 (9th Cir. 2011) (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

Federal courts, including in the Fifth Circuit, routinely find that advocacy organizations representing individuals with disabilities have associational standing to challenge violations of federal laws protecting individuals with disabilities in cases seeking systemic, injunctive relief

14

without the participation of individual members. *See, e.g.*, *Steward v. Abbott,* 189 F. Supp. 3d 620, 631-32 (W.D. Tex. 2016); *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 46-47 (D.D.C. 2019), appeal dismissed, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019); *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1019 (N.D. Ohio 2011); *Equal Rights Ctr. v. Abercrombie & Fitch Co.,* 767 F. Supp. 2d 510, 525 (D. Md. 2010).

Notably, two federal district courts have recently upheld associational standing in two actions challenging state voting laws as discriminatory under the ADA. In *Florida State Conference of NAACP v. Lee*, organizational plaintiffs, including Disability Rights Florida, challenged a new Florida law restricting voting rights under the ADA, among other claims. *See* No. 4:21CV187-MW/MAF, 2021 WL 6072197, at *1 (N.D. Fla. Dec. 17, 2021); *Fla. State Conf. of NAACP v. Lee Nat'l Republican Senatorial Comm.,* No. 4:21CV187-MW/MAF, 2021 WL 4818913, at *22 (N.D. Fla. Oct. 8, 2021). In both actions, the court found that Disability Rights Florida had standing to challenge the state law under the ADA as an organization, noting that "[t]o prevail on this claim, Plaintiffs must establish (1) that they—*or their constituents*—are qualified individuals with a disability." 2021 WL 4818913, at *23 (emphasis added); *see also id*. at *23 (plaintiffs must show that *their constituents* "'meet[] the essential eligibility requirements' to participate in the program or services at issue 'with or without reasonable modifications'") (emphasis added)) Further, in denying Defendants' summary judgment motion, the court observed that "Plaintiffs' members have standing as to each of the challenged provisions enacted or amended by [the state law]…since neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit." 2021 WL 6072197, at *1 (citing *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1316 (11th Cir. 2021) and *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003)).

Similarly, in *Sixth District of the African Methodist Episcopal Church, v. Kemp*, No. 1:21-CV-01284-JPB, 2021 WL 6495360 (N.D. Ga. Dec. 9, 2021), organizational plaintiffs, including disability rights organizations The Arc of Georgia, Georgia Advocacy Office, and Georgia ADAPT, challenged a Georgia voting law as discriminating against people with disabilities under the ADA, among other claims. Defendants did not challenge the ability of organizational plaintiffs to sue under the ADA, but it is nevertheless notable that the court denied the Motion to Dismiss and upheld Plaintiffs' standing. The court noted that "Plaintiffs allege that their *members and constituents* are qualified individuals with disabilities under the ADA," clarifying that it is, of course, the organizations' members—not the organizations themselves—that have disabilities and demonstrating that associational standing is routinely upheld, including in ADA cases pertaining to voting rights. *See id.* at *12 (emphasis added).

The cases cited by Defendants as support for their argument that individualized participation is required in ADA cases are inapposite. For example, Defendants cite language from *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that relates specifically to the definition of disability under the ADA, and stands for the proposition that a plaintiff may not rely on a medical diagnosis alone to prove that he or she has a disability. Nothing in *Toyota*—which addresses an individual employment action under Title I rather than Title II—suggests that a challenge to the effects of a statewide policy on a large group of people with disabilities requires the participation of every single person affected by that policy.[18] Similarly, *Windham v. Harris Cty., Texas*, 875 F.3d 229, 237 (5th Cir. 2017), was a case brought by an individual which, by definition, requires individualized participation.

---

[18]*Toyota*'s holding related to the definition of disability under the ADA has since been abrogated by the ADA Amendments Act of 2008, Pub. L. 110-325 (2008).

Lastly, Defendants argue that "[n]othing in the amended complaint suggests that disabled voters will face 'uniform' issues across Texas' 254 counties…individual participation is crucial for understanding the merits of disability claims." Dkt 175 15.[19] But the "uniformity"—which Plaintiffs do not concede is required—is present in the enactment of a statewide law, such as SB1, that *uniformly* imposes barriers and restricts the voting rights of people with disabilities across the state. Even when the disabilities of the affected individuals vary, the law and harm that it inflicts— in terms of the disenfranchisement and burdens on their right to vote—is uniform. That Plaintiff organizations' members have diverse disabilities is irrelevant to the question of whether SB1 imposes the same kind of harm to people with disabilities on a statewide basis. It is undisputed that it does.[20]

### 2. That Other Voting Options May be Accessible to Plaintiffs Does Not Negate Defendants' Obligations to Remedy the Discriminatory Effects of SB1

The State Defendants further argue that Plaintiffs "have not plausibly alleged that SB1 actually discriminates against voters with disabilities" on the grounds that "Plaintiffs have a right to vote, not a right to vote by their preferred method." Dkt 175 at 17. But whether "[d]isabled Texans have multiple options to vote," Dkt 175 at 17, does not negate Defendants' obligation to ensure that both its absentee and in-person voting programs are accessible to people with

---

[19] In support of their argument that "uniformity" is required, Defendants cite *Prison Just. League v. Bailey*, 697 F. App'x 362, 363–64 (5th Cir. 2017). But *Bailey* involves constitutional claims of excessive force against incarcerated people, not ADA claims. The court's discussion of a requirement that there be a "uniform retaliatory motive" pertains to the specific standards needed to prove the constitutional claims at issues in that litigation, which are not relevant here. Indeed, the court even notes that its analysis is specific to use of excessive force in prison cases which are "necessarily fact-intensive."

[20] Defendants go on to make an incomplete argument, stating: "…overlap between this amended complaint and the Houston Justice . . . complaint highlights the inherent error of allowing a plaintiff to make a broad assertion of associational standing without identifying specific members." Dkt 175 at 15. Defendants then object that the members Plaintiffs *did* identify are the same as those in the Houston Justice case, noting "these plaintiff groups cannot even identify *different people*." Defendants do not suggest that the specific individuals are not in fact members of both plaintiff organizations, and nothing in the law bars individuals from being members of multiple organizations. Plaintiffs do not assert that the identified individuals are the only ones harmed by SB1. Defendants cannot have it both ways, first arguing that Plaintiffs' complaints are not streamlined enough and then protesting that they are too streamlined when Plaintiffs groups attempt to coordinate for efficiency purposes.

disabilities. Numerous courts have rejected this exact argument in other cases challenging voting restrictions under the ADA. *See, e.g., Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) ("Defendants argue that even if absentee voting is not fully accessible, the full accessibility of Maryland's in-person polling places provides disabled voters with meaningful access to voting . . . we conclude that defendants' proposed focus is overbroad and would undermine the purpose of the ADA and its implementing regulations."); *Disabled in Action v. Bd. of Elections in New York*, 752 F.3d 189, 198–99 (2d Cir. 2014) ("[T]o assume the benefit is ... merely the opportunity to vote at some time and in some way [] would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others."); *see also United Spinal Ass'n v. Bd. of Elections in New York*, 882 F.Supp.2d 615, 623–24 (S.D.N.Y.2012); *Westchester Disabled on the Move v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004); *People First*, 491 F. Supp. 3d at 1158; *Fla. State Conf. of NAACP v. Lee*, No. 4:21CV187-MW/MAF, 2021 WL 6072197, at *6 (N.D. Fla. Dec. 17, 2021) ; *Fla. State Conf. of NAACP v. Lee Nat'l Republican Senatorial Comm.*, No. 4:21CV187-MW/MAF, 2021 WL 4818913, at *23 (N.D. Fla. Oct. 8, 2021); *AME v. Kemp,* No. 1:21-CV-01284-JPB, 2021 WL 6495360 at 14 (denying Defendants' Motion to Dismiss: "State Defendants' key argument…is that 'disabled voters have multiple options to vote.'… . . . A violation of Title II, however, does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity. Rather, a plaintiff states a claim under the ADA when the complaint alleges facts indicating that certain 'services, programs, and activities' are not 'readily accessible'

by reason of a disability…Plaintiffs need not show that the voting access allegedly denied here is absolute.").[21]

Defendants argue that their voting program is in compliance with ADA regulations at 28 C.F.R. § 35.150 because they already provide accessible voting systems and physical access to polling places. Dkt 175 at 17. However, these regulations apply only to the accessibility of *physical facilities*, not to programs like voting. Defendants do not attempt to explain how providing physically accessible facilities will remedy Plaintiffs' claims regarding onerous ID requirements, restrictions on assistance, and criminalization of that assistance. The Fourth Circuit addressed and rejected a similar argument in *Lamone*:

> Defendants cite an ADA-implementing regulation, 28 C.F.R. § 35.150(a), which they assert requires a reviewing court to view Maryland's voting program 'in its entirety.' However . . . This regulation is targeted principally at physical accessibility and allows a public entity to provide accessibility alternatives that would not require large-scale architectural modifications of existing facilities. Other ADA-implementing regulations, however, are applicable here and conflict with defendants' proposed focus on the entirety of Maryland's voting program…28 C.F.R. § 35.130…directly implements the general antidiscrimination mandate of Title II . . . this regulation clearly contemplates a focus on accessibility at a more granular level than entire government programs—the level of "policies, practices, and procedures."

813 F.3d 494, 504–05 (4th Cir. 2016).

As the Fourth Circuit stated and as pleaded in Plaintiffs' Amended Complaint, the relevant regulation in this context is 28 C.F.R. § 35.130. Compl., ¶¶ 124, 177. Defendants' argument is akin to saying that a ramp to access a building is a sufficient reasonable modification for a deaf individual who requires a sign language interpreter. As long as some voters with disabilities are

---

[21] Defendants cite *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969) to support their position, but *McDonald* addressed the constitutional right to vote, and has no bearing on claims under the ADA or section 504, neither of which had been enacted when it was decided.

denied meaningful access to one of Defendants' voting programs by the provisions of SB1, Defendants are in violation of the law.

### 3.   SB1's Reasonable Modifications Clause Does Not Remedy Plaintiffs' Claims.

Defendants further argue that Plaintiffs' claims fail because SB1 includes a clause noting that nothing in the law may be interpreted to prohibit an individual with a disabilities from requesting a reasonable modification. Dkt 175 at 17.[22] But this provision is simply a restatement of what federal law already requires. The statement itself provides no protections that are not already available under the ADA—nor any assurance that a requested modification *will actually be provided*. And more to the point, it does not undo discriminatory provisions in the law. As described in Plaintiffs' First and Second Amended Complaints, the SB1 provisions challenged by Plaintiffs inflict systemic harm on large groups of people with disabilities and impose a chilling effect deterring those who seek to assist Plaintiffs in voting. Compl. ¶¶ 124-132, 164-168, 177-189. These are not harms that can be remedied by any one individual, case-by-case reasonable modification requests, or even a perfunctory restatement of the ADA within the text of SB1.

The State Defendants' argument that the SOS is an incorrect Defendant for Plaintiffs' disability claims fails for the same reason that their sovereign immunity claims fail. As already explained, the SOS has a direct role in enforcing the challenged provisions here.

Defendants also wrongly suggest that Plaintiffs' ADA claims seek to "impose supervisory liability on" the SOS. Dkt 175 at 16. But Plaintiffs do not argue that the SOS must himself ensure local officials' compliance with the ADA. They ask only that the Court enjoin the SOS from

---

[22] In support, Defendants cite *Smith*, 956 F.3d at 317 which simply restates the statutory requirement that Plaintiffs must show that Defendants have failed to reasonably modify their program and does nothing to support Defendants' position here.

implementing and enforcing discriminatory voting policies. Because that relief is within the Court's power to grant, Defendants' argument should be rejected.

Defendants rely heavily on *Lightbourn v. County of El Paso*, 118 F.3d 421 (5th Cir. 1997), but that case is irrelevant here. The plaintiffs in *Lightbourn* argued that the SOS had an affirmative obligation to ensure local jurisdictions implemented accessible in-person voting systems. 118 F.3d at 423–24. The court held that "the Secretary has no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA" *Id*. at 432. Here, Plaintiffs are not seeking that the SOS enforce compliance with the ADA. Plaintiffs claims are based on the SOS's discriminatory implementation of statewide voting procedures, which discriminate against voters with disabilities. *Lightbourn* does not absolve the Secretary from his duty not to discriminate against voters with disabilities.

Similarly, Defendants' reliance on *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015) is unavailing. Ivy was brought by deaf students who complained about the lack of American Sign Language interpreters in TEA-licensed driver's education courses. *Ivy v. Williams* 781 F.3d 252 (5th Cir. 2015). The Fifth Circuit found that TEA was not the proper Defendant because TEA did not actually provide the education course. *Id*. at 256. But nothing in *Ivy* would have allowed for TEA to *restrict* the provision of ASL interpreters in driver's education courses. Here, State Defendants are *restricting* accommodations for voters with disabilities by implementing the use of forms limiting the type of assistance a voter with a disability can receive and affirmatively demanding voter ID information from voters with disabilities.

III.  **PLAINTIFFS ARE PERMITTED PRIVATE CAUSES OF ACTIONS FOR THEIR CLAIMS UNDER THE VOTING RIGHTS ACT AND THE CIVIL RIGHTS ACT.**

Defendants briefly—and wrongly—assert that Plaintiffs lack the right to bring claims under Section 101 of the Civil Rights Act and Section 208 of the Voting Rights Act. With the

Court having previously rejected these arguments, Plaintiffs address them just to the extent that the State Defendants "preserve them for further review." *See* Dkt 175 at 19. The State Defendants lack any reasonable basis for these arguments as to either the Civil Rights Act[23] or Section 208 of the Voting Rights Act,[24] and the Court is right to reject them.

---

[23] Defendants wrongly contend that Section 101 of the Civil Rights Act of 1964 does not provide a private right of action. In fact, the legislative history demonstrates that private plaintiffs have enforced this provision since the Section's enactment in 1871. *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). In adding the provision that allowed the Attorney General to also enforce Section 101, the House Judiciary Committee acknowledged Section 101 was historically enforced by private plaintiffs and stated that the bill's purpose was "to provide means of *further* securing and protecting the civil rights of persons within the United States" by granting the Attorney General authority to bring suit in addition to the suits individuals were already bringing. H.R.REP. NO. 85–291 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1966, 1966 (emphasis added) *see also Cox*, 340 F.3d at 1297. The Eleventh Circuit examined the text and legislative history of Section 101 and concluded that a private cause of action does exist. 340 F.3d at 1294–97. Recently, a court in this district came to the same conclusion. *Hughs*, 474 F. Supp. 3d at 858–59 ("Congress did not intend to foreclose private causes of action by also granting the Attorney General enforcement authority.").

[24] Defendants are incorrect that there is no private right of action under Section 208 of the Voting Rights Act. Courts, including the Fifth Circuit, have repeatedly affirmed the right of private plaintiffs to enforce Section 208. *See OCA-Greater Houston*, 867 F.3d at 604 (affirming summary judgment granted by Austin court in favor of private plaintiffs seeking to enforce Section 208 as against state law voting rule); *see also, e.g., Arkansas United v. Thurston*, 517 F. Supp. 3d 777 (W.D. Ark. 2021) (expressly holding that plaintiffs had a private cause of action to enforce Section 208 claim), *Democracy North Carolina v. North Carolina State Board of Election*, 476 F. Supp.3d 158, (M.D. N.C. 2020) (private plaintiffs demonstrated a likelihood of success on the merits of Section 208 claim), *Priorities USA v. Nessel*, 462 F. Supp. 3d 792 (E.D. Mich. 2020) (private plaintiffs' Section 208 claim survived motion to dismiss). Defendants' argument to the contrary is inconsistent with both the text of the VRA and how courts have interpreted provisions within it. Indeed, the text of the VRA itself contemplates that private plaintiffs may sue to enforce its provisions (which necessarily include Section 208) in discussing various rules courts must follow when "the Attorney General *or an aggrieved person* institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision."[24] 52 U.S.C. § 10302 (emphasis added); *see Arkansas United*, 517 F. Supp. 3d at 790 (discussing how Congress's addition of the "aggrieved person" language made "what was once implied now explicit: private parties can sue to enforce the VRA"); *see also Ala. State Conf. of N.A.A.C.P. v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020) ("The VRA, as amended, clearly expresses an intent to allow private parties to sue the States…. and explicitly provides remedies to private parties to address violations under the statute."), *cert. granted, judgment vacated sub nom. on other grounds, Alabama v. Alabama State Conf. of NAACP*, 141 S. Ct. 2618 (2021). The legislative history is in accord. *See* S. Rep. No. 295, c1975: 40 ("The amendment proposed by S. 1279 would authorize courts to grant similar relief to private parties in suits brought to protect voting rights …."). In enacting Section 208 and allowing voters to have assistance at the polls, Congress saw itself as protecting the constitutionally guaranteed right to vote, explaining that, "if a person who cannot read in English is permitted to vote, she must be permitted to have assistance at the polls or her right to vote is meaningless . . . Section 208 implements an existing right by prescribing minimal requirements as to the manner in which voters may choose to receive assistance." S. Rep. No. 417, 97th Cong., 2d Sess. at 63. Section 208's right to an assistor of choice thus "is a congruent and proportional remedy to enforce the guarantees of the Equal Protection Clause and does not impermissibly create a new constitutional violation not contemplated by the Fourteenth Amendment." 517 F. Supp. 3d at 789.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss (Dkt 175) should be denied in its entirety. To the extent any of Plaintiffs' claims are likely to be dismissed, however, Plaintiffs should be afforded the opportunity to amend their Complaint prior to dismissal.

Dated: January 19, 2022.

Respectfully Submitted,

/s/ Ryan V. Cox

Mimi M.D. Marziani
Texas Bar No. 24091906
Ryan V. Cox
Texas Bar No. 24074087
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
mimi@texascivilrightsproject.org
ryan@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
Andre Segura
Texas Bar No. 24107112
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
skumar@aclutx.org

23

aharris@aclutx.org
asegura@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Samantha Osaki*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavizky@aclu.org
slakin@aclu.org
sosaki@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

LIA SIFUENTES DAVIS
Texas State Bar No. 24071411
LUCIA ROMANO
Texas State Bar No. 24033013
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
ldavis@drtx.org
lromano@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)

jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Urja Mittal*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
umittal@jenner.com

***COUNSEL FOR PLAINTIFFS OCA-GREATER
HOUSTON, ET AL.***

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that all counsel of record in this case were served with this Response through the Court's CM/ECF electronic filing system on January 19, 2022.

*/s/ Ryan V. Cox*_____
Ryan V. Cox