IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| La Union del Pueblo Entero, et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 5:21-CV-00844-XR |
| Gregory W. Abbott, et al., | |
| Defendants. | |

**AMICUS CURIAE BRIEF OF**
**THE YOUNG BLACK LAWYERS' ORGANIZING COALITION**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

A.      SB 1 Seriously Chills YBLOC's Political Activities ........................................... 3

B.      SB 1 Injures YBLOC By Causing it to Divert Resources From Other
        Organizational Activities ...................................................................................... 6

C.      SB 1 Impermissibly Burdens YBLOC's Political Speech ................................... 8

        1.      YBLOC engages in protected speech through civic engagement ............................ 8

        2.      Section 7.04 both directly prohibits and indirectly chills political speech ............. 10

        3.      Section 7.04 cannot withstand strict scrutiny ................................................... 12

CONCLUSION ................................................................................................... 17

# TABLE OF AUTHORITIES

Page(s)

<span style="font-variant:small-caps">Cases</span>

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021) .................................................................................................14

*Barilla v. City of Houston,*
    13 F.4th 427 (5th Cir. 2021) ...........................................................................................3

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987) ...............................................................................................14, 16

*Buckley v. Am. Const. L. Found., Inc.,*
    525 U.S. 182 (1999) .........................................................................................................9

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .....................................................................................................8, 13

*Burson v. Freeman,*
    504 U.S. 191 (1992) ......................................................................................................16

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ...............................................................................................10, 12

*Common Cause Indiana v. Lawson,*
    937 F.3d 944 (7th Cir. 2019) ...........................................................................................7

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n,*
    760 F.3d 427 (5th Cir. 2014) .........................................................................................12

*Fed. Election Comm'n v. Wisconsin Right to Life, Inc.,*
    551 U.S. 449 (2007) ......................................................................................................13

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) .......................................................................................7

*Fulton v. Philadelphia,*
    141 S. Ct. 1868 (2021) ..................................................................................................12

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .........................................................................................................6

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ......................................................................................................10

*Houston Chronicle v. City of League City*,
    488 F.3d 613 (5th Cir. 2007) .............................................. 3

*Houston v. Hill*,
    482 U.S. 451 (1987) .......................................................... 10

*Laird v. Tatum*,
    408 U.S. 1 (1972) .............................................................. 10

*League of Women Voters of Fla. v. Browning*,
    575 F. Supp. 2d 1298 (S.D. Fla. 2008) ............................... 9

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................ 12, 13, 14

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) .......................................................... 13

*Meyer v. Grant*,
    486 U.S. 414 (1988) ........................................ 8, 9, 11, 13, 15

*Mills v. Alabama*,
    384 U.S. 214 (1966) .......................................................... 16

*Minnesota Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ...................................................... 15

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ............................... 3, 6, 7, 8

*Project Vote v. Blackwell*,
    455 F. Supp. 2d 694 (N.D. Ohio 2006) ............................... 10

*Schirmer v. Edwards*,
    2 F.3d 117 (5th Cir. 1993) ................................................. 16

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ......................................... 3, 4

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................ 3

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................ 9

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ......................................... 9, 11

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)...........................................................................................................8

**STATUTES**

Tex. Elec. Code § 31.001(a) ..............................................................................................3

**OTHER AUTHORITIES**

Press Release, *Dallasite Leads Young Black Lawyers' Organizing Coalition GOTV Voter
   Protection Effort to Provide 180k Pieces of PPE to Ensure Safe Voting for Black
   Communities in Texas & South Carolina*, THE DALLAS WEEKLY (Oct. 30, 2020),
   https://www.dallasweekly.com/articles/dallasite-leads-young-black-lawyers-organizing-
   coalition-gotv-voter-protection-effort-to-provide-180k-pieces-of-ppe-to-ensure-safe-voting-
   for-black-communities-in-texas-south-carolina/.................................................................4, 5

## INTRODUCTION

The Young Black Lawyers' Organizing Coalition ("YBLOC") is a nonpartisan civic education organization comprised of lawyers and law students working to protect and empower Black voters in Texas and six other states.  YBLOC was founded in 2019, in part, to combat the renewed efforts by the State of Texas to silence the voices of Black voters, using tools that on first glace might appear neutral.  However, the State of Texas has a long and fraught historical legacy of voter suppression and the exclusion of Black voters from the political process.  YBLOC seeks to combat voter suppression by building on a tradition of nonpartisan political resistance, rooted in and led by Black community-based and religious organizations.  Accordingly, YBLOC connects Black legal talent with Black grassroots communities to expand voter protection through community-centered public education to empower voters, community-based organizing to protect inclusive democracy, community-driven impact litigation to challenge voter suppression, and community-focused multi-media content to promote voter participation.  YBLOC's ability to support its communities rises and falls with its First Amendment rights.

This brief is respectfully submitted to illustrate SB 1's irreparable injury to Texans, and particularly the harms to nonpartisan civic organizations like YBLOC.  Section 7.04 of SB 1 criminalizes constitutionally protected civic engagement through broad, murky language that casts fear and silences communities.  The resulting gag on speech is plainly unconstitutional.  Even as a nonpartisan organization whose activities are rarely proximate to polling precincts, YBLOC is already experiencing the chill of civic engagement.  YBLOC expects that law students will be hesitant to volunteer, fearful of SB 1's prohibitions.  Multiple provisions of SB 1 create criminal liability never before seen in Texas elections law—and because that criminal liability is written vaguely for maximum application, potential volunteers may fear criminal charges if any of their

activities are misunderstood or misconstrued.  SB 1 therefore stifles the ability of young legal minds as organized by YBLOC to advise, guide, and advocate for Black Texan communities.  In short, SB 1 chills YBLOC's core First Amendment activity.

The severe harm to YBLOC's First Amendment activity confirms and corroborates that civic groups across the state have and will be chilled by the law as well.  SB 1 has caused YBLOC to divert resources to recalibrate and insulate its organization from SB 1's new swath of civil and criminal liabilities.  Because the Defendants are responsible for enforcing this law, and because this Court has authority to provide redress, the injuries are traceable to the instant parties and claims.  YBLOC's severe harms from SB 1 confirm, therefore, that standing exists for First Amendment claims.

YBLOC's constitutional injuries help illustrate standing here: SB 1 chills their constitutionally-protected speech.  In fact, plenty of organizations may have more cause for concern than YBLOC.  Other groups' members spend even more time in the shadow of SB 1 because they *go* to the polls and engage in more protected political activity near ballots.  As the YBLOC experience underscores, therefore, SB 1 Section 7.04 directly prohibits and indirectly chills political speech—harms which could not begin to withstand strict scrutiny.

YBLOC, therefore, respectfully urges this Court to grant Plaintiffs' requested relief as to their First Amendment rights.

## ARGUMENT

YBLOC knows from experience that SB 1 harms Black voters.  *Cf.* Houston Justice Second Am. Compl. ¶¶ 270–317, ECF No. 199 (alleging SB 1 discriminates on the basis of race); LUPE Am. Compl. ¶¶ 229–66, ECF No. 140 (same); LULAC Second Am. Compl. ¶¶ 249–56, ECF No. 194-1 (same).  SB 1 will directly impede civic engagement organizations from assisting these

voters in multiple ways, leaving these communities hamstrung understanding how to approach the polls.

To date, the thrust of Defendants' motions to dismiss has been that Plaintiffs lack standing. Specifically, they argue that Plaintiffs fail to plausibly allege traceability or redressability. *See, e.g.*, ECF No. 175 at 12–13. But in a recent matter affirming standing of the very named plaintiffs at issue here, the Fifth Circuit was clear: the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State, who serves as the 'chief election officer of the state.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) (quoting Tex. Elec. Code § 31.001(a)). With this framework in mind, YBLOC submits this amicus brief to articulate the serious harms SB 1 has caused it. This Court should enjoin the Defendants from enforcing SB 1's First Amendment restrictions against Plaintiffs and all other Texans now chilled, YBLOC included.

### A.       SB 1 Seriously Chills YBLOC's Political Activities

Article III does not give a speaker the choice of exercising her rights under threat of prosecution, or remaining silent until someone else tests the State's willingness to enforce its speech-suppressing statute. A statute chilling speech harms a speaker long before she "experience[s] 'an actual arrest, prosecution, or other enforcement action.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021). The prospect of punishment, and not just the punishment itself, can cause "chilled speech or self-censorship." *Barilla*, 13 F.4th at 431. The Fifth Circuit has "repeatedly" held "that 'chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020) (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)). Under these well-

settled principles, Plaintiffs have been injured by SB 1.  They have engaged and intend to continue engaging in protected interactions with voters that are arguably proscribed by SB 1.  *See, e.g.*, OCA-Greater Houston Second Am. Compl. ¶¶ 210–13, ECF No. 200.  And the State has done nothing here to rebut the presumption that it will enforce its newly enacted law.  *See Speech First*, 979 F.3d at 335.

SB 1's chilling effect on YBLOC's core political speech and expression illustrates the harm that Plaintiffs continue to suffer.  In the last national election, YBLOC distributed personal protective equipment (PPE for short) to Black voters, who were voting in person on election day during a global pandemic that has disproportionately impacted Black communities.[1]  YBLOC also "host[ed] voter education sessions led by young Black lawyers and law students in partnership with grassroots partners to make sure that Black voters have the information they need to safely, fully and freely cast their votes."  *Dallas Weekly* Press Release.  During these sessions, YBLOC members "t[aught] Black voters about [h]ow to navigate voting by mail and in-person voting[, w]hat kind of voter suppression tactics voters might confront in their home states and communities (including moving deadlines, misinformation, malfunctioning machines, election roll purges, and in-person voter intimidation)[, a]nd how voters can protect themselves and their votes this election."  *Id.*  And on election day, YBLOC mobilized teams of volunteers to help "respond[] to thousands of voter calls and systemic voting issues in local communities."  Young Black Lawyers'

---

[1]  Press Release, *Dallasite Leads Young Black Lawyers' Organizing Coalition GOTV Voter Protection Effort to Provide 180k Pieces of PPE to Ensure Safe Voting for Black Communities in Texas & South Carolina*, THE DALLAS WEEKLY (Oct. 30, 2020), https://www.dallasweekly.com/articles/dallasite-leads-young-black-lawyers-organizing-coalition-gotv-voter-protection-effort-to-provide-180k-pieces-of-ppe-to-ensure-safe-voting-for-black-communities-in-texas-south-carolina/ (*hereinafter*, "*Dallas Weekly* Press Release").

Organizing Coalition (YBLOC), Impact Report and Roadmap: Black Ballots, Black Futures (2020) (on file with author) (*hereinafter*, "YBLOC Impact Report & Roadmap").

The most important component of YBLOC's voter education programs, and by far the most requested by its community partners, has been to provide clear, digestible information about how to vote by mail.  YBLOC leaders have already received calls from community members concerned about the impact SB 1 will have on the mail-in voting process.  Because the COVID-19 pandemic disproportionately impacted Black communities, many Black voters voted by mail in 2020 and, as evidenced by the calls YBLOC has received, plan to do so again in the future.

Additionally, in 2021, YBLOC supported a nonpartisan community effort in Dallas County to provide equitable access to the polls for senior voters, voters with disabilities, and voters who lack access to transportation in one of the county's most economically disconnected communities—categories of voters that disproportionately rely on early voting—and provided organizers with voter protection training, including information about the Election Protection Hotline.  Because Black voters are the most likely to be deliberately "targeted by voter suppression tactics that s[eek] to undermine, undercount, and block Black votes," these efforts are crucial to ensure equal access to free and fair elections for the Black community in Texas.  *Id*.; *cf.* Houston Justice Second Am. Compl. ¶¶ 270–317, ECF No. 199 (alleging SB 1 discriminates on the basis of race); LUPE Am. Compl. ¶¶ 229–66, ECF No. 140 (same); LULAC Second Am. Compl. ¶¶ 249–56, ECF No. 194-1 (same).  YBLOC, like Plaintiffs, intends to continue these efforts in the next election cycle and those election cycles thereafter.

It should come as no surprise that SB 1 has already chilled YBLOC's mission to aid members of Black grassroots communities in "realiz[ing] [their] full electoral voice."  YBLOC, Impact Report and Roadmap: Black Ballots, Black Futures.  A typical user of the English language

would not call voter education or assistance "vote harvesting."  But Texas has enacted an overbroad and vague statute that proscribes First Amendment activities within an uncertain distance from a ballot.  *See infra* Section B.2.  Through this criminal ban on purported vote solicitation—advocacy of cause or candidate—SB 1 has entangled YBLOC's important work with a specter of criminal liability.  Consider just one example: Although months ahead of the next national election cycle, YBLOC fears a decline in qualified law students considering voter education volunteer opportunities with YBLOC.  The effect of SB 1 on the volunteer pool meaningfully limits YBLOC's nonpartisan, election-related civic education, which is largely conducted by YBLOC volunteers or at their direction.

**B.      SB 1 Injures YBLOC By Causing it to Divert Resources From Other Organizational Activities**

Organizations can also demonstrate an injury-in-fact by showing the measures they must take to comply with the challenged law.  When a law forces an organization to divert its time and money away from its usual activities—to focus "additional time and effort spent explaining" new election laws, for instance—the law has injured the organization.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *OCA-Greater Houston,* 867 F.3d at 610.  Plaintiffs have alleged just such an injury here.

Like Plaintiffs, YBLOC will be forced to divert resources to address the effect of SB 1.  As an initial matter, the severe penalties and amorphous scope of § 7.04 will hamper volunteer recruitment.  YBLOC's model of community engagement emphasizes the use of volunteers for "grassroots organizing in and with Black communities."  YBLOC Impact Report & Roadmap.  These volunteers conduct a majority of YBLOC's voter education sessions—the hallmark of its voter education mission.  Through these interactions with Black voters, the volunteers share the "how-to" and "know [your] rights" information necessary to resist and overcome voter

suppression.  YBLOC has also mobilized its volunteers to assist the Election Protection Hotline and Legal Rapid Response Network, which fields thousands of voter calls and works on systemic voting issues in local communities.  *Id.*  So long as the broad sweep of § 7.04 chills prospective volunteers, YBLOC and Plaintiffs will be forced to devote more of their limited resources toward recruitment.

Likewise, YBLOC and Plaintiffs will have to expend more resources training those who do volunteer on how to comply with the confusing contours of § 7.04.  *See Common Cause Indiana v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019).  Instead of spending time conducting voter education sessions with local partners, volunteers will now have to sit in mandatory trainings on what innocuous interactions with voters cross the line into criminal territory under § 7.04.  *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).

YBLOC may even have to curtail its programs given the strains of complying with SB 1.  *See OCA-Greater Houston*, 867 F.3d at 612.  Section 7.04 criminalizes voter interactions by those who "benefit" from advocating for political candidates and causes.  Before SB 1, YBLOC could send a paid legal fellow to provide voters with nonpartisan voter education.  Now, that fellow could be risking criminal charges by reaching out to voters.  To steer clear of any arguable application of § 7.04, YBLOC will likely have to restrict the way in which its volunteers and fellows directly engage with voters, lest they be prosecuted for "intend[ing] to deliver votes for [or against] a specific candidate or measure."

This, too, confirms that Plaintiffs have standing.  Plaintiffs and YBLOC have not diverted their resources to respond to an *imaginary* threat from SB 1.  They are not, on anyone's account, "lobbying group[s]" expending funds to contrive a basis for litigation.  *OCA-Greater Houston*, 867 F.3d at 612.  They are instead doing their level best to mitigate the "real-world impact" of

SB 1 on their "members and the public." *Id.* This diversion of personnel and time is a clear-cut basis for standing under *OCA-Greater Houston*. There, the Fifth Circuit held under materially identical circumstances that the Organization for Chinese Americans—Greater Houston (also a Plaintiff in this case) could challenge a Texas voting law restricting interpretation assistance to non-English speaking voters. *Id.* at 606. The court explained that OCA had been injured by the "additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters," and that this injury was sufficient to confer standing. *Id.* at 610. Although the injury may not have been "large," it "perceptibly impaired OCA's ability to get out the vote among its members." *Id.* at 612. Nothing in this case could call for a different result.

### C.   SB 1 Impermissibly Burdens YBLOC's Political Speech

#### 1.   YBLOC engages in protected speech through civic engagement

The vibrancy of our Nation's political system owes much to the Constitution. The First Amendment guarantees that all can participate in the political process—no matter what viewpoint they espouse, and no matter what party is in power. "If there is any fixed star in our constitutional constellation," Justice Jackson wrote, "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Nowhere has the need for First Amendment protection been greater—and nowhere has the Supreme Court been more solicitous of speech—than in the context of political speech. A principal purpose of the First Amendment was "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v. Grant*, 486 U.S. 414, 421 (1988). The Court has thus made clear that protected political speech includes political donations and expenditures, *see Buckley v. Valeo*, 424

U.S. 1, 16–17 (1976) (per curiam); symbolic acts, *see, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 405–06 (1989); and the circulation of initiative petitions, *see, e.g.*, *Meyer*, 486 U.S. at 421–22.

YBLOC has carried on the best of these political traditions.  Its efforts to register voters, to train voters to navigate voting processes and to protect themselves and their ballots, and to assist voters in casting their ballots all represent political speech of the highest order.  Under Fifth Circuit precedent, the First Amendment protects speech incident to voter registration activities, including "'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to fill out their forms; and 'asking' for information to verify that registrations were processed successfully." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013).  Although the Fifth Circuit has rejected a First Amendment right to register voters by returning their applications, *see id.* at 392–93, a State may not punish "core protected speech" that takes place during voter registration drives and voter protection trainings, *id.* at 390.  Similarly, the Supreme Court has recognized petition circulation as "core political speech."  *Meyer*, 486 U.S. at 422; *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 217 (1999).  Voter registration and training, like petition circulation, will almost always entail a discussion of the issues at stake in an upcoming election and why the prospective voter's voice matters.  *See Meyer*, 486 U.S. at 421.

YBLOC's voter registration efforts, voter protection training, and in-person assistance of voters "[u]ndoubtedly" involve protected speech at the heart of the First Amendment.  *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321-22 (S.D. Fla. 2008).  YBLOC has encouraged thousands of Black voters to check and update their voter registrations, and has educated them on their rights.  Many of these interactions occur in person, including in Black churches.  YBLOC also provides voters with actionable and timely voter protection information to allow them to cast their ballot effectively.  These efforts inevitably include discussions of

important political topics—not only the electoral system and the value of a person's vote, but also the substantive political issues at stake in upcoming elections, such as immigration, the economy, or healthcare. Additionally, YBLOC has partnered with community organizations to deliver PPE to Black voters casting their ballot in person during the COVID-19 pandemic. YBLOC's activities convey a clear political message: "Your vote matters." *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006).

> ## 2. Section 7.04 both directly prohibits and indirectly chills political speech

SB 1 will both directly and indirectly burden the political speech of Black-led civic organizations, undercutting their ability to pursue their objectives. Government regulations need not directly prohibit speech to run afoul of the First Amendment, and courts have repeatedly held laws that deter speech to be unconstitutional. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). Criminal sanctions in particular can have an overwhelming chilling effect on free speech. *See Houston v. Hill*, 482 U.S. 451, 459 (1987). "If the First Amendment has any force," the Court has said, "it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010). The Constitution therefore tolerates much less vagueness when a law implicating First Amendment rights threatens criminal penalties. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

SB 1 contains an exceedingly broad and exceedingly vague prohibition on interactions with voters. Section 7.04 makes it a crime to "knowingly provide[ ] . . . vote harvesting services in exchange for compensation or other benefit." The statute, in turn, defines "vote harvesting services" to penalize a broad swath of core First Amendment activity: any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail,

intended to deliver votes for a specific candidate or measure."  Making matters worse, the statute lacks any limiting principle that carves out protected political speech.  The statute defines a "benefit" as "anything reasonably regarded as a gain or advantage."

Section 7.04 bans advocacy on political issues in the vicinity of a ballot, and the combination of these vague provisions promises to have a devastating effect on speakers who register, educate, and assist voters.  A parent might advocate on behalf of raising funds for local schools in exchange for a "gain or advantage" for her children; a taxpayer might advocate for electing a politician who supports lowering taxes; and a Medicare recipient might advocate for expanding Medicare by sweeping a new party into power if such attempts have met a dead end in the capitol.  Section 7.04 threatens to penalize all this protected speech because the "benefit" requirement does no meaningful work in separating between commonplace political speech and harmful election malfeasance.

SB 1 is thus unlike the restrictions on voter registration drives upheld by the Fifth Circuit in *Voting for America, Inc.*  There, the challenged law did not "regulate[ ] the process of advocacy itself, dictating who could speak . . . or how to go about speaking."  732 F.3d at 390.  But SB 1 *does* regulate who may speak and how.  And SB 1 strikes fear over the interactive speech process *before* a voter registration form is filled out, including the very activities that the court conceded were core political speech: "[s]oliciting, urging and persuading the citizen to vote."  *Id.*  If viewpoint neutrality means anything, it is that the application of the Constitution could not depend on whether a canvasser encourages someone to vote for a particular candidate or to sign a petition for a ballot initiative.  Both are essential political interactions for which "the importance of First Amendment protections is at its zenith."  *Meyer*, 486 U.S. at 425 (internal quotation marks omitted).

### 3.    Section 7.04 cannot withstand strict scrutiny

First Amendment rights need breathing space.  For this reason, "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 438 (5th Cir. 2014) (quoting *Citizens United*, 558 U.S. at 340).  SB 1 does not further a compelling interest and is not narrowly tailored in any event.  The law therefore folds under strict scrutiny.

### i.    SB 1's application to YBLOC's constitutionally protected activity confirms that SB 1 is not narrowly tailored to any compelling government interest

At risk of repetition, § 7.04 criminalizes in-person interactions "with one or more voters, in the physical presence of an official ballot or a ballot voted by mail," when the interaction is performed for compensation or "a benefit," "occur[s] in the presence of the ballot or during the voting process" or "directly involve[s]" a ballot.  Section 7.04 specifically targets interactions "to deliver votes for a specific candidate or measure" and defines a "benefit" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person."  As shown above, this law burdens political speech and thus triggers strict scrutiny. *See* Section II.2, *supra*.

Under this standard of review, the State must prove that SB 1 furthers a compelling interest. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  The State has asserted interests in combating electoral fraud, protecting the secrecy of the ballot, promoting voter access, and ensuring that all legally cast ballots are counted.  But "the First Amendment demands a more precise analysis" than whether the State's interest is compelling "at a high level of generality."  *Fulton v. Philadelphia*, 141 S. Ct. 1868, 1881 (2021).  The question is whether the State has a compelling interest in

criminalizing all of the speech interactions covered by § 7.04.  Put another way, "[a] court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech." *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 478 (2007) (plurality opinion).

SB 1 is plainly unconstitutional when considered at the proper level of generality because many of its applications serve no compelling interest.  The State has come up far short in justifying its ban on advocacy in favor or against a candidate or ballot measure whenever a ballot is present. The mere fact that the speaker benefits in some way from her advocacy does not establish a compelling interest in targeting "direct one-on-one communication," which is "the most effective, fundamental, and perhaps economical avenue of political discourse." *Meyer*, 486 U.S. at 424, 427. As the Supreme Court has admonished, "legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment." *Buckley,* 424 U.S. 43, 50.  The First Amendment celebrates the speech that the State has criminalized.

### ii.      The State did not narrowly tailor Section 7.04 to its purported interest in preventing voter fraud

SB 1 also lacks the narrow tailoring required whenever "a law burdens core political speech." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (internal quotation marks omitted).  Yet SB 1 sweeps up a substantial amount of protected speech unrelated to voter fraud. And that collateral damage is entirely gratuitous:  Less restrictive alternatives exist—and are already in place—to protect against voter fraud.

To survive strict scrutiny, a law "must be the least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478.  A State may not, in other words, "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to

advance its goals." *Id.* at 486.  As the Supreme Court reiterated just this year, "[i]n the First Amendment context, . . . a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (internal quotation marks omitted).  When the State "confers on police a virtually unrestrained power to arrest and charge persons with a violation," the law is facially unconstitutional "because the opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident." *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (cleaned up).  The upshot is that both breadth and clarity matter to narrow tailoring.

SB 1's vague prohibitions broadly encompass innocuous activity, and its harsh criminal and financial penalties will deter even the most resolved citizens from exercising their First Amendment rights.  As explained above, the fatal problem is that § 7.04 fails to define its essential terms, including "in the physical presence of an official ballot," "interaction," or "gain or advantage."  The statute does not say whether the ballot must be visible, on the voter's person, within the voter's reach, or 100 feet away inside a polling place.  Nor does the statute explain whether mere encouragement to vote is a prohibited interaction even if the speaker does not acknowledge the presence of a ballot.  The statute does not even specify whether there must be a connection between the involvement of the ballot and the "inten[t] to deliver votes for a specific candidate or measure."  These prohibitions apply to anyone receiving a "benefit" for their speech, but this requirement does nothing to limit the reach of the statute.  A "benefit" includes "anything reasonably regarded as a gain or advantage" to the speaker or "another party whose welfare is of interest" to the speaker.  Virtually all political advocacy involves the specter of gain for the advocate or "another party whose welfare is of interest" to the advocate.  But there is nothing

unusual or nefarious about benefiting—however abstractly or concretely—from political advocacy. *See Meyer*, 486 U.S. at 427.

Given the statute's vague language and broad applicability, SB 1 will curtail YBLOC's ability to conduct political activities in the community. Consider, for example, that distribution of PPE to voters frequently involves conversations pertaining to the physical act of voting and to the public health issues surrounding COVID-19. Volunteers who receive so much as a free bottle of water for distributing PPE to voters may inadvertently violate SB 1 if they are at an uncertain distance from a polling place and in the "presence" of a ballot. Because any de minimis benefit, however abstract, can subject someone to the risk of violating the law, all political speech is potentially risky. Take the YBLOC volunteer seeking to facilitate voter education and protection programs in his community. He no longer knows whether discussing the importance of voting with someone outside of a polling place would qualify as an "in-person interaction . . . in the physical presence of an official ballot." Similarly, a young Black lawyer conducting in-person organizing at her church could fear repercussions if she realizes that some people in the congregation have their ballots with them for "souls to the polls," an annual tradition of the Black church in which congregants are encouraged to vote following Sunday services. A young voter may violate SB 1 simply by discussing a particular initiative or candidate with a relative whose mail-in ballot is sitting a few feet away on the kitchen table. SB 1 extends well "beyond close calls on borderline or fanciful cases"—here, "the whole point of the exercise is to prohibit the expression of political views." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018).

Texas cannot opt for a blunderbuss approach when it already has significant measures in place to protect against voter fraud and coercion. Before the passage of SB 1, § 276.013 of the Texas Election Code prohibited "influenc[ing] the independent exercise of the vote of another in

the presence of the ballot or during the voting process."  Section 7.03 of SB 1 clarified that § 276.013 prohibits "altering the ballot of another or . . . otherwise causing a ballot to not reflect the intent of the voter."  In view of these alternatives, the State cannot justify an effective ban on political speech in the presence of a ballot.  *See Jews for Jesus*, 482 U.S. at 575.

To be sure, courts have upheld restrictions on political speech when those restrictions were narrowly tailored to boundaries definable and knowable in advance to political speakers.  *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 210–11 (1992) (plurality opinion) (upholding ban on campaigning within 100 feet of a polling place); *Schirmer v. Edwards*, 2 F.3d 117, 124 (5th Cir. 1993) (upholding law prohibiting politicking within 600 feet of a polling place).  Section 7.04 has no similar limiting principle.  The *Burson* plurality observed that "governmental regulation of vote solicitation could effectively become an impermissible burden" if the law extends (as here) "some measurable distance from the polls."  504 U.S. at 210.  In this way, SB 1 parallels the election-day ban on the publication of political editorials invalidated in *Mills v. Alabama*, 384 U.S. 214, 219 (1966).  The breadth of § 7.04 far surpasses the restrictions on "vote solicitation"—that is, advocacy of cause or candidate—permitted by the First Amendment.  *Burson*, 504 U.S. at 210.

At bottom, the substantial intrusion into YBLOC's activities illustrates how poorly tailored § 7.04 is to Texas's purported goal of eliminating voter fraud and coercion.  YBLOC engages communities of color in Texas to educate and train voters; these efforts in resisting voter suppression are designed to ameliorate the effects of centuries of racially discriminatory voting practices that have historically plagued states like Texas.  *See* OCA-Greater Houston Second Am. Compl. ¶¶ 56, 68, ECF No. 200; Houston Justice Second Am. Compl. ¶¶ 86–111, ECF No. 199. Every day, YBLOC strives to safeguard the sanctity of the voting process by working to ensure equal access to the ballot.  The tragedy here is that the State has chosen to institute a law that, in

word or effect, chills the political participation of organizations working to expand voter participation—thus codifying the coercive voting practices that it purportedly seeks to prevent.

## CONCLUSION

As YBLOC is keenly aware, communities of color in Texas will suffer irreparable injuries if SB 1 is permitted to continue chilling their political engagement.  When any of its communities are kept from engaging in political dialogue, all of Texas is deprived of rich political discourse which is to be among the highest of American ideals.  SB 1 seeks to silence.  YBLOC, like Plaintiffs, asks only to be cloaked in the constitutional protection of free speech as they stir their communities to engage their civic duties.  YBLOC respectfully submits that this Court should grant all relief Plaintiffs request.

DATE:  January 21, 2022                    Respectfully submitted,

                                           /s/ Veronica S. Moyé
                                           Veronica S. Moyé, SBN 24000092
                                           Andrew LeGrand, SBN 24070132
                                           GIBSON, DUNN & CRUTCHER LLP
                                           2001 Ross Avenue
                                           Suite 2100
                                           Dallas, TX  75201-2911
                                           Telephone: 214.698.3100
                                           Facsimile:  214.571.2900
                                           vmoye@gibsondunn.com
                                           alegrand@gibsondunn.com

                                           *Attorneys for The Young Black Lawyers'
                                           Organizing Coalition*

Anne Champion
Lee R. Crain
Cate McCaffrey
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:212.351.4000
Facsimile: 212.351.4035
achampion@gibsondunn.com
lcrain@gibsondunn.com
cmccaffrey@gibsondunn.com

Katherine Maddox Davis
Cate Harding
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone:202.955.8500
Facsimile: 202.467.0539
kdavis@gibsondunn.com
charding@gibsondunn.com

Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520
pfuster@gibsondunn.com

Raena Ferrer Calubaquib
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile:  650.849.5333
rcalubaquib@gibsondunn.com

*Of Counsel*