IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, FRIENDSHIP-WEST BAPTIST CHURCH, THE ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST, AND TEXOMA REGIONS, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, TEXAS IMPACT, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC., and JAMES LEWIN, | |
| **Plaintiffs,** | |
| v. | **Case No. 5:21-cv-00844-XR** |
| THE STATE OF TEXAS, JOHN B. SCOTT, in his official capacity as the Texas Secretary of State, WARREN K. PAXTON, in his official capacity as the Texas Attorney General, MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator, JOHN CREUZOT, in his official capacity as the Dallas County District Attorney, LISA WISE, in her official capacity as the El Paso County Elections Administrator, YVONNE ROSALES, in her official capacity as the El Paso County District Attorney, and JOSÉ GARZA, in his official capacity as the Travis County District Attorney, | |
| **Defendants.** | |

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs are membership and community-based organizations, many of whom represent the interests of Latino and Black Texans, churches and other faith-based groups, and a Texan who has served as an election judge. Plaintiffs bring this action to challenge Senate Bill 1 ("SB1"), a new law that (among other things) restricts voter assistance; enables partisan poll watchers to intimidate voters and poll workers; and threatens to criminalize community-based voter

engagement activities that are otherwise protected by the United States Constitution, federal election law and the Texas Election Code.  On behalf of themselves and their members, Plaintiffs seek declaratory and injunctive relief to enforce the United States Constitution, the Voting Rights Act of 1965 ("VRA"), and the Americans with Disabilities Act ("ADA").

## I.    INTRODUCTION

1.    The 2020 general election in Texas was, according to the Texas Secretary of State's office, "smooth and secure."[1]  In the face of a global pandemic, the performance by Texas officials and voters alike during the 2020 election showcased their strength to overcome obstacles and fulfill the promise of democratic participation even, and perhaps especially, in light of a changing Texas electorate.

2.    Despite this, now on its third try, the Texas Legislature enacted SB1.  This new law imposes a series of additional burdens and restrictions that will have the effect of suppressing Texas voters and discouraging—including by criminalizing—work that has long been performed faithfully by public employees, private organizations and individuals to help citizens exercise their constitutional right to vote.  Among its many provisions, SB1:

- Targets Texans who need assistance to vote—including people who have limited English proficiency, disabilities, and/or less formal education—by adding multiple new requirements that hinder the provision of assistance at the polling place, curbside, or in connection with mail ballots (*e.g.*, Sections 6.01 (adding Sections 64.009(e), (f), (f-1), and (g) to the Election Code), 6.03 (adding Section 64.0322 to

---

[1] Taylor Goldenstein *et al.*, *Did a 'Smooth and Secure' 2020 Election Cost Texas Secretary of State Her Job?*, Houston Chronicle (May 21, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php; also available at https://electionlawblog.org/?p=122282.

the Election Code), 6.04 (amending Section 64.034 of the Election Code), 6.05 (amending Section 86.010(e) of the Election Code), and 6.06 (amending Sections 86.0105(a), (c), and (e) of the Election Code)).

- Gives partisan poll watchers "free movement" to intimidate and harass voters and poll workers by expanding watchers' authority, while constraining election administrators' ability to ensure peaceful, orderly elections under penalty of criminal prosecution (*e.g.*, Sections 4.01 (adding Section 32.075(g) to the Election Code), 4.06 (adding Section 33.051(g) to the Election Code), 4.07 (adding Section 33.056(e) to the Election Code), and 4.09 (amending Section 33.061(a) of the Election Code)).

- Quashes protected political speech and legitimate voter turnout initiatives through overbroad and vague criminal penalties for so-called "vote harvesting" (Section 7.04 (adding Section 276.015 to the Election Code)).

- Restricts counties from offering accommodations that facilitated record turnout in 2020, including allowing for drive-thru voting (Section 3.04 (amending Section 43.031(b) of the Election Code)), permitting the use of movable structures as polling places (Sections 3.12 (amending Section 85.061(a) of the Election Code) and 3.13 (amending Section 85.062(b) and adding Section 85.062(f) to the Election Code)), and authorizing 24-hour early voting (Sections 3.09 (amending Sections 85.005(a) and (c) of the Election Code) and 3.10 (amending Sections 85.006(e) of the Election Code)).

- Requires election clerks to reject otherwise valid mail ballot applications and mail ballots because of simple errors or omissions notwithstanding the clerk's ability to

verify the mail ballot application or mail ballot by other means (Sections 5.07 (adding Section 86.001(f) to the Election Code) and 5.13 (amending Section 87.041(b) of the Election Code)).

- Facilitates the investigation and prosecution of perfectly legal activity by voters, such as being excused from jury service or having the same name as a non-U.S. citizen or non-resident in the county (Sections 2.04 (amending Section 15.028 of the Election Code), 2.06 (adding Sections 18.065(e)-(g) to the Election Code), 2.07 (amending Section 18.068(a) and adding Section 18.068(a-1) to the Election Code), 2.08 (amending Section 31.006 of the Election Code), and 2.11 (amending Sections 62.114(b) and (c) of the Government Code)).

- Forces election officials to shift resources to meet tight deadlines for reporting voters for investigation and removing voters from the rolls to avoid additional requirements and penalties (Sections 2.06 (adding Section 18.065(e)-(g) to the Election Code)).

3.      Governor Gregory W. Abbott ("Abbott" or the "Governor")—who is the chief executive officer of the State of Texas[2]—called for this legislation on the pretextual grounds that it was necessary to prevent voter fraud.  But there is simply no evidence that voter fraud occurs in

---

[2] Tex. Const. Art. IV, § 1.  Governor Abbott was a named defendant in the original Complaint. (ECF No. 1).  Plaintiffs' decision to remove Governor Abbott as a defendant in the First Amended Complaint was solely in an effort to narrow the issues before the Court and shall not be construed as an admission that Governor Abbott is not a proper defendant for claims arising under the VRA and the U.S. Constitution particularly where, as alleged here, Governor Abbott championed the challenged laws (and indeed called for them to be made more stringent) and played a direct and personal role in the administration of Texas elections via his authority to issue proclamations. Plaintiffs expressly reserve the right to seek leave from this Court to further amend the operative complaint in order to add back Governor Abbott as a defendant for claims asserted here in light of the facts that will be developed during discovery.

Texas beyond the very few examples already identified through Texas's pre-existing processes and procedures.  Indeed, as Texas Representative Diego Bernal testified before the Congressional subcommittee on Civil Rights and Civil Liberties on July 29, 2021: "There [we]re 154 prosecutions of voter fraud in the past 17 years in Texas out of 94 million votes cast.  The likelihood of voter fraud in Texas is less than any one of us being struck by lightning."[3]  Thus, the additional burdens and restrictions on voting contained in SB1 are not, and cannot be, justified by invoking unspecified and unproven voter fraud.

4.      Rather, as described further below, SB1 is a reaction to Texas's changing electorate, which is now more racially diverse and younger than ever before.  Indeed, minority voter turnout in Texas in the 2018 mid-term election was dramatically higher than the 2014 mid-term, and turnout in the 2020 General Election—even in the face of COVID-related challenges—was higher than for any general election in the state since 1992.  Local election officials and community organizations throughout the State helped Texas voters fulfill their commitment to exercising their rights.  This effort—and the resulting success—merits universal praise.  Instead, however, the Texas Legislature responded to these community success stories by making baseless claims of threats to "election integrity," outlawing the very election procedures that made the 2020 election a success, and imposing additional requirements that will make it even harder for Texans—especially those in Texas's growing minority populations—to participate in our democracy.

5.      Each of SB1's limitations described above and below violates federal law and will cause irreparable harm to Plaintiffs and citizens of Texas more broadly.  In particular, SB1's new

---

[3] House Committee on Oversight & Reform, Democracy in Danger: The Assault on Voting Rights in Texas (July 29, 2021) https://oversight.house.gov/legislation/hearings/democracy-in-danger-the-assault-on-voting-rights-in-texas.

restrictions on voter assistance violate Sections 2 and 208 of the Voting Rights Act of 1965[4] and the Americans with Disabilities Act.[5]  SB1's ill-defined prohibition on "vote harvesting" violates both the First Amendment and the Fourteenth Amendment's Due Process Clause because these provisions criminalize protected speech and are unconstitutionally vague.  The provisions on poll watcher obstruction are similarly vague—putting poll workers at risk of arbitrary prosecution. SB1's restrictions on the exercise of the right to vote violate the First and Fourteenth Amendments by unduly burdening voting rights and impermissibly limiting free speech of voter assistors. Lastly, as set forth below, SB1 intentionally discriminates against Texas minority voters in violation of the Fourteenth and Fifteenth Amendments and Section 2.

6.      Plaintiffs respectfully request that the Court declare that the challenged provisions of SB1 are unlawful and enjoin Defendants from enforcing the challenged provisions.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because the claims in this action arise under federal law and seek to redress the deprivation of federal civil rights, including the right to vote.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants reside in Texas, and Defendants perform their official duties in this district.

---

[4] 52 U.S.C. §§ 10301 and 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice.").

[5] 42 U.S.C. §§ 12131, *et seq*.

### III.    PARTIES

**A.    Plaintiffs**

9.    Plaintiff LA UNIÓN DEL PUEBLO ENTERO ("LUPE") is a non-partisan membership organization founded by labor rights activists César Chávez and Dolores Huerta. LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement.  To promote civic engagement in the communities it serves, LUPE conducts know-your-rights discussions and membership meetings, participates in issue-focused advocacy, campaigns to support or oppose nonpartisan ballot measures through in-person canvassing, connects its members to social services, conducts census outreach, and conducts voter registration, education, and non-partisan get-out-the-vote campaigns (GOTV).  As part of their voter canvassing activities, LUPE members and paid staff interact with voters at the voters' homes, including in the physical presence of a ballot voted by mail.

10.    LUPE's individual members include registered voters who require assistance with voting in-person at the polling place, voting by mail, and voting curbside, as well as individuals who serve as assistors. LUPE is headquartered in San Juan, Texas, and its members primarily reside in Hidalgo, Cameron, Willacy, and Starr Counties, Texas.  LUPE has more than 8,000 members, including Latinos, U.S. citizens, and registered voters, some of whom are disabled. These voter members have disabilities that limit major life activities, including disabilities that limit their ability to walk, climb stairs, write or mark a ballot, interact with other people or otherwise navigate the polling place and voting process.  Some LUPE members are voters who are limited English proficient.  LUPE's disabled voter members require accommodations in the voting process that are prohibited by the challenged provisions of SB1.  Some of LUPE's voter members who are disabled and/or limited English proficient rely on assistors to vote. LUPE has organizational and associational standing to bring this lawsuit.

11.     Plaintiff FRIENDSHIP-WEST BAPTIST CHURCH ("FRIENDSHIP-WEST") is a non-partisan religious organization in Dallas County that serves a predominantly Black congregation of more than 12,000 members, a substantial number of whom are registered to vote in Texas.   To promote democracy and voter engagement in the community it serves, FRIENDSHIP-WEST serves as a polling place, provides voter education, and encourages its congregants and others to register, to vote, and to serve as poll workers and volunteer deputy registrars.   FRIENDSHIP-WEST has organizational and associational standing to bring this lawsuit.

12.     Plaintiffs ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST, AND TEXOMA REGIONS ("ADL") are made up of the regional offices of the non-partisan Anti-Defamation League in Texas.   ADL has at least 23,000 supporters who are Texas residents, a substantial number of whom are registered to vote in Texas.   ADL also has approximately 250 regional board members throughout Texas, a substantial number of whom are registered to vote in Texas.   ADL's mission in Texas, consistent with their national organization's overall mandate, is to protect the civil rights of all persons, eliminate vestiges of discrimination, racism, extremism, and antisemitism within communities in Texas, and to fight hatred in all its forms.   ADL has organizational standing to bring this lawsuit.

13.     Plaintiff SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT ("SVREP") is a nonprofit and non-partisan organization committed to promoting and increasing participation of Latino and other minority communities across the United States in the democratic process through voter registration, voter education, and voter participation activities.   In Texas, SVREP conducts voter registration and organizes non-partisan get-out-the-vote drives to remind

voters of election dates and to inform them about requirements for voting. SVREP has organizational standing to bring this suit.

14.     Plaintiff TEXAS IMPACT is a nonprofit, non-partisan, multi-denominational organization working to put faith into action by equipping faith leaders and their congregations with information, opportunities, and outreach tools to educate communities and engage with lawmakers on pressing policy issues. TEXAS IMPACT is comprised of dozens of member organizations, hundreds of member congregations, and more than 22,000 individual members who span the partisan spectrum and represent different ethnicities and denominations. TEXAS IMPACT's individual members include individuals who are registered to vote in Texas; individuals who require assistance with voting in-person at the polling place, by mail, and curbside; individuals who serve as assistors; and individuals who serve as poll workers and volunteer deputy registrars. TEXAS IMPACT also has members that take positions on ballot measures. To further its mission, TEXAS IMPACT works to ensure that all eligible Texans can exercise their right to vote free from suppression. To advance that goal, TEXAS IMPACT and its members (at all three levels: denominational bodies, congregations, and individuals) (a) assist voters with registration and voting; (b) educate voters on their rights, including eligibility to vote, eligibility to vote by mail, and polling place locations; and (c) encourage members and others to volunteer as volunteer deputy registrars and poll workers. TEXAS IMPACT has organizational and associational standing to bring this lawsuit.

15.     Plaintiff MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS ("MABA-TX") is a professional membership association of Latino lawyers located in Texas. MABA-TX is a multi-purpose organization, and its goals include, among other goals: to provide a forum and a means for lawyers to promote the social, economic and educational advancement of the people of

Texas; to speak on behalf of the Latino community on legal issues affecting the community; to serve the Latino populace as a professional association by providing services, assistance and advice on matters of legal concern to the community; to work through legislation, advocacy and education to accomplish these goals; and to preserve high standards of integrity, honor and professional courtesy among Latino lawyers. Members of MABA-TX include Latino registered voters who live throughout the State of Texas, including in Travis, El Paso and Dallas counties. MABA-TX has organizational and associational standing to bring this lawsuit.

16.     Plaintiff TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION ("TEXAS HOPE") is a nonprofit, membership organization that seeks to empower Latinos in Texas through civil engagement, civic education, and outreach. TEXAS HOPE's activities include helping register Latino citizens to vote, volunteering to take registered voters to the polls on election days, serving as poll watchers, administering voter education workshops, and conducting legislative advocacy on issues important to the Latino community including education, voting rights, immigrants' rights, healthcare, and housing. Members of TEXAS HOPE include Latino registered voters who reside throughout Texas including in the following counties: Bell, Bexar, Dallas, Denton, Ector, El Paso, Guadalupe, Harris, Lubbock, Tarrant, Tom Greene, Travis, Victoria, Wharton, and Williamson. TEXAS HOPE has organizational and associational standing to bring this lawsuit.

17.     Plaintiff JOLT ACTION is a nonprofit, membership organization whose mission is to increase the civic participation of Latinos in Texas to build a stronger democracy. JOLT ACTION conducts and trains community members to conduct non-partisan voter registration and voter mobilization, works to develop Latino youth leadership, promotes community and student organizing, and supports cultural activities. JOLT ACTION is a membership organization whose

members include Latino high school, community college, and university students, many of whom are Latino registered voters.   JOLT ACTION's members and paid staff assist voters who are disabled and/or limited English proficient.   JOLT ACTION has organizational and associational standing to bring this lawsuit.

18.     Plaintiff WILLIAM C. VELASQUEZ INSTITUTE ("WCVI") is a nonprofit and non-partisan public policy analysis organization that conducts research and works in Latino communities and with local leaders across Texas to increase Latino registration and voter turnout. WCVI's mission includes improving the level of political participation for all Latinos and other underrepresented communities.   WCVI analyzes and reports on Latino voter registration and participation and uses its research to educate and collaborate with Latino community leaders to increase Latino political participation.  WCVI conducts its work through policy seminars, social media campaigns and community workshops.  WCVI has organizational standing to bring this lawsuit.

19.     Plaintiff FIEL Houston Inc. ("FIEL") is a nonprofit, non-partisan membership organization based in Houston, Texas.  FIEL is an immigrant-led organization that advocates for just laws for immigrant youth, their families, access to higher education for all people regardless of immigration status, and access to justice for the Latino community.  FIEL was born out of the need for civic engagement in support of undocumented students seeking higher education and conducts organizing for the betterment of the communities it serves, including voter registration and civic education, phone-banking, census outreach, voter assistance, and other advocacy efforts. FIEL has approximately 11,000 members in the greater Houston area, including Latinos, U.S. citizens, and non-U.S. citizens.  FIEL members reside in parts of Texas where communities of color constitute significant portions of the population, including Harris County.  FIEL's individual

members include Latino registered voters who require assistance with voting in-person at the polling place and voting by mail, as well as individuals who serve as assistors. Some FIEL members are voters who are limited English proficient. Some of FIEL's voter members who are limited English proficient rely on assistors to vote. FIEL has organizational and associational standing to bring this lawsuit.

20.    Plaintiff JAMES LEWIN is a Texas voter residing in Austin, Texas. Mr. Lewin worked as a deputy election judge during the October 2020 early voting period. Mr. Lewin decided to work at the polls because he observed well-intentioned poll workers giving voters incorrect information in previous elections. Mr. Lewin wanted to ensure that polling places were staffed with informed workers who could provide correct information and guidance so that eligible voters could properly cast ballots that would count.

**B.    Defendants**

21.    Defendant the STATE OF TEXAS is one of the United States of America.

22.    Defendant JOHN B. SCOTT is the Secretary of State of Texas (the "Secretary"). The Secretary is "the chief election officer of the state," and the Texas Election Code "reflect[s] the Legislature's intent that election laws operate . . . under the direction and guidance of the Secretary of State."[6]

23.    Defendant Scott is a licensed attorney who previously served as lead attorney and signed an amended complaint on behalf of the plaintiff in *Donald J. Trump For President, Inc. et al. v. Boockvar et al.*, No. 4:20-cv-02078-MWB (M.D. Pa.), ECF No. 125, which (among other things) sued Pennsylvania's Secretary of State and county boards of elections seeking "[a]n order,

---

[6] TEX. ELEC. CODE § 31.001; *State of Texas v. Hollins*, No. 20-0729, 2020 WL 5919729, at *5 (Tex. Oct. 7, 2020).

declaration, and/or injunction that prohibits the [county boards of elections and Pennsylvania's Secretary of State] from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis." The amended complaint to which Defendant Scott was a signatory alleged on behalf of the plaintiff (among other things) that "[a]s part of the November 3, 2020 General Election, there are at least two Counties that had suspected instances of mail-in ballot fraud" and that "the disparate treatment between mail-in and in-person voters as to the verification of the voter's identity through signature verification has created an environment in Pennsylvania that encourages ballot fraud or tampering . . . ." *Id.* "[L]ess than 24 hours before oral argument was to begin, . . . Mr. Scott . . . requested this Court's permission to withdraw from the litigation."[7] The amended complaint was dismissed with prejudice and without granting leave to amend.[8]

24.     Under the Texas Election Code, Defendant Scott shall "obtain and maintain uniformity in the application, operation, and interpretation of [the] code and [other] election laws," "prepare detailed and comprehensive written directives and instructions" for "the appropriate state and local authorities," and "distribute these materials to the appropriate state and local authorities having duties in the administration of these laws."[9] The Secretary must also "assist and advise all election authorities with regard to the application, operation, and interpretation" of election laws.[10]

25.     Under Section 31.005 of the Texas Election Code (titled "Protection of Voting Rights; Enforcement"), the Secretary is authorized to "take appropriate action to protect" voting rights "from abuse by the authorities administering the state's electoral processes," which includes

---

[7] *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 909 (M.D. Pa. 2020).

[8] *Id.*

[9] TEX. ELEC. CODE § 31.003.

[10] TEX. ELEC. CODE § 31.004.

"order[ing] the person to correct the offending conduct."[11]  If the person "fails to comply with an order from the secretary of state under this section, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general."[12]

26.     Section 18.065 of the Texas Election Code requires the Secretary to "monitor each registrar for substantial compliance" with sections of the Texas Election Code.[13]  As described further below, SB1 layers on civil penalties for a registrar's failure to correct violations in the amount of "$1,000 for each violation corrected by the secretary of state under that subsection."[14]  Thus, the Secretary is directly involved in identifying violations and does, by correcting violations, directly affect the amount of the new civil penalty for which the registrar becomes liable.

27.     Texas election law requires the Secretary to "prescribe the design and content, consistent with this code, of the forms necessary for the administration of this code other than Title 15" such that the "design and content . . . enhance the ability of a person to understand the applicable requirements and to physically furnish the required information in the space provided."[15]  Among other things, the Secretary "shall design the form" for "registration by mail" and "shall prescribe the procedures necessary to implement this section" regarding the official form for registration by mail."[16]  The Secretary must also "maintain a supply of the official

---

[11] TEX. ELEC. CODE § 31.005(a)-(b); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020).

[12] TEX. ELEC. CODE § 31.005(c).

[13] TEX. ELEC. CODE §18.065.

[14] *Id.*

[15] *Hollins*, 620 S.W.3d 408 (citing TEX. ELEC. CODE § 31.002(a)).

[16] TEX. ELEC. CODE § 13.121.

application forms for ballots to be voted by mail and shall furnish the forms in reasonable quantities without charge to individuals or organizations requesting them for distribution to voters."[17]

28.     As described further below, under SB1, "[t]he secretary of state shall prescribe the form[s]" that must be completed and signed by persons providing assistance, including transportation and translation assistance, to voters.[18]

29.     Section 34.004 of the Texas Election Code provides that "[t]he secretary of state or a member of the secretary's staff may make inspections in the same manner as state inspectors whether or not a violation of election laws is suspected."[19]

30.     Under Section 34.005 of the Texas Election Code, "[t]he secretary of state may refer a reported violation of law for appropriate action to the attorney general, if the attorney general has jurisdiction, or to a prosecuting attorney having jurisdiction."[20]

31.     Under SB1, the Secretary is *required* to refer any and all "information indicating that criminal conduct in connection with an election has occurred" that he "receive[s] or discover[s]" to the Attorney General if the Secretary determines "that there is reasonable cause to suspect that criminal conduct has occurred."[21]  The Secretary is further required to "deliver to the attorney general all documents and information in the secretary's possession."[22]  This gives the

---

[17] TEX. ELEC. CODE § 84.013.

[18] *E.g.*, TEX. ELEC. CODE §§ 64.009(h), 64.0322(b).

[19] TEX. ELEC. CODE § 34.004.

[20] TEX. ELEC. CODE § 34.005.

[21] TEX. ELEC. CODE § 31.006(a).

[22] *Id.*

Secretary an active role in enforcing every provision of the Texas Election Code that may carry criminal penalties, including those challenged in the instant Second Amended Complaint.[23]

32.      Under Section 32.115 of the Texas Election Code, "[o]n request of a county executive committee or a county clerk, as appropriate, the secretary of state shall schedule and provide assistance for the training of election judges and clerks under Section 32.113 or 32.114" and "may provide similar training assistance to other political subdivisions."[24]

33.      The Secretary's website currently provides "Training and Education and Resources," including, among others, "Poll Worker Training"; "Volunteer Deputy Registrar Training"; an "Election Inspector Handbook"; and "Election Official Training Materials."[25]

34.      SB1 also provides that "[t]he secretary of state shall publish and maintain a training manual for watchers and shall make the manual available on the secretary of state's Internet website."[26] A "Poll Watcher's Guide[sic]" is currently available on the Secretary's website, but it has not been updated since November 2019.[27]

35.      As described further below, SB1 further gives the Secretary full authority to "prescribe any procedures necessary to implement" the sections of the Texas Election Code sections governing the "signature verification committee."[28]

---

[23] *E.g.*, TEX. ELEC. CODE §§ 15.028, 62.113, 33.051, 33.061, 64.034, 276.015, 276.016, 276.017.

[24] TEX. ELEC. CODE § 32.115.

[25] https://www.sos.texas.gov/elections/laws/education-resources.shtml.

[26] TEX. ELEC. CODE § 33.008.

[27] https://www.sos.texas.gov/elections/forms/pollwatchers-guide.pdf.

[28] TEX. ELEC. CODE §§ 87.0271(e).

36.     Defendant WARREN K. ("Ken") PAXTON is the Attorney General of Texas, the state's chief law enforcement officer.  He is sued in his official capacity.

37.     The Attorney General is Texas' chief law enforcement officer, with a "freestanding sovereign interest" in enforcing Texas law.[29]

38.     According to the Attorney General's website, Defendant Paxton's "role in enforcing the election laws" includes "statewide investigation authority and concurrent prosecution authority with local elected prosecutors over the election laws of the State" as well as having "deep experience and specialized resources to help train or assist local law enforcement and prosecution in working up complex and challenging election fraud cases."[30]  The Attorney General's website specifically notes that "Chapter 273, Texas Election Code, gives the OAG authority to investigate and prosecute election code violations anywhere in Texas."[31]  The Attorney General has prosecuted alleged violations of Texas's election laws alongside, or instead of, local district attorneys.[32]  Defendant Paxton also claims his office is "currently prosecuting over 500 felony election fraud offenses in Texas courts."[33]

---

[29] *City of Austin v. Abbott*, 385 F. Supp. 3d 537, 545 (W.D. Tex. Mar. 25, 2019).

[30] https://www.texasattorneygeneral.gov/initiatives/election-integrity (responding to question "What is the Office of the Attorney General's role in enforcing the elections laws?").

[31] *Id.* (responding to question "How are election fraud cases referred to the Office of the Attorney General?").

[32] https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-joint-prosecution-gregg-county-organized-election-fraud-mail-balloting-scheme.

[33] *See* Press Release, Ken Paxton, Attorney General of Texas, AG Paxton Announces Formation of 2021 Texas Election Integrity Unit (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.

39.    Although the Texas Court of Criminal Appeals recently held that Defendant Paxton lacks constitutional authority to unilaterally prosecute criminal offenses created by the Election Code, *see State v. Stephens*, --- S.W.3d ---, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021), Defendant Paxton may still assist the prosecuting district or county attorney upon request, *see id.* (citing *Saldano v. State*, 70 S.W.3d 873, 880 (Tex. Crim. App. 2002)); *see also* TEX. GOV'T CODE § 41.102.[34]

40.    Furthermore, Defendant Paxton is also charged with enforcing the civil provisions of the Texas Election Code, including Section 8.01 of SB 1, codified at Texas Election Code Section 31.129.

41.    Defendant Paxton has also recently filed suit on behalf of the State of Texas to enforce provisions of the Texas Election Code and to restrict the actions of a local election official, including by preventing him from mailing out mail ballot applications to many eligible voters unless those voters first submitted a request.[35]

42.    As described further below, Defendant Paxton has stated that prosecution of election-related offenses is one of his priorities.  For example, Defendant Paxton recently announced the formation of his "2021 Texas Election Integrity Unit," which he describes as a concentrated effort to devote agency lawyers, investigators, support staff, and resources to

---

[34] In the State Defendants' Motion to Dismiss the First Amended Complaint, they admit that the State of Texas and the Attorney General believe that *Stephens* was "wrongly decided" and "has filed a motion asking the Texas Court of Criminal Appeals to reconsider its decision." State Defs.' Mtn. to Dismiss the LUPE Plaintiffs' First Am. Compl. (ECF No. 176) at 1 n.2.

[35] *Hollins*, 2020 WL 5919729, at *5.

ensuring this local election season . . . is run transparently and securely."[36]  In fact, in the press release announcing the formation of his "2021 Election Integrity Unit," Defendant Paxton refers to himself as a "national leader in election integrity," brags about the "many elections administrators" that have been "held accountable for attempts to bend or break the boundaries of lawful practices" under his leadership, and claims his office is "currently prosecuting over 500 felony election fraud offenses in Texas courts."[37]

43.    Defendant MICHAEL SCARPELLO is the Elections Administrator of Dallas County.  He is sued in his official capacity.

44.    Defendant LISA WISE is the Elections Administrator of El Paso County.  She is sued in her official capacity.

45.    "In general, local election officials administer Texas elections.  They receive and review ballot applications, Tex. Elec. Code § 86.001, mail carrier and ballot envelopes to voters, id. § 86.002, receive and process marked ballots, id. §§ 86.006, 86.007(b), 86.011, verify voter signatures, *id.* § 87.027(i), and count the results, *id.* § 87.061."[38]

46.    Under Section 31.043 of the Texas Election Code, "[t]he county elections administrator shall perform: (1) the duties and functions of the voter registrar; (2) the duties and functions placed on the county clerk by this code; (3) the duties and functions relating to elections

---

[36] OFFICE OF THE ATTORNEY GENERAL, *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit* (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.

[37] *Id.*

[38] State Defs.' Mtn. to Dismiss the LUPE Plaintiffs' First Am. Compl. (ECF No. 176) at 23 (identifying local election officials as the administrators of elections properly subject to suit).

that are placed on the county clerk by statutes outside this code, subject to Section 31.044; and (4) the duties and functions placed on the administrator under Sections 31.044 and 31.045."[39]

47.     Under Section 83.002 of the Texas Election Code, "[t]he county clerk is the early voting clerk for the county in: (1) the general election for state and county officers and any other countywide election held at county expense; (2) a primary election; and (3) a special election ordered by the governor."[40]

48.     Defendant JOHN CREUZOT is the Dallas County District Attorney.  He is authorized to investigate and prosecute violations of the Texas Election Code in Dallas County. He is sued in his official capacity.

49.     Defendant YVONNE ROSALES is the El Paso County District Attorney.  She is authorized to investigate and prosecute violations of the Texas Election Code in El Paso County. She is sued in her official capacity.

50.     Defendant JOSÉ GARZA is the Travis County District Attorney.  He is authorized to investigate and prosecute violations of the Texas Election Code in Travis County.  He is sued is his official capacity.

51.     Under the Texas Election Code, Defendants Scarpello, Wise, Creuzot, Rosales, and Garza are responsible for implementing and enforcing a number of SB1's challenged provisions in their respective counties, including the new law's restrictions on voter assistance, SB1 §§ 6.01(f), 6.01(g), 6.03(b), 6.04, 6.05(e), and 6.06(c), and the "vote harvesting" provision, *id.* § 7.04(h).[41]

---

[39] TEX. ELEC. CODE § 31.043.

[40] TEX. ELEC. CODE § 83.002.

[41] TEX. ELEC. CODE §§ 64.009, 64.0322, 64.034, 86.010, and 86.0105.

52.     Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza are charged with enforcing and will enforce the provisions of SB1 challenged here.

## IV.     FACT BACKGROUND

### A.     Texas law has long restricted Latino and Black citizens' right to vote.

53.     SB1 is the latest chapter in Texas's "long, well-documented history of discrimination" against Latino and Black citizens in the voting and electoral processes.[42]

54.     From as early as 1845, the year Texas gained its statehood, the government has suppressed Latinos' political participation.  Laws prohibited Texans from using the Spanish language and Mexican-Americans from serving as election judges.

55.     Texas continued to formally disenfranchise Latino and Black citizens throughout the 19th and 20th centuries.  In 1902, Texas voters approved a constitutional amendment requiring poll taxes, the "primary purpose" of which was a "desire to disenfranchise the Negro and the poor white supporters of the Populist Party."[43]  The poll tax also disenfranchised Latino citizens, many of whom could not afford it.  Texas maintained a poll tax until the Supreme Court found such taxes unconstitutional in 1966.[44]

56.     In the late 19th and early 20th centuries, the Texas Legislature expanded poll watchers' power to challenge voters (without any requirement of substantiating evidence), which facilitated discriminatory and abusive challenges to voter eligibility in an apparent attempt to disenfranchise voters of color.[45]  Among other restrictions, the law included notorious Terrell

---

[42] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (quoting *Vera v. Richards*, 861 F.Supp. 1304, 1317 (S.D. Tex. 1994).

[43] *United States v. Texas*, 252 F. Supp. 234, 245 (W.D. Tex. 1966).

[44] *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966).

[45] Nicolas Riley, Brennan Ctr. for Justice, Voter Challengers 9–10 (2012), https://www.brennancenter.org/our-work/research-reports/voter-challengers.

election laws, which included a poll tax and provisions giving rise to "white primaries"[46] that also served to disenfranchise Black and Latino voters. One Texas newspaper declared that the white primary "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards."[47] This law remained in effect in some form until its 2003 repeal.[48]

57.    In the early 20th century, Texas Rangers actively discouraged Latinos from voting by selectively investigating them and scaring would-be voters by suggesting they would be imprisoned for voting if illiterate. The mere presence of armed Rangers at polling stations understandably intimidated Latino voters.

58.    In the early 20th century, on multiple occasions, mobs gathered at polling places to prevent Latinos from voting. In one such incident, the so-called "Good Government League" assaulted the Weslaco barrio election box, and the crowd reportedly shouted, "Don't let those Mexicans in to vote. Throw them out." Latino participation decreased as a result.

59.    In recent years, federal courts have overturned another insidious form of voting discrimination in Texas in the form of redistricting efforts. In 2006, the U.S. Supreme Court invalidated Texas's 2003 congressional redistricting plan, ruling the plan "b[ore] the mark of intentional discrimination" against Latinos.[49] In 2012, a federal court held Texas acted with

---

[46] *Id*. at 10, n. 75.

[47] DAVID MONTEJANO, ANGLOS AND MEXICANS IN THE MAKING OF TEXAS 1836–1986 144 (1986).

[48] *Id*. at 17.

[49] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006). In its reasoning, the Supreme Court noted that Texas "took away [] Latinos' [electoral] opportunity because Latinos were about to exercise it . . . The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active." *Id*. Texas thus "undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive." *Id*. at 439.

discriminatory purpose or effect and denied preclearance to the state's 2011 state legislative and congressional maps under Section 5 of the VRA.[50]  A second federal court also concluded that Texas intentionally discriminated against Latino and Black voters with its 2011 congressional and state legislative plans in violation of the VRA and the U.S. Constitution.[51]

60.     In addition to discriminatory redistricting, Texas has adopted other illegal measures to suppress minority participation in elections.  In 2016, the Fifth Circuit affirmed a district court's decision that Texas's photo voter identification law, S.B. 14, had a discriminatory effect on Latino and Black Texans' rights in violation of Section 2 of the VRA.[52]  The district court observed:

> [S.B.] 14's voter I.D. requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African-Americans and Hispanic voters as compared to Anglo voters. In other words, [S.B.] 14 does not disproportionately impact African-Americans and Hispanics by mere chance. Rather, it does so by its interaction with the vestiges of past and *current* racial discrimination.[53]

As a result of this litigation, the Texas Legislature later replaced S.B. 14.[54]  Although that new law has survived legal challenge, this does not erase the judgment of the Court of Appeals that the Texas Legislature adopted measures that had a discriminatory effect on Texans of color, in violation of federal voting-rights laws.[55]

61.     In 2019, Secretary of State David Whitley attempted to purge Texas's voter rolls by falsely alleging that nearly 100,000 "non-U.S. citizens" were illegally registered to vote.  In

---

[50] *Texas v. United States*, 887 F.Supp.2d 133 (D.D.C. 2012).

[51] *Perez v. Abbott*, 390 F. Supp. 3d 803, 816 (W.D. Tex. 2019).

[52] *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016).

[53] *Veasey v. Perry*, 71 F.Supp.3d 627, 698 (S.D. Tex. 2014) (emphasis added).

[54] *See Veasey v. Abbott*, 888 F.3d 792, 797 (5th Cir. 2018).

[55] *See id.*

fact, many of these alleged "non-U.S. citizens" were Latino naturalized U.S. citizens properly registered to vote.  The data underpinning the proposed voter purge, however, did not show voters' current citizenship status, which the Secretary of State knew before attempting to remove 100,000 eligible voters from the voter rolls.[56]  A federal district court enjoined the purge, but not before counties sent "ham-handed and threatening correspondence from the state which did not politely ask for information but rather exemplifie[d] the power of government to strike fear and anxiety and to intimidate the least powerful among us."[57]

**A.    Before SB1, Texas was already among the states that made it hardest to vote.**

62.    Texas voting procedures are among the most onerous in the country.[58]  For example, Texas has "reduced the number of polling stations in some parts of the state by more than 50% and has the most restrictive pre-registration law in the country."[59]

63.    Although most states allow voting by mail without some special showing,[60] Texas reserves mail voting only for individuals who (a) are 65 or older; (b) are sick or disabled; (c) will be out of the county during the entire election period (early voting and election day); or (d) are confined to jail but otherwise eligible to vote.[61]

---

[56] Alexa Ura, *Texas Will End Its Botched Voter Citizenship Review and Rescind Its List of Flagged Voters*, THE TEXAS TRIBUNE (April 26, 2019), https://www.texastribune.org/2019/04/26/texas-voting-rights-groups-win-settlement-secretary-of-state/.

[57] *Texas League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

[58] Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state*, THE TEXAS TRIBUNE (Oct. 19, 2020), https://www.texastribune.org/2020/10/19/texas-voting-elections/.

[59] *Id.*

[60] NATIONAL CONFERENCE OF STATE LEGISLATURES, *VOPP: Table 1: States with No-Excuse Absentee Voting* (May 1, 2021), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx.

[61] TEX. ELEC. CODE §§ 82.001–82.004 (2020).

64.     Unsurprisingly, Texas's election laws yield one of the nation's lowest voter turnout rates; the state's turnout rate trailed the national average in 2016, 2018, and 2020 (*even after* factoring in the state's relative successes in 2018 and 2020 described below).[62]

**B.     The 2020 General Election tested Texas voters in unprecedented ways—and Texans passed with flying colors.**

65.     Leading up to the 2020 General Election, Texas voters began to increase their turnout dramatically.   In the 2018 mid-term election, Texas voter turnout increased by 18 percentage points compared with the previous midterms.   Texas Latinos increased their vote share by about five percentage points—from 14.4% to 19.1% of all votes cast (compared to the 2014 midterm election).   As a result, Texas Latinos cast 922,146 more votes in the 2018 General Election than the 2014 General Election.

66.     In the 2020 election, Texas again achieved record voter turnout, with Texans casting 11,315,056 total votes in the 2020 general election[63] in spite of the COVID-19 pandemic that has killed tens of thousands in the state.   A total of 66.73% of Texas's registered voters cast ballots—the highest voter turnout for any election since 1992 and more than 7% higher than Texans' 2016 General Election turnout.[64]

---

[62] U.S. CENSUS BUREAU, *Voting and Registration in the Election of November 2016* (May 2017), Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html; U.S. CENSUS BUREAU, *Voting and Registration in the Election of November 2018* (April 2019), Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html; U.S. CENSUS BUREAU, *Voting and Registration in the Election of November 2020* (April 2021), Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.

[63] TEX. SEC'Y OF STATE, *Texas Election Results*: *2020 November 3rd General Election*, https://results.texas-election.com/races (last visited Sep. 1, 2021).

[64] TEX. SEC'Y OF STATE, *Turnout and Voter Registration Figures*, https://www.sos.texas.gov/elections/historical/70-92.shtml (last visited Sep. 1, 2021).

67.     In the 2020 election officials and poll workers faced unprecedented obstacles as well as new threats to their health and safety.  Not only were they tasked with operating polling places during a pandemic, but they also faced threats and harassment from members of the public spurred on by conspiracy theories.[65]  These threats were particularly unsettling to communities of color.  In the face of these threats, Texas election officials struggled to find enough poll workers to do the job in 2020.[66]

68.     In 2020, the Latino turnout rate jumped to 56.45%; Latino votes constituted more than one-fifth of all votes cast in the 2020 General Election.  According to Census estimates, turnout among Asian-American voters increased by 15% and turnout among Black voters in Texas increased by more than 10%.

69.     The strong 2020 voter turnout was due in part to efforts by public officials throughout the State of Texas to make voting more accessible.  Community-based civic engagement and faith-based groups such as Plaintiff organizations also played a role in educating voters and encouraging them to cast lawful ballots.

70.     In May 2020, Secretary of State Ruth Hughes released a checklist of health protocols for voters and election officials.[67]  For voters, the guidance suggested maintaining six

---

[65] *See, e.g.*, Michael Wines, *Here Are the Threats Terrorizing Election Workers*, N.Y. TIMES (Dec. 3, 2020), https://www.nytimes.com/2020/12/03/us/election-officials-threats-trump.html.

[66] John Engel, *Central Texas Election Officials Confront Nationwide Shortage of Poll Workers*, KXAN (Sep. 11, 2020), https://www.kxan.com/news/your-local-election-hq/central-texas-election-officials-confront-nationwide-shortage-of-poll-workers/.

[67] TEX. SEC'Y OF STATE, *Health Protocols for voters*, https://www.sos.texas.gov/elections/forms/health-protocols-for-voters.pdf (last visited Sept. 2, 2021).

feet of distance where possible and recommended that voters exhibiting symptoms of COVID-19 "consider utilizing curbside voting" if they met eligibility requirements.[68]

71.     The guidance also referenced the right of voters to rely on the aid of voting assistants (including interpreters).[69]

72.     On July 27, 2020, Governor Abbott issued a proclamation extending the early voting period in light of the COVID-19 pandemic and suspending the restriction in Texas Election Code § 86.006 that only allowed in-person delivery of ballots on Election Day.[70]

73.     Local election officials across the state developed creative ways to make traditional voting methods more accessible, including extended voting hours and additional mail ballot drop-off locations.

74.     Some large counties, including Harris and Bexar counties, extended voting hours at in-person polling locations.  Harris County implemented 24-hour voting for one night during the early voting period.[71]  Bexar County kept polling places open until 10:00 p.m. for several days during the early voting period to accommodate additional voters.[72]  Certain counties also encouraged eligible voters to apply for mail ballots and to do so early.

---

[68] *Id.* at 2.

[69] *Id.* at 3, 7

[70] OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Issues Proclamation Extending Early Voting Period for November 3rd Election* (Jul. 27, 2020), https://gov.texas.gov/news/post/governor-abbott-issues-proclamation-extending-early-voting-period-for-november-3rd-election.

[71] Alexa Ura, *Here's How Texas Elections Would Change, and Become More Restrictive, Under the Bill Texas Republicans are Pushing*, TEX. TRIB. (Apr. 21, 2021), https://www.texastribune.org/2021/04/21/texas-voting-restrictions-senate-bill-7/.

[72] David Lynch, *Bexar County's Early Voting Locations Staying Open Later this Week*, KENS5 (Oct. 27, 2020), https://www.kens5.com/article/news/politics/elections/bexar-countys-early-voting-locations-staying-open-later-this-week/273-c7e85454-46c8-4d7b-a048-85f306fc8281.

75.     In addition to expanding traditional in-person and mail-in voting, election officials in some counties created new, safe ways to vote.  Harris County, for example, opened drive-thru voting sites, which were used by almost 127,000 early voters in the county.[73]

76.     Texas voters also sought mail ballots in record numbers.  For example, the Travis County Clerk's office received requests from 65,678 people before September 30, 2020.  By comparison, only 27,000 mail ballots were mailed out in the 2016 election.[74]

77.     However, as voters sought to protect their health during the pandemic by voting by mail, Governor Abbott and Defendant Attorney General Paxton responded by imposing obstacles that limited exercise of the franchise.  For instance, Governor Abbott issued a proclamation on October 1, 2020, that arbitrarily limited mail ballot drop-off locations to one per county regardless of physical size or population.[75]  Attorney General Paxton filed suit against the Harris County Clerk to prevent him from mailing out mail ballot applications to many eligible voters unless those voters first submitted a request.[76]

---

[73] Ten percent (10%) of Harris County's in-person early voters (approximately 127,000 voters) took advantage of drive-thru voting. Jolie McCullough, *Nearly 127,000 Harris County Drive-Thru Votes Appear Safe after Federal Judge Rejects GOP-Led Texas Lawsuit*, TEX. TRIB. (Nov. 2, 2020), https://www.texastribune.org/2020/11/02/texas-drive-thru-votes-harris-county/.

[74] Russell Falcon, *Travis County Voters can Request a Mail Ballot until Oct. 23*, KXAN (Sept. 30, 2020), https://www.kxan.com/news/your-local-election-hq/travis-county-voters-can-request-a-mail-in-ballot-until-oct-23/.

[75] OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Issues Proclamation Enhancing Ballot Security* (Oct. 1, 2020), https://gov.texas.gov/news/post/governor-abbott-issues-proclamation-enhancing-ballot-security.

[76] OFFICE OF THE ATTORNEY GENERAL OF TEX., *AG Paxton Sues Harris County Clerk to Prevent Him from Unlawfully Sending Out Millions of Unsolicited Mail-In Ballot Applications* (Aug. 31, 2020), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-sues-harris-county-clerk-prevent-him-unlawfully-sending-out-millions-unsolicited-mail.

**C.**     **Following a historically successful election, some Texas politicians made baseless allegations of cheating.**

78.     By official accounts, Texas's 2020 General Election was a resounding success.  The Texas Secretary of State's office reassured the public that Texas had a "smooth and secure" election in 2020.[77]

79.     Governor Abbott nonetheless announced that "election integrity" would be an "emergency item" for the Texas Legislature's 2021 term, claiming that "[i]n the 2020 election, we witnessed actions throughout our state that could risk the integrity of our elections and enable voter fraud."[78]  But Governor Abbott has struggled to identify examples of such actions or to identify people who witnessed them.[79]

80.     Tellingly, there were only 23 *total* voter fraud complaints filed in Texas in 2020.[80] And, although Attorney General Paxton's office has spent 22,000 staff hours investigating voter fraud in the 2020 Election, he has identified only 16 minor offenses out of more than 11,000,000

---

[77] Goldenstein *et al.*, *supra* note 1.

[78] OFFICE OF THE TEX. GOVERNOR, *Governor Abbot Delivers 2021 State of the State Address*, (Feb. 1, 2021), https://gov.texas.gov/news/post/governor-abbott-delivers-2021-state-of-the-state-address; OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Holds Press Conference on Election Integrity Legislation*, (Mar. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-holds-press-conference-on-election-integrity-legislation.

[79] Alexa Ura, *Gov. Greg Abbott Formally Opens Texas GOP Bid to Clamp Down on Local Efforts Expanding Voter Access*, TEX. TRIB. (Mar. 15, 2021), https://www.texastribune.org/2021/03/15/texas-voting-greg-abbott/.

[80] Jeremy Rogalski, *Despite National Outcry, Texas Received Relatively Few Voting Fraud Reports this Election*, KHOU-11 (Nov. 20, 2020), https://www.khou.com/article/news/investigations/texas-received-few-voting-fraud-reports/285-deec7c9a-581b-42b1-b430-4cae7aef5f26.

ballots cast.[81]   That means about 99.999% of ballots were cast untainted by so much as an allegation—let alone any proof—of fraud.

81.     There is no evidence of widespread voter fraud in the 2020 election (or other elections in Texas for that matter).  Nor is there evidence that there is a substantial risk of fraud in future elections that Texas's already-restrictive voting laws did not previously address.

**D.     The Texas Legislature takes up anti-voter legislation.**

82.     Against this backdrop of a successful and untainted election in Texas, the Texas Legislature began its determined effort to restrict voting in the name of "election integrity."[82]

83.     On March 11, 2021, Texas Senator Bryan Hughes introduced Senate Bill 7 ("SB7") in the Texas Legislature as a sweeping so-called "voting integrity" bill.  Although SB7 ultimately did not succeed, SB1 contains many of the same restrictions designed to intimidate and discourage Texas voters and, in particular, Texas's minority voters.

84.     SB1 (also introduced by Senator Hughes) was heard before the Senate State Affairs Committee on August 9, 2021, and voted out of committee that same day.  SB1 passed the Senate in the early morning of August 12, 2021 on a party-line vote, following a 15-hour filibuster by Senator Carol Alvarado.

85.     SB1 was heard before the House Select Committee on Constitutional Rights and Remedies on August 23, 2021.  During the hearing, the Committee Chair permitted two witnesses

---

[81] Taylor Goldenstein, *Fact Checking Texas Lawmaker's Claim of 400 Voter Fraud 'Cases'*, HOUSTON CHRONICLE (Apr. 12, 2021), https://www.houstonchronicle.com/politics/texas/article/Fact-checking-Texas-lawmaker-s-claim-of-400-16095858.php.

[82] *See* HERITAGE ACTION FOR AMERICA, *Heritage Action Launches Election Integrity Campaign, Commits Over $10 Million* (Mar. 8, 2021), https://heritageaction.com/press/heritage-action-launches-election-integrity-campaign-commits-over-10-million; HERITAGE FOUNDATION, *The Facts About Election Integrity and the Need for States to Fix Their Election Systems* (Feb. 1, 2021), https://www.heritage.org/election-integrity-facts.

to testify virtually in favor of the bill without calling a vote to authorize virtual testimony or alerting the public that such testimony would be permitted.  At that time Texas was facing a surge of COVID-19 cases which discouraged in-person public participation in the hearing.   The Committee passed SB1 that same day.

86.     The House debated SB1 on August 26, 2021, and adopted seventeen amendments to the bill.

87.     The House passed SB1 on August 27, 2021.

88.     The House and Senate convened a conference committee, which issued its report to each chamber on August 30, 2021.

89.     The Senate and the House both passed the SB1 conference committee report on August 31, 2021, and the Legislature sent SB1 to the Governor for his signature on September 1, 2021.

90.     After the Legislature passed SB1, the Governor publicly stated that "[p]rotecting the integrity of our elections is critical in the state of Texas, which is why I made election integrity an emergency item during the 87th Legislative Session."[83]

91.     The Governor signed SB1 into law on September 7, 2021.

92.     SB1 went into effect on December 2, 2021.

93.     The next "Uniform Election Date" in the State of Texas is scheduled for November 8, 2022.

---

[83] OFFICE OF THE TEX. GOVERNOR, *Governor Abbott Statement On Passage Of Election Integrity Legislation* (Aug. 31, 2021), https://gov.texas.gov/news/post/governor-abbott-statement-on-passage-of-election-integrity-legislation.

**E.      State officials, including the Secretary, commence a "forensic audit" of Texas elections.**

94.      On September 23, 2021, the Secretary announced a "[f]ull [f]orensic [a]udit of 2020 General Election in [f]our [c]ounties."[84]  The news release stated that "[u]nder existing Texas laws, the Secretary of State has the authority to conduct a full and comprehensive forensic audit of any election and has already begun the process in Texas' two largest Democrat counties and two largest Republican counties—Dallas, Harris, Tarrant, and Collin—for the 2020 election."[85]

95.      According to materials available on the Secretary's website, part of the audit process includes "identif[ying] potential non-U.S. citizen voters" and "direct[ing] county voter registrars to take action to verify the eligibility of registered voters and cancel their registration if they do not present proof of eligibility."[86]  Moreover, "[o]nce that action has been taken," the Secretary's office "evaluates the persons cancelled and refers any instances of possible illegal voting to the Office of the Texas Attorney General for investigation (Sec. 31.006)."[87]

96.      The forensic audit will also include an examination of, among many other things, "Signature Verification Committee Materials."[88]

---

[84] https://www.sos.state.tx.us/about/newsreleases/2021/092321.shtml

[85] *Id.*

[86] https://www.sos.state.tx.us/about/forms/9-28-21-forensic-audit-summary.pdf.

[87] *Id.*

[88] *Id.*

97.     On November 19, 2021, Governor Abbott approved transferring $4 million in funding from Texas's state budget to the Secretary's office to establish an entirely "new Election Audit Division" tasked with "conducting comprehensive forensic audits in the State of Texas."[89]

**F.     State officials, including the Attorney General, support increased criminal penalties for so-called "illegal voting."**

98.     Still without any evidence of widespread voter fraud in the State of Texas, on September 30, 2021, Governor Abbott sent a letter to the Secretary of the Texas Senate calling for "[l]egislation increasing the penalties for illegal voting that were reduced in Senate Bill No. 1 that passed in the 87th Legislature, Second Called Session."[90]  In a September 30, 2021 press release, Governor Abbott praised the "tremendous progress" made by the State of Texas "in upholding the integrity of our elections," and stated that, "[b]y increasing penalties for illegal voting, we will send an even clearer message that voter fraud will not be tolerated in Texas."[91]

99.     According to Lieutenant Governor Dan Patrick, the amendment lowering the criminal classification from a second degree felony to a Class A misdemeanor was "added last minute" by the House "& went under the radar until Gov., @TXAG & I found it & agreed then it must be corrected.  The Senate will pass next week."[92]

---

[89]     https://gov.texas.gov/news/post/governor-abbott-approves-funding-to-launch-election-audit-division-within-texas-secretary-of-states-office;    https://www.ktsa.com/gov-abbott-establishes-election-audit-division/.

[90] https://gov.texas.gov/uploads/files/press/MESSAGE_3rd_called_87th_adding_matter_to_call_IMAGE_09-30-21.pdf.

[91]  https://gov.texas.gov/news/post/governor-abbott-adds-illegal-voting-penalty-increase-to-third-special-session-agenda; *see also* Greg Abbott (@GregAbbott_TX), TWITTER (Sept. 30, 2021, 6:46 PM EST).

[92] Dan Patrick @DanPatrick, TWITTER (Sept. 30, 2021, 6:21 PM EST).

100.    These sentiments by the Governor and Lieutenant Governor were echoed by Defendant Paxton, who tweeted that it was "[a]n outstanding decision to demand increased penalties for vote fraudsters . . . . I will continue to muster all my resources to defend election integrity!"[93]

101.    On October 4, 2021, the Texas Senate's State Affairs Committee heard testimony from certain supporters and opponents of increasing criminal penalties for illegal voting and the Senate ultimately passed Senate Bill 10 ("SB10").  SB10 would have increased the penalty for illegal voting from a Class A misdemeanor to a second degree felony.

**G.    SB1 imposes burdens that will discourage, intimidate and deter eligible Texas voters, and will disproportionately impact voters of color and voters with disabilities.**

102.    The Texas Legislature's claims of voter fraud and voter integrity are merely pretexts for their actual purpose in enacting SB1, which is to make it harder for citizens of color and citizens with disabilities to cast their votes.  SB1 intentionally discriminates on the basis of race and national origin and is consistent with Texas' longstanding efforts to discriminate against citizens of color in Texas.

**1.    SB1 restricts the ability of eligible Texans, including voters who have limited English proficiency, disabilities, and less formal education, to access voter assistance.**

103.    As Representative Bernal testified before Congress, "[t]here are no cases of voter fraud relating to voter assistance."[94]

---

[93] Ken Paxton (@KenPaxtonTX), TWITTER (Oct. 1, 2021, 11:34 PM EST).

[94] HOUSE COMMITTEE ON OVERSIGHT & REFORM, *Democracy in Danger: The Assault on Voting Rights in Texas* (July 29, 2021), https://oversight.house.gov/legislation/hearings/democracy-in-danger-the-assault-on-voting-rights-in-texas.

104.    SB1 nonetheless targets eligible voters who vote with assistance, including voters who have limited English proficiency, disabilities, and/or less formal education.   The law's restrictions on voter assistance will deprive many voters of their right to choose their assistors, which will discourage and ultimately depress voter participation and have a particularly negative impact on Latino and Asian American voters.  Section 6.04 of SB1 also limits the type of assistance that a voter can receive to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot."[95]   As a result, many eligible voters will not receive the assistance to which they are entitled, which will impede their ability to vote or result in avoidable error on their ballots.  In addition, individuals who assist voters will be deterred and prevented from providing assistance by the new restrictions and penalties in SB1.

105.    According to data collected pursuant to Section 203 of the Voting Rights Act,[96] more than 277,000 voting-age U.S. citizens with limited English proficiency live in a Texas county that is not required to provide materials in their primary language.   These citizens are disproportionately Asian American and Latino.

106.    The Centers for Disease Control and Prevention estimates that 28% of adults in Texas have a disability.[97]  These Texans are disproportionately Black, representing more than 21% of all Texans with a disability, but only 13% of the overall population.

107.    SB1 imposes at least four new restrictions on assistance for voters.

---

[95] S.B. 1 § 7.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.034).

[96] 52 U.S.C. § 10503.

[97] Centers for Disease Control and Prevention, Disability and Health U.S. State Profile Data for Texas, last updated June 28, 2021, https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/texas.html.

108.    First, SB1 alters the oath that an assistor must take before providing assistance to a voter.  The revised language is both more onerous and more intimidating.

109.    Under Section 6.04 of SB1, an assistor must now swear that the voter "represented to [them] they are eligible to receive assistance."[98]  This effectively requires the assistor to obtain from the voter a statement of eligibility for voter assistance.  Because one's eligibility for voter assistance necessarily turns on personal and/or medical background and information, this requirement will invade the privacy of and deter voters who need assistance.  It will further deter individuals from serving as assistors out of fear of criminal prosecution for failing to secure the appropriate "representation" of eligibility from voters.

110.    The assistor's oath must be made "under penalty of perjury" and the assistor must swear "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."[99]  This additional language will cause assistors to question every voter's "need" for assistance, which further invades the voter's privacy and opens assistors to the threat of prosecution for any misstep.

111.    An assistor must also swear that they did not "pressure" the voter to choose them as the assistor.[100]  This requirement will deter assistors from helping or even volunteering to help voters out of fear that the assistor may be perceived as pressuring their selection as assistors.  This will deprive voters of access to their chosen assistors.  Indeed, on its face, this provision will

---

[98] S.B. 1 § 6.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.034).

[99] *Id.*

[100] *Id.*

deprive voters of assistance from the person most likely to provide it—i.e., a person who encourages the voter to seek assistance.

112.    Second, in addition to the oath, Section 6.03 of SB1 requires assistors to fill out a form stating the assistor's "relationship to the voter," and whether the assistor "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee."[101]  With respect to voting by mail, Section 6.05 of SB1 requires assistors to fill out additional information on the mail ballot carrier envelope—namely, the assistor's "relationship to the voter" and whether the assistor "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance." This new requirement for information will deter assistors and increase the risk that the ballot will be rejected because the assistor made a clerical error.

113.    Together with Section 6.04, these new requirements will slow in-person voting and burden the right to vote of those seeking assistance, as each voter's assistor must take time to both complete a form and recite an oath.

114.    Third, Section 6.06 of SB1 makes it a crime to compensate (or offer, solicit, receive, or accept compensation for) assistance to mail voters.  This prohibits assistors who work for non-profit civic engagement organizations and who conduct voter outreach from assisting mail voters who require such assistance to vote.[102]  It will also likely deter many other assistors who fear prosecution because the section defines "compensation" to mean any "economic benefit."

---

[101] S.B. 1 § 6.03, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.0322(a)).

[102] S.B. 1 § 6.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 86.0105); TEX. PENAL CODE § 12.35.

115.    Finally, Section 6.01 of SB1 discourages voter assistance by imposing limitations on transportation to the polls for curbside voting.  Any individual other than a close relative who provides transportation to the polls to seven or more curbside voters who are entitled to receive ballots at the polling place entrance or curb under Section 64.009 of the Texas Election Code must complete and sign a form that contains the driver's name and address and state whether the driver is providing only transportation assistance or is also providing assistance with voting.[103]  SB1 provides that the form shall be delivered to the Secretary of State and retained as an election record available to the Attorney General for inspection upon request.[104]  Even though giving rides to seven or more voters is not illegal, this requirement will deter individuals from giving these rides, further reducing access to voting for voters who need assistance and depriving them of assistance by their chosen assistors.  In addition, poll watchers are expressly permitted to observe "any activity conducted under this section," which will further deter voter assistance by invading the privacy of curbside voters who receive assistance.[105]

116.    As a result of these provisions, voters eligible for assistance will be deprived of assistance and assistors will be deterred from and denied the opportunity to assist voters.

**2.    SB1 opens the door to intimidation and misconduct at the polls by tying the hands of poll workers and election officials.**

117.    The ability of poll workers and election officials to effectively control and (if necessary) remove poll watchers who are unruly or are violating the law is critical to protecting the right to vote.

---

[103] S.B. 1 § 6.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 64.009(f), (f-1)).

[104] *Id.* (codified at TEX. ELEC. CODE § 64.009(g)).

[105] *Id.* (codified at TEX. ELEC. CODE § 64.009(e)).

118.    In 2009, a group of predominantly white volunteers known as the "King Street Patriots" went to polling stations in minority neighborhoods in Harris County and interfered with voting.  In 2010, a poll watcher in Harris County stood directly behind and hovered over voters. An election judge requested that the overzealous poll watcher step back, but the watcher responded, "I have the right to stand wherever I want!"  In 2020, individuals in militia gear were gathered near an early voting location in Fort Worth.  In Travis County, a poll watcher was arrested after attempting to record activities during early voting with a hidden camera on her clothing.  In a 2021 training for poll watchers, an individual with the Harris County Republican Party, with a stated goal of recruiting an "army" of watchers, argued that poll watchers from specific areas of Harris County must "have the confidence and courage" to act as poll watchers in the areas "where the fraud is occurring."  The areas that the individual referenced when describing where poll watchers were coming from are suburban areas that are predominantly white.  The areas that the individual claimed were "where the fraud is occurring" are neighborhoods that are predominantly inhabited by people of color in Houston.  There was no evidence of fraud occurring in those neighborhoods.

119.    SB1 makes the work of poll workers even harder by loosening restrictions on poll watchers and at the same time limiting poll workers' ability to carry out their duty of "preserv[ing] order and prevent[ing] breaches of the peace and violations of [the election] code in the polling place."[106]

120.    First, SB1 limits the ability of poll workers to manage unruly poll watchers.  Section 4.06 of SB1 creates a new *criminal* offense—making it a Class A misdemeanor for an election officer to "intentionally or knowingly refuse[] to accept a watcher for service when acceptance of

---

[106] TEX. ELEC. CODE § 32.075(a).

the watcher is required by this section."[107]   This provision effectively criminalizes refusing to accept a poll watcher even if the polling place official is reasonably concerned that the watcher will be unruly or will actually intimidate voters.

121.    Section 4.01 of SB1 also prohibits "[a] presiding judge" from having a poll watcher "removed from the polling place" for "violating a provision of this code or any other provision of law relating to the conduct of elections, other than a violation of the Penal Code," unless the election judge or a clerk personally observed the violation.[108]   SB1 thus allows poll watchers to avoid being removed from a polling place, even after they violate the Election Code, and if there were dozens of witnesses as long as the election judge or clerk were not among them.

122.    Second, the Texas Election Code already allowed poll watchers to sit in a convenient location and report any activity that concerned them, but now, Section 4.07 of SB1 guarantees poll watchers the right to "free movement where election activity is occurring within the location at which the watcher is serving."[109]   In other words, under SB1, poll watchers can essentially go wherever they please within a polling place, even if their presence intimidates those present or causes other disruption.

123.    Third, Section 4.09 of SB1 adds that the existing offense of "knowingly prevent[ing] a watcher from observing an activity or procedure" now specifically includes "taking *any action* to obstruct the view of a watcher or distance the watcher from the activity or procedure

---

[107] S.B. 1 § 4.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.051(g)).

[108] S.B. 1 § 4.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 32.075(g)).

[109] S.B. 1 § 4.07, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.056(e)).

to be observed in a manner that would make observation not reasonably effective."[110]  There is no protection for poll workers taking routine actions of election administration that by chance obstruct the view of a poll watcher, provided such actions were taken "knowingly."  Similarly, there is no protection for poll workers who position themselves between a voter and a disruptive watcher in order to protect the privacy of the voter.

124.    Section 8.01 of SB1 adds another new provision to the Election Code, codified at TEX. ELEC. CODE § 31.129, entitled "Civil Penalty."  Subsection (b) of that provision states that "a[n] election official may be liable to this state for a civil penalty if the official: (1) is employed by or is an officer of this state or a political subdivision of this state; and (2) violates a provision of this code." TEX. ELEC. CODE § 31.129(b); *see also* TEX. ELEC. CODE § 1.005(4-a) (defining "election official").  Subsection (c) specifies that a "civil penalty imposed under this section may include termination of the person's employment and loss of the person's employee benefits." TEX. ELEC. CODE § 31.129(c).

125.    Fourth, Section 4.10 of SB1 allows the parties and candidates that appoint poll watchers to seek injunctive, mandamus, or "any other remedy available under law" whenever they "believe[] that the watcher was unlawfully prevented or obstructed from the performance of the watcher's duties."[111]

126.    Together, these provisions will intimidate poll workers into allowing poll watchers to roam around the polling place and stand uncomfortably close to voters.  Permitting poll watchers to stand over voters, make disruptive noises, and hawkishly observe voting activities is designed

---

[110] S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.061(a) (emphasis added)).

[111] S.B. 1 § 4.10, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.063).

to, and will, have a chilling and intimidating effect on Texas voters, particularly Black, Latino and Asian American voters, who are members of historically marginalized groups.

127.    SB1's new definition of poll watcher obstruction also is unconstitutionally vague. Under the revised Section 4.09, it may be unlawful for an election worker to take "any action" (no matter how small) if it renders "observation not reasonably effective."[112]

128.    The phrase "not reasonably effective" is not defined in SB1 or elsewhere in the Texas Elections Code.  SB1 provides no guidance as to what makes a watcher's observation activities "reasonably effective" or when routine actions of election administration unlawfully reduce the "effectiveness" of a watcher's observation.  Thus, the statute provides no objective standard for conduct that could "obstruct the view of a watcher" in a manner proscribed thereby— clearing a pathway for arbitrary application.[113]

129.    This ambiguity deprives Plaintiff Lewin and other election workers of reasonable notice of how to comply with the law and avoid severe jail time or fines.

130.    This ambiguity will further deter Texans from becoming poll workers, augmenting the struggles election officials already face to staff each polling location.

131.    Ultimately the burdens imposed by SB1 will fall on voters, particularly voters of color.  Should poll watchers engage in behavior that intimidates or harasses voters or election workers, including hovering over them or trailing voters through the polling place, election workers run the risk of criminal prosecution if they attempt to stop such behavior.  The risk of such intimidation has historically been and will continue to be higher for voters of color.

---

[112] *Compare* Tex. Elec. Code § 33.061(a) (2020) *with* S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.061(a)).

[113] S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.061(a) (2021).

**3.    SB1 prohibits voting procedures that facilitated record voter participation in 2020, despite no evidence that these measures contribute to voter fraud.**

132.    Several important accommodations that local officials in large, diverse counties adopted to ensure safe, secure voting during the 2020 Election in light of the COVID-19 pandemic are outlawed or undermined by SB1.

133.    For example, during the 2020 Election, Harris County's 24-hour voting allowed more than 10,000 Harris County voters to cast ballots overnight.[114]  But Sections 3.09 and 3.10 of SB1 prohibit future efforts to increase access to the polls by requiring early voting clerks to restrict voting hours to between 6:00 a.m. and 10:00 p.m. on weekdays and the last Saturday of the early voting period, and to between 9:00 a.m. and 10:00 p.m. on the last Sunday of the early voting period.[115]

134.    SB1 also effectively prohibits local election officials from providing drive-thru voting—like Harris County did in 2020—despite the lack of any evidence to suggest a link between more convenient voting hours and fraud or irregularities of any kind.[116]

---

[114] Peter Holley, *Meet the Harris County Voters Who Showed Up After Midnight to Cast a Ballot*, Tex. Monthly (Oct. 30, 2020), https://www.texasmonthly.com/news-politics/harris-county-24-hour-voting/.

[115] S.B. 1 §§ 3.09, 3.10, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 85.005(a), (c), and 85.006(e)).

[116] Notably, following the success of Harris County's drive-thru voting program, a bipartisan task force of local Harris County officials released a report stating that the task force had not found "proof of any election tampering, ballot harvesting, voter suppression, intimidation or any other type of foul play that might have impacted the legitimate cast or count of a ballot." Alan Rosen *et al.*, Harris County Election Security Task Force Final Productivity Report, p. 8 (Dec. 17, 2020), available                                                                                                    at https://www.dropbox.com/s/7mzy6aws7fnzvy9/Elections%20Security%20Task%20Force%20fin al%20report%20PUBLC%20FINAL%2012-17-20%20442p.pdf?dl=0  (last  accessed  Sep. 1, 2021).

135.     In particular, Sections 3.04, 3.12, and 3.13 of SB1 require polling places and early voting sites to be located "inside" buildings.[117]  Section 3.04 also expressly prohibits voting "from inside a motor vehicle" unless the voter meets other requirements.[118]  Further, except in the case of a natural disaster, "[a] polling place may not be located in a movable structure …."[119]

136.     SB1's additional requirements for mail ballots increase the likelihood that ballots submitted by eligible voters will be rejected based on a technicality.  Sections 5.07 and 5.13 require a clerk to reject any mail ballot or mail ballot application if the required information does not identify "the same voter identified on the applicant's application for voter registration . . . ."[120] This requires election clerks to reject otherwise valid mail ballots and mail ballot applications from voters eligible to vote by mail where, for example, the voter inadvertently omits their ID number or other required information, or where the clerk lacks ID information in the voter's record on file, even when the clerk can verify the voter's application or mail ballot envelope through other means.

---

[117] See S.B. 1 §§ 3.04, 3.12, 3.13, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 43.031; 85.061(a) (adding that an early voting location "shall be located *inside* each branch office" and not in a tent) (emphasis added), 85.062, respectively).

[118] S.B. 1 § 3.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 43.031(b)); S.B. 1 § 6.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 64.009).

[119] See S.B. 1 § 3.13, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (to be codified at TEX. ELEC. CODE §85.062); see also S.B. 1 §§ 3.04, 3.11, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at § 43.031, 85.061(a), respectively).

[120] See S.B. 1 §§ 5.07 and 5.13, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code §§ 86.001(f), 87.041(b)(8), respectively).  The corresponding provisions §§ 5.02 and 5.08 impose new requirements that a voter provide an ID number on the mail ballot application and mail ballot carrier envelope, respectively.

**4.    SB1 criminalizes otherwise lawful voter assistance by community-based non-partisan organizations through vague and overbroad "vote harvesting" prohibitions.**

137.    SB1 takes aim at community-based organizations that conduct non-partisan voter turnout activities and criminalizes these activities under the label "vote harvesting."

138.    Under Section 7.04 of SB1, a person commits an offense if he or she (a) "directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit;" (b) "directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services;" or (c) "knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services."[121]  Any violation is a third-degree felony, subject to a minimum of two years (and up to ten years) of jail time and a fine of up to $10,000.[122]

139.    SB1 defines "vote harvesting services" as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."[123]

140.    Section 7.04 of SB1 does not define "in-person interaction."  As a result, the statute does not limit the broad range of daily interactions that could come within the statute's prohibitions.[124]  SB1 on its face reaches pure speech, including political speech, so long as it is part of an "in-person interaction" somehow "in the physical presence of" an official ballot or a

---

[121] *Id.* (codified at TEX. ELEC. CODE § 276.015(b)–(d)).

[122] *Id.* (codified at TEX. ELEC. CODE § 276.015(f)); TEX. PENAL CODE § 12.34.

[123] *Id.* (codified at TEX. ELEC. CODE § 276.015(a)(2)).

[124] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX ELEC. CODE § 276.015(a)(2)).

mail ballot, and the speech is made with the intent to "deliver votes for a specific candidate or measure."

141.    Although SB1 requires a person to receive "compensation or other benefit" for a violation, the range of what could constitute "compensation or other benefit" is impossible for the average citizen to determine.  Section 7.04 of SB1 defines "benefit" to mean "anything reasonably regarded as a gain or advantage," no matter how minor, thus providing little guidance and little constraint on prosecutorial discretion.[125]

142.    This vague and overbroad offense will chill even ordinary interactions between family members, friends or neighbors.  For example, if a wife is a paid campaign worker for a local school bond issue and encourages her husband during dinner to support the local school bond issue when he casts his mail ballot while the mail ballot happens to be in the same room, then she could be found to have knowingly (i) interacted in-person with a voter (i.e., her husband), (ii) in the presence of his mail ballot, (iii) with intent to "deliver a vote" for the measure she supports (i.e., by supporting her choice on the measure), and (iv) received compensation from a campaign, sufficient to constitute "compensation" (i.e., her salary) under the inference set forth in Section 6.03.  In fact, under SB1's vote harvesting provisions, any person who works (or even volunteers) for a political campaign for a particular candidate or issue must now worry about the possible presence of a mail ballot anytime he or she discusses politics with a friend.  Similarly, an employee of any of a wide array of civic engagement organizations, including the Plaintiff organizations, could potentially be prosecuted under this provision by canvassing for a local measure (such as infrastructure improvements) and assisting a mail voter who invites her into the house and requests help voting.

---

[125] *Id*. (codified at TEX. ELEC. CODE § 276.015(a)(1)); *see also* TEX. PENAL CODE § 1.07(a)(7).

143.    As a result of these unusual provisions, SB1 will reduce voter participation by Texans who rely on assistance to cast their mail ballots.  Although these restrictions have the potential to burden all Texas voters, they will impose the greatest burdens on voters of color, language minority voters, elderly voters, low-income voters, and voters with disabilities.

**5.    SB1 further burdens state officials and expands investigation of voter registration applicants and registered voters, despite no evidence of widespread voter fraud.**

144.    As described above, there is simply no evidence that widespread voter fraud has occurred in any election administered by the State of Texas and its political subdivisions.  Nor is there any evidence of a substantial risk of such fraud given Texas's already strict voting laws.

145.    Nonetheless, SB1 effectively creates a pipeline for prosecution by sending names of possibly ineligible voters to law enforcement, even if the voters are in fact eligible or simply made a mistake.  Previously, the county voter registrar verified the voter's eligibility and removed ineligible voter from the rolls.  Under SB1 Section 2.04, however, if a person whom the voter registrar subsequently determines is not eligible to vote either registered to vote or voted in an election, the registrar must execute and deliver, "within 72 hours[,]" an affidavit with the relevant facts to the Attorney General, the Secretary of State, and the local prosecutor.[126]  The added threat of criminal prosecution will have a chilling effect on voter registration, particularly among groups, including Black, Latino and Asian American communities, who have been historically victimized by law enforcement.

146.    Section 2.04 also sweeps in and facilitates investigation and prosecution of perfectly legal activity by voters.  For example, a person could register to vote in her home county,

---

[126] *See* S.B. 1 § 2.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 15.028).

then move temporarily to a different county for work.  If the voter subsequently seeks exemption from jury duty because she is not present in her home county, the registrar can report the voter to law enforcement under SB1 as an ineligible person registered to vote even though the voter has committed no offense.

147.    Section 2.07 requires the Secretary of State to compare on a quarterly basis the lists of individuals who were excused from jury duty service for non-residence in the county with the statewide computerized voter registration list and to send notice to the voter registrar of the county.[127]  As with Section 2.04, properly-registered voters living temporarily away from home, as in the case of migrant workers, for example, may be purged from the voter roll as ineligible non-residents and targeted for prosecution.  This provision will also have a disparate impact on Latino voters.

148.    Section 2.06 of SB1 requires the Secretary of State to impose certain requirements on registrars who are not in substantial compliance with a provision or rule related to: (1) the delivery of the suspense list; (2) the cancellation following end of suspense list period; and (3) the electronic submission of information for maintenance of the statewide computerized voter registration list.  A county may also be held liable if the county's registrar "fails to take overt action to comply with" the imposed requirements.[128]  Section 8.01 of SB1 imposes a civil penalty on employees or officers of the state (and its political subdivisions) who violate a provision of the election code.  The civil penalties "may include termination of the person's employment and loss

---

[127] See S.B. 1 § 2.07, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE §§ 18.068(a), (a-1).

[128] See S.B. 1 § 2.06, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 18.065).

of the person's employment benefits."[129]  These additional penalties will force career officials to shift resources towards meeting tight deadlines for reporting voters for investigation and removing voters from the voter rolls—even in the absence of any pending election—just to avoid these penalties.

## H.   SB1 Will Harm Plaintiffs.[130]

149.   LUPE's members include Latino registered voters, some of whom have limited English proficiency and/or have limited formal schooling and limited literacy.  LUPE's members include Latino voters who require and use assistors of their choice to vote due to disability and/or inability or limited ability to read or write in English.  These voters use their chosen assistors to navigate the polling place, interact with poll workers, understand how to use the voting equipment and read, interpret, mark and cast the ballot.  Some of LUPE's members are illiterate because racially discriminatory practices in Texas prevented them from gaining a formal education.

150.   LUPE's members include voters who are disabled and require and use assistors of their choice, but who are not blind and can see and read the ballot.

---

[129] *See* S.B. 1 § 8.01, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 31.129(b), (c)).

[130] According to Fifth Circuit precedent, an association does not need to "set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing." *Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012); *id.* at 198 n.5 (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("[D]efendants cite to no authority -- nor are we aware of any -- that supports the proposition that an association must name names in a complaint in order properly to allege injury in fact to its members."). Where an association generally alleges "that some of its members" fall within the group of aggrieved citizens, the associational plaintiffs have "adequately alleged that some of its members were suffering a concrete, particularized injury" and have standing to proceed. *Hancock*, 487 F. App'x at 198–99; see *Lewis v. Hughs*, 475 F. Supp. 3d 597, 613 (W.D. Tex. 2020) (organizational plaintiffs had associational standing to challenge mail-in voting laws).

151.    LUPE members include voters with impairments that limit major life activities, including accessing the right to vote.  LUPE members include voters who require accommodations that SB1 limits or curtails with the imposition of new requirements for casting a ballot.  It will now be more difficult for LUPE members with disabilities to request a mail ballot, receive assistance with voting in person or by mail, or receiving a ride to the polls.

152.    LUPE's members also include voters who arrive at the polling place in a car with several individuals, including family members, as part of doing errands for the day, and have, and would in the future, use curbside voting or drive-thru voting.

153.    LUPE's members and staff include individuals chosen as assistors to assist voters with navigating the polling place, interacting with poll workers, understanding how to use the voting equipment and reading, interpreting, marking and casting the ballot.  LUPE's members and staff include individuals chosen as assistors to assist eligible voters with voting by mail, including helping the voters read, interpret, complete and return the application for ballot by mail and mail ballot.

154.    LUPE's members and staff include individuals who participate in in-person, door-to-door canvassing to support or oppose non-partisan ballot measures related to the development of infrastructure in the Rio Grande Valley colonias.  At times, a voter will ask a LUPE member or staff person who is canvassing to help the voter vote by mail.  Because LUPE's canvassing activities include in-person interaction with voters at their homes, including when a voter's mail ballot is in the home, LUPE members and staff are subject to investigation and prosecution under SB1's "vote harvesting" provisions.

155.    SB1 will injure LUPE by exposing the organization's paid staff and members to investigation and prosecution when they canvass for local measures (such as infrastructure

improvements) and either serve as a chosen assistor of a mail voter or advocate for a measure in the presence of a voter's mail ballot in the voter's home.

156.    SB1 will injure LUPE's members, including by depriving them of the assistors of their choice, which will cause LUPE members who vote in person to vote less than the complete ballot, not vote at all or make errors that will result in their ballot not being counted or being counted in a way that is contrary to the intent of the voter.  SB1 will also cause LUPE members who vote by mail to vote less than the complete ballot, not vote at all, or make errors that will result in their ballot not being counted or being counted in a way that is contrary to the intent of the voter.

157.    SB1 will also injure LUPE's members by extending wait times at the polling place as assistors are required to complete forms and take an oath for each assisted voter.

158.    SB1's requirements to provide additional information on mail ballot applications and carrier envelopes will injure LUPE's members by causing the rejection of their mail ballots when they make inadvertent clerical errors or where the clerk lacks ID information in the voter's record on file.

159.    LUPE's members include voters who will be intimidated by poll watchers roaming freely around polling places, watching and listening, and standing close to them while they vote.

160.    Members of LUPE include individuals who are migrant workers who are registered to vote.

161.    LUPE's members and staff include individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form; take an oath; and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds

the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.

162.    SB1 will force LUPE to divert its resources away from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of SB1 on its members.  LUPE has in the past, and will in the future, conducted GOTV activities aimed at Latino registered voters with low turnout.  LUPE has in the past, and will in the future, pay employees who, among their other duties: educate voters about an upcoming election; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  LUPE's employees have in the past, and will in the future, assisted voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code including assisting non-family members to prepare their ballots.

163.    Members of LUPE include individuals who volunteer to be assistors for family members and non-family members in connection with voting at the polls and by mail.  Members of LUPE include individuals who assist voters, including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote by mail including helping the voters prepare their mail ballots.  Members of LUPE include individuals who assist voters, including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using the voting equipment, reading and interpreting the ballot and recording a vote on the ballot.  Individual LUPE employees and/or members have in the past driven, and would plan in the future to drive, more than seven voters to the polls for curbside voting.

164.    SB1 will frustrate the mission of LUPE by reducing the number of people available to assist voters and reducing voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of turnout.  Members of LUPE face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and by mail.

165.    LUPE will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting. SB1 will also frustrate the mission of LUPE by reducing the number of people available to assist voters, and reducing the voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of voter turnout.  Members, employees, and the leadership of LUPE face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and vote by mail.

166.    SB1 will frustrate FRIENDSHIP-WEST's mission of encouraging its eligible congregants and community members, the majority of whom are Black, to register, to vote, and to serve as poll workers and volunteer deputy registrars, and will frustrate its ability to operate as a polling place.  FRIENDSHIP-WEST's congregants have already expressed hesitation to serve as poll workers in future Texas elections due to the lack of clarity around the impact of some of SB1's provisions and the several provisions that impose potential new criminal liability on poll workers.

167.    FRIENDSHIP-WEST has in the past and will in the future encourage civic education and participation among its congregants and in the communities it serves. FRIENDSHIP-WEST's voter engagement activities include registering eligible voters, hosting voter registrar trainings, providing written and online resources about in-person and mail voting,

holding events to encourage members to vote, recruiting poll workers and volunteer deputy registrars, and serving as a polling place.

168.    FRIENDSHIP-WEST's congregants include individuals who vote by mail and individuals who serve as poll workers.

169.    FRIENDSHIP-WEST believes it will have difficulty recruiting poll workers because of confusion about SB1's new rules and fear among volunteers about criminal prosecution.  Many of FRIENDSHIP-WEST's congregants who served as poll workers in previous elections, including the 2020 election, will be deterred from doing so in future elections because of potential harassment by poll watchers and the possibility of criminal prosecution if they regulate poll watcher conduct.

170.    FRIENDSHIP-WEST will also be required to divert and expend resources to conduct voter education; recruit, train, and manage new volunteers; and conduct community outreach to ensure that its congregants and community members comply with SB1's new, often confusing, and vague restrictions.  This is particularly true of the provision in SB1 that limits poll workers' ability to regulate poll watchers' conduct in polling places.  For the 2020 general election, FRIENDSHIP-WEST engaged in efforts to recruit its members to serve as poll monitors to watch poll watchers at polling places out of fear that poll watchers would intimidate and disrupt voters while they cast their ballots.  These fears are compounded now that poll watchers have, effectively, free movement within a polling location.  Indeed, in addition to planning events to explain the impact of SB1 on future elections, FRIENDSHIP-WEST also anticipates specifically conducting independent trainings for congregants who do choose to serve as poll workers, in addition to county-provided trainings, to ensure their congregants are aware of the limits SB1 places on poll

workers' ability to regulate poll watcher conduct so that their congregants are not exposed to criminal liability.

171.   ADL and its supporters will be irreparably harmed by SB1.  In 2020, ADL's outreach and education was aimed at ensuring voters had a plan for voting safely.  ADL worked to educate Texans on how to vote, when to vote, and where to vote, focusing primarily on early voting and mail-in voting (for eligible voters).  ADL provided information to a wide audience, including 700 schools participating in its "No Place for Hate" program.  ADL's voter education and outreach required its staff and volunteers to gather information from local election officials on the applicable rules in each jurisdiction, and those efforts were time consuming given 2020's rule changes and disinformation campaigns.

172.   ADL is similarly concerned with SB1's provisions that limit and criminalize voter assistance.  Although ADL does not directly assist voters with mail ballots or applications, it provides supporters with information about assisting voters.  ADL is concerned that by providing its at least 23,000 Texas supporters with information about how to assist voters with mail-in voting or applications, the organization would place itself and its supporters at risk of prosecution.

173.   ADL will be required to divert and expend resources on designing its voter education to properly inform Texas voters about SB1's new, often confusing and/or vague, provisions.

174.   SVREP will be irreparably harmed by SB1.  SVREP has in the past, and will in the future, encouraged civic education and participation in the communities it serves.  SVREP's voter engagement activities include registering eligible voters, hosting voter registrar trainings, providing written and online resources about in-person and mail voting (including information

about assisting disabled and language minority voters), and holding events to encourage community members to vote.

175.    SB1 will force SVREP to divert its resources away from its GOTV and leadership-building activities, which are central to its mission, in order to counteract the negative effects of SB1 on the community members and voters SVREP serves.  SVREP has in the past, and will in the future, conducted GOTV activities aimed at Latino registered voters with low turnout.  SVREP has in the past, and will in the future, employed paid canvassers to contact voters in person at their homes and: educate the voters about an upcoming election, and urge the voters to vote, encourage, offer and deliver assistance to the voters.  SVREP's paid canvassers have in the past, and will in the future, assisted voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code including assisting non-family members to prepare their ballots.

176.    Employees and volunteers of SVREP include individuals who encourage family members and non-family members to select them as assistors for voting at the polls and by mail. Employees and volunteers of SVREP include individuals who assist voters, including Latino elderly, disabled, limited English proficient and limited literacy voters, to vote by mail, including helping the voters prepare their mail ballots; employees and volunteers of SVREP include individuals who assist voters, including Latino elderly, disabled, and voters with limited English proficiency and limited literacy, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using the voting equipment, and reading and interpreting the ballot and recording a vote on the ballot.

177.    SVREP will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting.

178.    Employees and volunteers of SVREP conduct their activities with Latino registered voters, some of whom are limited English proficient and/or have limited formal schooling and limited literacy, including Latino voters who require and use assistors of their choice to vote due to disability or inability to read or write.  These voters use their chosen assistors to navigate the polling place; interact with poll workers; understand how to use the voting equipment; and read, interpret, mark and cast the ballot.

179.    SVREP's employees and volunteers conduct their activities individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form; take an oath and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.

180.    SB1 will also frustrate the mission of SVREP by reducing the number of people available to assist voters, and reducing the voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, and limited literacy rates, leading to low rates of voter turnout.  Volunteers, employees, and the leadership of SVREP face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and vote by mail.

181.    SVREP's volunteers and employees serve voters who are disabled and require and use assistors of their choice but who are not blind and can see and read the ballot, including curbside voters who arrive at the polling place in a car with several individuals, including family members, as part of doing errands for the day.  SVREP's volunteers and employees serve voters

who are illiterate because racially discriminatory practices in Texas prevented them from gaining a formal education.

182.    SB1 will irreparably harm TEXAS IMPACT, its individual members, its member organizations and member congregations, and their individual members.   TEXAS IMPACT manages a significant voter education campaign, conducts voter registration drives at churches, educates members about early voting, encourages members to vote, and distributes mail ballot applications to eligible voters through its Vote by Mail Captains program.   Twenty-five different congregations participated in that program in 2020, working to assist their elderly and disabled members in voting by mail during the pandemic.   TEXAS IMPACT's staff and interns were compensated for their work in the Vote by Mail Captains program, and TEXAS IMPACT and its member congregations provided funding and resources, including copying services and postage, to carry out the program.   TEXAS IMPACT also recruits volunteer deputy registrar and poll workers.

183.    TEXAS IMPACT will have difficulty recruiting poll workers because of confusion about SB1's new rules for partisan poll watchers and fear among volunteers of criminal prosecution for conduct that could "obstruct the view of a watcher."   Indeed, several of TEXAS IMPACT's individual members have already expressed hesitation to serve as poll workers in 2022 specifically because of SB1's poll watcher provision (Section 4.09).   And those who may plan to still serve as a poll worker have already started to prepare and alter their approach to engaging with poll watchers.

184.    SB1's new identification requirements for mail-in ballots impose an additional burden on mail voting, which a significant portion of TEXAS IMPACT members utilized during the 2020 election.   This provision, along with SB1's voter assistance provisions and signature

matching provisions will particularly harm the members of TEXAS IMPACT who are elderly or have disabilities for which they require assistance to vote, and who, due to age or disability, may not be able to hold a pen or write the same signature over time.

185.    TEXAS IMPACT's member organizations, member congregations, and individual members will be deterred from assisting voters who need it.  Members will also be deterred from assisting eligible voters because of SB1's enhanced information requirements and expanded oath requirement that limits what actions assistors may take to assist a voter without consideration of the range of needs of voters with disabilities and exposes assistors to potential criminal liability, and would require them to breach the privacy of a voter to confirm that the voter is eligible to receive assistance.

186.    TEXAS IMPACT has already diverted time and resources toward ensuring that its members comply with SB1's new, onerous, and often confusing and/or vague provisions.  TEXAS IMPACT hosted a two-and-a-half-hour event on November 13, 2021, to update and field questions from its members about the impacts of SB1.  Given the gravity of fear, concern, and confusion expressed about SB1 by TEXAS IMPACT members during and after this educational event, TEXAS IMPACT anticipates being required to continue diverting its resources toward educating its members about the harmful and confusing provisions of SB1.

187.    TEXAS IMPACT's individual members—and the individual members of its organizational members—include individuals who require assistance with voting in-person at the polling place, by mail, and curbside; and individuals who serve as assistors.  TEXAS IMPACT members also take positions on ballot measures.

188.    MABA-TX's members include Latino registered voters.

189.    MABA-TX's members include individuals chosen as assistors to assist eligible voters in the polling place and with voting by mail, including helping the voters navigate the polling place, interact with poll workers, read, interpret, complete and submit the ballot.

190.    MABA-TX's members include individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that assistors fill out a form, take an oath and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for engaging in activity that might be perceived to be "pressuring" a voter to use them as an assistor in violation of the required oath.

191.    SB1 will also injure MABA-TX's members by extending wait times at the polling place as assistors complete forms and take an oath for each assisted voter.

192.    SB1 will force MABA-TX to divert its resources away from its community education activities, which are part of its mission, in order to counteract the negative effects of SB1 on its members and the communities in which members practice.  MABA-TX has in the past, and will in the future, work to educate voters about upcoming elections, urge the voters to vote, and encourage, offer and provide assistance to the voters.

193.    Members of MABA-TX include individuals who volunteer to be assistors for family members and non-family members in connection with voting at the polls and by mail.

194.    MABA-TX will be required to divert resources to prepare new educational materials and conduct outreach to its members to educate them about SB1's new restrictions and requirements for assisting voters with mail and in-person voting.

195.    MABA-TX believes that SB1's negative effects on Latino voters will result in fewer Latinos casting ballots and the election of fewer Latino judges.  MABA-TX believes that SB1 will result in MABA-TX members practicing before less diverse judges.

196.    TEXAS HOPE and its members will be irreparably harmed by SB1.  Through its membership, Texas HOPE focused its 2020 efforts on GOTV strategies and encouraging Latinos to run for local office.  This included efforts to energize and educate voters.

197.    TEXAS HOPE's membership includes Latino voters who will be intimidated by poll watchers roaming freely around the polling place, watching and listening to voters, and standing close to them while they vote.

198.    TEXAS HOPE has members who qualify to vote by mail, and its membership will be harmed by the new barriers on mail voting imposed by SB1.

199.    TEXAS HOPE will be forced to divert resources to educate its membership about SB1's restrictions, the rights that voters still possess under the SB1 regime, and the continuing importance of voter participation.  For example, under SB1 partisan poll watchers have increased authority to get close to and possibly intimidate voters in the polling place. TEXAS HOPE will be required to divert resources into providing its members information about the rights of Latino voters to vote free of harassment in the polling place and recommended responses to voter harassment.

200.    Finally, due to its cumulative effect of suppressing Latino voters, laws such as SB1 depress Latino turnout by decreasing interest in and the convenience of voting.  In response, TEXAS HOPE will need to spend more of its resources on enfranchising and educating voters.  Specifically, resources TEXAS HOPE could have used to educate persons who could run for local office will need to be reallocated to its GOTV effort.

201.    SB1 will also hurt TEXAS HOPE members who have historically served as poll workers and election judges.  TEXAS HOPE believes it will have difficulty recruiting election workers because of confusion about SB1's new rules for partisan poll watchers and fear among volunteers about criminal prosecution.  Yet, political engagement, such as volunteering at the polls, is integral to TEXAS HOPE's mission of promoting Latino civil engagement.  Accordingly, TEXAS HOPE will have to divert additional resources to energize its members and the Latino community to serve as election officials.

202.    JOLT ACTION will be irreparably harmed by SB1.  JOLT ACTION has in the past, and will in the future, conduct GOTV activities, which are aimed at Latino registered voters with low turnout, and leadership-building activities, which are central to its mission.  In order to counteract the negative effects of SB1 on its members and the voters it serves, JOLT ACTION will be forced to divert its resources away from its GOTV and leadership-building activities.

203.    JOLT ACTION has in the past, and will in the future, employ paid canvassers to contact voters in person at their homes to, among other things, educate the voters about an upcoming election; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  JOLT ACTION's paid canvassers have in the past, and will in the future, assist voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code, including assisting non-family members to prepare their ballots.

204.    Members of JOLT ACTION include individuals who volunteer to be assistors for family members and non-family members in connection with voting at the polls and by mail. Members of JOLT ACTION include individuals who assist voters, including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote by mail, including helping voters prepare mail ballots.  Members of JOLT ACTION include individuals who assist voters,

including Latino, elderly, disabled, limited English proficient and limited literacy voters, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using voting equipment, reading and interpreting the ballot and recording a vote on the ballot.

205.    JOLT ACTION's membership and staff include individuals who have been chosen as assistors in the past and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form, take an oath, and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.  JOLT ACTION members, staff and volunteers have already expressed great concern about the liability they face when assisting voters. In response to these concerns related to SB1, JOLT ACTION has been forced to divert time and resources into a process in which they will decide whether to continue to offer voter assistance, which is critical to fulfilling their mission.

206.    SB1 will frustrate the mission of JOLT ACTION by reducing the number of people available to assist voters and reducing voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of turnout.  Members, employees, and the leadership of JOLT ACTION face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and by mail.

207.    JOLT ACTION will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-

person voting.  For example, JOLT ACTION must redirect its resources towards retraining and obtaining new materials because employees previously used iPad tablets to help voters request a mail ballot, but SB1 now requires that mail ballot applications be "submitted" in writing and signed "using ink on paper."

208.    WCVI will be irreparably harmed by SB1.  WCVI will be forced to divert resources away from research, policy seminars, and community workshops to mitigate the effects of SB1 on Latino voters. WCVI will be compelled to begin to work immediately with Latino leaders to ameliorate the negative effects of SB1, including undertaking time-consuming efforts to quell the fears of Latino voters about SB1's new voting restrictions and requirements,  explaining how limited English proficient voters may continue to utilize assistors of their choice for voting, and analyzing the scope of permissible assistance under SB1.  WCVI will be required to divert and expend resources on informing Texas Latino voters about SB1's new, often confusing and/or vague, provisions.

209.    FIEL and its members will be irreparably harmed by SB1.  SB1 will force FIEL to divert its resources away from its GOTV and leadership-building activities, which are central to its mission, in order to counteract the negative effects of SB1 on its members and the voters FIEL serves.  FIEL has in the past, and will in the future, conduct GOTV activities aimed at Latino registered voters with low turnout.  FIEL has in the past, and will in the future, employ paid canvassers to contact voters in person at their homes and educate the voters about an upcoming election, urge the voters to vote, and encourage, offer and deliver assistance to the voters.  FIEL's paid canvassers have in the past, and will in the future, assist voters in applying for and preparing their mail ballots as provided by Section 86.010 of the Texas Election Code including assisting non-family members to prepare their ballots.

210.    Members of FIEL include individuals who encourage family members and non-family members to select them as assistors for voting at the polls and by mail.  Members of FIEL include individuals who assist voters, including Latino elderly voters, disabled voters, and voters with limited English proficiency and limited literacy, to vote by mail including helping the voters prepare their mail ballots; members of FIEL include individuals who assist voters, including Latino, elderly, disabled, limited English proficiency and limited literacy voters, to vote in person at the polling place, including assisting voters in navigating the polling place, interacting with poll workers, using the voting equipment, reading and interpreting the ballot and recording a vote on the ballot.

211.    FIEL will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting.

212.    FIEL's membership and staff include individuals who are chosen as assistors and will be deterred from serving as chosen assistors by SB1's requirement that the assistor fill out a form, take an oath, and face criminal prosecution, conviction and punishment for inadvertently making a mistake on the form or with the oath, or for providing necessary assistance to voters that exceeds the scope of assistance described in the oath, or for encouraging a voter in a way that law enforcement officials will conclude is "pressur[ing]" a voter to use them as an assistor in violation of the required oath.

213.    SB1 will also frustrate the mission of FIEL by reducing the number of people available to assist voters, and reducing the voter turnout, of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of voter turnout.

Members, employees, and the leadership of FIEL face felony prosecution, conviction and punishment under SB1 for assisting voters to vote in person and vote by mail.

214.    FIEL's members include Latino registered voters, some of whom are disabled, have limited English proficiency and/or have limited formal schooling and limited literacy.  FIEL's members include Latino voters who require and use assistors of their choice to vote due to disability or inability to read or write.  These voters use their chosen assistors to navigate the polling place, interact with poll workers, understand how to use the voting equipment and read, interpret, mark and cast the ballot.

215.    Some of FIEL's members are illiterate because racially discriminatory practices in Texas prevented them from gaining a formal education.

216.    Members of FIEL include individuals who voted in Harris County in 2020 and cast ballots using drive-thru voting and/or temporary structures for voting, mail ballot applications proactively sent to them by election officials, and 24-hour voting.

217.    JAMES LEWIN was an election judge in the 2020 Election, and he intends to serve as an election judge in future Texas elections.  Election judges are election officials in Texas.  TEX. ELEC. CODE § 1.005(4-a)(E).  Before serving as an election judge in 2020, Mr. Lewin's greatest concern was that he and his team members would encounter disruption at the polls, including by poll watchers who sought to delay the voting process and discourage or intimidate voters. Fortunately, Mr. Lewin did not encounter any such disruptions during the 2020 Election. However, because SB1 limits election judges' ability to regulate poll watchers who engage in interference and intimidating conduct, and because SB1 creates risk of criminal prosecution for any "person" serving at a location "in an official capacity" who takes "any action to obstruct the view of a watcher or distance the watcher from [the observed activity] in a manner that would

make observation not reasonably effective," Mr. Lewin is concerned about his potential liability. Mr. Lewin is uncertain what "action" would make a watcher's observation "not reasonably effective." If SB1 is implemented, Mr. Lewin may hesitate to volunteer as an election judge again because of his (and his family members') fear for his personal safety and because of fear of criminal prosecution.

## COUNT I
**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

**SB1 violates the First and Fourteenth Amendment of the U.S. Constitution.**

218.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

219.    This claim challenges Sections 2.04, 2.06, 2.07, 4.01, 4.06, 4.07, 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

220.    A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications offered by the state for the burdens imposed by the law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

221.    The more a challenged law burdens the right to vote, the stricter the scrutiny courts apply when evaluating the law. *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

222.    SB1 inflicts severe burdens on Texas's voters through each individual restriction and the cumulative effect of all the measures that impose barriers to voting, including by:

- Targeting Texans who need assistance to vote—including people who have limited English proficiency, disabilities, and/or less formal education—by adding multiple new requirements that hinder the provision of assistance at the polling place, curbside, or in connection with mail ballots (e.g., Sections 6.03, 6.04, and 6.05) and by deterring those who would otherwise provide assistance (Section 6.06);

- Giving partisan poll watchers "free movement" to intimidate and harass voters and poll workers by expanding watchers' authority while constraining election administrators' ability to ensure peaceful, orderly elections under penalty of criminal prosecution (*e.g.*, Sections 4.01, 4.06, 4.07, and 4.09);

- Quashing legitimate voter turnout initiatives through overbroad and vague criminal penalties for so-called "vote harvesting" (Section 7.04);

- Facilitating investigation and prosecution of perfectly legal activity by voters, such as being excused from jury service or having the same name as a non-resident in the county (Sections 2.04, 2.06, and 2.07);

- Increasing the likelihood that otherwise valid mail ballots and mail ballot applications from voters eligible to vote by mail will be rejected because of simple errors or omissions, or lack of information at the clerk's office, notwithstanding the clerk's ability to verify the mail ballot or mail ballot application by other means (Sections 5.07 and 5.13); and

- Forcing election officials to shift resources to meet tight deadlines for reporting voters for investigation and removing voters from the rolls to avoid additional requirements and penalties (Section 2.06).

223.    By prohibiting Plaintiffs, their employees, and their members (as applicable) from communicating with voters about mail ballots, SB1's new criminal restrictions on ballot assistance and collection services (including what Texas self-servingly calls "vote harvesting services") will impose severe burdens on Texas voters wishing to vote by mail by limiting the number of people available to assist them.

224.    SB1's enhanced information requirements, expanded oath, exposure to a potential perjury charge, and accompanying enhanced criminal penalties for persons assisting voters will impose severe burdens on, and in some cases entirely deny, the right to vote of Texas voters with disabilities or language access barriers by limiting the number of people available to assist them with voting in person, including curbside voting, or by mail, for fear of criminal prosecution.

225.    SB1's criminalization of all forms of compensated assistance will also impose severe burdens on, and in some cases entirely deny, the right to vote of Texas voters with disabilities, advanced age, and/or language barriers by limiting the number of people available to assist them with voting by mail, for fear of criminal prosecution.  Blind and elderly voters, voters with disabilities, and voters who cannot read the languages in which ballots are printed because they have limited English proficiency or limited literacy, are made the most vulnerable by these new provisions.  These groups already have difficulty voting and face even higher burdens under the new law.

226.    The law's proponents have not demonstrated any evidence that voter assistance was a major source of misconduct or fraud in Texas elections (the occurrence of which in any non-trivial amount is entirely unproven) or that the pre-existing limitations on such assistance were insufficient to identify and prosecute the very few instances of any such misconduct in this state. In fact, with respect to vote by mail, Texas already imposes more restrictions on mail voting than

most states in the country.   And even in states that allow everyone to vote by mail, or even affirmatively mail every registered voter a ballot, fraud is rare.

227.   The additional requirements and limitations on filling out mail ballots and mail ballot applications will result in the disenfranchisement of voters who are qualified to vote by mail and whose mail ballots and mail ballot applications could be verified by other means.

228.   Under SB1, poll watchers will be emboldened while election officials who would otherwise be tasked with maintaining orderly elections will be deterred from taking action against even clearly intimidating behavior.   This makes it more likely that in-person voters who have historically been targets of harassment, including people of color and individuals with disabilities, will be subject to such abuse in and around polling places.

229.   The challenged additional limitations on voting serve no legitimate state interest. Indeed, any purported anti-fraud justification for these limitations is poorly disguised pretext.

## COUNT II
### Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza

### SB1 Violates the Fourteenth Amendment of The U.S. Constitution

230.   Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

231.   This claim challenges Sections 2.04, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

232.   Section 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend., XIV.

233.    The Fourteenth Amendment prohibits intentional racial discrimination by state actors.  Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions.  *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

234.    The facts alleged herein, among others to be uncovered during discovery, show that SB1 was enacted, at least partly, with the intent to discriminate against voters of color, on the basis of race and national origin, in violation of the United States Constitution.

235.    SB1's stated purpose as "relating to election integrity and security, including by preventing fraud in the conduct of elections in this state" is unfounded pretext since there is no evidence of widespread voter fraud in this state or any other state.

236.    Texas has a long, well-documented history of discrimination against Latino and Black citizens in the voting and electoral processes.  Indeed, courts have repeatedly found that Texas election laws were enacted with a discriminatory purpose or had a discriminatory effect— particularly as it pertains to Texas's Black and Latino voters.

237.    SB1 was enacted following record turnout among Black, Latino, and Asian-American voters in the 2018 and 2020 General Elections.

238.    The challenged provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black.

239.    The disparate racial impact that the challenged limitations on voting would have on Texas's minority voters was also a subject of discussion and testimony throughout the legislative process for SB1 and its precursor SB7.

240.    The aforementioned burdens and restrictions of SB1 placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote.

241.    Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB1, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB1, and the tenuousness of the stated justifications for SB1 raise a strong inference of a racially discriminatory purpose in violation of the Fourteenth Amendment.

## COUNT III
### Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza

### SB1 Violates the Fifteenth Amendment of the U.S. Constitution

242.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

243.    This claim challenges Sections 2.04, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

244.    Section 1 of the Fifteenth Amendment to the United States Constitution provides:

> The right of citizens of the United States to vote shall not be denied
> or abridged by the United States or by any State on account of race,
> color, or previous condition of servitude.

U.S. Const. amend., XV.

245.    The Fifteenth Amendment enfranchised voters nationwide, regardless of race or color, and is an independent source of authority to protect against discrimination in voting. "The Amendment bans racial discrimination in voting by both state and nation.  It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials . . . ." *Terry v. Adams*, 345 U.S. 461, 467 (1953).

246.     Similar to the Fourteenth Amendment, discriminatory intent under the Fifteenth Amendment may be established by proof that the defendants used race as a motivating factor in their decisions.  *Mobile v. Bolden*, 446 U.S. 55, 62, (1980) (plurality opinion) (citing *Vill. of Arlington Heights*, 429 U.S. at 265).

247.     The facts alleged herein, among others to be uncovered during discovery, show that SB1 was enacted, at least partly, with the intent to discriminate against voters of color, on the basis of race and national origin, in violation of the United States Constitution.

248.     SB1's stated purpose as "relating to election integrity and security, including by preventing fraud in the conduct of elections in this state" is unfounded pretext, since there is no evidence of widespread voter fraud in this state or any other state.

249.     Texas has a long, well-documented history of discrimination against Latino and Black citizens in the voting and electoral processes.  Indeed, courts have repeatedly found that Texas election laws were enacted with a discriminatory purpose or had a discriminatory effect— particularly as it pertains to Texas's Black and Latino voters.

250.     SB1 was enacted following record turnout among Black, Latino, and Asian-American voters in the 2018 and 2020 General Elections.

251.     The challenged provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black.

252.     The disparate racial impact that the challenged limitations on voting would have on Texas's minority voters was also a subject of discussion and testimony throughout the legislative process for SB1 and its precursor SB7.

253.    The aforementioned burdens and restrictions of SB1 placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote.

254.    Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB1, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB1, and the tenuousness of the stated justifications for SB1 raise a strong inference of a racially discriminatory purpose in violation of the Fifteenth Amendment.

**COUNT IV**
**Against All Defendants**

**SB1 discriminates against minority voters**
**in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, *et seq.***

255.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

256.    This claim challenges Sections 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

257.    Section 2 of the Voting Rights Act prohibits state political processes that are "not equally open to participation" by minority voters, such that those voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301.

258.    Laws enacted with a racially discriminatory purpose and/or that have a discriminatory effect violate Section 2. *See Veasey*, 830 F.3d at 229, 243; *see also Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).

259.    Discriminatory intent may be established by proof that defendants used race as a motivating factor in their decisions. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 265–66 (1977).  Even if a challenged legislation appears neutral on its face, discriminatory intent may still be inferred by analyzing the context during and by which the challenged provisions were enacted, and by reviewing the disproportionate racial impact of the challenged provisions.  *See id.* at 266–68; *Veasey*, 830 F.3d at 231–32.

260.    SB1's stated purpose as "relating to election integrity and security, including by preventing fraud in the conduct of elections in this state" is unfounded pretext, since there is no evidence of widespread voter fraud in this state or any other state.

261.    Texas has a long, well-documented history of discrimination against Latino and Black citizens in the voting and electoral processes.

262.    SB1 was enacted following record turnout among Black, Latino, and Asian-American voters in the 2018 and 2020 General Elections.

263.    The challenged provisions of SB1 specifically target and disproportionately burden assistance to voters with limited English proficiency, who are disproportionately Latino and Asian American, and individuals with disabilities in Texas, who are disproportionately Black.

264.    The aforementioned burdens and restrictions of SB1 placed on voters individually—and even more so collectively—abridge the opportunity of minority voters to participate in the political process and exercise their right to vote.

265.    As a result, under the totality of the circumstances, SB1's multifarious burdens and restrictions individually and collectively violate Section 2 of the Voting Rights Act by abridging and denying the right to vote and creating less opportunity for people of color than other members of the electorate to participate in the political process and to elect representatives of their choice, including Black and Latino voters, and including many of Plaintiffs' members and congregants. Texas's political process is not equally open to participation by minority voters.

## COUNT V
## Against all Defendants

**SB1 impedes voters' practical ability to get necessary and statutorily guaranteed assistance in violation of Section 208 of the Voting Rights Act, 52 U.S.C. § 10508.**

266.     Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

267.     This claim challenges Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1.

268.     Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" in English for any reason "may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

269.     Section 208 thus establishes the right of a voter with a disability or a voter with limited English proficiency or limited literacy to choose an assistor to assist the voter with the voting process, including physically navigating the polling place, interacting with poll workers, reading and interpreting the ballot, and marking the ballot.

270.     Although Texas election law provides voters who need assistance with the right to receive such assistance from a person of their choice as required by Section 208, SB1's new restrictions gut that provision by impeding the voter's practical ability to get assistance. Specifically, SB1:

   a.   Increases the likelihood that ballots by voters with disabilities or who require assistance will be rejected (Section 6.05);

   b.   Deters individuals from providing needed assistance to voters (Sections 6.01, 6.03, 6.04, and 6.06); and

   c.   Limits the type of assistance that voters can receive in filling out their ballot (Section 6.04).

271.    The challenged provisions of SB1 thus violate Section 208 of the Voting Rights Act.  *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (holding that Texas law limiting who can provide assistance to non-English speaking voters violated Section 208 of the Voting Rights Act and noting that "a state cannot restrict this federally guaranteed right [Section 208] by enacting a statute tracking its language, then defining terms more restrictively than as federally defined.").

## COUNT VI
**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

**SB1 discriminates against voters on the basis of a disability
in violation of Title II of the Americans with Disability Act, 42 U.S.C. § 12131, *et seq*.**

272.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

273.    This claim challenges Sections 6.01, 6.03, 6.04, 6.05, 6.06 and 7.04 of SB1.

274.    Title II of the Americans with Disabilities Act (the "ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

275.    The ADA directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and provide guidance on their content. 42 U.S.C. § 12134.  Regulations promulgated by the Attorney General require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. §35.130(b)(7).  Regulations promulgated by the Attorney General also make it unlawful discrimination for a public entity to:

a. "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

b. "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

c. "[U]tilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii); and

d. "[I]mpose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments. 28 C.F.R. § 35.130(b)(8).

276.    The ADA also states that it is unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of" any right protected by the ADA. 42 U.S.C. § 12203.

277.    Title II of the ADA applies to all services, programs, and activities or public entities, including voting.  42 U.S.C. § 12132.  "Voting is a quintessential public activity" and, accordingly, Title II requires state and local governments (i.e., "public entities") to ensure that people with disabilities have a full and equal opportunity to vote.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (noting in a case involving an ADA action by blind

voters against a Maryland election official that "[v]oting is a quintessential public activity. . . . Ensuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others. . . .") (citing 28 C.F.R. § 35.130); 28 C.F.R. § 35.130(b)(7).

278.    The State of Texas is a public entity as defined in Title II of the ADA, and the individual Defendants are the public officials responsible for running these public entities and supervising their operations as to voting within the State of Texas and must comply with Title II of the ADA.  42 U.S.C. § 12131(1).

279.    The members and/or constituents of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL include individuals with disabilities within the meaning of the ADA and are entitled to the protections of the ADA.  These individuals have a qualifying "disability" because they have "a physical or mental impairment that substantially limits one or more major life activities," including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. §§ 12102(1)(A), (2)(A).  These individuals are qualified for the programs, services, and activities being challenged herein in that they are registered voters or otherwise eligible to request and cast a ballot, in Texas elections, and are qualified to participate in Defendants' programs and activities related to voting. 42 U.S.C. § 12131(2).

280.    There is no valid justification for the burdens that SB1 imposes on voters with disabilities in making it harder for them to get necessary assistance described herein, as such restrictions will deny voters with disabilities equal access to the franchise and prevent such voters from exercising their fundamental right to vote.

281.    Specifically, Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 individually and collectively discriminate against qualified Texas voters with disabilities exercising their right to vote including on members and/or constituents of Plaintiff organizations as set forth above, in violation of Title II of the Americans with Disabilities Act of 1990.

282.    Through the acts and omissions described above, Defendants have discriminated against Plaintiffs on the basis of disability in violation of Title II of the ADA and its implementing regulations by:

a.    Denying people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, the opportunity to participate in and benefit from voting in a way that is equal to that afforded to those without disabilities;

b.    Denying people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other voters;

c.    Imposing eligibility criteria that exclude or tend to exclude people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, from fully and equally enjoying the state's voting program;

d.    Failing to reasonably modify the state's voting system to provide the services that people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, need to avoid discrimination; and

     e.      Interfering with the ability of people with disabilities and the Plaintiff organizations LUPE, SVREP, TEXAS IMPACT, JOLT ACTION, and FIEL that assist them to exercise their rights under the ADA.

283.     Unless the requested relief is granted, members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL who are qualified individuals with disabilities under the ADA and those similarly situated will be discriminated against and denied adequate access to the franchise.

284.     Unless the requested relief is granted, Plaintiff organizations LUPE, SVREP, TEXAS IMPACT, JOLT ACTION and FIEL will be required to incur substantial costs and divert resources from other activities in order to mitigate the effects of SB1's impermissible burdens on the ability of disabled persons to exercise their full and equal opportunity to vote.

285.     The relief sought by Plaintiffs would not require a fundamental alteration to Defendants' programs, services, or activities.

## COUNT VII
### Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza

### Section 7.04 of SB1 is unconstitutionally vague and burdens free speech
### in violation of the First and Fourteenth Amendments to the U.S. Constitution.

286.     Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

287.     This claim challenges Section 7.04 of SB1.

288.     A criminal law is unconstitutionally vague, and in violation of the Fourteenth Amendment's requirements of due process, if it "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Moore v. Brown*, 868 F.3d 398, 406 (5th Cir. 2017) (citation omitted); *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001). Courts apply a

"more stringent" vagueness inquiry when a law "interferes with the right of free speech or association." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010).

289.    A speech restriction is also facially unconstitutional and overbroad, in violation of the First Amendment, if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  A plaintiff "need only show that a statute or regulation might operate unconstitutionally under some conceivable set of circumstances."  *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

290.    Section 7.04 is unconstitutionally vague and overbroad in violation of both the First and Fourteenth Amendments because it because it fails to provide adequate notice of what is (or is not) prohibited, invites arbitrary and discriminatory enforcement, and a substantial number of its applications are unconstitutional when judged against its legitimate sweep.

291.    First, Section 7.04 fails to provide adequate notice of what is (or is not) prohibited. Section 7.04 of SB1 outlines a number of offenses for persons engaged in "vote harvesting services," which is confusingly defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."[131]   A violation results in a third-degree felony, subject to a minimum of two years (and up to ten years) of jail time and a fine of up to $10,000.[132]  Section 7.04

---

[131] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 276.015(a)(2)).

[132] TEX. PENAL CODE § 12.34(a)–(b).

of SB1 does not define "in-person interaction," potentially reaching a wide and varying range of possibilities. The statute's requirement that an interaction be "in the physical presence of" an official ballot or mail ballot is also unclear and does not adequately define the possible kinds of interactions that could come within the statute's prohibitions.[133] And the intent requirement (that the interaction be "intended to deliver votes") is also cryptic, apparently requiring nothing more than a political motivation (as opposed to an actual intent to defraud or deceive).

292.    Section 7.04's requirement that a person receive "compensation or other benefit" in exchange for the interaction does not ameliorate the vagueness.[134] Section 7.04 defines "benefit" to mean "anything reasonably regarded as a gain or advantage," no matter how minor.[135] The range of possible "benefit[s]" is itself wide and unpredictable to a reasonable person attempting to understand what conduct the law prohibits.

293.    Second, the lack of clarity (coupled with the provision's breadth) invites arbitrary and discriminatory enforcement. It would be largely up to prosecutors to determine whether to bring charges based on any in-person interaction between two people in the presence of a ballot, absentee ballot, or application for an absentee ballot. This possibility would be particularly acute for campaign workers because a benefit can be "inferred." A campaign worker could open herself to the possibility of criminal prosecution virtually any time she speaks about her work to another voter in the presence of a ballot, absentee ballot, or application for an absentee ballot.

---

[133] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 276.015(a)(2)).

[134] *Id.* (codified at Tex. Elec. Code § 276.015(e)(1)).

[135] *Id.* (codified at Tex. Elec. Code § 276.015(a)(1)).

294.    Likewise, because Section 7.04 of SB1 does not define "in-person interaction," the phrase impermissibly regulates a broad range of protected, political speech.  Speech is plainly a form of "in-person interaction."  The statute's requirement that an interaction be "in the physical presence of" an official ballot or mail ballot does not cure the overbreadth because pure speech is still covered so long as it is uttered in close proximity to a mail ballot (*e.g.*, in the same room or in the voter's purse).[136]  The range of possible "benefit[s]" is also broad and encompasses any salary paid to a campaign worker and any "benefit" given to a campaign volunteer (*e.g.*, free coffee and breakfast, campaign apparel, or tickets to a rally).  And the statute does not require that any compensation be provided for the specific speech at issue.  The compensation could be for some other "vote harvesting services," yet the uncompensated in-person communication could still be a crime.

295.    Section 7.04 therefore prohibits a wide range of protected speech reaching well beyond the statue's legitimate reach.   Under Section 7.04, a substantial number of daily conversations between a voter and a campaign worker or campaign volunteer are criminalized, so long as the parties are discussing a particular candidate or ballot measure and a mail ballot happens to be close enough to the voter and the campaign worker or volunteer to be considered "in the physical presence" thereof.  Section 7.04's substantial overbreadth thus impermissibly regulates constitutionally protected, political speech.

296.    A law also violates the Fourteenth Amendment if it restricts the freedom of speech protected by the First Amendment.  Under the First Amendment, the "government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Brown*

---

[136] S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 276.015(a)(2)).

*v. Entm't Merch. Ass'n*, 564 U.S. 786, 790–91 (2011).  When a law regulates speech on the basis of its content, it is presumptively unconstitutional and subject to strict scrutiny.  *See Reagan Nat'l Adver. Of Austin v. City of Austin*, 972 F.3d 696, 702 (5ᵗʰ Cir. 2020).  A law is content based when it "applies to particular speech because of the topic discussed or the idea or messaged expressed." *Id.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

297.    Section 7.04 of SB1 also impermissibly regulates speech in violation of the First Amendment.  Speech is plainly a form of "in-person interaction."  And Section 7.04 regulates speech on the basis of its content: namely, whether the speech is "intended to deliver votes for a specific candidate or measure."  "Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'"  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438–39 (5th Cir. 2014) (en banc) (quoting *Citizens United*).  Speech that is used to encourage and assist voters both implicates expressive conduct and also constitutes "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988); *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("Free trade in ideas [sic] means free trade in the opportunity to persuade to action . . . ." (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))).

298.    These new restrictions will have a chilling effect on Plaintiff organizations, who employ paid canvassers and conduct GOTV activities, because the prohibited activities encompass a wide range of interactions and conversations that may occur between Plaintiffs, their employees and organizers, and voters.  The extensive reach of the "vote harvesting" restrictions and the accompanying threat of criminal and civil penalties will deter Plaintiffs' members and volunteers

from participating in Plaintiffs' voter education and GOTV efforts, thereby limiting the means by which Plaintiffs and their constituents communicate with voters and engage in the political process.

299.    Section 7.04 does not promote any legitimate, much less compelling, governmental interest.  Section 7.04 also is not narrowly tailored to advance a compelling governmental interest through the least restrictive means.  In particular, Section 7.04 cannot be justified based on an interest in preventing fraud because it is not limited in any way to conduct or speech that is fraudulent, misleading, or unlawful, and it was already (i.e., before SB1) illegal to "influence the independent exercise of the vote or another in the presences of a ballot during the election process . . . ."  (Tex. Elec. Code § 276.013) or to vote or attempt to vote using someone else's ballot (*id.* § 64.012).

300.    Those prohibitions cannot be constitutionally justified.   Section 7.04 thus unconstitutionally infringes upon Plaintiffs' rights under the First and Fourteenth Amendments, and the Court should declare it unlawful and enjoin its implementation and enforcement.

## COUNT VIII
**Against Defendants Scott, Paxton, Creuzot, Rosales, and Garza**

**Section 4.09 of SB1 is unconstitutionally vague
in violation of the Fourteenth Amendment to the U.S. Constitution**

301.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

302.    This claim challenges Sections 4.09 and 8.01 of SB1.

303.    Section 4.09 of SB1 subjects persons serving in an official capacity at a polling place to criminal liability as a Class A misdemeanor for taking "any action to obstruct the view of

a watcher or distance the watcher from [the observed activity or procedure] in a manner that would make observation not reasonably effective."[137]

304.    Section 4.09 of SB1 does not impose any limitations on what "any action" may constitute, how small it may be, or what it means to have the intent to obstruct or distance a watcher "in a manner that would make observation not reasonably effective."

305.    Section 4.09 accordingly fails to provide adequate notice to poll workers, election judges, and other officials of what steps, if any, they can take when interacting with a poll watcher while still avoiding a risk of criminal liability.

306.    Section 4.09 similarly invites arbitrary and discriminatory enforcement because prosecutors have essentially free reign to assert, after the fact, that a poll worker took "any action" with the intent to obstruct or distance a watcher "in a manner that would make observation not reasonably effective."

307.    Section 4.09 thus gives poll watchers the ability to observe voting activities without regard for the safety or privacy of voters or poll workers while election officials who attempt to constrain poll watchers in order to maintain peaceful, orderly elections will face the penalty of criminal prosecution.  The threat of prosecution under Section 4.09 will cause individuals like Plaintiff Lewin and members of FRIENDSHIP-WEST and TEXAS IMPACT to self-censor either by refraining from serving as election officials in future elections, allowing poll watchers free reign to potentially harass Texas voters or election workers, or having to significantly alter their approach to engaging with poll watchers.

---

[137] S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at TEX. ELEC. CODE § 33.051(g)).

308.     Because the poll watcher provision in Section 4.09 is unconstitutional, any civil penalty imposed under Section 8.01 cannot be predicated on a violation of Section 4.09.  Plaintiffs are accordingly entitled under 42 U.S.C. § 1983 to the relief requested below.

309.     For each of the foregoing reasons and as described above, Section 4.09 of SB1 is unconstitutionally vague, and the Court should enjoin its implementation and enforcement.

**COUNT IX**
**Against Defendants Scott, Paxton, Scarpello, Wise, Creuzot, Rosales, and Garza**

**SB1 violates the First and Fourteenth Amendments of the U.S. Constitution.**

310.     Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as though fully set forth herein.

311.     This claim challenges Sections 6.01, 6.03, 6.04, 6.05, and 6.06 of SB1.

312.     SB1's enhanced information requirements, expanded oath, exposure to a potential perjury charge, and accompanying enhanced criminal penalties for persons assisting voters in Sections 6.01, 6.03, 6.04, 6.05, and 6.06 violate the free speech rights of individuals who assist voters at the polling place and with respect to voting by mail.

313.     The voter assistance restrictions violate the First and Fourteenth Amendments, on their face and as applied, by imposing additional burdens on, and preventing through fear of criminal prosecution, the delivery of voter assistance by assistors.

314.     Because the voter assistance restrictions cannot be constitutionally justified, they unconstitutionally infringe upon Plaintiffs' rights under the First and Fourteenth Amendments, and the Court should declare them unlawful and enjoin their implementation and enforcement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     A declaratory judgment that the challenged provisions in SB1 violate:

88

      a.     the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

      b.     the First and Fourteenth Amendments to the U.S. Constitution as impermissible restrictions on freedom of speech;

      c.     the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution;

      d.     Section 208 of the Voting Rights Act;

      e.     Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution for racial discrimination against minority voters; and

      f.     the Americans with Disabilities Act.

2.     An injunction prohibiting Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing any of the challenged provisions of SB1.

3.     An injunction prohibiting Defendants Paxton, Creuzot, Rosales, Garza, their agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing Section 8.01 of SB1, as applied to a violation of any of the challenged provisions of SB1.

4.     An order requiring Texas to preclear, under section 3(c) of the Voting Rights Act (52 U.S.C. § 10302(c)), all changes in statewide voting practices for a period of ten years;

5.     An order awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 52 U.S.C. § 20510(c), 42 U.S.C. § 1988 and other applicable laws; and

6.     Granting any such other and further relief as this Court deems just and proper.

Dated:  January 22, 2022

Respectfully submitted,

_/s/ Nina Perales_____

Nina Perales
Julia R. Longoria
MEXICAN AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210 224-5382
nperales@maldef.org
jlongoria@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com
* Admitted _pro hac vice_

_Attorneys for Plaintiffs:_
LA UNIÓN DEL PUEBLO ENTERO
  SOUTHWEST VOTER REGISTRATION
   EDUCATION PROJECT
  MEXICAN AMERICAN BAR
   ASSOCIATION OF TEXAS
  TEXAS HISPANICS ORGANIZED FOR
   POLITICAL EDUCATION
  JOLT ACTION
  WILLIAM C. VELASQUEZ INSTITUTE
  FIEL HOUSTON INC.

_/s/ Sean Morales-Doyle_____

Sean Morales-Doyle
Eliza Sweren-Becker*
Patrick A. Berry*
Andrew B. Garber*
Jasleen K. Singh*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Telephone: (646) 292-8310
Facsimile: (212) 463-7308
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu
patrick.berry@nyu.edu
andrew.garber@nyu.edu

* Admitted _pro hac vice_

Paul R. Genender
Texas State Bar No. 00790758
Elizabeth Y. Ryan
Texas State Bar No. 24067758
Matthew Berde*
Texas State Bar No. 24094379
Megan Cloud
Texas State Bar No. 24116207
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
Liz.Ryan@weil.com
Paul.Genender@weil.com
Matt.Berde@weil.com
Megan.Cloud@weil.com

-and-

Alexander P. Cohen*
Texas State Bar No. 24109739
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Telephone: (212) 310-8020
Facsimile: (212) 310-8007
Alexander.Cohen@weil.com

\* Admitted *pro hac vice*

*Attorneys for Plaintiffs:*
FRIENDSHIP-WEST BAPTIST
    CHURCH
ANTI-DEFAMATION LEAGUE
    AUSTIN, SOUTHWEST, AND
    TEXOMA REGIONS
TEXAS IMPACT
JAMES LEWIN