**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., *Plaintiffs*, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br> *Defendants.* | Lead Case No: 5:21-cv-844-XR |
| LULAC TEXAS, et al., *Plaintiffs*, <br><br> v. <br><br> JOHN SCOTT, et al., <br> *Defendants.* | Consolidated Case No: 1:21-cv-0786-XR |

## PLAINTIFFS LULAC TEXAS, VOTO LATINO, TEXAS ALLIANCE FOR RETIRED AMERICANS, AND TEXAS AFT'S SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs LULAC TEXAS, VOTO LATINO, TEXAS ALLIANCE FOR RETIRED AMERICANS, and TEXAS AFT, by and through their undersigned counsel, file this COMPLAINT for DECLARATORY and INJUNCTIVE RELIEF against Defendants JOHN SCOTT, in his official capacity as the Texas Secretary of State, KEN PAXTON, in his official capacity as the Texas Attorney General, JACQUELYN CALLANEN, in her official capacity as the Bexar County Elections Administrator, DANA DeBEAUVOIR, in her official capacity as the Travis County Clerk, ISABEL LONGORIA, in her official capacity as the Harris County Elections Administrator, YVONNE RAMÓN, in her official capacity as the Hidalgo County Elections Administrator, MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator, LISA WISE, in her official capacity as the El Paso County Elections Administrator, JOE GONZALES, in his official capacity as Bexar County District Attorney, JOSE GARZA, in

his official capacity as Travis County District Attorney, KIM OGG, in her official capacity as Harris County District Attorney, RICARDO RODRIGUEZ, JR. in his official capacity as Hidalgo County District Attorney, JOHN CREUZOT, in his official capacity as Dallas County District Attorney, and YVONNE ROSALES, in her official capacity as El Paso County District Attorney, and allege as follows:

## NATURE OF CASE

1.      Texas consistently ranks among the lowest states in the nation for voter turnout—a direct result of an ongoing campaign by state officials to limit access to the franchise, particularly for Texas's minority citizens.

2.      Last year, Texans encountered unprecedented challenges while attempting to vote in the midst of a global health crisis that upended even the most quotidian aspects of daily life. But the State did almost nothing to facilitate access to the ballot box. Instead, its attorney general and secretary of state took affirmative steps to make voting harder, going so far as to threaten to prosecute voting organizations, election officials, and individuals who attempted to assist their fellow citizens in exercising their constitutional right to vote.

3.      Despite the extraordinary obstacles imposed on voters and election workers alike, Texas voters persisted, often enduring hours-long lines to vote or having to navigate restrictive election administration procedures that changed even as the 2020 general election was ongoing. In the end, historic numbers of voters made their voices heard, with the State's highest voter turnout in nearly 30 years. This would not have been possible without the innovation of local election officials across the State, many of whom worked diligently to ensure that Texans had meaningful opportunities to exercise their right to vote.

4.     Most notable among the counties that sought to ensure voter access, even as state officials attempted to obstruct those efforts, was Harris County, which is home to more minority residents than any other Texas county—indeed, more minority residents than any other county's *total* residents.

5.     Harris County's election officials developed commonsense solutions to longstanding problems that have kept Texas voters, particularly racial and ethnic minority voters, away from the ballot box. They worked to ensure that early voting was accessible to all voters in Harris County—including keeping eight early voting sites open for one 24-hour period—and developed a drive-thru voting system that allowed thousands of voters to cast their ballots without leaving their vehicles. They also opened new polling places, invested in more voting machines, and undertook extensive efforts to educate residents about their voting options, from sending absentee ballot applications to registered voters to hosting a drive-in concert during the 24-hour early voting period with Houston's unofficial mayor, rapper Bun B.

6.     The efforts of election officials in Harris County and Texas's other urban centers successfully promoted turnout among the State's historically marginalized minority communities during the 2020 election. In Harris County, over *350,000* more voters cast ballots than in 2016— a nearly 7 percent increase in turnout. Minority voters accounted for over 56 percent of this additional turnout.

7.     Rather than celebrate this record-setting turnout and laud these innovations that helped remedy Texas's historic suppression of minority voters, the Texas Legislature has instead chosen to write the latest chapter in the State's long, troubling history of discrimination and disenfranchisement.

8.      Initially, the Legislature attempted to pass a voter suppression bill known as Senate Bill 7 ("SB 7"), which not only restricted almost every aspect of voting in Texas—including the methods used by minority voters to achieve 2020's historic turnout—but also made it easier to overturn election results. This effort failed only because members of the Texas House of Representatives left the legislative chamber in protest, denying the Legislature the quorum needed to pass the bill before the conclusion of the regular legislative session.

9.      Days later, Governor Greg Abbott announced a special session with the express goal of passing voter suppression legislation. And less than 48 hours after the first special session began, the Legislature began hearings on a new omnibus voter suppression bill: Senate Bill 1 ("SB 1"). In the House, concerned Texans waited 17 hours to be heard by lawmakers in the middle of the night, only to see those same lawmakers pass the bill out of committee along party lines in the early hours of the morning. In response to this rushed and perfunctory process, a group of House members left the State in protest, again denying the House the necessary quorum and delaying final passage of SB 1 for several weeks.

10.     But during a *second* special session, through a series of harried, controversial, and undemocratic maneuvers, the Legislature ultimately enacted SB 1, an omnibus voter suppression bill that burdens voters, restricts access to the franchise, and targets the very measures that communities of color disproportionately relied on to increase turnout in 2020 and other recent elections. *See generally* SB 1, 87th Leg., 2d Called Sess. (Tex. 2021). Among its unlawful provisions that restrict access to the ballot box (the "Suppressive Provisions"), SB 1:

        a.      Criminalizes efforts by public officials to encourage voters to submit absentee ballot applications;

b.      Imposes additional burdens on absentee voters by effectively eliminating ballot drop boxes;

c.      Eliminates drive-thru voting;

d.      Creates additional obstacles for voters to receive assistance at the polls or in completing and submitting absentee ballots;

e.      Limits early voting hours; and

f.      Empowers partisan poll watchers to employ voter intimidation tactics by granting them increased freedom in the polling place and limiting the oversight power of election workers.

11.     The Legislature enacted SB 1 not to preserve election integrity or combat election fraud—after all, the State's own election officials have acknowledged that elections in Texas are already secure—but rather to stem the growing tide of minority voter participation by weaponizing the false, repeatedly debunked accusations of widespread voter fraud advanced by supporters of former President Donald Trump during the 2020 presidential election. It is no coincidence that SB 1 passed just months after Texas Republican Party leaders, including the State's governor, attorney general, and members of its congressional delegation, tried and failed to overturn the presidential election results and disenfranchise millions of voters in *other* states.

12.     Because the Suppressive Provisions cannot be justified by any legitimate (much less compelling) state interests, their burdensome and disenfranchising effects violate the First and Fourteenth Amendments to the U.S. Constitution. And because these provisions were intended to impose a particular burden on Texas's Black and Latino communities—exacerbating the marginalization caused by more than a century of discriminatory practices undertaken by both the State and its citizens—SB 1 further violates the Voting Rights Act of 1965.

5

13.     Plaintiffs bring this lawsuit to protect both their rights and the rights of their members and constituencies, and to ensure equal access to the ballot box for all Texans.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution and the Voting Rights Act, 52 U.S.C. § 10301 et seq.

15.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States and involve the assertion of a deprivation, under color of state law, of a right under the U.S. Constitution and an Act of Congress providing for equal rights of citizens or of all persons within the United States.

16.     The Court has personal jurisdiction over Defendants, who are sued in their official capacities.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred and will occur in this judicial district.

18.     This Court has the authority to enter declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

19.     Plaintiff LULAC Texas ("LULAC") is the Texas chapter of the League of United Latin American Citizens, the oldest and largest Latino civil rights organization in the United States. LULAC's mission is to protect the civil and voting rights of Latinos. LULAC brings this action on behalf of itself and its members, who will be irreparably injured by the Suppressive Provisions of SB 1.

20.     Founded in 1929, LULAC has more than 8,000 members across Texas, including registered voters. LULAC regularly engages in voter registration, voter education, and other activities and programs designed to increase voter turnout among its members and their communities, which is critical to LULAC's mission. LULAC and its individual members and councils also spend time and resources on other social justice programming—including advocacy work centered on immigration-related issues and racial justice issues—as well as activities intended to strengthen the organization itself, such as recruiting new members and opening new chapters. SB 1 erects new barriers to voting that impose significant burdens on LULAC's members and constituents; as a result, LULAC must divert resources from other programs and activities to address the adverse impacts SB 1 and to assist its members and constituents in surmounting new barriers to registration and voting. If not for the Suppressive Provisions of SB 1, LULAC would be investing these resources in other activities—both voting-related and otherwise. Because of SB 1, LULAC and its members have suffered and will continue to suffer irreparable harm.

21.     Plaintiff Voto Latino brings this action on behalf of itself and its constituents and supporters. Voto Latino is a 501(c)(4) nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinx voters are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle, including the nearly 5.6 million eligible Latinx voters in Texas. Voto Latino considers eligible Latinx voters in Texas to be the core of its constituency. Voto Latino mobilizes Latinx voters in Texas through statewide voter registration initiatives, as well as peer-to-peer and digital voter education and get-out-the-vote ("GOTV") campaigns. In 2020 alone, Voto Latino registered 184,465 voters in Texas. In 2022, Voto Latino anticipates making

expenditures in the millions of dollars to educate, register, mobilize, and turn out Latinx voters across the United States, including in Texas.

22.     Individually and collectively, SB 1's Suppressive Provisions burden and disenfranchise those Texans that Voto Latino works to support and frustrates its mission of enfranchising and turning out Latinx voters in Texas. Voto Latino will have to expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states or its own registration efforts in Texas to combat SB 1's effects on its core constituency, and to assist its constituents in navigating the various additional hurdles that impede access to the franchise and threaten to silence the voices of Latinx voters. For example, Voto Latino will need to divert funds from its voter registration and GOTV digital advertisement budgets, as well as the time and energy of its staff and volunteers in Texas, to educate its constituents on how to successfully vote in Texas given the new restrictions imposed by SB 1, including provisions of SB 1 that place additional restrictions on voter assistance.  Because of SB 1, Voto Latino and its constituency have suffered and will continue to suffer irreparable harm.

23.     Plaintiff Texas Alliance for Retired Americans (the "Alliance") brings this action on behalf of itself and its members. The Alliance is incorporated in Texas as a 501(c)(4) nonprofit, social welfare organization. It has 145,038 members, composed of retirees from public and private sector unions, community organizations, and individual activists, and is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The provisions of SB 1 challenged in this lawsuit frustrate the Alliance's mission because they threaten to deprive individual members—in some cases successfully—of the right to vote and to have their votes counted, threaten the electoral prospects of the Alliance's endorsed candidates whose supporters

will face greater obstacles casting votes and having their votes counted, and make it more difficult for the Alliance and its members to effectively further their shared political purposes.

24.    The Alliance and its individual members spend resources on voter registration, phone banking, and GOTV activities, as well as activities aimed at expanding the Alliance itself, such as recruiting new members, opening new chapters, and making presentations to members' groups and seniors' groups. As a result of SB 1, the Alliance will have to divert resources from furthering these other activities to educate their members, among others, on how to successfully vote in Texas given the new restrictions and limitations. If not for the provisions of SB 1 challenged in this lawsuit, the Alliance would be investing those resources into other activities, such as voter registration, phone banking, and efforts to expand the chapter. Moreover, the right to vote of the Alliance's members across Texas will be burdened or denied as a result of SB 1, resulting in irreparable harm to the Alliance and its members.

25.    Plaintiff Texas AFT is a statewide labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other public school employees. Texas AFT advocates for the employment rights of its members and champions high-quality public education, fairness, democracy, and economic opportunity for students, families, and communities. Part of its mission is to help its membership select leaders who embrace and uphold the interests of its members and the values of the union. As a result of SB 1, Texas AFT will have to divert resources from these activities to educate its members on the new laws and to assist its members in navigating the barriers to voting imposed by SB 1. Moreover, Texas AFT's membership consists primarily of Texas voters, many of whom are Black and Latino. The provisions of SB 1 challenged in this lawsuit burden their right to vote

and place them at risk of disenfranchisement. Because of SB 1, Texas AFT and its members have suffered and will continue to suffer irreparable harm.

26.     Defendant John Scott is sued in his official capacity as the Texas Deputy Secretary of State and acting Texas Secretary of State (the "Secretary"). The Secretary is the State's chief elections officer and must "obtain and maintain uniformity in the application, operation, and interpretation" of the State's election laws. Tex. Elec. Code §§ 31.001(a), 31.003. The Secretary has authority to "take appropriate action to protect the voting rights" of Texans, including by ordering officials to correct offending conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005. The Secretary is also empowered under SB 1 to prescribe the voter assistance forms and create a mandatory training program for partisan poll watchers. *See* SB 1 §§ 4.04, 6.03 (adding Tex. Elec. Code §§ 33.008 and 64.0322). The Secretary acted under color of state law at all times relevant to this action.

27.     Defendant Ken Paxton is sued in his official capacity as the Texas Attorney General (the "Attorney General"). The Attorney General is empowered to "prosecute a criminal offense prescribed by the election laws of this state," Tex. Elec. Code § 273.021(a), including the new criminal provisions of SB 1. SB 1 further requires the Attorney General to be informed of all instances of unlawful voting or registration and empowers the Attorney General to use that information to investigate and prosecute such crimes. *See* SB 1 §§ 2.04, 2.08 (amending Tex. Elec. Code §§ 15.028 and 31.006). In addition, the Attorney General's office is currently investigating and prosecuting hundreds of purported election law violations. The Attorney General has also made clear that he plans to enforce the Suppressive Provisions of SB 1. For instance, on October 18, 2021, the Attorney General announced that he would be forming the Texas Election Integrity Unit to "monitor this season's local elections." The Election Integrity Unit is focused on—among

other things—violations of voter assistance laws, like SB 1 §§ 6.03–6.04, and so-called vote harvesting laws, like SB 1 § 7.04.[1] The Attorney General acted under color of state law at all times relevant to this action.

28.     Defendant Jacquelyn Callanen is sued in her official capacity as the Bexar County Elections Administrator. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

29.     Defendant Joe Gonzales is sued in his official capacity as Bexar County District Attorney. By virtue of his position, Defendant Gonzales is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 4.06, 4.09, 6.04, and 7.04.

30.     Defendant Dana DeBeauvoir is sued in her official capacity as the Travis County Clerk. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and

---

[1] The Texas Court of Criminal Appeals recently held that the Attorney General lacks the authority to *unilaterally* prosecute election law offenses and that such prosecutions violate the separation-of-powers clause of the Texas Constitution. *See State v. Stephens*, --- S.W.3d ---, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021). However, the Attorney General retains the power to assist district or county attorneys, upon request. *Id.* (further citation omitted); *see also* Tex. Gov't Code § 41.102. The Attorney General and the State of Texas have moved for reconsideration of the decision.

management of drive-thru voting locations, and the determination of hours for early voting locations.

31.    Defendant José Garza is sued in his official capacity as Travis County District Attorney. By virtue of his position, Defendant Garza is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 4.06, 4.09, 6.04, and 7.04.

32.    Defendant Isabel Longoria is sued in her official capacity as the Harris County Elections Administrator. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

33.    Defendant Kim Ogg is sued in her official capacity as Harris County District Attorney. By virtue of her position, Defendant Ogg is charged with investigating and prosecuting criminal violations of the Texas Election Code. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 4.06, 4.09, 6.04, and 7.04.

34.    Defendant Yvonne Ramón is sued in her official capacity as the Hidalgo County Elections Administrator. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the

placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

35.     Defendant Ricardo Rodriguez. Jr. is sued in his official capacity as Hidalgo County District Attorney. By virtue of his position, Defendant Rodriguez is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 4.06, 4.09, 6.04, and 7.04.

36.     Defendant Michael Scarpello is sued in his official capacity as the Dallas County Elections Administrator. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the placement and management of drive-thru voting locations, and the determination of hours for early voting locations.

37.     Defendant John Creuzot is sued in his official capacity as Dallas County District Attorney. By virtue of his position, Defendant Rodriguez is charged with investigating and prosecuting criminal violations of the Texas Election Code. He is sued for the manner in which he implements the provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1 §§ 4.06, 4.09, 6.04, and 7.04.

38.     Defendant Lisa Wise is sued in her official capacity as the El Paso County Elections Administrator. She is sued for the manner in which she implements the provisions of SB 1 challenged in this action, including, but not limited to, the distribution of absentee ballot applications, the placement of drop boxes, the placement and management of polling places, the

placement and management of drive-thru voting locations, and the determination of hours for early

voting locations.

39.     Defendant Yvonne Rosales is sued in her official capacity as the District Attorney

for the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. By virtue

of her position, Defendant Rosales is charged with investigating and prosecuting criminal

violations of the Texas Election Code. She is sued for the manner in which she implements the

provisions of SB 1 challenged in this action that impose criminal penalties, including, SB 1

§§ 4.06, 4.09, 6.04, and 7.04.

## STATEMENT OF FACTS AND LAW

### I.     Voter Turnout in Recent Texas Elections

40.     Texas has long struggled with voter turnout, often seeing some of the nation's

lowest rates of electoral participation. The cause of this consistently low voter turnout is clear: the

State's voting laws, which are the most restrictive in the United States.

41.     In spite of the obstacles that Texas voters must regularly navigate simply to exercise

their most fundamental democratic rights—obstacles made even more onerous by the unique and

unprecedented challenges of the COVID-19 pandemic—the most recent midterm and presidential

elections saw the State's highest voter turnout in decades.

42.     As lawmakers in the State are well aware, this increase in voter participation

coincides with significant demographic shifts in Texas's eligible voting age population. According

to U.S. Census Bureau estimates, the combined number of eligible Hispanic and Black voters in

the State has been steadily rising, while the number of eligible non-Hispanic white voters has

declined.

### A.     The 2018 Election

43.     In 2018, Texas saw its highest voter turnout for a midterm election in over two decades. That year, 46.3 percent of eligible voters cast ballots, up from just 28.3 percent during the midterm election just four years earlier.

44.     Due in large part to increased participation among minority voters, Democratic Party candidates defeated several high-profile Republican Party incumbents, flipped several competitive local offices, and picked up two seats in the U.S. House of Representatives, 12 seats in the Texas House, and two seats in the Texas Senate.

45.     In addition to these significant electoral victories, Democrats in Texas fielded their first competitive U.S. Senate candidate in 30 years. Although Republican Senator Ted Cruz was ultimately victorious, he was reelected by a margin of just 2.6 percentage points. Only six years earlier, he was elected by more than 15 percentage points.

46.     Democratic candidates in other statewide races were similarly competitive. Although Republican incumbents prevailed in the races for lieutenant governor and attorney general, both were decided by fewer than five percentage points. Four years earlier, the elections for these offices were decided by 20-point margins.

### B.     The 2020 Election

47.     Voter turnout increased again during the 2020 general election. In fact, Texas's voter turnout was the highest the State had seen since 1992, when two Texans—former President George H.W. Bush and billionaire Ross Perot—appeared on the ballot in the presidential race.

48.     In 2020, 66 percent of the State's 17 million registered voters cast ballots in the general election, an increase in turnout of almost 7 percent over the last presidential election in 2016.

49.     This increase was driven by a rise in minority and urban voter participation. In Harris County, for example, minority voters accounted for more than 56 percent of the increase in voter turnout over 2016. Similarly, in Dallas County, minority voters accounted for more than 54 percent of the increase.

50.     Although Republican presidential candidates used to count on carrying the Lone Star State by double-digit numbers, such margins of victory are no longer guaranteed.

51.     Due in part to increased participation by minority voters, former President Trump won Texas by fewer than ten percentage points in 2016. In 2020, his margin of victory narrowed even further to just over five percentage points.

### 1.     Early Voting in the 2020 Election

52.     To achieve the historic turnout that Texas saw in 2020, voters across the State relied heavily on early voting.

53.     In the 2020 general election, 9.7 million people—57 percent of the State's registered voters—voted early, surpassing the *total* number of votes cast in the 2016 general election.

54.     Election officials in counties across the State worked tirelessly to ensure that every voter had an opportunity to participate in the 2020 general election, including by offering early voting in many counties from 7:00 a.m. to 7:00 p.m.

55.     Harris County's efforts to ensure access to the ballot box for voters during the height of the pandemic were especially successful. There, polling places stayed open past 7:00 p.m. for several days to accommodate increased voter turnout and ensure that populations who have been historically excluded from the democratic process had an opportunity to participate.

56.     Harris County election officials also opened eight polling places for one period of 24-hour voting to accommodate shift workers. As a result of that effort, 10,250 voters were able to cast ballots between 7:00 p.m. and 7:00 a.m., 800 of whom voted between midnight and 7:00 a.m.

57.     Harris County election officials also operated ten drive-thru voting sites during the early voting period, which expedited the voting process and allowed voters to cast their ballots safely from their vehicles during the COVID-19 pandemic. Election officials estimated that over 127,000 voters cast ballots at drive-thru polling places during the early voting period.

58.     Harris County is by far the largest county in Texas and is also one of the most diverse. Over 70 percent of Harris County residents identify as non-white. Forty percent of Harris County residents identify as Hispanic or Latino and 20 percent identify as Black. Consequently, Harris County has more minority residents than any other Texas county's *total* residents.

59.     By offering extended early voting hours and drive-thru voting, Harris County increased access to the franchise in the 2020 general election, particularly for Black and Latino voters. Its election officials reported that although Black and Latino voters cast approximately 47.5 percent of all ballots in the election, their ballots accounted for more than half of the votes cast during extended voting hours and at drive-thru voting sites.

### 2.     Absentee Voting in the 2020 Election

60.     The State's historic voter turnout was also bolstered by increased use of absentee voting.

61.     In the 2020 general election, almost 1 million Texans voted absentee, more than double the number of absentee voters in the 2016 general election.

62.     To avoid delivery delays and ensure that their absentee ballots were timely received, many voters relied on ballot drop boxes—secure receptacles where absentee ballots could be delivered by voters to an election worker before election day.

63.     Counties with large numbers of Black and Latino voters helped drive the increase in absentee ballots. For example, in Harris County, 177,043 people voted by mail in the 2020 general election, up from 99,507 in 2016. In Dallas County, another majority-minority county, 77,588 people voted by mail in the 2020 general election, up from 42,697 in 2016.

64.     There was also a partisan trend to Texans' use of absentee ballots in 2020. For example, in Harris County, approximately 12 percent of the votes received for President Joe Biden were cast by mail, compared with only 9 percent of votes received for former President Trump. In Dallas County, approximately 9 percent of votes received for President Biden were cast by mail, compared with only 7 percent of the votes received for former President Trump.

65.     According to exit polls, 90 percent of Black voters and 58 percent of Hispanic voters in Texas cast their ballots for President Biden. Only 33 percent of non-Hispanic white voters cast their ballots for President Biden, with 66 percent of non-Hispanic white voters casting their ballots for former President Trump.

### 3.     Texas Officials' Efforts to Disenfranchise Voters During the 2020 Election

66.     From the start of Texas's early voting period during the 2020 general election, there were signs that historic turnout—especially among Black and Latino voters—was on the horizon.

67.     More than 1 million Texans cast their votes on the first day of early voting in the State. Harris County had the highest turnout of any county, with 170,00 ballots cast by the end of the day.

68.    Rather than celebrate or encourage these historic levels of political participation, Texas officials doubled their efforts to suppress turnout—even as voters were actively casting ballots.

69.    On October 1, 2020, Governor Abbott issued a proclamation that limited the use of absentee ballot drop boxes to just one drop box location per county, regardless of physical size or population. As a result, the 1.3 million registered voters in Dallas County and the 121 registered voters in Loving County had access to the same number of drop boxes: one.

70.    In Harris County, election officials were forced to close 11 of the county's 12 drop box locations, forcing 2.4 million registered voters in a 1,777-square-mile county to share a single drop box. Harris County and other large counties across the State scrambled to inform voters that, despite previous guidance to the contrary, they would no longer be able to use these additional drop boxes.

71.    In the weeks leading up to election day, during the State's early voting period, Republican elected officials and party leaders filed multiple lawsuits to block Harris County from allowing residents to vote using its drive-thru voting sites.

72.    These lawsuits, filed in state and federal courts, also attempted to invalidate the ballots that had *already been cast* at Harris County's drive-thru voting centers—an effort that, if successful, would have disenfranchised 127,000 voters.

73.    Notably, the legal challenges to drive-thru voting began in October, even though drive-thru voting locations had been used months earlier during the 2020 primary elections.

74.    Although these challenges were ultimately unsuccessful, Harris County election officials made the difficult choice to close all but one of its drive-thru voting locations on election day.

75.    To justify their suppressive actions to courts and the public, Republican officials and party leaders in Texas pointed to universally debunked allegations of widespread voter fraud.

76.    These dangerous falsehoods were weaponized by Republican leaders across the country in an effort to cast doubt on the results of the election and undermine the integrity of the electoral process. Former President Trump himself repeatedly and prominently amplified such claims while still in the White House.

77.    These false claims of voter fraud were widely debunked and contradicted by countless knowledgeable sources—including former President Trump's own director of the Cybersecurity and Infrastructure Agency, who concluded that the 2020 general election was "the most secure in American history."

78.    Similarly, former U.S. Attorney General William Barr concluded that there was no evidence of widespread election fraud, even after his office's concerted efforts to find it at former President Trump's direction.

79.    Despite these cynical and widespread attempts to undermine (and, in many cases, actually overturn) the presidential election results, no one produced even a *shred* of credible evidence of widespread voter fraud—in Texas or anywhere else in the country—and Republican officials have admitted as much.

80.    Keith Ingram, the director of the elections division in the Secretary's office, told the Texas House Elections Committee, "In spite of all the circumstances, Texas had an election that was smooth and secure. Texans can be justifiably proud of the hard work and creativity shown by local county elections officials."

81.    Indeed, to underscore that the State's litigation against Harris County to reduce access to the franchise during the 2020 election was not motivated by legitimate concerns about

election security—and were instead unjustified, partisan acts—the Attorney General took to the airwaves in June of this year to claim that former President Trump would have lost Texas if not for these efforts to curtail the expansion of mail voting.

### 4.   Texas Officials' Efforts to Disenfranchise Voters in Other States

82.   Unable to identify any evidence of widespread voter fraud in Texas, the State's Republican leaders and elected officials launched an unprecedented effort to overturn the election results in *other* states.

83.   Republican Representative Briscoe Cain—who now serves as chair of the Texas House Elections Committee—traveled to Pennsylvania after election day to personally assist former President Trump's legal team in their efforts to invalidate Pennsylvania's election results. Representative Cain tweeted that he was going to Philadelphia "to link up with a team of attorneys from across the country to fight for a fair and honest election."

84.   A federal court eventually found that the lawsuit Representative Cain supported was comprised of "strained legal arguments without merit and speculative accusations." *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa.), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Commonwealth*, 830 F. App'x 377 (3d Cir. 2020).

85.   On December 8, 2020, the Attorney General filed a lawsuit on behalf of the State seeking to invalidate the election results in Georgia, Pennsylvania, Michigan, and Wisconsin, asserting outlandish, unsubstantiated claims that the elections in those states were riddled with "rampant lawlessness" and "illegal voting." His lawsuit ignored the fact that such claims had already been rejected by multiple courts.

86.    The attorneys general of Georgia, Pennsylvania, Michigan, and Wisconsin resoundingly condemned the lawsuit initiated by the Attorney General. Georgia's Republican attorney general characterized the lawsuit as "constitutionally, legally and factually wrong."

87.    The U.S. Supreme Court quickly dismissed the Attorney General's lawsuit after concluding that "Texas ha[d] not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, No. 155, 2020 WL 7296814, at *1 (U.S. Dec. 11, 2020).

88.    But even a clear ruling from the Supreme Court was not enough to stop the State's Republican officials from undertaking an unprecedented and extraordinary effort to disenfranchise millions of voters in other jurisdictions.

89.    On December 27, 2020, Republican Congressman Louis Gohmert, along with Arizona's Republican presidential electors, sued then-Vice President Mike Pence. Their lawsuit claimed that, as vice president, Pence had the "exclusive authority" to determine which electors, if any, should be counted for each state. This argument was widely regarded as a last-ditch effort to pressure the former vice president to overturn former President Trump's electoral defeat. A federal judge ultimately dismissed Congressman Gohmert's lawsuit for lack of standing.

90.    On January 6, 2021, the Attorney General spoke at the so-called "Stop the Steal" rally that immediately preceded the attack on the U.S. Capitol. He told the crowd that other states, including Georgia, had "capitulated" and that he would keep fighting to overturn the election results.

91.    After the resulting insurrection left one Capitol police officer dead and others severely injured, the Attorney General was the only state attorney general nationwide who did not

sign either of the two statements collectively issued by other attorneys general condemning the violence.

92.     The State Bar of Texas is currently investigating whether the Attorney General's actions in the aftermath of the 2020 election, including spearheading the State's case before the U.S. Supreme Court, constituted professional misconduct.

## II.     Senate Bill 7

93.     Having failed to overturn the legitimate results of the 2020 presidential election, Texas's Republican leaders shifted their focus to passing legislation that targeted mechanisms disproportionately used by Texas's minority voters to cast their ballots in the 2020 election.

94.     First, the Senate passed SB 7—the precursor to SB 1—which died on the floor of the Texas House after a long and peculiar journey, rife with political chicanery and procedural maneuvering by the Republican majority to limit the ongoing, robust public debate on the suppressive effects of the bill and the lack of any legitimate justification for enacting it.

95.     SB 7, in its final form, was primarily a combination of anti-voting provisions from voter suppression bills introduced in each chamber: the Senate's original SB 7 and House Bill 6 ("HB 6").

96.     When SB 7 was brought forward for consideration in the Senate's State Affairs Committee, it was met with resounding opposition from Democratic lawmakers and the public.

97.     Legal experts testified that SB 7 would "discriminate against people of color and people with disabilities" and have a "disparate impact on people of color."

98.     Witness after witness explained that SB 7 would result in the abuse and intimidation of voters—especially voters of color—and make it more difficult for eligible, lawful voters to exercise the franchise.

99.     The Harris County Elections Administrator characterized the limitations imposed by SB 7 as "applying Jim Crow sundown laws to voting."

100.    Despite the powerful testimony of so many Texans, SB 7 ultimately passed the Senate and was sent to the House for consideration.

101.    Meanwhile, in the House, HB 6's author, Representative Cain, attempted from its inception to shield the bill's contents and effects from public scrutiny and critical testimony.

102.    On March 25, 2021, more than 100 Texans arrived at the State Capitol to testify before the House Elections Committee on the impact of HB 6. They never got the chance, as Representative Cain abruptly ended the hearing nearly as quickly as it began.

103.    During Representative Cain's introduction of HB 6, Democratic Representative and Elections Committee Vice Chair Jessica González recognized fellow Democratic Representative Nicole Collier to question Representative Cain about his bill.

104.    There are no Black members on the Elections Committee, and Representative Collier explained that she wanted "to make sure that there was a member of the Texas Legislative Black Caucus that would be able to ask questions to the witnesses and the bill author about the impact that this bill [would have] on [the Black] community." As Representative Collier noted, "Texas has a history of disenfranchising people of color, Black and brown people, and this bill is another method to do that."

105.    Representative Cain refused to take questions from Representative Collier, abruptly demanding the gavel back from Representative González and adjourning the hearing.

106.    On April 1, the House Elections Committee reconvened to consider HB 6 a second time—this time with the benefit of public testimony.

107.    Hundreds of Texans from across the State spoke out against HB 6, with some waiting over 22 hours to testify about the suppressive effects the bill would have on minority communities.

108.    One witness testified that even though the voter suppression tactics of HB 6 were not "as blatant as the beatings, lynchings, jailings, and intimidation used in the past," they are "just as dangerous to communities of color."

109.    Another witness testified that the bill would "invite vigilantism by poll watchers, who would be allowed to remain in the polling place even if they were intimidating voters and interfering with the casting of ballots." She explained that "many people will be deterred from voting if they think someone is going to follow them around a polling place and watch them vote."

110.    Another witness testified that the bill would "provide free range for people to come to insult [election workers], to intimidate [election workers], to watch over [election workers], and to actually put [election workers] in jeopardy."

111.    After so many Texans testified about the harmful, discriminatory impact of HB 6, the bill stalled in committee and Representative Cain turned his attention to SB 7. Once SB 7 arrived in the House, Representative Cain's treatment of the bill was designed once again to avoid any further testimony from his colleagues or the public about the burdens the Senate's bill would place on voters, especially communities of color.

112.    On April 29, Representative Cain brought SB 7 up for a vote in the Elections Committee without advance notice to anyone—not even his colleagues—and without first conducting a public hearing or providing his colleagues with the text of the committee's version of the bill.

113.    Indeed, rather than consider the version of SB 7 passed by the Senate, Representative Cain replaced it with *his* bill: HB 6. As a result, the House was precluded from considering any public comment or feedback on the original contents of SB 7, and the Senate was stopped from considering any public comment or feedback on the contents of HB 6.

114.    With this parliamentary maneuvering, SB 7 passed out of the Elections Committee along party lines and over the vehement objections of Representative Cain's Democratic colleagues.

115.    Four Democrats on the Elections Committee went so far as to pen a letter to U.S. Attorney General Merrick Garland, "bring[ing] to [his] attention the dangerous and disenfranchising actions of the Texas Legislature" as it "attempted to pass overarching election legislation that will suppress the right to vote for Black and Latino Texans."

116.    The House Democrats noted in particular that they "were not afforded the courtesy of prior notice or a public hearing featuring testimony from members of our most vulnerable, historically underserved communities," which constituted "a grave deviation from standard operating procedure in the Texas Legislature."

117.    Within a week, SB 7 was brought to the House floor for debate, where its racist roots were laid bare.

118.    Representative Cain began by introducing SB 7 as a bill intended to protect the "purity of the ballot box." That same phrase—the "purity of the ballot box"—is the language in the Texas Constitution that was used to justify the disenfranchisement of Black Texans after the Civil War, all-white primaries in Texas, and Jim Crow voter suppression laws. Despite telling fellow lawmakers that he had "read the debates and the journals" from the Texas Constitutional

Convention of 1875, at which the "purity of the ballot box" language was added to the Texas Constitution, Representative Cain claimed to be unaware of this history.

119.     And despite claiming that the purpose of SB 7 was to protect voters, Representative Cain was unable to articulate *what* precisely it protects them from. Of particular note, in response to questions from fellow lawmakers, Representative Cain was unable to point to a single example of voter fraud in the 2020 general election and admitted that it was "probably right" that the election was "free, fair, and secure."

120.     When Representative González asked if he had spoken to any minority groups about how SB 7 could affect people of color, Representative Cain responded, "Yes, I've spoken to—I can't remember his name—in the hall and I've actually read some proposed amendments *yesterday* from the NAACP."

121.     That single hallway interaction, with an individual whose name he could not even recall, appears to be the extent of Representative Cain's interaction with any minority group concerned about the disparate impact that SB 7 would have on voters of color.

122.     Representative Cain admitted to lawmakers that he had not performed any analysis on how the bill might affect minority voters and had not performed an impact study despite being asked to do so by a member of the Elections Committee.

123.     During a series of questions posed by Representative Rafael Anchía about whether Representative Cain had considered the discriminatory effects SB 7 could have on people of color, Representative Cain explained that while it had "crossed his mind," he assessed whether any given provision would be "bad" based on his "heart" and "gut feeling."

124.    The final stretch of the legislative session was no less controversial—and no less revealing of the Legislature's true intent in pursuing election legislation following the 2020 election.

125.    With less than 48 hours to spare to secure the bill's passage, the Republicans on SB 7's conference committee announced that they had "reached an agreement," even though the Democratic lawmakers on the committee had not even seen the final text of the bill at the time that announcement was circulated.

126.    After finally seeing a draft of this massive overhaul of the State's election system, the Harris County Elections Administrator observed that voter suppression "is alive and well in Texas."

127.    Just hours after SB 7's final text was distributed, Republican Senator Bryan Hughes moved to suspend the Senate's regular order of business and take up SB 7's conference committee report. Although multiple senators requested more time to understand the bill's sweeping changes, Senator Hughes pressed on with accelerated deliberation.

128.    The final text of SB 7 included several provisions that were not included in either the House or Senate version of the bill. Consequently, Senator Hughes was forced to introduce a resolution seeking the Senate's permission to suspend Senate Rule 12.03(4) and *retroactively* permit SB 7's conference committee to add text to the bill on matters not included in the prior versions. Senator Hughes could name just one other instance in the entire 87th Legislative Session where that rule was suspended.

129.    This seldom-used procedural maneuver was employed to make a number of major changes to the bill—including adding a provision that created a more lenient standard for

overturning election results—without allowing the public an opportunity to provide testimony and opposing viewpoints.

130.    The Texas Senate ultimately passed SB 7 on a party-line vote, and the bill moved to the Texas House.

131.    Once the bill reached the House, it was brought up for consideration with just hours left in the legislative session. Ultimately, the departure of dozens of Democratic lawmakers left the House without a quorum, and the bill died on the floor.

132.    Even the limited scrutiny SB 7 received in the Legislature was more than enough to show that it was nothing more than a desperate response to—and a transparent attempt to abridge—the increased participation and growing voting strength of minority communities in Texas.

133.    In an interview on May 9, 2021, Republican Lieutenant Governor Dan Patrick specifically acknowledged that SB 7 was intended to roll back Harris County's success in facilitating access to the franchise.

134.    Ignoring that legal challenges brought against Harris County's innovations were largely unsuccessful, Lieutenant Governor Patrick explained that SB 7 was drafted in part because in the "last election Harris County went their own way, while the other 253 counties followed the law. Those are the issues we're going to address [in SB 7]."

135.    In other words, SB 7 was drafted to prevent the county with the largest minority population in Texas from effectively enfranchising its citizens. And the same is true of SB 7's successor legislation, SB 1.

### III.     Senate Bill 1

#### A.     Legislative History

136.     Immediately after SB 7 died on the floor of the House, Governor Abbott threatened to bring the Legislature back for a special session and veto the portion of the State's budget that funds the salaries and benefits for over 2,000 legislative staffers and individuals working at legislative agencies.

137.     Within a few weeks, Governor Abbott made good on both of his threats: on June 18, 2021, he vetoed Article X of the State's budget, and on July 7, he called the first special session of the 87th Legislative Session.

138.     Before the special session began on July 8, House Republicans filed House Bill 3 ("HB 3"), which largely mirrored the language of SB 7. Shortly after HB 3 was filed, Senate Republicans filed SB 1, which likewise mirrored the language of SB 7. The House and Senate scheduled simultaneous hearings on each chamber's respective bill for July 10, less than 48 hours after the start of the special session.

139.     On Saturday, July 10, hundreds of concerned Texans arrived at the State Capitol before 8:00 a.m. to once again express their opposition to legislation that would suppress the right to vote. But the House Elections Committee did not open public testimony until *1:41 a.m.* on Sunday, July 11—over 17 hours after the committee meeting began. Although the Senate committee moved more quickly, dozens of Texans had to wait well past midnight to testify in opposition to SB 1.

140.     During the Senate committee hearing, Senator Hughes, the author of SB 1, made several notable admissions.

141.    Despite the fact that SB 1 was—for the most part—a retread of SB 7, Senator Hughes admitted to fellow Senator José Menéndez that he had still not spoken with any minority advocacy or civil rights organizations about how SB 1 could affect voters of color. He instead claimed that there were "some minorities who are Republicans who support the bill."

142.    In response to questions from Senator Royce West, Senator Hughes admitted that he was unaware of any studies analyzing the disparate impacts of these voting restrictions on people of color—and that he had made no attempt to commission one.

143.    In addition, during SB 1's introduction, Senator Hughes was asked repeatedly for examples of voter fraud related to the methods of voting the bill restricts. He was unable to provide any actual examples of fraud.

144.    Indeed, Keith Ingram, the director of the Secretary's elections division, said definitively, "I don't think we have evidence of actual fraud."

145.    Texas Republicans made similar admissions during the House hearings. When questioned by his colleagues regarding the need for HB 3, its author, Representative Andrew Murr, was unable to offer examples of voter fraud related to either drive-thru voting or ballot drop boxes, both of which were targeted by the bill. Rather, Representative Murr said that he was "not saying the ballots that were cast were not successfully done," an apparent admission that he had no examples of voter fraud to offer—and no reason to believe that it had happened. Instead, he stated that the goal was to stop "one jurisdiction" from conducting their elections in a way that other counties were not, notwithstanding the intentionally decentralized structure of Texas's election system.

146.    In other words, the purpose of HB 3 was to stop Harris County—the largest majority-minority county in the Lone Star State—from continuing successful policies that helped

address the State's longstanding history of discrimination against minority voters, *not* to address any credible or real concerns about voting by Texans who were not qualified to do so.

147.    Like Senator Hughes, Representative Murr admitted that he had not conducted a disparate impact study to assess how the new voting rules would affect voters of color and was unaware of one being conducted by anyone else.

148.    With the voter suppression bills moving at a breakneck pace, and otherwise powerless to stem the tide of suppressive legislation, House Democrats left the State for Washington, D.C., denying the House the quorum it needed to enact new bills. The legislators vowed to remain outside of Texas until the end of the special session and urged Congress to pass federal voting rights legislation.

149.    For some House Democrats, the decision to depart Texas came at great personal cost: many had to forgo family, medical, or child-care obligations in order to defeat SB 1. Others faced professional retaliation; Representative Joe Moody, for example, was stripped of his position as speaker pro tempore of the Texas House.

150.    Ultimately, the first special session ended without a quorum in the House, and Governor Abbott immediately called a second special session with the express goal of passing restrictive voter suppression legislation.

151.    When the Senate reconvened for the second special session, SB 1 was reintroduced—again, without an accompanying disparate impact study. The author of SB 1 was still unable to provide a single example of voter fraud linked to the methods of voting targeted by the bill. And again, Texans arrived in droves to testify about the disenfranchising effects of the legislation. Nonetheless, SB 1 passed out of the Senate committee along a party-line vote.

152.    Faced again with the imminent passage of SB 1, Senator Carol Alvarado took to the Senate floor to filibuster the voter suppression bill. Unable to eat, drink water, or lean against her desk, Senator Alvarado remained standing on the Senate floor for over 15 hours, speaking in opposition to the bill, telling the stories of Texans from across the State, engaging in colloquies with her colleagues, and breaking down the harmful effects of SB 1 line by line. Senator Alvarado laid out in painstaking detail what so many Texans already knew: SB 1 is designed to—and, if enforced, will—burden the franchise for lawful voters.

153.    When the Texas House reconvened for the second special session of the summer, it was again left without a quorum. In the days that followed, House Republicans voted to issue arrest warrants for all absent members, signed by House Speaker Dade Phelan. Law enforcement officers were deputized to arrest the absent members and return them to the House chamber against their will.

154.    The absent members sought extraordinary relief, including seeking writs of habeas corpus to prevent their arrests. These efforts were, in the short term, unsuccessful, and a number of absent members returned to the House under threat of arrest.

155.    Upon reaching quorum, the House worked at lightning speed, scheduling a committee hearing on SB 1 just three days into the session, swiftly passing SB 1 out of committee along party lines, and placing SB 1 on the floor for a vote the very next day, when the full House was in session.

156.    At the beginning of the debate over SB 1, Speaker Phelan told members that he would "appreciate members not using the word racism" during the debate and repeatedly used his gavel to silence House members who attempted to raise the issue. During one pointed exchange,

Representative Gina Hinojosa asked Representative Anchía if "intentional discrimination against people of a different race [is] racism," and Speaker Phelan admonished her.

157.     Representative Murr also repeatedly argued that increasing voter turnout was not a proper policy objective for the State.

158.     Ultimately, after a 12-hour floor debate, SB 1 was passed along party lines and returned to the Senate, where it again passed along party lines.

159.     Governor Abbott signed SB 1 into law on September 7, 2021.

**B.     The Suppressive Provisions**

160.     SB 1 impacts almost every method of casting a ballot in Texas, including both absentee and in-person voting. *See* SB 1 §§ 3.04, 3.09–3.10, 3.12–3.13, 4.01–4.02, 4.06–4.07, 4.09, 4.12, 5.01–5.03, 5.07–5.08, 6.03–6.04, 7.04 (hereinafter, the "Suppressive Provisions"). These Suppressive Provisions make it harder for eligible voters to participate in elections and unreasonably burden elections administrators.

**1.     Absentee Voting**

161.     At the outset, SB 1 inhibits voters from learning about how they can cast ballots by limiting the ability of county officials to ensure that eligible voters receive absentee ballot applications.

162.     It goes so far as to *criminalize* efforts by public officials to solicit voters to submit applications to vote absentee if the voters have not already requested applications. It further criminalizes the use of public funds to facilitate third-party distribution of absentee ballot applications. *See* SB 1 § 7.04 (adding Tex. Elec. Code §§ 276.016–276.017, 276.019).

163.     For those voters who do learn that they are eligible to vote absentee, SB 1 imposes an additional voter-identification requirement. Both absentee ballot applications and absentee

ballot carrier envelopes must now include either the voter's driver's license or personal identification card number or the last four digits of their social security number. If a voter has neither, they must provide a statement affirming that they have "not been issued" such a number. SB 1 also imposes an additional requirement that voters requesting absentee ballots sign their applications using "ink on paper" and prohibits "photocopied" signatures. *Id.* §§ 5.01–5.03, 5.07–5.08 (amending Tex. Elec. Code §§ 84.001(b), 84.002(a), and 84.011(a) and adding Tex. Elec. Code §§ 84.002(b-1), 86.001(f)–(f-2), and 86.002(g)–(i)).

164.    SB 1 further burdens absentee voters by requiring that their ballots "be received by an election official at the time of delivery" and that the election official "record the voter's name, signature, and type of identification . . . on a roster prescribed by the secretary of state." *Id.* § 4.12 (amending Tex. Elec. Code § 86.006(a) and adding Tex. Elec. Code § 86.006(a-2)). These new requirements effectively eliminate ballot drop boxes.

165.    As discussed in Part I.B *supra*, during the 2020 general election, ballot drop boxes provided an option that thousands of Texas voters relied upon to ensure that their lawfully cast ballots arrived in time to be counted, particularly in Harris County, which is home to the State's largest minority population. Use of drop boxes allowed absentee voters to avoid the substantial risk that delays in U.S. Postal Service operations would prevent their ballots from being delivered in time to be counted.

166.    Personal delivery of ballots via drop box was also a more secure option than mail delivery: before dropping off a ballot in person, the voter was already required to present their identification to an election official. *See* Tex. Elec. Code § 86.006(a-1). SB 1 nonetheless imposes yet another unnecessary administrative barrier to in-person absentee ballot return that fails to provide even incremental protection against fraud.

## 2.    In-Person Voting

167.    In-person voters, especially those in large, diverse counties, are also burdened by the Suppressive Provisions.

168.    For example, SB 1 prohibits the types of drive-thru voting locations that Harris County and other jurisdictions provided to increase access to the franchise during the 2020 primary and general elections. *See* SB 1 §§ 3.04, 3.12–3.13 (amending Tex. Elec. Code §§ 43.031(b), 85.061(a), and 85.062(b) and adding Tex. Elec. Code § 85.062(f-1)); *see also supra* Part I.B.

169.    Prior to SB 1, Texas law allowed counties to operate early voting within "any stationary structure" or "a movable structure." Tex. Elec. Code § 85.062. Accordingly, Harris County provided its citizens a drive-thru voting option, which a division of the Secretary's office approved. This program allowed nearly 130,000 voters to exercise their fundamental right to vote in the midst of the COVID-19 pandemic.

170.    There were no reported issues of fraud or malfeasance connected to this drive-thru voting program. Nevertheless, SB 1's proponents apparently concluded that drive-thru voting was *too* convenient for Harris County's voters; the bill explicitly forbids this option.

171.    SB 1 also makes it more difficult to obtain assistance while voting in person.

172.    Under Texas law, a voter at a polling place can ask for assistance in marking their ballot if they have (1) "a physical disability that renders [them] unable to write or see" or (2) "an inability to read the language in which the ballot is written." Tex. Elec. Code § 64.031. But SB 1 adds an unnecessary requirement that an assistant chosen by a voter fill out a *separate form* providing the assistant's name, address, and relationship with the voter and stating "whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." The same form must be incorporated into the carrier

envelope and completed by any person who assists a voter in completing their absentee ballot. *See* SB 1 § 6.03 (adding Tex. Elec. Code § 64.0322).

173.    In addition, SB 1 requires voter assistants to swear that they will confine their assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." *Id.* § 6.04 (amending Tex. Elec. Code § 64.034). Accordingly, voter assistants are no longer permitted to answer any questions posed to them by the voter.

174.    SB 1 requires this new procedure despite the fact that Texas law already requires that the name and address of a voter assistant be recorded in the poll list, *see* Tex. Elec. Code § 64.032(d); requires that the person assisting a voter take an oath that they will not influence the voter's choices, *see id.* § 64.034; and makes it a crime to assist a voter who is not eligible for assistance, to assist a voter in any way not permitted by law, to influence the voter, to provide assistance that has not been requested, to violate the limitations on who may serve as an assistant, or for an election officer to permit an ineligible person to provide assistance or to allow a voter ineligible for assistance to receive assistance, *see id.* § 64.036.

175.    Adding to these new restrictions on voter assistance—and building on Texas's already hyper-criminalized electoral system—SB 1 imposes vague prohibitions against providing or offering to provide, in exchange for any compensation or benefit, "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure," and threatens criminal penalties against any person who engages in these so-called "vote harvesting services" (the "Voter Interaction Ban"). SB 1 § 7.04 (adding Tex. Elec. Code § 276.015).

176.     The breadth of these criminal prohibitions suppresses a wide range of completely legitimate and commonplace activities, including core political speech.

### 3.     Early Voting

177.     These unreasonable and unjustified restrictions on in-person voting are compounded by SB 1's limitations on early voting hours.

178.     SB 1 prohibits counties from operating early voting before 6:00 a.m. or later than 10:00 p.m. on every day except Sunday, when early voting hours are further restricted. *See id.* § 3.09–3.10 (amending Tex. Elec. Code §§ 85.005 and 86.006(b), (e)).

179.     These prohibitions specifically target the early voting hours that the State's larger and more diverse counties provided to their voters during the 2020 general election.

180.     As Harris County officials explained, their 24-hour voting program ensured that voters with irregular and inflexible work schedules were not denied their ability to exercise their constitutional right to vote. *See supra* Part I.B.

181.     Expanded in-person voting hours are critical to ensuring access to the polls in Texas, where the vast majority of voters are ineligible to vote by mail. *See* Tex. Elec. Code §§ 82.001–82.004 (limiting eligibility for absentee voting to voters absent from their counties, voters with disabilities that prevent them from voting in person, voters 65 years or age or older, and eligible voters confined in jail).

182.     During the 2020 general election, 10,250 voters took advantage of Harris County's 24-hour voting program, many of whom might not have participated in the election at all had Harris County not been permitted to provide 24-hour voting.

183.    SB 1's reduction of permissible early voting hours serves no legitimate state interest. There is no reason to believe that unlawful activity is more likely to occur when polling places operate before 6:00 a.m. or after 10:00 p.m.

184.    Nor is there any reason to believe that these limitations relieve any meaningful administrative burdens given that counties retained the discretion to offer extended voting hours before SB 1. To the contrary, extended hours for early voting *reduce* administrative burdens by relieving congestion at polling places.

### 4.    Partisan Watchers

185.    Perhaps most insidiously, SB 1 gives partisan poll watchers free reign in polling places and allows them to intimidate voters—while at the same time disempowering voters and elections officials who feel intimidated or harassed.

186.    The Election Code allows candidates and political parties to send watchers ("Partisan Watchers") to polling places to "observe the conduct of an election." Tex. Elec. Code § 33.001. SB 1 now prohibits election officers in polling places from refusing to accept Partisan Watchers, prohibits anyone from denying Partisan Watchers "free movement" within polling places, requires that Partisan Watchers be permitted to get close enough to "see and hear" a voter's every activity in the polling place (except for completion of a ballot at a voting station), criminalizes election officers' intentional or knowing refusal to accept Partisan Watchers for service, and further criminalizes any action taken "to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective." SB 1 §§ 4.06–4.07, 4.09 (amending Tex. Elec. Code §§ 33.051(a)–(b), (d)–(e), 33.056(a), and 33.061(a) and adding Tex. Elec. Code §§ 33.051(a-1), (g)–(h) and 33.056(e)–(f)).

187.    In addition, SB 1 prohibits the removal of Partisan Watchers for violations of the law "unless the violation was observed by an election judge or clerk." *Id.* § 4.01 (adding Tex. Elec. Code § 32.075(g)–(h)).

188.    SB 1 also directs Partisan Watchers to "call to the attention of an election officer any observed or suspected irregularity or violation of the law in the conduct of the election." *Id.* § 4.02 (adding Tex. Elec. Code § 33.0015). But despite this broad mandate, SB 1 does not require that Partisan Watchers' beliefs or suspicions that unlawful activity is occurring at the polls be tethered to what Texas law actually permits or prohibits.

189.    As a result, Partisan Watchers are likely to take issue with voter behavior they subjectively believe to be suspicious or untoward, even where that conduct is perfectly legitimate and lawful. This is exactly what happened in polling places across the country in 2020, when partisan poll watchers inundated with false conspiracy theories about widespread fraud were dispatched in droves to "observe" voters, particularly in jurisdictions with significant minority populations.

190.    By conferring such broad, unchecked authority upon Partisan Watchers, Texas, on information and belief, has knowingly and directly invited voter intimidation, while providing no meaningful protection for the voters who become the victims of this activity.

191.    Voter intimidation has long been a serious problem in Texas, particularly for Black and Latino voters. *See infra* Parts IV–V. In prior elections, minority voters have been subjected to disproportionate scrutiny at polling places and verbal harassment.

192.    During the 2020 general election, supporters of former President Trump on several occasions harassed minority voters standing in line to enter polling locations. Those voters were able to escape that harassment once they entered the polling place.

193.    Now, under SB 1, voters entering polling places are faced with a choice between securing the help they need to exercise their constitutional right to vote or risking intimidation or harassment by Partisan Watchers.

194.    And it is all but certain that the threat of criminal and civil sanctions will make election officials much less likely to confront Partisan Watchers who are abusing their positions—and will deter citizens from volunteering to serve their communities as election workers.

195.    Balanced against the voter intimidation that the Suppressive Provisions invite, and the chilling effects they will have on voters and election officials alike, SB 1's empowerment of Partisan Watchers cannot be justified by any legitimate state interest. The bill's proponents certainly offered no plausible justification; its supporters identified no credible evidence suggesting that Partisan Watchers are improperly denied either access to polling places or the opportunity to observe activities within polling places.

### C.    State Interests

196.    Indeed, *none* of the Suppressive Provisions is justified by a compelling—let alone legitimate—state interest.

197.    Texas Republicans have argued time and time again that the provisions at issue in SB 1 make it "harder to cheat." But throughout the debate over SB 1 and its predecessor legislation, the proponents of the legislation—including Governor Abbott—have been unable to point to a *single* credible example of voter fraud in the 2020 general election, much less any instance of the so-called "cheating" that SB 1 would have prevented.

198.    Political actors have tried and failed for decades to come up with evidence that widespread voter fraud has occurred in the United States. In Texas in particular, there has been a concerted effort by right-leaning entities to demonstrate that widespread fraud has occurred in the

State's elections or that its elections are somehow insecure—which, despite their persistence, they have consistently been unable to accomplish.

199.    In fact, in 2020, the Attorney General spent over 22,000 staff hours investigating allegations of voter fraud but resolved only *16* prosecutions. All 16 cases involved Texans who gave incorrect addresses on their voter registration forms, not one of whom received jail time.

200.    One of the few isolated instances of fraud that emerged from the 2020 election cycle was the case of 62-year-old Hervis Rogers, who waited six hours in line to cast a ballot in the presidential primary and was arrested more than a year later on charges that he unlawfully voted while on parole. At the time that Mr. Rogers cast his ballot, he believed that he was eligible to vote and, in fact, was just three months away from having his voting rights restored. The Attorney General ordered Mr. Rogers's arrest the day before the Legislature was set to meet in special session to consider new voting restrictions and quickly took to social media to announce the charges, tweeting, "Hervis is a felon rightly barred from voting under TX law . . . I prosecute voter fraud everywhere we find it!"

201.    The Suppressive Provisions, however, do nothing to prevent the use of incorrect voter registration addresses or deter individuals mistakenly voting while on parole.

202.    In fact, proponents of SB 1 have been unable to point to a *single* legitimate problem that the legislation actually solves.

203.    In response to questions from fellow lawmakers regarding SB 7, Representative Cain admitted that it was "probably right" that the 2020 election was "free, fair, and secure" and instead argued that he did not have to wait for something bad to happen to enact SB 7.

204.    Similarly, when pressed on the merits of SB 1 during a Senate hearing, Senator Hughes admitted that he was unaware of any fraud cases stemming from the 2020 election: "I

know that we heard testimony that there was difficulty getting election workers and poll watchers, but I don't know that [there was] evidence of fraud."

205.    Despite the complete lack of evidence to support Republicans' phantom claims of fraud, SB 1 will serve to deter service-minded Texans from volunteering as election workers and create myriad new restrictions that will burden the right to vote for the State's lawful voters.

## IV.    Texas's History of Suppressing Black and Latino Political Participation

206.    SB 1 is simply the latest manifestation of centuries-long efforts by Texas officials to limit Black and Latino political participation.

207.    "Texas has a long, well-documented history of discrimination that has touched upon the rights of Blacks and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682–83 (S.D. Tex. 2017) (quoting *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 439–40 (2006)); *see also Perez v. Abbott* ("*Perez II*"), 253 F. Supp. 3d 864, 888, 906 (W.D. Tex. 2017) (three-judge panel) ("Texas's history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented . . . .").

208.    Texas's ongoing history of voting discrimination against minorities has deep historical roots. In 1866, Texas prohibited freed slaves from voting and holding office. After Reconstruction-era policies expanded ballot access, Texas systematically fought to suppress minority voting rights.

209.    White Texans barred minority voters from participating in the Democratic Party, which so dominated the State's politics into the mid-twentieth century that no other party was even

relevant. By 1923, Texas had passed a law explicitly providing that "in no event shall a negro participate in a Democratic primary in the State of Texas, and declaring ballots cast by negroes as void." SB 44, 38th Leg., 2d Sess. (Tex. 1923). After the U.S. Supreme Court invalidated that law, Texas maneuvered around the ruling by allowing political parties to set their own qualifications, after which Black and Latino voters were immediately barred from political participation once again.

210.     Texas further engaged in systematic disenfranchisement of Black and Latino voters by capitalizing on language barriers and literacy disparities, going so far as to prohibit anyone from assisting "illiterate" individuals or non-English speakers at the polls. These restrictions remained in place until federal court intervention in 1970.

211.     Texas also used a poll tax to disenfranchise Black and Hispanic voters, who were significantly more likely to be living in poverty. This significantly depressed Black and Latino registration and turnout throughout much of the twentieth century.

212.     After the Voting Rights Act of 1965 increased registration rates among Black and Latino Texans, the State quickly legislated counteractive measures. The following year, Texas enacted a law requiring that every voter reregister each year, a measure intended to mimic the poll tax's burden on minority voters. After a federal court found this annual-registration requirement unconstitutional, *see Beare v. Smith*, 321 F. Supp. 1100, 1101–02 (S.D. Tex. 1971) (three-judge panel), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974), Texas purged minority voters from its rolls by requiring all voters in the State to reregister before voting in future elections. These and other tactics used against minority voters eventually led Congress to include Texas as a covered state under Section 5 of the Voting Rights Act in 1975.

213.    The long history of discrimination against Black and Latino Texans has produced stark disparities between the everyday lives of minority and non-Hispanic white Texans. Black and Hispanic Texans make up a disproportionate number of individuals living in poverty. According to the U.S. Census Bureau's 2017 American Community Survey ("ACS") 1-Year Estimate, 8.5 percent of non-Hispanic white Texans lived below the poverty line, compared to 18.9 percent of Black Texans and 20.7 percent of Hispanic Texans.

214.    Disparities also exist in the areas of employment and income. According to the 2011–2015 ACS 5-Year Estimate, the median income among non-Hispanic white Texans ($31,235 for individuals, $56,411 for households) was significantly higher than that among Black Texans ($26,786 for individuals, $39,469 for households) and Hispanic Texans ($22,402 for individuals, $41,248 for households).

215.    And according to a 2018 study by the Economic Policy Institute, non-Hispanic white Texans had a significantly lower unemployment rate (3.9 percent) than Black Texans (5.7 percent) and Hispanic Texans (4.5 percent).

## V.    Current Suppression of Black and Latino Political Participation

216.    While Texas's efforts to limit Black and Latino voters' access to the franchise have a long and shameful heritage, they are by no means a thing of the past. The State continues to lead the nation in efforts to suppress minority political participation.

217.    A 2018 study by the U.S. Commission on Civil Rights found that Texas had "the highest number of recent [Voting Rights Act] violations in the nation." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 74 (2018). In every redistricting cycle since 1970, a federal court has found that Texas diluted minority voting strength in violation of the Voting Rights Act or the U.S. Constitution.

218.    In 2006, the U.S. Supreme Court held that Texas had enacted a congressional map that unlawfully diluted the voting strength of Latino voters in direct response to those voters' growing political power. *See LULAC*, 548 U.S. at 436–42. These actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440.

219.    During the 2010 redistricting cycle, federal courts found that Texas had intentionally diluted Black and Hispanic voting strength in crafting new congressional and state legislative maps. *See Perez II*, 253 F. Supp. 3d at 949–62; *Perez v. Abbott* ("*Perez I*"), 250 F. Supp. 3d 123, 145–80 (W.D. Tex. 2017) (three-judge panel); *Texas v. United States*, 887 F. Supp. 2d 133, 159–66, 177–78 (D.D.C. 2012) (three-judge panel), *vacated and remanded on other grounds*, 570 U.S. 928 (2013).

220.    In 2016, an en banc panel of the U.S. Court of Appeals for the Fifth Circuit concluded that there was evidence that Texas's 2011 law requiring photo identification for voters was motivated by a discriminatory purpose. *See Veasey v. Abbott*, 830 F.3d 216, 225, 234–43 (5th Cir. 2016) (en banc). The Fifth Circuit further "conclude[d] that the district court did not clearly err in determining that [the photo identification law] ha[d] a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act." *Id.* at 265.

221.    Texas also continues to use the enormous power of its criminal justice system to suppress minority political participation. Since the Attorney General took office in 2015, at least 72 percent of the prosecutions brought by his Election Integrity Unit have been against Black and Hispanic individuals—who, as of 2018, made up just 44 percent of the State's population.

222.    Because the rules governing voter registration and ballot casting can be confusing, the threat of criminal prosecution for violating such rules significantly deters eligible voters from participating in the political process. The severe racial and ethnic disparities in Texas's election-

related prosecutions intimidate minority voters, discouraging their participation in the State's elections.

223.    The Attorney General has not been alone in undertaking efforts that have intimidated minority voters. In 2019, former Secretary of State David Whitley issued an advisory decision to county registrars claiming to have a list of 95,000 noncitizens who were unlawfully registered to vote. The list was rife with errors, particularly because it failed to account for noncitizens who had since become naturalized. A federal judge called Secretary Whitley's and the Attorney General's actions "ham-handed and threatening" and lamented that these efforts stoked "fear and anxiety" among the State's minority population and "intimidate[d] the least powerful among us." *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-74-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

224.    In addition to the constant threat of criminal prosecution, Black and Latino Texans routinely face intimidation and misinformation at the polls.

225.    Dallas County's former elections administrator stated in 2018 that the severity and intensity of voter harassment and intimidation had reached levels she had not seen in her 30 years of service. During that year's election, a white poll worker in North Houston yelled racial insults at a Black voter, stating, "Maybe if I'd worn my blackface makeup today you could comprehend what I'm saying to you," and, "If you call the police, they're going to take you to jail and do something to you, because I'm white."

226.    The 2020 election was no better. On the first day of early voting at a Dallas polling place, an older white man falsely told a long line of mostly Black and Latino voters that they would not be allowed to vote if they were not inside the building by the time the polls closed.

227.    At a different Dallas polling location, supporters of former President Trump blared messages aimed at Black and Latino voters while one of them told the voters that the only place he sends people is to the morgue.

228.    In Bexar County, individuals inside and in the beds of three large trucks with Trump campaign flags and posters made several slow passes in front of a polling place where a line of primarily Latino and Black voters were standing.

229.    On October 29, cars and military-style trucks gathered in the parking lot of a Fort Bend polling place with loudspeakers, bullhorns, and a coffin.

230.    Incidents of former President Trump's supporters engaging in similar intimidating behavior were reported in Tarrant, Montgomery, and Harris Counties.

231.    Minority voter intimidation is likely to get even worse in upcoming elections, particularly *inside* polling places. Texas Republicans recently called for an "army" of poll watchers to descend on polling places in Harris County with predominantly Black and Latino populations. One of the polling places they have specifically targeted is the Wheeler Avenue Baptist Church, a Black congregation with a long history of civil rights activism.

232.    Political campaigns in Texas commonly resort to racial appeals that rely on stereotypes. During the 2018 campaign for the U.S. Senate, Senator Cruz ran ads capitalizing on fears founded on the stereotype that Latino immigrants are violent criminals. He also mocked his opponent's call for an investigation into the police shooting of an unarmed Black man in the man's own apartment.

233.    In support of former Congressman Pete Olson, who was facing a challenge by Sri Preston Kulkarni in 2018, the Fort Bend County Republican Party circulated an advertisement

depicting Ganesha, a Hindu deity, asking, "Would you worship a donkey or an elephant? The choice is yours."

234.     That same year, Congressman Pete Sessions claimed that his Black opponent, now-Congressman Colin Allred, wanted to legalize crack cocaine, and ran a digital ad placing Congressman Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth.

235.     Local campaigns in the State have also included racial appeals. For example, Vic Cunningham, a white candidate for Dallas County Commissioner in 2018, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian."

236.     Race played an enormous role in the 2020 election, fueled in significant part by police killings of Black Americans like George Floyd and Breonna Taylor.

237.     In Texas, Republican officials publicly mocked the worldwide outrage and protests that these killings provoked. One county Republican chair posted a Martin Luther King Jr. quote on a background with a banana. Other county Republican chairs spread false conspiracy theories on social media suggesting that George Floyd's murder was staged and that the protesters demanding racial justice nationwide were being paid by George Soros. Attempting to further fuel the fire with these blatantly false assertions, Republican Agriculture Commissioner Sid Miller publicly stated that Soros was starting a "race war."

238.     During the 2020 U.S. Senate race, Republican incumbent John Cornyn deployed several racial appeals. He nicknamed potential opponent Royce West, who is Black, "Restful Royce"—a clear reference to a longstanding racist stereotype.

239.    Senator Cornyn also publicly blamed China's "culture" for the coronavirus outbreak, playing into the same racial appeals used by former President Trump and other Republicans, who, for example, referred to the pandemic as the "Kung-Flu." An Asian American studies expert called this language "textbook racist discourse."

240.    And, just a few months ago, a Republican candidate in the State's special congressional election outright declared that she did not want Chinese immigrants in the United States.

241.    As courts have long recognized, voting in Texas is severely racially polarized, with non-Hispanic white voters consistently and cohesively supporting candidates different from those supported by Black and Latino voters. *See Veasey*, 830 F.3d at 258 (noting State's failure to contest evidence that "racially polarized voting exists throughout Texas"); *Perez I*, 250 F. Supp. 3d at 180 (noting "the existence of racially polarized voting throughout Texas").

242.    The racially polarized voting patterns in Texas are driven in significant part by attitudes about race and ethnicity. The Black Lives Matter movement, racial equity, discriminatory policing, and immigration policies all played outsized roles in the 2020 election in Texas.

243.    Members of Texas's two major political parties also exhibit sharp disagreements over issues relating to race and ethnicity. Members of the Democratic Party—which Black and Latino voters in the State overwhelmingly prefer—are significantly more likely to view Texas's voting laws as racially discriminatory, support removing Confederate monuments from public spaces, oppose immediate deportation of undocumented immigrants, and support comprehensive immigration reform with a pathway to citizenship than members of the Republican Party, which non-Hispanic white voters overwhelmingly prefer.

244.    In 2008, the Cooperative Congressional Election Study found that *60 percent* of Texas Republicans supported reimposing a literacy test for voting, compared to just 24 percent of the State's Democrats.

245.    The ongoing disparities in minority political participation are also reflected by the fact that Black and Hispanic lawmakers are underrepresented in the State's elected offices.

246.    While Hispanic residents constitute nearly 30 percent of the State's citizen voting age population, just *three* Hispanic Texans occupy the State's 29 statewide offices. Less than 20 percent of the seats in Texas's delegation to the U.S. House of Representatives, less than 25 percent of the seats in the Texas Senate, and just 26 percent of the seats in the Texas House are held by Hispanic lawmakers.

247.    While Black residents constitute approximately 13 percent of the State's citizen voting age population, not a single Black official occupies any of the State's 29 statewide offices, and only two Black lawmakers sit in the 31-seat Texas Senate. At the local level, many communities with large Black or Hispanic populations lack any minority representation at all.

248.    Moreover, members of the Texas Supreme Court (the highest state court for civil and juvenile cases) and the Texas Court of Criminal Appeals (the highest state court for criminal cases) are elected to at-large positions with numbered places, limiting the power of Black and Hispanic voters. Out of 17 judges currently sitting on these two courts, none is Hispanic or Black.

## CLAIMS FOR RELIEF

## COUNT I

**52 U.S.C. § 10301(a)**
**Violation of Section 2 of the Voting Rights Act**
**Against All Defendants**

249.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

250.    Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that either has the purpose or result of denying or abridging the right to vote on account of race. 52 U.S.C. § 10301(a). Section 2 is violated by laws that are enacted with a discriminatory purpose *or* that have a discriminatory effect. *See Veasey*, 830 F.3d at 229, 243; *see also Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).

251.    Discriminatory intent may be established by proof that defendants used race as a motivating factor in their decisions. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Even where challenged legislation appears neutral on its face, discriminatory intent may be inferred by analyzing the context during and by which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact. *See id.* at 266–68; *Veasey*, 830 F.3d at 231–32.

252.    All of the relevant indicia demonstrate that a racially discriminatory purpose was a motivating factor in the passage of SB 1, particularly the Suppressive Provisions: SB 1 §§ 3.04, 3.09–3.10, 3.12–3.13, 4.01–4.02, 4.06–4.07, 4.09, 4.12, 5.01–5.03, 5.07–5.08, 6.03–6.04, 7.04. The bill was introduced following record-setting voter turnout among Texas's Black and Hispanic populations and increasing successes among candidates supported by Black and Hispanic voters.

Legislative consideration of SB 1 was rushed, opportunities for public comment and analysis were limited, and the bill's stated rationales were unfounded pretext.

253.    By surgically targeting election practices employed in Texas's largest and most diverse jurisdictions—methods on which the State's Black and Hispanic populations disproportionately rely—the Suppressive Provisions were intended to disproportionately restrict access to the franchise for Black and Hispanic voters.

254.    The harmful effects of the Suppressive Provisions of SB 1 on Plaintiffs' members and constituents will require Plaintiffs to divert resources into programs and efforts to mitigate the harm caused by the Suppressive Provisions that would have otherwise been used for separate activities.

255.    Moreover, Plaintiffs LULAC, AFT, and the Alliance are traditional membership organizations, each of which counts thousands of Black and Latino Texans as members. LULAC, AFT, and the Alliance have members who will be irreparably injured by the Suppressive Provisions of SB 1.[2]

256.    As a result, the Suppressive Provisions violate Section 2 of the Voting Rights Act.

---

[2] Plaintiffs are not required to identify specific injured members in their pleadings. *See, e.g.*, *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012); *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2021 WL 5003274, at *4 (E.D. Tex. Oct. 28, 2021); *APFA Inc. v. UATP Mgmt. LLC*, No. 4:21-cv-00108-O, 2021 WL 1814695, at *5 (N.D. Tex. May 6, 2021); *Lewis v. Hughs*, 475 F. Supp. 3d 597, 613 (W.D. Tex. 2020).

## COUNT II

**U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983**
**Undue Burden on the Right to Vote**
**Against Defendants Gonzales, Garza, Ogg, Rodriguez, Creuzot, Rosales, Callanen,**
**DeBeauvoir, Longoria, Ramón, Scarpello, and Wise**

257.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

258.    Under the First and Fourteenth Amendments to the U.S. Constitution, a state cannot utilize election practices that unduly burden the right to vote.

259.    When addressing a challenge to a state election practice, a court balances the character and magnitude of the burden the practice imposes on the right to vote against the justifications offered by the state in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

260.    "However slight th[e] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

261.    As to Count II, Plaintiffs challenge provisions of SB 1 that:

    a.    Create additional burdens on voters requesting absentee ballots by imposing onerous, arbitrary identification requirements, *see* SB 1 §§ 5.02–5.03, 5.07–5.08, and on voters submitting absentee ballots by effectively eliminating ballot drop boxes, *see* SB 1 § 4.12;

    b.    Create additional obstacles for voters to receive assistance at the polls or in completing and submitting absentee ballots, *see id.* §§ 6.03–6.04; and

      c.    Empower partisan poll watchers to harass voters and encourage voter intimidation tactics, *see id.* §§ 4.01–4.02, 4.06–4.07, 4.09.

262.    These provisions individually and cumulatively burden the fundamental right to vote.

263.    SB 1's prohibition on ballot drop boxes eliminates a method of voting that absentee voters across Texas have relied upon to participate in the political process without advancing any state interest.

264.    The additional obstacles that SB 1 imposes on voters seeking assistance, and on individuals who assist voters, makes it more difficult for elderly voters, voters with disabilities, and voters with limited language proficiency to participate in the political process.

265.    In-person voters will also be forced to contend with newly empowered Partisan Watchers, whose intimidating behavior will go largely unchecked. Election officials are now prohibited from denying entry to Partisan Watchers, and because SB 1 threatens election officials with *criminal penalties* if they refuse to accept Partisan Watchers or take any action that obstructs Partisan Watchers' ability to observe activities in polling places, election officials will be much less likely to confront Partisan Watchers who abuse their positions.

266.    The Suppressive Provisions were enacted not to protect the right to vote, but to burden it. They are part of a scheme to weaponize unfounded allegations of fraud as a means to restrict access to the franchise. Their ultimate goal is to warp the electorate by making it harder for certain voters—minority voters in particular—to participate in the political process. The Suppressive Provisions target these voters to silence their voices and ensure that their collective voting strength does not translate to political power or accountability.

267.    This is nothing new, particularly in Texas. Courts have routinely found that Texas lawmakers have repeatedly restricted access to the franchise as a shield against demographic and partisan changes in the state.

268.    Moreover, by targeting communities that favor candidates of the Democratic Party, SB 1 serves to impermissibly fence out Democratic voters from the franchise.

269.    The blatantly partisan and disenfranchising considerations that fueled the Suppressive Provisions are not legitimate, much less compelling, governmental interests. The Suppressive Provisions thus cannot be justified under any standard of scrutiny.

270.    Several of the Suppressive Provisions of SB 1, specifically §§ 4.01–4.02, 4.06–4.07, 4.09, 4.12, and 6.03–6.04, will force Plaintiffs to divert resources from other programs in order to educate their members and constituents on how to successfully vote in Texas given the new restrictions imposed by SB 1.

271.    Plaintiffs LULAC, AFT, and the Alliance have members who have voted using a ballot drop box, which is prohibited by SB 1, § 4.12. LULAC and the Alliance have members who have received—or will in the future need—assistance voting in person or via an absentee ballot, which is limited by SB 1, §§ 6.03–6.04; and LULAC, AFT, and the Alliance have members who now face an increased risk of intimidation and harassment at the polls as result of the increased power SB 1, §§ 4.01–4.02, 4.06–4.07 and 4.09 provide to partisan poll watchers—something that could keep the members from the polls entirely.[3]

---

[3] *See supra* note 1.

272.    As a result, the burdens they impose on voters in Bexar, Travis, Harris, Hidalgo, Dallas, and El Paso Counties, and other counties throughout the State, violate the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT III

**U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983**
**Restriction on Free Speech and Expression**
**Against Defendants Gonzales, Garza, Ogg, Rodriguez, Creuzot, Rosales, Callanen,**
**DeBeauvoir, Longoria, Ramón, Scarpello, and Wise**

273.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

274.    The First Amendment to the U.S. Constitution protects against laws "abridging the freedom of speech." Free speech is protected both "from abridgment by Congress" and "from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

275.    Courts apply "strict scrutiny" to content-based restrictions on speech. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163.

276.    Strict scrutiny also applies to laws that burden political speech. *See, e.g.*, *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438–39 (5th Cir. 2014) (en banc). Efforts to encourage and assist voters constitute "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988); *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("'Free trade in ideas' means free trade in the opportunity to persuade to action . . . ." (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))).

277.    The Voter Interaction Ban prohibits any in-person interaction with a voter that takes place "in the physical presence of an official ballot or a ballot voted by mail" with intent to deliver votes for a specific candidate or measure, if the individual conducts such activities in exchange "for compensation or other benefit," with "benefit" vaguely defined as "anything reasonably regarded as a gain or advantage." SB 1 § 7.04 (adding Tex. Elec. Code §§ 276.015).

278.    These prohibited activities, which the Voter Interaction Ban refers to as "vote harvesting services," encompass a wide range of interactions and conversations that may occur between Plaintiffs, their employees and organizers, and voters. *Id.*

279.    Anyone who "directly or through a third party" "knowingly provides or offers to provide vote harvesting services in exchange for compensation or benefit" or "knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services" is subject to civil and criminal penalties. *Id.* A violation of this provision is punishable by up to ten years in prison and a fine of up to $10,000. *See id.*; Tex. Penal Code § 12.34.

280.    Interactions with voters, however, are inherently expressive, and an individual or organization that conducts such activities—whether formally or informally—engages in speech by encouraging participation in the political process. *Cf. Bernbeck v. Moore*, 126 F.3d 1114, 1115–16 (8th Cir. 1997) (rejecting argument that regulation of election "process" raises no First Amendment concerns).

281.    The Voter Interaction Ban is so broadly defined that it chills everything from core political speech to everyday common courtesy. Answering a voter's question about a candidate, handing a voter a sample ballot, discussing the merits of a candidate or ballot measure, or simply

telling a voter where to park when they arrive to drop off their ballot could all be deemed "vote harvesting services" if a ballot is nearby.

282.    The Voter Interaction Ban also restricts speech from broad categories of individuals—including some of Plaintiffs' members and employees, and most anyone who receives a "benefit" from an organization that supports a candidate or ballot measure—from communicating with prospective voters simply because of the perceived content of their message.

283.    The extensive reach of these restrictions and the accompanying threat of criminal and civil penalties will deter Plaintiffs' members and volunteers from participating in Plaintiffs' voter education and GOTV efforts, thereby limiting the means by which Plaintiffs and their constituents communicate with voters and engage in the political process.

284.    The Voter Interaction Ban thus violates the First Amendment because it infringes on the rights of free speech and free expression and imposes an outright prohibition on many forms of core political speech. These restrictions are not justified by any compelling state interest; other Texas laws already criminalize any undue influence or voter fraud that SB 1 might be intended to address. *See*, *e.g.*, Tex. Elec. Code § 276.013 (criminalizing "any effort to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process"); *id.* § 64.012 (criminalizing voting or attempting to vote ballot belonging to another person, impersonating another person, and marking or attempting to mark another person's ballot without their consent or specific direction).

285.    Plaintiffs LULAC, AFT, and the Alliance have members who have engaged in voter education and GOTV efforts. These members' protected speech will be chilled by the Voter

Interaction Ban.[4]  And Plaintiffs will be forced to divert resources from other programs in order to combat the chilling effects of the Voter Interaction Ban on their members and their constituents.

286.    As a result, SB 1 denies Plaintiffs and their members the rights guaranteed to them under the First Amendment to the U.S. Constitution.

**COUNT IV**

**52 U.S.C. § 10508**
**Violation of Section 208 of the Voting Rights Act**
**Against All Defendants**

287.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

288.    Section 208 of the Voting Rights Act guarantees voters with disabilities and voters with limited language proficiency the right to assistance by a person of the voter's choice. *See* 52 U.S.C. § 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice.").

289.    The U.S. Senate Judiciary Committee, in recommending Section 208's passage, recognized that voters with disabilities are best protected when they can choose the person who assists them with voting. *See* S. Rep. No. 97-417, at 62 (1982) ("To . . . avoid denial, or infringement of [the covered voter's] right to vote, the committee has concluded that they must be permitted to have the assistance of a person of their own choice.").

290.    Voting in this context includes "all action necessary to make a vote effective in any primary, special, or general election." 52 U.S.C. § 10310(c)(1); *see also OCA-Greater Hous. v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (noting that voting "plainly contemplates more than the

---

[4] *See supra* note 1.

mechanical act of filling out the ballot sheet" and "includes steps in the voting process before entering the ballot box").

291.    SB 1 prohibits anyone from engaging in any in-person interaction with a voter "in the physical presence of an official ballot" with intent to deliver votes for a specific candidate or measure if the individual conducts such activities in exchange "for compensation or other benefit." SB 1 § 7.04 (adding Tex. Elec. Code §§ 276.015).

292.    This provision effectively prevents broad categories of individuals—including some of Plaintiffs' members and employees, and most anyone who receives compensation from an organization that supports a candidate or ballot measure—from providing assistance to eligible voters because any such assistance would constitute an "in-person interaction" with a voter "in the presence of an official ballot or a ballot voted by mail." *Id.*

293.     By effectively preventing broad categories of individuals from assisting voters, SB 1 denies eligible voters, including Plaintiffs LULAC, AFT, and the Alliance's members— some of whom require assistance marking or reading their ballots—the right to receive assistance from the person of their choice as required by federal law.[5]

294.    As a result, SB 1's restriction on assisters impermissibly curtails the rights conferred by Section 208 of the Voting Rights Act and is thus preempted by federal law.

---

[5] *See supra* note 1.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a.      Declaring that SB 1 §§ 3.04, 3.09–3.10, 3.12–3.13, 4.01–4.02, 4.06–4.07, 4.09, 4.12, 5.01–5.03, 5.07–5.08, 6.03–6.04, and 7.04 violate Section 2 of the Voting Rights Act;

b.      Declaring that SB 1 § 7.04 violates Section 208 of the Voting Rights Act;

c.      Declaring that SB 1 §§ 4.01–4.02, 4.06–4.07, 4.09, 4.12, 5.02–5.03, 5.07–5.08, and 6.03–6.04 violate the First and Fourteenth Amendments to the U.S. Constitution;

d.      Declaring that SB 1 § 7.04 violates the First and Fourteenth Amendments to the U.S. Constitution;

e.      Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to the requirements of SB 1 §§ 3.04, 3.09–3.10, 3.12–3.13, 4.01–4.02, 4.06–4.07, 4.09, 4.12, 5.01–5.03, 5.07–5.08, 6.03–6.04, and 7.04 that violate Section 2 of the Voting Rights Act;

f.      Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to the requirements of SB 1 § 7.04 that violate Section 208 of the Voting Rights Act;

g.      Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to the requirements of SB 1 §§ 4.01–4.02, 4.06–

4.07, 4.09, 4.12, 5.02–5.03, 5.07–5.08, and 6.03–6.04 that violate the First and Fourteenth Amendments to the U.S. Constitution;

h.    Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to the requirements of SB 1 § 7.04 that violate the First and Fourteenth Amendments to the U.S. Constitution;

i.    Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

j.    Granting such other and further relief as the Court deems just and proper.

Dated: January 18, 2022.

Respectfully submitted,

*/s/  Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Haley Costello Essig*
Kathryn E. Yukevich*
Graham W. White*
Noah B. Baron*
Michael B. Jones*
Marcos Mocine McQueen
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
hessig@elias.law
kyukevich@elias.law
gwhite@elias.law
nbaron@elias.law
mjones@elias.law
mmcqueen@elias.law

John R. Hardin
Texas State Bar No. 24012784
**PERKINS COIE LLP**
500 North Akard Street, Suite 3300
Dallas, Texas 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
johnhardin@perkinscoie.com

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice

Domingo Garcia
Texas State Bar No. 07631950
**LAW OFFICE OF DOMINGO GARCIA PC**
1111 West Mockingbird Lane, Suite 1200
Dallas, Texas 75247-5012
Telephone: (214) 941-8300
dgarcia@lulac.org

*Counsel for Plaintiff LULAC Texas*