**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br>*Plaintiffs*,<br><br>v.<br><br>GREGORY W. ABBOTT, *et al.*,<br>*Defendants.* | § § § § § § § § | Case No. 5:21-cv-844-XR |
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br><br>v.<br><br>THE STATE OF TEXAS, ET AL.,<br>*Defendants* | § § § § § § § § | Case No. 5:21-cv-1085-XR |

**STATE DEFENDANTS' RESPONSE TO THE UNITED STATES'
OPPOSED MOTION TO COMPEL PRODUCTION**

State Defendants have already produced millions of records and dozens of fields[1] from two separate state databases—one from the Texas Secretary of State ("SOS") and one from the Texas Department of Public Safety ("DPS")—to the United States. As part of that process, State Defendants spent the Christmas and New Year's holidays negotiating both an ultrasensitive protective order and a cohort of fields from each database to be produced to the United States; responded to technically complex discovery that outlined precisely what the parties understood would be exchanged, in-person on an encrypted hard drive; and put to work separate teams of information technology specialists programming code for pulling the agreed fields. Just days before delivery, however, the United States—without having even seen the data—demanded additional information. But the United States does not need the data it already has, let alone the additional data it now seeks.

The United States requests the contents of three additional fields: 1) the "Card Status" field; 2) the "Surrendered DL/ID Number" field; and 3) the "License Surrendered" field. This request is irrelevant to the United States' claims because these fields contain no information about whether individuals physically possess a DPS-issued driver's license or ID card. Instead, the fields might contain evidence of cards from other states being surrendered or of one DPS-issued card being surrendered pursuant to DPS issuing another card. Neither can help the United States prove its claim.

Furthermore, forcing State Defendants to undergo the burdensome process of extracting fields data is not proportional to the needs of this case, particularly given that this second go-round will produce no additional benefit. State Defendants have already produced everything from the

---

[1] The SOS and DPS electronic databases, or files, are files that contains records on millions of Texans. For example, the Texas Department of Public Safety has driving records on every Texan with a driver's license. Those electronic records include "fields" that organize the records in the database. A non-electronic example of how the databases are organized would be a common phone book. The book is a file, the individuals identified in the book are records, and the records contain fields like name, address, and phone number. Here, the DPS and SOS databases are the books, the records are individual Texans, and the fields are each piece of data held in each record. State Defendants have already produced millions of records and dozens of fields in response to the United States's requests.

database that could possibly be useful to the United States. If anything, compelling production is likely to be a net negative, sending both the parties and the Court down a rabbit hole of competing expert analysis about the contents of fields that will have no bearing on the ultimate resolution of this case. Essentially, the United States's request asks for information that does not exist, imposes an undue burden to produce other information that will then be misinterpreted, threatens to bog down this Court with correcting that misinterpretation, and in the end will result in dated, useless information once the misinterpretation is resolved. It is difficult to imagine a bigger waste of time and energy.

Worse still, even if the production somehow did result in factual data the United States anticipates, such information could have no bearing on the resolution of this case. The United States' claim turns on whether a voter is denied the right to vote by mail because of an error or omission that is not material to the voter's qualifications. That is a legal question, not a factual one. Rather than focus on that threshold issue, however, the United States issued a Request for Production that, in relevant part, requested information on millions of Texans that is held in a database maintained by DPS. State Defendants have already produced all relevant and proportional information pursuant to that request, amounting to millions of records that total millions more fields of data, all in a good-faith effort to meet the aggressive time constraints involved in this litigation.

**BACKGROUND**

On November 4, 2021, the United States brought suit challenging three discreet sections of SB1—Sections 5.07, 5.13, and 6.04—claiming that the first two sections violate the Section 101 of the Civil Rights Act of 1964 (the "Materiality Provision") and that the third violates Section 208 of the Voting Rights Act. Following consolidation five days later, the United States issued its First Requests for Production on November 12, requesting extracts from databases maintained by SOS and DPS that contain vast amounts of information on millions of Texans. The Court held a status conference on November 16, which featured the United States' acknowledgement that this case involved "an

extremely aggressive schedule" that was "only possible if the parties agree to participate in discovery and not engage in dilatory tactics." Ex. D at 37-38. The Court agreed, observing that "none of us have time to fight over motions to compel." Ex. D at 39. In specifically addressing the United States' request for database excerpts, the Court further suggested that requests for admission followed by interrogatories might well achieve the United States' goals instead, which the United States promptly rebuffed. *Id.* at 44. Explaining its reluctance to follow this route, the United States expressed uncertainty that State Defendants "would be willing or able to conduct this analysis with the sort of degree of accuracy and expertise that the experts that the United States has retained have been able to do in the past." *Id.* at 44; *but see* Ex. E, United States First Set of Interrogatories (requesting that State Defendants respond to inquiries about SOS's TEAM database that the United States itself is fully capable of answering by using the database information produced by Defendants).

Following this status conference, State Defendants began to negotiate in good faith with the United States on both a protective order for this ultra-sensitive information and on the particular data fields that would be produced. Toward this end, State Defendants conferred with the United States on multiple occasions, including on December 6, December 9, and December 14, each time making substantial concessions in an effort to avoid the need for court intervention. While the United States appeared to agree to the particular fields on December 14, it followed up the next day with dated documents from nearly-decade-old litigation that it misinterpreted to demonstrate that three additional fields from DPS's 29-million-person database were relevant to determining whether an individual physically possesses DPS-issued identification. That same day, State Defendants timely served their Objections and Responses to the United States' First Request for Production. *See* Ex. A.

In the month that followed, SOS and DPS both worked diligently to meet the agreed-upon deadline for producing the relevant databases. State Defendants and their counsel also zealously pursued other discovery obligations in an attempt to meet this case's accelerated schedule. In

3

particular, substantial time and effort were dedicated to responding to other discovery requests from the United States, including its Second Request for Production, four Rule 45 subpoenas requesting production from non-party legislators, its First Requests for Admission, and its First Set of Interrogatories. That is to say nothing of State Defendants' other responsibilities in relation to the multitude of Private Plaintiffs in this consolidated litigation, nor the new lawsuit and preliminary injunction motion filed by a former plaintiff in this suit that also challenges SB1.

Through it all, the United States remained silent about these three irrelevant fields from the date it received State Defendants' Objections and Responses to their Request until mid-January, when it could be assured that adding those extra fields would be logistically impossible. Nonetheless, the United States informed State Defendants on January 12 that it would seek to compel production of the three additional fields. On January 18, 2022—following a burdensome month-long process for extracting the requested data—State Defendants produced records for millions of Texans that included all 30 data fields that had been agreed upon. A conference between the United States and State Defendants the following day failed to resolve the remaining disagreement, despite State Defendants again reiterating that the additional fields being sought were irrelevant, would cause confusion for no discernible benefit, and would require the entire month-long process be repeated. The United States' Motion to Compel followed on January 24, to which State Defendants now respond.

**ARGUMENT**

**I.  The Three Additional Data Fields Are Irrelevant to the United States' Claims.**

The United States challenges three particular provisions of the election integrity statute (SB1) that was recently enacted by the Texas Legislature. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Legis., 2d Spec. Sess. (Tex. 2021). While the United States advances two claims in this case, its First Request for Production only pertains to one of those claims—that Sections 5.07 and 5.13 of SB1

4

violate the Materiality Provision of the Civil Rights Act of 1964. Section 5.07 provides that an application to vote by mail that does not contain the same identifying information as the voter's application for voter registration will be rejected. Tex. Elec. Code Ann. § 86.001(f). Section 5.13 provides that a voter's mail-in ballot may not be accepted if the identifying information provided by the voter in the accompanying carrier envelope does not match the voter's application for voter registration. Tex. Elec. Code Ann. § 87.041(b)(8).

The United States argues that Sections 5.07 and 5.13 deny individuals the right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting," even though such errors or omissions are "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). It attempts to explain the relevance of the three additional fields to its Materiality Provision claim by theorizing that those fields "indicate whether some voters actually possess identification showing the number they must recite." ECF 205 at 8. However, as State Defendants have repeatedly attempted to explain in their discussions with the United States as well as their written Objections and Responses, these fields in fact "do not indicate whether an individual currently possess the license or identification" that meets the requirements of Sections 5.07 and 5.13. Ex. A at 18; *see also* Ex. B ¶¶ 4, 8.

Before receiving State Defendants' explanations, it was understandable why the United States would believe that the "Surrendered DL/ID Number" and "License Surrendered" fields would contain relevant information. However, these fields are designed to capture information related to the surrender of *out-of-state* driver's licenses or identification cards.[2] Ex. B ¶ 3. If an applicant for a Texas

---

[2] While the system's allowance for manual data entry may, on rare occasions, result in the mistaken entry of information on a surrendered identification document issued by DPS, the inclusion of such information in these fields is nothing more than a clerical error. These fields do not provide accurate information about whether that individual physically possesses a DPS-issued ID or the frequency of such surrenders in the aggregate. Ex. B ¶ 4.

5

driver's license or ID card still possesses such a card from another state, that out-of-state card must be surrendered when the Texas card is issued. Ex. B ¶ 6. These fields are designed to record whether the applicant's previous card from another state was surrendered, allowing DPS officials to share that information with their counterparts in other states. Ex. B ¶ 3. Obtaining information on whether applicants submitted an out-of-state ID card and, if so, what the identification number was for that card, is completely irrelevant to any determination of whether that individual currently possesses a DPS-issued driver's license or ID card.

The "Card Status" field is also not relevant. DPS utilizes this field to indicate whether there is one of any number of issues with a particular card that needs resolution. Ex. B ¶ 5. The universe of potential issues is by no means narrowly circumscribed, but those issues do have one thing in common—none of the issues or accompanying information are shared with SOS or otherwise used to determine voting eligibility, by mail or otherwise. Ex. B ¶ 5. While the field may show that an individual surrendered at some point in the past, it does not give any indication of whether the individual kept possession of another DPS-issued card at the time or was subsequently issued a new card. Ex. B ¶ 7. For example, the field may contain information on cards that were surrendered pursuant to the Texas's compliance with the federal REAL ID Act. Ex. B ¶ 6. After all, both federal law and Texas state law only permit a person to hold one driver's license *or* one identification card, but not both. *See* 6 C.F.R. § 37.29; Tex. Transp. Code Ann. § 521.183. Thus, the "Card Status" field cannot be relied upon to determine whether any individual currently has physical possession of a DPS-issued card. Ex. B ¶ 7.

## II. The Three Additional Data Fields Are Not Proportional to the Needs of the Case.

Even if the requested fields for 29 million Texans were relevant to the United States' claim, the Request would still fall short of meeting the distinct requirement for proportionality. *See Samsung Electronics Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017) (observing that relevancy and

proportionality "are related but distinct requirements"); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019) (stating that "relevance alone does not translate into automatic discoverability" because "[a]n assessment of proportionality is essential"). Rule 26's proportionality requirement is meant to "relieve[] parties from the burden of taking unreasonable steps to ferret out every relevant document." *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). Given the overwhelming amount of information contained in DPS's database, that requirement is especially pertinent here. Because the burden of providing these additional fields outweighs any likely benefit, the United States' request for these fields is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

The United States argues that "Defendants' recent production of TEAM and DPS database extracts demonstrates that such information can be produced without undue burden or expense." ECF 205 at 10. But that is a non sequitur. After lengthy negotiations, State Defendants reluctantly agreed to produce an immense amount of information contained in 30 data fields in order to avoid the very situation the United States has now created—the parties squabbling over minutia that will in no way determine the outcome of this case. The United States' attempt to transform State Defendants' willingness to accept these substantial burdens in the first instance into an argument that State Defendants are now duty bound to accept equal burdens in perpetuity should be rejected out of hand.

Make no mistake, complying with the United States' request the first time was a time-consuming, arduous affair. Ex. C ¶ 10. The technical experts at DPS first had to develop a "requirements document," which involves defining the data elements to be included, identifying the tables in which those elements reside, and defining the rules for extraction. Ex. C ¶ 3. That document then had to be reviewed and approved by DPS's Driver License Division as well as multiple teams from DPS's Information Technology Division. Ex. C ¶ 4. Next, DPS's Application Development team had to create and review the code to extract the data. Ex. C ¶ 5. That team then had to execute

7

the code in order to generate a test file, which involves confirming that the test contents match the requirements and then estimating the duration needed for the production extraction based on that test. Ex. C ¶ 6. DPS then had to extract the data, verify that extracted data, and place the encrypted data on the selected media for delivery. Ex. C ¶¶ 7-8. DPS was able to accomplish this in about a month the first time it produced the millions of records contained in the agreed-upon data field extracts. Ex. C ¶ 9. This process would be similarly burdensome the second time around.

Indeed, because the information in the DPS database is ever-changing, producing the three additional fields would require DPS to start over from square one and again produce all the other data field extracts all over again. Ex. C ¶ 11. DPS has no capability of capturing what the data was on the date of the first extraction and extracting the information in only the additional fields would produce a mismatch between the two data sets. Ex. C ¶ 11. In essence, the United States is requesting that State Defendants reproduce mountains of information that it already has so that it can also produce a few additional fields that it does not need. This waste of time and resources would endanger State Defendants' ability to continue to meet the agreed-upon expedited schedule in this case.

Production of the three additional fields is especially wasteful because the information provides no discernible benefit to the United States. As discussed above, those fields do not contain the information that the United States seems to believe, and the useful information in all the other fields has already been produced once. Should the United States persist in its mistaken belief and attempt to improperly utilize the information to prove lack of physical possession, confusion and a further waste of resources would ensue. But even if the fields could provide information on physical possession, they would still be of no benefit in this instance. That is because the Materiality Provision's application here is a pure question of law for which further factual development is unnecessary.

State Defendants filed their Motion to Dismiss on December 14, 2021, to which the United States responded on January 18, 2022. Thos filings both feature ample discussion of the United States'

claim under the Materiality Provision. To briefly review, the legal question of materiality focuses on whether the sought-after information is required (or prohibited) under other statutes. *See Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1174–75 (11th Cir. 2008). The provision asks "whether, accepting the error [or omission] as true and correct, the information contained in the error [or omission] is material to determining the eligibility of the applicant." *Browning*, 522 F.3d at 1175 (emphasis omitted). Courts have applied the provision to requirements analogous to those in this case, consistently finding such requirements valid. For example, *Browning* rejected a challenge to the requirement that registrants provide either their driver's license number or last four digits of their Social Security number to register to vote. *See id.* at 1174. Similarly, an Arizona district court rejected a challenge to the state's requirement that voters provide proof of citizenship, reasoning that because "only citizens may vote," the state could reasonably require proof of citizenship to vote, and that the state's "decision to require more proof than simply affirmation by the voter is not prohibited." *Gonzalez v. Arizona*, No. CV 06- 1268-PHX-ROS, 2007 WL 9724581, at *2 (D. Ariz. Aug. 28, 2007).

State Defendants' dismissal motion, which is still pending before this Court, applies these well-established legal principles to make three main arguments in relation to the Materiality Provision. First, the ample opportunities to cure incomplete or mismatched identifying information mean that Sections 5.07 and 5.13 do not deny any individual the opportunity to vote by mail. ECF 145 at 10-11. Second, even if those provisions prohibited some voters from voting by mail, they still would not violate the Materiality Provision because those voters could still vote in person. *Id.* at 12-13. Third, even if those sections of SB1 absolutely prohibited someone from voting, they still would not run afoul of the Materiality Provision because determining a would-be voter's identity is essential to ensuring that person qualifies to vote. *Id.* at 13. For its part, the United States contests all three legal arguments, contending that SB1's cure procedures do not fix SB1's alleged infirmity, ECF 195 at 22-25, that the existence of in-person voting is irrelevant, *id.* at 25-26, and that a voter's identification number is

immaterial to determining whether he is qualified to vote, *id.* at 19-20. State Defendants do not summarize these purely legal disputes here to further their arguments on the merits. Rather, State Defendants provide this summary to demonstrate that these *are* purely legal disputes.

Even if the three additional fields contained information on physical possession, that would not assist this Court in determining the purely legal matter before it. If State Defendants' legal arguments prevail, the number of individuals that lack physical possession of their identification documents would not matter because the information required under Sections 5.07 and 5.13 is material to those individual's qualifications to vote and/or do not infringe of their voting rights. Conversely, if the United States' legal positions are correct, the only possible relevance of determining whether individuals physically possess identification documents would be to demonstrate an injury sufficient to confer standing. But this determination would have no impact on the merits.

Additionally, the party primaries are less than a month away, and the United States has already agreed not to seek a preliminary injunction pursuant to those elections. By the time State Defendants would be able to provide this additional requested discovery, those primaries will have come and gone, and any data received will already be dated to the point of uselessness. State Defendants should not be burdened with an unnecessary re-do when the March primaries themselves will provide ample evidence of the rate that applications and mail-in ballots are rejected and not subsequently cured or cancelled in favor of in-person voting. Should the United States feel the need to sure up its standing, discovery in relation to this rate of rejection would be a far more accurate and less burdensome means of doing so. Given the substantial burden, potential for confusion, and lack of any benefit, the United States' effort to compel production of these additional fields should be denied.

## CONCLUSION

The United States' motion to compel production of three additional fields should be denied.

| | |
|---|---|
| Date: February 9, 2022 | Respectfully submitted. |
| | |
| K<small>EN</small> P<small>AXTON</small><br>Attorney General of Texas | */s/ Patrick Sweeten*<br>P<small>ATRICK</small> K. S<small>WEETEN</small><br>Deputy Attorney General for Special Litigation<br>Tex. State Bar No. 00798537 |
| B<small>RENT</small> W<small>EBSTER</small><br>First Assistant Attorney General | |
| | W<small>ILLIAM</small> T. T<small>HOMPSON</small><br>Deputy Chief, Special Litigation Unit<br>Tex. State Bar No. 24088531 |
| | E<small>RIC</small> A. H<small>UDSON</small><br>Senior Special Counsel<br>Tex. Bar No. 24059977 |
| | K<small>ATHLEEN</small> T. H<small>UNKER</small><br>Special Counsel<br>Tex. State Bar No. 24118415 |
| | L<small>EIF</small> A. O<small>LSON</small><br>Special Counsel<br>Tex. State Bar No. 24032801 |
| | J<small>EFFREY</small> M. W<small>HITE</small><br>Special Counsel<br>Tex. State Bar No. 24064380 |
| | O<small>FFICE OF THE</small> A<small>TTORNEY</small> G<small>ENERAL</small><br>P.O. Box 12548 (MC-009)<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2100<br>Fax: (512) 457-4410<br>patrick.sweeten@oag.texas.gov<br>will.thompson@oag.texas.gov<br>eric.hudson@oag.texas.gov<br>kathleen.hunker@oag.texas.gov<br>leif.olson@oag.texas.gov<br>jeff.white@oag.texas.gov |

**C<small>OUNSEL FOR</small> S<small>TATE</small> D<small>EFENDANTS</small>**

**C<small>ERTIFICATE OF</small> S<small>ERVICE</small>**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 9, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick Sweeten*
Patrick Sweeten