**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| HOUSTON JUSTICE, et al., | |
| *Plaintiffs,* | |
| v. | 5:21-cv-0844-XR |
| GREGORY WAYNE ABBOTT, et al., | |
| *Defendants.* | |
| MI FAMILIA VOTA, et al., | |
| *Plaintiffs,* | |
| v. | |
| GREG ABBOTT, et al., | |
| *Defendants.* | |

## HOUSTON JUSTICE AND MI FAMILIA VOTA PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

ARGUMENT. ............................................................................................................... 1

I.  THE TEXAS GOVERNOR, SECRETARY OF STATE, AND ATTORNEY
    GENERAL ARE PROPER DEFENDANTS. .......................................................... 2

    a.  Sovereign Immunity Does Not Apply to Plaintiffs' Voting Rights Act, ADA, and
        Rehabilitation Act Claims ............................................................................... 2

        i.  *Ex parte Young* is Satisfied as to the Remainder of Plaintiffs' Claims.................... 5

            1.  The Secretary of State is a Proper Defendant. ................................... 7

            2.  The Attorney General is a Proper Defendant. .................................. 11

    b.  Plaintiffs Have Standing to Bring their ADA, Section 504, and Section
        208 Claims ...................................................................................................... 13

        i.  Plaintiffs Have Standing to Bring Their 208 Claims ............................. 13

        ii.  Courts Routinely Uphold Associational Standing Without Individual
             Participation in ADA Cases ...................................................................... 14

II.  STATE DEFENDANTS DENY PLAINTIFFS MEANINGFUL ACCESS TO
     VOTING ............................................................................................................... 20

    a.  That Other Voting Options May be Accessible to Plaintiffs Does Not Negate
        Defendants' Obligations to Remedy the Discriminatory Effects of SB 1 .............. 20

        i.  SB 1's Reasonable Modifications Clause Does Not Remedy Plaintiffs' Claims 22

    b.  The ADA Prohibits Implementing Discriminatory Policies ..................................... 23

CONCLUSION. ......................................................................................................... 24

The Houston Justice and Mi Familia Vota Plaintiffs' Second Amended Complaint sets forth hundreds of pages of detailed facts establishing that provisions of the so-called Election Integrity Protection Act of 2021 (SB 1), wielded by the State Defendants, will harm the Plaintiffs and abridge their statutory and Constitutional rights. These allegations are sufficient to move forward on all claims against the State Defendants.

The Secretary of State and Attorney General are proper defendants because each is sufficiently tasked with enforcement of Texas's election laws, and each has demonstrated a desire and willingness to exercise that authority in pursuit of their unsupported claim that voter fraud threatens the integrity of Texas's elections. Nothing more is required to invoke the *Ex parte Young* exception to sovereign immunity.

The Governor cannot invoke immunity because he is named only in causes of action for which Congress has abrogated sovereign immunity. In these counts, the Governor stands in for the State itself. State Defendants do not argue that the Governor is an inappropriate defendant under these circumstances, choosing instead to dispute Fifth Circuit precedent regarding Congressional abrogation of sovereign immunity. That precedent, which establishes that the Governor is a proper defendant here, binds this Court.

As to The Arc of Texas's claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"), State Defendants' arguments demonstrate a fundamental misunderstanding of these laws and the concept of associational standing and systemic ADA and Section 504 claims. As outlined below, Plaintiffs have stated a claim under the ADA and Section 504.

## ARGUMENT

State Defendants challenge the Court's subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and challenge some of the Second Amended Complaint's claims as deficient under

Rule 12(b)(6). In evaluating both challenges, this Court is required to review the Second Amended Complaint "liberally and accept all of the plaintiff's factual allegations in the complaint as true." *Miller v. Hughs*, 471 F. Supp. 3d 768, 774 (W.D. Tex. 2020). If the Second Amended Complaint's allegations plausibly allege a jurisdictional basis and plausibly allege that State Defendants are responsible for the alleged misconduct, the motion must be denied. *Id.*

## I. THE TEXAS GOVERNOR, SECRETARY OF STATE, AND ATTORNEY GENERAL ARE PROPER DEFENDANTS.

State Defendants argue that all claims against them should be dismissed because they lack a sufficient enforcement connection to the challenged provisions, and therefore are not subject to the *Ex parte Young* exception to sovereign immunity. The State's motion ignores precedent regarding Congressional abrogation of sovereign immunity and misapplies *Ex parte Young*.

Sovereign immunity generally bars suits against state officials acting in their official capacities, but multiple exceptions to sovereign immunity apply to Plaintiffs' claims. First, Congressional abrogation or waiver exempt Plaintiffs' claims under the Voting Rights Act, Title II of the ADA, and section 504 of the Rehabilitation Act from sovereign immunity. Second, the Supreme Court's *Ex parte Young*, 209 U.S. 123 (1908), decision creates an exception to sovereign immunity in suits for injunctive relief against officials who have a sufficient enforcement connection to the challenged law. Plaintiffs address each in turn.

      a.  <u>Sovereign Immunity Does Not Apply to Plaintiffs' Voting Rights Act, ADA, and Rehabilitation Act Claims</u>

Defendants are not immune from suit under Plaintiffs' statutory claims. As State Defendants acknowledge, binding Fifth Circuit precedent recognizes that Congress abrogated sovereign immunity when it passed the Voting Rights Act of 1965 ("VRA"). *See* State Defendants' Motion to Dismiss the Houston Justice Plaintiffs' Second Amended Complaint ("Mot.") at 17, ECF No. 239 ("*OCA-Greater Houston v. Texas* holds that the VRA abrogates sovereign immunity, 867 F.3d 604, 614 (2017) . . .").

The Fifth Circuit has repeatedly held that "[t]here is no sovereign immunity with respect to Voting Rights Act claims." *Mi Familia Vota*, 977 F.3d 461, 469 & n.26 (5th Cir. 2020). State Defendants' sovereign immunity arguments thus have no bearing on Plaintiffs' claims under sections 2 and 208 of the VRA.[1]

The Arc of Texas's claim under Title II of the ADA is also exempt from sovereign immunity. "Congress can abrogate this immunity if it (1) 'makes its intention to abrogate unmistakably clear in the language of the statute' and (2) 'acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment.'" *Block v. Texas Bd. of L. Examiners*, 952 F.3d 613, 617 (5th Cir. 2020). The first prong is met, as Congress clearly stated in the statute its intent to abrogate sovereign immunity. *See id.*; *see also* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court . . . for a violation of" the ADA); *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). As to the second prong, the Supreme Court applies a three-part test to determine, on a claim-by-claim basis, whether Title II validly abrogates sovereign immunity. *Block*, 952 F.3d at 617. It asks "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.*

State Defendants' assertion of sovereign immunity with respect to Plaintiffs' ADA claims boils down to and is coextensive with their argument that Plaintiffs have not pleaded a violation of Title II. *See* Mot. at 18. However, as explained *infra* section II, Plaintiffs have sufficiently pleaded that SB 1's

---

[1] In urging the Court to hold otherwise, State Defendants cite only an out-of-circuit dissenting opinion. *See* Mot. at 17 (citing *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting).

onerous new rules regarding mail-in ballots and voter assistance violate Title II of the ADA. And unreasonably burdening Plaintiffs' right to vote is conduct that violates both the ADA and the Fourteenth Amendment. *See, e.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.); *see also Valentine v. Collier*, 993 F.3d 270, 280–81 (5th Cir. 2021) (alleged conduct that violated ADA and Eighth Amendment, which applies to the states through the Fourteenth Amendment, abrogated sovereign immunity under Title II).

Moreover, though *Lane* pertained to court access, the Court also extended its analysis to other areas protected by Title II, including voting:

> The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings, including unjustified commitment…the abuse and neglect of persons committed to state mental health hospitals…and irrational discrimination in zoning decisions…The decisions of other courts, too, document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, *and voting*. Notably, these decisions also demonstrate a pattern of unconstitutional treatment in the administration of justice.

541 U.S. at 524–25 (emphasis added) (citing *Doe v. Rowe*, 156 F. Supp. 2d 35, 57 (D. Me. 2001) (in case challenging state guardianship law as discriminating against voters with disabilities, holding that "Court concludes that State Defendants may not invoke sovereign immunity to shield them from Plaintiffs' claims under Title II of the ADA.")) (other internal citations omitted). *See also Fla. State Conf. of the NAACP v. Lee*, No. 4:21CV187-MW/MAF, 2021 WL 6072197, at *9 (N.D. Fla. Dec. 17, 2021) (citing *Lane* for "explaining that Title II of the ADA validly abrogated state sovereign immunity under the Fourteenth Amendment, in part, because it targeted discrimination against disabled persons in voting.").

Finally, under Section 504 of the Rehabilitation Act, a state waives its Eleventh Amendment immunity as to claims under Section 504 by accepting federal funds. *See* 42 U.S.C. § 2000d-7(a); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005) (en banc) (Louisiana education agencies

waived immunity from Section 504 claims by accepting federal funding); *Danny R. ex rel. Ilan R. v. Spring Branch Indep. Sch. Dist.*, 124 F. App'x 289, 289–90 (5th Cir. 2005) (citing *Pace* in holding that TEA is not immune from suit under Section 504). As State Defendants receive federal funding for elections, they have waived their immunity to suit under Section 504.[2] *See* Second Am. Compl. ¶ 361. The State's summary assertion that Plaintiffs "plead no facts showing such a waiver," Mot. at 18, simply ignores this portion of the Second Amended Complaint.

### i. Ex parte Young *is Satisfied as to the Remainder of Plaintiffs' Claims*

The remainder of the Plaintiffs' claims—those brought to enforce the Constitution and pursuant to 42 U.S.C. § 1983—fall within the *Ex parte Young* exception to sovereign immunity.[3] Under that exception, "[s]uits for injunctive or declaratory relief are allowed against a state official acting in violation of federal law if there is a 'sufficient "connection" to enforcing an allegedly unconstitutional law.'" *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021) (quoting *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020)). To establish a "sufficient connection," Plaintiffs need only show that the defendant "[has] the particular duty to enforce the statute in

---

[2] Texas has a significant pool of federal funds earmarked for making elections accessible and secure. The Texas Secretary of State's Election Funds Management Division receives and administers federal funding throughout the state. From 2020-21, Texas received $26,064,574 in funding through the Help American Vote Act ("HAVA"). Help America Vote Act (HAVA), Tex. Sec'y of State, John B. Scott, https://www.sos.texas.gov/elections/hava/hava_act.shtml (last visited Feb. 10, 2022); Texas Secretary of State, Help America Vote Act (HAVA) Update, Texas Association of Counties Legislative Conference (Aug. 27, 2020), https://www.sos.texas.gov/elections/forms/hava/HAVA-grant-presentation-TAC-8272020-update.pdf. In addition, Texas received $24,546,840 - pursuant to the CARES Act in 2020. *See* Election Assistance Commission – CARES Grant Funding Chart - July 22nd 2020, https://www.eac.gov/sites/default/files/paymentgrants/cares/FundingChart_CARES.pdf (last visited Feb. 10, 2022); Letter from Ruth R. Hughs, Tex. Sec'y of State, to Mona Harrington, Acting Exec. Dir., U.S. Election Assistance Comm'n (May 14, 2020), https://www.eac.gov/sites/default/files/paymentgrants/cares/TX_CARES_Disbursement_RequestLetter.pdf.
[3] To the extent the Court holds that Title II of the ADA does not abrogate sovereign immunity as to The Arc of Texas's claims, the enforcement authority articulated herein sufficiently exempts the claim from sovereign immunity under *Ex parte Young* as to the Secretary of State and Attorney General.

question and a demonstrated willingness to exercise that duty." *Id.* at 168 (citing *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). A "'scintilla of enforcement' by the relevant state official with respect to the challenged law will do." *Id.* at 179 (citing *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)). Moreover, "if an official *can* act, and there's a significant possibility that he or she *will* . . . the official has engaged in enough compulsion or constraint to apply the *Young* exception." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) (alteration in original) (internal citation omitted).

State Defendants appear to interpret the requirement that a defendant have "some connection" with enforcement of each challenged provision to mean that the defendant must be the last, or most Plaintiff-facing, link in the enforcement chain. *See, e.g.*, Mot. at 10 (suggesting authority to "bring[] an enforcement action" is necessary to render Secretary of State a proper defendant). Recent precedent that is directly on point shows otherwise. In *Texas Democratic Party v. Abbott*, plaintiffs who wished to vote by mail ballot during the COVID-19 pandemic challenged Texas's restriction of mail voting to those over the age of 65 or, if younger, only those who could satisfy certain disability or absentee criteria. 978 F.3d at 174. They named the Secretary of State as a defendant. The Fifth Circuit held that the Secretary of State had a sufficient enforcement connection to the exclusion of the plaintiffs from mail voting by virtue of the Secretary's "specific and relevant duty to design the application form for mail-in ballots, and to provide that form to local authorities and others who request it." *Id.* at 179 (citing Tex. Elec. Code §§ 31.002(a)-(b)). "Because local authorities are required to use the Secretary's absentee-ballot form outside of emergency situations, the Secretary has the authority to compel or constrain local officials based on actions [he] takes as to the application form." *Id.* at 180. Importantly, even though the court identified a "division of responsibilities" relating to absentee-ballot applications, it held "the Secretary has the needed connection." *Id.* at 180. It is not the case, as the State Defendants suggest, *see, e.g.,* Mot. at 10, that local officials' involvement in carrying

out some of the provisions of SB 1 absolves the State Defendants of their enforcement connection. *See, e.g.*, *City of Austin*, 943 F.3d at 1001 ("direct enforcement" of the challenged law is not required; "actions that [constrain] the plaintiffs [are] sufficient to apply the *Young* exception"); *see also Air Evac EMS, Inc. v. Texas Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017). Nor does *Ex parte Young* require that the Secretary be in a position to "bring[] an enforcement action." Mot. at 10.

Under *Ex parte Young*, Plaintiffs have pled an enforcement connection sufficient to sustain their claims against the Secretary of State as to Counts One, Two, and Three, and against the Attorney General as to Counts One, Two, Three, and Six.[4] Because the Governor is sued only pursuant to the Voting Rights Act, the *Ex parte Young* analysis is unnecessary as to him.

### 1. *The Secretary of State is a Proper Defendant.*

The Secretary of State is tasked with both overseeing the implementation of the Texas Election Code as a whole and enforcement of the provisions that Plaintiffs challenge. State Defendants' argument otherwise should be rejected.

As "chief election officer of the state," the Secretary of State maintains a significant role in enforcing SB 1 as part of the Texas Election Code. *See* Tex. Elec. Code § 31.001(a); *see also OCA-Greater Hous. v. Texas*, 867 F.3d at 614 (Secretary of State is "responsible for the administration and implementation of election laws in Texas, including ensuring the uniform application and interpretation of election laws throughout Texas."). That authority is reiterated throughout the Texas Election Code, as amended by SB 1. Among the Secretary's duties is to "prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code," Tex. Elec. Code § 31.003; coercive authority over election administrators to

---

[4] Counts Four, Five, Seven, and Eight are also brought against the Secretary and Attorney General, but, as discussed above, sovereign immunity does not apply to those claims.

guard against abuse, Tex. Elec. Code § 31.005; and to assist and advise all election officials on the application, operation, and interpretation of the Texas Election Code and to refer violations of election laws to the Attorney General, SB 1 § 2.08, Tex. Elec. Code § 31.006.

In addition to the Secretary's chief election officer role and the myriad responsibilities that come with that role, the Secretary is specifically and directly tasked with enforcing numerous aspects of SB 1. *See, e.g.*, SB 1 §§ 2.04, 2.05, 2.06, 2.08, 3.08, 3.10, 4.12, 4.14, 5.12, 87th Leg., 2nd Spec. Sess. (Tex. 2021).

Section 2.05, which Plaintiffs challenge, tasks the Secretary with creating and implementing voter purges using information from the Department of Motor Vehicles. SB 1 § 2.05 (amending Tex. Elec. Code § 16.0332(a-1) (providing the Secretary of State authority to enforce county registrars' compliance with SB 1 § 2.07) (amending Tex. Elec. Code § 18.068(a)). Sections 2.06 and 2.07 directly address the Secretary's authority in enforcing section 2.05.

Section 2.08 requires the Secretary to refer to the Attorney General "information indicating that criminal conduct in connection with an election has occurred." SB 1 § 2.08 (amending Tex. Elec. Code § 31.006). That enforcement authority implicates all of the criminal provisions of SB 1 that Plaintiffs challenge. Thus, by virtue of section 2.08, the Secretary has a direct enforcement authority as to the challenged poll watcher provisions in Sections 4.01-4.04, 4.06, and 4.09, the disclosure requirements in sections 6.01, 6.03 and 6.05, and the prohibition on the use of public funds to facilitate access to applications for mail ballots in section 7.04.

As discussed above, the Fifth Circuit has explicitly held that "the specific and relevant duty to design the application form for mail-in ballots" and "the authority to compel or constrain local officials based on actions [the Secretary] takes as to the application form," is sufficient for *Ex parte Young* purposes. *Texas Democratic Party*, 978 F.3d at 179-80; *see also* Tex. Elec. Code. § 31.002(b); *and see Lewis v. Hughs*, 475 F. Supp. 3d 597, 610 (W.D. Tex. 2020), *aff'd and remanded,* No. 20-50654, 2020 WL

5511881 (5th Cir. Sept. 4, 2020), *order withdrawn,* No. 20-50654, 2020 WL 6066178 (5th Cir. Oct. 2, 2020) (finding Texas Secretary of State to be a proper party in challenges to four provisions governing mail-in voting). Throughout SB 1, the Secretary is tasked with prescribing or updating the application for mail-in ballots and forms or rosters to enforce the Act's mandates. The Secretary will have to update the application for a mail-in ballot to implement SB 1's unlawful identification requirements in sections 5.02, 5.03, 5.07, and 5.08. *See Texas Democratic Party*, 978 F.3d at 179 (noting Secretary has the "specific and relevant duty to design the application form for mail-in ballots"). The Secretary is tasked with amending forms to accommodate SB 1's assistor provisions, specifically in sections 6.01 and 6.03. *See* SB 1 § 6.01 (amending Tex. Elec. Code § 64.009 to add subsection (f)); SB 1 § 6.03 (adding Tex. Elec. Code § 64.0322(b) governing forms to be completed by voter assistants). And the Secretary must prescribe a roster to be completed by election officials to ensure that no drop boxes may be used. *See* SB 1 § 4.12(a-2) (amending Tex. Elec. Code § 86.006). Finding that any of these provisions is unlawful "might lead to prohibiting the Secretary from using an application form" that is unlawful, satisfying *Ex parte Young. See Texas Democratic Party*, 978 F.3d at 180. The State Defendants do not acknowledge *Abbott*'s holding in this regard.

The Secretary is also directly assigned to enforce challenged Section 3.15 of SB 1, which eliminates straight-party voting: "The [S]ecretary of [S]tate shall adopt rules and establish procedures as necessary for the implementation of the elimination of straight-party voting to ensure that voters and county election administrators are not burdened by the implementation." Tex. Elec. Code § 31.012(d). The State Defendants do not acknowledge or address this clear enforcement authority.

In addition, SB 1 expands the Secretary's role in creating procedures for, and enforcing compliance by local registrars with, key provisions of SB 1. *See* SB 1 § 2.06 (amending Tex. Elec. Code § 18.065(e)); *see id.* § 3.08 (amending Tex. Elec. Code § 66.044, and tasking the Secretary with adopting rules regarding the opening and closure of polling places); *see id.* § 5.12 (adding Tex. Elec. Code §

87.0271(f)) (Secretary of State has authority to proscribe procedures for the implementation of signature verification committees); *see id.* § 5.14 (adding Tex. Elec. Code § 87.0411(f)) (Secretary of State has authority to proscribe procedures for the implementation of early voting ballot boards). As in *Texas Democratic Party*, these provisions give the Secretary "authority to compel or constrain local officials based on actions [he] takes," which in turn will harm the Plaintiffs. 978 F.3d at 180.

In short, SB 1 repeatedly and explicitly gives the Secretary of State "specific and relevant dut[ies]," and "the authority to compel or constrain local officials based on actions [the Secretary] takes." *Id.* at 179–80. The Secretary has more than a "scintilla" of enforcement authority under SB 1, which is enough to overcome the alleged immunity on Plaintiffs' constitutional claims. *Id.* at 179.

Moreover, there is no reason to doubt the Secretary's willingness to exercise his new authorities. Indeed, the Secretary has involved himself in the enforcement of SB 1 in several ways already. *See* Ashley Goudeau, *Texas This Week: Texas Secretary of State discusses implementation of new elections law*, KVUE (Dec. 26, 2021), https://www.kvue.com/article/news/politics/texas-this-week/texas-this-week-texas-secretary-of-state-full-interview/269-5f5e2476-0dea-47a9-bccd-6db163115848 (Defendant Scott describing his office's role as "referee," "able to throw the flag" regarding implementing SB 1). The Secretary created a permanent Election Audit Division to carry out the requirement that his office conduct forensic election audits. *See* Press Release, *ICYMI: Secretary John Scott: Full Forensic Audit will Restore Faith in Texas Elections* (Nov. 22, 2021), https://www.sos.texas.gov/about/newsreleases/2021/112221.shtml. And the office recently "call[ed] on Travis County to immediately review and re-examine" applications for mail ballots that Travis County rejected under SB 1. *See* Press Release, *Secretary Scott Calls on Travis County to Correct Erroneous Mail Ballot Application Rejections* (Jan. 14, 2022), https://www.sos.state.tx.us/about/newsreleases/2022/011422.shtml.

## 2. *The Attorney General is a Proper Defendant.*

When Plaintiffs' original and Amended Complaints were filed, the Attorney General was directly tasked with criminal enforcement of the election laws, including the general authority to "prosecute a criminal offense prescribed by the election laws of this state." Tex. Elec. Code § 273.021. The Texas Court of Criminal Appeals subsequently held section 273.021 of the Texas Election Code unconstitutional. *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021). The State has vehemently disagreed with that ruling and taken the position in a pending motion for reconsideration that the "Texas Attorney General has had the authority to prosecute certain election-law violations for 70 years," urging the Texas Court of Criminal Appeals to reconsider its decision holding otherwise. State of Texas's Motion for Rehearing at 1, *State v. Stephens*, No. PD-1032-20 (Dec. 30, 2021) (attached as Exhibit A).[5] But in the motion to dismiss before *this* Court, the State does an about-face, arguing that the Attorney General lacks such authority and the Court must "take the word" of the Texas Court of Criminal Appeals. Mot. at 16. Whatever the State Defendants' ultimate position on this issue, the *Stephens* court acknowledged that the Attorney General may be invited by a local district attorney to prosecute a violation of the Election Code, meaning the Attorney General will retain a connection to criminal enforcement of SB 1, even in the event that the *Stephens* ruling is not reconsidered. *See Stephens*, 2021 WL 5917198 at *9. While the Fifth Circuit rejected similar authority as satisfying the *Ex parte Young* exception in *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), State Defendants fail to mention in their motion that that decision was later vacated, *sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) (mem).

---

[5] Ken Paxton (@KenPaxtonTX), Twitter (Dec. 15, 2021, 2:43 PM), https://twitter.com/KenPaxtonTX/status/1471204223559872513 (calling the ruling "devastating for future elections in Texas").

More importantly, in addition to the authority discussed above, and apart from any effect of the *Stephens* decision, the Attorney General is tasked with enforcing section 18.065 of the Texas Election Code against the counties—including provisions that require counties to maintain "suspense lists" of voters—and is empowered to collect civil fines against counties who do not comply. *See* SB 1 § 2.06 (adding Tex. Elec. Code § 18.065(f)-(g)); Tex. Elec. Code § 18.065(a); Tex. Elec. Code § 15.083. SB 1 also explicitly holds election officials liable to the state for violations of any provision of the Texas Election Code, including those created or amended by SB 1—such as offering extended hour or drive-through voting. SB 1 § 8.01 (adding Tex. Elec. Code §§ 31.128, 31.129). All alleged violations are referred specifically to the attorney general for enforcement. SB 1 § 4.11 (amending Tex. Elec. Code § 34.005); SB 1 § 2.08 (amending Tex. Elec. Code § 31.006). Through these provisions, the Attorney General constrains local officials, which limits the voting options they can offer to voters, in turn harming Plaintiffs. *See Tex. Democratic Party*, 978 F.3d at 180.

The State complains that Plaintiffs did not, and cannot, show that the Attorney General is likely to enforce SB 1. This argument – which implies that the Attorney General may elect not to enforce the law he is charged with enforcing – should be quickly rejected. This action is a pre-enforcement challenge to a new law under which no election has yet taken place. There is no reason to believe the Attorney General will flout his law-enforcement responsibilities as elections near. There is a state-wide primary taking place in March 2022, and a general election in November 2022—formal enforcement is undoubtedly "on the horizon." Mot. at 16.

Proving this point, Attorney General Paxton has made clear that he is willing (and eager) to enforce the provisions of SB 1. Just last year, the Secretary sued Harris County in state court to block the county from distributing mail-in ballot applications during the COVID-19 pandemic—a policy that has now been codified in SB 1. *See State v. Hollins*, 620 S.W.3d 400 (Tex. 2020) (per curiam). Moreover, even if he now lacks the authority to directly bring criminal enforcement actions, the

Attorney General's many previous election-related prosecutions and pronouncements vowing to aggressively pursue future violations demonstrate his willingness and likelihood to enforce violations of the Election Code generally, even if only at the invitation of local district attorneys. *See* Second Am. Compl. ¶ 83.

        b. <u>Plaintiffs Have Standing to Bring their ADA, Section 504, and Section 208 Claims</u>

State Defendants argue that The Arc of Texas, Delta Sigma Theta Sorority, Inc. ("DST"), and Mi Familia Vota lack standing to bring their VRA Section 208 claim. State Defendants also argue that The Arc of Texas lacks standing to bring its ADA and Section 504 claims[6] because "[n]one of the Plaintiffs has a qualifying disability[,] each of them is an artificial entity that is incapable of being disabled," and "[d]isability claims require individual participation." Mot. at 18, 21.[7] This argument fails on multiple bases.

        *i. Plaintiffs Have Standing to Bring Their 208 Claims*

First, all three organizations have alleged that they have been forced to divert resources to respond to SB 1's new assistor provisions. Precedent clearly establishes such an injury is sufficient for

---

[6] Hereafter, references to Plaintiffs' ADA claims also encompass Plaintiffs' Section 504 claims. Section 504 and the ADA are interpreted in tandem. *See, e.g., Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020).

[7] The cases cited by Defendants are inapposite. *Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014);*Sims v. Texas Dep't of Hous. & Cmty. Affs.*, No. CIV.A. H-05-2842, 2005 WL 3132184 (S.D. Tex. Nov. 21, 2005); and *Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009(N.D. Ill. 2002) address third-party standing, which is not the basis on which Plaintiffs assert they have standing. Defendants' arguments conflating associational standing with third party standing fail because "the successful assertion of associational standing (both organizational and representational) fulfills prudential standing concerns and obviates the need to apply concepts of third-party standing as to the associations." *Veasey v. Perry*, 29 F. Supp. 3d 896, 905 (S.D. Tex. 2014) (finding NAACP had associational and organizational standing for Section 1983 and Section 2 claims).

standing under Section 208 claims, which is the only disability-related claim that DST and Mi Familia Vota join. *See, e.g., OCA-Greater Hous.*, 867 F.3d at 610-12; *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (finding that injury due to increased time spent on voter registration drives constituted sufficient injury in fact to confer standing); *see also Lewis*, 475 F. Supp. 3d at 613 (finding that organizational plaintiffs may establish standing where "getting out their membership's vote is germane to their purpose"); *see also New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286 (N.D. Ga. 2020) (holding that organizational plaintiff has standing to bring section 208 claim under diversion-of-resources theory), *appeal dismissed*, No. 20-13360-DD, 2021 WL 4128939 (11th Cir. Mar. 9, 2021).

Specifically, Plaintiffs The Arc of Texas, DST, and Mi Familia Vota properly allege that they will have to divert resources away from their routine activities towards addressing SB 1's illegal voter assistance limitations. Plaintiff DST alleges that SB 1 will require it to expend resources "providing public education regarding the changes in voting law and procedure, and responding to how these changes in law will affect their members' ability to engage in voter registration and voter assistance." Second Am. Compl. ¶ 48. Similarly, Plaintiff The Arc of Texas alleges that it "will have to expend more time, money, and resources on its efforts to educate and assist voters" with disabilities to understand and comply with SB 1's illegal voter assistance limitations. *Id.* ¶ 57. And Plaintiff Mi Familia Vota alleges that it will have to divert resources to "increase awareness and education about new restrictions on people who provide transportation and other physical and language assistance at the polls to ensure that the elderly, disabled, or non-English-speaking voters who Mi Familia Vota supports are able to vote in compliance with SB 1." *Id.* ¶ 64.

ii. *Courts Routinely Uphold Associational Standing Without Individual Participation in ADA Cases*

Next, The Arc of Texas has alleged associational standing, which an organization may invoke when "[a] its members would otherwise have standing to sue in their own right, [b] the interests at stake are germane to the organization's purpose, and [c] neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Whether the claim asserted or the relief requested requires the participation of individual members is a "prudential" matter that focuses on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.'" *N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F. Supp. 2d 474, 483 (D.N.J. 2008) (quoting *United Food & Com. Workers Union Local 751*, 517 U.S. 544, 554–57 (1996)); *see also Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010).

The thrust of State Defendants' argument regarding associational standing is that an organization could never represent the interests of its members in a lawsuit under the ADA because of the inherently individualized nature of disability claims. This argument is simply incorrect on the law and the circumstances of this case. Defendants seem to further suggest that Plaintiffs must prove that the Plaintiff organization itself is an individual with a disability. That argument mischaracterizes Plaintiffs' pleadings and is contrary to the concept of associational standing. The crux of Plaintiffs' claims for uniform, injunctive relief (not damages) is that SB 1 denies meaningful voting access to a large and diverse group of individuals with disabilities. Plaintiffs bring a facial challenge requesting injunctive relief enjoining SB 1 *precisely because* the harms identified have such a systemic impact on voters with disabilities and those who assist them that it would be both impracticable and insufficient to address individual claims one by one.

The Arc of Texas is a "statewide advocacy and membership organization—with 6,000 individual members and 27 local member chapters throughout the state—that supports and advocates for these rights on behalf of the IDD [intellectually and developmentally disabled] community" and "works with and alongside individuals with IDD and their families to identify barriers and solutions to inclusive education, competitive integrated employment, quality community-based services and

supports, and access to civil rights and justice." Second Am. Compl. ¶ 49. The Arc of Texas indisputably has members who are harmed by the provisions of SB 1, several of whom are highlighted in the Second Amended Complaint. *Id.* ¶¶ 58–61.

Federal courts, including in the Fifth Circuit, routinely find that advocacy organizations representing individuals with disabilities, including chapters of The Arc, have associational standing to challenge violations of federal laws protecting individuals with disabilities in cases seeking systemic, injunctive relief without the participation of individual members. *See, e.g.*, *Steward v. Abbott,* 189 F. Supp. 3d 620, 631–32 (W.D. Tex. 2016) (The Arc of Texas); *Sixth Dist. of the African Methodist Episcopal Church v. Kemp*, No. 1:21-CV-01284-JPB, 2021 WL 6495360, at *2–4 (N.D. Ga. Dec. 9, 2021) (The Arc of Georgia); *G.T. v. Kanawha Cnty. Schs.*, No. 2:20-CV-00057, 2020 WL 4018285, at *7 (S.D.W. Va. July 16, 2020) (The Arc of West Virginia); *N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F. Supp. 2d at 483 (The Arc of New Jersey).[8]

Notably, two federal district courts have recently upheld associational standing in two similar voting rights actions challenging state voting laws as discriminatory under the ADA. In *Florida State Conference of the NAACP v. Lee*, organizational plaintiffs, including Disability Rights Florida, challenged a new Florida law imposing similar voting rights restrictions under the ADA, among other claims. Defendants filed a Motion to Dismiss and a Motion for Summary Judgment, both of which were denied with respect to the ADA claims. *See* No. 4:21CV187-MW/MAF, 2021 (denying Motion for

---

[8] *See also Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 46–47 (D.D.C. 2019), *appeal dismissed*, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019); *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1019 (N.D. Ohio 2011); *Equal Rts. Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 525 (D. Md. 2010); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012); *Tellis v. LeBlanc*, No. 18-CV-0541, 2019 WL 1474777, at *4 (W.D. La. Apr. 3, 2019); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1172 (M.D. Ala. 2016); *Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.*, No. CIV. 105CV00585TFH, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005); *Yelapi v. DeSantis*, 525 F. Supp. 3d 1371, 1377 (N.D. Fla. 2021).

Summary Judgment); *Fla. State Conf. of the NAACP v. Lee*, No. 4:21CV187-MW/MAF, 2021 WL 4818913, at \*24 (N.D. Fla. Oct. 8, 2021) (denying Motion to Dismiss). The court found that Disability Rights Florida had standing to challenge this law as an organization, noting that "[t]o prevail on this claim, Plaintiffs must establish (1) that they—*or their constituents*—are qualified individuals with a disability." *Fla. State Conf. of the NAACP,* 2021 WL 4818913, at \*23 (emphasis added). *See also id.* ("Plaintiffs must show that *their constituents* "meet[] the essential eligibility requirements' to participate in the program or services at issue 'with or without reasonable modifications."") (emphasis added) (quoting *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1155 (N.D. Ala. 2021). In denying the defendants' Motion for Summary Judgment, the court noted that "Plaintiffs' members have standing as to each of the challenged provisions enacted or amended by SB 90 . . . neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit." *Fla. State Conf. of the NAACP*, 2021 WL 6072197, at \*1 (citing *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) and *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003)). *See also Sixth Dist. of the African Methodist Episcopal Church*, 2021 WL 6495360, at \*1 (denying Motion to Dismiss similar litigation challenging Georgia's voting law as discriminating against voters with disabilities on behalf of three disability rights organizations as plaintiffs, including The Arc of Georgia).[9]

The cases cited by State Defendants as support for their argument that individualized participation is required in ADA cases are inapposite. For example, State Defendants cite language

---

[9] The court noted that "Plaintiffs allege that their *members and constituents* are qualified individuals with disabilities under the ADA," clarifying that it is, of course, the organizations' members—not the organizations themselves—that have disabilities and demonstrating that associational standing is routinely upheld, including in ADA cases pertaining to voting rights. *Id.* at \*12 (emphasis added).

from *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that relates specifically to the definition of disability under the ADA and stands for the proposition that a plaintiff may not rely on a medical diagnosis alone to prove that he or she has a disability. Nothing in *Toyota*—which concerns an individual employment action under Title I rather than the instant action's systemic claims under Title II—addresses associational standing or suggests that a challenge to the effects of a statewide policy on a large group of people with disabilities requires the participation of every single person affected by that policy.[10] Similarly, *Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir. 2017), is a case brought by an individual which, by nature, requires individualized participation. State Defendants fail to cite any cases pertaining to systemic claims involving organizational plaintiffs. Further, Plaintiffs have identified particularized harms and specific examples of disabilities throughout the Second Amended Complaint. Second Am. Compl. ¶¶ 49–61, 217, 233–38, 337–365.[11]

Lastly, State Defendants argue that "[n]othing in the second amended complaint suggests that disabled voters will face 'uniform' issues across Texas's 254 counties . . . Given the diversity of alleged disabilities and needed accommodations, individual participation is crucial for understanding the merits of disability claims." Mot. at 20.[12] Though Plaintiffs do not concede that uniformity is required,

---

[10] *Toyota's* holding related to the definition of disability under the ADA has since been overturned by the ADA Amendments Act of 2008, Pub. L. 110-325 (2008).

[11] *Friends for America Free Enterprise Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 576–77 (5th Cir. 2002), cited by Defendants, is similarly inapposite. The case involves tortious interference—not ADA—claims regarding specific individual contracts, necessitating highly fact-specific and individualized inquiries.

[12] In support of their argument that "uniformity" is required, Defendants cite *Prison Justice League v. Bailey*, 697 F. App'x 362, 363–64 (5th Cir. 2017). But, unlike the instant case, *Bailey* does not involve ADA claims. Instead, it involves constitutional claims regarding corrections officers' use of excessive force against inmates and retaliation against them for filing grievances. The court's

as described in the Second Amended Complaint, SB 1's provisions *do* apply uniformly and harm large numbers of people with disabilities across Texas. Even when the disabilities of the affected individuals vary, the law and harm that SB 1 inflicts—denying voters with disabilities equal access to the state's voting programs—is uniform. That Plaintiffs' members have diverse disabilities is beside the point to the question of whether SB 1 imposes uniform harm to people with disabilities on a statewide basis. It does.[13]

---

discussion of a requirement that there be a "uniform retaliatory motive" or that the corrections officers "acted uniformly . . . to maliciously and sadistically cause harm" pertains to the specific standards needed to prove the constitutional claims at issues in that litigation, which are not relevant here. *Id.* Indeed, the court even notes that its analysis is specific to use of excessive force in prison cases which are "necessarily fact-intensive" and that even in such cases, "we do not . . . imply that these difficulties are insurmountable." *Id.* at 364. As described above, this is not the case with the pre-enforcement, systemic ADA claims in this litigation, challenging a statewide law restricting the voting rights of people with disabilities.

[13] Defendants go on to make an incomplete argument, stating: ". . . overlap between this second amended complaint and the OCA . . . complaint highlights the inherent error of allowing a plaintiff to make a broad assertion of associational standing without identifying specific members." Mot. at 21. Though it is not required to do so, Plaintiff The Arc of Texas *has* identified four specific members harmed by SB 1. Second Am. Compl. ¶¶ 58–61. Defendants then concede this point, but object that the members identified are the same as those in the OCA case, noting "these plaintiff groups cannot even identify *different people*. Having multiple groups bring the same claims on behalf of the same individuals does not make sense or promote judicial efficiency." Mot. at 21. Defendants do not suggest that the specific individuals are not, in fact, members of both plaintiff organizations, and nothing in the law bars individuals from being members of multiple organizations. Plaintiffs do not assert that the identified individuals are the *only* ones harmed by SB 1 and, in fact, have alleged that many Texans with disabilities will be so harmed (a fact which the Court must accept as true at the motion to dismiss stage). Regardless, Defendants' judicial efficiency argument is not relevant in deciding a Motion to Dismiss, and any concerns Defendants have regarding Plaintiffs' members can be addressed during discovery and trial.

## II. STATE DEFENDANTS DENY PLAINTIFFS MEANINGFUL ACCESS TO VOTING

### a. That Other Voting Options May be Accessible to Plaintiffs Does Not Negate Defendants' Obligations to Remedy the Discriminatory Effects of SB 1

State Defendants argue that Plaintiffs "have not plausibly alleged that SB 1 actually discriminates against voters with disabilities" on the grounds that "Plaintiffs have a right to vote, not a right to vote by their preferred method." Mot. at 22–23. However, that "[d]isabled Texans have multiple options to vote," Mot. at 23, does not negate State Defendants' obligation to ensure that both its absentee and in-person voting programs are accessible to people with disabilities. Courts have repeatedly rejected this exact argument, including in two recent orders in cases challenging similar voting laws in Florida and Georgia under the ADA. *See, e.g., Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) ("Defendants argue that even if absentee voting is not fully accessible, the full accessibility of Maryland's in-person polling places provides disabled voters with meaningful access to voting . . . . [W]e conclude that defendants' proposed focus is overbroad and would undermine the purpose of the ADA and its implementing regulations."); *Disabled in Action v. Bd. of Elections in N. Y.*, 752 F.3d 189, 198–99 (2d Cir. 2014) ("[T]o assume the benefit is . . . merely the opportunity to vote at some time and in some way [ ] would render meaningless the mandate that public entities may not 'afford [] persons with disabilities services that are not equal to that afforded others.'" (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 274 (2d Cir. 2003))); *Fla. State Conf. of the NAACP*, 2021 WL 6072197, at *6 ("". . . the plaintiffs do not have to show that they are prohibited from voting [in a particular manner], but only that voting [in that manner] is not 'readily accessible' to them.'" (quoting *People First*, 491 F. Supp. 3d at 1159)); *Fla. State Conf. of the NAACP*, 2021 WL 4818913, at *23 (same, denying defendants' Motion to Dismiss); *Sixth Dist. of the African Methodist Episcopal Church, v. Kemp*, No. 1:21-CV-01284-JPB, 2021 WL 6495360, at *13–14 (N.D. Ga. Dec. 9, 2021) ("State Defendants' key argument . . . is that 'disabled voters have multiple options to vote.' . . . A violation of Title II,

however, does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity . . . Plaintiffs need not show that the voting access allegedly denied here is absolute. Both the text of the ADA and cases interpreting it are clear that a partial denial of access could be actionable."). *See also United Spinal Ass'n v. Bd. of Elections in N.Y.*, 882 F. Supp. 2d 615, 623–24 (S.D.N.Y. 2012); *Westchester Disabled on the Move v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004); *People First*, 491 F. Supp. 3d at 1158.[14]

State Defendants argue that their voting program complies with ADA regulations, 28 C.F.R. § 35.150, because they already provide accessible voting systems and physical access to polling places. Mot. at 23–24. However, these regulations apply only to the accessibility of *physical facilities*, not to programs like voting. The physical accessibility of physical facilities such as polling places is not at issue in Plaintiffs' Second Amended Complaint, and Defendants do not attempt to explain how providing accessible facilities will remedy Plaintiffs' claims regarding onerous ID requirements, restrictions on assistance, and criminalization of that assistance. The Fourth Circuit has already addressed and rejected a similarly confused argument in *Lamone*:

> Defendants cite an ADA-implementing regulation, 28 C.F.R. § 35.150(a), which they assert requires a reviewing court to view Maryland's voting program "in its entirety." However, . . . [t]his regulation is targeted principally at physical accessibility and allows a public entity to provide accessibility alternatives that would not require large-scale architectural modifications of existing facilities . . . . Other ADA-implementing regulations, however, are applicable here and conflict with defendants' proposed focus on the entirety of Maryland's voting program . . . 28 C.F.R. § 35.130 . . . directly implements the general antidiscrimination mandate of Title II . . . this regulation clearly contemplates a focus on accessibility at a more granular level than entire government programs—the level of "policies, practices, and procedures."

813 F.3d at 504–05.

---

[14] Defendants are surely aware of this extensive precedent contrary to their position, which is why the only support they can muster for their argument is *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969). *McDonald*, however, addressed the constitutional right to vote, and has no bearing on claims under the ADA or Section 504, neither of which had been enacted when it was decided.

As the Fourth Circuit stated and as pleaded in Plaintiffs' Second Amended Complaint, the correct regulation is 28 C.F.R. § 35.130. Second Am. Compl. ¶¶ 342, 346. State Defendants' argument is akin to saying that a ramp to access a building is a sufficient reasonable modification for a deaf individual who requires a sign language interpreter. One aspect of a public entity's program being allegedly accessible to people with disabilities has no bearing on determining whether an entirely separate aspect of the public entity's program is accessible.[15] *See Lamone*, 813 F.3d at 503–04 (holding that the absentee ballot program was the appropriate scope for the court's ADA analysis, regardless of whether its physical voting locations were accessible). As long as some voters with disabilities are denied meaningful access to one of Defendants' voting programs by the provisions of SB 1, Defendants are in violation of the law.

i. *SB 1's Reasonable Modifications Clause Does Not Remedy Plaintiffs' Claims*

State Defendants further argue that Plaintiffs' claims fail because SB 1 includes a clause noting that nothing in the law may be interpreted to prohibit an individual with disabilities from requesting a reasonable modification. Mot. at 23.[16] But, as described in Plaintiffs' Second Amended Complaint, the SB 1 provisions challenged by Plaintiffs inflict systemic harm on large groups of people with disabilities and impose a chilling effect, deterring those who seek to assist Plaintiffs in voting. Second

---

[15] Further, whether voters with disabilities have other accessible options is a factual question that cannot be resolved on a motion to dismiss. *See, e.g., Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp,* No. 1:21-CV-01284-JPB, 2021 WL 6495360, at *13 (N.D. Ga. Dec. 9, 2021) (plausible allegations of restricted access must be taken as true at motion to dismiss stage).

[16] In their support, State Defendants cite *Smith*, 956 F.3d at 317, which simply restates the statutory requirement that Plaintiffs must show that State Defendants have failed to reasonably modify their program and does nothing to support State Defendants' position here.

Am. Compl. ¶¶ 217, 233–238, 337–365. These systemic harms cannot be remedied on a case-by-case basis and are not somehow cured by a restatement of a portion of the ADA within SB 1.

Plaintiffs allege that State Defendants have discriminated against voters with disabilities not only through denial of reasonable modifications, but in several other ways, including denying voters with disabilities equal access to voting, imposing eligibility criteria that screen out voters with disabilities, utilizing methods of administration that defeat the objectives of Defendants' voting programs with regards to voters with disabilities, and interfering with the ability of voters with disabilities and those who assist them to exercise their rights under the ADA. Second Am. Compl. ¶ 350. As Plaintiffs allege, State Defendants have excluded people with disabilities and denied meaningful access to the state's voting program. *Id.* ¶¶ 217, 233–38, 337–65.

### b. The ADA Prohibits Implementing Discriminatory Policies

State Defendants' argument that they are the incorrect defendants for Plaintiffs' disability claims fails for the same reason that their sovereign immunity claims fail. As discussed above, State Defendants have a direct role in enforcing the challenged provisions here.

Defendants argue that this Court lacks jurisdiction on the basis that State Defendants do not administer elections and claim Plaintiffs would "impose supervisory liability on the State Defendants." Mot. at 22. But Plaintiffs do not argue that State Defendants must *themselves* ensure local officials' compliance with the ADA. Here, State Defendants are *restricting* accommodations for voters with disabilities by implementing the use of forms limiting the type of assistance a voter with a disability can receive and affirmatively demanding voter ID information from voters with disabilities. Plaintiffs ask only that the Court enjoin State Defendants from implementing discriminatory voting policies. As such action is within the Court's power, the Motion to Dismiss should be denied.

Defendants rely heavily on *Lighthourn v. County of El Paso*, 118 F.3d 421 (5th Cir. 1997), but that case is irrelevant here. The plaintiffs in *Lighthourn* argued that the Secretary had an affirmative

obligation to ensure local jurisdictions implemented accessible in-person voting systems. 118 F.3d at 423–24. The court held that "the Secretary has no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Id.* at 432. Here, Plaintiffs are not seeking that the State Defendants enforce compliance with the ADA, but rather, Plaintiffs claims are based on the State Defendants' own discriminatory implementation of statewide voting procedures that discriminate against voters with disabilities. *Lightbourn* does not absolve the State Defendants from their duty not to discriminate against voters with disabilities. Similarly, State Defendants' reliance on *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015) is unavailing because, here, State Defendants do, in fact, implement and enforce the challenged actions. *Ivy* was brought by deaf students who complained about the lack of American Sign Language interpreters in TEA-licensed driver's education courses. *Id.* at 252. The Fifth Circuit found that TEA was not the proper Defendant because TEA did not actually provide the education course. *Id.* at 256. But nothing in *Ivy* would have allowed for TEA to *restrict* the provision of ASL interpreters in driver's education courses. Because State Defendants enforce provisions of SB 1 that restrict the accessibility of statewide voting procedures, they have discriminated against voters with disabilities and are properly sued here.

## CONCLUSION

For the foregoing reasons, the Court should deny State Defendants' Motion to Dismiss.

DATED:  February 11, 2022

Respectfully submitted,

STOEL RIVES LLP
By: _/s/ Wendy J. Olson_____
Wendy J. Olson (admitted *Pro hac vice*)
Laura E. Rosenbaum (admitted *Pro hac vice*)
Marc Rasich (admitted *Pro hac vice*)
Elijah Watkins (admitted *Pro hac vice*)
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Sean Lyons
State Bar No. 00792280
Sean@lyonsandlyons.com
Clem Lyons
State Bar No. 12742000
Clem@lyonsandlyons.com
LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
Telefax: (210) 225-6545

Courtney Hostetler (admitted *Pro hac vice*)
Ron Fein (admitted *Pro hac vice*)
John Bonifaz (admitted *Pro hac vice*)
Ben Clements (admitted *Pro hac vice*)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
rfein@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

*Attorneys for Plaintiffs Mi Familia Vota, Marla*
*López, Marlon López, and Paul Rutledge*

Reed Smith LLP, NAACP Legal Defense & Educational Fund, Inc., The Arc of the United States, Inc.

 /s/ Kenneth E. Broughton
Kenneth E. Broughton
Texas Bar No. 03087250
kbroughton@reedsmith.com

J. Keely Dulaney*
Texas Bar No. 24116306
kdulaney@reedsmith.com

Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110

Sarah M. Cummings
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
scummings@reedsmith.com

Kathryn Sadasivan*
Amir Badat*
Liliana Zaragoza†
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
ksadasivan@naacpldf.org
abadat@naacpldf.org
lzaragoza@naacpldf.org

Jennifer A. Holmes*
Georgina Yeomans*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org

26

gyeomans@naacpldf.org

Shira Wakschlag*
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

*Admitted Pro Hac Vice*
† *Pro Hac Vice* pending

*Counsel for Plaintiffs Houston Justice; Houston Area Urban League; Delta Sigma Theta Sorority, Inc.; The Arc of Texas; and Jeffrey Lamar Clemmons*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2022, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

_/s/ Jennifer A. Holmes_

NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org