**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-CV-0844-XR |
| | § | [Consolidated Lead Case] |
| GREGORY W. ABBOTT, et al., | § | |
|     Defendants. | § | |

| | | |
|---|---|---|
| OCA-GREATER HOUSTON, et al., | § | |
|     Plaintiffs, | § | |
| v. | § | Case No. 1:21-CV-0780-XR |
| | § | |
| JOSE A. ESPARZA, et al., | § | |
|     Defendants. | § | |

| | | |
|---|---|---|
| HOUSTON JUSTICE, et al., | § | |
|     Plaintiffs, | § | |
| v. | § | Case No. 5:21-CV-0848-XR |
| | § | |
| GREGORY WAYNE ABBOTT, et al., | § | |
|     Defendants. | § | |

| | | |
|---|---|---|
| LULAC TEXAS, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:21-CV-0786-XR |
| | § | |
| JOSE ESPARZA, et al., | § | |
|     Defendants. | § | |

| | | |
|---|---|---|
| MI FAMILIA VOTA, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-CV-0920-XR |
| | § | |
| GREG ABBOTT, et al., | § | |
|     Defendants. | § | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 5:21-CV-01085-XR |
| | § | |
| STATE OF TEXAS, et al., | § | |
|     Defendants. | § | |

## <u>OCA-GREATER HOUSTON, ET AL., PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION TO DISMISS</u>

<u>**TABLE OF CONTENTS**</u>

I.     Sovereign Immunity Does Not Bar Plaintiffs' Claims ........................................................1

     A.     The Secretary of State Is Not Immune from Suit. ......................................................2

     B.     The Attorney General Is Not Immune from Suit. ......................................................6

     C.     State Defendants Are Not Immune from Voting Rights Act and Civil Rights Act Claims. ...............................................................................................................12

     D.     State Defendants are Not Immune from Americans with Disabilities Act or Section 504 Claims. ...............................................................................................13

II.    Plaintiffs Have Stated a Claim under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, and Section 208 of The Voting Rights Act ..............................14

     A.     Courts Routinely Uphold Associational Standing Without Individual Participation in Americans with Disabilities Act Cases. .........................................15

     B.     That Other Voting Options May be Accessible to Plaintiffs Does Not Negate State Defendants' Obligations to Remedy the Discriminatory Effects of SB1 .............................................................................................................19

     C.     SB1's Reasonable Modifications Clause Does Not Remedy Plaintiffs' Claims. .....................................................................................................................21

     D.     The Secretary of State Is A Proper Defendant On Plaintiffs' Disability Rights Claims..............................................................................................................22

III.   Plaintiffs Have Private Causes of Action for Their Claims Under the Voting Rights Act and the Civil Rights Act...............................................................................................23

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) ........................................................................................................................1

*Ala. State Conf. of N.A.A.C.P. v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020) ....................................................................................24

*Alabama v. Ala. State Conf. of NAACP*, 141 S. Ct. 2618 (2021) .................................................................................................24

*Arkansas United v. Thurston*, 517 F. Supp. 3d 777 (W.D. Ark. 2021) ..............................................................................24

*Ass'n of Am. Physicians & Surgs. v. Tex. Med. Bd. (TMB)*, 627 F.3d 547 (5th Cir. 2010) ...........................................................................15, 16

*Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009 (N.D. Ill. 2002) ..........................................................................15

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) .......................................................................... 2, 4-6, 9

*Clapper v. Amnesty Intl. USA*, 568 U.S. 398 (2013) ...................................................................................................11

*Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011) ...............................................................................15

*Democracy North Carolina v. North Carolina State Bd. of Elec.*, 476 F. Supp. 3d 158 (M.D.N.C. 2020) ..............................................................................24

*Fla. State Conf. of NAACP v. Lee Nat'l Republican Senatorial Comm.*, No. 4:21CV187-MW/MAF, 2021 WL 4818913 (N.D. Fla. Oct. 8, 2021) ........................17, 20

*Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743 (2017) ...............................................................................................15

*Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 194 (5th Cir. 2012) ..............................................................................15

*Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015) ...............................................................................23

*Justice v. Hosemann,*
    771 F.3d 285 (5th Cir. 2014) ........................................................................8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014).....................................................................................15

*Lightbourn v. County of El Paso,*
    118 F.3d 421 (5th Cir. 1997) ......................................................................23

*Longoria v. Paxton,*
    No. 5:21-cv-01223-XR ........................................................................ 8, 10-12

*McDonald v. Bd. of Election Comm'rs,*
    394 U.S. 802 (1969)......................................................................................20

*Meadowbriar Home for Children, Inc. v. Gunn,*
    81 F.3d 521 (5th Cir. 1996) ........................................................................11

*Mi Familia Vota v. Abbott,*
    977 F.3d 461 (5th Cir. 2020) ...................................................................5, 12

*Nat'l Fed'n of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) ................................................................. 19-21

*OCA-Greater Houston v. Hughs,*
    867 F.3d 604 (5th Cir. 2017) ............................................................... *passim*

*Ostrewich v. Hudspeth,*
    No. 4:19-CV-00715, 2021 WL 4170135 (S.D. Tex. Sept. 14, 2021) ................... 8-9

*Priorities USA v. Nessel,*
    462 F. Supp. 3d 792 (E.D. Mich. 2020)......................................................24

*Prison Just. League v. Bailey,*
    697 F. App'x 362 (5th Cir. 2017) ...............................................................18

*Raj v. LSU,*
    714 F.3d 322 (5th Cir. 2013) ......................................................................12

*Ray v. Texas,*
    No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) .......14

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ..................................................................24

*Sims v. Texas Dep't of Hous. & Cmty. Affs.,*
    No. CIV.A. H-05-2842, 2005 WL 3132184 (S.D. Tex. Nov. 21, 2005) ...............15

*Smith v. Harris Cnty.*,
   956 F.3d 311 (5th Cir. 2020) ................................................................. 15, 21

*State v. Stephens*,
   No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021) ............................... 6-8

*Tex. League of United Latin Am. Citizens v. Abbott*,
   493 F. Supp. 3d 548 (W.D. Tex. 2020) *vacated on other grounds sub nom.*
   *Texas League of United Latin Am. Citizens v. Hughs*, No. 20-50867, 2021 WL
   1446828 (5th Cir. Feb. 22, 2021) ............................................................. 15

*Tex. Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020) ................................................................ 2-3

*Tex. Democratic Party v. Abbott*,
   978 F.3d 168 (5th Cir. 2020) ......................................................... *passim*

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*,
   534 U.S. 184 (2002) ......................................................................... 18

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
   517 U.S. 544 (1996) ......................................................................... 14

*Veasey v. Perry*,
   29 F. Supp. 3d 896, 905 (S.D. Tex. 2014) .................................................... 15

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) ................................................................. 8

*Ex parte Young*,
   209 U.S. 123 (1908) .................................................................. *passim*

**Federal Statutes**

42 U.S.C.
   § 1983 ................................................................................... 13, 15

52 U.S.C. § 10302 ........................................................................... 24

ADA Amendments Act of 2008, Pub. L. 110-325 (2008) .......................................... 18

Voting Rights Act, § 208 ............................................................. 14-15, 23-24

## State Statutes

Texas Elec. Code
§ 31.001................................................................................................4, 6
§ 31.002................................................................................................3, 5
§ 31.005................................................................................................2-4
§ 273.001.................................................................................................8

Texas Gov't Code § 402.028 ................................................................. 7-8

## Rules

Federal Rule of Evidence § 201 ..............................................................8

## Other Authorities

2021 Texas Senate Bill
§ 6.04.............................................................................................. *passim*
§ 6.06.............................................................................................. *passim*

Election Assistance Commission – CARES Grant Funding Chart -July 22nd 2020,
https://www.eac.gov/sites/default/files/paymentgrants/cares/FundingChart_C
ARES.pdf ................................................................................................14

Help America Vote Act (HAVA), Tex. Sec'y of State, John B. Scott,
https://www.sos.texas.gov/elections/hava/hava_act.shtml ......................14

H.R.REP. NO. 85–291 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1966 .......14

Press Release, SOS, Secretary Scott Calls on Travis County to Correct Erroneous
Mail Ballot Application Rejections, (Jan. 14, 2022),
https://www.sos.state.tx.us/about/newsreleases/2022/011422.shtml .......4

Press Release, OAG, AG Paxton Announces Formation of 2021 Texas Election
Integrity Unit (Oct. 18, 2021),
https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-
formation-2021-texas-election-integrity-unit ............................................9

Press Release, OAG, Edinburg Mayor, Wife Arrested in Organized Illegal Voting
Scheme (Apr. 25, 2019),
https://www.texasattorneygeneral.gov/news/releases/edinburg-mayor-wife-
arrested-organized-illegal-voting-scheme.................................................8

Press Release, OAG, Paxton Asks Court of Criminal Appeals to Reverse Its
Decision Stripping OAG of Authority to Stop Election Fraud (Jan. 3, 2022),
https://www.texasattorneygeneral.gov/news/releases/paxton-asks-court-
criminal-appeals-reverse-its-decision-stripping-oag-authority-stop-election-
fraud ................................................................................................7, 10

Press Release, OAG, San Antonio Election Fraudster Arrested for Widespread
   Vote Harvesting and Fraud (Jan. 13, 2021),
   https://www.texasattorneygeneral.gov/news/releases/ag-paxton-san-antonio-
   election-fraudster-arrested-widespread-vote-harvesting-and-fraud ........................................... 9

Press Release, OAG, Work of AG Paxton's Election Fraud Unit Results in Arrests
   of 4 Members of Organized Voter Fraud Ring in North Fort Worth (Oct. 12,
   2018), https://www.texasattorneygeneral.gov/news/releases/work-ag-paxtons-
   election-fraud-unit-results-arrests-4-members-organized-voter-fraud-ring-
   north-fort ................................................................................................................................ 9

S. Rep. No. 295, c1975: 40 ........................................................................................................... 24

S. Rep. No. 417, 97th Cong., 2d Sess., § 208 ............................................................................. 24

Plaintiffs' Second Amended Complaint involves challenges to a collection of unlawful new State statutory provisions, otherwise known as 2021 Texas Senate Bill 1 ("SB1") that violate multiple provisions of federal law—the Voting Rights Act ("VRA"), the Civil Rights Act ("CRA"), the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the First & Fourteenth Amendments to the United States Constitution. SB1 violates those provisions of federal law by imposing impermissible burdens on the right to vote for persons with disabilities and those who require language assistance and by infringing on core First Amendment rights.

State Defendants' Motion to Dismiss (Dkt 240) does not directly address the merits of Plaintiffs' claims, and relies upon novel, unsupported legal arguments that courts have previously rejected. State Defendants are state officials who are charged with enforcing the challenged state statutes, and, pursuant to clearly established law, are not immune from a suit challenging the new statutes as preempted by federal law. Plaintiffs have standing to sue on their own behalf and on behalf of their members, and Plaintiffs have more than sufficiently pleaded facts to support their claims. Accordingly, this Court should deny State Defendants' Motion to Dismiss.

## ARGUMENT

## I. SOVEREIGN IMMUNITY DOES NOT BAR PLAINTIFFS' CLAIMS

State Defendants' sovereign immunity is "not absolute," *AT&T Commc'ns v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001), and does not apply in an action, like this one, seeking prospective relief from violations of federal law. *Ex parte Young*, 209 U.S. 123, 159–60 (1908). The *Ex parte Young* exception to sovereign immunity applies when state officials "have 'some connection'" to the state law's enforcement. *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) (citing *Ex parte Young*, 209 U.S. at 157). In the Fifth Circuit, "the precise scope of the 'some connection' requirement is still unsettled."

*Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 (5th Cir. 2020). In some cases, the Fifth Circuit has recognized that a "scintilla of 'enforcement' by the relevant state official with respect to the challenged law" suffices. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quotations omitted). In others, the Court has suggested that the state official should have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty," *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (citations omitted), or that there otherwise be  a "special relation" between the state actor and the challenged statute, *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (en banc) (plurality op.); *see Tex. Democratic Party II*, 978 F.3d at 179 (noting that *Okpalobi* is "no[t] controlling precedent"). Regardless, the Secretary of State ("SOS") and Attorney General ("AG") have a sufficient connection to the enforcement of the SB1 provisions at issue in this case.[1]

## A.  The Secretary of State Is Not Immune from Suit.

The SOS is not immune from suit under *Ex parte Young*. Although State Defendants attempt to argue that the SOS lacks a "sufficient enforcement connection" to the challenged provisions, Dkt 240 at 6–9, the SOS is imbued with power to enforce SB1 in Texas Election Code Sections 31.001 to 31.005 and has taken actions to do so.

The Texas Election Code tasks the SOS, who is the Chief Election Officer, with "prescrib[ing] the design and content" of forms that local officials must use—including forms related to SB1's mail-in voter identification and assistance provisions and its voter assistance oath provision. Tex. Elec. Code §§ 31.001–31.002. The SOS is also charged with assisting and advising

---

[1] In their first Motion to Dismiss (Dkt 55), State Defendants contended that the Plaintiffs lacked standing generally as organizations or associations bringing claims on behalf of their members. State Defendants have largely abandoned those arguments in their current Motion to Dismiss (Dkt 240), except in connection with the ADA. Such arguments are meritless, as State Defendants appear to have recognized, and should be rejected by this Court at this and any later stage of this litigation.

in the application, operation, and interpretation of election laws, including the challenged provisions of SB1. *Id*. §§ 31.003–31.005; 2d Am. Compl. ¶ 35–39.

Those responsibilities are more than just a "*general* duty to see that the laws of the state are implemented," as State Defendants suggest. Dkt 240 at 7 (quoting *Tex. Democratic Party I*, 961 F.3d at 400–01). Rather, they involve enforcing each of the challenged SB1 provisions in particular. *Cf.* Dkt 240 at 5 (citing *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 877 (5th Cir. 2021) (unpublished)). For example, Section 31.002 directs the SOS to prescribe the design and content of mail-in ballot applications and mail-in carrier envelope, both of which the SOS will change to adopt SB1's new mail-in voter identification and assistance requirements (at Sections 5.02, 5.03, 5.06, 5.10, 5.12, and 6.06). *See* 2d Am. Compl. ¶¶ 35–39, 98-101, 125. Section 31.002 also instructs the SOS to prescribe the assistance oath form's design and content, which the SOS will update to incorporate the changes required by SB1 Section 6.04. *See* 2d Am. Compl. ¶¶ 149–152. Section 31.002 then requires local election officials to use these forms. These are far from "ministerial" duties—indeed, it is precisely these actions and their effects that Plaintiffs allege will inflict unlawful harm.

The Fifth Circuit has unequivocally held that this is enough for the *Ex parte Young* exception to sovereign immunity to apply with respect to the SOS. In *Texas Democratic Party II*, the Fifth Circuit held that the SOS's duty to design and issue mail-in ballot applications gave rise to a sufficient enforcement connection under *Ex parte Young*. 978 F.3d at 179–80. In so holding, the Fifth Circuit specifically rejected the argument State Defendants make here—that the SOS's forms do not constrain anybody else—on the ground that the SOS has the "authority to compel or constrain local officials based on actions [he] takes" as to these forms. *Id*. As the Fifth Circuit

explained, this is precisely the kind of "enforcement" authority that makes *Ex parte Young* applicable. *Id.* at 180; *City of Austin*, 943 F.3d at 1000; *cf.* Dkt 240 at 7.

State Defendants suggest that *Texas Democratic Party II* is distinguishable because relief against the SOS would not provide Plaintiffs relief. Dkt 240 at 8–9. Not so. Plaintiffs seek relief that would prevent the SOS's use of forms incorporating the challenged provisions of SB1, which will unlawfully burden Plaintiffs by requiring their members to provide immaterial and burdensome identification numbers in order to receive a mail-in ballot, and to take an unlawful voter assistance oath before assisting voters with disabilities or language barriers.[2]

The SOS has also shown a willingness to exercise his authority to enforce the mail-in voter identification and assistance oath provisions. *Tex. Democratic Party II*, 978 F.3d at 179. As alleged, the SOS plans to issue binding advisories and directives, pursuant to Sections 31.001 and 31.003 to 31.005, requiring local election officials to use SB1-updated mail-in ballot applications, carrier envelopes, and oath forms. 2d Am. Compl. ¶ 35–38. Indeed, as counties have struggled to roll out SB1, including its new provisions concerning vote-by-mail applications, the SOS has taken an active enforcement role, including advising counties that their actions are not proper and urging counties to "seek advice and assistance" from the SOS.[3] Contrary to State Defendants' assertion, this ongoing enforcement demonstrates that the SOS *is* using the process outlined in Section 31.005 to enforce SB1. *Cf.* Dkt 240 at 9. This is far more than a "scintilla of enforcement," and Plaintiffs have sufficiently alleged that the SOS is involved in the enforcement of each challenged

---

[2] State Defendants also attempt to distinguish *Texas Democratic Party II* as related only to "discrimination that allegedly occurs on the form itself." Dkt 240 at 8 (citing *Abbott,* 978 F.3d at 180). However, just as the plaintiffs in *Texas Democratic Party II* challenged the contents of vote by mail forms and their impact on voters under the age of 65, Plaintiffs here challenge the lawfulness of the contents of vote by mail forms and voter assistance forms and their impact on voters.

[3] Press Release, SOS, Secretary Scott Calls on Travis County to Correct Erroneous Mail Ballot Application Rejections, (Jan. 14, 2022), *available at* https://www.sos.state.tx.us/about/newsreleases/2022/011422.shtml.

provision. *City of Austin*, 943 F.3d at 1002; *Tex. Democratic Party II*, 978 F.3d at 180. Further, although local officials may also have duties to enforce parts of SB1, a "division of responsibilities" with local officials does not obviate the SOS's connection to the enforcement of Texas' election laws. *Tex. Democratic Party II*, 978 F.3d at 180.

State Defendants' arguments to the contrary lack merit. State Defendants rely on *Mi Familia Vota v. Abbott* to argue that local election officials, rather than the SOS, are charged with enforcing certain provisions of SB1. Dkt 240 at 6. But that case is inapposite. There, Plaintiffs challenged an electronic-voting-equipment requirement for certain counties in some circumstances. Plaintiffs sued to allow these counties to use paper ballots, which were prepared entirely by local officials under state law. *Mi Familia Vota*, 977 F.3d at 465, 468. Here, by contrast, the Texas Election Code directs the SOS, not local officials, to prepare forms with the mail-in voter identification requirements and the assistance procedure and oath requirements. *Compare* Tex. Elec. Code § 31.002 *with* § 52.002; *see Tex. Democratic Party II*, 978 F.3d at 179–80.

The Fifth Circuit has also rejected the argument that SOS has no enforcement connection to assistance provisions. *OCA-Greater Houston v. Hughs*, 867 F.3d 604, 613–14 (5th Cir. 2017). State Defendants go to great lengths to distinguish *OCA-Greater Houston*, wrongly suggesting that *OCA-Greater Houston* is distinguishable because it was a facial challenge under the VRA. But this case is also a facial challenge under, *inter alia*, the VRA. State Defendants also seem to suggest that *OCA-Greater Houston* is not controlling case law because it did not take into account a non-binding concurrence from state court that came out three years after *OCA-Greater Houston*. Dkt 240 at 7. State Defendants' strained logic speaks for itself. *OCA-Greater Houston* is controlling Fifth Circuit law, no matter how much State Defendants might disagree with it.

Citing to *City of Austin*, the State Defendants also argue that the SOS's referral of complaints to the AG for prosecution is not enforcement. Dkt 240 at 9 (citing 943 F.3d at 1000). However, unlike in *City of Austin*, where the Fifth Circuit held that the City of Austin "face[d] no threat of criminal prosecution" because it was a municipality, here, Plaintiffs face a real threat of criminal prosecution if the challenged provisions are violated. 943 F.3d at 1002; *see also infra* pp. 11–12. The SOS plainly plays a significant enforcement role in the prosecutions that the AG pursues. Under the AG's authority to prosecute Election Code violations,[4] the SOS plays an integral gatekeeping role in determining when there is "reasonable cause to suspect a crime has occurred" for many of the cases that the AG prosecutes. 2d Am. Compl., ¶ 39. Indeed, the SOS Election Audit Division was created to "ensure any cases of illegal voting or election crimes are investigated by the proper law enforcement authorities, including the Texas Attorney General's Office." *Id.*

Although the SOS's title as Chief Election Officer may not satisfy the connection requirement in all cases, here, the SOS's role as Chief Election Officer plainly does. *Tex. Democratic Party II*, 978 F.3d at 179; Dkt 240 at 7; *see* Tex. Elec. Code § 31.001. Here, as explained above, it is the actions the SOS will take as Chief Election Officer to administer and enforce the challenged provisions that threaten Plaintiffs with harm. *OCA-Greater Houston*, 867 F.3d 613–14; *City of Austin*, 943 F.3d at 1002. Accordingly, the SOS is not immune from suit.

**B.  The Attorney General Is Not Immune from Suit.**

The AG similarly has a sufficient enforcement connection with sections 6.04, 6.06, and 7.04 of SB1, and is therefore not immune from suit. Plaintiffs' claims against the AG involve

---

[4] As discussed below, and in light of *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021) (not released for publication), Plaintiffs also note that the AG also regularly prosecutes election code violations at the request of district and county attorneys.

provisions in SB1 that specifically threaten criminal prosecution. 2d Am. Compl. ¶¶ 176, 182, 188, 214, 226. For instance, Plaintiffs challenge Section 7.04 of SB1, the anti-"vote harvesting" provision, which specifically provides that an offense constitutes a third-degree felony. *Id.* at ¶ 195. Likewise, Section 6.06 of SB1 creates a felony offense. *Id.* at ¶ 162. And Section 6.04 requires voters' assistants to take an oath "under penalty of perjury," subjecting the assistants to criminal liability. *Id.* at ¶ 151.

The AG regularly investigates and prosecutes violations of the Election Code in two ways. First, the AG prosecutes Election Code violations at the request of district or county attorneys. *See* Tex. Gov't Code § 402.028. Second, the Election Code vests the AG with independent statutory enforcement authority to prosecute violations. *See* Tex. Elec. Code § 273.021 ("The attorney general may prosecute a criminal offense prescribed by the election laws of this state."). The AG has regularly prosecuted voters and assistants for alleged offenses of the Election Code related to assisting voters, voting by mail, and campaigning. 2d Am. Compl. ¶¶ 44–47. The AG has also threatened third parties with criminal sanctions for disseminating information to voters. *See* 2d Am. Compl. ¶ 44. Although State Defendants argue that the AG has no authority to prosecute such violations in light of *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021), the AG has already filed a motion for reconsideration in *Stephens* saying it was "wrongly decided"—a clear indication that the AG seeks, and intends to use, the authority to prosecute Texas Election Code violations.[5]

---

[5] While the Texas Court of Criminal Appeals recently held unconstitutional the legislature's assignment of independent authority to the AG to criminally prosecute violations of the Texas Election Code in trial courts, *Stephens*, 2021 WL 5917198, at *10, the AG has filed a motion urging that court to reconsider its ruling and vacate its judgment. *See* Press Release, OAG, Paxton Asks Court of Criminal Appeals to Reverse Its Decision Stripping OAG of Authority to Stop Election Fraud (Jan. 3, 2022), https://www.texasattorneygeneral.gov/news/releases/paxton-asks-court-criminal-appeals-reverse-its-decision-stripping-oag-authority-stop-election-fraud. Given that pending motion seeking to vacate *Stephens* and the AG's view that *Stephens* is "wrong on legal grounds" (*id.*), the AG remains a proper party to this suit because he is still likely to seek out opportunities to enforce criminal provisions in the Texas Election Code.

In any event, State Defendants argue that the AG's prosecution of Texas Election Code violations—whether under its independent authority or at the request of local prosecutors—is discretionary, and that Plaintiffs have not shown that "enforcement [is] forthcoming." Dkt 240 at 11 (quoting *Tex. Democratic Party II*, 978 F.3d at 181). Plaintiffs, however, have sufficiently alleged that the AG intends to exercise his discretion to prosecute Texas Election Code violations under Sections 6.04, 6.06, and 7.04, at the request of district or county attorneys. As an initial matter, the AG maintains and continuously seeks increased funding for an "Election Fraud Unit" housed within the AG's office with the express purpose of investigating and prosecuting violations of the Texas Election Code's criminal provisions, such as those at issue in this case.[6] 2d Am. Compl. ¶ 47. The unit regularly issues public-facing statements about its current cases and its goal to aggressively pursue new prosecutions.[7] *Id*. In 2021, representatives from the AG's office testified before the Texas Legislature that SB1 creates new offenses that the AG has the authority to prosecute. *Id.* ¶ 45. Indeed, the AG has already charged individuals for the exact sort of activities

---

*See* 2d Am. Compl. at ¶ 44. As long as the AG's motion remains pending in *Stephens*, it remains unsettled whether the AG will continue to threaten and pursue unilateral election-related prosecutions. *See id.* This Court also recently observed that Section 273.001 still envisions and likely requires the AG's participation in enforcement as to the investigation of Texas Election Code violations. *Longoria v. Paxton*, 5:21-cv-01223-XR, Dkt 53, at 22–23. *Furthermore*, regardless of the impact of *Stephens*, the AG will retain his ability to prosecute Texas Election Code violations at the request of a district or county attorney, which the AG regularly does. *See* Tex. Gov't Code § 402.028; *Stephens*, 2021 WL 5917198 at *10.

[6] *See* Press Release, OAG, Edinburg Mayor, Wife Arrested in Organized Illegal Voting Scheme (Apr. 25, 2019), https://www.texasattorneygeneral.gov/news/releases/edinburg-mayor-wife-arrested-organized-illegal-voting-scheme (noting over 100 prosecutions related to supposed Texas Election Code violations since 2015). At the motion to dismiss stage, a court may take judicial notice of matters of the public record under Federal Rule of Evidence 201. *E.g.*, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

[7] To hold that more is required to bring suit against the AG would violate the maxim that "it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Ostrewich v. Hudspeth*, No. 4:19-CV-00715, 2021 WL 4170135, at *11 (S.D. Tex. Sept. 14, 2021), *report and recommendation adopted*, No. 4:19-CV-00715, 2021 WL 4480750 (S.D. Tex. Sept. 30, 2021) (finding exception to sovereign immunity where AG's threat of prosecution under election code chilled political speech).

that would be prohibited under SB1 related to the bill's new "vote harvesting" provisions, and has publicly announced that he intends to continue to prosecute such "offenses."[8] *Id.* ¶ 44.

Unable to put forth a full-throated argument that the AG does not intend to prosecute Texas Election Code violations, State Defendants pivot to arguing that Plaintiffs lack standing because their injuries are not fairly traceable to the AG's conduct. Dkt 240 at 13. This argument also fails. The AG's continued pursuit of opportunities to bring prosecutions based on the criminal provisions in the Texas Election Code raises the threat of prosecution to more than mere speculation. When "an official can act, and there's a significant possibility that he or she will act to harm a plaintiff, the official has engaged in enough 'compulsion or constraint' to apply the *Young* exception." *See City of Austin*, 943 F.3d at 1002.

Moreover, the looming threat of future prosecution chills Plaintiffs and their members' willingness to participate in voting by mail and assistance to voters. This chilling effect, too, is fairly traceable to the AG's authority. *See Ostrewich v. Hudspeth*, No. 4:19-CV-00715, 2021 WL 4170135, at *6–8 (S.D. Tex. Sept. 14, 2021), *report and recommendation adopted*, No. 4:19-CV-00715, 2021 WL 4480750 (S.D. Tex. Sept. 30, 2021) (finding a substantial threat of future enforcement of an electioneering statute from the AG based a "pre-enforcement 'chilling' injury" although the AG had not threatened the plaintiff with arrest or prosecution); *cf.* Defs.' Br. at 21. In

---

[8] *See* Press Release, OAG, San Antonio Election Fraudster Arrested for Widespread Vote Harvesting and Fraud (Jan. 13, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-san-antonio-election-fraudster-arrested-widespread-vote-harvesting-and-fraud ("[M]y office is prepared to assist any Texas county in combating this insidious, un-American form of fraud."); Press Release, OAG, AG Paxton Announces Formation of 2021 Texas Election Integrity Unit (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit ("Furthermore, Attorney General Paxton continues to pursue prosecutions for criminals willing to commit election crimes. Since taking office in 2015, the Attorney General has resolved 286 prosecutions of Texas Election Code criminal offenses against 76 defendants. Attorney General Paxton is currently prosecuting over 500 felony election fraud offenses in Texas courts."); Press Release, OAG, Work of AG Paxton's Election Fraud Unit Results in Arrests of 4 Members of Organized Voter Fraud Ring in North Fort Worth (Oct. 12, 2018), https://www.texasattorneygeneral.gov/news/releases/work-ag-paxtons-election-fraud-unit-results-arrests-4-members-organized-voter-fraud-ring-north-fort ("My office is committed to ensuring that paid vote harvesters who fraudulently generate mail ballots, stealing votes from seniors, are held accountable ….").

*Ostrewich*, the court noted that although the local DA and the AG had not yet prosecuted any violations of the challenged statute, they had also "never disavowed their authority to do so nor affirmatively represented that they will not prosecute violations going forward." *Ostrewich*, No. 4:19-CV-00715, 2021 WL 4170135, at *8.

Nor is it merely speculative that a local district or county attorney will decide to prosecute one of Plaintiffs' members, or that the AG will agree to provide prosecutorial assistance in such a case. Dkt 240 at 13. As explained above, Plaintiffs' fear of prosecution is grounded in evidence of the AG's repeated actions and stated intentions. But in any event, this Court recently observed that "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Longoria v. Paxton*, 5:21-cv-01223-XR, Dkt 53, at 11, 16, 18–19 (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)). Here, the AG has continued to assert that he should lawfully have the ability to unilaterally prosecute election code violations, has not otherwise disavowed his previously expressed intent to prosecute violations alongside district or county attorneys, and has otherwise done nothing to suggest that such criminal prosecutions are unlikely.[9] Again, the AG continues to maintain, for example, an entire unit of his office dedicated to such prosecutions. The AG's well-established intent to prosecute election code violations is substantial enough to chill Plaintiffs' and their members' actions and is significantly greater than a "speculative chain of possibilities," as State Defendants argue. Defs.' Br. at 13 (citing *Clapper*

---

[9] *See* Press Release, OAG, Paxton Asks Court of Criminal Appeals to Reverse Its Decision Stripping OAG of Authority to Stop Election Fraud (Jan. 3, 2022), https://www.texasattorneygeneral.gov/news/releases/paxton-asks-court-criminal-appeals-reverse-its-decision-stripping-oag-authority-stop-election-fraud.

*v. Amnesty Intl. USA*, 568 U.S. 398, 414 (2013)).[10] State Defendants' implication that the AG would need to pursue prosecution against one of Plaintiffs' members *before* Plaintiffs could have standing to challenge the provisions of SB1 is not the law. *Compare* Defs.' Br. at 13, *with Ostrewich*, No. 4:19-CV-00715, 2021 WL 4170135, at *6–8, *and Longoria*, 5:21-cv-01223-XR, Dkt 53, at 11–13.

Finally, *City of Austin*, on which State Defendants rely, is distinguishable. There, the AG had only indirect enforcement authority to intervene in suits to assert the supremacy of a state housing statute over city ordinances. *City of Austin*, 934 F.3d at 1000 & n.1. The court held that the city had not shown the AG was likely to enforce the state statute against a city ordinance, where the city had shown only that the AG had "intervene[d] to defend *different* statutes under *different* circumstances" and where the city "face[d] no consequences if it attempt[ed] to enforce its Ordinance." *Id.* at 1002–03. Here, by contrast, the AG has the clear authority to criminally prosecute violations of the provisions at issue (whether independently or concurrently with local officials) and has not only shown a willingness to bring those prosecutions, but has trumpeted such

---

[10] State Defendants' reliance on *Clapper* to argue that it is speculative that the AG will assist local officials in prosecuting violations of the Election Code is misguided. The plaintiffs in *Clapper* lacked standing to challenge certain provisions allowing government surveillance because the plaintiffs "[had] no actual knowledge of the Government's . . . targeting practices" and "no specific facts demonstrating that the communications of their foreign contacts [would] be targeted." *Clapper*, 568 U.S. 398, 411–413. Whereas here, the AG has spent years consistently targeting and publicly highlighting prosecutions under the Texas Election Code and has demonstrated a willingness to assist local prosecutors in these prosecutions, as discussed above.

More broadly, State Defendants' argument that Plaintiffs lack Article III standing because their injuries are not traceable or redressable with respect to State Defendants largely rehashes their sovereign immunity arguments, as State Defendants admit. (Dkt 240 at 12–13). As set forth here, Plaintiffs' injuries are traceable to the State Defendants and redressable by the requested relief, because the State Defendants enforce the provisions in SB1 and declaratory or injunctive relief against the State Defendants would provide relief to Plaintiffs and their members. No more is required. On a motion to dismiss for lack of standing, the Court "presume[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *accord OCA-Greater Houston*, 867 F.3d at 610.

prosecutions and raised money to bring more of the same.[11] *See Longoria*, 5:21-cv-01223-XR, Dkt 53, at 24–25 (distinguishing *City of Austin* and finding that the AG's past willingness to enforce election code provisions was sufficient to demonstrate "some scintilla of 'enforcement'").

### C. State Defendants Are Not Immune from Voting Rights Act and Civil Rights Act Claims.

As State Defendants concede, the Fifth Circuit has expressly held that "[t]he VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity," *OCA-Greater Houston*, 867 F.3d at 614, and has repeatedly reaffirmed that holding, *e.g.*, *Mi Familia Vota v. Abbott*, 977 F.3d 461, 470 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020); Dkt 240 at 12. These cases likewise reaffirm the settled rule that private plaintiffs may bring suit to enforce the VRA against state officials. State Defendants recognize that this Court is bound by this body of precedent, Dkt 240 at 12, which is correct and consistent with settled law.

State Defendants' arguments with respect to Section 1983 are likewise misplaced. As already explained, under *Ex parte Young*, state sovereign immunity does not bar plaintiffs from seeking prospective *injunctive* relief against state officials who violate federal law. The rule is the same for claims brought under Section 1983, which expressly authorizes private causes of action against state officials who violate federal law or the Constitution while acting "under color of" state law. There is no categorical bar against private causes of action seeking injunctive relief against state officials under Section 1983, and State Defendants' cited authority does not suggest otherwise. Dkt 240 at 12. In *Raj v. LSU*, 714 F.3d 322 (5th Cir. 2013), the Fifth Circuit did *not*

---

[11] The State also relies on *Texas Democratic Party II*, 978 F.3d 168, but its analysis with respect to the AG is distinguishable. There, the Court relied on the AG's purported "general duty" to enforce the law, but did not analyze the AG's unique and specific statutory duty to bring criminal prosecutions under the Texas Election Code. Nor did that case analyze similar facts as here, where the AG routinely brought prosecutions relating to the same or similar offenses.

rule that the plaintiff was categorically barred from bringing claims under Section 1983 on the basis of sovereign immunity. Rather, the court held that Congress had not abrogated sovereign immunity under the Age Discrimination in Employment Act (a separate statute) and that *Ex parte Young* did not apply because the plaintiff had only brought claims against the state agencies instead of state officials. *Id.* at 328; *see also Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020).

### D. State Defendants are Not Immune from Americans with Disabilities Act or Section 504 Claims.

State Defendants are similarly wrong in arguing that Texas is not subject to claims under the ADA or Section 504 of the Rehabilitation Act. Title II of the ADA clearly states Congress's intent to abrogate sovereign immunity. 42 U.S.C. § 12202 ( "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court . . . for [an ADA] violation."); *see Tennessee v. Lane*, 541 U.S. 509, 518 (2004).

State Defendants' assertion of sovereign immunity with respect to Plaintiffs' ADA claims boils down to and is coextensive with their argument that Plaintiffs have not pleaded a violation of Title II. *See* Dkt 240 at 12 (citing *Block v. Tex. Bd. of Law* Examiners, 952 F.3d 613, 617 (5th Cir. 2020)). However, as explained below, Plaintiffs have sufficiently pleaded that SB1's onerous new rules regarding mail-in ballots and voter assistance violate Title II of the ADA, and therefore State Defendants' sovereign immunity argument fails.

With respect to Section 504 claims, a state waives its Eleventh Amendment immunity by accepting federal funds. *See* 42 U.S.C. § 2000d-7(a); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005) (en banc) (Louisiana education agencies waived immunity from Section 504 claims by accepting federal funding); *Danny R. ex rel. Ilan R. v. Spring Branch Indep. Sch. Dist.*, 124 F. App'x 289, 289–90 (5th Cir. 2005) (citing *Pace* in holding that a Texas agency is not

immune from suit under Section 504). Because the SOS's office receives federal funding for elections, it has waived any immunity from suit under Section 504.[12] State Defendants' claim that Plaintiffs "plead no plausible facts to show such waiver," Dkt 240 at 12, ignores the direct assertion to the contrary in the Plaintiffs Second Amended Complaint. *See* 2d Am. Compl. ¶ 53 ("In 2020, Texas received approximately $26,064,574 in funding through the Help America Vote Act ('HAVA'). In addition, Texas received $24,546,840 million pursuant to the CARES Act in 2020.").

## II. PLAINTIFFS HAVE STATED A CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT, AND SECTION 208 OF THE VOTING RIGHTS ACT

State Defendants do not challenge that Plaintiffs have stated claims pursuant to the CRA or Plaintiffs' claim that SB1's "vote harvesting" provisions violate the First Amendment by criminalizing core political speech; and State Defendants reference the contours of Plaintiffs' Section 208 claims only in passing.[13] State Defendants instead focus—unsuccessfully—on arguing that Plaintiffs failed to state a claim under the ADA and Section 504.

---

[12] Texas has a significant pool of federal funds earmarked for making elections accessible and secure. The SOS's Election Funds Management Division receives and administers federal funding throughout the state. From 2020-21, Texas received $26,064,574 in funding through the Help American Vote Act ("HAVA"). Help America Vote Act (HAVA), Tex. Sec'y of State, John B. Scott, https://www.sos.texas.gov/elections/hava/hava_act.shtml (last visited Feb. 11, 2022). In addition, Texas received $24,546,840 million pursuant to the CARES Act in 2020. *See* Election Assistance Commission – CARES Grant Funding Chart – July 22nd 2020, https://www.eac.gov/sites/default/files/paymentgrants/cares/FundingChart_CARES.pdf (last visited Feb. 11, 2022).

[13] State Defendants assert, but make no specific argument, that Plaintiffs' Section 208 claims cannot be brought by organizations and must also be evaluated on an individualized basis, as they argue for ADA/504 claims. However, these arguments are foreclosed by *OCA-Greater Houston*, 867 F.3d 604, which upheld an organization's standing to challenge a provision of the Election Code under Section 208, and which further relied on the experience of a single voter and assistant in upholding the facial challenge under Section 208. *Id*. at 610–13. The only case State Defendants cite, *Ray v. Texas*, No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008), does not hold or even hint that Section 208 claims can only be resolved on a case-by-case basis. Indeed, in *Ray*, the court considered the effect of the challenged law on "elderly and disabled voters" generally. *Id*. at *5.

Nor is there any logic behind State Defendants' assertion. Plaintiffs are not seeking damages but rather injunctive relief. Accordingly, individualized participation of every person injured by SB1 is not required. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc*., 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members.") (citation omitted);

### A. Courts Routinely Uphold Associational Standing Without Individual Participation in Americans with Disabilities Act Cases.

State Defendants argue that Plaintiffs have failed to state a claim under the ADA and Section 504[14] because "[n]one of the Plaintiffs has a qualifying disability . . . each of them is an artificial entity that is incapable of being disabled" and that "[d]isability claims require individual participation." Dkt 240 at 14, 15.[15] The thrust of State Defendants' argument is that an organization could never represent the interests of multiple members in a lawsuit under the ADA because of the inherently individualized nature of disability claims. This argument fundamentally misunderstands the concept of associational standing and the nature of disability law.[16]

---

*Ass'n of Am. Physicians & Surgs. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (observing that an "association's action for damages running solely to its members would be barred," but plaintiff that sought only declaratory and injunctive relief had standing).

For example, to demonstrate that Section 6.04 of SB1 violates Section 208 of the VRA and should be enjoined, Plaintiffs can provide evidence that one or several members need a form of assistance to vote that is prohibited by Section 6.04's Oath. This could include a member's need for an assistant to navigate the polling site, explain the functionality of a voting machine, or to answer the voter's questions. Evidence is not needed from every member who is entitled to assistance while voting.

[14] Hereafter, references to Plaintiffs' ADA claims also encompass Plaintiffs' Section 504 claims. Section 504 and the ADA are interpreted in tandem. *See, e.g.*, *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020).

[15] The cases cited by State Defendants are inapposite. *Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Sims v. Texas Dep't of Hous. & Cmty. Affs.*, No. CIV.A. H-05-2842, 2005 WL 3132184 (S.D. Tex. Nov. 21, 2005) and *Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009, 1014 (N.D. Ill. 2002) address third party standing, which is not the basis on which Plaintiffs assert they have standing. State Defendants' arguments conflating associational standing with third party standing fail because "the successful assertion of associational standing (both organizational and representational) fulfills prudential standing concerns and obviates the need to apply concepts of third-party standing as to the associations." *Veasey v. Perry*, 29 F. Supp. 3d 896, 905 (S.D. Tex. 2014) (finding NAACP had associational and organizational standing for Section 1983 and Section 2 claims).

[16] State Defendants also argue that although "Plaintiffs allege they have disabled members . . . only REVUP identifies those members." Defs.' Br. 14. However, in *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, the Fifth Circuit held that "nam[ing] names" or otherwise identifying a particular member is not a requirement at the pleading stage. 487 F. App'x 189, 194 (5th Cir. 2012). District courts applying *Hancock* routinely reject the argument that plaintiffs must name names at the pleading stage. *E.g.*, *Tex. League of United Latin Am. Citizens v. Abbott*, 493 F. Supp. 3d 548, 570 (W.D. Tex. 2020) ("[I]t is sufficient at this stage that the organizational plaintiffs have alleged that some of their members have suffered an injury, even without naming specific members.") *vacated on other grounds sub nom. Texas League of United Latin Am. Citizens v. Hughs*, No. 20-50867, 2021 WL 1446828 (5th Cir. Feb. 22, 2021)).

An association has standing to sue on behalf of its members when (i) "its members would otherwise have standing to sue in their own right," (ii) "the interests at stake are germane to the organization's purpose," and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000). Whether the claim asserted or the relief requested requires the participation of individual members is a "prudential" matter that focuses on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *New Jersey Prot. & Advocacy, Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 483 (D.N.J. 2008) (citing *United Food*, 517 U.S. at 554–57); *see also Ass'n of Am. Physicians & Surgs. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010).

Federal courts, including in the Fifth Circuit, routinely find that advocacy organizations representing individuals with disabilities have associational standing to challenge violations of federal laws protecting individuals with disabilities in cases seeking systemic, injunctive relief, with or without the participation of individual members. *See, e.g.*, *Steward v. Abbott*, 189 F. Supp. 3d 620, 631–32 (W.D. Tex. 2016); *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 46–47 (D.D.C. 2019), *appeal dismissed*, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019); *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1019 (N.D. Ohio 2011); *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 525 (D. Md. 2010).

Notably, two federal district courts have recently upheld associational standing in two actions challenging state voting laws as discriminatory under the ADA. In *Florida State Conference of NAACP v. Lee*, organizational plaintiffs, including Disability Rights Florida, challenged a new Florida law restricting voting rights under the ADA, among other claims. *See*

No. 4:21CV187-MW/MAF, 2021 WL 6072197, at *1 (N.D. Fla. Dec. 17, 2021); *Fla. State Conf. of NAACP v. Lee Nat'l Republican Senatorial Comm.*, No. 4:21CV187-MW/MAF, 2021 WL 4818913, at *22 (N.D. Fla. Oct. 8, 2021). The court found that Disability Rights Florida had standing to challenge the state law under the ADA as an organization, noting that "[t]o prevail on this claim, Plaintiffs must establish (1) that they—*or their constituents*—are qualified individuals with a disability." 2021 WL 4818913, at *23 (emphasis added); *see also id.* (plaintiffs must show that *their constituents* "'meet[] the essential eligibility requirements' to participate in the program or services at issue 'with or without reasonable modifications'") (emphasis added)). Further, in denying the defendants' summary judgment motion, the court observed that "Plaintiffs' members have standing as to each of the challenged provisions enacted or amended by [the state law] . . . since neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit." 2021 WL 6072197, at *1 (citing *Greater Birmingham Ministries v. Sec'y of State for State of Alab.*, 992 F.3d 1299, 1316 (11th Cir. 2021) and *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003)).

Similarly, in *Sixth District of the African Methodist Episcopal Church, v. Kemp*, No. 1:21-CV-01284-JPB, 2021 WL 6495360 (N.D. Ga. Dec. 9, 2021), organizational plaintiffs, including disability rights organizations The Arc of Georgia, Georgia Advocacy Office, and Georgia ADAPT, challenged a Georgia voting law as discriminating against people with disabilities under the ADA, among other claims. The defendants did not challenge the ability of organizational plaintiffs to sue under the ADA, but it is nevertheless notable that the court denied the Motion to Dismiss and upheld the plaintiffs' standing. The court noted that "Plaintiffs allege that their *members and constituents* are qualified individuals with disabilities under the ADA," clarifying that it is, of course, the organizations' members—not the organizations themselves—that have

disabilities and demonstrating that associational standing is routinely upheld, including in ADA cases pertaining to voting rights. *See id.* at *12 (emphasis added).

The cases cited by State Defendants are inapposite and do not that individualized participation is required in ADA cases. For example, State Defendants cite language from *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that relates specifically to the definition of disability under the ADA, and stands for the proposition that a plaintiff may not rely on a medical diagnosis alone to prove that he or she has a disability. Nothing in *Toyota*—which addresses an individual employment action under Title I rather than Title II—suggests that a challenge to the effects of a statewide policy on a large group of people with disabilities requires the participation of every single person affected by that policy.[17] Similarly, *Windham v. Harris Cty.*, 875 F.3d 229, 237 (5th Cir. 2017), was a case brought by an individual which, by definition, required individualized participation.

Lastly, State Defendants argue that "[n]othing in the amended complaint suggests that disabled voters will face 'uniform' issues across Texas' 254 counties . . . . [and] individual participation is crucial for understanding the merits of disability claims." Dkt 240 at 15.[18] But even if "uniformity" were required—and it is not—SB1 does *uniformly* impose barriers on and restrict the voting rights of people with disabilities across the state. Even when the disabilities of the affected individuals vary, the law and harm that it inflicts—denying voters with disabilities equal

---

[17] *Toyota*'s holding related to the definition of disability under the ADA has since been abrogated by the ADA Amendments Act of 2008, Pub. L. 110-325 (2008).

[18] In support of their argument that "uniformity" is required, State Defendants cite *Prison Just. League v. Bailey*, 697 F. App'x 362, 363–64 (5th Cir. 2017). But *Bailey* involves constitutional claims of excessive force against incarcerated people, not ADA claims. The court's discussion of a requirement that there be a "uniform retaliatory motive" pertains to the specific standards needed to prove the constitutional claims at issue in that litigation, which are not relevant here. *Id.* at 363. Indeed, the court even notes that its analysis is specific to use of excessive force in prison cases which are "necessarily fact-intensive." *Id.* at 364.

access to the state's voting program by imposing immaterial new mail-in ballot requirements and limiting voter assistance—is uniform. That Plaintiff organizations' members have diverse disabilities or will experience these burdens in different ways is irrelevant to the question of whether SB1 imposes the same kind of harm to people with disabilities on a statewide basis. It is undisputed that it does.[19]

### B. That Other Voting Options May be Accessible to Plaintiffs Does Not Negate State Defendants' Obligations to Remedy the Discriminatory Effects of SB1

State Defendants further argue that Plaintiffs "have not plausibly alleged that SB1 actually discriminates against voters with disabilities" on the grounds that "Plaintiffs have a right to vote, not a right to vote by their preferred method." Dkt 240 at 18. But whether "[d]isabled Texans have multiple options to vote," Dkt 240 at 18, does not negate State Defendants' obligation to ensure that both its absentee and in-person voting programs are accessible to people with disabilities. Numerous courts have rejected this exact argument in other cases challenging voting restrictions under the ADA. *See, e.g.*, *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) ("Defendants argue that even if absentee voting is not fully accessible, the full accessibility of Maryland's in-person polling places provides disabled voters with meaningful access to voting . . . we conclude that defendants' proposed focus is overbroad and would undermine the purpose of the ADA and its implementing regulations."); *Disabled in Action v. Bd. of Elections in New York*, 752 F.3d 189, 198–99 (2d Cir. 2014) ("[T]o assume the benefit is ... merely the

---

[19]State Defendants go on to make an incomplete argument, stating: "…overlap between this amended complaint and the Houston Justice . . . complaint highlights the inherent error of allowing a plaintiff to make a broad assertion of associational standing without identifying specific members." Dkt 240 at 16. State Defendants then object that the members Plaintiffs *did* identify are the same as those in the Houston Justice case, noting "these plaintiff groups cannot even identify *different people*." State Defendants do not suggest that the specific individuals are not in fact members of both plaintiff organizations, and nothing in the law bars individuals from being members of multiple organizations. Plaintiffs do not assert that the identified individuals are the *only* ones harmed by SB1. State Defendants cannot have it both ways, first arguing that Plaintiffs' complaints are not streamlined enough and then protesting that they are too streamlined when Plaintiffs groups attempt to coordinate for efficiency purposes.

opportunity to vote at some time and in some way [] would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others.") (internal quotation marks and citation omitted); *see also United Spinal Ass'n v. Bd. of Elections in New York*, 882 F.Supp.2d 615, 623–24 (S.D.N.Y.2012); *Westchester Disabled on the Move v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004); *People First*, 491 F. Supp. 3d at 1158; *Fla. State Conf. of NAACP v. Lee*, No. 4:21CV187-MW/MAF, 2021 WL 6072197, at *6 (N.D. Fla. Dec. 17, 2021); *Fla. State Conf. of NAACP v. Lee Nat'l Republican Senatorial Comm.*, No. 4:21CV187-MW/MAF, 2021 WL 4818913, at *23 (N.D. Fla. Oct. 8, 2021); *Sixth District of the African Methodist Episcopal Church v. Kemp,* No. 1:21-CV-01284-JPB, 2021 WL 6495360 at 14 ("State Defendants' key argument . . . is that 'disabled voters have multiple options to vote.'. . . A violation of Title II, however, does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity. Rather, a plaintiff states a claim under the ADA when the complaint alleges facts indicating that certain 'services, programs, and activities' are not 'readily accessible' by reason of a disability . . . .Plaintiffs need not show that the voting access allegedly denied here is absolute.").[20]

State Defendants argue that their voting program complies with ADA regulations (*e.g.*, 28 C.F.R. § 35.150) because Texas already provides accessible voting systems and physical access to polling places. Dkt 240 at 18. However, those regulations apply only to the accessibility of *physical facilities*, not to programs like voting by mail. State Defendants do not attempt to explain how providing physically accessible facilities will remedy Plaintiffs' claims regarding onerous ID

---

[20] Defendants cite *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969) to support their position, but *McDonald* addressed the constitutional right to vote, and has no bearing on claims under the ADA or section 504, neither of which had been enacted when it was decided.

requirements, restrictions on voter assistance, and criminalization of that assistance. The Fourth Circuit addressed and rejected a similar argument in *Lamone*:

> Defendants cite an ADA-implementing regulation, 28 C.F.R. § 35.150(a), which they assert requires a reviewing court to view Maryland's voting program 'in its entirety.' However . . . This regulation is targeted principally at physical accessibility and allows a public entity to provide accessibility alternatives that would not require large-scale architectural modifications of existing facilities. Other ADA-implementing regulations, however, are applicable here and conflict with defendants' proposed focus on the entirety of Maryland's voting program…28 C.F.R. § 35.130…directly implements the general antidiscrimination mandate of Title II . . . this regulation clearly contemplates a focus on accessibility at a more granular level than entire government programs—the level of "policies, practices, and procedures."

813 F.3d 494, 504–05 (4th Cir. 2016).

As the Fourth Circuit stated and as pleaded in Plaintiffs' Second Amended Complaint, the relevant regulation in this context is 28 C.F.R. § 35.130, which bars discrimination in or exclusion from *all* government-administrated programs, necessarily including mail-in voting and voter assistance. 2d Am. Compl., ¶¶ 129, 184.

### C.  SB1's Reasonable Modifications Clause Does Not Remedy Plaintiffs' Claims.

State Defendants further argue that SB1 includes a clause noting that nothing in the law may be interpreted to prohibit an individual with a disability from requesting a reasonable modification. Dkt 240 at 18.[21] But this provision is simply a restatement of what federal law already requires, and is no basis for dismissal. The clause itself provides no protections that are not already available under the ADA—nor any assurance that a requested modification *will actually be provided*. And more to the point, it does not undo the discriminatory provisions that

---

[21] In support, Defendants cite *Smith*, 956 F.3d at 317 which simply restates the statutory requirement that Plaintiffs must show that Defendants have failed to reasonably modify their program and does nothing to support Defendants' position here.

are expressly written into SB1. As described in Plaintiffs' Second Amended Complaint, the SB1 provisions challenged by Plaintiffs inflict systemic harm on large groups of people with disabilities and impose a chilling effect deterring those who seek to assist Plaintiffs in voting. 2d Am. Compl. ¶¶ 129–138, 140–46, 170–72, 182–193.

These are not harms that can be remedied by any one individual, case-by-case reasonable modification requests, or even a perfunctory restatement of the ADA within the text of SB1.

Plaintiffs allege that State Defendants have discriminated against voters with disabilities not only through denial of reasonable modifications, but in several other ways, including denying voters with disabilities equal access to voting, imposing eligibility criteria that screen out voters with disabilities, utilizing methods of administration that defeat the objectives of State Defendants' voting programs with regard to voters with disabilities, and interfering with the ability of voters with disabilities and those who assist them to exercise their rights under the ADA. 2d Am. Compl. ¶ 129–130, 132–134. As Plaintiffs allege, State Defendants have excluded people with disabilities and denied meaningful access to the state's voting program. *Id.* ¶¶ 129–138, 140–146, 182–193.

### D. The Secretary of State Is A Proper Defendant On Plaintiffs' Disability Rights Claims.

State Defendants' argument that the SOS is an incorrect Defendant for Plaintiffs' disability claims fails for the same reason that their sovereign immunity claims fail. As already explained, the SOS has a direct role in enforcing the challenged provisions here.

State Defendants also wrongly suggest that Plaintiffs' ADA claims seek to "impose supervisory liability on" the SOS. Dkt 240 at 17. But Plaintiffs do not argue that the SOS must himself ensure local officials' compliance with the ADA. They ask only that the Court enjoin the

SOS from implementing and enforcing discriminatory voting policies. Because that relief is within the Court's power to grant, State Defendants' argument should be rejected.

State Defendants rely heavily on *Lightbourn v. County of El Paso*, 118 F.3d 421 (5th Cir. 1997), but that case is irrelevant here. The plaintiffs in *Lightbourn* argued that the SOS had an affirmative obligation to ensure local jurisdictions implemented accessible in-person voting systems. 118 F.3d at 423–24. The court held that "the Secretary has no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Id*. at 432. Here, Plaintiffs are not seeking that the SOS enforce compliance with the ADA. Plaintiffs' claims are based on the SOS's discriminatory implementation of statewide voting procedures, which discriminate against voters with disabilities. *Lightbourn* does not absolve the Secretary from his duty not to discriminate against voters with disabilities.

Similarly, State Defendants' reliance on *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015) is unavailing. *Ivy* was brought against the Texas Education Agency ("TEA") by deaf students who complained about the lack of American Sign Language interpreters in TEA-licensed driver's education courses. 781 F.3d at 252–253. The Fifth Circuit found that TEA was not the proper Defendant because TEA did not actually provide the education course. *Id*. at 256. But nothing in *Ivy* would have allowed for TEA to *restrict* the provision of ASL interpreters in driver's education courses. Here, State Defendants are *restricting* accommodations for voters with disabilities by implementing the use of forms limiting the type of assistance a voter with a disability can receive and affirmatively demanding voter ID information from voters with disabilities.

### III. PLAINTIFFS HAVE PRIVATE CAUSES OF ACTION FOR THEIR CLAIMS UNDER THE VOTING RIGHTS ACT AND THE CIVIL RIGHTS ACT.

This Court has already rejected State Defendants' argument that Section 101 of the CRA and Section 208 of the VRA do not establish private rights of action, as State Defendants recognize.

Dkt 240 at 19–20. The Court was correct to reject these arguments as to both the CRA[22] and Section 208 of the VRA.[23]

## CONCLUSION

For the reasons stated herein, State Defendants' Motion to Dismiss should be denied in its entirety. To the extent any of Plaintiffs' claims are likely to be dismissed, however, Plaintiffs should be afforded the opportunity to amend their Complaint prior to dismissal.

---

[22] Defendants wrongly contend that Section 101 of the Civil Rights Act of 1964 does not provide a private right of action. In fact, the legislative history demonstrates that private plaintiffs have enforced this provision since the Section's enactment in 1871. *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). In adding the provision that allowed the AG to also enforce Section 101, the House Judiciary Committee acknowledged Section 101 was historically enforced by private plaintiffs and stated that the bill's purpose was "to provide means of *further* securing and protecting the civil rights of persons within the United States" by granting the Attorney General authority to bring suit in addition to the suits individuals were already bringing. H.R.REP. NO. 85–291 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1966, 1966 (emphasis added); *see also Cox*, 340 F.3d at 1297. The Eleventh Circuit examined the text and legislative history of Section 101 and concluded that a private cause of action does exist. 340 F.3d at 1294–97. Recently, a court in this district came to the same conclusion. *Hughs*, 474 F. Supp. 3d at 858–59 ("Congress did not intend to foreclose private causes of action by also granting the Attorney General enforcement authority.").

[23] Defendants are incorrect that there is no private right of action under Section 208 of the VRA. Courts, including the Fifth Circuit, have repeatedly affirmed the right of private plaintiffs to enforce Section 208. *See OCA-Greater Houston*, 867 F.3d at 604 (affirming summary judgment granted by Austin court in favor of private plaintiffs seeking to enforce Section 208 as against state law voting rule); *see also, e.g., Arkansas United v. Thurston*, 517 F. Supp. 3d 777 (W.D. Ark. 2021) (expressly holding that plaintiffs had a private cause of action to enforce Section 208 claim); *Democracy North Carolina v. North Carolina State Bd. of Elec.*, 476 F. Supp. 3d 158, (M.D.N.C. 2020) (private plaintiffs demonstrated a likelihood of success on the merits of Section 208 claim); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792 (E.D. Mich. 2020) (private plaintiffs' Section 208 claim survived motion to dismiss). Defendants' argument to the contrary is inconsistent with both the text of the VRA and how courts have interpreted provisions within it. Indeed, the text of the VRA itself contemplates that private plaintiffs may sue to enforce its provisions (which necessarily include Section 208) in discussing various rules courts must follow when "the Attorney General *or an aggrieved person* institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision." 52 U.S.C. § 10302 (emphasis added); *see Arkansas United*, 517 F. Supp. 3d at 790 (discussing how Congress's addition of the "aggrieved person" language made "what was once implied now explicit: private parties can sue to enforce the VRA"); *see also Ala. State Conf. of N.A.A.C.P. v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020) ("The VRA, as amended, clearly expresses an intent to allow private parties to sue the States…. and explicitly provides remedies to private parties to address violations under the statute."), *cert. granted, judgment vacated sub nom. on other grounds, Alabama v. Ala. State Conf. of NAACP*, 141 S. Ct. 2618 (2021). The legislative history is in accord. *See* S. Rep. No. 295, c1975: 40 ("The amendment proposed by S. 1279 would authorize courts to grant similar relief to private parties in suits brought to protect voting rights …."). In enacting Section 208 and allowing voters to have assistance at the polls, Congress saw itself as protecting the constitutionally guaranteed right to vote, explaining that, "if a person who cannot read in English is permitted to vote, she must be permitted to have assistance at the polls or her right to vote is meaningless . . . Section 208 implements an existing right by prescribing minimal requirements as to the manner in which voters may choose to receive assistance." S. Rep. No. 417, 97th Cong., 2d Sess. at 63. Section 208's right to an assistor of choice thus "is a congruent and proportional remedy to enforce the guarantees of the Equal Protection Clause and does not impermissibly create a new constitutional violation not contemplated by the Fourteenth Amendment." 517 F. Supp. 3d at 789.

Dated: February 22, 2022.

Respectfully submitted,

*/s/ Lia Sifuentes Davis*

LIA SIFUENTES DAVIS
Texas State Bar No. 24071411
LUCIA ROMANO
Texas State Bar No. 24033013
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
ldavis@drtx.org
lromano@drtx.org

Mimi M.D. Marziani
Texas Bar No. 24091906
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
mimi@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
Andre Segura
Texas Bar No. 24107112
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
skumar@aclutx.org

aharris@aclutx.org
asegura@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Samantha Osaki*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavizky@aclu.org
slakin@aclu.org
sosaki@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Urja Mittal*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
umittal@jenner.com

**COUNSEL FOR PLAINTIFFS OCA-GREATER
HOUSTON, ET AL.**

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that all counsel of record in this case were served with this Response through the Court's CM/ECF electronic filing system on February 22, 2022.

*/s/ Lia Sifuentes Davis*
Lia Sifuentes Davis