IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNION DEL PUEBLO ENTERO, ET AL, | . |
| | . |
| PLAINTIFFS, | . |
| vs. | . DOCKET NO. 5:21-CV-844-XR |
| GREGORY W. ABBOTT, ET AL, | . |
| | . |
| DEFENDANTS. | . |

TRANSCRIPT OF MOTION TO COMPEL
BEFORE THE HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
FEBRUARY 23, 2022

APPEARANCES:
FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE

REBECCA L. MARTIN, ESQUIRE

JULIA RENEE LONGORIA, ESQUIRE

JASON KANTERMAN, ESQUIRE

ELIZABETH YVONNE RYAN, ESQUIRE

GEORGINA YEOMANS, ESQUIRE

J. KEELY DULANEY, ESQUIRE

SHIRA WAKSCHLAG, ESQUIRE

MOHAMMED A. BADAT, ESQUIRE

KATHRYN E. YUKEVICH, ESQUIRE

UZOMA N. NKWONTA, ESQUIRE

```
 1
 2                          HALEY COSTELLO ESSIG, ESQUIRE
 3                          ADRIEL CEPEDA-DERIEUX, ESQUIRE
 4                          HANI MIRZA, ESQUIRE
 5                          LIA SIFUENTES DAVIS, ESQUIRE
 6                          ARI SAVITZKY, ESQUIRE
 7
 8    CONSOL PLAINTIFF USA:  DANIEL JOSHUA FREEMAN, ESQUIRE
 9                          RICHARD ALAN DELLHEIM, ESQUIRE
10                          MICHAEL ELLIOT STEWART, ESQUIRE
11                          JENNIFER JAESEON YUN, ESQUIRE
12                          DANA PAIKOWSKY, ESQUIRE
13
14
      FOR THE DEFENDANTS:   PATRICK SWEETEN, ESQUIRE
15
                           WILLIAM THOMAS THOMPSON, ESQUIRE
16
                           JEFFREY MICHAEL WHITE, ESQUIRE
17
                           CHAD ENNIS, ESQUIRE
18
                           RANJANA NATARAJAN, ESQUIRE
19
20
21
22
23    REPORTED BY:          GIGI SIMCOX, RMR, CRR
                           OFFICIAL COURT REPORTER
24                          UNITED STATES DISTRICT COURT
                           SAN ANTONIO, TEXAS
25
```

1    *(San Antonio, Texas; February 23, 2022, at 10:30 a.m., via*
2    *Zoom videoconference.)*
3          THE COURT:  Good morning.  Let's call 21 civil 844,
4    LUPE versus Abbott.
5          Who do we have on the call on behalf of the United
6    States?
7          MR. STEWART:  Good morning, Your Honor.  Michael
8    Stewart for the United States, and with me is my colleague
9    Mr. Freeman for any issues on the motion to compel.
10          THE COURT:  Thank you.
11          And for the Attorney General's office?
12          MR. SWEETEN:  Your Honor, this is Patrick Sweeten.
13    With me today is attorney Will Thompson and Jeff White, and
14    Mr. White will be addressing the motion before the Court
15    today.
16          THE COURT:  Thank you.
17          I'm sure we have several other counsel involved in
18    this case.  At this point I'm not going to ask for everyone to
19    recognize themselves, but if you do later chime in on this
20    issue, I'd ask that you please state your name, who you
21    represent, so the court reporter can get an accurate record.
22          We're here today on the United States' motion to
23    compel certain information from the AG's office.
24          So let me begin with you, Mr. Stewart.  It's my
25    understanding that the only field that we are still talking

1  about is the Card Status field out of TEAM, is that correct?

2          MR. STEWART:  Yes, Your Honor, with a slight

3  correction.  It's out of the DPS database.  Otherwise, that's

4  correct.

5          THE COURT:  Okay.  Out of the DPS.

6          So let me try to figure out here why we need this

7  information.  My understanding, the United States has two

8  claims in this case.  With regard to the second claim that's

9  at issue on this, isn't this 101 claim strictly legal in

10 nature?  What do we need discovery for anyway?

11         MR. STEWART:  Sure, Your Honor.

12         So this is related to the 101 claim, and what we

13 would say is there are two ways to understand.  What this

14 tries to fill out is the material prong -- the materiality

15 prong, rather, of the 101 claim.

16         And so we argue that, you know, in the first instance

17 you could determine materiality just by looking at what the

18 state law qualifications to vote are and comparing information

19 required to that to determine whether the error is material,

20 but, you know, the State has proffered in response to our

21 complaint the rationale that misstates the identity of the

22 voter.

23         And so what we are trying to test is sort of the

24 theoretical limits of that rationale, and so we'd say that,

25 you know, even if we're in a world where you could use

1   identity to determine qualifications, and that's material,

2   what this information will show is that some voters simply

3   aren't able to comply with that through no fault of their own,

4   that, you know, it is not enhancing the ability to determine

5   their identity to require this ID card information.

6          THE COURT:  So I'm trying to figure out, how much

7   data have you already received from the AG's office, and so

8   what incremental value does this Card Status field give you

9   that you don't otherwise already have?

10          MR. STEWART:  Sure, Your Honor.

11          What this Card Status shows, and it's the only field

12   that really shows this, is which voters have, you know,

13   received either a driver's license or an ID card and

14   potentially used that number in order — you know, on their

15   voter registration, so it appears in the TEAM database.

16          And they are no longer in possession of that card,

17   and so, you know, it makes difficulty then filling out either

18   an absentee ballot-by-mail application or a valid carrier

19   envelope that would be accepted by the registrar and allow

20   them to vote by mail.

21          And so, you know, the value is really in matching,

22   you know, what's in this against what's in the TEAM database

23   to determine, you know, which voters systematically aren't

24   going to be able to get mail ballots or vote by mail.

25          THE COURT:  So what happened in this initial round

1  here?  Did you ask for the Card Status field initially?  What

2  happened that this thing was dropped?

3      MR. STEWART:  Respectfully, Your Honor, it wasn't

4  dropped.  So this has been part of our ask from the beginning.

5  You know, this has been extensively negotiated with the State.

6  We were, you know, fortunately, able to come to an agreement

7  on the majority of the fields, seeking their retain or drop

8  that we've asked them for.

9      You know, as the — near the end of this, you know,

10  we continued to insist on Card Status, the State continued to

11  insist it wasn't relevant.  And we, you know, we told the

12  State as we were doing this that we reserved our right to move

13  for this later.  You know, we did that both when we were

14  reaching agreement and when we were accepting the database

15  later.

16      And so, you know, we've maintained our request for

17  this.  We just haven't been able to reach agreement on this

18  field.

19      You know, we did choose in the course of that a chain

20  of production of the remainder of the fields that we could

21  agree on, so that, you know, we could get started on our

22  analysis and our experts could get started on their analysis.

23      THE COURT:  Thank you.

24      So I guess it goes to Mr. White.  Why isn't this Card

25  Status field relevant?

1          MR. WHITE:  So Your Honor, there's a lot of confusion

2     on the part of the government about exactly what this Card

3     Status field means.  So I think it comes from some of the

4     labels of some of the potential statuses here use the term

5     "surrendered."  And the meaning for DPS is different from what

6     DOJ believes it means.

7          Surrendered is a surrender of the license, the

8     authority to do something.  And DPS is not concerned, does not

9     track in this database physical possession.  As the

10    declaration of Miss Gipson says, they don't have any field in

11    the database that indicates physical possession.

12         What the field, in some instances, some conditions in

13    this field could indicate a surrender of a license.  For

14    example, when the REAL ID requirements came into effect, they

15    prohibit an individual from having both a state-issued

16    identification card and a driver's license, where before that

17    used to be fine and there could have been people out there

18    that had one or both.

19         So when somebody goes to renew their driver's license

20    they go into the driver's license office, their record comes

21    up on the system, and the DPS employee sees that they have

22    two.  And what they will do is they will have to surrender the

23    ID.

24         It's marked in the database and tracked, but it

25    doesn't mean that DPS took the card off of them, cut it in

1  half and threw it in the trash, because many people will show

2  up without their ID, if they have a driver's license.  It's

3  not a physical possession field.  It is a field to track

4  whether an ID has — is legally valid, whether the license

5  that we once issued is now valid.

6          So there's confusion there.  And it's not so — the

7  reason that this wasn't produced is precisely for that point,

8  is that we were working repeatedly with DOJ to identify fields

9  that give them what they needed.

10          At the 26(f) conference the need for database

11  production was raised by the DOJ, who said there were a number

12  of issues, both related to security, privacy, and ensuring

13  that we wouldn't have to do this multiple times because we

14  wanted to ensure they got what they needed and there wasn't

15  confusion.

16          We discussed this on December 6th, December 9th,

17  December 14th twice, and December 15th, and we thought we had

18  reached agreement.  The day it was due we once again arranged

19  request for this field and several others, and ultimately we

20  had a call with Dan Freeman and said, basically if we're going

21  to keep asking for these things we would like to bring it to

22  the Court's attention now so that we don't have to do this

23  twice.

24          The concern all along was this is a significant

25  effort for DPS employees, out of their normal course of

1  business to go pull records for 29 million Texans.  It's not a

2  simple push of a button.  They have to write code.  They have

3  to validate the code.  They have to test it.  And then they

4  have to do the actual pull on a live database that's updated

5  daily.

6          And then so we did give them 29 million records, 30

7  fields for each of those 29 million people, and now here today

8  they are saying this one field is so important that we need to

9  do that process all over again.

10          We can't just pull one field.  We have to repeat the

11  pull.  It's a pull of 31 fields, so it's another 30-day

12  process.

13          THE COURT:  Let me ask you this, Mr. White.  I mean,

14  has the State of Texas produced this field in the past?

15          MR. WHITE:  To my recollection, I wasn't involved in

16  the prior cases where DPS databases have been produced.  In

17  the voter ID cases a large portion of the database may have

18  been produced, but in this case, it's not relevant to the

19  claims here for the reason I said.

20          To the extent that there's any relevance, which we

21  dispute, we have a separate opinion which explains why we do

22  believe it's a legal issue and there's no factual dispute that

23  really matters to this materiality question, but to the extent

24  there's any relevance, the field doesn't say what they think

25  it does and it will only lead to further confusion, disputes

1  about witnesses and experts.

2  　　　　THE COURT:  So let me give you a hypothetical.

3  　　　　We got Joe.  He's a Texas resident.  He surrenders

4  his state ID that he used to apply to vote by mail because he

5  now has his driver's license.  He just got his driver's

6  license.  If he tries to use the number on his driver's

7  license to vote by mail, his ballot is going to be rejected

8  even though he's eligible to vote in the state, do you agree?

9  　　　　MR. WHITE:  So I'm understanding your hypothetical

10 being the REAL ID context where an individual had the ID and

11 the driver's license, came in, renewed the driver's license,

12 and now the database may indicate that the ID was surrendered.

13 　　　　First, like I said before, he may have both cards and

14 so the field would not give you a clear indication that he

15 doesn't have the ability to provide the ID number on the ID

16 card.

17 　　　　THE COURT:  Well, we are talking about a relevance

18 standard, right?  So with the hypothetical I just presented to

19 you, this field is relevant, is it not?

20 　　　　MR. WHITE:  Well, I believe the 26 standard is

21 actually relevance and proportionality.

22 　　　　THE COURT:  We'll talk about proportionality in a

23 minute.  Let's hit relevance first.  Do you concede that under

24 the hypo I just gave you the field is relevant?

25 　　　　MR. WHITE:  So under the hypothetical, if somebody

registered with one number, that number is in the voter
registration database, which is a separate database than
TEAMs, and they combine a newer number that's different and
that number is not in TEAMs, and those don't match, and they
don't provide, as an alternative, the last four digits of
their social security number, which is an alternative way of
matching data, then, yes, there could be a rejection for that.

    THE COURT:  So the field —

    MR. WHITE:  With an opportunity —

    THE COURT:  I'm sorry.  Go ahead.  You go ahead.

    MR. WHITE:  I was just going to say there is
separately an opportunity to cure if any of those issues
arise.  Plus, there's also the ability to vote in person.

    THE COURT:  Right.  And so, you know, here I'm
dealing with a discovery issue first, right?  So I'm dealing
with relevance.  And then so all these other issues really go
to when I determine the issue of materiality as a matter of
law, so I'm just trying to get through the discovery issue
first without reaching the merits.  So with regard to the
discovery issue, I mean, there's a concession, albeit
reluctantly, that it's relevant.

    So let me focus on the proportionality.  The DPS
database, I'm assuming it's in digital form, right?  You-all
aren't creating something new, it already exists digitally,
correct?

1            MR. WHITE:  It's an electronic database.

2            But to select information and produce it in this

3    manner, there is an effort and it is a creation of a file.

4    It's not — it's not as — you couldn't just push a button of

5    the whole database and that would be it.  So we do have to —

6    DPS has to code to extract particular information and produce

7    it in a usable format.

8            THE COURT:  What I'm trying to understand is what DPS

9    did in this production initially.  It seems to me that it took

10   more trouble to deselect fields than it did to create fields

11   for production.  I mean, is that a fair statement?

12           MR. WHITE:  Well, I think if you're looking at it

13   from the whole context of what we discussed at the 26(f)

14   conference, and what's happened in the past, and the effort to

15   both get the Department of Justice what they need, and to

16   avoid confusion, the multiple meet and confers we had, the

17   discussion of why this field is not going to give them what

18   they need, or what they want, like I've said here, it was a

19   whole effort to get them precisely what they needed so that we

20   wouldn't have to come back and dispute what those fields mean.

21           And so if down the road if they come back and claim

22   that Card Status actually means the physical surrender was

23   given up, then we're going to have further disputes about

24   these issues.  And that's why we discussed all of this up

25   front, was to avoid that down the road.

1    So giving them everything, in the past the experience

2 at DPS in prior cases is that giving the DOJ everything they

3 misinterpret what the fields mean, as evidenced by the two

4 fields initially requested in the motion to compel that they

5 no longer request.

6    At first they said those are highly relevant and

7 important to their case.  We had to come back with a DPS

8 declaration and then they abandoned it because they recognized

9 that it's not what they need.  And so we got –– we talked to

10 the experts early in the process to make sure that DOJ is

11 getting what they need, to avoid disputes down the road, and

12 confusion and unnecessary delay along that basis.

13    THE COURT:  Well, then, let me go back to

14 Mr. Stewart.

15    I want to make sure I understand what you think the

16 Card Status field means and why you need it.  Let's go back to

17 that again, in light of what you just heard from Mr. White.

18    MR. STEWART:  Sure, Your Honor.

19    I think even Mr. White's example demonstrated that,

20 you know, at least some of these statuses are going to show

21 where a card has been turned over to some voter or by a Texas

22 individual to, you know, an official and is no longer in their

23 possession.

24    I think, you know, if you look at the Gipson

25 declaration, which is Attachment 2 to the State's response, I

1  mean, there are descriptions here of items that indicate that

2  the card by definition would not be in someone's possession.

3  Voluntary Surrender, surrenders one card for another.

4  Returned by Post Office.  Revoked.  And then once this

5  issue is — or Revoked Sex Offender — once the issue to

6  re-issue the card the status is removed.

7          I think there's another one.  You know, Items

8  Surrendered, the department receives the card from law

9  enforcement or found returned.  So by admission any of these,

10  the card wouldn't be in the voter's possession anymore, but,

11  you know, may have been used on their registration.

12          THE COURT:  Mr. White, do you want to respond?  And

13  again, tell me what you believe the Card Status field means.

14          MR. WHITE:  So the Card Status field means many

15  things, like if you look at Appendix A to the Gipson

16  declaration, there's a number of things that could be stated

17  in there, and essentially it's a field that tracks multiple

18  items to understand the full context of this.  It's not

19  something you can define on its own.

20          So to the extent the one option is Voluntary

21  Surrender, and that's in one of the examples a person no

22  longer wants to have a Texas ID and they mark it in here, but

23  that does not mean — again, we're getting back to the

24  confusion between surrender and actually coming into the

25  office, handing over a card, and cutting it up.

1          So people can –– an individual might write a letter
2    to DPS saying they no longer want their ID because they can no
3    longer drive and it may get marked in the system under
4    Voluntary Surrender.  They still have the card.
5          Returned by Post Office means it was just
6    undeliverable.  That doesn't mean somebody ever got the ID.
7          And like I said, the REAL ID example is somebody ––
8    it doesn't mean they don't have the cards.
9          So there's this confusion with the term "surrender"
10   that DOJ seems to believe that that says that they came in,
11   handed the card, DPS took it from them, and put it in the
12   trash can and put it through a shredder.  And that's simply ––
13   this field doesn't convey that information.
14         And as the Gipson declaration says, DPS has no field
15   in any database that tracks physical possession of a
16   DPS-issued driver's license or any ID card, paragraph 8.
17         THE COURT:  So in looking at the declaration, Docket
18   Number 247-2, I'm looking at page 6 of 6 of the filing, and it
19   says, "Items surrendered:  Applied if the department received
20   the person's card from law enforcement or if found and
21   returned to the department."
22         So isn't this field demonstrating at least in part
23   what the U.S. Government is trying to understand?
24         MR. WHITE:  So again, elsewhere in the declaration it
25   also explains that the number of these fields are –– could be

1    out of date and not maintained.  There's no guarantee that if

2    something was surrendered and later given back that that's

3    accurately tracked.

4            Furthermore, this doesn't necessarily mean it was

5    physically handed over to someone because everything is

6    computerized now and my understanding is that they don't

7    necessarily –– if law enforcement confiscates a card, they

8    don't necessarily send it to DPS anymore because DPS doesn't

9    need the card, they can update the database and the card is no

10   longer valid.

11           THE COURT:  So I understand all the interpretations

12   that the AG's office wants to make on this, but, again, I'm

13   dealing with a discovery dispute, and so relevant documents

14   have to be produced, and later if those relevant documents are

15   used by the proponent to make some kind of points on this

16   legal issue of materiality, then you-all are free to then

17   argue why those documents that were produced don't deserve

18   that explanation.  But that's down the road.

19           We're talking about a discovery dispute here, and so

20   documents, one, are produced if they're relevant.  Now let's

21   hit proportionality.  The Court finds that the Card Status

22   field is relevant.

23           So with regard to proportionality, what says the

24   Attorney General's office?

25           MR. WHITE:  So Your Honor, to produce this one

1 additional field requires producing all the fields again,

2 doing a complete new production.

3 So in the declaration of Mr. Crawford he explains

4 this is a four-week process.  They will need to write a new

5 code, verify the code, test the code.

6 THE COURT:  Well, I'm confused by that point.  I

7 mean, if you already wrote a code once, I mean, how difficult

8 is it to just update that code to include the Card Status

9 field and run again?

10 MR. WHITE:  Your Honor, the software development

11 to — it's not as simple as just adding another tick box and

12 running it.  You've got to go through the process of

13 identifying requirements.  It's a software development process

14 to identify requirements.

15 You draft the code.  You test the code.  You look at

16 what is pulled and verify that it makes sense, and before you

17 ever touch a live database that's affecting records of

18 29 million Texans that's used daily by normal driver's license

19 offices, law enforcement officials, because you don't want to

20 have a space that compromises that database.

21 Furthermore, you don't want to have a rush to run

22 these pulls.  You pull the data incorrectly because you didn't

23 go through these quality assurance processes, and then down

24 the road it gets identified and we have to do it again, or

25 there's allegations that information was withheld, which is

1 something that has happened in the past in prior litigation

2 where DPS was asked to rapidly produce information from their

3 database without going through the quality assurance process.

4        It resulted in certain information being

5 inadvertently omitted, experts having to be — expert reports

6 having to be updated, people having to be deposed, pulls

7 having to be re-done.  So it's critically important that you

8 don't skip these status in the process.

9        THE COURT:  Thank you.

10        Mr. Stewart, so the proportionality analysis, why

11 does it bend in your favor?

12        MR. STEWART:  And Your Honor, I think to a certain

13 extent some of these burden questions are moot, minus the

14 State's argument that the data they have already provided is,

15 you know, still on the point of uselessness following the

16 March Primary.

17        You know, I think the appropriate way to handle that

18 would then be to just refresh that under Rule 26(e) and we can

19 reach the whole database again anyway so that we're not, you

20 know, coming back at trial time arguing over whether this data

21 is stale.  So to the extent, you know, that production is

22 going to happen anyway, the Card Status field can easily just

23 be part of it.

24        But in any event, you know, even if that weren't the

25 case, I think, you know, the fact that relevant information

1  was withheld from the first production isn't really a burden
2  argument to adding that one field.  What we are not seeing is
3  that information about why this one field is burdensome just
4  by, you know, having to do it over because a relevant field
5  was withheld the first time to be burdensome, I don't think
6  you can use withholding a relevant field as a burden to defeat
7  then later producing it.
8         THE COURT:  And the timetable that the State's
9  requesting, I'm hearing it's going to take four weeks in their
10 estimation to rerun with the Card Status field now included.
11        MR. STEWART:  Yeah, Your Honor.  I think –– sorry, I
12 didn't mean to interrupt.  But the Primary is next Tuesday, so
13 I think if, you know, by the end of March we have a
14 production, I think that's perfectly fine.
15        THE COURT:  Mr. White, the end of March is well
16 within the four weeks that you-all think you need to do
17 adequate programming, quality assurance, any objection to a
18 discovery deadline to produce the fields now including Card
19 Status by the end of March?
20        MR. WHITE:  So I guess if I could, just to address a
21 couple of comments.  To the extent the DOJ is asserting that
22 our position is that the data is going to be stale after March
23 and we would have to do this anyway, I think the point raised
24 in the motions was that instead of requiring the State to redo
25 this production for fields that don't necessarily indicate

what the Department of Justice believes they do, we're going

to have data on a large Primary and data on mail-in ballots

and actual data on what happened, ensure the process, what was

rejected and what wasn't.

That would be easier to obtain than redoing this

database production, easier to understand, and so it was

identified as instead of doing this we're going to have actual

election data they can use.

On the second point that there's no burden to do

this, and like I said before, on December 15th we had a call

with DOJ with Dan Freeman when they were raising this Card

Status on the day our response was due, and we said, "If this

is an issue, we want to go to the Court now.  If it's not,

tell us you will agree to the field we are going to give you."

We had a call.  He got off the phone and called back

and said they will take what we have.  And we would have

disputed it up front to avoid specifically what we are talking

about now, having to do this twice.  So it's not as if we

expected this to happen prior to litigation, and that was why

we had that call.

As far as end of March, like I said before, and it's

in the Crawford declaration, I think we need -- four weeks

would be the time, 30 days, four weeks would be the time

required to repeat the process.

THE COURT:  So the Court has found that the requested

1   status or requested field of Card Status is relevant.

2          With regard to proportionality, that's dictated by

3   Rule 26(b)(1), "Unless otherwise limited by court order, the

4   scope of discovery is as follows:  Parties may obtain

5   discovery regarding any nonprivileged matter" -- this is not

6   subject to privilege -- "that is relevant" -- the Court found

7   relevance -- "to any party's claim" -- that's to the United

8   States' claim here -- "and proportional to the needs of the

9   case."

10         The proportionality factors being "considering the

11  importance of the issues at stake in the action" -- this is a

12  challenge to the various provisions of SB1, it's important to

13  the citizens of the State of Texas as a whole -- the amount in

14  controversy is not a factor here -- "the parties' relative

15  access to relevant information" -- all this information is

16  within the exclusive possession of the Texas Department of

17  Public Safety and the Texas Secretary of State -- "the

18  parties' resources" -- the Attorney General's office

19  apparently has resources to pursue great amounts of

20  litigation -- "the importance of the discovery in resolving

21  the issues" -- as noted before, this is a huge case to the

22  citizenry of the state of Texas -- "and whether the burden or

23  expense of the proposed discovery outweighs its likely

24  benefit" -- that also factors into this being proportional.

25         Accordingly, the Court orders that the Card Status

1  field now be included, that production be rerun.  The State is

2  to produce this information to the United States Government

3  under protective order on no later than the last day of March.

4          Anything else from the United States, Mr. Stewart?

5  Any other issues we perhaps need to nip in the bud now rather

6  than have misunderstandings later?

7          MR. STEWART:  Thank you, Your Honor.  I'm going to

8  turn it over to Mr. Freeman with your permission.

9          THE COURT:  Yes.

10          MR. FREEMAN:  Thank you, Your Honor.

11          The United States does have some concerns about the

12  pace of discovery at this point.  We wanted to just bring it

13  to the attention of the Court, for this Court to be aware of

14  the status of these issues.

15          The United States served its second request for

16  production, the first being the database request seeking basic

17  information about how SB1 would be implemented, on

18  December 3rd.  This included proposed search terms, search for

19  electronically stored information.

20          As of yet defendants have not produced even basic SB1

21  implementation materials or other responsive documents beyond

22  a January 4th production of a few outdated PowerPoints and

23  other peripheral materials.  The bulk of what we requested has

24  not been provided, nor has the State meaningfully objected to

25  these requests.

1          Moreover, despite this Court's order, no privilege

2     logs have been produced more than 30 days after the request

3     for production deadline.  At this point eleven and a half

4     weeks have passed since we served these requests for

5     production and eleven and a half weeks remain in the fact

6     discovery period.

7          The parties have not conducted depositions thus far

8     due to the lack of a document discovery.  We have attempted to

9     meet and confer repeatedly to avoid unnecessary motion

10    practice, having heard Your Honor's guidance on this, but the

11    State has repeatedly promised materials and failed to meet its

12    self-imposed deadlines.

13         We remain hopeful that the State will provide some

14    delayed discovery responses soon, but to the extent that

15    delays continue, we did want to alert the Court that

16    additional motion practice may be necessary in the future.

17         THE COURT:  So this is —

18         MR. SWEETEN:  Your Honor.

19         THE COURT:  Yeah.  This is just a status conference

20    we're having at this point.  There's no actual motions in

21    front of me.

22         But I guess I am curious, Mr. Sweeten, what's going

23    on?

24         MR. SWEETEN:  Your Honor, first of all, this is not

25    noticed before the Court.  This issue — Mr. Freeman wrote us

1  a letter earlier this week.  There is no notice to us that we

2  have to respond to these issues that he's now brought to the

3  attention of the Court.

4        You know, we have multiple people working on

5  discovery.  We're fulfilling our discovery obligations.  The

6  DOJ, what was left — what I can tell you right now is what

7  was left out of his presentation is that we have provided

8  responses to first set of interrogatories.  We have provided

9  responses to the RFPs.

10        We have an ongoing production.  There are a lot of

11  documents that they've requested.

12        You can see here the Court told the parties at the

13  initial status conference that, you know, if you're going to,

14  you know, if you're going to do this we are going to need to

15  try to work out a way to streamline this.

16        Now the DOJ, in breach of what they told, you know,

17  our attorneys on the 15th of December is asking for a re —

18  you know, a reproduction of extensive databases.  And that's

19  going to take some time.

20        What they failed to mention is that we have provided

21  the entire TEAM's database and 30 fields from the DPS database

22  which has 29 million people in them.  We had to negotiate an

23  ultrasensitive protective order, but based on the sensitive

24  nature of the data we have done that.  We are working on

25  production.

1          We also have, and what he also didn't mention, is

2    that we have third-party requests by DOJ, which includes

3    requests to various representatives, Representative Ashby,

4    Representative Cain, Senator Hughes, Representative Klick,

5    Representative Murr, and we have provided our objections and

6    responses to those.

7          We are still working and the production is rolling.

8    It's extensive.  The requests are extensive.  We've answered a

9    first set of interrogatories, first set of RFPs we've provided

10   responses to.  We have provided some documents, I understand.

11         We answered the first set of RFAs.  The second set of

12   RFPs, we're working on those.  We have a second set of RFAs, a

13   third set of RFPs.  I'm just reading my list here of the

14   various things -- and this is just one party.  This is just

15   DOJ.  And we have multiple parties.

16         We are answering those and we are being diligent with

17   respect to document production.  It takes time for the

18   attorneys on this team to review the various requests, the

19   various productions, and those are on a rolling basis.

20         And in fact, I'm told that we will be getting

21   something out to the DOJ this week.  And so we're working on

22   those things.

23         And this surprise attack, you know, without having --

24   I've got one of the -- the head of the discovery issues on

25   this SB1 case, Your Honor, is trying a case in front of

1   Judge Tipton in Houston today, and they well know that.

2          And so, you know, for us to get a surprise attack of

3   this nature, this broad, you know, request and complaining to

4   the Court without any context, without any sort of, you know,

5   full representation of what discovery obligations they have

6   put us in, you know, and all the various third-party requests

7   that I've named, and that's just DOJ.  We have other parties

8   that have also sent information.

9          So the State is diligently working on producing

10  discovery, on producing documents.  And if the Court — you

11  know, and if they want to file a motion with respect to this

12  rather than to talk to us in response to Mr. Freeman's email

13  from earlier this week, they can go ahead and we'll meet that

14  request.

15         We think it probably is better to go ahead and have

16  an additional discussion with Mr. Freeman rather than him

17  bring up, without notice to the State, you know, his own

18  personal view of our responses to discovery, because, first,

19  it's wrong; and, second, it's without context; and, three,

20  it's a surprise.

21         That's all I have to say on that, Your Honor, but,

22  you know, we're certainly welcome to meet, you know, any sort

23  of motion that they have, or we're happy to also meet and

24  confer and to continue this process because we thought we had

25  met and conferred in a way that was helpful to the database,

1  and we got a — you know, we felt like we had an agreement on

2  the 15th.

3          We were told that was acceptable.  And then now here

4  we are dealing with this motion to compel, and now it sounds

5  like we're going to be doing another production of those

6  materials.

7          So Your Honor, if we could — you know, I think this

8  surprise attack is inappropriate and I think we can better

9  respond to this if there's a motion or if there's some meet

10 and confer to be scheduled later this week or early next.

11         THE COURT:  Thank you.

12         Yeah.  No, like I said, I told you when I started

13 this that it's not a motion before me.

14         And so some courts, and this is one reason I guess I

15 don't adopt that practice, some courts just do a lot of

16 discovery disputes by either Rule 16 conferences or by letters

17 rather than motion practice.

18         I guess I'd prefer motion practice.  We tee it up.

19 The other party has notice of what exactly is being in dispute

20 and then we resolve it.  So I'm not making any orders on this.

21         I was curious, and the reason I brought the subject

22 up though about where are we at on things, I'm encouraged to

23 hear that we are doing rolling production.  So I'm happy to

24 hear that we're not waiting on compiling everything and then

25 producing once we've satisfied ourselves that we have a full

1 complete production. So I encourage you-all to do rolling

2 productions so the discovery here continues on.

3      Mr. Freeman, I'll just wait — well, one, I expect

4 you to meet and confer with Mr. Sweeten prior to the filing of

5 any motions regarding the second request for production or any

6 other outstanding discovery requests, but after you've met and

7 conferred you still believe that the documents have not been

8 produced — I guess I'm kind of curious when you say

9 "implementation documents of SB1," I'm not sure exactly what

10 that means myself. Maybe it was more clear in the second

11 request for production, but again, I'll just wait for the

12 motions to be filed and the responses and then we'll gather

13 again.

14      In addition to waiting for additional documents,

15 Mr. Freeman, do you see any other things down the pike that we

16 need to be made aware of now?

17      MR. FREEMAN: At this point, no, Your Honor. It may

18 be that there are privilege issues that arise, but we are not

19 certain about what those may be and won't know until we

20 receive privilege logs.

21      THE COURT: Yeah. And so same thing on privilege.

22 You know, I'll wait for any privilege logs, denote any

23 documents being withheld on the basis of some privilege.

24      You know, Mr. Sweeten, I will say one thing. You

25 know, some attorney from your staff last hearing I had here I

1 think took the unusual position that privilege, legislative

2 privilege even applied to discussions with the Texas Secretary

3 of State Election Officials Department.

4       You know, if you're going to assert legislative

5 privilege, the privilege is between legislators and members of

6 their staff.  If you can try to articulate a good faith basis

7 for how that's extended, I, of course, will hear it, but, to

8 me, that seems way overextended and not a good faith

9 objection, but I'll let you raise it if you think it's

10 defensible.

11       MR. SWEETEN:  Your Honor, our plan is to brief the

12 legislative privilege issue to this.  We are cognizant of the,

13 you know, what we believe are the contours of legislative

14 privilege, and you know, in some of that we've got, you know,

15 several orders and litigations that we've been involved in,

16 including the Perez litigation — I know you don't want me to

17 talk about Perez — but including the Perez litigation, Your

18 Honor, and we plan on — you know, we'll make those assertions

19 and of course explain those, you know, to the Court as to

20 where we think those — where we think those lines lie.

21       And so we plan to brief that issue to the Court.

22       THE COURT:  So you know, if you're going to make

23 those arguments, I want to see a privilege log.  I want to see

24 the "to," the "froms," all recipients.  You know, do we have

25 open government or is everything hidden?

1          And I'll just posit that, just as an open-ended

2   question.  I don't mean for you to respond.

3          MR. SWEETEN:  Thank you, Your Honor.

4          THE COURT:  Anything else, Mr. Stewart?  Mr. Freeman?

5          MR. FREEMAN:  Nothing else from the United States,

6   Your Honor.

7          THE COURT:  Does any other attorney representing any

8   other party want to bring something up to the Court's

9   attention at this time?  No one.  Thank you.

10          Mr. Sweeten, Mr. White, last words, anything you-all

11   want to bring up?

12          MR. SWEETEN:  Nothing, Your Honor, from the State.

13          THE COURT:  Good enough.  Thank you.

14          We're adjourned.

15      (Concludes proceedings.)

16                            -o0o-

17      I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.  I

19   further certify that the transcript fees and format comply

20   with those prescribed by the Court and the Judicial Conference

21   of the United States.

22

23   Date:  02/24/22          /s/  *Gigi Simcox*
                              United States Court Reporter
24                            262 West Nueve Street
                              San Antonio TX 78207
25                            Telephone:  (210)244-5037