**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF TEXAS, *et al.*,<br><br>Defendants. | Civil Action No.<br><br>5:21-CV-844-XR<br>(Consolidated) |

<u>LUPE PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

PAGE

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.        SOVEREIGN IMMUNITY DOES NOT BAR PLAINTIFFS' CLAIMS ............. 3

    A.    Sovereign Immunity Does Not Apply to Claims Arising Under the Voting Rights Act ................................................................................................................. 3

    B.    The Ex Parte Young Exception Applies to Plaintiffs' Non-VRA Claims ............. 4

II.       PLAINTIFFS HAVE STANDING TO LITIGATE THESE CLAIMS ................ 13

    A.    All Plaintiffs Adequately Plead Injury in Fact ...................................................... 14

        i.    Organizational Plaintiffs Sufficiently Plead Organizational Standing ..... 15

        ii.   All Membership-Based Plaintiffs Adequately Plead Associational Standing ............................................................................................ 17

        iii.  Defendants' Third-Party Standing Arguments Lack Merit ...................... 19

    B.    Plaintiff Lewin Sufficiently Pleads Injury in Fact ................................................ 20

    C.    The Invalidity of the Election Law Is Traceable to and Redressable by Defendants ............................................................................................................ 21

III.      PLAINTIFFS STATE LEGALLY SUFFICIENT CLAIMS ............................... 22

    A.    Sections 2 and 208 of the VRA Indisputably Allow a Private Right of Action ... 23

    B.    Plaintiffs Adequately Plead Claims under the Americans with Disabilities Act .. 24

        i.    LUPE, FIEL, Texas Impact, SVREP, and Jolt Action Adequately Allege They Serve Members Who Have Qualifying Disabilities ........................ 25

        ii.   Plaintiffs Sufficiently Allege That SB1 Denies Voters with Disabilities the Right to Vote and Discriminates Against Voters with Disabilities Based Upon Those Disabilities .......................................................................... 26

        iii.  Defendants Administer Elections ........................................................... 30

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
  851 F.3d 507 (5th Cir. 2017) ................................................4

*Arcia v. Sec'y of Fla.*,
  772 F.3d 1335 (11th Cir. 2014) ...........................................16

*Ark. United v. Thurston*,
  517 F. Supp. 3d 777 (W.D. Ark. 2021)...................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................22

*Ass'n of Am. Physicians v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...............................................17

*Barker v. Halliburton Co.*,
  645 F.3d 297 (5th Cir. 2011) ...............................................19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................22, 23

*City of Austin v. Abbott*,
  385 F. Supp. 3d 537 (W.D. Tex. 2019)......................3, 10, 12, 13

*City of Austin v. Paxton*,
  943 F.3d 993 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 1047 (2021) ....................................4, 5

*Common Cause Ind. v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) ...............................................16

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir. 2009*)* ...........................................16

*Crawford v. Marion Cty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) .....................................15

*Ctr. for Individual Freedom v. Carmouche*,
  449 F.3d 655 (5th Cir. 2006) ...........................................20, 21

*Danos v. Jones*,
  652 F.3d 577 (5th Cir. 2011) ...............................................19

iii

*Dep't of Com. v. N.Y.*,
    139 S. Ct. 2551 (2019)............................................................................22

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965)..............................................................................20

*Fla. State Conf. of the NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ...........................................................16

*Fla. State Conference of the NAACP v. Lee*,
    No. 4:21-cv-187, 2021 U.S. Dist. LEXIS 200532 (N.D. Fla. Oct. 8, 2021)...............24, 25, 29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..............................................................................21

*Hale v. King*,
    642 F.3d 492 (5th Cir. 2011) ................................................................26

*Hancock Cty. Bd. of Supervisors*, 487 F. App'x 189 (5th Cir. Aug. 31, 2012) ...........................17

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..........................................................................15, 17

*Ivy v. Williams*,
    781 F.3d 250 (5th Cir. 2015), *vacated and remanded sub nom.*, 137 S. Ct. 414
    (2016) ....................................................................................................30

*K.P. v. LeBlanc*,
    729 F.3d 427 (5th Cir. 2013) ..................................................................4

*League of United Latin Am. Citizens v. Abbott*,
    No. 21-CV-00259, 2021 U.S. Dist. LEXIS 231524 (W.D. Tex. Dec. 3, 2021) .....................24

*Lewis v. Hughs*,
    475 F. Supp. 3d 597 (W.D. Tex. 2020).......................................... *passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..............................................................................19

*Lightbourn v. Cty. of El Paso*,
    118 F.3d 421 (5th Cir. 1997) ................................................................30

*Longoria v. Paxton*,
    No. 21-cv-1223, 2022 U.S. Dist. LEXIS 25670 (W.D. Tex. Feb. 11, 2022) ................. *passim*

*Mi Familia Vota v. Abbott*,
    497 F. Supp. 3d 195 (W.D. Tex. 2020)..................................15, 19, 24

*Mi Familia Vota v. Abbott*,
  977 F.3d 461 (5th Cir. 2020) .................................................................3

*Morales v. TWA*,
  504 U.S. 374 (1992)...........................................................................13

*Morgan v. Swanson*,
  659 F.3d 359 (5th Cir. 2011) (en banc) ...........................................23

*Morse v. Republican Party*,
  517 U.S. 186 (1996)...........................................................................23

*NAACP v. City of Kyle, Tex.*,
  626 F.3d 233 (5th Cir. 2010) .............................................................15

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ...........................................................16

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) .............................................................27

*Ne. Ohio Coal. for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016) .............................................................16

*OCA-Greater Hous. v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ..................................................... *passim*

*OCA-Greater Hous. v. Texas*,
  No. 1:15-CV-00679, 2016 U.S. Dist. LEXIS 202494 (W.D. Tex. Aug. 12,
  2016) ....................................................................................................9

*Olivarez v. T-Mobile USA, Inc.*,
  997 F.3d 595 (5th Cir. 2021) .............................................................29

*Payne v. Midcrown Pavilion Apartments & Amy Carrillo*,
  No. SA-19-CV-00407-FB, 2021 U.S. Dist. LEXIS 161442 (W.D. Tex. Aug.
  26, 2021) ............................................................................................26

*People First of Ala. v. Merrill*,
  491 F. Supp. 3d 1076 (N.D. Ala. 2020)................................24, 25, 28

*Richardson v. Tex. Sec'y of State*,
  No. SA-19-cv-00963-OLG, 2019 U.S. Dist. LEXIS 234207 (W.D. Tex. Dec.
  23, 2019) ...........................................................................14, 24, 25, 29

*Rumsfeld v. Forum for Acad. & Institutional Rts, Inc.*,
  547 U.S. 47 (2006).............................................................................14

*Sanchez v. R.G.L.*,
    761 F.3d 495 (5th Cir. 2014) ...............................................................21

*Scott v. Schedler*,
    771 F.3d 831 (5th Cir. 2014) ...............................................................15

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ..........................................................1, 20

*State v. Hollins*,
    620 S.W.3d 400 (Tex. 2020) .....................................................6, 8, 9, 22

*State v. Stephens*,
    No. PD-1032-20, 2021 Tex. Crim. App. LEXIS 1194 (Tex. Crim. App. Dec.
    15, 2021) ...................................................................10, 12, 13, 22

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ........................................................................5, 12

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...............................................................................17

*T.O. v. Fort Bend Indep. Sch. Dist.*,
    2 F.4th 407 (5th Cir. 2021) ..................................................................29

*Tex. All. for Retired Ams. v. Hughs*,
    489 F. Supp. 3d 667 (S.D. Tex. 2020) .................................................23

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ....................................................5, 6, 8, 13

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) .........................................................4, 5, 9

*Tex. Democratic Party v. Hughs*,
    474 F. Supp. 3d 849 (W.D. Tex. 2020), *rev'd on other grounds*, 860 F. App'x
    874 (5th Cir. 2021)...............................................................................23

*Tex. Democratic Party v. Hughs*,
    860 F. App'x 874 (5th Cir. 2021) ..........................................................4

*United States v. Students Challenging Regul. Agency Proc.*,
    412 U.S. 669 (1973)..............................................................................14

*United Steel v. Anderson*,
    No. SA-17-cv-1242-XR, 2018 U.S. Dist. LEXIS 100539 (W.D. Tex. June 15,
    2018) .................................................................................14, 19

*Veasey v. Perry*,
  29 F. Supp. 3d 896 (S. D. Tex. 2014) ...................................................................24

*Warnock v. Pecos Cty.*,
  88 F.3d 341 (5th Cir. 1996) ....................................................................................3

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.*,
  No. 4:20-CV-973-SDJ, 2021 U.S. Dist. LEXIS 207787 (E.D. Tex. Oct. 28,
  2021) ......................................................................................................................17

*Ex parte Young*,
  209 U.S. 123 (1908) ....................................................................... *passim*

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ...........................................................................................23

**Statutes**

42 U.S.C. §§ 12102(1)(A), (2)(A) ...........................................................................25

52 U.S.C. § 10302 .....................................................................................................24

Senate Bill 1 ("SB1") infringes on the right to vote and disproportionally affects minority voters and voters with disabilities. SB1 also chills the ordinary actions of election officials, poll workers, and vote assistors by threatening significant civil and/or criminal liability. While the State and its top officials have been vocal supporters of SB1, they are quick to abdicate their responsibility for it, telling this Court that the State, its Attorney General, and the Secretary of State—its chief elections officer—cannot be held to account for SB1's unlawful impact. Instead, the State and its executives say that local election officials alone must answer for SB1. Defendants'[1] attempt to evade responsibility for SB1 is disingenuous and binding Fifth Circuit precedent provides that these Defendants, who enforce a law that violates the Constitution, the Voting Rights Act of 1965 ("VRA"), and the Americans with Disabilities Act ("ADA"), can be held to answer for it.

Defendants move to dismiss Plaintiffs' Second Amended Complaint (ECF 208) (the "2AC") on three main grounds: (1) sovereign immunity; (2) lack of standing; and (3) quibbles with a subset of Plaintiffs'[2] claims. All of these arguments fail.

*First*, sovereign immunity does not apply where it has been abrogated by statute (as it has been for Plaintiffs' VRA claims) or where an exception applies (as is the case under *Ex parte Young*, 209 U.S. 123 (1908) for Plaintiffs' non-VRA claims). While Defendants argue that they are not sufficiently connected to the enforcement of SB1 to permit application of *Ex parte Young*,

---

[1] The term "Defendants" is used to refer collectively to the moving defendants: Attorney General Warren K. Paxton ("AG"), Secretary of State John B. Scott ("Secretary"), and the State of Texas.
[2] The term "Plaintiffs" is used to refer collectively to plaintiffs: La Unión Del Pueblo Entero ("LUPE"); Friendship-West Baptist Church ("Friendship-West"); the Anti-Defamation League Austin, Southwest, and Texoma Regions ("ADL"); Southwest Voter Registration Education Project ("SVREP"); Texas Impact; Mexican American Bar Association of Texas ("MABA-TX"); Texas Hispanics Organized for Political Education ("Texas Hope"); Jolt Action; William C. Velasquez Institute ("WCVI"); FIEL Houston Inc.; and James Lewin.

the 2AC more than adequately pleads otherwise. Plaintiffs sued the State, Texas's chief elections officer, and Texas's chief law enforcement officer to enjoin them from enforcing laws that unlawfully restrict voting. SB1 is Texas's law. It gives the Secretary specific administrative, training, and enforcement obligations; and it gives the AG—who touts his record of enforcing Texas's election laws and advertises that he has prosecuted "a dozen critical election-integrity lawsuits" in 2020 alone[3]—specific investigatory and enforcement authority. Plaintiffs' allegations in the 2AC describing Defendants' enforcement roles and intentions are sufficient to survive the instant motion.

*Second*, Defendants' standing challenges fail. Standing requires injury in fact, traceability, and redressability. Each element is satisfied here. Plaintiffs are membership and community-based organizations, churches and other faith-based groups, and a Texan who has served as an election judge and intends to serve again. Long-standing precedent, including from within this Circuit, establishes Plaintiffs' ability to bring claims on behalf of themselves and, where applicable, their members. The 2AC contains more than 50 paragraphs describing in detail how the challenged provisions of SB1 will chill Plaintiffs' speech, force the diversion of critical resources in response to SB1, hamper Plaintiffs' ability to carry out their organizational missions, and burden their members' right to vote. As Defendants recognize, binding Fifth Circuit precedent holds that the invalidity of a Texas election law is traceable to and redressable by the State and the Secretary. *See* (ECF 255 at 12–13) (citing *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017)). Plaintiffs' allegations are more than sufficient to establish standing at this stage.

---

[3] Press Release, *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit*, OFFICE OF THE ATTORNEY GENERAL OF TEXAS (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.

*Third*, Defendants' challenges to Plaintiffs' individual claims ring hollow. For example, Defendants argue that Plaintiffs cannot assert ADA claims because they do not allege a qualifying disability and do not identify specific members with disabilities. (ECF 255 at 22). But Fifth Circuit precedent does *not* require associational plaintiffs to name specific members to survive a motion to dismiss, and Plaintiffs have otherwise sufficiently alleged that their members have qualifying disabilities. Moreover, while Defendants note their disagreement with this Court's prior ruling that there is a private right of action under the VRA, they do not ask the Court to revisit that decision, which in any event was correctly decided.

For these and the other reasons set forth below, Defendants' Motion to Dismiss Plaintiffs' 2AC (ECF 255) (the "Motion") should be denied.

## ARGUMENT

### I. SOVEREIGN IMMUNITY DOES NOT BAR PLAINTIFFS' CLAIMS

State Defendants argue that sovereign immunity bars all claims asserted against them in the 2AC.[4] *See* (ECF 255 at 1–10). Not so.

A. *Sovereign Immunity Does Not Apply to Claims Arising Under the Voting Rights Act*

Binding authority from the Fifth Circuit unequivocally holds that "[t]here is no sovereign immunity with respect to Voting Rights Act claims" as the "Voting Rights Act . . . validly abrogated state sovereign immunity." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 469 (5th Cir.

---

[4] Although Defendants do not refer to Rule 12(b)(1) in their papers, their arguments raise a jurisdictional challenge on sovereign immunity grounds, which should be considered under the Rule 12(b)(1) standard. *City of Austin v. Abbott*, 385 F. Supp. 3d 537, 540 (W.D. Tex. 2019) (Pitman, J.) (hereafter *Austin I*); *Warnock v. Pecos Cty.*, 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice."). Courts should not grant a motion to dismiss under Rule 12(b)(1) unless "it appears certain that the plaintiff cannot prove any set of facts that would entitle her to recovery." *Austin I*, 385 F. Supp. 3d at 540 (citing *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017)).

2020).[5]   Defendants offer no reason to depart from this binding authority.  Thus, sovereign immunity does not bar Plaintiffs' VRA claims (Counts IV and V of the 2AC).

      B.    *The Ex Parte Young Exception Applies to Plaintiffs' Non-VRA Claims*

Plaintiffs' non-VRA claims are also properly asserted against Defendants under *Ex parte Young*, which "provides an exception to the general rule preventing private suits against state officials in their official capacity in federal court." *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 877 (5th Cir. 2021).  Specifically, a lawsuit is not barred by the Eleventh Amendment as being "against" the state when it seeks (1) "prospective, injunctive relief" (2) "from a state actor, in her official capacity" (3) "based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013).

To invoke the exception against a particular state official, a plaintiff must also "demonstrate that the [sued] state officer has 'some connection' with the enforcement of the disputed act." *Id.* at 434.  Plaintiffs' burden here is not heavy.  Under *Ex parte Young*, "direct enforcement" is not required,[6] and the alleged connection to enforcement does not have to be explicit in the challenged law[7] or even significant; a "scintilla of enforcement by the relevant state official with respect to the challenged law will do." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (hereafter *Abbott II*) (quoting *Austin II*, 943 F.3d at 1002); *see Longoria v. Paxton*, No. 21-cv-1223, 2022 U.S. Dist. LEXIS 25670, at *32 (W.D. Tex. Feb. 11, 2022) (Rodriguez, J.).  For example, the Fifth Circuit has held that a sufficient connection exists where

---

[5] Internal citations and quotations are omitted unless otherwise stated.
[6] *Air Evac EMS, Inc. v. Texas*, 851 F.3d 507, 519–20 (5th Cir. 2017) (holding that direct enforcement by a particular government official is not required in order to satisfy *Ex parte Young*).
[7] *City of Austin v. Paxton*, 943 F.3d 993, 997–98 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 1047 (2021) (hereafter *Austin II*) (holding that "[t]he text of the challenged law need not [even] actually state the official's duty to enforce it . . .").

the government official before a court would potentially have to alter a form because of a judicial ruling. *Abbott II*, 978 F.3d at 179–80.

Nor does it have to be certain that Defendants will act in the way Plaintiffs suspect.[8] Indeed, where an official has even a marginal ability to compel or constrain conduct at issue, sufficient connection to enforcement exists. *Abbott II*, 978 F.3d at 179 (citing *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)); *see Longoria*, 2022 U.S. Dist. LEXIS 25670, at *32. Indeed, this Court recently recognized that a sufficient connection exists where a plaintiff can either (1) "put forth some evidence showing that the defendant has some authority to compel compliance with the law or constrain a person's ability to violate the law," (2) "provide some evidence showing that the defendant has a duty to enforce the statute in question and a demonstrated willingness to enforce" the law, or (3) put forth "evidence showing some scintilla of affirmative action by the state official."[9] *Longoria*, 2022 U.S. Dist. LEXIS 25670, at *32.

In their Motion, Defendants argue that they are not the proper officials to answer for SB1 as they lack a connection to SB1's enforcement. (ECF 255 at 2). For the reasons expressed below, they are wrong. Defendants also argue that dismissal is appropriate because the 2AC does not contain an explicit "provision-by-provision analysis" of how each defendant is connected to the enforcement of the challenged SB1 provisions. (ECF 255 at 2) (citing *Hughs*, 860 F. App'x at 877–78). But that is not the pleading standard in this Circuit, or any other.[10] As Defendants

---

[8] "[I]f an official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) (hereafter *Abbott I*) (quoting *Austin II*, 943 F.3d at 1002; *see also Steffel v. Thompson*, 415 U.S. 452, 475 (1974) (federal declaratory relief is available where a "plaintiff demonstrates a genuine threat of enforcement of a disputed . . . statute" even "when no state prosecution is pending").

[9] Moreover, if the Court determines that Plaintiffs have standing, application of *Ex parte Young* to these Defendants is further supported. *Austin II*, 943 F.3d at 1002 ("[A] finding of standing tends toward a finding that the *Young* exception applies to the state official(s) in question.").

[10] The "provision-by-provision" language on which Defendants rely appears only twice in the Fifth Circuit's precedents, articulated for the first time just over a year ago in *Abbot II*. In neither instance did the Fifth

concede, all Plaintiffs must do at the pleading stage is "allege a plausible set of facts" establishing Defendants' connection to SB1's enforcement. *See* (ECF 255 at 2). Plaintiffs do just that.

**Secretary of State John B. Scott**: Plaintiffs allege that the Secretary is deeply ingrained in the enforcement of SB1 as well as Texas's many other election laws. *See, e.g.*, (2AC ¶¶ 22–35, 61, 70, 115, 145, 147–48). As the Supreme Court of Texas recently explained, the Secretary is "the chief election officer of the state" and the Texas Election Code "reflect[s] the Legislature's intent that election laws operate . . . under the direction and guidance of the Secretary of State." *State v. Hollins*, 620 S.W.3d 400, 408 (Tex. 2020) (citing Tex. Elec. Code § 31.001(a)). The Secretary guides local officials in the conduct of elections and operates critical components of the election system in Texas, including promulgating forms for use by voters and officials, maintaining the Texas statewide database of registered voters, collecting and reporting election results, and directing local officials to refrain from activity that the Secretary considers to be in violation of the Texas Election Code. *See* (2AC ¶¶ 24–35).

In *OCA-Greater Houston*, the Fifth Circuit held that plaintiffs had standing to sue the Secretary because "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the chief election officer of the state." 867 F.3d at 613. This, "in turn, suggests that *Young* is satisfied as to the Secretary of State." *Abbott I*, 961 F.3d at 401. The same result follows here.

Looking to the challenged provisions of SB1, the Secretary's connection to enforcement is clear. For example, Section 18.065 already required the Secretary to "monitor each registrar for substantial compliance" with sections of the Texas Election Code. SB1 layers on civil penalties for a registrar's failure to correct violations and imposes fines of "$1,000 for each violation

Circuit imply that it was establishing a new standard of pleading to which plaintiffs must adhere in order to enjoin the enforcement of an unconstitutional statute.

corrected by the secretary of state under that subsection." (2AC ¶ 26). Thus, the Secretary has a duty under SB1 to identify and correct violations and impose fines for which a registrar becomes liable. Certainly, this qualifies as "some authority to compel compliance with the law or constrain a person's ability to violate the law" so as to warrant application of the *Young* exception here. *Longoria*, 2022 U.S. Dist. LEXIS 25670, at *32.[11]

For provisions carrying the risk of criminal penalties, and contrary to Defendants' arguments, the Secretary is not "a mere recipient of information." (ECF 255 at 3). Indeed, SB1 *requires* the Secretary to refer any and all "information indicating that criminal conduct in connection with an election has occurred" that he "receive[s] or discover[s]" to the AG if the Secretary determines "that there is reasonable cause to suspect that criminal conduct occurred." Tex. Elec. Code § 31.006(a); (2AC ¶ 31). The Secretary is further *required* to "deliver to the attorney general all pertinent documents and information in the secretary's possession." *Id.* This gives the Secretary an active role in enforcing every provision of the Texas Election Code that may carry criminal penalties, including those at issue here. These mandatory reporting requirements are unquestionably and expressly connected to enforcing SB1. Therefore, Plaintiffs have alleged sufficient facts tethering the Secretary to enforcement of the challenged SB1 provisions that contemplate criminal penalties. *See, e.g.*, (2AC ¶¶ 2, 5, 109–14, 120–23, 127–30, 137–41, 146–48); Tex. Elec. Code §§ 15.028, 33.051, 33.061, 64.034, and 276.015.[12]

---

[11] In their Motion, Defendants argue that SB1 merely imposes new penalties for preexisting statutory obligations and someone other than the Secretary actually collects those penalties. (ECF 255 at 5–6). This is of no moment where, as here, the Secretary also has a statutorily prescribed role in monitoring and identifying violations and determining the amounts of civil penalties. (ECF 255 at 5–6).

[12] The Secretary's critical role in enforcement is confirmed by Defendants' own public statements. The AG provides a link on its website to the Secretary's complaint form and explains that the AG's office "does not have resources to actively detect fraud, but rather relies on members of the public and election officials to observe fraud and report it to the Secretary of State, who screens complaints pursuant to Election Code Section 31.006 and refers credible allegations to the OAG." Election Integrity, OFFICE OF THE ATTORNEY GENERAL https://www.texasattorneygeneral.gov/initiatives/election-integrity (last visited March 1, 2022)

The Secretary is also unquestionably a proper defendant as to the challenged vote-by-mail provisions. As alleged in the 2AC, the Texas Election Code requires that the Secretary to "obtain and maintain uniformity in the application, operation, and interpretation of [the] code and [other] election laws, prepare detailed and comprehensive written directives and instructions for the appropriate state and local authorities, and assist and advise all election authorities with regard to the application, operation, and interpretation of election laws." (2AC ¶ 24) (citing Tex. Elec. Code §§ 31.003–31.004; *see also Abbott I*, 961 F.3d at 399 (quoting Tex. Elec. Code § 31.003). The Secretary is further authorized to "take appropriate action to protect voting rights from abuse by the authorities administering the state's electoral processes," which includes "order[ing] the person to correct the offending conduct." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 611 (W.D. Tex. 2020).

Citing these same election code provisions, the Fifth Circuit has recognized that "the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to support standing," suggesting that *Young* is satisfied as to the Secretary. *Abbott I*, 961 F.3d at 401; *see also Hollins*, 620 S.W.3d at 408; Tex. Elec. Code §§ 31.003–31.004. Indeed, if this Court (as in *Abbot II*) finds SB1's new vote-by-mail provisions are unlawful, the Secretary will be responsible for prescribing various forms to bring the State and local officials into compliance with the law. *See* (2AC ¶¶ 114, 136–43); *see, e.g.*, Tex. Elec. Code §§ 31.002(a), 84.002(a)(1-a), 84.0111, 86.001, 86.0105, 86.002(g), 86.010(e), and 276.015. Under *Abbott II*, this is sufficient to keep the Secretary in this case. 978 F.3d at 179–80.

The 2AC also alleges several ways in which SB1 "makes the work of poll workers even harder by loosening restrictions on poll watchers and at the same time limiting poll workers' ability to carry out their duty of preserving order and preventing breaches of the peace and violations of

(responding to the question "How Does the Office of the Attorney General Decide Which Election Fraud Cases to Pursue?").

the election code in the polling place." (2AC ¶¶ 117–26). Indeed, the conduct of poll watchers is at the heart of several of the challenged provisions, including Tex. Elec. Code §§ 32.075(g), 33.051(g), 33.056(e), and 33.061(a). *See* (2AC ¶¶ 117–31). The Secretary's same duties to "prepare detailed and comprehensive written directives and instructions relating to and based on [the Texas Election Code] and the election laws outside th[e] code" and to "assist and advise all election authorities with regard to the application, operation, and interpretation of . . . election laws" discussed above similarly establish a sufficient connection to the enforcement of SB1's poll watcher provisions to keep the Secretary in this case. *OCA-Greater Hous. v. Texas*, No. 1:15-CV-00679, 2016 U.S. Dist. LEXIS 202494, at *24–25 (W.D. Tex. Aug. 12, 2016) (Pitman, J.).

But SB1 goes a step further: now, the Secretary is specifically charged with *training and certifying* poll watchers. Tex. Elec. Code § 33.008 ("The secretary of state shall develop and maintain a training program for watchers. The training program must: (1) be available: (A) entirely via the Internet; and (B) at any time, without a requirement for prior registration; and (2) provide a watcher who completes the training with a certificate of completion."); Tex. Elec. Code § 33.031(b) ("In addition to the requirements of Subsection (a), to be eligible to serve as a watcher, a person must complete training under Section 33.008."). If the Court finds that SB1's poll watcher provisions offend federal law, the Secretary would be responsible for (1) re-training all watchers and (2) amending the State's training materials. These are unequivocal duties and obligations delegated expressly to the Secretary under SB1 and adequately connect the Secretary to the enforcement of those challenged SB1 provisions. *See Abbott II*, 978 F.3d at 180.

Texas election law also provides that the Secretary "shall prescribe the design and content" of necessary forms, which the counties must use. *Hollins*, 620 S.W.3d 408 (citing Tex. Elec. Code § 31.002(a)). Plaintiffs allege that Sections 6.01, 6.03, 6.04, and 6.05 of SB1 burden the right to

vote of those seeking voting assistance because these sections (1) invade the privacy of those voters by requiring disclosure of personal information, (2) expose assistors to the threat of potential prosecution, (3) increase the risk that a voter's ballot will be rejected because an assistor made a clerical error, and (4) will slow down the voting process by requiring assistors to complete new forms or recite an expanded oath. (2AC ¶¶ 108–13, 115); Tex. Elec. Code §§ 64.034, 64.0322(a), 86.010(e), 64.009, and 64.009(f)–(h). For Sections 6.01 and 6.03, SB1 expressly provides that "[t]he secretary of state shall prescribe the form . . . ." Tex. Elec. Code §§ 64.009(h), 64.0322(b). The Secretary is also required, pursuant Section 31.002(a) of the Texas Election Code, to update the forms amended by Sections 6.04 and 6.05. As in *Abbott II*, because assistors "are required to use the Secretary's . . . form . . . , the Secretary has the authority to compel or constrain" both assistors and those seeking assistance "based on actions she takes as to the . . . form." *Abbott II*, 978 F.3d at 179–80. Any ruling against Defendants on these provisions will require the Secretary to act. *Id.* Therefore, the Secretary is a proper defendant.

**Attorney General Ken Paxton**: Defendants argue that the AG is not a proper defendant because he "merely receives information" (ECF 255 at 7), has no authority to act on his own without invitation from local authorities in light of the decision of the Texas Court of Criminal Appeals in *State v. Stephens*, No. PD-1032-20, 2021 Tex. Crim. App. LEXIS 1194 (Tex. Crim. App. Dec. 15, 2021) (ECF 255 at 8), and is somehow unlikely to enforce any of SB1's provisions that carry the potential for criminal penalties (ECF 255 at 9). Defendants' arguments ignore the AG's conduct both pre- and post-*Stephens* as well as the very language of Texas's Election Code.

The AG is Texas's chief law enforcement officer, with a "freestanding sovereign interest" in enforcing Texas law. *City of Austin v. Abbott*, 385 F. Supp. 3d 537, 545 (W.D. Tex. Mar. 25, 2019). As this Court recently recognized, Texas's Election Code specifically delegates to the AG

the obligations of investigating and enforcing Texas's election laws. *Longoria*, 2022 U.S. Dist. LEXIS 25670, at *35. SB1 is no exception. *Id.* at *38 ("under SB1, the Attorney General has broad investigatory powers . . ."). Indeed, and as alleged in the 2AC, SB1 effectively creates a pipeline for prosecution by directing state and local officials to provide names of suspected ineligible voters, or information indicating criminal conduct, to the AG, and grants the AG access to information about individuals providing voter assistance. (2AC ¶¶ 3, 115, 145); Tex. Elec. Code §§ 15.028, 31.006, 64.009, 33.051, 33.061, 64.034, and 276.015.

As described in the 2AC, the AG has a history of prosecuting (or seeking to prosecute) so-called "election integrity" cases.[13] (2AC ¶¶ 38, 41, 42, 77, 80, 100). For example, even before SB1 (which purports to be concerned with "preventing fraud in the conduct of elections"), the AG's office is alleged to have "spent 22,000 staff hours investigating voter fraud in the 2020 Election"—despite having "identified only 16 minor offenses out of more than 11,000,000 ballots cast." (2AC ¶ 80). The AG also previously filed suit against the Harris County Clerk to prevent him from distributing mail ballot applications to *eligible voters* unless those voters first submitted a request. (2AC ¶ 77). Even more recently, the AG reportedly tried to secure an indictment against the Travis County Clerk for allegedly unlawfully obstructing a poll watcher.[14]

The AG has also been unequivocal about his intention to continue enforcing Texas's election laws, notwithstanding Defendants' arguments to the contrary. The AG has announced the formation of his 2021 Texas Election Integrity Unit, "which is a concentrated effort to devote

---

[13] In *In re Abbott*, the Fifth Circuit suggested that the AG was not a proper defendant where, among other things, he indicated that an abortion law would be enforced but did not say he would be the one doing the enforcing. 956 F.3d at 709. In this case, the AG has stated that *he* will continue to use *his* resources to enforce Texas's election laws, including SB1. *See* nn.16–17, *infra*. In fact, he has created an entire division of the AG's office to do so. *See* n.15, *infra*. These facts easily distinguish this case from *In re Abbott*.

[14] Reese Oxner, *Amid Texas GOP's Effort To Question Electoral Integrity, Attorney General Tried To Indict Travis County Elections Chief*, THE TEXAS TRIBUNE, (Dec. 20, 2021) https://www.texastribune.org/2021/12/20/texas-ken-paxton-travis-county-elections/.

agency lawyers, investigators, support staff, and resources to ensuring this local election season . . . is run transparently and securely."[15]  The AG also declared on social media that, "I have always been in favor of swift & sure justice on those who attack the heart of our constitutional republic. *I will continue to muster all my resources to defend election integrity*!"[16]  And, as recently as November of 2021, the AG tweeted that, "I will never back down to make sure Texas has safe and secure elections. *Election integrity is my number one priority*."[17]

The AG's public statements of intent and past efforts to enforce similar election laws are evidence that he will bring such enforcement actions in the future, which is a sufficient tie to the enforcement of SB1 for purposes of *Ex parte Young*.  *See Steffel*, 415 U.S. at 475; *Austin I*, 385 F. Supp. 3d at 545 ("[t]he attorney general bears 'some connection' to enforcement of the statute" where he "might bring a similar enforcement proceeding"); *see also Longoria*, 2022 U.S. Dist. LEXIS 25670, at *38 (acknowledging the importance of the AG's "willingness to enforce civil provisions of the Election Code" in other capacities both before and after *Stephens*).

As it stands, the Court does not need to decide whether *Stephens* would warrant a different result.  While Defendants want this Court to find that *Stephens* currently restrains the AG's ability to enforce SB1, thereby removing any connection between the AG and enforcement of SB1 (ECF 255 at 8 n.2), Defendants also state that they believe *Stephens* was wrongly decided and are in the process of seeking reconsideration of that decision.[18]  The AG cannot have it both ways.

Regardless, the findings in *Stephens* have not in any way led the AG to retract or alter any of his public statements concerning his willingness and intention to enforce Texas's Election Code,

---

[15] Press Release, *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit*, OFFICE OF THE ATTORNEY GENERAL OF TEXAS (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit.
[16] Ken Paxton (@KenPaxtonTX), TWITTER (Oct. 1, 2021, 11:34 PM EST) (emphasis added).
[17] Ken Paxton (@KenPaxtonTX), TWITTER (Nov. 5, 2021, 6:25 PM EST) (emphasis added).
[18] As of this filing, the AG's motion for reconsideration remains undecided.

including those matters regulated by SB1 (*i.e.*, vote-by-mail, etc.).[19]  Thus, the Court may still find

that Plaintiffs have sufficiently pleaded a connection to enforcement based on the AG's public

comments and his prior actions in enforcing similar laws.  *Austin I*, 385 F. Supp. 3d at 545; *Abbott

I*, 961 F.3d at 401; *see Morales v. TWA*, 504 U.S. 374, 381 (1992).

> **State of Texas**: Although Defendants argue that Texas is immune from suit on Plaintiffs'
>
> VRA claims, they also acknowledge that precedential authority from the Fifth Circuit
>
> unequivocally holds that there is no sovereign immunity with respect to VRA claims because "the
>
> Voting Rights Act abrogates sovereign immunity[.]"  (ECF 255 at 9) (citing *OCA-Greater Hous.*,
>
> 867 F.3d at 613–14).  While Defendants aver that *OCA-Greater Houston* was "wrongly decided[,]"
>
> they offer no basis for this Court to deviate from binding precedent.

## II.  PLAINTIFFS HAVE STANDING TO LITIGATE THESE CLAIMS

A plaintiff establishes standing by demonstrating that it "(1) [suffered] an injury in fact

(2) that is fairly traceable to the challenged conduct and (3) redressable by a favorable decision."

*Lewis*, 475 F. Supp. 3d at 611 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61

(1992)).  This standard applies equally to individuals and entities.  *OCA-Greater Hous.*, 867 F.3d

at 612.  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-

---

[19] According to the AG's website, the AG's "role in enforcing the election laws" includes "statewide investigation authority and concurrent prosecution authority with local elected prosecutors over the election laws of the State" as well as having "deep experience and specialized resources to help train or assist local law enforcement and prosecution in working up complex and challenging election fraud cases." *Election Integrity*, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, https://www.texasattorneygeneral.gov/initiatives/election-integrity (last visited Feb. 28, 2022) (responding to question "What is the Office of the Attorney General's role in enforcing the elections laws?").  The AG specifically notes that "Chapter 273, Texas Election Code, gives the OAG authority to investigate and prosecute election code violations anywhere in Texas." *Id.* (responding to question "How are election fraud cases referred to the Office of the Attorney General?").  The AG's website maintained such language even after issuance of the *Stephens* decision.  The fact that the AG's office affirmatively and publicly maintains its stance of having a role in prosecuting and enforcing election laws even after the *Stephens* decision further emphasizes the AG's intention to participate in election law cases and use the State's resources in doing so and further confirms the appropriateness of the AG being named as a defendant in this action.

controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rts, Inc.*, 547 U.S. 47, 52 n.2 (2006). Therefore, the 2AC may survive the instant Motion if the Court determines that any one of the Plaintiffs adequately pleads standing.

A. *All Plaintiffs Adequately Plead Injury in Fact*

"To constitute an injury in fact, [an] injury must be (1) . . . suffered by the plaintiff, not someone else; (2) 'concrete and particularized,' not abstract; and (3) actual or imminent, not conjectural or hypothetical." *Longoria,* 2022 U.S. Dist. LEXIS 25670, at *15 (quoting *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019)). As courts in this District recognize, "[t]he injury in fact requirement under Article III is qualitative, not quantitative, in nature, and the injury need not be substantial." *Richardson v. Tex. Sec'y of State*, No. SA-19-cv-00963-OLG, 2019 U.S. Dist. LEXIS 234207, at *15 (W.D. Tex. Dec. 23, 2019) (Garcia, J.) (quoting *OCA-Greater Hous.*, 867 F.3d at 612). Plaintiffs satisfy the injury in fact requirement if they can demonstrate harm amounting to anything more than an "identifiable trifle." *United States v. Students Challenging Regul. Agency Proc.*, 412 U.S. 669, 689 n.14 (1973); *OCA-Greater Hous.*, 867 F.3d at 612 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *United Steel v. Anderson*, No. SA-17-cv-1242-XR, 2018 U.S. Dist. LEXIS 100539, at *49 (W.D. Tex. June 15, 2018) (Rodriguez, J.) (quoting *Lujan*, 497 U.S. at 889).

For entity plaintiffs, injury in fact may be established under either of two independent theories: "associational standing" or "organizational standing." *OCA-Greater Hous.*, 867 F.3d at 612. As described below, all entity-Plaintiffs adequately plead standing under at least one theory.

i. <u>Organizational Plaintiffs Sufficiently Plead Organizational Standing</u>

Organizations may establish injury in fact under an organizational standing theory by showing that they have "diverted significant resources to counteract the defendant's conduct" where that conduct "significantly and perceptibly impaired the organization's ability to provide its 'activities—with the consequent drain on the organization's resources . . . .'" *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (hereafter *Kyle*) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982));[20] *Havens Realty Corp.*, 455 U.S. at 379 (affirming appellate court decision that dismissal on standing grounds had been improper). "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *see Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 209 (W.D. Tex. 2020) (Pulliam, J.) (quoting *Crawford*, 472 F.3d at 951) (same).

Federal circuit courts, including the Fifth Circuit, regularly find that voter-advocacy organizations have standing to challenge state election laws where those laws create unwanted demands on resources or require a diversion of resources to counteract the defendants' conduct. For example, in *OCA-Greater Houston*, OCA, a non-profit organization, alleged that its mission of getting out the vote was harmed by the "additional time and effort spent explaining the [challenged] provisions at issue to limited English proficient voters," which "frustrate[d] and complicate[d] its routine community outreach activities." 867 F.3d at 610. The Fifth Circuit found that the challenged statute perceptibly impaired OCA's ability to "get out the vote[,]" which was a vital part of the organization's mission and therefore sufficient to establish a cognizable injury. *Id.* at 612; *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (finding that injury due to increased

---

[20] The court in *Kyle* ultimately determined that the plaintiffs lacked standing after a full trial and does not counsel in favor of dismissal here at the pleading stage. 626 F.3d at 236.

time spent on voter registration drives constituted sufficient injury in fact to confer standing); *see also Lewis*, 475 F. Supp. 3d at 613 (finding that organizational plaintiffs may establish standing where "getting out their membership's vote is germane to their purpose"). The Sixth, Seventh, Ninth, and Eleventh Circuits have also affirmed findings of organizational standing and injury in fact under similar circumstances in voting rights cases.[21]

Here, Organizational Plaintiffs[22] allege:

- a mission to educate and encourage eligible Texans to vote and/or serve as assistors and volunteers, *see, e.g.*, (2AC ¶ 9) ("To promote civic engagement in the communities it serves, LUPE . . . conducts voter registration, education, and non-partisan get-out-the-vote campaigns (GOTV)."), (2AC ¶¶ 9–19) (all Organizational Plaintiffs);

- the expenditure of resources to meet these goals, (2AC ¶¶ 162) ("LUPE has in the past, and will in the future, pay employees who, among their other duties: educate voters about an upcoming election; urge the voters to vote; and encourage, offer and deliver assistance to the voters."), 170 (Friendship-West), 171 (ADL), 175 (SVREP), 186 (Texas Impact), 192, 194 (MABA-TX), 199 (Texas Hope), 203 (Jolt Action), 208 (WCVI), 209 (FIEL); and

- that SB1 will cause them to divert resources from their core missions, (*id.* ¶¶ 162) ("SB1 will force LUPE to divert its resources away from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of SB1 on its members."), 170 (Friendship-

---

[21] *See, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (voting rights organizations had standing where law would require them to divert resources from other projects to alleviate "voter confusion, erroneous registration removal, and chaos at the polling place"); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (organization that helped voters who are homeless had standing to challenge a change in law requiring overhaul of voter-education and get-out-the-vote programs to focus on in-person voting instead of mail-in voting); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (organizations had standing based on their expenditure of additional resources to assist people who would no longer be registered to vote through state public assistance offices); *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1342 (11th Cir. 2014) (voter registration organizations had standing to challenge program to remove non-U.S. citizens from voter rolls because they diverted resources towards addressing misidentification of citizenship); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009*)* (NAACP had standing to challenge a photo ID law because it diverted some of its resources to helping voters comply with the new provisions); *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1164–65 (11th Cir. 2008) (voting rights organizations had standing to challenge a voting law they reasonably anticipated would require diverting personnel and time towards educating volunteers and voters and to assisting voters left off the voter rolls on election day).

[22] The term "Organizational Plaintiffs" is used to refer to all Plaintiffs except James Lewin.

West), 173 (ADL), 175 (SVREP), 186 (Texas Impact), 192, 194 (MABA-TX), 199 (Texas Hope), 207 (Jolt Action), 208 (WCVI), 209, and 211 (FIEL).

These allegations are more than sufficient at the pleading stage to establish organizational standing to challenge the State's election laws under a diversion of resources theory. *See Havens Realty*, 455 U.S. at 379; *OCA-Greater Hous.*, 867 F.3d at 612.

> ii.  All Membership-Based Plaintiffs Adequately Plead Associational Standing

An entity has associational standing when (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Ass'n of Am. Physicians v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Contrary to Defendants' arguments, an association *does not* need to "set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing." *Hancock Cty. Bd. of Supervisors*, 487 F. App'x 189, 198 (5th Cir. 2012); *id.* at 198 n.5 (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006)) ("[D]efendants cite to no authority—nor are we aware of any—that supports the proposition that an association must name names in a complaint in order properly to allege injury in fact to its members."); *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2021 U.S. Dist. LEXIS 207787, at *7–8 (E.D. Tex. Oct. 28, 2021) (holding there is no requirement at the pleading stage "that an organization identify members who have been injured").[23]  Where an association generally alleges "that some of its members" fall

---

[23] Defendants misstate what is required at the pleading stage. (ECF 255 at 13–15). *Summers v. Earth Island Inst.* did not evaluate standing at the pleading stage. 555 U.S. 488, 500 (2009) (describing the procedural posture as being "after the trial is over, judgment has been entered, and a notice of appeal has been filed"). Even in the *Disability Rights Wis., Inc. v. Walworth Cty. Bd.* ("*DRW*") case cited by Defendants, the court acknowledged that the requirement that an organization include at least one member with standing to

within the group of aggrieved citizens, the associational plaintiff has "adequately alleged that some of its members were suffering a concrete, particularized injury" and has standing to proceed. *Hancock*, 487 F. App'x at 198–99; *see Lewis*, 475 F. Supp. 3d at 613.

The membership-based Organizational Plaintiffs clearly meet this pleading standard.[24] In particular, membership-based Organizational Plaintiffs allege:

- they have members (in many cases, thousands) in the state of Texas, *see, e.g.*, (2AC ¶¶ 14) ("TEXAS IMPACT is comprised of dozens of member organizations, hundreds of member congregations, and more than 22,000 individual members who span the partisan spectrum and represent different ethnicities and denominations, and include individuals who require assistance with voting in-person."), 10 (LUPE), 11 (Friendship-West), 15 (MABA-TX), 16 (Texas Hope), 17 (Jolt Action), and 19 (FIEL);

- harm to their members, whom the 2AC describes as voters, assistors, persons with disabilities, poll workers, and persons with limited English proficiency or limited literacy, (2AC ¶¶ 185) ("TEXAS IMPACT's member organizations, member congregations, and individual members will be deterred from assisting voters who need it. Members will also be deterred from assisting eligible voters because of SB1's increased information requirements and expanded oath requirement that limits what actions assistors may take to assist a voter without consideration of the range of needs of voters with disabilities and exposes assistors to potential criminal liability, and would require them to breach the privacy of a voter to confirm that the voter is eligible to receive assistance."), 155–59, 163–64 (LUPE), 166, 169 (Friendship-West), 188–91, 193, 195 (MABA-TX), 196–98, 201 (Texas Hope), 204–06 (Jolt Action), 209–10, and 212–16 (FIEL); and

- the ways in which the harm caused to these members flows directly from the challenged provisions of SB1. *See* (*id.* ¶¶ 103–148).

The voluminous factual allegations in the 2AC sufficiently satisfy Plaintiffs' burden at the pleading stage to make "general factual allegations" demonstrating at least a minimal showing of injury.

---

present that claim "*still allows for the member on whose behalf the suit is filed to remain unnamed by the organization*." 522 F.3d 796, 802 (7th Cir. 2008) (emphasis added). This fact distinguishes the current claim from that of the plaintiff in *DRW*. The *DRW* Plaintiff's amended complaint did not allege the current existence of any student with a disability who had suffered an injury because of the defendant's educational funding decision, but the Organizational Plaintiffs have adequately alleged harm to their members.

[24] ADL, SVREP, and WCVI are not membership-based organizations and have not pleaded associational standing. As explained above, ADL, SVREP, and WCVI have organizational standing.

*United Steel*, 2018 U.S. Dist. LEXIS 100539, at *49; *Mi Familia Vota*, 497 F. Supp. 3d at 209;

*Hancock*, 487 F. App'x at 198–99; *Lewis*, 475 F. Supp. 3d at 612–13.

### iii. Defendants' Third-Party Standing Arguments Lack Merit

The prohibition against third-party standing is inapplicable to Organizational Plaintiffs here, which have each established organizational and/or associational standing. Defendants argue that "the general prohibition on third-party standing" bars Plaintiffs' claims "regardless of whether the plaintiff has suffered his own injury." (ECF 255 at 21). Specifically, Defendants argue that, because membership-based Organizational Plaintiffs do not themselves have the right to vote, and are not themselves persons with disabilities, the "alleged rights at issue" in this matter belong to third parties—*i.e.*, Organizational Plaintiffs' members. (ECF 255 at 21). That is not the law. Indeed, none of the cases Defendants cite apply the third-party standing defense in the context of organizational or associational standing.[25] And for good reason: Defendants' application of the bar on third-party standing would eviscerate the long-recognized concepts of organizational and associational standing described above.

Moreover, a court in this District has previously addressed and rejected arguments similar to the ones Defendants now raise. *See Lewis*, 475 F. Supp. 3d at 613 n.2 (citing *Ass'n of Am. Physicians*, 627 F.3d at 551) (rejecting third-party standing defense where "Organizational Plaintiffs have sufficiently alleged that they have both direct organizational and associational standing to bring these claims"). Defendants' argument should likewise be rejected here.

---

[25] Defendants' cited authority is inapposite to any issue before this Court. (ECF 255 at 21). *Cf. Barker v. Halliburton Co.*, 645 F.3d 297, 299 (5th Cir. 2011) (dismissing husband's loss of consortium claim as derivative of wife's Title VII sexual harassment and retaliation claim); *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (dismissing secretary's claim for loss of employment as distinct from termination of employer); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014) ("This case does not present any issue of third-party standing, and consideration of that doctrine's proper place in the standing firmament can await another day.").

B.     *Plaintiff Lewin Sufficiently Pleads Injury in Fact*

Defendants do not contest that Plaintiff James Lewin's past and future service as an election judge is political activity and speech protected by the First Amendment. Nor do Defendants contest that Mr. Lewin intends to serve as an election judge in the future but may be dissuaded from doing so by SB1. And Defendants cannot contest that a court order striking SB1 would redress Mr. Lewin's concerns. Instead, Defendants argue that Mr. Lewin has only alleged "subjective," not "actual chilling" of his right of free speech. (ECF No. 255 at 21–22). Not so.

Rather, as alleged in the 2AC, Mr. Lewin's "greatest concern was that he and his team members would encounter disruption at the polls, including by poll watchers who sought to delay the voting process and discourage or intimidate voters." (2AC ¶ 217). In that case, Mr. Lewin would be forced to choose between (1) allowing poll watchers free reign to intimidate and interfere with voters and even risking bodily injury to himself and others and (2) removing poll watchers who are unruly and/or violating election law and facing criminal penalties under SB1. "[B]ecause of his (and his family members') fear for his personal safety and because of fear of criminal prosecution" under SB1, Mr. Lewin may be forced to self-censor. (2AC ¶ 217). This forced self-censorship is sufficient to establish Mr. Lewin's injury at the pleading stage. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) ("the Center's self-censorship constitutes sufficient injury to confer standing"); *see Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure."); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020) ("[The Court of Appeals] has repeatedly held, in the pre-enforcement context, that [c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."); *Longoria*, 2022 U.S. Dist. LEXIS 25670, at *18–20.

"[C]ontrolling precedent . . . establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing." *Carmouche*, 449 F.3d at 660.  Mr. Lewin alleges such here.

C.     *The Invalidity of the Election Law Is Traceable to and Redressable by Defendants*

With respect to the final two elements of standing, Defendants ignore that the Fifth Circuit has held that "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable *by the State itself and its Secretary of State*, who serves as the chief election officer of the state." *OCA-Greater Hous.*, 867 F.3d at 613 (emphasis added); *see also Lewis*, 475 F. Supp. 3d at 613 ("Because the challenged restrictions are all found in the Texas election code, their invalidity is undoubtedly both fairly traceable to and redressable by the Secretary.").

In any event, Plaintiffs may satisfy the traceability element by showing "a causal connection between the injury and the conduct complained of."  *See OCA-Greater Hous.*, 867 F.3d at 610 (quoting *Kyle*, 626 F.3d at 237).  Plaintiffs may satisfy the redressability requirement by showing that "it is likely . . . that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Plaintiffs need not demonstrate that the relief sought will completely cure the injury; showing that the desired relief "could potentially lessen its injury" in some way is sufficient.  *See Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014).  For the same reasons discussed above, Plaintiffs' injuries are traceable to Defendants, who are the state actors charged with the administration and enforcement of the State's election laws, including the challenged provisions of SB1.  *See* § I.B, *supra*; *OCA-Greater*

*Hous.*, 867 F.3d at 613; *Hollins*, 620 S.W.3d at 408. The injunctive relief sought here will necessarily lessen the harm alleged in the 2AC. Traceability and redressability are thus satisfied.[26]

Defendants claim that the chain of events required for the AG's participation in any criminal prosecution of election crimes (ECF 255 at 12) is too speculative to confer standing because it depends on "guesswork" as to whether "independent decisionmakers"—*i.e.* local prosecutors—will actually prosecute such crimes and invite the AG to assist them. However, future actions of third parties can support standing where those parties have "historically" behaved in a certain manner. *Dep't of Com. v. N.Y.*, 139 S. Ct. 2551, 2566 (2019). As recently as January of *this year*, the AG touted on his website the assistance his Election Integrity Unit provided to local prosecutors.[27] At this early stage of the litigation, Plaintiffs have made a sufficient showing that enjoining the AG would lessen at least some of the deterrent effect and risk of criminal prosecution occasioned by the challenged provisions of SB1.

### III.    PLAINTIFFS STATE LEGALLY SUFFICIENT CLAIMS

Defendants argue that, if the Court finds it has subject matter jurisdiction, it should dismiss three of Plaintiffs' nine claims under Rule 12(b)(6): Counts IV, V, and VI. (ECF 255 at 1). Dismissal is not appropriate under Rule 12(b)(6) unless, assuming the truth of all facts alleged, the complaint fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Allegations may be "either direct or inferential." *Twombly*, 550 U.S. at 562 (quoting *Car Carriers v. Ford Motor*

---

[26] To the extent Defendants argue that Plaintiffs fail to establish traceability as to the AG in light of *Stephens*, the AG's connection to enforcing Texas's voting laws is unquestionable. *See* § I.B, *supra*. Traceability is equally supported for those same reasons.

[27] *See, e.g.*, Press Release, *Paxton Helps Secure Fair and Safe Elections for Gregg County*, OFFICE OF THE ATTORNEY GENERAL OF TEXAS (Jan. 25, 2022), https://www.texasattorneygeneral.gov/news/releases/paxton-helps-secure-fair-and-safe-elections-gregg-county ("I would also like to thank my Election Integrity Unit, whose thorough investigation and assistance ensured that Gregg County will continue to have lawful and just local elections.").

*Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff," *Morgan v. Swanson*, 659 F.3d 359, 370 n.17 (5th Cir. 2011) (en banc) (quoting *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005)), and "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556.

A.  *Sections 2 and 208 of the VRA Indisputably Allow a Private Right of Action*

As Defendants concede, this Court has already rejected Defendants' argument that there is no private right of action under the Sections 2 and 208 of the VRA.  (ECF 255 at 28; ECF 126 at 24:9–25:14).  While Defendants disagree with the Court's earlier ruling and purport to preserve the issue for further review, they do not ask the Court to revisit its prior decision, which was correct for the reasons set forth in our earlier opposition brief.  (ECF 197 at 23–26; ECF 255 at 28).

Regardless, the Supreme Court has long recognized a private right of action with respect to Section 2 of the VRA.  *E.g.*, *Morse v. Republican Party*, 517 U.S. 186, 232 (1996) ("[T]he existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." (quoting S. Rep. No. 97-417, at 30)); *see also Tex. All. for Retired Ams. v. Hughs*, 489 F. Supp. 3d 667, 689 n.4 (S.D. Tex. 2020) ("In fact, organizations, like private parties, have historically been able to enforce Section 2 of the VRA.").  And, contrary to Defendants' arguments (which have already been made—and rejected—in this and other courts), there has been no fundamental shift in the applicable law.[28]

---

[28] For example, in *Alexander v. Sandoval*, the Supreme Court held that § 602 of Title VI the Civil Rights Act of 1964 did not imply a private right of action because enforcement powers were conferred only on federal agencies engaged in the distribution of public funds, but § 601 *did*.  532 U.S. 275, 279, 289 (2001). In other words, the fact that § 602 was limited to the Attorney General did not preclude a private right of action under § 601.  *See Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 859 (W.D. Tex. 2020) (discussing *Sandoval*), *rev'd on other grounds*, 860 F. App'x 874 (5th Cir. 2021).  This does nothing to undermine the existence of a private cause of action under the VRA.  And in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), on which Defendants also relied, the Supreme Court merely applied long-established

Plaintiffs' private right of action with respect to Section 208 of the VRA (assistance to blind, disabled, limited English proficiency, or limited literacy voters) is equally clear, and Defendants cite *no authority* to the contrary.[29]  As such, Defendants' arguments are properly rejected.  (ECF 126 at 24:19–25:14).

### B. *Plaintiffs Adequately Plead Claims under the Americans with Disabilities Act*

To adequately assert their ADA claims, Plaintiffs must allege "(1) that they—*or their constituents*—are qualified individuals with a disability; (2) that Plaintiffs' constituents were 'excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or w[ere] otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of' their disability."  *Fla. State Conference of the NAACP v. Lee*, No. 4:21-cv-187, 2021 U.S. Dist. LEXIS 200532, at *66–67 (N.D. Fla. Oct. 8, 2021) (emphasis added) (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1158 (N.D. Ala. 2020) (concluding that "the plaintiffs' *or their members'* physical impairments are a qualifying disability under the ADA"); *see also Richardson,* 2019 U.S. Dist. LEXIS 234207, at *8, 45–46 (plaintiff organization

---

precedent to conclude that a *Bivens* claim under the Fourth and Fifth Amendments could not proceed under unrelated precedents on the scope of qualified immunity.  This has nothing to do with these VRA claims, and other courts have already rejected this same argument. *E.g.*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 905–07 (S.D. Tex. 2014) (rejecting the defendants' argument that "the Supreme Court is taking a new hard line against implied rights of action" which left "the litigants without a specific claim on which to predicate their standing"); *Mi Familia Vota*, 497 F. Supp. 3d at 223 (finding the defendants' argument that the plaintiffs have no private cause of action to sue for violation of Section 2 of the VRA "has no merit"); *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-00259, 2021 U.S. Dist. LEXIS 231524, at *4 (W.D. Tex. Dec. 3, 2021) (Guaderrama, J.) (denying motion to dismiss to the extent it argued that Section 2 of the VRA does not provide for a private right of action).

[29] Section 3 of the VRA clearly contemplates "a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment" by "the Attorney General *or an aggrieved person*." 52 U.S.C. § 10302 (emphasis added).  As Defendants acknowledge, a federal court recently held that "[t]his language explicitly creates a private right of action to enforce the VRA," in addition to civil actions by the United States Attorney General.  *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 790 (W.D. Ark. 2021).  The Fifth Circuit also implicitly recognized a private right of action when it recognized the validity of the organizational plaintiff's Section 208 claims in *OCA-Greater Houston*.  867 F.3d at 615.

that "works to ensure that people with disabilities may live, work, learn, play, and participate fully in the community of their choice" had standing to pursue and adequately stated an ADA claim); *Steward*, 189 F. Supp. 3d at 631–32 (plaintiff entities that "provide counseling and referral services to persons with intellectual and developmental disabilities" had standing and stated an ADA claim).[30] Defendants' arguments that Plaintiffs fail to state a claim under Title II of the ADA miss the mark. (ECF 255 at 22–28).

> i. LUPE, FIEL, Texas Impact, SVREP, and Jolt Action Adequately Allege They Serve Members Who Have Qualifying Disabilities

First, Defendants argue that Organizational Plaintiffs cannot plead a qualifying disability because they "are artificial entities that could not be disabled" themselves (ECF 255 at 23). That is not the law. *Lee* and *Merrill* above explicitly contemplate organization-brought ADA claims on behalf of "constituents" and "members[.]" *Lee*, 2021 U.S. Dist. LEXIS 200532, at *66–67 (constituents); *Merrill*, 491 F. Supp. 3d at 1158 (members). *Richardson, Steward*, and *MX Grp.* also support the concept of organizational-driven ADA claims. *Richardson,* 2019 U.S. Dist. LEXIS 234207, at *45; *Steward*, 189 F. Supp. 3d at 631–32; *MX Grp.*, 293 F.3d at 328. And, as with Defendants' third-party standing argument, Defendants' reading would eviscerate long-standing precedent without justification. Simply put, Defendants are wrong.

Second, LUPE, Texas Impact, and FIEL adequately plead that their members have qualifying disabilities. *Cf.* (ECF 255 at 23–24); *see also* 42 U.S.C. §§ 12102(1)(A), (2)(A); (2AC ¶ 279). LUPE, for example, alleges that its members include individuals that "have disabilities that limit major life activities, including disabilities that limit their ability to walk, climb stairs, write or mark a ballot, interact with other people or otherwise navigate the polling place and voting

---

[30] *Cf. MX Grp.*, 293 F.3d at 328 (affirming judgment after trial for plaintiff entity's ADA claims because its "clients or potential clients were persons with a disability and . . . [Defendants denied the permit for a methadone clinic] because of Plaintiff's association with its clients/potential clients").

process." (2AC ¶ 10). Other Plaintiffs make similar allegations. *See, e.g.*, (*id.* ¶ 184) (describing the harms to "members of TEXAS IMPACT who are elderly or have disabilities for which they require assistance to vote, and who, due to age or disability, may not be able to hold a pen or write the same signature over time"); (*id.* ¶ 214) (alleging that "FIEL's members include Latino voters who require and use assistors of their choice to vote due to disability or inability to read or write"). SVREP and Jolt Action also allege that they and their members or constituents assist voters with qualifying disabilities. (2AC ¶¶ 17, 174, 176, 178, 181, 204).

Defendants' argument that more detail is required is not supported by their cited case law.[31] And, as explained above, ADA jurisprudence does not require Plaintiffs to identify specific members at the pleading stage. *Cf.* (ECF 255 at 23). LUPE, FIEL, Texas Impact, SVREP, and Jolt Action have all set forth allegations sufficient to satisfy the first prong of their ADA claims.

> ii. Plaintiffs Sufficiently Allege That SB1 Denies Voters with Disabilities the Right to Vote and Discriminates Against Voters with Disabilities Based Upon Those Disabilities

Contrary to the arguments in Defendants' brief (ECF 255 at 26–27), the 2AC contains numerous allegations that more than adequately describe the ways in which SB1's provisions deny voters with disabilities "the benefits of services, programs, or activities for which the public entity is responsible," or are "otherwise discriminated against by the public entity . . . by reason of" their disabilities. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011); (2AC ¶¶ 104, 106–16; *see also, e.g.*, *id.* ¶¶ 149–151, 156–57 (LUPE), 210, 212–14 (FIEL), 184–87 (Texas Impact), 174, 176–81 (SVREP), 204–06 (Jolt Action).

---

[31] In *Houston v. DTN Operating Co., LLC*, the complaint was "silent as to what her disability is or how this disability substantially affects a major life activity." No. 4:17-CV-00035, 2017 U.S. Dist. LEXIS 171676, at *9 (E.D. Tex. Oct. 17, 2017). That is not the case here. *Payne v. Midcrown Pavilion Apartments & Amy Carrillo*, No. SA-19-CV-00407-FB, 2021 U.S. Dist. LEXIS 161442, at *33 (W.D. Tex. Aug. 26, 2021) turned on a finding that an alleged cognitive disability did not qualify as a qualifying disability. This too is not relevant to the current matter.

While Defendants appear to focus on just one theory (*i.e.*, accommodations), allegations of discrimination may proceed on any one of three theories: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016). Here, Plaintiffs' allegations support all three. (2AC ¶¶ 272–85); *see also, e.g., id.* ¶¶ 102, 282(a), 282(b) (disparate treatment), 282(c) (disparate impact), 282(d) (accommodations).

As described in the 2AC, Plaintiffs' members have "disabilities that limit their ability to walk, climb stairs, . . . interact with other people or otherwise navigate the polling place and voting process" in addition to disabilities that limit their ability to "write or mark the ballot." (*E.g.*, 2AC ¶ 10 (LUPE)). These voters "require assistance with voting in-person at the polling place, voting by mail, and voting curbside." (*E.g.*, 2AC ¶ 10 (LUPE)). But Section 6.04 of SB1, for example, "limits the type of assistance that a voter can receive to 'reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot.'" (2AC ¶ 104). This means that, as a direct result of SB1's limitations, "many eligible voters *will not* receive the assistance to which they are entitled"—such as assistance walking, climbing stairs, interacting with other people or otherwise navigating the polling place and voting process— "which *will* impede their ability to vote or result in avoidable error on their ballots." (2AC ¶ 104); *see also* (*id.* ¶ 115) (Section 6.01 discourages group transportation to the polls for curbside voting, which "will deter individuals from giving these rides, further reducing access to voting for voters who need assistance and depriving them of assistance by their chosen assistors.").

SB1 also restricts—and even imposes criminal penalties on—those who would assist voters with disabilities. Section 6.06 "makes it a crime to compensate (or offer, solicit, receive, or

accept compensation for) assistance to mail voters." (2AC ¶ 114).[32] Sections 6.03 and 6.05 require assistors to disclose on a form or the mail ballot carrier envelope their "relationship to the voter" and whether they "received or accepted any form of compensation," which will (especially given Sections 6.05's and 6.06's criminal penalties) both "deter assistors and increase the risk that the ballot will be rejected because the assistor made a clerical error." (2AC ¶ 112); *see also id.* ¶¶ 138−39 (Section 7.04 criminalizes all "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure" and "knowingly collect[ing] or possess[ing] a mail ballot or official carrier envelope in connection with vote harvesting services"). As alleged, these provisions of SB1, individually and collectively, "[d]eny[] people with disabilities, including the members of Plaintiff organizations LUPE, TEXAS IMPACT, and FIEL with disabilities, the opportunity to participate in and benefit from voting in a way that is equal to that afforded to those without disabilities[.]" (*E.g.*, 2AC ¶ 282(a)).[33]

Moreover, as alleged in the 2AC, LUPE's members "require" the very "accommodations that SB1 limits or curtails with the imposition of new requirements for casting a ballot"—*i.e.*, assistance walking, climbing stairs, travelling to the polls, interacting with other people or otherwise navigating the polling place and voting process. (2AC ¶¶ 10, 104, 112, 114, 115, 151). And SB1 prevents Defendants from "reasonably modify[ing] the state's voting system to provide the services that people with disabilities, including the members of Plaintiff organizations LUPE,

---

[32] Since "compensation" is vaguely defined to mean any "economic benefit," this provision will likely deter many assistors who fear prosecution. (2AC ¶ 114).

[33] Contrary to the arguments in Defendants' brief, Plaintiffs do not have to allege that "getting appropriate assistance will be impossible." (ECF 255 at 27); *e.g.*, *Merrill*, 491 F. Supp. 3d at 1159 ("[P]laintiffs do not have to show that they are prohibited from voting in person"). But Plaintiffs did allege that SB1's "restrictions on voter assistance *will* deprive many voters of their right to choose their assistors, which *will discourage and ultimately depress voter participation . . . .*" (2AC ¶ 104).

TEXAS IMPACT, and FIEL with disabilities, need to avoid discrimination." (*See* 2AC ¶ 282(d)). Plaintiffs allege that "SB1's criminalization of all forms of compensated assistance will also impose severe burdens on, and in some cases entirely deny, the right to vote of Texas voters with disabilities, advanced age, and/or language barriers by limiting the number of people available to assist them with voting by mail, for fear of criminal prosecution." (2AC ¶ 225). To the extent Defendants attack these factual assertions, Defendants' arguments amount to disagreements of fact that cannot be resolved on a motion to dismiss.[34] *See Richardson*, 2019 U.S. Dist. LEXIS 234207, at *46 (denying motion to dismiss because "[t]he Secretary's request again ignores that the Court must accept Plaintiffs' allegations at this stage"); *Lee*, 2021 U.S. Dist. LEXIS 200532, at *68–71 (denying the defendants' motion to dismiss where plaintiffs made plausible allegations that Florida's voting law would cause election supervisors to move voting drop boxes inside, making them less accessible to voters with disabilities).

Contrary to the implication in Defendants' brief (ECF 255 at 27), the ADA does not require Plaintiffs to allege that a specific "decision . . . was made because of" disability status.[35] Regardless, the 2AC does allege that "[t]he Texas Legislature's claims of voter fraud and voter integrity are merely pretexts for their actual purpose in enacting SB1, which is to make it harder for citizens of color and citizens with disabilities to cast their votes." (2AC ¶ 102); *see also id.* ¶

---

[34] Defendants' argument that Plaintiffs cannot sustain a "failure-to-accommodate theory" because Texas already provides other accommodations is unavailing. (ECF 255 at 27–28). Defendants point to other provisions of the Texas Election Code not challenged here, such as a blanket prohibition on discrimination against voters with disabilities, curbside voting, and accommodations generally available to all Texas voters, but make no attempt to explain how these accommodations reasonably address the ways in which Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 of SB1 discriminate against voters with disabilities. This argument thus provides no basis to challenge the sufficiency of Plaintiffs' ADA claim.

[35] In the two cases Defendants cite, *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407 (5th Cir. 2021) and *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595 (5th Cir. 2021), the complaints from the individual plaintiffs contained no factual allegations of discrimination based on disability, other than conclusory statements. This is a marked contrast from the 2AC in the present matter.

280 ("There is no valid justification for the burdens that SB1 imposes ....").  Indeed, the 2AC alleges that, as a matter of fact, "[t]here are no cases of voter fraud relating to voter assistance." (2AC ¶ 103); *see also id.* ¶¶ 78–81 (alleging lack of evidence of voter fraud).  Yet SB1 specifically and arbitrarily curtails—and even criminalizes—the very accommodations voters with disabilities need to exercise their constitutional right to vote.  (2AC ¶¶ 10, 104, 112, 114, 115, 151).

### iii. Defendants Administer Elections

For the reasons detailed *supra*, Defendants play an active role in the administration and enforcement of SB1—despite their efforts to pass all responsibility for doing so to local election officials—and therefore administer elections for purposes of Plaintiffs' ADA claim.  *See* § I.B, *supra*.  Two cases Defendants cite, *Lightbourn v. Cty. of El Paso*, 118 F.3d 421 (5th Cir. 1997) and *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015), *vacated and remanded sub nom.*, 137 S. Ct. 414 (2016), do not compel a different conclusion.  For example, in *Lightbourn*, the plaintiffs—including a nonprofit that aids persons with disabilities—sued the Secretary, among others, under the ADA for failing to ensure that voters with disabilities were able to cast their ballots in secrecy. *Id.* at 423–34.  Relying on § 43.034 of the Texas Election Code, the Fifth Circuit found that local election officials, not the Secretary, had the duty to ensure accessibility of polling places to voters with disabilities.  *Id.* at 431.  Unlike *Lightbourn*, however, Plaintiffs' claims here have a clear and direct nexus to Defendants.  As described above, the Secretary prescribes the forms to be filled out by assistors and funnels any and all information regarding potential criminal violations he identifies to the AG for prosecution.  *See* § I.B, *supra*.  When Plaintiffs are harmed by SB1, it will be because Defendants themselves carried out their duties to enforce the law.

### CONCLUSION

For these reasons, Plaintiffs respectfully ask the Court to deny Defendants' Motion.

Respectfully submitted,

March 1, 2022

s/ Nina Perales
_____
Nina Perales
Julia R. Longoria
Mexican American Legal Defense And
Educational Fund
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
Fried, Frank, Harris, Shriver &
Jacobson LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

* Admitted *pro hac vice*

*Attorneys for Plaintiffs:*
LA UNIÓN DEL PUEBLO ENTERO
 SOUTHWEST VOTER REGISTRATION
  EDUCATION PROJECT
 MEXICAN AMERICAN BAR
  ASSOCIATION OF TEXAS
 TEXAS HISPANICS ORGANIZED FOR
  POLITICAL EDUCATION
 JOLT ACTION
 WILLIAM C. VELASQUEZ INSTITUTE
 FIEL HOUSTON INC.

s/ Sean Morales-Doyle
_____
Sean Morales-Doyle
Eliza Sweren-Becker*
Patrick A. Berry*
Jasleen K. Singh*
Andrew B. Garber*
Brennan Center for Justice at
NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
Telephone: (646) 292-8310
Facsimile: (212) 463-7308
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu
patrick.berry@nyu.edu
jasleen.singh@nyu.edu
andrew.garber@nyu.edu
* Admitted *pro hac vice*

Paul R. Genender
Texas State Bar No. 00790758
Elizabeth Y. Ryan
Texas State Bar No. 24067758
Matthew Berde*
Texas State Bar No. 24094379
Megan Cloud
Texas State Bar No. 24116207
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
Liz.Ryan@weil.com
Paul.Genender@weil.com
Matt.Berde@weil.com
Megan.Cloud@weil.com

-and-

Alexander P. Cohen*
Texas State Bar No. 24109739
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Telephone: (212) 310-8020
Facsimile: (212) 310-8007
Alexander.Cohen@weil.com

\* Admitted *pro hac vice*

*Attorneys for Plaintiffs:*
FRIENDSHIP-WEST BAPTIST
   CHURCH
ANTI-DEFAMATION LEAGUE
   AUSTIN, SOUTHWEST, AND
   TEXOMA REGIONS
TEXAS IMPACT
JAMES LEWIN

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on March 1, 2022, and that all counsel of record were served by CM/ECF.

s/ Nina Perales
NINA PERALES