**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | Case No. 5:21-cv-844-XR |
| v. | § | [Lead Case] |
| | § | |
| GREGORY W. ABBOTT, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |
| LEAGUE OF UNITED LATIN AMERICAN | § | |
| CITIZENS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Case No. 1:21-cv-786 |
| v. | § | [Consolidated Case] |
| | § | |
| JOHN SCOTT, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## LEGISLATORS' RESPONSE TO MOTION TO COMPEL

Attacking the very heart of legislative privilege, the LULAC Plaintiffs seek documents that reveal legislators' "intent in enacting SB 1." ECF 391 at 8. But "[t]he legislative privilege 'protects against inquiry into acts that occur in the regular course of the legislative process and *into the motivation for those acts.*'" *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)). It is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney*, 341 U.S. at 377.

On the LULAC Plaintiffs' theory, legislative privilege is so "qualified" that it provides no protection at all. Having alleged that the Legislature acted with discriminatory intent, the LULAC Plaintiffs believe themselves entitled to abrogate legislative privilege altogether. That is not how federal courts treat the legislative privilege protecting state legislators.

# BACKGROUND

The LULAC Plaintiffs' complaints regarding the production of the Legislators' documents come late, and without meaningful effort to resolve them without Court intervention. Counsel for the Legislators agreed to accept service of subpoenas *duces tecum* directed at Representatives Andrew Murr and Briscoe Cain, and Senators Byran Hughes and Paul Bettencourt on December 20, 2021.[1] The Legislators then timely objected to those subpoenas on January 1, 2022, and served supplemental objections and responses to the subpoenas on January 20th. *See* ECF 392 at App074–76; App094–157. In their objections, the Legislators explained that, in addition to being substantially overbroad, the subpoenas directly called for information subject to the legislative privilege, attorney-client privilege, and several other privileges. The parties met and conferred regarding those objections, and on February 11, the Legislators made their first production of documents in connection with the four subpoenas. *See* TXLEG_PROD_20220211 (232 documents). Plaintiffs then sent counsel a letter on February 22, complaining about the rate of production, and taking the untenable position that it was "improper as matter of law" to assert the legislative privilege at all. *See* ECF 392 at App091; *see also id.* ("[T]here is no legal basis to withhold documents pursuant to claims of legislative, investigative, or deliberative process privilege in this federal proceeding."). And Plaintiffs' also complained that the volume of the production was small in comparison to what they understood were "1,700 responsive documents."

The next day, the Legislators made their second production in connection with the four subpoenas. *See* TXLEG_PROD_20220223 (210 documents). And on February 24, counsel responded to the LULAC Plaintiffs' letter, explaining that the Legislators' had then produced all responsive, non-privileged documents, and offering to meet and confer regarding disagreements on any privilege assertions. *See* Exhibit A (Email of 02.24.2022). Counsel also explained that the 1,700 documents to

---

[1] While at one point Plaintiffs' state the subpoenas were served on December 15, *see* ECF 391 at 2, Plaintiffs themselves acknowledge that service of the subpoenas was not accepted under the 20th. *See* ECF 392, at App090 ("You agreed to accept service of the subpoenas to the Legislators on December 20, 2021.").

which Plaintiffs referred was the figure for the total number of documents collected from the Legislators, not the total number of documents identified as responsive to Plaintiffs' requests. *See id.* Plaintiffs did not respond to that letter.

On March 14, 2022, pursuant to the Court's ESI Order, *see* ECF 251, the Legislators' timely produced privilege logs for documents withheld in connection with those productions. *See* Exhibit B (Email of 03.14.2022); *see also* ECF 392 at App159–224. Again the LULAC Plaintiffs failed to respond to the Legislators' letter or object to the privilege logs.

Over a full month later, on April 20, counsel for the LULAC Plaintiffs emailed counsel for the Legislators to discuss the productions made pursuant to the subpoenas. Despite the Legislators' clarifying letter on February 24, counsel for Plaintiffs again complained about the 1,700 documents, insisting that more documents should be produced. *See* ECF 392 at App230–31. Plaintiffs also reiterated their objections to the Legislators' privilege assertions, disregarding the explanations given in the February 24 letter and ignoring the letter's invitation to meet and confer altogether. Counsel subsequently met and conferred in good faith on this subject, but were unable to come to an agreement regarding their differing positions. *See id.* at App226–228.

Meanwhile, three of the four legislators to whom the LULAC Plaintiffs sent subpoenas—Senator Hughes (April 19), Representative Cain (April 21), and Representative Murr (May 5)—gave depositions at the request of the Houston Area Urban League Plaintiffs. *See* Exhibit C (Deposition subpoenas). As usual, all parties to the litigation received notice of the depositions and were entitled to appear and ask the deponents questions. *See* Exhibit D (Email of 03.29.2022). The LULAC Plaintiffs had ample opportunity to ask the Legislators questions relating to their privilege assertions but failed to do so.

The LULAC Plaintiffs suggest that the Legislators took too long to produce documents, *see* ECF 391 at 4, but LULAC's own conduct belies that claim. In this very litigation, LULAC took far

longer—with far less justification—to produce any documents at all in response to discovery requests. LULAC received requests for production on January 22, 2022, *see* Exhibit E (Written discovery to LULAC Plaintiffs), but LULAC did not produce a single document until almost *twelve weeks* later. *See* Exhibit F (Letter of 04.15.2022). Far from being complete, that production was only twenty-seven pages long. *See id.* (producing LULAC000001–LULAC000027). LULAC did not finish producing documents until May 5, more than fourteen weeks after the requests, and two days after they filed their motion to compel. As of the date this brief was filed, the LULAC Plaintiffs have not provided a privilege log for those productions.

Everyone involved in this case—the Court, the parties, third parties, and counsel—have been working under an aggressive schedule. As this Court noted at the beginning of this case, "the plaintiffs are asking . . . everybody[] to do a heck of a lot of work in a short period of time." Hearing Tr. at 35 (Nov. 16, 2021). If the plaintiffs are not willing to meet the schedule they proposed in litigation they initiated, they cannot complain about the far-more-reasonable discovery conduct of third-party legislators. Furthermore, the record shows that the LULAC Plaintiffs waited over a month to object to the Legislators' productions, and never responded to counsel's letter of February 24. Only now, at the end of the discovery period, do Plaintiffs take issue with the production and privilege assertions, in a last-ditch effort to discover additional documents.

Not only did the LULAC Plaintiffs fail to timely seek to address their complaints, but they also failed to avail themselves of other informal methods of obtaining the information they desire. Namely, they did not even *attend* the depositions of the very witnesses to whom they sent subpoenas. The Court should not condone this inappropriate litigation behavior, and it need go no further to determine that Plaintiffs are not entitled to relief. But even if the LULAC Plaintiffs had timely and properly raised the issues presented by their motion to compel—which they have not—the motion should still be denied because it fails on the merits, for the reasons explained below.

# ARGUMENT

## I.     The Legislators Properly Asserted Legislative Privilege

Federal common law recognizes a legislative privilege protecting information related to the legislative process. A legislator's motivation for his official legislative acts is at the very core of this privilege. The LULAC Plaintiffs nonetheless ask this Court to invade that privilege by compelling the production of privileged documents.[2]

### A.     Legislative Privilege Protects Against Discovery into a Legislator's Motivation

The LULAC Plaintiffs seek documents that "appear most likely to be probative of the Law-makers' intent in enacting SB 1," ECF 391 at 8, but that strikes at the very core of legislative privilege. "The legislative privilege 'protects against inquiry into acts that occur in the regular course of the legislative process and *into the motivation for those acts*.'" *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)). It is "not consonant with our scheme of government for a court to inquire into the motives of legislators," *Tenney*, 341 U.S. at 377, but that is precisely what the LULAC Plaintiffs propose to do.

Indeed, the information in many of the privilege entries Plaintiffs challenge would directly reveal the Legislators mental impressions regarding contemplated and draft election integrity legisla-tion. Among other things, the LULAC Plaintiffs seek materials contained in the Legislators' bill books, internal notes, reports, memoranda, analyses, bill drafts, amendment drafts, data considered, hearing

---

[2]   The LULAC Plaintiffs argue at some length that neither the Speech and Debate Clause nor Texas law govern the privilege analysis in this case, *see* ECF 391 at 12–15, but precedent regarding those authorities is relevant to the scope of the legislative privilege protected by federal common law. After all, legislative immunity works the same way at different levels of government, *see, e.g.*, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 (1979) (noting that the Court's reasoning regarding legislative immunity "is equally applicable to federal, state, and regional legislators"); *Reeder v. Madigan*, 780 F.3d 799, 805 (7th Cir. 2015) ("There is no reason to find that legislators [at the state level] along with their aides are entitled to lesser protection than their peers in Washington."), and courts use "the scope of [legislative] immunity" to determine whether "a matter [is] covered by legislators' testimonial privilege." *A Helping Hand, LLC v. Baltimore County*, 295 F. Supp. 2d 585, 591 (D. Md. 2003); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (relying on an immunity case, *Tenney v. Brandhove*, 341 U.S. 367 (1951), when describing legislative privilege). Accordingly, this response cites cases considering legislators at other levels of govern-ment and/or cases considering immunity when relevant.

talking points, and other documents intended to be kept strictly confidential, and which were used as part of the Legislators' process of finding facts for, considering, and formulating election integrity legislation. *See* Exhibit G ¶¶ 4–8, 10 (Declaration of Senator Bryan Hughes); Exhibit H ¶¶ 4–6 (Declaration of Senator Paul Bettencourt); Exhibit I ¶¶ 4–8 (Declaration of Representative Andrew Murr); Exhibit J ¶¶ 4–8 (Declaration of Representative Briscoe Cain).

Courts routinely protect legislators from discovery regarding their motivations, including in cases about Texas's election laws. When the United States sought discovery related to Texas's voter-identification law, the court explained that legislative privilege protects against discovery into "a legislator's motivations with respect to a bill (*e.g.*, why a legislator voted a particular way, why a legislator supported or opposed different amendments, why a bill sponsor included different language in various Voter-ID bills, what factual information a legislator did or did not consider in supporting or opposing a bill, etc.)." *Texas v. Holder*, No. 12-cv-128, 2012 WL 13070060, at *4 (D.D.C. June 5, 2012). This Court should follow the same path here.

### B. Contrary to Plaintiffs' Claim, Courts Do Not Frequently Order Production of Legislatively Privileged Materials

The LULAC Plaintiffs contend that "courts often require state lawmakers to produce materials reflecting their thoughts and intentions in enacting legislation," ECF 391 at 7, but they mischaracterize the caselaw. For example, the LULAC Plaintiffs' lead citation did not order legislators to produce anything. It did not address what materials legislators can protect from discovery. On the contrary, it ordered production of documents in the possession of the Secretary of State because "[l]egislative privilege is a personal one" and "[t]he Secretary does not have standing to invoke legislative privilege." *Gilby v. Hughes*, 471 F. Supp. 3d 763, 767 (W.D. Tex. 2020).[3]

---

[3] The *Gilby* order was subject to a motion for reconsideration, which explained that the court was mistaken in a couple of respects, including by assuming that legislators had not invoked legislative privilege in that case. *See* The Texas Secretary of State's Opposed Motion for Reconsideration, or in the Alternative, for Certification or Clarification, No.

Similarly, the LULAC Plaintiffs cite *Perez v. Perry*, which did not compel the disclosure of privileged material. *See* ECF 391 at 7. On the contrary, *Perez* only provided general guidance about legislative privilege without applying that guidance to any specific discovery requests. *See Perez v. Perry*, No. SA-11-CV-360, 2014 WL 106927, at *3 (W.D. Tex. Jan. 8, 2014) (noting the court would, in the future, "determine whether the privilege has been waived or is outweighed by a compelling, competing interest").

The LULAC Plaintiffs also cite the Fifth Circuit's decision in *Jefferson*, but that case stands for the unremarkable proposition that "evidentiary privilege cannot bar the adjudication of a claim." *Jefferson Cmty. Health Care Centers, Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017). The court did not decide any discovery issue, much less order the production of documents protected by legislative privilege. Indeed, the court correctly "assum[ed] that the councilmembers' reasons for passing the resolutions are privileged in the sense that they cannot be directly compelled to disclose them." *Id.*

The LULAC Plaintiffs rely on *Veasey v. Perry*, *see* ECF 391 at 7, but that case's analysis is not persuasive. The court there appears to have ordered production of documents without deciding whether they were protected by legislative privilege by impermissibly distinguishing between discovery and trial. It ordered "disclosure in **discovery**" while expressly "reserve[ing] the question whether the legislative privilege should be pierced—making the products of discovery **admissible**—until the time of trial." *Veasey v. Perry*, No. 2:13-cv-193, 2014 WL 1340077, at *2 (S.D. Tex. Apr. 3, 2014) (emphasis in original). But if the privilege was not pierced, then the documents at issue were not "nonprivileged matter" within "the scope of discovery." Fed. R. Civ. P. 26(b)(1). This Court should not follow that court's erroneous analysis. In any event, even the *Veasey* court did not allow production to private plaintiffs. It required only "produc[tion] to the United States, under seal," and restricted access "to (1)

---

1:19-cv-1063, ECF No. 97 (W.D. Tex. July 17, 2020). The *Gilby* court did not rule on that motion for reconsideration before the case was dismissed based on sovereign immunity. *See* Final Judgment after Remand, No. 1:19-cv-1063, ECF No. 119 (W.D. Tex. July 28, 2021).

attorneys-of-record, their associates, staff, and assistants working on this litigation, (2) experts and experts' staff, and (3) the Court." *Veasey*, 2014 WL 1340077, at *4. That is not what the LULAC Plaintiffs seek here.

In the end, the LULAC Plaintiffs argue that legislative privilege does not promote the "public good," ECF 391 at 8, but that this is exactly what legislative privilege promotes. The privilege exists "not for [legislators'] private indulgence but for the public good." *Tenney*, 341 U.S. at 377. A republican form of government cannot well function without the ability to maintain confidences. Without the protection of legislative privilege, legislators will necessarily receive less candid advice and less helpful information from others. They will also be more reluctant to communicate or memorialize their thinking. That would only undermine the cause of good government.

### C. Plaintiffs' Nebulous Balancing Test Does Not Support Disregarding Legislative Privilege

The LULAC Plaintiffs argue that a five-factor balancing test favors production, but the Court should not apply that test. Even if it did, the factors as a whole weigh against the motion to compel.

The LULAC Plaintiffs' balancing test appears to originate from a 1979 district-court opinion about the official-information privilege. *See In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979). That opinion, however, is not persuasive on its own terms, *see id.* at 582 (relying on a Supreme Court dissent), and does not match current doctrine, *compare id.* at 582–83 (suggesting *in camera* review is "usually" required), *with United States v. Zubaydah*, 142 S. Ct. 959, 971 (2022) (rejecting in camera review in a states-secret case and noting it is only "sometimes" appropriate).

The balancing test was imported to the legislative-privilege context by *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100–01 (S.D.N.Y. 2003), but that court did not provide any reasoning for adopting those five factors. Nor could it have. A nebulous balancing test does not provide the kind of certain protection of confidentiality that promotes candid advice and good government. Moreover, the balancing test is ill-suited to assessing privilege because most of its factors arguably parallel the standard

for non-privileged discovery. A test that treats discovery into privileged material the same way courts always treat discovery into non-privileged material does not adequately protect the underlying privilege.

The first factor is "the relevance of the evidence sought to be protected," *Rodriguez*, 280 F. Supp. 2d at 101, but even in the complete absence of privilege, "the scope of discovery" is limited to "relevant" material. Fed. R. Civ. P. 26(b)(1). A privilege that is displaced when discovery would be relevant is no privilege at all.

The LULAC Plaintiffs claim that production of these documents is relevant to legislative intent, *see, e.g.*, ECF 391 at 12, but the fact that plaintiffs "alleg[e] racial discrimination—putting the government's intent directly at issue"—is not enough to "justify[] the 'substantial intrusion' into the legislative process" that rejecting legislative privilege would entail. *Lee*, 908 F.3d at 1188. The LULAC Plaintiffs effectively "call for a categorical exception [to legislative privilege] whenever a constitutional claim directly implicates the government's intent," *id.*, but "[t]he claim of an unworthy purpose does not destroy the privilege." *Tenney*, 341 U.S. at 377.

Plaintiffs' proposed "exception would render the privilege 'of little value,'" *Lee*, 908 F.3d at 1188 (quoting *Tenney*, 341 U.S. at 377), but legislative privilege is not some useless doctrine limited to cases in which the plaintiffs were not clever enough to allege discriminatory intent. On the contrary, "[t]he legislative privilege is important," *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015), and plays a crucial role in our government: "allow[ing] elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box." *Lee*, 908 F.3d at 1187.

To the extent the Court considers this factor, it should require a showing that the privileged documents are especially relevant, not merely relevant in the sense required for admissibility. *See* Fed. R. Civ. P. 401. The LULAC Plaintiffs do not attempt to show the documents are especially relevant. On the contrary, they forthrightly admit that they seek documents about bills they have not challenged,

instead of limiting their request to documents about the law at issue. ECF 391 at 9.

The second factor turns on "the availability of other evidence," *Rodriguez*, 280 F. Supp. 2d at 101, but ordinary rules for discovery of non-privileged material allow courts to consider the same issue. "[T]he scope of discovery is" informed by "the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1). Here, again, the LULAC Plaintiffs' five-factor balancing test would provide virtually no protection for privileged material beyond that provided for non-privileged material. To the extent the Court applies this factor, it should require plaintiffs to show that invading legislative privilege is a last resort, not a first preference. The LULAC Plaintiffs have not attempted to make that showing.

Regardless of how the Court thinks of the second factor, though, it cuts strongly against discovery here. There is plenty of available evidence relevant to legislative intent, including the public statements of legislators and the textually expressed intent contained in SB1 itself. "The purpose of this Act is to exercise the legislature's constitutional authority under Section 4, Article VI, Texas Constitution, to make all laws necessary to detect and punish fraud." SB1 § 1.02 ("purpose"); *see also id.* §§ 1.03, 1.04. In any event, the LULAC Plaintiffs may attempt to establish discriminatory intent using the types of evidence discussed in *Arlington Heights*. Recognizing that direct evidence of "purpose" would "frequently . . . be barred by privilege," *Arlington Heights* listed alternative sources of potential evidence regarding legislative intent. *Arlington Heights*, 429 U.S. at 268.

The third factor—"the 'seriousness' of the litigation and the issues involved," *Rodriguez*, 280 F. Supp. 2d at 101—also favors the Legislators. The strength of the LULAC Plaintiffs' claims remains unproven because they have not advanced beyond the motion-to-dismiss stage. The LULAC Plaintiffs contend that this factor favors them because voting rights are important, *see* ECF 391 at 10–11, but that would make the legislative-privilege analysis mirror the requirement that scope of even non-privileged discovery be determined "considering the importance of the issues at stake in the action." Fed.

R. Civ. P. 26(b)(1). In any event, to the extent the Court considers the issues underlying this case especially serious, that supports withholding privileged documents. The more serious the issue, the more important the confidentiality that ensures candid counsel and privacy for legislators to think.

The fourth factor is "the role of the government in the litigation," *Rodriguez*, 280 F. Supp. 2d at 101, but the claims at issue here were brought by private entities (the LULAC Plaintiffs), not the government. No state governmental entity "is a party plaintiff" seeking "affirmative relief." *EEOC v. Airborne Express*, No. 98-cv-1471, 1999 WL 124380, at *2 (E.D. Pa. Feb. 23, 1999). In any event, the Legislators are third parties, not even defendants. The LULAC Plaintiffs point to the Legislators' role in passing legislation, including SB1, *see* ECF 391 at 11, but that is the reason they are protected by legislative privilege, not a reason to abrogate legislative privilege. *See, e.g.*, *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) (explaining that the "rationale" for the legislative privilege is to "allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box"); *Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998) ("Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference.").

The fifth factor—"the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable," *Rodriguez*, 280 F.Supp.2d at 101—is especially important. If legislators cannot communicate and deliberate confidentially, they will be much less likely to receive honest counsel and useful information. Similarly, if legislators cannot keep their private notes private, they will be much less likely to commit their thoughts to writing. Neither outcome would be healthy for legislative decisionmaking.

In the end, the five-factor test is flawed, but to the extent the Court applies it, the test favors the Legislators.

### D.     Communicating with Non-Legislators Does Not Waive Legislative Privilege

The LULAC Plaintiffs argue that communications with anyone other than "legislators and

legislative staff" waive legislative privilege, ECF 391 at 15, but that would gut legislators' ability to gather information necessary for legislating.

The scope of legislative privilege, like other privileges, is defined by the purpose of the communication, not the employment status of the individuals involves. "[A] legislator's request for information to a State agency regarding pending legislation is subject to the legislative privilege and need not be produced." *Texas v. Holder*, No. 1:12-cv-128, 2012 WL 13070060, at *4 (D.D.C. June 5, 2012) (three-judge district court). Similarly, "activity engaged in by legislators is still protected by the legislative privilege even if there are communications with non-legislators, as long as the communications were pursuant to the proposal, formulation, and passage of legislation." *Thompson v. Merrill*, No. 2:16-cv-783, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020).

Indeed, the privilege log demonstrates that the Legislators often consulted third parties as part of their process of gathering facts for and considering election integrity legislation. Among those third parties are the Texas Attorney General's office, the Texas Secretary of State, other legislators and staff, local government officials, and the Texas Legislative Council. And in each case, the Legislators confirm that those communications were made for the purpose of aiding their legislative process, and were intended to be kept strictly confidential. *See* Exhibit G ¶ 9; Exhibit H ¶¶ 7–8; Exhibit J ¶ 9.

### 1. Legislative Privilege Covers Confidential Communications with Third Parties

The "legitimate legislative sphere" "plainly" includes "[t]he power to investigate." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975). Without the power to investigate, legislatures could not function properly. "[T]he power to investigate is inherent in the power to make laws because '(a) legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Id.* (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)). Because legislative investigation is so important, "[i]t is unquestionably the duty

of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action." *Watkins v. United States*, 354 U.S. 178, 187 (1957).

Legislative investigations are protected, regardless of whether they occur through the formal or informal means. There is "no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation." *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (en banc). "The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." *Id.* at 1287.

Courts around the country are in accord. The Third Circuit "agree[s] that fact-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation." *Government of Virgin Islands v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985). As a result, "fact-finding occupies a position of sufficient importance in the legislative process to justify the protection afforded by legislative immunity." *Id.* Similarly, the Ninth Circuit recognizes that "[c]ongressional investigative functions are protected." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983). The Second Circuit also treats "legislative factfinding activity" as "protected." *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988).

Just as legislative privilege protects "a legislature's gathering of information," it also protects "solicitation of policy advice." *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 671 (D. Ariz. 2016). Both warrant protection because they "bear on potential legislation." *Id.* "Meeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation, and participating in party caucuses to form a united position

on matters of legislative policy, assist legislators in the discharge of their legislative duty. These activities are also a routine and legitimate part of the modern-day legislative process." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007).

Sometimes, legislators receive information and advice from their own employees. Under modern conditions, "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Gravel v. United States*, 408 U.S. 606, 616 (1972). Because "the day-to-day work of such aides is so critical to the [legislators'] performance," legislative privilege necessarily protects information gathered by and from legislative employees. *Id.* at 616–17.[4]

Other times, legislators receive information and advice from executive-branch officials. When the purpose of those conversations is to help a legislator perform his legislative functions, they too are protected by legislative privilege. In *United States v. Dowdy*, for example, the Fourth Circuit considered evidence of a legislator's "conversations and arrangements with the United States Attorney, FHA and HHFA." 479 F.2d 213, 224 (4th Cir. 1973). The court was "firm in [its] conclusion that" the evidence "was barred." *Id.* Legislative privilege shielded the legislator's actions "gathering information in preparation for a possible subcommittee investigatory hearing." *Id.* For these reasons, "a legislator's request for information to a State agency regarding pending legislation is subject to the legislative privilege and need not be produced." *Texas v. Holder*, No. 1:12-cv-128, 2012 WL 13070060, at *4 (D.D.C. June 5, 2012) (three-judge district court).

The same is true for information or advice gathered from non-governmental third parties, "as long as the communications were pursuant to the proposal, formulation, and passage of legislation."

---

[4] Cases discussing the Speech or Debate Clause, including *Gravel*, are relevant here because the constitutional standard applicable to federal legislators and the common-law standard applicable to state legislators are analogous. *See, e.g.*, *Dennis v. Sparks*, 449 U.S. 24, 30 (1980) ("patterned after"); *Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 732–33 (1980) ("equated"). Courts considering the common-law privilege applicable to state legislators often rely on cases considering the constitutional privilege applicable to federal legislators. *See, e.g.*, *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 669 (D. Ariz. 2016).

*Thompson v. Merrill*, No. 2:16-cv-783, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020). When an aide "contact[s] individuals outside the legislator" in order "to gather information for a legislator," those communications are "covered by the legislative privilege." *Jeff D. v. Kempthorne*, No. 4:80-cv-4091, 2006 WL 2540090, at *3 (D. Idaho Sept. 1, 2006), *aff'd in part sub nom. Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011). Like other plaintiffs before them, Plaintiffs in this case "argue that the state legislative privilege is not applicable here because [certain] emails were sent to and received from third-party attorneys, lobbyists, and constituents," but courts rightly reject that argument. *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Ariz. 2016).

"Legislators must be permitted to have discussions and obtain recommendations from experts retained by them to assist in their legislative functions, without vitiating or waiving legislative privilege." *ACORN v. County of Nassau*, No. 2:05-cv-2301, 2009 WL 2923435, at *6 (E.D.N.Y. Sept. 10, 2009). Preventing confidential consultation with policy experts would undermine efforts to produce informed and intelligent legislation. The Court should protect such communications. *See, e.g., Backus v. South Carolina*, No. 3:11-cv-3120 (D.S.C. Feb. 08, 2012) (Doc. 103 at 2) ("[D]eposition topics 7 and 16 are quashed to the extent the questions involve communications between the Senate or the House and 'private consultants or experts.'").

As courts have recognized in the federal legislative context, "informal information gathering in connection with or in aid of a legitimate legislative act is itself protected," regardless of whether the information is gathered through "communications with organizations, constituents, or officials of a coordinate branch." *Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 54 (D.D.C. 2007). That is why legislative privilege focuses on "the activity at issue, not the identity of the party with which the Member comes in contact." *Id.* at 59; *cf. Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20, 23 (1st Cir. 1992) ("Under current legal theory, immunity attaches or does not attach depending on

what kind of action was performed rather than on who performed the action."). Legislators can "conduct investigations and obtain information without interference from the courts, at least when these activities are performed in a procedurally regular fashion." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995).

The rule could not be otherwise. Legislative privilege protects a legislator from having to disclose "sources of information." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983). That rule would not be administrable if legislators had to disclose certain sources but not others.

Of course, that does not mean legislative privilege applies to all communications with third parties. When a legislator participates in non-legislative activity—such as trying to lobby the executive branch regarding its use of executive power rather than trying to gather information from the executive branch for legislative purposes—then legislative privilege does not apply. *See, e.g.*, *United States v. Brewster*, 408 U.S. 501, 512–13 (1972) ("political matters," including "the making of appointments with Government agencies" "for constituents"); *United States v. Johnson*, 383 U.S. 169, 172 (1966) ("attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process"). The LULAC Plaintiffs do not contend that is an issue here.

### 2. Analogous Privileges Protect Conversations with Third Parties

The law recognizes a privilege when it wants to encourage open and honest communication, usually because the privileged communications are important for serving societal goals. Whether a privilege extends to a particular individual turns on that individual's role in serving the underlying goals justifying the privilege. It does not turn on the formal employment status of the individuals involved. That is why executive privilege protects the confidentiality of communications with third parties, regardless of whether those third parties are employed by the executive branch. And that is why attorney-client privilege protects third-party communications even when the third parties are not

employees of the attorney or the client. Plaintiffs' contrary position is inconsistent with the treatment of these analogous privileges and would make legislative privilege a legal anomaly.

Like legislative privilege, executive privilege exists to ensure that governmental decisionmakers have access to frank advice that might be inhibited by the threat of public disclosure. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974).

Presidents have long relied on informal advisors, not employed by the executive branch, such as members of the famed "kitchen cabinet."[5] That makes sense. "Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch."[6] But as with more formal advisors, "the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential." "That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests."[7] Thus, the Attorney General of the United States has concluded "that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege."[8]

---

[5] *See, e.g.*, Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory System*, 65 The Journal of American History 367 (1978), available at https://docs.house.gov/meetings/JU/JU00/20191211/110331/HMKP-116-JU00-20191211-SD951.pdf.

[6] Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys, 31 Op. O.L.C. 1, 5 (June 27, 2007), https://www.justice.gov/olc/file/477046/download.

[7] *Id.* at 6.

[8] *Id.* at 1; *see also* Applicability of Executive Privilege to the Recommendations of Independent Agencies Regarding Presidential Approval or Veto of Legislation, 10 Op. O.L.C. 176, 178 (Dec. 22, 1986), https://www.jus-

In short, executive privilege protects executive communications with members of the legislative branch. There is no reason legislative privilege should not similarly protect legislative communications with members of the executive branch.

Attorney-client privilege also protects communications with third-parties when those communications further the purposes of the attorney-client privilege. As with other privileges, "[t]he scope of the attorney-client privilege is shaped by its purposes." *Wolff v. Biosense Webster, Inc.*, No. 3:17-cv-328, 2018 WL 3795302, at *2 (W.D. Tex. Aug. 8, 2018) (quoting *United States v. El Paso Co.*, 682 F.2d 530, 538-39 (5th Cir. 1982)). Because the privilege protects candid communications between attorneys and clients, it extends to anyone who facilitates those conversations, regardless of whether those individuals are formally employed by the attorney, the client, or neither.

For example, if the attorney and client do not speak the same language, then some sort of interpreter or translator is necessary. But one fact that does not matter is who employs the interpreter or translator. There is "no significant difference" for purposes of privilege whether "the attorney sends a client speaking a foreign language to an interpreter," whether the attorney uses a "knowledgeable non-lawyer employee," whether a translator is "brought along by the client," or whether the attorney "sends the client to a non-lawyer proficient in [the client's language], with instructions to interview the client on the attorney's behalf and then render his own summary of the situation." *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961).

Thus, the attorney-client "privilege must include all the persons who act as the attorney's agents" because their assistance is "indispensable to [the attorney's] work and the communications of the client [are] often necessarily committed to them by the attorney or by the client himself." *Id.* The

---

tice.gov/file/23896/download (concluding that executive privilege does not distinguish between presidential communications with cabinet agencies and "independent agencies" because such a distinction "would be inconsistent with the underlying principle of executive privilege—the need to preserve the integrity of the President's decisionmaking process").

scope of the privilege depends on the role these third parties play in facilitating legal services, not whether attorneys place them "on their payrolls and maintain[] them in their offices." *Id.*

Plaintiffs argue that legislative privilege turns on whether an individual is formally employed by the legislative branch, but the Supreme Court has rejected reliance on formal employment status when considering both judicial immunity and legislative immunity. Absolute judicial immunity applies to officials who exercise quasi-judicial authority, even though they "are—from an administrative perspective—employees of the Executive Branch." *Butz v. Economou*, 438 U.S. 478, 511 (1978) (justifying immunity based on "the special nature of [officials'] responsibilities," not "their particular location within the Government"). The same is true for legislative immunity, which can protect members of a regional planning agency even if they are not members a state legislature. *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 n.30 (1979). That makes sense because, "[u]nder current legal theory, immunity attaches or does not attach depending on what kind of action was performed rather than on who performed the action." *Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20, 23 (1st Cir. 1992).

In the end, Plaintiffs' position would make legislative privilege turn on the formal employment status of third parties rather than the function those third parties serve, an analysis foreign to all analogous privileges.

\*     \*     \*

Finally, the LULAC Plaintiffs seem to suggest that communications with the Lieutenant Governor and his staff are not protected by legislative privilege because he is not a member of the legislative branch, *see* ECF 391 at 17, but Plaintiffs misunderstand the Lieutenant Governor's role in the Texas legislative process. The Lieutenant Governor has significant legislative responsibilities. He serves as President of the Senate and, in appropriate circumstances, debates and votes on legislation.

*See* Tex. Const. art. IV, § 16(b).[9] Because the Lieutenant Governor is part of "the legislative process itself," legislative privilege protects his "actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308 (applying legislative privilege to a governor). Even under a narrower, more technical approach, judges have applied legislative privilege to shield the Lieutenant Governor. *See Texas v. Holder*, No. 1:12-cv-128 (D.D.C. May 28, 2012) (three-judge district court) (Doc. 154 at 4–7). Legislative communications with the executive branch are protected by legislative privilege, but even if they were not, communications with the Lieutenant Governor and his staff would remain privileged because they are part of the legislative process.

The LULAC Plaintiffs concede, as they must, that officials formally outside the legislative branch are often entitled to legislative immunity. *See* ECF 391 at 16 n.3. "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Bogan*, 523 U.S. at 55; *see also Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 734 (1980) (state judges); *Baraka v. McGreevey*, 481 F.3d 187, 196 (3d Cir. 2007) (state governor and gubernatorial appointee). Wrongly assuming these immunity cases are irrelevant to the scope of the evidentiary privilege, the LULAC Plaintiffs overlook the fact that courts use "the scope of the immunity" to determine whether "a matter [is] covered by legislators' testimonial privilege." *A Helping Hand, LLC v. Baltimore County*, 295 F. Supp. 2d 585, 591 (D. Md. 2003); *see, e.g.*, *Hubbard*, 804 F.3d at 1308; *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 669 (D. Ariz. 2016). After all, "the immunity from suit derives from the testimonial privilege, not the other way around." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418 (D.C. Cir. 1995) (interpreting the Speech or Debate Clause).[10]

---

[9]  For more information about the role of the Lieutenant Governor, *see* Temporary Senate Rules, 87th Leg. (2021), https://senate.texas.gov/_assets/pdf/SenateRules87-temp-amended.pdf.

[10]  The first withheld document listed in the LULAC Plaintiffs' motion appears to have been included by mistake. It lists Representative Ashby as the custodian, *see* ECF 391-2 at App244, but the LULAC Plaintiffs did not name Representative Ashby in their motion to compel, *see* ECF 391 at 1–2.

## II.    The Legislators Properly Asserted Attorney-Client Privilege and Attorney Work Product

The LULAC Plaintiffs argue that the Legislators waived attorney-client privilege by communicating with third parties, *see* ECF 391 at 18–19, but they ignore the common-interest doctrine. This doctrine is "an extension of the attorney-client privilege." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012). It is a basic principle of this doctrine that persons do not waive the privilege by communicating with third parties who share a common legal interest. *See, e.g.*, *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) ("Whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims."). Likewise, the Legislators did not waive attorney-client privilege by communicating with other legislators who had a common legal interest.

The LULAC Plaintiffs specifically point to Alix Morris, the Deputy General Counsel of the Office of the Lieutenant Governor, as a third party included in confidential communications. *See id.* at 19. The LULAC Plaintiffs do not appear to dispute that various legislators (including the Lieutenant Governor) can have common interests in, for example, the drafting of legislation. That makes particular sense in Texas, where the Lieutenant Governor appoints Senators to serve on the committees that consider and markup legislation.[11] In light of such common interests, there is no reason to treat communications between a lawyer representing the Lieutenant Governor and other legislators or their staff as waiving attorney-client privilege. "If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged . . .

---

[11] *See* Temporary Senate Rules, 87th Leg., art. XI, Rule 11.01 (2021), https://senate.texas.gov/_assets/pdf/SenateRules87-temp-amended.pdf.

that relates to the matter is privileged as against third persons." Restatement (Third) of the Law Governing Lawyers § 76(1) (2000).

The LULAC Plaintiffs contest the existence of an attorney-client relationship between the Legislators and the Office of the Attorney General. *See* ECF 391 at 19. The declaration of Jonathan White explains that the Office of the Attorney General provided legal advice to the Legislators at the relevant time periods. *See* Exhibit K ¶¶ 4–6 (Declaration of Jonathan White). Furthermore, even if Plaintiffs were correct that no attorney-client relationship existed, which they are not, the communications would still be privileged because they were made for the purpose of gathering facts for, formulating, and considering election integrity legislation.

The LULAC Plaintiffs also question whether communications with the Texas Legislative Council are privileged. The Texas Legislative Council "provide[s] legal research and legal counsel with respect to [draft legislation] and other legislative matters."[12] TLC employees Tracy Snelson and Adam Moses as attorneys, and Carey Eskridge is the Deputy Research Division Director of TLC.[13] It is well-established that the involvement of employees who assist attorneys in the provision of legal advice does not waive the attorney-client privilege. *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (The "presence" of third parties who work with the attorney at issue "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."). Texas law confirms the confidential and privileged nature of communications with the Texas Legislative Council. *See* Tex. Gov't Code § 323.017.[14]

---

[12] Texas Legislative Council, *About the Council*, https://tlc.texas.gov/about (describing the work of attorneys in the legal division).

[13] Tracy Snelson: https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=333310; Adam Moses: https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=330975; .

[14] The LULAC Plaintiffs rely on now-vacated precedent that interpreted an older version of this statute with materially different wording. *See* ECF 391 at 20; *Texas v. United States*, 279 F.R.D. 24, 34 (D.D.C. 2012), *vacated in part*, 279 F.R.D. 176 (D.D.C. 2012) (noting that the prior version of the statute did not discuss privilege). Texas Government Code

Finally, the LULAC Plaintiffs appear to suggest that the attorney-client privilege is limited to litigation and does not apply to legal services performed in connection with drafting legislation. *See* ECF 391 at 21. That contradicts the modern rule. "A lawyer's assistance is legal in nature if the lawyer's professional skill and training would have value in the matter. Some early authority suggested that the attorney-client privilege extended only to legal assistance in litigation. That limitation has not been followed by modern American authority or in the Section." Restatement (Third) of the Law Governing Lawyers § 72, cmt. b (2000). Privileged communications can relate to a wide variety of legal services, including "legal counseling or advice, document preparation, litigation services, or any other assistance customarily performed by lawyers in their professional capacity." *Id.* The LULAC Plaintiffs do not dispute that assisting in the drafting of legislation is a task "customarily performed by lawyers in their professional capacity" or that legal "skill and training would have value in the matter." *Id.* Contrary to the LULAC Plaintiffs' speculation, there is nothing implausible about legislative clients seeking legal advice regarding previous legal violations or legal disputes to better inform their legislation.

With regard to the work product doctrine, the LULAC Plaintiffs raise two arguments, but neither is meritorious. First, they suggest that the Legislators cannot raise the work product doctrine because they are third-party subpoena recipients rather than defendants. *See* ECF 391 at 22–23. On

---

§ 323.017(a)-(c) provides: "(a) Communications, including conversations, correspondence, and electronic communications, between a member of the legislature or the lieutenant governor, an officer of the house or senate, a legislative agency, office, or committee, or a member of the staff of any of those officers or entities and an assistant or employee of the council that relate to a request by the officer or entity for information, advice, or opinions from an assistant or employee of the council are confidential and subject to legislative privilege. (b) A communication described by Subsection (a) is subject to attorney-client privilege if: (1) the assistant or employee of the council who is a party to the communication is a council attorney or is working at the direction of a council attorney; (2) the communication is given privately; and (3) the communication is made in connection with the council attorney's provision of legal advice or other legal services.(c) Information, advice, and opinions given privately by an assistant or employee of the council to a member of the legislature or the lieutenant governor, an officer of the house or senate, a legislative agency, office, or committee, or a member of the staff of any of those officers or entities, when acting in the person's official capacity, are confidential and subject to legislative privilege."

the contrary, "the Federal Rules and *Hickman* authorize the Court to protect third party work product in appropriate cases." *In re Student Fin. Corp*, No. 02-11620, 2006 WL 3484387, at *11 (E.D. Pa. Nov. 29, 2006). The LULAC Plaintiffs rely on *Federal Practice and Procedure*, but they omit the language that supports the Legislators here: The "argument that because Rule 26(b)(3) omits coverage of nonparty work product, protection should still be found under *Hickman v. Taylor . . .* has much to commend itself." 8 Wright & Miller, *Federal Practice and Procedure* § 2024 n.49 (3d ed.).

Second, the LULAC Plaintiffs argue that attorney work performed before a bill passes cannot be performed in anticipation of litigation, *see* ECF 391 at 23–24, but legislation and litigation are not mutually exclusive. A significant premise of voting-rights litigation is that it will affect how legislators draft legislation. Having succeeded in convincing state legislators to legislate in the shadow of the litigation that almost always follows passage of a major election bill, federal court plaintiffs cannot credibly claim that lawyers representing legislators do not act in anticipation of litigation.

## III. The Legislators Properly Asserted Investigative Privilege

Some of the Legislators' documents are also subject to investigative privilege, highlighting the sensitivity of the information being sought by Plaintiffs. Investigative privilege "protect[s] government documents relating to an ongoing criminal investigation." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570 n.2 (5th Cir. 2006). The privilege exists "to preserve the integrity of law enforcement techniques and confidential sources, protect[] witnesses and law enforcement personnel, safeguard[] the privacy of individuals under investigation, and prevent[] interference with investigations." *Tuite v. Henry*, 181 F.R.D. 175, 176-77 (D.D.C. July 31, 1998) (unpublished), *aff'd Tuite v. Henry*, 203 F.3d 53 (D.C. Cir. 1999); *see also In re Dep't of Investigation*, 856 F.2d 481, 483-84 (2d Cir.1988). Disclosure of the investigative materials withheld here would infringe on all these interests by revealing sources and methods, exposing the identities of individuals under investigation, and possibly compromising both ongoing and future investigations. *See* Exhibit K ¶ 7.

Even if these documents were not protected by investigative privilege, they would still be subject to legislative privilege. The Legislator that retained these documents did so not only for the purpose of forwarding them for investigation, but also as part of his own fact gathering process for assessing new election-related legislation. *See* Exhibit H ¶ 9. The LULAC Plaintiffs seem to argue that the Legislator waived legislative privilege by sharing the information with law enforcement, but the two privileges do not negate each other. Confidentially referring information to a law enforcement agency for an investigation, which would trigger investigative privilege, does not waive a legislator's interest in the confidentiality provided by legislative privilege.

## IV. Plaintiffs Are Not Entitled to Expenses Regardless of How the Court Resolves Their Motion to Compel

The LULAC Plaintiffs briefly suggest this Court "*must*" award them expenses, including attorney's fees, if it grants their motion to compel, ECF 391 at 7, but that contradicts Rule 37. "[T]he court must not order" a payment of expenses and fees, "if: . . . the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A). The LULAC Plaintiffs do not even acknowledge this standard. At no point do the LULAC Plaintiffs argue that the Legislators' position is not "substantially justified" or that awarding expenses would be just. Indeed, the LULAC Plaintiffs do not mention expenses in the Argument section of their motion. The closest they come to making an argument is merely mentioning expenses in the Legal Standard section. *See* ECF 391 at 7.

In any event, the Legislators' position is substantially justified, regardless of whether this Court ultimately agrees with it or not. Substantial justification "has never been described as meaning 'justified to a high degree,' but rather has been said to be satisfied if there is a 'genuine dispute,' or 'if reasonable people could differ as to [the appropriateness of the contested action].'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations omitted). The LULAC Plaintiffs concede that some courts agree with the

Legislators' position. *See* ECF 391 at 16. To be sure, the LULAC Plaintiffs' think those courts' opinions are not persuasive, *see id.*, but they do not contend those judges are not "reasonable people" or that "reasonable people" could not possibly agree with those judges. *Underwood*, 487 U.S. at 565. Even if binding precedent foreclosed the Legislators' argument—it does not—the Legislators are entitled to ask higher courts to revisit any contrary precedent, just as other litigants are.

Other circumstances also make an award of expenses unjust. First, the Legislators are public servants entitled to a presumption of good faith, and the LULAC Plaintiffs do not suggest that the Legislators have acted in bad faith during the discovery process. Second, the Legislators did not simply ignore the LULAC Plaintiffs' request. They produced responsive, non-privileged documents and a detailed privilege log for privileged documents. Third, any award would burden the public treasury and taxpayers. Fourth, the Legislators are third parties to this litigation, not plaintiffs or defendants. Fifth, the LULAC Plaintiffs' claims are subject to a pending motion to dismiss. Awarding the LULAC Plaintiffs expenses for discovery in a suit that they are not able to maintain (if the motion to dismiss is ultimately granted) would not be appropriate. Considering these factors together, along with the arguments made above, an award of expenses would not be just in this case.

## CONCLUSION

The Legislators respectfully request that the Court deny the LULAC Plaintiffs' motion to compel and deny the request for expenses.

Date: May 9, 2022

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

/s/ Patrick K. Sweeten

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation

BRENT WEBSTER
First Assistant Attorney General

Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR THE LEGISLATORS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 9, 2022, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN