IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, ET AL,
PLAINTIFFS,
vs.
GREGORY W. ABBOTT, ET AL,
DEFENDANTS.

DOCKET NO. 5:21-CV-844-XR

TRANSCRIPT OF MOTION TO COMPEL
BEFORE THE HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
MAY 13, 2022

APPEARANCES:

FOR THE PLAINTIFFS:
CHRISTOPHER DOOLEY DODGE, ESQUIRE
ELIAS LAW GROUP LLP
10 G STREET NE, SUITE 600
WASHINGTON DC 20002

SEAN MORALES DOYLE, ESQUIRE
BRENNAN CENTER FOR JUSTICE
120 BROADWAY
SUITE 1750
NEW YORK, NY 10271

DANIEL JOSHUA FREEMAN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVENUE
4CON 8.143
WASHINGTON DC 20530

FOR THE DEFENDANTS:

PATRICK SWEETEN, ESQUIRE
WILLIAM THOMAS THOMPSON, ESQUIRE
TEXAS ATTORNEY GENERAL
P.O. BOX 12548
MC 009
AUSTIN TX 78711

JOHN M. GORE, ESQUIRE
JONES DAY
51 LOUISIANA AVENUE, NW
WASHINGTON DC 20001

REPORTED BY:

GIGI SIMCOX, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
SAN ANTONIO, TEXAS

*(San Antonio, Texas; May 13, 2022, at 3:30 p.m., in open court.)*

THE COURT: Good afternoon.

Let's call 21 civil 844, LUPE versus Abbott.

Who do we have for the LUPE plaintiffs?

MR. DODGE: Good afternoon, Your Honor, you have Christopher D. Dodge, the Elias Law Group, on behalf of LULAC plaintiffs.

THE COURT: Thank you.

And on behalf of the State?

MR. SWEETEN: Your Honor, Patrick Sweeten and Will Thompson. Mr. Thompson is in the driver's seat today. I've been in D.C. taking depositions, so he's going to handle the legislative privilege motion today with the Court.

THE COURT: Thank you.

MR. THOMPSON: Your Honor, just for the clarity of the record, we represent the legislators today.

MR. SWEETEN: That's correct.

THE COURT: That is correct. Thank you.

Well, we'll see if that's the case. Actually, you're not, but, yeah.

Is there anybody else who is intending to make arguments today? No. Okay.

So Mr. Dodge, or Mr. Thompson, whoever wants to take this, my understanding is we're still talking over 280

documents. Is that what we are still talking about?

MR. DODGE: I believe the number is closer to 225, Your Honor --

THE COURT: 225.

MR. DODGE: -- identified -- yeah. The total count in those tables might be closer to 280, but there are duplicates between the tables because the lawmakers asserted multiple privileges as to several documents.

THE COURT: Okay. And so I'm assuming here that no other agreements have been reached.

MR. DODGE: That's correct, Your Honor.

THE COURT: So, you know, you've all made your arguments on the papers, and so I've read all of that. I guess maybe the best way to proceed here is to go through these three tables and try to figure out whether there's privilege or no privilege.

So Table A, for the most part, appears to me, to be documents that could possibly or potentially be subject to legislative privilege. There's a few I'm questioning, and so we can go through those. But before I start tackling this first table, I guess I'd like to have an understanding of how the Office of the Attorney General compiled these documents.

Did you just rely upon the legislators at issue giving you hard copies? Did you get the things in native? How did you get them?

MR. SWEETEN: Your Honor, I can speak to some of that.

We reached out to those legislators. We met with them regarding the subpoena and the scope of those subpoenas. We -- you know, obviously that included electronic documents. It included documents that are hard copies. So all of those, you know, types of medium would be included in what would have been collected from the legislators.

Then we began our privilege review of those materials. We compiled the privilege log. We've already sent out the documents that we felt were not privileged and responsive to the subpoenas, and then we withheld those documents that appear on the privilege log.

That's a general description of how we did it, Your Honor.

THE COURT: So what I'm trying to figure out, though, is so if you got some of these documents -- let's talk about the emails first. If you got some of those documents, did you get them native, or did you get them hard copy?

MR. SWEETEN: I don't want to tell the Court the wrong information. I was not -- I was part of some of the discussions. I think we certainly asked for that when that was available, but we have others that I think could tell the Court more about that.

Do you --

THE COURT: So the reason I'm asking for it, frankly, is, I mean, the "to" and the "from" are sometimes completely absent to the log. That's one problem.

And then the other problem is no one tells me whether there is any blind carbon copies on these either. And so when I'm trying to figure out whether there's been any waiver, the privilege logs are lacking detail.

Mr. Thompson.

MR. THOMPSON: Thank you, Your Honor.

I think a member of the Court staff asked me to speak from here, if that's okay.

My understanding is that to the extent we had the information, "to" and "from," like in an email, that it's provided in the log. At least that was certainly our goal and it's my understanding of what was accomplished.

Oftentimes the legislators had hard copies of documents. It may have been emails or may have just been other things where information was just missing, and so we didn't -- you know, it's just a print-off of some document. It doesn't say who it's to. It doesn't say who it's from. So we weren't in a position to provide that information.

But our goal certainly was to provide whatever information we had. I believe we have accomplished that. If there was any instance where it appears that we failed to do that, we would of course supplement the log.

THE COURT: Well, what emails? Did you review any emails that were provided to you in native format?

MR. THOMPSON: So again, like Mr. Sweeten, I did not personally review the emails. My understanding is that we did get emails in native format that we did provide "to" and "from" information when that happened.

THE COURT: Yeah. So the "to" and the "from" necessarily don't bother me. It's the BCCs that I'm wondering about. Are you -- is your office aware of any of the emails having BCC in there that has not been annotated in the log?

MR. THOMPSON: I can say that I am personally not aware of that happening. And I'm happy, of course, to check with the rest of the team and get an answer to Your Honor on that.

THE COURT: Okay. So then let's tackle this one at a time then.

Let's talk about Table A, the legislative privilege.

So a lot of these documents seem to be hard copy documents, either PDFs or word documents. To your point, I don't think we can tell who actually was the drafter, and so that seems to be one problem.

Where I'm heading with this is, let's just take a hypothetical, okay, apart from all this list. I'm -- just again, hypothetically, just because I see the name here, I'm Representative Ashby. Some third party sends me this, *How to*

*do Voter Restriction*, from Washington, D.C., has nothing to do with the Texas legislature. He gives it to the Representative Ashby. In this hypothetical, I am Representative Ashby, and I just make a few jots on this document.

I agree with you that the legislative privilege may allow for that document to be redacted as to Representative Ashby's notations, but why does the entirety of the document, under my hypothetical, not get produced?

MR. THOMPSON: So a couple of responses to that, Your Honor, and I want to make sure I understand the question properly.

To the extent the question is what will the privilege log show in that situation, if we are aware that anything came from an outside source, I believe we've endeavored to note that on the privilege log.

I believe we were successful in that. And that's part of why the plaintiffs were able to make the arguments they are in their motion about which documents are from outside sources.

THE COURT: So I'm looking at, I think -- hopefully, we're all talking off the same -- I'm looking at my law clerk.

The Table A, Table B, and Table C that I have is the same thing you-all have, right?

MR. THOMPSON: Yes. It was attached to the plaintiffs' motion.

THE COURT: Okay. So draft Table A in front of you.

MR. THOMPSON: I have it, Your Honor.

THE COURT: Author is completely blank.

MR. THOMPSON: So I think what that would mean in this privilege log is that we had to reason to believe it came from an outside source. At least some of the documents on this first page of Table A that are missing an author describe themselves as, you know, draft amendments to bills. And my understanding, at least, is those would be draft amendments that were produced in the senator's or the representative's office.

THE COURT: So let's take a look at Item 2, *Report on International Voting Practices*. I mean, who authored this report?

MR. THOMPSON: Certainly, off the top of my head, I do not know. I do not know --

THE COURT: So it certainly wasn't Representative Cain, H.e didn't go through and do an analysis of international voting practices, right?

MR. THOMPSON: Well, I guess I don't know. I assume that's -- I assume it with Your Honor, but --

THE COURT: So that's my problem with the logs is they don't provide me much guidance at all to make decisions.

Now let's turn to page 2, Notes and Bullet Talking Points. This is Representative Cain, Line Item 14. I mean,

how do I know -- did his staff draft bullet points for him to talk from, or did somebody from D.C. do that? I mean, there's just no way for me to know.

MR. THOMPSON: Well, Your Honor, I think it is typical for legislative staff to draft these kinds of bullet points for the members, and I think that would be probably the most reasonable assumption upon finding bullet points.

THE COURT: But you are relying on me to make an assumption to make evidentiary rulings.

MR. THOMPSON: Well, so, to be clear, that our position is that we would not necessarily make that assumption because, as we have argued in our briefing, we believe that legislative privilege can attach to information and advice provided by people outside the legislative branch.

THE COURT: Okay. So then on that big picture note, let's talk about that. I mean, how is it -- so we supposedly have an open government. The people are supposed to know what their representatives are doing.

And if so, throughout this process, though, we recognize the deliberation privilege so that legislators can talk to their staffs so they can reach appropriate decisions on how they are going to vote, what they are going to draft, and so I'm completely in agreement with that.

Anything that was drafted and was in between a legislator and his staff, and we can talk about how far the

staff goes, but that's all privilege.

But if I'm a lobbyist in D.C. under my hypothetical and I provide a report, and look at Line Item 34, that's a report provided to Representative Murr's office by an organization, from a third-party organization.

And there's a reference throughout this privilege log to a briefing book. I can't tell whether the briefing book was done by a member of the legislative staff, or was done by this third-party organization here on Line 34.

MR. SWEETEN: Your Honor, on Representative Murr's briefing book, that is something that he had because he was in the -- he was on the committee and he was presenting SB 1 during the summer of --

THE COURT: Yeah, no doubt he had it in his hand.

MR. SWEETEN: It his notes and his -- and it contains sort of his mental impressions and thoughts about the bill.

THE COURT: I completely agree with all that.

And so what I'm trying to figure out is, so I agree, his writings, his mental impressions, his notes, all that gets redacted.

But why does the underlying report from some third party not get produced? That writing, that original writing that he may have annotated on was not part -- not produced pursuant to the legislative privilege.

Help me understand that.

MR. THOMPSON: Sure, Your Honor.

And so I want to be clear about what I stated earlier. It is not our position that all communications with third parties are legislatively privileged, of course. There are plenty of communications with third parties or lobbyists and such that would not count as privilege and would not -- are not included on this log.

But there are times when communications with third parties are privileged because the privilege should turn on the communication and the activity at issue, not on the employment status of the individuals participating in the communication.

So the reason -- I think Your Honor referred to this as part of the "deliberative process." The reason society needs legislators like other members of the government to be able to deliberate with candor and confidentiality is that it produces better and more informed decision-making.

You can receive candid counsel in a way that simply would not be possible if all that counsel were going to be subject to public disclosure. This is true for executive privilege. It's all over cases like *Nixon*, for the President. It's also true in the legislative privilege context.

THE COURT: So I just, I cannot buy that argument, though. I mean, so let's take -- away from voting, let's just take an oil issue.

If the oil industry drafts legislation, drafts amendments, and gives it to a senator or a representative, and the senator and representative uses that work product done by an outside organization, in this case, my hypothetical, an oil lobbying firm, your position is that the people of the state of Texas should never be able to see that this work originally generated from the oil industry.

MR. THOMPSON: No, for a couple of reasons, Your Honor.

THE COURT: How? If it's no on that situation, how is it different in this situation?

MR. THOMPSON: Two quick clarifications.

One, our position is not that no one is ever allowed to see it. To the extent something is privileged, of course, it's up to the legislator to decide whether to make it public. And they sometimes do. Or to keep it confidential. Sometimes they do that.

On the substance of the hypothetical, I believe that we have explained in the log and in the declarations attached to our briefing that these are third-party situations where the third party is providing confidential information advice where there's like a pre-existing relationship between the third party and --

THE COURT: But they are not members of the legislative staff or members of the legislature.

MR. THOMPSON: That's correct. When they are described as third parties, I believe we were trying to indicate that they are not members of the legislative staff or members of the legislator -- of legislature.

If the line were drawn by the courts at who is a formal member of the legislative staff, I think that would be an oddly, formalist line for a functional analysis of issues like privilege.

THE COURT: Well, help me understand. You are saying that, and then in my oil example, you said, "Oh, no, there's no privilege there."

MR. THOMPSON: Sorry. What I meant to say is those facts as stated by Your Honor would not necessarily be enough to establish the privilege. So if a lobbyist just walks into an office and says, "I've got a draft bill. I think you guys should really consider this," I don't think we would be asserting privilege in that situation.

My understanding is --

THE COURT: So you are distinguishing it this way, that because an outside entity -- and I don't know whether one exists in this case or not. I'm just posing this as a hypothetical. But if an outside entity wanted to assist the State of Texas legislators in drafting restrictive voting practices, you are saying that because these legislators might have had some kind of pre-existing relationship with these

individuals who might share the same ideological perspectives, all of a sudden now, that makes it part of the umbrella of the legislative privilege?

MR. THOMPSON: So they may or may not share the same ideological preferences. My understanding is legislators sometimes get advice from people they expect to disagree with all the time.

But I think the key here is -- Your Honor has undoubtedly heard of the Kitchen Cabinet, that it goes all the way back to Andrew Jackson, where the President has outside advisers who he relies on for information and advice in performing his executive functions.

THE COURT: But I'm not here to talk about an executive privilege. I'm here trying to understand the legislative privilege.

MR. THOMPSON: It's just an analogy, Your Honor. I'm not purporting to say the executive privilege is at issue to those documents.

THE COURT: Because under that scenario I could be a senator and my Kitchen Cabinet has all my lobbyist friends and all my fundraising friends, and so, I mean, how far do you take your analogy? Under that, my Kitchen Cabinet could consist of a whole bunch of my political supporters, and all of that becomes now under the umbrella of legislative privilege?

MR. THOMPSON: The legislator in question, I do believe is entitled to decide where he seeks out information and advice for purposes of performing his legislative functions.

THE COURT: I agree with that. That doesn't mean it rises to privilege though.

MR. THOMPSON: Well, if we do not apply the privilege wherever legislators find it necessary to get information and advice, then it will necessarily inhibit the information and advice in those circumstances.

So the same considerations that weigh in favor of allowing legislators to use their staff, I think, weigh in favor on legislators to draw on third-party resources, insofar as there's a confidential relationship.

THE COURT: Okay. So again, I'm just like real narrow. So let's just focus on Table A and legislative privilege. Do you want to make any other arguments on that?

MR. THOMPSON: Well, Your Honor, I guess as I understand where the plaintiffs are coming from on Table A, and I'm sure my colleague on Zoom will correct me if I'm wrong, I don't think they are really disputing the legislative privilege, that those act within the scope of legislative privilege.

I understand their argument to be that because they believe the privilege to be qualified, the privilege should be

overcome by the fact that they have alleged discriminatory intent in this case.

And so I don't think we've really touched on that yet. I'm happy to --

THE COURT: And so the plaintiffs are asking for the *Rodriguez* case, the five-factor balancing test, to apply. And you say it should not apply.

MR. THOMPSON: Right. We say it should not apply, and in the alternative we satisfy it.

THE COURT: So before I get away from Table A, who is Elizabeth Alvarez?

MR. THOMPSON: My understanding is she is an attorney who was retained by some legislators.

THE COURT: Do we know which ones?

MR. THOMPSON: I believe the ones for whom she is listed on the log. I don't have any reason to disagree with that.

THE COURT: And so she is not employed by the State of Texas, she's just private counsel.

MR. THOMPSON: I understand her to either work at a private law firm or have her own firm. I do not believe she works at the Office of the Attorney General.

THE COURT: Nor does she work for the legislature.

MR. THOMPSON: I don't think she's a W-2 employee of the legislature. I think she is retained counsel by

legislators.

THE COURT: And so then if there's any attorney-client privilege that is applicable, it's only between her and her retained clients.

MR. THOMPSON: I agree. That would be the attorney-client privilege --

THE COURT: Yeah.

MR. THOMPSON: -- at issue.

There would be, of course, common interest extensions of -- excuse me. Insofar as someone were to argue that the attorney-client privilege had been waived by contacting a third party, then we'd of course be in the common interest extension of the attorney-client privilege analysis.

THE COURT: Well, normally there's a common defense extension not a common interest.

MR. THOMPSON: Well, I think it depends on the court you're in. But my understanding, we cited the restatement in our brief and I think the restatement recognizes that common interest applies to non-litigation matters.

THE COURT: Okay. Mr. Dodge, do you want to say anything on Table A?

MR. DODGE: Yeah, I would, just to clarify what my friend on the other side said, Your Honor.

The legislative privilege claims that we are challenging here are bifurcated between Table A and Table B.

And Table B shows instances where on the face of the log the privilege claim has been waived because the log identifies an outsider to the legislative branch who was included on the communications. That oftentimes was a constituent, such as Mr. Alan Vera. That oftentimes was a private attorney, like Miss Alvarez, who you identified. And sometimes it was also members of the executive agencies within Texas.

Table A more broadly represents instances where the State has simply failed -- or rather where the lawmakers have simply failed to meet their burden showing that the privilege applies.

And that's both under the *Perez* factors, but it's also precisely what Your Honor hit upon, which is that this table identifies things like reports, summaries, analyses that were before the legislators when they were considering the bill that are oftentimes, you know, produced by courts, and the log is insufficient to evaluate whether or not they met their burden there.

So that's not just a *Perez* factors claims, exactly what Your Honor indicated, which is that, you know, if a lobbying group or a think-tank were to provide these reports, there's no reason to assume that they are privileged. So I just wanted to clarify that point.

You also mentioned Miss Alvarez, and I'm glad to turn to attorney-client privilege, but that's Table C, and it

sounds like Your Honor wants to discuss Table B.

THE COURT: Yeah. So with regard to Table A -- I'm going to do this very linear so I don't mess up along the way.

So with regard to Table A, I'm going to probably take all these documents into in camera review. I want to satisfy myself because the log does not allow me to make these determinations without looking at the documents on authors, to, from, and CCs, and potentially BCCs, and the log doesn't let me, and maybe a look at the actual document will indicate that it was authored by some other party, and so maybe that will help me understand legislative privilege.

I do agree, though, and at the very least what would be redacted pursuant to legislative privilege would be any notations, writings, anything like that made by the legislators themselves or their staff members. So I agree with that proposition, but Table A I'm going to have to take a further review of.

Now --

MR. DODGE: And Your Honor, if I could --

I apologize, Your Honor, if I could just briefly comment on that point about the handwritten notes.

Handwritten notes and the like, and any other sorts of notations, nothing in the case law grants those kinds of things special status under the legislative privilege. They should still be evaluated under the five *Perez* factors.

And here, if you take a look at the declarations that the lawmakers submitted in conjunction with their response, they really put forth no evidence on the record indicating that release of any of these documents, including their notes, would have any chilling effect on their legislative activity.

And if you look at their response brief, I think their discussion with the fifth *Perez* factors is chill, they discuss it for all of two or three sentences without factual support.

And so while I agree that the handwritten notes may be more sensitive, the lawmakers here still have done very little to meet their burden under the *Perez* factors showing that those should not also be released.

THE COURT: So I'm going to give deference generally to the legislature -- legislators rather -- on leaning towards the redaction of anything, if I order it produced. And I may not. But I'm going to give deference to the legislators' writings, notations, mental impressions, this and that.

But I may apply -- I'm not saying I will -- I may apply your client the *Perez* factors. I call it the *Rodriguez* five-factor balancing test. And so I may look at that to see whether or not that will be applicable as I make an assessment.

And that one, I think it really needs to be done on a document-by-document basis. I don't think I can make some

kind of a global assessment of those five factors. I think it all depends on what each individual document shows.

So that's how I'll proceed on Table A.

So Table B. I think Table B appears to be documents that could be subject to the legislative privilege but there was waiver. And again, I have the same problem here where I can't tell by the log. My log, in many cases, the "to," and the "CC," and the "author" field, and the "subject" field even are completely blank. In some cases it's filled in, but in many cases it's not.

What am I to do with that?

MR. THOMPSON: Well, Your Honor, my understanding, of course, is that we have provided all the information that is available. If, you know, if legislators just have loose documents in their files that do not have "to" and "from" on them, then we're of course unable to provide "to" and "from" information on the log.

I don't think that necessarily affects the privilege analysis to these documents because, is it -- well, we can take it document by document, but for many of these documents we're talking about an analysis of what a legislator should do in his legislative capacity. Is it for an amendment? Should --

THE COURT: Yeah. So let's just take Number 2 on that list for an example.

This is a February 9th, 2021 email from a third party not employed by the legislator. I mean, there's no indication of the "to," the "from," the "subject," the "author." Nothing. I have nothing there.

MR. THOMPSON: I'm sorry, Your Honor. I'm trying to look at the document to see if there's something I can tell you about it.

MR. SWEETEN: Your Honor, that's B2, the document that you were just referencing?

THE COURT: Right.

MR. THOMPSON: It does not appear, to me, to be an email, which I think helps explain why we don't have the "to," or the "from" information.

THE COURT: But it came from somebody who was a third party not employed by the legislature.

MR. THOMPSON: That is correct. It is a written document.

I take it that the reason the log reveals that it was written by a third party is because we wanted to be up front in the privilege log and allow the Court to decide the disputed question of law between the parties, whether, you know, the involvement of a third party waives the privilege.

So as I understand the dispute between the parties, the name of the individual who drafted this is probably not material to the issue of law because both sides agree that the

person who drafted is not a W-2 employee of the legislature.

THE COURT: Let's go to 23 on there. It's a presentation contained in Senator Bettencourt's file, but it doesn't tell me who he gave the presentation to. It wasn't to anybody in the legislature. How does the legislative privilege apply?

MR. THOMPSON: I think it is fair to say it is not obvious from the face of this document whether it was given by Senator Bettencourt or given to Senator Bettencourt. They are talking points that apparently Senator Bettencourt was considering.

Maybe "talking points" is the wrong word. You know, it's some kind of analysis that apparently the senator was considering in performing his legislative functions, and we think that is sufficient to invoke the privilege based on his declaration and the description in the log.

THE COURT: Do you know who Lori Bohannon is?

MR. THOMPSON: Not off the top of my head, Your Honor. If you tell me how to spell the name, then I will --

THE COURT: Yeah. So she's listed in 24 and 25.

MR. THOMPSON: I'm sorry, Your Honor. Off the top of my head, I don't know who that is.

MR. DODGE: Your Honor, I believe she's a county clerk somewhere within the state.

THE COURT: So again, the senator's making

correspondence to someone not employed by the legislature and so I'm having trouble understanding how that could be subject to the legislative privilege, as well as 29, 30, 31, 32, 33, 34, 35, 36, 37. Senator Bettencourt is having some kind of communications back and forth with, quote, "constituents."

How is that subject to the legislative privilege?

MR. THOMPSON: Your Honor, I think this is the same issue we've been discussing. And the reason, of course, this shows up on the log is that we were being up front about the nature of the document.

THE COURT: I appreciate you guys doing that. I do.

MR. THOMPSON: We've had a long-standing dispute with some of the parties in this case about whether it is possible for the legislative privilege to extend to third parties who are either members of the executive branch, or not members of the state government at all.

So I do not at all dispute there will be documents on this log that if you conclude we are wrong on that legal question, then you would conclude that these documents should be produced.

We obviously think we're right on the legal question. I'm happy to get into more detail on that. Of course, it's covered in the briefing so far.

THE COURT: Yeah. No, it's covered in the briefing. And so I'm not making any final rulings, but to be

quite honest with you, I just can't see how it extends that far.

But maybe what we can drill down to right now is, well, how far does it extend. So let's talk about communications to the lieutenant governor or to your office, the OAG. And most of these communications are to the lieutenant governor's office not to the governor's office.

If there's communications between legislators and the lieutenant governor, how does that get encompassed within the legislative privilege?

MR. THOMPSON: The lieutenant governor plays an integral role in legislation and the legislative branch as in Texas, as this Court probably knows. I think it's widely understood that he's the president of the Senate and he has probably more day-to-day involvement in legislation than even the governor does. I think that's generally agreed among everybody.

THE COURT: Well, it certainly was the case with previous lieutenant governors.

Now, let's talk about, though, under the system of the State Constitution. Under the Texas Constitution the lieutenant governor falls within the executive branch, though, not the legislative branch, correct?

MR. THOMPSON: I agree with Your Honor that the Texas Constitution says the executive branch consists of, ellipses,

and includes lieutenant governor. It of course also gives him legislative responsibilities.

THE COURT: So but he gets to vote, but only in the event of a tie, correct?

MR. THOMPSON: That matches my recollection.

THE COURT: Does the lieutenant governor get to introduce legislation?

MR. THOMPSON: I believe there are situations in which he does but I don't want to swear to that as a matter of Texas law. I know certainly that the lieutenant governor often publicly releases a list of his legislative priorities for what he wants to --

THE COURT: So does the governor. That doesn't make him part of the legislature.

MR. THOMPSON: Well, it does, though, mean that the governor gets to assert legislative privilege. There are a number of cases saying that the governor can assert legislative privilege --

THE COURT: Don't get me confused, because the governor is not subject to any of this. So let's talk about the lieutenant governor.

MR. THOMPSON: Sure. I guess, just to be clear, the reason I'm talking about those cases is that everyone agrees the governor is part of the executive branch in the same sense the lieutenant governor is, but nonetheless, the governor can

assert a legislative privilege because of his legislative role.

It's not just the issue we were talking about, the legislators who have a privilege can communicate with the executive branch without waiving it, it's that even if a legislator does not assert legislative privilege the governor can assert legislative privilege over his own documents, for example, when they relate to things like how he is trying to influence legislation, whether he will sign or veto it, for example.

So cases like *Hubbard* from the Eleventh Circuit included both I think a governor and a former governor.

*American Trucking Associations* from the First Circuit included Rhode Island's former governor making a legislative privilege claim.

This is, I think, fairly commonplace. If it is true for the governor, I think it is *a fortiori* true for the lieutenant governor who has a more significant legislative role, in most people's view, including, I think, courts in Texas.

THE COURT: Mr. Dodge, do you want to chime in on the lieutenant governor issue?

MR. DODGE: Sure, Your Honor.

As an initial matter, I'm not aware of any case within the Fifth Circuit that has recognized that the federal

common law state legislative privilege extends to the governor. Frankly, I don't think one exists. I'm frankly not aware of one that extends to the lieutenant governor.

The one case that they do cite addressing the lieutenant governor comes from the District of Columbia, and the framework that that court adopted was it concluded that where a communication had to do with "one of the specific enumerated duties, all of the lieutenant governor" -- who is of course a member of the executive department in Texas, if he was acting towards "one of his specific enumerated duties toward the Senate, then the legislative privilege applies."

We don't actually agree with that analysis. We don't think any privilege applies. We think that the D.C. Court was flawed in its analysis. It relied on immunity cases rather than privilege cases to make that conclusion. But even if you adopt that framework, this is the only case that the lawmakers cite concerning lieutenant governor.

Even if you adopt that framework, the lawmakers here have not explained at all how any single one of the communications involving the lieutenant governor's office falls within the scope of one of his enumerated duties towards the Senate. These are things like appointing committee chairs, breaking ties, certain duties towards the committee of the whole Senate.

But what little can be gleaned from the privilege log

suggests that these communications were commentary on bills proposing legislation. Those are not duties of the lieutenant governor under the Texas Constitution. Those are, you know, things that any member of the public can do.

And so, you know, we disagree that this privilege extends to the lieutenant governor or the governor at all. The only on point case they cite offers a limited framework that they have not provided any analysis under.

And with respect to the cases that my friend was just mentioning, you know, we largely explained this in our brief, but the *Hubbard* case from the Eleventh Circuit, that has been distinguished by district courts within this circuit, including the *Bryant* decision.

We also think that's a very flawed decision on its own terms. It's serially conflated cases applying the federal Constitution Speech and Debate Clause as well as state absolute immunity with the more qualified state legislative privilege.

And so, again, even sort of giving the lawmakers every break here, I think there are two reasons why these lieutenant governor communications need to be produced.

One, the *Holder* analysis. They haven't provided any explanation how that applies here. And two, even on most of these lieutenant governor communications, there is someone outside of the state government involved, typically Miss

Alvarez, who you have identified.

So this isn't a situation where it's just a legislator's staffer talking to the lieutenant governor's office. There are typically a number of other individuals on virtually all the communications at issue here with the lieutenant governor's office. And so I think for those two reasons in particular all these lieutenant governor communications also need to be produced.

THE COURT: This one is a tricky one. I'm going to take that one under advisement.

Now, the other tricky part of all this is the communications with Mr. Ingram. So Mr. Ingram is employed as the Director of the Secretary of State's Election Division. So how does the legislative privilege apply to that?

MR. THOMPSON: I think it's like our discussion about third party generally except perhaps even stronger. Some courts that have not really confronted or agreed with our position on people outside of government have, nonetheless, said that executive branch officials, their involvement in communications with legislators should not waive privilege because it is so commonsensical the legislators would seek out information and advice from executive officials with important information related to the bills they want to draft and pass.

I think it is entirely normal, and we would expect legislators to say, "Mr. Ingram, as the Director of Elections,

may have important information for me to consider as I draft a bill." That's probably good for society as a whole to get more information like that from somebody who knows what he's talking about.

If we say that that waives privilege and that, you know, is subject to discovery from anybody who can come into court with an allegation of discriminatory intent, which is to say everybody, then presumably people are not going to make that kind of inquiry in the future and that will serve everyone poorly.

THE COURT: But, you know, the trouble is so where do we draw the line to this? So if we take this outside this case, and let's go back to my oil and gas case, you are saying it's commonsensical you would get advice.

So I'm a west Texas legislator, it would seem like common sense that I call my oil and gas buddies in the area and ask them how is this bill going to affect you, and all of that becomes subject to a privilege?

MR. THOMPSON: Well, Your Honor, I think we can take it even farther. We can take the hypothetical to what if it's an executive branch official, to what if it's a lobbyist. If Your Honor will permit me, I'll take it in the other direction. What if it's a staffer.

I'm not sure why the staffer should be any different, but the Courts have concluded they are nonetheless third

parties. They are not legislators. They do not own the privilege. Of course, legislators in some technical sense could perform their duties without confidential communications with staffers. We just recognize that it would be bad for the legislative process.

THE COURT: I don't need to go that far though. I think legislators ought to be able to talk to their staffers. They are paid staffers. I think that makes perfect sense. If I'm making the rules, that would be subject to privilege.

The problem I have and what we are discussing here is when it gets outside that group. It goes to the lieutenant governor. It goes to Mr. Ingram. It goes to outside lobbyists. It goes out to people I can't even identify in these privilege logs. That's where I'm having the problem.

MR. THOMPSON: Let me try one more pitch then.

I think I understand Your Honor's need for a dividing line, a limiting principle somewhere. What we would propose is the limiting principle should be based on the justification for the privilege in the first place. Because the justification for the privilege is based on the need for confidential information and advice, then the limiting principle should be based on whoever has that kind of pre-existing relationship for providing confidential information and advice.

If we draw the limiting principle based on the

employment status of the people in the conversation, it doesn't seem to be tied to the reasons we recognize the privilege in the beginning.

THE COURT: So I think we were on Mr. Ingram.

Mr. Dodge, do you want to respond to that?

MR. DODGE: If I could, Your Honor. A couple points.

I mean, with respect to my friend's suggestion what the limiting principle is, saying that it's whoever the legislator needs to speak to in confidence is no limiting principle at all. That is a mere suggestion of, you know, no matter how far afield the individual is a legislator has claimed that, "Oh, well, I really needed this person's input on a particular piece of legislation."

A much more sensible limiting principle, and one that is actually reflected in current Fifth Circuit law, is that it should be within the legislative sphear itself, and that is because the limiting principle behind the privilege is highly rooted in the separation of powers.

The purpose of the privilege is to protect legislators from investigation by the executive branch, or from conviction by the judicial branch, and that's why basically all Fifth Circuit law on this issue right now reflects that the dividing line is the legislative sphear itself.

If you're within the legislative sphear, privilege

can apply. Once you go out of it, the rational ceases because you are no longer operating within the legislative branch of government.

And you know, I don't need to go through the cases, they are in our brief, but that's the current state of Fifth Circuit law. The test is any outsider to the legislative branch.

And so to that extent, current law does not recognize the distinction between a man on the street or Mr. Ingram at the Secretary of State's office. I certainly think it's much clearer cut when you start talking about constituents, lobbyists, think-tanks. But again, the sensible line is the legislative branch itself.

MR. THOMPSON: If I may, Your Honor --

THE COURT: Yeah.

MR. THOMPSON: -- one clarification.

When my colleague on Zoom is talking about Fifth Circuit law, I'm reasonably confident he means district courts contained within the Fifth Circuit. I believe they cited one Fifth Circuit case, *Jefferson*.

But *Jefferson*, of course, stands for the proposition that the evidentiary privilege doesn't bar the adjudication on the merits of the claim. Doesn't really say much about how to apply legislative privilege.

I believe they have conceded in their reply brief

that they would like the Court to split with the Eleventh Circuit, to disagree with the analysis in that case. Your Honor well knows that the Fifth Circuit is always cheery to create a circuit split. Asking the Fifth Circuit to split with the Eleventh, the First, and the Ninth, would be quite a lift, Your Honor.

MR. DODGE: Well, if I could respond to that, Your Honor.

It's not creating a circuit split because the Fifth Circuit was already very clear in the *Jefferson* decision that the privilege here is qualified. That is based on Supreme Court law in *Gillock*. So there would be no creation of a circuit split.

With respect to my friend's comment about the sources of law establishing that the privilege is limited sort of at the border of the legislative branch, that's true that there are probably seven or eight district court decisions within this circuit reflecting that rule.

It's also wildly adopted elsewhere. I would have you look, for example, at the *Lee versus Virginia State Board of Elections* case from the Eastern District of Virginia which applied the same rationale and said there is no privilege when a legislator communicates with a state agency because they have gone beyond their branch to speak to an outsider.

And, you know, with respect to sort of the handful of

out-of-circuit cases that the other side relies upon, again, many of the cases they are discussing are not even talking about legislative privilege. They are talking about entirely separate legal doctrines.

And so, you know, they use these terms in their response very loosely and you sort of have to tease out which one is actually looking at a state legislative privilege claim. And again, very, very small number, the minority view that they relied upon are uniform cases where the analysis confuses what the source of law is.

MR. THOMPSON: In defense of our friends in the Eleventh Circuit, although they weren't confused, they just disagreed with the plaintiffs. They recognize that there are cases about immunity or about federal legislators and they said, "We, nonetheless, believe they are analogous because that is how the Supreme Court has treated them."

THE COURT: Yeah, I'll take --

MR. DODGE: Just very briefly on that point, Your Honor.

There are some very interesting discussion in the *Gillock* case that I would point the Court to. The Eleventh Circuit relied on the *Brewster* decision to basically say, "Well, the state legislative privilege is exactly the same as the federal legislative privilege."

In the *Gillock* case, the Supreme Court actually

said -- and that case involved the prosecution of a Tennessee state senator for bribery, and the Supreme Court actually said, "Well, if the Speech and Debate Clause applied here, none of this evidence would come in because it's an absolute evidentiary privilege, but because this is not a federal legislator because the Speech and Debate Clause does not govern here, it's more qualified privilege," and the evidence did come in.

And so, you know, that's sort of the final word, as far as whether or not the evidentiary privilege here is absolute or not, regardless of what the Eleventh Circuit said.

THE COURT: Okay. I'll take that under consideration and I'll receive those documents in camera as well.

So let's look at Table C.

Now, this table indicates documents that there's a claim of primarily attorney-client privilege. That's what I want to focus on. I know in some cases work product and legislative -- pardon me -- legislative privilege is also asserted, but I want to focus on just the attorney-client privilege.

So like, Line 1, who is Bill Sargent?

MR. THOMPSON: Off the top of my head, Your Honor, I don't know who Bill Sargent is. I didn't write the log, but it's a privileged statement.

THE COURT: Yeah. You can hopefully understand my

predicament here when I'm having to work just off the privilege log and I can't identify the "authors," the "to," and the "from," and then say from the privilege log that a document is or is not subject to the attorney-client privilege. The log is deficient.

So now, just to be clear, I'm not going to say -- I could say that the log was deficient, accordingly you have waived the privilege. I'm not going to do that to you guys.

But I -- maybe when I see the document in camera it will give me a better indication here about whether or not there's, one, an attorney-client privilege; and, two, a waiver of that privilege. But I can't tell from the log.

MR. THOMPSON: Well, Your Honor, just based on the log, my understanding of what's happening in Line 1 is that we have an attorney for a legislator involved and a third party who was apparently providing confidential information and advice for purposes of legislation.

I think what the log is trying to indicate is that one doesn't waive the legislative privilege by having one's attorney involved, and one doesn't waive the attorney-client by having the legislate -- the third party providing information and advice go through the legislative attorney.

THE COURT: So let's wait a minute here.

So let's go through the parameters of what constitutes attorney-client privilege. One, it's a privilege

because there's an attorney rendering legal advice to a client or a client seeking legal advice from the attorney.

So when we get third parties in here, like Lines 1 through 8 so far and there's a non-attorney, who is a non-client? How do we have an attorney-client relationship, much less an attorney-client privilege?

MR. THOMPSON: Well, so, again, I'm not speaking about the document, not having it in front of me.

One can imagine a situation which the attorney is tasked with legal work regarding the drafting of an amendment or something like that.

One could also imagine the legislator instructing the attorney to receive the information that he wants considered for purposes of how to draft that legislation from someone who he receives confidential information and advice. In that situation, it would appear to be at the intersection of attorney-client privilege and legislative privilege.

THE COURT: The alternative way of arguing this, is this is a subterfuge to receive documents under the cloak of attorney-client privilege so there won't have to be a disclosure of these documents' existence.

MR. THOMPSON: Well, I certainly would not say that, Your Honor. I think the document Your Honor has pointed to, and all the ones near it that I see, seem to also assert legislative privilege.

THE COURT: Well, who is Alan Vera?

MR. THOMPSON: That one I do know off the top of my head. He is a member of the Harris County Republican Party who frequently testifies before the legislature on election integrity issues. I believe he has a title, something like Chairman of the Harris County Republican Party Ballot Security Committee, or something like that.

THE COURT: So because Mr. Vera is an author of a document and sends it to a lawyer rather than sending it to Senator Bettencourt directly, that now -- if the lawyer -- I mean, pardon me -- if Mr. Vera had sent something to Mr. Bettencourt directly, there would be no attorney-client privilege, correct?

MR. THOMPSON: I believe that is correct. I don't understand Mr. Vera to be an attorney. Of course, I could be wrong.

THE COURT: Right. And whether he was an attorney, he had to be an attorney representing the senator, right?

MR. THOMPSON: Agreed, Your Honor. We would need both of those facts for it to be privileged under that ground.

THE COURT: But your argument is because he doesn't send it to the senator directly and sends it to somebody who is his general counsel, also now we have an attorney-client privilege?

MR. THOMPSON: Sorry. To be clear, Your Honor, I

doubt -- having not reviewed the document and not written the log, I doubt there would be a claim of an attorney-client privilege here, if there were not also a legislative privilege issue. I think what's --

THE COURT: Well, that's my problem. On Table C, I'm looking at the log and you are asserting both. Now, I understand your legislative privilege argument. What I'm questioning is attorney-client privilege arguments. Am I making sense?

MR. THOMPSON: I think you are making sense. Perhaps I'm not making sense.

THE COURT: So, you know, so I agree with your argument that may or may not be applicable as to legislative privilege, but I'm focusing right now just on attorney-client, and I can't see how because Mr. Vera sends something to Miss Aston, that that's attorney-client. How is that attorney-client?

*(Off the record discussion)*

MR. SWEETEN: What's the number?

THE COURT: The Document Number is 840845850865868.

MR. THOMPSON: Go to C3.

There's another numbering system.

THE COURT: Okay. So while Mr. Sweeten is looking for that, can you help me understand why all this now becomes attorney-client?

MR. THOMPSON: I think the attorney-client relationship at issue in the document Your Honor is talking about is between Miss Aston and the legislator. I think that what is happening is that the log is trying to make clear that the involvement of a legislator's lawyer, regardless of whether that lawyer is a W-2 employee of the legislature or not, should not be understood to waive the legislative privilege because there is an attorney-client relationship between the lawyer and the legislator. I do not think the log is intended to say Mr. Vera has provided confidential legal advice.

THE COURT: No, I understand that. No, I get that.

I just don't understand how a document created by Mr. Vera now gets cloaked with attorney-client and work-product privilege merely because it passed through Miss Aston. That's the part I don't understand.

Did Miss Aston make any annotations, comments on that that got to the senator and possibly that's how there's an attorney-client relationship? But on the face of the log, I can't determine that.

MR. THOMPSON: So I agree with Your Honor that to the extent Miss Aston made comments, that would be a privilege issue for attorney-client. I agree with Your Honor that insofar as it is from Mr. Vera without coming from Miss Aston, that's not the argument we would be making of course.

THE COURT: Yeah. Now let's turn to another issue here.

So there's some documents that are apparently written by a lawyer, Miss Alvarez. But then the CC list is long, and it goes out to the lieutenant governor's office, to the State Affairs Committee. I guess that's part of the legislature --

MR. THOMPSON: Yes.

THE COURT: -- or -- but what does it mean by director? So I was thinking at first it was a State Affairs Committee within the legislature, but then the word "director" confused me. What is the Director of State Affairs? And I don't understand that.

MR. THOMPSON: Your Honor, I'm happy to look at a specific entry, but my understanding is that the legislative staffer who sort of oversees a legislative committee is often referred to as the director.

THE COURT: And then it goes to the Texas Legislative Counsel. So let's talk about that. What do I do about the Texas Legislative Counsel? They are supposed to be an independent bipartisan -- I'm not sure what their existence is. They work for the legislature, right?

MR. THOMPSON: The Texas Legislative Counsel I believe is organized as an agency within the legislature.

THE COURT: Right.

MR. THOMPSON: I believe the speaker and the

lieutenant governor head the Texas Legislative Counsel.

MR. SWEETEN: And Your Honor, with respect to the Texas Legislative Counsel, that is their -- they have attorneys that provide advice to both Democratic and Republican staffers. They try to be neutral with respect to partisanship but they offer bill drafting services to legislators.

Also, under the Government Code Section 306, I think that's in the motion, but the state legislature is set out that those communications are intended to be, you know, confidential, that, you know, for -- open for advice. So that's TLC's, you know, their function.

THE COURT: So help me understand, though, that. So I understand there's supposed to be confidential advice so it may be subject to non-disclosure for purposes of like FOIA requests or something like that.

But let's assume it's an attorney in the Texas Legislative Counsel and he's talking to a legislator. I mean, has an attorney-client relationship been established such that it's entitled to attorney-client privilege and work-product privilege?

MR. THOMPSON: I think so, Your Honor.

So I think we may need to distinguish between TLC as a whole and the individual TLC employee in any given conversation. As I understand it, TLC wouldn't take any kind

of position on, "We should make sure this bill passes, or try to stop this bill from passing," but at least as I understand it if an individual TLC attorney is working with an individual legislator to draft language, then they are, you know, effectively on that legislator's team trying to accomplish that legislator's goals.

THE COURT: I understand all that. And I understand -- I'm not making any advisory opinions here, but -- and I can understand how maybe that would be carved out from FOIA, but I'm having a hard time -- let's go back to my base question.

To have an attorney-client privilege there has to be an attorney-client relationship. And so when TLC lawyers are speaking with these legislators, do they understand that they are their personal attorney and a client relationship has been formed?

MR. THOMPSON: I think so, Your Honor.

They are -- as I understand it, legal services and legal advice provided can certainly include things like bill drafting. It is the sort of thing that lawyers can use their legal training to do and improve.

I'm not aware of any reason that there would not be an attorney-client relationship there when a legislator is asking a licensed attorney to perform a task confidentially for which the legal services of that attorney are relevant.

THE COURT: I mean, so the drafting of legislation should -- of course, it can be done by a lawyer. I mean, it doesn't have to be done by a lawyer, right? That's not necessarily a legal task.

MR. THOMPSON: I'm sure that it's not some rule of law that only lawyers can do that. I agree, Your Honor. I don't think that's the test for whether there are legal services though.

THE COURT: So are they providing legal advice in these documents? Are they saying that we believe this legislation as drafted this way would pass muster under these legal tests, is that what these documents are talking about, or what?

MR. THOMPSON: Well, having not read the documents myself, my understanding is that the lawyers who reviewed them, of course, understand what attorney-client privilege is and made judgment calls about was this providing legal advice or not. I think the legal advice could constitute something broad, like what is the best way to draft this, but it could also be something narrower of course.

THE COURT: Counsel, do you want to chime in on TLC?

MR. DODGE: Sure, and if I could address a few issues, Your Honor.

I mean, I think the lawmakers have a big problem with all the entries on this table, that the fact that their

counsel here can't even identify who the attorney-client relationship is between on each of these entries.

And just going back to the first ten or so, you have a private citizen and a legislator's general counsel, and there's no plausible claim here that, you know, Senator Hughes' general counsel, or Senator Bettencourt's general counsel is in an attorney-client relationship with Mr. Vera or Mr. Sargent, who is a county clerk in Galveston County, that there is any attorney-client relationship there.

And the same goes for these TLC documents. You know, there is nothing in their briefing, there's nothing in the log, there's nothing in the declarations from these TLC individuals where they say, "Yes, it was my understanding that in communicating with Miss Alvarez, a private citizen, I understood her to be my client," or "In communicating with the lieutenant governor's office, I understood that staffer to be my client."

You know, there are some attorneys on some of these entries, but again it's not clear who the attorney-client relationship is between.

And to Your Honor's question about -- or rather to I think my friend on the other side, his point, if I represent a client and he says, "There's a critical document down at the DMV, can you go ask Jimmy at the DMV about this document," and I email Jimmy or I speak to him, that's not privileged. I'm

doing that at the direction of my client and in the service of representing him, but that's not a privileged communication at all because it's a third party who is beyond the scope of the attorney-client relationship.

And for that reason in their briefing, Your Honor, we are hearing for the first time about this common legal interest plan to try and pave road that they have all these disparate groups and it's not clear that any of them are actually clients of any of the attorneys on the communications.

But they have done nothing to establish this common legal interest. We have no declarations from any of the TLC people identified. We have no declarations from Miss Alvarez. We have no declarations from the lieutenant governor's office saying, "When making these communications I did so with the understanding that we were represented by common counsel," or that, "We were represented by separate counsel but we were working in conjunction towards a common legal goal," you know ahead of litigation. There is absolutely no evidence of that in the record.

With respect to the TLC, very narrowly, what the Texas Code says is that "Communications with TLC attorneys might be privileged if certain factors are established." Again, there is nothing in the record, there are no declarations from TLC attorneys actually establishing those,

you know, statutory requirements to establish a privilege. Never mind that that statute most likely does not govern here.

So again, you know, it's their burden to show that these are privileged documents. And the fact that counsel here can't even say who the attorney-client relationship is with means that they have failed to meet their burden on every single one of the entries on this table.

THE COURT: Yeah. The closest you seem to have come is, you know, there's I think -- I can't remember if it's Senator Bettencourt or someone else saying, "Well, I intended this stuff to be confidential." That doesn't establish any attorney-client relationship.

It doesn't say that -- you know, it just -- you know, a lot of us say things that we hope are confidential and it turns out to be that's not subject to any kind of privilege at all.

Okay. I'm --

MR. THOMPSON: One last point, Your Honor.

THE COURT: Sure. Go ahead.

MR. THOMPSON: There is also a declaration from Jonathan White discussing the attorney-client relationship there.

THE COURT: I remember that one too, yeah.

So I'm going to take all this under advisement.

I think it's within my authority to say there's a

wholesale waiver of a deficient privilege log, but I'm not going to go there. And so I'm going to carefully look at each of the documents, assess whether a privilege applies, what privilege applies, if a privilege applies.

Then I'm going to go look to see whether or not the *Rodriguez* five factors should or should not apply. I'm going to give deference to the legislators and their staff members and communications between that group, and give high deference to that as I do this analysis, but I cannot make any kind of final decisions today on the basis of this log.

Do you have those 200-and-so documents?

MR. THOMPSON: We do, Your Honor.

MR. SWEETEN: We brought all of them. They are in three boxes and I can work with your staff on how to get those --

THE COURT: 200 documents are three boxes?

MR. SWEETEN: They are. Well, one of them is like a really big document.

MR. THOMPSON: My understanding is one of the documents is some kind of data table or something like that, just a huge number of pages that our staff printed.

THE COURT: This is going to be fun. If you can -- Miss Doxey will escort you back to chambers and give me the boxes.

Mr. Dodge, do you want to say something?

MR. DODGE: Yes. One brief point.

There's also a fourth table in our motion, Your Honor. It's the shortest. It's about their claim of a lawmaker's assertion of an investigative privilege. It's one document. It's only two pages.

And it all more or less concerns a document that Alan Vera, who my colleagues on the other side mentioned before, sent into -- it's not clear, either the legislator's or the AG's office compiling what he alleged to be instances of alleged voting irregularities or violations.

And so in addition to claiming legislative privilege over these dozen or so documents, they also claim investigative privilege. That's addressed in our briefing. I'm happy to discuss it, if Your Honor would like.

THE COURT: Thank you. Somehow or another in all of this I went to A, B, C, and I didn't get to D.

Are you producing documents that are subject to D as well?

MR. THOMPSON: If by "producing," you mean we have them printed out.

THE COURT: No. To me, for in camera review.

MR. THOMPSON: We have that.

THE COURT: Okay. I will get back to you as soon as I can.

While we're at it, so this necessarily has a broader

group than just you-all, but the State today filed a motion for an extension of the scheduling order, pursuant to the Fifth Circuit's reversal of me on the denial of letting the Texas Republican -- or not Texas -- national Republican groups intervene in this case because we need more people in this party.

I ordered them today to be allowed to intervene, pursuant to the Fifth Circuit's decision. That's necessarily going to result in a delay in this case. That's number one.

And then number two is, it's going to take me a little bit to get through these rulings here on these documents.

And, par for this course, I fully expect to have an interlocutory appeal of any documents that I may decide to produce, which is going to lead to yet more delay, and so that ought to be a strong signal to the plaintiffs' groups.

I know you-all oppose and I know the US attorneys oppose, it's going to be granted to some extent. You-all need to work out with each other on this scheduling order, but I am left with no choice, pursuant to what the Fifth Circuit has ruled upon, other than to allow an extension here not to -- that's even apart from the valid reason that these lawyers have that you guys have a lot of cases going on.

So you-all are ordered to meet and confer and come up with an agreed upon scheduling order. If you can't, then what

I will entertain is a State defendants' proposed scheduling order, and the plaintiffs' proposed scheduling order, and then I'll make the decisions for you-all. That's not how this should work though.

MR. SWEETEN: Your Honor, we are happy to meet with plaintiffs' counsel. We will do so next week and we'll work towards something that may be agreeable for a continued scheduling order that would include the new intervenors and all parties.

THE COURT: Mr. Dodge, anything else today?

MR. DODGE: Not on the motion to compel, Your Honor, but I can tell from screens blinking on the Zoom that I think a number of my co-plaintiffs' counsel would like to be heard briefly on the scheduling issue, if you'll allow.

THE COURT: Sure. I'll just go first by who I see.

Mr. Freeman, do you want to say anything?

MR. FREEMAN: Yes, Your Honor.

We very much hear you with respect to the need for an extension in this case. We would ask, if possible, if you could let the parties know when you have availability for a trial in this matter. Obviously, we don't want to build the schedule around a trial date when Your Honor is not available to conduct a trial.

We also have not heard from the Republican Party intervenors as to whether they do, in fact, seek additional

discovery. The State's motion presupposes that, but to the extent the Republican Party intervenors do not actually seek additional discovery at this time, it may not be necessary to actually push forward the schedule.

I would note --

THE COURT: Well, we still have the problem of the Office of Attorney General having multiple litigations ongoing and they need a little bit of relief.

MR. FREEMAN: Yes, Your Honor.

The concern that the United States has with respect to that issue is that there is a trial set at the end of September in the redistricting matter where both the Office of the Texas Attorney General, and the United States, as well as attorneys from MALDEF are involved in both matters, and so to the extent this matter is pushed back we are going to have those two matters collide.

The State has also asked for a stay of that matter. That stay was rejected, and so we are running headlong into another trial in the western district involving many of the same attorneys.

THE COURT: Yeah. All I can tell you-all is you-all are going to have to work together. I mean, you-all are the lawyers in these fights and there's only so many hours and so you-all need to work together.

So as part of this meet and confer, someone get a

hold of the Republican National Committee intervenors and ask them what, if anything, they want to do and work them into that scheduling order as well, but I was trying to be, you know, limiting here about the number of fights, issues, and parties in this case, but the Fifth Circuit believes otherwise and so I just need to do what I'm told and that's what I'm doing.

Who else do we have on the line?

Miss Yeomans, do you want to say anything?

MISS YEOMANS: I don't have anything to add, your Honor, thank you.

THE COURT: Mr. Morales-Doyle.

MR. MORALES-DOYLE: I don't have anything to add either, Your Honor, though I would ask that to the extent Your Honor -- maybe this is presupposing that we can work out among yourselves, but I don't know if Your Honor has any guidance for us about the extent to which the Republican Party is entitled to discovery, because, you know, we don't know what they are going to ask for but it's going to be hard to take into account --

THE COURT: Yeah, so --

MR. MORALES-DOYLE: -- what time is necessary for documents.

THE COURT: Yeah. So that's a valid point.

So I'll give this general guidance. One is when you

ask me about trial dates, you-all feel free to coordinate with Miss Fernandez and she'll tell you what my calendar looks like, and so that's open to you.

With regard to discovery that the intervenors may want, we're not going to repeat discovery. So the intervenors are entitled to copies of whatever depositions have already been taken, discovery documents taken.

But the intervenors really need to show, in my mind, good cause for why they need additional discovery beyond what's already been taken, with what parties have been taken, because my mind-set that was going on when I denied the intervention is I don't know why the intervenors couldn't just file an amicus brief like other parties wanted to do.

If they want to assert -- I have no idea what they want to do, but if they want to assert new claims, they are, of course, now entitled to do so. And it could very well be that they don't want more discovery, but you-all will need discovery on whatever claims -- new claims they assert.

That's where I'm assuming this is headed, but we're not going to repeat discovery for the mere prospect of repeating discovery and forcing parties to waste time and expenses and being duplicative in discovery.

So hopefully that provides some kind of guidance.

MR. MORALES-DOYLE: That's very helpful, Your Honor. Thank you.

THE COURT: Anybody else, last word?

MR. THOMPSON: Your Honor, I think I saw Mr. Gore on the Zoom, who represents the Republicans as I understand it.

THE COURT: Okay. Mr. Gore, do you want to say anything?

MR. GORE: Good afternoon, Your Honor.

Yes. Thank you for giving us this opportunity to address the discovery issue.

We're at a little bit of a disadvantage since we haven't been involved in the discovery, so we appreciate Your Honor clarifying that we are entitled to the deposition transcripts and documents.

We are hoping to meet and confer to work out a process to get those quickly so we can take stock of whether we need to take any additional discovery and to what extent we need to do so. So we would look forward to participating in the meet and confer process to iron that out.

THE COURT: Are you intending to bring new claims to this?

MR. GORE: We are not intending to bring any new claims.

THE COURT: Oh, well, thank you. That helps.

So the scheduling shouldn't be impacted by that.

And just, Mr. Gore, you know, you are entitled to discovery, but, you know, just, you know, if someone didn't

ask one more question that you wished would have asked, let's not reopen another whole deposition just for that. There may be other ways you could propound that one additional question you think you need to ask, you know, but let's try to keep the train moving.

MR. GORE: Thank you, Your Honor. Understood.

And as I mentioned, we appreciate Your Honor facilitating our participation in the case and look forward to working through these issues through that meet and confer process to the extent we can.

MR. MORALES-DOYLE: Your Honor, if I may just ask one more question. I'm sorry.

THE COURT: Yeah.

MR. MORALES-DOYLE: I think that we've been operating with the presumption here that based on what you said to begin with, that to the extent you are going to grant at least in part the State's request, we need to meet and confer that the trial date will necessarily move, but given what we have just heard from counsel of the Republican Party, I do just want to raise the possibility that there might be room for changing some of the deadlines that we have in this case or extending discovery beyond today without necessarily moving the trial date.

And I wanted to get a sense from Your Honor before we go back to the meet and confer whether you think that's a

possibility, or you have sort of -- you are assuming at this point the trial date is moving.

THE COURT: So maybe it's just because I've worked with Mr. Sweeten in the past case, he's looking pretty tired, if you ask me, and so we can't be dragging all of us collectively and running tired, and so we've got to have some reasonableness in here.

In my mind, the way I look at the cases, the important case right now is the redistricting case, just because timetables have to be met and appeal decisions need to be made and clerks need to understand just what's happening on the ground.

And so that case needs to move forward and my case is secondary to that one, is the way I view things and so you-all need to plan accordingly around that. I understand this case is also important. And so that's not to say this is not important, this is as well, but we've got to work collaboratively together to make this work.

Anything else from --

MR. MORALES-DOYLE: Thank you, Your Honor.

THE COURT: -- the Attorney General's office?

MR. THOMPSON: One housekeeping matter, Your Honor.

Your Honor alluded to the possibility of an appellate review with regard to the privilege issues. I honestly don't know what Your Honor is going to decide or whether the clients

and the appellate lawyers will want to take an appeal, but they do appreciate if I ask the Court in district court proceedings if the Court would consider a stay pending appeal, or a short stay to allow a request for a stay, just in the event that someone concludes appellate review is necessary.

I'm happy to do that in writing, but I understand Your Honor often prefers the oral motion.

THE COURT: Well, let me first look at the documents and see whether I even have to go there. It could very well be that I say you get to keep most of these documents and only a small subset goes, and if I do that, depending on how I rule, then I don't think a stay would be appropriate.

But if I do a wholesale of everything, I could see where your point is taken and I'll make that decision at the time.

MR. THOMPSON: Thank you, Your Honor.

THE COURT: Okay. Miss Doxey will show you back. There are three boxes.

Miss Fernandez, this is for you. I think that needs to be docketed for a motion for new counsel in that criminal case.

We're adjourned.

*(Concludes proceedings)*

-o0o-

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date: 05/24/22

/s/ Gigi Simcox
United States Court Reporter
262 West Nueve Street
San Antonio TX 78207
Telephone: (210)244-5037