**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## <u>ORDER</u>

On this date, the Court considered the State of Texas and the Texas Secretary of State's motion to dismiss all claims brought by the Attorney General of the United States on behalf of the United States (ECF No. 145). After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code") by altering various election practices and procedures pertaining to voter assistance, voting by mail, and more. *See generally id.*

On November 4, 2021, the United States filed suit against Texas and its Secretary of State in his official capacity (together, the "State Defendants"), alleging that certain provisions of S.B. 1 violate federal voting rights law.[1] *See* Compl., *United States v. Texas*, No. 5:21-CV-1085-XR

---

[1] Days before and after the Governor signed S.B. 1 into law, several private plaintiffs also filed suit, alleging that certain provisions of S.B. 1 violate the United States Constitution and federal law. For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating

(W.D. Tex. Nov. 4, 2021), ECF No. 1. On November 30, 2021, the United States filed an amended complaint against the State Defendants. ECF No. 131.[2] The United States alleges that section 6.04 of S.B. 1 violates the Voting Rights Act of 1965 ("VRA") and that sections 5.07 and 5.13 of S.B. 1 violate the Civil Rights Act of 1964 ("CRA").[3] *Id.* ¶¶ 69, 75.

Section 6.04 amends section 64.034 of the Election Code by modifying the oath an assistor must take before assisting a voter in Texas. *See* S.B. 1 § 6.04. The United States contends that section 6.04 violates § 208 of the VRA, which guarantees any voter who requires assistance to vote, by reason of blindness, disability, or inability to read or write, the right to assistance by a person of their choice, other than the voter's employer, union, or agents thereof. ECF No. 131 ¶ 69. Specifically, the United States alleges that section 6.04 violates § 208 of the VRA insofar as it "prohibits a voter's assistor of choice from providing federally protected assistance by limiting permissible actions to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." *Id.* ¶ 68 (quotation marks omitted). The United States asserts that § 12(d) of the VRA authorizes the Attorney General of the United States to enforce § 208 of the VRA against the State Defendants. *Id.* ¶ 6.

Section 5.07 amends section 86.001 of the Election Code by now requiring the rejection of a vote-by-mail application if the applicant's driver's license, election identification certificate, or personal identification card number "does not identify the same voter identified on the applicant's

---

*OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *see also* Order, *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

[2] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

[3] Unless otherwise stated, all references to "CRA" refer to the Civil Rights Act of 1964.

application for voter registration[.]"[4] S.B. 1 § 5.07. Section 5.13 amends section 87.014 of the Election Code by now similarly requiring the rejection of a mail ballot carrier envelope if it does not include a driver's license, election identification certificate, or personal identification card number identifying "the same voter identified on the voter's application for voter registration[.]"[5] *Id.* § 5.13. The United States alleges that these provisions violate § 101 of the CRA because they require the rejection of vote-by-mail applications and mail ballot carrier envelopes based on errors or omissions that are not material to determining whether a person is qualified to vote under Texas law. ECF No. 131 ¶ 75. It submits that § 131 of the Civil Rights Act of 1957, as amended, authorizes the Attorney General to enforce § 101 of the CRA against the State Defendants. *Id.* ¶ 6.

Based on these allegations, the United States seeks a declaratory judgment that sections 6.04, 5.07, and 5.13 violate § 208 of the VRA and § 101 of the CRA. *Id.* at 18. It also requests an injunction barring the State Defendants from enforcing sections 6.04, 5.07, and 5.13, as well as an order directing them "to take appropriate action to ensure uniform compliance with this Court's order by state and local authorities administering the State's electoral processes[.]" *Id.*

On December 14, 2021, the State Defendants filed a motion to dismiss, seeking to dismiss all claims brought by the United States. ECF No. 145. The United States filed a response, ECF No. 195, and the State Defendants filed a reply, ECF No. 223. On March 18, 2022, the State Defendants filed a notice of supplemental authority. ECF No. 333. On March 23, 2022, the United States filed a response to the State Defendants' notice of supplemental authority. ECF No. 338.

---

[4] If the applicant has not been issued a driver's license, election identification certificate, or personal identification card number, S.B. 1 permits an applicant to submit the last four digits of her social security number. *See* S.B. 1 § 5.02. If the applicant has not been issued a social security number, she may instead submit a statement attesting that she has not been issued a driver's license, election identification certificate, personal identification card, or social security number. *See id.*

[5] The same alternative procedures for the submission of a vote-by-mail application discussed *supra* note 4 apply to the submission of a mail ballot carrier envelope. *See* S.B. 1 § 5.08.

# DISCUSSION

## I.   Legal Standards

The State Defendants move to dismiss the United States' claims on two grounds. First, they argue that the United States lacks standing to bring this suit and, as a result, has not met its burden of establishing the Court's subject matter jurisdiction. Second, they contend that the United States has failed to state a claim upon which relief may be granted under § 208 of the VRA and § 101 of the CRA, both because the Attorney General lacks the statutory authority to enforce those federal statutes and because the S.B. 1 provisions at issue are consistent with federal law.

### A.   Subject matter jurisdiction

Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case.[6] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Article III of the United States Constitution both establishes and limits a federal court's constitutional power to adjudicate a case. It "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. CONST. art. III, § 2). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Article III standing, therefore, "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). It provides definition to the constitutional limits of subject matter jurisdiction, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), by identifying "those disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted).

---

[6] Congress, by statute, has proclaimed that the "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The United States asserts claims against the State Defendants under the VRA and CRA. The Court, therefore, is statutorily authorized to adjudicate this case.

A federal court must consider a motion for lack of subject matter jurisdiction "before other challenges 'since the court must find jurisdiction before determining the validity of the claim.'" *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). Further, a federal court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). The party asserting federal jurisdiction has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan*, 504 U.S. at 561.

## B. Failure to state a claim

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims in a complaint for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993).

The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II.    Analysis

The State Defendants assert three main arguments in moving to dismiss the United States' claims. First, the State Defendants argue that the United States lacks standing to sue either Texas or its Secretary of State in federal court to enforce the VRA and CRA. ECF No. 145 at 7–10. Second, they contend that the United States has failed to state a claim upon which relief may be granted. *See id.* at 10–12, 15–18. And third, the State Defendants argue that the United States is textually precluded from enforcing the VRA and CRA against Texas and its Secretary. *Id.* at 12–15, 19–21. The Court addresses each argument in turn, beginning, as it must, with the State Defendants' jurisdictional contentions.

### A.  The United States has standing to enforce the VRA and CRA in federal court against Texas and its Secretary of State.

It is well settled under modern standing doctrine that a plaintiff seeking to vindicate its rights in federal court must first establish Article III standing by satisfying three irreducible requirements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The State Defendants adopt this modern framework for standing and claim that neither the Secretary of State nor any other state official enforces the oath, as revised by section 6.04, that an assistor must take before assisting a voter in Texas. ECF No. 145 at 8, 10. As a result, the State Defendants contend, any injury that the United States has suffered is not traceable to them. *Id.* at 7–10. Thus, they argue, a favorable judicial decision in this action will not redress any injury that the United States has suffered. *Id.*

6

The United States accepts the State Defendants' assumption that it must establish causation and redressability. It responds to the State Defendants' standing argument by first asserting that "the United States may suffer 'injury to its sovereignty arising from violation of its laws[.]'" ECF No. 195 at 10 (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). The United States then contends that injury to its sovereignty is "fairly traceable to Texas, which enacted and codified SB 1 and implements SB 1 through state officials and entities, and to Secretary Scott, who is the chief election officer of the state and is instructed by statute to obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* at 11 (quotations and citations omitted). Thus, the United States concludes, its "injury is likely to be redressed by an injunction barring the State and Secretary Scott from implementing or enforcing the challenged provisions of SB 1." *Id.*

Notwithstanding the parties' apparent agreement, whether the United States must satisfy the modern tripartite test for standing to enforce the VRA and CRA against a state or state official in federal court is, in the Court's assessment, an open question.[7] *See Alden v. Maine*, 527 U.S. 706, 755 (1999) ("A suit which is commenced and prosecuted against a State in the name of the United States by those who are entrusted with the constitutional duty to 'take Care that the Laws be faithfully executed,' differs in kind from the suit of an individual[.]") (quoting U.S. CONST. art II, § 3); *United States v. Texas*, 143 U.S. 621, 646 (1892) ("The question as to the suability of one

---

[7] Legal scholars have observed that modern standing doctrine is not always applicable when evaluating whether a sovereign entity has standing to sue in federal court. *See* Seth Davis, *Standing Doctrine's State Action Problem*, 91 NOTRE DAME L. REV. 585, 587 (2015) ("Standing doctrine requires private litigants to show a concrete, imminent, and personal injury-in-fact traceable to the defendant and redressable by a judicial remedy. Yet the doctrine does not require the same showing from government litigants."); Richard H. Fallon Jr., *The Fragmentation of Standing*, 93 TEXAS L. REV. 1061, 1080 (2015) ("The Supreme Court apparently never intended that the injury in fact, causation, and redressability requirements would apply to the federal and state governments in the same way as to private litigants."); Tara Leigh Grove, *Standing Outside of Article III*, 162 U. PA. L. REV. 1311, 1322 (2014) ("Under current law, the executive may assert in court the federal government's sovereign interests without satisfying the injury, causation, or redressability requirements that the judiciary applies to other actors.").

government by another government rests upon wholly different grounds."). *But see California*, 141 S. Ct. at 2113 ("Neither the individual nor the state plaintiffs have shown that the injury they will suffer or have suffered is 'fairly traceable' to the 'allegedly unlawful conduct[.]'").

It should come as no surprise that the law of Article III standing is not amenable to bright-line rules. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, nor when we say that this very fact is probably proof that the concept cannot be reduced to a one-sentence or one-paragraph definition."). Over time, the Supreme Court has evaluated Article III standing on a case-by-case basis, with due care for the facts and legal doctrines implicated in each case. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 757–58 (2013) (concluding that the United States has standing on appeal, despite its agreement with the lower court's constitutional ruling, provided that it intended to enforce the lower court's adverse judgment); *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (finding that Massachusetts "is entitled to special solicitude" in standing analysis because Congress authorized a "procedural right" and the Commonwealth has a "stake in protecting its quasi-sovereign interests").

Thus, consideration of whether and when the United States has standing to sue a state or state official in federal court to enforce federal statutes like the VRA and CRA must also account for the unique facts and legal doctrines implicated in such cases. *See Allen v. Wright*, 468 U.S. 737, 761 (1984) ("Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."). Since subject matter jurisdiction "should be considered when fairly in doubt[,]" *Iqbal*, 556 U.S. at 671, the Court undertakes a searching inquiry

that extends beyond the modern tripartite test for standing to determine whether the United States has standing to sue Texas and its Secretary of State in federal court to enforce the VRA and CRA. *See Henderson v. Stalder*, 287 F.3d 374, 379 n.5 (5th Cir. 2002) ("This court is obliged to raise the jurisdictional issue of standing *sua sponte* despite the parties' failure to raise it.").

### 1.     The United States has standing under *Debs*.

Over a century ago, the Supreme Court decided *In re Debs*, 158 U.S. 564 (1895), a case concerning the American Railway Union's strike against the Pullman Palace Car Company. In *Debs*, the United States sought an injunction in federal court against members of the American Railway Union to stop the strike, arguing that the strike had obstructed interstate commerce broadly and the delivery of domestic mail specifically. 158 U.S. at 565–70. The Supreme Court held that the United States had the authority to obtain injunctive relief in federal court against private parties to remove an obstruction to interstate commerce. *Id.* at 584. It explained that its holding was premised not only on the fact "that the United States have a property in the mails," but also on the more general principle that "[e]very government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other[.]" *Id.* at 583–84. Citing *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888), and *United States v. American Bell Tel. Co.*, 128 U.S. 315 (1888), the Supreme Court elaborated:

> It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the constitution are intrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from

taking measures therein to fully discharge those constitutional duties.

*Id.* at 586. "[I]njury to the general welfare," the Supreme Court determined, "is often of itself sufficient to give [the United States] a standing in court." *Id.* at 584.

In this case, the United States alleges that S.B. 1 "restricts eligible voters' ability to cast a ballot and have that ballot counted in several respects." ECF No. 131 ¶ 1. Specifically, it contends that sections 6.04, 5.07, and 5.13 of S.B. 1 "deny eligible voters meaningful assistance in the voting booth and require rejection of mail ballot materials for immaterial errors or omissions" in violation of § 208 of the VRA and § 101 of the CRA. *Id.* ¶ 2. According to the United States, "Prohibiting assistors from answering voters' questions, responding to requests to clarify ballot translations, and confirming that voters with visual impairments have marked a ballot as intended will curtail fundamental voting rights without advancing any legitimate state interest." *Id.* ¶ 4. It further alleges that "[c]onditioning the right to cast a mail ballot on a voter's ability to recall and recite the identification number provided on an application for voter registration months or years before will curtail fundamental voting rights without advancing any legitimate state interest." *Id.* ¶ 5.

Although "States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised," *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50 (1959), "[i]t is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure[,]'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). "The right to vote is a civil right deeply embedded in the Constitution[,]" *Oregon v. Mitchell*, 400 U.S. 112, 138 (1970), and "the Constitution vests broad power in Congress to protect the right to vote," *Shelby County v. Holder*, 570 U.S. 529, 570 (2013) (Ginsburg, J., dissenting). *See also Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("Undeniably the Constitution of the United States protects the

right of all qualified citizens to vote, in state as well as in federal elections."); *Baker v. Carr*, 369 U.S. 186, 208 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution[.]").

Acting upon its broad constitutional power to protect the right to vote, Congress passed the Civil Rights Acts of 1957, 1960, and 1964 "to cope with the problem [of voter discrimination] by facilitating case-by-case litigation against voting discrimination." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). These civil rights laws, however, did "little to cure the problem of voting discrimination." *Id.* As a result, Congress passed the VRA in 1965 "to address entrenched racial discrimination in voting, 'an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution.'" *Shelby County*, 570 U.S. at 535 (quoting *Katzenbach*, 383 U.S. at 309); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021) ("Congress enacted the landmark Voting Rights Act of 1965 . . . in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race."). In short, the Constitution and federal statutes derived therefrom, including the VRA and CRA, protect every citizen's right to vote. The United States charges that sections 6.04, 5.07, and 5.13 of S.B. 1 violate the VRA and CRA and undermine the right to vote. These allegations contemplate injury to the general welfare, so they are sufficient to establish that the United States has standing under *Debs* to enforce the VRA and CRA against Texas and its Secretary of State in federal court.

It is true that some courts have read *Debs* "as depending upon one or more of the particular elements of the facts on which it was decided, e.g., a situation of national emergency, a case where Congress had exercised the constitutional power which was impugned by the action sought to be redressed, the harm was a public nuisance, and there was a statute authorizing suit on which the

decision could have been grounded."[8] *United States v. Solomon*, 563 F.2d 1121, 1127 (4th Cir. 1977). Yet, "[n]either the Supreme Court nor the Fifth Circuit have expressly limited *Debs*'s implications for standing, at times offering both more expansive and confined readings of the scope of the interests supported by *Debs*." *United States v. Texas*, No. 1:21-CV-796-RP, 2021 WL 4593319, at *17 (W.D. Tex. Oct. 6, 2021), *cert. granted before judgment*, 142 S. Ct. 14 (2021).

In any event, the United States in this case seeks to vindicate its citizenry's right to vote by enforcing the VRA and CRA. Therefore, this case—like *Debs*—is one where Congress has exercised its constitutional power, and the United States alleges that Texas and its Secretary of State have impugned that power by enacting and implementing sections 6.04, 5.07, and 5.13 of S.B. 1. Additionally, the United States is acting—as it did in *Debs*—pursuant to federal statutes authorizing suit upon which the Court may ground its decision. And significantly, the United States' allegations raise serious concerns that Congress has deemed sufficiently important as shown by its enactment of the VRA and CRA.

Indeed, the United States alleges that the State Defendants are limiting its citizens' ability to vote and that Texas has a history of voting-related discrimination. ECF No. 131 ¶¶ 4–5, 14–15. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555. "States have no power to grant or withhold the franchise on conditions that are forbidden by the" Constitution, *Katzenbach v. Morgan*, 384 U.S. 641, 647 (1966), and "once the States grant the franchise, they must not do so in a discriminatory manner[,]" *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). Thus, in "the absence of additional guidance from the Supreme Court and the Fifth Circuit as to the scope of *Debs*'s standing analysis," *Texas*,

---

[8] Typically, courts have found that the United States has standing to sue under *Debs* when the case at issue involves interstate commerce. *United States v. Mattson*, 600 F.2d 1295, 1298 (9th Cir. 1979).

2021 WL 4593319, at *16, the Court concludes that the United States has standing under *Debs* to enforce the VRA and CRA against the State Defendants in federal court.

In enacting the VRA and CRA, Congress authorized the United States to enforce them. *See United States v. Raines*, 362 U.S. 17, 27 (1960) ("[W]e think it perfectly competent for Congress to authorize the United States to be the guardian of th[e] public interest in a suit for injunctive relief."). The Executive Branch has a constitutional "duty to 'take Care that the Laws be faithfully executed.'" *Allen*, 468 U.S at 761 (quoting U.S. CONST. art. II, § 3); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch[.]"). To fulfill its constitutional duty to take care that the laws are faithfully executed, the United States, through its Attorney General, now seeks to vindicate its citizenry's right to vote by enforcing the VRA and CRA. The Court now has the concomitant constitutional duty to adjudicate this case. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *see also F.E.R.C. v. Mississippi*, 456 U.S. 742, 795 (1982) (O'Connor, J., concurring) ("[T]he Framers substituted judicial review of state laws for congressional control of state legislatures.").

When assessing standing, the Supreme Court has "stressed that the alleged injury must be legally and judicially cognizable." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). "This requires, among other things, . . . that the dispute is 'traditionally thought to be capable of resolution through the judicial process[.]'" *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). Federal courts, on many occasions, have adjudicated cases concerning the validity of state legislation in relation to federal law. For example, as early as 1819, the Supreme Court reviewed the constitutionality of state legislation and proclaimed that the "government of the United States . . . though limited in its

powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, anything in the constitution or laws of any state to the contrary notwithstanding." *M'Culloch v. Maryland*, 17 U.S. 316, 406 (1819); *see also Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960) ("When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.").

Federal preemption law also exemplifies federal courts' well-established ability to adjudicate disputes on conflicting state and federal statutes. *See, e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 747 (1981) ("Of course, a state statute is void to the extent it conflicts with a federal statute—if, for example, compliance with both federal and state regulations is a physical impossibility, or where the law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (internal quotation marks and citations omitted); *United States v. Texas*, 557 F. Supp. 3d 810, 815 (W.D. Tex. 2021) ("'As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States' by preempting state law." (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991))). Moreover, the Supreme Court has expressly recognized that "the proper construction of a congressional statute" is "a question eminently suitable to resolution in federal court." *Massachusetts*, 549 U.S. at 516. History and Supreme Court precedent, therefore, support this Court's finding that the United States has standing under *Debs* to enforce the VRA and CRA against the State Defendants in federal court. *See Sprint*, 554 U.S. at 274 ("We have often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider.").

Further, it appears that Supreme Court precedent, at times, has presumed that the United States has standing to sue a state in federal court to enforce federal law. In *Mitchell*, for instance,

the Supreme Court exercised its original jurisdiction over three related cases to consider the constitutionality of three provisions in the 1970 amendments to the VRA. 400 U.S. at 117 n.1. Texas and Oregon initiated two of these cases against the Attorney General of the United States. *Id.* The United States initiated the third suit to enjoin Arizona from enforcing state laws that conflicted with the VRA and its 1970 amendments. *Id.* The Supreme Court resolved these three related cases on their merits, simply noting that "[n]o question has been raised concerning the standing of the parties or the jurisdiction of this Court." *Id.*

Similarly, in *Arizona v. United States*, 567 U.S. 387 (2012), the Supreme Court exercised appellate jurisdiction over a suit initiated by the United States against Arizona to enjoin state legislation on federal preemption grounds. *Id.* at 392–93. The Supreme Court held that certain provisions in the challenged state law were federally preempted, and it did so without questioning whether the United States had standing to sue Arizona in federal court for injunctive relief. *Id.* at 416. Years before, the Supreme Court had clearly established that federal courts must consider their jurisdiction before reaching the merits of a case. *See Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900) ("On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes."). This Supreme Court precedent further supports this Court's finding that the United States has standing under *Debs* to enforce the VRA and CRA against the State Defendants in federal court.

"At bottom, 'the gist of the question of standing' is whether [the plaintiff has] 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Massachusetts*, 549 U.S. at 517 (quoting *Baker*, 369 U.S. at 204). The United States alleges that certain S.B. 1 provisions "will disenfranchise eligible Texas citizens who seek to exercise their

right to vote, including voters with limited English proficiency, voters with disabilities, elderly voters, members of the military deployed away from home, and American citizens residing outside of the country." ECF No. 131 ¶ 3. "These vulnerable voters already confront barriers to the ballot box," the United States contends, "and SB 1 will exacerbate the challenges they face in exercising their fundamental right to vote." *Id.* The United States seeks to enforce the VRA and CRA to ensure that its citizens may exercise their constitutional right to vote. The allegations in the United States' amended complaint establish that the United States possesses a significant stake in ensuring the supremacy of its laws and the general welfare of its citizenry.

Thus, the Court concludes that the United States has standing under *Debs* to enforce the VRA and CRA against the State Defendants in federal court. As the Fifth Circuit has recognized:

> The Constitution cannot mean to give individuals standing to attack state action inconsistent with their constitutional rights but to deny to the United States standing when States jeopardize the constitutional rights of the Nation. Or that the United States may sue to enforce a statute but not sue to preserve the fundamental law on which that statute is based. Or that the United States may sue to protect a proprietary right but may not sue to protect much more important governmental rights, the existence and protection of which are necessary for the preservation of our Government under the Constitution.

*United States v. City of Jackson*, 318 F.2d 1, 15–16 (5th Cir. 1963).

### 2.     The United States has standing under modern standing doctrine.

Even if modern standing doctrine applies in cases where the United States seeks to enforce federal statutes in federal court, the United States has standing in this case to enforce the VRA and CRA against the State Defendants in federal court.

#### a.   Injury-in-fact

Modern standing doctrine requires a plaintiff to show that it has suffered an injury-in-fact "that is concrete and particularized and actual or imminent, not conjectural or hypothetical."

*Spokeo,* 578 U.S. at 339 (quotation marks and citation omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* at 340. Physical and monetary harms "qualify as concrete injuries under Article III." *TransUnion*, 141 S. Ct. at 2204. "Various intangible harms can also be concrete." *Id.* For instance, concrete harms may "include harms specified by the Constitution itself." *Id.* Further, an injury is particularized if it affects "the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quotation marks and citation omitted). The fact that a harm is "widely shared" does not preclude a plaintiff from establishing a particularized injury. *Massachusetts*, 549 U.S. at 522. Finally, an injury is actual or imminent if it has actually happened or if it is certainly impending. *Lujan*, 504 U.S. at 564 n.2.

The United States submits that it "relies on its own sovereign interest in seeing federal law enforced." ECF No. 195 at 12. Undoubtedly, the United States suffers a concrete harm to its sovereignty when its laws are violated.[9] *See Arizona*, 567 U.S. at 398 ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."); *Vt. Agency of Nat. Res.*, 529 U.S. at 771 ("It is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws . . . and the proprietary injury resulting from the alleged fraud); *Texas*, 557 F. Supp. 3d at 820 (indicating that the United States has an interest in enforcing federal supremacy); *Texas*, 2021 WL 4593319, at *14 ("The United States argues that it possesses a 'sovereign interest' in ensuring that States are not able to enact laws in plain violation of the Constitution. There is no doubt that harms to the exercise of Constitutional rights is a concrete harm for Article III purposes." (citing *Pleasant Grove City v. Summum*, 555 U.S. 460

---

[9] The State Defendants do not contest that the United States has suffered an injury-in-fact. Nevertheless, and to the extent the United States must satisfy the three elements under modern standing doctrine, the Court considers whether it has suffered an injury-in-fact *sua sponte*. *See Abraugh v. Altimus*, 26 F.4th 298, 303 (5th Cir. 2022) ("Article III standing is . . . required before a federal district court can exercise subject matter jurisdiction.").

(2009); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993))). In addition, the United States' injury to its sovereignty is actual. S.B. 1 went into effect on December 2, 2021, and sections 6.04, 5.07, and 5.13 were in effect when Texas held statewide elections on March 1, 2022.[10] Primary run-off elections are set for May 24, 2022, and national elections will take place on November 8, 2022.[11]

The United States' injury to its sovereignty is also sufficiently particularized in light of the well-established principle "that the constitution and the laws made in pursuance thereof are supreme[.]" *M'Culloch*, 17 U.S. at 426. The United States is "a government of the people" whose "powers are granted by them, and are to be exercised directly on them, and for their benefit." *Id.* at 405. Thus, "its sovereignty is conditioned on its ability to safeguard the rights of its citizens." *Texas*, 2021 WL 4593319, at *16; *see also Katzenbach*, 383 U.S. at 324 ("[T]he Federal Government [is] the ultimate parens patriae of every American citizen." (citing *Florida v. Mellon*, 273 U.S. 12, 18 (1927); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923))).[12] "Texas is not called to the bar of this court at the suit of an individual, but at the suit of the government established for the common and equal benefit of the people of all the states." *Texas*, 143 U.S. at 646. For purposes of Article III standing, the relevant consideration is that the United States itself has elements of sovereignty that state governments are bound to respect. *See* U.S. CONST. art. VI, cl. 2. When state governments enact laws that impugn the United States' sovereignty, a personal injury to the United States arises. That is precisely the case here.

---

[10] *See* Tex. Secretary of State, *Important Election Dates 2022-2024*, https://www.sos.texas.gov/elections/voter/important-election-dates.shtml#2022 (last visited May 24, 2022).

[11] *See supra* note 10.

[12] The United States may also have standing to file the instant suit in *parens patriae*. *See Texas*, 2021 WL 4593319, at *14–16.

### b. Causation and redressability

Modern standing doctrine also requires a plaintiff to show that its injury is fairly traceable to the defendants and that a favorable judicial determination will redress the injury. *Lujan*, 504 U.S. at 560–61. The State Defendants argue that the United States cannot establish these two elements because the Secretary of State does not enforce section 6.04 of S.B. 1.[13] ECF No. 145 at 8. The State Defendants contend that "the Secretary of State does not require assistors to take the oath, nor is the Secretary charged with enforcing that requirement." *Id.* "That duty," the State Defendants submit, "falls to the presiding election judge in each election precinct, who is 'in charge of and responsible for the management and conduct of the election at the polling place . . . that the judge serves.'" *Id.* (quoting Tex. Elec. Code § 32.071). They maintain that "[t]he election judge, and the clerks serving that judge, are additionally empowered to 'administer any oath required or authorized to be made at a polling place.'" *Id.* (quoting Tex. Elec. Code § 32.074). Thus, the State Defendants insist, "[a]n injunction against the Secretary would not redress the federal government's claimed injury[.]" *Id.*

Fifth Circuit "precedent, however, poses a significant obstacle." *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 399 (5th Cir. 2020). In *OCA-Greater Houston v. Texas*, the Fifth Circuit considered a challenge under § 208 of the VRA to an Election Code provision that imposed a restriction on the interpretation assistance that English-limited voters could receive. 867 F.3d 604, 606–07 (5th Cir. 2017). Texas and its Secretary of State argued in that case that the plaintiff had failed to establish that its injury was traceable to or redressable by them. *Id.* at 612–13. They contended—as they do in this case—that county election officials were responsible for plaintiff's injury. *Id.* at 613. The Fifth Circuit, however, disagreed and held that

---

[13] The State Defendants do not contend that the United States has failed to establish causation and redressability with respect to its claim challenging sections 5.07 and 5.13 of S.B. 1. *See generally* ECF No. 145.

the "facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" *Id.* (quoting TEX. ELEC. CODE § 31.001(a)).

The Fifth Circuit reached the same conclusion based on the same reasoning in *Texas Democratic Party I.* In that case, the plaintiffs sued Texas and its Secretary of State, among other state officials, to secure an injunction that would effectively suspend Texas's vote-by-mail rules as written during the COVID-19 pandemic. *Tex. Democratic Party I*, 961 F.3d at 395. The district court entered a preliminary injunction preventing the state officials from enforcing Texas's vote-by-mail rules as written. *Id.* The state officials then filed an emergency motion for a stay pending appeal, and a motions panel on the Fifth Circuit granted a temporary administrative stay to consider the motion for a stay pending appeal. *Id.*

The state officials argued before the motions panel that the plaintiffs could not establish standing because they could not show causation and redressability. *Id.* at 399. The Fifth Circuit again disagreed, concluding that, although local election officials administered Texas's vote-by-mail statutes in the first instance, the Secretary of State still "has the duty to 'obtain and maintain uniformity in the application, operation, and interpretation' of Texas's election laws, including by 'prepar[ing] detailed and comprehensive written directives and instructions relating to' those vote-by-mail rules." *Id.* (alterations in original) (quoting TEX. ELEC. CODE § 31.003). The Fifth Circuit also observed that "the Secretary of State has the power to 'take appropriate action to protect' Texans' voting rights 'from abuse by the authorities administering the state's electoral processes.'" *Id.* (quoting TEX. ELEC. CODE § 31.005(a)). It noted that these powers include the Secretary's ability "to issue orders and, if necessary, seek a temporary restraining order, injunction, or writ of mandamus." *Id.* at 399 n.19 (citing TEX. ELEC. CODE § 31.005(b)). "Based on that," the Fifth

20

Circuit held, "the state officials have not shown—at least as to the Secretary of State—that they are likely to establish that the plaintiffs lack standing." *Id.* at 399.

The same conclusion under the same reasoning is warranted here. The United States asserts that the "Texas Secretary of State is the State's chief election officer." ECF No. 131 ¶ 13 (citing TEX. ELEC. CODE § 31.001(a)). It alleges that the "Office of the Texas Secretary of State is responsible for coordinating implementation of SB 1 and maintaining uniform application, operation, and interpretation of all state election laws across the State." *Id.* (citing TEX. ELEC. CODE § 31.003). The United States also submits that the Secretary's "relevant duties include, but are not limited to, 'prepar[ing] detailed and comprehensive written directives and instructions' and 'distribut[ing] these materials to the appropriate state and local authorities having duties in the administration of [state election] laws.'" *Id.* (alterations in original) (quoting TEX. ELEC. CODE § 31.003). It asserts that the Secretary is "empowered to 'order a person performing official functions in the administration of any part of the electoral process' to correct any conduct that 'impedes the free exercise of a citizen's voting rights.'" *Id.* (quoting TEX. ELEC. CODE § 31.005(b)).

The United States further alleges that section 6.04 of S.B. 1 revises the oath an assistor must take before assisting a voter in Texas. *Id.* ¶ 41. It contends that this provision violates § 208 of the VRA because it "prohibits a voter's assistor of choice from providing federally protected assistance by limiting permissible actions to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." *Id.* ¶ 68 (quotation marks omitted). It therefore seeks an injunction barring the State Defendants, "their agents and successors in office, and all persons acting in concert with them from enforcing the requirements" set forth in section 6.04. *Id.* at 18. According to the United States, these allegations establish that its injury is traceable to and redressable by the State Defendants. The Court agrees.

21

The Secretary "is the chief election officer of the state." TEX. ELEC. CODE § 31.001(a). As chief election officer, the Secretary must "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.003. "In performing this duty," the Election Code explains, "the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code." *Id.* The Election Code also charges the Secretary with "distribut[ing] these materials to the appropriate state and local authorities having duties in the administration of these laws." *Id.* Section 6.04 and the revised oath articulated therein are a constituent part of the Election Code. The Secretary, therefore, is required to prepare detailed and comprehensive written directives and instructions relating to section 6.04. The Secretary must then distribute any and all prepared materials relating to section 6.04 to local authorities having duties in the administration of section 6.04, including, for example, election judges and clerks.

The Election Code further provides that the Secretary must "assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.004(a). The Secretary shall also "maintain an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b). Thus, if an election authority has a question concerning the application, operation, or interpretation of section 6.04, the Election Code requires the Secretary to assist and advise the election authority on this matter. It is axiomatic that the Secretary must have a stance on the application, operation, and interpretation of section 6.04 to fulfill these statutory duties and that his stance binds all election officials in Texas.

The Election Code also requires the Secretary to "adopt standards of training in election law and procedure for presiding or alternate election judges[.]" *Id.* § 32.111(a)(1). Specifically,

the Secretary must "develop materials for a standardized curriculum for that training; and distribute the materials as necessary to the governing bodies of political subdivisions that hold elections and to each county executive committee of a political party that holds a primary election." *Id.* § 32.111(a)(2)–(3). In addition, the Election Code states that a county clerk must "provide one or more sessions of training" to election judges and clerks. *Id.* § 32.114(a). The trainings that election judges must complete are premised upon "the standardized training program and materials developed and provided by the secretary of state[.]" *Id.* The Secretary must "schedule and provide assistance for the training of election judges and clerks" upon request by a county executive committee or a county clerk. *Id.* § 32.115. Since election judges and clerks are authorized to administer the oath as revised by section 6.04, it follows that the standardized training program and materials developed and provided by the Secretary include guidance on section 6.04.

And critically, the Election Code tasks the Secretary with taking "appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes." *Id.* § 31.005(a). The Election Code empowers the Secretary as follows:

> (b) The secretary of state may order a person performing official functions in the administration of any part of the electoral processes to correct offending conduct if the secretary determines that the person is exercising the powers vested in that person in a manner that:
>> (1) impedes the free exercise of a citizen's voting rights; or
>> (2) unless acting under an order of a court of competent jurisdiction, delays or cancels an election that the person does not have specific authority to delay or cancel.
> (c) If a person described by Subsection (b) fails to comply with an order from the secretary of state under this section, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general.

*Id.* § 31.005(b)–(c). Should the Court grant the United States the injunction it seeks, the Secretary has statutory recourse to enforce the Court's order against election judges and clerks administering

the oath as revised by section 6.04. Based upon the Secretary's sweeping delineated duties and grants of power in the Election Code, it is clear that the United States has met its burden to show that any injury to its sovereignty is fairly traceable to and redressable by the State Defendants.[14]

The State Defendants disagree. They argue that *Muskrat v. United States*, 219 U.S. 346 (1911), precludes the United States from establishing standing to sue Texas. *See* ECF No. 145 at 10; *see also* ECF No. 223 at 5–6. According to the State Defendants, "Even when a sovereign's legislature enacted the challenged law, that is not enough to give the sovereign an 'interest adverse' to the challenger." ECF No. 145 at 10 (quoting *Muskrat*, 219 U.S. at 361). But *Muskrat* held that Congress did not have the power to confer appellate jurisdiction upon the Supreme Court of suits brought by specifically named individuals against the United States so that the Supreme Court could determine the constitutionality of certain federal statutes. 219 U.S. at 362. Because the United States "has no interest adverse," the Supreme Court reasoned, no justiciable case exists. *Id.* at 361. In other words, *Muskrat* rejected Congress's attempt to create a cause of action that circumvented the Constitution's prohibition against advisory opinions. *Muskrat* does not, as the State Defendants seem to argue, stand for the broader and unrelated proposition that the United States does not have standing to sue Texas in federal court to enforce the VRA and CRA. Texas, as demonstrated throughout this litigation thus far, is committed to enforcing all provisions of S.B.

---

[14] Though not challenged by the State Defendants, the Court finds that, for the same reasons, the United States also has standing to pursue its claim as to sections 5.07 and 5.13 of S.B. 1 against the Secretary. The United States alleges that sections 5.07 and 5.13 violate § 101 of the CRA. ECF No. 131 ¶ 75. These provisions require the rejection of vote-by-mail applications and mail ballot carrier envelopes if they do not include an identification number. S.B. 1 states that a vote-by-mail application and a mail ballot carrier envelope must include a designated space for voters to provide the required identification number. *See* S.B. 1 § 5.03, 5.08. And the Election Code charges the Secretary with "prescrib[ing] the design and content . . . of the forms necessary for the administration of this code[.]" TEX. ELEC. CODE § 31.002(a). Thus, the "Secretary would need to correct the form[s] should the judiciary invalidate" sections 5.07 and 5.13. *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 178 (5th Cir. 2020). Moreover, the United States submits that it "presents a facial challenge to provisions of SB 1[,]" ECF No. 195 at 12 n.3, and *OCA-Greater Houston* squarely held that the "facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State[.]" 867 F.3d at 613. Under *OCA-Greater Houston*, therefore, the United States has standing to challenge the facial invalidity of sections 6.04, 5.07, and 5.13 of S.B. 1 against the State Defendants.

1, and the United States seeks to have Texas enjoined from implementing certain provisions. The State Defendants' and the United States' interests are clearly adverse.

As for the United States' standing to sue the Secretary, the State Defendants suggest that the Fifth Circuit's reasoning in *Texas Democratic Party I* is entitled to no weight because a "subsequent merits panel declined to adopt that reasoning." ECF No. 223 at 5 n.1. In *Texas Democratic Party II*, the Fifth Circuit considered whether the preliminary injunction the district court had issued was appropriate on the merits. 978 F.3d at 176. Far from abandoning the motions panel's reasoning in *Texas Democratic Party I*, the merits panel in *Texas Democratic Party II* effectively agreed with the motions panel, concluding that an individual plaintiff had "clear standing" to challenge the vote-by-mail provision at issue because the Secretary "would need to correct the [application] form [for absentee ballots] should the judiciary invalidate the age-based option." *Id.* at 178. "Thus," the merits panel reasoned, "the Secretary of State had a role in causing the claimed injury and is in a position to redress it at least in part." *Id.* The same is true here.

The Court is also not persuaded by the State Defendants' assertion that *OCA-Greater Houston* only applies in cases considering the facial validity of a Texas election statute. *See* ECF No. 145 at 9. To be sure, the Fifth Circuit in *Texas Democratic Party v. Hughs*, 974 F.3d 570 (5th Cir. 2020) (per curiam) noted that *OCA-Greater Houston* involved a facial challenge. *Id.* at 570–71. It did so after observing that an "important question" had not been resolved, namely "whether and to what extent *Ex parte Young*'s exception to sovereign immunity permits plaintiffs to sue the Secretary in an as-applied challenge to a law enforced by local officials." *Id.* at 570. *Hughs*, however, did not resolve that important question; rather, it held that the "openness of the question alone [was] sufficient reason to deny" the plaintiffs' request for summary affirmance of a district court order concluding that the Secretary was not entitled to sovereign immunity. *Id.* at 571.

Moreover, this case is a suit brought by the United States against Texas and its state official. "States have no sovereign immunity as against the Federal Government[.]" *West Virginia v. United States*, 479 U.S. 305, 311 (1987). *Hughs*, therefore, is inapposite, as are the three cases the State Defendants raise in their notice of supplemental authority. *See generally* ECF No. 333. Those cases also address the scope of the *Ex parte Young* exception to sovereign immunity.[15] *See Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022); *Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022); *Richardson v. Flores*, 28 F.4th 649 (5th Cir. 2022). Sovereign immunity plays no role here.

Equally unpersuasive is the State Defendants' argument that *OCA-Greater Houston* is not binding on the Court because, in their view, the panel failed to consider *Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972). *See* ECF No. 145 at 9; *see also* ECF No. 223 at 5. *Bullock*, according to the State Defendants, indicates that the Secretary's duties as outlined in the Election Code "are not 'a delegation of authority to care for any breakdown in the election process.'" ECF No. 223 at 5 (quoting *Bullock*, 480 S.W.2d at 372). The State Defendants' contention is based on conjecture and reads much into the opinion that simply cannot be supported by the panel's careful reasoning. And while the Fifth Circuit subsequently addressed *Bullock*, it did so in dicta and in the context of sovereign immunity. *See Tex. Democratic Party II*, 978 F.3d at 180.

There is also no reason to ignore *OCA-Greater Houston* in response to a concurrence in the Texas Supreme Court. *See* ECF No. 145 at 9. That the State Defendants believe *OCA-Greater Houston* was "wrongly" decided has no bearing. *See id.*; *see also* ECF No. 223 at 4–5. This Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit

---

[15] While there may be "significant overlap" between standing and *Ex parte Young* analyses, *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017), the fact remains that sovereign immunity is not relevant here.

court or a decision of the Supreme Court." *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

In sum, the United States has met its burden under modern standing doctrine to show that it has suffered an injury-in-fact that is fairly traceable to and redressable by the State Defendants. The United States, therefore, has standing to enforce the VRA and CRA against the State Defendants in federal court. The Court now turns to the State Defendants' remaining arguments.

### B.  The United States may proceed with its claim under § 208 of the VRA.

The State Defendants argue that United States' allegations fail to state a claim under § 208 of the VRA because section 6.04 of S.B. 1 is not preempted by and therefore does not violate § 208. *See* ECF No. 145 at 10–12; *see also* ECF No. 223 at 6–7. They also contend that the Attorney General of the United States is not congressionally authorized to enforce § 208 against Texas and its Secretary of State. *See* ECF No. 145 at 12–15; *see also* ECF No. 223 at 8–9.

### 1.    The United States has stated a claim under § 208 of the VRA.

"The Voting Rights Act is ambitious, in both goal and scope." *Brnovich*, 141 S. Ct. at 2351 (Kagan, J., dissenting). It contains comprehensive sections designed "to correct an active history of discrimination" and "deal with the accumulation of discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 44 n.9 (1986) (internal quotation marks and citation omitted). As is relevant here, § 208 of the VRA provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. The VRA defines the terms "vote" and "voting" expansively:

> The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting,

> casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

*Id.* § 10310(c)(1). "'To vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet." *OCA-Greater Houston*, 867 F.3d at 615. "It includes steps in the voting process *before entering* the ballot box, . . . and it includes steps in the voting process *after leaving* the ballot box[.]" *Id.* Thus, § 208 of the VRA guarantees a voter who requires assistance, because of blindness, disability, or inability to read or write, the right to assistance by a person of their choice in order to make their vote effective at all stages of the voting process.

The Election Code divides voter assistance into two categories: interpreters and assistors. Interpreters facilitate communication between a voter and an election officer when the election officer "does not understand the language used by the voter[.]" TEX. ELEC. CODE § 61.032. An assistor, on the other hand, assists a voter in marking or reading their ballot "if the voter cannot prepare or read the ballot because of: (1) a physical disability that renders the voter unable to write or see; or (2) an inability to read the language in which the ballot is written." *Id.* § 64.031. Section 6.04 of S.B. 1 requires an assistor to take the following oath before assisting a voter:

> I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.

S.B. 1 § 6.04.

The State Defendants argue that the United States' allegations fail to state a claim because § 208 does not preempt section 6.04.[16] ECF No. 145 at 10–12; *see also* ECF No. 223 at 6–7. In their view, § 208 only "says that certain voters 'may be given assistance by' certain assistants[,]" and section 6.04 does not preclude those voters from receiving that assistance. ECF No. 145 at 11 (quoting 52 U.S.C. § 10508). In other words, the State Defendants claim that § 208 does not preempt section 6.04 because § 208 addresses who may give assistance, while section 6.04 addresses what assistance is appropriate. ECF No. 223 at 6. Section 208, they submit, "leaves States with discretion to determine what constitutes appropriate assistance[.]" ECF No. 145 at 11.

The State Defendants interpret § 208 too narrowly. Section 208 guarantees a voter, who requires assistance to vote by reason of blindness, disability, or inability to read or write, the right to assistance by a person of their choice. 52 U.S.C. § 10508. The VRA defines the term "vote" as "all action necessary to make a vote effective[.]" *Id.* § 10310(c)(1). Section 208, therefore, not only describes who may give assistance. It also establishes what type of assistance may be given to a voter who requires assistance to vote because of blindness, disability, or inability to read or write—that assistance is whatever assistance is necessary to ensure their vote is effective.

Further, the United States plausibly alleges that § 208 preempts section 6.04. Federal preemption law is premised upon the Supremacy Clause, which provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. There are three different types of preemption: conflict, express, and field. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018). Generally, "all of them work in the same way: Congress enacts a law that

---

[16] The United States has not expressly alleged that § 208 "preempts" section 6.04. It has nonetheless responded to the State Defendants' argument by contending that federal law must prevail because compliance with both § 208 and section 6.04 is impossible. *See* ECF No. 195 at 18–19. The Court, therefore, addresses the parties' argument on this specific issue in terms of federal preemption.

imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* Conflict preemption, in particular, arises when the state law being challenged imposes a duty that is "inconsistent—*i.e.*, in conflict—with federal law." *Id.* Conflict preemption may take one of two forms: "(i) when compliance with both state and federal law is impossible, and (ii) when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Here, the United States alleges that section 6.04 prohibits assistors from assisting voters in ways that voters may need to make their votes effective. *See* ECF No. 131 ¶ 69. Section 6.04 requires assistors to take an oath that on its face limits the assistance they may offer to four actions: (1) reading the ballot to the voter; (2) directing the voter to read the ballot; (3) marking the voter's ballot; and (4) directing the voter to mark the ballot. *Id.* ¶ 68; *see also* S.B. § 6.04. However, the United States submits that voters with limited English proficiency or disabilities may need their assistors to assist them in additional ways to make their votes effective. *See* ECF No. 131 ¶¶ 3, 7, 45. For instance, voters with limited English proficiency or disabilities may need their assistors to answer questions, explain the voting process, and paraphrase complex language. *Id.* ¶ 45. These pleaded facts plausibly allege that § 208 conflicts with and therefore preempts section 6.04 of S.B. 1. Thus, the United States has stated a claim under § 208 of the VRA.[17]

---

[17] The fact that the United States is bringing a facial challenge, *see* ECF No. 195 at 12 n.3, does not alter the longstanding principle "that state laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480–81 (2013) (quoting *Maryland*, 451 U.S. at 746); *see also* ECF No. 223 at 6–7. "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a . . . violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)). Further, it makes no difference that "the Texas Legislature adopted the substance of Section 208 elsewhere in the Election Code[.]" ECF No. 223 at 6; *see also* ECF No. 145 at 11. "[A] state cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively

2.     **The Attorney General of the United States is congressionally authorized to enforce § 208 of the VRA against Texas and its Secretary of State.**

Section 12(d) of the VRA authorizes the Attorney General of the United States to file an action in federal court for prospective relief "[w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by" certain provisions of the VRA, including § 11(a). 52 U.S.C. §§ 10308(d), (f). Section 11(a), in turn, provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote" under specified chapters of Title 52, including Chapter 105, where § 208 is codified. *Id.* § 10307(a). Section 12(d) further authorizes the Attorney General to request an injunction and "an order directed to the State and State or local election officials to require them (1) to permit persons listed under chapters 103 to 107 of this title to vote and (2) to count such votes." *Id.* § 10308(d).

The State Defendants argue that the United States may not enforce § 208 against Texas and its Secretary of State because the VRA provides no explicit grant of authority to do so. *See* ECF No. 145 at 12–15; *see also* ECF No. 223 at 8–9. Looking to the history of amendments to the VRA for support, the State Defendants identify provisions that expressly authorize the Attorney General to enforce other provisions of the VRA, and they insist that the absence of an enforcement provision specific to § 208 indicates that the Attorney General has exceeded his authority in bringing this suit. *See* ECF No. 145 at 12–13; *see also* ECF No. 223 at 8.

---

than as federally defined." *OCA-Greater Houston*, 867 F.3d at 615. The Court is also not persuaded by the State Defendants' argument that section 6.04 is consistent with § 208's purpose. *See* ECF No. 145 at 11–12. The Supreme Court and Fifth Circuit have not always considered whether a state law is consistent with an allegedly conflicting federal law's purpose in concluding that it is physically impossible to comply with both the state and federal law. *See, e.g.*, *PLIVA, Inc. v, Mensing*, 564 U.S. 604 (2011); *Est. of Miranda v. Navistar, Inc.*, 23 F.4th 500 (5th Cir. 2022). *But see PLIVA*, 564 U.S. at 632 (Sotomayor, J., dissenting) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.") (internal quotation marks and citations omitted).

To be sure, the State Defendants accurately recount that Congress first amended the VRA in 1970 by adding §§ 201 and 202—proscribing literacy tests and durational residency requirements, respectively—and § 203—authorizing the Attorney General to file suit on behalf of the United States for violations of §§ 201 and 202. ECF No. 145 at 12; *see also* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 315–17. Five years later, Congress again amended the VRA by redesignating § 203 as § 204 and adding a substantively new § 203 that mandated election materials in languages other than English under certain circumstances. *See* Voting Rights Act Amendments of 1975, Pub. L. 94-73, 89 Stat. 402–03. Congress also inserted language into § 204 (formerly § 203) that authorized the Attorney General to file suit on behalf of the United States for violations of the newly enacted § 203. *See id.* at 403. In 1982, Congress once again amended the VRA by adding § 208, but without a corresponding provision expressly authorizing the Attorney General to sue for violations of this section. *See* Voting Rights Act Amendments of 1982, Pub. L. 97-205, 96 Stat. 131. The State Defendants contend that this omission is conclusive proof that Congress intentionally withheld from the Attorney General the power to enforce § 208. *See* ECF No. 145 at 12–13.

Yet, it "is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2015) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013)). It is also presumed "that Congress legislates with knowledge of [the] basic rules of statutory construction[.]" *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991). History confirms that Congress first authorized the Attorney General to sue under § 12(d) for § 11(a) violations when it originally enacted the VRA in 1965. Voting Rights Act of 1965, Pub. L. 89-110, 79. Stat. 444. Thus, when Congress codified § 208 under Chapter 105 of Title 52 nearly twenty years later, it did so with full

appreciation that § 11(a) would incorporate § 208 and that § 12(d) would authorize the Attorney General to sue for violations of § 208 because § 12(d) already applied to § 11(a). Congress could have chosen to amend the VRA by adding a provision that expressly authorized the Attorney General to sue for violations of § 208, but the "short answer is that Congress did not write the statute that way." *United States v. Naftalin*, 441 U.S. 768, 773 (1979). "Congress designed the [VRA] in a specific way," *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019), and the only task before the Court is to say "what Congress enacted[.]" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). Congress enacted a statutory scheme that authorizes the Attorney General to enforce § 208 of the VRA.[18]

Indeed, the Secretary is both a person and a state actor and is therefore subject to the prohibitions Congress codified in § 208. Specifically, the Secretary may not limit the ability of any voter, who requires assistance to vote by reason of blindness, disability, or inability to read or write, to make their vote effective. The United States alleges that the Secretary will continue to limit the ability of such voters to make their votes effective when he is implementing section 6.04 pursuant to his official duties under the Election Code. ECF No. 131 ¶ 70. Put differently, the United States contends that the Secretary has engaged in, or that there are reasonable grounds to believe that the Secretary is about to engage in, an act or practice that § 208 prohibits. As a result, the Attorney General has invoked his authority under § 12(d) to secure prospective relief on behalf of the United States. The Attorney General seeks—as § 12(d) allows—an injunction and an order directed to Texas and its Secretary of State that requires them to permit and count the vote of any voter who requires assistance under § 208 of the VRA.

---

[18] Having concluded that the VRA expressly authorizes the Attorney General to enforce § 208 against the Secretary, the Court need not consider whether an implied cause of action exists to do so. *See* ECF No. 195 at 16 n.7.

The State Defendants nevertheless maintain that the United States' interpretation of the relevant statutory provisions "would render portions of Section 12(d) superfluous." ECF No. 145 at 14. They emphasize that § 12(d) authorizes the Attorney General to file suit with respect to separate and distinct provisions. *Id.* If § 12(d) authorized suits for § 208 violations through § 11(a), the State Defendants argue, "then there would be no reason for Section 12(d) to authorize federal-government lawsuits to enforce several specific sections of the VRA." *Id.* They further note that §§ 204 and 301 separately authorize suits for violations of distinct provisions under Title II and Title III of the VRA. *Id.* at 14. The State Defendants therefore contend that the United States' interpretation "creates impermissible surplusage." ECF No. 223 at 9; *see also* ECF No. 145 at 14.

The canon against surplusage expresses "the idea that every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (alterations in original) (quotation marks and citation omitted). It is true that § 12(d) expressly authorizes the Attorney General to enforce §§ 2, 3, 4, 5, 10, and 11(a)–(b) of the VRA. 52 U.S.C. § 10308(d). But it is also plain that Congress codified § 208 under Chapter 105 of Title 52 with the understanding that § 11(a) already prohibited state actors from "fail[ing] or refus[ing] to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of" Title 52. *Id.* § 10307(a). In doing so, Congress affirmatively incorporated § 208 into § 11(a) and authorized the Attorney General to enforce § 208 under § 12(d), which, again, already applied to § 11(a). Canons of construction, including the canon against surplusage, "are no more than rules of thumb that help courts determine the meaning of legislation, and in interpretating a statute a court should always turn first to one, cardinal canon before all others." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992). That cardinal canon, as stated time and time again by the

34

Supreme Court, is "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* at 253–54. Where, as here, "the words of a statute are unambiguous . . . judicial inquiry is complete." *Id.* at 254. (quotation marks and citation omitted).

But even if the Court found that application of the canon against surplusage is appropriate in this case, the fact remains that § 12(d) is not wholly superfluous. Section 12(d) does much more than list sections of the VRA that the Attorney General may enforce. It retains significant consequence by also providing a non-exhaustive catalog of judicial remedies the Attorney General may request should he decide to enforce any of the listed sections. 52 U.S.C. § 10308(d). In particular, § 12(d) states that one of the remedies the Attorney General may seek is "an order directed to the State and State or local election officials to require them (1) to permit persons listed under chapters 103 to 107 of this title to vote and (2) to count such votes." *Id.* Section 12(d), therefore, also ensures that judicial relief is afforded to the voters that the VRA aims to protect.

What is more, "the canon against surplusage assists only where a competing interpretation gives effect to every clause and word of a statute." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (quotation marks and citation omitted). The State Defendants' interpretation, however, would fail to give effect to every clause and word of the VRA. Adopting an interpretation that would preclude the Attorney General from enforcing § 208 would nullify and give § 208 no practical effect; it would reduce § 208 to an "empty promise[.]" *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969); *see also United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007) ("It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity."). Such an interpretation would generate

precisely what the canon seeks to avoid: surplusage. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) ("[T]he canon . . . favors that interpretation which *avoids* surplusage[.]").[19]

The State Defendants also argue that the United States may not sue Texas because a state is not a "person" who can trigger the application of § 12(d). *See* ECF No. 145 at 14–15; *see also* ECF No. 223 at 8. There is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Nat. Res.*, 529 U.S. at 780. The presumption, however, is not "a hard and fast rule of exclusion." *Id.* at 781 (quotation marks and citation omitted); *see also Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447 (1945) ("Georgia, suing for her own injuries, is a 'person' within the meaning of [§] 16 of the Clayton Act[.]"). It may be disregarded "upon some affirmative showing of statutory intent to the contrary." *Vt. Agency of Nat. Res.*, 529 U.S. at 781. Such an affirmative showing clearly exists in the text of the VRA: Section 12(d) expressly authorizes the Attorney General to request a court order directed to a state and state election official requiring them to permit voters protected by § 208 to vote, and, as discussed, § 12(d) authorizes the Attorney General to enforce § 208 against Texas and its Secretary of State.

Moreover, the presumption is usually "applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before." *Id.* (quotation marks and citation omitted). Texas can claim no surprise at being hailed into federal court by the United States to answer for alleged violations of the VRA. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Veasy v. Abbott*, 830 F.3d 216 (5th Cir. 2016); *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979); *United States v.*

---

[19] The State Defendants' proposed interpretation would read the interplay between §§ 11(a) and 12(d) out of the VRA. It would also read § 208 and the right to an assistor of one's choice out of the statute. Indeed, the State Defendants not only argue that Attorney General cannot enforce § 208, but also contend in their motions to dismiss the private plaintiffs' § 208 claims in other actions challenging S.B. 1 that § 208 does not create a private cause of action. *See* ECF Nos. 240 at 27; 243 at 27; 255 at 35; *see also* ECF No. 239 at 25. "[R]epeals by implication are disfavored." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133 (1974).

*Texas*, 252 F. Supp. 234 (W. D. Tex. 1966), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006) ("The District Court recognized the long history of discrimination against Latinos and Blacks in Texas, and other courts have elaborated on this history with respect to electoral processes[.]") (internal quotation marks and citation omitted). The presumption that "person" does not include the sovereign, therefore, may be disregarded in this case.

The State Defendants' remaining arguments also miss the mark. They contend that the Attorney General may not enforce § 208 against them because local election officials are not failing or refusing to permit any person to vote when administering the oath as revised by section 6.04. ECF No. 145 at 13–14; *see also* ECF No. 223 at 8. They also claim that the "purpose of SB1 is to protect the right to vote" and that there "is no reason to think that local officials will undermine SB1's purpose by preventing eligible voters from voting." ECF No. 145 at 13–14. But the United States has filed this action because it maintains that the implementation and administration of section 6.04 *does* limit the ability of voters to make their votes effective. ECF No. 131 ¶¶ 2–4, 13, 66–70; *see also* ECF No. 195 at 8, 11. In arguing otherwise, the State Defendants assume the answer to one of the core merits questions in this case: whether section 6.04 limits the ability of voters to make their votes effective in violation of § 208. Put differently, their argument "conflates the merits of the suit with the [United States' ability] to bring it." *OCA-Greater Houston*, 867 F.3d at 613. The State Defendants cannot prevent the United States from enforcing § 208 of the VRA because they believe that section 6.04 "merely modifies an oath administered by local election officials and taken by assistors." ECF No. 145 at 14; *see also OCA-Greater Houston*, 864 F.3d at 613 ("Texas cannot defeat standing by arguing that the statute is facially valid, just misapplied by

county officials—a merits question that we may reach only when satisfied that OCA has standing."). That is a question for another day.

The State Defendants also make too much of the observation that the United States does not expressly allege that the Secretary "will fail or refuse to permit any person to vote" or "willfully fail or refuse to tabulate, count, and report" a person's vote. ECF No. 145 at 14; *see also* 52 U.S.C. § 10307(a). They note that the United States also fails to expressly allege that the Secretary "has engaged" or "is about to engage in any act or practice" prohibited by § 11(a). ECF No. 223 at 8; *see also* 52 U.S.C. § 10308(d). The United States, however, has sufficiently alleged that specific provisions of S.B. 1 violate the VRA and that the Secretary is bound to comply with the Election Code. These allegations are sufficient to state a plausible claim against the State Defendants under § 208 of the VRA. The State Defendants forget that the United States need not recite talismanic language for a "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Accordingly, the Court concludes that the Attorney General of the United States is congressionally authorized to enforce § 208 of the VRA against Texas and its Secretary of State.

### C.  The United States may proceed with its claim under § 101 of the CRA.

The State Defendants contend that the United States fails to state a claim under § 101 of the CRA because sections 5.07 and 5.13 of S.B. 1 do not violate § 101. ECF No. 145 at 15–18; *see also* ECF No. 223 at 9–12. The State Defendants also argue that the United States may not enforce § 101 against Texas and its Secretary of State because Texas is not a "person" subject to § 101 and because the Secretary's actions do not "deny the right of any individual to vote in any election." *See* ECF No. 145 at 19–21; *see also* ECF No. 223 at 12–13.

**1.     The United States has stated a claim under § 101 of the CRA.**

The CRA enforces the constitutional right to vote. Among those provisions that Congress

enacted in the CRA to protect the right to vote is § 101, which provides:

> (2) No person acting under color of law shall—
>     (B) deny the right of any individual to vote in any election
> because of an error or omission on any record or paper relating to
> any application, registration, or other act requisite to voting, if such
> error or omission is not material in determining whether such
> individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). The CRA, like the VRA, defines the term "vote" broadly: it includes

all action necessary to make a vote effective. *Id.* § 10101(a)(3)(A), (e). Section 101, therefore,

prohibits state actors from denying a person's right to make their vote effective based on an error

or omission that is not material to determining whether they are qualified to vote under state law.

The Election Code defines a "qualified voter" as a person who is eighteen years of age or

older, a United States citizen, a Texas resident, and a registered voter. TEX. ELEC. CODE § 11.002.

To be a "qualified voter" in Texas, one also cannot be declared mentally incapacitated or convicted

of a felony unless the voter has a fully discharged sentence or has been pardoned. *Id.* In addition,

Texas law authorizes six categories of voters to vote by mail: (1) those who expect to be absent

during the entire voting period; (2) those with a disability; (3) those who will be sixty-five years

or older on Election Day; (4) those who are confined in jail; (5) those who are involuntarily

committed; (6) and those who are certified participants in the State's address confidentiality

program. *Id.* §§ 82.001–.004, 82.007–.008.

A voter who is eligible to vote by mail must submit a signed application to vote by mail in

writing to an early voting clerk. *Id.* § 84.001. If the early voting clerk determines that the

application does not "fully comply with the applicable requirements," the clerk must mail to the

applicant a new application with a written notice that identifies the defects in the application and

explains to the applicant how the defects may be corrected. *Id.* § 86.008. The Election Code also instructs a voter who votes by mail to place their ballot "in the official ballot envelope and then seal the ballot envelope, place the ballot envelope in the official carrier envelope and then seal the carrier envelope, and sign the certificate on the carrier envelope." *Id.* § 86.005(c).

S.B. 1 requires a voter who votes by mail to provide a driver's license, election identification certificate, or personal identification card number on both their application to vote by mail and their mail ballot carrier envelope. S.B. 1 §§ 5.02, 5.08. If the voter has not been issued one of these identification numbers, S.B. 1 requires the voter to submit the last four digits of their social security number or a statement attesting that they have not been issued an identification number. *Id.* Section 5.07 of S.B. 1 states that "the clerk shall reject" a vote-by-mail application if the identification number on the application "does not identify the same voter identified on the applicant's application for voter registration[.]" *Id.* § 5.07. Section 5.13 of S.B. 1 similarly provides that a mail ballot "may be accepted only if" the identification number on the carrier envelope "identifies the same voter identified on the voter's application for voter registration[.]" *Id.* § 5.13.

The State Defendants argue that sections 5.07 and 5.13 do not violate § 101 of the CRA because they do not deny the right to vote. ECF No. 145 at 15. Relying on *Texas Democratic Party II*, they submit that a vote is denied under § 101 only if the would-be voter is absolutely prohibited from voting. *Id.* at 16. Sections 5.07 and 5.13, the State Defendants further note, provide cure processes that a voter may pursue if they believe that an early voting clerk improperly rejected their vote-by-mail application or mail ballot carrier envelope. *Id.* at 15–16. In their view, the cure processes foreclose any claim that sections 5.07 and 5.13 deny the right to vote. *Id.* at 16.

*Texas Democratic Party II*, however, is inapposite. There, the Fifth Circuit analyzed whether the right to vote had been denied under the Constitution, not a statute. *Tex. Democratic*

*Party II*, 978 F.3d at 188. Where a statute includes an explicit definition of a term, the Court must follow that definition. *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021). And here, the CRA expressly defines the term "vote" as "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting[.]" 52 U.S.C. § 10101(e). Texas law requires that an individual seeking to vote by mail submit a signed application to do so. TEX. ELEC. CODE § 84.001. It also instructs a voter who is voting by mail to place their ballot in an official carrier envelope. *Id.* § 86.005(c). Therefore, the preparation and submission of an application to vote by mail, as well as the preparation and submission of a mail ballot carrier envelope, are actions that voters must take in order to make their votes effective. Section 101, as a result, does not only apply when a voter is absolutely prohibited from voting. It also reaches the actions contemplated under sections 5.07 and 5.13.[20]

Furthermore, the opportunity to cure does not necessarily mean that sections 5.07 and 5.13 do not violate § 101 of the CRA. Section 101 provides that state actors may not deny the right to vote based on errors or omissions that are not material; it does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes. Thus, the initial rejection of a vote-by-mail application or mail ballot carrier envelope based on errors or omissions that are not material to determining whether an individual is qualified to vote under state law may constitute a violation of § 101.

The State Defendants alternatively argue that the information sections 5.07 and 5.13 requires is material under § 101 because it "is used to determine the identity of the person attempting to cast a mail ballot." ECF No. 145 at 18. "Without knowing the identity of the

---

[20] For these reasons, the State Defendants' argument that § 101 of the CRA only protects the right to vote in person, not by mail, is also unavailing. *See* ECF No. 145 at 17; ECF No. 223 at 9–10. The CRA defines the term "vote" broadly and does not exclude individuals who vote by mail from the right § 101 guarantees.

individual attempting to cast a ballot," they submit, "one cannot determine whether that individual is in fact qualified to vote" under Texas law. *Id.* The United States, however, alleges that an election identification certificate, personal identification card, or partial social security number has no material relation to determining whether an individual is either a qualified voter or entitled to vote by mail under Texas law. ECF No. 131 ¶ 74. It asserts that the State Defendants were able to ascertain a voter's identity before enacting sections 5.07 and 5.13. *Id.* ¶ 51. It further contends that, before enacting the challenged provisions, the State Defendants employed other means, including the use of signature matching, to verify a voter's identity. *Id.* ¶ 57. These allegations plausibly establish that sections 5.07 and 5.13 may require information that is unnecessary and therefore not material to determining an individual's qualifications to vote under Texas law. As a result, the United States has stated a claim under § 101 of the CRA.[21]

### 2.     The United States may enforce § 101 of the CRA against Texas and its Secretary of State.

Section 131(c) of the CRA authorizes the Attorney General of the United States to file a civil action in federal court "[w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by" § 101. 52 U.S.C. § 10101(c). Section 131(c) also expressly permits the Attorney General to file suit against a state:

> Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by [§ 101], the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned

---

[21] The State Defendants again argue that the United States has failed to state a claim in light of its assertion that it is bringing a facial claim. *See* ECF No. 223 at 12. As the Court previously stated, *see supra* note 17, the fact that the United States is bringing a facial challenge "does not speak at all to the substantive rule of law necessary to establish a . . . violation." *Bucklew*, 139 S. Ct. at 1127.

or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State.

*Id.* Under § 131(c), the Attorney General is authorized to seek prospective relief, "including an application for a permanent or temporary injunction, restraining order, or other order." *Id.*

The State Defendants argue that the United States may not enforce § 101 against the Secretary because local election officials, not the Secretary, would reject vote-by-mail applications and mail ballot carrier envelopes under sections 5.07 and 5.13. *See* ECF No. 145 at 19–20; *see also* ECF No. 223 at 12. But the Court has already concluded that the United States may enforce the CRA against the Secretary to enjoin sections 5.07 and 5.13.[22] To the extent the State Defendants argue that the United States' claim fails because it has not alleged that the Secretary has engaged in conduct that § 101 prohibits, the Court disagrees. The United States alleges that sections 5.07 and 5.13 require information that is not material to determining whether a person is qualified to vote under Texas law and that requiring the rejection of a vote-by-mail application or mail ballot carrier envelope based on the absence of immaterial information denies the right to vote under the CRA. ECF No. 131 ¶¶ 74–75. It also submits that the Secretary is responsible for maintaining uniform application, operation, and interpretation of S.B. 1. *Id.* ¶ 13. This includes prescribing the design and content of the forms necessary for the administration of the Election Code, such as vote-by-mail applications and mail ballot carrier envelopes. Tex. Elec. Code § 31.002(a). These allegations are sufficient to draw the reasonable inference that the Secretary is a proper defendant in this CRA claim.

Finally, the State Defendants argue that the United States cannot enforce § 101 of the CRA against Texas because § 131(c) authorizes the Attorney General to enforce § 101 against a state only when the Attorney General alleges that state officials "have committed" an action in the past

---

[22] *See supra* pp. 6–16 and note 14.

that constitutes a violation of § 101. ECF No. 145 at 21; *see also* ECF No. 223 at 12–13. At the time the United States filed its amended complaint, S.B. 1 had not been enacted. S.B. 1 has since been enacted and elections have subsequently been held.[23] The Secretary has accordingly implemented S.B. 1, including sections 5.07 and 5.13, pursuant to his official duties under the Election Code. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996) ("[I]n deciding a motion to dismiss for failure to state a claim, courts . . . may also consider matters of which they may take judicial notice."); FED. R. EVID. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *see also Mills v. Green*, 159 U.S. 651, 657–58 (1895) ("[T]his [C]ourt must take judicial notice of the days of public general elections[.]"). Thus, even if § 131(c) authorizes the Attorney General to enforce § 101 against states only when he has alleged that state officials "have committed" some action in the past that violates § 101—a dubious assertion—the allegations in the United States' amended complaint fairly establish this condition.

The Court therefore concludes that the Attorney General of the United States may enforce § 101 of the CRA against Texas and its Secretary of State.

## CONCLUSION

Accordingly, the State of Texas and the Texas Secretary of State's motion to dismiss all claims brought by the United States of America (ECF No. 145) is hereby **DENIED**. The United States may proceed with its claims under § 208 of the Voting Rights Act of 1965 and § 101 of the Civil Rights Act of 1964.

It is so **ORDERED**.

**SIGNED** this May 24, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[23] *See supra* note 10.