**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered the Texas Secretary of State and the Texas Attorney General's motion to dismiss all the claims that LULAC Texas, Voto Latino, the Texas Alliance for Retired Americans, and Texas AFT have asserted against them (ECF No. 243). After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code") by altering various election practices and procedures pertaining to early voting, voting by mail, voter assistance, and more. *See generally id.*

Days before and after the Governor signed S.B. 1 into law, several private plaintiffs filed suit, alleging that certain provisions of S.B. 1 violate federal law and the United States

Constitution.[1] This order addresses one of these suits filed by LULAC Texas, Voto Latino, the

Texas Alliance for Retired Americans, and Texas AFT (together, the "LULAC Plaintiffs"). *See*

Compl., *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. Sept. 7, 2021), ECF No. 1.

The LULAC Plaintiffs challenge sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.02, 4.06, 4.07, 4.09,

4.12, 5.01, 5.02, 5.03, 5.07, 5.08, 6.03, 6.04, and 7.04 of S.B. 1. ECF No. 207 ¶ 160.[2]

Sections 3.04, 3.09, 3.10, 3.12, and 3.13 implement changes to in-person voting

procedures. Sections 4.01, 4.02, 4.06, 4.07, and 4.09 alter poll watching practices. Sections 4.12,

5.01, 5.02, 5.03, 5.07, and 5.08 modify procedures for voting by mail. Sections 6.03 and 6.04

amend practices pertaining to voter assistance.[3] Finally, section 7.04 creates election law offenses

under sections 276.015, 276.016, 276.017, 276.018, and 276.019 of the Election Code.

---

[1] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *see also* Order, *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

[2] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

[3] In 2018, a district court enjoined the State of Texas and the Texas Secretary of State from enforcing sections 61.033 and 64.0321 of the Election Code. *See OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *1 (W.D. Tex. June 6, 2022). On June 6, 2022, the district court, upon request, modified its injunction to prohibit Texas and its Secretary of State from enforcing a portion of the oath as modified under section 6.04 of S.B. 1:

> As to the first ground, OCA notes that a portion of the amended oath now reads exactly as did the enjoined language in Section 64.0321. A portion of the oath now requires the assistor to attest to confining their assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." Tex. Elec. Code § 64.034. The enjoined language permits assistance in "(1) reading the ballot to the voter; (2) directing the voter to read the ballot; (3) marking the voter's ballot; or (4) directing the voter to mark the ballot. Tex. Elec. Code § 64.0321. Aside from changes in punctuation, the language is indistinguishable. Thus, the Court's reasoning in enjoining Section 64.0321 applies to the amended oath language just as it applied in the 2018 Injunction. . . . By requiring assistors to attest to following enjoined restrictions, the amended provision essentially re-ratifies the same restrictions that the Court enjoined. In doing so, the oath limits assistance-eligible voting to an impermissibly narrow set of activities. Therefore, as with the previous iteration of this language, the Court will enjoin enforcement of the portion of [section 6.04 of S.B. 1] inserting the previously enjoined language from Section 64.0321.

On January 19, 2022, the LULAC Plaintiffs filed their second amended complaint against the Texas Secretary of State and the Texas Attorney General, in their official capacities (together, the "State Defendants").[4] ECF No. 207. They allege that each of the S.B. 1 provisions they challenge violates § 2 of the Voting Rights Act of 1965 ("VRA") and that section 7.04 violates § 208 of the VRA. *Id.* ¶¶ 249–56, 287–94. The LULAC Plaintiffs seek to enjoin the State Defendants from implementing and enforcing each of the challenged S.B. 1 provisions. *Id.* at 62–63.

On February 9, 2022, the State Defendants filed a motion to dismiss all claims that the LULAC Plaintiffs have asserted against them. ECF No. 243. The LULAC Plaintiffs filed a response, ECF No. 281, and the State Defendants filed a reply, ECF No. 306. On March 18, 2022, the State Defendants filed a notice of supplemental authority. ECF No. 333.

## DISCUSSION

### I.    Legal Standards

The State Defendants move to dismiss the LULAC Plaintiffs' claims on three main grounds. First, the State Defendants argue that sovereign immunity bars the LULAC Plaintiffs from suing the Secretary of State and the Attorney General. Second, the State Defendants claim

---

*Id.* at *4. On June 14, 2022, OCA-Greater Houston filed a notice in this consolidated action, advising the Court of the district court's modified injunction. ECF No. 438. OCA-Greater Houston submits that "the United States and Private Plaintiffs' challenges to the same portions in this case may ultimately be rendered moot." *Id.* at 5. The United States and remaining private plaintiffs also filed a notice, advising that they agree with OCA-Greater Houston's position on the potential impact of the modified injunction on their claims challenging the same portions of section 6.04. ECF No. 440. Texas and its Secretary of State did not appeal the district court's modified injunction. Thus, all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are moot.

[4] The LULAC Plaintiffs have also sued, in their official capacities, Bexar County Elections Administrator Jacquelyn Callanen, Bexar County District Attorney Joe Gonzales, Travis County Clerk Dana DeBeauvoir, Travis County District Attorney José Garza, Harris County Elections Administrator Isabel Longoria, Harris County District Attorney Kim Ogg, Hidalgo County Elections Administrator Yvonne Ramón, Hidalgo County District Attorney Ricardo Rodriguez, Dallas County Elections Administrator Michael Scarpello, Dallas County District Attorney John Creuzot, El Paso County Elections Administrator Lisa Wise, and District Attorney for the 34th Judicial District Yvonne Rosales. ECF No. 207 ¶¶ 28–39. They assert claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments against these local elections administrators and district attorneys. *Id.* ¶¶ 257–86. The LULAC Plaintiffs do not assert these constitutional claims against the State Defendants. They are therefore not at issue here.

that the LULAC Plaintiffs lack standing to bring this suit. Third, the State Defendants contend that the LULAC Plaintiffs have failed to state a claim upon which relief may be granted.

### A.  Subject matter jurisdiction

Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case.[5] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The Eleventh Amendment and the doctrine of sovereign immunity limit a federal court's jurisdiction. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). The doctrine "also prohibits suits against state officials or agencies that are effectively suits against a state." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). Sovereign immunity, however, "is not limitless[.]" *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020). "A State may waive its sovereign immunity . . . and in some circumstances Congress may abrogate it by appropriate legislation." *Stewart*, 563 U.S. at 253–54 (internal citation omitted). Additionally, under *Ex parte Young*, 209 U.S. 123 (1908), "a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Reeves*, 954 F.3d at 736.

Article III of the United States Constitution also limits a federal court's constitutional power to adjudicate a case. It "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. CONST. art. III, § 2). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing, therefore,

---

[5] Congress, by statute, has proclaimed that the "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The LULAC Plaintiffs assert claims against the State Defendants under the VRA. The Court, therefore, is statutorily authorized to adjudicate this case.

"is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). It provides definition to the constitutional limits of subject matter jurisdiction, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), by identifying "those disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citation omitted).

A federal court must consider a motion for lack of subject matter jurisdiction "before other challenges 'since the court must find jurisdiction before determining the validity of the claim.'" *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

### B.  Failure to state a claim

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims in a complaint for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the

nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II.   Analysis

The Court addresses each of the State Defendants' three grounds for dismissal, beginning, as it must, with their jurisdictional contentions.

### A. Sovereign immunity does not bar the LULAC Plaintiffs' claims against the Secretary of State and the Attorney General.

The State Defendants claim that sovereign immunity bars the LULAC Plaintiffs' claims against the Secretary of State and the Attorney General. ECF No. 243 at 9–16. They argue that the LULAC Plaintiffs cannot satisfy the *Ex parte Young* exception to sovereign immunity. *Id.*

To be sure, "*Ex parte Young* is a 'necessary exception' to sovereign immunity, preventing state officials from using their state's sovereignty as a shield to avoid compliance with federal law." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 451 (5th Cir. 2022) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). But Congress may also abrogate a state's sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Indeed, the Fifth Circuit "has held that the Voting Rights Act, 'which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity.'" *Mi Familia Vota v. Abbott*, 977 F.3d 461, 469 (5th Cir. 2020) (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017)).

The LULAC Plaintiffs assert claims for injunctive relief under §§ 2 and 208 of the VRA. *See* ECF No. 207 ¶¶ 249–56, 287–94. Consequently, they need not satisfy the *Ex parte Young* exception to sovereign immunity to sue the State Defendants. Sovereign immunity, therefore, does not bar the LULAC Plaintiffs' claims against the Secretary of State and the Attorney General.

**B.  At least one of the LULAC Plaintiffs has standing to sue the Secretary of State and the Attorney General for injunctive relief under §§ 2 and 208 of the VRA.**

The State Defendants argue that the LULAC Plaintiffs have not established that they have either associational or organizational standing because they have not plausibly alleged, on a provision-by-provision basis, that they have suffered an injury in fact that is fairly traceable to and redressable by the Secretary of State and the Attorney General. ECF No. 243 at 17–27.

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan*, 504 U.S. at 560. "The plaintiff[s] must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Juridical entities may satisfy these requirements under an associational or organizational theory of standing. *OCA-Greater Hous.*, 867 F.3d at 610. At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). Where, as here, the plaintiffs challenge several provisions in a statute, they must plead "all the elements of standing for each provision they seek to challenge." *In re Gee*, 941 F.3d 153, 162 n.4 (5th Cir. 2019). Further, where, as here, multiple plaintiffs seek injunctive relief, only one needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

The LULAC Plaintiffs consist of four juridical entities: LULAC Texas ("LULAC"), Voto Latino, the Texas Alliance for Retired Americans (the "Alliance"), and Texas AFT. ECF No. 207 ¶¶ 19, 21, 23, 25. They assert that they each have associational or organizational standing to sue the Secretary of State and the Attorney General.[6] *Id.* ¶¶ 19–25, 254–55, 292–93. The Court need only determine whether the LULAC Plaintiffs have alleged, on a provision-by-provision basis, a

---

[6] Voto Latino asserts organizational standing only. ECF No. 281 at 11 n.1.

plausible set of facts to establish that at least one of them has standing to sue the Secretary of State

and the Attorney General for injunctive relief under §§ 2 and 208 of the VRA.

### 1. LULAC has associational standing.

Associational standing exists when the entity's "members would otherwise have standing

to sue in their own right, the interests at stake are germane to the [entity's] purpose, and neither

the claim asserted nor the relief requested requires the participation of individual members in the

lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)

(citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

### a. LULAC's members have standing to sue in their own right.

#### i. The LULAC Plaintiffs have shown that LULAC's members have suffered an injury in fact by alleging, on a provision-by-provision basis, a plausible set of facts establishing that each of the S.B. 1 provisions they challenge harms LULAC's members.

LULAC "has more than 8,000 members across Texas, including registered voters." ECF

No. 207 ¶ 20. LULAC's membership also includes volunteers who register and educate voters,

and participate in activities and programs that LULAC has designed to increase voter turnout

among its members and the community. *Id.* Contrary to the State Defendants' contentions, the

LULAC Plaintiffs dedicate no less than thirty-five paragraphs in their second amended complaint

to describe, on a provision-by-provision basis, how each of the S.B. 1 provisions they challenge in

this case harms their voting and volunteer members.[7] *Id.* ¶¶ 160–95.

Generally, section 3.04 establishes that a voter may not cast a ballot from inside a motor

vehicle. TEX. ELEC. CODE § 43.031(b). Sections 3.12 and 3.13 similarly provide that early voting

polling places must be located inside a building. *Id.* §§ 85.061(a), 85.062(b), 85.062(f-1). Texas

---

[7] The LULAC Plaintiffs need not identify specific members at the pleading stage. *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012).

8

previously "allowed counties to operate early voting within 'any stationary structure' or 'a movable structure.'" ECF No. 207 ¶ 169 (quoting TEX. ELEC. CODE § 85.062). For instance, "Harris County provided its citizens a drive-thru voting option, which a division of the Secretary's office approved." *Id.* This drive-thru voting option "allowed nearly 130,000 voters to exercise their fundamental right to vote in the midst of the COVID-19 pandemic." *Id.* However, the LULAC Plaintiffs allege that sections 3.04, 3.12, and 3.13 now burden voters' ability to cast a vote in person, despite there being "no reported issues of fraud or malfeasance connected to th[e] drive-thru program." *Id.* ¶ 170. These allegations sufficiently show at this stage that sections 3.04, 3.12, and 3.13—and the Election Code provisions they codified—have harmed LULAC's voting members by burdening their right to vote.

Sections 3.09 and 3.10 limit early voting hours. TEX. ELEC. CODE §§ 85.005, 85.006(b), 85.006(e). The LULAC Plaintiffs allege that these "prohibitions specifically target the early voting hours that the State's larger and more diverse counties provided to their voters during the 2020 general election." ECF No. 207 ¶ 179. They invoke Harris County's past elections procedures and submit that its "24-hour voting program ensured that voters with irregular and inflexible work schedules were not denied their ability to exercise their constitutional right to vote." *Id.* ¶ 180. In the LULAC Plaintiffs' view, "[e]xpanded in-person voting hours are critical to ensuring access to the polls in Texas, where the vast majority of voters are ineligible to vote by mail." *Id.* ¶ 181. They contend that sections 3.09 and 3.10 impose "unreasonable and unjustified restrictions on in-person voting[.]" *Id.* ¶ 177. These allegations sufficiently show at this stage that sections 3.09 and 3.10— and the Election Code provisions they codified—have harmed LULAC's voting members by burdening their right to vote.

Section 4.01 provides that a presiding judge may not remove a duly accepted poll watcher who has violated the Election Code or any other law pertaining to the conduct of elections unless an election judge or clerk observed the violation. TEX. ELEC. CODE § 32.075(g). Under section 4.02, a poll watcher must "call to the attention of an election officer any observed or suspected irregularity or violation of law in the conduct of the election." *Id.* § 33.0015. Section 4.06 makes it a class A misdemeanor if an election officer refuses, either intentionally or knowingly, to accept a poll watcher for service when acceptance of the poll watcher is otherwise required. *Id.* § 33.051(g). Section 4.07 allows a poll watcher "to sit or stand near enough to see and hear the election officers conducting the observed activity" and makes clear that a poll watcher "may not be denied free movement where election activity is occurring within the location at which the watcher is serving." *Id.* § 33.056(a), (e). Section 4.09 makes it an offense when a "person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity or procedure the person knows the watcher is entitled to observe[.]" *Id.* § 33.061(a). Sanctionable conduct under section 4.09 includes any action that obstructs a poll watcher's view or distances the poll watcher "from the activity or procedure to be observed in a manner that would make observation not reasonably effective." *Id.*

The LULAC Plaintiffs allege that sections 4.01, 4.02, 4.06, 4.07, and 4.09 each confer "broad, unchecked authority" upon poll watchers. ECF No. 207 ¶ 190. They observe that section 4.02 does not require a poll watcher to tether their suspicions about unlawful activity "to what Texas law actually permits or prohibits." *Id.* ¶ 188. They also submit that section 4.07 gives "poll watchers free reign in polling places and allows them to intimidate voters[.]" *Id.* ¶ 185. As a result, the LULAC Plaintiffs allege that poll watchers "are likely to take issue with voter behavior they

subjectively believe to be suspicious or untoward, even where that conduct is perfectly legitimate and lawful." *Id.* ¶ 189.

The LULAC Plaintiffs further contend that each of these provisions will invite "voter intimidation, while providing no meaningful protection for the voters who become the victims of this activity." *Id.* ¶ 190. They assert that "minority voters have been subjected to disproportionate scrutiny at polling places and verbal harassment[,]" *id.* ¶ 191, and more recently, "supporters of former President Trump on several occasions harassed minority voters standing in line to enter polling locations[,]" *id.* ¶ 192. The LULAC Plaintiffs allege that, because of these provisions, "voters entering polling places are faced with a choice between securing the help they need to exercise their constitutional right to vote or risking intimidation or harassment by" poll watchers. *Id.* ¶ 193. Additionally, they submit that sections 4.01, 4.06, and 4.09—and the prohibitions and criminal sanctions therein—will make election officials "much less likely to confront [poll watchers] who are abusing their positions—and will deter citizens from volunteering to serve their communities as election workers." *Id.* ¶ 194. These allegations sufficiently show at this stage that sections 4.01, 4.02, 4.06, 4.07, and 4.09—and the Election Code provisions they codified—have harmed LULAC's voting members by burdening their right to vote.

Section 4.12 permits the return of an early voting marked ballot only if an election official personally receives the ballot at the time of delivery. TEX. ELEC. CODE §§ 86.006(a)–(a-2). It requires the election official to record the voter's name, signature, and proof of identification on a roster that the Secretary of State has prescribed. *Id.* § 86.006(a-2). The LULAC Plaintiffs allege that these "new requirements effectively eliminate ballot drop boxes." ECF No. 207 ¶ 164. They contend that, "during the 2020 general election, ballot drop boxes provided an option that thousands of Texas voters relied upon to ensure that their lawfully case ballots arrived in time to

11

be counted[.]" *Id.* ¶ 165. At the time, voters were "already required to present their identification to an election official." *Id.* ¶ 166 (citing TEX. ELEC. CODE § 86.006(a-1)). According to the LULAC Plaintiffs, section 4.12 imposes an "administrative barrier to in-person absentee ballot return that fails to provide even incremental protection against fraud." *Id.* ¶ 166. These allegations sufficiently show at this stage that section 4.12—and the Election Code provisions it codified—has harmed LULAC's voting members by burdening their right to vote.

Section 5.01 requires an applicant to physically sign their vote-by-mail application. TEX. ELEC. CODE § 84.001(b). Sections 5.02, 5.03, and 5.08 provide that a voter must include predetermined personal identification information on their vote-by-mail application and mail ballot carrier envelope. *Id.* §§ 84.002(a)(1-a), 84.002(b-1), 84.011(a)(3-a). Under section 5.07, the early voting clerk must reject a vote-by-mail application if the applicant fails to include the predetermined personal identification information or if the information does not match the information on the applicant's voter registration application. *Id.* § 86.001(f)–(f-2). The LULAC Plaintiffs allege that each of these provisions impose unnecessary burdens on voters who wish to exercise their right to vote. *See* ECF No. 207 ¶¶ 12, 20, 160, 163. These allegations sufficiently show at this stage that sections 5.01, 5.02, 5.03, 5.07, and 5.08—and the Election Code provisions they codified—have harmed LULAC's voting members by burdening their right to vote.

Section 6.03 provides that a person who assists a voter must complete a form that includes their name and address, their relationship to the voter, and whether they received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee. TEX. ELEC. CODE § 64.0322. The form must be either incorporated into the mail ballot carrier envelope if the voter is voting by mail and has received assistance to do so, or submitted to an election officer when casting a ballot at a polling place, entrance, or curb if the voter is voting in person

12

and is being assisted to do so. *Id.* § 64.0322(b). Section 6.04 modifies the oath that a person who

assists a voter must take. *Id.* § 64.034. The LULAC Plaintiffs allege that each of these provisions

"make it more difficult to obtain assistance while voting in person." ECF No. 207 ¶ 171. They

claim that the form is "an unnecessary requirement" and that the modified oath prevents assistors

from answering "any questions posed to them by the voter." *Id.* ¶¶ 172–73. These requirements,

the LULAC Plaintiffs submit, are unnecessary because the Election Code already imposes other

requirements on assistors that arguably safeguard the voting process. *Id.* ¶ 174. These allegations

sufficiently show at this stage that sections 6.03 and 6.04—and the Election Code provisions they

codified—have harmed LULAC's voting members by burdening their right to vote.

      Section 7.04 codifies several new offenses under sections 276.015, 276.016, 276.017, and

276.019 of the Election Code. TEX. ELEC. CODE §§ 276.015–.017, .019. Section 276.015 makes

three general public activities a third-degree felony:

> (b) A person commits an offense if the person, directly or through a
> third party, knowingly provides or offers to provide vote harvesting
> services in exchange for compensation or other benefit.

> (c) A person commits an offense if the person, directly or through a
> third party, knowingly provides or offers to provide compensation
> or other benefit to another person in exchange for vote harvesting
> services.

> (d) A person commits an offense if the person knowingly collects or
> possesses a mail ballot of official carrier envelope in connection
> with vote harvesting services.

*Id.* §§ 276.015(b)–(d), (f). A "benefit" is "anything reasonably regarded as a gain or advantage,

including a promise or offer of employment, a political favor, or an official act of discretion,

whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1).

"Vote harvesting services" means any "in-person interaction with one or more voters, in the

physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a

specific candidate or measure." *Id.* § 276.015(a)(2). Section 276.015 makes it clear that if "conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both." *Id.* § 276.015(g).

Section 276.016 establishes four offenses for the solicitation and distribution of vote-by-mail applications by public and election officials. *Id.* § 276.016. Section 276.017 makes it a class A misdemeanor for an early voting clerk or other election official to knowingly mail or otherwise provide a vote-by-mail ballot "or other early voting by mail ballot materials to a person who the clerk or official knows did not submit an application for a ballot to be voted by mail[.]" *Id.* § 276.017(a)–(b). Section 276.019 provides that a public or election official "may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code." *Id.* § 276.019.

The LULAC Plaintiffs allege that section 276.015 "imposes vague prohibitions[.]" ECF No. 207 ¶ 175. They assert that the "breadth of these criminal prohibitions suppresses a wide range of completely legitimate and commonplace activities, including core political speech." *Id.* ¶ 176. The LULAC Plaintiffs also contend that sections 276.016, 276.017, and 276.019 "*criminalize* efforts by public officials to solicit voters to submit applications to vote absentee if the voters have not already requested applications." *Id.* ¶ 162 (emphasis in original). They claim that each of these provisions "criminalizes the use of public funds to facilitate third-party distribution of absentee ballot applications." *Id.* Thus, they assert that each of these provisions prevents "voters from learning about how they can cast ballots[.]" *Id.* ¶ 161. These allegations sufficiently show at this stage that section 7.04—as codified in sections 276.015, 276.016, 276.017, and 276.019 of the Election Code—have harmed LULAC's voting and volunteer members by burdening their right

to vote and by exposing them to criminal prosecution for conducting activities that fulfill LULAC's mission to protect voting rights.[8]

The State Defendants argue that the LULAC Plaintiffs have not suffered a concrete and actual harm caused by the Attorney General because they "do not claim that any district or county attorney has sought the Attorney General's assistance in prosecuting violations of the challenged SB1 provisions." ECF No. 306 at 7; *see also* ECF No. 243 at 22. It is true that an injury in fact must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal quotation marks and citation omitted). The State Defendants, however, misconstrue what the LULAC Plaintiffs actually allege. It is the Attorney General's credible threat of enforcement that, according to the LULAC Plaintiffs, harms LULAC's members. *See Longoria v. Paxton*, No. SA:21-CV-1223-XR, 2022 WL 447573, at *17 (W.D. Tex. Feb. 11, 2022), *vacated and remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022) ("To be clear, the irreparable harm alleged in this case is not *actual* enforcement of the anti-solicitation provision; the harm is the chilling effect on Plaintiffs' speech that arises from the credible *threat* of enforcement." (emphasis in original)).

Of the nineteen S.B. 1 provisions that the LULAC Plaintiffs challenge, only sections 4.06, 4.09, and 7.04 establish criminal offenses and therefore implicate the Attorney General's enforcement power. The LULAC Plaintiffs allege that sections 4.06 and 4.09 give poll watchers "free reign in polling places and allows them to intimidate voters—while at the same time disempowering voters and elections officials who feel intimidated or harassed." ECF No. 207 ¶

---

[8] The LULAC Plaintiffs do not include specific allegations regarding section 276.018 of the Election Code. *See generally* ECF No. 207; *see also* ECF No. 306 at 9 n.2. The Court, therefore, construes the LULAC Plaintiffs' challenge against section 7.04 as one that does not challenge the validity of section 276.018. To the extent that the LULAC Plaintiffs intended to assert claims that challenge section 276.018, those claims are dismissed because they have not alleged sufficient facts showing whether and how section 276.018 has harmed them or their members.

185. They contend that criminal prosecution "will make election officials much less likely to confront [poll watchers] who are abusing their positions[.]" *Id.* ¶ 194. As a result, the LULAC Plaintiffs allege, LULAC's voting members—particularly their Black and Hispanic voting members—will be deterred from voting. *See id.* ¶¶ 193, 255. They assert that a racially discriminatory purpose underlies these provisions and that these provisions "surgically target[] election practices employed in Texas's largest and most diverse jurisdictions[.]" *Id.* ¶ 252–53.

Furthermore, the LULAC Plaintiffs allege that section 7.04 inhibits their voting members "from learning about how they can cast ballots by limiting the ability of county officials to ensure that eligible voters receive absentee ballot applications." *Id.* ¶ 161. They also assert that section 7.04, as codified in section 276.015 of the Election Code, prevents their volunteer members from assisting eligible voters because their assistance may be interpreted to constitute the "in-person interaction" with a voter "in the presence of an official ballot or a ballot voted by mail" that section 276.015 criminally proscribes. *Id.* ¶ 292. In turn, the LULAC Plaintiffs allege, LULAC's eligible voting members may not obtain the assistance that federal law entitles them to receive. *Id.* ¶ 293.

The LULAC Plaintiffs further submit that the Attorney General can prosecute offenses under sections 4.06, 4.09, and 7.04. *Id.* ¶ 27. The Election Code, they contend, requires voter registrars and the Secretary of State to report election law offenses to the Attorney General. *Id.* (citing Tex. Elec. Code §§ 15.028, 31.006). They also assert that the "Attorney General's office is currently investigating and prosecuting hundreds of purported election law violations" and will continue to do so. *Id.* The LULAC Plaintiffs make clear that the Attorney General has "threaten[ed] to prosecute voting organizations, election officials, and individuals who attempted to assist their fellow citizens in exercising their constitutional right to vote." *Id.* ¶ 2.

In credibly threatening to enforce sections 4.06, 4.09, and 7.04 against election and public officials, the Attorney General harms LULAC's voting members—and its Black and Hispanic voting members in particular—by inhibiting their right to vote free from intimidation and harassment. Article III injuries "include harms specified by the Constitution itself[,]" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021), and "[i]t is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure[,]'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). *See also OCA-Greater Hous.*, 867 F.3d at 612 ("[T]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." (internal quotation marks and citation omitted)); TEX. ELEC. CODE § 62.0115(b)(2) (stating that voter has the right to "vote in secret and free from intimidation").

Further, the Attorney General's credible threat of enforcing section 7.04 also harms LULAC's volunteer members. By credibly threatening to enforce section 7.04 against individuals who wish to assist eligible voters, the Attorney General harms LULAC's volunteer members who, in fulfillment of LULAC's mission to protect voting rights, want to engage in activities that may constitute a crime under section 7.04. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) ("Plaintiffs face 'a credible threat of persecution' and 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979))). By extension, the Attorney General's credible threat of enforcing section 7.04 also harms LULAC's eligible voting members and their right to assistance by discouraging volunteer members from providing such assistance because they reasonably fear criminal prosecution. Taking all the factual allegations from the LULAC Plaintiffs' second amended complaint as true and construing these allegations in the light most favorable to the

LULAC Plaintiffs, it is clear that the LULAC Plaintiffs have made, at this stage of the proceedings, "a factual showing of perceptible harm." *Lujan*, 504 U.S. at 566.

The State Defendants alternatively argue that the LULAC Plaintiffs cannot demonstrate that any injury is imminent. ECF No. 306 at 8. To be sure, although the Election Code originally authorized the Attorney General to unilaterally "prosecute a criminal offense prescribed by the election laws of this state[,]" TEX. ELEC. CODE § 273.021(a), that is, for the time being, not the case. In *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198, at *11 (Tex. Crim. App. Dec. 15, 2021) (not released for publication), the Texas Court of Criminal Appeals held that this delegation of unilateral prosecutorial authority violated the separation-of-powers clause of the Texas Constitution.[9] But even absent the delegation of authority to independently prosecute election law offenses, the surviving provisions of the Election Code still envision, and likely require, the Attorney General's participation in enforcement activities. For example, section 273.001 provides:

> (a) If two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations. If the election covers territory in more than one county, the voters may present the affidavits to the attorney general, and the attorney general shall investigate the allegations.

> (b) A district or county attorney having jurisdiction or the attorney general may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election.

> (c) On receipt of an affidavit [from a registrar], the county or district attorney having jurisdiction and, if applicable, the attorney general shall investigate the matter.

> (d) On referral of a complaint from the secretary of state under Section 31.006, the attorney general may investigate the allegations.

---

[9] The State Defendants submit that "that *Stephens* was wrongly decided." ECF No. 243 at 15 n.1. Texas "has filed a motion asking the Texas Court of Criminal Appeals to reconsider its decision." *Id.*

TEX. ELEC. CODE § 273.001. Moreover, *Stephens* does not foreclose the Attorney General's authority to prosecute election law offenses, including those proscribed by sections 4.06, 4.09, and 7.04. The Court of Criminal Appeals made clear that "the consent and deputization order of a local prosecutor or the request of a district or county attorney for assistance" can provide the Attorney General with the authority to enforce election law offenses. *Stephens*, 2021 WL 5917198, at *10.

The LULAC Plaintiffs allege that the Attorney General has threatened to prosecute voting rights organizations and individuals who, like LULAC's volunteer members, wish to assist eligible voters who want to exercise their right to vote. ECF No. 207 ¶ 2. They claim that, since the Attorney General took office in 2015, he has prosecuted a disproportionate number of Black and Hispanic voters through his Election Integrity Unit. *Id.* ¶ 221. "[T]he Attorney General has also made clear that he plans to enforce" the S.B. 1 provisions challenged in this case. *Id.* ¶ 27.

Moreover, the Attorney General himself asserts that his office has statewide investigative authority and concurrent prosecutorial authority with local elected prosecutors over the election laws.[10] He has publicly declared that one of his key priorities is to investigate and prosecute allegations of voter fraud.[11] The Attorney General has also publicly touted that his office successfully prosecuted 534 election fraud offenses against 155 individuals, that 510 election offenses against 43 defendants remain pending, and that 386 active election fraud investigations currently exist.[12] In short, the Attorney General has demonstrated a willingness to enforce election law offenses under circumstances that, the LULAC Plaintiffs allege, are substantially similar to

---

[10] *See* Attorney General of Tex., *Election Integrity | Office of the Attorney General*, https://www.texas attorneygeneral.gov/initiatives/election-integrity (last visited July 3, 2022). The Court may take judicial notice of governmental websites, *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam), and may consider matters of which it takes judicial notice on a motion to dismiss, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[11] *See* Attorney General of Tex., *supra* note 10.

[12] *See* Attorney General of Tex., *supra* note 10.

those that LULAC's voting and volunteer members encounter. *Cf. City of Austin*, 943 F.3d at 1001–02. Based on these allegations and judicially noticed facts, the LULAC Plaintiffs have sufficiently shown at this stage that the Attorney General's credible threat of enforcing sections 4.06, 4.09, and 7.04 is certainly impending and therefore imminent.

In sum, the LULAC Plaintiffs have alleged, on a provision-by-provision basis, a plausible set of facts establishing that each of the S.B. 1 provisions they challenge harms LULAC's voting and volunteer members by either burdening their right to vote or by exposing them to criminal prosecution for conducting activities that fulfill LULAC's mission to protect voting rights. Thus, the LULAC Plaintiffs have alleged that LULAC's members have suffered an injury in fact.

### ii. The injury in fact that LULAC's members have suffered is fairly traceable to and redressable by the Secretary of State and the Attorney General.

Whether the injury in fact that LULAC's voting and volunteer members have suffered is fairly traceable to and redressable by the Secretary of State and the Attorney General is a straightforward inquiry. The invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the Secretary of State. *OCA-Greater Hous.*, 867 F.3d at 613. Further, the credible threat of enforcement that harms LULAC's voting and volunteer members is traceable to the Attorney General, who continues to retain authority to criminally prosecute election law offenses, including sections 4.06, 4.09, and 7.04.[13] An injunction prohibiting the Attorney General from enforcing sections 4.06, 4.09, and 7.04 will, at least partly, redress the injury in fact that LULAC's voting and volunteer members have suffered. *See Uzuegbunam v.*

---

[13] *Paxton v. Longoria*, No. 22-0224, 2022 WL 2080867 (Tex. June 10, 2022) does not hold otherwise. There, the Texas Supreme Court concluded that the Attorney General does not have authority to seek civil penalties under section 31.129 of the Election Code against an election official "based solely on the fact of the parties' agreement that [the Attorney General] lacks authority to enforce Section 31.129[.]" *Longoria*, 2022 WL 2080867, at *7.

*Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (internal quotation marks and citation omitted)).

The State Defendants counter that *OCA-Greater Houston* only applies in cases considering the facial validity of a Texas election statute. ECF No. 243 at 19. To be sure, the Fifth Circuit in *Texas Democratic Party v. Hughs*, 974 F.3d 570 (5th Cir. 2020) (per curiam), noted that *OCA-Greater Houston* involved a facial challenge. *Id.* at 570–71. The panel did so after observing that an "important question" had not been resolved, namely "whether and to what extent *Ex parte Young*'s exception to sovereign immunity permits plaintiffs to sue the Secretary in an as-applied challenge to a law enforced by local officials." *Id.* at 570. But the panel did not resolve that important question. Rather, it held that the "openness of the question alone [was] sufficient reason to deny" the plaintiffs' request for summary affirmance of a district court order concluding that the Secretary of State was not entitled to sovereign immunity. *Id.* at 571. Moreover, the VRA validly abrogated state sovereign immunity. *OCA-Greater Hous.*, 867 F.3d at 614. *Hughs*, therefore, is inapposite, as are the three cases the State Defendants raise in their notice of supplemental authority. *See generally* ECF No. 333. Those cases also address the scope of the *Ex parte Young* exception to sovereign immunity.[14] *See Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022); *Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022); *Richardson v. Flores*, 28 F.4th 649 (5th Cir. 2022). Sovereign immunity plays no role here.

Equally unpersuasive is the State Defendants' argument that *OCA-Greater Houston* is not binding on the Court because, in their view, the panel failed to consider *Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972). ECF No. 243 at 19–20. *Bullock*, according to the State Defendants,

---

[14] While there may be "significant overlap" between standing and *Ex parte Young* analyses, *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017), the fact remains that sovereign immunity is not relevant here.

indicates that the Secretary of State's duties under the Election Code are "not a delegation of authority to care for any breakdown in the election process." *Id.* at 19 (citing *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020 (citing *Bullock*, 480 S.W.2d at 372))). Their contention, however, is based on conjecture and reads much into the opinion that cannot be supported by the panel's careful reasoning. There is also no reason to ignore *OCA-Greater Houston* in response to a nonbinding concurring opinion of the Texas Supreme Court. *Id.* That the State Defendants believe *OCA-Greater Houston* was "wrongly" decided has no bearing. *Id.* The Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court." *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

Finally, the State Defendants argue that the LULAC Plaintiffs have failed to establish associational standing because their members do not "possess all of the indicia of membership in an organization." ECF No. 243 at 20–21 (quoting *Hunt*, 432 U.S. at 344). Demonstration of indicia of membership, however, is only required when the plaintiff association is not "a traditional voluntary membership organization[.]" *Hunt*, 432 U.S. at 344. That is not the case here. The LULAC Plaintiffs specifically allege, and the State Defendants do not dispute, that LULAC is a traditional membership organization. ECF No. 207 ¶ 255.

Thus, the LULAC Plaintiffs have alleged sufficient facts to show that the injury in fact that LULAC's members have suffered as to each of the challenged S.B. 1 provisions is fairly traceable to and redressable by the Secretary of State. The LULAC Plaintiffs have also alleged sufficient facts to show that LULAC's members' injuries as to sections 4.06, 4.09, and 7.04[15] are fairly

---

[15] To be clear, the Court's finding does not extend to section 276.018 of the Election Code. *See supra* note 8.

traceable to and redressable by the Attorney General. The LULAC Plaintiffs, therefore, have established that LULAC's members have standing to sue in their own right.[16]

### b.  The interests at stake are germane to LULAC's purpose.

The State Defendants do not dispute that the interests at stake in this action are germane to LULAC's purpose. *See generally* ECF Nos. 243, 306; *see also* ECF No. 281 at 12 n.3. Nor could they. LULAC "is the Texas chapter of the League of United Latin American Citizens, the oldest and largest Latino civil rights organization in the United States." ECF No. 207 ¶ 19. Its "mission is to protect the civil and voting rights of Latinos." *Id.* In filing this action, LULAC seeks to fulfill its purpose. The organization wants to vindicate its members' right to vote and ensure that its members can register and educate voters. *See id.* ¶ 13. Based on these uncontested allegations, there can be no question that the interests LULAC seeks to protect are germane to its purpose.

### c.  Neither the relief requested nor the claims asserted require the participation of LULAC's members in this lawsuit.

To determine whether the claim asserted or the relief requested requires the participation of an entity's members, courts must examine the claim's substance. *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009). However, "the third prong of the associational standing test is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). Further, the third prong is satisfied if the entity's "claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry." *Ass'n of Am.*

---

[16] The State Defendants argue that the LULAC Plaintiffs violate "the bar on third-party standing." ECF No. 243 at 27. They assert this argument in relation to Count III of the LULAC Plaintiffs' complaint. *Id.* But the LULAC Plaintiffs do not name the Secretary of State or the Attorney General as defendants under Count III. ECF No. 207 at 57. The Court, therefore, need not address this argument.

*Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). "[T]he third prong is solely prudential." *Id.* at 550.

The State Defendants argue that the LULAC Plaintiffs' claim under § 208 of the VRA requires the participation of individual members in this lawsuit. ECF No. 243 at 22–23; *see also* ECF No. 306 at 10. "[Section] 208 of the VRA guarantees a voter who requires assistance, because of blindness, disability, or inability to read or write, the right to assistance by a person of their choice in order to make their vote effective at all stages of the voting process." *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 1651215, at *14 (W.D. Tex. May 24, 2022). The State Defendants contend that, because § 208 contemplates different disabilities, an individual's right to assistance under § 208 is contingent upon the individual's asserted disability. ECF No. 243 at 23. They therefore submit that individual participation is necessary. *Id.*

But the LULAC Plaintiffs' claim under § 208 is not premised upon a specific individual's asserted disability. On the contrary, their claim rests on the allegation that section 7.04 of S.B. 1 prevents all eligible voters from receiving the assistance § 208 guarantees. *See* ECF No. 207 ¶¶ 292–94; *see also* ECF No. 281 at 17–18. In other words, the LULAC Plaintiffs' § 208 claim turns on the allegation that section 7.04 "prevents *all* eligible Section 208 voters from selecting a person who receives compensation for assistance." *Id.* at 18 (emphasis in original). Without question, it is more administratively convenient and efficient to assert such a challenge in a representative capacity. Further, the LULAC Plaintiffs allege that their members include assistors and eligible voters. *See* ECF No. 207 ¶¶ 292–93. These allegations sufficiently show at this stage that representative injured members exist.

Therefore, the LULAC Plaintiffs have established that neither the relief requested nor the claims asserted require the participation of LULAC's members in this lawsuit. Having done so,

the LULAC Plaintiffs have satisfied the three prongs of the associational standing test. LULAC, therefore, has associational standing to sue the Secretary of State and the Attorney General for injunctive relief under §§ 2 and 208 of the VRA.[17]

### 2. All of the LULAC Plaintiffs have organizational standing.

Organizational standing exists if the entity itself "meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). Under an organizational theory of standing, the entity may establish an injury in fact by alleging "a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). That is precisely what the LULAC Plaintiffs have alleged in this case.

LULAC engages in voter registration and education efforts, as well as other programs and activities that it has designed to increase voter turnout among its members and the community. ECF No. 207 ¶ 20. These efforts, programs, and activities are critical to LULAC's mission. *Id.* LULAC also dedicates its resources to programming that is unrelated to voting, including immigration and racial justice issues. *Id.* Its resources also support the organization's recruitment and expansion. *Id.* The challenged S.B. 1 provisions, however, raise "new barriers to voting that impose significant burdens on LULAC's members and constituents; as a result, LULAC must divert resources from other programs and activities to address the adverse impacts [of] S.B. 1 and to assist its members and constituents in surmounting new barriers to registration and voting." *Id.* But for the challenged S.B. 1 provisions, LULAC would invest its resources in other activities. *Id.*

---

[17] The allegations as to the Alliance's and Texas AFT's standing are substantially similar. Thus, it is likely that the LULAC Plaintiffs have alleged sufficient facts to establish that the Alliance and Texas AFT have associational standing to sue the Secretary of State and the Attorney General for injunctive relief under §§ 2 and 208 of the VRA.

Voto Latino is a "nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinx voters are enfranchised and included in the democratic process." *Id.* ¶ 21. It dedicates its resources to voter registration, as well as the mobilization of Hispanic voters in Texas and throughout the country. *Id.* Voto Latino's mobilization efforts consist of statewide voter registration initiatives, peer-to-peer and digital voter education, and get-out-the-vote ("GOTV") campaigns. *Id.* The nonprofit intends to spend millions of dollars to educate, register, and mobilize Hispanic voters in Texas and throughout the United States. *Id.* However, because of the challenged S.B. 1 provisions, it "will have to expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states or its own registration efforts in Texas to . . . assist its constituents in navigating the various additional hurdles[.]" *Id.* ¶ 22. Specifically, Voto Latino "will need to divert funds from its voter registration and GOTV digital advertisement budgets, as well as the time and energy of its staff and volunteers in Texas, to educate its constituents on how to successfully vote in Texas given the new restrictions imposed by SB 1[.]" *Id.*

The Alliance is a nonprofit, social welfare organization whose "mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work." *Id.* ¶ 23. It spends "resources on voter registration, phone banking, and GOTV activities, as well as activities aimed at expanding the Alliance itself, such as recruiting new members, opening new chapters, and making presentations to members' groups and seniors' groups." *Id.* ¶ 24. The challenged S.B. 1 provisions will require the Alliance "to divert resources from furthering these other activities to educate their members . . . on how to successfully vote in Texas given the new restrictions and limitations." *Id.* Otherwise, the Alliance "would be investing those resources into other activities, such as voter registration, phone banking, and efforts to expand the chapter." *Id.*

Finally, Texas AFT is a statewide labor union that "advocates for the employment rights of its members and champions high-quality public education, fairness, democracy, and economic opportunity for students, families, and communities." *Id.* ¶ 25. To fulfill its mission, Texas AFT helps "its membership select leaders who embrace and uphold the interests of its members and the values of the union." *Id.* However, in light of the challenged S.B. 1 provisions, it "will have to divert resources from these activities to educate its members on the new laws and to assist its members in navigating the barriers to voting imposed by SB 1." *Id.* Thus, the LULAC Plaintiffs have clearly suffered a cognizable organizational injury based on a diversion-of-resources theory.

The State Defendants' arguments to the contrary are unavailing. They first claim that the LULAC Plaintiffs have failed to allege a cognizable organizational injury on a provision-by-provision basis. ECF No. 243 at 23. That is incorrect. The LULAC Plaintiffs *do* allege that they have a suffered a cognizable organizational injury with respect to each of the S.B. 1 provisions they challenge. What the State Defendants fail to appreciate is that the organizational injury the LULAC Plaintiffs have alleged is the same for each of the S.B. 1 provisions they challenge. In order to counteract the effects of each of the challenged S.B. 1 provisions, the LULAC Plaintiffs are required to divert resources away from their routine community activities—such as phone banking, voter registration, efforts to expand members, and community advocacy and services dedicated to issues other than voting rights—to retrain staff, prepare new educational materials, conduct community outreach, and recruit, train, and manage new volunteers.

The State Defendants also rely on *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233 (5th Cir 2010), for the proposition that, "although the diversion of resources can constitute a requisite injury under certain circumstances, '[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact.'" *Id.* at 23–24 (quoting *City of Kyle*, 626 F.3d at 238). They argue

that the LULAC Plaintiffs' diversion-of-resources theory fails to establish an injury in fact because they have not identified specific projects that they have placed on hold or otherwise curtailed in light of the S.B. 1 provisions they challenge. *Id.* at 25–26 (citing *City of Kyle*, 626 F.3d at 238).

Setting aside the fact that the LULAC Plaintiffs *have* identified specific projects that need to be placed on hold, *see supra*, the Fifth Circuit expressly rejected such a prerequisite to standing at the pleading stage in *OCA-Greater Houston*:

> Our remark in *City of Kyle* that those plaintiffs could have established standing by "identif[ying] any specific projects that the HBA had to put on hold or otherwise curtail in order to respond to the revised ordinances" *was not a heightening of the* Lujan *standard, but an example of how to satisfy it by pointing to a non-litigation-related expense.*

867 F.3d at 612 (emphasis added). The plaintiff organization in *OCA-Greater Houston* alleged that it had been injured by the need for "'additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters' because 'addressing the challenged provisions frustrates and complicates its routine community outreach activities.'" *Id.* at 610. The panel held that the plaintiff organization's injury was a sufficient Article III injury to establish organizational standing because the Texas law at issue forced the organization to divert resources and "perceptibly impaired [its] ability to get out the vote among its members." *Id.* at 612 (internal quotation marks omitted). To establish a cognizable organizational injury, therefore, the LULAC Plaintiffs need not identify specific projects that they have placed on hold. Having done so, they have simply exceeded the requirements for pleading organizational standing.

The State Defendants' reliance on *Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018), again imposes an improper heightened pleading standard. In *Zimmerman*, a councilmember sued the City of Austin and asserted constitutional challenges against, *inter alia*, a provision in a local campaign-finance law that prohibited candidates from accepting more than a predetermined

aggregate sum of monetary contributions from individuals outside of the Austin area. 881 F.3d at 382. After a bench trial, the district court concluded that the councilmember lacked standing to challenge the provision. *Id.* On appeal, the councilmember argued that the provision prompted an Article III injury because "it caused him to change his campaign strategy and withhold solicitations he otherwise would have sent to individuals outside of the Austin area." *Id.* at 389. The Fifth Circuit, however, disagreed and affirmed the district court's ruling. *Id.* The panel found that the councilmember had not demonstrated at trial that he intended to engage in conduct that the provision proscribed. *Id.* But the panel said nothing about what an organization must allege to establish an injury in fact at the pleading stage. In fact, the panel observed that "changing one's campaign plans or strategies in response to an allegedly injurious law *can* itself be a sufficient injury to confer standing[.]" *Id.* at 390 (emphasis added). In doing so, the panel indicated that a diversion in efforts may be sufficient to establish an organizational injury at the pleading stage.

The State Defendants also cite *Fowler* and other out-of-circuit cases to argue that frustration of an organization's purpose, in and of itself, is insufficient to establish an injury in fact. *See* ECF No. 243 at 24–26. True enough. A "showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, *in and of itself*, to confer standing on the organization to sue on its own behalf." *Fowler*, 178 F.3d at 361 n.7 (emphasis added). The LULAC Plaintiffs, however, allege far more than a mere conflict between their missions and the S.B. 1 provisions they challenge. They assert that they must divert their resources away from their routine and anticipated projects, both voting-related and otherwise, to address the impact that each of the challenged S.B. 1 provisions will have on their voting and volunteer members. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract

social interests[.]" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also TransUnion*, 141 S. Ct. at 2204 ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").

Finally, the State Defendants observe that the LULAC Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." ECF No. 243 at 24 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (quotation marks omitted)). They contend that the LULAC Plaintiffs "must act in response to an impending injury." *Id.* In other words, the State Defendants claim that "a diversion of resources is cognizable only if the plaintiff 'would have suffered some other injury if it had not diverted resources to counteracting the problem.'" *Id.* (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).

The State Defendants mischaracterize *La Asociacion de Trabajadores*. There, the Ninth Circuit began its analysis by making clear that an "organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *La Asociacion de Trabajadores*, 624 F.3d at 1088 (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). The panel then noted that a plaintiff organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Id.* "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.* For example, the panel explained, in *Havens*, "housing discrimination threatened to make it more difficult for HOME to counsel people on where they might live if the organization didn't spend money fighting it." *Id.* (citing *Havens*, 455 U.S. at 379). "The organization could not avoid suffering one injury or the other, and therefore had standing to sue." *Id.*

In short, the Ninth Circuit's analysis in *La Asociacion de Trabajadores* stands for the same proposition that the Supreme Court and the Fifth Circuit have repeatedly acknowledged: "An entity can show an organizational injury by alleging that it must divert resources from its usual activities in order to lessen the challenged restriction's harm to its mission." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020), *rev'd and remanded on other grounds sub nom. Lewis*, 28 F.4th at 659 (citing *Havens*, 455 U.S. at 379); *see also OCA-Greater Hous.*, 867 F.3d at 612 (finding that plaintiff organization established injury in fact when it "went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public"); *La. ACORN Fair Hous.*, 211 F.3d at 305 ("[A]n organization could have standing if it had proven a drain on its resources from counteracting the effects of the defendant's actions." (citing *Fowler*, 178 F.3d at 360)). The LULAC Plaintiffs have alleged that they must divert their resources from their usual activities to address the harms that the challenged S.B. 1 provisions will cause to their missions. No more is required at the pleading stage.

Each of the LULAC Plaintiffs has adequately alleged a cognizable organizational injury. For the reasons discussed *supra*, they have also alleged sufficient facts to show that their organizational injury, as prompted by each of the S.B. 1 provisions they challenge, is fairly traceable to and redressable by the Secretary of State and that their organizational injury, as prompted by sections 4.06, 4.09, and 7.04[18], is fairly traceable to and redressable by the Attorney General. Thus, the LULAC Plaintiffs have established that they each have organizational standing to sue the Secretary of State and the Attorney General under §§ 2 and 208 of the VRA.

---

[18] *See supra* notes 8, 15.

### C.  The LULAC Plaintiffs have stated claims upon which relief may be granted under §§ 2 and 208 of the VRA.

Relying on *Alexander v. Sandoval*, 532 U.S. 275 (2001), the State Defendants argue that §§ 2 and 208 of the VRA do not create private causes of action.[19] ECF No. 54 at 24–29. The State Defendants further contend that, even if §§ 2 and 208 create private causes of action, nonvoting, organizational plaintiffs cannot enforce such causes of action. *Id.* The Court disagrees.

"The Fifteenth Amendment guarantees that the 'right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude,' § 1, and it grants Congress the authority to 'enforce' these rights 'by appropriate legislation,' § 2." *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 217 (2009) (quoting U.S. Const. amend. XV, §§ 1–2). "Congress enacted the landmark Voting Rights Act of 1965, 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq.*, in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021). "The Voting Rights Act is ambitious, in both goal and scope." *Id.* at 2351 (Kagan, J., dissenting). It contains comprehensive sections designed "to correct an active history of discrimination" and "deal with the accumulation of discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 44 n.9 (1986) (internal quotation marks and citation omitted).

Section 2 of the VRA "was enacted to forbid, in all 50 States, any 'standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color.'" *Shelby County v. Holder*, 570 U.S. 529, 536 (2013) (quoting 79 Stat. 437). "The current version forbids any 'standard, practice, or procedure' that

---

[19] The State Defendants incorporate the arguments from their first motion to dismiss. *See* ECF No. 243 at 27. Although the Court denied the State Defendants' motion to dismiss on this point at the hearing held on November 16, 2021, the Court provides a more thorough explanation for its denial herein.

'results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color.'" *Id.* at 536–37 (quoting 42 U.S.C. § 1973(a)). Section 208, on the other hand, provides that a "voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

To be sure, "private rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. However, "[o]rganizations and private parties have been permitted to enforce Section 2 of the VRA, both before and after the 2001 [*Sandoval*] case on which Defendants rely." *Veasy v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014). For example, in *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006), voters and interest groups challenged Texas's congressional redistricting plan under § 2. Similarly, in *Johnson v. De Grandy*, 512 U.S. 997 (1994), two groups of Hispanic and Black voters challenged Florida's legislative redistricting plan under § 2. Furthermore, in this Circuit, a Hispanic advocacy group filed suit against the City of Boerne, "alleging that the voting method adopted by the City Charter diluted minority voting strength, in violation of Section 2 of the Voting Rights Act[.]" *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433, 435 (5th Cir. 2012).

Organizations and private parties have also been permitted to enforce § 208 of the VRA. In *OCA-Greater Houston*, for instance, the plaintiff was a nonprofit organization conducting "Get Out the Vote" efforts among voters with limited English proficiency. 867 F.3d at 609. The suit alleged that a provision in the Election Code that restricted who could assist voters with limited English proficiency was preempted by § 208. *Id.* at 608. On the merits, the Fifth Circuit held that the challenged provision "impermissibly narrows the right guaranteed by Section 208 of the VRA." *Id.* at 615. District courts outside of this Circuit have similarly confirmed that organizations

and private plaintiffs may enforce § 208. *See Democracy N.C. v. N.C. State Bd. of Elections*, --- F. Supp. 3d ----, No. 1:20CV457, 2022 WL 715973, at *14 (M.D. N.C. 2022) (holding that natural person "has sufficiently alleged a plausible claim that North Carolina's absentee ballot voting laws violate Section 208"); *Fla. State Conf. of NAACP v. Lee*, --- F. Supp. 3d ----, No. 4:21cv187-MW/MAF, 2021 WL 6072197, at *9 (N.D. Fla. 2021) (holding that voting rights organizations stated a claim under § 208 of VRA); *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 796–97 (W.D. Ark. 2021) (same); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (same). Indeed, "every court that has considered the issue—and the Attorney General of the United States—agree[s] that private parties may enforce section 208." *Lee*, 2021 WL 6072197, at *9.

Further, the Court finds the *Lee* court's analysis of whether § 208 creates a private cause of action persuasive. *See id.* at * 7–9. The judicial task when assessing whether a statute creates a private cause of action is "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. In 1975, Congress amended § 3 of the VRA "by striking out 'Attorney General' . . . and inserting in lieu thereof the following[:] 'Attorney General or an aggrieved person.'" Voting Rights Act Amendments of 1975, Pub. L. 94-73, 89 Stat. 404. In its current form, § 3 makes clear that "an aggrieved person" may institute "a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State[.]"[20] 52 U.S.C. § 10302(a). Section 3, therefore, plainly provides that a private plaintiff may initiate a lawsuit under any statute that enforces the Fourteenth and Fifteenth Amendments.

---

[20] Congress has also made clear that in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, *other than the United States*, a reasonable attorney's fees, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e) (emphasis added).

"Congress clearly designed section 208 to enforce the Fourteenth Amendment's guarantees." *Lee*, 2021 WL 6072197, at *9. In *Lane*, the Supreme Court held that, upon enacting Title II of the American with Disabilities Act ("ADA"), Congress validly abrogated state sovereign immunity under the Fourteenth Amendment because Title II of the ADA sought to remedy, among other concerns, discrimination against disabled voters. 541 U.S. at 524, 533–34. The Supreme Court has also cautioned that, "because of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause[.]" *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). Thus, since § 208 is, by its terms, a statute designed for enforcement of the guarantees of the Fourteenth Amendment, "Congress must have intended it to provide private remedies." *Morse v. Republican Party of Va.*, 517 U.S. 186, 234 (1996). Congress certainly envisioned that private remedies under § 208 would be enforceable under § 3 of the VRA, which again, provides that a private plaintiff may initiate a lawsuit under *any* statute that enforces the Fourteenth Amendment. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2015) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013)).

In sum, the State Defendants fail to provide any caselaw showing that organizations or private plaintiffs cannot assert claims under §§ 2 and 208 of the VRA. On the contrary, caselaw clearly establishes that organizations, like the LULAC Plaintiffs, have historically been able to enforce §§ 2 and 208. Absent any compelling showing to the contrary, the Court is not inclined to deviate from firmly entrenched historical precedent that has permitted organizational plaintiffs,

like the LULAC Plaintiffs, to allege claims under §§ 2 and 208. The LULAC Plaintiffs, therefore, have stated claims upon which relief may be granted under §§ 2 and 208 of the VRA.

## CONCLUSION

For the foregoing reasons, the Texas Secretary of State and the Texas Attorney General's motion to dismiss all the claims that LULAC Texas, Voto Latino, the Texas Alliance for Retired Americans, and Texas AFT have asserted against them (ECF No. 243) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

Any and all claims challenging section 7.04 of S.B. 1, as codified in section 276.018 of the Texas Election Code, are **DISMISSED WITHOUT PREJUDICE**.

Any and all claims challenging portions of section 6.04 of S.B. 1 that the district court enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are **MOOT**.

All other claims that LULAC Texas, Voto Latino, the Texas Alliance for Retired Americans, and Texas AFT have asserted against the Texas Secretary of State and the Texas Attorney General may proceed.

It is so **ORDERED**.

**SIGNED** this July 12, 2022.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE