**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered the Texas Governor, the Texas Secretary of State, and the Texas Attorney General's motion to dismiss all claims that Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Mi Familia Vota, Marla López, Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons have asserted against them (ECF No. 239). After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code") by altering various election practices and procedures pertaining to early voting, voting by mail, voter assistance, and more. *See generally id.*

Days before and after the Governor signed S.B. 1 into law, several private plaintiffs filed suit, alleging that certain provisions of S.B. 1 violate federal law and the United States

1

Constitution.[1] This order addresses two of these suits filed by Houston Area Urban League ("HAUL"), Delta Sigma Theta Sorority, Inc. ("DST"), The Arc of Texas, Mi Familia Vota ("MFV"), Marla López, Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons (together, the "HAUL Plaintiffs").[2] *See* Compl., *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. Sept. 27, 2021), ECF No. 1; Compl., *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. Sept. 7, 2021), ECF No. 1. The HAUL Plaintiffs challenge sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.01, 5.02, 5.03, 5.04, 5.06, 5.07, 5.08, 5.11, 5.12, 5.13, 5.14, 6.01, 6.03, 6.04, 6.05, 6.07, 7.02, and 7.04 of S.B. 1. ECF No. 199 ¶¶ 260–62; 276–78; 295–97; 309–11; 323–24; 329; 339; 355.[3]

On January 18, 2022, the HAUL Plaintiffs filed their second amended complaint against the Texas Governor, (the "Governor"), the Texas Secretary of State (the "Secretary"), and the Texas Attorney General (the "Attorney General"), in their official capacities (together, the "State Defendants").[4] ECF No. 199. They assert eight claims as follows:

- HAUL, DST, MFV, the Lopezes, and Mr. Rutledge allege that all of the challenged provisions—except for sections 3.15, 4.06, 4.09, and 6.04—violate the First and Fourteenth Amendments because the provisions impose an undue burden on the right to vote, and they

---

[1] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021)) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *see also* Order, *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

[2] Houston Justice initially joined the HAUL Plaintiffs in filing this action. However, on February 22, 2022, the HAUL Plaintiffs filed an unopposed motion to withdraw Houston Justice as a party. ECF No. 275. The Court granted the motion.

[3] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

[4] The HAUL Plaintiffs have also sued, in their official capacities, Harris County District Attorney Kim Ogg, Bexar County District Attorney Joe Gonzales, Travis County District Attorney José Garza, Bexar County Elections Administrator Jacquelyn Callanen, and Harris County Elections Administrator Isabel Longoria. ECF No. 199 ¶¶ 77–79; 84–85.

name the Secretary and the Attorney General as defendants for this claim;

- HAUL, DST, and the Lopezes allege that all of the challenged provisions violate the Fourteenth Amendment because the provisions intentionally deny the right to vote on the basis of race, and they name the Secretary and the Attorney General as defendants for this claim;

- HAUL, DST, MFV, and the Lopezes allege that all of the challenged provisions violate the Fifteenth Amendment, and they name the Secretary and the Attorney General as defendants for this claim;

- HAUL, DST, MFV, and the Lopezes allege that all of the challenged provisions—except for sections 4.06 and 4.09—violate § 2 of the Voting Rights Act of 1965 ("VRA"), and they name the Governor, the Secretary, and the Attorney General as defendants for this claim;

- MFV, DST and The Arc of Texas allege that sections 6.01, 6.03, 6.04, 6.05, and 6.07 violate § 208 of the VRA, and they name the Governor, the Secretary, and the Attorney General as defendants for this claim;

- Mr. Clemmons alleges that sections 4.06, 4.07, and 4.09 violate the Fourteenth Amendment because the provisions are unconstitutionally vague, and he names the Secretary and the Attorney General as defendants for this claim; and

- The Arc of Texas alleges that sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.03, 6.04, 6.05, and 6.07 violate Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act, and it names the Secretary and the Attorney General as defendants for these two claims.

*Id.* ¶¶ 260–62; 276–78; 295–97; 309–11; 323–24; 329; 339; 355. The HAUL Plaintiffs seek to enjoin the State Defendants from enforcing each of the S.B. 1 provisions that they challenge under their constitutional and statutory claims. *Id.* at 129.

On February 8, 2022, the State Defendants filed a motion to dismiss all claims that the HAUL Plaintiffs have asserted against them. ECF No. 239. The HAUL Plaintiffs filed a response, ECF No. 252, and the State Defendants filed a reply, ECF No. 264. On March 18, 2022, the State

Defendants filed a notice of supplemental authority. ECF No. 333. Thereafter, on April 8, 2022, the HAUL Plaintiffs filed a response to the State Defendants' notice. ECF No. 359.

## DISCUSSION

### I.  Legal Standards

The State Defendants move to dismiss the HAUL Plaintiffs' claims on three grounds. First, the State Defendants argue that state sovereign immunity bars the HAUL Plaintiffs from suing the Governor, the Secretary, and the Attorney General. Second, the State Defendants claim that the HAUL Plaintiffs lack standing to bring this suit. Finally, the State Defendants contend that the HAUL Plaintiffs have failed to state a claim upon which relief may be granted under Title II of the ADA, § 504 of the Rehabilitation Act, and § 208 of the VRA.

#### A.  Subject matter jurisdiction

Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case.[5] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The Eleventh Amendment and the doctrine of sovereign immunity limit a federal court's jurisdiction. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). The doctrine of sovereign immunity "also prohibits suits against state officials or agencies that are effectively suits against a state." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). State sovereign immunity, however, "is not limitless[.]" *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020). "A State may waive its sovereign immunity . . . and in some circumstances Congress may abrogate it by appropriate

---

[5] Congress, by statute, has proclaimed that the "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The HAUL Plaintiffs assert claims against the State Defendants under federal law. The Court, therefore, is statutorily authorized to adjudicate this case.

legislation." *Stewart*, 563 U.S. at 253–54 (citation omitted). Additionally, under *Ex parte Young*, 209 U.S. 123 (1908), "a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Reeves*, 954 F.3d at 736.

Article III of the United States Constitution also limits a federal court's constitutional power to adjudicate a case. It "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. CONST. art. III, § 2). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing, therefore, "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). It provides definition to the constitutional limits of subject matter jurisdiction, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), by identifying "those disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted).

A federal court must consider a motion to dismiss for lack of subject matter jurisdiction "before other challenges 'since the court must find jurisdiction before determining the validity of the claim.'" *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The federal court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

### B.  Failure to state a claim

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II.   Analysis

The Court addresses each of the State Defendants' three grounds for dismissal, beginning, as it must, with their jurisdictional contentions.

### A.  State sovereign immunity does not bar the HAUL Plaintiffs' claims against the Governor, the Secretary, and the Attorney General.

The State Defendants claim that state sovereign immunity bars the HAUL Plaintiffs' claims against the Governor, the Secretary, and the Attorney General. ECF No. 239 at 10–26. They emphasize that the HAUL Plaintiffs cannot satisfy the *Ex parte Young* exception to state sovereign immunity. *Id.* at 11–25. The State Defendants also contend that the HAUL Plaintiffs have failed to demonstrate an alternative exception to state sovereign immunity. *Id.* at 25–26.

1. **The *Ex parte Young* exception to state sovereign immunity permits the HAUL Plaintiffs to sue the Secretary and the Attorney General for most of the S.B. 1 provisions that they challenge on constitutional grounds.**

State sovereign immunity under the Eleventh Amendment generally precludes suits against state officials in their official capacities. *City of Austin*, 943 F.3d at 997. The *Ex parte Young* exception to state sovereign immunity, however, allows private parties to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). The Supreme Court has counseled that, "[i]n determining whether the *Ex parte Young* doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). The Supreme Court has also made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his office, must have "some connection with the enforcement" of the challenged law. *Young*, 209 U.S. at 157.

Despite the straightforward inquiry that the Supreme Court envisioned, the Fifth Circuit has acknowledged that its own decisions "are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 n.21 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 999). Nevertheless, the Fifth Circuit has articulated some general rules. For instance, the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Id.* at 400–01 (emphasis in original) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Fifth Circuit has also determined that,"[i]f the official sued is not

statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." *Id.* at 401 (quotation marks and citation omitted). "Moreover," according to the Fifth Circuit, "a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce." *Id.*

The Fifth Circuit has further explained that plaintiffs must at least "show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Morris*, 739 F.3d at 746). Put differently, the state "official must be 'statutorily tasked with enforcing the challenged law[,]'" *id.* (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 161 (2021)), though whether the particular duty to enforce the statute in question "arises out of the general law, or is specially created by the [statute] itself, is not material so long as it exists[,]" *Young*, 209 U.S. at 157. "Enforcement typically means 'compulsion or constraint.'" *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). "A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Id.* (quoting *City of Austin*, 943 F.3d at 1002). In short, "if an 'official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception.'" *Tex. Democratic Party I*, 961 F.3d at 401 (emphasis in original) (quoting *City of Austin*, 943 F.3d at 1002).

Here, the HAUL Plaintiffs assert four claims under the First, Fourteenth, and Fifteenth Amendments against the Secretary and the Attorney General. ECF No. 199 ¶¶ 250–300, 327–36. They do so pursuant to 42 U.S.C. § 1983, which "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v.*

*Gabbert*, 526 U.S. 286, 290 (1999). Congress has not abrogated state sovereign immunity under §

1983. *Raj*, 714 F.3d at 328. Nonetheless, the HAUL Plaintiffs may institute a § 1983 action for

prospective injunctive relief consistent with the *Ex parte Young* exception to state sovereign

immunity. *Edelman v. Jordan*, 415 U.S. 651, 677 (1974).

> a. **The HAUL Plaintiffs have shown that the Secretary has a sufficient enforcement connection to all of the S.B. 1 provisions that they challenge on constitutional grounds.**

"Determining whether *Ex parte Young* applies to a state official requires a provision-by-

provision analysis[.]"[6] *Tex. Democratic Party II*, 978 F.3d at 179. "[T]he official must have the

requisite connection to the enforcement of the particular statutory provision that is the subject of

the litigation." *Id.* "This is especially true here because the Texas Election Code delineates between

the authority of the Secretary of State and local officials." *Id.*

Thus, the question before the Court at this stage of the proceedings is whether the HAUL

Plaintiffs have alleged a plausible set of facts establishing that the Secretary has a sufficient

enforcement connection to each of the S.B. 1 provisions that they challenge on constitutional

grounds—that is, whether the HAUL Plaintiffs have plausibly established that the Secretary can

and will enforce each of these provisions.

---

[6] The State Defendants contend that the HAUL Plaintiffs must, at the pleading stage, establish that the *Ex parte Young* exception applies to a state official on a provision-by-provision basis. ECF No. 239 at 10; ECF No. 264 at 9; *see also* ECF No. 333 at 2. They rely on *Texas Democratic Party II* and *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022), for their assertion. Neither of these cases, however, specifically hold that the *Ex parte Young* exception to state sovereign immunity *must* be assessed on a provision-by-provision basis at the pleading stage. Rather, these cases discuss the *Ex parte Young* exception to state sovereign immunity in reviewing the validity of a district court's injunction. Indeed, the Fifth Circuit has made clear that, at the pleading stage, plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction. *Physician Hosps. of Am.*, 691 F.3d at 652. Nevertheless, in resolving the instant motion to dismiss, the Court assumes, but does not decide, that the HAUL Plaintiffs must, at this stage of the proceedings, establish that the *Ex parte Young* exception to state sovereign immunity applies on a provision-by-provision basis.

> **i.    The HAUL Plaintiffs have plausibly established that the Secretary can enforce all of the S.B. 1 provisions that they challenge on constitutional grounds.**

The HAUL Plaintiffs name the Secretary as a defendant for their claims challenging sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.01, 5.02, 5.03, 5.04, 5.07, 5.08, 5.11, 5.12, 5.13, 5.14, 6.01, 6.03, 6.04, 6.05, 6.07, 7.02, and 7.04 under the First, Fourteenth, and Fifteenth Amendments.[7] ECF No. 199 ¶¶ 250–300, 329.

A state official is most clearly tasked with enforcing a statute when the state official is "specially charged with the duty to enforce the statute[.]" *Young*, 209 U.S. at 158. Sections 2.05, 2.06, and 2.07 charge the Secretary with enforcing these provisions.

Sections 2.05 and 2.07 establish additional procedures for the maintenance of voter rolls. Section 2.05 states, in relevant part:

> The secretary of state shall enter into an agreement with the Department of Public Safety under which information in the existing statewide computerized voter registration list is compared against information in the database of the Department of Public Safety on a monthly basis to verify the accuracy of citizenship status information previously provided on voter registration applications. In comparing information under this subsection, the secretary of state shall consider only a voter's information in the database of the Department of Public Safety that was derived from documents presented by the voter to the department after the person's current voter registration became effective, and may not consider information derived from documents presented by the voter to the

---

[7] The State Defendants submit that the HAUL Plaintiffs also challenge sections 3.08, 4.04, and 4.11 and that they direct these challenges against the Secretary. ECF No. 239 at 12. Not so. The HAUL Plaintiffs clearly allege which S.B. 1 provisions they challenge in paragraphs 250 through 365 of their complaint, none of which include sections 3.08, 4.04, and 4.11. Rather, the HAUL Plaintiffs refer to sections 3.08, 4.04, and 4.11 to show how S.B. 1 has expanded the Secretary's authority under the Election Code. ECF No. 199 ¶ 75. Further, the State Defendants claim that the HAUL Plaintiffs fail to establish that the Secretary has a sufficient enforcement connection to sections 5.06 and 5.10. ECF No. 239 at 12. But the HAUL Plaintiffs challenge sections 5.06 and 5.10 under Title II of the ADA and § 504 of the Rehabilitation Act, not the United States Constitution. ECF No. 199 ¶¶ 339, 349, 355. Thus, the HAUL Plaintiffs may, but need not, rely on the *Ex parte Young* exception to state sovereign immunity to assert claims challenging sections 5.06 and 5.10. Finally, the State Defendants fail to observe that the HAUL Plaintiffs also assert claims challenging sections 5.11, 6.07, 7.02, and 7.04 under the First, Fourteenth, and Fifteenth Amendments against the Secretary. *See* ECF No. 239 at 12, 14–22; *see also* ECF No. 199 ¶¶ 260, 276–77, 295–96. Nevertheless, the Court considers whether the *Ex parte Young* exception to state sovereign immunity applies.

> department before the person's current voter registration became
> effective.

TEX. ELEC. CODE § 16.0332(a-1). Upon receiving notice from the Secretary of a voter whose citizenship is in question based on the Secretary's comparison of voter registration and Department of Public Safety records, voter registrars must deliver a written notice to the voter, requiring them to submit "proof of United States citizenship in the form of a certified copy of the voter's birth certificate, United States passport, or certificate of naturalization or any other form prescribed by the secretary of state." *Id.* § 16.0332(a). Section 2.05 makes clear that the Secretary "shall prescribe rules for the administration of this section." *Id.* § 16.0332(d). In addition, "[n]ot later than December 31 of each year, the secretary of state shall provide a report to the legislature of the number of voter registrations canceled under this section during the calendar year." *Id.* § 16.0332(e).

Moreover, the Secretary is statutorily responsible for ensuring that voter registrars substantially comply with his rules and requirements implementing the statewide computerized voter registration list. *Id.* § 18.065(a). This necessarily includes the Secretary's rules and requirements pertaining to notices that he sends to voter registrars pursuant to section 2.07. Indeed, section 2.07 directs the Secretary to provide notice to voter registrars if he determines that a voter on the statewide computerized voter registration list is no longer "a resident of the county in which the voter is registered to vote[.]" *Id.* § 18.068(a).

Furthermore, section 2.06 requires the Secretary to sanction a voter registrar if he determines that the voter registrar failed to substantially comply with his rules or requirements implementing the statewide computerized voter registration list. *Id.* § 18.065(e). Specifically, for the first violation, the Secretary must require the voter registrar to attend a training course on compliance. *Id.* § 18.065(e)(1). Section 2.06 tasks the Secretary with developing and implementing

11

the training program. *Id.* § 18.065(h). In the event of a second violation, the Secretary must "audit the voter registration list for the county in which the registrar serves to determine the actions needed to achieve substantial compliance . . . and provide the results of the audit to the registrar[.]" *Id.* § 18.065(e)(2). For a third or any subsequent violation, if the Secretary determines that the voter registrar, within fourteen days of receiving the results of his audit, "has not performed any overt actions in pursuance of compliance with the actions identified" in those results, then he must "inform the attorney general that the county which the registrar serves may be subject to a civil penalty[.]" *Id.* § 18.065(e)(3). Section 2.06 also makes clear that the Secretary "shall adopt rules and prescribe procedures for the implementation of this section." *Id.* § 18.065(i). Thus, sections 2.05, 2.06, and 2.07 plainly establish that the Secretary is statutorily tasked with enforcing the same.

However, for the *Ex parte Young* exception to apply, "[t]he text of the challenged law need not actually state the official's duty to enforce it[.]" *City of Austin*, 943 F.3d at 997–98. It is enough that the state official's duty "arises out of the general law[.]" *Young*, 209 U.S. at 157. The Supreme Court's directive in *Young* is especially relevant in this case, where the Election Code includes several provisions that clearly empower the Secretary with duties to specifically enforce the remaining S.B. 1 provisions that the HAUL Plaintiffs challenge on constitutional grounds.

For instance, sections 5.01, 5.02, 5.03, and 5.07 establishes new requirements for vote-by-mail applications. In *Texas Democratic Party II*, the Fifth Circuit considered whether state sovereign immunity barred a challenge to an Election Code provision pertaining to vote-by-mail applications. Specifically, the plaintiffs alleged that an Election Code provision permitting only voters over the age of sixty-five to vote by mail was unconstitutional under the Twenty-Sixth Amendment. *Tex. Democratic Party II*, 978 F.3d at 174. The question before the Fifth Circuit was

whether the district court erred in requiring the Secretary to allow voters who are otherwise qualified to vote, but under the age of sixty-five, to vote by mail. *Id.*

To determine whether the Secretary was entitled to state sovereign immunity, the panel consulted the Election Code and observed that the Secretary "has the specific and relevant duty to design the application form for mail-in ballots . . . and to provide that form to local authorities and others who request it." *Id.* at 179 (citing TEX. ELEC. CODE §§ 31.002(a)–(b)). It further noted that the Election Code requires the Secretary to "furnish forms to those who request them for distribution to others." *Id.* at 179–80 (citing TEX. ELEC. CODE § 84.013). The panel also found it significant that the Election Code requires local officials "to use the Secretary's absentee-ballot form outside of emergency situations[.]" *Id.* at 180 (citing TEX. ELEC. CODE § 31.002(d)). Based on these duties found throughout the Election Code, the Fifth Circuit found that "the Secretary has the authority to compel or constrain local officials based on actions []he takes as to the application form." *Id.* The Fifth Circuit therefore held that, notwithstanding the division of responsibilities among the Secretary and local officials, the Secretary had a sufficient enforcement connection to the vote-by-mail provision at issue, justifying application of the *Ex parte Young* exception to state sovereign immunity as to the Secretary. *Id.*

The same conclusion is warranted here. Section 5.01 provides that a vote-by-mail application "must be submitted in writing and signed by the applicant using ink on paper." TEX. ELEC. CODE § 84.001(b). In other words, the provision imposes a wet-signature requirement for vote-by-mail applications. Section 5.02 generally provides that an applicant must now submit their driver's license, election identification certificate, or personal identification card number on their vote-by-mail application. TEX. ELEC. CODE § 84.002(a)(1-a). Section 5.03, in turn, expressly states that a vote-by-mail application must include a space for an applicant to enter the identification

information that section 5.02 requires. *Id.* § 84.001(a)(3-a). Section 5.07 provides that an early voting clerk must reject the applicant's vote-by-mail application if the required identification information on their application is either missing or does not match the identification information that the applicant previously provided on their voter registration application. *Id.* § 86.001(f).

As *Texas Democratic Party II* explained and the HAUL Plaintiffs allege, the Secretary is statutorily required to prescribe the design and content of "the forms necessary for the administration" of the Election Code. *Id.* § 31.002(a); *see also* ECF No. 199 ¶ 74. The forms "must enhance the ability of a person to understand the applicable requirements and to physically furnish the required information in the space provided." TEX. ELEC. CODE § 31.002(a). The Secretary must furnish samples of these forms to "the appropriate authorities who have administrative duties under this code; and other persons who request a form for duplication." *Id.* § 31.002(b). The Secretary must also maintain a supply of these forms and provide them to individuals and organizations that request them for distribution to voters. *Id.* § 84.013. Local officials must then use these forms, except in an emergency. *Id.* § 31.002(d).

It therefore follows that the Election Code requires the Secretary to modify vote-by-mail applications, so that they include the statutorily-required space for applicants to enter the identification information that the Election Code now requires. Consequently, as in *Texas Democratic Party II*, the Secretary has the authority to compel or constrain local officials based on the actions he takes with respect to vote-by-mail applications.

The same reasoning applies to the HAUL Plaintiffs' challenges to section 5.08, 5.12, 5.13, 5.14, and 6.07. Section 5.08 generally provides that a voter must submit their driver's license, election identification certificate, or personal identification card number on their mail ballot carrier envelope. *Id.* § 86.002(g). It makes clear that a mail ballot carrier envelope "must include a space

that is hidden from view when the envelope is sealed for the voter to enter" the required identification information. *Id.* Section 5.13 also provides that an early voting clerk must reject a mail-in ballot if the required identification information on the mail ballot carrier envelope is either missing or does not match the identification information that the voter previously provided on their voter registration application. *Id.* § 87.041(b)(8).

Section 5.12, in turn, describes what curative measures a signature verification committee must or may offer to a voter whose mail-in ballot has been rejected based on, for example, the absence of the required identification information. *Id.* § 87.0271(a)(4). The provision authorizes the Secretary to "prescribe any procedures necessary to implement this section." *Id.* §§ 87.0271(f). Section 5.14 similarly describes what curative measures an early voting ballot board must or may offer to a voter whose mail-in ballot has been rejected for the same reason. *Id.* § 87.0411(a)(4). The provision also authorizes the Secretary to "prescribe any procedures necessary to implement this section." *Id.* § 87.0411(f). Section 6.07 states that a space must appear on the reverse side of the mail ballot carrier envelope for an assistor to indicate their relationship to a voter. *Id.* § 86.013(b)(3). Thus, as with vote-by-mail applications, the Secretary has the authority to compel or constrain local officials and assistors based on the actions he takes with respect to the design and content of mail ballot carrier envelopes.

The State Defendants counter that local officials are the proper defendants for the HAUL Plaintiffs' challenges to these and other provisions because the provisions explicitly reference local officials. ECF No. 239 at 14–22. It is true that, "[i]f the official sued is not 'statutorily tasked with enforcing the challenged law,' then the requisite connection is absent and '[the Court's] *Young* analysis ends.'" *In re Abbott*, 956 F.3d at 709 (quoting *City of Austin*, 943 F.3d at 998). But the

Supreme Court also made clear long ago that the challenged provision need not explicitly identify the state official named as a defendant for the *Ex parte Young* exception to apply:

> The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, *and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.*

*Young*, 209 U.S. at 157 (emphasis added). Indeed, a state official may be statutorily tasked with enforcing a challenged provision based on the text in the challenged provision itself or the general law—such as, for example, the Election Code.

Further, it is worth noting that the provision at issue in *Texas Democratic Party II*, section 82.003 of the Election Code, did not explicitly refer to the Secretary either. In its entirety, section 82.003 states: "A qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day." TEX. ELEC. CODE § 82.003. Despite the absence of a specific reference to the Secretary in section 82.003, the Fifth Circuit located the Secretary's duties to enforce the provision in another section of the Election Code: "[T]he Secretary's specific duties regarding the application form under Section 31.002 are enough for us to conclude that the Secretary has at least a scintilla of enforcement authority for Section 82.003." *Tex. Democratic Party II*, 978 F.3d at 180. In short, the State Defendants' suggestion that the *Ex parte Young* analysis requires the Court to read each provision in a vacuum, without reference to any other Election Code provision—no matter how relevant to the enforcement question at hand—is entirely divorced from Fifth Circuit precedent, from the fundamental precepts of statutory interpretation,[8] and from common sense.

---

[8] "[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (ellipsis in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)).

Thus, it is immaterial that the Secretary is not expressly identified in the vote-by-mail and mail ballot carrier envelope provisions. The Election Code makes clear that it is the Secretary who is responsible for prescribing the design and content of vote-by-mail applications and mail ballot carrier envelopes. The challenged provisions, therefore, can be enforced only if and when the Secretary modifies vote-by-mail applications and mail ballot carrier envelopes to integrate the new identification requirements delineated in S.B. 1. The HAUL Plaintiffs allege that these provisions unconstitutionally burden the right to vote and intentionally discriminate on the basis of race. ECF No. 199 ¶¶ 260, 276–77. The *Ex parte Young* exception to state sovereign immunity authorizes the Court to "command[] a state official to do nothing more than refrain from violating federal law[.]" *Stewart*, 563 U.S. at 255. If the Court were to do so with respect to these provisions, then the Court's relief "might lead to prohibiting the Secretary from using [a vote-by-mail application or mail ballot carrier envelope] that expressed" unlawful requirements. *Tex. Democratic Party II*, 978 F.3d at 180. This was sufficient in *Texas Democratic Party II* and is certainly sufficient here, where the HAUL Plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction.

For the same reasons, it is also inconsequential that the provisions expressly task local officials with rejecting vote-by-mail applications and mail ballot carrier envelopes that do not contain the required identification information. Under the Election Code and in practice, local officials would be unable to reject either of these forms were it not for the Secretary first fulfilling his statutory duties to prescribe the design and content of vote-by-mail applications and mail ballot carrier envelopes. Put differently, it is the Secretary who is exclusively responsible for prescribing the design and content of vote-by-mail applications and mail ballot carrier envelopes in a manner that enables applicants and voters to enter the required identification information. If he fails to do so, then the Secretary necessarily compels or constrains local officials by preventing them from

rejecting these forms. Thus, this is not a case where the Secretary's "duty has nothing to do with enforcing" the vote-by-mail and mail ballot carrier envelope provisions. *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022). "Though there is a division of responsibilities, the Secretary has the needed connection" to these challenged provisions. *Tex. Democratic Party II*, 978 F.3d at 180.

 *Texas Democratic Party II* applies with equal force to the HAUL Plaintiffs' challenges to sections 4.12, 6.01[9], and 6.03. Section 4.12 states that the "in-person delivery of a marked ballot . . . must be received by an election official at the time of delivery." *Id.* § 86.006(a-2). The provision also provides that the "receiving official shall record the voter's name, signature, and type of identification . . . on a roster prescribed by the secretary of state." *Id.* The receiving official must "attest on the roster that the delivery complies" with the requirements for returning a mail-in ballot. *Id.* Under section 6.01, "[a] person who simultaneously assists seven or more voters . . . by providing the voters with transportation to the polling place must complete and sign a form . . . that contains the person's name and address[.]" *Id.* § 64.009(f). The provision requires the Secretary to prescribe the form. *Id.* § 64.009(h). Section 6.03 similarly requires an assistor to complete a form stating their name and address, their relationship to the voter, and whether they "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." *Id.* § 64.0322(a). Again, the Secretary must prescribe the required form. *Id.* § 64.0322(b). Consequently, sections 4.12, 6.01, and 6.03 can only be enforced if and when the Secretary prescribes the roster and forms. The HAUL Plaintiffs allege that these provisions impose requirements that unconstitutionally burden the right to vote and intentionally discriminate on the basis of race. ECF No. 199 ¶¶ 260, 262, 276–77. If the Court were to agree, then it could enjoin

---

[9] The HAUL Plaintiffs challenge two parts of section 6.01: (1) the part that now permits poll watchers to observe interactions between a voter and their assistor and (2) the part that requires assistors to complete a form when assisting voters. *See* ECF No. 199 ¶ 260.

the Secretary from prescribing the unlawful roster and forms. Indeed, the Secretary has the authority to compel or constrain local officials and assistors and therefore possesses a sufficient connection to these provisions.

The same is true for the HAUL Plaintiffs' challenges to section 3.15. The provision states that "[v]oting system ballots may not be arranged in a manner that allows a political party's candidates to be selected in one motion or gesture." TEX. ELEC. CODE § 124.002I. In other words, the provision eliminates straight-party voting. Although the Secretary "is not responsible for printing or distributing ballots[,]" *Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020), the Election Code expressly requires the Secretary to "adopt rules and establish procedures as necessary for the implementation of the elimination of straight-party voting[,]" TEX. ELEC. CODE § 31.012(d). The Election Code, therefore, makes plain that the Secretary has a clear and immediate duty—not mere discretion—to enforce section 3.15 and ensure the elimination of straight-party voting. If the Court were to find that section 3.15 is, as the HAUL Plaintiffs allege, unconstitutional, then the Court could enjoin the Secretary by prohibiting him from adopting rules and establishing procedures that are necessary to implement the elimination of straight-party voting. In doing so, the Secretary would constrain local officials based on his actions with respect to the unconstitutionality of section 3.15.

*Texas Alliance for Retired Americans* does not hold otherwise. In that case, three organizations and one individual filed suit against the Secretary challenging, on constitutional grounds, Texas House Bill 25 ("HB 25"). *Tex. All. for Retired Ams.*, 28 F.4th at 670. HB 25 eliminated straight-ticket voting in elections by repealing section 52.071 of the Election Code. *Id.* On appeal, the Secretary argued that state sovereign immunity applied. *Id.* at 671. In considering the Secretary's argument, the panel turned to the text of section 52.071, the provision that HB 25

repealed. *Id.* at 672. Upon reviewing the provision's text, the panel concluded that local officials, not the Secretary, were charged with enforcing section 52.071 and HB 25's repeal of the provision. *Id.* at 672–73. It observed that the plaintiffs had not identified a "duty of the Secretary that constrains election officials with respect to the straight-ticket option on ballots." *Id.* at 673.

Here, by contrast, the HAUL Plaintiffs have invoked section 31.012(d) of the Election Code, which again, expressly requires the Secretary to "adopt rules and establish procedures as necessary for the implementation of the elimination of straight-party voting[.]" TEX. ELEC. CODE § 31.012(d). The Secretary's statutory duty is more than a scintilla of enforcement and establishes that the Secretary has the authority to compel or constrain local officials under section 3.15.

The Fifth Circuit's reasoning in *Texas Democratic Party II* also extends to the HAUL Plaintiffs' challenges to sections 4.07 and 6.01. Section 4.07 allows a poll watcher "to sit or stand near enough to see and hear the election officers conducting the observed activity" and makes clear that an election judge generally may not deny a poll watcher "free movement where election activity is occurring within the location at which the watcher is serving." TEX. ELEC. CODE §§ 33.056(a), (e). Section 6.01 authorizes a poll watcher to observe most interactions between a voter and their assistor. *Id.* § 64.009(e). The Election Code requires the Secretary to "develop and maintain a training program for watchers." *Id.* § 33.008. An individual must complete the Secretary's training program to serve as a poll watcher. *Id.* § 33.031(b). Upon completion, the training program must provide the poll watcher with a certificate, which the poll watcher must present to a local official when they arrive at a polling place. *Id.* §§ 33.008(2), 33.051(a)(2)–(a-1). The Secretary's training program is the only means by which a poll watcher may learn what they can and cannot do at a polling place.

Therefore, the training program must necessarily provide the poll watcher with information on where they can sit or stand in accordance with sections 4.07 and 6.01. It is axiomatic that the Secretary, who is statutorily required to develop and maintain the training program, must develop a training program that will advise poll watchers of their privileges and responsibilities at polling places. By doing so, the Secretary necessarily compels or constrains poll watchers to conduct themselves in a manner that will ensure compliance with the Election Code. The Secretary's duty to inform poll watchers of their privileges and responsibilities under the Election Code is all the more essential given that S.B. 1 limits local officials from removing poll watchers who violate the Election Code or any other law pertaining to the conduct of elections. *Id.* § 32.075(g). Because it is the Secretary who bears the responsibility to ensure that poll watchers comply with the Election Code, the information that he disseminates through the training program is not merely advice, guidance, or interpretive assistance. *Cf. Richardson v. Flores*, 28 F.4th 649, 655 (5th Cir. 2022).

Citing a history of voter intimidation against minority voters, the HAUL Plaintiffs allege that sections 4.07 and 6.01 "increase voter and election official intimidation from poll watchers" and intimidate the assistants and the voters who need assistance." ECF No. 199 ¶¶ 105, 227, 230. If the HAUL Plaintiffs are correct, then the Court could enjoin the Secretary by, for example, requiring him to instruct poll watchers through his training program that their poll watching activities must satisfy constitutional standards. In doing so, the Secretary has the authority to compel or constrain poll watchers by limiting their poll watching to that which is permissible under the Election Code and the United States Constitution.

The Secretary also has the authority to compel or constrain under sections 3.04, 3.09, 3.10, 3.12, 3.13, and 4.01. Sections 3.04, 3.12, and 3.13 generally prohibit most voters from voting inside a motor vehicle and require that polling places be located inside a building. TEX. ELEC.

CODE §§ 43.031(b), 85.061(a), 85.062(b). Sections 3.09 and 3.10 generally limit early voting hours. *Id.* §§ 85.005(a), 85.006(e). Section 4.01 provides that a presiding judge may not remove a poll watcher who has violated the Election Code or any other law pertaining to the conduct of elections unless an election judge or clerk observed the violation. *Id.* § 32.075(g).

The Election Code states that the Secretary "shall adopt rules . . . to assist the presiding judge of a polling place in processing forms and conducting procedures required by [the Election Code] at the opening and closing of the polling place." *Id.* § 66.004. The rules that the Secretary *must* adopt necessarily include rules pertaining to voting inside a motor vehicle, outdoor polling places, early voting hours, and poll watchers. The HAUL Plaintiffs allege that sections 3.04, 3.09, 3.10, 3.12, and 3.13 unconstitutionally burden the right to vote by restricting voting activities that typically lead to greater voter turnout among minority communities. ECF No. 199 ¶¶ 200–05, 207–12, 276–77. The also contend that section 4.01 unconstitutionally "curtail[s] the ability of election officials to protect voters and volunteers and ensure secrecy of voters' ballots." *Id.* ¶ 227. Directing the Secretary not to adopt or to modify rules implementing sections 3.04, 3.09, 3.10, 3.12, 3.13, and 4.01—if found unconstitutional—would compel or constrain local officials based on the actions he takes in response to the unconstitutionality of these provisions. In other words, by adopting, implementing, and modifying relevant rules, the Secretary has the authority to compel or constrain local officials, who, in turn, must abide by the Secretary's rules.

The Secretary also has the authority to compel or constrain under sections 4.06, 4.09, 6.04, 6.05, 7.02, and 7.04. Section 4.06 makes it a class A misdemeanor if an election officer refuses, either intentionally or knowingly, to accept a poll watcher for service when acceptance is otherwise required. TEX. ELEC. CODE § 33.051(g). Section 4.09 establishes an offense if a "person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly

prevents a watcher from observing an activity or procedure the person knows the watcher is entitled to observe[.]" *Id.* § 33.061(a). Sanctionable conduct under section 4.09 includes any action that obstructs a poll watcher's view or distances the poll watcher "from the activity or procedure to be observed in a manner that would make observation not reasonably effective." *Id.*

Further, section 6.04[10] modifies the oath that a person who assists a voter must take. *Id.* § 64.034. Specifically, section 6.04 requires an assistor to take the following oath under penalty of perjury before assisting a voter:

> I swear (or affirm) under penalty of perjury that the voter I am
> assisting represented to me they are eligible to receive assistance; I
> will not suggest, by word, sign, or gesture, how the voter should
> vote; I will confine my assistance to reading the ballot to the voter,
> directing the voter to read the ballot, marking the voter's ballot, or

---

[10] In 2018, a district court initially enjoined Texas and the Secretary from enforcing sections 61.033 and 64.0321 of the Election Code. *See OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *1 (W.D. Tex. June 6, 2022). On June 6, 2022, the district court, upon request, modified its injunction to prohibit Texas and its Secretary from enforcing a portion of the amended section 6.04:

> As to the first ground, OCA notes that a portion of the amended oath now reads
> exactly as did the enjoined language in Section 64.0321. A portion of the oath
> now requires the assistor to attest to confining their assistance to "reading the
> ballot to the voter, directing the voter to read the ballot, marking the voter's ballot,
> or directing the voter to mark the ballot." Tex. Elec. Code § 64.034. The enjoined
> language permits assistance in "(1) reading the ballot to the voter; (2) directing
> the voter to read the ballot; (3) marking the voter's ballot; or (4) directing the voter
> to mark the ballot." Tex. Elec. Code § 64.0321. Aside from changes in
> punctuation, the language is indistinguishable. Thus, the Court's reasoning in
> enjoining Section 64.0321 applies to the amended oath language just as it applied
> in the 2018 Injunction. . . . By requiring assistors to attest to following enjoined
> restrictions, the amended provision essentially re-ratifies the same restrictions that
> the Court enjoined. In doing so, the oath limits assistance-eligible voting to an
> impermissibly narrow set of activities. Therefore, as with the previous iteration of
> this language, the Court will enjoin enforcement of the portion of [section 6.04 of
> S.B. 1] inserting the previously enjoined language from Section 64.0321.

*Id.* at *4.

On June 14, 2022, OCA-Greater Houston filed a notice in this consolidated action, advising the Court of the district court's modified injunction. ECF No. 438. OCA-Greater Houston submits that "the United States and Private Plaintiffs' challenges to the same portions in this case may ultimately be rendered moot." *Id.* at 5. The United States and remaining private plaintiffs also filed a notice, advising that they agree with OCA-Greater Houston's position on the potential impact of the modified injunction on their claims challenging the same portions of section 6.04. ECF No. 440. Texas and its Secretary did not appeal the district court's modified injunction. Thus, all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are moot.

> directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.

*Id.* Section 6.05 provides that a person commits a state jail felony if they knowingly fail to either sign the modified oath that is part of the certificate on a voter's mail ballot carrier envelope or include on the voter's mail ballot carrier envelope their signature, name, and address; their relationship to the voter; and whether they received or accepted any form of compensation in exchange for their assistance. *Id.* §§ 86.010(e)–(g). The Election Code also states that it is an offense to prohibit an employee from voting. *Id.* § 276.004(a). Section 7.02 makes it an exception for an employer's obligation to provide employees with leave to vote if the employee has any two-hour block outside of working hours during the voting period. *Id.*

Section 7.04 codifies several new offenses under sections 276.015, 276.016, 276.017, 276.018, and 276.019 of the Election Code.[11] Specifically, section 276.015 defines three general public activities as third-degree felonies:

> (b) A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

> (c) A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.

> (d) A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

---

[11] The Court is satisfied that the HAUL Plaintiffs' complaint includes sufficient allegations challenging each election law offense under section 7.04. *See* ECF No. 199 ¶¶ 26, 141–42, 157, 159, 214–15, 236, 242, 277.

*Id.* §§ 276.015(b)–(d), (f). A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1). "Vote harvesting services" means any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.* § 276.015(a)(2). Section 276.015 makes it clear that, "[i]f conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both." *Id.* § 276.015(g).

Section 276.016 establishes four offenses for the solicitation and distribution of vote-by-mail applications by public and election officials. *Id.* § 276.016. Section 276.017 makes it a class A misdemeanor for an early voting clerk or other election official to knowingly mail or otherwise provide a vote-by-mail ballot "or other early voting by mail ballot materials to a person who the clerk or official knows did not submit an application for a ballot to be voted by mail[.]" *Id.* § 276.017(a)–(b). Under section 276.018, it is a state jail felony if a person, "with the intent to deceive, . . . knowingly or intentionally makes a false statement or swears to the truth of a false statement: (1) on a voter registration application; or (2) previously made while making an oath, declaration, or affidavit described by this code." *Id.* § 276.018(a). Finally, section 276.019 provides that a public or election official "may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code." *Id.* § 276.019.

The Election Code now authorizes the Secretary to "refer a reported violation of law for appropriate action to the attorney general . . . or to a prosecuting attorney having jurisdiction." *Id.* § 34.005(a). It also *requires* the Secretary to report suspected election law offenses to the Attorney

General. *Id.* § 31.006(a). The Secretary certainly has the authority to compel or constrain others when he not only has the authority to refer, but also the obligation to report election law offenses under sections 4.06, 4.09, 6.04, 6.05, 7.02, and 7.04. *Cf. City of Austin*, 943 F.3d at 1001. The HAUL Plaintiffs allege that these provisions impose unconstitutional criminal penalties on election officials, assistors, and voters. ECF No. 199 ¶¶ 26, 214, 228, 235–36, 242. An injunction prohibiting the Secretary from referring or reporting offenses under these provisions would certainly help alleviate the harm that the HAUL Plaintiffs plausibly allege.

Further, the Election Code now provides that an election official is civilly liable if they violate an Election Code provision. TEX. ELEC. CODE § 31.129(b). Civil penalties may include termination and loss of employment benefits. *Id.* § 31.129(c). In light of his duty to report violations, the Secretary now has a specific role in ensuring that election officials comply with the Election Code. The Secretary's authority to report violations of the Election Code to the Attorney General also empowers him with the authority to compel or constrain election officials who, in turn, may credibly fear civil prosecution by way of the Secretary's referral to the Attorney General.

Thus, the Secretary also has the authority to compel or constrain under sections 5.04 and 5.11. Section 5.04 generally prohibits state and political subdivision employees and officers from distributing vote-by-mail applications to individuals who did not request an application. *Id.* § 84.0111(a). Section 5.11 describes how early voting clerks must create a signature verification committee, clarifying prerequisites for serving on the committee, and establishing that the committee may compare a voter's signature on their mail ballot carrier envelope "with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter." *Id.* §§ 87.027(d)–(e), (i). If the state and political subdivision employees or early voting clerks fail to comply with their statutory duties, then the Secretary could

report their conduct to the Attorney General. These local officials would then be subject to civil prosecution.[12] This credible threat of prosecution is, again, a consequence of the Secretary's authority to compel or constrain.

Seemingly conceding that the Secretary *does* have the authority to compel or constrain, the State Defendants cite *Mi Familia Vota* and repeatedly argue that the HAUL Plaintiffs have failed to show how the Secretary's duties harm them. ECF No. 239 at 14–22. In *Mi Familia Vota*, the Fifth Circuit considered whether the Secretary had a sufficient enforcement connection to section 43.007 of the Election Code requiring "counties to use electronic voting devices rather than paper ballots in order to be eligible to participate in Texas's Countywide Polling Place Program." 977 F.3d at 468. The panel observed that section 31.014 of the Election Code requires the Secretary "to provide standards for certifying electronic devices[.]" *Id.* However, because "the Plaintiffs' claims regarding section 43.007 [was] based on its prohibition of the use of paper ballots for those counties participating in the Countywide Polling Place Program[,]" the Fifth Circuit found it significant that local officials, not the Secretary, were responsible for printing and distributing ballots. *Id.* The panel accordingly noted that "[d]irecting the Secretary not to enforce the electronic-voting-devices-only provision in section 43.007 would not afford the Plaintiffs the relief that they seek, and therefore, the Secretary of State 'is not a proper defendant.'" *Id.* (quoting *In re Abbott*, 956 F.3d at 709). Immediately thereafter, the Fifth Circuit stated, "Although a court can enjoin

---

[12] The Election Code provision that authorizes civil penalties states that "'election official' has the meaning assigned by Section 31.128." Tex. Elec. Code § 31.129(a). Section 31.128, however, merely states that "'election official' does not include a chair of a county political party holding a primary election or a runoff primary election." *Id.* § 31.128. Thus, the Court refers to the Election Code's "Definitions" section to further clarify who is an "election official" subject to a civil penalty. The "Definitions" section confirms that an early voting clerk is an election official, *see id.* § 1.005(4-a), and is therefore subject to civil prosecution. Further, the Election Code defines a "political subdivision," in relevant part, as a county that "exists for the purpose of discharging functions of government[.]" *Id.* § 1.005(13)(B). Thus, section 5.04 reaches county employees who discharge services in voting, such as a county clerk—who is an "election official" under the Election Code. *Id.* § 1.005(4-a).

state officials from enforcing statutes, such an injunction must be directed to those who have the authority to enforce those statutes." *Id.*

In other words, *Mi Familia Vota* merely reiterates the well-established rule in the Fifth Circuit that a state official must be statutorily tasked with enforcing the challenged provision. It does not, as the State Defendants appear to suggest, hold that the HAUL Plaintiffs must also now show at the pleading stage how the Secretary's duties will harm them in order to invoke the *Ex parte Young* exception to state sovereign immunity. In any event, the HAUL Plaintiffs *do* explain how the Secretary's duties will harm them. They submit that the challenged "further burden the right to vote and curtail the participation of Black, Latino, and disabled voters." ECF No. 199 ¶ 17. But for the Secretary's duties in relation to each of the challenged provisions, the HAUL Plaintiffs and their members would not be harmed by the Secretary. *See id.* ¶¶ 38–70, 72–76, 196, 201, 216, 224, 231, 238, 241, 244.

The State Defendants further argue that the Secretary's referral of suspected election law offenses to the Attorney General does not "compel or constrain anyone." ECF No. 264 at 10. That is also incorrect. The threat of criminal prosecution that the Secretary's statutory duty carries certainly constrains the HAUL Plaintiffs and their members from engaging in otherwise lawful activity. The Supreme Court said so long ago when it established the *Ex parte Young* exception to state sovereign immunity:

> The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

*Young*, 209 U.S. at 155–56; *see also Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017) ("To the extent *Ex parte Young* requires that the state actor 'threaten' or 'commence' proceedings to enforce the unconstitutional act, state defendants' pervasive enforcement satisfies that test.").

Finally, the State Defendants also contend that the HAUL Plaintiffs improperly rely on the Secretary's general duties. ECF No. 239 at 17–18. In *Texas Alliance for Retired Americans*, *Lewis*, and *Richardson*, the Fifth Circuit recently signaled that reliance on the Secretary's "general duties" under the Election Code alone is generally insufficient to establish that the Secretary is statutorily tasked with enforcing a specific Election Code provision. *See Richardson*, 28 F.4th at 654 ("Since then, however, our precedent has clarified that the Secretary's general duties under the [Texas Election] Code fail to make the Secretary the enforcer of specific election code provisions.") (alterations in original) (quotation marks and citation omitted). Even assuming that these three cases specifically hold that reliance on the Secretary's "general duties" can *never* establish that the Secretary has a duty to enforce a specific Election Code provision, the HAUL Plaintiffs, as discussed *supra*, rely on far more than simply the Secretary's "general duties."[13] The State Defendants' argument, therefore, is unavailing.

---

[13] The Court recently heard oral argument in *Johnson v. Callanen*, No. 5:22-CV-409-XR (W.D. Tex. 2021). In that case, three visually impaired individuals and two non-profit organizations comprising visually impaired and otherwise disabled Texans filed suit against Ms. Callanen, in her official capacity as the Bexar County Elections Administrator, for violations of Title II of the ADA and § 504 of the Rehabilitation Act. The plaintiffs sought a reasonable modification to vote by mail in secret and free from intimidation in upcoming elections. Though it was clear that Ms. Callanen, who is also a defendant in this consolidated action, did not oppose the plaintiffs' request for a reasonable modification, she nonetheless responded to the plaintiffs' complaint with a motion to dismiss and opposed the plaintiffs' motion for a preliminary injunction. At the hearing, Ms. Callanen's counsel candidly stated that the basis for Ms. Callanen's opposition was her concern that, if she granted the requested modification, then the Secretary—pursuant to his "general duties" of ensuring that elections are conducted uniformly—would refer her conduct to the Attorney General, who, in turn, could impose civil penalties upon her, including revocation of her retirement. *See* TEX. ELEC. CODE §§ 31.129(c), 34.005. Indeed, Ms. Callanen's counsel referred to the deposition testimony in a prior case, where the Secretary testified under oath that referral to the Attorney General would be imminent if Ms. Callanen granted the requested modification. It is difficult to conceive of a clearer example of how the Secretary's statutory duties to obtain and maintain uniformity in the application, operation, and interpretation of

For the foregoing reasons, the Court concludes that the HAUL Plaintiffs have plausibly established that the Secretary is statutorily tasked with enforcing and can enforce all of the S.B. 1 provisions that they challenge on constitutional grounds.

> ### ii. The HAUL Plaintiffs have plausibly established that the Secretary will enforce all of the S.B. 1 provisions that they challenge on constitutional grounds.

To establish that the Secretary will enforce the S.B. 1 provisions that they challenge on constitutional grounds, the HAUL Plaintiffs need only show that the Secretary has a "demonstrated willingness" to exercise his duty to enforce those provisions. *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *Morris*, 739 F.3d at 746).

The HAUL Plaintiffs allege that the Secretary "is likely to carry out his duties under the law, including enforcement of S.B. 1" and each of the challenged provisions. ECF No. 199 ¶ 76. They further contend that the Secretary "has already expressed a commitment to broad exercise of his authority to oversee the electoral process, including by undertaking a so-called 'forensic audit' of Collin, Dallas, Harris, and Tarrant counties, despite no indication of any irregularities." *Id.*

The State Defendants contend that the HAUL Plaintiffs have failed to show that the Secretary has demonstrated a willingness to enforce the S.B. 1 provisions that create election law offenses. ECF No. 239 at 18. They concede that these provisions imbue the Secretary with "power," but claim that, because his "power" is "discretionary," the HAUL Plaintiffs cannot demonstrate that there is a "significant possibility" that the Secretary will enforce these provisions. *Id.* But the Secretary's power is not merely discretionary. While it is true that section 34.005 of the Election Code authorizes, but does not require, the Secretary to refer a reported violation of election law to the Attorney General or a local district attorney, Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 34.005, section

---

the Election Code—however "general" they may be—compel or constrain local officials—like Ms. Callanen—by subjecting them to credible, perilous consequences.

31.006(a) of the Election Code plainly states that the Secretary "shall" report his suspicions of criminal conduct under any provision of the Election Code to the Attorney General, *id.* § 31.006(a). The HAUL Plaintiffs' allegations, combined with the Secretary's mandatory duties discussed *supra*, sufficiently show at this stage of the proceedings that the Secretary will enforce the S.B. 1 provisions challenged on constitutional grounds.

Thus, the Court finds that the HAUL Plaintiffs have alleged a plausible set of facts establishing that the Secretary has a sufficient enforcement connection to all of the S.B. 1 provisions that they challenge on constitutional grounds. Their claims challenging these provisions under the First, Fourteenth, and Fifteenth Amendments may proceed against the Secretary pursuant to the *Ex parte Young* exception to state sovereign immunity.

> **b.   The HAUL Plaintiffs have shown that the Attorney General has a sufficient enforcement connection to all but four of the S.B. 1 provisions that they challenge on constitutional grounds.**

As with their claims under the First, Fourteenth, and Fifteenth Amendments against the Secretary, the relevant question before the Court at this stage of the proceedings is whether the HAUL Plaintiffs have alleged a plausible set of facts establishing that the Attorney General has a sufficient enforcement connection to the same S.B. 1 provisions that they challenge under the First, Fourteenth, and Fifteenth Amendments—that is, whether the HAUL Plaintiffs have plausibly established that the Attorney General can and will enforce the same S.B. 1 provisions that they challenge under the First, Fourteenth, and Fifteenth Amendments.

> i. **The HAUL Plaintiffs have plausibly established that the Attorney General can enforce all but four of the S.B. 1 provisions that they challenge on constitutional grounds.**

The HAUL Plaintiffs name the Attorney General as a defendant for their claims under the First, Fourteenth, and Fifteenth Amendments, challenging the same S.B. 1 provisions discussed *supra*.[14] ECF No. 199 ¶¶ 250–300.

As the HAUL Plaintiffs allege, the Attorney General is statutorily tasked with prosecuting criminal offenses prescribed by the Election Code. TEX. ELEC. CODE § 273.021; s*ee also* ECF No. 208 ¶ 80–81. He "is charged with enforcing the new statutory provisions[.]" ECF No. 199 ¶ 80. The Attorney General and local district attorneys "investigate and prosecute alleged violations of the Election Code, including those provisions introduced in SB 1." *Id.* ¶ 81 (citing TEX. ELEC. CODE §§ 273.001, 273.021). The Attorney General, therefore, has the authority to compel or constrain under sections 4.06, 4.09, 6.04, 6.05, 7.02, and 7.04—all of which establish one or more election law offenses.

Further, the Attorney General is now expressly tasked with compelling or constraining under section 8.01, the S.B. 1 provision that authorizes the Attorney General to collect a civil penalty from an election official who "violates a provision of this code." TEX. ELEC. CODE § 31.129(b). The civil penalty "may include termination of the person's employment and loss of the person's employment benefits." *Id.* § 31.129(c). Thus, he also has the authority to compel and constrain any and all election officials who are subject to civil prosecution for violations of sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.12, 5.01, 5.04, 5.07, 5.11,

---

[14] The State Defendants submit that the HAUL Plaintiffs also challenge sections 2.04, 4.11, 5.15, and 8.01, and that they direct these challenges to the Attorney General. ECF No. 239 at 22. Again, that is not the case. The HAUL Plaintiffs do not identify these provisions in their claims. *See* ECF No. 199 ¶¶ 250–365. Instead, they refer to these provisions to explain the Attorney General's role with respect to some of the S.B. 1 provisions that they actually challenge. *See id.* ¶¶ 75, 81–82; *see also* ECF No. 252 at 14.

5.12, 5.13, 5.14, 6.01, and 6.03—all of which establish requirements for election officials as defined under the Election Code, violations of which may result in civil prosecution.

However, the Court cannot conclude that the Attorney General has the authority to compel or constrain under sections 5.02, 5.03, 5.08, and 6.07. Section 5.02 requires an applicant to include certain identification information on their vote-by-mail application, and section 5.03 directs the Secretary to prescribe the design and content of a vote-by-mail application so that includes a space for entering the required identification information. *Id.* §§ 84.002(1-a), 84.011(a)(3-a). Section 5.08 does the same with respect to mail ballot carrier envelopes. *Id.* § 86.002(g). Section 6.07 similarly states that a space must appear on the reverse side of a mail ballot carrier envelope for an assistor to indicate their relationship to a voter. *Id.* § 86.013(b)(3).

But none of these provisions expressly create election law offenses or subject an election official to civil penalties. It does not appear that the Attorney General can criminally or civilly prosecute the Secretary for failing to prescribe the design and content of vote-by-mail applications and mail ballot carrier envelopes in accordance with sections 5.03, 5.08, and 6.07. It is also not plain that the Attorney General can prosecute an applicant who fails to include the required identification information pursuant to section 5.02. The HAUL Plaintiffs do not suggest otherwise in their complaint or briefing. Absent an explanation to the contrary, the Court must dismiss the HAUL Plaintiffs' claims challenging sections 5.02, 5.03, 5.08, and 6.07 under the First, Fourteenth, and Fifteenth Amendments against the Attorney General.

Therefore, the Court concludes that the HAUL Plaintiffs have plausibly established that the Attorney General is statutorily tasked with enforcing and can enforce all but four of the S.B. 1 provisions (sections 5.02, 5.03, 5.08, and 6.07) that they challenge on constitutional grounds.

ii.   **The HAUL Plaintiffs have plausibly established that the Attorney General will enforce all but four of the S.B. 1 provisions that they challenge on constitutional grounds.**

The HAUL Plaintiffs need only show that the Attorney General has a "demonstrated willingness" to exercise his duty to enforce the S.B. 1 provisions that they challenge on constitutional grounds to establish that the Attorney General will enforce those provisions. *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *Morris*, 739 F.3d at 746).

The HAUL Plaintiffs allege that, "[i]n word and deed, the Attorney General has demonstrated a willingness to enforce the election code, and there is no indication that he will make an exception for SB 1." ECF No. 199 ¶ 83. Citing the Attorney General's website, the HAUL Plaintiffs observe that, "[s]ince taking office in 2015, the Attorney General has resolved 286 prosecutions of Texas Election Code criminal offenses against 76 defendants . . . [and] is currently prosecuting over 500 felony election fraud offenses in Texas courts." *Id.* (alterations in original) (citation omitted). They further submit that the Attorney General "announced the formation of the 2021 Texas Election Integrity Unit to 'continue to pursue prosecutions for criminals willing to commit election crimes.'" *Id.* (citation omitted).

The HAUL Plaintiffs also assert that the Attorney General "has devoted additional staff and resources to focus on prosecuting election fraud cases." *Id.* According to the HAUL Plaintiffs, "[t]here is no reason to presume that the Attorney General will not pursue civil penalties and fines, as he is authorized to do, with the same vigor he has pursued criminal prosecutions in the past." *Id.* Indeed, "[j]ust last year, the Secretary sued Harris County in state court to block the county from distributing mail-in ballot applications during the COVID-19 pandemic—a policy that has now been codified in SB 1." ECF No. 252 at 14 (citing *State v. Hollins*, 620 S.W.3d 400 (Tex. 2020) (per curiam)). These allegations, combined with the Attorney General's duties discussed

34

*supra*, are sufficient at this stage of the proceedings to plausibly establish that the Attorney General has demonstrated a willingness to enforce the S.B. 1 provisions challenged on constitutional grounds.

The State Defendants argue that, since the Attorney General may not unilaterally prosecute election law offenses, "demonstrates why the Attorney General is not a proper defendant here." ECF No. 239 at 23. True, the Election Code originally authorized the Attorney General to unilaterally "prosecute a criminal offense prescribed by the election laws of this state." TEX. ELEC. CODE § 273.021(a). In *State v. Stephens*, however, the Texas Court of Criminal Appeals held that this delegation of unilateral prosecutorial authority violated the separation-of-powers clause of the Texas Constitution. No. PD-1032-20, 2021 WL 5917198, at *11 (Tex. Crim. App. Dec. 15, 2021) (not released for publication).[15]

But even absent the delegation of authority to independently prosecute election law offenses, the surviving provisions of the Election Code still envision, and likely require, the Attorney General's participation in enforcement activities. For instance, section 273.001 provides:

> (a) If two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations. If the election covers territory in more than one county, the voters may present the affidavits to the attorney general, and the attorney general shall investigate the allegations.
>
> (b) A district or county attorney having jurisdiction or the attorney general may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election.
>
> (c) On receipt of an affidavit [from a registrar], the county or district attorney having jurisdiction and, if applicable, the attorney general shall investigate the matter.

---

[15] The State Defendants submit that "that *Stephens* was wrongly decided." ECF No. 239 at 24 n.2. Texas "has filed a motion asking the Texas Court of Criminal Appeals to reconsider its decision." *Id.*

> (d) On referral of a complaint from the secretary of state under
> Section 31.006, the attorney general may investigate the allegations.

Tex. Elec. Code § 273.001. Moreover, *Stephens* does not foreclose the Attorney General's authority to prosecute election law offenses, including those prescribed by the S.B. 1 provisions challenged here. Indeed, the Court of Criminal Appeals made clear that "the consent and deputization order of a local prosecutor or the request of a district or county attorney for assistance" can provide the Attorney General with the authority to enforce election law offenses. *Stephens*, 2021 WL 5917198, at *10.

The State Defendants also suggest that the HAUL Plaintiffs must show that the Attorney General intends to enforce each of the S.B. 1 provisions that they challenge on constitutional grounds. ECF No. 264 at 13–14. Setting aside the fact that the HAUL Plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction, the State Defendants' argument strains credulity and defies logic. S.B. 1 is an omnibus election law that establishes several election law offenses and imposes sweeping civil liability on election officials for a variety of Election Code violations. It cannot be that the Attorney General must recite extensive portions of the Election Code so that the HAUL Plaintiffs can challenge on constitutional grounds the many S.B. 1 provisions that clearly implicate the Attorney General's civil and criminal enforcement power. As the Supreme Court first put it:

> It would seem to be clear that the attorney general, under his power
> existing at common law, and by virtue of these various statutes, had
> a general duty imposed upon him, which includes the right and the
> power to enforce the statutes of the state, including, of course, the
> act in question, if it were constitutional. His power by virtue of his
> office sufficiently connected him with the duty of enforcement to
> make him a proper party to a suit of the nature of the one now before
> the . . . court.

*Young*, 209 U.S. at 161.

The State Defendants' reliance on *City of Austin* is also unpersuasive. ECF No. 239 at 24. In *City of Austin*, the Fifth Circuit considered whether the *Ex parte Young* exception to state sovereign immunity applied to the Attorney General. 943 F.3d at 998. The City had passed a municipal ordinance prohibiting landlords from discriminating against tenants who paid their rent with federal housing vouchers. *Id.* at 996. Texas subsequently passed a state law barring municipalities or counties from adopting such ordinances. *Id.* The state statute empowered the Attorney General to enforce the law by intervening in any enforcement suit that the City might bring against a landlord for violating the municipal ordinance. *Id.* at 1000 n.1.

In response, the City sued the Attorney General, alleging that federal housing law preempted the state legislation. *Id.* at 997. The City argued that the *Ex parte Young* exception to state sovereign immunity applied because the Attorney General possessed the authority to enforce the state law and had a "habit" of intervening in lawsuits involving municipal ordinances to "enforce the supremacy of state law." *Id.* at 1001. The Fifth Circuit, however, held that this was not sufficient to demonstrate "some scintilla of 'enforcement,'" as the Attorney General's authority to enforce the statute alone did not constrain the City's ability to enforce its ordinance. *Id.* at 1001–02. According to the Fifth Circuit, simply because the Attorney General had "chosen to intervene to defend *different* statutes under *different* circumstances does not show that he is likely to do the same here." *Id.* at 1002 (emphasis in original). The Fifth Circuit also noted that "the City face[d] no consequences" if it enforced its ordinance. *Id.*

This case differs from *City of Austin* in many respects. Importantly, sections 4.06, 4.09, 6.04, 6.05, 7.02, and 7.04 each establish one or more election law offenses. In addition, under section 31.129 of the Election Code, election officials would face significant consequences if the Attorney General were to civilly prosecute them: They would risk losing their employment and

employment benefits if they violate sections 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.12, 5.01, 5.04, 5.07, 5.11, 5.12, 5.13, 5.14, 6.01, and 6.03.

Furthermore, under S.B. 1, the Attorney General has broad investigatory powers, and though S.B. 1 does not specify whether the Attorney General may enforce section 31.129, he has undoubtedly filed civil lawsuits against election officials, invoking the State's "intrinsic right to enact, interpret, and enforce its own laws." Appellant's Emergency Mot. for Relief Under Rule 29.3, *State v. Hollins*, 607 S.W.3d 923 (Tex. App.—Houston [14th Dist.] 2020, pet. granted) (No. 14-20-00627-CV), 2020 WL 5509152, at *9 (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)).

Moreover, and as already discussed at length, the Attorney General touts his office's eagerness to prosecute entities and individuals, like the HAUL Plaintiffs and their members, for criminal offenses under the Election Code. Far from different statutes under different circumstances, the Attorney General has demonstrated a willingness to enforce civil and criminal provisions of the Election Code regulating some of the same elections procedures that the HAUL Plaintiffs challenge as unconstitutional in this case. This is sufficient to establish that "formal enforcement [is] on the horizon." *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015)).

The State Defendants further contend that "[s]peculation that [the Attorney General] might be asked by a local prosecutor to 'assist' in enforcing SB 1 'is inadequate to support an *Ex parte Young* action against the Attorney General." ECF No. 239 at 24 (alterations in original) (quoting *In re Abbott*, 956 F.3d at 709). *In re Abbott*, however, is inapposite. There, the district court issued a temporary restraining order against the Governor and the Attorney General, exempting various categories of abortion from "GA-09, an emergency measure temporarily postponing non-essential

medical procedures during the COVID-19 pandemic." *In re Abbott*, 956 F.3d at 703. On appeal, the Fifth Circuit considered whether state sovereign immunity required dismissal of the Attorney General. *Id.* at 708. In particular, the Fifth Circuit considered whether the *Ex parte Young* exception to state sovereign immunity applied. *Id.* at 709. The panel observed that the district court had reasoned that the Attorney General "ha[d] 'authority' to prosecute violations of GA-09 'at the request of local prosecutors,' and that he ha[d] also 'publicly threatened enforcement' against abortion providers." *Id.* But in the Fifth Circuit's view, "[n]either rationale establishe[d] the Attorney General's 'connection' to enforcing GA-09 for *Ex parte Young* purposes." *Id.* "Speculation that he might be asked by a local prosecutor to 'assist' in enforcing GA-09," the Fifth Circuit determined, "is inadequate to support an *Ex parte Young* action against the Attorney General." *Id.* The Fifth Circuit also found it significant that "[t]he Attorney General threatened that GA-09 *would be enforced*, not that *he* would enforce it." *Id.* (emphasis in original).

In this case, by contrast, the HAUL Plaintiffs challenge S.B. 1 provisions that establish criminal and civil offenses under the Election Code. There is nothing temporary about the credible threat of criminal and civil prosecution by the Attorney General. Indeed, the Secretary is statutorily required to refer his suspicions of criminal offenses prescribed by the Election Code to the Attorney General, and the Secretary is also authorized to report any violations of the Election Code. Further, the HAUL Plaintiffs allege that the Attorney General has made it abundantly clear that he will enforce the Election Code. In other words, the Attorney General has not said that the challenged provisions *would be enforced*, but that *he* would enforce them.

Put differently, the Attorney General's credible threat of enforcing the challenged S.B. 1 provisions is not mere speculation. The Attorney General publicly maintains that one of his key

priorities is to investigate and prosecute allegations of voter fraud.[16] He has also publicly stated that 510 election offenses against 43 defendants remain pending and that 386 active election fraud investigations currently exist.[17] In light of *Stephens*, it must necessarily be the case that the Attorney General is prosecuting these election law offenses and pursuing these election fraud investigations along with local district attorneys. Indeed, the local district attorneys sued in this consolidated action have not expressly and affirmatively represented that they *never* intend to prosecute criminal offenses prescribed by the Election Code, and there are certainly many more local district attorneys throughout Texas who have not disavowed their intention to enlist the Attorney General's assistance to prosecute election law offenses. Consequently, the State Defendants' reliance on *In re Abbot* is unavailing. The HAUL Plaintiffs' allegations, combined with the Attorney General's duties discussed *supra*, sufficiently show at this stage of the proceedings that the Attorney General will enforce the challenged provisions.

Thus, the Court finds that the HAUL Plaintiffs have alleged a plausible set of facts establishing that the Attorney General has a sufficient enforcement connection to all but four of the S.B. 1 provisions (sections 5.02, 5.03, 5.08, and 6.07) that they challenge on constitutional grounds. Their claims challenging these provisions under the First, Fourteenth, and Fifteenth Amendments may proceed against the Attorney General pursuant to the *Ex parte Young* exception to state sovereign immunity.

---

[16] *See* Attorney General of Tex., *Election Integrity | Office of the Attorney General*, https://www.texas attorneygeneral.gov/initiatives/election-integrity (last visited July 28, 2022). The Court may take judicial notice of governmental websites, *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam), and may consider matters of which it takes judicial notice on a motion to dismiss, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[17] *See* Attorney General of Tex., *supra* note 16.

**2.  Congress validly abrogated state sovereign immunity for the HAUL Plaintiffs' claim under Title II of the ADA against the Secretary and for their claims under §§ 2 and 208 of the VRA against the Governor, the Secretary, and the Attorney General.**

*Ex parte Young* is not the only vehicle for obtaining relief against a state. Congress may also abrogate a state's sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). To abrogate a state's sovereign immunity, it must be shown that Congress "both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (alterations in original) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000)).

**a.  The HAUL Plaintiffs' claim under Title II of the ADA.**

"In enacting the ADA, Congress 'invoke[d] the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment[.]" *United States v. Georgia*, 546 U.S. 151, 154 (2006) (alterations in original) (quoting 42 U.S.C. § 12101(b)(4)). Indeed, the ADA specifically provides that a "State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. The Supreme Court has accordingly accepted this provision of the ADA "as an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *Georgia*, 546 U.S. at 154 (citing *Garrett*, 531 U.S. at 363–64).

As to whether Congress has acted pursuant to a valid grant of constitutional authority, the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Put differently, "Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of

its § 5 power." *Garrett*, 531 U.S. at 364. Thus, "the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation." *Id.*

Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees found in § 1 of the Fourteenth Amendment by enacting "appropriate legislation." U.S. CONST. amend. XIV, § 5. Section 1 of the Fourteenth Amendment provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. Thus, to determine whether Congress has acted pursuant to a valid grant of constitutional authority in enacting Title II, a court assesses, on a claim-by-claim basis:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 617 (5th Cir. 2020) (quoting *Georgia*, 546 U.S. at 159). The first step, according to the Fifth Circuit, is to determine whether the plaintiffs have stated a claim upon which relief may be granted under Title II of the ADA. *Id.* at 617–18.

### i.   The HAUL Plaintiffs have stated a valid claim under Title II.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities[,]" *id.* § 12102(1)(A), and Title II "defines

'public entities' to include local governments[,]" *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020) (citing 42 U.S.C. § 12131(1)(A)).

Here, the HAUL Plaintiffs allege that they have members "with disabilities within the meaning of the ADA and are entitled to the protections of the ADA." ECF No. 199 ¶ 343. Amy Litzinger, for example, lives with quadriplegic cerebral palsy, uses a power wheelchair, and "receives direct support staff assistance thirteen hours per day through the CLASS Medicaid Waiver program." *Id.* ¶ 58. Laura Halvorson "lives with muscular dystrophy, quadriplegia, and chronic neuromuscular respiratory failure." *Id.* ¶ 59. She "lacks muscle function and uses a ventilator twenty-four hours per day." *Id.* Ruben Fernandez "lives with cerebral palsy and has a label of Intellectual/Developmental Disability." *Id.* ¶ 60. Mr. Fernandez's "disability substantially limits several major life activities, including performing manual tasks, walking, standing, lifting, and caring for himself." *Id.* (citing 42 U.S.C. § 12102(2)(A)). Finally, Courtney Pugh "lives with Ulrich Congenital Muscular Dystrophy." *Id.* ¶ 61. She "is a wheelchair and daily-ventilator user who requires significant support with activities of daily living." *Id.*

Further, the HAUL Plaintiffs have filed suit against the Secretary and the Attorney General, in their official capacities. *Id.* ¶¶ 72, 80, 345. They allege that the Secretary and the Attorney General are "public entities pursuant to the ADA." *Id.* ¶ 345.

Together, these allegations establish that the HAUL Plaintiffs have properly invoked Title II of the ADA against public entities.

The Court now considers whether the HAUL Plaintiffs have alleged sufficient facts to state a *prima facie* case of discrimination under Title II. To do so, they must allege sufficient facts showing:

> (1) that [they, their members, or their constituents are] a qualified
> individual within the meaning of the ADA; (2) that [they, their

> members, or their constituents are] being excluded from
> participation in, or being denied benefits of, services, programs, or
> activities for which the public entity is responsible, or [are]
> otherwise being discriminated against by the public entity; and (3)
> that such exclusion, denial of benefits, or discrimination is by reason
> of [their or their members' or constituents'] disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997)).

As to the first element, a qualified individual within the meaning of Title II is a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

The HAUL Plaintiffs allege that they have "members who are qualified for the programs, services, and activities offered by Defendants—including vote by mail and in-person voting on Election Day and during early voting—because they are registered to vote in Texas, are otherwise eligible, and intend to vote in the next election[.]" ECF No. 199 ¶ 344. Indeed, Ms. Litzinger, Ms. Halvorson, Mr. Fernandez, and Ms. Pugh are registered to vote and reside in Texas. *Id.* ¶¶ 58–61. Each of them has previously voted in Texas either in person or by mail. *Id.* Thus, the HAUL Plaintiffs have sufficiently shown that their members are qualified individuals within the meaning of Title II.

With respect to the second and third elements, federal regulations provide that public entities may not, on the basis of disability, "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[.]" 28 C.F.R. § 35.130(b)(1)(ii). They also prohibit public entities from providing, by reason of disability, "a qualified individual with a disability with an aid, benefit, or service that

is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]" *Id.* § 35.130(b)(1)(iii). In addition, public entities may not "utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii). Federal regulations also make clear that public entities generally "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity[.]" *Id.* § 35.130(b)(8). Finally, the ADA itself provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by" the statute. 42 U.S.C. § 12203(b).

Here, the HAUL Plaintiffs allege that sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.03, 6.04, 6.05, and 6.07 of S.B. 1 violate Title II. ECF No. 199 ¶ 349. The Court has already discussed all but two of these provisions: sections 5.06 and 5.10. Section 5.06 provides that an election judge may permit a person who cancels their vote-by-mail application after being sent a mail-in ballot, and fails to return the sent mail-in ballot, "to vote only a provisional ballot[.]" TEX. ELEC. CODE § 84.035(b). Section 5.10 states that the electronic online tool early voting clerks use to track vote-by-mail applications and mail-in ballots must allow a voter to add or correct the identification information that is now required. *Id.* § 86.015(c)(4).

The HAUL Plaintiffs contend that these provisions "collectively and individually discriminate against people with disabilities in exercising their right to vote, including on members and/or constituents of [their] organizations." ECF No. 199 ¶ 349. Specifically, they assert that, in

requiring specific identification information on vote-by-mail applications, sections 5.02, 5.03, 5.06, 5.07, and 5.10:

> impose[] eligibility criteria that tends to screen out people with disabilities who may lack access to such IDs or other numbers by reason of their disabilities and denies voters with disabilities equal access to the early voting ballot application process by prohibiting Plaintiffs' members and other qualified voters with disabilities from voting even if they meet all other qualifications to vote by mail and denying them reasonable modifications to access the State's voting program.

*Id.* ¶ 349(a). The HAUL Plaintiffs further allege that sections 6.03, 6.05, and 6.07 interfere with disabled voters' ability to vote on an equal basis by "requiring those assisting voters with disabilities to fill out onerous forms and subjecting [them] to criminal liability for submitting incorrect forms[.]" *Id.* ¶ 349(b).

As to section 6.04, the HAUL Plaintiffs allege that the provision:

> in requiring those who assist voters to take an oath regarding the nature of their assistance under penalty of perjury, denies voters with disabilities equal access to voting by unlawfully limiting the scope of assistance the assistor can provide and interfering with the legal rights of voters with disabilities and those who assist them in exercising their rights and deny voters with disabilities equal access to voting.

*Id.* ¶ 349(c). The HAUL Plaintiffs therefore contend that the Secretary and the Attorney General have violated Title II and federal regulations. *Id.* ¶ 350. These allegations clearly establish the second and third elements for a *prima facie* case of discrimination under Title II.

The State Defendants counter that the HAUL Plaintiffs have failed to state a claim under Title II.[18] ECF No. 239 at 26–32. They first contend that the HAUL Plaintiffs cannot assert a Title

---

[18] The State Defendants assert the same arguments against the HAUL Plaintiffs' claims under § 208 of the VRA and § 504 of the Rehabilitation Act. ECF No. 239 at 6. Unless otherwise stated, the Court's analysis as to the sufficiency of the HAUL Plaintiffs' Title II claim also applies to the sufficiency of the HAUL Plaintiffs' claims under § 208 of the VRA and § 504 of the Rehabilitation Act.

II claim because the organizations themselves do not have a disability. *Id.* at 26. However, it is well settled that an organization may sue as the representative of its members. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Moreover, many courts have allowed organizations that serve disabled individuals to sue public entities under Title II. *See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362–64 (4th Cir. 2008); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–36 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir. 1997). They did so after observing that "Title II's enforcement provision extends to relief to '*any person* alleging discrimination on the basis of disability.'" *Innovative Health Sys., Inc.*, 117 F.3d at 47 (emphasis in original) (quoting 42 U.S.C. § 12133). "[T]he use of such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action under [Title II] as broadly as is permitted by Article III of the Constitution." *Id.* (quotation marks and citation omitted); *see also Steward v. Abbott*, 189 F. Supp. 3d 620, 630–32 (W.D. Tex. 2016) (finding that organizations have associational standing in Title II case); *Fla. State Conf. of NAACP v. Lee*, --- F. Supp. 3d ----, No. 4:21cv187-MW/MAF, 2021 WL 6072197, at *9 (N.D. Fla. 2021) (stating that plaintiffs must show "that they—*or their constituents*—are qualified individuals with a disability") (emphasis added). The Court sees no reason to carve out an exception in this case.

The State Defendants also argue that the HAUL Plaintiffs cannot assert Title II claims as third parties. ECF No. 239 at 27–29. This "argument conflates the merits of the suit with [their] standing to bring it." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). Thus, the State Defendants' discussion on standing is, for the most part, inapplicable in assessing whether the HAUL Plaintiffs have stated a valid claim under Title II.[19]

---

[19] Indeed, "[a]n organization can seek relief under either an associational standing theory or an organizational standing theory." *US Inventor Inc. v. Hirshfeld*, 549 F. Supp. 3d 549, 555 (E.D. Tex. 2021).

The State Defendants further argue that the HAUL Plaintiffs have failed to state a Title II claim because neither the Secretary nor the Attorney General "provide the benefits Plaintiffs say they should receive." ECF No. 239 at 29. ECF No. 239 at 29. On this point, the Court agrees with the State Defendants, to an extent. A *prima facie* case for discrimination under Title II requires a showing that the defendant public entity in some way provides the service or benefit at issue. *Ivy v. Williams*, 781 F.3d 250, 258 (5th Cir. 2015), *vacated and remanded as moot sub nom. Ivy v. Morath*, 137 S. Ct. 414 (2016). Although the Attorney General has authority to enforce criminal and civil offenses under the Election Code as discussed *supra*, it is unclear whether and how he provides the service or benefit at issue in this case, namely voting and voting by mail. The HAUL Plaintiffs do not offer a compelling explanation in their complaint or briefing. Thus, the Court concludes that, in this case, the Attorney General does not provide the service or benefit at issue and will therefore dismiss the Attorney General as a defendant to the HAUL Plaintiffs' Title II claim only.[20]

The Secretary, however, certainly provides the service or benefit of voting and voting by mail. The Secretary "is the chief election officer of the state." TEX. ELEC. CODE § 31.001(a). As chief election officer, the Secretary must "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.003. "In performing this duty," the Election Code explains, "the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code." *Id.* The Election Code also charges the Secretary with "distribut[ing] these materials to the appropriate state and local authorities having duties in the administration of these laws." *Id.* The Election Code further provides that the Secretary must

---

[20] The Court's finding does not extend to the HAUL Plaintiffs' claims under § 208 of the VRA and § 504 of the Rehabilitation Act against the Attorney General.

"assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.004(a). The Secretary shall also "maintain an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b).

The Election Code also requires the Secretary to "adopt standards of training in election law and procedure for presiding or alternate election judges[.]" *Id.* § 32.111(a)(1). Specifically, the Secretary must "develop materials for a standardized curriculum for that training; and distribute the materials as necessary to the governing bodies of political subdivisions that hold elections and to each county executive committee of a political party that holds a primary election." *Id.* §§ 32.111(a)(2)–(3). In addition, the Election Code states that a county clerk must "provide one or more sessions of training" to election judges and clerks. *Id.* § 32.114(a). The trainings that election judges and clerks must complete are premised upon "the standardized training program and materials developed and provided by the secretary of state[.]" *Id.* The Secretary must "schedule and provide assistance for the training of election judges and clerks" upon request by a county executive committee or a county clerk. *Id.* § 32.115. Moreover, the Election Code tasks the Secretary with taking "appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes." *Id.* § 31.005(a). The Election Code empowers the Secretary as follows:

> (b) The secretary of state may order a person performing official functions in the administration of any part of the electoral processes to correct offending conduct if the secretary determines that the person is exercising the powers vested in that person in a manner that:
>
> > (1) impedes the free exercise of a citizen's voting rights; or

(2) unless acting under an order of a court of competent jurisdiction, delays or cancels an election that the person does not have specific authority to delay or cancel.

(c) If a person described by Subsection (b) fails to comply with an order from the secretary of state under this section, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general.

*Id.* §§ 31.005(b)–(c).

Based on these statutory duties, it is clear that the Secretary is responsible for providing the service or benefit of voting and voting by mail. Indeed, the Election Code lists him first under chapter 31, which is titled "Officers to Administer Elections." Thus, his statutory duties permit him to "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service" at issue in this case. 28 C.F.R. § 35.130(b)(1)(ii). In implementing and enforcing the Election Code provisions to obtain and maintain the uniformity of all election laws, the Secretary must not "[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program[.]" *Id.* § 35.130(b)(1)(v). This includes, as the Election Code expressly requires, his provision of assistance to counties and local officials. Moreover, the Secretary may not "utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" when issuing directives, distributing election materials, and protecting voting rights. *Id.* § 35.130(b)(3). If he fails to do so, as the HAUL Plaintiffs allege in this case, then he is subject to liability under Title II.

The State Defendants have acknowledged in prior litigation that the "Secretary of State is the chief election officer, specially charged with administering elections." *Veasy v. Perry*, 29 F.

Supp. 3d 896, 923 (S.D. Tex. 2014). But they now contend otherwise, arguing that "local election officials, not the Secretary . . . administer Texas elections." ECF No. 239 at 29. They cite *Ivy* and *Lightbourn* to support their contention. *Id.* at 29–30. Both of these cases, however, are inapposite. Moreover, neither of these cases forecloses the possibility that the Secretary, in addition to local officials, is responsible for providing a service or benefit under Title II.

In *Ivy*, a class of hearing impaired individuals filed suit against the Texas Education Agency ("TEA") for violations of Title II. 781 F.3d at 251, 254. "In Texas, individuals under the age of 25 cannot obtain driver's licenses unless they submit a driver education certificate to the Department of Public Safety[.]" *Id.* at 252 (citing Tex. Transp. Code § 521.1601). The requisite driver education certificate is "only available from private driver education schools licensed by the TEA." *Id.* The plaintiffs requested injunctive relief requiring the TEA to bring driver education into compliance with Title II. *Id.* at 251. In response, the TEA filed a motion to dismiss for want of jurisdiction and for failure to state a claim. *Id.* at 253. The district court denied the TEA's motion, but certified its order for immediate appeal. *Id.* at 251.

On appeal, the Fifth Circuit considered whether the plaintiffs had failed to state a Title II claim. *Id.* at 254–58. The panel first observed that Title II prohibits a public entity from excluding a qualified individual with a disability from its services, programs, or activities because of the individual's disability. *Id.* at 254–55 (citing 42 U.S.C. § 12132). It then articulated the relevant legal issue as "whether the named plaintiffs have been 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of [the TEA].'" *Id.* at 255 (alterations in original) (quoting 42 U.S.C. § 12132). "To answer that question," the panel made clear, "we must decide whether driver education is a service, program, or activity of the TEA." *Id.* "Although this

[was] a close question[,]" the Fifth Circuit held that driver education was not a service, program, or activity of the TEA. *Id.*

In reaching its holding, the Fifth Circuit considered the plain text of Title II and interpretive guidance from the Department of Justice ("DOJ").[21] *See id.* at 255–57. The Fifth Circuit interpreted the phrase "services, programs, or activities of a public entity" in Title II to mean "what 'services, programs, or activities' are provided by the public entity." *Id.* (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)). The panel found it significant that "the TEA itself does not teach driver education, contract with driver education schools, or issue driver education certificates to individual students." Because the TEA's program "provide[d] the licensure and regulation of driving education schools, not driver education itself[,]" the Fifth Circuit found that the text of Title II "suggests that driver education is not a program, service, or activity of the TEA." *Id.*

Interpretive guidance from the DOJ "stated that a public entity is not accountable for discrimination in the employment or other practices of [a company licensed by the public entity], if those practices are not the result of requirements or policies established by the [public entity]." *Id.* at 256 (alterations in original) (quotation marks and citation omitted). The panel observed that the plaintiffs had alleged that it was "the TEA's *failure* to establish requirements or policies [that] allowed private driver education schools to be inaccessible." *Id.* (emphasis in original). The Fifth Circuit therefore determined that "the DOJ's interpretive guidance indicates that the TEA is not accountable for the driver education schools' inaccessibility because the TEA's requirements and policies have not caused it." *Id.*

---

[21] The Fifth Circuit also considered federal regulations and caselaw construing contractual and agency relationships between private and public entities. *See Ivy*, 781 F.3d at 255–58. Federal regulations, however, did not provide clarity, and contractual and agency relationships are not relevant here.

Here, whether the Secretary provides voting and vote-by-mail services is not a close question. The Election Code makes clear that voting in person and by mail are services or benefits that the Secretary provides. The Secretary has a concrete and specific role in the administration of elections throughout Texas and oversees voting processes and procedures. Indeed, the Election Code, including many of the S.B. 1 provisions that the HAUL Plaintiffs challenge in this case, requires the Secretary to implement the Election Code itself by way of rules and requirements. In other words, the Election Code charges the Secretary with administering elections.

Further, the Secretary's duties under the Election Code constitute far more than the mere licensing that the Fifth Circuit found insufficient in *Ivy*. The Secretary must provide voting and vote-by-mail services and must do so in a specific and particular manner pursuant to the Election Code. Indeed, it is precisely because of the Secretary's statutory obligation to implement and enforce the Election Code that, according to the HAUL Plaintiffs, he is subject to liability under Title II. Whereas the plaintiffs in *Ivy* claimed that the TEA had failed to establish requirements or policies to counteract disability discrimination, the HAUL Plaintiffs in this case allege that the Secretary violates Title II by administering elections in accordance with the Election Code. They are *not* alleging that the Secretary has failed to establish requirements or policies that allow their disabled members to access voting and vote-by-mail services or benefits. Put differently, the HAUL Plaintiffs contend that the Secretary, in administering elections according to the specific procedures and processes the Election Code contemplates, discriminates against disabled voters.

It is for this reason that the State Defendants' reliance on *Lightbourn* is also misplaced. In that case, five visually impaired individuals, among others, filed a Title II suit for injunctive relief against the Secretary. *Lightbourn*, 118 F.3d at 423. The plaintiffs alleged that the Secretary "discriminated against them by failing to ensure that persons with visual and mobility impairments

have access to 'polling sites and voting procedures.'" *Id.* In particular, they argued that Title II required the Secretary to provide them with the opportunity to vote in secret, without the assistance of an election worker or other person. *Id.* at 423–24, 431. The Fifth Circuit was not persuaded. It framed the relevant legal issue as whether the Secretary had "a duty to ensure that local election authorities comply with the ADA." *Id.* at 427. The panel then consulted the Election Code to review the Secretary's duties under certain provisions and determined that "the Secretary ha[d] no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Id.* at 432.

But here, the duty at issue is the Secretary's mandate to administer elections according to the Election Code. The HAUL Plaintiffs are *not* alleging that the Secretary has a duty to take steps to ensure that local officials comply with the ADA. It is therefore not the case that "the logic of Plaintiffs' claim would impose supervisory liability on the State Defendants." ECF No. 239 at 30. Rather, the Secretary is personally and potentially liable under Title II because *he* must administer elections in compliance with Election Code provisions that—the HAUL Plaintiffs allege—discriminate against disabled voters. *Lightbourn*, therefore, does not insulate the Secretary from the HAUL Plaintiffs' Title II claim.

Still, the State Defendants maintain that the HAUL Plaintiffs' Title II claim must be dismissed because they have not plausibly alleged that S.B. 1 "actually discriminates against voters with disabilities." *Id.* According to the State Defendants, no discrimination exists because "[d]isabled Texans have multiple options to vote in every election." *Id.* at 31. These alternatives, they submit, include voting in a polling place or at the curbside during early voting, in a polling place or at the curbside on Election Day, and by mail. *Id.* Their arguments miss the mark. The relevant question before the Court at this stage of the proceedings is whether the HAUL Plaintiffs

have alleged sufficient facts showing that the challenged S.B. 1 provisions violate Title II. The State Defendants' belief that the status quo already offers disabled voters meaningful access to vote—as Title II requires—is an argument for another day.

What is more, the HAUL Plaintiffs allege that the challenged provisions deny disabled voters not only equal and effective access to vote in person, but also equal and effective access to vote by mail. "Absentee and in-person voting are different benefits, and voters with disabilities are entitled to equal access to both." *Merrill v. People First of Ala.*, 141 S. Ct. 25, 27 (2020) (Sotomayor, J., dissenting); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) ("This case does not turn on whether there is a standalone right to vote privately and independently without assistance. Plaintiffs' argument is that defendants have provided such a benefit to non-disabled voters while denying that same benefit to plaintiffs on the basis of their disability."). Even assuming that the alternatives that the State Defendants identify constitute reasonable modifications under Title II, they do nothing for eligible disabled voters who are discriminated against when voting by mail. Surely, voting by mail cannot be a reasonable modification when, as the HAUL Plaintiffs plausibly allege, disabled voters who are eligible to vote by mail do not have meaningful access to actually do so because of their disabilities.

For these reasons, the State Defendants' contention that "Texas law allows for numerous accommodations for disabled voters" is also misplaced at this stage of litigation. ECF No. 239 at 31. The same goes for the State Defendants' argument that the HAUL Plaintiffs cannot state a

valid Title II claim because "Texas law expressly prohibits election officials from interpreting the Texas Election Code" in a manner that discriminates against disabled voters. *Id.* at 30. The question before the Court is whether the HAUL Plaintiffs have alleged sufficient facts to state a valid Title II claim, not whether existing law—in the State Defendants' opinion—already provides meaningful access to vote in person and by mail, and precludes discrimination against disabled voters.

The Court, therefore, finds that the HAUL Plaintiffs have stated a claim upon which relief may be granted under Title II of the ADA.

### ii. Congress acted pursuant to a valid grant of constitutional authority in enacting Title II of the ADA to prohibit discrimination in voting.

Having concluded that the HAUL Plaintiffs have stated a valid Title II claim, the Court now considers which aspects of the State Defendants' alleged conduct violate Title II and to what extent such misconduct also violates the Fourteenth Amendment. *Block*, 952 F.3d at 617.

In *Lane*, the Supreme Court held "that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." 541 U.S. at 533–34. In reaching its holding, the *Lane* Court considered the "constitutional right or rights that Congress sought to enforce when it enacted Title II." *Id.* at 522. The *Lane* Court observed that the Fourteenth Amendment requires that "all persons similarly situated should be treated alike[.]" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 439 (1985)). It then determined that Title II seeks to enforce this constitutional command by prohibiting discrimination against disabled persons. The *Lane* Court also found that Title II "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id.* at 522–23. "These rights include some, like the right of access to the courts at issue in this case,

that are protected by . . . the Fourteenth Amendment." *Id.* at 523. The *Lane* Court accordingly concluded that in enacting Title II, Congress validly abrogated state sovereign immunity as it applies to Title II cases implicating the right of access to the courts. *Id.* at 533–34.

In this case, the HAUL Plaintiffs allege that certain S.B. 1 provisions discriminate against their disabled members by burdening their right to vote. "The Fourteenth Amendment has been interpreted to protect voters generally from laws that excessively burden the right to vote and the conduct of the political process." *Veasy v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (Jones, J., joined by Jolly, Smith, Clement, and Owen, JJ., concurring in part) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008); *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 786–90 (1983)); *see also McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[B]ecause of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause[.]" (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). Thus, it is clear that the State Defendants' alleged misconduct violates both Title II and the Fourteenth Amendment.

It is of no consequence that the HAUL Plaintiffs challenge S.B. 1 provisions pertaining to the State Defendants' vote-by-mail program. The Fourteenth Amendment, and the Equal Protection Clause in particular, "extend to all action of the State denying equal protection of the laws, whatever the agency of the State taking the action, or whatever the guise in which it is taken." *Cooper v. Aaron*, 358 U.S. 1, 17 (1958) (citations omitted). The Election Code, in turn, provides that an eligible voter who has a physical condition that prevents them from appearing at a polling place on an election day without a likelihood of needing personal assistance or of injuring their

health has a right to vote by mail. TEX. ELEC. CODE § 82.002(a)(1). Therefore, voting by mail in

Texas is state action subject to the constitutional guarantees found in the Fourteenth Amendment.

Accordingly, the Court finds that Congress acted pursuant to a valid grant of constitutional

authority in enacting Title II to prohibit discrimination in voting. Thus, state sovereign immunity

presents no obstacle to the HAUL Plaintiffs' Title II claim against the Secretary.

### b.   The HAUL Plaintiffs' claims under §§ 2 and 208 of the VRA.

The Fifth Circuit "has held that the Voting Rights Act, 'which Congress passed pursuant

to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity.'" *Mi*

*Familia Vota*, 977 F.3d at 469 (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir.

2017)). State sovereign immunity, therefore, does not bar the HAUL Plaintiffs' claims under §§ 2

and 208 of the VRA against the Governor, the Secretary, and the Attorney General.

### 3.   Texas accepted federal funds and therefore waived sovereign immunity for the HAUL Plaintiffs' claim under § 504 of the Rehabilitation Act against the Secretary and the Attorney General.

A state waives its sovereign immunity to claims under § 504 of the Rehabilitation Act by

accepting federal funds. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 281 (5th Cir. 2005). The

HAUL Plaintiffs allege that the Secretary and the Attorney General "receive [f]ederal financial

assistance or funding[.]" ECF No. 199 ¶ 361. They claim that "Texas has a significant pool of

federal funds earmarked for making elections accessible and secure." *Id.* These allegations

plausibly establish that the Secretary and the Attorney General accepted federal funds. Thus, state

sovereign immunity does not bar the HAUL Plaintiffs' claim under § 504 of the Rehabilitation

Act.[22]

---

[22] State sovereign immunity belongs to the state and extends to its officials. *See Can. Hockey, L.L.C. v. Tex. A&M Univ. Athletic Dep't*, No. 20-20503, 2022 WL 445172, at *3 (5th Cir. 2022) ("State sovereign immunity divests federal courts of jurisdiction over states and their agencies and instrumentalities, unless *the state* consents to suit[.]") (emphasis added). Thus, by accepting federal funds, Texas waived the Secretary's and the Attorney General's

In sum, state sovereign immunity does not bar the HAUL Plaintiffs' claims under the First, Fourteenth, and Fifteenth Amendments, Title II of the ADA, §§ 2 and 208 of the VRA, and § 504 of the Rehabilitation Act. However, the Court will dismiss the HAUL Plaintiffs' Title II claim against the Attorney General for failure to state a claim.

## B.  The HAUL Plaintiffs have sufficiently shown that they have standing.

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Juridical entities may satisfy these requirements under an associational or organizational theory of standing. *OCA-Greater Hous.*, 867 F.3d at 610. At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician*, 691 F.3d at 652. Where, as here, the plaintiffs challenge several provisions in a statute, they must plead "all the elements of standing for each provision they seek to challenge." *In re Gee*, 941 F.3d 153, 162 n.4 (5th Cir. 2019). Further, where, as here, multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Here, the organizations are named as plaintiffs for all claims that the HAUL Plaintiffs assert against the Governor, the Secretary, and the Attorney General, except for one claim that Mr. Clemmons alone asserts against the Secretary and the Attorney General. Therefore, the HAUL

---

immunity for claims under § 504 of the Rehabilitation Act. Whether a specific state entity receives or directly benefits from federal financial assistance is a different question and more properly assessed under Rule 12(b)(6). "[A] plaintiff may not predicate a § 504 claim against a state actor on the mere fact that the state itself obtains federal money." *Lightbourn*, 118 F.3d at 427. The HAUL Plaintiffs have alleged that the Secretary and the Attorney General received federal financial assistance or funding. Their claim under § 504 of the Rehabilitation Act, therefore, is not subject to dismissal pursuant to Rule 12(b)(6) for failure to allege that the specific state entity receives federal funds.

Plaintiffs need only allege a plausible set of facts establishing that at least one organization and Mr. Clemmons have standing to assert these claims against the Governor, the Secretary, and the Attorney General.

The HAUL Plaintiffs have sufficiently shown that all organizational plaintiffs have organizational standing to assert each claim and challenge each S.B. 1 provision at issue in this case. Organizational standing exists if the entity itself "meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). The HAUL Plaintiffs have also sufficiently shown that Mr. Clemmons has standing to assert his claim and challenge each S.B. 1 provision at issue in his claim.

### 1.   HAUL, DST, MFV, and The Arc of Texas have organizational standing.

HAUL, DST, and MFV assert three claims against the Secretary and the Attorney General under the First, Fourteenth, and Fifteenth Amendments. ECF No. 199 ¶¶ 250–300. Their claims each challenge most of the S.B. 1 provisions discussed herein. *Id.* ¶¶ 260–62, 276–78, 295–97.

HAUL, DST, and MFV also assert a claim under § 2 of the VRA against the Governor, the Secretary, and the Attorney General. *Id.* ¶¶ 301–17. Their § 2 claim challenges all of the S.B. 1 provisions discussed herein. *Id.* ¶¶ 309, 311.

MFV, DST, and The Arc of Texas assert a claim under § 208 of the VRA against the Governor, the Secretary, and the Attorney General. *Id.* ¶¶ 318–26. Their § 208 claim challenges sections 6.01, 6.03, 6.04, 6.05, and 6.07. *Id.* ¶¶ 323–24.

The Arc of Texas asserts claims under Title II of the ADA and § 504 of the Rehabilitation Act against the Secretary and the Attorney General. *Id.* ¶¶ 337–65. Its disability claims challenge sections 5.02, 5.03, 5.06, 5.10, 6.03, 6.04, 6.05, and 6.07. *Id.* ¶¶ 339, 355.

### a. Injury in fact

Under an organizational theory of standing, an organization may establish an injury in fact by alleging "a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). That is precisely what the HAUL Plaintiffs have alleged in this case.

"HAUL is nonpartisan, nonprofit corporation with its principal office in Houston, Texas." ECF No. 199 ¶ 38. It is affiliated with the National Urban League, which "is the nation's oldest and largest community-based movement devoted to empowering African Americans to enter the economic and social mainstream." *Id.* "HAUL advocates for and provides social services to disadvantaged people of all races, gender, age groups and . . . disabilities." *Id.* In particular, "HAUL works to achieve economic and social justice for its constituents by providing community voter/political participation education and supporting and offering third[-]party voter registration, including through its two auxiliary, age-specific, volunteer groups." *Id.*

HAUL's work includes providing social services to disadvantaged individuals in Texas. *Id.* ¶ 41. But, in light of the S.B. 1 provisions that it challenges, "HAUL will be forced to divert time and resources from the other critical social services it provides to disadvantaged persons . . . to ensuring their clients . . . are able to vote in upcoming elections without being subjected to civil and criminal offenses and penalties." *Id.* Because of the challenged S.B. 1 provisions, HAUL will need "to retrain and educate their large constituencies on the new voting restrictions, procedures, and violations[.]" *Id.* In addition, "HAUL will have to increase its Get Out The Vote ('GOTV') work to respond to the lack of means and methods to vote" allegedly caused by each of the S.B. 1 provisions that it challenges. *Id.*

DST "is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women[.]" *Id.* ¶ 42. "The organization has 75 chapters that include alumnae and college chapters and approximately 20,445 members in Texas, most of whom are registered voters in Texas." *Id.* ¶ 44. DST's "top social action priorities" include voter registration and voter education programs. *Id.* ¶ 43. In particular, DST has dedicated extensive resources "to provide public education and training about the importance of the decennial Census and its impact on redistricting, the allocation of funding, and policy-making." *Id.*

But, because of the challenged S.B. 1 provisions, DST, "both nationally and particularly their chapters in Harris, Bexar, Travis and Dallas counties," will need "to divert time, money, and resources from other activities, such as their voter registration and voter education efforts[.]" *Id.* ¶ 48. This also includes their work "related to the post-Census redistricting cycle[.]" *Id.* DST will also need to train their Texan members on "providing public education regarding the changes in voting law and procedure[.]" *Id.*

MFV "is a national, non-profit civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice." *Id.* ¶ 62. The organization "operates in six states, including Texas." *Id.* Given each of the S.B. 1 provisions that they challenge, MFV "must divert personnel, time, and resources away from its routine community activities[.]" *Id.* ¶ 64. Specifically, MFV must now reallocate its resources to:

> (1) increase voter awareness, education, and support to comply with the expansive new rules of SB 1; (2) increase voter awareness and education about new voting restrictions that may result in rejected mail-in ballot applications or rejected ballots completed by lawfully registered voters; (3) increase awareness and education about the elimination of voting methods used in 2020 that will no longer be available to voters, including 24-hour voting and drive-through voting; (4) increase awareness and education about new restrictions on people who provide transportation and other physical and language assistance at the polls to ensure that the elderly, disabled,

> or non-English-speaking voters who [MFV] supports are able to
> vote in compliance with SB 1; (5) increase awareness and education
> about the new requirements to apply for mail-in ballots; . . . and (7)
> increase awareness and education of voters and poll workers about
> the expanded rights of poll watchers and the potential for
> intimidation of voters and poll workers under the new law.

*Id.*

MFV "will also have to expend resources to help lawfully registered voters monitor voter

rolls . . . and assist with the costly and complicated system of reestablishing lawful registration

status." *Id.* Further, MFV will need "to support voters who, under burdensome time constraints,

must cure mail-in ballots for alleged deficiencies—if election officials choose to provide notice."

*Id.* Such a response will require MFV "to spend finite resources on these activities so long as the

challenged provisions of SB 1 are in effect." *Id.* ¶ 65.

Finally, "The Arc of Texas has promoted, protected, and advocated for the human rights

and self-determination of Texans with intellectual and developmental disabilities ('IDD') since its

founding in 1953." *Id.* ¶ 49. It "is a statewide advocacy and membership organization—with 6,000

individual members and 27 local member chapters throughout the state—that supports and

advocates for these rights on behalf of the IDD community." *Id.* Specifically, "The Arc of Texas

works with and alongside individuals with IDD and their families to identify barriers and solutions

to inclusive education, competitive integrated employment, quality community-based services and

support[], and access to civil rights and justice." *Id.* The organization "has been instrumental in

the creation of virtually every program, service, right, and benefit that is now available to more

than half a million Texans with IDD." *Id.* ¶ 50. It "continues to advocate for including people with

intellectual and developmental disabilities in all aspects of society." *Id.*

"Voting rights has always been a central priority in [the] advocacy work of The Arc of

Texas." *Id.* ¶ 51. Indeed, "voting rights are intertwined with all of the organization's advocacy

efforts." *Id.* Each of the S.B. 1 provisions that The Arc of Texas challenges "makes it substantially

more difficult for The Arc of Texas to carry out its civic engagement mission." *Id.* ¶ 57. In light

of these challenged provisions, "The Arc of Texas will have to expend more time, money, and

resources on its efforts to educate and assist voters[,]" and will need "to divert resources form its

other core activities[.]" *Id.* The Arc of Texas, therefore, "is limited, and will continue to be limited,

in the resources that it can devote to its other core organizational goals." *Id.*

     These allegations sufficiently show that HAUL, DST, MFV, and The Arc of Texas have

suffered cognizable organizational injuries based on a diversion-of-resources theory.

     The State Defendants disagree and argue that the HAUL Plaintiffs "cannot rely on a

diversion-of-resources theory to demonstrate organizational standing because nothing about SB1

*causes* them to divert resources or actually impairs their activities." ECF No. 264 at 15 (emphasis

in original). The HAUL Plaintiffs' allegations, however, belie the State Defendants' contention.

     The State Defendants also rely on *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233 (5th Cir 2010),

for the proposition that "[n]ot every diversion of resources to counteract the defendant's conduct .

. . establishes an injury in fact." *Id.* (quoting *City of Kyle*, 626 F.3d at 238). They argue that the

HAUL Plaintiffs' diversion-of-resources theory fails to establish a cognizable injury because they

have not identified specific projects that they have placed on hold or otherwise curtailed in light

of the S.B. 1 provisions that they challenge. (citing *City of Kyle*, 626 F.3d at 238).

     Setting aside the fact that the HAUL Plaintiffs *have* identified specific projects that need

to be placed on hold, *see supra*, the Fifth Circuit expressly rejected such a prerequisite to standing

at the pleading stage in *OCA-Greater Houston*:

> Our remark in *City of Kyle* that those plaintiffs could have
> established standing by "identif[ying] any specific projects that the
> HBA had to put on hold or otherwise curtail in order to respond to
> the revised ordinances" *was not a heightening of the* Lujan *standard,*

> *but an example of how to satisfy it by pointing to a non-litigation-related expense.*

867 F.3d at 612 (emphasis added). The plaintiff organization in *OCA-Greater Houston* alleged that it had been injured by the need for "'additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters' because 'addressing the challenged provisions frustrates and complicates its routine community outreach activities."" *Id.* at 610. The panel held that the plaintiff organization's injury was a sufficient Article III injury to establish organizational standing because the Texas law at issue forced the organization to divert resources and "perceptibly impaired [its] ability to get out the vote among its members." *Id.* at 612 (quotation marks omitted). To establish a cognizable organizational injury, therefore, the HAUL Plaintiffs need not identify specific projects that they have placed on hold or otherwise curtailed. Having done so, they have simply exceeded the requirements for pleading organizational standing.

    Thus, the HAUL Plaintiffs have adequately alleged that HAUL, DST, MFV, and The Arc of Texas has suffered cognizable organizational injuries based on a diversion-of-resources theory to assert each claim challenging each of the S.B. 1 provisions at issue in this case. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[.]"[23] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact[.]").

---

[23] To the extent that the State Defendants argue that the HAUL Plaintiffs have failed to identify an injury for each challenged provision, "[w]hat the State Defendants fail to appreciate is that the organizational injury the [HAUL] Plaintiffs have alleged is the same for each of the S.B. 1 provisions they challenge." *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 2706116, at *13 (W.D. Tex. July 12, 2022).

### b. Causation and redressability

Whether HAUL's, DST's, MFV's, and The Arc of Texas's cognizable organizational injuries are fairly traceable to and redressable by the Secretary and the Attorney General is a straightforward inquiry. The invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the Secretary. *OCA-Greater Hous.*, 867 F.3d at 613. Further, the credible threat of enforcing the challenged S.B. 1 provisions, as discussed in the Court's *Ex parte Young* analysis *supra*, is fairly traceable to the Attorney General, who has authority to impose civil penalties on election officials and prosecute election law offenses.[24] An injunction prohibiting the Attorney General from enforcing these provisions will, at least partly, redress the injuries that these organizational plaintiffs have suffered. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks and citation omitted)).

The State Defendants argue that the organizational plaintiffs' injuries are not fairly traceable to nor redressable by the Secretary and the Attorney General. ECF No. 264 at 7–8. For the most part, their contentions echo those that they raised in asserting that the Secretary and the Attorney General are entitled to state sovereign immunity. *Id.* However, as the State Defendants observe, "Article III standing analysis and *Ex parte Young* analysis 'significantly overlap.'" *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac EMS, Inc.*, 851 F.3d at 520. Therefore, for the same reasons discussed in the Court's *Ex parte Young* analysis *supra*, these arguments are unpersuasive.

---

[24] *Paxton v. Longoria*, No. 22-0224, 2022 WL 2080867 (Tex. June 10, 2022) does not hold otherwise. There, the Texas Supreme Court concluded that the Attorney General does not have authority to seek civil penalties under section 31.129 of the Election Code against an election official "based solely on the fact of the parties' agreement that [the Attorney General] lacks authority to enforce Section 31.129[.]" *Longoria*, 2022 WL 2080867, at *7.

The State Defendants also contend that *OCA-Greater Houston* only applies in cases considering the facial validity of a Texas election statute. ECF No. 239 at 13. To be sure, in *Texas Democratic Party v. Hughs*, 974 F.3d 570 (5th Cir. 2020) (per curiam), the Fifth Circuit noted that *OCA-Greater Houston* involved a facial challenge. *Id.* at 570–71. The panel did so after observing that an "important question" had not been resolved, namely "whether and to what extent *Ex parte Young*'s exception to sovereign immunity permits plaintiffs to sue the Secretary in an as-applied challenge to a law enforced by local officials." *Id.* at 570. But the panel did not resolve that important question. Rather, it held that the "openness of the question alone [was] sufficient reason to deny" the plaintiffs' request for summary affirmance of a district court order concluding that the Secretary was not entitled to state sovereign immunity. *Id.* at 571. Moreover, as discussed *supra*, the *Ex parte Young* exception to state sovereign immunity applies to the HAUL Plaintiffs' claims under § 101 of the CRA and the First and Fourteenth Amendments, Congress validly abrogated state sovereign immunity in enacting the VRA and Title II, and Texas has waived sovereign immunity under § 504 of the Rehabilitation Act. *Hughs*, therefore, is inapposite.

Equally unpersuasive is the State Defendants' argument that *OCA-Greater Houston* is not binding on the Court because, in their view, the panel failed to consider *Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972). ECF No. 239 at 130. *Bullock*, according to the State Defendants, indicates that the Secretary's duties under the Election Code are "not a delegation of authority to care for any breakdown in the election process." *Id.* (citing *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020) (citing *Bullock*, 480 S.W.2d at 372))). Their contention, however, is based on conjecture and reads much into the opinion that cannot be supported by the panel's careful reasoning.

There is also no reason to ignore *OCA-Greater Houston* in response to a nonbinding concurring opinion of the Texas Supreme Court. *Id.* The State Defendants' belief that *OCA-*

*Greater Houston* was "wrongly" decided has no bearing. *Id.* The Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court." *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

However, the HAUL Plaintiffs have not sufficiently shown that their VRA claims are fairly traceable to and redressable by the Governor. The HAUL Plaintiffs' argument that the Governor is not entitled to state sovereign immunity under the VRA, though correct, does not establish that he is a proper defendant for their VRA claims. The HAUL Plaintiffs must plausibly show that their injuries are fairly traceable to and redressable by the Governor. The HAUL Plaintiffs' complaint only alleges that the Governor "is the chief executive officer of the State of Texas" and that he signed S.B. 1 into law. ECF No. 199 ¶¶ 25, 71. All other references to the Governor in the complaint provide important background information on the enactment of S.B. 1, but they fall short of plausibly showing how their injuries are fairly traceable to and redressable by the Governor. "As a result, Governor [Abbott] is not a proper defendant." *Morris*, 739 F.3d at 746.

Thus, the HAUL Plaintiffs have alleged sufficient facts to plausibly establish that HAUL, DST, MFV, and The Arc of Texas has standing to sue the Secretary and the Attorney General, but not the Governor, under each of their claims challenging each of the S.B. 1 provisions at issue in this case.[25]

### 2. Mr. Clemmons has standing.

Mr. Clemmons asserts a claim against the Secretary and the Attorney General under the Fourteenth Amendment. *Id.* ¶¶ 327–36. His claim challenges sections 4.06, 4.07, and 4.09. *Id.* ¶ 329.

---

[25] It is likely that associational standing exists as well.

### a.   Injury in fact

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019) (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater*, 867 F.3d at 612 (quotation marks and citation omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotation marks and citation omitted). Indeed, in the pre-enforcement context, a plaintiff need only "face 'a credible threat of prosecution' and 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (quoting *Babbitt v. Farm Workers*,

Mr. Clemmons "is a resident of Austin, Texas, and a senior at Huston-Tillotson University." ECF No. 199 ¶ 70. He "served as an election judge in Travis County for the July 14, 2020 primary election in Texas." *Id.* Mr. Clemmons "wants to continue to serve as an election judge in upcoming elections." *Id.* He fears, however, that he "could face devastating criminal penalties from fulfilling his responsibilities as an election judge." *Id.* In particular, he "is unable to ascertain whether his duties as an election judge, requiring him to take action where necessary to prevent poll watchers from speaking to voters, viewing voters' ballots, or otherwise being disorderly in the polling place, will require him to violate the Texas Election Code as amended

by" sections 4.06, 4.07, and 4.09. *Id.* ¶ 334. "Taken together, these provisions could expose [him] to criminal liability for taking action also required by the Texas Election Code in future elections." *Id.* ¶ 335. Mr. Clemmons, therefore, "has to choose between forgoing future service and facing criminal prosecution under the vague law." In other words, Mr. Clemmons alleges that the credible threat of enforcing these provisions against election judges injures him.

Section 4.06 makes it a class A misdemeanor if an election officer, including an election judge, refuses, either intentionally or knowingly, to accept a poll watcher for service when acceptance is otherwise required. TEX. ELEC. CODE § 33.051(g). Mr. Clemmons alleges that this provision "is impermissibly vague because it does not provide an election official, including an election judge, with notice of whether they can knowingly refuse to accept a poll watcher for behavior elsewhere prohibited in the Texas Election Code." ECF No. 199 ¶ 330. He submits that "other areas of the Texas Election Code provide reasons to exclude a poll watcher that could reasonably be interpreted as inconsistent with the broad language of this new provision." *Id.*

Section 4.07 allows a poll watcher "to sit or stand near enough to see and hear the election officers conducting the observed activity" and makes clear that an election judge may not deny a poll watcher "free movement where election activity is occurring within the location at which the watcher is serving." TEX. ELEC. CODE § 33.056(a), (e). Mr. Clemmons alleges that section 4.07 is "impermissibly vague because it does not give a person of ordinary intelligence fair notice of what conduct is prohibited." ECF No. 199 ¶ 331. In particular, he contends that the provision "does not define 'free movement,' nor does the Texas Election Code." *Id.* The absence of a definition, Mr. Clemmons submits, is all the more harmful because polling places "are crowded and full of other election officials trying, and indeed often legally obligated, to carry out their duties." *Id.* "If, for example, an election official is required to stand in a particular location that a poll watcher seeks

to occupy, is the election official required in all instances to move, to prevent a poll watcher from being denied free movement?" *Id.*

Mr. Clemmons also alleges that section 4.07 "does not make clear how it relates to other sections of the Texas Election Code that prevent poll watchers from speaking directly to a voter or election official, or observing a voter's ballot." *Id.* ¶ 332. For example, the Election Code provides that a poll watcher "may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice." TEX. ELEC. CODE § 33.057(b). The Election Code also prohibits a poll watcher from "convers[ing] with an election officer regarding the election, except to call attention to an irregularity of violation of law; convers[ing] with a voter; or communicat[ing] in any manner with a voter regarding the election." *Id.* §§ 33.058(a)(1)–(3). Thus, Mr. Clemmons does not know whether and to what extent these Election Code provisions impact his statutory responsibility as an election judge to allow poll watchers "free movement."

Finally, section 4.09 makes it an offense when an election judge "at a location at which the presence of watchers is authorized . . . knowingly prevents a watcher from observing an activity or procedure the [election judge] knows the watcher is entitled to observe[.]" *Id.* § 33.061(a). Sanctionable conduct under section 4.09 includes any action that obstructs a poll watcher's view or distances the poll watcher "from the activity or procedure to be observed in a manner that would make observation not reasonably effective." *Id.*

Mr. Clemmons contends that section 4.09 "fails to define the conduct it prohibits with sufficient specificity to apprise an ordinary person of its requirements." ECF No. 199 ¶ 333. "For example," he alleges, "it is not clear from the text from whose perspective the 'observation not reasonably effective' standard applies." *Id.* In addition, Mr. Clemmons claims that section 4.09 "is in conflict with other areas of the Texas Election Code, described above." *Id.* According to Mr.

Clemmons, section 4.09 "is so standardless that it invites arbitrary and disparate enforcement by parties not entrusted with policymaking authority." *Id.*

The Court is satisfied that the HAUL Plaintiffs have alleged sufficient facts to plausibly establish that Mr. Clemmons has suffered a cognizable injury. The Attorney General has the authority to enforce election law offenses, and the Election Code requires the Secretary to refer suspected election law offenses to the Attorney General. Further, the Attorney General has the authority to impose civil penalties on election officials, including election judges. The Secretary is also authorized to report violations of the Election Code to the Attorney General. Thus, sections 4.06, 4.07, and 4.09 subject election judges to criminal and civil prosecution. Mr. Clemmons wants to serve as an election judge and would do so were it not for these provisions. His intended future conduct is "'arguably proscribed' by the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). Mr. Clemmons, therefore, has sufficiently alleged a cognizable injury and "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt*, 442 U.S. at 298 (quotation marks and citation omitted).

### b. Causation and redressability

Once again, whether Mr. Clemmons's cognizable injury is fairly traceable to and redressable by the Secretary and the Attorney General is a straightforward inquiry. The invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the Secretary. *OCA-Greater Hous.*, 867 F.3d at 613. Further, the credible threat of enforcing sections 4.06, 4.07, and 4.09 is fairly traceable to the Attorney General, who has authority to impose civil penalties on election judges and prosecute election law offenses. An injunction prohibiting the Attorney General from enforcing these provisions will, at least partly, redress the injuries that Mr. Clemmons has suffered.

Thus, the HAUL Plaintiffs have alleged sufficient facts to plausibly establish that Mr. Clemmons has standing to sue the Secretary and the Attorney General under his claim challenging sections 4.06, 4.07, and 4.09.

## CONCLUSION

For the foregoing reasons, the Texas Governor, the Texas Secretary of State, and the Texas Attorney General's motion to dismiss all claims that Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Mi Familia Vota, Marla López, Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons have asserted against them (ECF No. 239) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

The claims challenging sections 5.02, 5.03, 5.08, and 6.07 of S.B. 1 under the First, Fourteenth, and Fifteenth Amendments to the United States Constitution against the Texas Attorney General are **DISMISSED WITHOUT PREJUDICE**.

Any and all claims challenging portions of section 6.04 of S.B. 1 that the district court enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are **MOOT**.

Any and all claims under Title II of the Americans with Disabilities Act against the Texas Attorney General are **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds.

Any and all claims under §§ 2 and 208 of the Voting Rights Act of 1965 against the Texas Governor are **DISMISSED WITHOUT PREJUDICE** on standing grounds.

All other claims that Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Mi Familia Vota, Marla López, Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons have asserted against the Texas Secretary of State and the Texas Attorney General may proceed.

It is so **ORDERED**.

**SIGNED** this August 2, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE