**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered the Texas Secretary of State and the Texas Attorney General's motion to dismiss the claims that OCA-Greater Houston, League of Woman Voters of Texas, REVUP-Texas, and Workers Defense Action Fund have asserted against them (ECF No. 240). After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code") by altering various election practices and procedures pertaining to early voting, voting by mail, voter assistance, and more. *See generally id.*

Days before and after the Governor signed S.B. 1 into law, several private plaintiffs filed suit, alleging that certain provisions of S.B. 1 violate federal statutes and the United States

Constitution.[1] This order addresses one of these suits filed by OCA-Greater Houston ("OCA-GH"), League of Woman Voters of Texas ("LWVTX"), REVUP-Texas ("REVUP"), and Workers Defense Action Fund ("WDAF") (together, the "OCA-GH Plaintiffs").[2] *See* Compl., *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. Sept. 3, 2021), ECF No. 1. The OCA-GH Plaintiffs challenge sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.04, 6.06, and 7.04 of S.B. 1. ECF No. 200 ¶ 96.[3]

On January 19, 2022, the OCA-GH Plaintiffs filed their second amended complaint against the Texas Secretary of State (the "Secretary") and the Texas Attorney General (the "Attorney General"), in their official capacities (together, the "State Defendants").[4] ECF No. 200. They assert eight claims as follows:

- The OCA-GH Plaintiffs allege that sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 violate § 101 of the Civil Rights Act of 1964 ("CRA"), Title II of the Americans with Disabilities Act ("ADA"), and § 504 of the Rehabilitation Act, and they name the Secretary as a defendant for these three claims;

- The OCA-GH Plaintiffs allege that sections 6.04 and 6.06 violate § 208 of the Voting Rights Act of 1965 ("VRA"), Title II of the ADA, and § 504 of the Rehabilitation Act, and they name the Secretary and the Attorney General as defendants for these three claims; and

---

[1] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *see also* Order, *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

[2] The Texas Organizing Project initially joined the OCA-GH Plaintiffs in filing this action. However, on April 13, 2022, the OCA-GH Plaintiffs filed an unopposed motion to withdraw the Texas Organizing Project as a party. ECF No. 366. The Court granted the motion.

[3] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

[4] The OCA-GH Plaintiffs have also sued, in their official capacities, Travis County Clerk Dana DeBeauvoir, Travis County District Attorney José Garza, Harris County Elections Administrator Isabel Longoria, and Harris County District Attorney Kim Ogg. ECF No. 200 ¶¶ 48–51.

- OCA-GH, LWVTX, and WDAF allege that section 7.04 violates the First and Fourteenth Amendments to the United States Constitution because the provision burdens free speech and is unconstitutionally vague, and they name the Attorney General as a defendant for these two claims.[5]

*Id.* ¶¶ 124–47, 176–94, 214–39. The OCA-GH Plaintiffs seek to enjoin the State Defendants from enforcing each of the S.B. 1 provisions that they challenge under their constitutional and statutory claims. *Id.* at 75–76.

On February 8, 2022, the State Defendants filed a motion to dismiss all claims that the OCA-GH Plaintiffs have asserted against them. ECF No. 240. The OCA-GH Plaintiffs filed a response, ECF No. 279, and the State Defendants filed a reply, ECF No. 300. On March 18, 2022, the State Defendants filed a notice of supplemental authority. ECF No. 333. Thereafter, on April 21, 2022, the OCA-GH Plaintiffs filed a response to the State Defendants' notice. ECF No. 379.

## DISCUSSION

### I.   Legal Standards

The State Defendants move to dismiss the OCA-GH Plaintiffs' claims on four grounds. First, the State Defendants argue that state sovereign immunity bars the OCA-GH Plaintiffs from suing the Secretary and the Attorney General. Second, the State Defendants claim that the OCA-GH Plaintiffs lack standing to bring this suit. Third, the State Defendants contend that the OCA-GH Plaintiffs have failed to state a claim upon which relief may be granted under Title II of the ADA, § 504 of the Rehabilitation Act, and § 208 of the VRA. Finally, the State Defendants argue that neither § 101 of the CRA nor § 208 of the VRA create private causes of action.

---

[5] The OCA-GH Plaintiffs also refer to section 6.05 of S.B. 1 throughout their complaint. *See* ECF No. 200 ¶¶ 37, 164, 181, 17, 21, 25, 33. However, these references do not expressly indicate whether and under what theory they challenge the provision. Indeed, the OCA-GH Plaintiffs do not include section 6.05 in their list of challenged S.B. 1 provisions. *See id.* ¶ 96. The Court, therefore, is unable to assess whether their challenge to section 6.05, if any, may proceed. As a result, the Court will dismiss any and all claims to section 6.05 on failure to state a claim grounds.

### A.  Subject matter jurisdiction

Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case.[6] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The Eleventh Amendment and the doctrine of sovereign immunity limit a federal court's jurisdiction. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). The doctrine of sovereign immunity "also prohibits suits against state officials or agencies that are effectively suits against a state." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). State sovereign immunity, however, "is not limitless[.]" *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020). "A State may waive its sovereign immunity . . . and in some circumstances Congress may abrogate it by appropriate legislation." *Stewart*, 563 U.S. at 253–54 (citation omitted). Additionally, under *Ex parte Young*, 209 U.S. 123 (1908), "a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Reeves*, 954 F.3d at 736.

Article III of the United States Constitution also limits a federal court's constitutional power to adjudicate a case. It "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. CONST. art. III, § 2). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing, therefore, "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). It provides definition to the constitutional

---

[6] Congress, by statute, has proclaimed that the "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The OCA-GH Plaintiffs assert claims against the State Defendants under federal law. The Court, therefore, is statutorily authorized to adjudicate this case.

limits of subject matter jurisdiction, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), by identifying "those disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted).

A federal court must consider a motion to dismiss for lack of subject matter jurisdiction "before other challenges 'since the court must find jurisdiction before determining the validity of the claim.'" *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The federal court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

**B.  Failure to state a claim**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving

party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II.   Analysis

The Court addresses each of the State Defendants' four grounds for dismissal, beginning, as it must, with their jurisdictional contentions.

### A.   State sovereign immunity does not bar the OCA-GH Plaintiffs' claims against the Secretary and the Attorney General.

The State Defendants claim that state sovereign immunity bars the OCA-GH Plaintiffs' claims against the Secretary and the Attorney General. ECF No. 240 at 12–20. They emphasize that the OCA-GH Plaintiffs cannot satisfy the *Ex parte Young* exception to state sovereign immunity. *Id.* at 12–19. The State Defendants also contend that the OCA-GH Plaintiffs have failed to demonstrate an alternative exception to state sovereign immunity. *Id.* at 19–20.

#### 1.   The *Ex parte Young* exception to state sovereign immunity permits the OCA-GH Plaintiffs to sue the Secretary and the Attorney General for all of the S.B. 1 provisions that they challenge under § 101 of the CRA and on constitutional grounds.

State sovereign immunity under the Eleventh Amendment generally precludes suits against state officials in their official capacities. *City of Austin*, 943 F.3d at 997. The *Ex parte Young* exception to state sovereign immunity, however, allows private parties to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). The Supreme Court has counseled that, "[i]n determining whether the *Ex parte Young* doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon*

*Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). The Supreme Court has also made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his office, must have "some connection with the enforcement" of the challenged law. *Young*, 209 U.S. at 157.

Despite the straightforward inquiry that the Supreme Court envisioned, the Fifth Circuit has acknowledged that its own decisions "are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 n.21 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 999). Nevertheless, the Fifth Circuit has articulated some general rules. For instance, the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Id.* at 400–01 (emphasis in original) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Fifth Circuit has also determined that,"[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." *Id.* at 401 (quotation marks and citation omitted). "Moreover," according to the Fifth Circuit, "a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce." *Id.*

The Fifth Circuit has further explained that plaintiffs must at least "show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Morris*, 739 F.3d at 746). Put differently, the state "official must be 'statutorily tasked with enforcing the challenged law[,]'" *id.* (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*,

7

141 S. Ct. 161 (2021)), though whether the particular duty to enforce the statute in question "arises out of the general law, or is specially created by the [statute] itself, is not material so long as it exists[,]" *Young*, 209 U.S. at 157. "Enforcement typically means 'compulsion or constraint.'" *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). "A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Id.* (quoting *City of Austin*, 943 F.3d at 1002). In short, "if an 'official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception.'" *Tex. Democratic Party I*, 961 F.3d at 401 (emphasis in original) (quoting *City of Austin*, 943 F.3d at 1002).

Here, the OCA-GH Plaintiffs assert one claim under § 101 of the CRA against the Secretary and two claims under the First and Fourteenth Amendments against the Attorney General. ECF No. 200 ¶¶ 124–28, 214–39. They do so pursuant to 42 U.S.C. § 1983, which "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). Congress has not abrogated state sovereign immunity under § 1983. *Raj*, 714 F.3d at 328. Nonetheless, the OCA-GH Plaintiffs may institute a § 1983 action for prospective injunctive relief consistent with the *Ex parte Young* exception to state sovereign immunity. *Edelman v. Jordan*, 415 U.S. 651, 677 (1974).

> **a. The OCA-GH Plaintiffs have shown that the Secretary has a sufficient enforcement connection to all of the S.B. 1 provisions that they challenge under § 101 of the CRA.**

"Determining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis[.]"[7] *Tex. Democratic Party II*, 978 F.3d at 179. "[T]he official must have the

---

[7] The State Defendants contend that the OCA-GH Plaintiffs must, at the pleading stage, establish that the *Ex parte Young* exception applies to a state official on a provision-by-provision basis. ECF No. 240 at 13; ECF No. 300 at 7; *see also* ECF No. 333 at 2. They rely on *Texas Democratic Party II* and *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022), for their assertion. Neither of these cases, however, specifically hold that the

requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Id.* "This is especially true here because the Texas Election Code delineates between the authority of the Secretary of State and local officials." *Id.*

Thus, the question before the Court at this stage of the proceedings is whether the OCA-GH Plaintiffs have alleged a plausible set of facts establishing that the Secretary has a sufficient enforcement connection to each of the S.B. 1 provisions that they challenge under § 101 of the CRA—that is, whether the OCA-GH Plaintiffs have plausibly established that the Secretary can and will enforce each of these provisions.

> ### i. The OCA-GH Plaintiffs have plausibly established that the Secretary can enforce all of the S.B. 1 provisions that they challenge under § 101 of the CRA.

The OCA-GH Plaintiffs name the Secretary as a defendant for their claim challenging sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 of S.B. 1 under § 101 of the CRA. ECF No. 200 ¶¶ 125, 127.

Sections 5.02, 5.03, and 5.07 establish new requirements for vote-by-mail applications. In *Texas Democratic Party II*, the Fifth Circuit considered whether state sovereign immunity barred a challenge to an Election Code provision pertaining to vote-by-mail applications. Specifically, the plaintiffs alleged that an Election Code provision permitting only voters over the age of sixty-five to vote by mail was unconstitutional under the Twenty-Sixth Amendment. *Tex. Democratic Party II*, 978 F.3d at 174. The question before the Fifth Circuit was whether the district court erred

---

*Ex parte Young* exception to state sovereign immunity *must* be assessed on a provision-by-provision basis at the pleading stage. Rather, these cases discuss the *Ex parte Young* exception to state sovereign immunity in reviewing the validity of a district court's injunction. Indeed, the Fifth Circuit has made clear that, at the pleading stage, plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction. *Physician Hosps. of Am.*, 691 F.3d at 652. Nevertheless, in resolving the instant motion to dismiss, the Court assumes, but does not decide, that the OCA-GH Plaintiffs must, at this stage of the proceedings, establish that the *Ex parte Young* exception to state sovereign immunity applies on a provision-by-provision basis.

in requiring the Secretary to allow voters who are otherwise qualified to vote, but under the age of sixty-five, to vote by mail. *Id.*

To determine whether the Secretary was entitled to state sovereign immunity, the panel consulted the Election Code and observed that the Secretary "has the specific and relevant duty to design the application form for mail-in ballots . . . and to provide that form to local authorities and others who request it." *Id.* at 179 (citing TEX. ELEC. CODE §§ 31.002(a)–(b)). It further noted that the Election Code requires the Secretary to "furnish forms to those who request them for distribution to others." *Id.* at 179–80 (citing TEX. ELEC. CODE § 84.013). The panel also found it significant that the Election Code requires local officials "to use the Secretary's absentee-ballot form outside of emergency situations[.]" *Id.* at 180 (citing TEX. ELEC. CODE § 31.002(d)). Based on these duties found throughout the Election Code, the Fifth Circuit found that "the Secretary has the authority to compel or constrain local officials based on actions []he takes as to the application form."[8] *Id.* The Fifth Circuit therefore held that, notwithstanding the division of responsibilities among the Secretary and local officials, the Secretary had a sufficient enforcement connection to the vote-by-mail provision at issue, justifying application of the *Ex parte Young* exception to state sovereign immunity as to the Secretary. *Id.*

The same conclusion is warranted here. Section 5.02 generally provides that an applicant must now submit their driver's license, election identification certificate, or personal identification card number on their vote-by-mail application. TEX. ELEC. CODE § 84.002(a)(1-a). Section 5.03, in turn, expressly states that a vote-by-mail application must include a space for an applicant to

---

[8] The State Defendants argue that the OCA-GH Plaintiffs have failed to allege how the Secretary compels or constrains the OCA-GH Plaintiffs themselves. ECF No. 240 at 15. But they need not do so. The Fifth Circuit found it sufficient in *Texas Democratic Party II* that the Secretary compelled and constrained local officials. *See also Tex. Alliance for Retired Ams.*, 28 F.4th at 672 ("If the official does not compel or constrain *anyone* to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation.") (emphasis added).

enter the identification information that section 5.02 requires. *Id.* § 84.001(a)(3-a). Section 5.07 provides that an early voting clerk must reject the applicant's vote-by-mail application if the required identification information on their application is either missing or does not match the identification information that the applicant previously provided on their voter registration application. *Id.* § 86.001(f).

As *Texas Democratic Party II* explained and the OCA-GH Plaintiffs allege, the Secretary is statutorily required to prescribe the design and content of "the forms necessary for the administration" of the Election Code. *Id.* § 31.002(a); *see also* ECF No. 200 ¶ 37. The forms "must enhance the ability of a person to understand the applicable requirements and to physically furnish the required information in the space provided." TEX. ELEC. CODE § 31.002(a). The Secretary must furnish samples of these forms to "the appropriate authorities who have administrative duties under this code; and other persons who request a form for duplication." *Id.* § 31.002(b). The Secretary must also maintain a supply of these forms and provide them to individuals and organizations that request them for distribution to voters. *Id.* § 84.013. Local officials must then use these forms, except in an emergency. *Id.* § 31.002(d).

It therefore follows that the Election Code requires the Secretary to modify vote-by-mail applications, so that they include the statutorily-required space for applicants to enter the identification information that the Election Code now requires. Consequently, as in *Texas Democratic Party II*, the Secretary has the authority to compel or constrain local officials based on the actions he takes with respect to vote-by-mail applications.[9]

The same reasoning applies to the OCA-GH Plaintiffs' challenge to section 5.12. The Election Code now generally provides that a voter must submit their driver's license, election

---

[9] Thus, the Secretary's duties are not merely "ministerial—that is, they compel action by nobody but the Secretary himself." ECF No. 240 at 15.

identification certificate, or personal identification card number on their mail ballot carrier envelope. *Id.* § 86.002(g). It makes clear that a mail ballot carrier envelope "must include a space that is hidden from view when the envelope is sealed for the voter to enter" the required identification information. *Id.* The Election Code also provides that an early voting clerk must reject a mail-in ballot if the required identification information on the mail ballot carrier envelope is either missing or does not match the identification information that the voter previously provided on their voter registration application. *Id.* § 87.041(b)(8). Section 5.12, in turn, describes what curative measures a signature verification committee must or may offer to a voter whose mail-in ballot has been rejected based on, for example, the absence of the required identification information. *Id.* § 87.0271(a)(4). The provision authorizes the Secretary to "prescribe any procedures necessary to implement this section." *Id.* § 87.0271(f). Thus, as with vote-by-mail applications, the Secretary has the authority to compel or constrain early voting clerks based on the actions he takes with respect to the design and content of mail ballot carrier envelopes.

The State Defendants counter that local officials are the proper defendants for the OCA-GH Plaintiffs' challenges to these vote-by-mail and mail ballot carrier envelope provisions because the provisions explicitly reference local officials. ECF No. 240 at 14. It is true that, "[i]f the official sued is not 'statutorily tasked with enforcing the challenged law,' then the requisite connection is absent and '[the Court's] *Young* analysis ends.'" *In re Abbott*, 956 F.3d at 709 (quoting *City of Austin*, 943 F.3d at 998). But the Supreme Court also made clear long ago that the challenged provision need not explicitly identify the state official named as a defendant for the *Ex parte Young* exception to apply:

> The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, *and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.*

*Young*, 209 U.S. at 157 (emphasis added). Indeed, a state official may be statutorily tasked with enforcing a challenged provision based on the text in the challenged provision itself or the general law—such as, for example, the Election Code.

Further, it is worth noting that the provision at issue in *Texas Democratic Party II*, section 82.003 of the Election Code, did not explicitly refer to the Secretary either. In its entirety, section 82.003 states: "A qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day." TEX. ELEC. CODE § 82.003. Despite the absence of a specific reference to the Secretary in section 82.003, the Fifth Circuit located the Secretary's duties to enforce the provision in another section of the Election Code: "[T]he Secretary's specific duties regarding the application form under Section 31.002 are enough for us to conclude that the Secretary has at least a scintilla of enforcement authority for Section 82.003." *Tex. Democratic Party II*, 978 F.3d at 180. In short, the State Defendants' suggestion that the *Ex parte Young* analysis requires the Court to read each provision in a vacuum, without reference to any other Election Code provision—no matter how relevant to the enforcement question at hand—is entirely divorced from Fifth Circuit precedent, from the fundamental precepts of statutory interpretation,[10] and from common sense.

Thus, it is immaterial that the Secretary is not expressly identified in sections 5.02, 5.03, 5.07, and 5.12. The Election Code makes clear that it is the Secretary who is responsible for prescribing the design and content of vote-by-mail applications and mail ballot carrier envelopes. The challenged provisions, therefore, can be enforced only if and when the Secretary modifies vote-by-mail applications and mail ballot carrier envelopes to integrate the new identification

---

[10] "[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (ellipsis in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)).

requirements delineated in S.B. 1. The OCA-GH Plaintiffs allege that sections 5.02, 5.03, 5.07, and 5.12 unlawfully impose immaterial requirements to vote by mail. ECF No. 200 ¶ 125. The *Ex parte Young* exception to state sovereign immunity authorizes the Court to "command[] a state official to do nothing more than refrain from violating federal law[.]" *Stewart*, 563 U.S. at 255. If the Court were to do so with respect to these provisions, then the Court's relief "might lead to prohibiting the Secretary from using [a vote-by-mail application or mail ballot carrier envelope] that expressed" unlawful requirements. *Tex. Democratic Party II*, 978 F.3d at 180. This was sufficient in *Texas Democratic Party II* and is certainly sufficient here, where the OCA-GH Plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction.

For the same reasons, it is also inconsequential that sections 5.07 and 5.12 expressly task local officials with rejecting vote-by-mail applications and providing curative measures for defective mail ballot carrier envelopes. Under the Election Code and in practice, local officials would be unable to reject either of these forms were it not for the Secretary first fulfilling his statutory duties to prescribe the design and content of vote-by-mail applications and mail ballot carrier envelopes. Put differently, it is the Secretary who is exclusively responsible for prescribing the design and content of vote-by-mail applications and mail ballot carrier envelopes in a manner that enables applicants and voters to enter the required identification information. If he fails to do so, then the Secretary necessarily compels or constrains local officials by preventing them from rejecting these forms. Thus, this is not a case where the Secretary's "duty has nothing to do with enforcing" the vote-by-mail and mail ballot carrier envelope provisions. *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022). "Though there is a division of responsibilities, the Secretary has the needed connection" to sections 5.07 and 5.12. *Tex. Democratic Party II*, 978 F.3d at 180.

*Texas Democratic Party II* applies with equal force to the OCA-GH Plaintiffs' challenge to section 5.10. The provision concerns an electronic online tool that the Secretary must "develop or otherwise provide" to early voting clerks. TEX. ELEC. CODE § 86.015(a). Section 5.10 states that the electronic online tool that early voting clerks use to track vote-by-mail applications and mail-in ballots must now permit a voter to add or correct the required identification information. *Id.* § 86.015(c)(4). The Election Code further states that the Secretary "shall adopt rules and prescribe procedures as necessary to implement this section." *Id.* § 86.015(e). Once again, the Secretary has the authority to compel or constrain early voting clerks based on his actions with respect to developing or otherwise providing the electronic online tool that must contain the required identification information.

Thus, the Secretary also has the authority to compel or constrain under section 5.06. The provision states that a person who cancels their vote-by-mail application after being sent a mail-in ballot, but fails to return the sent mail-in ballot, may "vote only a provisional ballot[.]"[11] *Id.* § 84.035(b). Section 5.06 tasks an election judge with providing the voter with a provisional ballot under these circumstances. *Id.* If the election judge fails to comply with their statutory duty, then the Secretary could report their conduct to the Attorney General. The election judge would then be subject to civil prosecution.[12] This credible threat of prosecution is, again, a consequence of the Secretary's authority to compel or constrain.

---

[11] The OCA-GH Plaintiffs allege that section 5.06 "adds immaterial burdens to the process of applying to and actually voting by mail." ECF No. 200 ¶ 99. That may be true, in light of the fact that a voter who decides to cancel their vote-by-mail application and instead vote in person may now vote only on a provisional ballot. But, it is unclear how the allegedly immaterial burdens associated with the identification information that S.B. 1 now requires implicate a voter who cancels their own vote-by-mail application, as section 5.06 appears to contemplate. TEX. ELEC. CODE § 84.035(b). Nevertheless, the Court construes, as it must, the allegations in the light most favorable to the OCA-GH Plaintiffs and finds that section 5.06 may constitute a violation of § 101 of the CRA.

[12] The Election Code provision that authorizes civil penalties states that "'election official' has the meaning assigned by Section 31.128." TEX. ELEC. CODE § 31.129(a). Section 31.128, however, merely states that "'election official' does not include a chair of a county political party holding a primary election or a runoff primary election."

Seemingly conceding that the Secretary *does* have the authority to compel or constrain, the State Defendants cite *Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020), and argue that the OCA-GH Plaintiffs have failed to show how the Secretary's duties harm them. ECF No. 240 at 14. In *Mi Familia Vota*, the Fifth Circuit considered whether the Secretary had a sufficient enforcement connection to section 43.007 of the Election Code requiring "counties to use electronic voting devices rather than paper ballots in order to be eligible to participate in Texas's Countywide Polling Place Program." 977 F.3d at 468. The panel observed that section 31.014 of the Election Code requires the Secretary "to provide standards for certifying electronic devices[.]" *Id.* However, because "the Plaintiffs' claims regarding section 43.007 [was] based on its prohibition of the use of paper ballots for those counties participating in the Countywide Polling Place Program[,]" the Fifth Circuit found it significant that local officials, not the Secretary, were responsible for printing and distributing ballots. *Id.* The panel accordingly noted that "[d]irecting the Secretary not to enforce the electronic-voting-devices-only provision in section 43.007 would not afford the Plaintiffs the relief that they seek, and therefore, the Secretary of State 'is not a proper defendant.'" *Id.* (quoting *In re Abbott*, 956 F.3d at 709). Immediately thereafter, the Fifth Circuit stated, "Although a court can enjoin state officials from enforcing statutes, such an injunction must be directed to those who have the authority to enforce those statutes." *Id.*

In other words, *Mi Familia Vota* merely reiterates the well-established rule in the Fifth Circuit that a state official must be statutorily tasked with enforcing the challenged provision. It does not, as the State Defendants appear to suggest, hold that the OCA-GH Plaintiffs must also now show at the pleading stage how the Secretary's duties will harm them in order to invoke the

---

*Id.* § 31.128. Thus, the Court refers to the Election Code's "Definitions" section to further clarify who is an "election official" subject to a civil penalty. The "Definitions" section confirms that an election judge is an election official, *see id.* § 1.005(4-a), and is therefore subject to civil prosecution.

*Ex parte Young* exception to state sovereign immunity. In any event, the OCA-GH Plaintiffs *do* explain how the Secretary's duties will harm them. They submit that the challenged provisions incorporate onerous new mail-in voter identification requirements and add immaterial burdens to voting by mail. ECF No. 200 ¶¶ 37, 99. But for the Secretary's duties in relation to each of the challenged provisions, the OCA-GH Plaintiffs and their members would not be harmed by the Secretary. *See id.* ¶¶ 17, 21, 25, 33.

Finally, the State Defendants contend that the OCA-GH Plaintiffs improperly rely on the Secretary's general duties. ECF No. 240 at 15–17. In *Texas Alliance for Retired Americans*, *Lewis*, and *Richardson v. Flores*, 28 F.4th 649 (5th Cir. 2022), the Fifth Circuit recently signaled that reliance on the Secretary's "general duties" under the Election Code alone is generally insufficient to establish that the Secretary is statutorily tasked with enforcing a specific Election Code provision. *See Richardson*, 28 F.4th at 654 ("Since then, however, our precedent has clarified that the Secretary's general duties under the [Texas Election] Code fail to make the Secretary the enforcer of specific election code provisions.") (alterations in original) (quotation marks and citation omitted). Even assuming that these three cases specifically hold that reliance on the Secretary's "general duties" can *never* establish that the Secretary has a duty to enforce a specific Election Code provision, the OCA-GH Plaintiffs, as discussed *supra*, rely on far more than simply the Secretary's "general duties."[13] The State Defendants' argument, therefore, is unavailing.

---

[13] The Court recently heard oral argument in *Johnson v. Callanen*, No. 5:22-CV-409-XR (W.D. Tex. 2021). In that case, three visually impaired individuals and two non-profit organizations comprising visually impaired and otherwise disabled Texans filed suit against Ms. Callanen, in her official capacity as the Bexar County Elections Administrator, for violations of Title II of the ADA and § 504 of the Rehabilitation Act. The plaintiffs sought a reasonable modification to vote by mail in secret and free from intimidation in upcoming elections. Though it was clear that Ms. Callanen, who is also a defendant in this consolidated action, did not oppose the plaintiffs' request for a reasonable modification, she nonetheless responded to the plaintiffs' complaint with a motion to dismiss and opposed the plaintiffs' motion for a preliminary injunction. At the hearing, Ms. Callanen's counsel candidly stated that the basis for Ms. Callanen's opposition was her concern that, if she granted the requested modification, then the Secretary—pursuant to his "general duties" of ensuring that elections are conducted uniformly—would refer her conduct to the Attorney General, who, in turn, could impose civil penalties upon her, including revocation of her

For the foregoing reasons, the Court concludes that the OCA-GH Plaintiffs have plausibly established that the Secretary is statutorily tasked with enforcing and can enforce all of the S.B. 1 provisions that they challenge under § 101 of the CRA.

**ii.** **The OCA-GH Plaintiffs have plausibly established that the Secretary will enforce all of the S.B. 1 provisions that they challenge under § 101 of the CRA.**

To establish that the Secretary will enforce the S.B. 1 provisions that they challenge under § 101 of the CRA, the OCA-GH Plaintiffs need only show that the Secretary has a "demonstrated willingness" to exercise his duty to enforce the provisions at issue. *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *Morris*, 739 F.3d at 746).

The OCA-GH Plaintiffs allege that the Secretary "routinely issues guidance to the county registrars of all 254 Texas counties on various election procedures." ECF No. 200 ¶ 35. They further assert that the Secretary "has or imminently will be issuing guidance to all counties regarding their compliance obligations with SB 1[,]" and thus, the challenged provisions. *Id.* ¶ 36. The OCA-GH Plaintiffs also maintain that the Secretary has "explicitly vowed to take a proactive role in overseeing counties' administration of elections." *Id.* These allegations, combined with the Secretary's mandatory duties discussed *supra*, sufficiently show at this stage of the proceedings that the Secretary will enforce the S.B. 1 provisions challenged under § 101 of the CRA.

Thus, the Court finds that the OCA-GH Plaintiffs have alleged a plausible set of facts establishing that the Secretary has a sufficient enforcement connection to sections 5.02, 5.03, 5.06,

---

retirement. *See* TEX. ELEC. CODE §§ 31.129(c), 34.005. Indeed, Ms. Callanen's counsel referred to the deposition testimony in a prior case, where the Secretary testified under oath that referral to the Attorney General would be imminent if Ms. Callanen granted the requested modification. It is difficult to conceive of a clearer example of how the Secretary's statutory duties to obtain and maintain uniformity in the application, operation, and interpretation of the Election Code—however "general" they may be—compel or constrain local officials—like Ms. Callanen—by subjecting them to credible, perilous consequences.

5.07, 5.10, and 5.12. Their claim challenging these provisions under § 101 of the CRA may proceed against the Secretary pursuant to the *Ex parte Young* exception to state sovereign immunity.

> **b. The OCA-GH Plaintiffs have shown that the Attorney General has a sufficient enforcement connection to the one S.B. 1 provision that they challenge on constitutional grounds.**

As with their claim under § 101 of the CRA against the Secretary, the relevant question before the Court at this stage of the proceedings is whether the OCA-GH Plaintiffs have alleged a plausible set of facts establishing that the Attorney General has a sufficient enforcement connection to the one S.B. 1 provision that they challenge on constitutional grounds—that is, whether the OCA-GH Plaintiffs have plausibly established that the Attorney General can and will enforce the one S.B. 1 provision that they challenge on constitutional grounds.

> **i. The OCA-GH Plaintiffs have plausibly established that the Attorney General can enforce the one S.B. 1 provision that they challenge on constitutional grounds.**

The OCA-GH Plaintiffs name the Attorney General as a defendant for their claims challenging section 7.04 under the First and Fourteenth Amendments. ECF No. 200 ¶¶ 214–39.

Section 7.04 codifies several new offenses under sections 276.015 of the Election Code.[14] TEX. ELEC. CODE § 276.015. Specifically, section 276.015 defines three general public activities as third-degree felonies:

> (b) A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

---

[14] Section 7.04 also codifies new offenses under sections 276.016, 276.017, 276.018 and 276.019 of the Election Code. TEX. ELEC. CODE §§ 276.016–.019. The OCA-GH Plaintiffs' allegations, however, do not appear to challenge these sections. *See* ECF No. 200 ¶¶ 195–213. Indeed, in asserting their challenge to section 7.04, they repeatedly refer to the "anti-harvesting provision" in section 7.04, which is found in section 276.015 of the Election Code only. *See id.* ¶¶ 44–47, 96, 195–96, 216, 218, 235. The Court, therefore, construes the OCA-GH Plaintiffs' claims challenging section 7.04 as claims that challenge the validity of section 276.015 only. To the extent that the OCA-GH Plaintiffs intended to assert claims challenging sections 276.016, 276.017, 276.018, or 276.019, those claims are dismissed on failure to state a claim grounds.

> (c) A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.
>
> (d) A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

*Id.* §§ 276.015(b)–(d), (f). A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1). "Vote harvesting services" means any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.* § 276.015(a)(2). Section 276.015 makes it clear that, "[i]f conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both." *Id.* § 276.015(g).

As the OCA-GH Plaintiffs allege, the Attorney General is statutorily tasked with prosecuting criminal offenses prescribed by the Election Code. TEX. ELEC. CODE § 273.021; s*ee also* ECF No. 200 ¶¶ 40, 42. He "is the chief law enforcement officer of the State of Texas and is empowered to enforce Texas laws, including criminal and civil provisions in the Texas Election Code at issue in this case." ECF No. 200 ¶ 40. He also "prosecutes election code violations at the requests of district or county attorneys." *Id.* at ¶ 42 (citing TEX. GOV'T CODE § 402.028). The Election Code further authorizes the Attorney General "to investigate and prosecute election code violations anywhere in Texas." *Id.* (citing TEX. ELEC. CODE § 273.021). According to the OCA-GH Plaintiffs, the Attorney General "has regularly relied on Section 273.021 of the Texas Election Code as a basis for independently prosecuting purported criminal offenses arising out of the

Election Code." *Id.* The Attorney General, therefore, has the authority to compel or constrain under section 7.04, which establishes several election law offenses.

Therefore, the Court concludes that the OCA-GH Plaintiffs have plausibly established that the Attorney General is statutorily tasked with enforcing and can enforce section 7.04, the one S.B. 1 provision that they challenge on constitutional grounds.

> **ii.    The OCA-GH Plaintiffs have plausibly established that the Attorney General will enforce the one S.B. 1 provision that they challenge on constitutional grounds.**

The OCA-GH Plaintiffs need only show that the Attorney General has a "demonstrated willingness" to exercise his duty to enforce the one S.B. 1 provision that they challenge on constitutional grounds to establish that the Attorney General will enforce that provision. *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *Morris*, 739 F.3d at 746).

The OCA-GH Plaintiffs allege that there "can be little doubt as to the [Attorney General's] interest in enforcing" section 7.04. ECF No. 200 ¶ 44. The Attorney General, after all, has prosecuted "alleged offenses related to assisting voters, voting by mail, and campaigning[.]" *Id.* The OCA-GH Plaintiffs further assert that the Attorney General "has threatened third parties with criminal sanctions for disseminating information to voters." *Id.* "Specifically," the OCA-GH Plaintiffs allege that "the [Attorney General] has prosecuted individuals for allegedly providing unlawful assistance, election-related perjury, 'vote-harvesting,' failure to comply with provisions related to mail ballot assistance, and mail ballot fraud." *Id.*

Additionally, the OCA-GH Plaintiffs assert that the testimony before the state legislature confirms the Attorney General's willingness to enforce section 7.04. In particular, they allege that representatives from the Attorney General's Office "repeatedly testified before Texas House and Senate committees in 2021 about proposed changes to the election code, indicating that the

[Attorney General] would prosecute new offenses under the changes." *Id.* ¶ 45. For example, "Jonathan White, Chief of Election Fraud for the [Attorney General], testified before the House Elections Committee that proposed changes to the election code would help the [Attorney General] address vote harvesting, help 'do what [they're] already doing' such as prosecuting unlawful assistance offenses [and] ballot handling offenses[.]'" *Id.* (alterations in original). The OCA-GH Plaintiffs make clear that representatives from the Attorney General's Office "repeatedly answered hypotheticals from legislators about what the [Attorney General] would or would not prosecute under the proposed changes to the election code." *Id.*

The OCA-GH Plaintiffs also allege that the Attorney General's social media publications underscore his commitment to enforcing any and all election law offenses. Specifically, they assert that the Attorney General "regularly posts on Twitter about his commitment to enforcing the Election Code and bringing criminal prosecutions against those who allegedly violate it." *Id.* ¶ 46. On July 9, 2021, for instance, the Attorney General posted on social media, "I prosecute voter fraud everywhere we find it." *Id.* On October 2, 2021, the Attorney General again publicized his demonstrated willingness to prosecute election law offenses: "Between pending cases & investigations—we're working more voter fraud cases than #Texas has ever seen." *Id.*

Further, the OCA-GH Plaintiffs note that the Attorney General has "created, maintains, and continuously seeks increased funding for an 'Election Fraud Unit' housed within his office and under his control, with the express purpose of investigating and prosecuting violations of criminal provisions in the Texas Election Code[.]" *Id.* ¶ 47. They explain that the Election Fraud Unit not only releases public statements about its prosecutions for election law offenses, but also "actively seeks to pursue additional prosecutions of such offenses." *Id.* The Attorney General and his Election Fraud Unit, according to the OCA-GH Plaintiffs, "have touted their prosecutions of

individuals for criminal offenses under the Election Code related to unlawful assistance, vote harvesting, failure to comply with provisions related to mail ballot assistance, and mail ballot fraud." *Id.* The Attorney General has also established an Election Integrity Unit within his office. *Id.* The OCA-GH Plaintiffs allege that the Attorney General formed the Election Integrity Unit "purportedly to investigate claims of lack of compliance with the Election Code during elections." *Id.* Upon formally announcing the creation of the Election Integrity Unit, the Attorney General pledged that he would continue "to pursue prosecutions for criminals willing to commit election crimes." *Id.* These allegations, combined with the Attorney General's duties discussed *supra*, are sufficient at this stage of the proceedings to plausibly establish that the Attorney General has demonstrated a willingness to enforce section 7.04.

The State Defendants argue that, since the Attorney General may not unilaterally prosecute election law offenses, "nothing in Plaintiffs' complaint supports the conclusion that formal enforcement is on the horizon." ECF No. 240 at 19. True, the Election Code originally authorized the Attorney General to unilaterally "prosecute a criminal offense prescribed by the election laws of this state." TEX. ELEC. CODE § 273.021(a). In *State v. Stephens*, however, the Texas Court of Criminal Appeals held that this delegation of unilateral prosecutorial authority violated the separation-of-powers clause of the Texas Constitution. No. PD-1032-20, 2021 WL 5917198, at *11 (Tex. Crim. App. Dec. 15, 2021) (not released for publication).[15]

But even absent the delegation of authority to independently prosecute election law offenses, the surviving provisions of the Election Code still envision, and likely require, the Attorney General's participation in enforcement activities. For instance, section 273.001 provides:

> (a) If two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection

---

[15] The State Defendants submit that "that *Stephens* was wrongly decided." ECF No. 240 at 19 n.2. Texas "has filed a motion asking the Texas Court of Criminal Appeals to reconsider its decision." *Id.*

with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations. If the election covers territory in more than one county, the voters may present the affidavits to the attorney general, and the attorney general shall investigate the allegations.

(b) A district or county attorney having jurisdiction or the attorney general may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election.

(c) On receipt of an affidavit [from a registrar], the county or district attorney having jurisdiction and, if applicable, the attorney general shall investigate the matter.

(d) On referral of a complaint from the secretary of state under Section 31.006, the attorney general may investigate the allegations.

TEX. ELEC. CODE § 273.001. Moreover, *Stephens* does not foreclose the Attorney General's authority to prosecute election law offenses, including those prescribed by section 7.04. Indeed, the Court of Criminal Appeals made clear that "the consent and deputization order of a local prosecutor or the request of a district or county attorney for assistance" can provide the Attorney General with the authority to enforce election law offenses. *Stephens*, 2021 WL 5917198, at *10.

The State Defendants' reliance on *City of Austin* is also unpersuasive. ECF No. 240 at 18. In *City of Austin*, the Fifth Circuit considered whether the *Ex parte Young* exception to state sovereign immunity applied to the Attorney General. 943 F.3d at 998. The City had passed a municipal ordinance prohibiting landlords from discriminating against tenants who paid their rent with federal housing vouchers. *Id.* at 996. Texas subsequently passed a state law barring municipalities or counties from adopting such ordinances. *Id.* The state statute empowered the Attorney General to enforce the law by intervening in any enforcement suit that the City might bring against a landlord for violating the municipal ordinance. *Id.* at 1000 n.1.

In response, the City sued the Attorney General, alleging that federal housing law preempted the state legislation. *Id.* at 997. The City argued that the *Ex parte Young* exception to state sovereign immunity applied because the Attorney General possessed the authority to enforce the state law and had a "habit" of intervening in lawsuits involving municipal ordinances to "enforce the supremacy of state law." *Id.* at 1001. The Fifth Circuit, however, held that this was not sufficient to demonstrate "some scintilla of 'enforcement,'" as the Attorney General's authority to enforce the statute alone did not constrain the City's ability to enforce its ordinance. *Id.* at 1001–02. According to the Fifth Circuit, simply because the Attorney General had "chosen to intervene to defend *different* statutes under *different* circumstances does not show that he is likely to do the same here." *Id.* at 1002 (emphasis in original). The Fifth Circuit also noted that "the City face[d] no consequences" if it enforced its ordinance. *Id.*

This case differs from *City of Austin* in many respects. Importantly, section 7.04 establish several election law offenses. Furthermore, under S.B. 1, the Attorney General has broad investigatory powers, and the Attorney General has undoubtedly filed lawsuits against election officials, invoking the State's "intrinsic right to enact, interpret, and enforce its own laws." Appellant's Emergency Mot. for Relief Under Rule 29.3, *State v. Hollins*, 607 S.W.3d 923 (Tex. App.—Houston [14th Dist.] 2020, pet. granted) (No. 14-20-00627-CV), 2020 WL 5509152, at *9 (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)).

Moreover, and as already discussed at length, the Attorney General touts his office's eagerness to prosecute entities and individuals, like the OCA-GH Plaintiffs and their members, for criminal offenses under the Election Code. Far from different statutes under different circumstances, the Attorney General has demonstrated a willingness to enforce civil and criminal provisions of the Election Code regulating some of the same elections procedures that the OCA-

GH Plaintiffs challenge as unconstitutional in this case. This is sufficient to establish that "formal enforcement [is] on the horizon." *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015)).

The State Defendants further contend that "speculation that the Attorney General might be asked by a local prosecutor to 'assist' in enforcing the law at issue is inadequate to support an *Ex parte Young* action against him." ECF No. 300 at 13 (quoting *In re Abbott*, 956 F.3d at 709). *In re Abbott*, however, is inapposite. There, the district court issued a temporary restraining order against the Governor and the Attorney General, exempting various categories of abortion from "GA-09, an emergency measure temporarily postponing non-essential medical procedures during the COVID-19 pandemic." *In re Abbott*, 956 F.3d at 703. On appeal, the Fifth Circuit considered whether state sovereign immunity required dismissal of the Attorney General. *Id.* at 708. In particular, the Fifth Circuit considered whether the *Ex parte Young* exception to state sovereign immunity applied. *Id.* at 709. The panel observed that the district court had reasoned that the Attorney General "ha[d] 'authority' to prosecute violations of GA-09 'at the request of local prosecutors,' and that he ha[d] also 'publicly threatened enforcement' against abortion providers." *Id.* But in the Fifth Circuit's view, "[n]either rationale establishe[d] the Attorney General's 'connection' to enforcing GA-09 for *Ex parte Young* purposes." *Id.* "Speculation that he might be asked by a local prosecutor to 'assist' in enforcing GA-09," the Fifth Circuit determined, "is inadequate to support an *Ex parte Young* action against the Attorney General." *Id.* The Fifth Circuit also found it significant that "[t]he Attorney General threatened that GA-09 *would be enforced*, not that *he* would enforce it." *Id.* (emphasis in original).

In this case, by contrast, the OCA-GH Plaintiffs challenge section 7.04, which establishes several criminal offenses under the Election Code. There is nothing temporary about the credible

threat of criminal prosecution by the Attorney General. Indeed, the Secretary is statutorily required to refer his suspicions of criminal offenses prescribed by the Election Code to the Attorney General. Further, the OCA-GH Plaintiffs allege that the Attorney General has made it abundantly clear that he will enforce the Election Code. In other words, the Attorney General has not said that the challenged provisions *would be enforced*, but that *he* would enforce them.

Put differently, the Attorney General's credible threat of enforcing the challenged S.B. 1 provisions is not mere speculation. The Attorney General publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud.[16] He has also publicly stated that 510 election offenses against 43 defendants remain pending and that 386 active election fraud investigations currently exist.[17] In light of *Stephens*, it must necessarily be the case that the Attorney General is prosecuting these election law offenses and pursuing these election fraud investigations along with local district attorneys. Indeed, the local district attorneys sued in this consolidated action have not expressly and affirmatively represented that they *never* intend to prosecute criminal offenses prescribed by the Election Code, and there are certainly many more local district attorneys throughout Texas who have not disavowed their intention to enlist the Attorney General's assistance to prosecute election law offenses. Consequently, the State Defendants' reliance on *In re Abbot* is unavailing. The OCA-GH Plaintiffs' allegations, combined with the Attorney General's duties discussed *supra*, sufficiently show at this stage of the proceedings that the Attorney General will enforce section 7.04.

---

[16] *See* Attorney General of Tex., *Election Integrity | Office of the Attorney General*, https://www.texas attorneygeneral.gov/initiatives/election-integrity (last visited July 28, 2022). The Court may take judicial notice of governmental websites, *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam), and may consider matters of which it takes judicial notice on a motion to dismiss, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[17] *See* Attorney General of Tex., *supra* note 16.

Thus, the Court finds that the OCA-GH Plaintiffs have alleged a plausible set of facts establishing that the Attorney General has a sufficient enforcement connection to section 7.04. Their challenges to this provision under the First and Fourteenth Amendments may proceed against the Attorney General pursuant to the *Ex parte Young* exception to state sovereign immunity.

### 2. Congress validly abrogated state sovereign immunity for the OCA-GH Plaintiffs' claims under Title II of the ADA against the Secretary and for their claim under § 208 of the VRA against the Secretary and the Attorney General.

*Ex parte Young* is not the only vehicle for obtaining relief against a state. Congress may also abrogate a state's sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). To abrogate a state's sovereign immunity, it must be shown that Congress "both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (alterations in original) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000)).

### a. The OCA-GH Plaintiffs' claims under Title II of the ADA.

"In enacting the ADA, Congress 'invoke[d] the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment[.]" *United States v. Georgia*, 546 U.S. 151, 154 (2006) (alterations in original) (quoting 42 U.S.C. § 12101(b)(4)). Indeed, the ADA specifically provides that a "State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. The Supreme Court has accordingly accepted this provision of the ADA "as an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *Georgia*, 546 U.S. at 154 (citing *Garrett*, 531 U.S. at 363–64).

As to whether Congress has acted pursuant to a valid grant of constitutional authority, the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty

28

which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Put differently, "Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power." *Garrett*, 531 U.S. at 364. Thus, "the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation." *Id.*

Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees found in § 1 of the Fourteenth Amendment by enacting "appropriate legislation." U.S. CONST. amend. XIV, § 5. Section 1 of the Fourteenth Amendment provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. Thus, to determine whether Congress has acted pursuant to a valid grant of constitutional authority in enacting Title II, a court assesses, on a claim-by-claim basis:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 617 (5th Cir. 2020) (quoting *Georgia*, 546 U.S. at 159). The first step, according to the Fifth Circuit, is to determine whether the plaintiffs have stated a claim upon which relief may be granted under Title II of the ADA. *Id.* at 617–18.

### i. The OCA-GH Plaintiffs have stated valid claims under Title II.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

12132. The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities[,]" *id.* § 12102(1)(A), and Title II "defines 'public entities' to include local governments[,]" *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020) (citing 42 U.S.C. § 12131(1)(A)).

Here, the OCA-GH Plaintiffs allege that their members include disabled individuals with "physical and/or mental impairments that substantially limit one or more of their major life activities, including but not limited to 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and/or working.'" ECF No. 200 ¶ 9 (quoting 42 U.S.C. § 12102(2)(A)); *see also id.* ¶¶ 23–24, 131–36, 168–73, 184–85. For instance, Ruben Fernandez is a member of REVUP who "lives with cerebral palsy and has a label of Intellectual/Development Disability." *Id.* ¶ 170. Amy Litzinger is another REVUP member who "lives with quadriplegic cerebral palsy." *Id.* ¶ 171. Laura Halvorson is also a REVUP member who "lives with muscular dystrophy, quadriplegia, and chronic neuromuscular respiratory failure." *Id.* ¶ 172. According to the OCA-GH Plaintiffs, "[t]hese examples are non-exhaustive." *Id.* ¶ 173.

Further, the OCA-GH Plaintiffs have filed suit against the Secretary and the Attorney General, in their official capacities. *Id.* ¶ 35, 40. They allege that the Secretary and the Attorney General "are public entities pursuant to the ADA[.]" *Id.* ¶ 52.

Together, these allegations establish that OCA-GH Plaintiffs have properly invoked Title II of the ADA against public entities.

The Court now considers whether the OCA-GH Plaintiffs have alleged sufficient facts to state a *prima facie* case of discrimination under Title II. To do so, they must allege sufficient facts showing:

> (1) that [they, their members, or their constituents are] a qualified individual within the meaning of the ADA; (2) that [they, their members, or their constituents are] being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or [are] otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of [their or their members' constituents'] disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997)).

As to the first element, a qualified individual within the meaning of Title II is a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

The OCA-GH Plaintiffs allege that their membership includes individuals who are qualified to vote in person and by mail under Texas law. ECF No. 200 ¶¶ 11, 170–72. Thus, the OCA-GH Plaintiffs have sufficiently shown that their members are qualified individuals within the meaning of Title II.

With respect to the second and third elements, federal regulations provide that public entities may not, on the basis of disability, "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[.]" 28 C.F.R. § 35.130(b)(1)(ii). They also prohibit public entities from providing, by reason of disability, "a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]" *Id.* § 35.130(b)(1)(iii). In addition, public entities may not "utilize criteria or methods of administration . . . [t]hat have the

purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii). Federal regulations also make clear that public entities generally "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity[.]" *Id.* § 35.130(b)(8). Finally, the ADA itself provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by" the statute. 42 U.S.C. § 12203(b).

Here, the OCA-GH Plaintiffs allege that sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 violate Title II. ECF No. 200 ¶ 135. As discussed *supra*, these provisions generally concern vote-by-mail procedures. They claim that the provisions discriminate against their members "with disabilities because they do not allow equal access to mail-in voting and exclude people with disabilities from participation in the services, programs, or activities of Defendants, namely, the State's mail-in voting program." *Id.* They also allege that the identification information that these provisions require and enforce "will screen out voters with disabilities who may not know or have access to the numbers by reason of disability and consequently will prevent Plaintiffs' members and other voters with disabilities from fully and equally enjoying access to voting." *Id.* ¶ 133.

In addition, the OCA-GH Plaintiffs claim that these provisions use "voter ID criteria that will subject Plaintiffs' members and other qualified voters with disabilities to discrimination by prohibiting them from voting even if they meet all other qualifications to vote by mail." *Id.* ¶ 134. They contend that the provisions do "not allow for any modification to the ID requirement and do[] not provide any way for Plaintiffs' members and other voters with disabilities who may not

know or have access to their ID numbers to vote by mail." *Id.* ¶ 131. The OCA-GH Plaintiffs also

assert that these provisions do "not provide a modification to its cure provision as to rejected

ballots, other than voting in person, which is not possible for many voters with disabilities." *Id.*

The OCA-GH Plaintiffs further allege that sections 6.04[18] and 6.06 violate Title II. *Id.* ¶¶

96, 164, 185. Section 6.04 requires an assistor to take the following oath under penalty of perjury

before assisting a voter:

> I swear (or affirm) under penalty of perjury that the voter I am
> assisting represented to me they are eligible to receive assistance; I
> will not suggest, by word, sign, or gesture, how the voter should
> vote; I will confine my assistance to reading the ballot to the voter,
> directing the voter to read the ballot, marking the voter's ballot, or
> directing the voter to mark the ballot; I will prepare the voter's ballot
> as the voter directs; I did not pressure or coerce the voter into

---

[18] In 2018, a district court initially enjoined Texas and the Secretary from enforcing sections 61.033 and
64.0321 of the Election Code. *See OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *1
(W.D. Tex. June 6, 2022). On June 6, 2022, the district court, upon request, modified its injunction to prohibit Texas
and its Secretary from enforcing a portion of the oath as modified under section 6.04:

> As to the first ground, OCA notes that a portion of the amended oath now reads
> exactly as did the enjoined language in Section 64.0321. A portion of the oath
> now requires the assistor to attest to confining their assistance to "reading the
> ballot to the voter, directing the voter to read the ballot, marking the voter's ballot,
> or directing the voter to mark the ballot." Tex. Elec. Code § 64.034. The enjoined
> language permits assistance in "(1) reading the ballot to the voter; (2) directing
> the voter to read the ballot; (3) marking the voter's ballot; or (4) directing the voter
> to mark the ballot." Tex. Elec. Code § 64.0321. Aside from changes in
> punctuation, the language is indistinguishable. Thus, the Court's reasoning in
> enjoining Section 64.0321 applies to the amended oath language just as it applied
> in the 2018 Injunction. . . . By requiring assistors to attest to following enjoined
> restrictions, the amended provision essentially re-ratifies the same restrictions that
> the Court enjoined. In doing so, the oath limits assistance-eligible voting to an
> impermissibly narrow set of activities. Therefore, as with the previous iteration of
> this language, the Court will enjoin enforcement of the portion of [section 6.04 of
> S.B. 1] inserting the previously enjoined language from Section 64.0321.

*Id.* at *4.

On June 14, 2022, OCA-GH filed a notice in this consolidated action, advising the Court of the district court's
modified injunction. ECF No. 438. OCA-Greater Houston submits that "the United States and Private Plaintiffs'
challenges to the same portions in this case may ultimately be rendered moot." *Id.* at 5. The United States and
remaining plaintiffs also filed a notice, advising that they agree with OCA-GH's position on the potential
impact of the modified injunction on their claims challenging the same portions of section 6.04. ECF No. 440. Texas
and its Secretary did not appeal the district court's modified injunction. Thus, all claims in this consolidated action
challenging the portions of section 6.04 that the district court recently enjoined in *OCA Greater Hous. v. Texas*, No.
1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are moot.

> choosing me to provide assistance; I am not the voter's employer,
> an agent of the voter's employer, or an officer or agent of a labor
> union to which the voter belongs; I will not communicate
> information about how the voter has voted to another person; and I
> understand that if assistance is provided to a voter who is not eligible
> for assistance, the voter's ballot may not be counted.

TEX. ELEC. CODE § 64.034. Section 6.06 makes it a state jail felony for a person to compensate or offer to compensate another person—or to solicit, receive, or accept compensation—for assisting voters. *Id.* §§ 86.0105(a), (c).

The OCA-GH Plaintiffs contend that these provisions "unlawfully restrict the sort of assistance that a voter may receive." ECF No. 200 ¶ 152. They observe that the modified oath no longer allows assistors to answer a voter's questions and allege that this "drastic limitation on the sort of assistance that can be provided and the threat of felony prosecution for perjury will prevent voters from receiving the assistance they need to vote." *Id.* Individuals with disabilities in particular, the OCA-GH Plaintiffs assert, "need a wide range of options for assistance based on their wide range of unique needs." *Id.* ¶ 154. However, they claim that the oath's "narrow view of the types of assistance voters might need will prevent voters with disabilities . . . from receiving the type of assistance they need even if they manage to secure assistants." *Id.* ¶ 155. For instance, qualified disabled voters "may need assistance to physically navigate the polling place, remember the voting process, communicate with poll workers, stay on task, or set up adaptive devices—all of which are not permitted and subject a potential assistant to criminal prosecution." *Id.* ¶ 158.

The OCA-GH Plaintiffs further allege that section 6.06 "severely limits the universe of potential assistants that a mail-in ballot voter can choose from" because the provision creates "a strict liability, state jail felony that criminalizes the provision of assistance by anyone who 'solicits, receives, or accepts compensation' for assisting a voter with their mail-in ballot." *Id.* ¶ 162. "For example," the OCA-GH Plaintiffs explain that section 6.06 "could prohibit a child from assisting

a parent with voting by mail if the parent gives the child a monthly allowance, or 'compensation.'"
*Id.* ¶ 163. "In addition, a person who asks a friend to assist them with voting and buys the friend a coffee as a token of appreciation for providing their assistance could be subjecting the friend to criminal prosecution for accepting a 'benefit' in exchange for providing assistance." *Id.* The OCA-GH Plaintiffs contend that section 6.06 and its "threat of criminal penalties for violations of SB 1's new restrictions on assistance will chill voters' ability to select the assistant of a person's choice when voting, in violation of the voter's rights under . . . the ADA." *Id.* ¶ 166. Both sections 6.04 and 6.06, the OCA-GH Plaintiffs allege, deny their disabled members a reasonable modification that may be necessary to avoid discrimination by reason of their disabilities. *Id.* ¶¶ 183–84.

Moreover, the OCA-GH Plaintiffs bolster their allegations with specific examples of how their members are directly impacted by sections 6.04 and 6.06. Mr. Fernandez, for instance, requires assistance to vote in person. *Id.* ¶ 170. His assistor helps "him in obtaining his ballot, and assists him in physically navigating the polling site in his manual wheelchair." *Id.* Mr. Fernandez also relies on his assistor to "read what is on the screen for him." *Id.* "If he does not understand what is read to him, he often needs to ask his chosen assistant questions about the information or words on the ballot." *Id.* Mr. Fernandez may also need to ask his assistor "to explain how the voting machine works, which includes answering questions about the machine's features and functionality." *Id.* To cast his vote effectively, "he needs assistance removing his printed paper ballot from the voting machine and placing it in the ballot counter." *Id.* Sections 6.04 and 6.06, the OCA-GH Plaintiffs allege, would not permit any of this. *Id.*

Similarly, Ms. Litzinger requires assistance to vote in person and by mail. *Id.* ¶ 171. When voting in person, Ms. Litzinger "requires assistance putting the ballot in the 'Scantron' machine since she lacks the dexterity to do this independently." *Id.* She must also ask her assistors to move

physical barriers that impede her access to the voting booth; hold and transfer items, such as her identification card and voter guides, from her backpack to her person for her use while voting; and help her drink from her water bottle when needed. *Id.* When voting by mail, Ms. Litzinger requires assistance to stuff the mail ballot carrier envelope and properly affix her signature. *Id.* Ms. Litzinger also requires assistance to mark her paper mail-in ballot. *Id.* The OCA-GH Plaintiffs allege that sections 6.04 and 6.06 limit Ms. Litzinger's ability to receive this assistance. *Id.* In fact, "[s]ome of Ms. Litzinger's direct support professionals have stated that they can no longer assist her in the manner they did previously given the new restrictions[.]" *Id.*

The same is true for Ms. Halvorson. *Id.* ¶ 172. She cannot "mark or submit the ballot herself and requires assistance putting the ballot into the 'Scantron' machine and marking the ballot on the touch screen." *Id.* At times, Ms. Halvorson "has to ask her assistor to explain the wording of lengthy amendments, which are not in plain language." *Id.* "Ms. Halvorson also brings information about candidates to the polling place to inform her vote and has been required to transfer this information to a paper sample ballot rather than being [on] her phone—something for which she must use an assistant." *Id.* According to the OCA-GH Plaintiffs, she will be unable to obtain this assistance in light of sections 6.04 and 6.06. *Id.* Indeed, as with Ms. Litzinger, "Ms. Halverson's personal care attendants have stated they may be unwilling to assist her with voting in the future for fear of prosecution." *Id.* These allegations clearly establish the second and third elements for a *prima facie* case of discrimination under Title II.

The State Defendants counter that the OCA-GH Plaintiffs have failed to state a claim under Title II.[19] ECF No. 240 at 21–27. They first contend that the organizations cannot assert a Title II

---

[19] The State Defendants assert the same arguments against the OCA-GH Plaintiffs' claims under § 208 of the VRA and § 504 of the Rehabilitation Act. ECF No. 240 at 21. Unless otherwise stated, the Court's analysis as to the sufficiency of the OCA-GH Plaintiffs' Title II claims also applies to the sufficiency of the OCA-GH Plaintiffs' claims under § 208 of the VRA and § 504 of the Rehabilitation Act.

claim because the organizations themselves do not have a disability. *Id.* at 22. However, it is well settled that an organization may sue as the representative of its members. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Moreover, many courts have allowed organizations that serve disabled individuals to sue public entities under Title II. *See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362–64 (4th Cir. 2008); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–36 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir. 1997). They did so after observing that "Title II's enforcement provision extends to relief to '*any person* alleging discrimination on the basis of disability.'" *Innovative Health Sys., Inc.*, 117 F.3d at 47 (emphasis in original) (quoting 42 U.S.C. § 12133). "[T]he use of such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action under [Title II] as broadly as is permitted by Article III of the Constitution." *Id.* (quotation marks and citation omitted); *see also Steward v. Abbott*, 189 F. Supp. 3d 620, 630–32 (W.D. Tex. 2016) (finding that organizations have associational standing in Title II case); *Fla. State Conf. of NAACP v. Lee*, --- F. Supp. 3d ----, No. 4:21cv187-MW/MAF, 2021 WL 6072197, at *9 (N.D. Fla. 2021) (stating that plaintiffs must show "that they—*or their constituents*—are qualified individuals with a disability") (emphasis added). The Court sees no reason to carve out an exception in this case.

The State Defendants also argue that the OCA-GH Plaintiffs cannot assert Title II claims as third parties. ECF No. 240 at 22–24. This "argument conflates the merits of the suit with [their] standing to bring it." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). Thus, the State Defendants' discussion on standing is, for the most part, inapplicable in assessing whether the OCA-GH Plaintiffs have stated valid claims under Title II.[20]

---

[20] Indeed, "[a]n organization can seek relief under either an associational standing theory or an organizational standing theory." *US Inventor Inc. v. Hirshfeld*, 549 F. Supp. 3d 549, 555 (E.D. Tex. 2021).

The State Defendants further argue that the OCA-GH Plaintiffs have failed to state a Title II claim because neither the Secretary nor the Attorney General administer elections. ECF No. 240 at 24–25. On this point, the Court agrees with the State Defendants, to an extent. A *prima facie* case for discrimination under Title II requires a showing that the defendant public entity in some way provides the service or benefit at issue. *Ivy v. Williams*, 781 F.3d 250, 258 (5th Cir. 2015), *vacated and remanded as moot sub nom. Ivy v. Morath*, 137 S. Ct. 414 (2016). Although the Attorney General has authority to enforce criminal offenses under the Election Code as discussed *supra*, it is unclear whether and how he provides the service or benefit at issue in this case, namely voting and voting by mail. The OCA-GH Plaintiffs do not offer a compelling explanation in their complaint or briefing. Thus, the Court concludes that, in this case, the Attorney General does not provide the service or benefit at issue and will therefore dismiss the Attorney General as a defendant to the OCA-GH Plaintiffs' Title II claims only.[21]

The Secretary, however, certainly provides the service or benefit of voting and voting by mail. The Secretary "is the chief election officer of the state." TEX. ELEC. CODE § 31.001(a). As chief election officer, the Secretary must "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.003. "In performing this duty," the Election Code explains, "the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code." *Id.* The Election Code also charges the Secretary with "distribut[ing] these materials to the appropriate state and local authorities having duties in the administration of these laws." *Id.* The Election Code further provides that the Secretary must "assist and advise all election authorities with regard to the application, operation, and

---

[21] The Court's finding does not extend to the OCA-GH Plaintiffs' claims under § 208 of the VRA and § 504 of the Rehabilitation Act against the Attorney General.

interpretation of this code and of the election laws outside this code." *Id.* § 31.004(a). The Secretary shall also "maintain an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b).

The Election Code also requires the Secretary to "adopt standards of training in election law and procedure for presiding or alternate election judges[.]" *Id.* § 32.111(a)(1). Specifically, the Secretary must "develop materials for a standardized curriculum for that training; and distribute the materials as necessary to the governing bodies of political subdivisions that hold elections and to each county executive committee of a political party that holds a primary election." *Id.* §§ 32.111(a)(2)–(3). In addition, the Election Code states that a county clerk must "provide one or more sessions of training" to election judges and clerks. *Id.* § 32.114(a). The trainings that election judges and clerks must complete are premised upon "the standardized training program and materials developed and provided by the secretary of state[.]" *Id.* The Secretary must "schedule and provide assistance for the training of election judges and clerks" upon request by a county executive committee or a county clerk. *Id.* § 32.115. Moreover, the Election Code tasks the Secretary with taking "appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes." *Id.* § 31.005(a). The Election Code empowers the Secretary as follows:

> (b) The secretary of state may order a person performing official functions in the administration of any part of the electoral processes to correct offending conduct if the secretary determines that the person is exercising the powers vested in that person in a manner that:
>
> (1) impedes the free exercise of a citizen's voting rights; or
>
> (2) unless acting under an order of a court of competent jurisdiction, delays or cancels an election that the person does not have specific authority to delay or cancel.

> (c) If a person described by Subsection (b) fails to comply with an order from the secretary of state under this section, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general.

*Id.* §§ 31.005(b)–(c).

Based on these statutory duties, it is clear that the Secretary is responsible for providing the service or benefit of voting and voting by mail. Indeed, the Election Code lists him first under chapter 31, which is titled "Officers to Administer Elections." Thus, his statutory duties permit him to "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service" at issue in this case. 28 C.F.R. § 35.130(b)(1)(ii). In implementing and enforcing the Election Code provisions to obtain and maintain the uniformity of all election laws, the Secretary must not "[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program[.]" *Id.* § 35.130(b)(1)(v). This includes, as the Election Code expressly requires, his provision of assistance to counties and local officials. Moreover, the Secretary may not "utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" when issuing directives, distributing election materials, and protecting voting rights. *Id.* § 35.130(b)(3). If he fails to do so, as the OCA-GH Plaintiffs allege in this case, then he is subject to liability under Title II.

The State Defendants have acknowledged in prior litigation that the "Secretary of State is the chief election officer, specially charged with administering elections." *Veasy v. Perry*, 29 F. Supp. 3d 896, 923 (S.D. Tex. 2014). But they now contend otherwise, arguing that "local election officials, not the Secretary . . . administer Texas elections." ECF No. 240 at 24. They cite *Ivy* and

*Lightbourn* to support their contention. *Id.* at 24–25. Both of these cases, however, are inapposite. Moreover, neither of these cases forecloses the possibility that the Secretary, in addition to local officials, is responsible for providing a service or benefit under Title II.

In *Ivy*, a class of hearing impaired individuals filed suit against the Texas Education Agency ("TEA") for violations of Title II. 781 F.3d at 251, 254. "In Texas, individuals under the age of 25 cannot obtain driver's licenses unless they submit a driver education certificate to the Department of Public Safety[.]" *Id.* at 252 (citing TEX. TRANSP. CODE § 521.1601). The requisite driver education certificate is "only available from private driver education schools licensed by the TEA." *Id.* The plaintiffs requested injunctive relief requiring the TEA to bring driver education into compliance with Title II. *Id.* at 251. In response, the TEA filed a motion to dismiss for want of jurisdiction and for failure to state a claim. *Id.* at 253. The district court denied the TEA's motion, but certified its order for immediate appeal. *Id.* at 251.

On appeal, the Fifth Circuit considered whether the plaintiffs had failed to state a Title II claim. *Id.* at 254–58. The panel first observed that Title II prohibits a public entity from excluding a qualified individual with a disability from its services, programs, or activities because of the individual's disability. *Id.* at 254–55 (citing 42 U.S.C. § 12132). It then articulated the relevant legal issue as "whether the named plaintiffs have been 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of [the TEA].'" *Id.* at 255 (alterations in original) (quoting 42 U.S.C. § 12132). "To answer that question," the panel made clear, "we must decide whether driver education is a service, program, or activity of the TEA." *Id.* "Although this [was] a close question[,]" the Fifth Circuit held that driver education was not a service, program, or activity of the TEA. *Id.*

In reaching its holding, the Fifth Circuit considered the plain text of Title II and interpretive guidance from the Department of Justice ("DOJ").[22] *See id.* at 255–57. The Fifth Circuit interpreted the phrase "services, programs, or activities of a public entity" in Title II to mean "what 'services, programs, or activities' are provided by the public entity." *Id.* (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)). The panel found it significant that "the TEA itself does not teach driver education, contract with driver education schools, or issue driver education certificates to individual students." Because the TEA's program "provide[d] the licensure and regulation of driving education schools, not driver education itself[,]" the Fifth Circuit found that the text of Title II "suggests that driver education is not a program, service, or activity of the TEA." *Id.*

Interpretive guidance from the DOJ "stated that a public entity is not accountable for discrimination in the employment or other practices of [a company licensed by the public entity], if those practices are not the result of requirements or policies established by the [public entity]." *Id.* at 256 (alterations in original) (quotation marks and citation omitted). The panel observed that the plaintiffs had alleged that it was "the TEA's *failure* to establish requirements or policies [that] allowed private driver education schools to be inaccessible." *Id.* (emphasis in original). The Fifth Circuit therefore determined that "the DOJ's interpretive guidance indicates that the TEA is not accountable for the driver education schools' inaccessibility because the TEA's requirements and policies have not caused it." *Id.*

Here, whether the Secretary provides voting and vote-by-mail services is not a close question. The Election Code makes clear that voting in person and by mail are services or benefits that the Secretary provides. The Secretary has a concrete and specific role in the administration of

---

[22] The Fifth Circuit also considered federal regulations and caselaw construing contractual and agency relationships between private and public entities. *See Ivy*, 781 F.3d at 255–58. Federal regulations, however, did not provide clarity, and contractual and agency relationships are not relevant here.

elections throughout Texas and oversees voting processes and procedures. Indeed, the Election Code, including many of the S.B. 1 provisions that the OCA-GH Plaintiffs challenge in this case, requires the Secretary to implement the Election Code itself by way of rules and requirements. In other words, the Election Code charges the Secretary with administering elections.

Further, the Secretary's duties under the Election Code constitute far more than the mere licensing that the Fifth Circuit found insufficient in *Ivy*. The Secretary must provide voting and vote-by-mail services and must do so in a specific and particular manner pursuant to the Election Code. Indeed, it is precisely because of the Secretary's statutory obligation to implement and enforce the Election Code that, according to the OCA-GH Plaintiffs, he is subject to liability under Title II. Whereas the plaintiffs in *Ivy* claimed that the TEA had failed to establish requirements or policies to counteract disability discrimination, the OCA-GH Plaintiffs in this case allege that the Secretary violates Title II by administering elections in accordance with the Election Code. They are *not* alleging that the Secretary has failed to establish requirements or policies that allow their disabled members to access voting and vote-by-mail services or benefits. Put differently, the OCA-GH Plaintiffs contend that the Secretary, in administering elections according to the specific procedures and processes the Election Code contemplates, discriminates against disabled voters.

It is for this reason that the State Defendants' reliance on *Lightbourn* is also misplaced. In that case, five visually impaired individuals, among others, filed a Title II suit for injunctive relief against the Secretary. *Lightbourn*, 118 F.3d at 423. The plaintiffs alleged that the Secretary "discriminated against them by failing to ensure that persons with visual and mobility impairments have access to 'polling sites and voting procedures.'" *Id.* In particular, they argued that Title II required the Secretary to provide them with the opportunity to vote in secret, without the assistance of an election worker or other person. *Id.* at 423–24, 431. The Fifth Circuit was not persuaded. It

framed the relevant legal issue as whether the Secretary had "a duty to ensure that local election authorities comply with the ADA." *Id.* at 427. The panel then consulted the Election Code to review the Secretary's duties under certain provisions and determined that "the Secretary ha[d] no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Id.* at 432.

But here, the duty at issue is the Secretary's mandate to administer elections according to the Election Code. The OCA-GH Plaintiffs are *not* alleging that the Secretary has a duty to take steps to ensure that local officials comply with the ADA. It is therefore not the case that the OCA-GH Plaintiffs "would impose supervisory liability on the [Secretary]." ECF No. 240 at 25. Rather, the Secretary is personally and potentially liable under Title II because *he* must administer elections in compliance with Election Code provisions that—the OCA-GH Plaintiffs allege—discriminate against disabled voters. *Lightbourn*, therefore, does not insulate the Secretary from the OCA-GH Plaintiffs' Title II claims.

Still, the State Defendants maintain that OCA-GH Plaintiffs' Title II claims must be dismissed because they "have not plausibly alleged that S.B. 1 actually discriminates against voters with disabilities[.]" *Id.* According to the State Defendants, no discrimination exists because "[d]isabled Texans have multiple options to vote in every election." *Id.* at 26. These alternatives, they submit, include voting in a polling place or at the curbside during early voting, in a polling place or at the curbside on Election Day, and by mail. *Id.* "After all," the State Defendants contend, "Plaintiffs have a right to vote, not a right to vote by their preferred method." *Id.* Their arguments miss the mark. The relevant question before the Court at this stage of the proceedings is whether the OCA-GH Plaintiffs have alleged sufficient facts showing that the challenged S.B. 1 provisions

violate Title II. The State Defendants' belief that the status quo already offers disabled voters meaningful access to vote—as Title II requires—is an argument for another day.

What is more, the OCA-GH Plaintiffs allege that the challenged provisions deny disabled voters not only equal and effective access to vote in person, but also equal and effective access to vote by mail. "Absentee and in-person voting are different benefits, and voters with disabilities are entitled to equal access to both." *Merrill v. People First of Ala.*, 141 S. Ct. 25, 27 (2020) (Sotomayor, J., dissenting); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) ("This case does not turn on whether there is a standalone right to vote privately and independently without assistance. Plaintiffs' argument is that defendants have provided such a benefit to non-disabled voters while denying that same benefit to plaintiffs on the basis of their disability."). Even assuming that the alternatives that the State Defendants identify constitute reasonable modifications under Title II, they do nothing for eligible disabled voters who are discriminated against when voting by mail. Surely, voting by mail cannot be a reasonable modification when, as the OCA-GH Plaintiffs plausibly allege, disabled voters who are eligible to vote by mail do not have meaningful access to actually do so because of their disabilities.

For these reasons, the State Defendants' contention that "Texas law allows for numerous accommodations for disabled voters" is also misplaced at this stage of litigation. ECF No. 240 at 26. The same goes for the State Defendants' argument that the OCA-GH Plaintiffs cannot state a valid Title II claim because "Texas law expressly prohibits election officials from interpreting the

Texas Election Code" in a manner that discriminates against disabled voters. *Id.* at 25. The question before the Court is whether the OCA-GH Plaintiffs have alleged sufficient facts to state valid Title II claims, not whether existing law—in the State Defendants' opinion—already provides meaningful access to vote in person and by mail, and precludes discrimination against disabled voters.

The Court, therefore, finds that the OCA-GH Plaintiffs have stated claims upon which relief may be granted under Title II of the ADA.

ii. **Congress acted pursuant to a valid grant of constitutional authority in enacting Title II of the ADA to prohibit discrimination in voting.**

Having concluded that the OCA-GH Plaintiffs have stated valid Title II claims, the Court now considers which aspects of the State Defendants' alleged conduct violate Title II and to what extent such misconduct also violates the Fourteenth Amendment. *Block*, 952 F.3d at 617.

In *Lane*, the Supreme Court held "that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." 541 U.S. at 533–34. In reaching its holding, the *Lane* Court considered the "constitutional right or rights that Congress sought to enforce when it enacted Title II." *Id.* at 522. The *Lane* Court observed that the Fourteenth Amendment requires that "all persons similarly situated should be treated alike[.]" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 439 (1985)). It then determined that Title II seeks to enforce this constitutional command by prohibiting discrimination against disabled persons. The *Lane* Court also found that Title II "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id.* at 522–23. "These rights include some, like the right of access to the courts at issue in this case, that are protected by . . . the Fourteenth Amendment." *Id.* at 523. The *Lane* Court accordingly

46

concluded that in enacting Title II, Congress validly abrogated state sovereign immunity as it applies to Title II cases implicating the right of access to the courts. *Id.* at 533–34.

In this case, the OCA-GH Plaintiffs allege that certain S.B. 1 provisions discriminate against their disabled members by burdening their right to vote. "The Fourteenth Amendment has been interpreted to protect voters generally from laws that excessively burden the right to vote and the conduct of the political process." *Veasy v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (Jones, J., joined by Jolly, Smith, Clement, and Owen, JJ., concurring in part) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008); *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 786–90 (1983)); *see also McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[B]ecause of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause[.]" (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). Thus, it is clear that the State Defendants' alleged misconduct violates both Title II and the Fourteenth Amendment.

It is of no consequence that the OCA-GH Plaintiffs challenge S.B. 1 provisions pertaining to the State Defendants' vote-by-mail program. The Fourteenth Amendment, and the Equal Protection Clause in particular, "extend to all action of the State denying equal protection of the laws, whatever the agency of the State taking the action, or whatever the guise in which it is taken." *Cooper v. Aaron*, 358 U.S. 1, 17 (1958) (citations omitted). The Election Code, in turn, provides that an eligible voter who has a physical condition that prevents them from appearing at a polling place on an election day without a likelihood of needing personal assistance or of injuring their health has a right to vote by mail. TEX. ELEC. CODE § 82.002(a)(1). Therefore, voting by mail in Texas is state action subject to the constitutional guarantees found in the Fourteenth Amendment.

Accordingly, the Court finds that Congress acted pursuant to a valid grant of constitutional authority in enacting Title II to prohibit discrimination in voting. Thus, state sovereign immunity presents no obstacle to the OCA-GH Plaintiffs' Title II claims against the Secretary.

### b. The OCA-GH Plaintiffs' claim under § 208 of the VRA.

The Fifth Circuit "has held that the Voting Rights Act, 'which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity.'" *Mi Familia Vota*, 977 F.3d at 469 (quoting *OCA-Greater Hous.*, 867 F.3d at 614). State sovereign immunity, therefore, does not bar the OCA-GH Plaintiffs' claim under § 208 of the VRA against the Secretary and the Attorney General.

### 3. Texas accepted federal funds and therefore waived sovereign immunity for the OCA-GH Plaintiffs' claims under § 504 of the Rehabilitation Act against the Secretary and the Attorney General.

A state waives its sovereign immunity to claims under § 504 of the Rehabilitation Act by accepting federal funds. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 281 (5th Cir. 2005). The OCA-GH Plaintiffs allege that the State Defendants "receive federal financial assistance or funding[.]" ECF No. 200 ¶ 53. They also allege that, in 2020, Texas received $26,064,574 in funding through the Help America Vote Act and $24,546,840 pursuant to the CARES Act. *Id.* These allegations sufficiently show, at this stage of the proceedings, that the State Defendants accepted federal funds. Thus, state sovereign immunity does not bar the OCA-GH Plaintiffs' claims under § 504 of the Rehabilitation Act.[23]

---

[23] State sovereign immunity belongs to the state and extends to its officials. *See Can. Hockey, L.L.C. v. Tex. A&M Univ. Athletic Dep't*, No. 20-20503, 2022 WL 445172, at *3 (5th Cir. 2022) ("State sovereign immunity divests federal courts of jurisdiction over states and their agencies and instrumentalities, unless *the state* consents to suit[.]") (emphasis added). Thus, by accepting federal funds, Texas waived the Secretary's and the Attorney General's immunity for claims under § 504 of the Rehabilitation Act. Whether a specific state entity receives or directly benefits from federal financial assistance is a different question and more properly assessed under Rule 12(b)(6). "[A] plaintiff may not predicate a § 504 claim against a state actor on the mere fact that the state itself obtains federal money." *Lightbourn*, 118 F.3d at 427. The OCA-GH Plaintiffs have alleged that the Secretary and the Attorney General

In sum, state sovereign immunity does not bar the OCA-GH Plaintiffs' claims under § 101 of the CRA, the First and Fourteenth Amendments, Title II of the ADA, § 208 of the VRA, and § 504 of the Rehabilitation Act. However, the Court will dismiss the OCA-GH Plaintiffs' Title II claims against the Attorney General for failure to state a claim.

### B.  The OCA-GH Plaintiffs have sufficiently shown that they have standing.

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Juridical entities may satisfy these requirements under an associational or organizational theory of standing. *OCA-Greater Hous.*, 867 F.3d at 610. At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician*, 691 F.3d at 652. Where, as here, the plaintiffs challenge several provisions in a statute, they must plead "all the elements of standing for each provision they seek to challenge." *In re Gee*, 941 F.3d 153, 162 n.4 (5th Cir. 2019). Further, where, as here, multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Here, OCA-GH is a named plaintiff for all claims that the OCA-GH Plaintiffs assert against the Secretary and the Attorney General. Therefore, the OCA-GH Plaintiffs need only allege a plausible set of facts establishing that OCA-GH has standing to assert these claims against the Secretary and the Attorney General.

---

received federal financial assistance or funding. Their claim under § 504 of the Rehabilitation Act, therefore, is not subject to dismissal pursuant to Rule 12(b)(6) for failure to allege that the specific state entity receives federal funds.

The OCA-GH Plaintiffs have sufficiently shown that OCA-GH has organizational standing to assert each claim and challenge each S.B. 1 provision at issue in this case. Organizational standing exists if the entity itself "meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

### 1. Injury in fact

Under an organizational theory of standing, an organization may establish an injury in fact by alleging "a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). That is precisely what the OCA-GH Plaintiffs have alleged in this case.

OCA-GH "is a national membership-driven civil rights organization of community advocates dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ('AAPIs')." ECF No. 200 ¶ 14. It is one of the many chapters and college affiliates across the country, whose mission is: "(1) to advocate for social justice, equal opportunity, and fair treatment; (2) to promote civic participation, education, and leadership; (3) to advance coalitions and community building; and (4) to foster cultural heritage." *Id.* The organization's usual activities include fundraising and programming, with the express goal of empowering the AAPI community. *Id.* ¶ 15. It fulfills its mission through leadership training, education workshops, arts and cultural events, advocacy campaigns, voting rights initiatives, legal clinics, internships, scholarships, mentorship, and civic engagement. *Id.*

The OCA-GH Plaintiffs allege that each of the S.B. 1 provisions that they challenge in this case will harm OCA-GH. *Id.* ¶ 17. They contend that the challenged provisions will "frustrate OCA-GH's mission of promoting civic participation among the AAPI community, including expanding voter registration and increasing voter turnout among AAPI voters, [by] forcing OCA-

GH to expend its resources counteracting SB 1's various unlawful effects." *Id.* Because of the challenged provisions, OCA-GH must divert resources away from its usual activities "and instead direct resources toward educating and helping volunteers and voters navigate those provisions' new burdensome restrictions on mail-in voting and assistance for non-English speakers, and the criminal and civil penalties associated with those provisions." *Id.* As a result, "OCA-GH will spend less time and money on its normal programming efforts . . . and will reach fewer voters overall." *Id.* But for the challenged provisions, "OCA-GH would not have to conduct this type of public education[.]" *Id.*

The OCA-GH Plaintiffs further allege that section 7.04 "will also directly harm OCA-GH by infringing on the organization's right to engage in political speech and expression." *Id.* ¶ 18. To address this infringement, "OCA-GH will need to curtail its activities, including canvassing voters' homes, providing volunteers with food, water, or gifts that may be construed as 'compensation,' hosting candidate and issues forums, and other in-person interactive activities meant to promote democratic engagement and grassroots political change, or else risk incurring and exposing members to criminal and civil penalties." *Id.* These allegations sufficiently show that OCA-GH has suffered cognizable organizational injuries.

Thus, the OCA-GH Plaintiffs have adequately alleged that OCA-GH has suffered cognizable organizational injuries based on a diversion-of-resources theory and under the First Amendment to assert each claim challenging each of the S.B. 1 provisions at issue in this case. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[.]"[24] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also*

---

[24] To the extent that the State Defendants argue that the OCA-GH Plaintiffs have failed to identify an injury for each challenged provision, "[w]hat the State Defendants fail to appreciate is that the organizational injury the

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("If a defendant has caused . . .
monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact[.]").

### 2.  Causation and redressability

Whether the OCA-GH Plaintiffs' cognizable organizational injuries are fairly traceable to
and redressable by the Secretary and the Attorney General is a straightforward inquiry. The
invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the
Secretary. *OCA-Greater Hous.*, 867 F.3d at 613. Further, the credible threat of enforcing the
challenged S.B. 1 provisions, as discussed in the Court's *Ex parte Young* analysis *supra*, is fairly
traceable to the Attorney General, who has authority to prosecute election law offenses.[25] An
injunction prohibiting the Attorney General from enforcing these provisions will, at least partly,
redress the injuries that the OCA-GH Plaintiffs have suffered. *See Uzuegbunam v. Preczewski*, 141
S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability
requirement." (quotation marks and citation omitted)).

The State Defendants argue that the OCA-GH Plaintiffs' cognizable organizational injuries
are not fairly traceable to nor redressable by the Secretary and the Attorney General. ECF No. 240
at 20–21. For the most part, their contentions echo those that they raised in asserting that the
Secretary and the Attorney General are entitled to state sovereign immunity. *Id.* However, as the
State Defendants observe, "Article III standing analysis and *Ex parte Young* analysis 'significantly
overlap.'" *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div.*

---

[OCA-GH] Plaintiffs have alleged is the same for each of the S.B. 1 provisions they challenge." *La Unión del Pueblo
Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 2706116, at *13 (W.D. Tex. July 12, 2022).

[25] *Paxton v. Longoria*, No. 22-0224, 2022 WL 2080867 (Tex. June 10, 2022) does not hold otherwise. There,
the Texas Supreme Court concluded that the Attorney General does not have authority to seek civil penalties under
section 31.129 of the Election Code against an election official "based solely on the fact of the parties' agreement that
[the Attorney General] lacks authority to enforce Section 31.129[.]" *Longoria*, 2022 WL 2080867, at *7.

*of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)). Therefore, for the same reasons discussed in the Court's *Ex parte Young* analysis *supra*, these arguments are unpersuasive.

The State Defendants also contend that *OCA-Greater Houston* only applies in cases considering the facial validity of a Texas election statute. ECF No. 240 at 15. To be sure, in *Texas Democratic Party v. Hughs*, 974 F.3d 570 (5th Cir. 2020) (per curiam), the Fifth Circuit noted that *OCA-Greater Houston* involved a facial challenge. *Id.* at 570–71. The panel did so after observing that an "important question" had not been resolved, namely "whether and to what extent *Ex parte Young*'s exception to sovereign immunity permits plaintiffs to sue the Secretary in an as-applied challenge to a law enforced by local officials." *Id.* at 570. But the panel did not resolve that important question. Rather, it held that the "openness of the question alone [was] sufficient reason to deny" the plaintiffs' request for summary affirmance of a district court order concluding that the Secretary was not entitled to state sovereign immunity. *Id.* at 571. Moreover, as discussed *supra*, the *Ex parte Young* exception to state sovereign immunity applies to the OCA-GH Plaintiffs' claims under § 101 of the CRA and the First and Fourteenth Amendments, Congress validly abrogated state sovereign immunity in enacting the VRA and Title II, and Texas has waived sovereign immunity under § 504 of the Rehabilitation Act. *Hughs*, therefore, is inapposite.

Equally unpersuasive is the State Defendants' argument that *OCA-Greater Houston* is not binding on the Court because, in their view, the panel failed to consider *Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972). ECF No. 240 at 15–16. *Bullock*, according to the State Defendants, indicates that the Secretary's duties under the Election Code are "not a delegation of authority to care for any breakdown in the election process." *Id.* at 16 (citing *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020) (citing *Bullock*, 480 S.W.2d at 372))). Their contention, however, is based on

conjecture and reads much into the opinion that cannot be supported by the panel's careful reasoning.

There is also no reason to ignore *OCA-Greater Houston* in response to a nonbinding concurring opinion of the Texas Supreme Court. *Id.* The State Defendants' belief that *OCA-Greater Houston* was "wrongly" decided has no bearing. *Id.* The Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court." *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

Finally, the State Defendants contend that the OCA-GH Plaintiffs' injuries are not fairly traceable to the Attorney General because whether the Attorney General will enforce the challenged S.B. 1 provisions is "highly speculative." ECF No. 240 at 21. But the OCA-GH Plaintiffs, as discussed *supra*, *have* sufficiently alleged that the Attorney General can and will enforce the challenged provisions. It is the Attorney General's credible threat of enforcement that harms the OCA-GH Plaintiffs and their members. *See Longoria v. Paxton*, --- F. Supp. 3d ----, No. SA:21-CV-1223-XR, 2022 WL 447573, at *17 (W.D. Tex. 2022*), vacated and remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022) ("To be clear, the irreparable harm alleged in this case is not *actual* enforcement of the anti-solicitation provision; the harm is the chilling effect on Plaintiffs' speech that arises from the credible *threat* of enforcement.") (emphasis in original).

Moreover, the OCA-GH Plaintiffs allege that section 7.04 inhibits "core political speech" and that the "threat of criminal prosecution inhibits Plaintiffs' and their members' full exercise of their First Amendment rights." ECF No. 200 ¶¶ 220, 224. In the pre-enforcement context, the OCA-GH Plaintiffs need only allege "an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). The OCA-GH Plaintiffs have done so.

Thus, the OCA-GH Plaintiffs have alleged sufficient facts to plausibly establish that OCA-GH has standing to sue the Secretary and the Attorney General under each of their claims challenging each of the S.B. 1 provisions at issue in this case.[26]

### C. The OCA-GH Plaintiffs have stated claims upon which relief may be granted under § 101 of the CRA and § 208 of the VRA.

Relying on *Alexander v. Sandoval*, 532 U.S. 275 (2001), the State Defendants argue that § 101 of the CRA and § 208 of the VRA do not create private causes of action.[27] ECF No. 55 at 25–31. The State Defendants further contend that, even if these statutes create private causes of action, nonvoting, organizational plaintiffs cannot enforce such causes of action. *Id.* The Court disagrees.

### 1. Section 101 of the CRA creates a private cause of action.

The CRA enforces the constitutional right to vote. Among the protections the CRA affords is the "materiality" provision set forth under § 101, which provides:

> (2) No person acting under color of law shall—
>
> (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). The CRA defines the term "vote" broadly: it includes all action necessary to make a vote effective. *Id.* § 10101(a)(3)(A), (e). Section 101, therefore, prohibits state

---

[26] It is likely that all other OCA-GH Plaintiffs also have organizational standing.

[27] The State Defendants incorporate the arguments from their first motion to dismiss. *See* ECF No. 240 at 27. Although the Court denied the State Defendants' motion to dismiss on these points at the hearing held on November 16, 2021, the Court provides a more thorough explanation for its denial herein.

actors from denying a person's right to make their vote effective based on an error or omission that is not material to determining whether they are qualified to vote under state law.

Section 131(c) of the CRA authorizes the Attorney General of the United States to file a civil action in federal court "[w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by" § 101. 52 U.S.C. § 10101(c). But "[p]rivate rights of action were recognized under the statute long before the 1957 amendment that *added* the provisions which *also* allows the [U.S] Attorney General to bring an enforcement action." *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 858 (W.D. Tex. 2020), *rev'd and remanded on other grounds*, 860 F. App'x 874 (5th Cir. 2021) (emphasis in original) (citing *Smith v. Allwright*, 321 U.S. 649, 651 (1944); *Chapman v. King*, 154 F.2d 460, 461 (5th Cir. 1946); *Mitchell v. Wright*, 154 F.2d 924, 925 n.1 (5th Cir. 1946)).

Congress granted the U.S. Attorney General the power to enforce the CRA "because enforcement purely by private parties was not enough, and the intent was to make enforcement stronger without taking anything away." *Id.* Indeed, the U.S. Attorney General "at that time introduced the legislation and testified before Congress that the additional enforcement provision would not impair the ability of private individuals to bring suit under the Act." *Id.*; *see also Civil Rights Act of 1957: Hearings on S. 83, an amendment to S. 83, S. 427, S. 428, S. 429, S. 468, S. 500, S. 501, S. 502, S. 504, S. 505, S. 508, S. 509, S. 510, S. Con. Res. 5 before the Subcomm. on Const. Rights of the Comm. on the Judiciary*, 85th Cong. 60–61, 67–73 (1957) (statement and testimony of the Hon. Herbert Brownell, Jr., Attorney General of the United States). Accordingly, it should come as no surprise that private plaintiffs have continued to assert claims under § 101, despite the U.S. Attorney General's clear enforcement authority. *Hughs*, 474 F. Supp. 3d at 858.

The Court finds support for its conclusion in the statute itself. "For a statute to create . . . private rights, its text must be 'phrased in terms of the persons benefitted.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 692 n.13 (1979)). Section 101 states that "[n]o person acting under color of law shall deny the right of any individual to vote" because of an immaterial error or omission. 52 U.S.C. § 10101(a)(2)(B). "Undoubtedly, "the focus of the text is . . . the protection of each individual's right to vote." *Schwier v. Cox*, 340 F.3d 1284, 1298 (11th Cir. 2003). Moreover, it commands, by use of the term "shall," that state officials refrain from acting in a manner that violates the statute. In other words, § 101 imposes a duty upon state officials not to deny individuals their right to vote based on immaterial errors or omissions. This duty-creating language makes it all the more reasonable to impute to Congress an intent to create a private cause of action under § 101. *Gonzaga*, 536 U.S. at 284 n.3.

Further, neither the Supreme Court nor the Fifth Circuit have prohibited private plaintiffs from asserting claims under § 101.[28] *Hughs*, 474 F. Supp. 3d at 859. As such, "many courts have recognized a private right of action[.]" *Id.* Judicial recognition of private § 101 claims and Congress's clear intent not to foreclose private causes of action under § 101 establish that "[t]here is no reason to shield the type of violations at issue herein from the reach of private litigants." *Id.* That the U.S. Attorney General now has the authority to enforce § 101 "does not mean that private actions under § 101 are no longer available."[29] *Id.* "[R]epeals by implication are disfavored."

---

[28] *Vote.Org v. Callanen*, --- F.4th ----, No. 22-50536, 2022 WL 2389566, at *5 n.5 (5th Cir. 2022), does not hold otherwise. There, the Fifth Circuit granted a stay pending appeal of a district court's order for injunctive relief, finding that an Election Code provision violates both the CRA and the United States Constitution. *Vote.Org*, 2022 WL 2389566, at *1. In doing so, the Fifth Circuit expressly stated that it need not resolve whether § 101 "create[s] an implied cause of action or a private right enforceable in a § 1983 suit." *Id.*, at *5 n.5.

[29] Taking the State Defendants at their word would mean that neither private litigants nor the U.S. Attorney General could enforce the rights guaranteed in § 101 against Texas's highest election and enforcement officials. *See La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-00844-XR, 2022 WL 1651215, at *22 (W.D. Tex. May 24, 2022) (summarizing State Defendants' arguments that the U.S. Attorney General may not enforce § 101 against the Secretary or the Attorney General).

*Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133 (1974). Therefore, the Court concludes that § 101 of the CRA creates a private cause of action.

### 2.   Section 208 of the VRA creates a private cause of action.

"The Fifteenth Amendment guarantees that the 'right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude,' § 1, and it grants Congress the authority to 'enforce' these rights 'by appropriate legislation,' § 2." *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 217 (2009) (quoting U.S. CONST. amend. XV, §§ 1–2). "Congress enacted the landmark Voting Rights Act of 1965, 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq.*, in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021). "The Voting Rights Act is ambitious, in both goal and scope." *Id.* at 2351 (Kagan, J., dissenting). It contains comprehensive sections designed "to correct an active history of discrimination" and "deal with the accumulation of discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 44 n.9 (1986) (quotation marks and citation omitted).

Section 208 provides that a "voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Organizations and private parties have also been permitted to enforce § 208 of the VRA. In *OCA-Greater Houston*, for instance, the plaintiff was a nonprofit organization conducting "Get Out the Vote" efforts among voters with limited English proficiency. 867 F.3d at 609. The suit alleged that a provision in the Election Code that restricted who could assist voters with limited English proficiency was preempted by § 208. *Id.* at 608. On the merits, the Fifth

Circuit held that the challenged provision "impermissibly narrows the right guaranteed by Section 208 of the VRA." *Id.* at 615. District courts outside of this Circuit have also confirmed that organizations and private plaintiffs may enforce § 208. *See Democracy N.C. v. N.C. State Bd. of Elections*, --- F. Supp. 3d ----, No. 1:20CV457, 2022 WL 715973, at *14 (M.D. N.C. 2022) (holding that person "sufficiently alleged a plausible claim that North Carolina's absentee ballot voting laws violate Section 208"); *Lee*, 2021 WL 6072197, at *9 (N.D. Fla. 2021) (holding that organizations stated a claim under § 208 of VRA); *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 796–97 (W.D. Ark. 2021) (same); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (same). Indeed, "every court that has considered the issue—and the Attorney General of the United States—agree[s] that private parties may enforce [§] 208." *Lee*, 2021 WL 6072197, at *9.

Further, the Court finds the *Lee* court's analysis on the question of whether § 208 creates a private cause of action persuasive. *See id.* at *7–9. The judicial task when assessing whether a statute creates a private cause of action is "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. In 1975, Congress amended § 3 of the VRA "by striking out 'Attorney General' . . . and inserting in lieu thereof the following[:] 'Attorney General or an aggrieved person.'" Voting Rights Act Amendments of 1975, Pub. L. 94-73, 89 Stat. 404. In its current form, § 3 makes clear that "an aggrieved person" may institute "a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State[.]"[30] 52 U.S.C. § 10302(a). Section 3, therefore, plainly provides that a private plaintiff may initiate a lawsuit under any statute that enforces the Fourteenth and Fifteenth Amendments.

---

[30] Congress has also made clear that in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, *other than the United States*, a reasonable attorney's fees, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e) (emphasis added).

"Congress clearly designed section 208 to enforce the Fourteenth Amendment's guarantees." *Lee*, 2021 WL 6072197, at \*9. In *Lane*, the Supreme Court held that, upon enacting Title II, Congress validly abrogated state sovereign immunity under the Fourteenth Amendment because Title II sought to remedy, among other concerns, discrimination against disabled voters. 541 U.S. at 524, 533–34. The Supreme Court has also cautioned that, "because of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause[.]" *McDonald*, 394 U.S. at 807 (quoting *Harper*, 383 U.S. at 670). Thus, since § 208 is, by its terms, a statute designed for enforcement of the guarantees of the Fourteenth Amendment, "Congress must have intended it to provide private remedies." *Morse v. Republican Party of Va.*, 517 U.S. 186, 234 (1996). Congress certainly envisioned that private remedies under § 208 would be enforceable under § 3 of the VRA, which again, provides that a private plaintiff may initiate a lawsuit under *any* statute that enforces the Fourteenth Amendment. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2015) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." (quotation marks and citation omitted)). Section 208, therefore, creates a private cause of action.

In sum, caselaw clearly establishes that organizations, like the OCA-GH Plaintiffs, have historically been able to enforce these provisions. Absent any compelling showing to the contrary, the Court is not inclined to deviate from firmly entrenched historical precedent that has permitted organizational plaintiffs to invoke these provisions. The OCA-GH Plaintiffs, therefore, have stated claims upon which relief may be granted under § 101 of the CRA and § 208 of the VRA.

**CONCLUSION**

For the foregoing reasons, the Texas Secretary of State and the Texas Attorney General's motion to dismiss the claims that OCA-Greater Houston, League of Woman Voters of Texas, REVUP-Texas, and Workers Defense Action Fund have asserted against them (ECF No. 240) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

Any and all claims challenging portions of section 6.04 of S.B. 1 that the district court enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are **MOOT**.

Any and all claims challenging section 6.05 of S.B. 1 are **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds.

Any and all claims challenging section 7.04 of S.B. 1, as codified in sections 276.016, 276.017, 276.018, and 276.019 of the Texas Election Code, are **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds.

Any and all claims under Title II of the Americans with Disabilities Act against the Texas Attorney General are **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds.

All other claims that OCA-Greater Houston, League of Woman Voters of Texas, REVUP-Texas, and Workers Defense Action Fund have asserted against the Texas Secretary of State and the Texas Attorney General may proceed.

It is so **ORDERED**.

**SIGNED** this August 2, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE