**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered the State of Texas, the Texas Secretary of State, and the Texas Attorney General's motion to dismiss all claims that La Unión del Pueblo Entero, Friendship-West Baptist Church, the Anti-Defamation League Austin, Southwest, and Texoma Regions, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin have asserted against them (ECF No. 255). After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code") by altering various election practices and procedures pertaining to early voting, voting by mail, voter assistance, and more. *See generally id.*

1

Days before and after the Governor signed S.B. 1 into law, several private plaintiffs filed suit, alleging that certain provisions of S.B. 1 violate federal statutes and the United States Constitution.[1] This order addresses one of these suits filed by La Unión del Pueblo Entero ("LUPE"), Friendship-West Baptist Church, the Anti-Defamation League Austin, Southwest, and Texoma Regions, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin (together, the "LUPE Plaintiffs"). *See* Compl., *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021), ECF No. 1. The LUPE Plaintiffs challenge sections 2.04, 2.06, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 5.07, 5.13, 6.01, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of S.B. 1. ECF No. 208 ¶¶ 219, 231, 243, 256, 267, 273, 287, 302, 311.[2]

On January 25, 2022, the LUPE Plaintiffs filed their second amended complaint against the State of Texas, the Texas Secretary of State (the "Secretary") in his official capacity, and the Texas Attorney General (the "Attorney General") in his official capacity (together, the "State Defendants").[3] ECF No. 208. They assert nine claims and allege as follows:

- Sections 2.04, 2.06, 2.07, 4.01, 4.06, 4.07, 4.09, 5.07, 5.13, 6.03, 6.04, 6.05, 6.06, and 7.04 violate the First and Fourteenth Amendments because the provisions impose an undue burden on the right to vote, and they name the Secretary and the Attorney General as defendants for this claim;

---

[1] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *see also* Order, *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

[2] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

[3] The LUPE Plaintiffs have also sued, in their official capacities, Dallas County Elections Administrator Michael Scarpello, El Paso County Elections Administrator Lisa Wise, Dallas County District Attorney John Creuzot, El Paso County District Attorney Yvonne Rosales, and Travis County District Attorney José Garza. ECF No. 208 ¶¶ 43–44; 48–50.

- Sections 2.04, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 violate the Fourteenth and Fifteenth Amendments because the provisions intentionally deny the right to vote on the basis of race, and they name the Secretary and the Attorney General as defendants for these two claims;

- Sections 4.01, 4.06, 4.07, 4.09, 6.03, 6.04, 6.05, 6.06, and 7.04 violate § 2 of the Voting Rights Act of 1965 ("VRA"), and they name Texas, the Secretary, and the Attorney General as defendants for this claim;

- Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 violate § 208 of the VRA, and they name Texas, the Secretary, and the Attorney General as defendants for this claim;

- Sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 violate Title II of the Americans with Disabilities Act ("ADA"), and they name the Secretary and the Attorney General as defendants for this claim;

- Section 7.04 violates the First and Fourteenth Amendments because the provision is unconstitutionally vague and burdens free speech, and they name the Secretary and the Attorney General as defendants for this claim;

- Sections 4.09 and 8.01 violate the Fourteenth Amendment because the provisions are unconstitutionally vague, and they name the Secretary and the Attorney General as defendants for this claim; and

- Sections 6.01, 6.03, 6.04, 6.05, and 6.06 violate the First and Fourteenth Amendments because the provisions burden free speech, and they name the Secretary and the Attorney General as defendants for this claim.

*Id.* ¶¶ 218–314. The LUPE Plaintiffs seek to enjoin the State Defendants from enforcing each of the S.B. 1 provisions that they challenge under their constitutional and statutory claims. *Id.* at 89.

On February 15, 2022, the State Defendants filed a motion to dismiss all claims that the LUPE Plaintiffs have asserted against them. ECF No. 255. The LUPE Plaintiffs filed a response, ECF No. 301, and the State Defendants filed a reply, ECF No. 313. On March 18, 2022, the State

Defendants filed a notice of supplemental authority. ECF No. 333. Thereafter, on April 8, 2022, the LUPE Plaintiffs filed a response to the State Defendants' notice.[4] ECF No. 358.

## DISCUSSION

### I.   Legal Standards

The State Defendants move to dismiss the LUPE Plaintiffs' claims on four grounds. First, the State Defendants contend that state sovereign immunity bars the LUPE Plaintiffs from suing Texas, the Secretary, and the Attorney General. Second, the State Defendants claim that the LUPE Plaintiffs lack standing to bring this suit. Third, the State Defendants argue that the LUPE Plaintiffs have failed to state a claim upon which relief may be granted under Title II of the ADA. Finally, the State Defendants submit that §§ 2 and 208 of VRA do not create private causes of action.

### A.   Subject matter jurisdiction

Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case.[5] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The Eleventh Amendment and the doctrine of sovereign immunity limit a federal court's jurisdiction. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). The doctrine of sovereign immunity "also prohibits suits against state officials or agencies that are effectively suits against a state." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). State sovereign immunity, however, "is not limitless[.]" *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020). "A State may waive its

---

[4] Though named as a defendant, Ms. Wise filed a response in opposition to the State Defendants' motion to dismiss the LUPE Plaintiffs' claims. ECF No. 302.

[5] Congress, by statute, has proclaimed that the "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The LUPE Plaintiffs assert claims against the State Defendants under federal law. The Court, therefore, is statutorily authorized to adjudicate this case.

sovereign immunity . . . and in some circumstances Congress may abrogate it by appropriate legislation." *Stewart*, 563 U.S. at 253–54 (citation omitted). Additionally, under *Ex parte Young*, 209 U.S. 123 (1908), "a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Reeves*, 954 F.3d at 736.

Article III of the United States Constitution also limits a federal court's constitutional power to adjudicate a case. It "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. CONST. art. III, § 2). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing, therefore, "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). It provides definition to the constitutional limits of subject matter jurisdiction, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), by identifying "those disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted).

A federal court must consider a motion to dismiss for lack of subject matter jurisdiction "before other challenges 'since the court must find jurisdiction before determining the validity of the claim.'" *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The federal court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). At the pleading stage, "the

plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

### B.  Failure to state a claim

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II.  Analysis

The Court addresses each of the State Defendants' four grounds for dismissal, beginning, as it must, with their jurisdictional contentions.

### A.  State sovereign immunity does not bar the LUPE Plaintiffs' claims against Texas, the Secretary, and the Attorney General.

The State Defendants claim that state sovereign immunity bars the LUPE Plaintiffs' claims against Texas, the Secretary, and the Attorney General. ECF No. 255 at 8–17. They emphasize that the LUPE Plaintiffs cannot satisfy the *Ex parte Young* exception to state sovereign immunity.

*Id.* at 8–16. The State Defendants also contend that the LUPE Plaintiffs have failed to demonstrate an alternative exception to state sovereign immunity. *Id.* at 16–17.

> **1. The *Ex parte Young* exception to state sovereign immunity permits the LUPE Plaintiffs to sue the Secretary and the Attorney General for most of the S.B. 1 provisions that they challenge on constitutional grounds.**

State sovereign immunity under the Eleventh Amendment generally precludes suits against state officials in their official capacities. *City of Austin*, 943 F.3d at 997. The *Ex parte Young* exception to state sovereign immunity, however, allows private parties to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). The Supreme Court has counseled that, "[i]n determining whether the *Ex parte Young* doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). The Supreme Court has also made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his office, must have "some connection with the enforcement" of the challenged law. *Young*, 209 U.S. at 157.

Despite the straightforward inquiry that the Supreme Court envisioned, the Fifth Circuit has acknowledged that its own decisions "are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 n.21 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 999). Nevertheless, the Fifth Circuit has articulated some general rules. For instance, the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are

implemented.'" *Id.* at 400–01 (emphasis in original) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Fifth Circuit has also determined that,"[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." *Id.* at 401 (quotation marks and citation omitted). "Moreover," according to the Fifth Circuit, "a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce." *Id.*

The Fifth Circuit has further explained that plaintiffs must at least "show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Morris*, 739 F.3d at 746). Put differently, the state "official must be 'statutorily tasked with enforcing the challenged law[,]'" *id.* (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 161 (2021)), though whether the particular duty to enforce the statute in question "arises out of the general law, or is specially created by the [statute] itself, is not material so long as it exists[,]" *Young*, 209 U.S. at 157. "Enforcement typically means 'compulsion or constraint.'" *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). "A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Id.* (quoting *City of Austin*, 943 F.3d at 1002). In short, "if an 'official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception.'" *Tex. Democratic Party I*, 961 F.3d at 401 (emphasis in original) (quoting *City of Austin*, 943 F.3d at 1002).

Here, the LUPE Plaintiffs assert six claims under the First, Fourteenth, and Fifteenth Amendments against the Secretary and the Attorney General. ECF No. 208 ¶¶ 218–54, 286–314.

They do so pursuant to 42 U.S.C. § 1983, which "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). Congress has not abrogated state sovereign immunity under § 1983. *Raj*, 714 F.3d at 328. Nonetheless, the LUPE Plaintiffs may institute a § 1983 action for prospective injunctive relief consistent with the *Ex parte Young* exception to state sovereign immunity. *Edelman v. Jordan*, 415 U.S. 651, 677 (1974).

> **a. The LUPE Plaintiffs have shown that the Secretary has a sufficient enforcement connection to all but one of the S.B. 1 provisions that they challenge on constitutional grounds.**

"Determining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis[.]"[6] *Tex. Democratic Party II*, 978 F.3d at 179. "[T]he official must have the requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Id.* "This is especially true here because the Texas Election Code delineates between the authority of the Secretary of State and local officials." *Id.*

Thus, the question before the Court at this stage of the proceedings is whether the LUPE Plaintiffs have alleged a plausible set of facts establishing that the Secretary has a sufficient enforcement connection to each of the S.B. 1 provisions that they challenge on constitutional grounds—that is, whether the LUPE Plaintiffs have plausibly established that the Secretary can and will enforce each of these provisions.

---

[6] The State Defendants contend that the LUPE Plaintiffs must, at the pleading stage, establish that the *Ex parte Young* exception applies to a state official on a provision-by-provision basis. ECF No. 255 at 8; ECF No. 313 at 7; *see also* ECF No. 333 at 2. They rely on *Texas Democratic Party II* and *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022), for their assertion. Neither of these cases, however, specifically hold that the *Ex parte Young* exception to state sovereign immunity *must* be assessed on a provision-by-provision basis at the pleading stage. Rather, these cases discuss the *Ex parte Young* exception to state sovereign immunity in reviewing the validity of a district court's injunction. Indeed, the Fifth Circuit has made clear that, at the pleading stage, plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction. *Physician Hosps. of Am.*, 691 F.3d at 652. Nevertheless, in resolving the instant motion to dismiss, the Court assumes, but does not decide, that the LUPE Plaintiffs must, at this stage of the proceedings, establish that the *Ex parte Young* exception to state sovereign immunity applies on a provision-by-provision basis.

> **i.   The LUPE Plaintiffs have plausibly established that the Secretary can enforce all but one of the S.B. 1 provisions that they challenge on constitutional grounds.**

The LUPE Plaintiffs name the Secretary as a defendant for their claims challenging sections 2.04, 2.06, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 5.07, 5.13, 6.01, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01 of S.B. 1 under the First, Fourteenth, and Fifteenth Amendments. ECF No. 208 ¶¶ 219, 231, 243, 287, 302, 311.

A state official is most clearly tasked with enforcing a statute when the state official is "specially charged with the duty to enforce the statute[.]" *Young*, 209 U.S. at 158. Sections 2.06, 2.07, and 2.08 charge the Secretary with enforcing these provisions.

Most clearly, section 2.08 provides that the Secretary must report suspected election law offenses to the Attorney General. TEX. ELEC. CODE § 31.006(a). The provision requires the Secretary to "deliver to the attorney general all pertinent documents and information in the secretary's possession." *Id.* Undoubtedly, the Secretary is statutorily tasked with enforcing a provision that expressly requires him to report suspected election law offenses for prosecution.

The Secretary is also statutorily tasked with enforcing sections 2.06 and 2.07, which establish additional procedures for the maintenance of voter rolls. The Election Code provides:

> The secretary of state shall enter into an agreement with the Department of Public Safety under which information in the existing statewide computerized voter registration list is compared against information in the database of the Department of Public Safety on a monthly basis to verify the accuracy of citizenship status information previously provided on voter registration applications. In comparing information under this subsection, the secretary of state shall consider only a voter's information in the database of the Department of Public Safety that was derived from documents presented by the voter to the department after the person's current voter registration became effective, and may not consider information derived from documents presented by the voter to the department before the person's current voter registration became effective.

*Id.* § 16.0332(a-1). Upon receiving notice from the Secretary of a voter whose citizenship is in question based on the Secretary's comparison of voter registration and Department of Public Safety records, voter registrars must deliver a written notice to the voter, requiring them to submit "proof of United States citizenship in the form of a certified copy of the voter's birth certificate, United States passport, or certificate of naturalization or any other form prescribed by the secretary of state." *Id.* § 16.0332(a). The Election Code makes clear that the Secretary "shall prescribe rules for the administration of this section." *Id.* § 16.0332(d). In addition, "[n]ot later than December 31 of each year, the secretary of state shall provide a report to the legislature of the number of voter registrations canceled under this section during the calendar year." *Id.* § 16.0332(e).

Moreover, the Secretary is statutorily responsible for ensuring that voter registrars substantially comply with his rules and requirements implementing the statewide computerized voter registration list. *Id.* § 18.065(a). This necessarily includes the Secretary's rules and requirements pertaining to notices that he sends to voter registrars pursuant to section 2.07. Indeed, section 2.07 directs the Secretary to provide notice to voter registrars if he determines that a voter on the statewide computerized voter registration list is no longer "a resident of the county in which the voter is registered to vote[.]" *Id.* § 18.068(a).

Furthermore, section 2.06 requires the Secretary to sanction a voter registrar if he determines that the voter registrar failed to substantially comply with his rules or requirements implementing the statewide computerized voter registration list. *Id.* § 18.065(e). Specifically, for the first violation, the Secretary must require the voter registrar to attend a training course on compliance. *Id.* § 18.065(e)(1). Section 2.06 tasks the Secretary with developing and implementing the training program. *Id.* § 18.065(h). In the event of a second violation, the Secretary must "audit the voter registration list for the county in which the registrar serves to determine the actions

needed to achieve substantial compliance . . . and provide the results of the audit to the registrar[.]" *Id.* § 18.065(e)(2). For a third or any subsequent violation, if the Secretary determines that the voter registrar, within fourteen days of receiving the results of his audit, "has not performed any overt actions in pursuance of compliance with the actions identified" in those results, then he must "inform the attorney general that the county which the registrar serves may be subject to a civil penalty[.]" *Id.* § 18.065(e)(3). Section 2.06 also makes clear that the Secretary "shall adopt rules and prescribe procedures for the implementation of this section." *Id.* § 18.065(i). Thus, sections 2.06 and 2.07 plainly establish that the Secretary is statutorily tasked with enforcing the same.[7]

However, for the *Ex parte Young* exception to apply, "[t]he text of the challenged law need not actually state the official's duty to enforce it[.]" *City of Austin*, 943 F.3d at 997–98. It is enough that the state official's duty "arises out of the general law[.]" *Young*, 209 U.S. at 157. The Supreme Court's directive in *Young* is especially relevant in this case, where the Election Code includes several provisions that clearly empower the Secretary with duties to specifically enforce the remaining S.B. 1 provisions that the LUPE Plaintiffs challenge on constitutional grounds.

For instance, section 5.07 establishes new requirements for vote-by mail applications. In *Texas Democratic Party II*, the Fifth Circuit considered whether state sovereign immunity barred a challenge to an Election Code provision pertaining to vote-by-mail applications. Specifically, the plaintiffs alleged that an Election Code provision permitting only voters over the age of sixty-five to vote by mail was unconstitutional under the Twenty-Sixth Amendment. *Tex. Democratic Party II*, 978 F.3d at 174. The question before the Fifth Circuit was whether the district court erred

---

[7] The State Defendants describe the Secretary's duties under sections 2.06, 2.07, and 2.08 as merely "sharing information" that "does not involve 'compulsion or constraint' and is therefore not enforcement." ECF No. 255 at 10–11. That is incorrect. The provisions plainly establish that the Secretary is statutorily required to subject individuals, whom he believes have engaged in election law offenses, to prosecution. They also require the Secretary to impose sanctions upon voter registrars whom, in his estimation, have not complied with his rules and requirements implementing the statewide computerized voter registration list. There can be no clearer example of compulsion or constraint and therefore enforcement.

in requiring the Secretary to allow voters who are otherwise qualified to vote, but under the age of sixty-five, to vote by mail. *Id.*

To determine whether the Secretary was entitled to state sovereign immunity, the panel consulted the Election Code and observed that the Secretary "has the specific and relevant duty to design the application form for mail-in ballots . . . and to provide that form to local authorities and others who request it." *Id.* at 179 (citing TEX. ELEC. CODE §§ 31.002(a)–(b)). It further noted that the Election Code requires the Secretary to "furnish forms to those who request them for distribution to others." *Id.* at 179–80 (citing TEX. ELEC. CODE § 84.013). The panel also found it significant that the Election Code requires local officials "to use the Secretary's absentee-ballot form outside of emergency situations[.]" *Id.* at 180 (citing TEX. ELEC. CODE § 31.002(d)). Based on these duties found throughout the Election Code, the Fifth Circuit found that "the Secretary has the authority to compel or constrain local officials based on actions []he takes as to the application form."[8] *Id.* The Fifth Circuit therefore held that, notwithstanding the division of responsibilities among the Secretary and local officials, the Secretary had a sufficient enforcement connection to the vote-by-mail provision at issue, justifying application of the *Ex parte Young* exception to state sovereign immunity as to the Secretary. *Id.*

The same conclusion is warranted here. The Election Code now generally requires an applicant to submit their driver's license, election identification certificate, or personal identification card number on their vote-by-mail application. TEX. ELEC. CODE § 84.002(a)(1-a). Indeed, it expressly states that a vote-by-mail application must include a space for an applicant to

---

[8] The State Defendants argue that the LUPE Plaintiffs have failed to allege how the Secretary compels or constrains the LUPE Plaintiffs themselves. ECF No. 313 at 8. But they need not do so. The Fifth Circuit found it sufficient in *Texas Democratic Party II* that the Secretary compelled and constrained local officials. *See also Tex. Alliance for Retired Ams.*, 28 F.4th at 672 ("If the official does not compel or constrain *anyone* to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation.") (emphasis added).

enter the required identification information. *Id.* § 84.001(a)(3-a). Section 5.07 provides that an early voting clerk must reject the applicant's vote-by-mail application if the required identification information on their application is either missing or does not match the identification information that the applicant previously provided on their voter registration application. *Id.* § 86.001(f).

As *Texas Democratic Party II* explained and the LUPE Plaintiffs allege, the Secretary is statutorily required to prescribe the design and content of "the forms necessary for the administration" of the Election Code. *Id.* § 31.002(a); *see also* ECF No. 208 ¶ 27. The forms "must enhance the ability of a person to understand the applicable requirements and to physically furnish the required information in the space provided." TEX. ELEC. CODE § 31.002(a). The Secretary must furnish samples of these forms to "the appropriate authorities who have administrative duties under this code; and other persons who request a form for duplication." *Id.* § 31.002(b). The Secretary must also maintain a supply of these forms and provide them to individuals and organizations that request them for distribution to voters. *Id.* § 84.013. Local officials must then use these forms, except in an emergency. *Id.* § 31.002(d).

It therefore follows that the Election Code requires the Secretary to modify vote-by-mail applications, so that they include the statutorily-required space for applicants to enter the identification information that the Election Code now requires. Consequently, as in *Texas Democratic Party II*, the Secretary has the authority to compel or constrain local officials based on the actions he takes with respect to vote-by-mail applications.

The same reasoning applies to the LUPE Plaintiffs' challenge to section 5.13. The Election Code now generally provides that a voter must submit their driver's license, election identification certificate, or personal identification card number on their mail ballot carrier envelope. *Id.* § 86.002(g). It makes clear that a mail ballot carrier envelope "must include a space that is hidden

14

from view when the envelope is sealed for the voter to enter" the required identification information. *Id.* Section 5.13, in turn, requires an early voting clerk to reject a mail-in ballot if the required identification information on the mail ballot carrier envelope is either missing or does not match the identification information that the voter previously provided on their voter registration application. *Id.* § 87.041(b)(8). Thus, as with vote-by-mail applications, the Secretary has the authority to compel or constrain early voting clerks based on the actions he takes with respect to the design and content of mail ballot carrier envelopes.

The State Defendants counter that local officials are the proper defendants for the LUPE Plaintiffs' challenges to these vote-by-mail and mail ballot carrier envelope provisions because the provisions explicitly reference local officials. ECF No. 255 at 11–12. It is true that, "[i]f the official sued is not 'statutorily tasked with enforcing the challenged law,' then the requisite connection is absent and '[the Court's] *Young* analysis ends.'" *In re Abbott*, 956 F.3d at 709 (quoting *City of Austin*, 943 F.3d at 998). But the Supreme Court also made clear long ago that the challenged provision need not explicitly identify the state official named as a defendant for the *Ex parte Young* exception to apply:

> The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, *and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.*

*Young*, 209 U.S. at 157 (emphasis added). Indeed, a state official may be statutorily tasked with enforcing a challenged provision based on the text in the challenged provision itself or the general law—such as, for example, the Election Code.

Further, it is worth noting that the provision at issue in *Texas Democratic Party II*, section 82.003 of the Election Code, did not explicitly refer to the Secretary either. In its entirety, section 82.003 states: "A qualified voter is eligible for early voting by mail if the voter is 65 years of age

or older on election day." TEX. ELEC. CODE § 82.003. Despite the absence of a specific reference to the Secretary in section 82.003, the Fifth Circuit located the Secretary's duties to enforce the provision in another section of the Election Code: "[T]he Secretary's specific duties regarding the application form under Section 31.002 are enough for us to conclude that the Secretary has at least a scintilla of enforcement authority for Section 82.003." *Tex. Democratic Party II*, 978 F.3d at 180. In short, the State Defendants' suggestion that the *Ex parte Young* analysis requires the Court to read each provision in a vacuum, without reference to any other Election Code provision—no matter how relevant to the enforcement question at hand—is entirely divorced from Fifth Circuit precedent, from the fundamental precepts of statutory interpretation,[9] and from common sense.

Thus, it is immaterial that the Secretary is not expressly identified in sections 5.07 and 5.13. The Election Code makes clear that it is the Secretary who is responsible for prescribing the design and content of vote-by-mail applications and mail ballot carrier envelopes. The challenged provisions, therefore, can be enforced only if and when the Secretary modifies vote-by-mail applications and mail ballot carrier envelopes to integrate the new identification requirements delineated in S.B. 1. The LUPE Plaintiffs allege that sections 5.07 and 5.13 unconstitutionally require local officials "to reject otherwise valid mail ballot applications and mail ballots because of simple errors or omissions[.]" ECF No. 208 ¶ 2. The *Ex parte Young* exception to state sovereign immunity authorizes the Court to "command[] a state official to do nothing more than refrain from violating federal law[.]" *Stewart*, 563 U.S. at 255. If the Court were to do so with respect to these provisions, then the Court's relief "might lead to prohibiting the Secretary from using [a vote-by-

---

[9] "[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (ellipsis in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)).

mail application or mail ballot carrier envelope] that expressed" unlawful requirements. *Tex. Democratic Party II*, 978 F.3d at 180. This was sufficient in *Texas Democratic Party II* and is certainly sufficient here, where the LUPE Plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction.

For the same reasons, it is also inconsequential that sections 5.07 and 5.13 expressly task local officials with rejecting vote-by-mail applications and mail ballot carrier envelopes that do not contain the required identification information. Under the Election Code and in practice, local officials would be unable to reject either of these forms were it not for the Secretary first fulfilling his statutory duties to prescribe the design and content of vote-by-mail applications and mail ballot carrier envelopes. Put differently, it is the Secretary who is exclusively responsible for prescribing the design and content of vote-by-mail applications and mail ballot carrier envelopes in a manner that enables applicants and voters to enter the required identification information. If he fails to do so, then the Secretary necessarily compels or constrains local officials by preventing them from rejecting these forms. Thus, this is not a case where the Secretary's "duty has nothing to do with enforcing" the vote-by-mail and mail ballot carrier envelope provisions. *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022). "Though there is a division of responsibilities, the Secretary has the needed connection" to sections 5.07 and 5.13. *Tex. Democratic Party II*, 978 F.3d at 180.

*Texas Democratic Party II* applies with equal force to the LUPE Plaintiffs' challenges to sections 6.01 and 6.03. Under section 6.01, "[a] person who simultaneously assists seven or more voters . . . by providing the voters with transportation to the polling place must complete and sign a form . . . that contains the person's name and address[.]" TEX. ELEC. CODE § 64.009(f). The provision requires the Secretary to prescribe the form. *Id.* § 64.009(h). Section 6.03 similarly requires an assistor to complete a form stating their name and address, their relationship to the

voter, and whether they "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." *Id.* § 64.0322(a). Again, the Secretary must prescribe the required form. *Id.* § 64.0322(b). Consequently, sections 6.01 and 6.03 can only be enforced if and when the Secretary prescribes the forms. The LUPE Plaintiffs allege that these provisions unconstitutionally "hinder the provision of assistance at the polling place, curbside, or in connection with mail ballots[.]" ECF No. 208 ¶ 2. If the Court were to agree, then it could enjoin the Secretary from prescribing these unlawful forms. Indeed, the Secretary has the authority to compel or constrain assistors and therefore possesses a sufficient connection to these provisions.

The Fifth Circuit's reasoning in *Texas Democratic Party II* also extends to the LUPE Plaintiffs' challenge to section 4.07. The provision allows a poll watcher "to sit or stand near enough to see and hear the election officers conducting the observed activity" and makes clear that an election judge generally may not deny a poll watcher "free movement where election activity is occurring within the location at which the watcher is serving." TEX. ELEC. CODE §§ 33.056(a), (e). The Election Code requires the Secretary to "develop and maintain a training program for watchers." *Id.* § 33.008. An individual must complete the Secretary's training program to serve as a poll watcher. *Id.* § 33.031(b). Upon completion, the training program must provide the poll watcher with a certificate, which the poll watcher must present to a local official when they arrive at a polling place. *Id.* §§ 33.008(2), 33.051(a)(2)–(a-1). The Secretary's training program is the only means by which a poll watcher may learn what they can and cannot do at a polling place.

Therefore, the training program must necessarily provide the poll watcher with information on where they can sit or stand in accordance with section 4.07. It is axiomatic that the Secretary, who is statutorily required to develop and maintain the training program, must develop a training program that will advise poll watchers of their privileges and responsibilities at polling places. By

18

doing so, the Secretary necessarily compels or constrains poll watchers to conduct themselves in a manner that will ensure compliance with the Election Code. The Secretary's duty to inform poll watchers of their privileges and responsibilities under the Election Code is all the more essential given that S.B. 1 limits local officials from removing poll watchers who violate the Election Code or any other law pertaining to the conduct of elections. *Id.* § 32.075(g). Because it is the Secretary who bears the responsibility to ensure that poll watchers comply with the Election Code, the information that he disseminates through the training program is not merely advice, guidance, or interpretive assistance. *Cf. Richardson v. Flores*, 28 F.4th 649, 655 (5th Cir. 2022).

Citing a history of voter intimidation against minority voters, the LUPE Plaintiffs allege that section 4.07 unconstitutionally "[g]ives partisan poll watchers 'free movement' to intimidate and harass voters [.]" ECF No. 208 ¶¶ 2, 57. If the LUPE Plaintiffs are correct, then the Court could enjoin the Secretary by, for example, requiring him to instruct poll watchers through his training program that their poll watching activities must satisfy constitutional standards. In doing so, the Secretary has the authority to compel or constrain poll watchers by limiting their poll watching to that which is permissible under the Election Code and the United States Constitution.

The Secretary also has the authority to compel or constrain under sections 3.04, 3.09, 3.10, 3.12, 3.13, and 4.01. Sections 3.04, 3.12, and 3.13 generally prohibit most voters from voting inside a motor vehicle and require that polling places be located inside a building. TEX. ELEC. CODE §§ 43.031(b), 85.061(a), 85.062(b). Sections 3.09 and 3.10 generally limit early voting hours. *Id.* §§ 85.005(a), 85.006(e). Section 4.01 provides that a presiding judge may not remove a poll watcher who has violated the Election Code or any other law pertaining to the conduct of elections unless an election judge or clerk observed the violation. *Id.* § 32.075(g).

The Election Code states that the Secretary "shall adopt rules . . . to assist the presiding judge of a polling place in processing forms and conducting procedures required by [the Election Code] at the opening and closing of the polling place." *Id.* § 66.004. The rules that the Secretary *must* adopt necessarily include rules pertaining to voting inside a motor vehicle, outdoor polling places, early voting hours, and poll watchers. The LUPE Plaintiffs allege that these provisions unconstitutionally "restrict[] counties from offering accommodations" and "constrain[] election administrators' ability to ensure peaceful, orderly elections[.]" ECF No. 208¶ 2. Directing the Secretary not to adopt or to modify rules implementing sections 3.04, 3.09, 3.10, 3.12, 3.13, and 4.01—if found unconstitutional—would compel or constrain local officials based on the actions he takes in response to the unconstitutionality of these provisions. In other words, by adopting, implementing, and modifying relevant rules, the Secretary has the authority to compel or constrain local officials, who, in turn, must abide by the Secretary's rules.

The Secretary also has the authority to compel or constrain under sections 4.06, 4.09, 6.04, 6.05, 6.06, and 7.04. Section 4.06 makes it a class A misdemeanor if an election officer refuses, either intentionally or knowingly, to accept a poll watcher for service when acceptance is otherwise required. TEX. ELEC. CODE § 33.051(g). Section 4.09 establishes an offense if a "person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity or procedure the person knows the watcher is entitled to observe[.]" *Id.* § 33.061(a). Sanctionable conduct under section 4.09 includes any action that obstructs a poll watcher's view or distances the poll watcher "from the activity or procedure to be observed in a manner that would make observation not reasonably effective." *Id.*

Further, section 6.04[10] modifies the oath that a person who assists a voter must take. *Id.* §

64.034. Specifically, section 6.04 requires an assistor to take the following oath under penalty of

perjury before assisting a voter:

> I swear (or affirm) under penalty of perjury that the voter I am
> assisting represented to me they are eligible to receive assistance; I
> will not suggest, by word, sign, or gesture, how the voter should
> vote; I will confine my assistance to reading the ballot to the voter,
> directing the voter to read the ballot, marking the voter's ballot, or
> directing the voter to mark the ballot; I will prepare the voter's ballot
> as the voter directs; I did not pressure or coerce the voter into
> choosing me to provide assistance; I am not the voter's employer,
> an agent of the voter's employer, or an officer or agent of a labor
> union to which the voter belongs; I will not communicate
> information about how the voter has voted to another person; and I
> understand that if assistance is provided to a voter who is not eligible
> for assistance, the voter's ballot may not be counted.

---

[10] In 2018, a district court initially enjoined Texas and the Secretary from enforcing sections 61.033 and 64.0321 of the Election Code. *See OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *1 (W.D. Tex. June 6, 2022). On June 6, 2022, the district court, upon request, modified its injunction to prohibit Texas and its Secretary from enforcing a portion of the oath as modified under section 6.04:

> As to the first ground, OCA notes that a portion of the amended oath now reads
> exactly as did the enjoined language in Section 64.0321. A portion of the oath
> now requires the assistor to attest to confining their assistance to "reading the
> ballot to the voter, directing the voter to read the ballot, marking the voter's ballot,
> or directing the voter to mark the ballot." Tex. Elec. Code § 64.034. The enjoined
> language permits assistance in "(1) reading the ballot to the voter; (2) directing
> the voter to read the ballot; (3) marking the voter's ballot; or (4) directing the voter
> to mark the ballot." Tex. Elec. Code § 64.0321. Aside from changes in
> punctuation, the language is indistinguishable. Thus, the Court's reasoning in
> enjoining Section 64.0321 applies to the amended oath language just as it applied
> in the 2018 Injunction. . . . By requiring assistors to attest to following enjoined
> restrictions, the amended provision essentially re-ratifies the same restrictions that
> the Court enjoined. In doing so, the oath limits assistance-eligible voting to an
> impermissibly narrow set of activities. Therefore, as with the previous iteration of
> this language, the Court will enjoin enforcement of the portion of [section 6.04 of
> S.B. 1] inserting the previously enjoined language from Section 64.0321.

*Id.* at *4.

On June 14, 2022, OCA-Greater Houston filed a notice in this consolidated action, advising the Court of the district court's modified injunction. ECF No. 438. OCA-Greater Houston submits that "the United States and Private Plaintiffs' challenges to the same portions in this case may ultimately be rendered moot." *Id.* at 5. The United States and remaining private plaintiffs also filed a notice, advising that they agree with OCA-Greater Houston's position on the potential impact of the modified injunction on their claims challenging the same portions of section 6.04. ECF No. 440. Texas and its Secretary did not appeal the district court's modified injunction. Thus, all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are moot.

*Id.* Section 6.05 provides that a person commits a state jail felony if they knowingly fail to either sign the modified oath that is part of the certificate on a voter's mail ballot carrier envelope or include on the voter's mail ballot carrier envelope their signature, name, and address; their relationship to the voter; and whether they received or accepted any form of compensation in exchange for their assistance. *Id.* §§ 86.010(e)–(g). Section 6.06 makes it a state jail felony for a person to compensate or offer to compensate another person—or to solicit, receive, or accept compensation—for assisting voters. *Id.* §§ 86.0105(a), (c).

Section 7.04 codifies several new offenses under sections 276.015 and 276.018 of the Election Code.[11] *Id.* § 276.015. Specifically, section 276.015 defines three general public activities as third-degree felonies:

> (b) A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

> (c) A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.

> (d) A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

*Id.* §§ 276.015(b)–(d), (f). A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1).

---

[11] Section 7.04 also codifies new offenses under sections 276.016, 276.017, and 276.019 of the Election Code. TEX. ELEC. CODE §§ 276.016–.017, .019. The LUPE Plaintiffs' allegations, however, do not appear to challenge these sections. *See* ECF No. 208 ¶¶ 2, 138–41, 108–16, 153–55, 161, 222, 291–92, 294–95, 297. The Court, therefore, construes the LUPE Plaintiffs' claims challenging section 7.04 as claims that challenge the validity of sections 276.015 and 276.018 only. To the extent that the LUPE Plaintiffs intended to assert claims challenging sections 276.016, 276.017, or 276.019, those claims are dismissed on failure to state a claim grounds.

"Vote harvesting services" means any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.* § 276.015(a)(2). Section 276.015 makes it clear that, "[i]f conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both." *Id.* § 276.015(g). Under section 276.018, it is a state jail felony if a person, "with the intent to deceive, . . . knowingly or intentionally makes a false statement or swears to the truth of a false statement: (1) on a voter registration application; or (2) previously made while making an oath, declaration, or affidavit described by this code." *Id.* § 276.018(a).

The Election Code now authorizes the Secretary to "refer a reported violation of law for appropriate action to the attorney general . . . or to a prosecuting attorney having jurisdiction." *Id.* § 34.005(a). It also *requires* the Secretary to report suspected election law offenses to the Attorney General. *Id.* § 31.006(a). The Secretary certainly has the authority to compel or constrain others when he not only has the authority to refer, but also the obligation to report election law offenses under sections 4.06, 4.09, 6.04, 6.05, 6.06, and 7.04. *Cf. City of Austin*, 943 F.3d at 1001. Indeed, the LUPE Plaintiffs allege that, according to the Secretary's website, the Secretary's office "refers any instances of possible illegal voting to the Office of the Texas Attorney General for investigation." ECF No. 208 ¶ 95. They further allege that sections 4.06, 4.09, 6.04, 6.05, 6.06, and 7.04 unlawfully deter election administrators from ensuring orderly elections under penalty of criminal prosecution; unlawfully hinder assistors from providing necessary assistance to voters by subjecting them to criminal prosecution; and proscribe constitutionally-protected political speech. *Id.* ¶ 2. An injunction prohibiting the Secretary from referring or reporting offenses under these provisions would certainly help alleviate the harm that the LUPE Plaintiffs plausibly allege.

Further, under section 8.01, an election official is now civilly liable if they violate an Election Code provision. TEX. ELEC. CODE § 31.129(b). Civil penalties may include termination and loss of employment benefits. *Id.* § 31.129(c). In light of his duty to report violations, the Secretary now has a specific role in ensuring that election officials comply with the Election Code. The Secretary's authority to report violations of the Election Code to the Attorney General also empowers him with the authority to compel or constrain election officials who, in turn, may credibly fear civil prosecution by way of the Secretary's referral to the Attorney General.

Thus, the Secretary also has the authority to compel or constrain under section 2.04. The provision states that a voter registrar must, within seventy-hours of determining "that a person who is not eligible to vote registered to vote or voted in an election . . . execute and deliver to . . . the secretary of state . . . an affidavit stating the relevant facts" *Id.* § 15.028. If the voter registrar fails to timely comply with their statutory duty, then the Secretary could report their conduct to the Attorney General. The voter registrar would then be subject to civil prosecution.[12] This credible threat of prosecution is, again, a consequence of the Secretary's authority to compel or constrain.

The LUPE Plaintiffs allege that section 2.04 is unconstitutional because it "[f]ascilitates the investigation and prosecution of perfectly legal activity by voters, such as being excused from jury service or having the same name as a non-U.S. citizen or non-resident in the county[.]" ECF No. 208 ¶ 2. If the Court enjoins enforcement of section 2.04, then the Secretary could no longer refer a voter registrar who does not comply with the provision to the Attorney General for civil prosecution. The Secretary's authority to enforce that specific provision, after all, would not exist.

---

[12] The Election Code provides that an elections administrator or county clerk may be designated as a voter registrar. TEX. ELEC. CODE §§ 12.001, 12.031. Section 8.01 states that "'election official' has the meaning assigned by Section 31.128." *Id.* § 31.129(a). Section 31.128, however, merely states that "'election official' does not include a chair of a county political party holding a primary election or a runoff primary election." *Id.* § 31.128. Thus, the Court refers to the Election Code's "Definitions" section to further clarify who is an "election official" under section 8.01. The "Definitions" section confirms that an elections administrator or county clerk is an election official, *see id.* § 1.005(4-a), and is therefore subject to civil prosecution under section 8.01.

Seemingly conceding that the Secretary *does* have the authority to compel or constrain, the State Defendants cite *Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020), and argue that the LUPE Plaintiffs have failed "to sufficiently allege how enjoining the Secretary will prevent the alleged harm from the challenged SB1 provisions." ECF No. 255 at 13. In *Mi Familia Vota*, the Fifth Circuit considered whether the Secretary had a sufficient enforcement connection to section 43.007 of the Election Code requiring "counties to use electronic voting devices rather than paper ballots in order to be eligible to participate in Texas's Countywide Polling Place Program." 977 F.3d at 468. The panel observed that section 31.014 of the Election Code requires the Secretary "to provide standards for certifying electronic devices[.]" *Id.* However, because "the Plaintiffs' claims regarding section 43.007 [was] based on its prohibition of the use of paper ballots for those counties participating in the Countywide Polling Place Program[,]" the Fifth Circuit found it significant that local officials, not the Secretary, were responsible for printing and distributing ballots. *Id.* The panel accordingly noted that "[d]irecting the Secretary not to enforce the electronic-voting-devices-only provision in section 43.007 would not afford the Plaintiffs the relief that they seek, and therefore, the Secretary of State 'is not a proper defendant.'" *Id.* (quoting *In re Abbott*, 956 F.3d at 709). Immediately thereafter, the Fifth Circuit stated, "Although a court can enjoin state officials from enforcing statutes, such an injunction must be directed to those who have the authority to enforce those statutes." *Id.*

In other words, *Mi Familia Vota* merely reiterates the well-established rule in the Fifth Circuit that a state official must be statutorily tasked with enforcing the challenged provision. It does not, as the State Defendants appear to suggest, hold that the LUPE Plaintiffs must also now show at the pleading stage how the Secretary's duties will harm them in order to invoke the *Ex parte Young* exception to state sovereign immunity. In any event, the LUPE Plaintiffs *do* explain

how the Secretary's duties will harm them. They submit that the challenged provisions add unnecessary requirements that hinder the provision of assistance at the polling place, curbside, or voting by mail; give poll watchers wide discretion to intimidate and harass voters and poll workers; infringe upon political speech and legitimate voter outreach activities; restrict counties from offering reasonable modifications; require local officials to reject vote-by-mail applications and mail-in ballots based on immaterial errors or omissions; facilitate the investigation and prosecution of legal activity; and force election officials to shift resources to comply with unlawful requirements pertaining to voter rolls—all in violation of the United States Constitution. ECF No. 208 ¶ 2. But for the Secretary's duties in relation to each of the challenged provisions, the LUPE Plaintiffs and their members would not be harmed by the Secretary. *See id.* ¶¶ 149–217.

Finally, the State Defendants contend that "the LUPE Plaintiffs improperly seek to rely on general statutes concerning the Secretary's authority." ECF No. 255 at 13. In *Texas Alliance for Retired Americans*, *Lewis*, and *Richardson*, the Fifth Circuit recently signaled that reliance on the Secretary's "general duties" under the Election Code alone is generally insufficient to establish that the Secretary is statutorily tasked with enforcing a specific Election Code provision. *See Richardson*, 28 F.4th at 654 ("Since then, however, our precedent has clarified that the Secretary's general duties under the [Texas Election] Code fail to make the Secretary the enforcer of specific election code provisions.") (alterations in original) (quotation marks and citation omitted). Even assuming that these three cases specifically hold that reliance on the Secretary's "general duties" can *never* establish that the Secretary has a duty to enforce a specific Election Code provision, the LUPE Plaintiffs, as discussed *supra*, rely on far more than simply the Secretary's "general duties."[13] The State Defendants' argument, therefore, is unavailing.

---

[13] The Court recently heard oral argument in *Johnson v. Callanen*, No. 5:22-CV-409-XR (W.D. Tex. 2021). In that case, three visually impaired individuals and two non-profit organizations comprising visually impaired and

However, the Court cannot conclude that the Secretary compels or constrains under section 2.11. The provision, which amends the Texas Government Code, requires the clerk of the court to "send a copy of the list of persons excused or disqualified in the previous month because the persons do not reside in the county" to the Secretary. TEX. GOVT. CODE § 62.114(b). Section 2.11 does not expressly charge the Secretary with enforcement. The surrounding provisions only affirm that it is the clerk of the court who must maintain the list. *Id.* § 62.114(a). In addition, the clerk of the court does not appear to be an election official who is subject to civil prosecution under section 8.01. It is therefore not apparent how the Secretary may compel or constrain the clerk of the court or anyone else. The LUPE Plaintiffs offer no explanation in their complaint or briefing. Absent an explanation to the contrary, the Court must dismiss the LUPE Plaintiffs' claims challenging section 2.11 under the Fifteenth Amendment against the Secretary.

For the foregoing reasons, the Court concludes that the LUPE Plaintiffs have plausibly established that the Secretary is statutorily tasked with enforcing and can enforce all but one of the S.B. 1 provisions (section 2.11) that they challenge on constitutional grounds.

---

otherwise disabled Texans filed suit against Ms. Callanen, in her official capacity as the Bexar County Elections Administrator, for violations of Title II of the ADA and § 504 of the Rehabilitation Act. The plaintiffs sought a reasonable modification to vote by mail in secret and free from intimidation in upcoming elections. Though it was clear that Ms. Callanen, who is also a defendant in this consolidated action, did not oppose the plaintiffs' request for a reasonable modification, she nonetheless responded to the plaintiffs' complaint with a motion to dismiss and opposed the plaintiffs' motion for a preliminary injunction. At the hearing, Ms. Callanen's counsel candidly stated that the basis for Ms. Callanen's opposition was her concern that, if she granted the requested modification, then the Secretary—pursuant to his "general duties" of ensuring that elections are conducted uniformly—would refer her conduct to the Attorney General, who, in turn, could impose civil penalties upon her, including revocation of her retirement. *See* TEX. ELEC. CODE §§ 31.129(c), 34.005. Indeed, Ms. Callanen's counsel referred to the deposition testimony in a prior case, where the Secretary testified under oath that referral to the Attorney General would be imminent if Ms. Callanen granted the requested modification. It is difficult to conceive of a clearer example of how the Secretary's statutory duties to obtain and maintain uniformity in the application, operation, and interpretation of the Election Code—however "general" they may be—compel or constrain local officials—like Ms. Callanen—by subjecting them to credible, perilous consequences.

27

ii. **The LUPE Plaintiffs have plausibly established that the Secretary will enforce all but one of the S.B. 1 provisions that they challenge on constitutional grounds.**

To establish that the Secretary will enforce the S.B. 1 provisions that they challenge on constitutional grounds, the LUPE Plaintiffs need only show that the Secretary has a "demonstrated willingness" to exercise his duty to enforce those provisions. *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *Morris*, 739 F.3d at 746).

The LUPE Plaintiffs allege that the "Secretary is the chief election officer of the state, and the Texas Election Code reflect[s] the Legislature's intent that election laws operate . . . under the direction and guidance of the Secretary[.]" ECF No. 208 ¶ 22 (alterations and ellipsis in original) (quotation marks and citations omitted). They submit that the Secretary "is a licensed attorney who previously served as lead attorney" and was involved in litigation against the Pennsylvania Secretary of State and county boards of elections, "seeking [a]n order, declaration, and/or injunction that prohibits the [county boards of elections and Pennsylvania's Secretary of State] from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis." *Id.* ¶ 23 (alterations in original) (quotation marks and citation omitted). Additionally, they allege that "Governor Abbot approved transferring $4 million in funding from Texas's state budget to the Secretary's office to establish an entirely new Election Audit Division tasked with conducting comprehensive forensic audits in the State of Texas." *Id.* ¶ 97 (quotation marks and citation omitted). The LUPE Plaintiffs also cite several Election Code provisions that, as discussed *supra*, undoubtedly require the Secretary to take affirmative steps with respect to each of the S.B. 1 provisions that they challenge. *Id.* ¶¶ 24–35. These allegations, combined with the Secretary's mandatory duties discussed *supra*, sufficiently show at this stage of the proceedings that the Secretary will enforce the S.B. 1 provisions challenged on constitutional grounds.

Thus, the Court finds that the LUPE Plaintiffs have alleged a plausible set of facts establishing that the Secretary has a sufficient enforcement connection to all but one of the S.B. 1 provisions (section 2.11) that they challenge on constitutional grounds. Their claims challenging these provisions under the First, Fourteenth, and Fifteenth Amendments may proceed against the Secretary pursuant to the *Ex parte Young* exception to state sovereign immunity.

> **b.  The LUPE Plaintiffs have shown that the Attorney General has a sufficient enforcement connection to all but two of the S.B. 1 provisions that they challenge on constitutional grounds.**

As with their claims under the First, Fourteenth, and Fifteenth Amendments against the Secretary, the relevant question before the Court at this stage of the proceedings is whether the LUPE Plaintiffs have alleged a plausible set of facts establishing that the Attorney General has a sufficient enforcement connection to the same S.B. 1 provisions that they challenge under the First, Fourteenth, and Fifteenth Amendments—that is, whether the LUPE Plaintiffs have plausibly established that the Attorney General can and will enforce the same S.B. 1 provisions that they challenge under the First, Fourteenth, and Fifteenth Amendments.

> **i.  The LUPE Plaintiffs have plausibly established that the Attorney General can enforce all but two of the S.B. 1 provisions that they challenge on constitutional grounds.**

The LUPE Plaintiffs name the Attorney General as a defendant for their claims under the First, Fourteenth, and Fifteenth Amendments, challenging the same S.B. 1 provisions discussed *supra*. ECF No. 208 ¶¶ 219, 231, 243, 287, 302, 311.

As the LUPE Plaintiffs allege, the Attorney General is statutorily tasked with prosecuting criminal offenses prescribed by the Election Code. TEX. ELEC. CODE § 273.021; s*ee also* ECF No. 208 ¶ 38. He "is Texas' chief law enforcement officer, with a freestanding sovereign interest in enforcing Texas law." ECF No. 208 ¶ 37 (quotation marks and citation omitted). The Attorney

General's "role in enforcing the election laws includes statewide investigation authority and concurrent prosecution authority with local elected prosecutors over the election laws of the State[.]" *Id.* ¶ 38 (quotation marks and citation omitted). The Attorney General, therefore, has the authority to compel or constrain under sections 4.06, 4.09, 6.04, 6.05, 6.06, and 7.04—all of which establish one or more election law offenses.

Further, the Secretary must report suspected election law offenses to the Attorney General. TEX. ELEC. CODE § 31.006(a). To be eligible to vote in Texas, a voter must "be a resident of the territory covered by the election for the office or measure on which the person desires to vote[.]" *Id.* § 11.001(a)(2). Section 2.07, by extension, requires the Secretary to determine whether a voter on the statewide computerized voter registration list is not a resident of the county in which the voter is registered to vote. *Id.* § 18.068(a). If the Secretary determines that a voter is not a resident of the county in which the voter is registered to vote, then it appears that he must report the voter to the Attorney General on suspicion of unlawful voting pursuant to his statutory duty. The Attorney General, therefore, has the authority to compel or constrain under section 2.07.

Moreover, the Attorney General is expressly tasked with compelling or constraining under section 8.01, the provision that authorizes the Attorney General to collect a civil penalty from an election official who "violates a provision of this code." *Id.* § 31.129(b). The civil penalty "may include termination of the person's employment and loss of the person's employment benefits." *Id.* § 31.129(c). Thus, he also has the authority to compel and constrain any and all election officials who are subject to civil prosecution for violations of sections 2.04, 2.06, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 5.07, 5.13, 6.01, and 6.03—all of which establish requirements for election officials as defined under the Election Code, violations of which may result in civil prosecution.

However, the Court cannot conclude that the Attorney General has the authority to compel or constrain under sections 2.08 and 2.11. Section 2.08 provides that the Secretary must report suspected election law offenses to the Attorney General. *Id.* § 31.006(a). It does not appear that the Attorney General can criminally or civilly prosecute the Secretary for failing to report election law offenses. Similarly, it does not appear that the Attorney General can criminally or civilly prosecute a clerk of the court for failing to comply with section 2.11. The LUPE Plaintiffs do not offer an explanation in their complaint or briefing. Absent an explanation to the contrary, the Court must dismiss the LUPE Plaintiffs' claims challenging sections 2.08 and 2.11 under the Fourteenth and Fifteenth Amendments against the Attorney General.

Therefore, the Court concludes that the LUPE Plaintiffs have plausibly established that the Attorney General is statutorily tasked with enforcing and can enforce all but two of the S.B. 1 provisions (sections 2.08 and 2.11) that they challenge on constitutional grounds.

> **ii.  The LUPE Plaintiffs have plausibly established that the Attorney General will enforce all but two of the S.B. 1 provisions that they challenge on constitutional grounds.**

The LUPE Plaintiffs need only show that the Attorney General has a "demonstrated willingness" to exercise his duty to enforce the S.B. 1 provisions that they challenge on constitutional grounds to establish that the Attorney General will enforce those provisions. *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *Morris*, 739 F.3d at 746).

The LUPE Plaintiffs allege that "the Attorney General has prosecuted alleged violations of Texas's election laws alongside, or instead of, local district attorneys." ECF No. 208 ¶ 38. They submit that the Attorney General has claimed that "his office is currently prosecuting over 500 felony election fraud offenses in Texas courts." *Id.* (quotation marks and citation omitted). The LUPE Plaintiffs further assert that the Attorney General "recently filed suit on behalf of the State

of Texas to enforce provisions of the Texas Election Code and to restrict the actions of local election official[s], including by preventing [them] from mailing out mail ballot applications to many eligible voters unless those voters first submitted a request." *Id.* ¶ 41.

The LUPE Plaintiffs also cite to the Attorney General's social media publications, where he announced "that it was [a]n outstanding decision to demand increased penalties for vote fraudsters . . . I will continue to muster all my resources to defend election integrity!" *Id.* ¶ 100 (alterations in original) (quotation marks and citation omitted). The LUPE Plaintiffs allege that the Attorney General "has stated that prosecution of election-related offenses is one of his priorities." *Id.* ¶ 42. For instance, they submit that the Attorney General "recently announced the formation of his '2021 Texas Election Integrity Unit,' which he describes as a concentrated effort to devote agency lawyers, investigators, support staff, and resources to ensuring this local election season . . . is run transparently and securely." *Id.* (ellipsis in original). They further allege that the Attorney General "refers to himself as a national leader in election integrity, [and] brags about the many elections administrators that have been held accountable for attempts to bend or break the boundaries of lawful practices under his leadership[.]" *Id.* (quotation marks and citation omitted). These allegations, combined with the Attorney General's duties discussed *supra*, are sufficient at this stage of the proceedings to plausibly establish that the Attorney General has demonstrated a willingness to enforce the S.B. 1 provisions challenged on constitutional grounds.

The State Defendants argue that, since the Attorney General may not unilaterally prosecute election law offenses, "[t]hese and other allegations relating to the Attorney General's authority to prosecute violations of Texas's election laws are . . . insufficient to establish the Attorney General as a proper defendant." ECF No. 255 at 15. True, the Election Code originally authorized the Attorney General to unilaterally "prosecute a criminal offense prescribed by the election laws of

this state." TEX. ELEC. CODE § 273.021(a). In *State v. Stephens*, however, the Texas Court of Criminal Appeals held that this delegation of unilateral prosecutorial authority violated the separation-of-powers clause of the Texas Constitution. No. PD-1032-20, 2021 WL 5917198, at *11 (Tex. Crim. App. Dec. 15, 2021) (not released for publication).[14]

But even absent the delegation of authority to independently prosecute election law offenses, the surviving provisions of the Election Code still envision, and likely require, the Attorney General's participation in enforcement activities. For instance, section 273.001 provides:

> (a) If two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations. If the election covers territory in more than one county, the voters may present the affidavits to the attorney general, and the attorney general shall investigate the allegations.
>
> (b) A district or county attorney having jurisdiction or the attorney general may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election.
>
> (c) On receipt of an affidavit [from a registrar], the county or district attorney having jurisdiction and, if applicable, the attorney general shall investigate the matter.
>
> (d) On referral of a complaint from the secretary of state under Section 31.006, the attorney general may investigate the allegations.

TEX. ELEC. CODE § 273.001. Moreover, *Stephens* does not foreclose the Attorney General's authority to prosecute election law offenses, including those prescribed by the S.B. 1 provisions challenged here. Indeed, the Court of Criminal Appeals made clear that "the consent and deputization order of a local prosecutor or the request of a district or county attorney for assistance"

---

[14] The State Defendants submit that "that *Stephens* was wrongly decided." ECF No. 255 at 15 n.2. Texas "has filed a motion asking the Texas Court of Criminal Appeals to reconsider its decision." *Id.*

can provide the Attorney General with the authority to enforce election law offenses. *Stephens*, 2021 WL 5917198, at *10.

The State Defendants also suggest that the LUPE Plaintiffs must show that the Attorney General intends to enforce each of the S.B. 1 provisions that they challenge on constitutional grounds. ECF No. 255 at 16. Setting aside the fact that the LUPE Plaintiffs need only allege a plausible set of facts establishing the Court's jurisdiction, the State Defendants' argument strains credulity and defies logic. S.B. 1 is an omnibus election law that establishes several election law offenses and imposes sweeping civil liability on election officials for a variety of Election Code violations. It cannot be that the Attorney General must recite extensive portions of the Election Code so that the LUPE Plaintiffs can challenge on constitutional grounds the many S.B. 1 provisions that clearly implicate the Attorney General's civil and criminal enforcement power. As the Supreme Court first put it:

> It would seem to be clear that the attorney general, under his power existing at common law, and by virtue of these various statutes, had a general duty imposed upon him, which includes the right and the power to enforce the statutes of the state, including, of course, the act in question, if it were constitutional. His power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before the . . . court.

*Young*, 209 U.S. at 161.

The State Defendants' reliance on *City of Austin* is also unpersuasive. ECF No. 255 at 16. In *City of Austin*, the Fifth Circuit considered whether the *Ex parte Young* exception to state sovereign immunity applied to the Attorney General. 943 F.3d at 998. The City had passed a municipal ordinance prohibiting landlords from discriminating against tenants who paid their rent with federal housing vouchers. *Id.* at 996. Texas subsequently passed a state law barring municipalities or counties from adopting such ordinances. *Id.* The state statute empowered the

Attorney General to enforce the law by intervening in any enforcement suit that the City might bring against a landlord for violating the municipal ordinance. *Id.* at 1000 n.1.

In response, the City sued the Attorney General, alleging that federal housing law preempted the state legislation. *Id.* at 997. The City argued that the *Ex parte Young* exception to state sovereign immunity applied because the Attorney General possessed the authority to enforce the state law and had a "habit" of intervening in lawsuits involving municipal ordinances to "enforce the supremacy of state law." *Id.* at 1001. The Fifth Circuit, however, held that this was not sufficient to demonstrate "some scintilla of 'enforcement,'" as the Attorney General's authority to enforce the statute alone did not constrain the City's ability to enforce its ordinance. *Id.* at 1001–02. According to the Fifth Circuit, simply because the Attorney General had "chosen to intervene to defend *different* statutes under *different* circumstances does not show that he is likely to do the same here." *Id.* at 1002 (emphasis in original). The Fifth Circuit also noted that "the City face[d] no consequences" if it enforced its ordinance. *Id.*

This case differs from *City of Austin* in many respects. Importantly, sections 4.06, 4.09, 6.04, 6.05, 6.06, and 7.04 each establish one or more election law offenses. In addition, under section 31.129 of the Election Code, election officials would face significant consequences if the Attorney General were to civilly prosecute them: They would risk losing their employment and employment benefits if they violate sections 2.04, 2.06, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.07, 5.07, 5.13, 6.01, or 6.03.

Furthermore, under S.B. 1, the Attorney General has broad investigatory powers, and though S.B. 1 does not specify whether the Attorney General may enforce section 31.129, he has undoubtedly filed civil lawsuits against election officials, invoking the State's "intrinsic right to enact, interpret, and enforce its own laws." Appellant's Emergency Mot. for Relief Under Rule

29.3, *State v. Hollins*, 607 S.W.3d 923 (Tex. App.—Houston [14th Dist.] 2020, pet. granted) (No. 14-20-00627-CV), 2020 WL 5509152, at *9 (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)).

Moreover, and as already discussed at length, the Attorney General touts his office's eagerness to prosecute entities and individuals, like the LUPE Plaintiffs and their members, for criminal offenses under the Election Code. Far from different statutes under different circumstances, the Attorney General has demonstrated a willingness to enforce civil and criminal provisions of the Election Code regulating some of the same elections procedures that the LUPE Plaintiffs challenge as unconstitutional in this case. This is sufficient to establish that "formal enforcement [is] on the horizon." *Tex. Democratic Party II*, 978 F.3d at 181 (quoting *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015)).

The State Defendants further contend that "[s]peculation that the Attorney General might be asked by a local prosecutor to 'assist' in enforcing SB 1 is inadequate to support an *Ex parte Young* action against the Attorney General." ECF No. 255 at 15 (quoting *In re Abbott*, 956 F.3d at 709). *In re Abbott*, however, is inapposite. There, the district court issued a temporary restraining order against the Governor and the Attorney General, exempting various categories of abortion from "GA-09, an emergency measure temporarily postponing non-essential medical procedures during the COVID-19 pandemic." *In re Abbott*, 956 F.3d at 703. On appeal, the Fifth Circuit considered whether state sovereign immunity required dismissal of the Attorney General. *Id.* at 708. In particular, the Fifth Circuit considered whether the *Ex parte Young* exception to state sovereign immunity applied. *Id.* at 709. The panel observed that the district court had reasoned that the Attorney General "ha[d] 'authority' to prosecute violations of GA-09 'at the request of local prosecutors,' and that he ha[d] also 'publicly threatened enforcement' against abortion

providers." *Id.* But in the Fifth Circuit's view, "[n]either rationale establish[d] the Attorney General's 'connection' to enforcing GA-09 for *Ex parte Young* purposes." *Id.* "Speculation that he might be asked by a local prosecutor to 'assist' in enforcing GA-09," the Fifth Circuit determined, "is inadequate to support an *Ex parte Young* action against the Attorney General." *Id.* The Fifth Circuit also found it significant that "[t]he Attorney General threatened that GA-09 *would be enforced*, not that *he* would enforce it." *Id.* (emphasis in original).

In this case, by contrast, the LUPE Plaintiffs challenge S.B. 1 provisions that establish criminal and civil offenses under the Election Code. There is nothing temporary about the credible threat of criminal and civil prosecution by the Attorney General. Indeed, the Secretary is statutorily required to refer his suspicions of criminal offenses prescribed by the Election Code to the Attorney General, and the Secretary is also authorized to report any violations of the Election Code. Further, the LUPE Plaintiffs allege that the Attorney General has made it abundantly clear that he will enforce the Election Code. In other words, the Attorney General has not said that the challenged provisions *would be enforced*, but that *he* would enforce them.

Put differently, the Attorney General's credible threat of enforcing the challenged S.B. 1 provisions is not mere speculation. The Attorney General publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud.[15] He has also publicly stated that 510 election offenses against 43 defendants remain pending and that 386 active election fraud investigations currently exist.[16] In light of *Stephens*, it must necessarily be the case that the Attorney General is prosecuting these election law offenses and pursuing these election fraud

---

[15] *See* Attorney General of Tex., *Election Integrity | Office of the Attorney General*, https://www.texas attorneygeneral.gov/initiatives/election-integrity (last visited July 28, 2022). The Court may take judicial notice of governmental websites, *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam), and may consider matters of which it takes judicial notice on a motion to dismiss, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[16] *See* Attorney General of Tex., *supra* note 15.

investigations along with local district attorneys. Indeed, the local district attorneys sued in this consolidated action have not expressly and affirmatively represented that they *never* intend to prosecute criminal offenses prescribed by the Election Code, and there are certainly many more local district attorneys throughout Texas who have not disavowed their intention to enlist the Attorney General's assistance to prosecute election law offenses. Consequently, the State Defendants' reliance on *In re Abbot* is unavailing. The LUPE Plaintiffs' allegations, combined with the Attorney General's duties discussed *supra*, sufficiently show at this stage of the proceedings that the Attorney General will enforce the challenged provisions.

Thus, the Court finds that the LUPE Plaintiffs have alleged a plausible set of facts establishing that the Attorney General has a sufficient enforcement connection to all but two of the S.B. 1 provisions (sections 2.08 and 2.11) that they challenge on constitutional grounds. Their claims challenging these provisions under the First, Fourteenth, and Fifteenth Amendments may proceed against the Attorney General pursuant to the *Ex parte Young* exception to state sovereign immunity.

### 2. Congress validly abrogated state sovereign immunity for the LUPE Plaintiffs' claim under Title II of the ADA against the Secretary and for their claims under §§ 2 and 208 of the VRA against Texas, the Secretary, and the Attorney General.

*Ex parte Young* is not the only vehicle for obtaining relief against a state. Congress may also abrogate a state's sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). To abrogate a state's sovereign immunity, it must be shown that Congress "both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (alterations in original) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000)).

### a.  The LUPE Plaintiffs' claim under Title II of the ADA.

"In enacting the ADA, Congress 'invoke[d] the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment[.]" *United States v. Georgia*, 546 U.S. 151, 154 (2006) (alterations in original) (quoting 42 U.S.C. § 12101(b)(4)). Indeed, the ADA specifically provides that a "State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. The Supreme Court has accordingly accepted this provision of the ADA "as an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *Georgia*, 546 U.S. at 154 (citing *Garrett*, 531 U.S. at 363–64).

As to whether Congress has acted pursuant to a valid grant of constitutional authority, the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Put differently, "Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power." *Garrett*, 531 U.S. at 364. Thus, "the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation." *Id.*

Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees found in § 1 of the Fourteenth Amendment by enacting "appropriate legislation." U.S. CONST. amend. XIV, § 5. Section 1 of the Fourteenth Amendment provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. Thus, to determine whether Congress has acted pursuant to a valid grant of constitutional authority in enacting Title II, a court assesses, on a claim-by-claim basis:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 617 (5th Cir. 2020) (quoting *Georgia*, 546 U.S. at 159). The first step, according to the Fifth Circuit, is to determine whether the plaintiffs have stated a claim upon which relief may be granted under Title II of the ADA. *Id.* at 617–18.

### i.   The LUPE Plaintiffs have stated a valid claim under Title II.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities[,]" *id.* § 12102(1)(A), and Title II "defines 'public entities' to include local governments[,]" *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020) (citing 42 U.S.C. § 12131(1)(A)).

Here, the LUPE Plaintiffs allege that their members "include individuals with disabilities within the meaning of the ADA and are entitled to the protections of the ADA." ECF No. 208 ¶ 279. They submit that "[t]hese individuals have a qualifying 'disability' because they have a physical or mental impairment that substantially limits one or more major life activities, including, but not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* (quotation marks and citations omitted). For instance, "LUPE's

members include voters who are disabled and require and use assistors of their choice, but who are not blind and can see and read the ballot." *Id.* ¶ 150. LUPE's members also "include voters who require accommodations that SB 1 limits or curtails with the imposition of new requirements for casting a ballot." *Id.* ¶ 151.

Further, the LUPE Plaintiffs have filed suit against the Secretary and the Attorney General, in their official capacities. *Id.* ¶¶ 22, 36. They allege that the Secretary and the Attorney General are public officials who are subject to Title II. *Id.* ¶ 278.

Together, these allegations establish that the LUPE Plaintiffs have properly invoked Title II of the ADA against public entities.

The Court now considers whether the LUPE Plaintiffs have alleged sufficient facts to state a *prima facie* case of discrimination under Title II. To do so, they must allege sufficient facts showing:

> (1) that [they, their members, or their constituents are] a qualified individual within the meaning of the ADA; (2) that [they, their members, or their constituents are] being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or [are] otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of [their or their members' or constituents'] disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997)).

As to the first element, a qualified individual within the meaning of Title II is a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

41

The LUPE Plaintiffs allege that their members "are qualified for the programs, services, and activities being challenged herein in that they are registered voters or otherwise eligible to request and cast a ballot, in Texas elections, and are qualified to participate in Defendants' programs and activities related to voting." ECF No. 208 ¶ 279. Thus, the LUPE Plaintiffs have sufficiently shown that their members are qualified individuals within the meaning of Title II.

With respect to the second and third elements, federal regulations provide that public entities may not, on the basis of disability, "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[.]" 28 C.F.R. § 35.130(b)(1)(ii). They also prohibit public entities from providing, by reason of disability, "a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]" *Id.* § 35.130(b)(1)(iii). In addition, public entities may not "utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii). Federal regulations also make clear that public entities generally "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity[.]" *Id.* § 35.130(b)(8). Finally, the ADA itself provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by" the statute. 42 U.S.C. § 12203(b).

Here, the LUPE Plaintiffs allege that sections 6.01, 6.03, 6.04, 6.05, 6.06, and 7.04 violate Title II. ECF No. 208 ¶ 273. As discussed *supra*, these provisions generally implement new procedures and requirements that assistors must follow and complete before assisting a voter. The LUPE Plaintiffs claim the provisions burden "voters with disabilities in making it harder for them to get necessary assistance[.]"*Id.* ¶ 280. For instance, they allege that section 6.01 "will deter individuals from giving . . . rides, further reducing access to voting for voters who need assistance[.]" *Id.* ¶ 115. They contend that sections 6.03, 6.04, and 6.05 "will slow in-person voting and burden the right to vote of those seeking assistance[.]" *Id.* ¶ 113. In addition, they submit that section 6.06 "prohibits assistors who work for non-profit civic engagement organizations and who conduct voter outreach from assisting mail voters who require . . . assistance to vote." *Id.* ¶ 114. They similarly allege that section 7.04 "will reduce voter participation by Texans who rely on assistance to cast their mail ballots" and "will impose the greatest burdens on . . . voters with disabilities." *Id.* ¶ 143. The LUPE Plaintiffs therefore submit that their disabled voting members will be unable to obtain "equal access to the franchise" and will be prevented "from exercising their fundamental right to vote." *Id.* ¶ 280. These allegations clearly establish the second and third elements for a *prima facie* case of discrimination under Title II.

The State Defendants counter that the LUPE Plaintiffs have failed to state a claim under Title II. ECF No. 255 at 29–35. They first contend that the LUPE Plaintiffs cannot assert a Title II claim because the organizations themselves do not have a disability. *Id.* at 30–31. However, it is well settled that an organization may sue as the representative of its members. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Moreover, many courts have allowed organizations that serve disabled individuals to sue public entities under Title II. *See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362–64 (4th Cir. 2008); *MX*

*Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–36 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir. 1997). They did so after observing that "Title II's enforcement provision extends to relief to '*any person* alleging discrimination on the basis of disability.'" *Innovative Health Sys., Inc.*, 117 F.3d at 47 (emphasis in original) (quoting 42 U.S.C. § 12133). "[T]he use of such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action under [Title II] as broadly as is permitted by Article III of the Constitution." *Id.* (quotation marks and citation omitted); *see also Steward v. Abbott*, 189 F. Supp. 3d 620, 630–32 (W.D. Tex. 2016) (finding that organizations have associational standing in Title II case); *Fla. State Conf. of NAACP v. Lee*, --- F. Supp. 3d ----, No. 4:21cv187-MW/MAF, 2021 WL 6072197, at *9 (N.D. Fla. 2021) (stating that plaintiffs must show "that they—*or their constituents*—are qualified individuals with a disability") (emphasis added). The Court sees no reason to carve out an exception in this case.

The State Defendants further argue that the LUPE Plaintiffs have failed to state a Title II claim because neither the Secretary nor the Attorney General administer elections. ECF No. 255 at 31–33. On this point, the Court agrees with the State Defendants, to an extent. A *prima facie* case for discrimination under Title II requires a showing that the defendant public entity in some way provides the service or benefit at issue. *Ivy v. Williams*, 781 F.3d 250, 258 (5th Cir. 2015), *vacated and remanded as moot sub nom. Ivy v. Morath*, 137 S. Ct. 414 (2016). Although the Attorney General has authority to enforce criminal and civil offenses under the Election Code as discussed *supra*, it is unclear whether and how he provides the service or benefit at issue in this case, namely voting and voting by mail. The LUPE Plaintiffs do not offer a compelling explanation in their complaint or briefing. Thus, the Court concludes that, in this case, the Attorney General

does not provide the service or benefit at issue and will therefore dismiss the Attorney General as a defendant to the LUPE Plaintiffs' Title II claim only.

The Secretary, however, certainly provides the service or benefit of voting and voting by mail. The Secretary "is the chief election officer of the state." TEX. ELEC. CODE § 31.001(a). As chief election officer, the Secretary must "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.003. "In performing this duty," the Election Code explains, "the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code." *Id.* The Election Code also charges the Secretary with "distribut[ing] these materials to the appropriate state and local authorities having duties in the administration of these laws." *Id.* The Election Code further provides that the Secretary must "assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code." *Id.* § 31.004(a). The Secretary shall also "maintain an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b).

The Election Code also requires the Secretary to "adopt standards of training in election law and procedure for presiding or alternate election judges[.]" *Id.* § 32.111(a)(1). Specifically, the Secretary must "develop materials for a standardized curriculum for that training; and distribute the materials as necessary to the governing bodies of political subdivisions that hold elections and to each county executive committee of a political party that holds a primary election." *Id.* §§ 32.111(a)(2)–(3). In addition, the Election Code states that a county clerk must "provide one or more sessions of training" to election judges and clerks. *Id.* § 32.114(a). The trainings that election judges and clerks must complete are premised upon "the standardized training program and

materials developed and provided by the secretary of state[.]" *Id.* The Secretary must "schedule and provide assistance for the training of election judges and clerks" upon request by a county executive committee or a county clerk. *Id.* § 32.115. Moreover, the Election Code tasks the Secretary with taking "appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes." *Id.* § 31.005(a). The Election Code empowers the Secretary as follows:

> (b) The secretary of state may order a person performing official functions in the administration of any part of the electoral processes to correct offending conduct if the secretary determines that the person is exercising the powers vested in that person in a manner that:
>
> > (1) impedes the free exercise of a citizen's voting rights; or
> >
> > (2) unless acting under an order of a court of competent jurisdiction, delays or cancels an election that the person does not have specific authority to delay or cancel.
>
> (c) If a person described by Subsection (b) fails to comply with an order from the secretary of state under this section, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general.

*Id.* §§ 31.005(b)–(c).

Based on these statutory duties, it is clear that the Secretary is responsible for providing the service or benefit of voting and voting by mail. Indeed, the Election Code lists him first under chapter 31, which is titled "Officers to Administer Elections." Thus, his statutory duties permit him to "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service" at issue in this case. 28 C.F.R. § 35.130(b)(1)(ii). In implementing and enforcing the Election Code provisions to obtain and maintain the uniformity of all election laws, the Secretary must not "[a]id or perpetuate discrimination against a qualified individual with

a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program[.]" *Id.* § 35.130(b)(1)(v). This includes, as the Election Code expressly requires, his provision of assistance to counties and local officials. Moreover, the Secretary may not "utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" when issuing directives, distributing election materials, and protecting voting rights. *Id.* § 35.130(b)(3). If he fails to do so, as the LUPE Plaintiffs allege in this case, then he is subject to liability under Title II.

The State Defendants have acknowledged in prior litigation that the "Secretary of State is the chief election officer, specially charged with administering elections." *Veasy v. Perry*, 29 F. Supp. 3d 896, 923 (S.D. Tex. 2014). But they now contend otherwise, arguing that "[i]n general, local election officials administer Texas elections." ECF No. 255 at 32. They cite *Ivy* and *Lightbourn* to support their contention. *Id.* at 31–32. Both of these cases, however, are inapposite. Moreover, neither of these cases forecloses the possibility that the Secretary, in addition to local officials, is responsible for providing a service or benefit under Title II.

In *Ivy*, a class of hearing impaired individuals filed suit against the Texas Education Agency ("TEA") for violations of Title II. 781 F.3d at 251, 254. "In Texas, individuals under the age of 25 cannot obtain driver's licenses unless they submit a driver education certificate to the Department of Public Safety[.]" *Id.* at 252 (citing Tex. Transp. Code § 521.1601). The requisite driver education certificate is "only available from private driver education schools licensed by the TEA." *Id.* The plaintiffs requested injunctive relief requiring the TEA to bring driver education into compliance with Title II. *Id.* at 251. In response, the TEA filed a motion to dismiss for want

of jurisdiction and for failure to state a claim. *Id.* at 253. The district court denied the TEA's motion, but certified its order for immediate appeal. *Id.* at 251.

On appeal, the Fifth Circuit considered whether the plaintiffs had failed to state a Title II claim. *Id.* at 254–58. The panel first observed that Title II prohibits a public entity from excluding a qualified individual with a disability from its services, programs, or activities because of the individual's disability. *Id.* at 254–55 (citing 42 U.S.C. § 12132). It then articulated the relevant legal issue as "whether the named plaintiffs have been 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of [the TEA].'" *Id.* at 255 (alterations in original) (quoting 42 U.S.C. § 12132). "To answer that question," the panel made clear, "we must decide whether driver education is a service, program, or activity of the TEA." *Id.* "Although this [was] a close question[,]" the Fifth Circuit held that driver education was not a service, program, or activity of the TEA. *Id.*

In reaching its holding, the Fifth Circuit considered the plain text of Title II and interpretive guidance from the Department of Justice ("DOJ").[17] *See id.* at 255–57. The Fifth Circuit interpreted the phrase "services, programs, or activities of a public entity" in Title II to mean "what 'services, programs, or activities' are provided by the public entity." *Id.* (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)). The panel found it significant that "the TEA itself does not teach driver education, contract with driver education schools, or issue driver education certificates to individual students." Because the TEA's program "provide[d] the licensure and regulation of driving education schools, not driver education itself[,]" the Fifth Circuit found that the text of Title II "suggests that driver education is not a program, service, or activity of the TEA." *Id.*

---

[17] The Fifth Circuit also considered federal regulations and caselaw construing contractual and agency relationships between private and public entities. *See Ivy*, 781 F.3d at 255–58. Federal regulations, however, did not provide clarity, and contractual and agency relationships are not relevant here.

Interpretive guidance from the DOJ "stated that a public entity is not accountable for discrimination in the employment or other practices of [a company licensed by the public entity], if those practices are not the result of requirements or policies established by the [public entity]." *Id.* at 256 (alterations in original) (quotation marks and citation omitted). The panel observed that the plaintiffs had alleged that it was "the TEA's *failure* to establish requirements or policies [that] allowed private driver education schools to be inaccessible." *Id.* (emphasis in original). The Fifth Circuit therefore determined that "the DOJ's interpretive guidance indicates that the TEA is not accountable for the driver education schools' inaccessibility because the TEA's requirements and policies have not caused it." *Id.*

Here, whether the Secretary provides voting and vote-by-mail services is not a close question. The Election Code makes clear that voting in person and by mail are services or benefits that the Secretary provides. The Secretary has a concrete and specific role in the administration of elections throughout Texas and oversees voting processes and procedures. Indeed, the Election Code, including many of the S.B. 1 provisions that the LUPE Plaintiffs challenge in this case, requires the Secretary to implement the Election Code itself by way of rules and requirements. In other words, the Election Code charges the Secretary with administering elections.

Further, the Secretary's duties under the Election Code constitute far more than the mere licensing that the Fifth Circuit found insufficient in *Ivy*. The Secretary must provide voting and vote-by-mail services and must do so in a specific and particular manner pursuant to the Election Code. Indeed, it is precisely because of the Secretary's statutory obligation to implement and enforce the Election Code that, according to the LUPE Plaintiffs, he is subject to liability under Title II. Whereas the plaintiffs in *Ivy* claimed that the TEA had failed to establish requirements or policies to counteract disability discrimination, the LUPE Plaintiffs in this case allege that the

Secretary violates Title II by administering elections in accordance with the Election Code. They are *not* alleging that the Secretary has failed to establish requirements or policies that allow their disabled members to access voting and vote-by-mail services or benefits. Put differently, the LUPE Plaintiffs contend that the Secretary, in administering elections according to the specific procedures and processes the Election Code contemplates, discriminates against disabled voters.

It is for this reason that the State Defendants' reliance on *Lightbourn* is also misplaced. In that case, five visually impaired individuals, among others, filed a Title II suit for injunctive relief against the Secretary. *Lightbourn*, 118 F.3d at 423. The plaintiffs alleged that the Secretary "discriminated against them by failing to ensure that persons with visual and mobility impairments have access to 'polling sites and voting procedures.'" *Id.* In particular, they argued that Title II required the Secretary to provide them with the opportunity to vote in secret, without the assistance of an election worker or other person. *Id.* at 423–24, 431. The Fifth Circuit was not persuaded. It framed the relevant legal issue as whether the Secretary had "a duty to ensure that local election authorities comply with the ADA." *Id.* at 427. The panel then consulted the Election Code to review the Secretary's duties under certain provisions and determined that "the Secretary ha[d] no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Id.* at 432.

But here, the duty at issue is the Secretary's mandate to administer elections according to the Election Code. The LUPE Plaintiffs are *not* alleging that the Secretary has a duty to take steps to ensure that local officials comply with the ADA. It is therefore not the case that "the LUPE Plaintiffs would impose supervisory liability on the [Secretary]." ECF No. 255 at 32. Rather, the Secretary is personally and potentially liable under Title II because *he* must administer elections in compliance with Election Code provisions that—the LUPE Plaintiffs allege—discriminate

against disabled voters. *Lightbourn*, therefore, does not insulate the Secretary from the LUPE Plaintiffs' Title II claim.

Still, the State Defendants maintain that the LUPE Plaintiffs' Title II claim must be dismissed because they "have not identified any provision of SB1 that discriminates against voters with disabilities." *Id.* at 33. According to the State Defendants, no discrimination exists because "Texans with disabilities have multiple options to vote[.]" *Id.* These alternatives, they submit, include voting in a polling place or at the curbside during early voting, in a polling place or at the curbside on Election Day, and by mail. *Id.* Their arguments miss the mark. The relevant question before the Court at this stage of the proceedings is whether the LUPE Plaintiffs have alleged sufficient facts showing that the challenged S.B. 1 provisions violate Title II. The State Defendants' belief that the status quo already offers disabled voters meaningful access to vote—as Title II requires—is an argument for another day.

What is more, the LUPE Plaintiffs allege that the challenged provisions deny disabled voters not only equal and effective access to vote in person, but also equal and effective access to vote by mail. "Absentee and in-person voting are different benefits, and voters with disabilities are entitled to equal access to both." *Merrill v. People First of Ala.*, 141 S. Ct. 25, 27 (2020) (Sotomayor, J., dissenting); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) ("This case does not turn on whether there is a standalone right to vote privately and independently without assistance. Plaintiffs' argument is that defendants have provided such a benefit to non-disabled voters while

denying that same benefit to plaintiffs on the basis of their disability."). Even assuming that the alternatives that the State Defendants identify constitute reasonable modifications under Title II, they do nothing for eligible disabled voters who are discriminated against when voting by mail. Surely, voting by mail cannot be a reasonable modification when, as the LUPE Plaintiffs plausibly allege, disabled voters who are eligible to vote by mail do not have meaningful access to actually do so because of their disabilities.

For these reasons, the State Defendants' contention that "Texas law provides numerous accommodations for disabled voters" is also misplaced at this stage of litigation. ECF No. 225 at 34. The same goes for the State Defendants' argument that the LUPE Plaintiffs cannot state a valid Title II claim because "state law expressly prohibits election officials from interpreting any provision of the Texas Election Code" in a manner that discriminates against disabled voters. *Id.* at 33. The question before the Court is whether the LUPE Plaintiffs have alleged sufficient facts to state a valid Title II claim, not whether existing law—in the State Defendants' opinion—already provides meaningful access to vote in person and by mail, and precludes discrimination against disabled voters.

The Court, therefore, finds that the LUPE Plaintiffs have stated a claim upon which relief may be granted under Title II of the ADA.

> ii.   **Congress acted pursuant to a valid grant of constitutional authority in enacting Title II of the ADA to prohibit discrimination in voting.**

Having concluded that the LUPE Plaintiffs have stated a valid Title II claim, the Court now considers which aspects of the State Defendants' alleged conduct violate Title II and to what extent such misconduct also violates the Fourteenth Amendment. *Block*, 952 F.3d at 617.

In *Lane*, the Supreme Court held "that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority

to enforce the guarantees of the Fourteenth Amendment." 541 U.S. at 533–34. In reaching its holding, the *Lane* Court considered the "constitutional right or rights that Congress sought to enforce when it enacted Title II." *Id.* at 522. The *Lane* Court observed that the Fourteenth Amendment requires that "all persons similarly situated should be treated alike[.]" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 439 (1985)). It then determined that Title II seeks to enforce this constitutional command by prohibiting discrimination against disabled persons. The *Lane* Court also found that Title II "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id.* at 522–23. "These rights include some, like the right of access to the courts at issue in this case, that are protected by . . . the Fourteenth Amendment." *Id.* at 523. The *Lane* Court accordingly concluded that in enacting Title II, Congress validly abrogated state sovereign immunity as it applies to Title II cases implicating the right of access to the courts. *Id.* at 533–34.

In this case, the LUPE Plaintiffs allege that certain S.B. 1 provisions discriminate against their disabled members by burdening their right to vote. "The Fourteenth Amendment has been interpreted to protect voters generally from laws that excessively burden the right to vote and the conduct of the political process." *Veasy v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (Jones, J., joined by Jolly, Smith, Clement, and Owen, JJ., concurring in part) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008); *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 786–90 (1983)); *see also McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[B]ecause of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause[.]" (quoting

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). Thus, it is clear that the State Defendants' alleged misconduct violates both Title II and the Fourteenth Amendment.

It is of no consequence that the LUPE Plaintiffs challenge S.B. 1 provisions pertaining to the State Defendants' vote-by-mail program. The Fourteenth Amendment, and the Equal Protection Clause in particular, "extend to all action of the State denying equal protection of the laws, whatever the agency of the State taking the action, or whatever the guise in which it is taken." *Cooper v. Aaron*, 358 U.S. 1, 17 (1958) (citations omitted). The Election Code, in turn, provides that an eligible voter who has a physical condition that prevents them from appearing at a polling place on an election day without a likelihood of needing personal assistance or of injuring their health has a right to vote by mail. TEX. ELEC. CODE § 82.002(a)(1). Therefore, voting by mail in Texas is state action subject to the constitutional guarantees found in the Fourteenth Amendment.

Accordingly, the Court finds that Congress acted pursuant to a valid grant of constitutional authority in enacting Title II to prohibit discrimination in voting. Thus, state sovereign immunity presents no obstacle to the LUPE Plaintiffs' Title II claim against the Secretary.

### b.  The LUPE Plaintiffs' claims under §§ 2 and 208 of the VRA.

The Fifth Circuit "has held that the Voting Rights Act, 'which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity.'" *Mi Familia Vota*, 977 F.3d at 469 (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017)). State sovereign immunity, therefore, does not bar the LUPE Plaintiffs' claims under §§ 2 and 208 of the VRA against Texas, the Secretary, and the Attorney General.

In sum, state sovereign immunity does not bar the LUPE Plaintiffs' claims under the First, Fourteenth, and Fifteenth Amendments, Title II of the ADA, and §§ 2 and 208 of the VRA.

However, the Court will dismiss the LUPE Plaintiffs' Title II claim against the Attorney General for failure to state a claim.

### B. The LUPE Plaintiffs have sufficiently shown that they have standing.

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Juridical entities may satisfy these requirements under an associational or organizational theory of standing. *OCA-Greater Hous.*, 867 F.3d at 610. At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician*, 691 F.3d at 652. Where, as here, the plaintiffs challenge several provisions in a statute, they must plead "all the elements of standing for each provision they seek to challenge." *In re Gee*, 941 F.3d 153, 162 n.4 (5th Cir. 2019). Further, where, as here, multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Here, LUPE is a named plaintiff for all claims that the LUPE Plaintiffs assert against Texas, the Secretary, and the Attorney General. Therefore, the LUPE Plaintiffs need only allege a plausible set of facts establishing that LUPE has standing to assert these claims against Texas, the Secretary, and the Attorney General.

The LUPE Plaintiffs have sufficiently shown that LUPE has organizational standing to assert each claim and challenge each S.B. 1 provision at issue in this case. Organizational standing exists if the entity itself "meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

### 1.   Injury in fact

Under an organizational theory of standing, an organization may establish an injury in fact by alleging "a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). That is precisely what the LUPE Plaintiffs have alleged in this case.

LUPE "is a non-partisan membership organization founded by labor rights activists César Chávez and Dolores Huerta." ECF No. 208 ¶ 9. Its "mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement." *Id.* To fulfill its mission, LUPE "conducts know-your-rights discussions and membership meetings, participates in issue-focused advocacy, campaigns to support or oppose nonpartisan ballot measures through in-person canvassing, connects its members to social services, conducts census outreach, and conducts voter registration, education, and non-partisan get-out-the-vote campaigns (GOTV)." *Id.* "LUPE has more than 8,000 members, including Latinos, U.S. citizens, and registered voters, some of whom are disabled." *Id.* ¶ 10.

The LUPE Plaintiffs allege that each of the S.B. 1 provisions that they challenge in this case will harm LUPE. *See id.* ¶¶ 149–65. Specifically, they contend that the challenged provisions "will force LUPE to divert its resources away from its GOTV, voter registration and community education activities, which are central to its mission[.]" *Id.* ¶ 162. The organization is compelled to do so "in order to counteract the negative effects of SB1 on its members." *Id.* The LUPE Plaintiffs allege that "LUPE has in the past, and will in the future, conduct[] GOTV activities aimed at Latino registered voters with low turnout." *Id.* Additionally, "LUPE has in the past, and will in the future, pay employees who, among their other duties: educate voters about an upcoming election; urge the voters to vote; and encourage, offer and deliver assistance to voters." *Id.*

The LUPE Plaintiffs further allege that "LUPE will be required to divert resources to retrain staff, prepare new educational materials, recruit, train and manage new volunteers, and conduct community outreach to comply with SB1's new restrictions and requirements for assisting voters with mail and in-person voting." *Id.* ¶ 165. The LUPE Plaintiffs explain that this diversion of resources will "frustrate the mission of LUPE by reducing the number of people available to assist voters, and reducing the voter turnout of voters who rely on assistance, including Latinos with limited English proficiency, limited literacy rates and low rates of voter turnout." *Id.* These allegations sufficiently show that LUPE has suffered a cognizable organizational injury based on a diversion-of-resources theory.

The State Defendants' arguments to the contrary are unavailing. They first claim that the LUPE Plaintiffs have failed to allege a cognizable organizational injury on a provision-by-provision basis. ECF No. 255 at 18. That is incorrect. The LUPE Plaintiffs *do* allege that they have suffered an injury with respect to each of the S.B. 1 provisions that they challenge. What the State Defendants fail to appreciate is that the injury that the LUPE Plaintiffs have alleged is the same for each of the S.B. 1 provisions that they challenge. In order to counteract the effects of each of these provisions, LUPE must divert resources away from its routine community activities—such as membership meetings, census outreach, and GOTV campaigns—to retrain staff, prepare new educational materials, and recruit, train, and manage new volunteers.

The State Defendants also rely on *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233 (5th Cir 2010), for the proposition that, "although the diversion of resources can constitute a requisite injury under certain circumstances, '[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact.'" *Id.* at 23 (quoting *City of Kyle*, 626 F.3d at 238). They argue that the LUPE Plaintiffs' diversion-of-resources theory fails to establish a cognizable injury because

they have not identified specific projects that they have placed on hold or otherwise curtailed in light of the S.B. 1 provisions that they challenge. *Id.* at 24 (citing *City of Kyle*, 626 F.3d at 238).

Setting aside the fact that the LUPE Plaintiffs *have* identified specific projects that need to be placed on hold, *see supra*, the Fifth Circuit expressly rejected such a prerequisite to standing at the pleading stage in *OCA-Greater Houston*:

> Our remark in *City of Kyle* that those plaintiffs could have established standing by "identif[ying] any specific projects that the HBA had to put on hold or otherwise curtail in order to respond to the revised ordinances" *was not a heightening of the* Lujan *standard, but an example of how to satisfy it by pointing to a non-litigation-related expense.*

867 F.3d at 612 (emphasis added). The plaintiff organization in *OCA-Greater Houston* alleged that it had been injured by the need for "'additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters' because 'addressing the challenged provisions frustrates and complicates its routine community outreach activities.'" *Id.* at 610. The panel held that the plaintiff organization's injury was a sufficient Article III injury to establish organizational standing because the Texas law at issue forced the organization to divert resources and "perceptibly impaired [its] ability to get out the vote among its members." *Id.* at 612 (quotation marks omitted). To establish a cognizable organizational injury, therefore, the LUPE Plaintiffs need not identify specific projects that they have placed on hold or otherwise curtailed. Having done so, they have simply exceeded the requirements for pleading organizational standing.

The State Defendants' reliance on *Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018), also imposes an improper heightened pleading standard. In *Zimmerman*, a councilmember sued the City of Austin and asserted constitutional challenges against, *inter alia*, a provision in a local campaign-finance law that prohibited candidates from accepting more than a predetermined aggregate sum of monetary contributions from individuals outside of the Austin area. 881 F.3d at

382. After a bench trial, the district court concluded that the councilmember lacked standing to challenge the provision. *Id.* On appeal, the councilmember argued that the provision prompted an Article III injury because "it caused him to change his campaign strategy and withhold solicitations he otherwise would have sent to individuals outside of the Austin area." *Id.* at 389.

The Fifth Circuit disagreed and affirmed the district court's ruling. *Id.* The panel found that the councilmember had not demonstrated at trial that he intended to engage in conduct that the provision proscribed. *Id.* However, the panel said nothing about what an organization must allege to establish a cognizable injury at the pleading stage. In fact, the Fifth Circuit observed that "changing one's campaign plans or strategies in response to an allegedly injurious law *can* itself be a sufficient injury to confer standing[.]" *Id.* at 390 (emphasis added). In doing so, the panel indicated that a diversion of efforts may be sufficient to establish a cognizable organizational injury at the pleading stage.

The State Defendants also cite *Fowler* and other out-of-circuit cases to argue that frustration of an organization's purpose, in and of itself, is insufficient to establish an injury. *See* ECF No. 255 at 25, 27. True, a "showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, *in and of itself*, to confer standing on the organization to sue on its own behalf." *Fowler*, 178 F.3d at 361 n.7 (emphasis added). The LUPE Plaintiffs, however, allege far more than a mere conflict between LUPE's mission and the S.B. 1 provisions that they challenge. As discussed *supra*, they assert that they must divert resources away from their routine and anticipated projects, both voting-related and otherwise, to address the impact that each of the challenged S.B. 1 provisions will have on LUPE's voting and volunteer members. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract

social interests[.]" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("If a defendant has caused [] monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact[.]").

Finally, the State Defendants claim that a "diversion of resources is . . . cognizable only if the plaintiff 'would have suffered some other injury if it had not diverted resources to counteracting the problem.'" ECF No. 255 at 23 (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). But the State Defendants mischaracterize *La Asociacion de Trabajadores*. There, the Ninth Circuit began its analysis by making clear that an "organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *La Asociacion de Trabajadores*, 624 F.3d at 1088 (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). The panel then noted that a plaintiff organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Id.* "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.* In *Havens*, the panel explained, "housing discrimination threatened to make it more difficult for HOME to counsel people on where they might live if the organization didn't spend money fighting it." *Id.* "The organization could not avoid suffering one injury or the other, and therefore had standing to sue." *Id.*

In short, the Ninth Circuit's analysis in *La Asociacion de Trabajadores* stands for the same proposition that the Supreme Court and the Fifth Circuit have repeatedly acknowledged: "An entity can show an organizational injury by alleging that it must divert resources from its usual activities in order to lessen the challenged restriction's harm to its mission." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020), *rev'd and remanded on other grounds sub nom. Lewis*, 28 F.4th at

659 (citing *Havens*, 455 U.S. at 379); *see also OCA-Greater Hous.*, 867 F.3d at 612 (finding that

plaintiff organization established injury in fact when it "went out of its way to counteract the effect

of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but

toward mitigating its real-world impact on OCA's members and the public"); *La. ACORN Fair*

*Hous.*, 211 F.3d at 305 ("[A]n organization could have standing if it had proven a drain on its

resources from counteracting the effects of the defendant's actions." (citing *Fowler*, 178 F.3d at

360)). The LUPE Plaintiffs have alleged that LUPE must divert resources from its usual activities

to address the harms that the challenged S.B. 1 provisions will cause to its mission. No more is

required at the pleading stage.[18]

Thus, the LUPE Plaintiffs have adequately alleged that LUPE has suffered a cognizable

organizational injury based on a diversion-of-resources theory to assert each claim challenging

each of the S.B. 1 provisions at issue in this case.

### 2. Causation and redressability

Whether LUPE's cognizable organizational injury is fairly traceable to and redressable by

Texas, the Secretary, and the Attorney General is a straightforward inquiry. The "invalidity of a

Texas election statute is, without question, fairly traceable to and redressable by the State itself

and its Secretary of State[.]"[19] *OCA-Greater Hous.*, 867 F.3d at 613. Further, the credible threat

of enforcing the challenged S.B. 1 provisions, as discussed in the Court's *Ex parte Young* analysis

---

[18] The State Defendants also argue that the LUPE Plaintiffs have failed to show that any injury with respect to the Attorney General is imminent. ECF No. 255 at 25; *see also* ECF No. 313 at 13. For the reasons discussed in the Court's *Ex parte Young* analysis *supra*, the Court disagrees. Further, the State Defendants' argument that the LUPE Plaintiffs do not have third-party standing is misplaced. ECF No. 255 at 28. "An organization can seek relief under either an associational standing theory or an organizational standing theory." *US Inventor Inc. v. Hirshfeld*, 549 F. Supp. 3d 549, 555 (E.D. Tex. 2021).

[19] In light of clear, binding Fifth Circuit precedent, it matters not that the LUPE Plaintiffs purportedly "fail to allege enforcement of the provisions challenged . . . by a state official such that the alleged harm is traceable to the State and redressable by a favorable decision." ECF No. 255 at 18.

*supra*, is fairly traceable to the Attorney General, who has authority to impose civil penalties on election officials and prosecute election law offenses.[20] An injunction prohibiting the Attorney General from enforcing these provisions will, at least partly, redress the injuries that LUPE has suffered. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks and citation omitted)).

The State Defendants argue that the LUPE Plaintiffs' injuries are not fairly traceable to nor redressable by the Secretary and the Attorney General. ECF No. 255 at 18–20. For the most part, their contentions echo those that they raised in asserting that the Secretary and the Attorney General are entitled to state sovereign immunity. *Id.* However, as the State Defendants observe, "Article III standing analysis and *Ex parte Young* analysis 'significantly overlap.'" *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)). Therefore, for the same reasons discussed in the Court's *Ex parte Young* analysis *supra*, these arguments are unpersuasive.

The State Defendants also contend that *OCA-Greater Houston* only applies in cases considering the facial validity of a Texas election statute. ECF No. 255 at 19–20. To be sure, in *Texas Democratic Party v. Hughs*, 974 F.3d 570 (5th Cir. 2020) (per curiam), the Fifth Circuit noted that *OCA-Greater Houston* involved a facial challenge. *Id.* at 570–71. The panel did so after observing that an "important question" had not been resolved, namely "whether and to what extent *Ex parte Young*'s exception to sovereign immunity permits plaintiffs to sue the Secretary in an as-applied challenge to a law enforced by local officials." *Id.* at 570. But the panel did not resolve that important question. Rather, it held that the "openness of the question alone [was] sufficient

---

[20] *Paxton v. Longoria*, No. 22-0224, 2022 WL 2080867 (Tex. June 10, 2022) does not hold otherwise. There, the Texas Supreme Court concluded that the Attorney General does not have authority to seek civil penalties under section 31.129 of the Election Code against an election official "based solely on the fact of the parties' agreement that [the Attorney General] lacks authority to enforce Section 31.129[.]" *Longoria*, 2022 WL 2080867, at *7.

reason to deny" the plaintiffs' request for summary affirmance of a district court order concluding that the Secretary was not entitled to state sovereign immunity. *Id.* at 571. Moreover, as discussed *supra*, the *Ex parte Young* exception to state sovereign immunity applies to the LUPE Plaintiffs' claims under the First, Fourteenth, and Fifteenth Amendments, and Congress validly abrogated state sovereign immunity in enacting the VRA and Title II. *Hughs*, therefore, is inapposite.

Equally unpersuasive is the State Defendants' argument that *OCA-Greater Houston* is not binding on the Court because, in their view, the panel failed to consider *Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972). ECF No. 255 at 20. *Bullock*, according to the State Defendants, indicates that the Secretary's duties under the Election Code are "not a delegation of authority to care for any breakdown in the election process." *Id.* (citing *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020) (citing *Bullock*, 480 S.W.2d at 372))). Their contention, however, is based on conjecture and reads much into the opinion that cannot be supported by the panel's careful reasoning.

There is also no reason to ignore *OCA-Greater Houston* in response to a nonbinding concurring opinion of the Texas Supreme Court. *Id.* The State Defendants' belief that *OCA-Greater Houston* was "wrongly" decided has no bearing. *Id.* The Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court." *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

Finally, the State Defendants contend that the LUPE Plaintiffs' injuries are not fairly traceable to the Attorney General because whether the Attorney General will enforce the challenged S.B. 1 provisions is "highly speculative." ECF No. 255 at 19. But the LUPE Plaintiffs, as discussed *supra*, *have* sufficiently alleged that the Attorney General can and will enforce most of the provisions that the LUPE Plaintiffs challenge. It is the Attorney General's credible threat of

enforcement that harms the LUPE Plaintiffs and their members. *See Longoria v. Paxton*, --- F.
Supp. 3d ----, No. SA:21-CV-1223-XR, 2022 WL 447573, at *17 (W.D. Tex. 2022*), vacated and
remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022) ("To be
clear, the irreparable harm alleged in this case is not *actual* enforcement of the anti-solicitation
provision; the harm is the chilling effect on Plaintiffs' speech that arises from the credible *threat*
of enforcement.") (emphasis in original).

Moreover, the LUPE Plaintiffs allege that sections 6.01, 6.03, 6.04, 6.05, 6.06 and 7.04
inhibit burden free speech in part because they subject their members to criminal prosecution. ECF
No. 208 ¶¶ 286–300, 310–14. In the pre-enforcement context, the LUPE Plaintiffs need only allege
"an intention to engage in a course of conduct arguably affected with a constitutional interest, but
proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Susan B. Anthony List
v. Driehaus*, 573 U.S. 149, 161–64 (2014). The LUPE Plaintiffs have done so.

Thus, the LUPE Plaintiffs have alleged sufficient facts plausibly establishing that LUPE
has standing to sue the Secretary and the Attorney General under each of their claims, as well as
Texas under their claims under §§ 2 and 208 of the VRA, challenging each of the S.B. 1 provisions
at issue in this case. [21]

### C. The LUPE Plaintiffs have stated claims upon which relief may be granted under §§ 2 and 208 of the VRA.

Relying on *Alexander v. Sandoval*, 532 U.S. 275 (2001), the State Defendants argue that
§§ 2 and 208 of the VRA do not create private causes of action.[22] ECF No. 53 at 35–40. The State

---

[21] It is likely that all other LUPE Plaintiffs also have organizational standing.

[22] The State Defendants incorporate the arguments from their first motion to dismiss. *See* ECF No. 255 at 35.
Although the Court denied the State Defendants' motion to dismiss on these points at the hearing held on November
16, 2021, the Court provides a more thorough explanation for its denial herein.

Defendants further contend that, even if these statutes create private causes of action, nonvoting, organizational plaintiffs cannot enforce such causes of action. *Id.* The Court disagrees.

"The Fifteenth Amendment guarantees that the 'right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude,' § 1, and it grants Congress the authority to 'enforce' these rights 'by appropriate legislation,' § 2." *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 217 (2009) (quoting U.S. Const. amend. XV, §§ 1–2). "Congress enacted the landmark Voting Rights Act of 1965, 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq.*, in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021). "The Voting Rights Act is ambitious, in both goal and scope." *Id.* at 2351 (Kagan, J., dissenting). It contains comprehensive sections designed "to correct an active history of discrimination" and "deal with the accumulation of discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 44 n.9 (1986) (quotation marks and citation omitted).

Section 2 of the VRA "was enacted to forbid, in all 50 States, any 'standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color.'" *Shelby County v. Holder*, 570 U.S. 529, 536 (2013) (quoting 79 Stat. 437). "The current version forbids any 'standard, practice, or procedure' that 'results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color.'" *Id.* at 536–37 (quoting 42 U.S.C. § 1973(a)). Section 208, on the other hand, provides that a "voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

To be sure, "private rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. However, "[o]rganizations and private parties have been permitted to enforce Section 2 of the VRA, both before and after the 2001 [*Sandoval*] case on which Defendants rely." *Veasy*, 29 F. Supp. 3d at 906. For example, in *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006), voters and interest groups challenged Texas's congressional redistricting plan under § 2. Similarly, in *Johnson v. De Grandy*, 512 U.S. 997 (1994), two groups of Hispanic and Black voters challenged Florida's legislative redistricting plan under § 2. Furthermore, in this Circuit, a Hispanic advocacy group filed suit against the City of Boerne, "alleging that the voting method adopted by the City Charter diluted minority voting strength, in violation of Section 2 of the Voting Rights Act[.]" *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433, 435 (5th Cir. 2012).

Organizations and private parties have also been permitted to enforce § 208 of the VRA. In *OCA-Greater Houston*, for instance, the plaintiff was a nonprofit organization conducting "Get Out the Vote" efforts among voters with limited English proficiency. 867 F.3d at 609. The suit alleged that a provision in the Election Code that restricted who could assist voters with limited English proficiency was preempted by § 208. *Id.* at 608. On the merits, the Fifth Circuit held that the challenged provision "impermissibly narrows the right guaranteed by Section 208 of the VRA." *Id.* at 615. District courts outside of this Circuit have also confirmed that organizations and private plaintiffs may enforce § 208. *See Democracy N.C. v. N.C. State Bd. of Elections*, --- F. Supp. 3d ----, No. 1:20CV457, 2022 WL 715973, at *14 (M.D. N.C. 2022) (holding that person "sufficiently alleged a plausible claim that North Carolina's absentee ballot voting laws violate Section 208"); *Lee*, 2021 WL 6072197, at *9 (N.D. Fla. 2021) (holding that organizations stated a claim under § 208 of VRA); *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 796–97 (W.D. Ark.

2021) (same); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (same). Indeed, "every court that has considered the issue—and the Attorney General of the United States—agree[s] that private parties may enforce [§] 208." *Lee*, 2021 WL 6072197, at *9.

Further, the Court finds the *Lee* court's analysis on the question of whether § 208 creates a private cause of action persuasive. *See id.* at *7–9. The judicial task when assessing whether a statute creates a private cause of action is "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. In 1975, Congress amended § 3 of the VRA "by striking out 'Attorney General' . . . and inserting in lieu thereof the following[:] 'Attorney General or an aggrieved person.'" Voting Rights Act Amendments of 1975, Pub. L. 94-73, 89 Stat. 404. In its current form, § 3 makes clear that "an aggrieved person" may institute "a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State[.]"[23] 52 U.S.C. § 10302(a). Section 3, therefore, plainly provides that a private plaintiff may initiate a lawsuit under any statute that enforces the Fourteenth and Fifteenth Amendments.

"Congress clearly designed section 208 to enforce the Fourteenth Amendment's guarantees." *Lee*, 2021 WL 6072197, at *9. In *Lane*, the Supreme Court held that, upon enacting Title II, Congress validly abrogated state sovereign immunity under the Fourteenth Amendment because Title II sought to remedy, among other concerns, discrimination against disabled voters. 541 U.S. at 524, 533–34. The Supreme Court has also cautioned that, "because of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection

---

[23] Congress has also made clear that in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, *other than the United States*, a reasonable attorney's fees, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e) (emphasis added).

Clause[.]" *McDonald*, 394 U.S. at 807 (quoting *Harper*, 383 U.S. at 670). Thus, since § 208 is, by its terms, a statute designed for enforcement of the guarantees of the Fourteenth Amendment, "Congress must have intended it to provide private remedies." *Morse v. Republican Party of Va.*, 517 U.S. 186, 234 (1996). Congress certainly envisioned that private remedies under § 208 would be enforceable under § 3 of the VRA, which again, provides that a private plaintiff may initiate a lawsuit under *any* statute that enforces the Fourteenth Amendment. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2015) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." (quotation marks and citation omitted)). Section 208, therefore, creates a private cause of action.

In sum, caselaw clearly establishes that organizations, like the LUPE Plaintiffs, have historically been able to enforce these provisions. Absent any compelling showing to the contrary, the Court is not inclined to deviate from firmly entrenched historical precedent that has permitted organizational plaintiffs to invoke these provisions. The LUPE Plaintiffs, therefore, have stated claims upon which relief may be granted under §§ 2 and 208 of the VRA.

## CONCLUSION

For the foregoing reasons, the State of Texas, the Texas Secretary of State, and the Texas Attorney General's motion to dismiss all claims that La Unión del Pueblo Entero, Friendship-West Baptist Church, the Anti-Defamation League Austin, Southwest, and Texoma Regions, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin have asserted against them (ECF No. 255) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

Any and all claims challenging section 2.11 of S.B. 1 under the Fourteenth and Fifteenth Amendments to the United States Constitution against the Texas Secretary of State are **DISMISSED WITHOUT PREJUDICE**.

Any and all claims challenging section 2.08 and 2.11 of S.B. 1 under the Fourteenth and Fifteenth Amendments to the United States Constitution against the Texas Attorney General are **DISMISSED WITHOUT PREJUDICE**.

Any and all claims challenging portions of section 6.04 of S.B. 1 that the district court enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are **MOOT**.

Any and all claims challenging section 7.04 of S.B. 1, as codified in sections 276.016, 276.017, and 276.019 of the Election Code, are **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds.

Any and all claims under Title II of the Americans with Disabilities Act against the Texas Attorney General are **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds.

All other claims that La Unión del Pueblo Entero, Friendship-West Baptist Church, the Anti-Defamation League Austin, Southwest, and Texoma Regions, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin have asserted against the State of Texas, the Texas Secretary of State, and the Texas Attorney General may proceed.

It is so **ORDERED**.

**SIGNED** this August 2, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE