IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br>*Plaintiffs,*<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | 5:21-CV-0844-XR<br>[Consolidated Cases] |

**ORDER**

On this date, the Court considered Defendant Kim Ogg's motion to dismiss all claims that several private plaintiffs in this consolidated action have asserted against her (ECF No. 344). After careful consideration, the Court issues the following order.

**BACKGROUND**

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code") by altering various election practices and procedures pertaining to early voting, voting by mail, voter assistance, and more. *See generally id.*

Days before and after the Governor signed S.B. 1 into law, several private plaintiffs (together, the "Private Plaintiffs") filed suit, alleging that certain provisions of S.B. 1 violate federal statutes and the United States Constitution.[1] In light of the decision issued by the Texas

---

[1] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR

1

Court of Criminal Appeals in *State v. Stephens*, No. PD-1032-20, 2021 WL 5917198, at *10 (Tex. Crim. App. Dec. 15, 2021) (not released for publication), the Private Plaintiffs[2] filed amended complaints and added Harris County District Attorney Kim Ogg as a defendant in her official capacity. ECF Nos. 199, 200, 207.[3] The Private Plaintiffs challenge several S.B. 1 provisions and allege that Ogg is a proper defendant for their claims under the First, Fourteenth, and Fifteenth Amendments, §§ 2 and 208 of the Voting Rights Act of 1965 ("VRA"), Title II of the Americans with Disabilities Act ("ADA"), and § 504 of the Rehabilitation Act. *Id.*

On March 29, 2022, District Attorney Ogg filed a motion to dismiss all claims that the Private Plaintiffs have asserted against her. ECF No. 344. The Private Plaintiffs filed responses, ECF Nos. 360, 361, 377, and Ogg filed replies, ECF Nos. 378, 380.

## DISCUSSION

### I. Legal Standards

District Attorney Ogg moves to dismiss the Private Plaintiffs' claims on three grounds. First, Ogg contends that state sovereign immunity bars the Private Plaintiffs from suing her. Second, Ogg claims that the Private Plaintiffs lack standing to bring their suits. Finally, Ogg argues that the Private Plaintiffs have failed to state a claim upon which relief may be granted.

---

(W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *see also* Order, *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

[2] To be clear, only the following private plaintiffs added Ogg as a defendant to their complaints: LULAC Texas, Voto Latino, the Texas Alliance for Retired Americans, Texas AFT, Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Mi Familia Vota, Marla López, Marlon López, Paul Rutledge, Jeffrey Lamar Clemmons, OCA-Greater Houston, League of Woman Voters of Texas, REVUP-Texas, and Workers Defense Action Fund.

[3] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

### A. Subject matter jurisdiction

Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case.[4] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The Eleventh Amendment and the doctrine of sovereign immunity limit a federal court's jurisdiction. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). The doctrine of sovereign immunity "also prohibits suits against state officials or agencies that are effectively suits against a state." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). State sovereign immunity, however, "is not limitless[.]" *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020). "A State may waive its sovereign immunity . . . and in some circumstances Congress may abrogate it by appropriate legislation." *Stewart*, 563 U.S. at 253–54 (citation omitted). Additionally, under *Ex parte Young*, 209 U.S. 123 (1908), "a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Reeves*, 954 F.3d at 736.

Article III of the United States Constitution also limits a federal court's constitutional power to adjudicate a case. It "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. CONST. art. III, § 2). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing, therefore, "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). It provides definition to the constitutional

---

[4] Congress, by statute, has proclaimed that the "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The Private Plaintiffs assert claims against Ogg under federal law. The Court, therefore, is statutorily authorized to adjudicate this case.

limits of subject matter jurisdiction, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), by identifying "those disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted).

A federal court must consider a motion to dismiss for lack of subject matter jurisdiction "before other challenges 'since the court must find jurisdiction before determining the validity of the claim.'" *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The federal court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

### B. Failure to state a claim

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving

party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II. Analysis

The Court addresses each of District Attorney Ogg's three grounds for dismissal, beginning, as it must, with her jurisdictional contentions.

### A. State sovereign immunity does not bar the Private Plaintiffs' claims.

District Attorney Ogg first claims that state sovereign immunity bars the Private Plaintiffs' claims against her. ECF No. 344 at 6–16. In particular, she emphasizes that the Private Plaintiffs cannot satisfy the *Ex parte Young* exception to state sovereign immunity. *Id.*

> **1. The *Ex parte Young* exception to state sovereign immunity permits the Private Plaintiffs to sue District Attorney Ogg for the S.B. 1 provisions that create and implicate criminal offenses under the Election Code.**

State sovereign immunity under the Eleventh Amendment generally precludes suits against state officials in their official capacities. *City of Austin*, 943 F.3d at 997. The *Ex parte Young* exception to state sovereign immunity, however, allows private parties to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). The Supreme Court has counseled that, "[i]n determining whether the *Ex parte Young* doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). The Supreme Court has also

made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his office, must have "some connection with the enforcement" of the challenged law. *Young*, 209 U.S. at 157.

Despite the straightforward inquiry that the Supreme Court envisioned, the Fifth Circuit has acknowledged that its own decisions "are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 n.21 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 999). Nevertheless, the Fifth Circuit has articulated some general rules. For instance, the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Id.* at 400–01 (emphasis in original) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Fifth Circuit has also determined that, "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." *Id.* at 401 (quotation marks and citation omitted). "Moreover," according to the Fifth Circuit, "a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce." *Id.*

The Fifth Circuit has further explained that plaintiffs must at least "show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Morris*, 739 F.3d at 746). Put differently, the state "official must be 'statutorily tasked with enforcing the challenged law[,]'" *id.* (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 161 (2021)), though whether the particular duty to enforce the statute in question "arises out of the general law, or is specially created by the [statute] itself, is not material so long as it exists[,]" *Young*, 209 U.S. at 157. "Enforcement typically means 'compulsion or constraint.'" *Tex.*

6

*Democratic Party II*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). "A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Id.* (quoting *City of Austin*, 943 F.3d at 1002). In short, "if an 'official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception.'" *Tex. Democratic Party I*, 961 F.3d at 401 (emphasis in original) (quoting *City of Austin*, 943 F.3d at 1002).

Here, the Private Plaintiffs name District Attorney Ogg as a defendant for their claims challenging several S.B. 1 provisions. ECF No. 199 ¶¶ 250–300; ECF No. 200 ¶¶ 214–39; ECF No. 207 ¶¶ 54–60. A state official is most clearly tasked with enforcing a statute when the state official is "specially charged with the duty to enforce the statute[.]" *Young*, 209 U.S. at 158. However, for the *Ex parte Young* exception to apply, "[t]he text of the challenged law need not actually state the official's duty to enforce it[.]" *City of Austin*, 943 F.3d at 997–98. It is enough that the state official's duty "arises out of the general law[.]" *Young*, 209 U.S. at 157.

In *Stephens*, the Texas Court of Criminal Appeals concluded that the Election Code's delegation of prosecutorial authority to the Texas Attorney General under section 273.021 violated the separation-of-powers clause of the Texas Constitution. 2021 WL 5917198, at *9. Thus, only local district attorneys have independent authority to prosecute criminal offenses under the Election Code. Even before *Stephens*, however, the Election Code explicitly contemplated that county and district attorneys would prosecute criminal offenses. For example, the Election Code provides that the attorney general "may direct the county or district attorney . . . to prosecute an offense that the attorney general is authorized to prosecute under Section 273.021 or to assist the attorney general in the prosecution." Tex. Elec. Code § 273.021.

The Private Plaintiffs also allege that Ogg can and will enforce the S.B. 1 provisions that create criminal offenses. ECF No. 199 ¶¶ 77, 81; ECF No. 200 ¶¶ 48, 181, 225, 239; ECF No. 207 ¶ 33. Indeed, Ogg concedes that she "indisputably has the statutory authority within the boundaries of Harris County to prosecute cases under any and all Texas statutes that set out criminal offenses, including criminal offense provisions of the Election Code." ECF No. 344 at 9.

Together, the language of the Election Code and *Stephens* confirm that county and district attorneys have authority to compel or constrain a person's ability to violate the S.B. 1 provisions that create and implicate criminal offenses. *See Tex. Democratic Party I*, 961 F.3d at 401. This is sufficient to establish that county and district attorneys, by virtue of their office, have "some connection" with enforcement of the challenged, offense-creating S.B. 1 provisions beyond a "general duty to see that the laws of the state are implemented." *Morris*, 739 F.3d at 746; *see also Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 583 (W.D. Tex. 2020) ("Because [p]laintiffs have pled that [the district attorney] is responsible for representing the state in criminal matters, including prosecuting violations of the [challenged] provisions, plaintiffs have met their burden of demonstrating a scintilla of enforcement to fall within the *Ex parte Young* exception."). However, there is no indication that Ogg has a sufficient enforcement connection to any challenged S.B. 1 provision that does not create or implicate a criminal offense.

District Attorney Ogg's arguments to the contrary focus almost exclusively on the purported lack of actual or threatened enforcement of the challenged provisions. In so arguing, Ogg conflates the jurisdictional question with the merits question. Ogg has not affirmatively represented that she *never* intends to enforce the challenged provisions or that she intends to comply with any future court order enjoining such enforcement. Indeed, as district attorney, Ogg "has all the powers, duties, and privileges in Harris County relating to criminal matters for and in

behalf of the state that are conferred on district attorneys in the various counties and districts." TEX. GOV'T CODE § 43.180(c).

In the "absence of compelling contrary evidence," the Court will "assume a credible threat of prosecution" where, as here, the challenged provisions have caused the Private Plaintiffs to divert resources to address the credible, potential enforcement of these provisions. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020). Put differently, should the Court determine that any of the challenged provisions are unconstitutional, the appropriate relief for the Private Plaintiffs would be to issue an order permanently enjoining District Attorney Ogg from enforcing the provisions. Thus, to conclude that the Private Plaintiffs lacks standing to challenge the provisions that create or implicate criminal offenses based on the purported absence of any enforcement of these laws *for now*, would improperly and permanently deprive the Private Plaintiffs of much-needed relief *later*. In other words, that Ogg "was willing to offer to stipulate to non-enforcement" does *not* help prove the point.[5] ECF No. 344 at 14.

Accordingly, the Court concludes that the Private Plaintiffs have met their burden of alleging a plausible set of facts establishing that District Attorney Ogg has a sufficient enforcement connection to sections 4.06, 4.09, 6.04, 6.05, 6.06, 7.02, and 7.04[6]—all of which create or implicate one or more criminal offenses under the Election Code.[7]

---

[5] The Court said substantially the same in *Longoria v. Paxton*, --- F. Supp. 3d ----, No. SA:21-CV-1223-XR, 2022 WL 447573, at *11–12 (W.D. Tex. Feb. 11, 2022). The Fifth Circuit's opinion on appeal did not hold otherwise. *See Longoria v. Paxton*, No. 22-50110, 2022 WL 2208519 (5th Cir. 2022).

[6] The Court's finding extends to sections 276.015, 276.016, 276.017, and 276.018 of the Election Code, all of which contemplate criminal offenses. Section 276.019, on its face, does not appear to create a criminal offense.

[7] Because the Court concludes that the Private Plaintiffs have standing to sue District Attorney Ogg for the S.B. 1 provisions that create or implicate criminal offenses only, *see infra*, the Court does not consider whether an alternative exception to state sovereign immunity permits the Private Plaintiffs to sue Ogg for the S.B. 1 provisions that do not create or implicate criminal offenses.

### B. The Private Plaintiffs have sufficiently shown that they have standing.

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Juridical entities may satisfy these requirements under an associational or organizational theory of standing. *OCA-Greater Hous.*, 867 F.3d at 610. At the pleading stage, "the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician*, 691 F.3d at 652. Where, as here, the plaintiffs challenge several provisions in a statute, they must plead "all the elements of standing for each provision they seek to challenge." *In re Gee*, 941 F.3d 153, 162 n.4 (5th Cir. 2019). Further, where, as here, multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Here, Houston Area Urban League ("HAUL"), Delta Sigma Theta Sorority, Inc. ("DST"), The Arc of Texas, Mi Familia Vota ("MFV"), OCA-Greater Houston ("OCA-GH"), and LULAC Texas ("LULAC") each assert claims against District Attorney Ogg. Therefore, the Private Plaintiffs need only allege a plausible set of facts establishing that each of them, as organizations, has standing to assert these claims against Ogg.

The Private Plaintiffs have sufficiently shown that they each have organizational standing to assert each claim and challenge sections 4.06, 4.09, 6.04, 6.05, 6.06, 7.02, and 7.04. Organizational standing exists if the entity itself "meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

1. **Injury in fact**

Under an organizational theory of standing, an organization may establish an injury in fact by alleging "a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). That is precisely what the Private Plaintiffs have alleged in this case.

"HAUL is nonpartisan, nonprofit corporation with its principal office in Houston, Texas." ECF No. 199 ¶ 38. It is affiliated with the National Urban League, which "is the nation's oldest and largest community-based movement devoted to empowering African Americans to enter the economic and social mainstream." *Id.* "HAUL advocates for and provides social services to disadvantaged people of all races, gender, age groups and . . . disabilities." *Id.* In particular, "HAUL works to achieve economic and social justice for its constituents by providing community voter/political participation education and supporting and offering third[-]party voter registration, including through its two auxiliary, age-specific, volunteer groups." *Id.*

HAUL's work includes providing social services to disadvantaged individuals in Texas. *Id.* ¶ 41. But, in light of the S.B. 1 provisions that it challenges, "HAUL will be forced to divert time and resources from the other critical social services it provides to disadvantaged persons . . . to ensuring their clients . . . are able to vote in upcoming elections without being subjected to civil and criminal offenses and penalties." *Id.* Because of the challenged S.B. 1 provisions, HAUL will need "to retrain and educate their large constituencies on the new voting restrictions, procedures, and violations[.]" *Id.* In addition, "HAUL will have to increase its Get Out The Vote ('GOTV') work to respond to the lack of means and methods to vote" allegedly caused by each of the S.B. 1 provisions that it challenges. *Id.*

DST "is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women[.]" *Id.* ¶ 42. "The organization has 75 chapters that include alumnae and college chapters and approximately 20,445 members in Texas, most of whom are registered voters in Texas." *Id.* ¶ 44. DST's "top social action priorities" include voter registration and voter education programs. *Id.* ¶ 43. In particular, DST has dedicated extensive resources "to provide public education and training about the importance of the decennial Census and its impact on redistricting, the allocation of funding, and policy-making." *Id.*

But, because of the challenged S.B. 1 provisions, DST, "both nationally and particularly their chapters in Harris, Bexar, Travis and Dallas counties," will need "to divert time, money, and resources from other activities, such as their voter registration and voter education efforts[.]" *Id.* ¶ 48. This also includes their work "related to the post-Census redistricting cycle[.]" *Id.* DST will also need to train their Texan members on "providing public education regarding the changes in voting law and procedure[.]" *Id.*

MFV "is a national, non-profit civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice." *Id.* ¶ 62. The organization "operates in six states, including Texas." *Id.* Given each of the S.B. 1 provisions that they challenge, MFV "must divert personnel, time, and resources away from its routine community activities[.]" *Id.* ¶ 64. Specifically, MFV must now reallocate its resources to:

> (1) increase voter awareness, education, and support to comply with the expansive new rules of SB 1; (2) increase voter awareness and education about new voting restrictions that may result in rejected mail-in ballot applications or rejected ballots completed by lawfully registered voters; (3) increase awareness and education about the elimination of voting methods used in 2020 that will no longer be available to voters, including 24-hour voting and drive-through voting; (4) increase awareness and education about new restrictions on people who provide transportation and other physical and language assistance at the polls to ensure that the elderly, disabled,

>or non-English-speaking voters who [MFV] supports are able to vote in compliance with SB 1; (5) increase awareness and education about the new requirements to apply for mail-in ballots; . . . and (7) increase awareness and education of voters and poll workers about the expanded rights of poll watchers and the potential for intimidation of voters and poll workers under the new law.

*Id.*

MFV "will also have to expend resources to help lawfully registered voters monitor voter rolls . . . and assist with the costly and complicated system of reestablishing lawful registration status." *Id.* Further, MFV will need "to support voters who, under burdensome time constraints, must cure mail-in ballots for alleged deficiencies—if election officials choose to provide notice." *Id.* Such a response will require MFV "to spend finite resources on these activities so long as the challenged provisions of SB 1 are in effect." *Id.* ¶ 65.

"The Arc of Texas has promoted, protected, and advocated for the human rights and self-determination of Texans with intellectual and developmental disabilities ('IDD') since its founding in 1953." *Id.* ¶ 49. It "is a statewide advocacy and membership organization—with 6,000 individual members and 27 local member chapters throughout the state—that supports and advocates for these rights on behalf of the IDD community." *Id.* Specifically, "The Arc of Texas works with and alongside individuals with IDD and their families to identify barriers and solutions to inclusive education, competitive integrated employment, quality community-based services and support[], and access to civil rights and justice." *Id.* The organization "has been instrumental in the creation of virtually every program, service, right, and benefit that is now available to more than half a million Texans with IDD." *Id.* ¶ 50. It "continues to advocate for including people with intellectual and developmental disabilities in all aspects of society." *Id.*

"Voting rights has always been a central priority in [the] advocacy work of The Arc of Texas." *Id.* ¶ 51. Indeed, "voting rights are intertwined with all of the organization's advocacy

13

efforts." *Id.* Each of the S.B. 1 provisions that The Arc of Texas challenges "makes it substantially more difficult for The Arc of Texas to carry out its civic engagement mission." *Id.* ¶ 57. In light of these challenged provisions, "The Arc of Texas will have to expend more time, money, and resources on its efforts to educate and assist voters[,]" and will need "to divert resources form its other core activities[.]" *Id.* The Arc of Texas, therefore, "is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals." *Id.*

OCA-GH "is a national membership-driven civil rights organization of community advocates dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ('AAPIs')." ECF No. 200 ¶ 14. It is one of the many chapters and college affiliates across the country, whose mission is: "(1) to advocate for social justice, equal opportunity, and fair treatment; (2) to promote civic participation, education, and leadership; (3) to advance coalitions and community building; and (4) to foster cultural heritage." *Id.* The organization's usual activities include fundraising and programming, with the express goal of empowering the AAPI community. *Id.* ¶ 15. It fulfills its mission through leadership training, education workshops, arts and cultural events, advocacy campaigns, voting rights initiatives, legal clinics, internships, scholarships, mentorship, and civic engagement. *Id.*

Each of the challenged S.B. 1 provisions in this case, however, will harm OCA-GH. *Id.* ¶ 17. OCA-GH contends that the challenged provisions will "frustrate [its] mission of promoting civic participation among the AAPI community, including expanding voter registration and increasing voter turnout among AAPI voters, [by] forcing OCA-GH to expend its resources counteracting SB 1's various unlawful effects." *Id.* Because of the challenged provisions, OCA-GH must divert resources away from its usual activities "and instead direct resources toward educating and helping volunteers and voters navigate those provisions' new burdensome

14

restrictions on mail-in voting and assistance for non-English speakers, and the criminal and civil penalties associated with those provisions." *Id.* As a result, "OCA-GH will spend less time and money on its normal programming efforts . . . and will reach fewer voters overall." *Id.* But for the challenged provisions, "OCA-GH would not have to conduct this type of public education[.]" *Id.*

Finally, LULAC engages in voter registration and education efforts, as well as other programs and activities that it has designed to increase voter turnout among its members and the community. ECF No. 207 ¶ 20. These efforts, programs, and activities are critical to LULAC's mission. *Id.* LULAC also dedicates its resources to programming that is unrelated to voting, including immigration and racial justice issues. *Id.* Its resources also support the organization's recruitment and expansion. *Id.* The challenged S.B. 1 provisions, however, raise "new barriers to voting that impose significant burdens on LULAC's members and constituents; as a result, LULAC must divert resources from other programs and activities to address the adverse impacts [of] S.B. 1 and to assist its members and constituents in surmounting new barriers to registration and voting." *Id.* But for the challenged S.B. 1 provisions, LULAC would invest its resources in other activities. *Id.*

District Attorney Ogg's assertions that the Private Plaintiffs lack standing echo the contentions that she raised in asserting that she is entitled to state sovereign immunity. ECF No. 344 at 16–18. For the reasons discussed in the Court's *Ex parte Young* analysis, those arguments are unavailing.

Accordingly, the Private Plaintiffs have adequately alleged that HAUL, DST, MFV, The Arc of Texas, OCA-GH, and LULAC have suffered a cognizable organizational injury based on a diversion-of-resources theory to assert each claim challenging sections 4.06, 4.09, 6.04, 6.05, 6.06, 7.02, and 7.04.

### 2. Causation and redressability

Whether the Private Plaintiffs' cognizable organizational injuries are fairly traceable to and redressable by District Attorney Ogg is a straightforward inquiry. Ogg has authority to prosecute criminal violations of the Election Code. An injunction prohibiting Ogg from enforcing the challenged S.B. 1 provisions that create criminal offenses will, at least partly, redress the injuries that LUPE has suffered. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks and citation omitted)).

However, it is not apparent that any injuries arising from challenged S.B. 1 provisions that do *not* create or implicate criminal offenses are fairly traceable to and redressable by Ogg.

Thus, the Private Plaintiffs have alleged sufficient facts plausibly establishing that they have standing to sue District Attorney Ogg under each of their claims challenging each of the S.B. 1 provisions that create criminal offenses only.

### C. The Private Plaintiffs have stated claims upon which relief may be granted.

Finally, the Private Plaintiffs have stated claims upon which relief may be granted with respect to the challenged S.B. 1 provisions that create or implicate criminal offenses. Once again, District Attorney Ogg's assertions otherwise echo the contentions that she raised in asserting that she is entitled to state sovereign immunity. ECF No. 344 at 19–20. For the reasons discussed in the Court's *Ex parte Young* analysis, those arguments are unavailing.

## CONCLUSION

For the foregoing reasons, Defendant Kim Ogg's motion to dismiss all claims that the Private Plaintiffs in this consolidated action have asserted against her (ECF No. 344) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

Any and all claims that the Private Plaintiffs have asserted challenging sections 4.06, 4.09, 6.04, 6.05, 6.06, 7.02, and 7.04 of S.B. 1 against Defendant Kim Ogg may proceed.

Any and all other claims that the Private Plaintiffs have asserted against Defendant Kim Ogg that do not challenge criminal offenses under the Election Code are **DISMISSED WITHOUT PREJUDICE**.

It is so **ORDERED**.

**SIGNED** this August 2, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE