```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE WESTERN DISTRICT OF TEXAS
2                            SAN ANTONIO DIVISION

3
     LA UNION DEL PUEBLO ENTERO,      .
4    ET AL,                           .
                                      .
5                 PLAINTIFFS,         .
            vs.                       . DOCKET NO. 5:21-CV-844-XR
6                                     .
     GREGORY W. ABBOTT, ET AL,        .
7                                     .
                  DEFENDANTS.         .
8

9

10                     TRANSCRIPT OF MOTION HEARING
                  BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                    UNITED STATES DISTRICT JUDGE
                          NOVEMBER 14, 2022
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:       NINA PERALES, ESQUIRE
17                             JULIA RENEE LONGORIA, ESQUIRE
                               MALDEF
18                             110 BROADWAY STREET, #300
                               SAN ANTONIO TX 78205
19

20                             DANA PAIKOWSKY, ESQUIRE
                               U.S. DEPARTMENT OF JUSTICE
21                             4 CONSTITUTION SQUARE
                               WASHINGTON DC 20503
22

23                             RICHARD ALAN DELLHEIM, ESQUIRE
                               U.S. DEPARTMENT OF JUSTICE
24                             9150 M STREET NE/8.1815
                               WASHINGTON DC 20530
25
```

```
 1
    FOR THE DEFENDANTS:      PATRICK K. SWEETEN, ESQUIRE
 2                           WILLIAM THOMAS THOMPSON, ESQUIRE
                             TEXAS ATTORNEY GENERAL
 3                           P.O. BOX 12548
                             MC 009
 4                           AUSTIN TX 78711

 5

 6                           JOHN GORE, ESQUIRE
                             JONES DAY
 7                           51 LOUISIANA AVENUE NW
                             WASHINGTON DC 20001
 8

 9  REPORTED BY:             GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
10                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; November 14, 2022, at 1:00 p.m., in*
2    *open court.)*
3         THE COURT:  Let's call LUPE versus Texas, 21 civil
4    844.
5         Appearances, please.
6         MISS PERALES:  For the plaintiffs, Your Honor, the
7    private plaintiffs, Nina Perales, representing the LUPE
8    plaintiffs, and speaking –– there will be other plaintiffs'
9    counsel participating remotely.
10        With me today is Robin Sanders, Julia Longoria.
11        THE COURT:  Thank you.
12        And for the intervenors.
13        MR. GORE:  Good afternoon, Your Honor, John Gore for
14   the intervenors.
15        THE COURT:  And anybody else who might want to
16   address here, just identify yourself when it's time for you to
17   do so.
18        So we're here on Docket Number 469, LUPE, et al and
19   LULAC's opposed motion to compel production of documents and
20   interrogatories.  Has there been any advancement of this
21   problem or where do we stand?
22        MISS PAIKOWSKY:  Your Honor, I just wanted to briefly
23   introduce myself, Dana Paikowsky on behalf of the United
24   States and I have my colleague Richard Dellheim here as well.
25        THE COURT:  Thank you.

1          So Miss Perales.

2          MISS PERALES:  Your Honor, with respect to the

3  Court's question, the status of the situation is reflected in

4  the most recent briefs that have been filed.

5          THE COURT:  Thank you.

6          So with that then, let me ask the question this way.

7  Has there been any document produced by the intervenors?

8          MISS PERALES:  No, Your Honor.  The intervenors have

9  not produced a single document, nor have they produced a

10  privilege log, nor were they willing to accept any Rule 45

11  deposition subpoenas, with the exception of one, a

12  Miss Fountain.

13          THE COURT:  And while I'm asking the questions then,

14  have they answered any interrogatory?

15          MISS PERALES:  Your Honor, the defendant intervenors

16  did provide a document purporting to respond to the

17  interrogatories but much of what was in that document was

18  relying on information identified by parties in the case,

19  including State defendants.  And with respect to identifying

20  documents, of course, said that documents would be identified

21  later.

22          THE COURT:  And with regard to the requests for

23  production, so how did you propound them?  Did you propound

24  them under Rule 34 or 45 to the intervenors?

25          MISS PERALES:  Under 34.

1          THE COURT:  Under 34?

2          MISS PERALES:  Yes, as parties in the case.

3          THE COURT:  Yeah.  So you threw me for a loop when

4     you mentioned 45 there.

5          MISS PERALES:  Oh.  Plaintiffs have also sought to

6     depose five individuals as Rule 45 deposition subpoenas and

7     those were individuals who volunteer essentially with

8     defendant intervenors, like election integrity chair for the

9     county republican party.

10          THE COURT:  Thank you.  So let's then turn to the

11     discovery requests first.  We can talk about the depositions

12     later.

13          From the intervenors, who drafted your responses and

14     objections?

15          MR. GORE:  Your Honor, John Gore.  Counsel drafted

16     those responses and objections.

17          THE COURT:  The name of counsel who drafted them.

18          MR. GORE:  Oh, I see.  Yeah, I did.

19          THE COURT:  You personally drafted the responses and

20     objections?

21          MR. GORE:  With input from clients and other counsel

22     on the team, yes.

23          THE COURT:  And so have you read Federal Rule of

24     Civil Procedure 34?

25          MR. GORE:  Yes.

1          THE COURT:  And so Federal Rule of Civil Procedure

2   34, I want to talk about objections.  "An objection must state

3   whether any responsive materials are being withheld on the

4   basis of that objection.  An objection to part of a request

5   must specify the part and permit inspection of the rest."

6          Did you allow inspection or production of any other

7   documents?

8          MR. GORE:  We did not allow inspection of documents

9   as we were still collecting the documents at the time we

10  propounded our objections and responses.

11         THE COURT:  To this day have you permitted inspection

12  or produced any documents?

13         MR. GORE:  We have not produced any documents to

14  date.  We have engaged in multiple meet and confers.

15         THE COURT:  So you're in violation of Rule 34.

16         MR. GORE:  No, I don't believe that we are, Your

17  Honor.

18         THE COURT:  So how are you not in violation of 34?

19         MR. GORE:  We have engaged in multiple good faith

20  efforts to meet and confer with plaintiffs and their ––

21         THE COURT:  You haven't produced a privilege log and

22  you haven't produced any –– I mean, are there no documents

23  that are not subject to any privilege?

24         MR. GORE:  We have been working to get –– collect

25  those documents.

1            THE COURT:  That's not answering my question.  Are

2  there any documents that you have in your possession, custody,

3  or control that are not subject to any privilege?

4            MR. GORE:  I don't know that.  I don't believe that

5  there are.

6            THE COURT:  How can you not know that?  How many

7  months has it been?

8            MR. GORE:  We are — as I said, we've been collecting

9  the documents.  Our clients are political parties that engage

10  in First Amendment protected activities, including political

11  activities around the general election.

12            We believe there may be some documents — here's, I

13  think, where the rub of the issue is, Your Honor.  They have

14  asked, for example, for documents that were shared with the

15  Texas Legislature by the intervenor defendants.

16            THE COURT:  How is that subject to any privilege?

17            MR. GORE:  We don't believe that it would be, but we

18  also don't understand why they would need to get that from us

19  rather than from State defendants —

20            THE COURT:  Because State defendants are asserting

21  privilege, which is the subject right now of an appeal at the

22  Fifth Circuit.

23            MR. GORE:  And anything that we propounded would

24  already be part of the public record.

25            THE COURT:  No, sir.  No.  What they are arguing up

1   there is that if a document happens to pass through a

2   legislator's eyes, or if a legislator happens to whiff a

3   document, then all of a sudden it miraculously becomes

4   legislative privilege.

5           You-all are not members of the legislature, nor are

6   you staff members of the legislature who consult with the

7   legislators.  And so you are third parties who gave up

8   documents and sent them to various legislators and so you do

9   not fall under that privilege.  And you just admitted you

10  don't fall under that privilege.

11          MR. GORE:  I think the fact that we're not

12  legislators underscores the difficulty and challenges that

13  we've had with these particular discovery requests.

14          THE COURT:  Have you read Federal Rules of Civil

15  Procedure 26(g)?

16          MR. GORE:  Yes.

17          THE COURT:  And it says, "If certification violation"

18  -- so by you, you admitted, Mr. Gore, that you signed and

19  drafted these responses to discovery requests and the

20  objections, "If you violated the Rule without substantial

21  justification, the Court, on motion, or on its own, must" --

22  that's a must -- "impose appropriate sanctions on the signer."

23          So why shouldn't you be sanctioned individually?

24          MR. GORE:  I mean, we have, in good faith --

25          THE COURT:  You keep saying that.  How many months

1  have gone by since your requests for production were due?

2          MR. GORE:  It has been a couple of months, Your

3  Honor.  We recognize that.  We've been trying to work out a

4  schedule with the plaintiffs.  They also asked for an

5  extension from us, which we granted, with respect to the

6  discovery requests that we propounded.

7          We were hoping to work collaboratively with them to

8  understand their request.  For example, Your Honor, they have

9  asked for a bunch of things that underscore that aren't

10  relevant to this case.  For example, we're not members of the

11  legislature.  We didn't enact SB 1, and we don't enforce it.

12          They've asked us a bunch of questions about —

13          THE COURT:  But that doesn't make it nonrelevant.

14          MR. GORE:  Their theory of the case, and in their

15  briefing, their theory is that that somehow reflects the

16  legislative intent of the Texas Legislature.

17          THE COURT:  No.  What they are trying to determine,

18  I'm assuming, is what was before the legislature that might

19  have possibly informed their intent.  And so you-all gave

20  these individuals — I'm assuming you didn't give it to every

21  member of the legislature, but you gave them some things, and

22  so they are entitled to look at what you gave them and what

23  was before them to figure out whether or not it formed part of

24  their intent.

25          MR. GORE:  Even if we concede that point, Your Honor,

1 the broad swath and the lion's share of their discovery

2 requests don't go to information that was before the Texas

3 Legislature.  It goes to information that's strictly internal

4 to the intervenor defendants, their third-party political

5 allies, and their own candidates.

6       THE COURT:  Let's take this all a step.  I guess if

7 we have to do this, we'll do this the hard way.

8       Response to Request for Production Number 1.  So they

9 sought "All documents, including but not limited to

10 communications, talking points, and memoranda sent to or

11 exchanged with the Texas Legislature."

12       So that's not asking for stuff that was just internal

13 to you.  Request for Production Number 1 asked for stuff you

14 sent or exchanged with the Texas Legislature.  So how you

15 responded to all of that was you said, "It's unduly

16 burdensome, not proportional, overly broad, irrelevant."

17       So it's relevant.  How is it unduly burdensome?

18 Don't your clients know what they sent or exchanged with

19 members of the Texas Legislature?

20       MR. GORE:  We came up with a set of search terms that

21 would cover the discovery requests.

22       THE COURT:  You're not — things go a whole lot

23 easier when you answer the question I ask you.

24       MR. GORE:  Yes, I believe the clients do know that.

25       THE COURT:  Okay.  So how is it unduly burdensome to

1   produce that then?  That was your objection.  You said it was

2   unduly burdensome to produce that.

3           MR. GORE:  I think we made a number of objections to

4   these discovery requests.

5           THE COURT:  And that's another problem.  So, you

6   know, the amendments, the rules of procedure were supposed to

7   stop this gamesmanship.  And so you had, before we even got to

8   the request for productions themselves, nine and a half pages

9   of objections.  Those are all stricken.

10          The Federal Rules of Civil Procedure, as amended in

11  2016, do not allow these kind of boilerplate objections.

12  Those days are gone.  That's why I asked you whether you've

13  read Rule 34 as it stands today.

14          So now we're going to stand by just the objections

15  you raised in each individual request for production.  So

16  you've admitted to me now it's not unduly burdensome and you

17  know what documents were sent.  So why do you need this

18  continued meet and confer with the other side to produce

19  stuff?

20          MR. GORE:  Well, for example, Your Honor, look at

21  Request Number 2.

22          THE COURT:  No, we're looking at 1.

23          MR. GORE:  Okay.  Well, I think —

24          THE COURT:  You seem to want to — you want to glance

25  over 1 because 1 is very particular there about what you

1  should be producing and you're not producing it.

2          MR. GORE:  As I said, we have told plaintiffs we will

3  produce that by December 1st.

4          THE COURT:  Why is it taking so long?

5          MR. GORE:  Our clients are involved in the general

6  election.

7          THE COURT:  That's gone.

8          MR. GORE:  It is.

9          THE COURT:  And for the most part you guys lost, but

10  go ahead.

11          MR. GORE:  That's why we're collecting and reviewing

12  the documents.  We're actively reviewing the documents now.

13  We've collected them.  We're reviewing them.  We're trying to

14  identify specific documents that they fall into these

15  categories.

16          THE COURT:  Okay.  So let's stop here.  You just say

17  your clients were heavily involved in the elections.  Was the

18  lawyer team heavily involved in the elections too that you

19  couldn't be doing this work on the side?

20          MR. GORE:  Yes.

21          THE COURT:  Really?

22          MR. GORE:  Yes.

23          THE COURT:  So —

24          MR. GORE:  And the plaintiffs haven't claimed any

25  prejudice.  Trial is still eight months away.

1          THE COURT:  Well, when are they going to get these

2    documents?   Seven months from now?

3          MR. GORE:  They will get them by December 1st.  We

4    will produce all the documents that fall into the categories

5    of external communications with the Texas Legislature.

6          THE COURT:  Okay.  So you are throwing in caveats

7    here.  "External."

8          MR. GORE:  Well, communications.

9          THE COURT:  They are asking for what was sent to or

10   exchanged with the Texas Legislature.  That's your obligation

11   to produce.

12         MR. GORE:  I understand that and I'm simply drawing a

13   distinction between internal documents that were not shared

14   with the legislature and those documents that were.

15         THE COURT:  Number 1 didn't ask for that.

16         MR. GORE:  Excellent.

17         THE COURT:  Okay.  So then I'm hearing from you that

18   you're going to produce all documents responsive to Request

19   for Production Number 1 without objection and without any

20   assertion of privileges by December 1.  Is that what I'm

21   hearing?

22         MR. GORE:  Yes, Your Honor.

23         THE COURT:  Moving on to 2.  What's your objections

24   to 2?

25         MR. GORE:  Our objection to 2 is multifold.  One,

1  that these categories –– this is not tied to SB 1.  This says

2  election administration.  It says voting, election integrity,

3  conduct of elections from January 1, 2020 to the present.

4          It's potentially a very broad swath of documents that

5  aren't tethered to SB 1 and don't have anything to do with the

6  legislature's decision to enact SB 1.  We think that Request

7  Number 1, if that's proper, there's no need for Request Number

8  2 because those documents don't relate to SB 1 and the

9  legislature's decision to enact SB 1.

10          THE COURT:  Now we've got a good response there.

11          So Miss Perales, what's your response to that?

12          MISS PERALES:  Your Honor, our response is that if

13  it's overbroad, what ––

14          THE COURT:  Well, what is the relevance of your

15  request, I guess is what we need to establish first because

16  you're only entitled to stuff that's both relevant and then

17  proportional.  So what's the relevance?

18          MISS PERALES:  Well, looking at the term "election

19  integrity," that is the articulated justification both by

20  defendant intervenors and defendants for SB 1 and so we

21  requested their communications, talking points, and memoranda

22  that they provided to the decision-makers on election

23  integrity.  Election administration, voting, and the conduct

24  of elections have to do with those things that SB 1 touches

25  upon, because SB 1 is a very broad bill.

1          THE COURT:  So but look at it from their perspective,

2     how are they supposed to find this — this is a large swath.

3     You are talking about stuff related to election

4     administration, voting, election integrity, and the conduct of

5     elections.

6          I mean, so and you're not even caveating it to —

7     well, you are.  There's a caveat here to "sent to or exchanged

8     with the Texas Legislature."  So what you're envisioning, I

9     guess, first, that we're going to filter here from your set of

10    data to just material that was exchanged with various members

11    of the legislature from January 1 to 2020 to the present.

12         So we've got two filters here.  One, stuff that was

13    sent to or exchanged with legislators.  And then, two, we have

14    date parameters.  But I'm also troubled here with we've got

15    broad categories here.  So how are they supposed to conduct

16    that kind of search?

17         MISS PERALES:  Well, Your Honor, we were waiting

18    until October 20th for defendant intervenors to propose search

19    terms for their document search.

20         On October 20th, defendant intervenor said that they

21    had come up with search terms by themselves, not in

22    consultation with us, had run them only on Harris County, and

23    had come up with 24,000 documents.

24         We would have wanted all of this, first of all, to

25    happen in August, but putting aside the timing issue, we would

1  have wanted a hit list to see the number of documents that
2  were associated with each of these terms and the opportunity
3  to negotiate with defendant intervenors about modifying the
4  search terms that defendant intervenors had come up with.
5       They only ran their search terms for Harris County,
6  have not even run those search terms for any other defendant
7  intervenor, and have not provided us an opportunity to narrow
8  the search terms.
9       THE COURT:  So, you know, the rules anticipate that
10 the parties will try to negotiate amongst themselves without
11 court intervention on this, but this is where — I speak on
12 this topic nationwide and I'm going to go to Georgetown here
13 in a couple of days on this very topic.
14      So I believe in communication between counsel,
15 however, the rules are structured such that requesting party
16 requests, then producing party produces.  And until such time
17 as there's a showing that the production has been deficient,
18 you know, it's noble for counsel to try to negotiate between
19 themselves as to search terms and key terms but I find nothing
20 in the rules that mandate that requesting parties get to have
21 a seat at the table about how a producing party engages in
22 their production.
23      So that's basically what you are asking for.  You are
24 asking to be a part of the search terms.  Now, so —
25      MISS PERALES:  Well, Your Honor, production or a

1  privilege log.

2       THE COURT:  Yeah.  So here's the other problem with

3  this is that they have produced nothing and I'm at a loss to

4  understand what may be privileged.  I don't believe that this

5  is subject to any kind of legislative privilege.  I'm not sure

6  I understand what this First Amendment is about.  So of course

7  they have a First Amendment right as an entity to speak.

8       But you-all insist on interjecting yourself into this

9  lawsuit.  You guys weren't sued.  You intervened.  I denied

10  you intervention.  You took that up on appeal to the Fifth

11  Circuit and the Fifth Circuit mandated that you be allowed to

12  intervene.  In fulfillment with that mandate, I allowed you to

13  intervene.

14       And so to the extent that you're trying to argue now

15  that you get to intervene and assert now some First Amendment

16  argument that you don't have to produce anything, that's very

17  perplexing to me.  I don't understand that at all.

18       And this failure to produce any kind of privilege

19  log, I don't understand that either, because the rules require

20  you to do so.

21       So we're still left with an overly broad request for

22  Production Number 2.  You-all need to meet and confer on

23  Number 2, figure out what key terms you believe would be

24  conducive to getting what you think you need, but requesting

25  party doesn't get to dictate how a producing party actually

1   does their production.

2          The caveat with that, though, is if you-all engage in

3   a deficient production and a requesting party gave you key

4   terms to search and you failed to do so, and then you do your

5   deficient production and the deficient production is proved to

6   be deficient, you again have created for yourself a new 26(g)

7   rule violation for which I can entertain sanctions for.

8          So that's the obstacle you face by not meeting and

9   conferring with the other side in a good faith effort to try

10  to resolve this dispute.

11         MR. GORE:  Your Honor, I believe I understand Your

12  Honor's ruling on that point.  I did want to address a couple

13  of points that Your Honor raised, if I might.

14         First, one of our objections that these requests are

15  overbroad is that they are way outside of the scope of the

16  amended scheduling order that was entered in this case.

17         THE COURT:  Well, so now that's a problem too,

18  because the amended scheduling order in this case is after the

19  Fifth Circuit's mandate and after I allowed you-all to come

20  in, so —

21         MR. GORE:  And that's our point.  So the amended

22  scheduling order limited discovery during this period to the

23  primary election in 2022 and limited discovery against

24  intervenors to witnesses we disclosed.  We didn't disclose any

25  witnesses, and yet they have come in with these very broad

1  discovery requests and requests for production.

2  THE COURT:  Say that first part again for me.

3  MR. GORE:  An amended scheduling order was limited to

4  discovery during the primary election period.  And it was —

5  the only discovery that was authorized with respect to

6  intervenors was discovery against witnesses disclosed or newly

7  disclosed by intervenors.  We haven't disclosed any witnesses.

8  So they have come now with these very broad discovery

9  requests that aren't tethered to witnesses we disclosed.  We

10  had understood Your Honor's order as a very narrow scheduling

11  order allowing only very narrow discovery for the remainder of

12  that primary election period.

13  There's a second period that's now started with

14  respect to the 2022 general election.  And the plaintiffs

15  asked for that limitation.  That was in the joint notice that

16  was entered by the parties on June 7th.  I can read, Your

17  Honor, from that joint notice what the plaintiffs actually

18  said.

19  THE COURT:  One second.  Let me pull that one up in

20  front of me.  Do you know what the docket number is on that

21  one?

22  MR. GORE:  Yes.  It's Document 436.

23  Recall, Your Honor, after the Fifth Circuit's opinion

24  in this case the case was remanded.  We moved to intervene,

25  which Your Honor granted, and Your Honor also vacated the then

1   existing scheduling order and ordered the parties to confer

2   and propose a new scheduling order.  And this joint notice

3   issued on June 7th, filed with the court on June 7th, was that

4   joint proposal to the Court.

5          And if you look at page 2, scroll down to the second

6   full paragraph, it starts "plaintiffs' proposal."  And this

7   was plaintiffs' proposal with what should happen in the

8   primary discovery period, which was the period ongoing at the

9   time our intervention was granted, which the parties asked the

10  Court to extend.

11         And if you look at the second sentence, it starts,

12  "intervenors may conduct non-duplicative discovery" — that

13  would be us conducting discovery since we're new parties to

14  the case.  "Plaintiffs may take discovery of witnesses

15  disclosed by intervenors."

16         And then there's some other discovery they wanted to

17  take.  They wanted to depose Miss Adkins, Miss Kristi Hart.

18  And then a few lines down it says, "any witnesses newly

19  disclosed by intervenors and any witness who may have

20  testimony concerning documents produced pursuant to the motion

21  to compel response to the legislative subpoena."

22         If you flip over to page 3, there's further language

23  from the plaintiffs' proposal about how they envisioned the

24  remainder of discovery going.  So about two-thirds of the way

25  down that page, the heading says, "Plaintiffs and County

1   Defendants' Proposal."  This was the proposal with respect to

2   the secondary discovery period.  They want it to relate only

3   to the November 2022 general election.

4         And then the next sentence says, "Plaintiffs and

5   county defendants further propose that plaintiffs and

6   defendants may commence or reopen no more than eight

7   depositions per side, absent further leave of court."

8         Down to the bottom of page 3, carried over to page 4,

9   they talk about a limitation on the number of depositions,

10   "During the supplemental discovery period we will

11   appropriately limit the burden on the parties around the

12   general election season and reflect the more limited nature of

13   discovery that needs to be completed."  That's the discovery

14   that the plaintiffs asked the Court for.

15         If Your Honor turns to Docket 437, that's the order

16   from the Court which incorporates the limitations that the

17   plaintiffs asked for.  So on page 1, towards the bottom,

18   there's a paragraph that starts "discovery."

19         "Discovery during the primary election discovery

20   period may include discovery from witnesses both already and

21   newly disclosed by intervenors."  And then it lists the

22   remainder of the discovery that the plaintiffs asked for,

23   including the depositions of Miss Adkins and Miss Hart.

24         And at the bottom of the page it says that

25   intervenors may conduct additional but limited non-duplicative

1  discovery.

2        If you turn to page 2, scroll down to the fourth full

3  paragraph, starts discovery, "Discovery during the general

4  election discovery period may include discovery on any and all

5  matters relating to the November 2022 general election, as

6  well as any and all documents produced in response to any and

7  all successful motions to compel filed during the primary

8  period."

9        Next paragraph, "The parties may commence or reopen

10 no more than ten depositions per side absent further leave of

11 the Court."

12       So what the Court authorized was what the plaintiffs

13 asked for, which was very narrow discovery.  We were candidly

14 perplexed by their request for production propounded on us.

15 We didn't disclose any witnesses.  We haven't disclosed any

16 witnesses at any period of this case.

17       THE COURT:  You're confusing me now.

18       MR. GORE:  Yeah.

19       THE COURT:  We were talking about a request for

20 production.  How did we move to this topic about witnesses?

21       MR. GORE:  Sure.

22       THE COURT:  Production Number 2 didn't talk about

23 witnesses.

24       MR. GORE:  That's exactly our point.  If you look at

25 page 1 of your scheduling order it says, "Discovery during the

1 primary election period may include discovery from witnesses

2 both already and newly disclosed by intervenors."  That's the

3 only discovery that the amended scheduling order authorized

4 against intervenors.

5          Remember, the Court wanted to move the case forward,

6 wanted to narrow the scope of the remaining discovery so that

7 we could have a trial in this case next summer.  And so the

8 only discovery they asked for from intervenors and that they

9 asked to be allowed to take from intervenors was discovery

10 about witnesses that we might disclose.

11          Now, I assume that would have been document requests

12 of those witnesses.  That could have been requests for

13 admissions of those witnesses.  And obviously it would have

14 been depositions of any such witnesses.

15          But we never disclosed any witnesses.  So the only

16 discovery they asked for was they wanted to know — they

17 wanted to have discovery against our witnesses.  That's the

18 only discovery the Court authorized.

19          And now they have come with these really broad

20 requests for production and interrogatories that aren't aimed

21 at witnesses disclosed by us because we haven't disclosed any

22 witnesses.  And that, we've raised that issue and we've asked

23 them about it and we haven't gotten an answer as to how this

24 fits within the scheduling order.

25          That's why we're a little perplexed by these

1 discovery requests, and one of the main reasons we say they
2 were overly broad.
3          And let me just say, Your Honor, the reason I said
4 before that we're happy to give these external communications
5 to the plaintiffs, we think those are outside the scheduling
6 order too but we understand that those may be documents that
7 they are interested in, the Court may be interested in
8 allowing them to have.
9          But beyond that, we've gone so far afield of any
10 witnesses disclosed, non-existent witnesses disclosed by the
11 intervenors, that's where our struggle with the threshold has
12 been in trying to engage in a good faith meet and confer
13 process.
14          THE COURT:  What's your response to that?
15          MISS PERALES:  Thank you, Your Honor.
16          I have to confess.  It took a little while to
17 understand defendant intervenors' reading of the amended
18 scheduling order, but if I could start by saying that the
19 operative document here is the amended scheduling order.
20          The amended scheduling order does not incorporate the
21 joint notice that counsel has spent so much time focusing on.
22 The only thing I will say about the joint notice, Docket 436,
23 is that it nowhere says that plaintiffs seek to limit the
24 discovery that they would take of intervenor defendants --
25 defendant intervenors.

1    The joint notice was filed with the court about three

2  weeks after the defendant intervenors entered the case and

3  there's nothing in here that says that we want to limit our

4  discovery.

5    Counsel has presented a blend of both scope arguments

6  and timing arguments and I think it's important to separate

7  those when looking at the Court's amended scheduling order,

8  Docket 437.

9    First of all, the Court provides the deadline for

10  completion of discovery on matters related to the primary

11  election as to plaintiffs', State defendants, and county

12  defendants as August 12th.  And then the Court provides the

13  deadline for completion of discovery on matters related to the

14  primary election as to intervenors is October 24th.

15    Plaintiffs propounded their requests for production

16  and interrogatories in the first and second week of July.  So

17  as to paper discovery, Your Honor, all of that fits, even

18  within defendant intervenors what we contend is a misreading

19  of the Court's amended scheduling order of August 12th.

20    Nevertheless, defendant intervenors make scope

21  objections to our discovery which was propounded even within

22  their August 12th deadline, and they object to the scope of

23  discovery claiming it really could only be as to witnesses

24  that they disclosed because somehow when the Court says that

25  "may include, primary election discovery may include discovery

1  from witnesses both already and newly disclosed by

2  intervenors," that that is read as must be limited to

3  discovery from witnesses both already and newly disclosed by

4  intervenors.  So we certainly don't read the scope limitations

5  in this amended scheduling order that the defendant

6  intervenors do.

7        And as to the timing, only to reassert, Your Honor,

8  that we propounded the discovery on July 7th and July 13, the

9  paper discovery, and then of course having not received any

10  documents were then forced to try to notice depositions, you

11  know, before the October 24th deadline which we do believe is

12  a two-way discovery period.

13        When the Court says in its amended scheduling order,

14  "The deadline for completion of discovery on matters related

15  to the primary election as to intervenors is October 24th,

16  2022," we never understood that to be a one-way discovery

17  where they were able to propound on us but somehow we were

18  required to take all of our discovery before August 12th.

19        THE COURT:  Let's step back though and let me

20  understand the relevance, especially to Number 2 that's very

21  broad.  What do you think is relevant?  What relevant

22  materials do you think you're going to gather from the

23  intervenors here regarding your case?

24        MISS PERALES:  Well, Your Honor, we would like to

25  know, at least with Number 2, which has to do with

1    communications with the Texas Legislature, materials that

2    defendant intervenors were exchanging or sending to Texas

3    legislators, for example, about election integrity, perhaps a

4    communications urging legislators to adopt measures to ensure

5    election integrity, because they were asserting that there was

6    voter fraud and specific types of voter fraud and so it falls

7    within that request on Number 2.  We do believe it's relevant.

8           THE COURT:  And so I'm still stuck with the phrases

9    "election administration, voting integrity, or conduct," those

10   are all very broad phrases.  So I mean, do you have a sense of

11   just who the key players are in this litigation now, because

12   in Number 2 you have asked with the entirety of the Texas

13   Legislature.

14          I mean, are there ten or 15 key custodians of data

15   that you think are primarily in contact with the intervenor

16   group?  I mean, it's certainly not all several hundred of

17   them, right?

18          MISS PERALES:  It's more likely, Your Honor, to be

19   the flip of that, which is that there are probably ten to 15

20   persons that defendant intervenors can identify who conducted

21   most of the communications with the Texas Legislature.  But it

22   can't be said that only, for example, a committee chairman

23   would be the only person who may have been in communication.

24          THE COURT:  No, and I understand that.  There's

25   probably a committee chairman, and there's probably several

1   key staffers of that person, and there's perhaps a select few

2   others.  But what I'm hearing from you is you have not

3   identified them?

4           MISS PERALES:  No, Your Honor.

5           THE COURT:  So how are we going to get through Number

6   2 then?  You are hearing me say that your phrases are too

7   vague.  Are you going to withdraw Number 2 and try to

8   rephrase, or how are you going to overcome this?

9           MISS PERALES:  Well, Your Honor, to withdraw and

10  rephrase would mean that there would be a change to the

11  schedule because I think we're all in agreement

12  October 24th has passed.

13          It is our contention that if there were responsive

14  documents, for example, election integrity, that's a pretty

15  easy to understand phrase and one that lies at the heart of

16  defendant intervenors' defense of SB 1 in this case.  They

17  should have been able to produce those documents and then

18  said, you know, we can't produce the others because it's too

19  many or we don't know what that word means.

20          THE COURT:  So Mr. Gore, have you done any kind of

21  sampling of your database to figure out how many hits Request

22  for Production Number 2 might generated?

23          MR. GORE:  Not specific to Number 2.  We have looked

24  at election administration and election integrity.  And

25  especially voting, as you can imagine, that's an

1  extraordinarily broad term in our universe.

2          So we're happy to work with plaintiffs to talk a

3  little bit about how to find other ways to narrow it, make it

4  a little bit more specific to the legislature.  But, again, if

5  we just come back to the amended scheduling order where all of

6  the discovery during this period was supposed to be about the

7  primary election, this is way beyond that.

8          THE COURT:  No, but I mean, how do you get past

9  Miss Perales' and I think it's — we're all textualists now —

10 right? — so how did "may" all of a sudden become "will be

11 only limited to?"

12         MR. GORE:  Because it's clear from the order that the

13 order, if you look at page 1, primary election discovery, the

14 second paragraph, first and second paragraphs under that say,

15 "The deadline for completion of discovery on matters related

16 to the primary election," it says that in both paragraphs.

17 That was the only discovery that was ongoing at the time of

18 our intervention.

19         Discovery with respect to everything else had already

20 been closed because the Court was going to be holding the

21 trial over this past summer, right around the time we filed

22 our motion to intervene.

23         THE COURT:  But the second line deals with a

24 deadline.  It doesn't deal with scope.  And then so we go one,

25 two, three, four paragraphs, "Discovery during the primary

1 election discovery period may include discovery," so it didn't
2 limit discovery to any kind of topics.
3         MR. GORE:  No, that's exactly right, but I
4 respectfully disagree on paragraphs one and two.  Those are
5 both deadlines and limitations of scope because they say
6 "discovery related to the primary election."
7         Recall, there had been full discovery already in the
8 case of expert witnesses, fact witnesses.  The only discovery
9 that was still ongoing was discovery about how SB 1 had been
10 applied and administered in the 2022 primary election.  That's
11 what was going on at the time we intervened.
12         What the Court did was extend the period for that
13 discovery.  And then in paragraph 4 it authorized other
14 discovery that was beyond the primary election consistent with
15 the joint notice the parties had filed.
16         There had been disputes about deposing Miss Adkins
17 and Miss Hart.  There had been disputes about the LULAC
18 plaintiff's motion to compel and documents that might be
19 propounded in response to that, to an order on that motion.
20         So what the Court did was authorize a limited scope
21 of additional discovery beyond the primary election.  And
22 that's — if you read the joint notice, that's exactly what
23 the parties asked for.
24         Parties asked for continuation of primary election
25 discovery and a couple of categories of discovery beyond that,

1   given both that we as intervenors had just entered the case

2   but also that there were lingering discovery disputes with

3   respect to earlier periods.  That's all this authorized during

4   this discovery period.

5           And none of the RFPs are limited to witnesses

6   disclosed by us or to the primary election.  If you look

7   beyond one and two and three and four, and we can go through

8   the whole list, but none of them have anything to do — they

9   are certainly not limited, I should say, Your Honor, to the

10  primary election or the witnesses we disclosed because there

11  aren't any such witnesses.  And that's, I think, the

12  fundamental challenge here is to engage on that point.

13          The scheduling order is clear.  And they haven't

14  moved to amend the scheduling order.  They haven't brought a

15  motion under Rule 16.  They haven't explained why good cause

16  would exist to amend the scope of the scheduling order with

17  respect to primary election and these other issues.

18          I think Your Honor is well aware that we didn't want

19  to extend discovery when we intervened in the case.

20          THE COURT:  I didn't know what you wanted to do.

21          MR. GORE:  We wanted to be involved in the case and

22  protect our legal interests here.

23          THE COURT:  I thought the AG's office was doing a

24  perfectly fine job without you, but go ahead.

25          MR. GORE:  They were doing a fantastic job without

1  us, but there was limited discovery that lingered between the
2  parties and an interest in taking more discovery related to
3  the primary election.  That was it.
4         And so we've been abiding by that or trying to abide
5  by that and don't understand these requests to relate to be
6  limited to the primary election or to be limited to witnesses
7  we've disclosed.  And we could walk through each of the
8  requests and talk about why that is.  I don't know that we
9  need to belabor that and take Your Honor's time to do that,
10 but that's where we've been fundamentally struggling.
11        THE COURT:  Let me stop you here, Mr. Gore, though.
12 To reread all nine pages of your general objections, you know
13 what?  You never raised that argument in all those nine pages,
14 nor in response to any objections to the requests for
15 production.  In the objections you never raised that as an
16 objection.
17        MR. GORE:  We raised that it was overbroad and we
18 further through the meet and confers and further
19 correspondence --
20        THE COURT:  Yeah, but, no, you never raised the
21 scheduling order arguments that you're raising now.
22        MR. GORE:  We certainly did in our further
23 correspondence with plaintiffs about our overbreadth objection
24 and about the burden objection.
25        THE COURT:  Yeah.  So we'll nip that one in the bud.

1  So the documents are relevant and they're not outside the
2  scope of the amended scheduling order.
3          So now, plaintiffs' group, the verbiage is too broad.
4  So "voting" especially.  I mean, I don't know what to do about
5  the word "voting," that's just that's crazily overly broad.
6  So you work out amongst yourselves and I'll wait to see what
7  kind of production is made.
8          What reasonable people should do is we ought to
9  figure out who the 15 or 20 staffers or members of legislature
10 were in contact with the intervenor groups from January 1,
11 2020, to the present, that exchanged communication talking
12 about election integrity or administration.  That's what
13 reasonable people should do.
14         Hopefully, I have reasonable people in front of me.
15         MISS PERALES:  Yes, Your Honor.
16         THE COURT:  So we can spend the rest of the day going
17 through all the others.  I guess Number 3 and 4, and that's
18 why Mr. Sweeney [verbatim] is here, so what makes
19 communications different between the Office of the Governor,
20 or the Office of the AG, the Lieutenant Governor, and the
21 Secretary of State?
22         MR. SWEETEN:  Your Honor, with respect to that issue,
23 I think the position we've taken was on the depositions.  I
24 mean, that's our filing.
25         THE COURT:  So you have no opposition to the

1  intervenor groups sending to the plaintiffs any communications
2  they may have had with any of those four offices.
3       MR. SWEETEN:  Well, I mean, Your Honor, we have not
4  asserted such an objection, and those would be, you know,
5  presumably in the possession of intervenors, if they exist.
6  And so our interest was with respect to the scheduling order
7  and the depositions, so...
8       THE COURT:  Thank you.  So hearing no opposition from
9  the Attorney General's office about this, then why doesn't
10 intervenors want to send out any information?
11      MR. GORE:  So, again, I think our answer on Number 3
12 would be the same as our answer on Number 1.  I think our
13 answer on Number 4 and Number 5 would be the same as our
14 answer on Number 2.  We, again, just have the same overbreadth
15 issue potentially.  And I think I understand Your Honor to be
16 encouraging us and instructing us to further engage on that,
17 which we're happy to do.
18      THE COURT:  So, unlike Number 2 though, I mean, here
19 they're specific.  They are asking about SB 1, SB 7, HB 3, HB
20 6.  There's nothing here about this broad voting generally.
21 Now, Number 4 does hit on what you are concerned about.
22      MR. GORE:  Right.  I may have been speaking in too
23 much shorthand, Your Honor.  I think Request Number 3 tracks
24 Request Number 1.
25      THE COURT:  Yeah.

1          MR. GORE:  And Requests 4 and 5 track Request Number

2    2.

3          THE COURT:  So I expect Number 3 is going to be fully

4    complied with by December 1.

5          Number 4, again, I have problems with the general

6    phrase "voting."  That's unduly broad.

7          Okay.  Number 5, Harris County.  So you're under the

8    impression that the intervenors were communicating with the

9    elections administrator of Harris County or Dallas County?

10         MISS PERALES:  Yes, Your Honor, because the

11   intervenors include the Harris County Republican Party and the

12   Dallas County Republican Party, so it is our expectation that

13   there would have been communication between them.

14         THE COURT:  But that's not what you're asking for.

15   You are asking about not the Harris County party or the Dallas

16   County Republican Party, you are asking about the elections

17   administrator of Harris County.

18         MISS PERALES:  Yes, Your Honor.  Defendant

19   intervenors' communications with local elections

20   administrators in Harris and Dallas County.

21         THE COURT:  And so I'm frankly kind of surprised.  Do

22   you guys have any communications that you said to those two

23   administrators?

24         MR. GORE:  I can't say for certain, but I don't think

25   many, if any.

1          THE COURT:  So then your objection which is — I know
2    I'm riding you guys hard, but when you raise an objection of
3    unduly burdensome, it can't be unduly burdensome if you
4    already know that there's not many.
5          MR. GORE:  I think that reflected our knowledge at
6    the time, Your Honor, but, yes, I understand Your Honor's
7    point.
8          THE COURT:  Number 6.
9          So Number 6, the problem, Miss Perales, is you don't
10   have any date parameters on this.  I guess you reference SB 1,
11   SB 7, HB 3, and HB 6.  I mean, every legislative session
12   there's an SB 1 — right? — SB 7, HB 3, and HB 6.  Which
13   legislative session are you talking about?
14         MISS PERALES:  I believe those are in the definitions
15   provided with the discovery, Your Honor, but they are limited
16   to those bills and their relevant sessions.
17         THE COURT:  Yeah.  So, you know, again, now I'll harp
18   on you.  Just like what the intervenors did, nine pages of
19   general objections is improper.  And then requesting parties
20   coming up with their own listing of definitions is also
21   improper.  You have to list with specificity in your request
22   for production what you're seeking, and so —
23         MISS PERALES:  I don't believe there's been a
24   misunderstanding as to those phrases, Your Honor, but we are
25   more than happy to clarify that, you know, SB 1 belongs to its

1  relevant session, and so forth.

2          THE COURT:  Now, the other problem I have is, okay,

3  so let's assume that the intervenors were discussing with The

4  Heritage Foundation and Texas Public Policy Foundation and all

5  these other groups, how is that relevant to what was before

6  and what was the intent of the Texas Legislature in enacting

7  this legislation?

8          MISS PERALES:  This is an appropriate moment, Your

9  Honor, to point out that plaintiffs have not limited their

10 claims in this case to intentional racial discrimination,

11 although those claims are in the case and we do consider them

12 important.

13         There is other evidence in this case, including the

14 effect of the challenged provisions of SB 1.  And it is

15 certainly our interest to learn if there were any

16 communications or other documents among defendant intervenors

17 opining as to the likely impact of SB 1, particularly on

18 groups of vulnerable voters.

19         THE COURT:  I'm still stuck with, okay, so you picked

20 certain parties, The Republican Party of Texas.  Maybe I see

21 some relevance there, but if the intervenors are having

22 communications with The Heritage Foundation or The Texas

23 Public Policy Foundation, I mean, why limit it to those

24 groups?  Why not ask whether any of those insurrection groups

25 on January 6th were all part of this?

1        I mean, I don't understand where you're getting at
2   with this list.
3        MISS PERALES:  These groups are often associated with
4   claims of voter fraud, using certain methods of voting, and so
5   we certainly were being thoughtful about the list that we
6   created and putting on there lists of groups that do talk
7   about voter fraud with respect to, for example, mail voting,
8   or what is called in SB 1 "vote harvesting," and other
9   practices that we contend are impaired or limited under SB 1.
10        THE COURT:  But where's — one second.  I'm trying to
11   help you out, so, don't worry.
12        So I'm trying to figure out here, though, I mean,
13   let's assume The Heritage Foundation is thinking about these
14   kind of issues and they are in discussion with the
15   intervenors.  I still don't understand.
16        You're going to have to have a tie in then, right?
17   Don't you have to bring in that somehow or another that
18   members of the Texas Legislature or at least the leadership
19   team were aware of The Heritage Foundation and their positions
20   on all this?
21        MISS PERALES:  Only with respect to the intent claim,
22   Your Honor, but because we have other claims such as the
23   effect, a document or an email going —
24        THE COURT:  Oh, it just dawned on me what you're
25   doing.  Okay.

1          Yeah, so you want to respond to that?

2          MR. GORE:  Yeah, I do, actually, Your Honor.  Thank

3  you.

4          So a couple of things.  It's not relevant to any

5  issue presented in the case, not even on effects because,

6  again, these are communications that are internal and they

7  don't necessarily reflect anything about the effects of SB 1.

8          So, for example, we've also raised a First Amendment

9  objection here that I think is a very strong one and we've put

10 declarations into the record about this.  So let's just say,

11 and I don't know if this is true or not --

12         THE COURT:  So let me make sure I understand your

13 First Amendment arguments.  So, yes, your group has a First

14 Amendment right to speech, but how is it being curtailed in

15 this lawsuit by requiring you to produce documents that you've

16 been sending out to all over the world?

17         MR. GORE:  Let me cite Your Honor to the *Perry versus*

18 *Schwarzenegger* case from the Ninth Circuit, which we've relied

19 on in our briefing.

20         THE COURT:  So wait a minute.  I just want to make

21 sure.  There is a national Republican group relying on Ninth

22 Circuit case law?

23         MR. GORE:  We're all textualists now, as I think Your

24 Honor said before.

25         THE COURT:  Okay.  I just want to make sure I caught

1  that.  Okay.

2         MR. GORE:  Certainly.  And in that case it was

3  proponents of Proposition 8 in California and intervening to

4  defend that particular proposition.

5         The Court held that those intervenors were entitled

6  to the full discovery protections of any party, including the

7  First Amendment, and they showed in that case that any

8  internal communications, or communications just with their

9  political allies, weren't relevant to the questions presented

10 in that case, and, in fact, were protected from disclosure.

11        The right to associate with other like-minded groups

12 includes the right to communicate about common issues —

13 issues of common interest with respect to public policy,

14 politics, election integrity, election administration, or SB

15 1.

16        So, for example, if there was some document from The

17 Heritage Foundation — and I don't know if there is or there

18 isn't — let's say there was a document from The Heritage

19 Foundation where it was — again, this is not stuff that was

20 broadcast publicly or put on its website or sent out to the

21 general public, but there was some communication back and

22 forth between that group and my clients formulating a position

23 with respect to SB 1, formulating a position with respect to

24 election integrity measures or voting measures, that's all

25 protected from compelled disclosure under the First Amendment

1    under the *Perry* case and a long line of other cases.

2            THE COURT:  So I could see that argument being made

3    that this was to a third party, but by you intervening in this

4    lawsuit, why haven't you waived that argument?

5            MR. GORE:  We haven't waived our First Amendment

6    rights by intervening.  That's what the *Perry* case holds.  The

7    *Perry* case holds that when an intervenor comes into the case,

8    it has the same rights as any other party.

9            THE COURT:  But you have your rights.  No one is

10   curtailing it.  You-all get to talk to all these other groups.

11   What's being done, pursuant to Rule 34 is, since you have now,

12   you've made yourselves parties, what's being required is you

13   have to disclose, and so I still don't understand the First

14   Amendment abridgment.

15           MR. GORE:  It's just like attorney-client privilege.

16   We didn't waive our attorney-client privilege by intervening

17   in the lawsuit.  They can't now ask —

18           THE COURT:  But the First Amendment is not a

19   privilege.  It's a right.

20           MR. GORE:  No, but it's a privilege against compelled

21   disclosure.  It's a privilege against compelled disclosure of

22   internal communications, strategy discussions on issues of

23   public policy and public import.  It's clear — that's a clear

24   holding in the *Perry* case and other cases that we've cited in

25   our briefs.  And so we have a — the privilege is against

1 compelled disclosure of internal communications and internal
2 documents with respect to public policy positions and issues
3 of public import.
4        And we've even put affidavits into the record from
5 each of the clients explaining how compelled disclosure of
6 these documents and communications, such as they exist, would
7 have a chilling effect on the intervenor defendants' ability
8 to formulate positions and engage in the political process, as
9 is their right under the First Amendment.
10        THE COURT:  So assuming you are right, you get to
11 keep everything out?  Like let's just say that your client
12 sent to The Heritage Foundation some already existing report
13 in academia.  Does that communication also now get subject
14 into this umbrella of a First Amendment protection, or is it
15 internal communications back and forth?  How far does your
16 argument go?
17        MR. GORE:  We think it goes quite far.  Now, to your
18 hypothetical, I don't know if there is some academic study
19 that was passed around these groups.
20        THE COURT:  That's the problem with all of your broad
21 objections.  And I guess I have another problem with your — I
22 don't know — I mean, by this time I'm amazed that you guys
23 have not figured out what is there.
24        It would be a whole lot more productive to have a
25 fruitful discussion if we actually sort of knew what was in

1  existence.  I mean, hypothetically there may be nothing with

2  regarding, you know, ten of these groups and we could be

3  having an easier discussion saying "none."

4         MR. GORE:  Right.  And I appreciate where Your Honor

5  is coming from on that, but I think in principal any of the

6  communications that went back and forth certainly would be

7  protected by the First Amendment.

8         I'll just note that with respect to our discovery

9  request the plaintiffs have also asserted First Amendment

10  privileges.  And the LULAC plaintiffs have even said they are

11  not going to identify or produce documents in response to a

12  similar request, which would add communications and documents

13  that may have exchanged with other third-party political

14  allies.

15         So I don't think the position we are taking is

16  unique.  I think it's well supported by the case law,

17  including the *Perry* case, and it's consistent with the

18  position that at least some of the plaintiffs' groups have

19  taken with respect to our discovery request.

20         So we think there's a serious First Amendment issue

21  here, and we've also cited cases that say because it's so

22  obvious on its face that these requests strike at First

23  Amendment protected communications and we don't even have to

24  produce a privilege log, and those cases we have cited to Your

25  Honor as well.

1          If you look at the scope of these requests, 6 and

2    particularly 7, which goes beyond SB 1, again, it's election

3    administration, and voting, and everything under the sun.

4    Again, we're getting into areas of public policy advocacy

5    where the intervenor defendants have a strong First Amendment

6    right, any privilege against compelled disclosure, whether

7    it's under third-party discovery requests or first-party

8    discovery requests, it's all the same.  That First Amendment

9    privilege persists as plaintiffs themselves have recognized.

10          MISS PERALES:  Your Honor, if I may, four quick

11   points.

12          First, as to Request for Production Number 6, these

13   are not internal to defendant intervenors.  The Heritage

14   Foundation is a 501(c)(3) organization.  I think it would be a

15   great surprise to them to hear that they work for the National

16   Republican Party.

17          THE COURT:  Maybe, maybe not.

18          MISS PERALES:  Nevertheless, these are completely

19   separate.

20          THE COURT:  I get that, but his point still remains,

21   okay, even with separate third-party organizations he argues

22   that they have a First Amendment right to communicate with

23   each other.

24          MISS PERALES:  And he points to *Perry versus*

25   *Schwarzenegger*, and we do encourage the Court to read that

1   case because *Perry versus Schwarzenegger* says that the
2   privilege is evaluated document by document and that there
3   should be a privilege log.

4          We are at step one here with discovery, failure to
5   produce any documents and no privilege log.  The defendant
6   intervenors want to take you to step three, which is somehow
7   making rulings on privilege assertions that are not specific
8   to any documents.

9          They have not run their own search terms against four
10  of the five defendant intervenors.  And their declarations,
11  you know, it's the same declaration each time, but only Harris
12  County includes the number of documents that were produced
13  from the search term run.  The others omit that sentence.  And
14  it's our understanding that they haven't even begun to run
15  these searches, or if they have we haven't heard a single
16  thing about them.

17         Finally, Your Honor, with respect to plaintiffs'
18  discovery responses, LUPE plaintiffs gave the Bates number
19  ranges of all of the documents that they produced to State
20  defendants that were responsive to defendant intervenors'
21  discovery requests because there was the overlap there.  We
22  held nothing back under the First Amendment, and —

23         THE COURT:  So Mr. Gore says that you were raising
24  claims that some other third-party groups affiliated with
25  you-all you held back.

1          MISS PERALES:  Well, to the extent that there is any
2    plaintiff who has not yet produced the documents or has
3    invoked the First Amendment privilege, they have not refused
4    to produce a privilege log.  The plaintiffs are united.  There
5    may have been different discovery responses from different
6    plaintiffs, but the plaintiffs are united on two points.  The
7    privilege has to be asserted document by document and there
8    has to be a privilege log.

9          And the fact that the Court is struggling at this
10   point, asking, well, is there one document, or what sort of
11   document might that be, is directly the result of the fact
12   that we are at step one here and we should not be
13   fast-forwarded to making rulings on, you know, privilege
14   assertions for documents that haven't even been included in a
15   privilege log.

16         MR. GORE:  If I might, Your Honor, let me just cite
17   to the LULAC plaintiff's responses to our request for
18   production, which is the ones I referred to earlier.  We have
19   attached those as an exhibit to our reply brief that we filed
20   on Friday.

21         Page 13, they reproduce Request for Production Number
22   6, which lists a number of groups, such as Priorities USA,
23   moveon.org, Fair Fight, MOVE Texas, Project Vote, their
24   objection is this request seeks communications and documents
25   which would divulge any existing strategic partnerships and

1   operations and intrude upon LULAC's First Amendment's rights.

2   Disclosure of such information would severely chill LULAC's

3   exercise of its associational rights and those of its

4   strategic partners.  And then they say LULAC will not identify

5   or produce documents in response to those requests.

6           THE COURT:  It didn't produce a privilege log?

7           MR. GORE:  To date it has not.

8           MISS PERALES:  The discovery was served much later,

9   Your Honor, and so, you know, it is —

10          THE COURT:  Are you intending to produce a privilege

11  log on that, or not?

12          MISS PERALES:  I represent the LUPE plaintiffs in

13  this case and not the LULAC plaintiffs, but I do believe LULAC

14  plaintiffs are here in the hearing today and might be able to

15  speak for themselves.

16          I will say they have not refused to produce a

17  privilege log and that discovery schedule is much later — is

18  much later in time than the one that we are dealing with here

19  today.

20          THE COURT:  I'm going to think about 6 and 7.

21          Okay.  We are on 8.  So why isn't 8 also — well, so

22  here's the problem I have with 8.  I mean, do you think the

23  intervenors produced poll worker training materials, is that

24  what you are trying to get at?

25          MISS PERALES:  Yes, Your Honor.  Election judges,

1  election clerks, and other poll workers, training materials,

2  presentations created or provided, yes.

3       THE COURT:  So, I mean, I thought the Secretary of

4  State provided training materials.  Are you trying to argue

5  that the Secretary of State devised that office's training

6  materials based upon what these intervenors gave?

7       MISS PERALES:  No, not at all, Your Honor.

8       THE COURT:  Well, then, how is this relevant?

9       MISS PERALES:  Well, because the defendant

10 intervenors, we believe, provide additional advice and

11 training to poll workers and election judges, separate and

12 apart from what the Secretary of State does to train.

13      THE COURT:  So you are talking about to the

14 Republican designees?

15      MISS PERALES:  Yes, Your Honor.

16      THE COURT:  Your response to that.

17      MR. GORE:  Yeah.  Your Honor, I will say that prior

18 to SB 1 I believe there were such training materials.  SB 1

19 created this requirement for the Secretary of State in the

20 first instance.  I don't know what pre-SB 1 practice has to do

21 with the challenge to SB 1.

22      THE COURT:  That's not what I'm hearing.  What I'm

23 hearing is — well, maybe I'm wrong.

24      What I thought you were telling me is in light of SB

25 1 the intervenors created training material for Republican

1  party designees.  Is that what you are asking for?

2          MISS PERALES:  Well, before and after, Your Honor.

3          THE COURT:  So he's saying before there was no

4  requirement and that they didn't do it.

5          MISS PERALES:  No.  I believe they are saying they

6  don't do it now but they used to.

7          MR. GORE:  We did provide training before SB 1, but

8  what does that have to do with SB 1?

9          THE COURT:  Well, that's a good point too.  So let's

10  say they did provide training materials before SB 1.  What's

11  the relevance of that?

12          MISS PERALES:  The relevance of that, Your Honor, we

13  believe has to do with their position with respect to ensuring

14  election integrity and what types of practices or changes, you

15  know, they think are necessary.

16          THE COURT:  Yeah.  No, you're asking actually for the

17  training materials created for poll workers, and so the

18  representation being made to me is after the enactment of SB 1

19  the intervenors never did anything else.

20          MISS PERALES:  We don't have that in the discovery

21  response, Your Honor.

22          MR. GORE:  I don't know what did or did not

23  particularly happen with respect to the general election.  I

24  just want to be clear on that point.

25          But I'm looking at this discovery request.  It goes

1 | back to January 1st of 2018.  It's saying, with Request 9, if

2 | we look at those together, that's three and a half years

3 | before SB 1 was enacted.

4 |      THE COURT:  So your relevancy objection is sustained

5 | there.  Anything after the enactment of SB 1 that your clients

6 | created needs to be produced.

7 |      MR. GORE:  Your Honor, I'll just note for the record

8 | we have raised also a First Amendment objection with respect

9 | to these, since they go to our political activities in concert

10 | with our own volunteers and our own party officials.

11 |      Internal communications we may or may not have with

12 | poll watchers are part and parcel of election day operations,

13 | part and parcel of exercising our rights to participate in

14 | elections.

15 |      THE COURT:  Let's just take a wild hypothetical,

16 | completely unfounded.  You-all created training material that

17 | told your poll workers, "Everybody come armed to the hilt when

18 | you're doing your poll watching," you don't think that's

19 | relevant to being produced?

20 |      MR. GORE:  I appreciate that that's a hypothetical.

21 |      THE COURT:  That's a wild hypothetical.

22 |      MR. GORE:  Wild hypothetical.  Thank you for that

23 | caveat.

24 |      I don't think it's relevant to the operation of SB 1,

25 | because the question here is how does SB 1 operate in

1   practice, and our poll watchers who are complying with SB 1 or

2   otherwise exercising rights under SB 1 somehow violating the

3   laws of SB 1 create a violation of the law with respect to

4   those poll watchers.

5          So I'm not quite sure.  I don't think there's a claim

6   related to "being armed at the hilt," at a polling place, but

7   I do believe there are other claims with respect to poll

8   watcher activities.  Those are activities that poll watchers

9   engaged in as poll watchers in a polling place.

10         THE COURT:  Let me make sure I understand your First

11  Amendment argument on this then.  I mean, you-all have no

12  control over who the poll watcher is, right?  And so there may

13  not even be an association between your clients and the poll

14  watcher.  They may be completely unknown people to you.

15         MR. GORE:  Well, the poll watchers are appointed by

16  the parties or the candidates.

17         THE COURT:  But you're not the Republican Party of

18  Texas.

19         MR. GORE:  But the county parties participate in that

20  as well, so...

21         THE COURT:  But you're not the Harris County

22  Republican Party either.

23         MR. GORE:  Yeah, we are.  That's one — one of the

24  intervenors is the Harris County Republican Party and another

25  is the Dallas County Republican Party.  And they participate.

1        And they in the past -- those are the entities in the

2  past that have done poll watcher training.  I agree with you

3  on the national parties.  National parties aren't involved in

4  this, but the county parties have in the past, in the pre-SB 1

5  world.

6        When I said there was some training, it was done at

7  the county level not by the national party entities, and so

8  those county parties do designate poll watchers consistent

9  with SB 1 in the Texas Election Code, so those are actual

10  poll -- poll watchers are representatives of parties and

11  campaigns.

12        I think what Your Honor may be asking about is poll

13  workers and election judges.  And I'm not aware that there's

14  any -- ever been any training with respect --

15        THE COURT:  Yeah.  No, I was talking about poll

16  watchers.  Yeah.  I'm going to take under advisement 6, 7, and

17  9.

18        Moving to 10.  So what are you trying to get at here,

19  Miss Perales?

20        MISS PERALES:  Sorry, Your Honor.  I was catching up

21  on my notes.

22        Instances of poll watchers or poll workers

23  discriminating against or harassing voters is directly

24  relevant to the rules that were in play before SB 1 and the SB

25  1's loosening of controls on poll watchers, for example.

1          THE COURT:  Well, I mean, this thing is so vague
2    though.  I don't even understand what you're looking for.  Are
3    you talking about like one instance a discrimination of
4    harassment was reported, that you're asking for any documents
5    that they received about a report?  Or are you trying to get
6    at documents where they are inciting people to discriminate?
7          I'm not sure I understand the question at all.
8          MISS PERALES:  Any and all, Your Honor.
9          THE COURT:  Any and all is no longer allowed either.
10   MISS PERALES:  Point well-taken, Your Honor.
11         We are looking for documents that touch on questions
12   of either poll worker or poll watcher harassment or
13   discrimination against voters, whether that is a report
14   received by the party entities that are defendant intervenors
15   or discussions of those things internally.
16         THE COURT:  Isn't that stuff you should be getting
17   from the Texas Secretary of State's office?
18         MISS PERALES:  Sometimes a poll worker harassment or
19   watcher harassment is reported to the Secretary of State, but
20   not all the time.  Sometimes it can be reported to a
21   candidate's campaign office.  Sometimes to MALDEF.  Sometimes
22   to a county party.
23         But there could also include an internal document
24   saying, "When we tell people to stand very close to voters, we
25   get complaints that our poll watchers are harassing those

1  voters."  It could be an, you know, an internal discussion

2  document as well showing an awareness of, you know, some of

3  these things that poll watchers can do sometimes that are felt

4  as harassing.

5        THE COURT:  Do you-all receive any of these kind of

6  reports?  I mean, I guess the Harris County party might?

7        MR. GORE:  We don't receive official reports, no.

8  Those would go through official channels.  Whether some voter

9  may have called and said I'm having this issue, I can't speak

10  to that.  I guess it's possible.  I would note that this —

11  again, the date range goes back to January 1 of 2018.

12        THE COURT:  Well, that's changed to the SB 1

13  effective date.

14        MR. GORE:  Okay.  Thank you.

15        THE COURT:  Now, with that, does that cure your

16  objections, or not?

17        MR. GORE:  I think no for two reasons.

18        One is that SB 1 — again, I haven't heard how this

19  is relevant to SB 1.  SB 1 does require poll watchers to swear

20  an oath that they won't harass voters at the polls and they

21  won't interfere with the voting process.

22        So if there's an allegation in the case that poll

23  watchers have been doing that, in the post-SB 1 world, I guess

24  that gets to defects in SB 1 and part of their challenge, but

25  I don't understand the pre-SB 1 challenge on that at all, nor

1 do I understand why any one off call to us would be at all

2 relevant to the operation of SB 1 as opposed to some official

3 report somewhere else.

4      The second thing I'll note is, again, to the extent

5 that poll watchers are agents of the party, if we're having

6 communications with poll watchers about any topic related to

7 election administration implicates our First Amendment rights

8 and privileges and our opportunity to engage in that political

9 activity which is guaranteed both by statute in Texas and by

10 the First Amendment.

11      THE COURT:  I'm going to take 10 under advisement.

12      11.  So now, 11 clearly implicates any of those First

13 Amendment arguments that Mr. Gore is raising.

14      How do you get around that?

15      MISS PERALES:  Your Honor, we believe the First

16 Amendment privilege has to be evaluated document by document

17 and after the production of a privilege log.  We don't not

18 believe in the First Amendment, but we do believe fervently

19 that it has to be evaluated appropriately and as contemplated

20 by the rules of discovery.

21      MR. GORE:  I'd just like to note on the privilege log

22 question, Your Honor, we have cited several cases, including

23 cases after *Perry*, that hold that a privilege log isn't

24 required where it's obvious on the face that the request would

25 implicate the First Amendment privilege and that compelled

1  disclosure would violate the First Amendment.

2          I'll cite the Court to the *Apple* case that we cited

3  to in our reply brief that we filed on Friday.

4          I'll also note that with respect to certain of these

5  individuals, this would really apply to poll watchers and

6  other volunteers.  Disclosure of their names on a privilege

7  log also implicates their First Amendment interests.

8          And there's a case we have cited in our reply brief,

9  *The American Civil Rights Union* case that talks about how

10  compelled disclosure of identities of volunteers on behalf of

11  a political operation could violate the First Amendment,

12  particularly when what we are talking about is a hot button

13  issue like election integrity and election administration —

14          THE COURT:  Well, that could be overcome by

15  redaction, right?

16          MR. GORE:  Certainly with respect to the names,

17  that's true, but I just wanted to make the point that there's

18  another level to the First Amendment objection with respect to

19  disclosure of those identities, in addition to the broader

20  First Amendment points that we've raised.

21          I think as Your Honor has pointed out, both 11 and 12

22  are communications between the parties and their candidates,

23  strikes right at the heart of the First Amendment.

24          THE COURT:  Yeah.  This goes all the way down to 20.

25  I'm going to take 6, 7, 9, 10 through 20 under advisement.

1    And I'll let you know whether I sustain the First Amendment

2    claim in its entirety or require a privilege log, and so we'll

3    get back to you on that.

4            So then while Mr. Sweeney is here and the U.S.

5    Government is here, what else do we need to take up?  Do we

6    need to take up depositions, or what else do we need to take

7    up?

8            MR. SWEETEN:  Your Honor, so we did file a short

9    motion addressing the issue of depositions.  Mr. Thompson —

10   and I answer to Sweeney or Sweeten, so —

11           THE COURT:  Oh, I'm sorry.  I apologize.

12           MR. SWEETEN:  No worries, Your Honor.  But

13   Mr. Thompson is here to address that issue, if you will allow.

14           THE COURT:  Go ahead, Mr. Thompson.

15           MR. THOMPSON:  Your Honor, I am happy to go first, if

16   Your Honor prefers it that way —

17           THE COURT:  It doesn't matter to me.

18           MR. THOMPSON:  — I think it's a smaller piece of

19   their dispute about depositions and I'm happy to come at the

20   end.

21           THE COURT:  So they want them and you don't, so go

22   ahead.

23           MR. THOMPSON:  Okay.  Thank you, Your Honor.

24           And for the court reporter, my name is Will Thompson

25   from the Office of the Attorney General.  I represent the

1  State defendants.

2       The gist of this is the deadline issue, Your Honor,

3  that's addressed in the amended scheduling order.  There's a

4  deadline for primary election related discovery as to the

5  pre-existing parties that was in August.  There is a deadline

6  for primary related discovery.

7       THE COURT:  So, you know, we always want to keep

8  visiting the past.  Let's just move forward.  So apart from

9  deadline issues, what's the real objection to presenting

10  people for deposition?

11       MR. THOMPSON:  So they are not even our deponents.

12  Your Honor, our only point is, if they are conducting

13  discovery depositions at this point in time, we are in the

14  general election discovery period.  Your Honor imposed a ten

15  deposition limit, and those depositions should count against

16  their limit.

17       The only thing we're trying to avoid here is kind of

18  a mismatch of, we all agreed to ten, and now they are going to

19  get 18 instead.

20       THE COURT:  So, you know, I'm not metaphysically

21  present behind the scenes, so I have no idea how many

22  depositions have already been taken place.  So what has taken

23  place?

24       MR. THOMPSON:  As to the primary election discovery,

25  that's all over and done with I think.  I don't know the exact

1   numbers but many dozens of depositions were taken.  What I'm

2   talking about is the general election period.  I believe the

3   answer is zero as to both sides.

4          THE COURT:  So you confused me by 18.  Where did we

5   go to 18?

6          MR. THOMPSON:  When they noticed these depositions,

7   there's a dispute between the movants and respondents as to

8   whether these depositions count on the ten per side limit.  We

9   took the position it does count.  They took the position it

10  doesn't.  There's been discussion in the papers about whether

11  Your Honor will clarify that in this hearing.

12         To the extent Your Honor decides to addresses it, we

13  believe that the deposition conducted at this time should

14  count toward the limit.  There's nothing in the scheduling

15  order that provides an exception to that, that I'm aware of.

16         THE COURT:  Miss Perales.

17         MISS PERALES:  Your Honor, we have a position on this

18  and so does the United States.  My understanding of the

19  situation is that the Court's amended scheduling order allows

20  for a period of discovery after the general election,

21  including ten depositions per side.  And that's the general

22  election period of discovery.

23         Plaintiffs have sought to depose defendant

24  intervenors' witnesses, and we sought to do that within this

25  period of time in which we were taking discovery of defendant

1  intervenors.

2          We have noticed 30(b)(6) depositions of the defendant

3  intervenors themselves, as well as five Rule 45 associated

4  persons depositions.  Those depositions should not count

5  against the ten depositions per side provided by the Court.

6          THE COURT:  So are you saying it's ten, ten, ten, and

7  ten, is that what you are saying?

8          MISS PERALES:  Ten per side.

9          THE COURT:  So my point is how are you counting

10  sides?  Is the U.S. one side?  Is the intervenors another

11  side?  Are the plaintiffs' groups another side and the State

12  defendants another side?

13          MISS PERALES:  No, Your Honor.  We are one side.  And

14  they are another side.

15          THE COURT:  Okay.  So then if you're taking six

16  depositions, then are you limiting yourself to four others?

17          MISS PERALES:  No.  We do not want to limit ourselves

18  to four because the amended schedule says as to the general

19  election discovery we should have ten per side.  We don't want

20  to disturb that, but our depositions of defendant intervenors,

21  which were supposed to start in the early fall after we got

22  the documents —

23          THE COURT:  You are saying these were primary

24  depositions —

25          MISS PERALES:  Yes, Your Honor.

1          THE COURT:  — and should not be counted against on
2  the general count?

3          MISS PERALES:  Yes, Your Honor.  Thank you for
4  clarifying.

5          THE COURT:  Okay.  Now I get it.

6          So what's wrong with that, Mr. Thompson?

7          MR. THOMPSON:  Thank you, Your Honor.

8          I think there are two problems with that.  The first
9  is these deposition requests came well after the deadline for
10 any depositions related to the primary elections.  And the
11 second point is, at least as I understand it, these
12 depositions would not be limited to the primary election, just
13 kind of the substantive limitation for the — for those
14 earlier sets of depositions.

15         As I understand it, there are definition sections
16 within the notices that include general election voting, for
17 example.  And so that's the two parts, untimeliness, and it's
18 not actually limited to primary discovery.

19         THE COURT:  So Miss Perales, he's complaining that
20 there's going to be seepage.

21         MISS PERALES:  No, Your Honor.  We offered to limit
22 the depositions of defendant intervenors to primary election
23 questions so that they wouldn't count against the ten per side
24 in the general election discovery phase.  And I can find a
25 document —

1        THE COURT:  Let me make sure I nail you down on this.

2        What I heard Mr. Thompson complaining about is you

3   are going to ask about primary stuff but there's going to be

4   seepage going into general, so basically you get a double

5   depo.

6        MISS PERALES:  We -- I don't believe that's our

7   position, Your Honor.

8        THE COURT:  So you're telling me you're not going to

9   ask of those six people general election questions?

10   *(Off the record discussion)*

11        MISS PERALES:  I have to go back to the letter, Your

12   Honor, just to make absolutely sure, but my understanding is

13   that we offered to limit the depositions to primary election

14   only.  And then, of course, if we could -- if we wanted to use

15   one of our ten per side on one of those people, I suppose then

16   we could do that because the ten per side would remain intact.

17        MR. GORE:  Thank you, Your Honor, a few points, and

18   we agree with the State defendants on the points they have

19   raised so I won't belabor those.  But, again, we are getting

20   far afield of the amended scheduling order.

21        THE COURT:  But the timing, going back to the timing,

22   the timing was all a result of the Fifth Circuit mandate.

23        MR. GORE:  Well, let me address the timing portion

24   first then.  I was going to address it second portion but I'll

25   do this first.

1          Page one of the scheduling order says, "The deadline
2   for completion of discovery on matters related to the primary
3   election as to plaintiffs is August 12th, 2022."
4          They didn't indicate an interest in deposing anyone
5   from the intervenor defendants until October 5th.  So on
6   October 5th we got an email saying that they wanted to depose
7   some individuals that they had identified through Google
8   searches.  They are not witnesses we disclosed, which is my
9   other point on the amended scheduling order.
10         Again, if you look at that paragraph in the amended
11  scheduling order on page 1, it says, "During the primary
12  election period discovery may include discovery from witnesses
13  already and newly disclosed by intervenors."  These are not
14  people we disclosed.  We haven't disclosed any witnesses.
15         So these are individuals who they have located and
16  asked to be able to depose.  That didn't happen until
17  October 5th.  The depositions have been noticed for January.
18         In addition to those individuals, they've also
19  noticed some 30(b)(6) depositions.  It's a total of eight
20  depositions, nearly double the ten deposition limit that's in
21  the current scheduling order.
22         It's also double the limit they asked for in the
23  joint notice.  They only wanted eight more depositions as of
24  the date of the joint notice when we were already parties.  So
25  now what they are seeking is 18 total depositions when they

1  asked for eight and the Court granted them 10.

2        I'll also just note that it is true that at one point

3  as we were trying to negotiate back and forth the plaintiffs

4  offered to limit these depositions to matters related to the

5  primary election.  They then rescinded that offer and took a

6  different position in subsequent correspondence and in their

7  briefing before the Court.

8        Take a look at the 30(b)(6) notices, which, again, we

9  have appended to our briefing.  The 30(b)(6) notices are just

10  the RFPs copied and pasted.  So all the issues we've talked

11  about earlier today with respect to First Amendment privilege,

12  with respect to overbreadth, with respect to scope, and

13  relevance of their RFPs, also pertain to the 30(b)(6) notices

14  that they've issued.

15        So this goes well beyond anything limited to the

16  primary election.  It has nothing to do with the primary

17  election, for all the reasons I have said before, just like

18  their RFPs aren't limited to the primary election.

19        So we've gone beyond anything that was in the amended

20  scheduling order, beyond the primary election, and these were

21  noticed well after the deadline and have carried forward now

22  into January.

23        And again, we are unclear as to what any of this has

24  to do with SB 1.  What our clients may have done before SB 1,

25  with respect to internal communications and internal political

1   strategy, not only is protected by the First Amendment but has

2   no bearing on SB 1's operation.

3          So for all those reasons, including what's in the

4   scheduling order and what the State defendants have laid out

5   today, we agree that these depositions should not be allowed

6   to go forward and that any depositions they want to take count

7   against the ten deposition limit.

8          MISS PERALES:  Your Honor, before the United States

9   gives their position I wanted to refer the Court to ECF 469-12

10  at pages 2 through 4 where plaintiffs offer to limit

11  depositions of the defendant intervenors to matters related to

12  the primary election.

13         I also, with permission to approach either the bench

14  or the courtroom deputy, have prepared a demonstrative exhibit

15  for the Court to spare some of the work that may go into the

16  Court's ultimate ruling.

17         MISS PAIKOWSKY:  Your Honor, Dana Paikowsky for the

18  United States.

19         To be clear, the United States has not served any

20  discovery on defendant intervenors, nor have defendant

21  intervenors served any discovery on the United States.  So we

22  participate in today's hearing for the narrow purpose of

23  ensuring that adjudicating or the resolution of this discovery

24  dispute will not prejudice the United States' interests here.

25         As we explained in our filing to the Court, we

1  believe that it would be appropriate for the Court to clarify,

2  to find good cause exists to clarify that the amended

3  scheduling order -- excuse me -- that any depositions that the

4  private plaintiffs may take of the defendant intervenors that

5  did not concern the November general election will not count

6  against the ten depositions that have been provided

7  cumulatively for plaintiffs' side.

8         THE COURT:  So I was right.  It is ten here, ten

9  here, ten here, and ten there?

10        MISS PAIKOWSKY:  No, Your Honor.  It's ten total for

11 the United States and private plaintiffs related to the

12 November general election.

13        And so, as we understand it, the private plaintiffs

14 are looking to take depositions of the defendant intervenors

15 for matters that relate purely to pre-general election

16 matters, so primary election matters.

17        And so we believe that good cause exists to enter

18 that any of those depositions that don't relate to the general

19 election do not count against the ten deposition amount that

20 was provided to the plaintiffs' side parties to discuss the

21 November general election, in part because we believe that

22 those depositions are necessary to present the Court with a

23 full record of what transpired during the November general

24 election.

25        THE COURT:  Thank you.

1          Do you have any input onto this argument about the
2     First Amendment and how the Court should navigate around some
3     of this that will likely come up in depositions?
4          MISS PAIKOWSKY:  Not at this time, Your Honor.
5          THE COURT:  That was helpful.  Thank you.
6          Mr. Gore.
7          MR. GORE:  Your Honor, thank you.
8          I just wanted to point out one thing.  Miss Perales
9     sort of cited to the portion of the record where plaintiffs
10    had offered to limit that.  As I mentioned, that was
11    withdrawn.  I cite Your Honor to Document 471-6, pages 1 to 2,
12    to which we responded at 471-7.  Those were attachments as
13    exhibits to our first brief here.
14         So there was some back and forth on this.  The
15    plaintiffs' position changed.  And if you read the briefing,
16    there's nothing in the briefing that those depositions would
17    be so limited.
18         THE COURT:  I'll enter an order about how the
19    depositions should go forth.  I'm going to take all of this
20    under advisement.
21         What else do we need to talk about while we are here,
22    Mr. Gore?
23         MR. GORE:  I don't believe anything from us, Your
24    Honor.
25         MR. SWEETEN:  Nothing, Your Honor, from the State

1  defendants.

2         THE COURT:  Anything else from the plaintiffs?

3         MISS PERALES:  Nothing from the plaintiffs, Your

4  Honor, only that my –– the attorneys with me here have urged

5  me that if the Court would like to take briefing on any First

6  Amendment legal issues, we are happy to provide it.  As you

7  know, our position has been that entertaining the First

8  Amendment privilege assertions at this point is premature

9  because we don't have documents.

10         THE COURT:  So that's easy for –– I could easily

11  order, well, okay, I do nothing on First Amendment.  They have

12  to do a privilege log.  That's easy, but that doesn't help me

13  about how to handle a deposition.  So how are we going to

14  handle the depositions?

15         MISS PERALES:  If Your Honor would like to take

16  briefing from us, we are happy to provide it.  Because our

17  position has been that these arguments are premature, we have

18  not provided the Court with fulsome briefing on the topic.

19  But if the Court does want it, we are happy to provide it.

20         THE COURT:  So any of the four of you are welcome to

21  submit briefing on how a deposition should either not go

22  forward, or if it goes forward in part, how should it go

23  forward, because, yeah, the request for production is easy, I

24  just say we'll do a privilege log but that doesn't help us

25  with how to handle a deposition at all.

1        MISS PERALES:  Thank you, Your Honor.

2        THE COURT:  Okay.  Thank you all.  Let's get that

3   briefing to me in the next five days and then hopefully

4   somewhere right after Thanksgiving I'll produce a ruling on

5   all the remaining issues.

6        And with that, I've got a criminal case right behind

7   you.  I'll be out in a moment.

8     *(Recess)*

9     *(Concludes proceedings)*

10                          -o0o-

11   I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.  I

13   further certify that the transcript fees and format comply

14   with those prescribed by the Court and the Judicial Conference

15   of the United States.

16

17   Date:  11/28/22          /s/  *Gigi Simcox*
                              United States Court Reporter
18                            262 West Nueve Street
                              San Antonio TX 78207
19                            Telephone:  (210)244-5037

20

21

22

23

24

25