```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO                 .
 4  ENTERO, ET AL,                      .
                                        .
 5            PLAINTIFFS,               .
         vs.                            . DOCKET NO. 5:21-CV-844-XR
 6                                      .
    GREGORY W. ABBOTT, ET AL,           .
 7                                      .
              DEFENDANTS.               .
 8

 9

10        TRANSCRIPT OF MOTION TO COMPEL PROCEEDINGS
          BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                   FEBRUARY 16, 2023
12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFF:      ZACHARY DOLLING, ESQUIRE
17  OCA                     TEXAS CIVIL RIGHTS PROJECT
                            1405 MONTOPOLIS DRIVE
18                          AUSTIN TX 78741

19

20                          EDGAR SALDIVAR, ESQUIRE
                            AMERICAN CIVIL LIBERTIES UNION
21                          P.O. BOX 8306
                            HOUSTON TX 77288
22

23  FOR THE DEFENDANT:      ERIC J.R. NICHOLS, ESQUIRE
    HARRIS COUNTY DA        BUTLER SNOW
24                          SXSW CENTER
                            1400 LAVACA STREET, SUITE 1000
25                          AUSTIN TX 78701
```

```
 1
 2     REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                 OFFICIAL COURT REPORTER
 3                               UNITED STATES DISTRICT COURT
                                 SAN ANTONIO, TEXAS
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        *(San Antonio, Texas; February 16, 2023, at 2:00 p.m., in*
2  *open court.)*
3                THE COURT:  LUPE versus Texas, 21 civil 844.
4                MR. NICHOLS:  Good afternoon, Judge.
5                THE COURT:  Afternoon.
6                Might we announce names for the record.
7                MR. DOLLING:  This is Zack Dolling on behalf of the
8  OCA plaintiffs.
9                MR. NICHOLS:  And Eric Nichols here on behalf of
10 defendant Harris County District Attorney, as well as the
11 respondent on the motion to compel.
12               THE DEPUTY CLERK:  It's on the docket for 2:30, so
13 hopefully everybody that is speaking is here online or in
14 court.  I'm not sure.
15               THE COURT:  So I'm being told I'm starting half an
16 hour early.  Are we expecting more people here or not?
17               MR. NICHOLS:  I think they filed a motion to compel.
18 I'm answering it.  So I think we're here.
19               THE COURT:  So we have everybody we need?
20               MR. NICHOLS:  I think so.
21               THE COURT:  Okay.  So where to go with this.
22               So by now I think everybody knows me.  I look at big
23 pictures and I try to figure out, instead of going into
24 minutia, what are we trying to do.  So with regard to the
25 discovery request being sent to District Attorney Ogg, big

4

1 | picture, what are you trying to get from her and her office,
2 | and why?
3 |      MR. DOLLING:  We're trying to get any evidence that
4 | would go to show that ——
5 |      THE COURT:  Pull the mike just a little closer to
6 | you.  Thanks.  And you might want to make sure it's on.
7 |      MR. DOLLING:  We are just trying to get any evidence
8 | that exists that would go to demonstrate that defendant Ogg
9 | poses a credible threat of prosecution with respect to the
10 | provisions of SB 1 that we are challenging and that we believe
11 | case law supports would include past prosecutions or
12 | investigations, or potentially ongoing prosecutions or
13 | investigations of both alleged defenses under those provisions
14 | as well as similar provisions, similar criminal provisions.
15 |      And we also believe that that evidence would go to
16 | show a demonstrated willingness to enforce the provisions that
17 | we have challenged with respect to the Ex Parte Young
18 | doctrine.
19 |      THE COURT:  And so I don't know anything about
20 | District Attorney Ogg.  How long has she been in office?
21 |      MR. DOLLING:  I believe since 2017, Your Honor.
22 |      THE COURT:  And so your request for production, how
23 | far back were you going?
24 |      MR. DOLLING:  We requested for January 1st, 2016 to
25 | the present day.

1        THE COURT:  So she wasn't the district attorney.

2        MR. DOLLING:  That's correct, Your Honor.

3        THE COURT:  Yeah, so that's problem number one —

4    right? — because, you know, we're looking at her willingness

5    or desirability to prosecute, right?

6        So did she take office January 1, 2017?

7        MR. DOLLING:  I'm not entirely sure, Your Honor, but

8    it was after the time period we began with.

9        THE COURT:  Do you know the answer to that?

10        MR. NICHOLS:  I should know off the top of my head.

11    I'm looking it up right now, Judge.

12        THE COURT:  Okay.  So let's just assume it was

13    January 1, 2017 until I'm told differently.

14        We probably, if we're going — I'm not making any

15    rulings.  I just want to figure out just how this would all

16    work.

17        When we would be talking about prosecutions, or —

18    well, now, when you are asking for stuff are you asking for

19    like actual indictments, or are you just looking for — are

20    you also including investigations that did not lead to an

21    indictment?  What are you looking for?

22        MR. DOLLING:  We did include investigations that

23    didn't lead to an indictment.  Essentially all investigations

24    or prosec — I believe it was phrased "investigations or

25    prosecutions of violations or suspected violations," of what

1  we defined as criminal election law.

2       THE COURT:  And so we're challenging in this lawsuit

3  just SB 1, so is that a problem that, you know, SB 1 didn't

4  get enacted into — I ought to know this.

5       What's the effective date of SB 1?

6       MR. DOLLING:  I believe it's December 2021.

7       THE COURT:  So with regard to stuff that might have

8  happened from 2017 to November of 2021, why do you think that

9  that is relevant to this case and the allegations that you're

10  seeking about enforcement of SB 1?

11      MR. DOLLING:  Well, I believe that the case law we

12  cited in our motion supports the idea that the prosecution and

13  investigation of similar crimes regulating similar election-

14  or voting-related conduct is relevant to showing a threat of

15  prosecution for these newer provisions.

16      THE COURT:  And so with regard to relevance, though,

17  so let's talk hypothetically.  Let's say that there was

18  somebody between 2017 and 2021 that was investigated for and

19  indicted for actually paying, bribing people to vote.  I mean,

20  why would that be relevant to anything in this lawsuit that we

21  have right now?

22      MR. DOLLING:  I suppose for the same reason that I

23  just stated, Your Honor.  I believe that that would show

24  defendant Ogg's willingness to prosecute crimes that were

25  within the same realm as voting-related conduct, is what we

1   are — as the provisions of SB 1 regulate that we challenged

2   here.

3          And also this is, again, sort of speculative because

4   we have no answers or documents to go off of, but potentially

5   one could imagine that investigations that pre-dated SB 1

6   could lead to prosecutions under SB 1, once SB 1 goes into

7   effect.

8          THE COURT:  So, Mr. Nichols, so the Fifth Circuit

9   already has sort of rejected the sovereign immunity argument,

10  so what's your next back-up position?

11         MR. NICHOLS:  Well, first, let me answer the Court's

12  question.  So they were correct, that District Attorney Ogg

13  was elected in the 2016 election, took office, as you said,

14  January 1st, 2017, and she was re-elected in 2020 for a second

15  term.

16         The sovereign immunity issue is still very much alive

17  at the Fifth Circuit.

18         THE COURT:  Well —

19         MR. NICHOLS:  What happened —

20         THE COURT:  It wasn't good enough to make it past —

21  was it Higginbotham?  I can't remember who said you weren't

22  going to get there.

23         MR. NICHOLS:  No, I think that what the Court is

24  referring to is that we did seek a stay pending the appeal of

25  the discovery at issue.  And that, if that's what the Court is

1   referring to, the Court is 100 percent correct.  That

2   position, that request for a stay was rejected, but the reason

3   why it was rejected was not because the Fifth Circuit decided

4   the sovereign immunity issue.

5          It issued a ruling basically saying that you can't

6   show irreparable harm from the discovery that is pending, or

7   any proceedings before this honorable district court regarding

8   that matter, and they also pointed out a very interesting

9   issue, which, as the Court knows, is still pending out there

10  too, which is that the plaintiffs in the case have made not

11  only 1983 claims but they've also made claims under federal

12  statutes including the Voting Rights Act that include, as the

13  Court is well aware, a waiver of sovereign immunity as part of

14  the statute.

15         And so that's the ruling that the Fifth Circuit has

16  made, but the underlying appeal that relates to this very

17  important issue and very interesting issue of whether a

18  Section 1983 claim can be made against someone like my client

19  who has not -- there's no evidence was involved in creating SB

20  1, there's no evidence to suggest that she spoke in favor of

21  it, there's no evidence to suggest that she's ever prosecuted

22  anyone, as the Court suggested earlier in asking questions to

23  the plaintiffs, under any provision of SB 1, whether her mere

24  status as the elected district attorney in Harris County is

25  enough to shoehorn into the Ex Parte Young exception to

1  sovereign immunity.

2          It's a fascinating issue.  The Court has made a

3  ruling on that and we fully appreciate and respect the Court's

4  ruling, but I did want to just get the Court up to speed on

5  kind of where that sovereign immunity issue is.

6          THE COURT:  So I'm reading from the bottom of page 4,

7  top of page 5 on the Fifth Circuit's denial.  "Ogg has no

8  likelihood of succeeding on the merits of a sovereign immunity

9  defense and she suffers no irreparable harm when we deny her

10  sovereign immunity protections," so that's what I read.

11          MR. NICHOLS:  Judge, I'll look at the opinion -- I

12  mean --

13          THE COURT:  It's the very last sentence of page 4,

14  top of page 5.

15          MR. NICHOLS:  No, it's concerning the VRA claims,

16  Judge.  You have to go -- I'm sorry, Judge, I apologize.

17          THE COURT:  So you are saying 1983, the Court didn't

18  address that?

19          MR. NICHOLS:  Correct.  And that's the really

20  interesting issue, Judge.

21          THE COURT:  But why wouldn't they have said that?

22          MR. NICHOLS:  Because so that --

23          THE COURT:  That would be the easiest way to stay

24  discovery -- right? -- if they had said it.

25          MR. NICHOLS:  No, but the point is, this is the

1  interesting part of this whole big picture like you're talking

2  about.

3          So if this were a straight 1983 case I believe that

4  the Fifth Circuit may very well come out a different way.

5  They would have said, you know, we are going to look at the

6  sovereign immunity issue, we're going to stay it.

7          But what the plaintiffs did in this case, and it's a

8  very interesting thing that's happening, and I don't know if

9  you've seen this in other cases or not, but it's a very

10  interesting thing that's happening is, so plaintiffs who would

11  normally just make a 1983 claim are adding to their claims,

12  their complaints, claims under statutes that carry with them a

13  waiver of sovereign immunity.

14          Even if they are not prepared, and we respectfully

15  suggest they are not here, to make specific allegations that

16  my client, for example, visited any injury on any one of the

17  Voting Rights Act, or that any injury that the plaintiffs are

18  claiming could be tracked under *Lujan* back to my client.

19          And so the basis for the Fifth Circuit's denial of

20  the stay was in recognition of this new strategy.  We don't

21  think the strategy is sound, but that's where the Fifth

22  Circuit came out.

23          And in my respectful view is that because they have

24  alleged not only a 1983 claim, but also a VRA claim, Voting

25  Rights Act claim, then you can't meet the standard for a stay

1  of the discovery pending your underlying appeal.

2        THE COURT:  So I'm trying to — I mean, so if your

3  client is claiming that she's an improper party because she

4  hasn't done anything, isn't the easiest way just saying,

5  answer interrogatory saying that from January 1, 2017 up to

6  the present I have never investigated, prosecuted, or indicted

7  anyone for an election offense?  And so she answers that way

8  and that makes everything else moot.

9        MR. NICHOLS:  And, Judge, last night at 11:00,

10  11:00 p.m., you haven't seen this, it's not part of the record

11  before you —

12        THE COURT:  That seems to be happening a lot today.

13        MR. NICHOLS:  I know, but I received some additional

14  discovery from other plaintiffs, other than the OAC

15  plaintiffs, and they must have been reading your mind because

16  they sent an interrogatory basically along the lines of what

17  the Court just said.

18        So I have not had a chance to really digest this

19  since I got it at 11:00 last night.  Certainly need to talk to

20  my client about it, but this is a different type of request

21  than what we are talking about today, which as the Court

22  understands from the questions you asked, involves going

23  through the DA's files and pulling investigations and things

24  like that.  It's a very, very different thing.

25        And maybe there is a different way of skinning this

1  cat, so to speak, and maybe we get there, but I think this
2  11:00 p.m. last-night discovery is a lot closer to what the
3  Court is suggesting.
4          THE COURT:  So everything I do in all these cases
5  gets appealed, so I'm trying to go with the path of least
6  resistance right now.
7          So apparently you have sent this interrogatory.  Why
8  shouldn't we just wait to see if the answer is yes or no?  If
9  the answer is no, I haven't done anything since I took office
10 in 2017, that makes all this moot.
11         Now, if the answer is yes, let's now figure out how
12 we tackle this.  If the answer is yes, rather than all the
13 documents and all this other stuff, don't you need to — just
14 like a couple of lines saying — and now I could see also two
15 issues being raised.
16         Let's say it was an investigation but not an
17 indictment, so there's always privacy concerns about district
18 attorneys potentially violating people's due process rights,
19 and so but what's wrong with just then, if the answer is yes,
20 she says — okay, let's just take a hypothetical — we have
21 had ten instances.  I'm just making up numbers.
22         Instance number one was for blah.  It was an
23 investigation of X-Y-Z.  We don't identify the person's name
24 so we don't get into these due process issues out there, and
25 then the result was inconclusive and investigation dismissed,

1    whatever.  And then on to two, on to three, on to four.

2              Why doesn't that get you what you need?

3         MR. DOLLING:  I believe that would get us what we

4    need, Your Honor.  We would be satisfied with statements as to

5    the existence and subject matter of investigations and

6    prosecutions.

7              We're not interested in personally identifying

8    information or any sort of work product or attorney-client

9    privilege information.  I think that we've made that pretty

10   clear in our negotiations with opposing counsel and in our

11   briefing.

12             And with regard to the requests that were sent last

13   night, we were not — I'm not aware of what they asked for

14   myself, but if that is what is at issue then I think that

15   the —

16        THE COURT:  Oh, I'm sorry.  So I thought those were

17   yours.  This is OCA's?

18        MR. NICHOLS:  They are OCA.  The ones that came in

19   last night were from LULAC, the LULAC plaintiffs.

20        THE COURT:  Okay.

21        MR. DOLLING:  But the Court's sort of plan that you

22   have outlined makes sense to me.  The only snag, I would say,

23   is that we are coming up very quickly on the dispositive

24   motions deadline and so if we took action like that it would

25   probably need to be on some sort of fairly expedited time

1  line.

2        THE COURT:  Yeah.  So now if — let's just assume

3  hypothetically Ogg's office has done something from January 1,

4  2017 to the present, isn't my suggestion of just these

5  answering interrogatory number, not even producing any

6  documents, just answer an interrogatory where you list one

7  through ten in my hypothetical, doesn't that cure all your

8  burdensome and all the other arguments that you were raising?

9        MR. NICHOLS:  Absolutely.  It goes a long, long way.

10       Little bit of the devil in details in terms of the

11  scope of what criminal law prosecutions or violations we are

12  talking about.  We have had some healthy discussions between

13  counsel about that and I think we can continue those.

14       As a matter of fact, we submitted a declaration from

15  somebody at the DA's office that I think starts down the path

16  of what you're suggesting, so I think we've already got a head

17  start on it.

18       THE COURT:  So on scope, I mean, you have to have a

19  statute that you're investigating somebody for and charge.

20       MR. NICHOLS:  Sure.

21       THE COURT:  So I mean, that ought to be limiting

22  right there.

23       MR. NICHOLS:  I think so, Judge.  And if we could

24  limit it to the statutes that were amended by SB 1, that would

25  be one thing.  I'm not sure that — I don't want to speak for

1    them.

2          THE COURT:  Why is that not — why isn't SB 1 and any

3    statutes that were amended by SB 1 the proper scope?

4          MR. NICHOLS:  I think it is.

5          THE COURT:  That's a question for him.

6          MR. NICHOLS:  Oh, sorry.

7          THE COURT:  Yeah.

8          MR. DOLLING:  That is what we asked for.

9          MR. NICHOLS:  Okay.  It's always good to get in front

10   of the Court because sometimes there may be telephone game

11   loss of meaning but I think you've helped resolve that.

12          THE COURT:  So I'm envisioning right now just an

13   interrogatory.  No requests for production.  If later you

14   think you need the actual documents we'll take that up, but

15   I'm thinking it's just an interrogatory.  It's January 1, 2017

16   to the present.  It's talking about investigations of SB 1 or

17   any statutes that were amended by SB 1.

18          I'm going to let you-all continue to talk, but if I

19   have to make that an order you-all know that that's going to

20   be the order.

21          MR. NICHOLS:  You've been very clear, Judge.  I get

22   it.

23          THE COURT:  Okay.  Anything else we need to take up

24   here in any of the other discovery disputes?

25          So were you asking for communications between Ogg and

1   the AG or other office holders, is that still an issue or not?

2          MR. DOLLING:  I think that we — I think that — I

3   believe that we would be entitled to those as relevant for the

4   reasons I expressed earlier but I understand if the Court

5   might disagree with that.

6          THE COURT:  Well, actually, I'm not in disagreement

7   with that.  If you think you need those, I mean —

8          MR. DOLLING:  I think that —

9          THE COURT:  I mean, let's just assume hypothetically,

10  because I don't know what's out there.  Let's just say

11  hypothetically Ogg is sending a letter to Paxton saying, I'm

12  going to lay low for now, but rest-assured I'm going to

13  prosecute these things.  Why isn't that relevant?

14         MR. NICHOLS:  It might be relevant, but it's not —

15  it doesn't exist.  But I'm happy, if the Court wants me to

16  check and see if anything like that exists, I'm happy to do

17  it.

18         THE COURT:  So I think that's what was requested.

19         So, you know, a lot of times we fight about these

20  things, and it's like we don't have to fight about it if the

21  answer is just "No."

22         MR. DOLLING:  I just wanted to highlight that

23  apparently the answer to many of our interrogatories is that

24  the documents or the communications we've requested do not

25  exist, and it doesn't make sense as to why that can't just be

1   the answer.

2           THE COURT:  Because we have a lot of lawyers in this

3   case who have to make a lot of theoretical arguments.

4           MR. NICHOLS:  But there is one important distinction

5   and I don't want to lose it, and I think you understand from

6   what I said earlier what that is, is that this is a matter, if

7   you recall, where as in other litigation we came forward

8   proactively after my client was added administratively in the

9   litigation.

10          We came proactively with a proposal that we enter

11  into a stipulation, like we've done in other cases within the

12  federal courts, within this judicial district that basically

13  says that we will not prosecute anything pending the

14  consideration of these matters by a federal judge.

15          And for whatever reason, it didn't work for the

16  plaintiffs in this case.  I don't want to get into legislating

17  why or questioning why, but I want to make sure that you

18  understand that this is a situation where we have, from the

19  get-go, tried to do what we could to avoid me having to take

20  up your time in talking about these discovery matters.

21          And with the plaintiffs pushing on these issues,

22  that's where we get to.  And as a lawyer, as a professional, I

23  have zero reticence about saying how interesting these issues

24  are.

25          The issue that is coming up because of the

1    plaintiff's position is fascinating, and it's going to be a

2    new — I don't know if you want to call it a wrinkle or a new

3    stage I think of jurisprudence in the sovereign immunity

4    space.

5            THE COURT:  So I agree with all of that but I will

6    say this.  This will actually make your task go to present

7    because apparently you've already made a commitment that

8    you're not going to prosecute so the time frame is even less,

9    so that ought to take the burdensome argument out.

10           But from the plaintiff's perspective and a public

11   policy perspective we have got everybody playing this game of,

12   oh, well, I, the AG's office, doesn't enforce any of this.

13   This all goes down to the local district attorneys.  And the

14   local district attorneys will — and so we've got a statute

15   here where no one — everybody seems to be the proud father

16   for political purposes but no one wants to be the actual

17   guardian responsible for any liability or litigation purposes.

18           MR. NICHOLS:  And, Judge, I can tell you, there is no

19   evidence and I don't think the plaintiffs would say there is

20   any that my client is either the father, or the mother, or the

21   Godmother of any of this.

22           And that's why I want to make the point that we're

23   trying to minimize our involvement because we know how busy

24   the Court is and we appreciate the Court's time on these

25   matters.

```
 1              THE COURT:  Any other issues we need to tackle while
 2   we are here?
 3              MR. DOLLING:  I don't think so, Your Honor.  I would
 4   just respectfully disagree with opposing counsel's
 5   characterization of the —
 6              THE COURT:  Stipulation?
 7              So I always try to — I always look forward.  I don't
 8   look back.  I don't want to keep hearing about the fights in
 9   the past.  I just want to clean up and move forward.
10              I think we have cleaned up and moved forward.
11              MR. DOLLING:  So if you don't mind me just clarifying
12   what the final decision is.  Send an interrogatory for
13   January 2017 onward for investigations and prosecutions of SB
14   1 provisions and the statutory provisions — or statutory
15   sections that were amended by SB 1, and we are also permitted
16   to continue to seek communications with various entities
17   related to those same sort of SB 1 provisions and statutory
18   amendments?
19              THE COURT:  Concerning enforcement, yes, that's
20   correct.
21              MR. DOLLING:  Okay.  Thank you.
22              THE COURT:  Okay.  I'm sure I'll see you-all back.
23   Hopefully not in a discovery fight but something else.
24              MR. DOLLING:  Thank you, Your Honor.
25              THE COURT:  Thank you.
```

1        MR. NICHOLS:  Thank you, Your Honor.

2      *(Concludes proceedings)*

3                          –o0o–

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above–entitled matter.  I

6  further certify that the transcript fees and format comply

7  with those prescribed by the Court and the Judicial Conference

8  of the United States.

9

10 Date:  02/17/23          /s/  *Gigi Simcox*
                            United States Court Reporter
11                          262 West Nueve Street
                            San Antonio TX 78207
12                          Telephone:  (210)244–5037

13

14

15

16

17

18

19

20

21

22

23

24

25