# Exhibit L

UNEDITED REALTIME TRANSCRIPTION DISCLAIMER

The following transcript of proceedings, or any portion thereof, is being delivered UNEDITED and UNCERTIFIED by the court reporter.

The purchaser agrees not to disclose this realtime, unedited transcription in any form(written or electronic)to anyone who has no connection to this case.  This is an unofficial transcription which should not be relied upon for purposes of verbatim citation of testimony.

This transcription has not been proofread.  It is a draft transcript, NOT a certified transcript.  As such, it may contain computer-generated mistranslations of stenotype code or electronic transmission errors, resulting in inaccurate or nonsensical symbols which cannot be deciphered by non-stenotypists.

Corrections will be made in the preparation of the certified transcription, resulting in differences in content, page and line numbers, punctuation, and formatting.

THE REPORTER:  Going on the record at 9:37 a.m.  And today is February 27th, 2023, and we are on the record.  Did you all want to do the federal read on, or were you okay with waiving the Rule 30?

2

1        MS. PERALES:  We'll waive.
2        THE REPORTER:  Okay.
3        If all counsel and all parties please
4  state their appearances and who they represent for the
5  record?
6        MS. PERALES:  Good morning, my name is
7  Nina Perales and I represent the Lupe plaintiffs,
8  L-U-P-E.
9        MS. HOLMES:  Good morning, my name is
10 Jennifer Holmes and I represent the Haul plaintiff's,
11 H-A-U-L.
12        MR. BIRRING:  Good morning, I'm Sameer
13 Birring and I represent the Harris County Election
14 Administrator Clifford Tatum, in his official capacity.
15        MR. WASSDORF:  William Wassdorf for
16 the Attorney General's Office representing State
17 defendants.
18        MR. GORE:  Good morning, this is John
19 Gore.  I represent the intervenor defendants.
20        MR. TAYLOR:  My name is Andy Taylor.
21 I do not represent any parties in this litigation, but
22 I do represent the witness, Mr. Alan Vera, and I did
23 have just one confirmation question.  I was told that
24 nobody in this proceeding today is going to audio tape
25 or video tape what's happening, it's just everybody's

3

1  watching by Zoom but they're not actually taping or
2  tape recording the Zoom, other than the court reporter
3  who is -- is Here in the room, is that true?
4        MS. PERALES:  My understanding is that
5  there maybe an audio recording by the court reporter
6  service for the purpose of ensuring and accurate
7  transcription, but we agreed in writing prior to this
8  deposition that we would not video record --
9        MR. TAYLOR:  Okay.
10        MS. PERALES:  -- the deposition.
11        MR. TAYLOR:  And cause I'm the new guy
12 here, it -- does that include all the participants who
13 are watching?
14        MS. PERALES:  Well, I only speak for
15 the Lupe plaintiffs, but perhaps we can get an
16 agreement from counsel on the Zoom that they are not
17 recording the deposition.
18        MR. TAYLOR:  That would be wonderful.
19        MS. PERALES:  If you could just put
20 your agreement in the chat, that would be a big time
21 saver.
22        (All Zoom counsel agreed in chat.)
23        MS. PERALES:  Okay.  I think we've got
24 everyone.  I can check the chat on the break too.
25        Swear swear affirm.

4

1        ALAN VERA,
2  Having been first duly sworn, was examined and
3  testified as follows:
4        MS. PERALES:  And let's get our
5  agreement on the record now, before we get started with
6  me reintroducing myself to you.
7        I will agree that an objection from
8  any one of counsel on the defense side will serve as an
9  objection for all.  Now, under the Federal Rules, it's a
10 form objections largely are the ones that we're are
11 going to be having today.  And I understand that you
12 would like to have an agreement that simply saying form
13 objection is sufficient.
14        MR. WASSDORF:  Correct.
15        MS. PERALES:  And the only thing that
16 I would ask of you is if I don't understand perhaps
17 what the form objection might be, I can ask for
18 clarification.
19        MR. WASSDORF:  Absolutely.
20        MS. PERALES:  And is that the
21 agreement of -- of counsel on the defense side?
22        MR. GORE:  Yes.
23        MR. WASSDORF:  Yes.
24        MR. TAYLOR:  Yes.
25        MS. PERALES:  Thank you.

5

1        DIRECT EXAMINATION
2  BY MS. PERALES:
3     Q.  Good morning, Mr. Vera.
4     A.  Good morning.
5     Q.  Earlier you heard me introduce myself, I'm
6  Nina Perales and I represent a group of plaintiffs
7  called the Lupe plaintiffs.  Everybody else has
8  introduced themselves already, and so I'll just go
9  ahead and start asking you some of the preliminary
10 questions in this deposition.
11        My first question is, have you ever
12 been deposed before?
13     A.  No, I have not.
14     Q.  All right. So since this is your first voyage
15 into a deposition I'm going to go through some of the
16 ground rules with you.
17        You have just taken an oath to tell
18 the truth and that's subject to federal penalties.  So
19 it's important to answer my questions truthfully,
20 accurately, and completely; do you understand?
21     A.  I do.
22     Q.  Now, do you understand that your oath to the
23 tell the truth today is the same as if you were
24 testifying in front of a judge in the courtroom, in the
25 sense that you're oath is to speak the truth?

Alan Vera - 2/27/2023

14

1    A.  Marketing consulting.
2    Q.  Okay. Can you briefly describe for me your
3  current involvement with the Harris county republican
4  party?
5    A.  I am a volunteer.  I serve as chairman of the
6  Harris County Republican Party Ballot Security
7  Committee, that is an unpaid unreimbursed position.
8    Q.  I'm going to circle back to, to more details
9  about the Ballot Security Committee.  So I'm just going
10  to put a pin in that and ask if you hold a membership
11  in other political organizations besides Harris County
12  Republicans?
13    A.  I am on the board of directors of a -- an
14  election integrity organization called Texas Election
15  Network.
16    Q.  Any other membership in other political
17  organization?
18    A.  Give me a second. None that I can recall at
19  this time.
20    Q.  Do you hold membership in any other types of
21  associations besides political organizations; such as a
22  fraternal, or I don't know, maybe you serve on your
23  neighborhood, you know, homeowners association or
24  anything like?
25    A.  No, we are members of Freedom Street Rescue.

15

1  We foster abandon puppies.
2    Q.  I think I would have 20 dogs if I did that.
3    A.  Last Thursday we had 11.
4    Q.  11.  And are the -- any of them fosters at
5  this point or have you just --
6    A.  Seven of those are fosters, they've all
7  arrived at their new homes in New England.
8    Q.  Wonderful. Any other organizations that you
9  can think of?
10    A.  None that I can think of.
11    Q.  Okay. Are you a registered voter in Harris
12  County?
13    A.  I am.
14    Q.  Have you ever served as an election judge at
15  the polling place?
16    A.  Yes, ma'am.
17    Q.  Okay.  Tell me about that, how?
18    A.  From 2010 to 2013, I served as the alternate
19  presiding judge at Wesley Elementary School in
20  Congressional District 18.  I think five, seven
21  elections total.
22    Q.  Did you serve as a Poll worker for any other
23  period of time besides this one?
24    A.  No ma'am.
25    Q.  Have you ever served as a poll watcher?

16

1    A.  I have.
2    Q.  Tell me about that?
3    A.  I served as a Poll watcher in several smaller
4  and local elections, usually on the May Uniform
5  Election Day.  And I was asked to serve as a Poll
6  watcher for the 2015, I believe 2015 Cy-Fair ISD bond
7  election.  The first of billion dollar bond election in
8  Texas.
9    Q.  School bond?
10    A.  School bond.
11    Q.  Have you ever been a block walker or
12  sometimes referred to as a canvasser for either a
13  political candidate or for turn out the vote effort?
14    A.  I believe years ago maybe as many as 10 years
15  ago I assisted my precinct chair to block walk our
16  neighborhood and leave flyers hanging on doorknobs.
17    Q.  And do you remember what that was in support
18  of, or against?
19    A.  It was in support of the republican ticket.
20    Q.  Okay.  And did the door hangers then have the
21  names of the candidates that were on the ticket?
22    A.  If I remember correctly, they did.
23    Q.  Can you think of any other occasions where
24  you were going door to door from house to house for
25  either a candidate or some kind of campaign?

17

1    A.  No, I can't.
2    Q.  When you did this effort about 10 years ago
3  did you knock on doors and engage with voters?
4    A.  We knocked on doors, waited for a voter to
5  answer, if the voter didn't answer we simply left the
6  hanger, if a voter answered we introduced ourselves and
7  explained, the candidates for whom we were campaigning.
8    Q.  So you had the chance to have some
9  face-to-face interaction with voters?
10    A.  Some.
11    Q.  Other than the -- so let me just ask you, do
12  you -- is the phrase that you're most comfortable with
13  block walking or canvassing or something else?
14    A.  In my mind those are two different functions
15  block walking is a political activity to gain support
16  for candidate or issue in my mind.  Canvassing is
17  asking questions and getting information.
18    Q.  Okay.
19    A.  So in my mind, which is sometimes strange,
20  those are two slightly different issue.
21    Q.  Have you ever done canvassing?
22    A.  I have not personally.
23    Q.  Okay.  So besides that block walking effort
24  that you described, have you ever worked on the
25  campaign of a political candidate or for a political

18

1 issue?
2     A.  Not since 2014.
3     Q.  And tell me about that, in 2014 in what way
4 did you work on a political campaign --
5     A.  In 2014 before I came chair of the Harris
6 County Republican Party Ballot Security Committee, I
7 handed out campaign literature for Dan Patrick.
8     Q.  And where did you handout the campaign
9 literature?
10     A.  In my neighborhood.
11     Q.  And you went door to door?
12     A.  Yes, ma'am.
13     Q.  Is that different from the --
14     A.  Same thing.
15     Q.  -- same thing?
16     A.  Uh-huh.
17     Q.  Okay.  So besides the handing out of the
18 campaign material in the block walking effort, have you
19 worked on any other campaigns either, maybe making
20 phone calls from a central location to urge voters to
21 turn out or --
22     A.  Yes.
23     Q.  -- other types of campaign activity?
24     A.  I can't recall anything beyond what I've
25 already described to you.

19

1     Q.  Okay.  Do you know if you'll be testifying in
2 this case?
3     A.  I do not know.
4     Q.  Okay.  I'm going to ask you a couple questions
5 now about the Ballot Security Committee.  You mentioned
6 that before you became involved with the Ballot
7 Security Committee you were handing out the campaign
8 material for the republican ticket and you mention that
9 was probably about 10 years ago.
10         So tell me whether your involvement
11 with the Ballot Security Committee then was at the time
12 of the creation of the Ballot Security Committee?
13     A.  No, ma'am.  It was not.  Ballot Security
14 Committee had been created at least 15 years prior to
15 my taking the chairmanship in 2014.
16     Q.  Okay.  If you could for me summarize the --
17 are you still chair of the Ballot Security Committee?
18     A.  I still am.
19     Q.  And as chair you're familiar with the
20 activities of the Ballot Security Committee?
21     A.  Yes.
22     Q.  Can you tell me in a sort of summary fashion,
23 the various activities of the Ballot Security
24 Committee?
25     A.  As described in the Republican -- Harris

20

1 County Republican bylaws, Ballot Security is
2 responsible for promoting election integrity and in all
3 the activities that support that.  So that would
4 include discipline on voter registration, recruiting
5 and training of Poll watchers.  In prior years we were
6 also responsible for recruiting election workers, but
7 we have surrendered that in the last two cycles, to the
8 party staff; supporting good election legislation as
9 guided by the executive committee and testifying when
10 possible in support of good election legislation.
11     Q.  I'm just catching up.  You mentioned
12 discipline on voter registration, to you mean the voter
13 registration conducted by the Harris county republican
14 party or voter registration in a bigger sense?
15     A.  Thank you for the clarification.  We observe
16 and monitor Harris county's voter registration's roles.
17     Q.  Does the Harris County republican party
18 conduct voter registration efforts of they own?
19     A.  I believe they do, but I am not a part of
20 that.
21     Q.  You mentioned in prior years that you used to
22 recruit election workers, but you had surrendered that
23 to party staff in the last two election cycles; is that
24 right?
25     A.  That is correct.

21

1     Q.  And when you say party staff, who -- who is
2 that?
3     A.  These are paid employees who work for the
4 party.
5     Q.  And so it's their function now to collect
6 names and submit them to the Harris County elections
7 for vetting for Poll workers?
8     A.  That is correct.
9     Q.  Okay.  Tell me how you recruit and train Poll
10 watchers?
11     A.  The recruiting takes many forms.  I am a
12 frequent speaker at political organizations.  We run
13 notices for Poll watchers in the county party news
14 letter and online.  The ballot security committee
15 members are also encouraged to reach out in their
16 neighborhoods and find people in serving as Poll
17 watchers.  Training Poll watchers I do personally, no
18 one else hands that.  It is a two hour class in person
19 with a test at the end and except for the 2020 COVID
20 year it has never been an online class.  It's always
21 been in person.
22     Q.  When was the most recent training that you
23 conducted?
24     A.  Most recent training was October of 2022.
25     Q.  Okay.

Alan Vera - 2/27/2023

---

22

1    A.  I did 17 classes that summer into the fall.
2    Q.  When you're doing the training in the two
3  hour class, do you use any kind of materials of any
4  sort?
5    A.  There are two kinds of materials, there is a
6  PowerPoint presentation which technically belongs to
7  the Harris County Republican Party, I created that for
8  them.  And there Poll watcher guide book which I hand
9  at no charge to every student.
10    Q.  You mention the PowerPoint presentation
11  belongs to Harris County, are you the author of the
12  PowerPoint?
13    A.  I am.
14    Q.  Okay. And the Poll watcher guide book, who is
15  the author of that?
16    A.  The original one?  My wife Colleen.  It's
17  been updated after every legislative session because
18  the code changes.
19    Q.  And who does the updating?
20    A.  I'm -- I do it now, unfortunately.
21    Q.  Where do you do the trainings for the Poll
22  watchers?
23    A.  All over the county, Whenever possible in
24  county owned buildings. We have community centers that
25  the Harris County Government has set up.  Whenever

---

23

1  possible we conduct the training in those publicly
2  owned centers.
3    Q.  So do you bring with you your laptop with the
4  PowerPoint on it?
5    A.  I do.
6    Q.  Do you have like a little projector?
7    A.  A projector is usually provided by the
8  facility, but there have been times that I brought a
9  spare, thank God.
10    Q.  And you mention that the guide book that you
11  provide at no cost, does that mean that you personally
12  make the photo copies?
13    A.  In 2022 the County Republican Party paid for
14  the reproduction of the guide books.
15    Q.  Okay. And are -- are the trainees allowed to
16  take that guide book home with them after they're done?
17    A.  They take them home with them and encouraged
18  to take them with them to the Polls.
19    Q.  Now you mention a test at the end, is that a
20  written test?
21    A.  It's not a written test, it's an oral.  It's
22  a review.
23    Q.  And then is that conducted with the group as
24  a whole?
25    A.  It's conducted with the group as a whole.

---

24

1    Q.  So do people just, you call out the questions
2  and people raise their hands and call the answers?
3    A.  Correct, uh-huh.
4    Q.  Do you have the test written down in front of
5  you?
6    A.  It's on the PowerPoint slides?
7    Q.  Okay. And so you just know at the end which
8  questions to call out for people to make sure?
9    A.  There are 20 questions, they appear in
10  sequence on the slides.
11    Q.  Oh, I see. So there's something at the very
12  end of the PowerPoint that has the questions?
13    A.  Correct.
14    Q.  Understood. When you update your PowerPoint
15  for a training, do you save the PowerPoints from
16  before?
17    A.  I don't remember. I think so, I don't think I
18  delete them from my laptop.
19    Q.  Okay.  So for example if you wanted to
20  compare what your training looked like before SB 1 and
21  after SB 1 would you be able to go --
22    A.  I could do so.  Yes, ma'am.
23    Q.  Okay.  Thank you.
24        MR. TAYLOR:  Mr. Vera, let her
25  completely finish her question, you're anticipating it

---

25

1  ever so slightly.
2        THE WITNESS:  Thank you. Thank you.
3    Q.  (BY MS. PERALES) Okay. Next on my list is
4  supporting legislation related to election integrity
5  and I would like to know what activities fall under
6  that topic?
7    A.  The primary activities that fall under that
8  topic is providing our Harris County republican
9  representatives with lists of items in the election
10  code that need to be addressed, and then testifying in
11  the Senate and house committees that are hearing any
12  bills written to those lists of suggestions.
13    Q.  When you provide the lists, do you generally
14  prepare that in written form?
15    A.  It varies. There are some meetings in which I
16  have a list typed up and copied, others are simply
17  verbal discussions over a cup of coffee.
18    Q.  You mentioned Harris County legislators?
19    A.  Republican legislators, sorry.
20    Q.  Yes, of course.  Does that include House and
21  Senate?
22    A.  Yes, ma'am.
23    Q.  Okay.
24        MS. PERALES:  I'm sorry, should we
25  take a break?

---

26

1      MR. TAYLOR:  No, no, no, I was just
2  making a point -- nothing about what you all are doing.
3      MS. PERALES:  Sorry.  Just let me know
4  if you're going to need a break.
5  Q.  (BY MS. PERALES) And we were talking about
6  Harris County Republican, let's start with members of
7  the House.  With whom have you met who is currently in
8  the house or with whom have you communicated who's
9  currently in the House about goals for ballot integrity
10  legislation?
11      MR. TAYLOR:  Let me just hop in for a
12  quick second.  My job here is just to protect
13  attorney-client privilege and that's it.  But if you're
14  going to ask questions that might be involved with
15  legislative privilege or something like that, I -- I'm
16  going to defer to the other lawyers who represent other
17  parties, I just want to make that clear.
18      MS. PERALES:  Understood.
19      MR. TAYLOR:  Okay.
20  A.  It -- it varies by session.  In preparation
21  for the current session, the republican party of Harris
22  County hosted a luncheon and every one or our Harris
23  County Republican State Representatives and Senators
24  attended.
25  Q.  (BY MS. PERALES) Okay. And at that luncheon

27

1  did you engage with anybody -- I'm just trying to get a
2  sense of how this works -- did you engage with elected
3  officials, at the luncheon about ballot integrity
4  legislation?
5  A.  At the luncheon I had five minutes to discuss
6  some of the problems that had not been -- the loopholes
7  have not been closed that are causing problems with out
8  election workers with the entire group.
9  Q.  I see, so you were essentially making a
10  presentation to them?
11  A.  Informal presentation, yes.
12  Q.  But you had the floor?
13  A.  For five minutes.
14  Q.  That's good, okay.  And when you say
15  loopholes that weren't closed, does that mean SB 1?
16  A.  No, it means in general.
17  Q.  Okay.
18  A.  What has been reported by our election
19  workers that needs to be addressed.
20  Q.  Okay. You mentioned the list that -- that can
21  be many written form, aside from the list have you ever
22  written something more detailed about a proposal that
23  you wanted a legislator to consider.  So for example,
24  have you ever taken a stab at maybe drafting a
25  provision that you would want to see?

28

1      MR. WASSDORF:  I'm going to object to
2  the extent that this could get into any responses to
3  legislative inquires on the grounds of legislative
4  privilege.
5  Q.  (BY MS. PERALES) You may answer.
6  A.  Not until this year for the current session.
7  I was asked to join a task force of grass roots
8  activist to examine and work on the concerns about
9  ERIC, E-R-I-C, electronic registration information
10  center. We studied it, interviewed people across the
11  country for seven months and I was asked to draft a
12  possible bill that would open the ERIC functions put
13  broader range of solutions.  It's the first time I've
14  done that.
15  Q.  Uh-huh.
16  A.  That has been -- I did not submit it, it was
17  submitted by our task force leader and it has become a
18  bill in the current legislature.
19  Q.  In the current Texas legislature?
20  A.  Current Texas -- the 88th Legislative
21  session.
22  Q.  And the task force that you were on was it a
23  Texas only task force?
24  A.  Texas only task force.
25  Q.  Okay. So prior to working on drafting

29

1  legislation, this -- for this 88th regular session, in
2  the past if you had a proposal that you wanted to see
3  enacted, how much detail would you put into writing it
4  down?
5  A.  I understand. Again, with acknowledging the
6  objection, in between the first and second special
7  sessions of the 87th legislature I sent an email with
8  two sentences to the legal counsel of our senator
9  asking that they consider adding these two sentences to
10  Senate bill one for is second special session.  They
11  studied it, liked it, recommended it and it was added
12  to Senate bill one.
13  Q.  And when you say our senator, do you mean
14  Senator Bettencourt?
15  A.  I do.
16  Q.  Okay.  And then do you remember what the two
17  sentences were on?
18  A.  Yes.  The two sentences involved requiring
19  the every county in Texas to reconcile the number of
20  ballots with the number of voters after every election.
21  Q.  Do you remember the name of Senator
22  Bettencourt's I guess general counsel?
23  A.  I do.
24  Q.  Tell me what that is.  That -- by the way,
25  that was very good, whoever prepared you for this

Alan Vera - 2/27/2023

30

1  deposition is -- did a great job.
2      A.   Sonya Aston.
3      Q.   And did you send the two sentences to
4  Ms. Aston by email?
5      A.   By email.
6      Q.   Okay.  And did she then respond to you?
7      A.   She respond and said I'll see what I can do.
8      Q.   Okay.  Then how did you know -- how did you
9  come to learn that it was well taken and then going to
10  be put in the bill?
11     A.   Well, as you know in Texas legislature every
12  special session, every bill has to be refiled.  So when
13  Senate bill was refiled for the second special session
14  my two sentences were there.
15     Q.   Do you think you would still have that email
16  to Ms. Aston if your email history somewhere?
17     A.   I don't think so, it's been well over a year.
18     Q.   Okay. What email service do you use?
19     A.   Outlook.
20     Q.   Outlook. Do you know if outlook keeps your
21  older emails?
22     A.   I don't know.
23     Q.   Okay. Okay. Now, I think last on my list is
24  testifying when possible in the legislature, do you
25  recall testifying in the do you recall testifying on SB

31

1  1 at all?
2      A.   I do.
3      Q.   Okay.  And do you recall testifying on SB 1
4  in the second special?
5      A.   I do.
6      Q.   Okay. I remember being in a committee hearing
7  and you and I were both there and you were testifying,
8  I can't remember for sure if it was the second special.
9  But I -- I remember your testimony, do you -- would
10  you, for example in the second special provide both
11  written and verbal testimony?
12     A.   Rarely.
13     Q.   Okay.
14     A.   Rarely.  Occasionally I will bring exhibits
15  to supplement my verbal testimony.  I rarely provide
16  written testimony.
17     Q.   Okay. Do you recall whether you provided any
18  written testimony on SB 1 or it's predecessor's bills
19  HB 6, SB 7?
20     A.   I don't think I did provide written
21  testimony.  I think it was all verbal.
22     Q.   Do you go up with like index cards or a piece
23  of paper?
24     A.   I type up every work I'm going to say and
25  I've timed it out for two minutes in the Senate and

32

1  three minutes in the house.
2      Q.   And you take those notes back with you?
3      A.   I do.
4      Q.   Okay.  I noticed when I -- I went to the
5  Harris County Republican Party website that there was a
6  link that -- that one could click on to get involved or
7  volunteer with the party and it allowed me to put my
8  name and my VYD information if I wanted to serve as an
9  election worker; are you aware of that part of the
10  website?
11     A.   I am aware.
12     Q.   Do you know if those pages or the information
13  that's gathered there is used also to recruit Poll
14  watchers?
15     A.   I don't deal with that information, but I
16  think it's not impossible that once the party contacts
17  the person who left their name they could add Poll
18  watching as an option of volunteer activity.
19     Q.   How do you get the names of potential Poll
20  watchers?
21     A.   I get them from the county party.
22     Q.   Okay. So the paid staff?
23     A.   Uh-huh.
24     Q.   All right.  And who is responsible for
25  getting those individuals to a training that you would

33

1  give?
2      A.   The paid staff.
3      Q.   Okay. So you don't have to be chasing people
4  down telling them, it's at Saturday at 10 a.m.
5      A.   Not anymore.
6      Q.   Okay. Okay. When I'm quiet I'm crossing off
7  questions, so it's a good thing. I'm already on page 6,
8  we're just zipping right along here.
9          MR. TAYLOR:  You left out a key fact,
10  what's the last page number?
11         (Laughter.)
12         MS. PERALES:  Well, it's not six,
13  but -- but we're actually making really -- I think our
14  conversation, so it touched on several different
15  things, so I'm catching up with myself and crossing off
16  the questions.
17         THE WITNESS:  While you're doing that,
18  can we take a break?
19         MS. PERALES:  Of course.
20         THE WITNESS:  Thank you.
21         MS. PERALES:  Let's take a five minute
22  break.
23         THE REPORTER:  Okay.  Going off the
24  record at 10:29 a.m.
25         (Off the record.)

34

1        THE REPORTER:  Going back on the
2   record at 10:42 a.m.  []
3      Q.   (BY MS. PERALES:)  Okay. Mr. Vera, I am going
4   to ask you some more specific questions about Poll
5   watchers and your training of the Poll watchers
6   comparing the before SB 1 to the after SB 1 period of
7   time, okay?
8        So did your training change at all for
9   Poll watchers with respect to what they could do in the
10  polling place while voting is happening?
11     A.   It did not change significantly. The two
12  greatest changes.
13        MR. GORE:  Let me -- let me just
14  interject here an objection.  We've allowed latitude on
15  the Poll watcher training and I'm fine you confirming
16  there were changes to the training.  Anything like the
17  substance of the training the Harris County Republican
18  Party has asserted a First Amendment right to
19  confidentiality and First Amendment privilege not to
20  disclose the substance of the training.  So I'm going
21  to ask the witness or instruct the witness not to
22  answer anything about the substance of the training.
23     Q.   (BY MS. PERALES:)  Mr. Vera are you going to
24  follow counsel's advice and not testify about the
25  substance of the Poll watcher training?

35

1      A.   I am.
2      Q.   Okay. And you did that very elegantly, I -- I
3   mentioned previously that so times your. Counsel will
4   direct you not to answer and we will then work on that
5   at another time.
6        You mentioned that your Poll watcher
7   training did not change significantly, but would it be
8   fair to say that your Poll watcher training did change
9   in some respect from the pre-SB 1 period to the post SB
10  1 period?
11     A.   Yes.
12     Q.   Aside from the training that you give Poll
13  watchers, do you also receive communications from Poll
14  watchers while election day is going on?
15     A.   I do.
16     Q.   Okay. And generally how to you receiver those
17  communications?
18     A.   By text or email.
19     Q.   Have you ever had a poll watcher call you on
20  your cell phone during election day to ask for you
21  guidance or advice?
22     A.   Yes.
23     Q.   So then would it be fair to say you
24  communicate with Poll watchers by text email and
25  telephone?

36

1      A.   Yes.
2      Q.   And in these communications, would it be fair
3   to say that they're asking for your guidance about what
4   to in a particular situation?
5      A.   Frequently.
6      Q.   Okay. And to you then provide that guidance
7   to them based on your understanding of SB 1 and other
8   parts of the election code that deal with Poll
9   watchers?
10     A.   That is correct.
11     Q.   You mentioned the training manual that you
12  encouraged, that you've created, that you encourage the
13  Poll watchers to bring with them to the polling place
14  on election day; is that correct?
15     A.   I mentioned it, yes.
16     Q.   Okay. Can you tell me approximately how many
17  pages long it is?
18     A.   It is a graded booklet where there are tabs
19  available to you.  I'm going to guess it is a total of
20  18 pages folded and collated an cut very uniquely.
21     Q.   Does each page contain approximately 250
22  words?
23     A.   No.  It's a tiered appearance so that there's
24  a tab on what the content is.  So there's a tab that
25  says ID and they flip it up in that opened is all the

37

1   informing on ID.
2      Q.   Okay?
3      A.   So -- and on the back are the actual
4   citations from the election code that relate to the
5   issue on the opposite side of the page.  So 18 pages
6   but they're not same size.
7      Q.   Okay. So if I took the words from your manual
8   and I put them in let's say a word processing document
9   about how many pages long will it be?
10     A.   I don't know.
11     Q.   Would it be more than 18?
12     A.   No --
13     Q.   I'm trying to figure out --
14     A.   What font size?
15     Q.   ( Laughter. ) 12?
16     A.   Yes, then be more than 18 because the font
17  side I have to use for the code is much smaller to fit
18  all the relevant code.
19     Q.   Okay. Okay. Would it be fair to say that your
20  Poll watcher guide is different from the Poll watcher
21  published by the secretary of state?
22     A.   It is. It is in format.
23     Q.   Okay.
24     A.   It's much more usable.
25     Q.   Okay.

Alan Vera - 2/27/2023

70

1  SB 7, I believe.
2          So in the lead up to the 2021, Texas
3  legislative regular session, it's fair to say that you
4  were interested in seeing one or more bills put forward
5  that we're going to deal with election issues?
6      A.  That's correct.
7      Q.  Okay. So prior to the start of the 2021
8  legislative session, what steps did you take to
9  advocate for election related legislation in the
10  upcoming session?
11     A.  That was the 87th session.  In the early days
12  of the session I visited in person in the capital with
13  the state reps and the senators who represent Harris
14  County and this was a verbal communication of the kinds
15  of issues we think needed to be fixed.  So we visited
16  together and I talked and they took notes.
17     Q.  Okay.  Tell me the names of those people.
18     A.  Briscoe Cain, Valoree Swanson, Mike
19  Schofield, Paul Bettencourt.
20     Q.  Any other senators?
21     A.  No.
22     Q.  How about Bryan Hughes?
23     A.  No.
24     Q.  Okay.  Cain, Swanson, and Schofield are
25  members of the house, right?

71

1      A.  Correct.
2      Q.  Okay.  Tell me about how many times you
3  communicated with Briscoe Cain?
4      A.  Well, it was the initial visit where I
5  visited all of them. I think twice before the
6  committees began hearing, maybe two times the most.
7      Q.  So this would have been after the -- the legg
8  started?
9      A.  After the opening day of the Legg but before
10  the committees began hearing bills.
11     Q.  Okay. Did you do any work prior -- sorry. Did
12  you do any work prior to the start of the session?
13     A.  I work all the time.  Can you be more
14  specific.
15     Q.  So bill filing usually opens in November of
16  the year preceding, so just taking you from --
17  following the November 2020 election, knowing that
18  there's an upcoming legislative session?
19     A.  Right.
20     Q.  Just in that period before the legislative
21  session starts, did you do work -- and I'm sure you
22  must have so maybe the better question is, what work
23  did do you to prepare for a accomplishing your goals
24  with respect to your legislation --
25     A.  -- I understand -- I understand your question

72

1  now, thank you.  Again, just to be clear I -- in that
2  year was mostly phone calls in advance and those start
3  in June.  I began calling Swanson and Cain and
4  Schofield in June of 2020 discussing issues that were
5  of concern to the Ballot Security Committee, not bills
6  just issues that needed to be addressed.
7      Q.  Uh-huh.
8      A.  And then that continued in January of 2021
9  when I visited their offices and followed up on those
10  issues.
11     Q.  Okay. Understood. You met with them one on
12  one?
13     A.  Well, in June it was phone calls in January
14  it was visits one on one uh-huh.
15     Q.  Did you meet with the members personally or
16  did you meet with their staff?
17     A.  Probably a mix, I can't remember exactly, but
18  I'm sure the -- the members were there on one of the
19  visits and staff on others.
20     Q.  Okay. What do you remember advocating on that
21  were related to SB 1, meaning either ended up in -- in
22  SB 1 or one of its predecessor's bills?
23     A.  Oh, I see, I see, I see --
24         MR. WASSDORF:  I'm going to object
25  again on the basis of legislative privilege to the

73

1  extent that any of the contents of these communications
2  were in response to a legislative inquiry and instruct
3  you not to answer in that regard.
4          MS. PERALES:  I don't think you can
5  instruct him not to answer.
6          MR. WASSDORF:  Well, I mean --
7          MS. PERALES:  But let's -- let's take
8  a minute to think about it.
9          MR. TAYLOR:  Doesn't the state --
10  doesn't the state own that privilege though.  I mean
11  it's not a privilege that --
12         MS. PERALES:  Well, it's -- it's maybe
13  the privilege of a legislator, but it's -- they're
14  third parties.  They're not parties to the action here.
15         MR. WASSDORF:  I don't know.
16         MS. PERALES:  Let me think about this.
17  Let me think about this.  I'm -- I'm not going to
18  trying to steamroll you.  I do want to stay on the
19  record.
20         MR. WASSDORF:  I -- I was asserting
21  the privilege of instructing him not to answer based on
22  Mr. Taylor's representation that he was going to defer
23  to us with respect to our respective privilege
24  objections.
25         MR. TAYLOR:  Yeah.  And I can make it

74

1   easier perhaps.  I don't want my client a witness to be
2   put in a position where somebody has asserted a
3   privileged and then said that he improperly waived that
4   privilege.  So I don't think we have, he and I don't
5   have any choice, but if somebody's going to raise a
6   privilege today, we're just going to have to you know
7   not answer that question.  But I'm not saying that the
8   privilege is valid or invalid, I have no idea because
9   I'm not involved in this case.  So that's -- but that's
10  the practical reality is I am instructing him not to
11  answer questions that these other lawyers are
12  asserting, but not because they're valid, but because
13  they're asserted.
14          MS. PERALES:  Uh-huh.  So can you tell
15  me if you're going to assert the legislative privilege
16  and instruct the, Mr. Vera not to answer with respect
17  to all communications with legislators and staff?
18          MR. WASSDORF:  No, it's just any --
19  the contents of any communications that he made in
20  response to an inquiry from a legislator or legislative
21  staff.
22          MS. PERALES:  So can you tell me what
23  it was about my question to Mr. Vera that may have
24  raised that issue for you?
25          MR. WASSDORF:  I'm having difficulty

75

1   in remembering what exactly the wording of the question
2   was, but as it was read the scope of the question
3   appeared to potentially encompass his communications to
4   the legislators or legislative staff in response to a
5   legislative inquiry.
6           MS. PERALES:  One second.
7           Let me see if I can divide his
8   testimony in such a way that we are able to segregate
9   those questions on the record and deal with them
10  separately, perhaps down the line a little bit in the
11  deposition.
12          MR. WASSDORF:  Sure.
13      Q.  (BY MS. PERALES:)  So Mr. Vera, would it be
14  fair to say that you had communications with
15  legislators and staff in which you were bringing forth
16  information or requests at your initiative; that's a
17  yes or no question.
18      A.  Yes.
19      Q.  Okay.  Were there ever times when you were
20  communicating with legislators and staff in response to
21  a question from them?
22      A.  Yes.
23      Q.  Okay.  So I'm going to try to divide your
24  testimony into what I believe is non-objectionable, you
25  bringing forth information to legislators and staff at

76

1   your initiative and then we will try to deal separately
2   with your communications with legislators and staff
3   where they're requesting something from you?
4       A.  This is going to be difficult.
5       Q.  Okay.
6       A.  Because the interaction and the dynamics of
7   the exchanges and discussions, those things overlap
8   continually.
9       Q.  Yeah, okay.
10      A.  It's going to be difficult.
11      Q.  Okay.  Well, with without discussing the
12  substance of what they may have been asking you and
13  what you may have been let me try get a sense of how
14  that would have unfolded.  Would it be fair to say that
15  you communicated with legislators and their staff in
16  person, by phone, and by email?
17      A.  That would be an accurate statement.
18      Q.  Okay.  Did you ever have any Zoom meetings
19  with legislators or staff?
20      A.  Did not.
21      Q.  Okay.  And so is it your testimony that when
22  you were communicating with legislators and their staff
23  that it was a -- a combination of you bringing forth
24  information at your initiative or requests at your
25  initiative and then getting inquiries from them and

77

1   then you're responding to those inquires?
2       A.  If I understand the question, yes, it was
3   both those issues and frequently in the same meetings.
4       Q.  Okay.  Is it fair to say so summarize your
5   earlier testimony that you started calling house
6   members and staff and Senator Bettencourt and staff in
7   the summer prior to the January 2021 session, and that
8   your communications with them continued both either
9   through email calls or in person meetings until the
10  enactment of SB 1?
11      A.  Well if an enactment means final passage,
12  yes, because SB 1 did not become effective till
13  December of 2021 so yes to the enactment.
14      Q.  Okay.  When you responded to inquires from
15  legislators or staff would it be fair to say that you
16  were giving them information as well as suggestions on
17  crafting SB 1, or what ultimately became SB 1?
18      A.  It would be more -- it would most accurate to
19  say that when I was responding to questions it was
20  providing specific information on problems we had
21  faced.
22      Q.  Uh-huh.
23      A.  Not craft -- how to craft SB 1.
24      Q.  But suggestions certainly about where, where
25  you wanted to see language to solve certain problems

**78**

1 that you had seen?
2    A.  I think you've gone a little too far on the
3 specificity.  It wasn't the language it was we've got
4 to find how to fix this.  I wasn't suggesting the
5 language and how to fix it.
6    Q.  Certainly not bill language, let met -- let
7 ask my question in a better way then.
8    A.  Okay.
9    Q.  When you're communicating in response to
10 inquiries from legislators, you were giving them both
11 factual information as well as telling them from your
12 perspective that either certain holes needed to be
13 plugged in the statute or certain issues needed to be
14 addressed by the statute?
15    A.  That is correct, but what I did not do is
16 provide language for the statute.
17    Q.  Okay. You mention that prior to the start of
18 the 2021 regular session you started calling
19 legislators and their staff on certain issues as far
20 as -- as the summer before so summer of 2021 -- I'm
21 sorry, summer of 2020 --
22    A.  2020.
23    Q.  -- And I had asked you a question about what,
24 of those communications were relevant to SB 1, or what
25 ended up in SB 1.  So just focusing on your outreach to

**79**

1 legislators, starting before the start of the 2021
2 regular session, can you tell me what issue you were
3 reaching out on that were relevant top SB 1?  So for
4 example there's lot issues in the election code and I
5 know that you work on lots of different things?
6    A.  Uh-huh.
7    Q.  But just specific to what was addressed in SB
8 1 can you remember starting the summer of 2020 what you
9 were advocating onto the members?
10    A.  At that time I know I mentioned growth in
11 mail ballot harvesting in Harris County. I know I
12 mentioned problems with election judges preventing Poll
13 watchers from being close enough to see and hear
14 activity, and that was partly due to COVID, okay?
15 Those are the two major issues in the summer was the
16 mail ballot harvesting problem and the carryover Poll
17 obstruct problem.
18    Q.  So prior to SB -- actually SB 7 and HB 6 --
19    A.  Uh-huh.
20    Q.  Getting filed --
21    A.  Uh-huh.
22    Q.  In the regular session did you advocate for
23 example on -- and I'm just going to go through the
24 provisions -- requiring a registrar to report
25 ineligible registrants or voters to law enforcement

**80**

1 officials?
2    A.  No, I did not.
3    Q.  Did you --
4    A.  But I -- to be clear, I want to be -- I do
5 remember also repeating a prior concern about people
6 registering to vote using a commercial post office box
7 as a residence address.  And that was in addition to
8 the Poll watcher and the mail ballot harvesting, sorry,
9 I forgot that.
10    Q.  Well that's what I'll going to go through the
11 list because who could remember all of it it's a long
12 list?
13    A.  Okay.
14    Q.  Do you remember raising  before SB 1 was
15 filed concerns to legislators or advocating that
16 legislators address voter registration list maintenance
17 issues, other than this residential address issue?
18    A.  At that time, no.  The PO box registration
19 was the issue I raced.
20    Q.  And so you mentioned at that time, no, so I'm
21 going to make a note to you about that later on as
22 well. Do you remember advocating that SB 1 have any
23 provisions regarding the secretary or state reserving
24 the names of voters excused from jury duty for non
25 residence?

**81**

1    A.  No.
2    Q.  Do you remember advocating before SB 1 was
3 filed on requiring the secretary of state to refer
4 information around potential criminal conduct to the
5 AG?
6    A.  No.
7    Q.  Now this is leading up to before SB 1 gets
8 filed, how about recommending that legislators require
9 polling place to be inside a building?
10    A.  That wasn't -- that wasn't on my list.
11    Q.  Okay. How about recommending to legislators
12 that they're not be 24 hour voting?
13    A.  That wasn't on my list.
14    Q.  Okay. Do you recall before SB 1 was filed
15 recommending to legislators that the election code
16 contain a specific provision that voting machines not
17 allow straight ticket voting?
18    A.  Not on my list.
19    Q.  Okay. Do you recall recommending to
20 legislators that SB 1 limit the presiding judge from
21 removing a watcher unless the watcher committed certain
22 infractions, whether those be of the Election Code or
23 the Penal Code?
24    A.  Not that specific thought, but in the summer
25 I raised the concerns about Poll watchers not being

**82**

1  allowed to observe what they're entitled to observe.
2  So I raised the general topic, not that specific topic.
3      Q.  Do you know how that specific topic -- how
4  that specificity about prohibiting election judges from
5  removing watchers unless the watcher committed certain
6  infractions; do you know where they language came from?
7      A.  I do not.
8      Q.  Okay. And of course I should have asked you
9  about the ones above as well, do you know where the
10 language came from in SB 1 about having to have the
11 polling place be in a permanent structure?
12     A.  Not that specific thought, no.  That didn't
13 come from my discussions.
14     Q.  All right. And then do you know where the
15 language of SB 1 came from about not having 24 hour
16 voting?
17     A.  No, I do not.
18     Q.  Okay. Do you -- do you recall whether you
19 were advocating before SB 1 was filed on making it
20 Class A misdemeanor to refuse to accept a watcher?
21     A.  Not specifically that, no.
22     Q.  Do you know the source of where that came
23 from in SB 1?
24     A.  I do not.
25     Q.  Okay.  Now, there's a provision in SB 1 which

**83**

1  I believe you said that you did advocate with respect
2  to, which is that the watcher may not be denied free
3  movement where election activity is occurring and the
4  watcher is entitled to sit or stand near enough to see
5  or hear?
6      A.  Yes.
7      Q.  You advocated on that?
8      A.  Yes.
9      Q.  Okay.  And did you advocate with respect to
10 it being a Class A misdemeanor to take action to
11 obstruct the view of a watcher or distance the watcher?
12     A.  It was already a Class A misdemeanor.
13     Q.  Okay. Do you recall advocating that there be
14 either different or increased penalties to -- for an
15 election judge to either distance the watcher or impede
16 the view of the watcher?
17     A.  Not specifically.  I did, in my summer phone
18 calls, advocate for their being a stronger penalty for
19 election judges who prevent Poll watchers from
20 performing their duties.
21     Q.  Before SB 1 was introduced, did you advocate
22 on prohibiting mail ballot drop boxes?
23     A.  I did not.
24     Q.  Do you know whether that language -- what was
25 the source of that language for SB 1?

**84**

1      A.  I don't know.
2      Q.  Okay.  Before SB 1 was introduced, did you
3  advocate for either applications for ballot by mail or
4  mail ballots to have increased requirements for
5  presenting ID numbers, and then having -- those ID
6  numbers need to be verified in order to count either
7  the application, process the application, or count the
8  mail ballot?
9      A.  Not specifically but I did tell you
10 previously that in the summer phone calls I was raising
11 concerns about mail ballot harvesting in Harris county.
12     Q.  Okay.  You didn't have that specific proposal
13 though, let's add an ID requirement to the paperwork
14 and have those things required to be checked?
15     A.  I did not have that specific proposal.  I may
16 have pointed out in one of two phone calls, but the
17 states of Wyoming and Alabama required a photocopy of
18 the copy of the driver's license of the voter to be
19 included with the ballot.
20     Q.  Do you know the -- the source of specific
21 language in SB 1 requiring the ID numbers for ABBM's
22 and mail ballots?
23     A.  I do not.
24     Q.  Okay. Before SB 1 was introduced, did you
25 advocate at all with legislators for additional

**85**

1  information to be asked from individuals who transport
2  curb side voters?
3      A.  Did not.
4      Q.  Do you know where the source of that
5  language?
6      A.  No, ma'am.
7      Q.  Okay. Prior to the introduction of SB 1, did
8  you advocate with legislators to increase requirements
9  on polling place assisters, namely, that the assister
10 oath include additional statements?
11     A.  That was not on my list, no.
12     Q.  Okay. And what about whether the assister has
13 to say they were being compensated by a campaign or a
14 PAC?
15     A.  That wasn't me.
16     Q.  How about with respect to mail assisters mail
17 not male like y'all --
18     A.  M-A-I-L.
19     Q.  -- M-A-I-L.  Assistance with voting by mail
20 did you advocate at all prior to the introduction of SB
21 1 that persons who assist voters who are voting by mail
22 are requesting a mail ballot provide additional
23 information about their relationship and compensation?
24     A.  Not that specifically.
25     Q.  Okay.  Do you know the source of that?

86

```
 1    A.  I do not.
 2    Q.  Do you know the source of -- or where it came
 3  from in SB 1 that the assister oath be lengthened and
 4  that --
 5    A.  I do not know the source.
 6    Q.  Okay. Now there's a -- a provision in SB 1
 7  that makes it an offense to compensate or offer to
 8  compensate another person to assist voters in voting by
 9  mail, did you advocate on that issue prior to SB 1's?
10    A.  I did not.
11    Q.  Okay. Do you know how that language got into
12  the bill?
13    A.  I do not.
14    Q.  All right. So there is a part of SB 1 that
15  talks about vote harvesting and so I understand that
16  you had raised a concern related to that.  And so did
17  you advocate with legislators that it should be
18  prohibited to have an in person interaction with a
19  voter in the presence of the ballot where the -- the
20  person is advocating for a particular candidate or a
21  measure?
22    A.  That was not from me.
23    Q.  Okay. So what did you advocate for -- well
24  let me -- let me close that. To you know where that
25  language came from in SB 1 or its predecessors related
```

87

```
 1  to prohibited vote harvesting services as an in person
 2  interaction with one or more voters in physical
 3  presence of official ballot intended to deliver votes
 4  for specific candidate or measure?
 5    A.  I do not know where it came from.
 6    Q.  Okay. So what were you advocating for with
 7  protect to the vote harvesting?
 8    A.  Okay. So we got to be careful about stepping
 9  on the objections, okay?
10    Q.  Yeah, I'm just asking what you were
11  advocating for?
12    A.  In my calls I was describing a problem we
13  were, at that time, investigating. In January and
14  February of 2020 a flood of ABBM was received by the
15  Harris county clerk with significant issues. So I'm
16  reporting problems. 106 ABBMs delivered in a single
17  envelope with no assistant signature to correspond with
18  the act of mailing. Witness signatures on ABBMs
19  requested by people that died in 1990 and 2000 and as
20  recently of 2015 asking for an ABBM in 2020, that's a
21  problem. ABBM signed with a witness by voters whose
22  name was spelled wrong in the signature, that was our
23  concern of ballot harvesting, okay?  And it was
24  significant and there were a number of them. So that,
25  I was advocating for solutions to prevent or toughen
```

88

```
 1  the penalties for that kind of conduct.
 2    Q.  Okay.  Now I -- and what you're saying
 3  triggering memory in my part that there's at least one
 4  document produced where you were sending an email
 5  saying that the voter wasn't even necessarily involved
 6  in that process and that you felt that vote harvesting
 7  relating to the in person interaction may have been not
 8  all of what you would like to see with respect to vote
 9  harvesting?
10    A.  You're remembering correctly, but that was an
11  inquiry from a state legislator, so I won't comment,
12  your -- your memory was correct.
13    Q.  Okay.  I -- okay.  It was produced and it
14  seemed to me that it was you saying to them -- or at
15  least what I saw you saying to them something along
16  those lines.  So then, would bit fair to say that prior
17  to the introduction of SB 1 you had a concern about
18  vote harvesting that may have been related to
19  falsification of information outside the presence of
20  the voter as opposed to anything that might be
21  happening between the voter and someone who's asking
22  them to vote a certain way?
23    A.  The concerns I was raising in the summer of
24  2020 were ballot harvesting in a definition that did
25  not include direct interaction with the voter, where
```

89

```
 1  the voter was unaware that they were requesting a mail
 2  in ballot.
 3    Q.  Okay.  So I want to stay in the time period
 4  prior to the introduction of SB 1 and shift slightly to
 5  your communications with people who are not
 6  legislators?
 7    A.  Uh-huh.
 8    Q.  Namely first, the secretary of state's
 9  office, did you communicate at all with the secretary
10  of states office about what you would want to see in
11  voter integrity legislation in the 2021 session?
12    A.  I did not, no.
13    Q.  Next I'll go to the -- the office of the
14  governor.  Did you communicate with anybody in the
15  office of the governor related to what he would want to
16  see in voter integrity legislation for the 2020
17  session?
18    A.  No, I did not.
19    Q.  And then finally with the respect to the
20  office of Texas attorney general, did you communicate
21  with anybody in the office of Texas attorney general
22  about anything you would have wanted to see in the 2021
23  session related to voter integrity legislation?
24    A.  No, I did not.
25    Q.  Now I'm going to bring you up to the time
```

90

1   period of the regular session, the bills are now
2   introduced, you mentioned that you probably had two
3   meetings with legislators or legislative staff after
4   the opening day?
5       A.  One or two, uh-huh.
6       Q.  Uh-huh.  So in addition to personal meetings
7   -- well let me ask you this, do you know how many times
8   you went up to Austin during the regular session?
9       A.  Well before the committee hearings began with
10  bills, only twice.  So January February, two times.
11      Q.  Uh-huh?
12      A.  Once the committee hearings began for hearing
13  election bills it was almost weekly.
14      Q.  And in the almost weekly visits that you were
15  making after HB 6 and SB 7 are introduced?
16      A.  We filed.
17      Q.  Were introduced and the committees started
18  doing their meetings, were you meeting also almost
19  weekly with legislators or legislative staff?
20      A.  No. Once that -- once the committee meetings
21  began my time was spent in the committee meetings.
22  They drag out forever.  So yeah I might see staff or
23  members in the hallway or in the Capital Grill, the
24  meetings were few and far between after there.
25      Q.  So what might, what do they call it,

91

1   buttonhole people in the halls or in the Capital Grill
2   and talk to them about the election integrity bills?
3       A.  If that means I tripped over them, then yes.
4   I may have tripped over them and made a comment.
5       Q.  Okay.  So at this point, what is the means by
6   which you are communicating with legislators or
7   legislative staff?  At this point has it shifted to
8   emails, phone calls?
9       A.  At that point it begins to shift to emails
10  initiated by the legislators or their staff.
11      Q.  Uh-huh.
12      A.  I am the boots on the ground and I frequently
13  get an email asking me to look for unintended
14  consequences in the language of the bill and I respond
15  with my best evaluation of what might be the unintended
16  consequences. The email you referenced earlier on the
17  issue of ballot harvesting being an in person
18  definition was inquiry from a legislator, and that was
19  my response.
20      Q.  Okay, so would it be fair to say then that,
21  once the committee hearings start your interactions
22  with legislative staff and legislators are in the form
23  of providing feedback on specific bill language that
24  they want to vet with you?
25      A.  In general, yes.  In general, yes. There have

92

1   been -- there were two occasions in that first regular
2   session when in testimony I mentioned suggestions that
3   might make the bill better, and in those two cases --
4   only two -- I was contacted while I was still waiting
5   to testify on later bills and spent time explaining to
6   the staff, this is what I was referring to.
7       Q.  And generally that -- would that be by phone
8   or --
9       A.  Well, it's in person.
10      Q.  In person?
11      A.  While I'm still there in Austin.
12      Q.  I see.  So you might -- a legislator --
13  legislative staff might track you down while you're
14  still in the building and ask you to respond as they're
15  vetting bill language?
16      A.  Asking me to explain specifically what I was
17  suggesting in my testimony that might make the bill
18  better.
19      Q.  Okay.  Did you have ever an exchange like
20  that that resulted in bill changing in some way?
21      A.  I assume there -- yes, but I can't remember
22  which bill. It was not one of these, except for the
23  reconciliation of votes and voters.
24      Q.  Okay. So just specific to HB 6, SB 7, SB 1,
25  it's predecessor's bills, do you ever recall advocating

93

1   during the regular session for something to either be
2   added or changed about those bills that you saw come to
3   fruition?
4       A.  Not in the regular session.
5       Q.  Okay. And you've testified in favor of the
6   bills during the regular session HB 6 and SB 7, is that
7   correct?
8       A.  Correct.
9       Q.  Did you advocate for any bills that were not
10  HB 6 or SB 7 to kind of reach out and incorporate maybe
11  a -- a smaller bill that was also moving through the
12  Legg?
13      A.  Please state the question again so I'm clear
14  did I ever advocate for bringing another bill into SB
15  7.
16      Q.  Yeah.
17      A.  There was one point -- not in regular session
18  I don't think -- but I advocating bringing Senate bill
19  1589 into Senate bill one or 7, whatever the number was
20  at the time.
21      Q.  And did that happen?
22      A.  Nope.
23      Q.  Was 1589 one of the Bettencourt bills?
24      A.  It was.  Show you how much influence have.
25      Q.  Well -- and Senator Bettencourt he had filed

94

1    some -- so smaller stand alone bills; is that correct.
2        A.   It is.
3        Q.   Did you ever communicate by text with either
4    legislators or legislative staff?
5        A.   No.  I think Briscoe Cain may have texted me
6    once to ask me to stop testifying on all the bills,
7    swear to God.
8                (Everyone Laughing).
9        Q.   (BY MS. PERALES:) Did he offer a reason why,
10   or did you understand why he was asking?
11       A.   This meeting is running too long.  The
12   committee hearing is running too long, stop testifying.
13   That was the one I can recall.
14       Q.   Okay. You mentioned that you typically didn't
15   submit written testimony when you testified, but did
16   you submit anything in writing to either legislators or
17   legislative staff that showed your thought or
18   perspectives on either SB 7, or HB 6 -- and it could be
19   anything, a memo, an email, a mark up of the bill with
20   your concerns?
21       A.   At that time I'm sure that I don't leave
22   copies of my testimony, but I sometimes give Exhibits.
23   Yes, I did give out Exhibits showing the examples of
24   the dead voters who requested mail ballots, okay, in
25   January February 2020.  So those were handed out to the

95

1    committees, that was it.
2        Q.   And then specific to the bills themselves did
3    you ever give them any writings that gave your thoughts
4    or reactions to what was in the bill or what wasn't in
5    the bill or how the bill was written?
6        A.   Only when -- when asked, I -- I didn't
7    proactively.
8        Q.   Uh-huh?
9        A.   But if they -- when they asked me say, take a
10   look at this see what are the unintended consequences
11   I replied.
12       Q.   And unintended consequences, when you say
13   that you mean how the bill language would play out in
14   real life?
15       A.   Yes.
16       Q.   And whether it would accomplish the goals of
17   the bill?
18       A.   That's correct.
19       Q.   Okay.  And when you would be asked -- and I
20   won't ask you for specifics of that just yet -- you
21   could have potential have responded in writing with
22   respect to that?
23       A.   By email, potentially.  Yes.
24       Q.   Okay.
25       A.   Usually those were either emails or tell

96

1    phone calls.
2        Q.   Do you recall ever advocating for something
3    to be taken out of either SB 7 or HB 6?
4        A.   I think the language defining ballot
5    harvesting as requiring personal contact with the voter
6    qualify as that but again, that was in response to a
7    question from a legislator.
8        Q.   Okay. Now as SB 7 and HB 6 are moving through
9    the regular session what communications are you having
10   with the secretary of state regarding those bills,
11   where Keith [Ingram], Christina [Adkins], or anybody
12   else in the secretary of state's office?
13       A.   I don't think I'm having any communications
14   with them about the bills.  I can't recall any bills
15   communication with them about HB 6 or SB 7.
16       Q.   You weren't saying for example saying, hey,
17   when you testify don't forget, this issue has come up
18   in Harris County, anything in which you're encouraging
19   them to either include information or have a certain
20   perspective?
21       A.   I can't recall ever communicating with the
22   SOS office or anyone there about those bills while the
23   sessions while the session was in progress?
24       Q.   Okay.  Were there other bills for example
25   that you sent information to Keith we Ingram on that

97

1    have to with elections?
2        A.   No, no. You should know that Keith Ingram
3    doesn't really like me a whole lot, okay?  So I send
4    formal complaints when I uncovered some wrongdoing, and
5    that's normally when I communicate with him.  We don't
6    communicate directly a whole lot.
7        Q.   So if Keith Ingram said, for example, you had
8    provide him bill language on something or another,
9    would that be false?
10       A.   I wouldn't know where it came from.
11       Q.   Okay.
12       A.   I wouldn't know where they came from.
13       Q.   Okay. Same question with respect to the
14   attorney general's office, as the HB 6, SB 7 are moving
15   through the regular session were you having any
16   communications with the office of attorney general
17   related to these bills?
18       A.   No, during that time my communications with
19   the office of attorney general were complaining about
20   lack of action on complaints I had already filed.
21       Q.   Okay.  And then with respect to communication
22   with office of governor, were you having any with the
23   officer of the govern -- office of the governor on HB
24   6, SB 7 during the regular session?
25       A.   I cannot remember any communications with the

102

1    A.  Did not.
2    Q.  Did you advocate with legislators or other
3  officials regarding voting machines not allowed
4  straight ticket voting?
5    A.  Did not.
6    Q.  Now you were advocating on Poll watchers?
7    A.  I was.
8    Q.  And so is there a point at which you began to
9  advocate on the specific provisions in SB 1 related to
10  Poll watchers, such as prohibiting election judges from
11  removing unruly watchers unless the watcher's behavior
12  violates the Penal Code or was personally observed by
13  the election judge?
14    A.  I was not advocating for that.  I will tell
15  you that during that time period I advocated for
16  removing some of the original language of SB 1 which
17  allowed poll watchers to carry cameras and take photos
18  and record inside the polling place.  I was opposed to
19  that.
20    Q.  Okay.  Now, the provisions related to -- okay
21  did you advocate in the legislature with other
22  officials during this time period up to passage of SB 1
23  that it be made a class A misdemeanor to refuse to
24  accept a watcher?
25    A.  I did not.

103

1    Q.  Did you advocate during this time period with
2  either legislators or other officials that SB one
3  include language saying that a watcher may not be
4  denied free movement where election activity is
5  occurring -- occurring and is entitled to sit or stand
6  near enough to see and hear the on conduct of the
7  observed activity?
8    A.  Only in my testimony to the committee.
9    Q.  And with respect to the time period that
10  we've defined leading the passage of SB 1 did you
11  advocate with legislators or other officials to make it
12  a class A misdemeanor to take any -- for an election
13  official to take any action to obstruct the view of a
14  watcher or distance the watcher from the activity or
15  procedure being observed?
16    A.  Only in my testimony to the committee.
17    Q.  Did you advocate, leading up to the passage
18  of SB 1, on prohibiting mail ballot drop boxes?
19    A.  I did not personally advocate in that.
20    Q.  Okay.  Did you advocate leading up to the
21  passage of SB 1 for language in the bill that would
22  require voters to put ID numbers on ABBM's or mail
23  ballots as part of the process of verifying voter
24  identity?
25    A.  I did not advocate.

104

1    Q.  Okay.  Did you advocate leading up to the
2  passage SB 1 for new information to be gathered from
3  individuals transporting curbside voters?
4    A.  I did not advocate for that prevision.
5    Q.  Did you advocate leading up to the passage of
6  SB 1 with legislators or other officials on adding
7  language to assister oath?
8    A.  I did not.
9    Q.  Did you advocate leading up to the passage of
10  SB 1 with legislators or other officials for
11  requirement that individuals assisting with mail ballot
12  preparation provide their relationship and whether they
13  were compensated?
14    A.  I did not advocate in that specific issue.
15    Q.  Did you advocate leading up to the passage of
16  SB 1 for -- either with legislators or others that
17  there be a state jail felony when a person compensates
18  or offers to compensate another person to assist
19  voters?
20    A.  I did not advocate for that provision.
21    Q.  Okay.  And did you advocate leading town the
22  passage of SB 1 with legislators or others that SB 1
23  prohibit what it terms vote harvesting services that
24  would be an in person interaction with a voter in the
25  presence of a ballot intended to advocate for certain

105

1  ballot positions?
2    A.  I did not advocate for that provision.
3    Q.  Leading up to the passage of SB 1 did you
4  advocate with legislators or officials on
5  opposing civil penalty on election official who violate
6  the election code?
7    A.  I did not advocate for that provision.
8    Q.  So you mentioned earlier -- okay, well here's
9  -- here's a question for you, some of these provisions
10  seem related to things that Harris County was doing in
11  the general election of 2020?
12    A.  Uh-huh.
13    Q.  For example, expanding the hours of voting to
14  24 hours, having voting occur kind of in areas where
15  it's not a permanent structure but more of tent set up
16  or nonpermanent structure, but you did -- you're saying
17  that your advocacy in the legislature our legislators
18  did not touch on those things that Harris County had
19  done in particular?
20    A.  Immediately after the 2020 election, okay?  I
21  did my own local analysis for our legislators on what
22  had happened in that election.  And one of the issues
23  that I addressed was the incredible problems and the
24  almost disenfranchisement of 2,000 voters in drive-thru
25  voting because of the poor -- poor way it was handled.

106

1  So talked about that locally, okay?  And I'm -- I'm
2  sure many of our legislators heard my comment on that
3  topic.
4      Q.  Did you ever speak to legislators and urge
5  them to do something about what you had found with
6  respect to the drive-thru receipting?
7      A.  I did not do that.  I was questioned at
8  length on drive-thru voting by Senator Royce West
9  during the Senate state affairs committee hearing on SB
10  1 in the first special session.  And that's why, for
11  half an hour got into all the details and problems of
12  drive-thru voting.
13      Q.  Okay. So we've covered these specific
14  provisions, so let me sort of change somewhat to ask
15  you, on what provisions were you communicating with
16  legislatures or legislative staff during the period
17  leading occupy to enactment of SB 1?
18      A.  During that period of time I was not doing
19  any individual advocacy with legislators or their
20  staffs accept between the first and special session
21  when I asked Senator Bettencourt's staff to carry those
22  two sentences and put them into SB 1 for me, everything
23  else was in public testimony.
24      Q.  What about answering questions from
25  legislators --

107

1      A.  Yes.
2      Q.  -- as we had discussed earlier, were you
3  answering questions from legislators during the period
4  of the -- either the regular or the first or the second
5  special session?
6      A.  Yes, I would get questions from legislators
7  asking me to review this document and this language and
8  see if there are any unintended consequences, that's
9  normal.
10      Q.  And then you provide your feedback?
11      A.  Correct.
12      Q.  Okay.  And so about how often, how many times
13  per week during the first or second special were you
14  providing that kind of feedback to legislators or
15  staff?
16      A.  Well, during the first special session it was
17  no more than twice a week. The second special session
18  it was only once a week at max that anybody asked.
19      Q.  Okay.
20      A.  Things were pretty settled by then.
21      Q.  Okay.  And then with respect to who was
22  asking can you give me the names of the people who were
23  seeking your input on the bill language or for the --
24  you know, for your reaction to this?
25      A.  I would get emails from State Rep Jacey

108

1  Jetton, State Rep Valoree Swanson, Senator Bettencourt
2  and his staff, and I think 90 percent of the emails I
3  got requesting my point of view were those three people
4  or their staffs.
5      Q.  Did you ever have a request for your feedback
6  from Briscoe Cain or his staff?
7      A.  In the regular session I did get a -- a
8  request from on HB 6.
9      Q.  Okay. And with respect to Mike Schofield did
10  you ever get a request from him for feedback or
11  reaction either him or his staff?
12      A.  Did not.
13      Q.  Okay.  How about Representative Clardy, did
14  you have any communications with either him or his
15  staff related to bill language?
16      A.  No.
17      Q.  Okay.  Jacey Jetton, would it be fair to say
18  it was not somebody you had met with at the early part
19  of the session?
20      A.  That's correct.  He's a representative from
21  Fort Bend county so he would not have attend the Harris
22  County's events where we discussed election legislation
23  --
24      Q.  I'm sorry, I stepped on your answer.  And so
25  tell me how you begin to start communicating with

109

1  Representative Jetton about SB 1?
2      A.  Very simple, I got an email from his staff
3  asking me to comment on these sections of the bill, and
4  I gave them my comments.
5      Q.  Would it be fair to say that, during the time
6  that you were providing your comments on bill language
7  in the regular session, the first and second special
8  session, that what you were being asked to comment on
9  was broader than Poll watchers or harvesting?
10      A.  Yes.  It would be a correct statement,
11  because the email usually simply asked, please take a
12  lack at these sections and tell us if there are any
13  unintended consequences from that language.
14      Q.  And then you would provide your concerns or
15  your thoughts about how the bill language would play
16  out in real life?
17      A.  I have would provide my feedback on that --
18  those -- those exact words, the current language might
19  be misinterpreted, misconstrued, or abused for a -- a
20  result I didn't want.
21      Q.  Or also might fail to address a problem that
22  you perceived?
23      A.  Correct, yes.
24      Q.  Okay.  And would it be fair to say then those
25  type of legislator requests covered most provisions in

110

1    SB 1?
2        A.   I can't answer that because I won't remember.
3    I know that most of the request I get for that feedback
4    specify sections of the language they want me to look
5    at.  I don't know if it covered all -- SB one is a
6    pretty long bill.
7        Q.   Maybe I'll -- I'll be slightly more specific,
8    were you asked to respond to language related to Poll
9    watchers for example?
10       A.   Yes.
11       Q.   Okay.  Were you asked to respond to language
12   related to vote harvesting?
13       A.   Yes.
14       Q.   Were you asked to respond to language related
15   to voter assistance?
16       A.   No, I was not.
17       Q.   Okay.  Were you asked to respond to language
18   related to 24 hour voting?
19       A.   No I was not.
20       Q.   Were you asked to responds to language
21   related to temporary polling places or moveable polling
22   places, given that you had raised some concerning about
23   that in your testimony?
24       A.   I was not because they thought they already
25   had the solution.

111

1        Q.   Okay.  So they weren't asking for you help on
2    that one?
3        A.   Correct.
4        Q.   Were you asked to provide your thoughts on
5    the bill language related to voters providing ID
6    numbers on either ABBM's or mail ballots?
7        A.   I was and I was -- my -- I was and I was
8    ignored.
9        Q.   Okay. Is there anything else that you can
10   think of in your mind that were part of SB 1 that you
11   were asked to provide your feedback on that I haven't
12   touched in just the moment or two?
13       A.   I can't remember, we covered so much.  If I
14   think of it I'll -- I'll mention it, but right now I
15   can't think of thinking else.
16       Q.   Now with protect to feedback you provided on
17   Poll watchers, tell me the field back you Poll
18   watchers.
19            MR. WASSDORF:  I'm going to object on
20   the grounds of privilege and ask the witness not to
21   testify?
22            MS. PERALES:  And Mr. Vera, are you
23   going to follow the instruction of Mr. Wassdorf not to
24   testify on the feedback that you provided legislators
25   related to Poll watchers.

112

1            THE WITNESS:  I am.
2        Q.   (BY MS. PERALES) Okay.  Now, what feedback
3    did you provide to legislators with respect to vote
4    harvesting?
5            MR. WASSDORF:  Same objection.
6        Q.   (BY MS. PERALES) Are you going to follow the
7    advice of Mr. Wassdorf and decline to testify on the
8    feedback that you provided to legislators or staff
9    about vote harvesting?
10       A.   I am.
11       Q.   Next I'll ask you what feedback you provided
12   to legislators or staff related to the requirement that
13   voters provide an ID number on either their ABBM or
14   their mail ballot?
15            MR. WASSDORF:  Same objection.
16       Q.   (BY MS. PERALES) Are you going to follow the
17   instruction of Mr. Wassdorf and decline to testify on
18   the feedback you provided to the legislators about the
19   voter ID on mail voting?
20       A.   I am.
21       Q.   (BY MS. PERALES:)  Okay.  What feedback did
22   you provide to legislators or staff related to what we
23   call drive-thru voting?
24            MR. WASSDORF:  Same objection.
25       Q.   (BY MS. PERALES) Are you going to follow the

113

1    instruction of Mr. Wassdorf and not -- and decline to
2    testify regarding the feedback that you provided
3    legislators about drive-thru voting?
4        A.   I am.
5        Q.   (BY MS. PERALES:) Were you asked to provide
6    feedback on any of the voter registration provisions of
7    SB 1, including for example the requirement that the
8    registrar report an ineligible registrant or voter to
9    law enforcement?
10       A.   I was not.
11       Q.   Were you asked to provide any feedback by
12   legislators on the provisions of SB 1 requiring the
13   secretary of state to refer any information about
14   criminal conduct to the attorney general?
15       A.   I was not.
16       Q.   Were you asked to provide any feedback by
17   legislators about the provision of SB 1 that requires
18   the secretary of state to receive lists of voters
19   excused from jury duty for nonresidence?
20       A.   I was not.
21       Q.   Were you asked to provide any feedback by
22   legislators on the provisions of SB 1 having to do with
23   24 hour voting?
24       A.   I was not.
25       Q.   Were you asked to provide any feedback by

114

1 legislators or staff on the provision of SB 1 having to
2 do with mail ballot drop boxes?
3     A.  I was not.
4     Q.  Were you asked to provide any feedback by
5 legislators or staff on bill language addressing
6 individuals who bring people to the polls for curbside
7 voting?
8     A.  I was not.
9     Q.  So if we take the time period leading up to
10 passage of SB 1 at the end of the second special, based
11 on all of your experiences in those sessions, what is
12 your understanding of the source of the language in SB
13 1 about voter assistance in the polling place?
14     A.  Yeah, I don't know. I have no idea where it
15 came from, it was not one of my areas of focus.
16     Q.  Okay. Same question with respect to the
17 provisions on 24 -- and I'm just going name certain
18 practices that occurred in Harris County.  24 hour
19 voting, mail ballot drop boxes, and drive-through
20 voting, do you know the source of where those ideas
21 came from in the bill?
22     A.  No, I don't.
23     Q.  Okay.
24     A.  The language in the bill on the drive-thru
25 voting, because the language addressed the kind of

115

1 facility, was almost taken from the federal court in
2 downtown Houston.
3     Q.  Okay.
4     A.  There was a -- there was a civil action and a
5 judge -- the federal judge rule that language early
6 portion of the code was different from the language in
7 the election day portions of the code. And what I
8 observed is that SB 1 simply took the languages from
9 the election day provide to early voting.  So I wasn't
10 part of that process, but that's -- that's what I
11 observed.  [stopped]
12     Q.  Okay. Thank you.  Based on your experience
13 through passage of SB 1, do you know where the -- what
14 the source or the idea or the language was related to
15 voters providing an ID number when sending in either an
16 ABBM or a mail ballot?
17     A.  I do not know the source of that language.
18     Q.  Now you had raised a concern yourself that
19 there was essentially nonvoters submitting applications
20 for ballot by mail?
21     A.  Uh-huh.
22     Q.  In the names of others?
23     A.  Uh-huh.
24     Q.  Do you have any sense of how the bill ends up
25 saying somebody who submits an ABBM or mail ballot

116

1 ought to provide additional information, like an ID
2 number?
3     A.  Senate bill one did not affect those section
4 of the code that dealt with falsifying or forging
5 ABBM's for people that are unaware that their names are
6 being used.  That was not changed by SB 1.
7     Q.  So do you have any sense of where the new ID
8 requirements came from in -- in terms of who might have
9 proposed it or?
10     A.  I don't know. I don't know.
11     Q.  Okay. What is your sense of the source of --
12 of the language on vote harvesting that's in SB 1?
13 Based on your knowledge through the passing of SB 1, do
14 you know where that language came from about vote
15 harvesting, which is advocating in person with a voter
16 in the presence of the ballot in favor of a particular
17 candidate or measure?
18     A.  No don't know where that came from.
19     Q.  And how about that portion of SB 1, do you
20 know for example who suggested or what the source of
21 the provision is that it's a state jail felony when a
22 person compensates or offers to compensate another
23 person to assist voters?
24     A.  I don't know the source of that.
25     Q.  Okay. Earlier I had asked you about whether

117

1 you communicated with the secretary of state's office?
2     A.  Uh-huh.
3     Q.  Either Keith Ingram or Christina [Atkins]
4 during either the first or the special session?
5     A.  Uh-huh.
6     Q.  Although, I'm not sure if I asked about the
7 first or the special session, so let me just ask you.
8 Do you remember communicating with anybody from the
9 secretary states office Keith Ingram, Christina
10 [Atkins] about SB 1 or related issues during either the
11 first or second special?
12     A.  I clearly remember not communicating with
13 anyone in the SOS office about SB 1 during the regular
14 session or the two special sessions.
15     Q.  Okay.  What about for example your Poll
16 watcher trainings, do you recall sharing your Poll
17 watcher training PowerPoint with Kieth Ingram --
18     A.  Yes that was different.
19     Q.  -- and/or Christina [Atkins]?
20     A.  In a -- in a senate state affairs committee
21 hearing they were both present, I was there to testify,
22 and at that point SB 1 was passing, was going to pass,
23 and required a secretary of state to provide poll
24 watcher training as part of new requirements of Senate
25 01.  I said to Keith, by the way I've got a

**118**

1  presentation I've been use for years that updates,
2  would you like to see it?  So this was back in you
3  know, 2021, and they said I'd love to see it, so I'll
4  just email it to you.  Christina said, yeah, copy me
5  too.  So I sent them my PowerPoint, the old PowerPoint,
6  pre-SB 1, and sent it by to both of them.
7      Q.   Okay.  And so would you agree with me that
8  that was related to SB 1 with respect to the provision
9  that would require the secretary state to state to
10  start training poll watchers?
11      A.   I would agree that it's relevant to that but
12  it was not an advocacy for that.  I wasn't advocating,
13  it was -- it was done deal, SOS was going to have to
14  train Poll watchers and I offered them some -- a head
15  start in the training materials.
16      Q.   Okay.  Were there any other communications
17  that you had with's either the secretary of state, the
18  AG, or the governor's office during this period of time
19  that you might not classify as advocacy but was
20  communication related or touching on SB one's
21  provisions?
22      A.   Let me think.
23      No that was long after that I -- I can't remember
24  any. I cannot remember any other communications.
25      Q.   Okay. So would it then be fair to say that

**119**

1  you sent a copy of your Poll worker training
2  PowerPoint?
3      A.   Poll watcher.
4      Q.   I'm sorry that you for that.  Your -- let me
5  ask the question again, would it be fair to say that
6  you sent a copy of your Poll watcher training
7  PowerPoint to Mr. Ingram and Ms. [Atkins] of the
8  secretary of state's office in early September, 2021?
9      A.   I think that's probably correct.
10      Q.   Okay.  Would you mark this as the next Exhibit
11  please?
12          The court reporter has handed you what
13  has been marked deposition Exhibit No. 3 do you
14  recognize this as at least partly an email from you on
15  September second 2021 to Keith Ingram and Christina
16  Atkins attaching your Poll watcher PowerPoint?
17      A.   Yeah, I specifically attached the 2020 Poll
18  watcher version, that's correct.
19          (Exhibit No. 4 marked).
20      Q.   (BY MS. PERALES:) The court reporter has
21  handed you what has been marked Deposition Exhibit No.
22  4, can you identify this document?
23      A.   It appears to be a photocopy of my 2020 Poll
24  watcher training class.
25      Q.   Is Exhibit No. 4 what would have been the

**120**

1  attachment to Exhibit No. 3, the email?
2      A.   That's correct.
3      Q.   How do I know this is your 2020 training,
4  where can I tell on here?
5      A.   I don't know if you can tell from the
6  document or not.  Hang on.
7          You can tell because there's nothing
8  in here about having to take the secretary of state's
9  Poll watcher training which was changed in 2021, so on
10  a slide that says before election day, if you look up
11  I'll show you.  That slide, the new one would say have
12  to take the secretary of state Poll watcher training
13  also.
14      Q.   So you recall making that change to your
15  training after SB 1 passed?
16      A.   Yes.
17      Q.   Okay. Okay.  If Mr. Ingram or Miss Atkins
18  asked you for your 2022 poll watcher training as follow
19  up, would you send it to them?
20      A.   Not without checking with [char rest eagle].
21      Q.   Did you check with [char rest eagle] about
22  2021 --
23      A.   I let her know that I was sending this, yes.
24      Q.   [Okay]. So counsel, based on the fact that
25  Mr. Vera shared this document outside the bounds of the

**121**

1  Harris county republican party we would respectfully
2  request that counsel produce the 2022 Poll worker
3  training prepared by Mr. Vera?
4      A.   Poll watcher.
5      MS. PERALES:  Poll watcher training.
6  Poll watcher training prepared by Mr. Vera.
7      MR. GORE:  Okay.  We have asserted our
8  first amendment privilege with respect to that
9  document.  It's contained on the log as well I believe.
10  Mr. Vera has made clear there were changes to that
11  document from the 2020 version.  So those -- that new
12  version remains subject to privilege.  It hasn't been
13  shared outside the Harris County Republican Party.
14  Mr. Vera has testified that he has not done so, would
15  not do so permission of the Chair of the Harris County
16  Republican Party.  So we're -- we maintaining that it
17  is still subject to privilege, including because it
18  contains knew content that hasn't been disclosed
19  outside of the Harris County republican party.
20      MS. PERALES:  Now the fact that it has
21  been disclosed doesn't necessarily mean that it's
22  privileged are you -- so -- and -- and thus we would
23  assert that the privilege claim has been waived with
24  respect to Mr. Vera's Poll watcher training from 2022
25  because he has shared externally his 2020 Poll watcher

122

1  training.  Is it your contention that that the
2  differences between the two documents is subject to the
3  first amendment privilege.
4        MR. GORE:  It's our contention that
5  the 2020 was also subject to first almost privilege and
6  that privilege waived only with respect to the 2020
7  document.  The 2022 document is a separate document and
8  that document remains subject to the First Amendment
9  river privilege that has been asserted over that
10  document.
11        MS. PERALES:  Okay.
12     Q.  MS. PERALES:  Mr. Vera earlier in your
13  deposition you testified you weren't sure if your
14  email, Microsoft outlook, kept your emails from more
15  than a year ago?
16     A.  Uh-huh.
17     Q.  And you've testified earlier in the
18  deposition that you did have back and forth exchanges
19  with either legislators or legislative staff by email,
20  in which you were providing feedback on provisions of
21  SB 1; is that right?
22     A.  Yes.
23     Q.  As part of the process of being involved in
24  this case, did you search for those emails in which you
25  were providing feedback to legislators or initiating

123

1  conversations with them relevant to provisions of SB 1?
2     A.  Did not search for any documents in my own
3  files.
4     Q.  Okay.
5     A.  Are you -- I was given by the attorneys a
6  whole set of documents that were produced, one of which
7  included a feedback to state rep [hi top's] question to
8  me about SB 1 and the language about harvesting.
9     Q.  Okay.  Did you turn over your computer to
10  anybody to have them search your emails as part of your
11  involvement in this case?
12     A.  I did not.
13     Q.  Okay.  If your Microsoft Outlook did in fact
14  save emails that are older than a year old or two years
15  old would your emails going back and forth with the
16  legislator be there and -- and your providing feedback
17  and having your communications?
18     A.  I don't know, there -- they should be.
19     Q.  Okay.  Mr. Vera, the court reporter has handed
20  you what had been marked Deposition Exhibit number 5 is
21  this the email that you were referencing a moment ago
22  in which you had an exchange with representative [which
23  on ] regarding in person activity with a voter and vote
24  harvesting?
25        (Exhibit No. 5 marked.)

124

1     A.  Yes, it does.  This looks like the document
2  that I mentioned in that previous testimony.
3     Q.  (BY MS. PERALES:) and what is the date of
4  your email to representative [chat on the]?
5     A.  August 20th, 2021.
6     Q.  So this is some time before the passage of SB
7  1?
8     A.  Some time during -- it looks like the second
9  special session.
10     Q.  Okay.  Do you know who [Tori Mack far land
11  is]?
12     A.  I think at that time [Tory Mcfar land] was on
13  the staff of [JCia on the].
14     Q.  And [Coleen] I believe you mentioned earlier
15  in the deposition is your wife?
16     A.  Correct, uh-huh.
17     Q.  Okay.  And so in this -- in this email
18  subpoena is it -- is it fair to say that you're
19  alerting representative [jaton] to something that
20  you've characterized as an unintended consequence in
21  version of SB 1 that was going to be heard in committee
22  the following day; is that right?
23     A.  Yes, ma'am?
24     Q.  And then representative [on the] responds
25  "thank you for sharing and good catch we will work with

125

1  chairman [me] on an amendment", closed quote?
2     A.  Uh-huh.
3     Q.  Okay.  Now I know earlier you had suggested
4  that maybe this exchange was -- as part of
5  representative [on] asking for your feedback, is that
6  right?
7     A.  Yes.
8     Q.  Okay.  Do you -- where is the email below
9  that, where he asks for your feedback?
10     A.  Well there's no -- I don't think's an email
11  below that, I think it was a phone call from Ms. [Tory]
12  asking me -- saying state rep [which on] would like you
13  to comment on that aspect SB 1.
14     Q.  And the aspect being that vote harvesting was
15  defined as an in person interaction?
16     A.  Yes.
17     Q.  And then you provided your feedback in this
18  email; is that right?
19     A.  That's correct.
20     Q.  And then representative [chance on] responds
21  to you?
22     A.  Uh-huh.
23     Q.  And then, it sort of cut off at the top, but
24  it looks like you may have taken that exchange and then
25  forwarded it to chair [seeing fell] and some others?

130

1    A.  Exhibit number 7 looks like an automated
2  reply from the office of Senator Bob [Hall] to the
3  chair of Harris County republican party.
4    Q.  Okay. Identify number 8 for me?
5    A.  Exhibit number 8 appears to be automated
6  reply From officer of senator donna [carpal] to the
7  chair Harris County Republican Party.
8    Q.  And can you identify nine for me?
9    A.  Exhibit number 9 appears to be automated
10  reply office of Senator Bettencourt to the chair of the
11  Harris County republican party.
12    Q.  And is the state on all three exhibits August
13  10th of 2021?
14    A.  It is.
15    Q.  And they're all at about 4:30 in the morning,
16  yes?
17    A.  Yeah, between 4:30 and 4:45, yup.
18    Q.  Okay. Do you know what email these Exhibits
19  were responding to?
20    A.  I have no idea.
21    Q.  Okay.  Does the date August 10th, 2021 in
22  anyway refresh your recollection about whether this
23  might have been related to communications on SB 1?
24    A.  It does not. I -- that was in the end of
25  second special session but no, I can't tell.

131

1    Q.  Okay. Thank you.
2         MEMO:  [Come back mark] Exhibits.
3    Q.  Did you have any communications with Senator
4  Hall that related in any way to SB 1?
5    A.  Oh goodness, I don't remember.
6    Q.  Okay. Same question with snort Donna
7  [Campbell] did you have any communications with Donna
8  Campbell about SB 1?
9    A.  I don't remember. The only reason I -- I
10  hedged on Senator Hall he was very good when I did
11  public testimony before the senate committee on state
12  affairs of have asking me many follow up questions.  So
13  I don't know if I may have sent him an email or not.
14    Q.  SB 1 was heard in Senate state affairs on
15  August 9th, 2021?
16    A.  Okay.
17    Q.  And since these auto replies are coming from
18  the wee hours of August 10th?
19    A.  Uh-huh.
20    Q.  Is -- is it possible that you remember
21  sending some kind of follow up communication to various
22  senators following your testimony?
23    A.  I don't remember doing that.  And if I'd had
24  it would have come from my email address, not the party
25  chairs.

132

1    Q.  Okay. Okay. Is there any part of SB 1 as it
2  was passed by the legislature that you believe
3  responded to your concern about the vote harvesting
4  being defined as an in person interaction?
5    A.  I don't remember for certain because it's a
6  long bill, but I do know that they did not affect the
7  section of the code already established for dealing
8  with the concerns I had of people stealing others
9  identities to vote by mail, they did -- they left that
10  alone.
11    Q.  Is there any part of SB 1 as it was passed
12  that you think tracks very closely with communications
13  that you made with legislators?
14    A.  Oh goodness --
15    Q.  Either something that you initiated or
16  something that was the product of the back and forth
17  where you're providing feedback?
18    A.  Well, I've already told you that I was --
19  after the previous election I was very concerned about
20  the way Poll watchers were obstructed.  So some of the
21  Poll watcher improvements certainly tracked with my
22  concerns, okay?  I told you that I had -- I had after
23  the 2020 November election, I had gone public with many
24  serious concerns about drive-thru voting and so that
25  was reflected.  So I think you know at least Poll

133

1  watcher -- poll watchers were better protected, the
2  issue of voting as it was with the aberration in
3  drive-thru was addressed.  And they did not mess with
4  the clear language of mail ballot harvesting that was
5  not involving personal interaction.  So those three
6  things for sure.
7    Q.  Do you recall having conversations with
8  legislators around making it a -- an offense to have a
9  paid person assist a voter in voting by mail?
10    A.  I didn't have any such discussion with
11  legislators.
12    Q.  Do you have to an understanding of what need
13  was meant to be addressed by that?
14    A.  I have an understanding from what I've been
15  told, having -- sitting around the committee hearing
16  rooms talking to others but I did not initiate.
17    Q.  Okay.  And you don't have a first hand
18  acknowledgment of the reasons for that?
19    A.  I do not, nope.
20    Q.  Do you have any first hand knowledge about
21  the reasons for prohibiting in person interaction with
22  a voter in the presence of the mail ballot with --
23  while advocating for a particular candidate or outcome?
24    A.  No, I was not, I was not privy to those
25  discussion or this original complaints.

138

1  vote by mail, they don't remember which -- which number
2  they used when they first registered, put them both.
3      Q.  Were there also voters who hadn't put a
4  number when they registered?
5      A.  It's possible.  I -- I don't know that -- I
6  don't know that, it could be possible.  I don't know
7  that.
8      Q.  If a voter had lived at the same address for
9  example since pre-HAVA Help America Vote Act?
10     A.  Uh-huh.
11     Q.  It's possible that their registration, which
12  would have occurred pre-200 wasn't accompanied by an ID
13  number at all, isn't that right?
14     A.  It's possible.
15     Q.  And they would be over 65 and just have
16  stayed put the whole time?
17     A.  Uh-huh.
18     Q.  Do you recall hearing from paid staff of the
19  party that there were voters in that situation that
20  they hadn't provide any number -- had not provided any
21  number at all with their original registration because
22  it had been a long time ago?
23     A.  I had not heard that specifically.
24     Q.  Okay.  But you did hear about voter putting
25  one number and Harris county having a different number,

139

1  and so the -- the Harris County couldn't match it?
2      A.  I heard that from the people on our signature
3  verification committee.
4      Q.  Did you hear that from any of the party staff
5  that were getting questions from voters?
6      A.  Yes, yes.
7          MS. PERALES:  Can we have a five
8  minute break?
9          THE REPORTER:  Okay.  Going off the
10  record at 2:49 p.m.
11         (Off the record.)
12         THE REPORTER:  Back on the record at
13  3:01 p.m.
14     Q.  (BY MS. PERALES:)  Mr. Vera, are there any
15  topics or is there any information that you know about
16  relevant to SB 1 that you discussed with Mr. Gore that
17  you haven't talked about today in the deposition,
18  either because I didn't ask you or for any other
19  reason?
20     A.  I can't think of anything, give me a second.
21  Nope, nope.
22     Q.  Okay. So I'm going to pass the witness but
23  I'm not going to conclude the deposition or conclude my
24  questioning of the witness.  We're going to leave the
25  deposition open at the end in order to allow for us to

140

1  be able to resolve some of the issues that have come up
2  with respect to invocation of either First Amendment
3  privilege or legislative privilege that are not
4  resolved, so with that caveat I'm going to pass the
5  witness?
6          MR. GORE:  If I can just say on the
7  record, we appreciate where you're coming from.  We
8  obviously object to holding the deposition open.  We
9  think all the privilege assertions have been
10  appropriate.  We understand that you are reserving the
11  right to keep the deposition only -- open only with
12  respect to those privilege issue, is that -- is that
13  correct?
14         MS. PERALES:  Yes.  That's right, and
15  when you say those privilege issues then we can go back
16  and fort all day.  When you say those privilege issues
17  it's specifically the -- the places today where the
18  within has declined to testify because of either
19  legislative privilege or because of first amendment
20  privilege.
21         MR. [GORE]:  Thank you for
22  clarification.  We stand on our objection, but we
23  appreciate the clarification.
24         MS. PERALES:  Would you like to switch
25  seats.

141

1          MS. HOLMES:  Sure.
2          Cross [examination].
3      Q.  Good afternoon, Mr. Vera, we met earlier but
4  my name's Jennifer Holmes, I represent the hall
5  plaintiffs.  And I have just a handful of kind of
6  clarifying questions for you. It shouldn't take too
7  long. You testified that you're the chair of the ballot
8  security committee for the Harris County republican
9  party, correct?
10     A.  Correct.
11     Q.  And who else is on the ballot security
12  committee?
13     A.  The ballot security committee is made up of
14  members that are appointed by the Senate district
15  chairs of each Senate district in Harris County.  And
16  based on the bylaws of the party, Senate districts can
17  appoint one or two members to ballot security,
18  depending upon the size of the district.  There are
19  three appointees by the party chair and she's allowed
20  to appointment two others.
21     Q.  And so that was Cindy [seeing] who appointed
22  you and two others to the committee?
23     A.  Yes, for this current term, uh-huh.
24     Q.  And what are the names of the two other
25  members?

**158**

1 aren't they?
2        MS. PERALES:  Yes, but they're also
3 leading. I don't mean to stop your roll, so if you have
4 more.
5        MR. GORE:  Okay.  Thank you.
6   Q.  (BY MR. VERA.)  Okay.  I need to say one more
7 -- so Mr. Vera, if you believe that these communication
8 might become public, would that chill your expression
9 in these emails?
10   A.  It would.
11   Q.  And if these emails became public in this
12 litigation or otherwise turned over to plaintiffs,
13 would you be less likely to engage in that full and
14 frank communication in the future?
15   A.  In that format, yes.
16   Q.  And if you were subject to questioning about
17 internal conversations you had about the Harris County
18 republican party would that also make you less likely
19 to engage in those kinds of conversations in the
20 future?
21   A.  It would.
22   Q.  Would that be true for communications that
23 are not reduced to email or writing?
24   A.  Yes.
25   Q.  Thank you, Mr. Vera.  I have no further

**159**

1 questions?
2        MS. PERALES:  Before we go off the
3 record I have just one more thing, which is to ask
4 counsel for Mr. Vera or for the defendant interveners
5 if you plan to conduct a search for responsive
6 documents of Mr. Vera's email and his computer, because
7 I believe he's testified that he does have relevant and
8 responsive documents, but hasn't searched and hasn't
9 given over his computer to be searched.  And I'd just
10 like to know if you're -- if you -- if counsel would
11 agree to that prior to the dead line, or how we should
12 proceed?
13        MR. GORE:  Well I -- I can speak only
14 for the intervener defendants and Harris Country
15 Republican party, and I'll Mr. [Taylor] speak for
16 Mr. Vera.  I think we've been really up front
17 throughout our in discover correspondence that we only
18 have custody and control over Harris county republican
19 party email addresses and document, those were the
20 email a addresses and documents we searched to respond
21 to the discovery requests that were propounded on the
22 Harris county republican party, and we have made
23 productions and created a privilege log off of that
24 production and that collection.  We didn't receive any
25 objection to that scope of collection or production.

**160**

1 So that's -- that's how we've proceeded in the case,
2 and we think that that's a fulsome and -- and complete
3 collection and production consistent with the Harris
4 County republican party's obligations under the rules.
5        MS. PERALES:  I believe that Mr. Vera
6 was designated as a custodian  though for records for
7 Harris County in this case, and so after having
8 designated him as a custodian, it -- it would be
9 plaintiff's position that it is incumbent then on GOP
10 defendant interveners to search what he has and it
11 appears that it hasn't extended to what he has. It's
12 not even clear Mr. Vera has a Harris County GOP email
13 address since his -- most of his email come from
14 his business address that -- that we have today.  So if
15 we have to kind of leave the dispute where it is then
16 we'll -- we'll follow up more on that but I just wanted
17 to know if -- if there was anything more to our
18 positions to -- to presented today.
19        MR. GORE:  I'll just put one more
20 thing on the record, we certainly did identify Mr. Vera
21 as a document custodian. In the same correspondence we
22 said we would look -- search official files of the
23 committee and the official committee email addresses.
24 We do have within the files at least documents related
25 to the ballot security committee and others, so we

**161**

1 could search through those, but we've never represented
2 that we would search through Mr. Vera's personal email,
3 and that's outside the custody and control of the
4 committee.  I just put that on there to complete the
5 record and I think probably wouldn't engage on this
6 separately unless Mr. Taylor has something he'd like to
7 add.
8        MR. TAYLOR:  I mean, like I said
9 before I -- I don't represent a party, I just represent
10 a non party witness.  Correct me if I'm wrong, but I
11 was not aware and don't believe currently that there's
12 any subpoena that's been issued and on Mr. Vera in his
13 individual capacity to produce any documents so I have
14 not searched documents that Mr. Vera might have access
15 to individually.  Obviously, if there's a subpoena and
16 it's appropriate and you know we'll -- we'll comply
17 with our obligations, but you're catching me flat
18 footed because this is the -- the first I've heard
19 about it.
20        MS. PERALES:  Okay, thank you.  All
21 right.  We're going to hold the deposition open, but I
22 believe the questioning for today and the conversation
23 for today has concluded.
24        THE REPORTER:  I just need to get on
25 the record if there's any further stipulations you want