# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
        Plaintiffs,              )  Civil Action
                                 )  No. SA-21-CV-00844-XR
vs.                              )
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
        Defendants.              )
                                 )
```

_____

ORAL DEPOSITION OF

ALAN VERA

FEBRUARY 27, 2023

_____


        ORAL DEPOSITION OF ALAN VERA, produced as a

witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on February 27, 2023, from 10:00 a.m. to 3:37 p.m.,

Nilda Codina, Notary in and for the State of Texas,

recorded by machine shorthand, from Javier N. Maldonado

& Associates, P.C., 1415 North Loop W., Suite 600,

Houston, Texas, County of Harris pursuant to the

Federal Rules of Civil Procedure, and the provisions

stated on the record or attached hereto.

**2**

1   A-P-P-E-A-R-A-N-C-E-S
2   For the LUPE Plaintiffs:
3   Ms. Nina Perales
    Julia Longoria (Via Zoom)
4   Fatima Menendez (Via Zoom)
    MEXICAN AMERICAN LEGAL DEFENSE
5   AND EDUCATIONAL FUND
    110 Broadway, Suite 300
6   San Antonio, Texas 78205
    Phone:(210)224-5476
7   Fax: (210)224-5382
    nperales@maldef.org
8   jlongoria@maldef.org
    fmenendez@maldef.org
9
    Patrick A. Berry (Via Zoom)
10  Jasleen Singh (Via Zoom)
    Robyn Sanders (Via Zoom)
11  BRENNAN CENTER FOR JUSTICE
    AT NYU SCHOOL OF LAW
12  120 Broadway, Suite 1750
    New York, NY 10271
13  Phone: (646) 292-8310
    Facsimile: (212) 463-7308
14  patrick.berry@nyu.edu
    jasleen.singh@nyu.edu
15  sandersr@brennan.law.nyu.edu
16  Kevin Zhen
    FRIED, FRANK, HARRIS, SHRIVER &amp;
17  JACOBSON LLP
    One New York Plaza
18  New York, New York 10004
    Phone: (212) 859-8000
19  Facsimile: (212) 859-4000
    kevin.zhen@friedfrank.com
20
    FOR Plaintiffs LULAC Texas; Voto Latino; Texas Alliance
21  for Retired Americans; and Texas AFT
    Daniela Lorenzo (Via Zoom)
22  ELIAS LAW GROUP LLP
    10 G Street NE, Suite 600
23  Washington, D.C. 20002
    Phone: (202) 968-4490
24  dlorenzo@elias.law
25

**3**

1   Attorneys for Plaintiffs Houston Justice; Houston Area
    Urban League; Delta Sigma Theta Sorority, Inc.; The Arc
2   of Texas; and Jeffrey Lamar Clemmons
3   Ms. Jennifer A. Holmes.
    Breanna Williams (Via Zoom)
4   Uruj Sheikh (Via Zoom)
    NAACP LEGAL DEFENSE AND
5   EDUCATIONAL FUND, INC.
    700 14th Street NW, 6th Floor
6   Washington, DC 20005
    Phone:(202) 682-1300
7   Fax: (202) 682-1312
    jholmes@naacpldf.org
8   bwilliams@naacpldf.org
    usheikh@naacpldf.org
9
    Attorneys for Plaintiffs OCA-Greater Houston; League of
10  Women Voters of Texas; REVUP- Texas; Texas Organizing
    Edgar Saldivar (Via Zoom)
11
    ACLU FOUNDATION OF TEXAS, INC.
12  5225 Katy Freeway, Suite 350
    Houston, TX 77007
13  Phone: (713) 942-8146
    Fax: (915) 642-6752
14  esaldivar@aclutx.org
15
    Attorneys for Plaintiffs Mi Familia Vota; Marla López;
16
    Mark Bieter
17  STOEL RIVES LLP
    760 SW Ninth Avenue, Suite 3000
18  Portland, OR 97205
    mark.bieter@stoel.com
19
20
21
22
23
24
25

**4**

1   Attorneys for Isabel Longoria
2   Sameer S. Birring
    Jonathan Fombonne (Via Zoom)
3   Heena Kepadia (Via Zoom)
    Neeharika Tumati (Via Zoom)
4   OFFICE OF THE HARRIS COUNTY
    ATTORNEY CHRISTIAN D. MENEFEE
5   1019 Congress
    15th Floor
6   Houston, Texas 77002
    Phone:(713)274-5142
7   sameer.birring@harriscountytx.gov
    jonathan.fombonne@harriscountytx.gov
8   heena.kepadia@harriscountytx.gov
    neeharika.tumati@cao.hctx.net
9
    For Defendant Bexar County Elections Administrator
10  Jacquelyn Callanen
11  Lisa Cubriel (Via Zoom)
    Catherine Wilson (Via Zoom)
12  Assistant District Attorney, Civil Division
    101 W. Nueva, 7th Floor
13  San Antonio, Texas 78205
    Lisa.Cubriel@bexar.org
14  Catherine.wilson@bexar.org
15  Attorney for Defendant Yvonne Ramón
16  Josephine Ramirez-Solis (Via Zoom)
    Jacqueline Villarreal (Via Zoom)
17  Assistant District Attorney
    100 E. Cano, First Floor
18  Hidalgo County Courthouse Annex III
    Edinburg, Texas 78539
19  Phone: (956) 292-7609
    Fax: (956) 318-2301
20  josephine.ramirez@da.co.hidalgo.tx.us
    jacqueline.villarreal@da.co.hidalgo.tx.us
21
    Attorneys for Defendant Dana DeBeauvoir
22
    Anthony Nelson (Via Zoom)
23  tony.nelson@traviscountytx.gov
24
25

**5**

1   For State Defendants:
2   William G. Wassdorf
    Kathleen Hunker (Via Zoom)
3   Ethan Szumanski (Via Zoom)
    ATTORNEY GENERAL KEN PAXTON
4   P.O. Box 12548
    Austin, Texas 78711-2548
5   Phone:(512)936-1666
    Fax:(512)320-0667
6   will.wassdorf@oag.texas.gov
    kathleen.Hunker@oag.texas.gov
7   ethan.szumanski@oag.texas.gov
    Intervenor - Defendants Republican National Committee,
8   National Republican Senatorial Committee, National
    Republican Congressional Committee, Harris County GOP,
9   Dallas County GOP
    John M. Gore
10
    JONES DAY
11  51 Louisiana Ave., N.W.
    Washington, D.C. 20001-2113
12  Phone: (202) 879-3939
    Fax: (202) 626-1700
13  jmgore@jonesday.com
14
15  FOR THE WITNESS:
16  Mr. Andy Taylor, Esq.
    ANDY TAYLOR
17  2628 Highway 36 S. #288
    Brenham, Texas 77833
18  Phone:(713)222-1817
    Fax:(713)222-1815
19  ataylor@andytaylorlaw.com
20  ALSO PRESENT REMOTELY:
21  Benjamin Limric (Via Zoom)
    Michael Stewart (Via Zoom)
22  UNITED STATES DEPARTMENT OF JUSTICE
    benjamin.limric@usdoj.gov
23  michael.stewart3@usdoj.gov
24
25

6

1              I-N-D-E-X
2                              PAGE
3    Appearances...........................................2
4    ALAN VERA
5    Direct Examination by Ms. Perales...................7
6    Direct Examination by Ms. Holmes..................145
7    Cross-Examination by Mr. Gore.....................160
8    Proceedings concluded.............................166
9    Reporter's certificate............................167
10             E-X-H-I-B-I-T-S
11                             PAGE
12   Exhibit No. 1 Notice of Deposition.................14
13   Exhibit No. 2 Poll Watcher's Guide.................43
14   Exhibit No. 3 Email from Christina Adkins.........123
15   Exhibit No. 4 Texas Poll Watcher Training manual...123
16   Exhibit No. 5 Redacted First Amendment Privilege...127
17   Exhibit No. 6 Email(5/19/2021)....................131
18   Exhibit No. 7 Email(8/10/2021)....................133
19   Exhibit No. 8 Email from Donna Campbell...........133
20   Exhibit No. 9 Email from Paul Bettencourt.........134
21
22
23
24
25

7

1              P-R-O-C-E-E-D-I-N-G-S
2         THE REPORTER:  Going on the record at
3    9:37 a.m. And today is February 27th, 2023, and we are
4    on the record.  Did you all want to do the federal read
5    on, or were you okay with waiving the Rule 30?
6         MS. PERALES:  We'll waive.
7         THE REPORTER:  Okay.
8         If all counsel and all parties please
9    state their appearances and who they represent for the
10   record.
11        MS. PERALES:  Good morning, my name is
12   Nina Perales and I represent the Lupe Plaintiffs,
13   L-U-P-E.
14        MS. HOLMES:  Good morning, my name is
15   Jennifer Holmes and I represent the Haul Plaintiff's,
16   H-A-U-L.
17        MR. BIRRING:  Good morning, I'm Sameer
18   Birring and I represent the Harris County Election
19   Administrator Clifford Tatum, in his official capacity.
20        MR. WASSDORF:  William Wassdorf for
21   the Attorney General's Office representing State
22   Defendants.
23        MR. GORE:  Good morning, this is John
24   Gore.  I represent the Intervenor Defendants.
25        MR. TAYLOR:  My name is Andy Taylor.

8

1    I do not represent any parties in this litigation, but
2    I do represent the witness, Mr. Alan Vera, and I did
3    have just one confirmation question.  I was told that
4    nobody in this proceeding today is going to audio tape
5    or video tape what's happening, it's just everybody's
6    watching by Zoom but they're not actually taping or
7    tape recording the zoom, other than the court reporter
8    who is -- is Here in the room, is that true?
9         MS. PERALES:  My understanding is that
10   there maybe an audio recording by the court reporter
11   service for the purpose of ensuring and accurate
12   transcription, but we agreed in writing prior to this
13   deposition that we would not video record --
14        MR. TAYLOR:  Okay.
15        MS. PERALES:  -- the deposition.
16        MR. TAYLOR:  And cause I'm the new guy
17   here, it -- does that include all the participants who
18   are watching?
19        MS. PERALES:  Well, I only speak for
20   the Lupe plaintiffs, but perhaps we can get an
21   agreement from counsel on the Zoom that they are not
22   recording the deposition.
23        MR. TAYLOR:  That would be wonderful.
24        MS. PERALES:  If you could just put
25   your agreement in the chat, that would be a big time

9

1    saver.
2         (All Zoom counsel agreed in chat.)
3         MS. PERALES:  Okay.  I think we've got
4    everyone.  I can check the chat on the break too.
5         ALAN VERA,
6    Having been first duly sworn, was examined and
7    testified as follows:
8         MS. PERALES:  And let's get our
9    agreement on the record now, before we get started with
10   me reintroducing myself to you.
11        I will agree that an objection from
12   any one of counsel on the defense side will serve as an
13   objection for all.  Now, under the Federal Rules, it's
14   a form objections largely are the ones that we're are
15   going to be having today.  And I understand that you
16   would like to have an agreement that simply saying form
17   objection is sufficient.
18        MR. WASSDORF:  Correct.
19        MS. PERALES:  And the only thing that
20   I would ask of you is if I don't understand perhaps
21   what the form objection might be, I can ask for
22   clarification.
23        MR. WASSDORF:  Absolutely.
24        MS. PERALES:  And is that the
25   agreement of -- of counsel on the defense side?

10

1         MR. GORE:  Yes.
2         MR. WASSDORF:  Yes.
3         MR. TAYLOR:  Yes.
4         MS. PERALES:  Thank you.
5              DIRECT EXAMINATION
6    BY MS. PERALES:
7    Q.   Good morning, Mr. Vera.
8    A.   Good morning.
9    Q.   Earlier you heard me introduce myself, I'm
10   Nina Perales and I represent a group of plaintiffs
11   called the Lupe plaintiffs.  Everybody else has
12   introduced themselves already, and so I'll just go
13   ahead and start asking some of the preliminary
14   questions in this deposition.
15            My first question is, have you ever
16   been deposed before?
17   A.   No, I have not.
18   Q.   All right.  So since this is your first
19   voyage into a deposition I'm going to go through some
20   of the ground rules with you.
21            You have just taken an oath to tell
22   the truth and that's subject to federal penalties.  So
23   it's important to answer my questions truthfully,
24   accurately, and completely; do you understand?
25   A.   I do.

11

1    Q.   Now, do you understand that your oath to the
2    tell the truth today is the same as if you were
3    testifying in front of a judge in the courtroom, in the
4    sense that you're oath is to speak the truth?
5    A.   I understand.
6    Q.   Okay.  Is there anything today that would
7    prevent you from giving me your full attention and
8    answering truthfully, such as illness or some other
9    problem?
10   A.   I am 74 years old, I will need frequent
11   bathroom breaks.
12   Q.   Got it.  And that takes me right to the
13   bathroom breaks, which is you are not a hostage here.
14   If you need to take a break at any time, you can ask
15   for a break we will take a break.  The only question I
16   have of you, is that if there's a question laying out
17   on the table, if you would answer it before we take the
18   break; is that all right?
19   A.   Understood.  Understood.
20   Q.   Okay.  Thank you.  Now, counsel will make
21   objections for the record from time to time and you
22   just heard us talking a moment ago about objections,
23   and, generally when there is an objection you still go
24   ahead and answer; however, if counsel instructs you not
25   to answer, please don't answer and we will work it out

12

1    among ourselves, okay?
2    A.   Understood.
3    Q.   So a few instructions related to the fact
4    that we have a court reporter here.  Generally, in
5    conversations sometimes we talk over each other, but
6    because the court reporter can only take down one
7    speaker at a time, will you agree to let me finish my
8    question before you answer, and then I will let you
9    finish your answer before I begin my next question?
10   A.   Agreed.
11   Q.   Okay.  It's also -- you're doing a great job
12   by the way of speaking up but my next instruction is to
13   please make your answers out loud and audible so the
14   court reporter can hear them; is that all right?
15   A.   Understood.
16   Q.   Okay.  Now, the court reporter cannot take
17   down gestures like shrugs or head nods, so will you
18   agree to give your answers verbally?
19   A.   Agreed.
20   Q.   Now, if you don't understand the question,
21   will you please ask me to rephrase it for you?
22   A.   Agreed.
23   Q.   Now, I might ask you a question that calls
24   for you to give me your best estimate as to something,
25   and I'm entitled to your best estimate, but I don't

13

1    want you to guess; is that all right?
2    A.   Understood.
3    Q.   Okay.  Thank you.  Now, sometimes you might
4    remember more to an answer later in the day.  Sometimes
5    the questions percolate a little bit.  So if that's the
6    case, and you've remembered something more it's okay to
7    tell me at that point and we'll add it to the record
8    and then we'll go back to whatever else it is that
9    we're discussing; is that all right with you?
10   A.   Understood.
11   Q.   Okay.  I might use some terms interchangeably
12   in today's deposition, I don't know if I will or not,
13   but I want to check now to make sure if we have the
14   same understanding of the terms.  If I use the word
15   Hispanic and Latino, will you understand that I mean
16   the same thing by those words?
17   A.   Agreed.
18   Q.   Okay.  I'm going to try not to use jargon,
19   but if I use the word ABBM, will you understand that to
20   be application for ballot by mail?
21   A.   Understood.
22   Q.   Thank you.  Do you have any questions about
23   the deposition process before we begin?
24   A.   No, ma'am.
25   Q.   Thank you.  I understand from the

14

1  introduction this morning that you are being
2  represented by Mr. Andy Taylor; is that correct?
3     A.  That is correct.
4     Q.  Are you also being represented by Mr. John
5  Gore?
6     A.  That is not correct.
7     Q.  And are you being represented by the Attorney
8  General's Office?
9     A.  I am not.
10    Q.  When did your representation -- when did
11 Mr. Taylor's representation of you begin, do you know?
12    A.  The week after I was subpoenaed.
13    Q.  Okay.  Do you have any other lawyers that
14 represent you in this matter?
15    A.  I do not.
16    Q.  Okay.  I'm going to ask you some questions
17 about your preparation for the deposition, but I want
18 to let you know that I do not want to know anything
19 that you said to your lawyer or that your lawyer said
20 to you; okay?
21    A.  Understood.
22    Q.  Can you tell me the steps that you took to
23 prepare for this deposition?
24    A.  I received, through my attorney a very large
25 cachet of document that were in discovery and I read

15

1  those.
2     Q.  Did you bring any of those documents with you
3  today?
4     A.  Did not.
5     Q.  Okay.  Can you generally remember what it was
6  that you reviewed for the deposition?
7     A.  Generally, emails, email attachments, and one
8  or two PowerPoint presentations.
9     Q.  And did you understand this to be discovery
10 that the Harris County Republican Party had produced in
11 this litigation?
12    A.  I did not.  I did not ask questions about the
13 source of the discovery.
14    Q.  Were the documents generally related to
15 Harris County Republican Party?
16    A.  The documents came in two folders, one of
17 which said Harris County, as in the Government.  The
18 other of which said Secretary of State.
19    Q.  Okay.  And when you -- you mentioned a moment
20 ago emails, do you recall generally who the emails were
21 between?
22    A.  That was quite varied, it involved many
23 different people.
24    Q.  And did those people include folks with the
25 Harris County Republican Party?

16

1     A.  They did.
2     Q.  And did some of them include members of the
3  legislature?
4     A.  One or two did.
5     Q.  And did some of them include staff or
6  employees of the Texas Secretary of State?
7     A.  Some of them did.
8     Q.  Did you meet with anybody in advance of this
9  deposition to prepare?
10    A.  I had a Zoom meeting with my attorney for him
11 to brief me on what to expect.
12    Q.  Okay.  And about how long did that Zoom
13 meeting last?
14    A.  There were two sessions, the first one an
15 hour the second one two hours.
16    Q.  Okay.  Was anybody else on the Zoom besides
17 you and Mr. Taylor?
18    A.  Yes, Mr. Jones was.
19    Q.  Okay.  Would that be Mr. Gore --
20    A.  -- I'm sorry John -- John -- Mr. Gore is --
21    Q.  -- (Laughter.)
22    A.  -- Mr. Gore was on the call.
23    Q.  Perhaps some day okay.
24       (Exhibit No. 1 marked.)
25    Q.  (BY MS. PERALES) Mr. Vera, the court reporter

17

1  has handed you what has been marked deposition Exhibit
2  No. 1. And from time to time we will mark certain
3  documents and talk about them and the one that you will
4  look at is always going to be the one with the special
5  orange sticker on it and I'll tell you now don't try to
6  leave with the special orange sticker documents or the
7  court reporter will chase you down and try to get them
8  back; okay?
9     A.  I understand.
10    Q.  Do you recognize this document?
11    A.  I do.
12    Q.  Okay.  Do you recognize it as the notice of
13 deposition seeking your attendance at this deposition
14 today?
15    A.  I recognize it as a predecessor to the notice
16 I received today, this one still says 8:30 a.m. and the
17 one I received says 9:30 a.m.
18       (Laughter.)
19    Q.  (BY MS. PERALES) you're right, that's my
20 fault.
21    A.  Okay.
22    Q.  Thank you for spotting that.  So with the
23 exception of the time though, are you hear testifying
24 today pursuant to this deposition notice?
25    A.  I am.

18

1    Q.  Okay.  Thank you.  I'd like to start with
2  some questions about your background, do you live in
3  Harris County?
4    A.  I do.
5    Q.  How long have you lived in Harris County?
6    A.  Since November of 1980.
7    Q.  Okay.  Are you originally from somewhere not
8  Harris County?
9    A.  Yes.
10   Q.  Tell me where you grew up?
11   A.  El Paso.
12   Q.  Oh, El Paso.  West Texas?
13   A.  Yes, ma'am.
14   Q.  Did you go to high school there?
15   A.  Yes, ma'am.
16   Q.  Did you complete any education following high
17 school?
18   A.  I did.
19   Q.  Okay.  And what was that?
20   A.  I have an undergraduate degree from Loyola
21 University in New Orleans.
22   Q.  Anything after that?
23   A.  U.S. Army.
24   Q.  Okay.  When did you serve?
25   A.  1970 to 1975.

19

1    Q.  Tell me about your current occupation, if you
2  have one?
3    A.  I am semi-retired.
4    Q.  And what are you semi-retired from?
5    A.  Marketing consulting.
6    Q.  Okay.  Can you briefly describe for me your
7  current involvement with the Harris County Republican
8  Party?
9    A.  I am a volunteer.  I serve as chairman of the
10 Harris County Republican Party Ballot Security
11 Committee, that is an unpaid unreimbursed position.
12   Q.  I'm going to circle back to, to more details
13 about the Ballot Security Committee.  So I'm just going
14 to put a pin in that and ask if you hold a membership
15 in other political organizations besides Harris County
16 Republicans?
17   A.  I am on the board of directors of a -- an
18 election integrity organization called Texas Election
19 Network.
20   Q.  Any other membership in other political
21 organization?
22   A.  Give me a second.  None that I can recall at
23 this time.
24   Q.  Do you hold membership in any other types of
25 associations besides political organizations; such as a

20

1  fraternal, or I don't know, maybe you serve on your
2  neighborhood, you know, homeowners association or
3  anything like?
4    A.  No, we are members of Freedom Street Rescue.
5  We foster abandon puppies.
6    Q.  I think I would have 20 dogs if I did that.
7    A.  Last Thursday we had 11.
8    Q.  11.  And are the -- any of them fosters at
9  this point or have you just --
10   A.  Seven of those are fosters, they've all
11 arrived at their new homes in New England.
12   Q.  Wonderful.  Any other organizations that you
13 can think of?
14   A.  None that I can think of.
15   Q.  Okay.  Are you a registered voter in Harris
16 County?
17   A.  I am.
18   Q.  Have you ever served as an election judge at
19 the polling place?
20   A.  Yes, ma'am.
21   Q.  Okay.  Tell me about that, how?
22   A.  From 2010 to 2013, I served as the alternate
23 presiding judge at Wesley Elementary School in
24 Congressional District 18.  I think five, seven
25 elections total.

21

1    Q.  Did you serve as a poll worker for any other
2  period of time besides this one?
3    A.  No ma'am.
4    Q.  Have you ever served as a poll watcher?
5    A.  I have.
6    Q.  Tell me about that?
7    A.  I served as a poll watcher in several smaller
8  and local elections, usually on the May Uniform
9  Election Day.  And I was asked to serve as a poll
10 watcher for the 2015, I believe 2015 Cy-Fair ISD bond
11 election.  The first of billion dollar bond election in
12 Texas.
13   Q.  School bond?
14   A.  School bond.
15   Q.  Have you ever been a block walker or
16 sometimes referred to as a canvasser for either a
17 political candidate or for turn out the vote effort?
18   A.  I believe years ago maybe as many as 10 years
19 ago I assisted my precinct chair to block walk our
20 neighborhood and leave flyers hanging on doorknobs.
21   Q.  And do you remember what that was in support
22 of, or against?
23   A.  It was in support of the republican ticket.
24   Q.  Okay.  And did the door hangers then have the
25 names of the candidates that were on the ticket?

Alan Vera - 2/27/2023

---

**22**

1    A.  If I remember correctly, they did.
2    Q.  Can you think of any other occasions where
3  you were going door to door from house to house for
4  either a candidate or some kind of campaign?
5    A.  No, I can't.
6    Q.  When you did this effort about 10 years ago
7  did you knock on doors and engage with voters?
8    A.  We knocked on doors, waited for a voter to
9  answer, if the voter didn't answer we simply left the
10  hanger, if a voter answered we introduced ourselves and
11  explained, the candidates for whom we were campaigning.
12    Q.  So you had the chance to have some
13  face-to-face interaction with voters?
14    A.  Some.
15    Q.  Other than the -- so let me just ask you, do
16  you -- is the phrase that you're most comfortable with
17  block walking or canvassing or something else?
18    A.  In my mind those are two different functions
19  block walking is a political activity to gain support
20  for candidate or issue in my mind.  Canvassing is
21  asking questions and getting information.
22    Q.  Okay.
23    A.  So in my mind, which is sometimes strange,
24  those are two slightly different issue.
25    Q.  Have you ever done canvassing?

---

**23**

1    A.  I have not personally.
2    Q.  Okay.  So besides that block walking effort
3  that you described, have you ever worked on the
4  campaign of a political candidate or for a political
5  issue?
6    A.  Not since 2014.
7    Q.  And tell me about that, in 2014 in what way
8  did you work on a political campaign --
9    A.  In 2014 before I came chair of the Harris
10  County Republican Party Ballot Security Committee, I
11  handed out campaign literature for Dan Patrick.
12    Q.  And where did you handout the campaign
13  literature?
14    A.  In my neighborhood.
15    Q.  And you went door to door?
16    A.  Yes, ma'am.
17    Q.  Is that different from the --
18    A.  Same thing.
19    Q.  -- same thing?
20    A.  Uh-huh.
21    Q.  Okay.  So besides the handing out of the
22  campaign material in the block walking effort, have you
23  worked on any other campaigns either, maybe making
24  phone calls from a central location to urge voters to
25  turn out or --

---

**24**

1    A.  Yes.
2    Q.  -- other types of campaign activity?
3    A.  I can't recall anything beyond what I've
4  already described to you.
5    Q.  Okay.  Do you know if you'll be testifying in
6  this case?
7    A.  I do not know.
8    Q.  Okay.  I'm going to ask you a couple
9  questions now about the Ballot Security Committee.  You
10  mentioned that before you became involved with the
11  Ballot Security Committee you were handing out the
12  campaign material for the republican ticket and you
13  mention that was probably about 10 years ago.
14        So tell me whether your involvement
15  with the Ballot Security Committee then was at the time
16  of the creation of the Ballot Security Committee?
17    A.  No, ma'am.  It was not.  Ballot Security
18  Committee had been created at least 15 years prior to
19  my taking the chairmanship in 2014.
20    Q.  Okay.  If you could for me summarize the --
21  are you still chair of the Ballot Security Committee?
22    A.  I still am.
23    Q.  And as chair you're familiar with the
24  activities of the Ballot Security Committee?
25    A.  Yes.

---

**25**

1    Q.  Can you tell me in a sort of summary fashion,
2  the various activities of the Ballot Security
3  Committee?
4    A.  As described in the Republican -- Harris
5  County Republican bylaws, Ballot Security is
6  responsible for promoting election integrity and in all
7  the activities that support that.  So that would
8  include discipline on voter registration, recruiting
9  and training of poll watchers.  In prior years we were
10  also responsible for recruiting election workers, but
11  we have surrendered that in the last two cycles, to the
12  Party staff; supporting good election legislation as
13  guided by the Executive Committee and testifying when
14  possible in support of good election legislation.
15    Q.  I'm just catching up.  You mentioned
16  discipline on voter registration, to you mean the voter
17  registration conducted by the Harris County Republican
18  Party or voter registration in a bigger sense?
19    A.  Thank you for the clarification.  We observe
20  and monitor Harris County's voter registration's roles.
21    Q.  Does the Harris County Republican Party
22  conduct voter registration efforts of they own?
23    A.  I believe they do, but I am not a part of
24  that.
25    Q.  You mentioned in prior years that you used to

---

26

1  recruit election workers, but you had surrendered that
2  to party staff in the last two election cycles; is that
3  right?
4      A.  That is correct.
5      Q.  And when you say party staff, who -- who is
6  that?
7      A.  These are paid employees who work for the
8  Party.
9      Q.  And so it's their function now to collect
10  names and submit them to the Harris County elections
11  for vetting for poll workers?
12      A.  That is correct.
13      Q.  Okay.  Tell me how you recruit and train poll
14  watchers?
15      A.  The recruiting takes many forms.  I am a
16  frequent speaker at political organizations.  We run
17  notices for poll watchers in the county party news
18  letter and online.  The Ballot Security Committee
19  members are also encouraged to reach out in their
20  neighborhoods and find people in serving as poll
21  watchers.  Training poll watchers I do personally, no
22  one else hands that.  It is a two hour class in person
23  with a test at the end and except for the 2020 COVID
24  year it has never been an online class.  It's always
25  been in person.

27

1      Q.  When was the most recent training that you
2  conducted?
3      A.  Most recent training was October of 2022.
4      Q.  Okay.
5      A.  I did 17 classes that summer into the fall.
6      Q.  When you're doing the training in the two
7  hour class, do you use any kind of materials of any
8  sort?
9      A.  There are two kinds of materials, there is a
10  PowerPoint presentation which technically belongs to
11  the Harris County Republican Party, I created that for
12  them.  And there poll Watcher Guide book which I hand
13  at no charge to every student.
14      Q.  You mention the PowerPoint presentation
15  belongs to Harris County, are you the author of the
16  PowerPoint?
17      A.  I am.
18      Q.  Okay.  And the Poll Watcher Guide book, who
19  is the author of that?
20      A.  The original one?  My wife Colleen.  It's
21  been updated after every legislative session because
22  the code changes.
23      Q.  And who does the updating?
24      A.  I'm -- I do it now, unfortunately.
25      Q.  Where do you do the trainings for the poll

28

1  watchers?
2      A.  All over the county, Whenever possible in
3  county owned buildings.  We have community centers that
4  the Harris County Government has set up.  Whenever
5  possible we conduct the training in those publicly
6  owned centers.
7      Q.  So do you bring with you your laptop with the
8  PowerPoint on it?
9      A.  I do.
10      Q.  Do you have like a little projector?
11      A.  A projector is usually provided by the
12  facility, but there have been times that I brought a
13  spare, thank God.
14      Q.  And you mention that the guidebook that you
15  provide at no cost, does that mean that you personally
16  make the photo copies?
17      A.  In 2022 the County Republican Party paid for
18  the reproduction of the guide books.
19      Q.  Okay.  And are -- are the trainees allowed to
20  take that guidebook home with them after they're done?
21      A.  They take them home with them and encouraged
22  to take them with them to the Polls.
23      Q.  Now you mention a test at the end, is that a
24  written test?
25      A.  It's not a written test, it's an oral.  It's

29

1  a review.
2      Q.  And then is that conducted with the group as
3  a whole?
4      A.  It's conducted with the group as a whole.
5      Q.  So do people just, you call out the questions
6  and people raise their hands and call the answers?
7      A.  Correct, uh-huh.
8      Q.  Do you have the test written down in front of
9  you?
10      A.  It's on the PowerPoint slides?
11      Q.  Okay.  And so you just know at the end which
12  questions to call out for people to make sure?
13      A.  There are 20 questions, they appear in
14  sequence on the slides.
15      Q.  Oh, I see.  So there's something at the very
16  end of the PowerPoint that has the questions?
17      A.  Correct.
18      Q.  Understood.  When you update your PowerPoint
19  for a training, do you save the PowerPoints from
20  before?
21      A.  I don't remember.  I think so, I don't think
22  I delete them from my laptop.
23      Q.  Okay.  So for example if you wanted to
24  compare what your training looked like before SB 1 and
25  after SB 1 would you be able to go --

Alan Vera - 2/27/2023

30

```
 1      A.  I could do so.  Yes, ma'am.
 2      Q.  Okay.  Thank you.
 3          MR. TAYLOR:  Mr. Vera, let her
 4  completely finish her question, you're anticipating it
 5  ever so slightly.
 6          THE WITNESS:  Thank you.  Thank you.
 7      Q.  (BY MS. PERALES) Okay.  Next on my list is
 8  supporting legislation related to election integrity
 9  and I would like to know what activities fall under
10  that topic?
11      A.  The primary activities that fall under that
12  topic is providing our Harris County republican
13  representatives with lists of items in the election
14  code that need to be addressed, and then testifying in
15  the Senate and house committees that are hearing any
16  bills written to those lists of suggestions.
17      Q.  When you provide the lists, do you generally
18  prepare that in written form?
19      A.  It varies.  There are some meetings in which
20  I have a list typed up and copied, others are simply
21  verbal discussions over a cup of coffee.
22      Q.  You mentioned Harris County legislators?
23      A.  Republican legislators, sorry.
24      Q.  Yes, of course.  Does that include House and
25  Senate?
```

31

```
 1      A.  Yes, ma'am.
 2      Q.  Okay.
 3          MS. PERALES:  I'm sorry, should we
 4  take a break?
 5          MR. TAYLOR:  No, no, no, I was just
 6  making a point -- nothing about what you all are doing.
 7          MS. PERALES:  Sorry.  Just let me know
 8  if you're going to need a break.
 9      Q.  (BY MS. PERALES) And we were talking about
10  Harris County Republican, let's start with members of
11  the House.  With whom have you met who is currently in
12  the House or with whom have you communicated who's
13  currently in the House about goals for ballot integrity
14  legislation?
15          MR. TAYLOR:  Let me just hop in for a
16  quick second.  My job here is just to protect
17  attorney-client privilege and that's it.  But if you're
18  going to ask questions that might be involved with
19  legislative privilege or something like that, I -- I'm
20  going to defer to the other lawyers who represent other
21  parties, I just want to make that clear.
22          MS. PERALES:  Understood.
23          MR. TAYLOR:  Okay.
24      A.  It -- it varies by session.  In preparation
25  for the current session, the Republican Party of Harris
```

32

```
 1  County hosted a luncheon and every one or our Harris
 2  County Republican State Representatives and Senators
 3  attended.
 4      Q.  (BY MS. PERALES) Okay.  And at that luncheon
 5  did you engage with anybody -- I'm just trying to get a
 6  sense of how this works -- did you engage with elected
 7  officials, at the luncheon about ballot integrity
 8  legislation?
 9      A.  At the luncheon I had five minutes to discuss
10  some of the problems that had not been -- the loopholes
11  have not been closed that are causing problems with out
12  election workers with the entire group.
13      Q.  I see, so you were essentially making a
14  presentation to them?
15      A.  Informal presentation, yes.
16      Q.  But you had the floor?
17      A.  For five minutes.
18      Q.  That's good, okay.  And when you say
19  loopholes that weren't closed, does that mean SB 1?
20      A.  No, it means in general.
21      Q.  Okay.
22      A.  What has been reported by our election
23  workers that needs to be addressed.
24      Q.  Okay.  You mentioned the list that -- that
25  can be many written form, aside from the list have you
```

33

```
 1  ever written something more detailed about a proposal
 2  that you wanted a legislator to consider.  So for
 3  example, have you ever taken a stab at maybe drafting a
 4  provision that you would want to see?
 5          MR. WASSDORF:  I'm going to object to
 6  the extent that this could get into any responses to
 7  legislative inquires on the grounds of legislative
 8  privilege.
 9      Q.  (BY MS. PERALES) You may answer.
10      A.  Not until this year for the current session.
11  I was asked to join a task force of grass roots
12  activist to examine and work on the concerns about
13  ERIC, E-R-I-C, electronic registration information
14  center.  We studied it, interviewed people across the
15  country for seven months and I was asked to draft a
16  possible bill that would open the ERIC functions put
17  broader range of solutions.  It's the first time I've
18  done that.
19      Q.  Uh-huh.
20      A.  That has been -- I did not submit it, it was
21  submitted by our task force leader and it has become a
22  bill in the current legislature.
23      Q.  In the current Texas Legislature?
24      A.  Current Texas -- the 88th Legislative
25  session.
```

34

1    Q.   And the task force that you were on was it a
2    Texas only task force?
3    A.   Texas only task force.
4    Q.   Okay.  So prior to working on drafting
5    legislation, this -- for this 88th regular session, in
6    the past if you had a proposal that you wanted to see
7    enacted, how much detail would you put into writing it
8    down?
9    A.   I understand.  Again, with acknowledging the
10   objection, in between the first and second special
11   sessions of the 87th legislature I sent an email with
12   two sentences to the legal counsel of our senator
13   asking that they consider adding these two sentences to
14   Senate bill one for is second special session.  They
15   studied it, liked it, recommended it and it was added
16   to Senate bill one.
17   Q.   And when you say our senator, do you mean
18   Senator Bettencourt?
19   A.   I do.
20   Q.   Okay.  And then do you remember what the two
21   sentences were on?
22   A.   Yes.  The two sentences involved requiring
23   the every county in Texas to reconcile the number of
24   ballots with the number of voters after every election.
25   Q.   Do you remember the name of Senator

35

1    Bettencourt's I guess general council?
2    A.   I do.
3    Q.   Tell me what that is.  That -- by the way,
4    that was very good, whoever prepared you for this
5    deposition is -- did a great job.
6    A.   Sonya Aston.
7    Q.   And did you send the two sentences to
8    Ms. Aston by email?
9    A.   By email.
10   Q.   Okay.  And did she then respond to you?
11   A.   She respond and said I'll see what I can do.
12   Q.   Okay.  Then how did you know -- how did you
13   come to learn that it was well taken and then going to
14   be put in the Bill?
15   A.   Well, as you know in Texas Legislature every
16   special session, every bill has to be re-filed.  So
17   when Senate bill was re-filed for the second special
18   session my two sentences were there.
19   Q.   Do you think you would still have that email
20   to Ms. Aston if your email history somewhere?
21   A.   I don't think so, it's been well over a year.
22   Q.   Okay.  What email service do you use?
23   A.   Outlook.
24   Q.   Outlook.  Do you know if outlook keeps your
25   older emails?

36

1    A.   I don't know.
2    Q.   Okay.  Okay.  Now, I think last on my list is
3    testifying when possible in the legislature, do you
4    recall testifying in the do you recall testifying on SB
5    1 at all?
6    A.   I do.
7    Q.   Okay.  And do you recall testifying on SB 1
8    in the second special?
9    A.   I do.
10   Q.   Okay.  I remember being in a committee
11   hearing and you and I were both there and you were
12   testifying, I can't remember for sure if it was the
13   second special.  But I -- I remember your testimony, do
14   you -- would you, for example in the second special
15   provide both written and verbal testimony?
16   A.   Rarely.
17   Q.   Okay.
18   A.   Rarely.  Occasionally I will bring exhibits
19   to supplement my verbal testimony.  I rarely provide
20   written testimony.
21   Q.   Okay.  Do you recall whether you provided any
22   written testimony on SB 1 or it's predecessor's bills
23   HB 6, SB 7?
24   A.   I don't think I did provide written
25   testimony.  I think it was all verbal.

37

1    Q.   Do you go up with like index cards or a piece
2    of paper?
3    A.   I type up every work I'm going to say and
4    I've timed it out for two minutes in the Senate and
5    three minutes in the House.
6    Q.   And you take those notes back with you?
7    A.   I do.
8    Q.   Okay.  I noticed when I -- I went to the
9    Harris County Republican Party website that there was a
10   link that -- that one could click on to get involved or
11   volunteer with the Party and it allowed me to put my
12   name and my VYD information if I wanted to serve as an
13   election worker; are you aware of that part of the
14   website?
15   A.   I am aware.
16   Q.   Do you know if those pages or the information
17   that's gathered there is used also to recruit poll
18   watchers?
19   A.   I don't deal with that information, but I
20   think it's not impossible that once the party contacts
21   the person who left their name they could add poll
22   watching as an option of volunteer activity.
23   Q.   How do you get the names of potential poll
24   watchers?
25   A.   I get them from the county party.

Alan Vera - 2/27/2023

38

1  Q.  Okay.  So the paid staff?
2  A.  Uh-huh.
3  Q.  All right.  And who is responsible for
4  getting those individuals to a training that you would
5  give?
6  A.  The paid staff.
7  Q.  Okay.  So you don't have to be chasing people
8  down telling them, it's at Saturday at 10 a.m.
9  A.  Not anymore.
10  Q.  Okay.  Okay.  When I'm quiet I'm crossing off
11  questions, so it's a good thing.  I'm already on page
12  6, we're just zipping right along here.
13  MR. TAYLOR:  You left out a key fact,
14  what's the last page number?
15  (Laughter.)
16  MS. PERALES:  Well, it's not six,
17  but -- but we're actually making really -- I think our
18  conversation, so it touched on several different
19  things, so I'm catching up with myself and crossing off
20  the questions.
21  THE WITNESS:  While you're doing that,
22  can we take a break?
23  MS. PERALES:  Of course.
24  THE WITNESS:  Thank you.
25  MS. PERALES:  Let's take a five minute

39

1  break.
2  THE REPORTER:  Okay.  Going off the
3  record at 10:29 a.m.
4  (Off the record.)
5  THE REPORTER:  Going back on the
6  record at 10:42 a.m.
7  Q.  (BY MS. PERALES:) Okay.  Mr. Vera, I am going
8  to ask you some more specific questions about poll
9  watchers and your training of the poll watchers
10  comparing the before SB 1 to the after SB 1 period of
11  time, okay?
12  So did your training change at all for
13  poll watchers with respect to what they could do in the
14  polling place while voting is happening?
15  A.  It did not change significantly.  The two
16  greatest changes.
17  MR. GORE:  Let me -- let me just
18  interject here an objection.  We've allowed some
19  latitude on the poll watcher training and I'm fine you
20  confirming there were changes to the training.
21  Anything about the substance of the training, the
22  Harris County Republican Party has asserted a First
23  Amendment right to confidentiality and First Amendment
24  privilege not to disclose the substance of the
25  training.  So I'm going to ask the witness or instruct

40

1  the witness not to answer anything about the substance
2  of the training.
3  Q.  (BY MS. PERALES:) And Mr. Vera, are you going
4  to follow counsel's advice and not testify about the
5  substance of the poll watcher training?
6  A.  I am.
7  Q.  Okay.  And you did that very elegantly, I --
8  I mentioned previously that so times your Counsel will
9  direct you not to answer and we will then work on that
10  at another time.
11  You mentioned that your poll watcher
12  training did not change significantly, but would it be
13  fair to say that your poll watcher training did change
14  in some respect from the pre-SB 1 period to the post SB
15  1 period?
16  A.  Yes.
17  Q.  Aside from the training that you give poll
18  watchers, do you also receive communications from poll
19  watchers while election day is going on?
20  A.  I do.
21  Q.  Okay.  And generally how do you receive those
22  communications?
23  A.  By text or email.
24  Q.  Have you ever had a poll watcher call you on
25  your cell phone during election day to ask for you

41

1  guidance or advice?
2  A.  Yes.
3  Q.  So then would it be fair to say you
4  communicate with poll watchers by text, email, and
5  telephone?
6  A.  Yes.
7  Q.  And in these communications, would it be fair
8  to say that they're asking for your guidance about what
9  to do in a particular situation?
10  A.  Frequently.
11  Q.  Okay.  And do you then provide that guidance
12  to them based on your understanding of SB 1 and other
13  parts of the election code that deal with poll
14  watchers?
15  A.  That is correct.
16  Q.  You mentioned the training manual that you
17  encouraged, that you've created that you encourage the
18  poll watchers to bring with them to the polling place
19  on election day; is that correct?
20  A.  I mentioned it, yes.
21  Q.  Okay.  Can you tell me approximately how many
22  pages long it is?
23  A.  It is a graded booklet where there are tabs
24  available to you.  I'm going to guess it is a total of
25  18 pages folded and collated and cut very uniquely.

42

1    Q.  Does each page contain approximately 250
2  words?
3    A.  No.  It's a tiered appearance so that there's
4  a tab on what the content is.  So there's a tab that
5  says ID, and they flip it up in that opened is all the
6  informing on ID.
7    Q.  Okay.
8    A.  So -- and on the back are the actual
9  citations from the election code that relate to the
10  issues on the opposite sides of the page.  So 18 pages,
11  but they're not same size.
12    Q.  Okay.  So if I took the words from your
13  manual and I put them in let's say a word processing
14  document, about how many pages long would it be?
15    A.  I don't know.
16    Q.  Would it be more than 18?
17    A.  No --
18    Q.  I'm trying to figure out --
19    A.  What font size?
20        (Laughter.)
21    Q.  (BY MS. PERALES) 12.
22    A.  Yes, then be more than 18 because the font
23  side I have to use for the code is much smaller to fit
24  all the relevant code.
25    Q.  Okay.  Okay.  Would it be fair to say that

43

1  your Poll Watcher Guide is different from the Poll
2  Watcher Guide published by the secretary of state?
3    A.  It is.  It is in format.
4    Q.  Okay.
5    A.  It's much more usable.
6    Q.  Okay.
7    A.  It is a flip chart as opposed to a PDF, you
8  know, like several 100 pages long.
9    Q.  Would you say that there are -- well, so
10  your's is much shorter, so it doesn't contain
11  everything from the secretary of state's guide?
12    A.  Uh-huh.
13    Q.  Would you say that there are substantive
14  differences between your guide and the secretary of
15  state?
16    A.  There's no content difference, mine is more
17  compact.
18    Q.  So for example, do you -- would you maybe be,
19  your guide by different from the secretary state's
20  guide if it offered examples that might be different
21  from those of the secretary of state.  You see what I'm
22  getting at, whether they're --
23    A.  I understand --
24        MR. GORE:  And let me just renew the
25  objection, because again this is an area where the

44

1  Harris County Republican Party has asserted a First
2  Amendment Privilege.  I think you can answer yes or no
3  to the question, but instruct the witness not to
4  provide any discussion of the substance of any such
5  differences.
6    A.  You're supposed to ask me, will I follow
7  counsel, yes.
8        (Laughter.)
9    Q.  (BY MS. PERALES) Are you following your
10  counsel's advice?
11    A.  I am following the counsel's advice.
12    Q.  All right.  So your counsel said don't give
13  substantive, but he's allowed to answer yes or no.
14        So is the answer to then yes or no to
15  my question whether there are substantive differences
16  between your guide and the secretary of state's guide?
17    A.  Let me ask you to clarify for me which
18  secretary of state Poll Watcher Guide you're referring
19  to, because there are many iterations.
20        MR. TAYLOR:  And Nina, just to clarify
21  you already know this, but Mr. Gore is not Alan Vera's
22  personal counsel.  You're saying your lawyer this,
23  "your lawyer that.  That's actually me, Andy Taylor,
24  but Mr. Gore represents Harris County Republican Party,
25  and that's why he rather than me is asserting this

45

1  First Amendment Privilege because I'm not representing
2  the Republican Party in this litigation.  So just that
3  -- just to keep things straight.
4        MS. PERALES:  Thank you for that
5  clarification.
6    Q.  (BY MS. PERALES:) So Mr. Vera when you
7  decline to answer based on Mr. Gore's instruction, you
8  are declining to answer based on the instruction of a
9  lawyer who is not your lawyer, but who is the lawyer
10  for the Harris County Republican Party?
11    A.  That is correct.
12    Q.  Thank you.  And to clarify my question I'm
13  going to mark, although I only have one copy.  A
14  January 2022 publication by the secretary of state's
15  Elections Division titled Poll Watchers Guide.  We will
16  mark that deposition Exhibit No. 2.
17        (Exhibit No. 2 marked.)
18    Q.  (BY MS. PERALES:) Take a moment if you will
19  to take a look at the document?
20    A.  Even they had a change for SB 1. Thank you
21  for letting me see that.  The combination of the
22  PowerPoint and the Guide that they carry with them, is
23  very similar to this booklet, combined.
24    Q.  Okay.  So let me ask you a few questions,
25  with respect to Exhibit 2, had you ever seen that

46

1  version of the document before I gave it to you today?
2      A.   Online.  I reviewed it online, but not hard
3  copy.
4      Q.   Okay.  So when I make reference to the
5  secretary of state's Poll Watcher Guide, will you
6  understand that I'm referring to the January 2022
7  version?
8      A.   I do, yes.
9      Q.   Okay.  Now, let me go back to my earlier
10  question, which is that the -- your guide, which you've
11  described as 18 pages, would you agree with me that
12  there are substantive differences between your guide
13  and Exhibit 2?
14      A.   That is a difficult question to answer
15  because --
16          MR. GORE:   Again, I'm just going to
17  renew the objection and instruct the witness that he
18  may answer to the extent that doing so does not reveal
19  the substantive content of his guidebook which -- over
20  which Harris County Republican Party has asserted a
21  First Amendment Privilege.
22      A.   The combination of the PowerPoint
23  presentation and the guide is substantively the same as
24  what's in here, combined.
25      Q.   (BY MS. PERALES:) I understand.  So if

47

1  combined you -- you believe they're substantively the
2  same.  Would it then be correct that your guide by
3  itself is not substantively the same as the secretary
4  of state's guide?
5      A.   My guide is focused on the questions and
6  issues the poll watcher confronts at the polling place
7  itself, not the background of how poll watchers are
8  appointed et cetera, that's in class.
9      Q.   And so would the answer to my question then
10  be yes?
11      A.   The answer is, it is not substantively
12  different in content from those portions of this
13  document that address the activity at the polling
14  place.
15      Q.   Is it your contention then that your guide
16  contains every piece of matter that the secretary of
17  state's guide contains with respect to poll watcher
18  behavior in the, or activities in the poll place?
19      A.   It does.  It does, on the activity at the
20  polling place, yes, they're very consistent.
21      Q.   Did you copy and paste out of the secretary
22  of state guide?
23      A.   I did not.
24      Q.   Okay.
25      A.   I use illustrations.

48

1      Q.   You mean like pictures?
2      A.   Yes.
3      Q.   I see, okay.  Let's talk about the PowerPoint
4  again and the -- and your -- your Poll Watcher Guide.
5  With respect to the guide which your trainees take home
6  with them; is that correct?
7      A.   Uh-huh, that is correct.
8      Q.   Can you estimate how many copies of your
9  guide either in the current version or in past versions
10  are circulating in the world?
11      A.   I know that Harris County Republican Party
12  printed 5,000 of them for our use here in Harris
13  County, so that's the ones I know about.
14      Q.   And you when you say printed 5,000, you mean
15  just for the November 2022 election?
16      A.   For the primary election, primary runoff, and
17  the November election.
18      Q.   Okay.  So since January of 2022?
19      A.   That's correct, because SB 1 went into affect
20  December of 2021.
21      Q.   And were the Poll Watcher Guides printed by
22  the Republican Party only physically distributed by you
23  or were they distributed by other folks as well?
24      A.   Only by me in my classes.
25      Q.   And how many have you distributed?

49

1      A.   Probably 1,000.
2      Q.   Okay.  And do you know where those copies are
3  today?
4      A.   Yes.  Oh, the ones I distributed?
5      Q.   Yes.
6      A.   I do not.  They're -- they're in the
7  possession of the poll Watchers, as far as I know.
8      Q.   Have you ever printed your PowerPoint and
9  given that to anybody?
10      A.   No, ma'am.
11      Q.   Would you say that with respect to the
12  approximately 1,000 Poll Watcher Guides that you
13  prepared, that there is a possibility that at this
14  point some of those guides have made their way to other
15  individuals who maybe weren't the original recipients?
16          MR. TAYLOR:  Objection to form.
17      A.   I have no idea.
18      Q.   (BY MS. PERALES:) Do you think that it's
19  possible that some of your guides maybe in circulation
20  beyond the original recipients?
21          MR. TAYLOR:  Objection to form.
22      A.   I have no idea.
23      Q.   (BY MS. PERALES:) If a general member of the
24  public asked you for your guide, let's say a friend of
25  one of your trainees comes at the end of the training

50

1  and says, "I'm here to pick up Susan, Susan's guide
2  looks very interesting," and they would ask for another
3  copy, would you give them another copy?
4      A.  No.
5      Q.  And why is that?
6      A.  Because I only want these in the hands of the
7  people I've trained.
8      Q.  Okay.  What steps do you take to ensure that
9  the guides stay in the hands of the people you trained?
10     A.  All the steps I can take.  The guides are
11 with me personally and I personally hand them to the
12 students and they leave with them, once they leave I
13 have no control.
14     Q.  Okay.  Okay.  I'm going to ask you some
15 questions about your training of poll watchers.  Well,
16 let me ask you an earlier question first, just to nail
17 down something.  Is there anybody else who trains,
18 besides you, who trains poll watchers who will serve on
19 behalf of Harris County Republican Party?
20     A.  No.
21     Q.  I'm going to ask you some questions now about
22 your training with the understanding that they may draw
23 objections, and so I will just embark upon them for the
24 purpose of the record.
25         Can you tell me how your training of

51

1  poll watchers may have changed or didn't change based
2  on the enactment of that part of SB 1 that says "Poll
3  watchers may not be denied free movement where election
4  activity is occurring within the location at which the
5  watcher is serving?
6         MR. GORE:  Objection, First Amendment
7  Privilege, instruct the witness not to answer.
8      Q.  (BY MS. PERALES)  And will you follow the
9  instruction of Mr. Gore not to answer?
10     A.  I will.
11     Q.  Did your training of poll watchers change
12 following enactment of that portion of SB 1 that
13 prohibits an election official from taking any action
14 to obstruct the view of a watcher or distance the
15 watcher from the activity or procedure to be observed
16 in a manner that would make observation not reasonably
17 effective?
18         MR. GORE:  Objection, First Amendment
19 privilege, instruct the witness not to answer.
20     Q.  (BY MS. PERALES:) Were you -- are you
21 following Mr. Gore's instruction?
22     A.  I am.
23     Q.  Are you aware that -- well, Harris County
24 Republican Party is the appointing authority for its
25 watchers; is that correct?

52

1      A.  That is correct.
2      Q.  Are you aware that SB 1 has now allowed the
3  appointing authority that believes a watcher was
4  unlawfully prevented or obstructed from the performance
5  of the watcher's duties to seek relief in court?
6      A.  I am aware.
7      Q.  Are you aware of any changes in activity of
8  the Harris County Republican Party with respect to
9  being able to take court action when you believe one of
10 your watchers is being unlawfully prevented or
11 obstructed?
12         MR. GORE:  So I'm going to object on
13 First Amendment privilege grounds to the extent the
14 question calls for actions that are not public or
15 communications that are not public and that are
16 internal only to the Harris County Republican Party, to
17 the extent there's anything public out there the
18 witness can testify, but with respect to anything not
19 public, I instruct the witness not to answer.
20     Q.  (BY MS. PERALES:) Mr. Vera, are you going to
21 follow Mr. Gore's instruction?
22     A.  I am.
23     Q.  Can you answer the question with respect to
24 public information only?
25     A.  I am not aware at this time of any public

53

1  statement or intent from the Harris County Republican
2  Party to seek court action with regard to a poll
3  watcher.
4      Q.  Without telling me any substance, are you
5  aware of any private communication regarding that?
6      A.  No.
7      Q.  Can you tell me what "Free Movement of Poll
8  Watchers," means to you?
9      A.  Free Movement of poll Watchers," means that
10 with the exception of a voter voting by themselves at
11 the voting booth, the poll watcher is free to move
12 around the polling place to observe all other election
13 activity.  The voting booth is off limits if the voter
14 is by himself of herself, or if the voter is being
15 assisted by an assistant the voter brought with them.
16     Q.  How far from the voter should a watcher stand
17 to respect that off-limits area you described?
18     A.  It's not specified in statute, but they
19 should not be close enough to see the ballot or hear
20 the voter's discussion with the assistant.
21     Q.  If the watcher isn't looking at the ballot,
22 how close can the watcher stand?
23     A.  If the voter is being assisted by an election
24 worker who is working that polling location, the poll
25 watcher can be right there at the voting booth, and SB

54

1  1 says can even inspect the ballot.  That's not true
2  when the voter's being assisted by their own chosen
3  assistant.
4      Q.  So how -- you know if a watcher asks you how
5  close can I be in order to perform that function and
6  you say being right there, how close is right there in
7  a numerical sense?
8      A.  We are still referring to a voter being
9  assisted by an election worker, I've told the poll
10  watchers they can be right there at the polling booth
11  to be able to see every action made by the election
12  worker and hear every instruction given by the voter to
13  the election worker, close enough to see and hear.
14      Q.  Okay.  And how far is that in terms of
15  distance?
16      A.  It depends how good the poll watchers vision
17  and hearing is.
18      Q.  Okay.  So let's say it's not great, but the
19  poll watcher still capable of seeing and hearing, if
20  the poll watcher says can I stand one foot from the
21  voter, would you say that's okay?
22      A.  I would tell the vote poll watcher if you
23  need to stand one foot from the voter to see and hear
24  everything, yes.  Do not make contact with the voter or
25  the election worker.

55

1      Q.  You mean physical contact?
2      A.  Correct.
3      Q.  And so you mention a moment ago, with respect
4  to a voter being assisted by a poll worker, that the
5  watcher now has the ability to inspect the ballot; do
6  you recall that testimony?
7      A.  Yes.
8      Q.  Okay.  And do you understand that to be
9  inspect the ballot as it's being voted?
10      A.  The language in the code of SB 1 states that
11  the voter, that the poll watcher may observe the
12  preparation of the ballot, does not say anything beyond
13  that.  So what I have told my poll watchers in class
14  is, if you think you need to you can see that the
15  election worker who is assisting the voter is carrying
16  out the voter's instructions in preparing the ballot.
17      Q.  And that means for example being able to see
18  the poll worker make selection of candidate preference?
19      A.  As instructed by the voter, correct.  The key
20  issue counselor is, is the assistant carrying out the
21  expressed instructions of the voter, that's it.
22      Q.  And so the watcher then, you would advise can
23  stand close enough to see and hear not only the voters
24  instructions to the poll worker, but then the poll
25  worker --

56

1      A.  Executing the instructions.
2      Q.  -- by making the preference selections on the
3  ballot?
4      A.  That is correct.
5      Q.  What actions by an election official would
6  obstruct the view of a watcher that would make the
7  observation not reasonably effective when it came to
8  voting?
9      A.  Are you referring to the actual preparation
10  of the ballots or other examples in the polling place?
11      Q.  The preparation of the ballot.
12      A.  Then the election, one offense the election
13  worker could take would be to constantly move his body
14  to block the poll watcher's vision of the ballot
15  preparation.
16      Q.  Now, with respect to not preparation of the
17  ballot, but other activities -- interacting with voters
18  in the polling place, what action could an election
19  worker take that would obstruct the view of a watcher
20  in a manner that would make observation not reasonably
21  effective?
22      A.  At the voter check-in table, the poll watcher
23  has to be able to hear everything said between the
24  voter and the election worker and to see the
25  information that's coming up on the screen as the voter

57

1  checks in.
2          So if the election worker, by shifting
3  his body to block the screen or making the table so
4  close to the wall the poll watcher can't stand there,
5  those are things that the election workers could do
6  that would prohibit the -- the poll watcher from being
7  able to see and hear all the transactions.
8      Q.  Okay.  Describe for me actions by a poll
9  worker that would distance the watcher from the
10  activity or procedure to be observed in a manner that
11  would make observation not reasonably effective with
12  respect to activities that involve the voter?
13      A.  The most blatant example of that is an
14  election judge, the presiding judge of a polling place
15  telling the voter they cannot move any closer than this
16  distance.
17      Q.  Or telling the watcher?
18      A.  Right, telling the watcher they cannot be any
19  closer than this distance.
20      Q.  Okay.  So for example saying you can't get
21  closer than three feet to the poll worker assisting the
22  voter and casting the ballot?
23      A.  Correct.
24      Q.  Okay.  Is it within the scope of what a poll
25  watcher can do to write down the names of voters as

58

1 they check in to vote?
2     A.  That is not normally within the scope of the
3 poll watcher's activity.
4     Q.  Would you consider it prohibited?
5     A.  It's not specifically prohibited in statute.
6 When I'm asked that question I tell my students --
7             MR. GORE:  -- I'm just going to again
8 interject the objection and instruct the witness not to
9 divulge what he tells his students during training on
10 First Amendment grounds.
11     Q.  (BY MS. PERALES:) And are you going to follow
12 Mr. Gore's instructions?
13     A.  I am.
14     Q.  Uh-huh, let me see if I can find another way
15 to, got this.  If I were to ask you whether you would
16 advise me to refrain from writing down the names of
17 voters as they check in, would you advise me to refrain
18 from doing that?
19     A.  Mr. Gore?
20             MR. GORE:  I understand the question
21 to be a hypothetical about Ms. Perales.
22             MS. PERALES:  And -- and I don't live
23 in Harris County, so.
24     A.  I would advise the poll watcher to refrain
25 from writing down the voter's names.

59

1     Q.  (BY MS. PERALES) Okay.  Have you ever had a
2 poll watcher contact you for guidance on what to do if
3 the voter is communicating with an assistor in a
4 language other than English?
5     A.  I have never had a poll watcher contact me
6 for that reason because the poll watchers are
7 instructed in advance about what to do in that
8 situation.
9     Q.  Okay.  Understanding that the poll watcher is
10 instructed on how they personally should behave, have
11 you ever had a poll watcher contact you to express a
12 concern about an in person assistance in the polling
13 place in a language other than English?
14     A.  No.
15     Q.  Okay.  Are you familiar with organized block
16 walking activities of the Harris County Republican
17 Party?
18     A.  From a distance.
19     Q.  Okay.  Do you know how the Harris County
20 Republican Party recruits block walkers?
21     A.  What I know is that the precinct chairs are
22 encouraged to organize people from the precincts to do
23 block walking.
24     Q.  And when the precinct chairs organize people
25 from their precincts to do block walking, is that

60

1 typically an activity that is in support of multiple
2 Republican candidates at the same time or something
3 different?
4     A.  I think it is a mixture.  If it is a block
5 walking activity before a general election, it's
6 usually multiple candidates.  If it's before a specific
7 school board election it maybe for only one or two
8 candidates.
9     Q.  Do you know generally what block walkers do
10 when they're block walking?
11     A.  Only from what they've told me.
12     Q.  Okay.  Tell me what you know from what
13 they've told you?
14     A.  They work from a list, either in paper or on
15 the phone, they knock on the door, they know the
16 person's name ahead of time, and they follow a script
17 on how to engage the voter with the message being
18 delivered.
19     Q.  Okay.  Do you know the source of the lists of
20 voters?
21     A.  I do not.
22     Q.  Do you know if block walkers know when
23 they're knocking on the door, if the voter is over age
24 65?
25     A.  I do not know that.

61

1     Q.  Do you know if block walkers know when
2 they're knocking on the door if the voter has requested
3 a mail ballot or is eligible to request a mail ballot?
4     A.  I don't know that.
5     Q.  Do you know if the Party gives, I don't know
6 a better word than swag, do you know if the Party gives
7 out like T-shirts or buttons or other things to its
8 block walkers?
9     A.  I do not know for certain, but I have seen
10 candidates give buttons and shirts to block walkers.
11     Q.  And would those be block walkers that were
12 organized by the Harris County Republican Party?
13     A.  I'm not sure.
14     Q.  Have you seen the script that the block
15 walkers use when they interact with the voter?
16     A.  I have not.
17     Q.  Okay.  Do you know if the Harris County
18 Republican Party recruits individuals to be available
19 to provide assistance to voters in person at the
20 polling place?
21     A.  I have never seen that activity by the
22 Republican Party of Harris County.
23     Q.  Do you know whether, for example -- do
24 you know whether for example, if Harris County
25 Republican Party has a table set up outside the polling

62

1 place at the appropriate distance, and whether voters
2 have ever asked people at that table to come in and
3 help them, you know, with assistance in casting the
4 ballot?
5     A.  I am not aware that the Harris County
6 Republican Party has ever set up tables outside a
7 polling place.
8     Q.  Okay.  Have you ever worked outside a polling
9 place encouraging voters as they go in?
10     A.  Not for the last 14 years.
11     Q.  And I take -- I take it from that, that your
12 activities which might have been urging voters to vote
13 for a particular candidate, and at the point at which
14 you become the chair of the Ballot Security --
15         MR. TAYLOR:  Committee.
16         MS. PERALES:  Committee.  I wanted to
17 get it right and I wrote it down on the first page.
18     Q.  (BY MS. PERALES:) Is that right?
19     A.  What was the question?
20     Q.  That your activities urging voters to vote
21 for particular candidates, either door to door or
22 outside the polling place, ended when you became the
23 chair of the Ballot Security?
24     A.  That's basically correct.
25     Q.  And can you give me an insight into why?

63

1     A.  I am in charge of election integrity so I
2 don't endorse candidates during primaries.  I don't
3 pick between republican candidates, and for the general
4 election I'm usually too busy with details at the
5 polling places.
6     Q.  That raises a question I had in the back of
7 my mind.  Can you tell me how many people currently are
8 on the Ballot Security Committee for Harris County
9 Republican Party?
10     A.  There are 13 voting members, and there are
11 eight non-voting members.
12     Q.  And from where are the voting members drawn?
13     A.  The voting members are appointed by the SD or
14 Senate District chairs and by the county Party Chair
15 from the SD's, from the Senate District areas.
16     Q.  And -- and from where are the eight
17 non-voting members drawn?
18     A.  They are selected by me.
19     Q.  Okay.  Do they serve a term of a certain
20 length?
21     A.  Two years.
22     Q.  Do the -- does this Ballot Security Committee
23 hold meetings at regular intervals?
24     A.  Monthly.
25     Q.  Who pays for the coffee and donuts?

64

1     A.  There is no coffee and donuts.
2     Q.  It's a very serious meeting then?
3     A.  Very serious.
4     Q.  Okay.  Do you hold these meetings at a party
5 headquarters or at a restaurant?
6     A.  We hold the meetings in the lobby conference
7 room of the Party headquarters building.
8     Q.  Okay.  So no food?
9     A.  No food.
10     Q.  Okay.  Do you have a vote, because you
11 mentioned there are 13 voting members?
12     A.  I have a vote in the committee, yes.
13     Q.  Okay.  Have you personally ever assisted a
14 voter who needed assistance voting in person in the
15 polling place?
16     A.  During the time I was an alternate judge at
17 Wesley elementary school I was asked by voters from
18 that precinct to assist them and yes, I did.
19     Q.  And what types need for assistance did you
20 see at that time?
21     A.  During that time I was asked by a voter to
22 explain why there were no democrat candidates for that
23 office and I had to explain that none had filed to run.
24 The voter was concerned and confused, I explained that.
25     Q.  Okay.

65

1     A.  The -- another voter asked me to explain a
2 bond proposition to them I told them I was not allowed
3 to do anything, but read the language on the ballot and
4 could not answer questions.
5     Q.  Okay.  And so my next question is, what was
6 the -- what was it about the voter that required
7 assistance in voting.  So for example inability to read
8 or write or physical disability or --
9     A.  I had not had any of those instances.  The
10 questions I got were about specific ballot issues.
11     Q.  I see.  Okay.  So would it be fair to say
12 then that you've never assisted in voting in person at
13 the polling place a physically disabled voter who
14 required your assist -- who required assistance to
15 vote?
16     A.  In the places I've worked they always came
17 with their own assistant.
18     Q.  Okay.  Have you ever had occasion to assist a
19 voter who was, who didn't speak English and needed
20 assistance interpreting the ballot at the polling
21 place?
22     A.  Only to the extent of showing them how to
23 turn on the Spanish language ballot and the headphones
24 that read the ballot in Spanish.
25     Q.  Okay.  Have you ever interacted with a voter

66

1  in Spanish while delivering that type of assistance?
2      A.  Yes, but just to give the instructions on how
3  to access the Spanish language ballot and the Spanish
4  language reading of the ballot.
5      Q.  I won't presume, but you are from El Paso,
6  does that mean you speak Spanish?
7      A.  It means I spoke Spanish before I spoke
8  English.
9      Q.  And you still have some ability today?
10     A.  I can order a beer and chips with the best of
11 them.
12          (Laughter.)
13     Q.  (BY MS. PERALES:)  Okay.  Have you ever
14 assisted a family member or friend?
15     A.  I have not.
16          MR. TAYLOR:  Let the question finish
17 before you answer.
18          THE WITNESS:  Thank you, sorry.
19     Q.  (BY MS. PERALES:)  I've been talking up until
20 now about voting in the polling place, but I'll also
21 ask, have you ever assisted a voter who requested your
22 assistance in casting a ballot by mail?
23     A.  I have not.
24     Q.  Have you ever assisted a voter in preparing
25 an application for ballot by mail?

67

1      A.  I have not.
2      Q.  And that includes friends, family members,
3  neighbors, anybody like that?
4      A.  It does.
5      Q.  Okay.  Are you aware of any instances in the
6  polling place in which a voter assistor helped a voter
7  who was not eligible for voter assistance?
8      A.  Repeat the question, please.
9      Q.  Are you aware of any instances in which a
10 voter assistor helped a voter in the polling place who
11 was not eligible for voter assistance?
12     A.  I have not personally seen that.  I have
13 received reports from poll watchers expressing that
14 concern.
15     Q.  Okay.  And what would you do in response to
16 that concern?
17     A.  I would simply have the poll watchers take
18 notes and submit it with the report.
19     Q.  Okay.  And did you ever follow up on any --
20 well, did you ever receive any written concerns like
21 that?
22     A.  Yes.
23     Q.  And what did you do to follow up?
24     A.  We followed up with the Ballot Security
25 Committee looking into the voter assistant, because

68

1  they sign in now.  We've done open records request,
2  received the name of the assistant, and done a little
3  digging.  We haven't found anything extraordinarily
4  evil.
5      Q.  Anything slightly evil?
6      A.  No, just questions about whether the voter
7  really did need an assistant or not.
8      Q.  Okay.
9      A.  But those are judgment calls in many cases.
10     Q.  Have you ever contacted a voter to verify
11 whether the voter needed assistance?
12     A.  I have not.
13     Q.  Okay.  Now, have you -- are you aware of any
14 instances in which a voter assistor told a voter how to
15 vote in the polling place?
16     A.  We have had those incidents reported to me by
17 poll watchers and by election workers and they were
18 simply instructed to advise the assistor that they're
19 to follow the direction of the voter and not vote in
20 place of the voter.  So, yes we have had those
21 instances reported.
22     Q.  Did you ever receive any reports like that in
23 writing?
24     A.  Yes.
25     Q.  Okay.  And so since you received it in

69

1  writing after the voting has ended, what have you done,
2  if anything in response to receiving something in
3  writing?
4      A.  Two things, the issue is, the issue and the
5  incident is reported on our legislative preparation
6  documents and reported to the Harris County Republican
7  Party's election issue repository.  So there's two
8  records of it.
9      Q.  And would you have access to those records
10 today?
11     A.  I do not have access to the main repository,
12 only my own notes.
13     Q.  Okay.  And do you have notes documenting any
14 instances in which an assistor told a voter how to
15 vote?
16     A.  I do.
17     Q.  Okay.  Where are those notes now?
18     A.  They're at home.
19     Q.  Okay.  And you would be capable of producing
20 them in some form, if needed --
21     A.  I could, but you could not read them probably
22 because they're all handwritten.
23     Q.  Can you recall the date of the most recent
24 time you would have noted an -- a report of an assistor
25 telling a voter how to vote in a polling place?

70

1    A.  I cannot recall, it has been a while.
2    Q.  Okay.  Has it been more than five years?
3    A.  No, but more than two.
4    Q.  Okay.  And that would be a single instance or
5  multiple instances?
6    A.  I can't remember.
7    Q.  Okay.  Okay.  Do you recall the last time you
8  asked an election worker to instruct an assistant to
9  carry out the wishes of the voter?
10    A.  I never do that personally.  I instruct
11  either the poll watcher or one of my workers to bring
12  the issue up with the election judge.
13    Q.  And do you recall the last time you did that?
14    A.  In early voting for the November 2022
15  election?
16    Q.  Do you recall where that polling place was?
17    A.  I don't.
18    Q.  Okay.  And was that a single instance or
19  multiple instances?
20         MR. TAYLOR:  Let me -- let me hop in,
21  I'm the new kid on the block here, but I was told that
22  the November 2020 election cycle was not going to be
23  discussed today and this witness didn't prepare --
24         MS. PERALES:  Okay.
25         MR. TAYLOR:  -- for that subject area.

71

1  Now, I could be wrong, but that's what I was told.
2         MS. PERALES:  Yeah, and I'm sorry we
3  sort of drifted into that because I was asking when
4  something happened and he mentioned --
5         MR. TAYLOR:  Right, right.
6         MS. PERALES:  -- so thank you for that
7  reminder.  I will not ask you about that from the
8  November 2022, because we're going to stick to before
9  that.
10    Q.  (BY MS. PERALES:)  Before November of 2022,
11  can you think of an instance where you instructed poll
12  watcher or poll worker to deal with an issue of an
13  assistor who was suspected of telling a voter how to
14  vote?
15    A.  I believe that in the May uniform election
16  date of 2022, so it was not the November, but the May
17  in an ESD Emergency Services District Election, I did
18  have a poll watcher, I gave a poll watcher guidance to
19  have the presiding judge counsel the assistor not to
20  make decisions for the voter.
21    Q.  And do you know whether the assistor was a
22  private individual or an election worker?
23    A.  It was an election worker.
24    Q.  And how did your watcher know that election
25  worker was telling that particular voter how to vote?

72

1    A.  Because the election worker was the assistant
2  and the poll watcher is now allowed to be at the booth
3  with the election worker assistant, and the poll
4  watcher was and could overhear and see what's going on.
5    Q.  And what did the poll watcher say exactly
6  that -- that communicated their understanding that the
7  election worker was somehow voting for the voter or
8  telling the voter how to vote?
9    A.  The voter was pondering different races and
10  candidates and the election worker was making strong
11  suggestions on whom the voter should choose.
12    Q.  Do you know whether that particular voter was
13  physically disabled or --
14    A.  I do not.
15    Q.  -- okay.  Okay.  Do you know whether -- did
16  the watcher report that the voter -- let me see, how do
17  I ask this question?  Let me start again.  Did the
18  watcher report that the election worker assistor voted
19  for the voter, prepared the ballot in anyway that was
20  different than what the voter wanted?
21    A.  That particular instance, the poll watcher
22  reported that the election worker assistant was
23  strongly suggesting to the voter which choices he
24  should make in casting his ballot.
25    Q.  Okay.  And understanding that, that's not

73

1  okay.  Did the poll watcher communicate how the ballot
2  was ultimately prepared?
3    A.  Poll watcher communicated that he, as he
4  should have, spoke directly to the election worker.
5  Okay.  And then went and saw the presiding judge to
6  also come and reinforce it.
7    Q.  Did the poll watcher say how the ballot was
8  prepared?
9    A.  I did not ask that.
10    Q.  Can you think of any other examples from
11  before the 2022 general election of a poll watcher
12  raising a concern to you or an election official
13  raising a concern to you about an assistor who was
14  voting for the voter or telling the voter how to vote?
15    A.  How far back do you want to go?
16    Q.  Let's go back in five years.
17    A.  Okay.  So in 2018, okay?  Early voting,
18  November election there were people camped in the
19  parking lot outside the Moody gardens -- moody polling
20  place and they were intercepting voters in the lot
21  locking arms with them and walking them into the poll
22  and announcing themselves as the assistant.
23    Q.  Okay.  And do you know whether any of those
24  assistors told voters how to vote?  Did any watcher or
25  election official tell you those assistors told the

74

1 voters how to vote?
2     A.   It was very similar to what I just described
3 to you in the other situation that, yes, the reports
4 then came in that the assister who had attached herself
5 to the voter was strongly suggesting to the voter which
6 candidates they should select at the polling place --
7 the polling booth -- the voting booth.
8     Q.   So was it one assistor at issue?
9     A.   There were four people working the parking
10 lot.
11    Q.   Okay.  But you heard from the watchers or the
12 poll workers that it was this one particular lady?
13    A.   No, it was all four ladies.
14    Q.   Okay.  Four ladies.  And do you know whether
15 the ballot was prepared in accordance with the voter's
16 wishes in those instances?
17    A.   I do not.
18    Q.   Okay.  Okay.  Do you have any other examples
19 within the past five years?
20    A.   Not that I can think of at this time.
21    Q.   Okay.  I am about to change to another topic
22 can we take a five minute break?
23         THE REPORTER:  Okay.  Going off the
24 record at 11:41 a.m.
25         (Off the record.)

75

1         THE REPORTER:  Going back on the
2 record at 11:54 a.m.
3     Q.   (BY MS. PERALES:)  Okay.  Mr. Vera, I'm going
4 to turn to talking about the time leading up to the
5 introduction of the election related bills in the 2021
6 regular session.  So at this point we're not at SB 1 as
7 we've come to know it, but at that time we had HB 6 and
8 SB 7, I believe.
9         So in the lead up to the 2021, Texas
10 Legislative regular session, it's fair to say that you
11 were interested in seeing one or more bills put forward
12 that we're going to deal with election issues?
13    A.   That's correct.
14    Q.   Okay.  So prior to the start of the 2021
15 legislative session, what steps did you take to
16 advocate for election related legislation in the
17 upcoming session?
18    A.   That was the 87th session.  In the early days
19 of the session I visited in person in the capital with
20 the state reps and the senators who represent Harris
21 County and this was a verbal communication of the kinds
22 of issues we think needed to be fixed.  So we visited
23 together and I talked and they took notes.
24    Q.   Okay.  Tell me the names of those people.
25    A.   Briscoe Cain, Valoree Swanson, Mike

76

1 Schofield, Paul Bettencourt.
2     Q.   Any other senators?
3     A.   No.
4     Q.   How about Bryan Hughes?
5     A.   No.
6     Q.   Okay.  Cain, Swanson, and Schofield are
7 members of the House, right?
8     A.   Correct.
9     Q.   Okay.  Tell me about how many times you
10 communicated with Briscoe Cain?
11    A.   Well, it was the initial visit where I
12 visited all of them.  I think twice before the
13 committees began hearing, maybe two times the most.
14    Q.   So this would have been after the -- the Legg
15 started?
16    A.   After the opening day of the Legg But before
17 the committees began hearing bills.
18    Q.   Okay.  Did you do any work prior -- sorry.
19 Did you do any work prior to the start of the session?
20    A.   I work all the time.  Can you be more
21 specific.
22    Q.   So bill filing usually opens in November of
23 the year preceding, so just taking you from --
24 following the November 2020 election, knowing that
25 there's an upcoming legislative session?

77

1     A.   Right.
2     Q.   Just in that period before the legislative
3 session starts, did you do work -- and I'm sure you
4 must have, so maybe the better question is, what work
5 did do you to prepare for a accomplishing your goals
6 with respect to your legislation --
7     A.   -- I understand -- I understand your question
8 now, thank you.  Again, just to be clear I -- in that
9 year was mostly phone calls in advance and those start
10 in June.  I began calling Swanson and Cain and
11 Schofield in June of 2020 discussing issues that were
12 of concern to the Ballot Security Committee, not bills
13 just issues that needed to be addressed.
14    Q.   Uh-huh.
15    A.   And then that continued in January of 2021,
16 when I visited their offices and followed up on those
17 issues.
18    Q.   Okay.  Understood.  You met with them one on
19 one?
20    A.   Well, in June it was phone calls in January
21 it was visits one on one, uh-huh.
22    Q.   Did you meet with the members personally or
23 did you meet with their staff?
24    A.   Probably a mix, I can't remember exactly, but
25 I'm sure the -- the members were there on one of the

78

1  visits and staff on others.
2      Q.  Okay.  What do you remember advocating on
3  that were related to SB 1, meaning either ended up
4  in -- in SB 1 or one of its predecessor's bills?
5      A.  Oh, I see, I see, I see --
6          MR. WASSDORF:  I'm going to object
7  again on the basis of Legislative Privilege to the
8  extent that any of the contents of these communications
9  were in response to a legislative inquiry and instruct
10  you not to answer in that regard.
11          MS. PERALES:  I don't think you can
12  instruct him not to answer.
13          MR. WASSDORF:  Well, I mean --
14          MS. PERALES:  But let's -- let's take
15  a minute to think about it.
16          MR. TAYLOR:  Doesn't the state --
17  doesn't the state own that privilege though.  I mean
18  it's not a privilege that --
19          MS. PERALES:  Well, it's -- it's maybe
20  the privilege of a legislator, but it's -- they're
21  third parties.  They're not parties to the action here.
22          MR. WASSDORF:  I don't know.
23          MS. PERALES:  Let me think about this.
24  Let me think about this.  I'm -- I'm not going to
25  trying to steamroll you.  I do want to stay on the

79

1  record.
2          MR. WASSDORF:  I -- I was asserting
3  the privilege of instructing him not to answer based on
4  Mr. Taylor's representation that he was going to defer
5  to us with respect to our respective privilege
6  objections.
7          MR. TAYLOR:  Yeah, and I can make it
8  easier perhaps.  I don't want my client a witness to be
9  put in a position where somebody has asserted a
10  privilege and then said that he improperly waived that
11  privilege.  So I don't think we have, he and I don't
12  have any choice, but if somebody's going to raise a
13  privilege today, we're just going to have to, you know,
14  not answer that question.  But I'm not saying that the
15  privilege is valid or invalid, I have no idea because
16  I'm not involved in this case.  So that's -- but that's
17  the practical reality, is I am instructing him not to
18  answer questions that these other lawyers are
19  asserting, but not because they're valid, but because
20  they're asserted.
21          MS. PERALES:  Uh-huh.  So can you tell
22  me if you're going to assert the Legislative Privilege
23  and instruct the, Mr. Vera not to answer with respect
24  to all communications with legislators and staff?
25          MR. WASSDORF:  No, it's just any --

80

1  the contents of any communications that he made in
2  response to an inquiry from a legislator or legislative
3  staff.
4          MS. PERALES:  So can you tell me what
5  it was about my question to Mr. Vera that may have
6  raised that issue for you?
7          MR. WASSDORF:  I'm having difficulty
8  in remembering what exactly the wording of the question
9  was, but as it was read the scope of the question
10  appeared to potentially encompass his communications to
11  the legislators or legislative staff in response to a
12  legislative inquiry.
13          MS. PERALES:  One second.
14          Let me see if I can divide his
15  testimony in such a way that we are able to segregate
16  those questions on the record and deal with them
17  separately, perhaps down the line a little bit in the
18  deposition.
19          MR. WASSDORF:  Sure.
20      Q.  (BY MS. PERALES:)  So Mr. Vera, would it be
21  fair to say that you had communications with
22  legislators and staff in which you were bringing forth
23  information or requests at your initiative; that's a
24  yes or no question.
25      A.  Yes.

81

1      Q.  Okay.  Were there ever times when you were
2  communicating with legislators and staff in response to
3  a question from them?
4      A.  Yes.
5      Q.  Okay.  So I'm going to try to divide your
6  testimony into what I believe is non-objectionable, you
7  bringing forth information to legislators and staff at
8  your initiative and then we will try to deal separately
9  with your communications with legislators and staff
10  where they're requesting something from you?
11      A.  This is going to be difficult.
12      Q.  Okay.
13      A.  Because the interaction and the dynamics of
14  the exchanges and discussions, those things overlap
15  continually.
16      Q.  Yeah, okay.
17      A.  It's going to be difficult.
18      Q.  Okay.  Well, with without discussing the
19  substance of what they may have been asking you and
20  what you may have been, let me try get a sense of how
21  that would have unfolded.
22          Would it be fair to say that you
23  communicated with legislators and their staff in
24  person, by phone, and by email?
25      A.  That would be an accurate statement.

82

1    Q.   Okay.  Did you ever have any Zoom meetings
2  with legislators or staff?
3    A.   Did not.
4    Q.   Okay.  And so is it your testimony that when
5  you were communicating with legislators and their
6  staff, that it was a -- a combination of you bringing
7  forth information at your initiative or requests at
8  your initiative and then getting inquiries from them
9  and then you're responding to those inquires?
10    A.   If I understand the question, yes, it was
11  both those issues and frequently in the same meetings.
12    Q.   Okay.  Is it fair to say then to summarize
13  your earlier testimony that you started calling House,
14  Members and staff and Senator Bettencourt and staff in
15  the summer prior to the January 2021 session, and that
16  your communications with them continued both either
17  through email, calls, or in person meetings until the
18  enactment of SB 1?
19    A.   Well, if an enactment means final passage,
20  yes, because SB 1 did not become effective till
21  December of 2021, so, yes to the enactment.
22    Q.   Okay.  When you responded to inquires from
23  legislators or staff, would it be fair to say that you
24  were giving them information as well as suggestions on
25  crafting SB 1, or what ultimately became SB 1?

83

1    A.   It would be more -- it would most accurate to
2  say that when I was responding to questions it was
3  providing specific information on problems we had
4  faced.
5    Q.   Uh-huh.
6    A.   Not craft -- not how to craft SB 1.
7    Q.   But suggestions certainly about where, where
8  you wanted to see language to solve certain problems
9  that you had seen?
10    A.   I think you've gone a little too far on the
11  specificity.  It wasn't the language, it was we've got
12  to find how to fix this.  I wasn't suggesting the
13  language and how to fix it.
14    Q.   Okay.  Certainly not bill language, let met
15  -- let ask my question in a better way then.
16    A.   Okay.
17    Q.   When you're communicating in response to
18  inquiries from legislators, you were giving them both
19  factual information as well as telling them from your
20  perspective that either certain holes needed to be
21  plugged in the statute or certain issues needed to be
22  addressed by the statute?
23    A.   That is correct, but what I did not do was
24  provide language for the statute.
25    Q.   Okay.  You mention that prior to the start of

84

1  the 2021 regular session you started calling
2  legislators and their staff on certain issues as far
3  as -- as the summer before so summer of 2021 -- I'm
4  sorry, summer of 2020 --
5    A.   2020.
6    Q.   -- And I had asked you a question about what,
7  of those communications were relevant to SB 1, or what
8  ended up in SB 1.  So just focusing on your outreach to
9  legislators, starting before the start of the 2021
10  regular session, can you tell me what issues you were
11  reaching out on that were relevant to SB 1?  So for
12  example there's lots of issues in the election code and
13  I know that you work on lots of different things?
14    A.   Uh-huh.
15    Q.   But just specific to what was addressed in SB
16  1, can you remember starting the summer of 2020 what
17  you were advocating on to the members?
18    A.   At that time I know I mentioned growth in
19  mail ballot harvesting in Harris County.  I know I
20  mentioned problems with election judges preventing poll
21  watchers from being close enough to see and hear
22  activity, and that was partly due to COVID, okay?
23  Those are the two major issues in the summer, was the
24  mail ballot harvesting problem and the carryover poll
25  watcher obstruction problem.

85

1    Q.   So prior to SB -- actually, SB 7 and HB 6 --
2    A.   Uh-huh.
3    Q.   Getting filed --
4    A.   Uh-huh.
5    Q.   In the regular session, did you advocate for
6  example on -- and I'm just going to go through the
7  provisions, requiring a registrar to report ineligible
8  registrants or voters to law enforcement officials?
9    A.   No, I did not.
10    Q.   Did you --
11    A.   But I -- to be clear, I want to be -- I do
12  remember also repeating a prior concern about people
13  registering to vote using a commercial post office box
14  as a residence address.  And that was in addition to
15  the poll watcher and the mail ballot harvesting.
16    Q.   Uh-huh.
17    A.   Sorry, I forgot that.
18    Q.   Well, that's what I'm going to go through the
19  list because who could remember all of it, it's a long
20  list?
21    A.   Okay.
22    Q.   Do you remember raising before SB 1 was
23  filed, concerns to legislators or advocating that
24  legislators address voter registration list maintenance
25  issues, other than this residential address issue?

86

1    A.  At that time, no.  The PO Box registration
2  was the issue I raised.
3    Q.  And so you mentioned at that time, no.  So
4  I'm going to make a note to ask you about it later on
5  as well.  Do you remember advocating that SB 1 have any
6  provisions regarding the secretary or state receiving
7  the names of voters excused from jury duty for
8  nonresidence?
9    A.  No.
10    Q.  Do you remember advocating before SB 1 was
11  filed on requiring the secretary of state to refer
12  information around potential criminal conduct to the
13  AG?
14    A.  No.
15    Q.  Now, this is leading up to before SB 1 gets
16  filed, how about recommending that legislators require
17  polling place to be inside a building?
18    A.  That wasn't -- that wasn't on my list.
19    Q.  Okay.  How about recommending to legislators
20  that they're not be 24 hour voting?
21    A.  That wasn't on my list.
22    Q.  Okay.  Do you recall before SB 1 was filed
23  recommending to legislators that the election code
24  contain a specific provision that voting machines not
25  allow straight ticket voting?

87

1    A.  Not on my list.
2    Q.  Okay.  Do you recall recommending to
3  legislators that SB 1 limit the presiding judge from
4  removing a watcher unless the watcher committed certain
5  infractions, whether those be of the Election Code or
6  the Penal Code?
7    A.  Not that specific thought, but in the summer
8  I raised the concerns about poll watchers not being
9  allowed to observe what they're entitled to observe.
10  So I raised the general topic, not that specific topic.
11    Q.  Do you know how that specific topic -- how
12  that specificity about prohibiting election judges from
13  removing watchers unless the watcher committed certain
14  infractions; do you know where that language came from?
15    A.  I do not.
16    Q.  Okay.  And of course I should have asked you
17  about the ones above as well, do you know where the
18  language came from in SB 1 about having to have the
19  polling place be in a permanent structure?
20    A.  Not that specific thought, no.  That didn't
21  come from my discussions.
22    Q.  All right.  And then do you know where the
23  language in SB 1 came from about not having 24 hour
24  voting?
25    A.  No, I do not.

88

1    Q.  Okay.  Do you -- do you recall whether you
2  were advocating before SB 1 was filed on making it
3  Class A Misdemeanor to refuse to accept a watcher?
4    A.  Not specifically that, no.
5    Q.  Do you know the source of where that came
6  from in SB 1?
7    A.  I do not.
8    Q.  Okay.  Now, there's a provision in SB 1 which
9  I believe you said that you did advocate with respect
10  to, which is that the watcher may not be denied free
11  movement where election activity is occurring and the
12  watcher is entitled to sit or stand near enough to see
13  or hear?
14    A.  Yes.
15    Q.  You advocated on that?
16    A.  Yes.
17    Q.  Okay.  And did you advocate with respect to
18  it being a Class A Misdemeanor to take action to
19  obstruct the view of a watcher or distance the watcher?
20    A.  It was already a Class A Misdemeanor.
21    Q.  Okay.  Do you recall advocating that there be
22  either different or increased penalties to -- for an
23  election judge to either distance the watcher or impede
24  the view of the watcher?
25    A.  Not specifically.  I did in my summer phone

89

1  calls, advocate for their being a stronger penalty for
2  election judges who prevent poll watchers from
3  performing their duties.
4    Q.  Before SB 1 was introduced, did you advocate
5  on prohibiting mail ballot drop boxes?
6    A.  I did not.
7    Q.  Do you know where that language -- what was
8  the source of that language for SB 1?
9    A.  I don't know.
10    Q.  Okay.  Before SB 1 was introduced, did you
11  advocate for either applications for ballot by mail or
12  mail ballots to have increased requirements for
13  presenting ID numbers, and then having -- those ID
14  numbers need to be verified in order to count either
15  the application, process the application, or count the
16  mail ballot?
17    A.  Not specifically, but I did tell you
18  previously that in the summer phone calls I was raising
19  concerns about mail ballot harvesting in Harris County.
20    Q.  Okay.  You didn't have that specific proposal
21  "though, let's add an ID requirement to the paperwork
22  and have those things required to be checked"?
23    A.  I did not have that specific proposal.  I may
24  have pointed out in one or two phone calls, that the
25  states of Wyoming and Alabama required a photocopy of

90

1  the driver's license of the voter to be included with
2  the ballot.
3      Q.  Do you know the -- the source of specific
4  language in SB 1 requiring the ID numbers for ABBMs and
5  mail ballots?
6      A.  I do not.
7      Q.  Okay.  Before SB 1 was introduced, did you
8  advocate at all with legislators for additional
9  information to be asked from individuals who transport
10 curb side voters?
11     A.  Did not.
12     Q.  Do you know where the source of that
13 language --
14     A.  No, ma'am.
15     Q.  -- okay.  Prior to the introduction of SB 1,
16 did you advocate with legislators to increase
17 requirements on polling place assistors; namely, that
18 the assistor oath include additional statements?
19     A.  That was not on my list, no.
20     Q.  Okay.  And what about whether the assistor
21 would have to say whether they were being compensated
22 by a campaign or a PAC?
23     A.  That wasn't me.
24     Q.  How about with respect to mail assistors,
25 mail, not male like y'all --

91

1      A.  M-A-I-L.
2      Q.  -- M-A-I-L, assistance with voting by mail,
3  did you advocate at all prior to the introduction of SB
4  1 that persons who assist voters who are voting by mail
5  are requesting a mail ballot provide additional
6  information about their relationship and compensation?
7      A.  Not that specifically.
8      Q.  Okay.  Do you know the source of that?
9      A.  I do not.
10     Q.  Do you know the source of -- or where it came
11 from in SB 1 that the assistor oath be lengthened and
12 that --
13     A.  I do not know the source.
14     Q.  -- okay.  Now, there's a -- a provision in SB
15 1 that makes it an offense to compensate or offer to
16 compensate another person to assist voters in voting by
17 mail, did you advocate on that issue prior to SB 1's?
18     A.  I did not.
19     Q.  Okay.  Do you know how that language got into
20 the Bill?
21     A.  I do not.
22     Q.  All right.  So there is a part of SB 1 that
23 talks about vote harvesting and so I understand that
24 you had raised a concern related to that.  And so did
25 you advocate with legislators that it should be

92

1  prohibited to have an in person interaction with a
2  voter in the presence of the ballot where the -- the
3  person is advocating for a particular candidate or a
4  measure?
5      A.  That was not from me.
6      Q.  Okay.  So what did you advocate for -- well,
7  let me -- let me close that.  Do you know where that
8  language came from in SB 1 or its predecessors related
9  to prohibited vote harvesting services as an in person
10 interaction with one or more voters in the physical
11 presence of an official ballot intended to deliver
12 votes for a specific candidate or measure?
13     A.  I do not know where it came from.
14     Q.  Okay.  So what were you advocating for with
15 protect to the vote harvesting?
16     A.  Okay.  So we got to be careful about stepping
17 on the objections, okay?
18     Q.  Yeah, I'm just asking what you were
19 advocating for?
20     A.  In my calls I was describing a problem we
21 were, at that time, investigating.  In January and
22 February of 2020, a flood of ABBM was received by the
23 Harris County Clerk with significant issues.
24         So I'm reporting problems.  106 ABBMs
25 delivered in a single envelope with no assistant

93

1  signature to correspond with the act of mailing.
2  Witness signatures on ABBMs requested by people that
3  died in 1990 and 2000 and as recently as 2015 asking
4  for an ABBM in 2020, that's a problem.
5         ABBM signed with a witness by voters
6  whose name was spelled wrong in the signature, that was
7  our concern of ballot harvesting, okay?  And it was
8  significant and there were a number of them.  So that,
9  I was advocating for solutions to prevent or toughen
10 the penalties for that kind of conduct.
11     Q.  Okay.  Now, I -- and what you're saying is
12 triggering memory in my part that there's at least one
13 document produced where you were sending an email
14 saying that the voter wasn't even necessarily involved
15 in that process and that you felt that vote harvesting
16 related to the in person interaction may have been not
17 all of what you would like to see with respect to vote
18 harvesting?
19     A.  You're remembering correctly, but that was an
20 inquiry from a state legislator, so I won't comment,
21 your -- your memory was correct.
22     Q.  Okay.  I -- okay.  It was produced and it
23 seemed to me that it was you saying to them -- or at
24 least what I saw you saying to them something along
25 those lines.  So then, would bit fair to say that prior

94

1  to the introduction of SB 1 you had a concern about
2  vote harvesting that may have been related to
3  falsification of information outside the presence of
4  the voter as opposed to anything that might be
5  happening between the voter and someone who's asking
6  them to vote a certain way?
7      A.   The concerns I was raising in the summer of
8  2020, were about ballot harvesting in a definition that
9  did not include direct interaction with the voter,
10  where the voter was totally unaware that they were
11  requesting a mail in ballot.
12     Q.   Okay.  So I want to stay in the time period
13  prior to the introduction of SB 1, and shift slightly
14  to your communications with people who are not
15  legislators?
16     A.   Uh-huh.
17     Q.   Namely, first, the secretary of state's
18  office, did you communicate at all with the secretary
19  of state's office about what you would want to see in
20  voter integrity legislation in the 2021 session?
21     A.   I did not, no.
22     Q.   Next I'll go to the -- the office of the
23  governor.  Did you communicate with anybody in the
24  office of the governor related to what he would want to
25  see in voter integrity legislation for the 2021

95

1  session?
2      A.   No, I did not.
3      Q.   And then finally with the respect to the
4  office of Texas Attorney General, did you communicate
5  with anybody in the office of the Texas Attorney
6  General about anything you would have wanted to see in
7  the 2021 session related to voter integrity
8  legislation?
9      A.   No, I did not.
10     Q.   Now, I'm going to bring you up to the time
11  period of the regular session, the bills are now
12  introduced, you mentioned that you probably had two
13  meetings with legislators or legislative staff after
14  the opening day?
15     A.   One or two, uh-huh.
16     Q.   Uh-huh.  So in addition to personal meetings
17  -- well, let me ask you this, do you know how many
18  times you went up to Austin during the regular session?
19     A.   Well, before the committee hearings began
20  with bills, only twice.  So January, February, two
21  times.
22     Q.   Uh-huh.
23     A.   Once the committee hearings began for hearing
24  election bills it was almost weekly.
25     Q.   And in the almost weekly visits that you were

96

1  making after HB 6 and SB 7 are introduced?
2      A.   We filed.
3      Q.   Were filed, were introduced and the
4  committees started doing their meetings, were you
5  meeting also almost weekly with legislators or
6  legislative staff?
7      A.   No, once that -- once the committee meetings
8  began my time was spent in the committee meetings.
9  They drag out forever.  So, yeah, I might see staff or
10  members in the hallway or in the Capital Grill, the
11  meetings were few and far between after that.
12     Q.   So what might, what do they call it,
13  buttonhole people in the halls or in the Capital Grill
14  and talk to them about the election integrity bills?
15     A.   If that means I tripped over them, then yes.
16  I may have tripped over them and made a comment.
17     Q.   Okay.  So at this point, what is the means by
18  which you are communicating with legislators or
19  legislative staff?  At this point has it shifted to
20  emails, phone calls?
21     A.   At that point it begins to shift to emails
22  initiated by the legislators or their staff.
23     Q.   Uh-huh.
24     A.   I am the boots on the ground and I frequently
25  get an email asking me to look for unintended

97

1  consequences in the language of this bill and I respond
2  with my best evaluation of what might be the unintended
3  consequences.  The email you referenced earlier on the
4  issue of ballot harvesting being an in person
5  definition was inquiry from a legislator, and that was
6  my response.
7      Q.   Okay.  So would it be fair to say then that,
8  once the committee hearings start your interactions
9  with legislative staff and legislators are in the form
10  of providing feedback on specific bill language that
11  they want to vet with you?
12     A.   In general, yes.  In general, yes.  There
13  have been -- there were two occasions in that first
14  regular session when in testimony I mentioned
15  suggestions that might make the Bill better, and in
16  those two cases -- only two -- I was contacted while I
17  was still waiting to testify on later bills and spent
18  time explaining to the staff, this is what I was
19  referring to.
20     Q.   And generally that -- would that be by phone
21  or --
22     A.   Well, it's in person.
23     Q.   In person?
24     A.   While I'm still there in Austin.
25     Q.   I see.  So you might -- a legislator --

98

1 legislative staff might track you down while you're
2 still in the building and ask you to respond as they're
3 vetting bill language?
4     Q.  Asking me to explain specifically what I was
5 suggesting in my testimony that might make the Bill
6 better.
7     Q.  Okay.  Did you ever have an exchange like
8 that that resulted in bill changing in some way?
9     A.  I assume there -- yes, but I can't remember
10 which bill.  It was not one of these, except for the
11 reconciliation of votes and voters.
12    Q.  Okay.  So just specific to HB 6, SB 7, SB 1,
13 it's predecessor's bills, do you ever recall advocating
14 during the regular session for something to either be
15 added or changed about those bills that you saw come to
16 fruition?
17    A.  Not in the regular session.
18    Q.  Okay.  And you've testified in favor of the
19 bills during the regular session HB 6 and SB 7, is that
20 correct?
21    A.  Correct.
22    Q.  Did you advocate for any bills that were not
23 HB 6 or SB 7 to kind of reach out and incorporate maybe
24 a -- a smaller bill that was also moving through the
25 Legg?

99

1     A.  Please state the question again so I'm clear,
2 did I ever advocate for bringing another bill into SB
3 7?
4     Q.  Yeah.
5     A.  There was one point -- not in regular session
6 I don't think -- but, I advocated bringing Senate bill
7 1589 into Senate bill one or 7, whatever the number was
8 at the time.
9     Q.  And did that happen?
10    A.  Nope.
11    Q.  Was 1589 one of the Bettencourt bills?
12    A.  It was.  Show you how much influence I have.
13    Q.  Well, and Senator Bettencourt he had filed
14 some -- so smaller stand alone bills; is that correct?
15    A.  Yes.
16    Q.  Did you ever communicate by text with either
17 legislators or legislative staff?
18    A.  No, I think Briscoe Cain may have texted me
19 once to ask me to stop testifying on all the bills,
20 swear to God.
21        (Everyone Laughing.)
22    Q.  (BY MS. PERALES:) Did he offer a reason why,
23 or did you understand why he was asking?
24    A.  This meeting is running too long.  The
25 committee hearing is running too long, stop testifying.

100

1 That was the only one I can recall.
2     Q.  Okay.  You mentioned that you typically
3 didn't submit written testimony when you testified, but
4 did you submit anything in writing to either
5 legislators or legislative staff that showed your
6 thoughts or perspectives on either SB 7, or HB 6 -- and
7 it could be anything, a memo, an email, a mark up of
8 the Bill with your concerns?
9     A.  At that time I'm sure that I don't leave
10 copies of my testimony, but I sometimes give Exhibits.
11 Yes, I did give out Exhibits showing the examples of
12 the dead voters who requested mail ballots, okay, in
13 January, February 2020.  So those were handed out to
14 the committees, that was it.
15    Q.  And then specific to the bills themselves,
16 did you ever give them any writings that gave your
17 thoughts or reactions to what was in the Bill or what
18 wasn't in the Bill or how the Bill was written?
19    A.  Only when -- when asked, I -- I didn't
20 proactively.
21    Q.  Uh-huh.
22    A.  But if they -- when they asked me say, take a
23 look at this, see what are the unintended consequences
24 I replied.
25    Q.  And unintended consequences, when you say

101

1 that you mean how the Bill language would play out in
2 real life?
3     A.  Yes.
4     Q.  And whether it would accomplish the goals of
5 the Bill?
6     A.  That's correct.
7     Q.  Okay.  And when you would be asked -- and I
8 won't ask you for the specifics of that just yet -- you
9 could have potentially responded in writing with
10 respect to that?
11    A.  By email, potentially, yes.
12    Q.  Okay.
13    A.  Usually those were either emails or telephone
14 calls.
15    Q.  Do you recall ever advocating for something
16 to be taken out of either SB 7 or HB 6?
17    A.  I think the language defining ballot
18 harvesting as requiring personal contact with the voter
19 qualify as that, but again that was in response to a
20 question from a legislator.
21    Q.  Okay.  Now, as SB 7 and HB 6 are moving
22 through the regular session, what communications are
23 you having with the secretary of state regarding those
24 bills, where Keith Ingram, Christina Adkins, or anybody
25 else in the secretary of state's office?

102

```
 1     A.  I don't think I'm having any communications
 2  with them about the bills.  I can't recall any
 3  communications with them about HB 6 or SB 7.
 4     Q.  You weren't for example saying, hey, when you
 5  testify don't forget, this issue has come up in Harris
 6  County, anything in which you're encouraging them to
 7  either include information or have a certain
 8  perspective?
 9     A.  I can't recall ever communicating with the
10  SOS office or anyone there about those bills while the
11  session was in progress.
12     Q.  Okay.  Were there other bills for example
13  that you sent information to Keith Ingram on that had
14  to do with elections?
15     A.  No, no.  You should know that Keith Ingram
16  doesn't really like me a whole lot, okay?  So I send
17  formal complaints when I uncovered some wrongdoing, and
18  that's normally when I communicate with him.  We don't
19  communicate directly a whole lot.
20     Q.  So if Keith Ingram said, for example, you had
21  provided him bill language on something or another,
22  would that be false?
23     A.  I wouldn't know where it came from.
24     Q.  Okay.
25     A.  I wouldn't know where they came from.
```

103

```
 1     Q.  Okay.  Same question with respect to the
 2  attorney general's office, as the HB 6, SB 7 are moving
 3  through the regular session were you having any
 4  communications with the office of the attorney general
 5  related to these bills?
 6     A.  No, during that time my communications with
 7  the office of attorney general were complaining about
 8  lack of action on complaints I had already filed.
 9     Q.  Okay.  And then with respect to
10  communications with office of the governor, were you
11  having any with the officer of the governor -- office
12  of the governor on HB 6, SB 7 during the regular
13  session?
14     A.  I cannot remember any communications with the
15  governor's office.
16         MR. TAYLOR:  Nina, at what point --
17  I'm not suggesting right now -- do you want to break
18  for lunch?
19         MS. PERALES:  Whenever the witness --
20  as I mentioned, you're not a hostage here -- whenever
21  the witness feels like he's comfortable and ready to
22  take that break.
23         MR. TAYLOR:  Do you feel like you're
24  making quicker progress than anticipated where it makes
25  sense to just try to get this over with, or is that
```

104

```
 1  unrealistic?
 2         MS. PERALES:  So a lot of the rest of
 3  this is -- hold on a second, let me just check and see.
 4  So I pretty much -- you've sensed I sort of reached the
 5  end of my questions with respect to regular session.
 6  So this would be a natural stopping point because you
 7  know my next set of questions -- not about the
 8  pre-pre-session or the regular, but my next set of
 9  questions are going to be about the specials and
10  then --
11         MR. TAYLOR:  You think that would be
12  at least an hour?
13         MS. PERALES:  Very similar --
14         MR. TAYLOR:  I'm just trying to figure
15  out if we should break for lunch.
16         MS. PERALES:  -- yes, I think we
17  should break for lunch, if the witness is, you know --
18         THE WITNESS:  I never had such power.
19         THE REPORTER:  Going off the record at
20  12:44 p.m.
21         (Off the record.)
22         THE REPORTER:  Going back on the
23  record at 1:42 p.m.
24     Q.  (BY MS. PERALES:)  Okay.  We're back on the
25  record, Mr. Vera, and I'm going to update our
```

105

```
 1  conversation to the time period of the first and second
 2  special sessions in 2021.  If you recall the 2021
 3  regular session ended over the Memorial Day weekend
 4  without passage of SB 7, HB 6, and then we had the two
 5  special sessions culminating with the legislature's
 6  passage of what then came to be known as SB 1.
 7         So during the -- now, you had
 8  mentioned earlier in your testimony that you did some
 9  advocacy during the first special session.  Do you
10  remember at this point, I think bills were introduced,
11  I'm not sure whether we got to the committee hearings
12  during the first special, but can you generally give me
13  a sense of what you were doing during the first special
14  on the election integrity bill?
15     A.  Well, I testified before the state -- Senate
16  State Affairs Committee on a Saturday.  And I testified
17  in the House for Mr. Murrell's Bill that same day and
18  then things kind of ended because everyone had fled to
19  Washington, there was no quorums so they couldn't
20  conduct business.
21     Q.  Okay.  Do you remember at that point what you
22  were focused on in terms of provisions in the Bill, had
23  your focus remained the same as it was before these
24  bills were filed in the regular or had your advocacy
25  expanded to additional portions of the Bill?
```

106

1      A.   Nothing changed during the first special
2   session, but while that was going on we were doing our
3   analysis of Harris County's elections again and found
4   once, again, that we had many precincts, many vote
5   centers, where there were many ballots than voters.  So
6   between the first and second special sessions is when I
7   advocated for the addition of two sentences to what was
8   then SB 1 that would require every county to reconcile
9   the number of ballots and number of voters.
10     Q.   Okay.  So in -- I'm going to go over with you
11  again some of the provisions of SB 1 and my question
12  will be, with respect to the time leading up to the
13  legislature's passage of SB 1, whether you did any
14  advocacy on these provisions?
15     A.   Now, we're including the summer of 2021?
16     Q.   Yeah, all the way through.
17     A.   Okay.
18     Q.   From pre-filing all the way through -- well
19  you've told me in pre-filing period what you were
20  focused on?
21     A.   Uh-huh.
22     Q.   But now through you know end of September
23  2021, did you advocate at all with legislatures or
24  any -- any other officials to have registration
25  provisions in SB 1?

107

1      A.   No, I did not.
2      Q.   Did you advocate to require the secretary of
3   state to refer information about criminal conduct to
4   the attorney general?
5      A.   Did not.
6      Q.   Did you advocate with respect to sending
7   lists of voters who were excused from jury duty for
8   nonresidence to the secretary of state?
9      A.   Did not.
10     Q.   Did you advocate for -- with any legislators
11  or other officials for language in the Bill that would
12  only inside the physical building?
13     A.   Did not.
14     Q.   Did you advocate with legislators or other
15  officials about containing the hours of voting so that
16  there wouldn't be voting between 10 p.m. and 6 a.m.
17     A.   Did not.
18     Q.   Did you advocate with legislators or other
19  officials regarding voting machines not allowing
20  straight ticket voting?
21     A.   Did not.
22     Q.   Now, you were advocating on poll watchers?
23     A.   I was.
24     Q.   And so is there a point at which you began to
25  advocate on the specific provisions in SB 1 related to

108

1   poll watchers, such as prohibiting election judges from
2   removing unruly watchers unless the watcher's behavior
3   violates the Penal Code or was personally observed by
4   the election judge?
5      A.   I was not advocating for that.  I will tell
6   you that during that time period I advocated for
7   removing some of the original language of SB 1 which
8   allowed poll watchers to carry cameras and take photos
9   and record inside the polling place.  I was opposed to
10  that.
11     Q.   Okay.  Now, the provisions related to -- okay
12  did you advocate in the legislature with other
13  officials during this time period up to passage of SB 1
14  that it be made a Class A Misdemeanor to refuse to
15  accept a watcher?
16     A.   I did not.
17     Q.   Did you advocate during this time period with
18  either legislators or other officials that SB 1 include
19  language saying that a watcher may not be denied free
20  movement where election activity is occurring --
21  occurring and is entitled to sit or stand near enough
22  to see and hear the conduct of the observed activity?
23     A.   Only in my testimony to the committee.
24     Q.   And with respect to the time period that
25  we've defined leading the passage of SB 1, did you

109

1   advocate with legislators or other officials to make it
2   a Class A Misdemeanor to take any -- for an election
3   official to take any action to obstruct the view of a
4   watcher or distance the watcher from the activity or
5   procedure being observed?
6      A.   Only in my testimony to the committee.
7      Q.   Did you advocate, leading up to the passage
8   of SB 1, on prohibiting mail ballot drop boxes?
9      A.   I did not personally advocate in that.
10     Q.   Okay.  Did you advocate leading up to the
11  passage of SB 1 for language in the Bill that would
12  require voters to put ID numbers on ABBMs or mail
13  ballots as part of the process of verifying voter
14  identity?
15     A.   I did not advocate.
16     Q.   Okay.  Did you advocate leading up to the
17  passage of SB 1 for new information to be gathered from
18  individuals transporting curbside voters?
19     A.   I did not advocate for that provision.
20     Q.   Did you advocate leading up to the passage of
21  SB 1 with legislators or other officials on adding
22  language to assistor oath?
23     A.   I did not.
24     Q.   Did you advocate leading up to the passage of
25  SB 1 with legislators or other officials for

110

1  requirement that individuals assisting with mail ballot
2  preparation provide their relationship and whether they
3  were compensated?
4      A.  I did not advocate in that specific issue.
5      Q.  Did you advocate leading up to the passage of
6  SB 1 for -- either with legislators or others that
7  there be a state jail felony when a person compensates
8  or offers to compensate another person to assist
9  voters?
10     A.  I did not advocate for that provision.
11     Q.  Okay.  And did you advocate leading down the
12  passage of SB 1 with legislators or others that SB 1
13  prohibit what it terms vote harvesting services that
14  would be an in person interaction with a voter in the
15  presence of a ballot intended to advocate for certain
16  ballot positions?
17     A.  I did not advocate for that provision.
18     Q.  Leading up to the passage of SB 1 did you
19  advocate with legislators or other officials on
20  imposing a civil penalty on election officials who
21  violate the election code?
22     A.  I did not advocate for that provision.
23     Q.  So you mentioned earlier -- okay.  Well,
24  here's -- here's a question for you, some of these
25  provisions seem related to things that Harris County

111

1  was doing in the general election of 2020?
2      A.  Uh-huh.
3      Q.  For example, expanding the hours of voting to
4  24 hours, having voting occur kind of in areas where
5  it's not a permanent structure, but more of a tent set
6  up or nonpermanent structure, but you did -- you're
7  saying that your advocacy in the legislature with
8  legislators did not touch on those things that Harris
9  County had done, in particular?
10     A.  Immediately after the 2020 election, okay?  I
11  did my own local analysis for our legislators on what
12  had happened in that election.  And one of the issues
13  that I addressed was the incredible problems and the
14  almost disenfranchisement of 2,000 voters in drive-thru
15  voting because of the poor -- poor way it was handled.
16  So talked about that locally and I'm -- I'm sure many
17  of our legislators heard my comment on that topic.
18     Q.  Did you ever speak to legislators and urge
19  them to do something about what you had found with
20  respect to the drive-thru voting?
21     A.  I did not do that.  I was questioned at
22  length on drive-thru voting by Senator Royce West
23  during the Senate State Affairs Committee hearing on SB
24  1 in the first special session.  And that's why, for
25  half an hour got into all the details and problems of

112

1  drive-thru voting.
2      Q.  Okay.  So we've covered these specific
3  provisions, so let me sort of change somewhat to ask
4  you, on what provisions were you communicating with
5  legislatures or legislative staff during the period
6  leading up to the enactment of SB 1?
7      A.  During that period of time I was not doing
8  any individual advocacy with legislators or their
9  staffs accept between the first and special session
10  when I asked Senator Bettencourt's staff to carry those
11  two sentences and put them into SB 1 for me, everything
12  else was in public testimony.
13     Q.  What about answering questions from
14  legislators --
15     A.  Yes.
16     Q.  -- as we had discussed earlier, were you
17  answering questions from legislators during the period
18  of the -- either the regular or the first or the second
19  special session?
20     A.  Yes, I would get questions from legislators
21  asking me to review this document and this language and
22  see if there are any unintended consequences, that's
23  normal.
24     Q.  And then you provide your feedback?
25     A.  Correct.

113

1      Q.  Okay.  And so about how often, how many times
2  per week during the first or second special were you
3  providing that kind of feedback to legislators or
4  staff?
5      A.  Well, during the first special session it was
6  no more than twice a week.  The second special session
7  it was only once a week at max, that anybody asked.
8      Q.  Okay.
9      A.  Things were pretty settled by then.
10     Q.  Okay.  And then with respect to who was
11  asking, can you give me the names of the people who
12  were seeking your input on the Bill language or for the
13  -- you know, for your reaction to this?
14     A.  I would get emails from State Rep Jacey
15  Jetton, State Rep Valoree Swanson, Senator Bettencourt
16  and his staff, and I think 90 percent of the emails I
17  got requesting my point of view were those three people
18  or their staffs.
19     Q.  Did you ever have a request for your feedback
20  from Briscoe Cain or his staff?
21     A.  In the regular session I did get a -- a
22  request from that on HB 6.
23     Q.  Okay.  And with respect to Mike Schofield,
24  did you ever get a request from him for feedback or
25  reaction either him or his staff?

114

1    A.  Did not.
2    Q.  Okay.  How about Representative Clardy, did
3  you have any communications with either him or his
4  staff related to bill language?
5    A.  No.
6    Q.  Okay.  Jacey Jetton, would it be fair to say
7  it was not somebody that you had met with at the early
8  part of the session?
9    A.  That's correct.  He's a representative from
10  Fort Bend County, so he would not have attended the
11  Harris County's events where we discussed the election
12  legislation --
13    Q.  I'm sorry, I stepped on your answer.  And so
14  tell me how you begin to start communicating with
15  Representative Jetton about SB 1?
16    A.  Very simple.  I got an email from his staff
17  asking me to comment on these sections of the Bill, and
18  I gave them my comments.
19    Q.  Would it be fair to say that during the time
20  that you were providing your comments on bill language
21  in the regular session, the first and second special
22  session, that what you were being asked to comment on
23  was broader than poll watchers or harvesting?
24    A.  Yes, it would be a correct statement, because
25  the email usually simply asked, please take a look at

115

1  these sections and tell us if there are any unintended
2  consequences from that language.
3    Q.  And then you would provide your concerns or
4  your thoughts about how the Bill language would play
5  out in real life?
6    A.  I would provide my feedback on that --
7  those -- those exact words, the current language might
8  be misinterpreted, misconstrued, or abused for a -- a
9  result I didn't want.
10    Q.  Or also might fail to address a problem that
11  you perceived?
12    A.  Correct, yes.
13    Q.  Okay.  And would it be fair to say then those
14  types of legislator requests covered most provisions in
15  SB 1?
16    A.  I can't answer that because I won't remember.
17  I know that most of the request I get for that feedback
18  specify sections of the language they want me to look
19  at.  I don't know if it covered all -- SB 1 is a pretty
20  long bill.
21    Q.  Maybe I'll -- I'll be slightly more specific,
22  were you asked to respond to language related to poll
23  watchers, for example?
24    A.  Yes.
25    Q.  Okay.  Were you asked to respond to language

116

1  related to vote harvesting?
2    A.  Yes.
3    Q.  Were you asked to respond to language related
4  to voter assistance?
5    A.  No, I was not.
6    Q.  Okay.  Were you asked to respond to language
7  related to 24 hour voting?
8    A.  No, I was not.
9    Q.  Were you asked to responds to language
10  related to temporary polling places or moveable polling
11  places, given that you had raised some concerns about
12  that in your testimony?
13    A.  I was not because they thought they already
14  had the solution.
15    Q.  Okay.  So they weren't asking for your help
16  on that one?
17    A.  Correct.
18    Q.  Were you asked to provide your thoughts on
19  the Bill language related to voters providing ID
20  numbers on either ABBMs or mail ballots?
21    A.  I was and I was -- my -- I was and I was
22  ignored.
23    Q.  Okay.  Is there anything else that you can
24  think of in your mind that were parts of SB 1 that you
25  were asked to provide your feedback on that I haven't

117

1  touched in just the moment or two?
2    A.  I can't remember, we covered so much.  If I
3  think of it I'll -- I'll mention it, but right now I
4  can't think of thinking else.
5    Q.  Now with protect to feedback you provided on
6  poll watchers, tell me the feedback that you provided
7  on poll watchers.
8      MR. WASSDORF:  I'm going to object on
9  the grounds of legislative privilege and ask the
10  witness not to testify.
11      MS. PERALES:  Okay.
12    Q.  (BY MS. PERALES) And Mr. Vera, are you going
13  to follow the instruction of Mr. Wassdorf not to
14  testify on the feedback that you provided legislators
15  related to poll watchers?
16      THE WITNESS:  I am.
17    Q.  (BY MS. PERALES:) Okay.  Now what feedback
18  did you provide legislators with respect to vote
19  harvesting?
20      MR. WASSDORF:  Same objection.
21    Q.  (BY MS. PERALES) Are you going to follow the
22  advice of Mr. Wassdorf and decline to testify on the
23  feedback that you provided to legislators or staff
24  about vote harvesting?
25    A.  I am.

118

```
1     Q.  Next I'll ask you what feedback you provided
2   to legislators or staff related to the requirement that
3   voters provide an ID number on either their ABBM or
4   their mail ballot?
5           MR. WASSDORF:  Same objection.
6     Q.  (BY MS. PERALES) Are you going to follow the
7   instruction of Mr. Wassdorf and decline to testify on
8   the feedback you provided to the legislators about the
9   voter ID on mail voting?
10    A.  I am.
11    Q.  (BY MS. PERALES:) Okay.  What feedback did
12  you provide to legislators or staff related to what we
13  call drive-thru voting?
14          MR. WASSDORF:  Same objection.
15    Q.  (BY MS. PERALES) Are you going to follow the
16  instruction of Mr. Wassdorf and not -- and decline to
17  testify regarding the feedback that you provided
18  legislators about drive-thru voting?
19    A.  I am.
20    Q.  (BY MS. PERALES:) Were you asked to provide
21  feedback on any of the voter registration provisions of
22  SB 1, including for example the requirement that the
23  registrar report an ineligible registrant or voter to
24  law enforcement?
25    A.  I was not.
```

119

```
1     Q.  Were you asked to provide any feedback by
2   legislators on the provisions of SB 1 requiring the
3   secretary of state to refer any information about
4   criminal conduct to the attorney general?
5     A.  I was not.
6     Q.  Were you asked to provide any feedback by
7   legislators about the provision of SB 1 that requires
8   the secretary of state to receive lists of voters
9   excused from jury duty for nonresidence?
10    A.  I was not.
11    Q.  Were you asked to provide any feedback by
12  legislators on the provisions of SB 1 having to do with
13  24 hour voting?
14    A.  I was not.
15    Q.  Were you asked to provide any feedback by
16  legislators or staff on the provision of SB 1 having to
17  do with mail ballot drop boxes?
18    A.  I was not.
19    Q.  Were you asked to provide any feedback by
20  legislators on bill language addressing
21  individuals who bring people to the polls for curbside
22  voting?
23    A.  I was not.
24    Q.  So if we take the time period leading up to
25  passage of SB 1 at the end of the second special, based
```

120

```
1   on all of your experiences in those sessions, what is
2   your understanding of the source of the language in SB
3   1 about voter assistance in the polling place?
4     A.  Yeah, I don't know.  I have no idea where it
5   came from, it was not one of my areas of focus.
6     Q.  Okay.  Same question with respect to the
7   provisions on 24 -- and I'm just going name certain
8   practices that occurred in Harris County.  24 hour
9   voting, mail ballot drop boxes, and drive-thru voting,
10  do you know the source of where those ideas came from
11  in the Bill?
12    A.  No, I don't.
13    Q.  Okay.
14    A.  The language in the Bill on the drive-thru
15  voting, because the language addressed the kind of
16  facility, was almost taken from the Federal Court in
17  downtown Houston.
18    Q.  Okay.
19    A.  There was a -- there was a civil action and a
20  judge -- the Federal Judge ruled that the language in
21  the early voting portions of the code was different
22  from the language in the election day portions of the
23  code, and what I observed is that SB 1 simply took the
24  languages from election day and applied them to early
25  voting.  So I wasn't part of that process, but
```

121

```
1   that's -- that's what I observed.
2     Q.  Okay.  Thank you.  Based on your experience
3   through passage of SB 1, do you know where the -- what
4   the source or the idea or the language was related to
5   voters providing an ID number when sending in either an
6   ABBM or a mail ballot?
7     A.  I do not know the source of that language.
8     Q.  Now you had raised a concern yourself that
9   there was essentially non-voters submitting
10  applications for ballot by mail?
11    A.  Uh-huh.
12    Q.  In the names of others?
13    A.  Uh-huh.
14    Q.  Do you have any sense of how the Bill ends up
15  saying somebody who submits an ABBM or mail ballot
16  ought to provide additional information, like an ID
17  number?
18    A.  Senate Bill 1 did not affect those sections
19  of the code that dealt with falsifying or forging ABBMs
20  for people that are unaware that their names are being
21  used.  That was not changed by SB 1.
22    Q.  So do you have any sense of where the new ID
23  requirements came from in -- in terms of who might have
24  proposed it or?
25    A.  I don't know.  I don't know.
```

122

1    Q.  Okay.  What is your sense of the source of
2  the language on vote harvesting that's in SB 1?  Based
3  on your knowledge through the passing of SB 1, do you
4  know where that language came from about vote
5  harvesting, which is advocating in person with a voter
6  in the presence of the ballot in favor of a particular
7  candidate or measure?
8    A.  No, I don't know where that came from.
9    Q.  How about that portion of SB 1, do you know
10  for example who suggested or what the source of the
11  provision is that it's a state jail felony when a
12  person compensates or offers to compensate another
13  person to assist voters?
14    A.  I don't know the source of that.
15    Q.  Okay.  Earlier I had asked you about whether
16  you communicated with the secretary of state's office
17    A.  Uh-huh.
18    Q.  Either Keith Ingram or Christina Adkins
19  during either the first or the special session?
20    A.  Uh-huh.
21    Q.  Although, I'm not sure if I asked about the
22  first or the special session, so let me just ask you.
23  Do you remember communicating with anybody from the
24  secretary states office Keith Ingram, Christina Adkins
25  about SB 1 or related issues during either the first or

123

1  second special?
2    A.  I clearly remember not communicating with
3  anyone in the SOS office about SB 1 during the regular
4  session or the two special sessions.
5    Q.  Okay.  What about for example your poll
6  watcher trainings, do you recall sharing your poll
7  watcher training PowerPoint with Keith Ingram --
8    A.  Yes, that was different.
9    Q.  -- and/or Christina Adkins?
10    A.  In a -- in a Senate State Affairs Committee
11  hearing they were both present, I was there to testify,
12  and at that point SB 1 was passing, was going to pass,
13  and required a secretary of state to provide poll
14  watcher training as part of new requirements of Senate
15  Bill 1. I said to Keith, by the way I've got a
16  presentation have been use for years that updates,
17  would you like to see it?  So this was back in you
18  know, 2021, and they said I'd love to see it, so I'll
19  just email it to you.  Christina said, yeah, copy me
20  too. So I sent them my PowerPoint, the old PowerPoint,
21  pre-SB 1, and sent it by email to both of them.
22    Q.  Okay.  And so would you agree with me that
23  that was related to SB 1 with respect to the provision
24  that would require the secretary state to state to
25  start training poll watchers?

124

1    A.  I would agree that it's relevant to that, but
2  it was not an advocacy for that.  I wasn't advocating,
3  it was -- it was a done deal, SOS was going to have to
4  train poll watchers and I offered them some -- a head
5  start in the training materials.
6    Q.  Okay.  Were there any other communications
7  that you had with either the secretary of state, the
8  AG, or the governor's office during this period of time
9  that you might not classify as advocacy, but was
10  communication related or touching on SB one's
11  provisions?
12    A.  Let me think.  No, that was long after that
13  I -- I can't remember any.  I cannot remember any other
14  communications.
15    Q.  Okay.  So would it then be fair to say that
16  you sent a copy of your poll worker training
17  PowerPoint?
18    A.  Poll watcher.
19    Q.  I'm sorry, thank you for that.  Your -- let
20  me ask the question again, would it be fair to say that
21  you sent a copy of your poll watcher training
22  PowerPoint to Mr. Ingram and Ms. Adkins of the
23  secretary of state's office in early September, 2021?
24    A.  I think that's probably correct.
25    Q.  Okay.  Would you mark this as the next

125

1  exhibit please?
2       The court reporter has handed you what
3  has been marked deposition Exhibit No. 3. Do you
4  recognize this as at least partly an email from you on
5  September 2, 2021, to Keith Ingram and Christina Atkins
6  attaching your poll watcher PowerPoint?
7       (Exhibit No. 3 marked.)
8    A.  Yeah, I specifically attached the 2020 poll
9  watcher version, that's correct.
10    Q.  (BY MS. PERALES:) The court reporter has
11  handed you what has been marked Deposition Exhibit No.
12  4. Can you identify this document?
13       (Exhibit No. 4 marked.)
14    A.  It appears to be a photocopy of my 2020 poll
15  watcher training class.
16    Q.  (BY MS. PERALES) Is Exhibit No. 4 what would
17  have been the attachment to Exhibit No. 3, the email?
18    A.  That's correct.
19    Q.  How do I know this is your 2020 training,
20  where can I tell on here?
21    A.  I don't know if you can tell from the
22  document or not, hang on.
23       You can tell because there's nothing
24  in here about having to take the secretary of state's
25  poll watcher training which was changed in 2021, so on

126

1  a slide that says before election day, if you look up
2  I'll show you. That slide, the new one would say have
3  to take the secretary of state poll watcher training
4  also.
5      Q. So you recall making that change to your
6  training after SB 1 passed?
7      A. Yes.
8      Q. Okay. Okay. If Mr. Ingram or Ms. Adkins
9  asked you for your 2022 poll watcher training as follow
10  up, would you send it to them?
11      A. Not without checking with Charis Eagle.
12      Q. Did you check with Charis Eagle about 2021 --
13      A. I let her know that I was sending this, yes.
14      Q. Okay.
15          MS. PERALES: So counsel, based on the
16  fact that Mr. Vera shared this document outside the
17  bounds of the Harris County Republican Party, we would
18  respectfully request that counsel produce the 2022 poll
19  worker training prepared by Mr. Vera?
20      A. Poll watcher.
21          MS. PERALES: Poll watcher training.
22  Poll watcher training prepared by Mr. Vera.
23          MR. GORE: Okay. We have asserted our
24  First Amendment Privilege with respect to that
25  document. It's contained on the log as well, I

127

1  believe. Mr. Vera has made clear there were changes to
2  that document, from the 2020 version. So those -- that
3  new version remains subject to privilege. It hasn't
4  been shared outside the Harris County Republican Party.
5          Mr. Vera has testified that he has not
6  done so, would not do so without permission of the
7  Chair of the Harris County Republican Party. So we're
8  -- we're maintaining that it is still subject to
9  privilege, including because it contains new content
10  that hasn't been disclosed outside of the Harris County
11  Republican Party.
12          MS. PERALES: Now the fact that it
13  hasn't been disclosed doesn't necessarily mean that
14  it's privileged are you -- so -- and -- and thus we
15  would assert that the privilege claim has been waived
16  with respect to Mr. Vera's poll watcher training from
17  2022 because he has shared externally his 2020 poll
18  watcher training.
19          Is it your contention that the
20  differences between the two documents is subject to the
21  First Amendment Privilege?
22          MR. GORE: It's our contention that
23  the 2020 document was also subject to First Amendment
24  Privilege, and that privilege was waived only with
25  respect to the 2020 document. The 2022 document is a

128

1  separate document and that document remains subject to
2  the First Amendment privilege that has been asserted
3  over that document.
4          MS. PERALES: Okay.
5      Q. (BY MS. PERALES) Mr. Vera earlier in your
6  deposition you testified that you weren't sure if your
7  email, Microsoft outlook, kept your emails from more
8  than a year ago?
9      A. Uh-huh.
10      Q. And you've testified earlier in the
11  deposition that you did have back and forth exchanges
12  with either legislators or legislative staff by email,
13  in which you were providing feedback on provisions of
14  SB 1; is that right?
15      A. Yes.
16      Q. As part of the process of being involved in
17  this case, did you search for those emails in which you
18  were providing feedback to legislators or initiating
19  conversations with them relevant to provisions of SB 1?
20      A. I did not search for any documents in my own
21  files.
22      Q. Okay.
23      A. Are you -- I was given by the attorneys a
24  whole set of documents that were produced, one of which
25  included a feedback to State Rep Jetton's question to

129

1  me about SB 1 and the language about harvesting.
2      Q. Okay. Did you turn over your computer to
3  anybody to have them search your emails as part of your
4  involvement in this case?
5      A. I did not.
6      Q. Okay. If your Microsoft Outlook did in fact
7  save emails that are older than a year old or two years
8  old, would your emails going back and forth with the
9  legislator be there and -- and your providing feedback
10  and having your communications?
11      A. I don't know, there -- they should be.
12      Q. Okay. Mr. Vera, the court reporter has
13  handed you what has been marked Deposition Exhibit No.
14  5.
15          Is this the email that you were
16  referencing a moment ago in which you had an exchange
17  with Representative Jetton regarding in person activity
18  with a voter and vote harvesting?
19          (Exhibit No. 5 marked.)
20      A. Yes, it does. This looks like the document
21  that I mentioned in that previous testimony.
22      Q. (BY MS. PERALES:) And what is the date of
23  your email to Representative Jetton?
24      A. August 20th, 2021.
25      Q. So this is some time before the passage of SB

130

1  1?
2      A.  Some time during -- it looks like the second
3  special session.
4      Q.  Okay.  Do you know who Tori McFarland is?
5      A.  I think at that time Tori McFarland was on
6  the staff of Jacey Jetton.
7      Q.  And Coleen, I believe you mentioned earlier
8  in the deposition is your wife?
9      A.  Correct, uh-huh.
10     Q.  Okay.  And so in this -- in this email
11 subpoena is it -- is it fair to say that you're
12 alerting Representative Jetton to something that you've
13 characterized as an unintended consequence in the
14 version of SB 1 that was going to be heard in committee
15 the following day; is that right?
16     A.  Yes, ma'am?
17     Q.  And then Representative Jetton responds
18 "thank you for sharing and good catch, we will work
19 with chairman Murrell on an amendment", closed quote?
20     A.  Uh-huh.
21     Q.  Okay.  Now, I know earlier you had suggested
22 that maybe this exchange was -- as part of
23 representative Jetton asking for your feedback; is that
24 right?
25     A.  Yes.

131

1      Q.  Okay.  Do you -- where is the email below
2  that, where he asks for your feedback?
3      A.  Well, there's no -- I don't think's an email
4  below that, I think it was a phone call from Ms. Tori
5  asking me -- saying State Rep Jetton would like you to
6  comment on that aspect SB 1.
7      Q.  And the aspect being that vote harvesting was
8  defined as an in person interaction?
9      A.  Yes.
10     Q.  And then you provided your feedback in this
11 email; is that right?
12     A.  That's correct.
13     Q.  And then Representative Jetton responds to
14 you?
15     A.  Uh-huh.
16     Q.  And then, it sort of cut off at the top, but
17 it looks like you may have taken that exchange and then
18 forwarded it to Chair Siegel and some others?
19     A.  It looks like that.
20     Q.  Okay.
21     A.  Just keeping her posted.
22     Q.  Okay.  All right.
23     A.  Yeah, looks like those are all HCRP employees
24 or officers.
25     Q.  I wanted to ask, did anybody besides you with

132

1  Harris County Republican Party talk to legislators or
2  legislative staff about issues or provisions that ended
3  up in SB 1?
4      A.  It's certainly possible.  I don't know -- I
5  can't name people who did nor can I say they didn't.
6  The Ballot Security Committee -- let me back up.
7          During the Harris County Republican
8  Party Executive Committee Meeting at the beginning of
9  each legislative session, the Executive Committee
10 passes a resolution that gives guidance to Ballot
11 Security Committee on which changes in general to the
12 election code to support and which changes to oppose as
13 we interact with the state legislators.
14         So we all receive those same marching
15 orders, and so I'm up there a lot, but others can be up
16 there as well as long as they stay in line with the
17 Executive Committee directed at us, we're all right.
18     Q.  Okay.  And do you know if -- so you say --
19 let me ask you this.  Did -- did Chair Siegel have
20 interactions with members of the legislature or staff
21 on some of these issues or provisions that end up in SB
22 1?
23     A.  I am not aware.  I know that Chair Siegel and
24 Senator Bettencourt communicate regularly, okay?  But I
25 cannot tell you whether or not they discussed Senate

133

1  Bill 1.
2          The court reporter is not catching
3  that.  Ask them to speak louder, and more slowly.
4          (Discussions in hallway, laughter.)
5      Q.  (BY MS. PERALES:)  The court reporter has
6  handed you what has been marked Deposition Exhibit No.
7  6.  Do you recognize this as an email from May 19th,
8  2021, from you?
9          (Exhibit No. 6 marked.)
10     A.  Uh-huh.
11     Q.  (BY MS. PERALES:)  To --
12     A.  Senate or Bryan Hughes.
13     Q.  Senator Hughes and it looks like some more
14 senators --
15     A.  Don Buckingham, Paul Bettencourt, Louis Culp,
16 these are members of the Senate Committee on State
17 Affairs that hears election bills.
18     Q.  And then you CC some staffers, would that be
19 right, as well as some folks with the Harris County
20 Republican Party?
21     A.  That's correct.
22     Q.  Okay.  And I see Sonya Aston is there?
23     A.  Yes.
24     Q.  And she was staffing with?
25     A.  Senator Bettencourt.

134

1    Q.   And then can you sort of generally help me
2  understand what is it that you are sending to these
3  legislators and staff?
4    A.   On this date, May 19th, we're coming to the
5  end of the regular session Senator Bettencourt's bill,
6  Senate Bill 1589, had passed the Senate earlier, but
7  had not been heard in the Committee in the House at
8  all, so this note asked him to consider adding that
9  portion of SB 1589 to the Article 4 Provision of Senate
10  Bill 7, which was still in process.
11    Q.   Okay.  And were these Election Marshals under
12  the Bill themselves law enforcement officers?
13    A.   Yes.
14    Q.   And did 1589 position them inside the polling
15  place?
16    A.   No.
17    Q.   And where would it have positioned them?
18    A.   It simply made them available to be called,
19  to respond to reports of criminal election activity.
20    Q.   How would that be different than just calling
21  the regular police?
22    A.   These people will actually respond.
23    Q.   That's what happens when you ask an open
24  ended question in a deposition.
25    A.   Uh-huh.

135

1    Q.   Okay.  Thank you one more question about
2  Exhibit No. 6, sorry?
3            (Exhibit No. 6 marked.)
4    A.   Uh-huh.
5    Q.   (BY MS. PERALES) You say here, quote, "please
6  see the attached record of our invited testimony to the
7  senate committee on state affairs" closed quote, do you
8  see that line there?
9    A.   Yes.
10    Q.   And would that be an example of a time when
11  you did provide something in writing to the Senate?
12    A.   No, I was just attaching my notes.  The notes
13  I spoke from when I testified in support of SB 1, 1589.
14    Q.   Do you remember if those note are typed or
15  handwritten?
16    A.   They're typed, I can't read my handwritten
17  notes.
18            (Laughter.)
19    Q.   (BY MS. PERALES) I have three emails and I'm
20  going to mark each of them.  Okay.  Can you identify I
21  believe it's No. 7 for me?
22            (Exhibit No. 7 marked.)
23    A.   Exhibit No. 7 looks like an automated reply
24  from the office of Senator Bob Hall to the Chair of
25  Harris County Republican Party.

136

1    Q.   (BY MS. PERALES) Okay.  Identify No. 8 for
2  me.
3            (Exhibit No. 8 marked.)
4    A.   Exhibit No. 8 appears to be automated reply
5  From office of Senator Donna Campbell to the Chair of
6  the Harris County Republican Party.
7    Q.   And can you identify 9 for me?
8            (Exhibit No. 9 marked.)
9    A.   Exhibit No. 9 appears to be automated reply
10  office of Senator Bettencourt to the Chair of the
11  Harris County Republican Party.
12    Q.   (BY MS. PERALES) And is the date on all three
13  exhibits August 10th of 2021?
14    A.   It is.
15    Q.   And they're all at about 4:30 in the morning,
16  yes?
17    A.   Yeah, between 4:30 and 4:45, yup.
18    Q.   Okay.  Do you know what email these exhibits
19  were responding to?
20    A.   I have no idea.
21    Q.   Okay.  Does the date August 10th, 2021 in
22  anyway refresh your recollection about whether this
23  might have been related to communications on SB 1?
24    A.   It does not.  I -- that was in the end of
25  second special session, but no, I can't tell.

137

1    Q.   Okay.  Thank you.  Did you have any
2  communications with Senator Hall that related in any
3  way to SB 1?
4    A.   Oh, goodness.  I don't remember.
5    Q.   Okay.  Same question with Senator Donna
6  Campbell, did you have any communications with Donna
7  Campbell about SB 1?
8    A.   I don't remember.  The only reason I -- I
9  hedged on Senator Hall he was very good when I did
10  public testimony before the senate committee on state
11  affairs of house asking me many follow up questions.  So
12  I don't know if I may have sent him an email or not.
13    Q.   SB 1 was heard in Senate State Affairs on
14  August 9th, 2021?
15    A.   Okay.
16    Q.   And since these auto replies are coming from
17  the wee hours of August 10th?
18    A.   Uh-huh.
19    Q.   Is -- is it possible that you remember
20  sending some kind of follow up communication to various
21  senators following your testimony?
22    A.   I don't remember doing that.  And if I'd had
23  it would have come from my email address, not the party
24  chairs.
25    Q.   Okay.  Okay.  Is there any part of SB 1 as it

138

1  was passed by the legislature that you believe
2  responded to your concern about the vote harvesting
3  being defined as an in person interaction?
4      A.  I don't remember for certain because it's a
5  long bill, but I do know that they did not affect the
6  sections of the code already established for dealing
7  with the concerns I had of people stealing others
8  identities to vote by mail, they did -- they left that
9  alone.
10     Q.  Is there any part of SB 1 as it was passed
11  that you think tracks very closely with communications
12  that you made with legislators?
13     A.  Oh, goodness --
14     Q.  Either something that you initiated or
15  something that was the product of the back and forth
16  where you're providing feedback?
17     A.  Well, I've already told you that I was --
18  after the previous election I was very concerned about
19  the way poll watchers were obstructed.  So some of the
20  poll watcher improvements certainly tracked with my
21  concerns, okay?  I told you that I had -- I had after
22  the 2020 November election, I had gone public with many
23  serious concerns about drive-thru voting and so that
24  was reflected.  So I think, you know, at least poll
25  watcher -- poll watchers were better protected, the

139

1  issue of voting as it was with the aberration in
2  drive-thru was addressed.  And they did not mess with
3  the clear language of mail ballot harvesting that was
4  not involving personal interaction.  So those three
5  things for sure.
6      Q.  Do you recall having conversations with
7  legislators around making it a -- an offense to have a
8  paid person assist a voter in voting by mail?
9      A.  I didn't have any such discussion with
10  legislators.
11     Q.  Do you have an understanding of what need was
12  meant to be addressed by that?
13     A.  I have an understanding from what I've been
14  told, having -- sitting around the committee hearing
15  rooms talking to others, but I did not initiate that.
16     Q.  Okay.  And you don't have a first hand
17  acknowledgment of the reasons for that?
18     A.  I do not, nope.
19     Q.  Do you have any first hand knowledge about
20  the reasons for prohibiting in person interaction with
21  a voter in the presence of the mail ballot with --
22  while advocating for a particular candidate or outcome?
23     A.  No, I was not, I was not privy to those
24  discussions or this original complaints.
25     Q.  And -- and no staff or legislator said, oh

140

1  that's there because so and so really felt?
2      A.  No, no.
3      Q.  Okay.  Okay.  With respect to any or the
4  other provisions of SB 1, do you have any knowledge
5  about what the source or origin was, whether it was
6  a particular colleague in the Republican Party maybe
7  from another County or a particular legislator who was
8  the reason that that provision is there in the Bill?
9      A.  No, I don't.  Not directly, I -- I do know
10  that -- I'm sorry, I don't know, I understand that
11  prior to that session beginning there were a number of
12  election attorneys that were writing legislative
13  language and submitting it.
14     Q.  Uh-huh.
15     A.  But I can't track any one item to any one
16  attorney.
17     Q.  Can you tell me the names of those attorneys?
18     A.  I can't tell you the names of all -- I know
19  Eric Opiela was one of them, and he's the only one I
20  can remember.
21     Q.  Okay.
22     A.  Because he's kind of up front about it.
23         (Laughter).
24     Q.  (BY MS. PERALES) Did you have -- you know, we
25  talked about Senator Bettencourt, he's your local

141

1  senator.  We haven't talked that much about Brian
2  Hughes who was this author/main sponsor.
3          Did you ever have any exchange of
4  communication with either Brian Hughes or his staff
5  from let's say the beginning of the regular session
6  through the end of the second special?
7      A.  No, I did not.  But let me just double check.
8  No, the only communication was in committee with --
9  either it was with the Senator or his staff.
10     Q.  Do you have any interaction with republican
11  candidates running for office and advising them about
12  what's in SB 1?
13     A.  No, I don't get involved with candidates much
14  at all.  I answer questions, but I don't interact with
15  them, I don't take part in their campaigns.
16     Q.  And do you recall, for example in 2022, since
17  SB 1 is a fairly new piece of legislation, do you
18  recall answering any questioning of any candidate or
19  their campaign staffers about the meaning of SB 1?
20     A.  The only questions I remember answering from
21  candidates at that time was about whether the candidate
22  could still appoint a poll watcher, and secondly are
23  there any new requirements of poll watchers in which I
24  have to -- had to reply about the SOS training now
25  being mandatory.  Because of course the candidate can

142

1  appoint poll watchers, but Harris County -- our Party
2  would only appoint poll watchers that I trained, so.
3      Q.  So aside from poll watchers can you think of
4  any other --
5      A.  I can't think of anything else, hang on.  No.
6          However, because of SB 1 I was asked
7  to take a look at the mail ballot application mailers
8  that Harris County Republican Party was going to send
9  out to the republicans over 65 and I had to completely
10 rewrite them.
11     Q.  I was just going to ask about outreach by the
12 Party to potential mail voters?
13     A.  Uh-huh.
14     Q.  So did you work on revising the outreach
15 materials for the Harris County Republican Party --
16     A.  I did.
17     Q.  To the voters over 65?
18     A.  Correct.  I had to redo it completely.
19     Q.  All right.  And so you made those changes to
20 the, what are they like, mailers?
21     A.  Yes, they were -- they were mailers into the
22 layout stage, not quite what was called the mechanical
23 stage, but I had to change those.
24     Q.  Okay.  Around the time of the 2022 primary
25 election?

143

1      A.  Uh-huh.
2      Q.  Were you offering any guidance or advice to
3  deal with any requests from voters coming in about how
4  to apply for their mail ballots?
5      A.  I was giving -- I was the Party staff, the --
6  the paid staff advice on how to answer questions about
7  the new mail ballot requirements.
8      Q.  Do you recall the nature of the questions
9  that you were getting in the 2022 primary period from
10 voters about either applying for ballot by mail or
11 returning that mail ballot related to SB 1 --
12     A.  The questions weren't coming to me, they were
13 coming to staff, but they were calling me to get the
14 information; but it was just the general stuff, now
15 which number do I have to put?  Can I just put my whole
16 driver's license number, et cetera?  Basic fundamental
17 questions.
18     Q.  What would your advice -- what was your
19 advice during the primary period about which number the
20 voters should put?
21     A.  Well, I had the staff tell the voters, put
22 both numbers, okay?  Because the issue was the number
23 the voter put on the ABBM or the carrier envelope had
24 to match a number in the voters registration record.
25 And many of these -- the voters were not old enough to

144

1  vote by mail, they don't remember which -- which number
2  they used when they first registered, put them both.
3      Q.  Were there also voters who hadn't put a
4  number when they registered?
5      A.  It's possible.  I -- I don't know that -- I
6  don't know that, it could be possible.  I don't know
7  that.
8      Q.  If a voter had lived at the same address for
9  example since pre-HAVA, Help America Vote Act?
10     A.  Uh-huh.
11     Q.  It's possible that their registration, which
12 would have occurred pre-200 wasn't accompanied by an ID
13 number at all; isn't that right?
14     A.  It's possible.
15     Q.  And they would be over 65, and just have
16 stayed put the whole time?
17     A.  Uh-huh.
18     Q.  Do you recall hearing from paid staff of the
19 Party that there were voters in that situation that
20 they hadn't provide any number -- had not provided any
21 number at all with their original registration because
22 it had been a long time ago?
23     A.  I had not heard that specifically.
24     Q.  Okay.  But you did hear about voters putting
25 one number and Harris County having a different number,

145

1  and so the -- the Harris County couldn't match it?
2      A.  I heard that from the people on our signature
3  verification committee.
4      Q.  Did you hear that from any of the Party staff
5  that were getting questions from voters?
6      A.  Yes, yes.
7          MS. PERALES:  Can we have a five
8  minute break?
9          THE REPORTER:  Okay.  Going off the
10 record at 2:49 p.m.
11         (Off the record.)
12         THE REPORTER:  Back on the record at
13 3:01 p.m.
14     Q.  (BY MS. PERALES:) Mr. Vera, are there any
15 topics or is there any information that you know about
16 relevant to SB 1 that you discussed with Mr. Gore that
17 you haven't talked about today in the deposition,
18 either because I didn't ask you or for any other
19 reason?
20     A.  I can't think of anything, give me a second.
21 Nope, nope.
22     Q.  Okay.
23         MS. PERALES:  So I'm going to pass the
24 witness, but I'm not going to conclude the deposition
25 or conclude my questioning of the witness.  We're going

146

1  to leave the deposition open at the end in order to
2  allow for us to be able to resolve some of the issues
3  that have come up with respect to invocation of either
4  First Amendment Privilege or Legislative Privilege that
5  are not resolved, so with that caveat I'm going to pass
6  the witness.
7          MR. GORE:  If I can just say on the
8  record, we appreciate where you're coming from.  We
9  obviously object to holding the deposition open.  We
10 think all the privilege assertions have been
11 appropriate.  We understand that you are reserving the
12 right to keep the deposition only -- open only with
13 respect to those privilege issues, is that -- is that
14 correct?
15         MS. PERALES:  Yes.  That's right, and
16 when you say those privilege issues then we can go back
17 and forth all day.  When you say those privilege issues
18 it's specifically the -- the places today where the
19 witness has declined to testify because of either
20 Legislative Privilege or because of First Amendment
21 Privilege.
22         MR. GORE:  Thank you for
23 clarification.  We stand on our objection, but we
24 appreciate the clarification.
25         MS. PERALES:  Okay.  Would you like to

147

1  switch seats?
2          MS. HOLMES:  Sure.
3              EXAMINATION
4  BY MS. HOLMES:
5      Q.  Good afternoon, Mr. Vera, we met earlier, but
6  my name's Jennifer Holmes, I represent the Haul
7  plaintiffs.  And I have just a handful of kind of
8  clarifying questions for you.  It shouldn't take too
9  long.  You testified that you're the chair of the
10 Ballot Security Committee for the Harris County
11 Republican Party, correct?
12     A.  Correct.
13     Q.  And who else is on the Ballot Security
14 Committee?
15     A.  The Ballot Security Committee is made up of
16 members that are appointed by the Senate District
17 Chairs of each Senate District in Harris County.  And
18 based on the bylaws of the Party, senate districts can
19 appoint one or two members to ballot security,
20 depending upon the size of the district.  There are
21 three appointees by the Party Chair and I am one and
22 she's allowed to appointment two others.
23     Q.  And so that was Cindy Siegel who appointed
24 you and two others to the committee?
25     A.  Yes, for this current term, uh-huh.

148

1      Q.  And what are the names of the two other
2  members?
3      A.  Dan Alan, and Steve Carlton -- or Carlin,
4  C-A-R-L-I-N. Steve Carlin.
5      Q.  And what are Mr. Alan and Mr. Carlin's
6  duties -- actually, sorry, let me ask you a question
7  before that.  What are Mr. Alan and Mr. Carlin's
8  titles?
9      A.  They're just members, but they're also
10 precinct chairs.
11     Q.  And what are their duties with the Ballot
12 Security Committee?
13     A.  We recently organized into work group, and
14 Mr. Alan has responsibility for digital poll watching
15 and Mr. Carlin is taking charge of mail ballot
16 observation or BBM observation.
17     Q.  And were Mr. Alan and Mr. Carlin on the
18 Ballot Security Committee during the 2020 election
19 cycle?
20     A.  They were not.
21     Q.  Who was on the committee during that cycle?
22     A.  I don't have all the names memorized, there
23 13 members -- voting members, and about eight or nine
24 nonvoting members, and they change every two years.  So
25 neither one of them were on at the 2020 cycle, other

149

1  people appointed by their Senate district chairs of
2  course in those seat.
3      Q.  And how about the 2022 primary, who was on
4  the committee?
5      A.  Those people were on the committee.
6      Q.  Sorry, these people meaning the 13?
7      A.  Steve -- Steve Carlin and -- and Dan Alan
8  were on the committee along the 11 others.  I don't
9  have all the names memorized.
10     Q.  Did Mr. Alan, Mr. Carlin, or any of the other
11 current or former members of the Ballot Security
12 Committee join you in your conversations or emails to
13 legislators about the legislative bills that eventually
14 became SB 1?
15     A.  I'm not aware that they did, and they are
16 done independently.  They're allowed to do so as long
17 as they're following the guidelines of the Executive
18 Committee resolution, okay?  So they could
19 independently communicate.
20         Former members of the committee have
21 traveled with me to Austin to testify on the days that
22 I go to testify.
23     Q.  And can you tell me the names of the member
24 of the committee who testified during the 2021
25 legislative session on -- on SB 1 or any of the

150

1  predecessors --
2      A.  Yes.  Ken Moore M-O-O-R-E was the most
3  frequent person to accompany to me to testify.
4      Q.  Anyone else?
5      A.  Nope, it's a lonely road.
6      Q.  Did Mr. Moore submit written testimony?
7      A.  I don't believe he did, I believe I was only
8  verbal testimony.
9      Q.  Do you know if he used written notes when he
10 testified?
11     A.  Handwritten about half hour before he
12 testified.
13     Q.  I'd like to ask you about the training you
14 provide to poll watchers?
15     A.  Uh-huh.
16     Q.  We -- you testified earlier about the
17 training materials and that include -- included a
18 PowerPoint and a guidebook, correct?
19     A.  Uh-huh.
20     Q.  When you give the guidebook to the poll
21 watchers do you instruct them to keep it confidential?
22     A.  I tell them to keep it with them at all times
23 and that they should hang onto it for 22 months after
24 the election.
25     Q.  Do you tell them to not share it with anyone

151

1  else?
2      A.  I don't know if I tell them not to share, I
3  just tell them to keep it in their possession.
4      Q.  Do poll watchers sign anything saying they
5  will keep the guidebook confidential?
6      A.  They do not.
7      Q.  Concerning the poll watcher PowerPoint
8  training that you create?
9      A.  Uh-huh.
10     Q.  Does anyone review that PowerPoint to offer
11 suggestions or edits?
12     A.  The general council for the Party reviews it.
13     Q.  And is that the general council for Harris
14 County Republican Party?
15     A.  Harris County Republican Party.
16     Q.  And what is that persons name?
17     A.  Ed Hubbard.
18     Q.  Does anyone else review the PowerPoint
19 training?
20     A.  The power -- the County Chair does.
21     Q.  Anyone else?
22     A.  Nope.
23     Q.  And when the County Chair has reviewed your
24 PowerPoint training, has she made any edits,
25 corrections, or suggestions.

152

1      A.  Not this year.
2      Q.  And are you referring to the 2022 training?
3      A.  Uh-huh.
4      Q.  How about for the 2020 training?
5      A.  We didn't have a party chair to speak of in
6  2020, so it was cursory review.  The party chair at the
7  time was Keith Nielsen and he did not review the
8  presentation.
9      Q.  Can you explain what you mean that you did
10 not have a Party Chair, but the Party Chair was Keith
11 Nielsen?
12     A.  We did, there was -- that was the COVID year
13 and it was kind of a mess.  The state convention was
14 delayed months, okay?  And so everything was behind
15 schedule, the organizing of the Party, so the chair --
16 the County Party Chair who should have stepped down in
17 May of 2020 was still in office in August of 2020, they
18 hadn't elected a new chair yet.  And when the new chair
19 came in, I know the bills hadn't been paid for a while,
20 and we just had a lot of catching up to do.  COVID had
21 a significant impact on that.
22     Q.  It was a chaotic time.
23     A.  It was.  It was.
24     Q.  Okay.  How about the guidebook poll watchers,
25 does anyone review that to offer suggestions or edits?

153

1      A.  Same two people, the Party Chair and the
2  general council.
3      Q.  And have you received corrections, edits, or
4  comments?
5      A.  No.
6      Q.  Is that true for both the 2022 guidebook?
7      A.  And the?
8      Q.  And the 2020 guidebook?
9      A.  That's correct.
10     Q.  Do you have Exhibit 3 before you or can you
11 pull it out of that stack, please?  Do I have it?  And
12 do you recall that Exhibit 3 is an email that you sent
13 to Keith Ingram and Christina Adkins --
14     A.  Correct.
15     Q.  On September 2, 2021?
16     A.  Correct.
17     Q.  And it attached the 2020 poll watcher
18 PowerPoint training?
19     A.  Correct.
20     Q.  Okay.  In the email at the bottom you write
21 in the second paragraph, you're talking about the --
22 the PowerPoint deck.  You said there's -- I think it
23 should say there's a version, but it says "there's
24 aversion with the audio available, but it's hosted on
25 the TrueTheVote website and requires checking in and

154

1 creating an account, free;" did I read that correctly?
2    A.   Correct.
3    Q.   Was the 2020 poll watcher PowerPoint training
4 accessible on the TrueTheVote website?
5    A.   The 2021 was.
6    Q.   The 2021 --
7    A.   Uh-huh.
8    Q.   Okay.  Oh, sorry.  I misheard you, the 2020
9 version was?
10    A.   Was.
11    Q.   Okay.  And how would someone -- first, can
12 you explain, what is true to vote?
13    A.   True the vote is a nonprofit nonpartisan
14 organization started in 2010 to promote election
15 integrity nationally.
16    Q.   Is it part of the Harris County Republican
17 Party?
18    A.   It is not.
19    Q.   And during what time period was the poll
20 watcher training available on the true to vote website?
21    A.   From approximately the first of August until
22 the end of October.
23    Q.   Of 2020?
24    A.   Of 2020, yeah.
25    Q.   And if anyone wanted to go to the true to

155

1 vote website and see the -- the PowerPoint, what would
2 they have to do?
3    A.   They'd have to sign in, create an account,
4 okay?  And be passed by the truth, the vote gate keeper
5 who was kind of helping me get the training out there.
6    Q.   Were there any restrictions on who could sign
7 in and create an account?
8    A.   They would have to -- yes, but it was --
9 remember this was COVID, also, so I couldn't have in
10 person training because groups of 50 or more were
11 forbidden.  And so they would submit their names,
12 TrueTheVote would send names to me, I would vet their
13 voting history, and give a thumbs up or thumbs down as
14 far as access to the back to the class.
15    Q.   And what did you base the thumbs up or thumbs
16 down on?
17    A.   On, primary voting history.
18    Q.   What about the primary voting history?
19    A.   Republican voting primary voting in at least
20 three primary elections.
21    Q.   Any other requirements for someone to access
22 the training?
23    A.   They had -- no, they had to be a registered
24 voter three and have three successive republican
25 primary votes, elections.

156

1    Q.   Would that have to be in Harris County or
2 anywhere within Texas?
3    A.   No, it was all within Harris County.
4    Q.   Is the 2022 poll watcher training available
5 anywhere online?
6    A.   No, it's not available online.  You have --
7 now that we're out of COVID you have to take the course
8 in person.  We do have a video because we had poll
9 watchers who took the class in May and now it's October
10 and they'd like a refresher.  The party had a private
11 YouTube channel, password protected, that the poll
12 watchers who had already completed the in person class
13 could request to see again, and that access was managed
14 by the paid party staff.
15    Q.   Okay.  And in terms of the 2020 poll watcher
16 training?
17    A.   Uh-huh.
18    Q.   The PowerPoint, did you ever share it outside
19 of the Harris County Republican Party other than
20 sending it to Keith Ingram, and Christina Adkins, and
21 putting it on the TrueTheVote website?
22    A.   That was it.
23    Q.   So you've testified about your duties to
24 recruit and train poll watchers?
25    A.   Uh-huh.

157

1    Q.   Is it also part of your responsibilities to
2 assign poll watchers to particular polling locations?
3    A.   I don't make the assignments, the Party in
4 the 2022 general election, the executive director of
5 the Party made the assignments.
6    Q.   How about in the 2022 primary?
7    A.   Those were all made by the executive director
8 of the Party.
9    Q.   And who is the executive director?
10    A.   Well, he was Casey Voeks, V-O-E-K-S he
11 certainly resigned.
12    Q.   And how about the 2020 election cycle, who
13 made the decision to assign poll watchers to various
14 polling locations?
15    A.   In 2020 I made those decisions because there
16 was no party staff.
17    Q.   And in 2020 when you were deciding the
18 assignments, did you place a poll watcher in every
19 polling location in the county?
20    A.   All right.  The poll watchers first of all, I
21 never place a poll watcher alone there's always two.
22 Next is, I make sure we have poll watchers at the
23 critical ballot handling areas of early voting ballot
24 board, signature verification committee, and central
25 count.  Then the rest of the polling locations for poll

158

1  watchers are selected based on history of data
2  discrepancies with the election judges.  The judges
3  that need the most help get the poll watchers.
4       Q.  And what kind of data discrepancies would you
5  consider --
6       A.  Data discrepancies number one would be more
7  ballots than votes.  Precincts or polling places that
8  had more ballots turned in than voters who signed in.
9  Discrepancy number 2 would be provisional ballot
10  affidavits without ballots.  And those are the two
11  major issues that we measure by.
12       Q.  Did you -- in considering these -- these two
13  categories of data discrepancies?
14       A.  Uh-huh.
15       Q.  Did you review any information or data to
16  figure out where these discrepancies were happening?
17       A.  We get -- we download the -- that data after
18  every election.  And so we know at what polling
19  location the discrepancy happened and we know who the
20  election judge was at that polling location.  And so
21  the next election we look to see where's that judge
22  been appointed and they get the poll watcher help.
23       Q.  So the decision is made more based on where a
24  particular judge posted rather than the polling place
25  location that had the -- the data discrepancies?

159

1       A.  That's generally to -- true.  It's the
2  association of data discrepancies with an election
3  judge, and the poll watchers are sent to support that
4  election judge and to help them out.
5       Q.  So during the 2020 general election, what
6  were your, I guess, priority polling locations based on
7  your review of data discrepancies?
8       A.  I don't remember the exact locations because
9  the judges move, but I had 80 polling locations on
10  election day that receive poll watchers.  I had
11  probably 10 during early voting that receive poll
12  watchers.
13       Q.  Earlier today you mentioned Moody Gardens was
14  that --
15       A.  Yeah, I met --
16       Q.  -- okay.  Let me finish my question though.
17  Earlier today you mentioned -- now you've corrected you
18  -- you were talking about Moody Park, was that a -- a
19  location, a polling location where you prioritize
20  sending poll watchers during the 2020 election?
21       A.  Moody Park was not a priority for the 2020
22  election for poll watchers.
23       Q.  Had it -- was it a priority for the 2022
24  primary election?
25       A.  It was not.

160

1       Q.  Okay.  Can you recall any of the polling
2  place that were priorities during the 2020 general
3  election for sending poll watchers?
4       A.  The 2020 general election?
5       Of the West Gray Multi Service Center, I think
6  Hiram Clark, and I'm not -- I'm not remembering we've
7  changed polling places so many times now, I don't
8  remember.
9       Q.  How about during the 2022 primary election,
10  do you recall any polling locations that were
11  priorities in your opinion to send poll watchers?
12       A.  During the 2022 primary election republican
13  poll watchers could only watch in republican polls.  So
14  that was a practice section for the poll watcher
15  candidates for the fall.  And they were simply sent
16  based on convenience to them to get experience with the
17  election process.
18       Q.  When you're deciding where to assign poll
19  watchers, do you consider anything about partisan
20  affiliation of voters in that certain area?
21       A.  No, because Harris County has county wide
22  polling.  So any voter of any party can vote anywhere,
23  our main concern is the judges and their track record.
24       Q.  Do you consider anything about population
25  density in a certain area?  This area, more people live

161

1  here, more people are voting here, we should send a
2  poll watcher here, is that part of the consideration?
3       A.  It is not part of our consideration.  That
4  should be part of the consideration for the county's
5  placement of polls based on voter density, but that's
6  not part of our consideration.
7       Q.  If you give me one minute I may be done here?
8       A.  Yes, ma'am.
9       Q.  Okay.
10       MS. HOLMES:  I am likewise going to
11  pass the witness, but I will reiterate what Ms. Perales
12  said on the record about holding the deposition open
13  for resolution of disputes over the invocation of
14  legislative purpose and First Amendment Privilege.
15       MR. GORE:  Subject to that statement
16  I'll just reiterate our prior objection.
17       MR. BIRRING:  We don't have any
18  questions today.  We will reserve the questions for
19  trial if you're a witness there.
20       MS. PERALES:  Shall we ask the people
21  on the Zoom call?
22       (Getting situated for Zoom
23  examination.)
24       MR. TAYLOR:  Look a poll watcher.
25       (Laughter.)

162

1    MS. PERALES: Does anybody have any
2 questions? Zoom people, speak now or forever hold your
3 piece or at least until -- unless we reopen? Anything
4 folk? No. Okay. I don't hear anything from Zoom.
5    MR. GORE: MR. GORE: Okay. I have a
6 few questions for you Mr. Vera, thank you for your
7 patience today.
8    THE WITNESS: Yes, sir.
9    CROSS-EXAMINATION
10 BY MR. GORE:
11   Q. I want to pick up on where Ms. Holmes ended
12 and -- and where you deploy poll watchers. Do you
13 consider anything about voter demographics in where you
14 would send poll watchers or assign as priority
15 locations for poll watchers?
16   A. We do not.
17   Q. Mr. Vera, do you have to Exhibit 5 handy?
18   A. I have it.
19   Q. And Mr. Vera, you see that this is an email
20 chain that includes emails between you and
21 representative Jetton, and then a forward from you to
22 members of the Harris County Republican Party; is that
23 right?
24   A. Correct.
25   Q. So I want to focus on this top email here

163

1 where there's box that says "redacted for First
2 Amendment Privilege," and that's an email you sent
3 internally to the Harris County Republican Party; is
4 that right?
5    A. Correct.
6    Q. So is it fair to say that you sometimes send
7 internal emails regarding your legislative advocacy --
8 activities?
9    A. Correct.
10   Q. Do you also send emails regarding -- internal
11 email regarding poll watcher activities?
12   A. Correct.
13   Q. Do you also send internal emails regarding
14 election integrity issues?
15   A. Correct.
16   Q. When you send those emails, do you expect
17 them to remain confidential within the Harris County
18 Republican Party?
19   A. I do.
20   Q. Does that expectation of confidentiality
21 allow you to be full and frank in those internal
22 communications when you have them?
23   A. It does.
24   Q. If -- if you believe that those
25 communications might become public, would you be less

164

1 likely to engage them?
2    A. I'd be less likely.
3    Q. Would you be less likely to be full and frank
4 in those conversations if you believed they might
5 become public?
6    A. I'd be less likely.
7    MS. PERALES: I just want to object to
8 the leading nature of the questions?
9    MR. GORE: Well, I -- I'm not sure how
10 they're leading, I think they're yes or no questions,
11 aren't they?
12   MS. PERALES: Yes, but they're also
13 leading. I don't mean to stop your roll, so if you
14 have more.
15   MR. GORE: Okay. Thank you.
16   Q. (BY MR. GORE) Okay. I just have one more
17 question. So Mr. Vera, if you believe that these
18 communications might become public, would that chill
19 your expression in these emails?
20   A. It would.
21   Q. And if these emails became public in this
22 litigation or otherwise turned over to plaintiffs,
23 would you be less likely to engage in that full and
24 frank communication in the future?
25   A. In that format, yes.

165

1    Q. And if you were subject to questioning about
2 internal conversations you had about the Harris County
3 Republican Party, would that also make you less likely
4 to engage in those kinds of conversations in the
5 future?
6    A. It would.
7    Q. Would that be true for communications that
8 are not reduced to email or writing?
9    A. Yes.
10   Q. Thank you, Mr. Vera.
11   MR. GORE: I have no further
12 questions.
13   MS. PERALES: Before we go off the
14 record I have just one more thing, which is to ask
15 counsel for Mr. Vera or for the defendant interveners
16 if you plan to conduct a search for responsive
17 documents of Mr. Vera's email and his computer, because
18 I believe he's testified that he does have relevant and
19 responsive documents, but hasn't searched and hasn't
20 given over his computer to be searched. And I'd just
21 like to know if you're -- if you -- if counsel would
22 agree to do that prior to the deadline, or how we
23 should proceed?
24   MR. GORE: Well, I -- I can speak only
25 for the intervener defendants and Harris Country

166

1 Republican party, and I'll Mr. Taylor speak for
2 Mr. Vera. I think we've been really up front
3 throughout our in discovery correspondence that we only
4 have custody and control over Harris County Republican
5 Party email addresses and documents, those were the
6 email addresses and documents we searched to respond to
7 the discovery requests that were propounded on the
8 Harris County Republican Party, and we have made
9 productions and created a privilege log off of that
10 production and that collection.
11         We didn't receive any objection to
12 that scope of collection or production. So that's --
13 that's how we've proceeded in the case, and we think
14 that that's a fulsome and -- and complete collection
15 and production consistent with the Harris County
16 Republican Party's obligations under the rules.
17         MS. PERALES: I believe that Mr. Vera
18 was designated as a custodian though for records for
19 Harris County in this case, and so after having
20 designated him as a custodian, it -- it would be
21 plaintiff's position that it is incumbent then on GOP
22 Defendant Interveners to search what he has, and it
23 appears that it hasn't extended to what he has.
24         It's not even clear Mr. Vera has a
25 Harris County GOP email address since his -- most of

167

1 his emails were coming from his business address that
2 -- that we have today. So if we have to kind of leave
3 the dispute where it is, then we'll -- we'll follow up
4 more on that, but I just wanted to know if -- if there
5 was anything more to our positions to -- to present
6 today.
7         MR. GORE: I'll just put one more
8 thing on the record, we certainly did identify Mr. Vera
9 as a document custodian. In the same correspondence we
10 said we would look -- search official files of the
11 Committee and the Official committee email addresses.
12 We do have within the files at least some documents
13 related to the Ballot Security Committee and others, so
14 we did search through those, but we've never
15 represented that we would search through Mr. Vera's
16 personal email, and that's outside of the custody and
17 control of the committee. I just put that on there to
18 complete the record and I think probably wanted to
19 engage on this separately unless Mr. Taylor has
20 something he'd like to add.
21         MR. TAYLOR: I mean, like I've said
22 before I -- I don't represent a party, I just represent
23 a non-party witness. Correct me if I'm wrong, but I
24 was not aware and don't believe currently that there's
25 any subpoena that's been issued on Mr. Vera in his

168

1 individual capacity to produce any documents. So I
2 have not searched documents that Mr. Vera might have
3 access to individually.
4         Obviously, if there's a subpoena and
5 it's appropriate and, you know, we'll -- we'll comply
6 with our obligations, but you're catching me flat
7 footed because this is the -- the first I've heard
8 about it.
9         MS. PERALES: Okay. Thank you. All
10 right. We're going to hold the deposition open, but I
11 believe the questioning for today and the conversation
12 for today has concluded.
13         THE REPORTER: I just need to get on
14 the record, if there's any further stipulations you
15 want to put on the record, which I believe we passed
16 that, maybe, and if there's any copies anybody would
17 like to order?
18         MS. PERALES: I need to order, and
19 I'll talk with you off the record about the need for
20 expedite and transcript.
21         THE REPORTER: Okay.
22         MS. HOLMES: I'd also like a rough.
23         THE REPORTER: Okay. With that we're
24 going off the record at 3:37 p.m.
25         (Proceedings concluded.)

169

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TEXAS
2          SAN ANTONIO DIVISION
3 LA UNION DEL PUEBLO ENTERO,  )
  et al.,                       )
4                               )
    Plaintiffs,        )  Civil Action
5                      )  No. SA-21-CV-00844-XR
  vs.                  )
6                      )
  GREGORY W. ABBOTT, et al.,   )
7                               )
    Defendants.        )
8                      )
9        REPORTER'S CERTIFICATE
      DEPOSITION OF ALAN VERA
10       FEBRUARY 27, 2023
11   I, Nilda Codina, Notary in and for the State
12 of Texas, hereby certify to the following:
13   That the witness, ALAN VERA, was duly sworn
14 by the officer and that the transcript of the oral
15 deposition is a true record of the testimony given by
16 the witness;
17   I further certify that pursuant to FRCP Rule
18 30(f)(1) that the signature of the deponent:
19 _____ was requested by the deponent or a
20 party before the completion of the deposition and
21 returned within 30 days from date of receipt of the
22 transcript. If returned, the attached Changes and
23 Signature Page contains any changes and the reasons
24 therefor;
25 __X___ was not requested by the deponent or a

170

1  party before the completion of the deposition.

2         I further certify that I am neither attorney

3  nor counsel for, related to, nor employed by any of the

4  parties to the action in which this testimony was

5  taken.

6         Further, I am not a relative or employee of

7  any attorney of record in this cause, nor do I have a

8  financial interest in the action.

9         Subscribed and sworn to on this the 8th day

10  of March, 2023.

11         _____

            NILDA CODINA

12         Notary Public in and

            For the State of Texas

13         My Commission No. 12878135-3

            Expires:  10/24/2023

14

            INTEGRITY LEGAL SUPPORT

15         Firm Registration No. 528

            9901 Brodie Lane

16         Suite 160-400

            Austin, TX 78748

17         Phone:(512)320-8690

18

19

20

21

22

23

24

25