**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| La Unión Del Pueblo Entero, *et al.*, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | No. 5:21-cv-00844-XR |
| | § | |
| Gregory W. Abbott, *et. al.*, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

STATEMENT OF UNCONTESTED FACTS .............................................................................3

STANDARD OF REVIEW ..................................................................................................6

ARGUMENT ...................................................................................................................6

I.  SB 1 DOES NOT VIOLATE THE FEDERAL MATERIALITY
    PROVISION (United States Count 2, OCA Count 1) ........................................................6

    A.   SB 1 Does Not Even Implicate The Materiality Provision ...........................................7

    B.   There Is No Tenable Basis To Conclude That SB 1 Violates
         The Federal Materiality Provision .......................................................................13

II. SB 1 IS NOT UNCONSTITUTIONALLY VAGUE
    (LUPE Counts 7 and 8, HAUL Count 6, OCA Count 8)...................................................16

    A.   Plaintiffs' Pre-Enforcement Facial Challenges Are Premature ...................................16

    B.   The Challenged Provisions Are Not Unconstitutionally Vague ...................................17

III. SB1 DOES NOT VIOLATE FREE SPEECH RIGHTS
     (LUPE Counts 7 and 9, OCA Count 7, LULAC Count 3) ...............................................22

    A.   Plaintiffs' First Amendment Challenges Are Unfounded
         Facial Challenges .........................................................................................22

    B.   Plaintiffs' First Amendment Claims Are Meritless ..................................................23

IV. SB1 DOES NOT VIOLATE SECTION 208 OF THE VRA
    (LUPE Count 5, HAUL Count 5, OCA Count 4, LULAC Count 4)...................................27

CONCLUSION ...............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) (per curiam) ....................................................................15

*Alexander v. Sandoval,*
    532 U.S. 275 (2001).............................................................................................28

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983).................................................................................1, 8, 23

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023).............................................................................11, 12, 13

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021).......................................................................1, 3, 8, 24

*Broyles v. Texas,*
    618 F. Supp. 2d 661 (S.D. Tex. 2009) ..................................................................7

*Burdick v. Takushi,*
    504 U.S. 428 (1992).............................................................................................23

*Burson v. Freeman,*
    504 U.S. 191 (1992)..................................................................................... *passim*

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...............................................................................................6

*Circuit City Stores v. Adams,*
    532 U.S. 105 (2001).............................................................................................13

*City of Boerne v. Flores,*
    521 U.S. 507 (1997).............................................................................................16

*Clark v. Martinez,*
    543 U.S. 371 (2005).............................................................................................16

*Clingman v. Beaver,*
    544 U.S. 581 (2005).............................................................................................15

*Democracy N.C. v. N.C. State Bd. of Elections,*
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ...............................................................29

*Fla. State Conf. of NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ..............................................................8, 11, 12

*Freeman v. Quicken Loans, Inc.,*
    566 U.S. 624 (2012).............................................................................................13

*Friedman v. Snipes,*
    345 F. Supp. 2d 1356 (S.D. Fla. 2004) ...............................................................13

*FTC v. Bunte Bros., Inc.,*
    312 U.S. 349 (1941).............................................................................................15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ..........................................................................................................7

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ........................................................................................................15

*Harrison v. PPG Indus., Inc.*,
  446 U.S. 578 (1980) ........................................................................................................13

*Ind. Democratic Party v. Rokita*,
  458 F. Supp. 2d 775 (S.D. Ind. 2006) ..............................................................................7

*Jarecki v. G. D. Searle & Co.*,
  367 U.S. 303 (1961) ........................................................................................................12

*Johnson v. United States*,
  576 U.S. 591 (2015) ........................................................................................................20

*Knox v. Brnovich*,
  907 F.3d 1167 (9th Cir. 2018) ..................................................................................22, 26

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) .........................................................................................19

*McDonald v. Bd. of Election Comm'rs of Chi.*,
  394 U.S. 802 (1969) ..........................................................................................................9

*Meyer v. Grant*,
  486 U.S. 414 (1988) ........................................................................................................25

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) ....................................................................................................25

*Ne. Ohio Coal. for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016) ............................................................................................7

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ........................................................................................................15

*Priorities USA v. Nessel*,
  487 F. Supp. 3d 599 (E.D. Mich. 2020) ....................................................................28, 30

*Ray v. Texas*,
  No. 2-06-CV-385, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) ....................................29

*Ritter v. Migliori*,
  142 S. Ct. 1824 (2022) ............................................................................................. passim

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) .....................................................................................17, 18

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973) ........................................................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ................................................................................................25

*Schirmer v. Edwards*,
    2 F.3d 117 (5th Cir. 1993) ...................................................................................17

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) .................................................................. *passim*

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) .........................................................................................17

*Storer v. Brown*,
    415 U.S. 724 (1974) ...............................................................................................1

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) .................................................................................9

*Tex. League of United Latin Am. Citizens v. Hughs*,
    978 F.3d 136 (5th Cir. 2020) ............................................................................3, 4

*Texas v. Johnson*,
    491 U.S. 397 (1989) .............................................................................................26

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ..................................................................................1, 8, 23

*United States v. Mississippi*,
    380 U.S. 128 (1965) ...............................................................................................7

*United States v. Petrillo*,
    332 U.S. 1 (1947) .................................................................................................17

*United States v. Robinson*,
    367 F.3d 278 (5th Cir. 2004) ...............................................................................17

*United States v. Stevens*,
    559 U.S. 460 (2010) ......................................................................................22, 23

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ...............................................................................24

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) .......................................................................17, 18, 19, 21

*Vote.Org v. Callanen*,
    39 F.4th 297 (5th Cir. 2022) ........................................................................ *passim*

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ...........................................................22, 23, 25, 26

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) .............................................................................................22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ........................................................................15

*Yates v. United States*,
    574 U.S. 528 (2015) ........................................................................12

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. amend. XV ........................................................................7

42 U.S.C. § 3030s ........................................................................18

52 U.S.C. § 10101 ........................................................................ *passim*

52 U.S.C. § 10508 ........................................................................3

52 U.S.C. § 20104 ........................................................................28

52 U.S.C. § 20105 ........................................................................28

Ariz. Rev. Stat. § 16-611 ........................................................................14

Del. Code tit. 15, § 4972 ........................................................................14

Del. Code tit. 15, § 5514 ........................................................................14

Fla. Stat. § 101.64 ........................................................................15

Fla. Stat. § 101.5614 ........................................................................15

10 Ill. Comp. Stat. 5/17-16 ........................................................................15

Minn. Stat. § 204C.15 ........................................................................30

N.C. Gen. Stat. § 163-182.1 ........................................................................15

N.J. Stat. § 19:62-11 ........................................................................14

Ohio Rev. Code § 3505.28 ........................................................................15

25 Pa. Cons. Stat. § 3050 ........................................................................15

25 Pa. Cons. Stat. § 3058 ........................................................................15

25 Pa. Cons. Stat. § 3146.6 ........................................................................15

25 Pa. Cons. Stat. § 3150.16 ........................................................................15

Tex. Elec. Code § 11.002 ........................................................................11

Tex. Elec. Code § 13.001 ........................................................................9, 10

Tex. Elec. Code § 13.002 ........................................................................9, 10, 12

Tex. Elec. Code § 18.001 ........................................................................9, 10

Tex. Elec. Code § 32.075 ........................................................................20

Tex. Elec. Code § 33.051 ........................................................................19

Tex. Elec. Code § 33.056 ........................................................................21

# TABLE OF AUTHORITIES
(continued)

| | Page(s) |
|---|---|
| Tex. Elec. Code § 33.057 | 20, 21 |
| Tex. Elec. Code § 33.058 | 21 |
| Tex. Elec. Code § 33.061 | 20 |
| Tex. Elec. Code § 63.003 | 15 |
| Tex. Elec. Code § 65.011 | 14 |
| Tex. Elec. Code § 82.001 | 3, 13 |
| Tex. Elec. Code § 82.002 | 3, 13 |
| Tex. Elec. Code § 82.003 | 3, 13 |
| Tex. Elec. Code § 82.004 | 3, 13 |
| Tex. Elec. Code § 82.007 | 13 |
| Tex. Elec. Code § 82.008 | 13 |
| Tex. Elec. Code § 84.032 | 9 |
| Tex. Elec. Code § 86.005 | 14 |
| Tex. Elec. Code § 86.008 | 9 |
| Tex. Penal Code § 6.02 | 18 |
| Tex. Penal Code § 6.03 | 18 |
| Va. Code § 24.2-611 | 15 |
| Va. Code § 24.2-649 | 26 |

**OTHER AUTHORITIES**

| | |
|---|---|
| Fed. R. Civ. P. 56 | 2, 6 |
| *Governor Abbott Prioritizes Election Integrity this Legislative Session*, WBAP (Mar. 15, 2021) | 4 |
| H.R. Rep. No. 88-914, pt. 2 (1963) | 8, 11 |
| *Online Poll Worker Training Program*, Texas Secretary of State | 21 |
| Proclamation, No. 41-3752, 45 Tex. Reg. 5455 (Aug. 7, 2020) | 3, 4 |
| Proclamation, No. 41-3772, 45 Tex. Reg. 7079 (Oct. 9, 2020) | 4 |
| Report on the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections (2005) | 24 |
| S. Rep. No. 97-417 (1982) | 29 |
| Texas Senate Bill 1 | *passim* |

## INTRODUCTION

Intervenor-Defendants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee support and seek to uphold free and fair elections for all voters, including the voters of Texas. Accordingly, Intervenor-Defendants ask the Court to uphold the Texas Legislature's duly enacted law governing the State's elections, Senate Bill 1 ("SB 1"), and to grant summary judgment against Plaintiffs on various of their claims.[1]

"States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). In other words, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). And because voter "[f]raud is a real risk," states may act prophylactically to prevent it "without waiting for it to occur and be detected within its own borders." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2347–48 (2021).

The Texas Legislature acted on this mandate in SB 1, which it enacted "to prevent fraud in the electoral process," promote "voter access," "increas[e] the stability of [] constitutional democracy," and make "the conduct of elections . . . uniform and consistent throughout this state." SB 1 §§ 1.03, 1.04. SB 1 put in place a series of commonsense and constitutional reforms to the Texas Election Code that promote security in mail voting, standardize early in-person voting

---

[1] On May 16, 2023, the Court bifurcated the trial and ordered that the present round of summary judgment motions be limited to Plaintiffs' "effects" claims. *See* Dkt. No. 596. As of the time of this filing, the parties had not reached agreement regarding which of Plaintiffs' claims are "effects" claims. Intervenor-Defendants file this motion to preserve their defenses should the Court determine that any of the claims it addresses are "effects" claims.

statewide, ban vote harvesting, clarify the responsibilities of poll watchers, and ensure that voters receive appropriate assistance in completing and casting their ballots.

But, almost as soon as SB 1 was signed into law, the United States and groups of private plaintiffs—led by La Unión Del Pueblo Entero (LUPE), the Texas chapter of the League of United Latin American Citizens (LULAC), OCA Greater Houston (OCA), and the Houston Area Urban League (HAUL)—rushed to court to challenge it. Although none of Plaintiffs' challenges to SB 1 has merit, four sets of claims fail "as a matter of law," Fed. R. Civ. P. 56(a), and the Court therefore should grant summary judgment against Plaintiffs on those claims.

*First*, the United States' and OCA Plaintiffs' materiality challenge to SB 1's identification-number requirements for absentee applications and mail ballots is fundamentally flawed. SB 1's identification-number requirements do not even *implicate*, let alone *violate*, the federal materiality provision because they do not "deny the right of any individual to vote" or affect a determination whether any "individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). The United States' and OCA Plaintiffs' claims contravene the materiality provision's plain text and rest on a misinterpretation that would invalidate numerous longstanding state election rules. The Court should decline the invitation to subject every paper-based state-law voting rule to the superintendence of this rarely-invoked 58-year-old federal statute.

*Second*, the LUPE, HAUL, and OCA Plaintiffs' vagueness challenges to SB 1's vote-harvesting and poll-worker provisions are both premature and doomed on the merits. Such pre-enforcement facial challenges are generally prohibited, and the provisions easily pass constitutional scrutiny in any event.

*Third*, the LUPE, OCA, and LULAC Plaintiffs' claims that SB 1's voter-assistance and vote-harvesting provisions violate the free speech rights of paid partisans seeking to deliver votes

for their benefactors are both premature and meritless.  Providing voter assistance is not protected speech under the First Amendment, and SB 1 imposed only modest regulations to protect the State's most vulnerable voters from "undue influence."  *Brnovich*, 141 S. Ct. at 2340.  Moreover, there is no First Amendment right to engage in the kind of paid electioneering in the presence of a ballot that SB 1 prohibits.  Indeed, Texas's vote-harvesting ban is functionally no different from bans on electioneering in polling places upheld by the Supreme Court.  *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199, 210 (1992).

*Finally*, the LUPE, HAUL, OCA, and LULAC Plaintiffs—but tellingly *not* the United States—argue that SB 1's modest voter-assistance regulations violate Section 208 of the Voting Rights Act (VRA).  The VRA guarantees certain voters assistance from *"a* person of [their] choice," not—as Plaintiffs maintain—from *any* person in existence. 52 U.S.C. § 10508 (emphasis added).  The VRA thus preserved states' authority to adopt reasonable voter-assistance regulations to protect their most vulnerable citizens, just as the Legislature did in SB 1.  The Court should grant summary judgment.

## STATEMENT OF UNCONTESTED FACTS

Texas provides voters a panoply of options to complete and cast their ballots.  All voters may vote in person on Election Day or during an extensive early-voting period.  *See Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) (*LULAC*). Texas also permits several groups of voters—the elderly, disabled, incarcerated, and those out-of-state during the voting period—to vote by mail.  *See* Tex. Elec. Code §§ 82.001–.004.

SB 1 arose from lessons learned in the 2020 election, which took place amid the unprecedented public-health crisis caused by the COVID-19 pandemic.  *See, e.g.*, Proclamation, No. 41-3752, 45 Tex. Reg. 5455, 5456–57 (Aug. 7, 2020).  Texas orchestrated a statewide response

to ensure that all Texans would have the opportunity to vote safely in 2020.  For example, Governor Abbott extended the early-voting period ahead of the November general election and allowed counties to accept hand-delivered mail ballots before Election Day.  *See id.* at 5457.

But a few counties went further and implemented rules not authorized by state law.  Harris County sent mail ballot applications to all registered voters over the age of 65, set up "drive-thru" voting locations, kept some early-voting locations open overnight, and established 12 ballot "drop box" sites.  *See* Longoria Dep. at 76–77  (Ex. A).  Other counties moved to set up multiple drop-box locations, even as most counties had only one.  *See LULAC*, 978 F.3d at 141.  These actions created inconsistent rules between counties and hindered poll watchers from observing the drop-offs.  *See id.*  In response, Governor Abbott clarified that counties could establish only one drop-off site for mail ballots.  *See* Proclamation, No. 41-3772, 45 Tex. Reg. 7079, 7080–81 (Oct. 9, 2020).  The Fifth Circuit upheld the Governor's actions.  *See LULAC*, 978 F.3d 136.

In 2021, Governor Abbott "made election integrity an emergency item" for the legislative session because "[i]n the 2020 election, [people] witnessed actions throughout [the] state that could risk the integrity of our elections and enable voter fraud."  *Governor Abbott Prioritizes Election Integrity this Legislative Session*, WBAP (Mar. 15, 2021).  After months of consideration, compromises between competing draft bills, multiple public hearings, and two special sessions, the Legislature passed SB 1, and Governor Abbott signed it into law on September 7, 2021.

As relevant to this motion, SB 1 made several modest changes to Texas's election rules.  *First*, Section 5.02 requires voters applying for a mail ballot to include:

> "(A) the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety;
>
> (B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or

(C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B)."

Section 5.08 requires individuals casting mail ballots to provide the same information on the ballot "carrier envelope."  If a voter fails to submit an identification number or provides a non-matching number on an application or mail ballot, election officials must provide the voter notice and an opportunity to cure (sections 5.07, 5.10, 5.12 and 5.14).  Voters unable to cure their applications may vote in person (sections 5.05 and 5.06).  A voter may cure a deficient mail ballot during the six days after Election Day.  SB 1 § 5.12.

*Second*, the Legislature prohibited vote harvesting in section 7.04.  An individual may not, in exchange for "compensation," engage in an "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure."  *Id.* § 7.04.

*Third*, the Legislature clarified the rights and duties of poll watchers.  Election officials may not remove poll watchers from polling places unless they witnessed a legal violation, "knowingly refuse[] to accept" properly credentialed poll watchers, or "knowingly prevent[]" poll watchers from observing activities the law "entitle[s]" them to observe (sections 4.01, 4.06, 4.07, 4.09).  The Legislature reaffirmed, however, that poll watchers "may not interfere in the orderly conduct of an election."  *Id.* § 4.02.  SB 1 also required the Secretary of State to establish a training program to ensure poll watchers understand their duties and relevant rules (section 4.04).

*Finally*, the Legislature sought to prevent abuses in voter assistance.  SB 1 requires assistants to complete certain forms (sections 6.01, 6.03, and 6.05) and updates the voter-assistance oath and a rule against compensated strangers providing voter assistance (sections 6.04 and 6.06).

The 2022 primary and general elections were conducted under SB 1.  Despite Plaintiffs' fears that SB 1 would suppress voter turnout, turnout in Texas in the 2022 general election

compared favorably to past turnout and national trends.  *See* Hoekstra Supp. Resp. to McDaniel at 10–11 (Ex. B).  Moreover, Texas's rejection rate for mail ballots plummeted between the 2022 primary and general elections to just 2.7%.  *See* Hoekstra Supp. Resp. to Hersh at 6–8 (Ex. C); *see also* Hersh Second Supp. Rep. at 10 (accounting for curing and concluding "the uncured/uncanceled rejection rate [to] be 2.5%") (Ex. D).  Out of the more than 8.1 million votes cast in the 2022 general election, only 6,355 mail ballots were rejected for reasons related to SB 1.  *See* Hoekstra Supp. Resp. to Hersh at 3 (Ex. C).  "That is well less than one out of every thousand votes statewide."  *Id.*  And several county election officials agreed that the 2022 general election ran more smoothly than the primary election as voters became more familiar with SB 1.  *See, e.g.*, Adkins Second Dep. at 32–33, 64–65 (Ex. E); Callanen Second Dep. at 16, 36, 51 (Ex. F); Johnson Second Dep. at 72 (Ex. G).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Accordingly, summary judgment is warranted against any plaintiff who pursues a legally deficient theory of liability.  *See id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

The Court should grant summary judgment on Plaintiffs' materiality, vagueness, First Amendment, and Section 208 claims because each fails "as a matter of law."  Fed. R. Civ. P. 56(a).

## I.   SB 1 DOES NOT VIOLATE THE FEDERAL MATERIALITY PROVISION (United States Count 2, OCA Count 1)

The United States' and the OCA Plaintiffs' materiality claims fail as a matter of law because sections 5.02 and 5.08 of SB 1 do not even implicate, let alone violate, the federal

materiality provision.[2]

### A.  *SB 1 Does Not Even Implicate The Materiality Provision.*

The materiality provision directs:

> No person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

Congress enacted this provision and the broader § 10101 of which it is part "to enforce th[e] [Fifteenth] Amendment[,]" *United States v. Mississippi*, 380 U.S. 128, 138 (1965), which guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1; *see also Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006); *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009).

Congress's purpose was to "forbid[] the practice of *disqualifying potential voters* for their failure to provide information irrelevant to determining their eligibility to vote." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003) (emphasis added).  In particular, Congress addressed "the practice of requiring unnecessary information for voter registration"—such as listing the registrant's "exact number of months and days in his age"—"with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an

---

[2] The OCA Plaintiffs lack a private right to enforce the materiality provision, which provides that only "the Attorney General may" enforce that statute.  52 U.S.C. § 10101(c); *see Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (holding that there is no private right to sue and recognizing circuit split); *see also Vote.Org v. Callanen*, 39 F.4th 297, 305 n.5 (5th Cir. 2022) (reserving question).  Nor should the Court permit Plaintiffs to evade that limit through § 1983, which provides a private right of action to enforce only "unambiguously conferred right[s]." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002).  Intervenor-Defendants recognize that the Court has already rejected this argument, *see* Dkt. No. 448 at 55–58, but preserve it for appeal.

excuse to disqualify potential voters." *Id.* "Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); *see* H.R. Rep. No. 88-914, pt. 2, at 5 (1963) ("[R]egistrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting" an African-American's application "for the same or more trivial reasons."). The federal materiality statute thus functions as a safeguard against discriminatory application of state voter qualification and registration rules. *See Schwier*, 340 F.3d at 1294; *Browning*, 522 F.3d at 1173.

Of course, states must enact many voting laws that have nothing to do with voter qualifications or registration. *See Timmons*, 520 U.S. at 358; *Anderson*, 460 U.S. at 788 (distinguishing between state laws that "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, [and] the voting process itself"). "Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. The federal materiality provision has no application to such rules. *See Ritter v. Migliori*, 142 S. Ct. 1824, 1824–25 (2022) (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6.

Plaintiffs nonetheless contend that sections 5.02 and 5.08—which govern requests for and completion of mail ballots by registered voters already deemed qualified to vote—violate the materiality provision. *See* Dkt. No. 131 ¶ 75; Dkt. No. 200 ¶ 125. Section 5.02 requires a requestor to supply a personal identification number (or statement that she has not been issued one) on her application for a mail ballot. *See* SB 1 § 5.02. Section 5.08 requires an individual to supply the same information on the carrier envelope containing a mail ballot. *See id.* § 5.08.[3]

---

[3] The OCA Plaintiffs also challenge various SB 1 provisions that implement the identification-number requirements contained in sections 5.02 and 5.08. *See* Dkt. No. 200 ¶ 125.

For at least three reasons, the materiality provision's plain text demonstrates that sections 5.02 and 5.08 do not violate it.  *First*, the materiality provision prohibits only "deny[ing] the right of any individual to vote," not imposing mandatory rules on the act of requesting and casting a ballot like Texas's identification-number requirements.  52 U.S.C. § 10101(a)(2)(B).

Start with section 5.02.  It does not "deny the right of any individual to vote," *id.*, because noncompliance is not used to "disqualify potential voters," *Schwier*, 340 F.3d at 1294.  Rather, a person who fails to provide the identification number on an absentee application remains qualified, eligible, and registered to vote in the upcoming election (and future elections).  *See* SB 1 § 5.02; *see also* Tex. Elec. Code §§ 13.001–.002, 18.001.  In fact, election officials must mail to any such person a new application with written notice that identifies the defect and explains how it may be cured.  *See* Tex. Elec. Code § 86.008.  And anyone who does not cure her application always remains free to vote in person.  *See id.* § 84.032.  Thus, no one loses the "right to vote" for failure to comply with section 5.02 because "Texas permits [such voters] to vote in person; that is the exact opposite of absolutely prohibit[ing] them from doing so."  *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020).  Section 5.02 does not implicate "the right to vote," but merely "a claimed right to receive absentee ballots," *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969), lying far beyond the scope of the materiality provision, *see Tex. Democratic Party*, 961 F.3d at 403–04 ("right to vote" does not encompass a right "to vote by mail").

Section 5.08 likewise does not deny any individual "the right . . . to vote."  52 U.S.C. § 10101(a)(2)(B).  In the first place, voters who fail to comply with section 5.08 receive notice and

---

None of these challenges survives failure of Plaintiffs' claims against sections 5.02 and 5.08.  Section 5.03, for example, merely establishes corresponding carrier envelope spaces for the information required by section 5.02.  S.B. 1 § 5.03.  All other sections challenged by the OCA Plaintiffs provide *cure* opportunities for voters who violate sections 5.02 or 5.08.  *See id.* §§ 5.06, 5.07, 5.10, and 5.12.  Of course, curing procedures that facilitate voting do not deny any individual "the right . . . to vote."  52 U.S.C. § 10101(a)(2)(B).

an opportunity to cure.  *See* SB 1 § 5.12.  Only when a voter declines this opportunity do election officials decline to count a ballot.  *See id.*

That result of declining to count a noncompliant mail ballot does not implicate, let alone violate, the federal materiality provision.  Election officials do not "disqualify potential voters," *Schwier*, 340 F.3d at 1294, or deny anyone's right to vote when they decline to count a ballot "because [an individual] did not follow the rules for casting [it]," *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *see id.* ("When a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.'").  As the Fifth Circuit has reasoned, "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the federal materiality provision.  *Vote.Org*, 39 F.4th at 305 n.6.

After all, "the *right* . . . to vote" protected by the materiality provision, 52 U.S.C. § 10101(a)(2)(B) (emphasis added), is obviously different from the *act* of voting.  An individual possesses the right to vote when she satisfies the state-law qualifications; states, including Texas, use registration to confirm those qualifications.  *See* Tex. Elec. Code §§ 13.001–.002, 18.001.  But even after qualifying and registering, a voter "may be unable to cast a vote for any number of reasons," such as showing up to the polls after Election Day, failing to sign or use a secrecy envelope for a mail ballot, attempting to vote for too many candidates for a single office, returning the ballot to the wrong location, or arriving at the wrong polling place.  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).  Application of those rules does not deny anyone the right to vote—and neither does section 5.08.  *See id.* ("Even the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right."); *see also Rosario v.*

*Rockefeller*, 410 U.S. 752, 757 (1973) (application of neutral state-law voting requirement does not "disenfranchise" voters).  In all of these scenarios, the voter has not been disqualified or denied the *right* to vote on equal terms with all other voters, but instead has failed to complete the *act* of voting in compliance with state law.  *See Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *Schwier*, 340 F.3d at 1294.

*Second*, the materiality provision requires that the error or omission affect a "determin[ation] whether such individual is qualified under State law to vote."  52 U.S.C. § 10101(a)(2)(B).  It therefore regulates requirements and practices related to qualifications and registration to vote, not rules "that must be met in order to cast a ballot that will be counted." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *see Vote.Org*, 39 F.4th at 305 n.6.  In other words, to fall within the scope of the materiality provision, "it is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications."  *Ball v. Chapman*, 289 A.3d 1, 38 (Pa. 2023) (Brobson, J., concurring in part and dissenting in part).

The qualifications to vote under Texas law are age, U.S. citizenship, mental capacity, lack of felony conviction, and residency.  *See* Tex. Elec. Code § 11.002. Providing an identification number on an absentee application or mail ballot is not one of them.  *See id.*  Indeed, sections 5.02 and 5.08 result in rejection of a noncompliant application (with notice, an opportunity to cure, and an opportunity to vote in person) or noncompliant ballot (after notice and an opportunity to cure), not a "determin[ation]" that the individual is or is not "qualified under State law to vote."  52 U.S.C. § 10101(a)(2)(B).  In other words, sections 5.02 and 5.08 do not result in any individual being disqualified from voting, stripped of the right to vote, or removed from the list of registered voters. *Compare, e.g.*, *Schwier*, 340 F.3d at 1294; *Browning*, 522 F.3d at 1173; H.R. Rep. No. 88-

914, pt. 2, at 5.  These sections therefore fall outside the plain terms of the materiality provision.  *See Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *see also Vote.Org*, 39 F.4th at 305 n.6; *Schwier*, 340 F.3d at 1294; *Browning*, 522 F.3d at 1173.

The two other subsections of § 10101(a)(2) underscore this point.  Just as "a word is known by the company it keeps," *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961), so too is a statutory provision, *see Yates v. United States*, 574 U.S. 528, 543 (2015).  Those subsections require election officials to apply uniform "standard[s], practice[s], [and] procedure[s]" in determining "whether any individual is *qualified* . . . to vote," 52 U.S.C. § 10101(a)(2)(A) (emphasis added), and restrict the use of literacy tests "as a *qualification* for voting," *id.* § 10101(a)(2)(C) (emphasis added).  Thus, "like the other two [subsections]," the materiality provision "relates to determinations of *who* may vote—*i.e.*, voter qualifications," not what voters must *do* to cast a valid ballot.  *Ball*, 289 A.3d at 37 (Brobson, J., concurring in part and dissenting in part).  To say the least, it would be unusual to sandwich a provision governing *all* paper-based election regulations between two voter-qualification provisions.

*Third*, the materiality provision demands that the "record or paper" be related to an "application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), so it applies "only" to documents related to "voter registration specifically," *Vote.Org*, 39 F.4th at 305 n.6; *see supra* at 7–8 (showing enacting Congress's intent to bar abuses in voter registration process).  The references to any "application" or "registration" are straightforward, showing the materiality provision governs processes used to *initially* determine a person's qualifications to vote.  Nearly every state (including Texas) makes that determination through a voter "application" or "registration" process.  *See, e.g.*, Tex. Elec. Code § 13.002.  And SB 1 made no changes to Texas's voter registration process.  In fact, sections 5.02 and 5.08 can only affect voters who have

-12-

successfully registered.  *See id.* §§ 82.001–.004, 82.007–.008 (only "a qualified voter" can apply "for early voting by mail").  That dooms Plaintiffs' challenges to sections 5.02 and 5.08 because the materiality provision does not "apply to the counting of ballots by individuals already deemed qualified to vote."  *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004).

Nor can Plaintiffs broaden the statute's reach by invoking the phrase "other act requisite to voting."  "[W]here general words follow an enumeration of specific items, [those] words are read as applying only to other items akin to those specifically enumerated."  *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980).  Thus, the phrase "other act requisite to voting" must be "controlled and defined by reference to the enumerated categories" of "application" and "registration."  *See Circuit City Stores v. Adams*, 532 U.S. 105, 115 (2001).  In fact, failure to apply the *ejusdem generis* canon would render the words "registration" and "application" superfluous—an outcome courts must "avoid[]."  *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).  The phrase "other act requisite to voting" therefore refers only to the functional equivalents of "application" and "registration"—*i.e.*, the initial processes to assess voter qualifications.  *See Ball*, 289 A.3d at 38 n.11 (Brobson, J., concurring in part and dissenting in part).  Because sections 5.02 and 5.08 do not regulate voter registration, the Court should grant summary judgment.

**B.**     ***There Is No Tenable Basis To Conclude That SB 1 Violates The Federal Materiality Provision.***

The United States and the OCA Plaintiffs may offer two arguments in an attempt to salvage their materiality claims.  Both are unpersuasive.

*First*, the United States and OCA Plaintiffs may point out that the personal identification numbers on an application or mail ballot are "not material" to determining an individual's qualifications to vote.  *See* Dkt. No. 200 ¶ 125; Dkt. No. 131 ¶ 74.  That is entirely correct—but it also *disproves* Plaintiffs' claims.  As explained above, the identification-number requirements are

not used to determine any individual's qualifications to vote, so they do not implicate, let alone

violate, the federal materiality provision, *see supra* Part I.A.

In fact, Plaintiffs' proposed reading of the federal materiality provision is breathtakingly

broad—and, unsurprisingly, incorrect.  Under Plaintiffs' reading, states could enact no mandatory

rules against errors on any voting "record[s] or paper[s]" except those that merely implement the

requirements for "determining whether [an] individual . . . is an eligible voter."  Dkt. No. 200

¶¶ 124–25.  In other words, under Plaintiffs' construction, states could not adopt *any* requirements

for voting-related papers that do not confirm the individual's qualifications to vote.

Take, for example, Texas's requirement that a voter sign a mail ballot carrier envelope.

*See* Tex. Elec. Code. § 86.005(c).  Under Plaintiffs' proposed reading, the signature requirement

would violate the federal materiality provision: a failure to provide a signature is an "omission" or

"error" on a "record or paper," and a signature is "not material in determining whether the

individual . . . is an eligible voter."  Dkt. No. 200 ¶¶ 124–25.

Take, as another example, the Legislature's commonplace prohibition on "mark[ing] [a]

ballot for more candidates for an office than the number of persons to be elected for that office."

Tex. Elec. Code § 65.011.  Under the Election Code, "none of [those] votes may be counted."  *Id.*

Yet on Plaintiffs' view, the overvote prohibition would violate the materiality provision:

mismarking a ballot is an "omission" or "an error" on a "record or paper" that is "not material in

determining whether the individual . . . is an eligible voter."  Dkt. No. 200 ¶¶ 124–25.

These examples illustrate the disruption Plaintiffs' (wrong) interpretation of the materiality

provision would cause.  But there are many more—both in Texas and elsewhere.  Plaintiffs'

misconstruction imperils routine and commonsense election rules across the country such as

signature requirements, *see, e.g.*, N.J. Stat. § 19:62-11; Del. Code tit. 15, § 5514(a)(1), overvote

prohibitions, *see, e.g.*, Del. Code tit. 15, § 4972(b)(6); Ariz. Rev. Stat. § 16-611; Fla. Stat. § 101.5614(5); 10 Ill. Comp. Stat. 5/17-16; Ohio Rev. Code § 3505.28; N.C. Gen. Stat. § 163-182.1(a)(4), secrecy-envelope requirements, *see, e.g.*, 25 Pa. Cons. Stat. §§ 3146.6(a), 3150.16(a); Fla. Stat. § 101.64, pollbook requirements, *see, e.g.*, Va. Code § 24.2-611, 25 Pa. Cons. Stat. § 3050; Tex. Elec. Code § 63.003, and voter-assistance forms, *see, e.g.*, 25 Pa. Cons. Stat. § 3058.

In short, Plaintiffs' reading "would subject virtually every electoral regulation" related to voting records and papers to the superintendence of the federal materiality provision, "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). Indeed, if Plaintiffs are correct, many state election rules have been invalid since Congress enacted the materiality provision nearly six decades ago. That not only defies the statute's plain text, but also the rule that "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (internal quotation marks and citation omitted); *see Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam). The absurdity of discovering, sixty years after the fact, that the materiality provision invalidates *all* these commonplace rules confirms the folly of Plaintiffs' interpretation. *See FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941). Congress did not "hide [the] elephant[]" of this sweeping outcome "in [the] mousehole[]" of the materiality provision. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Moreover, Plaintiffs' interpretation of the materiality provision would render it constitutionally suspect. Congress's exercise of its Fifteenth Amendment power is subject to important limits. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). Among them, an enforcement statute must be justified by the "evidence in the record" assembled

by the enacting Congress.  *City of Boerne v. Flores*, 521 U.S. 507, 525–26 (1997) (discussing the VRA).  When enacting the materiality provision, Congress marshalled evidence of racially discriminatory practices in *voter registration*.  *See supra* at 7–8.  But adopting Plaintiffs' reinterpretation would decouple the provision's reach from the problem Congress sought to solve—and place the statute in constitutional jeopardy.  Plaintiffs' interpretation should be rejected for this reason alone.  *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005).

*Second*, the United States and OCA Plaintiffs may point to the statutory definition of "vote," which this Court views as "broad[]," Dkt. No. 424 at 39.  But the materiality provision does not guarantee an entitlement to request or cast a ballot without complying with state law; instead, it protects "the *right* . . . to vote" on equal terms with all other voters in the state.  52 U.S.C. § 10101(a)(2)(B) (emphasis added).  Thus, the question is not, as Plaintiffs argue, whether the identification-number requirements result in a ballot not being "counted."  Dkt. No. 195 at 3.  Rather, the question is whether the requirements "disqualify potential voters" and deprive them of the *opportunity* to cast their ballot on equal terms.  *Schwier*, 340 F.3d at 1294; *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).  Sections 5.02 and 5.08 work no such deprivation.  *See supra* Part I.A.  The Court should grant summary judgment.

## II.    SB 1 IS NOT UNCONSTITUTIONALLY VAGUE
(LUPE Counts 7 and 8, HAUL Count 6, OCA Count 8).

The LUPE Plaintiffs, HAUL Plaintiffs, and OCA Plaintiffs allege that various of SB 1's vote-harvesting and poll-worker provisions are unconstitutionally vague.  These pre-enforcement facial challenges are both premature and doomed on the merits.

### A.    *Plaintiffs' Pre-Enforcement Facial Challenges Are Premature.*

The Court should grant summary judgment because Plaintiffs' facial vagueness challenges are premature.  "In the context of pre-enforcement review . . . examining facial vagueness is often

difficult, perhaps impossible, because facts are generally scarce." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008). That is why a vagueness challenge must ordinarily be raised as a defense to prosecution. *See Burson*, 504 U.S. at 210 n.13; *Schirmer v. Edwards*, 2 F.3d 117, 124 (5th Cir. 1993).

Yet here, *no* Plaintiff has been charged with violations of the challenged provisions. Nor do Plaintiffs bother to identify specific prosecutions they object to. Instead, Plaintiffs offer baseless speculation about how Texas prosecutors and courts *might* enforce these provisions. *See, e.g.*, Dkt. No. 199 ¶ 330. In other words, such prosecutions might *never* occur, but even if they were to occur in the future, Texas courts can adopt a "limiting construction rather than a facial invalidation" at that time. *Burson*, 504 U.S. at 210 n.13. Because the Texas courts have not even been given the *chance* to do so, summary judgment is warranted. *See, e.g.*, *id.*

**B.  *The Challenged Provisions Are Not Unconstitutionally Vague.***

In all events, the Court should grant summary judgment because Plaintiffs' vagueness claims fail on the merits. The Due Process Clause prohibits the enforcement of laws that do not give "'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). This standard is deferential to legislatures, and a statute is not unconstitutionally vague merely because its application is at times unclear. Indeed, "[m]any perfectly constitutional statutes use imprecise terms," *id.* at 1214, and due process "does not require impossible standards" of clarity, *United States v. Petrillo*, 332 U.S. 1, 7 (1947). Moreover, facial vagueness challenges succeed only against provisions that are "impermissibly vague in all of [their] applications." *Vill. of Hoffman Ests. V. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982). Facial vagueness challenges are among "the most difficult . . . to mount successfully," *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004), and Plaintiffs have not done so here.

1.     The LUPE and OCA Plaintiffs allege that section 7.04's vote harvesting prohibition is unconstitutionally vague.  *See* Dkt. No. 208 ¶¶ 137–43.  But section 7.04 is quite specific about what it bans:  A person violates section 7.04 if (1) she is party to an "in-person interaction" (2) with "one or more voters" (3) "in the physical presence of an official ballot or a ballot voted by mail," in which she (4) intends "to deliver votes for a specific candidate or measure," and (5) receives "compensation," defined as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion."

Plaintiffs unpersuasively argue that several of these elements are vague.  *First,* they profess confusion about the concept of an "in-person interaction."  Dkt. No. 208 ¶ 291.  But plenty of statutes use this or similar language.  *See, e.g.*, 42 U.S.C. § 3030s(a) (referring to an "assessment" that "shall be administered through . . . in-person interaction").  In any event, legislatures need not use perfectly clear language, and anyone can "employ[] . . . experience and common sense" to determine whether she is interacting with someone else.  *Roark & Hardee LP*, 522 F.3d at 548.  The vagueness doctrine does not constitutionalize gripes about the *breadth* of pellucid terms.

*Second*, Plaintiffs argue that people cannot always know when they are "in the physical presence" of a ballot.  Dkt. No. 208 ¶¶ 140–42, 294.  Building on that premise, Plaintiffs offer hypotheticals of a hidden ballot "in the same room or in the voter's purse."  *Id.* ¶ 294.  But under Texas law, prosecutors must show scienter as to every element of a criminal offense, with recklessness as the default *mens rea*.  *See* Tex. Penal Code § 6.02(c).  To be convicted, then, a paid persuader must at least "consciously disregard[] a substantial and unjustifiable risk" that a ballot is present.  *Id.* § 6.03(c).  This robust "scienter requirement … mitigate[s]" any vagueness concerns.  *Vill. of Hoffman Ests.*, 455 U.S. at 499 & n.14 (collecting cases).

*Third*, Plaintiffs object to the statute's requirement that a vote harvester "intend[] to deliver votes," on grounds that it reaches too many "political[ly] motivat[ed]" actions. Dkt. No. 208 ¶ 291. Here, though, Plaintiffs do not even bother to brand their disagreement with the Legislature's choice as a "vagueness" concern; instead, they are concerned about protecting "political" activities. *Id.* In any event, the specific intent element "undermines any assertion that this phrase is unconstitutionally vague." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023).

*Fourth*, Plaintiffs assail the statutory definition of "benefit" as unduly "wide." Dkt. No. 208 ¶ 292. But Plaintiffs raise no meaningful argument that the provision is actually *vague*. They simply resent the Legislature's crystal-clear decision to cast a wide net to prevent paid partisans from engaging in electioneering in the presence of a ballot in exchange for *any* compensation.

In sum, Plaintiffs' objections to section 7.04 boil down to a substantive disagreement with the Legislature over policy—not clarity. They forthrightly express frustration that their campaign workers cannot press voters to fill out their ballots in a particular way. *See id.* ¶ 298. Indeed, that specific activity is clearly prohibited by section 7.04: Paid activists cannot approach someone and try to persuade them to vote for a candidate or cause when their ballot is immediately present. The archetypal situation in which that will occur is when a voter is holding or filling out a mail ballot. Given the statute's valid and unambiguous reach, Plaintiffs cannot show that section 7.04 is "impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 495.

2.    Plaintiffs next challenge various SB 1 provisions regulating poll workers, but none are vague. *First*, the HAUL Plaintiffs challenge section 4.06, which prohibits an election judge from "intentionally or knowingly refus[ing] to accept a watcher for service when acceptance . . . is required by this section." SB 1 § 4.06 (amending Tex. Elec. Code § 33.051). They claim this

provision is vague because it does not specify whether an election official "can knowingly refuse to accept a poll watcher for behavior *elsewhere* prohibited in the Texas Election Code." Dkt. No. 199 ¶ 330 (emphasis added). This allegation misinterprets Texas law, which specifically provides that election officials *can* remove poll watchers for violating the Penal Code, for "breach of the peace," or for any other "violation of law." Tex. Elec. Code § 32.075(g)–(h).

*Second*, the LUPE and HAUL Plaintiffs challenge section 4.09—which, far from injecting vagueness, clarifies existing law. *See* Dkt. No. 199 ¶ 329; Dkt. No. 208 ¶ 301–09. Section 4.09 amends section 33.061(a) of the Election Code, which prohibits an election judge from "knowingly prevent[ing] a watcher from observing an activity" at a polling place. Section 4.09 clarifies this prohibition by restricting it to actions that prevent a poll watcher from observing activities that the election official "knows the watcher is entitled to observe." The new law even provides examples of such prohibited actions, such as "obstruct[ing]" a poll watcher's view and "distanc[ing]" the poll watcher from an activity "in a manner that would make observation not reasonably effective."

Plaintiffs cannot plausibly claim that this provision is vague. So they fault the law for not specifying *exactly* how far away poll watchers may stand when election officials "know[] the watcher is entitled to observe." SB 1 § 4.09; *see* Dkt. No. 199 ¶ 333; Dkt. No. 208 ¶¶ 127–28. But many laws incorporate "qualitative" standards that must be applied "on a particular occasion," and such standards are constitutionally valid. *Johnson v. United States*, 576 U.S. 591, 603–04 (2015) (emphasis omitted); *id.* ("the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree."). A contrary conclusion would force the Legislature to impose a one-size-fits-all distance rule ill-suited to the varied circumstances of polling locations.

In any event, state law provides more guidance than Plaintiffs admit. Chapter 33 identifies the activities poll watchers are entitled to observe, and section 33.057(b) limits poll watchers from

being present when a voter is preparing her ballot.  SB 1 itself states that poll watchers "may not interfere in the orderly conduct of an election," SB 1 § 4.02, and as required by SB 1, the Secretary of State created a training course that poll watchers must complete and that provides yet more guidance on applicable rules, *see Online Poll Worker Training Program*, Texas Secretary of State, sos.state.tx.us/elections/onlinepollworker.shtml (last visited May 23, 2023).  Nothing in SB 1 prevents election officials from reliably enforcing these requirements.

*Third*, the HAUL Plaintiffs challenge section 4.07.  *See* Dkt. No. 199 ¶ 329.  But only civil remedies are available for violations of section 4.07, *see* SB 1 § 4.10, and courts have "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," *Vill. of Hoffman Ests.*, 455 U.S. at 498–99.  Section 4.07 easily passes muster under that standard.  In particular, section 4.07 amends Texas Election Code 33.056, which already guaranteed the right of poll watchers to "sit or stand . . . near the election officers conducting the observed activity."  Section 4.07 *added* detail to preexisting law, clarifying that the position of observation must be near "enough to see and hear" "the election officers conducting the observed activity," and further that watchers cannot be "denied free movement where election activity is occurring."

The HAUL Plaintiffs object that the statute does not define "free movement."  Dkt. No. 199 ¶¶ 331–32.  SB 1, however, provides plenty of clarity, specifying that poll watchers are entitled to "free movement *where election activity is occurring*."  SB 1 § 4.07 (emphasis added).  Beyond that, the Election Code imposes several rules for poll watchers.  For example, section 33.057(b) restricts their presence when a voter is preparing her ballot, and section 33.058 specifies that watchers may not, "[w]hile on duty," communicate with election officials or voters.  Section 4.07's reference to "free movement" is subject to the Election Code's other, more specific provisions.

There is nothing vague about a "general[]" rule with easily understood "exceptions." *Knox v. Brnovich*, 907 F.3d 1167, 1183 (9th Cir. 2018).  The Court should grant summary judgment.

### III.    SB1 DOES NOT VIOLATE FREE SPEECH RIGHTS (LUPE Counts 7 and 9, OCA Count 7, LULAC Count 3).

Summary judgment is also warranted on the LUPE, OCA, and LULAC Plaintiffs' First Amendment challenges to SB 1's vote-harvesting ban and various voter-assistance provisions.  *See* Dkt. No. 208 ¶ 311; Dkt. No. 207 ¶ 284; Dkt. No. 200 ¶¶ 195–213.  Plaintiffs' facial challenges are improper and doomed on the merits.

### A.  *Plaintiffs' First Amendment Challenges Are Unfounded Facial Challenges.*

To start, summary judgment is warranted because Plaintiffs' claims are facial challenges. *See* Dkt. No. 208 ¶ 313.  "Courts generally disfavor facial challenges, and for good reasons." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).  "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).  Thus, Plaintiffs face the "daunting" challenge of proving that "'a substantial number of [the provisions'] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Voting for Am.*, 732 F.3d at 387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

Plaintiffs cannot carry that burden on any of their claims.  Plaintiffs' attacks on section 7.04 focus on farfetched hypotheticals—*e.g.*, where a paid persuader pushes a citizen to vote in a particular way while unaware of a ballot hidden "in the same room or in the voter's purse."  Dkt. No. 208 ¶ 294.  Plaintiffs, moreover, do not dispute that states can bar partisan "advocacy" while voters are actually filling out their ballots—the archetypal behavior reached by section 7.04.  *See*

*supra* at 19.  Thus, section 7.04 has a "plainly legitimate sweep," and Plaintiffs offer no reason to think any unconstitutional applications are comparatively significant.  *Stevens*, 559 U.S. at 473.

The same is true of LUPE's challenges to SB 1's provisions clarifying the role of voter assistants.  Content to plead *ipse dixit*, the LUPE Plaintiffs offer no examples to highlight how these provisions could violate speech rights.  *See* Dkt. No. 208 ¶¶ 310–14.  But again, it is easy to identify the "plainly legitimate sweep" of these provisions, *Stevens*, 559 U.S. at 473, which prevent paid partisans from pressuring vulnerable voters as they fill out their ballots.

**B.  *Plaintiffs' First Amendment Claims Are Meritless*.**

Plaintiffs' First Amendment claims also fail on the merits.  To start, Plaintiffs misstate the legal standard, claiming strict scrutiny applies.  *See* Dkt. No. 207 ¶¶ 275–76; Dkt. No. 208 ¶ 296.  Election rules with incidental speech effects are *not* subject to strict scrutiny but rather to the *Anderson/Burdick* framework.  *See Voting for Am.*, 732 F.3d at 387–88.  Under that test, courts first assess whether an election rule imposes a "severe" burden on protected speech.  *Id.*  If so, the rule "must be 'narrowly drawn to advance a state interest of compelling importance.'"  *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).  Less-than-severe burdens, by contrast, can be justified by "a State's 'important regulatory interests.'"  *Id.* (quoting *Timmons*, 520 U.S. at 358).

1.    Section 7.04's vote-harvesting ban clearly withstands scrutiny under the *Anderson-Burdick* framework because it imposes an incidental and modest burden on speech.  The provision applies only where an individual is "in the physical presence" of a ballot—an inherently narrow range of scenarios.  Paid persuaders otherwise remain free to operate whenever a ballot is not immediately present—*which will be* the vast majority of the time.  In this respect, section 7.04 functions much like constitutionally permissible bans on solicitation near polling places.  *See Burson*, 504 U.S. at 210.  And this modest burden is easily justified by the State's "compelling

interest in protecting voters from confusion and undue influence." *Id.* at 199.  States can justifiably worry that paid partisans will unduly pressure voters—particularly the elderly—to fill out their ballots in a particular way, and that risk is especially acute when the voter has their ballot in hand.

Yet even if Plaintiffs were correct that section 7.04 is subject to strict scrutiny, precedent and history demonstrate that its vote-harvesting ban is still valid.  Section 7.04 is functionally equivalent to laws in every State requiring the use of secret ballots and preventing others from trying to persuade an individual while he is voting.  *See id.* at 206 ("[A]ll 50 States limit access to the areas in or around polling places.").  The states adopted these rules because, when voting was not done privately, bystanders frequently pressured individuals to vote in a particular way.  *See id.* at 201–02.  States' interests in combatting such pressure and "protecting voters from confusion and undue influence" is "obviously . . . compelling." *Id.* at 199.

This interest is even more compelling in the mail ballot context.  When a voter casts a mail ballot, she is *more* vulnerable to undue influence because, unlike with in-person voting, election officials are not present to deter heavy-handed pressure.  This risk is especially acute for elderly voters.  *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016).  Relatedly, "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Brnovich*, 141 S. Ct. at 2347 (quoting Report on the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (2005)).  If every state can shield in-person voting from pressure by paid canvassers, surely Texas can extend the same protection to voters who fill out their ballots elsewhere.

Moreover, section 7.04 is narrowly tailored to fulfill Texas's interests in preventing undue influence and pressure.  Section 7.04 prohibits persuasion by compensated activists only "in the physical presence of" a ballot—*i.e.*, situations where an individual is actively voting or is being pressured to do so.  And because voting "is a weighty civic act," the state is entitled to "set it aside

as an island of calm in which voters can peacefully contemplate their choices." *Minn. Voters All. V. Mansky*, 138 S. Ct. 1876, 1887 (2018) (quotation marks omitted).

Resisting that conclusion, Plaintiffs cite *Meyer v. Grant*, 486 U.S. 414 (1988), where the Supreme Court struck down a Colorado law prohibiting campaigns from paying persuaders to approach potential voters under *any circumstances*. *Id.* at 424; *see* Dkt. No. 207 ¶ 276. Section 7.04 is nothing like the law at issue in *Meyer.* Just consider the vast array of situations where Plaintiffs' employees can continue to reach potential voters. Outside the polling place, they can approach voters in any location and at any time save one: when a ballot is physically present. Simply put, section 7.04 does not "restrict[] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424. It imposes a modest limit on the *timing* of that "discourse" to protect voters from undue influence. Thus, *Meyer* only highlights the weakness of Plaintiffs' challenge to section 7.04.

2.    Standing alone, the LUPE Plaintiffs contend that various provisions clarifying the role of voter assistants "violate the free speech rights of individuals who assist voters." Dkt. No. 208 ¶ 312. They challenge requirements that assistants complete simple forms (sections 6.01, 6.03, and 6.05), take an oath that they "did not pressure or coerce the voter into choosing [her] to provide assistance" (section 6.04), and the updated prohibition on assistance by compensated strangers (section 6.06). These claims do not withstand scrutiny.

*First*, these claims fail at the threshold because assisting voters is not protected speech. "[N]ot every procedural limit on election-related conduct automatically runs afoul of the First Amendment." *Voting for Am.*, 732 F.3d at 392. Instead, "[t]he challenged law must restrict political discussion or burden the exchange of ideas," not merely regulate conduct. *Id.* And only "inherently expressive" conducted is protected. *Rumsfeld v. Forum for Acad. & Institutional Rts.,*

*Inc.*, 547 U.S. 47, 66 (2006).   To determine whether conduct bears sufficient "communicative elements" to warrant First Amendment protection, courts examine whether it is intended "to convey a particular[] message" and whether "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

Voter assistance flunks that test.   Providing voter assistance does not "inherently express[]" anything. *Voting for Am.*, 732 F.3d at 389.   There is no "likelihood"—"great" or otherwise—that someone observing voter assistance would understand the assistant to convey a "particularized message" about voting. *Johnson*, 491 U.S. at 404.   An observer is far more likely to conclude that the person is providing assistance at the voter's request.   And while an assistant might understand her own activities to convey a message, "[c]onduct does not become speech for First Amendment purposes merely because the person engaging in [it] intends to express an idea." *Voting for Am.*, 732 F.3d at 388.   Voter assistance is therefore not protected speech. *Cf Knox*, 907 F.3d at 1181 (ballot collection is not expressive conduct under First Amendment).

*Second*, even if voter assistance could be understood as speech, the challenged provisions do not burden it.   Sections 6.01, 6.03, and 6.05 require individuals who transport seven or more voters needing assistance to a polling place, or who assist voters in accordance with the Texas Election Code, to complete a short informational form.   The LUPE Plaintiffs do not dispute the relevance of the requested information or explain how fulfilling this requirement is burdensome.   Indeed, *many* states require voter assistants to complete forms. *See, e.g.*, Va. Code § 24.2-649.

Similarly, the LUPE Plaintiffs cannot show that section 6.04's revision of the voter-assistance oath burdens speech.   Aside from vague allegations that the revised oath is "more intimidating," the LUPE Plaintiffs plead only two alleged burdens.   Dkt. No. 208 ¶ 108.   First, they attack assistants' duty to aver that the voter "represented to [them that] they are eligible to

receive assistance." *Id*. ¶ 109.  But it is hard to see the supposed speech burden here.  An assistant does not need to *know* that a voter is eligible for assistance—only to aver that the voter *represented* she was assistance-eligible.  *See*, *e.g.*, Contractor Dep. at 35–36 (Ex. H) (admitting this point).  If a voter seeking assistance does not volunteer her eligibility, the would-be assistant can simply ask.  Second, plaintiffs object to the attestation that an assistant did not "pressure" the voter to choose them.  *Id*. ¶ 111.  Here again, the purported burden on speech rights is hard to see.  Ordinary people know the difference between "volunteering to help" and prohibited "pressure."  *Id.*

Nor can the LUPE Plaintiffs show that section 6.06's prohibition on compensating others (or accepting compensation) to assist voters violates the First Amendment.  *Id.* ¶ 114.  Plaintiffs claim this rule will deter organizations from paying people to assist strangers.  *See id.*  But that policy disagreement has no basis in the First Amendment, and Plaintiffs remain free to engage in voter assistance on an uncompensated basis.

*Third*, even if any of the challenged provisions could be understood as burdening the speech rights of voter assistants, these provisions are amply justified by Texas's compelling interests in protecting the integrity of voter assistance.  Protecting vulnerable voters from "undue influence" and pressure by compensated partisans is not only an important interest; it is a "compelling" one.  *Burson*, 504 U.S. at 199.  The Court should grant summary judgment.

## IV. SB1 DOES NOT VIOLATE SECTION 208 OF THE VRA (LUPE Count 5, HAUL Count 5, OCA Count 4, LULAC Count 4).

Finally, the LUPE, LULAC, HAUL, and OCA Plaintiffs argue that various voter-assistance provisions of SB 1 violate Section 208 of the VRA.[4]  Their arguments rest on the mistaken premise

---

[4] Summary judgment is warranted on Plaintiffs' section 208 claims for an additional reason: Congress has not granted them the right to sue.  While section 208 makes no mention of a private right to sue, Congress provided for enforcement by other means.  The VRA requires "[t]he chief election officer of each State" to "provide public notice[] . . . of the availability of . . .

that Section 208 preempts state laws that place *any* limits on whom disabled individuals can select to provide voter assistance. *See, e.g.*, Dkt. No. 200 ¶¶ 163, 166. But Section 208 allows certain voters to choose "*a* person of [their] choice" to assist them in voting—not *any* person in existence. And SB 1 imposes only modest regulations to prevent potential abuses—exactly the type of laws Congress sought to leave undisturbed when it enacted Section 208.

*First*, Plaintiffs challenge section 6.06's prohibition on individuals offering or receiving compensation in exchange for assisting voters. *See* Dkt. No. 200 ¶ 179; Dkt. No. 208 ¶ 267. But this challenge misreads Section 208. Section 208 states that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." It "does not say that a voter is entitled to assistance from *the* person of his or her choice or *any* person of his or her choice." *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020). Congress's decision not "to use a definite article" "must be given meaning," and it clearly "suggests that some state law limitations on the identity of persons who may assist voters [are] permissible." *Id.* Indeed, positing otherwise would bar states from preventing even incarcerated felons from providing voter assistance.

The Court should not impute that radical intent to Congress. To the contrary, when Congress enacted Section 208, it expected states to continue regulating voter assistance to prevent fraud, undue influence, and abuse. In fact, the Senate Judiciary Committee acknowledged that voters who need assistance "are more susceptible than the ordinary voter to having their vote

---

assistance under section [208]," 52 U.S.C. § 20104(c), and expressly authorizes "the United States Attorney General or a person who is personally aggrieved" by noncompliance with section 20104 to "bring an action for declaratory or injunctive relief," *id.* § 20105(a). The existence of this enforcement scheme "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). Intervenor-Defendants recognize that the Court has already rejected this argument, *see* Dkt. No. 448 at 58–60, and preserve it for appeal.

unduly influenced or manipulated."  S. Rep. No. 97-417, at 62 (1982).  Thus, the Committee recognized that Section 208 did not interfere with "the legitimate right of any State to establish necessary election procedures" so long as they are "designed to protect the rights of voters."  *Id.* at 63.   Instead, Congress understood Section 208 as a guarantee that each voter, not the government, would choose her own assistant.  *See id.* at 62; *see also Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 236 (M.D.N.C. 2020) (finding violation where "the State has chosen the person who will assist the voter").   In short, Section 208 "does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals." *Ray v. Texas*, No. 2-06-CV-385, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008).

Section 6.06 is precisely the type of law Congress expected states to pass in harmony with the VRA.  Consistent with the VRA's plain text, section 6.06 leaves voters with a vast universe of potential voting assistants, including any "attendant or caregiver previously known to the voter," friends, families, and volunteers.  "[T]he State has [not] chosen the person who will assist [any] voter" in Texas.  *Democracy N.C.*, 476 F. Supp. 3d at 236.  Texas has only acted sensibly to protect voters from a small group particularly likely to apply pressure in pursuit of partisan ends.  Section 208 permits, rather than prevents, this commonsense protection.

*Second*, the LUPE and LULAC Plaintiffs argue that Section 208 preempts section 7.04's vote-harvesting ban, positing that the ban will prevent their employees from assisting voters.  *See* Dkt. No. 208 ¶ 267; Dkt. No. 207 ¶¶ 292–94.  This argument, however, rests on a mistaken premise: merely providing voter assistance is not an act "designed to deliver votes for or against a specific candidate or measure" under section 7.04.  SB 1 § 7.04.  Plaintiffs' employees would cross the line only if they attempted to persuade the assisted individual to vote in a particular way—an action that is *not* part of voter assistance under Texas law or Section 208.  Indeed, other states also

prohibit such advocacy by those providing voter assistance.  *See, e.g.*, Minn. Stat. § 204C.15. Prohibiting partisan pressure in the guise of "assistance" is precisely the type of reasonable regulation that Section 208 allows.  *See Priorities USA*, 487 F. Supp. 3d at 619.

*Third*, the HAUL and LUPE Plaintiffs argue that sections 6.01, 6.03, 6.05, and 6.07 of SB 1 violate Section 208 because they require voter assistants to fill out forms or disclose their assistance on a mail ballot.  *See* Dkt. No. 199 ¶ 324; Dkt. No. 208 ¶ 267.  But *nothing* in the text of Section 208 creates or recognizes rights for voter assistants.  To the contrary, Section 208 creates rights only for those *needing* assistance and, thus, does not bar the State's transparency measures.

*Finally*, the HAUL and LUPE Plaintiffs argue that SB 1's revisions to the voter-assistance oath violate section 208.  *See* Dkt. No. 208 ¶ 267; Dkt. No. 199 ¶¶ 323–24.  At this stage, *see* Dkt. No. 444 at 2 n. 3, their only remaining live challenges target section 6.04's requirements that assistants (1) attest that the voter represented her eligibility for assistance and (2) refrain from communicating how the assisted voter voted.  Again, however, Section 208 does not create *any* rights for voter assistants, and section 6.04 imposes only modest, non-cognizable burdens on assistants in any event.  Because neither requirement limits a voter's choice of assistant, Plaintiffs' Section 208 challenges fail.

## CONCLUSION

The Court should grant summary judgment for Defendants on Plaintiffs' materiality, vagueness, First Amendment, and Section 208 claims.

Dated: May 26, 2023

Respectfully submitted,

*/s/ John M. Gore*
John M. Gore
E. Stewart Crosland (*pro hac vice*)
Stephen J. Kenny (*pro hac vice*)
Louis J. Capozzi III (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
skenny@jonesday.com
lcapozzi@jonesday.com

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2023, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ John M. Gore*