IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 1

STATUTORY BACKGROUND ............................................................................ 7

LEGAL STANDARD ............................................................................................ 8

ARGUMENT .......................................................................................................... 8

    I.    SB 1 Mail Ballot Provisions Deny the Statutory Right to Vote in an Election. ......... 9

        A.    SB 1 Requires Officials to Reject Certain Mandatory Mail Voting Materials. ........................................................................................... 10

        B.    Cure Procedures Do Not Absolve a Denial of the Statutory Right to Vote. ...... 13

    II.    SB 1 Regulates Errors or Omissions on Mail Ballot Materials. ............................ 16

    III.    SB 1 Regulates Records or Papers Related to Voting by Mail. .............................. 17

    IV.    SB 1 Regulates Materials Relating to Applications and Other Acts Requisite to Voting. ................................................................................................ 18

    V.    SB 1 Requires Identification Numbers That Are Not Material to Voter Qualifications. ......................................................................................... 19

        A.    Identification Numbers Are Not Material to Texas Voter Qualifications. ........ 20

        B.    Identification Numbers Required by SB 1 Do Not Consistently Establish or Confirm Voter Identity. ...................................................................... 23

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 8

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................. 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 8

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995) .......................................................... 7

*Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018) ............... 14

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) ............................................. 20, 21

*Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ................................. 16

*Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408 (3d Cir. 2020) ...................... 9

*Gutierrez v. Saenz*, 565 F. Supp. 3d 892 (S.D. Tex. 2021) ................................................... 9

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) ........................................... 20

*Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963) ............................................................ 18

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ............................................................. 18

*Kohus v. Toys R Us, Inc.*, 282 F.3d 1355 (6th Cir. 2002) ................................................. 17

*La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022) .................. passim

*League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174, 2021 WL 5312640
    (W.D. Ark. Nov. 15, 2021) ................................................................................... 11

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) .................................... 12, 16, 20, 23

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) ............................................ 12, 14

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *judgment vacated sub nom.*
    *Ritter v. Migliori*, 143 S. Ct. 297 (2022) ................................................... 9, 11, 18, 20

*Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790 (W.D. Mo. 2020) .............................. 11

*Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990).............. 12

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)................................................. 8

*Ritter v. Migliori*, 142 S. Ct. 1824 (2022) ................................................................... 10

*Ritter v. Migliori*, 143 S. Ct. 297 (2022)...................................................................... 9

*Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014 (5th Cir. 1993) ......................................... 8

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ................................................ 19, 20, 22

*Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285
    (11th Cir. 2006) ............................................................................................... 22

*Schwier v. Cox*, 439 F.3d 1285 (11th Cir. 2006) ............................................................ 23

*Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039 (D.N.D. 2020)...................................... 12

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260
    (N.D. Ga. 2021) .............................................................................................. 13

*Smiley v. Holm*, 285 U.S. 355 (1932) ............................................................................ 20

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) ........................................................................ 10

*Tex. Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) .......................................... 10

*United States v. Ambriz*, 727 F.3d 378 (5th Cir. 2013).......................................................... 9

*United States v. Boards*, 10 F.3d 587 (8th Cir. 1993) ...................................................... 18

*United States v. Crawford*, 229 F. Supp. 898 (W.D. La. 1964), *rev'd sub nom.*
    *United States v. Clement*, 358 F.2d 89 (5th Cir. 1966) ............................................... 7

*United States v. Gonzales*, 520 U.S. 1 (1997) ................................................................ 12

*Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) ......................................................... 10

*Vote.org v. Ga. State Election Bd.*, No. 1:22-cv-1734, 2023 WL 2432011
(N.D. Ga. Mar. 9, 2023) ........................................................................................ 13
*Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006) ...................... 20, 22
*Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206 (5th Cir. 2009) ...................................... 8

**Statutes**
5 U.S.C. § 552 ........................................................................................................ 17
5 U.S.C. § 552a ....................................................................................................... 17
44 U.S.C. § 2201 ..................................................................................................... 17
44 U.S.C. § 3301 ..................................................................................................... 17
52 U.S.C. § 10101 ............................................................................................. passim
Tex. Elec. Code § 11.002 ...................................................................................... 20, 21
Tex. Elec. Code §§ 82.001-.004, 82.007-.008 ................................................... 12, 15, 22
Tex. Elec. Code § 84.001 .......................................................................... 2, 10, 17, 19
Tex. Elec. Code § 84.002 .......................................................................................... 2
Tex. Elec. Code § 84.007 ..................................................................................... 14, 17
Tex. Elec. Code § 85.005 ........................................................................................ 18
Tex. Elec. Code § 86.001 ................................................................................... passim
Tex. Elec. Code § 86.002 .......................................................................................... 2
Tex. Elec. Code § 86.005 ..................................................................................... 10, 19
Tex. Elec. Code § 86.006 ........................................................................ 2, 10, 18, 19
Tex. Elec. Code § 86.011 ..................................................................................... 14, 15
Tex. Elec. Code § 86.015 ..................................................................................... 14, 15
Tex. Elec. Code § 87.0271 ....................................................................................... 15
Tex. Elec. Code § 87.041 ................................................................................... passim
Tex. Elec. Code § 87.0411 ....................................................................................... 15
Tex. Elec. Code § 101.052 .................................................................................. 10, 17
Tex. Elec. Code § 101.057 ............................................................................ 10, 18, 19
Tex. Elec. Code § 101.107 ............................................................................ 10, 18, 19
Tex. Elec. Code § 105.001 ....................................................................................... 18
Tex. Elec. Code § 105.004 ....................................................................................... 18
Tex. Elec. Code §§ 105.001-.004 ......................................................................... 12, 15

**Secondary Sources**
Carolyn Puckett, *The Story of the Social Security Number*, 69 Soc. Sec. Bull., no. 2, 2009 ......... 2
*Error*, Black's Law Dictionary (11th ed. 2019) ...................................................... 16
Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and
Other Voting at Home Options* (July 12, 2022) .................................................... 12
*Omission*, Black's Law Dictionary (11th ed. 2019) ................................................ 16
*Paper*, Black's Law Dictionary (11th ed. 2019) .................................................... 17
*Record*, Black's Law Dictionary (11th ed. 2019) .................................................. 17

**Rules**
Fed. R. Civ. P. 56 ..................................................................................................... 8

**Legislative History**
10 Cong. Rec. 6715 (1964) ..................................................................................... 16

## INTRODUCTION

Texas Senate Bill 1 (SB 1) requires Texas election officials to reject mail ballot materials if a voter fails to correctly recite identification numbers that are not material to determining the voter's qualifications to vote or to vote by mail.  SB 1 thus violates Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101 (a)(2)(B) (Section 101).  Facts material to this determination are not disputed, as even the Director of the Elections Division of the Office of Texas Secretary of State (SOS) has acknowledged that identification numbers are unrelated to voter qualifications.  And as a practical matter, identification numbers are neither necessary to establish voter identity nor ordinarily used to do so.  Nonetheless, SB 1 has required more than 36,000 mail ballots to be rejected—including more than 11,000 ballots in the November 2022 general election alone—and over 2.6 million registered voters remain particularly vulnerable to disenfranchisement due to incomplete or erroneous State records.  The State's flawed voter registration database magnifies SB 1's harms, as some qualified Texas voters who comply fully with SB 1 mandates nonetheless face disenfranchisement through no fault of their own.  Indeed, about one in seven Texas voters can accurately complete mail ballot materials but still be denied the statutory right to vote based on SB 1.  Because SB 1 requires election officials to reject mail ballots materials for errors or omissions that are not material to establishing a voter's qualifications to vote under Texas law, this Court should grant summary judgment in favor of the United States on its Section 101 claim.

## BACKGROUND

Texas Senate Bill 1 (SB 1) is an omnibus election law that restricts eligible voters' ability to cast a mail ballot and have that ballot counted.  *See* Election Integrity Protection Act of 2021, Tex. S.B. 1, 87th Leg., 2d C.S., ch. 1 (2021).  Texas law has long required that eligible voters

who seek to cast a ballot by mail "must make an application for an early voting ballot," Tex. Elec. Code § 84.001(a), (f), and that voters must return mail ballots "in the official carrier envelope," *id.* § 86.006, or—in the case of members of the military, military family members, and overseas citizens—in an ordinary envelope along with "a signature sheet," a form on which the voter may provide a signature and other required information, *see id.* § 101.107(b).  SB 1 newly requires voters to provide "the number of the applicant's [Texas] driver's license, election identification certificate, or a personal identification card issued by the Department of Public Safety" (DPS number) on mail ballot applications, carrier envelopes, and signature sheets, even if the identification is no longer valid.  Tex. Elec. Code § 84.002(1-a)(A), (b-1); *id.* § 86.002(g)(1), (h).  SB 1 then directs that voters who have never been issued a DPS number must either provide the last four digits of their Social Security number (SSN4) or state that they have never been issued a DPS number or SSN.  *See* Tex. Elec. Code § 84.002(1-a)(B)-(C); *id.* § 86.002 (g)(2)-(3).[1]  Section 5.07 of SB 1 requires that early voting clerks "shall reject" mail ballot applications that do not include a DPS number or SSN4 that identifies "the same voter identified on the applicant's application for voter registration."  Tex. Elec. Code § 86.001(f). Similarly, Section 5.13 of SB 1 establishes that a mail ballot "may be accepted only if" the DPS number or SSN4 on the carrier envelope or signature sheet identifies "the same voter identified on the applicant's application for voter registration."  Tex. Elec. Code § 87.041(b)(8).

To implement SB 1, the SOS has issued updated forms and materials, including the application for a ballot by mail (ABBM), the mail ballot carrier envelope, the signature sheet,

---

[1] Very few voters can simply state on mail voting materials that they have never been issued a DPS number or SSN.  *See, e.g.*, Carolyn Puckett, *The Story of the Social Security Number*, 69 Soc. Sec. Bull., no. 2, 2009, at 55 (explaining that "nearly every legal resident of the United States" has been issued a Social Security Number), *available at* https://perma.cc/PP2Z-V3E5.

and guidance documents.  U.S. Statement of Undisputed Facts (SUF) ¶¶ 23, 80, 82-84, 90-91 (attached).  Official forms required to obtain and cast a mail ballot direct voters to provide a single identification number, which must be a DPS number if the voter has been issued DPS identification.  SUF ¶¶ 92-95.  Specifically, the updated ABBM now directs voters to "PROVIDE ONE" identification number, a DPS number or—if the voter "do[es] not have" DPS identification—their SSN4, and the carrier envelope and signature sheet instruct voters that they "MUST PROVIDE ONE OF THE FOLLOWING NUMBERS," a DPS number "OR"—if the voter "do[es] not have" DPS identification—their SSN4.  SUF ¶¶ 92-94.  None of these documents suggests that any voter may provide either a DPS number, a SSN4, or both, let alone advises voters to provide both numbers.  SUF ¶ 95.  Guidance from the SOS directs local officials to reject ABBMs and carrier envelopes that do not bear a DPS number or SSN4 that matches voter registration records.  SUF ¶ 35, 90, 100-103.

Following SB 1's effective date, the SOS identified that incomplete records in the Texas Election Administration Management (TEAM) system could interfere with the ability of many qualified voters to cast a mail ballot that would be counted under the new requirements.  SUF ¶ 131.  Over a year later, nearly 190,000 Texas voters who have been issued DPS identification still lack a DPS number in TEAM records, and more than 90,000 Texas registered voters have neither a DPS number nor a SSN4 affiliated with their voter registration record.  SUF ¶¶ 140-141.  In addition, roughly 2.4 million Texas voters have only one of their multiple DPS numbers in TEAM, and TEAM remains error-ridden, including over 60,000 DPS numbers inconsistent with DPS records and nearly 45,000 SSN4s inconsistencies between TEAM and DPS databases.  SUF ¶¶ 142-144.  In light of these persistent inadequacies, both the SOS and county officials have directed duly registered and qualified Texas voters whose registration records are

incomplete or erroneous for SB 1 purposes to submit new voter registration applications.  SUF ¶ 105.

SB 1 has resulted in widespread rejection of otherwise valid mail ballot materials. TEAM lacks records adequate to determine the number of ABBMs rejected statewide on account of SB 1, SUF ¶¶ 149, 151, but data produced by Bexar County and Harris County alone document over 3,000 ABBM rejections in the November 2022 General Election for failure to meet SB 1 requirements, only about 1,200 of which were successfully cured.  SUF ¶ 152(b)-(c). In the March 2022 primary election, more than 25,000 ballots were rejected statewide based on a mismatched or missing DPS number or SSN4.  SUF ¶¶ 153-154.  Primary runoffs and a constitutional amendment election in May 2022 featured mail ballot rejection rates well above pre-SB 1 norms.  SUF ¶ 155-156, 174-177.  And in the November 2022 general election, SB 1 required officials across Texas to reject more than 11,000 mail ballots.  SUF ¶ 161.

The individual experiences of voters and county officials illustrate the widespread harms caused by SB 1.  For example, in the 2022 primary election, Ms. Pam Gaskin, a 75-year old voter who had been registered to vote in Fort Bend County for over 40 years, had her ABBM rejected after she followed the form's instructions and submitted her Texas Driver License number, which she later learned was not in the voter registration database.  SUF ¶¶ 180-181. And in the general election, Mr. Roberto Benavides, a 76-year old voter in Travis County, attempted to respond to a notice of mail ballot rejection, but his efforts to cure were unsuccessful and his vote went uncounted.  SUF ¶ 182-185.  Local election officials eventually informed Mr. Benavides that the Texas Driver License number in his voter registration record contained a typo.  SUF ¶ 184.  More broadly, county election officials reported voter confusion and frustration, including cases of voters discarding carrier envelopes that election officials had

returned due to a failure to meet SB 1 requirements rather than taking additional steps to overcome the ballot rejection.  SUF ¶¶ 99, 186.  And in the 2022 general election, five individuals who successfully submitted a Federal Post Card Application—a ballot request form available only to members of the military, military family members, and overseas citizens, *see* 52 U.S.C. § 20302(a)(4)—had ballots rejected for failure to meet SB 1 requirements.  SUF ¶ 163.

DPS numbers and SSN4s required by SB 1 are not used to ensure that voters are qualified to vote or to cast a mail ballot under Texas law, to identify voters, or to flag potential fraud.  Mr. Keith Ingram, then serving as Director of the Elections Division of the SOS, thus acknowledged in a 2022 deposition that "individual eligibility criteria ha[ve] nothing to [d]o with the number." SUF ¶ 15.[2]  Nor do election officials ordinarily use these numbers to look up voter records, and the SOS does not instruct them to do so.  SUF ¶¶ 118-120.  Rather, election officials look up voters using other information on mail ballot materials—such as the voter's name, date of birth, and address—just as they did before SB 1.  SUF ¶ 120.  Election officials must also verify a voter's identity using the signature by which the voter attests to identity and eligibility, just as they did before SB 1.  Tex. Elec. Code § 87.041(b)(2); SUF ¶ 65.  Further, the SOS and county officials do not consider a DPS number or SSN4 mismatch or omission to be evidence of fraud. SUF ¶¶ 187-191.  And because matching a DPS number or SSN4 against incomplete and erroneous voter registration records fails to identify some voters accurately and requires election officials to reject mail ballot materials from those voters, who simply followed instructions on applications, carrier envelopes, and signature sheets and provided accurate information.  SUF ¶¶ 34-36, 51, 92-94, 100-103, 131, 134-137, 139-146, 180-185.

---

[2] Mr. Ingram now serves as a project manager within the Elections Division.  SUF ¶ 16.

Some state and local officials have taken substantial measures to mitigate SB 1's impact on voters, particularly in response to widespread rejections of ballot applications and mail ballots during the March 2022 primary election.  SUF ¶ 122.  Although SB 1's text establishes a hierarchy of identification—with voters who have a DPS number required to provide that number and only voters who lack a DPS number permitted to provide a SSN4, *see* Tex. Elec. Code §§ 84.002(a)(1-a), 86.002(g); SUF ¶¶ 32, 50—officials have accepted a SSN4 from voters with a DPS number on file.  SUF ¶ 96.  Similarly, state officials have recommended that voters provide *both* a DPS number and SSN4, and some counties have added inserts to mail voting materials with similar guidance.  SUF ¶¶ 97, 123.  However, the continued presence of a hierarchy of identification on official forms and instructions has puzzled voters and inhibited efforts to reduce disenfranchisement.  SUF ¶ 124.  Moreover, counties have spent significant sums to implement SB 1's mail ballot provisions.  SUF ¶ 125.  But even as counties strive to develop and share best practices, long-term implementation of those practices will require sustained local resources.  SUF ¶ 122.

Despite these efforts, SB 1 continues to disenfranchise Texas voters at historic rates.  In the November 2022 general election, officials initially rejected 4.1% of mail ballots returned, and over 80% of those ballots were rejected based on the SB 1 mail ballot requirements.  SUF ¶¶ 158, 161.  Ultimately, more than 50% of individuals whose mail ballots were rejected due to SB 1 did not successfully cure their mail ballot or vote in person.  SUF ¶ 158.  The 2.7% final mail ballot rejection rate is nearly three times the national average and well above historical rejection rates in Texas.  SUF ¶¶ 157, 159-160.  Ms. Christina Adkins, Acting Director of the Elections Division of the SOS, has acknowledged that mail ballot rejection may persist at current rates, SUF ¶ 179, and county officials uniformly agree that good faith implementation of SB 1

cannot eliminate rejection of mail ballot applications and mail ballots entirely, SUF ¶ 126. Rather, the undisputed facts establish that, unless enjoined, SB 1 will continue to disenfranchise Texas voters based on errors or omissions not material to determining whether a voter is qualified under State law to vote or vote by mail.

## STATUTORY BACKGROUND

Section 101 of the Civil Rights Act of 1964, as amended, prohibits persons acting under color of law from denying "the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).  The term "vote" here "includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted."  *Id.* § 10101(e); *see also id.* § 10101(a)(3)(A).  "Section 101, as a result, does not only apply when a voter is absolutely prohibited from voting" and does not permit "state actors [to] initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes."  *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022).  This provision was "necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995); *see also, e.g.*, *United States v. Crawford*, 229 F. Supp. 898, 901-02 (W.D. La. 1964) (describing practice of denying registration to Black "applicants on account of errors or omissions in their application forms while registering white applicants who have made similar errors or omissions"), *rev'd on other grounds sub nom. United States v. Clement*, 358 F.2d 89 (5th Cir. 1966).

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material is if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). When considering a motion for summary judgment, courts "must draw all reasonable inferences in favor of the nonmoving party" and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial.").

## ARGUMENT

SB 1 violates Section 101 by requiring officials to reject mail ballot applications and mail ballots if applications, carrier envelopes, and signature sheets lack a DPS number or SSN4 that matches voter registration records, a criterion not material to determining a voter's qualifications under Texas law. To violate Section 101, a state law must (1) deny the right of any individual to "vote" in an election (as defined), (2) based on an "error or omission," (3) on a "record or paper," (4) "relating to any application, registration, or other act requisite to voting," and (5) that is not "material in determining whether" that "individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B); *see also Migliori v. Cohen*, 36 F.4th 153, 162 &

n.56 (3d Cir. 2022), *judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022).[3]  The undisputed facts establish all five elements here.  Thus, SB 1 has forced Texas election officials to reject tens of thousands of mail ballot applications and mail ballots in violation of federal law, denying Texas voters the statutory right to vote protected by Section 101.  And in many cases, SB 1 has required officials to discard valid votes cast by Texans fully qualified to vote under State law, including voters who faithfully followed SB 1 mandates but whose materials were rejected solely because of State database errors.

I.      **SB 1 Mail Ballot Provisions Deny the Statutory Right to Vote in an Election.**

SB 1 requires state officials to deny the statutory right of individuals "to vote in an election," 52 U.S.C. § 10101(a)(2)(B), by rejecting submission of mail ballot applications and submission of mail ballot carrier envelopes or signature sheets, "action[s] required by State law prerequisite to voting, casting a ballot, and having such ballot counted," *id.* § 10101(a)(3)(A), (e) (defining "vote").  The statutory right to vote protected by Section 101 is expansive because the provision "defines the term 'vote' broadly [to] include[] all action necessary to make a vote effective."  *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540 (citing 52 U.S.C. §§ 10101(a)(3)(A), (e)).  Because "vote" includes the entire voting process, "that addition to the

---

[3] The Supreme Court vacated *Migliori* after the underlying dispute became moot.  *See Ritter v. Migliori*, 143 S. Ct. 297 (2022) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)). Despite this vacatur, the substantive analysis in *Migliori* remains convincing.  *See Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 903-04 (S.D. Tex. 2021); *see also, e.g.*, *United States v. Ambriz*, 727 F.3d 378, 384 n.8 (5th Cir. 2013) (relying on "a case that was vacated for other reasons"); *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 427 (3d Cir. 2020) (relying on vacated opinion whose "prior analysis continues to resonate").

plain meaning controls." *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020).  Thus, the rejection of

mail ballot materials mandated by SB 1 fulfills the first element of a Section 101 claim.[4]

A.      **SB 1 Requires Officials to Reject Certain Mandatory Mail Voting Materials.**

Under Texas law, "[t]o be entitled to vote an early voting ballot by mail, a person who is

eligible for early voting must make an application for an early voting ballot to be voted by mail,"

either an ABBM or a Federal Post Card Application.  Tex. Elec. Code §§ 84.001(a), 101.052(e);

SUF ¶¶ 21-28; *see also La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540-41.  And after

obtaining and marking a mail ballot, most voters must "place it in the official ballot envelope and

then seal the ballot envelope, place the ballot envelope in the official carrier envelope and then

seal the carrier envelope, . . . sign the certificate on the carrier envelope," and then return the

carrier envelope to the early voting clerk.  Tex. Elec. Code §§ 86.005(c), 86.006; SUF ¶ 47; *see*

*also La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540-41.  Only military and overseas voters

may return ballots without an official carrier envelope; they may provide a signature sheet inside

an ordinary envelope or alongside a ballot returned by fax.  *See* Tex. Elec. Code §§ 101.057,

101.107; SUF ¶¶ 48-49.  "Therefore, the preparation and submission of an application to vote by

mail, as well as the preparation and submission of a mail ballot carrier envelope [or signature

---

[4] Section 101 does not rely on a colloquial conception of the "right to vote" or on the definition
of that right for constitutional purposes.  *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541.
Moreover, alternative constructions of Section 101 offered in dissenting and non-binding
opinions should not guide this Court's analysis.  *See Ritter v. Migliori*, 142 S. Ct. 1824, 1824-26
(2022) (Alito, J., dissenting); *Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) (stay opinion);
*see also Tex. Democratic Party v. Abbott*, 978 F.3d 168, 176 (5th Cir. 2020) (acknowledging
motion panels do not bind merits panels).  Several limiting constructions of Section 101 offered
in *Ritter* and *Vote.org* conflict with the statute's plain text and would nullify the statute's core
protections.  *See, e.g.*, *Ritter*, 142 S. Ct. at 1825 (Alto, J., dissenting) (excluding paperwork
rejection for failure to "follow the rules" from the protection of Section 101); *Vote.org*, 39 F.4th
at 305 n.6 (same); *cf.* 52 U.S.C § 10101(a)(2)(B) (establishing a statutory right to vote
notwithstanding errors on certain requisite paperwork).

sheet], are actions that voters must take in order to make their votes effective." *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541.

But SB 1 then requires election officials to reject mail ballot materials under specified conditions. At the application stage, Section 5.07 of SB 1 dictates that early voting clerks "shall reject" a mail ballot application if the DPS number or SSN4 provided "does not identify the same voter identified on the applicant's application for voter registration." Tex. Elec. Code § 86.001(f); SUF ¶¶ 32-34; *see also La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541. In practice, this requires election officials to reject applications without a DPS number or SSN4 and applications where the DPS number or SSN4 does not match current voter registration records. SUF ¶¶ 34-35. Then at the ballot acceptance stage, Section 5.13 of SB 1 establishes that a mail ballot "may be accepted only if" the DPS number or SSN4 "provided by the voter identifies the same voter identified on the voter's application for voter registration." Tex. Elec. Code § 87.041(b)(8); SUF ¶¶ 50-51; *see also La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541. Again, the SOS has interpreted this provision to require rejection of mail ballots if the DPS number or SSN4 is missing or does not match current voter registration records. SUF ¶¶ 51, 63. These rejections deny the statutory right to vote and thus establish the first element of a Section 101 claim.

The availability of in-person voting does not negate SB 1's denial of the statutory right to vote. Although all 50 states operate polling places on Election Day, this Court and others have concluded that Section 101 protects against rejection of mail ballot materials. *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541 n.20; *see also Migliori*, 36 F.4th at 156-57; *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021); *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020);

*Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018).[5]  This is because Section

101 applies to "*any* individual" participating in "*any* election" and to "*any* record or paper"

relating to "*any* application, registration, or act requisite to voting."  52 U.S.C. § 10101(a)(2)(B)

(emphasis added); *see also, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (explaining that

"the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever

kind'" (quoting *Webster's Third New International Dictionary* 97 (1976))).

　　Mail voting is particularly vital for voters who cannot vote in person.  *See Martin v.

Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018) (finding in-person cure "illusory,

particularly for the category of voters who cannot vote in person due to physical infirmity").

Texas law limits early voting by mail primarily to individuals for whom in-person voting may be

physically impossible or unduly burdensome.  Tex. Elec. Code §§ 82.001-.004, 82.007-08,

105.001-.004; SUF ¶¶ 17, 19, 206.  Some voters eligible to cast a mail ballot find it essential to

rely on the vote-by-mail provisions Texas has enacted, *see* SUF ¶ 199, and these voters have

been disenfranchised once their mail ballot materials were rejected based on errors or omissions

not material to voter qualifications, *see* SUF ¶¶ 157-158, 161, 182-186, 196.  Fundamentally, "a

state that creates a system for absentee voting must administer it in accordance" with federal law.

*Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020) (internal quotation

marks omitted); *see also, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d at 1338; *Raetzel v.

Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

---

[5] Some states have adopted "all-mail elections," but this method of conducting elections "does
not preclude in-person voting opportunities on or before Election Day."  Nat'l Conf. of State
Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home
Options* (July 12, 2022), https://perma.cc/7N8E-WEA3.

In the first year of implementation, the mail ballot provisions of SB 1 resulted in widespread rejection of applications for mail ballots and rejection of tens of thousands of mail ballots. SUF ¶¶ 147-161. Despite extraordinary efforts by county officials, these problems persist, and ballot rejection rates in the November 2022 election remained well above pre-SB 1 levels in Texas and nearly three times the national average. SUF ¶¶ 157-161, 175-177. The Acting Director of the Elections Division of the Texas SOS has recognized that mail ballot rejections may persist at current rates, SUF ¶ 179, and county officials consistently agree that good faith implementation of SB 1 cannot eliminate mail ballot application and ballot rejection entirely, SUF ¶ 126.

### B.     Cure Procedures Do Not Absolve a Denial of the Statutory Right to Vote.

Denial of the statutory right to vote under Section 101 is complete when a particular application or carrier envelope is rejected; an opportunity to cure the rejection, submit another application, or cancel a mail ballot does not negate the denial of the statutory right to vote. *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541; *see also Vote.org v. Ga. State Election Bd.*, No. 1:22-cv-1734, 2023 WL 2432011, at *7 (N.D. Ga. Mar. 9, 2023) (rejecting the "argument that the opportunity to cure an error rehabilitates any potential violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same). SB 1 provides that mail ballot materials must be rejected if the materials lack an identification number matching voter registration records, blocking the applicant's ability to cast a mail ballot or have that ballot counted. *See* Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 32-35, 50-51, 63. The existence of additional, more onerous procedures that voters could use to try to overcome the rejection does not negate the original denial. Section 101's plain text does not permit election officials to reject mail ballot materials based on errors or omissions not material to voter qualifications *unless and until* voters successfully provide the requested information or

13

the State fixes its own database errors or omissions.  *See* 52 U.S.C. § 10101(a)(2)(B); *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541.  Ultimately, even with a cure process, the fact remains that SB 1 requires rejection of mail ballot materials if a voter does not submit an identification number that matches voter registration records.  *See* Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 37, 39, 61, 63, 67-68.  That rejection denies the statutory right to vote.

Even if cure procedures were legally relevant—and they are not—cure procedures under SB 1 do not protect the franchise because some voters cannot effectively use them to ensure their application is accepted and their valid ballot is counted.  *Cf. Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030-31 (N.D. Fla. 2018) (finding cure provisions inadequate to resolve due process concerns when "the opportunity to cure has proven illusory"); *Martin v. Kemp*, 341 F. Supp. 3d at 1339 (same).  Cure limitations are most acute for applications. Because the ABBM submission deadline and cure deadline are both 11 days before Election Day, some voters who submit an application on or near that deadline do not receive notice of rejection prior to the deadline to cure.  *See* Tex. Elec. Code §§ 84.007(c), 86.001(f)-(f-2), 86.011(d); SUF ¶¶ 38-39, 200-202.  Moreover, curing an application can be difficult.  Currently, only voters who have both a DPS number and SSN4 on their voter registration file can cure defects on the face of the application using the online ballot tracker, *see* Tex. Elec. Code § 86.015(b), and as of December 2022, over 750,000 registered voters in Texas lack either a DPS number or an SSN4 on their registration record; none of these voters can access the ballot tracker.  SUF ¶¶ 73, 137.  Other voters must submit a new ABBM with a new DPS number or SSN4 that matches one in the voter file or update their registration record by submitting a new voter registration form or using a web application on Texas.gov.  SUF ¶¶ 37.

Voters who attempt to cure rejection of a mail ballot for failure to meet SB 1 requirements also face substantial impediments.  Following identification of a carrier envelope defect, election officials may either return a ballot to a voter or hold the ballot and notify the voter of the defect.  Tex. Elec. Code §§ 86.011(d), 87.0271(b)-(c), 87.0411(b)-(c); SUF ¶¶ 58, 61, 67-68.  When a ballot is returned to the voter, the ballot and an accompanying corrective action form must be returned to county election officials before the polls close on Election Day, creating a narrow window for ballot return, particularly for voters with limited availability or mobility.  *See* Tex. Elec. Code §§ 82.001-.004, 82.007-.008, 105.001-.004; SUF ¶¶ 67, 203, 205. When election officials hold the ballot, most voters must either correct the identification number in the online ballot tracker or appear in person to deliver a corrective action form to county election officials by the sixth day after Election Day.  Tex. Elec. Code §§ 87.0271(c), 87.0411(c); SUF ¶¶ 68, 203.  But once again, the online ballot tracker is available only to voters who have both a DPS number and SSN4 on their voter registration file.  *See* Tex. Elec. Code § 86.015(b); SUF ¶¶ 71-73.  And Texans eligible to vote by mail may be unable to return a form in person for the same reasons they cannot vote in person; they are physically absent from their county of residence, elderly, disabled, or the like.  *See* Tex. Elec. Code §§ 82.001-.004, 82.007-.008; SUF ¶¶ 19, 199, 206.  In any case, some voters who return mail ballots on or immediately before Election Day are disenfranchised by late notice of a defect.  *See* Tex. Elec. Code §§ 87.0271(c), 87.0411(c); SUF ¶¶ 204-205.

Members of the military, military family members, and overseas citizens may cure a rejected ballot by providing a new signature sheet with the required identification number via email, fax, common carrier, or hand delivery.  SUF ¶ 207.  Although this affords military and overseas voters with broader cure opportunities, such voters are more likely to be located where

15

personal electronic communications and postal delivery are not reliably or consistently available. SUF ¶ 208.  Because the SB 1 cure process increases the number of interactions required for a voter to complete their absentee voting process successfully, military and overseas voters are more likely than other voters to face challenges in getting their ballot counted if their mail voting materials contain an error or omission concerning a DPS number or SSN4.  SUF ¶ 208.  Thus, as a matter of both law and uncontested fact, the SB 1 cure process does not remedy the statutory denial of the right to vote.

## II.    SB 1 Regulates Errors or Omissions on Mail Ballot Materials.

SB 1 requires election officials to reject mail ballot applications and mail ballots based on errors or omissions regarding identification numbers.  *See* Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 32, 34-35, 50-51, 63.  Acting upon such "errors or omissions" meets the second element of a Section 101 claim.  52 U.S.C. § 10101(a)(2)(B).  Specifically, if the voter provides a DPS number or SSN4 that does not match voter registration records, it is an "error" for SB 1 purposes.  *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008) ("[A]n error by definition mistakenly and *incorrectly* represents the underlying substantive element"); *see also Error*, Black's Law Dictionary (11th ed. 2019) ("An assertion or belief that does not conform to objective reality.").  The result is the same if the voter makes a mistake when recording a DPS number or SSN4, if voter registration records do not contain an accurate number the voter has provided, or if voter registration records lack a DPS number or SSN4 entirely.  Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶ 100-102, 105.  On the other hand, if the voter provides no number at all, it is an "omission."  *See Martin v. Crittenden*, 347 F. Supp. 3d at 1306 (addressing "failure to provide" requested information); *see also Omission*, Black's Law Dictionary (11th ed. 2019) ("Something that is left out, left undone, or otherwise neglected."); 10 Cong. Rec. 6715 (1964) (Statement of Sen. Kenneth Keating) (describing

legislative intent of Section 101 to address failure to complete paperwork calling for redundant information).  Thus, an "error or omission" under SB 1 triggers denial of the statutory right to vote for purposes of Section 101.

### III.    SB 1 Regulates Records or Papers Related to Voting by Mail.

SB 1 targets errors or omissions "on a[] record or paper," 52 U.S.C. § 10101(a)(2)(B), fulfilling the third element of a Section 101 claim.  *See also* Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 34-35, 51, 63.  Although the Civil Rights Act does not define "record" for purposes of Section 101, federal statutes consistently afford the term an expansive meaning.  *See* 5 U.S.C. § 552a(a)(4) ("any item, collection, or grouping of information"); 44 U.S.C. § 2201(2) ("documentary materials"); *id.* § 3301 ("all recorded information, regardless of form or characteristics"); *see also* 5 U.S.C. § 552(f)(2) (noting that "record" includes information maintained "in any format, including an electronic format"); *Record*, Black's Law Dictionary (11th ed. 2019) ("Information that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceivable form.")  Similarly, the Civil Rights Act does not define "paper," but that term bears an "obvious[]" meaning.  *Kohus v. Toys R Us, Inc.*, 282 F.3d 1355, 1359 (6th Cir. 2002); *see also Paper*, Black's Law Dictionary (11th ed. 2019) ("Any written or printed document or instrument.").

Mail voting materials subject to SB 1 requirements are records or papers.  Applications to vote by mail typically "must be submitted in writing and signed by the applicant using ink on paper."  Tex. Elec. Code § 84.001(b); *see also* Tex. Elec. Code § 84.007(b), (b-1) (requiring hard copy return to local clerks); SUF ¶ 21; *cf.* Tex. Elec. Code § 101.052(a-1) (permitting eligible voters to scan a paper Federal Post Card Application and transmit that digital record to the early voting clerk).  Most voters must then return an "official carrier envelope" to early voting clerks, an original paper document bearing identification numbers and containing a voter's ballot

envelope, which in turn contains the cast ballot.  *See* Tex. Elec. Code §§ 85.005(c); 86.006(a);

SUF ¶ 47.  Even military and overseas voters who chose to return their ballots with a signature

sheet (*i.e.*, a form on which the voter provides a signature and other required information) rather

than in a carrier envelope must, in almost all cases, return paper copies of their ballot and

signature sheet by mail, common or contract carrier, or courier.  *See* Tex. Elec. Code

§§ 101.057(a), 101.107(b); SUF ¶ 48.  Only military voters in hostile fire zones may return their

ballot and signature sheet via fax, *see* Tex. Elec. Code §§ 105.001(a)(2), 105.004; SUF ¶ 49, but

even this procedure both transmits a digital record and results in the printing of a paper copy

thereafter accepted or rejected.  Thus, the error or omission that triggers denial of the statutory

right to vote under SB 1 occurs on a "record or paper" for purposes of establishing a Section 101

violation.

### IV.   SB 1 Regulates Materials Relating to Applications and Other Acts Requisite to Voting.

SB 1 also relates directly to an "application, registration, or other act requisite to voting,"

52 U.S.C. § 10101(a)(2)(B), meeting Section 101's fourth element.  "[A]ct requisite to voting" is

a "broad statutory classification," *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), that

separately encompasses each method of voting authorized by the State.  *See Migliori*, 36 F.4th at

152 n.56; *see also United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993) (applying

"prerequisite to voting" to voting by mail); *Kennedy v. Lewis*, 325 F.2d 210, 212-12 (5th Cir.

1963) (rejecting narrow construction of "requisite to voting").  Under Texas law, "the

preparation and submission of an application to vote by mail, as well as the preparation and

submission of a mail ballot carrier envelope, are actions that voters must take in order to make

their votes effective."  *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541; *see also* Tex. Elec.

Code § 101.107(b) (permitting a subset of voters to submit a signature sheet in lieu of an official

carrier envelope).  Specifically, an ABBM is an application requisite to voting for most individuals who seek to cast a mail ballot.  *See* Tex. Elec. Code § 84.001(a); SUF ¶ 36. Similarly, acceptance of a carrier envelope or a signature sheet is "an act requisite to voting" for individuals who cast a mail ballot.  *See* Tex. Elec. Code §§ 86.005(c), 86.006, 101.057, 101.107; SUF ¶¶ 48, 63, 70.  Once again, for purposes of Section 101, "vote" includes "all action necessary to make a vote effective including, but not limited to, . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes."  52 U.S.C. § 10101(a)(3)(A), (e).  Therefore, the challenged provisions of SB 1 concern an "application, registration, or other act requisite to voting" under Section 101.

## V.  SB 1 Requires Identification Numbers That Are Not Material to Voter Qualifications.

Finally, whether a voter can accurately recite a DPS number or SSN4 recorded in voter registration records is "not material in determining whether such individual is qualified under State law to vote," 52 U.S.C. § 10101(a)(2)(B), fulfilling Section 101's fifth element.  Section 101 restricts materiality to "whether such individual is qualified under State law to vote," 52 U.S.C. § 10101(a)(2)(B); a voter's qualifications under the statute do not extend to redundant confirmation of voter identity or other means to identify potential election crimes, *see, e.g.*, *Schwier v. Cox* (*Schwier I*), 340 F.3d 1284, 1294 (11th Cir. 2003).  Ability to present a matching identification number is not a substantive eligibility requirement under Texas law.  *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540 (listing qualifications) (citing Tex. Elec. Code §§ 11.002, 82.001-.004, 82.007-.008).  As the Director of the Elections Division of the SOS recognized, "individual eligibility criteria ha[ve] nothing to [d]o with the number."  SUF ¶ 15. Rather, a DPS number or SSN4 "is unnecessary and therefore not material to determining an individual's qualifications."  *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 542 (describing

standard).  Moreover, the identification number requirements of SB 1 are not "material" to determining a voter's identity, both because county officials do not ordinarily use this information to establish voter identity and because database limitations and errors preclude consistently accurate voter identification.  *See* SUF ¶¶ 120, 137-145.

### A.    Identification Numbers Are Not Material to Texas Voter Qualifications.

A DPS number or SSN4 is not material to determining whether a voter is qualified to vote.  To determine whether an error or omission is material, the information required must be compared to qualifications to vote under state law.  *See Migliori*, 36 F.4th at 162-63; *Schwier I*, 340 F.3d at 1297; *Martin v. Crittenden*, 347 F. Supp. 3d at 1308-09; *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006); *see also Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (deeming "failure to provide information, such as race or social security number, that is not directly relevant to the question of eligibility" not to be material). Through its focus on materiality "in determining whether such individual is qualified under State law to vote," Section 101 distinguishes between the few prerequisites that one must meet to be "qualified" to vote and the many additional procedural requirements that merely enforce, measure, or confirm those underlying qualifications.  52 U.S.C. § 10101(a)(2)(B).  The category of qualifications is limited to certain substantive characteristics, like age and citizenship, that are "germane to one's ability to participate intelligently in the electoral process."  *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966); *see also* Tex. Elec. Code § 11.002.  All other regulations—including state law concerning "protection of voters, prevention of fraud and corrupt practices, [and] counting of votes," *Smiley v. Holm*, 285 U.S. 355, 366 (1932)—fall outside that category.  Although such procedural requirements might help officials enforce the states' qualifications, they are not themselves voter qualifications simply because state law mandates them.  *See*, *e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013)

(distinguishing between setting qualifications and "obtaining the information necessary to enforce . . . qualifications").  So, too, whether one is "qualified" under Section 101 turns on whether one possesses characteristics such as age, citizenship, and residence, not whether one "fail[s] to follow needlessly technical instructions."  *Diaz*, 435 F. Supp. 2d at 1213.[6]

The DPS number or SSN4 listed on a voter's registration record is not material to qualifications to vote or vote by mail in Texas.  This Court has already set out the qualifications to vote under the Texas Election Code, as well as the specific qualifications to cast a ballot by mail.

> The Election Code defines a "qualified voter" as a person who is eighteen years of age or older, a United States citizen, a Texas resident, and a registered voter.  To be a "qualified voter" in Texas, one also cannot be declared mentally incapacitated or convicted of a felony unless the voter has a fully discharged sentence or has been pardoned.  In addition, Texas law authorizes six categories of voters to vote by mail: (1) those who expect to be absent during the entire voting period; (2) those with a disability; (3) those who will be sixty-five years or older on Election Day; (4) those who are confined in jail; (5) those who are involuntarily committed; (6) and those who are certified participants in the State's address confidentiality program.

*La Unión del Pueblo Entero*, 604 F. Supp. at 540 (citing Tex. Elec. Code §§ 11.002, 82.001-.004, 82.007-.008); *see also* SUF ¶¶ 5, 17.  A DPS number or SSN4 is not material to determining any of these qualifications, and whether an individual provides a DPS number or SSN4 listed in voter registration records on mail ballot materials does not establish that the individual is eighteen, a U.S. citizen, a Texas resident, and a registered voter and whether the individual has been disenfranchised due to felony conviction or mental incapacitation.  *See* Tex. Elec. Code § 11.002; SUF ¶ 15.  Nor does providing a DPS number or SSN4 listed in voter

---

[6] Because Section 101 only applies to paperwork requirements, however, most electoral regulations fall outside of its scope.  *See, e.g.*, *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 55 (S.D.N.Y. 2022) (distinguishing between errors regarding a voter's assigned polling place and errors "on any record or paper").

registration records at the application stage—and again on a carrier envelope or signature sheet—establish whether an individual will be absent from their home county during the early voting period and on Election Day, has a disability, will be 65 or older on Election Day, expects to give birth within three weeks of Election Day, is confined in jail, has been involuntarily committed, or is a participant in an address confidentiality program.  *See* Tex. Elec. Code §§ 82.001-.004, 82.007-.008; *see also* SUF ¶ 20.  And even as a practical matter, county officials neither need nor typically use a DPS number or SSN4 to query registration records for purposes of identifying the voter or confirming that the voter is duly registered and has previously been found qualified to vote.  SUF ¶¶ 119-120.

Section 101 does not permit state actors to require voters to recite redundant information that confirms a known identity, even as a prophylactic against voter impersonation.  *See Schwier v. Cox* (*Schwier II*), 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (rejecting contention that any information that "could help to prevent voter fraud" is material to qualifications), *aff'd*, 439 F.3d 1285 (11th Cir. 2006).  To compare the DPS number or SSN4 on mail ballot materials with a voter's registration record, as SB 1 requires, officials must have already discerned the voter's identity sufficiently to know the voter "identified on the applicant's application for voter registration" or "the voter's application for voter registration."  Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 119-120.  And once election officials have determined an applicant or voter's identity, additional requirements that confirm identity are not material to determining whether the applicant or voter is qualified to vote or vote by mail and compounds the chance for error and disenfranchisement.  *See Schwier I*, 340 F.3d at 1294.  Thus, courts have found a wide range of information—such as a driver's license number matching state records, *Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1266, 1270; a social security number, *Schwier v. Cox* (*Schwier III*),

439 F.3d 1285, 1286 (11th Cir. 2006) (mem. op.); or a birth year on an absentee ballot envelope, *Martin v. Crittenden*, 347 F. Supp. 3d at 1308-09—not to be material to determining a voter's qualifications, even though this information could conceivably confirm a voter's identity.  So too here.  A voter's ability to provide a DPS number or SSN4 found in voter registration records is not material to determining whether a voter is qualified to vote under Texas law.

**B.      Identification Numbers Required by SB 1 Do Not Consistently Establish or Confirm Voter Identity.**

Even if information used to confirm a known voter's identity were material to determine whether an individual is qualified to vote under Texas law—and it is not—implementation of SB 1 has established that a voter's DPS number or SSN4 fails to identify voters accurately.  Rather, because of inaccuracies, omissions, and incomplete records in voter registration databases, the requirement to provide a DPS number or SSN4 on mail ballot materials subverts otherwise accurate identification of the voter in some cases.  SUF ¶¶ 139-145.  There are four basic database problems that prevent the use of a DPS number or SSN4 to confirm identity.

1. Over two million Texas registered voters have been issued more than one DPS number, but the TEAM database can associate only one DPS number with each voter.  SUF ¶ 142.

2. Over 450,000 Texas registered voters do not have a DPS number associated with their TEAM record, although nearly 190,000 of these voters have been issued a DPS number.  SUF ¶¶ 139-140.

3. Over 90,000 Texas registered voters do not have a DPS number or SSN4 associated with their voter registration record.  SUF ¶ 141.

4. Tens of thousands of Texas registered voters have typographic errors in the DPS number or SSN4 listed in their registration records.  SUF ¶ 144.

A DPS number or SSN4 cannot be "material" to a voter's qualifications based on confirmation of identity if accurately providing that number cannot and will not identify that voter.

The database issues outlined above have had real-world effects: voters whose registration records are impacted by these issues are less likely to complete the mail voting process successfully.  Over 2.7 million records of registrants—15% of Texas's statewide voter registration database—have multiple DPS numbers, DPS numbers missing from TEAM, or discrepancies in DPS number or SSN4 between TEAM and the DPS database.  SUF ¶ 144.  6.4% of mail ballots cast by these at-risk voters were rejected for failure to meet SB 1 requirements, whereas only 2.8% of mail ballots cast by voters without these database issues were rejected based on an incorrect or missing DPS number or SSN4.  SUF ¶¶ 164-165.  This difference is highly statistically significant.  SUF ¶ 166.  More broadly, among these at-risk voters, 22.4% of those who successfully requested a mail ballot for the November 2022 general election did not ultimately cast a mail ballot that was counted.  SUF ¶ 167.  By comparison, among voters without these database issues, only 16.2% of those who successfully requested a mail ballot for the November 2022 general election did not ultimately cast a mail ballot that was counted.  SUF ¶ 162.  Once again, this difference is highly statistically significant.  SUF ¶ 169.  The Elections Division of the SOS also received requests for assistance concerning voters whose registration records lacked a DPS number, lacked the DPS number on their most recently issued identification, or contained a typo, each of whom had mail ballot materials rejected due to SB 1. SUF ¶¶ 170-172.

These database issues have also proven persistent.  Officials within the SOS undertook efforts prior to the rollout of SB 1 to reduce the number of TEAM records missing DPS data. SUF ¶¶ 132-134.  The February 28, 2022, report of Dr. Eitan Hersh, an expert witness retained

by the United States, also alerted the State concerning the four database issues noted above.  SUF ¶ 135.  However, Dr. Hersh's February 3, 2023 supplemental report, based on data extracted after the November 2022 election, found that the number of Texas registered voters who do not have a DPS number or SSN4 associated with their voter registration record declined by less than 10% during a year of intensive implementation.  SUF ¶¶ 135, 141.  Moreover, the number of registered voters with multiple DPS numbers grew over this period, the number of registered voters with typographic errors in DPS numbers moderately declined, and the number of registered voters with SSN4s inconsistencies held constant.  SUF ¶¶ 135, 142-144.  Not only does SB 1 deny the statutory right to vote based on errors or omissions not material to voter qualifications under Texas law, but the law fails to serve its ostensible purpose of confirming voter identity, due to chronic errors and structural limitations in the State's voter registration databases.  Therefore, the identification number requirements of SB 1 are not "material" to determining whether a voter is qualified under State law to vote generally or to vote by mail specifically, even if qualifications were erroneously extended to incorporate confirmation of a known voter's identity.

## CONCLUSION

For the foregoing reasons, this Court should grant the United States summary judgment. A proposed order is attached hereto.

Date:  May 26, 2023

KRISTEN CLARKE
Assistant Attorney General

ELISE C. BODDIE
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
DANA PAIKOWSKY
MICHAEL E. STEWART
JENNIFER YUN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
daniel.freeman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2023, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-4355
daniel.freeman@usdoj.gov