EXHIBIT

30

TEXAS SECRETARY OF STATE

# Early Voting by Mail (ABBM and FPCA)





# Resources

- **Elections Forms Index**

https://www.sos.state.tx.us/elections/forms/pol-sub/index.shtml#photo-id

- **Conducting Your Elections Page**

https://www.sos.texas.gov/elections/laws/local-laws.shtml

- **Texas Election Code**

https://statutes.capitol.texas.gov/



# TOPICS COVERED

1. Eligibility to Vote by Mail

2. Methods of Submitting an ABBM

3. Reviewing ABBMs

4. Accepting and Rejecting ABBMs



**TEXAS SECRETARY OF STATE**

# ELIGIBILITY TO VOTE BY MAIL



# Eligibility to Vote by Mail

- **A qualified voter may vote by mail if the voter:**
  - Will be 65 or older on Election Day (Annual or Regular ABBM)
  - Has a Disability (Annual or Regular ABBM)
  - Is Expecting to Give Birth Within Three Weeks Before or After Election Day (Regular ABBM) <span style="color:red">(New Law)</span>
  - Is Civilly Committed Under Chapter 841, Health and Safety Code (Regular ABBM) <span style="color:red">(New Law)</span>
  - Expects to be Absent from County during Early Voting and on Election Day (Regular ABBM)
  - Is Confined in Jail (Regular ABBM)
  - Is in the Attorney General Address Confidentiality Program (Regular ABBM)
  - Is Military or Dependent of Military & Outside of Home Texas County (FPCA)
  - Is Temporarily Living Outside the United States (FPCA)
  - Is Living Outside the United States and the Voter has Indicated their Intent to Return is Uncertain (FPCA)
  - Is a member of the National Guard or Dependent (FPCA) <span style="color:red">(New Law)</span>

  Chapters 82 and 101, Texas Election Code



TEXAS SECRETARY OF STATE

# Annual ABBM

- Certain voters may submit a single Annual ABBM and receive ballots for <u>all</u> elections held by all entities in which the voter is eligible to vote in that calendar year.

- **<u>Eligible Voters:</u>**

  - **<u>ONLY</u>** for Voters 65+ or with Disability

  - Applicant must **indicate** they want the ABBM to be an Annual ABBM (not automatic) OR applicant does not specify the election for which a ballot is requested

  - Voters applying for reason of absence from county do not qualify for Annual ABBM.

- Submitted to the early voting clerk of **ANY** political subdivision, not just to the county early voting clerk. Sec. 86.0015.

**TEXAS SECRETARY OF STATE**

# Annual ABBM

A qualified voter is eligible for early voting by mail if the voter has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health.

Section 82.002(a)(1), Texas Election Code



# Eligibility to Vote by Mail

**NEW LAW:  House Bill 3920 (2021)**

- A qualified voter may vote by mail if the voter is expecting to give birth within three weeks before or after election day.  However, voters in this category are <u>not</u> eligible to submit an Annual ABBM.

Section 82.002(a)(2), Texas Election Code



TEXAS SECRETARY OF STATE

# Eligibility to Vote by Mail

**NEW LAW:  House Bill 3107 (2021)**

- Created a new category of eligibility for voting by mail for voters who have been civilly committed under Chapter 841 of the Health and Safety Code.

Section 82.008, Texas Election Code



**TEXAS SECRETARY OF STATE**

# Eligibility to Vote by Mail

**NEW LAW:  House Bill 3107 (2021)**

- Expanded FPCA eligibility to a member of the Texas National Guard or the National Guard of another state or a member of the reserves serving on active duty, and includes their spouse or dependents.

Section 101.001, Texas Election Code



**TEXAS SECRETARY OF STATE**

# Eligibility to Vote by Mail

## NEW LAW:  House Bill 3920 (2021)

- The following do not constitute sufficient cause to entitle a voter to vote by mail under the disability category:

  (1) a lack of transportation;

  (2) a sickness that does not prevent the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health; or

  (3) a requirement to appear at the voter's place of employment on election day.

Section 82.002(b), Texas Election Code



| Type | Who Can Use? | Application Delivery | Filing Period | Expiration Date | Ballots Received |
|------|--------------|---------------------|---------------|-----------------|------------------|
| Regular ABBM | <ul><li>65+ on Eday</li><li>Disability</li><li>Expected to Give Birth Within Three Weeks Before or After Eday</li><li>Absent from County</li><li>Confined in Jail</li><li>Civilly Committed under Chapter 841, Health and Safety Code</li><li>Address Confidentiality</li></ul> | <ul><li>In person by voter not later than the 11th day before Eday</li><li>Regular Mail</li><li>Common or Contract Carrier</li><li>Fax</li><li>Email (signed, scanned attachment)</li></ul> | January 1 of calendar year through 11th day before election day for which ballot is requested. | Good for one election only (plus runoff if requested). Expires after the election for which ballot was requested. OR Voter cancels ABBM. | Ballot(s) for election(s) held by early voting clerk to whom application submitted (and runoff ballot, if requested). |
| Annual ABBM | <ul><li>65+ on Eday</li><li>Disability</li></ul> | <ul><li>Same as Regular ABBM</li></ul> | January 1 of calendar year*+ *On or before 11th day before Eday, to receive ballot for that election +Up to 60 days before election held in January or February. | December 31 OR Until: <ul><li>Voter cancels ABBM</li><li>Registration cancelled</li><li>Voter registers in a new county</li></ul> | All ballots for all elections held by all political subdivisions in the year in which submitted.+ |
| FPCA | <ul><li>Military Voter Outside Home Texas County (or Dependent)</li><li>National Guard (or Dependent)</li><li>U.S. Citizen Overseas</li></ul> | <ul><li>In person by voter not later than the 11th day before Eday</li><li>Regular Mail</li><li>Common or Contract Carrier</li><li>Fax</li><li>Email (signed, scanned attachment)</li></ul> | January 1 of calendar year*+ *If registered, on or before 11th day before Eday, to receive ballot for that election. If not registered but eligible to register, not later than 20th day before Eday. +Up to 60 days before election held in January or February. | Same as Annual ABBM | All ballots for all elections held by the county, city, or school district, in the year in which submitted (unless eligible for federal ballot only).+ |

TEXAS SECRETARY OF STATE

# METHODS OF SUBMITTING AN ABBM OR FPCA

# Unlawful Solicitation and Distribution of an Application to Vote by Mail

**NEW LAW:  Senate Bill 1 (2021)**

A public official or election official commits an offense if the official, while acting in an official capacity, knowingly:

1. Solicits the submission of an application to vote by mail from a person who did not request an application;

2. Distributes an ABBM to a person who did not request the application unless the distribution is expressly authorized by another provision of the Texas Election Code;

3. Authorizes or approves the expenditure of public funds to facilitate third-party distribution of an ABBM to a person who did not request the application; or

4. Completes any portion of an ABBM and distributes the application to an applicant.

Section 276.016, Texas Election Code



# Methods of Submitting an ABBM or FPCA

- **There are different ways for a voter to submit an ABBM or FPCA**:
  - In person by voter not later than the 11th day before Election Day (unless that day is a Saturday, Sunday, or legal state or national holiday, in which case the last day is the first preceding regular business day) <span style="color:red">(New Law)</span>
  - By regular mail
  - By common or contract carrier
  - By email
  - By facsimile

Sections 84.007 and 84.008, Texas Election Code



# Methods of Submitting an ABBM or FPCA

**NEW LAW:  House Bill 3107 (2021)**

- Effective September 1, 2021, voters may now personally deliver their ABBM or FPCA to the early voting clerk not later than the close of regular business in the early voting clerk's office or 12 noon, whichever is later, on the 11th day before election day (unless that day is a Saturday, Sunday, or legal state or national holiday, in which case the last day is the first preceding regular business day.)

- For the May uniform election date, this deadline is Tuesday, April 25, 2023.

- However, see the slide on the next page regarding voters voting by mail due to absence from the county of residence.

Sections 84.007, 84.008, and 101.052, Texas Election Code



# Methods of Submitting an ABBM or FPCA

**For voters voting by mail due to absence from the county of residence:**

- If a voter's early voting ballot application is submitted on or after the first day of the period for early voting by personal appearance, the voter is ineligible for early voting by mail unless the voter is absent from the county when the application is submitted.

- This means that once early voting in person has started, the voter may no longer deliver their ABBM or FPCA in person to the early voting clerk.  This is due to the fact that the voter must be absent from the county when the application is submitted.

Sections 82.001 and 101.002, Texas Election Code

Case 5-21-cv-00844-XR   Document 609-8   Filed 05/26/23   Page 19 of 145

# Methods of Submitting an ABBM

- On request of the applicant, an application for a ballot to be voted by mail on the ground of confinement in jail may be submitted to the early voting clerk, at the discretion of the authority in charge of the jail, by personal delivery by the jail authority or by a designated subordinate of the authority.

Section 84.009, Texas Election Code



TEXAS SECRETARY OF STATE

# Methods of Submitting an ABBM or FPCA

-   If an ABBM is faxed or emailed or if an FPCA is faxed, then the applicant **must** submit the ORIGINAL application BY MAIL to the early voting clerk so that the early voting clerk **receives the original no later than the 4th business day after receiving the emailed or faxed ABBM or faxed FPCA**.

-   If the early voting clerk does not receive the original ABBM or FPCA by that deadline, then the emailed or faxed ABBM or faxed FPCA will be considered incomplete, and the early voting clerk may **NOT** send the applicant a ballot. The early voting clerk should retain a copy of the FPCA for their own records, but should send the FPCA submitted by the voter to the voter registrar for registration purposes.

Section 84.007, Texas Election Code

**TEXAS SECRETARY OF STATE**

# Methods of Submitting an ABBM

For information on how a voter may submit a request to vote by mail if he/she participates in the Attorney General Address Confidentiality Program, please see our advisory here:

**No. 2020-28** - Registering a Voter who is part of a Confidentiality Program



TEXAS SECRETARY of STATE

# ABBM Ballot Tracker

## NEW LAW:  House Bill 1382 (2021)

- Requires the Secretary of State to provide an online tool on the Secretary of State's website that enables a person who has submitted an Application for a Ballot by Mail to track the location and status of the person's application and ballot.  The tracking tool must require the voter to provide certain personally identifiable information in order for the voter to obtain information related to their ballot.

- The ballot by mail tracker must be updated with each of the following events to provide information on:
  - When an application to vote by mail has been received by the early voting clerk;
  - When the mail ballot application has been accepted or rejected by the early voting clerk;
  - When the official ballot has been placed in the mail by the early voting clerk;
  - When the person's marked ballot is received by the early voting clerk; and
  - Whether the early voting ballot board has accepted or rejected the ballot.
  - For each carrier envelope containing a mail ballot, the ballot by mail tracker must assign or record a serially numbered and sequentially issued barcode or tracking number unique to each envelope.

**NOTE:** The mail ballot tracker is only available for elections in which the county election officer is the early voting clerk.

Section 86.015, Texas Election Code

# Methods of Submitting an ABBM

Voters may use either:

- An SOS official (formal) application (Sec. 84.011); or

- An informal application (Sec. 84.002)



# TEXAS SECRETARY OF STATE

# NEW Formal Application – Prescribed by SOS

**Application for a Ballot by Mail**

If someone helps you complete this form or mails, emails or faxes this form for you, that person must complete the Witness/Assistant Box 6 below. If you email or fax this form to the Early Voting Clerk, you must also send the original hardcopy to the Early Voting Clerk. If you are faxing or emailing this form on or near the deadline to apply for a Ballot by Mail, you must send the original hardcopy so that the Clerk receives it no later than the fourth business day after the day the Clerk received your email or fax. Original signatures are required on both the fax or email image and the physical hard copy. Electronic signatures are not permitted. THE HARDCOPY OF THIS APPLICATION MUST BE RECEIVED BY THE EARLY VOTING CLERK AND MEET ALL LEGALLY REQUIRED DEADLINES. Please read the instructions on the back of this form completely. If you have any questions, please call the Early Voting Clerk in your county of registration or the office of the Texas Secretary of State at 1-800-252-8683 or log on to www.sos.texas.gov for a list of County Early Voting Clerks and their email and physical addresses.

## 1. Voter Information: Please print all information clearly and legibly

**YOU MUST PROVIDE ONE OF the following numbers**

Name: _____
Last,            First,            Middle            Suffix (Jr., Sr.)

**Residence Address as shown on your Voter Registration Certificate**

Address: _____
Street            Apt. # (if any)    City            State        Zip Code

**Optional Information:** Providing this information is helpful to the Early Voting Clerk, but not required.

Date of Birth: _____/_____/_____   VUID#: _____   Pct #: _____

Email: _____   Tel. #: _____

Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#)

___ ___ ___ – ___ ___ – ___ ___ ___ ___

If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

X X X – X X – ___ ___ ___ ___

☐ I have not been issued a Texas Driver's License/Texas Personal Identification Number/Texas Election Identification Certificate or Social Security Number

## 2. Mail my Ballot to:

☐ My Residence Address (as listed on my Voter Registration Certificate)

☐ Other Address - You may use the Other Address line only if the other address fits one of the categories below.

Address _____   Apt. # (if any)   City _____   State _____   Zip Code _____

**My Other Address is: (Check one)**
☐ The mailing address listed on my Voter Registration Certificate
☐ Address Outside the County (voters absent from the county)
☐ Hospital, Nursing Home, Long-Term Care Facility, Retirement or Assisted Living Center or a Relative _____ (Indicate Relationship)
☐ Address of the Jail/Civil Commitment Facility or a Relative _____ (Indicate Relationship)

## 3. Reason For Voting by Mail:

☐ 65 Years of Age or Older
☐ Disability (as defined in Texas Election Code 82.002(a), see instruction on reverse) By checking this box, "I affirm that I have a sickness or physical condition that prevents me from appearing at the polling place on Election Day without a likelihood of needing personal assistance or of injuring my health."
☐ Expected to give birth within three weeks before or after Election Day
☐ Expected Absence from the County (You may apply for a ballot for one election and its resulting runoff, if your dates of absence from the county include both elections)

Date you can begin to receive mail at your out of county address: ____ / ____ / ____   Date of return to residence address: ____ / ____ / ____

# Contents of Application

**NEW LAW:  House Bill 3920 (2021)**

- An application for a ballot to be voted by mail on the ground of disability must require the applicant to affirmatively indicate the following:  "I have a sickness or physical condition that prevents me from appearing at the polling place on election day without a likelihood of needing personal assistance or injuring my health."

- This statement must be affirmatively indicated by the voter on their application to vote by mail.

- **Note:** This statement is not required from a voter who is expecting to give birth within three weeks before or after election day.

Sections 82.002 and 84.002, Texas Election Code



TEXAS SECRETARY OF STATE

# Contents of Application

ABBMs that are prepared and distributed by campaigns must include the information required under Section 84.002 of the Election Code, including the statement that must be affirmatively indicated by the voter on their ABBM if voting by mail on the ground of disability.



# Contents of Application

**NEW LAW:  House Bill 3107 (2021)**

For an application for a ballot to be voted by mail on the ground of involuntary civil commitment, the application must include the address of the facility operated by or under contract with the Texas Civil Commitment Office or of a person related to the applicant within the third degree of consanguinity, as determined under Chapter 573, Government Code.

Section 84.002, Texas Election Code

**TEXAS SECRETARY OF STATE**

# Contents of Application

**NEW LAW:  Senate Bill 1 (2021)**

An application for ballot by mail (ABBM) must be submitted in writing and signed by the applicant using ink on paper. An electronic signature or photocopied signature is not permitted.

Section 84.001, Texas Election Code



# Contents of Application

**NEW LAW:  Senate Bill 1 (2021)**

- An ABBM **MUST** contain: (1) the number of the applicant's driver's license, election identification certificate (EIC), or personal identification card issued by the DPS; (2) the last four digits of the applicant's social security number, if the applicant has not been issued a DPS number described above; or (3) a statement that the applicant has not been issued a number described by (1) or (2).

- An applicant may use the number of an expired driver's license, EIC, or personal identification card to fulfill this requirement if the license or identification is otherwise valid.

Section 84.002, Texas Election Code

**TEXAS SECRETARY OF STATE**

# Informal Application

☑ In writing (i.e., not verbal)

☑ Signed by applicant or witness

☑ Contain Applicant's Name

☑ State Registered Residence Address

☑ Contain Address to which ballot to be mailed

☑ State Grounds for voting by mail

☑ Indicate which election the application is for

☑ DL No., Election ID Cert. No., or Personal ID Card No.

TEXAS SECRETARY OF STATE

# Reviewing ABBMs



**TEXAS SECRETARY OF STATE**

# Best Practices When Reviewing ABBMs

- The EV Clerk should review the following items on an ABBM:
  - Timeliness
  - Proper Delivery (mail, common/contract carrier, fax, in person by voter, email)
  - Correct Clerk (if not, forward)
  - **Registration Status**
  - **Residence and Mailing Address**
  - Additional Considerations
    - Outside county, disability, 65 or older
    - Ensure ALL required information was provided
- Recommend date-stamping the application on the date it is received by the EV Clerk

**TEXAS SECRETARY OF STATE**

# Best Practices When Reviewing ABBMs

Because Section 84.002 of the Election Code now requires the applicant to provide their driver's license number, election identification certificate number, or personal identification card number issued by the Department of Public Safety on the ABBM, the early voting clerk will work directly with the voter registrar of their county to confirm the voter's registration information and status.



# Best Practices When Reviewing ABBMs

Per Section 1.011 of the Election Code, the application may be signed by a witness if the voter cannot sign the application due to physical disability or illiteracy.

- If the voter cannot sign his/her name, the voter must affix his/her mark to the ABBM, to which the witness must attest.

- If the voter cannot make the mark, the witness must state that fact on the application.

- The witness MUST affix the witness's own signature to the application and state the witness's own name, in printed form. The witness must also state his/her residence address unless the witness is an election officer, in which case the witness must state the witness's official title.

# Best Practices When Reviewing ABBMs

A voter also may be assisted with completing and submitting an ABBM.

- There is no requirement in the Election Code that applicants must be eligible for assistance under Section 64.031 of the Election Code in order to be assisted in completing an ABBM.

- However, the best practice is that the applicant only be assisted if the applicant requests assistance.

TEXAS SECRETARY OF STATE

# Best Practices When Reviewing ABBMs

Mistakes with respect to completing the assistance portion on an ABBM do not cause rejection of the application.  However, a person who in the presence of the applicant otherwise assists an applicant in completing an early voting ballot application commits a Class A misdemeanor offense if the person knowingly fails to comply with Section 1.011(d) of the Code in the same manner as a witness.

Section 84.003, Texas Election Code



# ACCEPTING AND REJECTING ABBMS

**TEXAS SECRETARY OF STATE**

# Accepting and Rejecting ABBMs

**NEW LAW:  Senate Bill 1 (2021)**

If the information required by Section 84.002(a)(1-a) of the Election Code included on the ABBM does not identify the same voter identified on the applicant's voter registration application, the clerk shall reject the application per Section 86.001(f) of the Code.

- If an ABBM is rejected under Section 86.001(f) of the Code, the clerk shall provide notice of the rejection. The notice must include information regarding the ability to correct or add the required information through the online ballot by mail tracker described in Section 86.015(c).

- If the applicant corrects the ABBM online and that application subsequently identifies the same voter identified on the applicant's voter registration application, the clerk shall provide a ballot to the voter. (Sec. 86.001(f-2)).

# Rejecting an ABBM

- Mail/otherwise deliver "Notice of Rejected Application for Ballot By Mail" (Form 6-2)
  - Include a new ABBM if original received on or before **18th** day before election day. (Sec. 86.008)
    - Tuesday, April 18, 2023, for May 6, 2023 election
- Keep rejected application in file & attach copy of rejection notice



# Deadline to Mail Ballots

- **For all Other Voters (not Military or Overseas):**
  - EV Clerk must mail the balloting materials not later than the 7th day after the later of:
    - the date the EV Clerk has accepted a voter's application for a ballot by mail; OR
    - the date the ballots become available for mailing.
  - However, if the 7th day falls earlier than the 37th day before election day, the voter's mail ballot must be mailed no later than the 30th day before election day. (Sec. 86.004(a)).
  - This means that for every application that comes in before the 37th day before election day, the balloting materials must be mailed by the 30th day before election day. Any application that comes in after the 37th day before election day will follow the 7-day timeline in Sec. 86.004.
  - Ballots should continue to be mailed on a rolling basis as ABBMs come in and are processed.

# Carrier Envelope

**NEW LAW:  Senate Bill 1 (2021)**

The carrier envelope sent to the voter must include a space that is hidden from view when the envelope is sealed for the voter to enter:

> (1) the number of the voter's driver's license, election identification certificate, or personal identification card issued by the DPS;

> (2) the last four digits of the voter's social security number, if the voter has not been issued a DPS number described above; or

> (3) a statement that the voter has not been issued a number described by (1) or (2) above.  (Sec. 86.002(g)).

A voter may use the number of an expired driver's license, EIC, or personal identification card to fulfill this requirement if the license or identification is otherwise valid. (Sec. 86.002(h)).

# TEXAS SECRETARY OF STATE

# <span style="color:red">NEW</span> <span style="color:navy">Carrier Envelope</span>





**CARRIER ENVELOPE FOR EARLY VOTING BALLOT**
*(SOBRE DE ENVÍO PARA LA BOLETA DE VOTACIÓN ADELANTADA)*

(Early Voting Clerk
should preprint return address or affix address label)

Place
Stamp
Here

**WARNING:** (1) Knowingly possessing another person's ballot or Carrier Envelope may be a crime unless you provide your signature, printed name and address (2) A person commits an offense if the person compensates another person or receives compensation for  depositing a Carrier Envelope in the mail as part of a scheme in which the person is compensated based on the number of Carrier Envelopes deposited. For additional information on offenses related to Carrier Envelopes, please see the "Information About Returning Your Carrier Envelope," included with the materials sent to you with your ballot.

**ADVERTENCIA:** (1) El acto de poseer conscientemente la boleta o el sobre de envío de otra persona puede ser un delito a menos de que usted proporcione su firma, nombre en letra de molde, y su dirección. (2) Una persona comete un delito si recompensa o recibe compensación a cambio de depositar el sobre de envío en el correo como parte de un plan en el cual la persona es recompensada en base al número de sobres de envío depositados. Para obtener información adicional sobre los delitos relacionados con los sobres de envío, por favor vea la "Información Sobre La Devolución Del Sobre de Envío," incluido con los materiales enviados a usted con su boleta.

6-15
Prescribed by Secretary of State Section 86.013, Texas Election Code
07/2022



**TEXAS SECRETARY OF STATE**

# Envelope Open – Inside Flap

REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD
INFORMACIÓN REQUERIDA: DEBE PROPORCIONAR UNO DE LOS SIGUIENTES NÚMEROS Y DEBE ESTAR ASOCIADO CON SU REGISTRO DE VOTANTE

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID#) (Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas) (NO ES el número de su Registro Electoral VUID#)

If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number (Si no tiene una Licencia de Conducir de Texas o una Tarjeta de Identificación Personal de Texas o Certificado de Identificación Electoral de Texas, proporcione los 4 últimos dígitos de su número de Seguro Social)

XXX - XX - _ _ _ _

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or a Social Security Number (No se me ha expedido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o un Certificado de Identificación Electoral de Texas ni un número de Seguro Social.)

CONTACT INFORMATION (INFORMACIÓN DE CONTACTO): Phone (Teléfono): _____   Email (Correo Electrónico): _____

SEAL ENVELOPE AND SIGN OVER SEALED FLAP
(SELLE EL SOBRE Y FIRME SOBRE LA SOLAPA SELLADA)

X _____
SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)

Oath of Person Assisting Voter: "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." Juramento de la Persona Asistiendo al Votante: "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; preparé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

If you are an assistant, provide information below: (Si usted es un asistente o testigo, marque la casilla correcta y proporcione su información):
Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle one: Yes No
¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia? Marque un Círculo: Sí No

Printed Name (Nombre en letra de molde)   Signature (Firma)

Relationship to Voter (Relación al votante)   Street Address (Domicilio residencial)

Completed by Early Voting Clerk (Completado por el Secretario de Votación Adelantada):
Name of Election (Nombre de Elección): _____
Name of Voter (Nombre del votante): _____
Date of Election (Fecha de Elección): ___/___/___

Instructions to Witness: You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here ☐
(Instrucciones al Testigo: Usted está sirviendo como testigo para _____ (nombre del votante). Debe completar la sección a continuación si es testigo de la marca del votante, o si el votante no puede hacer una marca. Si el votante no puede hacer una marca, marque aquí ☐.)

Signature (Firma)   Printed Name (Nombre en letra de molde)

Street Address (Domicilio residencial)

- Voter must add their personal identification information to the Carrier Envelope



# TEXAS SECRETARY OF STATE

# NEW Carrier Envelope

**Instructions to the Voter:**
- This envelope must be sealed and signed by the voter before it leaves the voter's hands. Do not sign this envelope unless the ballot has been marked by you or at your direction. **(Instrucciones al Votante:** Este sobre debe ser sellado y firmado por el votante antes de que salga de sus manos.  No firme este sobre a menos de que la boleta haya sido llenada por usted o bajo su dirección.)
- This Carrier Envelope may not be used to return more than one voter's ballot. (Este sobre de envío no debe ser utilizado para entregar la boleta de más de un solo votante.)
- For instructions on the methods and deadlines to deliver this Carrier Envelope, see the "Information About Returning Your Carrier Envelope," included with the materials sent to you with your ballot. (Para obtener instrucciones sobre los métodos y plazos para entregar este sobre de envío, vea la "Información Sobre La Devolución de su Sobre de Envío," incluido con los materiales enviados a usted con su boleta.)

**Instructions to Assistant (if applicable):**
- A voter may only be assisted with reading or marking the ballot if the voter has a physical disability that renders the voter unable to write or see, or has an inability to read the language in which the ballot is written.  If you are assisting the voter, you must read the oath and complete the section below, before assisting the voter.  **(Instrucciones al Asistente (si es aplicable):** Un votante sólo puede recibir ayuda para leer o marcar la boleta si el votante tiene una discapacidad física la cual le impide escribir o ver, o si no tiene la habilidad de leer el idioma en el cual la boleta está escrita. Si usted asiste al votante, debe leer el juramento y completar la siguiente sección abajo, antes de asistir al votante.)

**Instructions to Person Depositing Carrier Envelope in Mail or to Common or Contract Carrier:**
- If you are assisting a voter by depositing the Carrier Envelope in the mail or with a common or contract carrier, you must complete the assistant section below. **(Instrucciones para la Persona Que Deposita el Sobre de Envío en el Correo o al Transportista Común o Contratado:** Si asiste a un votante depositando el sobre de envío en el correo o con un transportista común o contratado, debe completar la sección de asistente que aparece a continuación.)

**I certify that the enclosed ballot expresses my wishes independent of any dictation or undue persuasion by any person. (Certifico que la boleta adjunta expresa mis deseos independientemente de ningún dictado o persuasión indebida por parte de cualquier persona.)**

**SEAL ENVELOPE AND SIGN OVER SEALED FLAP (SELLE EL SOBRE Y FIRME SOBRE LA SOLAPA SELLADA)** → ✗ _____ SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)

**Oath of Person Assisting Vote:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." **Juramento de la Persona Asistiendo al Votante:** "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

**If you are an assistant, provide information below: (Si usted es un asistente proporcione la siguiente información):**

Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle one:  Yes  No
¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia? Marque con un Círculo:  Sí  No

Printed Name (Nombre en letra de molde) _____   Signature (Firma) _____

Relationship to Voter (Relación al votante) _____   Street Address (Domicilio residencial) _____

**Completed by Early Voting Clerk (Completado por el Secretario de Votación Adelantada):**

Name of Election (Nombre de Elección): _____

Name of Voter (Nombre del votante): _____

Date of Election (Fecha de Elección): _____ / _____ / _____

**Instructions to Witness:** You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____
**(Instrucciones al Testigo:** Usted está sirviendo como testigo para _____ (nombre del votante). Debe completar la sección a continuación si es testigo de la marca del votante, o si el votante no puede hacer una marca. Si el votante no puede hacer una marca, marque aquí _____)

Signature (Firma) _____   Printed Name (Nombre en letra de molde) _____

Street Address (Domicilio residencial) _____



TEXAS SECRETARY OF STATE

# Carrier Envelope

**NEW LAW:  Senate Bill 1 (2021)**

- No record associating an individual voter with a ballot may be created.  (Sec. 86.002(i)).

- Due to the changes made to the carrier envelope and mail ballot forms required under Senate Bill 1, the early voting clerk CANNOT use old stock.  Please make note of this when ordering your balloting materials.

- The online ballot by mail tracker must allow the voter to add or correct identification information required under Section 84.002(a)(1-a) or 86.002(g). (Sec. 86.015(c)).



# Opportunity to Correct Defect: Signature Verification Committee

**NEW LAW:  Senate Bill 1 (2021)**

Section 87.0271 of the Code provides a procedure by which a voter can correct certain defects in their carrier envelope containing their voted ballot. Not later than the second business day after a signature verification committee discovers the defect and before the committee decides whether to accept or reject a timely delivered ballot under Section 87.027, the committee shall:

(1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and

(2) return the carrier envelope to the voter by mail, if the committee determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day. (Sec. 87.0271(a), (b)).

# Opportunity to Correct Defect: Early Voting Ballot Board

**NEW LAW:  Senate Bill 1 (2021)**

Section 87.0411 of the Code provides a procedure by which a voter can correct certain defects in their carrier envelope containing their voted ballot. Not later than the second business day after an early voting ballot board discovers the defect and before the board decides whether to accept or reject a timely delivered ballot under Section 87.041, the board shall:

> (1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and

> (2) return the carrier envelope to the voter by mail, if the board determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day. (Sec. 87.0411(a), (b)).

TEXAS SECRETARY OF STATE

# Notice to the Texas Attorney General

**The EV clerk shall, not later than the 30th day after election day, deliver notice to the Attorney General of cancellation requests received, including certified copies of cancellation requests, applications, and carrier envelopes, if available. (Section 84.037(b), Election Code)**

If you have not already created an account with the Attorney General's office to provide the required information, go to https://oagtx.force.com/mbsr, acknowledge the information screen, then:

Click the "Sign Up" link near the login prompt and create an account as head election official;

Wait for your account to be validated/confirmed (this is a manual verification process);

Once you are confirmed and logged in, follow the on-screen prompts to report data and upload documents.

# ABBM Transparency and Public Information

- A copy of an ABBM, including the Annual ABBM, is not available for public inspection (except to the voter whose application it is) until the first business day after the election day of the **EARLIEST** occurring election (rather than latest) for which the application is submitted. (Sec. 86.014(a)).
  - So it's available after the <u>first</u> election, rather than the last.
  - Originals of any ABBMs and carrier envelopes are not available for public inspection until those materials are delivered to the custodian after the election. (Sec. 86.014(b)).
- **Early Voting Rosters**
  - Information on the early voting roster for a person to whom a ballot has been mailed is not available until the 1st business day after election day. (Sec. 87.121(f)).
    - Except to a voter seeking to verify the accuracy of his or her own ballot by mail. (Sec. 87.121(f)).
    - The name of a voter who voted by mail is available no later than the day following the day the early voting clerk receives the ballot. (Sec. 87.121(h)).

TEXAS SECRETARY OF STATE

# Questions?

# elections@sos.texas.gov



EXHIBIT

31

Message
_____

| | |
|---|---|
| From: | Sam Taylor [SMTaylor@sos.texas.gov] |
| Sent: | 1/28/2022 5:31:34 PM |
| To: | 'Goldenstein, Taylor' [taylor.goldenstein@chron.com] |
| Subject: | ABBM rejection rate - as of Wednesday 1/26 |

Sensitivity:   Personal

Hi Taylor,

Just got your VM – as of Wednesday morning (1/26/22), our new ballot tracking system showed that 21,522 applications for ballot by mail, and 1,888 of those have been rejected.

I am working to get updates on these numbers as of today, as well as how many counties have entered data into the system.

It's worth noting that all 254 counties have access to the statewide TEAM database, so they can use that at any time to input this data and verify voters' identification for purposes of accepting their ABBM and mailing them a ballot. However, 38 counties also have their own separate voter registration database (referred to as 'offline' counties), which is required by law (Texas Election Code Sec. 18.061) to communicate and update information in the statewide system. These are typically the larger counties (I've included a full list of them below, as well as the name of their respective vendors).

FYI – the 'SPLIT' counties are those who have split election administration responsibilities – the County Clerk runs the actual elections (including early voting and ballots by mail) and the County Tax Assessor-Collector runs voter registration. Most counties have appointed Election Administrators (EAs), but these 'SPLIT' counties have elected officials that split election administration duties:

| | | | |
|---|---|---|---|
| Bastrop | EA | Offline | Votec |
| Bell | EA | Offline | Votec |
| Bexar | EA | Offline | Votec |
| Burnet | EA | Offline | Votec |
| Cameron | EA | Offline | Votec |
| Collin | EA | Offline | Votec |
| Dallas | EA | Offline | VOTEC |
| Denton | EA | Offline | Votec |
| Ector | EA | Offline | Votec |
| Ellis | EA | Offline | VOTEC |
| El Paso | EA | Offline | VEMAC/VOTEC |
| Erath | SPLIT | Offline | VEMAC/VOTEC |
| Fort Bend | EA | Offline | Votec |
| Grayson | EA | Offline | Votec |
| Gregg | EA | Offline | Votec |
| Guadalupe | EA | Offline | Votec |

| Harris | EA | Offline | Votec |
|---|---|---|---|
| Hays | EA | Offline | VEMAC/VOTEC |
| Henderson | EA | Offline | VEMAC/VOTEC |
| Hidalgo | EA | Offline | VEMAC/VOTEC |
| Kaufman | EA TYPE | Offline | VOTEC |
| Lubbock | EA | Offline | VOTEC |
| McLennan | EA | Offline | Votec |
| Midland | EA | Offline | Votec |
| Montgomery | EA | Offline | County |
| Nueces | SPLIT | Offline | VOTEC |
| Rockwall | EA | Offline | Votec |
| Smith | EA | Offline | Votec |
| Tarrant | SPLIT | Offline | Votec |
| Taylor | EA | Offline | Votec |
| Tom Green | EA | Offline | Votec |
| Travis | SPLIT | Offline | Bpro |
| Upton | EA | Offline | Votec |
| Waller | EA | Offline | Votec |
| Webb | EA | Offline | Votec |
| Williamson | EA | Offline | Votec |
| Wood | EA | Offline | SW Data |
| Young | EA | Offline | VR Systems |

Best,

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116
Cell: 512-538-5293



STATE105170

EXHIBIT
32

# Don't Forget Your ID Numbers!



Under the flap on your teal and white carrier envelope, where it says
"Required Information," you must provide at least one of the
required ID numbers. **We recommend providing both.**

# No Olvides Tu Número de Identificación!



Bajo la solapa del sobre de envío color verde azulado y blanco, en donde
dice "Información Requerida," debe usted proveer al menos uno de los
números de ID requeridos. **Nosotros recomendamos que escriba los dos.**



EXHIBIT

EXHIBIT

33

Message

| | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 3/23/2022 8:38:46 PM |
| **To:** | LegalTeam [LegalTeam@sos.texas.gov] |
| **Subject:** | FW: ABBM Insert |
| **Attachments:** | ABBM Reminder Insert 2.docx |

**From:** sgarza@co.kleberg.tx.us <sgarza@co.kleberg.tx.us>
**Sent:** Wednesday, March 23, 2022 3:37 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** ABBM Insert

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

Hello,

I sent in a previous email requesting approval of an insert from SOS. This is another version that I got from one of my fellow clerks. I am not sure if she has already requested approval. Can you let me know asap so that we can do our mail out.

Respectfully yours,
Stephanie G. Garza
Kleberg County Clerk
P O Box 1327
Kingsville, TX 78364
ph. (361) 595-8548
fax (361) 593-1355
sgarza@co.kleberg.tx.us

STATE151558

EXHIBIT

34



The Carrier Envelope is **NEW**!!

Don't forget to provide your **Texas Driver's License Number/Identification Number**/**or** your **Election Identification Number AND** the **last four of your Social Security Number**

*(Underneath the top flap of the envelope)*

**<u>BEFORE</u>** you Seal and Sign your envelope!

*For questions or guidance, call the County Clerk's Office at 361-595-8548*



The Carrier Envelope is **NEW**!!

Don't forget to provide your **Texas Driver's License Number/Identification Number**/**or** your **Election Identification Number AND** the **last four of your Social Security Number**

*(Underneath the top flap of the envelope)*

**<u>BEFORE</u>** you Seal and Sign your envelope!

*For questions or guidance, call the County Clerk's Office at 361-595-8548*



The Carrier Envelope is **NEW**!!

Don't forget to provide your **Texas Driver's License Number/Identification Number**/**or** your **Election Identification Number AND** the **last four of your Social Security Number**

*(Underneath the top flap of the envelope)*

**<u>BEFORE</u>** you Seal and Sign your envelope!

*For questions or guidance, call the County Clerk's Office at 361-595-8548*

**STATE151559**

# EXHIBIT 35

Message
_____

| | |
|---|---|
| **From:** | Alexa Buxkemper [ABuxkemper@sos.texas.gov] |
| **Sent:** | 9/21/2022 11:30:51 PM |
| **To:** | Lena Proft [LProft@sos.texas.gov]; Elec Legal [ElecLegal@sos.texas.gov] |
| **Subject:** | RE: Absentee Ballot by Mail insert |

I replied to them yesterday and approved the form.  The email was sent to me by legal.

**Alexa Buxkemper, C.E.R.A. #499**
**Elections Security Trainer – Elections Division**
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code.  It is not intended to serve as a legal opinion for any matter.  Please review the law yourself, and consult with an attorney when your legal rights are involved.*

**From:** Lena Proft <LProft@sos.texas.gov>
**Sent:** Wednesday, September 21, 2022 2:51 PM
**To:** Elec Legal <ElecLegal@sos.texas.gov>
**Subject:** FW: Absentee Ballot by Mail insert

I think this reminder insert is fine. Does anyone disagree?

**From:** LegalTeam <LegalTeam@sos.texas.gov>
**Sent:** Tuesday, September 20, 2022 1:33 PM
**To:** ElectionSecurity <ElectionSecurity@sos.texas.gov>
**Cc:** Lena Proft <LProft@sos.texas.gov>
**Subject:** FW: Absentee Ballot by Mail insert

Please review

**From:** Elections Internet <Elections@sos.texas.gov>
**Sent:** Tuesday, September 20, 2022 9:53 AM
**To:** LegalTeam <LegalTeam@sos.texas.gov>
**Subject:** FW: Absentee Ballot by Mail insert

**From:** Allie Thomas <athomas@navarrocounty.org>
**Sent:** Tuesday, September 20, 2022 9:47 AM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** Absentee Ballot by Mail insert

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to.

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to .

Hello,

We are wanting to print this on a little slip of paper and include it in each and every ballot by mail we send out to remind the voter to fill out information under secrecy information. We were told we need to get SoS approval so we wanted to send this before we print it and add it to all of the ballot envelopes.

Thanks for your time!

--
Allie Thomas
Elections Administrator
Navarro County
903-875-3330

STATE151935

EXHIBIT

36

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*La Unión del Pueblo Entero v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**February 28, 2022**

I.       **Abstract**

1.   In Senate Bill 1 ("SB 1"), Texas imposes new identification verification rules when registered voters choose to cast ballots by mail. As I will demonstrate, more than 1 in 7 Texans can submit a ballot application – as well as a ballot itself – in perfect accordance with the state's instructions under SB 1, and yet Texas election officials must still reject the voters' forms. Officials must reject the voters' forms because Texas's voter registration database does not contain the information necessary for election officials to accurately confirm the identity of millions of Texans who possess proper identification numbers. SB 1 delays and/or prevents citizens from casting ballots who follow the state's instructions and are eligible to vote by mail.

II.      **Summary of Inquiry**

2.   For Texas voters who understand the mail ballot instructions and correctly fill out the state's mail ballot forms in accordance with the rules set forth by SB 1, how many of them could have their forms rejected due to the state's inability to confirm the voters' identification numbers? I answer this question by merging personal information contained in Texas's voter registration database with information contained in Texas's Department of Public Safety (DPS) records. Through comparing records of identification numbers, including driver's licenses and other DPS ID Numbers as well as social security numbers, I have found that over 2.6 million Texans can accurately and completely fill out government forms in accordance with SB 1 and with the forms' instructions, and their forms would still be rejected by Texas election officials. Included in this number are hundreds of thousands of senior citizens (65 and older),

disabled veterans, homebound citizens, and overseas citizens (including some at military addresses), populations that are most likely to make use of mail balloting.

3. According to SB 1, a registered voter applying for a mail ballot must now include "the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety" ("DPS ID Number"). If a registrant "has not been issued" a DPS ID Number, then he or she must include in his/her mail ballot application "the last four digits of the applicant's social security number" ("SSN4"). When submitting a completed ballot by mail, registrants must again provide a DPS ID Number or, if they do not have a DPS ID Number, their SSN4.

4. When Texas election officials receive a mail ballot application, or when they receive a completed mail ballot, the officials must compare the DPS ID Number or SSN4 listed by the registrant with the official records in the voter registration database. The Texas voter registration database, also known as Texas Election Administration Management system ("TEAM"), lists a DPS ID Number and/or an SSN4 for most voters. If the voter does not provide an identification number that is listed on TEAM, "the clerk shall reject the application."[1]

5. I have determined three main reasons why correctly filled-out forms that are required by Texas under SB 1 would be rejected by election officials:

---

[1] Note that election officials do not confirm mail ballot applicants' DPS ID Numbers by looking up those numbers on a DPS database. According to the state's guidelines, election officials are to "check the voter's application for ballot by mail and the carrier envelope to be sure that the number of the voter's driver's license, election identification certificate, or personal identification card issued by the DPS is included *and is associated with the voter's registration record* (my emphasis)." In other words, if a voter has a valid DPS ID but it happens not to be associated with the registration record in TEAM, election officials must reject the voter's mail ballot forms. See: "Early Voting Ballot Board & Signature Verification Committee, Handbook for Election Judges and Clerks 2022," Office of the Texas Secretary of State, page 14.

a. <u>Reason #1:</u> Millions of Texans have multiple DPS ID Numbers. Many have both a personal identification number and a driver's license number. Some have multiple driver's license numbers. According to SB 1 requirements, voters may list on their mail ballot applications any of their DPS ID Numbers, including expired ones. However, the TEAM voter registration database shows only one DPS ID Number for each voter. If the voter uses a DPS ID Number on his or her mail ballot application but it is not the same number listed in TEAM, SB 1 requires election officials to reject the application.

b. <u>Reason #2:</u> Hundreds of thousands of Texans are listed in TEAM without a DPS ID Number at all. These voters tend to be older. Almost half are over 65 and may, by law, request an absentee ballot without offering any reason. As I show below, *the majority* of these individuals do, in fact, have DPS ID Numbers. If they submit a mail ballot application or mail ballot with their DPS ID Number listed, as they are instructed to do by Texas's updated application form, SB 1 requires clerks to reject their materials.

c. <u>Reason #3:</u> Tens of thousands of Texans are listed in TEAM with SSN4s and DPS ID Numbers that have typographical errors in them. (As Texas is one of only eight states that has not adopted online voter registration, Texas may have more citizens registering to vote using paper forms than is typical elsewhere in the country, which can lead to transcription errors when the information is entered into a computer system.[2]) When voters who are listed with typographical errors in their ID numbers submit a mail ballot form with their proper SSN4 or DPS ID

---

[2] National Conference of State Legislatures, "Online Voter Registration," July 26, 2021, https://www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-registration.aspx.

Number, SB 1 requires election officials to reject these forms on account of inaccurate record-keeping in Texas government records.

6. These are not the only reasons that Texas election officials will reject mail ballots and ballot applications as a result of SB 1's identification requirements for absentee balloting. There are other reasons that are beyond the scope of this analysis but could cause additional Texans to have mail ballot forms rejected by state election officials. For instance, applicants might accidentally include a typographical error when writing down their DPS ID Number or their SSN4 on their mail ballot forms. A separate analysis would be required to estimate how many mail ballot forms might be rejected for this reason. Applicants might also have lost, misplaced, or surrendered their license or other DPS ID card and therefore cannot complete the mail application form required by SB 1. A separate analysis would be required to estimate how many forms might be rejected for this reason.[3] Setting aside these other possibilities, the three reasons stated above affect over 2.6 million Texans, according to my analysis. These Texans possess an identification number required by SB 1 and can properly fill out mail ballot application forms and, nevertheless, SB 1 will require election officials to reject their forms.

7. SB 1 essentially asks 1 in 7 registered voters to be lucky in order to cast a mail ballot without their application or ballot being rejected: the voters must guess correctly which one of several possible identification numbers are listed on TEAM, and they

---

[3] There is a field on the DPS database related to "card status" that could possibly be used to count the number of individuals who have DPS ID Numbers but they do not have access to their ID cards, for instance because they surrendered the cards. If license status information was made available to me, I could provide a supplementary analysis of these records.

must hope that TEAM records do not contain typographical errors on their individual records.

III.    **Background and Qualifications**

8. I am a tenured associate professor of political science at Tufts University in Medford, Massachusetts. I joined the faculty at Tufts in July 2017. Prior to that, I was an assistant professor and a resident fellow of the Institution for Social and Policy Studies at Yale University in New Haven, Connecticut. I joined the faculty at Yale in 2011. I received my PhD in government from Harvard University in 2011.

9. In addition to my appointment in the Department of Political Science, I currently have two other affiliations. I serve as an Associate Professor of Civic Studies at the Tisch College for Civic Life, also at Tufts University. And, during the 2022 calendar year, I have an affiliation as an Emerson Collective Fellow in the Emerson Collective's Democracy Cohort. Through the Emerson Collective, I am engaging in research on the civic role of business leaders.

10. My scholarly research focuses on U.S. elections, on topics such as voter behavior, civic engagement, election administration, and political campaigns. My methodological focus is on using individual-level data such as voter registration records to study politics. Publications that specifically include analysis of individual-level voter registration data include, among others, *Hacking the Electorate* (Cambridge University Press, 2015); "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name" (*Statistics and Public Policy*, 2017); "The Primacy of Race in the Geography of Income-Based Voting" (*American Journal of Political Science*, 2016); Validation: What Big Data Reveal about Survey

6

Misreporting and the Real Electorate" (*Political Analysis*, 2012); and "The Politics of 130,000 Religious Leaders (*Journal for the Scientific Study of Religion*, 2021).

11. I have been deposed as an expert witness five times, in *Judicial Watch v. King*, *Fish v. Kobach*, *Stringer v. Pablos*, *U.S. v. City of Eastpointe*, and *Holmes v. Moore*. The first three of these cases were focused on compliance with the National Voter Registration Act in Indiana, Kansas, and Texas, respectively. *U.S. v. Eastpointe* focused on compliance with the Voting Rights Act. *Holmes v. Moore* was a case in North Carolina state court involving a voter identification law. I have also served as an expert consultant in *Texas v. Holder* and *Veasey v. Perry*, two cases involving a voter identification law in the State of Texas.

12. In four of the above cases, my work as an expert required me to develop and implement methods to link individual records between voter registration databases and other databases (namely, driver's license databases). I use a similar methodology in this report. It is also the methodology that is the focus of the peer-reviewed work I published in "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name."

13. I have filed declarations in other cases in which I was not deposed. These include, among others, *Vote Forward v. DeJoy*, a 2020 case involving the U.S. Post Office and mail voting, as well as *Kelly v. Verizon*, a class action case for which voter registration data was used to evaluate the domicile of class members.

14. I have served as an expert both for defendants (e.g. *Judicial Watch v. King*, *Kelly v. Verizon*) as well as for plaintiffs (e.g. *Fish v. Kobach*, *U.S. v. City of Eastpointe*).

15. I am compensated for my work at a rate of $350 per hour.

16. A copy of my current CV is attached as Exhibit A to this Report.

IV.     **Analysis Plan and Summary Statistics**

**A.  Overview**

17. The analysis here requires me to look up registered voters in the Department of Safety's database of ID holders. For each registrant, I seek answers to four simple questions:

   i.   Does the registrant have a DPS ID Number?

  ii.   Does the registrant have more than one DPS ID number?

 iii.   Does the DPS ID Number(s) listed for a voter in the DPS database match the DPS ID Number listed for that voter in the TEAM database?

  iv.   Does the SSN4 listed in the DPS database match the SSN4 listed for that voter in the TEAM database?

18. The first of these questions is relevant because some registrants are not listed in TEAM with any DPS ID Number. If these individuals possess a DPS ID number, they are required by SB 1 to list it on their mail ballot application. If these registrants list their DPS ID Number, SB 1 requires election officials to reject their forms as the number is not recorded on the TEAM database.[4]

---

[4] The Texas Secretary of State has issued guidance to election officials that if registrants (even those possessing DPS ID Numbers) list their SSN4 when applying for a mail ballot, then their ballots and ballot applications should not be rejected (Texas Secretary of State, "FAQs on Applications for Ballots by Mail (ABBMs)," January 28, 2022, page 8.). However, Texas's handbook (see footnote 1) offers conflicting guidance, which is consistent with the law and with the application form instructions, that registrants with a DPS ID Number must list that number. On the mail application form itself, a registrant is not asked to list their SSN4 if they possess a DPS ID Number. The registrant would have no obvious way of knowing of alternative guidance, as it is inconsistent with SB 1's text and the text of the mail ballot application form. In addition, the state has allocated no funds with the passage of SB 1 to pay for any kind of educational advertisement that indicates the Secretary's interpretation of the law. For the lack of allocation of funds for public education, see: Jerry McGinty, Legislative Budget Board, "Fiscal Note 87th Legislature 2nd Called Session 2021," August 30, 2021.

19. The second question is relevant because registrants with more than one DPS ID Number can list one of their Numbers that happens not to be the one recorded in the TEAM database. If registrants list a number but not one listed on the TEAM file, their forms are rejected.

20. The third and fourth questions are relevant because typographical errors in the recording of SSN4s and DPS ID Numbers mean that registrants can fill out their correct DPS ID Number or SSN4 but their forms will be rejected because the correct number is not the same as the number listed on the TEAM file.

21. While the analysis that follows is simple in principle, it is somewhat complex in the details. The main reason for the complexity is that "looking up" a voter in the DPS database is not as straightforward as it sounds. Suppose, for instance, that I look up each registrant by their social security number. I could do so, and then compare the DPS ID Number for that voter listed in TEAM with the DPS ID Number(s) for that voter listed in the DPS records. I do perform such an analysis. However, the work is not complete. If voters are listed in TEAM with typos in their social security numbers, then they would not match to their DPS record on the basis of the social security number. Similarly, if voters are listed in TEAM with no social security number at all, then they would not match to their DPS record either. Consequently, simply linking the TEAM database and the DPS database on the basis of a social security number does not provide critical information such as the number of people with erroneous social security numbers listed on TEAM. Thus, I need to use additional strategies to look up registrants in the DPS database.

22. Before proceeding with the analysis, I will summarize key features of the two databases upon which this analysis relies: the DPS file of ID holders and the TEAM file of registered voters. Then, I will explain the methodology I use to link the two files together. Finally, I will conduct the analysis and explain the results. In the results, I will be attentive to several subpopulations of interest, including registrants who are aged 65 years or older, registrants with overseas mailing addresses, and registrants whose DPS records suggest they are disabled or homebound.

## B. Data Used in Analysis

### Department of Public Safety Data

23. As transmitted to me, the DPS database of driver's license holders and other ID holders was divided into 10 separate files. According to the file labels, the files were extracted from Texas's DPS system on January 7, 2022. I combined the ten files into one file.

24. In total, the DPS file contains 36,227,819 records. In nearly all cases, each row is associated with a unique DPS ID Number.[5] For each of these numbers, the row shows information such as the name, address, and social security number of the associated individual. Many Texans are listed on more than one row with different DPS ID Numbers. This is evidenced by data on nine-digit social security numbers (SSN9) contained in the DPS database. Of the 36.2 million DPS records, 94.98% are listed with an SSN9. The other 5 percent are missing an SSN9. Of those with an SSN9 listed, 24,569,348 (71.40%) have a unique SSN9 within the database. The remaining

---

[5] Out of the 36.2 million rows, there are 140 rows that show a duplicate DPS ID Number. All other rows show unique DPS ID Numbers.

records (9,841,121) represent individuals who are listed with two more or more different DPS ID Numbers to their name.

25. From the data provided to me by the state, I cannot determine all the circumstances under which individuals have multiple DPS ID Numbers. Primarily, it appears to be the result of individuals who possess both a driver's license number and a personal identification number. But there are tens of thousands of individuals who have multiple driver's license numbers or multiple personal identification numbers. Texans with multiple DPS ID Numbers may have numbers that are expired as well as ones that are unexpired. However, according to SB 1, a registered voter applying for a mail ballot or submitting a mail ballot may use current or expired DPS ID Numbers.

26. The DPS database shows other evidence of individuals possibly possessing multiple DPS ID Numbers in addition to the fact that individuals appear on multiple rows. In about ten percent of rows in the DPS file (specifically, in 3,440,039 rows), there is a field populated with data that is called "AKA DL/ID Number." This field appears to list additional identification numbers associated with a person on the file. However, many of these numbers appear different in format to Texas's DPS ID Numbers, such as that they include letters in addition to numbers. Because I am not certain of the meaning of the AKA DL/ID Number field, I make the conservative assumption that these numbers are not DPS ID Numbers that Texans could use in submitting a mail ballot application or mail ballot.

27. Table 1 shows the rate at which key fields in DPS are missing data. As is clear, zero records – or at least less than 0.01% of records – are missing names, birthdates,

gender (male or female), or zip code. A small number of records are missing a street

address number. And, as noted above, 5.02% of DPS records are missing an SSN9.

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---|
| Missing SSN | 5.02% |
| Missing unique SSN9 | 21.6 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.04 |
| Missing Zip Code | 0.00 |
| **TOTAL IN DATABASE** | 36,227,819 |

### Voter Registration Data

28. On January 27, 2022, I received a copy of Texas voter registration records (TEAM).
    According to the file labels, the files were extracted by Texas on January 24, 2022.
    Each of 254 counties had records contained in separate files. On each row of each
    county file, an individual registered voter is listed with personal information (e.g.
    name, birthdate, address) and information about the person's election participation.
    On each row, the individual voter is also associated with a Voter Unique Identifier
    number, or "VUID."

29. For individuals who have recently cast ballots, the database extract that was produced
    by the state shows multiple records per person (one row per election in which each
    person is recorded as casting a ballot). For individuals who have not recently cast
    ballots (or not ever cast ballots), the database extract shows one row per person.[6]

---

[6] Earlier in January, I received an initial production of the TEAM voter file that only contained records of
individuals who had cast ballots in recent elections. It excluded registrants who had not cast ballots in recent
elections. The January 24, 2022 production addressed this limitation by including non-voting registrants.

30. In order to conduct the analysis in this report, I need to create a version of the TEAM file in which each individual who Texas considers a registered voter is listed once. By doing so, I am able to report on the total number of registrants whose mail ballot forms could be rejected due to SB 1's identification number requirements. Since the version of TEAM transmitted to me has many individuals listed on more than one row, I take the following steps to de-duplicate the database.

31. First, for the individuals who have cast a ballot in one or more elections, I preserve the record of their most recent election. I preserve the most recent election because this record is presumed to be most up-to-date. I also preserve records of registrants who are listed as having not cast ballots in recent elections.

32. In total, across all 254 counties, this sums to 18,656,786 records. I create a file with fields from TEAM relevant to my analysis, including name, address, birthdate, gender, and identification number fields, plus a few other fields such as whether the individual has a non-US mailing address.

33. Of these 18,656,786 records, 822,166 are duplicative on all the fields I retained. That is, the same individual with all the same identifiers is listed on multiple rows within the county TEAM files. I remove these duplicates. This leaves 17,834,620 records.

34. I next remove six records that have no VUID listed. My methodology requires the database to have a unique identifier associated with each person. As the VUID identifier is available for all but six records, I utilize it as a unique identifier, which is why I remove the 6 records without a VUID.

35. Although VUID is called a "unique identifier", the VUID listed on the TEAM files (even after the de-duplication procedures above) is only unique for 91.06% of

records. Duplicates appear to represent individuals who are listed under different residential addresses or different mailing addresses but are the same person and have a common VUID. As an extreme example, consider the case of one individual who is listed five times on TEAM. In all five records, she has the same VUID, the same birthdate, driver's license number, social security number, and date of registration. In one county, she appears twice but on one of these two records she has a mailing address listed while on the other one she does not. This individual is also listed at three other addresses in three other counties.

36. In order to work with a version of the TEAM database in which each registrant is represented once on the file, I remove records that are duplicative on VUID. For instance, in the case of the individual mentioned above whose VUID appears five times, I retain one of her five records. If any of the duplicate records on VUID differ such that one record contains a social security number while another does not, I retain the record that contains a social security number.[7] This de-duplication removes 808,560 additional records, leaving the statewide file with 17,026,054 records. My analysis is based on this database of 17,026,054 records.

37. While Texas did not supply me with a file in which each person it considers to be a registered voter is listed once, the state does report statistics about the total number of registrants in its records, both statewide and by county. Are the state's published numbers comparable to the data I am using? According to its report from January 2022 (the month in which I was supplied with a version of the TEAM file), Texas

---

[7] I retain the record containing a social security number to enable me to link the TEAM record to the DPS database using the social security number for as many records as possible, per the methodology described below.

reports 17,119,632 registered voters.[8] In the records supplied to me, after de-duplication, there are 17,026,054.

38. While the two files are close in the overall number of records, I checked, county by county, to determine if any counties showed substantially different numbers of registrants between the published numbers and the ones from the database supplied to me. In Figure 1, I count registered voters by county, and compare the number listed on the Secretary's website with the numbers in the file sent to me. In the left panel, I show all 254 counties. In the right panel, I zoom in on the 246 counties in which fewer than 50,000 individuals are registered. Both panels indicate that no county is an outlier. That is, there is no county where the number of registrants according to the Secretary's website differs meaningfully from the number in the data provided to me. The differences between the two are likely attributable to the fact that registration databases are dynamic, with additions and removals occurring frequently. The snapshot of the voter file provided to me is slightly different in the number of records from the snapshot used by Texas in publishing its January 2022 statistics, but the databases appear to be comparable. I have no reason to believe that the differences between versions of the TEAM database would systematically impact the analysis that follows or bear on any of the conclusions I draw.

---

[8] Texas Secretary of State, "January 2022 Voter Registration Figures," https://www.sos.state.tx.us/elections/historical/jan2022.shtml.

**FIGURE 1: Comparisons of Counts of Registered Voters by County in TEAM data supplied to me (after de-duplication procedures) with TEAM data published by Texas**



**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---|
| Missing SSN | 2.34% |
| Missing Unique SSN9 | 6.64 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.05 |
| Missing M/F Gender | 3.68 |
| Missing Street Number | 0.07 |
| Missing Zip Code | 0.05 |
| **TOTAL IN DATABASE** | 17,026,054 |

39. Table 2 shows the rate at which key fields in TEAM are missing data. As is clear, zero records – or at least less than 0.01% of records – are missing names. A small number – less than a tenth of a percent – are missing birthdates, street numbers, or zip codes. Whereas the DPS data treats gender as a binary field, with only M or F listed,

the TEAM file has other gender designations. Most significantly, 623,052 individuals are listed with gender code of U. For the purpose of linking databases using the gender field, I treat those not M or F as missing on gender.

### C. Data Quality Checks in TEAM Voter Records

40. I performed a series of additional diagnostics on the TEAM file, examining the quality of the key fields.

41. Birthdates. On TEAM, 4,066 individuals have invalid birthdates. These are either missing completely or have dates such as "01-01-0001". Another 5,235 individuals have birthdates indicating they were born before 1912, suggesting they are over 110 years old. Of these, most (4,824) have birthdates listed before October 1, 1906. That date, according to AARP, is the birthdate of the oldest American as of January 2022.[9] That is, TEAM lists almost five thousand registered voters with birthdates older than the oldest American. Many of these individuals are listed with birthdates such as January 1, 1900 and January 1, 1901.

42. Social Security Number. The social security number (SSN) field in TEAM is missing completely for 398,140 individuals. For 436,948 additional individuals, a four-digit SSN is listed rather than a nine-digit SSN.[10]

43. While 16,190,957 (95.10%) have a nine-digit SSN listed on TEAM, some of these numbers are invalid. For instance, SSNs cannot start with three zeroes (000-XX-XXXX), nor can they end with four zeroes (XXX-XX-0000). They cannot start with a 9 (9XX-XX-XXXX), nor start with a 666 (666-XX-XXXX), nor can they have two

---

[9] Karen Skiba, "Oldest American Credits Long Life to Avoiding Worry," AARP, May 20, 2021. This individual died in late January 2022.
[10] Nine individuals are listed with five-digit or six-digit social security numbers, which are invalid.

zeroes in the middle (XXX-00-XXXX).[11] All of these instances appear in the TEAM file and affect 183 records. Another 181 records share an SSN listed as 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. Seven records share the SSN of 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.

44. Much more common than invalid SSN9s are duplicative SSN9s. Several hundred thousand records on TEAM share an SSN9 with another record. In most of these cases, these are multiple records of the same individual who has multiple rows with different VUIDs. In other cases, however, different people (with different names and dates of birth) are listed with a common SSN9. There are 15,835 records who share a 9-digit SSN with another registrant in Texas, according to TEAM, but have a different last name, first name, and date of birth from that other listed registrant.

45. Altogether, 15,895,752 individuals of the 16,190,957 listed with an SSN9 have a unique nine-digit SSN. That is, SSN9 is not unique for 1.82% of individuals who are listed with an SSN9. Thus, while a 9-digit SSN is, in principle, a unique identifier, that isn't quite the case in TEAM records. A variety of circumstances can result in duplicate SSN9s, including individuals assigned incorrect SSN9s, such as 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, and typos such that a person ends up being listed with the SSN9 of another person who has a similar SSN9.

46. Driver's License/ID card. Of all the records in TEAM, 537,270 (3.16%) are not listed with a DPS ID Number. Of these, 102,074 are also not listed with an SSN4 or SSN9. Apart from TEAM records missing a DPS ID Number altogether, other records have ID numbers listed that are not valid. For instance, 3,610 have a nine-digit DPS ID Number even though the DPS ID is officially an 8-digit number. Forty-seven

---

[11] Social Security Administration, "Social Security is Changing the Way SSNs are Issued," https://www.ssa.gov/kc/SSAFactSheet--IssuingSSNs.pdf.

individuals share an DPS ID Number of 11111111 and thirty individuals share the number 99999999.

**TABLE 3: Summary of Field Completeness in TEAM**

| TOTAL Records in TEAM analysis | 17,026,054 | |
|---|---|---|
| Records with unique SSN9 | 15,895,752 | 93.36% |
| Records with SSN4 | 16,627,905 | 97.66 |
| Records with DPS ID Number | 16,488,784 | 96.84 |
| Records lacking SSN4 and DPS ID No. | 102,074 | 0.6 |

47. Table 3 summarizes information about the SSN and DPS ID Number information contained in TEAM. In Table 3, records for SSN4 and DPS ID Number include those that are invalid. For instance, the 47 individuals listed with DPS ID numbers as 11111111 are included in the totals. If such a person possesses a DPS ID Number that is not 1111111 and includes that number on a mail ballot application, election officials would reject the application as it does not match the 11111111 that is listed on TEAM.

**TABLE 4: Terminology Review**

| TEAM database | Database of registered voters (Texas Election Administration Management system) |
|---|---|
| DPS database | Database of Department of Public Safety ID card holder (e.g. driver's licenses) |
| DPS ID Number | An 8-digit DPS identification number (e.g. driver's license number) |
| SSN9 | Complete, nine-digit social security number |
| SSN4 | The last four digits of a social security number |

48. <u>Address and Gender</u>. While most TEAM records list standard residential addresses, 9,130 registrants are listed without a zip code and 11,621 records do not have a street

address number. Gender is either missing or defined as unknown or other than male and female for 627,115 records.

49. Before proceeding with the next stage of the report, Table 4 reviews and summarizes a few key abbreviations of terms used up until this point in my report.

## V.     Methodology for Linking Records between TEAM and DPS

50. As stated above, the methodology of this analysis is to look up each registered voter in the DPS database and determine if the registered voter has one (or more) DPS ID Numbers listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers and SSN4s listed on TEAM versus those listed on the DPS Database.

51. I will adapt a methodology I developed and published in Ansolabehere and Hersh (2017).[12] I will illustrate this methodology through an example of a fictitious registered voter. I will call this person John Smith and assign him the fake social security number of 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 and the fake birthdate of July 4, 1976. The fictitious John Smith is a male who lives at 655 E Cesar E. Chavez Blvd, San Antonio TX 78205. This is the address of the United States Courthouse. It is a real address. But, again, our fake illustrative person, John Smith, does not actually live there.

52. Suppose John Smith has a unique social security number listed on TEAM database. That is, his SSN9 is listed in registration records and no one else on TEAM is listed with that SSN9. He would be one of 93.36% of registered voters with a unique SSN9 on the TEAM file. The first step of my analysis is to merge the TEAM file with the DPS file for these 93.36% of TEAM records on the basis of their SSN9s.

---

[12] Stephen Ansolabehere and Eitan Hersh, "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender and Name," *Statistics and Public Policy*, 4:1, 2017.

**TABLE 5: Illustration of Linking TEAM and DPS based on SSN9**

| TEAM Database | | | DPS Database | | |
|---|---|---|---|---|---|
| Name | SSN9 | DPS ID No. | Name | SSN9 | DPS ID No. |
| John Smith | **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** | (missing) | John Smith | **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** | 11223344 |

53. In the scenario depicted in Table 5, John Smith does not have a DPS ID Number listed on the TEAM file (similar to more than half a million Texans). When I search for his SSN9 on the DPS file, however, I find his record and learn that he does, in fact, have a DPS ID Number. If Smith were to include only this DPS ID Number on his mail ballot application (as the mail ballot application form instructs him to do), his application would be rejected by election officials since that DPS ID Number does not appear in TEAM.

54. After linking TEAM and DPS based on SSN9s, I calculate the key statistics, such as the number of individuals who, like Smith, do not have a DPS ID Number listed in TEAM but do have one listed in DPS.

55. For two reasons, I also must match TEAM and DPS based on identifiers other than SSN9. For one, 6.5% of registrants in Texas are not listed in TEAM with a unique SSN9. For another, suppose there are inaccuracies in how SSN9 is stored. Maybe, when John Smith registered to vote, an election official entered Smith's social security number with a typo, noting it as 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 instead of 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. In this scenario, John Smith would not match to his DPS record based on the SSN9, since the SSN9 is recorded incorrectly. Additionally, if Smith were to submit a mail ballot application using the last four digits of his social security number as his identification, his application would be rejected. He would write "6789" as his SSN4, but the TEAM record would show "6782".

56. Therefore, in addition to linking TEAM and DPS based on SSN9s, I also link the databases on combinations of personal information. The first combination I will use is first name + last name + date of birth. I use the following procedure. Observing that birthdate in TEAM is stored MM-DD-YYYY while in DPS it is stored as YYYY-MM-DD, I reconfigure the TEAM birthdate information to match DPS. Next, following my past research (Ansolabehere and Hersh, 2017), I prepare the first name and last name fields. Sometimes, names are stored differently in different databases. For instance, names with dashes, apostrophes, or spaces are sometimes stored with punctuation or spaces and other times not. Names with suffixes, such as Jr. or III, are sometimes stored with the suffix as part of the surname and other times not. I process the first and last names in TEAM by removing punctuation, spaces, and suffixes. I then combine the three fields into a field I will refer to as "ND" for name + date of birth.

57. Thus, the fictitious John Smith would have an ND value of "JOHNSMITH1976-07-04." I create this field in the TEAM file and I create an equivalent field in the DPS file. I then merge the files together on the basis of this ND field, just as I had done using SSN9. I can then compare how John Smith's SSN4 and DPS ID Number appear on the TEAM file with how these numbers appear on the DPS file.

58. Is ND a unique identifier similar to SSN9? Excluding the records of individuals who are missing birthdate information in TEAM, ND uniquely identifies 98.62% of individuals in TEAM. The remaining 1.38% are duplicative. Note that the rate of duplicates on ND is *less than* the rate of duplicates on SSN9 in TEAM (1.82%),

which was discussed above. In addition, because name and birthdate are rarely missing, the identifier is available for 17,021,992 (99.98%) of the records.

59. There are several reasons why an individual might not have a unique ND identifier in a small number of cases. Similar to non-unique SSN9s, there are some individuals in TEAM who are listed multiple times, with different VUIDs, or perhaps at different addresses. The de-duplication processes described earlier in this report would not have accounted for individuals listed with different VUIDs. These individuals would nevertheless show up as duplicates on ND and SSN9. In addition, just as there are rare cases on TEAM where different individuals (with different names and birthdates) share an SSN9, there are a small number of individuals who are different people but share a value on ND. In the case of SSN9, the duplicate is due to an error, as no two individuals are supposed to share an SSN9. With the ND identifier, there are a small number of individuals who do share a first name, last name, and exact date of birth with another registrant.

60. How common is it for two different people to share a value on ND? Consider individuals who have unique SSN9s on TEAM (N=15,895,752). Because they are unique on SSN9, they are not likely to include instances of individuals who are listed on TEAM more than once with different VUIDs. Of those with a unique SSN9, 99.64% (15,838,711) also have a unique ND value. Thus, the remaining 0.36% may have a non-unique ND because they share a name and date of birth with another registrant.

61. I guard against linking two different people who share a common ND by only attempting to link records if the value of ND is unique on the TEAM file. In other

words, for the 1.38% of records that are not unique on TEAM based on their ND (either because they contain erroneous information, identify individuals who are listed multiple times in TEAM, or identify multiple individuals who have the same name and birthdate), I do not attempt to link them to the DPS database using ND. Furthermore, in an analysis described below, I will be able to estimate whether individuals who are listed in TEAM are a false-positive match to different individuals with the same names and birthdates who are listed in DPS.

62. In addition to linking TEAM and DPS based on SSN9 and based on the combination of name and birthdate, I perform one additional linkage between the files, based on address, gender, and date of birth. Why is this additional linkage necessary? While the Name + Date of Birth combination is available for nearly all registrants in TEAM and exhibits a higher rate of uniqueness than SSN9, it does have a drawback in linking individuals between two databases. Namely, it is stored less consistently than SSN9. Surnames often change when people marry. First names are sometimes recorded with nicknames. The fictitious John Smith may have registered to vote using his nickname, Johnny Smith. Or, maybe John Smith took on a hyphenated surname when he got married. As such, he is listed as John Smith in the DPS records but John Smith-Jones on TEAM. Name inconsistencies across databases mean that a person with a unique name and date of birth on TEAM might fail to match to his or her record on DPS.

63. Accordingly, I also link records between TEAM and DPS with an alternative identifier that excludes name information. I match individuals based on a combination of address, date of birth, and gender. Following procedures discussed in Ansolabehere

and Hersh (2017), I extract two pieces of information from addresses, the street number and the five-digit zip code. I then combine them. Our fictitious character John Smith lives at 655 E Cesar E. Chavez Blvd, San Antonio TX 78205. From this address, I would extract 65578205 (the 655 from the street number, the 78205 from the zip code). By extracting just these numbers, I avoid possible inconsistencies in how addresses are stored in different databases. In one database, Smith's address might be listed as "E Cesar E Chavez Blvd" whereas in another database it could be listed as "East Cesar Chavez Boulevard". Due to inconsistences in naming conventions of streets, I focus just on the street number and zip code.

64. I combine the address information with the date of birth and gender (represented by "M" or "F") of registrants. I call this combination ADG, for address + date of birth + gender. For instance. John Smith's ADG combination would be 655782051976-07-04M. If the individual does not have residential address information listed but does have mailing address information listed, I use the mailing address (and PO boxes, when street addresses are not present) in place of the residential address.

65. The ADG identifier can be constructed for all registrants who have a gender, birthdate, and address listed. This amounts to 16,398,349 individuals (96.31% of TEAM). Of these, the ADG identifier is unique for 99.29% of them. This compares to 98.62% for ND and 98.18% for SSN. Among individuals who are unique on SSN, 99.52% are also unique on ADG.

66. As with the other identifiers, there are rare circumstances where two different individuals share the same ADG identifier. For instance, two twins of the same gender who are registered at the same address would be two different people with a

matching ADG. As with the other identifiers, I only seek to link records based on ADG for individuals who are unique on ADG in the TEAM file. Thus, in the case of same-gender, same-address twins, I would not seek to link them to DPS based on ADG. However, assuming they are uniquely identified by either their SSN or DN, they would be linked to the DPS file in those ways.

67. Just as the ND combination will not match individuals if there is a discrepancy in the name or date of birth field, the ADG combination will not match individuals if there is a discrepancy in the address, gender, or date of birth fields. The most likely scenario of a non-match on ADG is when an individual has an old residential address listed on one database and a new residential address listed on another database. If a person has two different addresses listed on TEAM and DPS, then the person's records will not match on ADG. However, assuming the individual has a unique SSN9 listed OR has his/her name and birthdate listed consistently across databases, then the person on TEAM would match to his/her record on DPS. Out of all 17,026,054 registered voters, I can attempt to link all but 39,549 (0.23%) records to DPS. These 0.23% of records are not unique on the TEAM file on any of SSN9, ND, or ADG.

68. Table 6 summarizes the names of the fields used to match across databases. On the DPS file, I create a parallel set of fields: SSN9, ND, and ADG. The major difference between preparing the TEAM file and the DPS file is that the DPS file has multiple rows of individuals who have more than one DPS ID Number. Thus, the linkage fields are meant to uniquely identify individual *people* on DPS but they are not meant to uniquely identify individual *records*. When linking records between TEAM and

DPS, I thus perform 1-to-many merges. This means that for each TEAM record that is unique on SSN9, I find one or more records on DPS that match that SSN9. For each TEAM record that is unique on ND, I find one or more records on DPS that match that ND. And for each TEAM record that is unique on ADG, I find one or more records on DPS that match that ADG.

**TABLE 6: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
| --- | --- | --- |
| **SSN9** | 9-digit social security number | "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" |
| **ND** | First name + Last name + Date of birth | "JOHNSMITH1977-07-04" |
| **ADG** | Address + Date of birth + Gender | "655782051976-07-04M" |

69. In creating these linkage combinations, some questions may arise. First, if a record in TEAM links to a record on DPS based on ND or ADG, how confident ought we be that the person with these name, birthdate, address, and gender attributes on TEAM is the same person with these attributes on DPS? Below, I will validate the accuracy of the linkage technique by comparing social security numbers of those who match on ND or ADG. I will show that a person who matches on ND or ADG almost always matches on SSN9 as well. And when the person does not have matching SSN9s, it is far more likely to be due to a typographical error in SSN9 rather than a false positive match on ND or ADG.

70. The second question that arises is why use the particular combinations here (ND and ADG) rather than other possible combinations. Indeed, in prior court cases and published work, I utilized alternative algorithms. For instance, in *Fish v. Kobach*, I utilized ND, ADN (address, date of birth, and name), and AD (address and date of

birth). In Hersh and Ansolabehere (2017), which relates to expert testimony of Dr. Ansolabehere in *Veasey v. Perry*, we used several additional combinations, such as gender, date of birth, and name (GDN).

71. The exact set of linking combinations depends on the features of the data and the research question in any particular case. The methodology can be adapted based on what is needed. For instance, in *Veasey v. Perry*, a nine-digit social security number was only available for half of registered voters in Texas (Ansolabehere and Hersh, 2017). In the present case, SSN9 is available for over 90% of registrants. As such, one need to rely less on combinations of other identifiers. In the current data, because gender is missing for about 4% of records but name and birthdate are missing for less than 0.01% of records, it is advantageous to link based on name and birthdate (ND) without adding gender to that combination. Because first names are typically distinctive by gender, gender only aids in generating unique identifiers in rare cases when two individuals with the exact same name and birthdate are of different genders.

72. The combinations used here, ND and ADG, are advantageous because they uniquely identify almost every registered voter and together, they are able to do so without using the name field (in the case of ADG) and the address field (in the case of ND). Due to residential moves, nick-names, and married names, these two fields can be stored inconsistently across databases. Successive attempts at matching based on SSN9, ND, and ADG allow for matches to individuals who are missing data or have inconsistent records on SSN9, name, address, and gender.

73. Finally, as the analysis below demonstrates, the three linkages used here identify almost all (98.7%) of registrants on the DPS database who have a DPS ID Number listed on TEAM. Additional attempts to link the databases based on different combinations of address, gender, date of birth, and name would only serve to find a few more DPS ID holders and identify a few more instances of problems associated with SB 1's identification number requirements.

**Subpopulations**

74. In addition to preparing the DPS database and TEAM databases as described above, I prepare the data files so I can observe rates of problematic SSN4s and DPS ID Numbers for specific subpopulations of registered voters.

   a. Over 65: I create a file that notes every registered voter listed as born before 1957 and after 1906. This represents the over-65 population (excluding those with implausibly old birthdates).

   b. Recent Voters: I create a file that notes every registered voter who cast a ballot in the November 2020 election. Why these voters? I sought to determine whether problems with the ID verification requirement are just concentrated among registrants who have obsolete records or who have not recently cast ballots. If that were the case, maybe the problems identified would not be seen as acute. However, problems affecting records of individuals who just recently voted suggests the identification verification requirement impacts actively engaged voters.

c. <u>Overseas Voters</u>: I create a file that notes every registered voter who has a non-US mailing address. These could include some members of the armed forces, military families, and other overseas citizens who would be particularly likely to cast ballots by mail.

d. <u>Homebound/Disabled Veteran</u>: In the DPS database, individuals are flagged if they have a status as a disabled veteran or a homebound person. I perform a separate link between TEAM records and the DPS records of those who have a disabled veteran flag or homebound flag using the same methodology as used for the general population.

## VI.   Linkage Part I: TEAM Records with missing DPS ID Numbers

75. I divide the analysis into two parts. First, I examine individuals whose TEAM records do not show any DPS ID Number. Second, I examine individuals whose TEAM records do show a DPS ID Number.

76. Out of 17,026,054 records in TEAM, 537,270 do not have a DPS ID Number listed in the voter registration records. If any of these individuals actually has a DPS ID Number, they are instructed by the mail ballot application forms to include that DPS ID Number. But SB 1 requires that these forms – the application and the ballot itself – to be rejected because the DPS ID Number is not listed on TEAM.

77. Registrants who do not have a DPS ID Number recorded on TEAM are different from those who do have a DPS ID Number recorded on TEAM. Namely, they are older. The median age for a registrant without a DPS ID Number on TEAM is 58. The median age for a registrant with a DPS ID Number on TEAM is 48. Whereas 24% of

individuals with a DPS ID Number on TEAM are 65 or older, that rate is nearly double (42%) for individuals without a DPS ID Number. Age 65 and older is relevant as all voters 65 and older may request an absentee ballot under Texas law.

**TABLE 7: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

|  |  | Unique SSN9 | | |
|---|---|---|---|---|
|  |  | Present | Absent | TOTAL |
| **DPS ID** | Present | 15,745,864 | 742,920 | 16,488,784 |
| **Number** | Absent | 149,888 | 387,382 | 537,270 |

78. I link the 537,270 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG techniques described above.

79. I first link by SSN9. Of the 537,270 individuals without a DPS ID Number, 149,888 have a unique SSN9 listed (as noted in Table 7). Of those, 83.93% match to the DPS database by their SSN9. A total of 76.18% of the records match to a single DPS ID Number, and 7.75% link to multiple DPS ID Numbers.

80. I next link these individuals based on ND. As noted in Table 7, most individuals who lack DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a unique ND combination. Of the 537,270 lacking a DPS ID Number on TEAM, 517,283 (96.28%) have a unique ND. Of those who have a unique ND, 33.86% match to a single DPS record and 5.46% match to multiple DPS records.

81. I next link these individuals based on ADG. Of 537,270 records lacking a DPS ID Number on TEAM, 478,632 (89.09%) have a unique ADG. Of those with a unique ADG, 36.82% match to a single DPS record and 4.54% match to multiple DPS records.

**TABLE 8: Results of Linking TEAM to DPS Records for TEAM Records without a DPS ID Number listed**

|     | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|-----|-----------------|---------------------|-----------------------|--------------------|
| **SSN9** | 16.07% | 76.18% | 7.75% | 149,888 |
| **ND** | 60.68 | 33.86 | 5.46 | 517,283 |
| **ADG** | 58.63 | 36.82 | 4.54 | 478,632 |
| **Any** | 47.97 | 45.64 | 6.39 | 531,251 |

82. Table 8 summarizes the analysis of records that do not have a DPS ID Number listed on the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows that I attempted to match 149,888 records in TEAM based on SSN9. This reflects the number of TEAM records with a unique SSN9. Of those, 16.07% did not match to DPS. The others did match.

83. The bottom row of Table 8 provides the overall summary for the TEAM records lacking a DPS ID Number. Of the 537,270 total records lacking a DPS ID Number, I attempted to link 531,251 (98.88%) to the DPS database. (The other 1.12% did not have a unique or complete value for SSN9, ND, or ADG). Of the 531,251 individuals I attempted to find on DPS, a majority (52.03%) matched to a DPS record. That amounts to 276,405 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number on their mail ballot application. However, SB 1 requires that their ballot application, and their ballot, to be rejected because the number is not listed on TEAM.

84. <u>Subpopulations:</u> Of the 276,405 individual who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 155,583 are over age 65

- 95,892 voted in the 2020 election

- 59,567 are over 65 AND voted in the 2020 election

- 374 have non-US mailing addresses

- 781 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers clearly show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

## A.  Validation of Methodology

85. There are obvious reasons why an individual who matches on SSN9 would fail to match on ND or ADG. If there is a nickname used in one database, if a surname has changed, if gender is not recorded as male or female, or if an address has changed, this would cause individuals who match on SSN9 not to match on one or more of the other combinations. However, individuals who match on ND or ADG *but DO NOT* match on SSN9 present a puzzle. Do these individuals fail to match on SSN9 because ND or ADG are causing false positive matches between two different people? Or do these individuals fail to match on SSN9 because the SSN9 information is recorded in error on either TEAM or DPS?

**TABLE 9: Rates of Mismatches on SSN9 for Records that Matched on ND or ADG**

| If matched on… | SSN9 Match | SSN9 No Match | N |
|---|---|---|---|
| **ND** | 97.63 | 2.37 | 83,504 |
| **ADG** | 97.66 | 2.34 | 98,547 |

86. In Table 9, I show how often records that match on ND or ADG do not match on SSN9. It is rare. For instance, the first row assesses those who have SSN9 present on both TEAM and DPS and who matched on ND. Of these 83,504 individual records, 97.63% also matched on SSN. As the table shows, on both ND and ADG, just over 2 percent of individuals have mismatched SSN9s.

87. In these 2 percent of cases with mismatched SSN9s, I conduct a further analysis. This analysis demonstrates conclusively that individuals who match on ND or ADG but not on SSN9 fail to match because of typos in SSN9 rather than because these linkage strategies generate false-positive matches.

88.  The further analysis I conduct uses a measurement tool known as Levenshtein distance. The Levenshtein distance is simply the number of characters in a string that would need to change in order for two strings to match each other. For instance, consider these two strings of numbers. String #1 is: 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. String #2 is: 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. The Levenshtein distance between these two strings is 1, since only one character would need to change for these two strings to be identical. Now consider the Levenshtein distance between String #1 (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) and a new string, String #3. String #3 is 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. The Levenshtein distance between String #1 and String #3 is 8, because 8 of the 9 numbers in String #1 (all the numbers except the 5) would need to change for 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 to equal 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.

89. Now consider the registrants in TEAM who match to individuals in DPS based on their ND or ADG, but they do not have matching SSN9s. If these represent false-positive matches (i.e. two different people who share traits such as name, address, birthdate, and gender), then their social security numbers should be entirely different

from one another. If their social security numbers are entirely different from one another, then the Levenshtein distance should be high (i.e. most or all of the numbers in the SSN9 would need to change for these two random people to have matching SSN9s). However, consider another possibility, which is that the person who matches on ND or ADG but not on SSN9 is one individual with one SSN9, but there is an error in how this person's SSN9 is recorded either on TEAM or on DPS. The recording error in a Texas database would be the reason the records do not match based on an SSN9. If there is a typographical error on one or two of the digits, then the Levenshstein distance would be low (i.e. just one or two of the digits would need to change for these two SSN9s to match).

**TABLE 10: Levenshtein Distance Measures between SSN9 on DPS and SSN9 on TEAM for records that match on ND or ADG but Do Not Match on SSN9**

|   | ND | ADG |
|---|---|---|
| **1** | 65.49% | 66.07% |
| **2** | 18.47 | 18.98 |
| **3** | 2.57 | 2.61 |
| **4** | 1.87 | 1.95 |
| **5** | 1.56 | 1.61 |
| **6** | 2.62 | 2.65 |
| **7** | 3.18 | 2.52 |
| **8** | 2.98 | 2.69 |
| **9** | 1.26 | 0.91 |
| **N** | 1,982 | 2,302 |

90. For each record that matches on ND or ADG but does not match on SSN9, I compare the SSN9 as it is recorded in TEAM and the SSN9 as it is recorded in DPS. In Table 10, I record the distribution of Levenshtein distances. As is shown, for approximately 85% of these cases, the Levenshtein distance is 1 or 2, which signals that the SSN9s

as recorded in TEAM and DPS are identical but for one or two digits. Table 10 provides conclusive evidence that in the rare cases in which records match on DN or AGD but not on SSN9, it is overwhelmingly because there are typos in the recording of SSN9s.

**B. Typographical Errors in SSN4**

91. The above analysis is not only useful in validating the linkage technique used here. It also signals an issue with SB 1. Namely, some typos in SSN9 happen to be in the last four digits of the social security number. A registered voter who applies for a mail ballot and records their SSN4 correctly on the application will have their application rejected if there is a typo in SSN4. Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,726 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,726 cases result from inaccuracies on TEAM. They would result in election officials rejected mail ballot forms from citizens who include their correct SSN4 on the forms.

**VII.   Linkage Part II: TEAM Records Listed with DPS ID Numbers**

92. I now turn to the analysis of the 16,488,784 records in which a DPS ID Number is listed in the TEAM databases. As noted above, in Table 7, 95.5% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of 15,745,864 records with a unique SSN9 on TEAM, 99.66%

match to a record in DPS. However, 15.60% of the records match to more than one DPS ID Number.

93. Next, I link records based on the ND combination. The ND combination is unique for 16,269,349 individuals who have a DPS ID Number listed on TEAM. Of these, 97.39% match to a record in DPS. However, 15.20% match to more than one DPS ID Number.

94. Next, I link records based on the ADG combination. The ADG combination is unique for 15,803,406 individuals who have a DPS ID Number listed on TEAM. Of these, 79.32% match to a record in DPS. However, 9.84% match to more than one DPS ID Number. Notice, fewer individuals on TEAM match to records on DPS based on the ADG indicator compared to the ND indicator. This is attributable to residential address differences between individuals listed on TEAM and those same individuals listed on DPS.

**TABLE 11: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|      | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|------|-----------------|---------------------|-----------------------|--------------------|
| **SSN9** | 0.34%       | 84.06%              | 15.60%                | 15,745,864         |
| **ND**   | 2.61        | 82.19               | 15.20                 | 16,269,349         |
| **ADG**  | 20.68       | 69.48               | 9.84                  | 15,803,406         |
| **Any**  | 1.30        | 85.25               | 13.45                 | 16,455,254         |

95. Table 11 summarizes the analysis of records missing a DPS ID Number on the voter file. Consider the bottom row. Of the 16,488,784 records in TEAM listed with a DPS ID Number, I attempted to link 16,455,264 (99.80%) of them to the DPS database. The remaining 0.20% did not have a unique or complete record on SSN, ND, and

ADG. Of these 16,455,254 records, 98.70% (that is, all but 1.30%) matched to a record in DPS. However, 13.45% of these 16.5 million people are listed more than once on DPS, with multiple ID numbers. These 13.45% of records sum up to 2,213,676 records. That is, for 2.2 million Texas registered voters who have a DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

96. The 2.2 million figure may be a significant underestimate. Recall that on about 10% of rows in the DPS file, ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the 14,027,371 TEAM records that linked to a *single* DPS ID Number, 1,412,213 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. If these ID Numbers are current or expired Texas ID Numbers such as driver's license numbers, a registrant who uses these alternative numbers when submitting a mail ballot application or mail ballot would also have his or her forms rejected. However, as stated earlier, it is unclear from the information Texas has provided thus far whether the "AKA DL/ID Number" field includes any DPS ID Number or some DPS ID Numbers combined with ID numbers from other states or other kinds of numbers altogether. Accordingly, I will focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

97. Subpopulations: Of the 2,213,676 individuals who match to multiple DPS ID Numbers,

- 189,699 are over age 65

- 1,105,194 voted in the 2020 election

- 114,129 are over 65 AND voted in the 2020 election

- 277 have non-US mailing addresses

- 5,308 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

**A. Validation of Methodology**

98. As in the analysis regarding individuals not listed with DPS ID Numbers, I now conduct the same validation exercise for those who do have DPS ID Numbers listed. Namely, I investigate the records that matched between TEAM and DPS based on ND and/or ADG, but did not match across databases on SSN9.

**TABLE 12 Rates of Mismatches on SSN9 for Records that Matched on ND or ADG**

| | **SSN9** | | |
|---|---|---|---|
| **If matched on…** | Match | No Match | N |
| **ND** | 99.81 | 0.19 | 15,420,951 |
| **ADG** | 99.78 | 0.22 | 12,100,999 |

99. In Table 12, I restrict the analysis to those who have an SSN9 recorded both in the TEAM file and the DPS file. The rows indicate the percent that matched on SSN9. As

Table 11 shows, if an individual record linked based on ND or ADG, the record also links based on SSN9 in 99.8% of cases. But even in these 0.2% of cases, why do individuals link on name, address, date of birth, and gender, but not on SSN9?

**TABLE 13: Levenshtein Distance Measures between SSN9 on DPS and SSN9 on TEAM for records that match on ND or ADG but Do Not Match on SSN9**

|   | ND | ADG |
|---|---|---|
| **1** | 70.06% | 70.51% |
| **2** | 19.24 | 19.30 |
| **3** | 2.36 | 2.32 |
| **4** | 1.56 | 1.56 |
| **5** | 0.71 | 0.70 |
| **6** | 1.27 | 1.19 |
| **7** | 1.85 | 1.65 |
| **8** | 1.99 | 1.86 |
| **9** | 0.94 | 0.91 |
| **N** | 29,982 | 26,520 |

100.    As Table 13 shows, in 90% of cases in which a record links based on ND or ADG but not SSN9, the SSN9 listed in TEAM and the SSN9 listed in DPS are off by just one or two digits. This is indicative that typos in one or two positions in an SSN9 are the cause of most the mismatches.

**B.  Typographical Errors in SSN4**

101.    Looking just at the last 4 digits of social security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 40,718 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on

a mail ballot application, then their application will be rejected because of incorrectly

recorded data in TEAM.

102.    <u>Subpopulations:</u> Of the 40,718 individuals whose SSN4s listed on TEAM do not

match the SSN4s listed in the DPS database

- 15,544 are over age 65

- 28,880 voted in the 2020 election

- 12,015 are over 65 AND voted in the 2020 election

-  25 have non-US mailing addresses

- 98 individuals matched to DPS records indicating homebound status or

    disabled veteran status.

These numbers clearly show that many active voters who are eligible to vote by mail

under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4

listed in the DPS database.

**C. Typographical Errors in DPS ID Numbers**

103.    Just as there are discrepancies between the SSNs listed in TEAM and the

corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers.

However, they are more complicated to tabulate. For each of the three linkages

(SSN9, ND, and ADG), I calculate the rate of mismatches on DPS ID between the

two databases. As Table 14 shows, in over 99% of cases, the DPS ID Number listed

on TEAM matches one of the DPS ID Numbers listed in the DPS database. (In this

analysis, for registrants who match to multiple DPS ID Numbers, I count them in the

"match" column if one of the DPS ID Numbers listed in DPS matches the DPS ID

Number listed in TEAM.)

**TABLE 14 Rates of Mismatches on DPS ID Number for Records that Matched on SSN9, ND, or ADG**

| If matched on… | DPS ID Match | DPS ID No Match | N |
|---|---|---|---|
| SSN9 | 99.59 | 0.41 | 15,692,006 |
| ND | 99.56 | 0.44 | 15,844,010 |
| ADG | 99.24 | 0.76 | 12,536,045 |

104.     Table 15 calculates Levenshtein distances between the DPS ID Numbers recorded on TEAM and the DPS ID Numbers recorded on DPS. The table makes the calculation for the less than 1% of individuals who have mismatched DPS ID Numbers. For individuals on TEAM whose records match to multiple DPS ID Numbers, the table reflects the DPS ID Number on the DPS database that is closest (i.e. has the lowest Levenshstein distance).

**TABLE 15: Levenshtein Distance Measures between DPS ID Number on DPS and DPS ID Number on TEAM for records that match on SSN9, ND, or ADG**

| | SSN9 | ND | ADG |
|---|---|---|---|
| 1 | 25.36% | 26.05% | 15.71% |
| 2 | 6.94 | 7.22 | 4.51 |
| 3 | 1.25 | 1.33 | 1.13 |
| 4 | 2.20 | 2.22 | 2.47 |
| 5 | 8.58 | 8.35 | 9.93 |
| 6 | 22.54 | 21.64 | 25.92 |
| 7 | 24.89 | 24.70 | 29.76 |
| 8 | 8.24 | 8.49 | 10.57 |
| N | 64,346 | 68,959 | 94,870 |

105.     As Table 15 shows, about 20-33% of mismatched DPS ID Numbers are off by just one or two digits. The majority of those with mismatched DPS ID Numbers show entirely different DPS ID Numbers. For example, consider the 64,346 individuals (Table 15, Column 1) who have a DPS ID Number and SSN9 listed on TEAM. They were matched to DPS records based on their SSN9. However, a comparison between the DPS ID Number listed in TEAM and the DPS ID Number listed in the DPS database show mismatching DPS ID Numbers. While a third of these are just off by one or two digits (suggesting typographical errors), most are showing completely different DPS ID Numbers.

106.     Why does this occur? In some of the cases where the DPS ID Numbers are completely different, it is because these individuals in TEAM have a typo in their social security numbers rather than their DPS ID Numbers. When they match to a record in the DPS ID database based on their SSN9, they are actually matching to a different person (i.e. they match to the person who has the social security number that is incorrectly recorded for them). In other cases, these registrants may be matching to the right record in DPS, but the DPS database shows an entirely different DPS ID Number than is shown in TEAM.

107.     In order to provide an estimate of the number of registrants who have a DPS ID Number listed in TEAM that is different than the DPS ID Number listed in DPS, I cannot count all the results in Table 15. Some of these individuals might have an accurate DPS ID Number but they have an inaccurate SSN9, so if they just use their DPS ID Number when submitting a mail ballot application, their application would not be rejected.

108.    Thus, I will use conservative estimate of faulty DPS ID Numbers. I use the lowest Levenshtein distance of any of three linkages (SSN9, ND, ADG). An example will help explain this. Suppose John Smith has a typo in his SSN9 as it is listed in TEAM. His SSN9 is 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, but it is listed in TEAM as 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. When I link his record to DPS, his links to another person's records. She is Jane Doe, and her SSN9 is 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. Now, when I compare the DPS ID Number on John Smith's TEAM record to the DPS ID Number on the record he matches to (Jane Doe's record), the DPS ID Numbers are completely different. They might have a Levenshtein distance of 6, 7, or 8.

109.    However, I also link John Smith to his DPS record based on his ND and ADG combinations. In those linkages, Smith links to his actual record in DPS. If there are no typos or other discrepancies in how his DPS ID Number is stored, he would have a Levenshtein distance of zero, and I would not treat this as a problematic record with respect to the DPS ID Number. (I would, of course, treat it as a problematic record with respect to the faulty SSN9). However, suppose that Smith *also* has a typo or other discrepancy in his DPS ID Number. On TEAM, his DPS ID Number would read 11223345, but on the DPS database his DPS ID Number would read 11223344. The comparison between these numbers would generate a Levenshtein distance of 1.

110.    For each person in TEAM, I thus calculate the Levenhstein distance between their DPS ID Number listed in TEAM and *the closest* DPS ID Number they link to in the DPS database. By this conservative estimation method, I calculate that 68,190 individuals do not have a DPS ID Number in TEAM that matches any DPS ID Number in DPS.

111. <u>Subpopulations:</u> Of the 68,190 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but do not have DPS ID Numbers that correspond to the DPS database,

- 17,270 are over age 65

- 34,187 voted in the 2020 election

- 11,690 are over 65 AND voted in the 2020 election

- 18 have non-US mailing addresses

- 370 individuals matched to DPS records indicating homebound status or disabled veteran status.

## VIII.   Summary of Results

112. To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4.

a. **276,405** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. These individuals are instructed to list their DPS ID, but when they do so, their ballot or ballot application will be rejected.

    i.   Of these, **155,583** are over 65 years old, **59,567** of whom voted as recently as the 2020 general election.

    ii.   Of these, **1,155** have overseas addresses or are listed as disabled veterans or as homebound citizens.

b. **2,213,676** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number

that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

    i. Of these, **189,699** are over 65 years old, **114,129** of whom voted as recently as the 2020 general election.

    ii. Of these, **5,585** have overseas addresses or are listed as disabled veterans or as homebound citizens.

c. **44,444** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

d. At least **68,190** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

113.    Altogether, over 2.6 million registered voters in Texas (out of 17 million) are at risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.6 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.

**IX.    Conclusion**

114.    The identification number requirements of SB 1 require election officials to reject mail ballots and mail ballot applications from a large number of voters due to limitations and errors in the state's record-keeping practices rather than due to any limitations or oversights on the part of eligible voters. Texas's databases are simply not well-suited to SB 1's demands. The law demands that those who have a DPS ID

list the ID number on mail ballot applications. Yet, many of these ID numbers are not stored by Texas on its voter registration records. The law demands that some registrants include social security number information. But the state database has tens of thousands of typos in its recording of Texans' social security numbers. The database has even more typos in its recording of Texans' DPS ID Numbers. The law demands that voters list one of their DPS ID numbers when applying for a mail ballot, but millions of voters have more than one DPS ID number, and election official are only able to validate one of them.

115.    The disconnect between the quality and completeness of Texas's records versus the demands of SB 1 results in election officials delaying and/or preventing citizens from casting ballots who follow all the rules and are eligible to vote by mail. As I have shown, over 2.6 million Texans can follow all the rules and instructions set forth by SB 1 when applying for, or submitting, an absentee ballot, and they still face a substantial risk that their applications and ballots will be rejected. Those affected include Texans living overseas, disabled veterans and homebound citizens living at home, plus over 350,000 senior citizens.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 28th Day of February, 2022.

_____

Eitan Hersh

# CURRICULUM VITAE

## EITAN HERSH

## Contact

Department of Political Science, Tufts University
108 Packard Hall
Medford, Massachusetts 02155

Tel: 617.627.2043
Email: eitan.hersh@tufts.edu
Web: www.eitanhersh.com

## Employment

Associate Professor, Political Science
Tufts University, 2017-Present

Assistant Professor, Political Science
Yale University, 2011-2017

## Education

Ph.D. in Political Science, Harvard University (2011)
M.A. in Political Science, Harvard University (2010)
B.A. in Philosophy, Tufts University, *summa cum laude* (2005)

## Books

Eitan Hersh. *The Golden Rulers: Business, Wealth, and Civic Leadership in America*. Current book project, in development.

Eitan Hersh. 2020. *Politics is for Power: How to Move Beyond Political Hobbyism, Take Action, and Make Real Change*. New York: Scribner.

Eitan Hersh. 2015. *Hacking the Electorate: How Campaigns Perceive Voters*. Cambridge: Cambridge University Press.

## Scholarly Articles

Eitan Hersh and Yanna Krupnikov. 2021. "Freedom of Expression in an age of Social Media, Misinformation, and Political Polarization," Symposium in *PS: Political Science and Politics*, Symposium proposal accepted.

Laura Royden and Eitan Hersh. 2021. "The Young American Left and Attitudes About Israel." Forthcoming in *Contemporary Jewry*.

Eitan Hersh. 2021. "The Political Role of Business Leaders." Forthcoming at *Annual Review of Political Science*.

Gabrielle Malina and Eitan Hersh. 2021. "The Politics of 130,000 American Religious Leaders: A New Methodological Approach." *Journal for the Scientific Study of Religion* 60 (4): 709-725.

Aaron Kaufman and Eitan Hersh. 2020. "The Political Consequences of Opioid Overdoses." *PLOS ONE* 15 (8): 1-10.

Laura Zatz, Eitan Hersh, Kimberly Gudzune, Anne Thorndike, Matthew Goldenberg, and Sara Bleich. 2020. "Physicians' Political Party Affiliation and Clinical Management of Obesity," *Clinical Obesity*: 1-9.

Justin Grimmer, Eitan Hersh, Marc Meredith, and Clayton Nall. 2018. "Obstacles to Estimating Voter ID Laws' Effect on Turnout." *Journal of Politics* 80 (3): 1045-1051.

Bernard Fraga and Eitan Hersh. 2018. "Are Americans Stuck in Uncompetitive Enclaves? An Appraisal of U.S. Electoral Competition" *Quarterly Journal of Political Science* 13 (3): 291-311.

Eitan Hersh and Yair Ghitza. 2018. "Mixed-Partisan Households and Electoral Participation in the United States" *PLOS ONE* 13(10): 1-18.

Stephen Ansolabehere and Eitan Hersh. 2017. "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name" *Statistics and Public Policy*. 4(1): 1-10.

Eitan Hersh and Brian Schaffner. 2017. "Post-Materialist Particularism: What Petitions Can Tell Us about Biases in the American Policy Agenda," *American Politics Research* doi.org/10.1177/1532673X17722989.

Ryan Enos and Eitan Hersh. 2017 "Campaign Perceptions of Electoral Closeness: Uncertainty, Fear, and Over-Confidence." *British Journal of Political Science*. 47(3): 501-519.

Eitan Hersh and Matthew Goldenberg. 2016. "Democratic and Republican Physicians Provide Different Care on Politicized Health Issues," *Proceedings of the National Academy of Sciences*. 113 (42): 11811-11816.

Vivekinan Ashok, Daniel Feder, Mary McGrath, and Eitan Hersh. 2016 "The Dynamic Election: Patterns of Early Voting Across Time, Space, Age, and Party," *Election Law Journal*. 15(2): 115-128.

Eitan Hersh and Clayton Nall. 2016. "The Primacy of Race in the Geography of Income-Based Voting: New Evidence from Public Voting Records." *American Journal of Political Science*. 60 (2): 289-303.

Ryan Enos and Eitan Hersh. 2015. "Party Activists as Campaign Advertisers: The Ground Campaign as a Principal-Agent Problem." *American Political Science Review*. 109 (2): 252-278.

Stephen Ansolabehere and Eitan Hersh. 2013. "Gender, Race, Age and Voting: A Research Note." *Politics and Governance*. 1 (2): 132-137.

Eitan Hersh. 2013. "The Long-Term Effect of September 11 on the Political Behavior of Victims' Families and Neighbors." *Proceedings of the National Academy of Sciences*. 110 (52): 20959-20963.

Eitan Hersh and Brian F. Schaffner. 2013. "Targeted Campaign Appeals and the Value of Ambiguity." *Journal of Politics*. 75 (2): 520-534.

Stephen Ansolabehere and Eitan Hersh. 2012. "Validation: What Big Data Reveal About Survey Misreporting and the Real Electorate." *Political Analysis* 20(4): 437-459.

Stephen Ansolabehere, Eitan Hersh, and Kenneth Shepsle. 2012. "Movers, Stayers, and Registration: Why Age is Correlated with Registration in the U.S." *Quarterly Journal of Political Science* 7(4): 333-363.

Eitan Hersh. 2012. "Primary Voters Versus Caucus Goers and the Peripheral Motivations of Political Participation. *Political Behavior*. 34(4): 689-718.

Bernard Fraga and Eitan Hersh. 2011. "Voting Costs and Voter Turnout in Competitive Elections." *Quarterly Journal of Political Science* 5(4): 339-356.

# Other Writing

Lily Geismer and Eitan Hersh, "Laugh at the 'S.N.L.' School Board Skit, Take Your Local Politics Seriously," *New York Times*, November 1, 2021.

Eitan Hersh, "Rage-Donating Only Made Democrats Feel Better," *Atlantic*, November 12, 2020.

Eitan Hersh and Yanna Krupnikov, "Another Political Gender Gap Emerges," *The Hill*, October 9, 2020.

Eitan Hersh, "Lower Barriers to Participation, Don't Raise Them," *Boston Globe*, September 30, 2020.

Eitan Hersh and Daniel Horn, "Health care workers need to engage on politics," *USA TODAY*, September 11, 2020.

Eitan Hersh, "How Democrats Can Repair Their Generational Divide," *Politico*, March 12, 2020.

Eitan Hersh, "'We All Really Need To Do Hard Things'" *The Progressive*, January 31, 2020.

Eitan Hersh, "Listen Up, Liberals: You Aren't Doing Politics Right," *New York Times*, January 27, 2020.

Eitan Hersh, "College-Educated Voters are Ruining American Politics," *The Atlantic*, January 20, 2020.

Eitan Hersh, "What Rich Centrists Could Learn from Howard Schultz about Political Power," *Niskanen Center*, January 16, 2020.

Eitan Hersh, "Politics is for Power, Not Consumption," *Boston Review*, November 4, 2019.

Eitan Hersh, "The Political Beliefs and Civic Engagement of Physicians in an Era of Polarization," Introduction to special issue, guest editor of special issue, *Journal of Health Politics, Policy, and Law* 44, 2019.

Eitan Hersh, "In a Deep Blue or Red State? You Can Still Influence Politics," *New York Times*, October 29, 2018.

Eitan Hersh, "Political Hobbyists are Ruining the Country," *New York Times*, July 2, 2017.

Eitan Hersh, "The Most Dangerous Hobby," *Boston Globe*, May 3, 2016.

Occasional essays in media outlets such as the Washington Post's Monkey Cage and *FiveThirtyEight*

Justin Grimmer, Brian Feinstein, Eitan Hersh, and Daniel Carpenter, "Are Close Elections Random?" Working Paper.

Stephen Ansolabehere and Eitan Hersh. 2014. "Voter Registration: The Process and Quality of Lists." In *The Measure of American Elections*, eds. Barry C. Burden and Charles Stewart III. Cambridge: Cambridge University Press.

Stephen Ansolabehere and Eitan Hersh. 2011. "Who *Really* Votes?" In *Facing the Challenge of Democracy*, eds. Paul M. Sniderman and Benjamin Highton. Princeton: Princeton University Press.

Stephen Ansolabehere, et al., "Voter Registration List Quality Pilot Studies," Caltech/MIT Voting Technology Project Report, June 8, 2010.

# Teaching

"Information, Technology, and Political Power"
"U.S. Elections: Rules, Strategies, Outcomes"
"Advanced Seminar on U.S. National Elections"
"The Flow of Power: Civic Journalism"

# Awards & Fellowships

Emerson Collective Fellowship, 2022
Grant for Antisemitism study, Klarman Family Foundation and One8 Foundation, 2020
Best Book in Information, Technology, and Politics, APSA, 2016
Pi Sigma Alpha award for best paper presented at MPSA, 2013
MPSA Emerging Scholar award, 2013

# Referee Service

*American Journal of Political Science American Political Science Review*, *American Politics Research*, *American Sociological Review*, *British Journal of Political Science*, *Economics and Politics Election Law Journal*, *Electoral Studies*, *Journal of Elections, Public Opinion and Parties Journal of Experimental Political Science*, *International Journal of Public Opinion Research*, *Journal of Politics*, *Journal of Urban Affairs Legislative Studies Quarterly*, *Political Analysis*, *Political Behavior*, *Political Psychology*, *Political Research Quarterly*, *Political Science Research and Methods*, *Politics and Governance*, *Proceedings of the National Academy of Sciences*, *PS: Political Science and Politics*, *Public Opinion Quarterly*, *Research and Politics*, *Review of Economics and Statistics*, *State Politics and Policy Quarterly*.

# Invited Talks

I have given presentations at annual meetings of the American Political Science Association, Midwest Political Science Association, and Society for Political Methodology.

I have given invited talks at Boston University, BYU, Columbia, Chicago, Dartmouth, Harvard, Harvard Kennedy School, Harvard Medical School, McGill, MIT, NYU, UCLA, University of Massachusetts-Amherst, Michigan, UNC, UPenn Annenberg School, Princeton, Stanford, Stanford Law School, Washington University-St. Louis, Yale, and Yale Law School.

# Consulting & Service

Editorial Board, *Election Law Journal*, 2020-
Academic Advisor, Free Expression Survey, Knight Foundation, 2021-2022.
Academic Advisor, Antisemitism Survey, Anti-Defamation League, 2021-2022.
Member, Brookline, MA, Select Board's Taskforce to Reimagine Policing, 2020-2021
Academic Advisor, 100 Million: Nonvoter Study, Knight Foundation, 2019-2020.
Witness, United States Senate Committee on the Judiciary, May 16 2018
(Facebook/Cambridge Analytica scandal)
Commissioner, Commission on Youth Voting and Civic Knowledge, CIRCLE, 2012-14
Statistical Consultant, *Texas v. Holder* (Voter ID case)
Statistical Consultant, *Veasey v. Perry* (Voter ID case)
Expert, *Judicial Watch, et al v. King, et al*, Indiana Voter Registration Case
Expert, *Fish v. Kobach*, Kansas Voter Registration Case
Expert, *Stringer, et al v. Pablos*, Texas Voter Registration Case
Expert, *United States v. Eastpointe, MI*, Voting Rights Act case
Expert, *Collins v. Adams*, Kentucky Voter ID case
Expert, *LULAC of Iowa v. Iowa Secretay of State*, Absentee ballot case
Expert, *Vote Forward v. DeJoy* US Post Office mail ballot case
Expert, *Holmes v. Moore* North Carolina Voter ID case

EXHIBIT
37

Message

| | |
|---|---|
| **From:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Sent:** | 12/20/2021 7:12:32 PM |
| **To:** | Adam Bitter [ABitter@sos.texas.gov]; John Scott [JScott@sos.texas.gov]; Joe Esparza [JEsparza@sos.texas.gov] |
| **Subject:** | RE: Weekend Comparative Process |

This is really great. We have helped a lot of voters through this process.

Topline takeaways:

- We've helped complete the registration records for nearly 600,000 voters who previously had no SSN on record.
- We've helped complete the registration records for nearly 700,000 voters with no DL/ID number on record.
- In all, that's approximately 1.3 million out of the 1.9 million universe we initially identified who should not have any issues whatsoever voting by mail in Texas if they are qualified and choose to do so.
- This is good government at work.
- This process helps disabled and elderly Texas voters make their voices heard.

-Sam

**From:** Adam Bitter <ABitter@sos.texas.gov>
**Sent:** Monday, December 20, 2021 10:54 AM
**To:** John Scott <JScott@sos.texas.gov>; Joe Esparza <JEsparza@sos.texas.gov>; Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** FW: Weekend Comparative Process



**From:** Kristi Hart <KHart@sos.texas.gov>
**Sent:** Monday, December 20, 2021 10:16 AM
**To:** Keith Ingram <KIngram@sos.texas.gov>; Adam Bitter <ABitter@sos.texas.gov>
**Subject:** Weekend Comparative Process

Good morning!

As you know, we ran the comparative process over the weekend. We did run queries prior to and following the process. That information is listed below.

| Query | Before | After |
|---|---|---|
| Number of active and suspense voting records with no TDL in the record: | 1,344,584 | 493,823 |

| | | |
|---|---|---|
| Number of active and suspense voting records with no SSN in the record: | 1,165,612 | 422,259 |
| Number of active and suspense voting records with only 4 digits of SSN in the record: | 1,165,639 | 422,053 |
| Number of active and suspense voting records with neither TDL or SSN in the record: | 259,227 | 106,911 |
| Number of active and suspense voting records with full TDL but no SSN in the record: | 906,444 | 315,376 |
| Number of active and suspense voting records with at least 4 digits of SSN but no TDL in the record: | 1,085,062 | 386,881 |

STATE019730

EXHIBIT

38

Message

| | |
|---|---|
| **From:** | Kristi Hart [KHart@sos.texas.gov] |
| **Sent:** | 12/23/2022 5:46:14 PM |
| **To:** | Keith Ingram [KIngram@sos.texas.gov]; Christina Adkins [CAdkins@sos.texas.gov]; Adam Bitter [ABitter@sos.texas.gov] |
| **Subject:** | Comparative Process |

The process is complete. Below are the initial and post query results.

| | Initial | Post |
|---|---|---|
| Number of active and suspense voters that have no TDL on their voter record. (null value) | 512,134 | 463,393 |
| Number of active and suspense voters that have no SSN on their voter record. (null value) | 461,146 | 392,084 |
| Number of active and suspense voters that have neither a TDL or SSN on their voter record. (null value for both fields) | 95,181 | 93,867 |
| Number of active and suspense voters that have TDL but null value for SSN. | 365,965 | 298,217 |
| Number of active and suspense voters that have at least four digits of SSN but null value for TDL. | 416,891 | 369,468 |

STATE137751

EXHIBIT
39

**Second Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**


*United States v. Texas*


**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**February 3, 2023**

## I.      Abstract

1.  This report contains three analyses. First, using new data supplied to me in January 2023, I calculate the number of registered voters in Texas whose registration records indicate that they could have a mail ballot application or carrier envelope rejected on account of identification verification requirements imposed by Senate Bill 1 ("SB 1"). My analysis shows similar results as in two prior expert reports that I have filed in this case. I find that 1 in 7 Texans can accurately and completely fill out a mail ballot application and the application could still be rejected on account of SB 1's verification procedures.

2.  Second, I conduct an analysis of rejected mail ballots during the first federal election held since the passage of SB 1, the November 2022 election. Among other findings, I show that the overwhelming majority (more than 80%) of rejected mail ballots were rejected on account of SB 1 identification rules.

3.   Third, I analyze the behavior in the November election of individuals who I have flagged as having records that could lead to mail ballot rejections. Those deemed at risk have a significantly lower rate of successfully voting by mail than the general population.

## II.      Replication of Previous Analyses and Meta-Analysis

4.  In a February 28, 2022 report ("Initial Report"), I described a methodology for evaluating the number of Texans who were particularly vulnerable to having a mail ballot application rejected on account of identification verification rules in SB 1. For several reasons, a registered voter could fill out a mail ballot application (or mail ballot carrier envelope) correctly but the materials would be rejected by election officials:

a.  Many Texans have multiple identification numbers because they have multiple Department of Public Safety IDs ("DPS IDs"). But Texas only stores up to one DPS ID Number on its list of registered voters (the Texas Election Administration System, or "TEAM"). If a registrant lists a correct DPS ID number on mail ballot materials but not the number that happens to be listed in TEAM, the voter's mail ballot or mail ballot application will be rejected.

b.  Some Texans are listed on TEAM without a DPS ID Number. Many of these individuals do in fact have DPS IDs. They are instructed by the language in the mail ballot application and on the carrier envelope to list only their DPS ID when filling out mail ballot forms. However, because their DPS ID Number is absent from TEAM, their materials will be rejected.

c.  Administrative records are not perfect. Tens of thousands of Texans are listed on TEAM with typos in their Social Security numbers ("SSN") and/or their DPS ID numbers. When a registered voter fills out a mail ballot application (or ballot carrier envelope) correctly, the material will be rejected on account of these administrative typos.

5.  In my Initial Report, I established a methodology for linking TEAM records to DPS records in order to count the number of individuals who might have their materials rejected. In addition to explaining the methodology, I was able to test the validity of the methodology. I reported that 1 in 7 registered voters in Texas could have their mail ballot materials rejected on account of SB 1 even if they followed instructions correctly. I concluded that "Texas's databases are simply not well-suited to SB 1's demands" (Paragraph 114). On account of incomplete records as well as typos and other

inconsistencies across state databases, the law can prevent citizens from voting. I conducted subgroup analyses to show that the affected population includes many senior citizens, Texans living overseas, disabled veterans and homebound citizens, all of whom rely on mail voting more than the general population.

6. In a May 4, 2022 supplemental report ("First Supplemental Report"), in addition to some new analyses, I replicated the analysis described above with updated DPS and TEAM records. Whereas DPS and TEAM data in the Initial Report were produced in January 2022, data in the First Supplemental Report were produced by the State in March and April 2022. The results were substantively the same.

7. In January of 2023, I received yet another update to DPS and TEAM records. The DPS records were drawn in December of 2022, and the TEAM records were compiled in early January 2023.

8. In Appendix A to this report, I describe the details of this additional replication with the new data from December 2022/January 2023. In Table A, here, I provide the top-line summary statistics from that analysis and place the results in context, alongside results from the Initial Report and First Supplemental Report.

4

**TABLE A: Summary of Results from Three Analyses of DPS and TEAM Records**

| | Initial Report | First Suppl. Report | Second Suppl. Report |
|---|---|---|---|
| | **February 2022** | **May 2022** | **January 2023** |
| No DPS ID in TEAM; Possesses DPS ID | 276,405 | 209,137 | 189,095 |
| One DPS ID in TEAM; Possesses Multiple DPS IDs | 2,213,676 | 2,392,733 | 2,394,435 |
| Typo/Inconsistent SSN4 in DPS vs TEAM | 44,444 | 44,915 | 44,353 |
| Typo/Inconsistent DPS ID in DPS vs TEAM | 68,190 | 74,897 | 62,461 |
| **Total Issues** | **2,602,715** | **2,721,682** | **2,690,344** |
| **Total TEAM Records** | **17,026,054** | **17,330,189** | **17,451,752** |
| **Issues/Total (Percent)** | **15.3%** | **15.7%** | **15.4%** |

9.  As the first line of data in Table A shows, the results indicate a decline in the number of individuals who are listed in TEAM without a DPS ID Number but who do in fact possess a DPS ID Number. The number went from 276,000 when I first ran the analysis a year ago to 209,000 a few months later, to 189,000 in the current analysis.

10. During the same period, the number of Texas registered voters who are listed in DPS with more than one DPS ID number has increased from 2,214,000 to 2,393,000 to 2,394,000. As noted in the Initial Report, according to SB 1, a voter may use a current or expired ID in filling out mail ballot materials, but TEAM only stores zero or one ID number per registered voter.

11. The number of typos or other data errors in the storage of Social Security numbers (specifically in the last four digits of the Social Security numbers ("SSN4")) is nearly exactly the same across the three analyses. The number of typos or errors in DPS ID numbers went from 68,000 to 75,000 and then down to 62,000. The last rows of Table A summarize the total number of issues and divides these by the total number of TEAM

records. The analysis was performed three times over the course of twelve months with three different snapshots of Texas administrative data. The results are consistent, with 15-16% of records affected by issues that might lead to ballot materials being rejected on account of SB 1 requirements, even with voters dutifully following mail ballot instructions.

### III.     Analysis of November 2022 Federal Election

12. In this section, I analyze mail ballot data from the November 2022 federal election. First, I measure the consistency between statistics reported by Texas and the January 3, 2023 data transmitted to me regarding participation in the November election. Then, I report three key findings.

   a. I estimate that the initial mail ballot rejection rate in Texas at 4.1%. This is higher than the final rejection rate of 2.7% that Texas has reported.

   b. I estimate that over 80% of rejected mail ballots are rejected on SB 1 grounds. I count 5 Federal Post Card Application ("FPCA") voters—military and overseas voters—whose ballots were rejected on SB 1 grounds.

   c. I estimate that more than 50% of individuals who are flagged for having a mail ballot rejected due to SB 1 did not end up voting in the November election, either by mail or in person.

13. According to the website of the Texas Secretary of State, in the November 2022 election, 7,775,713 votes were cast in person and 359,526 ballots were cast by mail.[1] [2] The count of 359,526 mail ballots submitted is higher than 345,697, which is the count provided by state officials to the media.[3] It is also higher than 345,679, which is the count disclosed by Texas in court documentation in January 2023.[4]

14. In the January 2023 TEAM database I received, there are 8,178,445 voter history records associated with the November 8, 2022 election. However, about 70,000 of these records are instances of registrants who are listed on more than one line of the TEAM database, for instance a line representing that they requested a mail ballot but another line representing that they actually voted in person.

15. In order to gauge turnout as it is represented in the TEAM records, I retain only the most recent voter history record for each registrant, by selecting the date listed as most recently

---

[1] See "November 08, 2022 GENERAL ELECTION Cumulative Totals Thru Close of Business November 08, 2022" https://earlyvoting.texas-election.com/Elections/getElectionEVDates.do. The counts as reported by Texas here are dynamic and are regularly updated. The counts listed reflect numbers as of January 30, 2022. The mail ballots in this tabulation come from county numbers and appear to reflect ballots submitted rather than ballots officially counted. This is evidenced by the fact that the state website records ballots submitted as early as October 2, 2022, a date prior to when signature verification committees began to meet and review mail ballots. For information on the timeline for reviewing ballots, see: "Early Voting Ballot Board & Signature Verification Committee, Handbook for Election Judges and Clerks 2022," Texas Secretary of State Elections Division. See Page 9: "A [signature verification] committee may not begin operating before the 20th day before election day." https://www.sos.state.tx.us/elections/forms/ballot-board-handbook.pdf.

[2] Note that there is more than one way to tabulate voter turnout. For instance, elsewhere on its website, the Texas Secretary of State's office refers to ballots counted in the gubernatorial election (the highest office on the ballot in 2022) as its voter turnout. See Texas Secretary of State, "Turnout and Voter Registration Figures (1970-current)," https://www.sos.texas.gov/elections/historical/70-92.shtml. For matching turnout statistic in gubernatorial election, see Texas Secretary of State, "Official Canvas Report," Page 8, https://results.texas-election.com/static/data/Reports/47009/OfficialCanvassReport.pdf?v=1673559121148.

[3] Ashley Lopez, "Despite Mail Voting Changes, Ballot Rejections Remain Relatively Low in 2022 Midterms," NPR, January 13, 2023.

[4] See "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories," Page 13, *United States v. Texas*, January 19, 2023.

updated. After this procedure, all in-person ballots cast (election day ballots and early ballots, including provisional ballots) yield a tally of 7,775,194. This number is nearly identical to the count of 7,775,713 in-person ballots received according on the State's website as referenced above. Since the website is continuously updated but the voter file I received is static and dated January 3rd, it is expected that the number counted on the website would be slightly higher than tabulated based on the static voter file. Note that some of these ballots (5,901 of them) have a code indicating that they were ultimately rejected. Nearly all the others (7,768,874) have a code indicating that they were accepted. The remaining 419 records have neither an accepted nor rejected code.[5]

16. 378,487 other records have a code associated with a mail ballot. Nearly all of these have one of the following "ballot status" codes:

**TABLE B: Ballot Status Codes of Mail Ballot Records in November 2022 Election**

| CODE | Definition | Count |
|---|---|---|
| **AB** | Absentee ballot received | 1,492 |
| **AC** | Absentee ballot cancelled by voter | 16,420 |
| **AM** | Absentee ballot mailed | 29,719 |
| **AV** | Absentee ballot accepted | 322,423 |
| **AX** | Absentee ballot rejected | 8,366 |
| **RB** | Absentee ballot returned by PO | 20 |
| **(No Code)** | | 47 |

17. Of these records, the total ballots submitted are those with codes AB (Absentee ballot received), AV (absentee ballot accepted), and AX (absentee ballot rejected). These sum

---

[5] The method of voting is defined by a field in the database called "ballot type." The rejected/accepted status comes from a different field, called "ballot status". For in-person ballot types, 7,768,874 have a code of "A" (accepted); 5,901 have a code of "R" (rejected); and 419 have no code.

to 332,281.[6] The other codes reflect ballots that either never reached the voter (returned by Post Office) or were received by the voter but the voter never mailed back the ballot or else cancelled the request.

18. This number (332,281) is lower than the other counts mentioned above, both in public reports (345,697 ballots received) and in the State's count on its website (359,526 ballots received). One possible explanation for the discrepancy is if those sources include in their counts ballots that were cancelled by voters. Adding in these 16,420 records would bring the voter file count up to 348,701. However, based on the codes and definitions made available to me, I will count ballots submitted as only those that have the codes of AB, AV, or AX.

19. According to the January 2023 data, there are 18,187 records listed with a reason that a ballot was rejected. Of these, 13,638 were mail ballot rejections. About 40% of records that indicate a reason for a mail ballot being rejected have a status code that indicates the ballot was accepted. Presumably, these are cases in which a ballot was initially rejected but eventually cured and accepted. Of all the mail ballot rejections, 11,430 (83.8%) have a code indicating that identification verification was the reason for the rejection.[7] With 13,638 rejections and 332,281 mail ballots submitted, the rejection rate is estimated as 4.1%. This number is higher than the publicly reported rate of 2.7%.[8]

---

[6] If one calculates this number without removing the duplicate voters listed in TEAM, as described above, the total count of submitted ballots would nevertheless be quite similar: 332,885.

[7] These codes are: IS, ISR, EVBIS, EVBISR, EVCIS, EVCISR, and ISF. The first two of these codes are identified in Defendant's disclosed document STATE057755. The remaining codes are identified by county disclosed documents, such as Dallas County document, MS016221.

[8] According to NPR, 9,348 of 345,697 mail ballots were rejected. These numbers are based on "NPR inquiries with state officials." Ashley Lopez, "Despite mail voting changes, ballot rejections remain relatively low in 2022 midterms," NPR, January 13, 2023

20. Among those with rejected ballots include 5 individuals who use Federal Post Card Applications, which are voter registration forms used by members of the military, their families, and American citizens who are residing overseas.

21. Of the 11,430 records indicating voters who were rejected on SB 1 grounds, less than half of them (44.4%) are associated with a registrant whose record also shows that they were able to vote either by mail or in person. Most (55.6%) failed to vote successfully following their ballot being rejected.

22. If one calculates the rate of rejected ballots as those that appear as uncured in the TEAM file, the rejection rate would be lower than 4.1%. For example, of all 13,638 records listed with a reason that a mail ballot was rejected, 8,306 show no indication that the registrant successfully voted, whether by curing the mail ballot or cancelling the mail ballot and voting in person. If we divide 8,306 by the sum of 8,306 and 322,423 (the number of successful mail votes), then the uncured/uncanceled rejection rate would be 2.5%, which is close to the rejection rate of 2.7% reported by the State. Such a calculation does not take into account those voters who, in order to resolve a rejection attributable to SB 1, needed to vote in person rather than by mail.

23. The analysis above suggests a mail ballot rejection rate of 4.1% and an uncured/uncanceled rejection rate of 2.5%. However, estimates of rejection rates must be observed with caution, as some cured ballots may have had their codes in TEAM overridden once they were cured. According to Kristi Hart, the State's Director of Election Administration and Voter Registration, TEAM records that are rejected but eventually cured would have the rejection flag overridden.[9] At the same time, in some

---

[9] Deposition transcript of Kristi Hart, Director of Election Administration and Voter Registration, Office of Texas Secretary of State, Pages 133-135, *United States v. Texas*, June 30, 2022.

cases registrants have multiple records on TEAM, one indicating a rejection and one an accepted form. Thus, from the TEAM data alone, it is not possible to offer a definitive account of the number of ballots rejected and cured. The numbers reported here reflect what can be discerned with the available data.

24. In comparison to the March 2022 primary, which was the first election held under SB 1 rules, two facts are apparent. First, the rejection rate reported in the March 1, 2022 state primary was higher than in November; 12% of ballots were reportedly rejected in March.[10] Second, a smaller share of voters who cast ballots did so by mail in November 2022 (4.4% according to the State's reporting) compared to the share in March 2022 (5.6%).[11]

### IV.      Relationship between Records Flagged and Mail Voting in 2022 Election

25. The first part of the analysis in this report showed that 15% of Texas registered voters could have a problem voting by mail on account of SB 1. The second part of the analysis showed that some 4% of mail voters had ballots rejected on account of SB 1 identification rules. Here, I will briefly put these two analyses in context of one another.

26. As I noted in my First Supplemental Report, a useful analogy to the problems identified here is that of a hospital that has poor record-keeping practices. Suppose the hospital had incorrect records for 15% of the population. In any one year, few people go to the hospital, so it isn't the case that 15% of the total public will be mistreated by the hospital on account of poor record-keeping. But when those in that 15% "at-risk" population

---

[10] Robert Garrett, "Rejection of Texans' Mail Ballots Decline Markedly from the Big Surge in March Primary", *Dallas Morning News*, Dec 23, 2022.
[11] https://earlyvoting.texas-election.com/Elections/getElectionDetails.do.

suddenly need to visit the hospital, they may be inconvenienced or harmed on account of the record-keeping. The analogy is helpful because it clarifies that while there is a large pool of citizens at risk of having a problem, most will not be confronted with that problem in any one election year.

27. Consider the 2.7 million records of registrants whose data demonstrate a possible barrier to meeting SB 1 requirements. I merge these with the records of individuals who requested a mail ballot in November 2022. Of all the 2.7 million registrants with record issues, 28,437 requested a mail ballot. It is not surprising that only a small percent of these 2.7 million voters requested a mail ballot, as only about 2% of all registered voters in Texas voted by mail in the November election.[12] Among those 28,437 registrants who tried to cast a mail ballot, 6,380—or 22.44%—never cast a successful mail ballot. These registrants include those rejected due to SB 1 and those rejected for reasons other than SB 1, as well as those who never returned their ballot or returned their ballot late. In comparison, among those registrants who are not in the "at risk" pool of the 2.7 million voters, only 16.17% of them who began the mail voting process never cast a successful mail ballot (a statistically significant six percentage-point difference, $p < .0001$). Again, this baseline of 16.17% includes those whose mail ballot applications or ballots are rejected for reasons unrelated to SB1 as well as individuals who do not end up returning a mail ballot at all or returning it late. The fact that the subpopulation of 2.7 million has a

---

[12] According to Texas, in November 2022, there were approximately 346,000 mail voters and 17,672,000 registrants, so 2% of all registrants cast a mail ballot.  This figure represents the percentage of all *registered voters* who cast mail ballots in November 2022, rather than the percentage of *voters who cast ballots* in the November 2022 election who did so by mail, as discussed in Paragraph 24.  For mail ballot estimates, see above. For registration counts, see: https://www.sos.texas.gov/elections/historical/70-92.shtml.

much higher rate of non-voting by mail *conditional on requesting a ballot* is likely to be related to SB 1 requirements.

**V.      Conclusion**

28. In this analysis, I have replicated my main analysis for the second time. The analysis shows (as it has shown twice before) that about 15% of registration records in Texas could have an issue with the SB 1 identification verification rule if the registrant was to apply to vote by mail. Second, I have shown that while only 2% of registrants voted by mail in the 2022 general election, more than 11,000 ballots were rejected on account of SB 1 identification issues. Most of the individuals who submitted those rejected ballots did not successfully vote, either by mail or in-person. Third, I have shown that "at-risk" registrants who tried to cast a ballot by mail in the 2022 general election were significantly less likely to successfully vote by mail than individuals who are not in the pool of the 2.7 million "at-risk" registrants.


I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.


DATED this 3rd Day of February, 2023.

_____

Eitan Hersh

### APPENDIX A: REPLICATION OF ANALYSIS USING DEC 2022/JAN 2023 VERSIONS OF DATA

**A. Databases**

1. <u>DPS</u>. The updated DPS database I received is dated December 17, 2022. The database contains 37,377,423 records, an increase of almost a million records from the 36,417,304 records identified in the March 2022 data I analyzed in my prior supplemental report. As in the versions previously analyzed, the December 2022 version of the data has complete or nearly complete records in all fields of interest (e.g., name, date of birth, address, gender) except that 5% of records are not populated with Social Security numbers, which was also the case in the prior versions. Table 1 below updates Table 1 of my Initial Report with the new data.

2. The percent of DPS records with missing SSNs has declined from 5.02% in the Initial Report to 4.98% in the First Supplemental Report, to 4.85% here. The percent of records missing a *unique* SSN9 (i.e., the number of SSNs associated with more than one DPS ID Number) has increased from 21.6% to 27.5% here (the First Supplementary Report had this rate even higher, at 28.7%).

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---|
| Missing SSN | 4.85% |
| Missing unique SSN9 | 27.49 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.03 |
| Missing ZIP Code | 0.00 |
| **TOTAL IN DATABASE** | 37,377,423 |

3.  <u>TEAM</u>. The updated version of TEAM records is dated January 3, 2023. The TEAM data was transmitted to me as a single data file. (In prior transmissions, the data had been stored by county in separate files). Registered voters can be listed on many lines within the file. For instance, Texas counts 28,868 registered voters in Anderson County as of January 2023.[13] In the January 2023 TEAM export I received, there are 57,459 rows of registrants in Anderson County. Different rows show different interactions that registrants have had with the election system. I processed the data so that each person, represented by their Voter Unique Identification Number (VUID), is listed one time. Specifically, I observed the dates labeled "ballot_last_updated" and retained the most recent date for each registrant. I also retained registrants who had no date listed in this field.

4.  After the de-duplication process, the January 2023 TEAM file consists of **17,451,752** records. I sought to confirm that this number is close to the State's official reporting. According to the Secretary of State's website, as of January 2023, there were **17,450,474** registered Texas voters. Given the typical fluctuation in registration numbers, a difference of less than 0.01% suggests the data I have been given by the State is consistent with the State's publicly reported information.

**B.  Data Quality Checks in the TEAM Voter Records**

5.  I performed the same set of data quality checks as described in my prior reports. Tables 2 and 3 offer summary statistics on key fields of interest. In the updated data, 2.27% of records are missing SSN (compared 2.52% in March 2022 and 2.34% in January 2022).

---

[13] https://www.sos.state.tx.us/elections/historical/jan2023.shtml

In the January 2023 data, 2.62% are missing a DPS ID Number (compared to 2.85% in April 2022 and 3.16% in January 2022).

6. The numbers are all similar to those in my previous reports, with one exception. In the January 2023 data as well as the January 2022 data, less than 1% of records are missing street number and ZIP code. In the March 2022 data, over 20% of the records were missing this information.

**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---:|
| Missing SSN | 2.27% |
| Missing Unique SSN9 | 5.86 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.01 |
| Missing M/F Gender | 3.65 |
| Missing Street Number | 0.07 |
| Missing ZIP Code | 0.03 |
| **TOTAL IN DATABASE** | 17,451,752 |

**TABLE 3: Summary of Field Completeness in TEAM**

| | | |
|---|---|---|
| **TOTAL Records in TEAM analysis** | **17,451,752** | |
| **Records with unique SSN9** | 16,428,895 | 94.14% |
| **Records with SSN4** | 17,056,442 | 97.73 |
| **Records with DPS ID Number** | 16,994,311 | 97.38 |
| **Records lacking SSN4 and DPS ID No.** | 93,208 | 0.53 |

## C. Methodology

7. The methodology employed is the same as in my Initial Report. See Paragraphs 50-73 in that report for a detailed explanation. My goal is to look up each registered voter in the

DPS database and determine if the registered voter has one (or more) DPS ID Numbers listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers and SSN4s listed on TEAM versus those listed on the DPS Database. I create three linkage fields to connect the TEAM and DPS databases together. The first field is the nine-digit Social Security number (SSN9). The second field is the combination of name (First and Last) and date of birth. I call this linkage field "ND" for Name + Date of Birth. The third field, a combination of Address (Street Number and ZIP code) + Date of Birth + Gender, I call "ADG". Table 4 (a replica of Table 6 from my Initial Report) illustrates the three linking fields with an example of a fictional registered voter named John Smith.

**TABLE 4: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
|---|---|---|
| **SSN9** | 9-digit Social Security number | "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" |
| **ND** | First name + Last name + Date of birth | "JOHNSMITH1976-07-04" |
| **ADG** | Address + Date of birth + Gender | "655782051976-07-04M" |

8. As in the prior reports, in addition to calculating statistics for the whole population of registered voters, I also look at several subpopulations, including registrants over 65, registrants who voted in 2020, registrants who have homebound/disabled veteran statuses, and registrants who are listed with specific codes in TEAM signaling that they have applied using Federal Post Card Application (FPCA) registration forms, which are voter registration forms used by members of the military, their families, and Americans who are residing overseas. I refer to these as FPCA voters. In the April report, I did a separate analysis of "voluntary surrender" designations in DPS records, but I concluded, based on disclosures from Texas, that these designations did not contain sufficient information to determine if the citizen holding a surrendered card would or would not be

able to use the ID card for the purposes of mail voting. Accordingly, I do not repeat the analysis of surrendered licenses here.

**D. Linkage Part I: TEAM Records with missing DPS ID Numbers**

9.  I divide the analysis into two parts. First, I examine individuals whose TEAM records do not show any DPS ID Number. Second, I examine individuals whose TEAM records do show a DPS ID Number.

10. Out of 17,451,752 records in TEAM, 457,441 do not have a DPS ID Number listed in the voter registration records. If any of these individuals actually has a DPS ID Number, they are instructed by the mail ballot forms to include that DPS ID Number (and *only* that identification number). But SB 1 requires these forms—the application and the ballot carrier envelope—to be rejected because the DPS ID Number is not listed within registration records.

**TABLE 5: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

| | | Unique SSN9 | | |
|---|---|---|---|---|
| | | Present | Absent | TOTAL |
| **DPS ID** | Present | 16,340,755 | 653,556 | 16,994,311 |
| **Number** | Absent | 88,140 | 369,301 | 457,441 |

11. I link the 457,441 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG linkage fields.

12. I first link by SSN9. Of the 457,441 individuals without a DPS ID Number in TEAM, 88,140 have a unique SSN9 listed (as noted in Table 5). Of those, 71.42% match to the DPS database by their SSN9. A total of 64.81% of the records match to a single DPS ID Number, and 6.61% link to multiple DPS ID Numbers.

13. I next link these individuals based on ND. As noted in Table 5, most individuals who lack DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a unique ND combination. Of the 457,441 lacking a DPS ID Number on TEAM, 449,224 (98.2%) have a unique ND. Of those who have a unique ND, 23.72% match to a single DPS record and 4.22% match to multiple DPS records.

14. I next link these individuals based on ADG. Of 457,441 records lacking a DPS ID Number on TEAM, 401,073 (87.68%) have a unique ADG. Of those with a unique ADG, 26.81% match to a single DPS record and 3.48% match to multiple DPS records.

**TABLE 6: Results of Linking TEAM to DPS Records for TEAM Records without a DPS ID Number listed**

|  | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|---|---|---|---|---|
| **SSN9** | 28.58% | 64.81% | 6.61% | 88,140 |
| **ND** | 72.06 | 23.72 | 4.22 | 449,224 |
| **ADG** | 69.70 | 26.81 | 3.48 | 401,073 |
| **Any** | 58.36 | 36.25 | 5.39 | 454,073 |

15. Table 6 summarizes the analysis of records that do not have a DPS ID Number listed on the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows that I attempted to match 88,140 records in TEAM based on SSN9. This reflects the number of TEAM records without a DPS ID Number that include a unique SSN9. Of those, 28.58% did not match to DPS. The others did match.

16. The bottom row of Table 6 provides the overall summary for the TEAM records lacking a DPS ID Number. Of the 457,441 total records lacking a DPS ID Number, I attempted to link 454,073 (99.26%) to the DPS database. (The other 0.74% did not have a unique or

complete value for SSN9, ND, or ADG). Of the individuals I attempted to find on DPS, 42% matched to a DPS record. That amounts to 189,095 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number (and only their DPS ID Number) on their mail ballot forms. However, if they follow those instructions and list only that DPS ID Number, SB 1 requires their ballot applications, and their ballots, to be rejected because the number is not listed on TEAM.

17. <u>Subpopulations:</u> Of the 189,095 individuals who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 74,982 are over age 65

- 52,157 voted in the 2020 election

- 28,152 are over 65 AND voted in the 2020 election

- 1,475 have FPCA statuses

- 391 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

18. <u>Typos in Social Security Number.</u> Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,431 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,431 cases result from inaccuracies on TEAM. They would cause election

officials to reject mail ballot forms from citizens who include their correct SSN4 on the forms. A voter may include an SSN4 on ballot materials as a precautionary measure based on supplemental instructions from election administrators.[14]

### E.  Linkage Part II: TEAM Records Listed with DPS ID Numbers

19. I now turn to the analysis of the 16,994,311 records in which a DPS ID Number is listed in the TEAM databases. As noted above in Table 5, 96.2% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of 16,340,755 records with a unique SSN9 on TEAM, 99.71% match to a record in DPS. However, 16.34% of the records match to more than one DPS ID Number.

20. Next, I link records based on the ND combination, as described in Paragraph 11 above. The ND combination is unique for 16,869,025 individuals who have a DPS ID Number listed on TEAM. Of these, 97.66% match to a record in DPS. However, 15.89% match to more than one DPS ID Number.

21. Next, I link records based on the ADG combination. The ADG combination is unique for 16,316,427 individuals who have a DPS ID Number listed on TEAM. Of these, 85.19% match to a record in DPS. However, 11.01% match to more than one DPS ID Number.

**TABLE 7: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|  | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|---|---|---|---|---|
| **SSN9** | 0.29% | 83.36% | 16.34% | 16,340,755 |
| **ND** | 2.34 | 81.76 | 15.89 | 16,869,025 |
| **ADG** | 14.81 | 74.19 | 11.01 | 16,316,427 |

---

[14] See discussion of the State's instructions in my Initial Report, Footnote 4, and in First Supplemental Report, Paragraphs 50-55.

| **Any** | 0.82 | 85.07 | 14.10 | 16,980,669 |

22. Table 7 summarizes the analysis of records with a DPS ID Number on the voter file. Consider the bottom row. Of the 16,994,311 records in TEAM listed with a DPS ID Number, I attempted to link 16,980,669 (99.92%) of them to the DPS database. The remaining 0.08% did not have a unique or complete record on SSN, ND, and ADG. Of these 16,980,669 records, 99.18% matched to a record in DPS. However, many of them are listed more than once on DPS, with multiple ID numbers. These 14.10% of records sum up to 2,394,435 records. That is, for 2.4 million Texas registered voters who have a DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot envelope) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

23. The 2.4 million figure may be an underestimate. Many DPS ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the TEAM records that linked to a *single* DPS ID Number, 1,407,010 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. During her April 20, 2022 deposition, Sheri Gibson, chief of the Texas DPS driver's license division, explained that these AKA DL/ID numbers are identification numbers associated with the ID holder that are either erroneous or originate from a prior version of the State's license system. If registrants use these alternative identification numbers when submitting a mail ballot application or mail ballot, they will also have their forms rejected because the AKA DL/ID Numbers are not the identification numbers on the voter registration records that are associated with these

registrants. Because some AKA ID Numbers are considered by DPS to be erroneous or otherwise invalid (i.e., not just "expired," which does not impact validity for SB 1 purposes), in order to perform a conservative analysis, I focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

24. Subpopulations: Of the 2,394,435 individuals who match to multiple DPS ID Numbers,

- 174,880 are over age 65

- 1,073,661 voted in the 2020 election

- 91,469 are over 65 AND voted in the 2020 election

- 1,325 have FPCA status

- 5,279 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

25. Typos in Social Security Number. Looking just at the last 4 digits of Social Security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 40,922 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on a mail ballot application, then their application will be rejected because of incorrectly recorded data in TEAM.

    a.  <u>Subpopulations:</u> Of the 40,922 individuals whose SSN4s listed on TEAM do not match the SSN4s listed in the DPS database

- 14,945 are over age 65
- 25,795 voted in the 2020 election
- 10,294 are over 65 AND voted in the 2020 election
- 100 have FPCA status
- 110 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4 listed in the DPS database.

26. <u>Typos in DPS ID Numbers.</u> Just as there are discrepancies between the SSNs listed in TEAM and the corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers. Using the methodology for calculating these discrepancies that was explained in my Initial Report, I calculate that 62,461 individuals have a DPS ID Number in TEAM that does not match any DPS ID Number in the DPS database.

    a.  <u>Subpopulations:</u> Of the 62,461 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but have DPS ID Numbers that do not correspond to the DPS database,

- 14,602 are over age 65
- 27,441 voted in the 2020 election
- 9,006 are over 65 AND voted in the 2020 election
- 75 have FPCA status

- 359 individuals matched to DPS records indicating homebound status or disabled veteran status.

**F.  Summary of Results from Updated Analysis**

27. To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4. The analysis from the updated TEAM and DPS files show the following:

   a.  **189,095** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. Official forms instruct these individuals to list only their DPS ID, but if they do so, their ballot or ballot application will be rejected.

      i.  Of these, **74,982** are over 65 years old, **28,152** of whom voted in the most recent presidential election.

      ii.  Of these, **1,475** have FPCA status or are listed as disabled veterans or as homebound citizens.

   b.  **2,394,435** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

      i.  Of these, **174,880** are over 65 years old, **91,469** of whom voted in the most recent presidential election.

      ii.  Of these, **5,279** have FPCA status or are listed as disabled veterans or as homebound citizens.

25

    c.   **44,353** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

    d.   At least **62,461** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

28. Altogether, **2.7 million** registered voters in Texas (out of 17.5 million) are at an increased risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.7 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.