# EXHIBIT 40

Message

| | |
|---|---|
| **From:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Sent:** | 4/6/2022 10:30:19 PM |
| **To:** | Goldenstein, Taylor [Taylor.Goldenstein@chron.com] |
| **Subject:** | Re: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections |

That spreadsheet is what has been reported into our system by the counties, we just exported the data into a spreadsheet. Not our data, it's the counties' data. Any discrepancies you'd have to ask the specific counties about.

**From:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Sent:** Wednesday, April 6, 2022 5:26:02 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** Re: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

Interesting and good to know. Thank you!

Lastly, some of this data seems like it could be off. Like Starr County -- 204 Dem ballots rejected out of 298 total, a 68 percent rejection rate?

--

## Taylor Goldenstein

Austin bureau reporter | **Houston Chronicle/Hearst Newspapers**

**o** 512-439-2891 **m** 512-200-2910

**e** taylor.goldenstein@chron.com

Twitter: @taygoldenstein

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Wednesday, April 6, 2022 5:04 PM
**To:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Subject:** [EXTERNAL] RE: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

STATE106595

That suggestion was pretty universal from county election officials, as well as legislators, including Senator Bettencourt.

Specifically, we heard that some county election officials were physically taking a highlighter and circling the ID field, so the cosmetic change we're making is to put bold red lines around the ID field, similar to what's already in place around the signature field (see a .pdf of the ballot envelope design here), so that county officials do not have to do any manual work to draw attention to the ID section for mail-in voters.

---

**From:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Sent:** Wednesday, April 6, 2022 4:46 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** Re: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Thanks so much! Can you confirm whether that "cosmetic" suggestion was from Sen. Bettencourt (he mentioned red lettering in an interview)? I wanted to make sure you're referencing that same thing when you talk about a cosmetic change.

--

## Taylor Goldenstein

Austin bureau reporter | **Houston Chronicle/Hearst Newspapers**

**o** 512-439-2891  **m** 512-200-2910

**e** taylor.goldenstein@chron.com

Twitter: @taygoldenstein



**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Wednesday, April 6, 2022 4:24 PM
**To:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Subject:** [EXTERNAL] RE: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

Yes – our office launched the VoteReady campaign on February 7th with radio, digital, out of home/billboards and grassroots advertising.

Each cycle since the 2017 session, our office has received approximately $4 million from the Texas Legislature to educate voters about Voter ID requirements in Texas. The contract is bid out competitively to potential vendors who must

STATE106596

execute on ad creation and purchasing of radio, TV spots for each primary and general election in both English and Spanish.

During the 2021 session, that overall voter education budget figure was reduced to $3.5 million. Nevertheless, our campaign running now through November is focusing on the new ID requirements for mail-in ballots specifically, as well as in-person voter ID requirements. Essentially, we're having to educate on two different types of Voter ID requirements – mail ballots and in-person voting – with a reduced budget compared to what the Legislature has provided in years past. Nevertheless, we've decided to focus as much as we can on the mail ballot ID requirement since it's new, whereas most Texas voters are well familiar with in-person voter ID requirements.

In the lead up to the November general election, we have TV, Radio, digital, out of home and grassroots advertisements planned as part of the campaign, as well as activations at community events across the state.

Generally speaking, we are hearing from county election officials that the rejected mail-in ballots are due to voters not putting *any* ID information on the carrier envelope – leaving the space blank. As a result, we are currently working on a cosmetic improvement to the carrier envelope itself to highlight and draw attention to the new ID field so that voters do not miss it going forward.

It's also worth noting that individuals who had a mail ballot issued to them had successfully provided an ID number on the application for a ballot by mail. So, it's not a matter of not having a valid ID number, it's that, by and large, the voters whose ballots were rejected simply did not provide an ID number on the mail ballot carrier envelope itself, despite having provided a number on the ABBM weeks earlier.

Best,

-Sam

---

**From:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Sent:** Wednesday, April 6, 2022 2:35 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** Re: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Apologies, ONE more: Can you tell me what kind of education efforts SOS made to the public (not election officials) prior to the primary? Or does SOS expect election officials to transmit that information?

---

**Taylor Goldenstein**
Austin bureau reporter | **Houston Chronicle/Hearst Newspapers**

**o** 512-439-2891  **m** 512-200-2910

**e** taylor.goldenstein@chron.com

Twitter: @taygoldenstein

STATE106597

**From:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Sent:** Wednesday, April 6, 2022 11:32 AM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** Re: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

Sorry one more, and apologies bc I think I've asked before: Do you have 2020 rejection numbers? Or in the past was that info only kept by the counties?

––

## Taylor Goldenstein

**Austin bureau reporter | Houston Chronicle/Hearst Newspapers**

**o** 512-439-2891  **m** 512-200-2910

**e** taylor.goldenstein@chron.com

Twitter: @taygoldenstein

**From:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>
**Sent:** Wednesday, April 6, 2022 11:24 AM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** Re: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

Hi Sam,

Thanks for this data. I'm picking up this story. Here are some qs I had for you:

1. Is this a statewide record for rejections?
2. What is the SOS doing to prevent this issue in the runoff and future elections? What is it expecting elections officials to do to curb the issue?
3. Why do you think the rejection rate was so high this year?
4. What is SOS Scott's reaction to the high rejection rates?
5.

6.  Do we know how many people who were rejected ended up voting in person? Is that tracked, and if so, can you give me that data?
7.  Anything else you'd want to be sure people know?

Thanks for your time,
Taylor

—

## Taylor Goldenstein
Austin bureau reporter | **Houston Chronicle/Hearst Newspapers**

**o** 512-439-2891  **m** 512-200-2910

**e** taylor.goldenstein@chron.com

Twitter: @taygoldenstein



**From:** Harris, Cayla <Cayla.Harris@express-news.net>
**Sent:** Wednesday, April 6, 2022 11:01 AM
**To:** Goldenstein, Taylor <Taylor.Goldenstein@chron.com>; Eckhart, Robert <Robert.Eckhart@chron.com>
**Subject:** Fw: Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

—

Cayla Harris
Austin Bureau Reporter
Houston Chronicle/San Antonio Express-News
732-298-3917 | @caylajharris

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Tuesday, April 5, 2022 9:48 PM
**Subject:** [EXTERNAL] Statewide Mail Ballot Rejection Rates - Texas March 1 Primary Elections

Good Morning,

To those of you who have inquired regarding statewide data on mail ballot rejection rates for the March 1 Primary Elections in Texas, I wanted to provide you with the following information. This data has been provided to our office by county election officials and is reflected in the statewide database, which maintains both voter registration and voting history data:

Based on Canvassed totals, below are the official turnout figures for the March 1 Primary Elections:

| Total Number of Ballots Cast |
| --- |

| Democratic | 1,075,601 |
|---|---|
| Republican | 1,954,172 |
| **Statewide Total** | **3,029,773** |

Based on vote history data submitted to our office by each of Texas' 254 counties, the mail-ballot rejection numbers and rates are as follows:

| Party | Total Number of Mail Ballots | Total Mail Ballots Rejected | Rejection Percentage |
|---|---|---|---|
| Democratic | 110,967 | 14,281 | **12.87%** |
| Republican | 87,980 | 10,355 | **11.77%** |
| **Statewide Total** | **198,947** | **24,636** | **12.38%** |

Best,

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
512-463-6116



STATE106600

# EXHIBIT 41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

LA UNIÓN DEL PUEBLO ENTERO, et al.,        §
                                            §
                    Plaintiffs               §
                                            §
        v.                                   §        Consolidated Case
                                            §        No. 5:21-cv-00844-XR
THE STATE OF TEXAS, et al.,                  §
                                            §
                    Defendants.              §
                                            §
                                            §

<u>**DEFENDANT LISA WISE'S OBJECTIONS AND SUPPLEMENTAL AND AMENDED**</u>
<u>**RESPONSES TO LUPE PLAINTIFFS' AMENDED THIRD SET OF**</u>
<u>**INTERROGATORIES**</u>

**PROPOUNDING PARTY:**        **LUPE PLAINTIFFS**

**RESPONDING PARTY:**        **DEFENDANT LISA WISE**

**SET NUMBER:**        **THREE**

        Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Lisa Wise, in her

official capacity as the El Paso County Elections Administrator, responds as follows to LUPE

Plaintiffs' Amended Third Set of Interrogatories (the "Interrogatories," and each individually, an

"Interrogatory"):

**I.        GENERAL RESPONSES.**

        1.        These responses and objections are made solely for the purpose of and in relation

to this matter.   Defendant's responses herein are based only upon the information and

documentation that is presently available and known to Defendant.   It is possible that further

investigation, discovery, analysis, legal research, and/or preparation may result in ascertainment

of additional documentation or provide additional meaning to currently known factual conclusions

and legal contentions, all of which may result in the modification of these objections and responses.

Accordingly, Defendant reserves the right to amend and/or supplement her responses and

objections at a later time and to make additional objections that may become apparent.   By this

statement, however, Defendant does not agree to or adopt any duty to supplement beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules, or any applicable rule or order.

2.     The following General Responses and Objections apply to each Interrogatory propounded by Plaintiffs and are incorporated by reference into each of the specific Interrogatory responses with the same force and effect as if set forth in full therein.

3.     Defendant reserves the right to make any use of, or to introduce at any hearing and at trial, information and/or documents responsive to the Interrogatories but discovered subsequent to the date of this response, including, but not limited to, any such information or documents obtained in discovery in this matter.

4.     Defendant will not respond to Interrogatories that Defendant or any other party to this litigation deems to embody material that is private, business confidential, proprietary, trade secret, or otherwise protected from disclosure pursuant to Texas law, Federal Rule of Civil Procedure 26(c)(7), or Federal Rule of Evidence 501.  Under appropriate circumstances, Defendant may agree to respond to such Interrogatories pursuant to the Stipulated Confidentiality and Protective Order entered in the above-captioned case (ECF No. 237).

5.     Defendant reserves all objections or other questions as to the competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding in or trial of this or any other action for any purpose whatsoever of this response and any document or thing identified or provided in response to the Interrogatories.

6.     Defendant will not construe the Interrogatories as an attempt to impose discovery obligations on Defendant beyond those authorized by the Federal Rules of Civil Procedure. Defendant will not undertake discovery obligations beyond those authorized by the Federal Rules of Civil Procedure or the applicable Local Rules.

7.     Defendant reserves the right to object on any ground at any time to such other or supplemental interrogatories as Plaintiffs may at any time propound involving or relating to the subject matter of these Interrogatories.

## II.    GENERAL OBJECTIONS.

1.    Defendant objects to all Definitions, Instructions, and Interrogatories inclusive, to the extent they purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific Interrogatory on the ground that such enlargement, expansion, or alteration renders said Interrogatory vague, ambiguous, unintelligible, overly broad, unduly burdensome, and uncertain.

2.    Defendant objects to all Definitions, Instructions, and Interrogatories inclusive, insofar as they seek information protected by the attorney-client privilege, the work product doctrine, the common interest or joint defense privilege, or any other applicable privilege or protection from discovery.  Such information or documents shall not be produced in response to the Interrogatories and any inadvertent disclosure or production thereof shall not be deemed a waiver of any privilege or right with respect to such documents or information or documents or of any work product immunity that may attach thereto.

3.    Defendant objects to all Definitions, Instructions, and Interrogatories inclusive, to the extent they seek information protected from disclosure pursuant to Texas law or Federal Rule of Evidence 501.  Such information shall not be provided in response to the Interrogatories, and any inadvertent production thereof shall not be deemed a waiver of any privilege or right with respect to such information.

4.    Defendant objects to Definition No. 1 to the extent it defines the "County" to mean "Defendant Lisa Wise and any of their past or present agents, advisors, employees, representatives, attorneys, consultants, contractors, or other persons or entities acting or purporting to act on Defendant's behalf or subject to Defendant's control."  Said definition is vague and ambiguous. Defendant will interpret the "County" to mean Defendant Lisa Wise and the El Paso County Elections Department.

5.    Defendant objects to Definition No. 3 to the extent it defines "ABBM" to mean "Application for a Ballot By Mail."  Said definition is vague and ambiguous to the extent it potentially encompasses multiple types of applications for ballots by mail.  Defendant will interpret "ABBM" to mean an application for ballot by mail as described in Section 84.001 of the

Texas Election Code, and to exclude any such applications made by military personnel or other persons overseas as described in Section 105.001 of the Texas Election Code.

6. Defendant objects to Definition No. 4 on the grounds that it is vague and ambiguous to the extent it defines "Omission Defect," in relevant part, as an "impairment" because this term is neither self-evident nor defined. Defendant will interpret the term to mean any defect on an ABBM or ballot carrier envelope caused by a voter failing to provide the number from his or her driver's license, election identification certificate, or personal identification card, or the last four digits of his or her social security number, or failing to state that he or she has never been issued such a number.

7. Defendant objects to Definition No. 5 on the grounds that it is vague and ambiguous to the extent it defines "Mismatch Defect," in relevant part, as an "impairment" because this term is neither self-evident nor defined. Defendant will interpret the term to mean any defect on an ABBM or ballot carrier envelope caused by a voter failing to provide a number from his or her driver's license, election identification certificate, or personal identification card, or the last four digits of his or her social security number that matches one associated with their voter file.

8. Defendant objects to Instruction No. 6 to the extent it seeks to enlarge Defendant's obligations under the Federal Rules of Civil Procedure. Defendant is willing to meet and confer with Plaintiffs regarding any attorney-client-privilege or work-product objection that she makes.

9. Defendant objects to Instruction No. 7 to the extent that it seeks to impose an obligation to provide supplemental information greater than that required by the Federal Rules of Civil Procedure. Defendant also objects to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, or any applicable privilege or protection. Defendant further objects to Instruction No. 7 on the grounds that it would subject Defendant to unreasonable and undue annoyance, oppression, burden, and expense.

## III. SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES.

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Defendant

responds to the specific interrogatories in LUPE Plaintiffs' Third Set of Interrogatories as follows:

**INTERROGATORY NO. 1:**

State the following data regarding ABBMs and mail ballots from the November 2022 General Election:

    a.  Number of ABBMs received by the County;

    b.  Number of ABBMs the County flagged for rejection because of an application defect of any kind;

    c.  Number of ABBMs that the County ultimately accepted after an applicant cured a recorded defect of any kind;

    d.  Number of ABBMs the County flagged for rejection because of an Omission Defect;

    e.  Number of ABBMs the County flagged for rejection because of a Mismatch Defect;

    f.  Number of ABBMs that the County ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect;

    g.  Number of ABBMs the County ultimately rejected because of an Omission Defect or Mismatch Defect;

    h.  Number of ABBMs the County ultimately rejected because of any other reason;

    i.  Number of ABBMs the County ultimately accepted;

    j.  Number of mail ballots received by the County;

    k.  Number of carrier envelopes the County received and reviewed for defects of any kind;

    l.  Number of carrier envelopes the County flagged for rejection because of a defect of any kind;

    m.  Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot;

    n.  Number of mail ballots that the County ultimately accepted and counted after a voter cured a carrier envelope defect of any kind;

    o.  Number of carrier envelopes the County flagged for rejection because of an Omission Defect;

p.  Number of carrier envelopes the County flagged for rejection because of a Mismatch Defect;

q.  Number of carrier envelopes the County flagged for rejection because of an Omission Defect or Mismatch Defect, then the mail ballot was cancelled by the voter;

r.  Number of ballots that the County ultimately accepted and counted after a voter cured either a Mismatch Defect or Omission Defect; and

s.  Number of mail ballots ultimately accepted and counted by the County.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the foregoing General Objections, which Defendant incorporates by reference herein, Defendant objects to this Interrogatory because it is improperly compound and contains multiple subparts.  Defendant further objects that this Interrogatory's subparts (g)-(s) exceed the 25 interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1) when considered in the aggregate with prior interrogatories served by LUPE Plaintiffs and when the discrete subparts in all sets of interrogatories served by LUPE Plaintiffs are considered.  In responding to these Interrogatories, Defendant reserves all rights to raise objections to Plaintiffs serving Interrogatories beyond those permitted under the Federal Rules of Civil Procedure in the future.

Without waiving the General and Specific Objections above, Defendant responds that for the November 2022 General Election, El Paso County (a) received 10,380 ABBMs; (b) flagged 238 ABBMs for rejection because of an application defect of any kind; (c) does not maintain a record of the number of ABBMs ultimately accepted after an applicant cured a recorded defect of any kind; (d) does not maintain a record of the number of ABBMs flagged for rejection because of an Omission Defect; (e) does not maintain a record of the number of ABBMs flagged for rejection because of a Mismatch Defect; (f) does not maintain a record of the number of ABBMs ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect; (g) ultimately rejected 157 ABBMs because of an Omission Defect or Mismatch Defect; (h) ultimately rejected 81 ABBMs for any other reason; (i) ultimately accepted 10,142 ABBMs; (j) received

8,866 mail ballots; (k) received and reviewed 8,264 carrier envelopes for defects of any kind; (l) flagged 1,191 carrier envelopes for rejection because of a defect of an kind; (m) had 639 mail ballots that were cancelled by voters who voted in person, either using an ordinary or provisional ballot; (n) ultimately accepted and counted 602 mail ballots after a voter cured a carrier envelope defect of any kind; (o) does not maintain a record of the number of carrier envelopes flagged for rejection because of an Omission Defect; (p) does not maintain a record of the number of carrier envelopes flagged for rejection because of a Mismatch Defect; (q) does not maintain a record of the number of carrier envelopes flagged for rejection because of an Omission Defect or Mismatch Defect, then the mail ballot was cancelled by the voter; (r) ultimately accepted and counted 598 mail ballots after a voter cured either a Mismatch Defect or Omission Defect; and (s) ultimately accepted and counted 8,103 mail ballots during the November 2022 General Election in Texas. Defendant further responds that 157 ABBMs were flagged for rejection because of either an Omission Defect or a Mismatch Defect.

**SUPPLEMENTAL AND AMENDED RESPONSE TO INTERROGATORY NO. 1:**

In addition to the foregoing General Objections, which Defendant incorporates by reference herein, Defendant objects to this Interrogatory because it is improperly compound and contains multiple subparts. Defendant further objects that this Interrogatory's subparts (g)-(s) exceed the 25 interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1) when considered in the aggregate with prior interrogatories served by LUPE Plaintiffs and when the discrete subparts in all sets of interrogatories served by LUPE Plaintiffs are considered. In responding to these Interrogatories, Defendant reserves all rights to raise objections to Plaintiffs serving Interrogatories beyond those permitted under the Federal Rules of Civil Procedure in the future.

Without waiving the General and Specific Objections above, Defendant responds that for the November 2022 General Election, El Paso County (a) received 10,380 ABBMs, excluding Federal Post Card Applications; (b) rejected 238 ABBMs because of an application defect of any kind, and does not separately maintain records of the total number of ABBMs initially flagged due

to a defect of any kind; (c) does not maintain a record of the number of ABBMs ultimately accepted after an applicant cured a recorded defect of any kind; (d) does not maintain a record of the number of ABBMs flagged for rejection because of an Omission Defect; (e) does not maintain a record of the number of ABBMs flagged for rejection because of a Mismatch Defect; (f) does not maintain a record of the number of ABBMs ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect; (g) ultimately rejected 157 ABBMs because of an Omission Defect or Mismatch Defect; (h) ultimately rejected 81 ABBMs for any other reason; (i) ultimately accepted 10,142 ABBMs; (j) received 8,866 mail ballots; (k) received and reviewed 8,264 carrier envelopes for defects of any kind; (l) flagged 1,191 carrier envelopes for rejection because of a defect of an kind; (m) had 639 mail ballots, including 8 FPCA [Federal Post Card Application] ballots, that were cancelled by voters who voted in person, either using an ordinary or provisional ballot; (n) ultimately accepted and counted 602 mail ballots after a voter cured a carrier envelope defect of any kind; (o) does not maintain a record of the number of carrier envelopes flagged for rejection because of an Omission Defect; (p) does not maintain a record of the number of carrier envelopes flagged for rejection because of a Mismatch Defect; (q) does not maintain a record of the number of carrier envelopes flagged for rejection because of an Omission Defect or Mismatch Defect, then the mail ballot was cancelled by the voter; (r) ultimately accepted and counted 598 mail ballots after a voter cured either a Mismatch Defect or Omission Defect; and (s) ultimately accepted and counted 8,103 mail ballots during the November 2022 General Election in Texas.  Defendant further responds that 157 ABBMs were flagged for rejection because of an Omission Defect, a Mismatch Defect, or both.  While the El Paso County Elections Department maintains records for ABBMs rejected due to an identification document defect, it does not designate such defects as "Omission" defects or "Mismatch" defects, and so 157 ABBMs were ultimately rejected because of any identification document defect, *i.e.*, including, potentially, an "Omission" defect, a "Mismatch" defect, or both.

**INTERROGATORY NO. 2:**

State the following data regarding ABBMs and mail ballots from the November 2020

General Election:

    a.  Number of ABBMs the County received;

    b.  Number of ABBMs the County rejected;

    c.  Number of carrier envelopes the County received and reviewed in processing ballots by mail;

    d.  Number of carrier envelopes the County flagged for defects of any kind;

    e.  Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot; and

    f.  Number of carrier envelopes with defects of any kind that were cured and ultimately counted.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the foregoing General Objections, which Defendant incorporates by reference herein, Defendant objects to this Interrogatory because it is improperly compound and contains multiple subparts. Defendant further objects that this Interrogatory exceeds the 25 interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1) when considered in the aggregate with prior interrogatories served by LUPE Plaintiffs and when the discrete subparts in all sets of interrogatories served by LUPE Plaintiffs are considered. In responding to these Interrogatories, Defendant reserves all rights to raise objections to Plaintiffs serving Interrogatories beyond those permitted under the Federal Rules of Civil Procedure in the future. Defendant further objects that subparts (a) and (b) are duplicative of Interrogatories 8 and 9 served in Plaintiffs' First Set of Interrogatories, to which Defendant has already responded.

Without waiving the General and Specific Objections above, Defendant responds that for the November 2020 General Election (a) El Paso County received 46,563 ABBMs; (b) El Paso County rejected 1,535 ABBMs; (c) El Paso County received and reviewed 26,563 carrier envelopes in processing ballots by mail; (d) El Paso County flagged 115 carrier envelopes for defects of any kind; (e) 2,748 mail ballots were cancelled by voters who voted in person, either using an ordinary or provisional ballot; and (f) does not maintain a record of the number of carrier

envelopes with defects of any kind that were cured and ultimately counted in the November 2020 election.

**SUPPLEMENTAL AND AMENDED RESPONSE TO INTERROGATORY NO. 2:**

In addition to the foregoing General Objections, which Defendant incorporates by reference herein, Defendant objects to this Interrogatory because it is improperly compound and contains multiple subparts. Defendant further objects that this Interrogatory exceeds the 25 interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1) when considered in the aggregate with prior interrogatories served by LUPE Plaintiffs and when the discrete subparts in all sets of interrogatories served by LUPE Plaintiffs are considered. In responding to these Interrogatories, Defendant reserves all rights to raise objections to Plaintiffs serving Interrogatories beyond those permitted under the Federal Rules of Civil Procedure in the future. Defendant further objects that subparts (a) and (b) are duplicative of Interrogatories 8 and 9 served in Plaintiffs' First Set of Interrogatories, to which Defendant has already responded.

Without waiving the General and Specific Objections above, Defendant responds that for the November 2020 General Election (a) El Paso County received 45,563 ABBMs, including Federal Post Card Applications and duplicate applications; (b) El Paso County rejected 1,535 civilian ABBMs, excluding Federal Post Card Applications; (c) El Paso County received and reviewed 26,563 carrier envelopes in processing ballots by mail; (d) El Paso County flagged 115 carrier envelopes for defects of any kind; (e) 2,748 mail ballots, excluding FPCA ballots, were cancelled by voters who voted in person, either using an ordinary or provisional ballot; and (f) does not maintain a record of the number of carrier envelopes with defects of any kind that were cured and ultimately counted in the November 2020 election.

**INTERROGATORY NO. 3:**

State the following data regarding ABBMs and mail ballots from the November 2018 General Election:

    a.  Number of ABBMs the County received;

    b.  Number of ABBMs the County rejected;

    c.   Number of carrier envelopes the County received and reviewed in processing ballots by mail;

    d.   Number of carrier envelopes the County flagged for defects of any kind;

    e.   Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot; and

    f.   Number of carrier envelopes with defects of any kind that were cured and ultimately counted.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the foregoing General Objections, which Defendant incorporates by reference herein, Defendant objects to this Interrogatory because it is improperly compound and contains multiple subparts.  Defendant further objects that this Interrogatory exceeds the 25 interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1) when considered in the aggregate with prior interrogatories served by LUPE Plaintiffs and when the discrete subparts in all sets of interrogatories served by LUPE Plaintiffs are considered.  Defendant further objects that this Interrogatory subjects Defendant to unreasonable and undue annoyance, oppression, and burden, and it is not proportional to the needs of the case, because it concerns the November 2018 General Election.

Without waiving the General and Specific Objections above, Defendant responds that for the November 2018 General Election (a) El Paso County does not have records indicating the number of ABBMs it received for the November 2018 General Election; (b) El Paso County does not have records indicating the number of ABBMs it rejected in the November 2018 General Election; (c) El Paso County received and reviewed 11,723 carrier envelopes in processing ballots by mail; (d) El Paso County flagged 89 carrier envelopes for defects of any kind; (e) 1,024 mail ballots were cancelled by voters who voted in person, either using an ordinary or provisional ballot, in El Paso County; and (f) does not maintain a record of the number of carrier envelopes with defects of any kind that were cured and ultimately counted in El Paso County.

**SUPPLEMENTAL AND AMENDED RESPONSE TO INTERROGATORY NO. 3:**

In addition to the foregoing General Objections, which Defendant incorporates by reference herein, Defendant objects to this Interrogatory because it is improperly compound and contains multiple subparts.  Defendant further objects that this Interrogatory exceeds the 25 interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1) when considered in the aggregate with prior interrogatories served by LUPE Plaintiffs and when the discrete subparts in all sets of interrogatories served by LUPE Plaintiffs are considered.  Defendant further objects that this Interrogatory subjects Defendant to unreasonable and undue annoyance, oppression, and burden, and it is not proportional to the needs of the case, because it concerns the November 2018 General Election.

Without waiving the General and Specific Objections above, Defendant responds that for the November 2018 General Election (a) El Paso County did not track the total number of ABBMs it received in the November 2018 General Election, but it received and accepted 11,634 ABBMs during the November 2018 election, including Federal Post Card Applications; (b) El Paso County does not have records indicating the number of ABBMs it rejected in the November 2018 General Election; (c) El Paso County received and reviewed 11,723 carrier envelopes in processing ballots by mail; (d) El Paso County flagged 89 carrier envelopes for defects of any kind; (e) 1,024 civilian and FPCA mail ballots were cancelled by voters who voted in person, either using an ordinary or provisional ballot, in El Paso County; and (f) El Paso County does not maintain a record of the number of carrier envelopes with defects of any kind that were cured and ultimately counted in El Paso County.

Dated: April 17, 2023                                  Respectfully submitted,

*Orion Armon*
Orion Armon (CO SBN 34923)
**COOLEY LLP**
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Telephone: +1 720 566-4000
Facsimile: +1 720 566-4099

oarmon@cooley.com

**COOLEY LLP**
Kathleen Hartnett* (CA SBN 314267)
khartnett@cooley.com
Beatriz Mejia* (CA SBN 190948)
bmejia@cooley.com
David Louk* (CA SBN 304654)
dlouk@cooley.com
Kelsey Spector* (CA SBN 321488)
kspector@cooley.com
Germaine Habell* (CA SBN 333090)
ghabell@cooley.com
Caroline A. Lebel* (CA SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: +1 415 693-2000
Facsimile: +1 415 693-2222

**STATES UNITED DEMOCRACY CENTER**
Christine P. Sun* (CA SBN 218701)
3749 Buchanan St., No. 475165
San Francisco, CA 94147-3103
Telephone: +1 615 574-9108
christine@statesuniteddemocracy.org

**STATES UNITED DEMOCRACY CENTER**
Ranjana Natarajan (TX SBN 24071013)
1801 E 51st St., Suite 365, No. 334
Austin, TX 78723
Telephone: +1 323 422-8578
ranjana@statesuniteddemocracy.org

**STATES UNITED DEMOCRACY CENTER**
Marina Eisner* (DC SBN 1005593)
1101 17 Street NW
Washington, DC 20036
Telephone: +1 240 600-1316
marina@statesuniteddemocracy.org

**STATES UNITED DEMOCRACY CENTER**
Robert Cotter* (IL SBN 6334375)
7510 N. Greenview Ave., Apt. #3
Chicago, IL 60626
Telephone: +1 224-235-2606
robert@statesuniteddemocracy.org

*Admitted pro hac vice*

**Attorneys for Lisa Wise, in her official capacity as the El Paso County Elections Administrator**

### <u>CERTIFICATE OF SERVICE</u>

I certify that on April 17, 2023, a true and correct copy of the foregoing document was sent via electronic mail to all counsel of record.

*/s/ David S. Louk*
David S. Louk

# EXHIBIT 42

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br>*Plaintiffs*,<br><br>v.<br><br>GREGORY W. ABBOTT, *et al.*,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 5:21-cv-844-XR |
| OCA-GREATER HOUSTON, *et al.*,<br>*Plaintiffs*,<br><br>v.<br><br>JANE NELSON, *et al.*,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-780-XR |
| HOUSTON JUSTICE, *et al.*,<br>*Plaintiffs*,<br><br>v.<br><br>GREGORY WAYNE ABBOTT, *et al.*,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 5:21-cv-848-XR |
| LULAC TEXAS, *et al.*,<br>*Plaintiffs*,<br><br>v.<br><br>JANE NELSON, *et al.*,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-0786-XR |
| MI FAMILIA VOTA, *et al.*,<br>*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *et al.*,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 5:21-cv-0920-XR |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff,* v. | § § § |
| THE STATE OF TEXAS, *et al.,* *Defendants.* | § § Case No. 5:21-cv-1085-XR § § § § |

## DEFENDANT BEXAR COUNTY ELECTION ADMINISTRATOR JACQUELYN CALLANEN'S OBJECTIONS AND RESPONSES TO LULAC PLAINTIFFS' THIRD SET OF INTERROGATORIES

TO:   LULAC Plaintiffs, through their counsel of record.

Pursuant to Federal Rules of Civil Procedure 33, Defendant Bexar County Elections Administrator Jacquelyn Callanen hereby submits her objections and responses to LULAC Plaintiffs' Third Set of Interrogatories.

Dated: March 17, 2023.

Respectfully submitted,

JOE D. GONZALES
Bexar County Criminal District Attorney

By: /s/ *Lisa V. Cubriel*
LISA V. CUBRIEL
Bar No. 24045731
Assistant District Attorney – Civil Division
LARRY L. ROBERSON
Bar No. 24046728
Civil Section Chief
**Bexar County District Attorney's Office**
101 W. Nueva, 7th Floor
San Antonio, Texas 78205-3030
Telephone: (210) 335-2142
Facsimile: (210) 335-2773
Email: Lisa.Cubriel@bexar.org
lroberson@bexar.org
*Attorney for Defendant Bexar County Elections Administrator Jacquelyn Callanen*

2

CERTIFICATE OF SERVICE

 I do hereby certify that, on the 17th day of March, 2023, a true and correct copy of Defendant Bexar County Election Administrator Jacquelyn Callanen's Responses to LULAC Plaintiffs' Third Set of Interrogatories has been sent via e-mail to all counsel of record.


By: /s/ *Lisa V. Cubriel*
    LISA V. CUBRIEL

<u>BEXAR COUNTY ELECTIONS ADMINISTRATOR JACQ**UELYN CALLANEN'S**
OBJECTIONS AND RESPONSES TO **LULAC PLAINTIFFS'**
THIRD SET OF INTERROGATORIES</u>

<u>INTERROGATORY NO. 1:</u>   Identify and describe all the government interests you purport to be advanced by each of the Challenged Provisions of SB1.  Include in your description how each of the Challenged Provisions serves each interest, including any evidence, and whether you contend each interest was in fact the basis for the enactment of each Challenged Provision.

RESPONSE: Defendant Callanen objects to this interrogatory because she is not a state policymaker and had no involvement in the enactment of SB 1, which is a creation of the Texas Legislature. **Defendant Callanen cannot speculate as to the Texas Legislature's basis** for enacting the Challenged Provisions. Defendant Callanen further objects to this Interrogatory to the extent it seeks legal conclusions which Defendant Callanen is not qualified to render.  The information Plaintiffs seek may be found in the legislative history materials or obtained through discovery requests to state officials involved in the enactment of the Challenged Provisions now codified in the Texas Election Code.

<u>INTERROGATORY NO. 2:</u>  State and describe all instances of which you are aware, if any, of voter fraud in your county connected to:

    (a)  any person advocating for "specific candidate or measure" to a voter who is

          holding a sealed mail ballot;

    (b)  the use of "photocopied" signature or signatures other than "ink on paper" on ABBMs.

RESPONSE: None; Defendant Callanen is not aware of any instances of voter fraud as outlined in subsections (a) and (b) above.

<u>INTERROGATORY NO. 3:</u>  For the November 2022 general election, please provide the following data regarding ABBMS and mail ballots:

    a.   Number of ABBMs received by the county;

    b.   Number ABBMs the county flagged for rejection because of an application defect of any kind;

    c.   Number of ABBMs that the county ultimately accepted after an applicant cure a recorded defect of any kind;

    d.   Number of ABBMs the county flagged for rejection because of an Omission Defect;

e.  Number of ABBMs the county flagged for rejection because of a Mismatch Defect;

f.  Number of ABBMs that the county ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect;

g.  Number of carrier envelopes the county received and reviewed for defects of any kind;

h.  Number of carrier envelopes the county flagged for rejection because of a defect of any kind;

i.  Number of mail ballots that the county ultimately accepted and counted after a voter cured a carrier envelope defect of any kind;

j.  Number of carrier envelopes the county flagged for rejection because of any Omission Defect;

k.  Number of carrier envelopes the county flagged for rejection because of a Mismatch Defect;

l.  Number of ballots that the county ultimately accepted and counted after a voter cured either a Mismatch Defect or Omission Defect.

RESPONSE: The numbers provided below were generated by the Bexar County Election Department's vendor, VOTEC.

a.  39,655
b.  1482
c.  468
d.  1459
e.  **Unable to provide because this is not listed as a separate category in the vendor's** software. The vendor does not provide a code.
f.  **Unable to provide because this is not listed as a separate category in the vendor's** software. The vendor does not provide a code.
g.  40,189
h.  662
i.  39,655
j.  662
k.  410
l.  299

5

EXHIBIT
43

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>*Defendants.* | 5:21-cv-844-XR |
| OCA-GREATER HOUSTON, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>JANE NELSON, et al.,<br><br>*Defendants.* | 1:21-CV-0780-XR |

**DEFENDANT HARRIS COUNTY ELECTIONS ADMINISTRATOR, CLIFFORD
TATUM'S RESPONSES AND OBJECTIONS TO OCA PLAINTIFF'S FIRST SET OF
INTERROGATORIES**

**TO:**    OCA Plaintiffs', by and through their attorneys' of record, Zachary Dolling, et al., Texas
Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741,
zachary@texascivilrightsproject.org

Defendant Clifford Tatum, in his official capacity at Harris County Elections Administrator

pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure serves these responses and

objections on Plaintiffs OCA- Greater Houston, League of Women Voters of Texas, REVUP-

Texas, and Workers Defense Action Fund interrogatories.

Dated: March 17, 2023

Respectfully submitted,

/s/ Sameer S. Birring
**CHRISTIAN D. MENEFEE**
Harris County Attorney
Texas Bar No. 24088049
Christian.Menefee@harriscountytx.gov
**JONATHAN G.C. FOMBONNE**
First Assistant Harris County Attorney
Texas Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
**TIFFANY S. BINGHAM**
Managing Counsel
Texas Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
**SAMEER S. BIRRING**
Senior Assistant County Attorney
Texas Bar No. 24087169
Sameer.Birring@harriscountytx.gov
**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

*Attorneys for Defendant* Clifford Tatum, in his
Official Capacity as Harris County Elections
Administrator

## DEFENDANT TATUMS' OBJECTIONS AND RESPONSES TO OCA-PLAINTIFFS FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** For the November 2022 general election, and with respect only to timely received applications for a ballot by mail ("ABBMs"), state:

**OBJECTION:** Defendant Tatum objects to this interrogatory as it is a compound interrogatory consisting of discrete subparts. Defendant Tatum will respond as if each discrete subpart is a separate interrogatory.

a.   The number of ABBMs received by Harris County.

   **Response:** 82,276

b.   The number of ABBMs initially rejected by Harris County:

   i.   Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (*i.e.*, pursuant to Texas Election Code § 86.001(f)).

   **Response:**  1,556

   ii.   Pursuant to any other provision of the Texas Election Code.

   **Response:**  892

c.   The number of ABBMs initially rejected by Harris County pursuant to SB 1 Section 5.07 (*i.e.*, pursuant to Texas Election Code § 86.001(f)) but later accepted because the applicant cured the defect necessitating rejection, whether via an online tool, through the mail, or in person. This includes curing through the submission of a subsequent ABBM.

   **Response:**  732

d.   The number of ABBMs finally rejected by Harris County:

   i.   Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (*i.e.*, pursuant to Texas Election Code § 86.001(f)).

   **Response:** 677

    ii.  Pursuant to any other provision of the Texas Election Code.

**Response:**  582

  e.  The number of ABBMs finally accepted by Harris County.

**Response:** 81,075

**INTERROGATORY NO. 2:** For the November 2022 general election, and with respect only to timely received ballots by mail, state:

  a.  The number of ballots by mail received by Harris County.

**RESPONSE:** 64,175

  b.  The number of ballots by mail initially flagged for rejection by Harris County:

    i.  Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**RESPONSE:** 4,751

    ii.  Pursuant to any other provision of the Texas Election Code.

**RESPONSE:**  2,192

  c.  The number of ballots by mail initially flagged for rejection pursuant to SB 1

Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) but ultimately accepted because the voter cured the flagged defect, whether via an online tool, through the mail, or in person.

**RESPONSE:** 2,003

  d.  The number of ballots by mail initially flagged for rejection pursuant to SB 1

Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) and then cancelled by the voter.

**RESPONSE:** 0

  e.  The number of voters whose ballots by mail were initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election

4

Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) who did not cure the flagged defect and then voted in person:

    i.  By casting a regular ballot.

**RESPONSE:** 9

    ii.  By casting a provisional ballot.

**RESPONSE:** 117

f.  The number of ballots by mail finally rejected by Harris County:

    i.  Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**RESPONSE:** 2,557

    ii.  Pursuant to any other provision of the Texas Election Code.

**RESPONSE:** 2,184

g.  The number of ballots by mail finally accepted by Harris County.

**RESPONSE:** 61,508

**INTERROGATORY NO. 3:** For the November 2022 general election, state Harris County's final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places.

**RESPONSE:**  1.47%

**INTERROGATORY NO. 4:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 3 and the final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places, during:

a.  The November 2020 general election

b.  The November 2018 general election

**OBJECTION:** Defendant Tatum objects to this interrogatory because, at the time these interrogatories were propounded, the scheduling order in this litigation limited discovery

to matters related to the 2022 general election (Dkt. 437). Thus, these requests were outside the scope of the discovery. Without waiving this objection, Defendant may supplement this response with data if it can be obtained later.

**INTERROGATORY NO. 5:** For the November 2022 general election, state Harris County's final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places.

      **RESPONSE:**  4.16%

**INTERROGATORY NO. 6:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 5 and the final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places, during:

     a.  The November 2020 general election

     b.  The November 2018 general election

**OBJECTION:**  Defendant Tatum objects to this interrogatory because, at the time these interrogatories were propounded, the scheduling order in this litigation limited discovery to matters related to the 2022 general election (Dkt. 437). Thus, these requests were outside the scope of the discovery. Without waiving this objection, Defendant may supplement this response with data if it can be obtained later.

EXHIBIT

44

**EXHIBIT**

**Johnson 5**

exhibitsticker.com

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **5:21-CV-0844-XR** |
| | § | **(Consolidated Cases)** |
| **GREGORY ABBOTT, et al.** | § | |
| *Defendants.* | § | |

## DEFENDANT DYANA LIMON-MERCADO'S OBJECTIONS AND RESPONSES TO OCA PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:   OCA Plaintiffs, by and through their attorneys of record.

Comes now Defendant Dyana Limon-Mercado in her official capacity as Travis County Clerk, and hereby serves their Objections and Responses to OCA Plaintiffs' First Set of Interrogatories.

Respectfully submitted,

**DELIA GARZA**
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767
Telephone:   (512) 854-9513
Facsimile:   (512) 854-4808

By:   */s/ Anthony J. Nelson*
LESLIE W. DIPPEL
State Bar No. 00796472
Leslie.Dippel@traviscountytx.gov
ANTHONY J. NELSON
State Bar No. 14885800
Tony.Nelson@traviscountytx.gov
PATRICK T. POPE
State Bar No. 24079151
Patrick.Pope@traviscountytx.gov

**ATTORNEYS FOR DEFENDANTS DYANA LIMON-MERCADO AND JOSÉ GARZA, IN THEIR OFFICIAL CAPACITIES AS TRAVIS COUNTY CLERK, AND DISTRICT ATTORNEY, RESPECTIVELY.**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all parties and counsel of record via electronic mail, as follows, on the 23rd day of March, 2023.

*/s/ Anthony J. Nelson*
ANTHONY J. NELSON
PATRICK T. POPE
Assistant County Attorneys

## I.    OBJECTIONS TO DEFINITIONS

1.    Defendant Limon-Mercado objects to Plaintiff's definition of "you" as including "Travis County, including the Office of the Travis County Clerk, the Travis County Clerk, her predecessors and successors..." This definition is overly broad and improperly includes prior County Clerk administrations not included or the subject of this litigation.  Additionally, said definitions could be construed to require the disclosure of information concerning matters made exempt from discovery under Federal Rule of Civil Procedure 26(b)(1) and the Federal Rules of Evidence, including, but not limited to attorney work product, litigation privilege, deliberative process privilege, grand jury proceedings, and ongoing criminal investigations.

## II.    RESPONSES AND OBJECTIONS TO OCA PLAINTIFFS' FIRST SET OF INTERROGATORIES

**Interrogatory No. 1:** For the November 2022 general election, and with respect only to timely received applications for a ballot by mail ("ABBMs"), state:

a. The number of ABBMs received by Travis County.

**Response: 28,516.**

b. The number of ABBMs initially rejected by Travis County:

i. Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (*i.e.*, pursuant to Texas Election Code § 86.001(f)).

**Response: 761.**

ii. Pursuant to any other provision of the Texas Election Code.

**Response: 1,023.**

c. The number of ABBMs initially rejected by Travis County pursuant to SB 1 Section 5.07 (*i.e.*, pursuant to Texas Election Code § 86.001(f)) but later accepted because the applicant

cured the defect necessitating rejection, whether via an online tool, through the mail, or in person. This includes curing through the submission of a subsequent ABBM.

**Response: 190.**

    d. The number of ABBMs finally rejected by Travis County:

        i. Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (i.e., pursuant to Texas Election Code § 86.001(f)).

**Response: 571.**

        ii. Pursuant to any other provision of the Texas Election Code.

**Response: 815.**

    e. The number of ABBMs finally accepted by Travis County.

**Response: 26,732.**

**Interrogatory No. 2:** For the November 2022 general election, and with respect only to timely received ballots by mail, state:

    a. The number of ballots by mail received by Travis County.

**Response: 21,443.**

    b. The number of ballots by mail initially flagged for rejection by Travis County:

        i. Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (i.e., pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**Response: 827.**

        ii. Pursuant to any other provision of the Texas Election Code.

**Response: 126.**

    c. The number of ballots by mail initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8),

and/or 87.0411(a)(4)) but ultimately accepted because the voter cured the flagged defect, whether via an online tool, through the mail, or in person.

**Response: 401.**

    d. The number of ballots by mail initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) and then cancelled by the voter.

**Response: 0.**

    e. The number of voters whose ballots by mail were initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) who did not cure the flagged defect and then voted in person:

        iii. By casting a regular ballot.

**Response: 0.**

        iv. By casting a provisional ballot.

**Response: 27.**

    f. The number of ballots by mail finally rejected by Travis County:

        v. Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (i.e., pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**Response: 418.**

        vi. Pursuant to any other provision of the Texas Election Code.

**Response: 45.**

    g. The number of ballots by mail finally accepted by Travis County.

**Response: 20,980.**

**Interrogatory No. 3:** For the November 2022 general election, state Travis County's final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places.

Response: 4.86%.

**Interrogatory No. 4:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 3 and the final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places, during:

   a. The November 2020 general election

**Response: 1.33% of Submitted Applications for Mail Ballots Rejected in November 2020 General Election.**

   b. The November 2018 general election

**Response: 3.56% of Submitted Applications for Mail Ballots Rejected in November 2018 General Election.**

**Interrogatory No. 5:** For the November 2022 general election, state Travis County's final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places.

**Response: 2.16%.**

**Interrogatory No. 6:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 5 and the final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places, during:

   a. The November 2020 general election

**Response: 0.42% of Mail Ballots Rejected in November 2020 General Election.**

   b. The November 2018 general election

**Response:  Response: 0.47% of Mail Ballots Rejected in November 2018 General Election.**

EXHIBIT
45

| | |
|---|---|
| **From:** | Keith Ingram |
| **To:** | justin.williamson@house.texas.gov |
| **Cc:** | Adam Bitter |
| **Subject:** | county by county mail ballot numbers |
| **Date:** | Thursday, April 7, 2022 3:00:57 PM |
| **Attachments:** | image001.png |
| | 2022 Primary BBM A-R.xlsx |
| **Sensitivity:** | Personal |

Based on Canvassed totals, below are the official turnout figures for the March 1 Primary Elections:

| | **Total Number of Ballots Cast** |
|---|---|
| Democratic | 1,075,601 |
| Republican | 1,954,172 |
| **Statewide Total** | **3,029,773** |

Based on vote history data submitted to our office by each of Texas' 254 counties, the mail-ballot rejection numbers and rates are as follows:

| Party | Total Number of Mail Ballots | Total Mail Ballots Rejected | Rejection Percentage |
|---|---|---|---|
| Democratic | 110,967 | 14,281 | **12.87%** |
| Republican | 87,980 | 10,355 | **11.77%** |
| **Statewide Total** | **198,947** | **24,636** | **12.38%** |

Keith Ingram

Director, Elections Division

Office of the Secretary of State

800-252-VOTE(8683)

www.sos.state.tx.us/elections/index.shtml

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as personal legal advice to you for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

STATE087299

EXHIBIT
46

**ELECTIONS**

# Mail-in ballot rejections decreased in Texas in the May elections

Data from the Texas Secretary of State shows the mail-in ballot rejection rate was less than 4% in the primary runoffs.



Author: **Christian Aleman**
Pub ished: **4:46 PM CDT July 8, 2022**
Updated: **10:41 PM CDT July 8, 2022**



AUST N, Texas — New data shared by the Office of the Texas Secretary of State shows that ma  - n ba  ot reject ons decreased between the March pr mary e ect ons to the  atest pr mary runoffs  n May.

Accord ng to the data, the statew de ma  - n ba  ot reject on rate was  ess than 4%  n the pr mary runoffs. That's down from more than 12%  n the March pr mary e ect ons.

Sponsored Links

**Discover in a Minute: The Game Everyone's Talking About**

Raid Shadow Legends

Look ng at the numbers, a tota of 24,636 ma -n ba ots were rejected n the March 1 Democrat c and Repub can pr mar es wh e 7,244 ma -n ba ots were rejected n both runoffs. For the May 7 Const tut ona Amendment e ect on, the ma -n ba ot reject on rate was just over 5% w th 9,420 ma -n ba ots rejected.

The Office of the Texas Secretary of State cred ts voter educat on on beha f of county e ect on offic a s across the state w th the decrease n reject ons. The efforts nc ude educat ng about the new D requ rement, updat ng the des gn of the carr er enve ope to p ace a red box around the D fie d and educat ona pamph ets about ma -n vot ng.

"We are confident that these steps, n comb nat on w th more voter educat on and pos t ve engagement from oca e ect on offic a s, he ped s gn ficant y reduce ma ba ot reject on rates n both the May 7 and May 24 e ect ons," the Texas Secretary of State's Office sa d n an ema .

**RELATED:** More than 12% of mail-in ballots were rejected in Texas under new GOP voting rules, final tally shows

The reject on of ma -n ba ots n the 2022 e ect ons has come nto focus as a resu t of the passage of Texas Senate B 1 n 2021, the Repub can vot ng aw mp ement ng new changes and t ghter restr ct ons on vot ng.

SB 1 was passed n the second eg s at ve sess on fo ow ng protests by Texas Democrats as Repub cans argued that more e ect on secur ty was needed fo ow ng the 2020 pres dent a e ect on.

n part, the b added D requ rements for ma -n vot ng by requ r ng voters to prov de the r dr ver's cense number or the ast four d g ts of the r Soc a Secur ty number when app y ng for the ba ot. t a so created fe ony charges for e ect on offic a s who send unso c ted ma -n ba ot app cat ons.

How to earn up to $20k from the OpenAI
bug bounty program!



FEATURED BY 

The new ma - n ba ot requ rements resu ted n the ncrease of ba ots rejected n the March pr mary when 12% of Texans had the r ba ot rejected, accord ng to The Texas Tr bune.

n Centra Texas spec fica y, the reject on numbers fo ow the state trend as they decrease between the pr mar es and the atest runoffs.

The data shows that n Trav s County, 673 or 7.15% of ma - n ba ots were rejected n the Democrat c pr mary, wh e 260 or 11.95% of such ba ots were rejected n the Repub can pr mary. For the Democrat c pr mary runoff on May 24, 193 or 2.4% of ma - n ba ots were rejected and 90, or 3.99%, of the ba ots were rejected n the Repub can pr mary runoff.

**RELATED:** Texas mail ballot rejections soar under new restrictions

Reject on of app cat ons for ma - n ba ots was a so an ssue under the new Repub can vot ng aw and resu ted n about 27% of app cat ons for ma - n ba ots be ng rejected by the Trav s County C erk's Office ahead of the March pr mar es.

At that t me, the c erk's office sa d t had not rece ved enough nformat on on how to cure app cat ons for ba ots w th the Secretary of State's Office, wh ch the SOS refuted.

W amson County shows a s m ar trend between the March and May e ect ons. n the March 1 Democrat c pr mary, 269 or 10.86% of ma - n ba ots were rejected and 264 or 14.3% of ba ots n the Repub can pr mary were tossed.

Then n the runoffs, 42 ba ots mak ng up 1.96% of those subm tted were rejected n the May Democrat c pr mary runoff and 63 ba ots, mak ng up 3.77% of those cast, were rejected.

The Secretary of State's Office sa d t wou d expand ts voter educat on efforts for the fa w th ts "VoteReady" campa gn to he p fam ar ze voters w th D requ rements.

**KVUE on social media:** Facebook   Tw tter   nstagram   YouTube

Nearly 23,000 mail-in ballots rejected in Texas due to new requirement | KVUE

**PEOPLE ARE ALSO READING:**

Tenants at Falls on Bull Creek raise concerns about living conditions

Uvalde mom who ran into school to save kids says police are harassing her for speaking out

Abbott issues executive order permitting officials to return immigrants in Texas illegally to the border

**District Of Columbia: New "Grocery Allowance" Everyone on Medicare Can Apply for**

Healthy Living | Sponsored

**American Shoppers Should Think Twice Before Buying from These 2 Stores**
Last year this tool saved its customers over $160 million, and with just a few clicks you can start saving too.

Moneywise.com | Sponsored

Install Now

**Here's How Much Gutter Guards Should Cost You In 2023**
Try this instead of gutter cleaning

LeafFilter Partner | Sponsored

Get Quote

**Simple Japanese Trick for Nail Infection**

Healthy Guru | Sponsored

Read More

**Heart Surgeon Begs Americans: "Stop Doing This To Your Fruit"**
The top 3 common foods that you would have never guessed were the cause of your fatigue.

Gundry MD | Sponsored

**District Of Columbia Launches New Guidelines For Cars Used Less Than 50 Miles/Day**

BindRight Auto Insurance Quotes | Sponsored

**Gov. Greg Abbott signs electric vehicle fee into law**
KVUE

**Kari Lake loses for a second time in courtroom bid to overturn election defeat**
KVUE

LOADING NEXT ARTICLE...

# EXHIBIT 47

**Texas 2022 General Election Supplement to Report**
**Voting Assistance & Vote by Mail**
**La Union del Pueblo Entero et al. v. State of Texas et al.**
**Tammy Patrick**

1. On February 28, 2022, I submitted a report entitled "Voting Assistance & Vote By Mail" in connection with the case La Unión del Pueblo Entero et al. v. State of Texas et al., which I will refer to here as the "Original Report."

2. On April 29, 2022, I submitted a supplemental report extending the Original Report based on facts and data related to voting by mail from Texas's March 1, 2022, primary election, the first statewide election conducted under the provisions of SB1, which I will refer to as the "First Supplemental Report."

3. This report supplements and extends the Original Report and the First Supplemental Report based on facts and data related to voting by mail from Texas's November 8, 2022, general election.

4. This report also supplements Section One of the Original Report regarding my employment and election experience.  As of December 1, 2022, I serve as the Chief Executive Officer of Programs for the National Association of Election Officials, commonly referred to as the Election Center.  The Election Center was established as the first national training and certification organization of election professionals in 1992.[1]

## Introduction & Summary of Conclusions

5. Since implementation of SB1, rejection rates of both the applications for ballots by mail (ABBMs) as well as ballot carrier envelopes have continued to exceed the rejection rates historically seen in Texas and nationwide. This supplemental report documents that although rejection rates have diminished from the increase experienced in the initial elections of 2022, Texas reports that it is still rejecting mail ballots at a rate of 2.7%[2]—almost three times the national average (1%[3])—and more than the state's

---

[1] Election Center - About Us.  https://www.electioncenter.org/about-us.php.

[2] Lopez, Ashley. "Despite mail voting changes, ballot rejection rates remail relatively low in 2022 midterms." NPR. (January 13, 2023). https://www.npr.org/2023/01/13/1148799521/mail-ballot-rejection-rates-state-tally

[3] United States Election Assistance Commission EAVs Survey data from 2020,  Election 2020 at Page 36 (page 46 of PDF): https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf
United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf
United States Election Assistance Commission EAVs Survey data from 2016,2016 at Page 25 (Page 31 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf

average prior to SB1 passage.[4] What I have observed supports the conclusion that SB1 creates unnecessary barriers to eligible Texas voters to participate in the franchise.

6. Issues anticipated in the Original Report and in the First Supplemental Report with voters being able to comply with the new requirements under SB1 in applying for an absentee ballot and completing a ballot carrier envelope manifested in the general election, with rejection numbers exceeding both the national trends as well as Texas's historical trends.

7. Following the rise of rejection rates in the primary election, local election officials went to great lengths to reduce the rejection rates, often at a substantial cost in time and resources—they hired additional staff dedicated to answering voter calls and questions around the requirements,[5] printed and mailed additional voter instructions,[6] and experienced what will be an ongoing expense given that new Texas voters become eligible to vote by mail every day. Given the combined fact of an aging population resulting in Texas voters who will encounter these new requirements for the first time in every election cycle moving forward and the historic under-funding of election offices,[7] this level of effort is untenable.

8. Midterm voters are traditionally high-efficacy voters,[8] those with the propensity to have voting experience and understanding of policies and procedures necessary to successfully engage with the franchise as compared with presidential general election voters. Even within this voting cohort the impact of SB1 was substantial.

---

[4] "In 2020, Texas had a 0.8% mail ballot rejection rate; in 2018 it was 1.7%." Lopez, Ashley. "Despite mail voting changes, ballot rejection rates remail relatively low in 2022 midterms." NPR. (January 13, 2023). https://www.npr.org/2023/01/13/1148799521/mail-ballot-rejection-rates-state-tally
[5] Worthy, Ariel. "Fewer Harris County mail-in ballots are being rejected compared to March Primaries." *Houston Public Media.* (November 4, 2022). https://www.houstonpublicmedia.org/articles/news/politics/elections/2022/11/04/436774/fewer-harris-county-mail-in-ballots-are-being-rejected-compared-to-march-primaries/
[6] Taylor Goldenstein. "10,000 mail ballots rejected in large Texas counties as new ID requirement is phased in." Houston Chronicle. (November 11, 2022). https://www.houstonchronicle.com/politics/election/2022/article/New-Texas-law-leads-to-10-000-rejected-mail-17577757.php and Cheng, Yilun. "Harris County leaders remind voters of state ID requirements for casting mail ballots." Houston Chronicle. (October 3, 2022) https://www.houstonchronicle.com/news/houston-texas/article/Harris-County-leaders-remind-voters-of-state-ID-17484190.php
[7] Stewart, Charles III. "The Cost of Conducting Elections" (May 2022)https://www.commonsenseamerican.org/wp-content/uploads/2022/05/TheCostofConductingElections-2022.pdf.
[8] Sometimes referred to as "core" voters: "One of the most commonly understood patterns in electoral turnout is the fact that turnout in presidential elections tends to be much higher than for midterm elections. Traditional analyses of these differential patterns in turnout have focused on the notion of "surge and decline" and "core and peripheral" voters (Campbell 1960)." The paper looks at the impact of knowledge on a voter's participation in the franchise and finds that "core voting and persistent non-voting appear to be strongly driven by both age and knowledge." Stephen Ansolabehere and Brian Schaffner. "Beyond the Core and Periphery: A New Look at Voter Participation Across Elections." (November 30, 2015). https://cces.gov.harvard.edu/files/cces/files/ansolabehere_schaffner_core_periphery.pdf

## Analysis

### Overall Rejection Rates

9. Texas reported that the State rejected mail ballots at a rate of 2.7%—almost three times the national average (1%), and more than the state's average prior to SB1 passage (1.7% in the comparable midterm election of 2018).[9]  Because the national average rejection rate of vote by mail ballots hovers around 1%, when a state or jurisdiction's rate exceeds that it can spur additional review and analysis. Even rejection rates below the national average can sometimes lead to performance audits of ballot rejections. The Washington State Legislature mandated a performance audit of ballot rejection rates even though they historically fall below the 1% rejection threshold.[10]

### Curing and Use of the Ballot Tracking Portal

10. In the State Defendants' Supplemental Interrogatory Responses, it is stated that hundreds of thousands of Texas voters submitted ABBMs since the new requirements.  The numbers of submittals in each of the statewide elections in 2022 is as follows:[11]

---

[9] United States Election Assistance Commission EAVs Survey data from 2020,  Election 2020 at Page 36 (page 46 of PDF): https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf
United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf
United States Election Assistance Commission EAVs Survey data from 2016,2016 at Page 25 (Page 31 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf
[10] McCarthy, Pat, Office of the Washington State Auditor. "Performance Audit Report Highlights: Evaluating Washington's Ballot Rejection Rates." (February, 2022). https://sao.wa.gov/wp-content/uploads/Tabs/PerformanceAudit/PA_Evaluating_WA_Rejected_Ballots_2-pager.pdf
[11] Defendants' Supplemental Interrogatory Responses dated January 19, 2023 at Page 12.



11.Texas offers a "Ballot by Mail Tracker" (referred to after this as the "Tracker") on the Texas Secretary of State's "My Voter Portal" at votetexas.gov[12] in an attempt allow voters the opportunity to remedy issues with their ABBM.  Some voters whose ABBMs were at first rejected were successful in either having their ABBM accepted, or they had it cancelled so that they could then go and vote in person.[13] Unfortunately, the data I have seen does not distinguish how many voters fall into each of the two categories of voters—there isn't a distinction made, so we cannot know how many voters were able to successfully fulfill their requests and vote by mail as they originally intended or how many had to cancel their ABBM and vote in their secondary choice for mode of voting, in person.  This lack of clarity limits the ability to determine the portal's success rate of allowing originally rejected voters to obtain a mail ballot.

12. What we do know from the data is that there were hundreds of voters who used the Tracker during the 2022 election cycle and were unsuccessful in navigating the new requirements. 267 voters, more than 1 in 4 voters (28% of the 946 voters who used the Tracker in all 2022 elections through the November general), were unsuccessful in remedying the issues with their ABBM.[14]

13. The overall use of the tracker for rejected ABBMs was relatively low.  Even if ABBM rejection in the November General Election only matched the 2.7% reported ballot rejection rate[15] then fewer than one

---

[12] https://www.votetexas.gov/voting-by-mail/track-my-ballot.html
[13] Ibid. Page 11.
[14] Ibid Page 12.
[15] This is a conservative estimate because voters must successfully navigate SB 1 requirements for an ABBM first before they receive a ballot.

in twenty voters who had an ABBM rejected used the tracker. Fewer than one in twenty-five voters used the tracker successfully to cure or cancel an ABBM.[16]



14. Across the elections conducted in 2022, almost a thousand voters—963—who used[17] the Tracker in an attempt to cure their ballot deficiencies were unable to do so.[18] Beyond that, it was widely reported that more than 10,000 ballots were rejected in the midterm alone.[19] To date, I have not seen any analysis as to why those voters did not attempt to cure their ballots through the use of the Tracker or other methods (for instance, an analysis of the number of page hits on the tracker, number of login attempts, number of successful logins but then incomplete or abandoned efforts, etc.), or why the number of voters who attempted to use the tracker (6,247[20]) was considerably less than the overall number of rejected ballots.

## Election Officials' Education Efforts

15. Elevated rejection rates lingered because voters in Texas had continued challenges with satisfying the requirements of SB1 in the submission of their absentee ballots despite substantial reported efforts

---

[16] Ibid Page 12.

[17] The term "used" is reflective of that utilized in the "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories." It is unclear if this means every log-in or further attempt to use after a log-in attempt.

[18] Ibid pages 13-14.

[19] Taylor Goldenstein. "10,000 mail ballots rejected in large Texas counties as new ID requirement is phased in." *Houston Chronicle.* (November 11, 2022). https://www.houstonchronicle.com/politics/election/2022/article/New-Texas-law-leads-to-10-000-rejected-mail-17577757.php

[20] "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories". Pages 13-14.

by county election officials.  Measures taken by these election officials resulted in the somewhat decreased rejection rates. Some hired additional staff. According to Leah Shah with the Harris County Election Administrator's Office, they increased their "mail ballot team by 20 people dedicated to only reaching out to voters who are voting by mail, that are needing assistance, that have questions about the process," Shah said. "And of course, reaching back out to the voters if they require corrections."[21] Some counties, such as Bexar County, included special inserts to explain the new process,[22] as did Travis County.[23] Dallas County invested money in publicity campaigns that they attribute as a key factor in the reduction in rejections: "The Dallas County Commissioners Court spent north of $42 million in the last five years to ramp up staffing, equipment and advertising for elections. Daniel and Noble said this was money well spent, because the rejection rate of mail-in ballots was lower—something they attribute to public campaigns on the issue."[24]  The price tag that comes with implementation of new laws and educating the electorate can be large,[25] yet election officials are rarely provided sufficient funding to adequately complete the task.[26]  It was reported that the Legislature actually reduced the voter education budget from $4 million previously to $3.5 million for the current two-year budget cycle.[27] Additional funding is necessary to cover the additional activities required by SB1 to properly serve Texas voters.

[21]Worthy, Ariel. "Fewer Harris County mail-in ballots are being rejected compared to March Primaries."  *Houston Public Media*. (November 4, 2022).
https://www.houstonpublicmedia.org/articles/news/politics/elections/2022/11/04/436774/fewer-harris-county-mail-in-ballots-are-being-rejected-compared-to-march-primaries/
[22] Taylor Goldenstein. "10,000 mail ballots rejected in large Texas counties as new ID requirement is phased in." *Houston Chronicle*. (November 11, 2022). https://www.houstonchronicle.com/politics/election/2022/article/New-Texas-law-leads-to-10-000-rejected-mail-17577757.php
[23] Cheng, Yilun. "Harris County leaders remind voters of state ID requirements for casting mail ballots." *Houston Chronicle*. (October 3, 2022) https://www.houstonchronicle.com/news/houston-texas/article/Harris-County-leaders-remind-voters-of-state-ID-17484190.php
[24] Peterson, Josephine. "Dallas elections chief says it went well, amid state law changes and public anxiety." *The Dallas Morning News*. (November 21, 2022) https://www.dallasnews.com/news/politics/2022/11/20/dallas-elections-chief-says-it-went-well-amid-state-law-changes-public-anxiety/
[25] One example from New Jersey: "According to the counties' summation, both laws caused the county clerks to spend an additional $2.8 million in printing, postage, labor and other costs on the 2018 general and 2019 primary and general elections." And "Neither of the new vote-by-mail laws included a funding mechanism to address the costs incurred by the county boards of elections," the NJAC continued, giving as one example the close to $63,000 in additional labor, supplies and contracted costs." O'Dea, Colleen. "Changes in Vote-by-Mail Ruled Null and Void, Unfunded Mandates." *NJ Spotlight News*. (November 19, 2019).
[26] Stewart, Charles III. "The Cost of Conducting Elections" (May 2022)
https://www.commonsenseamerican.org/wp-content/uploads/2022/05/TheCostofConductingElections-2022.pdf
Zachary Mohr, PhD; Martha Kropf, PhD; JoEllen Pope, MPA CPA; Mary Jo Shephard, PhD; and Madison Esterle, MPA. "Election Administration Spending in Local Election Jurisdictions: Results from a Nationwide Data Collection Project".  Paper for the 2018 Election Sciences, Reform, and Administration (ESRA) conference University of Wisconsin-Madison on July 26-27, 2018. https://esra.wisc.edu/wp-content/uploads/sites/1556/2020/11/mohr.pdf
[27] Mizan, Nusaiba. "Texas has less to spend on voter outreach as election approaches under new rules*." Austin American-Statesman*. (September 21, 2022)
https://www.statesman.com/story/news/politics/state/2022/09/21/texas-election-2022-voter-education-campaign-has-less-money-spend/69506679007/

## Supplemental Conclusion on the General Election

16. Although the rates of rejection have declined, due to substantial efforts by county election officials—there are still thousands of eligible Texas voters who are unable to successfully submit ABBMs and/or have their voted ballots accepted for counting.

17. Texas rejection rates are still some of the highest in the nation, exceeding the traditional benchmark of 1% and their pre-SB1 midterm rate of 1.7%.[28]

18. These findings and concerns are echoed by election officials in other states who are seeing the introduction of bills in their states similar to SB1.[29]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 10, 2023

Signed: *Tammy Patrick*

Tammy Patrick

Executed in: St. Mary's County, Maryland

---

[28] United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf

[29] Lopez, Ashley. "Local election officials in Florida call for scrapping new ID rules for mail voting." *NPR*. (January 27, 2023). Florida election officials want to scrap mail ballot ID requirements : NPR

# EXHIBIT 48

Message

| | |
|---|---|
| **From:** | Wallace, Jeremy [Jeremy.Wallace@chron.com] |
| **Sent:** | 12/1/2021 4:03:58 PM |
| **To:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Subject:** | Re: 2021 Legislative Summary - Election Law Advisory |
| **Sensitivity:** | Personal |

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

Thanks for sharing this. Really helpful.


Jeremy Wallace
Political Writer
Houston Chronicle and
San Antonio Express-News
512-479-1407 office
512-373-5137 cell

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Tuesday, November 30, 2021 11:34 AM
**To:** Wallace, Jeremy <Jeremy.Wallace@chron.com>
**Subject:** [EXTERNAL] RE: 2021 Legislative Summary - Election Law Advisory

Hi Jeremy,

Per our discussion yesterday, we can provide statewide numbers based on what we have in our TEAM database to help calculate the rejection rate of mail-in ballots for the November 2020 General Election in Texas.

Confirmed that our database shows **2,079** mail ballots were rejected in the November 2020 Election, out of a total of **1,030,264** mail ballots received by the counties. That means the rejection rate was approximately **0.2%,** according to our records.

I would note that there is a different data set out there based on what counties self-report to the Election Assistance Commission each year, which our office does not independently verify. Page 46 of the Election Administration and Voting Survey (EAVS) report from the EAC shows **982,362 mailed ballots counted**, with **8,304 rejected**. That comes out to **0.8%** rejection rate – higher but still below 1%.

Just wanted to provide you with both sets of data to show that, no matter what source you use, the rejection rate for mail-in ballots was below 1% for the 2020 election. Let me know if you have any questions or need additional info on this.

Best,


**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116

Cell: 512-538-5293



**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Monday, November 29, 2021 9:03 PM
**To:** 'Wallace, Jeremy' <Jeremy.Wallace@chron.com>
**Subject:** Re: 2021 Legislative Summary - Election Law Advisory
**Sensitivity:** Personal

Hi Jeremy,

Just wanted to let you know i'll have updated figures for you tomorrow. Those numbers only covered part of the full picture statewide and the number of total absentee ballots cast was much larger. Unclear if the number of rejected ones also increased, but suffice it to say if it's not significantly larger, the % rejection rate is not going to change much.

Will have exact figures for you tomorrow.

Best,

-Sam

---

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Monday, November 29, 2021 5:52 PM
**To:** 'Wallace, Jeremy'
**Subject:** 2021 Legislative Summary - Election Law Advisory

Hi Jeremy,

Checked with our elections division and we were able to run the numbers of absentee ballots rejected in the 2020 General Election, as well as total # of absentee ballots accepted:

**2,079** Absentee Ballots Rejected
**667,003** Absentee Ballots Accepted

That comes out to a 0.3% rejection rate statewide.

Also wanted to flag the election law advisory we put out recently, which includes an overview of changes under SB 1: https://www.sos.texas.gov/elections/laws/advisory2021-21.shtml

I think the highlighted portions below are what you're looking for – relating to the cure process:

# Article 5: Voting by Mail
- **Requirements for Application to Vote by Mail**

- o An application for ballot by mail (ABBM) must be submitted in writing and signed by the applicant using ink on paper. An electronic signature or photocopied signature is not permitted. (Sec. 84.001(b)).
- o An ABBM must contain: (1) the number of the applicant's driver's license, election identification certificate (EIC), or personal identification card issued by the DPS; (2) the last four digits of the applicant's social security number, if the applicant has not been issued a DPS number described above; or (3) a statement that the applicant has not been issued a number described by (1) or (2). (Sec. 84.002(a)(1-a)). An applicant may use the number of an expired driver's license, EIC, or personal identification card to fulfill this requirement if the license or identification is otherwise valid. (Sec. 84.002(b-1)).
- o The official ABBM form prescribed by the SOS must provide a space for entering the information required in Section 84.002(a)(1-a). (Sec. 84.011).
- o If the information required by Section 84.002(a)(1-a) included on the ABBM does not identify the same voter identified on the applicant's voter registration application, the clerk shall reject the application. (Sec. 86.001(f)). If an ABBM is rejected under Section 86.001(f), the clerk shall provide notice of the rejection. The notice must include information regarding the ability to correct or add the required information through the online ballot by mail tracker described in Section 86.015(c). (Sec. 86.001(f-1)). If the applicant corrects the ABBM online and that application subsequently identifies the same voter identified on the applicant's voter registration application, the clerk shall provide a ballot to the voter. (Sec. 86.001(f-2)).
- **Prohibitions on Distribution of Application for Ballot by Mail Form**: Except as provided by Section 84.0111(c) or as otherwise authorized by the Texas Election Code, an officer or employee of this state or of a political subdivision of this state may not distribute an ABBM to a person who did not request an application under Section 84.001. (Sec. 84.0111(a)). An officer or employee of this state or of a political subdivision of this state may not use public funds to facilitate the distribution by another person of an ABBM to a person who did not request an application under Section 84.001. (Sec. 84.0111(b)). A political party or a candidate for office may distribute an ABBM to a person who did not request an application under Section 84.001. (Sec. 84.0111(c)).
- **Mail Ballot Cancellation**
  - o A person who receives a notice of defect related to a submitted mail ballot from the early voting ballot board or the signature verification committee under Section 87.0271 or 87.0411 may cancel their mail ballot application by appearing in person at the early voting clerk's office and executing an affidavit that the applicant received notice of a defect. (Sec. 84.032).
  - o An election judge may permit a person to whom an early voting ballot has been sent who cancels the person's application in accordance with Section 84.032 but fails to surrender the mail ballot to the early voting clerk, deputy early voting clerk, or presiding judge as provided by Section 84.032 to vote only a provisional ballot. (Sec. 84.035).
- **Requirements for Carrier Envelopes**
  - o The carrier envelope must include a space that is hidden from view when the envelope is sealed for the voter to enter: (1) the number of the voter's driver's license, EIC, or personal identification card issued by the DPS; (2) the last four digits of the voter's social security number, if the voter has not been issued a DPS number described above; or (3) a statement that the voter has not been issued a number described by (1) or (2). (Sec. 86.002(g)). A voter may use the number of an expired driver's license, EIC, or personal identification card to fulfill this requirement if the license or identification is otherwise valid. (Sec. 86.002(h)).
  - o No record associating an individual voter with a ballot may be created. (Sec. 86.002(i)).
- **Storage of Mail Ballots not Timely Returned**: If a mail ballot is not timely returned, the clerk shall enter the time of receipt on the carrier envelope and retain it in a locked container for the period for preserving precinct election records. (Sec. 86.011(c)).
- **Curing Certain Defects in the Mail Ballot Tracker**: The online ballot by mail tracker must allow the voter to add or correct identification information required under Section 84.002(a)(1-a) or 86.002(g). (Sec. 86.015(c)).

- **Signature Verification Committee Appointment Procedures**
  - For elections in which party alignment is indicated on the ballot, the signature verification committee must be appointed from the list provided by the county chair, and the names shall be listed in order of the county chair's preference. The chair and the vice chair of the SVC shall be appointed from the lists provided and must be the highest-ranked persons on the respective lists from the political parties whose nominee for governor received the most and second most votes in the county in the most recent gubernatorial general election. (Sec. 87.027(d)).
  - To be eligible to serve on the SVC, a person must be eligible for appointment as a presiding election judge, except that the person must be a qualified voter of the territory prescribed by Section 87.027. (Sec. 87.027(e)).
- **SVC Signature Comparison**: The SVC may compare the signatures on the voter's ballot application and the carrier envelope certificate with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. (Sec. 87.027(i)).
- **EVBB Signature Comparison**
  - The EVBB may only accept a ballot if the identification information provided by the voter on the carrier envelope under Section 86.002(g) identifies the same voter identified on the voter's application for voter registration. (Sec. 87.041(b)).
  - If a voter provides the required identification information on the carrier envelope under Section 86.002(g) and such information identifies the same voter identified on the voter's application for voter registration, the signature on the ballot application and on the carrier envelope certificate shall be rebuttably presumed to be the signatures of the voter. (Sec. 87.041(d-1)).
  - In making the determination as to whether the signatures on the voter's ballot application and the carrier envelope certificate are those of the voter, the EVBB may also compare the signatures with any known signature of the voter on file with the county clerk or voter registrar. (Sec. 87.041(e)).
- **Opportunity to Correct Defect: Signature Verification Committee**
  - Section 87.0271 provides a procedure by which a voter can correct certain defects in their carrier envelope containing their voted ballot. Not later than the second business day after a signature verification committee discovers the defect and before the committee decides whether to accept or reject a timely delivered ballot under Section 87.027, the committee shall: (1) determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and (2) return the carrier envelope to the voter by mail, if the committee determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day. (Sec. 87.0271(a), (b)).
  - If the SVC determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the SVC may notify the voter of the defect by phone or email and inform the voter that the voter may cancel their mail ballot in accordance with Section 84.032 or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. (Sec. 87.0271(c)).
  - If the SVC takes one of the actions described above, the committee must take that action with respect to each ballot in the election to which these options apply. (Sec. 87.0271(d)).
  - Poll watchers are entitled to observe these activities by the SVC. (Sec. 87.0271(e)).
  - The SOS is authorized to prescribe any procedures necessary to implement Section 87.0271. (Sec. 87.0271(f)).
- **Opportunity to Correct Defect: Early Voting Ballot Board**
  - Section 87.0411 provides a procedure by which a voter can correct certain defects in their carrier envelope containing their voted ballot. Not later than the second business day after an early voting ballot board discovers the defect and before the board decides whether to accept or reject a timely delivered ballot under Section 87.041, the board shall: (1)

determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day; and (2) return the carrier envelope to the voter by mail, if the board determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day. (Sec. 87.0411(a), (b)).

- o   If the EVBB determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the EVBB may notify the voter of the defect by phone or email and inform the voter that the voter may cancel their mail ballot in accordance with Section 84.032 or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. (Sec. 87.0411(c)).
- o   If the EVBB takes one of the actions described above, the board must take that action with respect to each ballot in the election to which these options apply. (Sec. 87.0411(d)).
- o   Poll watchers are entitled to observe these activities by the EVBB. (Sec. 87.0411(e)).
- o   The SOS is authorized to prescribe any procedures necessary to implement Section 87.0411. (Sec. 87.0411(f)).

- **Submission of Information to the Attorney General**: Not later than the 30th day after election day, the early voting clerk shall deliver notice to the attorney general of any ballot rejected because the EVBB or SVC determined that a violation of the Election Code occurred. (Sec. 87.0431(b)).
- **Separate Storage and Tabulation of Mail Ballots, Early Voting in Person Ballots, and Election Day Ballots**
    - o   Ballots voted by mail shall be tabulated and stored separately from the ballots voted by personal appearance and shall be separately reported on the returns. (Sec. 87.062).
    - o   Early voting in person ballots, election day ballots, and ballots voted by mail shall be tabulated separately and shall be separately reported on the election returns. (Sec. 87.103).
- **Scanning of Mail Ballot Records**: Electronic records made under Section 87.126 shall record both sides of any application, envelope, or ballot recorded, and all such records shall be provided to the EVBB, SVC, or both. (Sec. 87.126(a-1)).
- **Notes of EVBB/SVC Members**: Permits EVBB and SVC members to take any notes reasonably necessary to perform the members' duties. Notes taken by these individuals may not contain personally identifiable information. Each member who takes notes shall sign the notes and deliver them to the presiding judge or committee chair, as applicable, for delivery to the custodian of election records. Notes collected under this section shall be preserved in the same manner as precinct election records under Section 66.058. (Sec. 87.128).

Hope this helps, feel free to give me a call if you need anything else in the meantime.

Best,

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116
Cell: 512-538-5293



# EXHIBIT 49

TEXAS SECRETARY OF STATE

# Corrective Action Process Early Voting Clerk Actions

## Elections Division – Texas Secretary of State
## 40th Annual Election Law Seminar – August 2022

[DateTime]          Texas Secretary of State Elections Division          1

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division



# CHANGES TO APPLICATION FOR BALLOT BY MAIL (ABBM)

[DateTime]                    Texas Secretary of State Elections Division                    2

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111280



## Box 1:  Personal Identification Numbers – Voter must provide:

- Texas Driver's License, Texas Personal Identification Number, or Election Identification Certificate Number issued by DPS, OR
- Last four digits of SSN, OR
- An indication that they have not been issued either number.

- **The personal identification information provided by the voter on the ABBM MUST be validated using the voter's voter registration record.**

[DateTime]                     Texas Secretary of State Elections Division                     3

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111281



# Ballot by Mail Tracker
## Available at **www.votetexas.gov**

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111282

**TEXAS SECRETARY OF STATE**

# Key Points to Remember

- Voters are not required to provide both types of identification numbers.

- If a voter provides both numbers, only one number has to match the VR record.

- Do not delay in mailing rejection notices.

- Voters are not required to use the Ballot by Mail Tracker to correct missing information. They can submit a new ABBM or a new VR application, whichever is applicable.

- County early voting clerks are REQUIRED to submit rejected ABBM information to TEAM (or through their vendor, if it provides data to TEAM). This is what populates the Ballot by Mail Tracker.

[DateTime]                    Texas Secretary of State Elections Division                    5

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111283

TEXAS SECRETARY OF STATE

# Notice of Rejected ABBM Forms

- If the early voting clerk rejects an ABBM because the voter failed to provide any of the required identification information or the information included on the ABBM does not match the voter's voter registration record, the early voting clerk must provide the voter with notice of the rejection in accordance with Section 86.001
    - Notice of Rejected ABBM (Form 6-2)
    - Notice of Rejected ABBM-Missing or Incorrect Personal Identification Numbers (Form 6-3)
    - Notice of Rejected ABBM-Required Identification Number is not Associated with Your Voter Record (Form 6-4)

[DateTime]               Texas Secretary of State Elections Division                    6

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111284

TEXAS SECRETARY OF STATE

# Deadline to Correct Defects in ABBM

- If a voter receives a Notice of Rejected Application for a Ballot by Mail or the voter logs into the Ballot by Mail Tracker and sees that there is missing or incorrect personal identification information, the voter must either (1) complete the required validation on the Ballot by Mail Tracker no later than the 11th day before election day, or (2) complete a new ABBM that must be received by the early voting clerk no later than the 11th day before election day. (Secs. 84.007(c), 86.015).

- The early voting clerk must review all pending ABBMs that were initially rejected due to missing or incorrect personal identification information. If the applicant did not subsequently provide the missing or corrected identification information, the early voting clerk should send a final rejection notice. The early voting clerk can use the standard Notice of Rejected Application for Ballot by Mail form (Form 6-2) and mark reason 16 on the form.

- If a voter corrects a defective ABBM after early voting by personal appearance has begun, the early voting clerk should confirm that the voter did not vote in person before sending balloting materials to the voter.

[DateTime]                    Texas Secretary of State Elections Division                    7

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111285



TEXAS SECRETARY OF STATE

# CHANGES TO FEDERAL POST CARD APPLICATION (FPCA) PROCESS

[DateTime]                    Texas Secretary of State Elections Division                    8

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111286

# FPCA Signature Sheet

- **Voter Information**

- **Personal Identification Information**

- **Witness/Assistant information, if applicable**

- **Voter Signature**

[DateTime]                              Texas Secretary of State Elections Division                        9

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111287

TEXAS SECRETARY OF STATE

# Impacts on FPCA Voters

- To facilitate the mailing of FPCA balloting materials, early voting clerks may use any type of mailing envelope that contains the Official Election Mail logo and the required postage-paid information **as long as the early voting clerk includes a required signature sheet for the voter to complete**.

- All FPCA voters must be provided with an Official Election Signature Sheet for an FPCA Voter if their balloting materials were sent by email.

- **If the balloting materials were sent by physical mail, but the early voting clerk is using one of the FVAP envelopes that does not contain all of the requirements for the carrier envelope, the voter MUST be provided with an Official Election Signature Sheet for an FPCA Voter to return with their marked ballot.**

- **What this means for SVC/EVBB review?** There may be an increased number of signature sheets for FPCA voters.

[DateTime]                    Texas Secretary of State Elections Division                    10

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111288



# NEW REQUIREMENTS FOR THE CARRIER ENVELOPE

[DateTime]          Texas Secretary of State Elections Division                    11

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111289



Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111290



Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111291



Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111292

TEXAS SECRETARY OF STATE

# Key Points to Remember

- Voters are not required to provide both types of identification numbers.

- If a voter provides both numbers, only one number has to match the VR record.

- The secrecy flap may be opened by the early voting clerk's staff for processing.

- Be mindful with these carrier envelopes, as they have personally identifiable information that needs to be guarded.

- Carrier envelopes are not public information at this point in the election process.

[DateTime]                    Texas Secretary of State Elections Division                    15

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111293



TEXAS SECRETARY OF STATE

# NEW PROCESS FOR EVBB/SVC

[DateTime]                     Texas Secretary of State Elections Division                     16

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111294

TEXAS SECRETARY OF STATE

# New Comparison Requirements

- The EVBB shall only accept a ballot if the personal identification information (ex: SSN or TXDL) matches the voter registration record.

- The SVC/EVBB is matching the information on the carrier envelope to the **VR record**.

- The number on the carrier envelope does not have to be the same number on the ABBM — it must only match the VR record.

[DateTime]                 Texas Secretary of State Elections Division                 17

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division



TEXAS SECRETARY OF STATE

# EARLY VOTING CLERK PROVIDING NOTIFICATION OF DEFECTS

[DateTime]                Texas Secretary of State Elections Division                18

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111296

**TEXAS SECRETARY OF STATE**

# Early Voting Clerk
# Notification of Defects

- Under Section 86.011(d) of the Code, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, **the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect**. Additionally, **the early voting clerk may notify the voter of the defect by phone** and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their ABBM and vote in person.
  - **Early voting clerks may return carrier to voter for correction.**
  - **Early voting clerks may notify voter of defect by phone and inform the voter they can come to the EVC's office to correct defect or cancel their application.**

[DateTime]                    Texas Secretary of State Elections Division                    19

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111297

TEXAS SECRETARY OF STATE

# Early Voting Clerk
# Notification of Defects

- What defects can an early voting clerk provide notice about?
  - Missing signature
  - Missing or incomplete **witness** information
  - Missing or incomplete **assistant** information
  - If the early voting clerk is removing the secrecy flap before the ballot is sent to the SVC/EVBB:
    - Missing personal identification information
    - Incorrect personal identification information



[DateTime]                    Texas Secretary of State Elections Division                    20

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111298

Texas Secretary of State

# Early Voting Clerk
# Notification of Defects

- If an early voting clerk chooses to notify voters of defects in their carrier envelope under Section 86.011(d), **the clerk must apply these procedures uniformly to all voters in similar circumstances.**

- The SOS recommends keeping a log to track the ballots mailed to voters and the ballots in the possession of the early voting clerk before ballots are delivered to the SVC or EVBB.

- The early voting clerk may return defective carrier envelopes by mail under Section 86.011(d) up until the point when SVC/EVBB begins notifying voters of defects by phone or email. The early voting clerk should determine this cutoff date in coordination with the SVC/EVBB.



[DateTime]                    Texas Secretary of State Elections Division                    21

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111299

TEXAS SECRETARY OF STATE

# Early Voting Clerk
# Notification of Defects

- **Poll watchers may be present for this process.** (Sec. 86.011(d)).

- Poll watchers are not authorized to remain in the early voting clerk's office at all times to wait for a potential notification to a voter. However, if a poll watcher is present in the office when an early voting clerk is notifying voters of defects by phone or a voter appears to correct a defect in person, the poll watcher may observe this process.

- There is no specific posting requirement for this notification.

[DateTime]                     Texas Secretary of State Elections Division                     22

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

TEXAS SECRETARY OF STATE

# Notice of Carrier Defects

- EVC Notice of Carrier Defect Mailed with Corrective Action Form (Form 6-11)
- EVC Notice of Carrier Defect Phone with Corrective Action Form (Form 6-12)

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111301

TEXAS SECRETARY OF STATE

# Correcting Defect by Cancellation

- If the voter received a defective carrier envelope in the mail or was notified by telephone or email about a defect, the voter may request to have their ABBM/marked ballot cancelled in accordance with Section 84.032.

- If the voter has possession of the defective carrier envelope, it may be surrendered at an early voting or election day polling place in order to vote a regular ballot in person.

- The voter may also surrender the ballot at the early voting clerk's office and be given a Notice of Surrendered Ballot by Mail to take to the polling place and vote a regular ballot.

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111302

TEXAS SECRETARY OF STATE

# Resources

- **No.2022-08** - NEW LAW: Senate Bill 1 – Opportunity to Correct Defects on Application for a Ballot by Mail and Carrier Envelope
- **No.2022-12** - Additional Procedures Regarding Correction of Defects on Application for Ballot by Mail or Carrier Envelope
- Training and Educational Resources Page

[DateTime]                    Texas Secretary of State Elections Division                    25

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111303

TEXAS SECRETARY OF STATE

# Questions?

## elections@sos.texas.gov

[DateTime]                    Texas Secretary of State Elections Division                    26

Texas Secretary of State Elections Division

8/18/2022

Texas Secretary of State Elections Division

STATE111304

# EXHIBIT 50

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br>    *Plaintiffs*, | §<br>§<br>§ | |
| v. | §<br>§ | Case No. 5:21-cv-844-XR<br>[Lead Case] |
| GREGORY W. ABBOTT, *et al.*,<br>    *Defendants*. | §<br>§<br>§ | |
| | § | |
| UNITED STATES OF AMERICA,<br>    *Plaintiff*, | §<br>§ | |
| v. | §<br>§ | Case No. 5:21-cv-1085-XR<br>[Consolidated Case] |
| THE STATE OF TEXAS, ET AL.,<br>    *Defendants* | §<br>§<br>§ | |

### STATE DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO THE UNITED STATES' SECOND SET OF INTERROGATORIES

TO:     Plaintiff the United States of America, by and through their attorneys of record, Michael E. Stewart, Daniel J. Freeman, Richard Alan Dellheim, Dana Paikowsky, and Jennifer Yun, United States Department of Justice Civil Rights Division, 950 Pennsylvania Avenue NW, Washington, DC 20530

Jane Nelson, in her official capacity as the Texas Secretary of State, and the State of Texas (collectively "State Defendants"[1]) hereby serve their Supplemental Objections and Responses to the United States' Second Set of Requests for Interrogatories, pursuant to the Federal Rules of Civil Procedure. Because present circumstances prevent State Defendants from signing these responses, State Defendants' counsel will serve properly executed interrogatory answers on the requesting party not later than 21 days after serving these unexecuted answers. *See* W.D. Tex. Local Rule CV-33(a).

---

[1] All previous references to "Defendants" have been changed to "State Defendants" for the sake of clarity.

Date: January 19, 2023                    Respectfully submitted.

KEN PAXTON                                WILLIAM T. THOMPSON
Attorney General of Texas                 Acting Chief, Special Litigation Unit
                                          Tex. State Bar No. 24088531

BRENT WEBSTER                             */s/ Kathleen T. Hunker*
First Assistant Attorney General          KATHLEEN T. HUNKER
                                          Special Counsel
                                          Tex. State Bar No. 24118415

                                          Office of the Attorney General
                                          P.O. Box 12548 (MC-009)
                                          Austin, Texas 78711-2548
                                          Tel.: (512) 463-2100
                                          Fax: (512) 457-4410
                                          will.thompson@oag.texas.gov
                                          kathleen.hunker@oag.texas.gov

                                          **Counsel for State Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of January, 2023, the attached State Defendants' Supplemental Objections and Responses to the United States' Second Request of Interrogatories was served on opposing counsel via electronic mail.

                                          */s/ Kathleen T. Hunker*
                                          KATHLEEN T. HUNKER
                                          Special Counsel

## GENERAL OBJECTIONS

Under Rule 26(b)(1), the proper scope of discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (2015). Among the considerations that are germane to that inquiry are "the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The twin demands for relevancy and proportionality "are related but distinct requirements." *Samsung Electronics Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017). Thus, if the information sought is irrelevant to the party's claims or defenses, "it is not necessary to determine whether it would be proportional if it *were* relevant." *Walker v. Pioneer Prod. Servs., Inc.*, No. CV 15-0645, 2016 WL 1244510, at *3 (E.D. La. Mar. 30, 2016). Conversely, "relevance alone does not translate into automatic discoverability" because "[a]n assessment of proportionality is essential." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019). Accordingly, State Defendants object to these requests to the extent that the information sought is either irrelevant or disproportionate.

State Defendants object to the definition of "conviction" or "convicted" as vague, overbroad, and ambiguous. Specifically, the term "an admission or finding of guilt" is subject to different interpretations. State Defendants understand the term to include pleas of guilt, stipulations of guilt, and acknowledgments of the offense. Therefore, State Defendants understand the terms "conviction" and "convicted" not to pertain to cases in which a defendant or suspect pleaded nolo contendere or no contest, or to cases in which a defendant otherwise reached an outcome that—though not a conviction by a judge or jury in a court of law—nonetheless involved violation of Texas Law.

State Defendants also object to the definition of "impermissible in-person voter assistance" as vague and ambiguous. Specifically, it is defined as "the acts of influencing or coercing a voter in the presence of their ballot"; yet Interrogatory No. 4 seeks instances of "impermissible in-person voter assistance" that occurred "by influencing or coercing a voter in the presence of their ballot." Therefore, this definition is tautological, and its meaning is not discernible. For this reason, State Defendants interpret the term "impermissible in-person voter assistance" to mean any in-person voter assistance that is not permissible.

Finally, State Defendants object to the definition of "voting by impersonation" as vague and ambiguous. The definition uses the term "vote harvesting," which is not defined. Therefore, State Defendants adopt the meaning of "vote harvesting" that State Defendants have otherwise used in the course of this litigation. Furthermore, the definition of "voting by impersonation" includes "improperly returning a ballot on behalf of another," which is a broad, sweeping, and undefined category of conduct. For this reason, the term "voting by impersonation" is vague and ambiguous because it is not limited in scope. Hence, State Defendants interpret the term "voting by impersonation" as those instances in which someone illegally votes as or on behalf of someone who is eligible to vote that does not constitute vote harvesting.

These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to State Defendants' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Likewise, these answers and objections are not intended to be, and shall not be construed as, agreement with the United States' characterization of any facts, circumstances, or legal obligations. State Defendants reserve the right to contest any such characterization as inaccurate and object to the Requests insofar as they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

4

State Defendants will provide their answers based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. State Defendants object to and will refrain from extending or modifying any words employed in the Requests to comport with any expanded definitions or instructions. State Defendants will answer the Requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Western District of Texas.

## SPECIFIC OBJECTIONS AND RESPONSES TO THE UNITED STATES' SECOND SET OF INTERROGATORIES

**INTERROGATORY NO. 4**: State each instance in which a person has been convicted of violating Texas law for providing or attempting to provide impermissible in-person voter assistance by influencing or coercing a voter in the presence of their ballot, including but not limited to relevant violations of Sections 64.012(a)(4), 64.036, 276.013(a)(1), and 276.013(a)(6) of the Texas Election Code.

## OBJECTIONS AND RESPONSE:

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case and unduly burdensome, including for the reason that the United States does not limit its request to particular date ranges or particular statutory provisions. To that end, State Defendants object to this interrogatory to the extent that it requires State Defendants to search and examine all case records without limitation to time or statutory provision. *See* Fed. R. Civ. P. 26(b)(1). The Office of the Attorney General of Texas began tracking, investigating, and prosecuting election fraud cases in 2004. Therefore, State Defendants read this interrogatory to seek information dating from 2004 to the present. Furthermore, the Office of the Attorney General of Texas may not be aware of other prosecutions that may have been filed by criminal district attorneys.

Additionally, State Defendants object to this Interrogatory to the extent that it calls for information that is publicly available or otherwise equally accessible to the United States. In that same vein, the Office of the Attorney General has already produced charts of pending and completed prosecutions from the Office of the Attorney General, as well as copies of prosecution-diversion agreement at bates stamped ranges STATE087312–STATE087395. Those materials represent a summary of business records held by the Office of the Attorney General, and ascertaining the information requested in this interrogatory will impose substantially the same burden on OAG as it would Plaintiffs' counsel. Fed. R. Civ. P. 33(d).

Finally, State Defendants object to this interrogatory to the extent that it calls for information subject to investigative privilege, attorney–client privilege, or attorney work-product privilege. Because the Office of the Attorney General is actively involved in investigations and prosecutions of election-related crimes, all three privileges likely apply to on-going investigations and prosecutions.

Subject to and without waiving these objections, State Defendants answer as follows:

The following table represents convictions for providing impermissible in-person voter assistance by influencing or coercing a voter in the presence of his or her ballot but does not include mere instances of such occurrences without convictions:

| Case No. | Name | Location | Resolution Date | Laws Violated | Final Disposition |
|---|---|---|---|---|---|
| S-18-3065-CR; 18-CR-83358 | Rosita Tones Flores | Nueces/ San Patricio County | 6/12/2018 | Tex. Elec. Code§§ 64.012, 86.006, 64.036 | Convicted |
| 06-CR-2166-B | Maria Dora Flores | Nueces County | 8/4/2006 | Tex. Elec. Code§ 64.012 | Pleaded Guilty |
| 11-05590- CRM-CCL1 | Christine Thomas Shank | Brazos County | 2/6/2012 | Tex. Elec. Code§ 64.036 | Pleaded Guilty |
| 1108201lCCL- B | Gilda Hernandez | Dallas/ Rockwall County | 4/5/2012 | Tex. Elec. Code§§ 86.006, 64.036, 86.010 | Pleaded Guilty |
| 4-CCR-02977-A/14-CCR-02983-A/14-CCR-02984-A/14-CCR-02985-A/14-CCR-02987-A/14-CCR-02989-A/14-CCR-02991-A/14-CCR-02993-A/14-CCR-02995-A/14-CCR-02996-A/14-CCR-02997-A/14-CCR-02999-A/14-CCR-03003-A | Tomasa Chavez | Cameron County | 1/22/2015 | Tex. Elec. Code§§ 86.0051, 86.010, 86.006, 64.036 | Pleaded Guilty |
| 14-CCR-02980-A | Facunda Garcia | Cameron County | 3/19/2015 | Tex. Elec. Code§ 64.036 | Pleaded Guilty |

| | | | | | |
|---|---|---|---|---|---|
| 14-CCR-02978-C/14-CCR-02998-C/14-CCR-03000-C/14-CCR-03001-C/14-CCR-03002-C/14-CCR-03004-C/14-CCR-03005-C/14-CCR-03006-C/14-CCR-03007-C/14-CCR-03008-C | Vicenta Verino | Cameron County | 8/19/2015 | Tex. Elec. Code§§ 64.036, 86.010, 86.0051, 86.006 | Pleaded Guilty |
| CR-15-08767- E; CR-15- 08768-E; CR-15-08769-E; CR-15-08770- E; CR-15- 08771-E; CR-15-08772-E; CR-15-08773- E; CR-15- 08774-E; CR-15-08775-E; CR-15-08776- E; CR-15- 08777-E; CR-15-08778-E; CR-15-08779- E; CR-15- 08780-E; CR-15-08781-E | Guadalupe Rivera, Sr. | Hidalgo County | 7/11/2016 | Tex. Elec. Code§ 64.036 | Pleaded Guilty |
| 20080,20081 | Christina Lichtenberger | Duval/Live Oak County | 12/14/2010 | Tex. Elec. Code§§ 64.036, 86.006 | Pleaded Guilty |
| 20082,20083 | Andrea Campos Bierstedt | Duval/Live Oak County | 12/14/2010 | Tex. Elec. Code§§ 64.036, 86.006 | Acknowledgment of Offense |

8

| 14-CCR-02979-A/14-CCR-03010-A/14-CCR-03011-A | Bernice Garcia | Cameron County | 4/8/2015 | Tex. Elec. Code§§ 64.036, 86.006, 86.0051 | Acknowledgment of Offense |
|---|---|---|---|---|---|
| CX3772923814 | Consuelo Barrientos Cantu | Frio County | 6/15/2018 | Tex. Elec. Code§ 64.036 | Stipulation of Guilt |
| CX3772923814 | Maria Delcarmen Vela | Frio County | 6/15/2018 | Tex. Elec. Code§ 64.036 | Stipulation of Guilt |
| 20084, 20085, 20086, 20087, 20088, 20089, 20090,20091 | Alicia Pena Perez | Duval/Live Oak County | 12/14/2010 | Tex. Elec. Code§§ 64.036, 86.006 | Pleaded Guilty |

**INTERROGATORY NO. 5:** State each instance in which a person has been convicted of violating Texas law by voting or attempting to vote by impersonation using a mail ballot, including but not limited to violations of Sections 64.012, 64.036, 276.013(a)(2), 276.013(a)(3), or 276.013(a)(7) of the Texas Election Code.

**OBJECTIONS AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, and unduly burdensome, including for the reason that the United States does not limit its request to particular date ranges or particular statutory provisions. To that end, State Defendants object to this interrogatory to the extent that it requires State Defendants to search and examine all case records without limitation to time or statutory provision. *See* Fed. R. Civ. P. 26(b)(l). The Office of the Attorney General of Texas began tracking, investigating, and prosecuting election fraud cases in 2004. Therefore, State Defendants read this interrogatory to seek information dating from 2004 to the present. Furthermore, the Office of the Attorney General of Texas may not be aware of other prosecutions that may have been filed by criminal district attorneys.

Additionally, State Defendants object to this interrogatory to the extent that it calls for information that is publicly available or otherwise equally accessible to the United States. In that same vein, the Office of the Attorney General has already produced charts of pending and completed prosecutions from the Office of the Attorney General, as well as copies of prosecution-diversion agreement at bates stamped ranges STATE087312-STATE087395. Those materials represent a summary of business records held by the Office of the Attorney General, and ascertaining the information requested in this interrogatory will impose substantially the same burden on OAG as it would Plaintiffs' counsel. Fed. R. Civ. P. 33(d).

Finally, State Defendants object to this interrogatory to the extent that it calls for information subject to investigative privilege, attorney-client privilege, or attorney work-product privilege. Because the Office of the Attorney General is actively involved in investigations and prosecutions of election-related crimes, all three privileges likely apply to on-going investigations and prosecutions.

Subject to and without waiving these objections, State Defendants answer as follows:

State Defendants understand this interrogatory not to pertain to cases involving violation of Texas Law for voting or attempting to vote by impersonation not through the use of a mail ballot. Nor do State Defendants understand this interrogatory to pertain to cases that might also constitute vote harvesting. Therefore, State Defendants identify the following convictions for voting or attempting to vote by impersonation using a mail ballot but do not include mere instances of such occurrences without convictions:

| Case No. | Name | Location | Resolution Date | Laws Violated | Final Disposition |
|---|---|---|---|---|---|
| B-05-2101-0- CR-B | Melva Kay Ponce | Bee County | 7/26/2005 | Tex. Elec. Code§ 64.012 | Pleaded Guilty |

**SUPPLEMENTAL RESPONSE:** Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, the individual and case identified above remains the only instance that is responsive to this interrogatory.

**INTERROGATORY NO. 6:** State the number of voters who have collected, modified, or added a Texas driver's license number, Texas election identification certificate number, Texas personal identification card number, or the last four digits of their social security number to their voter registration record using any online portals provided pursuant to SB 1 from December 2, 2021 until the present, disaggregated by portal. In answering this interrogatory, do not include voter registration information submitted or updated as part of an online driver license renewal or change-of-address transaction, pursuant to Section 5 of the National Voter Registration Act, 52 U.S.C. § 20504, and the settlement agreement in *Stringer v. Hughs,* No. 5:21-cv-46 (W.D. Tex.).

**OBJECTIONS AND ORIGINAL RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. Additionally, State Defendants object to this interrogatory to the extent that it requests information through "the present," which would result in the inclusion of incomplete and inaccurate information if applied to the May 7, 2022 election, for which early voting began on April 25, 2022. Subject to and without waiving these objections,

State Defendants answer as follows:

State Defendants do not possess the capability to provide information responsive to this interrogatory. Aside from the methods specifically excluded in the interrogatory itself, the only "online portal[]" through which the referenced identifying information could have been updated by a voter is located on the Texas.gov website. That website is maintained by the Texas Department of Information Resources, which is not a party to this case. A voter is required to enter his current driver license number, ID number, voter registration card VUID, and Social Security Number in order to access this portal for the purpose of updating the voter's name or address. The identifying information of voters who submit a change of name or address on Texas.gov is transmitted to the Office of the Texas Secretary of State ("SOS") on a nightly basis. If the TEAM database is missing the driver license/ID number or Social Security number disclosed by the voter in gaining access to Texas.gov, that voter's missing information is updated in TEAM.

There is no individual field or combination of fields in TEAM that would allow State Defendants to isolate the specific information requested in this interrogatory. The TEAM system contains an audit log that tracks the history of changes or updates made to a voter's record, but that audit log does not differentiate between the types of changes offered through the Texas.gov system. Because of these limitations that are inherent in the TEAM system, State Defendants are unable to provide data that is responsive to this interrogatory.

**SUPPLEMENTAL RESPONSE:**

Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, State Defendants remain unable to provide data responsive to this interrogatory.

**INTERROGATORY NO. 7:** State the number of voters who have cured identification defects in their Application for a Ballot By Mail using any online portals provided pursuant to SB 1 from December 2, 2021 until the present, disaggregated by portal.

**OBJECTIONS AND ORIGINAL RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. Additionally, State Defendants object to this interrogatory to the extent that it requests information through "the present," which would result in the inclusion of incomplete and inaccurate information if applied to the May 7, 2022 election, for which early voting began on April 25, 2022. Subject to and without waiving these objections, State Defendants answer as follows:

The only "online portal[]" through which identification defects in a voter's Application for a Ballot By Mail ("ABBM") may be cured is the Ballot by Mail Tracker available at VoteTexas.gov.[2] A voter can use the Tracker to cure an initial failure to provide any of the required personal identification numbers or if the numbers provided do not match the voter registration record. While SOS can

---

[2] https://teamrv-mvp.sos.texas.gov/BallotTrackerApp/#/login

determine the number of voters who used the Tracker to correct a defect in their ABBM and subsequently had their ABBM accepted, this total does not necessarily provide the exact information requested in this interrogatory. That is because the TEAM system is a living database that captures only the current or most recent status associated with any information in a voter's record. Therefore, State Defendants can only provide ABBM figures for the March 1, 2022 Primary reflecting the final status of voters in the TEAM system. With those caveats and limitations in mind, State Defendants can represent that the total number of ABBMs submitted for the March 1, 2022 Primary was 264,647; the total number of voters who used the Tracker to correct a defect in their ABBM was 364; and the total number of those voters who used the Tracker to correct a defect in their ABBM and either had their ABBM accepted or cancelled their application and instead voted in person was 237.

**SUPPLEMENTAL RESPONSE:** Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, State Defendants supplement their response with the following counts as calculated by the Texas Secretary of State:

> May 7, 2022 Constitutional Amendment Election
> Total number of ABBMs submitted: 288,865.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM: 48.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM and had their ABBM accepted or cancelled their application and voted in person: 16.

> May 24, 2022 Primary Runoff Election
> Total number of ABBMs submitted: 280,277.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM: 11.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM and had their ABBM accepted or cancelled their application and voted in person: 7.

> November 8, 2022 General Election
> Total number of ABBMs submitted: 431,571.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM: 523.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM and had their ABBM accepted or cancelled their application and voted in person: 419.

**INTERROGATORY NO. 8:** State the number of voters who have cured carrier envelope identification defects using any online portal provided pursuant to SB 1 from February 9, 2022 to present, disaggregated by portal.

**OBJECTIONS AND ORIGINAL RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. Additionally, State Defendants object to this interrogatory to the extent that it requests information through "the present," which would result in the inclusion of incomplete and inaccurate information if applied to the May 7, 2022 election, for which early voting began on April 25, 2022. Subject to and without waiving these objections, State Defendants

answer as follows:

The only "online portal[]" through which a voter may cure carrier envelope identification defects is again the Ballot by Mail Tracker available at VoteTexas.gov. Using this portal, a voter can cure the following three defects:

1. The carrier envelope did not contain the voter's Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number, or the Last 4 digits of his Social Security Number;
2. The identification number provided by the voter did not match the number associated with his voter registration record; or
3. The voter was not issued one of the documents with the required number and did not indicate this fact on the carrier envelope.

SOS can determine the number of voters who used the Tracker to correct a defective carrier envelope and subsequently had their mail-in ballot accepted, but this total does not necessarily provide the exact information requested in this interrogatory. That is because the TEAM system is a living database that captures only the current or most recent status associated with any information in a voter's record. Therefore, State Defendants can only provide mail ballot figures for the March 1, 2022 Primary reflecting the final status of voters in the TEAM system. Considering those limitations, State Defendants can represent that the total number of mail ballots submitted for the March 1, 2022 Primary was 198,947; the total number of voters who used the Tracker to correct a defective carrier envelope was 2,628; and the total number of voters who used the Tracker to correct a defective carrier envelope and either had their mail ballot accepted or cancelled their mail ballot and instead voted in person was 1,788.

**SUPPLEMENTAL RESPONSE:** Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, State Defendants supplement their response with the following counts as calculated by the Texas Secretary of State:

May 7, 2022 Constitutional Amendment Election
Total number of mail ballots submitted: 190,469.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope: 1,017.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope and had their mail ballot accepted or cancelled their mail ballot and voted in person: 937.

May 24, 2022 Primary Runoff Election
Total number of mail ballots submitted: 183,260.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope: 1,071.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope and had their mail ballot accepted or cancelled their mail ballot and voted in person: 1,063.

November 8, 2022 General Election
Total number of mail ballots submitted: 345,679.

Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope: 1,531.

Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope and had their mail ballot accepted or cancelled their mail ballot and voted in person: 1,496.

EXHIBIT
51

Message
_____

**From:**        Elections Internet [Elections@sos.texas.gov]
**Sent:**        3/9/2022 3:25:43 PM
**To:**
**CC:**          Elections Internet [Elections@sos.texas.gov]
**Subject:**     RE:
_____


Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

To find the application for ballot by mail (ABBM) and instructions on submitting the application, please
visit our website:
https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwebservices.sos.state.tx.us%2Fforms%2F5
-
15f.pdf&amp;data=04%7C01%7CElections%40sos.texas.gov%7Ce7642fd3c89e445e602f08da01e113da%7C760188c0f63443a
096dfec1b8eca6719%7C0%7C0%7C637824363456299788%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMz
IiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000&amp;sdata=bDpnoJUU2Ga2e4Mg1GVrk82nZHWv37%2BkXBOnc3eXbek%3D&amp;re
served=0. You can also contact your Early Voting Clerk to request an application be mailed to you.

Your completed ABBM needs to be submitted to the Early Voting Clerk in your home Texas County.

Contact information for the Early Voting Clerk in your Texas County is available here:
https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.sos.state.tx.us%2Felections%2Fvoter
%2Fcounty.shtml&amp;data=04%7C01%7CElections%40sos.texas.gov%7Ce7642fd3c89e445e602f08da01e113da%7C760188c
0f63443a096dfec1b8eca6719%7C0%7C0%7C637824363456299788%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIj
oiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000&amp;sdata=qb025okJFWQOigdurFzvEve2Gz0vOlEp3fXqbHaL6hI%3D&
amp;reserved=0.

Your application for a ballot by mail can be submitted via mail, in-person delivery by the voter before
the start of early voting, or email.  Note that if you are emailing your completed ABBM to the Early
Voting clerk, then the original, hard copy of the application MUST be mailed and received by the Early
Voting clerk no later than the 4th business day after receiving the emailed ABBM.

Again, thank you for contacting our office.

Elections Division
Office of the Secretary of State
800-252-VOTE(8683)
https://gcc02.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.sos.state.tx.us%2Felections%2Findex.
shtml&amp;data=04%7C01%7CElections%40sos.texas.gov%7Ce7642fd3c89e445e602f08da01e113da%7C760188c0f63443a09
6dfec1b8eca6719%7C0%7C0%7C637824363456299788%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIi
LCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000&amp;sdata=%2BsiBOPcnVrqSiGsr4eBrL1MRMx55B70T584SVfWVvZY%3D&amp;rese
rved=0
For Voter Related Information, please visit:

The information contained in this email is intended to provide advice and assistance in election matters
per §31.004 of the Texas Election Code.  It is not intended to serve as a legal opinion for any
matter.  Please review the law yourself, and consult with an attorney when your legal rights are
involved.

-----Original Message-----
From:
Sent: Wednesday, March 9, 2022 9:09 AM
To: Elections Internet <Elections@sos.texas.gov>
Subject:

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open
attachments unless you are expecting the email and know that the content is safe. If you believe this to
be a malicious or phishing email, please send this email as an attachment to
Informationsecurity@sos.texas.gov.

My husband turned 65 and requested a mail in ballot. He put both his TDL and SSN on the application. He
never got a ballot! (He's white!) How can he be sure to get a ballot for midterm elections??

Sent from my iPhone

STATE140711

# EXHIBIT 52

DECLARATION OF J. SCOTT WIEDMANN

1. My name is Joseph Scott Wiedmann.  I reside in Clifton, Virginia.  I am the Acting Director of the Federal Voting Assistance Program ("FVAP" or "the Program") in the United States Department of Defense ("DoD"), and have served in this capacity since 2022. After originally joining the FVAP in 1993, I have served in various capacities within FVAP with my most recent tenure as Acting Director.

2. Acting pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S. Code § 20301 ("UOCAVA" or the "Act"), the President of the United States on June 8, 1988, in Executive Order 12642, designated the Secretary of Defense to coordinate and facilitate all actions required to discharge federal responsibilities under the Act.  Through the promulgation of DoD Instruction 1000.04, these responsibilities are assigned to FVAP.

3. UOCAVA protects the voting rights of U.S. citizens who are active members of the Uniformed Services, the Merchant Marine, the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, their eligible family members and U.S. citizens residing outside the United States. UOCAVA provides the legal basis for absentee voting requirements for these citizens.

4. FVAP supports all eligible voters, both military and civilian, with the absentee voting process through consultations within the Department of Defense and the appropriate departments and agencies of the federal government. Through the dissemination of information FVAP assists potential voters, inclusive of members of the uniformed services, their eligible family members and overseas citizens to communicate with their election offices.

5. Pursuant to the Act, the Program is responsible for prescribing two key absentee voting related forms associated with establishing federal election eligibility for covered individuals. The Federal Post Card Application ("FPCA") acts as a simultaneous voter registration and absentee ballot request, and the Federal Write-In Absentee Ballot ("FWAB") acts as a "backup ballot" should the ballot requested from a state election office not arrive or remain unavailable. The Program also compiles and publishes information on state-by-state absentee registration and voting procedures in a Voting Assistance Guide and online at FVAP.gov, which is distributed to Voting Assistance Officers serving in our military as well as U.S. embassies and consulates.  At its core, the information provided in the Voting Assistance Guide and on FVAP.gov is intended to help eligible voters successfully navigate the absentee voting processes prescribed by states by understanding key state election dates and deadlines for submission of documents.  FVAP's products and web site also provide instructions on how voters can complete and submit the FPCA and FWAB to their state of legal voting residence.

6. As authorized by 52 U.S. Code § 20301(b), the FPCA is intended to serve as a simultaneous instrument for eligible U.S. citizens to register and request absentee ballots from their legal voting jurisdiction. Section 20302(a)(4) requires that "each State shall use the official post card for simultaneous voter registration application and absentee ballot application." State requirements under UOCAVA also include transmitting requested blank absentee ballots to voters by the 45th day prior to elections for federal office and offering an electronic option for the transmission of

blank ballots if requested. States must also notify a voter if, and why, a registration or ballot request is rejected, and provide a free access system for voters to verify receipt of a ballot. The sense of Congress enshrined in UOCAVA is that election administrators should be aware of the importance of the ability of each uniformed services member to vote, and perform their election administrator's duties with the intent to ensure that each uniformed services voter receive the utmost consideration and that each valid ballot is duly counted. Further, it provides that "all eligible American voters, regardless of race, ethnicity, disability, the language they speak, or the resources of the community in which they live, should have an equal opportunity to cast a vote and to have that vote counted."

7. I am familiar with the challenges of supporting the absentee voting process for active duty military personnel and their families stationed away from their legal voting residence, either domestically or overseas, and for those United States citizens residing overseas. UOCAVA was amended in 2010 after Congress determined the need for a minimum 45-day ballot transmission and return timeframe, coupled with electronic transmission of the blank absentee ballot. The intent is to allow voters sufficient time to receive, vote, and return absentee ballots.

8. FVAP conducts post-election surveys of active duty military voters after each regularly scheduled general election for federal office. The 2020 post-election survey found that military members expressed difficulties with several aspects of the absentee voting process: the voter registration and ballot request process; not receiving an absentee ballot from their state or the ballot arriving too late; reaching the state's election website; returning the ballot; and the mailing system.

9. On October 8, 2021, the State of Texas completed its coordination with FVAP and approved supporting instructions for the 2022-23 Voting Assistance Guide and FVAP.gov for the completion of the FPCA and its submission to appropriate Texas local election offices. The approved instructions specified to UOCAVA voters: "You must provide either a Texas-issued ID number or the last four digits of your Social Security Number. If you do not have either of these numbers you must enter in Section 6: 'I do not have a Social Security Number or Texas-issued ID number.'"

10. During the 2022 general election FVAP responded to calls and emails from Texas UOCAVA voters who had questions regarding what identification numbers to provide on voting forms. FVAP personnel used informal guidance provided by the Texas Secretary of State's Office stating that it is "permissible to provide both numbers" (Texas-issued ID number and the last four digits of their Social Security Number). Since both numbers are not *required*, no changes were made to the guidance provided on FVAP.gov. FVAP standard operating procedures require that state information contained on FVAP.gov reflect the Chief Election Official's approved instructions to voters (which in 2022 stated that voters must provide one *or* the other number).

11. I am familiar with instructions issued by the Texas Secretary of State's office contained in Elections Advisory 2021-18, which provides guidance and clarification on the review and acceptance of returned voted ballots where election officials determine a supporting carrier envelope contains defects under S.B. 1. As described, an Early Voting Ballot Board and Signature Verification Committee may convene between 20 days and four days prior to an election for federal offices to review returned carrier envelopes and review them for defects. If a defect is found in a carrier envelope for a voted ballot, the responsible board may determine it would be

possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day. In that case, the responsible board shall return the carrier envelope to the voter by mail. If, however, the board determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the board may notify the voter of the defect by phone or email along with information instructing that the voter may cancel their mail ballot or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. Given the time and distance complexities associated with voters attempting to vote absentee under UOCAVA, this provision effectively provides no choice in terms of correcting a defect for these voters. The potential for an active duty military service member or an overseas citizen to successfully return in person to the early voting clerk's office within six days of the election is extremely unlikely and cost prohibitive.

12. I am familiar with instructions issued by the Texas Secretary of State's office contained in Elections Advisory 2022-08 and the impacts on "Federal Post Card Application (FPCA) Voters." This would allow "FPCA voters" who have a defect in their signature sheet to submit a corrected signature sheet by email, fax, personal delivery, or mail. This would increase the number of interactions required for a voter to successfully complete the absentee voting process, which could eliminate military voters in remote or sensitive locations, as well as those who may not have regular internet access. FVAP 2020 post-election surveys show that while about nine out of ten active-duty military have reliable internet access, just under three in four have reliable printer access, and fewer than two-thirds have reliable access to a scanner. Fewer than one in four active duty military members report reliable access to a fax machine.

13. It is my understanding, based on instructions issued by the Texas Secretary of State's office contained in Elections Advisory 2022-08, that the online mechanisms provided by the state of Texas may be difficult to access for correcting reported defects as the login requires both the same social security and state identification number as what is on file. However, the voter may not have used both numbers when originally registering to vote. Another concern is the means by which an election official may choose to contact a voter with a defect on their signature sheet. It is unclear how this notification would occur, as it states notification is required to be same method by which all voters are contacted. U.S. citizens around the world will be in different time zones and may not be available to receive a phone call from a Texas county election official, and the time for mail to travel to the voter for a return response could severely limit the potential for a successful correction.

14. In general, I am of the understanding that S.B. 1 as implemented may negatively impact the ability of military members, their eligible family members, and overseas U.S. citizens to successfully register, request, and cast an absentee ballot in Texas elections for federal offices. Many of these citizens depend on the federally prescribed forms and accompanying instructions to provide voter registration and absentee ballot request upon submission. However, S.B. 1 appears to impose a series of multiple follow-up communications in relatively short timeframes for ballot requests or for absentee ballots found to be defective under S.B. 1. This can lead to disenfranchisement, as these voters are regularly in situations where internet access, electronic communications, and postal delivery are not reliably or consistently available.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 22, 2023.

WIEDMANN.J
.SCOTT.1229
663301

Digitally signed by
WIEDMANN.J.SCOTT.
1229663301
Date: 2023.05.22
11:31:25 -04'00'

J. Scott Wiedmann

EXHIBIT

53

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br>*Plaintiffs*,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br>*Defendants*. | 5:21-cv-0844-XR |
| OCA-GREATER HOUSTON, et al.,<br>*Plaintiffs*,<br><br>v.<br><br>TEXAS SECRETARY OF STATE JOHN SCOTT,<br>et al.,<br>*Defendants*. | 1:21-cv-0780-XR |
| HOUSTON JUSTICE, et al.,<br>*Plaintiffs*,<br><br>v.<br><br>GREGORY WAYNE ABBOTT, et al.,<br>*Defendants*. | 5:21-cv-0848-XR |
| LULAC TEXAS, et al.,<br>*Plaintiffs*,<br><br>v.<br><br>JOHN SCOTT, et al.,<br>*Defendants*. | 1:21-cv-0786-XR |
| MI FAMILIA VOTA, et al.,<br>*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, et al.,<br>*Defendants*. | 5:21-cv-0920-XR |

1

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                              *Plaintiff*,<br><br>        v.<br><br>STATE OF TEXAS, et al.,<br>                              *Defendants*. | 5:21-cv-1085-XR |

**<u>Expert Report of Professor Douglas L. Kruse, Ph.D.</u>**

**Distinguished Professor**
**Rutgers School of Management and Labor Relations**
**Co-Director, Program for Disability Research**
**94 Rockafeller Road**
**New Brunswick, N.J. 08903**

On Behalf of Plaintiffs in *La Unión Del Pueblo Entero, et. al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.; and OCA-Greater Houston, et al. v. Esparza, et al.*, Case No. 5:21-cv-844(XR)

February 28, 2022

## Declaration of Professor Douglas L. Kruse, Ph.D.

I, Douglas Kruse, do hereby declare as follows:

I have been retained to act as an expert witness for the Plaintiffs in the above-captioned action.

Attached hereto as Exhibit A is a true and accurate copy of my February 28, 2022 Report in support of Plaintiffs' case, and the exhibits attached thereto (collectively, my "report").

My report describes the primary data and other information I considered in forming my opinions.

My CV is attached as Appendix A to my report, and sets forth my qualifications and all publications I have authored in the past 10 years.

Within the last four years, I have not provided reports as an expert witness or court monitor in any cases.

I am compensated for work on my report at a rate of $200 per hour.

I respectfully adopt and incorporate into this Declaration my report, which describes the testimony I am offering in support of Plaintiffs' case.

I understand and intend that my report is to be presented to the Court with the same weight and consequences as if I had stated the report orally, under oath, in a court of law. I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

I am aware that discovery in this case is ongoing, and I reserve the right to continue to supplement the foregoing report in light of additional facts, testimony, and/or materials that may come to light.

Executed this February 28, 2022, in Mercer County, New Jersey.

Douglas L. Kruse, Ph.D.

2

**Report on Texas voting lawsuit**
**February 28, 2022**

# PURPOSE OF ENGAGEMENT

**1.**　　I have been retained by Plaintiffs in *La Union Del Pueblo Entero, et al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.*; and *OCA-Greater Houston, et al. v. Esparza, et al*., Consolidated Case No. 5:21-cv-844 (W.D. Tex.) to provide my expert opinions on issues related to the ways in which SB 1 erects barriers that harm voters with disabilities by impeding their access to voting in the State of Texas.

# QUALIFICATIONS

**2.**　　I am currently a Distinguished Professor in the School of Management and Labor Relations at Rutgers University.  I have been a Research Associate at the National Bureau of Economic Research in Cambridge, Massachusetts since 1995, and a Research Fellow at the IZA Institute of Labor Economics in Bonn, Germany since 2016.  In 2013-14, I served as a Senior Economist at the Council of Economic Advisers in the Executive Office of the President in Washington, D.C.

**3.**　　I received my Bachelor's Degree in Economics from Harvard University in 1981, my Master's Degree in Economics and Certification in Public Policy Analysis and Program Evaluation from the University of Nebraska-Lincoln in 1983, and my Ph.D. in Economics from Harvard University in 1988.

**4.**　　At Rutgers I am Co-Director of the Program for Disability Research, and am Associate Director of the Institute for the Study of Employee Ownership and Profit Sharing.  I have also served as our school's Associate Dean of Academic Affairs, and as Ph.D. Director where I oversaw Ph.D. students in their coursework, exams, and dissertations.

**5.**　　My research focuses on two areas: 1) economic, social, and political inclusion of people with disabilities, with a focus on the relationship of disability to employment and political participation, and 2) the causes, consequences, and implications of employee ownership and profit sharing plans.

**6.**　　I have authored, co-authored, or edited 14 books, along with 123 journal articles or book chapters, and 22 reports.  The book publishers include Cambridge University Press, University of Chicago Press, and Yale University Press among others.  Four of the books and 40 of the articles and book chapters have been published within the past 10 years.  My research has been cited over 12,000 times according to Google Scholar.

**7.**　　I have substantial expertise on the topic of voting among people with disabilities.  I have been principal investigator (PI) or Co-PI on four grant-funded national post-election surveys on the voting experiences of people with and without disabilities.  Two of these surveys were funded by the U.S. Election Assistance Commission.  Following the release of key results, the data were further analyzed with results published in peer-reviewed journals; one of these articles received a major award from the Western Political Science Association.  In addition to these

4

surveys, I have analyzed U.S. Census microdata after each election since 2008 and co-authored fact sheets with detailed analyses of disability and voter turnout in each election, along with pre-election fact sheets projecting the number of eligible voters with disabilities in 2016 and 2020. The most recent fact sheet analyzing the 2020 election was jointly released with the U.S. Election Assistance Commission.

**8.**      My professional service includes being Associate Editor of the British Journal of Industrial Relations from 2011 to 2021, and Associate Editor of the Journal of Participation and Employee Ownership from 2017 to the present.  My service to society includes being a member of the President's Committee on Employment of People with Disabilities from 1998 to 2000, and a member of the State Rehabilitation Advisory Council, New Jersey Division of Vocational Rehabilitation from 1999 to 2013.

**9.**      I have testified four times before Congress on my economic research.

**10.**      I have been PI or Co-PI on 24 grants with total funding of $16.4 million.  Currently I am PI or Co-PI on four disability-related grants, including two 5-year grants for centers funded by the National Institute on Disability, Independent Living, and Rehabilitation Research in the U.S. Department of Health and Human Services.

# EXECUTIVE SUMMARY

**11.**      The U.S. Department of Justice–charged with enforcing and interpreting the Americans with Disabilities Act (ADA)–has explained:

> Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, many people with disabilities have been excluded from this core aspect of citizenship.  People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities.  People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp.  People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.[1]

**12.**      This report finds that:

**13.**      Voting eligible people with disabilities vote at lower rates than those without disabilities, vote by mail significantly more often than those without disabilities, and experience barriers to voting—both in person and by mail—more frequently than people without disabilities.

**14.**      At least 3 million voting-eligible Texans have disabilities.

**15.**      Voting-eligible citizens in Texas with disabilities face a myriad of barriers in accessing voting stemming from high rates of needing assistance in activities of daily living, higher

---

[1] *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, U.S. DEPARTMENT OF JUSTICE, October 10, 2014, https://www.ada.gov/ada_voting/ada_voting_ta.htm.

likelihood of living alone, lower likelihood of having a vehicle they can drive, other barriers to travel, lower likelihood of internet access, and lower average education levels compared to those without disabilities. Voting-eligible disabled citizens in Texas are more socially isolated which limits their support networks for assistance in voting.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the barriers to obtaining necessary resources and assistance in exercising the right to vote.

16.     Only 59.4% of voting-eligible people with disabilities in Texas voted in 2020, compared to 64.5% of those without disabilities.  The 5.1 percentage point gap is well outside the statistical margin of error, so we can be highly confident of a true gap in the population.

17.     Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot.

18.     While specific data on voting difficulties by disability status are not available in Texas, national data show a high rate of voting difficulties among people with disabilities. In 2020, 21.3% of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities. There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

19.     Based on these findings, and in my expert opinion, several provisions of SB 1 will pose barriers to Texas citizens with disabilities who wish to exercise their right to vote.

20.     Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 place restrictions on mail voting for applications and correcting rejected applications that will burden many people with disabilities who find it less difficult to vote by mail due to their disabilities.

21.     Section 6.01 requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  This new requirement will create additional barriers for voters with disabilities who rely on group transportation to vote curbside.  Because many people with disabilities face transportation barriers and social isolation, this new requirement will make it harder for some people with disabilities to find people willing to provide transportation assistance.

22.     Section 6.04 adds language to the assistor oath which substantially restricts the types of assistance that can be given, which will burden people with disabilities who, because of their disabilities, need assistance to vote.  There are many types of assistance people with disabilities need that go beyond the assistance permitted by SB 1. Because many people with disabilities will need this assistance, this restriction will interfere with many people's ability to vote.

23.     Sections 6.03 and 6.05 create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. Because people with disabilities are far more likely to use curbside voting and many people with disabilities need voting assistance, this will create an extra barrier to voting for some people with disabilities in finding people willing to provide assistance. It will also increase the likelihood that a voter's ballot will be rejected, either due to a

clerical error because they had inadequate assistance, or a mistake in the documentation of the assistance they did receive.

**24.**    Section 6.06 makes it a crime to compensate (or offer, solicit, receive, or accept compensation for) someone for helping a voter vote by mail. While there is an exception for previously known attendants or caregivers, this section will prohibit people with disabilities from getting assistance from a substantial number of people who they may have routinely turned to, including close friends or neighbors. It will also prohibit people with disabilities from getting assistance from staff or volunteers with community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community.

**25.**    Section 7.04 makes it a crime   to receive any form of compensation or    benefit for collecting another voter's mail ballot. It also criminalizes in-person interaction with a voter about a specific candidate or measure, in the physical presence of a ballot, while receiving any form of compensation or benefit.  This provision will impose barriers on    people with disabilities who require assistance to vote, who live alone and face transportation barriers, and who may benefit from assistance while continuing to vote independently.

**26.**    In sum, in my expert opinion, these provisions of SB 1 will harm a significant number of Texans with disabilities and impose new barriers to them in exercising the right to vote.

# DEFINITION OF DISABILITY

**27.**    The ADA protects all those with a substantial limitation in one or more major life activities. The U.S. Department of Justice has explained:

> The term 'substantially limits' shall be construed  broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA…The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.[2]

# INTERPRETING THE DATA

**28.**    This report presents an overview of the prevalence and characteristics of people with disabilities, drawing on analysis of six nationally representative surveys.  Three of these surveys are conducted by the U.S. Census Bureau:  the American Community Survey (ACS), the Survey of Income and Program Participation SSA Supplement (SIPP), and the Current Population Survey Voting and Registration Supplement (CPS).[3] The other three surveys are the National

---

[2] *Questions and Answers about the Department of Justice's Notice of Proposed Rulemaking to Implement the Americans with Disabilities Act Amendments Act of 2008*, U.S. DEPARTMENT OF JUSTICE, January 30, 2014, https://www.ada.gov/nprm_adaaa/adaaa-nprm-qa.htm.

[3] *See American Community Survey*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/cps/about/supplemental-surveys.html (last visited 2/28/2022) (the relevant supplemental surveys are the Social Security Administration Supplement and Voter Registration Supplement, in addition to the general survey).

Household Travel Survey (NHTS) conducted by the Federal Highway Administration, the Survey of the Performance of American Elections (SPAE) conducted by the Caltech/MIT Voting Technology Project, and the Disability and Voting Accessibility Survey (DVAS) sponsored by the U.S. Election Assistance Commission and conducted by Rutgers University and SSRS Inc.[4] Each of these surveys has a large sample and uses a combination of methods to obtain information on a wide range of population characteristics.  Responding households are chosen randomly, and any differences from known values in the population are corrected using statistical weights in order to ensure the final sample is representative of the population.

**29.**    I rely on ACS data where the measures are available, because this dataset: i) has a much larger sample size ensuring estimates with smaller margins of error, and ii) is more comprehensive by including residents living in group quarters, unlike the SIPP, CPS, and NHTS. Group quarters are categorized in ACS into either "institutional" settings (nursing homes, mental hospitals, and correctional facilities) or "non-institutional" settings (college dorms, military barracks, group homes, missions, and shelters).  As will be explained below, people with disabilities are both significantly more likely than those without disabilities to be living by themselves when living in the community, and are also more likely to be living in institutional group quarters.  To the extent that people with disabilities in institutional group quarters have more severe disabilities and face greater barriers, the CPS, SIPP, and NHTS will underreport the disparities faced by people with disabilities overall.

**30.**    The ACS and CPS have measures of both age and citizenship, so I limit the samples to the voting-eligible population (citizens age 18 or older).  The DVAS includes only the voting-eligible population, and the SPAE includes only registered voters.  The SIPP and NHTS have age but not citizenship measures, so estimates from those surveys are based on the voting-age population (age 18 or older).

**31.**    The ACS and CPS measure disability using six questions.  Four of the questions measure impairments (vision, hearing, cognitive, and mobility), and two of the questions measure activity limitations (difficulty dressing or bathing, and difficulty going outside alone).  These questions were chosen after extensive cognitive research by the Census Bureau, using interviews and focus groups to ascertain how respondents understood and interpreted the survey questions, to maximize the likelihood that answers to the final chosen questions would reflect accurate reporting of disabilities rather than alternative understandings of the questions.[5]  SIPP uses a more extensive set of over 100 questions to derive its disability measure.  The DVAS measures

---

[4] *National Household Travel Survey, U.S. Department of Transportation*, FEDERAL HIGHWAY ADMINISTRATION, https://nhts.ornl.gov/ (last visited 2/28/2022); *Survey of the Performance of American Elections*, MIT ELECTION LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections (last visited 2/28/2022); *U.S. Election Assistance Commission Study on Disability and Voting in the 2020 Elections*, https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020 (last visited 2/28/2022).

[5] Kristen Miller and Theresa J. Demaio, *Report of Cognitive Research on Proposed ACS Disability Questions*, US CENSUS BUREAU, August 28, 2006, https://www.census.gov/library/working-papers/2006/adrm/ssm2006-06.html.

disability using the six ACS and CPS questions plus a seventh broader question, whereas the NHTS and SPAE each use one general question to measure disability.

**32.**     An important note is that the six questions used by the ACS and CPS are likely to capture only a portion of the full disability population (as defined by the broad ADA definition described above).  One issue is that people might underreport disabling conditions, as found in research comparing subjective reports to objective reports of health conditions.[6]  A second important issue is that measuring disability is made difficult by the wide variation in types of disability (e.g., hearing, vision, mobility, cognitive, developmental, chronic illnesses, and others) and the severity of disabilities (e.g., whether the condition causes a major or mild limitation in life activities).  Asking about all types of disabilities is not feasible in a survey, and due to the wide variation it is inevitable that any set of questions will miss some disabilities.  The six standard Census questions are likely to undercount speech impairments and learning disabilities, as well as mental illnesses such as depression and bipolar disorder.  They may also undercount people with episodic conditions that wax and wane such as epilepsy, Lupus, and Multiple Sclerosis, and conditions like cancer, long-COVID, or back problems that cause pain or fatigue. The Census surveys nonetheless provide a valuable window on a large portion of the disability population.  Because the six questions are likely to undercount certain types of disabilities, I also present results from a more extensive set of disability questions used in a SIPP module in 2014.  These more extensive questions have not been used in any major survey since 2014.  Due to the greater number of questions that cover a broader range of disabilities, the SIPP is likely to be a more comprehensive portrait of the disability population, although it has the drawback that it excludes people in institutional group quarters and does not have a citizenship measure as noted above.

**33.**     In this report I focus on the population of people with disabilities living in Texas.  The ACS has a large sample size of 127,398 for Texas, while the SIPP and CPS have smaller samples of 1,569 and 4,290.  The NHTS has a sample size of 44,040 for Texas.  These sample sizes are more than the standard sample size of 1,000 used to obtain reliable estimates within large populations.  Due to the smaller samples in SIPP and CPS, in several breakdowns I complement the Texas numbers from those surveys with numbers for the overall U.S., plus estimates of the significance of any differences between the U.S. and Texas samples.  The SPAE and DVAS have good samples for national estimates but do not have large enough samples within Texas for meaningful analysis, so I only present national figures from those surveys.

**34.**     In a number of places, I compare results between people with and without disabilities, showing that people with disabilities face economic and social disparities and higher rates of voting difficulties that are linked to lower voter participation.  These disparities are maintained when holding constant the effects of demographic characteristics (race, ethnicity, gender, age, and educational attainment).  The effects of disability may be even greater than indicated by the simple difference between people with and without disabilities, because voters without disabilities may face many other non-disability-related difficulties, such as language barriers.

**35.**     All estimates presented in this report use survey weights to ensure the sample is representative of the disability population on key characteristics.  Due to the pandemic possibly

---

[6] Michael Baker, Mark Stabile, and Catherine Deri, *What do self-reported, objective, measures of health measure?*, 39 J. HUMAN RESOURCES 1067 (2004).

affecting survey responses, the Census Bureau issued the 2020 ACS data with experimental weights, which I use in this report.  To ensure the results did not change substantially due to the pandemic, I have also made comparisons to the 2019 ACS data.  The results of this comparison (not reported here but available on request) are very similar on all key variables between 2019 and 2020.

**36.**     In short, the Census surveys do a reasonable job of providing a portrait of a large portion of the disability population, and are extensively used by scholars in peer-reviewed research on the status of people with disabilities.  To the extent that they undercount people with disabilities, they will undercount the number of people who face disability-related disparities and challenges in voting and other important activities.

# OVERVIEW: PREVALENCE AND GENERAL CHARACTERISTICS OF PEOPLE WITH DISABILITIES AND IMPLICATIONS FOR VOTING ACCESS

## Summary

**37.**     In order to fully understand the extensive barriers people with disabilities face in accessing their fundamental right to vote, it is critical to provide an overview of the general barriers people with disabilities face in their daily lives and how each of these factors can impact access to voting. People with disabilities are likely to face a myriad of barriers in exercising the right to vote.  These barriers can stem from a number of disability-related issues, including the need for assistance in activities of daily living, increased likelihood of living alone, lower likelihood of having a vehicle one can drive, other barriers to traveling, lower likelihood of internet access, and lower levels of education.  In addition, the lower economic status of people with disabilities, reflected in lower incomes and higher poverty rates, creates challenges in exercising the right to vote.  For example, people with disabilities are less likely to have the money to buy computers or own their own vehicles, making it harder to access information or get to election offices and polling sites. The social stigma many people with disabilities experience further compounds the difficulties they face in accessing voting.

## Overall Prevalence and Types of Disability

**38.**     Both ACS and SIPP data can be used to provide estimates of the number of people with disabilities in Texas. The ACS uses only 6 questions so is a more conservative estimate, while the SIPP disability measure is based on over 100 questions and is a more expansive estimate. Based on the 2020 ACS 6-question measure, Table 1 shows that 15.6% of voting-eligible people in Texas have disabilities, representing 3 million people. Based on the SIPP survey's more extensive set of disability questions, 30.5% of voting-age people in Texas have disabilities, representing 5.6 million people when applied to 2020 population numbers.[7]  The range of 3 to

---

[7] The 5.6 million figure assumes that the proportion of adults with disabilities in Texas using the SIPP measure did not change between 2014 and 2020, and that among all Texans with

5.6 million people reflects differences in whether disability is measured more narrowly or broadly.  Two important points about this range are:  1) both numbers indicate that a substantial portion of Texans have disabilities; and 2) when the narrower ACS measure is used, this is likely to result in conservative estimates of the number of people who face disability-related disparities.

**39.**     Whether one uses the narrower or broader measure, disability prevalence is projected to grow as the overall population ages in the next few decades.[8]

**40.**     As shown in Table 1, a breakdown of ACS data by disability type shows that the Texas population of citizens with disabilities includes (the categories may overlap):

- 1,604,700 people with mobility impairments,

- 1,082,500 with cognitive impairments,

- 875,900 with hearing impairments,

-  638,500 with vision impairments,

- 596,300 with difficulty dressing or bathing, and

- 1,127,500 with difficulty going outside alone due to a physical or mental condition.

**41.**     Table 1 also shows the margin of error for each estimate, reflecting the potential for sampling error.  The margin of error of 0.3% around the disability prevalence estimate of 15.6% means that there is a 95% probability that the true population value lies within plus or minus 0.3% of the estimate, or between 15.3% and 15.9%.

**42.**     These numbers are very similar to those from before the onset of the pandemic in 2020.  In 2019, the ACS data indicate that 15.6% of the Texas adult citizen population and 16.4% of the U.S. adult citizen populations had disabilities.

**43.**     The SIPP survey provides a more detailed look at variation in disabling conditions in Texas.  As shown in Table 2, more than 10% of the Texas population has difficulty with physical activities of walking, climbing stairs, lifting, standing, pushing or pulling, and crouching.  More than one-eighth (13.4%) have difficulty with one or more basic activities of daily living such as getting into a bed or chair, taking a bath or shower, eating, preparing meals, or using a telephone.  Applied to 2020 Texas population figures, 2.4 million Texans have difficulty with one or more

---

disabilities age 18 or older, the percent who are eligible citizens matches the percent in the 2020 ACS (93.9%).

[8] *Ageing and Disability*, UNITED NATIONS DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS, last visited 2/28/2022, https://www.un.org/development/desa/disabilities/disability-and-ageing.html#:~:text=Currently%2C%20it%20is%20estimated%20that,experience%20moderate %20to%20severe%20disability.

activities of daily living.  The abilities needed for several of these activities are also needed in the act of voting, both in person and by mail.

## Demographic Characteristics

**44.**    The prevalence of disability in Texas is markedly higher among Native Americans, Black people, older people, and those with lower levels of education.  The 2020 ACS data in Table 3 show that:

- Black people (17.9%) and Native Americans (17.8%) are more likely to have disabilities, compared to white non-Hispanic (16.3%) people. While the overall rate of disability (14.2%) is lower among Hispanic/Latinx citizens than among non-Hispanic/Latinx citizens overall, this is largely due to their younger average age that is linked to lower disability rates.  When broken down by age group, the rate of disability is significantly higher among Hispanic/Latinx citizens in every age group except for the youngest (18-34).[9]  As a consequence, Hispanic/Latinx citizens are likely to face disparities linked both to disability and to their Hispanic/Latinx heritage.  Similarly, the higher rates of disability among Black citizens means that they are likely to face disparities linked both to disability and to race.

- The disability rate climbs strongly with age, from 7.7% among those aged 18-34 to 70.3% among those aged 85 or older.

- The disability rate declines strongly as the rate of education rises, from 28.1% among those without a high school degree to 9.4% among those with a graduate degree.

**45.**    The relationship between education and disability reflects causality in both directions. Disability can limit education due to barriers that people with disabilities often encounter in furthering their education, such as lack of a correct diagnosis or appropriate accommodations, especially for poorer children.  Education also has an impact on disability: it can open up jobs with safer working conditions that are less likely to lead to disability, and provide higher incomes that increase access to health services and assistive technology that help people cope with potentially disabling conditions.

**46.**    The estimated total number of voting-eligible people with disabilities in Texas is 1,551,800 among women, 1,472,400 among men, 1,533,400 among white non-Hispanic/Latinx people, 428,300 among Black non-Hispanic/Latinx people, and 881,800 among Hispanic/Latinx people.  Compared to pre-pandemic 2019 data, the percentages and numbers of people with disabilities in Texas are very similar between 2019 and 2020.

## Economic Status

---

[9] The rates of disability for Hispanic/Latinx compared to white non-Hispanic people are 6.9% compared to 8.0% among those age 18-34, 9.9% compared to 8.2% among those age 35-49, 18.8% compared to 14.9% among those age 50-64, and 42.5% compared to 35.0% among those age 65 or older.

**47.**     People with disabilities in Texas have very low employment rates and high poverty rates. As shown in Table 4, only 40.1% of working-age (18-34) Texans with disabilities were employed in 2020, which is just over half the rate of people without disabilities (74.2%).  Among all ages, people with disabilities were almost twice as likely to live in poverty (18.0% compared to 9.2%).  They were also much more likely to receive income from Social Security (47.4% compared to 13.3%), reflecting both disability and retirement income provided through Social Security.  In part due to their low incomes, 20.3% receive public assistance income or food stamps, and 26.5% receive health care coverage through Medicaid or another low-income plan, compared to 10.3% and 6.1% (respectively) of people without disabilities.  Additional breakdowns show that this pattern is very similar between Texas and the U.S. as a whole, and between 2019 and 2020.

**<u>Living Situation and Need for Assistance</u>**

**48.**     People with disabilities in Texas are more likely to live alone and be unmarried, and a large portion need assistance with activities of daily living.  From the 2020 ACS data shown in Table 4:

- People with disabilities are significantly more likely than people without disabilities to live alone—that is, not living with others either in the community or in institutional group quarters (20.8% compared to 12.3%).

- They are less likely to be currently married with a spouse present (42.8% compared to 52.4%), and more likely to be separated or divorced (19.4% compared to 12.1%) or widowed (14.4% compared to 3.4%) while not being currently married.

- They are four times more likely than people without disabilities to live in institutional group quarters (4.7% compared to 1.1% are in nursing homes, mental hospitals, or correctional facilities).

**49.**     These patterns of disparities are very similar between Texas and the entire U.S.

**50.**     People with disabilities are also more likely to need assistance with activities of daily living, which are measured only in SIPP.  Because the 2014 SIPP sample has only 566 Texans with disabilities, I also provide numbers for the full U.S. sample of 10,003.  From the data shown in Table 5, close to two-fifths of people with disabilities (41.2% in Texas and 37.4% in the U.S.) need assistance with one or more activities, with especially high rates for going outside of the home for errands (25.5% in Texas), accessing the Internet (15.2%), doing light housework (13.7%), keeping track of money (12.0%), and preparing meals (11.0%).

**51.**     Applied to the 2020 Texas population, this indicates that close to 2.3 million Texas citizens age 18 or older need assistance with one or more daily activities.

**52.**     Because a large number of people with disabilities live alone, many who need assistance must rely on non-household members.  Over one-third (34.9%, or an estimated 1.9 million in 2020) of Texans with disabilities receive assistance in daily activities from family members, 4.0% (220,000) from friends or neighbors, 4.0% (220,000) from paid help, 1.4% (79,000) from

partners or companions,  1.4% (78,000) from other non-relatives, with a total of 10.6% (589,000) from any non-relative (these categories overlap as individuals may receive help from more than one person).

**53.**     The above characteristics create greater challenges to voting for many people with disabilities, particularly when they need assistance and find it difficult to arrange such assistance due to their higher likelihood of living alone and greater social isolation.

**<u>Computer and Internet Access</u>**

**54.**     Due in part to their lower average incomes, people with disabilities in Texas are less likely to have internet access.  From the 2020 ACS data shown in Table 6:

- Among Texas citizens with disabilities eligible to vote, 84.5% live in homes with internet access, compared to 95.2% for people without disabilities.

- Translated into absolute numbers, an estimated 460,600 citizens with disabilities who are eligible to vote in Texas live in homes without internet access.

**55.**     These digital gaps also show up when looking at individual rather than household access to the internet.  Further data from the Census Bureau's 2019 Current Population Survey Computer and Internet Use Supplement show that:

- People with disabilities in Texas are less likely to use the internet at home (60.1% compared to 78.9% of people without disabilities).

- This gap is not decreased by adding in internet access outside the home.  Considering all forms of internet access, 60.5% of people with disabilities use the internet in any location compared to 82.3% of people without disabilities.

- Translated into absolute numbers, an estimated 823,200 Texas citizens with disabilities do not use the internet either inside or outside the home.

- The disability gaps are not explained by age differences between people with and without disabilities.  While older people are less likely to access the internet, Table 5 shows that large disability gaps exist within each age group.

- While the 2019 survey has a limited sample of Texans with disabilities, the disability gaps in each measure are outside of the margin of error.

**56.**     These disability gaps in computer and internet access can impact the ability of citizens with disabilities to obtain necessary resources for voting.  Not having internet access can make it more difficult to:  a) register to vote; b) find out how and where to vote, particularly if polling places have been changed;  c) gather information on candidates and issues in order to make informed decisions in voting; and d) cure issues with mail-in ballot applications.  These difficulties create special problems when voting information is only provided in an online format.

14

**Transportation**

**57.**     People with disabilities face transportation barriers.  Based on the 2017 National Household Travel Survey, 1.8 million Texans age 18 or older have travel-limiting disabilities, defined as "a temporary or permanent condition or handicap that makes it difficult to travel outside of the home."  The rate of travel-limiting disability in Texas was 10.0% among those age 18 or older.  Several findings shown in Table 7 are:

- Texans with disabilities were four times more likely to live in zero-vehicle households (14.4% compared to 3.0% of Texans without disabilities).

- Texans with disabilities took fewer average trips per day (2.3 compared to 3.5) and were more likely to take no trips in a day (40.0% compared to 15.8%).

- Texans with disabilities are less likely to be drivers than are those without disabilities (59.6% compared to 93.0%).

- Texans with disabilities were slightly more likely to use public transportation (12.6% compared to 8.8% among  Texans without disabilities).

- Texans with disabilities did not make up for transportation barriers by using ride-hailing services such as taxis or Uber (only 2.6% did so in the past month compared to 8.8% of Texans without disabilities) or by relying on online purchases (only 31.5% did so compared to 54.2% of Texans without disabilities.).

- Over half (53.6%) of Texans with disabilities agreed that travel is a financial burden, compared to only 39.6% of those without disabilities.

**58.**     These results are supported when employing a broader disability measure using national data.  As also shown in Table 7, the 2020 Disability and Voting Accessibility Survey (DVAS), shows that only 69.6% of people with disabilities can drive their own or a family vehicle, compared to 90.0% of people without disabilities.  People with disabilities were also more likely than those without disabilities to say they faced transportation problems "very often" or "always" (5.6% compared to 2.9%).

**59.**     Transportation difficulties can have a negative impact on voting as research finds a significantly higher likelihood of voting among those who have a vehicle they can drive.[10]

**Social Isolation, Stigma, and Bias**

**60.**     The lower employment levels, greater likelihood of living alone, lower internet access, and transportation barriers among people with disabilities documented above all contribute to social isolation.  The greater social isolation of people with disabilities is also evidenced in their

---

[10] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout. 55* POLITICAL RESEARCH QUARTERLY 167 (2002).

lower likelihood of socializing with friends, relatives, or neighbors.[11]  This social isolation limits the support network upon which people with disabilities may rely for assistance with fundamental daily activities, including accessing the right to vote.

**61.**     The social isolation is reflected in, and reinforced by, the well-documented stigma attached to disability that continues to be manifested in attitudinal studies of the general population.[12]  These attitudes toward people with disabilities impact all areas of an individual's life.  The stigma attached to disability may impact the perception of a person's abilities that do not align with reality. This can impact the ability of people with disabilities to vote by, for example, making people (particularly those outside of their families) less willing to assist them with voting, and can also result in people with disabilities themselves being less willing to ask for assistance when needed.

# VOTING BARRIERS FACING PEOPLE WITH DISABILITIES

## Voter Participation

**62.**     People with disabilities in Texas and nationwide are less likely to vote than their non-disabled counterparts. Data from the Current Population Survey Voting and Registration Supplement, conducted by the Census Bureau every two years following national elections, show that 71.9% of eligible citizens with disabilities in Texas were registered to vote in 2020, and 59.4% voted, compared to 71.2% and 64.5% of citizens without disabilities respectively.  These numbers show that citizens with disabilities in Texas had a similar registration rate as those without disabilities (within the margin of error), but they were 5.2 points less likely to vote, and the voting gap is outside the margin of error.  In the U.S. as a whole, people with disabilities were 3.0 points less likely to be registered to vote, and 5.7 points less likely to vote, and the larger U.S. sample means that we are at least 99.9% confident that there is a true participation gap in the population.  These figures are provided in Table 8.  Similar disability participation

---

[11] Harris Interactive, *The ADA: 20 Years Later*, KESSLER FOUNDATION AND THE NATIONAL ORGANIZATION ON DISABILITY at 15-16, July 2010, http://www.advancingstates.org/hcbs/article/ada-20-years-later-2010-survey-americans-disabilities.

[12] Fatima Jackson-Best and Nancy Edwards, *Stigma and intersectionality: a systematic review of systematic reviews across HIV/AIDS, mental illness, and physical disability*, 18 BMC PUBLIC HEALTH 919 (2018); Barbara Muzzatti, *Attitudes towards disability: beliefs, emotive reactions, and behaviors by non disabled persons*, 35 GIORNALE ITALIANO DI PSICOLOGIA 313 (2008); Katarina Scior, *Public awareness, attitudes and beliefs regarding intellectual disability:  A systematic review*, 32 RESEARCH IN DEVELOPMENTAL DISABILITIES 2164 (2011); Denise Thompson, Karen Fisher, Christiane Purcal, Chris Deeming, and Pooja Sawrikar, *Community attitudes to people with disability: Scoping project No. 39.*, DISABILITY STUDIES AND RESEARCH CENTRE, UNIVERSITY OF NEW SOUTH WALES (2011); Harold Yuker, *Attitudes toward Persons with Disabilities, Springer* (1st Ed. 1988).

16

gaps at the national level are found in all of the 13 studies going back to the 1992 elections, which use differing samples and definitions of disability.[13]

**63.** In both the Texas and overall U.S. samples, the disability voting gap is larger than the disability registration gap, indicating that lower voting among people with disabilities cannot be explained by lower registration rates.

**64.** The importance of variation across different types of disability is shown in the voting figures. Broken down by type of disability, national voter participation in 2020 was lowest among people with difficulty dressing or bathing (49.4%), cognitive impairments (50.7%), and difficulty going outside alone (51.6%), but participation was also low among those with visual impairments (59.2%) or difficulty walking or climbing stairs (60.4%). These numbers are drawn from Table 9.

**65.** Research indicates that several factors contribute to the disability participation gap, including lower levels of education and income, lower feelings of political efficacy among people with disabilities, and greater social isolation that reduces the likelihood of being recruited to vote by friends, neighbors, or colleagues. These factors do not, however, fully explain the disability gap in participation.[14] Part of the remaining gap in participation can be traced to lower turnout due to prior difficulties in voting.[15]

**66.** An important note is that voter participation can vary substantially across elections for citizens both with and without disabilities. An increase in participation in an election among people with disabilities does not necessarily indicate the absence of continued voting barriers that discourage participation.

**<u>Voting method</u>**

**67.** Each voting method can present access barriers to people with different types of disabilities. Voting by mail can be an attractive option for people with mobility impairments, transportation problems, or other issues that make it hard to leave one's home. This is particularly relevant to the 10.0% of Texans who report travel-limiting disabilities as shown in Table 7, and the 8.3% of Texans who have difficulty walking or climbing stairs and 5.8% of Texans who have difficulty going outside alone, as shown in Table 1. The 3.3% of voting-

---

[13] Summarized in Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States*, 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[14] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout. 55* POLITICAL RESEARCH QUARTERLY 167 (2002); Lisa Schur, Todd Shields, & Kay Schriner, *Generational cohorts, group membership, and political participation by people with disabilities,* 58 POLITICAL RESEARCH QUARTERLY 487 (2005); and Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States,* 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[15] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 SOCIAL SCIENCE QUARTERLY 1374 (2017).

eligible Texans with vision impairments, however, may not be able to vote independently with a mail ballot, and may need polling places where they can vote independently with an accessible machine required by the 2002 Help America Vote Act (HAVA).

68.    Overall, people with disabilities are much more likely to vote by mail.  Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot, producing a gap of 22.0%, as shown in Table 8.  Voting by mail was less likely in Texas than in the entire U.S. for people both with and without disabilities, but the disability gap was larger.  The percentages of people with and without disabilities who voted by mail in the full U.S. were 53.2% and 41.9% respectively, producing a gap of 11.3%.  The rate of voting by mail is high across all of the major disability types, as shown in Table 9.  For many people with mobility restrictions, transportation barriers, and difficulty standing in long lines, voting by mail is effectively the only option they have to vote.

69.    Voting by mail increased in 2020 due to the pandemic.  Differences by disability status, however, existed before the pandemic.  In the 2016 general election, Texas voters with disabilities were more than three times as likely as voters without disabilities to vote by mail (19.8% compared to 6.0%).

**Barriers to In-Person Voting**

70.    As noted above, the disability gap in voter participation is not fully explained by standard predictors of participation.  Voting barriers appear to play a role, as voter participation is lower when voting is more time-consuming and difficult.  People with disabilities can face extra barriers in:

- Finding or getting to the polling place, particularly for those facing transportation barriers as described above.

- Getting inside the polling place, particularly for those in wheelchairs or with visual impairments.

- Standing in line, particularly for those with chronic illnesses or health conditions that limit their endurance.

- Being prevented from voting by poll workers, particularly for those who appear to have a cognitive disability.

- Reading or seeing the ballot, particularly for those with cognitive or vision impairments.

- Understanding how to vote or use the equipment, particularly for those with cognitive, vision, or upper arm mobility impairments.

- Communicating with poll workers, particularly for those with hearing, speech, or cognitive impairments.

18

- Writing on the ballot, particularly for those with impairments limiting upper body mobility.

- Physically operating the voting machine, particularly for those with vision impairments or impairments limiting upper body mobility.

**71.**     There is empirical evidence on a number of these factors.  Barriers in finding or getting to polling places have been shown to lower voter participation among people in general.[16] These barriers can be greater for people with disabilities:  one study found substantially lower voter participation among people with mobility limitations in areas with streets in poor condition.[17]

**72.**     Analysis of the nationally representative Survey of the Performance of American Elections (SPAE) conducted following the 2020 elections shows that 1.2% of all registered voters with disabilities said they did not vote because "I tried to vote, but was not allowed to when I tried" compared to 0.3% of people without disabilities.[18]  In addition, 1.4% of registered voters with disabilities in the U.S. reported they did not vote due to long lines at the polls, compared to 0.3% of those without disabilities.   Taken together, these results indicate that a substantial portion of the 5.7 point national disability gap in voter participation (from Table 9) can be accounted for by a greater likelihood that registered voters with disabilities said they were not allowed to vote or were dissuaded by the long lines.

**73.**     In the 2020 DVAS, over one-sixth (18.0%) of people with disabilities who voted at a polling place or election office reported at least one or more barriers, which was almost twice the rate of voters without disabilities (9.8%). The rate of barriers was especially high among those with cognitive impairments (30.0%) and those needing help with daily activities (24.8%).

**74.**     Specific barriers are listed in Table 10.  The most common polling place barriers people with disabilities faced were difficulty waiting in line (7.4% among all polling place voters with disabilities), difficulty reading or seeing the ballot (3.8% ), and getting inside the polling place (3.2%).  These problems were especially likely among those with vision and mobility impairments, and those needing help in daily activities.[19]

---

[16] Henry E. Brady & John E. McNulty, *Turning out to vote: The costs of finding and getting to the polling place*, 105 AMERICAN POLITICAL SCIENCE REVIEW 115 (2011).

[17] Philippa Clarke, Jennifer Ailshire, Els Nieuwenhuijsen, Marijke de Kleijn–de Vrankrijker, *Participation among adults with disability: The role of the urban environment*, 72 SOCIAL SCIENCE & MEDICINE 1674 (2011).

[18] The figures in this paragraph are derived from analysis in *Survey of the Performance of American Elections*, MIT ELECTION DATA + SCIENCE LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections, last visited 2/28/2022. The data contain responses from 18,200 people registered to vote.

No further information is available on what respondents meant by saying they were "not allowed to vote." This could indicate legal barriers such as having their eligibility challenged, having a mail ballot rejected, not having proper ID, or being at the wrong polling place.

[19] *See* Thad E. Hall & R. Michael Alvarez, *Defining the Barriers to Political Participation for Individuals with Disabilities*, THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION,

**75.**     News reports provide examples from across the country of several of these barriers in voting at polling places:

- Liam Dougherty, who has a progressive muscular disability, has had problems getting inside polling places, waiting in line due to bladder control issues, and having poll workers not know how to lower the machine to reach his wheelchair.[20]

- Elizabeth Clay, who is missing her right leg, has difficulty navigating city streets and getting to her polling place.[21]

- Xian Horn, who has cerebral palsy, found the wheelchair-accessible entrance of her polling place blocked by trash cans.[22]

- Emily Ladau, who has Larsen syndrome which affects bone development, found the accessible entrance to her polling place locked, and had to rely on her father to go in through the main entrance to ask a poll worker to open the door.[23]

- LouAnn Blake, who is blind, found that poll workers did not know how to set up the audio ballot technology at her voting location.[24]

- Kathy Hoell, a wheelchair user with a brain injury, was initially denied permission to vote because poll workers told her she is not "smart enough," and has had poll workers lead her to stairs she could not climb and prevented her from using an accessible voting machine because they had not turned it on.[25]

---

May 14, 2012, https://elections.itif.org/reports/AVTI-001-Hall-Alvarez-2012.pdf (describing problems of polling place access, reading the ballot, and understanding the voting process among focus group participants with disabilities in Los Angeles in 2010).

[20] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.

[21] *Id.*

[22] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

[23] *Id.*

[24] Jeanine Santucci, *30 years after the ADA, access to voting for people with disabilities is still an issue*, USA TODAY, July 26, 2020.

[25] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, PEW TRUSTS, February 1, 2018, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

**76.**     In addition, anonymous reports from voters with disabilities collected around the country by a disability organization regarding voter experiences in the 2020 election included[26]:

- "I could not turn on the screen"

- "No headsets were available"

- "Headsets available, did not work"

- "Poll worker did not know how to turn on the audio features"

- "Poll worker did not know how to make the sound louder or softer"

- "I did not know how to 'go back' or change who or what I voted for"

- "Had error message and could not vote"

- "Had to vote in person because I did not get my mail-in or absentee ballot"

- "Could not understand my ballot"

**77.**     Barriers to polling place access in Texas were identified in settlements since  2015 between the Justice Department and Harris, Nueces, Galveston, and McLennan counties, which included "steep ramps, gaps in sidewalks and walkways, and locked gates along the route barring pedestrian access."[27]

**<u>Barriers to Voting With a Mail Ballot</u>**

**78.**     Potential barriers to voting with a mail ballot include:

- Complicated instructions in applying for a mail ballot

---

[26] *Experience Survey Results: Power of the Disability Vote*, SABE GOVOTER PROJECT, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.
[27] *Justice Department Reaches Agreement with Harris County, Texas, to Ensure Polling Place Accessibility for Voters with Disabilities*, US DEPARTMENT OF JUSTICE, March 12, 2019, https://www.justice.gov/opa/pr/justice-department-reaches-agreement-harris-county-texas-ensure-polling-place-accessibility; *Settlement Agreement Between the United States of America and Nueces County Texas Under the Americans with Disabilities Act* at §H, https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html; *Settlement Agreement Between the United States of America and Galveston County, Texas Under the Americans with Disabilities Act* at Attachment E, available at https://www.ada.gov/galveston_tx_pca/galveston_tx_sa.html; *Settlement Agreement Between the United States of America and McLennan County, Texas Under the Americans with Disabilities Act* at Attachment E, available at: https://www.ada.gov/mclennan_pca/mclennan_sa.html.

- Application requirements to identify as a person with a disability, which many people with significant impairments are reluctant to do due to disability stigma noted above

- The requirement to apply for a mail ballot in every election

- Difficulty reading or seeing the ballot, particularly for people with visual impairments

- Difficulty understanding the ballot or how to fill it out, particularly for people with cognitive or developmental disabilities

- Difficulty filling out the ballot or placing it in an envelope, particularly for people with limited dexterity

- Difficulty taking the ballot to a mailbox, a drop box, or an election office, particularly for people with mobility impairments or difficulty going outside alone

- Postage expense in mailing the ballot in locations where stamps are required to return a ballot

**79.**     In the 2020 DVAS survey, the overall rate of difficulty in voting with a mail ballot was 5.4% among voters with disabilities. The rate was especially high among those with visual impairments (22.1%) who expressed the most difficulties with reading and filling out the ballot, as shown in Table 11.

**80.**     Barriers to voting by mail are exemplified in the following anecdotal cases from across the country:

- Jack Dougherty voted by mail in 2020 after many experiences of barriers to voting at a polling place.  Due to dexterity issues, he said he had difficulty in filling out the bubbles on the mail ballot and writing his name and address on the correct lines.[28]

- Katie Maunder, who is blind, said she could not have filled out her mail ballot without her mother's help.[29]

- Sheryl Grossman has Bloom syndrome, a genetic disorder that weakens her immune system and causes cognitive disabilities.  She cannot safely go to a polling place or allow anyone into her home, and cannot complete a mail ballot, so she had to tape her mail ballot to her door with a list of choices and watch as election officials filled out and sealed the ballot.[30]

---

[28] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.
[29] *Id.*
[30] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

- Joanne Wolf, who has multiple sclerosis and cannot write by hand or sign a mail ballot, had her ballot with a signature stamp rejected twice.[31]

**81.**    In addition, anonymous reports from voters with disabilities collected by a disability organization regarding voter experiences with mail ballots in the 2020 election included a number of barriers that included[32]:

- "I had to ask for help."

- "I had problems understanding how to complete the ballot."

- "I had problems mailing my ballot."

- "I had to pay postage."

**82.**    Experiencing these types of difficulties predicts attitudes among people with disabilities that discourage voting in the future.[33]


**Need for Assistance in Voting**

**83.**    As described earlier, about two-fifths of people with disabilities need assistance with one or more activities of daily living.  Many people who need assistance with activities of daily living will also need voting assistance, since voting requires functional abilities that are often needed to perform activities of daily living (for example, manual dexterity needed for getting dressed or preparing meals is also needed in operating most voting machines).  In the 2020 DVAS, 6.2% of people with disabilities who voted at a polling place reported needing assistance in voting, compared to 3.7% of those without disabilities.[34]  Among those who voted by mail, 10.5% of people with disabilities reported needing assistance in doing so, compared to 1.1% of voters without disabilities.[35]  The greater gap in assistance needed in mail voting is likely due to the greater likelihood of severe disability among those who vote by mail.

**84.**    Among people with disabilities who needed assistance in voting in a polling place, such assistance was most commonly provided by election officials (54%), family members (19%), and home aides (6%).  Among those who needed assistance in voting with a mail ballot, such assistance was most commonly provided by family members living with the voter (56%), family

---

[31] *Id*.

[32] *Experience Survey Results: Power of the Disability Vote*, SABE GOVOTER PROJECT, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.

[33] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 SOCIAL SCIENCE QUARTERLY 1374 (2017).

[34] The difference of 2.7 points is within the 3.1 point margin of error.

[35] The difference of 9.4 points is outside the 3.5 point margin of error.

members not living with the voter (19%), friends or neighbors (8%), home aides (7%), or other non-relatives (6%).

**85.**     People with disabilities are less likely to be able to vote independently (without assistance) with no difficulties.  The 2020 DVAS found that over one-fifth (21.3%) of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities.  There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

**86.**     As described earlier, Texans with disabilities are more likely than those without disabilities to live in institutional group quarters such as nursing homes and assisted living settings.  Those in institutions generally have more severe disabilities that are more likely to require assistance in voting and daily activities.  There is, however, tremendous variation in registration and voting procedures, staff attitudes, and likelihood of voting among nursing homes and assisted living settings; one study found that residents who wanted to vote were unable to do so at nearly one-third of sites, and that staff and administrator attitudes were a critical factor.[36]

**87.**     Assistance in voting is about more than just driving someone to the polls or helping them with the physical act of marking a ballot.  People with mental health disabilities may require and receive assistance in various aspects of the voting process that in no way suggest the assistor is "voting for" the person with a disability or exercising improper influence over the voter. A substantial literature supports the idea that people with cognitive disabilities, including intellectual and developmental disabilities, can make important decisions such as voting while relying on trusted assistors in executing those decisions.[37]  Such assistance can "facilitate the exercise of autonomy" for individuals with certain neurological or cognitive conditions.[38] In the context of voting, this assistance often involves more than just reading the ballot aloud and helping people to mark it.

---

[36] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[37] *Id.*; Raymond Raad, Jason Karlawish, & Paul S. Appelbaum, *The capacity to vote of persons with serious mental illness*, 60 PSYCHIATRIC SERVICES 624 (2009); Jason H. Karlawish et al, *Addressing the ethical, legal, and social issues raised by voting by persons with dementia*, 292 JAMA 1345 (2004); Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

[38] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

# SB 1 IMPOSES BARRIERS ON TEXAS VOTERS WITH DISABILITIES THAT WILL MAKE IT HARDER FOR THEM TO VOTE AND MAY PREVENT SOME FROM VOTING ALTOGETHER

88.    The above findings are relevant to an analysis of the likely effects of SB 1 on the ability to vote among people with disabilities.  Drawing on these data and my knowledge of the voting needs of people with disabilities, it is my opinion  that SB 1 will impose barriers to voting on Texans with disabilities. The following provisions of SB 1 make it harder for Texans with disabilities to vote and may prevent some from voting altogether:

## Sections 5.02, 5.03, 5.06,  5.07, 5.10, and 5.12

89.    These sections impose new requirements to vote by mail.  They now require voters to provide the number on their Texas driver's license, Texas election identification certificate, or Texas personal ID card on both their mail-in ballot applications and on the ballot carrier envelopes used to return their ballot. If the voter has not been issued one of these numbers, the voter may instead provide the last four digits of their Social Security number. If the voter has not been issued any of these numbers, the voter may sign a statement indicating that they have never been issued one of these numbers.  The law further provides that if the information the voter provides does not "identify the same voter identified" on the voter's registration application, then the mail-in ballot application and/or ballot in the voter's carrier envelope must be rejected.  SB 1 provides that a voter may be notified by phone or e-mail of the defect and that the voter may request to have the voter's application to vote by mail canceled or go to the voting clerk's office in person to correct the defect or go through an online curing process. There are several relevant research findings regarding the likely impact of these provisions on voters with disabilities:

90.    Texas voters with disabilities were almost four times as likely as those without disabilities to vote by mail in 2020 (30.2% compared to 8.2%), so these additional requirements to be able to vote by mail, and the critical consequences if the ID number they provide does not match the ID number with which they registered, are likely to have a significant negative impact on many voters with disabilities.

91.    Remembering how one recorded ID information on a registration application is likely to be difficult for many people with disabilities. Because disability correlates with age, it may have been a long time since they first registered and many of them may have difficulty remembering what ID information they presented for their initial registration. As noted above, an estimated 1,082,500 eligible voters in Texas have cognitive disabilities, which are measured as difficulty in concentrating, remembering, or making decisions. The records or identifying documents may be held by family members or facility staff, and may not be readily available to people with disabilities.  The staff in congregate settings may be unwilling or uninterested in helping people with disabilities get the correct information; as noted, research has found that staff attitudes are

key determinants of whether residents have the necessary information for voting.[39] Though SB 1 permits a voter to "make a statement" that they have not been issued any of the permissible identification numbers, a voter cannot make a statement indicating that they have been issued one of these numbers but do not know the number or do not have access to it or cannot provide the number for some other reason.

**92.**     Among those whose applications are initially rejected, it is likely that correcting the information will be difficult for many people with disabilities. Whether attempting to remedy this in person or online, it is unclear how a voter who does not know these numbers will be able to cure the defect. Further, voters who are voting by mail due to a disability may be unable to go in person to cure the defect for the same reason they did not vote in person.

**93.**     The online curing option may not help voters who are unable to cure in person because, as discussed above, people with disabilities have lower levels of internet access: a full 15% of Texans with disabilities living in the community (not in group quarters) do not have internet access in their homes, compared to only 5% of those without disabilities.[40]  The gap is larger among those age 65 or older, where 40% of Texans with disabilities compared to 18% of those without disabilities do not have internet access.  Even those with internet access may be limited by inaccessible websites.  A 2020 report found that 98% of all websites are not fully accessible to people with disabilities.[41]  Since 15% of Texans with disabilities do not have access to the internet at their homes, it is my opinion they will be disenfranchised by this provision since many will not be able to cure in person either.

**94.**     Indeed, as has already been reported, as of February 25, 2022, election officials in the most populous Texas counties have rejected roughly 30% of the absentee ballots they have received largely because voters did not include their driver's license number or Social Security number, or the numbers they put down did not match what officials had on file–new provisions imposed by SB 1. As reported, this rate of rejection represents a significant increase from past elections, including 2020, when the statewide rejection rate of absentee ballots was less than 1% for the general election. In 2020, officials rejected 8,304 absentee ballots in Texas out of nearly a million votes across the state. This year, that number has already been surpassed in just two counties.[42] As reported by the *New York Times*:

> But with voting by mail limited to elderly and disabled voters, the concern that initially rejected ballots will disenfranchise voters has grown. Guillermina

---

[39] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[40] The ACS does not measure internet access for those living in institutional or non-institutional group quarters.

[41] Ruderman Family Foundation, *98% of Websites Fail to Comply With Accessibility for People With Disabilities,* ICT SOLUTIONS & EDUCATION MAGAZINE, https://isemag.com/2020/11/telecom-98-percent-of-websites-fail-to-comply-with-accessibility-requirements-for-people-with-disabilities/, last visited 2/28/22.

[42] Nick Corasantini, *Ballot Rejections in Texas Spike After New Voting Law*, NEW YORK TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

Nevárez lives at home in the Maverick County border region with her husband, Alfonso Nevárez Sr., and her 98-year-old mother, who is disabled and recovering from a recent surgery. In all three of their ballots, they missed the field to include their identification information, presuming that since their ballot application had been accepted they were free to cast their ballot. "We didn't look at the fine print," said Ms. Nevárez, who is also the mother of a former Democratic state representative. "And there's so much of it, the fine print." She corrected the three ballots and sent them back by mail. She is hoping that the information is correct — because of her mother's condition, they cannot go in person to fix any issues. "It is very upsetting," Ms. Nevárez said.[43]

95.     I conclude with a reasonable degree of certainty, based on the above data, that Texans with disabilities are four times more likely to vote by mail, more likely to have difficulty accessing the requisite ID numbers and ensuring the numbers on the application and envelope match, and less likely to be able to access the curing process online or in person. As such, the new barriers imposed by Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 will make it harder for people with disabilities to vote. Therefore, I conclude that these sections will cause some Texans with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# **SECTION 6.01**

96.     This section requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting. There are several research findings relevant to this section's impact on voters with disabilities.

97.     As discussed above, voters with disabilities are more likely to face transportation barriers than people without disabilities. Among all Texans of voting age, 10% report a disability that limits travel. Texans with disabilities are four times more likely to live in a zero-vehicle household (14.4% compared to 3.0%) and are less likely to be drivers (59.6% compared to 93.0%). Further, 5.8% of Texans have difficulty going outside alone, representing 1.1 million people. Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. Because curbside voting is only available to certain voters who are far more likely to have a disability and people with disabilities are more likely to face transportation barriers and social isolation, it is my opinion that additional barriers to providing assistance in the form of group transportation for curbside voting will burden voters with disabilities.

98.     I can conclude with reasonable certainty, based on the above data, that Texans with disabilities are more likely to face transportation barriers, more likely to live alone, and more likely to be socially isolated. As such, the barriers imposed by Section 6.01 on providing group transportation to the polls for curbside voting will make it harder for some Texans with disabilities to vote. Therefore, I conclude that Section 6.01 will cause some Texans with

---

[43] *Id.*

disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# **SECTION 6.04**

**99.**    This section adds language to the assistor oath, substantially restricting the amount of assistance that can be given by anyone except an election officer.  This will make voting more difficult for many people with disabilities.  Texas data show that 41.2% of people with disabilities need assistance in one or more daily activities. National data show that 6.2% of people with disabilities who voted in a polling place required assistance, and 10.5% of voters with disabilities who voted with a mail ballot required assistance.

**100.**    This section limits the type of assistance that can be given by an assistor to reading or marking the ballot, or directing the voter to read or mark the ballot.  Because the law does not define everything that could constitute assistance, voters with disabilities as well as assistors will be unsure of what assistance is allowed, and voters may be reluctant to make use of assistance even when it is available for fear of violating the law. This does not allow the assistor to explain the voting process and choices.  In my expert opinion, this is likely to interfere with people with disabilities' ability to vote, in particular for the 1,082,500 Texans with cognitive impairments who are eligible to vote, and other people with neurological and developmental disabilities who benefit from assistance in making informed choices in important areas of life. Some examples of valuable voting assistance that arguably go beyond the narrow definition of assistance in the oath include:

- Using an American Sign Language interpreter to interpret the ballot to someone who is deaf and does not read written English fluently. ASL and English are different languages with different syntax and grammar. ASL sometimes requires a signed explanation and interpretation of key terms and concepts.

- Reminding someone with memory issues from a Traumatic Brain Injury about how to use his or her marked sample ballot to refresh recollection about how he or she wanted to vote.

- Using simple plain language to help someone with cognitive or developmental disabilities understand the voting process. This can include answering the voter's questions about the voting process or the ballot.

- Helping someone with a mobility or cognitive disability navigate the physical polling place to find the information they need, speak to the poll workers, and get to the voting booth.

- Helping someone with Autism Spectrum Disorder cope with stressful voting lines, noises, sensations, or lights. This may include implementing calming strategies to support the person so that he or she votes without triggering feelings of being overwhelmed.

- Helping someone with a visual impairment set up and use the accessible voting machine. This may include setting up the headphones or troubleshooting technical issues that arise while the voter is voting and helping the voter deliver his or her paper ballot to the ballot counter.

- Helping a person with an anxiety disorder cope with the anxiety of a possibly new and stressful situation of navigating the voting technology and process. This may include verbal reassurance that the person marked the ballot in the manner he or she intended.

**101.**    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04. Therefore, I conclude that section 6.04 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTIONS 6.03 AND 6.05

**102.**    These sections create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. These sections will make it more likely that the ballot of a person with a disability is rejected because of a clerical error or a minor mistake by the person providing assistance.  These sections may also make it more difficult for people with disabilities to find assistance at all. As noted above, many people with disabilities are socially isolated and may have a hard time finding someone to assist them. One-fifth of voters with disabilities who needed voting assistance in 2020 reported receiving it from people who were not family or household members.  Due to the higher need for assistance with voting among people with disabilities, this provision creates an extra barrier to voting for some people with disabilities.

**103.**    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance from people other than family members. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to find needed assistance because of sections 6.03 and 6.05 requirements of additional forms and statements. Therefore, I conclude that sections 6.03 and 6.05 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.06

**104.**    This section criminalizes the provision of assistance by any person who solicits, receives, or accepts compensation for helping a voter with their mail ballot unless the assistor is an attendant or caregiver. While attendants and caregivers are exempt, this section will prevent friends, neighbors, and other non-family members from assisting people with disabilities if they receive any type of economic benefit. It will also prohibit people with disabilities from getting

29

help from community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community. The 2020 DVAS study showed that just under one-fifth (18.1%) of people providing assistance to voters with disabilities with voting by mail were friends, neighbors, or other non-relatives apart from home aides.  In my expert opinion, this provision will discourage well-meaning assistors from providing that assistance, because any type of compensation or thank you, such as reimbursement for gas, could be construed as violating the law. This will restrict the ability to obtain assistance for a substantial number of people with disabilities.

**105.**     Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. It is thus very possible that a worker or volunteer with a community or civic engagement organization, a neighbor, a friend, or another non-family member may be the best and only option to assist them with voting by mail.

**106.**     I conclude with a reasonable degree of certainty, based on the above data, that a number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from people other than previously known attendants or caregivers. Therefore I conclude that Section 6.06 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not.

# **SECTION 7.04**

**107.**     This section limits "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." It also makes it a crime for any person to receive compensation or other benefit for collecting another voter's ballot. As noted above, many voters with disabilities require assistance in voting, and restrictions on in-person interactions will limit their ability to obtain needed assistance.  Such interaction may be of particular benefit to voters with cognitive impairments and developmental disabilities who may have difficulty understanding the issues and voting process but, as described above, have the right to vote.  Finding assistance may be especially difficult for many people with disabilities given their higher likelihood of living alone, and lower rate of socializing as documented above.  It is very possible that someone connected to a campaign (possibly the person who assists them regularly) may be the best and only option to assist them with voting.  Even if they are assisted by someone working or volunteering with a campaign, this does not imply that their vote will be influenced by that person.  As noted above, assisted decision making can "facilitate the exercise of autonomy" for people with certain conditions.[44]  The assisted voter must approve the vote before it is filed.

**108.**     In addition, people with mobility limitations may not be able to personally deliver their ballots to mailboxes, and they may not have a close family or household member or lawful assistant to do so. Restricting the individuals who can help with this process will create extra difficulties for these voters in delivering their ballot.

---

[44] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021)

**109.**    I conclude with a reasonable degree of certainty, based on the above data that a large number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from persons other than a close family or household member or lawful assistant. Therefore I conclude that Section 7.04 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# **CONCLUSION**

**110.**    In sum, in my opinion, based on reasonable certainty, these provisions of SB 1 will create an extra burden in voting for a significant number of people with disabilities across the state of Texas and may prevent some from voting altogether.  As documented above, people with disabilities already face many social and economic disparities that impact their ability to vote, including a high rate of needing assistance in activities of daily living, higher likelihood of living alone, lower likelihood of driving or travel in general, lower likelihood of internet access, and lower economic resources compared to those without disabilities.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the difficulty of obtaining necessary resources and assistance in exercising the right to vote.  The number of barriers voters with disabilities face in Texas  help explain why voting-eligible Texans with disabilities were 5.1 percentage points less likely than those without disabilities to vote in 2020.  SB 1 creates extra voting barriers for many Texans with disabilities, making it more burdensome for them to exercise their right to vote. Media reports have already demonstrated that people with disabilities are facing new barriers related to SB 1.[45] In my opinion, SB 1 will cause some Texans with disabilities to be disenfranchised entirely and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

---

[45] *See* Juana Summers and Barbara Sprunt, *Texas election workers provide practical and emotional support to confused voters*, NATIONAL PUBLIC RADIO, Feb. 7, 2022, https://www.npr.org/2022/02/27/1082821390/texas-election-workers-provide-practical-and-emotional-support-to-confused-voter;%20; *see also* Nick Corasaniti, *Ballot Rejections in Texas Spike After New Voting Law*, NY TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

**Table 1:  Disability Prevalence in Texas Using Census Definition, 2020**

**Figures are for Texas citizens age 18 or older.**

|  | Number | % of adult citizens | Margin of error (+/-) |
|---|---|---|---|
|  | **(1)** | **(2)** | **(3)** |
| **Total citizens age 18 or older** | 19,425,500 | 100.0% |  |
| **No disability** | 16,401,300 | 84.4% | 0.3% |
| **Disability** | 3,024,200 | 15.6% | 0.3% |
|  |  |  |  |
| **Type of disability** |  |  |  |
| **Hearing impairment** | 875,900 | 4.5% | 0.1% |
| **Vision impairment** | 638,500 | 3.3% | 0.1% |
| **Cognitive impairment** | 1,082,500 | 5.6% | 0.2% |
| **Mobility impairment** | 1,604,700 | 8.3% | 0.2% |
| **Difficulty with dressing or bathing** | 596,300 | 3.1% | 0.1% |
| **Difficulty going outside home alone** | 1,127,500 | 5.8% | 0.2% |
|  |  |  |  |
| **Sample size** | 127,398 |  |  |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.  A disability is defined as having one or more of the six conditions listed.  See https://www.census.gov/topics/health/disability/guidance/data-collection-acs.html.

The margin of error is based on a 95% confidence interval.

**Table 2: Disability Prevalence Using More Expansive Definition**
Figures represent percent of Texas adults age 18 or older

| | Percent (1) | Margin of error (+/-) (2) |
|---|---|---|
| Any disability | 30.5% | 2.4% |
| | | |
| Hearing impairment | 6.3% | 1.2% |
| Vision impairment | 4.7% | 1.1% |
| Speech impairment | 2.1% | 0.7% |
| Difficulty with physical activities: | | |
| Walking 3 blocks | 13.5% | 1.7% |
| Climbing stairs | 12.7% | 1.6% |
| Lifting | 9.3% | 1.4% |
| Grasping | 4.3% | 1.0% |
| Standing^ | 15.9% | 1.8% |
| Pushing/pulling^ | 12.9% | 1.7% |
| Sitting^ | 8.2% | 1.4% |
| Crouching^ | 19.3% | 2.0% |
| Reaching^ | 7.9% | 1.3% |
| Difficulty with activities of daily living due to physical or mental condition: | | |
| Any of above | 13.4% | 1.7% |
| Getting around inside home | 1.7% | 0.6% |
| Going outside home for errands | 8.3% | 1.4% |
| Getting in bed or chair | 4.3% | 1.0% |
| Taking bath or shower | 4.5% | 1.0% |
| Getting dressed | 3.0% | 0.8% |
| Eating | 0.7% | 0.4% |
| Using toilet | 1.7% | 0.6% |
| Keeping track of money | 4.7% | 1.1% |
| Preparing meals | 4.1% | 0.9% |
| Doing light housework | 5.0% | 1.0% |
| Taking medicine | 3.8% | 1.0% |
| Using telephone | 1.3% | 0.5% |
| Mental or cognitive impairment: | | |
| Learning disability | 4.3% | 1.1% |
| Alzheimer's, senility, or dementia | 3.4% | 0.9% |
| Intellectual disability | 1.7% | 0.7% |
| Developmental disability | 0.7% | 0.5% |
| Other mental/emotional condition | 4.4% | 1.1% |
| Sample size | 1,569 | |

^ These conditions were not included as part of the expanded disability definition but are reported here to illustrate the range of limitations faced by people with disabilities. Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  Discussion of the disability definition and fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html. The margin of error is based on a 95% confidence interval.

**Table 3: Disability and Demographic Characteristics in Texas, 2020**

**Figures are for Texas citizens age 18 or older.**

| | Total with disability (1) | Total with no disability (2) | % with disability (3) | Margin of error (+/-) (4) |
|---|---|---|---|---|
| **Total citizens age 18 or older** | 3,024,200 | 16,401,300 | 15.6% | 0.3% |
| **Female** | 1,551,800 | 8,385,000 | 15.6% | 0.4% |
| **Male** | 1,472,400 | 8,016,300 | 15.5% | 0.4% |
| **Asian** | 60,400 | 707,000 | 7.9% | 1.1% |
| **Black non-Hispanic/Latinx** | 428,300 | 1,963,400 | 17.9% | 0.9% |
| **Hispanic/Latinx** | 881,800 | 5,312,000 | 14.2% | 0.5% |
| **Native American/Alaskan** | 8,600 | 39,700 | 17.8% | 4.3% |
| **White non-Hispanic/Latinx** | 1,533,400 | 7,851,200 | 16.3% | 0.4% |
| **Other race/ethnicity** | 111,600 | 528,000 | 17.4% | 1.5% |
| **Age 18-34** | 487,600 | 5,874,500 | 7.7% | 0.4% |
| **Age 35-49** | 445,800 | 4,468,800 | 9.1% | 0.4% |
| **Age 50-64** | 761,000 | 3,732,800 | 16.9% | 0.6% |
| **Age 65-74** | 601,700 | 1,591,700 | 27.4% | 0.9% |
| **Age 75-84** | 460,600 | 620,300 | 42.6% | 1.4% |
| **Age 85+** | 267,500 | 113,200 | 70.3% | 2.2% |
| **No HS degree** | 583,000 | 1,488,100 | 28.1% | 1.0% |
| **HS degree** | 948,100 | 3,988,500 | 19.2% | 0.6% |
| **Some college, no degree** | 720,300 | 4,025,800 | 15.2% | 0.5% |
| **Associate's degree** | 212,200 | 1,335,200 | 13.7% | 0.9% |
| **Bachelor's degree** | 360,000 | 3,633,600 | 9.0% | 0.4% |
| **Graduate degree** | 200,600 | 1,930,100 | 9.4% | 0.6% |
| **Overall sample size** | 23,590 | 103,808 | | |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.

The margin of error is based on a 95% confidence interval.

**Table 4:  Economic Status and Living Situation of People with Disabilities**

Figures are for Texas citizens age 18 or older.

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Employed if working age (18-64)** | 40.1% | 74.2% | -34.0% | 1.3% | * |
| **In poverty** | 18.0% | 9.2% | 8.9% | 0.8% | * |
| **Social Security income** | 47.4% | 13.3% | 34.0% | 0.9% | * |
| **Public assistance income or food stamps** | 20.3% | 10.3% | 10.0% | 0.8% | * |
| **Medicaid or other low-income health plan** | 26.5% | 6.1% | 20.4% | 0.8% | * |
| **Living situation** | | | | | |
|    **Live alone** | 20.8% | 12.3% | 8.6% | 0.8% | * |
|    **Live with others, not in group quarters** | 73.3% | 85.6% | -12.3% | 0.8% | * |
|    **Noninstitutional group quarters^** | 1.2% | 1.1% | 0.2% | 0.1% | |
|    **Institutional group quarters^^** | 4.7% | 1.1% | 3.6% | 0.2% | * |
| **Marital status** | | | | | |
|    **Married, spouse present** | 42.8% | 52.4% | -9.6% | 1.0% | * |
|    **Separated/divorced** | 19.4% | 12.1% | 7.3% | 0.8% | * |
|    **Widowed** | 14.4% | 3.4% | 11.0% | 0.6% | * |
|    **Never married** | 23.4% | 32.1% | -8.8% | 0.9% | * |
| **Sample size** | 9,609 | 23,590 | 103,808 | | |

* Disability gap is outside 95% margin of error.
^ College dorm, military barracks, group home, mission, or shelter
^^  Nursing home, mental hospital, or correctional facility
Based on analysis of Census Bureau's 2020 American Community Survey microdata.

**Table 5:  Need for Assistance in Disability Population**

Figures represent percent of disability population age 18 or older.

| | Texas | Margin of error (+/-) | United States | Margin of error (+/-) |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| **Any help needed with activities of daily living** | 41.2% | 4.5% | 37.4% | 1.1% |
| **Need help with:** | | | | |
| **Getting around inside home** | 3.5% | 1.5% | 3.8% | 0.4% |
| **Going outside home for errands** | 25.5% | 4.0% | 21.2% | 1.0% |
| **Getting in bed or chair** | 7.5% | 2.3% | 7.2% | 0.6% |
| **Taking bath or shower** | 9.4% | 2.5% | 8.6% | 0.7% |
| **Getting dressed** | 6.6% | 2.1% | 6.9% | 0.6% |
| **Walking** | 7.9% | 2.3% | 8.2% | 0.6% |
| **Eating** | 0.5% | 0.5% | 1.3% | 0.3% |
| **Using toilet** | 3.4% | 1.7% | 3.3% | 0.4% |
| **Keeping track of money** | 12.0% | 2.9% | 12.2% | 0.8% |
| **Preparing meals** | 11.0% | 2.7% | 12.0% | 0.8% |
| **Doing light housework** | 13.7% | 2.9% | 15.4% | 0.8% |
| **Taking medicine** | 9.7% | 2.8% | 8.8% | 0.7% |
| **Accessing Internet** | 15.2% | 3.1% | 13.4% | 0.8% |
| | | | | |
| **Help provided by^:** | | | | |
| **Family members** | 34.9% | 4.3% | 30.7% | 1.1% |
| **Friends or neighbors** | 4.0% | 1.8% | 4.0% | 0.5% |
| **Paid help** | 4.0% | 1.6% | 4.2% | 0.5% |
| **Partner or companion** | 1.4% | 1.1% | 1.3% | 0.3% |
| **Other non-relative** | 1.4% | 1.0% | 1.9% | 0.3% |
| **Any non-family member** | 10.6% | 2.7% | 10.7% | 0.7% |
| | | | | |
| **Sample size** | 566 | | 10,003 | |

Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  See Table 2 for prevalence figures using this definition of disability.  Fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html.

The margin of error is based on a 95% confidence interval.
^ The categories overlap as the individual may have received help from more than one person.

**Table 6:  Computer and Internet Access by Disability Status in Texas**

**Figures are for Texas citizens age 18 or older.**

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Home has internet access, 2020** | | | | | |
| **All** | 84.8% | 95.2% | -10.4% | 0.7% | * |
| **Age 18-64** | 90.4% | 96.3% | -5.9% | 0.8% | * |
| **Age 65 or older** | 60.5% | 82.3% | -21.8% | 1.3% | * |
| **Individual uses internet at home, 2019** | | | | | |
| **All** | 60.1% | 78.9% | -18.8% | 4.5% | * |
| **Age 18-64** | 68.0% | 80.8% | -12.8% | 6.4% | * |
| **Age 65 or older** | 53.1% | 67.9% | -14.8% | 6.8% | * |
| **Individual uses internet at home or elsewhere, 2019** | | | | | |
| **All** | 60.5% | 82.3% | -21.8% | 4.4% | * |
| **Age 18-64** | 68.9% | 84.4% | -15.5% | 6.3% | * |
| **Age 65 or older** | 53.1% | 70.4% | -17.3% | 6.8% | * |
| **Sample size** | | | | | |
| **2020 data** | 19,465 | 96,970 | | | |
| **2019 data** | 535 | 3,906 | | | |

\* Disability gap is outside 95% margin of error.

Home internet access figures are based on analysis of Census Bureau's 2020 American Community Survey microdata, and individual internet use is based on analysis of November 2019 Current Population Survey Computer and Internet Use Supplement microdata.

**Table 7: Transportation and Disability**

| | All (1) | Disability (2) | No disability (3) | Disability gap (4) | |
|---|---|---|---|---|---|
| **Data for Texans age 18 or older^** | | | | | |
| Have travel-limiting disability | 10.0% | 100.0% | 0.0% | | |
| Live in zero-vehicle household | | 14.4% | 3.0% | 11.4% | * |
| Average trips per day | | 2.3 | 3.5 | -1.2 | * |
| No trips in a day | | 40.0% | 15.8% | 24.2% | * |
| Driver | | 59.6% | 93.0% | -33.4% | * |
| Public transportation in past 30 days | | 12.6% | 8.8% | 3.8% | * |
| Used ride-hailing in past 30 days | | 2.6% | 8.8% | -6.2% | * |
| Average online purchases for delivery in past month | | 31.5% | 54.2% | -22.7% | * |
| Agree that travel is a financial burden | | 53.3% | 39.6% | 13.7% | * |
| **National data from 2020 survey with broader disability measure^^** | | | | | |
| Can drive own or family vehicle | | 69.6% | 90.0% | -20.4% | * |
| Most often use for basic transportation: | | | | | |
| Own or family vehicle | | 82.7% | 93.3% | -10.7% | * |
| Someone else's vehicle | | 6.4% | 1.8% | 4.7% | * |
| Taxi or rideshare | | 3.2% | 0.5% | 2.7% | * |
| Para-transit | | 1.3% | 0.2% | 1.1% | * |
| Other public transportation | | 4.9% | 3.0% | 1.9% | |
| Other | | 1.5% | 1.2% | 0.3% | |
| Have transportation problems "very often" or "always" | | 5.6% | 2.9% | 2.6% | * |
| **Sample size** | | 1,768 | 787 | | |

^ From analysis of 2017 National Highway Travel Survey data at https://nhts.ornl.gov/

^^ From https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 31

**Table 8: Voting and Disability in 2020**

| | Texas No disability (1) | Any disability (2) | Disability gap (3) | Margin of error on gap (+/-) (4) | | United States No disability (5) | Any disability (6) | Disability gap (7) | Margin of error on gap (+/-) (8) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Among all eligible to vote: | | | | | | | | | | |
|    Registered to vote | 71.2% | 71.9% | 0.7% | 4.2% | | 73.0% | 70.1% | -3.0% | 1.1% | * |
|    Voted | 64.5% | 59.4% | -5.2% | 4.6% | * | 67.5% | 61.8% | -5.7% | 1.1% | * |
| | | | | | | | | | | |
| Method if voted: | | | | | | | | | | |
|    In person on election day | 14.2% | 9.5% | -4.7% | 3.6% | * | 31.2% | 25.8% | -5.4% | 1.3% | * |
|    Early in person | 77.6% | 60.2% | -17.5% | 5.7% | * | 26.9% | 21.0% | -5.8% | 1.2% | * |
|    Mail ballot | 8.2% | 30.2% | 22.0% | 5.2% | * | 41.9% | 53.2% | 11.3% | 1.5% | * |
| | | | | | | | | | | |
| Sample size | 3,745 | 545 | | | | 70,898 | 11,000 | | | |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 9: Voting by Disability Type in 2020**

All figures are for entire United
States

| | No disability (1) | Any disability (2) | | Hearing impairment (3) | | Vision impairment (4) | | Cognitive impairment (5) | | Mobility impairment (6) | | Difficulty dressing or bathing (7) | | Difficulty going outside alone (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Among all eligible to vote:** | | | | | | | | | | | | | | | |
| **Registered to vote** | 73.0% | 70.1% | * | 76.2% | * | 67.4% | * | 61.6% | * | 69.4% | * | 61.9% | * | 61.8% | * |
| **Voted** | 67.5% | 61.8% | * | 68.5% | | 59.2% | * | 50.7% | * | 60.4% | * | 49.4% | * | 51.6% | * |
| | | | | | | | | | | | | | | | |
| **Method if voted:** | | | | | | | | | | | | | | | |
| **In person on election day** | 31.2% | 25.8% | * | 25.4% | * | 24.6% | * | 26.4% | * | 25.0% | * | 23.4% | * | 23.0% | * |
| **Early in person** | 26.9% | 21.0% | * | 22.0% | * | 22.0% | * | 19.3% | * | 19.4% | * | 14.4% | * | 16.7% | * |
| **Mail ballot** | 41.9% | 53.2% | * | 52.6% | * | 53.3% | * | 54.2% | * | 55.7% | * | 62.1% | * | 60.2% | * |
| | | | | | | | | | | | | | | | |
| **Sample size** | 70,898 | 11,000 | | 3,633 | | 1,466 | | 3,315 | | 6,255 | | 1,689 | | 3,769 | |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 10:  In-Person Voting Difficulties by Disability Type in 2020**

| Types of voting difficulties | No disability (1) | Any disability (2) | Hearing impairment (3) | Visual impairment (4) | Cognitive impairment (5) | Mobility impairment (6) | No need for help in daily activities (7) | Need help in daily activities (8) |
|---|---|---|---|---|---|---|---|---|
| Any difficulty in voting in person at polling place or election office | 9.8% | 18.0% * | 19.3% | 23.5% | 30.0% ** | 17.2% * | 15.2% | 24.8% * |
| 1.  Difficulty in finding or getting to the polling place | 2.3% | 1.4% | 1.0% | 3.8% | 3.6% | 1.2% | 0.8% | 3.1% |
| 2.  Difficulty in getting inside the polling place (for example, steps) | 0.4% | 3.2% * | 1.6% | 1.1% | 2.4% | 5.1% * | 2.1% | 6.0% * |
| 3.  Difficulty waiting in line | 6.2% | 7.4% | 8.5% | 1.4% * | 11.2% | 5.1% | 7.1% | 8.1% |
| 4.  Difficulty reading or seeing the ballot | 0.0% | 3.8% * | 4.1% | 20.5% * | 7.4% * | 5.2% * | 1.5% * | 9.7% * |
| 5.  Difficulty understanding how to vote or use the voting equipment | 2.9% | 2.7% | 0.9% | 2.2% | 3.5% | 2.9% | 2.6% | 2.9% |
| 6.  Difficulty communicating with poll workers or other officials at the polling place | 0.6% | 2.1% | 3.2% | 1.1% | 2.5% | 2.6% | 1.3% | 3.8% |
| 7.  Difficulty writing on the ballot | 0.0% | 1.2% * | 0.9% | 1.2% | 2.3% | 2.2% | 0.5% | 3.2% |
| 8.  Difficulty operating the voting machine | 0.9% | 1.0% | 1.0% | 4.1% | 1.5% | 0.0% | 0.9% | 1.2% |
| 9.  Other type of difficulty in voting | 0.3% | 1.8% * | 4.0% | 2.2% | 4.3% | 1.2% | 1.7% | 2.0% |
| Sample size | 371 | 697 | 124 | 72 | 139 | 298 | 506 | 189 |

* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 8.

**Table 11:  Specific Mail Voting Difficulties by Disability Type in 2020**

| Types of mail voting difficulties | No disability (1) | Any disability (2) | | Hearing impairment (3) | Visual impairment (4) | | Cognitive impairment (5) | Mobility impairment (6) | | No need for help in daily activities (7) | Need help in daily activities (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any difficulty receiving, returning, reading, understanding, or filling out ballot | 2.1% | 5.4% | * | 5.1% | 22.1% | * | 6.3% | 6.4% | * | 3.8% | 8.9% | * |
| Any difficulty reading, understanding, or filling out ballot | 0.7% | 2.3% | | 1.6% | 7.9% | * | 2.5% | 2.5% | | 1.8% | 3.3% | |
| Difficulty reading mail ballot | 0.0% | 1.4% | * | 1.6% | 5.7% | * | 1.9% | 1.2% | | 1.0% | 2.3% | |
| Difficulty understanding mail ballot | 0.4% | 0.4% | | 0.0% | 0.0% | | 0.0% | 0.4% | | 0.3% | 0.5% | |
| Difficulty filling out mail ballot | 0.0% | 0.8% | | 0.0% | 2.2% | | 0.6% | 1.3% | | 0.4% | 1.7% | |
| Other difficulty completing mail ballot | 0.4% | 0.1% | | 0.0% | 0.0% | | 0.0% | 0.3% | | 0.2% | 0.0% | |
| Difficulty receiving mail ballot | 1.7% | 1.9% | | 2.5% | 5.9% | | 3.0% | 1.9% | | 1.7% | 2.5% | |
| Difficulty returning mail ballot | 0.0% | 0.7% | * | 1.6% | 6.7% | | 2.0% | 0.9% | * | 0.2% | 1.9% | |
| Sample size | 319 | 797 | | 119 | 75 | | 155 | 398 | | 526 | 267 | |

* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 11.

# **<u>EXHIBIT A</u>**

CURRICULUM VITAE

Douglas L. Kruse

ADDRESSES:
School of Management and Labor Relations             34 Wilson Road
Rutgers University                                   Princeton, N.J.  08540
94 Rockafeller Road                                  609-924-3422
New Brunswick, N.J. 08903
(848) 445-5991
E-mail:  dkruse@smlr.rutgers.edu

EDUCATION:

Harvard University, Cambridge, Massachusetts.
        Ph.D. in Economics, June, 1988.

            Major fields:  Labor Economics, Comparative Economic Systems.
            Minor fields:  Applied Econometrics, Industrial Organization.
            Dissertation topic:  Empirical test of Weitzman profit-sharing theory, and effect of
                profit sharing on productivity and growth.

University of Nebraska-Lincoln, Lincoln, Nebraska.
        M.A. in Economics, August 1983.
        Certification in Public Policy Analysis and Program
            Evaluation, 1983.
        Fields: Public Policy, Field Research, Comparative Economic Systems.

Harvard University, Cambridge, Massachusetts.
        B.A. in Economics, June 1981, Magna Cum Laude.

EMPLOYMENT:

Distinguished Professor, July 2014-present; Professor, July 2000-June 2014; Associate
        Professor, July 1994-June 2000; Assistant Professor, July 1988-June 1994; Dept. of
        Human Resource Management, School of Management and Labor Relations, Rutgers
        University.  Member of the Graduate Faculties in Economics, Labor and Employment
        Relations, and Human Resource Management.

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers
        University, 2017-2018.

45

Senior Economist, Council of Economic Advisers, Executive Office of the President,
    Washington, D.C., September 2013-August 2014.
Teaching Assistant, 9/86-5/88, Dept. of Economics, Harvard University.
    Labor Economics, Econometrics, Comparative Economic Systems, and
    Labor Thesis Advising.

    Economic Development Consultant, 5/83-9/84, Department of Economic Development,

State of Nebraska, Lincoln, Nebraska.


OTHER POSITIONS:

National Bureau of Economic Research (Cambridge, Massachusetts), Research Associate,
    September 1995-present, Faculty Research Fellow, September 1990-August 1995.

IZA Institute of Labor Economics (Bonn, Germany), Research Fellow, March 2016-present.

Associate Editor, British Journal of Industrial Relations, January 2011-June 2021.

Associate Editor, Journal of Participation and Employee Ownership, January 2017-present.

Editorial Board member, Human Resource Management Journal, January 2017-present.

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect
    Phil Murphy, November 2017-January 2018.

President, International Association for the Economics of Participation, 2012-2014; Vice-
    President, 2010-2012.

Co-director, Program for Disability Research, School of Management and Labor Relations,
    Rutgers University, January 2005-present.

Director, Ph.D. Program in Industrial Relations and Human Resources, School of
    Management and Labor Relations, Rutgers University July 2007-June 2013.

President's Committee on Employment of People with Disabilities, Subcommittee on
    Employment Disability Concerns (Washington, D.C.), January 1998-December 2000.

New Jersey State Rehabilitation Council, October 1999-June 2013.


BOOKS:

How Did Employee Ownership Firms Weather the Past Two Recessions?  Kalamazoo, MI:
W.E. Upjohn Institute for Employment Research, 2017.  By Fidan Kurtulus and
Douglas Kruse.

Sharing Ownership, Profits, and Decision-making in the 21st Century, Volume 14 in the
series "Advances in the Economic Analysis of Participatory and Labor-managed
Firms." Bingley, UK: Emerald Publishing, 2013.  Edited by Douglas Kruse.

People with Disabilities: Sidelined or Mainstreamed?  Cambridge, England: Cambridge
University Press, 2013.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

    Reviewed in British Journal of Industrial Relations, Industrial and Labor Relations
Review, and Journal of Occupational Rehabilitation.

The Citizen's Share: Putting Ownership Back Into Democracy.  New Haven, CN:  Yale
University Press, 2013.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

    Reviewed in Administrative Science Quarterly, Journal of American History, and
Contemporary Sociology.

Shared Capitalism at Work: Employee Ownership, Profit Sharing, Gainsharing, and Broad-
based Stock Options.  Chicago:  University of Chicago Press, 2010.  Edited by
Douglas Kruse, Richard Freeman, and Joseph Blasi.

    Reviewed in Industrial and Labor Relations Review and Economic Record.

In the Company of Owners: The Truth About Stock Options (And Why Every Employee
Should Have Them).  New York:  Basic Books, 2003.  By Joseph Blasi, Douglas
Kruse, and Aaron Bernstein.

    Named a "Noteworthy Book in Industrial Relations and Labor Economics, 2003," by
Princeton University Industrial Relations Section.
    Named as one of the top 10 business books of 2003 by Business Week.
    Reviewed in Academy of Management Perspectives, Library Journal, and Journal of
Moral Education.

A Working Nation: Workers, Work, and Government in the New Economy.  New York:
Russell Sage Foundation, 2000.  By David T. Ellwood, Rebecca M. Blank, Joseph
Blasi, Douglas Kruse, William A. Niskanen, and Karen Lynn-Dyson.

    Reviewed in Journal of Economic Literature, Industrial and Labor Relations Review,
Journal of Social Policy, and Monthly Labor Review.

Stock Options, Corporate Performance, and Organizational Change. Oakland, CA: National
Center for Employee Ownership, 2000. By Joseph Blasi, Douglas Kruse, James Sesil,
Maya Kroumova, and Ryan Weeden.

Meeting Future Workforce Needs.  Menomonie, WI: University of Wisconsin-Stout, 1999. By Thomas Jennings, Steve Fusco, George Erickcek, Stacey Floyd, Chip Kenney, Douglas Kruse, Rob McInnes, Paul Mulka, Darlene Robbins, Martin Sicker, and Duane Watson.

Spinal Cord Injury:  An Analysis of Medical and Social Costs.  New York:  Demos Publications, 1998.  By Monroe Berkowitz, Paul O'Leary, Douglas Kruse, and Carol Harvey.

Kremlin Capitalism: The Privatization of the Russian Economy. Ithaca, NY:  Cornell University Press, 1997.  By Joseph Blasi, Maya Kroumova, and Douglas Kruse.

>    Chinese translation published by Shanghai Far East Publishers in 2000.

>    Reviewed in Annals of the American Academy of Political and Social Science, Australian Journal of International Affairs, British Journal of Sociology, Business and the Contemporary World, Business History, Business Week, Choice, Europe-Asia Studies, Economics of Transition, Fortune, Journal of East-West Business, Journal of Political Ecology, Library Journal, New York Review of Books, Review of Political Economy, Russian Review, Slavic Review, Social Science Journal, Washington Monthly, and World Today.

Profit Sharing: Does It Make A Difference?  Kalamazoo, MI:  W.E. Upjohn Institute for Employment Research, 1993.  By Douglas Kruse.

>    Awarded "Richard A. Lester Prize for Outstanding Book in Industrial Relations and Labor Economics, 1993," by Princeton University Industrial Relations Section.

>    Reviewed in Journal of Economic Literature, Journal of Comparative Economics, Industrial and Labor Relations Review, Relations Industrielles.

The New Owners:  The Mass Emergence of Employee Ownership in Public Companies and What it Means to American Business. New York:  HarperCollins, 1991.  By Joseph Blasi and Douglas Kruse.

>    Russian translation published by Delo Publishers (Moscow) in 1995.

>    Named a "Noteworthy Book in Industrial Relations and Labor Economics, 1991," by Princeton University Industrial Relations Section.

>    Reviewed in Journal of Economic Literature, British Journal of Industrial Relations, Administrative Science Quarterly, Economic and Industrial Democracy.

Employee Ownership and Employee Attitudes:  Two Case Studies.

Norwood, Pennsylvania:  Norwood Editions, 1984. By Douglas Kruse.

Reviewed in <u>British Journal of Industrial Relations</u>, <u>California Management Review</u>, <u>Economic and Industrial Democracy</u>.

PUBLISHED ARTICLES AND CHAPTERS:

<u>Disability</u>

"Disability and precarious work."  Forthcoming in <u>Oxford Handbook on the Sociology of Disability</u>, Oxford University Press, 2022.  By Lisa Schur and Douglas Kruse.

"Disability and Remote Work During the Pandemic with Implications for Cancer Survivors," <u>Journal of Cancer Survivorship,</u> forthcoming.  By Douglas Kruse, So Ri Park, Yana Rodgers, and Lisa Schur.

"COVID-19 and Employment Losses for Workers with Disabilities: An Intersectional Approach," forthcoming in Sophie Hennekam, Joy Beatty, and Mukta Kulkarni, eds., <u>Handbook of Disability and Management</u>, DeGruyter, 2022.  By Lisa Schur, Yana van der Meulen Rodgers, and Douglas Kruse, February 2021.

"Disability and influence in job interviews," <u>International Journal of Conflict Management</u>, forthcoming.  By Mason Ameri, Terri Kurtzberg, Lisa Schur, and Douglas Kruse.

"Qualitative Examination of Voting Empowerment and Participation Among People Living with Traumatic Brain Injury,"  <u>Archives of Physical Medicine and Rehabilitation</u>, forthcoming.  By Flora McConnell Hammond, Christine Davis, Mark Hirsch, Julia Snow, Martha Kropf, Lisa Schur, Douglas Kruse, and Andrew Ball.

"Telework after COVID: A "silver lining" for workers with disabilities?" <u>Journal of Occupational Rehabilitation</u> Vol. 30, no. 4, 2020: 521-536.  By Lisa Schur, Mason Ameri, and Douglas Kruse.

"No Room at the Inn?  Disability Access in the New Sharing Economy," <u>Academy of Management Discoveries,</u> August 2020, 6(2): 176-205.  By Mason Ameri, Sean Rogers, Lisa Schur, and Douglas Kruse.

"Disability in the Unionized Workplace."  In Susanne Bruyere, ed., <u>Employment and Disability: Issues, Innovations, and Opportunities</u>.  Ithaca, NY:  Cornell University Press, 2019.  By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas Kruse.

"Why Do Workers with Disabilities Earn Less?  Occupational Ability Requirements and Disability Discrimination." <u>British Journal of Industrial Relations</u> Vol. 56, No. 4,

December 2018, pp. 798-834.  By Douglas Kruse, Lisa Schur, Sean Rogers, Mason Ameri.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," ILR Review Vol. 71, No. 2, March 2018, pp. 329-364. By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, and Douglas Kruse.

"Disability at Work: A Look Back and Forward," Journal of Occupational Rehabilitation, Vol. 57, No. 4, December 2017, pp. 482-497.  By Lisa Schur, Kyongji Han, Andrea Kim, Mason Ameri, Meera Adya, Peter Blanck, and Douglas Kruse.

"Are Workers with Disabilities More Likely to be Displaced?"  International Journal of Human Resource Management, Vol. 27, No. 14 (2016): 1550-1579.  By Sophie Mitra and Douglas Kruse.

"Disability and Election Policies and Practices," in Barry C. Burden & Charles Stewart, eds., The Measure of American Elections.  Cambridge, England: Cambridge University Press, 2014. By Lisa Schur and Douglas Kruse.

"Accommodating Workers with and Without Disabilities," Human Resource Management, Vol. 53, No. 4, July/August 2014, pp. 593-621.  By Lisa Schur, Lisa Nishii, Meera Adya, Douglas Kruse, Susanne Bruyere, and Peter Blanck.

"Assessing Voting Competence and Political Knowledge: Comparing Individuals with Traumatic Brain Injuries and 'Average' College Students," Election Law Journal. Vol. 11, No. 2, 2012, pp. 52-69.  By Jessica N. Link, Martha Kropf, Mark Alexander Hirsch, Flora M. Hammond, Jason Karlawish, Lisa Schur, Douglas Kruse, Christine S. Davis.

 "Projecting Potential Demand for Workers with Disabilities," Monthly Labor Review, Vol. 133, No. 10, October 2010.  By Douglas Kruse, Lisa Schur, and Mohammed Ali.

"Is Disability Disabling in All Workplaces?  Workplace Disparities and Corporate Culture," Industrial Relations, Vol. 48, No. 3, July 2009, pp. 381-410.  By Lisa Schur, Douglas Kruse, Joseph Blasi, and Peter Blanck.

"Corporate Culture and the Employment of People with Disabilities," Behavioral Sciences and the Law, Vol. 23, 2005, pp. 3-20.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

"Calibrating the Impact of the ADA's Employment Provisions," Stanford Law and Policy Review, Vol. 14.2, 2003, pp. 267-290.  By Peter Blanck, Lisa Schur, Douglas Kruse, Susan Schwochau, and Chen Song.

"Disability and Employment: Symposium Introduction," Industrial Relations, Vol. 42, No. 1, January 2003.  By Douglas Kruse and Thomas Hale.

"Employment of People with Disabilities Following the ADA," <u>Industrial Relations</u>, Vol. 42, No. 1, January 2003, pp. 31-66.  By Douglas Kruse and Lisa Schur.

"Does the Definition Affect the Outcome?  Employment of People with Disabilities Under Alternative Disability Definitions," in David Stapleton and Richard Burkhauser, eds., <u>Why the Decline in Employment of People with Disabilities: A Policy Puzzle</u>. Kalamazoo, MI:  W.E.  Upjohn Institute for Employment Research, 2003, pp. 279-300.  By Douglas Kruse and Lisa Schur.

"Enabling Democracy:  Disability and Voter Turnout," <u>Political Research Quarterly</u>, Vol. 55, No. 1, March 2002, pp. 167-190.  By Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner.

Awarded prize by the Western Political Science Association as the best article published in the journal in 2002.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," <u>Social Science Quarterly</u>, Vol. 81, No. 2, June 2000, pp. 571-587.  By Lisa Schur and Douglas Kruse.

"Persons with Disabilities:  Demographic, Income, and Health Care Characteristics," <u>Monthly Labor Review</u>, Vol. 121, No. 9, September 1998, pp. 13-22. By Douglas Kruse.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," <u>Proceedings of the CSUN Conference on Technology and Persons with Disabilities</u>, Los Angeles, CA, March 1997.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

"Computer Use, Computer Training, and Employment Outcomes Among People with Spinal Cord Injuries," <u>Spine</u>, Vol. 21, No. 7, April 1996, pp. 891-896.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

<u>Employee Ownership, Profit Sharing, and Stock Options</u>

"Why Profit Sharing is Essential for Building Middle-class Incomes and Wealth," in Ray Boshara and Ida Rademacher, eds., <u>The Future of Building Wealth: Brief Essays on the Best Ideas to Build Wealth—for Everyone</u>.  St. Louis, MO:  Federal Reserve Bank of St. Louis and Aspen Institute, 2021, pp. 435-440.

"Guest editorial: New research on the impact of COVID-19 on employee-owned firms and the racial wealth gap in the context of the research literature", Journal of Participation and Employee Ownership, Vol. 4 No. 2 (2021), pp. 89-91. https://doi.org/10.1108/JPEO-09-2021-030.  By Blasi, J., Kruse, D. and Weltmann, D.

51

"The response of majority employee-owned firms during the pandemic compared to other firms," *Journal of Participation and Employee Ownership,* Vol. 4 No. 2  (2021), pp. 92-101. https://doi.org/10.1108/JPEO-09-2021-0014.  By Blasi, J., Kruse, D., & Weltmann, D.

"Race and gender wealth equity and the role of employee share ownership," Journal of Participation and Employee Ownership, Vol. 4 No. 2, pp. 116-135. https://doi.org/10.1108/JPEO-08-2021-0008. By Weissbourd, J., Conway, M., Klein, J., Chang, Y., Kruse, D., Hoover, M., Leverett, T., McKinley, J. & Trenholm, Z.

"Do Employee Share Owners Face Too Much Financial Risk?  Analysis of the Survey of Consumer Finances," ILR Review, forthcoming, https://doi.org/10.1177/00197939211007394.   By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Aligning Interests to Leverage a Racially Diverse Workforce: The Effects of Racial Diversity on Firm-Level Outcomes Under the Use of Broad-Based Stock Options," Organization Science, forthcoming. By Han, J. H.**,** Shin, D.-J., Castellano, W. G., Konrad, A. M., Kruse, D. L., & Blasi, J. R..

"Where does profit sharing work best? A meta-regression analysis," British Journal of Industrial Relations, 58(2), 2020, pp. 364-395.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The State of ESOPs: What's Past Is Prologue: Introduction to the Special Issue on Employee Ownership, Policy, and New Data," Journal of Participation and Employee Ownership, Volume 2, Issue 3, Fall 2019.  By Joseph Blasi, Dan Weltmann, and Douglas Kruse.

"Broad-based Employee Stock Ownership: What Makes It Effective in the Management of Human Resources: Introduction to the Special Issue," Human Resource Management, Volume 58, Issue 6, November-December 2019, 567-584.  By Frank Mullins, Dan Weltmann, Douglas Kruse, and Joseph Blasi.

"An Empirical Analysis of the Relationship between Employee Ownership and Employment Stability in the US: 1999–2011," British Journal of Industrial Relations, Vol. 56, No. 2, June 2018, pp. 245-291.  By Fidan Kurtulus and Douglas Kruse.

"Shared Capitalism in the U.S.: Evaluation and Future Policies."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 361-373. By Joseph R. Blasi and Douglas L. Kruse

"An American Historical Perspective on Employee Ownership."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 114-130.  By Joseph R. Blasi and Douglas L. Kruse.

"What does the U.S. Research Show about Worker Ownership?"  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 211-226.  By Joseph R. Blasi, Richard Freeman, and Douglas L. Kruse

"Broad-based Employee Stock Ownership and Profit-Sharing:  History, Evidence, and Policy Implications," <u>Journal of Participation and Employee Ownership</u>, Vol. 1, No. 1, 2018, 38-60.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.

"Having a Stake: Evidence and Implications for Broad-based Employee Stock Ownership and Profit Sharing" Policy Brief, February 2017. Third Way, Washington, D.C. http://www.thirdway.org/report/having-a-stake-evidence-and-implications-for-broad-based-employee-stock-ownership-and-profit-sharing.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.

"Does Employee Ownership Improve Performance?" <u>IZA World of Labor</u>, December 2016, http://wol.iza.org/articles/does-employee-ownership-improve-performance;

"Do Broad-based Employee Ownership, Profit Sharing, and Stock Options Help the Best Firms Do Even Better?" <u>British Journal of Industrial Relations</u>, Vol. 54, No. 1, March 2016, pp. 55-82.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Anti-shirking effects of group incentives and human-capital-enhancing HR practices." <u>Advances in the Economic Analysis of Participatory and Labor-Managed Firms,</u> 16: 199-221, 2015.  By Andrea Kim, Kyongji Han, Joseph R. Blasi, and Douglas L. Kruse.

"Does Employee Ownership Affect Attitudes and Behaviors?  The Role of Selection, Status, and Size of Stake."  <u>Advances in the Economic Analysis of Participatory and Labor-Managed Firms,</u> 16: 251-277, 2015.  By Dan Weltmann, Joseph Blasi, and Douglas Kruse.

"Employee Stock Ownership and Profit Sharing in the New Era of Financialization and Inequality in the Distribution of Capital Income," in Christian Weller, ed., <u>Inequality, Uncertainty, and Opportunity: The Varied and Growing Role of Finance in Labor</u>

<u>Relations</u>.  Champaign, IL: Labor and Employment Relations Association, 2015, pp. 225-246.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Involvement work systems and operational effectiveness: Exploring the moderating effect of national power distance." <u>Journal of International Business Studies</u> Vol. 46, No. 3, 2014: 332-354. By Yuan Jiang, Saba Colakoglu, David P. Lepak, Joseph R. Blasi, and Douglas L. Kruse.

> Awarded the 2016 International HRM Scholarly Research Award, Human Resources Division, Academy of Management.

"Group Incentives and Financial Performance: The Moderating Role of Innovation," <u>Human Resource Management Journal</u>, Vol. 24, No. 1, 2014, 77-94.  By Rhokeun Park and Douglas Kruse.

"Firm Survival and Performance in Privately-held ESOP Companies," in Douglas Kruse, ed., <u>Sharing Ownership, Profits, and Decision-making in the 21st Century</u>, Volume 14 in the series "Advances in the Economic Analysis of Participatory and Labor-managed Firms." Bingley, UK:  Emerald Publishing, 2013.  By Joseph Blasi, Douglas Kruse, and Dan Weltmann.

"Employee share ownership and profit sharing in different institutional contexts," <u>International Journal of Human Resource Management</u>, Vol. 23, No. 8, 2012 pp. 1513-1518.  By Erik Poutsma, Joseph Blasi, and Douglas Kruse.

"An Empirical Analysis of Risk Preferences, Compensation Risk, and Employee Outcomes," in Ed Carberry, ed., <u>Employee Ownership and Shared Capitalism: New Directions in Research</u> Ithaca, NY:  Cornell University Press, 2011.  By Fidan Ana Kurtulus, Douglas L. Kruse, and Joseph R. Blasi.

"Solidarity and Sharing: Unions and Shared Capitalism," in Ed Carberry, ed., <u>Employee Ownership and Shared Capitalism: New Directions in Research</u> Ithaca, NY:  Cornell University Press, 2011.  By John E. McCarthy, Paula Voos, Adrienne.E. Eaton, Douglas L. Kruse, and Joseph R. Blasi.

"Worker Attitudes Toward Employee Ownership, Profit Sharing, and Variable Pay," in <u>Advances in the Economic Analysis of Participatory and Self-managed Firms, Volume 12</u>, edited by Jed DeVaro.  Bingley, UK:  Emerald Publishing, 2011, pp. 143-168. By Fidan Ana Kurtulus, Douglas Kruse, and Joseph Blasi.

"Employee stock ownership and diversification," <u>Annals of Operations Research</u>, April 2010, Vol. 176, No. 1, pp. 95-107.  By Harry Markowitz, Joseph Blasi, and Douglas Kruse.

"Employee involvement and group incentives in manufacturing companies: a multi-level analysis," Human Resource Management Journal, Vol. 20, No. 3, 2010, pp. 227-243. By Rhokeun Park, Eileen Appelbaum, and Douglas Kruse.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 41-76). By Douglas Kruse, Joseph Blasi, and Rhokeun Park.

 "Worker Responses to Shirking under Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 77-104). By Richard Freeman, Douglas Kruse and Joseph Blasi.

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 105-138). By Joseph Blasi, Douglas Kruse, and Harry Markowitz.

"Creating a Bigger Pie?  The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 139-166). By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 225-256). By Erika Harden, Douglas Kruse, and Joseph Blasi.

 "Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 257-290). By Douglas Kruse, Richard Freeman, and Joseph Blasi.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL:

University of Chicago Press, 2010, pp. 351-376).  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.

"Labor Practices and Outcomes Across Countries: Analysis of a Single Multinational Firm," in International Differences in the Business Practices and Productivity of Firms, edited by Richard Freeman and Kathryn Shaw.  Chicago: University of Chicago Press, 2009, pp. 105-136.  By Richard Freeman, Douglas Kruse, and Joseph Blasi.

"The Same Yet Different: Worker Reports on Labor Practices and Outcomes in a Single Firm Across Countries," Labour Economics, August 2008, Vol. 15, No. 4, pp. 750-71. By Richard Freeman, Douglas Kruse, and Joseph Blasi.

"Broad-based Employee Stock Options in the United States: Company Performance and Characteristics," Management Revue, Vol. 18, No. 2, 2007, pp. 5-22.  By James Sesil, Maya Kroumova, Douglas Kruse, and Joseph Blasi.

"The Changing Nature of Worker Ownership, Stock Options, and Profit Sharing in Corporate America," in The New American Workplace, edited by Edward Lawler and James O'Toole.  Palgrave Macmillan Publishers, 2006.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

"Are Diversification and Employee Ownership Incompatible?" The Journal of Employee Ownership Law and Finance, Vol. 18, No. 4, Fall 2006.  By Joseph Blasi and Douglas Kruse.

"Employee Ownership in the 2002 General Social Survey," The Journal of Employee Ownership Law and Finance, Vol. 18, No. 3, Summer 2006.  By Joseph Blasi and Douglas Kruse.

"The Political Economy of Employee Ownership in the United States: From Economic Democracy to Industrial Democracy?" International Review of Sociology, January 2006.  By Joseph Blasi and Douglas Kruse.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," in Virginie Perotin and Andrew Robinson, eds., Advances in the Economic Analysis of Participatory and Self-managed Firms, Vol. 8.  Greenwich, CN: JAI Press, 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Does Employee Ownership Enhance Firm Survival?" in Virginie Perotin and Andrew Robinson, eds., Advances in the Economic Analysis of Participatory and Self-managed Firms, Vol. 8.  Greenwich, CN:  JAI Press, 2004.  By Rhokeun Park, Douglas Kruse, and James Sesil.

56

"The Effects of Restructuring Charges on Employer Contributions to Profit Sharing Plans," Journal of Accounting and Public Policy, Vol. 23, 2004, pp. 247-278.  By Scott Jackson, Elaine Mauldin, William Wilcox, and Douglas Kruse.

"Employee Stock Ownership," in Carl E. Van Horn and Herbert A. Schaffner, eds., Work in America: An Encyclopedia of History, Policy, and Society.  Santa Barbara, CA: ABC Clio, 2004, pp. 178-181.  By Joseph Blasi and Douglas Kruse.

"An Assessment of Employee Ownership In The United States With Implications For The EU," International Journal of Human Resource Management, September 2003.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," Proceedings of the 55th Annual Meeting, Industrial Relations Research Association, January 2003, pp. 307-317.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Sharing Ownership via Employee Stock Ownership," in Laixiang Sun, ed., Ownership and Governance of Enterprises: Recent Innovative Developments.  New York:  Palgrave MacMillan, 2003, pp. 96-123.  By James Sesil, Douglas Kruse, and Joseph Blasi.

"Research Evidence on the Prevalence and Effects of Employee Ownership," Journal of Employee Ownership Law and Finance, Vol. 14, No. 4, Fall 2002, pp. 65-90.  By Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," British Journal of Industrial Relations, Vol. 40, No. 2, June 2002, pp. 273-294.  By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Broad-based Stock Option Programs: A Union-Nonunion Comparison," in David Lewin, ed.,  Advances in Industrial and Labor Relations.  Greenwich, CN:  JAI Press, 2002.  By Maya Kroumova, James Sesil, Douglas Kruse, and Joseph Blasi.

"Worker Ownership, Participation and Control: Toward a Theoretical Model," in Michael J. Handel, ed., Sociology of Organizations: Classic, Contemporary and Critical Readings.  Thousand Oaks, Ca.: Sage Publications, 2002.    By William Foote Whyte, Joseph Blasi, and Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," Proceedings of the Global Human Resource Management Conference, June 2001. By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Employee Equity: Employee versus Owner Issues in Organizations," in Cary L. Cooper and Denise M. Rousseau, eds., Trends in Organizational Behavior, Volume 8.  New York and London: John Wiley & Sons, April 2001. By Joseph Blasi and Douglas Kruse.

"Is Employee Ownership An Unstable Form?  Or A Stabilizing Force?" in Margaret Blair and Thomas Kochan, eds., The New Relationship: Human Capital in the American Corporation.  Washington, D.C.: Brookings Institution, 2000. By Margaret Blair, Douglas Kruse, and Joseph Blasi.

"Broad-Based Stock Options and Company Performance: What the Research Tells Us," Journal of Employee Ownership Law and Finance, Vol. 12, No. 3, Summer 2000.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Decentralisation of Bargaining Systems and Financial Participation: A Comparative Analysis of Italy, UK, and the US," Lavoro e Relazioni Industriali, Summer 1999, No. 1, pp. 1-41. By Alessandra Del Boca, Douglas Kruse, and Andrew Pendleton.

"Giving Employees an Ownership Stake," Brookings Review, Fall 1999, Vol. 17, No. 4, pp. 23-26. By Margaret Blair and Douglas Kruse.

"Public Opinion Polls on Employee Ownership and Profit Sharing," Journal of Employee Ownership Law and Finance, Vol. 11, No. 3, Summer 1999, pp. 3-25.  By Douglas Kruse and Joseph Blasi.

"Profit Sharing and the Demand for Low-Skill Workers," in Richard Freeman and Peter Gottschalk, eds., Generating Jobs: Increasing the Demand for Low-Skill Workers. New York:  Russell Sage Foundation, 1998, pp. 105-153. By Douglas Kruse.

"Employee Ownership, Employee Attitudes, and Firm Performance: A Review of the Evidence," in Daniel J.B. Mitchell, David Lewin, and Mahmood Zaidi, eds., Handbook of Human Resource Management.  Greenwich, CN: JAI Press, 1997, pp. 113-151. By Douglas Kruse and Joseph Blasi.

      Reprinted in Samuel Estreicher, ed., Employee Representation in the Emerging Workplace: Alternatives/Supplements to Collective Bargaining (Boston: Kluwer Law International, 1998), pp. 581-626.

"Financial Returns of Public ESOP Companies:  Investor Effects vs. Manager Effects," Financial Analysts Journal, Vol. 52, No. 4, Summer 1996, pp. 51-61.  By Michael Conte, Joseph Blasi, Douglas Kruse, and Rama Jampani.

"Why Do Firms Adopt Profit Sharing and Employee Ownership Plans?" British Journal of Industrial Relations, Vol. 34, No. 4, December 1996, pp. 515-38. By Douglas Kruse.

"Employee Stock Ownership and Corporate Performance Among Public Companies," Industrial and Labor Relations Review, Vol. 50, No. 1, October 1996, pp. 60-79.  By Joseph Blasi, Michael Conte, and Douglas Kruse.

"Employee Ownership Through 401(k) Plans: The NCEO-Rutgers University Study," Journal of Employee Ownership Law and Finance, Vol 8, No. 4, Fall 1996, pp. 13-32. By Susan Prolman and Douglas Kruse.

"The Impact of Financial Participation on Employee and Firm Performance," Corporate Effectiveness and Human Resource Practices, Conference Proceedings, Institute of Labor and Industrial Relations, University of Illinois, October 1996, pp. 423-463.  By Douglas Kruse and Joseph Blasi.

"Profit Sharing and Public Policy," Journal of Economic Issues, Vol. 28, No. 2, June 1994. By Douglas Kruse.

    Reprinted in Basque journal Economiaz: Revista Vasca de Economia, Numero 33, 3er Cuatrimestre, 1995.

"Employees and Managers as Shareholders," Human Resource Planning, Vol. 17, No. 4, 1994, pp. 31-40. By Joseph Blasi, Douglas Kruse, and James Gasaway.

"Employee Ownership and Participation: Trends, Problems, and Policy Options," Journal of Employee Ownership Law and Finance.  Vol 5, No. 2, Spring 1993, pp. 41-73. By Joseph Blasi and Douglas Kruse.

"The New Owners: Stock Price Performance for Public Companies with Significant Employee Ownership,"  Journal of Employee Ownership Law and Finance, Vol. 4, No. 3, Summer 1992, pp. 95-130.  By Joseph Blasi, Michael Conte, and Douglas Kruse.

"Profit Sharing and Productivity:  Microeconomic Evidence from the United States," Economic Journal, Vol. 102, No. 410, Jan. 1992, pp. 24-36. By Douglas Kruse.

"Employee Ownership," in Peter Newman, Murray Milgate, and John Eatwell, eds., The New Palgrave Dictionary of Money and Finance.  London:  MacMillan Press Ltd., 1992, pp. 759-761. By Joseph Blasi and Douglas Kruse.

"Profit Sharing in the 1980's: Disguised Wages or a Fundamentally Different Form of Compensation?" in Randall Eberts and Erica Groshen, eds., Structural Changes in U.S. Labor Markets: Causes and Consequences.  Armonk, NY:  M.E. Sharpe, 1992. By Douglas Kruse.

"ESOPs, Profit Sharing, and Other Contingent Compensation Plans: How Do They Affect Corporate Performance?"  Financial Management, Winter 1991, pp. 91-100.  By Michael Conte and Douglas Kruse.

59

"The Role of Profit Sharing in Employee Compensation," <u>Commentary</u> (journal of the National University of Singapore), Vol. 9, No. 1/2, November 1991.  By Douglas Kruse and James Chelius.

"Strategic Problems and Tactical Promise: Unions and Employee Ownership," <u>Labor Law Journal</u>, Vol. 42, No. 8, August 1991, pp. 498-507. By Joseph Blasi and Douglas Kruse.

"Employee Ownership: Opportunities for Unions," <u>Work Place Topics</u>, Vol. 2, No. 1, July 1991, pp. 1-22.  By Joseph Blasi and Douglas Kruse.

"The New Owners: Employee Ownership in Public Companies," <u>Journal of Employee Ownership Law and Finance</u>, Vol III, No. 3, Summer 1991, pp. 129-152.  By Joseph Blasi and Douglas Kruse

"Profit Sharing and Employment Variability:  Microeconomic Evidence on the Weitzman Theory," <u>Industrial and Labor Relations Review</u>, Vol. 44, No. 3, April 1991, pp. 437-453. By Douglas Kruse.

Reprinted in Morris Kleiner, ed., <u>Industrial Relations: Institutions and Organizational Performance</u> (Hampshire, England: Dartmouth, 1994).

"Profit Sharing and Productivity," in Alan Blinder, ed., <u>Paying For Productivity: A Look at the Evidence</u>.  Washington, D.C.:  Brookings Institution, 1990.  By Martin Weitzman and Douglas Kruse.

Reprinted in Louis Putterman and Randy Kroszner, eds., <u>The Economic Nature of the Firm</u>, 1996.

<u>Other topics</u>

"Effects of Leader Networking Behaviors and Vertical Faultlines on Support for Innovation," *Small Group Research*, 2020, 51(5), 616-650.  By Chung, Y., Jiang, Y., Blasi, J. R., & Kruse, D. L.

"Worksite Segregation and Performance-Related Attitudes," <u>Work and Occupations</u>, February 2010; vol. 37, No. 1, pp. 45-72.  By Niki Dickerson, Lisa Schur, Douglas Kruse, and Joseph Blasi.

"High Performance Work Practices at Century's End: Incidence, Diffusion, Industry Group Differences and the Economic Environment, <u>Industrial Relations</u>, Vol. 45, No. 4, October 2006, pp. 547-578.  By Joseph Blasi and Douglas Kruse.

"The New Employee/Employer Relationship," in David Ellwood et al., <u>Working Nation: Workers, Work, and Government in the New Economy</u>.  New York:  Russell Sage Foundation, 2000.  By Douglas Kruse and Joseph Blasi.

> Reprinted in Samuel Estreicher, ed., <u>Global Competition and the American Employment Landscape: As We Enter the 21st Century</u> (Boston: Kluwer Law International, 2001).

"Illegal Child Labor in the United States: Prevalence and Characteristics," <u>Industrial and Labor Relations Review</u>, Vol. 54, No. 1, October 2000, pp. 17-40.  By Douglas Kruse and Douglas Mahony.

"Flexible Work Hours and Labor Productivity: Some Evidence from the Pharmaceutical Industry," <u>Industrial Relations</u>, Vol. 35, No. 1, January 1996, pp. 123-139.  By Edward Shepard, Thomas Clifton, and Douglas Kruse.

"Pension Substitution in the 1980's:  Why the Shift Toward Defined Contribution Plans?" <u>Industrial Relations</u>, Vol. 34, No. 2, April 1995, pp. 218-241. By Douglas Kruse.

"Gender Differences in Attitudes Toward Unions," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 1, October 1992, pp. 89-102.  By Lisa Schur and Douglas Kruse.

"Supervision, Working Conditions, and the Employer Size-Wage Effect," <u>Industrial Relations</u>, Vol. 31, No. 2, Spring 1991, pp. 229-249. By Douglas Kruse.

"Displaced versus Disadvantaged Workers:  Policy Issues and Research Questions," in John Addison, ed., <u>Job Displacement: Consequences and Implications for Policy</u>. Detroit, MI:  Wayne State University Press, 1991. By Douglas Kruse.

"The Economic Implications of Employment Rights and Practices in the U.S.," <u>Journal of Comparative Economics</u>, Vol. 14, September 1990, pp. 221-253. By Douglas Kruse.

"International Trade and the Labor Market Experience of Displaced Workers," <u>Industrial and Labor Relations Review</u>, Vol. 41, No. 3, April 1988, pp. 402-417. By Douglas Kruse.

"Industrial Policy at the State Level in the United States," <u>Journal of Economic Issues</u>, XIX:2, June 1985.  By F. Gregory Hayden, Douglas Kruse, and Steven Williams.

"Small Business Financing:  A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," <u>Proceedings of the Small Business Institute Directors' Association Conference, 1984</u>, February 1984, pp. 125-138.  By Douglas Kruse, Steve Williams and F. Gregory Hayden.


BOOK REVIEWS AND MISCELLANY:

"Foreword," <u>Institutional Analysis and Praxis: The Social Fabric Matrix Approach</u>, Tara
   Natarajan, Wolfram Elsner, and Scott Fullwiler, eds. (New York: Springer, 2009), pp.
   vii-viii.

"Commentary on 'The Economic and Social Impacts of Telework' by Sean Doherty et al.,"
   <u>Telework: The New Workplace of the 21st Century</u>.  Washington, D.C.: U.S.
   Department of Labor, 2000, pp. 98-102.

"<u>The Ownership Solution: Towards a Shared Capitalism for the 21st Century</u>: A Review,"
   <u>Economic Analysis: The Journal of Enterprise and Participation</u>, Vol. 2, No. 1, 1999,
   pp. 70-72.

"<u>America's Agenda: Rebuilding Economic Strength</u>: A Review," <u>Journal of Comparative
   Economics</u>, Vol. 19, No. 1, August 1994, pp. 122-124.

"<u>Pensions and the Economy</u>:  A Review," <u>Industrial and Labor Relations Review</u>, Vol. 46,
   No. 3, July 1993.

"<u>Three Worlds of Labor Economics</u>:  A Review."  <u>Journal of Economic Issues</u>, XXIV:3,
   September 1990.

"<u>Workers' Self-Management in the United States</u>:  A Review." <u>Journal of Economic Issues</u>,
   XIX:3, September 1985.

"<u>Workplace Democracy and Social Change</u>:  A Review."  <u>Journal of Economic Issues</u>,
   XVII:4, December 1983.


CONGRESSIONAL TESTIMONY:

"Research on Stock Options," Testimony before the U.S. House of Representatives,
   Committee on Financial Services, Subcommittee on Capital Markets, Insurance, and
   Government Sponsored Enterprises, April 21, 2004.

"Research Evidence on Prevalence and Effects of Employee Ownership," Testimony before
   the Subcommittee on Employer-Employee Relations, Committee on Education and the
   Workforce, U.S. House of Representatives, February 13, 2002.

"Profit Sharing and Gainsharing," Testimony before U.S. House of Representatives
   Committee on Small Business, Subcommittee on Regulation, Business Opportunities,
   and Technology, July 15, 1994.

"Testimony before the House Subcommittee on Economic Stabilization," <u>The National
   Entrepreneurship Act: Hearing before the Subcommittee on Economic Stabilization of</u>

the Committee on Banking, Finance, and Urban Affairs.  May 15, 1984, Serial No. 98-92. Washington, D.C.:  Government Printing Office, 1984.

REPORTS:

Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results Submitted to the Election Assistance Commission.  February 2021.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2020 Elections, September 2020.  By Lisa Schur and Douglas Kruse.

Fact sheet: Elected Officials with Disabilities, September 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2018 Elections, July 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2016 Elections, August 2017.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2016 Elections, September 2016.  By Lisa Schur and Douglas Kruse.

Disability, Voter Turnout, and Voting Difficulties in the 2012 Elections, report submitted to the U.S. Election Assistance Commission, June 2013.  By Lisa Schur, Meera Adya, and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2010 Elections, August 2011.  By Lisa Schur and Douglas Kruse.

Inclusive Capitalism for the American Workforce: Reaping the Rewards of Economic Growth through Broad-based Employee Ownership and Profit Sharing.  Center for American Progress, March 2011.  By Richard B. Freeman, Joseph R. Blasi, and Douglas L. Kruse.

Fact sheet:  Disability and Voter Turnout in the 2008 Elections, August 2009.  By Lisa Schur and Douglas Kruse.

Shared Capitalism, Employee Attitudes, and Company Outcomes:  An Analysis of the Great Place to Work Dataset, 2006-2008, submitted to the Sloan Foundation, December 2009.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

Employment of People with Disabilities: Report to the National Council on Disability, May 2007.  By Douglas Kruse (Principal Investigator) with James Schmeling, Meera Adya,

Carol Harvey, Todd Honeycutt, William Myhill, Cynthia Smith, M.A., Michael Morris, and Peter Blanck.

Assessment of Test Questions to Identify Disability Status: Report to the Bureau of Labor Statistics, January 2004.  By Douglas Kruse.

Theoretical Study on Stock Options in Small and Medium Enterprises, Report to the Enterprise-Directorate General, Commission of the European Communities, October 2002.  By Andrew Pendleton, Joseph Blasi, Douglas Kruse, Erik Poutsma, and James Sesil.

Non-standard Work Arrangements and Disability Income, Report to the Disability Research Institute, University of Illinois Urbana-Champaign, August 2002.  By Lisa Schur and Douglas Kruse.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities, Report to the Rutgers Disability Research Consortium and N.J. Developmental Disabilities Council, March 1999.  By Douglas Kruse, Lisa Schur, Kay Schriner, and Todd Shields.

Disability and Employment: Characteristics of Employed and Non-employed People with Disabilities, Report to the Office of Policy, U.S. Department of Labor, September 1997.  By Douglas Kruse.

Disability, Employment, and Earnings in the Dawn of the Computer Age, Report to the Rutgers Disability Research Consortium and the N.J. Developmental Disabilities Council, October 1995.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, Report to the U.S. Department of Labor, March 1995. By Linda Bell and Douglas Kruse.

Characteristics of Nebraska Migrants:  Data from the 1980 Census.  Lincoln, NE: Department of Economic Development, State of Nebraska, September 1984.

Equity Capital and Nebraska Small Businesses.  Lincoln, NE: Policy Research Office, State of Nebraska, 1984.  By F. Gregory Hayden, Douglas Kruse, and Steve Williams.

Nebraska Socioeconomic Indicators.  Lincoln, NE:  State of Nebraska, May 1984.  By Steve Williams and Douglas Kruse.


WORKING PAPERS AND CURRENT RESEARCH:

"Progress or Regress amid the Pandemic? Disability, Voting Accessibility, and Voter Turnout From 2008 to 2020," presented at APSA annual conference, October 1, 2021.  By Lisa Schur, Douglas Kruse, Lauren Gilbert, Mason Ameri, and Meera Adya.

"See Me, Not the Disability: Field Experiments on Disability, Veteran, and Gender Status in Hiring Outcomes." By Mason Ameri, Lisa Schur, Meera Adya, and Douglas Kruse. October 2019.

"Disability and the Unionized Workplace," IZA Discussion Paper No. 12258, March 2019. By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas L. Kruse.

"Do Employee Share Owners Face Too Much Financial Risk?"  IZA Discussion Paper No. 12303, April 2019.  By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values,"  IZA Discussion Paper No. 11617, June 2018.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior." By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, Douglas Kruse.  Working Paper No. 21560, National Bureau of Economic Research, Cambridge, MA, September, 2015.  Published in ILR Review.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" NBER Working Paper 14830, April 2009.  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER Working Paper 14225, August 2008. By Douglas Kruse, Joseph Blasi, and Rhokeun Park.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," NBER Working Paper 14234, August 2008.   By Erika Harden, Douglas Kruse, and Joseph Blasi. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Creating a Bigger Pie?  The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," NBER Working Paper 14230, August 2008.  By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER Working Paper 14233, August 2008. By Douglas Kruse, Richard Freeman, and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Worker Responses to Shirking under Shared Capitalism," NBER Working Paper 14227, August 2008.  By Richard Freeman, Douglas Kruse and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," NBER Working Paper 14229, August 2008.  By Joseph Blasi, Douglas Kruse, and Harry Markowitz.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," National Bureau of Economic Research Working Paper Number 10177, January 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Chris Mackin.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," presented at Columbia conference "Democracy, Participation, and Development," May 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," November 1998.  By Douglas Kruse and MaryAnne Hyland.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research Working Paper No. 5302, October 1995.  By Alan Krueger and Douglas Kruse.

GRANTS AND CONTRACTS:

Disability and Voting Accessibility in the 2020 Elections.  Lisa Schur and Douglas Kruse. This $318,000 contract from the U.S. Election Assistance Commission funded a post-election national survey of 2569 people on disability and voting in the 2020 elections. Report was delivered February 17, 2021.

Disability Inclusive Employment Policy RRTC (Rehabilitation Research and Training Center).  Douglas Kruse, Lisa Schur, Mason Ameri, and Yana Rodgers.  Funded by U.S. Department of Health and Human Services.  Project period 2020-2025.  Center is based at Syracuse with Rutgers and Harvard as partners.  Doug Kruse is PI on the Rutgers subaward of $943,000, and co-PI on the overall award of $4,375,000 based at Syracuse.

Disability and Assistive Technology.  Douglas Kruse, Lisa Schur, Mason Ameri, and Hazel-Anne Johnson.  "SFW-HTF-RL: Collaborative Research: Future of Work for People with Disabilities – Physical and Cognitive Training Through Perceptive and Adaptive Soft (PECASO) Wearable Robots." Funded by National Science Foundation.  Project period 2020-2024.  Project is based at CUNY with Rutgers as partner.  Doug Kruse is

PI on the Rutgers subaward of $619,279, and co-PI on the overall award of $1,884,010 based at CUNY.

Employee Ownership and Employment Stability.  Co-PI with Fidan Kurtulus for $40,000 grant from W.E. Upjohn Institute for Employment Research, 2012-2014.  We examined public employee ownership firms over the 1999-2011 period, analyzing their employment stability and survival during the two recessions. The results were published in a book in 2014.

Disability Discrimination and Job Requirements.  Co-PI for $200,000 grant from Employment Policy Rehabilitation Research and Training Center, based at University of New Hampshire and funded by National Institute on Disability and Rehabilitation Research, 2010-2015.  This project matches data on disability earnings gaps by occupation to data on occupational job tasks and ability requirements, examining whether disability earnings gaps are limited to occupations in which an impairment should limit productivity, or instead also exist in occupations where impairments do not limit productivity, which would support the idea that discrimination is at work.

Organizational Practices and Disability.  Co-investigator for $500,000 grant from the Office of Disability Employment Policy, U.S. Department of Labor, 2006-2007.  A consortium of Rutgers, Cornell, and Syracuse researchers worked with three other research partners and six companies to study how corporate policies and practices, and manager and co-worker attitudes, can limit or facilitate employment opportunities for people with disabilities.  The researchers developed case study standards and methodology, and then applied them in six case studies. The information from the case studies will provide lessons about what works in diverse settings, helping companies develop "best practices" for employing people with disabilities and providing a platform for ongoing benchmarking and self-evaluation.

Disability and Demand-side Employment Placement Models.  Co-investigator for $2.5 million grant in collaboration with Syracuse University and the University of Illinois, 2006-2011, from the National Institute on Disability and Rehabilitation Research, U.S. Dept. of Education.  This establishes a 5-year center to study factors affecting employer demand for people with disabilities.  The Rutgers projects include studies on contingent work, worker displacement, and 10-year projections of demand for specific abilities.

Desired and Actual Work Arrangements Among People with Disabilities.  Principal investigator for $51,350 in grants for putting disability questions on the 2006 General Social Survey.  In combination with two work modules (the Work Orientation module and the Quality of Work Life module), these data provide the first representative estimates of desired work arrangements among both employed and non-employed people with disabilities, and the attitudes and experiences of employed people with disabilities.

Shared Capitalism: Co-investigator with Richard Freeman, Joseph Blasi, and Chris Mackin for $650,000 grant from Russell Sage Foundation and Rockefeller Foundation, September 2000-December 2006.  We did case studies of 14 U.S. companies with various forms of employee ownership, stock options, and profit sharing, with surveys from 41,000 employees.  For nationally-representative data, we sponsored questions on the 2002 and 2006 General Social Surveys regarding attitudes toward and experience with employee ownership and profit sharing.  Results will form the basis of a conference, several articles, and a book.

Design of Disability Questions for Current Population Survey:  Principal investigator for $102,500 grant from Presidential Task Force on Employment of Adults with Disabilities, August 2001-December 2002.  I worked with the Bureau of Labor Statistics, under a Presidential Executive Order, to design disability questions for the monthly population survey of the federal government.

Disability Research Institute:  Co-investigator for 5-year cooperative agreement with Social Security Administration to do research on employment and disability income among people with disabilities.  One project with Lisa Schur, funded by a $54,000 grant, analyzed the prevalence and trends of alternative work arrangements among people with disabilities over the 1992-2000 period, and legal issues facing workers with disabilities in such arrangements.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities: Co-investigator for $102,500 in grants from the New Jersey Developmental Disabilities Council, National Institute on Disability and Rehabilitation Research, Presidential Task Force on Employment of Adults with Disabilities, and Rutgers School of Management and Labor Relations for national surveys following the November 1998 and 2000 elections.   The 2000 survey had 1000 respondents and the 1998 survey had 1240 respondents, with 500 respondents with disabilities in 2000 and 700 respondents with disabilities in 1998.  The project, done with collaborators Lisa Schur (Rutgers), Kay Schriner, and Todd Shields (U. of Arkansas), compared people with and without disabilities in levels and determinants of voter turnout and other forms of political participation.

Survival and Growth of Private ESOP Firms:  Co-investigator with Joseph Blasi for $20,000 grant from ESOP Foundation, National Center for Employee Ownership, and Foundation for Enterprise Development, May, 2000-December, 2000.  This project uses 1983-99 longitudinal Dun & Bradstreet data for 3010 firms to investigate the relative survival and growth patterns of ESOP vs. non-ESOP firms.

<u>Disability and Employment</u>:  Principal investigator for $25,000 grant from U.S. Department of Labor, 1997.  I analyzed Survey of Income and Program Participation dataset to construct baseline information for evaluating likely impacts of policy proposals to encourage employment among people with disabilities.  The report provides portraits of employed and non-employed people with disabilities, and comparisons to the general population, with respect to demographic characteristics, personal and household income sources and amounts, health care insurance and utilization, and employment characteristics of the employed.

<u>Disability, Employment, and Computer Use</u>:  Co-investigator, with Alan Krueger of Princeton University, for $100,000 grant from Rutgers Disability Research Consortium and Princeton Industrial Relations Section.  We analyzed employment patterns among mobility-impaired individuals, and the extent to which computer technologies have affected the employability and earnings power of such individuals.

<u>ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries</u>:  Co-investigator, with Linda Bell of Haverford College, for $25,000 grant from U.S. Department of Labor to collect and analyze survey data from publicly-held firms in airlines and high-technology industries, 1995.

<u>The Productivity and Stability Theories of Profit Sharing</u>:  Principal investigator for $47,000 grant from W.E. Upjohn Institute for Employment Research to study profit sharing in publicly-held companies.  Published in Upjohn book in 1993.

PRESENTATIONS:

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to American Council on the Blind, February 22, 2021, with Lisa Schur.

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to U.S. Election Assistance Commission, February 17, 2021, with Lisa Schur.

"Disability and Voting: What Does the Research Say?" Presentation with Lisa Schur for "POWER: The Disability Vote" webinar, sponsored by American Association of People with Disabilities and REV UP! Campaign, June 22, 2020.

"Disability and Voting." Presentation with Lisa Schur for "Protecting the Right to Vote for People with Disabilities" webinar, sponsored by Leadership Conference On Civil and Human Rights, and National Disability Rights Network, May 21, 2020.

"Understanding Support for Employee Ownership," New Jersey/New York Center for Employee Ownership, Rutgers University, October 29, 2019.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," International Association for the Economics of Participation conference, University of Ljubljana, Slovenia, July 2018.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," Beyster Symposium, LaJolla, CA, June 2018.

"Employee Ownership: A Look at the Evidence," Vermont Employee Ownership Center, University of Vermont, Burlington, VT, June 2018.

"Disability and Employment," Sciences Po, St. Germain-en-Laye, Paris, France, March 16, 2018.

"Citizenship and Disability," Sciences Po, St. Germain-en-Laye, France, March 12, 2018.

"Tying Employee Rewards to Company Performance through Employee Ownership and Profit Sharing," University of Pennsylvania, July 2017.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," International Association for the Economics of Participation, Copenhagen, Denmark, July 2016.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," Beyster Symposium, LaJolla, CA, June 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," World Bank, January 13, 2016, with Mason Ameri and Lisa Schur.

"The Impact of Employee Stock Ownership and Profit Sharing for Low Income Families: The Rutgers University Kellogg Foundation Research Project," Kelso Workshop, Rutgers University, January 11, 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," NBER Summer Institute on Law and Economics, July, 2015, with Mason Ameri and Lisa Schur.

"How Did Employee Ownership Firms Weather the Last Two Recessions? Employee Ownership and Employment Stability in the U.S.: 1999-2010," Beyster Symposum, University of California-San Diego, January 2015, with Fidan Kurtulus.

"Survey Results on Polling Place Accessibility in the 2012 Elections," U.S. Election
Assistance Commission, Washington, D.C., May 9, 2013

"Differentiating the Truly Great Place to Work Companies From the Good Companies,"
Beyster Mid-year Fellows Workshop, Rutgers University, February 2013.

"Shared Capitalism," Keynote Address, International Association for the Economic of
Participation, Paris, France, July 2010.

"The Effects of Accommodations on the Employment of People with Disabilities," Jacobus
ten Broek Symposium, National Federation of the Blind, Baltimore, MD, April 15,
2011.

"Research Overview for Discussion of CPS Disability Supplement," U.S. Bureau of Labor
Statistics, Washington, D.C., October 19, 2010

"Does Shared Capitalism Help the Best Firms Do Even Better?" Centre for Economic
Performance, London School of Economics, May 26, 2011.

"Shared Capitalism, Corporate Culture, and Performance," Beyster Institute, University of
California-San Diego, July 2009.

"Disability at Work:  Job Characteristics and Attitudes of Employees with Disabilities,"
Labor and Employment Relations Association annual conference, San Francisco, CA,
January 2009.

"Disability and Employment: Building a Research Agenda," Interagency Committee on
Disability Research, Subcommittee on Employment, Washington, D.C., June 2008.

"Shared Capitalism Research Project," Organizational Dynamics, University of
Pennsylvania, May 2008.

"Building Inclusive Organizations for Employees with Disabilities," School of Management
and Labor Relations, Rutgers University, May 2008.

"Disability and Voter Turnout," University of North Carolina-Charlotte and Carolinas
Rehabilitation Center, April 2008.  With Lisa Schur.

"Worker Responses to Shirking," M.I.T. Sloan School of Management, November 2007.
With Richard Freeman and Joseph Blasi.

"Corporate Culture and the Experiences of Employees with Disabilities," Society of
Industrial and Organizational Psychology, Dallas, TX, May 2006.  With Lisa Schur.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Risk: Is It Economic Democracy, or Just Another Risk for Workers? Employee Attitudes Toward Risk-Sharing and Financial Participation in Company Rewards," October 2006.

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," Industrial Relations Research Association, January 2004.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, Washington, D.C., June 5-6, 2002.  With Lisa Schur.

"Research Evidence on Prevalence and Effects of Employee Ownership," National Bureau of Economic Research, Cambridge, MA, April 12, 2002.

"Changes in the Workforce: Trends and Implications for Employment Law and Collective Bargaining," Industrial Relations Research Association, New Jersey chapter, April 1, 2002.  With Lisa Schur.

"Does the Definition Affect the Outcome?  Employment Trends Under Alternative Measures of Disability," Employment & Disability Policy Institute sponsored by Cornell University, Washington, D.C., October 2001.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, University of Illinois at Urbana-Champaign, April 26, 2001.

"Comments on 'The Economic and Social Impacts of Telework'," Conference on Telework, U.S. Department of Labor, New Orleans, LA, October 2000.

"Telecommuting and Home-based Work: Differences by Disability Status," Cornell Summer Institute on Disability and Employment Policy, Ithaca, NY, July 2000.

"Disability and Voter Turnout," presented to President's Committee on Employment of People with Disabilities, Subcommittee on Employee Disability Concerns, Washington, D.C., January 2000.

"Employment and Participation Among People with Disabilities," presented to European Union High Level Group on Disability, Washington, D.C., October 1999.

"Polling Place Accessibility for People with Disabilities," National Task Force on Elections Accessibility, Washington, D.C., June 1999, with Lisa Schur.

"Telecommuting and Home-based Work: Differences by Disability Status," Society for Disability Studies, Washington, D.C., May 1999.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," Conference on Democracy, Participation, and Development, Columbia, NY, April 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," President's Committee on Employment of People with Disabilities, Washington, D.C., January 1999.

"The New Employee/Employer Relationship," Aspen Institute's Domestic Strategy Group, Aspen, Colorado, July 1998.

"The Wealth and Income Consequences of Employee Ownership," paper by Peter Kardas et al., presented at NBER conference "Shared Capitalism: Mapping the Research Agenda," Washington, D.C., May 1998.

"Is Employee Ownership an Unstable Form?  Or a Stabilizing Force?" MIT-Brookings Conference on Corporations and Human Capital, Dedham, MA, January, 1998.

"Employment Policies for the 21st Century," Social Security Administration conference on "Employment Post the Americans with Disabilities Act," Washington, D.C., November 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Society for Disability Studies, Minneapolis, MN, May 1997, with Lisa Schur.

"Profit Sharing and the Demand for Low-Skill Workers," Federal Reserve Bank of Dallas, April 1997.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," Conference on Technology and Persons with Disability, California State University-Northridge, Los Angeles, CA, March 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Southern Political Science Association, Atlanta, GA, November 1996, with Lisa Schur.

"Disability, Employment, and Computer Use," American Spinal Injury Association, Seattle, WA, April 1996.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," Dept. of Economics, University of Maryland, Towson, MD, April 1996.

"Profit Sharing and Employee Ownership:  Review of the Issues and Research," Industrial Relations Research Association, San Francisco, CA, January 1996.

"Profit Sharing, Employee Ownership, and Corporate Governance," Seminar on Corporate Governance, Columbia University Law School, November 1995.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research, Cambridge, MA, July 1995.

"Employee Ownership and Profit Sharing in the U.S. and Europe," Chinese State Commission for Restructuring the Economic System, New York, NY, July 1995.

"Profit Sharing and the Demand for Low-Skill Workers," Demand-Side Strategies for the Low-Wage Labor Market conference, Russell Sage Foundation, New York, NY, June 1995.

"Profit Sharing and Public Policy," Association for Evolutionary Economics, New York, NY, January 1994.

"Does Profit Sharing Affect Productivity?" Dept. of Economics, Columbia University, New York, NY, October 1993.

"Does Profit Sharing Affect Productivity?" National Bureau of Economic Research, Cambridge, MA, July 1993.

"Does Profit Sharing Affect Productivity?" Cornell University, Ithaca, NY, May 1993.

"Does Profit Sharing Affect Productivity?" Eastern Economics Association, Washington, D.C., March 1993.

"Profit Sharing, Productivity, and Employment Stability," U.S. Department of Labor, Pension and Welfare Benefits Administration, Washington, D.C., March 1990.

"Policy Implications of Profit Sharing," paper delivered at Society for the Advancement of Socio-Economics, Washington D.C., March 1990.

"Profit Sharing in the 1980's:  Disguised Wages or a Fundamentally Different Form of Compensation?" paper delivered at Wage Structure Conference, Federal Reserve Bank of Cleveland, November 1989.

"Profit Sharing and Productivity" (with Martin Weitzman), paper delivered at Brookings Institution conference on worker compensation and productivity, Washington, D.C., March 1989.

"The Economic Implications of Employment Rights and Practices in the United States," paper delivered at AEA/ACES Annual Meeting, New York, December 1988.

"Small Business Financing: A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," with F. Gregory Hayden and Steven Williams, Small Business Institute Directors Association, February 1984, Denver, Colorado.

"The Effect of Employee Ownership on Desires for Participation," Western Social Science Association, April 1982, Denver, Colorado.


SERVICE TO PROFESSION:

Editor, British Journal of Industrial Relations, January 2011- June 2021.

Associate Editor, Journal of Participation and Employee Ownership, 2017-present.

Guest co-editor, special issue on Employee Ownership, Human Resource Management, 2018.

Co-chair, Awards Committee, Labor and Employment Relations Association, 2015-2018.

Member, Board of Reviewers, Industrial Relations, 1993-2004.

Recognized by Industrial and Labor Relations Review as one of its "most productive reviewers" over the 1995-99 period.

Referee for
Academy of Management Journal
American Economic Review
American Journal of Industrial Medicine
British Journal of Industrial Relations
Canadian Journal of Economics
Comparative Economic Studies
The Economic Journal
Human Resource Management
Industrial and Labor Relations Review
Industrial Relations
Journal of Comparative Economics
Journal of Disability Policy Studies
Journal of Economics and Business
Journal of Economic Behavior and Organization
Journal of Economic Issues
Journal of Labor Economics
The Milbank Quarterly
Organization Science

Policy Studies Journal
Quarterly Journal of Economics
Review of Economics and Statistics
Social Science Quarterly

SERVICE TO GOVERNMENT:

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect
Phil Murphy, November 2017-January 2018.

Member of State Rehabilitation Advisory Council, New Jersey Division of Vocational
Rehabilitation, 1999-2013.

Report prepared for National Council on Disability, Employment of People with
Disabilities, May 2007.

Member of Advisory Committee for the Disability Statistics Center, Cornell University,
2004-2009.

Member of Blue Ribbon Expert Advisory Panel for the ADA Impact Study, funded by the
National Council on Disability, 2004-2005.

Member of Advisory Committee for the Rehabilitation Research and Training Center for
Economic Research on Employment Policy for Persons with Disabilities, Cornell
University, 1998-2004.

Member of President's Committee on Employment of People with Disabilities,
Subcommittee on Employment Disability Concerns, 1998-2000.

Consultant on designing Behavioral Risk Factor Surveillance System questions to identify
environmental barriers facing people with disabilities, conducted by Craig Hospital
(Denver, CO) with funding by Centers for Disease Control, 1998.

Consultant on designing and writing vocational rehabilitation book about labor market
prospects for people with disabilities, Rehabilitation Services Administration, 1998-
99.

Data prepared at request of Joint Economic Committee of the U.S. Congress, on employer
stock and 401(k) plans, August 1998.

Report prepared for U.S. Department of Labor, Office of Policy, Disability and
Employment: Characteristics of Employed and Non-employed People with
Disabilities, September 1997.

Report prepared for U.S. Department of Labor, Office of the American Workplace, ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, with Linda Bell, 1995.

Referee for National Science Foundation grant proposals, 1995, 1999.

Testimony before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, U.S. House of Representatives, concerning employee ownership and retirement security, February 13, 2002.

Testimony before U.S. House of Representatives Committee on Small Business, Subcommittee on Regulation, Business Opportunities, and Technology (Ron Wyden, Chair), concerning bill to provide incentives for profit-sharing and gainsharing plans, July 15, 1994.

Testimony before U.S. House of Representatives Committee on Banking, Finance, and

Urban Affairs, Subcommittee on Economic Stabilization (Charles Schumer, Chair), concerning

"The National Entrepreneurship Act," May 15, 1984.


SERVICE TO RUTGERS UNIVERSITY:

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers University (July 2017-December 2018)
Director, Ph.D. Program in Industrial Relations and Human Resources, School of Management and Labor Relations, Rutgers University (July 2007-June 2013)
New Brunswick Faculty Council representative (2014-2017)
Advisory Committee on Instructional Computing member (2001-2005)
University Research Council member (1998-2012)
Faculty mentoring committee member for Jasmine Feng (2016-present), Saunjuhi Verma (2015-present), Janice Fine (2007-2012), Saul Rubinstein (1996-2002), Stan Gully, (2000-2005), Ryan Smith (1995-2000), Marlene Kim (1993-1999), Barbara Rau (1995-1997), and Kirsten Wever (1997-1999).
Dissertation committee chair for Eric Schulz (1997), Rhokeun Park (2007), Andrea Kim (2013), Mason Ameri (2017), and Saehee Kang (current).
Dissertation committee member for Michael Zigarelli (1995), James Gasaway (1999), Maya Kroumova (1999), Douglas Mahony (2001), Haejin Kim (2003), Sean Way (2004), Saba Colakoglu (2008), and Dan Weltmann (2017).
Master's thesis committee chair for Sean Way (2001) and Rhokeun Park (2003)
Ph.D. Policy Committee, School of Management and Labor Relations (1995-1998, 2000-2005)
Library Committee, School of Management and Labor Relations (1988-1993, 1997-1998)
Admissions Committee (1989-1990, 1991-1992)

Health and Safety Committee, School of Management and Labor Relations (1989-1990)
Several faculty recruitment committees (1991-present)

AFFILIATIONS:

American Economic Association
Association for Comparative Economic Studies
Association for Evolutionary Economics
Labor and Employment Relations Association
Royal Economic Society
Society for Disability Studies

# EXHIBIT 54

Message

| From: | Elections Internet [Elections@sos.texas.gov] |
|---|---|
| Sent: | 11/14/2022 5:54:31 PM |
| To: | |
| Subject: | RE: Vote Texas Contact Message (EI Response) |

Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

The county should have sent you a notice with the corrective action form on the back. You must deliver the completed Corrective Action Form in person to the Early Voting Clerk's office by the end of business today, Monday, November 14, 2022.

You may correct missing or incorrect personal identification information online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov or by delivering the Corrective Action Form to the Early Voting Clerk's Office no later than the 6th day after Election Day. When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Both your Texas Driver's License or Texas Personal Identification Card number AND your Social Security number must be associated with your voter registration record to use the Ballot by Mail Tracker. Once your personal identification number is validated by the Ballot by Mail Tracker, the Carrier Envelope you previously submitted will be processed. Once your corrective action has been reviewed, the date of review and the status of your Carrier Envelope will be displayed on the Ballot by Mail Tracker. You do not have to appear in person at the Early Voting Clerk's Office if you make your correction online. To utilize the Ballot by Mail Tracker, you must enter:
- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number AND
- Your residence address as listed in your voter registration record

Again, thank you for contacting our office.  If you have any additional questions or if we can be of further assistance, please contact our office at 1.800.252.8683 or email us at Elections@sos.texas.gov.

Elections Division Staff
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)

elections@sos.texas.gov | www.sos.state.tx.us

**or Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code.  It is not intended to serve as a legal opinion for any matter.  Please review the law yourself, and consult with an attorney when your legal rights are involved.*

**From:**
**Sent:** Thursday, November 10, 2022 1:43 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:**
**Subject:** Vote Texas Contact Message

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

From: ▇▇▇▇▇▇▇▇

I received a letter saying my Texas license number was not filled in on my ballot. It WAS!. How do I find the "corrective action form"? I did a search but cant find it.

STATE122691

# EXHIBIT 55

**Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*United States v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**May 4, 2022**

## I.      Abstract

1.  Since I filed my expert report on February 28, 2022, I have received updated Department of Public Safety (DPS) data and updated voter registration (TEAM) data from the State of Texas. I have also received a rebuttal to my report written by Dr. Mark Hoekstra. Finally, I have received voter history information from the March 1, 2022 Texas primary, the first election that was administered under the identification verification rules set forth by Senate Bill 1 (SB 1).

2.  In this supplemental report, I re-run the main analysis conducted in my February report with the updated DPS and TEAM data. Then, I respond to the main points raised by Dr. Hoekstra. Lastly, I conduct a new analysis of data from the March 1 primary.

3.  My key findings are as follows:

    a.  In spite of the passage of several months of time that might have allowed databases to be updated and identification issues to be resolved, my updated analysis finds that over 1 in 7 Texas registered voters can submit a mail ballot application and/or a mail ballot in perfect accordance with SB 1 and yet election officials must reject the voters' forms.

        -  Tens of thousands of registered voters are listed with typos in the DPS ID numbers and/or Social Security Numbers on the databases maintained by election officials.

        -  Hundreds of thousands of individuals who have valid DPS IDs are not listed in election records with these ID numbers.

        -  Over two million individuals have multiple DPS IDs, while only one of the numbers is listed by election officials.

Altogether, over 2.7 million out of 17.3 million registered voters could fill out a mail ballot form correctly and have it rejected due to one or more of these circumstances. This population includes many Texans over 65-years-old, Texans who are homebound and disabled veterans, and active-duty members of the military and their families.

b. Following this update to my analysis, I address critical flaws in the rebuttal report of Dr. Hoekstra. I explain how Dr. Hoekstra's framework for analyzing the effects of SB 1 (i.e., estimating the typical number of voters who will be burdened in any given election) is inappropriate. Using data from the March 2022 primary election, I also show how Dr. Hoekstra's analysis is wrong even on his own terms of evaluation. Whereas Dr. Hoekstra argues that "the likely burden on the…registered voters who will either have to cure their ballot or vote in person as a result of SB 1 is likely minimal, and quite possibly zero," I find that the vast majority of Texans whose mail ballots were rejected due to SB 1 in March 2022 did not end up voting at all, either by mail or in person.

## II.   Updated analysis using new versions of DPS and TEAM databases

### A. Databases

4. <u>DPS</u>. The updated DPS database I received is dated March 13, 2022. The database contains 36,417,304 records, an increase of 189,485 (0.5%) records from the January 2022 version of the file I analyzed in my main report. As in the version previously analyzed, the March version of the data has complete or nearly complete records in all fields of interest (e.g., name, date of birth, address, gender) except that 5% of records are

not populated with Social Security Numbers, which was also the case in the January data. Table 1 below updates Table 1 of my main report with the new data.

5.  The March update to the DPS database contains an additional field that was not previously made available to me: "Card Status." The status field is populated with a variety of codes. Of relevance here is a code named "Voluntary Surrender," which may indicate that the ID holder does not possess a physical identification card with that ID number listed on it. Without a physical identification card, it may be difficult for a person to access their ID number and write it on a government form.

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---|
| Missing SSN | 4.98% |
| Missing unique SSN9 | 28.65 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.03 |
| Missing Zip Code | 0.00 |
| **TOTAL IN DATABASE** | 36,417,304 |

6.  <u>TEAM</u>. The updated version of TEAM records is dated April 21, 2022.[1] In the TEAM data, each county's records are stored in a different file. Registered voters can be listed on many lines within a county file. For instance, Texas counts 29,128 registered voters in Anderson County as of March 2022.[2] In the April TEAM export I received, there are

---

[1] At the time that I received the March DPS data, I also received an updated version of the TEAM data. That export was dated April 5, 2022. Upon inspection, that export from TEAM excluded several million registered voters. I alerted counsel to this problem, and I was soon supplied with a new export, dated April 13, 2022. Upon inspection, this second export of TEAM again excluded several million registered voters. I alerted counsel again and received the April 21 export on April 25. I do not expect the difference in time between when the DPS export was executed and when the corrected TEAM export was executed affects any of the substantive findings or conclusions in this report.

[2] https://www.sos.state.tx.us/elections/historical/march2022.shtml

261,644 rows of registrants in Anderson County. Different rows show different interactions that registrants have had with the election system. For each county file, I processed the data so that each person, represented by their Voter Unique Identification Number (VUID), is listed one time. Specifically, I observed the dates labeled "ballot_last_updated" and retained the most recent date for each registrant. I also retained registrants who had no date listed in this field. If there were registrants with multiple records but only one of the records listed a Social Security Number (SSN) or DPS ID Number, I retained the record with those identifiers. I retained the fields of interest (e.g., name, address, date of birth, and so forth) and combined the 254 county files into a single file. I then identified individuals who had records in multiple county files. I kept only one record for each of these individuals, again ensuring to retain a record with an SSN or DPS ID if only one of the records contained these identifiers.

7.   After the de-duplication process, the April TEAM file consists of **17,330,189** records. I sought to confirm that this number is close to the state's official reporting. According to the Secretary of State's website, as of March 2022, there were **17,183,996** registered Texas voters. Given the typical fluctuation in registration numbers and the fact that the April 21 records were pulled several weeks after the publicly reported numbers were calculated, a difference of less than 1% suggests the data I have been given by the state is consistent with the state's publicly reported information.

**B.   Data Quality Checks in the TEAM Voter Records**

8.   I performed the same set of data quality checks as described in my initial report. Tables 2 and 3 offer summary statistics on key fields of interest. There are slightly fewer records listed with Social Security Numbers and slightly more records listed with DPS ID

Numbers. Specifically, whereas 2.34% of records in TEAM were missing an SSN in the January data, 2.52% of records are missing an SSN in the April data. Whereas 3.16% of records in TEAM were missing a DPS ID Number in the January data, 2.85% of records are missing a DPS ID Number in the April data.

9. The numbers are all similar to the January data, with the exception of the address fields. Whereas less than 1% of records in the January file were missing values for street number and zipcode, over 20% of the records in the April file are missing this information. The absence of address information is concentrated in registration records that also have a blank "ballot_last_updated" field.

10. The difference in the address fields may be attributable to the fact that state supplied me with a different format of the database in April than in January. Ultimately, it is not clear to me why the state's April records show so many voters with missing address information. However, as my methodology uses information other than address information (e.g., name and birthdate, SSN), I can proceed to update the analysis from my prior report with the March and April data. And, indeed, the overall results are very similar in this supplementary report as in my initial report.

**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---|
| Missing SSN | 2.52% |
| Missing Unique SSN9 | 6.25 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.07 |
| Missing M/F Gender | 3.73 |
| Missing Street Number | 22.57 |
| Missing Zip Code | 22.56 |
| **TOTAL IN DATABASE** | 17,330,189 |

**TABLE 3: Summary of Field Completeness in TEAM**

| | | |
|---|---|---|
| **TOTAL Records in TEAM analysis** | **17,330,189** | |
| **Records with unique SSN9** | 16,246,791 | 93.75% |
| **Records with SSN4** | 16,893,085 | 97.48 |
| **Records with DPS ID Number** | 16,836,041 | 97.15 |
| **Records lacking SSN4 and DPS ID No.** | 105,536 | 0.61 |

## C.  Methodology

11. The methodology employed is the same as in my initial report. See Paragraphs 50-73 in

that report for a detailed explanation. My goal is to look up each registered voter in the

DPS database and determine if the registered voter has one (or more) DPS ID Numbers

listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers

and SSN4s listed on TEAM versus those listed on the DPS Database. I create three

linkage fields to connect the TEAM and DPS databases together. The first field is the

nine-digit Social Security Number (SSN9). The second field is the combination of name

(First and Last) and date of birth. I call this linkage field "ND" for Name + Date of Birth.

The third field, a combination of Address (Street Number and Zipcode) + Date of Birth +

Gender, I call "ADG". Table 4 (a replica of Table 6 from my previous report) illustrates

the three linking fields with an example of a fictional registered voter named John Smith.

**TABLE 4: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
|---|---|---|
| **SSN9** | 9-digit social security number | "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" |
| **ND** | First name + Last name + Date of birth | "JOHNSMITH1977-07-04" |
| **ADG** | Address + Date of birth + Gender | "655782051976-07-04M" |

12. As in the main report, in addition to calculating statistics for the whole population of

registered voters, I also look at several subpopulations. In the prior report, I observed a.)

registered voters over age 65, b.) 2020 general election voters, c.) voters with overseas

mailing addresses, and d.) individuals marked in the DPS database as homebound or

disabled veterans. In this report, I again investigate registrants over 65, registrants who

voted in 2020, and registrants who have homebound/disabled veteran statuses. Instead of

looking at voters with overseas mailing addresses (a population that may contain

members of the armed forces and military families), I investigate registrants who are

listed with specific codes in TEAM signaling that they have applied for Federal Post Card

Application (FPCA) registration forms, which are voter registration forms used by

members of the military, their families, and Americans who are residing overseas. I refer

to these as FPCA voters. Finally, I also investigate the subpopulation of registrants who

match to DPS records indicating that their licenses have been "voluntarily surrendered."

**D. Linkage Part I: TEAM Records with missing DPS ID Numbers**

13. I divide the analysis into two parts. First, I examine individuals whose TEAM records do

not show any DPS ID Number. Second, I examine individuals whose TEAM records do

show a DPS ID Number.

14. Out of 17,330,189 records in TEAM, 494,148 do not have a DPS ID Number listed in the

voter registration records. If any of these individuals actually has a DPS ID Number, they

are instructed by the mail ballot application forms to include that DPS ID Number (and

*only* that identification number). But SB 1 requires that these forms – the application and

the ballot carrier envelope – to be rejected because the DPS ID Number is not listed

within registration records.

**TABLE 5: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

| | | Unique SSN9 | | |
|---|---|---|---|---|
| | | Present | Absent | TOTAL |
| **DPS ID** | Present | 16,144,007 | 692,034 | 16,836,041 |
| **Number** | Absent | 102,784 | 391,364 | 494,148 |

15. I link the 494,148 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG linkage fields that are described in Paragraph 11 above.

16. I first link by SSN9. Of the 494,148 individuals without a DPS ID Number, 102,784 have a unique SSN9 listed (as noted in Table 5). Of those, 73.33% match to the DPS database by their SSN9. A total of 66.76% of the records match to a single DPS ID Number, and 6.56% link to multiple DPS ID Numbers.

17. I next link these individuals based on ND. As noted in Table 5, most individuals who lack DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a unique ND combination. Of the 494,148 lacking a DPS ID Number on TEAM, 482,787 (97.7%) have a unique ND. Of those who have a unique ND, 25.81% match to a single DPS record and 4.58% match to multiple DPS records.

18. I next link these individuals based on ADG. Of 498,148 records lacking a DPS ID Number on TEAM, 231,002 (46.74%) have a unique ADG. Recall that many more records in the April TEAM data are missing address information than in the January data. ADG is the only linking field that makes use of address information. Of those with a unique ADG, 38.98% match to a single DPS record and 3.85% match to multiple DPS records.

**TABLE 6: Results of Linking TEAM to DPS Records for TEAM Records without a DPS ID Number listed**

|     | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|-----|-----------------|---------------------|-----------------------|--------------------|
| SSN9 | 26.67% | 66.76% | 6.56% | 102,784 |
| ND | 69.61 | 25.81 | 4.58 | 482,787 |
| ADG | 57.16 | 38.98 | 3.85 | 231,002 |
| Any | 57.00 | 37.39 | 5.58 | 486,421 |

19. Table 6 summarizes the analysis of records that do not have a DPS ID Number listed on the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows that I attempted to match 102,784 records in TEAM based on SSN9. This reflects the number of TEAM records without a DPS ID Number that include a unique SSN9. Of those, 26.67% did not match to DPS. The others did match.

20. The bottom row of Table 6 provides the overall summary for the TEAM records lacking a DPS ID Number. Of the 494,148 total records lacking a DPS ID Number, I attempted to link 486,421 (97.65%) to the DPS database. (The other 2.35% did not have a unique or complete value for SSN9, ND, or ADG). Of the individuals I attempted to find on DPS, 43% matched to a DPS record. That amounts to 209,137 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number (and only their DPS ID Number) on their mail ballot application. However, if they follow those instructions and list only that DPS ID Number, SB 1 requires their ballot applications, and their ballots, to be rejected because the number is not listed on TEAM.

21. <u>Subpopulations:</u> Of the 209,137 individuals who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 83,622 are over age 65

- 66,001 voted in the 2020 election

- 32,252 are over 65 AND voted in the 2020 election

- 1,574 have FPCA statuses

- 378 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

22. <u>Typos in Social Security Number.</u> Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,015 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,015 cases result from inaccuracies on TEAM. They would cause election officials to reject mail ballot forms from citizens who include their correct SSN4 on the forms.

**E.  Linkage Part II: TEAM Records Listed with DPS ID Numbers**

23. I now turn to the analysis of the 16,836,041 records in which a DPS ID Number is listed in the TEAM databases. As noted above in Table 5, 95.9% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of

16,144,007 records with a unique SSN9 on TEAM, 99.53% match to a record in DPS. However, 16.03% of the records match to more than one DPS ID Number.

24. Next, I link records based on the ND combination, as described in Paragraph 11 above. The ND combination is unique for 16,669,651 individuals who have a DPS ID Number listed on TEAM. Of these, 97.36% match to a record in DPS. However, 15.61% match to more than one DPS ID Number.

25. Next, I link records based on the ADG combination, as described in Paragraph 11 above. The ADG combination is unique for 12,662,154 individuals who have a DPS ID Number listed on TEAM. Of these, 80.74% match to a record in DPS. However, 7.91% match to more than one DPS ID Number.

**TABLE 7: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|        | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|--------|-----------------|---------------------|-----------------------|--------------------|
| **SSN9** | 0.47%         | 83.49%              | 16.03%                | 16,144,007         |
| **ND**   | 2.64          | 81.75               | 15.61                 | 16,669,651         |
| **ADG**  | 19.26         | 72.83               | 7.91                  | 12,662,154         |
| **Any**  | 1.17          | 84.57               | 14.25                 | 16,787,046         |

26. Table 7 summarizes the analysis of records with a DPS ID Number on the voter file. Consider the bottom row. Of the 16,836,041 records in TEAM listed with a DPS ID Number, I attempted to link 16,787,046 (99.70%) of them to the DPS database. The remaining 0.30% did not have a unique or complete record on SSN, ND, and ADG. Of these 16,787,046 records, 98.83% matched to a record in DPS. However, many of them are listed more than once on DPS, with multiple ID numbers. These 14.25% of records sum up to 2,392,733 records. That is, for 2.4 million Texas registered voters who have a

DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot envelope) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

27. The 2.4 million figure may be an underestimate. Many DPS ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the TEAM records that linked to a *single* DPS ID Number, 1,421,849 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. During her April 20, 2022 deposition, Sheri Gibson, chief of the Texas DPS driver's license division, explained that these AKA DL/ID numbers are identification numbers associated with the ID holder that are either erroneous or originate from a prior version of the state's license system.  If registrants use these alternative identification numbers when submitting a mail ballot application or mail ballot, they will also have their forms rejected because the AKA DL/ID Numbers are not the identification numbers on the voter registration records that are associated with these registrants. However, if these ID Numbers are considered by DPS to be erroneous or otherwise invalid (i.e., not just "expired," which does not impact validity for SB 1 purposes), the implications for SB 1 are unclear to me. Accordingly, in order to perform a conservative analysis, I focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

28. Subpopulations: Of the 2,392,733 individuals who match to multiple DPS ID Numbers,

- 166,035 are over age 65

- 1,060,944 voted in the 2020 election

- 82,575 are over 65 AND voted in the 2020 election

- 1,344 have FPCA status

- 4,134 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

29. <u>Typos in Social Security Number</u>. Looking just at the last 4 digits of social security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 41,900 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on a mail ballot application, then their application will be rejected because of incorrectly recorded data in TEAM.

    a. <u>Subpopulations:</u> Of the 41,900 individuals whose SSN4s listed on TEAM do not match the SSN4s listed in the DPS database

    - 14,991 are over age 65

    - 27,247 voted in the 2020 election

    - 10,121 are over 65 AND voted in the 2020 election

    - 101 have FPCA status

    - 88 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4 listed in the DPS database.

30. Typos in DPS ID Numbers. Just as there are discrepancies between the SSNs listed in TEAM and the corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers. Using the methodology for calculating these discrepancies that was explained in my previous report, I calculate that 74,897 individuals do not have a DPS ID Number in TEAM that matches any DPS ID Number in DPS.

   a. Subpopulations: Of the 74,897 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but do not have DPS ID Numbers that correspond to the DPS database,

      - 15,835 are over age 65

      - 31,781 voted in the 2020 election

      - 9,475 are over 65 AND voted in the 2020 election

      - 83 have FPCA status

      - 342 individuals matched to DPS records indicating homebound status or disabled veteran status.

31. Voluntary surrender: Out of 36.4 million DPS records, 2,881,780 have a designation of "voluntary surrender." I isolated a subset of the DPS records to just the ones listed with the "voluntary surrender" status and I matched the TEAM records based on SSN, ND, and ADG to these DPS records. I find that 1,704,499 current registered voters match to a "voluntary surrender" ID Number.

32. Most of these 1.7 million registrants seem to have other DPS IDs that are not surrendered. After matching the TEAM records to surrendered DPS IDs, I checked to see if the DPS ID number listed on the voter file matches to the surrendered ID Number listed in DPS. In 1,487,008 cases (87.24%), the current registered voter has a different ID number listed than the surrendered ID.

33. The other 217,491 do not have a different DPS ID Number. For the 217,491 registered voters who match to a DPS ID record for which the TEAM database shows the same DPS ID Number as a surrendered license, these Texans might be at risk of not being able to provide the ID Number that election officials have on file.

34. However, DPS's Sheri Gipson explained in her deposition that the "voluntary surrender" status designation is not a reliable indicator of whether a person is in physical possession of the card that lists the associated identification number. In some cases – but not in all cases – Texans who have "voluntary surrender" status may have physically surrendered the card during a surrender transaction. They also may or may not have disposed of the card once it was no longer valid. Therefore, I cannot confidently use this designation in counts of individuals who may be affected by SB 1. Instead, I treat all DPS ID Numbers associated with registered voters to be valid numbers for the purpose of identification verification under SB 1. However, if hundreds of thousands of individuals have a DPS ID Number listed on TEAM records that is associated with a license that they potentially cannot access because it has been physically surrendered or discarded, this likely increases the problems associated with SB 1.

**F.  Summary of Results from Updated Analysis**

35. To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4. The analysis from the updated TEAM and DPS files show the following:

    a.  **209,137** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. These individuals are instructed to list only their DPS ID, but if they do so, their ballot or ballot application will be rejected.

        i.  Of these, **83,662** are over 65 years old, **32,252** of whom voted as recently as the 2020 general election.

        ii.  Of these, **1,952** have FPCA status or are listed as disabled veterans or as homebound citizens.

    b.  **2,392,733** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

        i.  Of these, **166,035** are over 65 years old, **82,575** of whom voted as recently as the 2020 general election.

        ii.  Of these, **5,478** have FPCA status or are listed as disabled veterans or as homebound citizens.

    c.  **44,915** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

    d.  At least **74,897** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

36. Altogether, <u>**over 2.7 million**</u> registered voters in Texas (out of 17.3 million) are at risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.7 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.

### III.     Response to Dr. Hoekstra

37. Dr. Mark Hoekstra's rebuttal report of March 29, 2022 does not challenge my database matching technique or the numbers derived from this technique. Rather, he challenges the interpretation of these numbers and the application of the technique to the questions raised in this case. Unfortunately, Dr. Hoekstra's interpretations and assumptions suffer from a number of serious flaws. I will address four key problems in his analysis.

#### A.  Measuring Burdens

38. Dr. Hoekstra approaches this case by asking whether SB 1 makes absentee voting substantially burdensome such that it affects the overall rate of voting in Texas elections. I do not believe this is the right question. Texas law grants certain voters the right to vote by mail. As I have shown, citizens who are fully qualified by Texas law to vote by mail will have their applications and mail ballots rejected because the state's records do not actually allow officials to verify voters' personal identification in the way SB 1 requires.

The fact that so many Texans, including elderly and disabled citizens and members of the military, can fully comply with the law but will nevertheless have ballots rejected seems problematic. Whether Texans who are denied the ability to vote by mail can learn about the rejection and make other arrangements in time to vote in person on Election Day, thus "curing" the problem, is worth considering, and I address it below. But the fact that SB 1 requires the rejection of mail ballot materials is a problem, even if voters still manage to find a way to vote.

39. However, even if one believes, as Dr. Hoekstra asserts, that the main question here is about whether SB 1 will affect turnout rates, Dr. Hoekstra's analysis is flawed because it relies on evidence that is irrelevant to the issues surrounding SB 1. All of Dr. Hoekstra's tables and figures are copied-and-pasted from an article about mail voting and turnout rates that was published in 2021 in *Science Advances*.[3] That article, written by Professor Andrew Hall and his students, is first-rate. I assign it to my own students in my course on elections. One of its main findings is that 64-year-olds and 65-year-olds in Texas voted at the same rate (but using different voting methods) in years prior to the adoption of SB 1. The article does not deal with the question of what happens when new burdens, such as identification verification requirements, are introduced to voters.

40. Dr. Hoekstra views the comparison between 64-year-olds and 65-year-olds as a test for how burdens on mail voters *in general* affect overall turnout. For 64-year-olds, Dr. Hoekstra views the burden as high. After all, in Texas, a 64-year-old needs an excuse, such as they are out of town or sick, in order to cast a ballot by mail. But 65-year-olds can choose to vote absentee by mail without a specific reason, so their burden to vote by

---

[3] Dr. Hoekstra incorrectly identifies the journal in which this article is published. The article "How did absentee voting affect the 2020 U.S. election?" was published in *Science Advances*, not *Science.*

mail is low. Dr. Hoekstra reasons that if 64-year-olds and 65-year-olds have the same turnout rates in 2020, as Dr. Hall's research shows, then burdens on mail voters *in general* do not affect turnout. As Dr. Hoekstra puts it, "it is implausible to believe that the much more moderate limitations on absentee voting enacted by SB1 would reduce turnout."

41. To understand why Dr. Hoekstra's reasoning is flawed, just consider how easy it is for a Texan to anticipate if they will be at least 65 years old on Election Day. In contrast, consider how difficult it is for a Texan to anticipate if they will have a problem voting by mail due to SB 1. They would have to think: "Do election officials have my DPS ID Number on record?  Is my DPS ID recorded with a typo in state records? I have more than one DPS ID, which one do officials have on record? Do officials have my Social Security Number on record? Is there a typo in that record?"

42. The contrast in how easy it is to answer the question of how old one is compared to the difficulty in answering the questions about SB 1 protocols illustrates why Dr. Hoekstra's comparison of the burdens of SB 1 relative to the burdens of mail balloting prior to SB 1 is inapt. Baked into the similarity in overall turnout between 64-year-olds and 65-year-olds in 2020 (and earlier years) is an awareness on the part of each age group whether they qualified to vote by mail. If they did not qualify by age, they knew they would have to vote in person or offer a valid excuse. They could plan accordingly. But with SB 1, it is likely that many registrants do not know if their identification information matches information held by election authorities. They won't know whether they will get caught up in delays and ballot rejections until they are in the midst of the process of trying to vote by mail. They won't know how quickly, or how close to Election Day, it will be

before they are advised by election officials of a problem with their materials. And, as I'll show below, by that point it is often too late for the voter to be able to correct the problem.

43.  In analogizing the burdens on mail voting before SB 1 to those created by SB 1, Dr. Hoekstra misjudges the issues involved in this case. The burdens of SB 1, particularly the burdens created by faulty and incomplete state records that lead to uncertainty on the part of a voter of how and whether they can comply with SB 1, are categorically different than the burdens of mail voting related to simple and clear rules such as age-based eligibility.

### B.  Dr. Hoekstra's Mischaracterization of a "Simulation"

44. Dr. Hoekstra repeatedly refers to my analysis as a "simulation," which is a mischaracterization of the research. In Dr. Hoekstra's strawman interpretation, he supposes that I am "simulating" an election held under SB 1 and then estimating that 1 in 7 voters will be affected in that election. This number is preposterous, argues Dr. Hoekstra, because it requires "rather extreme assumptions," such as that everyone in Texas attempts to vote by mail, "a set of potential absentee voters that is vastly larger than anything seen in Texas history." I agree it would be preposterous to assume every Texas voter would attempt to vote by mail in a single election, but I do not make that assumption in my research.

45. My analysis is not a "simulation" of how many voters are likely to be affected by SB 1 in any given election. Rather, the analysis shows how many Texans could run into trouble if an election was approaching and they wanted or needed to cast a ballot by mail. In the first paragraph of my report, I explain that 1 in 7 Texans "can submit a ballot application

– as well as a ballot itself – in perfect accordance with the state's instructions under SB 1, and yet Texas election officials must still reject the voters' forms."

46. In rebutting an argument that I never made, Dr. Hoekstra's report misses the mark. Consider the voters under 65 in Texas. Some may get sick. Some may become disabled. Some may expect a baby to come within a few weeks of Election Day. Some may get called out of town for work or for a family obligation. Some may be members of the military who are called overseas. If we were to "simulate" how many Texans would fall into these categories in any specific election, the number would likely be modest. But in any given election cycle, it is impossible to anticipate which specific Texans are going to be sick or out of town, or become disabled, or expectant of a baby, or called overseas. So, the question I answered in my report is how many Texans, should they suddenly fall into these categories and therefore become eligible to vote by mail, might have their mail ballot materials rejected.

47. To offer an analogy, suppose a hospital in Texas has medical records for 17 million citizens. But for 2.6 million of these people, the records are incomplete or incorrect. If one of these 2.6 million Texans comes into the hospital to receive treatment, they could face a delay in care or, worse, they could be denied medical care altogether. How big of a problem are the faulty medical records? Well, since only a small fraction of the public will come sick to the hospital in any one year, an analyst *could* treat the record-keeping issues as a small problem. Dr. Hoekstra's reasoning is akin to the view that few people use the hospital each year, so the faulty records are not a serious problem. Plus, in his line of reasoning, sick patients could always try to find another hospital. My read of the situation is different. Since any one of these 2.6 million people could come to this

hospital in any year, the fact that the hospital's records are incomplete or incorrect for so many people creates a broad risk to the public.

### C. Mail Voters Including DPS IDs and SSNs in SB 1 Forms

48. Dr. Hoekstra's report advances an argument that a narrowly-distributed set of guidelines to voters should be taken more seriously than the plain text of SB 1 and SB 1's implementation materials.

49. Texas's mail ballot application states clearly the circumstances under which voters should list the last four digits of their social security number (SSN4) on the form: voters are instructed to list their social security number only if they do not have a driver's license number or other DPS identification number. The ballot application states, **"If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Number, give the last 4 digits of your Social Security Number."** This exact same language is printed on the carrier envelope used for submitting a mail ballot. The language in the text of SB 1 is similar: **"…if the applicant has not been issued a number described by Paragraph (A) [a DPS ID number], the last four digits of the applicant's social security number."**

50. In my original report (footnote 4), I explain that the Texas Secretary of State has issued guidance that encourages voters to include both a DPS identification number and an SSN4 on these documents, if they have both. However, because that guidance is not conveyed in SB 1, on the carrier envelopes that most Texans must use, or on the mail ballot applications issued by the Secretary of State, my analysis does not presume that voters will follow the Secretary's guidance.

51. Dr. Hoekstra considers this a "serious flaw" in my analysis. On multiple occasions in his rebuttal report, he draws attention to a February 16, 2022 press release and video message in which Secretary of State John Scott recommends that voters write down on mail ballot forms both their SSN4 and their DPS ID Number. Dr. Hoekstra writes, "A more credible analysis would assess the extent to which voters who could encounter a problem write down both numbers, as recommended by the Secretary of State."

52. The text of Secretary's Scott press release summarizes the language of the mail ballot materials and the text of SB 1.[4]  A voter must record their DPS ID Number, **"OR if you have not been issued one of the above numbers, the last 4 digits of your Social Security Number."** Further down on the webpage, however, and in contrast to the language just quoted, the press release continues, "You may put both numbers in the spaces provided on your ABBM and Carrier Envelope."

53. The Secretary's website directs readers to a YouTube video statement by the Secretary of State. On the video, the Secretary articulates his recommendation that registrants include both the SSN4 and DPS ID on the mail ballot forms, even though both are not required.

54. The Secretary's message was released approximately two weeks before the March 1, 2022 election. In an election season involving 15 million nonvoters and 3 million voters (including over 150,000 mail voters), the Secretary's video message has been viewed a total of 676 times, as of April 27, 2022. That View Count includes three views by me, and probably dozens, if not hundreds, of views by other experts such as Dr. Hoekstra, by lawyers, and by government officials. In short, it appears that few ordinary Texas voters have viewed Secretary of State Scott's message.

---

[4] https://www.sos.state.tx.us/about/newsreleases/2022/021622.shtml

55. On the one hand, then, we have the text of SB 1 and the text of the standard mail ballot request form and the text of the carrier envelope, all of which say that voters should include an SSN4 only if they do not have a DPS ID number. On the other hand, we have press statements that few have seen but that suggest voters should include both a DPS ID and SSN4 when submitting mail ballot forms. Given the differences in the distribution rates for the differing interpretations of SB 1, I think it is appropriate to assume voters will follow the instructions on the forms that they must fill out rather than the advice of Secretary Scott.

**D. Can Voters Correct Problems Caused by SB 1?**

56. Dr. Hoekstra's next argument is that mail voters whose materials are rejected due to SB 1 can cure the problem and successfully vote either by mail or in person. For this reason, he expects SB 1 would not have a measurable impact on voting rates. Dr. Hoekstra performs no test of this claim. Rather, he supports the claim through the argument, discussed above, that the burdens imposed by SB 1 are smaller than the burdens imposed on 64-year-olds prior to 2021. Since 64-year-olds and 65-year-olds voted at the same rates in 2020, Dr. Hoekstra thinks burdens from SB 1 are "implausible."

57. As I will now show, through an analysis of voter data from Texas's March 1 election, Dr. Hoekstra's speculation is clearly wrong. The majority of Texas registrants whose mail ballots were rejected by the state failed to have a ballot counted. In addition to this evidence, I will also provide data to help explain why voters are unable to vote after their ballots are rejected. As is true across the country, mail voters in Texas tend to cast ballots at the end of the election season, sending in their ballot very close to the receipt deadline. Correcting an error requires knowing about an error, and many voters may not submit

mail ballot forms with enough time to learn about an error, particularly if they are not immediately responsive to telephone calls from unfamiliar numbers or emails from unfamiliar senders. A voter who submits a ballot application near the deadline may not learn that the application was rejected due to SB 1 compliance until it is too late to correct it. The next section describes the data and analysis of the March 1 election that advances these claims.

### IV.    March 1, 2022 Election Analysis

58. The April voter file export contains voter history data from the March 1, 2022 primary election, the first election held under SB 1. I restrict my attention here to records with the election date listed as "03-01-2022." Across the counties, 3,164,179 TEAM records have information related to the March 3, 2022 election. Not all of these records appear to be records of successful voters. Some represent individuals whose ballots were rejected or who sought a mail ballot application but never submitted the ballot.

59. The database export shows no record of individuals whose mail ballot *applications* were rejected due to SB 1 compliance issues.[5] However, according to the database, 31,107 records are listed with a code for a reason that their ballots for the March 1 primary were rejected. More than 4 in 5 of these (specifically, 25,429 of them, or 82%) are listed with a designation related to the SB 1 law. The designation is for ballots that have "Incorrect or Missing SSN/ TDL #."  These numbers align fairly closely with Election Director Keith

---

[5] I would have analyzed rejected applications if they had been made available to me in the TEAM export. In deposition, Mr. Keith Ingram, director of Texas's Election Division, testified that fields used to track acceptance and rejection of mail ballot applications were included in the export. An Excel spreadsheet labeled STATE057755 shows a code of "IS" under a field of "mail in request reject reason" to indicate "Incorrect or Missing SSN / TDL #." However, while the April TEAM database export does use this code for rejected ballots, it shows no such code for rejected mail ballot applications.

Ingram's April 7, 2022 disclosure indicating a total of 24,636 rejected ballots statewide. Mr. Ingram's report seems to include records of all rejected mail ballots, though, not specifically those associated with incorrect/missing identification numbers. Part of the discrepancy is attributable to the fact that there are some individuals who have multiple rows in the database indicating that ballots were rejected more than one time.

60. A key question is how many of the individuals who had their ballots rejected were then able to vote in person or vote by mail following a correction. Dr. Hoekstra asserts that voters can easily substitute in-person voting for mail voting, and because of this, there really is no meaningful burden. Dr. Hoekstra concludes his rebuttal report by saying that "the likely burden on the…registered voters who will either have to cure their ballot or vote in person as a result of SB 1 is likely minimal, and quite possibly zero."

61. As I show just below, Dr. Hoekstra's assessment is incorrect. But first, it is worth showcasing that there are instances that are consistent with Dr. Hoekstra's theories. There are voters whose records indicate that they applied for and received mail ballots in early February. But then they seemed to hit a snag. The voter file lists that their ballots were rejected, with a code of "IS", indicating missing or incorrect information in the SSN or DPS ID fields. Fortunately, on other rows in the voter file, the record shows that these same voters, whose mail ballots were rejected, ended up casting ballots in-person on March 1.

62. The scenario I just outlined seems to be the kind of story that Dr. Hoekstra has in mind, namely, a voter hit a problem with SB 1 compliance but was then able to vote in person. However, these cases represent the minority of impacted voters. Out of 25,429 individuals who had mail ballots rejected on account of missing/incomplete identification

numbers, only 6,509 (25.60%) have records indicating that they cast an accepted mail ballot or voted in person. The remaining 18,920 (74.40%) are recorded as not having cast a vote. That is, **3 out of 4 Texans who had their mail ballot rejected due to SB 1 requirements did not go on to successfully cast a ballot in the election.**

63. Dr. Hoekstra did not just argue that few Texans would be affected by SB 1. He argued specifically (paragraph 30) that, *conditional on a registrant having to cure their ballot due to SB 1*, there would be little or no consequence for turnout. However, as just shown with the state's data, among qualified Texans who went through the trouble of applying for and submitting a mail ballot and then had their mail ballot rejected due to SB 1, 3 out of 4 of them ended up not having any ballot counted in the March 1 primary at all.

**The Timing of Mail Ballots**

64. If mail applicants and mail voters have materials rejected, they are supposed to be notified by phone and/or email. But if they are not immediately responsive and/or they submit forms right before the deadline, then it might not be possible for them to cure the problems presented by SB 1. It turns out that many mail voters submit forms very close to the deadline.

65. Consider the calendar for the March 1 state primary in Texas. Texans could send applications for a mail ballot as early as January 1, 2022. Applications had to be received by election officials no later than February 18. In the TEAM records, 260,275 registrant records are listed as submitting an absentee ballot application. Figure 1 shows the dates on which those applications were received.

**FIGURE 1**



Note: "Jan 1" includes a handful of records that are listed as submitted prior to Jan 1. "LATE" combines all dates after February 18.

66. As Figure 1 shows, out of the 49-day period in which registrants could submit a ballot application, almost no applications were received for the first third of the timespan. Then, starting on January 18, weekdays saw a consistent stream of applications, up until (and, actually, after) the February 18 deadline. In fact, of all the applications that were received before the deadline, 1 in 5 were received in the last week (February 12-February 18). Another 9,973 applications were received after the deadline.

**FIGURE 2**



Note: "Feb 1" includes a handful of records that are listed as submitted prior to Feb 1. "LATE" combines all dates after March 3.

67. Figure 2 shows the pattern of dates in which the ballots themselves were received. These data include 196,831 records and include ballots that were received late or were otherwise marked invalid. Here, the pattern looks different than in Figure 1 in that the bars rise as Election Day approaches. As the election date gets closer, there are, on average, more ballots each day. In fact, the last week of eligibility (from February 25 until March 3) shows 39% of ballots received by election officials. Over 11% of ballots

submitted on time were received on a single date, February 28, the day before Election Day.

68. These patterns suggest that voters may have difficulty addressing problems in mail balloting due to SB 1. Given that 1 in 5 Texans who submit applications on time do so in the last week of eligibility, and given that 2 in 5 Texans who submit ballots on time do so in the last week of the election season means that many voters may not learn that they must address problems caused by SB 1 until it is too late.[6] This concern is particularly salient given that three-quarters of individuals whose mail ballots were rejected due to SB 1 did not go on to vote by any method.

### V.       Summary of Findings

69. In this report, I have updated my analysis of TEAM and DPS data using more recent exports from the State of Texas. The results of this new analysis are consistent with the analysis of my prior report: many Texans can submit mail ballot forms correctly and yet their forms will be rejected due to deficiencies in state records.

70. Furthermore, I have addressed the major points raised by Dr. Hoekstra. Unlike other requirements on mail voters in Texas (e.g., the requirement to have an excuse to vote by mail if under age 65), SB 1 requires eligible voters to know detailed information about state record-keeping in order to vote by mail without risk of being rejected due to no fault of their own. While rejected voters can, in theory, cure errors by *not* voting by mail, and

---

[6] According to Texas statute, Section 87.0271(c), in the days right before an election, election officials *may* try to notify voters by phone or email and instruct them in how to cure a problem, such as coming in person to vote at the early voting clerk's office. Furthermore, voters may be able to cure some SB 1 problems by providing identification verification during a grace period following an election. However, it is not clear the extent to which officials are able to make contact with registrants whose ballots/applications are rejected to SB 1. Clearly, the March election data shows that most voters with ballots rejected due to SB 1 did not end up voting.

instead voting in person, the March 1 election data confirms that three-quarters of

rejected voters did not successfully vote in the election after their ballots were rejected

due to SB1.

I declare under penalty of perjury under the laws of the United States that the forgoing is
true and correct to the best of my knowledge.

DATED this 4th Day of May, 2022.

_____

Eitan Hersh

# EXHIBIT 56

# EARLY VOTING BALLOT BOARD & SIGNATURE VERIFICATION COMMITEE

## Handbook for Election Judges and Clerks
## 2022

### FOR USE IN GENERAL, PRIMARY, AND
#### OTHER POLITICAL SUBDIVISION ELECTIONS



**Issued by**

The Office of the Texas Secretary of State, Elections Division
1-800-252-VOTE(8683) or (512) 463-5650
www.sos.texas.gov
www.VoteTexas.gov

STATE001325

# TABLE OF CONTENTS

**INTRODUCTION**                                                                              i

**CHAPTER 1 — CREATION OF THE EARLY VOTING BALLOT BOARD & SIGNATURE
          VERIFICATION COMMITTEE**                                                            1

SECTION A.  COMPOSITION OF THE EVBB                                                           1
SECTION B.  COMPOSITION OF A SIGNATURE VERIFICATION COMMITTEE                                 2

**CHAPTER 2 — SIGNATURE VERIFICATION COMMITTEE CONVENES**                                     5

SECTION A.   Convening the Signature Verification Committee                                   5
SECTION B.   Delivery Of Materials To The Committee                                           6
SECTION C.   Receipt For Delivery                                                             7
SECTION D.   Security Of Early Voting Ballots                                                 7

**CHAPTER 3  — THE EARLY VOTING BALLOT BOARD CONVENES**                                       9

SECTION A.   Convening the Early Voting Ballot Board                                          9
SECTION B.   Delivery of Materials to the Board                                               10
SECTION C.   Receipt for Delivery                                                             11
SECTION D.   Security of Early Voting Ballots                                                 12

**CHAPTER 4  — QUALIFYING BALLOTS VOTED BY MAIL OR VOTED USING MAIL
          PROCEDURES**                                                                        13

SECTION A.   Types Of Early Voting Ballot Applications                                        13
SECTION B.   Valid Reasons For Voting Early By Mail                                           13
SECTION C.   Qualifying Early Voting Ballots Voted By Mail                                    14
SECTION D.   Qualifying Signatures for the Signature Verification Committee                   18
SECTION E.   Accepted Ballots                                                                 19
SECTION F.   Rejected Ballots                                                                 20

**CHAPTER 5 — COUNTING HAND-COUNTED PAPER BALLOTS**                                           22

SECTION A.   Establishing The Counting Teams                                                  22
SECTION B.   Opening The Ballot Box Containing Hand-Counted Paper Ballots                     22
SECTION C.   Rules Governing The Counting Procedure                                           23
SECTION D.   The Counting Procedure                                                           23
SECTION E.   Rules For Counting Manually-Cast Or Hand-Counted Optical Scan Ballots           24
SECTION F.   Handling The Election Returns For Paper Ballots                                  27
SECTION G.   Reporting Early Votes                                                            30

**CHAPTER 6 — EXAMINING, PREPARING, AND COUNTING VOTED OPTICAL
          SCAN BALLOTS**                                                                      31

SECTION A.   Processing Ballots Counted At Central Counting Station                           31
SECTION B.   Delivery Of Ballot Box                                                           31

STATE001326

**CHAPTER 7 — RECONVENING EARLY VOTING BALLOT BOARD**     32

       SECTION A.    Establishing The Early Voting Ballot Board To Review Provisional Ballots     32
       SECTION B.    Reconvening For Qualifying Late Early Ballots By Mail     36

**APPENDIX A. Signature Verification Committee**     38
QUESTIONS IN REGARDS TO VERIFYING SIGNATURES.     38
SITUATIONS.     40

**APPENDIX B. Early Voting Ballot Board**     43
QUESTIONS IN REGARDS TO BOARD.     43
SITUATIONS.     45

STATE001327

# INTRODUCTION

The Elections Division of the Secretary of State's Office has prepared this handbook for an overview of the Early Voting Ballot Board and Signature Verification Committee.  This handbook contains a thorough outline of who is able to serve as part of the Early Voting Ballot Board, who is able to serve on the Signature Verification Committee, convening the board/committee, qualifying ballots and counting ballot procedures for the Early Voting Ballot Board and Signature Verification Committee.  It incorporates changes in election laws through the regular and special sessions of the 87th Texas Legislature (2021).

The handbook starts at the selection process of the Early Voting Ballot Board and Signature Verification Committee, whether it is for a Primary, General, or a Political Subdivisions Election. Throughout the handbook, references are made to the appropriate section in the Texas Election Code or the Texas Administrative Code, unless otherwise indicated.  Information in *italics* relates to primary elections.

The Elections Division of the Secretary of State's Office is open during the hours that the polls are open for voting on all uniform election dates.  Answers to questions on election law and procedures may be obtained by telephoning the Elections Division toll-free at 1-800-252-2216 or (512) 463-5650.

Please visit us at our Internet home page for additional election information at https://www.sos.texas.gov/, as well as https://www.votetexas.gov/.

The Office of the Secretary of State does not discriminate on the basis of race, color, national origin, sex, religion, age, or disability in employment or the provision of services.

i

STATE001328

# CHAPTER 1

## CREATION OF THE EARLY VOTING BALLOT BOARD & SIGNATURE VERIFICATION COMMITTEE

### SECTION A.  COMPOSITION OF THE EVBB

1. An early voting ballot board (EVBB) shall be created in each election to process early voting results from the territory served by the early voting clerk. [Sec. 87.001] No matter what type of election an entity is having, they must have an early voting ballot board.

2. The EVBB consists of a presiding judge, an alternate judge and at least one other member. The presiding judge and the alternate presiding judge of the EVBB are appointed in the same manner as a presiding election judge and alternate presiding judge, respectively. Except in the general election for state and county officers, each county chair of a political party with nominees on the general election ballot shall submit to the county election board a list of names of persons eligible to serve on the early voting ballot board in order of the county chair's preference. The county election board shall appoint at least one person from each list to serve as a member of the early voting ballot board. The same number of members must be appointed from each list. The county election board shall appoint persons as members of the early voting ballot board in the order of preference indicated on each list. The other members are appointed by the presiding judge in the same manner as the precinct election clerks. In addition to the members appointed under the general election, the county election board shall appoint as the presiding judge the highest-ranked person on the list provided under that subsection by the political party whose nominee for governor received the most votes in the county in the most recent gubernatorial general election. The county election board shall appoint as the alternate presiding judge the highest-ranked person on the list provided by the political party whose nominee for governor received the second most votes in the county in the most recent gubernatorial general election. [Sec. 87.002]

   **NOTE:** If the county has an elections administrator, or if commissioners court has transferred the election duties of the county clerk to the county tax assessor-collector, he/she will serve as the county election board chair in place of the county clerk. [Secs. 31.043, 31.072 & 31.073]

   **We recommend that the county election board appoint the members of the early voting ballot board for the November 8, 2022 general election no later than October 6, 2022, to allow time for notice requirements.**

| Type of Election | Presiding Judge and Alternate Presiding Judge | EVBB Clerks |
|---|---|---|
| General Election for State and County Officers | County Election Board – from list provided by political party whose nominee for governor received the most (presiding judge) and second-most (alternate presiding judge) votes in the county | County Election Board – from lists provided by political parties (same number from each list) |

1

| Primary Elections | County Chair of Political Party with approval of County Executive Committee | Presiding Judge of EVBB |
| All Other County-Ordered Elections | Commissioners Court if no County Election Board is established | Presiding Judge of EVBB |
| All Other Elections | Authority ordering election | Presiding Judge of EVBB |

3. To be eligible for appointment to the early voting ballot board, a person must meet the requirements for eligibility for service as a presiding election judge [Sec. 32.051], except that the appointee must be a qualified voter of the territory served by the early voting clerk and is not required to be a qualified voter of any other particular territory. [Sec. 87.003]

4. An EVBB member would be ineligible if they hold public elective office, are an opposed candidate in election on the same day, are related to an opposed candidate within 2nd degree by blood or marriage, or serve as campaign treasurer/campaign manager for candidate in the election.

5. Required Oaths by Early Voting Ballot Board Members: All EVBB members should recite this oath, prior to beginning service on the Board. [Sec. 87.006]

   For use in Joint Primary Elections, General Election for State and County Officers, Elections ordered by the Governor:

   "I swear (or affirm) that I will objectively work to be sure every eligible voter's vote is accepted and counted, and that only the ballots of those voters who violated the Texas Election Code will be rejected. I will make every effort to correctly reflect the voter's intent when it can be clearly determined. I will not work alone when ballots are present and will work only in the presence of a member of a political party different from my own. I will faithfully perform my duty as an officer of the election and guard the purity of the election."

   For use in all Separate Primary Elections and Other Elections that do not contain Party Affiliation:

   "I swear (or affirm) that I will objectively work to be sure every eligible voter's vote is accepted and counted, and that only the ballots of those voters who violated the Texas Election Code will be rejected. I will make every effort to correctly reflect the voter's intent when it can be clearly determined. I will not work alone when ballots are present. I will faithfully perform my duty as an officer of the election and guard the purity of the election."

## SECTION B. COMPOSITION OF A SIGNATURE VERIFICATION COMMITTEE

1. Unlike an EVBB that is mandatory, a Signature Verification Committee (SVC) may be created. There are two ways for this committee to be created. The first way is through the early voting clerk. The early voting clerk has authority for determining whether a signature verification committee is needed. The second way is through a petition that is submitted to the early voting clerk. The petition must contain at least 15 registered voters in the territory in order for the committee to be created. The SVC must consist of not fewer than five members. If more than 12 members are appointed to serve on the signature verification committee, the early voting clerk may designate two or more subcommittees of not less than six members. [Sec. 87.027]

2

**STATE001330**

2. In an election in which party alignment is indicated on the ballot, each county chair of a political party with a nominee or aligned candidate on the ballot shall submit to the appointing authority a list of names of persons eligible to serve on the signature verification committee in order of the county chair's preference. The authority shall appoint at least two persons from each list in the order of preference indicated on each list to serve as members of the committee. The same number of members must be appointed from each list. The authority shall appoint as the chair of the signature verification committee the highest-ranked person on the list provided by the political party whose nominee for governor received the most votes in the county in the most recent gubernatorial general election. The authority shall appoint as vice chair of the signature verification committee the highest-ranked person on the list provided by the political party whose nominee for governor received the second most votes in the county in the most recent gubernatorial general election. [Sec. 87.027(d)]

3. The signature verification committee is a group that meets prior to election day to compare the signatures on the applications for ballot by mail to the corresponding carrier envelopes. [Sec. 87.027] If the early voting clerk determines that a signature verification committee is desirable **or** if the clerk receives a petition signed by 15 registered voters, the clerk shall issue a written order creating the committee. The deadline to submit a petition requesting creation of a signature verification committee for the November 8, 2022 election is October 1, 2022. [Secs. 87.027, 1.006] A request submitted by mail is considered submitted at the time of its receipt by the early voting clerk. The early voting clerk determines the number of members on the committee, providing for a minimum of five (the committee chair and four members).

4. In order to serve on the committee, a person must be a qualified voter of the entity. **IT is NOT RECOMMENDED that members who serve on the EVBB also serve on the SVC. This creates a conflict because if a SVC has determined that the signatures on the application for ballot by mail or carrier envelope are not those of the same person, the EVBB may make a determination that the signatures are those of the same person by a majority vote of the board's membership. [Sec. 87.027(j)]**

The county chairs' lists for the appointment of the signature verification committee members are not subject to the June 30th or the July 30th deadline. The county elections board shall appoint the members of the signature verification committee not later than the 5th day after the date the early voting clerk issues the order calling for the creation of the committee OR not later than October 15, 2022, if the committee is created after a valid petition was submitted requesting its creation. [Sec. 87.027(c)] We recommend that the signature verification committee be appointed (if needed) by October 10, 2022, to allow time for all necessary notice requirements. Therefore, we recommend that the parties submit the lists to the chair of the county elections board (county clerk or elections administrator) by August 29, 2022, to allow for appointment during the month of September or no later than the October 10, 2022 recommended date. The highest-ranked person on the list provided by the party whose candidate for governor received the highest vote total in the 2018 gubernatorial election countywide shall be appointed as chair of the signature verification committee. The highest-ranked person on the list provided by the party whose candidate for governor received the second highest vote total in the 2018 gubernatorial election countywide shall be appointed as vice chair of the signature verification committee. For the remaining members, the county election board must select at least two qualified individuals from each chair's list. If clerks beyond the minimum requirement are ordered, an equal number must be chosen from each list.

3

| Type of Election | Chair and Vice Chair | SVC Clerks |
|---|---|---|
| General Election for State and County Officers | County Election Board appoints the chair, in an election for which the board is established -- from list provided by political party whose nominee for governor received the most (chair) and second-most (vice chair) votes in the county | County Election Board appoints, in an election for which the board is established --from list provided by the county chairs |
| Primary Elections | County Chair of Political Party with approval of County Executive Committee | County Chair of Political Party with approval of County Executive Committee |
| All Other County-Ordered Elections | Commissioners Court | Commissioners Court |
| All Other Elections | Authority ordering election | Authority ordering election |

4

# CHAPTER 2

## SIGNATURE VERIFICATION COMMITTEE CONVENES

### SECTION A. CONVENING THE SIGNATURE VERIFICATION COMMITTEE

1. The early voting clerk shall determine the place, day or days, and hours of operation of the signature verification committee and shall state that information in the order calling for the committee's appointment. A committee may not begin operating before the 20th day before election day. [Sec. 87.027(f)]

2. The early voting clerk shall post a copy of the order calling for the appointment of the signature verification committee. The copy must remain posted continuously for at least 10 days before the first day the committee meets. [Sec. 87.027(g)]

3. The committee must complete the following tasks:
   (a) Compare the signature on each carrier envelope certificate (except those signed for a voter by a witness) with the signature on the voter's ballot application to determine whether the signatures are those of the voter. [Sec. 87.027(i)] The signature verification committee may use electronic copies of the mail ballot application and carrier envelope certificate for comparing signatures.
   (b) The committee may also compare the signatures with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. If ballot materials or ballot applications are recorded electronically as provided by Section 87.126, the signature verification committee may use an electronic copy of a carrier envelope certificate or the voter's ballot application in making the comparison under Section 87.027(i).
   (c) Rejection of signatures must be made by a majority vote of the committee. [Sec. 87.027(i)]
   (d) The only purpose of the SVC is to compare signatures; the EVBB will count the ballot. **THE SVC SHOULD NOT COUNT BALLOTS. [Sec. 87.027(j)]**
   (e) Applications for ballot by mail and carrier envelopes containing voted ballots must include the number of the voter's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety ("DPS"). If the voter has not been issued one of these DPS numbers, the voter must include the last four digits of the voter's social security number on the application for ballot by mail and carrier envelope. If the voter has not been issued any of these numbers, the application for ballot by mail and carrier envelope must include a statement that the voter has not been issued any of the numbers. The provided number must be associated with the voter's registration record. **NOTE: The voter must also provide this personal identification information on the application for ballot by mail. However, if the voter includes an identification number on the carrier envelope, the number on the carrier envelope does NOT have to match the type of number on the voter's application for ballot by mail as long as both numbers are associated with the voter's registration record.** [Secs. 84.002(a)(1-a), 86.002(g)]
   (f) If a ballot is received and the voter did not sign the carrier envelope; or it cannot be determined that the signature on the carrier envelope is the voter's signature; or the carrier envelope has missing or incorrect personal identification information; or the witness information is incomplete, the signature verification committee must follow the corrective action process in Section 87.0271. [Tex. Sec'y of State Election Advisory No. 2022-08]
   (g) No later than the second business day after the signature verification committee discovers one of the defects mentioned above and before the committee decides whether to accept or reject a timely delivered ballot, the committee must determine if it would be possible for the voter to correct the

STATE001333

defect and return the carrier envelope before the time the polls are required to close on election day. If the signature verification committee determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the signature verification committee must return the carrier envelope to the voter by mail. If the signature verification committee determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the committee may notify the voter of the defect by telephone or email and inform the voter that the voter may request to have the voter's application by mail canceled or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. Poll watchers are entitled to observe this process. [Sec. 87.0271; Tex. Sec'y of State Election Advisory No. 2022-08]

## SECTION B. DELIVERY OF MATERIALS TO THE COMMITTEE

1. If a signature verification committee is appointed for the election, the early voting clerk shall deliver the jacket envelopes containing the early voting ballots voted by mail to the committee instead of to the early voting ballot board. [Sec. 87.027(h)]

2. The following notices must be posted on an entity's website if available: [Sec. 87.027(k-1)]
   a. Copy of order calling for the appointment
   b. EV Clerk's notice of names and addresses of members
   c. Notice of delivery of ballots

3. Deliveries may be made only during the period of the committee's operation at times scheduled in advance of delivery by the early voting clerk. The clerk shall post notice of the time of each delivery. The notice must remain posted continuously for at least two days before the date of the delivery. [Sec. 87.027(h)]

4. Postings shall be made on the bulletin board used for posting notice of meetings of the commissioners court, in an election for which the county election board is established or a primary election, or of the governing body of the political subdivision in other elections. [Sec. 87.027(k)]

5. The committee chair or committee members may request from the voter registrar, county clerk, or election administrator ahead of time signatures that are on file from the past six years. Our office recommends that this request be made ahead of time in order to give the voter registrar, county clerk or election administrator ample time. This information may be provided electronically.

6. The signature verification committee may also compare the signatures on a voter's ballot application or carrier envelope with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. [Sec. 87.027(i)]

7. Applications for ballot by mail and carrier envelopes containing voted ballots must include the number of the voter's driver's license, election identification certificate, or personal identification card issued by DPS. If the voter has not been issued one of these DPS numbers, the voter must include the last four digits of the voter's social security number on the application for ballot by mail and carrier envelope. If the voter has not been issued any of these numbers, the application for ballot by mail and carrier envelope must include a statement that the voter has not been issued any of the numbers. [Secs. 84.002(a)(1-a), 86.002(g)].

8. The committee compares signatures on applications and corresponding carrier envelopes only to determine that the signatures on these documents are of the same person or not. [Sec. 87.027(i)]. The signature

6

STATE001334

verification committee may use electronic copies of the mail ballot application and carrier envelope certificate for comparing signatures. The standard should be whether the two signatures could have been made by the same person. If using electronic signatures to compare, please have a plan in place and use that procedure throughout the duration.

9.  The committee places carrier envelopes and applications that are the signatures of the same person in one container and those that are not of the same person in another separate container.

10. Committee chair delivers sorted materials to the Board as directed by the presiding judge of the Board.

11. If the signature verification committee has decided that the signatures are from the same person, the Board may not override the committee's decision.  If the signature verification committee has decided that the signatures are not from the same person, the Board may override the committee's decision that the signatures are of the same person by a majority vote of the Board. [Sec. 87.027(j)]

12. A determination that signatures are not from the same person must be made by a majority vote of the committee or subcommittee as applicable.  If the early voting clerk has designated subcommittees within the signature verification committee, the subcommittee makes its signature determinations by a majority vote of the subcommittee members.  [Sec. 87.027(l)] There is nothing in the Election Code that states what constitutes a majority vote. This may be something that is discussed among the committee to determine what constitutes a majority vote. Please note that if the committee has determined what constitutes a majority vote, the committee must use that process throughout the entire process.

13. The Board makes a determination if the signature verification committee cannot determine whether the signatures are made by the same person.

14. **Convening the Committee after election day**. The early voting clerk may determine whether or not the committee will need to reconvene after election day to verify signatures or leave that authority with the early voting ballot board. We recommend that this decision be made prior to election day. If the authority is left with the committee, we recommend that the committee coordinate with the board and the early voting clerk for delivery of the jacket envelope ballots by mail.

## SECTION C. RECEIPT FOR DELIVERY

1.  Upon delivery of a sealed early voting ballot box, the committee chair of the signature verification committee must inspect the box to determine whether the seals on the box are intact, and whether the numbers on the seals correspond to the numbers indicated on the record of serial numbers prepared by the early voting clerk.  [Secs. 87.062(b), 127.068]

2.  If the seals are intact and the numbers match, the committee chair should accept the ballot box and so indicate on the receipt.

3.  If the seals are not intact or the numbers do not match, the committee chair should accept the ballot box, but note any discrepancies on the receipt and in his or her records.

## SECTION D. SECURITY OF EARLY VOTING BALLOTS

1.  The voted early voting ballots must be secured from the last day of voting by personal appearance at a polling place until the day the ballots are counted.  [1 T.A.C. § 81.34]

    a.  If the signature verification meets before election day, the committee chair shall, upon each adjournment of the board, lock and seal each ballot box prior to delivering the boxes back to the custodian of records.  The

7

chair shall complete a ballot box security form indicating each serial number used to seal each box. The form shall be signed by the chair and another committee member who has witnessed the procedure. In a general election for state and county officers, the committee member must be from a different political party than the judge. The custodian of records shall also sign the form.

b. The committee chair shall deliver the key(s) used to lock the ballot box(es) to the custodian. The key shall be retained by the authority designated in accordance with Section 66.060(a) of the Code:

   (1) the sheriff for an election ordered by the governor or county authority or *a primary election*, except that in a year when the office of sheriff is on the ballot, the key shall be delivered to the county judge. When both these offices are on the ballot, the key shall be delivered to the county auditor or to a designated member of the commissioners court who is not on the ballot and who is appointed by the court, if the county does not have an auditor;

   (2) the chief of police or city marshal for an election ordered by a city authority; or

   (3) the constable of the justice precinct in which the office of the political subdivision is located, or if the office of constable is vacant, the sheriff of the county in which the political subdivision is located if the election is ordered by an authority of a political subdivision other than a city or county.

c. Upon reconvening the committee, the chair shall ensure that each ballot box is intact. The chair shall follow these procedures each day except upon final delivery to the custodian of records or delivery to the central counting station.

d. If it is impracticable for the chair to deliver the ballot boxes each day upon adjournment, the authority conducting the election shall submit an alternate security procedure to the Secretary of State for approval.

8

STATE001336

# CHAPTER 3

## THE EARLY VOTING BALLOT BOARD CONVENES

**SECTION A.  CONVENING THE EARLY VOTING BALLOT BOARD**

1.  The Early Voting Ballot Board (the "Board") generally meets twice during an election.  First, the Board meets to qualify ballots by mail on election day or after the last day to vote early by personal appearance.  Second, the Board meets after election day to review any provisional ballots and to qualify any mail-in ballots received by the 5th and 6th day after election day from voters casting a ballot from outside the U.S. or military voters on active duty or the spouse of a military person on active duty who is located outside the voter's home county.

2.  The board must convene to complete the following tasks:
    (a)  Qualify and Process Regular Ballots by Mail
    (b)  Qualify and Process Late Ballots (old and new categories)
    (c)  Qualify and Process Provisional Ballots

3.  Convening the Board on election day or after the period for early voting by personal appearance ends.

Except as provided below, the Board may meet to qualify and accept ballots at any time after the end of the early voting by personal appearance, but <u>may not count</u> votes until the polls open on election day.  [Secs. 87.024-87.0241]

**NOTES**:

- General rule: May convene at the end of the period for early voting by personal appearance (3rd day before) to <u>qualify</u> ballots.
- In elections conducted by a county with a population of 100,000 or more <u>and elections held jointly with such a county or conducted with such a county through a contract for election services</u>, the Board may meet to <u>qualify and accept</u> voted mail ballots beginning the end of the 9th day before the last day of the period of early voting.
- If there is a central counting station that has been established, then the ballots will not be sent to the ballot board, but rather to central count.
- The Board, like the Committee, may also compare the signatures on a voter's ballot application or carrier envelope with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. [Sec. 87.041(e)]

4.  Convening the Board after election day.

a.  The Board cannot convene until the 6th day after an election because voters that did not have a valid form of identification when voting have 6 days: (1) present to the voter registrar a valid photo identification, (2) complete one of the two curing affidavits set out in Section 65.054(b)(2)(B) (consistent religious objection to photographs) or Section 65.054(b)(2)(C) (identification unavailable due to declared natural disaster), or (3) apply for and receive a disability exemption. A board may convene earlier but continue on a rolling basis until the 6th day after election day.

STATE001337

b. In an election held on the date of the general election for state and county officers, the Board must convene <u>no later than the 13th day after the date of the election</u> to count provisional ballots.

c. In all other elections held on dates other than the date of the general election for state and county officers, the Board must convene no later than the 9th day to complete the review of provisional ballots.

d. The Board shall convene on the 9th day after election day or earlier if the early voting clerk certifies that all ballots from outside of the U.S. have been received and all provisional ballots have been processed by the voter registrar. [Sec. 87.125]  If this date falls on a Saturday, Sunday, or legal state or national holiday, the Board convenes on the next regular business day. [Sec. 87.125(c)].

e. *For Primary and Primary Runoff Elections – not earlier than 6 p.m. on the second Tuesday or later than 1 p.m. on the third day after election day at the hour specified by the county chair.*

f. The Board also must convene after election day to review ballots subject to the corrective action process under Section 87.0411. [<u>Tex. Sec'y of State Election Advisory No. 2022-08</u>]

SEE CHAPTER 7 FOR RECONVENING OF BALLOT BOARD FOR THE PROCESSING AND COUNTING OF PROVISIONAL AND OVERSEAS LATE BALLOTS.


**SECTION B. DELIVERY OF MATERIALS TO THE BOARD**

1. The board should obtain from the authority conducting the election a package of supplies, including the following forms:

   a. Oath of Election Judges and Clerks; [Sec. 62.003]

      "I swear (or affirm) that I will not in any manner request or seek to persuade or induce any voter to vote for or against any candidate or measure to be voted on, and that I will faithfully perform my duty as an officer of the election and guard the purity of the election."

   b. Poll List of Early Voting by Mail Voters or Voters Voting by Mail Procedure; [Sec. 87.021]

   c. List of Early Voting Provisional Voters; [1 T.A.C. §§ 81.172 – 81.174]

   d. List of Provisional Voters Who Presented Proper Identification to Voter Registrar; [Sec. 65.0541]

   e. Envelope for Rejected Early Voting Ballots; [Sec. 87.043]

   f. Tally Sheets; [Sec. 65.004]

   g. Return Sheets; [Sec. 65.014]

   h. Envelopes for distribution of returns and election records; [Sec. 66.003]

   i. Statement of Compensation; [Sec. 32.094]

   j. List of "ID" Voters; and

   k. Notice of Delivery of Ballots Voted by Mail (if delivered prior to the opening of the polls).

2. The early voting clerk delivers to the board:

   a. Each ballot box containing ballots voted by personal appearance;

   b. List of Declared Write-In Candidates (if applicable);

   c. The early voting clerk's key to each ballot box;

   d. The jacket envelopes containing ballots voted by mail and the corresponding applications;

STATE001338

e. The list of registered voters, containing voters' permanent and mailing addresses of record, used in conducting early voting;

f. Notice of Rejection of Early Voted Ballots (to be completed by Judge of Ballot Board);

g. The ballot transmittal form for early voted ballots; and

h. Receipt for each ballot box, to be completed when box received.

3. The custodian of the key to the second lock on the ballot boxes containing ballots voted by personal appearance must deliver his or her key to the presiding officer of the early voting ballot board at his or her request if the Board will be hand counting personal appearance ballots. [Sec. 87.025]

4. If ballots will be counted electronically at the central counting station, then:

- The key and the unopened ballot box should be delivered to the central counting station at the direction of the presiding judge of the central counting station and not to the ballot board, since the law prohibits the ballot board judge from opening the early voting by personal appearance ballot boxes containing ballots that are to be counted by automatic tabulating equipment at a central counting station. [Sec. 87.101]

- If accessible voting equipment (such as direct recording electronic equipment ("DREs")) or precinct count optical scan equipment was used for early voting, the ballot board should not process the early voting by personal appearance ballot boxes or voting machines.

5. The custodian of the key is:

-- for county elections, the county sheriff, unless the sheriff is on the ballot, in which case the key is kept by the county judge. If both the sheriff and the county judge are on the ballot, the key is kept by the county auditor, or if there is no county auditor, by a member of the commissioners court, named by the court, who is not on the ballot.

-- for city elections, the chief of police or city marshal.

-- for elections of other political subdivisions, the constable of the justice precinct in which the office of the political subdivision's governing body is located, or if there is no constable in that precinct, the sheriff. [Sec. 66.060(a)]

6. Notice of each delivery to be made prior to the time the polls open on election day must be posted at the main early voting polling place for at least 24 hours immediately preceding the delivery. [Secs. 87.023(b), 87.024(b)]

7. In the general election for state and county officers, if ballots are to be delivered before election day, the early voting clerk must notify the county chair of each political party with a nominee on the ballot at least 24 hours before the first delivery is made. [Secs. 87.023(c), 87.024(c)]

## SECTION C. RECEIPT FOR DELIVERY

1. Upon delivery of a sealed early voting ballot box, the presiding judge of the early voting ballot board must inspect the box to determine whether the seals on the box are intact, and whether the numbers on the seals correspond to the numbers indicated on the record of serial numbers prepared by the early voting clerk. [Secs. 87.062(b), 127.068]

2. If the seals are intact and the numbers match, the presiding judge should accept the ballot box and so indicate on the receipt.

STATE001339

3.   If the seals are not intact or the numbers do not match, the presiding judge should accept the ballot box, but note any discrepancies on the receipt and in his or her records.

## SECTION D. SECURITY OF EARLY VOTING BALLOTS

1.   The voted early voting ballots must be secured from the last day of voting by personal appearance at a polling place until the day the ballots are counted.  [1 T.A.C. § 81.34]

   a.   If the early voting ballot board convenes before election day, the presiding judge shall, upon each adjournment of the board, lock and seal each ballot box prior to delivering the boxes back to the custodian of records.  The judge shall complete a ballot box security form indicating each serial number used to seal each box.  The form shall be signed by the judge and another early voting ballot board member who has witnessed the procedure.  In a general election for state and county officers, the early voting ballot board member must be from a different political party than the judge.  The custodian of records shall also sign the form.

   b.   The presiding judge shall deliver the key(s) used to lock the ballot box(es) to the custodian.  The key shall be retained by the authority designated in accordance with Section 66.060(a) of the Code:

      (1)   the sheriff for an election ordered by the governor or county authority or *a primary election*, except that in a year when the office of sheriff is on the ballot, the key shall be delivered to the county judge.  When both these offices are on the ballot, the key shall be delivered to the county auditor or to a designated member of the commissioners court who is not on the ballot and who is appointed by the court, if the county does not have an auditor;

      (2)   the chief of police or city marshal for an election ordered by a city authority; or

      (3)   the constable of the justice precinct in which the office of the political subdivision is located, or if the office of constable is vacant, the sheriff of the county in which the political subdivision is located if the election is ordered by an authority of a political subdivision other than a city or county.

   c.   Upon reconvening the ballot board, the presiding judge shall ensure that each ballot box is intact.  The presiding judge shall follow these procedures each day except upon final delivery to the custodian of records.

   d.   If it is impracticable for the ballot board judge to deliver the ballot boxes each day upon adjournment, the authority conducting the election shall submit an alternate security procedure to the Secretary of State for approval.

STATE001340

# CHAPTER 4

## QUALIFYING BALLOTS VOTED BY MAIL OR VOTED USING MAIL PROCEDURES

## SECTION A. TYPES OF EARLY VOTING BALLOT APPLICATIONS

The early voting ballot board may encounter several types of applications for early voting ballots. There is not only one form that may be used. They include:

1. The "Application for Ballot by Mail" prescribed by the Secretary of State. [Secs. 84.001(a), 84.011]

2. An informal application for a ballot by mail, which is a written request by the applicant that is not made on the official application form prescribed by the Secretary of State. This application must comply with the statutory requirements for applying for a ballot by mail. [Sec. 84.001(c)]

3. The "Application for Limited Ballot" prescribed by the Secretary of State. [Sec. 112.005]

4. The "Federal Post Card Application" (FPCA) used by military and overseas citizen voters. [Sec. 101.003]

5. The "Application for Presidential Ballot" prescribed by the Secretary of State (only applicable in elections held in November of the presidential election year). [Sec. 113.003]

6. The "Application for Emergency Early Voting Ballot Due to Sickness or Physical Disability" prescribed by the Secretary of State. [Sec. 102.002]

7. The "Application for Emergency Early Ballot Due to Death in Family" prescribed by the Secretary of State. [Sec. 103.002]

8. The "Affidavit for Voting at Early Voting Place on Election Day" prescribed by the Secretary of State for voting by disabled voters when electronic voting equipment is being used at the precinct polling place. [Sec. 104.002]

## SECTION B. VALID REASONS FOR VOTING EARLY BY MAIL

Only the following persons may vote early by mail:

1. Persons who are 65 years of age or older on election day. [Sec. 82.003]

2. Persons who have a sickness or physical condition that prevents them from appearing at the polling place on election day without a likelihood of needing personal assistance or injuring their health. [Sec. 82.002(a)(1)]

3. Persons who are expecting to give birth within three weeks before or after election day. [Sec. 82.002(a)(2)]

4. Persons who are confined in jail at the time the application is submitted must be either:

   a. serving a misdemeanor sentence that ends on or after election day; or

   b. pending trial or appeal after denial of bail or if release on bail is unlikely until after election day. [Sec. 82.004]

5. Persons who expect to be absent from the county of residence on election day and during regular early voting hours for that part of the period for early voting remaining after the application is made. [Sec. 82.001]  If this reason for voting early is checked, the address to which the ballot was mailed must be an address outside the county. [Sec. 86.003(c)(1)]

6. Persons who are civilly committed under Chapter 841 of the Texas Health and Safety Code. [Sec. 82.008]

7. Persons who are certified for participation in the address confidentiality program.

STATE001341

a. An application for ballot by mail submitted by a person eligible under Section 82.007 must include:

   i. the name and address at which the person is registered to vote;

   ii. the substitute post office box designated by the attorney general for the person's use in place of the true residential address; and

   iii. an indication of each election for which the person is applying for a ballot. [Sec. 84.0021]

b. The information on an application for ballot by mail submitted by a voter related to the **address at which the voter is registered is confidential**, except that it must be disclosed if requested by a law enforcement agency or required under a court order. This application is valid for 3 years.

## SECTION C. QUALIFYING EARLY VOTING BALLOTS VOTED BY MAIL

1. Each jacket envelope will contain:

   a. an application for an early ballot to be voted by mail (or one of the other application procedures in Section A above) [Secs. 86.011(b), (c)]; If FPCA was submitted, jacket envelope must include a copy of the FPCA and the signature cover sheet.

   b. the envelope in which the application was delivered to the early voting clerk, if applicable; and

   c. the carrier envelope, which will contain:

   -- a ballot envelope with the ballot inside; and

   -- statements of residence, copy of identification, or other requested items, if applicable. [Sec. 86.002]

2. Remove the application and carrier envelope from the jacket envelope.

3. Check the voter's application to be sure that it states a legal ground for voting early by mail (See Section B above). [Sec. 87.041(b)(3)]

4. If the reason for voting early by mail is absence from the county, the application must show an address outside the county to which the ballot was mailed. [Sec. 87.041(b)(5)]

   **NOTE**: If the application was submitted after the period for early voting by personal appearance began, the application must show that the voter was absent from the county when the application was submitted. A voter checking expected absence from county and providing an out of county address on the official application is sufficient.

5. Check the voter's application for ballot by mail and the carrier envelope to be sure that the number of the voter's driver's license, election identification certificate, or personal identification card issued by the DPS is included and is associated with the voter's registration record. If the voter has not been issued one of these DPS numbers, the last four digits of the voter's social security number must be included on the application for ballot by mail and the carrier envelope and must be associated with the voter's registration record. If the voter has not been issued any of these numbers, the application for ballot by mail and the carrier envelope must include a statement that the voter has not been issued any of the numbers. The voter's registration record should also reflect that the voter has not been issued any of the numbers. **NOTE: If the voter includes an identification number on the carrier envelope, the number on the carrier envelope does NOT have to match the type of number on the voter's application for ballot by mail as long as both numbers are associated with the voter's registration record.**

6. If the grounds for voting by mail is either being 65 or over, or disability, and the applicant has not provided his or her official mailing address as shown on the list of registered voters as the address for mailing his or her ballot, the address provided must be that of a hospital, nursing home, other long term care facility, retirement center, or the address of a relative within the second degree by affinity or third degree by consanguinity with whom the applicant is living. [Sec. 86.003(c)(3)]

14

7.  If the reason for voting early by mail is confinement in jail, the address to which the balloting materials must be addressed is that of the jail facility or a relative within the second degree by affinity or third degree by consanguinity.  [Sec. 86.003(c)(2)]

8.  Check to make sure that the address to which the ballot was mailed is one of the following:

    a.  the voter's residence or mailing address indicated on the voter's registration record;

    b.  the facility that the voter is residing at if the voter has indicated on his or her application to vote by mail that the reason for voting is 65 years of age or older or disability and has provided a mailing address that does <u>not</u> match the voter's official residence or mailing address, if the facility is one of the following:

        (1)  hospital;

        (2)  nursing home or long-term care facility;

        (3)  retirement center; or

        (4)  person related to the voter within second degree by affinity (marriage) or third degree by consanguinity.  Relatives include: parent, child, brother, sister, grandparent, grandchild, great-grandchild, great-grandparent, uncle, aunt, nephew, niece, spouse, spouse's parent, son-in-law, daughter-in-law, brother's spouse, sister's spouse, spouse's brother, spouse's sister and spouse's grandparent.

    c.  the jail facility, if the reason for voting by mail is confinement in jail, or the address of a relative listed in Section C.7 above.

    d.  an address outside of the county, if the reason for voting by mail is expected absence from the county.

    e.  the voter's new address as provided on the enclosed statement of residence if the voter has moved within the county but has failed to update his address with the county voter registrar and is having a ballot mailed to a new residence address. [Secs. 84.002, 86.002, 86.003, 87.041

**NOTE**: Please note that although you will be looking to ensure that the ballot was mailed to an address, you will not be determining where the voter mails back their ballot. You should not be looking at the delivery postmark.

9.  Check the list of registered voters to ensure applicant is a registered voter. [Sec. 87.041(b)(4)]

**Note:** Due to various address confidentiality laws, some voters will not have a residential address next to their name on the list of registered voters.

    a.  If an "S" notation appears next to a voter's name on the list of registered voters, or if the residence address on the application for ballot by mail does not match the residence address on the list of registered voters, the carrier envelope will be stamped "STATEMENT ENCLOSED." The voter's ballot may NOT be accepted UNLESS a completed, signed Statement of Residence is included in the carrier envelope. If a completed Statement of Residence is not enclosed, you must follow the corrective action process in Section 87.0411 (see Section F of this chapter). [Tex. Sec'y of State Election Advisory No. 2022-08]

    b.  If an "ID" notation appears next to a voter's name on the list of registered voters, the voter's ballot may NOT be accepted unless the voter encloses a copy of one of the documents listed below that establishes the voter's identity:

        (1)  Texas Driver's License issued by the Department of Public Safety ("DPS");

        (2)  Texas Election Identification Certificate issued by DPS;

STATE001343

(3) Texas Personal Identification  Card issued by DPS;

(4) Texas Handgun License issued by DPS;

(5) United States Military  Identification  Card containing  the person's photograph;

(6) United States Citizenship  Certificate/Certificate of Naturalization  containing  the person's photograph; or

(7) United States Passport.

> **NOTE:** For voters who are aged 18-69, the above IDs may be expired for up to 4 years. For voters who are 70 years of age or older, the above IDs may be expired for any length of time. Please note that some IDs do not have expiration dates: Texas Personal Identification Cards for persons aged 60 or older may be permanent and marked "INDEF"; Texas Election Identification Certificates for persons aged 70 or older are permanent cards; some military ID cards are permanent, including Uniformed Services ID cards and Veterans Affairs ID cards, usually marked "INDEF"; and certificates of naturalization and certificates of citizenship do not expire.

**If a voter does not possess, and cannot reasonably obtain, one of the above acceptable forms of photo identification, the voter may also enclose a copy of one of the supporting forms of identification listed below that establishes the voter's identity along with a signed <u>Reasonable Impediment Declaration</u>:**

- copy or original of a government document that shows the voter's name and an address, including the voter's voter registration certificate (other examples of government documents include, but are not limited to: driver's licenses from other states, ID cards issued by federally recognized Native American tribes (if the ID card contains an address), DPS Receipts (without a photo), expired voter registration certificates, and, for voters aged 18-69, expired Texas DPS-issued driver licenses or personal ID cards (over 4 years));
- copy of or original  current utility  bill;
- copy of or original  bank statement;
- copy of or original  government check;
- copy of or original  paycheck; or
- copy of or original of (a) a certified domestic (from a U.S. state or territory) birth certificate or (b) a document confirming birth admissible in a court of law which establishes the voter's identity (which may include a foreign birth document).

**NOTE: The address on either a supporting form of ID or an acceptable photo identification does not need to match the address on the list of registered voters.**

**\*If a voter does not have a valid form of photo identification, they may apply for a free election identification certificate at their local Texas Department of Public Safety office. Reminder: (a) if a voter does not possess one of the seven (7) acceptable forms of photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise valid, and the voter can reasonably obtain one of these forms of identification; or (b) if the voter possesses, but did not bring to the polling place, one of the seven forms of acceptable photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise**

STATE001344

**valid; or (c) if the voter does not possess one of the seven forms of acceptable photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise valid, could otherwise not reasonably obtain one, but did not bring a supporting form of identification to the polling place; and the voter does not have a permanent disability exemption indicated on their voter registration certificates, the voter may cast a provisional ballot at the polls.**

**Exemption**: Voters with a disability may apply with the county voter registrar for a <u>permanent</u> exemption. The application must contain written documentation from either the U.S. Social Security Administration evidencing the applicant's disability, or from the U.S. Department of Veterans Affairs evidencing a disability rating of at least 50 percent. In addition, the applicant must state that he or she has no valid form of photo identification. Those who obtain a disability exemption will be allowed to vote by presenting a voter registration certificate reflecting the exemption.

**Provisional Voting:** If a voter (a) does not possess one of the seven (7) acceptable forms of photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise valid, and the voter can reasonably obtain one of these forms of identification; or (b) possesses, but did not bring to the polling place, one of the seven forms of acceptable photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise valid; or (c) does not possess one of the seven forms of acceptable photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise valid, could otherwise not reasonably obtain one, but did not bring a supporting form of identification to the polling place; and the voter did not present a voter registration certificate with a permanent disability exemption indicated on their voter registration certificate, the voter may cast a provisional ballot at the polls.

The voter will have six (6) calendar days after election day to: (1) present to the voter registrar an acceptable form of photo identification; (2) execute a Reasonable Impediment Declaration and present to the voter registrar an acceptable form of supporting identification if the voter does not possess and cannot reasonably obtain one of the acceptable forms of photo identification; (3) complete one of the curing affidavits (consistent religious objection to being photographed or natural disaster exception), if applicable; or (4) qualify for a permanent disability exemption, if applicable.

c.  An application from a voter who is accepted into the Address Confidentiality Program must also include their substitute P.O. Box designated by the Attorney General and an indication of each election for which the person is applying for a ballot. This application is valid for 3 years, unlike a regular ABBM.

d.  Certain persons may vote even though they are not registered to vote in your county and their names do not appear on your list of registered voters. They are:

(1) Persons applying on Federal Post Card Applications. The FPCA may be used by persons who are registered voters of your county or who are not registered voters of your county since the federal post card application acts as a temporary registration pending permanent voter registration status (see note below). [Sec. 101.001]

STATE001345

(2) Persons applying for limited ballots. If a person moves from one county to another, and the person is either still registered in the former county of residence or was registered in the former county of residence when the person applied to register in the new county of residence, the voter may vote in their new county of residence, on offices or propositions that are on the ballot in both their new county and the county of his or her former residence. [Sec. 112.002]

e. If the voter's name does not appear on the list of registered voters and he or she is not categorized in the group of voters listed in "d" above, the presiding judge must refer to the registration correction list, if provided, to see if the voter's name appears on that form.

## SECTION D: QUALIFYING SIGNATURES FOR THE SIGNATURE VERIFICATION COMMITTEE

1. Check to see that the certificate on the carrier envelope was properly executed. The certificate is the statement the voter signs and may include portions filled out by assistants or witnesses. [Sec. 87.041(b)(1)

2. Check the signatures of the applicant on the application and on the carrier envelope to confirm that both signatures have been executed by the voter, unless either document was signed by a witness. [Sec. 87.041(b)(2)]

3. A voter may use different witnesses/assistants on their application for ballot by mail and on their certificate. If a voter uses a witness, you would not compare signatures and the ballot should be accepted pending all other qualifications.

4. The early voting ballot board or the signature verification committee may also compare the signatures on a voter's ballot application or carrier envelope with any known signature of the voter on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. [Secs. 87.027(i), 87.041(e)]

5. If there is no signature on the carrier envelope (by voter or witness), you must follow the corrective action process in Section 87.0411 (see Section F of this chapter). [Tex. Sec'y of State Election Advisory No. 2022-08] If the signature is not on the certificate but elsewhere on envelope, this satisfies Section 87.041(b)(1).

-- **EXCEPTIONS**:

a. If the voter was unable to sign his or her name, the application and/or carrier envelope must each be signed by a witness. Different people may have witnessed the voter's mark on the application and on the carrier envelope. If the voter was unable to sign the application and/or carrier envelope himself or herself and one or both were signed by witnesses, then the signature will not be compared. [Sec. 87.041(b)(2)]

b. If the voter applied for an early voting ballot on the Application for Emergency Early Ballot Due to Death in Family or the Affidavit for Voting at Early Voting Place on Election Day, the certificate on the carrier envelope does not need to be signed by the applicant. The carrier envelope will have a notation "103" or "104" written on it by the early voting clerk when the voter applies under these procedures. [Secs. 103.004(c), 104.004(c)]

**NOTE:** A voter's witnessed application or witnessed carrier envelope are not invalid merely because there is no explanation of the voter's inability to make his or her mark. A ballot may not be rejected merely because the voter signed either the application or the carrier envelope and the other document was witnessed.

STATE001346

    c.  If the voter applied for a ballot on the Application for Emergency Early Voting Ballot Due to Sickness or Physical Disability, the name, address, and signature of the representative who delivered the application to the early voting clerk must appear on the application and on the carrier envelope containing the voted ballot.  The same representative who submitted the voter's application must deliver the voter's ballot back to the early voting clerk, and the same representative's name must appear on both the application and the carrier envelope.  [Secs. 102.002, 102.004(b), 102.006(a), (b)]

    d.  Applicants applying for a limited ballot or a presidential ballot also known as a restricted ballot must have two applications if voting this procedure by mail (i.e., the application for early ballot by mail and the application for the "restricted" ballot) enclosed in the jacket envelope.  [Secs. 111.004, 112.005, 113.003]

6.  If a voter provides personal identification information on the carrier envelope that matches the voter's registration record, the signatures on the application for ballot by mail and on the carrier envelope shall be rebuttably presumed to be the signatures of the voter.  [Sec. 87.041(d-1)]

7.  **Signatures that have been either accepted or rejected need to be separated. If the committee has determined that the signatures are not those of the same person, the board may make a determination that the signatures are those of the same person by a majority vote of the board's membership.** [Sec. 87.027(j)]

## SECTION E. ACCEPTED BALLOTS

1.  If the applicant has met all the requirements discussed above, the ballot must be accepted for voting.

2.  Open the carrier envelope without defacing the certificate on the carrier envelope and remove the ballot envelope.  [Sec. 87.042(a)]

    a.  A ballot is considered valid even if it is not enclosed in a ballot secrecy envelope; the voter simply loses his/her secrecy of the votes cast.  [Secs. 86.005(d), 87.042(d)]

    b.  If the front of the carrier envelope has "Statement Enclosed" stamped on it, check to see that the statement of residence form is enclosed.  If the applicant's name appears on the list of registered voters with an "S" notation beside it, the applicant is required to complete the statement of residence prior to voting.  If the completed, signed statement is not enclosed, you must follow the corrective action process in Section 87.0411 (see Section F of this chapter). [Tex. Sec'y of State Election Advisory No. 2022-08]

        **NOTE**: It is the position of the Office of the Secretary of State that the lack of a statement of residence form included in the envelope of an FPCA voter does not result in a rejected ballot since the FPCA would act as a temporary registration that would prevail over the residence address provided on any previous registration applications already on file.

    c.  If the applicant's name appears on the list of registered voters with an "ID" notation beside it, an applicant who possesses an acceptable form of photo identification is required to submit a copy of acceptable photo identification (or, if the voter does not possess, and cannot reasonably obtain, an acceptable form of photo ID, a signed Declaration of Reasonable Impediment (see Form 5-22a) and an acceptable form of supporting documentation, or, if the voter has a voter registration certificate with an "E" notation on it, that), along with their mail ballot, unless the voter checks one of the "Exemptions (If Applicable)" boxes on Form 5-22a.

3.  Place the unopened ballot envelope in a ballot box or other safe container.  [Sec. 87.042(b)]

STATE001347

4. Enter the voter's name on the poll list for early voters voting by mail or list for voters using other mail procedures such as limited ballot. [Secs. 87.041(c), 102.008, 103.005, 104.006]

   a. If the voter is an FPCA voter, place a check in the "FPCA" column on the poll list next to the voter's name. [Sec. 101.004]

   b. If the voter applied for a limited ballot, place a check in the column marked "Limited Ballot" on the poll list next to the voter's name. [Sec. 111.008]

   c. In presidential general elections, if the voter applied for a presidential ballot only, place a check in the column marked "Pres. Ballot" on the poll list next to the voter's name. [Sec. 111.008]

   d. If the voter is an overseas citizen voter eligible only for a federal ballot, place a check in the column "Overseas Citizen" on the poll list next to the voter's name. (Only applicable in *primary* and general elections for state and county officers since these voters are limited to federal offices only.) [Sec. 111.008]

5. Place the application for the early voting ballot and the envelope that was used to mail the application (if applicable), the carrier envelope, and any accompanying papers back into the jacket envelope. (If the jacket envelope is to be used in a subsequent election, the early voting clerk may provide another envelope to be used in lieu of the jacket envelope.) Place any affidavits, statements of residence, and copies of identification in Envelope No. 4 to be delivered to the voter registrar. [Sec. 87.044(a)]

6. At least 10 early voting ballots voted by mail must be qualified before the ballots may be counted. Ballots may be removed for manual, hand counting at any time when there are at least 10 ballot envelopes containing ballots that have been qualified in the ballot box (or other safe container). If ballots are to be counted by electronic equipment, the general custodian of election must transmit the accepted by mail ballots to the presiding judge of the central counting station in a locked and sealed ballot box or other container approved by the Secretary of State.

## SECTION F.  REJECTED BALLOTS

1. If the application and carrier envelope do not meet the requirements discussed above, the ballot must be rejected and may not be counted. [Sec. 87.041(d)]

2. If a ballot is received and the voter did not sign the carrier envelope; or it cannot be determined that the signature on the carrier envelope is the voter's signature; or the carrier envelope is missing a required statement of residence; or the carrier envelope has missing or incorrect personal identification information; or the witness information is incomplete, the early voting ballot board must follow the corrective action process in Section 87.0411. [Tex. Sec'y of State Election Advisory No. 2022-08].

3. No later than the second business day after the early voting ballot board discovers one of the defects mentioned above and before the ballot board decides whether to accept or reject a timely delivered ballot, the committee must determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day. If the early voting ballot board determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the early voting ballot board must return the carrier envelope to the voter by mail. If the early voting ballot board determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the ballot board may notify the voter of the defect by telephone or email and inform the voter that the voter may request to have the voter's application by mail canceled or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. Poll watchers are entitled to observe this process. [Sec. 87.0411; Tex. Sec'y of State Election Advisory No. 2022-08]

20

4. If the application and carrier envelope do not meet the requirements of the Code and the voter does not correct the defects (if applicable), write the word "rejected" on the carrier envelope. [Sec. 87.041(d)]

5. Write the word "rejected" on the corresponding jacket envelope. [Sec. 87.041(d)]

6. Place the unopened carrier envelopes containing rejected ballots in the large envelope or container marked "Rejected Early Voting Ballots." [Sec. 87.043(b)]

7. The "Rejected Early Voting Ballot" envelope must be sealed and signed by the presiding judge, and the date and nature of the election must be written on the envelope.  More than one envelope may be used if necessary.  Record the number of rejected ballots, which are placed in the envelope for rejected ballots. [Secs. 87.043(a), (b)]

8. If the ballot was rejected after the carrier envelope was opened, the presiding judge should make a note on the carrier envelope of the reason the carrier envelope was opened and then rejected.

9. Place the application, the envelope used to mail the application to the early voting clerk (if applicable), and any accompanying papers or affidavits in the corresponding jacket envelope.  (If the jacket envelope is to be used in a subsequent election, the early voting clerk may provide another envelope to be used in lieu of the jacket envelope.)  [Sec. 87.044(a)]

   **NOTE**:   The Early Voting Ballot Board judge must deliver written notice to the voter of the reason for the rejection of his or her ballot no later than the 10th day after election day.  [Sec. 87.0431]  If this notice is not provided within 10 days and the ballots have been sent back and placed in a ballot box, a court order will be needed to reopen the ballot box. Please contact our office for sample court orders if needed.

STATE001349

# CHAPTER 5

## COUNTING HAND-COUNTED PAPER BALLOTS

### SECTION A. ESTABLISHING THE COUNTING TEAMS

1.  There may be more than one counting team to tally the early voting ballots.  [Secs. 81.002, 65.001]

2.  Each counting team must consist of two or more early voting ballot board members.  [Secs. 81.002, 65.001]

    a.  One member will be designated the reader.

    b.  The reader may also keep a tally list.

    c.  If there are only two members on a team, one member will keep two tally lists, and the reader will keep one tally list in addition to reading the ballots.

3.  If there is more than one counting team, after all ballots have been counted, the votes for each candidate and/or proposition must be added together with the tallies of the other counting teams, and the totals must be placed on the return sheet.

4.  A member of a counting team may not be replaced after the vote tallying is begun unless each existing discrepancy among the three tally lists is corrected before the replacement is made.  [Secs. 81.002, 65.006(a)]

5.  If a counting member is replaced, he or she must certify the accuracy of the tally list as of the time he or she was replaced.  [Secs. 81.002, 65.006(b)]

### SECTION B. OPENING THE BALLOT BOX CONTAINING HAND-COUNTED PAPER BALLOTS

**NOTE**: ELECTRONIC BALLOTS CAST IN PERSON ARE NOT TABULATED BY THE EARLY VOTING BALLOT BOARD, BUT RATHER AT A CENTRAL COUNTING STATION.

1.  Open the double-locked ballot box containing the ballots voted by personal appearance.  [Sec. 87.062]

    **NOTE**:  The early voting clerk will deliver one key to the ballot box when he or she delivers the ballots. The custodian of the second key will deliver the second key at the time specified by the early voting ballot board's presiding judge.  [Secs. 87.021(1), 87.025]

2.  After the presiding judge opens the ballot box, the judge shall remove any provisional ballots and verify the number of provisional ballots in the ballot box, which is reflected on the Early Voting List of Provisional Voters.

3.  The provisional ballots shall be prepared for delivery to the voter registrar and placed in a closed and sealed box for delivery by the general custodian of election records to the voter registrar.  [1 T.A.C. § 81.174]

4.  All early voting ballots must be sorted by precinct before they are counted so that a separate total of early voting votes cast in each precinct may be obtained.  [Sec. 87.1231]

5.  For political subdivisions using hand-counted paper ballots, early voting ballots cast by personal appearance may be counted while the ballots cast by mail are being qualified if the early voting ballot board consists of enough members.

6.  When at least 10 early voting ballots cast by mail have been qualified and placed in the ballot box or other container, the ballot envelopes may be removed from the box or container, opened, the ballots removed, the ballot envelopes discarded, and the ballots counted.  This process may be repeated any time there are at least 10 ballot envelopes in the box or container.  [Sec. 87.062(a)]

STATE001350

**NOTE**:   If there is more than one ballot in a ballot envelope, neither ballot may be counted.   The presiding judge must make a notation on the back of each ballot of the reason the ballot was not counted.   These ballots are then placed with the voted ballots in the early voting ballot box. [Sec. 65.010(a)(2)]

## SECTION C. RULES GOVERNING THE COUNTING PROCEDURE

1.   The ballots must be counted separately by precinct.   [Sec. 87.1231]

2.   Ballots voted by mail must be tabulated and stored separately from the ballots voted by personal appearance and must be separately stated on the returns. [Sec. 87.062(c)]

3.   Three original tally lists are required for each precinct.   [Secs. 65.004, 87.1231]   A separate page of the same tally book may be used for each precinct's tally list.   These tally lists should be completely filled out, and include the following:

-- Names and offices of candidates and/or propositions;

-- Date;

-- Precinct number;

-- Type of election;

-- Name of presiding judge;  and

-- Signature of the person keeping the tally list.

4.   Before the counting begins, the early voting ballot box should be inspected to ensure that it is empty.   It should then be locked and remain locked (except as authorized by the presiding judge), and within view of the counting officials.   [Sec. 65.003(c)]

5.   No marks should be made on any ballot by an election official, except that if a ballot is not counted because the judge determines it was not provided by the early voting clerk or because two or more ballots were folded together, an election official must indicate on the back of the ballot the reason for not counting it. [Sec. 65.010(c)]

## SECTION D. THE COUNTING PROCEDURE

1.   The reader must read and distinctly announce to the officials keeping the tally lists each name of a candidate or proposition for which there is a vote.   [Sec. 65.005(a)]

2.   The intent of the voter in marking the ballot may be determined by:

a.   a distinguishing mark adjacent to the name of a candidate or voting choice associated with a proposition;

b.   an oval, box, or similar marking clearly drawn around the name of a candidate or a voting choice associated with a proposition;

c.   a line drawn through:

(1) the names of all candidates in a manner that indicates a preference for the candidate not marked if the names of the candidates not marked do not exceed the number of persons that may be elected to that office;

(2) a voting choice associated with a proposition in a manner that clearly indicates a preference for the other voting choice associated with the proposition;  or

d.   any other evidence that clearly indicates the intent of the voter in choosing a candidate or deciding on a proposition.   [Sec. 65.009]

STATE001351

3. As each vote is read, a tally mark is made by the corresponding name or number on the tally lists.  [Sec. 65.005(a)]

4. The tally lists should be compared periodically  and any errors or discrepancies corrected.  [Sec. 65.005(b)]

5. When the reader has completely read and announced all the votes on the ballot, he or she deposits the ballot in the locked early voting ballot box.

6. Any voted ballot that is not counted is also deposited in the box containing the counted ballots.  [Sec. 65.012(b)]

   **NOTE**: A ballot that was not counted should contain a clear notation on the back that it was not counted to avoid an accidental counting  during a recount, etc.  [Sec. 65.010(c)]

## SECTION E.  RULES FOR COUNTING MANUALLY-CAST OR HAND-COUNTED OPTICAL SCAN BALLOTS

(See generally,  Chapter 65 and Secs. 64.003-64.006)

1. The voter should mark his or her ballot by placing an "X" or other mark in the square beside each candidate or proposition  which he or she wishes to vote (See Figure  1).  [Sec. 64.003]

| *(Primary Election Ballot)* |
| :---: |
| For Governor |
| ☐ Candidate A |
| ☐ Candidate B |
| * ☒ Candidate C |

| (General Election Ballot) | | | | |
| :--- | :--- | :--- | :--- | :--- |
| Candidates for Governor | PARTY A  ☐ Candidate A | PARTY B  ☐ Candidate B | PARTY C  * ☒ Candidate C | Independent        Write-In |

**Figure 1.  Illustrations of marked ballots.**
**(The asterisks indicate the candidates for whom the ballot is counted.)**

2. Election officials shall not refuse to count a ballot because the voter marked his or her ballot by scratching out the names of candidates for whom, or the statement of propositions for which, he or she did not want to vote (See Figure 2). [Sec. 65.009(b)]

| Candidates for | PARTY A | PARTY B | PARTY C | INDEPENDENT | WRITE-IN |
| :--- | :--- | :--- | :--- | :--- | :--- |
| First Office | ☐ ~~Candidate~~ | ☐ ~~Candidate~~ | ☐ ~~Candidate~~ | ☐ ~~Candidate~~ | ☐ _____ |
| Second Office | * ☐ Candidate | ☐ ~~Candidate~~ | | ☐ ~~Candidate~~ | ☐ _____ |
| Third Office | * ☐ Candidate | ☐ ~~Candidate~~ | | ☐ ~~Candidate~~ | ☐ _____ |
| Fourth Office | * ☐ Candidate | ☐ ~~Candidate~~ | | | |
| Fifth Office | * ☐ Candidate | | | | |
| Sixth Office | * ☐ Candidate | | | | |
| Seventh Office | * ☐ Candidate | ☐ ~~Candidate~~ | | | |

STATE001352

| | | | | | |
|---|---|---|---|---|---|
| Eighth Office | * ☐Candidate | ☐Candidate | | ☐Candidate | |
| Etc. | | | | | |

**Figure 2.  Illustration of the scratch method.**
**(The asterisks indicate the candidates for whom the ballot is counted.)**

3.  **Figure 2.  Illustration of Guideline No. 1.**
   **Two party squares marked and individual candidates also marked in one or more columns.**
   **(The asterisks indicate the candidates for whom the ballot is counted.)**

| Candidates for | PARTY A | PARTY B | PARTY C | ☐INDEPENDENT | ☐WRITE-IN |
|---|---|---|---|---|---|
| First Office | * ☒ Candidate | * ☒ Candidate | ☐Candidate | ☐Candidate | ☐_____ |
| Second Office | ☐Candidate | * ☒ Candidate | | ☐Candidate | ☐_____ |
| Third Office | * ☒ Candidate | Candidate | | ☐Candidate | ☐_____ |
| Fourth Office | ☐Candidate | ☐Candidate | | | |
| Fifth Office | ☐Candidate | | | | |
| Sixth Office | * ☒ Candidate | | | | |
| Seventh Office | ☐Candidate | ☐Candidate | | | |
| Eighth Office | ☐Candidate | * ☒ Candidate | | ☐Candidate | |
| Etc. | | | | | |

Guideline No. 1.  Where more than one candidate square is marked, those votes may not be tallied, and the ballot may be counted only for candidates individually marked, if any. (If there are no candidates individually marked, no portion of the ballot is counted.) [Sec. 65.009(d)]

a.  An entire ballot cannot be voided if the intent of the voter can be determined for any one race or proposition on the ballot. [Sec. 65.009(c)]

b.  An individual vote is not counted in the following situations:

   (1)  An individual vote is not counted if the intent of the voter cannot be determined. [Sec. 65.009(c)]

   (2)  An individual vote is not counted if the voter marked more than one candidate for one race ("overvote").

   In municipal, school board, or other political subdivision elections where it is possible to vote for more than one candidate in the same race, a ballot may not be counted if a voter has marked more candidates than are to be elected. [Sec. 65.011]  A ballot is not invalid if the voter has marked fewer candidates than the number to be elected ("undervote"). [Sec. 65.009]

VOTE FOR NONE, ONE, TWO, OR THREE
☒ Candidate
☒ Candidate
☐ Candidate
☐ Candidate

25

STATE001353

☒ Candidate

☒ Candidate

**Figure 3.  Illustration of overvoting; voter has voted for more candidates
than are to be elected.  (No portion of this ballot is counted.)**

VOTE FOR NONE, ONE, TWO, OR THREE

\* ☒ Candidate

☐ Candidate

\* ☒ Candidate

☐ Candidate

☐ Candidate

☐ Candidate

**Figure 4.  Illustration of undervoting; voter has voted for fewer candidates
than are to be elected.  (A vote is counted for each candidate receiving a vote.)**

(3)  An individual vote is not counted in the following write-in voting situations:

(a)  The voter used a sticker or rubber stamp with the name of a write-in candidate printed or written on it. [Sec. 65.008(b)]

(b)  The election is a November general election, city council officer elections, an independent or common school district trustee election, special elections for state representative and state senator, or other elections where declaration of write-in is required and the voter writes in the name of a person whose name is not on the list of declared write-in candidates.  [Secs. 144.006, 146.031(d), 146.054, 146.055, 146.082, 171.0231, Election Code; Secs. 11.056(c), 11.304, 130.081, 130.0825, Education Code; Sec. 285.131, Health and Safety Code; Secs. 326.0431 & 326.0432, Local Government Code; Secs. 36.059, 49.101, 63.0945, Water Code]

(c)  *The election is a primary and the voter writes in a vote for a candidate for public or party office; write-in voting in a primary election is not permitted. [Sec. 172.112]*

(d)  The election is a runoff election and a voter writes in any candidate's name; no write-in votes may be counted at a runoff election. [Sec. 146.002]

(e)  The voter voted for the presidential candidate of one party and the vice-presidential candidate of another party or voted for the presidential or vice-presidential candidate of one party and wrote in the name of a candidate he or she desires to vote for instead of that candidate's running mate. [Sec. 192.037]

c.  A ballot is not counted in the following situations:

(1)  A ballot is not counted if the intent of the voter cannot be determined. [Sec. 65.009] (See Figure 5).

| Candidates for | PARTY A | PARTY B | PARTY C | INDEPENDENT | WRITE-IN |
|---|---|---|---|---|---|
| First Office | ☒ Candidate | ☐ Candidate | ☒ Candidate | ☐ Candidate | ☐ _____ |
| Second Office | ☒ Candidate | ☒ Candidate | | ☐ Candidate | ☐ _____ |
| Third Office | ☐ Candidate | ☒ Candidate | | ☒ Candidate | ☒ *John Smith* |
| Fourth Office | ☒ Candidate | ☒ Candidate | | | |
| Fifth Office | ☒ Candidate | | ☒ Candidate | | |

26

STATE001354

| Sixth Office | ☐Candidate | ☒ Candidate | ☒ Candidate | | |
| Seventh Office | ☒ Candidate | ☒ Candidate | | | |
| Eighth Office | ☒ Candidate | ☒ Candidate | | ☐Candidate | |
| Etc. | | | | | |

**Figure 5.  Illustration of lack of knowledge of intent of voter.**
**(No portion of this ballot is counted.)**

(2) A <u>ballot</u> is not counted if two or more ballots are folded together in a manner that indicates they were folded together when deposited in the ballot box by the voter.  [Sec. 65.010(a)(2)]

(3) A <u>ballot</u> is not counted if the ballot is not numbered or not signed by the judge and the judge determines that this ballot was not provided at the polling place.  However, this ballot may be counted if the judge determines that it was provided at the polling place.  [Secs. 65.010(a)(1), (b)]

(4) A provisional ballot found by an election worker not contained within the provisional voter affidavit envelope.  [1 T.A.C. §§ 81.172-81.174]

Guideline No. 6.   Where the voter marks a candidate but writes in a declared write-in, the write-in vote is counted.

| Candidates for | PARTY A | PARTY B | PARTY C | ☐INDEPENDENT | ☐WRITE-IN |
|---|---|---|---|---|---|
| First Office | ☐Candidate | ☒ Candidate | ☐Candidate | | * ☐_John Smith_ |
| Second Office | ☐Candidate | *☒ Candidate | | | ☐_____ |
| Third Office | ☐Candidate | * ☐Candidate | | | ☐_____ |
| Fourth Office | ☒ Candidate | ☒ Candidate | | | |
| Fifth Office | ☐Candidate | | | | |
| Sixth Office | ☐Candidate | | | | |
| Seventh Office | ☐Candidate | * ☐Candidate | | | |
| Eighth Office | ☐Candidate | * ☐Candidate | | | |
| Etc. | | | | | |

**Figure 6.  Casting a write-in vote.  Illustration of Guideline No. 6.**
**(The asterisks indicate the candidates for whom the ballot is counted.)**

Guideline No. 6.   Where voter fails to properly mark an "X" in the write-in box, the write-in vote may be counted if the presiding judge can determine the intent of the voter. [Secs. 52.070(e), 65.009]

## SECTION F.  HANDLING THE ELECTION RETURNS FOR PAPER BALLOTS

1. Making out the returns.

   a. After all ballots are counted, the tally list, including separate totals for precincts, must be totaled and signed by the counting officer keeping it.  If more than one officer has kept one particular list, each officer signs the list upon finishing.  [Sec. 65.005(c)]

   b. Total each tally list to obtain the total number of votes cast for each candidate and/or for or against each proposition.  [Sec. 65.005(c)]

   c. The presiding judge must make out and sign all copies of the returns. [Sec. 65.014(c)]

STATE001355

d.  A separate return sheet must be made for each precinct. [Sec. 87.1231]

e.  Ballots voted by mail must be tabulated and stored separately from the ballots voted by personal appearance and must be separately stated on the returns. [Sec. 87.062(c)]

f.  Election officials should also prepare a summary return sheet to show complete early voting returns for all precincts.

2.  Distribution of election returns, poll lists, and tally lists.

a.  There must be four copies of the returns for each precinct. [Secs. 65.014(c), 87.1231]

b.  There must be three copies of the poll list (or four copies of the combination form). [Sec. 63.003(b)]

c.  There must be three originals of the tally list for each precinct. [Secs. 65.004, 87.1231]

3.  Five envelopes for distribution of election records are furnished with the supplies.

a.  Envelope No. 1 is addressed to the presiding officer of the local canvassing authority. [Sec. 66.003(b)(1)]

--  County judge (general election for state and county officers or election held by the county).

--  *County chair (primary election).*

--  Mayor (municipal election).

--  Presiding officer of the governing board (other elections).

b.  Envelope No. 2 is addressed to the general custodian of election records. [Secs. 66.001, 66.003(b)(2)]

--  County clerk or county elections administrator (general election for state and county officers, election held by the county, *primary election*).

--  City clerk or secretary (municipal election).

--  Secretary of the governing board, or if none, the presiding officer of the governing board (other elections).

c.  Envelope No. 3 is addressed to the early voting ballot board judge. [Sec. 66.003(b)(3)]

d.  Envelope No. 4 is addressed to the Voter Registrar. [Sec. 66.003(b)(4)]

e.  *Envelope No. 5 is addressed to the County Chair in a primary election.*

4.  The records of the election must be distributed as follows:

a.  Contents of Envelope No. 1. [Sec. 66.022]

(1)  The original of the election returns of early voting ballots for each precinct.

(2)  One copy of the tally list for each precinct (from each counting team, if applicable).

b.  Contents of Envelope No. 2. [Sec. 66.023]

(1)  A copy of the returns of the early voting ballots for each precinct and the summary return.

(2)  A copy of the tally list for each precinct (from each counting team, if applicable).

(3)  The original of the poll list of early voting voters voting by personal appearance and by mail.

(4)  The signature roster.

(5)  The precinct early voting list.

(6)  An affidavits completed at the polling place.

28

     (7)  Any certificates of appointment of poll watchers.

  c.  Contents of Envelope No. 3. [Sec. 66.024]

     (1)  A copy of the returns of early voting ballots for each precinct and the summary return.

     (2)  A copy of the poll list of early voters voting by personal appearance and by mail.

     (3)  A copy of the ballot register.

  d.  Contents of Envelope No. 4. [Sec. 66.0241]

     (l)  The precinct list of registered voters.

     (2)  The registration correction list, if any.

     (3)  Any Statements of Residence completed at the polling place or by mail or copies of identification submitted by mail.

     (4)  List of "ID" Voters.

     (5)  Copy of Combination Form, if used instead of individual affidavits.

  e.  *Contents of Envelope No. 5.*

     --  *Original of the Statement of Compensation, in a primary election.*

  f.  Contents of early voting ballot box. [Sec. 66.025]

     (1)  The voted ballots.

     (2)  A copy of the early voting returns for each precinct and the summary return.

     (3)  A copy of the tally list for each precinct.

     (4)  A copy of the poll list of early voters voting by personal appearance and by mail.

5.  Manner and time of delivery of records.

  a.  The presiding judge must deliver Envelope No. 1 in person to the presiding officer of the local canvassing authority, or if that officer is unavailable, to the general custodian of election records. [Sec. 66.051(a)]

  b.  The presiding judge must deliver Envelope No. 2 and Ballot Box No. 3, the rejected ballot envelope, the jacket envelopes containing the carrier envelopes and applications, and all unused supplies in person to the general custodian of election records. [Sec. 66.051(b)]

  c.  The presiding judge retains Envelope No. 3. [Sec. 66.051(c)]

  d.  The presiding judge must deliver Envelope No. 4 in person to the voter registrar, or if that officer is unavailable, to the general custodian of election records for later delivery to the voter registrar. [Sec. 66.051(d)]

  e.  The judge delivers the keys to the Ballot Box to:

     (1)  The sheriff for an election ordered by the governor or a county authority or *for a primary election*, unless the sheriff is on the ballot, in which case the keys are delivered to the county judge. If both the sheriff and the county judge are on the ballot, the keys are delivered to the county auditor, or, if there is no county auditor, to a member of the commissioners court, named by the court, who is not on the ballot. [Sec. 66.060(a)(1)]

     (2)  The chief of police or city marshal for an election ordered by a city authority. [Sec. 66.060(a)(2)]

STATE001357

(3) The constable of the justice precinct in which the governing body's office is located, or if the constable's office is vacant, to the sheriff of the county, for an election ordered by a political subdivision other than a county or city. [Sec. 66.060(a)(3)]

f. *Envelope No. 5 is delivered to the County Chair.*

g. Time.

(1) Records must be delivered to the appropriate authority immediately after the returns are completed. [Secs. 66.053(a), 87.063]

(2) If the judge determines that the ballots will not be counted in time to permit delivery of the records by 2:00 a.m. of the day following the election, he or she must notify the general custodian of election records by telephone between midnight of election day and 1:00 a.m. of the following day of:

-- The vote totals tallied for each candidate and for and against each measure at the time of notification.

-- The expected time of finishing the count. [Secs. 66.053(b), 87.063]

(3) In every election, the early voting ballot board records must be delivered to the appropriate authorities not later than 24 hours after the polls close. [Secs. 66.053(c), 87.063]

6. At the time the early voting ballot board records are delivered, supplies shall be returned to the authority responsible for providing such supplies. The presiding judge shall follow the instructions of such authority regarding the storage or return of empty ballot boxes and their keys and other equipment. [Sec. 87.123]

## SECTION G. REPORTING EARLY VOTES

1. The presiding judge of the Board must deliver the counted ballots, the early voting election returns, other early voting election records, and ballot box keys to the appropriate authorities. [Sec. 87.063]

2. The early voting totals must reflect the number of early votes for each candidate or measure by election precinct. [Secs. 67.004(c), 87.1231]

STATE001358

# CHAPTER 6

## EXAMINING, PREPARING, AND COUNTING VOTED OPTICAL SCAN BALLOTS

### SECTION A. PROCESSING BALLOTS COUNTED AT CENTRAL COUNTING STATION

NOTE:    If the ballots are to be delivered to the central counting station before the time the polls are closed on election day, the intervals during the day at which the ballots are to be delivered must be stated in the resolution, order, or other official action authorizing the early deliveries. [Sec. 127.124]

1.  The early voting clerk shall deliver the early voting ballots to the central counting station. This should include the container for the early voting electronic system ballots that are to be counted by automatic tabulating equipment at a central counting station. This shall be done without opening the container.

2.  The early voting electronic system ballots counted at a central counting station, the ballots cast at precinct polling places and the ballots voted by mail shall be tabulated separately and shall be separately reported on returns. [Sec. 87.103]

3.  The general custodian of records shall post a guard to ensure the security of ballot boxes containing voted ballots throughout the period of tabulation at the central counting station. [Sec. 127.1232(a)]

4.  The general custodian of election records in a county with a population of 100,000 or more shall implement a video surveillance system that retains a record of all areas containing voted ballots from the time the voted ballots are delivered to the central counting station until the canvass of precinct election returns. The surveillance system must also retain a record of all areas containing voted ballots from the time the voted ballots are delivered to the signature verification committee or early voting ballot board until the canvass of precinct election returns. Video must be made available to the public by a livestream. The recorded video is an election record and must be retained by the general custodian of election records until the end of the calendar year in which the election is held or an election contest filed in the county has been resolved, whichever is later. [Sec. 127.1232(b)-(d)]

### SECTION B. DELIVERY OF BALLOT BOX

1.  Poll watchers may accompany election officials delivering ballot container after optical scan mail ballots are qualified.  [Sec. 33.060]

    If delivery is made in a vehicle, it is sufficient to allow the watchers to follow in a different vehicle and to drive in such a manner that the watchers are able to keep the delivery vehicle in sight.

2.  The officers must present the ballot box to the presiding judge of the counting station or his or her designee.

3.  The delivering officers must then exchange the ballot box for a signed receipt. [Sec. 127.068(a)]

4.  The rejected ballot envelopes, jacket envelopes containing the carrier envelopes, and any unused supplies are returned to the general custodian of election records.

STATE001359

# CHAPTER 7

### RECONVENING EARLY VOTING BALLOT BOARD

The early voting ballot board must reconvene after the election to review and qualify provisional ballots and to qualify ballots that were cast from outside the United States on or before election day and that are received by the sixth day after election day.  The early voting clerk may determine whether or not the committee will need to reconvene after election day to verify signatures or leave that authority with the early voting ballot board. We recommend that this decision be made prior to election day. If the authority is left with the committee, we recommend that the committee coordinates with the board and the early voting clerk for delivery of the jacket envelope ballots by mail. If there is a SVC, the SVC must verify the signatures before the EVBB meets. The SVC would follow the same procedures of when they first convene.

## SECTION A. ESTABLISHING THE EARLY VOTING BALLOT BOARD TO REVIEW PROVISIONAL BALLOTS

The authority appointing the early voting ballot board may determine which members of the board will review and count the provisional ballots.  The entire ballot board is not required to be present.  A minimum of three members of the board is required to conduct the review.

1. Convening Early Voting Ballot Board.

   a. The presiding judge of the early voting ballot board may convene the board as soon as practicable after the voter registrar has completed the review of the provisional ballots, **or if the voter registrar reviews the provisional ballots in "batches" and releases completed "batches" sequentially, the presiding judge may convene the board as soon as practicable after the voter registrar has completed one or more "batches."**  The judge must post a notice on the bulletin board used for posting notices of meetings of the governing body ordering the election no later than 24 hours before each time the board is scheduled to meet. The board may also convene while the voter registrar continues the review.

   b. The early voting ballot board cannot convene a final time until after the 6th day after the election due to voter ID verification. We recommend to review provisional ballots on a rolling basis.

2. Delivery of Materials To Early Voting Ballot Board.

   a. The board should obtain from the authority conducting the election a package of supplies, including the:

      (1) Return sheets;

      (2) Tally sheets; and

      (3) Envelopes for Accepted and Rejected Ballots.

   b. The general custodian will deliver to the early voting ballot board the Lists of Provisional Voters from each precinct.

3. Delivery of Provisional Ballots.

   a. The early voting ballot board presiding judge shall take receipt of (1) the provisional ballots directly from the voter registrar or the custodian of election records and (2) the List of Provisional Voters Who Presented Proper Identification to Voter Registrar at a time and place to be determined by the presiding judge. [Sec. 65.0541]

   b. The presiding judge completes the Verification of Provisional Ballots and Serial Numbers Form by signing at the time of receipt that the seal(s) were intact, the serial numbers of the seal(s) were accurately reflected, and the number of provisional ballots received.

STATE001360

4.  Review of Provisional Ballots.

The early voting ballot board shall review both the election judge's and the voter registrar's notation on each Provisional Ballot Affidavit Envelope to determine whether or not the ballot should be counted as indicated below.

a.  Provisional ballots to be counted:

(1)  The ballot shall be counted if the voter failed to submit identification at the polling place, but the voter registrar indicated the voter presented an acceptable form of photo identification or executed a Reasonable Impediment Declaration and presented one of the forms of supporting identification in person at the registrar's office within six calendar days after the date of the election and the voter was otherwise eligible to vote in the election.

(2)  The ballot shall be counted if the voter failed to submit identification at the polling place, but the voter registrar indicated on the Provisional Ballot Affidavit Envelope that the voter applied for and received the disability exemption under Section 13.002(i) of the Election Code by the sixth day after election day and the voter was otherwise eligible to vote in the election.

(3)  The ballot shall be counted if the voter failed to submit identification at the polling place, but the voter registrar indicated the voter completed one of the two curing affidavits set out in Section 65.054(b)(2)(B) (consistent religious objection to being photographed) or 65.054(b)(2)(C) (identification unavailable due to declared natural disaster) no later than the sixth day after election day.

(4)  If the election judge indicated that the reason for casting a provisional ballot was that the voter appeared on the list of registered voters as having cast a ballot by mail, and the voter claimed that he or she never received the mail ballot, or would like to cancel his or her mail ballot, the provisional ballot shall be counted if the voter's mail ballot has not already been received.

(5)  If the voter registrar indicated that the provisional voter is registered to vote in the territory holding the election, the ballot shall be counted.

(6)  If the voter registrar indicated that the provisional voter is registered to vote, but was erroneously listed in the wrong precinct, the ballot shall be counted.

(7)  If the voter was erroneously removed from the voter registration list and is otherwise qualified to vote, the ballot shall be counted.

(8)  If the voter registrar has information in the office that the voter completed a voter registration application, and the voter is otherwise qualified, the ballot shall be counted.  (For example, evidence that the voter submitted and application at a DPS office or via a volunteer deputy registrar.)

b.  Provisional ballots not to be counted:

(1)  If the election judge indicated that the voter did not provide an acceptable form of identification and the voter registrar noted that the voter did not (1) present an acceptable form of identification to the voter registrar, (2) did not execute a Reasonable Impediment Declaration and did not present a form of supporting identification, (3) complete one of the curing affidavits set out in Section 65.054(b)(2)(B) or 65.054(b)(2)(C), or (4) apply for and receive a disability exemption by the sixth day after election day, then the ballot shall not be counted.

(2)  If the election judge indicated that a voter with a permanent disability exemption to the identification requirements did not submit the registration certificate at the polling place, and the voter registrar notes that the voter failed to (1) present their registration certificate with exemption, (2) present

33

STATE001361

another form of acceptable identification, or (3) apply for and receive a permanent disability exemption by the sixth day after election day, the ballot shall not be counted.

(3) If a voter voted provisionally due to having an outstanding mail ballot that has not yet been cancelled, the provisional ballot shall not be counted <u>if the provisional voter has already voted</u>.

(4) If the voter registrar indicated that the provisional voter is not registered to vote in the territory holding the election or the registration was not effective in time for the election, the ballot shall not be counted.

(5) If the voter registrar indicated that the provisional voter is registered to vote at a different precinct other than the one the voter voted in, the ballot shall not be counted. This is not the case if the county that is part of the countywide polling place program.

(6) If the election judge indicated that the voter was on the list of registered voters, but the voter's registered residence address is outside the political subdivision, the ballot shall not be counted.

(7) If the voter registrar indicated that an incomplete application was received from the provisional voter but the required additional information was not returned, the ballot shall not be counted.

5. Disposition of Accepted or Rejected Ballots.

   a. The presiding judge shall indicate the disposition of each ballot on the provisional voter affidavit envelope.

   b. The presiding judge shall also indicate the disposition of each ballot on the List of Provisional Voters for that precinct.

   c. The ballots to be counted shall be removed from their provisional ballot envelopes (which are sealed in a secrecy envelope). After at least 10 secrecy envelopes have been removed from the provisional ballot envelopes and placed in a separate container, the secrecy envelopes are opened, and the ballots are counted under the normal procedure for counting ballots by mail in an election either by hand counting or by central counting station [See Chapters 5 and 6]. The presiding judge of the early voting ballot board or central counting station shall complete a return sheet of the votes and record them by precinct. The Provisional Voter Affidavit Envelopes are placed in the Envelope for Accepted Voters and delivered to the general custodian of election records.

   d. The Provisional Voter Affidavit Envelopes that are not counted are placed in the Envelope for Rejected Provisional Ballots and delivered to the general custodian of election records.

   e. Rejected Provisional Ballot Affidavit Envelopes may not be opened except by court order. [1 T.A.C. § 81.176(14)]

6. Counting Paper Ballot Provisional Ballots.

   a. See Chapters 5 and 6 for counting rules.

   b. Once counted, the provisional ballots shall be re-locked and returned to the custodian of election records. The key shall be delivered to the custodian of the key.

   c. If a DRE system is used for provisional voting, the entity conducting the election will direct how provisional ballots are processed.

7. Counting of Provisional Ballots Electronically (optical scan).

   a. The manager of the central counting station shall decide whether the ballot board shall manually count the ballots with the totals manually added to the computer count for a canvas total or whether the central counting station shall reconvene.

34

STATE001362

b. The manager shall send notice to the presiding judge of the ballot board prior to reconvening the board as to whether the ballots are to be counted manually by the board or whether the ballots are to be prepared for delivery to the central counting station.

c. If the ballots are to be counted by the central counting station, the manager must post notice at least 24 hours prior to reconvening the central counting station.  Section 1.006 does not apply.

d. A ballot transmittal form must be completed by the presiding judge of the ballot board.  The transmittal form will accompany the accepted provisional ballots.

e. Prior to the beginning of the count at a central counting station, the manager shall run the required second logic and accuracy test using the same test deck as on Election Day. After the count is complete, the manager shall run the required third logic and accuracy test. If the test is not successful, the count is void.

f. The central counting manager may add the provisional ballots to the original returns by hand in order to provide one complete return sheet, may enter the provisional ballots directly on the electronic voting system to have one final electronic return sheet or may provide a separate return sheet with just provisional ballot vote totals.  The return sheets are placed in Envelope No. 2 and delivered to the custodian of election records.

g. The counted provisional ballots and other election materials are returned to the custodian of election records and retained for the appropriate preservation period.

**NOTE**:   Since provisional ballots will probably be processed and counted at the same time as the late early voting by mail ballots, additional procedures relating to late ballots pursuant to 1 T.A.C. Sec. 81.37 may also apply.

8. Notice to Provisional Voters.

Not later than the 10th day after the local canvass, the early voting ballot board's presiding judge shall deliver written notice regarding whether the provisional ballot was counted to the provisional voter, and if the ballot was not counted, the reason the ballot was not counted. The presiding judge shall use the information provided on the affidavit to obtain the proper mailing address for the voter and the final resolution of the provisional ballot.

9. Distribution of Provisional Voting Records.

a. Custodian of election records receives:

(1) Lists of Provisional Voters;

(2) Return sheets;

(3) Tally Sheets;

(4) Envelopes for Accepted and Rejected Provisional Ballot Affidavit Envelopes;

(5) Counted Ballots; and

(6) Verification of Provisional Ballots and Serial Numbers.

b. Custodian of the key receives the key to the ballot box after it has been locked.

c. Presiding officer of the canvassing authority receives:

(1) Return sheets; and

(2) Tally Sheets.

STATE001363

**SECTION B. RECONVENING FOR QUALIFYING LATE EARLY BALLOTS BY MAIL**

1.  Requirements for ballots to be counted late.

    The Board must reconvene to count mail ballots which:

    a.  arrived by 5pm on the day after election and bear a cancellation mark of a common or contract carrier or courier indicating a time not later than 7pm at the location of the election on election day.

    b.  were cast from outside the United States;

    c.  were placed in delivery before the polls closed; and

    d.  arrived not later than the 5th day (non military overseas) or 6th day (military) after election day. [Sec. 86.007(d)]

        **NOTE:**   If the 5th or 6th day falls on a Saturday, Sunday, or federal or state holiday, this deadline is extended to the next regular business day. [Sec. 86.007(d-1)]

2.  When should the board reconvene?

    a.  The general rule is on the 9th day after election day or earlier, if the early voting clerk can determine that all ballots cast from outside the United States have been received. [Sec. 87.125(a)]

    b.  For a general election for state and county officers, the date moves to the 13th day after election day, or earlier if the early voting clerk can determine that all ballots cast from outside the United States have been received. [Sec. 87.125(a-1)]

3.  The Carrier Envelope must be:

    a.  timely submitted;

    b.  properly addressed with postage (no postage is required for FPCA carrier envelopes); and

    c.  bear a cancellation mark from a postal service before the polls close or a receipt mark from a common or contract carrier indicating the ballot was received before the polls closed.

4.  Additional general provisions.

    a.  The presiding judge shall notify the early voting clerk as to the time and place where the board will reconvene. The notice must be made in time so the early voting clerk may give proper notice of the delivery. The early voting clerk must post notice of delivery of jacket envelopes and any other accompanying papers to the early voting ballot board at least 24 hours prior to the delivery. The notice shall be posted at the main early voting polling place. Section 1.006 does not apply.

    b.  The presiding judge shall send notice to the custodian of the key and the custodian of election records to redeliver the ballot box containing the counted ballots and the key to the box. After the late ballots have been counted, the presiding judge shall lock the late counted ballots in the ballot box. The presiding judge shall deliver the ballot box to the general custodian of election records and the key to the ballot box to the custodian of the key.

    c.  Poll watchers are entitled to be present.

    d.  If all mail ballots were received by the close of voting on election day or no ballots were received by the appropriate deadline for the election, the early voting clerk shall certify that fact and deliver the certification to the canvassing board before they convene to canvass the votes. [Sec. 87.125(a)]

5.  Special provisions for paper ballots.

STATE001364

a. Once the ballots have been qualified, the presiding judge shall use the regular method of counting ballots by keeping three new tally sheets, counting by precinct, and having at least two members per tally team.  [Ch. 65, Secs. 87.062, 87.103; 1 T.A.C. § 81.37(b)]

b. Once the board has counted all the ballots, an original and three copies of the return sheet shall be prepared.

c. The distribution of the tally sheets and return sheets shall be made in accordance with the Texas Election Code, Subchapter B, Chapter 66.

d. The canvassing board shall add the returns from both early voting return sheets when canvassing the vote.

6. Provisions for Electronic Voting Systems. [1 T.A.C. § 81.37(c); Sec. 87.103]

a. The manager of the central counting station shall decide whether the ballot board shall manually count the ballots with the totals manually added to the computer count for a canvass total or whether the central counting station shall reconvene.

b. The manager shall send notice to the presiding judge of the ballot board prior to reconvening the board as to whether the ballots are to be counted manually by the board or whether the ballots are to be prepared for delivery to the central counting station.

c. If the ballots are to be counted by the central counting station, the manager must post notice at least 24 hours prior to reconvening the central counting station.  Section 1.006 does not apply.

d. A ballot transmittal form must be completed by the presiding judge of the ballot board.  The transmittal form will accompany the ballots qualified.

e. The manager must order a 2nd test to be conducted prior to the count.  The test must be successful.

f. Poll watchers are entitled to be present.

g. After the 2nd test is successful, the unofficial election results preserved by electronic means shall be loaded in the tabulating equipment.

h. The tabulation supervisor shall print a status report before the count is to begin.  This status report shall be compared with the report run on election night.  If the two status reports do not match, the electronic ballots must be counted by hand and the total manually added to the returns printed on election night.

i. If the status reports match, the tabulation supervisor may order the count to begin.  The precinct returns from these counts may be included with the original precinct counts.  The tabulation supervisor does not need to keep the precinct-by-precinct results of the late ballots separate from other early voted ballots.

j. Once the ballots have been counted, results shall be prepared in the regular manner.  The manager shall prepare a certification and attach it to the returns, then place both in envelope #1 to be delivered to the presiding officer of the canvassing board indicating that the results supersede any returns printed prior to the reconvening of the central counting station after election day.

k. After the results have been prepared, a successful 3rd test must be performed.

l. The results, ballots, and distribution of ballots and all records shall be made in the regular manner.

37

STATE001365

# APPENDIX A

**This chapter will have examples of questions we see arise for a Signature Verification Committee and examples of situations.**

1. **Do the signatures on the voter's mail ballot application and carrier envelope have to be identical?**

   The Signature Verification Committee's duty is to compare signatures, but the committee members are not handwriting experts. The committee members should use their best judgment in determining whether the signatures on the voter's mail ballot application and carrier envelope are those of the same voter. The committee chair or committee members may request from the county clerk, election administrator, or voter registrar any signatures that are on file for a voter. This information may be provided electronically. The committee must decide by a majority vote that the signatures are of the same person, or not of the same person. The standard should be whether the two signatures could have been made by the same person.

   In addition, if the voter provides personal identification information on the carrier envelope that matches the voter's registration record, the signatures on the mail ballot application and the carrier envelope shall be rebuttably presumed to be the signatures of the voter. [Sec. 87.041(d-1))] Thus, the only way to reject a mail ballot due to a signature mismatch is for a member of the SVC to rebut this presumption. The presumption may be rebutted by presenting other past signatures on file with the early voting clerk or voter registrar that would support a finding that the signatures on the carrier envelope and mail ballot application are not those of the same voter.

2. **When does the committee need to ask for copies of signatures from the county clerk or voter registrar?**

   There is nothing in the Election Code that states when such a request should be made. The committee members may ask for these documents of voters' signatures in advance as long as it is reasonable. We recommend that the request be made with ample time to allow the clerk or registrar to prepare the requested documents. Electronic copies of these documents may be sent to the committee. Only committee members can request this information.

3. **What is a majority vote?**

   The Election Code does not state what constitutes a majority of the SVC. Some counties will determine by the full committee, committee members present, or members of the subcommittees. Our recommendation is that the board come to an agreement of what constitutes a majority and that the committee use that standard throughout the process.

4. **May the SVC keep notes?**

   The SVC may not disclose the results of the accepted and rejected ballots. However, the committee may keep notes. Please keep in mind that these notes are subject to public information requests.

5. **Are the carrier envelopes and applications public information?**

STATE001366

Yes. A copy of an application for a ballot to be voted by mail is not available for public inspection, except to the voter seeking to verify that the information pertaining to the voter is accurate, until the first business day after the election day of the earliest occurring election for which the application is submitted. Originals of the applications and carrier envelopes are not available for public inspection until those materials are delivered to the general custodian of election records after the election. [Sec. 86.014]

**6.  Does the SVC separate rejected and accepted ballots?**

Yes. The SVC needs to separate the rejected and accepted ballots, because if the SVC has determined that the signatures are not those of the same person, the board may make a determination that the signatures are those of the same person by a majority vote of the board's membership. The EVBB **may not** determine whether a voter's signatures on the carrier envelope certificate and ballot application are those of the same person if the committee has determined that the signatures are those of the same person.  [Sec. 87.027(j)]

**7.  When is the earliest the SVC can meet?**

The first day the SVC can meet is 20 days before the election day. For the November 8, 2022 election, the earliest the SVC may meet is October 19, 2022. There is no county population requirement for meeting 20 days before Election Day.

**8.  Is there a limit on how many times the SVC may meet?**

No. There is no limit on the times the SVC may meet. The clerk shall post notice of the time of each delivery. The notice must remain posted continuously for at least two days before the date of the delivery. [Sec. 87.027(h)] Postings required by this section shall be made on the bulletin board used for posting notice of meetings of the commissioners court, in an election for which the county election board is established or a primary election, or of the governing body of the political subdivision in other elections. [Sec. 87.027(k)] The SVC may meet after Election Day to verify signatures of late ballots; however, that is to the discretion of the early voting clerk.

**9.  May a vacancy be filled if the SVC has convened?**

Yes. A vacancy on the committee shall be filled by appointment from the original list or from a new list submitted by the appropriate county chair. [Sec. 87.027(d)]

STATE001367

<div style="border:1px solid">

### SITUATION 1:
### Voter's Signature does not Match

</div>

1. The SVC's duty is to compare signatures, but the committee members are not handwriting experts. The committee members should use their best judgment in determining whether the signatures on the voter's mail ballot application and carrier envelope are those of the same voter. The committee chair or committee members may request from the county clerk, election administrator, or voter registrar any signatures that are on file for a voter. This information may be provided electronically. The committee must decide by a majority vote that the signatures are of the same person, or not of the same person. The standard should be whether the two signatures could have been made by the same person.

2. If the voter provides personal identification information on the carrier envelope that matches the voter's registration record, the signatures on the mail ballot application and the carrier envelope shall be rebuttably presumed to be the signatures of the voter. [Sec. 87.041(d-1))] Thus, the only way to reject a mail ballot due to a signature mismatch is for a member of the SVC to rebut this presumption. The presumption may be rebutted by presenting other past signatures on file with the early voting clerk or voter registrar that would support a finding that the signatures on the carrier envelope and mail ballot application are not those of the same voter.

3. A majority vote must be decided by the committee members. For example, if there are 5 members, you may decide 3 out of 5 is a majority, or 4 out of 5. Once decided, the committee needs to be consistent with that process. If you have subcommittees, they must consist of at least two members each, with the chair as the deciding vote.

4. If committee members are unsure whether a signature is that of the voter or not, they should put those aside. The committee may decide if all members will need to look at the signature as a whole or let the subcommittees decide amongst themselves. If the committee is unsure of certain signatures, they may request from the county clerk, election administrator or voter registrar copies of signatures that are on file.

5. A rejected signature must be decided by a majority vote. If there are subcommittees, the committee needs to decide whether the subcommittees may make a majority vote with the chair as the tie breaker if needed, or if they must put those potential rejected ballots aside and decide as whole which ones should be rejected by a majority.

6. Even if unsure, the committee must make a decision whether to accept or reject a signature.

7. If the signature is rejected, the committee must place and separate the rejected and accepted carrier envelopes.

8. Once the committee has accepted and rejected all carrier envelopes, the committee has no authority to review the signatures again once delivered to the general custodian of the election.

<div style="border:1px solid">

### SITUATION 2:
### Voter's Signature is not on the Signature Line for the Carrier Envelope

</div>

1. If a voter's signature does not appear on the signature line also known as the certificate of the carrier envelope, but is located elsewhere on the envelope, then the signature is valid. As long as the signature is somewhere on the envelope, then the signature would be valid.

STATE001368

2. What if the carrier envelope is signed by a witness? If the carrier envelope is witnessed, then there would be no signature to be compared by the committee. However, that does not invalidate the signature. A carrier envelope may be witnessed, as long as the witness portion is completed correctly.

3. What if the ABBM is signed by the voter, but their carrier envelope is witnessed? A voter may complete their ABBM and then have their carrier envelope witnessed. For example, if a person suffers an injury that would prevent them from signing (such as a broken hand) after they submit their ABBM, the voter may have a person witness their carrier envelope. The answer would be the same if a person has someone witness their ABBM but the voter signed their carrier envelope. This does not invalidate the signature, as long as the witness portion is completed correctly.

4. What if the signature that is signed by the witness on the carrier envelope and the application for ballot by mail do not match? A voter may have someone witness their application for ballot by mail and their carrier envelope. The voter does not have to use the same witness. The witness must include the printed name of the person that cannot sign, affix the witness' own signature to the document, print the witness' own name, and state their residence address or official title, if the witness is an election officer. The only time a witness may not fill out their information would be if the witness is a relative within the 2nd degree by affinity or 3rd degree by consanguinity OR the witness was physically living in the same dwelling as the voter at the time of witnessing the carrier. [Sec. 86.0051(a),(e)] If the witness fits under one of these categories, then they would need to include that information on the carrier.

---

**SITUATION 3:**
**Committee did not Separate Rejected and Accepted Ballots**

---

1. If the committee does not separate the rejected and accepted carrier envelopes, do they have to start all over? No. If the committee cannot determine what carrier envelopes were accepted and rejected, then they would pass all carrier envelopes to the EVBB. There is nothing in the Election Code that states the SVC may review all carrier envelopes again. However, the EVBB has authority to review rejected signatures and overturn rejected decisions made by the SVC. [Sec. 87.027(j)] Therefore, our office recommends that since the EVBB has the authority to review rejected signatures by the SVC, the carrier envelopes should be forwarded to the EVBB for review. The SVC may still continue to verify signatures after taking this action.

2. Our office recommends that the SVC comes up with a checklist of (1) what constitutes a majority; (2) how the committee will accept and reject signatures; (3) how the committee will separate rejected and accepted signatures; (4) whether the committee will choose to verify signatures electronically or paper; (5) how the committee will verify signatures if they choose to verify by electronic or paper; (6) if using electronic verification, then have a number to call if a technical error occurs; (7) if there are any signatures that are questionable, know where to separate them; (8) who is going to sign off on the ballot box for delivery to the general custodian of election records; and (9) set up a time to deliver the box to the custodian of election records.

STATE001369

---

**SITUATION 4:**
**Creating a Subcommittee**

---

1.  If more than 12 members are appointed to serve on the signature verification committee, the early voting clerk may designate two or more subcommittees of not less than six members. If subcommittees have been designated, a determination as to whether or not the signature on the application for ballot by mail and the signature on the carrier envelope are the signatures of the voter is made by a majority of the subcommittee. [Sec. 87.027(l)]

2.  If the SVC has less than 12 members you still may have a subcommittee. Please keep in mind that the subcommittees need to be even. If there is an election where party alignment is indicated on the ballot, you should take that into consideration when making subcommittees. If possible, try to have different party alignment in each subcommittee. This should be done amongst the committee and before the committee begins verifying signatures. Whatever process is decided should be used throughout the whole verification process.

3.  A determination that the signature on the application for ballot by mail or the signature on the carrier envelope are the signatures of the voter may be made by a subcommittee of less than six members. However, a determination that the signature on the application for ballot by mail or the signature on the carrier envelope are not the signatures of the voter may not be made by a subcommittee of less than six members. If the SVC has 12 or fewer total members and subcommittees consist of less than six members, a determination that the signature on the application for ballot by mail or the signature on the carrier envelope are not the signatures of the voter must be made by a majority of the entire SVC.

4.  If a subcommittee is created, the chair should be the tie breaker. Therefore, the chair should not be part of a subcommittee.

5.  If there are subcommittees, the full signature verification committee needs to decide whether the subcommittees have authority to accept or reject ballots using a majority vote of the subcommittee members. Alternatively, the whole committee could decide to give the subcommittee authority to accept ballots and set aside rejected ballots and decide as whole which ones should be rejected by a majority.

STATE001370

# APPENDIX B

This appendix will have examples of questions we see arise for an Early Voting Ballot Board and examples of common situations.

1. **Our entity doesn't have any ballots by mail. Do we have to have a ballot board?**

   Yes. All entities must have a ballot board. An early voting ballot board shall be created in each election to process early voting results and provisional ballots from the territory served by the early voting clerk. [Sec. 87.001] You must always appoint a ballot board because you will not know until Election Day whether there will be provisional ballots that need to be reviewed by the EVBB.

2. **May the deputy early voting clerks or election day workers serve on the ballot board?**

   This depends. Our office advises that a deputy early voting clerk may not serve on the EVBB, as the duties conflict in scope and time for performance. An election day officer may serve on the EVBB. Please keep in mind that both duties may not be performed at the same time.

3. **May the early ballot board members serve on the signature verification committee?**

   Not recommended. Since the ballot board members may override a rejected signature decision by the committee, a ballot board member should not serve on the signature verification committee. [Sec. 87.027]

4. **Do members from the ballot board have to be from different parties?**

   Yes. The same number of members must be appointed from each list provided by political parties with party affiliation on the ballot. This includes all parties that have nominees on the general election ballot including the Libertarian Party and Green Party.

5. **What if our county does not have a chair from one of the political parties?**

   The party first needs to fill the vacancy of the party chair. Then the chair would be able to provide a list of names. If there is no vacancy filled, then the presiding judge or county election board, whichever is applicable, should appoint members.

6. **If the EVBB is verifying signatures and not the SVC, when does the board need to ask for copies of signatures from the county clerk or voter registrar?**

   There is nothing in the Election Code that states when such a request should be made. The board members may ask for these documents of voters' signatures in advance as long as it is reasonable. We recommend that the request be made with ample time to allow the clerk or registrar to prepare the requested documents. Electronic copies of these documents may be sent to the board.

7. **What is a majority vote?**

   The Election Code does not state what constitutes a majority of the EVBB. Some counties will determine by the full board membership or board members present. Our recommendation is that the board come to an agreement of what constitutes a majority and that the board use that standard throughout the process.

STATE001371

**8. May the EVBB keep notes?**

The EVBB may not disclose the results of the accepted and rejected ballots. However, the board may keep notes. Please keep in mind that these notes are subject to public information requests.

**9. Are the carrier envelopes and applications public information?**

Yes. A copy of an application for a ballot to be voted by mail is not available for public inspection, except to the voter seeking to verify that the information pertaining to the voter is accurate, until the first business day after the election day of the earliest occurring election for which the application is submitted. Originals of the applications and carrier envelopes are not available for public inspection until those materials are delivered to the general custodian of election records after the election. [Sec. 86.014]

**10. Does the EVBB separate rejected and accepted ballots?**

Yes. The EVBB needs to separate the rejected and accepted ballots. If the board did not separate rejected and accepted ballots and cannot determine which ones were accepted or rejected, the board will need to start the process over as they have the authority to do so.

**11. When is the earliest the EVBB can meet?**

This depends on the population of the county. This is the same rule if your entity is in a county with this population and conducting an election jointly or contracting for election services with the county. Counties with a population of less than 100,000 may convene at the end of the period for early voting by personal appearance (4th day before election day). Ballots may not be counted until after the polls open on election day. Counties with a population of 100,000 or more may convene on the 12th day before election day. The EVBB may deliver ballots to the central counting station for early counting after the end of the early voting period. Results may not be released until the close of polls on election day.

**12. Is there a limit on how many times the EVBB may meet?**

No. There is no limit on the times the EVBB may meet. The clerk shall post notice each time the ballot board convenes. The clerk shall also post notice of delivery of ballots each time. The notice must remain posted 24 hours before delivery. The prescribed SOS form is AW6-6 (Mail ballots only) & AW6-7 (Mail and paper balloting materials). This notice must be posted at the main early voting polling place at least 24 hours prior to first delivery of ballots. [Sec. 87.0222] In general elections for state and county officers, the county clerk/elections administrator must notify each county chair at least 24 hours of each delivery.

**13. May a vacancy be filled if EVBB has convened?**

Yes. A vacancy on the board shall be filled by appointment such as a vacancy for a presiding judge/alternate judge on Election Day. [Sec. 32.007]

44

---

**SITUATION 1:**
**Two Ballots in One Carrier Envelope**

---

If you receive an envelope or package with two carrier envelopes from individuals registered at the same address inside and the carrier envelopes are separated (meaning two different carrier envelopes with two different ballots), then you may accept the ballots pending any other qualifications. If you receive an envelope or package with two or more carrier envelopes from individuals registered at the same address inside and the carrier envelopes are not separated (meaning two or more ballots are in one carrier), then you may not accept both ballots and they would be rejected. This scenario is often found when a couple mails both their ballots in the same carrier envelope.

---

**SITUATION 2:**
**Carrier Envelope Witness/Assistant Portion Filled out Incorrectly**

---

If you receive a carrier envelope with the witness/assistant portion filled out incorrectly, the carrier envelope cannot be accepted.

If the early voting clerk receives a timely carrier envelope that does not fully comply with the applicable requirements of the Texas Election Code, the clerk may deliver the carrier envelope in person or by mail to the voter and may receive, before the deadline, the corrected carrier envelope from the voter, or the clerk may notify the voter of the defect by telephone and advise the voter that the voter may come to the clerk's office in person to correct the defect or cancel the voter's application to vote by mail and vote on election day. If the early voting clerk provides such notifications to one voter, the same procedures must be applied uniformly to all carrier envelopes. A poll watcher is entitled to observe these notifications. [Sec. 86.011(d)] This procedure may be used if the early voting clerk can determine that two carrier envelopes are in one larger envelope.

---

**SITUATION 3:**
**Wrong Ballot in Wrong Carrier Envelope Delivered to Board**

---

These different scenarios are for a Primary/May Uniform Date Election where the county has contracted with local entities to serve as the local entities' early voting clerk.

**Scenario 1:**

The early voting ballot board ("EVBB") for the May 7, 2022 election is meeting to count ballots. They open a ballot secrecy envelope and there is a primary runoff ballot inside. As the ballot secrecy envelope would have been separated from the carrier envelope, there would be no way to determine which voter's ballot this is.

**Procedure for 1:**

This ballot cannot be counted nor retained in a carrier envelope to be forwarded to the EVBB for the runoff primary election. We suggest that the EVBB presiding judge make a notation on the ballot to

STATE001373

explain the situation and why the ballot was not counted. The ballot should be stored in the envelope that contains the other rejected ballots (which will still be in their carrier envelopes). [Sec. 87.043] As there is no way to know which voter submitted this ballot, no notice of rejection can be sent to the voter. There is no authority in the Texas Election Code to store a voted ballot outside of the jacket or carrier envelope. Additionally, while the EVBB qualified the voter's ballot with respect to the May 7, 2022 election, the EVBB did not qualify the ballot with respect to the runoff primary. The May 7, 2022 EVBB does not have the authority to qualify a ballot for the runoff primary.

**Scenario 2a:**

The EVBB for the May 7, 2022 election reviews a carrier envelope (that is marked to show it is a carrier for the May 7, 2022 election) and determines it will accept the ballot. The EVBB proceeds to open the carrier envelope to remove the ballot secrecy envelope, but the ballot is not in a secrecy envelope. The EVBB is able to immediately determine that the ballot inside the carrier is a primary runoff ballot. In this scenario, the ballot is tied to a particular voter as the carrier envelope is still effectively with the ballot.

**Procedure for 2a:**

We recommend that the EVBB immediately put the ballot back in the carrier envelope and seal the envelope. The EVBB should deliver the carrier envelope to the early voting clerk, who should then place the carrier envelope in the jacket envelope for that voter for the primary runoff, ready to be forwarded to the EVBB for that election at the appropriate time. We also suggest that the presiding judge of the EVBB write a memo to detail what occurred, what actions were taken, and the date those actions were taken. The presiding judge and at least one other member of the EVBB should sign off on the memo. A copy of the memo should be placed in the voter's May 7, 2022 jacket envelope and a copy provided to the early voting clerk for placement in the voter's primary runoff jacket envelope. When the EVBB for the primary runoff election convenes and sees a carrier envelope for the May 7, 2022 election in the jacket envelope for the primary runoff, the memo will serve to inform that EVBB of what has occurred.

**Scenario 2b:**

As a corollary to scenario 2a, as the voter's May 7, 2022 carrier envelope contained the primary runoff ballot, it is possible that the primary runoff carrier contains the May 7, 2022 ballot. Can the early voting clerk take the runoff primary carrier and provide it to the May 7, 2022 EVBB for processing?

**Procedure for Scenario 2b:**

As we can identify the voter under these scenarios, and hopefully contact the voter, the chain of custody can be well established. Regarding the carrier envelope for the runoff, which presumably contains the May 7, 2022 ballot, we suggest that the early voting clerk call the voter (if possible) to see if voter can confirm that the May 7, 2022 ballot is probably in the runoff carrier envelope. If the voter confirms that s/he believes the ballot in the primary runoff carrier envelope is in fact the May 7, 2022 ballot (or if the early voting clerk is unable to reach voter), the early voting clerk may forward that carrier envelope to the May 7, 2022 election EVBB to process as normal, if able to do so in a timely manner. We do not recommend that the early voting clerk open the carrier envelope, with or without the voter's permission, to determine whether the carrier actually contains the May 7, 2022 ballot. Only the EVBB should be opening this carrier envelope, once the EVBB has determined that the carrier envelope was properly processed (signature comparison completed, voter eligibility determined, etc.). We do suggest that the early voting clerk write a memo to detail what occurred, what actions were taken, and the date those actions were taken, and place a copy of the memo in the voter's May 7, 2022 jacket envelope. Another copy should be placed in the voter's primary runoff jacket envelope.

STATE001374

**Scenario 3a:**

The EVBB for the May 7, 2022 election qualifies the carrier envelope and finds two ballots, each inside a separate ballot secrecy envelope or neither ballot in a ballot secrecy envelope.

**Procedure for Scenario 3a:**

Under this limited circumstance, the EVBB may open the ballot secrecy envelopes, if used by the voter. (The EVBB has the discretion to open a ballot secrecy envelope in limited circumstances, such as to see if there is a statement of residence included in the secrecy envelope rather than the carrier envelope. It is also not a requirement for a ballot to be in the secrecy envelope.) If one of the ballots is for the May 7, 2022 election and one is for the primary runoff election, the May 7, 2022 ballot may be counted. The primary runoff ballot cannot be counted. There is no authority for the EVBB to, for example, copy the carrier envelope for the May 7, 2022 election and place the runoff ballot back in the carrier envelope for forwarding to the primary runoff EVBB (as in scenario 2b, above). We suggest that the presiding judge of the EVBB makes a notation on the primary runoff ballot to explain the situation and why the ballot was not counted. The primary runoff ballot should be stored in the envelope that contains the rejected ballots (which will still be in their carrier envelopes). [Sec. 87.043] We recommend sending this voter a rejection letter, even though this EVBB is not the proper ballot board for the May 24, 2022 primary runoff ballot. As above, we recommend that a memo be written and signed by the EVBB presiding judge to detail actions taken. A copy of the memo should be placed in the voter's May 7, 2022 jacket envelope and a copy provided to the early voting clerk for placement in the voter's primary runoff jacket envelope.

**Scenario 3b:**

The EVBB for the May 7, 2022 election qualifies the carrier envelope, later discovers that the ballot secrecy envelope contains both a May 7, 2022 ballot and a primary runoff ballot.

**Procedure for 3b:**

As in scenario 3a, the May 7, 2022 ballot may be counted, but the May 24, 2022 primary runoff ballot cannot be counted. No notice can be sent to the voter as the identity of the voter cannot be determined by the time the error (2 ballots in one secrecy envelope) is discovered. Again, we suggest that the presiding judge of the EVBB make a notation on the rejected primary runoff ballot and store it with the rejected May 7, 2022 ballots.

---

| **SITUATION 4:** |
| **Voter's Mailing Address on ABBM is Different than Voter Registration Address on File** |

If the grounds for voting by mail is either being 65 or over or disability, and the applicant has not provided his or her official mailing address as shown on the list of registered voters as the address for mailing his or her ballot, the address provided must be that of a hospital, nursing home, other long term care facility, retirement center, or the address of a relative within the second degree by affinity or third degree by consanguinity with whom the applicant is living. If this information was not provided on the Application for Ballot by Mail, the ballot should be rejected per Section 87.041 of the Code.

STATE001375

EXHIBIT

57

**ADDENDUM TO**

**Second Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*United States v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**May 8, 2023**

1

## I.      Summary

1. In Part IV of my February 3, 2023 report ("Second Supplemental"), I compared the successful mail voting rates in the November 2022 election of individuals whose records I had deemed "at risk" for a ballot being rejected on account of the identification requirements in SB 1 with the successful mail voting rates of those not deemed "at risk." I found that at-risk voters successfully voted by mail at a significantly lower rate than other voters. In his March 3, 2023 rebuttal report, the State's witness, Dr. Mark Hoekstra, raised questions about this analysis. He suggested that my analysis had not accounted for the possibility that voters in the at-risk pool a.) could have been rejected for reasons unrelated to SB 1, b.) simply substituted voting in-person for voting by-mail, and c.) exhibit different voting rates from other voters for reasons that are correlated with being in the at-risk pool but have nothing to do with SB 1 compliance (See Hoekstra at Paragraph 21).

2. Following my review of Dr. Hoekstra's report but before my April 20, 2023 deposition, I conducted additional, informal analyses to answer questions raised by Dr. Hoekstra, such as checking whether "at-risk" voters did indeed substitute in-person voting for mail voting. During the deposition, the counsel for the State asked if I had done analysis since writing my last report. I disclosed I had done an analysis related to Dr. Hoekstra's comments, though I had not formally written up computer code nor written up my notes. At my deposition, the State's counsel asked that I share an updated analysis.

3. Responsive to the State's counsel's request, I went back to the database and conducted the updated analysis that I report on here. I am also providing updated programming code to accompany this addendum. In short, the updated analysis shows that voters in the "at-risk" pool who applied for a mail ballot (successfully or unsuccessfully) were significantly less likely to successfully vote (either by mail or in person) in the November 2022 election. This finding cannot be explained by substitution of in-person voting for voting by mail. The finding also cannot be explained by key demographic or geographic factors (e.g., age, county of residence). Registered voters in the at-risk population who apply for a mail ballot are more than twice as

likely as other voters to have a record in the TEAM database indicating that their ballot was rejected due to SB 1. This evidence is consistent with the view that the 2.7 million Texans for whom identification numbers are incorrectly or incompletely recorded in TEAM are significantly more likely than other voters to have ballots rejected and to fail to successfully vote because of SB 1.

**II.     Analysis**

4.   I start the analysis with the 8,178,445 TEAM records that indicated any kind of interaction with election officials related to the November 8, 2022 election (See Paragraph 14 of Second Supplemental Report). Of these records, 422,605 have an "application status" code, which indicates that the registrant requested a mail ballot, and 390,012 have a "ballot type" code, which indicates that the registrant successfully requested a mail ballot.[1] TEAM does show some records of individuals with an "application status" code who do not have a "ballot type" code. TEAM also shows some records of individuals who have a "ballot type" code but not an "application status" code. I perform analyses of voter turnout here separately among those who have an indicator that they requested a ballot and among those who have an indicator they were sent a mail ballot. The results are substantively the same either way.

5.   While there are 8,178,445 records in TEAM associated with the November 2022 election, tens of thousands of individuals are listed multiple times. For instance, a person might have one record indicating she had a mail ballot rejected and then a separate record indicating that she had a mail ballot accepted. In this analysis, I create a file where each person is listed once, and I record for that person whether she has any records in TEAM at all indicating she a.) requested a ballot, b.) received a ballot, c.) voted by mail, and d.) voted at all.

---

[1] In the Second Supplemental analysis, I focused on individuals who successfully requested a mail ballot. These are records that have a ballot type designation as "AB" in TEAM. However, as an alternative, one can base this analysis on the application status field so as to include individuals who tried, but failed, to receive a mail ballot. The decision, one way or the other, does not affect any of the core results, as I will show here.

- Of 393,324 individuals who requested a ballot, 81.9% successfully voted by mail and 89.9% voted by any method (mail or in person).
- Of 386,478 individuals who were sent a ballot, 83.4% successfully voted by mail and 89.8% voted by any method (mail or in person).

6. Next, I merge this data in with the records of the 2.7 million individuals who I deem "at risk" (See Section II and Appendix A of Second Supplemental for information about how I defined the "at risk" population). These are individuals who either have no DPS ID Number listed in TEAM but do possess a DPS ID Number, have multiple DPS ID Numbers but only one of them listed in TEAM, or have typos in their DPS ID Numbers or their Social Security Numbers listed in TEAM. Among those who either requested a mail ballot or were sent a mail ballot, I measure whether the rate of a successful vote differs depending on whether someone is in the "at-risk" pool or not.

**TABLE 1**

*Individuals who applied for Mail Ballot*

|  | Successful Mail Vote | Successful Vote Any Method | Observations |
|---|---|---|---|
| **Not "At Risk"** | 82.4% | 90.6% | 364,267 |
| "At Risk" | 75.9% | 82.2% | 29,057 |
| **DIFFERENCE** | **6.5 pp** | **8.4 pp** | |

*Note: "pp" means percentage points. It is the difference between the two numbers above it.*

*Individuals who were sent a Mail Ballot*

|  | Successful Mail Vote | Successful Vote Any Method | Observations |
|---|---|---|---|
| **Not "At Risk"** | 83.8% | 90.4% | 358,041 |
| "At Risk" | 77.6% | 81.9% | 28,437 |
| **DIFFERENCE** | **6.2 pp** | **8.5 pp** | |

*Note: "pp" means percentage points. It is the difference between the two numbers above it.*

4

7. As Table 1 shows, regardless of whether one measures the voting rates among those who requested ballots or were sent ballots, Texas registrants in the at-risk pool who attempted to vote by mail are over 6 percentage points less likely to successfully vote by mail and 8.5 percentage points less like to successfully vote at all, compared to those not in the at-risk pool. All the differences in this table are highly statistically significant ($p < .0001$). Note that the version of this analysis from my Second Supplemental Report is the 6.2 percentage point difference in mail voting among those who were sent a mail ballot (bottom left of Table 1). Table 1 here shows three additional comparisons, finding a consistent, large difference in participation rates among those in the at-risk pool and those not in the at-risk pool.

8. Dr. Hoekstra raised the possibility that the individuals who are in the "at-risk" pool are different from those not in the "at-risk" pool in ways that are correlated with voter turnout but have nothing to do with identification numbers. Dr. Hoekstra performed no analysis on this point, and his critique is undermined by the fact that the analysis here is conditioned on individuals requesting a ballot. However, responsive to Dr. Hoekstra's critique, I analyzed the data with two key control variables, age and county.

9. As noted in my February 28, 2022 report, at Paragraph 77, registrants without a DPS ID on TEAM tend to be older than other registrants. Suppose that, conditional on requesting a ballot, the at-risk pool has a higher share of older voters and that those older voters are more likely to not successfully vote. A regression analysis that controls for age is responsive to a challenge of this sort.

10. In a regression framework, I also control for county variation using county fixed-effects. Including county fixed-effects accommodates a concern that what is explaining the lower rates of successful voting in the at-risk pool is related to specific counties that have disproportionate share of the at-risk pool and disproportionate share of individuals who try, but fail, to vote after requesting an absentee ballot.

11. Table 2 shows the regression results from an ordinary least squares regression model.[2] The first row is comparable to the percentages in Table 1. For example, in the second column, the -.084 figure means that, controlling for age and county, those in the at-risk pool are 8.4 percentage points less likely to successfully vote (by mail or in person) conditional on applying for a mail ballot. That number, 8.4, is the same as listed in Table 1. This means that adding the control variables does not affect the relationship between "at risk" and participation. The same pattern is true across all four estimates. Note that I also ran this regression model and included gender as an additional control variable. Including gender also has no bearing on the significant relationship between being in the at-risk population and successfully voting.

**TABLE 2**

|  | **Applied for Ballot** | | **Sent Ballot** | |
|---|---|---|---|---|
|  | **Mail Vote** | **Any Vote** | **Mail Vote** | **Any Vote** |
| "At Risk" | -.067 (.002) | -.084 (.002) | -.063 (.002) | -.089 (.002) |
| Age (in 10s) | .019 (.0004) | .018 (.0003) | .017 (.0004) | -.018 (.0003) |
| Constant | .686 (.003) | .776 (.003) | .714 (.003) | .770 (.003) |
| N | 393,229 | 393,229 | 386,387 | 386,387 |

NOTE: Each column represents an output from an OLS regression analysis measuring the relationship between "at-risk" and voting while controlling for age and for county of residence. Standard errors are reported in parentheses.

12. Another comment offered by Dr. Hoekstra is that some individuals who did not end up voting by mail successfully may have not voted for reasons unrelated to identification issues that are concentrated in the "at-risk" pool. I observed individuals who requested a mail ballot but then asked to cancel the mail ballot ("ballot type" code "AC"). I re-ran the analysis excluding these individuals. The results are the same.

---

[2] Multivariate ordinary least squares (OLS) regression is a common way to measure the relationship between two variables while controlling for other factors. In this case, OLS allows me to measure the relationship between being in the at-risk population and voting successfully, while controlling for age and county of residence. If the relationship between being at-risk and voting successfully is significant even when the other factors are included in the model, this means that the differences in turnout rates between at-risk and non at-risk voters are not attributable to those other factors.

13. A final piece of evidence that confirms that identification issues are at the heart of differences between the at-risk pool and the non at-risk pool comes from the ballot codes in TEAM indicating a ballot was rejected on account of ID issues. As noted in my Second Supplemental report (Paragraph 19), over 11,000 records show a rejection code related to identification issues. Are those rejection codes concentrated in the at-risk population? Yes.

   - 2.8% of Texas registrants who were sent a ballot and are <u>not</u> in the at-risk pool had their ballot rejected due to SB 1 identification requirements.

   - 6.4% of Texas registrants who were sent a ballot and are in the at-risk pool had their ballot rejected due to SB 1 identification requirements.

This rate for the at-risk registrants is more than double the rate of those not in the at-risk pool, and the difference is, again, statistically significant at the $p < .0001$ level.

## III.    Conclusion

14. As requested by the State's counsel at my deposition, this addendum summarizes the additional analysis I conducted following my review of Dr. Hoekstra's March 3, 2022 report. The main new analysis I performed responded to the question of whether at-risk voters were less likely to vote at all in the November 2022 election or just less likely to vote by mail. I have found that the at-risk voters are significantly less likely than the non-at-risk voters to vote and to vote by mail. This finding is robust when controlling for age and county, and when setting aside individuals who requested their mail ballots to be cancelled. I further show that those in the at-risk pool are more than twice as likely as other voters to have ballots rejected specifically on account of SB 1 identification requirements. The findings strengthen the conclusions of my previous report that individuals for whom TEAM incorrectly or incompletely records identification numbers are significantly less likely to vote on account of identification requirements of SB 1.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 8th Day of May, 2023.

Eitan Hersh

# EXHIBIT 58

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.texas.gov

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

## John B. Scott
Secretary of State

### ELECTION ADVISORY
### No. 2022-02

TO:      County Elections Officers (County Clerks/Elections Administrators/Tax Assessors-Collectors)

FROM:    Keith Ingram, Director of Elections

DATE:    January 10, 2022

RE:      Instructions and Deadlines for Mailing/Emailing Ballots Under the Federal "MOVE Act" for Overseas Voters

---

Pursuant to the federal Military and Overseas Voter Empowerment ("MOVE") Act, the blank official ballot must be mailed or emailed to any voter who submits a Federal Postcard Application ("FPCA"). **All FPCAs submitted on or after January 1, 2022 are effective for the 2022 primaries and general election.**

Section 84.007, Texas Election Code, provides that if an ABBM is faxed or emailed or if an FPCA is faxed, then the applicant must submit the original application by mail to the early voting clerk so that the early voting clerk **receives the original no later than the 4th business day after receiving the emailed or faxed ABBM or faxed FPCA.** An FPCA still has independent authority for email delivery under Section 101.052. This means an emailed FPCA is **not** required to be followed by hardcopy.

## Deadline to Mail Overseas Ballots

As a reminder, all ballots to FPCA voters **must** be mailed on or before the 45th day before election day. **The deadline for mailing ballots for the 2022 primary election is Saturday, January 15, 2022.** Please note that although the deadline falls on a Saturday, it does <u>not</u> extend to the next business day. **Therefore, we recommend mailing your ballots by Friday, January 14, 2022.** If you plan on mailing your ballots on Saturday, we recommend that you consult with your local post office to confirm dates/hours their office will be open.

If a FPCA is received after the 45th-day deadline, the ballot should be mailed or emailed not later than the seventh calendar day after the date the FPCA is received. If a regular (non-FPCA) application for a ballot by mail is received after the 45th-day deadline from a voter who is not in the military or overseas, the ballot should be mailed not later than the

STATE040059

seventh calendar day after the date the application is accepted. TEX. ELEC. CODE § 86.004(b).

The following are important deadlines affecting FPCA voters:

**March 1, 2022 General Primary Election**

- **Saturday, January 15, 2022** - Deadline to mail or email ballots to ALL FPCA voters. (We have more information about deadlines to mail ballots in *Advisory No. 2021-18 - March 1, 2022 Primary Election Law Calendar*.)
- **Friday, February 18, 2022** - Deadline to Receive FPCAs and Deadline to request an emailed, unmarked ballot.
- **3 Business Days after FPCA Voter Activity** - Submit your FPCA tracking information for new FPCAs received, FPCA ballots mailed and received to the Office of the Secretary of State in order that the Ballot by Mail Tracker is populated with timely information. As a reminder, offline counties can update FPCA information via file import, online counties may update directly in TEAM.

**May 24, 2022 Primary Runoff Election**

- **Saturday, April 9, 2022** - Deadline to mail or email ballots to ALL FPCA voters. (We have more information about deadlines to mail ballots in *Advisory No. 2021-18 - March 1, 2022 Primary Election Law Calendar.)*
- **Friday, May 13, 2022** - Deadline to Receive FPCAs and Deadline to request an emailed, unmarked ballot.
- **3 Business Days after FPCA Voter Activity** - Submit your FPCA tracking information for new FPCAs received, FPCA ballots mailed and FPCA ballots received to the Office of the Secretary of State in order that the Ballot by Mail Tracker is populated with timely information. As a reminder, offline counties can update FPCA information via file import; online counties may update directly in TEAM.

**November 8, 2022 General Election for State and County Officers**

- **Saturday, September 24, 2022** - Deadline to mail or email ballots to ALL FPCA voters. (We will have more information about deadlines to mail ballots in our November 8, 2022 Election Law Calendar.)
- **Friday, October 28, 2022** - Deadline to Receive FPCAs and Deadline to request an emailed, unmarked ballot.
- **3 Business Days after FPCA Voter Activity** - Submit your FPCA tracking information for new FPCAs received, FPCA ballots mailed and FPCA ballots received to the Office of the Secretary of State in order that the Ballot by Mail Tracker is populated with timely information. If you need an updated spreadsheet for submission, please contact a member of the Voter Registration team as soon as possible.

# Emergency Ballots

We would also like to take this time to remind you that you have the authority to create emergency ballots. If you do not receive your ballots in time to meet the 45-day deadline,

STATE040060

you may create your own paper ballots or, if you have a copy of the ballot in the Adobe .pdf format, which is often provided by the printer for your proofing, you may forward a copy to the voter.  If you have a physical copy of the ballot and a scanner, you could scan the ballot and attach a copy of the scanned ballot to the email to the voter.  If you have a copy of the ballot in Microsoft Word, you could attach a copy in that format.  The main key is that it should be in a digital format that the average voter will be able to open and print.

# Instructions for Emailing Ballots

Any voter who submits an FPCA and requests that the ballot be emailed, must be emailed a blank official ballot.  The voter should be emailed a signature sheet and detailed instructions on returning their voted mail ballot.  Below you will find information related to email instructions which we encourage you to use and modify as necessary for your county:

**Instructions to the Early Voting Clerk**

When an early voting clerk emails the balloting materials to a MOVE voter, the early voting clerk should take the following steps:

1. **Paste MOVE Act Email Ballot Instructions into the email.** The MOVE Act Email Ballot Instructions form contains several instances where the early voting clerk will need to add attachments and personalize the email to make sure that MOVE voters receive all instructions necessary for completing and returning the marked ballots, as appropriate to their early voting clerk.
2. **Attach Ballot or Insert a Link to the Ballot and List of Certified Write-In Candidates (if applicable).**  The Early Voting Clerk will need to attach an Unmarked Ballot (appropriate to the voter's specific precinct) and the List of Certified Write-In Candidates, if applicable.  The Early Voting Clerk may insert a link to the unmarked ballot, as the ballot is "static," which means that voter can mark and print the ballot without being connected to the Internet.
3. **Attach all applicable instructions.**  The Early Voting Clerk must remember to include the ballot instructions for the applicable method of voting and the <u>signature sheet (PDF)</u> as prescribed by the Office of the Secretary of State.
4. **Insert early voting clerk contact information in the attached notice to voter.** In the email instructions to the voter, the early voting clerk should include the clerk's telephone number, email and mailing address in the designated areas for MOVE voters to use if they need additional assistance in completing or returning their marked ballot by mail.
5. **The early voting clerk MUST provide the voter with a signature sheet that contains a place for the voter to include the required personal identification number.**
6. **The early voting clerk MUST provide the voter with information about mailing the voted ballot back to the early voting clerk.**
   - The voter can mail their FPCA, ballot or FWAB postage-free using a proper return envelope.  Below are the envelopes prescribed by FVAP for this purpose:
     - **Standard U.S. Envelope Size (#10)**
       - <u>FPCA Postage-Paid Return Envelope</u>
       - <u>Ballot Return and FWAB Postage-Paid Return Envelope</u>

STATE040061

- Ballot Return and FWAB Security Envelope
- **Standard Europe Envelope Size (C4)**
  - FPCA Postage-Paid Return Envelope
  - Ballot Return and FWAB Postage-Paid Return Envelope

**NOTE: Starting in 2022, you must send the signature sheet to FPCA email ballot voters, as the voters must include their required personal identification number for review by the early voting ballot board.**

7. **The county has two choices with regard to the <u>carrier envelope or mailing envelope for voters to use when returning the voted ballot</u>:**
   - The county may rely on the voter to print the carrier envelope from the link provided on the email; or
   - If the county has access to the appropriate software and the technological ability, it may include, as an attachment with the unmarked ballot, a carrier envelope file that has the voter's name in the upper left hand corner and the county's return mailing address to assist the MOVE voter in returning their marked ballot by mail.

## Sample Email Instructions to Voter

The text below contains a sample email you may use to provide voters with their balloting materials. Please note that the email contains information that must be personalized to your county.

> Dear FPCA Voter:
>
> Per your request and in accordance with the Military and Overseas Voter Empowerment (MOVE) Act, this correspondence includes your unmarked ballot for the upcoming election. This email also includes instructions for processing the ballot, and a list of certified write-in candidates, if applicable.
>
> If, after reading the instructions, you have questions regarding the completion or return mailing of this ballot, please contact your early voting clerk at [insert county telephone number] or by email at [insert county email address].
>
> **Note: Your marked ballot must be received in our office by regular mail on or before 7:00 p.m. on <u>Election Day</u>. If you are a non-military overseas citizen submitting your ballot from <u>outside</u> the United States, the ballot must be postmarked by Election Day and received by the county elections office no later than the 5th day after Election Day. If you are a member of the military, Merchant Marine or National Guard, the ballot must be received by the 6th day after election day. If your ballot is not received by the applicable deadline, it will be rejected and will not be counted for this election.**
>
> Instructions for Processing the Emailed Ballot
>
> - Open the attachment designated as the unmarked ballot, or click on the link in your email to access your ballot.
> - Follow the ballot instructions provided for marking your ballot.

- Place the marked ballot in a secrecy (or security) envelope. An envelope may have been provided, or you may use any envelope you have at your disposal. If you cannot provide a secrecy envelope at all, don't worry; the lack of a secrecy envelope will not invalidate your ballot.
- Print out and complete the signature sheet (PDF). The signature sheet MUST be completed and returned with the voted ballot. The signature sheet contains information that is required for the Early Voting Ballot Board to verify when reviewing your ballot.
- Place your marked ballot contained in the secrecy envelope, and the signature sheet in your carrier envelope. **Note that the carrier envelope is "postage-free" if mailed within the U.S. postal system, including APO and FPO addresses, U.S. Embassies and Consulates for use by absentee voters covered under UOCAVA. You are not required to use the "postage-free" envelope. You can place the marked ballot and signature sheet in a separate envelope and affix the proper postage for mailing.**
- Put your name and current mailing address in the upper left hand corner of your mailing envelope or carrier envelope, if it has not already been pre-printed by our office. Also, put the county address in the middle of the envelope (if not already provided for you).
- Mail marked ballot to our county elections office: [county official, please insert your mailing address here for affixing to the federal envelope, if used].

Instructions for Marking the Emailed Ballot

- Make sure you follow the instructions provided by our office for marking the ballot and for voting for write-in candidates, if any.

Federal Write-In Ballot Process

- If you have submitted an FPCA by the state application deadline of the 11th day before election day AND you do not feel you can return your ballot by the deadline, you are entitled to use a "FWAB" -- a "Federal Write-in Absentee Ballot" -- to vote in federal elections only.
- The Federal Voting Assistance Program (FVAP) provides a Federal Write-In Absentee Ballot (FWAB) wizard. According to FVAP, this wizard will seamlessly, intuitively, and easily guide a military or overseas voter through the State-specific requirements for completing the FWAB, including providing the voter all federal candidate choices. Here is a link to their website: http://www.fvap.gov/.

## Resources

The following items are helpful guidance on the MOVE Act's requirements:

- MOVE Act FAQ
- Administrative Rule Implementing the MOVE Act

If you have any questions relating to the implementation of the MOVE Act, please contact our office at your earliest convenience. You may reach the Legal Department at 1-800-252-2216, Option 2.

STATE040063

KI:CA:MB

STATE040064

# EXHIBIT 59

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.texas.gov

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

### John B. Scott
### Secretary of State

### ELECTION ADVISORY
### NO. 2022-03

TO:     County Elections Officers (County Clerks/Elections Administrators/Tax Assessors-
        Collectors)

FROM:   Keith Ingram, Director of Elections

DATE:   January 10, 2022

RE:     Procedures for Federal Write-In Absentee Ballots (FWABs) from FPCA Voters and
        Voters in Hostile Fire Pay and Combat Zones

In preparation for the March 1, 2022 primary, May 24, 2022 primary runoff, November 8, 2022 general election, and other 2022 elections, this memo will focus on procedures for receiving Federal Write-In Absentee Ballots ("FWABs") from Federal Postcard Application ("FPCA") voters and from voters in hostile fire pay or combat zones.

## Use of the Federal Write-In Absentee Ballot for General Election

The Federal Write-In Absentee Ballot is the federal form voters may use to vote before an election if they have not received their official ballot.  A voter who has submitted his/her FPCA, but has not received the official ballot, may use the FWAB as a write-in ballot to ensure that his/her vote is received.

A FWAB may be used in any election for any office for which balloting materials may be sent through email transmission under Section 101.104 of the Election Code, which includes primary elections.  A FWAB may also be used in any election in which there is a federal office on the ballot, a special election to fill a vacancy in the legislature, or any election held jointly with either of those elections.  (The voter does not have to ask for their ballot to be emailed to be entitled to use a FWAB; this just defines the category of elections to which the FWAB applies.)

As reminder, this means that the FWAB is not limited to federal offices on the general election ballot, but may include the state and county offices as well.  The FWAB may also include the offices in an election held jointly with the general election for state and county offices.  Please note that some voters still will not be eligible to receive a full ballot, but rather will be qualified to receive a federal-only ballot.  This includes voters voting under Chapter 114 of the Code, who have indicated that they are indefinitely away or have no intention to return to the United States.

In order for a voter to be entitled to use the FWAB, he or she must be a voter who is eligible to use the FPCA (an overseas citizen or a military voter, spouse, or dependent). The voter must also have filed the FPCA with the early voting clerk by the eleventh day before election day.  If you have an FPCA on file for a voter and receive a FWAB from the voter <u>before</u> you have mailed or emailed the official ballot, you must continue with normal procedures and mail or email the voter

STATE034974

an official ballot. If the official ballot is returned by the deadline, you will forward the official ballot to the early voting ballot board. If the deadline for receiving military and overseas ballots passes and you have only the voter's FWAB, then forward the FWAB to the early voting ballot board for processing.

**Please note that the voter must have submitted the FPCA at the same time as or before submitting the FWAB**. If the FWAB is submitted before an FPCA or without an FPCA, it cannot be counted.  If a FWAB is filed with you, but you do not have a corresponding FPCA on file for that voter, we suggest that you immediately notify the voter by phone, email, or letter, that his or her FWAB will not be counted and that the voter must submit an FPCA by mail, fax, or as an attachment to an email before another FWAB is filed.  You may also wish to explain that the FWAB is a "back up" ballot and that by filing the FPCA, the voter will receive a full ballot from your office and that the FWAB will only be counted if the voter does not return the regular ballot.  Also, please note that no marked ballots can be emailed by the voter.  Therefore, a FWAB that is sent via email along with an image of an FPCA (which can be emailed), must be rejected.

Here is a link to the FPCA form: Federal Post Card Application.  The FWAB is available online through this link: Federal Write-In Absentee Ballot.

## Voters in Combat Zones/Hostile Fire Pay Areas

Pursuant to Section 105.001 of the Election Code, military voters stationed in recognized hostile fire or imminent danger pay areas, or areas designated as combat zones by the President of the United States, are authorized to return an early voting ballot by telephonic facsimile transmission (fax). Only military voters on active duty and their spouses or dependents stationed in these areas qualify to submit their voted ballots in this manner.  (The ballot may not be returned by email regardless of category.)

Following this memo is a current list of all territories designated as hostile fire or imminent danger pay areas, or combat zones. The State of Texas continues to work with the Federal Voting Assistance Program ("FVAP") to implement this program in Texas.  The program operates as follows:

1. A voter in a designated zone receives, by mail or email, a ballot with the voting materials and envelopes from the early voting clerk, per normal procedure. The voter decides if he would like to return his ballot by fax. The voter may also choose to return the ballot by mail.
2. If the voter decides to return the ballot by fax, he may fax the ballot directly to the early voting clerk, along with the FVAP cover sheet located at: FWAB Fax Cover Sheet.  Please note that you may accept a faxed ballot directly from the voter.
3. The voter may fax the ballot to FVAP, which will then fax the following items to the Texas early voting clerk: (1) the faxed voted ballot; (2) the faxed cover sheet signed by the voter; and (3) the faxed cover sheet initiated by FVAP.
4. When the early voting clerk receives these materials, the faxed voted ballot is folded, placed in a ballot envelope and sealed. The ballot envelope, along with both faxed cover sheets and application to vote by mail or FPCA, is placed in the jacket envelope.
5. The early voting clerk must keep a record of the names of the voters whose ballots were received by fax. Before the early voting clerk forwards the faxed ballot to the early voting ballot board, he or she must be certain that: (1) no more than one faxed ballot has been received for the voter; and (2) the voter did not return the original ballot by mail.
   - If you have received more than one ballot, returned by fax and forwarded to you by FVAP, from the voter, then the first one received should be forwarded to the ballot board.

STATE034975

- o   If you have received both the original ballot from the voter, and also a ballot returned by fax and forwarded by FVAP, the first one received should be forwarded to the ballot board.
- o   Any subsequent ballots received from the same voter are considered not timely returned, and are <u>not</u> forwarded to the ballot board, but <u>are</u> retained by the early voting clerk.
6.  The jacket envelopes containing faxed ballots are delivered to the early voting ballot board along with the other early voting by mail ballots and are processed in the same manner as other ballots. However, since there will be no carrier envelopes for these ballots, the voter's signature on the fax cover sheet is compared with the voter's signature on the application for ballot by mail or FPCA.

**<u>Faxed Ballot Return Deadline/Other Procedures</u>**

- Faxed ballots must be received by the close of polls on election day in order to be counted. If a faxed ballot appears to have reached the FVAP office before 7:00 p.m. on election day, but did not reach **your** office by 7:00 p.m., the ballot is considered late. Faxed ballots received in accordance with Chapter 105 of the Election Code are <u>not</u> eligible to be counted late under Section 86.007 of the Code. **Late counting applies only to ballots returned by mail from outside the United States.**
- In order to be faxed, ballots must fit on an 8 ½" by 11" sheet of paper. Therefore, if the ballot is larger than 8 ½" by 11", you may receive **several** faxed sheets associated with one ballot.
- The early voting ballot board will count the faxed ballots in the regular manner. For counties using electronic voting equipment, the ballots are delivered to the central counting station with the other electronic ballots. The central counting station manager will determine whether to hand-count or duplicate the faxed ballots.

The Secretary of State will provide FVAP with the number to your office fax.  You will not be responsible for keeping your fax number up-to-date with FVAP.  **It is most important that you let our office know if you change your fax number so we can forward the change to FVAP.** You may wish to review your county's contact information in the Texas portion of the online voter's guide at FVAP Guide.

As previously noted, voters in designated hostile fire or imminent danger pay areas and combat zones may choose to fax their ballot directly to the county.  However, these voters may instead choose to fax the ballot to FVAP, which will then forward the ballot to the county. The fax numbers that qualified military voters use to fax their ballot to FVAP are: (703) 693-5527; DSN 223-5527; or toll-free, 800-368-8683 (from US, Canada, Guam, Puerto Rico, Virgin Islands).  If you (or your voters) have problems with any of these numbers, you may check for updated numbers at FVAP Texas Guide.

If you have any questions about any of the procedures addressed above, please contact the Elections Division toll-free at 1-800-252-2216.

KI:CA:MB

**Designated Hostile Fire or Imminent Danger Pay Areas (as of April 2021)**
https://comptroller.defense.gov/Portals/45/documents/fmr/Volume_07a.pdf

| Location | Qualifying Area |
|---|---|
| Afghanistan | land and airspace |
| Algeria | land |

STATE034976

Page 4

| | |
|---|---|
| Azerbaijan | land |
| Burundi | land |
| Cameroon (Far North and North) | land |
| Chad | land |
| Colombia | land |
| Congo, Democratic Republic of (formerly Zaire) | land |
| Cuba/Guantanamo Bay Detention Facilities | land |
| Djibouti | land |
| Egypt | land |
| Ethiopia | land |
| Iran | land |
| Iraq | land and airspace |
| Israel | land |
| Jordan | land |
| Kenya | land |
| Kosovo | land and airspace |
| Lebanon | land |
| Libya | land and airspace |
| Malaysia (Sabah) | land |
| Mali | land |
| Mediterranean Sea (Water area of the Mediterranean Sea extending from the North African Coast northward into Mediterranean Sea, bounded on the east at 26° 00' E longitude, extending north to 34° 35' N latitude, extending west to the East Coast of Tunisia.) | sea |
| Niger | land |
| Pakistan | land |
| Philippines | land |
| Saudi Arabia | land |
| Somalia | land and airspace |
| Somalia Basin (Water area of the Somalia Basin with coordinates: 11°10'N-51°15'E; 06°00'N-48°30'E; 05°00'N-50°30'E; 11°30'N-53°34'E; 05°00'N-50°30'E; 01°00'N-47°00'E; 03°00'S-43°00'E; 01°00'S-41°00'E; and 06°00'N-48°30'E | sea |
| South Sudan | land and airspace |
| Sudan | land and airspace |
| Syria | land and airspace |
| Tunisia | land and airspace |
| Turkey (Land area, excluding the Turkish Straits (i.e., the Dardanelles, the Sea of Marmara, and the Bosporus Straits) and including the limited airspace south of 37-45N and east of 43-00E (excluding geographic area encompassing 40-mile radius from center of Izmir, Turkey) | land |
| Uganda | land |
| Yemen | land |

# EXHIBIT 60

Prescribed by Secretary of State
Sections 63.0011, 87.0271, 87.0411
Texas Election Code
1/2022 (6-14)

| | |
|---|---|
| Authority Conducting Election (Autoridad Administrando la Elección) | Date of Election (Fecha de la Elección) |
| Title of Election (Título de la Elección) | Printed Name of Early Voting Clerk's Representative Nombre de Representante del Secretario de Votación Adelantada |

## CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE

| Name of Voter (Nombre del Votante) | Voter's VUID# (Número de registración del votante (VUID#)) |
|---|---|

**Early Voting Clerk:** Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)

| 1. | Voter Did Not Sign the Carrier Envelope Certificate (El votante no firmó el Sobre de Envío) |
|---|---|
| 2. | Signature on Carrier Envelope Certificate Could Not Immediately be Determined to be That of the Voter (No se pudo determinar inmediatamente que la firma en el Certificado del Sobre de Envío es la del votante) |
| 3. | Required Statement of Residence Was Not Included with the Carrier Envelope (La Constancia de Domicilio Permanente requerida no se incluyó con el Sobre de Envío) |
| 4. | Missing or Incorrect Personal Identification Numbers or Social Security Number (Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos) |

_____  _____  _____  _____  **or** (o)  _____  _____  _____  _____
**Texas Driver's License or Texas Personal Identification Card**                    **Last 4 Digits of Social Security Number**
(Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas)     (Los 4 últimos dígitos de número de Seguro Social)

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.

| 5. | Incomplete Information with Respect to a Witness (Información incompleta con respecto a un testigo) |
|---|---|

_____                                    _____
**Signature of Witness** (Firma del testigo)                  **Printed Name of Witness** (Nombre en letra de molde del testigo)

_____
**Street Address of Witness** (Domicilio residencial del testigo)

**Signature Box**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct.
(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta).

X _____
**Signature of Voter** (Firma del Votante)

## STATEMENT OF RESIDENCE (CONSTANCIA DE DOMICILIO PERMANENTE)

For persons whose residence address does not match the voter registration on the list of registered voters
Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos

| Last Name include suffix, if any Apellido Incluir sufijo, si lo hay (Jr., Sr., III) | First Name Nombre de Pila | Middle Name (if any) Segundo Nombre (si lo hay) | Former Name Apellido Anterior |
|---|---|---|---|

**Residence Address:** Street Address and Apartment Number, City State, and Zip.
If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address)
Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal.
(Si no existe un domicilio, describe donde vive (no incluya apartados postales, rutas rurales o dirección del trabajo)

**Gender** (Optional)
Sexo (Opcional)
☐ Male Masculino
☐ Female Femenino

**Mailing Address:** Address, City, State, and Zip (If mail cannot be delivered to your residence address) Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial)

**Date of Birth:** Month, Day, Year
Fecha de Nacimiento: Mes, Día, Año
_____ / _____ / _____

| City and County of Former Residence in Texas Ciudad y Condado de residencia anterior en Texas | City and County of Current Residence in Texas Ciudad y Condado de residencia actual en Texas | Telephone Number (Optional) Include Area Code Teléfono (Opcional) – Incluya Código de Área |
|---|---|---|

**Texas Driver's License Number or Texas Personal Identification Card Number** (Issued by the Department of Public Safety)
Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública)

If you do not have a Texas Driver's License or Personal Identification Card, give the last 4 digits of your Social Security Number. Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social.

_____  _____  _____  _____

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o número de Seguro Social.

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing. Entiendo que el proporcionar falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.
- Soy residente de este condado y ciudadano de los Estados Unidos; y
- No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, periodo de libertad condicional, o he sido indultado; y
- No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria que estoy totalmente mentalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto

X _____        Date: _____ / _____ / _____
                                (fecha:)

**Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.**
Firma del solicitante o su agente (apoderado) y relación de éste con el solicitante, o nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.

STATE019841

EXHIBIT
61

📱 **Mobile Version | Contact | En Español**



Search _____ [Go]

## Track My Ballot and Correct ID Information

Once you've sent your ballot by mail to your county's <u>Early Voting Clerk</u>, you can check the status of your mail-in ballot through our <u>**Ballot by Mail Tracker**</u>, available on the Texas Secretary of State's '<u>My Voter Portal</u>.'

To track your mail-in ballot, you must enter the following information:

- First Name
- Last Name
- Date of Birth
- The last 4 digits of your Social Security Number
- Your Driver's License or Department of Public Safety Personal ID number
- Your residential address (must appear exactly as listed on your voter registration record. To look up the address listed on your voter registration record, use the 'Am I Registered?' tool)
- City
- ZIP code

**How to Correct a Defect on your Application for Ballot by Mail**

If you received a <u>notice (PDF)</u> that your ABBM was rejected because you did not provide an identification number or the number included on your ABBM did not match one of the numbers associated with your voter registration record, you may correct the defect online through the Texas Secretary of State's <u>Ballot by Mail Tracker</u>. When you log in to the Ballot by Mail Tracker, you will be prompted to enter your personal identification number(s). Once your personal identification number is validated by the Mail Ballot Tracker, the Application for a Ballot by Mail you previously submitted will be processed.

To utilize the Ballot by Mail Tracker, you must enter:

- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number; AND
- Your residence address as listed in your voter registration record

If you received a notice that your ABBM was rejected for another reason, you may be able to cure the defect by <u>submitting a new ABBM (PDF)</u> to your county's Early Voting Clerk with the corrected information.

To confirm your information as listed on your voter registration record be sure to visit the 'Am I Registered?' tool on the Texas Secretary of State's <u>My Voter Portal</u>.

If you have specific questions about your registration or the status of your Application for Ballot by Mail, you should <u>contact your county elections office</u>.

**\*\*NOTE: You can also use the process above to add or correct identification information on your <u>mail ballot carrier envelope (PDF)</u>.**

**Switch to Mobile Site**

# EXHIBIT 62

Texas Office of the Secretary of State
# Voter Name and Address Changes
## Welcome

This free service is offered to registered Texas voters who need to submit Name and/or Address changes.

You may use this service to update your Texas voter registration information. Allowable updates include changes to your current residential address and/or your changes to your name.

### NOTE:

**If you update your county of residence to a new county, your voter registration in your current county will be cancelled. Your voter registration information will be updated to the corresponding county of your new residential address.**

You will receive a new Voter Certificate in the mail within 30 days of submitting a change through this service. If you submit changes less than 30 days prior to an election, you must vote at your current polling location.

## To use this service, you need your:

- Current Driver License or ID Card
- Social Security Number
- Voter Registration Card VUID (Voter Unique Identifier) Number may be obtained from your County Voter Registrar .

**This service does not change your address or name on your Driver License. Please visit the Driver License and ID Card Online Services website to update your address.**

For technical assistance with this application, please call 1-877-452-9060 or send an email to Texas.gov Help.

For questions regarding voter registration you may contact your local County Voter Registrar .

Privacy - Terms

EXHIBIT
63

TEXAS SECRETARY OF STATE

# Training for EVBB/SVC Members on New Ballot by Mail Procedures

General Election for State and County Officers (GESCO)

Texas Secretary of State – Elections Division



10/11/2022          Texas Secretary of State Elections Division          1

---

TEXAS SECRETARY OF STATE

# TOPICS COVERED

- Changes to ABBMs
- Changes to FPCA Process
- New Requirements for the Carrier Envelope
- New Process for EVBB/SVC
- Possible Scenarios Regarding Carrier Envelopes
- Notifying Voters of Defects
- Correcting Defects
- Impacts on FPCA Voters
- New Forms
- Early Voting Clerk Providing Notification of Defects



10/11/2022          Texas Secretary of State Elections Division          2



CHANGES TO ABBMs

10/11/2022          Texas Secretary of State Elections Division          3

# CHANGES TO THE ABBM

**Box 1:  Personal Identification Numbers – Voter must provide:**

• Texas Driver's License, Texas Personal Identification Number, or Election Identification Certificate
  Number issued by DPS, OR
• Last four digits of SSN, OR
• An indication that they have not been issued either number.

• **The personal identification information provided by the voter on the ABBM MUST be validated
  off of the voter's voter registration record.**

10/11/2022          Texas Secretary of State Elections Division          4

STATE152427

## TEXAS SECRETARY OF STATE

# Key Points to Remember

- Voters are not required to provide both types of identification numbers.
- If a voter provides both numbers, only one number has to match the VR record.
- Early Voting Clerks should not delay in mailing rejection notices.
- Voters are not required to use the Ballot by Mail Tracker to correct missing information.  They can submit a new ABBM or a new VR application, whichever is applicable.
- County early voting clerks are REQUIRED to submit rejected ABBM information to TEAM (or though their vendor, if it provides data to TEAM).  This is what populates the Ballot by Mail Tracker.

10/11/2022                    Texas Secretary of State Elections Division                    5

## TEXAS SECRETARY OF STATE

# CHANGES TO FPCA PROCESS

10/11/2022                    Texas Secretary of State Elections Division                    6

STATE152428

FPCA Signature Sheet

- Voter Information
- Personal Identification Information
- Witness/Assistant information, if applicable
- Voter Signature



# Impacts on FPCA Voters

- To facilitate the mailing of FPCA balloting materials, early voting clerks may use any type of mailing envelope that contains the Official Election Mail logo and the required postage-paid information **as long as the early voting clerk includes a required signature sheet for the voter to complete**.

- All FPCA voters must be provided with an Official Election Signature Sheet for an FPCA Voter if their balloting materials were sent by email.

- **If the balloting materials were sent by physical mail, but the early voting clerk is using one of the FVAP envelopes that does not contain all of the requirements for the carrier envelope, the voter MUST be provided with an Official Election Signature Sheet for an FPCA Voter to return with their marked ballot.**

- **What this means for SVC/EVBB review?** There may be an increased number of signature sheets for FPCA voters.

10/11/2022                     Texas Secretary of State Elections Division                     8

STATE152429

Texas Secretary of State Elections Division                                     10/11/2022





STATE152430





- Voter must add their personal identification information to the Carrier Envelope

STATE152431

TEXAS SECRETARY OF STATE

# Key Points to Remember

* Voters are not required to provide both types of identification numbers.

* If a voter provides both numbers, only one number has to match the VR record.

* The secrecy flap may be opened by the early voting clerk's staff for processing.

* Be mindful with these carrier envelopes, as they have personally identifiable information that needs to be guarded.

* Carrier envelopes are not public information at this point in the election process.



10/11/2022                Texas Secretary of State Elections Division                13

---

TEXAS SECRETARY OF STATE

# NEW PROCESS FOR EVBB/SVC



10/11/2022                Texas Secretary of State Elections Division                14

STATE152432

TEXAS SECRETARY OF STATE

# New Comparison Requirements

- The EVBB shall only accept a ballot if the personal identification information (ex: SSN or TXDL) matches the voter registration record.
- The SVC/EVBB is matching the information on the carrier envelope to the **VR record**.
- The number on the carrier envelope does not have to be the same number on the ABBM – it must only match the VR record.

10/11/2022            Texas Secretary of State Elections Division            15

TEXAS SECRETARY OF STATE

# Rebuttable Presumption

- If the personal identification information provided matches the VR record, the signatures on the ABBM and the carrier envelope are rebuttably presumed to be those of the voter.
- The presumption may be rebutted by presenting other past signatures on file with the EVC or VR that would support a finding that the signatures on the carrier envelope and ABBM are not those of the voter.



10/11/2022            Texas Secretary of State Elections Division            16

STATE152433

TEXAS SECRETARY OF STATE

## POSSIBLE SCENARIOS REGARDING CARRIER ENVELOPES



10/11/2022            Texas Secretary of State Elections Division            17

---

TEXAS SECRETARY OF STATE

## Possible Scenarios – Carrier Envelopes

- **Scenario 1**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record. The SVC or EVBB has completed the verification of personal identification information and should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.



10/11/2022            Texas Secretary of State Elections Division            18

STATE152434

## TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 2**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record, but it is a different type of number than what the voter listed on the ABBM. (Example: Voter provided last four digits of social security number on ABBM and a driver's license number on carrier envelope.) Because the voter's voter registration record contains both personal identification numbers, the SVC or EVBB is able to verify the voter's identity. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted.**



10/11/2022                     Texas Secretary of State Elections Division                     19

---

## TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 3**: Voter provides the last four digits of their social security number on the carrier envelope. The voter registration record contains a driver's license number and social security number. The SVC or EVBB is able to validate that the partial social security number on the carrier envelope matches the number in the voter's voter registration record. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted.**
  - NOTE: The obligation of the SVC or EVBB in reviewing the identification information on a carrier envelope is to determine if the information provided by the voter on the envelope identifies the same voter identified on the voter's voter registration record. (Secs. 87.027, 87.0271, 87.041(b)(8), 87.0411).

10/11/2022                     Texas Secretary of State Elections Division                     20

---

Texas Secretary of State Elections Division                                                                10/11/2022

TEXAS SECRETARY OF STATE

## Possible Scenarios – Carrier Envelopes

- **Scenario 4**: Voter indicates on the carrier envelope that they have not been issued any of the required personal identification numbers, and the voter's voter registration record does not contain any of these numbers. The SVC or EVBB has completed the verification of personal identification information, and it must rely on the signature comparison process for this part of the review. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted**.



10/11/2022                         Texas Secretary of State Elections Division                              21

---

TEXAS SECRETARY OF STATE

## Possible Scenarios – Carrier Envelopes

- **Scenario 5**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter does not include an identification number on the carrier envelope. The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope, as described in more detail below. If the voter timely corrects the defect, and there are no other grounds for rejection, **the ballot would be accepted.**



10/11/2022                         Texas Secretary of State Elections Division                              22

---

Texas Secretary of State Elections Division                                                                11

**STATE152436**

TEXAS SECRETARY OF STATE

## Possible Scenarios – Carrier Envelopes

- **Scenario 6**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter indicates on the carrier envelope that they have not been issued one of the applicable identification numbers.  The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope.  If the voter timely corrects the defect, and there are no other grounds for rejection, **the ballot would be accepted.**

10/11/2022                 Texas Secretary of State Elections Division                 23

TEXAS SECRETARY OF STATE

## NOTIFYING VOTERS OF DEFECTS



10/11/2022                 Texas Secretary of State Elections Division                 24

STATE152437

---

**TEXAS SECRETARY OF STATE**

# Meeting Requirements

| | First Day Mail Ballots can be Reviewed | Texas Election Code Section |
|---|---|---|
| Signature Verification Committee (All counties and local political subdivisions) | 20th day before election day | Sec. 87.027(f) |
| Early Voting Ballot Board (Counties with a population of 100,000 or more) | 12th day before election day | Sec. 87.0222(a) |
| Early Voting Ballot Board (Counties with a population under 100,000) | 4th day before election day | Sec. 87.022 |

10/11/2022          Texas Secretary of State Elections Division          25

---

**TEXAS SECRETARY OF STATE**

# Signature Verification Committee Corrective Action Process

- The following defects are eligible for correction when identified by the signature verification committee (Sec. 87.0271(a)):
  - The voter did not sign the carrier envelope certificate.
  - The SVC cannot determine whether the signature on the carrier envelope is that of the voter.
  - The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
  - If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    - **NOTE:** Incomplete information about an assistant cannot be corrected and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.



10/11/2022          Texas Secretary of State Elections Division          26

---

STATE152438

**TEXAS SECRETARY OF STATE**

# Early Voting Ballot Board
# Correction Process

- The following defects are eligible for correction when identified by the early voting ballot board (Sec. 87.0411(a)):
  - The voter did not sign the carrier envelope certificate.
  - The EVBB cannot determine whether the signature on the carrier envelope is that of the voter.
  - **The voter did not include the required statement of residence.**
  - The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
  - If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    - **NOTE:** Incomplete information about an assistant cannot be corrected by EVBB/SVC and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.
- Only the EVBB has the authority to open the sealed part of carrier envelope to determine if a statement of residence (SOR) has been submitted.
  - The only exception is for FPCA voters. An SVC must open the sealed envelope to obtain the Signature Sheet for FPCA Voter, as this is necessary for the signature verification process.



10/11/2022                 Texas Secretary of State Elections Division                 27

---

**TEXAS SECRETARY OF STATE**

# Corrective Action Timelines

- **Returning the Carrier Envelope by Mail:** If the SVC or EVBB determines that it would be possible for the voter to correct the defect and return the carrier envelope **before the time the polls are required to close on election day,** the SVC or EVBB **must** mail the original defective carrier envelope to the voter. This determination must be made not later than the second business day after the SVC or EVBB discovers a defect, and before the SVC or EVBB decides whether to accept or reject a timely delivered mail ballot. (Secs. 87.0271(b), 87.0411(b)).

- **Notifying the Voter of Defect by Phone or Email:** If the SVC or EVBB determines that it would NOT be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, **the SVC or EVBB may notify the voter of the defect by telephone or email** and inform the voter that the voter may come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. (Secs. 87.0271(c), 87.0411(c)).



10/11/2022                 Texas Secretary of State Elections Division                 28

STATE152439

TEXAS SECRETARY OF STATE

If the SVC or EVBB takes one of the actions described above, the committee or board <u>must</u> take that action with respect to each ballot in the election to which these options apply.

(Secs. 87.0271(d), 87.0411(d)).

10/11/2022          Texas Secretary of State Elections Division          29

---

TEXAS SECRETARY OF STATE

# Recommendations

- The SOS recommends that before qualifying mail ballots, the EVBB/SVC meet with the early voting clerk to determine dates to convene and to establish timelines for the corrective action process. (Secs. 87.0411, 87.0271).

10/11/2022          Texas Secretary of State Elections Division          30

STATE152440

TEXAS SECRETARY OF STATE

# Establishing Timelines and Guidelines for the Corrective Action Process

- The SVC or EVBB must set a uniform policy for when carrier envelopes will be mailed to the voter versus when voters will be notified of the defect by phone or email.
- The SVC or EVBB should determine whether it will notify voters of a defect by both phone and email, if both are available.
- The SVC or EVBB should establish a policy for making multiple attempts to reach a voter if it is unsuccessful in reaching a voter by phone or email on the first attempt.
- Consider U.S. Postal Service (USPS) guidelines.  Ask your EVC to consult with your local post office.
- **SOS Recommendation**: The SVC or EVBB should consider implementing a policy to provide notification of a defect by phone or email to all voters whose ballots are reviewed by the SVC or EVBB on or after the 14th day before election day (approximately 10 business days).  This may be modified based on discussions with your local USPS representatives.

10/11/2022              Texas Secretary of State Elections Division              31

---

TEXAS SECRETARY OF STATE

# Carrier Envelope Returned by Mail

1. Stamp or mark the voter's carrier envelope with the words "**Corrective Action Required.**"
2. Note the appropriate defect on the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail.
3. Mail the voter's defective carrier envelope along with the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail.  The early voting clerk should include an envelope for the voter to return the corrected carrier envelope to the early voting clerk.  This envelope should contain the Official Election Mail logo prescribed by the USPS. The voter must be notified if the return envelope needs additional postage.
4. Enter the voter's information on the Roster of Voters with Defective Carrier Envelopes – Returned to the Voter by Mail.

**\*The actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022              Texas Secretary of State Elections Division              32

STATE152441

Texas Secretary of State Elections Division                                      10/11/2022

---

### TEXAS SECRETARY of STATE

# Notifying Voter by Phone or Email
# (Carrier Envelope is NOT mailed to Voter)

- **If notifying by email:**
    1. Send the voter the Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email via email.
    2. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the voter should be noted on the roster.
    3. **Parameters for Email Notification:** The SOS recommends that the early voting clerk set up an email address for corrective action notifications. The early voting clerk and the SVC or EVBB should establish rules and procedures for utilizing this email address. Any emails sent or received through the corrective action process are considered election records under the Election Code, are subject to the Public Information Act, and should be retained by the general custodian of election records. The general custodian should consult with their attorney regarding any requests for such emails, as certain information may be exempt from disclosure under the Public Information Act.

**\*The actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022                       Texas Secretary of State Elections Division                       33

---

### TEXAS SECRETARY of STATE

# Notifying Voter by Phone or Email
# (Carrier Envelope is NOT mailed to Voter)

**If notifying by phone:**
1. Contact the voter using any known phone number on file with the early voting clerk or in the possession of the SVC or EVBB.
   - **NOTE:** As a reminder, the voter registrar may not transcribe, copy or otherwise record a telephone number furnished on a voter registration application. (Sec. 13.004). The SVC or EVBB may be able to review a voter registration application at the voter registrar's office to obtain a phone number. The registrar may also read a phone number from a voter registration application to a member of the SVC or EVBB, if necessary.
2. The SVC or EVBB should create a phone script that explains to the voter that the voter's mail ballot was received by the early voting clerk's office and has been reviewed by the SVC or EVBB, whichever is applicable.
3. The SOS recommends that the SVC or EVBB confirm the voter's identity using publicly available information.
   - **Example:** Ask the voter to confirm their voter registration address and whether they requested a mail ballot for the given election.
4. The voter should be told that upon review of the carrier envelope, the SVC or EVBB discovered a defect in the carrier envelope. **The specific defect should be explained.**
5. The SVC or EVBB should explain the process for the voter to correct the defect as well as the process to cancel their mail ballot and vote in person during early voting or on election day.
6. Provide a return phone number that the voter may use to confirm that they were contacted by the SVC or EVBB. The number provided should be the number of the early voting clerk's office so the voter can verify this information and obtain details about the corrective action process during times that the SVC or EVBB are not meeting.
7. The voter's name should be entered on the Roster and the action taken by the SVC or EVBB should be noted on the roster.

**\*Many of the actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022                       Texas Secretary of State Elections Division                       34

---

Texas Secretary of State Elections Division                                      17

**STATE152442**

TEXAS SECRETARY OF STATE

## If the SVC or EVBB is unable to contact the voter...

1. The SVC or EVBB should leave a detailed message explaining that the SVC or EVBB determined there was a defect in the voter's carrier envelope and explain the process for correcting the defect

2. The SVC or EVBB should NOT provide any details related to a voter's personally identifiable information on a voicemail or with a person who is not the voter.

3. The SVC or EVBB should leave a return number that the voter may use to validate the information provided by phone.

4. The SVC or EVBB should mail the voter a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

5. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the SVC or EVBB should be noted on the roster.

- If the SVC or EVBB does not have a phone number or email to notify the voter: The SVC or EVBB should mail a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

**\*Many of the actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**

10/11/2022                    Texas Secretary of State Elections Division                    35

---

TEXAS SECRETARY OF STATE

# Key Points to Remember

- Any actions taken by the SVC or EVBB shall be uniformly applied to every ballot in the election to which this procedure applies.  (Secs. 87.0271(d), 87.0411(d)).

- A poll watcher is entitled to observe any action taken by the SVC or EVBB related to the corrective action process.  (Secs. 87.0271(e), 87.0411(e)).

- Poll watchers may not transcribe or make notes of any voter's personally identifiable information while observing the activities of the SVC or EVBB.



10/11/2022                    Texas Secretary of State Elections Division                    36

STATE152443



**CORRECTING DEFECTS**

10/11/2022          Texas Secretary of State Elections Division          37

---

TEXAS SECRETARY OF STATE

# How do Voters Correct Defects?

- **If the carrier envelope was mailed back to the voter, the voter MUST return the carrier envelope with the revisions/corrections.**
  - **Deadline for Correction:** If the SVC or EVBB has returned the voter's carrier envelope by mail for correction, the voter also MUST return the carrier envelope to the early voting clerk no later than 7:00 p.m. on election day for the ballot to be processed and counted. (Secs. 87.0271(b), 87.0411(b)).

- **If the carrier envelope was NOT mailed back to the voter, the voter may correct the defects in the following ways:**
  - Utilizing the BBM Tracker for defects related to a missing or incorrect personal identification numbers.
  - Appearing in person at the EV clerk's office and submitting a Corrective Action Form.
  - Cancelling their mail ballot and voting in person.
  - **Deadline for Correction:** This corrective action process must occur no later than the 6th day after election day. The EVBB cannot finally reject a ballot before the 7th day after election day. (Secs. 87.0271(g), 87.0411(g)).

**Corrective actions taken by the voter MUST be provided to the EVBB for their final review of the ballot before determining acceptance or rejection.**

10/11/2022          Texas Secretary of State Elections Division          38

---

STATE152444

TEXAS SECRETARY OF STATE

# Correcting Defect by Cancellation

- After receiving a Notice of Carrier Defect by mail or receiving notification via email or phone, the voter may opt to cancel their ballot by mail and vote a regular ballot in person. All cancellations must be completed in accordance with Section 84.032. If the voter is an Annual ABBM voter, a cancellation request submitted for these purposes applies only to the current election unless the voter specifically requests to cancel their Annual ABBM. (Sec. 84.038).

- There is no process under Texas law by which a voter can cancel a mail ballot application by phone. **All cancellations must be in writing and completed in accordance with Section 84.032 of the Texas Election Code**.

- See pages 13-14 of Advisory 2022-08 for more details.

10/11/2022          Texas Secretary of State Elections Division          39

TEXAS SECRETARY OF STATE

# IMPACTS ON FPCA VOTERS



10/11/2022          Texas Secretary of State Elections Division          40

STATE152445

# Impacts on FPCA Voters

- If the FPCA voter provides missing or incorrect identification information on their carrier envelope or signature sheet, or did not include the Official Election Signature Sheet for an FPCA Voter, the voter must be notified of the defect in the same manner as a regular ABBM voter.

- **Because the signature sheet is separate from the voted ballot and is authorized under state and federal law, FPCA voters who have a defect in their signature sheet have additional methods for returning this corrected or missing required documentation.**

- Specifically, an FPCA voter may submit a corrected signature sheet by email, fax, personal delivery, or mail.  The SVC or EVBB should make an appropriate notation on their roster to indicate how FPCA voters were notified of a defect and how the FPCA voter provided the corrected signature sheet to the SVC or EVBB. (Secs. 1.007, 31.003, 31.004, 87.0271(f), 87.0411(f), 101.007, 101.109).

10/11/2022          Texas Secretary of State Elections Division          41

# NEW FORMS

10/11/2022          Texas Secretary of State Elections Division          42

STATE152446

## TEXAS SECRETARY OF STATE

# Notice of Carrier Defect

- We have prescribed two versions of this form:
  - The Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail
  - The Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email

- The Notice of Carrier Defect contains the Corrective Action Form for Defective Carrier Envelope on the reverse side of the form.

10/11/2022            Texas Secretary of State Elections Division            43



## TEXAS SECRETARY OF STATE

# Corrective Action Form for Defective Carrier Envelope (6-14)

- **Top half of form contains the Corrective Action Form**

- Bottom half of form is the Statement of Residence

10/11/2022            Texas Secretary of State Elections Division            44

STATE152447

TEXAS SECRETARY OF STATE

## Roster of Voters with Defective Carrier Envelopes (Forms 8-20, 8-21, 8-22)

- EVBB/SVC should create a roster to track the corrective action process.
- SOS has prescribed three different sample forms for use by EVBB/SVC.
- EVBB/SVC can also track the information electronically or create their own roster.

10/11/2022                 Texas Secretary of State Elections Division                 45

TEXAS SECRETARY OF STATE

## Notice of Surrendered Ballot (6-13)

- Upon surrendering their mail ballot, the voter will be issued the **Notice of Surrendered Ballot by Mail**. The voter will take this form to their early voting or election day polling place and present the form to the election judge, entitling the voter to vote a regular ballot in person.

10/11/2022                 Texas Secretary of State Elections Division                 46

STATE152448



TEXAS SECRETARY OF STATE

# EARLY VOTING CLERK PROVIDING NOTIFICATION OF DEFECTS



10/11/2022          Texas Secretary of State Elections Division          47

---

TEXAS SECRETARY OF STATE

# Early Voting Clerk Notification of Defects

- Under Section 86.011(d) of the Code, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, **the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect.** Additionally, **the early voting clerk may notify the voter of the defect by phone** and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their ABBM and vote in person.
    - Early voting clerks may return carrier to voter for correction.
    - Early voting clerks may notify voter of defect by phone and inform the voter they can come to the EVC's office to correct defect or cancel their application.

10/11/2022          Texas Secretary of State Elections Division          48

STATE152449

---

TEXAS SECRETARY OF STATE

## Early Voting Clerk
## Notification of Defects

- What defects can an early voting clerk provide notice about?
  - Missing signature
  - Missing or incomplete witness information
  - Missing **assistant** information
  - If the early voting clerk is removing the secrecy flap before the ballot is sent to the SVC/EVBB:
    - Missing personal identification information
    - Incorrect personal identification information

10/11/2022       Texas Secretary of State Elections Division       49

---

TEXAS SECRETARY OF STATE

## Early Voting Clerk
## Notification of Defects

- If an early voting clerk chooses to notify voters of defects in their carrier envelope under Section 86.011(d), **the clerk must apply these procedures uniformly to all voters in similar circumstances.**

- **Poll watchers may be present for this process.** (Sec. 86.011(d)).



10/11/2022       Texas Secretary of State Elections Division       50

---

STATE152450



STATE152451

EXHIBIT
64

Message

| | |
|---|---|
| **From**: | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B3FBA6E4A38E415F84C198A226931A4A-HMARTINEZ |
| | [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B3FBA6E4A38E415F84C198A226931A4A-HMARTINEZ] |
| **Sent**: | 10/27/2022 6:08:57 PM |
| **To**: | ▓▓▓▓▓▓▓▓▓▓▓ |
| **CC**: | Elections Internet [Elections@sos.texas.gov] |
| **BCC**: | Christina Adkins [CAdkins@sos.texas.gov] |
| **Subject**: | Vote seems to be suppressed (EI Response) |

As an initial matter, thank you for your concern and for taking the time to send in the inquiry.

In order to best assist your daughter, please have her contact our office directly and as soon as possible.  We are happy to assist her with her ballot by mail issue(s).

Heidi Martinez
Managing Attorney – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.state.tx.us/elections

For Voter Related Information, please visit:



VOTETEXAS.GOV
POWERED BY THE *TEXAS SECRETARY OF STATE*

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Tuesday, October 25, 2022 7:16 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** Vote seems to be suppressed

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

My daughter is a registered voter and is a student that now lives out of state.  She sent her mail-in ballot application at the beginning of October.  The application asked for "EITHER" DL number "OR" SSN, so she put in the DL number.  Her application was then rejected.  We called Comal County and they said "her registration has her SSN, so she needs to put that".  First of all, if that were the case then the application should have said so to begin with! That's very misleading. The rejection letter also said that in order to fix that information on her ballot, she could simply log in to the ballot tracker.  However, the ballot tracker REQUIRES you to enter BOTH your SSN and DL number, so it denied her access because her voter registration apparently doesn't include SSN yet.  So there was no way to fix it.

After contacting numerous people, we were then instructed to go to txapps.texas.gov and use the "Voter name and address changes" form that is located there.  We successfully got into that site and were able to add her SSN and DL number to her voter registration.  The following day, she was finally able to get into the ballot tracker yet there was no ballot or mail in application associated with her name.  So once again, we called the county. They said that they could see that she added her SSN and DL number and they

would" take care of it".  The gal on the phone said as soon as she "rejects the ballot again", it will then show up on the ballot tracker and my daughter can then correct her information there and consequently, her original mail in application will then be accepted.  This elaborate and confusing process made zero sense to me , but I said "ok".  Now, my daughter can no longer log into the ballot tracker.  It is again saying that she doesn't exist.  This is beyond frustrating and completely unnecessary.  My daughter is a registered voter and has already voted in several elections.  Now, as a student attending college, you're telling her she cannot vote!  She cannot simply resend a new mail-in application because this long and drawn out process wasted too much time and it takes too long for mail to get back and forth from Maine.  This is a case of complete incompetence on someone's part and deception on the part of both the rejection letter we received and the State of Texas Secretary of State website.  Please let me know if there is anything else we can possibly do to allow my daughter to use her Constitutional right to vote, since she has done everything correctly up to this point but Texas insists on suppressing her vote with its idiotic and deceptive process!

Sincerely,

Comal County

STATE133482

EXHIBIT 65

Message

| | |
|---|---|
| **From**: | Elections Internet [Elections@sos.texas.gov] |
| **Sent**: | 10/9/2022 5:08:22 AM |
| **To**: | |
| **CC**: | Elections Internet [Elections@sos.texas.gov] |
| **Subject**: | RE: Vote Texas Contact Message |

Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

The Early Voting Clerk in your home Texas County is the one responsible for mailing all balloting materials to you. Please check with your county Early Voting Clerk as to the status of your ballot by mail.

Contact information for the Early Voting Clerk in your Texas County is available here:
https://www.sos.state.tx.us/elections/voter/county.shtml

Again, thank you for contacting our office.

**Elections Division**
Office of the Secretary of State
800-252-VOTE(8683)
www.sos.state.tx.us/elections/index.shtml
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

---

**From:**
**Sent:** Saturday, October 8, 2022 6:28 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:**
**Subject:** Vote Texas Contact Message

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

From:

I am voting by mail. Last election we had to put the identifying info we used when we originally registered to vote. I dont remember which ID I used so I put both Drivers license and last 3 digits of my social. Now the instructions say One form of ID. Do we still have to use what we originally registered with? Will we be penalized if we put more than one type of ID? Thank you

**CONFIDENTIAL**

**STATE128049**

EXHIBIT

66

Message

| | |
|---|---|
| **From:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Sent:** | 3/3/2022 3:26:56 PM |
| **To:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Subject:** | Fwd: Weekend Comparative Process |

Get Outlook for iOS

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Wednesday, February 16, 2022 11:43:49 AM
**To:** 'Lopez, Ashley' <alopez@kut.org>
**Subject:** FW: Weekend Comparative Process

Ashley,

Below is the report provided by our voter registration team back in December. They ran the numbers before we worked with DPS to backfill missing ID information for those who had either a missing TDL number or a missing SSN, and then ran the numbers afterward.

There was testimony on this that Keith provided last summer indicating approximately 2 million registered voters in Texas only had one number in their voter registration record. Jessica Huseman reported on this back in July 2021 for *Texas Monthly*.

After working with DPS, we were able to add any ID information from their files to voters' registration records to make them more complete in order to minimize the impact of a voter not having one or the other, and that number came down to approximately 737,000 as of December 20th. Alexa Ura from the *Texas Tribune* reported on this in mid-January 2022.

There are currently 17,183,996 registered voters in Texas, eligible for the March 1 primary election. Based on the data below, there are 844,340 registered voters who have either *only one* or *no* ID information in their voter registration record. That's about 4.9% of all registered voters in Texas. That means 95% have both numbers in their record.

Hope this helps clarify things. These are the numbers straight from the statewide voter registration database. To the extent that any county voter registrars you've spoken to maintain a different system, I'll let them explain that. All of them have access to the TEAM system.

Best,

-Sam

**From:** Kristi Hart
**Sent:** Monday, December 20, 2021 10:16 AM
**To:** Keith Ingram; Adam Bitter
**Subject:** Weekend Comparative Process

Good morning!

As you know, we ran the comparative process over the weekend. We did run queries prior to and following the process. That information is listed below.

| Query | Before | After |
|---|---|---|
| Number of active and suspense voting records with no TDL in the record: | 1,344,584 | 493,823 |
| Number of active and suspense voting records with no SSN in the record: | 1,165,612 | 422,259 |
| Number of active and suspense voting records with only 4 digits of SSN in the record: | 1,165,639 | 422,053 |
| Number of active and suspense voting records with neither TDL or SSN in the record: | 259,227 | 106,911 |
| Number of active and suspense voting records with full TDL but no SSN in the record: | 906,444 | 315,376 |
| Number of active and suspense voting records with at least 4 digits of SSN but no TDL in the record: | 1,085,062 | 386,881 |

STATE045838

# EXHIBIT 67

Message
| | |
|---|---|
| **From:** | Andre Montgomery [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1FB5BA11EA034BB18440CFDBD54FD914-ATMONTGOMER] |
| **Sent:** | 11/2/2022 6:12:02 PM |
| **To:** | |
| **CC:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | RE: Vote Texas Contact Message (EI Response) |

Good afternoon.

Section 86.001(f) (copied below) provides that an application for ballot by mail must include the same identifying numbers as the voter's registration information. Either the last four digits of the SSN or all the digits in a Texas identification card/driver's license are required to register to vote (or the applicant must indicate that they have not been issued either of these numbers). Although both numbers are not required, the number provided on the application for ballot by mail must match the number in the voter's registration record. This means that if the voter registered to vote using only the SSN, for example, the last four digits of that SSN must be provided on the application for ballot by mail. If the voter provided their Texas driver's license number instead, and that driver's license number is not associated with the voter's registration record, the application for ballot by mail would be rejected. Voters can add either number to their registration record by submitting a voter registration form and including the number on that application and marking the application as an update to their existing voter registration record. Additionally, either number can be added to the registration record by using the Texas.gov website.

On the Application for Ballot by Mail prescribed by the Office of the Secretary of State, instructions are included on the application which state the following: "If you have been issued one of the required numbers, but it is not associated with your voter registration record, please contact your local registrar to inquire about how to add one of those required numbers to your voter registration record." Therefore, we recommend that if a voter is unsure which number is associated with their voter registration record, the voter contract their county of registration to confirm which number is a part of their voter registration record and provide that number. It is also permissible for a voter to put both numbers on the application although only one number is required.

We hope this information will be helpful to you.

Elections Division Staff
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

          Sec. 84.002.  CONTENTS OF APPLICATION.  (a)  An early voting ballot
application must include:

          (1)  the applicant's name and the address at which the applicant
is registered to vote;

          (1-a)  the following information:

    (A) the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety;

    (B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or

    (C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B);

  (2) for an application for a ballot to be voted by mail on the ground of absence from the county of residence, the address outside the applicant's county of residence to which the ballot is to be mailed;

  (3) for an application for a ballot to be voted by mail on the ground of age or disability, the address of the hospital, nursing home or other long-term care facility, or retirement center, or of a person related to the applicant within the second degree by affinity or the third degree by consanguinity, as determined under Chapter 573, Government Code, if the applicant is living at that address and that address is different from the address at which the applicant is registered to vote;

  (4) for an application for a ballot to be voted by mail on the ground of confinement in jail, the address of the jail or of a person related to the applicant within the degree described by Subdivision (3);

  (5) for an application for a ballot to be voted by mail on any ground, an indication of each election for which the applicant is applying for a ballot;

  (6) an indication of the ground of eligibility for early voting; and

  (7) for an application for a ballot to be voted by mail on the ground of involuntary civil commitment, the address of the facility operated by or under contract with the Texas Civil Commitment Office or of a person related to the applicant within the degree of consanguinity described by Subdivision (3).

 (b) An application for a ballot to be voted by mail on the ground of absence from the county of residence must indicate that the applicant satisfies the requirements prescribed by Section 82.001.

 (b-1) A person may use the number of a driver's license, election identification certificate, or personal identification card that has expired for the purpose of fulfilling the requirement under Subsection (a)(1-a) if the license or identification is otherwise valid.

 (c) An application for a ballot to be voted by mail on the ground of disability must require the applicant to affirmatively indicate that the

applicant agrees with the statement, "I have a sickness or physical condition that prevents me from appearing at the polling place on election day without a likelihood of needing personal assistance or injuring my health," as prescribed by Section 82.002(a).

Sec. 86.001.   REVIEWING APPLICATION AND PROVIDING BALLOT.   (a)   The early voting clerk shall review each application for a ballot to be voted by mail.

(b)   If the applicant is entitled to vote an early voting ballot by mail, the clerk shall provide an official ballot to the applicant as provided by this chapter.

(c)   Except as provided by Section 86.008, if the applicant is not entitled to vote by mail, the clerk shall reject the application, enter on the application "rejected" and the reason for and date of rejection, and deliver written notice of the reason for the rejection to the applicant at both the residence address and mailing address on the application.   A ballot may not be provided to an applicant whose application is rejected.

(d)   If the application does not include the applicant's correct voter registration number or county election precinct of residence, the clerk shall enter the appropriate information on the application before providing a ballot to the applicant.

(e)   If the applicant does not have an effective voter registration for the election, the clerk shall reject the application unless the clerk can determine from the voter registrar that the applicant has submitted a voter registration application and the registration will be effective on election day.

(f)   If the information required under Section 84.002(a)(1-a) included on the application **does not identify the same voter identified on the applicant's application for voter registration** under Section 13.002(c)(8), the clerk shall reject the application.

(f-1)   If an application is rejected under Subsection (f), the clerk shall provide notice of the rejection in accordance with Subsection (c).   The notice must include information regarding the ability to correct or add information required under Section 84.002(a)(1-a) through the online tool described by Section 86.015(c).

(f-2)   If an applicant corrects an application for a ballot to be voted by mail online and that application subsequently identifies the same voter identified on the applicant's application for voter registration, the clerk shall provide a ballot to the applicant as provided by this chapter.

(g)   If a ballot is provided to the applicant, the clerk shall indicate beside the applicant's name on the list of registered voters that a ballot to be voted by mail was provided to the applicant and the date of providing the ballot unless the form of the list makes it impracticable to do so.

**From:** ████████████████████████████████

**Sent:** Monday, October 31, 2022 10:08 AM

**To:** Elections Internet <Elections@sos.texas.gov>

**Cc:** ████████████████████

**Subject:** Vote Texas Contact Message

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to                              .

From: ██████████████████████

When filling out my mothers VOTE BY MAIL form the county refused to send her a ballot due to not using a prior number "the last four numbers of her social security ID" instead using the STATE OF TEXAS Drivers License number. Since both were an option on the application Either Texas Drivers license or Last four of social security number I feel that this is an error in the APPLICATION For a Ballot by Mail. Ector County refuses to send her a ballot because she used her legal ID form of her Texas Drivers License.

CONFIDENTIAL

# EXHIBIT 68

**Message**

| | |
|---|---|
| **From:** | Kristi Hart [KHart@sos.texas.gov] |
| **Sent:** | 5/10/2022 10:06:23 PM |
| **To:** | Joe Esparza [JEsparza@sos.texas.gov]; Keith Ingram [KIngram@sos.texas.gov] |
| **CC:** | Sam Taylor [SMTaylor@sos.texas.gov]; Adam Bitter [ABitter@sos.texas.gov] |
| **Subject:** | RE: INETMAIL: Not able to vote |

This has been resolved.

The voter in question below has successfully cured her ballot through the ballot tracker and been provided information as to how to update her record with the county.

All is well.

**From:** Joe Esparza <JEsparza@sos.texas.gov>
**Sent:** Tuesday, May 10, 2022 4:28 PM
**To:** Kristi Hart <KHart@sos.texas.gov>; Keith Ingram <KIngram@sos.texas.gov>
**Cc:** Sam Taylor <SMTaylor@sos.texas.gov>; Adam Bitter <ABitter@sos.texas.gov>
**Subject:** RE: INETMAIL: Not able to vote

OK I saw you're contacting her – thank you for that.

**From:** Kristi Hart
**Sent:** Tuesday, May 10, 2022 4:04 PM
**To:** Joe Esparza <JEsparza@sos.texas.gov>; Keith Ingram <KIngram@sos.texas.gov>
**Cc:** Sam Taylor <SMTaylor@sos.texas.gov>; Adam Bitter <ABitter@sos.texas.gov>
**Subject:** RE: INETMAIL: Not able to vote

There is no record of a mail ballot in TEAM for the March primary election. For information on that, the county would need to be contacted.

Her ballot for the May 7th CA has been rejected by EVC for Missing TDL/SSN and is available on the tracker for correction. Using the information in her record, I am able to access her in the tracker easily.  The tracker does use ssn/state id as provided by dps but not sure if it is her most recent number.

Shall we have someone call her and walk her through this?

**From:** Joe Esparza <JEsparza@sos.texas.gov>
**Sent:** Tuesday, May 10, 2022 3:05 PM
**To:** Keith Ingram <KIngram@sos.texas.gov>; Kristi Hart <KHart@sos.texas.gov>
**Cc:** Sam Taylor <SMTaylor@sos.texas.gov>; Adam Bitter <ABitter@sos.texas.gov>
**Subject:** FW: INETMAIL: Not able to vote

Can y'all unpack this? I'd assume if she went through the ballot tracker to correct this would have allowed her to complete the VBM process.

**From:** Raymond Rodriguez <Raymond.Rodriguez@house.texas.gov>
**Sent:** Tuesday, May 10, 2022 2:09 PM
**To:** Joe Esparza <JEsparza@sos.texas.gov>
**Subject:** FW: INETMAIL: Not able to vote

**CONFIDENTIAL**

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Mr. Esparza,

I was hoping to get in contact with a liaison from your office to assistant me with this case. Would you be able to provide a contact for me?

Best regards,

Best regards,

**Raymundo Rodríguez**

Legislative Assistant
State Representative Dan Huberty
512-463-0520
Capitol Office GS.2

---

**From:** Amy Rister <Amy.Rister@house.texas.gov> **On Behalf Of** District127 Huberty
**Sent:** Tuesday, May 10, 2022 1:20 PM
**To:** Raymond Rodriguez <Raymond.Rodriguez@house.texas.gov>
**Subject:** FW: INETMAIL: Not able to vote

Please contact the Secretary of State's office. They don't have Government Relations so you'll have to find a press or executive contact over there.

**Amy Rister**

*Chief of Staff*
State Representative Dan Huberty
512-463-0520
Capitol Office GS.2

---

**From:**
**Sent:** Monday, May 9, 2022 2:55 PM
**To:** District127 Huberty <District127.Huberty@house.texas.gov>
**Subject:** INETMAIL: Not able to vote

**Prefix:** Mr
**First Name:**
**Middle Name:**
**Last Name:**
**Suffix:**
**Title:**
**Business:** Self

**CONFIDENTIAL**

**Address line 1:** ██████████████
**Address line 2:**
**City:** HUMBLE
**State:** TX
**Zipcode:** 77346
**Phone:** ████████
**E-mail:** ████████████

**Subject:**
Not able to vote

**Message:**
Dan Huberty: You and the rest of your buddies have totally screwed up on voting by mail. My wife ████ was not able to vote in the recent primaries, because of the law you passed. ████ is handicap and it is just easier for her to vote by mail. She filled out the required forms with proper identification numbers and she received the mail-in ballots. She completed the ballots and added her Texas Personal Identification Number to the ballots and mailed them in. She just got back a rejection notices of her votes because - Texas database does NOT have her Texas Personal Identification Number, it was never updated. ████ registered to vote some 40+ years ago, when she was still driving and has a Texas Driver License. She can not drive, so she got a Texas Personal Photo Id for voting and Identification, etc. a couple years ago. We were thinking if you changed the law - that you would also change voter Database to include such items as Texas Personal Photo ID number issued after the voter registered to vote. All your forms say that is acceptable and should be used. The Republicans need to go back and fix the system - so that ████ and many others still have their right to vote. In the past 40+ years both ████ and I have voted for Republicans in most elections. BUT NO MORE!!!! You need to complete the work and get the problem fixed. ████████████

**ComputerIP:** ████████████
**MemberDistrict:** 127

CONFIDENTIAL

# EXHIBIT 69

Message

| | |
|---|---|
| **From**: | Elections Internet [Elections@sos.texas.gov] |
| **Sent**: | 4/11/2022 6:26:24 PM |
| **To**: | ▐▐▐▐▐▐▐▐▐▐ ; ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ |
| **CC**: | Elections Internet [Elections@sos.texas.gov] |
| **Subject**: | RE: Need Identification Card Number in voter registration database, not old Driver's License Number |

Hello ▐▐▐▐ :

Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

The Early Voting Clerk in your home Texas County is the one responsible for mailing all balloting materials to you. Please check with your county Early Voting Clerk as to the status of your ballot by mail.

Contact information for the Early Voting Clerk in your Texas County is available here:
https://www.sos.state.tx.us/elections/voter/county.shtml


Again, thank you for contacting our office.


**Elections Division**
Office of the Secretary of State
800-252-VOTE(8683)
www.sos.state.tx.us/elections/index.shtml
For Voter Related Information, please visit:


**VOTETEXAS.GOV**
POWERED BY THE TEXAS SECRETARY OF STATE

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*


To better serve you, the Texas Secretary of State is conducting a "Customer Satisfaction Survey." Your responses are confidential and will be used only for the purposes of evaluating our services. Please consider taking the survey, and thank you for your time.


**From:** ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐
**Sent:** Monday, April 11, 2022 12:14 PM
**To:** Elections Internet <Elections@sos.texas.gov>; ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐
**Subject:** Need Identification Card Number in voter registration database, not old Driver's License Number

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

▐▐▐▐▐▐▐▐ is 94 years old. After his Driver's License expired in 2017 he decided not to renew it but rather to get an Identification Card instead. His application for ballot by mail was rejected. Checked his voter registration status at votetexas.com and determined that his old expired Driver's License number is still In the database, not his current Identification Card number. Enclosed is a scan of his expired Driver's License and his current Identification Card. Please update the database so that his Identification Card number is linked to his voter registration.

**CONFIDENTIAL**                                                                    **STATE133375**

Thanks

Sent from Mail for Windows

CONFIDENTIAL

STATE133376