EXHIBIT 80

Keith Ingram                                        March 28, 2023

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION
   LA UNION DEL PUEBLO ENTERO,    )
3  et al.,                        )
                  Plaintiffs,     )
4       vs.                       )Civil Action No.
   STATE OF TEXAS, et al.,        )5:21-cv-844(XR)
5                 Defendants.     )(Consolidated Cases)

6

                  ------------------------
7                     ORAL DEPOSITION OF
                      KEITH INGRAM
8                     March 28, 2023
                        Volume 1
9                 ------------------------

10

11      ORAL 30(b)(1) DEPOSITION OF KEITH INGRAM, Volume

12  1, produced as a witness at the instance of the

13  Plaintiffs, and duly sworn, was taken in the

14  above-styled and numbered cause on March 28, 2023, from

15  9:15 a.m. to 4:18 p.m., before Dana Shapiro, CSR, in

16  and for the State of Illinois, reported by machine

17  shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18  pursuant to the Federal Rules of Civil Procedure and

19  any provisions stated on the record or attached

20  hereto.

21

22

23

24

25
```



Keith Ingram

March 28, 2023
Pages 2 to 5

## Page 2

```
1          A P P E A R A N C E S
2
3   FOR PLAINTIFFS OCA/REVUP TEXAS (via ZOOM):
4   MS. LUCIA ROMANO
    DISABILITY RIGHTS TEXAS
5   1500 McGowen, Suite 100
    Houston, Texas 77004
6   713-974-7691
    lromano@disabilityrightstx.org
7            -and-
    MS. COURTNEY LUTHER
8   DISABILITY RIGHTS TEXAS
    2222 West Braker Lane
9   Austin, Texas 78758
    512-454-4816
10  cluther@disabilityrightstx.org
11  FOR INTERVENOR-DEFENDANTS HARRIS COUNTY REPUBLICAN
    PARTY, DALLAS COUNTY REPUBLICAN PARTY, REPUBLICAN
12  NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL
    COMMITTEE AND NATIONAL REPUBLICAN CONGRESSIONAL
13  COMMITTEE (appeared via ZOOM):
14  MR. STEPHEN J. KENNY
    JONES DAY
15  51 Lousiana Avenue, NW
    Washington, D.C. 20001
16  202-879-3939
    skenny@jonesday.com
17
    FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
18  THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
    LAMAR CLEMMONS (appeared via ZOOM):
19
    MS. KATHRYN SADASIVAN
20  MR. VICTOR GENECIN
    MS. URUJ SHEIKH
21  NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
    40 Rector Street, Fifth Floor
22  New York, New York 10006
    212-965-2200
23  ksadasivan@naacpldf.org
    vgenecin@naacpldf.org
24  usheikh@naaacpldf.org
25
```

## Page 3

```
1          A P P E A R A N C E S (continued):
2   FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO SOUTHWEST
    VOTER REGISTRATION EDUCATION PROJECT:
3
    MS. NINA PERALES
4   MS. JULIA R. LONGORIA(via ZOOM)
    MS. FATIMA L. MENENDEZ(via ZOOM)
5   MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
    110 Broadway, Suite 300
6   San Antonio, Texas 78205
    210-224-5476
7   nperales@maldef.org
    jlongoria@maldef.org
8   fmenendez@maldef.org
             -and-
9   MR. JASON KANTERMAN (via ZOOM)
    MR. KEVIN ZHEN (via ZOOM)
10  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
    One New York Plaza
11  New York, New York 10004
    212-859-8519
12  Jason.Kanterman@friedfrank.com
    Kevin.Zhen@friedfrank.com
13
    FOR PLAINTIFFS LULAC, TEXAS, VOTO LATINO, TEXAS
14  ALLIANCE FOR RETIRED AMERICANS, TEXAS AFT (via ZOOM):
15  MS. MARISA O'GARA
    ELIAS LAW GROUP LLP
16  250 Massachusetts Avenue, NW, Suite 400
    Washington, D.C. 20001
17  202-968-4490
    mogara@elias.law
18
19  FOR THE UNITED STATES:
20  MR. JUSTIN BENNETT(via ZOOM)
    MR. RICHARD A. DELLHEIM
21  MR. MICHAEL E. STEWART
    U.S. DEPARTMENT OF JUSTICE
22  CIVIL RIGHTS DIVISION
    950 Pennsylvania Avenue, NW
23  Washington, D.C. 20530
    800-253-3931
24  Justin.Bennett@usdoj.gov
    Richard.Dellheim@usdoj.gov
25  Michael.Stewart3@usdoj.gov
```

## Page 4

```
1          A P P E A R A N C E S (continued):
2            -and-
    MR. DANIEL J. FREEMAN
3   U.S. DEPARTMENT OF JUSTICE
    CIVIL RIGHTS DIVISION
4   4 Constitution Square (4CON)
    150 M Street, N.E./8.143
5   Washington, D.C. 20530
    202-305-4355
6   Daniel.Freeman@usdoj.gov
7   FOR DEFENDANTS THE STATE OF TEXAS, GREG ABBOTT, IN HIS
    OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN
8   HER OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
    WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE
9   ATTORNEY GENERAL:
10  MS. KATHLEEN HUNKER
    MR. ETHAN SZUMANSKI
11  OFFICE OF THE ATTORNEY GENERAL
    P.O. Box 12548
12  Austin, Texas 78711-2548
    512-463-2100
13  kathleen.hunker@oag.texas.gov
    ethan.szumanski@oag.texas.gov
14
    FOR OFFICE OF THE TEXAS SECRETARY OF STATE:
15
    MR. ADAM BITTER
16  OFFICE OF THE SECRETARY OF STATE
    Capitol Building, Rm 1E.8
17  P.O Box 12697
    Austin, Texas 78711-2697
18  512-475-2813
    abitter@sos.texas.gov
19
    FOR DEFENDANT LISA WISE, IN HER OFFICIAL CAPACITY AS
20  THE EL PASO COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
21  MR. GERMAINE HABELL
    COOLEY LLP
22  Wells Fargo Center, South Tower
    355 South Grand Avenue, Suite 900
23  Los Angeles, California 90071-1560
    213-561-3227
24  ghabell@cooley.com
25
```

## Page 5

```
1          A P P E A R A N C E S (continued):
2   FOR DEFENDANTS BEXAR COUNTY ELECTIONS ADMINISTRATOR,
    JACQUELYN CALLANEN AND BEXAR COUNTY DISTRICT ATTORNEY
3   JOE D. GONZALES (via ZOOM):
4   MS. LISA V. CUBRIEL
    ASSISTANT DISTRICT ATTORNEY-CIVIL SECTION
5   BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
    7th Floor Paul Elizondo Tower
6   101 West Nueva
    San Antonio, Texas 78205-3030
7   210-335-2142
    Lisa.Cubriel@bexar.org
8
    FOR PLAINTIFF MI FAMILIA VOTA (via ZOOM):
9
    MS. COURTNEY HOSTETLER
10  FREE SPEECH FOR PEOPLE
    1320 Centre Street, #405
11  Newton, Massachusetts 02459
    617-249-3015
12  chostetler@freespeechforpeople.org
13  FOR DEFENDANTS CLIFFORD TATUM, IN HIS OFFICIAL CAPACITY
    AS HARRIS COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
14
    MR. SAMEER S. BIRRING
15  SENIOR ASSISTANT COUNTY ATTORNEY
    OFFICE OF THE HARRIS COUNTY ATTORNEY
16  1019 Congress Plaza, 15th Floor
    Houston, Texas 77002
17  713-274-5101
    Sameer.Birring@harriscountytx.gov
18
    FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
19  DELIA GARZA (via ZOOM):
20  MS. LEIGH ANN TOGNETTI
    ASSISTANT DISTRICT ATTORNEY
21  100 East Cano, First Floor
    Hidalgo County Courthouse Annex III
22  Edinburg, Texas 78539
    956-292-7609
23  leigh.tognetti@da.co.hidalgo.tx.us
24
    ALSO PRESENT (via ZOOM):
25  MS. MORGAN HUMPHREY
    MS. SAMANTHA KOBOR
```



Keith Ingram

March 28, 2023
Pages 6 to 9

Page 6

```
 1                       INDEX
 2                                              PAGE
   Appearances...................................2-5
 3 KEITH INGRAM VOLUME 1
        Examination by MR. FREEMAN...............8
 4      Examination by MS. PERALES..............145
        Examination by MR. GENECIN.............184
 5 Signature and Changes........................219
   Reporter's Certificate.......................221
 6
                      EXHIBITS
 7 NO.           DESCRIPTION                     PAGE
   No. 1         Interrogatories                 27
 8 No. 2    absentee ballot mail form           39
   No. 3            email                        44
 9 No. 4            email                        48
   No. 5        carrier envelope                 50
10 No. 6        secrecy envelope                 53
   No. 7            email                        57
11 No. 8    voter instruction sheet             58
   No. 9            email                        60
12 No. 10       signature sheet                  62
   No. 11       presentation                     65
13 No. 12    votetexas.gov page                  72
   No. 13           portal                       73
14 No. 14           email                        76
   No. 15 voter registration application        82
15 No. 16   notice of rejected application      93
   No. 17   notice of rejected application      93
16 No. 18       texas.gov page                   96
   No. 19       texas.gov page                   97
17 No. 20           email                       100
   No. 21          NPR story                    116
18 No. 22           email                       124
   No. 23           email                       145
19 No. 24           email                       148
   No. 25            SB 1                        149
20
21
22
23
24
25
```

Page 7

```
 1              (WHEREUPON, the witness was duly
 2         sworn.)
 3              KEITH INGRAM,
 4 called as a witness herein, having been first duly
 5 sworn, was examined and testified as follows:
 6              EXAMINATION
 7 BY MR. FREEMAN:
 8    Q.    My name is Dan Freeman.  This is the
 9 general election deposition of Mr. Keith Ingram in the
10 matter of La Union Del Pueblo Entero v. Abbott, U.S.
11 District Court for the Western District of Texas,
12 docket No. 5:21-cv-844.
13         Again, as you know, my name is Dan Freeman.
14 I represent the United States in this matter.  With me
15 here today are Mr. Richard Dellheim and Mr. Mike
16 Stewart.  And I will let everyone else introduce
17 themselves.
18    MS. PERALES:  Nina Perales for Plaintiffs LUPE,
19 L-U-P-E, et al.
20    MS. HUNKER:  Kathleen Hunker and Ethan Szumanski
21 representing the State Defendants along with individual
22 legislators for the purposes of legislative privilege
23 to the extent it's raised today.  With me is Adam
24 Bitter, General Counsel for The Office of the Texas
25 Secretary of State.
```

Page 8

```
 1    MR. FREEMAN: If those who are on Zoom who intend
 2 to ask questions could introduce themselves as well.
 3    MR. GENECIN:  This is Victor Genecin,
 4 G-E-N-E-C-I-N, of NAACP LDF for the HAUL Plaintiffs.  I
 5 do intend to ask questions.
 6    MR. FREEMAN:  Anyone else on Zoom who intends to
 7 ask questions today?
 8    MR. FREEMAN: Thank you very much.  I will ask
 9 those who are on Zoom to please put themselves on mute
10 when you are not speaking.  I will ask everyone else in
11 the room to just remember to please silence your cell
12 phones.
13 BY MR. FREEMAN:
14    Q.    Mr. Ingram, I know you have been deposed
15 many times in this matter and others. We do need to go
16 through a few quick ground rules for the record.  The
17 deposition will proceed as a question and answer.  The
18 court reporter will be recording my questions and your
19 answers so it's important for both of us to articulate
20 rather than gesture.  Do you understand?
21    A.    I understand.
22    Q.    The purpose of the deposition is to obtain
23 your full testimony regarding your opinions -- or
24 excuse me -- your knowledge with respect to the matters
25 in this case.  So I need you to provide full and
```

Page 9

```
 1 complete answers.  Do you understand?
 2    A.    I do.
 3    Q.    I may not always be clear.  If you don't
 4 understand, will you please ask me to restate the
 5 question in a clear manner?
 6    A.    I will.
 7    Q.    If you need a break, will you let me know
 8 and we'll finish the question and see about a break?
 9    A.    Sure.
10    Q.    If you need coffee -- I see you already
11 have water -- please let me know between questions, and
12 we will see about getting you some.  Okay?
13    A.    Okay.
14    Q.    If you want to talk to your attorney,
15 that's fine, but if there is a question pending or you
16 are in the middle of an answer, let's finish up the
17 answer first and then you can talk with your attorney.
18 Will that work?
19    A.    Sure.
20    Q.    Sometimes you will remember things later in
21 the day.  If that happens, let me know while it's on
22 your mind and we can add to the record.  Will you do
23 that?
24    A.    I will.
25    Q.    I will give you a chance to do that towards
```



Page 10

1 the end as well.
2        Sometimes after we have been talking for
3 awhile, you realize a prior answer was not entirely
4 accurate.  If you realize that, will you let me know so
5 we can correct the record?
6        A.    I will.
7        Q.    Sometimes while you are answering, you may
8 think of a document that will help you remember or help
9 you answer more accurately.  If you do, will you let me
10 know?
11       A.    I will.
12       Q.    We may have the document here.  If not, we
13 may be able to help you get it.  I see that you also
14 have a copy of the Election Laws of Texas 2022 edition
15 in front of you.  Can I ask you, do you intend to
16 refresh your recollection, if need be?
17       A.    If need be, yes, sir.
18       Q.    Mandatory question.  Are you on any
19 medication or drugs of any kind that might make it
20 difficult for you to answer or understand my questions?
21       A.    I'm not.
22       Q.    Is there any other reason you can think of
23 why you would not be able to answer my questions fully
24 and accurately?
25       A.    Seasonal allergies are making my throat

Page 11

1 dry, but that's about it.
2        Q.    Well, we'll make sure you have enough
3 water.  We can take breaks if need be.  If truly
4 necessarily, we'll make a Claritin run.
5        Last thing.  I want to remind you that you
6 are under oath and subject to federal penalties for
7 giving false or misleading testimony.  So it's
8 important to answer my questions truthfully, accurately
9 and completely.  Do you understand?
10       A.    I do.
11       Q.    Any questions so far?
12       A.    No, sir.
13       Q.    All right.  Just for the record, are you
14 represented by counsel here today?
15       A.    I am.
16       Q.    Who is that?
17       A.    Kathleen Hunker, and Adam Bitter is our
18 general counsel for our agency.
19       Q.    Without going into the substance of any
20 discussions you had with counsel, what did you do to
21 prepare for this deposition?
22       A.    Did meet with Kathleen and Ethan a couple
23 of times, and reviewed some documents.
24       Q.    What were those documents?
25       A.    They were our answers to discovery, I

Page 12

1 believe, the most recent set of discovery questions,
2 interrogatories, request for production, request for
3 admission.  I also reviewed our results from the
4 comparison that we did in December after the general
5 election in '22.  So that we tried to harvest more
6 driver's license numbers.  And I looked at the
7 spreadsheet for the mail ballot rejection rates for all
8 of the elections in '22 including the general.
9        Q.    Do you know --
10       A.    Then a few mass emails that we sent over
11 the summer.
12       Q.    Do you know if that spreadsheet from mail
13 ballot rejection rates has been produced in this
14 litigation?
15       A.    As far as I know it was, yes.
16       MS. HUNKER:  It was.
17 BY MR. FREEMAN:
18       Q.    Was anyone else present besides Kathleen
19 and Ethan during sessions?
20       A.    In the first session, Adam Bitter was
21 there.  The next two Zena was there as deputy general
22 counsel.
23       Q.    I see.  Thank you.
24       Did you bring any documents with you here
25 today besides the Election Laws of Texas Manual?

Page 13

1        A.    I did not.
2        Q.    Did you speak with anyone else about your
3 deposition today outside of your immediate family?
4        A.    I did.  I talked to Christina Adkins in our
5 office, I talked to Kristi Hart, and I talked to Donna
6 Davidson at the Republican Party of Texas.
7        Q.    What did you discuss with Ms. Davidson?
8        A.    The same thing that I talked to Christina
9 about.  There was an incident with regard to a poll
10 watcher in Northern Hidalgo County.  For the life of me
11 I can't remember any details, neither could Christina,
12 and neither could Donna.
13       Q.    Anything else?
14       A.    That's it.
15       Q.    Okay.  So since we last spoke in April of
16 2022 has your role in the office of the Texas Secretary
17 of State changed?
18       A.    It has.
19       Q.    What's your current title?
20       A.    I'm not sure what the title is.  I think
21 it's project manager or special projects.  I have been
22 designated to work on one project.
23       Q.    What's that project?
24       A.    The project is potentially replacing the
25 ERIC system that we have that we're currently using to



Keith Ingram

March 28, 2023
Pages 14 to 17

Page 14

1  use to compare voter registrations across state lines.
2      Q.    What was the impetus for your change in
3  role?
4      A.    We had an organizational hearing at the
5  Texas house for the House Elections Committee on March
6  10 or March 9, and then the Secretary was not pleased.
7  She thought that my exchange with Representative
8  Swanson was indicator that maybe it would be good for
9  her and for me to change roles.
10     Q.    What was the impetus for the creation of
11 the role that you are now in?
12     A.    Well, we have been discussing -- there is
13 legislation that would require us to leave the ERIC
14 system, Electronic Registration Information Center, and
15 if any of that passes then we still have a law, legal
16 obligation to compare voter roles across state lines.
17 So we have a need to figure out what comes next if
18 ERIC -- if we have to withdraw from ERIC.
19     Q.    In your new role do you report to the
20 acting director of the elections division?
21     A.    Yes.
22     Q.    That's Ms. Adkins?
23     A.    It is.
24     Q.    In your new role will you have any role in
25 the implementation of SB 1's mail voting requirements

Page 15

1  in future elections?
2      A.    I will not. I might be asked for advice.
3  I might be asked for research, but that would be the
4  limit of it.
5      Q.    So at this time would it be fair to say
6  that your knowledge concerning implementation of SB 1's
7  mail voting requirements is strictly looking back at
8  past elections, and not looking forward as to planned
9  changes?
10     MS. HUNKER: Objection, form.
11 BY THE WITNESS:
12     A.    I would agree with that.
13 BY MR. FREEMAN:
14     Q.    Would it be fair to say you do not have
15 personal knowledge about future improvements to
16 implementation of SB 1?
17     MS. HUNKER: Objection, form.
18 BY THE WITNESS:
19     A.    Well, I don't know what you mean by
20 improvements. I know that, you know, we are always
21 planning and preparing for the next election. That
22 began immediately after November 2022 we began
23 preparing for 2024. And so obviously I'm aware of
24 those discussions.
25 BY MR. FREEMAN:

Page 16

1      Q.    Okay. Are you no longer a part of the
2  discussions in terms of planning for the next election
3  and implementation of SB 1?
4      A.    Well, I don't know because right now it's
5  all legislation all of the time. We will pick up the
6  planning discussion again this summer.
7      Q.    Well, you guessed my next topic. Did you
8  testify before the Texas Legislature in the interim
9  between the third special session of the 87th leg and
10 the opening of the 88th Texas legislature?
11     A.    I don't remember. Did we have an interim
12 hearing and house selections? I know there was one
13 scheduled in Senate State of Affairs, but they
14 cancelled, you know. I don't know. I don't know if I had a
15 house -- can you tell me if I did?
16     Q.    I don't know.
17     A.    I don't think we had an interim hearing.
18     Q.    So not to your knowledge?
19     A.    Not to my knowledge.
20     Q.    Just to close the loop. Did you help any
21 other staff of the elections division prepare for
22 testimony during the interim between the 87th
23 legislature and the opening of the 88th?
24     A.    No.
25     Q.    Are you aware of any other instances when

Page 17

1  staff of the elections division testified before the
2  Texas Legislator between 87th Legislature and opening
3  of the 88th?
4      A.    I'm not.
5      Q.    Since the opening of 88th Texas Legislator,
6  have you testified before any committee of Texas House
7  or Texas Senate?
8      A.    I have.
9      Q.    Which committee?
10     A.    House elections.
11     Q.    That's it?
12     A.    That's it.
13     Q.    Was that on March 9 you said?
14     A.    It was.
15     Q.    Was that the only time you testified?
16     A.    It was.
17     Q.    Since the opening of the 88th Texas
18 Legislature, have any other staff of the elections
19 division testified before any committee of the Texas
20 House or Texas Senate?
21     A.    Yes, Christina Adkins has.
22     Q.    Which committee?
23     A.    House Elections and Senate State Affairs,
24 and I believe that she was called up in the House.
25 There is a special committee on security. I don't know



Keith Ingram

March 28, 2023
Pages 30 to 33

Page 30

1    A.    That you need --
2    MS. HUNKER: Objection, form.
3 BY THE WITNESS:
4    A.    You need to be sure and put identification
5 number under the flap of the envelope, and they would
6 have a picture of the boxes at the top of the carrier
7 envelope on the back where they are covered up when you
8 put the flap down so they could see those boxes, see
9 what they looked like, and get reminded they needed to
10 fill one of them out.
11 BY MR. FREEMAN:
12    Q.    Did these inserts suggest that voters
13 include both a driver's license number and Social
14 Security number if they had them?
15    A.    I don't know. We told counties they could
16 suggest that as a possibility, but they couldn't
17 require it.
18    Q.    Was that suggestion something that you
19 considered to be helpful to the voters?
20    A.    Absolutely, yes. We strongly suggested
21 they do suggest it to their voters. But make sure that
22 your voters know it's not required to put both, but
23 they increase their chance of success if they do.
24    Q.    Did you also testify before the house
25 committee on elections on March 9 that putting the

Page 31

1 resident's address in the ballot tracker log-in was
2 keeping voters out?
3    A.    Yes.
4    Q.    Did you suggest that the legislator enact
5 legislation that would replace resident's address with
6 date of birth in the log-in requirements?
7    A.    I did.
8    Q.    Is this the only change that you
9 recommended with respect to the mail voting provisions
10 of SB 1?
11    A.    I don't know what you mean by that
12 question. In the hearing, yes.
13    Q.    Have you suggested any other changes in
14 other venues?
15    A.    Yes.
16    Q.    What changes have you suggested?
17    A.    It's our belief that the correction
18 process, the corrective action procedure needs to have
19 a standardized date where anybody who's correcting a
20 mail ballot has that date by which to fix it. The way
21 the current law is, if the early voting clerks send
22 back the mail ballot to the voter the voter has until
23 7:00 p.m. on election day to get that back. And if a
24 ballot board sends a collective action notice to a
25 voter, they have until six days after the election to

Page 32

1 come in person and fix it. So we want to match those
2 two dates up, and we also believe that ballot boards
3 need more time on the front end, more days to meet. So
4 we suggested that change. And there is one other
5 thing. I know there is three. I can never remember
6 the third.
7    Q.    Well, if you remember later.
8    A.    I will.
9    Q.    Thank you very much.
10         This is the type of thing that's going to
11 bother you.
12    A.    It is going to bother me. Our other
13 suggestion is have them where they can just mail back
14 the corrective action form and where the ballot doesn't
15 ever leave the voting clerk's office. If the voter
16 sends it in right now, the early voting clerk has the
17 option of sending the ballot back to the voter. The
18 early voting ballot board has the option of sending the
19 ballot back to the voter. We would like to take that
20 away and keep the ballot in the office and just send a
21 corrective action form and have them be able to mail it
22 back instead of deliver it in person.
23    Q.    Is that the existing correction process for
24 FPCA voters?
25    A.    Yes, sort of. I mean an FPCA voter can

Page 33

1 send a new signature sheet. So yes, it's kind of like
2 that, but it's a different form. Since FPCA voters
3 have the ability to do a signature sheet in the first
4 place, they have more flexibility.
5    Q.    Did a bill to replace resident's address
6 with date of birth in the ballot tracker come before
7 the House Elections Committee on March 16?
8    A.    It wasn't exactly what the bill language
9 did. The bill language made the DL or social optional,
10 you know, pick one or the other instead of both and add
11 date of birth and take away resident's address.
12    Q.    Who testified on behalf of the Office of
13 the Secretary of State on that bill?
14    A.    Christina Adkins.
15    Q.    Do you know if Ms. Adkins testified for the
16 bill or merely on the bill?
17    A.    We are never for or against legislation.
18 It's not our office's role. We are resource witness to
19 answer any questions about the implementation that they
20 might have.
21    Q.    If your office favors the substantive
22 provisions of a bill you are still merely on the bill
23 rather than for the bill?
24    A.    Our office doesn't officially favor
25 anything.



Keith Ingram

March 28, 2023
Pages 38 to 41

Page 38

1    Q.    Well, if they don't have a driver's license
2  number or Social Security number on record, is there a
3  connection between the voter providing that number and
4  the voter establishing their identity?
5    A.    Yes.
6    Q.    Does the voter establish their identity
7  when they submit a mail ballot request with their
8  driver's license number if the driver's license number
9  isn't on TEAM?
10       MS. HUNKER:  Objection, form, asked and answered.
11  BY THE WITNESS:
12    A.    I don't know what you are getting at.  Yes.
13  BY MR. FREEMAN:
14    Q.    So switching gears, and we don't need to
15  take a break yet, that's good.
16        How long did you serve as director of the
17  elections division in the Office of the Texas Secretary
18  of State?
19    A.    11 years, two months, five days.
20    Q.    Based on your experience would you agree --
21    A.    Not that I was counting.
22    Q.    Based on your experience, would you agree
23  that a form provided to voters should be designed so
24  that a voter who follows the instructions will have the
25  form accepted?

Page 39

1       MS. HUNKER:  Objection, form.
2  BY THE WITNESS:
3    A.    Yes, that's true. That's the goal of the
4  form.
5  BY MR. FREEMAN:
6    Q.    Since the May 2022 runoff, did the Office
7  of the Secretary of State make any changes to the
8  absentee ballot by mail application?
9    A.    We changed several forms. I'm pretty sure
10  the application if it's got an oath of assistance on it
11  it changed, yes.
12       MR. FREEMAN:  Mark this as Exhibit 2.
13          (WHEREUPON, a certain document was
14          marked Deposition Exhibit No. 2,
15          for identification, as of 3/28/23.)
16  BY MR. FREEMAN:
17    Q.    Mr. Ingram, is this the current absentee
18  ballot by mail form? I will represent to you this
19  form, I don't believe the date is on it, but it's the
20  form that's currently on your website and it's dated
21  December 9, 2021.
22    A.    Yes. I mean it looks like it, yes.
23    Q.    Okay. This form is still in effect, the
24  form that's on the website?
25    A.    It is.

Page 40

1    Q.    Any current plans to alter the form?
2    A.    No.
3    Q.    Has your office considered altering the
4  form since it was issued?
5    A.    No, not this form.
6    Q.    Why not?
7    A.    There is not a need to.
8    Q.    Is there a statutory reason this form could
9  not inform voters that they may provide both a Texas
10  driver's license number and a partial Social Security
11  number?
12       MS. HUNKER:  Objection, form.
13  BY THE WITNESS:
14    A.    It's not what the law says. The form
15  outlines the law.
16  BY MR. FREEMAN:
17    Q.    Okay. And so if the form outlines the law,
18  is it not allowed for the form to inform voters that
19  they may provide both numbers?
20    A.    Not on the form. It's not the law.
21    Q.    Understood.
22        Has your office suggested any kind of
23  amendments to SB 1 that would permit including that
24  information on this form?
25    A.    No. There is plenty of outside channels

Page 41

1  that emphasize that point.
2    Q.    So is it not necessary to your mind?
3    A.    Agree with that.
4    Q.    This form does clarify that the Texas
5  driver's license number is not your voter registration
6  VUID number, correct?
7    A.    Agree.
8    Q.    Is that in the law --
9       MS. HUNKER:  Objection, form.
10  BY MR. FREEMAN:
11    Q.    -- that clarification?
12    A.    Well, it's in the law is Texas election
13  identification certificate number. People think that
14  means their voter registration number.
15    Q.    Why is it permissible to include this
16  clarification and not the clarification that a voter
17  may include both numbers if they wish?
18    A.    Because if we did that you would be sitting
19  there asking me questions about why we are requiring
20  people to do something the law doesn't require. That
21  would be a different lawsuit, but it would still be a
22  lawsuit.
23    Q.    Do other forms promulgated by your office
24  include a red box around required information
25  frequently omitted by voters?



Page 42

1     A.    The carrier envelope does.
2     Q.    Is this a reason why this form doesn't have
3  a red box around the SB 1 identification number
4  requirements?
5     A.    It's not needed.
6     Q.    Why is it not needed?
7     A.    Because the application can just be redone
8  any time.  It's a much less formal document.  It's not
9  the vote.
10    Q.    Can it be redone if it's rejected -- strike
11 that.
12          Can it be redone if the voter does not
13 become aware of the rejection until after the ballot
14 application deadline?
15    MS. HUNKER:  Objection, form.
16 BY THE WITNESS:
17    A.    It can't.  But the voter can vote in person
18 at that point.  They have still complete ability to
19 vote.
20 BY MR. FREEMAN:
21    Q.    Just to confirm.  During the 2022 general
22 election, did your office continue to advise election
23 administrators not to apply a hierarchy between DPS
24 numbers and Social Security numbers when determining
25 whether this form meets SB 1 requirements and identify

Page 43

1  the correct voter?
2     A.    I lost your thread there.
3     Q.    Just confirming.  During the 2022 general,
4  did your office continue to tell local election
5  administrators, county clerks they didn't need to apply
6  a hierarchy between the DPS number and the SSN when
7  they were determining whether an ABBM adequately
8  identifies a voter for SB 1 purposes?
9     A.    Absolutely.
10    Q.    From an election administration
11 perspective, during the 2022 general election did the
12 language on this form directing voters to give their
13 SSN for quote, if you do not have a Texas driver's
14 license, Texas personal identification number or a
15 Texas election identification certificate number, serve
16 a purpose?
17    MS. HUNKER:  Objection, form.
18 BY THE WITNESS:
19    A.    It follows the law.
20 BY MR. FREEMAN:
21    Q.    What is the purpose of the law in stating
22 that --
23    MS. HUNKER:  Objection, form.
24 BY MR. FREEMAN:
25    Q.    -- to your knowledge?

Page 44

1     A.    You would have to ask the legislature that
2  question.
3     Q.    Fair enough.
4     MR. FREEMAN:  We can mark this as Exhibit 3.
5          (WHEREUPON, a certain document was
6           marked Deposition Exhibit No. 3,
7           for identification, as of 3/28/23.)
8  BY MR. FREEMAN:
9     Q.    Before we turn to Exhibit 3 can I ask one
10 more question about the form marked as Exhibit 2.
11 Regardless of what the legislature's intention is, are
12 you able to identify a valid election administration
13 purpose for including the language beginning, if you do
14 not have a Texas driver's license on the ABBM form?
15    MS. HUNKER:  Objection, form.
16 BY THE WITNESS:
17    A.    The election administration purpose is to
18 accurately state the law on the form.
19 BY MR. FREEMAN:
20    Q.    Nothing else?
21    A.    That's it.
22    Q.    Mr. Ingram, what's the document that has
23 been marked as Exhibit 3?
24    A.    It looks like an email.
25    Q.    If you go to the last page.  Just take a

Page 45

1  look at that real quickly.  The email from Ms.
2  Oehlschlager.
3     A.    Okay.
4     Q.    Am I correct that Ms. Oehlschlager wrote
5  that because her mother followed the directions on the
6  ABBM and nonetheless did not receive her mail ballot,
7  this is an error in the application for a ballot by
8  mail?
9     A.    I'm not sure exactly what she is trying to
10 say here.  I don't understand the issue with it.
11    Q.    Well, if I'm correct, Ms. Oehlschlager's
12 mother submitted her driver's license number, and the
13 county said she should have used the last four numbers
14 of her Social Security rather than her driver's license
15 number; is that your understanding of this email?
16    A.    That I think is what she is trying to say,
17 yes.
18    Q.    Do you agree that because she followed the
19 instructions on the form and provided her driver's
20 license number rather than her Social, and did not
21 receive a ballot, that the error is in the application?
22    MS. HUNKER:  Objection, form.
23 BY MR. FREEMAN:
24    Q.    The form itself?
25    A.    No, I do not agree with that.



Keith Ingram

March 28, 2023
Pages 50 to 53

Page 50

1    A.    No.
2    Q.    Do you consider the rejection of Ms.
3 Martin's daughter's ABBM to be her daughter's fault?
4    A.    I don't know what your interest in
5 assessing fault is.  I'm not going to say it's
6 anybody's fault.
7    Q.    Is the ABMM designed to maximize the
8 likelihood a voter who follows the instructions will
9 have the form accepted?
10    A.    I don't know.  It follows the law.
11    Q.    Going about an hour.  Do you want to take a
12 break for a minute or are you okay?
13    A.    I'm fine.
14    Q.    Since the May 2022 runoff -- we're changing
15 gears.  Did the Office of the Secretary of State make
16 any changes to the mail ballot carrier envelope?
17    A.    Yes.
18    MR. FREEMAN:  We can mark this as Exhibit 5.
19        (WHEREUPON, a certain document was
20        marked Deposition Exhibit No. 5,
21        for identification, as of 3/28/23.)
22 BY MR. FREEMAN:
23    Q.    Mr. Ingram, what's this document?
24    A.    Well, it's an 8 1/2 x 11 copy of pieces of
25 a carrier envelope.

Page 51

1    Q.    Is this the up-to-date version of the
2 carrier envelope?
3    A.    It looks like it.
4    Q.    What changes were made during the general
5 election period?
6    A.    We put a red box around the numbers and we
7 changed the oath of office.
8    Q.    Did your staff consider any further changes
9 to the mail ballot carrier envelope during the general
10 election period?
11    A.    We did not.
12    Q.    Why not?
13    A.    There wasn't a need.
14    Q.    Did your office have any concerns about the
15 red box being fully accessible to voters with any kinds
16 of disabilities?
17    A.    No.
18    Q.    Is there an issue with the red type and
19 voters with disabilities?
20    A.    I understand that to be the case, yes.
21    Q.    What's the issue?
22    A.    There's some people with some kinds of
23 visual impairments don't see it.
24    Q.    Would it be helpful to Texas voters if the
25 mail ballot carrier envelope itself informed voters

Page 52

1 that they may provide both a Texas driver's number and
2 Social Security number?
3    MS. HUNKER:  Objection, form.
4 BY THE WITNESS:
5    A.    That's not the law.
6 BY MR. FREEMAN:
7    Q.    Would it be helpful if it did?
8    A.    Doesn't matter if it's helpful or not.
9    MS. HUNKER:  Objection.
10 BY THE WITNESS:
11    A.    It's not the law.  We can't suggest to
12 voters that both numbers are required.  We can suggest
13 to voters that they go ahead and voluntarily use both
14 numbers, and that they increase their chances of
15 success if they do, and we can hound that message big,
16 but we can't make any suggestion on the official form
17 that both numbers are required.
18 BY MR. FREEMAN:
19    Q.    Just so I understand it.  Why can you not
20 say it's optional on the form?
21    A.    Because that's not the law.
22    Q.    Okay.  Are there any current plans to alter
23 the carrier envelope?
24    A.    If the law changes we will change the
25 carrier envelope.

Page 53

1    MR. FREEMAN:  On to Exhibit 6.
2        (WHEREUPON, a certain document was
3        marked Deposition Exhibit No. 6,
4        for identification, as of 3/28/23.)
5 BY MR. FREEMAN:
6    Q.    Mr. Ingram, what's this document?
7    A.    This is the secrecy envelope that's put
8 inside of the carrier envelope that contains the voter
9 ballot.  So copy of the front and back of it.
10    Q.    Is this up to date?
11    A.    Yes.
12    Q.    What changes were made during the general
13 election period to this document?
14    A.    I don't know what specific changes were
15 made.  It looks like it was modified in July of '22,
16 but I don't know what changed.
17    Q.    Were the assistants instructions changed?
18    A.    Well, it has to be, but the oath is not on
19 here, so I don't know why we would change it.
20    Q.    Any other changes you are able to identify?
21    A.    Yes, it's No. 2 on the instruction to
22 assistants that's what changed.
23    Q.    Paragraph 2 under instructions states that,
24 "A voter must provide one of the following numbers,"
25 correct?



Keith Ingram

March 28, 2023
Pages 62 to 65

Page 62

1  provisions of SB 1?
2      A.   We try to say things in a more English and
3  flowing manner.
4      MR. FREEMAN:  I think it's a good time to take a
5  quick break.
6          (WHEREUPON, a recess was had.)
7  BY MR. FREEMAN:
8      Q.   Mr. Ingram, since the May 2022 runoff, did
9  The Office of the Secretary of State make any changes
10 to the FPCA signature sheet?
11     A.   Yes.
12     MR. FREEMAN:  Mark this as Exhibit 10.
13         (WHEREUPON, a certain document was
14         marked Deposition Exhibit No. 10,
15         for identification, as of 3/28/23.)
16 BY MR. FREEMAN:
17     Q.   Mr. Ingram, what's this document?
18     A.   This is the signature sheet for voters from
19 overseas or military who's domestic or oversees.
20     Q.   Is this the up-to-date version of that
21 form?
22     A.   It is.
23     Q.   What changes were made during the general
24 election period?
25     A.   The oath language was changed.

Page 63

1      Q.   That's all?
2      A.   That's it.
3      Q.   Did you or your staff consider any further
4  changes to the FPCA signature sheet during the general
5  election period?
6      A.   We did not.
7      Q.   Why not?
8      A.   There was no need.
9      Q.   Is there a statutory reason, just to
10 confirm, that the FPCA signature sheet could not inform
11 military overseas voters that they may provide both a
12 Texas driver's license number and a four digit Social?
13     A.   That's not required by the law.
14     Q.   Just to close the loop, if it's not
15 required by the law it can't be on this form, correct?
16     MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18     A.   The form is a map to the law.
19 BY MR. FREEMAN:
20     Q.   Any current plans to alter the signature
21 sheet?
22     A.   No.
23     Q.   Are you aware of how many FPCA voters had
24 their ballot rejected during the 2022 general election
25 because of SB 1 requirements related to numbers

Page 64

1  associated with the voter registration record?
2      A.   I don't know.
3      Q.   Are you aware of how many active duty
4  members of the military had their ballots rejected
5  during the 2022 general because of SB 1 number
6  requirements?
7      A.   I don't know.
8      Q.   Do you have any practical basis to believe
9  that any rejected ballots submitted by FPCA voters were
10 not returned by eligible Texas voters who were who they
11 said they were?
12     MS. HUNKER:  Objection, form.
13 BY THE WITNESS:
14     A.   I'm sorry.  I don't understand the
15 question.
16 BY MR. FREEMAN:
17     Q.   Do you have any reason to believe that any
18 FPCA voters -- strike that.
19         Do you have any reason to believe that any
20 FPCA ballots that were rejected due to SB 1 were
21 submitted by individuals who were not eligible Texas
22 voters?
23     MS. HUNKER:  Objection, form.
24 BY THE WITNESS:
25     A.   I don't know.

Page 65

1  BY MR. FREEMAN:
2      Q.   Do you have any future plans to address
3  ballot rejections among active duty military
4  specifically?
5      A.   Not other than, you know, the what we are
6  going to do with ballot boards, educate them on the
7  early voting process and their opportunities there.
8      Q.   My colleague intends to address training
9  conducted by The Office of the Secretary of State
10 during Rule 30(b)(6) deposition, but I have a few quick
11 questions about updates to the training prior to the
12 end of last year.  So if we could mark this document as
13 Exhibit 11 I promise we will only talk about a few
14 pages.
15         (WHEREUPON, a certain document was
16         marked Deposition Exhibit No. 11,
17         for identification, as of 3/28/23.)
18 BY MR. FREEMAN:
19     Q.   Mr. Ingram, what's this document?
20     A.   It appears to be a presentation on ballot
21 by mail.
22     Q.   Is this the most recent presentation on
23 ballot by mail that your office has provided?
24     A.   I believe so.  I mean what I find on those
25 power points is the date that it's printed is the date



Keith Ingram

March 28, 2023
Pages 66 to 69

Page 66

1 that shows up on here.  So it's not really a very
2 useful guide.  But as far as I know, we didn't change
3 our guidance or instructions in our presentations
4 throughout the '22 year.
5      Q.    It's from the election law seminar.  Do you
6 know when that was held?
7      A.    I don't.  It was in July or August.
8      Q.    Okay.  Did you participate in the drafting
9 of this document?
10      A.    I did review it, yes.
11      Q.    So others drafted, but you reviewed after
12 it had been drafted; would that be right?
13      A.    That's correct.
14      Q.    Did you give the training based on this
15 document?
16      A.    No, sir.
17      Q.    Who did?
18      A.    I don't remember, maybe Heidi Martinez.
19      Q.    Who is Ms. Martinez?
20      A.    She is one of our staff attorneys.
21      Q.    Does this presentation -- are you aware of
22 whether this presentation instructed local clerks to
23 inform voters upon request whether they had a driver's
24 license or SSN on file?
25      A.    As I stated before, we don't have to tell

Page 67

1 them to do that.  That's something they do, they answer
2 voter's questions.
3      Q.    Just to be clear, they -- you don't train
4 them to do that, that's just something you expect them
5 to do?
6      MS. HUNKER:  Objection, form.
7 BY THE WITNESS:
8      A.    I expect county election officials to
9 answer voter questions, yes, I do.
10 BY MR. FREEMAN:
11      Q.    Including that question?
12      A.    Yes, including that question very much so.
13      Q.    Turning to page 31.  What are the matters
14 set on page 31?
15      A.    The best practices when reviewing an
16 application for ballot by mail.
17      Q.    So this is the review conducted by the
18 early voting clerk?
19      A.    Early voting clerk is the one who reviews
20 applications for ballot by mail, yes.
21      Q.    The early voting clerk has to look up the
22 registration status of the voter as part of that
23 process?
24      A.    That's correct.
25      Q.    And do you suggest as part of that training

Page 68

1 how they should look up the voter registration status
2 of an applicant?
3      A.    No.
4      Q.    Do you have an understanding of how they
5 typically go about doing that?
6      A.    They either use TEAM or they use their
7 local system.  And some off-line counties use TEAM for
8 this.
9      Q.    What information do they plug in when they
10 are trying to pull up the registration status like
11 name?
12      A.    Well, I mean if you're using TEAM you can
13 search by voter name.  That's probably the way they do
14 it.  They are limited to their county.
15      Q.    If we turn to page 32.  What are the
16 matters set out here?
17      A.    This talks about the new law.
18      Q.    This is talking about looking up
19 identification numbers; is that correct?
20      A.    That's correct.
21      Q.    That is separate from looking up
22 registration status?
23      A.    It's part of the registration status.
24      Q.    But it's --
25      A.    That's what it says at the last sentence

Page 69

1 you talk to the voter registrar to confirm the voter
2 registration and status.
3      Q.    But am I correct that the numbers provided
4 here, driver's license, Social Security number, they
5 are not used to look up the voter, they are used to
6 confirm the voter; is that correct?
7      A.    They are used to make sure the voter has
8 properly identified themself on the application, yes.
9      Q.    Those numbers are not used to find the
10 voter in TEAM as part of the ABBM processing, correct?
11      A.    No, sir.  I mean not usually.  I guess they
12 could look it up by DL number if they wanted to.
13      Q.    Do you have any understanding as to
14 whether -- strike that.
15      Do you instruct local officials to do that?
16      MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18      A.    We don't tell them how they use TEAM.  All
19 of the fields are available to look up anything they
20 want to look up.
21 BY MR. FREEMAN:
22      Q.    Are you aware of any local officials using
23 the Texas driver's license number or Social Security
24 number to look up a voter as part of the initial
25 determination of their registration status?



Keith Ingram                                                    March 28, 2023
                                                               Pages 106 to 109

Page 106

1    Q.   All the voter needs to do to get that
2  driver's license number is to call the clerk with
3  pre-SB 1 information and ask for which driver's license
4  number is on file, no?
5       MS. HUNKER:  Objection, form.
6  BY THE WITNESS:
7    A.   No.
8  BY MR. FREEMAN:
9    Q.   Why not?
10   A.   Because they can call and ask, "What do I
11  have on file?"  They will say DL or SSN or both.
12   Q.   What if they say what number is on file?
13   A.   If the voter -- then I would imagine, I
14  don't know because I'm not a county, but if I was a
15  county voter registrar I would say, "What driver's
16  license number -- what's your driver's license number?"
17  They would look and say, "Yup that's what you got."
18   Q.   Okay.  Thank you for that clarification.
19       How many DPS ID numbers can be associated
20  with a voter's TEAM record?
21   A.   One.
22   Q.   Has there been any discussion, to your
23  knowledge, of adding a field to TEAM so that additional
24  driver's license numbers could be listed?
25   A.   That's something that we have recently

Page 107

1  discussed to think about the next iteration of TEAM,
2  and whether or not they want to have another field for
3  an ID number.  That decision has not been made yet.
4    Q.   What's the stage of the procurement process
5  for the next iteration of TEAM at this point?
6    A.   We are going through the drafting of the
7  RFP, RFO, whatever we are calling it.
8    Q.   Do you know when that will be complete?
9    A.   Soon.  If I had my way it would have been
10  two weeks ago.
11   Q.   To be clear, if a voter has been issued
12  multiple DPS numbers and provides a DPS ID number
13  different from the one listed in TEAM on an ABBM and
14  does not also provide a Social Security number, that
15  ABBM will be rejected, correct?
16   A.   If they don't provide a number that's in
17  their voter registration record they will be rejected,
18  yes, at least temporarily.
19   Q.   Same thing on mail ballot?
20   A.   Same thing on mail ballot.
21   Q.   Would you agree a duly registered voter
22  whose ballot was rejected under these circumstances was
23  not at fault?
24       MS. HUNKER:  Objection, form.
25  BY THE WITNESS:

Page 108

1    A.   I'm not going to get into assignment of
2  fault.
3  BY MR. FREEMAN:
4    Q.   Do you know if the fact that DPS has issued
5  multiple ID numbers to the same individuals over their
6  lifetimes has led to the rejection of mail ballot
7  materials under SB 1?
8       MS. HUNKER:  Objection, form.
9  BY THE WITNESS:
10   A.   It's my understanding that's happened at
11  least in Bexar County because I have a member of the
12  ballot board who has been coming up here for the
13  election meetings because of it.
14  BY MR. FREEMAN:
15   Q.   Have you conducted any further inquiry into
16  the extent to which such voters have had their mail
17  ballot materials rejected?
18   A.   Just what she says.
19   Q.   Is there anything else that could have been
20  done for voters who have multiple DPS ID numbers to
21  ensure their ballots are counted?
22   A.   I don't know how to answer that question.
23   Q.   I don't run an elections office.  I'm
24  asking if you know of anything else that could have
25  been done by your office to help those voters?

Page 109

1    A.   I don't know how to answer that question.
2    Q.   Okay.  Is there anything else that the
3  voter could have done if they have an old number on
4  TEAM and submit number on their new ID card or vice
5  versa?
6    A.   Well, the voter has the responsibility to
7  make sure their information in the voter registration
8  record is correct and accurate and updated.  The voter
9  bears that responsibility.
10   Q.   Do you know how many registered voters in
11  Texas have been issued multiple numbers in their
12  lifetimes?
13   A.   I do not.
14   Q.   Do you know how many ABBM or mail ballots
15  have been rejected on account of the voters submitting
16  a correct DPS ID number that was not listed on TEAM?
17   A.   I don't.
18   Q.   Have there been any actions taken by your
19  office other than in-filling driver's license numbers
20  as part of the HB2515 process to address the absence of
21  driver's license numbers or up-to-date driver's license
22  numbers on voter registration records?
23   A.   We have made sure we have got a pipeline
24  from Texas.gov so that we can capture that log-in
25  information whenever someone logs in to fill in the



Page 182

1    A.    If I do it will be related to the voter
2  cross-check system.
3    Q.    Do you know if you will be providing any
4  legal analysis or legal interpretation of election code
5  for The Secretary of State?
6    A.    If requested, sure.  They have mentioned
7  they would like me to do some research projects.
8    Q.    Prior to March of 2023, did Ms. Christina
9  Adkins report to you?
10    A.    She did.
11    Q.    You mentioned earlier in the deposition you
12  will now report to her?
13    A.    That's correct.
14    Q.    Is your position still described as
15  director for Secretary of State?
16    A.    I do not believe so.  I'm not sure if I'm
17  project manager or an attorney five, but something
18  other than a director four.
19    Q.    Do you know if there has been any change in
20  your annual salary?
21    A.    It should stay the same.
22    Q.    Will your new duties turn in part on
23  whether the Texas legislature enacts new legislation in
24  this current session?
25    A.    Sort of, but not really.  The sort of that

Page 183

1  is that, you know, assuming that they pass legislation
2  that makes the withdrawal from ERIC, which makes the
3  need more pressing.  But either way with ERIC losing
4  members we need to fill those gaps.  So probably there
5  needs to be a supplemental system no matter what.
6    Q.    Very clearly explained.  Thank you.  I
7  think I understood what you said.  It's a complicated
8  topic.
9    A.    Agreed.
10    MS. PERALES:  I believe that I'm done.  I will
11  pass the witness.  I think the next attorney is Victor
12  Genecin if he's there.  Shows him on screen.
13    MS. PERALES:  Victor, are you there?
14    MR. GENECIN:  I'm here.
15        EXAMINATION
16  BY MR. GENECIN:
17    Q.    I believe I'm unmuted.  Let's just see.
18  Yes, I can either turn on the screen.  Can you see me?
19    A.    I can.
20    Q.    Very good.  So, Mr. Ingram, my name is
21  Victor Genecin.  I'm with NAACP LDF.  We represent the
22  Houston Area Urban League Plaintiffs here.  I don't
23  believe you and I have ever met, have we?
24    A.    I don't believe so, no, sir.
25    Q.    I'm sorry not to be able to meet you today

Page 184

1  in person.  Like Ms. Perales, if I go quiet it's
2  because I'm eliminating questions from my outline.
3  Unlike Ms. Perales if I suddenly start swearing, you
4  should know it's not about you, it's about trying to
5  make the technology work because I have got exhibits I
6  would like to show you and I'm not convinced that I can
7  do that properly.  But to start I just have a few
8  questions.
9        First of all, during the 2022 general
10  election was any data collected by the State concerning
11  the race of voters?
12    A.    No.
13    Q.    How about concerning the ethnicity of
14  voters?
15    A.    No.
16    Q.    Am I correct that the State does not
17  collect any such data?
18    A.    Agreed.
19    Q.    Turning to what happens after elections.
20  Does your office conduct any of what I would call after
21  action reports or after action meetings in which you
22  get together with either people in your office or with
23  the counties to discuss issues or problems they
24  encountered during the election?
25    A.    Yes, we do.  We do a version of that

Page 185

1  internally as well as with county advisory group.
2    Q.    Who are the members of your county advisory
3  group?
4    A.    I will forget some.  It's better if I just
5  provide a list later then try to recall them off the
6  top of my head.
7    Q.    Why don't we do this.  We will leave a
8  blank in the transcript here and we can fill that in
9  with your list.  How's that?
10    A.
11        That's fine.  It's about 30 some odd
12  counties.
13    Q.    In terms of people with whom you meet
14  internally after an election to conduct an after action
15  group, who are those people?
16    A.    It is our attorneys as well as our election
17  trainers.
18    Q.    In what form does that internal after
19  election review take?
20    MS. HUNKER:  Objection, form.
21  BY THE WITNESS:
22    A.    It's just a meeting in the conference room
23  and some people appear on TEAMS.
24  BY MR. GENECIN:
25    Q.    So it's a meeting, people talk?



EXHIBIT

81

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
    LA UNION DEL PUEBLO ENTERO,      )
 3  et al.,                          )
                      Plaintiffs,    )
 4       vs.                         )Civil Action No.
    STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
 5                    Defendants.    )(Consolidated Cases)

 6
                    ------------------------
 7                      ORAL DEPOSITION OF
                        KEITH INGRAM
 8                      March 28, 2023
                           Volume 1
 9                  ------------------------

10

11       ORAL 30(b)(6) DEPOSITION OF KEITH INGRAM, Volume

12  1, produced as a witness at the instance of the

13  Plaintiff, and duly sworn, was taken in the

14  above-styled and numbered cause on March 28, 2023, from

15  4:22 p.m. to 7:22 p.m., before Dana Shapiro, CSR, in

16  and for the State of Illinois, reported by machine

17  shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18  pursuant to the Federal Rules of Civil Procedure and

19  any provisions stated on the record or attached

20  hereto.

21

22

23

24

25
```



Keith Ingram

March 28, 2023
Pages 2 to 5

## Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR PLAINTIFFS OCA/REVUP TEXAS (via ZOOM):
 4   MS. LUCIA ROMANO
     DISABILITY RIGHTS TEXAS
 5   1500 McGowen, Suite 100
     Houston, Texas 77004
 6   713-974-7691
     lromano@disabilityrightstx.org
 7        -and-
     MS. COURTNEY LUTHER
 8   DISABILITY RIGHTS TEXAS
     2222 West Braker Lane
 9   Austin, Texas 78758
     512-454-4816
10   cluther@disabilityrightstx.org
11   FOR INTERVENOR-DEFENDANTS HARRIS COUNTY REPUBLICAN
     PARTY, DALLAS COUNTY REPUBLICAN PARTY, REPUBLICAN
12   NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL
     COMMITTEE AND NATIONAL REPUBLICAN CONGRESSIONAL
13   COMMITTEE (appeared via ZOOM):
14   MR. STEPHEN J. KENNY
     JONES DAY
15   51 Louisiana Avenue, NW
     Washington, D.C. 20001
16   202-879-3939
     skenny@jonesday.com
17
     FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
18   THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
     LAMAR CLEMMONS (appeared via ZOOM):
19
     MR. KATHRYN SADASIVAN
20   MR. VICTOR GENECIN
     MS. URUJ SHEIKH
21   NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
     40 Rector Street, Fifth Floor
22   New York, New York 10006
     212-965-2200
23   ksadasivan@naacpldf.org
     vgenecing@naacpldf.org
24   usheikh@naaacpldf.org
25
```

## Page 3

```
 1          A P P E A R A N C E S (continued):
 2   FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO SOUTHWEST
     VOTER REGISTRATION EDUCATION PROJECT:
 3
     MS. NINA PERALES
 4   MS. JULIA R. LONGORIA(via ZOOM)
     MS. FATIMA L. MENENDEZ(via ZOOM)
 5   MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
     110 Broadway, Suite 300
 6   San Antonio, Texas 78205
     210-224-5476
 7   nperales@maldef.org
     jlongoria@maldef.org
 8   fmenendez@maldef.org
          -and-
 9   MR. JASON KANTERMAN (via ZOOM)
     MR. KEVIN ZHEN (via ZOOM)
10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
     One New York Plaza
11   New York, New York 10004
     212-859-8519
12   Jason.Kanterman@friedfrank.com
     Kevin.Zhen@friedfrank.com
13
     FOR PLAINTIFFS LULAC, TEXAS, VOTO LATINO, TEXAS
14   ALLIANCE FOR RETIRED AMERICANS, TEXAS AFT (appeared via
     ZOOM):
15
     MS. MARISA O'GARA
16   ELIAS LAW GROUP LLP
     250 Massachusetts Avenue, NW, Suite 400
17   Washington, D.C. 20001
     202-968-4490
18   mogara@elias.law
19   FOR THE UNITED STATES:
20   MR. JUSTIN BENNETT(appeared via ZOOM)
     MR. RICHARD A. DELLHEIM
21   MR. MICHAEL E. STEWART
     U.S. DEPARTMENT OF JUSTICE
22   CIVIL RIGHTS DIVISION
     950 Pennsylvania Avenue, NW
23   Washington, D.C. 20530
     800-253-3931
24   Justin.Bennett@usdoj.gov
     Richard.Dellheim@usdoj.gov
25   Michael.Stewart3@usdoj.gov
          -and-
```

## Page 4

```
 1          A P P E A R A N C E S (continued):
 2   MR. DANIEL J. FREEMAN
     U.S. DEPARTMENT OF JUSTICE
 3   CIVIL RIGHTS DIVISION
     4 Constitution Square (4CON)
 4   150 M Street, N.E./8.143
     Washington, D.C. 20530
 5   202-305-4355
     Daniel.Freeman@usdoj.gov
 6
     FOR DEFENDANTS THE STATE OF TEXAS, GREG ABBOTT, IN HIS
 7   OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN
     HER OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
 8   WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS
     ATTORNEY GENERAL:
 9
     MS. KATHLEEN HUNKER
10   MR. ETHAN SZUMANSKI
     OFFICE OF THE ATTORNEY GENERAL
11   P.O. Box 12548
     Austin, Texas 78711-2548
12   512-463-2100
     kathleen.hunker@oag.texas.gov
13   ethan.szumanski@oag.texas.gov
14   FOR OFFICE OF THE TEXAS SECRETARY OF STATE:
15   MR. ADAM BITTER
     OFFICE OF THE SECRETARY OF STATE
16   Capitol Building, Rm 1E.8
     P.O Box 12697
17   Austin, Texas 78711-2697
     512-475-2813
18   abitter@sos.texas.gov
19   FOR DEFENDANT LISA WISE, IN HER OFFICIAL CAPACITY AS
     THE EL PASO COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
20
     MR. GERMAINE HABELL
21   COOLEY LLP
     Wells Fargo Center, South Tower
22   355 South Grand Avenue, Suite 900
     Los Angeles, California 90071-1560
23   213-561-3227
     ghabell@cooley.com
24
     FOR DEFENDANTS BEXAR COUNTY ELECTIONS ADMINISTRATOR,
25   JACQUELYN CALLANEN AND BEXAR COUNTY DISTRICT ATTORNEY
     JOE D. GONZALES (via ZOOM):
```

## Page 5

```
 1          A P P E A R A N C E S (continued):
 2   MS. LISA V. CUBRIEL
     ASSISTANT DISTRICT ATTORNEY-CIVIL SECTION
 3   BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
     7th Floor Paul Elizondo Tower
 4   101 West Nueva
     San Antonio, Texas 78205-3030
 5   210-335-2142
     Lisa.Cubriel@bexar.org
 6
     FOR PLAINTIFF MI FAMILIA VOTA (via ZOOM):
 7
     MS. COURTNEY HOSTETLER
 8   FREE SPEECH FOR PEOPLE
     1320 Centre Street, #405
 9   Newton, Massachusetts 02459
     617-249-3015
10   chostetler@freespeechforpeople.org
11   FOR DEFENDANTS CLIFFORD TATUM, IN HIS OFFICIAL CAPACITY
     AS HARRIS COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
12
     MR. SAMEER S. BIRRING
13   SENIOR ASSISTANT COUNTY ATTORNEY
     OFFICE OF THE HARRIS COUNTY ATTORNEY
14   1019 Congress Plaza, 15th Floor
     Houston, Texas 77002
15   713-274-5101
     Sameer.Birring@harriscountytx.gov
16
     FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
17   DELIA GARZA (via ZOOM):
18   MS. LEIGH ANN TOGNETTI
     ASSISTANT DISTRICT ATTORNEY
19   100 East Cano, First Floor
     Hidalgo County Courthouse Annex III
20   Edinburg, Texas 78539
     956-292-7609
21   leigh.tognetti@da.co.hidalgo.tx.us
22
     ALSO PRESENT (via ZOOM):
23   MS. MORGAN HUMPHREY
     MS. SAMANTHA KOBOR
24
25
```



Keith Ingram

March 28, 2023
Pages 6 to 9

Page 6

1                     INDEX
2                                           PAGE
   Appearances.................................2-5
3  KEITH INGRAM VOLUME 1
          Examination by MR. STEWART................7
4         Examination by MS. PERALES...............71
   Signature and Changes......................114
5  Reporter's Certificate.....................116
6                   EXHIBITS
   NO.              DESCRIPTION          PAGE
7  No. 1              Notice              9
8  No. 2              responses          11
9  No. 3              verification       12
10 No. 4              email              35
11 No. 5               results           39
12 No. 6              email              48
13 No. 7              email              54
14 No. 8              email              60
15 No. 9           news article         104
16 No. 10          The Clips            104
17 No. 11           Training            109
18
19
20
21
22
23
24
25

Page 7

1          (WHEREUPON, the witness was duly
2          sworn.)
3          EXAMINATION
4  BY MR. STEWART:
5      Q.    Good afternoon, Mr. Ingram.  I know we have
6  met before.  I'm Mike Stewart.  I'm here for the United
7  States.  This is the 30(b)(6) portion of your
8  deposition on behalf of the Secretary of State,
9  correct?
10     A.    I understand.
11     MR. STEWART:  Does everybody else want to make an
12 appearance?  I will represent I'm here with Mr. Dan
13 Freeman and Mr. Richard Dellheim for the United States.
14         Nina, do you want to make an appearance?
15     MS. PERALES:  Nina Perales for the LUPE
16 Plaintiffs, L-U-P-E.
17     MS. HUNKER:  Kathleen Hunker and Ethan Szumanski
18 representing the State Defendants as well as individual
19 legislators for the purpose of representing their
20 legislative privilege to the extent it comes up.
21 Accompanied by Adam Bitter who represents the Secretary
22 of State as general counsel.
23     MR. STEWART:  Is there anyone else on the Zoom
24 who plans to ask questions on this deposition?
25     MR. GENECIN:  I do.  Victor Genecin from NAACP

Page 8

1  LDF for the Houston Area Urban League Plaintiffs.  And
2  I'm looking forward to asking questions on 30(b)(6)
3  portion.
4      MR. STEWART:  Anyone else?
5  BY MR. STEWART:
6      Q.    Thank you.  I know you've been here for
7  sometime today already, Mr. Ingram.  I think we can
8  shorten sort of the ground rule portion, but just to
9  get it for the record.  Can we agree basically all of
10 the same ground rules as far as not speaking over each
11 other, asking for clarification, waiting until a
12 question is answered to ask for a break or consult with
13 your attorney if needed will apply to this deposition
14 as well?
15     A.    Sure.
16     Q.    If I'm ever unclear, please ask for
17 clarification.  Okay?
18     A.    I will.
19     Q.    If I ask you a question, you ever think of
20 a document that would be helpful, just let us know and
21 we may have it and be able to run it down.
22     A.    I can.
23     Q.    Then the same necessary question my
24 colleague asked.  Is there -- have you taken any
25 medication, drugs, any other things that might affect

Page 9

1  your ability to understand my questions or give full
2  and complete answers today?
3      A.    No.
4      Q.    Thank you.  I'm going to go ahead and hand
5  you our first exhibit for this portion of deposition.
6          (WHEREUPON, a certain document was
7          marked SOS Exhibit No. 1, for
8          identification, as of 3/28/23.)
9  BY MR. STEWART:
10     Q.    Do you recognize this document, Mr. Ingram?
11     A.    I do.
12     Q.    Is this the deposition notice pursuant to
13 which you are testifying this afternoon?
14     A.    It is.
15     Q.    If you flip to Exhibit A, which is a list
16 of topics.  I understand you are prepared to testify on
17 some of these topics today; is that correct?
18     A.    That's correct.
19     Q.    Just so we understand the topics that will
20 be excluded from this deposition will be 15, parts of
21 31 and 32, all of 34 and all of 17.  I apologize those
22 are out of order.  15, 17, 31 in part, 32 in part, and
23 34 will be excluded from this portion, correct?
24     A.    I believe that's correct, yes, sir.
25     Q.    You are prepared to testify on all of the



Keith Ingram

March 28, 2023
Pages 18 to 21

Page 18

1 complicated.
2    Q.    Does the Secretary of State's Office
3 consider cancellation of ABBM to be a form of cure?
4    A.    Well, it's choice of voter as to whether or
5 not to pursue voting by mail or decide to vote in
6 person. From my perspective if the voter successfully
7 votes that's a win.
8    Q.    You haven't considered specifically to put
9 that under the umbrella of cure, if it's aimed towards
10 successful voting?
11    MS. HUNKER:  Objection, form.
12 BY THE WITNESS:
13    A.    Right.  It's not a cure of application if
14 they decide to vote by person, but it is a successful
15 vote.
16 BY MR. STEWART:
17    Q.    So then turning back to the same language
18 you looked at on page 12.  This was presented this way
19 and then as use ballot by mail tracker to correct the
20 defects and have ABBM corrected or canceled their
21 application and voted in person because that's the way
22 data is maintained with those two things together,
23 right?
24    A.    The data is maintained as to whether or not
25 there was successful vote, yes.

Page 19

1    Q.    Turning to Exhibit 8 beginning on the
2 bottom of page 12 on the same exhibit.  Do you see
3 where I am?
4    A.    Yes.
5    Q.    There is a portion where that asks state
6 the number of voters who have cured carrier envelope
7 identification defects using any on-line portal
8 provided pursuant to SB1 from February 9, 2022 to
9 present, correct?
10    A.    Correct.
11    Q.    The original response identified that TEAM
12 captures only the current or most recent status seeked
13 with any information in voter records, correct?
14    A.    That's correct.
15    Q.    Does that remain true for data collected
16 through the November 8, 2022 general election?
17    A.    That's correct.
18    Q.    Looking at the supplemental response on
19 page 13 and take a moment if you need to.  But does the
20 data information here remain accurate, to the best of
21 your understanding today?
22    A.    From the first answer, yes.
23    Q.    By the first answer which one are you
24 identifying?
25    A.    I'm talking about the response and not the

Page 20

1 supplement response as far as I know supplemental
2 response is accurate as well.  I want to separate the
3 two.
4    Q.    For the clean record, specifically for the
5 supplemental response do the numbers there appear
6 accurate to you?
7    A.    Yes.
8    Q.    So if we turn to page 14 what appears to be
9 the final item or the final paragraph says total number
10 of voters who use the ballot by mail tracker to correct
11 defective carrier envelope and had their mail ballot
12 accepted or cancelled -- withdraw that.
13    Total number of voters who use the ballot
14 by mail tracker to correct a defective carrier envelope
15 and had their mail ballot accepted or cancel their mail
16 ballot voted in person: 1,496.
17    Do you see where I am?
18    A.    I do.
19    Q.    I may know the answer to this, but similar
20 question as before, does the Secretary of State
21 maintain data that could separately show the number of
22 voters who used the tracker to correct a carrier
23 envelope and separately the number of voters who
24 cancelled?
25    A.    I think we could get there.

Page 21

1    Q.    How would you get there?
2    A.    With a separate query for people who using
3 this universe of numbers at 1531, if we still have that
4 list, and using it to who voted to decide to check who
5 voted in person.
6    Q.    Is it Ms. Hart who would know how to do
7 that as well?
8    A.    Well, she would know if there is a query
9 they could get that info.
10    Q.    Is it correct that similar to an ABBM, the
11 tracker cannot be used to cancel a mail ballot request?
12    A.    That's correct.
13    Q.    What was the overall statewide rejection
14 rate of ABBM for the November 22 general election?
15    MS. HUNKER:  Objection, form.
16 BY THE WITNESS:
17    A.    I don't know.
18 BY MR. STEWART:
19    Q.    Do you know if there was somewhere we could
20 find that information?
21    A.    We can check and see what TEAM says, but
22 it's not accurate.
23    Q.    Why is it inaccurate?
24    A.    Because not all of the counties entered the
25 information.



Keith Ingram

March 28, 2023
Pages 22 to 25

Page 22

1    Q.    Is there any other reason other than lack
2  of information from counties that it would be
3  inaccurate?
4    A.    We have got the continuing program.  It's a
5  live database and changes come and somebody has
6  cancelled or gone out of the system since then that
7  information won't be there anymore.
8    Q.    Just so I'm clear, that's because records
9  for an individual voter could have rolled off that
10  would show that information?
11    A.    That's right.
12    Q.    Do you know approximately what portion of
13  the counties entered information for ABBMs?
14    A.    No.
15    Q.    Would you estimate it's more or less than
16  50 percent?
17    MS. HUNKER:  Objection, form.
18  BY THE WITNESS:
19    A.    So I think probably more than 50 percent of
20  counties entered ABBM information, but they don't
21  represent more than 50 percent of voters.
22  BY MR. STEWART:
23    Q.    What was the overall statewide rejection
24  rate of mail ballots for the November 22 general
25  election?

Page 23

1    A.    2.7 percent.
2    Q.    Do you know what portion of those
3  rejections were because of missing or incorrect ID
4  information?
5    A.    I know that there is 163 of them that were
6  rejected because they supplied a number on their
7  carrier envelope, but didn't have one in their voter
8  registration record.
9    Q.    That's because -- withdraw that.
10    Those are identified, the 163 are ones that
11  there was no number in the voter registration record at
12  all?
13    A.    That's right.
14    Q.    Is that the only breakdown of that
15  information you are able to give as far as rejections
16  because of SB 1 identification number requirement?
17    A.    Without running a query that's what
18  information I have now.
19    Q.    Is there a query that can be run to
20  determine how many rejected that were provided an ID
21  number and there was an ID number in the team database,
22  but it was incorrect or mismatched?
23    A.    There is a query that can determine how
24  many were rejected for a mismatched number or that, you
25  know, they didn't provide a number that was in the

Page 24

1  record.
2    Q.    Do you know that information sitting here?
3    A.    I don't.
4    Q.    Do you know of any counties that entered
5  partial ABBM data?
6    MS. HUNKER:  Objection, form.
7  BY MR. STEWART:
8    Q.    We know there are some based on your
9  testimony that did not enter ABBM data correct, and
10  then are there some that entered complete ABBM data, to
11  your knowledge?
12    A.    Yes.
13    Q.    Are there any that say started entering
14  ABBM data, but didn't complete or started after certain
15  date or for whatever reason is incomplete?
16    A.    Yes, I believe Bexar County falls in that
17  category.
18    Q.    Do you know why they changed their entry
19  practices?
20    A.    Well, because we were after the counties to
21  enter the ABBM data.
22    Q.    Do you remember approximately what date
23  that was when you asked counties to enter?
24    A.    No, I mean we were continuously contacting
25  counties, and we felt weren't, you know, doing what

Page 25

1  they are supposed to do with regard to ballot tracker
2  from the time mail ballots started coming back.
3    Q.    Was that in the run up to the general or
4  primary?
5    A.    General.
6    Q.    Are you aware of any counties that failed
7  to enter mail ballot rejection data into TEAM for the
8  general election?
9    A.    We had much better success with that.  It
10  could be some were miscoded, but pretty sure we got
11  most compliance with that.
12    Q.    Those were what you would say were human
13  error?
14    A.    Right.
15    Q.    Any other reasons they might be miscoded?
16    A.    I mean you can call it human error, but
17  it's because they don't know what code applies to what
18  situation.
19    Q.    Basically an attempt to enter data but done
20  incorrectly?
21    A.    Correct.
22    Q.    Are you aware of any technical issues with
23  TEAM that prevented the entry of complete and accurate
24  mail ballot data for the general election?
25    A.    Not in general election, no.



Keith Ingram

March 28, 2023
Pages 34 to 37

Page 34

1  one voter a certain way they have got to treat all
2  voters similarly situated the same way.
3      Q.   Did the Secretary of State's Office issue,
4  leaving aside those responses to those questions, any
5  new guidance regarding the ID number requirements after
6  the primary runoff?
7      A.   No.
8      Q.   Nothing about the implementation should
9  have changed following the primary runoff, correct?
10     A.   I don't believe so.  I mean we sent
11  reminders about that implementation, we had seminar
12  presentations about that implementation.  We sent, you
13  know, materials that they could print and distribute to
14  voters about that implementation, but the guidance
15  itself didn't change after that.
16     Q.   Did any county request to modify a form
17  used to implement the ID number requirement following
18  the primary runoff?
19     A.   We had some requests for different sizes
20  and shapes and orientations of the carry envelope.  I
21  believe all of those were before the runoff.
22     Q.   Anything that would have changed the
23  substance of either the carrier envelope or the ABBM
24  form?
25     A.   No.

Page 35

1      Q.   Anything that would have changed the
2  substance of any of the instruction forms that the SOS
3  prepares?
4      A.   No.
5      MR. STEWART:  I think this is SOS 4.
6          (WHEREUPON, a certain document was
7           marked Deposition Exhibit No. 4,
8           for identification, as of 3/28/23.)
9  BY MR. STEWART:
10     Q.   You should have document SOS 4, state
11  122242.  I will give you a second to read that.  That's
12  the double-sided.  Let me know when you have had a
13  chance to read it.  Are you good?
14     A.   Yes.
15     Q.   This appears to be an email from a voter to
16  Secretary of State's Office, correct?
17     A.   I agree with that.
18     Q.   The voter identifies, would you agree with
19  the characterization, that they say the Tarrant County
20  election office said the numbers in the voter
21  registration database, I take that to mean their ID
22  numbers were transposed.
23     A.   That's what she says that her Social
24  Security number was entered incorrectly when she
25  originally registered back in 1980.

Page 36

1      Q.   She says that Tarrant's reply was that the
2  voter had to come to their office to fix the issue,
3  correct?
4      A.   That's what she says.
5      Q.   Would advice be correct, to the best of
6  your knowledge?
7      A.   Well, it kind of depends what issue they
8  were telling her that she needed to correct.  If she
9  needed to correct the number in the voter registration
10  record obviously she could do that with a voter
11  registration application and she doesn't need to come
12  in person.  If she's trying to fix the problem with the
13  application for ballot by mail then probably she needs
14  to show up in person or fill out a new application with
15  the transposed digits.
16     Q.   I see.  So if the problem were with the
17  ABBM, would she be able to correct that in the portal?
18     A.   If the problem was that the original number
19  was transposed, the only way to fix it in the portal
20  was to create the transposed numbers are correct.
21     Q.   The portal can't be used to change what's
22  in TEAM, it only be used to change what's on the ABBM?
23     A.   That's correct.
24     Q.   So how would she fix the issue -- if it is
25  correct that the issue in TEAM, what ways could she be

Page 37

1  directed to fix that?
2      A.   I think the only way you can fix that to
3  fill out a new voter registration application with the
4  correct number.
5      Q.   So if TEAM then is the source of
6  transposition, it would be correct from Tarrant that
7  she would need to go into the office to correct that?
8      MS. HUNKER:  Objection, form.
9  BY THE WITNESS:
10     A.   You don't need to fill out a voter
11  registration application in person.
12  BY MR. STEWART:
13     Q.   That's something she also could have done
14  remotely, correct?
15     A.   That's correct.
16     Q.   If it's correct in fact that the numbers
17  are transposed in TEAM, she would not be able to enter
18  the portal entering the correct number, right?
19     A.   That's correct.  She would have to enter
20  the transposed number and agree it's the correct number
21  for her mail bound application to be accepted.
22     Q.   Got it.  I want to turn to -- I think last
23  year when we spoke we discussed the HB2512 process; do
24  you recall?
25     A.   I do.



Keith Ingram

March 28, 2023
Pages 38 to 41

Page 38

1    Q.    That's the process for present purposes by
2  which driver's license, ID number or SSN data is
3  imported from DPS database into team, correct?
4    A.    That's correct.
5    Q.    Was the HB2512 process run at any point in
6  2022 following the primary election?
7    A.    No.
8    Q.    Was it --
9    A.    It was in December.
10   Q.    In December following the general election?
11   A.    Not before the general.
12   Q.    Not before the general, but in 2022
13  following -- let me withdraw that.  It was not run
14  between the primary and the general, correct?
15   A.    That's correct.
16   Q.    It was run following the general before the
17  end of the year?
18   A.    I agree.
19   Q.    Has it been run again since then?
20   A.    No, sir.
21   Q.    Is that a regular annual process is that
22  why it was run in December?
23   A.    It has historically been run in December,
24  not every December, but obviously the last two.
25   Q.    I'm going to hand you what will be SOS 5.  I

Page 39

1  will state I don't know why this document presented
2  without a Bates number.  You Bates number on it.  It is
3  state 137751.  Just to put that on the record.
4                (WHEREUPON, a certain document was
5           marked Deposition Exhibit No. 5,
6           for identification, as of 3/28/23.)
7    MS. HUNKER:  Thank you.
8  BY MR. STEWART:
9    Q.    Do you recognize this document, Mr. Ingram?
10   A.    I do.
11   Q.    What is this?
12   A.    This is the result of the comparison
13  process from December of '22.
14   Q.    That's the same HB2512 process we were just
15  discussing?
16   A.    That's correct.
17   Q.    So the initial numbers, would they reflect
18  the state of the database following the 2021 process?
19   A.    Plus whatever changes were made in the
20  course of the 2022.
21   Q.    So they wouldn't reflect any changes from a
22  systemic process, but they could represent -- reflect
23  what I will call ad hoc changes to individual records?
24   MS. HUNKER:  Objection, form.
25  BY THE WITNESS:

Page 40

1    A.    That's correct.  If an individual went to
2  DPS to renew driver's license and supplied a new number
3  or changed a number, it would be reflected in this.
4  BY MR. STEWART:
5    Q.    And then the post numbers reflect the state
6  of the database following the HB2512 process in
7  December of 2022, correct?
8    A.    Agree with that.
9    Q.    Looking at these numbers.  There would be
10  some organic change in these numbers without the HP2512
11  process perhaps not to this degree, but they wouldn't
12  look the same as the 2021 numbers, correct?
13   A.    Agree with that.
14   Q.    Would you agree that though the HP2512
15  process did change these numbers to some extent?
16   A.    Yes.
17   Q.    Do you think the majority of this change is
18  due to HP2512?
19   MS. HUNKER:  Objection, form.
20  BY THE WITNESS:
21   A.    When you say this change what do you mean?
22  BY MR. STEWART:
23   Q.    From the initial numbers on the left to the
24  post numbers on the right, each of which decreased.
25  For each of those categories, would you say the

Page 41

1  majority of the decrease is attributable to the HP2512
2  process?
3    A.    I would say the changes exclusively related
4  to 2512 process.
5    Q.    Why do you think additional numbers were
6  caught in the 2022 process that were not caught in the
7  2021 process?
8    A.    Because database is not the same.
9    Q.    You are saying some individuals may have,
10  for example, added an SSN or a driver's license to the
11  DPS database during the year 2022 before this was run
12  that are then pulled into the team database?
13   A.    No.  I mean that could happen.  But more
14  likely is the information in the TEAM database changed
15  so our matching was more efficient.
16   Q.    I see.  So do you think it was mostly
17  attributable to improvement in matching on these
18  records?
19   A.    Not -- the matching criteria didn't change.
20  So the data that we use improves and the matching gets
21  better.  So if a voter supplied one or the other of the
22  numbers then it's easier to pull in the other number.
23   Q.    You anticipated my next question.  The
24  matching criteria was the same in the 2022 process as
25  in the 2021 process?



Keith Ingram

March 28, 2023
Pages 42 to 45

Page 42

1    A.    Yes.
2    Q.    Would there have been any new registrants
3 who were able to register with only one of the driver's
4 license or SSN numbers?
5    A.    One of those numbers is the only thing
6 that's required so definitely we could have had new
7 registrants who registered with one number or the
8 other, and we were able to get the other number for
9 that voter pulled in through that process.
10   Q.    Just so it's clear in my mind, this would
11 have -- the change in these numbers from initial to
12 post would capture 2021 first time registrants who
13 registered with one number, and then had the other
14 number pulled in through this HP2512 process?
15   A.    I agree with that. I think you meant to
16 say '22 in that question.
17   Q.    I appreciate that correction.
18         Looking at these individual categories,
19 looking at the third category, number of active and
20 suspense, I'm going from top to bottom, the third
21 category number of active and suspense voters that have
22 neither a TDL or SSN on their voter record, no value
23 for both fields. So those are the individuals in TEAM
24 who did not have either the TDL or the -- any portion
25 of an SSN, correct?

Page 43

1    A.    Agree with that.
2    Q.    That number moved by less than 2,000,
3 correct?
4    A.    It looks like about 1,300 maybe.
5    Q.    Why do you think the movement in that was
6 smaller than in the other categories?
7    A.    Because it's the hardest category to do
8 anything with.
9    Q.    Have you discussed any way to capture more,
10 improve the HP2512 process for that category of voters
11 in the future?
12   A.    No.
13   Q.    Just a couple quick questions. After the
14 HP2512 process is run, how are those changes filtered
15 out to off-line counties?
16   A.    They are supposed to sync their data with
17 ours on a monthly basis.
18   Q.    That occurs monthly?
19   A.    It does or it's supposed to.
20   Q.    Is that a two-way sync? So, for example,
21 if something gets changed in the county's off-line
22 database more recently than the information in TEAM,
23 should that be then filtering into TEAM as well?
24   A.    So there is two different things that you
25 might be confusing here. Any changes in voter

Page 44

1 registration record that the county gets from the voter
2 is supposed to be reported nightly. So that's what we
3 call our batch process. That's not the same as syncing
4 the data. Syncing the data means we want to make sure
5 everything we have got in our system is captured in
6 off-line system so the databases are identical, right.
7 So the goal is to have zero differences in the sync
8 file. This kind of change in the SOS file is what we
9 are trying to sync to the voters. Then of course there
10 are other kinds of changes the county makes with regard
11 to pre-syncing in particular that aren't reflected in
12 an individual voter change that we would get in a batch
13 process. We want to sync those up as well. So those
14 are the two things that we are syncing is making sure
15 that everything from our database is in theirs and
16 making sure all of their precinct lines they may have
17 re-drawn are in ours.
18   Q.    Taking those two processes separately
19 because I assume -- do those processes run at the same
20 time?
21   A.    Yes.
22   Q.    They do?
23   A.    The sync is simultaneous.
24   Q.    So the sync is referring to information
25 from TEAM filtering down to the counties?

Page 45

1    A.    That's right.
2    Q.    That occurs monthly?
3    A.    It's supposed to occur monthly. We have to
4 do it much less often. With this change in law it
5 became expedient to do it more often.
6    Q.    All new registrations are entered by the
7 county into their databases, correct?
8    A.    That's right, many changes to registration
9 is entered.
10   Q.    Those changes are coming upward to TEAM
11 daily?
12   A.    That's right.
13   Q.    Then new information from HP2512 is going
14 from TEAM to the counties monthly?
15   A.    Well, we sync the database monthly. The
16 new information from 2512 is obviously an annual thing.
17   Q.    I see. It would be part of that monthly
18 sync process?
19   A.    It would.
20   Q.    Information entered into the texas.gov
21 portal that gets pulled over, where does that go first?
22   A.    To TEAM.
23   Q.    That will to the counties as part of the
24 monthly process?
25   A.    That's right.



Keith Ingram

March 28, 2023
Pages 46 to 49

Page 46

1    Q.    If there is any difference in the county
2  and state databases, would those likely be due to a lag
3  in time between basically the monthly process
4  occurring?
5    MS. HUNKER:  Objection, form.
6  BY THE WITNESS:
7    A.    That's right, or they haven't resolved
8  everything that was a difference in the last sync file.
9  BY MR. STEWART:
10    Q.    What does it mean to resolve it?
11    A.    To choose one or the other.
12    Q.    When something comes down from the sync
13  file from TEAM to the county, the county needs to
14  resolve each of those in their own database?
15    A.    That's correct.
16    Q.    If there is an import from Texas.gov, those
17  cannot be used by the county in the cure process until
18  the next sync occurs; is that correct?
19    A.    No, they can use TEAM.  They are -- all
20  have access to TEAM and we told them to use tell.
21    Q.    They wouldn't be reflected in the county,
22  but the instruction from the SOS is to also look in the
23  TEAM database?
24    A.    That's right.
25    Q.    Do you know if all counties follow that

Page 47

1  instruction?
2    A.    I don't know that for sure.  I'm pretty
3  sure Bexar County didn't.  Jackie does what Jackie
4  does.
5    Q.    Any others you think may not have?
6    A.    No, I'm pretty sure they mostly did.
7    Q.    Are you aware of any counties -- withdraw
8  that.  Good news is I'm shortening my questions here.
9        Did any county report -- rephrase that.
10        Did any off-line counties report to the SOS
11  their vendors having issues with information keeping
12  for mail ballots for the general election?
13    A.    Not for the general.
14    Q.    For the primary?
15    A.    Yes.
16    Q.    Which counties were those if you recall?
17    A.    The VOTEC counties.
18    MR. STEWART:  Could we take a short break.
19        (WHEREUPON, a recess was had.)
20  BY MR. STEWART:
21    Q.    I'm going to show you, Mr. Ingram, the next
22  document if I can find it.
23    MR. STEWART:  I believe we are at SOS 6.  It's
24  Bates stamped 123228.
25        (WHEREUPON, a certain document was

Page 48

1        marked SOS Exhibit No. 6, for
2        identification, as of 3/28/23.)
3  BY MR. STEWART:
4    Q.    Give you a second to read, Mr. Ingram.
5    A.    Okay.
6    Q.    This is a mass email from the Secretary of
7  State's Office to county election officials?
8    A.    That's correct.
9    Q.    That's with instructions on finalizing
10  election reporting for the March 1 primary, correct?
11    A.    That's correct.
12    Q.    I want to focus on the section that
13  bulleted incomplete or missing TDL/SSN/on-line cure
14  available.  I'm going to look at the last paragraph
15  there to make sure I understand what it's saying.  Are
16  these directions on how ABBM information should be
17  entered into TEAM?
18    A.    Yes.
19    Q.    It says, "For ballots marked incomplete or
20  missing TDL/SSN on-line cure available following the
21  deadline for correction the ABBM records will need to
22  be updated to received after deadline.  Off-line
23  counties will need to submit status update for these
24  records.  Please verify correct coding for these
25  statuses with your vendors."

Page 49

1        Did I read that right?
2    A.    You did.
3    Q.    Does this mean that in TEAM no ABBM would
4  ultimately be identified as incomplete or missing
5  TDL/SSN on-line cure available once the cure deadline
6  has passed?
7    A.    That's what it looks like.  I'm not sure
8  why it says for ballots marked and then talks about
9  ABBMs.
10    Q.    So you are saying there's a mismatch there
11  between describing ballots on the one hand and ABBM on
12  the other?
13    A.    Agreed.
14    Q.    Would these instructions effect ballot
15  recordkeeping?
16    A.    Well, they reflect final status.
17    Q.    The final status of ABBMs?
18    A.    Exactly.
19    Q.    Would any -- I'm sorry.
20    A.    It's got the same discrepancy in the first
21  paragraph.  Not sure.
22    Q.    What I'm trying to understand is would you
23  be able to tell using TEAM then whether any ABBM was
24  rejected for incomplete or missing TDL/SSN on-line cure
25  available after the cure deadline has passed using the



Page 58

1  voter registration.
2      Q.    That being because it could either be the
3  driver's license or SSN?
4      A.    That's correct.
5      Q.    Because this voter was able to log in to
6  the ballot tracker, their registration record must
7  already contain the driver's license and the SSN,
8  correct?
9      A.    That's correct.
10     Q.    The SOS response directed the voter to
11 contact Tarrant County; is that correct?
12     A.    That's right.
13     Q.    If you look back at 118034.  Tarrant County
14 directed the voter to contact the Secretary of State if
15 they are unable to use the tracker; is that correct?
16     A.    That's correct.
17     Q.    Which one of those two responses is
18 correct?  In other words, who should the voter be
19 contacting in that circumstance?
20     MS. HUNKER:  Objection, form.
21 BY THE WITNESS:
22     A.    If Tarrant County hasn't inputted the
23 information into the tracker, the tracker is not going
24 to be of use to the voter.  I mean Andre is correct,
25 that the way you got it fix this is with Tarrant County

Page 59

1  because you have logged in successfully in the tracker,
2  you don't see anything to fix.  So that's Tarrant
3  County's problem.
4  BY MR. STEWART:
5      Q.    So in the instance where let's say tracker
6  information is not appearing or populating for a known
7  mail ballot, the county should be entering that
8  information?
9      A.    Absolutely.
10     Q.    A voter with an issue should be contacting
11 the county?
12     A.    Yes.
13     Q.    Are there circumstances where a voter
14 should be contacting the Secretary of State for ballot
15 tracker issues?
16     A.    They will call us if they are having
17 trouble accessing it.
18     Q.    So is it correct to say then the Secretary
19 of State's Office manages the access portion of the
20 ballot tracker and the county is manage the individual
21 ballot information portion?
22     A.    The substance of information --
23     MS. HUNKER:  Objection, form.
24 BY THE WITNESS:
25     A.    -- within the tracker is contributed by the

Page 60

1  counties.
2  BY MR. STEWART:
3      Q.    But the counties don't have any control
4  over the access portion, correct?
5      A.    That's correct.
6      Q.    To your knowledge, did any other voters
7  identify a similar issue such as this where they are
8  able to access the tracker but information wasn't
9  populating in the tracker?
10     A.    Not in the general.
11     Q.    Not in the general.  Did that happen in the
12 primary?
13     A.    In the primary, yes.
14     Q.    Did you identify the route cause of that
15 issue in the primary?
16     A.    It's because the VOTEC system wasn't
17 mapping to the TEAM system properly.  The general is
18 just because the county didn't enter the information.
19     Q.    Let's look at SOS 8.
20           (WHEREUPON, a certain document was
21            marked Deposition Exhibit No. 8,
22            for identification, as of 3/28/23.)
23 BY MR. STEWART:
24     Q.    We're back in Tarrant County.  Would you
25 agree this chain appears to reflect a communication

Page 61

1  from an overseas voter to the Secretary of State
2  regarding an attempt to vote in Tarrant County?
3      A.    It's I think more accurate to say it's an
4  exchange between Tarrant County and the voter, which
5  was then forwarded to our office.
6      Q.    Fair.
7      MR. STEWART:  For the record, this is state
8  118344.  Should have done that before.
9  BY MR. STEWART:
10     Q.    So if -- the earliest email in the chain
11 appears to be from Tarrant County, correct?
12     A.    Agreed.
13     Q.    That email references a signature sheet.
14 What in this context, for the record, is a signature
15 sheet?
16     A.    It's got the same information on it that
17 the carrier envelope does, but it's a piece of paper
18 that's put inside the envelope with a ballot instead of
19 reconstructing an envelope.
20     Q.    Tarrant County email that begins the chain
21 states to the voter, "On your signature sheet you
22 posted your SSN only."
23           Did I read that right?
24     A.    That's what it says.
25     Q.    What are the circumstances where a voter



Keith Ingram

March 28, 2023
Pages 62 to 65

Page 62
1 needs to use an SSN and a driver's license number on a
2 signature sheet?
3      A.   There is not any.  I don't know why in the
4 world Tarrant County said that.  That's dumb.
5      Q.   So then looking there is an email on the
6 first page from Jennifer Ethridge that's on November 8,
7 2022 at 9:01 a.m.  This voter indicates that they have
8 a Social Security number, but not a Texas driver's
9 license, right?
10      A.   That's what they say.
11      Q.   So with that, if this information they
12 provided is correct, they wouldn't be able to use the
13 on-line tracker, correct?
14      A.   That's correct.
15      Q.   So how is an overseas voter such as this
16 one assuming what they have represented here is correct
17 able to cure a carrier envelope that's been rejected
18 for ID number reasons?
19      A.   Well, Tarrant County shouldn't have
20 rejected it.  So this -- if we get this, call Tarrant
21 County happen immediately.
22      Q.   This was an error on Tarrant County's part?
23      A.   Absolutely.
24      Q.   Leaving aside the specific issues of this
25 document.  If an overseas voter's carrier envelope or

Page 63
1 mail ballot is rejected for lacking an ID number
2 entirely, what are their options to cure?
3      A.   Well --
4      MS. HUNKER:  Objection, form.
5 BY THE WITNESS:
6      A.   If the carrier envelope doesn't have a
7 number on it then they need to supply a number with
8 another signature sheet.
9 BY MR. STEWART:
10      Q.   They need to send another signature sheet?
11      A.   That's right.
12      Q.   Is there -- given this exchange is
13 occurring on November 8, is it likely that could happen
14 before the cure period closes?
15      A.   Sure, they can email them.
16      Q.   They can email the new signature sheet to
17 Tarrant?
18      A.   That's correct.
19      Q.   Did Tarrant advise them of that option?
20      A.   I don't know.  If they didn't they should
21 have.  They shouldn't have rejected it in the first
22 place.  So I mean we can talk about Tarrant County if
23 you want to.
24      Q.   Do you know whether counties have been
25 advising overseas voters of the ability to email

Page 64
1 corrective forms?
2      A.   Email a new signature sheet?
3      Q.   Correct.
4      A.   Yes.
5      Q.   They have?
6      A.   Well, I hope so.
7      Q.   Are you aware either way they actually
8 have?
9      A.   I know we have told them that's a
10 possibility for FPCA voters.
11      Q.   That's something SOS has directed counties
12 as possible?
13      A.   Sure.
14      Q.   New topic.  Did the Secretary of State's
15 Office make any voter fraud referrals to the AG in
16 connection with the 2022 general election?
17      A.   Yes.
18      Q.   Do you know how many?
19      A.   I don't.
20      Q.   Do you know how any of those were resolved?
21      A.   I don't.  I presume they are still pending.
22      MS. HUNKER:  I'm going to quickly object in
23 raising investigative privilege and advise my client
24 that although he can answer certain information, not to
25 disclose any details that would compromise an

Page 65
1 investigation or ongoing prosecution as well as would
2 reveal any type of investigative methods that could
3 again compromise how the Attorney General's Office
4 proceeds in these matters going forward.
5 BY MR. STEWART:
6      Q.   Are you aware of any public information
7 about how those were resolved?
8      A.   No.
9      Q.   Were any of those for mail ballot
10 impersonation?
11      MS. HUNKER:  Objection, form.
12 BY THE WITNESS:
13      A.   I don't know.  I would have to look at the
14 log sheet.
15 BY MR. STEWART:
16      Q.   That log sheet has been produced, correct?
17      A.   Probably, but we can probably update.
18 There's been a lot of complaint activity in the last
19 couple months.
20      Q.   Do you know whether any referrals for mail
21 ballot impersonation were based on mismatching or
22 missing ID numbers?
23      A.   I don't believe so.
24      Q.   Are mismatching or missing ID numbers on
25 mail ballots a factor in considering whether to refer



Page 66
1  potential fraud to the AG?
2      A.    No.
3      MR. STEWART:  Can we take two minutes?
4          (WHEREUPON, a recess was had.)
5  BY MR. STEWART:
6      Q.    I have a few more questions and this is to
7  go back to the topic of legislative communications.  I
8  wanted to dig in to what were the topics discussed with
9  the legislators with whom you discussed the
10 identification number provisions that we identified
11 earlier.
12     A.    So I thought the question was discussions
13 with legislators about SB 1.
14     Q.    So I will limit those to -- for the purpose
15 of this question to the identification number and cure
16 provisions of SB 1.
17     A.    Okay.
18     Q.    So how many of those conversations pertain
19 to those topics?
20     A.    The corrective action procedure we
21 discussed with all four of those legislators.
22     Q.    What was the nature of their feedback?
23     MS. HUNKER:  Going to object.  I represent
24 Senator West, Senator Hughes, Representative Reggie
25 Smith as well as Representative Bucy for the purposes

Page 67
1  of protecting their privilege today.  On behalf of the
2  four legislators I object to the question on the basis
3  of legislative privilege.  It's wholly inappropriate
4  for this question to be asked at all given the pending
5  appeal to which we are all a party.  We vehemently
6  disagree with the district court's decision to prevent
7  this kind of questioning while we await decision from
8  the Fifth Circuit.  Nonetheless the district court has
9  wrongly made clear that attorneys who raise these
10 objections face the possibility of contempt.  We have a
11 duty to our client to protect their privileged
12 information.  Because of the district court's orders
13 and threats, we cannot instruct our witness not to
14 answer this question.  However, the state Defendants,
15 and Senator West, Senator Hughes, Representative Reggie
16 Smith, and Representative Bucy reserve all rights to
17 challenge this improper questioning including sealing
18 this portion of the transcript, preventing its further
19 disclosure or use at trial, appealing and seeking any
20 emergency relief from the Fifth Circuit, and any other
21 relief allowed by law.  We further designate this
22 testimony as confidential under the protective order in
23 this case, I believe it's ECF237.
24 BY MR. STEWART:
25     Q.    Just for the record, are you following your

Page 68
1  counsel's advice to assert the privilege and not
2  answer?
3      MS. HUNKER:  Objection.  To clarify, I did not
4  instruct my witness not to answer.  I'm simply raising
5  the objection to preserve it for both the legislators
6  and the State Defendants who I represent.  We are going
7  to pursue other forms of relief that I just listed.  We
8  are also stating that we think this portion of the
9  testimony should be now deemed confidential under the
10 protective order that was filed in this case.
11 BY MR. STEWART:
12     Q.    The question is on the table.
13     A.    So we talked about the corrective action
14 process with all four of those legislators.
15     Q.    What did they state about the corrective
16 action process?
17     A.    Is there anything --
18     MR. STEWART:  I will stipulate to the same
19 objection.
20     MS. HUNKER:  If you can stipulate then I'm going
21 to raise the same objection.
22     MR. STEWART:  I will stipulate to the same
23 objection.
24 BY THE WITNESS:
25     A.    You know, the conversation is kind of a

Page 69
1  two-way street.  It's not them asking us offering or
2  vice versa, but it's a general recognition that there
3  are things in the law that need to be standardized.
4  And so, you know, what are your thoughts on what those
5  things should be, right?  So we talked about with each
6  one of the four standardizing the cure period so that
7  everybody has the same cure period, and doing away with
8  mailing back the carrier envelope to the voter and
9  instead mailing a corrective action form that could
10 then be mailed back to the office instead of delivered
11 in person since, you know, there is a reason why these
12 folks are generally voting by mail.  And giving ballot
13 boards more time to meet earlier in the process so that
14 they can get notice out to the voters.
15 BY MR. STEWART:
16     Q.    Were those -- was that feedback coming from
17 the legislators to the SOS or ideas the SOS shared with
18 legislators?
19     A.    It's a little bit of both.
20     MS. HUNKER:  Objection.  I'm going to raise
21 legislator privilege and if you can stipulate.
22     MR. STEWART:  Stipulate you will raise the same
23 objection.
24 BY THE WITNESS:
25     A.    It's a little bit of both.  The specifics



Page 82

1    MS. HUNKER:  Objection, form.
2  BY THE WITNESS:
3    A.    The absolute number probably has increased,
4  but the percentage has probably gone down.
5  BY MS. PERALES:
6    Q.    Understood.  Do you keep track of number of
7  referrals you make to law enforcement?
8    A.    Yes.
9    Q.    With respect to section 2.11.
10    A.    Yes.
11    Q.    This is also related to persons excused
12  from jury duty for non-residence in the county.  And it
13  adds a requirement for the clerk to report not only to
14  the voter registrar, but also to the Secretary of
15  State.  So in some ways it's connected to that previous
16  provision that we looked at together.  And is your
17  testimony the same then that with respect to section
18  2.11 you, the Secretary of State, have not received any
19  referrals or lists from county jury clerks?
20    A.    That's correct of people who have been
21  excused because of non-residence in the county.
22    Q.    Thank you. Section 3.04 on page 14.  I feel
23  bad for massacring some of my descriptions of these
24  provisions.  But this is basically a requirement that
25  polling places be located inside a building, and

Page 83

1  essentially a prohibition on what people might call
2  drive-thru voting; is that right?
3    MS. HUNKER:  Objection, form.
4  BY THE WITNESS:
5    A.    I agree it's a prohibition on generalized
6  drive-thru voting and says that only people who qualify
7  for curbside voting can vote from a car.
8  BY MS. PERALES:
9    Q.    I accept your distinction between curbside
10  voting and drive-thru --
11    A.    Right.
12    Q.    -- voting.
13          Since the primary runoff election in 2022,
14  have you -- has your office received any expressions of
15  concern or opposition to the elimination of drive-thru
16  voting?
17    A.    Not that I'm aware of, no, ma'am, from
18  either the public or counties?
19    Q.    For you -- sorry?
20    A.    From either the public or counties.
21    Q.    Okay.
22          Did you have any communications from the
23  Secretary of State with, for example, the Office of
24  Attorney General that's separate and apart from
25  attorney-client stuff related to this litigation

Page 84

1  related to the prohibition on drive-thru voting?
2    A.    No.
3    MS. HUNKER:  I'm going to remind my client to
4  give me a second to object.
5  BY MS. PERALES:
6    Q.    We had talked earlier about a provision of
7  SB 1 that was given an effective date of 2026 that you
8  had some concerns might be problematic to carry out.
9  And so I wanted to ask you a similar question with
10  respect to section 3.04.  Since May of 2022, which
11  takes us into the March of 2023, have you had
12  conversations with legislators or legislative staff
13  about making changes to SB 1 other than that provision
14  that we were talking about that has an effective date
15  of 2026?
16    MS. HUNKER:  Objection, form.
17  BY THE WITNESS:
18    A.    Yes.
19  BY MS. PERALES:
20    Q.    Can you describe those?
21    A.    Yes. Well, what we have talked about is the
22  corrective action procedure needs a little bit of
23  tweaking for better implementation, smoother
24  implementation, more uniform implementation.  The main
25  change would be to stop the possibility of sending the

Page 85

1  ballot back to the voter instead of just sending a
2  corrective action form and having them mail it back.
3          The second thing is standardizing the cure
4  period so that it is not the case that some people have
5  until 7:00 p.m. on election day and other people have
6  six days after election day.  Have everybody have the
7  same cure period.  Then to allow the ballot boards more
8  time on the front end to start meeting earlier so that
9  they get notice to the voters sooner.
10    Q.    Do you think that with respect to item
11  number one, the cure procedure, do you think that if
12  the ballot board is able to retain custody of the
13  ballot and send the cure form, do you think that will
14  result in more ballots being cured?
15    A.    Yes, fewer ballots being lost in the mail.
16    Q.    Why would it result in more ballots being
17  cured?
18    A.    Because the opportunity to mail back the
19  correction form instead of having to deliver it in
20  person makes it more available.
21    Q.    Is that because a voter is more likely to
22  mail back the cure form than they are to physically
23  travel to the election administrator's office to
24  personally drop off the ballot?
25    MS. HUNKER:  Objection, form.



Keith Ingram

March 28, 2023
Pages 86 to 89

Page 86

1 BY THE WITNESS:
2      A.     I mean we don't know.  I mean some voters
3 can drive it in as easily as they can mail it, but
4 there is a reason why people vote by mail.  Generally
5 it's because they are not as mobile.  So to increase
6 the odds of them curing we need to have a mail back
7 form.
8 BY MS. PERALES:
9      Q.     Texas vote by mail eligibility involves
10 being for the most part either over age 65 or
11 physically disabled, is that correct -- or disabled in
12 some way?
13      A.     Agreed.
14      Q.     So you had listed basically four things,
15 the 2026 effective date provision, and then the three
16 things you just talked to me about now.  Have you had
17 any discussions with members of the legislator or
18 legislative staff about amending any of the provisions
19 in SB 1 that are the subject of this lawsuit?
20      A.     No.
21      Q.     So then I won't have to ask it for each
22 individual provision.
23          Let's look at --
24      A.     Oh, we did talk to one senator's office
25 about possible changes to poll watchers.

Page 87

1      Q.     Which senator's office was that?
2      A.     Royce West.
3      Q.     Now I will take a deep breath and I will
4 put my question on the record.  My question is what
5 communications if you could describe the substance of
6 the communication with Senator West's office regarding
7 making changes to SB 1's provisions related to poll
8 watchers?
9      MS. HUNKER:  I object on legislative privilege
10 grounds.  I represent Senator West for the purposes of
11 protecting his privilege today.  On behalf of Senator
12 West I object to that on the basis of legislative
13 privilege.  It's wholly inappropriate for this question
14 to be asked at all given the pending appeals to which
15 we are all a party.  We vehemently disagree with the
16 district court's decision to permit this kind of
17 questioning while we await a decision from the Fifth
18 Circuit.  Nonetheless the district court has wrongly
19 made clear that attorneys who raise these objections
20 face the possibility of contempt.  We have a duty to
21 our clients to protect their privileged information.
22 Because of the district court's orders and threat we
23 cannot instruct the witness not to answer this
24 question.  However, the State Defendants and Senator
25 West reserve all rights to challenge this improper

Page 88

1 questioning including sealing this portion of the
2 transcript, preventing its further disclosure or use at
3 trial, appealing or seeking any emergency relief from
4 the Fifth Circuit, and any other relief allowed by law.
5 We further designate this testimony as confidential
6 under the protected order in this matter.
7 BY THE WITNESS:
8      A.     So what we talked to him about was the
9 incident in Dallas County where the poll watcher had a
10 certificate that -- of appointment and had a
11 certificate that they had been trained, but they didn't
12 have to show an ID they were the same person on those
13 certificates.  So he wondered if maybe an ID
14 requirement for poll watchers should be added to the
15 code.  And we told him that was his choice.  But, you
16 know, that's an incident that we had with a poll
17 watcher that blew up into a confrontation that probably
18 didn't need to happen.
19 BY MS. PERALES:
20      Q.     Do you know where the precinct was located
21 in Dallas County?
22      A.     I don't.
23      Q.     Do you know if the poll worker and the poll
24 watcher were of different races?
25      A.     I don't know.

Page 89

1      MS. HUNKER:  Objection, form.
2 BY MS. PERALES:
3      Q.     When you say that you told Senator West
4 that it was ultimately up to him whether he wanted to
5 propose such a change, did you make a recommendation
6 either way?
7      MS. HUNKER:  I'm going to object on legislative
8 privilege grounds.
9 BY THE WITNESS:
10      A.     No.
11      MS. PERALES:  I will give you your fully
12 expressed objection.
13      MS. HUNKER:  Thank you.
14      THE WITNESS:  Sorry.
15 BY THE WITNESS:
16      A.     No.
17 BY MS. PERALES:
18      Q.     So having recalled that discussion with
19 Senator West related to poll watchers, do you recall
20 having any discussions with any other members of the
21 legislator or legislative staff about changing any of
22 the language in SB 1 related to poll watchers?  Anybody
23 else besides Senator West?
24      A.     No, that was -- that would be the only one.
25      Q.     Then so just to see if I can jog your



# EXHIBIT 82



## In The Matter Of

### La Union Del Pueblo Entero, et al.,

### Plaintiffs

### v

### State Of Texas, et al.,

### Defendants

## CASE

### 5:21-cv-00844

## Date

### 4-26-2022

## Witness

### Keith Ingram

**Original
Certified Transcript**

**National Court Reporters Inc.  ·  888.800.9656  ·
NationalCourtReporters.com
NCRNetwork@nationalcourtreporters.com**

Serving Legal Professionals From Coast To Coast and Internationally

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 1 (1 - 4)
1 (1 - 4)



Page 1

1 UNITED STATES DISTRICT COURT
2 WESTERN DISTRICT OF TEXAS
  SAN ANTONIO DIVISION
3 LA UNION DEL PUEBLO ENTERO )
  et al.,                    )
4      Plaintiffs,           )
                             ) Civil Action No. SA-21-cv-
5 v.                         )      00844-XR
                             ) (Consolidated Cases)
6 STATE OF TEXAS, et al.,    )
       Defendants.           )
7
8
9
10 ---------------------------------
11      ORAL DEPOSITION OF
          KEITH INGRAM
12        APRIL 26, 2022
             Volume 1
13
14 ---------------------------------
15
16      ORAL DEPOSITION OF KEITH INGRAM  produced
17 as a witness at the instance of Plaintiff, and duly
18 sworn, was taken in the above-styled and numbered cause
19 on the 26th day of April, 2022 from 9:18 a.m. to 2:19
20 p.m. before Jana Newhouse, a Certified Shorthand
21 Reporter in and for the State of Texas, reported by oral
22 shorthand, located at Price Daniel Sr. State Office
23 Building, 209 West 14th Street, Austin, Texas 78701,
24 pursuant to the Federal Rules of Civil Procedure, and the
25 provisions stated on the record or attached hereto.

Page 2

1      A P P E A R A N C E S
2
3 FOR THE PLAINTIFF:
4 Mr. Michael E. Stewart, DOJ
  UNITED STATES
5 950 Pennsylvania Avenue, Northwest
  Washington, DC 20530
6 Telephone: (202) 598-7233
  email:  michael.stewart3@usdoj.gov
7
  Mr. Richard Dellheim, DOJ
8 UNITED STATES
  950 Pennsylvania Avenue, Northwest
9 Washington, DC 20530
  Telephone: (202) 598-7233
10 email: richard.dellheim@usdoj.gov
11 Mr. Dan Freeman, DOJ
   TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
12 950 Pennsylvania Avenue, NW
   Washington, DC 20530
13 Telephone: (202) 514-2000
   email: daniel.freeman@usdoj.gov
14
   Mr. Jennifer J. Yun, DOJ
15 LAW OFFICES OF JENNER & BLOCK, LLP
   1099 New York Avenue, NW
16 Washington, DC 20001
   Telephone: (202) 637-6334
17 email: jennifer.yun@usdoj.gov
18 Mr. Jason S. Kanterman, LUPE, Southwest Voter
   Registration Education Project, Mexican American Bar
19 Association of Texas, Texas Hispanics Organized for
   Political Education, Jolt Action, William C. Velasquez
20 Institute, Fiel Houston, Inc.
   LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
21 LLP
   One New York Plaza
22 New York, New York 10004
   Telephone: (212) 859-8000
23 Fax: (212) 859-4000
   email: jason.kanterman@friedfrank.com
24
25

Page 3

1      A P P E A R A N C E S Continued
2
3 Ms. Eliza Sweren-Becker, LUPE
  VOTING RIGHTS & ELECTIONS PROGRAM
4 Brennan Center for Justice at NYU School of Law
  Telephone: (646) 925-8765
5 email: eliza.sweren-becker@nyu.edu
6 Mr. Graham W. White, LULAC
  LAW OFFICES OF ELIAS LAW GROUP, LLP
7 10 G Street NE, Suite 600
  Washington, D.C. 20002
8 Telephone: (202) 968-4490
  email: gwhite@elias.law
9
10 Mr. Patrick Berry
   COUNSEL, DEMOCRACY PROGRAM
11 Brennan Center for Justice
   120 Broadway, Suite 1750
12 New York, New York 10271
   Telephone: (646) 925-8754
13 email: patrick.berry@nyu.edu
14 FOR THE DEFENDANT:
15 Mr. Jeffery White, OAG
   ATTORNEY GENERAL KEN PAXTON OFFICE
16 SPECIAL COUNSEL SPECIAL LITIGATION UNIT
   P.O. Box 12548
17 Austin, Texas 78711
   Telephone: (512) 936-0677
18 Fax: (512) 457-4410
   email: jeff.white@oag.texas.gov
19
   Ms. Kathleen T. Hunker, OAG
20 ATTORNEY GENERAL KEN PAXTON OFFICE
   SPECIAL COUNSEL SPECIAL LITIGATION UNIT
21 209 West 14th Street
   Austin, Texas 78711
22 Telephone: (512) 936-0677
   Fax: (512) 457-4410
23 email: kathleen.hunker@oag.texas.gov
24
25

Page 4

1      A P P E A R A N C E S Continued
2
3 Mr. J. Aaron Barnes, OAG
  ATTORNEY GENERAL KEN PAXTON OFFICE
4 SPECIAL COUNSEL SPECIAL LITIGATION UNIT
  209 West 14th Street
5 Austin, Texas 78711
  Telephone: (512) 936-2021
6 email: aaron.barnes@oag.texas.gov
7 Mr. Adam Bitter, SOS
  OFFICE OF THE SECRETARY OF STATE
8 209 West 14th Street
  Austin Texas, 78701
9 Telephone: (512) 475-2813
  Fax: (512) 475-4316
10 abitter@sos.texas.gov
11 Mr. David Louk, El Paso County
   LAW OFFICES OF COOLEY LLP
12 3 Embarcadeo Center, 20th Floor
   San Francisco, California 94111
13 Telephone: (415) 720-3673
   Fax: (415) 693-2222
14 email: dlouk@cooley.com
15 Ms. Wendy Olson
   LAW OFFICES OF STOEL RIVES, LLP
16 101 South Capital Boulevard, Suite 1900
   Boise, Idaho 83702
17 Telephone: (208) 387-4291
   email: wendy.olson@stoel.com
18
   Ms. Lisa Cubriel, Bexar County
19 ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
   101 West Nueva Street, 7th Floor
20 San Antonio, Texas 78205
   Telephone: (210) 335-2142
21 Fax: (210) 335-2773
   email: lisa.cubriel@bexar.org
22
23
24
25

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

1 (1 - 4) Keith Ingram
**Page: 1 (1 - 4)**

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 33 of 238

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

**Keith Ingram 2 (5 - 8)**
**2 (5 - 8)**

Page 5

A P P E A R A N C E S Continued

Mr. Anthony J. Nelson, Travis County Rebecca Guerrero and José Garza
ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S OFFICE
314 West 11th Street, Suite 500
Austin, Texas 78767
Telephone: (512) 854-4801
email: tony.nelson@traviscountytx.gov

Ms. Leigh Tognetti
ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY
100 East Cano, Courthouse Annex III, 1st Floor
Edinburg, Texas 78539
Telephone: (956) 292 7609
Fax: (956) 292-7619
email: leigh.tognetti@da.co.hidalgo.tx

Mr. Zachary David Dolling, TCRP
CIVIL RIGHTS PROJECT
P.O. BOX 17757
Austin, Texas 78760
Telephone: (832) 767-3650
email: zachary@texascivilrightsproject.org

Ms. Lia Sifuentes Davis, Bexar County
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758
Telephone: (512) 454-4816
Fax: (512) 454-3999
email: ldavis@drtx.org

ALSO PRESENT:
National Court Reporters Inc., Host
Ms. Rebecca Martin, LUPE
Mr. Juan Estrada
Ms. Josephine Ramirez
Amir Badat
Jon

Page 6

INDEX

Appearances. . . . . . . . . . . . . . . . . . . . .   2

KEITH INGRAM

   Direct Examination by Mr. Jeffery White. . . .   10

   Direct Examination by Mr. Kanterman. . . . . .   117

Changes and Signature. . . . . . . . . . . . . . .   217

Reporter's Certificate . . . . . . . . . . . . . .   219

PLAINTIFF EXHIBITS

NO.  DESCRIPTION                                    PAGE

1    Notice of RULE 30(B)(6) Deposition of the
     Office of the Texas Secretary of State and
     Request for Documents Relied upon by
     RULE 30(B)(6) Designee (6-pgs)                 15

2    Email from Keith Ingram to Justin Williamson
     regarding county by county mail ballot numbers
     with attachment 2022 Primary BBM A-R
     Bates No. STATE087299 (1-pg)                   20

3    Column Headings and Description related to
     individual voter registration recording TEAM
     Bates No. STATE057754  (2-pgs)                 24

4    Draft of Voter History Import Bates No.
     STATE057755.xlsx (1-pg)                        36

5    Election Code, Title 7. Early Voting, Subtitled
     A. Early Voting Chapter 84. Application for
     Ballot Subchapter A. Application for Ballot
     (3-pgs)                                        50

6    Application for a Ballot by Mail Bate Nos.
     STATE031879 and STATE031880 (2-pgs)            56

Page 7

PLAINTIFF EXHIBITS Continued

NO.  DESCRIPTION                                    PAGE

7    Carrier Envelope for Early Voting Ballot Bate
     Nos. STATE03217 through STATE032019 (3-pgs)    59

8    Official Election Signature Sheet for an FPCA
     Voter Bate Nos. STATE040053 and STATE040053
     (2-pgs)                                        62

9    Notice of Rejected Application for Ballot By
     Mail Bate Nos. STATE031645 and STATE031646
     (2-pgs)                                        64

10   Notice of Rejected Application for Ballot By
     Mail Bate Nos. STATE031643 and STATE031644
     (2-pgs)                                        68

11   Texas Secretary of State FAQs on Applications
     for Ballot by Mail (ABBMs) Bate Nos.
     STATE001713 through STATE001743 (31-pgs)       72

12   Election Advisory No.2022-08 Letter to
     Election Officials from Keith Ingram dated
     January 28, 2022 regarding New Law: Senate
     Bill - Opportunity to Correct Defects on
     Application for Ballot by Mail and Carrier
     Envelope Totals Bate Nos. STATE019849 through
     STATE019876 (28 pgs)                           73

13   Election Code Title 7. Early Voting, Subtitle
     A. Early Voting Chapter 86. Conduct of Voting
     by mail (5-pgs)                                82

14   Notice of Rejected Application for Ballot by
     Mail Bate Nos. STATE031641 and STATE031642    91

15   Notice of Carrier Defect Carrier Envelope
     Returned to the Voter by Mail Bate Nos.
     STATE019845 and STATE019846 (2-pgs)            92

16   Email from Jacque Callanen to Keith Ingram
     dated January 21, 2022 regarding
     "another question please" Bates No. STATE052241
     (1-pg)                                         98

Page 8

PLAINTIFF EXHIBITS Continued

NO.  DESCRIPTION                                    PAGE

17   Email from Exchange Administrative Group to
     Christina Obermiller regarding FPCA ID
     Question - FACP/Obermiller Bate Nos.
     STATE052242 and STATE052243 (2-pgs)            102

18   Consolidated Plaintiffs' Third Amended
     Cross Notice of RULE 30(b)(6) Deposition of
     the Office of the Texas Secretary of State
     (20-pgs)                                       118

19   SB 1 (76-pgs)                                  122

20   Tex. Penal Code 38.01 (10-pgs)                 162

21   Article "In Texas, thousands of mail ballots
     were rejected following new ID requirements
     dated March 16, 2022 (5-pgs)                   192

22   Article "Secretary Hughs Commends Texas Voters
     Following November 3rd General Election (1-pg)  200

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

2 (5 - 8) Keith Ingram
**Page: 2 (5 - 8)**

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 3 (9 - 12)

3 (9 - 12)

Page 9

1       P R O C E E D I N G S
2            (On the record at 9:18 a.m.)
3       COURT REPORTER:  Today's date is April
4  the 26th, 2022, the time is 9:18 a.m.  We are on the
5  record in the United States -- for the United States
6  District Court for the Western District of Texas, San
7  Antonio Division, La Unión Del Pueblo Entero v the State
8  of Texas.
9            This is the oral deposition of Mr. Keith
10  Ingram, and at this time will counsel for -- will
11  counsel please state their name for the record, and whom
12  they are representing, please?
13       MR. STEWART:  Michael Stewart for the
14  United States.
15       MR. DELLHEIM:  Richard Dellheim for the
16  -- for the United States.
17       MR. KANTERMAN:  Jason Kanterman from
18  Fried, Frank, Harris, Shriver & Jacobson on behalf of
19  the LUPE Plaintiffs.
20       MR. JEFFREY WHITE:  Jeff White for the
21  State Defendants.
22       MS. HUNKER:  Kathleen Hunker for the
23  State Defendants.
24       MR. BARNES:  Aaron Barnes for the State
25  Defendants.

Page 10

1       COURT REPORTER:  Okay.
2       MR. BITTER:  Adam Bitter with Secretary
3  of State.
4       MR. RHINES:  And Zachary Rhines with the
5  Secretary of State.
6       COURT REPORTER:  Thank you.  At this time
7  I will swear in the witness.
8       Mr. Ingram, will you please raise your
9  right hand?
10            (The witness complies.)
11       COURT REPORTER:  Do you solemnly swear or
12  affirm that the testimony you give today will be the
13  truth, the whole truth and nothing but the truth so help
14  you God?
15       THE WITNESS:  I do.
16       COURT REPORTER:  Thank you.
17            KEITH INGRAM,
18  having been first duly sworn, testified as follows:
19       DIRECT EXAMINATION
20  BY MR. STEWART:
21     Q.  All right.  Good morning, Mr. Ingram.
22     A.  Howdy.
23     Q.  MR. STEWART:  I'll just note for the
24  record, beforehand, we discussed with the State that
25  while we're providing Zoom for access reasons, we won't

Page 11

1  be using this video at trial.  We're agreed to that,
2  yeah?
3       MR. JEFFREY WHITE:  Yes, thank you.
4       MR. STEWART:  Great.
5     Q.  (BY MR. STEWART)  So good morning, Mr. Ingram,
6  I'm Mike Stewart from the Department of Justice.  I just
7  want to thank you for joining us this morning, first of
8  all.
9            First thing, could you just state your
10  name and spell it for the record?
11     **A.  Sure.  My name is Brian Keith Ingram,**
12  **B-r-i-a-n, K-e-i-t-h, I-n-g-r-a-m.**
13     Q.  Thank you.  And are you here today on behalf
14  of the Texas Secretary of State?
15     **A.  I am.**
16     Q.  Before we do anything else, I just want to
17  make sure we are set up for a smooth deposition.  I want
18  to make -- I'm correct understanding you've been deposed
19  before, correctly?
20     **A.  I have.**
21     Q.  Great, thank you.
22            So then I know you're aware of all this,
23  but I think, just to go over it, it works best if you
24  wait to start your answer until I completely finish my
25  question, and I'll wait to ask a new question until

Page 12

1  you're finished your answer, can we agree to that?
2     **A.  Sure.**
3     Q.  An attorney may object to a question, after
4  which you can still answer unless they specifically
5  instruct you not to, okay?
6     **A.  Okay.**
7     Q.  Can you agree that if you ever don't
8  understand a question or need clarification you will say
9  so?
10     **A.  Sure.**
11     Q.  And can we assume that you understood the
12  question if you answer without asking for clarification?
13     **A.  That's fine.**
14     Q.  Great.  Is there any reason you're aware of
15  that your memory or ability to answer questions would be
16  impaired today?
17     **A.  No.**
18     Q.  Anything -- any reason you're aware of that
19  your ability to effectively communicate your answers
20  would be impaired today?
21     **A.  No, sir.**
22     Q.  Great.  And last, I understand you may need
23  breaks at some points throughout the day.
24            You can just let me know if you need a
25  break, the only thing I will ask you to plead any

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

3 (9 - 12) Keith Ingram
Page: 3 (9 - 12)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 4 (13 - 16)
4 (13 - 16)

Page 13

1  pending question, to answer any pending question before
2  you take a break, all right?
3      **A.  That's fine.**
4      Q.  Thank you.  So next, just some background
5  question.
6          You are currently employed by the Texas
7  Secretary of State?
8      **A.  I am.**
9      Q.  What's your cur -- or how long have you been
10 employed there?
11     **A.  Ten years and a few months.**
12     Q.  And what's your current job title?
13     **A.  I'm the director of the Elections Division.**
14     Q.  What's your -- what are your responsibilities
15 in that role?
16     **A.  Well, to manage the division.  That helps the**
17 **secretary fulfill his responsibility as chief election**
18 **officer for the State of Texas.**
19     Q.  And how long have you held that role?
20     **A.  Ten years and four months.**
21     Q.  So your entire time with the Secretary of
22 State?
23     **A.  That's right.**
24     Q.  Thank you.  And then you are here on behalf of
25 the Texas Secretary of State, how did you prepare to

Page 14

1  testify in this deposition?
2          MR. JEFFREY WHITE:  I'll just instruct
3  the witness if -- not to get into any communications you
4  may have had with counsel, but otherwise, you can answer
5  that question.
6          THE WITNESS:  Sure.
7      **A.  So I reviewed the 30(b)(6) Depo Notice for**
8  **both the Department of Justice and the private**
9  **Plaintiffs, and I had a small visit with my voter**
10 **registration manager.**
11     Q.  (BY MR. STEWART)  And who is that?
12     **A.  Kristi Hart.**
13         **I also reviewed some documents.  I**
14 **reviewed the documents that are related to the fields**
15 **that are in the TEAM database, and then there was a**
16 **document from DPS that showed all of the interactions**
17 **they had with us, the data they provided to us.**
18     Q.  Thank you.  Has that document been produced,
19 do you know?
20     **A.  I think so, yes.**
21     Q.  Approximately how much time did you spend
22 preparing?
23     **A.  Couple, three hours.**
24     Q.  Did you speak with Secretary Scott in the
25 course of preparing?

Page 15

1      **A.  I did not.**
2      Q.  Okay.  Did you meet with attorneys from the
3  Texas Attorney General's Office in the course of
4  preparing --
5      **A.  I did.**
6      Q.  -- without revealing the content of any
7  conversations?
8      **A.  Sure.**
9      Q.  I'm going to show you what we'll mark as
10 Exhibit 1.
11         (Plaintiff's Exhibit No. 1 was marked for
12 identification.)
13     Q.  (BY MR. STEWART)  Are you familiar with this
14 document?
15     **A.  Yes.**
16     Q.  And do you recognize this as the United
17 States' notice for this 30(b)(6) deposition today?
18     **A.  Yes.**
19     Q.  Turning quickly to Page A-2 document -- of
20 this document, are these topics you prepared to testify
21 on today?
22     **A.  It is.**
23     Q.  Is there any topic on this list, 1 through I
24 believe it's 7, and all subparts, that you are not
25 prepared to testify on today?

Page 16

1      **A.  Well, there's eight and I --**
2      Q.  Eight.
3      **A.  -- I'm ready on all eight.**
4      Q.  Great, thank you.  All right.
5          All right.  I'm going to turn, then, to
6  the first of these topics.
7          Are you familiar with the Texas Election
8  Administration Management database?
9      **A.  I am.**
10     Q.  If I refer to that as the TEAM database, can
11 we -- we're agreed that it refers to that database?
12     **A.  Sure, but TEAM is more than a database.**
13     Q.  What else is TEAM?
14     **A.  It's an election management system.**
15     Q.  If I use the shorthand TEAM, will you
16 understand I'm referring to the database portion of it
17 when the question is related to the database?
18     **A.  Well, yeah, we'll have to see in context**
19 **whether I can under -- agree to that or not, but ...**
20     Q.  Okay.  Yeah, that's fine.  If there's any
21 portion where it's unclear, you can just ask for
22 clarification.
23     **A.  Sure.**
24     Q.  So I think you started on this, but generally
25 what is the TEAM database?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

4 (13 - 16) Keith Ingram
Page: 4 (13 - 16)

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 36 of 238

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 5 (17 - 20)
5 (17 - 20)

Page 17

1  A.  So TEAM is, first of all, it is the
2  Java-compliant electronic database of voters in Texas,
3  so that's -- that's its main function, but it also has
4  within it candidate management portions, candidate
5  filing, and also has an election night reporting
6  function, as well as the ability to canvas the election
7  returns within the TEAM system and advance the
8  candidates through from filing, to primary, to primary
9  runoff, to general election.
10  Q.  And are you familiar with the fields that were
11  included in the TEAM database production in this case?
12  A.  Yes.
13  Q.  How did you become familiar with those fields?
14  A.  I reviewed the documentation provided by our
15  Kristi Hart.
16  Q.  Are there any fields used to administer the
17  mail-in ballot provisions of SB 1 that weren't included
18  in the TEAM database production in this case?
19       MR. JEFFREY WHITE:  Objection, form.
20  A.  I'm not sure I understand the question.
21  Q.  (BY MR. STEWART)  Are there any fields that
22  track the acceptance or rejection of either absentee
23  ballot by mail applications or carrier envelopes that
24  were not included in the TEAM database production in
25  this case?

Page 18

1  A.  No.
2       MR. JEFFREY WHITE:  Objection, form.
3  A.  You -- you should have all of those.
4  Q.  (BY MR. STEWART)  Okay.  Do a field -- does a
5  field or fields exist in the TEAM database to track the
6  acceptance or rejection of applications for absentee
7  ballots by mail?
8  A.  There are -- I mean, there's functions in the
9  TEAM database to track that activity.
10  Q.  And what are those functions?
11  A.  The -- you just enter application received,
12  and the TEAM system will record application received.
13  Q.  Does it record whether an application is
14  accepted or rejected?
15  A.  It does.
16  Q.  Does it record the reason for that acceptance
17  or rejection?
18  A.  It does.
19  Q.  Who enters that information?
20  A.  County election officials.
21  Q.  And that is uploaded to the central TEAM
22  database from the offline counties?
23       MR. JEFFREY WHITE:  Objection, form.
24  A.  Well, some of them, and some of them use TEAM
25  directly for the management of mail ballots.

Page 19

1  Q.  (BY MR. STEWART)  Cleaning that up a second,
2  so what's the difference between counties that use TEAM
3  directly and counties that use an offline system?
4       MR. JEFFREY WHITE:  Objection, form.
5  A.  So the online counties are the counties that
6  use TEAM for their election management, they use it for
7  the voter registration, and, whenever they get a voter
8  registration application, they will enter it directly
9  into TEAM and it's in TEAM in realtime.
10       Offline counties, they will have their
11  own voter registration system, and, when they enter a
12  voter registration application, then that will batch
13  process with our system overnight to capture that new
14  registration.
15  Q.  (BY MR. STEWART)  And when you say batch
16  process, what does that mean?
17  A.  It means that we get information from the
18  counties, and we give information to the counties about
19  anything that we've got with regard to their voters, so
20  that processing occurs overnight.  It's an automatic
21  process.
22  Q.  So how many offline counties are there?
23  A.  I'm not sure at the exact time.  I believe
24  there's 38, currently.
25  Q.  And do they tend to be larger or smaller, or

Page 20

1  have any specific characteristics?
2       MR. JEFFREY WHITE:  Objection, form.
3  A.  Generally, it's the larger counties in Texas
4  by population.
5  Q.  (BY MR. STEWART)  Okay.  And then can the TEAM
6  database be used to track acceptance or rejection of
7  ballot carrier envelopes by mail?
8  A.  Yes.
9  Q.  I'm going to show you what's tagged
10  "State087299", this will be Exhibit 2.
11       (Plaintiff's Exhibit No. 2 was marked for
12  identification.)
13       MR. STEWART:  Sorry, Jeff.
14  Q.  (BY MR. STEWART)  Are you familiar with this
15  email?
16  A.  I am.
17  Q.  And what does this email show?
18  A.  It shows the total number of ballots cast in
19  the Republican and Democratic primary on March 1st, as
20  well as the total number of mail ballots and mail
21  ballots rejected in each of those primaries.
22  Q.  Is this based on information in TEAM?
23  A.  It is.
24  Q.  Is this information accurate, to the best of
25  your knowledge?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

5 (17 - 20) Keith Ingram
Page: 5 (17 - 20)

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 6 (21 - 24)
6 (21 - 24)

Page 21

1   A.   It's as accurate as the counties that gave it
2   to us, so this is from the counties.  We worked very
3   diligently with them to make sure it was accurate.
4   Q.   Do you have any reason to doubt the counties'
5   accuracy?
6   A.   I do not.
7   Q.   All right.  So turning then a little -- to a
8   little bit about the ways the TEAM database is
9   maintained -- and to take a step back, what are the ways
10  a qualified individual can register to vote in Texas?
11         MR. JEFFREY WHITE:  Objection, form.
12  A.   So a person can register to vote by going to
13  the Department of Public Safety and getting a driver's
14  license, and asking that that information be used to
15  either register to vote or update their voter
16  registration.  If a person has an online transaction
17  with the Department of Public Safety, they can do the
18  same thing and update their registration or register to
19  vote that way.
20         If a person is already registered to vote
21  in one county, they can update their voter registration
22  address into a new county using another system at
23  Texas.gov that's hosted by our Department of Information
24  Resources, and that allows them to register to vote in a
25  new county.

Page 22

1         And then a person can also use a paper
2   application, a postcard paper application and mail it in
3   to the voter registrar of the county that they would
4   like to register in.
5   Q.   (BY MR. STEWART)  Am I correct understanding
6   that some -- sorry, is that information then entered by
7   the county into a database?
8   A.   The voter registrations that come from DPS or
9   from Texas.gov will show up on the county's dashboard,
10  or, if it's an offline county, it shows up on something
11  called the County Data Warehouse as a task to be worked.
12  But whenever somebody clicks on that task, either on
13  their dashboard or from CDW, then they will see,
14  pre-populated, the information that the voter provided
15  with regard to name, and address and social security
16  number, driver's license, all the stuff.
17         For an online application that's just
18  being entered by paper, you pull up a new voter and
19  enter the data manually.
20  Q.   In your previous answer you referred to CDW,
21  what does that mean?
22  A.   County Data Warehouse, it's for offline
23  counties.  It's where they get their task list from
24  TEAM.
25  Q.   And so you discussed a little bit about

Page 23

1   updating registration information, how can information
2   be changed after a record is initially entered?
3   A.   Well, you can change the information the same
4   way that you can enter new information, which is update
5   your information at DPS and have that update your VR
6   record, either in person or online.  You can also do it
7   at Texas.gov, you can update your name and address,
8   including, as I said, an address into a new county, or
9   you can submit a new paper application.
10  Q.   Does each record then pertain to one
11  individual voter?
12         MR. JEFFREY WHITE:  Objection, form.
13  A.   Well, I don't know what you mean by record.
14  Q.   (BY MR. STEWART)  So how -- let's take a step
15  back then.
16         How is the TEAM database organized, with
17  respect to voter registration records?
18         MR. JEFFREY WHITE:  Objection, form.
19  A.   I don't know how to answer that question.
20  Q.   (BY MR. STEWART)  Does the TEAM database
21  consist of records of individual voters?
22  A.   Again, it -- there are individual voter
23  registrations that are hosted in the TEAM database.
24  Q.   And how is the information for an individual
25  voter registration organized?

Page 24

1   A.   I don't know what you mean.
2   Q.   Okay.  Let me show you a document.  This was
3   produced with "State057754", stamped.  That one's two
4   pages, sorry.
5         (Plaintiff's Exhibit No. 3 was marked for
6   identification.)
7   Q.   (BY MR. STEWART)  Now, this document contains
8   a list of column headings and descriptions, are these
9   column headings that appear related to an individual
10  voter registration record in TEAM?
11  A.   Yes.
12  Q.   And so what would you call the collection of
13  all this information pertaining to one individual voter?
14  A.   I would call it the voter registration file
15  for that voter.
16  Q.   Voter registration.
17         Are there any circumstances where
18  multiple voter registration files are created for one
19  voter?
20  A.   No.
21  Q.   Can there be clerical errors that would lead
22  to that?
23  A.   No.
24  Q.   So there are no circumstances in the entire
25  database where there is more than one voter registration

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

6 (21 - 24) Keith Ingram
Page: 6 (21 - 24)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 7 (25 - 28)
7 (25 - 28)

Page 25

1  file for one voter?
2     A.   All of the information regarding a voter
3  should be under one VUID.
4     Q.   Are there any processes or procedures by which
5  the Secretary of State checks for multiple entries for
6  an individual voter?
7     A.   Sure.
8     Q.   What are those?
9     A.   We have a duplicate matching process that we
10 do, we try to do it every summer, and then we also get
11 duplicate information from the Electronic Registration
12 Information Center.
13    Q.   Are any particular fields used to make the
14 comparison, to determine whether something is a
15 duplicate?
16    A.   Well, it's the same kind of matching we do on
17 all of ours, which includes name, date of birth, social
18 and last DL.
19    Q.   And when you say all of ours, what are you
20 referring to?
21    A.   Any matching process we do is going to use
22 data points in the file to do the matching.
23    Q.   And by DL, are you referring to a driver's
24 license?
25    A.   I am.

Page 26

1     Q.   Thank you.  And so other than those fields, if
2  fields contain different information, a match is still
3  registered, correct?
4          MR. JEFFREY WHITE:  Objection, form.
5     Q.   (BY MR. STEWART)  Let me withdraw that and
6  take a step back.
7          The fields you described as requiring to
8  match were, can you repeat those again, sir?
9     A.   Well, I mean, we match on a variety of fields,
10 but -- but it's some combination of first name, last
11 name, former last name, date of birth, social security
12 number and driver's license or personal ID number.
13    Q.   Do all of those fields need to match to create
14 a match?
15    A.   If necessary we go to address, residence
16 address.
17    Q.   So what do you mean by if necessary?
18    A.   Well, if -- if we feel like we've got a match
19 but we don't know for sure, then we go to the residence
20 address and see if there's a similarity there.
21    Q.   Sorry, what would indicate that you may have a
22 match?
23    A.   Well, I mean, if you've got first name, last
24 name, date of birth in common, that's a pretty weak
25 match, but it's an indicator that it may be a match, and

Page 27

1  so you need to dig further.
2     Q.   So if you have those three pieces of
3  information and address, would you consider it a match?
4     A.   Potentially.  It depends on the purposes for
5  which we were doing it.  In order to harvest the
6  full-nines, or the social security number, or the
7  driver's license number out of the DPS database,
8  generally, we would use that as a match to get that
9  number for --
10    Q.   And how is that matching criteria determined?
11    A.   I'm not sure what you mean.
12    Q.   Sure.  Who is responsible for determining what
13 criteria are required for a match?
14    A.   Our office.
15    Q.   And whom within your office?
16    A.   Well, I mean, we've got a rule -- we've got a
17 TAC rule that our office has promulgated with regard to
18 matching criteria.
19    Q.   Sorry, what is a TAC rule?
20    A.   A Texas Administrative Code rule.
21    Q.   Do you know where we could, the number of that
22 rule, where we could find it?
23    A.   I believe it's 81.6, I could be wrong.
24    Q.   Okay.  And is that rule used in all
25 circumstances for matching?

Page 28

1     A.   No.  Like I said, the -- the ad hoc process
2  that we do whenever we get a jury file from the DPS,
3  then we try to maximize the number of personal ID
4  numbers in that.  We -- we -- that's the only time we
5  really use the residential address criteria.
6     Q.   And so when you use the ad hoc process, does
7  that depart from the TAC rule?
8     A.   No.  It's just in addition to.  It's --
9  there's nothing in -- in violation of the TAC rule, it's
10 just additional matching that we do.
11    Q.   And how do you determine the criteria for that
12 additional matching?
13    A.   To get the best result for the voters.
14    Q.   So you work backwards to determine what will
15 import the most information?
16    A.   No.
17          MR. JEFFREY WHITE:  Objection, form.
18    Q.   (BY MR. STEWART)  So then how -- sorry.
19          Who then is tasked with determining the
20 criteria when you're departing from the -- or excuse me,
21 I'll withdraw that.
22          Who is tasked with determining the
23 matching criteria in the ad hoc process?
24    A.   Myself, Kristi Hart the voter registration
25 manager, and then the engineers at the vendor that host

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

7 (25 - 28) Keith Ingram
Page: 7 (25 - 28)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 9 (33 - 36)
9 (33 - 36)

Page 33

1    MR. JEFFREY WHITE:  Objection, form.
2    A.   I don't know, you'd have to ask ERIC.
3    Q.   (BY MR. STEWART)  Are you aware of any errors
4  that still exist in the TEAM database?
5    MR. JEFFREY WHITE:  Objection, form.
6    A.   I don't know what you mean by errors.
7    Q.   (BY MR. STEWART)  Are you aware of any
8  systemic errors that affect the accuracy of the data in
9  the TEAM database?
10   A.   Systemic errors?
11   Q.   Yes.
12   A.   What -- what would a systemic error be?
13   Q.   Well, are you aware of any issues with the
14 accuracy of the data in the TEAM database?
15   A.   I don't know how to answer that question.
16   Q.   Do you have an understanding of the accuracy
17 rate of the information in the TEAM database?
18   A.   We rely on TEAM to give us accurate
19 information.
20   Q.   But have you tested the rate at which the
21 information in TEAM is accurate?
22   A.   I don't even know how you would do that.  If
23 you've got a suggestion, then I'd be glad to follow it.
24   Q.   If an error is discovered in the TEAM
25 database, how is it corrected?

Page 34

1    A.   I don't know what you mean by an error in the
2  TEAM database.
3    Q.   If information pertaining to an individual
4  voter is discovered to be inaccurate, how is it
5  corrected?
6    A.   Well, the voter registrar in that county would
7  have to be the one determining that it was inaccurate,
8  and they would have to correct it.
9    Q.   So it's done on a county-by-county basis?
10   A.   The counties are the voter registrars in
11 Texas.
12   Q.   Does the Secretary of State's Office ever send
13 information correcting a voter registration record to
14 the counties?
15   MR. JEFFREY WHITE:  Objection, form.
16   A.   We send updates all the time.  Do you want to
17 call that a correct, I don't know.  But we send updates
18 to counties all the time that we receive electronically
19 from the DPS, as well as from the Texas.gov.
20   Q.   (BY MR. STEWART)  Understood.  Is the
21 Secretary of State in possession of data on applications
22 for ballot by mail from the March 2020 primary?
23   A.   Do we have information in TEAM --
24   Q.   Yes.
25   A.   -- regarding applications for ballot by mail

Page 35

1  --
2    Q.   Yes.
3    A.   -- for the March primary?  Yes.
4    Q.   Yeah, okay.
5    What fields is that information reflected
6  in?
7    A.   The application fields.
8    Q.   Which are what?
9    A.   The ones pertaining to the mail ballot
10 applications.
11   Q.   Yes.  What I'm asking is which fields pertain
12 to mail ballot applications?
13   A.   The ones that do.
14   Q.   I'm sorry, are you prepared to answer these
15 questions?
16   A.   I am.
17   Q.   Okay.  Can you please then list for me the
18 fields that pertain to mail ballot applications?
19   A.   I don't know what that means, list the fields.
20   Q.   What are the names of the fields, in this
21 column headings field on what we've marked as Exhibit 2
22 (sic), which ones pertain --
23   A.   Well --
24   Q.   -- to mail ballot applications?
25   A.   -- this is just what's in the voter record at

Page 36

1  the end of the process, this is not all of the -- all of
2  the things that can happen with regard to an application
3  for a mail ballot.
4    Q.   Okay.  Let me change topics here a little bit.
5    This was produced marked "State057755",
6  and this is a particular tab that we labeled "Voter
7  History File".  I just have a clarifying question here.
8    (Plaintiff's Exhibit No. 4 was marked for
9  identification.)
10   Q.   (BY MR. STEWART)  So in this Voter History
11 Import section, which is what it says at the top, I want
12 to direct your attention to the Ballot Reject Reason
13 header, does that represent a field in the TEAM
14 database?
15   A.   No.
16   Q.   No?
17   What does that represent?
18   A.   That represents ballot reject reasons in the
19 TEAM database.
20   Q.   Is that information maintained in the TEAM
21 database?
22   A.   Well, yes and no.  I mean, the -- the TEAM
23 database is a living thing, right?
24   Q.   Uh-huh.
25   A.   And so we have for the first time, in the

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

9 (33 - 36) Keith Ingram
Page: 9 (33 - 36)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 11 (41 - 44)
11 (41 - 44)

Page 41

1  discuss this, we need to --
2        MR. STEWART:  Yeah.  Why don't -- you
3  know what, that's a good point, Jeff.  I meant to flag
4  that, and we will find a better time to do that.
5        Has this already been marked?  Okay.
6  Just set it aside for now.  We'll come back to this.
7        Q.  (BY MR. STEWART)  So talking generally then
8  about the jury wheel transfer, what is the purpose of
9  that transfer?
10       A.  The -- the purpose of the jury wheel file --
11       Q.  Uh-huh.
12       A.  -- from DPS is to use it to create jury panels
13 for counties.
14       Q.  And why is that information transferred to the
15 Secretary of State?
16       A.  Because it's our job to create the jury panels
17 for counties.
18       Q.  I see.  Is that information ever used to
19 update voting records?
20       A.  Yes.
21       Q.  Which fields from that information -- or
22 excuse me, let me withdraw that.
23       What information from the jury wheel
24 update is used to update voting records?
25       A.  Well, I mean, all of it's used to update voter

Page 42

1  records.
2        Q.  So any information on the jury wheel update
3  can be used to update a voting record?
4        A.  That's right.
5        Q.  What information is needed to match something
6  in the jury wheel file to a record in TEAM?
7        A.  Well, it's what I said before.  We're going to
8  use first name, last name, date of birth, DL number or
9  personal ID number and social.
10       Q.  And is that subject to the process set forth
11 in the regulations?
12       A.  It's subject to that process, plus.
13       Q.  What do you mean by plus?
14       A.  The plus that we talked about before.  We were
15 -- we've talked about this process already, it's the ad
16 hoc process --
17       Q.  The --
18       A.  -- HB 2512.
19       Q.  The ad hoc process can be used to match the
20 jury wheel file to the TEAM database?
21       A.  No.
22       Q.  Sorry, I must be confused then.
23       You just said it's subject to the ad hoc
24 process, but now it can't be used?
25       A.  No, it is used.

Page 43

1        Q.  Okay.  The ad hoc process is used to match the
2  jury wheel file to the TEAM database?
3        A.  No.
4        Q.  You'll have to und -- you have to explain to
5  me the distinction you're drawing --
6        A.  Well --
7        Q.  -- that it is used but it's not.
8        A.  Well, we use it to get the numbers.  Right?
9  We use the jury wheel file in order to get full-nine of
10 social for as many voters as we can.  This last time we
11 used the jury file, also, to get as many driver's
12 license numbers as we could.
13       Q.  And when you say this last time, what are you
14 referring to?
15       A.  The most recent time that we've done the HB
16 2512 process.
17       Q.  Was that on or around December 20, 2021?
18       A.  It was.
19       Q.  And you said that was used to import full-nine
20 social security numbers?
21       A.  That's right.
22       Q.  Was it required to have a matching driver's
23 license in order to import that full-nine social
24 security number?
25       A.  Mostly, yes.

Page 44

1        Q.  What do you --
2        A.  The way it works is, first off, we look for
3  social security numbers that match.
4        Q.  Uh-huh.
5        A.  Social security numbers plus name and date of
6  birth, which is our strongest match, and then, once
7  we've got that out of the list, then we look for DL
8  matches, so the list of remaining pool of persons gets
9  smaller every time.
10       Q.  When you say the list of remaining pool of
11 persons, what are you referring to?
12       A.  The -- the list of unattached records.
13       Q.  Unattached to what?
14       A.  Each other.
15       Q.  Between the jury wheel file and the TEAM
16 database?
17       A.  Of vo -- between a voter and a driver.
18       Q.  I see.  And so --
19       A.  We're not comparing databases.  I mean, we are
20 matching databases together, but we're comparing a voter
21 to a driver.  And if we get a voter and a driver that
22 are the same person, and we can fill out the number for
23 that person, that's what we're doing.
24       Q.  And when you're saying you're matching a voter
25 and a driver, you're doing that by comparing the

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

11 (41 - 44) Keith Ingram
Page: 11 (41 - 44)

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 41 of 238

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 13 (49 - 52)
13 (49 - 52)

Page 49

1  under our TAC rule is first name, last name, former last
2  name, date of birth and full-nine.
3      Q.  Understood.  And so just to clarify, is the 25
4  -- 2512 process the only process in which you use
5  driver's license as a matching criteria?
6      A.  To get socials, yes, I believe so.  I -- I can
7  check with my voter registration manager, but I don't
8  think we use it for anything else.  I know that ERIC
9  uses it.  I mean, that's the reason why we give the
10  driver's license file to ERIC, but I don't know how ERIC
11  uses it.  They've got their own --
12      Q.  And so --
13      A.  -- black box.
14      Q.  -- but there you mean the driver's license
15  number?
16      A.  What?
17      Q.  You said you know ERIC uses it, and by it you
18  mean the driver's license number?
19      A.  That's right.
20      Q.  All right.  So with respect to that export
21  from DPS to TEAM that occurred on or around December 20,
22  2021, how was that information then communicated to what
23  we described previously as offline counties?
24      A.  It was -- it was communicated through the CDW.
25      Q.  And what, I'm sorry, what is the CDW?

Page 50

1      A.  The County Data Warehouse.
2      Q.  Were there any issues with that communication?
3      A.  I don't believe so, no.  We also communicated
4  it, I did a webinar and we did the mass email, I
5  believe, maybe an advisory.
6          MR. STEWART:  How long have we been on
7  the record?
8          COURT REPORTER:  Forty-one minutes.
9          MR. STEWART:  Okay.  Thank you.
10      Q.  (BY MR. STEWART)  All right.  Other than the
11  ones you've described here right now, are there any
12  other exchanges we haven't discussed that bring
13  information into voter registration records from DPS?
14      A.  I can't think of any.
15      Q.  Let me -- all right.
16          MR. STEWART:  I believe we're on, it's 5?
17          COURT REPORTER:  5, yes.
18      Q.  (BY MR. STEWART)  All right.  I'm going to
19  show you what's been marked as Exhibit 5 which is --
20  I'll represent to you this is Chapter 84 of the Texas
21  Election Code.
22          (Plaintiff's Exhibit No. 5 was marked for
23  identification.)
24      Q.  (BY MR. STEWART)  On Page 2 I want to turn
25  your attention to what begins Section 8 -- 84.002, are

Page 51

1  you familiar with this section?
2      A.  Yes.
3      Q.  Are these the -- are these the provisions
4  amended by SB 1 with respect to identification number,
5  social security number or a statement that an applicant
6  has neither information on an application for a ballot
7  by mail?
8          MR. JEFFREY WHITE:  Objection, form.
9      A.  This section was amended by SB 1, yes.
10      Q.  (BY MR. STEWART)  Has the Secretary of State
11  published any interpretive guidance for Section 84.002
12  since S -- since the SB 1 amendments?
13      A.  Any interpretive guidance?
14      Q.  Yes.  Any information that can be used to
15  interpret this statutory provision?
16      A.  Yes.
17      Q.  What information has the Secretary of State
18  published?
19      A.  Well, we did an advisory, I did a legislative
20  summary, we changed the form.
21      Q.  And by the form, what -- which form do you
22  mean?
23      A.  The application for ballot by mail.
24      Q.  Okay.  All right.  Looking at Section 84.002
25  1-a(B) it says, "if the applicant has not been issued a

Page 52

1  number described by Paragraph (A), the last four digits
2  of the applicant's social security number", did I read
3  that correctly?
4      A.  That's right.
5      Q.  How do you interpret the language "if the
6  applicant has not been issued a number described by
7  Paragraph (A)"?
8      A.  Well, the way it looks is that they have
9  created a hierarchy with driver's license first, last
10  four second, but that's not the way in practice that
11  this works.  Either number will work, and we suggest to
12  the voters that they use both numbers so that they
13  increase their odds of success.
14      Q.  And when you say that's not the way in
15  practice that it works, is that an interpretation that
16  the Secretary of State's Office has published?
17      A.  That's right.
18      Q.  And --
19      A.  That's the way we've taught it in several
20  Webexes, that's the way it is in the advisory, that's
21  the way it is in mass emails that we've sent out.
22      Q.  Uh-huh.
23      A.  That's the way it is in questions we've
24  answered, that's the way it is in town halls when we've
25  talked about it.

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

13 (49 - 52) Keith Ingram
Page: 13 (49 - 52)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 14 (53 - 56)
14 (53 - 56)

Page 53

1  Q.  And how did you arrive at that interpretation?
2  A.  It's the most voter-friendly.
3  Q.  Was there any point where you interpreted it
4  to establish a hierarchy?
5  A.  No.
6  Q.  So from the initial implementation of SB 1,
7  you interpreted it to establish a hierarchy?
8  A.  From before SB 1 was signed into law.
9  Q.  And so how do you interpret the phrase "not
10 been issued"?
11 A.  Same way you do.
12 Q.  Which is -- how do I do it?
13 A.  By what it means.  It means if you don't have
14 a DL, use your social.  That clearly cannot be the way
15 the way this law works, and it's not.
16 Q.  And when you say it's clearly not how this law
17 works, what is that based on?
18 A.  Our interpretation.
19 Q.  I'm sorry?
20 A.  Because the way that it's supposed to work, if
21 you look at -- if you look at Chapter 86, what you're
22 supposed to do when you look at these numbers is see if
23 there's -- if it matches a number in the voter's record.
24 There's no hierarchy for the Signature Verification
25 Committee or the Ballot Board, there's no hierarchy.

Page 54

1  They don't look for a driver's license first.  The --
2  the only places that there's -- there is a hierarchy is
3  in this.  But the people who actually review the number,
4  to make sure it matches a voter, are not told to use a
5  hierarchy.
6  Q.  Sorry, which provision of the law are you
7  describing there?
8  A.  The ones about the Signature Verification
9  Committee and the Early Voting Ballot Board, and how
10 they are supposed to work with this information.
11 Q.  So you're saying this provision of the law
12 does not apply to the Signature Verification Committee
13 or Early Voting Ballot Board?
14 A.  I'm saying --
15 MR. JEFFREY WHITE:  Object --
16 A.  -- they're told to look to see if the number
17 matches a number in the voter's record with --
18 Q.  (BY MR. STEWART)  Told by whom?
19 A.  The legislature.
20 Q.  And you're saying the Signature Verification
21 Committee or Early Voting Ballot Board does not need to
22 consider Section 84.002 when doing so?
23 A.  They need to make sure that there's a number
24 on the application that matches a number in the voter's
25 record.

Page 55

1  Q.  Thank you, but my question is, do they need to
2  consider Section 84.002 when doing so?
3  A.  They need to make sure that a number supplied
4  by the voter matches a number in the voter's record.
5  MR. STEWART:  I'll object as
6  nonresponsive.
7  A.  That --
8  Q.  (BY MR. STEWART)  Do they --
9  A.  I answered your question, you just don't like
10 the answer.
11 MR. STEWART:  I'll object as
12 nonresponsive to that as well.
13 Q.  (BY MR. STEWART)  Do they need to consider
14 Section 84.002, yes or no, when doing so?
15 MR. JEFFREY WHITE:  Objection, form.
16 A.  They need to follow the instructions of the
17 legislature, and make sure that the number provided by
18 the voter matches a number in the voter's record.
19 MR. STEWART:  All right.  I'll object as
20 nonresponsive.
21 Q.  (BY MR. STEWART)  Do you interpret Section
22 86.002 as similar language in the same way, with respect
23 to carrier envelopes?
24 MR. JEFFREY WHITE:  Objection, form.
25 A.  Exactly.  And that's why we have told the

Page 56

1  voter you can use either number or both, and we
2  recommend using both.
3  Q.  (BY MR. STEWART)  All right.  Let me -- you
4  mentioned some implementation documents that went to
5  counties.
6  MR. STEWART:  I think we're on, I believe
7  --
8  COURT REPORTER:  6.
9  MR. STEWART:  -- 6, thank you.
10 That's for you.
11 Q.  (BY MR. STEWART)  So I'll show you what we've
12 marked as Exhibit 6.
13 (Plaintiff's Exhibit No. 6 was marked for
14 identification.)
15 Q.  (BY MR. STEWART)  Is this the application for
16 a ballot by mail that the Secretary of State's Office
17 distributed to counties?
18 A.  It is the revised application for a ballot by
19 mail that we have promulgated, yes.
20 Q.  And sorry, you said this form was prepared by
21 the Secretary of State's Office?
22 A.  It was.
23 Q.  Can counties modify this form?
24 A.  So you don't need to have a particular form in
25 order to apply for a ballot by mail, you can just have a

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

14 (53 - 56) Keith Ingram
Page: 14 (53 - 56)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 15 (57 - 60)
15 (57 - 60)

Page 57

1 handwritten document, but it needs to contain the
2 elements of 84.002.  We suggest if a county is going to
3 modify this form, number one, that it doesn't say
4 promulgated by the Secretary of State on it, and number
5 two, that they run it by us first, just to make sure
6 they're not missing anything important.  We suggest the
7 same thing for candidates and campaigns.
8     Q.   Got it.  Are they required to run it by you,
9 or is that a suggestion?
10        MR. JEFFREY WHITE:  Objection, form.
11     A.   For -- for this particular form it's a
12 suggestion, a very strong suggestion, because what you
13 end up with is something like what Harris County did on
14 the carrier envelope or on the application, where they
15 left off important information and confused voters in
16 the process.
17     Q.   (BY MR. STEWART)  Sorry, is it -- and then
18 with the carrier envelope, is that required to be run by
19 you if there are any alterations by counties?
20        MR. JEFFREY WHITE:  Objection, form.
21     A.   Yes, absolutely.  That one's got to be run by
22 us.
23     Q.   (BY MR. STEWART)  Yeah.  And who at the
24 Secretary of State is authorized to grant that approval
25 for counties to change the form -- the carrier envelope

Page 58

1 form?
2        MR. JEFFREY WHITE:  Objection, form.
3     A.   Our lawyers.
4     Q.   (BY MR. STEWART)  And so then I'll direct your
5 attention to the box, top half of the page, right side
6 in a black background and white letters.
7        It says, "You must provide one of the
8 following numbers", and then underneath it there is a
9 box with space for entering ID numbers or an SSN-four or
10 a checkbox, is that correct?
11     A.   That's correct.
12     Q.   Is this the section that implements the SB 1
13 mail-in ballot provisions with respect to the
14 application ballot by mail?
15     A.   Yes.
16     Q.   And does this track the language of SB 1?
17     A.   It does.
18     Q.   And this has the if you do not have a Texas
19 driver's license, Texas personal ID number or Texas
20 election identification certificate number, give the
21 last four digits of your social security number,
22 correct?
23     A.   That's correct.
24     Q.   And so your direction to voters was to provide
25 that only if they did not have a Texas driver's license,

Page 59

1 a Texas personal ID number or --
2     A.   The --
3     Q.   -- a Texas election identification --
4        MR. JEFFREY WHITE:  Objection --
5     Q.   (BY MR. STEWART)  -- certificate?
6        MR. JEFFREY WHITE:  -- form.
7     A.   The form tracks the law, yes.  That's what
8 it's supposed to do.
9     Q.   (BY MR. STEWART)  So the form is faithful to
10 the language of the law?
11        MR. JEFFREY WHITE:  Objection, form.
12     A.   The form tracks the law, which is what a good
13 form does.
14     Q.   (BY MR. STEWART)  I'll show you Exhibit 7.
15        (Plaintiff's Exhibit No. 7 was marked for
16 identification.)
17     Q.   (BY MR. STEWART)  Do you recognize this
18 document?
19     A.   Yes.
20     Q.   What is this document?
21     A.   It's a PDF, I believe, of a revised carrier
22 envelope.
23     Q.   Is this accurate with respect to the contents
24 of the revised carrier envelope?
25        MR. JEFFREY WHITE:  Objection, form.

Page 60

1     A.   Without looking at every word, I believe so,
2 yes, sir.
3     Q.   (BY MR. STEWART)  And you said counties need
4 approval to modify this form, correct?
5     A.   Yes.
6     Q.   Did any counties request that modification
7 this -- in the March -- for the March 2020 primary
8 election?
9     A.   Yes.
10     Q.   Do you recall which counties did so?
11     A.   I believe Tarrant and Dallas both had a little
12 different situation with regard to the number under the
13 flap and the shorter cutaway flap.
14     Q.   Were there any counties that requested to
15 modify for which the Secretary of State denied approval?
16     A.   I don't think so.
17     Q.   Were there any counties that requested to
18 modify for which the Secretary of State suggested
19 further modifications based on the proposed county's
20 modifications?
21        MR. JEFFREY WHITE:  Objection, form.
22     A.   Yes.  We have -- we have suggested further
23 changes.
24     Q.   (BY MR. STEWART)  Looking at what is Page --
25 the third page of this PDF, and in the box about halfway

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

15 (57 - 60) Keith Ingram
Page: 15 (57 - 60)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 16 (61 - 64)
16 (61 - 64)

Page 61

1 down the page beginning, black background white letters,
2 "Required Information", and then "you must provide one
3 of the following numbers and it must be associated with
4 your voter registration record", is this the area used
5 to implement the SB 1 language with respect to ballot
6 carrier envelopes?
7    A.  Yes.
8        MR. JEFFREY WHITE:  Objection, form.
9    Q.  (BY MR. STEWART)  And does this have the if
10 you do not have a Texas driver's license, or a personal
11 identification card or a Texas election identification
12 certificate number, give the last four digits of your
13 social security number language?
14    A.  It does.
15    Q.  Is it the same in Spanish?
16    A.  It is.
17    Q.  And does that track the language of SB 1?
18    A.  It does.
19    Q.  Are there currently any plans to modify this
20 form for future elections?
21    A.  Yes.
22    Q.  What are those plans?
23    A.  We have revised it.  We are getting final
24 approvals now, but it's got a red box around this, these
25 three, to draw attention to it.

Page 62

1    Q.  Uh-huh.  Will that still track the language of
2 SB 1?
3    A.  Yes.
4    Q.  Are there any plans to modify the application
5 for a ballot by mail for the -- for future elections?
6    A.  No.
7    Q.  Show you one more.
8        MR. STEWART:  I believe we're at 8?
9        COURT REPORTER:  Uh-huh.
10    Q.  (BY MR. STEWART)  Are you familiar with this
11 document?
12        (Plaintiff's Exhibit No. 8 was marked for
13 identification.)
14    A.  I am.
15    Q.  (BY MR. STEWART)  What is this document?
16    A.  This is a signature sheet that a federal
17 postcard application voter is supposed to use when they
18 send back their mail ballots.
19    Q.  Is this prepared by the Secretary of State?
20    A.  It is.
21    Q.  Is this mailed to FPCA voters by -- and sorry,
22 if I say FPCA, federal postcard applicant -- is this
23 mailed to FPCA voters by counties or by the Secretary of
24 State's Office?
25    A.  It's --

Page 63

1        MR. JEFFREY WHITE:  Objection, form.
2    A.  The balloting materials are mailed by
3 counties.
4    Q.  (BY MR. STEWART)  By county.
5        Was the purpose of this form to implement
6 SB 1, specifically?
7    A.  Well, the original purpose of the signature
8 verification -- a signature sheet, is to assist those
9 voters who don't know how to do the origami to put
10 together a carrier envelope.  So this can be used in
11 lieu of a carrier envelope, and it's specifically
12 allowed by a statute for FPCA voters.  So the original
13 purpose of a signature sheet is to replace a carrier
14 envelope for voters who don't want to create a carrier
15 envelope from materials that have been emailed to them.
16    Q.  So this form predated SB 1?
17    A.  This form predates SB 1.
18    Q.  But it was modified to reflect SB 1 before the
19 March 2020 primary?
20    A.  That's correct.
21        MR. JEFFREY WHITE:  Objection, form.
22    Q.  (BY MR. STEWART)  Marked as -- it was modified
23 to reflect SB 1 before the March 2022 primary, correct?
24    A.  That's correct.
25    Q.  And is the language implementing SB 1 the box

Page 64

1 about a little less than halfway down the page that
2 begins "Required Information"?
3    A.  That's correct.
4    Q.  And that's similarly to the carrier envelope
5 and the ballot by mail application, has the if you do
6 not have a Texas driver's license language, correct?
7    A.  That's correct.
8        MR. JEFFREY WHITE:  Objection, form.
9    Q.  (BY MR. STEWART)  And that tracks SB 1?
10    A.  It does.
11    Q.  Are there any plans to modify this form in the
12 future?
13    A.  We do not.
14        MR. STEWART:  This is No. 9.  Give that
15 to Jeff, I'll get the marked version.
16        (Plaintiff's Exhibit No. 9 was marked for
17 identification.)
18    Q.  (BY MR. STEWART)  All right.  I'll show you
19 what's been marked as Exhibit 9, do you recognize this
20 form?
21    A.  Yes.
22    Q.  What is this form?
23    A.  It's the Notice of Rejected ABBM.
24    Q.  Did this form predate SB 1?
25    A.  Yes.

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

16 (61 - 64) Keith Ingram
Page: 16 (61 - 64)

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 45 of 238

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 17 (65 - 68)
**17 (65 - 68)**

Page 65

1  Q.  But it was it amended in light of SB 1?
2  **A.  Yes.**
3  Q.  Is this the version that's currently in use?
4  **A.  I don't know.**
5  Q.  Reading it over, do you see any differences
6 from the version currently in use?
7  **A.  I would have to see, because I wonder if**
8 **there's more than one of these.  I know there's about**
9 **four different notices for carrier envelope rejection, I**
10 **just don't know if there's more than one for rejected**
11 **ABBM.**
12  Q.  Sure.  So to, I guess to reflect it -- to ask
13 it a different way, is this a version currently in use?
14  **A.  I believe so, yes.**
15  Q.  And when is this sent to voters?
16  **A.  When their application for a ballot by mail**
17 **doesn't contain the required personal identification**
18 **number.**
19  Q.  And does this form direct voters to provide
20 both their driver's license or personal identification
21 card number and the last four digits of the social
22 security number?
23  **A.  So this form is used whenever their record**
24 **doesn't contain either one, and they -- we want them to**
25 **update to have them.**

Page 66

1  Q.  And the direction is to submit an updated
2 voter registration or update information online,
3 correct?
4  **A.  They can either use the enclosed application,**
5 **or they can do it at Texas.gov, yes.**
6  Q.  Does receiving this indicate that a voter's
7 existing registration is invalid?
8  **A.  No.**
9  Q.  Then turning to the update your information
10 online it says, "To access the voter registration portal
11 via Texas.gov you must have", and there's a list of four
12 items and the final two are your social security number
13 -- excuse me.  I'll withdraw that.
14  Looking at the update your information
15 online section, there is a portion that says, "To access
16 the voter registration portal via Texas.gov you must
17 have", and a list of four items, correct?
18  **A.  That's correct.**
19  Q.  Two of those are your Texas driver's license
20 or Texas personal identification card and your social
21 security number, correct?
22  **A.  That's correct.**
23  Q.  Does -- where does Texas.gov draw that
24 information from to compare what a voter provides?
25  MR. JEFFREY WHITE:  Objection, form.

Page 67

1  **A.  From the driver's license database.**
2  Q.  (BY MR. STEWART)  From the driver's license
3 database maintained by DPS?
4  **A.  Well, yes, but I'm sure DPS does what they do**
5 **for us, and they give a copy of the database to DIR, to**
6 **do the validation.**
7  Q.  Sorry, what is DIR?
8  **A.  Department of Information Resources.**
9  Q.  I'm sorry, DIR, right, I see.
10  So it's Department of Information
11 Resources that runs Texas.gov?
12  **A.  That's correct.**
13  Q.  And they receive their information from DPS?
14  **A.  That's correct.**
15  Q.  Thank you.
16  **A.  And in answer to your earlier question, we did**
17 **suggest that they supply both numbers.**
18  Q.  Uh-huh.  And who authorized that
19 interpretation?
20  MR. JEFFREY WHITE:  Objection, form.
21  **A.  I guess me.  I don't know what you mean, that**
22 **interpretation.**
23  Q.  (BY MR. STEWART)  Who needs to give final
24 approval for this form?
25  **A.  Well, me.**

Page 68

1  Q.  Did Secretary Scott see the form?
2  **A.  I don't know if he did or not.**
3  Q.  Does Secretary Scott need to approve the form
4 before it can be used?
5  **A.  No.**
6  MR. STEWART:  I believe we're 10?
7  COURT REPORTER:  Yes.
8  MR. STEWART:  Okay.
9  Q.  (BY MR. STEWART)  So I'm showing you what's
10 been marked as Exhibit 10, do you recognize this
11 document?
12  (Plaintiff's Exhibit No. 10 was marked
13 for identification.)
14  **A.  Yes.**
15  Q.  (BY MR. STEWART)  Is this a separate document
16 that can be sent to voters if an application for ballot
17 by mail was rejected?
18  **A.  Yes.  This one is for a different reason.**
19  Q.  And what is the reason for this one?
20  **A.  Well, the first one was because they didn't**
21 **have a number in their system.  This one is if they've**
22 **got a missing number, one or the other, or they've**
23 **provided an incorrect number.**
24  Q.  And how was this use -- sorry, I think I
25 actually got -- I'll withdraw that.

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

17 (65 - 68) Keith Ingram
**Page: 17 (65 - 68)**

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 19 (73 - 76)
19 (73 - 76)

Page 73

1   A.   I know I did one in January.  Was this one it?
2   Q.   And were you the person giving that
3   presentation, or was it someone else at the Secretary of
4   State's Office?
5   A.   Again, I gave a presentation in January on the
6   ballot by mail process.
7   Q.   Actually, let me put this aside for a minute.
8          I'll show you what we've marked as No.
9   12.
10         (Plaintiff's Exhibit No. 12 was marked
11  for identification.)
12   Q.   (BY MR. STEWART)  Turning to No. 12, do you
13  recognize this document?
14   A.   I'm still looking at 11.
15   Q.   Sure, I'm going to ask about No. 12, though,
16  so you can put No. 11 aside for now.
17   A.   Yeah.  I'm looking at 11, thank you.
18   Q.   Okay.
19         MR. STEWART:  If we're going to take time
20  for that, I'm going to ask to go off the record.
21         COURT REPORTER:  The time is 10:25 a.m.,
22  we are off the record.
23         (Off the record at 10:25 a.m.)
24         COURT REPORTER:  The time is 10:45 a.m.,
25  we are back on the record.

Page 74

1   Q.   (BY MR. STEWART)  All right.  Thank you.
2   Thank you, Mr. Ingram.
3          I think we were still on Document 12, do
4   you recognize this document?
5   A.   I do.
6   Q.   What is this document?
7   A.   It's our advisory regarding the cure process
8   on applications for ballot by mail and carrier
9   envelopes.
10   Q.   And what is an advisory?
11   A.   An advisory is something that our office
12  issues.  It's more formal than a mass email.
13   Q.   To whom is it distributed?
14   A.   County election officials, sometimes to
15  cities, schools and other political subdivisions, if
16  applicable.  This one, I believe, went to all the lists.
17   Q.   Does it provide official instructions to
18  county election officials?
19   A.   It does.
20   Q.   Okay.  Did you prepare this document?
21   A.   Not in the first instance.  I definitely
22  reviewed and helped revise, but I wasn't the primary
23  drafter.
24   Q.   And that's your signature on the document,
25  right?

Page 75

1   A.   It is.
2   Q.   Did the Secretary of State review this
3   document?
4          Secretary Scott, to be clear.
5   A.   I don't know.
6   Q.   You don't know whether Secretary Scott
7   reviewed this document?
8   A.   I don't.
9   Q.   Who created the interpretations of SB 1's mail
10  ballot provisions that are reflected in this document?
11   A.   Our office.
12   Q.   And whom in your office does -- was involved?
13   A.   The way a document like this comes together is
14  a collaborative effort by our attorneys, our legal
15  director, myself, and usually Adam Bitter, the general
16  counsel, will sit in on those meetings.
17   Q.   Did you consult with Secretary Scott on these
18  interpretations before issuing this document?
19   A.   I mean, not specifically.  I mean, the -- the
20  whole general idea, obviously, was something that we
21  talked about, so that he would be prepared to talk to
22  the media and -- and to town halls, so yes.  I mean, I
23  -- I assume he reviewed it, but I don't know for sure.
24  I would have to ask him.
25   Q.   So you published this without knowing whether

Page 76

1   he reviewed it?
2   A.   Sure.
3   Q.   Who is authorized at the Secretary of State's
4   Office to make these interpretations of the law?
5   A.   Me.
6   Q.   You?
7          So you are able to send these without
8   Secretary Scott's review?
9   A.   Well, I mean, we have a lot of cooks in our
10  kitchen, so I don't do anything by myself.  I'm
11  certainly not a cowboy out there, riding the range
12  alone.
13   Q.   Is there anyone you report to whom reviews --
14  who reviews this before it is sent out?
15   A.   As I said, we've got a whole lot of cooks in
16  our kitchen, and a lot of people review everything we
17  do.
18   Q.   Specifically, are there any cooks you report
19  to who review it before it goes out?
20   A.   Sure.
21   Q.   Who is that?
22   A.   It's the deputy secretary, Joe Esparza.
23   Q.   So Deputy Secretary Esparza reviewed this
24  before it went out?
25   A.   Sure.

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

19 (73 - 76) Keith Ingram
**Page: 19 (73 - 76)**

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 47 of 238

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 20 (77 - 80)
20 (77 - 80)

Page 77

1    MR. JEFFREY WHITE:  Objection, form.
2    Q.   (BY MR. STEWART)  Did secretary -- does Deputy
3 Secretary Esparza need to approve these interpretations
4 of the law before they are finalized?
5    A.   Well, if he doesn't think that we need to say
6 something, then he will say so and we won't say it.
7    Q.   Is his formal approval needed?
8    A.   I don't know what you mean by formal approval.
9    Q.   Did he direct you to change any of your
10 interpretations of the law in this document?
11    A.   No.
12    Q.   All right.  So let's turn to Page 3 of this
13 document.
14         Before you do that, so who does have
15 ultimate authority then, to determine the Secretary of
16 State's official policy?
17    A.   Well, I mean, we do.
18    Q.   Sorry, who is we?
19    A.   Me, my legal director, Christina Adkins; our
20 general counsel, Adam Bitter; the deputy secretary.
21    Q.   So could you determine Secretary of State
22 official policy on your own?
23    A.   Like I said, I am not a lone ranger out there
24 on the range by myself.
25    Q.   I guess the question is, who needs to give

Page 78

1 final approval for a policy before it becomes Secretary
2 of State official policy?
3    A.   We have a lot of people who review our
4 advisories before they go out.
5    Q.   And all of their assent is needed?
6    A.   Well, if they've got any proposed
7 modifications, then they've got the opportunity to make
8 modifications.
9    Q.   Who --
10    A.   We do not have -- we do not have a sheet where
11 people sign off formally on it.
12    Q.   Sure.  Whose affirmative assent is needed --
13    A.   Me.
14    Q.   -- to approve a policy?
15         Only yours?
16    A.   No.
17    Q.   Who else's?
18    A.   I don't know what you mean.  We don't have a
19 process like that in our office.  That's -- that's not a
20 part of our process.  We have a collaborative process
21 where people have the opportunity to make input, then we
22 all agree it's ready to go out.
23    Q.   Who is able to reject a policy before it is
24 finalized?
25    MR. JEFFREY WHITE:  Objection, form.

Page 79

1    A.   Anybody can raise a question about anything in
2 the process.
3    Q.   (BY MR. STEWART)  If two people disagree over
4 that question, whose interpretation governs?
5    A.   We try to work it out, and we get a
6 collaborative view.
7    Q.   If you're unable to work it out, whose
8 interpretation governs?
9    MR. JEFFREY WHITE:  Objection, form.
10    A.   Eventually, it will come down to whoever has
11 the -- the strongest feeling and the most arguments to
12 back it up.  I mean, I don't know what you mean.  We --
13 we have a collaborative process.  We don't send
14 something out that we haven't all gotten on board with.
15    Q.   (BY MR. STEWART)  So there needs to be
16 affirmative consent from everyone on this team before
17 any document is sent out?
18    A.   Don't know what affirmative consent means.
19    Q.   If anyone -- if anyone on the team disagrees
20 with something in this document, is it not sent out?
21    A.   They have the opportunity to propose changes.
22    Q.   But if anyone disagrees, is it not sent out?
23    MR. JEFFREY WHITE:  Objection, form.
24    A.   We don't -- we don't work like that, we don't
25 take a vote and then say at three to two we win.  That's

Page 80

1 not how we work.
2    Q.   (BY MR. STEWART)  Can something be sent out
3 that the Secretary of State Scott disagrees with?
4    A.   No, absolutely not.
5    Q.   Can something be sent out that you disagree
6 with?
7    A.   No, absolutely not.
8    Q.   Can something be sent out that Deputy
9 Secretary of State Esparza disagrees with?
10    A.   No.
11    Q.   Can something be sent out that Ms. Adkins
12 disagrees with?
13    A.   Sometimes, maybe, but I doubt it.  It's not a
14 something happens very often in the 10 years we've
15 worked together.
16    Q.   So turning to Page 3, to Scenario 3, it says
17 the "Voter provides the last four digits of their social
18 security number on the ABBM.  The voter registration
19 record contains a driver's license number and social
20 security number.
21         The early voting clerk is able to
22 validate that the partial security -- social security
23 number on the ABBM matches the number in the voter's
24 registration record.  The early voting clerk must accept
25 the ABBM and send a ballot to the voter", and then it

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

20 (77 - 80) Keith Ingram
Page: 20 (77 - 80)

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 48 of 238

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 22 (85 - 88)
22 (85 - 88)

Page 85

1    MR. JEFFREY WHITE:  Objection, form.
2    A.   Maybe that's what they thought, but they
3    didn't say it.  What they said is the application, the
4    information has to identify the same voter.
5    Q.   (BY MR. STEWART)  Sorry, what do you mean by
6    what they thought?
7    A.   The legislature.
8    Q.   So you're saying the legislature may have
9    thought they were incorporating that, but the Secretary
10   of State's Office is interpreting that they did not?
11       MR. JEFFREY WHITE:  Objection, form.
12   A.   No.  I made it very clear on record in
13   committee hearings the way that we were going to
14   interpret this.  What we said in the committee hearings
15   every time we got the opportunity to talk about this is
16   that we're going to look at the numbers and see if it
17   matches a number in the voter's record, and, if it does,
18   we're going to accept it.
19   Q.   (BY MR. STEWART)  Did the legislature make any
20   amendments to that?
21   A.   They did not.
22       MR. JEFFREY WHITE:  Objection, form.
23   Q.   (BY MR. STEWART)  Did you explicitly state
24   that you were not going to refer to the hierarchy?
25       MR. JEFFREY WHITE:  Objection, form.

Page 86

1    A.   I explicitly said we're going to take
2    whichever number they offer, and, if they identify a
3    voter in the voter registration record, then we're going
4    to accept that.
5    Q.   Were you discussing the hierarchy in the
6    course of that conversation?
7        MR. JEFFREY WHITE:  Objection, form.
8    A.   That -- the question was what if they provide
9    one and not the other, and they've got the other one.
10   Q.   (BY MR. STEWART)  That was what was
11   specifically asked at the hearing?
12   A.   I don't know, some version of that, but --
13   Q.   You don't know --
14   A.   -- like I --
15   Q.   -- whether that was specifically asked at the
16   hearing?
17   A.   Dude, I'm not going to go and memorize a
18   transcript.  You can look up the hearing transcript if
19   you want to.  Representative Bucy had questions, I had
20   answers.  He wanted to know how we would interpret this,
21   I told him how we would interpret it.
22   Q.   Okay.  Thank you.  But what you're saying is
23   you don't know whether that was the specific question
24   you were answering?
25       MR. JEFFREY WHITE:  Objection, form.

Page 87

1    You've asked this multiple times.  If you have the
2    transcript, we can show him the transcript.
3        MR. STEWART:  Sir, if the witness would
4    like to be responsive, I can move on.
5    A.   I have responded to your question.
6    Q.   (BY MR. STEWART)  Did you know, yes or no?
7        Or excuse me, was that the context in
8    which that statement was made?
9    A.   That was definitely the context.  He thought
10   this could be read more restrictively.  We told the
11   committee that we are not going to read it
12   restrictively.
13   Q.   And he thought it could be read more
14   restrictively and did not amend the language correctly,
15   correct?
16       MR. JEFFREY WHITE:  Objection, form.
17   A.   The language was amended.  This is not the
18   original language.
19   Q.   (BY MR. STEWART)  Sorry, and he did not amend
20   either 84.002(a)'s hierarchy or this reference in
21   86.001(f), correct?
22   A.   The language was amended so that this whole
23   identify the same voter --
24   Q.   Uh-huh.
25   A.   -- is -- was amended into it, I believe.  I'll

Page 88

1    have to go check, but I'm pretty sure that was the
2    change they made to accommodate what I was talking
3    about.
4    Q.   So your interpretation -- so the -- excuse me,
5    the Secretary of State's interpretation is that that
6    identify the same voter language is what allows for that
7    interpretation?
8    A.   That's right, and because it used to be more
9    restrictive.  It used to say the only way you could do
10   it is if they provided the number on the voter
11   registration application, and obviously this does not
12   say that.
13   Q.   So this expanded it beyond the application
14   itself?
15   A.   That's right.
16   Q.   Turning to -- back to Document 12 then and
17   looking at Scenario 6 it says, "A voter provides both
18   types of personal identification numbers, example:
19   driver's license number and last four digits of social
20   security number, on their ABBM.  The voter registration
21   record contains both types of personal identification
22   numbers; one on the ABM -- BBM matches the record, but
23   the other does not match.
24       Because the early voting clerk is able to
25   validate one of the numbers to the voter's voter

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

22 (85 - 88) Keith Ingram
Page: 22 (85 - 88)

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 23 (89 - 92)
23 (89 - 92)

Page 89

1  registration record", in parens, "and thus verify the
2  identity of the voter, the clerk must accept the ABBM
3  and send a ballot to the voter":
4            Is that still the current interpretation?
5      **A.   Sure.**
6      Q.   Yeah.  And so when there is an affirmatively
7  incorrect number on an ABBM, it is still accepted as
8  long as that other number is correct?
9      **A.   If the number matches and can identify the**
10 **same voter as the application for voter registration**
11 **then yes.**
12     Q.   What's the statutory basis for that
13 interpretation?
14     **A.   86.001(f).**
15     Q.   Who arrived at that interpretation?
16     **A.   Our office.**
17     Q.   Did Secretary of Scott -- did Secretary Scott
18 review that interpretation?
19     **A.   I don't know if he reviewed that or not, but**
20 **he's certainly been telling everybody he can to put both**
21 **numbers on the -- on the forms.**
22     Q.   So he -- just so I heard you correct, you said
23 he's been telling everyone he can to put both numbers on
24 the form?
25     **A.   That you can and you should.**

Page 90

1      Q.   I see.  But you don't know whether he reviewed
2  this interpretation, specifically, about --
3      **A.   He had -- he had the opportunity to review it.**
4  **I didn't hear anything from him specifically about any**
5  **of this.**
6      Q.   And by had the opportunity, was this document
7  sent to him before it was issued?
8      **A.   It was sent to everybody, yes.**
9      Q.   Scenario 8, "Voter indicates on the ABBM that
10 they have not been issued any of the required personal
11 identification numbers.  If the voter's voter
12 registration record does not contain any of these
13 numbers, the early voting clerk must accept the ABBM and
14 send a ballot to the voter", is that still the current
15 guidance?
16     **A.   That is.**
17     Q.   Is any check run to see whether the voter is
18 correct, that they have not been issued those personal
19 identification numbers?
20     **A.   That's what this provides.  They -- the voter**
21 **indicates that they don't have any of these numbers,**
22 **there's not any of these numbers in the record, that's**
23 **the check.**
24     Q.   And is that checked against TEAM?
25     **A.   It's checked against TEAM.**

Page 91

1      Q.   If the voter has numbers in the DPS record --
2  or excuse -- let me withdraw that.
3            If the voter has a driver's license
4  number in the DPS database, but it's not reflected in
5  the TEAM database, and has a social security number in
6  the DPS database, but it's not reflected in the TEAM
7  database, will their ballot be accepted if they check
8  that box under this scenario?
9            MR. JEFFREY WHITE:  Objection, form.
10     **A.   We don't check the DLs database whenever we're**
11 **looking at ABBMS, we look at TEAM.**
12     Q.   And by DLs you mean DPS?
13     **A.   That's right.**
14     Q.   Okay.
15            MR. STEWART:  We are on -- sorry, getting
16 another paper here --
17            COURT REPORTER:  14.
18            MR. STEWART:  -- 14.
19     Q.   (BY MR. STEWART)  All right.  I'll show you
20 what we're marking as Document 14.
21            (Plaintiff's Exhibit No. 14 was marked
22 for identification.)
23     Q.   (BY MR. STEWART)  Do you recognize this
24 document?
25     **A.   I do.**

Page 92

1      Q.   What is this document?
2      **A.   This is the global rejection of an application**
3  **for ballot by mail.**
4      Q.   And in what circumstances is this sent?
5      **A.   For any of the ordinary rejection reasons.**
6      Q.   Uh-huh.  And then I'll show you -- and by
7  ordinary rejection reasons, what do you mean?
8      **A.   You know, the -- any of them.  I mean, there -**
9  **- there's a list here of 17, do you want me to read**
10 **them?**
11     Q.   No.  You don't need to do that.
12            MR. STEWART:  And then this is?  Sorry.
13            COURT REPORTER:  15.
14            MR. STEWART:  15.
15     Q.   (BY MR. STEWART)  I'll show you what's been
16 marked as No. 15.
17            (Plaintiff's Exhibit No. 15 was marked
18 for identification.)
19     Q.   (BY MR. STEWART)  Do you recognize this
20 document?
21     **A.   I do.**
22     Q.   What is this document?
23     **A.   It's called a Notice of Carrier Defect.**
24     Q.   And what is the purpose of this document?
25     **A.   This is to help the voter with -- do the --**

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

23 (89 - 92) Keith Ingram
Page: 23 (89 - 92)

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 50 of 238

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 25 (97 - 100)
**25 (97 - 100)**

Page 97

1  director Sam Taylor, the secretary, the deputy
2  secretary.
3      Q.   So the secretary was part of those
4  conversations?
5      A.   Absolutely.
6      Q.   How frequently was the secretary involved in
7  those conversations?
8      A.   Not often.
9      Q.   About how -- about how many times?
10     A.   When we were about ready to release product.
11     Q.   So he would review the product after -- or
12  excuse me, at about the time it was ready to be
13  released?
14     A.   That's right.
15     Q.   Did he suggest any changes to the product?
16         MR. JEFFREY WHITE:  Objection --
17     A.   No, sir.
18         MR. JEFFREY WHITE:  -- to the extent
19  you're -- this gets into the deliberative process while
20  they're debating policies before they're finalized.  I
21  am going to instruct him that he is not to disclose the
22  content of discussions that would have gone into
23  deliberation regarding the final form.  But if it's
24  regarding what the final form is, then he can speak to
25  that.

Page 98

1         MR. STEWART:  Well, let me just probe
2  that for a second.
3      Q.   (BY MR. STEWART)  Was the purpose of these
4  conversations with the secretary to develop policy?
5      A.   Not really.
6      Q.   Okay.  So did Secretary Scott direct any
7  changes to those forms?
8      A.   He did not.
9         MR. STEWART:  We are at 17?
10        COURT REPORTER:  16.
11        MR. STEWART:  16, excuse me.
12     Q.   (BY MR. STEWART)  I'm sorry.
13     A.   I can get it.
14     Q.   Okay.  I thought I was getting better.
15        MR. JEFFREY WHITE:  We'll get a smaller
16  table next time.
17     Q.   (BY MR. STEWART)  So I'll show you what's been
18  marked as Document 16, it is Bates stamped "State052241"
19  on the bottom.
20         (Plaintiff's Exhibit No. 16 was marked
21  for identification.)
22     Q.   (BY MR. STEWART)  This appears to be an email
23  between you and Jacque Callanen, is that correct?
24     A.   That's correct.
25     Q.   Who is Ms. Callanen?

Page 99

1      A.   She is the election administrator in Bexar
2  County.
3      Q.   Uh-huh.  If you could take a second to review
4  the first email in this chain, dated Friday, January 21,
5  2022 at 10:31 a.m., what do you understand Ms. Callanen
6  to be asking?
7      A.   Well, I don't have the attachments, but what
8  appears to have happened is that someone sent in an
9  application for ballot by mail with a copy of their
10  driver's license.
11     Q.   And it appears that otherwise the application
12  for ballot by mail, identification number or social
13  security number portions were not filled out, correct?
14     A.   Looks like it.
15     Q.   And what was your response to Ms. Callanen
16  when she asked what to do with that --
17     A.   That the DL --
18     Q.   -- application?
19     A.   -- copy could supplement the ABBM, and that
20  they could use that DL copy to update the voter
21  registration record with that driver's license number
22  and accept that application.
23     Q.   So the guidance was that if TEAM did not
24  reflect a driver's license number, but the voter sent a
25  copy of their driver's license, that copy could be used

Page 100

1  to both update TEAM, and then accept the application for
2  ballot by mail?
3         MR. JEFFREY WHITE:  Objection, form.
4      A.   That's correct.
5      Q.   (BY MR. STEWART)  Is that the official
6  interpretation of the Secretary of State's Office?
7      A.   Sure.
8      Q.   Are you aware of any other circumstances where
9  that happened?
10     A.   Not this, precisely, but we have had 84.014
11  get discussed quite a bit by county election officials.
12     Q.   And what is 84.014?
13     A.   It says that your -- you can use information
14  on an application for ballot by mail to update a voter
15  registration record.
16     Q.   And what were those discussions?
17     A.   They wanted to know can you use the
18  application that's got a number that you don't have in
19  the file to update the record, and the answer to that is
20  no.  And the reason why you could here is because they
21  sent in a copy of the driver's license.
22     Q.   Why is the answer generally no?
23     A.   Because then it tautology and SB 1 would be
24  ineffective.
25     Q.   And why is that?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

25 (97 - 100) Keith Ingram
**Page: 25 (97 - 100)**

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

**Keith Ingram 29 (113 - 116)**
**29 (113 - 116)**

Page 113

1   A.   Right.
2   Q.   And is that how final interpretation of
3   statutes are reached as well?
4   A.   Well, if -- if a question comes up, and that's
5   -- that's why it's hard about this question is this
6   question hasn't come up.  We have had zero inquiries
7   about an -- an assistant wants to do this, and it's not
8   in the oath, and what is -- what are we going to do?
9   What I would tell them to do is they should assist the
10  voter.  Right?
11       And I'm pretty sure any of my lawyers
12  would say assist the voter, but this is not a question
13  that's come up for discussion, because it's not a
14  question that we've gotten from either voters, their
15  assistants or counties.
16  Q.   So do you typically wait to receive a question
17  to interpret a statute?
18  A.   No, absolutely not.
19  Q.   But in this circumstance you have?
20  A.   No.  We just haven't had occasion to answer
21  the question.
22  Q.   And other than being asked questions by
23  counties, what are other occasions to answer the
24  question?
25  A.   If a voter asks, or an assistant, or a

Page 114

1   potential assistant.  A potential assistant could call
2   our office and say I'm worried about this, because I
3   need to do some more things other than these four.
4   Well, that hasn't happened.
5   Q.   I see.  But so, in general, policy is created
6   in response to questions from external individuals?
7   A.   No, no.
8   Q.   So then what are the circumstances where  a
9   Secretary of State policy is created?
10  A.   I -- I don't know how to answer that question.
11  We create policy in a number of ways in our office.
12  Q.   And what are those ways?
13  A.   We write advisories, we send mass emails.
14  Those are reviewed before they go out, by a lot of
15  folks.  We decide on frequently asked questions, and
16  what the answers are going to be, sometimes
17  prophylactically, sometimes in response to really
18  frequently asked questions.  So you can't just say we
19  set policy one way, we set policy as we need to set
20  policy.
21       We decide how we're going to answer a
22  question as we need to answer the question.  Sometimes
23  we're pretty sure that question is going to come, so we
24  prepare an answer in advance, sometimes a question comes
25  out of left field we never expected, we've got to come

Page 115

1   up with an answer.
2        So saying we set policy one way,
3   generally, with a formal committee and sign-offs, we
4   don't do that.  We're a small agency, and in our small
5   agency of less than 200 people, we are in a very small
6   division of about 30 people.  So this is not a -- this
7   is not a great big bureaucratic monstrosity.  Right?
8   We've got six lawyers plus Christina and I.  We ask each
9   other the question, we have meetings a couple times a
10  week and talk about what questions are you hearing.
11  Q.   So the policy on the assistor oath that you've
12  just articulated, that an assistor can provide the forms
13  of assistance needed, was that formulated by you,
14  sitting here today?
15  A.   Absolutely.  And it would be my answer if --
16  if we get asked that question, that's what I would tell
17  our lawyers to say, if they need assistance, give them
18  assistance.
19  Q.   Would others need to concur in that policy?
20  A.   Don't know.
21  Q.   So for example, if Ms. Adkins agreed with your
22  -- disagreed, rather, with the interpretation you've
23  come up with today, what would your process be?
24  A.   Why do you disagree?  What else are you going
25  to tell them?

Page 116

1   Q.   And how would you ultimately arrive at the
2   final policy?
3   A.   Collaboratively.
4   Q.   So could that policy change from where you're
5   sitting here today?
6   A.   Potentially, but I don't think so.  We would
7   all say assist the voters.
8   Q.   And what's your basis for saying that?
9   A.   Because I know how our office works.
10       THE WITNESS:  We just lost the Zoom.
11       MR. STEWART:  It's okay.  We can go off
12  the record anyway.
13       COURT REPORTER:  The time is 11:27 a.m.,
14  we are off the record.
15       (Off the record at 11:27 a.m.)
16       COURT REPORTER:  The time is 11:38 a.m.,
17  we are back on the record.
18  Q.   (BY MR. STEWART)  Mr. Ingram, just one more
19  thing I want to go back to.
20       On Exhibit 3, which I think was the TEAM
21  field layout, earlier, I asked you about the ballot
22  status field on the second page, and you indicated that
23  AV means ballot accepted.
24       If I recall correctly, you didn't know,
25  sitting here, what A meant?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

29 (113 - 116) Keith Ingram
**Page: 29 (113 - 116)**

EXHIBIT

83

Christina Adkins
July 20, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO, ET AL )
                                  )
    PLAINTIFFS,                   )
                                  )
VS.                               )CIVIL ACTION NO.
                                  )5:21-CV-844 (XR)
                                  )(CONSOLIDATED CASES)
STATE OF TEXAS, ET AL,            )
                                  )
    DEFENDANTS.                   )



*********************************************************

                ORAL DEPOSITION OF

                 CHRISTINA ADKINS

                  JULY 20, 2022

*********************************************************



        ORAL DEPOSITION of CHRISTINA ADKINS, produced as

a witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on the 20th day of July, 2022, from 9:00 a.m. to 3:06

p.m., before Gabriela S. Silva, CSR, RPR in and for the

State of Texas, reported by stenograph, at William P.

Clements Building, 300 W. 15th Street, Austin, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Christina Adkins
July 20, 2022

Page 2

```
1              A P P E A R A N C E S
2
3
4   COUNSEL FOR THE PLAINTIFFS:
5   JENNIFER J. YUN
    DANA PAIKOWSKY
6   U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
    Robert F. Kennedy Building
7   950 Pennsylvania Avenue NW
    Washington, DC 20530
8   (202) 353-5225
9   MARK L. BIETER
    STOEL RIVES, LLP
10  101 S. Capitol Boulevard, Suite 1900
    Boise, ID 83702
11  (208) 387-4217
12  LISA VIOLET CUBRIEL (via Zoom)
    BEXAR COUNTY DA'S OFFICE, CIVIL LITIGATION
13  P.O. Box 12548
    Austin, Texas 78711
14  (210) 335-2311
15  GRAHAM WHITE (via Zoom)
    ELIAS LAW GROUP
16  10 G St NE
    Washington, DC 20002
17  (202) 968-4490
18  ANTHONY J. 'TONY' NELSON (via Zoom)
    ASSISTANT TRAVIS COUNTY ATTORNEY
19  P.O. Box 1748
    Austin, Texas 78767
20  (512) 854-4801
21  MICHAEL 'MIKE' FISCHER (via Zoom)
    JONES DAY
22  51 Louisiana Ave NW
    Washington, DC 20001
23  (202) 879-3939
24
25
```

Page 3

```
1
              APPEARANCES (cont'd.)
2
    COUNSEL FOR THE DEFENDANTS:
3
    KATHLEEN HUNKER
4   J. AARON BARNES
    SPECIAL LITIGATION UNIT
5   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
6   Austin, Texas 78711
    (512) 936-2021
7
8   ADAM BITTER
    ZAC RHINES
9   KATHERINE PITCHER
    OFFICE OF THE SECRETARY OF STATE
10  Capitol Building, Rm. 1E.8
    P.O. Box 12697
11  Austin, Texas 78711
    (512) 475-2813
12
13  ALSO PRESENT (via Zoom)
14  JASON S. KANTERMAN
    SAMEER BIRRING
15  BARBARA NICHOLAS
    REBECCA MARTIN
16  JOSEPHINE RAMIREZ
    PATIENCE ADEGBOYEGA
17  LEIGH TOGNETTI
18
19
20
21
22
23
24
25
```

Page 4

```
1              I N D E X
2                                              PAGE
3   Appearances....................................  02
4
    Exhibits.......................................  04
5
6
    CHRISTINA ADKINS
7
        Direct Examination by MRS. YUN..............   07
8   Cross-Examination by MR. BIETER.............  120
    Cross-Examination by MRS. CUBRIEL...........  196
9
10  Changes and Signature..........................  199
11  Reporter's Certificate.........................  201
12
```

Page 5

```
1              E X H I B I T S
2
3   Exhibit No. 1
        State 053428.............................   20
4
    Exhibit No. 2
5       State 053284.............................   32
6   Exhibit No. 3
        State 035247.............................   34
7
    Exhibit No. 4
        State 034156.............................   38
9   Exhibit No. 5
        State 031647.............................   44
10
    Exhibit No. 6
11      State 040997.............................   45
12  Exhibit No. 7
        State 051170.............................   49
13
    Exhibit No. 8
14      State 034565.............................   58
15  Exhibit No. 9
        State 031546.............................   67
16
    Exhibit No. 10
17      State 019849.............................   78
18  Exhibit No. 11
        State 046960.............................   86
19
    Exhibit No. 12
20      State 073074.............................   91
21  Exhibit No. 13
        KSAT News Article........................   98
22
    Exhibit No. 14
23      State 036721.............................  102
24  Exhibit No. 15
        State 081255.............................  138
25
```

Christina Adkins
July 20, 2022

Page 6

```
 1                EXHIBITS (cont'd.)
 2
    Exhibit No. 16
 3       State 075391............................  147
 4  Exhibit No. 17
         State 078343............................  160
 5
    Exhibit No. 18
 6       State 075307............................  162
 7  Exhibit No. 19
         State 001713............................  166
 8
    Exhibit No. 20
 9       State 075401............................  174
10  Exhibit No. 21
         State 031879............................  180
11
    Exhibit No. 22
12       State 032017............................  180
13  Exhibit No. 23
         State 076578............................  183
14
    Exhibit No. 24
15       State 074958............................  186
16  Exhibit No. 25
         State 075495............................  192
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              P R O C E E D I N G S
 2         (On the record at 9:00 a.m.)
 3         (Witness sworn in.)
 4             CHRISTINA ADKINS,
 5  having first been duly sworn, testified as follows:
 6              DIRECT EXAMINATION
 7  BY MRS. YUN:
 8     Q.  Good morning, Mrs. Adkins.
 9     A.  Good morning.
10     Q.  My name is Jennifer Yun.  I'm from the Department
11  of Justice.  Thank you for joining us this morning.
12  Could you please state your name and spell it for the
13  record?
14     A.  My name is Christina Worrell Adkins.
15  C-H-R-I-S-T-I-N-A, Worrell, W-O-R-R-E-L-L, Adkins,
16  A-D-K-I-N-S.
17     Q.  Thank you.  Before we do anything else, I want to
18  make sure we are set up for a smooth deposition.  Have
19  you been -- have you ever been deposed before?
20     A.  No.
21     Q.  Okay.  So here are some ground rules to help us
22  throughout the deposition.  So first, this works best
23  for the court reporter if you wait to start your answer
24  until I finish my question.  Is that okay with you?
25     A.  Sure.
```

Page 8

```
 1     Q.  Also, the court reporter cannot indicate any head
 2  nods or any other gesture so every answer needs to be
 3  verbal.  Is that okay with you?
 4     A.  Yes.
 5     Q.  Your attorney may object to a question, but you
 6  should still answer the question unless they
 7  specifically instruct you not to do so.  Is that okay?
 8     A.  Yes.
 9     Q.  Can you agree that if you don't understand a
10  question or need -- need any clarification, you'll say
11  so?
12     A.  Yes.
13     Q.  And also, if you can't hear me or -- also, just
14  let me know.
15     A.  Of course.
16     Q.  And on the other hand, if you answer without
17  asking for any clarification, I'll assume that you have
18  understood my question.  Is that fair?
19     A.  Sure.
20     Q.  Is there any reason you're aware of that your
21  memory and ability to answer questions would be impaired
22  today?
23     A.  No.
24     Q.  Is there any reason you're aware of that your
25  ability to effectively communicate your answers would be
```

Page 9

```
 1  impaired today?
 2     A.  No.
 3     Q.  Have you consumed any prescription medication,
 4  drugs, alcohol, suffered any condition or injury or
 5  otherwise have reason to believe you might be impaired
 6  from testifying truthfully and accurately today?
 7     A.  No.
 8     Q.  I want to remind you that you're under oath and
 9  subject to penalties for giving false or misleading
10  testimony.  So it's important to answer my questions
11  truthfully, accurately and completely.  Do you
12  understand?
13     A.  I do.
14     Q.  And finally, if you need a break, just let me
15  know and we can take one.  I'll just ask that you answer
16  any pending question before we take a break.  Is that
17  okay?
18     A.  Of course.
19     Q.  Great.  Do you have any questions?
20     A.  No.
21     Q.  Okay.  Did you prepare to testify at this
22  deposition?
23         MRS. HUNKER:  Objection, form.
24     A.  Yes.
25     Q.  (By Mrs. Yun) How did you prepare?
```

Christina Adkins
July 20, 2022

Page 34

1 counties to apply to vote for Ballot by Mail.
2    Q.  Do you know how election officials established
3 that a voter who sent in this ABBM form was a registered
4 voter in their county?
5         MRS. HUNKER:  Objection, form, ambiguous and
6 vague.
7    A.  Generally speaking, I think the counties would
8 look at the information that's on this form and confirm
9 that that person is a registered voter in their county
10 in the part -- as they process the application form.
11    Q.  (By Mrs. Yun) And this form does not require the
12 voter to put down their ID number or their -- or the
13 last four digits of their social security.  Correct?
14    A.  That's correct.
15    Q.  Okay.
16         (Exhibit Number 3 was marked.)
17    Q.  (By Mrs. Yun) I'm handing you what's been marked
18 as Exhibit 3.  Do you recognize this document?
19    A.  Yes.  It appears to be a modified version of our
20 form, but it's -- it's a modified version of our form,
21 but it's not our official form, no.
22    Q.  Okay.  If you look at the second page, it says,
23 Prescribed by Secretary of State 12/17.  So prescribed
24 by Secretary of State does not mean that's your official
25 form?

Page 35

1    A.  No.  If they're modifying -- if a county modifies
2 our forms, they're supposed get pre-approval from our
3 office for modifying it.  I don't know whose form this
4 is.  We also instruct that they take off the prescribed
5 language because it's not our official form at that
6 point.  So I don't know whose form this is.
7    Q.  Yeah, so that language should not be there,
8 Prescribed by the Secretary of State?
9    A.  We generally tell our counties that if they're
10 modifying an official form, they have to get
11 pre-approval.  We usually tell them to remove the
12 prescribed by language and say approved by.  Some
13 counties are better at doing that than others, but this
14 form, it looks like our carrier, but I don't know whose
15 version it is.
16    Q.  Okay.
17    A.  It's different than what we prescribed in 2017.
18    Q.  I see.  So the carrier envelope that was -- the
19 official carrier envelope, which is not this, before
20 December 2021, that official form did not require the
21 voter to put down their ID number or the last four
22 digits of their social.  Correct?
23    A.  That's correct.
24    Q.  Okay.  So let's move on to talk about mail voting
25 requirements under SB1, not previous to SB1.  What is

Page 36

1 your office's interpretation of SB1's requirements with
2 regards to voters who provide the last four digits of
3 their social security number even though they have a
4 driver's license number?
5    A.  Could you repeat that question again?
6    Q.  Sure.
7    A.  And if I may interrupt?  Can we mute somebody?
8 Okay.  Go on, I'm sorry.
9    Q.  Yes.  So what is your office's interpretation of
10 SB1's requirements for voters -- with regards to voters,
11 mail voters, who provide their -- the last four digits
12 of their social security number on their mail ballot
13 materials even though they have a driver's license
14 number?
15         MRS. HUNKER:  Objection, form, calls for a
16 legal conclusion, vague, ambiguous.
17    A.  What do you mean by interpretation?  As to what
18 aspect of that?
19    Q.  (By Mrs. Yun) Well, so if a county said -- so I
20 guess we can take the interpretation part out of the
21 question.
22    A.  Yeah.
23    Q.  Let me try again.  So if a county asks, Okay, we
24 have an ABBM from a voter who put down the last four
25 digits of their social security number on their ABBM and

Page 37

1 nothing for their driver's license number, but our voter
2 registration system -- voter registration database shows
3 both their driver's license number as well as the last
4 four digits of their social.  Do we accept this ABBM
5 even though they did not put down their driver's license
6 number and they only put down their social security
7 number?
8    A.  As long as --
9         MRS. HUNKER:  Objection, form, vague,
10 ambiguous, compound, calls for a legal conclusion.  You
11 can answer.
12    A.  As long as they -- the number that the voter
13 provided matches what's in the voter registration
14 record, we would instruct the county to accept that ABBM
15 as long as it -- the application was otherwise valid.
16    Q.  (By Mrs. Yun) So -- okay.  Understood.  Would it
17 be permissible for your office to instruct counties to
18 do something other than accept it as long as it's valid
19 otherwise in the future?
20         MRS. HUNKER:  Objection, form, calls for
21 legal conclusion.  You can answer.
22    A.  I don't understand the question.  I'm sorry.
23    Q.  (By Mrs. Yun) Sure.  So I think my understanding
24 is that you're saying that as long as their last four
25 digits of social matches what they have on the voter

EXHIBIT

84

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-844 (XR)
                                 ) (Consolidated Cases)
STATE OF TEXAS, et al.,          )
                                 )
          Defendants.            )

--------------------------------------------------------------

ORAL DEPOSITION OF:

CHRISTINA ADKINS

April 11, 2023

---------------------------------------------------

        Oral deposition of CHRISTINA ADKINS, produced as a

    witness at the instance of the plaintiffs, and duly sworn,

    was taken in the above-styled and numbered cause on the

    11th day of April, 2023, before Patrick Stephens,

    Certified Court Reporter, at 209 W. 14th Street,

    Austin, Texas 78701.



Christina Adkins

April 11, 2023
Pages 2 to 5

## Page 2

A P P E A R A N C E S

ON BEHALF OF THE US DEPARTMENT OF JUSTICE:

    JENNIFER K. YUN, ESQ.

    U.S. Department of Justice, Civil Rights Division

    950 Pennsylvania Avenue NW

    Washington, DC 20530

    Telephone:  (202) 305-5533

    jennifer.yun@usdoj.gov

ON BEHALF OF THE STATE DEFENDANTS:

    KATHLEEN HUNKER, ESQ.

    ADAM BITTER, ESQ.

    ETHAN SZUMANSKI, ESQ.

    Office of the Attorney General

    P.O. Box 12548 (MC-009)

    Austin, Texas 78711

    Telephone:  (512) 936-2275

    kathleen.hunker@oag.texas.gov

    adam.bitter@sos.texas.gov

ALSO PRESENT VIA ZOOM:

    Victor Genecin, LDF-HAUL Plaintiffs

    Louis J. Capozzi, Intervenor Defendants

    Germaine Habell, El Paso EA

    Josephine Ramirez-Solis, Hidalgo County

    Kevin Zhen, LUPE Plaintiffs

    Leigh Ann Tognetti, Hidalgo County

    Lisa Cubriel, Bexar County

    Mike Stewart, DOJ

    Nina Perales, LUPE Plaintiffs

    Omeed Aleraool, LULAC Plaintiffs

    Wendy Olson, MFV Plaintiffs

## Page 4

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | HB 357 | 13 |
| 2 | SB 975 | 18 |
| 3 | Early Voting Form (Spanish) | 24 |
| 4 | 10/27/22 E-mail | 25 |
| 5 | Carrier Envelope Text | 26 |
| 6 | 10/9/22 E-mail | 30 |
| 7 | Carrier Insert | 36 |
| 8 | 4/1/22 E-mail | 38 |
| 9 | Texas.gov Webpage | 52 |
| 10 | Texas.gov Webpage (2) | 54 |
| 11 | Texas Voter Reg. Application | 55 |
| 12 | 11/14/22 E-mail | 56 |
| 13 | 1/22/21 E-mail | 71 |
| 14 | EAC Guide | 74 |

## Page 3

I N D E X

APPEARANCES................................................ 02

CHRISTINA ADKINS

    Cross-Examination by Ms. Yun ................... 05

Reporter's Certificate.................................... 80

## Page 5

P R O C E E D I N G S

2    COURT REPORTER:  All right, Ms. Adkins.  Would

3 you raise your right hand for me?

4    THE WITNESS:  (Complies with request.)

5    COURT REPORTER:  Do you solemnly swear or affirm

6 the testimony you'll give will be the truth, the whole truth

7 and nothing but the truth, so help you God?

8    THE WITNESS:  Yes, I do.

9    COURT REPORTER:  Okay.  Great.  You may take

10 over.

11    MS. YUN:  Thank you.

12    (Whereupon,

13    CHRISTINA ADKINS

14 was called as a witness herein and, having first been

15 duly sworn, was examined and testifies as follows on:)

16    CROSS-EXAMINATION

17 BY MS. YUN:

18    Q   Good morning, Ms. Adkins.

19    A   Good morning.

20    Q   Good to see you again.  As you already know, my name

21 is Jennifer Yun, and I'm from the US Department of Justice.

22 Thank you for joining us.  Could you please state your name for

23 the record?

24    A   Yes.  My name is Christina Adkins.

25    Q   And before we do anything else, I'm sure you remember,



Christina Adkins

April 11, 2023
Pages 26 to 29

Page 26

1 BY THE WITNESS (resuming):
2    A   I think that the instruction on the form state what --
3 states what the law requires that it state.
4    Q   So do you agree that it's misleading or do you not
5 agree that it's misleading?
6    A   I think that it states what the law requires.  That's
7 -- that's all I can put on the form.
8    Q   Did your office consider any changes to these
9 instructions during the general election period?
10    A   No, because there have been no subsequent legislative
11 sessions that would have given us the ability to change the
12 language.
13    Q   Understood.  Thank you.  And for the carrier envelope
14 -- well, I'll mark this and make sure it's in English.  Exhibit
15 Number 5 is being handed over here.  Can you tell me what this
16 document is?
17    A   This appears to be a printed copy of the text of a
18 ballot-by-mail envelope, what we refer to as the carrier
19 envelope.
20    Q   And what version is this as far as you can tell from
21 the first page?
22    A   This is the one that was revised and issued in July
23 2022.
24    Q   So what changes were made during that iteration of
25 this form?

Page 27

1    A   If I recall, there were two changes that were made to
2 the form:  First was to modify the oath of assistance on the
3 form as a result of some litigation that indicated certain
4 statements had to be removed; and then the second change was to
5 add some color to the box on the inside where it contains the
6 personal identification numbers.  In the original issuance of
7 this form, that -- those boxes were in black I ke all of the
8 other boxes on here, and to draw attention to it, we put those
9 boxes in red.
10    Q   Okay.  Did your office consider any further changes to
11 this carrier envelope other than those two changes that you
12 mentioned?
13    A   Everything that's on here is set by statute, and so
14 we're very limited in what we can modify and we're also limited
15 space-wise.
16    Q   So the box being in red, that was okay to modify.
17    A   There wasn't anything in statute that indicated the
18 box had to be a certain color, and we were taking the
19 opportunity, since we had to make changes regarding oath of
20 assistance, to do something to draw a little bit more attention
21 to that box based on feedback from counties and voters.
22    Q   I want to circle back briefly to what we spoke about
23 on Exhibit 4, which is the E-mail about ABBMs.  My apologies.
24 So this problem of putting one of the two ID numbers down and
25 then being told that, like, actually, you have to put that that

Page 28

1 number is not associated with your record, you have to put the
2 other number down, have you heard -- have you heard about other
3 voters who have the same issue during the period leading up to
4 the general election?
5    A   I can't think of a specific scenario, but I do recall
6 my -- my team reporting to me that they did have a handful of
7 calls related to that issue, but not -- not as many as they did
8 in the primary election.
9    Q   And so it appears that this Ms. Martinez, the managing
10 attorney, responded and asked Ms. Martin to have her daughter
11 contact your office; is that right?
12    A   That's correct.
13    Q   Do you -- does your office have any other plans to
14 address -- address this issue of people having put the number
15 that is not associated with their registration record?
16        MS. HUNKER:  Objection to form.
17 BY THE WITNESS (resuming):
18    A   I mean, I -- I don't think we're going to make any
19 changes or consider any changes to our documentation until we
20 get through the legislative session.
21    Q   Okay.  So absent any legislative changes, do you have
22 any plans to address it in any other way other than asking the
23 voter to call and offer help that way?
24        MS. HUNKER:  Objection to form.
25 BY THE WITNESS (resuming):

Page 29

1    A   I mean, I -- I would say that because -- as far as
2 modifying the forms itself, because everything is set by statute
3 and there's not a lot of real estate left to do anything else or
4 provide supplemental instructions -- you know, we are bound by
5 what the law tells us we can put on these forms, and then beyond
6 that, if there's any -- any other efforts that we would undergo,
7 again, I'm not really in the position right now to make those
8 kinds of policy calls.
9    Q   Okay.  And that's because you're in an acting position
10 as opposed to a permanent position?
11    A   That's correct.
12    Q   Okay.  And as the legal director, you would consult
13 with the elections director to brainstorm any solutions; is that
14 right?
15    A   That's correct.
16    Q   And do you have any ideas as -- with your
17 legal-director hat on, do you have any ideas as to what else
18 your office might do other than helping these voters
19 individually on the phone?
20        MS. HUNKER:  Objection, form.
21 BY THE WITNESS (resuming):
22    A   I would say that we currently do quite a bit of
23 training with our election officials and with our ballot boards.
24 We provide training to them on what the corrective -- corrective
25 action requirements are and we work with counties pretty broadly



Page 66

1    MS. HUNKER:  Objection to form.
2  BY THE WITNESS (resuming):
3    A   Again, I don't know -- I don't know what results in
4  that reduction.  All I know is that we're going to make sure
5  that we're doing our part to make -- to train on what the law is
6  and what those requirements are and what opportunities are
7  available to make corrections or to remedy those rejection
8  issues.  I don't want an election official or ballot board
9  member to be in a position of not knowing what those options
10  are, but that's the most that I can do.
11    Q   Okay.  Do you believe that there will be reductions in
12  general in -- okay.  Let me try it again.  Do you believe that
13  there will be any further reduction in mail-ballot rejections in
14  future elections?
15    A   I -- that, I don't know.  I -- I -- I don't recall the
16  actual rejection rate in November, but I remember that it was
17  pretty consistent with what we had seen in previous years prior
18  to the corrective-action process being in place -- or the ID
19  requirements being in place.  So I remember it was relatively
20  consistent with what we had in the past.  I can't really
21  speculate on future elections because I don't know what the laws
22  are going to be going forward.  I -- I don't know what changes
23  there might be that could -- that maybe are unrelated to this
24  issue but could impact rejection rates.
25    Q   Okay.  Absent any further legal changes, do you have

Page 67

1  any predictions as to what's going to happen to the rejection
2  rate?
3    A   I really don't.  I don't know.  I'm sorry.
4    Q   It's okay.  So moving on to voter education as opposed
5  to training of county officials, does your office intend to
6  conduct more -- any more voter education concerning SB1's
7  mail-ballot requirements in the future?
8    A   So I don't know the answer to that.  I'm not the
9  person that makes decisions on our voter-education campaign.
10  That's our communications director who just left and we have a
11  new one starting --
12    Q   Okay.
13    A   -- so I imagine I'll be working with that new
14  communications director to map out what we can and can't do and
15  what we have a budget for.
16    Q   I see.  And who's the new communications director?
17    A   Her name is Alicia Pierce, and she has not started
18  yet --
19    Q   Okay.
20    A   -- so don't scare her away.
21    Q   I just read a lot of E-mails from Mr. Taylor, so --
22    A   Sure.
23    Q   -- you know, I've never met him, but I just...
24    A   You feel l ke you know him.
25    Q   Exactly.

Page 68

1    A   Yes.
2    Q   So you said it would depend on the budget and it would
3  depend on sort of your discussions with her?
4    A   Uh-huh.  And -- and I have to throw this in:  And I
5  imagine any other subsequent law changes --
6    Q   Yes.
7    A   -- that are -- that could impact the campaign.
8    Q   Right.  So you also don't know whether it will be more
9  or less compared to what happened leading up to the November
10  election.
11    A   Correct.
12    Q   So you testified that you don't really know exactly
13  what would drive rejection rates down.  I'm just going to apply
14  that same principle to voter education and ask you the same
15  question just for the sake of completeness.  So do you expect
16  that further voter education would drive down mail-ballot
17  rejection rates in the future?
18    A   Again, I -- you know, I don't know the answer to that.
19  I'm not -- that's -- that's not my area of expertise, and I just
20  don't know what kind of data would -- we can look at that would
21  give us a sense.  I -- I think there's a lot of factors that --
22  that impact rejection rates.
23    Q   Okay.  What do you believe led to the reduction in the
24  rejection rates between the March primary and the November
25  general election in terms of mail ballots?

Page 69

1    A   I mean, again, I don't really know that I can point to
2  any one thing.  I think there's a number of factors that
3  contribute to that.  Anytime there's a change in the law, it
4  takes a few elections for voters to get used to that change.  I
5  think our county election officials were very aggressive after
6  the primary -- or even during the primary in educating people on
7  those changes.
8    I also think that our county election officials did
9  something pretty brilliant with respect to the ID number
10  requirements.  You know, one -- one of the things that we talked
11  about with our counties is that if somebody submitted an ABBM or
12  a carrier envelope that was missing an ID number or they
13  realized that the voter didn't have both numbers in the
14  statewide voter registration system, in TEAM, they didn't just
15  focus on correcting it for that election.  They were --
16  everybody was pretty aggressive about getting those folks to
17  submit a new voter registration application or go online to get
18  that update, and so we have more complete records, because that
19  is a viable cure option is updating your voter registration
20  record with that -- with that number.
21    And so rather than just doing a cure for the one election,
22  I think they were pretty good about looking at the bigger
23  picture.  And so if -- you know, they would -- they would help
24  facilitate that change, get that information to voters, which is
25  one of the things that we educated on, and I think the counties



# EXHIBIT 85

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÓN DEL PUEBLO ENTERO,   *
et al.,                       *
            Plaintiffs,       *
                              *
v.                            *   Civil Action No.
                              *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,       *
            Defendants.       *



*******************************************************

    ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
     THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
      THROUGH ITS DESIGNATED REPRESENTATIVE,
                 TACOMA PHILLIPS
                 APRIL 13, 2023

*******************************************************



            DEPOSITION of TACOMA PHILLIPS,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th day of

April, 2023, from 3:20 p.m. to 6:28 p.m., before

Christy R. Sievert, CSR, RPR, in and for the State

of Texas, reported by machine shorthand, at the

offices of the Dallas County Records Building, 500

Elm Street, Dallas, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

**2**

```
1         A P P E A R A N C E S
2
3   FOR PLAINTIFF LA UNIÓN DEL PUEBLO ENTERO:
4   MS. NINA PERALES
        Mexican American Legal Defense
5         and Educational Fund
        110 Broadway, Suite 300
6   San Antonio, Texas  78205
        nperales@maldef.org
7
8   FOR MICHAEL SCARPELLO IN HIS OFFICIAL CAPACITY AS
        DALLAS COUNTY ELECTIONS ADMINISTRATOR:
9
        MR. BEN L. STOOL
10  MR. JASON SCHUETTE
        Assistant District Attorney
11  Civil Division
        Criminal District Attorney's Office
12  500 Elm Street, Suite 6300
        Dallas, Texas  75202
13  ben.stool@dallascounty.org
        jason.schuette@dallascounty.org
14
15  FOR THE STATE DEFENDANTS:
16  MS. KATHLEEN T. HUNKER
        Office of the Attorney General
17  Special Counsel for Communications
        Post Office Box 12548
18  Austin, Texas  78711
        512-463-2096
19  kathleen.hunker@oag.texas.gov
20
        FOR THE UNITED STATES OF AMERICA:
21
        MR. MICHAEL E. STEWART
22  U.S. Department of Justice
        Civil Rights Division
23  950 Pennsylvania Avenue NW
        Washington, D.C.  20530
24  michael.stewart3@usdoj.gov
25
```

**3**

```
1         A P P E A R A N C E S
          (continued)
2
3   COUNSEL APPEARING REMOTELY:
4   KEVIN ZHEN
        BARBARA NICHOLAS
5   KIM BARR
        LISA CUBRIEL
6   GERMAINE HABELL
        LEIGH ANN TOGNETTI
7   JOSEPHINE RAMIREZ-SOLIS
        STEPHEN KENNY
8
9   ALSO PRESENT:
10  KRISTEN GEOFFRION, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1         I N D E X
                        PAGE
2
    pearances.............................. 2-3
3
    hibits................................ 5
4
    oceedings............................. 6
5
    COMA PHILL PS:
6
        Examination by Ms. Perales................. 9
7       Examination by Mr. Stewart................. 73
        Examination by Ms. Hunker................. 86
8
        anges and Signature................... 121-122
9
        porter's Certification................ 123-124
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1         E X H I B I T S
2   NUMBER      DESCRIPTION
3   Exhibit 1   Notice of Deposition
4   Exhibit 2   SB No. 1
5   Exhibit 3   Oath of Assistance
6   Exhibit 4   Oath of Assistance
                Oath of Interpreter
7
        Exhibit 5   Voters with Disabilities
8               MS019322 - 019323
9   Exhibit 6   Notice of Deposition
10  Exhibit 7   Early Voting Vote Center
                Locations, 11-8-22 General
11              Election
12  Exhibit 8   E-mail correspondence
                8-2-22, Election Crimes
13              Contact Information
                MS 024658 - 024673
14
        Exhibit 9   (Withdrawn)
15
        Exhibit 10  Dallas County Elections
16              Department, Voter Education
17
18
19
20
21
22
23
24
25
```

Tacoma Phillips - 4/13/2023

6

```
1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  This is the
3    deposition of Tacoma Phillips, Dallas County
4    Elections Administrator, in the matter of La Union
5    Del Pueblo Entero, et al., vs. Gregory W. Abbott, et
6    al.
7          Our location is 500 Elm Street, Dallas,
8    Texas.
9          Today's date is April 13, 2023.  The time
10   is 3:20 p.m.
11         My name is Kristen Geoffrion.
12         Would all persons present please introduce
13   themselves for the record.
14         MS. PERALES:  Nina Perales for the
15   LUPE plaintiffs.
16         MR. STEWART:  Michael Stewart for the
17   United States.
18         MS. HUNKER:  Kathleen Hunker from the
19   Office of the Texas Attorney General representing
20   State defendants along with individual legislators.
21         MR. STOOL:  Ben Stool, Criminal
22   District Attorney's Office of Dallas County, Texas,
23   representing the defendant Michael Scarpello, the
24   Elections Administrator of Dallas County, Texas, and
25   his office, anybody in the Dallas County Elections
```

7

```
1    Department, including the witness that's about to
2    testify.
3          MR. SCHUETTE:  Jason Schuette,
4    assistant district attorney for Dallas County
5    assisting Mr. Stool.
6          (Oath administered.)
7          THE VIDEOGRAPHER:  Ms. Phillips,
8    there's a microphone there, if you could attach it.
9    Thank you.
10         MR. STOOL:  Before we get started with
11   this, I want to read into the record the discovery
12   production we have already done concerning complaint
13   books, voter assistance complaints, poll watcher
14   complaints, general complaints, that the elections
15   department has that we referred to Mr. Scarpello's
16   testimony.
17         Okay.  Complaint books from 2016 to 2020,
18   Bates numbers MS009125 through MS012093 and then
19   MS014094 through MS015460.  They were responsive to
20   plaintiff's first set of requests for production in
21   numbers 9 and 11 produced on March 7th of 2022.
22         Now, general November complaints and
23   primary and primary runoff complaints, Bates numbers
24   MS018637 and MS018638, responsive to plaintiff's
25   first requests for production number 11 produced on
```

8

```
1    January 26, 2023.
2          Voter systems complaints, Bates number
3    MS024971, responsive to the LUPE plaintiff's sixth
4    request for production number 62 produced on
5    March 31, 2023.
6          And finally, the poll watcher complaints
7    Bates number MS024972, responsive to the LULAC
8    plaintiff's seventh request for production number
9    70, produced on March 31, 2023.
10         MS. PERALES:  Can I just ask you to
11   clarify, there was -- the third to the last that you
12   read out was MS018637 through, and then I didn't
13   catch the. . .
14         MR. STOOL:  Oh, actually, that was in
15   the second grouping, but it was MS018637 and
16   MS018638.
17         MS. PERALES:  Got it.  Thank you.
18         MR. STOOL:  You're welcome.
19         MS. PERALES:  All right.  Are we ready
20   to start?
21         TACOMA PHILLIPS,
22   having been first duly sworn,
23        testified as follows:
24         EXAMINATION
25   BY MS. PERALES:
```

9

```
1    Q.  Ms. Phillips, good afternoon.
2    A.  Good afternoon.
3    Q.  Would you please state your name for the
4    record?
5    A.  Tacoma Phillips.
6    Q.  And now I know you've had your deposition
7    taken before because you and I were together last
8    year.  So I'm just going to go briefly over the
9    ground rules.
10         Do you understand that you are under oath?
11   A.  Yes.
12   Q.  And do you understand that the oath that
13   you have taken to tell the truth is the same as if
14   you were testifying in a courtroom before a judge?
15   A.  Yes.
16   Q.  Is there anything that would prevent you
17   from giving me your full attention and responding
18   accurately today, such as illness or taking a
19   medication that makes you fuzzy?
20   A.  No.
21   Q.  Is there anything else that might prevent
22   you from understanding my questions or answering
23   them fully?
24   A.  No.
25   Q.  You can take a break at any time.  I would
```

78
1    A.  Yes.
2    Q.  If you received a carrier envelope, say you
3   had sent a notice of rejection and then no cure
4   comes, it just -- you know, you send the carrier
5   envelope back, otherwise don't receive it back, or
6   you've sent an e-mail, phone call, don't hear back
7   from the voter, would you then send a second notice
8   when the ballot was finally rejected because it was
9   not cured?
10    A.  The ballot board sends a notice of a final
11   rejection letting the voter know their ballot was
12   rejected because for this reason.
13    Q.  How is that sent to voters?
14    A.  By mail.
15    Q.  By mail.  Is that process the same after
16   SB1 as it was before SB2?
17    A.  For the ballot board, I guess, yes.  I'm
18   not sure.
19    Q.  Okay.  Do you know how we could find out?
20    A.  About the ballot board?
21    Q.  About basically is the notice that was sent
22   a final rejection the same before SB1 went into
23   place and after?
24    A.  Yeah, ask the ballot board judge.
25    Q.  I am going to ask you to pick back up

79
1   Exhibit 10, which Ms. Perales handed you.  It's that
2   same spreadsheet.
3       I know you testified you weren't familiar
4   with this document specifically, but if you look
5   back on page 10 where Ms. Perales had you directed
6   before, the image you see with the highlighting on
7   it, does that accurately look like an ABBM to you,
8   or at least a portion --
9    A.  ABBM application?
10    Q.  A portion of an ABBM.
11    A.  Yes.
12    Q.  Do you see where under where it says, "You
13   must provide one of the following numbers," there's
14   some highlighted language and the blanks to provide
15   ID numbers?  Do you see that?
16    A.  Yes.
17    Q.  You'll see the first paragraph says, "Texas
18   driver's license, Texas personal identification
19   number, or election identification certificate
20   number issued by the Department of Public Safety,
21   not your voter registration VuID number."  And then
22   after that it says, "If you do not have a Texas
23   driver's license, Texas personal identification
24   number or a Texas election identification
25   certificate number, give the last four digits of

80
1   your Social Security number," and four blanks for
2   that.
3       Do you see where I am?
4    A.  Yes.
5    Q.  Does that direction to provide a Social
6   Security number if you do not have a driver's
7   license, personal identification number or election
8   identification certificate number accurately reflect
9   how you evaluated ABBMs?
10       MS. HUNKER:  Objection; form.
11    A.  Say that again.
12   BY MR. STEWART:
13    Q.  So I guess what I'm asking is, would you
14   only accept an ABBM that listed the last four of an
15   SSN if the voter did not have a Texas driver's
16   license, Texas personal identification number or an
17   election identification certificate number?
18       MS. HUNKER:  Objection; form.
19    A.  Repeat that again, please.
20   BY MR. STEWART:
21    Q.  Sure.  Maybe I'll ask it in a different
22   way.
23       If in your voter registration database it
24   showed that a voter had a Texas driver's license
25   number and an SSN four, and on an ABBM the voter

81
1   entered only their SSN four, would you still accept
2   that ABBM?
3    A.  Yes.
4    Q.  So does this language to provide the last
5   digits of the Social Security number if you do not
6   have a driver's license number seem accurate?
7       MS. HUNKER:  Objection; form.
8    A.  Seem accurate for?
9   BY MR. STEWART:
10    Q.  As a direction to a voter.
11       MS. HUNKER:  Same objection.
12    I.  can't answer for the voter.
13   BY MR. STEWART:
14    Q.  Do you think it might mis- -- let me
15   rephrase it, then.
16       Did you hear from any voters who seemed to
17   be misled by that language?
18    A.  Yes.
19    Q.  And what did you hear from those voters?
20    A.  We heard from the voter if they gave us
21   their Texas ID number, if they're older and don't
22   drive anymore but on file they still have just their
23   driver's license number, then -- and they also have
24   on file voter registration record their Social
25   Security number but they did not provide it, then it

82

1  says you -- you told me "or," and I was, like, yes,
2  I understand what the application says, but we need
3  to have what you have on file.
4      Q.  Approximately how many voters did you hear
5  from with a complaint like that?
6      A.  I can't give you an approximate number, but
7  I can give you -- let's say a lot.
8      Q.  A lot?
9      A.  Uh-huh.
10      Q.  Would that be over a hundred?
11      A.  I wouldn't -- I wouldn't say me.  I could
12  say my staff, answering the telephone calls, we
13  might have gotten over a hundred.  I don't know
14  because I -- I wouldn't know.
15      Q.  Sure.
16      A.  I do -- I can give you one example of a
17  voter that I do remember, a son calling in for his
18  father.  And he put just the -- his Texas ID because
19  he no longer drives, and he didn't put his last four
20  digits of his Social Security number.  And he had
21  his old driver's license number and his Social
22  Security number on the voter registration record,
23  but he had a different one, and so it was a
24  mismatch.  So we had to reject it.  And so he called
25  us and he was a little angry.  But we were able to

83

1  guide him through to get it fixed.  But, yes, we did
2  get a lot of that, yes.
3      Q.  Okay.  You can put that document aside now.
4          Do you have a lot of direct communication
5  with voters in your job?
6      A.  Yes.
7      Q.  Did you or, you know, did your staff report
8  to you hearing from voters who said they did not
9  plan to vote by mail in November 2022 because they
10  couldn't conform to these requirements?
11      A.  Are you asking if they called us
12  specifically and say:  I'm not going to vote by mail
13  because of this reason here?
14      Q.  I can start with that question, sure, if
15  you've heard from anyone like that?
16      A.  No.
17      Q.  Was there any who once you started trying
18  to explain the ID number requirements jumped off of
19  the process?
20      A.  Yes.
21      Q.  How about how many did that happen for?
22      A.  Quite a few.  I don't -- I can't give you a
23  direct number, but, yes, quite a few.
24      Q.  Did they tend to be older voters?
25      A.  Yes.

84

1      Q.  Did that happen at all with military or
2  overseas voters?
3      A.  Not that I know of.  Military overseas
4  voters, they're used to putting their driver's
5  license because it's -- their Social Security
6  number because that form asks for that information.
7  So we have -- we did not have any problems for the
8  UOCAVA voters.
9          MS. PERALES:  And that is UOCAVA,
10  U-O-C-A-V-A.
11      A.  I apologize.  Thank you for saying that.
12  BY MR. STEWART:
13      Q.  Thank you.
14          And then as a final topic.  I know you
15  discussed the ballot tracker a bit with Ms. Perales,
16  the online ballot tracker, that is.  And if I recall
17  right, you discussed with Ms. Perales issues about
18  voters who could not log into the ballot tracker.
19  Is that right?
20      A.  Yes.
21      Q.  Did you hear from any voters who attempted
22  to use the ballot tracker to cure ballot
23  materials and were able to log in but weren't able
24  to complete the cure once they were in?
25      A.  I don't recall completely.  So when they

85

1  log in, completely cure.  What do you mean by that?
2      Q.  So if they had a -- let's say ABBM as an
3  example.  If they had an ABBM rejected for an ID
4  number, a missing ID number, and they log into the
5  ballot tracker, they're able to get in, but then
6  they're not actually able to complete the cure, so
7  the problem is not one of access to the ballot
8  tracker but just the ability to use it to complete
9  the cure, did you have any voters descr be an issue
10  like that to you?
11      A.  Not that I can recall.
12      Q.  Okay.  You are -- and by "you," I mean
13  Dallas -- are an offline county for the voter
14  registration database, correct?
15      A.  Correct.
16      Q.  Were you aware of any issues with your
17  offline database communicating with the TEAM
18  database for the -- for the general election cycles?
19  So that's only sort of following the May runoff,
20  communicating data between the two to -- for voter
21  registration records.
22      A.  That would be a question for the voter
23  registration manager.
24      Q.  Okay.  That's fine.
25          MR. STEWART:  With that, I will pass

98

1 voters' information in the system, in your voter
2 registration system.
3      Did you observe that fewer voters did not
4 have any ID number in the system whether that be a
5 Social Security number or a Texas ID number in the
6 November 2022 general election as compared to the
7 previous elections?
8   A.  I think it's maybe about the same.  I don't
9 think it's -- there's a big -- a big difference in
10 that.
11   Q.  Did you observe fewer voters with only a
12 Social Security number or Texas ID number in their
13 voter registration file but not both in the November
14 election as compared to the prior elections?
15   A.  It's about the same.
16   Q.  Okay.  And do you know whether fewer voters
17 failed to put down their ID number at all when
18 submitting their application for ballot by mail or
19 their carrier envelope?
20   A.  Say that again.
21   Q.  Sure.  Did you observe that fewer voters
22 failed to put an ID number down at all on their
23 application for ballot by mail or their carrier
24 envelope in the November 2022 general election
25 compared to the primaries?

99

1   A.  It's about the same.
2   Q.  And did you at any point do an assessment
3 to compare those numbers?
4   A.  No.
5   Q.  Are you aware that the Secretary of State's
6 office harvested ID numbers, both Texas ID numbers
7 and Social Security numbers, from DPS?
8   A.  Yes, I've heard they did.
9   Q.  Did you observe whether or not the number
10 of voters who did not have ID numbers in the system
11 declined after that harvesting took place?
12   A.  I did not notice.
13   Q.  Is that something you just didn't pay
14 attention to or. . .
15   A.  It's something I didn't pay attention to.
16   Q.  And so you ta ked a little bit with counsel
17 about logging into the ballot tracker.  Do you
18 recall that conversation?
19   A.  Yes.
20   Q.  Did voters have, based on your experience,
21 fewer issues logging into the ballot tracker in
22 November 2022 compared to the primary?
23   A.  No, it was about the same.
24   Q.  Is that something that you paid attention
25 to, or is it that something -- is it something you

100

1 paid attention to, will be my question.
2   A.  If it was a voter who -- it might have been
3 a new voter who failed to put in their information,
4 and they would have to go to the ballot tracker.  So
5 it would be about the same.  Because if you have a
6 voter from the beginning in -- in the primary who
7 went ahead and cured their ballot, then they
8 wouldn't have the problem -- the same problem.  So
9 you have a new voter who have that same problem
10 versus an old voter.
11   Q.  So that actually is -- you bring up an
12 interesting point.  Did you notice that once a voter
13 had gone through -- had a notice of defect and gone
14 through the cure process, that they no longer had a
15 difficulty in the subsequent election?
16      MR. STEWART:  Objection; form.
17 BY MS. HUNKER:
18   Q.  Let me rephrase that.
19      As compared to the general electorate, did
20 you notice that voters that had gone through the
21 cure process after receiving their notice of defect
22 were less likely to have a mismatch or missing ID
23 number in the subsequent election?
24      MS. PERALES:  Objection; foundation.
25      MR. STEWART:  Objection; form.

101

1 BY MS. HUNKER:
2   Q.  You can answer.
3   A.  Well, let me put it this way.  You have a
4 voter who voted in the primary election who filled
5 out the application perfectly, the carrier envelope
6 perfectly.  Then come back in November and failed to
7 put their information on their carrier envelope, and
8 so it was rejected.  So you will have that.  So you
9 will have the voters who are not used to this form
10 or filling out -- putting this information in, and
11 so they're being rejected.  So. . .
12   Q.  Did you observe less voter confusion
13 regarding the ID number requirements for ballots by
14 mail in the November 2022 general election as
15 compared to the prior elections, the primary or May
16 local?
17   A.  No, same thing, is if -- if we did get a
18 call like a voter confusion, it's a voter who is
19 filling out the application for the first time, a
20 new applicant.  So you're still having the same
21 problems.
22   Q.  Did you talk voters through the ballot
23 tracker, using the ballot tracker?
24   A.  Yes.
25   Q.  And did you talk voters through adding

# EXHIBIT 86

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÓN DEL PUEBLO ENTERO,   *
et al.,                       *
        Plaintiffs,           *
                              *
v.                            *   Civil Action No.
                              *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,       *
        Defendants.           *



********************************************************

       ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
        THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
         THROUGH ITS DESIGNATED REPRESENTATIVE,
                   MICHAEL SCARPELLO
                   APRIL 13, 2023

********************************************************



             DEPOSITION of MICHAEL SCARPELLO,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th day of

April, 2023, from 10:20 a.m. to 2:25 p.m., before

Christy R. Sievert, CSR, RPR, in and for the State

of Texas, reported by machine shorthand, at the

offices of the Dallas County Records Building, 500

Elm Street, Dallas, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

**Page 2**

1  A P P E A R A N C E S
2
3  FOR PLAINTIFF LA UNIÓN DEL PUEBLO ENTERO:
4  MS. NINA PERALES
   Mexican American Legal Defense
5   and Educational Fund
   110 Broadway, Suite 300
6   San Antonio, Texas  78205
   nperales@maldef.org
7
8  FOR MICHAEL SCARPELLO IN HIS OFFICIAL CAPACITY AS
   DALLAS COUNTY ELECTIONS ADMINISTRATOR:
9
   MR. BEN L. STOOL
10  MR. JASON SCHUETTE
   Assistant District Attorney
11  Civil Division
   Criminal District Attorney's Office
12  500 Elm Street, Suite 6300
   Dallas, Texas  75202
13  ben.stool@dallascounty.org
   jason.schuette@dallascounty.org
14
15  FOR THE STATE DEFENDANTS:
16  MS. KATHLEEN T. HUNKER
   Office of the Attorney General
17  Special Counsel for Communications
   Post Office Box 12548
18  Austin, Texas  78711
   512-463-2096
19  kathleen.hunker@oag.texas.gov
20
   FOR THE UNITED STATES OF AMERICA:
21
   MR. MICHAEL E. STEWART
22  U.S. Department of Justice
   Civil Rights Division
23  950 Pennsylvania Avenue NW
   Washington, D.C.  20530
24  michael.stewart3@usdoj.gov
25

**Page 4**

1  I N D E X
          PAGE
2
   pearances................................ 2-3
3
   hibits...................................... 5
4
   oceedings.................................. 6
5
   CHAEL SCARPELLO:
6
   Examination by Ms. Perales.................. 7
7  Examination by Mr. Stewart................. 74
   Examination by Ms. Hunker................. 94
8
   anges and Signature................... 152-153
9
   porter's Certification................ 154-155
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1  A P P E A R A N C E S
      (continued)
2
3  COUNSEL APPEARING REMOTELY:
4  KEVIN ZHEN
   BARBARA NICHOLAS
5  KIM BARR
   LISA CUBRIEL
6  GERMAINE HABELL
   LEIGH ANN TOGNETTI
7  JOSEPHINE RAMIREZ-SOLIS
   STEPHEN KENNY
8
9  ALSO PRESENT:
10  KRISTEN GEOFFRION, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1  E X H I B I T S
2  NUMBER        DESCRIPTION
3  Exhibit 1   Notice of Deposition
4  Exhibit 2   SB No. 1
5  Exhibit 3   Oath of Assistance
6  Exhibit 4   Oath of Assistance
          Oath of Interpreter
7
   Exhibit 5   Voters wi h Disabilities
8       MS019322 - 019323
9  Exhibit 6   Notice of Deposition
10  Exhibit 7   Early Voting Vote Center
          Locations, 11-8-22 General
11       Election
12  Exhibit 8   E-mail correspondence
          8-2-22, Election Crimes
13       Contact Information
          MS 024658 - 024673
14
15
16
17
18
19
20
21
22
23
24
25

6

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  This is the
3    deposition of Michael Scarpello, Dallas County
4    Elections Administrator, in the matter of La Union
5    Del Pueblo Entero, et al., vs. Gregory W. Abbott, et
6    al.
7        Our location is 500 Elm Street, Dallas,
8    Texas.
9        Today's date is April 13, 2023.  The time
10   is 10:20 a.m.
11       My name is Kristen Geoffrion.
12       Would all persons present please introduce
13   themselves for the record.
14       MS. PERALES:  Nina Perales for
15   plaintiffs, Lupe, et al.
16       MR. STEWART:  Michael Stewart for the
17   United States.
18       MS. HUNKER:  Kathleen Hunker with the
19   Office of the Texas Attorney General representing
20   State defendants as well as individual legislators.
21       MR. STOOL:  Ben Stool, Criminal
22   District Attorney's Office of Dallas County, Texas,
23   representing Defendant Michael Scarpello, the
24   Elections Administrator of Dallas County, Texas.
25       THE WITNESS:  Michael Scarpello.

7

1        MICHAEL SCARPELLO,
2        having been first duly sworn,
3        testified as follows:
4        EXAMINATION
5    BY MS. PERALES:
6    Q.  Good morning, Mr. Scarpello.
7    A.  Good morning.
8    Q.  I'm going to have to ask you to state your
9    name again for the record now that you're sworn in.
10   A.  Michael Scarpello.
11   Q.  And what is your title?
12   A.  I'm the elections administrator for Dallas
13   County.
14   Q.  And I know that you have had your
15   deposition taken before.  I believe we may have
16   deposed you twice last spring.
17   A.  I think so.
18   Q.  So I will go over the ground rules quickly
19   just as a refresher, if that's all right with you.
20   A.  Sure.
21   Q.  Do you understand that you are under oath?
22   A.  Yes.
23   Q.  Do you understand that the oath that you
24   have taken to tell the truth today is the same oath
25   that you take when you testify in court --

8

1    A.  Yes.
2    Q.  -- in front of a judge?
3    A.  Yes.
4    Q.  Is there anything today that would prevent
5    you from giving me your full attention and
6    responding accurately such as illness or medication?
7    A.  No.
8    Q.  Is there anything today that would prevent
9    you from understanding my questions and answering
10   them fully?
11   A.  No.
12   Q.  This is your deposition.  If you need to
13   take a break at any time, please ask.  And my only
14   request is that if there is a question out on the
15   table, that you answer the question before we take
16   the break.
17   A.  Okay.
18   Q.  Counsel may make objections, but unless you
19   are instructed not to answer, generally, you will go
20   ahead and answer the question and the objection will
21   simply be made for the record.  Okay?
22   A.  Okay.
23   Q.  Because the court reporter cannot take down
24   words when people are speaking simultaneously, I
25   will ask you to wait for me to finish my question

9

1    before you start your answer, and I will wait for
2    you to finish your answer before I start my next
3    question.  Is that okay?
4    A.  Yes.
5    Q.  It's important for you to make your answers
6    out loud because the court reporter cannot take down
7    head nods or shrugs.  So will you agree to make your
8    answers out loud?
9    A.  Yes.
10   Q.  He's humorous now.  Let's see where he is
11   in a couple of hours.
12       If you don't understand the question,
13   please ask me to rephrase it for you.  Can you agree
14   to that?
15   A.  Yes.
16   Q.  Now, with respect to information, I'm
17   entitled to your best estimate, but I don't want you
18   to guess.  Is that okay?
19   A.  Yes.
20   Q.  And then, finally, do you have any
21   questions about the deposition before we begin?
22   A.  No.
23   Q.  I would like to cover some definitions with
24   you.
25   A.  Okay.

82

1   A.  Yes.
2   Q.  Was it -- was that number who were hired
3  about the same between the primary and the general?
4  In 2022.  I'll specify.
5   A.  I would imagine it's higher in the general
6  because of the higher number of ballots.
7   Q.  Comparing it this year with prior generals,
8  do you know whether it was about the same?
9   A.  Considerably smaller.  In prior elections,
10  the mail ballot process was a completely
11  paper-driven process, and there was literally one --
12  100, 150 people working on mail ballots as far as
13  the signature verification.  They were comparing
14  paper applications to paper registrations to paper
15  carrier envelopes, et cetera.
16       When I came in, we digitized that process.
17  It's now all electronic.  And so there's -- the
18  early -- the voting ballot board or the signature
19  verification committee, for instance, instead of
20  hauling papers around the office, they're just
21  looking at a computer screen, comparing two
22  signatures side by side.  So the entire process has
23  gone from 125 people to a dozen people.
24   Q.  I see.  And the digitization is what allows
25  you to reduce that amount of hiring?

83

1   A.  Yes.
2   Q.  On a slightly different topic, you know,
3  you described a number of things, voter education
4  efforts, the ballot inserts.  Is there anything else
5  you office did to mitigate the risks that
6  eligible -- elig ble voters would have their ABBM or
7  mail ballot rejected because of an ID number issue
8  during the general election?
9   A.  During the general election, no.
10   Q.  Is there a distinction you're drawing with
11  a different election?
12   A.  With the primary, we had -- because it was
13  the first time out, we had -- we had a budget where
14  we were going to extraordinary measures to contact
15  voters who had problems with their ballots.  What we
16  saw on the general election is those numbers went
17  down considerably.
18   Q.  Do you think there's -- let me str ke that.
19       But I think you testified you believed
20  that those numbers are too high, correct?
21   A.  Yes.
22   Q.  Do you think there's anything your office
23  could do beyond what it's done this year, you know,
24  across the primary in general to bring those
25  rejection numbers down further?

84

1   A.  I think we will continue to look at ways
2  within the law to try to educate people and then --
3  you know, to prevent them from making those mistakes
4  as well as to try to cure the -- after they make
5  those mistakes, including changing the legislation.
6  I mean, that -- that -- that's part of the problem,
7  that it's very difficult to cure right now.
8   Q.  What is making it difficult to -- what is
9  making it difficult to cure?
10   A.  So you have an 80-year-old woman who is
11  voting by mail, and she is in a nursing home and
12  she's voting by mail for that reason because she
13  doesn't want to go to a polling place.  She'll send
14  in her ballot, maybe doesn't fill out the carrier
15  envelope properly, and the cure process says, okay,
16  person that can't -- can't get out of the nursing
17  home, you need to come down to our office to cure.
18  It's just -- it's a -- it's a bad law.  And there
19  are efforts to try to allow them to cure through the
20  mail or through -- through, you know, web --
21  electronic means.
22   Q.  Do you anticipate you could ever get the
23  number of voters -- the number of eligible voter
24  registrars, I should say, who are rejected based on
25  the ID requirements down to zero?

85

1   A.  That would be the goal.
2   Q.  Do you think it would be possible?
3   A.  No.
4   Q.  Do you know -- or have you separated out
5  about how much money, you know, your county spent
6  implementing specifically the ID number provisions
7  of SB1 in the general election?
8   A.  I don't know that off the top of my head.
9  I think that, generally, if I remember correctly,
10  last year we got a budget of $180,000 to -- for
11  those educational efforts.  No, I -- and I could --
12  I'm guessing on that number.
13   Q.  Is there an additional administrative cost
14  as well?
15   A.  Yes, for the early voting ballot board,
16  their -- they have to increase their numbers.  Their
17  work is increased.  And that's paid for by our
18  department.
19   Q.  Got it.  But just you don't know exactly
20  what that costs?
21   A.  (Shakes head negatively.)
22   Q.  I'll ask you, you know, whether this is for
23  you or Ms. Phillips, contacting voters whose ballots
24  are rejected, would that be better directed to
25  toward Ms. Phillips?

Micheal Scarpello - 4/13/2023

86

1   A.  I can attempt to answer.
2   Q.  Sure.  Sure.
3       So for the general election, you know, are
4   you familiar with any voters -- or are you aware of
5   any voters, I'll say, who didn't provide a phone
6   number or e-mail address at which to contact them?
7   A.  Yes.
8   Q.  And how did you contact them?
9   A.  They do it through the mail.
10  Q.  Did you attempt to call any voters?
11  A.  For the primary last year, we -- we -- I'll
12  just back up for a second.
13  Q.  Sure.
14  A.  There's no requirement for someone to put
15  their phone number or e-mail address.  So we
16  don't -- there's a low percentage of people that
17  provide that information.  And so last year, in the
18  primary, we took that list of voters, we went to an
19  outside vendor, we had them match up names to -- to
20  find numbers, and then we made those -- and then we
21  had that outside services make those calls.  We did
22  not do that for the general election.
23  Q.  Okay.  Switching gears a little bit.
24      Were there voters whose mail ballots were
25  received and who would have received their rejection

87

1   notice too late to cure?
2   A.  Yes.
3   Q.  Do you believe that category of voters will
4   always exist?
5   A.  Yes.
6   Q.  In -- in the general election, were there
7   any military or overseas voters that you needed to
8   contact to cure either an ABBM or mail ballot?
9   A.  I would assume so, yes.
10  Q.  Do you know approximately how many?
11  A.  I don't.
12  Q.  Do you know how you contacted them?
13  A.  I would assume the same, either by phone,
14  e-mail, or -- or through snail mail.
15  Q.  Do you know how many were able to cure?
16  A.  I don't.
17  Q.  Do you know if there were any for whom, you
18  know, given the timing and challenges of being
19  overseas it just wasn't possble for them to cure?
20  A.  I don't.
21  Q.  Are the means of cure the same for military
22  overseas voters as they are for other voters, you
23  know, voting by mail?
24  A.  I believe so.  But I'm not sure about that.
25  Q.  Okay.  For the 2022 general, did you refer

88

1   any voters to law enforcement for potential mail
2   ballot impersonation fraud because the ID number on
3   their carrier envelope did not match what was in the
4   voter registration database?
5   A.  No.
6   Q.  Did you make any other referrals for
7   potential instances of voter impersonation fraud in
8   connection with mail voting?
9   A.  Voter impersonation fraud?
10  Q.  Well, let's just say voter fraud in
11  connection with -- with mail voting in the 2022
12  general, did you make any law enforcement referrals?
13  A.  With mail voting, no.
14  Q.  Okay.  I believe you discussed with
15  Ms. Perales that you think the rate of mail voting
16  is down this general election compared to previous
17  general elections as a percentage of the overall
18  votes cast.  Is that right?
19  A.  That's my memory of it, yes.
20  Q.  Are you familiar with any communications
21  from voters who said they did not plan to vote by
22  mail for the general election because of the SB1
23  requirements?
24  A.  Not that I can recall.
25  Q.  Do you think the number of ABBMs was about

89

1   the same between this year as previous elections?
2   A.  I just don't recall those -- those numbers.
3   We have them, but I just don't know them off the top
4   of my head.
5   Q.  No problem.
6       You're an offline county for TEAM
7   purposes, right?
8   A.  Correct.
9   Q.  And do you still use VEMACS as your vendor?
10  A.  Yes, we do.  VOTEC is the company.  VEMACS
11  is the -- is the product.
12  Q.  So VOTECS is the vendor -- VOTEC, excuse
13  me.  It's V-O-T-E-C, right?
14  A.  Yes.
15  Q.  And then VEMACS is the database itself?
16  A.  Correct.
17  Q.  Were there any -- strike that.
18      Were there any issues communicating data
19  between VEMACS and TEAM during the general election
20  cycle?  So that's from May 25th when the runoff
21  ended in 2022 onward.
22          MS. HUNKER:  Objection; form.
23  A.  I don't recall when, but there were issues
24  of synchronization between VEMACS and TEAM this last
25  year.  I just don't recall when that was.

EXHIBIT
87

Jacquelyn Callanen                                    February 28, 2023

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

   LA UNION DEL PUEBLO        )
 4 ENTERO, ET AL.,            )
                              )
 5           Plaintiffs,      )
                              ) Case No. 5:21-CV-844-XR
 6 vs.                        )
                              )
 7 GREGORY W. ABBOTT, ET AL.,)
                              )
 8           Defendants.      )
   _____)
 9 OCA-GREATER HOUSTON,       )
   ET AL.,                    )
10                            )
             Plaintiffs,      )
11                            ) Case No. 1:21-CV-780-XR
   vs.                        )
12                            )
   JANE NELSON, ET AL.,       )
13                            )
             Defendants.      )
14 _____)
   HOUSTON JUSTICE, ET AL.,   )
15                            )
             Plaintiffs,      )
16                            ) Case No. 5:21-CV-848-XR
   vs.                        )
17                            )
   GREGORY WAYNE ABBOTT,      )
18 ET AL.,                    )
                              )
19           Defendants.      )
   _____)
20 LULAC TEXAS, ET AL.,       )
                              )
21           Plaintiffs,      )
                              ) Case No. 1:21-CV-0786-XR
22 vs.                        )
                              )
23 JANE NELSON, ET AL.,       )
                              )
24           Defendants.      )
   _____)
25 MI FAMILIA VOTA, ET AL.,   )
                              )
```



Jacquelyn Callanen

February 28, 2023
Pages 2 to 5

## Page 2

```
 1            Plaintiffs,  )
                           )
 2  vs.                    )
                           ) Case No. 5:21-CV-0920-XR
 3  GREG ABBOTT, ET AL.,   )
                           )
 4          Defendants.    )
    _____)
 5  UNITED STATES OF AMERICA, )
                           )
 6          Plaintiff,     )
                           )
 7  vs.                    )
                           ) Case No. 5:21-CV-1085-XR
 8  THE STATE OF TEXAS,    )
    ET AL.,                )
 9                         )
            Defendants.    )
10  _____)
11
12      ****************************************
13          ORAL AND VIDEOTAPED DEPOSITION OF
14               JACQUELYN CALLANEN
15                FEBRUARY 28, 2023
16      ****************************************
17
18          THE ORAL AND VIDEOTAPED DEPOSITION of
19  JACQUELYN CALLANEN, produced as a witness at the
20  instance of the Defendant, and duly sworn, was taken
21  in the above styled and numbered cause on Tuesday,
22  the 28th day of February, 2023 from 9:10 a.m. to
23  3:51 p.m., before PAMELA SUE PETERSON, Certified
24  Shorthand Reporter in and for the State of Texas,
25  reported by stenographic and computer-aided
```

## Page 3

```
 1  transcription, at the Office of the Texas Attorney
 2  General, Weston Centre, 112 East Pecan Street,
 3  3rd Floor, San Antonio, Texas 78205, pursuant to the
 4  Federal Rules of Civil Procedure and the provisions
 5  stated on the record or attached hereto.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1  APPEARANCES OF COUNSEL:
 2  For Plaintiff HOUSTON JUSTICE, HOUSTON AREA URBAN
    LEAGUE, DELTA SIGMA BETA SORORITY, INC., THE ARC OF
 3  TEXAS, MI FAMILIA VOTA, MARLA LOPEZ, MARLIN LOPEZ,
    PAUL RUTLEDGE, JEFFREY LAMAR CLEMENS:
 4
    NAACP LEGAL DEFENSE FUND
 5  BY:  VICTOR GENECIN, ESQUIRE
    40 Rector Street
 6  5th floor
    New York, New York 10006
 7  (929) 388-9246
    vgenecin@naacpldf.org
 8
 9  For Defendant GREGORY W. ABBOTT AND JANE NELSON, ET
    AL:
10
    KEN PAXTON, ATTORNEY GENERAL OF TEXAS
11  OFFICE OF THE ATTORNEY GENERAL
    BY:  DAVID BRYANT, ESQUIRE
12       KATHLEEN T. HUNKER, ESQUIRE (Via Zoom
    Videoconference)
13  P.O. Box 12548
    Austin, Texas 78711-2548
14  (512) 936-2275
    david.bryant@oag.texas.gov
15
16  For Defendant UNITED STATES OF AMERICA:
17  U.S. DEPARTMENT OF JUSTICE
    CIVIL RIGHTS DIVISION
18  BY:  DANA PAIKOWSKY, ESQUIRE
    Robert F. Kennedy Building
19  950 Pennsylvania Avenue NW
    Washington, District of Columbia 20530
20  (202) 353-5225
    dana.paikowsky@usdoj.gov
21
22
23
24
25
```

## Page 5

```
 1  APPEARANCES OF COUNSEL (Continued):
 2  For Witness JACQUELYN F. CALLANEN, CERA:
 3  JOE D. GONZALES, CRIMINAL DISTRICT ATTORNEY
    OFFICE OF BEXAR COUNTY CRIMINAL DISTRICT ATTORNEY
 4  BY:  LISA V. CUBRIEL, ESQUIRE
    Paul Elizondo Tower
 5  101 West Nueva
    7th Floor
 6  San Antonio, Texas 78205-3030
    (210) 335-2142
 7  lisa.cubriel@bexar.org
 8
    Also Present:
 9
    JACQUELYN F. CALLANEN, CERA
10      Witness
11  JULIA R. LONGORIA (Via Zoom Videoconference)
        Mexican American Legal Defense and Educational
12      Fund, Inc.
13  CAROLINE LEBAL (Via Zoom Videoconference)
    NATALIE FELSEN (Via Zoom Videoconference)
14      Cooley, LLP
        On behalf of El Paso County Elections
15      Administrator Lisa Wise
16  MARINA EISNER (Via Zoom Videoconference)
        States United Democracy Center
17
    LOUIS J. CAPOZZI (Via Zoom Videoconference)
18      Jones Day
        On behalf of intervenors
19
    KEVIN ZHEN (Via Zoom Videoconference)
20      Fried, Frank, Harris, Shriver & Jacobson, LLP
        On behalf of LUPE Plaintiffs
21
    JOSEPHINE RAMIREZ SOLIS (Via Zoom Videoconference)
22      Office of Criminal District Attorney
        Hidalgo County
23      On behalf of Hidalgo County Elections
        Administrator
24
    GABE HODGE (Via Zoom Videoconference)
25      Observer
```



Jacquelyn Callanen

February 28, 2023
Pages 6 to 9

Page 6

```
1   APPEARANCES (Continued):
2   BEN STOOL (Via Zoom Videoconference)
         Observer
3
    TONY NELSON (Via Zoom Videoconference)
4        Observer
5   HEENA KEPADIA (Via Zoom Videoconference)
         Observer
6
    ERIC NICHOLS (Via Zoom Videoconference)
7        Observer
8   DAVID FLORES
         Videographer
9
    PAMELA SUE PETERSON
10       Certified Shorthand Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1                 E X H I B I T S (Continued)
2   Deposition                                    PAGE
3   Exhibit 6    Texas Secretary of State         210
                 John B. Scott
4                Election Advisory No. 2022-12
5   Exhibit 7    Texas Secretary of State         212
                 John B. Scott
6                Election Advisory No. 2022-18
7   Exhibit 8    Defendant Bexar County Election  214
                 Administrator Jacquelyn Callanen's
8                Responses to State Defendants'
                 First Requests for Admissions
9                and First Set of Interrogatories
10  Exhibit 9    Black and White Copy of           58
                 Insert
11
    Exhibit 10   Notice of Rejected Application    218
12               for Ballot by Mail 1/2022
13  Exhibit 11   Notice of Rejected Application    220
                 for Ballot by Mail - Required
14               Personal Identification Number
                 is not Associated with Your
15               Voter Record - 1/2022
16  Exhibit 12   Poll Watcher's Guide             221
                 The State of Texas
17               Issued by the
                 Secretary of State
18               Elections Division
19  Exhibit 13   Color Copy of Insert              60
20  Exhibit 14   Bexar County Spreadsheet         125
                 of Mail Ballot Request List
21               Requested Between 05/25/22
                 and 10/28/22
22
    Exhibit 15   Information of Person that       193
23               Provided Transportation to
                 Seven or More Voters
24               July 2022
25
```

Page 7

```
1                    I N D E X
2                                                 PAGE
3   Appearances.........................................4
4   Index...............................................7
5   JACQUELYN F. CALLANEN, CERA
         Examination by Mr. Bryant....................11
6        Examination by Ms. Paikowsky................105
         Examination by Mr. Genecin.................145
7        Further Examination by Mr. Bryant..........203
8   Witness Signature Page............................236
9   Reporter's Certificate............................238
10
11                  E X H I B I T S
12  Deposition                                    PAGE
13  Exhibit 1    State Defendants' Amended Notice    14
                 of Intent to Take Oral and
14               Videotaped Deposition of the
                 Office of the Bexar County
15               Elections Administrator, Pursuant
                 to Rule 30(b)(6)
16  Exhibit 2    Election Reconciliation -          90
                 Official Totals
17
    Exhibit 3    Table of Ballots by Mail          205
18               Accepted/Ballots by Mail
                 Rejected/% Rejected by County
19
    Exhibit 3A   Table of Ballots by Mail          206
20               Accepted/Ballots by Mail
                 Rejected/% Rejected by County
21
    Exhibit 4    Texas Secretary of State          206
22               John B. Scott
                 Election Advisory No. 2022-07
23
    Exhibit 5    Texas Secretary of State          208
24               John B. Scott
                 Election Advisory No. 2022-08
25
```

Page 9

```
1                 E X H I B I T S (Continued)
2   Deposition                                    PAGE
3   Exhibit 16   Information of Person that       195
                 Provided Transportation to
4                Seven or More Voters for
                 Curbside Voting
5                January 2022
6   Exhibit 17   Handbook for Election Judges     222
                 and Clerks - Qualifying
7                Voters on Election Day 2022
8
9                 INFORMATION REQUESTED
10          Page                         Line
11          127                          14
12
            192                          11
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Jacquelyn Callanen

February 28, 2023
Pages 10 to 13

Page 10

1 SAN ANTONIO, TEXAS, TUESDAY, FEBRUARY 28, 2023
2 9:10 A.M.
3
4       THE VIDEOGRAPHER: Good morning. We are
5 now on the record. This begins the deposition of
6 Jacquelyn Callanen in the matter of La Union
7 del Pueblo Entero, et al versus Gregory W. Abbot,
8 et al in the United States District Court for the
9 Western District of Texas, San Antonio Division,
10 Civil Action Number 521CV844XR.
11       Today is February 28, 2023, and the time is
12 9:10 a.m. This deposition is being taken at
13 112 East Pecan at the request of the Defendant. The
14 videographer is David Flores and the court reporter
15 is Pamela Peterson. We are with Magna Legal
16 Services. Will counsel and all parties present state
17 their appearances and whom they represent.
18       MS. CUBRIEL: Lisa Cubriel on behalf of the
19 Bexar County Elections Administrator, Jacquelyn
20 Defendant. I'm with the office of the Bexar County
21 Criminal District Attorney.
22       MS. CALLANEN: I'm Jackie Callanen, Bexar
23 County elections administrator.
24       MR. BRYANT: My name's David Bryant. I am
25 one of the attorneys for the State Defendants in this

Page 11

1 case, and I'm with the Office of the Attorney General
2 of Texas.
3       MS. PAIKOWSKY: My name is Dana Paikowsky
4 and I represent the United States. I'm with the
5 United States Department of Justice.
6       MR. GENECIN: And I'm Victor Genecin and I
7 represent Plaintiffs Houston Justice, Houston Area
8 Urban League, Delta Sigma Beta Sorority,
9 Incorporated, The Arc of Texas, Mi Familia Vota,
10 Marla Lopez, Marlin Lopez, Paul Rutledge and Jeffrey
11 Lamar Clemens.
12
13       JACQUELYN CALLANEN,
14 having been first duly sworn, testified as follows:
15
16       EXAMINATION
17 BY MR. BRYANT:
18    Q.  Miss Callanen, I know you're very
19 experienced at deposition procedures. You've been
20 deposed previously two times in this case alone; is
21 that right?
22    A.  Yes, sir.
23    Q.  And about how many times overall have you
24 been deposed?
25    A.  Probably another four. So, about six.

Page 12

1    Q.  Okay. You understand that you're under
2 oath just as if you were in a court of law as you
3 testify today?
4    A.  Yes, sir.
5    Q.  And I would ask that if at any time I ask
6 questions that -- that you don't fully understand,
7 will you please ask me to clarify it? And I'll do my
8 best to do so.
9    A.  Thank you.
10    Q.  Okay. Now, how long have you had your
11 current position as Bexar County elections
12 administrator?
13    A.  Since 2005.
14    Q.  Okay. And in that capacity, did you have
15 responsibilities with respect to the general election
16 that occurred in November of 2022?
17    A.  Yes, sir.
18    Q.  Could you describe generally your
19 responsibility for that election.
20    A.  Again, as the elections administrator for a
21 county, we are charged with setting up the elections,
22 following the secretary of state's directions,
23 calendar, advisories, the Texas election code.
24       And what that means on the ground level is,
25 actually, our office does the entire election from

Page 13

1 the poll sites, training the election officers, the
2 clerks, programming our election. We print our own
3 ballots in-house. We contract with the entities. We
4 contract with the facilities, contract with
5 transportation company to deliver all of the
6 equipment, and then we are in charge with tabulation.
7       And so, our election does not stop at the
8 end of election night. We go through the canvas.
9 And so, it's a total package.
10    Q.  And approximately how many full-time
11 employees work under your overall supervision or
12 management?
13    A.  There are 20 of us.
14    Q.  And on election day, about how many people
15 are directly involved in the -- in the operation of
16 the -- the poles and the entire mechanism of the
17 election in Bexar County?
18    A.  Approximately 1,200.
19    Q.  Okay. Now, today you're here as what's
20 referred to as a Rule 30(b)(6) witness. Do you have
21 an understanding of what that means?
22    A.  No, sir.
23    Q.  Generally, as I understand it, you're
24 the -- you're the representative of Bexar County --
25    A.  Oh, okay.



Jacquelyn Callanen                                February 28, 2023
                                                  Pages 54 to 57

Page 54

1  percent rejection rate and one percent is -- is not
2  that much.  So, it's hard to put a numeric value on
3  that.
4       Q.   Okay.  Now, earlier in your testimony you
5  described a -- a process, I believe, whereby mail-in
6  voters, especially over-65 voters, make applications
7  annually?
8       A.   Yes, sir.
9       Q.   Okay.  Is -- are the amount of the annual
10 applications increasing in Bexar County, say from
11 23 -- 2023 as compared to 2022?
12      A.   No.
13      Q.   How -- how are -- is that number moving
14 over time?
15           MS. CUBRIEL:  I'm going to object to --
16      Q.   BY MR. BRYANT:  The number of annual
17 applications that you receive in Bexar County --
18           MS. CUBRIEL:  I'm going to object.
19      Q.   BY MR. BRYANT:  -- for mail-in voters?
20           MS. CUBRIEL:  I'm sorry.  I'm going to
21 object because I think you're going beyond the scope
22 of the amended scheduling order, getting too far away
23 from asking her about matters related specifically to
24 the general election that just passed.
25           MR. BRYANT:  You can answer --

Page 55

1           MS. CUBRIEL:  You can answer if you know.
2       Q.   BY MR. BRYANT:  You can answer unless she
3  instructs you not to.
4       A.   What came -- what came to mind from your --
5  from your question is, the annual applications.  We
6  have State-prescribed annual applications.  But in
7  the difference of -- and -- and I know we talked
8  about it before, that we refer to it as a last like
9  election.  So, if I compare the '18 to '22, the by
10 mail and then the presidential elections are much
11 higher.
12          But please understand that candidates,
13 candidates hire consultants and consultants handle
14 their by mail.  And so, the consultants have all
15 become very astute at making their mail ballot
16 applications annual applications.
17          And so, we see a huge influx of annual
18 applications in a presidential year.  We see a lot.
19 Then, like I said, a third of them will come in on
20 the governors, the -- the other general.  This year,
21 which is the odd year and it's just municipal
22 elections, they're almost nonexistent.
23          I mean, as -- as I -- as I came over today,
24 I looked, we have 854 in with an election coming up
25 next May 6th.  So, it -- it -- that's things that

Page 56

1  just -- I can't give you a -- I can't give you a
2  definite answer because there's too many variables.
3       Q.   Thank you.  Another subject.  You had
4  mentioned earlier in your testimony some inserts that
5  were done.  Could you describe more fully for
6  somebody who doesn't understand that what Bexar
7  County did --
8       A.   Right.
9       Q.   -- in 2022 with respect to inserts.
10      A.   I'm going to scream if I didn't -- here
11 they are.  We -- this went through many iterations of
12 planning.  When SB-1 was rolled out, the secretary of
13 state wrote an insert for the ballots for us to
14 include in all of the ballots.  But it was a complete
15 eight-and-a-half by 11 page with a lot of legalese on
16 it, and in the form, and the voters just didn't read
17 it.  They just -- I mean, when you sending them
18 stuff, they're looking for their ballot.  They just
19 didn't read it.
20          So, when we had our, like I said,
21 unacceptable high rejection rate, we said, huh-uh,
22 can't do that.  So, we said we're going to start with
23 this.  And this has gone through, like, three
24 iterations of it.  We -- we -- we did -- first, we
25 did one in black and white, and that didn't jump out

Page 57

1  at them.  And then we did one that had duller --
2  duller colors on it, and that didn't jump out at
3  them.  We did it in -- in May.
4          And by November, we had passed this around
5  to everybody and said, you know, is this going to
6  jump out at them?  And -- and then what we did
7  specifically, and this is sort of a catch-22 because
8  I'm really proud of it, but part of me says, this was
9  evil Jackie, because we specifically made it small
10 and a quarter sheet so when they pulled all their
11 stuff out of the envelope, this would hopefully fall
12 on the floor so that they had to see it.  And --
13      Q.   You tried --
14      A.   -- and --
15      Q.   You tried to make it as attention-getting
16 as possible?
17      A.   Exactly.  Exactly.  And we got to a 1.7
18 rejection rate.
19      Q.   Okay.  Now --
20          MR. GENECIN:  David, I don't want to
21 interrupt the witness, but I would like to request
22 that you mark the document that Miss Callanen has
23 brought as an exhibit.
24          MR. BRYANT:  I'll be -- be happy to do
25 that.



Jacquelyn Callanen

February 28, 2023
Pages 62 to 65

Page 62

1  sites.  We -- we were -- we just sort of threw
2  everything at it that we could because it was just so
3  important.
4      Q.  Okay.  You were describing some media
5  outreach and voter education efforts that occurred in
6  connection with the November 2022 general election;
7  is that right?
8      A.  Yes, sir.
9      Q.  Were those efforts that were made
10  specifically in and by Bexar County or were they a
11  broader effort, or both?
12      A.  We, the election's office, had our own
13  outreach.  But again, members of my commissioner's
14  court entered into it and they did their own outreach
15  for it also, separate and apart from the elections
16  office.
17      Q.  Okay.  Could you describe as -- as much as
18  you recall, the media outreach that was done to
19  educate voters about mail-in balloting in connection
20  with the November 2022 general election process in
21  Bexar County.
22      A.  Sure.  I mean, we -- we did press
23  conferences twice a week.  We did, again, outreach
24  everywhere we went, every -- every presentation we
25  put on, every meeting we went to.  We worked with the

Page 63

1  AARP.  We worked with Oasis.  We -- we did outreach
2  with the organizations that -- that go to the senior
3  citizens to -- to try and -- we worked very heavily
4  with the disability community.  In fact, we're still
5  working with the disability community at this time.
6  So, we -- we -- we just tried to do as much as we
7  could.
8      Q.  And during what period of time were those
9  efforts undertaken with respect to the November 2022
10  general election process?
11      A.  They started the middle of September
12  through Novem- -- November.  Because, again, the
13  middle of September is basically, again, for us is
14  when that's the go button, because we all have to
15  abide by the MOVE Act, which is the federal military
16  MOVE Act, and that's always 45 days before an
17  election.  So, once our ballots go out, it's --
18  somebody's hit the go button.
19      Q.  Did Bexar County comply with that 45-day
20  requirement in connection with the general
21  election --
22      A.  Absolutely.
23      Q.  -- in 2022?
24      A.  Absolutely.
25          MR. GENECIN:  David, would this be a good

Page 64

1  time for a break?
2          MR. BRYANT:  Certainly.  Let's take a
3  break.
4          THE VIDEOGRAPHER:  Time is 10:21.
5  Correction, 10:28 a.m. and we are off the record.
6          (A brief recess was taken.)
7          THE VIDEOGRAPHER:  Time is 10:38 a.m. and
8  we are on the record.
9      Q.  BY MR. BRYANT:  Miss Callanen, you were
10  testifying before the break about outreach and voter
11  education efforts that were made in connection with
12  the November 2022 general election.  And it sounded
13  to me as if those were fairly extensive and ramped up
14  from previous elections; is that correct?
15      A.  Yes, sir.  Yes, sir.
16      Q.  Do you anticipate looking forward that
17  it'll be necessary to continue to increase and
18  increase the level of effort and expense that Bexar
19  County does on -- on voter education and outreach?
20  Or do you believe that over time the need to do that
21  will level off or decline as people understand better
22  the -- the procedures?
23          MS. PAIKOWSKY:  Objection; form.
24          THE WITNESS:  I -- I understand your
25  question.  I -- again, this is an odd number year, so

Page 65

1  we will have so many less people.  And I think we
2  will have to duplicate our media outreach for 2024.
3  Because, again, you keep hearing me say we had 40,000
4  now and 124,000.  So that, to me, is there's another
5  80,000 that have not used the new method.
6          So, we're going to stay attuned to that and
7  stay focused on that.  So, I expect that when we get
8  to the 2024 we'll duplicate what we've done.
9      Q.  BY MR. BRYANT:  Okay.  Do you have any
10  expectations on that subject beyond 2024?
11      A.  No, sir.
12      Q.  Okay.  You testified earlier about efforts
13  that your office makes to contact people whose
14  mail-in ballots have initially been rejected.  And I
15  believe you indicated that sometimes that's by
16  e-mail, sometimes that's by phone.
17          Could you describe the extent and
18  regularity of those efforts that were undertaken in
19  connection with the November 2022 general election.
20      A.  Yes, sir.  Well, in SB-1 it opened up the
21  door for us to be able to have outreach so that they
22  could cure their -- their ballots, that's the phrase
23  we use, they could cure their ballots.  And they
24  opened up the avenue of the phone and by e-mail as
25  opposed to sending them the hard copy reject and



Jacquelyn Callanen

February 28, 2023
Pages 82 to 85

Page 82

1      THE WITNESS: Okay. Well, the -- the
2  visually impaired had filed a lawsuit asking for the
3  same accommodations that we have with the military.
4  We have a very robust military vote -- voting
5  population. And the federal government permits us to
6  e-mail their ballots to them. And if they're in a
7  hostile fire zone, they may e-mail them back.
8      And the visually impaired have petitioned
9  the district court to allow us to e-mail ballots to
10  them so that in the comfort of their home, they can
11  use their own screen scrapers or sip-and-puffs,
12  whatever they would need, to be able to mark their
13  ballot to have it as a fillable PDF, and then it
14  could be printed off and so they could actually be
15  voting in private without any assistance.
16      And my understanding is, due to the
17  timeliness, the judge chose three of those people out
18  of that organization for us to e-mail them their
19  ballots, and so we did this. We -- we had their
20  names and we e-mailed their ballots to them as a
21  pilot.
22      It was not a hundred percent success. The
23  screen scrapers -- my understanding, the screen
24  scrapers work with one type of PDF, but the fillable
25  PDF is -- is another. So, we went back after the

Page 83

1  election, they did successfully vote. They e-mailed
2  their ballots. They printed them. They mailed them
3  back to us. And so they did, in fact, vote.
4      But the judge has, I don't want to say -- I
5  use the phrase, kicked the can down the road until
6  March to come back and reevaluate where this will go,
7  but then knowing that that will be too late for us to
8  institute it for May.
9      Q.  BY MR. BRYANT: All right. Were there any
10  other instances in which the accommodations were
11  requested for persons with disabilities in connection
12  with the 2022 general election in Bexar County beyond
13  what you've already testified about?
14      A.  No. I mean, we -- we have -- I think we
15  talked about it, sir, earlier about the curbside
16  voting. And we --
17      Q.  Yes, ma'am.
18      A.  -- we have units, like big tablets that --
19  that they vote on in their car and -- and again,
20  that's a very, very readily accessible, very, very
21  well-promoted and very, very well-attended part of
22  our voters.
23      Q.  Okay. To the best of your knowledge, did
24  Bexar County comply with the provisions of SB-1
25  relating to accomodations for voters in connection

Page 84

1  with the general election in 2022?
2      A.  Yes, sir.
3      Q.  You mentioned the military voters. Were
4  there any military voters whose votes were rejected
5  in connection with the 2022 general election by
6  Bexar County?
7      A.  Yes, sir.
8      Q.  Could you describe what occurred in that
9  regard.
10      A.  Again, to my -- to my knowledge, and I do
11  not have a number, with the military ballots, they
12  are required to put a -- it's called a signature
13  sheet and -- and they must sign it with a wet
14  signature and -- and enclose it with their ballot.
15  So that -- again, we don't know how far that ballot's
16  coming, so there's no signature on the outside again.
17      And so, they -- they have the opportunity
18  to insert it inside. And the organization, the early
19  ballot board, when they open that ballot, if that
20  signature sheet is not in there, then they reject
21  that ballot. And so, there were some that did not
22  have the signature sheet in it. I don't know how
23  many.
24      Q.  In those instances, was there an effort
25  made to cure or otherwise allow those military voters

Page 85

1  to vote?
2      A.  Yes. Again, that group was able to e-mail
3  them, to send in a signature sheet.
4      Q.  And to what extent was that done?
5      A.  I don't know.
6      Q.  Okay. Do you know whether there were any
7  military voters who ultimately were unable to cast
8  their ballot in Bexar County in connection with the
9  2022 general election?
10      A.  I know there were some rejected.
11      Q.  Okay. And not cured?
12      A.  Correct.
13      Q.  Okay. There's technology, I understand,
14  that is used in connection with mail-in ballots
15  that's referred to as Votracker [sic]. Are you
16  familiar with that?
17      A.  Yes, sir.
18      Q.  Did the Votracker [sic] -- Votracker [sic]
19  technology work properly with respect to Bexar County
20  voters in the -- connection with the general election
21  in 2022, to the best of your knowledge?
22      A.  Our local ballot tracker worked.
23      Q.  Did Bexar County synch, S-Y-N-C-H --
24      A.  You got it.
25      Q.   -- its system with TEAM's in the last half



Jacquelyn Callanen                                    February 28, 2023
                                                      Pages 110 to 113

Page 110

1        In the 2022 November general election, did
2    the ABBM forms that Bexar County used include the
3    and/or language with respect to IDs, the -- the SB-1
4    ID provision?
5        A.    From the State, the new ones that we had to
6    get --
7        Q.    Uh-huh.
8        A.    -- yes.
9        Q.    In the 2022 November general election, did
10   you -- do you believe voters were confused by that
11   language?
12       A.    Oh, absolutely.
13       Q.    In the November 2022 general election, did
14   Bexar County's carrier envelopes include the and/or
15   language from SB-1's mail ballot ID provision as
16   well?
17       A.    Yes.  It was from the secretary of state.
18   We used exactly what they sent us.
19       Q.    In the November 2022 general election, were
20   voters confused by that and/or language?
21       A.    I'm sure they were.
22            MR. BRYANT:  Objection to form.
23            MR. GENECIN:  Calls for speculation.
24       Q.    BY MS. PAIKOWSKY:  So, I'm going to
25   backtrack a little bit.  Again, to voter education

Page 111

1    efforts, which I want to specify include things like
2    creating the ballot insert and -- and everything
3    you've discussed previously.  How much money did
4    Bexar County spend on voter education efforts you
5    described?
6        A.    Out of the election -- my budget.  The
7    general fund budget.  We spent -- I spent $40,000
8    which was, you know, minimal.  But that was all
9    towards the voter education part.  I spoke previously
10   about two commissioners on the -- on the court that
11   got involved and they set a budget of 200,000 that
12   they spent.
13       Q.    How do those numbers, the 40,000 and
14   200,000, compare to like elections?
15       A.    Again, prior to that, the court was not
16   involved.  And when it's a like election, thank you,
17   we have and I do have a media person that comes on
18   that manages social media, setting up the -- the
19   media, you know, press conferences and all of that.
20   So, that has stayed the same for, like, the last
21   10 years.
22       Q.    As compared to the November 2022 general
23   election and the amount of money the county expended
24   on voter education, was it more or less than in -- or
25   the same as in other like elections?

Page 112

1        A.    Well, again, this -- this one cost more
2    because we had to pay for the insert, you know,
3    numerous times.  So, we had them, you know, put away
4    the first version, put away the second version.  And,
5    you know, I mean at that, we're -- we're just talking
6    a couple thousand dollars to have -- to have sheets
7    printed and -- and cut.
8            And then, again, other than, as I said,
9    when we sent all of our remaining stock back to our
10   printer to have those redacted, you know, we had a
11   bill from them.
12       Q.    Were there any other resources that your
13   office devoted to voter education efforts related to
14   the ID provision, the ballot ID provision, in the
15   2022 general election?
16       A.    No.
17       Q.    In the November 2022 general election, did
18   your office expend any resources to educate your
19   employees about implementing the ID provision of
20   Senate Bill 1?
21       A.    Okay.  I mean, we had in-house training.  I
22   don't know if that counts as expending, but we had
23   numerous in-house trainings.  We have -- when we deal
24   with our election officials for their training and
25   for their -- when we trained all of our judges and

Page 113

1    all of our workers, the early voting -- our early
2    voting crews, not necessarily did we train them for
3    early bal- -- for the ballot -- mail ballot.
4            But we had to bring them up and give them
5    the knowledge of it because voters were going to be
6    coming in.  So, you know, did -- it was minimal what
7    we expended, but we made sure that they all had
8    copies of the insert, that they had copies of this
9    carrier envelope if they saw exactly what was needed
10   so that if somebody came in and asked, or was
11   starting to carry on a conversation with them, that
12   they wouldn't feel like, what are they talking about.
13            And so, every time we had a training
14   session we entered into that.  But again, I don't
15   know how to quantify that.
16       Q.    From your experience in the November 2022
17   general election, do you anticipate continuing with
18   the same efforts you've already described?
19       A.    Yes.
20       Q.    I'm going to switch gears a little bit and
21   ask you about mail ballot processing and absentee
22   ballot -- ABBM processing.  So, for the November 2022
23   general election, did your office hire employees or
24   contractors in order to facilitate, support or assist
25   with mail voting and the implementation of



Jacquelyn Callanen

February 28, 2023
Pages 114 to 117

Page 114

1  Senate Bill 1's identification requirements?
2      A.  Absolutely.  But let me, please, speak to
3  that.  I think when David asked me earlier on in the
4  day, I mean, my staff is 20 in number.  And so, we
5  have a fantastic mail -- we call them the mail room
6  people who are full-time temps that -- now -- I don't
7  want -- permanent temps, because they'll come and
8  work with us through an election and then they go
9  away and they'll come back and work.
10     And so, we have two strong leads, one from
11 each party.  They are full-time temps and they manage
12 that, and then we bring in temps for them.  Again, we
13 bring in temps to answer phones.  I mean, we bring in
14 temps to handle that work flow.
15     As you heard me say before, every piece of
16 paper that comes in our office is scanned, and it's
17 scanned into that database.  And so, yes, we -- we do
18 bring in -- we bring in tons of temps.  We couldn't
19 do it without our faithful temps.
20     Q.  Was the staffing needs of the November 2022
21 general election -- actually, withdrawn.
22     You mentioned that your office hires
23 temporary staff around election time.
24     A.  Yes, ma'am.
25     Q.  Were your staffing needs greater for the

Page 115

1  November 2022 general election with respect to
2  staffing or processing mail ballots and implementing
3  Senate Bill 1 than they had been in like elections
4  for mail voting needs?
5      A.  Yes.
6      Q.  Why was that?
7      A.  Again, because of the additional -- that
8  perforated flap that -- that I was speaking of.  In
9  March, in the -- in the primaries, we didn't have the
10 ability or didn't understand that SB-1 allowed us to
11 take that flap down.
12     And so, when we turned over the early
13 ballot board and, you know, took -- but as we got
14 into this, we understood that we could facilitate
15 things by taking just one of -- we were allowed to
16 take, like, the top perf down so that it fell down
17 but it wasn't completely removed and very
18 time-consuming because that had to be a one-by-one
19 person with a letter opener.  I mean -- and so, yes,
20 we did have additional temps brought on board in
21 November of 2022.
22     Q.  Do you bring in temp -- temporary staff or
23 additional hiring to assist with the processing of
24 ABBMs as well?
25     A.  Yes.

Page 116

1      Q.  Were the staffing needs for the
2  November 2022 general election, with respect to
3  hiring temporary staff or additional workers, greater
4  than like elections, with respect to processing
5  ABBMs?
6      A.  We probably added one -- one or two more.
7  Because with SB-1, the -- the usual -- or the
8  routine, I guess is the word I'm looking for, prior
9  to SB-1, you know, they would scan it, they would
10 look at it.  Was -- you know, was it all correctly
11 filled out.  Did it have a precinct number.  Was it
12 signed.  And then it would be like, okay, accept it
13 and it would go into the cyber space so that we,
14 then, would be able to print a ballot for it.
15     But with SB-1, that process took longer.
16 Because now, not only would they scan it in put it
17 in, yes, do you have -- this is the name.  This is
18 the signature.  That's the address we have.  This is
19 the precinct.
20     Now they had to stop and look at the TDL or
21 the SSN and bring up the voter registration card that
22 we had scanned to make sure that we had that number
23 there.  And so, not only -- how do I say this because
24 I'm -- I'm not technical.  Please understand me.
25     But in the past when we had these people

Page 117

1  doing this, they had one computer and one screen.
2  But to facilitate the voter registration, we now gave
3  them a second screen so that they could -- does that
4  make sense?  Do you understand?  Okay.  That's -- and
5  so, yes, it took longer.  And so, yes, we had to get
6  more temps.
7      Q.  For the additional staffing that your
8  office had to hire during the 2022 general election
9  to assist with mail ballot and ABBM processing,
10 approximately how much did that cost?
11     A.  I actually barely know that number.  It
12 costs us about $218,000.
13     Q.  Is $218,000 an unusual -- unusually high
14 expense for temporary staff and additional workers as
15 compared to like elections?
16     A.  For this one, yes, it was.  It got my
17 attention.
18     Q.  Given your experience in the November 2022
19 general election, do you anticipate your needs to
20 hire temporary staff and additional employees to
21 process mail ballots will remain higher in the future
22 than it has been in the past?
23     A.  Yes.
24     Q.  Where does the money come from -- or excuse
25 me.  Withdrawn.



Jacquelyn Callanen

Page 118

1    In the November 2022 general election,
2 where did your office get the money to hire these
3 additional employees?
4    A.  From the general fund.  From Bexar County's
5 general fund, my office budget.
6    Q.  What impact, if any, did the county's
7 funding of these additional staff members have on the
8 budgets of your other programs?
9    A.  In the long run, I would say it had
10 none because the county judge was very specific in
11 addressing the fact that we -- we were to be granted
12 whatever we needed for getting this done because he
13 was very, very understanding.
14    Q.  What impact, if any, did the county's
15 funding of your additional program have on other
16 programs or county initiatives?
17    A.  Again, I wouldn't know that.
18    Q.  Do you believe that there is anything
19 further your office could do beyond what it did in
20 November 2022 to bring down rejection rates further?
21 Excuse me.  Withdrawn.
22    Do you believe that there's anything your
23 office could do beyond what it did in November -- in
24 the November 2022 general election to bring down
25 rejection rates further because people were unable to

Page 119

1 comply with the ID provisions in Senate Bill 1?
2    A.  I foresee us doing exactly what we've been
3 doing, from the inserts, to the media, to whatever.
4    Q.  Is there anything additional you believe
5 you could do?
6    A.  That's a tough -- that's a tough question.
7 I -- I hope and I pray that some of my smarter
8 counterparts have developed things like this, and
9 that when we get together we share and that we can
10 assist from different -- I'm hoping someone has
11 looked at it from a different angle and helps do
12 that.
13    But again, like, we had our 40,000 people
14 vote by mail or applications, and when we look back,
15 that's basically the same pool that we had vote in
16 2018.  And so, then they are already educated and
17 they -- they understand this.
18    And I think, again, for this May election,
19 our upcoming election and for November, we'll have a
20 much smaller turnout.  And so, it will be our heart
21 and true, it's going to be the core of our -- our
22 voters.  And I think through this year they -- they
23 get it.  They get it, because they lived through
24 March of last year and -- and November.  And so, I
25 see us doing the exact same thing this year.

Page 120

1    And as I said, just to meet with
2 counterparts, there's got to be smarter and better
3 ideas out there as we ramp up to '24, because that's
4 where we'll see people who have not done this before,
5 and we'll have to go back into a major push.
6    Q.  From your experiences implementing SB-1's
7 Senate -- ID provision in the November 2022 election,
8 do you believe you will ever be able to get the
9 rejection rate to zero?
10    A.  No.
11    Q.  Why not?
12    A.  Human nature.  Human nature.  There --
13 there's somebody that just is sure that they've done
14 everything and filled it out correctly and haven't
15 signed it.  I mean, we -- we get -- we get ballots
16 where on the outside it's -- it's -- it's perfect.
17 The numbers are there.  The signatures are there, but
18 then when they open it -- when it goes to the early
19 ballot board and they open it, there's no ballot in
20 it.  They forgot to put the ballot in.  I mean, I --
21 I'm sorry, that's our -- that's the reality we live
22 in.
23    Q.  To your knowledge, in the November 2022
24 general election, were any eligible voters prevented
25 from voting because of Senate Bill 1's ID provisions?

Page 121

1    A.  I would say, no, with a little bit of a
2 reservation.  One of the difficulties that we had
3 with the curing process was, we -- we -- they'd send
4 it back, they'd notify them and they could, then,
5 hand-deliver their ballot back to our office; okay?
6    And so, they would bring the ballot back to
7 us.  And they can bring that ballot back on election
8 day.  So, in the morning -- and, again, I don't want
9 to ramble, but in -- in the morning the first couple
10 ones that came in, we would have a husband come in
11 and he would have the two ballots.  He would have his
12 and his wife's.  Well, we could only accept his.  We
13 could not accept his wife's because they had to
14 hand -- hand-deliver it, show their photo ID, sign it
15 in.
16    And the gentlemen -- the first couple, they
17 were angry, as -- as they should be, as they should
18 have been.  And so, those few in the morning, that --
19 that wife, spouse, her ballot was not turned in.  And
20 you know, we explained, go ahead and vote in person.
21 Okay.
22    So, did they?  I don't know.  But I know
23 by, like, 10:00 that morning it was becoming obvious
24 that this was a problem.  And so, we're really
25 blessed because right across the street from --



Jacquelyn Callanen

February 28, 2023
Pages 122 to 125

Page 122

1  across the freeway from us is our post office.
2      So, I mean, I literally got money out of my
3  wallet and had a staff member run over there and buy
4  books of stamps so that if this happened again and
5  again, which it did, we were giving them -- you know,
6  probably shouldn't tell people this, but we were
7  giving them a stamp to put on that ballot and take it
8  directly across the street and mail it and make sure
9  it was time stamped.
10      Because, again, our legislation has said if
11  the ballot is date stamped by 7 o'clock on election
12  day it can be delivered the next day.  And so, that
13  was, like, an on-the-fly, we did it.  We -- we
14  managed to do that.  But I can't account for those
15  first hours.  So, I hope that makes sense to you.
16      Q.  Is it possible that in the 2022 general
17  election some eligible voters were prevented from
18  voting because they were not able to cure ballot
19  defects that arose under Senate Bill 1's ID
20  provisions?
21      A.  I'm sure.  Excuse me.
22      Q.  Okay.  So, I'm going to ask you a couple of
23  process questions.  And I think the point of these
24  questions is to ascertain if anything has changed
25  since the last time you were deposed.

Page 123

1      So, since the November 2022 election, has
2  anything changed about the way your office processes
3  incoming ABBMs with respect to the voter ID
4  provision?
5      A.  No.
6      Q.  Similarly, has anything changed in your
7  office with respect to the process by which you
8  receive and intake a ballot to determine compliance
9  with SB-1's mail identification provision in the
10  November 2022 election?
11      A.  Well, we haven't had an election since
12  November 2022, so we haven't brought any in, but we
13  brought the ABBMs in, and we're doing the -- you
14  know, the same thing, the same processing, the two
15  screens, making sure we have the numbers.  But I'm
16  sorry, I can't go to the ballots.
17      Q.  No.  I -- I got turned around.  So, since
18  the March primaries, has anything changed about the
19  way your office receives and processes ballots to
20  determine compliance with SB-1's mail identification
21  provisions?
22      A.  Sure.  I mean, very proudly say, you know,
23  we've actually gotten into the rhythm.  We -- we've
24  gotten so that, as far as the temps and training,
25  it's gone a lot smoother.  So, I mean, we -- we

Page 124

1  had -- we jokingly said we had the 18 by November,
2  because they knew how to look for it and what to look
3  for.  And so, from that standpoint, it -- it did
4  cycle down.
5      Q.  In your previous testimony, you mentioned
6  when a ballot, or ABBM comes in, a staffer who
7  receives it would often type in the first name or a
8  date of birth in order to pull up the record and
9  identify the voter.  Is that still your process?
10      A.  Yes, ma'am.
11      Q.  Earlier you testified that your office does
12  not make phone calls or send e-mails to cure ballot
13  defects for ID -- ID ballot defects.
14      A.  Correct.
15      Q.  Does your office use phone calls or e-mails
16  to notify people of issues with their ABBMs failure
17  to comply with SP-1's identification provision?
18      A.  Yes, ma'am.  Yes, ma'am.  If -- if they've
19  given us that information.
20      Q.  How long has your office -- excuse me.  Has
21  your -- withdrawn.
22      Has your office changed its process for
23  notifying voters about ID issues with their ABBMs
24  since the March primary?
25      A.  No.

Page 125

1      Q.  Okay.  I am going to show you a document
2  which, I believe --
3      MS. PAIKOWSKY:  Are we on JCS3 3; is that
4  right?
5      MR. BRYANT:  3, 3?
6      MS. PAIKOWSKY:  So, you had done -- you had
7  done two exhibits.  One was marked JCS1 -- one was
8  marked JCS2 and the other one was 13.
9      THE WITNESS:  That was from --
10      MR. BRYANT:  And I also -- I also added 9.
11      MS. PAIKOWSKY:  And you added 9.
12      MR. BRYANT:  But I believe that the -- I
13  assume you're trying to keep the -- not duplicate
14  exhibit --
15      MS. PAIKOWSKY:  Yeah, numbers.  Should I
16  just start --
17      MR. BRYANT:  -- numbers.  And I believe the
18  last one that I have marked is 13.
19      MS. PAIKOWSKY:  13.
20      MR. BRYANT:  So, if you start with -- yours
21  with 14, we ought to be okay.
22      (Exhibit 14 was marked.)
23      MS. PAIKOWSKY:  All right.  So, we're going
24  to call this JCS3, 14.  There you go.
25      THE WITNESS:  Thank you, ma'am.



Jacquelyn Callanen

February 28, 2023
Pages 126 to 129

Page 126

1     MS. PAIKOWSKY:  I have copies for you both,
2  and a copy for you as well.
3     MS. CUBRIEL:  Thank you.
4  Q.  BY MS. PAIKOWSKY:  Okay.  Do you recognize
5  this document?
6  A.  Yes, ma'am.
7  Q.  So, I will represent that this document is
8  well over a thousand pages long, so what we have here
9  is an excerpt.  It is the first page and the 840th
10  page.  Can you explain to me what this document is.
11  A.  Sure.  This is a list -- well, by code of
12  the people who requested a mail ballot app-- -- a mail
13  ballot from May 25th, which was after the primary
14  runoff until 10/28, which was the deadline for
15  accepting applications for the November 2022
16  election.
17  Q.  Can I have you look at the fourth name from
18  the bottom.
19  A.  On what page?
20  Q.  On the -- on page 840 of -- again, this is
21  Exhibit JCS3 14.
22  A.  I'm going to go to George Rigley?
23  Q.  Yes.
24  A.  Yes.
25  Q.  Okay.  And can you explain to me what V3

Page 127

1  status means?
2  A.  Huh-uh.  I'm sorry.  V3?  No, I don't have
3  the list of codes with me.  I'm sorry.
4  Q.  That's okay.
5  A.  No, it's not.  I apologize.  I feel badly.
6  Q.  Yeah, we can -- we can perhaps leave a
7  space in the transcript, and if you want to provide
8  that information --
9  A.  Okay.  Cool.
10  Q.  -- on the back end; is that okay?
11  A.  Uh-huh.
12     MR. BRYANT:  Yeah.
13     MS. PAIKOWSKY:  Wonderful.  Okay.
14  INFORMATION REQUESTED:_____
15  _____
16     MS. CUBRIEL:  Can we go off -- go off the
17  record real quick?
18     THE VIDEOGRAPHER:  The time is 12:57 p.m.
19  and we are off the record.
20     (Off-the-record discussion.)
21     THE VIDEOGRAPHER:  The time is 12:59 p.m.
22  and we are on the record.
23  Q.  BY MS. PAIKOWSKY:  Okay.  Has your office
24  ever referred a voter whose ABBM or carrier envelope
25  did not match -- actually, withdrawn.

Page 128

1  Since the March primary, has your office
2  ever referred a voter whose ABBM or carrier envelope
3  did not match their TEAM record, or their ID did not
4  match, to the office of the secretary of state as a
5  potential case for voter fraud?
6  A.  No.
7  Q.  Has your office ever made a similar
8  referral to the AG's office?
9  A.  For this year?
10  Q.  Correct.  For the reason --
11  A.  Right.  Yeah.
12  Q.  Have you ever referred -- withdrawn.
13  Has your office ever referred a voter
14  because their ID number on their ABBM or carrier
15  envelope did not match their TEAM record to the AG's
16  office as a potential case of voter fraud?
17  A.  No.
18  Q.  Has your office ever referred a voter
19  who -- whose ID number on their ABBM or carrier
20  envelope did not match their TEAM record to the
21  county DA's office as a potential case of voter
22  fraud?
23  A.  No.
24  Q.  Why not?
25  A.  Because you -- usually when we see that,

Page 129

1  when -- when we see that, it's -- it's usually a
2  human error where either the voter, as they were
3  putting it down, transposed two numbers.  Or as we
4  say, as the processor entering it, fat-fingered it
5  and -- and put in a different number.
6  So, I mean, they get a second look if they
7  don't, and that's where we catch the -- the human
8  error.
9  Q.  Did your office make any referrals for any
10  other instances of potential voter fraud to any of
11  the groups mentioned:  the secretary of state, the
12  attorney general or county DA or any other law
13  enforcement during the November 2022 general
14  election?
15  A.  No.
16  Q.  Sound of silence, crossing out questions.
17  So, hopefully that's a good thing.
18  So based on your experiences in the
19  November 2022 general election, do you have concerns
20  about implementing SB-1's identification provisions
21  during a presidential cycle?
22  A.  Yes.
23  Q.  Why is that?
24  A.  Because we will be dealing with a new group
25  of potential voters who are not familiar with the



Jacquelyn Callanen                                         February 28, 2023
                                                           Pages 142 to 145

Page 142

1    Q.  BY MS. PAIKOWSKY:  Why do you think your
2  county's rejection rate was lower than the statewide
3  rate?
4    A.  Because I'm proud of our insert and the
5  work we did.
6    Q.  Do you think that other counties have the
7  same level of resources and expertise as Bexar County
8  to implement the kinds of interventions you
9  discussed?
10      MS. CUBRIEL:  Objection; form.
11      THE WITNESS:  I had made reference to that
12  before that, you know, prior to 2020, I would have
13  answered, yes.  But since we've had such a turnover
14  in election leadership, I -- I think it's really hard
15  for a new person to get all the nuances and
16  understand how you have to touch your voters.
17    Q.  BY MS. PAIKOWSKY:  Do economic resources
18  factor into county's ability to implement the kinds
19  of solutions you did in Bexar County in November of
20  2022?
21    A.  I would say absolutely.
22    Q.  So, earlier, you mentioned that the
23  November 2022 general election ran more smoothly than
24  the November 2020 election.  Can you describe more
25  about why that was.

Page 143

1    A.  Again, just sheer numbers.  It -- it -- it
2  basically was just a numbers thing.  Because as we
3  talked about mainly, you know, the mail ballots, when
4  you're dealing with 124,000 going out and 92,000
5  coming back, our office, because we do, we handle
6  everything in house, every single piece of it is
7  handled in house, in 2020 my office, we were -- we
8  were working two shifts.  We didn't have to do that
9  in 2022.
10      In 2020, we were, I think, since you had
11  asked, we did, like, 1,200 voters that we had --
12  workers that we had to put out there.  Well, in
13  2022 -- or 2020, because we expected more voters, we
14  had more workers.  And so we were, like, at 1,800.
15      And so, that's what I'm speaking to, the
16  more complexities, it's -- takes longer to get 1,800
17  people than it does to get 1,200.  It takes longer to
18  do 124 applications than it does to do 40.
19    Q.  And in the differences between the
20  November '22 general election and the November '20
21  general election, would you say that COVID-19 also
22  impacted the smoothness of one election as compared
23  to the other?
24    A.  No, because we had that figured out prior
25  to that November.

Page 144

1    Q.  Do you believe that the November 2022
2  general election was smoother than the 2018 general
3  election?
4    A.  No.  They were the same.
5    Q.  Okay.  As compared to the 2018 general
6  election, was mail voting more difficult in the 2022
7  general election?  And I'm referring to both
8  processing mail ballots and voter education.
9    A.  Yes.
10    Q.  Why is that?
11    A.  With the ID requirement.  The new -- you
12  know, the new -- relatively new ID requirement that
13  we didn't have in prior elections.
14    Q.  Was there any information that would have
15  been useful to administering mail voting in the
16  general election that was not captured in the TEAM
17  database?
18    A.  No.  My initial reaction would be, no.  But
19  in hindsight, during this back and forth -- I mean,
20  if -- if you were looking for multiples, you know,
21  maybe we would open up that for multiples.  But as an
22  administrator doing the election at the time, no.
23    Q.  Does your county keep any data on ABBM
24  rejections that is not reflected in TEAM?
25    A.  No.

Page 145

1    Q.  Does your county keep any data on carrier
2  envelope rejections that is not reflected in TEAM?
3    A.  No.
4    Q.  I think that is all my questions.
5      MS. PAIKOWSKY:  I would like to go off the
6  record if that's okay for just maybe five minutes and
7  we can chat and then come back on.
8      THE VIDEOGRAPHER:  The time is 1:27 p.m.
9  and we are off the record.
10      (A brief recess was taken.)
11      THE VIDEOGRAPHER:  The time is 1:33 p.m.
12  and we are on the record.
13      MS. PAIKOWSKY:  And I am going to pass the
14  witness at this time.
15      MR. GENECIN:  Thank you.
16
17          EXAMINATION
18  BY MR. GENECIN:
19    Q.  Good afternoon, Miss Callanen.
20    A.  Good afternoon, sir.
21    Q.  My name is Victor Genecin.
22    A.  Victor.  I said, "Dennis."  I'm sorry.
23    Q.  And I've got a few questions for you.  Just
24  a little while ago, when you were answering
25  Ms. Paikowsky's questions, you cited the number



EXHIBIT 88

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5            Plaintiffs            )(
                                    )(
 6   VS.                            )(     CASE NO.
                                    )(     5:21-cv-844-XR
 7                                  )(     (LEAD CASE)
     GREGORY W. ABBOTT, et al.      )(
 8            Defendants            )(

 9   ─────────────────────────────────────────────────────

     OCA-GREATER HOUSTON, et al.    )(
10            Plaintiffs            )(
                                    )(  CASE NO.
11   VS.                            )(  1:21-cv-780-XR
                                    )(
12   JANE NELSON, et al.            )(
              Defendants            )(
13   ─────────────────────────────────────────────────────

14   HOUSTON AREA URBAN LEAGUE,     )(
     et al.                         )(
15            Plaintiffs            )(
                                    )(  CASE NO.
16   VS.                            )(  5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
              Defendants            )(
18   ─────────────────────────────────────────────────────

19   LULAC TEXAS, et al.            )(
              Plaintiffs            )(
20                                  )(
                                    )(  CASE NO.
21   VS.                            )(  1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
              Defendants            )(
23   ─────────────────────────────────────────────────────

24

25
```



Hilda Salinas

April 20, 2023
Pages 2 to 5

## Page 2

```
 1  _____
 2  MIFAMILIA VOTA, et al.      )(
          Plaintiffs          )(
 3                            )(   CASE NO.
    VS.                       )(   5:21-cv-0920-XR
 4                            )(
    GREG ABBOTT, et al.        )(
 5        Defendants          )(
 6  _____
    UNITED STATES OF AMERICA   )(
 7        Plaintiff           )(
                             )(   CASE NO.
 8  VS.                       )(   5:21-cv-1085-XR
                             )(
 9  THE STATE OF TEXAS, et al. )(
          Defendants          )(
10  _____
11
            ORAL AND VIDEOTAPED DEPOSITION OF
12                HILDA ANN SALINAS
                   APRIL 20, 2023
13  _____
14
15
16
17        ORAL AND VIDEOTAPED DEPOSITION OF HILDA ANN
18  SALINAS, OFFICE OF THE HIDALGO COUNTY ELECTION
19  ADMINISTRATOR, produced as a witness at the instance of
20  the State Defendants, taken in the above-styled and
21  numbered cause on APRIL 20, 2023, between the hours of
22  9:32 a.m. to 12:08 p.m. at the Office of Texas Attorney
23  General, Child Support Division, Pharr Regional Office,
24  3508 North Jackson Road, Suite 100, Pharr, Texas, and
25  1:32 p.m. to 4:55 p.m. at Bryant & Stingley, Inc., 1305
```

## Page 3

```
 1  East Nolana, Suite D, McAllen, Texas, reported
 2  stenographically by DONNA McCOWN, Certified Court
 3  Reporter No. 6625, in and for the State of Texas,
 4  pursuant to the Federal Rules of Civil Procedure and
 5  any provisions stated on the record or attached
 6  therein.
 7            APPEARANCES
        COUNSEL FOR STATE DEFENDANTS:
 8
        AMY S. HILTON
 9      OFFICE OF THE TEXAS ATTORNEY GENERAL
        P.O. Box 12548
10      Austin, Texas, 78711-2548
11      COUNSEL FOR HIDALGO COUNTY ELECTIONS ADMINISTRATOR:
12      JOSEPHINE RAMIREZ SOLIS
        LEIGH ANN TOGNETTI
13      HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
        100 East Cano Street
14      Edinburg, Texas  78539
15      COUNSEL FOR TRAVIS COUNTY DEFENDANTS:
16      TONY NELSON, via Zoom
        TRAVIS COUNTY ATTORNEY'S OFFICE
17      P.O. Box 1748
        Austin, Texas  78767
18
        COUNSEL FOR BEXAR COUNTY ELECTIONS ADMINISTRATOR:
19
        LISA CUBRIEL, via Zoom
20      BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
        101 West Nueva, 7th Floor
21      San Antonio, Texas  78205
22      COUNSEL FOR EL PASO COUNTY ELECTIONS ADMINISTRATOR:
23      GERMAINE HABELL, via Zoom
        COOLEY LLP
24      Wells Fargo Center, South Tower
        355 South Grand Avenue, Suite 900
25      Los Angeles, California  90071-1560
```

## Page 4

```
 1  COUNSEL FOR INTERVENOR DEFENDANTS:
 2      STEPHEN KENNY, via Zoom
        JONES DAY
 3      51 Louisiana Avenue, NW
        Washington, DC  20001
 4
    COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE,
 5  et al.:
 6      VICTOR GENECIN, via Zoom
        NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
 7      40 Rector Street, 5th Floor
        New York, New York 10006
 8
    COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
 9
        MICHAEL STEWART, via Zoom
10      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue NW, 4CON 8th Floor
11      Washington, DC  20530
12  COUNSEL FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
    et al.:
13
        NINA PERALES
14      JULIA LONGORIA, via Zoom
        MALDEF
15      110 Broadway, Suite 300
        San Antonio, Texas  78205
16
    ALSO PRESENT:
17      Mark Longoria, Videographer
        Abigail Young, via Zoom
18
19
20
21
22
23
24
25
```

## Page 5

```
 1               INDEX
 2                                     PAGE
    Appearances ...........................   2
 3
    HILDA ANN SALINAS
 4  Examination by Ms. Hilton ...............   6
    Examination by Ms. Perales ..............  65
 5  Examination by Mr. Stewart .............. 137
    Examination by Mr. Genecin .............. 162
 6  Examination by Ms. Hilton ............... 191
    Examination by Mr. Stewart .............. 198
 7
    Errata Sheet/Signature Page ............. 201
 8
    Reporter's Certificate .................. 203
 9
    Attached to the end of the transcript:  Stipulations
10
11            EXHIBITS
    NUMBER  DESCRIPTION                      PAGE
12
13    1    Notice of Deposition ...........   10
14    2    Responses and Objections to State
           Defendants' Requests for Admission and
15         Interrogatories ................   56
16    3    Responses and Objections to LULAC's
           Interrogatories ................   94
17    4    Hidalgo County Absentee Rejection Letter
           List ........................... 102
18
19    5    Elections Operations Department Election
           Workers Training ............... 116
20    6    Affidavit, Patricia Correa ..... 134
21    7    Hidalgo County Ballot by Mail List ... 142
22           REQUESTED DOCUMENTS/INFORMATION
    NUMBER  DESCRIPTION                      PAGE
23
24    1    What JAR stands for ............ 190
      2    Other files used to prepare the machines
25         for election .................. 190
```



Hilda Salinas

April 20, 2023
Pages 6 to 9

Page 6

1       THE VIDEOGRAPHER:  Today's date is
2    Thursday, April 20, 2023.  The time is 9:32 a.m.
3    Deposition of Hilda Ann Salinas.  We're on the record.
4            HILDA ANN SALINAS,
5    having been duly sworn, testified as follows:
6            EXAMINATION
7    BY MS. HILTON:
8       Q.  Good morning, Ms. Salinas.
9       A.  Good morning.
10      Q.  My name is Amy Hilton.  I'm an assistant
11   attorney general with the Office of the Attorney
12   General, representing the State defendants in this
13   case.  Nice to meet you.
14      A.  Nice to meet you too.
15      Q.  Could you please spell your name for the
16   record.
17      A.  H-I-L-D-A, Ann, A-N-N, Salinas, S-A-L-I-N-A-S.
18      Q.  Thank you.  I'm just going to start with some
19   introductory things.  You may already be familiar with
20   them.  So I'll -- I'm sorry to burden you with this.
21   So we'll just do some brief introductory things.
22           Have you been deposed before?
23      A.  No.
24      Q.  Okay.  You understand you're under oath today,
25   correct?

Page 7

1       A.  Yes.
2       Q.  For the court reporter, you'll need to provide
3    verbal answers, like "yes" and "no," rather than
4    nodding or shaking your head, because she is taking
5    down every word that we're speaking.
6       A.  Okay.
7       Q.  Does that sound good?
8       A.  Yes, uh-huh.
9       Q.  It also helps the court reporter if we don't
10   talk over each other.  I'm really bad at this because a
11   deposition is kind of like a conversation.  So I'm
12   going to try my best to not cut you off, if you
13   wouldn't mind also doing the same --
14      A.  I'll try my best too.
15      Q.  Thank you.  Thank you.  It happens to all of
16   us.
17      A.  Yes.
18      Q.  If you don't understand any of my questions,
19   will you please let me know?
20      A.  I will.
21      Q.  And if you do answer a question, I'm going to
22   assume you understood it.  Is that okay?
23      A.  Okay.
24      Q.  If you need a break at any time, please just
25   let me know.  That will be fine.  We'll take breaks

Page 8

1    periodically through the day anyway, but if there's any
2    particular time you want to take a break, we can always
3    take a break.
4            I just ask that if there's a question
5    pending, please go ahead and answer the question, and
6    then we'll take a break.  Okay?
7       A.  Okay.
8       Q.  If you hear an objection from your counsel,
9    that is typically for the Court to decide at a later
10   date.  So unless you're instructed otherwise by your
11   attorney, you can go ahead and answer the question.
12   Does that make sense?
13      A.  Yes.
14      Q.  Okay.
15      A.  So I'll answer.
16      Q.  Okay.
17      A.  Yes, right.  Yes.
18      Q.  All right.  You'll have -- you'll know.  When
19   we get there, if your attorney instructs you not to
20   answer, it will be very clear.
21      A.  Okay.  Thank you.
22      Q.  Okay.  Are you -- have you consumed anything
23   today, on any medications today that might impair your
24   ability to testify truthfully at your deposition?
25      A.  No.

Page 9

1       Q.  All right.  With the introductory stuff kind of
2    done there, let's move to preparation.  What did you do
3    to prepare for your deposition today?
4       A.  Reviewed advisories, e-mails, just general
5    information in regards to what was going to be
6    discussed today.
7       Q.  Okay.  And did you bring any of those documents
8    with you?
9       A.  No, ma'am.
10      Q.  Are you referring to Secretary of State
11   advisories?
12      A.  Yes.
13      Q.  Do you remember which ones you reviewed?
14      A.  I wouldn't be able to say exactly.
15      Q.  Do you recall the date of those advisories,
16   roughly?
17      A.  In the year 2022.
18      Q.  What kinds of e-mails did you review prior to
19   the deposition?
20      A.  The e-mails that the Secretary of State did
21   send us.
22      Q.  And do you recall the dates of those e-mails?
23      A.  Also 2022.
24      Q.  Did you meet with anyone in preparation for
25   today's deposition?



Hilda Salinas

April 20, 2023
Pages 66 to 69

Page 66

1  Q. If I say "the County," will you understand that
2  to mean Hidalgo County?
3  A. Yes.
4  Q. Okay. I know you answered a few questions
5  about your background, but I wanted to ask some
6  in-between questions as well.
7      Can you tell me where you grew up?
8  A. Here in the Valley.
9  Q. Okay.
10 A. In Pharr, Texas.
11 Q. Pharr?
12 A. Pharr, Texas.
13 Q. Right where we are today?
14 A. Uh-huh.
15 Q. Okay. Can you tell me about the education that
16 you have completed in your life?
17 A. My high school, bachelor's degree in
18 communications, journalism, and my master's degree in
19 public administration.
20 Q. Where did you complete your bachelor's?
21 A. In -- it was UTPA.
22 Q. Okay. And how about your master's?
23 A. UTRGV.
24 Q. Okay. Same institution --
25 A. Yes --

Page 67

1  Q. -- but --
2  A. -- different name.
3  Q. -- just went by a different name.
4  A. Public affairs. Public affairs.
5  Q. Okay. And you mentioned that you previously
6  served in the elections administration office as the
7  interim elections administrator and also as an
8  elections analyst, correct?
9  A. Yes.
10 Q. Can you tell me when you first joined the
11 elections administration office?
12 A. In 2016.
13 Q. In 2016. And did you work for the elections
14 administration office from 2016 to the present?
15 A. Yes.
16 Q. Have you held any other positions in the
17 elections administration office other than the ones
18 you've already named?
19 A. No.
20 Q. Okay. So then I can assume that when you
21 started there, you started as an elections analyst?
22 A. Yes.
23 Q. Okay. Thank you.
24    I'm going to start by asking some
25 questions about vote by mail, which is sometimes the

Page 68

1  trickiest part. So some of my questions are based on
2  what we've learned talking with other counties.
3      So if I phrase something differently or in
4  a way that you don't understand, please ask me to
5  rephrase it. Okay?
6  A. Okay.
7  Q. All right. With respect to vote by mail, did
8  your county include any inserts in either the ABBM
9  envelope that was going to the voter or the mail voting
10 packet that went to the voter?
11 A. I just want to let you -- I just wanted to
12 pause because it went down. It says "connecting."
13     THE COURT REPORTER: Okay. Timeout then.
14 Off the record.
15     (Dropped off Zoom)
16     (Brief recess)
17 A. Can you repeat the question, just to make sure
18 that -- it was the application for ballot by mail and
19 the mail carrier envelope.
20 Q. And the mail packet, the mail voting --
21 A. The kit.
22 Q. -- packet. Yeah, the kit.
23 A. Yes. In the application for ballot by mail,
24 when we do mail that out, that's only the application
25 for ballot by mail in the envelope.

Page 69

1      But in the mail carrier kit, what, of
2  course, is included is the white envelope where, you
3  know, the ballot, you know, goes in, also the purple
4  one, you know, once we put everything in there, and
5  then it's the green envelope, which is, you know, how
6  it's -- how it's mailed out.
7      We did add a little flyer, I'm going to
8  say 3-by-5, a flyer that did state on the top, "Please
9  don't forget your information," and it included the --
10 an exact replica of what the mail carrier envelope
11 looks like, to make sure to put your -- your -- either
12 your driver's license or your Social Security number or
13 to check the box that states if you don't have either
14 one of those.
15     Also, it does encourage them to list both
16 the driver's license and the Social Security number.
17 And that was the addition that we included on top of
18 all the other documents that's included.
19 Q. Thank you.
20 A. Uh-huh.
21 Q. Do you know if that was -- that particular
22 insert was produced in discovery?
23 A. I'm not sure. I don't know. Yes, yes, yes, I
24 do remember seeing information like that going in,
25 uh-huh.



MAGNA ▶
LEGAL SERVICES

Hilda Salinas

April 20, 2023
Pages 70 to 73

Page 70

1    Q.  Okay.  And so with respect to your past answer,
2  then, would it be correct to say that you did not send
3  voters any inserts or other material with their
4  application for ballot by mail informing them about the
5  ID requirements of SB 1?
6    A.  No, we did not.  There wasn't anything included
7  in that one.
8    Q.  All right.  And then with respect to the mail
9  voting kit, you did include a 3-by-5 card with
10  information?
11    A.  Something like that, uh-huh.
12    Q.  Something around that size with information
13  about the SB 1 ID requirements; is that right?
14    A.  Yes, uh-huh.
15    Q.  Okay.  I'm going to ask you to walk me through
16  the process of when your office receives an ABBM, and
17  then I'm going to ask about the process of when your
18  office receives the carrier envelope.
19         So first, with respect to the ABBM, when
20  your office receives an application for ballot by mail,
21  would it be fair to say that your office will review it
22  to see if there is an ID number provided on it?
23    A.  Yes.
24    Q.  And if there's a number there that you will put
25  that number into your system to see if it matches with

Page 71

1  the voter's record?
2    A.  Right.  We look up the information on the
3  voter, of course, of -- the application for ballot by
4  mail, it's entered into our -- into our voting system,
5  our database.  And then we check to see if -- with the
6  voter registration application, if all that information
7  is matching and if it's included.
8    Q.  So it is possible sometimes, though, that the
9  voter would put the last four of their Social on the
10  ABBM, and you don't have the last four of the Social in
11  the voter's record in your database, correct?
12    A.  Correct.
13    Q.  And, similarly, with the driver's license, it
14  could be that the voter puts the driver's license
15  number on the ABBM, and you don't have a driver's
16  license number to match to in your database, correct?
17    A.  Right.  It could be vice versa or switched,
18  uh-huh.
19    Q.  And in that situation, if that happens, what do
20  you do with the ABBM at that point?
21    A.  At that point?  Of course, it's entered, and --
22  it's entered into the system that it has been rejected
23  due to a mismatch or not having the correct
24  information.  And the system then generates the notice.
25         And then at that point, once it's

Page 72

1  generated, my staff does try to communicate with the
2  voter to let them know what happened.  And then, of
3  course, we review the options that they can either go
4  in through ballot tracker or they can come into the
5  office, or we can send it to them.  They could add the
6  number .  They could mail it back, depending.  It's on a
7  case-by-case basis.
8    Q.  If you -- if the voter says "Send it to me
9  again," do you send them a fresh new ABBM, or do you
10  send them their old ABBM back?
11    A.  It's the one that they've already submitted.
12    Q.  Okay.  So you send them the one that they've
13  already submitted.  And do you use any markings on
14  that?  Do you use a highlighter to highlight the area
15  where the person is supposed to provide the number?
16    A.  I'm not sure of that detail, but I do know that
17  the staff does communicate with the voter and does
18  explain everything thoroughly.
19    Q.  Okay.  So let's say, then, that the voter
20  provides the additional information and sends it back
21  to you.  You then attempt to match that information to
22  what you have in your database; is that right?
23    A.  Correct.
24    Q.  And if you do match it, let's say, for example,
25  the voter had previously provided the last four of the

Page 73

1  Social, but this time they also provide their driver's
2  license and you're able to match that driver's license
3  number, what do you do with the ABBM at that point?
4    A.  Well, we match it, and, of course, we make sure
5  that everything correct -- is correct and matched.  But
6  that's it.  Nothing -- nothing else is added to the
7  voter registration system because it's not a voter
8  registration application.
9    Q.  Okay.  And you anticipated my next question.
10  So if you are able to match the ID number, you would go
11  ahead and send the voter the mail voting kit, correct?
12    A.  Yes.  It would proceed as -- as usual.
13    Q.  However, you would not go into the voter
14  registration system that you have and update the
15  voter's record; is that correct?
16    A.  We -- we wouldn't, no.
17    Q.  So, theoretically, the problem that the voter
18  had in this situation that we're discussing could
19  repeat itself in a future election where, for example,
20  the voter would only provide the last four of the
21  Social, you wouldn't be able to match it to your
22  records, and then you would send the ABBM back to the
23  voter again; is that right?
24    A.  It can --
25         MS. RAMIREZ SOLIS:  Objection, form.



Hilda Salinas                                                    April 20, 2023
                                                           Pages 146 to 149

Page 146

1 insight into that?
2    A. I don't.
3    Q. Okay. All right. We can put this document
4 aside.
5       I think you testified earlier that your
6 county advised voters to put both the -- their Texas ID
7 number, whether it was a driver's license or ID card,
8 and the last four of their Social Security number on
9 mail ballot materials; is that right?
10   A. Correct. It was a flyer. It was a 3-by-5
11 flyer that had all that information explaining.
12   Q. You anticipated. Did that go on the insert
13 that you put with the carrier envelope?
14   A. Yes, it did. It went in the mail carrier
15 envelope kit.
16   Q. Why did you start advising voters to do that?
17   A. It's something that -- of course, this was
18 decided upon when I was the assistant director, and the
19 directive came from the previous elections
20 administrator.
21       As when we were talking and discussing, of
22 course we went through the -- through the point to
23 where we were implementing the new laws and trying to
24 come up with new procedures, correct. So that is
25 something that we decided to do.

Page 147

1       It's something that we were already doing
2 in a sense when it came to registering voters when we
3 participated in voter registration drives. "Oh, we'll
4 just go ahead and put both," not knowing what would,
5 you know, happen in the future. So it was something
6 that we just thought it would be better for the voter,
7 just go ahead and include both.
8       We -- I even appeared in commissioners
9 court stating that; on the media when I was conducting
10 interviews, encouraging the voters to list both the
11 driver's license and the Social Security number. It's
12 just better to be safe for it to be a practice, and we
13 would not, you know, incur any rejects or any problems
14 with the mail carrier ballot.
15   Q. Did your office receive any feedback or
16 communications from voters that they were not placing
17 both because of the language on the ABBM form where it
18 requested the numbers?
19   A. In speaking to one of the managers and the
20 employees that does work on that, which is the
21 operations department, they did state that the wording
22 is small, the -- the print, the font is really small.
23 So that they did hear some complaints stating that,
24 "Oh, it's because I didn't see it." "Oh, I didn't
25 know," you know, type responses.

Page 148

1    Q. And I think the form itself directs voters to
2 place the last four of their SSN if they do not have a
3 Texas driver's license or ID number; is that right?
4    A. I think it does state that, yes.
5    Q. Yeah. And so were you attempting to, say,
6 overcome that language in directing voters to put both?
7    A. Overcome as in how?
8    Q. Were you attempting to direct the voters who
9 did have a Texas driver's license or ID number to put
10 their SSN for -- regardless of, you know, the language
11 that said only to put the SSN for if you did not have a
12 driver's license or ID number?
13   A. It's not that we were trying to make a press --
14 like a statement to where we were not overcoming that
15 language. It was in an effort to assist the voter and
16 to assist them and make sure that the process was
17 smooth for them.
18       As it is, some of these voters are
19 65 years and older or do have a disability. So if they
20 were to come into a situation where they had to correct
21 their mail carrier envelope, we were trying to deter
22 that. We were trying to assist them.
23   Q. So you felt like clarifying the language helped
24 the voter?
25   A. In some situations, yes.

Page 149

1    Q. I know you spoke briefly earlier about some of
2 your education efforts around the November 2022 -- I
3 should say voter education efforts around the general
4 election, which I think you said included social media
5 and media interviews. Anything else?
6    A. Like I stated, appearing at -- placing an item
7 on our commissioners court meetings, going over the
8 information there; as well as the media, press
9 releases. Anybody had any questions, we were made
10 available. Everybody was cross-trained to answer
11 questions.
12   Q. Did you discuss your voter education efforts
13 with the Secretary of State's office at all?
14   A. As far as I know, no, we did not.
15   Q. And did they discuss their voter education
16 efforts with -- with you at all?
17   A. What they went -- what -- the information that
18 they did give us was just the information that, you
19 know, had changed, how to implement guidance. That's
20 the information that they gave us.
21   Q. How much of your overall voter education effort
22 was dedicated toward the ID number requirement for mail
23 ballot materials?
24   A. For the November election, it was a refresher.
25   Q. Do you think you'll continue to do that in the



Hilda Salinas

April 20, 2023
Pages 150 to 153

Page 150

1 future?
2    A.  Yes.  We -- we do include it.  We still mention
3 it, "Just remember, you do need to, you know, put your
4 driver's license and your Social Security number on the
5 mail carrier ballot," or "When you're submitting an
6 application for ballot by mail, just make sure you
7 input this information," so it's stated like that.
8    Q.  And I think -- switching topics, then.  I think
9 you said earlier, also, that you used all available
10 means to contact voters when they needed to cure mail
11 ballot materials; is that right?
12    A.  Correct.
13    Q.  Did you, as a matter of course, mail back
14 materials, or did you wait for the voter to request
15 them to be sent back?
16    A.  I would -- it would be through the early voting
17 ballot board.  I do know that they were communicating
18 with them.  And then again, it was based within how
19 much time -- how many days were left over prior to the
20 deadlines.
21        So if there was enough time and they did
22 request for us to mail it to them or the early voting
23 ballot board to mail the information to them, then they
24 would, or if it was us, then we would.  It just
25 depended on the situation.

Page 151

1    Q.  For the period of when -- before the early
2 voting ballot board convened, when you said your office
3 was looking under the flap to make sure that the ID
4 number was there, would you send back ballots that were
5 missing an ID number at that point, or would you call
6 the voter and see what they wanted?
7    A.  We would call the voter and see how they would
8 want to proceed.
9    Q.  Was there a date after which you stopped
10 sending ballots back to voters because there wouldn't
11 have been enough time to mail them back by the
12 deadline?
13    A.  I do, more or less, have an estimation.  It
14 was, roughly, like, maybe 10, 11 days.
15    Q.  Okay.  Are you aware of any voters who received
16 notice of rejection too late to cure before the
17 deadline?
18    A.  I'm not aware.
19    Q.  Okay.  If a voter was sent notice that their
20 mail ballot materials were going to be rejected because
21 they didn't comply with the ID number requirement and
22 then you didn't hear from them again, would you send
23 them a final notice of rejection after the time period
24 to cure had passed?
25    A.  Yes.  The final notice was sent to them.

Page 152

1    Q.  Is that sent by mail?
2    A.  Yes.
3    Q.  When your office receives mail ballot
4 materials, do you use the ID number information,
5 whether it be a driver's license or Texas ID or a last
6 four Social Security number, for any purpose other than
7 determining whether you could accept that ABBM or
8 ballot?
9    A.  We did not.
10    Q.  Did you have to hire any employees specifically
11 to administer mail balloting during the 2022 general
12 election cycle?
13    A.  We did hire temps to assist us with the
14 election, but it was mainly to assist with
15 organizational, you know, duties, you know, keeping
16 everything organized and in order.  Mainly the
17 permanent staff would work on those types of duties.
18    Q.  Got it.  To the extent you know, was the number
19 of temps you had to hire for the 2022 general higher
20 than the 2018 midterm?
21    A.  Again, I -- in the 2018, I was an election
22 analyst.  I wouldn't be able to say -- compare it to
23 the 2018.  I don't know, but I can speak for this
24 election, and we did hire temps.  We did hire -- in
25 total, we do have 10 -- 10, 12 temps.

Page 153

1    Q.  Do you have any sense of how that compares to
2 prior elections?
3    A.  In some cases, we do need more assistance,
4 depending on the scale of the election.  If it's a
5 pretty big election, let's say a presidential, then
6 yes, we do hire more as we do have more mail -- mail-in
7 ballots, more applications for ballot by mail, more
8 voter registrations.  So it depends on -- on the
9 election.
10    Q.  Were there any resources that you would say
11 your office had to dedicate to mail balloting because
12 of the new ID number requirements under SB 1 that it
13 didn't have to before those requirements were in place?
14    A.  In regards to setting up early voting ballot
15 board, we did need to make sure that we had a computer.
16 They needed an e-mail account.  They -- of course,
17 phones to be able to call the voters to let them know
18 about their -- to come in to cure, you know, their
19 ballot, things like that.  It was more technological in
20 that sense.
21    Q.  Makes sense.  Do you have a sense of how much
22 it cost your office to administer specifically the ID
23 number requirements in terms of dollars?
24    A.  I don't have, more or less, an estimation, but
25 I do know that it did incur more paper.  It did -- we



Hilda Salinas

April 20, 2023
Pages 154 to 157

Page 154

1  did need to train more. We did need to change our
2  training modules. We did need to, again, you know, add
3  more of the technological aspect in regards to setting
4  up our early voting ballot board to make sure that they
5  had the resources that they needed.
6       Also, the ballot by mail carrier and the
7  kits, all that information did change. All of that
8  needed to be updated, the applications for ballot by
9  mail as well. Updating our website, making sure that
10 everything was current and up-to-date. It trickled
11 down to each and every, you know, point and aspect of
12 the election.
13     Q. Do you think those expenses will be recurring
14 in future elections or many of them one time?
15     A. I think it is going to be reoccurring, again,
16 depending on the scale of the election. Of course,
17 like, for example, the mail carrier envelopes, how all
18 of that changed. We were experiencing -- the fact that
19 we had to purchase our mail kits in sections because of
20 the paper shortage.
21      So we were experiencing situations like
22 that, but now we all have -- you know, we have the
23 entire kit together. So we've already made those
24 purchases, so it would just be to keep it consistent
25 and keep it going.

Page 155

1      Q. Makes sense. Did you receive any feedback from
2  voters about the online ballot by mail tracker?
3      A. I did hear some complaints to where it wasn't
4  user friendly.
5      Q. Uh-huh.
6      A. Again, I've only seen it as in a screenshot
7  type, as -- as I don't have access to it, but that you
8  can -- you can imagine an elderly person who's 65 or
9  75, 85, you know, plus having to input their
10 information in there.
11      The complaint that we did receive was that
12 you would think that you would put, I guess, you know,
13 18 -- you know, 1825 South McColl, let's just state,
14 right, all in one line, and it was segmented to where
15 you would need to put the number, the South in one
16 other little box, and then the street name in another
17 little box. Everything was -- was separated, so it
18 was -- it was hard. It was a little difficult for
19 them.
20      Q. Got it.
21      A. Those are the kind of complaints that I
22 received in regards to the mail tracker.
23      Q. Any other specific issues besides the address
24 entry that you heard?
25      A. They weren't really familiar where or what to

Page 156

1  put. For example, they would want to put the full name
2  avenue, but if they put in avenue, it didn't really
3  match their voter registration application. It needed
4  to say A-V-E type, so little things like that is what
5  the types of complaints that -- that I received.
6      Q. Got it. Did your office have any experience
7  with military or overseas voters, essentially FPCA
8  voters --
9      A. Yes, we did.
10     Q. -- who needed to -- who needed to cure the ID
11 numbers on their ballot?
12     A. The process for that was that if they did need
13 to cure that they were able to log in through the mail
14 ballot tracker.
15     Q. That's right. I think you testified to that
16 earlier, that they were directed to the mail ballot
17 tracker.
18     A. Yes.
19     Q. Were there any overseas or military voters who
20 cured by any other means?
21     A. As far as I know of, no, I wasn't --
22     Q. Okay.
23     A. -- made aware.
24     Q. So for this question, I don't want to get into
25 details. I just want to get a sense of whether this

Page 157

1  happened or not to protect any privilege that, you
2  know, your county might have.
3      But did you make any referrals to law
4  enforcement for potential fraud in mail balloting in
5  connection with the November 2022 general election?
6      A. No, we did not.
7      Q. Do you -- is anyone in your office trained to
8  use the ID numbers on mail ballots as a potential
9  indicator of fraud?
10     A. I don't understand.
11     Q. Sure. I guess let me phrase it this way. Does
12 your office consider a mismatched or omitted ID number
13 on either an ABBM or a carrier envelope to be
14 potentially indicative of mail ballot fraud?
15     A. No. Our office did not think of it in that way
16 or form.
17     Q. Okay. Were there any instances where a
18 mismatch or omission on the ID number revealed that the
19 voter whose name was on the mail ballot materials was
20 not, in fact, the individual who sent the mail ballot
21 material to your office?
22     A. I was not made aware of any such situation.
23     Q. Okay. Did you receive any feedback or
24 communications from voters indicating that voting by
25 mail was too difficult once these ID number



# EXHIBIT 89

Transcript of the Testimony of

**Michael Scarpello**

**Date:**

May 04, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO )
      et al.,                    )
 4         Plaintiffs,           )
                                 ) Civil Action No. SA-21-cv-
 5    v.                         )        00844-XR
                                 ) (Consolidated Cases)
 6    STATE OF TEXAS, et al.,    )
           Defendants.           )
 7

 8

 9         ---------------------------------------

10         ORAL AND VIDEOTAPED DEPOSITION OF
                   MICHAEL SCARPELLO
11                    MAY 4, 2022
                       Volume 1
12
           ---------------------------------------
13

14

15              ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL

16    SCARPELLO produced as a witness at the instance of

17    Plaintiff, and duly sworn, was taken in the above-styled

18    and numbered cause on the 4th day of May, 2022 from 10:21

19    a.m. to 1:11 p.m. before Nancy Newhouse, a Certified

20    Shorthand Reporter in and for the State of Texas,

21    reported by oral shorthand, located at the Dallas County

22    Records Building, 500 Elm Street, Suite 6300, Dallas,

23    Texas 75202, pursuant to the Federal Rules of Civil

24    Procedure, and the provisions stated on the record or

25    attached hereto.
```

Michael Scarpello

May 04, 2022
Pages 2 to 5

---

Page 2

```
1           A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4    Ms. Nina Perales
     MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
5    110 Broadway, Suite 300
     San Antonio, Texas 78205
6    Telephone: (210) 224-5476
     Fax: (210) 224-5382
7    email: nperales@maldef.org
8    Ms. Julia R. Longoria, LUPE
     MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, INC
9    110 Broadway, Suite 300
     San Antonio, Texas 78205
10   Telephone: (210) 224-5476
     Fax: (210) 224-5382
11   email: jlongoria@maldef.org
12   Ms. L. Brady Bender, DOJ
     DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
13   DIVISION
     950 Pennsylvania Avenue, NW
14   Washington, DC 20530
     Telephone: (202) 598-0146
15   email: laura.bender@usdoj.gov
16   Ms. Camryn Pak, DOJ
     DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
17   DIVISION
     950 Pennsylvania Avenue, NW
18   Washington, DC 20530
     Telephone: (202) 598-0146
19   email: camryn.pak@usdoj.gov
20   Mr. Graham W. White, LULAC
     LAW OFFICES OF ELIAS LAW GROUP, LLP
21   10 G Street NE, Suite 600
     Washington, D.C. 20002
22   Telephone: (202) 968-4490
     email: gwhite@elias.law
23
24
25
```

---

Page 4

```
1           A P P E A R A N C E S Continued
2
3     Mr. Anthony J. Nelson, Travis County Rebecca Guerrero
      and José Garza
4    ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
     OFFICE
5    314 West 11th Street, Suite 500
     Austin, Texas 78767
6    Telephone: (512) 854-4801
     email: tony.nelson@traviscountytx.gov
7
     Ms. Leigh Tognetti
8    ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY
     100 East Cano, Courthouse Annex III, 1st Floor
9    Edinburg, Texas 78539
     Telephone: (956) 292 7609
10   Fax: (956) 292-7619
     email: leigh.tognetti@da.co.hidalgo.tx
11
     Ms. Josephine Ramirez Solis
12   ASSISTANT CRIMINAL DISTRICT ATTORNEY
     100 East Cano
13   Edinburg, Texas 78539
     Telephone: (956) 292-7609 ext. 8186
14   Fax: (956) 292-7619
     email: josephine.ramirez@da.co.hidalgo.tx.us
15
16
17
18
     ALSO PRESENT:
19   Mr. Terry Van DerHeyden, Videographer
     Ms. Kelsey Pormasdoro, DOJ
20   Ms. Breanna Williams
     Ms. Laura Durbin, BCDAO
21
22
23
24
25
```

---

Page 3

```
1           A P P E A R A N C E S Continued
2
3    FOR THE DEFENDANT:
4    Mr. William T. Thompson, OAG
     ATTORNEY GENERAL KEN PAXTON OFFICE
5    DEPUTY CHIEF, SPECIAL LITIGATION UNIT
     P.O. Box 12548 (MC-009)
6    Austin, Texas 78711
     Telephone: (512) 463-2100
7    Fax: (512) 457-4410
     email: will.thompson@oag.texas.gov
8
     Mr. Jason G. Schuette, OAG
9    DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
     RECORDS BUILDING
10   500 Elm Street, Suite 6300
     Dallas, Texas 75202
11   Telephone: (214) 653-7358
     Fax: (214) 653-6134
12   email: schuette@dallascounty.org
13   Mr. Ben L. Stool, OAG
     DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
14   RECORDS BUILDING
     500 Elm Street, Suite 6300
15   Dallas, Texas 75202
     Telephone: (214) 653-7358
16   Fax: (214) 653-6134
     email: ben.stool@dallascounty.org
17
     Ms. Barbara Nicholas, OAG
18   DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
     RECORDS BUILDING
19   500 Elm Street, Suite 6300
     Dallas, Texas 75202
20   Telephone: (214) 653-7358
     Fax: (214) 653-6134
21   email: barbara.nicholas@dallascounty.org
22
23
24
25
```

---

Page 5

```
1                     INDEX
2
3    Appearances. . . . . . . . . . . . . . . .       2
4    MICHAEL SCARPELLO
5        Direct Examination by Mr. Thompson . . . . . .   7
6        Cross-Examination by Ms. Perales . . . . . . .  87
7
8    Changes and Signature . . . . . . . . . . . . .   93
9    Reporter's Certificate. . . . . . . . . . . . .   95
10
11               DEFENDANT EXHIBITS
12   NO.   DESCRIPTION                           PAGE
13   1     Printout from the Dallas County Elections
           website (6-pgs)                           9
14
     2     Email from Zachary Bowen to Michael Scarpello
15         regarding Voting Records Bates No. MS007415
           (1-pg)                                    19
16
     3     Email thread between Kate Hall; James Palomo;
17         Toni Pippins-Poole; Robert Heard; Laura
           Granado; Brylon Franklin; Tandy Smith; Tacoma
18         Phillips regarding Tyrrell Powell Voter Fraud
           dated between May 15, 2019 through May 20, 2019
19         Bate Nos. MS007418 through MS007422  (8-pgs)  28
20   4     Article from Dallas Observer Newspaper dated
           April 24, 2017 Bates No. MS007397 through
21         MS007400 (4-pg)                            33
22   5     Unofficial results from Dallas County for the
           March 6, 2018 Republican Primary (28-pgs)   44
23
     6     Unofficial results from Dallas County for the
24         March 6, 2018 Democratic Primary (28-pgs)   45
25
```

---

Michael Scarpello

May 04, 2022
Pages 6 to 9

Page 6

1           DEFENDANT EXHIBITS Continued

2   NO.  DESCRIPTION                                    PAGE

3    7   Unofficial Final Summary Results Report for
         2022 March Primary from Dallas County (44-pgs)   47
4

5    8   Article from the Dallas Morning News regarding
         Dallas County to eliminate 39 voting sits in
         May election to ease problems at the polls        70
6        (9-pgs)

7    9   S.B. No. 1 (76-pgs)                               79

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1           P R O C E E D I N G S

2           (On the record at 10:21 a.m.)

3           VIDEOGRAPHER:  Good morning, we are now

4   on record.  This begins Videotape No. 1 in the

5   deposition of Michael Scarpello in the matter of, The

6   Consolidated Case of La Unión Pueblo Del Entero et al. v

7   Gregory W. Abbott, et al.

8           This deposition is being held at the

9   Dallas County office located at 500 Elm Street  75202.

10  Today's date is May 4, 2022, and the time is 10:21 a.m.

11  All parties have been recorded by the court reporter,

12  and their appearances are noted.

13          Will the reporter please swear in the

14  witness?

15          COURT REPORTER:  Mr. Scarpello, will you

16  please raise your right hand?

17          (The witness complies.)

18          COURT REPORTER:  Do you solemnly swear or

19  affirm that the testimony you give today will be the

20  truth, the whole truth and nothing but the truth so help

21  you God?

22          THE WITNESS:  I do.

23          COURT REPORTER:  Thank you.

24          MICHAEL SCARPELLO,

25  having been first duly sworn, testified as follows:

Page 8

1          DIRECT EXAMINATION

2   BY MR. THOMPSON:

3       Q.  Good morning Mr. Scarpello, my name is Will

4   Thompson.  I'm a lawyer from the Office of the Attorney

5   General --

6       A.  Okay.

7       Q.  -- and I represent the State Defendants in

8   this case.

9           Would you state your name for the record,

10  please?

11      A.  Michael Scarpello.

12      Q.  I understand you've been deposed before,

13  including recently, right?

14      A.  Yes.

15      Q.  So I'm not going to spend a bunch of time

16  going over the ground rules for a deposition, because it

17  sounds like you understand them, but, if at any point

18  you want to take a break, just let me know.

19          And you understand you're under oath

20  today, right?

21      A.  Yes.

22      Q.  You haven't taken any medication or anything

23  that would affect your ability to testify?

24      A.  Ibuprofen this morning.

25      Q.  But it hasn't prevented you from being able to

Page 9

1   testify accurately, has it?

2       A.  No, no.

3       Q.  Okay.  What is your job title?

4       A.  I am the elections administrator for Dallas

5   County.

6       Q.  Now, rather than trying to run through your

7   biographical information in detail, I have Exhibit 1

8   that we can mark.  It is a printout from the Dallas

9   County Elections website.

10          (Defendant's Exhibit No. 1 was marked for

11  identification.)

12      A.  Uh-huh.

13      Q.  (BY MR. THOMPSON)  And I will ask you if you

14  recognize this Exhibit 1?

15      A.  Yes.

16      Q.  Does it appear to be an accurate copy of

17  information contained on the Dallas Elections website?

18      A.  Yes.

19      Q.  Now, if you flip to Page 2, do you see a

20  section entitled "Meet your Elections Administrator"?

21      A.  Yes.

22      Q.  Does this section contain biographical

23  information about you?

24      A.  Yes.

25      Q.  Is all that information accurate?

Michael Scarpello

May 04, 2022
Pages 66 to 69

Page 66

1   put -- they'll mix up which -- which ballot goes in the
2   right carrier envelope, sometimes they'll put two
3   envelopes in a -- or two -- two ballots in a security
4   secrecy envelope.  I mean, there is just a whole variety
5   of variations of -- of -- of mistakes that voters make.
6       Q.   Are the mistakes more common when there are
7   multiple elections happening at the same time?
8       A.   Yes.
9       Q.   I believe you testified earlier that the law,
10  SB 1, took effect on December 2nd, 2021, is that right?
11      A.   Correct.
12      Q.   Is it fair to say that the first election in
13  which you implemented SB 1 was the March primary?
14      A.   Yes.
15      Q.   Is it more difficult to implement a new law
16  like SB 1 the first time you're doing it, compared to
17  later times when you're doing it?
18      A.   Of course.
19      Q.   Would you say that your implementation of the
20  law has improved between the March 1st primary and the
21  May 7th election, for example?
22      A.   I think that anytime that there's a change, it
23  takes time to implement that change.  Unfortunately, for
24  the March primary election, the State did not give
25  elections administrators the proper time to adminis --

Page 67

1   to make those changes.
2            SB 1 was passed, you know, in September,
3   I think it was, and implemented December 2nd.  After the
4   law is passed, there's -- there are election advisories
5   that come from the Secretary of State that explain how
6   to implement those -- those vague rules, as they're seen
7   in the law.
8            Unfortunately, what -- there's
9   clarifications, webinars, election advisories.  There
10  was 46 of those in the last 80 days, that -- that we
11  received from the State, 46 of those prior to
12  implementing the March 1st election, and the last of
13  which was literally the day before the election.  And so
14  whenever you have a situation like that, when the State
15  is so late in their guidance, there's going to be
16  problems implementing.
17      Q.   And I understand this may seem obvious to you,
18  but just in case it's not obvious to the Court, is that
19  an unusually-high number of election advisories?
20      A.   Yes.
21      Q.   Did they come --
22      A.   SB 1 is a very complex law.
23      Q.   And is it fair to say that the advisories came
24  closer to Election Day than they normally would?
25      A.   Yes.

Page 68

1       Q.   Were you left with less time to implement SB 1
2   than you would have liked?
3       A.   Yes.
4       Q.   Did that make it more difficult to implement
5   it correctly?
6       A.   Yes.
7       Q.   Do you know whether voters were also affected
8   by the fact that SB 1 was new for the March primary?
9       A.   I can speculate that they were, yes.
10      Q.   Aside from speculation, do you have any
11  personal knowledge about voters who misunderstood the
12  rule -- misunderstood the new rules, for example?
13      A.   Yes.
14      Q.   Could -- could you just give an example or two
15  of how that happened?
16      A.   Voters that would not fill out their
17  applications correctly, et cetera.
18      Q.   And in instances like this, were you often
19  able to explain the new rules to the voters?
20      A.   We -- we tried, and we went to extraordinary
21  means to do so.  We went to the Commissioners Court and
22  obtained funding to -- to do a public outreach campaign
23  to educate voters, and then we also reached out to those
24  who -- who made mistakes on their applications, we --
25  phone banking, et cetera, to try to get them to cure.

Page 69

1       Q.   So what was the timing of the public outreach
2   campaign?
3       A.   Mid February, late February.
4       Q.   Is that when it began?
5       A.   Yes.
6       Q.   And is it still going on?
7       A.   That particular campaign, no, but our -- our
8   educational efforts on our website, et cetera, are.
9       Q.   Okay.  How long did the campaign go on -- this
10  specific campaign you are talking about?
11      A.   About two weeks.
12      Q.   Okay.  But then continued educational efforts?
13      A.   Uh-huh, yes.
14      Q.   Now, kind of apart from the broad-spectrum
15  public campaigns that you were talking about, you also
16  said you reached out to individual voters who had made
17  errors, is that right?
18      A.   Yes.
19      Q.   How -- how did that work?
20      A.   I think we -- well, we sent them written
21  communications, emails and phone banks, phone calls.
22      Q.   And -- and these communications explained the
23  specific error the voter in question had made?
24      A.   Yes.
25      Q.   And you designed these communications to try

EXHIBIT

90

Transcript of the Testimony of

**Isabel Longoria**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4

 5   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 6   LA UNION DEL PUEBLO ENTERO, et al *

 7   v.                          *      CASE NO. 5:21-cv-844-XR

 8   GREGORY W. ABBOTT, et al     *

 9   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al    *

11   v.                          *      CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al            *

13   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al        *

15   v.                          *      CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al   *

17   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al           *

19   v.                          *      CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al            *

21   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al       *

23   v.                          *      CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al           *

25   * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Isabel Longoria

April 20, 2022
Pages 2 to 5

Page 2

1  UNITED STATES OF AMERICA        *
2  v.                              *      CASE NO. 5:21-cv-1085-XR
3  THE STATE OF TEXAS, et al       *
4  * * * * * * * * * * * * * * * * * * * * * * * * * *
5
6              ORAL AND VIDEOTAPED DEPOSITION OF
7                     ISABEL LONGORIA
8                     APRIL 20, 2022
9                     VOLUME 1 OF 1
10
11         Oral and videotaped deposition of Isabel Longoria,
12  produced as a witness at the instance of the defense, and duly
13  sworn, was taken in the above-styled and numbered cause on April
14  20, 2022, from 9:24 a.m. to 2:32 p.m., before Terrie Doyle
15  Escobar, CSR in and for the State of Texas, reported by oral
16  stenography, at the Office of the Texas Attorney General,
17  Consumer Protection Division, Houston Regional Office, 808 Travis
18  Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of
19  the Federal Rules of Civil Procedure.
20
21
22
23
24
25

Page 3

1                    A P P E A R A N C E S
2
3  FOR THE HAUL PLAINTIFFS:
4      MR. KENNETH E. BROUGHTON
5      REED SMITH, LLP
6      811 MAIN STREET, SUITE 1700
7      HOUSTON, TEXAS  77002
8      PHONE: 713-806-8434
9      EMAIL: kbroughton@reedsmith.com
10
11  FOR STATE DEFENDANTS:
12      MR. WILLIAM T. THOMPSON
13      OFFICE OF THE ATTORNEY GENERAL
14      DEPUTY CHIEF, SPECIAL LITIGATION UNIT
15      POST OFFICE BOX 12548
16      AUSTIN, TEXAS  78711
17      PHONE: 512-936-2567
18      EMAIL: will.thompson@oag.texas.gov
19
20  FOR DEFENDANT ISABEL LONGORIA:
21      MS. CHRISTINA BEELER
22      MR. JONATHAN FOMBONNE
23      OFFICE OF THE HARRIS COUNTY ATTORNEY
24      1019 CONGRESS PLAZA, 15TH FLOOR
25      HOUSTON, TEXAS  77002

Page 4

1      PHONE: 713-274-5101
2      EMAIL: Jonathan.Fombonne@cao.hctx.net
3
4  FOR DEFENDANT YVONNE RAMON:
5      MS. JOSEPHINE RAMIREZ SOLIS (Present via Zoom)
6      OFFICE OF CRIMINAL DISTRICT ATTORNEY - HIDALGO COUNTY, TEXAS
7      CHIEF, CIVIL DIVISION
8      100 E. CANO
9      EDINBURG, TEXAS  78539
10      PHONE: 956-292-7609
11      EMAIL: josephine.ramirez@da.co.hidalgo.tx.us
12
13  FOR PLAINTIFFS LULAC TEXAS and VOTO LATINO:
14      MR. MIKE JONES (Present via Zoom)
15      ELIAS LAW GROUP, LLP
16      10 G ST. NE, STE. 600
17      WASHINGTON, D.C.  20002
18      PHONE: 202-985-1752
19      EMAIL: mjones@elias.law
20
21  FOR PLAINTIFF UNITED STATES OF AMERICA:
22      MS. L. BRADY BENDER (Present via Zoom)
23      UNITED STATES DEPARTMENT OF JUSTICE
24      CIVIL RIGHTS DIVISION, VOTING SECTION
25      950 PENNSYLVANIA AVENUE NW

Page 5

1      4CON 8TH FLOOR
2      WASHINGTON, DC  20530
3      PHONE: 202-353-5373
4      EMAIL: laura.bender@usdoj.gov
5
6  ALSO PRESENT:
7      MR. TERRY HARRISON, VIDEOGRAPHER
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Isabel Longoria

April 20, 2022
Pages 6 to 9

Page 6

         I N D E X

1

2

3  APPEARANCES . . . . . . . . . . . . . . . . . . . 3

4

5  DIRECT EXAMINATION BY MR. THOMPSON. . . . . . . . . 8

6

7  CROSS-EXAMINATION BY MR. FOMBONNE . . . . . . . . . 162

8

9  CHANGES AND SIGNATURE . . . . . . . . . . . . . . . 164

10

11  REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . 166

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

         E X H I B I T S

1

2

3  EXHIBIT LONGORIA 1:  OFFICIAL RESULTS FOR 2022 PRIMARY

4  ELECTIONS IN HARRIS COUNTY (DEMOCRATIC & REPUBLICAN). . . . . 13

5

6  EXHIBIT LONGORIA 2:  OFFICIAL RESULTS FOR 2018 DEMOCRATIC

7  PRIMARY ELECTION. . . . . . . . . . . . . . . . . 16

8

9  EXHIBIT LONGORIA 3:  OFFICIAL RESULTS FOR 2018 REPUBLICAN

10  PRIMARY ELECTION . . . . . . . . . . . . . . . . . 18

11

12  EXHIBIT LONGORIA 4:  NOTICE TO VOTERS WITH DISABILITIES . . . 21

13

14  EXHIBIT LONGORIA 5:  DISABILITY COMPLAINT FORM . . . . . . . 21

15

16  EXHIBIT LONGORIA 6:  SENATE BILL NO. 1. . . . . . . . . . . 39

17

18  EXHIBIT LONGORIA 7:  PRELIMINARY ELECTION RECONCILIATION -

19  UNOFFICIAL TOTALS RE: HARRIS COUNTY PRIMARY ELECTIONS 2022. . 104

20

21  EXHIBIT LONGORIA 8:  ELECTION RECONCILIATION - OFFICIAL

22  TOTALS RE: HARRIS COUNTY DEMOCRATIC PRIMARY ELECTION 2022 . . 107

23

24  EXHIBIT LONGORIA 9:  ELECTION RECONCILIATION - OFFICIAL

25  TOTALS RE: HARRIS COUNTY REPUBLICAN PRIMARY ELECTION 2022 . . 115

Page 8

1          P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good morning.  Today is

3  Wednesday, April 20, 2022.  We're on the record, and the time is

4  9:24.

5          THE COURT REPORTER:  Okay.  And would everyone

6  like to state whom they represent, appearances?

7          MR. THOMPSON:  Sure.  Will Thompson from the

8  Office of the Attorney General.  I represent the State

9  defendants.

10          MR. FOMBONNE:  Jonathan Fombonne, Harris County

11  Attorney's Office, representing defendant Isabel Longoria.

12          MS. BEELER:  Christina Beeler, from Harris County

13  Attorney's Office, representing Isabel Longoria.

14          MR. BROUGHTON:  Kenneth Broughton, of the law firm

15  of Reed Smith here in Houston, representing the HAUL plaintiffs.

16                  Isabel Longoria,

17  having been first duly sworn, testified as follows:

18                  DIRECT EXAMINATION

19  BY MR. THOMPSON:

20     Q.  Good morning, Ms. Longoria.  How are you?

21     A.  Great.

22     Q.  Would you just spell your name for the record so we

23  have it.

24     A.  Isabel Longoria, I-S-A-B-E-L.  Longoria is

25  L-O-N-G-O-R-I-A.

Page 9

1     Q.  Thank you.  Now, I believe you've been deposed before;

2  right?

3     A.  Yes.

4     Q.  So we'll just go over -- cover the ground rules, but I

5  know that you know what you're doing.  We're going to try not to

6  talk over each other for the benefit of the court reporter, if

7  that makes sense.  If you don't understand any question I'm

8  asking, will you please ask for clarification?

9     A.  Absolutely.

10     Q.  And if you answer a question I ask, I'm going to assume

11  that you understood the question; is that fair?

12     A.  Fair.

13     Q.  Your lawyer may object to some of the questions.  Even

14  if there's an objection, you're supposed to answer the question

15  unless your lawyer instructs you on grounds of privilege not to

16  answer the question.  Does that make sense?

17     A.  Understood.

18     Q.  And just tell me at anytime if you want a break.  We

19  try and get an answer to any pending question, but other than

20  that, we can take a break whenever you want.

21     A.  Understood.

22     Q.  Your job title is elections administrator; is that

23  right?

24     A.  Yes.

25     Q.  And you work for Harris County?

Isabel Longoria

April 20, 2022
Pages 30 to 33

Page 30

1 provided to them are not accessible to them. And, so, if not
2 given those two ways, they would seek another option, if at all
3 available by the state.
4    Q.  Let me reframe the question. Your previous testimony
5 was about some number of voters, roughly, a dozen, who requested
6 an accommodation related to the cure process; right?
7    A.  Sure.
8    Q.  And those voters requested an accommodation that would
9 have allowed them to go through the cure process without using
10 either of the two options you testified about earlier; right?
11   A.  Yes.
12   Q.  What was the option that they wanted as an
13 accommodation for going through the cure process?
14   A.  Any alternative to appearing in person because they
15 were physically not able to appear in person in a safe manner.
16 And they were open, as I understand, to all options, be it phone,
17 email, fax, any other option or alternative to appearing in
18 person.
19   Q.  What did they say about why it would be unsafe for them
20 to appear in person?
21   A.  Broadly, again, they have a disability or are homebound
22 in such a way that, for example, the very reason they engaged in
23 mail ballot voting is because they could not leave their home.
24 And so to cure their mail ballot, they again could not leave
25 their home to cure. And so they requested a cure process or

Page 31

1 accommodations that would have been given to them essentially by
2 definition of using mail ballot voting.
3    Q.  Was this related to concerns about COVID?
4    A.  As I understand, it was about their physical abilities
5 to leave their home or not.
6    Q.  So you think that voters who made these requests just
7 can't leave their homes at all; is that right?
8    A.  That is what they shared with us.
9    Q.  But did your office provide an accommodation for those
10 voters?
11   A.  By law, we can only accept the cure forms for mail
12 ballots either using documents received from the state that a
13 person updates on the website or if that individual visits us in
14 person.
15   Q.  When you say "by law," you can only do those things, is
16 that based on your understanding of SB1?
17   A.  Yes, sir. My understanding of SB1 and advice from the
18 Secretary of State's Office, the different advisories suggest to
19 us that the only method that we can accept cure forms is, again,
20 if that person -- in the cure period, if that person visits our
21 office or submits -- uses the state's website.
22   Q.  Did any of the Secretary of State advisories addressing
23 those two options discuss requests for accommodation?
24   A.  I don't remember specifically at this time.
25   Q.  Do you know what the ultimate result was for those

Page 32

1 voters who requested an accommodation for the mail ballot cure
2 process?
3    A.  It would be dependent on what actions they took voter
4 by voter.
5    Q.  Sorry. So do you know, for example, whether any or all
6 of those voters wound up voting?
7    A.  Broadly, it was a mixed bag of some voters, as I
8 understand, who did or did not end up curing their mail ballots.
9    Q.  When you say it was a mixed bag, are you saying some
10 voters might have cured their mail ballots and some didn't?
11   A.  Correct.
12   Q.  And do you know how many cured their mail ballots and
13 how many didn't?
14   A.  I do not.
15   Q.  Do you have any kind of estimate for the percentages?
16   A.  I do not.
17   Q.  Do you have records that would allow us to determine
18 that information?
19   A.  No.
20   Q.  How do you know that it was a mixed bag?
21   A.  I can -- the people in my office who take these calls,
22 the call centers, report these summaries to me just broadly on
23 what they hear and the context and issues that have been raised
24 by voters on calls.
25   Q.  You're referring to the people who take calls in which

Page 33

1 some number of voters requested an accommodation?
2    A.  Yes.
3    Q.  But the people who take those calls wouldn't know if
4 the voter, for example, later, a week after, he spoke to someone
5 in the call center, got internet access, and went through the
6 cure process; would he?
7    A.  No.
8    Q.  So is it fair to say that as to the voters who
9 requested an accommodation related to the cure process for mail
10 ballots, your office wouldn't know whether those voters wound up
11 successfully going through the cure process or not?
12   A.  There is no form or method in the office to directly
13 track who does ultimately call us about any one issue and then
14 who ultimately cures.
15   Q.  So is the answer yes?
16   A.  It's a bit of a nuance question. It's not that the
17 office doesn't know generally, it's that there's no form to track
18 that as you kind of stated earlier. If you wouldn't mind
19 clarifying the question, perhaps.
20   Q.  You can't provide any testimony about whether any
21 particular voter who requested an accommodation related to the
22 cure process for mail ballots wound up successfully completing
23 the cure process or not; correct?
24   A.  Correct.
25   Q.  You can't identify anybody in the Harris County

EXHIBIT
91

Transcript of the Testimony of

**Isabel Longoria**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4

 5  * * * * * * * * * * * * * * * * * * * * * * * * * * *

 6  LA UNION DEL PUEBLO ENTERO, et al *

 7  v.                         *      CASE NO. 5:21-cv-844-XR

 8  GREGORY W. ABBOTT, et al        *

 9  * * * * * * * * * * * * * * * * * * * * * * * * * * *

10  OCA-GREATER HOUSTON, et al       *

11  v.                         *      CASE NO. 1:21-cv-780-XR

12  JOHN SCOTT, et al               *

13  * * * * * * * * * * * * * * * * * * * * * * * * * * *

14  HOUSTON JUSTICE, et al          *

15  v.                         *      CASE NO. 5:21-cv-848-XR

16  GREGORY WAYNE ABBOTT, et al     *

17  * * * * * * * * * * * * * * * * * * * * * * * * * * *

18  LULAC TEXAS, et al              *

19  v.                         *      CASE NO. 1:21-cv-0786-XR

20  JOHN SCOTT, et al               *

21  * * * * * * * * * * * * * * * * * * * * * * * * * * *

22  MI FAMILIA VOTA, et al          *

23  v.                         *      CASE NO. 5:21-cv-0920-XR

24  GREG ABBOTT, et al              *

25  * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Isabel Longoria

April 20, 2022
Pages 2 to 5

## Page 2

1  UNITED STATES OF AMERICA        *
2  v.                              *    CASE NO. 5:21-cv-1085-XR
3  THE STATE OF TEXAS, et al       *
4  * * * * * * * * * * * * * * * * * * * * * * * * * *
5
6              ORAL AND VIDEOTAPED DEPOSITION OF
7                      ISABEL LONGORIA
8                      APRIL 20, 2022
9                      VOLUME 1 OF 2
10
11          Oral and videotaped deposition of Isabel Longoria,
12  produced as a witness at the instance of the plaintiffs, and duly
13  sworn, was taken in the above-styled and numbered cause on April
14  20, 2022, from 2:45 p.m. to 4:56 p.m., before Terrie Doyle
15  Escobar, CSR in and for the State of Texas, reported by oral
16  stenography, at the Office of the Texas Attorney General,
17  Consumer Protection Division, Houston Regional Office, 808 Travis
18  Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of
19  the Federal Rules of Civil Procedure.
20                      * * * * *
21  APPEARANCES:
22
23  FOR THE PLAINTIFFS:
24      MR. KENNETH E. BROUGHTON
25      REED SMITH, LLP

## Page 3

1          811 MAIN STREET, SUITE 1700
2          HOUSTON, TEXAS  77002
3          PHONE: 713-806-8434
4          EMAIL: kbroughton@reedsmith.com
5
6  FOR STATE DEFENDANTS:
7      MR. WILLIAM T. THOMPSON
8      OFFICE OF THE ATTORNEY GENERAL
9      DEPUTY CHIEF, SPECIAL LITIGATION UNIT
10     POST OFFICE BOX 12548
11     AUSTIN, TEXAS  78711
12     PHONE: 512-936-2567
13     EMAIL: will.thompson@oag.texas.gov
14
15  FOR DEFENDANT ISABEL LONGORIA:
16     MS. CHRISTINA BEELER
17     MR. JONATHAN FOMBONNE
18     OFFICE OF THE HARRIS COUNTY ATTORNEY
19     1019 CONGRESS PLAZA, 15TH FLOOR
20     HOUSTON, TEXAS  77002
21     PHONE: 713-274-5101
22     EMAIL: Jonathan.Fombonne@cao.hctx.net
23
24  FOR DEFENDANT YVONNE RAMON:
25     MS. JOSEPHINE RAMIREZ SOLIS (Present via Zoom)

## Page 4

1  OFFICE OF CRIMINAL DISTRICT ATTORNEY - HIDALGO COUNTY, TEXAS
2  CHIEF, CIVIL DIVISION
3  100 E. CANO
4  EDINBURG, TEXAS  78539
5  PHONE: 956-292-7609
6  EMAIL: josephine.ramirez@da.co.hidalgo.tx.us
7
8  FOR PLAINTIFFS LULAC TEXAS and VOTO LATINO:
9      MR. MIKE JONES (Present via Zoom)
10     ELIAS LAW GROUP, LLP
11     10 G ST. NE, STE. 600
12     WASHINGTON, D.C.  20002
13     PHONE: 202-985-1752
14     EMAIL: mjones@elias.law
15
16  FOR PLAINTIFF UNITED STATES OF AMERICA:
17     MR. L. BRADY BENDER (Present via Zoom)
18     UNITED STATES DEPARTMENT OF JUSTICE
19     CIVIL RIGHTS DIVISION, VOTING SECTION
20     PHONE: 202-353-5373
21     EMAIL: laura.bender@usdoj.gov
22
23  ALSO PRESENT:
24     MR. TERRY HARRISON, VIDEOGRAPHER
25

## Page 5

1                    I N D E X
2
3  APPEARANCES . . . . . . . . . . . . . . . . . . . . . .  2
4
5  DIRECT EXAMINATION BY MR. BROUGHTON . . . . . . . . . . .  6
6
7  CHANGES AND SIGNATURE . . . . . . . . . . . . . . . . . 65
8
9  REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . . 67
10
11                  E X H I B I T S
12
13  EXHIBIT LONGORIA 10:  CUMULATIVE REPORT - OFFICIAL, HARRIS
14  COUNTY, TEXAS - GENERAL AND SPECIAL ELECTIONS (11/3/2020) . . 14
15
16  EXHIBIT LONGORIA 11:  LETTERS FROM ISABEL LONGORIA TO TEXAS
17  STATE REPRESENTATIVES . . . . . . . . . . . . . . . . . 16
18
19  EXHIBIT LONGORIA 12:  LETTER FROM ISABEL LONGORIA TO TEXAS
20  SENATORS AND REPRESENTATIVES OF HARRIS COUNTY . . . . . . . 18
21
22  EXHIBIT LONGORIA 13:  EMAILS FROM CHRISTINA ADKINS
23  AND KEITH INGRAM . . . . . . . . . . . . . . . . . . . 33
24
25  EXHIBIT LONGORIA 14:  HOUSTON PUBLIC MEDIA ARTICLE . . . . . 56

Isabel Longoria

April 20, 2022
Pages 6 to 9

Page 6

1       P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Good afternoon.  Today is
3 Wednesday, April 20, 2022.  We're on the record.  The time is
4 2:45.  Would counsel present state appearances, please.
5           MR. BROUGHTON:  Kenneth Broughton, the firm of
6 Reed Smith, for the -- all plaintiffs.
7           MS. BEELER:  Christina Beeler for the Harris
8 County Attorney's Office for defendant Isabel Longoria.
9           MR. FOMBONNE:  Jonathan Fombonne, Harris County
10 Attorney's Office, also for Ms. Longoria.
11          MR. THOMSON:  Will Thomson, Texas Attorney
12 General's Office representing the State defendants.
13              Isabel Longoria,
14 having been first duly sworn, testified as follows:
15          DIRECT EXAMINATION
16 BY MR. BROUGHTON:
17    Q.   Ms. Longoria, as I've said, my name is Kenneth
18 Broughton, and I represent -- and I'll tell you exactly who:  I'm
19 here on behalf, really, I think of all of the various plaintiffs
20 in these various lawsuits.  My specific clients are Houston
21 Justice, Houston Area Urban League, Delta Sigma Theta Sorority
22 Inc., The Arc of Texas, and Jeffrey Lamar Clements.  Okay?
23         So again, you know, anytime anybody needs a break, if
24 you'll just say so.  You've done a great job earlier today about
25 asking for rewording or repeating a question.  So don't hesitate.

Page 7

1    A.   Okay.
2    Q.   All right.  Go ahead and tell us your name for the
3 record.
4    A.   Isabel Longoria.
5    Q.   And what is your current job title?
6    A.   Harris County Elections Administrator.
7    Q.   And when did you begin your time as the elections
8 administrator for Harris County?
9    A.   In November 2020.
10    Q.   And when will your tenure end?
11    A.   I am slated to resign on July 1, 2022.
12    Q.   So is that position a nonpartisan position?
13    A.   Yes.
14    Q.   And how is one selected?
15    A.   Broadly, the members of the Harris County Election
16 Commission accepts resumes, select a candidate, nominate that
17 candidate, and then that is, for lack of a better term, ratified
18 by the Harris County Commissioners Court.
19    Q.   Are you a member of any professional organizations?  Is
20 like there an election administrators organization --
21    A.   Oh, yeah.
22    Q.   -- or anything like that?
23    A.   I apologize.  Yes.  The Texas Association of Elections
24 Administrators.
25    Q.   Okay.  And is that pretty -- is there one in each

Page 8

1 county, all 254 counties, or?
2    A.   It's a statewide organization with representatives from
3 the majorities of counties in Texas, as I understand.
4    Q.   All right.  How long have you been in the TAEA?  Is
5 that what people call it?  Or what do people just refer to it
6 shorthand?  TAEA?
7    A.   TAEA is a shorthand --
8    Q.   Okay.
9    A.   I've been in it as an official member since I can -- I
10 think since about May 2021, if I'm not mistaken.
11    Q.   Okay.  And where'd you grew up?
12    A.   Here in Houston, Texas.
13    Q.   Okay.  And tell us about your formal schooling.
14    A.   I went -- received an undergraduate degree in sociology
15 from Trinity University in San Antonio, and a master's degree
16 from the UT Austin LBJ School of Public Affairs in public
17 affairs.
18    Q.   Okay.  And what years did you obtain those degrees?
19    A.   I graduated from Trinity University in 2010 with a
20 bachelor's degree and graduated with my master's from UT Austin
21 in 2012.
22    Q.   And just walk us through your employment once you got
23 your master's degree up until you assumed your present role.
24    A.   Since receiving my master's, I worked for State
25 Representative Jessica Farrar as a policy analyst at the Texas

Page 9

1 Legislature.  I then worked for the House Democratic Campaign
2 Committee working on organizing fundraising and field campaigns
3 in South Texas in Harris County.  I then believe I went on to
4 work for State Senator Sylvia Garcia as a policy analyst working
5 in both her district, legislative and campaign -- or and her
6 campaign offices.  I then moved on to AARP as an associate state
7 director of I believe advocacy and outreach helping people over
8 the age of 50, you know, live and age gracefully in Texas, and
9 then went on to run for office, Houston City Council - District
10 H.  And then shortly thereafter there was COVID.  And then I was
11 hired by interim county clerk Chris Hollins as a special advisor
12 for voting rights and access in the Harris County Clerk's Office,
13 and then shortly thereafter appointed as the Harris County
14 Elections Administrator.
15    Q.   And did you apply for the administrator job?
16    A.   Yes.
17    Q.   Okay.  And what about that job was appealing to you?
18 Why did you want that job?
19    A.   I love Houston, I love Harris County, I wanted to work
20 in my hometown, and I believe strongly in the rule of law and
21 government and in the fundamental of people engaging in their
22 democracy.
23    Q.   As elections administrator, do you oversee the general
24 staffing and budget for that office?
25    A.   Yes.

Isabel Longoria

Page 38

1   A.  Usually, people who are older, who maybe have -- you
2   know, their driver's license has expired or their need to drive
3   has expired; therefore, they don't get a Texas driver's license.
4   Individuals who for whatever reason have no interest in ever
5   driving and therefore would never get a driver's license.  Past
6   that, I'm not familiar with the requirements of what it takes to
7   acquire a driver's license, so I can't say who -- who would
8   qualify or not pass that.  But as I understand it, generally,
9   when we see it in our office, people who don't have driver's
10  licenses are usually older.
11      Q.  Apparently, your counsel wouldn't qualify if, for one,
12  if she didn't have glasses on.
13          (Laughter erupts in room.)
14  (BY MR. BROUGHTON:)
15      A.  Fair enough.
16      Q.  Okay.  So the other form -- another form of
17  identification required is -- would be the last four digits of a
18  Social Security number; is that right?
19      A.  Correct, yes.
20      Q.  From your experience, are there categories of citizens
21  who don't have a Social Security number?
22      A.  To the extent that I understand citizenship
23  qualifications, I believe, broadly, all citizens have Social
24  Security numbers.  Whether or not they are on the voter file is a
25  different aspect.

Page 39

1   Q.  Okay.  And what do you mean by that?
2   A.  That previous to January, as I understood it, the only
3   way that your driver's license, Social Security number, or other
4   form -- you know, other information that a voter gave us ended up
5   on a voter's file was because that voter submitted it to us
6   either when registering to vote or when updating information in
7   their voter file.  So if you've never submitted a voter
8   registration card with your Social Security number on it, then we
9   would never have it uploaded in our system.
10      Q.  And in real life situations, did that turn out to
11  affect a lot of people in Harris County?
12      A.  Yes.
13      Q.  And so tell us about that.
14      A.  There were voters who in attempting to fill their mail
15  ballot application or their mail ballot, ultimately, submitted to
16  our office an application with either the last four digits of a
17  Social Security number or their driver's license number which by
18  definition of the signing of the form, they shared to us was, you
19  know, true and accurate for them.  However, regardless of if the
20  application contained that information, our voter file may not
21  have contained that information.  For example, some older voters
22  when they registered to vote were not required by law to submit a
23  Social Security number or driver's license number with their
24  voter registration card, so they would never have up to that
25  moment ever needed to update their voter file with that

Page 40

1   information.  So it tended to be older voters, again, who had
2   those numbers available to them but had not updated them in their
3   voter registration file, in addition to which I believe the
4   Secretary of State's Office shared with us that they had come
5   into possession of certain driver's license numbers that they had
6   applied to voters' records using some kind of ID matching or
7   record matching system that voters then reported to us was not
8   their driver's license number.  So the application -- the number
9   they provided on their application was not that of the vote --
10  was not the same as the one on the voter file.  And so in trying
11  to investigate that and help voters, we figured out that some
12  driver's license numbers uploaded by the State were not correctly
13  matched to those ballots which then ultimately either had to be
14  corrected or, you know, ultimately had the voter's application to
15  vote by mail rejected.
16      Q.  So you said that for some older voters I guess when
17  they had originally obtained or registered to vote, it wasn't
18  required to list their Social Security number; did I understand
19  you correctly?
20      A.  Correct, yes.
21      Q.  Do you know approximately when that requirement of
22  putting a Social Security number on your voter registration card
23  started?
24      A.  As I understand from people in my office who've shared
25  it with me kind of informally, I believe that was sometime in the

Page 41

1   '70s or '80s that it then became mandatory for someone to include
2   a Social Security number on a voter registration card.
3   Unfortunately, I don't know or can't remember the exact date at
4   this time.
5       Q.  So for somebody like my parents who would have first
6   voted before the 1970s or '80s, then that would not have been on
7   their card; is that your understanding?
8       A.  That's -- at that time, they would not have been
9   required to submit a Social Security number or driver's license
10  number with their voter registration card.  I'd have to look up
11  the provisions to see if it was even optional for them to include
12  it.
13      Q.  Okay.  So any other problems you recall that Harris
14  County voters have experienced with respect to these new ID
15  requirements of SB1 with respect to mail-in voting?
16      A.  Yes.  Expanding the question now to mail ballot voting,
17  in the cure process.  So, broadly, that's taking to mean that as
18  voters submit to us an application or even a mail ballot carrier
19  envelope that does not have an ID number, one, we have to send --
20  we have to return those applications or carrier envelopes back to
21  the voters or we call or email them if we have that information
22  on record -- again, it's something that they optionally provide
23  when registering to vote -- to alert those voters as to their
24  need to kind of update or resubmit an application form or carrier
25  envelope with the correct information based on time.  If a voter

Isabel Longoria

April 20, 2022
Pages 42 to 45

Page 42

1  sends us their application one day before the deadline, you know,
2  they may not have enough time regardless to, you know, correct
3  that application and get it back to us.  So time is against them.
4  If, as I described earlier, there's a discrepancy as to what is
5  on their voter file versus what is provided on their application,
6  be it a typo or if there's an inconsistency in what's in the
7  record, taking time to investigate and get into the bottom of
8  that which then the clock runs out and, therefore, voters can't
9  apply even to vote by mail.  Later, if their application to vote
10  is accepted if they do correct their voter registration form --
11  and that requires sending another form to our voter registration
12  department to update that information, which in and of itself, if
13  you don't have access to computers or printers or can't get to
14  our office in person becomes an onerous task.  For some
15  individuals, they may not even be able to engage in the process
16  to update their voter file or even cure their mail ballot.  Those
17  tend to be problems even in the application process.
18       Fast forward, let's say you make it through the
19  application process, the voter's approved, you get to the mail
20  ballot process, you receive a mail ballot, you send it back to
21  us, the State has given us a template which because of time we
22  had to use for a mail ballot envelope on what we call a secrecy
23  flap, which means that the ID numbers have to be included under a
24  flap so that as those numbers are -- as that mail ballot is going
25  through the postal service, you can assume that certain

Page 43

1  information is hidden under that flap.  Voters don't see that
2  there's a space under the flap, don't know to include the
3  information under the flap, think that because they've included
4  that information on their application, they don't need to do it
5  on the carrier envelope, and so you have missing ID numbers for
6  that purpose.  And then that could be sent -- either sent back to
7  you if you get a mail ballot back.  Voters have expressed
8  frustrations at having to correct their mail ballots and having
9  to go through that process and some have not returned their mail
10  ballots because of that.
11       Let's keep moving forward.  So you've gone through all
12  of that process, again, assuming that the information in your
13  voter file is correct and matched up to your card, it requires
14  more time from our early voting ballot board and more resources
15  from our voter registration and mail ballot teams to research
16  someone's voter file to match those numbers; and then for the
17  early vote ballot board, to make those determinations if the
18  numbers match and then if the signatures match; further
19  complicated by the fact that if you are lacking a signature but
20  have an ID number that is correct, you by law can presume that
21  that mail ballot can be accepted, but even then it's a bit
22  ambiguous for the early voting ballot board, as I understand, on
23  when and how that should be applied.
24       Then assuming you don't match numbers, you have six
25  days in the cure period to then come in person or return by mail

Page 44

1  your mail ballot.  But if you can't come in person and if you
2  can't return it by mail to cure your mail ballot, then you are
3  effectively kind of out of options to cure your mail ballot even
4  though you have the correct number, even though you could cure
5  it.  So ultimately leading to about 20 percent of mail ballots in
6  Harris County that were rejected by the early voting ballot board
7  because of lack of ID or ID curing issue.
8       I'm happy to repeat any of that for the reporter.
9  Q.  (Laughs.)
10  A.  I know that was quite a lengthy --
11  Q.  I have a question back to people being able to go
12  online and cure and things like that.  Has your office
13  experienced very many people who for whatever reason don't have a
14  computer or are not computer literate or that sort of thing?
15  A.  Yes.
16  Q.  Tell us about that.
17  A.  It tends to be older voters or voters without means who
18  more likely than not don't have access to a printer.  So they
19  might have access to the internet on their phone or get access to
20  internet through a community center or other means or may even
21  request that we print and send to them a mail ballot application.
22  But if you don't have a printer, then your option is to, you
23  know, call us or hope that another application has gotten to you
24  in some form.
25       And then postage, individuals may not be aware or be

Page 45

1  able to go out and purchase postage to send back their
2  applications or mail ballots to our office.  I will say there's a
3  caveat that any election mail received by our office without
4  postage must be accepted by the U.S. Postal Service, but not all
5  voters are aware that they can send election mail in the post and
6  that it'll get to our office.
7  Q.  I wouldn't have known that either, just like the
8  buzzer.  (Laughs.)  Let's see here.
9  A.  Oh, and I believe -- sorry.  I misspoke earlier.  In
10  the cure process, yeah, I said in person or by mail.  Yeah, those
11  are the items -- options for curing.
12  Q.  How does a voter know if their vote-by-mail application
13  has been accepted?
14  A.  Either, one, you receive a mail ballot -- so you can
15  presume that your mail ballot application has been accepted --
16  you can call our office, mail ballot department, to check on the
17  status of your mail ballot application, you can visit the Harris
18  County website or the Texas Secretary of State website if you're
19  able to access either of those websites to see the status of your
20  application, or you'll receive a letter, phone call, or email
21  from us if there for any reason is a reason -- if your
22  application was not accepted.
23  Q.  What are the reasons a vote-by-mail application might
24  be denied?
25  A.  Oh, boy.  A vote-by-mail application can be denied for

EXHIBIT
92

Transcript of the Testimony of

**Yvonne Ramon**

**Date:**

May 10, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs STATE OF TEXAS

Yvonne Ramon                                                    May 10, 2022

```
 1

 2                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 3                        SAN ANTONIO DIVISION

 4
   LA UNION DEL PUEBLO            )
 5 ENTERO, ET AL                  )
                                  )
 6 vs.                            )  CASE NO. 5:21-cv-0844-XR
                                  )
 7                                )
   STATE OF TEXAS, ET AL          )
 8 _____

 9 OCA-GREATER HOUSTON, ET AL)
                                  )
10 vs.                            )  CASE NO. 1:21-cv-0780-XR
                                  )
11 TEXAS SECRETARY OF STATE       )
   JOHN SCOTT, ET AL              )
12 _____
   HOUSTON AREA URBAN             )
13 LEAGUE, ET AL                  )
                                  )
14 vs.                            )  CASE NO. 5:21-cv-0848-XR
                                  )
15 GREGORY WAYNE ABBOTT, ET       )
   AL                             )
16 _____
   LULAC TEXAS, ET AL             )
17 LEAGUE, ET AL                  )
                                  )
18 vs.                            )  CASE NO. 1:21-cv-0786-XR
                                  )
19 JOHN SCOTT, ET AL              )
   _____
20 MI FAMILIA VOTA, ET AL         )
                                  )
21 vs.                            )  CASE NO. 5:21-cv-0920-XR
                                  )
22 GREG ABBOTT, ET AL             )
   _____
23 UNITED STATES OF AMERICA       )
                                  )
24 vs.                            )  CASE NO. 5:21-cv-1085-XR
                                  )
25 STATE OF TEXAS, ET AL          )
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Yvonne Ramon

Page 2

1
2          ORAL & VIDEOTAPED DEPOSITION
3              YVONNE RAMON
4           May 10, 2022
5
6     ORAL & VIDEOTAPED DEPOSITION OF YVONNE RAMON,
7 produced as a witness at the instance of the United
8 States and duly sworn, was taken in the above-styled and
9 numbered cause on the 10th day of May, 2022, from
10 9:06 a.m. to 4:09 p.m., before Dora Canizales, Certified
11 Shorthand Reporter in and for the State of Texas,
12 reported by computerized stenotype method at the Hidalgo
13 County Safety Division, 9805 North Tenth Street,
14 McAllen, Texas 78504, pursuant to the Federal Rules of
15 Civil Procedure and the provisions stated on the record
16 or attached hereto.
17
18
19
20
21
22
23
24
25

Page 3

1                  APPEARANCES
2
3 FOR LULAC PLAINTIFFS:
4      Graham W. White
       Associate, Litigation
5      Elias Law Group
       10 G. Street, NE Suite 600
6      Washington, DC 20002
       Telephone:  202-968-4507
7      GWhite@elias.law
8
9 FOR THE UNITED STATES:
10     Jaywin Singh Malhi
       Voting Section
11     Civil Rights Division
       Department of Justice
12     (202) 305-0115
       E-mail: Jaywin.Malhi@usdoj.gov
13
14
   FOR PLAINTIFFS OCA-GREAER HOUSTON, ET AL:
15
       Susana Lorenzo-Giguere
16      - and -
       Ashley Harris
17     Asian American Legal Defense & Education Fund
       99 Hudson Street, 12th Floor
18     New York, NY 10013
       Telephone: (212) 966-5932
19      E-mail: llorenzo-giguere@aaldef.org
20
21
   FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATION:
22
       Josie Ramirez
23     Assistant District Attorney
       The Latino Legal Voice for Civil Rights in America
24     110 Broadway, Suite 300
       San Antonio, Texas 78205
25     Telephone: (210) 224-5476 ext. 206
       E-mail: nperales@maldef.com

Page 4

1
2     - AND -
3
   Leigh Ann Tognetti
4    Assistant District Attorney
   100 East Cano Street
5    Edinburg, Texas 78539
   Telephone: (956) 292-7600
6    E-mail: leigh.tognetti@da.co.hidalgo.tx.us
7
8
9 FOR STATE OF TEXAS DEFENDANTS:
10
   Ari Herbert
11    Texas Attorney General's Office
   Price Daniel Sr State Office Building
12    209 W. 14th Street
   Austin, Texas  78701-1614
13
14 ALSO PRESENT:  Mark Longoria, Videographer.
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2                  INDEX
3                            PAGE
4 YVONNE RAMON
5 Examination by Mr. White ........................7
   Examination by Mr. Malhi .......................188
6 Examination by Ms. Lorenzo-Giguere .............237
   Examination by Mr. Malhi .......................241
7 Changes and Signature ..........................260
   Court Reporter's Certificate ...................263
8
9                  EXHIBITS
10
11 EXHIBIT          DESCRIPTION          PAGE
12 1         Deposition Notice          10
13 2         Senate Bill 1              20
14
15
16
17
18
19
20
21
22
23
24
25

Yvonne Ramon

May 10, 2022
Pages 6 to 9

Page 6

1        THE VIDEOGRAPHER:  We are now on the
2 record.  This begins Videotape Number 1 in the
3 deposition of Yvonne Ramon in the matter of La Union Del
4 Pueblo Entero vs. Texas, in the United States District
5 Court for the Western District of Texas, San Antonio,
6 Division 5--- I'm sorry, 5:21-cv-0844-XR.
7        Today is Tuesday, May 10, 2022 and the
8 time is 9:06 a.m.
9        This deposition is being taken at 9805
10 North Tenth Street, McAllen, Texas, at the request of
11 Magna Legal Services.
12        The videographer is Mark Longoria of Magna
13 Legal Services, and court reporter is Dora Canizales of
14 Magna Legal Services.
15        Would counsel and all parties present
16 state their appearance and whom they represent?
17        MR. WHITE:  This is Graham White from the
18 Elias Law Group on behalf of LULAC plaintiffs.
19        MS. RAMIREZ:  Josie Ramirez and Leigh Ann
20 Tognetti on behalf of the defendant, Yvonne Ramon.
21        MR. HERBERT:  Ari Herbert from the Texas
22 Attorney's General Office on behalf of State defendants.
23        MR. MALHI:  This is Jaywin Singh Malhi on
24 behalf of the United States.  And along with me is a
25 student intern, Cameron Pack.

Page 7

1        MS. HARRIS:  This is Ashley Harris on
2 behalf of the OCA plaintiffs.
3        MS. RAMIREZ:  Anyone else wants to
4 identify themselves?  Okay.
5        (Witness sworn by Court Reporter.)
6              YVONNE RAMON,
7 having been first duly sworn, testified as follows:
8              EXAMINATION
9   Q   (BY MR. WHITE) Ms. Ramon, good morning.
10  A   Good morning.
11  Q   Good to see you again.
12  A   Nice to see you as well.
13  Q   So as you know, my name is Graham White.  I
14 represent LULAC with the Texas Alliance Retired
15 Americans and Texas AFT, and so I represent one of the
16 several plaintiff groups in this matter.
17        And I think after I finish my questioning
18 today there may be lawyers for other groups that may
19 have questions to ask as well, and they will introduce
20 themselves when the time comes.
21        Now, I know you were sworn in.  But can
22 you please state your full name for the record?
23  A   Yvonne Ramon.
24  Q   And can you also state your business address?
25  A   We are at 213 South Closner Avenue in Edinburg,

Page 8

1 Texas.
2   Q   And did you bring anything with you to the
3 deposition today?
4   A   I didn't.
5   Q   Okay.  Now, I know you've been deposed before.
6   A   Yes.
7   Q   And so I won't spend too much time on
8 preliminaries.  But just for the record, I just want to
9 go over some of the ground rules for today.
10        As you know, this just to make sure that
11 your answers to my questions are audible.  No shaking of
12 your head or "huh-uh" or things like that that will make
13 it hard for the court reporter to transcribe.  Does that
14 make sense?
15  A   Yes.
16  Q   Please wait for me to finish my questions
17 before you answer, and do your best not to interrupt me.
18 And I will do the same -- same thing for the sake of the
19 court reporter.
20  A   Yes.
21  Q   So you understand that you're under oath today?
22  A   Yes.
23  Q   And you will testify truthfully and honestly
24 and that oath has the same effect as if you were
25 testifying in a court of law?

Page 9

1   A   Yes.
2   Q   If the question is unclear to you, just let me
3 know.  If you don't ask for clarification, I will assume
4 you understood the meaning of the question.  Does that
5 make sense?
6   A   I understand.
7   Q   Okay.  Your attorney may object to some of my
8 questions.  Those objections are for the judge to
9 consider at a later point.  Unless your attorney
10 specifically instructs you not to answer, just answer my
11 question.
12  A   I understand.
13  Q   Okay.  Finally, if you need to take a break for
14 any reason, just let me know.  I will try to go -- take
15 a break maybe every hour or so.
16        The only thing that I ask is that if a
17 question is pending when we break, that you just answer
18 before we go off the record.
19  A   Yes.
20  Q   Okay, great.
21        Is there anything that might impair your
22 ability to testify truthfully and honestly today?
23  A   No.
24  Q   Have you taken any medication, alcohol, or
25 drugs that would impair your testimony today?

Yvonne Ramon

Page 14

1 umbrella.
2        The VR database processors, there are
3 seven.  And I think the rest of the departments work in
4 the operations of the election, in administration of the
5 election.  And so pretty much I think all 20 work
6 everything.
7    Q    Got it.  And you have temporary employees for
8 the elections operations --
9    A    I do.
10    Q    -- department as well?
11    A    I do.  There are anywhere between three to
12 seven temporary employees that can be on or off,
13 depending on the election itself and the other duties of
14 the office.
15    Q    Great.  And about how many elections have you
16 run as the Hidalgo County Elections Administrator?
17    A    I didn't go back to check.  But when I did my
18 report a couple of years ago, it was over 200, so I'm
19 sure it's somewhere around there.
20    Q    Okay.  So let me ask you this then:  How long
21 have you been in your current role?
22    A    September 2nd will be 14 years.  So not quite
23 14, but right around the corner.
24    Q    And what did you do before then?
25    A    I was actually in education.  I had just

Page 15

1 started a school that summer as secondhand to a
2 principal.  That school was supposed to be mine as
3 principal one day, and that's how she hired me on.  So I
4 was working in education.
5    Q    And what made you decide to go from education
6 to elections administration?
7    A    Truly, that is a story all on its own,
8 honestly.
9    Q    Sure.
10    A    My prayer is always where do you need me, Lord,
11 and this is where I ended up.
12    Q    Understood.  Does your office have a mission
13 statement?
14    A    No, we don't.
15    Q    Would you say that helping people register to
16 vote is part of your office's objectives?
17    A    Yes.
18    Q    Would you say that making voting more
19 accessible is part of your office's objectives?
20    A    Yes.
21    Q    And would you say that ensuring eligible voters
22 are able to cast a ballot as part of your office's
23 objectives?
24    A    Yes.
25    Q    And how does the -- you mentioned this a second

Page 16

1 ago, but can you just explain how your office interacts
2 with the Secretary of State's office on a day-to-day
3 basis?
4    A    The Secretary of State's office has always been
5 our I think number one support system.  We look to them
6 for guidance.  We look to them for instructions when
7 something changes, when something is new.  We wait
8 anxiously for them to guide us.
9        And so, of course, they interpret the
10 election code.  So whenever there is a question, that's
11 who we call firsthand.
12        So without them, I don't know what we
13 would do because they are truly our support.
14    Q    And who in the Secretary of State's office do
15 you generally contact with questions about an election?
16    A    Well, I am part of the advisory committee that
17 was formed in 2020.  There are 27 counties that were
18 asked to represent the State.
19        And so we're usually talking with Keith
20 Ingram and Christina Adkins.
21        But, of course, dialing the 1-800 number,
22 and you hit number 3, any of the legal attorneys that
23 answer, we work with all of them.
24    Q    Okay.  What is this advisory committee that you
25 just mentioned?

Page 17

1    A    In 2020, Christina Adkins and Keith Ingram
2 asked 27 of us -- I don't know how many are still on
3 board, but there were 27 back then, I ran across the
4 e-mail just last week -- and they asked if we would join
5 them for -- you know, it could be monthly meetings and,
6 when necessary, even more often.
7        And we discuss changes, we discuss
8 anything that -- topics that are important.  And so it's
9 been a -- it's been a rewarding experience.
10    Q    So during these discussions, is the Secretary
11 of State's office soliciting your advice?
12    A    In a sense, it's not about soliciting our
13 advice, but, for example, with the carrier envelope, we
14 were part of the team that would receive the prototypes
15 and, you know, look at it.  I would have my staff in
16 that department look at it and give suggestions.
17        At the end, they decide.  We don't.  But
18 the check off list that was part of Senate Bill 1, you
19 know, again, I looked at it, I talked to some poll
20 workers and if anything was missing.  Because they're
21 the ones that work it.
22        So we submit this fact.  I'm not exactly
23 sure what they do with the final product, but we do give
24 our experiences sometimes.
25    Q    Understood.  And you said that you-all -- the

Yvonne Ramon

May 10, 2022
Pages 134 to 137

Page 134

1 we send to the State. So it takes a little longer.

2    Q    And one other thing I think you mentioned when
3 I asked about the impact on Hidalgo County was that
4 there was a paper shortage. I don't think I explored
5 that particular --

6    A    Yeah. Nationwide. There was a paper shortage.
7 So that's why in trying to prepare for the year the way
8 the State was asking us to be ready, because we needed
9 to be ready with all these forms, we couldn't, and we
10 haven't been able to because the vendors were not
11 allowing us to order such large quantities.

12          That also brings down the price, but, you
13 know, the more you order, the less per item charge. But
14 we couldn't because nationwide, there is a paper
15 shortage.

16          Right now we're having difficulty finding
17 yellow paper for the sample ballots, for example. They
18 don't let you order, you know, boxes and boxes, reams
19 and reams of paper. They limit you to how much you can
20 order because there is a paper shortage.

21    Q    And when did your office become aware about the
22 paper shortage?

23    A    In December, January. We already knew this was
24 coming.

25    Q    Okay.

Page 135

1    A    I'm trying to jump the gun. You have to also
2 remember it was redistricting and that we were doing a
3 massive mail-out, which is 357,000-plus cards that
4 needed to be printed and sent out.

5          Our vendor did tell us that once we did
6 ours, he had to turn others away because he didn't have
7 any more paper, no more paper in stock.

8    Q    Do you know, on average, how many voters use
9 vote by mail in Hidalgo County during a primary
10 election?

11    A    How many voters what?

12    Q    Use vote by mail during a primary recollection
13 in Hidalgo County?

14    A    For in general?

15    Q    During a primary election.

16    A    During a primary election. Vote by mail. I
17 didn't look at that figure. I just looked at the -- too
18 many -- too many percentages to remember.

19    Q    Sure.

20    A    I can tell you that during a primary, the
21 percentage of complete voter turnout would be anywhere
22 between 15 percent to 21, 22. Except 2016 had a little
23 higher turnout, 25. But usually it's anywhere between
24 15 to 21, 22 percent voter turnout. But too many -- to
25 many numbers to remember the breakdown.

Page 136

1    Q    Okay.

2    A    In each category.

3    Q    I have other questions that will be about
4 numbers, so hopefully I won't be over grueling in that
5 regard.

6          So during the March 2022 primary, we sort
7 of talked about some of the problems that were caused by
8 the identification matching provisions.

9          Is it fair to say that there were high
10 levels of rejection of mail-in ballot applications
11 compared to previous years?

12          MR. HERBERT: Objection, form.

13    A    I did check that carefully, and definitely.
14 When we would have a rejection rate of 1 to 2 percent --
15 I think there was one year that we had a 2.2 -- we
16 actually had a 19 percent rejection rate in the March
17 2022.

18    Q    (BY MR. WHITE) Okay. And I'm going to ask you
19 more specifics about those numbers in just a second.

20          The question I just asked is about whether
21 there were high levels of rejection of mail-in ballot
22 application. Were there also high levels of rejection
23 mail-in ballots --

24    A    Yes.

25    Q    -- compared to previous --

Page 137

1    A    Yes, I did check that as well for 2022. And,
2 again, the rejection rate of applications minimal,
3 again, 1 percent, 1 1/2 percent. And the applications
4 rejection rate in 2022 was 13 percent.

5    Q    And so let's just focus for a second on the
6 applications. What were the reasons for some of these
7 rejection rates for  applications?

8    A    The majority was lack of ID.

9    Q    When you say "lack of ID," do you mean a person
10 not listing an identification --

11    A    Exactly.

12    Q    -- on the mail-in application?

13    A    Exactly. They were using the old form. Or if
14 they -- even if they used the new form, they didn't --
15 their eyes didn't gravitate to the right side, which was
16 a new area on the application that required the ID.

17    Q    And when you say the majority of the problems
18 were caused by missing ID, is that a guess or --

19    A    No, no. It is the majority. Because, again --
20 because a person submits an application doesn't mean
21 they qualify. So some are rejected because they don't
22 qualify. They don't meet the guidelines whether they're
23 not 65 and if they're -- they didn't check
24 disabled, they didn't check the primary. You have to
25 check Democrat or Republican, and some people don't. So

# EXHIBIT
# 93

Transcript of the Testimony of

**Jacquelyn Callanen**


**Date:**

April 20, 2022


**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Jacquelyn Callanen                                      April 20, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, )
     ET AL                       )
 4                               )
     vs.                         )  CASE NO. 5:21-CV-844-XR
 5                               )
     GREGORY W. ABBOTT, ET AL    )
 6   _____
     OCA-GREATER HOUSTON, ET AL  )
 7                               )
     vs.                         )  CASE NO. 1:23-CV-780-XR
 8                               )
     JOHN SCOTT, ET AL           )
 9   _____
     HOUSTON JUSTICE, ET AL      )
10                               )
     vs.                         )  CASE NO. 5:21-CV-848-XR
11                               )
     GREGORY WAYNE ABBOTT, ET AL )
12   _____
     LULAC TEXAS, ET AL  )
13                               )
     vs.                         )  CASE NO. 1:21-CV-0786-XR
14                               )
     JOHN SCOTT, ET AL           )
15   _____
     MIFAMILIA VOTA, ET AL       )
16                               )
     vs.                         )  CASE NO. 5:21-CV-0920-XR
17                               )
     GREG ABBOTT, ET AL          )
18   _____
     UNITED STATES OF AMERICA  )
19                               )
     vs.                         )  CASE NO. 5:21-CV-1085-XR
20                               )
     THE STATE OF TEXAS, ET AL   )
21   _____

22             ORAL VIDEOTAPED DEPOSITION

23                 JACQUELYN CALLANEN

24                   APRIL 20, 2022

25
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                   210-697-3408

ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 20TH day of April, 2022, from 9:27 a.m. to 7:07 p.m., before Sarah A. Prugh, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the Offices of The Mexican American Legal Defense and Educational Fund, 110 Broadway Street, Suite 300, San Antonio, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY LAMAR CLEMMONS:

Ms. Sarah Cummings Stewart (Via Zoom)
Reed Smith, LLP
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
Telephone: 469-680-4200
E-mail: sarah.stewart@reedsmith.com

Ms. Ciara A. Sisco
Email: csisco@naacpldf.org
Ms. Liliana Zaragoza (Via Zoom)
Email: lzaragoza@naacpldf.org
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: 212-965-2200

FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON, INC.:

Ms. Nina Perales
E-mail: nperales@maldef.org
Ms. Julia R. Longoria (Via Zoom)
E-mail: jlongoria@maldef.org
Mexican American Legal Defense and Educational Fund
110 Broadway, Suite 300
San Antonio, Texas 78205
Telephone: 210-224-5476

Ms. Jasmine Johnson (Via Zoom)
Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, New York 10004
Telephone: 212-859-8000
E-mail: jasmine.johnson@friedfrank.com

FOR PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF TEXAS, REVUP-TEXAS, TEXAS ORGANIZING PROJECT AND WORKERS DEFENSE ACTION FUND:

Mr. Thomas Buser-Clancy (Via Zoom)
ACLU Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Telephone: 713-942-8146

Ms. Lia Sifuentes Davis (Via Zoom)
Disability Rights Texas
2222 West Braker Lane
Austin, Texas 78758-1024
Telephone: 512-454-4816
E-mail: ldavis@drtx.org

Ms. Susana Lorenzo-Giguere (Via Zoom)
Asian American legal Defense and Education Fund
99 Hudson Street, 12th Floor
New York, NY 10013
Telephone: 212-966-5932
E-mail: slorenzo-giguere@aaldef.org

FOR PLAINTIFF LULAC TEXAS:

Mr. Graham W. White
Elias Law Group, LLP
10 G Street NE, Suite 600
Washington, DC 20002
Telephone: 202-968-4490
E-mail: gwhite@elias.law

FOR PLAINTIFF MI FAMILIA VOTA:

Ms. Wendy Olson (Via Zoom)
Stoel Rivas, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702
Telephone: 208-387-4291
E-mail: wendy.olson@stoel.com

FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR YVONNE RAMON:

Ms. Leigh Tognetti (Via Zoom)
Hidalgo County District Attorney's Office
E-mail: josephine.ramirez@da.co.hidalgo.tx.us

FOR DEFENDANT HIDALGO COUNTY CRIMINAL DISTRICT ATTORNEY RICARDO RODRIGUEZ, JR.:

Ms. Jacqueline Villarreal (Via Zoom)
Assistant District Attorney

FOR DALLAS COUNTY:

Ms. Barbara Nicholas (Via Zoom)
Dallas District Attorney's Office

FOR DEFENDANTS GUERRERO & GARZA:

Mr. Anthony "Tony" Nelson (Via Zoom)
Assistant Travis County Attorney
E-mail: tony.nelson@traviscountytx.gov

FOR UNITED STATES OF AMERICA:

Mr. Jaywin Singh Malhi (Via Zoom)
Trial Attorney
Civil Rights Division, Voting Section
US Department of Justice
Telephone: 202-598-0146
E-mail: jaywin.malhi@usdoj.gov

FOR DEFENDANT BEXAR COUNTY ELECTIONS ADMINISTRATOR JACQUELYN CALLANEN:

Ms. Lisa V. Cubriel
Assistant District Attorney -- Civil Division
101 W. Nueva, 7 h Floor
San Antonio, Texas 78205-3030
Telephone: 210-335-2142
E-mail: Lisa.Cubriel@bexar.org

FOR DEFENDANTS:

Ms. Kathleen T. Hunker
Special Counsel
ka hleen.hunker@oag.texas.gov
Office of the Attorney General
P. O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Telephone: 512-463-2100

Jacquelyn Callanen

April 20, 2022
Pages 6 to 9

Page 6

1 ALSO PRESENT:
2    Mr. Sam Fishman (Via Zoom)
     Mr. Patrick Pope (Via Zoom)
3    Mr. Trey Grun, Videographer
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1         VIDEOGRAPHER:  Good morning.  Today's date
2 is Wednesday, April 20th, 2022.  The time is 9:27 a.m.
3 We are on the record.  Will counsel and all parties
4 present please state their appearances and whom they
5 represent?
6         MR. WHITE:  Graham White on behalf of
7 Elias Law Group representing the LULAC plaintiffs.
8         MS. PERALES:  Nina Perales with MALDEF
9 representing the LUPE plaintiffs.  And with me today is
10 Julia Longoria.
11        MS. CUBRIEL:  Lisa Cubriel from the Bexar
12 County District Attorney's office here today
13 representing the named defendant Jacquelynn Callanen.
14        MS. SISCO:  Ciara Sisco with the NAACP
15 Legal Defense and Educational Fund representing the HAUL
16 plaintiffs.
17        MS. HUNKER:  Kathleen Hunker with the
18 Texas Attorney's General Office representing the state
19 defendants.
20        VIDEOGRAPHER:  Will the court reporter
21 please swear in the witness?
22        JACQUELYNN CALLANEN,
23 having been first duly sworn, testified as follows:
24        EXAMINATION
25

Page 7

1
2                   INDEX
3                            PAGE
4 JACQUELYNN CALLANEN
5 Examination by Mr. White .........................8
  Examination by Ms. Perales ....................169
6 Examination by Ms. Sisco ......................255
  Examination by Mr. Mahli ......................310
7 Examination by Ms. Hunker .....................321
  Court Reporter's Certificate ..................355
8
9                 EXHIBITS
10
11 EXHIBIT      DESCRIPTION              PAGE
12 A      Plaintiff's Amended Notice of      11
          Rule 30(b)(6) Deposition to the
13        Office of the Bexar County
          Elections Administrator
14
   B      SB-1                        78
15
   C      Don't Forget your ID Numbers!   127
16
   D      Oaths                       234
17
   E      Oath of Assistance          234
18
   F      Certified Summary Results   271
19        Report, Joint General, Special,
          Charter and Bond Election,
20        November 3, 3030
21 G      KSAT-12 Article             274
22
23
24
25

Page 9

1 BY MR. WHITE:
2    Q.  Ms. Callanen, good to see you again.
3    A.  Hi, Graham.  Jackie, please, it is easier.
4    Q.  Well, I think for the record I will stick with
5 Ms. Callanen just so we have a clean transcript if you
6 don't mind.  As you know, my name is Graham White.  I
7 represent the LULAC plaintiffs in this case.  There are
8 other lawyers here for the plaintiffs who will be asking
9 questions after me but I am going to sort of get us
10 started.  And I know you were just sworn in but can you
11 please state your full name for the record?
12   A.  Sure.  Jacquelynn Fay Callanen.
13   Q.  Can you also please state your business
14 address?
15   A.  1103 South Frio, San Antonio, 78207.
16   Q.  And you have been deposed before; correct?
17   A.  Yes, sir.
18   Q.  So I won't take too long going over some of the
19 ground rules but I did want to hit a couple of the most
20 important basics.  So you understand that your answers
21 here today are under oath meaning that the oath you take
22 today is the same as if you were swearing an oath in
23 open court?
24   A.  Yes, sir.
25   Q.  If any question that I ask you is unclear, will

Jacquelyn Callanen

April 20, 2022
Pages 126 to 129

Page 126

1 that there was potentially a problem with ballots
2 getting rejected?
3     A.   Ballots or applications?
4     Q.   I'm sorry.  Applications being rejected.
5     A.   Again, probably by the third week of January.
6     Q.   And in between say late January and the March
7 primary, did your office take additional steps to
8 educate voters and the requirements?
9     A.   Yes, we updated the web site.  We put the
10 envelopes out there and just tried to get as much of the
11 word out to the media, that kind of stuff.
12    Q.   When you say media, are you referring to media
13 appearances by yourself or --
14    A.   Myself, yes.
15    Q.   And what platforms would you typically use?
16    A.   Just have news conferences.
17    Q.   Did you seek any approval from -- sorry.
18 Strike that.  Did you contact the secretary of state's
19 office before doing media appearances about --
20    A.   No, sir.
21    Q.   Since the March primary, do you have additional
22 plans to engage in proactive voter education about the
23 mail-in identification provisions?
24    A.   Again, yes, sir.  And I showed you the insert
25 that we have gone to for great planning.

Page 127

1     Q.   Right.  So I would like to talk about that and
2 we will mark this as --
3          REPORTER:  C.
4     Q.   (By Mr. White) -- C.
5          MS. PERALES:  No, we have a different
6 piece of paper.  Here we go.  Thank you.
7          THE WITNESS:  I still have this many.
8          MS. PERALES:  I think you should mark
9 this.  We did this for you.
10         (Exhibit C marked)
11    Q.   (By Mr. White) Okay.  I would like to mark
12 something else as Exhibit C which this is in paper
13 format which I think might be easier for folks to --
14    A.   You don't want to pick my strips up off the
15 ground?
16    Q.   This might be easier for everyone.
17    A.   Thanks, Nina.
18         MS. PERALES:  I will be checking the
19 translation while you all discuss.
20    Q.   (By Mr. White) Okay.  So are you familiar with
21 this exhibit that I have just passed you?
22    A.   Yes, sir.
23    Q.   What is it?
24    A.   It is our attempt at correcting a lot of the
25 errors that we saw in the March 1st mail ballot

Page 128

1 application and mail ballot return.  So we inserted
2 these in every one of the mail ballots that we have sent
3 out for the May 7th election.  And again, we are going
4 to change it just a little bit to take the color teal
5 off of it so that is generic for the 24th.  And then we
6 will revisit this over the summer to see if we can tweak
7 it in some way or, you know, is our learning curve
8 smoothing out now and are we passed all of this?  So we
9 will definitely revisit it in the summer.
10    Q.   When did you decide to put something like this
11 together?
12    A.   Probably, probably two weeks before the March
13 1st ones.  Once we were seeing these rejection things, I
14 mean we, myself and the mail room people were basically
15 just -- we have to do something.  What with we going to
16 do?  How are we going to do this?  What are we going to
17 do?  And that seemed to have been a theme across the
18 state because -- and we got a message after March 1st.
19 We all received a message from the secretary of state's
20 office saying if you are thinking of doing anything, we
21 have to approve it before.  So that led us to believe
22 that more, you know, wasn't just a Bexar County thing.
23 It was more widespread.  And so a lot of us did these.
24         I was in touch with Christina Adkins and
25 she sent me the one the state had come up with after

Page 129

1 much thought.  And we killed that one and said no, that
2 was just way too wordy.  It was way too legalese.  It
3 wasn't in like common -- what we need.  And so we got
4 permission to use ours.
5         So I don't know how many different ones of
6 these are around the state.  But again, they recognize
7 that I guess a lot of us were saying we have to do
8 something.  We have to do something.
9     Q.   Let me go back and ask you first about the
10 message from the secretary of state's office that you
11 referenced on March 1st.  Was this sort of -- was this
12 an advisory from the secretary of state's office sent to
13 you?
14    A.   Not an advisory.  Just an email.  We get them
15 from -- they will just do blasts I guess is the term.
16 And it was saying if you are thinking of doing anything
17 and you want to put an insert in, make sure we approve
18 it.
19    Q.   Okay.  Was this email sent out to all county
20 election administrators?
21    A.   I am sure everyone, yes.
22    Q.   Is this email something you have produced in
23 discovery at this point?
24    A.   No, I didn't even think to, no.  I'm sorry.
25    Q.   And what was -- can you be more specific about

Page 214

1    A.  Yes, ma'am.
2    Q.  Those were mail ballots?
3    A.  Yes, ma'am, that were returned to us and that
4  the ballot board rejected, yes, ma'am.
5    Q.  And that number is 3,940.  And then you have
6  837 that were cured.
7    A.  That came in to cure out of that 39.  So that
8  is 20 percent -- 22 some percent.
9    Q.  So I am getting 3,103.
10   A.  That did not --
11   Q.  That did not cure.
12   A.  Okay.  3,103?
13   Q.  Yeah, 3,103.  So that is 1,117 plus 2,823 minus
14  837 gets us 3,103.
15   A.  Yes, ma'am.
16   Q.  So how would we describe that 3,103?  3,103 are
17  the number of voters in Bexar County who sent you a mail
18  ballot.  You could not match the ID number and they
19  didn't cure in time so their vote was not counted.
20   A.  Correct.
21   Q.  Okay.  Now, do you have a sense of how many
22  people sent you an application for a mail ballot and you
23  couldn't match their number and you never got a cured
24  application for mail ballot from them?
25   A.  No, that we didn't track.  Like I said, we

Page 215

1  didn't have that system in place.
2    Q.  Do you know how many times you mailed out to a
3  voter a new application for ballot by mail because you
4  weren't able to verify the first time?
5    A.  Again, we didn't track that.  We didn't know it
6  would be --
7    Q.  So would you agree with me there is some number
8  of people who sent an application for ballot by mail and
9  you couldn't match their number and they were unable to
10  cure and so they never received a mail ballot?
11        MS. HUNKER:  Objection, form.
12        THE WITNESS:  Correct, although we did
13  send rejects to them and new applications up to the
14  point where the gate came down and it was closed.  So
15  again, I just don't know what that push/pull was.
16   Q.  (By Ms. Perales)  It is also possible, isn't it,
17  and this would be a terrible situation.  But if the
18  voter sent you the first application for ballot by mail
19  and put the driver's license and you couldn't match the
20  driver's license, so you sent them a new application for
21  ballot by mail and they put the social down, and then
22  you couldn't match the social either, that could happen;
23  couldn't it?
24   A.  Oh, sure.
25   Q.  And do you know if it happened for anybody in

Page 216

1  particular?
2    A.  I don't.
3    Q.  Is that because you weren't tracking those
4  individual voters?
5    A.  Correct.  Again, because the system we have had
6  no coding for it in there.  Previously, it had never
7  been an issue.  It was handled manually.  If something
8  came in and we had to reject it, we sent something out
9  and we literally kept it in a box.  I mean we kept it
10  filed.  We knew where it was.  But the computer system,
11  the database didn't even have the codes in there.
12   Q.  Do you recall your office receiving any phone
13  calls from voters who said I received a second
14  application for ballot by mail from you and I filled
15  that one out too and I still got rejected?
16   A.  Yes.
17   Q.  Do you know how many voters were twice
18  rejected?
19   A.  No, no, that would have been anecdotally.  But
20  yes, we would hear it.
21   Q.  And I will represent to you that El Paso County
22  got some pretty angry phone calls from voters.
23   A.  So did we.  So did we.  And again, as I spoke
24  before, we had to have a meeting with the staff to allow
25  them to say they don't deserve to be spoken to like

Page 217

1  that.  So and again, in all of the years I have been
2  here, I have never had to have a meeting like that, to
3  even say something like that because we are a customer
4  service driven organization and that is part of who we
5  are.  And we had to do that for the first time and that
6  was sad.
7    Q.  Did you have any voters call with confusion
8  about the verifying of the numbers on the mail ballot
9  applications or mail ballots who were Spanish speaking
10  voters?
11   A.  Oh, sure.
12   Q.  Did you have a Spanish speaking staff person
13  who would talk to them on the phone?
14   A.  Yes, ma'am.  Yes, ma'am.
15   Q.  You mentioned that at some point, you started
16  sending voter registration forms to voters who had --
17  who were obviously already registered --
18   A.  Correct.
19   Q.  -- but for whom you couldn't get some kind of
20  number on them?
21   A.  Correct.
22   Q.  Did you receive any phone calls from voters who
23  were confused about why you were sending them a voter
24  registration form?
25   A.  Yes, ma'am.

Jacquelyn Callanen

April 20, 2022
Pages 274 to 277

Page 274

1      THE WITNESS:  Maybe not.  Let's stay to
2  five percent.
3      Q.  (By Ms. Sisco) Okay.  All right.  And I am
4  going to enter another.  So I am going to enter this as
5  Exhibit --
6      REPORTER:  G.
7      (Exhibit G marked)
8      Q.  (By Ms. Sisco) -- G, thank you.  Mr. Callenan,
9  can you tell me what this is?  Actually, it is kind of
10  hard to see.  Forgive the printing here.  Can you tell
11  what this is?  And if not --
12      A.  I think it is a news article.
13      Q.  Yes.  So that's right.  This is a KSAT.com
14  article entitled more than 1900 Bexar County mail
15  Ballots rejected following new voting law requirement.
16      A.  Right.
17      Q.  And this is from March 8th so these numbers are
18  not final.
19      A.  Correct.
20      Q.  So I am going to direct your attention to the
21  back of this front page here.  The second to last
22  paragraph starts on election night.
23      A.  Uh-huh.
24      Q.  Can you read that -- those two sentences for
25  me?

Page 275

1      A.  Where it says on election night?
2      Q.  Yes.
3      A.  Callenan told reporters that the county was
4  running about a 35 percent rejection rate for mail
5  ballots before SB-1 went into effect.  She says a
6  typical election would probably be two or three percent
7  rejection rate.
8      Q.  Thank you.
9      A.  So again, not taking into account that massive
10  election in 2020.
11      Q.  Yes, okay.  Got it.  And so obviously that
12  35 percent reduction rate is no longer accurate;
13  correct?
14      A.  Correct, it went down.
15      Q.  And would you say that the two or three percent
16  is typical still?
17      A.  Yeah, somewhere in there.
18      Q.  Okay.  Okay.  Great.  I just wanted to make
19  sure we are on the same page.  So is it fair to say that
20  the number of mail ballots rejected in the March primary
21  is significantly greater than in years past?
22      A.  Yes.
23      Q.  And when we talk about mail ballots that are
24  ultimately rejected, is that number inclusive of mail
25  ballots that were cured?

Page 276

1      MS. HUNKER:  Objection, form.
2      THE WITNESS:  I am not sure I understand.
3  We are still talking about the primary 2022?  What
4  election?
5      Q.  (By Ms. Sisco) Yes, yes, sure.
6      A.  Like I say, we cured 837.  And prior to that,
7  we didn't see people coming in to cure their ballots
8  because that was not an option for our senior citizens
9  voting.
10      Q.  Right.  And but when we are talking about like
11  the number, I think I can pull it up.  It was like a
12  3000 number.  Hold on.
13      A.  Oh, our 31 when we all did the math?
14      Q.  Exactly, that number.
15      A.  3103.
16      Q.  Yes, okay.  Thank you.  Does that include
17  ballots that were cured?  Well, now I am confused.
18  Strike that.  Sorry.
19      A.  Now I am confused.  I am not sure we added
20  those two numbers --
21      MS. HUNKER:  Objection, form.
22      THE WITNESS:  -- but then I don't know if
23  we subtracted them or not.
24      Q.  (By Ms. Sisco) And now I have lost my place in
25  both my outline and my notes looking for the --

Page 277

1      A.  My note said the 3103 did not cure.  So 837
2  cured.
3      Q.  Okay.  Exactly.
4      A.  That is what my notes say.
5      Q.  Thank you.  Yes.  I'm sorry.  Thank you both.
6  Okay.  And then I'm sorry but now I lost my place here.
7  Okay.  So that 31 and change number did not include
8  people that cured?
9      A.  Correct.
10      Q.  Okay.  And did that include people who spoiled
11  their mail-in ballot to just go vote in person?
12      A.  No.
13      Q.  So that number, the 31 and change, that number
14  of mail ballots rejected represents individuals who
15  attempted to submit a ballot but did not have their vote
16  counted; is that right?
17      A.  Correct.
18      Q.  And those people never got to participate in
19  the March primary?
20      A.  Correct.
21      MS. HUNKER:  Objection, form.
22      Q.  (By Ms. Sisco) Does that greater number of
23  rejected ballots concern you?
24      A.  Oh, sure.  These are our voters.
25      Q.  Can you tell me more about that?

Jacquelyn Callanen                                April 20, 2022
                                                  Pages 278 to 281

Page 278

1    A.  Again, every one of these voters is important.
2 Every one of them is a vote.  And when we disenfranchise
3 or we lose one, that is not right.  That is not what we
4 are in business for.
5    Q.  Thank you.  And have you -- actually, scratch
6 that because you have answered it already.  Do you have
7 any reason to believe that this significantly larger
8 number of rejected of people who had their ballots
9 rejected are not otherwise eligible voters?
10       MS. HUNKER:  Objection, form.
11       THE WITNESS:  I'm sorry.  I don't
12 understand.
13    Q.  (By Ms. Sisco) I can rephrase.  Do you have any
14 reason to believe that the people -- that the majority
15 of the people whose votes weren't counted because they
16 were rejected, do you think that they are -- do you
17 think there is voter fraud going on there or do you
18 think they are eligible voters who misunderstood or
19 messed up?
20       MS. HUNKER:  Objection, form.
21       THE WITNESS:  I think they were eligible
22 voters.
23    Q.  (By Ms. Sisco) Do you think the SB-1, this ID
24 number requirement confused voters?
25    A.  Yes.

Page 279

1    Q.  Did the secretary of state provide adequate
2 guidance on this requirement to voters?
3    A.  In my opinion which is only an opinion, the
4 answer would be no.
5    Q.  And has -- do you think the secretary of state
6 has provided additional -- since the March 2022 primary,
7 do you think that now the secretary of state has
8 provided adequate guidance to voters?
9    A.  No.
10    Q.  Okay.  Thank you.  So we talked a lot about how
11 people can come in person to cure their votes?
12    A.  Yes.
13    Q.  Okay.  And I believe you said that they
14 could -- you, if their application is rejected, you were
15 just sending them a new application?
16    A.  Correct.
17    Q.  So could they have returned that by mail?
18    A.  Absolutely.
19    Q.  Okay.  Do you know how many people did that?
20    A.  No.  As I said, we weren't tracking that at the
21 time.
22    Q.  And could they provide like their number?
23 Could they cure it by email?
24    A.  They could but they didn't.
25    Q.  Okay.

Page 280

1    A.  Again, there was a strong hesitancy of sending
2 information like that over the internet in an email.
3 And I don't blame them.
4    Q.  Understood.  And would they provide an updated
5 number by phone?
6    A.  No.
7    Q.  Okay.  And we talked about they could
8 theoretically do it online but it didn't work and only
9 39 voters were able to do that?
10    A.  Correct.
11    Q.  Okay.  Can a voter -- could a voter who came in
12 person to cure their ballot, could they do that curbside
13 or would they have to physically go into your office and
14 talk to an elections worker?
15    A.  We did provide curbside for that.
16    Q.  Okay.  Great.  And we have talked a lot about
17 the steps that your office, the various steps that your
18 office has taken to help voters kind of understand and
19 cure their ballot issues.  Do you remember that?
20    A.  Yes.
21    Q.  And one of the things you mentioned is that
22 your office started advising people to just put both
23 numbers on everything?
24    A.  Correct.
25    Q.  When did you start advising that?

Page 281

1    A.  When it became apparent that we had a problem.
2    Q.  And when was that?
3    A.  You know, probably like the third week of
4 January.
5    Q.  Okay.  And why did you start advising that?
6    A.  Again, because we were noticing that we were
7 getting the wrong number.  I don't want to say it is the
8 wrong number.  The other number.
9    Q.  Got it.  Okay.  And you also mentioned that
10 your office sent voter registration cards with new
11 applications when the original was rejected; correct?
12    A.  Correct.
13    Q.  Did that require the use of resources like
14 staff or funding to do that that wasn't necessary in
15 prior elections?
16    A.  Correct.
17    Q.  Can you describe a little bit what additional
18 resources were required?
19    A.  I mean, again, you have the staff time to do
20 it.  You have the cost of the new voter registration
21 card.  You have the cost of the mailer.  You have your
22 envelopes that are nine cents a piece.  You have your
23 application, the new application.  You have the new
24 voter registration card and you are going to pay the
25 postage out.  So each one was a necessary financial

Jacquelyn Callanen

Page 310

1    Q.   Was the response provided in written or oral
2 format?  Scratch that.  Does the secretary of state
3 provide any written guidance to you regarding the ADA?
4           MS. HUNKER:  Objection, form.
5           THE WITNESS:  No.
6    Q.   (By Ms. Sisco) Has the secretary of state
7 provided any written guidance pertaining to the ADA and
8 SB-1 specifically?
9    A.   No.
10   Q.   Does the secretary of state provide any
11 training to you -- never mind.
12          MS. SISCO:  Okay.  Thank you.  That's it.
13 I will turn the witness over.  Can we go off the record?
14          VIDEOGRAPHER:  Yes.  The time is 6:11 p.m.
15 We are off the record.
16          (Recess taken)
17          VIDEOGRAPHER:  The time is 6:12 p.m.  We
18 are back on the record.
19          EXAMINATION
20 BY MR. MALHI:
21   Q.   Hi, Ms. Callenan.  My name is Jaywin and I am
22 one of the attorneys on behalf of the United States.  I
23 am mindful of the time so if it works for you, can we
24 just jump into the questions?
25   A.   Please.

Page 311

1    Q.   My first set of questions is about your
2 validation process for mail ballot materials.  And just
3 to make sure we are on the same page, when I use the
4 term mail ballot materials, I am using that generically
5 to encompass both applications for ballot by mail but
6 also the mail ballot carrier envelopes.  So take us --
7 let's think back to pre-SB-1, before SB-1 was in effect.
8    A.   Yes.
9    Q.   How did your office determine that the voter
10 who sent in mail ballot material was an eligible
11 registered voter?
12   A.   Again, once the application reaches us, when we
13 enter it into the database, it is either a voter -- and
14 our system is set up that -- in such a way -- excuse
15 me -- that when we touch that record in an election, it
16 will actually tell the data processor the age of the
17 voter.  They don't have to figure out using years of
18 birth.
19   Q.   Understood.  And now when you are actually
20 looking up that voter in your database to confirm they
21 are eligible and registered, what pieces of information
22 are you entering to actually pull up the voter's record?
23   A.   It --
24   Q.   Just to clarify -- sorry.  This is pre-SB-1,
25 what information were you entering?

Page 312

1    A.   Yes.  Basically, we used whichever is the
2 shortcut.  If they have their voter registration number
3 on that card, which a number of the consultants do, we
4 put in that ten digit number and it brings up their
5 record.  If the card does not have their voter
6 registration number on it, then we have to put in their
7 name.  And then at some point, we have to put in their
8 birth date.
9           For instance, if we had Joe Smith, it
10 would bring up 97 of them.  And so to narrow the field,
11 then we would put in the birth date.  So it is different
12 depending on the application.
13   Q.   Understood.  So now post-SB-1, now that SB-1
14 has come into effect, how do you determine that the
15 voter who submits a mail ballot material is an eligible
16 registered voter?
17   A.   Again, we do the same data entry at that point
18 using one of the points I just spoke to.  But when it
19 brings the record up, we have adjusted our screens so
20 that it will go and pull in whether there is a TDL or
21 the last four of the SSN.
22   Q.   Got it.  So when you are actually typing in the
23 voter now post-SB-1 to look up their record, are you
24 typing in their Texas driver's license number or the
25 last four digits of their social security number or some

Page 313

1 other piece of information first?
2    A.   No, we are using the same information that we
3 used pre-SB-1.  We are putting in their voter
4 registration number or their first and last name and
5 their birth date.
6    Q.   And then -- sorry.  Go ahead.
7    A.   We do not type in the TDL or the SSN.
8    Q.   But I understand that after you pulled up the
9 voter record, the voter registration record, you will
10 then cross check the ID number; right?  Is the Texas
11 driver's license or the social security number; is that
12 correct?
13   A.   Yes, we had our vendor modify our system,
14 upgrade it so that those numbers appear on the
15 right-hand side of the screen if they are there.
16   Q.   So now pre-SB-1 again, how long on average
17 would you estimate it took your office to process a
18 single -- let's say application for ballot by mail?
19   A.   I think they can absolutely process them within
20 three minutes.
21   Q.   And now post-SB-1, on average, how long do you
22 think it takes to process on average a single
23 application for ballot by mail?
24   A.   Prior -- to answer your question, as we started
25 at the beginning of SB-1, we were processing it the same

# Don't Forget Your ID Numbers!



Under the flap on your teal and white carrier envelope, where it says "Required Information," you must provide at least one of the required ID numbers. **We recommend providing both.**

# No Olvides Tu Número de Identificación!



Bajo la solapa del sobre de envío color verde azulado y blanco, en donde dice "Información Requerida," debe usted proveer al menos uno de los números de ID requeridos. **Nosotros recomendamos que escriba los dos.**



EXHIBIT

EXHIBIT
94

Charlie Johnson                                              March 29, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO, ET AL.,)(
        Plaintiffs,                   )(
 4                                    )(   Case No.:
    V.                                )(   5:21-cv-0844-XR
 5                                    )(
    TEXAS, ET AL.,                    )(
 6      Defendants.                   )(
 7  _____

    OCA-GREATER HOUSTON, ET AL.,      )(
 8      Plaintiffs,                   )(
                                      )(
 9  V.                                )(   Case No.:
                                      )(   1:21-cv-0780-XR
10  TEXAS SECRETARY OF STATE          )(
    JANE NELSON, ET AL.,              )(
11      Defendants.                   )(
12  _____

    HOUSTON AREA URBAN LEAGUE, ET AL., )(
13      Plaintiffs,                   )(
                                      )(   Case No.:
14  V.                                )(   5:21-cv-0848-XR
                                      )(
15  GREGORY WAYNE ABBOTT, ET AL.,     )(
        Defendants.
16  _____

17  LULAC TEXAS, ET AL.,              )(
        Plaintiffs,                   )(
18                                    )(   Case No.:
    V.                                )(   1:21-cv-0786-XR
19                                    )(
    JANE NELSON, ET AL.,              )(
20      Defendants.                   )(
21  _____

    MI FAMILIA VOTA, ET AL.,          )(
22      Plaintiffs,                   )(
                                      )(   Case No.:
23  V.                                )(   5:21-cv-0920-XR
                                      )(
24  GREG ABBOTT, ET AL.,              )(
        Defendants.                   )(
25  _____
```



Charlie Johnson

March 29, 2023
Pages 2 to 5

---

Page 2

1 THE UNITED STATES OF AMERICA,    )(
    Plaintiff,                )(
2                          )(  Case No.
  V.                       )(  5:21-cv-1085-XR
3                          )(
  STATE OF TEXAS, ET AL.,        )(
4     Defendants.            )(
5 *********************************************************
6        ORAL 30(b)(6) DEPOSITION OF
7        TRAVIS COUNTY CLERK'S OFFICE
8        TESTIMONY OF CHARLIE JOHNSON
9            March 29, 2023
10 *********************************************************
11
12
13        ORAL DEPOSITION OF CHARLIE
14 JOHNSON, produced as a witness at the instance of the
15 Consolidated Plaintiffs, and duly sworn, was taken in
16 the above-styled and numbered cause on the 29th day of
17 March, 2023, from 10:38 a.m. to 1:10 p.m., before
18 STEPHANIE DAVIS, CSR, in and for the State of Texas,
19 reported by oral stenograph, at the Travis County
20 Attorney's Office, 314 West 11th Street, Fifth Floor,
21 Austin, Texas, pursuant to the Federal Rules of Civil
22 Procedure and the provisions stated on the record or
23 attached herein.
24
25

---

Page 4

1 FOR THE STATE OF TEXAS, GREG ABBOTT, IN HIS OFFICIAL
  CAPACITY AS GOVERNOR OF TEXAS; JANE NELSON, IN HER
2 OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE;
  WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE
3 TEXAS ATTORNEY GENERAL:
4        LOUIS J. CAPOZZI (Appeared Remotely)
      JONES DAY
5     51 Louisiana Avenue, Northwest
    Washington, DC  20001
6     lcapozzi@jonesday.com
7
  FOR DAN HAYES, CHARLIE JOHNSON, AND BRIDGETTE
8 ESCABEDO, IN THEIR OFFICIAL CAPACITIES AS TRAVIS
  COUNTY CLERKS AND DISTRICT ATTORNEY, RESPECTIVELY:
9
     ANTHONY J. NELSON
10        PATRICK T. POPE
     TRAVIS COUNTY ASSISTANT COUNTY ATTONEY
11     314 West 11th Street, Fifth Floor
    Austin, Texas  78767
12     tony.nelson@traviscountytx.gov
    patrick.pope@traviscountytx.gov
13
14 FOR HIDALGO COUNTY ELECTIONS ADMINISTRATOR DELIA
  GARZA:
15
     LEIGH ANN TOGNETTI (Appeared Remotely)
16        ASSISTANT DISTRICT ATTORNEY
     100 East Cano, First Floor
17     Hidalgo County Courthouse Annex III
    Edinburg, Texas  78539
18     leigh.tognetti@da.co.hidalgo.tx.us
19
20 ALSO PRESENT:
21        GABE HODGE, paralegal for Mr. Nelson
22
23
24
25

---

Page 3

1        A P P E A R A N C E S
2 FOR TEXAS CIVIL RIGHTS PROJECT:
3        ZACHARY DOLLING
     HANI MIRZA
4        VERONIKAH WARMS
     1405 Montopolis Drive
5     Austin, Texas  78741
    zachary@texascivilrightsproject.org
6     hani@texascivilrightsproject.org
    veronikah@texascivilrightsproject.org
7
  FOR THE U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS
8 DIVISION:
     DANA PAIKOWSKY
9        JOHN SULLIVAN BAKER (Appeared Remotely)
     Robert F. Kennedy Building
10        950 Pennsylvania Avenue, Northwest
    Washington, DC  20530
11     dana.paikowsky@usdoj.gov
    john.bakersullivan@usdoj.gov
12
  FOR OCA-GREATER HOUSTON, ET AL.:
13
     KENNETH BROUGHTON (Appeared Remotely)
14        REED SMITH, LLP
     811 Main Street, Suite 1700
15     Houston, Texas  77002-6110
    kbroughton@reedsmith.com
16
  FOR ATTORNEY GENERAL KEN PAXTON:
17
     WILLIAM D. WASSDORF
18        AARON BARNES
     ASSISTANT ATTORNEY GENERAL
19        PO Box 12548
    Austin, Texas, 78711-2548
20     will.wassdorf@oag.texas.gov
    aaron.barnes@aog.texas.gov
21
  FOR HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE:
22
     ANNE CRISP (Appeared Remotley)
23        BUTLER SNOW LLP
     1400 Lavaca Street, Suite 1000
24        Austin, Texas 78701
    anne.crisp@butlersnow.com
25

---

Page 5

1            I N D E X
2                      PAGE
3 Appearances ...................................    3
4 DAN HAYES
  Examination by Mr. Dolling ..................    7
5 Examination by Ms. Paikowsky ...............   39
  Examination by Mr. Wassdorf ................   53
6 Further Examination by Mr. Dolling ..........   72
  Further Examination by Ms. Paikowsky ........   84
7 Further Examination by Mr. Wassdorf ..........   88
8 Changes and Signature Page ..................   92
9 Reporter's Certificate ......................   95
10
11        E X H I B I T S
12 NUMBER   DESCRIPTION                 PAGE
13   3     Notice of Rejected Application for
14        Ballot by Mail ..................   26
15   4     V.T.C.A. Election Code ?84.014 .....   29
16   5     Defendant Dyana Limon-Mercado's
     Objections and Responses to OCA
17        Plaintiffs' First Set of
     Interrogatories ...................   35
18
    6     Defendant Dyana Limon-Mercado's
19        Objections and Responses to State
     Defendants' Second Set of
20        Interrogatories ...................   47
21   7     Bates Stamped 064.134766 ...........   51
22   8     Notice of Carrier Defect ..........   73
23   9     Bates Stamped 064.128072 ...........   73
24  10     Bates Stamped 064.134344 ...........   78
25



Charlie Johnson                                          March 29, 2023
                                                         Pages 6 to 9

---

Page 6

1       P R O C E E D I N G S
2           THE COURT REPORTER:  All right,
3  everyone.  We are on the record.  This is the
4  deposition of Charlie Johnson starting at 10:45 a.m.,
5  on March 29th, 2023.  Will counsel please state their
6  appearance for the record.
7           MR. NELSON:  Yes.  Assistant Travis
8  County attorney Tony Nelson for the Travis County
9  defendants and the witness, Charlie Johnson.
10          MR. DOLLING:  Zachary Dolling from
11 Texas Civil Rights Project on behalf of the OCA
12 plaintiffs.
13          MR. WASSDORF:  Will Wassdorf with the
14 office of the Attorney General on behalf of State
15 defendants.
16          MR. BARNES:  Aaron Barnes with the
17 office of the Attorney General on behalf of State
18 defendants.
19          MS. WARMS:  Veronikah Warms with the
20 Texas Civil Rights Project on behalf of the OCA
21 plaintiffs.
22          MS. PAIKOWSKY:  Dana Paikowsky on the
23 behalf of the United States.
24          MR. MIRZA:  Hani Mirza on behalf of the
25 OCA plaintiffs with the Texas Civil Rights Project.

---

Page 7

1           CHARLIE JOHNSON,
2  having been duly sworn, testified as follows:
3           THE COURT REPORTER:  Sir, on Zoom, if
4  you'd like to go ahead and identify yourself.
5           MR. BROUGHTON:  Kenneth Broughton for
6  et al plaintiffs.
7           THE COURT REPORTER:  All right.  If
8  that's everyone, we'll go ahead and proceed.
9               EXAMINATION
10 BY MR. DOLLING:
11     Q.   Good morning, Mr. Johnson.  My name is Zach
12 Dolling.  Thank you for being here today.  Could you
13 please state your name and spell it for the record?
14     A.   Charlie Johnson, C-H-A-R-L-I-E
15 J-O-H-N-S-O-N.
16     Q.   For the benefit of the court reporter and
17 the people attending via Zoom who may not be able to
18 see you well, will you please provide verbal answers
19 like yes and no rather than nodding or shaking your
20 head?
21     A.   Yes.
22     Q.   It's also important that we don't speak over
23 one another so that the court reporter can get a clean
24 record of what's said.  I'll do my best to wait for
25 you to finish talking.  Can you do your best to wait

---

Page 8

1  for me to finish talking as well?
2      A.   I will.
3      Q.   Thank you.  If you don't understand a
4  question, will you please let me know?
5      A.   Yes.
6      Q.   And if you do answer without asking for
7  clarification, I'm going to assume that you understood
8  the question; is that fair?
9      A.   It is.
10     Q.   Your attorney may object to a question,
11 after which you must still answer unless they
12 specifically instruct you not to.  Do you understand?
13     A.   I do.
14     Q.   And if at any time you want to take a break,
15 just let me know.  All I ask is that if there is a
16 pending question, you answer it before we take that
17 break.  Is that okay?
18     A.   That is.
19     Q.   Is there -- have you taken any prescription
20 medications, alcohol, drugs, suffered any condition or
21 injury or otherwise have reason to believe that you
22 might be impaired in testifying truthfully and
23 accurately today?
24     A.   No.
25     Q.   And finally, I'd like to remind you that you

---

Page 9

1  are under oath and subject to federal penalties for
2  false or misleading testimony.  It's important that
3  you answer my questions fully, completely, and
4  truthfully; do you understand?
5      A.   I do.
6      Q.   And do you have any questions for me before
7  we get started?
8      A.   I do not.
9      Q.   Okay.  I believe in front of you, you have
10 something that should be marked as Exhibit 1 -- it's
11 one of those two -- and if you could just flip through
12 that quickly.  Let me know when you're done.
13     A.   I'm done.
14     Q.   Have you seen this document before?
15     A.   I have.
16     Q.   And I'm just going to read the title, which
17 is on page 2, "Second Amended Notice of Rule 30(b)(6)
18 Deposition of the office of the Travis County Clerk."
19 Did I read that correctly?
20     A.   You did.
21     Q.   And do you understand that you are here
22 today pursuant to this notice?
23     A.   I do.
24     Q.   And do you understand that the Travis County
25 Clerk's office has designated you to provide testimony



Charlie Johnson                                                 March 29, 2023
                                                                Pages 38 to 41

Page 38

1 hundreds.  And so I'll just turn to Interrogatory
2 Number -- think it's Number 2, but there's numerous
3 subparts.  And this will be on page 4 of 6, and we'll
4 start -- and it's in the middle.  And it says,
5 "Interrogatory Number 2 for the November '22 general
6 election and with respect only to timely received
7 ballots by mail," do you see that?
8     A.   I do.
9     Q.   State -- and then we turn the page to
10 Subpart F.  It says, "State the number of ballots by
11 mail finally rejected by Travis County pursuant to
12 SB-1, Sections 5.12, 5.13, and/or 5.14 because the
13 information provided by the voter did not identify the
14 same voter identified on the voter's application for
15 voter registration."  Did I read that correctly?
16    A.   You did.
17    Q.   And that refers to the ID matching
18 requirements of SB-1; is that correct?
19    A.   It does.
20    Q.   And the answer there is 418 ballots were
21 finally rejected; is that correct?
22    A.   That is correct.
23    Q.   And so I just wanted to go back -- just to
24 circle back to what you said previously.
25    A.   Understood.

Page 39

1     Q.   And I believe that's all my questions for
2 now; so I can pass the witness.
3          MR. NELSON:  Can we go off record
4 before we start further exam?
5          THE COURT REPORTER:  We are off the
6 record.
7          (Off the record.)
8          THE COURT REPORTER:  All right,
9 everyone.  We are back on the record.
10         EXAMINATION
11 BY MS. PAIKOWSKY:
12    Q.   All right.  Good -- I guess it's still
13 morning.  Good morning, Mr. Johnson.  My name is Dana
14 Paikowsky.  I'm with the United States.  So I'm just
15 going to pick up a little bit on -- I will talk
16 louder, and I will pick up on some of what we've been
17 talking about.  So your office previously testified
18 that some voters had difficulty complying with the --
19 SB-1's mail ballot ID requirement.  Was that still
20 true during the 2022 general election?
21    A.   In the course of reaching out to voters,
22 specifically by phone, there was some difficulty in
23 getting some folks to utilize the tracker, the online
24 Secretary of State tracker.  Oftentimes it would
25 require 30 to 40 minutes of someone's time, and

Page 40

1 typically folks that are a little less familiar with
2 computers and the Internet, that sort of thing, it
3 took a little bit longer.  And there were occasions
4 where we weren't able to complete the cure process
5 online, and there were indications that they would
6 continue to attempt to do so on their own or seek help
7 or something like that.
8     Q.   Are you aware of any voters who were unable
9 to cure and unable to vote in the November 2022
10 general election?
11    A.   Well, there were several folks -- there's
12 were 400 or so, as we just saw, that were unable to
13 cure and their ballots were ultimately rejected.
14    Q.   Did some voters have difficulty complying
15 with SB-1's mail identification requirement on the
16 front end?  For example, providing a wrong
17 identification number or failing to list an
18 identification number at all?
19    A.   Yes, there was several, in the hundreds,
20 where folks either entered the wrong -- or placed the
21 wrong number on their application and their ballots or
22 didn't include it at all.  And that resulted in a
23 rejection.
24    Q.   When you heard from some of the voters who
25 were affected by Senate Bill 1's mail identification

Page 41

1 requirement, did any voters indicate confusion with
2 the process?
3     A.   We had several phone calls.  People seeking
4 clarification on how that process would work, yes.
5     Q.   So I'm going to turn a little bit to the
6 sort of mechanics of the processing of ABBMs and mail
7 ballots.  When your office receives an ABBM, how does
8 your office look up that voter's voter file?
9     A.   Depends on the information that they give
10 us.  If they provide a VUID, which is the state ID, we
11 typically look it up that way.  If not, then we'll do
12 a name and date of birth match to find the voter that
13 matches the information on the rest of the
14 application.
15    Q.   The same question for carrier envelopes.
16 How does your office pull up a voter's file once
17 you've received a carrier envelope?
18    A.   Well, the carrier envelope includes a unique
19 identification number that is tied specifically to
20 that voter.  So it is a much, much simpler process.
21 Once that is received, it can be scanned and tied
22 immediately to that voter that it has been received
23 before it goes onto signature verification to continue
24 verifying all the information on it.
25    Q.   And that's a bar code that's on the carrier



Charlie Johnson

March 29, 2023
Pages 42 to 45

Page 42

1 envelope that you provide to the voter and to send
2 back to you?
3     A.   That's correct.
4     Q.   Does your office use the driver's license or
5 social security number for any purpose beyond
6 determining whether an ABBM or mail ballot can be
7 accepted in light of Senate Bill 1?
8     A.   Other than as an additional piece of
9 information to help research the voter to find out who
10 the application might be for -- but it would be very
11 rare -- no.
12     Q.   Is there ever an instance where --
13 withdrawn.
14        Can you think of an instance where you were
15 unable to look up a voter based on name, birth date,
16 and other identification -- other information on their
17 ballot aside from a driver's license or social
18 security number?
19     A.   That does happen occasionally.
20     Q.   Previous to Senate Bill 1, were you ever
21 unable to look up a voter's file with the information
22 provided on an ABBM or carrier envelope?
23     A.   Yes.
24     Q.   Would you be able to look up -- does your
25 county send out notices of final rejection?  This is

Page 43

1 distinct from notices of a ballot defect or any ABBM
2 defect to let people know that their ballot was
3 rejected or their ABBM was rejected.
4     A.   Yes, we are required to send out that
5 additional notice indicating that their ballot has
6 been rejected.
7     Q.   And how do you provide that notice?
8     A.   By mail.  And I apologize, I might have said
9 ballot.  But if I said ballot, I meant application.
10 That their application had been rejected.
11     Q.   What about for ballots?
12     A.   Yes, that's a very similar process.  After
13 the cure period has ended, we will send out a final
14 rejection notice indicating that their ballot had been
15 finally rejected.
16     Q.   For the November 2022 general election, did
17 your office hire employees or contractors to
18 facilitate, support, or assist with mail voting and
19 the implementation of SB-1's identification
20 requirements?
21     A.   We hire temporary workers.
22     Q.   Why?
23     A.   Well, this is a matter of standard operating
24 procedure.  For every election, we hire a number of
25 temporary workers to help manage the extra volume of

Page 44

1 applications and ballots that we receive in and around
2 an election period.
3     Q.   Did you hire -- I'm sorry, withdrawn.
4        Were your needs greater -- hiring needs
5 greater after Senate Bill 1's identification
6 requirements?
7     A.   I could not speak to that.  I started in
8 2020.  We had -- it was a very large election.  We had
9 lots and lots of folks, and then -- so I really could
10 not compare the elections under SB-1 to my experience
11 to elections before that, as far as the number of
12 temporary employees we had to hire to handle those
13 tasks.
14     Q.   Is there anyone who might be able to?
15     A.   It's possible that Bridgette might be able
16 to.
17     Q.   So during the November 2022 general
18 election, were there voters who you needed to notify
19 of a ballot defect but did not provide a phone number
20 or an email address?
21     A.   Prior to which election?
22     Q.   In the November '22 general election?
23     A.   Were there voters that we had to notify who
24 did not provide a phone number or email?  Yes.
25     Q.   And how did you contact those voters?

Page 45

1     A.   Just by mail.
2     Q.   In the November 2022 general election, were
3 there voters who did not pick up the phone when they
4 were called?
5     A.   Yes.
6     Q.   How did you contact those voters?
7     A.   By mail or email if they provided it.
8     Q.   In the November 2022 general election, were
9 there voters in your county whose mail ballot
10 rejection notice was not mailed until it was too late
11 for them to cure an ID issue?
12     A.   For their ballots?
13     Q.   Correct.
14     A.   I don't think so.
15     Q.   So you mentioned previously you send cure
16 notices up until the last day a voter can cure.  Were
17 there any voters for whom you had to send notice by
18 mail, but that notice couldn't be sent out until the
19 last day or shortly before the cure period was over?
20     A.   Are you referring to applications or to
21 ballots?
22     Q.   Ballots.
23     A.   For typical ballot by mail voters, the
24 deadline to receive their ballot is typically the next
25 business day after an election, which gives us roughly



Page 46

1 a week to have that voter cure if necessary. And we
2 make every effort to get the notice in the mail
3 immediately and initiate those phone calls right away.
4 Typically within 24 hours, if we can. The exception
5 to that would be our SPCA, which oversees military
6 folks who have an additional period of time in which
7 to sent their ballot in. And it is possible that if
8 we receive their ballot on the deadline, there is not
9 enough turnaround to contact that person to have them
10 cured before the deadline.
11      Q.   Has your office ever referred -- actually,
12 withdrawn.
13           Based on your experience thus far, do you
14 believe that the rejection rate for ID defects will
15 ever be zero?
16      A.   I have never seen rejection rate for ballots
17 at zero.
18      Q.   Why do you believe that the rejection rate
19 for ID issues will never be zero?
20           MR. WASSDORF:  Objection.  Form.
21      A.   I couldn't speak to that.
22      Q.   Do you believe that human error can impact
23 the ability to comply with the ID provisions of Senate
24 Bill 1?
25      A.   I've seen folks transpose a number.

Page 47

1 Assuming that's human error, yes.
2      Q.   And do you believe human error, for example,
3 in the database can also result in ballot rejection?
4      A.   Absolutely.
5      Q.   So is it fair to say that human error and
6 database errors will continue to be a cause of
7 rejections unrelated to the eligibility of the voter
8 to cast a ballot by mail?
9      A.   In the normal course of events of our
10 business activities, there will always be some small
11 amount of human error; so sure.  Certainly.
12      Q.   I'm going to pass out an exhibit.
13           MS. PAIKOWSKY:  I think -- are we on 5?
14           MR. NELSON:  6.
15      Q.   Do you recognize this document?
16      A.   I do.
17      Q.   And so the top says, "Defendant Dyana
18 Limon-Mercado's Objections and Responses to State
19 Defendants' Second Set of Interrogatories."  And I
20 will have you turn to the last page, page 6.
21 Actually, I guess we'll start on page 5.  And so
22 Interrogatory Number 4 reads, "Please identify and
23 describe the specificity of Travis County's final
24 rejection rate of timely received ballots by mail
25 expressed as a percentage of all timely received

Page 48

1 ballots by mail and round it to two decimal points for
2 the following elections."  And then it asks for the
3 2012 election -- which your office represented it
4 doesn't have numbers for -- as well as the 2014
5 election.  But then, for the 2016 election, it reads
6 .98; for the November 2018 election, it reads .47; for
7 the 2020 election, it reads .42; and the November 2022
8 general election, it reads 2.16.  Why, in your
9 experience processing ballots, was the rejection rate
10 higher in 2022 than in previous past elections?
11      A.   The only response I could give to that is
12 based off the total number of rejected ballots,
13 ID-related versus not ID-related.  There were more
14 ID-related rejections than not.
15      Q.   Were ID issues the primary reason for
16 rejection of ballots during the 2022 general election?
17      A.   Yes.
18      Q.   All right.  So we can set that exhibit
19 aside.  Has your office ever referred a voter whose
20 ABBM or carrier envelope did not match the Team record
21 to the office of the Secretary of State as a potential
22 case of voter fraud?
23      A.   I don't recall.
24      Q.   Has your office ever referred a voter whose
25 ABBM or carrier envelope did not match their voter

Page 49

1 record to any other law enforcement authority as a
2 potential case of voter fraud?
3      A.   To law enforcement?  I don't recall ever
4 having to do that.
5      Q.   Are you aware of any instances where
6 fraudulent voting was identified because of an ID
7 mismatch?
8      A.   I don't recall an instance, no.
9      Q.   Did your office receive any communications
10 from voters indicating that they were dissuaded from
11 voting by mail in the November 2022 general election?
12      A.   I don't remember a specific email, no.
13      Q.   You mentioned previously that your office,
14 when checking identification numbers, will first look
15 at your county database and then turn to Team.  When
16 you do look at the Team numbers, does your office ever
17 do live checks?
18      A.   Live check is done by voter registration.
19 If you, mean the live check process that's done with
20 the Secretary of State's office and counties, that is
21 not our office that executes that.
22      Q.   And so the live check process wouldn't be
23 part of the process of comparing an ID to ensure
24 compliance with SB-1?
25      A.   Not on the early voting clerk's side, no.



Charlie Johnson

March 29, 2023
Pages 50 to 53

Page 50

1    Q.   Okay.  Now, see we have our exhibits.
2          (Off the record conversation.)
3          MR. WASSDORF:  You want to go off the
4    record for a second?
5          THE COURT REPORTER:  We are off the
6    record.
7          (Off the record.)
8          MR. NELSON:  Okay.  We're back on the
9    record.  And for counsel who is participating by Zoom,
10   everyone should have received earlier a supplemental
11   production consisting of the ballot by mail and
12   carrier envelope inserts, and that was Bates Stamped
13   Number 064.134766 through 134769 of those documents in
14   English and in Spanish.  In addition, you should have
15   just received a one-page, which is 064.134770, which
16   is an email exchange between Bridgette Escobedo and
17   Christina Adkins with the Secretary of State's office
18   regarding the submission of these inserts for approval
19   and the response from the Secretary of State's office.
20   And with that, I turn it back to counsel for
21   examination.
22   Q.   So I think I may hold off on asking about
23   this -- well, actually, no.  Okay.  So one question
24   first:  So earlier you mentioned how you might use a
25   driver's license or SSN in the ballot processing

Page 51

1    workflow.  What is a situation where you have a
2    voter's full name, date of birth, and address you
3    would need to use a driver's license or SSN to look
4    them up?
5    A.   I wouldn't see a reason to use one of those
6    to look them up.
7    Q.   So -- let's actually -- let's make this
8    Exhibit 7.  And this is the document that says at the
9    top, "Don't forget your ID numbers."  Do you recognize
10   this document?
11   A.   I do.
12   Q.   And there's two pages if you want to take a
13   moment to review.  So the flyer on the first page,
14   would you mind telling us what that is?
15   A.   On the first page is the insert that we
16   would include and a request for an application for
17   ballot by mail.  It is just included in the envelope
18   along with the application itself as a reminder to
19   include one or the other or both IDs when returning
20   the application back to our office.
21   Q.   And it says at the bottom, "We recommend
22   providing both."  Is that correct?
23   A.   That's correct.
24   Q.   And why is it you recommend providing both?
25   A.   Secretary of State's office has indicated

Page 52

1    that is the best practice -- to include both -- just
2    in case if the voter registration system is missing
3    one or the other.  We have both in which to verify.
4    Q.   So the second page says, "Don't forget your
5    ID numbers," as well.  What is this document?
6    A.   Very similar.  It is included in the ballot
7    package that we send out along with all of the other
8    prescribed documents, including the ballots, to remind
9    our voters to include their IDs on their carrier
10   envelope.  One or the other or both as we recommend.
11   Q.   And were you involved in the development of
12   these documents?
13   A.   Yes.
14   Q.   Why did your office decide to develop these
15   inserts?
16   A.   We decided in the spring of 2022 we wanted
17   to take an extra measure to educate our voters to
18   include those numbers in an effort to reduce our
19   rejection rate.
20   Q.   Do you feel you were effective in lowering
21   the rejection rate?
22   A.   I do.
23   Q.   What is your basis for that belief?
24   A.   Well, it's speculation based off of gut
25   feeling.  But the rejection rates did decline, to my

Page 53

1    recollection, pretty significantly between the primary
2    and the elections that followed in 2022.
3    Q.   I think that is it for me, and I will pass
4    the witness.
5          MR. NELSON:  Quick question.  With
6    Exhibit 7, were you including the email -- the
7    Adkins/Escobedo email or not?
8          MS. PAIKOWSKY:  I was going to wait.
9          MR. NELSON:  Okay.  That's fine.  I
10   just wanted to make sure we're clear on what Exhibit 7
11   is.  Thank you.
12         MR. WASSDORF:  Do we want to ask if
13   anyone on the Zoom has any questions or are we just
14   going to assume they don't?
15         MS. PAIKOWSKY:  Does anyone on Zoom
16   have any questions?
17         MS. TOGNETTI:  Not for Hidalgo County.
18         MS. PAIKOWSKY:  All right.  Hearing
19   nothing.
20               EXAMINATION
21   BY MR. WASSDORF:
22   Q.   Earlier you testified that with respect to,
23   I think it was, Exhibit 3, that this only allowed ID
24   numbers to be added to a voter registration; is that
25   correct?



Charlie Johnson

March 29, 2023
Pages 90 to 93

Page 90

1 sent out an application for ballot-by-mail and
2 requested, it would also include one of these inserts
3 that recommended putting both numbers on there?
4     A.   If they got the application from our office,
5 yes.
6     Q.   And then I believe you also testified
7 earlier that Travis County has made social media posts
8 and other voter education efforts encouraging people
9 to put both numbers on it; is that correct?
10     A.   We have.
11     Q.   And so there are multiple ways that voters
12 would have been informed that you encourage them to
13 include both numbers other than the language on the
14 carrier envelope?
15     A.   That's correct.
16     Q.   Have -- do any two voters have the same
17 name?
18     A.   I don't know.  It's possible.
19     Q.   So do you think it's possible that there are
20 two James Smiths that live in Travis County?
21     A.   It's certainly possible, yes.
22     Q.   Do any two voters have the same date of
23 birth?
24     A.   Just the date of birth?  That's
25 mathematically certain, yes.

Page 91

1     Q.   Do you think it's possible that there are
2 two voters out there that have both the same name and
3 the same date of birth?
4     A.   It's possible.  I don't know.
5     Q.   Do you think the inclusion of a driver's
6 license number, personal identification number, or
7 social security number makes your identification of a
8 voter more certain?
9     A.   At times, it can certainly help, yes.
10     Q.   Pass the witness.
11         MS. PAIKOWSKY:  Does anybody else on
12 the line have any questions?  Hearing none, we can go
13 of the record.
14         MR. NELSON:  Going once, going twice.
15 And is Mr. -- before we go off the record, is
16 Mr. Johnson released at this point?
17         MS. PAIKOWSKY:  I believe so.
18         MR. WASSDORF:  Yes.
19         MR. NELSON:  Thank you, Charlie.
20         THE COURT REPORTER:  We are off the
21 record, everyone.
22         (End of testimony at 13:10 p.m.)
23
24
25

Page 92

1                  CHANGES AND SIGNATURE
2 PAGE     LINE                    CHANGE     REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 93

1         I, CHARLIE JOHNSON, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5         _____
6         CHARLIE JOHNSON
7 THE STATE OF TEXAS   )
8 COUNTY OF TRAVIS     )
9     Before me, _____, on
10 this day personally appeared CHARLIE JOHNSON, known to
11 me (or proved to me under oath or through
12 _____) (description of identity card
13 or other document) to be the person whose name is
14 subscribed to the foregoing instrument and
15 acknowledged to me that they executed the same for the
16 purposes and consideration therein expressed.
17
18         Given under my hand and seal of office this
19 _____ day of _____, 2023.
20
21
22
23
24         _____
25         Notary Public in and for the State of Texas



EXHIBIT

95

Transcript of the Testimony of

**The Office of the Dallas County Elections Administrator**

**Date:**

April 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Page 66

1 little bit for me, please?  Can you slow down?
2          MS. HUNKER:  Yes.
3          THE REPORTER:  Thank you.  Okay.  I'm
4 ready.
5          MS. HUNKER:  Ready?
6          THE REPORTER:  Uh-huh.
7              REEXAMINATION
8 BY MS. HUNKER:
9    Q.   Mr. Lopez, when we were talking about the
10 document just earlier, we were referencing the
11 Plaintiff's Exhibit Number 3, correct?
12    A.   Number 3?
13         (Ms. Perales holding document up.)
14    A.   Yes.
15    Q.   And so let's look on the second page of that
16 exhibit.
17    A.   Okay.
18    Q.   And this is where it says "Primary Election
19 Comparison," correct?
20    A.   Yes.
21    Q.   And you were speaking to Counsel about Day 12,
22 correct?
23    A.   Yes.
24    Q.   And that was February 25th, 2022, correct?
25    A.   Yes.

Page 67

1    Q.   And that is the day that the polls were
2 extended an additional three hours; is that correct?
3    A.   Yes.
4    Q.   This chart does not list the times in which
5 voters voted, correct?
6    A.   Correct.
7    Q.   And so you don't know when the voters voted
8 that day, is that correct?
9    A.   That's correct.
10    Q.   And if we look at 2018 and 2014, it appears
11 that the last day of Early Voting has the most number of
12 in-person votes for the Early Voting period; is that
13 correct?
14    A.   That's correct.
15         MS. PERALES:  Objection.
16         MS. HUNKER:  No more questions.
17         MS. PERALES:  No more questions here.
18         MR. STOOL:  We don't have any questions.
19         MS. PERALES:  Shall we go off the record
20 while they switch microphones?
21         MS. HUNKER:  I think so.
22         MR. STOOL:  Yes.
23         THE VIDEOGRAPHER:  Okay.  We're going back
24 off the record.  The time is 12:16 p.m.
25         (Discussion off the record.)

Page 68

1          THE VIDEOGRAPHER:  Okay.  We're back on
2 the record.  The time is 12:19 p.m.
3              EXAMINATION
4 BY MS. PERALES:
5    Q.   Good afternoon, Ms. Phillips.
6    A.   Hello.
7    Q.   Can you please --
8          THE REPORTER:  Oh, I forgot to swear her
9 in.
10         MS. PERALES:  I know.  I just thought of
11 that.
12    Q.   Can you please give us a second because we want
13 to make sure that you're sworn in.
14    A.   Okay.
15         THE REPORTER:  Okay.  Can you please raise
16 your right hand?
17         (Witness sworn by the court reporter.)
18         THE REPORTER:  Okay.  Thank you.
19         MS. PERALES:  Do we know -- can we mute
20 that participant?
21         (The Videographer moves head up and down.)
22         MS. PERALES:  We're going to take a minute
23 to mute someone.
24         THE WITNESS:  Okay.
25         THE VIDEOGRAPHER:  I don't have the

Page 69

1 permission to mute them, so we'll just have to ask them.
2          MR. STOOL:  Just to --
3          THE VIDEOGRAPHER:  Never mind.  We're
4 good.
5          MS. PERALES:  Thank you.
6             TACOMA PHILLIPS,
7 having being first duly sworn, testified as follows:
8              EXAMINATION
9             (Continued)
10 BY MS. PERALES:
11    Q.   Ms. Phillips, you've been here since the start
12 of Mr. Lopez's testimony; is that correct?
13    A.   Yes.
14    Q.   And so you've already heard me introduce myself
15 and walk him through some of the rules of the road for a
16 deposition; is that right?
17    A.   Yes.
18    Q.   So I'll -- I'll ask you a shorter version of
19 those questions --
20    A.   Okay.
21    Q.   -- which is, first:  Have you ever had your
22 deposition taken?
23    A.   No.
24    Q.   Okay.  First time.  It's an honor to be taking
25 your deposition.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                  Pages 150 to 153

Page 150

1 BY MS. BENDER:
2    Q.  Okay.  Ms. Phillips, thank you for being here
3 today.  I just had a few follow-up questions for you
4 based upon your conversation earlier.
5        So you talked earlier about looking up an
6 individual --
7           (Lights went off in the room.)
8           THE REPORTER:  Do y'all want to go off the
9 record?
10          MR. BENDER:  Yeah.
11          MS. PERALES:  Yeah.
12          THE REPORTER:  Can we go off the record?
13          THE VIDEOGRAPHER:  Okay.  We're going off
14 record at 2:13.
15          (Discussion off the record.)
16          THE VIDEOGRAPHER:  Okay.  We are back on
17 the record at 2:15 p.m.
18          MS. PERALES:  Brady, we need you to start
19 again, but also to start by saying who you are.
20          MS. BENDER:  Yes.  Hi.  So this is Brady
21 Bender.  I represent the United States.
22    Q.  (By Ms. Bender)  So I just have a few questions
23 to follow up on the conversation from earlier.  You had
24 talked earlier about looking up an individual voter in
25 VEMAC when you were -- received an ABBM or carrier

Page 151

1 envelope.
2        When you received an application for ballot by
3 mail or a carrier envelope before SB 1, how would you
4 find the voter in your database to confirm eligibility
5 and registration?
6    A.  By looking them up in VEMACS, the same way --
7    Q.  So what do you confirm --
8    A.  We will use the voter's last name, first name.
9 The application always asks for a date of birth.  It
10 wasn't required, but they can put it on there, or we
11 will look up through their address.
12    Q.  Okay.  And when you receive an ABBM or mail
13 ballot carrier envelope after SB 1, how do you find the
14 voter in your database?
15    A.  Are you asking for the ABBM or the carrier
16 envelope?
17    Q.  Either one.  If they are different, then let's
18 start with the ABBM.
19    A.  Okay.  If we are looking up for ABB- -- ABBM
20 application, we would still look them up by the first
21 name, last name, date of birth.  Since they did provide
22 a driver's license or the last four digits of Social
23 Security, we can also look that voter up by their
24 driver's license.
25    Q.  And for the -- if mail ballot carrier envelope,

Page 152

1 would you look them up using different information?
2    A.  With the mail ballot carrier envelope, with the
3 VEMACS voter reg- -- VEMAC system, it creates a label;
4 and the label has a bar code on there.  Also it has the
5 voter's -- voter's certificate, which is in-house in
6 V- -- in VR system.
7    Q.  Okay.  And you said you would use the label
8 information --
9    A.  Yes.
10   Q.  -- to look them up?
11   A.  Yes.
12   Q.  Before SB 1, how long, on average, would you
13 estimate that it took your office to process an ABBM?
14   A.  Maybe a minute or less.
15   Q.  And after SB 1, how long would you estimate for
16 your office to process an ABBM?
17   A.  Maybe a minute or less.  About the same time.
18 It's actually --
19   Q.  Okay.
20   A.  -- verifying, looking up the voter.
21   Q.  Okay.  Before SB 1, how long would you estimate
22 it took to process a mail ballot carrier en- --
23   A.  I --
24          MS. HUNKER:  Objection, form.
25   A.  -- could not guess on that because I do not

Page 153

1 verify the carrier envelope.  Signature verification
2 does.
3    Q.  (By Ms. Bender)  Okay.  Okay.  During the March
4 2022 primary, if mail ballot materials did not list a
5 driver's license number that appeared in the database,
6 but it had the last four digits of the social security
7 number and it matched the database, would you accept it?
8    A.  Yes.
9    Q.  And is this always your interpretation of the
10 law?
11          MS. HUNKER:  Objection to form.
12   A.  Yes, either-or, whichever they put on there.
13 And if it's in our voter registration system, we -- we
14 picked either-or, either one.
15   Q.  (By Ms. Bender)  Okay.  So throughou- -- so
16 throughout the time that you were processing ballots for
17 March '22 -- '22 primary, you would accept it if it had
18 either a driver's license number or a Social Security
19 number?
20   A.  Yes.
21   Q.  Okay.  And if it listed an incorrect driver's
22 license number compared to what you had in the database,
23 but it had the last four digits of the Social Security
24 number that matched the database, would you accept that?
25   A.  Yes.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 182 to 185

Page 182

1        THE REPORTER:  Wait just a second, please.
2 Okay.  Thank you.
3        MS. HUNKER:  Okay.
4            REEXAMINATION
5 BY MS. HUNKER:
6    Q.   Going back to that scenario, the father and the
7 son --
8    A.   Uh-huh.
9    Q.   -- the father may not be over 65, correct?
10   A.   Uh-huh.
11       THE REPORTER:  Was that a "yes"?
12       THE WITNESS:  I'm sorry.  I'm sorry.
13 "Yes."
14   Q.   And so if the father were not over 65, he would
15 not have to put his date of birth, correct?
16       MS. PERALES:  Objection.
17   A.   That --
18   Q.   (By Ms. Hunker)  I can rephrase the question.
19   A.   Yes, please.
20   Q.   You had mentioned earlier that date of birth
21 was not required on the application form, correct?
22   A.   Beforehand, yes.
23   Q.   Yes.  And so if the father was not over 65,
24 there would be no requirement for him to put -- put his
25 date of birth on the application; is that correct?

Page 183

1    A.   I believe there's no requirement on the
2 application now.  I believe it's optional.  I'm not
3 quite sure.  I have to look at a application.
4    Q.   Pre-SB 1?
5    A.   I believe on pre -- I believe SB 1 is optional.
6 I have to look at the application.  I -- to my
7 recollection, I don't remember; but I believe it's not a
8 requirement.
9    Q.   Okay.  And so you had spoken about voters who
10 you thought had given up and would not be requesting a
11 mail in ballot; is that correct?
12   A.   That's correct.
13   Q.   You don't know if those individuals decided to
14 vote by personal appearance?
15   A.   I do not know.
16   Q.   How do you know that they, first, gave up?
17   A.   They said so.
18   Q.   Okay.  And second, that it was connected to the
19 ID requirement?
20   A.   They said so.
21   Q.   Okay.  Do you know if they, in fact, decided to
22 resubmit --
23   A.   I do not know.
24   Q.   -- their application to vote by mail?
25   A.   I don't know.

Page 184

1        MS. HUNKER:  That's all.
2        MS. PERALES:  Let's go off the record.
3        MR. SCHUETTE:  Do we need to ask the
4 assembled --
5        MS. PERALES:  Assembled people on Zoom,
6 are we ready to go off the record?
7        MS. BENDER:  No questions.  Thank you.
8        MS. PERALES:  That was Brady.
9        THE VIDEOGRAPHER:  We're going off the
10 record.  The time is 3:07 p.m.
11       (Lunch recess.)
12       THE VIDEOGRAPHER:  Okay.  We are back on
13 the record.  The time is 4:17 p.m.
14       MS. PERALES:  I think we are ready to
15 swear the witness.
16       THE REPORTER:  Okay.
17       Sir, would you raise your right hand,
18 please?
19       (Witness sworn by the court reporter.)
20       THE REPORTER:  Thank you.
21       MICHAEL SCARPELLO,
22 having being first duly sworn, testified as follows:
23           EXAMINATION
24 BY MS. PERALES:
25   Q.   Good afternoon.

Page 185

1    A.   Good afternoon.
2    Q.   Will you state your name for the record,
3 please?
4    A.   Michael Scarpello.
5    Q.   Thank you.  I'll introduce myself to you
6 because you weren't here before.
7    A.   Okay.
8    Q.   My name is Nina Perales.  I'm with the Mexican
9 American Legal Defense and Educational Fund, and I
10 represent the LUPE group of Plaintiffs --
11   A.   Okay.
12   Q.   -- in this matter.
13       Have you ever had your deposition taken before?
14   A.   Yes.
15   Q.   Have you ever taken a deposition before?
16   A.   Yes.
17   Q.   Okay.  Let's start with:  Have you had your
18 deposition taken before.
19       Can you tell me the most recent time you had
20 your deposition taken?
21   A.   Two -- two weeks ago or something.
22   Q.   Okay.
23   A.   Two or three weeks -- I'm not sure --
24   Q.   All right.
25   A.   -- but in there.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 246 to 249

Page 246

1 have expressed to you concerns about people -- voters
2 having a harder time voting under SB 1?
3     A.   Yes.
4          MS. HUNKER:  Objection, form.
5     Q.   (By Ms. Perales) Have you spoken to any
6 individual voters who had problems voting under SB 1?
7     A.   I have to think. I'm not sure. Yes, yes. Now
8 that I'm thinking about it, yes.
9     Q.   Tell me about what you can remember of those
10 communications.
11    A.   I was trying to remember. This one had to do
12 with a particular constituent's mother not being able to
13 get a replacement mail ballot. Gosh, I'm -- I'm trying
14 to remember the details, but having to do with the --
15 the mail ballot aspects, as far as providing the IDs, et
16 cetera.
17    Q.   So this was a voter who was trying to fulfill
18 the ID number requirement --
19    A.   Yes.
20    Q.   -- that was created by SB 1 --
21    A.   Uh-huh.
22    Q.   -- and through -- using the mail ballot and was
23 having a hard time --
24    A.   Yes.
25    Q.   -- voting?

Page 247

1     A.   Uh-huh.
2     Q.   Do you know if that voter ever successfully
3 voted?
4     A.   Yes.
5     Q.   You do know?
6     A.   This one I'm thinking of, yes.
7     Q.   And did that voter successfully vote?
8     A.   Yes.
9     Q.   Okay. Do you know how the voter voted, like,
10 did the -- did the voter, for example, end up having to
11 go to the polling place and vote in person?
12    A.   No. I think they got a replacement -- a
13 replacement ballot, I believe.
14    Q.   Okay. So you -- you were not getting all the
15 phone calls that Tacoma Phillips was getting?
16    A.   I typically don't. I mean, that's why Tacoma's
17 there.
18    Q.   Right. Would it be correct to say that you did
19 not work for Dallas County Elections in the November
20 2020 election?
21    A.   That's correct.
22    Q.   That saves us a few questions.
23    A.   Uh-huh.
24    Q.   Would you say that, as a general matter, voter
25 turnout in the partisan primary is lower than voter

Page 248

1 turnout in the general election?
2     A.   Yes.
3     Q.   And would you say, as a general matter, that
4 voter turnout in a spring election, like the one that
5 will happen in May, on May 7th, would typically be lower
6 than the turnout in a primary election?
7     A.   Yes.
8     Q.   Do you have any concerns about the impact of SB
9 1 on the upcoming November 2022 midterm election?
10         MS. HUNKER:  Objection, form.
11    A.   Yes.
12    Q.   (By Ms. Perales) Okay. And can you list what
13 those concerns are?
14    A.   I have continuing concerns about the provisions
15 of the -- the ID requirements for mail ballots, in that
16 the high rejection rate for applications and the
17 ballots, themselves. I have concerns about the chilling
18 effect that the poll watcher provisions have on poll
19 worker recruitment and retention. I'd have to kind of
20 think a little bit deeper about some of the other
21 provisions of SB 1, but those are my main ones.
22    Q.   Do you believe that there are voters who will
23 attempt to vote by mail in the November general election
24 who have not yet encountered the ID matching
25 requirements of SB 1 because they didn't vote in the

Page 249

1 primary?
2     A.   Absolutely.
3     Q.   All right. And do you anticipate that, at
4 least for some of those voters, for the first time, they
5 are going to have either their application for ballot by
6 mail or their mail ballot rejected because there is not
7 a matching ID number in your records?
8     A.   Yes.
9          MS. PERALES:  Can we go off the record for
10 a few minutes?
11         (Mr. Stool moves head up and down.)
12         THE VIDEOGRAPHER:  Going off the record.
13 The time is 5:53.
14         (Break taken.)
15         (Deposition Exhibit Number 8 marked.)
16         THE VIDEOGRAPHER:  We are back on the
17 record. The time is 6:08.
18    Q.   (By Ms. Perales) I'm handing you what has been
19 marked Deposition Exhibit Number 8.
20         (Document handed to the witness and Counsel.)
21    Q.   Do you -- do you recognize this document?
22    A.   Yes.
23    Q.   And do you -- do you see it's got some Bates
24 stamp numbers on it starting with "MS" in the bottom
25 right-hand -- oh, the -- yes, the Bates stamp MS, and

EXHIBIT

96

Lisa Wise                                              April 18, 2023

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                  SAN ANTONIO DIVISION

4   LA UNION DEL PUEBLO        )
    ENTERO, et al.,            )
5                              )
                Plaintiffs,    )
6                              )
    vs.                        )
7                              ) NO. 5:21-cv-844-XR
    GREGORY W. ABBOTT, et al., )
8                              )
                Defendants.
9   -----------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF

11                     LISA WISE

12                  April 18, 2023

13                (REMOTELY REPORTED)

14  -----------------------------------

15      The Oral and Videotaped Deposition of LISA WISE,

16  produced as a witness at the instance of the defendant,

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 18th of April, 2023 from 9:13 a.m.

19  to 3:27 p.m., in and for the State of Texas, reported by

20  machine shorthand, conducted El Paso County Courthouse

21  500 E. San Antonio, 5th Floor, Suite 503 El Paso, Texas

22  79901, pursuant to the Federal Rules of Civil Procedure

23  and the provisions stated on the record or attached

24  hereto.

25



Lisa Wise

April 18, 2023
Pages 2 to 5

---

**Page 2**

```
1              A P P E A R A N C E S
2  For the Plaintiff(s):
3      Ms. Caroline A. Lebel
       Cooley LLP
4      1144 15th Street, Suite 2300
       Denver, Colorado 80202-2686
5      Clebel@cooley.com
6      Ms. Kathleen Hartnett
       Cooley LLP
7      1144 15th Street, Suite 2300
       Denver, Colorado 80202-2686
8      Khartnett@cooley.com
9      Mr. David S. Louk
       Cooley LLP
10     1144 15th Street, Suite 2300
       Denver, Colorado 80202-2686
11     Dlouk@cooley.com
12     Marina Eisner
       States United Democracy Center
13     1101 17th St NW, Suite 250
       Washington, D.C. 20036
14
15  For the Defendant(s):
16     Ms. Kathleen T. Hunker
       Office of the Attorney General
17     P.O. Box 12548
       Austin, Texas 78711-2548
18     Kathleen.hunker@oag.texas.gov
19  Also Appearing:
20  Michael Stewart - For the United States
21  Nina Perales - For the LUPE plaintiffs
22  Erica Rosales Nigaglioni - El Paso County Attorney's
23  Office for the plaintiffs
24  Leo Betancourt - Videographer
25
```

**Page 3**

```
1  Appearing (remotely):
2  Christina Sanchez - El Paso County
3  Ethan Szumanski - Texas OAG
4  Germaine Habell - El Paso EA
5  John Gore - GOP Intervenors
6  Josephine Ramirez-Solis - Hidalgo
7  Justin Goldberg
8  Kevin Zhen - LUPE
9  Lisa Cubriel - Bexar County
10  Zachary Berg - TX OAG
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                 I N D E X
2  WITNESS:
3  LISA WISE
4      Examination By Ms. Hunker            7
5      Examination By Mr. Stewart:         81
6      Examination By Ms. Perales         122
7      Reexamination By Ms. Hunker        171
8
9  CHANGES AND SIGNATURE                  178
10  REPORTER'S CERTIFICATION              180
11
12  EXHIBIT            DESCRIPTION       PAGE
13  Exhibit 1   Notice of Deposition       14
14  Exhibit 2   List of early voting locations for   15
15              November 2022
16  Exhibit 3   Defendant Wise's Objections and   55
17              Supplemental and Amended Responses
18              to State Defendants' Second Set of
19              interrogatories
20  Exhibit 4   State 115611- Ballot by mail   55
21  Exhibit 6   Corrective Action Process Early   135
22              Voting Clerk Action August 2022
23  Exhibit 7   El Paso County Cured Ballot Overall   142
24              Summary Report 2022 November General
25  Exhibit 8   EPC011867 & EPC011868      144
```

**Page 5**

```
1  Exhibit 9   Single Election Status  Codes Screen   146
2              Shot
3  Exhibit 10  Ballot by Mail Ballots Returned,   148
4              November 2022
5  Exhibit 11  Email EPC012167           150
6  Exhibit 12  Email EPC012187           159
7  Exhibit 13  Oath of Assistance & Oath of   163
8              Interpreter Forms
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Lisa Wise

April 18, 2023
Pages 6 to 9

Page 6

1      THE VIDEOGRAPHER: We are now on the
2 record. This begins the video deposition of Lisa Wise,
3 Elections Administrator, in the matter of La Union Del
4 Pueblo Entero, et al., versus Gregory W. Abbott, et al.,
5 in the United States District Court, Western District of
6 Texas, San Antonio Division.
7 Today's date is April 18th, 2023. The time is 9:13 a.m.
8 This deposition is being taken at the El Paso County
9 Courthouse, El Paso, Texas.
10 Will the counsel please introduce yourself. Afterwards,
11 the court reporter will swear in the witness.
12      MS. HUNKER: Kathleen Hunker, from the
13 Office of the Texas Attorney General, representing State
14 defendants and individual legislators.
15      MS. LEBEL: Caroline Lebel from Cooley LLP,
16 here for the witness.
17      MS. HARTNETT: Kathleen Hartnett, also from
18 Cooley LLP, for the witness.
19
20      MR. STEWART:  Michael Stewart for the
21 United States.
22      MS. PERALES: Nina Perales with the LUPE
23 plaintiffs.
24      MS. ROSALES NIGAGLIONI: Erica Rosales
25 Nigaglioni, with El Paso County Attorney's Office, for

Page 7

1 the plaintiffs.
2      MR. LOUK: David Louk from Cooley LLP, also
3 here on behalf of the witness.
4      MS. EISNER: Marina Eisner from States
5 United Democracy Center, also on behalf of the witness.
6      THE REPORTER: Ms. Wise, may I please have
7 you raise your right hand?
8      (Witness sworn.)
9      LISA WISE,
10 having been duly sworn, testified as follows:
11      EXAMINATION
12 BY MS. HUNKER:
13   Q. Good morning, Ms. Wise.
14   A. Good morning.
15   Q. Thank you very much for coming here today. My
16 name is Kathleen Hunker and, as I said earlier, I'm an
17 attorney with the Office of the Texas Attorney General
18 representing the State defendants.
19      Can I -- can you please state your name and
20 then spell it for the record.
21   A. It's Lisa Wise, L-I-S-A, W-I-S-E.
22   Q. Now, Ms. Wise, I know you were deposed last
23 year in this case on two occasions, so you have some
24 familiarity with how depositions work. Nevertheless, I'm
25 going to start with some instructions, introducing

Page 8

1 questions. After that's done, I'll move on to the main
2 subjects of the deposition. Okay?
3   A. Yes, ma'am.
4   Q. Since your depositions in this case back in
5 April 2022, have you been deposed before?
6   A. Since those, no.
7   Q. But you understand that you are under oath,
8 correct?
9   A. I do.
10   Q. And you understand that the oath would have the
11 same effect as if you were testifying in open court?
12   A. I do.
13   Q. For the court reporter, you will need to
14 provide verbal answers, like yes or no, rather than
15 nodding or shaking your head or using fill words. This
16 has extra importance here today because we have many
17 attorneys participating on Zoom, and they may not be
18 able to see you if you were -- if they're dialling in.
19 Does that make sense?
20   A. Yes.
21   Q. It also helps the court reporter if we don't
22 talk over one another. I'm going to do my best to wait
23 for you to finish your answer before I ask my next
24 question. Will you do your best to make sure that you
25 wait until I finish my question before you start your

Page 9

1 answer?
2   A. I will.
3   Q. If you don't understand the question, will you
4 please let me know?
5   A. Yes.
6   Q. And if you do answer the question, I'm going to
7 assume that you understood it. Is that fair?
8   A. Yes.
9   Q. If you need a break at any time, please just
10 let me know. My only request is that you answer any
11 pending question on the table before we take that break.
12 Okay?
13   A. Yes.
14   Q. Also, if you hear an objection from counsel,
15 that is typically for the Court to decide at a later
16 date. I, therefore, ask that you go ahead and answer
17 the question, unless you're instructed otherwise by your
18 counsel. Does that make sense?
19   A. Yes.
20   Q. Have you consumed anything such as prescription
21 medications or alcohol that could affect your ability to
22 understand my questions and answer truthfully and
23 accurately?
24   A. No.
25   Q. Are you experiencing any physical condition,



Lisa Wise                                                         April 18, 2023
                                                                 Pages 74 to 77

Page 74

1        MS. LEBEL: Object to form.
2    A.  No.
3    Q.  (BY MS. HUNKER) How many full-time employees
4 are in your office?
5    A.  Currently, there's 17 besides myself.  So 18
6 with me included.
7    Q.  And how many do you hire before an election?
8        MS. LEBEL: Object to form.
9    A.  I apologize.
10       Depends on the election.  As far as temps?
11 Is that what you mean?
12   Q.  (BY MS. HUNKER) Yes.
13   A.  Okay.  On a small election, it may be 8 to 10.
14 On a large election, it -- it could be 25.
15   Q.  And how many temporary workers did your office
16 hire leading up to the November 2022 General Election?
17   A.  Sorry.  I'm thinking in my mind.  I believe 12.
18   Q.  Is that typical for a general mid-term
19 election?
20       MS. LEBEL: Object to form.  This is beyond
21 the scope of the deposition.
22   A.  I think -- I would say more, we would do around
23 10.  Maybe a couple more this time.
24   Q.  (BY MS. HUNKER) Did your office receive any
25 communications from the Department of Justice regarding

Page 75

1 an alleged incident of voter fraud that was conducted in
2 connection with the November 2022 General Election?
3        MR. STEWART: I just want to object on the
4 basis of investigative privilege, to the extent an
5 investigation is ongoing.
6        I'm not instructing the witness not to
7 answer, I'm just putting that objection on the record.
8        MS. HUNKER: And to clarify, I'm not going
9 to get into the substance of any violations.  I just
10 want to know whether or not a violation occurred or a
11 communication occurred.
12   A.  No.
13   Q.  (BY MS. HUNKER) Did your office receive any
14 communication from the Department of Homeland Security
15 regarding any alleged incident of voter fraud in
16 connection with the November 8th, 2022 General Election?
17       MR. STEWART: Same objection.
18   A.  No.
19   Q.  (BY MS. HUNKER) Did your office receive any
20 communication from the Department of State regarding an
21 alleged incident of voter fraud in connection with the
22 November 8th, 2022 General Election?
23       MR. STEWART: Same objection.
24   A.  No.
25   Q.  (BY MS. HUNKER) Did your office receive any

Page 76

1 communication from the United States Department of
2 Justice regarding any alleged violation of federal law?
3        MR. STEWART: Same objection.
4        MS. LEBEL: Object to form.
5    A.  No.
6    Q.  (BY MS. HUNKER) Did your office receive any
7 communication from the Department of Homeland Security
8 regarding any alleged violation of federal law in
9 connection with November 8th, 2022 General Election?
10       MR. STEWART: Same objection.
11       MS. LEBEL: Object to form.
12   A.  No.
13   Q.  (BY MS. HUNKER) Did your office receive any
14 communications from the Department of State regarding an
15 alleged violation of federal law in connection with the
16 November 8th, 2022 General Election?
17       MR. STEWART: Same objection.
18       MS. LEBEL: Object to form.
19   A.  No.
20   Q.  (BY MS. HUNKER) Did your office contact the
21 Department of Justice regarding any alleged incident of
22 voter fraud in connection with the November 8th, 2022
23 General Election?
24       MS. LEBEL: Object to form.
25       MR. STEWART: Same objection.

Page 77

1    A.  No.
2    Q.  (BY MS. HUNKER) Did your office contact the
3 Department of Homeland Security regarding any alleged
4 incident of voter fraud in connection with the November
5 8th, 2022 General Election?
6        MR. STEWART: Same objection.
7        MS. LEBEL: Object to form.
8    A.  No.
9    Q.  (BY MS. HUNKER) And did your office contact
10 the Department of State regarding any alleged voter
11 fraud conducted in connection with the November 8th,
12 2022 General Election?
13       MR. STEWART: Same objection.
14       MS. LEBEL: Object to form.
15   A.  No.
16   Q.  (BY MS. HUNKER) Did your office report any
17 alleged incident of voter fraud to the County District
18 Attorney in connection with the November 8th, 2022
19 General Election?
20       MS. LEBEL: Object to form and object on
21 the basis of investigation privilege.
22   A.  So do I answer?  The answer is no.
23   Q.  (BY MS. HUNKER) Don't give me any substantive
24 details --
25   A.  Okay.  The answer is no.  The answer is no.



Lisa Wise                                                    April 18, 2023
                                                            Pages 78 to 81

Page 78

1    Q.  And for the next line of questioning, dont give
2  me any substantive details.  I'm just asking whether or
3  not there was either a referral or some --
4    A.  Yes.  The answer is no to that question.
5    Q.  Did your office make any referral in
6  connection -- let me rephrase that.
7        Did your office make any referral
8  regarding any possible incident of criminal activity
9  conducted in connection with the November 8th, 2022
10 General Election to the County District Attorney?
11       MS. LEBEL:  Object to form and object on
12 the basis of investigation privilege.
13    A.  No.
14    Q.  (BY MS. HUNKER)  Did your office report any
15 alleged incident of voter fraud in connection with the
16 November 8th, 2022 General Election to the Office of the
17 Attorney General in Texas?
18       MS. LEBEL:  Same objections.
19    A.  No.
20    Q.  (BY MS. HUNKER)  Did your office contact the
21 Office of the Texas Attorney General regarding any
22 incident of alleged criminal activity conducted in
23 connection with November 8th, 2022 General Election?
24       MS. LEBEL:  Same objections.
25    A.  No.

Page 79

1    Q.  (BY MS. HUNKER)  Did your office report any
2  election irregularities to the Office of the Secretary
3  of State regarding any irregularity that occurred in the
4  November 2022 General Election?
5        MS. LEBEL:  Object to form.
6    A.  Can I ask what you mean by "irregularity"?
7    Q.  (BY MS. HUNKER)  Sure.
8        In this case, it would be a violation of
9  the Texas Election Code.
10    A.  No.
11    Q.  And did your office report -- let me strike.
12       Did your office submit any complaints to
13 the Office of the Secretary of State regarding any
14 alleged incidents of criminal activity conducted in
15 connection with November 8th, 2022 General Election?
16       MS. LEBEL:  Object.  Form and investigation
17 privilege.
18    A.  No.
19    Q.  (BY MS. HUNKER)  Are you aware of any alleged
20 violations of the Texas Election Code that occurred in
21 connection with the November 8th, 2022 General Election
22 in El Paso County?
23       MS. LEBEL:  Object to form and on the basis
24 of investigation privilege.
25    A.  No.

Page 80

1    Q.  (BY MS. HUNKER)  And are you aware of any
2  alleged violations of the Texas Criminal Code that
3  occurred in connection with the November 8th, 2022
4  General Election in El Paso County?
5        MS. LEBEL:  Objection.  Form and on the
6  basis of investigation privilege.
7    A.  No.
8        MS. HUNKER:  If we can take a quick
9  five-minute break, so I can review my notes?
10       MS. LEBEL:  Sure.
11       THE VIDEOGRAPHER:  The time is 11:42 a.m.
12 and off the record.
13       (A recess was taken.)
14       THE VIDEOGRAPHER:  The time is 12:03 p.m.
15 We're back on the record.
16    Q.  (BY MS. HUNKER)  Ms. Wise, I realize I forgot
17 to ask you two or three small questions.  And once we
18 finish that, I'll pass you along to some of the
19 plaintiff groups in this case.
20       Did El Paso County offer curbside voting at
21 each of its polling locations for the November 2022
22 General Election?
23    A.  Yes.
24    Q.  And did any of those curbside locations have to
25 close at any point during the course of the election?

Page 81

1        MS. LEBEL:  Object to form.
2    A.  No.
3    Q.  (BY MS. HUNKER)  All right.
4        MS. HUNKER:  I'm going to pass the witness
5  and reserve my remaining time for any rebuttal that
6  needs to occur.
7        MS. LEBEL:  Should we check in if the
8  intervenor defendants are going to be asking any
9  questions?
10       MR. STEWART:  Sure.  Why don't we just give
11 them the opportunity.  If anyone -- intervenor
12 defendants?
13       MR. CORE:  Yeah.  Thanks for checking.  We
14 have no questions at this time.
15       MR. STEWART:  Okay.
16            EXAMINATION
17 BY MR. STEWART:
18    Q.  My name is Mike Stewart.  I'm here on behalf of
19 the United States.  I want to thank you for being here,
20 Ms. Wise, again.
21       I know Ms. Hunker already went through the
22 ground rules with you earlier today, and so I don't
23 think we need to redo that, just to say that you
24 understand all the same ground rules apply, and you're
25 still under oath, correct?



Lisa Wise

Page 86

1  Administrator account?
2      A.  Yes.  It's El Paso County Elections.
3      Q.  Were any of the groups you spoke with -- you
4  know, you gave the example of rotary groups -- were any
5  of those in Spanish?
6      A.  None that I spoke to, no.
7      Q.  More broadly with your office, do you know if
8  there were any?
9      A.  I know that when we did the -- like, our voter
10 registration drives, both of -- we have Spanish speakers
11 at those, and I know that they did address that with
12 people that had questions and things like that.
13        So I know they were able to communicate if
14 somebody brought that question up in Spanish at those
15 locations, but -- those events.  But when I would speak
16 at events, no.
17     Q.  I think you said you did not have any paid
18 media in connection with the November 2022 General,
19 right?
20     A.  Correct.
21     Q.  Who developed the content of this outreach?
22 Let's take them one at a time.
23        So we'll start with, you know, what you're
24 going to say in an in-person town hall, you know, who
25 comes up with the content for that?

Page 87

1        MS. LEBEL:  Object to form.
2      A.  Generally I do.  When -- and it's basically
3  based off of the insert and things like that, which I
4  created in conjunction with our County Attorney's Office
5  to make sure there wasn't any issue with that.  And then
6  also, share that with the SOS, just to let them know
7  that we were doing that and -- so they knew that that
8  was something we were promoting.
9      Q.  (BY MR. STEWART)  Did the SOS, and I assume you
10 mean the Secretary of State --
11     A.  Yes, yes --
12     Q.  Yeah, just for the record.
13        Did the SOS have any feedback on the
14 insert?
15     A.  I think they supported that.  I mean, you know,
16 we had had those conversations that other counties were
17 also doing some inserts.  And that's kind of where we
18 got the idea, too.  So I believe they were in favor of
19 it.
20     Q.  Did you pattern your insert off another county?
21        MS. LEBEL:  Object to form.
22     A.  No, I don't think we did.  We may have picked
23 from a couple that we saw that we liked, but we really
24 drafted that on our own with our attorneys.
25     Q.  (BY MR. STEWART)  Did the SOS ask you to change

Page 88

1  anything on the insert?
2      A.  No.
3      Q.  And then for social media, were you also coming
4  up with the content for that?
5      A.  Yes.
6      Q.  Did you consult with the SOS on your voter
7  education efforts in any way beyond the insert?
8      A.  No.
9      Q.  Were you aware during the General Election
10 period of the voter education efforts conducted by the
11 Secretary of State?
12        MS. LEBEL:  Object to form.
13     A.  I'm aware that they had mentioned that that was
14 going to be a component.
15        But as far as voter education, we would
16 receive our advisories, but I did not -- I was not
17 seeing anything out in the -- I guess, in the public if
18 that's what you're asking.
19     Q.  (BY MR. STEWART)  Yeah.  Maybe I'll ask it more
20 crisply, you know.
21        Did you notice the presence of the
22 Secretary of State's voter education efforts during the
23 General Election?
24        MS. HUNKER:  Objection.  Form.
25        MS. LEBEL:  Object to form.

Page 89

1      A.  I remember a press release.  And that's --
2  that's what I remember.
3      Q.  (BY MR. STEWART)  Okay.  Did you receive any
4  feedback from voters regarding the voter education
5  efforts you undertook?
6      A.  Yes.  I mean, I know that they did appreciate
7  the insert, and we -- especially with the ballot, where
8  we would send the picture of what the envelope would
9  look like and highlight where they were supposed to
10 actually fill it in and send the screenshot.  I know
11 that people -- we did get positive feedback on that.
12     Q.  Did you hear from any voters who were
13 continuing to struggle with the ID number requirements
14 during the General Election?
15        MS. LEBEL:  Object to form.
16        MS. HUNKER:  Object to form.
17     A.  Yes, we did.
18     Q.  (BY MR. STEWART)  About how many?
19        MS. LEBEL:  Object to form.
20     A.  That's really tough to -- to give.  I didn't
21 keep -- I didn't keep track of that.  We would get some
22 calls, and I -- I don't know the number.
23     Q.  (BY MR. STEWART)  Was it primarily by phone?
24        MS. LEBEL:  Object to form.
25     A.  Primarily by phone.  We would -- we would get



Lisa Wise

April 18, 2023
Pages 90 to 93

Page 90

1 maybe something on an application, a little note like,
2 why do I have to fill this out, like, something like
3 that. But mostly phone.
4       Q. (BY MR. STEWART) Was most of that feedback
5 regarding the ID requirement?
6            MS. LEBEL: Object to form.
7            MS. HUNKER: Objection. Form.
8       A. Was the feedback about the ID requirement
9 regarding the ID?
10      Q. (BY MR. STEWART) Yeah. I guess that's -- let
11 me --
12      A. Sorry.
13      Q. -- strike that question and make -- make it
14 much clearer.
15            I guess I would say, what portion of the,
16 you know, overall feedback you received from voters
17 during the General Election period pertained to the ID
18 requirement?
19            MS. LEBEL: Object to form.
20            MS. HUNKER: Object to form.
21      A. It's hard for me to really quantify that,
22 honestly. Because, like I said, we really didn't
23 keep -- keep track of it in, like, how many calls we got
24 about the ID. But we did still spend a lot of time
25 explaining ID -- ID requirements to -- to voters that

Page 91

1 were on it to vote by mail.
2      Q. (BY MR. STEWART) Did you generate any topics
3 for future voter education based on what you were
4 hearing from voters?
5      A. So generally we do a pretty robust media
6 package for presidential years 'cause we always have
7 something that comes up.
8            For example, in 2024 -- I'm sorry. In
9 2020, we had the pandemic. So in 2024, we will, again,
10 do a media package, and one of the components will be
11 the identifier. We will really try to replace some of
12 that pandemic language with the -- the identifier, the
13 changes, and, frankly, any major changes that come out
14 of this legislative session.
15            So we -- we try to do that because we have
16 a lot of voters who do only vote every four years, and
17 we like to -- you know, we don't have an endless budget,
18 so we kind of put that all in -- what we can in the
19 presidential years.
20      Q. I -- I believe you've already said, correct me
21 if I'm wrong, that at some point, your office began
22 advising voters to put both their driver's license or ID
23 number and their Social Security number on mail ballot
24 materials; is that correct?
25      A. Correct.

Page 92

1      Q. That did not begin during the General --
2 right -- that predated the General?
3      A. That predated the General.
4      Q. Why did you continue to give that advice?
5      A. We had done that about -- we didn't do it
6 initially in March until we started to see these -- you
7 know, these rejection rates and these -- coming back, so
8 then we started to include it, I would say about,
9 halfway through the actual process in -- for the March
10 election.
11            So basically we just said, look, let's --
12 let's not wait for an application to be rejected, let's
13 just give them all this information at the very
14 beginning. So we -- if somebody asked us for, you know,
15 an application, then with the application we would send
16 them that information.
17            Now, people can also get an application on
18 our website or they could get it from a party. You
19 know, there might be other entities that send out the
20 application. We can't control that they didn't have the
21 insert or any of that information in there, and so we
22 may still receive applications that were not -- that
23 didn't comply with that requirement.
24      Q. Were there any ways besides the insert that you
25 transmitted that message to voters?

Page 93

1            MS. LEBEL: Object to form.
2            MS. HUNKER: Object to form.
3      A. The social media, the -- you know, what we did
4 with interviews. Anything we could, we would try to get
5 that information out. But frankly, you know, the best
6 bang for the buck was with the application because they
7 were, we know, going to fill that out, and it was there
8 included in the packet.
9            MR. STEWART: I want to use -- I think
10 we're on number 5?
11            THE REPORTER: Yes.
12      Q. (BY MR. STEWART) And I don't want to rush you
13 reading it, but, in general, do you recognize this
14 document?
15      A. Yes.
16      Q. And what is this?
17      A. This is our application for ballot by mail.
18      Q. And your office uses the standard ABBM prepared
19 by the Secretary of State, correct?
20      A. We do.
21      Q. And you would agree that the portion that
22 implements the ID number requirement is below the
23 bold -- or the capital letters, rather, you must provide
24 one and then lower case of the following numbers?
25      A. Yes.



Lisa Wise                                                    April 18, 2023
                                                            Pages 94 to 97

Page 94

1    Q.  And then, if you look at the second paragraph
2  under there, so after the first set of blanks, it says:
3           "If you do not have a Texas driver's
4  license, Texas personal identification number, or a
5  Texas election identification certificate number, give
6  the last four digits of your Social Security number."
7           Did I read that right?
8    A.  Yes.
9    Q.  And so would you agree this language appears to
10 establish a hierarchy wherein you only give a driver's
11 license number or identification number, identification
12 certificate number if you do not have -- excuse me.
13 Strike that.
14          Would you agree this language appears to
15 establish a hierarchy wherein you only give the last
16 four of your Social Security number if you do not have a
17 Texas ID card number?
18          MS. LEBEL:  Object to form.
19          MS. HUNKER:  Object to form.
20   A.  Yes.
21   Q.  (BY MR. STEWART)  Was the insert meant to
22 address that?
23          MS. LEBEL:  Object to form.
24   A.  The insert was meant to address that, whether
25 you put social's last four or whether you put your

Page 95

1  driver's license.  Just because you put one on doesn't
2  necessarily mean that's the one that we have on file.
3           And so we were seeing where people were
4  putting one or the other, and it was very frustrating,
5  I'm sure for them as well as for us, to say, look,
6  that's not the one we have, that's not the one you
7  registered with whenever you registered.  So it was just
8  basically to -- to combat that with whether you just put
9  the driver's license and we had the last sosh [sic],
10 just to fill both out.
11   Q.  (BY MR. STEWART)  Do you think this language
12 was misleading to voters?
13          MS. LEBEL:  Object to form.
14          MS. HUNKER:  Objection.  Form.
15   A.  I don't think it's written as well as it could
16 be, yes.
17          I -- I will say if I could, one of the
18 other things we did in the questionnaire as before is we
19 would highlight that box.
20   Q.  (BY MR. STEWART)  Okay.
21   A.  So that they would be able to see that that is
22 what we're talking about with the insert.
23   Q.  Would that be on the ABBM?
24   A.  Yes.  So with --
25   Q.  I'm sorry.  Go ahead.

Page 96

1    A.  I'm sorry.  So when they asked for a ballot by
2  mail request, we'd send them the request with the
3  insert, and we would highlight that box.
4    Q.  Did you highlight it on the carrier envelope as
5  well?
6    A.  Yes.
7    Q.  And are you describing hand highlighting with a
8  highlighter?
9    A.  So on this we would hand highlight.  On the
10 carrier envelope, we had a screenshot where on the
11 screenshot -- we didn't actually highlight the envelope,
12 we'd highlight the screenshot that would say this is
13 where it is on the carrier envelope.
14   Q.  Got it.  You can put that aside.
15          I'm quiet for a little bit.  I'm skipping
16 questions.
17   A.  No, no.  Take your time.
18   Q.  Did I understand right that you do plan media
19 spending for voter outreach in the future?
20   A.  Yes.
21   Q.  Do you know what your budget will be for that?
22          MS. LEBEL:  Object to form.
23   A.  In the past, I believe it's been around
24 $15,000.
25   Q.  (BY MR. STEWART)  Is -- who allocates that

Page 97

1  money?
2    A.  Our county commissioner's court.
3    Q.  Okay.  Have you had any discussions about what
4  that number will look like in the future?
5          MS. LEBEL:  Objection.  This is going
6  beyond the scope of the notice topics and the parties'
7  stipulation.
8          MR. STEWART:  Okay.  I'll withdraw that
9  question.
10   Q.  (BY MR. STEWART)  I believe you already
11 answered questions from Ms. Hunker about how you
12 processed mail ballot materials during the General
13 Election, but I do just want to ask one follow-up about
14 that specific to the General Election.
15          During the General Election period, did
16 your office use the driver's license number or Social
17 Security number on mail ballot materials for any purpose
18 other than determining whether they could be accepted in
19 light of SB1?
20          MS. LEBEL:  Object to form.
21          MS. HUNKER:  Object to form.
22   A.  No.
23   Q.  (BY MR. STEWART)  Turning briefly to the cure
24 process.
25          So I know -- I want to make sure I have



Lisa Wise

April 18, 2023
Pages 106 to 109

Page 106

1    A. I don't, I don't.
2    Q. During the November 2022 General Election, do
3 you know how common it was for a mail ballot to be
4 rejected for multiple reasons?
5    A. Not -- I mean, not really. Because once -- if
6 it was rejected for the ID or the mismatch, then we
7 would notice -- you know, we would send them
8 notification.
9        If they were rejected for, let's say,
10 untimely, like, if they were to be received after the
11 deadline, then that was what the rejection reason was.
12 You weren't -- we didn't go through and process those to
13 see, well, did they have the ID. I mean, if they came
14 in after the deadline, they were rejected.
15    Q. Is it possible then that untimely ballots would
16 also have needed to be rejected for additional reasons
17 such as the ID requirement?
18    A. Yes.
19    Q. When -- for timely ballots that are rejected,
20 when you keep records on those ballots, do those records
21 reflect all the reasons for rejection or just one?
22        MS. LEBEL: Object to form.
23    A. They reflect not just one, but if you -- if
24 they're received timely, there's -- I can't remember
25 exactly what they are, but there's a couple on there.

Page 107

1    Q. (BY MR. STEWART) Okay. During the
2 November 2020 General Election, did you receive feedback
3 from voters attempting to use the online ballot tracker
4 to cure their ballots my mail?
5    A. Yes.
6    Q. Was that feedback positive or negative?
7    A. For our office, it was mostly negative. I
8 believe if they could -- you know, if they could use it,
9 they just did. They didn't call our office and tell us
10 we love the ballot tracker. So they would call us and
11 say there's something wrong, we can't figure out the
12 ballot tracker.
13    Q. Did voters tend to identify any specific issues
14 with the ballot tracker during the November 2022 General
15 Election?
16    A. I think a mix of just maybe not used to using
17 some sort of computerized platform is one. Not knowing
18 what information they needed to have to -- to get in,
19 what -- not knowing what the steps were once they did.
20 So we did have some -- some calls with that.
21    Q. Were you able to walk some voters through the
22 process to use the cure portal?
23    A. Some, yes, we were.
24    Q. Were there some who were unable to use the cure
25 portal even after that phone conversation with your

Page 108

1 office?
2        MS. LEBEL: Object to form.
3        MS. HUNKER: Object to form.
4    A. I'm sorry. A couple of times we would kind of
5 start going over it, and they would say, I'll just cure
6 on the ballot. Because they have to send the ballot
7 back anyway, so they have the notice of, you know,
8 defect. And if they can get on the -- there and send
9 it -- fix it on the ballot tracker or they can just send
10 the ballot back. And so a lot of times, they would just
11 say, I'll just send the ballot track back or the ballot
12 back.
13    Q. (BY MR. STEWART) Got it. Did any voters
14 request to cancel their mail ballot after being unable
15 to use the online portal?
16    A. Not that I know of.
17    Q. Did any voters, to your knowledge, during the
18 2022 General Election abandon their attempts to vote by
19 mail after being unable to use the cure portal?
20        MS. LEBEL: Object to form.
21    A. The way that we have the ballots, it would be
22 marked as rejected, and I don't know if that's just
23 because they couldn't use the core -- the -- the -- that
24 platform, but then went to -- to vote in person after
25 their ballot had been rejected.

Page 109

1    Q. (BY MR. STEWART) Based on your experience in
2 the November 2022 General Election, do you believe the
3 number of eligible voters who had their ballots rejected
4 based on the ID number requirement will ever be zero?
5        MS. LEBEL: Object to form.
6    A. No.
7    Q. (BY MR. STEWART) And I believe you testified
8 previously that your office did not refer any voters to
9 any law enforcement, whether it be federal or state, for
10 potential fraud based on an ID mismatch or omission on
11 mail ballot materials; is that correct?
12        MS. LEBEL: Object on the basis of
13 investigation privilege.
14    A. Correct.
15    Q. (BY MR. STEWART) Leaving aside sort of whether
16 it was referred to law enforcement, are you aware of any
17 instances where fraudulent voting was identified during
18 the November 2022 General Election because of an ID
19 mismatch?
20        MS. LEBEL: Object to form.
21        MS. HUNKER: Object to form.
22    A. No.
23    Q. (BY MR. STEWART) Are you aware of any
24 instances in El Paso County during the November 2022
25 General Election where an ID number omission identified



Lisa Wise                                                      April 18, 2023
                                                          Pages 110 to 113

Page 110
1 an ineligible voter?
2          MS. LEBEL:  Object to form.
3          MS. HUNKER:  Object to form.
4     A. No.
5     Q. (BY MR. STEWART)  Are you aware of any
6 instances in El Paso County during the November 2022
7 General Election where an ID number omission identified
8 someone impersonating the voter named on the mail ballot
9 materials?
10         MS. LEBEL:  Object to form.
11    A. No.
12    Q. (BY MR. STEWART)  Are you aware of any
13 instances in El Paso County during the November 2022
14 General Election where an ID number mismatched as
15 opposed to omission identified for your office an
16 ineligible voter?
17         MS. LEBEL:  Same objection.
18    A. No.
19    Q. (BY MR. STEWART)  Are you aware of any instance
20 in El Paso County during the November 2022 General
21 Election where an ID number mismatch as opposed to
22 omission identified someone impersonating the voter
23 named on the mail ballot materials?
24         MS. LEBEL:  Same objection.
25    A. No.

Page 111
1     Q. (BY MR. STEWART)  For the November 2022 General
2 Election, did employees in your office receive any
3 training or guidance on when to refer a voter for
4 potential voter fraud to law enforcement based on an
5 omission or mismatch of the ID number on mail ballot
6 materials?
7          MS. LEBEL:  Object to form.
8     A. I don't believe they received any training.  I
9 mean, our office is -- is small enough as far as -- I
10 mean, our ballot by mail people I speak with all the
11 time.  They -- I believe they would have brought that to
12 my attention.
13    Q. (BY MR. STEWART)  Was that something
14 individuals in your office were looking for?
15         MS. LEBEL:  Object to form.
16         MS. HUNKER:  Object to form.
17    A. I don't think particularly.
18    Q. (BY MR. STEWART)  And aside from the ID number
19 requirement -- and no need to get into details, just a
20 yes or no to protect the privilege -- did your office
21 make any referrals for other instances of potential
22 voter fraud besides the ID number requirement to law
23 enforcement during the November 2022 General Election?
24    A. No.
25    Q. Did your office receive any communications from

Page 112
1 voters during the November 2022 General Election
2 indicating that they did not plan to vote by mail for
3 that election?
4     A. I'm sorry.  Can you repeat that?
5     Q. Yeah.
6          Were there any voters who communicated with
7 your office specifically for the purpose of saying they
8 did not plan to vote by mail during the November 2022
9 General Election?
10         MS. LEBEL:  Object to form.
11         MS. HUNKER:  Objection.  Form.
12    A. I'm not a hundred percent clear.  Like, just
13 called us to tell us I'm not gonna vote by mail?
14    Q. (BY MR. STEWART)  I guess or saying, you know,
15 perhaps it's too difficult or they have some concern
16 about the process?
17    A. I believe we had a couple where someone had
18 just called and we had to explain, you know, you have to
19 have somebody call for their own application and you go
20 through the whole kind of spiel.  And then they said,
21 I'll just go in person.
22    Q. Were there any who indicated they did not plan
23 to vote entirely?
24    A. Not that I remember.
25    Q. Do you know how the statewide mail ballot

Page 113
1 rejection rate for the November 2022 General compares to
2 El Paso County's?
3     A. I believe it was 2.22 -- no, I'm sorry.  2 -- 2
4 something, 2 percent.
5     Q. So was El Paso County's lower than the State's?
6     A. A little bit, at 1.9.  I think that's -- if I
7 remember correctly.
8     Q. Why do you think El Paso County's rejection
9 rate was lower than the statewide rejection rate?
10         MS. LEBEL:  Object to form.
11    A. I mean, I can speculate.  I think we -- we did
12 a lot with those -- I think the inserts did go a long
13 way.  I think anything we could do to get the word out
14 there we did, with free media basically, which was just
15 a lot of interviews.  That's, again, just a speculation.
16    Q. (BY MR. STEWART)  For the November 2022 General
17 Election, was El Paso County still an offline county for
18 TEAM purposes?
19    A. Yes.
20    Q. And was VOTEC still your vendor for offline
21 database?
22    A. VOTEC is still our vendor, yes.
23    Q. Were there any issues during the November 2022
24 General Election cycle communicating data between the
25 statewide TEAM database and the VOTEC offline database



Lisa Wise

April 18, 2023
Pages 118 to 121

Page 118

1      Let me put it this way; during the
2  November 2022 General Election cycle, did El Paso County
3  do any investigation of whether the ID numbers, so
4  driver's license, SSN, and ID number, contained in VOTEC
5  are accurate?
6          MS. LEBEL:  Object to form.
7          MS. HUNKER:  Object to form.
8      A.  So, like, specifically check if, like, my
9  driver's license matches what the DPS gave the State?
10     Q.  (BY MR. STEWART)  Yes.
11     A.  No.
12     Q.  Did you conduct any investigation like that for
13  El Paso County voters located in TEAM?
14     A.  No.
15     Q.  Earlier today, I believe counsel asked you
16  whether the November 2022 General Election was
17  successful in El Paso County, specifically as it relates
18  to mail balloting; is that right?
19     A.  Yes.
20     Q.  And you said it was successful, right?
21     A.  Yes.
22     Q.  How do you define success in this circumstance?
23     A.  So -- it -- when I would look at success, I
24  mean, that was kind of a question I asked, is that I
25  would say, you know, were we have -- was there anything

Page 119

1  that violated the code?  Was there anything that stood
2  out that was obviously we'd done something wrong and
3  that kept voters from voting?  You know, those kinds of
4  things is how I guess I would deem that.
5      Q.  So were you answering it from the standpoint of
6  the El Paso County Election Administration's
7  administration of the election?
8      A.  Yes.
9      Q.  Do you believe there were areas for
10  improvement?
11     A.  Yes.
12     Q.  What were those?
13     A.  There's always things I know that we can do
14  better.  I think that in -- with regards to -- we did
15  have to send out a corrected ballot.  I know we
16  mentioned that earlier.  We -- I believe there's things
17  we could be quicker on.  I mean, I know sometimes we get
18  stuff out in 48 hours.  With the sheer volume, sometimes
19  we can't get stuff out in 24 hours.  I'd love to have
20  our staff trained even better, having more knowledge on
21  the Election Code.
22          So there's always a couple of things I'd
23  love to see us do a little bit differently.  Have more
24  money.  I'd love to do a media package every election,
25  every general election.  Those are our wish list, so --

Page 120

1      Q.  So when you say that the election was
2  successful, was that making any comment on, you know,
3  whether the mail ballots rejection rate was acceptable?
4          MS. HUNKER:  Object to form.
5          MS. LEBEL:  Object to form.
6      A.  I don't think so.  I think it's just, to me,
7  did we do the best we could with what we had?  And
8  that's, I guess, how I kind of looked at it.
9      Q.  (BY MR. STEWART)  And I think you also
10  testified earlier that you weren't aware of any voters
11  who were unable to vote because of SB1; is that right?
12     A.  Correct.
13     Q.  That doesn't include voters having their mail
14  ballots rejected because of the identification number
15  requirement, correct?
16     A.  Correct.
17     Q.  How did you understand -- so, let me strike
18  that.
19          What did you include in not able to vote
20  then when you were asked that question?
21     A.  I'm sorry?
22     Q.  Sure.
23          When counsel asked you, you know, were any
24  voters unable to vote, how did you determine whether
25  someone was unable to vote?

Page 121

1      A.  You know, I guess a final rejection on a
2  ballot, that if they had sent that and they weren't able
3  to cure in time, if we didn't get in touch with them.
4  We did hear from a few voters where we sent their ballot
5  back to be cured, and they thought it was just a second
6  ballot, and so they didn't open it.  I do remember two
7  voters specifically that called our office that said, I
8  tossed that ballot because I thought that was a second
9  ballot and you just sent me another ballot.
10          And so, I mean, those -- obviously those
11  voters didn't vote, and they thought they had voted
12  because they did not take the -- they did not open up
13  the notice of defect.  So those, you know, little kind
14  of pockets out there.
15     Q.  So those are people you would characterize as
16  unable to vote in the past election?
17     A.  Well, they thought they did, and they didn't.
18  So --
19     Q.  Sure.
20          MR. STEWART:  Can we go off the record for
21  two minutes?
22          MS. LEBEL:  Yup.
23          THE VIDEOGRAPHER:  The time is 1:36 p.m.
24  And we're off the record.
25          (A recess was taken.)



Lisa Wise

April 18, 2023
Pages 138 to 141

Page 138

1          MS. LEBEL:  Object to form.
2     A.  Sure, yes.
3     Q.  (BY MS. PERALES)  Would it be fair to say that
4  somebody who votes from home because they have a
5  physical disability that affects their mobility might
6  have some difficulty getting to your office to correct
7  the mail ballot carrier envelope?
8     A.  Yes.
9     Q.  Would it also be fair to say that if a voter is
10  over 65, they could also have some kind of mobility
11  challenges that would make it difficult for them to
12  physically get to your office?
13          MS. LEBEL:  Object to form.
14     A.  Yes.
15     Q.  (BY MS. PERALES)  Okay.  And I believe you
16  testified earlier that your office does not personally
17  deliver carrier envelopes to voters at their address; is
18  that right?
19     A.  Correct.
20     Q.  Is there a reason that you don't do that?
21     A.  The sheer number of applications that we have
22  and -- I mean, that's one reason.  We -- we don't -- we
23  have, like, two county vehicles.  I mean, we don't even
24  have cars for our staff to do county work in, as already
25  we don't.  And, frankly, I think there's a safety issue

Page 139

1  with that; I don't encourage our staff to go out to the
2  voters' homes for any reason.
3     Q.  Okay.  So then would you agree with me that
4  when we're looking at slide 19 in this presentation,
5  that perhaps the most feasible approach would be to
6  simply mail the carrier envelope back to the voter so
7  the voter may correct the defect?
8          MS. LEBEL:  Object to form.
9          MS. HUNKER:  Objection.  Form.
10     A.  Yes.
11     Q.  (BY MS. PERALES)  Do you recall for the
12  November 2020 General Election if any voters came
13  personally to your office to correct the defect for the
14  ID number?
15     A.  I believe, eight.
16     Q.  And there's also another possibly, which is
17  that the voter could cancel the mail ballot and vote in
18  person; is that correct?
19     A.  Yes.
20     Q.  But would you agree with me that if somebody
21  had physical mobility challenges as a result of
22  disability or advanced age, voting in person is -- also
23  could present challenges?
24          MS. LEBEL:  Object to form.
25          MS. HUNKER:  Objection.  Form.

Page 140

1     A.  Yes.
2     Q.  (BY MS. PERALES)  Would it be fair to say that
3  with your 17 employees, you run a very large election
4  administration operation compared to other counties in
5  the state?
6          MS. LEBEL:  Object to form.
7          MS. HUNKER:  Objection.  Form.
8     A.  Compared to most, yes.  Although there are
9  obviously, I think, seven or eight larger than us.
10     Q.  (BY MS. PERALES)  And I believe in the
11  deposition of Bexar County, Ms. Callanan referred to the
12  offline counties as the big boys.
13     A.  Yes.
14     Q.  And El Paso is one of the big boys, yes?
15     A.  I would say big girls, but yes.
16     Q.  There we go.
17          Would it be fair to say then that you are
18  not personally aware of every instance in which a voter
19  might decide that, for example, going through this
20  process of curing the ID number is simply more than they
21  can handle, and they choose not to vote?
22          MS. LEBEL:  Object to form.
23          MS. HUNKER:  Object to form.
24     A.  Correct.
25     Q.  (BY MS. PERALES)  Would it also be fair to say

Page 141

1  that you wouldn't necessarily become personally aware of
2  a situation in which a voter relies on a nonprofit
3  community organization worker to come to their house and
4  help them with their mail ballot and that, as a result
5  of not having that person visit the voter, the voter
6  doesn't vote?
7          MS. LEBEL:  Object to form.  And I want to
8  make sure we're still staying within the scope of
9  November 2022 specifically.
10     Q.  (BY MS. PERALES)  With respect to the November
11  2022 General Election?
12          MS. HUNKER:  Objection.  Form.
13     A.  Correct.
14     Q.  (BY MS. PERALES)  And with respect to the
15  November 2022 General Election, you wouldn't necessarily
16  become personally aware if an individual who relies on
17  an assister to help them vote in person wouldn't be able
18  to vote because their assister was deterred by the new
19  requirements in SB1?
20          MS. LEBEL:  Object to form.
21          MS. HUNKER:  Objection.  Form.
22     A.  Correct.
23     Q.  (BY MS. PERALES)  And you wouldn't personally
24  be aware, would you, if with respect to the two
25  incidents involving unruly poll watchers in the



# EXHIBIT 97

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3    LA UNIÓN DEL PUEBLO     §
     ENTERO, ET AL.,         §
4                            §
          PLAINTIFFS,        §
5                            §
          V.                 §   CIVIL ACTION NO.5:21-CV-844 (XR)
6                            §   (CONSOLIDATED CASES)
     STATE OF TEXAS, ET      §
7    AL.,                    §
                             §
8         DEFENDANTS.        §

9

10   ************************************************************

11                    ORAL DEPOSITION OF

12                       FRANK PHILLIPS

13                      MARCH 31, 2023

14   ************************************************************

15        ORAL DEPOSITION OF FRANK PHILLIPS, PRODUCED AS A

16   WITNESS AT THE INSTANCE OF THE PLAINTIFF, AND DULY

17   SWORN, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED CAUSE

18   ON THE 31ST DAY OF MARCH, 2023, FROM 9:14 A.M. TO

19   12:40 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED

20   NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED BY

21   MACHINE SHORTHAND, FROM DALLAS COUNTY, TEXAS, PURSUANT

22   TO THE TEXAS RULES OF CIVIL PROCEDURE, THE TEXAS SUPREME

23   COURT EMERGENCY ORDER REGARDING THE COVID-19 STATE OF

24   DISASTER AND THE PROVISIONS STATED ON THE RECORD OR

25   ATTACHED HERETO.
```



Frank Phillips

March 31, 2023
Pages 2 to 5

Page 2

```
1        A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    MS. JENNIFER YUN
     ATTORNEYS, VOTING SECTION
5    CIVIL RIGHTS DIVISION
     U.S. DEPARTMENT OF JUSTICE
6    950 PENNSYLVANIA AVENUE NW
     WASHINGTON, D.C. 20530
7    TELEPHONE:  (202) 307-2767
     E-MAIL:    JENNIFER.YUN@USDOJ.GOV
8
     MR. WILLIAM D'ANGELO (VIA ZOOM)
9    ARENTFOX SCHIFF
     555 WEST FIFTH STREET
10   48TH FLOOR LOS ANGELES
     CALIFORNIA 90013
11   TELEPHONE:  (213) 443-7667
     E-MAIL:    WILLIAM.DANGELO@AFSLAW.COM
12
13 FOR THE DEFENDANTS:
14   MS. KATHLEEN HUNKER
     OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF TEXAS
15   P.O. BOX 12548 (MC-009)
     AUSTIN, TEXAS 78711,
16   TELEPHONE:  (512) 463-2100
     E-MAIL:    KATHLEEN.HUNKER@OAG.TEXAS.GOV
17
18 INTERVENOR DEFENDANTS:
19   MR. STEPHEN J. KENNY (VIA ZOOM)
     JONES DAY
20   51 LOUISIANA AVENUE N.W.
     WASHINGTON, D.C. 20001
21   TELEPHONE:  (202) 879-3939
     E-MAIL:    SKENNY@JONESDAY.COM
22
23
24
25
```

Page 3

```
1            I N D E X
2
3  APPEARANCES. . . . . . . . . . . . . . . .     2
4  SWORN STATEMENT OF FRANK PHILLIPS
5    EXAMINATION BY MS. YUN. . . . . . . . .     5
6    EXAMINATION BY MS. HUNKER . . . . . . .    96
7    FURTHER EXAMINATION BY MS. YUN. . . . .   107
8    FURTHER EXAMINATION BY MS. HUNKER . . .   113
   CHANGES AND SIGNATURE. . . . . . . . . . .   116
9  JURAT. . . . . . . . . . . . . . . . . . .   117
   REPORTER'S CERTIFICATE . . . . . . . . . .   118
12
13
14           E X H I B I T S
15
16 NO.  DESCRIPTION                           PAGE
17  1   WFAA ARTICLE . . . . . . . . . . . .    18
    2   DENTON RECORD-CHRONICLE ARTICLE 5/7/21 . . .   26
18  3   DENTON COUNTY VOTER REGISTRATION FIGURES . .   32
    4   TARRANT COUNTY VOTER REGISTRATION FIGURES. .   34
19  5   WFAA ARTICLE ON MAIL-IN VOTING . . . . .   36
    6   SPREADSHEET MARCH 2022 PRIMARY ELECTION MAIL BALLOT
20  REJECTION . . . . . . . . . . . . . . .     45
    7   E-MAIL CHAIN DATED 4/1/22. . . . . . . . .   56
21  8   ABBM FORM. . . . . . . . . . . . . . .     95
    9   CARRIER ENVELOPE . . . . . . . . . .      95
22
23
24
25
```

Page 4

```
1        REPORTED FROM DALLAS COUNTY, TEXAS
2        P R O C E E D I N G S
3
4
5        THE REPORTER:  WE ARE NOW ON THE RECORD.
6  TODAY IS MARCH 31ST, 2023.  THE TIME IS NOW 9:14 A.M.
7  CENTRAL STANDARD TIME.
8        WE ARE HERE TO TAKE MR. FRANK PHILLIPS'S
9  DEPOSITION IN THE MATTER LA UNIÓN DEL PUEBLO ENTERO, ET
10 AL., PLAINTIFFS, VS. STATE OF TEXAS, ET AL., DEFENDANTS.
11       WE ARE CURRENTLY LOCATED AT 2001 BEACH
12 STREET, SUITE 700, FORT WORTH, TEXAS, 76103.
13       AT THIS TIME, WILL COUNSEL STATE YOUR
14 APPEARANCE FOR THE RECORD, PLEASE.
15       MS. YUN:  JENNIFER YUN FROM THE DEPARTMENT
16 OF JUSTICE.
17       MS. HUNKER:  KATHLEEN HUNKER WITH THE OFFICE
18 OF THE TEXAS ATTORNEY GENERAL REPRESENTING STATE
19 DEFENDANTS AND INDIVIDUAL EX-LEADERS.
20       MR. D'ANGELO:  WILLIAM D'ANGELO FROM
21 ARENTFOX SCHIFF REPRESENTING -- CO-COUNSEL FOR THE
22 PLAINTIFFS.
23       THE REPORTER:  ANYBODY ELSE FROM ZOOM?
24       MR. KENNY:  STEPHEN KENNY, JONES DAY,
25 REPRESENTING THE INTERVENOR DEFENDANTS.
```

Page 5

```
1        THE REPORTER:  THANK YOU.
2        MR. FRANK PHILLIPS, IF YOU COULD PLEASE
3  RAISE YOUR RIGHT HAND.
4        THE WITNESS:  I DO.
5        FRANK PHILLIPS,
6   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED
7        AND TESTIFIED AS FOLLOWS:
8             EXAMINATION
9  BY MS. YUN:
10  Q.  GOOD MORNING, MR. PHILLIPS.
11  A.  GOOD MORNING.
12  Q.  WE MET ALREADY, BUT I'M JENNIFER YUN FROM THE
13 U.S. DEPARTMENT OF JUSTICE.
14  A.  OKAY.
15  Q.  THANK YOU FOR JOINING US THIS MORNING.
16  A.  SURE.
17  Q.  COULD YOU PLEASE STATE YOUR NAME FOR THE RECORD?
18  A.  FRANK PHILLIPS.
19  Q.  BEFORE WE DO ANYTHING ELSE, I WANT TO MAKE SURE
20 WE HAVE A SMOOTH DEPOSITION.
21      ARE YOU -- HAVE YOU EVER BEEN DEPOSED BEFORE?
22  A.  I HAVE NOT.
23  Q.  SO HERE'S SOME GROUND RULES TO HELP US THROUGHOUT
24 THE DEPOSITION.  SO FIRST THIS WORKS BEST FOR THE COURT
25 REPORTER IF YOU WAIT TO START YOUR ANSWER UNTIL I
```



Frank Phillips

March 31, 2023
Pages 38 to 41

Page 38

1  A. I BELIEVE SO.
2  Q. YEAH.
3  A. I DON'T REMEMBER THE EXACT DATE.
4  Q. OKAY. YEAH.
5  A. I BELIEVE THAT'S CORRECT.
6  Q. I WILL JUST -- I CAN ALSO REFRESH YOUR MEMORY ON
7  THE FIRST EXHIBIT WE LOOKED AT, WHICH QUOTED YOU ABOUT
8  THE CARROLLTON CASE.
9  A. UH-HUH.
10  Q. WAS OCTOBER 2020, IS WHEN YOU --
11  A. OKAY.
12  Q. -- SPOKE.
13  A. YEAH.
14  Q. OKAY. I'M SORRY. THAT IS --
15  A. WELL, THAT WOULD BE ACCURATE.
16  Q. YEAH.
17  A. I STILL THINK IT'S ACCURATE.
18  Q. OKAY.
19  A. YEAH.
20  Q. AND SO YOU STILL BELIEVE THAT STATEMENT TO BE
21  ACCURATE THAT IT'S A VERY SMALL FRACTION?
22  A. ABSOLUTELY.
23  Q. OKAY. YOU CAN SET THAT ONE ASIDE.
24      OKAY. WE'RE GOING TO TURN TO SB 1, SB 1'S MAIL
25  VOTING REQUIREMENTS TO BE EXACT.

Page 39

1      SO I THINK YOU ALREADY ANSWERED THIS QUESTION,
2  BUT JUST TO MAKE SURE, SINCE SB 1 WAS IMPLEMENTED, SO
3  DECEMBER OF 2021, YOUR OFFICE HAS NEVER REFERRED -- I
4  BELIEVE YOU TESTIFIED -- AND PLEASE CORRECT ME IF I'M
5  WRONG -- THAT YOUR OFFICE HAS NEVER REFERRED ANY VOTER
6  AS A POTENTIAL CASE OF MAIL VOTER IMPERSONATION SINCE
7  THIS CARROLLTON CASE HAPPENED; IS THAT RIGHT?
8  A. THAT'S CORRECT.
9  Q. OKAY. SO IT IS FAIR TO SAY THAT NO ONE WAS EVER
10  REFERRED TO LAW ENFORCEMENT AS A POTENTIAL CASE OF VOTER
11  FRAUD BASED ON ANY SB 1 MAIL VOTING REQUIREMENTS.
12      MS. HUNKER: OBJECTION; FORM.
13  A. THAT'S FAIR TO SAY FOR DENTON COUNTY, YES.
14  Q. (BY MS. YUN) ARE YOU AWARE OF ANY OTHER COUNTY
15  THAT -- WHERE THAT MAY HAVE HAPPENED?
16  A. I AM NOT.
17  Q. AND WOULD IT -- IS IT FAIR TO SAY THAT IF YOU
18  DETECTED ANY MAIL VOTER IMPERSONATION, YOU WOULD REFER
19  THAT CASE TO A LAW ENFORCEMENT AGENCY?
20  A. YES.
21  Q. JUST GOING BACK, I JUST REMEMBERED THAT YOU SAID
22  THAT WITH THE CARROLLTON CASE, YOU E-MAILED THE
23  SECRETARY OF STATE'S OFFICE, AS WELL AS CALLED THE
24  SHERIFF'S OFFICE.
25      WHAT HAPPENED WITH THE SECRETARY OF STATE'S

Page 40

1  OFFICE?
2  A. NOTHING.
3  Q. OKAY.
4  A. I NEVER GOT A REPLY.
5  Q. UNDERSTOOD.
6      OKAY. SO WHEN I SAY -- I'M GOING TO REFER TO
7  SB 1'S ID NUMBER REQUIREMENTS FREQUENTLY GOING FORWARD.
8  A. OKAY.
9  Q. AND I'M REFERRING TO THE REQUIREMENT THAT EVERY
10  VOTER HAS TO PUT AN ID NUMBER, EITHER THEIR LAST FOUR
11  DIGITS OF THEIR SOCIAL OR THEIR TEXAS ID NUMBER OR CHECK
12  THE BOX THAT THEY DON'T HAVE EITHER --
13  A. CORRECT.
14  Q. -- WHEN THEY'RE SENDING IN THEIR APPLICATION FOR
15  BALLOT BY MAIL OR THEIR MAIL BALLOTS?
16      IS THAT CLEAR?
17  A. YES.
18  Q. OKAY. AND WHEN I SAY ABBM, I'M REFERRING TO THE
19  APPLICATION.
20  A. APPLICATION FOR BALLOT BY MAIL, YES.
21  Q. YES. YEAH. JUST SO THAT THE RECORD IS CLEAR.
22      DO YOU BELIEVE THAT SB 1'S ID NUMBER REQUIREMENTS
23  FOR MAIL VOTING ARE NECESSARY TO PREVENT MAIL VOTER
24  IMPERSONATION?
25      MS. HUNKER: OBJECTION; FORM.

Page 41

1  A. TO YOUR EXACT QUESTION, THE ANSWER WILL BE NO.
2  Q. (BY MS. YUN) AND WHY IS THAT?
3  A. WELL, I MEAN, I THINK WE'VE DONE A DECENT JOB IN
4  THE PAST WITHOUT THOSE REQUIREMENTS, BUT THAT DOESN'T
5  MEAN THESE REQUIREMENTS DON'T ADD ANOTHER LAYER OF
6  SECURITY. SO WE'VE PROVEN WE CAN DO IT WITHOUT IT,
7  BUT -- SO, I MEAN, THAT'S WHAT I BASE THAT OUT OF.
8  WE'VE DONE IT BEFORE WITHOUT IT.
9  Q. UH-HUH. THAT'S FAIR.
10      DO YOU BELIEVE THAT SB 1'S ID REQUIREMENTS ARE
11  NECESSARY TO PREVENT ANY OTHER TYPES OF ELECTION CRIMES?
12  A. OKAY. WHEN YOU SAY SB 1 REQUIREMENTS, WHAT SB 1
13  REQUIREMENTS ARE YOU SPEAKING OF?
14  Q. THE ID NUMBER.
15  A. THE ID NUMBERS?
16      MS. HUNKER: SAME OBJECTION.
17  A. YEAH. OFF THE TOP OF MY HEAD, I CAN'T THINK OF
18  ANY OTHER ELECTION CRIME THAT IT WOULD PREVENT.
19  Q. (BY MS. YUN) OKAY. SO TALKING ABOUT THE --
20  MOVING AWAY FROM ANY ELECTION CRIMES OR REFERRALS TO LAW
21  ENFORCEMENT, I THINK WE'VE -- I SORT OF PARAPHRASED IT
22  EARLIER.
23      BUT, IN YOUR OWN WORDS, WHAT IS YOUR
24  UNDERSTANDING OF SB 1'S ID NUMBER REQUIREMENTS FOR MAIL
25  VOTING?



Frank Phillips

March 31, 2023
Pages 42 to 45

Page 42

1  A. THE APPLICANT OR THE VOTER RETURNING A CARRIER
2  ENVELOPE WITH A VOTED MAIL BALLOT HAS TO EITHER PUT
3  THEIR TEXAS DRIVER'S LICENSE, OR ID NUMBER, OR THE LAST
4  FOUR OF THEIR SOCIAL SECURITY NUMBER.  AND ONE OF THOSE,
5  WHICHEVER ONE THEY PUT OR BOTH, WOULD HAVE TO MATCH WHAT
6  IS IN OUR VOTER REGISTRATION SYSTEM REGARDING SAME LIKE
7  NUMBER, TEXAS DL, OR SOCIAL SECURITY.
8  Q. OKAY.  SO THE OFFICIAL ABBM, AND THE CARRIER
9  ENVELOPES, STATE THAT VOTERS SHOULD PUT EITHER THEIR
10 STATE ID NUMBER OR THE LAST FOUR DIGITS OF THEIR SOCIAL
11 RATHER THAN PUTTING BOTH NUMBERS DOWN; IS THAT CORRECT?
12 A. CORRECT.
13 Q. SO I'M GOING TO ASK YOU ABOUT HOW SB 1'S ID
14 NUMBER REQUIREMENTS HAVE IMPACTED YOUR OFFICE AND DENTON
15 COUNTY VOTERS, BUT I WOULD LIKE TO TAKE THAT ELECTION BY
16 ELECTION SINCE MANY ELECTIONS HAVE HAPPENED --
17 A. SURE.
18 Q. -- SINCE SB 1 WENT INTO EFFECT.
19    SO I BELIEVE THERE WAS A SPECIAL ELECTION IN
20 JANUARY 2022; IS THAT RIGHT?
21 A. THAT'S CORRECT.
22 Q. HOW DID THE ID NUMBER REQUIREMENT -- SB 1'S ID
23 REQUIREMENT AFFECT YOUR OFFICE FOR THAT ELECTION?
24    MS. HUNKER:  OBJECTION; FORM.
25 A. I GUESS IN TWO WAYS.  BECAUSE -- THIS WILL TAKE A

Page 43

1  LITTLE EXPLANATION.  BECAUSE THE LEGISLATURE PASSED THAT
2  BILL TOWARDS THE VERY END OF THE SESSION LATE IN THE
3  YEAR, AND IT REQUIRED CHANGES TO ENVELOPES,
4  APPLICATIONS, PRINTING --
5  Q. (BY MS. YUN)  UH-HUH.
6  A. -- AND, YOU KNOW, THERE'S STILL -- AT THE TIME,
7  ANYWAY, THERE WAS KIND OF STILL A SHORTAGE OF PAPER,
8  HARD TO GET, REGARDLESS OF WHAT THE PAPER WAS USED FOR,
9  IT PUT US IN A -- US ANYWAY.  BECAUSE I THINK WHEN THE
10 LEGISLATURE FIRST PASSED IT, THEY'RE ASSUMING THE FIRST
11 ELECTION COMING UP IS GOING TO BE MARCH PRIMARY.
12 Q. RIGHT.
13 A. AND FOR MOST OF THE STATE, THAT WAS CORRECT.
14 Q. UH-HUH.
15 A. IT WAS NOT CORRECT FOR US BECAUSE WE HAD A
16 SPECIAL ELECTION IN JANUARY.  AND SO IT PUT US IN A
17 CRUNCH WHERE WE WERE TRYING TO GET THE NEW CARRIER
18 ENVELOPE IN PLACE, AND WHICH WE DID.  BUT THEN IT WAS
19 NEW TO VOTERS.
20 Q. UH-HUH.
21 A. SO THERE WAS THAT.
22    AND INITIALLY, I BELIEVE, SOME CONFUSION WITH
23 VOTERS, ESPECIALLY THOSE WHO HAD BEEN VOTING BY MAIL FOR
24 YEARS.  SO WE HAD A HIGHER-THAN-NORMAL REJECTION RATE.
25 Q. AND THAT WAS -- THAT SPECIAL ELECTION, WAS THAT

Page 44

1  TOWARDS THE END OF JANUARY OR TOWARDS THE BEGINNING OF
2  JANUARY?
3  A. I'M SORRY, I DON'T REMEMBER.
4  Q. SO -- AND THEN THE NEXT ELECTION WAS THE MARCH
5  PRIMARY?
6  A. CORRECT.
7  Q. AND COULD YOU TELL US ABOUT HOW THE ID NUMBER
8  REQUIREMENT AFFECTED YOUR OFFICE FOR THAT ELECTION?
9  A. YEAH.  WELL, YOU HAVE A COUPLE OF THINGS.  YOU
10 HAVE A TRAINING CURVE FOR EARLY VOTING BALLOT BOARD,
11 'CAUSE WE HAVE TO TRAIN THEM WHAT THEIR NEW DUTIES ARE,
12 WHAT TO LOOK FOR.  OUR STAFF FOR THE SAME REASONS.
13    BUT YOU HAD, OF COURSE, A MUCH WIDER -- A MUCH
14 LARGER VOTER REGISTRATION POOL TO PULL FROM THAN WE DID
15 IN JANUARY.  SO WE SUFFERED THE SAME INITIAL HIGH
16 REJECTION RATE AT THE BEGINNING OF OUR ELECTION.
17 Q. YOU JUST SAID THAT AT THE BEGINNING OF EARLY
18 VOTING.
19    SO DID THE REJECTION RATE EVENTUALLY GO DOWN?
20 A. IT DID.  IT DECLINED STEADILY THROUGHOUT THE
21 VOTING PERIOD, YES.
22 Q. WOULD YOU SAY THAT THE REJECTION RATE DID REMAIN
23 HIGH OVERALL AT THE END OF THE -- OVERALL?
24    MS. HUNKER:  OBJECTION; FORM.
25 A. I THINK BY THE END OF THE VOTING PERIOD, WE WERE

Page 45

1  PROBABLY STILL SLIGHTLY HIGHER THAN NORMAL, BUT WE WERE
2  MUCH CLOSER THAN NORMAL.
3  Q. (BY MS. YUN)  I'M GOING TO SHOW YOU AN EXHIBIT.
4  I'M HANDING YOU WHAT'S BEEN MARKED AS EXHIBIT 6.  AND
5  I'LL REPRESENT TO YOU THAT THIS WAS A SPREADSHEET
6  PRODUCED BY THE STATE OF TEXAS REGARDING THE MARCH 2022
7  PRIMARY ELECTION MAIL BALLOT REJECTION.  AND THEY'RE
8  DIVIDED -- SEPARATED FOR THE REPUBLICAN PRIMARY AND THE
9  DEMOCRATIC PRIMARY.
10    (EXHIBIT 6 MARKED.)
11 A. OKAY.
12 Q. (BY MS. YUN)  OKAY.  SO ON THE SECOND PAGE -- I
13 BELIEVE DENTON IS ON THE SECOND PAGE.  FOR THE
14 REPUBLICAN PRIMARY, IT'S SHOWING 17.39 PERCENT.
15    DOES THIS COMPORT WITH YOUR MEMORY OF WHAT
16 HAPPENED DURING THAT MARCH PRIMARY FOR THE REPUBLICAN
17 PARTY?
18 A. THAT -- I MEAN, I'LL START IT WITH I DON'T KNOW
19 WHERE THEY GOT THEIR NUMBERS FROM.
20 Q. UH-HUH.
21 A. BUT THIS DOES NOT FEEL INACCURATE.  IT FEELS LIKE
22 IT'S PROBABLY PRETTY CLOSE.
23 Q. OKAY.  LET'S SWITCH QUICKLY TO THE -- I BELIEVE
24 SO -- IT'S THE SECOND PAGE OF THE DEMOCRATIC --
25 A. YEAH.



Frank Phillips

March 31, 2023
Pages 50 to 53

Page 50

1  WE ARE BACK ON THE RECORD.
2     Q.  (BY MS. YUN)  SO WE'VE BEEN TALKING ABOUT THE ID
3  NUMBER REQUIREMENTS FOR A LITTLE BIT, SO I WANT TO ASK
4  YOU ABOUT SOME OF THE WORK THAT YOUR OFFICE DID WITH
5  VOTERS TO TELL THEM ABOUT THE ID REQUIREMENT.
6     A.  OKAY.
7     Q.  DID YOUR OFFICE COMMUNICATE WITH VOTERS REGARDING
8  THE NEW ID NUMBER REQUIREMENTS UNDER SB 1?
9     A.  YES, WE DID.
10    Q.  HOW -- HOW DID YOU DO THAT?
11    A.  A COUPLE WAYS.  ONE, THROUGH SOCIAL MEDIA, MAINLY
12  A FACEBOOK ACCOUNT.  SECOND WAS AN INSERT THAT WE PUT
13  INTO OUR MAIL BALLOT THAT GAVE THEM A STEP BY STEP WITH
14  LITTLE SCREENSHOTS, FOR LACK OF A BETTER TERM.  "ENTER
15  YOUR ID NUMBER HERE."  WE EVEN PUT ON THERE, "WE
16  RECOMMEND" -- "WE KNOW THE FORM SAYS 'OR.'  WE RECOMMEND
17  YOU PUT BOTH," JUST IN CASE WE DIDN'T HAVE THE ONE YOU
18  DECIDE TO PUT DOWN.  EXPLAINED TO THEM -- TO THEM TO DO
19  THAT BEFORE THEY SEALED THE FLAP.  AND THEN AFTER THEY
20  SEALED THE FLAP, TO PUT A SIGNATURE.  AND THEN WE --
21  WHICH IS STILL ON OUR WEBSITE TODAY.  WE HAD A VIDEO ON
22  HOW TO COMPLETE YOUR APPLICATION AND YOUR CARRIER
23  ENVELOPES.
24    Q.  AND WHEN DID YOU -- WHEN DID YOUR OFFICE START
25  SEND ING OUT INSERTS WITH THE MAIL BALLOTS?

Page 51

1     A.  I COULD BE MISTAKEN ON THIS, BUT I BELIEVE -- I
2  DON'T BELIEVE WE DID IT IN THE JANUARY SPECIAL ELECTION,
3  BUT WE DID FOR THE PRIMARY.  I STAND TO BE CORRECTED ON
4  THAT BY MY MAIL BALLOT PERSON.
5     Q.  OKAY.  AND THE INSERT THAT YOU WERE REFERRING TO,
6  COULD WE GET A COPY OF THAT?  I UNDERSTAND THAT YOU
7  DON'T HAVE IT WITH YOU.
8     A.  I DON'T HAVE IT WITH ME, BUT SURE.
9     Q.  BUT -- YEAH, THROUGH MS. HUNKER, IF YOU COULD
10  SEND IT OVER.
11    A.  SURE.
12    Q.  THANK YOU.
13       AND THE INSERT, YOU SAID, WAS FOR THE MAIL BALLOT
14  CARRIER ENVELOPE; IS THAT RIGHT?
15    A.  THAT'S CORRECT.
16    Q.  AND WHY DID YOUR OFFICE DECIDE TO ENGAGE IN THOSE
17  EFFORTS?
18    A.  BECAUSE OF OUR INITIAL EXPERIENCE WITH THE HIGHER
19  REJECTION RATE, WE WANTED TO -- I MEAN, IT'S EASY TO
20  MISS WHERE IT'S AT ON THE CARRIER ENVELOPE, SO WE WANTED
21  TO MAKE SURE THEY SAW IT.
22    Q.  AND YOU JUST TOLD ME THAT ON THE INSERT IT
23  SAYS -- IT RECOMMENDS TO VOTERS TO PUT BOTH NUMBERS
24  DOWN; IS THAT RIGHT?
25    A.  THAT WE RECOMMEND THAT, YES.

Page 52

1     Q.  AND DID YOU ALSO -- WAS THAT RECOMMENDATION
2  COMMUNICATED THROUGH OTHER MEANS?
3     A.  IT'S ON THAT VIDEO THAT I SPOKE OF THAT'S ON THE
4  WEBSITE, YES.
5     Q.  AND DO YOU REMEMBER WHEN THE VIDEO WAS PUT ON THE
6  WEBSITE?
7     A.  I DON'T.
8     Q.  WAS IT BEFORE THE GENERAL ELECTION?
9     A.  YES, DEFINITELY.
10    Q.  SO IT WAS IN PLACE BEFORE THE MARCH PRIMARY AS
11  WELL?
12    A.  I'M NOT SURE IF IT WAS IN THE INTERIM OR EVEN
13  BEFORE THE PR MARY.  I'M JUST NOT SURE.  BUT I KNOW IT
14  WAS IN PLACE FOR THE GENERAL.  BUT EXACTLY WHEN IT WENT
15  UP, I'M NOT SURE.
16    Q.  OKAY.  AND YOU TOUCHED ON THIS A LITTLE BIT A
17  MOMENT AGO, BUT WHY DID YOU RECOMMEND PUTTING BOTH
18  NUMBERS DOWN?
19    A.  MAINLY BECAUSE WE WERE SEEING, WHICH YOU KIND OF
20  REFERENCED EARLIER IN YOUR LIST OF POSSIBLE REASONS FOR
21  CURE, WE WOULD FIND THAT SOMEONE WOULD PUT THEIR
22  DRIVER'S LICENSE NUMBER OR STATE ID NUMBER AND NOT THEIR
23  SOCIAL.  BUT THE SOCIAL WE HAD.  WE DID NOT HAVE THEIR
24  DL OR VICE VERSA.  SO WE WANTED TO GIVE THEM EVERY
25  OPPORTUNITY TO PREVENT A CURE SITUATION SO THEY COULD

Page 53

1  HIT ONE OF THE NUMBERS THAT WE HAPPENED TO HAVE.
2     Q.  RIGHT.
3        SO THE INSERT THAT YOU WERE DESCRIBING IS
4  SOMETHING THAT YOUR OFFICE CREATED, CORRECT?
5     A.  THAT'S CORRECT.
6     Q.  AND ARE YOU AWARE OF THE SECRETARY OF STATE'S
7  INSERT FOR THE ID NUMBER REQUIREMENT?
8     A.  I'M AWARE THEY HAVE ONE.  I CAN'T RECALL WHAT IT
9  LOOKS LIKE, TO BE HONEST WITH YOU.
10    Q.  DID YOU CONSIDER USING THE SECRETARY OF STATE'S
11  INSERT?
12    A.  OKAY.  WHAT I -- WHAT I BELIEVE TO BE ACCURATE,
13  BUT I COULD BE WRONG AGAIN, I THINK WE CAME UP WITH OUR
14  INSERT FIRST.  AND WHEN THEY CAME OUT WITH THEIRS, I'M
15  SURE WE LOOKED AT IT AND STUCK WITH OURS.  PROBABLY HAS
16  THE SAME TYPE OF INFO.
17    Q.  GOT IT.
18       AND BASED ON YOUR EXPERIENCE THUS FAR IN 2022,
19  ARE YOU PLANNING ON USING THE INSERT GOING FORWARD?
20    A.  WE ARE STILL USING IT.  AND JUST OUT OF AN EXCESS
21  OF CAUTION, WE'LL PROBABLY CONTINUE TO USE IT.
22    Q.  HAVE YOU CONSIDERED USING -- OR CREATING ONE FOR
23  ABBMS?
24    A.  I THINK WE DID TALK ABOUT IT.  A LOT OF ABBMS
25  DON'T COME FROM US.  THEY GET THEM ON THEIR OWN.  THEY



Frank Phillips

March 31, 2023
Pages 70 to 73

Page 70

1  IF THERE'S AN E-MAIL ADDRESS.
2    A. YES.
3    Q. SO IF THERE IS NO E-MAIL ADDRESS, YOU CALL; IS
4  THAT RIGHT?
5    A. IF WE HAVE THAT NUMBER.
6    Q. AND SOMETIMES YOU CALL AND NO ONE PICKS UP,
7  RIGHT?
8    A. THAT HAPPENS MORE OFTEN THAN NOT THESE DAYS.
9    Q. OKAY. AND WHAT IS -- WHAT DOES YOUR STAFF DO?
10   A. WELL, IF THEY CALL -- IF THEY HAVE A NUMBER, CALL
11  IT AND NOBODY ANSWERS, THEY LEAVE A VOICEMAIL. AND WE
12  HAVE A -- WE HAVE A DEDICATED OUTLOOK INBOX FOR THE
13  EARLY VOTING BALLOT BOARD SIGNATURE VERIFICATION
14  COMMITTEE THAT ALL OF THOSE E-MAILS AND/OR VOICEMAILS
15  WILL GO BACK TO --
16   Q. OKAY.
17   A. -- SO THEY'RE NOT JUST BOUNCING AROUND
18  20 DIFFERENT EMPLOYEES. SO IT GOES STRAIGHT TO THE
19  BALLOT BOARD FOR THEM TO RESPOND TO.
20       NOW, IF WE HAVE NEITHER AN E-MAIL OR PHONE
21  NUMBER, THEN WE JUST MAIL THE LETTER.
22   Q. SO IT'S POSSIBLE THAT IF YOU ARE MAILING SORT OF
23  CLOSE TO THE ELECTION, THAT THEY WON'T GET THE NOTICE
24  UNTIL --
25   A. TOTALLY POSSIBLE.

Page 71

1    Q. -- IT'S TOO LATE; IS THAT RIGHT?
2        MS. HUNKER: OBJECTION; FORM.
3    A. IT'S TOTALLY POSSIBLE.
4    Q. (BY MS. YUN) IN 2022, TO THE BEST OF YOUR
5  RECOLLECTION, WERE THERE ANY MILITARY OR OVERSEAS VOTERS
6  WHO YOU NEEDED TO CONTACT FOR AN ID NUMBER ERROR ON
7  THEIR ABBM OR MAIL BALLOT?
8    A. I BELIEVE THERE WAS ONE OR TWO MAX. IT WAS VERY
9  LOW.
10   Q. OKAY.
11   A. MILITARY GUYS ARE USUALLY PRETTY GOOD AT FILLING
12  THEIR STUFF OUT CORRECTLY.
13   Q. DO YOU KNOW HOW YOUR OFFICE WAS ABLE TO CONTACT
14  THEM?
15   A. I DO NOT. I -- I WOULD THINK IT WAS BY E-MAIL,
16  BUT THAT'S NOT NECESSARILY THE WAY IT WAS. JUST DEPENDS
17  ON HOW THEY SUBMITTED THEIR STUFF.
18   Q. OKAY. SO YOU DON'T HAVE ANY PERSONAL KNOWLEDGE
19  OF CONTACTING OVERSEAS OR MILITARY VOTERS ABOUT AN ID
20  NUMBER?
21   A. IT WOULDN'T BE ME PERSONALLY, NO.
22   Q. OR DO YOU RECALL ANY SPECIFIC INSTANCES THAT YOU
23  HEARD FROM YOUR STAFF --
24   A. I MEAN, I REMEMBER STAFF TALKING ABOUT IT, BUT
25  IT -- AND I'M GOING TO SAY THIS BECAUSE, YOU KNOW,

Page 72

1  GENERALLY THROUGHOUT ANY ELECTION --
2    Q. UH-HUH.
3    A. -- YOU JUST CHECK IN.
4    Q. RIGHT.
5    A. "HOW ARE THINGS GOING?"
6    Q. RIGHT.
7    A. "ARE THERE ANY ISSUES?" AND I DO REMEMBER THEM
8  TALKING ABOUT ONE OR TWO.
9    Q. OKAY. AND YOU DON'T REMEMBER HOW THOSE ISSUES
10  RESOLVED?
11   A. I DON'T.
12   Q. I'M GOING TO TALK ABOUT SOME OF THE STAFFING THAT
13  YOU MENTIONED AROUND ELECTIONS.
14       SO DURING THE PRIMARIES IN MARCH 2022 --
15   A. OKAY.
16   Q. -- DID YOUR OFFICE HIRE ANY EMPLOYEES OR
17  CONTRACTORS OR TEMPORARY EMPLOYEES IN ORDER TO
18  FACILITATE OR ASSIST WITH MAIL VOTING REQUIREMENTS OF
19  SB 1?
20   A. YES.
21   Q. HOW MANY? DO YOU REMEMBER?
22   A. I DON'T REMEMBER THE EXACT NUMBER. I'M GOING TO
23  GIVE YOU AN ESTIMATE.
24   Q. UH-HUH.
25   A. I WOULD GUESS PROBABLY FOUR OR FIVE JUST FOR THAT

Page 73

1  PURPOSE.
2    Q. OKAY. AND WHY WAS THAT?
3    A. JUST THE SHEER VOLUME WE WERE GETTING, AND IT
4  TAKES -- IT TAKES A LOT OF PEOPLE TO STUFF THOSE
5  ENVELOPES BECAUSE WE DON'T -- UNLIKE SOME COUNTIES, WE
6  DON'T FARM OUT TO THIRD PARTIES OUR MAIL BALLOTS.
7    Q. OKAY.
8    A. WE DO IT ALL IN-HOUSE.
9    Q. UH-HUH.
10   A. TO THE BEST OF MY RECOLLECTION, IT WAS FOUR OR
11  FIVE PEOPLE.
12   Q. OKAY. AND WHEN YOU SAID THE SHEER VOLUME, SO THE
13  VOLUME OF -- IT WASN'T THE -- WELL, SO IT WAS THE SHEER
14  VOLUME OF MAIL BALLOTS THAT NEEDED TO BE --
15   A. THAT'S A FAIR STATEMENT. I'M PROBABLY JUST
16  REMEMBERING, YOU KNOW, THE PEOPLE WE HAD LINED UP IN THE
17  HALL STUFFING BALLOTS.
18   Q. UH-HUH.
19   A. IT'S NOT NECESSARILY CONTRIBUTED TO SB 1, I
20  GUESS. DOES THAT MAKE SENSE?
21   Q. YEAH. I'M JUST TRYING TO -- SO LET ME JUST ASK
22  IT DIFFERENTLY.
23   A. YEAH.
24   Q. SO THE FOUR OR FIVE PEOPLE THAT YOU DESCRIBED,
25  WERE THOSE PEOPLE HIRED BECAUSE -- SOLELY BECAUSE OF



Frank Phillips

March 31, 2023
Pages 94 to 97

Page 94

1  Q. LET'S GO WITH DENTON COUNTY FIRST, AND THEN YOU
2  CAN TALK ABOUT IN GENERAL.
3       MS. HUNKER: OBJECTION; FORM.
4  A. SURE. ONE WOULD BE JUST OUR GENERAL INCREASE IN
5  POPULATION.
6  Q. (BY MS. YUN) UH-HUH.
7  A. AND I THINK IT'S JUST BECOME MORE -- I HATE TO
8  SAY ADVERTISED. I THINK IT'S PROMOTED MORE THAN IT USED
9  TO BE.
10  Q. UH-HUH.
11  A. I THINK PEOPLE TAKE ADVANTAGE OF MAIL VOTING. I
12  MEAN, I JUST THINK PEOPLE -- A LOT OF PEOPLE DO IT JUST
13  BECAUSE IT'S CONVENIENT. SO A POPULATION INCREASE AND
14  THE GENERAL PROMOTION OF VOTING BY MAIL IS CAUSING AN
15  INCREASE.
16  Q. UH-HUH.
17      AND WOULD YOU AGREE THAT FOR SOME FOLKS IN DENTON
18  COUNTY, THAT IT IS THE ONLY WAY FOR THEM TO VOTE?
19      MS. HUNKER: OBJECTION; FORM.
20  A. FOR SOME FOLKS, YES.
21  Q. (BY MS. YUN) DUE TO DISABILITY, FOR EXAMPLE?
22      MS. HUNKER: OBJECTION; FORM.
23  A. PROBABLY DISABILITY, YES.
24  Q. (BY MS. YUN) AND WOULD YOU AGREE THAT FOR SOME
25  FOLKS, IT IS VERY DIFFICULT FOR THEM TO CURE THEIR MAIL

Page 95

1  BALLOT ERROR?
2       MS. HUNKER: OBJECTION; FORM.
3  A. I WOULD SAY YES.
4  Q. (BY MS. YUN) OKAY. AND I THINK YOU TESTIFIED
5  EARLIER -- AND CORRECT ME IF I'M WRONG -- THAT SOMETIMES
6  FOLKS DON'T GET NOTIFIED IN TIME TO CURE THEIR MAIL
7  BALLOT IN ORDER FOR THEIR BALLOT TO COUNT; IS THAT
8  RIGHT?
9  A. YEAH, ESPECIALLY IF THEY TURN IT IN NEAR THE END,
10  YOU KNOW, THE LAST DAY OF EARLY VOTING, THEN, YES, IT'S
11  GOING TO BE TOUGH.
12      MS. YUN: I THINK I AM ALMOST DONE. I JUST
13  WANT TO TAKE A QUICK BREAK.
14      THE REPORTER: THE TIME IS 11:58 A.M. WE
15  ARE OFF THE RECORD.
16      (OFF THE RECORD.)
17      THE REPORTER: THE TIME IS 12:05 P.M. WE
18  ARE BACK ON THE RECORD.
19      MS. YUN: OKAY. JUST FOR THE RECORD, SO
20  WE'RE GOING TO MARK THE ABBM FORM THAT MR. PHILLIPS
21  LOOKED AT AS EXHIBIT 8. AND THEN THE CARRIER ENVELOPE
22  THAT HE LOOKED AT TO REFRESH HIS RECOLLECTION AS EXHIBIT
23  NO. 9.
24      (EXHIBITS 8 AND 9 MARKED.)
25  Q. (BY MS. YUN) SO JUST TO WRAP UP, IS THERE

Page 96

1  ANYTHING ELSE THAT YOU DISCUSSED WITH THE STATE ABOUT
2  YOUR TRIAL TESTIMONY THAT WE HAVEN'T DISCUSSED THUS FAR
3  TODAY?
4  A. I HAVEN'T DISCUSSED WITH THE STATE ABOUT MY --
5      THE WITNESS: OH, ARE YOU THE STATE?
6      MS. HUNKER: I'M THE STATE.
7  Q. (BY MS. YUN) SORRY. THE AG'S OFFICE,
8  MS. HUNKER.
9  A. NO.
10      MS. YUN: NOTHING ELSE. AND SO I'LL PASS
11  THE WITNESS.
12      MS. HUNKER: ARE THERE ANY OTHER PLAINTIFF
13  GROUP THAT WOULD LIKE TO ASK QUESTIONS OF THE WITNESS ON
14  THE ZOOM CALL?
15      MR. D'ANGELO: NOT FOR ME, THANK YOU.
16      MS. HUNKER: THAT WAS WILLIAM D'ANGELO.
17      ANY OTHER PLAINTIFF GROUPS HAVE ANY
18  QUESTIONS FOR THE WITNESS?
19      HEARING NONE, THE STATE IS GOING TO DO A
20  SHORT DIRECT EXAMINATION.
21      EXAMINATION
22  BY MS. HUNKER:
23  Q. MR. PHILLIPS, HAVE VOTERS CONVEYED TO YOU
24  CONCERNS ABOUT VOTER FRAUD?
25  A. YES.

Page 97

1  Q. HAVE VOTERS CONVEYED TO YOU CONCERNS ABOUT MAIL
2  BALLOT VOTER FRAUD SPECIFICALLY?
3  A. YES.
4  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
5  VOTER FRAUD, INCLUDING MAIL BALLOT VOTING FRAUD, EXISTS
6  UNDERMINE THEIR CONFIDENCE IN ELECTION RESULTS?
7  A. ABSOLUTELY.
8  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
9  VOTER FRAUD, INCLUDING MAIL VOTER FRAUD, EXISTS
10  UNDERMINE THEIR TRUST IN THE ELECTORAL PROCESS?
11  A. YES.
12  Q. HAVE YOU SEEN AN INCREASE IN THE LACK OF TRUST IN
13  THE ELECTORAL PROCESS OVER THE LAST FEW YEARS?
14  A. WITHOUT A DOUBT.
15  Q. DO YOU RECALL TALKING WITH COUNSEL ABOUT HOW THE
16  SB 1 ID REQUIREMENT FOR MAIL-IN BALLOTS ADDED ANOTHER
17  LAYER OF PROTECTION?
18  A. YES.
19  Q. WHAT DID YOU MEAN BY THAT?
20  A. I BELIEVE WE WERE TALKING ABOUT PRIOR TO SB 1 AND
21  THE ID REQUIREMENTS, YOU KNOW, HAD WE DISCOVERED ANY
22  MAIL FRAUD. AND THE ANSWER WAS NO. BUT, IN MY MIND,
23  THAT DOESN'T MEAN YOU DON'T ADD ANOTHER SECURITY --
24  ANOTHER LEVEL OF SECURITY, ESPECIALLY WHEN IT COMES TO
25  WHAT YOU WERE JUST TALKING ABOUT, ABOUT THE PERCEPTION



# EXHIBIT 98

Rachelle Obakozuwa                                                March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO           §
 4  ENTERO, et al.,              §
           Plaintiffs,           §
 5                               §
    v.                           §    Case No. 5:21-cv-844-XR
 6                               §
    GREGORY W. ABBOTT, et        §
 7  al.,                         §
           Defendants,           §
 8                               §
    _____    §
 9                               §
    OCA-GREATER HOUSTON, et      §
10  al.,                         §
           Plaintiffs,           §
11                               §
    v.                           §    Case No. 1:21-cv-780-XR
12                               §
    JANE NELSON, et. al.,        §
13         Defendants,           §
                                 §
14  _____    §
                                 §
15  HOUSTON JUSTICE, et          §
    al.,                         §
16         Plaintiffs,           §
                                 §
17  v.                           §    Case No. 5:21-cv-848-XR
                                 §
18  GREGORY WAYNE ABBOTT,        §
    et al.,                      §
19         Defendants,           §
                                 §
20  _____    §
                                 §
21  LULAC Texas, et al.,         §
           Plaintiffs,           §
22                               §
    v.                           §    Case No. 1:21-cv-0786-XR
23                               §
    JANE NELSON, et al.,         §
24         Defendants,           §
                                 §
25  _____    §
```



Rachelle Obakozuwa

March 21, 2023
Pages 2 to 5

## Page 2

```
1   MI FAMILIA VOTA, et          §
    al.,                         §
2        Plaintiffs,             §
                                 §
3   v.                           §   Case No. 5:21-cv-0920-XR
                                 §
4   GREG ABBOTT, et al.,         §
         Defendants.             §
5
6
7
8
9           ORAL AND VIDEOTAPED DEPOSITION OF
10                 RACHELLE OBAKOZUWA
11                  MARCH 21, 2023
12
13
14
15       ORAL AND VIDEOTAPED DEPOSITION OF RACHELLE
16  OBAKOZUWA, produced as a witness at the instance of the
17  Defendants and duly sworn, was taken in the above styled
18  and numbered cause on Tuesday, March 21, 2023, from
19  3:51 p.m. to 6:44 p.m., before DONNA QUALLS, Notary
20  Public in and for the State of Texas, reported by
21  computerized stenotype machine, at the offices of Harris
22  County Attorney's Office, 1019 Congress Street, 15th
23  Floor, Houston, Texas, pursuant to the Federal Rules of
24  Civil Procedure, and any provisions stated on the record
25  or attached hereto.
```

## Page 3

```
1            A P P E A R A N C E S
2
3   FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
        SAMEER S. BIRRING
        TIFFANY BINGHAM
4       OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
        D. MENEFEE
5       1019 Congress, 15th Floor
        Houston, Texas  77002
6       (713) 274-5142
        sameer.birring@harriscountytx.gov
7
8   FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
        JENNIFER A. HOLMES
9       NAACP Legal Defense and Educational Fund, Inc.
        700 14th Street N.W., Suite 600
10      Washington, District of Columbia  20005
        (347) 573-0197
11      jholmes@naacpldf.org
12
    FOR THE UNITED STATES:
13      DANA PAIKOWSKY
        U.S. DEPARTMENT OF JUSTICE
14      950 Pennsylvania Avenue, NW
        Washington, District of Columbia  20530
15      (202) 353-5225
        dana.paikowsky@usdoj.gov
16
17  FOR THE STATE DEFENDANTS:
        KATHLEEN T. HUNKER
18      OFFICE OF THE ATTORNEY GENERAL
        P.O. BOX 12548 (MC-009)
19      AUSTIN, TEXAS  78711-2548
        (512) 463-2100
20      kathleen.hunker@oag.texas.gov
21
    Also Present:
22      STEPHEN KENNY (Via Zoom)
        BRADLEY PROWANT (Via Zoom)
23      BREANNA WILLIAMS, NAACP (Via Zoom)
        CARRIE LEBEL (Via Zoom)
24      GERMAINE HABELL (Via Zoom)
        JOHN GORE, GOP (Via Zoom)
25      JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```

## Page 4

```
1   LEIGH TOGNETTI (Via Zoom)
    LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
2   LUCIA ROMANO (Via Zoom)
    MIKE STEWART, DOJ (Via Zoom)
3   URUJ SHEIKH, LDF (Via Zoom)
    REGGIE WRIGHT, THE VIDEOGRAPHER
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1                      INDEX
2                                              PAGE
3
    Appearances...................................    3
4
5   RACHELLE OBAKOZUWA
6   Examination by Ms. Hunker.....................    7
    Examination by Ms. Paikowsky..................   56
7   Examination by Ms. Holmes.....................   65
    Further Examination by Ms. Hunker.............   88
8
9   Corrections & Signature.......................   98
10
    Reporter's Certificate........................  100
11
12                  EXHIBIT INDEX
13
    NUMBER        DESCRIPTION                     PAGE
14  Exhibit 17    Report to secretary of state,    47
                  dated 12/08/2022
15  Exhibit 18    PowerPoint presentation, dated   79
                  03/29/2022
16  Exhibit 19    Oath of assistance              83
    Exhibit 20    Oath of assistance and          84
17                interpreter
18
19
20
21
22
23
24
25
```



Rachelle Obakozuwa

March 21, 2023
Pages 6 to 9

Page 6

1          THE VIDEOGRAPHER:  We are now on the
2   record.  This begins Videotape No. 1 in the deposition
3   of Rachelle Obakozuwa in the matter of La Union -- La
4   Union Del Pueblo Entero, et al., versus Gregory W.
5   Abbott, et al., filed in the United States District
6   Court, Western District of Texas, San Antonio Division,
7   Case No. 5:21-CV-844-XR.  Time is 3:51 p.m.
8          THE REPORTER:  Can I have all counsel
9   please state your appearance for the record.
10         MS. HUNKER:  Kathleen Hunker for the Texas
11   Attorney General's Office representing the State
12   defendants.
13         MS. HOLMES:  Jennifer Holmes on behalf of
14   the HAUL plaintiffs.
15         MS. PAIKOWSKY:  Dana Paikowsky on behalf of
16   the United States.
17         MR. BIRRING:  Sameer Birring on behalf of
18   the Harris County Elections Administrator witnesses.
19         MS. BINGHAM:  And Tiffany Bingham on behalf
20   of the Harris County Election Administrator's Office.
21         MR. KENNY:  Stephen Kenny, Jones Day, on
22   behalf of Intervenor-Defendants.
23         MS. HUNKER:  Thank you.
24             RACHELLE OBAKOZUWA,
25   having been duly sworn, testified as follows:

Page 7

1              EXAMINATION
2   BY MS. HUNKER:
3      Q.  Good afternoon.
4      A.  Good afternoon.
5      Q.  My name is Kathleen Hunker.  I am with the
6   office of the Texas Attorney General representing the
7   State defendants in this matter.
8          Can you please state and then spell your
9   name for the record.
10     A.  Rachelle Obakozuwa,
11   R-A-C-H-E-L-L-E O-B-A-K-O-Z-U-W-A.
12     Q.  Thank you.  I'm going to start with some
13   instructions and introductory questions.  Then after
14   that's finished, I'll move on to the main subject of the
15   deposition.  Okay?
16     A.  Okay.
17     Q.  Have you ever been deposed before?
18     A.  Yes.
19     Q.  How many times?
20     A.  Once.
21     Q.  And what was that case about?
22     A.  The Department of Justice against Harris County
23   for ADA.
24     Q.  And so that was an ADA claim?
25     A.  Correct.

Page 8

1      Q.  And was that involving Harris County elections?
2      A.  Yes.
3      Q.  And when was this deposition?
4      A.  I believe it was 2018.
5      Q.  And do you happen to remember the case name?
6      A.  No.
7      Q.  You understand that you're under oath, correct?
8      A.  Correct.
9      Q.  For the court reporter, you will need to
10   provide verbal answers like "yes" or "no" rather than
11   nodding or shaking your head.  This has extra importance
12   here today because we have a bunch of attorneys
13   participating remotely through Zoom, and they may not --
14   they may not be able to see if they are dialing in.
15         Does that make sense?
16     A.  Yes.
17     Q.  It also helps the court reporter if you and I
18   don't speak over one another.  I'm going to do my best
19   to wait for you to finish your answer before I ask my
20   next question.  Will you do your best to wait for me to
21   finish my question before you start your answer?
22     A.  Yes.
23     Q.  If you don't understand a question that I ask,
24   will you please let me know?
25     A.  Yes.

Page 9

1      Q.  And if you do answer a question, I'm going to
2   assume that you understood the question; is that fair?
3      A.  Yes.
4      Q.  If you need a break at any time, that's fine.
5   Please just let me know.  My only request is that you
6   answer any pending question before we take a break.
7   Okay?
8      A.  Okay.
9      Q.  Also, if you hear an objection from your
10   counsel, that is typically for the court to decide at a
11   later date.  I therefor ask that you go ahead and answer
12   the question unless you are instructed not to answer.
13   Okay?
14     A.  Okay.
15     Q.  Now, I'm obliged to ask the following
16   questions:  Have you consumed any alcohol today?
17     A.  No.
18     Q.  Have you consumed any drugs today?
19     A.  No.
20     Q.  Are you aware of anything that would affect
21   your ability to testify truthfully and accurately today?
22     A.  No.
23     Q.  You did not bring any documents with you today,
24   correct?
25     A.  Correct.



Rachelle Obakozuwa

Page 54

1    Q.  Okay.  And did you receive any feedback from
2  the organizations about your community engagement
3  events?
4    A.  Not that I'm aware of.
5    Q.  Okay.  Did you receive any feedback from other
6  community groups, not necessarily the ones regarding --
7  that you held of -- the community engagement event with?
8    A.  We attempted to reach multiple community
9  groups, and so we received feedback from some that they
10  were not available or not interested.
11    Q.  And do you know if voters -- if your
12  outreach -- let me -- let me rephrase the question.
13        Are you aware if voters -- strike that.
14        Based on any feedback you received from
15  your public information campaign, did you find that it
16  helped voters alleviate their confusion regarding their
17  ID requirements?
18        MS. HOLMES:  Objection to form.
19    A.  Some.
20    Q.  (BY MS. HUNKER)  Can you elaborate at all?
21    A.  We still received ballots that are incorrectly
22  submitted without sufficient information -- the ballot
23  by mail.  So they're either not seeing the campaign or
24  the campaign didn't address them specifically in a way
25  that was successful.

Page 55

1    Q.  And is Harris County continuing to engage in
2  the voter education efforts?
3    A.  Yes.
4    Q.  And when you say you're engaging in voter
5  education efforts, do you mean specifically to include
6  the ID requirement for vote by mail?
7    A.  Yes.
8    Q.  And are you working on reaching the groups that
9  were not necessarily reached in the first round of voter
10  education efforts?
11    A.  We are looking to reach every group in Harris
12  County.
13    Q.  Would you consider your public awareness
14  campaign a success?
15    A.  Yes.
16        MS. HUNKER:  I think we can go off the
17  record.
18        THE VIDEOGRAPHER:  We are going off the
19  record at 5:05 p.m.
20        (Recess from 5:05 p.m. to 5:17 p.m.)
21        THE VIDEOGRAPHER:  We are back on the
22  record at 5:17 p.m.
23        MS. PAIKOWSKY:  I think -- Kathleen, are
24  you going to pass the witness?
25        MS. HUNKER:  Yes.  I have no other

Page 56

1  questions at this time, and I'm passing the witness but
2  reserve redirect.
3            EXAMINATION
4  BY MS. PAIKOWSKY:
5    Q.  Welcome.  Thank you for testifying this
6  afternoon.  My name is Dana Paikowsky, and I'm with the
7  United States.  So I'm going to start out maybe circling
8  back on some of these questions about voter education
9  related to the identification provision of Senate
10  Bill 1.
11        Did your office produce an insert to
12  include with the carrier envelope to explain the ID
13  provision during the November 2022 general election?
14    A.  Not a separate one.  We included the one the
15  state provided.  And that is my understanding.  By the
16  way, I'm not -- I don't think I was set to -- to testify
17  on that topic.
18    Q.  Okay.
19    A.  Ballot by mail.
20    Q.  Would you know of who might be able to testify
21  about the development of a ballot insert?
22    A.  The development of it would be our
23  communications person, Nadia.  I have seen a lot of the
24  flyers.  I'm just not aware of a particular one that was
25  put in the ballot by mail.

Page 57

1    Q.  You described some voter education efforts that
2  your office engaged in around Senate Bill 1's
3  identification provision.  Why did you undertake those
4  efforts?
5    A.  There were voter questions and confusion about
6  why their ballots weren't being counted -- or why their
7  ballots were being rejected.  I apologize.  And -- and
8  the -- there were changes that SB1 had that we knew
9  would affect every voter who was voting by mail.
10    Q.  And do you anticipate needing to continue to
11  do -- maintain these efforts in future elections?
12    A.  Yes.
13    Q.  Earlier you testified that SB1 necessitated an
14  increase in temporary and full-time staff.  Why is that?
15    A.  There are a lot of implications for SB1.  With
16  the rejection of mail ballots, there has to be more
17  communication to voters.  So it takes more bodies to
18  create that communication to send items to the voters,
19  and there's a higher rate of transaction.  So it
20  requires more workers.
21        Additionally, SB1 affected some of our
22  staffing for election workers.  And so that was one of
23  the reasons recruitment efforts had to increase.  So we
24  had to have more staff for that.  And there are more
25  procedural-type questions and calls that we get.  So our



EXHIBIT

99

Dan Hayes                                                    March 29, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, ET AL.,)(
          Plaintiffs,                   )(
 4                                      )(   Case No.:
     V.                                 )(   5:21-cv-0844-XR
 5                                      )(
     TEXAS, ET AL.,                     )(
 6        Defendants.                   )(
 7   _____

     OCA-GREATER HOUSTON, ET AL.,       )(
 8        Plaintiffs,                   )(
                                        )(
 9   V.                                 )(   Case No.:
                                        )(   1:21-cv-0780-XR
10   TEXAS SECRETARY OF STATE           )(
     JANE NELSON, ET AL.,               )(
11        Defendants.                   )(
12   _____

     HOUSTON AREA URBAN LEAGUE, ET AL., )(
13        Plaintiffs,                   )(
                                        )(   Case No.:
14   V.                                 )(   5:21-cv-0848-XR
                                        )(
15   GREGORY WAYNE ABBOTT, ET AL.,      )(
          Defendants.
16   _____

17   LULAC TEXAS, ET AL.,               )(
          Plaintiffs,                   )(
18                                      )(   Case No.:
     V.                                 )(   1:21-cv-0786-XR
19                                      )(
     JANE NELSON, ET AL.,               )(
20        Defendants.                   )(
21   _____

     MI FAMILIA VOTA, ET AL.,           )(
22        Plaintiffs,                   )(
                                        )(   Case No.:
23   V.                                 )(   5:21-cv-0920-XR
                                        )(
24   GREG ABBOTT, ET AL.,               )(
          Defendants.                   )(
25   _____
```



Dan Hayes

March 29, 2023
Pages 2 to 5

Page 2

1 THE UNITED STATES OF AMERICA,    )(
    Plaintiff,              )(
2                            )( Case No.
    V.                       )( 5:21-cv-1085-XR
3                            )(
STATE OF TEXAS, ET AL.,         )(
4    Defendants.            )(
5 *******************************************************
6        ORAL 30(b)(6) DEPOSITION OF
7         TRAVIS COUNTY CLERK'S OFFICE
8         TESTIMONY OF DAN HAYES
9             March 29, 2023
10 *******************************************************
11
12
13           ORAL DEPOSITION OF DAN HAYES,
14 produced as a witness at the instance of the
15 Consolidated Plaintiffs, and duly sworn, was taken in
16 the above-styled and numbered cause on the 29th day of
17 March, 2023, from 9:04 a.m. to 10:34 a.m., before
18 STEPHANIE DAVIS, CSR, in and for the State of Texas,
19 reported by oral stenograph, at the Travis County
20 Attorney's Office, 314 West 11th Street, Fifth Floor,
21 Austin, Texas, pursuant to the Federal Rules of Civil
22 Procedure and the provisions stated on the record or
23 attached herein.
24
25

Page 3

1            A P P E A R A N C E S
2 FOR TEXAS CIVIL RIGHTS PROJECT:
3      ZACHARY DOLLING
       HANI MIRZA
4      VERONIKAH WARMS
       1405 Montopolis Drive
5      Austin, Texas 78741
       zachary@texascivilrightsproject.org
6      hani@texascivilrightsproject.org
       veronikah@texascivilrightsproject.org
7
  FOR THE U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS
8 DIVISION:
       DANA PAIKOWSKY
9      JOHN SULLIVAN BAKER (Appeared Remotely)
       Robert F. Kennedy Building
10     950 Pennsylvania Avenue, Northwest
       Washington, DC 20530
11     dana.paikowsky@usdoj.gov
       john.bakersullivan@usdoj.gov
12
  FOR OCA-GREATER HOUSTON, ET AL.:
13
       KENNETH BROUGHTON (Appeared Remotely)
14     REED SMITH, LLP
       811 Main Street, Suite 1700
15     Houston, Texas 77002-6110
       kbroughton@reedsmith.com
16
  FOR ATTORNEY GENERAL KEN PAXTON:
17
       WILLIAM D. WASSDORF
18     AARON BARNES
       ASSISTANT ATTORNEY GENERAL
19     PO Box 12548
       Austin, Texas 78711-2548
20     will.wassdorf@oag.texas.gov
       aaron.barnes@aog.texas.gov
21
  FOR HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE:
22
       ANNE CRISP (Appeared Remotley)
23     BUTLER SNOW LLP
       1400 Lavaca Street, Suite 1000
24     Austin, Texas 78701
       anne.crisp@butlersnow.com
25

Page 4

1 FOR THE STATE OF TEXAS; GREG ABBOTT, IN HIS OFFICIAL
  CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN HER
2 OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
  WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE
3 TEXAS ATTORNEY GENERAL:
4 ALSO PRESENT:

       LOUIS J. CAPOZZI (Appeared Remotely)
5      JONES DAY
       51 Louisiana Avenue, Northwest
6      Washington, DC 20001
       lcapozzi@jonesday.com
7
  FOR DAN HAYES, CHARLIE JOHNSON, AND BRIDGETTE
8 ESCABEDO, IN THEIR OFFICIAL CAPACITIES AS TRAVIS
  COUNTY CLERKS AND DISTRICT ATTORNEY, RESPECTIVELY:
9
       ANTHONY J. NELSON
10     PATRICK T. POPE
       TRAVIS COUNTY ASSISTANT COUNTY ATTONEY
11     314 West 11th Street, Fifth Floor
       Austin, Texas 78767
12     tony.nelson@traviscountytx.gov
       patrick.pope@traviscountytx.gov
13
14 FOR HIDALGO COUNTY ELECTIONS ADMINISTRATOR DELIA
  GARZA:
15
       LEIGH ANN TOGNETTI (Appeared Remotely)
16     ASSISTANT DISTRICT ATTORNEY
       100 East Cano, First Floor
17     Hidalgo County Courthouse Annex III
       Edinburg, Texas 78539
18     leigh.tognetti@da.co.hidalgo.tx.us
19 ALSO PRESENT:
20     GABE HODGE, paralegal for Mr. Nelson
21
22
23
24
25

Page 5

1            I N D E X
2                        PAGE
3 Appearances ................................    3
4 CHARLIE JOHNSON
  Examination by Mr. Dolling ...................    7
5 Examination by Ms. Paikowsky .................   30
  Further Examination by Mr. Dolling ...........   40
6 Examination by Mr. Wassdorf ..................   41
  Further Examination by Mr. Dolling ...........   56
7 Further Examination by Ms. Paikowsky .........   57
  Further Examination by Mr. Wassdorf ..........   58
8
  Changes and Signature Page ..................   61
9
  Reporter's Certificate ......................   64
10
11           E X H I B I T S
12 NUMBER   DESCRIPTION               PAGE
13   1     Second Amended Notice of Rule 30(b)(6)
          Deposition of the Office of the Travis
14        County Clerk ......................    9
15   2     State's Defendants' Cross Notice of
          Intent to Take Oral and Videotaped
16        Deposition of the Office of the Travis
          County Clerk, Pursuant to Rule 30(b)(6)   47
17
18
19
20
21
22
23
24
25



Dan Hayes                                                    March 29, 2023
                                                              Pages 6 to 9

---

Page 6

1        P R O C E E D I N G S
2            THE COURT REPORTER:  Good morning, we
3  are on the record.  The time is 9:04 a.m., on March
4  29th, 2023.  Will counsel please state their
5  appearance for the record.
6            MR. NELSON:  Yes.  Assistant Travis
7  County Attorney Tony Nelson for the Travis County
8  defendants and the witness, Dan Hayes.
9            MR. DOLLING:  Zachary Dolling from
10 Texas Civil Rights Project on behalf of the OCA
11 plaintiffs.
12           MR. POPE:  Patrick Pope with the Travis
13 County Attorney's office on behalf of Travis County.
14           MR. WASSDORF:  Will Wassdorf with the
15 office of the Attorney General on behalf of State
16 defendants.
17           MR. BARNES:  Aaron Barnes with the
18 office of the Attorney General on behalf of State
19 defendants.
20           MS. WARMS:  Veronikah Warms with Texas
21 Civil Rights Project on behalf of OCA plaintiffs.
22           MS. PAIKOWSKY:  Dana Paikowsky on
23 behalf of the United States.
24           MR. MIRZA:  Hani Mirza on behalf of the
25 OCA plaintiffs with the Texas Civil Rights Project.

---

Page 7

1            THE COURT REPORTER:  Thank you.
2            DAN HAYES,
3  having been duly sworn, testified as follows:
4            EXAMINATION
5  BY MR. DOLLING:
6            MR. DOLLING:  Can we go off the record
7  for just a second because I realized that we may not
8  have set up a Zoom.
9            THE COURT REPORTER:  We're off the
10 record.
11           (Off the record.)
12           THE COURT REPORTER:  We are back on the
13 record.
14     Q.   Good morning, Mr. Hayes.  My name is Zach
15 Dolling, and I'm here on behalf of the OCA plaintiffs.
16 Could you please state your name and spell it for the
17 record?
18     A.   My name is Dan Hayes, D-A-N H-A-Y-E-S.
19           MR. DOLLING:  Has the witness been
20 sworn?
21           THE COURT REPORTER:  Yes.
22           MR. DOLLING:  Sorry.
23     Q.   For the benefit of the court reporter and
24 the people attending via Zoom who might not be able to
25 see you well or hear you well, will you provide verbal

---

Page 8

1  answers like yes and no rather than nodding or shaking
2  your head?
3      A.   Absolutely.
4      Q.   It's also important that we don't speak over
5  one another so that the court reporter can get a clean
6  record of what's said.  I'll do my best to wait for
7  you to finish speaking.  Can you do the same for me?
8      A.   Yes.
9      Q.   Thank you.  If you don't understand a
10 question, will please let me know?
11     A.   Yes.
12     Q.   And if you do answer without asking for
13 clarification, I'm going to assume that you understood
14 the question; is that fair?
15     A.   Yes.
16     Q.   Your attorney may object to a question,
17 after which you still need to answer unless they
18 specifically instruct you not to.  Do you understand?
19     A.   Yes.
20     Q.   If at any time you want a break, just let me
21 know, but I ask that you finish answering any question
22 that's pending before we do that; is that okay?
23     A.   Yes.
24     Q.   Is there any reason you can think of that
25 your ability to effectively communicate your answers

---

Page 9

1  would be impaired today?
2      A.   No.
3      Q.   Have you taken any prescription medication,
4  alcohol, drugs, suffered any condition or injury or
5  otherwise have reason to believe that you might be
6  impaired from testifying truthfully and accurately
7  today?
8      A.   No.
9      Q.   And finally, I'm just going to remind you
10 that you're under oath and subject to federal penalty
11 for false or misleading testimony; so it's important
12 that you answer my question fully, completely, and
13 truthfully.  Do you understand?
14     A.   Yes.
15     Q.   Do you have any questions before we get
16 started?
17     A.   No.
18     Q.   Okay.  Great.  So I'm going to hand you
19 this.  I'd like to mark it as Exhibit Number 1.
20           (Off the record conversation.)
21     Q.   So just to give you a chance to flip through
22 that.  Have you seen this document before?
23     A.   I believe so, yes.
24     Q.   And if you just read the top -- the name --
25 the title on the second page.  It says, "Second



Dan Hayes

Page 30

EXAMINATION
1
2  BY MS. PAIKOWSKY:
3      Q.  I'm Dana Paikowsky for the United States
4  this morning.  Thank you for taking the time to
5  testify.  I similarly just want to take a couple
6  minutes to get a sense of whether or not you have
7  knowledge about some things or whether someone else
8  would be the right person.  So are you involved in
9  voter education efforts related to mail voting at all?
10     A.  I am.
11     Q.  Can you describe to me what kinds of voter
12 education efforts your office made during the November
13 2022 general election?
14     A.  As mentioned before, we did social media
15 posts, we provided notices -- I don't want to say
16 "notices," that's a legal term -- but those
17 high-viz -- neon paint, neon yellow, orange,
18 whatever -- pieces of paper highlighting the
19 requirements for ballot-by-mail.  Also, we do post on
20 where voting locations are, times, things like that.
21     Q.  So I'm specifically interested in voter
22 education around the ID provision in mail voting.
23     A.  Uh-huh.
24     Q.  Were there any efforts that you made to
25 educate voters around that provision specifically?

Page 31

1      A.  Yes.
2      Q.  And are those efforts the same as you
3  previously described?
4      A.  Yes.
5      Q.  In those outreach and education efforts
6  during the November 2022 general election, did your
7  office advise voters to provide both an ID number and
8  an SSN four on their ABBMs or carrier envelopes?
9      A.  Yes.
10     Q.  Why did you advise voters to provide both
11 the -- excuse me.  Withdrawn.
12         Why did you advise voters to provide both
13 when the language in the statute and also of the ABBM
14 carrier envelopes directs voters to put one or the
15 other?
16     A.  Would you repeat that?  I had a hard time
17 hearing.
18     Q.  Yeah.
19     A.  Okay.
20     Q.  Why did you advise voters to put both
21 numbers down?
22     A.  Okay.  Under the guidance of the SOS and the
23 recommendation of the SOS so that voters -- it was
24 deemed that it was completely acceptable to have both
25 numbers, because a voter may not know which of those

Page 32

1  numbers is associated with their voter record; so to
2  cover all bases, so to speak, we advised our voters
3  who submitted an ABBM or ballot-by-mail carrier to put
4  both numbers.
5      Q.  Do the forms that you use for an ABBM or
6  carrier envelope also ask voters to provide both
7  numbers or just one?
8      A.  Which forms are you referring to?
9      Q.  The ABBMs and the carrier envelopes.
10     A.  Okay.  No, they do not -- they do not say
11 both, as far as I remember.
12     Q.  As part of your voter education efforts, did
13 your office include an insert with their absentee
14 ballot-by-mail applications explaining the ID
15 requirement and asking for voters to provide both
16 numbers?
17     A.  If I remember correctly, yes.
18     Q.  And has your office produced that insert to
19 us?
20     A.  I do not...
21         MR. NELSON:  Again, I believe so.  But
22 if we haven't, we can supplement that.
23         MS. PAIKOWSKY:  Yeah, I wasn't able to
24 find ballot inserts, but we'll connect with you and
25 check that out on the back end.

Page 33

1      Q.  So were you involved in the design or
2  production of that ballot insert?
3      A.  It was a collaborative effort.  We all look
4  at it and provide input, yes.
5      Q.  Can you describe to me why you provided or
6  created that form?
7      A.  We saw, initially, in the first time --
8  first implementation of the SB-1 provisions regarding
9  this that we realized that voters did not always know
10 which of the numbers was associated with their voter
11 record.  We -- with discussions in our office, we
12 decided that we wanted to do both to help the voters
13 cover all the bases, as mentioned before so that the
14 voter's application and their ballot-by-mail would
15 hopefully reduce the chance of it being rejected.
16     Q.  Did you find including these inserts with
17 the ABBM was helpful in driving down rejection rates?
18     A.  That's a comparison I can't make.  A cause
19 and effect on -- rejection rates did go down.  I can't
20 say what the cause was.
21     Q.  Did your office include a ballot insert with
22 the carrier envelope to explain the ID requirement
23 during the November 2022 general election?
24     A.  We provided an insert in the outgoing -- we
25 call it a ballot package, which includes the carrier



Dan Hayes

March 29, 2023
Pages 34 to 37

Page 34

1 envelope and a bunch of other stuff. Yes, we did.
2    Q.   Is it the same insert that you included with
3 the ABBM?
4    A.   It is a different color, but it provides the
5 same educational information.
6    Q.   Why did your office create this insert?
7    A.   For the same reason for the application to
8 help inform the voter that it's perfectly okay to
9 provide both numbers so that they could reduce the
10 chance of it being rejected and make sure that they
11 provided the proper number associated with their voter
12 record.
13    Q.   Have you modified this insert over time?
14    A.   Other than color, I do not believe -- I
15 believe we might have highlighted, like, a little
16 circle around it to highlight -- just make it pop a
17 little more, so to speak, so it's a bit more visible.
18    Q.   And I'm just going to again say that we're
19 going to check to see if they've been produced, but I
20 think the multiple versions would be helpful to see
21 over time.
22       MR. NELSON:  Okay.
23    Q.   Can you explain why you made changes to the
24 form since -- excuse me -- to the ballot insert since
25 your office first began using it?

Page 35

1    A.   If we did, they were minor.  Probably,
2 verbiage, fonts, something like that.  I cannot
3 remember on the initial one if we had a circle around
4 it, but mostly, just so it's visible.  So it's clear,
5 you know, you learn; and so we make those changes.
6    Q.   And the visibility is important because it
7 helps emphasize certain information; is that correct?
8    A.   That is correct.
9    Q.   And what information are you hoping to
10 emphasize?
11    A.   The need for both the driver's license and
12 the social security number if they have them.
13    Q.   And why did you want to emphasize that to
14 voters?
15    A.   So that they could put them on there and
16 reduce the rejection rate.
17    Q.   During the time that you were producing
18 these inserts for the ABBMs and ballot carrier
19 envelopes, did you confer with the Secretary of
20 State's office about those efforts?
21    A.   I believe we did.
22    Q.   And what feedback did the Secretary of
23 State's office give you on those ballot inserts?
24    A.   If I remember correctly, the SOS
25 preemptively gave information that we could do this --

Page 36

1 that we could provide inserts, and they verified that
2 we could notify voters that they could put both
3 numbers, and it would be perfectly okay; so that's the
4 feedback.
5    Q.   And this also is -- if you don't know this
6 or if another designee would be better to testify
7 about it:  To your knowledge, did the Secretary of
8 State's office recommend you develop these ballot
9 inserts as a best practice for implementation for
10 Senate Bill 1?
11    A.   I don't remember that specifically.
12    Q.   Based on your experience in the 2022 general
13 election, do you foresee a need to continue to engage
14 in these affirmative voter education efforts related
15 to the ID provision -- the mail ballot ID provision in
16 future elections?
17    A.   Yes.
18    Q.   Why is that?
19    A.   Travis County, it's very important to our
20 office to educate our voters so that their ballots may
21 be accepted -- counted -- as appropriate.  We have --
22 we believe in voter education and helping people vote.
23    Q.   Does your county have any plans to -- I'm
24 sorry, withdrawn.
25       Would your ability to continue these efforts

Page 37

1 depend on your budget in future years?
2    A.   It does cost money, and money is always a
3 consideration.  So I -- dependent?  Let's just say
4 it's a consideration.
5    Q.   In the November 2022 general election, did
6 your office hire employees or contractors in order to
7 facilitate, support, or assist with mail voting or the
8 implementation of the SB-1's identification
9 requirements?  And I'm also including voter education
10 efforts in this question.
11    A.   Would you state again the types -- the first
12 part of your question for me?
13    Q.   Yeah.  And I also am cognizant that there's
14 another designee who's testifying.
15    A.   Sure.
16    Q.   The question is:  During the November 2022
17 election, did your office hire employees or
18 contractors to facilitate the mail voting process and
19 specifically implement SB-1'S identification
20 requirements?  And as part of that, I'm asking also
21 about affirmative voter education efforts?
22    A.   Yes --
23       MR. NELSON:  Before you -- well, I was
24 going to say before you answer:  If, again, as was
25 pointed out, if it's a question that's regarding an



EXHIBIT 100

Transcript of the Testimony of

**Lisa Wise**

**Date:**

April 13, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Lisa Wise                                                      April 13, 2022

1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                       SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
4          Plaintiffs,          )
                                )
5    v.                         ) Civil Action No. SA-21-CV-
                                )             00844-XR
6    GREGORY W. ABBOTT, et al., )
           Defendants.          )
7

8

9          ----------------------------------------

10             ORAL AND VIDEOTAPED DEPOSITION OF
                          LISA WISE
11                      APRIL 13, 2022
                         Volume 1
12
           ----------------------------------------
13

14

15             ORAL AND VIDEOTAPED DEPOSITION OF LISA

16   WISE  produced as a witness at the instance of Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 13th day of April, 2022 from 10:02

19   a.m. mountain time to 5:27 p.m. mountain time, before

20   Nancy Newhouse, a Certified Shorthand Reporter in and for

21   the State of Texas, reported by oral shorthand, located

22   at the 500 East San Antonio, Room 503, El Paso, Texas

23   79901, pursuant to the Federal Rules of Civil Procedure,

24   and the provisions stated on the record or attached

25   hereto.

Lisa Wise

April 13, 2022
Pages 2 to 5

## Page 2

```
1                A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4    Ms. Nina Perales
     MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
5    110 Broadway, Suite 300
     San Antonio, Texas 78205
6    Telephone: (210) 224-5476
     Fax: (210) 224-5382
7    email: nperales@maldef.org
8    Mr. Graham W. White, LULAC
     LAW OFFICES OF ELIAS LAW GROUP, LLP
9    10 G Street NE, Suite 600
     Washington, D.C. 20002
10   Telephone: (202) 968-4490
     email: gwhite@elias.law
11
     Mr. Kevin Zhen, LUPE, Via Zoom Southwest Voter
12   Registration Education Project, Mexican American Bar
     Association of Texas, Texas Hispanics Organized for
13   Polical Education, Jolt Action, William C. Velasquez
     Institute, Fiel Houston, Inc.
14   LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
     LLP
15   One New York Plaza
     New York, New York 10004
16   Telephone: (212) 859-8000
     Fax: (212) 859-4000
17   email: kevin.zhen@friedfrank.com
18   Mr. Jason S. Kanterman, LUPE, Via Zoom Southwest Voter
     Registration Education Project, Mexican American Bar
19   Association of Texas, Texas Hispanics Organized for
     Political Education, Jolt Action, William C. Velasquez
20   Institute, Fiel Houston, Inc.
     LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
21   LLP
     One New York Plaza
22   New York, New York 10004
     Telephone: (212) 859-8000
23   Fax: (212) 859-4000
     email: jason.kanterman@friedfrank.com
24
25
```

## Page 4

```
1            A P P E A R A N C E S Continued
2
3    Ms. Ashley Harris, OCA-GH
     ACLU FOUNDATION OF TEXAS, INC
4    5225 Katy Freeway, Suite 350
     Houston, Texas 77007
5    Telephone: (713) 942-8146
     Fax: (915) 642-6752
6    email: aharris@aclutx.org
7    Mr. Thomas Buser-Clancy, OCA-GH
     ACLU FOUNDATION OF TEXAS, INC
8    5225 Katy Freeway, Suite 350
     Houston, Texas 77007
9    Telephone: (713) 942-8146
     Fax: (915) 642-6752
10   email: tbuser@aclutx.org
11
     FOR THE DEFENDANT:
12
     Mr. Jeffery White, OAG
13   ATTORNEY GENERAL KEN PAXTON OFFICE
     SPECIAL COUNSEL SPECIAL LITIGATION UNIT
14   209 West 14th Street
     Austin, Texas 78701
15   Telephone: (512) 936-0677
     Fax: (512) 457-4410
16   email: jeff.white@oag.texas.gov
17   Ms. Kathleen T. Hunker, OAG
     ATTORNEY GENERAL KEN PAXTON OFFICE
18   SPECIAL COUNSEL SPECIAL LITIGATION UNIT
     209 West 14th Street
19   Austin, Texas 78701
     Telephone: (512) 936-0677
20   Fax: (512) 457-4410
     email: kathleen.hunker@oag.texas.gov
21
     Ms. Kelsey Spector, El Paso County
22   LAW OFFICES OF COOLEY, LLP
     3 Embarcadeo Center, 20th Floor
23   San Francisco, California 94111
     Telephone: (415) 693-2015
24   email: kspector@cooley.com
25
```

## Page 3

```
1            A P P E A R A N C E S Continued
2
3    Ms. Julia R. Longoria, LUPE
     MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, INC
4    110 Broadway, Suite 300
     San Antonio, Texas 78205
5    Telephone: (210) 224-5476
     Fax: (210) 224-5382
6    email: jlongoria@maldef.org
7    Ms. Jasleen Singh, LUPE
     BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
8    120 Broadway, Suite 1750
     New York, New York 10271
9    Telephone: (646) 292-8389
     email: jasleen.singh@nyu.edu
10
     Ms. Wendy Olson, Mi Familia Vota
11   LAW OFFICES OF STOEL RIVES, LLP
     101 South Capitol Boulevard, Suite 1900
12   Boise, ID 83702
     Telephone: (208) 387-4217
13   email: wendy.olson@stoel.com
14   Mr. Jaywin Singh Malhi, DOJ
     TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
15   950 Pennsylvania Avenue, NW
     Washington, DC 20530
16   Telephone: (202) 598-0146
     email: jaywin.malhi@usdoj.gov
17
     Ms. L. Brady Bender, DOJ
18   DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
     DIVISION
19   950 Pennsylvania Avenue, NW
     Washington, DC 20530
20   Telephone: (202) 598-0146
     email: laura.bender@usdoj.gov
21
     Mr. Greg Byran, DOJ
22   DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
     DIVISION
23   950 Pennsylvania Avenue, NW
     Washington, DC 20530
24   Telephone: (202) 598-0146
     email: greg.bryan@usdoj.gov
25
```

## Page 5

```
1            A P P E A R A N C E S Continued
2
3    Ms. Kathleen Hartnett, El Paso County
     LAW OFFICES OF COOLEY, LLP
4    3 Embarcadeo Center, 20th Floor
     San Francisco, California 94111
5    Telephone: (415) 693-2015
     email: khartnett@cooley.com
6
     Ms. Angelica Leo, El Paso County
7    LAW OFFICES OF COOLEY, LLP
     3175 Hanover Street
8    Palo Alto, California 94304
     Telephone: (650) 843-5075
9    email: aleo@cooley.com
10   Mr. Jed Untereker
     ASSISTANT COUNTY ATTORNEY-CIVIL DIVISION CHIEF
11   500 East San Antonio, Room 503
     El Paso, Texas 79901
12   Telephone: (915) 546-2083
     Fax: (915) 546-2133
13   email: junterekes@epcounty.com
14   Christina Sanchez
     DIRECTOR ASSISTANT COUNTY ATTORNEY
15   500 East San Antonio, Room 503
     El Paso, Texas 79901
16   Telephone: (915) 546-2083
     Fax: (915) 546-2133
17   email: csanchez@epcounty.com
18   Ms. Lisa Cubriel
     ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
19   101 West Nueva Street, 7th Floor
     San Antonio, Texas 78205
20   Telephone: (210) 335-2142
     Fax: (210) 335-2773
21   email: lisa.cubriel@bexar.org
22   Mr. Anthony J. Nelson, Rebecca Guerrero and José Garza
     ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
23   OFFICE
     314 West 11th Street, Suite 500
24   Austin, Texas 78767
     Telephone: (512) 854-4801
25   email: tony.nelson@traviscountytx.gov
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900       San Antonio, Texas 78232
210-697-3400                                                     210-697-3408

Lisa Wise

April 13, 2022
Pages 6 to 9

---

**Page 6**

```
 1              A P P E A R A N C E S  Continued
 2
 3     Ms. Liegh Tognetti
       ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY COMMUNITY
 4     SERVICE AGENCY
       2524 North Closner Boulevard
 5     Edinburg, Texas 78541
       Telephone: (956) 383-6240
 6
       Ms. Josephine Ramirez Solis
 7     ASSISTANT CRIMINAL DISTRICT ATTORNEY
       100 East Cano
 8     Edinburg, Texas 78539
       Telephone: (956) 292-7609 ext. 8186
 9     Fax: (956) 292-7619
       email: josephine.ramirez@da.co.hidalgo.tx.us
10
11
12
13
14
15
16     ALSO PRESENT:
       Ms. Yvonne Natividat, Videographer
17     Ms. Marina Eisner
       Ms. Savannah Kumar
18
19
20
21
22
23
24
25
```

---

**Page 7**

```
 1                        INDEX
 2
 3     Appearances. . . . . . . . . . . . . . . . .    2
 4     LISA WISE
 5         Direct Examination by Mr. Jeffery White. . . .  11
 6
 7     Changes and Signature. . . . . . . . . . . .  252
 8     Reporter's Certificate . . . . . . . . . . .  254
 9
10                  DEFENDANT EXHIBITS
11     NO.  DESCRIPTION                            PAGE
12     1    Letter from Governor Greg Abbott's office to
            Ruth Hughs dated July 27, 2020 (4-pgs)     42
13
14     2    Letter from Governor Greg Abbott's office to
            Ruth Hughs dated October 1, 2020 (5-pgs)   46
15     3    S.B. 1 (76-pgs)                           110
16     4    Texas Secretary of State Elections Division
            Slides dated 2/17/22(9-pgs)               124
17
18     5    Voter Information Field Guide (1-pg)      144
19     6    Summary Results Report 2022 March Primary -
            Official Final Early Voting Results (32-page) 220
20     7    Election Summary Report 2018 March Primary
            Summary for Jurisdiction Wide, All Races
21          Official Final Early Voting Results (11-pgs) 224
22     8    Summary Results Report 2022 March Primary
            Official Final Election Day Results (32-pgs)  23
23
24     9    Election Summary Report 2018 March Primary
            Summary for Jurisdiction Wide, All races
            Official Final Election Day Results (11-pgs) 235
25
```

---

**Page 8**

```
 1              DEFENDANT EXHIBITS Continued
 2     NO.  DESCRIPTION                            PAGE
 3     10   Election Summary Report 2018 March Primary
            Summary for Jurisdiction Wide, All Counters,
 4          All Races Official Final Election Results
            Ballots Cast 67,942 Percent 15.45 (11-pgs)  239
 5
       11   Summary Results Report 2022 March Primary
 6          Official Final Election Day Results (32-pgs)  241
 7     12   Election Reconciliation - Official Totals    244
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 9**

```
 1                  P R O C E E D I N G S
 2          (On the record at 10:02 a.m.)
 3          VIDEOGRAPHER:  We are now on record.
 4     This begins Videotape No. 1 in the deposition of Lisa
 5     Wise in the matter of, La Unión Pueblo Del Entero (sic)
 6     et al. v Gregory Abbott, et al., in the United States
 7     District Court Western District of Texas, San Antonio
 8     Division.  Today is April 13, 2022, the time is 10:02
 9     a.m. Mountain Standard Time.
10          This deposition is being taken at the
11     county courthouse here in El Paso, Texas at the request
12     of the Office of the Attorney General of Texas.  The
13     videographer is Yvonne Natividad of Magna Legal
14     Services, and the court reporter -- reporter is Nancy
15     Newhouse of Magna Legal Services.
16          Will all counsel and all parties present
17     state their appearances and whom they represent?
18          MR. JEFF WHITE:  Jeff White, I'm with the
19     Office of Attorney General for the State Defendants.
20          MS. SPECTOR:  Kelsey Spector on behalf of
21     El Paso County.
22          MS. HARTNETT:  Kathleen Hartnett with
23     Cooley LLP on behalf of El Paso County and the witness.
24          MR. GRAHAM WHITE:  Graham White with the
25     LULAC Plaintiffs.
```

---

Lisa Wise

April 13, 2022
Pages 10 to 13

Page 10

1      MS. PERALES: Nina Perales with MALDEF on
2 behalf of the LUPE Plaintiffs.
3      MS. SANCHEZ: Christina Sanchez,
4 Assistant County Attorney, El Paso County.
5      VIDEOGRAPHER: Will there be anyone on --
6 anyone on Zoom who need to introduce themselves? No?
7 Or no one that needs on on there?
8      MS. HARTNETT: This is Kathleen Hartnett
9 for the witness. I think we agreed off the record that
10 the court reporter was going to get everyone's
11 information via email, so everyone should email the
12 court reporter --
13      VIDEOGRAPHER: Okay.
14      MR. JEFF WHITE: And Jeff White --
15      MS. HARTNETT: -- in the chat.
16      MR. JEFF WHITE: -- I agree, yes.
17      VIDEOGRAPHER: Okay. And will the court
18 reporter please swear in the witness?
19      COURT REPORTER: Ms. Wise, will you
20 please raise your right hand?
21      (The witness complies.)
22      COURT REPORTER: Do you solemnly swear or
23 affirm that the testimony you give today will be the
24 truth, the whole truth and nothing but the truth so help
25 you God?

Page 11

1      THE WITNESS: I do.
2      COURT REPORTER: Thank you.
3      LISA WISE,
4 having been first duly sworn, testified as follows:
5      DIRECT EXAMINATION
6 BY MR. JEFF WHITE:
7    Q. Ms. Wise, can you please state and spell your
8 name for the record, please?
9    A. It's Lisa Wise, L-i-s-a, W-i-s-e.
10    Q. And what is your job title?
11    A. I'm the El Paso County elections
12 administrator.
13    Q. And have you been deposed before?
14    A. I have.
15    Q. Okay. So you understand you are under oath,
16 and you are to tell the truth when you answer your
17 questions?
18    A. I do.
19    Q. And when you're answering the questions, could
20 you please answer audibly and -- and not by nodding your
21 head or saying things like "uh-huh", so the -- the
22 record, we can get that down on the record?
23    A. Yes.
24    Q. And before you answer, I would ask that you
25 please let me finish my question, could you do that as

Page 12

1 well; it will help with the record?
2    A. Yes.
3    Q. And if your counsel may object to some of the
4 questions that I answer -- or sorry, your counsel may
5 object to some of the questions that I ask, could you
6 please -- do you understand that you are to answer
7 unless you are invoking a privilege?
8    A. Yes.
9    Q. And will you please let me know if I ask a
10 question and you don't understand, or if you don't hear
11 me?
12    A. Yes.
13    Q. And is there anything today that would affect
14 your ability to answer truthfully the questions that I'm
15 going to ask?
16    A. No.
17    Q. What did you do to prepare for this deposition
18 today?
19    A. I reviewed the SB 1 legislation, I looked over
20 some of the documents that I produced and I read through
21 some of the Texas Election Code that was affected by
22 SB 1.
23    Q. And you -- you said you're a elections
24 administrator in El Paso County, correct?
25    A. Yes.

Page 13

1    Q. And how long have you been in that role?
2    A. Seven years today.
3    Q. Today?
4    A. Today.
5    Q. Okay. Lucky day.
6      And did you work in El Paso County before
7 you became elections administrator?
8    A. I did not.
9    Q. What brought you to El Paso County?
10    A. My then husband in 2014 got a job offer here,
11 and so we moved in 2014 here, to El Paso County.
12    Q. And how did you get the role of elections
13 administrator?
14    A. I applied for the position, it was listed on a
15 county website. I went through the interview process,
16 and then I was -- I was hired the -- in April of 2015.
17    Q. And who made that hiring decision?
18    A. The Election Commission, it's made up of five
19 members.
20    Q. Is that a statewide commission?
21    A. No, it's a county.
22    Q. And who is on that commission?
23    A. The county judge, the tax assessor, the county
24 clerk, the chair of the county Republican Party and the
25 chair of the county Democratic Party.

Lisa Wise                                                      April 13, 2022
                                                           Pages 114 to 117

Page 114

1  did need assistance on there.  Sometimes they do,
2  sometimes they don't, so we keep the oaths, obviously.
3       Q.  What is poll pad?
4       A.  The poll pad is the -- is what we use to sign
5  in a voter.  It looks like a tablet, it's -- you -- you
6  sign it, you verify your address, you may select the
7  ballot style, depending on if you're in a primary, and
8  that keep -- it holds your signature and it keeps track
9  for everyone who's voted.
10      Q.  Do you have elections officials working at
11 polling places that can -- can assist voters themselves?
12      A.  Yes.
13      Q.  And do they receive training for that purpose?
14      A.  Yes.  It's -- it's rare that they are asked to
15 assist, honestly, but yes, we do go over that when we go
16 over what -- what you can do and what elections that
17 whether they require one or whether you need two people
18 there, and -- and the forms and things like that.
19      Q.  Do you have bilingual election officials
20 available to help voters?
21      A.  Yes.  All of our locations have bilingual
22 speakers, Spanish speakers.
23      Q.  So before SB 1, are you aware of incidents
24 when a voter needed assistance and couldn't get it?
25           MS. SPECTOR:  Objection, calls for

Page 115

1  speculation.
2       A.  No, I'm not.
3       Q.  (BY MR. WHITE)  And in the March 2022 primary,
4  are you aware of any incidents when a voter needed
5  assistance but wasn't able to get what they needed?
6           MS. SPECTOR:  Objection, calls for
7  speculation.
8       A.  No, I'm not.
9       Q.  (BY MR. WHITE)  Are you aware of changes made
10 in SB 1 to the oath of assistance for mail-in ballots?
11      A.  Yes.
12      Q.  So on the Exhibit 3 --
13      A.  Uh-huh.
14      Q.  -- I -- I directed you to, can you go to Page
15 53?
16           (The witness complies.)
17      Q.  (BY MR. WHITE)  And I'll point you to Line 15
18 on that Page, and do you see where it says Section 6.05?
19      A.  Yes.
20      Q.  And can you read Line 17 to 19 of that section
21 on that Page 53, please?
22      A.  "A person who assists a voter to prepare a
23 ballot to be voted by mail shall enter on the official
24 carrier envelope of the voter".
25      Q.  And do you see the subprovision starting on

Page 116

1  this Page 53 and, I believe, carrying over to Page 54?
2       A.  Yes.
3       Q.  So are you familiar with that change?
4       A.  Yes.
5       Q.  And as an election administrator, you -- do
6  you review the carrier envelopes when they come in?
7       A.  Do I review the carrier envelopes, like after
8  we order them, or after they have been mailed back?
9       Q.  After they've been mailed back by a voter.
10      A.  I don't review all of them, no.
11      Q.  Would you be aware of any issues with voters
12 filling out this portion mandated by Section 6.05 of SB
13 1?
14      A.  I think if there were issues that were
15 substantial or noteworthy with that, that my ballot by
16 mail staff member would have brought that to my
17 attention, or the signature verification would have
18 brought -- brought something like that to my attention.
19      Q.  And are you aware of any issues with this new
20 provision in Section 6.05 of SB 1 in the March 2022
21 primary?
22      A.  No.
23      Q.  So now I want to go to the -- the numerical
24 identification information required by SB 1, what do you
25 understand the new requirements to be for numerical

Page 117

1  identification for voting by mail?
2           MS. SPECTOR:  Objection, calls for legal
3  conclusion.
4       A.  That there is now a space on the application
5  that asks for either the last four digits of your social
6  security number or driver's license, and that one of
7  those needs to be filled out in order for us to accept
8  the application, and that once we receive that
9  application, we have to match that with one of the
10 identifiers we have on file in our system.
11      Q.  (BY MR. WHITE)  And -- strike that.
12           How do you do the matching process on
13 applications for ballots by mail?
14           MS. SPECTOR:  Objection, vague.
15      A.  We go into our voter registration system, and
16 there is a screen for an application for ballot by mail,
17 and we verify on both things if that registration has on
18 their record, if that voter has either the driver's
19 license that matches that, or the last four digits of
20 their social security that matches what they put on the
21 form.  If so, then we process it, assuming it's signed
22 and that everything else is filled out.
23      Q.  (BY MR. WHITE)  And in the March primary, did
24 you have voters who put both numbers on their form?
25           MS. SPECTOR:  Objection, vague.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Lisa Wise                                                    April 13, 2022
                                                            Pages 118 to 121

Page 118

1    A.  Eventually we did, after we start -- had to
2  tell people put both so that we know, it -- it has a
3  better chance of matching.
4    Q.  (BY MR. WHITE)  And what were they doing
5  before you told them to do that?
6    A.  There was a mix.  Some of them were putting
7  nothing, some of them were putting their VUID, some of
8  them were putting maybe the driver's license and we had
9  the soc, or the soc and we had the driver's license, so
10  that was ...
11    Q.  And you changed the process along the way, to
12  get them to put both numbers down, is that correct?
13        MS. SPECTOR:  Objection, vague.
14    A.  We tried to do a kind of a -- a little
15  outreach.  When in doubt, fill both out is what we
16  started to -- we did a little media, we would go -- we
17  went to Commissioners Court, and the -- we did a kind of
18  a push of fill both out, that same thing, and eventually
19  we just put a notice back with them, stating that --
20  that possibly, with their rejection, that we recommend
21  filling both out.
22    Q.  (BY MR. WHITE)  So you said that some voters
23  would submit their application for ballot by mail with
24  no numbers, correct?
25    A.  Yes.

Page 119

1    Q.  Do you know why?
2        MS. SPECTOR:  Objection, calls for
3  speculation.
4    A.  I -- I can guess.  There's -- I think there's
5  two main reasons why:  one is that they hadn't had to in
6  the past, this was a new process; and two is that form
7  has, I believe, so much information on it that it's --
8  it's easy to -- to miss -- to miss things on that -- on
9  that form.
10    Q.  (BY MR. WHITE)  So is it they were just doing
11  what they had done in the past, which is not putting
12  down those numbers, is that correct?
13        MS. SPECTOR:  Object to form.
14    A.  Part of that is, yes.
15    Q.  (BY MR. WHITE)  Do you -- did you receive any
16  calls explaining why people were unable to put the
17  numbers down?
18    A.  We had calls from voters who said that that
19  box was not on their application, even though we have
20  the application on file that that box was there.  We had
21  calls from people complaining, why do I have to give you
22  this information when I already gave it to you on my
23  registration.  We had other calls that it's private, I
24  don't, you know, want to put that on there, and we've
25  had people who just said yes, I -- I missed it, I

Page 120

1  thought it was optional, or something like that.
2    Q.  In the March 2022 primary, did you hear from
3  any voter saying that they couldn't put the number down,
4  because they didn't have their ID card or their driver's
5  license anymore?
6    A.  I don't remember getting a call that -- that
7  has that as the reason.
8    Q.  Do you track whether they put down one number
9  or two on the application?
10        MS. SPECTOR:  Object to form.
11    A.  I don't believe we track whether they put one
12  or two on the application, no.
13    Q.  (BY MR. WHITE)  Do you track the reasons that
14  the application for ballot by mail was rejected for
15  failing to meet the numerical ID requirement of SB 1?
16        MS. SPECTOR:  Objection, vague.
17    A.  Yes.
18    Q.  (BY MR. WHITE)  And how do you do that?
19    A.  Our ballot by mail application process, the
20  system does not have that report available yet on the
21  rejected applications, it's only once you put the ballot
22  in, so we created, back when we switched -- when we
23  switched our -- our person in charge of that, and
24  switched some processes.  We basically create a
25  spreadsheet for the rejected applications on and list

Page 121

1  the reason why.
2    Q.  And did you review that to prepare for today's
3  deposition?
4    A.  I've reviewed it previously, not necessarily
5  just for this deposition.  When we were just working
6  through it during the election, I -- I reviewed it.
7    Q.  So do you understand, based on that form, what
8  the -- the reasons were that these applications for
9  ballot by mail were getting rejected?
10    A.  Yes.
11    Q.  And what was the major reason?
12        MS. SPECTOR:  Objection, vague.
13    A.  Missing or incorrect identifier.
14    Q.  (BY MR. WHITE)  And does the form tell you why
15  it's missing or incorrect?
16        MS. SPECTOR:  Objection, vague.
17    A.  No.
18    Q.  (BY MR. WHITE)  And stepping back to when you
19  checked the number, do you check your offline system to
20  match the number on the application for ballot by mail?
21        MS. SPECTOR:  Objection, vague.
22    A.  No, we don't check -- the only thing that we
23  have that -- for applications, on rejections, if they're
24  accepted, they go into the system and then they go into
25  the process of having a bail -- a ballot sent out to

EXHIBIT
101

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
               SAN ANTONIO DIVISION
LA UNION DEL PUEBLO          )
ENTERO, et al.,              )
          Plaintiff,         )
                             )
V.                           ) CASE NO. 5:21-CV-844-XR
                             ) [LEAD CASE]
GREGORY W. ABBOTT, et        )
al.,                         )
          Defendant.         )
OCA-GREATER HOUSTON, et      )
al.,                         )
          Plaintiff,         )
                             )
V.                           ) CASE NO. 1:21-CV-780-XR
                             )
JOHN SCOTT, et al.,          )
          Defendant.         )

HOUSTON JUSTICE, et al.,     )
          Plaintiff,         )
                             )
V.                           )
                             ) CASE NO. 1:21-CV-848-XR
GREGORY WAYNE ABBOTT, et     )
al.,                         )
          Defendant.         )
LULAC TEXAS, et al.,         )
          Plaintiff,         )
                             )
V.                           ) CASE NO.
                             ) 5:21-CV-0786-XR
JOHN SCOTT, et al.,          )
          Defendant.         )
MI FAMILIA VOTA, et al.,     )
          Plaintiff,         )
                             )
V.                           ) CASE NO.
                             ) 1:21-CV-0920-XR
GREG ABBOTT, et al.,         )
          Defendant.         )
```



Page 2

```
 1       UNITED STATES OF AMERICA,  )
               Plaintiff,  )
 2                                   )
         V.                          ) CASE NO.
 3                                   ) 5:21-CV-1085-XR
         THE STATE OF TEXAS, et      )
 4       al.,                        )
               Defendant.  )
 5
         ******************************************************
 6       HYBRID ORAL AND VIDEOTAPED DEPOSITION OF
 7                    DANA DEBEAUVOIR
 8                      MAY 2, 2022
 9       ******************************************************
10            HYBRID ORAL AND VIDEOTAPED DEPOSITION OF DANA
11       DEBEAUVOIR, produced as a witness at the instance of the
12       Defendants, and duly sworn, was taken in the
13       above-styled and numbered cause on May 2, 2022, from
14       8:38 a.m. to 11:52 a.m , before Ashley Cason, Apprentice
15       Reporter and Notary Public, in and for the State of
16       Texas, reported by machine shorthand, at the offices of
17       TRAVIS COUNTY ATTORNEY'S OFFICE, 314 West 11th Street,
18       5th Floor, Austin, Texas 78767, pursuant to the Federal
19       Rules of Civil Procedure and the provisions stated on
20       the record.
21
22
23
24
25
```

Page 3

```
 1                    APPEARANCES
 2       For the Plaintiff:
 3          TONY NELSON
            PATRICK POPE
 4          Travis County Attorney's Office
            314 West 11th Street, Suite 500,
 5          Austin, Texas 78767
            (512) 854-9513
 6          tony nelson@traviscountytx gov
 7       For the Defendant:
 8          PATRICK K  SWEETEN
            JACK DISORBO
 9          DEPUTY ATTORNEY GENERAL FOR SPECIAL LITIGATION
            300 West 15th Street,
10          Austin, Texas 78701
            (512) 463-4139
11          patrick sweeten@oag texas gov
12
         Also Present via Zoom:
13
            GABRIEL HODGE
14          BRADY BENDER
            CAMRYN PAK
15          JASLEEN SINGH
            JAYWIN SINGH MALHI
16          JOSEPHINE RAMIREZ
            MEERA AIYER
17          LEIGH TOGNETTI
            KATIE FRIEL
18          BARBARA NICHOLAS
19       Videotaped by:
20          DAVID FLORES
21       Reported by:
22          ASHLEY CASON
23
24
25
```

Page 4

```
 1                    INDEX
                              PAGE
 2
         Appearances                 2
 3
         WITNESS: DANA DEBEAUVOIR
 4
            Examination by MR  SWEETEN       7
 5
         Reporter's Certificate      145
 6
 7            EXHIBITS
 8       NUMBER   DESCRIPTION            PAGE
 9       Exhibit 1           18
            State Laws Governing Early Voting
10
         Exhibit 2           40
11          Rule 11 Agreement Between Relators
            and Respondent
12
         Exhibit 3           58
13          Senate Bill 1
14       Exhibit 4           66
            OAG Election Fraud Violations
15
         Exhibit 5           73
16          The Dallas Morning News Article
17       Exhibit 6           73
            The Detroit News Article
18
         Exhibit 7           74
19          Caller Times Article
20       Exhibit 8           75
            NPR Article
21
         Exhibit 9           106
22          Instructions for Ballot Application
23       Exhibit 10          107
            Instructions for Ballot Application
24
25
```

Page 5

```
 1       Exhibit 11................................  109
            Texas Secretary of State Article
 2
 3       Exhibit 12................................  118
            Texas Secretary of State Election
 4          Division FAQs
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2  (Pages  2  to  5)





Page 6

1   (All parties present have hereby waived the necessity of
2   the reading of the statements by the court reporter as
3   required by Rule 30(b)(5).)
4                   PROCEEDINGS
5           THE VIDEOGRAPHER:  We are now on the
6   record.  This begins the deposition of
7   Ms. Dana DeBeauvoir in the matter of the La Union Pueblo
8   Del Entero, et al., versus Greg Abbott, et al., in the
9   Western District of Texas San Antonio Division.  Today
10  is May 2nd, 2022, and the time is 8:38 a.m.
11          This deposition is being taken at Travis
12  County Attorney's Office, 314 West 11th Street Austin,
13  Texas, at the request of the Office of the Attorney
14  General.  The videographer is David Flores of Magna
15  Legal Services.  And the court reporter is Ashley Cason
16  of Magna Legal Services.  Will Counsel and all parties
17  present state their appearances and who they represent?
18          MR. SWEETEN:  Patrick Sweeten on behalf --
19  if you want to start, Tony, go ahead.
20          MR. NELSON:  Doesn't matter.
21          MR. SWEETEN:  Yeah.  Okay.
22          MR. NELSON:  Yes.  Tony Nelson and Patrick
23  Pope, assistant county attorneys on behalf of former
24  Travis County clerk, Dana DeBeauvoir.  And we also have
25  present our paralegal, Gabe Hodge.

Page 7

1           MR. SWEETEN:  Patrick Sweeten on behalf of
2   the State defendants in this case.  Along with me today
3   is attorney Jack Disorbo.
4           THE VIDEOGRAPHER:  Will the court reporter
5   please swear in the witness?
6                   DANA DEBEAUVOIR,
7       having been first duly sworn, testified as follows:
8                   EXAMINATION
9   BY MR. SWEETEN:
10      Q.  Good morning, Ms. DeBeauvoir.  Would you state
11  and your spell your name, please?
12      A.  Yes.  Dana DeBeauvoir and it's D-A-N-A D-E-,
13  capital B as in boy, -E-A-U-V-, as in valentine, -O-I-R.
14      Q.  Okay.  And you served for approximately
15  36 years as the Travis County clerk; is that correct?
16      A.  Correct.
17      Q.  You were -- you've ran -- you've run for
18  election eight or nine times, I think --
19      A.  That's --
20      Q.  -- is that correct?
21      A.  -- correct.
22      Q.  And you've won each time, right?
23      A.  Yes.
24      Q.  Okay.  Now, each time you've run, you've run as
25  a Democrat, correct?

Page 8

1       A.  Correct.
2       Q.  And you remember the Democrat party, correct?
3       A.  Yes.
4       Q.  All right.  So you've been deposed before,
5   correct?  I --
6       A.  Yeah.
7       Q.  I know I talked to you back in 2020.  I think
8   we had two depositions that were election cases that
9   were going on.  Have you been deposed other than those
10  two times that you recall?
11      A.  Possibly many years ago.  I'm recalling early
12  in my career, Americans with Disabilities, that case was
13  the -- when the new family medical leave act law was put
14  into place.  I believe I was the first for that.
15      Q.  Okay.  Since you've -- you've had some
16  experience, I'll -- I'll just briefly kind of back over
17  the -- the rules that we want to utilize today in this
18  deposition.  The first is to just let you know that
19  you're under oath at all times.  You understood that,
20  correct?
21      A.  Correct.  Yes.
22      Q.  The second is that -- that when we're talking
23  today, our court reporter here is going to have to take
24  everything that we say down.  So to make her job easier,
25  I want us to kind of have an agreement, which is:  When

Page 9

1   I ask a question, if you would wait to give your answer
2   until the question is asked, and then I will in turn,
3   when you're answering, I will try to wait until you're
4   finished until I ask the next question, and that will
5   help us make sure that we have a good record of these
6   proceedings today.  Is that fair?
7       A.  Agreed.
8       Q.  Great.  The other thing is -- is that she can't
9   take down shakes of the heads, uh-huhs, huh-uhs, that
10  sort of thing.  Things that we might do in normal
11  conversation, we have to make sure that we get a verbal
12  answer for it from; and therefore, there may be times
13  where I follow up and say is that a yes or is that a
14  no or something like that --
15      A.  Understood.
16      Q.  -- but that's the reason I'm doing it, is to
17  make sure she can get a good record, and we have one
18  later.
19          If there's an objection today from your
20  counsel, you -- unless you're instructed not to answer,
21  then please go ahead and provide a response and then,
22  you know, we -- but -- but, you know, objections are
23  fairly common in deposition.  So -- but we need you to
24  answer unless instructed otherwise.
25          Finally, if we need to -- I'm going to try





Page 86

1    that if you're in line on time, you can still vote?
2        A. We are --
3             MR. NELSON: Object -- hold on.
4             Objection; form. Document speaks for
5    itself.
6             But go ahead and answer.
7        A. I was going to say, we're -- we're correct. It
8    applies to both election day and early voting.
9        Q. (BY MR. SWEETEN) Okay. And that's what SB 1
10   does?
11       A. Yes, it is.
12       Q. All right. And that's a good thing, isn't it?
13       A. It is.
14       Q. Okay. Now --
15       A. There are good things about this bill.
16       Q. Okay. And then here's another one. It's
17   section 7.02, and you don't have to look at it. You may
18   know this, but you can, you're free to.
19             You would agree that --
20       A. Did you say 7?
21             MR. SWEETEN: 7.02.
22             MR. NELSON: Do you have a page number,
23   Counsel?
24       A. We're pretty deep in. 7.10. Okay. 57.
25             MR. SWEETEN: There you go. Thank you.

Page 87

1             THE WITNESS: Sure. That's what being a
2    clerk gets you.
3             (In sotto voce.)
4             MR. NELSON: Try not to read it because she
5    has to write it down.
6             THE WITNESS: I'm sorry. I'm so sorry.
7    Sorry.
8             MR. NELSON: And then after you finish
9    reading, if he has a question, I'm sure he'll ask it.
10       Q. (BY MR. SWEETEN) So 7.2 adds protections for
11   employees for early voting as well as for election day,
12   correct?
13             MR. NELSON: Objection; form.
14             If you can answer that.
15       A. Well, it starts by saying a person commits an
16   offense.
17       Q. (BY MR. SWEETEN) And that existed, right?
18   That already was in the election code under section
19   27 -- 276.004 A and B, they're amended to read as
20   follows. And the added languages or while early voting
21   is in progress?
22       A. To allow employees to vote equally during early
23   voting, not just election day.
24       Q. It -- it extended protections against lawyers
25   penalizing voters who vote for --

Page 88

1        A. Okay.
2        Q. -- in early voting, right?
3        A. Yes.
4        Q. And do you think that's a good thing?
5        A. Yes. It depends on what the level of offense
6    is, but incentives for employers to let voters go vote
7    is usually a good thing.
8        Q. Okay. Very good. So let's go back to the
9    video, if I can -- if it hasn't died on me. Let's see.
10             MR. NELSON: Oh. Yeah.
11             MR. SWEETEN: Here we go. So here you're
12   taking a break. We're at 2:27. It's a long press
13   conference.
14             THE WITNESS: It really was. They
15   wanted -- they wanted me to cover every single thing,
16   and I had to be like a professor, very well organized,
17   because they were going to ask me about every single one
18   of those forms.
19             MR. SWEETEN: Oh, my goodness.
20             MR. NELSON: And what mark are we at?
21   What --
22             MR. SWEETEN: 2:29, it says, so...
23             Well, maybe. I think we're offline now.
24       Q. (BY MR. SWEETEN) Well, I'll tell you what.
25   Let's just keep going. I can ask you -- I remember

Page 89

1    enough about it. So what was -- what was the purpose --
2    why -- why did you hold the press conference in January
3    of 2022?
4        A. Okay. I did it for two reasons: First of all,
5    it was to correct a lot of misinformation in social
6    media. So the idea was if I could get a -- a lot of
7    reporters and television networks in, I can try to have
8    one opportunity to get all the facts straight. So that
9    was my -- my first goal, was correct misinformation; the
10   second, was to try to provide all of the media a
11   one-stop shop for what was actually correct. So counter
12   the bad, provide them with what is correct information
13   and try to give them, meaning the media, a -- a -- a --
14   the -- the quickest sort of 25 words or less, if I
15   could, way to describe the problem that voters were
16   having. In other words, if -- if you sat down and tried
17   to vote by mail, what would you see if you were in that
18   position? Bring it down to their -- to their level.
19   That was my intent. Show them in person, on paper,
20   where the problems were.
21       Q. And -- and you were trying to communicate -- so
22   you were trying to communicate both to the press and to
23   the people about how to properly adhere -- follow SB 1?
24       A. Correct.
25       Q. Okay. And -- and part of that was that you



Page 90

1   were -- you were suggesting that they -- that they
2   utilize both numbers, both their driver's license number
3   and their voter ID -- voter identification card number
4   on their -- on their mail-in ballots when they send them
5   in, right?
6        A.   That was before we got clarification and before
7   the courts stepped in, so I had to be very careful about
8   the information that I gave to my constituents because
9   we were gagged from telling anybody exactly what to do.
10  So I had to be cautious about explaining that yes,
11  voters, in order the protect themselves from making a
12  mistake that could turn out to be a fatal error, should
13  actually write both numbers.  But there was an
14  interpretation under law that if I went around just
15  saying that to everybody, that then I was in fact
16  promoting early voting.  And that was a felony
17  provision, I believe -- felony provision under Senate
18  Bill 1.
19       Q.   Who -- where did you get the interpretation.  I
20  don't want -- if you've talked to your lawyers, I don't
21  want to get that.  Okay?
22       A.   Well, it's my lawyers.  Of course I talked to a
23  county attorney.
24       Q.   Okay.  So the county attorneys -- you were
25  advised that you could --

Page 91

1        A.   To be very careful.
2        Q.   To be careful.  But are you saying that it was
3   your view that you couldn't tell people how to early
4   vote in your position as the Travis County election
5   administrator?
6        A.   I couldn't tell them how to avoid mistakes on
7   voting by mail without advocating for voting by mail.
8   It was my catch-22.
9        Q.   Okay.  And so you interpreted SB 1 to prohibit
10  you from saying -- telling people how they could
11  properly cast an absentee or a mail-in voting ballot?
12       A.   There was sufficient risk that I felt gagged.
13       Q.   Okay.  Well, I mean, you gave that press
14  conference, and you were very clear, right?  I mean, you
15  didn't -- you weren't gagged at that point.  When you
16  were talking you were very open about how you can
17  properly cast a mail-in ballot, weren't you?
18            MR. NELSON:  Objection; form.  You can
19  answer to the extent --
20       A.   I was careful about what I said.
21       Q.  (BY MR. SWEETEN)  Okay.  Well, I mean, you told
22  folks that if you're going to cast a ballot that you
23  need to put both of your numbers on there, right?
24       A.   What I said was that the best advice you're
25  going to get from your own political party, from your

Page 92

1   neighbors, from your friends, and from all the
2   information you're going to read about this is that it's
3   the best idea to use both numbers.
4        Q.   Okay.  And -- and you weren't -- I mean, this
5   is a very public conference.  You gave that information.
6   You weren't in any way -- nobody investigated you, to
7   your knowledge, on that point, right?
8        A.   I was pretty fearless by then.
9        Q.   Okay.  But that's not my question.  My question
10  is --
11            MR. SWEETEN:  I have to object to
12  nonresponsive for the record.
13       Q.  (BY MR. SWEETEN)  But -- but my question is
14  different.  My question is:  Do you know if anybody
15  investigated you regarding these remarks that you made
16  in January of 2022?
17       A.   I would not have known.
18       Q.   Okay.  Has any law enforcement or anybody
19  contacted you about those remarks that you made?
20       A.   I would not have known.
21       Q.   Okay.  All right.  So -- but needless to say,
22  no one directly contacted you and said we're looking at
23  this issue, right?  Because they were --
24       A.   So far, no.
25       Q.   Okay.  All right.  So you -- you were critical

Page 93

1   of the Secretary of State's office in that press
2   conference, right?
3        A.   Yeah.
4        Q.   And I think one thing that came up in the press
5   conference was that you said that they had a portal that
6   you weren't able to -- that -- that wasn't updated as --
7   as of January 2020 when you made these remarks; is that
8   right?
9        A.   I was referring to the voter register database
10  that did not include sufficient information for the
11  large counties which typically didn't access the
12  database where they had loaded the information regarding
13  driver's license numbers.  So the large counties didn't
14  have access to the information.  It was missing for us.
15  In fact, all we could pull up was a blank screen.  And
16  if we wanted to try to verify our ballots by mail, then
17  we had to, you know, wait for them to be ready to give
18  us the information or try to bypass and join onto the
19  team system.  But if big counties try to get onto the
20  team system, which is designed for small counties, it
21  crashes teams.  So it was a problem.
22            I also defended the Secretary of State's
23  office, too, because I -- I believe they replaced Biden
24  legislature in an untenable situation.  They were asked
25  to implement a law that there was not time nor resources

MAGNA
LEGAL SERVICES

Page 94

1  provided to do so.  So they did a poor job of
2  implementation, and they were set up to do a poor job.
3      Q.  To your knowledge -- and you left in late
4  January, to -- to your knowledge, was the SOS Portal
5  eventually something that was accessible to --
6      A.  Very late in the game.
7      Q.  Okay.
8      A.  I believe it was after I left.
9      Q.  Okay.
10     A.  Too late.
11     Q.  And so when we're talking about access -- let
12  me make sure I understand the facts on the ground.  So
13  your concern was that a voter might send in their --
14  their ballot --
15     A.  Huh-uh.
16     Q.  No?
17     A.  Huh-uh.
18     Q.  Their registration?
19     A.  No, their application for a ballot by mail.
20     Q.  Okay.  So then let's start over.  So your
21  concern is that a voter would send their application to
22  vote by mail, and one thing that you were concerned
23  about having is they wouldn't put any number on there,
24  right?
25     A.  Or -- or they would put the wrong one and it

Page 95

1  didn't match what was on the database, and then there
2  was no way to find out another number.
3      Q.  Okay.  And so give me an instance of where that
4  happened.  Was -- let's pick a certain voter.  What kind
5  of -- give me an example of when that happened?
6          MR. NELSON:  Hold on.  You're talking about
7  after SB 1 was implemented?
8          MR. SWEETEN:  Correct.
9      A.  I -- I wouldn't be able to do that, but what I
10  can tell you is -- because you're -- you're confusing
11  two individual parts of a process, okay?  The first part
12  is the application for the ballot by mail, and the
13  second part is when the ballot -- when the voter, excuse
14  me, sends their voted ballot back in.
15          And depending on where we were in the
16  process of the first part of the -- of it or the second
17  part of it, they were varying rejection rates.  We
18  started out in just the application process with an
19  overall 50 percent rejection rate.  That was before the
20  courts intervened to help us be able to talk to our
21  constituents about how to cure their application.  But
22  that took a lot of time, and it wasted a lot of time
23  voters could have had available to them to cure their
24  ballots.  We got that application -- read -- rejection
25  rate down to I think it was 27 percent before I left.

Page 96

1  Then on the side of receiving ballots back in, by then,
2  the court had intervened, and we start setting up a
3  crew.  And by then, I was starting to depart -- to call
4  voters.  And we hired a whole room full of people to
5  start calling people and saying, you know, what's --
6  what's your driver's license number, basically, because
7  that was the magic number that we needed.  And once that
8  started, we were able to drop the rejection rate down
9  from -- that 27 percent, we got it down to a much lower
10  rating.  I think I heard after I left that we had gotten
11  it down to about 8 percent.  That's still way higher or
12  much higher than it should have been.  The -- the
13  typical percentage you would have expected would be
14  about 1 to 1 and a half percent.
15     Q.  Okay.  So you -- you've said a lot there and
16  I've got a lot of questions.  But let -- let's start
17  with this one:  Can you look at Exhibit 3 and page 61 of
18  that?
19          MR. SWEETEN:  Bill, this is SB 1.
20          MR. NELSON:  You said page 61?
21          MR. SWEETEN:  That's right.
22          MR. NELSON:  Okay.  Thank you.
23     Q.  (BY MR. SWEETEN)  Are you there --
24     A.  I am.
25     Q.  Okay.  So you said you were concerned you may

Page 97

1  violate SB 1 if you gave info on how to correct
2  mistakes, right?
3      A.  That's correct.
4      Q.  Now, you would --
5      A.  It wasn't -- Pat -- Patrick, I'm sorry.  It
6  wasn't just me.  It was every elections office in the
7  state.
8      Q.  All right.  Now, you would agree with me that
9  the prohibition in section A, it is -- if you look at E
10  on page 61, it basically says subsection A does not
11  apply if the public official or election official -- and
12  you're -- you're a public official or election official,
13  correct?
14          MR. NELSON:  Was.
15     Q.  (BY MR. SWEETEN)  You were at the time,
16  correct?
17     A.  Well, I was before the primary.
18     Q.  All right.  So let -- let's just keep it to
19  January 2022 when you made these remarks at the press
20  conference.  Now, it's the case, it's subsection A.  It
21  says subsection A does not apply if the public official
22  or election official, which you were one in January
23  of 2022, right?  Let's stop there --
24     A.  Correct.  Yes, yes.  I'm sorry.  I'm trying to
25  read this and answer you, too.

MAGNA
LEGAL SERVICES

EXHIBIT
102

Jennifer Colvin                                    March 21, 2023

```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

   LA UNION DEL PUEBLO            §
 4 ENTERO, et al.,                §
        Plaintiffs,               §
 5                                §
   v.                             §    Case No. 5:21-cv-844-XR
 6                                §
   GREGORY W. ABBOTT, et          §
 7 al.,                           §
        Defendants,               §
 8 _____  §
                                  §
 9                                §
   OCA-GREATER HOUSTON, et        §
10 al.,                           §
        Plaintiffs,               §
11                                §
   v.                             §    Case No. 1:21-cv-780-XR
12                                §
   JANE NELSON, et. al.,          §
13      Defendants,               §
                                  §
14 _____  §
                                  §
15 HOUSTON JUSTICE, et            §
   al.,                           §
16      Plaintiffs,               §
                                  §
17 v.                             §    Case No. 5:21-cv-848-XR
                                  §
18 GREGORY WAYNE ABBOTT,          §
   et al.,                        §
19      Defendants,               §
                                  §
20 _____  §
                                  §
21 LULAC Texas, et al.,           §
        Plaintiffs,               §
22                                §
   v.                             §    Case No. 1:21-cv-0786-XR
23                                §
   JANE NELSON, et al.,           §
24      Defendants,               §
                                  §
25 _____  §
```



Jennifer Colvin

March 21, 2023
Pages 2 to 5

---

**Page 2**

1  MI FAMILIA VOTA, et          §
   al.,                         §
2        Plaintiffs,            §
                                §
3  v.                           §  Case No. 5:21-cv-0920-XR
                                §
4  GREG ABBOTT, et al.,         §
         Defendants.            §
5
6
7
8
9              ORAL AND VIDEOTAPED DEPOSITION OF
10                      JENNIFER COLVIN
11                      MARCH 21, 2023
12
13
14
15      ORAL AND VIDEOTAPED DEPOSITION OF JENNIFER COLVIN,
16  produced as a witness at the instance of the Defendants
17  and duly sworn, was taken in the above styled and
18  numbered cause on Tuesday, March 21, 2023, from
19  12:20 p.m. to 3:43 p.m., before DONNA QUALLS, Notary
20  Public in and for the State of Texas, reported by
21  computerized stenotype machine, at the offices of Harris
22  County Attorney's Office, 1019 Congress Street, 15th
23  Floor, Houston, Texas, pursuant to the Federal Rules of
24  Civil Procedure, and any provisions stated on the record
25  or attached hereto.

---

**Page 4**

1  LEIGH TOGNETTI (Via Zoom)
   LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
2  LUCIA ROMANO (Via Zoom)
   MIKE STEWART, DOJ (Via Zoom)
3  URUJ SHEIKH, LDF (Via Zoom)
   ZACHARY DOLLING, TCRP, OCA (Via Zoom)
4  REGGIE WRIGHT, THE VIDEOGRAPHER
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1        A P P E A R A N C E S
2
3  FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
      SAMEER S. BIRRING
      TIFFANY BINGHAM
4     OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
      D. MENEFEE
5     1019 Congress, 15th Floor
      Houston, Texas  77002
6     (713) 274-5142
      sameer.birring@harriscountytx.gov
7
8  FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
      JENNIFER A. HOLMES
9     NAACP Legal Defense and Educational Fund, Inc.
      700 14th Street N.W., Suite 600
10    Washington, District of Columbia  20005
      (347) 573-0197
11    jholmes@naacpldf.org
12
   FOR THE UNITED STATES:
13    DANA PAIKOWSKY
      U.S. DEPARTMENT OF JUSTICE
14    950 Pennsylvania Avenue, NW
      Washington, District of Columbia  20530
15    (202) 353-5225
      dana.paikowsky@usdoj.gov
16
17 FOR THE STATE DEFENDANTS:
      KATHLEEN T. HUNKER
18    OFFICE OF THE ATTORNEY GENERAL
      P.O. BOX 12548 (MC-009)
19    AUSTIN, TEXAS  78711-2548
      (512) 463-2100
20    kathleen.hunker@oag.texas.gov
21
   Also Present:
22    STEPHEN KENNY (Via Zoom)
      BRADLEY PROWANT (Via Zoom)
23    BREANNA WILLIAMS, NAACP (Via Zoom)
      CARRIE LEBEL (Via Zoom)
24    GERMAINE HABELL (Via Zoom)
      JOHN GORE, GOP (Via Zoom)
25    JOHN SULLIVAN BAKER, DOJ (Via Zoom)

---

**Page 5**

1                    INDEX
2                                          PAGE
3
   Appearances...................................    3
4
5  JENNIFER COLVIN
6  Examination by Ms. Hunker.....................    7
   Examination by Ms. Paikowsky..................   47
7  Examination by Ms. Holmes.....................   74
   Further Examination by Ms. Hunker.............   92
8
9  Corrections & Signature.......................  104
10
   Reporter's Certificate........................  106
11
12             EXHIBIT INDEX
13
   NUMBER       DESCRIPTION                 PAGE
14 Exhibit 11   Election reconciliation       24
                official totals
15 Exhibit 12   Defendant Harris County       38
                Elections Administrator,
16              Clifford Tatum's responses and
                objections to state defendants'
17              second set of interrogatories,
                and third set of requests for
18              Production
   Exhibit 13   Ballot insert                 41
19 Exhibit 14   Ballot insert                 53
   Exhibit 15   Call log spreadsheet          77
20 Exhibit 16   Harris County Elections        89
                Administrator, Clifford Tatum's
21              supplemental responses to state
                defendants' second set of
22              interrogatories
23
24
25



Jennifer Colvin

March 21, 2023
Pages 6 to 9

Page 6

1          THE VIDEOGRAPHER:  We are now on the
2    record.  This begins Videotape No. 1 in the deposition
3    of Jennifer Colvin in the matter of La Union Del Pueblo
4    Entero, et al., versus Gregory W. Abbott, et al.  Case
5    No. 5:21-CV-844-XR.
6          THE REPORTER:  Can I have all parties state
7    their name and appearance for the record.
8          MS. HUNKER:  Kathleen Hunker representing
9    the state defendants from the attorney general's office.
10          MS. HOLMES:  Jennifer Holmes on behalf of
11    the private plaintiffs, specifically the HAUL
12    plaintiffs.
13          MS. PAIKOWSKY:  Dana Paikowsky on behalf of
14    the United States.
15          MR. BIRRING:  Sameer Birring from the
16    Harris County Attorney's Office on behalf of the Harris
17    County Elections Administrator witnesses.
18          MS. BINGHAM:  And Tiffany Bingham on behalf
19    of Harris County Elections Administrator.
20          THE REPORTER:  Can I have you raise your
21    right hand.
22          MR. KENNY:  Stephen Kenny, Jones Day on
23    behalf of Intervenor-Defendants.
24               JENNIFER COLVIN,
25    having been duly sworn, testified as follows:

Page 7

1               EXAMINATION
2    BY MS. HUNKER:
3     Q.  Good afternoon.
4     A.  Hello.
5     Q.  My name is Kathleen Hunker.  I'm a lawyer with
6    the Office of the Texas Attorney General representing
7    the State defendants in this matter.
8          Can you please state and then spell your
9    name for the record?
10     A.  Sure.  Jennifer Colvin.
11    J-E-N-N-I-F-E-R C-O-L-V, as in "Victor," -I-N.
12     Q.  Thank you.  I'm going to start with some
13    introductory questions and instructions.  After that's
14    done, I'll move on to the main subject of the
15    deposition.  Okay?
16     A.  Yes.
17     Q.  Have you been deposed before?
18     A.  No.
19     Q.  But you understand that you are under oath,
20    correct?
21     A.  Correct.
22     Q.  And that oath would have the same effect as if
23    you were testifying in a court of law?
24     A.  Yes.
25     Q.  For the court reporter, you will need to

Page 8

1    provide verbal answers like "yes" or "no" rather than
2    nodding or shaking your head.  This has some extra
3    importance here today because we have many attorneys
4    participating remotely and they may not be able to see
5    you if they're dialing in.
6     A.  Okay.
7     Q.  Does that make sense?
8     A.  Yes.
9     Q.  It also helps the court reporter if we don't
10    talk over one another.  I'm going to do my best to wait
11    for you to finish your answers before I ask my next
12    question.  Will you do your best to wait for me to
13    finish my asking my question before you start your
14    answer?
15     A.  I will.
16     Q.  If you don't understand the question, will you
17    please let me know?
18     A.  I will.
19     Q.  And if you do answer the question, I'm going to
20    assume that you understood the question.
21          Is that fair?
22     A.  Yes.
23     Q.  If you need a break at any time, please let me
24    know.  My only request is that you answer any pending
25    question before we take a break.  Okay?

Page 9

1     A.  Okay.
2     Q.  Also, if you hear an objection from your
3    counsel, that is typically for a Court to decide at a
4    later date.  I, therefore, ask that you go ahead and
5    answer the question unless you are instructed not to
6    answer.  Okay?
7     A.  Okay.
8     Q.  Now I'm obliged to ask the following questions:
9    Have you consumed any alcohol today?
10     A.  No.
11     Q.  Have you consumed any drugs today?
12     A.  No.
13     Q.  Are you aware of anything that would affect
14    your ability to testify truthfully and accurately today?
15     A.  No.
16     Q.  You haven't brought any documents with you,
17    correct?
18     A.  Correct.
19     Q.  Now I'm going to direct your attention to the
20    first exhibit we have submitted in this case.  You
21    should have the documents in front of you.  This is
22    Exhibit 1.
23          Do you have that document in front of you?
24     A.  I do.
25     Q.  And I'd like you to turn to the first page.  Do



Jennifer Colvin

March 21, 2023
Pages 58 to 61

Page 58

1    Q. So I'm going to ask you some questions about
2 final rejections, and I want to define that for a
3 second. So a final rejection, I'm using to mean a voter
4 has either failed to cure a ballot defect or a ballot
5 defect -- a cure was insufficient for some reason.
6         Did your county send out notices of final
7 rejection in the 2022 general election to people who
8 were unable to cure their ballot defects or whose cure
9 were insufficient?
10    A. Yes.
11    Q. What is the process for providing this final
12 notice?
13    A. The --
14        MS. HUNKER: Objection; form.
15    A. The board will give us -- well, we -- the
16 ballots are already in our possession, but the board
17 will -- we change the code to a final rejection code,
18 and it's generated through VOTEC, our voter management
19 system. And we mail the letter to the voter.
20    Q. (BY MS. PAIKOWSKY) So the final notice comes
21 through a letter only?
22    A. Yes.
23    Q. And earlier you mentioned -- so a prelim- --
24 how would you provide notice for a -- withdrawn.
25        How is the process different for providing

Page 59

1 a final notice of rejection versus a notice of a ballot
2 defect?
3    A. A ballot defect, we will call the voter or send
4 them a letter or e-mail them if there's an e-mail
5 provided to tell them the different ways that they have
6 to -- that they can cure.
7    Q. So earlier we were talking about staffing
8 needs. Did implementing Senate Bill 1's identification
9 requirements change the staffing needs of your office to
10 process and facilitate the mail voting procedures?
11    A. It did.
12    Q. In what way?
13    A. We created -- since the ballot board give --
14 they gave us their duties of calling and informing the
15 voters of their mismatch or missing IDs, we created a
16 team, an SB1 team, of approximately 12 employees that
17 would do the calling and notifying the voters. And they
18 would also -- we also had to increase our mail room,
19 scan room team to help pull the flaps of all the ballots
20 that came back.
21    Q. And these 12 employees, were they full time?
22    A. No.
23    Q. How many employees, between mail room increases
24 and this SB1 team, would you say you had to add during
25 the 2022 general election?

Page 60

1    A. Approximately 20.
2    Q. And do you know how much hiring these
3 additional employees cost?
4    A. Not off the top of my head, no.
5    Q. Are these staffing needs greater than -- what
6 were required in previous, past elections?
7        MS. HUNKER: Objection; form.
8    A. Yes. Depending on the size of the election, of
9 course.
10    Q. (BY MS. PAIKOWSKY) Did processing ABBMs take
11 longer in the November 2020 general election than it has
12 in similar past elections because of Senate Bill 1's ID
13 requirements?
14        MS. HUNKER: Objection; form.
15    A. Yes, to an extent.
16    Q. (BY MS. PAIKOWSKY) How did the processing of
17 ABBMs change -- actually withdrawn.
18        Did processing ABBMs during the
19 November 2022 general election change in terms of how
20 long it took in the 2022 general election as -- as
21 opposed to similar past elections?
22    A. Can you clarify similar past elections? Are
23 you referring to March primaries?
24    Q. I'm referring to --
25    A. Or prior to SB1?

Page 61

1    Q. Prior to SB1.
2    A. Yes, it took longer.
3    Q. And why was that?
4    A. We had to look in a separate part -- their ID
5 is not on the front screen of where we enter an app. We
6 have to actually go into the voter's profile to look at
7 the additional information.
8    Q. As compared to past elections, did implementing
9 Senate Bill 1's ID provisions impact how long it took to
10 process carrier envelopes?
11    A. Yes.
12    Q. And in what way?
13    A. Because we had to tear the flap and -- first we
14 would tear the flap, and then we would have to process
15 the ones that didn't have ID with extra -- that caused
16 extra work for the office. Yeah, that's it.
17    Q. Based on your experience implementing Senate
18 Bill 1's mail ballot ID provisions, do you believe your
19 office will continue to need to expend more resources on
20 staffing to support mail voting than it has in the past?
21    A. Yes, depending on the size of the election.
22 For presidential, then most definitely.
23    Q. So I guess comparing like elections to like
24 elections. So --
25    A. I would say it would remain the same.



Jennifer Colvin

March 21, 2023
Pages 66 to 69

Page 66

1 to get voters either return their ballots or get them
2 noticed in a timely way?
3     A. It wouldn't impact our office mailing them out
4 in any way.  We would mail them as soon as we received
5 them.
6     Q. But your knowledge would it impact --
7 withdrawn.
8         Although it did not impact your ability to
9 send the notice, did it impact voters' ability to
10 receive the notice for their ballots in any way?
11     A. Possibly.  I didn't hear of any voters saying
12 they didn't receive notice.
13     Q. But there was a delay?
14         MS. HUNKER:  Objection; form.
15     A. Possibly.
16     Q. (BY MS. PAIKOWSKY)  Okay.  So I know we
17 mentioned -- and I can take us back here.  But there
18 were 30 voters, UOCAVA voters, whose ballots were
19 rejected.  Do you know if any of those voters had their
20 ballot rejected because of an identification number
21 issue?
22     A. I believe so.  I don't know the total there.
23     Q. Were there any voters, UOCAVA voters, who had
24 an ABBM rejected because of an identification issue?
25     A. I believe so.

Page 67

1     Q. Do you know approximately how many?
2     A. I don't know that number off the top of my
3 head.
4     Q. Are you aware of any for whom, given the
5 timing, it just wasn't possible for them to cure these
6 issues?
7         MS. HUNKER:  Objection; form.
8     A. No.
9     Q. (BY MS. PAIKOWSKY)  Earlier we were discussing
10 ballots that might be rejected for multiple reasons.  Do
11 you have a sense for how common that is?
12     A. It's not very common.
13     Q. When you say "not very common," can you give me
14 an estimate?
15     A. Generally, it's rejected for either no
16 signature or no ID, not normally for both.  They don't
17 usually send a voter ballot back without one or the
18 other.
19     Q. In the November 2022 general election, were
20 voters in your county able to use the State's website to
21 track and cure their ballots?
22     A. Yes.
23     Q. To your knowledge, did any voters in the 2022
24 general election have difficulty using that system?
25     A. We had a couple that called that were very

Page 68

1 elderly and said they weren't able to use the system.
2 But we walked them through it, and we were able to help
3 them cure.
4     Q. Based on your experience implementing SB1's
5 mail ballot identification provision, thus far, do you
6 believe the rejection rate will ever be zero?
7     A. No.
8     Q. Why not?
9     A. Because we're -- a lot of our voters are
10 elderly and they forget.  They forget they have to
11 include their ID.
12     Q. Did your office receive any communications from
13 voters who were frustrated by Senate Bill 1's mail
14 ballot identification provision during the November 2022
15 general election?
16     A. It would be in the call log if we did.
17     Q. Are you aware of the statewide rejection rate
18 for a ABBMs during the November 2022 general election?
19     A. Statewide, no.
20     Q. Sorry.  So -- and this also might be -- let me
21 know if this is not sort of within your experience.
22         But has your office ever referred a voter
23 whose ABBM or carrier envelope did not match their TEAM
24 record to the office of the secretary of state as a
25 potential case of voter fraud?

Page 69

1     A. No.  Wait, can you elaborate?  I'm sorry.
2     Q. So if there is a mis- -- mismatch between a
3 voter's ID on their ABBM or carrier envelope, has that
4 ever caused you to reach out to the office of secretary
5 of state to let them know that this might be a potential
6 case of voter fraud?
7     A. No.
8     Q. Has your office made a similar referral, again,
9 because of an ID mismatch as a potential case of voter
10 fraud to the attorney general's office?
11     A. No.
12     Q. Has your office ever made a referral for voter
13 fraud -- potential voter fraud because of an ID mismatch
14 to the county DA's office?
15     A. Can we clarify?  We're talking about
16 November 2022?
17     Q. Correct.
18     A. Okay.  No.
19     Q. Have you made criminal referrals based on ID
20 mismatches as a potential case of voter fraud since SB1
21 was enacted?
22     A. No.
23     Q. Why not?
24     A. We haven't had a reason to.
25     Q. And why not?



Jennifer Colvin

March 21, 2023
Pages 70 to 73

Page 70

1    A. We haven't had any that were the wrong voter.
2  I get -- I don't know how to answer that question. Like
3  I don't know what answer you're looking for.
4    Q. Any answer you give is the right answer.
5        All right. So I know you had mentioned
6  that you might have limited experience with TEAM. But
7  if you could just kind of -- if you know it, you know
8  it. If you don't, just let us know.
9        So to your knowledge, has your county ever
10 had issues communicating your data to TEAM or vice
11 versa?
12   A. No.
13   Q. You don't know or you --
14   A. I use TEAM quite often actually.
15   Q. So I'm talking about -- you're an offline
16 county; is that right?
17   A. Yes.
18   Q. Has there ever been difficulty receiving data
19 from TEAM or sending it up to TEAM with the merges?
20   A. I'm not sure about that part. That's a
21 different department.
22   Q. I see. So can you explain to me a little bit
23 about how you interact with TEAM?
24   A. Sure. We use TEAM to upload daily ballot
25 activity files to alert TEAM of applications received,

Page 71

1  rejected, okay, whatever the case may be. That way the
2  voter can go onto their website and cure if need be.
3    Q. Based on your experience, is the data in TEAM
4  related to ID numbers -- voter's ID numbers complete?
5        MS. HUNKER: Objection; form.
6    A. I would say from what I've seen, yes. I've
7  never ran across a file that doesn't have one or the
8  other.
9    Q. (BY MS. PAIKOWSKY) I guess maybe to rephrase.
10       So have you ever ran across instances where
11 a voter has either a driver's license number or social
12 security number that is not reflected on TEAM?
13   A. Yes. Let me clarify. If we received an
14 application and it -- they provided their Texas driver's
15 license and TEAM had the social but didn't have the
16 driver's license, yes, we've seen that.
17   Q. So by complete, I meant, you know, a voter
18 might have both a driver's license number and social
19 security number but TEAM only has one or the other. Is
20 that an instance where you've seen?
21   A. On the application or in our voter management
22 system?
23   Q. In TEAM or in the voter management system.
24   A. So in our voter management system, yes. I've
25 seen where we've had two and TEAM only has one.

Page 72

1    Q. Are there instances where TEAM has two and you
2  have one?
3    A. Yes.
4    Q. Do you know why that might be?
5    A. I don't. That's voter registrar.
6    Q. Have you ever come across instances where the
7  ID numbers or social security numbers in TEAM are
8  inaccurate?
9    A. No.
10   Q. Would it surprise you to know that an expert
11 witness retained by the United States found that some
12 mail voters had their ballots rejected solely because of
13 database errors?
14       MS. HOLMES: Objection; form.
15   A. Your question -- what? Repeat it. I'm sorry.
16   Q. (BY MS. PAIKOWSKY) Would it surprise you to
17 know that an expert witness retained by the United
18 States found that some mail voters had their ballots
19 rejected solely because of database issues in TEAM?
20       MS. HOLMES: Objection; form.
21   A. In our county or --
22   Q. (BY MS. PAIKOWSKY) Across --
23   A. -- just in general?
24   Q. In general.
25   A. Would it surprise me, no. I mean, every --

Page 73

1  every system is -- there's room for error in any system;
2  so it wouldn't surprise me.
3    Q. What would your reaction be if it were proven
4  as part of the evidence in this case that some voters in
5  your county had mail ballots rejected because of
6  database issues that make it impossible for them to
7  comply with SB1's mail ballot ID requirement under no
8  fault of their own?
9        MS. HUNKER: Objection; form.
10   A. Can you repeat the first part of your question?
11 My apologies.
12   Q. (BY MS. PAIKOWSKY) I know. This is like a
13 paragraph.
14       So what would your reaction be if it were,
15 in fact, proven as part of the evidence of this case
16 that some voters in your county had their mail ballots
17 rejected because of database issues that make it
18 impossible for them to comply with SB1's mail ballot ID
19 requirement and for no fault of their own?
20       MS. HUNKER: Objection; form.
21   A. I would hope they would get it fixed in the
22 future.
23       MS. PAIKOWSKY: Okay. I think that I am
24 ready to pass the witness.
25       MS. HOLMES: I think I'll have some



# EXHIBIT 103

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
                          SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-844-XR
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
          Defendants.            )
          ---------------------------------------------------------
OCA-GREATER HOUSTON, et al.,     )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 1:21-cv-780-XR
                                 )
JOHN SCOTT, et al.,              )
                                 )
          Defendants.            )
          ---------------------------------------------------------
HOUSTON JUSTICE, et al.,         )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-848-XR
                                 )
GREGORY WAYNE ABBOTT, et al.,    )
                                 )
          Defendants.            )
          ---------------------------------------------------------
```

Kristi Hart

June 30, 2022
Pages 2 to 5

---

Page 2

LULAC TEXAS, et al.,          )
                             )
        Plaintiffs,           )
                             )
V.                           ) Case No. 1:21-cv-0786-XR
                             )
JOHN SCOTT, et al.,           )
                             )
        Defendants.           )
-----------------------------------------
MI FAMILIA VOTA, et al.,       )
                             )
        Plaintiffs,           )
                             )
V.                           ) Case No. 5:21-cv-0920-XR
                             )
GREG ABBOTT, et al.,          )
                             )
        Defendants.           )
-----------------------------------------
UNITED STATES OF AMERICA,      )
                             )
        Plaintiffs,           )
                             )
V.                           ) Case No. 5:21-cv-1085-XR
                             )
THE STATE OF TEXAS, ET AL.,    )
                             )
        Defendants.           )
-----------------------------------------

---

Page 3

ORAL DEPOSITION OF KRISTI HART

June 30, 2022

-----------------------------------------------------

Oral deposition of KRISTI HART, produced as a witness at

the instance of the plaintiffs, and duly sworn, was taken

in the above-styled and numbered cause on the 30th day of

June, 2022, before Patrick Stephens, Certified

Court Reporter, at the William P. Clements Building,

10th Floor Conference Room, 300 W. 15th Street,

Austin, Texas 78701.

---

Page 4

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
JENNIFER K. YUN, ESQ.
RICHARD A. DELLHEIM, ESQ.
MICHAEL E. STEWART, ESQ.
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone:  (202) 305-5533
Jennifer.yun@usdoj.gov
Richard.dellheim@usdoj.gov
Michael.stewart3@usdoj.gov
ON BEHALF OF THE PLAINTIFFS, MI FAMILIA VOTA
MARK L. BIETER, ESQ.
Stoel Rives LLP
101 S. Capitol Boulevard
Suite 1900
Boise, Idaho 83702
Telephone: (208) 387-4217
Mark.bieter@stoel.com
ON BEHALF OF THE DEFENDANTS:
KATHLEEN HUNKER, ESQ.
J. AARON BARNES, ESQ.
Office of the Attorney General
P.O. Box 12548 (MC-009)
Austin, Texas 78711
Telephone:  (512) 936-2275
Kathleen.hunker@oag.texas.gov
Aaron.barnes@oag.texas.gov

---

Page 5

A P P E A R A N C E S (Cont.)

ALSO PRESENT:

ADAM BITTER, ESQ., General Counsel

ZAC RHINES, ESQ., Assistant General Counsel

Office of the Secretary of State

Capitol Building, Rm 1E.8

P.O. Box 12697

Austin, Texas 78711

Telephone:  (512) 475-2813

abitter@sos.texas.gov

zrhines@sos.texas.gov

ALSO PRESENT VIA ZOOM:

Georgina Yeomans, Legal Defense Fund

Leigh Tognetti, ADA Hidalgo County

Chuck Roberts, Republican Committees

Victoria Giese, Butler Snow Law Firm

Wendy Olson, Stoel Rives LLP

Barbara Nicholas, Scarpello Law Firm

---

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Kristi Hart

June 30, 2022
Pages 6 to 9

Page 6

I N D E X

1
2  APPEARANCES ............................................... 04
3  KRISTI HART
4        Cross-Examination by Ms. Yun ................... 09
5        Cross-Examination by Mr. Bieter ............... 140
6
7
8
9
10
11
12
13
14  Reporter's Certificate ................................. 168
15
16
17
18
19
20
21
22
23
24
25

Page 7

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Presentation | 16 |
| 2 | E-mail | 22 |
| 3 | DPS Document | 46 |
| 4 | Jury Presentation | 51 |
| 5 | Ultrasensitive Document (1) | 62 |
| 6 | Ultrasensitive Document (2) | 65 |
| 7 | Ultrasensitive Document (3) | 70 |
| 8 | Ultrasensitive Document (4) | 73 |
| 9 | E-mail | 78 |
| 10 | E-mail | 81 |
| 11 | Ultrasensitive Document (5) | 109 |
| 12 | E-mail | 124 |
| 13 | Spreadsheet | 129 |
| 14 | Defendant's Objections | 133 |
| 15 | Ultrasensitive Document (6) | 137 |
| 16 | E-mail | 142 |
| 17 | PowerPoint | 145 |
| 18 | PowerPoint (2) | 150 |
| 19 | E-mail | 153 |
| 20 | E-mail | 155 |
| 21 | E-mail | 159 |
| 22 | E-mail | 161 |

Page 8

P R O C E E D I N G S

1
2        COURT REPORTER:  Good morning.  Today's date is
3  June 30, 2022.  The time is 9:07 a.m.  We're here for the oral
4  deposition of Ms. Kristi Hart.  Would counsel please introduce
5  themselves for the record?
6        MS. HUNKER:  My name is Kathleen Hunker.  I'm
7  with the Texas Attorney General's Office representing the State
8  defendants.  Accompanying me are my colleagues, Aaron Barnes as
9  well as Ali Thorburn.  Also with us today is two attorneys from
10  the Secretary of State's Office, Adam Bitter and Zac Rhines.
11        MS. YUN:  Jennifer Yun on behalf of the
12  United States.
13        MR. DELLHEIM:  Richard Dellheim on behalf of the
14  United States.
15        MR. STEWART:  Michael Stewart for the
16  United States.
17        MR. BIETER:  Mark Bieter for the
18  Mi Familia Vota plaintiff.
19        COURT REPORTER:  All right.  Great.  Ms. Hart,
20  would you raise your right hand for me?
21        THE WITNESS:  (Complies with request.)
22        COURT REPORTER:  Do you solemnly swear or affirm
23  the testimony you'll give will be the truth, the whole truth
24  and nothing but the truth, so help you God?
25        THE WITNESS:  I do.

Page 9

1        COURT REPORTER:  Okay.  Great.  You may take
2  over.
3        (Whereupon,
4              KRISTI HART
5  was called as a witness herein and, having first been
6  duly sworn, was examined and testifies as follows on:)
7              CROSS-EXAMINATION
8  BY MS. YUN:
9    Q   Good morning, Ms. Hart.
10    A   Good morning.
11    Q   My name is Jennifer Yun from the Department of
12  Justice, and thank you for being here with us this morning.
13  And if you can't hear me very well, just let me know and I'll
14  speak up.  Could you please state your name for the record one
15  more time?
16    A   Kristi Hart.
17    Q   Before we do anything else, I want to make sure that
18  we can have a smooth deposition.  Have you been deposed before?
19    A   Yes.
20    Q   How many times?
21    A   Once.
22    Q   When was that?
23    A   2020.
24    Q   Okay.  So not too long ago.
25    A   Not too long ago.
26    Q   So, as you might remember, here are some ground rules

Kristi Hart

Page 22

1   A   It's an E-mail.
2   Q   And you received this E-mail; correct?
3   A   Based on what's here.  I -- I don't remember this
4   E-mail.  I don't recall this specifically.
5   Q   Okay.  Who is Lillian Eder?
6   A   She's a member of the voter-registration team.
7   Q   So she still is employed by the Secretary of State's
8   office.
9   A   Yes.
10  Q   And she still reports to you?
11  A   I'm sorry?
12  Q   She still reports to you?
13  A   Yes.
14  Q   So recognizing that the attachment of this E-mail
15  that I handed you appears to be a draft that Ms. Eder drafted
16  for your review, I wanted to ask you a couple of questions.  So
17  if you are to go to the attachment, under the second bullet, it
18  says:  Process the following files for the counties to receive
19  notifications.  And under that, it says:  TDL mismatch.  Do you
20  know what that means?
21  A   We have a process in our system that when a voter
22  registration is entered into the system and the county enters
23  that that it will compare that to the DPS database, and if
24  there's a mismatch of information, then that is sent to us and
25  we send that to the counties for review.

Page 23

1   Q   So when that happens, you do not update what is in
2   the TEAM system, you just flag it and send it back to the
3   county; is that right?
4   A   Our office is responsible for providing that
5   information to the counties, but the counties have their --
6   they're respons ble for the voter registration in their
7   counties, so they're the ones that would make any update to the
8   information.
9   Q   I see.  So when you are -- when you're reviewing this
10  information and trying to match with the DPS data, that means
11  that the counties have already entered that information into
12  the TEAM system.  Is that -- am I understanding that correctly?
13  A   Yes, but just for clarification there, we don't
14  review the data; we review the -- the record -- or the
15  mismatched record and we simply provide that to the appropriate
16  county.
17  Q   And you made a distinction between record and data
18  here.  Could you just explain that distinction to me?
19  A   A record contains data, but I think I just wanted to
20  clarify that it's a single record and the data within that
21  record related to that voter registration.
22  Q   So that record means a voter-registration record for
23  a single voter.  Am I understanding that correctly?
24  A   Each record would represent a single voter.
25  Q   Understood.  Thank you.  And the third sub-bullet

Page 24

1   under what we were just looking at on this document, it says:
2   TX online applications.  Could you explain what that is?
3   A   Those are records that -- where a -- it's an
4   application hosted by DIR on our Texas.gov website where a
5   voter can go in and do a name change or an address change, and
6   those are sent to our office in a batch process on a nightly
7   basis.
8   Q   Sorry.  Could you repeat that?  Batch process?
9   A   They come in to us once a night --
10  Q   Uh-huh, once a night.
11  A   -- and we process those out.
12  Q   And a few rows -- a few lines down, it says:
13  Poss ble duplicates.  What is that referencing?
14  A   We have a validation process that -- that we run.  We
15  also have information that we receive from ERIC, the Electronic
16  Registration Information system [sic], that identifies possible
17  duplicates and we provide those to the counties as well.
18  Q   So are these duplicates -- could you explain where
19  those duplicates are located?  So, you know, one -- one copy
20  here and another copy there.  What are those locations?
21         MS. HUNKER:  Objection, form; vague, ambiguous.
22  BY THE WITNESS (resuming):
23  A   I don't --
24  Q   Let me try it --
25  A   -- understand what you're asking.

Page 25

1   Q   Let me try again.  So let's start with ERIC.
2   A   Okay.
3   Q   So when you discover a duplicate, that means that
4   there is another record that is the same as the first record
5   somewhere else in the system within the same -- within the TEAM
6   system.  Is that what you mean by duplicates?
7         MS. HUNKER:  Objection, form.
8   BY THE WITNESS (resuming):
9   A   It doesn't mean that they are the same as, it means
10  they're possibly, based on whatever criteria is used to do the
11  comparison.  So if they're the same as, then we send those to
12  the county voter registrars again to review and make those
13  determinations, yes.
14  Q   So potential duplicates within the TEAM system.  Is
15  that a fair description?
16  A   Yes.
17  Q   Great.  Thank you.  And two lines down from that on
18  the same document, it says:  Export files to the CDW for
19  off-line counties.  To start off, what is an off-line county?
20  A   It is a county that maintains their own
21  voter-registration system.  So we have some of those in Texas,
22  and this is referencing the interface that we have with those
23  counties and their systems.
24  Q   And why are some counties off-line and some counties
25  not off-line?

Kristi Hart

June 30, 2022
Pages 30 to 33

Page 30

1 Objection, compound.
2 BY THE WITNESS (resuming):
3    A   Yes.
4    Q   Could you explain what that might be?
5    A   Well, for this particular process, you could have
6 first name, last name, Texas driver's license or you could have
7 first name, last name, the last four digits and date of birth
8 or you could have first name, last name and a full nine.  So if
9 I understood your question, you're asking do they all have to
10 be there for this particular process to identify a weak match,
11 no.
12    Q   Okay.  I appreciate that.  My question was -- I think
13 I wasn't very clear with my question, so let me -- so what I
14 was asking is that if you don't have any of those three numbers
15 matching, none of them -- so, for example, if it's first name,
16 last name, residential address -- could that possibly be
17 flagged as a weak match?  But their -- their driver's license
18 numbers don't match, their Social Security numbers don't match.
19    A   For this particular process, I do not believe so, but
20 I would have to -- I'd have to review that to give you a firm
21 answer.
22    Q   So we will talk about some of these processes a
23 little more in depth later, but for now, are there any other
24 responsibilities of the voter-registration team that are not
25 reflected in either of the documents that I handed to you?

Page 31

1    A   I can't list them off the top of my head, but I'm
2 absolutely certain there are other responsibilities that are
3 not listed on these two sheets.
4        MS. HUNKER:  And I'm going to object as -- for
5 speculation.
6 BY MS. YUN (resuming):
7    Q   Okay.  So let's take a little bit more in detail
8 about your office's maintenance of the TEAM system.  And we're
9 done with the exhibits for now.
10    A   Okay.
11    Q   So how is data generally entered into the TEAM
12 system?
13        MS. HUNKER:  Objection, form; vague, ambiguous.
14 BY THE WITNESS (resuming):
15    A   When you say entered into, I believe that would only
16 include manual entry.  You're saying entered into the system.
17 Of course we also have several electronic processes, but that's
18 not directly entered manual data entry.
19    Q   Okay.  So maybe my parlance was not exactly correct,
20 but could you -- so could you explain those electronic
21 processes?  And you can use a different verb other than entered
22 to explain what you meant by that.
23    A   Sure.  We -- we -- and can I ask specifically -- are
24 you talking about voter registrations?
25    Q   Yes, exactly.

Page 32

1    A   So we have information that comes to us from DPS,
2 Department of Public Safety.  We have several processes that
3 come from them to us in an electronic file through a secure
4 transfer and then we also receive information from our DIR
5 vendor for the Texas online application that we spoke about
6 earlier in terms of changes or updates to a voter-registration
7 record and then we have manual data entry at the counties.
8    Q   So the manual entry portion of it only happens at the
9 county level; is that correct?
10    A   Yes.
11    Q   And I didn't quite catch the vendor name for the
12 Texas online portion of that.  Is that a different vendor than
13 Civix?
14    A   Yes.  That's through the Texas.gov website, and
15 that's a DIR vendor --
16    Q   And --
17    A   -- and I believe it's Deloitte.
18    Q   And could you just explain what DIR stand for?
19    A   The Department of Information Resources.
20    Q   And in terms of the data transfer between DPS and the
21 TEAM system, did the manner of that transfer change over time?
22    A   I can't speak to that.
23    Q   How does TEAM determine whether a voter registration
24 is for a new voter or an update of an existing record?
25        MS. HUNKER:  Objection, form.

Page 33

1 BY THE WITNESS (resuming):
2    A   If it's coming in, then obviously the first thing is
3 we look to see if there's an existing record, and we match to
4 our current voter registration list.  If not, then obviously it
5 would be a new registrant, but it depends on where it's coming
6 from.  So if it's coming from DPS, it's sent to us
7 acknowledging that this is an initial registration because
8 that's something the voter, I believe, puts in their online
9 process, but obviously, if we do a manual entry for something,
10 we check to see if there's already a record there.
11    Q   Are any particular fields used to check whether there
12 is an existing record?
13    A   Are you talking about manual entry?  I'm trying to --
14    Q   Yes, manual entry first, yeah.
15    A   Sure.  We have a -- first of all, they enter exactly
16 what's on the voter-registration application, and so once that
17 goes in, it does have first name, last name, date of birth.
18 They can put in their Texas driver's license; they can put in
19 last four of their social on that information.  We do check
20 that against DPS to make sure that those things match if it is
21 an initial registrant and then we also check that within our
22 system to make sure that there's not already a registration
23 there.
24    Q   So if any of those numbers are given, the Texas
25 driver's license number or the last four digits of social, you

Kristi Hart

Page 38

1 match it with what's there based on the criteria set for that
2 particular process, and then if there's nothing there, it goes
3 as a new registrant.
4      Q    So we talked about the duplicate process a little bit
5 earlier, and you said that that was an annual process; right?
6      A    I'm sorry.  I didn't hear.
7      Q    We talked about the duplicate batch process earlier,
8 and am I remembering correctly that you said it was an annual
9 process?
10     A    Yes.
11     Q    And so each year you run the process, and if there
12 are any possible duplicates, you send those on to the counties
13 to process.
14     A    Yes.
15     Q    And what are some scenarios -- how do duplicates get
16 created?
17          MS. HUNKER:  Objection, form.
18 BY THE WITNESS (resuming):
19     A    I'm sorry.  I couldn't hear you.
20     Q    Oh.  How do -- how -- why are there some duplicates
21 in the TEAM system?  Like, what are some ways in which those
22 get created and then they get flagged and then processed?
23          MS. HUNKER:  Objection, form; ambiguous; calls
24 for speculation.
25 BY THE WITNESS (resuming):

Page 39

1      A    Yeah.  I don't know that I can give specific examples
2 of that.
3      Q    And do you know when the duplicate batch process, the
4 annual process, started happening with the TEAM system?
5      A    It was prior to my time.  I do not know.
6      Q    And is the annual nature of it, is that required by a
7 regulation or a state law provision?  Do you know?
8      A    I do not recall.  I don't know that the annual is
9 part of a requirement, but we are required, yes, to conduct a
10 comparative analysis of the system.
11     Q    Are there any circumstances that might create
12 multiple TEAM records that pertain to one Texas voter?
13          MS. HUNKER:  Objection, form; vague; calls for
14 speculation, outside of personal knowledge.
15 BY THE WITNESS (resuming):
16     A    Can you repeat that again?
17     Q    Yeah.  Are there any circumstances that you're aware
18 of that might create multiple TEAM records that pertain to one
19 single individual Texas voter?
20          MS. HUNKER:  Same objection.
21 BY THE WITNESS (resuming):
22     A    I can't think of any particularly, if you're asking
23 for a specific example of that.  I mean, I think -- I think you
24 do have to look at data entry as a possibility or different
25 information actually provided.  But, again, that's why we -- we

Page 40

1 do our checks on the system for that.
2      Q    When you say data entry, you mean when someone is
3 manually entering something.
4      A    Yes.
5      Q    How common, if you know, are errors in the TEAM
6 system that are due to inaccurate data entry?
7          MS. HUNKER:  Objection, form; outside of
8 personal knowledge, calls for speculation.
9 BY THE WITNESS (resuming):
10     A    I don't know.  It's not information I could give you
11 off the top of my head.
12     Q    Do you know if data entry errors occur with greater
13 frequency in some places than others?
14          MS. HUNKER:  Objection, form; calls for
15 speculation, outside of personal knowledge.
16 BY THE WITNESS (resuming):
17     A    And I don't know what you mean by, In some places
18 greater than others.
19     Q    Say, some counties than others.
20          MS. HUNKER:  Objection, form --
21 BY THE WITNESS (resuming):
22     A    Oh.  No.
23          MS. HUNKER:  -- calls for speculation --
24 BY THE WITNESS (resuming):
25     A    No --

Page 41

1          MS. HUNKER:  -- outside of personal knowledge.
2 BY THE WITNESS (resuming):
3      A    -- I'm not aware that there's a distinction there.
4      Q    So I think you mentioned -- you referenced some of
5 this earlier in your testimony.  So you mentioned a validation
6 process of data.  Could you explain what you meant by that?
7      A    Well, the duplicate batch process would be an example
8 of that where, you know, we run information and, again, provide
9 that to the counties for them to review.  You know, it's --
10 that would be an example if -- that I referenced earlier.
11     Q    Are there other examples?
12     A    We do have information that we get from ERIC that is
13 looking at records within our system and providing back things
14 that may look -- that need deeper investigation, if you will,
15 and we provide those to the counties as well.
16     Q    And could you explain -- well, could you spell out
17 what ERIC stands for first and then I can ask another question.
18     A    I think I did earlier.
19     Q    Oh.
20     A    The Electronic Registration Information Center.
21     Q    Oh, okay.  Sorry, sorry.  I didn't catch that.  And
22 where is that system?  Sorry -- strike that.  Where is ERIC's
23 information coming from?
24          MS. HUNKER:  Objection, form; calls for
25 speculation, outside of personal knowledge.  Also ambiguous as

EXHIBIT
104

Transcript of the Testimony of

**Pamiel Gaskin**

**Date:**

June 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Pamiel Gaskin                                                June 29, 2022

```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

 4       LA UNIÓN DEL PUEBLO        )
         ENTERO, et al.,            )
 5                                  )    Case No.
              Plaintiffs,           )    5:21-cv-844-XR
 6                                  )
         VS.                        )    (Consolidated for
 7                                  )    space)
         GREGORY W. ABBOTT,         )
 8       et al.,                    )
              Defendants.           )
 9

10

11

12       _ _ _ _ _ _ _ _ _ _

13              DEPOSITION OF PAMIEL J. GASKIN
                   June 29, 2022, 9:25 a.m.
14
             Location:  U.S. Department of Justice
15             1000 Louisiana Street, Suite 2300
                        Houston, Texas
16
                 Volume 1 of 1 - Pages 1 - 127
17                                   _ _ _ _ _ _ _ _ _ _

18

19

20

21

22

23       Stenographic Reporter:
         DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)
24       dsanderscsr@gmail.com

25       JOB NO. 845774
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                   210-697-3408

Pamiel Gaskin

## Page 2

```
 1            A P P E A R A N C E S
 2
 3  ON BEHALF OF OCA-GREATER HOUSTON:
 4    ACLU TEXAS
      P.O. Box 8306
 5    Houston, Texas  77288
      512.983.0775
 6    aharris@aclutx.org
 7    Represented by: Ms. Ashley Harris
 8  ***
    ON BEHALF OF TEXAS CIVIL RIGHTS PROJECT ON BEHALF OF
 9  PAMIEL GASKIN:
10    TEXAS CIVIL RIGHTS PROJECT
      1405 Montopolis Drive
11    Austin, Texas  78741
      512.474.5073
12    zachary@texascivilrightsproject.org
13    Represented by: Mr. Zachary Dolling
14  ***
    ON BEHALF OF STATE DEFENDANTS:
15
      OFFICE OF THE ATTORNEY GENERAL
16    SPECIAL LITIGATION UNIT
      P.O. Box 12548, Capitol Station
17    Austin, Texas  78711
      512.936.2567
18    jack.disorbo@oag.state.tx.us
19    Represented by: Mr. Jack DiSorbo
                      Mr. Zachary Berg
20
      ***
21  ON BEHALF OF YSABEL RAMON:
22    HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
      100 E. Cano, Courthouse Annex III, 1st Floor
23    Edinburg, Texas  78359
      956.292.7609
24    leigh.tognetti@da.co.hidalgo.tx.us
25    Represented by: Ms. Leigh Tognetti - via Zoom
```

## Page 3

```
 1  ON BEHALF OF UNITED STATES OF AMERICA:
 2    DEPARTMENT OF JUSTICE
      Civil Rights Division, Voting Section
 3    Washington, DC  20530
      202.353.5373
 4    dana.paikowsky@usdoj.gov
 5    Represented by: Ms. Dana Paikowsky
 6  ***
 7  ON BEHALF OF HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE:
 8    BUTLER SNOW LLP
      1400 Lavaca Street, Suite 1000
 9    Austin, Texas  78701
      737.802.1800
10    victoria.giese@butlersnow.com
11    Represented by: Ms. Victoria A. Giese - via Zoom
12
    ON BEHALF OR INTERVENOR DEFENDANTS:
13
      JONES DAY
14    51 Louisiana Avenue, NW
      Washington, DC  20001
15    202.879.3667
      skenny@jonesday.com
16
      Represented by:  Stephen Kenny - via Zoom
17
18  ALSO PRESENT VIA ZOOM:
19  Kenny Buser-Clancy
20  Tiffany Bingham - Harris County
21  Savannah Kumar
22  Barbara Nicholas - Scarpello & Creuzot
23
24
25
```

## Page 4

```
 1                    INDEX
 2              ORAL DEPOSITION OF
 3       PAMIEL J. GASKIN, JUNE 29, 2022
 4                                        Page
 5  BY MR. DiSORBO.........................   6
 6
 7  Start time - 9:25 a.m. End time - 12:18 p.m.
 8  Total pages: 127
 9
10
11  REPORTER CERTIFICATION..................  127
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1              EXHIBIT INDEX
 2            ORAL DEPOSITION OF
 3     PAMIEL J. GASKIN, JUNE 29, 2022
 4            Description              Page
 5  ***Introduced ONLY
    Exhibit C      How Texas officials and ...... 105
 6                 voting groups are trying to
                   limit mail ballot rejections
 7
    Exhibit E      Gaskin Twitter profile........ 115
 8
    Exhibit F      Gaskin interview picture...... 118
 9
10
11             •_____•
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Pamiel Gaskin

June 29, 2022
Pages 6 to 9

Page 6

1          PAMIEL J. GASKIN,
2    having been first duly sworn, testified as follows:
3          E X A M I N A T I O N
4    BY MR. DiSORBO:
5      Q.    Good morning, Ms. Gaskin.  My name is
6    Jack DiSorbo.  This is Zachary Berg, on behalf of
7    the State.
8          MR. DiSORBO:  Do the other attorneys
9          want to state their appearance real quick?
10         Okay.
11     Q.    (BY MR. DiSORBO)  Okay.  So will you
12   please state and spell your name for the record,
13   ma'am.
14     A.    My name is Pamiel, P-A-M-I-E-L, Johnson
15   Gaskin, G-A-S-K-I-N.
16     Q.    Okay.  Now, what is your race, ma'am?
17     A.    African-American.
18     Q.    Okay.  Do you understand that you're
19   under oath today?
20     A.    I do understand that.
21     Q.    And because you're under oath, do you
22   understand that you have to answer my questions
23   truthfully?
24     A.    Yes.
25     Q.    Okay.  And do you understand that this

Page 7

1    testimony is being recorded?
2      A.    I do.
3      Q.    Okay.  And so have you ever given a
4    deposition before?
5      A.    I have.
6      Q.    You have.
7            How many times?
8      A.    Twice.
9      Q.    And what was the nature of those
10   depositions?
11     A.    It was over 30 years ago, in a rate
12   case.  I worked for AT&T, and we had a rate case
13   before the State.
14     Q.    Okay.  Were both of those rate cases?
15     A.    Yes.
16     Q.    Both of the depositions, I mean?
17     A.    Both depositions were in rate cases.
18     Q.    Thank you.
19           And so since you've given a
20   deposition before, you understand that for the court
21   reporter you'll need to give verbal answers like
22   "yes" or "no" instead of shaking or nodding your
23   head.  Does that make sense?
24     A.    Yes, it does.
25     Q.    Thank you, ma'am.

Page 8

1            Now, are you aware of anything that
2    would affect your testimony today?
3            Let me rephrase the question.
4            Are you aware of anything that would
5    prevent you from being able to give accurate and
6    honest testimony today?
7      A.    No.
8      Q.    Not under drugs or alcohol or anything
9    like that?
10     A.    No.
11     Q.    And that is just a standard question I
12   ask everybody, not --
13     A.    No.
14     Q.    How did you prepare for this deposition?
15     A.    Prepare?
16     Q.    Yes, ma'am.
17     A.    I didn't really do any preparation other
18   than I had a -- I did have a conversation with the
19   attorneys.
20     Q.    With the attorneys.
21           So you had one meeting with the
22   attorneys?
23     A.    One meeting.
24     Q.    And who was in that meeting?
25     A.    Ashley and Dana.

Page 9

1            THE WITNESS:  Zach, were you there?
2    No.
3      A.    He's a guy.
4      Q.    (BY MR. DiSORBO)  About how long did
5    that meeting last?
6      A.    Less than an hour.
7      Q.    Less than an hour.  Okay.
8            So you've said you've given two
9    depositions before.  Have you ever testified in
10   court before?
11     A.    No.
12     Q.    Have you ever testified in any other
13   sort of proceeding, like before the legislature or
14   something like that?
15     A.    I have.
16     Q.    And when was that?
17     A.    In the early '90s.
18     Q.    And what did you testify about?
19     A.    The State was trying to change the names
20   of certain cities in Texas, and I went to testify to
21   request that they not change the name of my maternal
22   grandmother's birthplace.
23     Q.    And where is that?
24     A.    Nigton, Texas.
25     Q.    Nigton?

Pamiel Gaskin

June 29, 2022
Pages 18 to 21

Page 18

1 during the special session. Do you understand that,
2 ma'am?
3    A.   I understand that.
4    Q.   Okay. Thank you.
5         Now, do you understand that the
6 United States and OCA Greater Houston are plaintiffs
7 in this case?
8    A.   I don't know what OCA Houston is.
9    Q.   Okay. I'll move on. It's not
10 important.
11        Do you understand that you were
12 disclosed as a potential witness in this case?
13   A.   I do understand that.
14   Q.   Do you know why that was done?
15   A.   Because I had some issues with my
16 attempts to -- to receive my application for a
17 mail-in ballot.
18   Q.   Any other reasons that you're aware of?
19   A.   No.
20   Q.   Okay. Now, I'm glad that you mentioned
21 that, ma'am, because I do want to talk about that a
22 little bit. But I have a few preliminary questions
23 first.
24   A.   Okay.
25   Q.   Now, are you registered to vote?

Page 19

1    A.   I am.
2    Q.   Where?
3    A.   Fort Bend County.
4    Q.   Fort Bend County.
5         Have you ever always been registered
6 there?
7    A.   Well, since I lived there in -- since 46
8 years.
9    Q.   Have you ever been registered anywhere
10 else?
11   A.   I was registered in Harris County prior
12 to that.
13   Q.   Harris County.
14   A.   And Galveston County prior to that.
15   Q.   And Galveston County. Okay.
16        And I think I remember reading some
17 great story about the first time that you registered
18 to vote in Galveston County. I think your father
19 drove you to get registered there, something like
20 that?
21   A.   He did.
22   Q.   Tell me a little bit about that.
23   A.   You had to be 21 to vote at that time.
24   Q.   Okay.
25   A.   My birthday is in March; so I was in

Page 20

1 school. He called me. He said, "For your birthday,
2 I'm going to come get you. Give me your schedule,
3 your class schedule, and I'm going to come get you
4 and get you registered to vote."
5         So I told him what my class schedule
6 was. He showed up on a Thursday afternoon, about 1
7 o'clock. Drove me back to Galveston County.
8         That morning -- next morning took me
9 to register to vote, and drove me back to Austin
10 that afternoon so I could go to my 1 o'clock class.
11   Q.   That's great.
12        Do you remember what class it was?
13   A.   No. No. No. I'm 75. That was -- I
14 was 21 then.
15   Q.   Sometimes when you've got great stories
16 like that, you remember random details, that sort of
17 thing.
18   A.   That's not a detail I remember.
19   Q.   Well, that's a long drive from Austin to
20 Galveston.
21   A.   Yeah.
22   Q.   Now, you said that you voted in the
23 March 2022 primary; correct?
24   A.   I did.
25   Q.   Okay. Now, I understand you had some

Page 21

1 trouble voting in that election; correct?
2    A.   I did.
3    Q.   Now, in your own words, can you tell me
4 about what happened.
5    A.   Sure. In Texas you have to apply every
6 year for a mail-in ballot. So part of my just
7 general housekeeping is that I take care of those
8 types of things the first week of the month --
9    Q.   Okay.
10   A.   -- of January.
11        So on or about January 3rd, I pulled
12 out -- I went to Fort Bend County's website. Pulled
13 down the application to vote by mail for both me and
14 my husband. Pulled them down. Filled them out. We
15 signed them. Well -- and I mailed it in. Mailed
16 them in.
17        And about ten days later, I got a
18 letter saying that, through no fault of mine, my
19 application had been rejected.
20        So I called the election office and
21 spoke with Veronica -- Veronica Fernandez, who is
22 the early voting clerk. They don't have -- it's not
23 a big office. And she said I had used the wrong
24 form.
25        I said, "Well, Veronica, I got the

Pamiel Gaskin

June 29, 2022
Pages 22 to 25

Page 22

1  form from you guys."
2           She said, "Well, the Secretary of
3  State didn't send us the right forms in time, and we
4  didn't populate the correct form until around the
5  6th of January."
6           I said.  "Okay.  Is the correct form
7  there now?"
8           She said, "Yes."
9           So I pulled the correct form down.
10  Filled it out.  Mailed it in.  And I had just -- it
11  was -- this was on the 13th.
12           On the 20th, I had just finished a
13  League of Women Voters activity, and I was on my way
14  home.  And Veronica called me and said, "Don't shoot
15  the messenger.  Your application has been rejected."
16           I said, "For what?"
17           She said, "You didn't put the
18  correct ID on your application."
19           I said, "Veronica, what do you mean
20  I didn't put the right ID?  It asks for my driver's
21  license number, and that's what I put on there."
22           She says, "Well" --
23           I said, "What was I supposed to put
24  on it?"
25           She said, "Well, I can't tell you,

Page 23

1  because if I do, I could go to jail because of the
2  new law."
3           And I said, "Well, obviously since
4  you're only asking for two things, it must be my
5  Social Security number."  I said, "What number is
6  it?"
7           And she said, "It's the number you
8  use when -- the ID you used when you first
9  registered to vote that's in your voter record
10  here."
11           And I said, "Well, Veronica, I
12  registered to vote 46 years ago in this county.
13  What" -- so I said, "Okay.  It could only be one of
14  two things, since you're only asking for two things.
15           "So is it my -- if I tell you what
16  it is, can you confirm that?"
17           She said, "Yes, I can do that."
18           I said, "Okay.  Is it my Social
19  Security number?"
20           She said, "Yes, it is."
21           I said, "Thank you very much."
22           I pulled down another form.  And
23  this time, leaving nothing to chance, everywhere
24  there was a blank, even on the optional information,
25  I filled it all in, and mailed it back on the 14th.

Page 24

1           And on the 28th of January -- no,
2  the 31st of January, I got my ballots in the mail.
3  28 days, three tries.
4      Q.    And then you submitted those ballots
5  correctly --
6      A.    I did.
7      Q.    -- correct?  Yeah.
8           And did you track those ballots
9  after you submitted them?
10      A.    I did.
11      Q.    Where did you track them?
12      A.    On ballot tracker.  You go to the County
13  site, and it's a little thing you click on that says
14  "Track my ballot."
15      Q.    And I guess it lets you know once the
16  ballot's been accepted?
17      A.    It tells you.  You can see when it was
18  saved; you can see when it was accepted; and you can
19  see -- they use a funny term for it being processed.
20  And I don't remember what it is.  But you can tell
21  when it's being processed.
22      Q.    And your and your husband's votes were
23  eventually processed; correct?
24      A.    Yes, they were.
25      Q.    Okay.  Well, thank you for explaining

Page 25

1  that to me.  I want to ask a few questions just so I
2  make sure I understand all of the details of it.
3           So when your first -- your first
4  application that was rejected, you received a notice
5  in the mail from the County; correct?
6      A.    Uh-huh.
7      Q.    And that first form was rejected because
8  you had inadvertently used the wrong form; correct?
9      A.    No.  I didn't inadvertently use the
10  wrong form, because that would tend to -- I used the
11  form that the County provided, and it was the wrong
12  form.
13      Q.    Yes.
14      A.    It wasn't inadvertent on my part.  I
15  didn't have a choice either/or.
16      Q.    You used the only form that was on the
17  website?
18      A.    I used the only form that was available
19  to me, yes.
20      Q.    And the form that was available to you
21  was incorrect?
22      A.    That is correct.
23      Q.    Okay.  You don't think the County
24  purposely kept the old form on the website, do you?
25      A.    No.

EXHIBIT

105

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO        *
     ENTERO, et al.            *
 4                             *
                               *
 5   VS.                       *   Civil Action No.
                               *   5:51-cv-00844-XR
 6                             *
     GREGORY W. ABBOTT, et al.  *
 7

 8   ********************************************************

 9           ORAL AND VIDEOTAPED DEPOSITION OF
                    ROBERTO BENAVIDES
10                   MARCH 30, 2023
                   (Reported Remotely)
11
     ********************************************************
12

13           ORAL AND VIDEOTAPED DEPOSITION of ROBERTO
     BENAVIDES, produced as a witness at the instance of the
14   Defendants, and duly sworn, was taken remotely in the
     above-styled and numbered cause on the 30th day of
15   March, 2023, between the hours of 9:03 a.m. and
     11:06 a.m., before TRICIA FOX WILLIAMS, CSR, in and for
16   the State of Texas, reported by machine shorthand, with
     the witness located in Austin, Texas, in accordance with
17   the Federal Rules of Civil Procedure and the provisions
     stated on the record or attached hereto.
18

19

20

21

22

23

24

25
```



Roberto Benavides

March 30, 2023
Pages 2 to 5

---

**Page 2**

```
1          A P P E A R A N C E S
       (All appearances via videoconference)
2
3   COUNSEL FOR THE PLAINTIFFS:
4     MS. VERONIKAH WARMS
      MR. ZACHARY DOLLING
5     MR. HANI MIRZA
      Texas Civil Rights Project
6     1405 Montopolis Drive
      Austin, Texas 78741
7     (512)474-5073
      veronikah@texascivilrightsproject.org
8
9   COUNSEL FOR THE PLAINTIFFS:
10    MS. LUCIA ROMANO
      MR. PETER HOFER
11    Disability Rights Texas
      2222 W. Braker Lane
12    Austin, Texas 78758-1024
      (512)454-4816
13    lromano@drtx.org
14
15  COUNSEL FOR THE PLAINTIFFS:
16    MS. DANA PAIKOWSKY
      US Department of Justice - Civil Rights Division
      150 M Street NE
17    Washington, DC 20002
      (202)514-3847
18    dana.paikowsky@usdoj.gov
19
20  COUNSEL FOR THE DEFENDANTS:
21    MR. DAVID BRYANT
      MR. ZACHARY BERG
      Office of the Texas Attorney General
22    300 W. 15th Street
      Austin, Texas 78701
23    (512)574-1514
      david.bryant@oag.texas.gov
24    zachary.berg@oag.texas.gov
25
```

---

**Page 3**

```
1           APPEARANCES CONTINUED
2
    COUNSEL FOR THE DEFENDANTS:
3
      MS. LISA CUBRIEL
4     Bexar County District Attorney's Office
      Civil Litigation
5     PO Box 12548
      Austin, Texas 78711-2548
6     (210)335-2311
      lisa.cubriel@bexar.org
7
8   COUNSEL FOR THE DEFENDANTS:
9     MS. JOSEPHINE RAMIREZ-SOLIS
      Hidalgo County District Attorney's Office
10    100 E. Cano Street
      Edinburg, Texas 78539-4582
11    (956)292-7609
      josephine.ramirez@da.co.hidalgo.tx.us
12
13  COUNSEL FOR THE INTERVENOR DEFENDANTS:
14    MR. STEPHEN KENNY
      Jones Day
15    51 Louisiana Avenue NW
      Washington, DC 20001
16    (202)879-3667
      skenny@jonesday.com
17
18  ALSO PRESENT:
19    MS. ROSIE JONES, Videographer
20
21
22
23
24
25
```

---

**Page 4**

```
1                  INDEX
2                                            PAGE
3   Appearances....................................2-3
4   ROBERTO BENAVIDES
        Examination by Mr. Bryant...................6
5
    Signature and Changes............................58
6
    Reporter's Certificate...........................60
7
8
                 EXHIBIT INDEX
9
    NO. DESCRIPTION                              PAGE
10
    Exhibit 1-  Subpoena to Testify at a Deposition
11              in a Civil Action...................8
    Exhibit 2-  OCA-Greater Houston and HAUL
12              Plaintiffs' Sixth Supplemental Rule
                26(a)(1) Initial Disclosures........8
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
1        THE VIDEOGRAPHER:  We are now on the
2   record.  This begins videotape No. 1 in the deposition
3   of Roberto Benavides in the matter of La Union Del
4   Pueblo Entero, et al. V. Gregory W. Abbott, et al. in
5   the United States District Court for the Western
6   District of Texas.  Today is March 30th, 2023, and the
7   time is approximately 9:03 a.m.
8        This deposition is being taken at
9   Disability Rights Texas at the request of the Office of
10  the Attorney General of Texas.  The videographer is
11  Rosie Jones of Magna Legal Services, and the court
12  reporter is Tricia Williams of Magna Legal Services.
13  Will counsel and all parties present state their
14  appearances and whom they represent.
15       MR. BRYANT:  My name is David Bryant,
16  along with Zachary Berg, I represent the state
17  defendants in this case.
18       MS. WARMS:  Veronikah Warms with the Texas
19  Civil Rights Project representing the OCA plaintiffs in
20  this case, along with Zachary Dolling of the Texas Civil
21  Rights Project --
22       MS. PAIKOWSKY:  This is Dana Paikowsky --
23       MS. WARMS:  -- representing the witness.
24  Sorry.
25       MS. PAIKOWSKY:  This is Dana Paikowsky for
```



Roberto Benavides                                    March 30, 2023
                                                     Pages 6 to 9

Page 6

1  the United States.  Are we on the record right now?  Can
2  we go off the record one second?
3          THE VIDEOGRAPHER:  Yes.  The time is
4  9:04 a.m., we're off the record.
5          (Break from 9:04 a.m. to 9:06 a.m.)
6          THE VIDEOGRAPHER:  Time is 9:06 a.m.,
7  we're on the record.  Will the court reporter please
8  swear in the witness.
9          THE REPORTER:  My name is Tricia Williams,
10 Texas CSR No. 8273, I am administering the oath and
11 reporting the deposition remotely by stenographic means
12 from my residence in New Braunfels, Texas.  The witness
13 is located in Austin, Texas.  Mr. Benavides, will you
14 raise your right hand?
15         ROBERTO BENAVIDES,
16 having been duly sworn, testified as follows:
17         EXAMINATION
18 BY MR. BRYANT:
19 Q.   Mr. Benavides, my name is David Bryant, I
20 represent the state defendants in this action.  What's
21 your current residence address?
22 A.   8010 Briarton Drive, Austin, Texas.
23 Q.   And how long has that been your address?
24 A.   Since 1997.
25 Q.   Your name was disclosed in this litigation as

Page 7

1  someone who has potentially knowledge that's relevant to
2  the case, and that's why we're here today.  Have you
3  given your deposition or testified in court before?
4  A.   Never have.
5  Q.   I'm going to be asking you a series of
6  questions, the other attorneys will have a chance to ask
7  you questions after I do.  If at any time you don't
8  understand my question, or have difficulty hearing me,
9  or otherwise need me to repeat or clarify the question,
10 please ask me to do so.
11         Similarly, if at any time you need a break
12 for the many reasons people can need breaks, please feel
13 free to ask for one and you'll get it.  I'll ask you
14 questions as expeditiously as I can, but it may take a
15 little while.  And if you need breaks, please feel free
16 to get it.
17         Do you have any kind of difficulty with
18 the English language?  In my brief meeting with you, you
19 don't -- you seem to have none whatsoever.
20 A.   No, I think I'm pretty good.
21 Q.   Okay.  Do you have any other -- any health
22 problems or any other conditions that would in any way
23 affect your testimony here today?
24 A.   No.
25 Q.   Okay.  Thank you.  I want to hand you what's

Page 8

1  been marked as, in a pretty primitive way, as State
2  Exhibit 1 to your deposition.
3          (Exhibit 1 marked for identification.)
4  Q.   (By Mr. Bryant)  This is a copy of the subpoena
5  that our office prepared and issued in connection with
6  this case.  Have you seen State Exhibit 1 before?
7  A.   No.
8  Q.   Did you -- were you advised that you were
9  subpoenaed and requested to appear today?
10 A.   Not -- (inaudible.)
11         (Reporter requests clarification.)
12 A.   You said was I subpoenaed?
13 Q.   (By Mr. Bryant)  Yes.
14 A.   I wasn't subpoenaed, I was just asked to come
15 and do a deposition.
16 Q.   Okay.
17         THE WITNESS:  Did you hear it that time?
18         THE REPORTER:  Yes, sir.  Just try to
19 speak up.  Thank you.
20 Q.   (By Mr. Bryant)  In any event, you're here, so
21 we'll proceed with some questions.  And I want to hand
22 you also what's been marked as State Defendant's Exhibit
23 2 in connection with this deposition.
24         (Exhibit 2 marked for identification.)
25 Q.   (By Mr. Bryant)  This is a document that was

Page 9

1  prepared and provided to our office in connection with
2  this litigation, and it's a listing of various people
3  who likely have information that is subject to
4  discovery.  Do you see your name listed on page 5 of
5  that document?
6  A.   I do, No. 12.
7  Q.   Okay.  Did you have any input to this, or
8  any --
9  A.   No, not at all.
10 Q.   Okay.  What have you done, if anything, in
11 preparation for your deposition here today?
12 A.   Nothing.  Just met with the lawyers, that was
13 about it.
14 Q.   Okay.  What lawyers did you meet with?
15 A.   These three people right here.
16 Q.   Okay.
17 A.   Ms. Veronikah, Zach, and Dana.
18 Q.   Okay.  When did you do that?
19 A.   Yesterday, or a couple days ago, and then we
20 met for a little bit this morning.
21 Q.   Okay.  In connection with that preparation, did
22 you review any documents?
23 A.   No, not at all.
24 Q.   Okay.  Now, today you heard the court reporter
25 give you the oath requiring you to answer truthfully to



Roberto Benavides

March 30, 2023
Pages 10 to 13

Page 10

1 the best of your ability.
2    A.   Right.
3    Q.   You understand that oath?
4    A.   Yes.
5    Q.   Do you understand that it's the same as if you
6 were testifying in a courtroom in front of a judge or
7 jury?
8    A.   I do.
9    Q.   Now, you mentioned that you live on Briarton
10 Lane in Austin?
11    A.   Briarton Drive.
12    Q.   Briarton Drive.
13    A.   Uh-huh.
14    Q.   And who are the members of hour household
15 there?
16    A.   I have an adult son that lives with us, his
17 name is William Benavides.  My wife just passed away
18 last year, in October of last year, right when I was
19 voting and stuff.  And I did call the --
20    Q.   I'm sorry to hear that.
21    A.   You know, so it's just me and my son right now,
22 and he kind of keep an eye on me, you know, because
23 otherwise I'd be all by myself, me and the cat.
24    Q.   And I don't know whether you mentioned, how old
25 is your adult son?

Page 11

1    A.   He's 44.  I have other children, but he's the
2 only one that lives there with me.  I have other
3 children, but they don't live there, just him.
4    Q.   Do any of them live nearby?
5    A.   I have another son that lives in Onion Creek
6 here in Austin, a daughter in Boston, Massachusetts, and
7 another son in Bolo, Illinois.
8    Q.   What's the age of your son who lives in Onion
9 Creek?
10    A.   He's 46.
11    Q.   And about how far does he live from your home
12 address?
13    A.   About 10 minutes.
14    Q.   As of the fall of 2022, was your adult son
15 living with you?
16    A.   Yes.
17    Q.   And when did he start living with you, other
18 than at birth?  I assume he hasn't lived with you
19 continually for 44 years, but when did he come back to
20 home?
21    A.   15 years ago.
22    Q.   Okay.
23    A.   He broke up with his girlfriend, he couldn't
24 afford the rent by himself, so my wife, very generous,
25 you know, stay with us.

Page 12

1    Q.   And is he employed?
2    A.   Yes.
3    Q.   And what's his job?
4    A.   He's apartment maintenance.
5    Q.   And looking back to the fall of 2022, did he
6 have that job then as well?
7    A.   Similar to that.  He worked for Angie's List
8 doing, you know, maintenance work and stuff.
9    Q.   Typically home maintenance --
10    A.   Right.
11    Q.   -- for the people in the area?
12    A.   They call it Angie Handy.  If somebody had like
13 a little project going on, and he would do stuff like
14 that.  He wanted to spend as much time as possible at
15 home about the last year and a half or so, because my
16 wife was very sick and he wanted to be around her and
17 stuff.  This way he wasn't working like he is now, full-
18 time as an apartment manager.
19    Q.   So during the fall of 2022, he had some control
20 over his work schedule and --
21    A.   Yes.  He --
22    Q.   -- when he --
23    A.   -- could --
24    Q.   -- worked and when he needed to be somewhere
25 else?

Page 13

1    A.   He could accept or refuse the job.
2         THE REPORTER:  Y'all try to speak one at a
3 time.
4    A.   I'm sorry.
5    Q.   (By Mr. Bryant)  Me too.  I'll try not to speak
6 over you.  And could you describe your wife's health
7 condition during the period roughly from September
8 through November of 2022.
9    A.   She was in hospice care, and I was the primary
10 caretaker.  The nurse would come over once or twice a
11 week.
12    Q.   And during that period, did your wife need you
13 to be there for specific tasks, or just to be sure
14 everything was okay?
15    A.   No, I mean, she couldn't do anything.  She
16 needed help just getting up from the bed to go to the
17 bathroom.  So I had to kind of help her walk in there,
18 wait there with her, and then help her back out.  She
19 couldn't do anything anymore.  You know, she's --
20    Q.   Now, the disclosure that is State Defendant's
21 Exhibit 2 describes that you have knowledge regarding
22 your actions relating to voting in the November 2022
23 election.
24    A.   Uh-huh.
25    Q.   Had you voted in the primary in 2022?



Roberto Benavides                                    March 30, 2023
                                                     Pages 14 to 17

Page 14

1    A.   Yes.
2    Q.   Had you voted in the 2020 general election?
3    A.   Yes, I did.
4    Q.   And sounds like you vote pretty regularly; is
5 that right?
6    A.   The last three times by mail, and before that
7 in person.
8    Q.   Okay.  So the three times that you voted by
9 mail include the primary in 2022?
10   A.   Uh-huh.
11   Q.   Was that both the first primary and the
12 run-off, or did you only vote in the first primary?
13   A.   Just the first primary.
14   Q.   Okay.  And the 2020 general election?
15   A.   Yes, I voted.
16   Q.   By mail?
17   A.   By mail.
18   Q.   And did you vote in the primary in 2020?
19   A.   I don't think so.
20   Q.   Okay.
21   A.   I don't think so.
22   Q.   And you voted or attempted to vote by mail in
23 November of 2022?
24   A.   Yes.
25   Q.   Okay.  Are there any other times that you can

Page 15

1 recall where you voted or attempted to vote by mail?
2    A.   The 2016 election.
3    Q.   That was the general election?
4    A.   Yes, the general presidential.
5    Q.   Other than the 2016 presidential election, do
6 you recall voting by mail or attempting to vote by mail
7 in any other earlier elections?
8    A.   I think that was about it.
9    Q.   Okay.  And what caused you, if anything, to
10 decide to attempt to vote by mail in 2016 for the first
11 time?
12   A.   My wife was already starting to have health
13 problems, and we do everything together, so we used to
14 go vote together.  So especially when you have to wait
15 and line and stuff, and with the heat, and she had COPD
16 also, so I requested a mail in ballot for her.  And I
17 said, well, if she's just going to vote by mail, I might
18 as well do it too.
19   Q.   And did your wife vote by mail successfully in
20 2016 general election?
21   A.   Yes, yes.  Uh-huh.
22   Q.   And did you successfully vote by mail in the
23 2016 general election?
24   A.   Yes, I did.
25   Q.   Now, do you recall whether you or your wife

Page 16

1 attempted to vote by mail or voted by mail in the
2 election in 2018?
3    A.   Is that local election, 2018?
4    Q.   Well, those every two year elections --
5    A.   Like for senator and stuff?
6    Q.   It would include some statewide and national
7 places.  Like I believe that 2018 included the
8 senatorial election between --
9    A.   I can't --
10   Q.   -- Mr. O'Rourke and Mr. Cruz.
11   A.   Yeah.  I don't remember if we did or not.
12   Q.   Okay.
13   A.   If we did or not.  I can't remember.
14   Q.   All right.
15   A.   We might have, but I'm not sure.
16   Q.   Okay.  You don't have any recollection --
17   A.   No.
18   Q.   -- of any --
19   A.   But the presidential --
20   Q.   -- specifics regarding --
21        (Simultaneous cross-talk.)
22        (Reporter requests clarification.)
23   Q.   (By Mr. Bryant)  Okay.  Let me be sure that I
24 didn't mess up your answer.  The other thing I would
25 mention is, as we talk, we kind of have a normal

Page 17

1 conversation, and you all sometimes say uh-huh.  That
2 doesn't translate --
3    A.   Okay.
4    Q.   -- into a piece of paper very well.
5    A.   Yes.
6    Q.   So if you can say yes or no --
7    A.   Okay.
8    Q.   -- that will help everybody.
9    A.   Sure.
10   Q.   So is it correct that you don't have any
11 recollection regarding whether you or your wife voted in
12 2018?
13   A.   Yes.
14   Q.   Okay.  In the primary in 2020, did you vote by
15 mail?
16   A.   Yes.
17   Q.   Did you have any issues with getting your
18 ballot accepted?
19   A.   No.
20   Q.   Did your wife vote by mail?
21   A.   Yes.
22   Q.   Did she have any issues in getting her ballot
23 accepted?
24   A.   No.
25   Q.   Okay.  Let me ask you about the general



Roberto Benavides

March 30, 2023
Pages 18 to 21

Page 18

1 election in 2020.
2    A.   Okay.
3    Q.   Did you vote by mail in that election?
4    A.   Yes.
5    Q.   Did your wife vote by mail in that election?
6    A.   Yes.
7    Q.   Did either of you have any issues in getting
8 your ballots accepted?
9    A.   No.
10   Q.   Do you recall specifically what the procedure
11 was that you followed in voting by mail in 2020?
12   A.   Just verified the information on the envelope,
13 and signed the name on the outside of the envelope, and
14 mailed it in.
15   Q.   And did your wife, in the 2020 general
16 election, personally verify her ballot and envelope?
17   A.   Yes.  She had cancer, but she was fully -- she
18 knew everything that was going on.
19   Q.   Okay.  And so did she have a marked change
20 between '20 and '22 in her health condition I assume?
21   A.   Her physical health, but mentally, everything
22 was the same.
23   Q.   Did your wife vote or attempt to vote in the
24 2022 primary?
25   A.   She did vote.

Page 19

1    Q.   And did she vote by mail?
2    A.   Yes, she did.
3    Q.   Did she fill out her ballot in the accompanying
4 envelope?
5    A.   She did.
6    Q.   Did you vote in the 2022 primary by mail?
7    A.   I don't remember if I voted.  We're not too big
8 on primaries.  I don't remember.  I don't remember.
9    Q.   Okay.  Do you recall whether, in connection
10 with the 2022 primary, your wife provided some type
11 identification number with her ballot, or on her
12 envelope, or both?
13   A.   I don't remember my wife voting for the 2022
14 primary.
15   Q.   Let's ask about the voting that you and your
16 wife did in connection with the 2022 general election.
17 Did your wife vote in that election?
18   A.   Yes, she did.
19   Q.   Did she vote by mail?
20   A.   Yes.
21   Q.   Did she fill out her own ballot and envelope?
22   A.   Yes, she did.
23   Q.   Did she provide a driver's license, or social
24 security numbers, or some other type of identification
25 with her ballot and envelope?

Page 20

1    A.   All three.  The voter ID number, her last four
2 numbers of the social security number, and she doesn't
3 have a driver's license, but she put down her ID number.
4    Q.   And was her mail in ballot accepted without any
5 problems?
6    A.   Yes, it was.
7    Q.   Were -- strike that.  Was she aware of some
8 changes in the voting laws in Texas between 2020 and
9 2022 that related to how you do mail in balloting?
10        MS. WARMS:  Objection, form.  You can
11 answer the question if you know.
12   A.   No, we didn't do any research or anything like
13 that.  She wasn't aware, neither was I.
14   Q.   (By Mr. Bryant)  Okay.  So were you aware at
15 any time prior to November 2022 of any laws that had
16 changed in Texas relating to voting by mail?
17   A.   No.
18   Q.   How did you and your wife get your mail in
19 ballots in 2022?  And if you need to separate how you
20 did it versus how she did it, please feel free to do so.
21   A.   I think I went online and requested mailed in
22 ballots.
23   Q.   And did you request them for both you and your
24 wife?
25   A.   Yes, I did.

Page 21

1    Q.   Did you receive them?
2    A.   Yes, I did.  We did.
3    Q.   Approximately when in comparison to the actual
4 election day did you make that request?
5    A.   Sometime in September.  I didn't save any
6 paperwork so I can't give you exact dates, but --
7    Q.   Do you recall about how long it was after you
8 made the online application for you and your wife in
9 September 2022 that you actually received the ballot and
10 envelope?
11   A.   It was between a week and two weeks.
12   Q.   Okay.  What did you and your wife do next after
13 receiving that ballot and envelope in September or
14 October of 2022 to attempt to cast your ballots?
15   A.   We filled them out as soon as possible, because
16 it was getting close to the date.  So we went ahead
17 and -- you know, we sat the kitchen table, her on one
18 side, me on the other, and we filled them out and mailed
19 them back.
20   Q.   Okay.  And what's your best estimate as to how
21 long you did that before the election day, which I think
22 was November 8th?
23   A.   Probably around the first week of October or
24 somewhere in there.  I'm going to guess, I'm not sure,
25 you know.



Roberto Benavides

March 30, 2023
Pages 22 to 25

Page 22

1   Q.  Okay.
2   A.  I don't know.
3   Q.  And did you have any confusion or questions
4   when you filled out the mail in ballots?  And when I say
5   you, I mean you or your wife.
6   A.  No, we didn't have any problems.
7   Q.  Okay.  And did you -- you promptly mail in
8   those mail in ballots after you filled them out?
9   A.  Yes.
10  Q.  About how long would that time interval be
11  between when you filled them out and when you mailed
12  them in October of 2022?
13  A.  Same day or the next day.
14  Q.  Okay.  And when you prepared your mail in
15  ballot, did you provide some identification information
16  on the ballot and/or the envelope?
17  A.  Yes, we did.
18  Q.  And what information did you personally provide
19  related to your mail in ballot in October 2022?
20  A.  The voter ID number that you get with your
21  registration card, the driver's license number, and the
22  last four numbers of my social security card.
23  Q.  Okay.  And how long, approximately, had you had
24  that driver's license?
25  A.  For the last -- we moved here in '93, '94.  So

Page 23

1   almost going on 30 years.  29 years.
2   Q.  Had you ever had any other Texas driver's
3   licenses other than the one that you were using and
4   provided on your ballot or envelope in October 2022?
5   A.  No, that's the only license that I've ever had.
6   Q.  Prior to casting your mail in ballot, did you
7   contact, either directly or online, anybody connected
8   with the election process in Travis County?
9   A.  No, I did not.
10  Q.  When you cast your ballot, at least the first
11  time, did you feel that you understood the requirements
12  and had complied with them?
13  A.  Yes.
14  Q.  All right.  What's the next thing that you
15  heard after you and your wife mailed in your ballots
16  relating to those ballots?
17  A.  I'm not sure how long it was, maybe two weeks
18  later I received a notice in the mail that my ballot was
19  rejected because the driver's license number did not
20  match what they had on file and what my actual license
21  number is did not match.  So I requested a second
22  ballot.
23  Q.  When you received that notice, did you have or
24  try to have any conversations with anyone at Travis
25  County related to the election process?

Page 24

1   A.  No, because I thought at my age and everything,
2   it would be very simple for me to write maybe a three
3   instead of an eight or a five.  So I thought I probably
4   did something wrong, especially kind of stressed out and
5   stuff.  So I figured I must have wrote the wrong number,
6   so I'll just try again.
7   Q.  Okay.  And how did you request an additional
8   ballot?
9   A.  I'm not sure if I went online again or if I
10  called.  I can't remember.
11  Q.  This mail notice related to the mail ballot
12  that you received in October or November of 2022, did
13  that relate only to your ballot, or did your wife also
14  receive a notice related to her ballot?
15  A.  Only myself.  My wife had no problems at all.
16  Q.  And after you made a request for a second --
17  strike that.  When you received a notice relating to
18  your initial mail in ballot, did it provide any
19  information to you as to how to cure any problem that
20  might have existed?
21  A.  Not that I'm aware of.  Just a very simple --
22  just a checkmark that something didn't match, you know,
23  like this didn't match that, so -- according to their
24  records.  So that was pretty simple.
25  Q.  Okay.  I understand it provided the information

Page 25

1   as to what had caused them to initially reject the
2   ballot.  Did it provide any other information about what
3   options you had to get your ballot counted?
4   A.  If it did, I don't remember.
5   Q.  Is it fair to say that you made the decision
6   yourself that what you should do is request another
7   ballot?
8   A.  Yes.
9   Q.  Did you discuss that with anyone prior to the
10  time that you did it?
11  A.  No.
12  Q.  And did you receive a second ballot?
13  A.  I did.
14  Q.  Approximately when did you receive a second
15  mail in ballot in October or November of 2022?
16  A.  Sometime in October, maybe towards the middle
17  of October.  I'm not sure on the date.
18  Q.  Did you determine at any time whether the
19  initial rejection of your mail in ballot in connection
20  with the November 2022 election was because of a -- that
21  you had transposed one or more numbers in your driver's
22  license number, or whether the state had the wrong
23  driver's license number on record for you?
24  A.  I didn't know what the problem was.  All I knew
25  is that the numbers didn't match, so I thought I'd try



Roberto Benavides

March 30, 2023
Pages 26 to 29

Page 26

1  it again.
2      Q.  Okay.  And is that true today, that you don't
3  know?
4      A.  I do know now.
5      Q.  Okay.  Well, we'll get to that a little bit
6  later.
7      A.  Yes.
8      Q.  So once you received a second mail in ballot,
9  what did you do?
10      A.  Filled it out exactly the same, the same voter
11  ID number, license driver's number, same one that I
12  had because it's the one that's on my license, and the
13  last four numbers of my social security card.
14      Q.  Okay.  And did you check to make sure that you
15  had both your social security number and your driver's
16  license number written down exactly correctly?
17      A.  I checked extra carefully this time.
18      Q.  And once you completed your second mail in
19  ballot and the envelope, what did you do?
20      A.  Mailed it back as soon as I could.
21      Q.  Okay.  And when did you next hear anything
22  about your ballot after mailing in the second one?
23      A.  That was it, I thought it was all done.
24      Q.  Okay.  And so did there come a time when you
25  concluded or learned that your ballot had not been

Page 27

1  counted or cast?
2      A.  Yes, when Dana called me at home and she said
3  that there had been a problem with the ballot.
4      Q.  Approximately when was that?
5      A.  Two months ago.  Maybe two months ago, three, I
6  don't know.
7      Q.  And what other conversation did you have with
8  Dana at that time?
9      A.  I just told her I was not aware that there had
10  been problems.  I knew that I had voted twice, but I
11  didn't know that, you know, there was other problems.
12      Q.  Okay.  All right.  You mentioned that you
13  learned something about whether the initial rejection
14  was because of an error in your writing down one of your
15  numbers, or an error in the state database that
16  contained those numbers; is that correct?
17      A.  That's correct.
18      Q.  When did you learn of that problem?
19      A.  About three or four days ago.
20      Q.  Okay.  And what did you learn at that time?
21      A.  I called the voter's office, and the lady said
22  that their records show that my driver's license number
23  ends in a five, and my actual driver's license number
24  ends in a four.
25      Q.  Did you have any conversation with the election

Page 28

1  officials at any time relating to the numbers that you'd
2  provided for your social security number?
3      A.  No, not the social security.  She said
4  everything -- the social security number was okay, the
5  voter ID number was okay, my address is okay, it's just
6  a problem with the driver's license number, that was the
7  only problem.
8      Q.  Okay.  Do you know the name of the person that
9  you spoke to on that occasion?
10      A.  No, I don't.
11      Q.  How did you and that person get in touch with
12  each other?
13      A.  I was told to call voter -- the Travis County
14  voter office, or whatever they call it.
15      Q.  Who told you to do that?
16          MS. WARMS:  Objection, privileged.
17      Q.  (By Mr. Bryant)  Did one of your attorneys tell
18  you to do that?
19      A.  Yes.  Excuse me.  Because I wanted to find out
20  why it was rejected.
21          MR. DOLLING:  Mr. Benavides, we're going
22  to instruct you not to disclose the content of any of
23  the conversations that we have had with you.
24          THE WITNESS:  All right.
25          THE REPORTER:  Who's speaking?

Page 29

1          MR. DOLLING:  This is Zach Dolling for the
2  OCA plaintiffs and for the witness.
3      Q.  (By Mr. Bryant)  Have you ever heard of
4  something called ballot tracker?
5      A.  No.
6      Q.  Do you -- so is it fair to say that you have no
7  information about ballot tracker even as we sit here
8  today?
9      A.  No, I don't.
10      Q.  Do you have any information about any method by
11  which you could have checked on the status of your
12  ballot in the November 2022 general election?
13      A.  No.
14      Q.  Have you ever gone online to a website called
15  votetexas.org or Vote Texas?
16      A.  I might have, but -- you know.  Yes, I did, I
17  guess.  Yeah.
18      Q.  You did.  Approximately when did you do that?
19      A.  Probably, I don't know, before the election
20  maybe.
21      Q.  When you say before the election, are you
22  referring to before the November 2022 election?
23      A.  Right.
24      Q.  Do you have any recollection as to how many
25  times you went online to that website, Vote Texas?



Roberto Benavides

March 30, 2023
Pages 42 to 45

Page 42

1 whether any have occurred.  I'm not getting into the
2 content of them.  So you can answer that question.
3     A.   Yes.
4     Q.   And how many occasions?
5     A.   Once.
6     Q.   And was that in preparation for this
7 deposition, or on a different occasion?
8     A.   Preparation.
9     Q.   So this is the conversation that you mentioned
10 earlier that has occurred in the last two days?
11     A.   Yes.
12     Q.   Was that the first time that you met Dana, or
13 was she on the phone or otherwise not present?
14     A.   I had talked to her on the phone before, Dana.
15     Q.   And you met her in person for the first time?
16     A.   Yes.
17     Q.   When?
18     A.   The same day, two or three days ago.
19     Q.   Okay.  And was Dana present throughout that
20 deposition preparation meeting?
21     A.   Yes.
22     Q.   Did you ever consider voting in person in the
23 November 2022 general election, either early voting or
24 on election day itself?
25     A.   No, I did not.

Page 43

1     Q.   Is there any reason why that would not have
2 been possible?
3     A.   Taking care of my wife, I guess.  I didn't want
4 to leave her alone for too long of a time.
5     Q.   Well, is it correct that your wife passed away
6 several weeks before the election day?
7     A.   Correct.
8          MR. MIRZA:  Objection, form.
9     A.   I had already voted by mail.
10     Q.   (By Mr. Bryant)  Is there any reason why you
11 could not have either voted in person on election day or
12 voted in person in early voting sometime after your
13 wife's passing?
14          MR. MIRZA:  Objection, form.
15          MS. WARMS:  Objection, form.
16     A.   I had already voted by mail, so I didn't even
17 think about it.
18     Q.   (By Mr. Bryant)  Had you thought about it, is
19 there anything that would have prevented you?  Had you
20 known that your -- that there was some issue with your
21 ballot being counted, referring to your second mail in
22 ballot, is there any reason why you could not have cast
23 your ballot in person on election day, or in the week or
24 two prior thereto during the early voting period?
25          MS. WARMS:  Objection, form.  You can

Page 44

1 answer.
2     A.   I didn't think about it because I had voted by
3 mail the last three times, so I figured I'll just do it.
4     Q.   (By Mr. Bryant)  Okay.  My question was -- I
5 understand your thought process, why you didn't think it
6 was necessary, but my question is if you had known that
7 there was an issue with your mail in ballot, is there
8 any reason why you couldn't have cast a ballot in person
9 on election day or in the early voting period after your
10 wife passed?
11          MS. WARMS:  Objection, form.  You can
12 answer.
13     A.   I didn't think about it, I guess because I was
14 busy taking care of my wife and I didn't want to leave
15 her.  So that was the main thought in my head.  So
16 you're saying when I -- I should have just went and
17 voted in person?
18     Q.   (By Mr. Bryant)  My question is whether -- had
19 you known that you -- that your mail in ballot had not
20 been --
21     A.   I didn't know.
22     Q.   -- counted -- I understand that, but if you had
23 known, is there any reason why you couldn't have voted
24 in person on November 8th, 2022, election day?
25     A.   Because I didn't want to leave my wife alone.

Page 45

1     Q.   Your wife had passed already at that point,
2 right?
3          MS. WARMS:  Okay.
4     A.   Yeah, but I had already voted by mail.
5          MS. WARMS:  Objection, cumulative.
6          MR. BRYANT:  I'm trying to get an answer
7 to my actual question.
8          MS. WARMS:  He's answered your question.
9     Q.   (By Mr. Bryant)  Was there any physical
10 obstacle to your voting in person after your wife passed
11 in mid October 2022?
12     A.   I had already voted, so I didn't even consider
13 that.
14          MS. WARMS:  Objection, form.
15          MR. BRYANT:  Objection, nonresponsive.
16     Q.   (By Mr. Bryant)  During the period in September
17 and October of 2022 prior to your wife's passing, did --
18 were there times when your son looked after your wife
19 and you took care of other necessary tasks?
20     A.   Very shortly, just for a very small amount of
21 time.
22     Q.   And --
23     A.   Because she wanted me there.  There's things
24 that I can do that he couldn't do.
25     Q.   And did -- during that period, how did you take



Roberto Benavides                                    March 30, 2023
                                                     Pages 46 to 49

Page 46

1 care of the normal necessities of life, like getting
2 groceries and getting prescriptions and taking care of
3 normal day-to-day business?
4        MS. WARMS:  Objection, form.
5    A.  Hurried.  I went as fast as I could and got
6 back home.
7    Q.  (By Mr. Bryant)  And so you didn't rely on your
8 son for those types of tasks during that period in
9 September and October of 2022?
10   A.  No.
11   Q.  Were there periods when you were away from the
12 home an hour or more taking care of those types of tasks
13 in September or October of 2022?
14   A.  Very briefly.  I mean, like I says, I tried to
15 keep it as short as possible.  Wasn't gone very long.
16   Q.  But were there instances where it took an hour
17 or more for you to accomplish the task of being away
18 during that period?
19   A.  I can't remember of any instance.
20   Q.  Have you ever been a party to a lawsuit?
21   A.  No.
22   Q.  You testified earlier that one time in, at
23 least in September or October of 2022, you went online
24 to the Vote Texas website; is that right?
25   A.  That's correct.

Page 47

1    Q.  Did you see on that website an option for you
2 to track your ballot?
3    A.  No, or I don't remember seeing it.
4    Q.  Do you have any knowledge as to whether or not
5 you had the ability to track your ballot and find out
6 whether it had been accepted or not?
7        MS. WARMS:  Objection, form.  You can
8 answer if you know.
9    A.  I didn't try it.  I mean --
10   Q.  (By Mr. Bryant)  So you made a decision that
11 you were not going to try to track your ballot in
12 connection with the November 2022 election?
13   A.  I voted, and I thought that was it.  I was
14 done.
15   Q.  Okay.  And was there any particular reason why
16 you did not try to verify that your ballot had been
17 accepted?
18       MR. MIRZA:  Objection, form.
19       MS. WARMS:  Objection, form.  You can
20 answer.
21   A.  Was there any reason for me to think that --
22   Q.  (By Mr. Bryant)  Was there any reason why you
23 didn't try to verify at any point that your ballot had
24 been accepted?
25       MS. WARMS:  Objection, form.  You can

Page 48

1 answer.
2    A.  There's no reason.  I just -- like I said, I
3 voted and I trusted the system, and that was that.
4    Q.  (By Mr. Bryant)  As you sit here today, do you
5 know whether or not the ballot that you cast in the
6 November 2022 general election, the second mail in
7 ballot, was or was not accepted?
8    A.  It was not accepted.
9    Q.  And do you have any knowledge of that other
10 than from Dana?
11   A.  The only knowledge I have is from the voter
12 office, Travis County voter office.  I called them, and
13 they said it was not accepted because it was -- got too
14 late.
15   Q.  And that was a conversation that you had when?
16   A.  Three or four days ago.
17   Q.  Is that a different reason for rejection of the
18 ballot than Dana told you about in your first
19 conversation?
20       MS. WARMS:  Objection, form.  Sorry.  If
21 you can finish the question you originally were
22 answering, I interrupted you.
23   Q.  (By Mr. Bryant)  Okay.  My question was about
24 the initial conversation that you had with Dana alone.
25 Did she tell you that your vote had -- your mail in

Page 49

1 ballot in the November 2022 general election had been
2 rejected?
3    A.  No.
4    Q.  Did you ever receive information from Dana that
5 your mail in ballot in the November 2022 election had
6 been rejected?
7        MS. WARMS:  Objection, attorney/client
8 privilege.  I instruct you not to answer to the extent
9 that the content of your conversations with your
10 attorneys.
11   Q.  (By Mr. Bryant)  I'm not asking about any
12 content of conversations with your attorneys, I'm asking
13 about your conversation with Dana, who is not your
14 attorney.  Could you answer that question?
15   A.  What was the question again?
16   Q.  Okay.  Did you ever get information from Dana
17 as to a reason or reasons why your second mail in ballot
18 in the November 2022 election was not accepted?
19   A.  No.
20   Q.  During your initial conversation with Dana, did
21 Dana raise with you the issue of the driver's license
22 number discrepancy that we've discussed?
23   A.  No.
24   Q.  Did Dana raise with you during that
25 conversation any issue related to the timing of receipt



Roberto Benavides                                    March 30, 2023
                                                     Pages 50 to 53

Page 50

1 by the Travis County election authorities of your second
2 mail in ballot in connection with the November 2022
3 general election?
4    A.  No.
5    Q.  I believe you testified that you have voted in
6 person before in your -- when you lived at your current
7 address?
8    A.  Yes.
9    Q.  And so you know where you would go to vote in
10 person had you wished to do so, or if you wish to do so
11 in the future?
12        MS. WARMS:  Objection, form.  You can
13 answer.
14    A.  Yes, I know where it is.
15    Q.  (By Mr. Bryant)  Do you happen to know any of
16 the election officials at that polling place?
17    A.  No.
18    Q.  Have you ever had any trouble voting in person
19 when you wanted to vote in person?
20        MS. WARMS:  Objection, form.  You can
21 answer.
22    A.  No.
23    Q.  (By Mr. Bryant)  Have you ever served as a poll
24 worker or otherwise been involved in elections yourself?
25    A.  No.

Page 51

1    Q.  Do you have any plans to vote either by mail in
2 ballot or in person in future elections?
3        MS. WARMS:  Objection, form.  You can
4 answer.
5    A.  I don't know.  It all depends how I -- my
6 health.  I'm almost 76 years old, so.
7    Q.  (By Mr. Bryant)  In connection with the
8 November 2022 general election -- you may have testified
9 to this, I just don't remember the answer.  What is
10 the -- what's your best recollection of the date when
11 you mailed the second mail in ballot?
12    A.  Must have been like the middle of October
13 sometime, but I don't remember the exact date.
14    Q.  Okay.  How did you mail it?
15    A.  Just the local neighborhood mailbox.  We have
16 one of those big, you know, cluster boxes, and --
17    Q.  You put it in that neighborhood mailbox?
18    A.  Yes.
19    Q.  So as far as you know, was it properly
20 addressed and stamped?
21    A.  Yes.
22    Q.  And can you say that you mailed that second
23 mail in ballot prior to October 20th?
24    A.  I don't remember.
25    Q.  Is it possible that you mailed it a little bit

Page 52

1 later?
2        MS. WARMS:  Objection, form.  You can
3 answer.
4    A.  I don't remember if I did or not.  I don't have
5 the exact date.
6    Q.  (By Mr. Bryant)  Okay.  Well, you had raised
7 the issue that you received some information that it --
8 the second mail in ballot was not received until --
9    A.  October 28th.
10    Q.  Okay.  And did information that you received
11 from the Travis County election officials say that it
12 specifically was received on October 28th by them or
13 then, or sometime after that?
14    A.  By them, no.
15    Q.  Okay.  And so is it fair to say that you don't
16 know, you don't have any knowledge as to how long before
17 that October 28th date you mailed it --
18    A.  That's correct.
19    Q.  -- specifically?
20    A.  That's correct.
21    Q.  Okay.  If I understand your testimony also, it
22 is that you had no contact with any election official,
23 either by phone or in person, at any time during the
24 last half of 2022?
25    A.  That's correct.

Page 53

1    Q.  Did you understand in November of 2022 that you
2 had the option to hand deliver your second mail in
3 ballot to the Travis County election location?
4    A.  I did not.  I didn't know that.
5    Q.  Do you know anyone else, besides yourself,
6 whose mail in ballot was not counted in the November
7 2022 general election?
8    A.  I don't know of anybody else.
9    Q.  As you sit here today, do you have any
10 information about the voting law changes that were made
11 in Texas in 2021, sometimes referred to as SB1?
12    A.  No.
13    Q.  Mr. Benavides, are you a member of a political
14 party?
15    A.  Not -- no.
16    Q.  When you vote in the primaries, which primary
17 do you vote in?
18    A.  Democratic.
19    Q.  Has that always been the case?
20    A.  That's always the case.
21    Q.  Have you ever donated to political campaigns?
22    A.  No.
23    Q.  Have you ever worked for a political campaign?
24    A.  No, I haven't.
25    Q.  Have you ever donated to organizations that



EXHIBIT
106



# In The Matter Of

## La Union Del Pueblo Entero, et al.,

## Plaintiffs

## State Of Texas, et al.,

## Defendants

# CASE

## 5:21-cv-844

# Date

## 4-27-2022

# Witness

## Jonathan Sherman White

**ORIGINAL
TRANSCRIPT**

**National Court Reporters Inc.  ·  888.800.9656  ·
NationalCourtReporters.com
NCRNetwork@nationalcourtreporters.com**
Serving Legal Professionals From Coast To Coast and Internationally

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 1 (1 - 4)

1 (1 - 4)

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TEXAS
2            SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO      §
   ENTERO, ET AL.,          §
4        Plaintiffs,        §  Civil Action No.
                            §  5:21-cv-844 (XR)
5  VS.                      §  (Consolidated Cases)
                            §
6  STATE OF TEXAS, ET AL.   §
        Defendants.         §
7  *******************************************

8            ORAL DEPOSITION OF

9        JONATHAN SHERMAN WHITE

10           APRIL 27, 2022

11

12 *******************************************

13       ORAL DEPOSITION OF JONATHAN SHERMAN WHITE,

14 produced as a witness at the instance of the Plaintiffs

15 and Plaintiff-Intervenors, and duly sworn, was taken in

16 the above-styled and numbered cause on the 27th day of

17 April 2022, from 9:11 a.m. to 5:31 p.m., before Caroline

18 Chapman, CSR in and for the State of Texas, reported by

19 Computerized Stenotype Machine, Computer-Assisted

20 Transcription, held at the William P. Clements Jr. State

21 Office Building, 300 West 15th Street, Hearing Room

22 1001E, Austin, Texas, pursuant to the Federal Rules of

23 Civil Procedure.

24

25

**Page 2**

1            A P P E A R A N C E S

2  COUNSEL FOR THE PLAINTIFFS AND PLAINTIFF-INTERVENORS:
       RICHARD A. DELLHEIM
3      DANA PAIKOWSKY
       Attorneys, Voting Section
4      Civil Rights Division
       U.S. Department of Justice
5      950 Pennsylvania Avenue NW
       Washington, D.C. 20530
6      (202) 305-4355
       daniel.freeman@usdoj.gov
7      dana.paikowsky@usdoj.gov

8      JENNIFER J. YUN (via videoconference)
       Trial Attorney
9      Voting Section, Civil Rights Division
       U.S. Department of Justice
10     4 Constitution Square
       150 M Street NE
11     Washington, DC 20530
       (202) 307-2767 (202) 305-5533
12     jennifer.yun@usdoj.gov

13 COUNSEL FOR THE DEFENDANTS THE STATE OF TEXAS, ET AL.:
       ERIC HUDSON
14     Office of the Attorney General for the
       State of Texas
15     Special Litigation Division
       P.O. Box 125248, Capitol Station
16     Austin, Texas 78711-2548
       (512) 936-2266 Fax: (512) 457-2548
17     eric.hudson@oag.texas.org

18 COUNSEL FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND
   EDUCATIONAL FUND (MALDEF):
19     NINA PERALES
       Vice President of Litigation
20     Mexican American Legal Defense and
       Educational Fund, Inc. (MALDEF)
21     JULIA LONGORIA (via videoconference)
       Staff Attorney at MALDEF
22     110 Broadway, Suite 300
       San Antonio, TX  78201
23     210) 845-5147 Fax:  (210) 224-5382
       nperales@maldef.org

24
       - and -
25

**Page 3**

1     A P P E A R A N C E S (CONTINUED)

2      KATIE M. FRIEL (via videoconference)
       Fellow, Voting Rights & Elections
3      Brennan Center for Justice at NYU School of Law
       120 Broadway,  Suite 1750
4      New York, NY 10271
       (646) 292-8310 Fax:  (212) 463-7308
5      freilk@brennan.law.nyu.edu

6  COUNSEL FOR THE LUPE PLAINTIFFS:
       ELIZA SWEREN-BECKER (via videoconference)
7      Counsel, Voting Rights & Elections Program
       Brennan Center for Justice at NYU School of Law
8      120 Broadway, Suite 1750
       New York, NY 10271-202
9      (646) 925-8765 Fax: (917) 597-9040
       Eliza.sweren-becker@nyu.edu

10 COUNSEL FOR MI FAMILIA VOTA PLAINTIFFS:
11     LAURA E. ROSENBAUM (via videoconference)
       STOEL RIVES, LLP
12     760 SW Ninth Avenue, Suite 3000
       Portland, OR 97205
13     (503) 294-9642
       Laura.rosenbaum@stoel.com

14 COUNSEL FOR DEFENDANT TRAVIS COUNTY CLERK REBECCA
15 GUERRERO AND DISTRICT ATTORNEY JOSE P. GARZA:
       ANTHONY "TONY" NELSON (via videoconference)
16     Civil Litigation Division of the Travis County
       Attorney's Office
17     P.O. Box 1748
       Austin, TX 78767-1748
18     (512) 854-9513 Fax: (512) 854-4808
       tony.nelson@traviscountytx.gov

19 COUNSEL FOR YVONNE RAMÓN ELECTIONS ADMINISTRATORS OF
20 HIDALGO COUNTY:
       LEIGH ANN LEAVELL TOGNETTI (via videoconference)
21     Hidalgo County District Attorney's Office
       100 East Cano, Courthouse Annex III, 1st Floor
22     Edinburg, TX 78539
       (956) 292-7609 EXT 8182
23     Leigh.tognetti@da.co.hidalgo.tx.us

24
25

**Page 4**

1     A P P E A R A N C E S (CONTINUED)

2  COUNSEL FOR THE HIDALGO COUNTY DISTRICT ATTORNEY'S
   OFFICE:
3      VICTOR M. GARZA (via videoconference)
       Chief Administrative Attorney
4      Civil Division-Assistant District Attorney
       Office of the Criminal District Attorney
5      Hidalgo County, Texas
       100 East Cano Street
6      Edinburg, TX 78539
       (956) 292-7609 EXT. 8185
7      Fax: (956) 292-7619
       victor.garza@da.co.hidalgo.tx.us

8  COUNSEL FOR OCA-GREATER HOUSTON PLAINTIFFS:
9      ZACHARY "ZACH" DOLLING (via videoconference)
       STAFF ATTORNEY
10     TEXAS CIVIL RIGHTS PROJECT
       P.O. Box 17757
11     Austin TX 78760
       (512) 496-4746
12     zachary@texascivilrightsproject.org

13 COUNSEL FOR REVUP:
       LUCIA IRENE ROMANO-OSTROM (via videoconference)
14     Supervising Attorney
       Disability Rights Texas
15     1500 McGowen Street, Suite 100
       Houston, TX 77004-1153
16     (832) 681-8210
       lromano@disabilityrightstx.org

17 COUNSEL FOR ISABEL LONGORIA WITH THE HARRIS COUNTY
   ATTORNEY'S OFFICE:
18     SUSANNAH MITCHAM (via videoconference)
19     ASSISTANT COUNTY ATTORNEY
       Office of the Harris County Attorney
20     1019 Congress, 15th Floor
       Houston, TX 77002
21     (713) 274-5334
       Susannah.Mitcham@cao.hctx.net

22
23
24
25

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

1 (1 - 4) Jonathan Sherman White

**Page: 1 (1 - 4)**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 2 (5 - 8)

2 (5 - 8)

Page 5

```
 1              A P P E A R A N C E S  (CONTINUED)
 2   COUNSEL FOR MICHAEL SCARPELLO ELECTIONS ADMINISTRATOR
     FOR DALLAS COUNTY:
 3        BENJAMIN LAURENCE "BEN" STOOL (videoconference)
          Criminal District Attorney's Office
 4        Dallas County, Texas
          500 Elm Street, Suite 6300
 5        Dallas, TX 75202-3371
          (214) 653-6243
 6        Ben.Stool@dallascounty.org
 7   Also present:  Joanna Howe, Reed Smith Law Clerk
                    (via videoconference)
 8        jhowe@reedsmith.com
 9        Lauren Putnam (via videoconference)
          Michael Garza (via videoconference)
10        Marina Eisner (via videoconference)
          Julia Longoria (via videoconference)
11        Breanna Williams (via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1              I N D E X
 2   Appearances  . . . . . . . . .    2
 3   JONATHAN SHERMAN WHITE
                                  PAGE
 4   Examination by Ms. Paikowsky . . . . .      7
 5   Examination by Ms. Perales . . . . . 113
     Examination by Ms. Rosenbaum . . . . 227
 6   Signature and Changes . . . . . . . 234
     Reporter's Certificate  . . . . . . 236
 7
 8              E X H I B I T S
 9   NO. DESCRIPTION                     PAGE
10   Exhibit 1   Office of the Attorney General of   18
                 Texas Election Fraud Violations,
11               Prosecutions Resolved
     Exhibit 2   V.T.C.A. Election Code,             26
12               Section 64.034 Oath, Effective
                 December 2, 2021, Currentness
13   Exhibit 3   V.T.C.A. Election Code,             30
                 Section 64.034 Oath, Effective
14               September 1, 2013 to December 1,
                 2021
15   Exhibit 4   V.T.C.A. Election Code,             77
                 Section 276.013 Election Fraud,
16               Effective December 2, 2021
     Exhibit 5   Election Integrity, State054622     90
17               through State054677
     Exhibit 6   Office of the Attorney General     104
18               Election Fraud Violations,
                 Prosecutions Resolved
19               State087323 through State087339
     Exhibit 7   Legislative Budget Board, Austin,  109
20               Texas, Criminal Justice Impact
                 Statement, 87th Legislature 1st
21               Called Session 2021, July 9, 2021
     Exhibit 8   Senate Bill 1                      114
22   Exhibit 9   V.T.C.A. Election Code,            181
                 Section 64.036 Unlawful
23               Assistance, Effective
                 September 1, 2005, Currentness
24
25
```

Page 7

```
 1            JONATHAN SHERMAN WHITE
 2   having been first duly sworn, testified as follows:
 3                  EXAMINATION
 4   BY MS. PAIKOWSKY:
 5      Q.  So good morning, Mr. White.
 6      A.  Good morning.
 7      Q.  My name is Dana Paikowsky.  I'm from the
 8   Department of Justice.  And I wanted to thank you for
 9   joining us this morning.  At this time, if anybody has a
10   cell phone, I'd ask that they silence it before we
11   proceed.
12          Again, I would also like to note for the
13   record that although the Zoom link is being recorded and
14   projected, it's just for the purpose of facilitating
15   remote access, and we have stipulated with counsel that
16   we will not be using this video at trial.
17          So, first thing, I would like you to
18   please state your name and spell it for the record.
19      A.  Jonathan White.  J-O-N-A-T-H-A-N, W-H-I-T-E.
20      Q.  Uh.
21      A.  Middle initial is S.
22      Q.  Thank you so much, Mr. White.
23      A.  Uh-huh.
24      Q.  So before we do anything else, I want to make
25   sure that we're set up for a smooth deposition.  Have
```

Page 8

```
 1   you ever been deposed before?
 2      A.  No, ma'am.
 3      Q.  Well, as you may already know, this process
 4   works best if you wait to start your answer until I have
 5   completely finished the question.  Is that something we
 6   can agree to?
 7      A.  Yes, ma'am.
 8      Q.  Also, the court reporter cannot indicate in her
 9   notes nods and other gestures, including "Uh-huhs" and
10   "Huh-uhs," so every answer should be verbal.  Is that
11   okay?
12      A.  Correct.
13      Q.  Thank you.
14          Also, an attorney may object to a
15   question, after which you can still answer unless they
16   specifically instruct you not to.  Do you understand?
17      A.  Yes.
18      Q.  Can you also agree that if you don't understand
19   a question or need clarification, you will let me know?
20      A.  Yes.
21      Q.  Can we assume that you understood a question if
22   you answer without asking for clarification?
23      A.  That sounds fair.
24      Q.  Is there any reason you're aware of that your
25   memory and ability to answer questions would be impaired
```

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

2 (5 - 8) Jonathan Sherman White

**Page: 2 (5 - 8)**

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 234 of 238

5:21-cv-844 (XR)                    Entero v Texas                    Jonathan Sherman White 22 (85 - 88)
4/27/2022            NATIONAL COURT REPORTERS INC 888.800.9656              22 (85 - 88)

Page 85

1  identifying information, or an identifier such as a DL
2  or the last four of the social.  That could be an
3  obstacle to a vote harvesting crew that wishes to bypass
4  the voter.
5          And then, as I already stated, it could
6  also be an obstacle to gaining the voter's compliance,
7  because here's a stranger asking for my DL number so
8  that they can complete these documents on my behalf or
9  submit this, you know, carrier envelope on my behalf, so
10  it -- by putting the control of the interaction more in
11  the voter's hands because those are -- those are numbers
12  that the voter has access to that the harvester is less
13  likely to have access to, I think it promotes security
14  in that fashion.
15      Q.  So if I, moving forward, refer to the activity
16  you described of collecting as many absentee ballots and
17  collecting and submitting ballots by mail as illegal
18  vote harvesting, will you understand what I'm referring
19  to?
20      A.  Sure.  And if for some reason that definition
21  needs clarifying, then I'll bring it up at that time.
22      Q.  You mentioned that SB1's mail ballot
23  identification requirements would be more effective in
24  preventing some vote harvesting more so than others.
25  Are there instances you can think of where SB1's mail

Page 86

1  ballot identification requirements would not be
2  effective in deterring vote harvesting?
3      A.  The primary scenario I can think of is where a
4  vote harvesting crew already has enough information
5  about the voters that they possess those identifying
6  numbers that have to be provided.
7      Q.  Do you believe that SB1's mail ballot
8  identification requirements would be effective in
9  preventing vote harvesting if a defendant filled out
10  either the voter's application or mail ballot in the
11  presence of that voter?
12          MR. HUDSON:  Objection, form, foundation.
13  Objection, incomplete hypothetical.
14      A.  If I understand the question, I think that
15  the -- the piece that I mentioned earlier, where the
16  voter could be put off by a harvester requesting that
17  information from the voter, that could reduce the
18  likelihood of a successful vote harvesting transaction.
19  I think that would be my answer.
20      Q.  And can you think of situations where a
21  perpetrator might be able to obtain an ID from the
22  person they're seeking to harvest a ballot from?
23          MR. HUDSON:  Objection, incomplete
24  hypothetical.  Objection, foundation.
25      A.  An ID number or an actual -- actual

Page 87

1  identification document.  They could just ask for it,
2  and if the voter was inclined to provide it or show it
3  to them because they had that level of trust somehow
4  with a stranger or -- or a harvester maybe that they've
5  known from previous election cycles, that's possible.
6      Q.  Uh-huh.
7          Do you have any personal knowledge of the
8  operative underlying facts of a case that was positively
9  resolved, so the spreadsheet we've been working on,
10  where the defendant who engaged in voter -- in a vote
11  harvesting crime filled out the voter's ballot or
12  absentee ballot by mail request in the voter's presence?
13      A.  Sure.  Although I would say, because this --
14  this isn't the most up-to-date document.  Some of the
15  most recent cases are the ones that are immediately
16  popping into my mind and they're not on this document
17  yet, but they have been resolved.
18      Q.  They have been resolved?
19      A.  And there may be ones on here as well that I
20  would have to take a look at, but most of these cases
21  focus on the -- on the -- kind of the harvesting side of
22  the process rather than the seeding or the application
23  side of the process, from what I looked through.
24  Actually, you know, I was flagging the ones that were --
25  that were unlawful assistance interactions, and so we

Page 88

1  probably do have some application fraud situations here.
2  But a majority -- I would say a majority of the
3  application violation cases do involve completing an
4  application in the presence of the voter.
5      Q.  The majority involve completing an application
6  in the presence of the voter?
7      A.  Most of it happens in the presence of the
8  voter.  And I think the reason for that is because
9  eventually they have to go back to the voter for the
10  ballot, and so it's helpful to have that prior
11  interaction with the voter.  It's helpful to get -- it's
12  easy to get an actual signature from the voter for an
13  application, because I'm just helping you get a mail
14  ballot.
15      Q.  Right.
16      A.  Now, when you go to the mail ballot, that's
17  where the skill comes in.
18      Q.  So in most of these vote harvesting schemes,
19  the harvesters are trying to build some relationship
20  with the people they're targeting?
21      A.  I would say they're trying to -- trying to
22  establish some level of trust or confidence with that --
23  with that voter.  If they're doing it well, they are.
24      Q.  And in those instances, is it possible that
25  they could ask the voter for their identification number

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 235 of 238

5:21-cv-844 (XR)
4/27/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 23 (89 - 92)

23 (89 - 92)

Page 89

1 or have the voter fill out their own identification
2 number?
3    A.  That's right.  Absolutely.
4       MS. PAIKOWSKY:  If it's okay, can I take a
5 five-minute break?
6    A.  Sure.
7       MR. HUDSON:  No objection.
8       (Lunch recess.)
9    Q.  (By Ms. Paikowsky)  Mr. White, I'm going to go
10 back to asking questions about SB1's mail ballot
11 identification provisions.  Without SB1's mail ballot
12 identification provisions, would your office have other
13 means of detecting vote harvesting?
14       MR. HUDSON:  Object to the extent that
15 that would encroach on investigator privilege, and
16 remind you of the stipulation concerning the running
17 objection.  Just instruct the witness, to the extent
18 that that would encroach on methods of investigation or
19 practices, I'll instruct you not to answer.
20    A.  Yeah.  Without going into our mental
21 impressions and our investigative practices, I guess I
22 could say we have prosecuted vote harvesting cases in
23 the past.
24    Q.  And this, again, is not seeking specific
25 information about any investigation, but do you have --

Page 90

1 does your office have methods by which you would detect
2 potential illegal vote harvesting?
3       MR. HUDSON:  Same objections.
4    A.  We have --
5       MR. HUDSON:  Same instruction.
6    A.  We have other methods.
7    Q.  All right.  I'm going to show you a document
8 that we can mark Exhibit 5.
9       (Exhibit 5 marked.)
10       MS. PERALES:  What are you marking?  You
11 tell me.  This is 5?
12       MS. PAIKOWSKY:  This is 5.
13    Q.  (By Ms. Paikowsky)  Do you recognize this
14 document?  Sorry, and I should say this is marked
15 State -- Bates No. State 05462.
16    A.  Yes, I believe I do.
17    Q.  And what is this document?
18    A.  It is a PowerPoint file including some
19 information about election integrity at the Attorney
20 General's Office.
21    Q.  Who created this PowerPoint?
22    A.  I guess a collaboration involving myself and
23 some other members of our team, I'm not sure exactly
24 who.
25    Q.  What has the slide show been used for?

Page 91

1    A.  This specific version, I'm not 100 percent
2 sure, but -- I couldn't say for sure.
3    Q.  What are instances where you presented some
4 version of this slide show?
5    A.  The one I recall is -- would be the Secretary
6 of State's annual elections conference for elections
7 administrators.
8    Q.  And in that conference, who are you presenting
9 this slide show to?
10    A.  Elections officials.
11    Q.  What is the purpose of giving this presentation
12 to election officials?
13    A.  To inform them about election integrity efforts
14 and enforcement and to give them some information on
15 what they can look for in terms of detecting election
16 fraud and how to report it.
17    Q.  If you wouldn't mind turning to Bates
18 No. 054641.
19    A.  Okay.
20    Q.  Can you describe this slide?
21    A.  So this slide is intended to show some examples
22 or representations of examples of mail ballot
23 application activity that might be associated with --
24 with fraud or vote harvesting operations.
25    Q.  Does this slide show tools that your office

Page 92

1 uses to detect vote harvesting and impersonations?
2    A.  The intent was to show elections administrators
3 items that they might detect, and if looking -- if
4 looked into further might find evidence of fraud that
5 they would report to our office.
6    Q.  So is it fair to say that the examples you see
7 here might give your office or others cause to
8 investigate potential absentee ballot by mail fraud?
9    A.  They might if we received a complaint with this
10 type of information inside of it.
11    Q.  Have there been instances -- again, not going
12 into privileged information about any specific
13 investigation -- have there been instances in the past
14 where you office has received a complaint that includes
15 an example that you -- similar to those that you've
16 provided here to detect a vote harvesting?
17    A.  Yes.
18    Q.  To your knowledge, will your office continue to
19 rely on this tool to detect vote harvesting?
20    A.  We'll continue to rely on complaints that have
21 credible information about election fraud.
22    Q.  And the kinds of evidence that you might
23 consider credible evidence warranting an investigation
24 would be -- would include what's provided on this slide
25 show?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

23 (89 - 92) Jonathan Sherman White

Page: 23 (89 - 92)

Case 5:21-cv-00844-XR   Document 609-11   Filed 05/26/23   Page 236 of 238

5:21-cv-844 (XR)
4/27/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 24 (93 - 96)

24 (93 - 96)

Page 93

1  A.  If -- if some of these were submitted to us
2  with other facts, then, yes, that could -- that could
3  spark an investigation.
4  Q.  Okay.  I'm going to have us turn to the next
5  page, State 054642.  Can you describe the purpose of
6  this slide?
7  A.  This slide is an example of handwriting that
8  appears to come from one individual indicating that
9  applications for mail ballots were filled out by a
10  single person, which would indicate organized vote
11  harvesting activity.
12  Q.  So is seeking out examples like this of similar
13  handwriting a tool that your office can use to detect
14  vote harvesting?
15  A.  If we receive a complaint with that
16  information, then, yes.
17  Q.  Has your office used this tool to detect vote
18  harvesting before when you received complaints that
19  include evidence showing similar handwriting?
20  THE REPORTER:  I'm sorry.  Include?
21  MS. PAIKOWSKY:  Similar handwriting.
22  A.  We've seen examples of similar handwriting come
23  to us in the form of a complaint.
24  Q.  And has your office --
25  A.  We would investigate that.

Page 94

1  Q.  You would investigate that.  In order to detect
2  vote harvesting?
3  A.  Yeah.  To some extent the detection has already
4  been done when we receive the complaint, so we don't
5  actively detect vote harvesting or use this in some way
6  to detect vote harvesting in general.
7  Q.  So it would be used as a way to potentially
8  build a case substantiating a claim of vote harvesting?
9  A.  I think I would agree with that.
10  Q.  Has your office used this kind of evidence
11  successfully to detect or substantiate a claim of vote
12  harvesting in the past?
13  A.  I think I would say that we have received
14  information like this and we would act upon it.
15  Q.  To your knowledge, would your office continue
16  to rely on this kind of evidence or tool to detect and
17  substantiate allegations of vote harvesting?
18  A.  Sure.  With the caveat of us not really using
19  this to actively detect and screen for vote harvesting.
20  Q.  All right.  I'm going to ask that we turn to
21  the next page, which is State 054643.  And again, could
22  you describe what the purpose of this slide is?
23  A.  So the purpose of this slide is just to
24  illustrate that if you have a different signature on an
25  application than you have on a carrier envelope, then

Page 95

1  that would be an obvious indication of potential fraud,
2  and that would be one of the tools that could be used by
3  elections administrators to detect fraud, which they
4  could then report for investigation.
5  Q.  And is this -- so -- withdrawn.
6  Is this a tool your office recommends
7  election officials use to detect vote harvesting?
8  A.  We have presented this as information that they
9  could use to detect suspicious behavior and report it
10  for investigation, yes.
11  Q.  And does your office use evidence of a similar
12  kind of mismatched signatures to substantiate
13  allegations of vote harvesting?
14  A.  That would be one way that -- that we could
15  potentially substantiate a particular type of illegal
16  activity.
17  Q.  Have you -- and is that illegal activity --
18  could that illegal activity include vote harvesting?
19  A.  Correct.
20  Q.  Has your office in the past used this kind of
21  evidence showing mismatched signatures to substantiate
22  allegations of vote harvesting?
23  A.  We have.
24  Q.  To your knowledge, will your office continue to
25  rely on this tool to detect and substantiate vote

Page 96

1  harvesting in the future?
2  A.  Sure.
3  Q.  All right.  Let me turn to the next slide.
4  This is State 054644.  Mr. White, would you mind
5  describing what the purpose of this slide is?
6  A.  Yes.  This would be an example of a
7  potential -- potentially fraudulent signature from a
8  voter that would be electronic in nature, or that could
9  have been captured from an electronic device and printed
10  out on an application without the voter's knowledge.
11  Q.  Is this a tool that your office recommends
12  officials use to detect potential vote harvesting
13  violations?
14  A.  If an elections administrator were to see this
15  type of signature on a document it would -- we would
16  recommend they take a look at it, and, if warranted,
17  refer that to us for investigation.
18  Q.  And would your office use this kind of evidence
19  to substantiate vote harvesting?
20  A.  The method is probably somewhat outdated, but
21  if we saw this, we would -- we would take a look at it
22  for sure.
23  Q.  Have you ever used this kind of evidence of
24  electronic signatures to substantiate vote harvesting
25  cases in the past?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

24 (93 - 96) Jonathan Sherman White

Page: 24 (93 - 96)

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 54 (213 - 216)

54 (213 - 216)

Page 213

1  or some other polling place, and without respect to
2  whether the food is being offered as an inducement to
3  vote, but just having a barbecue set up, chicken plates
4  on the lawn of the county courthouse, outside the
5  electioneering zone does not violate Texas law, right?
6          MR. HUDSON:  Objection, form, incomplete
7  hypothetical.  Objection, asked and answered.
8  Objection, foundation.  Go ahead.
9      A.   I -- yeah, I mean, I might miss something, but,
10 you know, absent -- absent some facts that actually
11 indicate an offense under the Election Code or some
12 other code, no, I mean people can gather and have food.
13     Q.   And you mentioned that the chicken plate is a
14 phenomenon of South Texas.  Is that what you've heard?
15     A.   That's what I've heard.
16     Q.   Are you aware that campaigns set up barbecues
17 and tents and lawn chairs and hand out food to people in
18 other parts of Texas besides South Texas?
19     A.   That wouldn't surprise me to hear that.  I just
20 haven't heard a lot of those stories.
21     Q.   What percent of the cases that you have
22 prosecuted of voter assistance fraud have involved Anglo
23 defendants versus non Anglo defendants?
24     A.   No idea.
25     Q.   Have you ever seen an instance where a voter

Page 214

1  cast a ballot for a family member who was ineligible
2  because the family member was dead?
3      A.   I'm trying to think of whether I have any of
4  those cases on the resolved prosecutions spreadsheet.
5  But I -- I could say I have seen that scenario, but I
6  would be limited to talking about the facts of those
7  scenarios unless they've been resolved prosecutions.
8      Q.   Would the answer be the same if I asked you if
9  you've ever seen instances where a voter cast the ballot
10 for a family member who was ineligible because the
11 family member was no longer a resident of the
12 jurisdiction?
13     A.   We've had lots of residency cases, but I don't
14 remember one where a vote was cast for a family member.
15     Q.   You've never seen, for example, parents vote a
16 mail ballot for a child who's in college but that child
17 is already gone and voting on their own wherever they
18 went?
19     A.   I don't recall the fact of the family member
20 voting another family member's ballot who had, you know,
21 vacated the residency or moved their residency.
22     Q.   Can you give me any other examples of a voter
23 casting a ballot for another voter who is ineligible
24 either because of felony convictions, deceased, absent,
25 no longer a resident?  Any other examples of people

Page 215

1  voting for other people, basically?
2      A.   Sure.  Well, the one that comes to mind
3  immediately is the one associated with the victim's
4  assistance coordinator of Omar Escobar, whose vote
5  harvesting operation caught up a deceased voter who had
6  been -- who had passed away nine years earlier, and
7  applied for a mail ballot for that voter, and that mail
8  ballot got voted.  The issue in the case was actually
9  pending that offense to the specific person, and we
10 ultimately did not obtain that conviction against
11 Ms. Garza in that case.
12     Q.   Did you charge her?  Did you go to court?
13     A.   We did.
14     Q.   Was she acquitted?
15     A.   No.
16     Q.   The charges were dropped?
17     A.   The charges were dropped.
18     Q.   Okay.  Do you have any sense of the relative
19 proportion of fraud that occurs by family members voting
20 for other family members versus one of these vote
21 harvesting operations that you've identified in your
22 chart?
23     A.   I have a very general sense of it based on just
24 a cumulative 14 years of dealing with cases.
25     Q.   And what is your sense?

Page 216

1      A.   The exception to the rule.
2      Q.   What would be fair to say, also, though, that
3  you are less likely to learn of an instance in which a
4  family member votes for another family member because
5  it's isolated and there are fewer people to report it?
6      A.   I would say we're probably equally likely to
7  learn of it if the voter is deceased, for example,
8  because there are ways that gets flagged by the system.
9  If it's a -- we might -- anytime a voter is aware that
10 their ballot has been taken and voted against their will
11 or they show up to vote in person to vote but they're
12 told, "No, you've already voted by mail," or something
13 like that, it's fairly likely that that could get
14 reported.
15         So I think I agree with the premise that
16 it is probably more likely in a number of situations for
17 a vote harvesting operation to be reported than a family
18 member.  It's also not across the board, and there are
19 other factors in a vote harvesting operation that make
20 it extremely unlikely for those offenses to be reported,
21 as well, such as the fact that if it's done correctly,
22 vote harvesting is invisible to the voter.  "Someone
23 stopped by to help me with my ballot," and as far as the
24 voter knows, they voted exactly the way the voter wanted
25 them to vote, because I asked you, "Who would you like

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

54 (213 - 216) Jonathan Sherman White

**Page: 54 (213 - 216)**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 55 (217 - 220)

55 (217 - 220)

Page 217

1 to vote for for this race?"  And I may or may not
2 mention the down ballot races, which I fill in for the
3 people that I'm actually working for, because I don't
4 care about who's up ballot when I'm vote harvesting.  I
5 care about local elections that I'm getting paid for.
6         So, you know, done properly, vote
7 harvesting is invisible to the voter, and unless there's
8 a situation where something has been just completely --
9 you know, without the voter's knowledge or consent,
10 there has been an application for a mail ballot and they
11 are planning on voting in person and find out that,
12 "Wait a second.  No, I already voted by mail?  No, I
13 don't."  That's going to get reported a lot of the time,
14 you know.  So I agree and -- and would disagree or
15 distinguish --
16     Q.  Uh-huh.
17     A.  -- on other grounds.
18     Q.  Is it also the case that if a voter assister, a
19 mail ballot voter assister is doing everything the way
20 that they are supposed to do, that the experience is
21 similarly seamless for the voter, who understands that
22 the assister is filling out according to their wishes
23 and helping them with the ballot and in a completely
24 appropriate way.  The voter would similarly have a
25 seamless and non-troubling experience with that?

Page 218

1     A.  Yeah.  And I would say it's more likely that
2 the voter would have a bad experience when the vote
3 harvester is doing the wrong thing, but, yeah, I think
4 that that's the challenging -- that's the challenge of
5 investigating mail ballot fraud and proving it after the
6 fact, is that, done correctly, it may look to the voter
7 just like it's done appropriately.
8     Q.  I'm going to ask you no more questions about
9 your testimony.
10         Is it -- is it your contention that when
11 you are advising a legislator during the legislative
12 process about facts related to voter fraud, that you
13 have an attorney-client relationship with the
14 legislator?
15         MR. HUDSON:  I'm going to object to the
16 extent that that would encourage attorney-client
17 privilege between me and my client, or attorney work
18 product, or legislative privilege.  To the extent that
19 you can answer that without revealing any
20 attorney-client privilege or any other privileges,
21 you're free to do so.  Otherwise, I'm instructing you
22 not to answer.
23     A.  I don't know that I can.
24         THE REPORTER:  Can we take a short break?
25         (Brief recess.)

Page 219

1         MS. PERALES:  Yes.
2     Q.  Okay.  We're back on the record.  I was -- and
3 I'm also checking -- okay.  I was asking you some
4 questions about the attorney-client relationship.
5         Look, it's the end.  You can see right
6 here, there's nothing -- there's nothing down below,
7 so --
8         MR. HUDSON:  You can't sweet talk him into
9 answering your question.
10         THE WITNESS:  That's exciting.
11         MR. HUDSON:  For purposes of the record,
12 we're all laughing.  I know this isn't being recorded,
13 but I want to make it very clear that we're all
14 chuckling about that one.
15         MS. PERALES:  Yes, it's all in good humor.
16 And I've been foiled by Mr. Hudson and my charm
17 offensive.
18     Q.  (By Ms. Perales)  So I do have some questions
19 for you about the attorney-client privilege, which is,
20 is there a difference, in your mind, in terms of whether
21 you've formed an attorney-client relationship with a
22 legislator or whether you are giving fact information --
23 for example, like the number of prosecutions or what a
24 prosecution was about -- versus advising them on
25 something like the interpretation of statutory language?

Page 220

1 Do you draw a distinction there at all?
2         MR. HUDSON:  I'm going to object.  That's
3 an improper contention.  Mr. White is here as a fact
4 witness, not to give legal opinions about
5 attorney-client, attorney work product.  We also have a
6 stipulation on the record.  With that, I'll instruct you
7 not to answer to the extent that your answer would
8 encroach on any stipulated privileges.  To the extent
9 that you can answer, you're free to do so.
10     A.  I don't -- I don't know that I can.
11     Q.  Okay.  Well, that was -- that is me kind of
12 getting closer to what I really want to ask you about,
13 which is discussions that you've had with legislators
14 that you consider not privileged by the attorney-client
15 privilege.  Not every discussion you've ever had with a
16 legislator can be understood to be attorney-client
17 privileged.  Would you agree with me on that?
18     A.  Certainly not questions that I was asked at a
19 legislative committee hearing.  Things like that would
20 be -- would be covered, I would agree.
21     Q.  So for the purpose of the record, are you
22 asserting that any private conversation you would have
23 had with a legislator, regardless of the content, would
24 be privileged as attorney-client privilege?
25         MR. HUDSON:  Same objections.

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

55 (217 - 220) Jonathan Sherman White

**Page: 55 (217 - 220)**