**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | |
| v. | 5:21-cv-844-XR |
| GREGORY W. ABBOTT, et al., | |
| *Defendants.* | |
| OCA-GREATER HOUSTON, et al., | |
| *Plaintiffs,* | |
| v. | 1:21-cv-0780-XR |
| JANE NELSON, et al., | |
| *Defendants.* | |

**PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF
TEXAS, AND REVUP-TEXAS'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ...................................................................................... 1

II.  STATEMENT OF UNDISPUTED FACTS ................................................................... 2

   A.   Voting by mail in Texas before SB 1 was safe and secure. ................................... 2

   B.   SB 1 requires voters to write a number on their mail-ballot paperwork that can be
successfully matched to a number in the voter registration database. ........................ 4

   C.   The database used for SB 1's matching-number requirement is riddled with errors.......... 8

   D.   SB 1's matching-number requirement predictably disenfranchises approximately 40,000
Texas voters over the course of 2022. ..................................................................... 14

   E.   SB 1's notice-and-cure process fails to stop mass disenfranchisement........................... 18

     i.   The notice-and-cure processes failed for a number of reasons. ..................................... 19

   F.   The record is full of stories from voters exemplifying the problems identified above..... 24

   G.   The parties in this case. ......................................................................................... 26

     i.   Plaintiffs .................................................................................................................. 26

        a.   The League of Women Voters of Texas ................................................................. 26

        b.   OCA-Greater Houston ........................................................................................... 32

        c.   REVUP-Texas........................................................................................................ 35

     ii.  Defendants............................................................................................................... 40

        a.   The Texas Secretary of State ................................................................................. 40

        b.   The Harris County Elections Administrator and the Travis County Clerk............. 42

III. ARGUMENT................................................................................................................ 43

   A.   A DPS ID number or an SSN4 is not material in determining a voter's qualifications. .. 44

   B.   A voter's ability to provide a number that matches their voter file in TEAM is not
material to determining the voter's identity................................................................. 45

   C.   Providing a number that happens to match the number in their voter file is totally
unrelated to determining a voter's qualifications to vote........................................... 50

   D.   Whether a voter provides a matching identification number on their carrier envelope,
after having *already done so* on the ABBM, is not material to determining their qualifications
to vote....................................................................................................................... 52

   E.   It does not matter that *some* voters may be able to cure *some* SB 1-related ABBM or mail
ballot rejections.......................................................................................................... 53

IV.  CONCLUSION AND RELIEF SOUGHT ................................................................... 54

# TABLE OF AUTHORITIES

CASES

*Democratic Executive Committee of Florida v. Detzner*, 347 F. Supp. 3d 1017
(N.D. Fla. 2018) ........................................................................................54

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) ...................................45

*La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022)..........54

*League of Women Voters of Arkansas v. Thurston*, 2021 WL 5312640 (W.D. Ark.
Nov. 15, 2021) ...................................................................................43, 50, 53

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) .........................44, 50, 53

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) ...............................54

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated on other grounds sub
nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022)....................................44, 52

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ..........................................43

*Schwier v. Cox*, 439 F.3d 1285 (11th Cir. 2006) ...................................45, 49

*Sixth District of African Methodist Episcopal Church v. Kemp*, 2021 WL 6495360
(N.D. Ga. Dec. 9, 2021) ........................................................................ 49-50

*Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020)....................3

*Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020).............40, 42

*Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006) .............45, 49

STATUTES

52 U.S.C. § 10101.......................................................................................44

52 U.S.C. § 10101(a)(2)(B) ................................................................1, 43, 54

52 U.S.C. § 10101(a)(3)(A) .......................................................................43, 54

52 U.S.C. § 10101(e) ...............................................................................43, 54

Act of May 31, 1870, ch. 114, 16 Stat. 140 (1870) .......................................43

Pub.L. 85-315, pt. IV, § 131, Sept. 9, 1957, 71 Stat. 637 ...................................................43

Pub.L. 86-449, Title VI, § 601, May 6, 1960, 74 Stat. 90 ...................................................43

Pub.L. 88-352, Title I, § 101, July 2, 1964, 78 Stat. 241 ...................................................43

Pub.L. 89-110, § 15, Aug. 6, 1965, 79 Stat. 445 ...................................................43

R.S. § 2004 ...................................................43

TEC § 11.002 ...................................................2, 44

TEC § 18.012 ...................................................9

TEC § 18.061 ...................................................9

TEC § 31.001(a) ...................................................40

TEC § 31.002 ...................................................5, 40

TEC § 31.002(a) ...................................................40

TEC § 31.002(d) ...................................................40

TEC § 31.003 ...................................................40

TEC § 82.001 ...................................................3, 45

TEC § 82.002 ...................................................3, 45

TEC § 82.003 ...................................................3, 45

TEC § 82.004 ...................................................3, 45

TEC § 82.007 ...................................................3, 45

TEC § 82.008 ...................................................3, 45

TEC § 84.001 ...................................................3

TEC § 84.001(b-1) ...................................................5, 11

TEC § 84.002 ...................................................3

TEC § 84.002(a)(1-a) ...................................................5, 6

TEC § 84.002(a)(1-a)(C) ...................................................45

TEC § 84.002(b-1) .............................................................................................5, 25

TEC § 84.007 ...........................................................................................................3

TEC § 84.011(a) .......................................................................................................5

TEC § 84.011(a)(3-a) ...............................................................................................5

TEC § 84.032 ...........................................................................................................4

TEC § 84.033 ...........................................................................................................4

TEC § 84.035(b) .......................................................................................................2

TEC § 86.001 ...................................................................................................3, 42

TEC § 86.001(f) ........................................................................................................5

TEC § 86.002 ...........................................................................................................3

TEC § 86.002(g) ...................................................................................................5, 6

TEC § 86.002(g)(3) ................................................................................................45

TEC § 86.002(h) ................................................................................................5, 11

TEC § 86.005 ...........................................................................................................3

TEC § 86.006 ...........................................................................................................3

TEC § 86.006(h) .....................................................................................................47

TEC § 86.008 ...........................................................................................................3

TEC § 86.012 ...........................................................................................................3

TEC § 86.013 ...........................................................................................................3

TEC § 86.015 ...................................................................................................41, 42

TEC § 86.015(b) .....................................................................................................20

TEC § 86.015(c)(2) .............................................................................................4, 47

TEC § 86.015(c)(4) ...................................................................................................6

TEC § 87.001 ...........................................................................................................4

TEC § 87.027(a) .................................................................................................... 4

TEC § 87.027(i) ................................................................................................. 4, 46

TEC § 87.041 ...................................................................................................... 42

TEC § 87.041(b) ............................................................................................... 4, 46

TEC § 87.041(b)(2) .............................................................................................. 4

TEC § 87.041(b)(8) .............................................................................................. 5

TEC § 87.041(e) ................................................................................................... 4

TEC § 87.0271 ................................................................................................. 6, 42

TEC § 87.0271(b) ............................................................................................... 18

TEC § 87.0271(c) ............................................................................................... 18

TEC § 87.0271(f) ............................................................................................... 40

TEC § 87.0411 ..................................................................................................... 6

TEC § 87.0411(b) ............................................................................................... 18

TEC § 87.0411(c) ............................................................................................... 18

TEC § 87.0411(f) ............................................................................................... 40

Tex. Gov't Code § 62.001(a)(2) ......................................................................... 12

Tex. Gov't Code § 62.001(c) .............................................................................. 12

Tex. Gov't Code § 62.001(f) ............................................................................... 12

Tex. Transp. Code § 521.044 .............................................................................. 12

Tex. Transp. Code § 730.005 .............................................................................. 12

OTHER AUTHORITIES

*Secretary Nelson Names Adkins to Serve as Elections Director*, TEX. SEC. OF
      STATE (April 26, 2023) *available at* https://www.sos.state.tx.us/about/news
      releases/2023/042623.shtml ........................................................................ 25

## I. PRELIMINARY STATEMENT

Senate Bill 1 ("SB 1") unlawfully imposes a burdensome, error-prone matching-identification-number requirement for mail ballot-related paperwork that mail-in voters must meet or be disenfranchised. Under SB 1, qualified voters must write a putative identification ("ID") number on their mail ballot application that matches the number in their voter registration record in order to have their application approved. And voters must also write a matching number on the carrier envelope containing their mail ballot to have their ballot counted. This matching-number requirement violates Section 101 of the Civil Rights Act of 1964 ("CRA"), which bars states from denying the right to vote based on errors or omissions on voting-related paperwork that are "not material in determining whether [the voter] is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B).

The undisputed facts show a violation here. Tens of thousands of Texans, including Plaintiff organizations' members, have been and will be denied the right to vote for failure to write a matching number on their mail ballot applications or on their mail ballot carrier envelopes. Possessing an ID number is not one of the qualifications to vote in Texas, and the undisputed facts show that the ID numbers here are not used to determine voters' identities; thus, an error or omission in including the required matching number on voting-related paperwork cannot be a basis for denying the right to vote. Moreover, the database against which the voter-written number must be matched contains millions of erroneous or missing ID numbers, such that many voters are arbitrarily disenfranchised *even when they provide a valid ID number*. A voter's error or omission in failing to write a number that happens to match with an incomplete and error-riddled database certainly cannot be material to determining whether they are qualified to vote. Finally, even if SB

1

1's matching-number requirement could lawfully be imposed on voters once at the application stage, imposing it *again* at the mail-ballot stage assuredly violates Section 101. Summary judgment can be granted on any of these bases.

Accordingly, Plaintiffs OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas (collectively, "OCA Plaintiffs") move for summary judgment on their claims, brought on their own behalf and on behalf of their members, with respect to SB 1's matching-number requirement. OCA Plaintiffs request the Court declare that the Texas Election Code provisions codifying SB 1's matching-number requirement[1] violate Section 101 of the CRA and permanently enjoin the Texas Secretary of State ("SOS"), the Harris County Elections Administrator ("HCEA"), and the Travis County Clerk ("TCC") from enforcing these provisions.

## II. STATEMENT OF UNDISPUTED FACTS

### A. Voting by mail in Texas before SB 1 was safe and secure.

Under Texas law, a "qualified voter" is an individual who is 18 years or older, is a U.S. citizen, resides in the state, hasn't been adjudged mentally incompetent or finally convicted of a felony (unless they have completed their sentence or been pardoned), and is registered to vote. Tex. Elec. Code § 11.002 (hereinafter "TEC"). Qualified voters are eligible to vote by mail if, on Election Day, they are: 65 years of age or older; sick or disabled; confined in jail; away from their home county; expect to give birth within three weeks either before or after election day; participate

---

[1] OCA Plaintiffs challenge SB 1 Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14, which added or amended Texas Election Code Sections 84.002(a)(1-a), (b-1); 84.011(a)(3-a); 86.001(f), (f-1), (f-2); 86.002(g), (h), (i); 86.015(c)(4); 87.0271(a)(4); 87.041(b)(8); and 87.0411(a)(4). OCA Plaintiffs additionally challenged SB 1 Section 5.06 in their Second Amended Complaint, which amended the Texas Election Code to provide that a person who cancels their mail ballot, but who fails to return the mail ballot, may "vote only a provisional ballot." *See* Tex. Elec. Code. § 84.035(b). OCA Plaintiffs now voluntarily withdraw their challenge to SB 1 Section 5.06.

in the attorney general-administered address confidentiality program; or civilly committed under certain conditions. *Id.* §§ 82.001–82.004, .007–.008. This scheme is "designed to make voting more available to some groups who cannot easily get to the polls." *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403 (5th Cir. 2020). The majority of those who vote by mail qualify due to age or disability.[2]

A qualified voter seeking to obtain a mail ballot is required to fill out an application for a ballot by mail ("ABBM"), including "the applicant's name and the address at which the applicant is registered to vote," information demonstrating the voter's eligibility for a mail ballot, "an indication of each election for which the applicant is applying for a ballot," and a mailing address, if different from the address of registration. *See* TEC § 84.002. The voter must also sign the application. *Id.* § 84.001.

The voter then sends their completed ABBM to their county's early voting clerk. *Id.* § 84.007. If the early voting clerk finds that the ABBM is defective for any reason, and depending on the time frame, the clerk is required to send the voter a second ABBM along with a brief explanation of each defect in the first and instructions for submitting the second. *Id.* § 86.008. Once the clerk is in receipt of a timely and non-defective ABBM, the clerk will send the voter an official ballot, a ballot envelope in which to place the ballot, and an official carrier envelope in which to place the ballot envelope. *Id.* §§ 86.001–002, .012–.013.

After receiving the mail-ballot materials, the voter is—among other things—required to sign the carrier envelope and return the ballot materials to the early voting clerk. *Id.* §§ 86.005–.06, .013. Next, the Early Voting Ballot Board ("EVBB"), which counties must convene for every

---

[2] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 86:9–13.

election, *id.* § 87.001, determines whether to accept the mail ballot based on a variety of factors, such as double-checking that the voter's ABBM states a legal ground for voting by mail, or confirming whether the voter included a statement of residence, if so-required, *id.* § 87.041(b). Importantly, the EVBB is required to compare the signature on the voter's ABBM to the signature on the voter's carrier envelope to verify that the two signatures were not "executed by a person other than the voter." *Id.* § 87.041(b)(2). An optional Signature Verification Committee ("SVC") may also be appointed to carry out substantially the same function. *Id.* §§ 87.027(a), (i).[3] Finally, if at some point during the above process a voter decides to vote in person, they are permitted to cancel their ABBM (and mail ballot). *Id.* §§ 84.032–033.

Additionally, in September 2021, the Texas Legislature directed the SOS to develop an online tool for tracking ABBMs and mail ballots, which "must . . . for each carrier envelope, record or assign a serially numbered and sequentially issued barcode or tracking number that is unique to each envelope." *See id.* § 86.015(c)(2) (the "Ballot by Mail Tracker"). Accordingly, carrier envelopes now bear a unique number that links them to an associated voter and their ABBM.[4] Counties are responsible for entering the information used to track ABBMs and mail ballots into the Ballot by Mail Tracker.[5]

**B.  SB 1 requires voters to write a number on their mail-ballot paperwork that can be successfully matched to a number in the voter registration database.**

SB 1's number-matching requirement, codified in SB 1 Sections 5.02, 5.03, 5.07, 5.08,

---

[3] The voter's ABBM and carrier envelope signatures may also be compared with other signatures on file with the county clerk or voter registrar. TEC §§ 87.027(i), 87.041(e).

[4] *See, e.g.*, Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 56:24–57:16; Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 41:15–42:3.

[5] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 56:12–20, 59:18–60:5.

5.10, 5.12, 5.13, and 5.14, layers atop these processes a new requirement that voters write an ID number that matches an ID number in a state database on their mail-ballot paperwork.

At the ABBM stage, SB 1 Section 5.02 requires voters to write one of three pieces of information on their ABBMs: (1) the "number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety" (collectively, a "DPS ID number");[6] or (2) if the applicant "has not been issued" a DPS ID number, "the last four digits of [their] social security number" ("SSN4"); or (3) if the applicant lacks both a DPS ID number and an SSN4, a statement to that effect. TEC § 84.002(a)(1-a). SB 1 Section 5.07 instructs that the early voting clerk *shall* reject an ABBM if the clerk determines that "the information required under [SB 1 Section 5.02] included on the application does not identify the same voter identified on the applicant's application for voter registration." TEC § 86.001(f).

SB 1 then re-imposes the same requirements all over again at the mail-ballot stage. SB 1 Section 5.08 requires that the carrier envelope in which the ballot envelope is mailed include a space, hidden from view when sealed, for the voter to enter the same identification number information as required on the ABBM. TEC § 86.002(g).[7] SB 1 Section 5.13 instructs the EVBB that it may accept a mail ballot *only if* "the information required under [SB 1 Section 5.08] provided by the voter [on the carrier envelope] identifies the same voter identified on the voter's application for voter registration." TEC 87.041(b)(8).[8]

---

[6] SB 1 Section 5.03 sets out the requirement that the SOS's "officially prescribed" ABBM must have a space for entering this information. TEC § 84.011(a), (a)(3-a); *see id.* § 31.002. A voter is permitted to use an expired DPS ID number, if the number is otherwise valid, for purposes of fulfilling these requirements. *Id.* § 84.002(b-1).

[7] As with the ABBM, a voter is permitted to use an expired DPS ID number, if the number is otherwise valid, for purposes of fulfilling these requirements. TEC § 86.002(h).

[8] SB 1 Sections 5.12 and 5.14 amend the responsibilities of the EVBB, and the SVC if appointed,

While SB 1's text creates a hierarchy of ID numbers for a voter to provide (*i.e.*, a DPS ID in the first instance, followed by an SSN4 only if the voter has no DPS ID, TEC §§ 84.002(a)(1-a), 86.002(g)), the SOS testified that "that's not the way in practice that this works. Either number will work, and we suggest to the voters that they use both numbers so that they increase their odds of success."[9] The SOS has instructed counties that voters may supply both a DPS ID number and an SSN4 on an ABBM or carrier envelope and, so long as one of the numbers matches to their voter registration record, their mail-in materials should be accepted.[10] The SOS and Harris and Travis counties similarly recommend to voters through pamphlets, commercials, and other public outreach that they provide both types of ID number on their ABBMs or carrier envelopes, and have devoted and will continue to devote substantial resources to educating voters about SB 1.[11]

---

to include notifying the voter of any carrier envelope flagged for rejection for a variety of reasons, including pursuant to SB 1's matching-number requirement, and sets out a notice-and-cure scheme which OCA Plaintiffs describe in greater detail later in this motion. *See* TEC §§ 87.0411; 87.0271. SB 1 Section 5.10 requires the SOS's Ballot by Mail Tracker to "allow a voter to add or correct information" on their ABBM or carrier envelope as required by SB 1's matching-number requirement. TEC § 86.015(c)(4).

[9] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 52:5–13. In this regard, the SOS distinguishes between the statute's instructions to the voter and the statute's instructions to elections officials. *Id.* at 53:20–55:10, 69:16–71:9, 81:19–84:23, 93:16–96:13.

[10] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 52:8–25; Ex. 20, Ingram Dep. March 28, 2023, at 42:21–43:9; Ex. 70 at STATE 060480–507 (SOS Election Advisory No. 2022-08); *see, e.g.*, Ex. 75 at STATE034527 (providing instruction in March 22, 2022, PowerPoint entitled "Training for EVBB/SVC members on new Ballot by Mail Procedures (Primary Focused)"); Ex. 76 at STATE112340 (same, in October 11, 2022, PowerPoint entitled "Training for EVBB/SVC Members on New Ballot by Mail Procedures, General Election for State and County Officers").

[11] Ex. 11, SOS 30(b)(6) Dep. March 29, 2023, Taylor, at 28:15–29:13, 33:14–35:4; Ex. 17, TCC 30(b)(6) Dep. March 29, 2023, Hayes, at 30:11–32:17, 36:12–37:4; Ex. 77 (SOS mass e-mail to Texas county election officials regarding the SOS's "VoteReady" pamphlet); Ex. 78 (VoteReady Pamphlet), *available at* https://www.votetexas.gov/docs/ballot-by-mail-info-card-eng.pdf, last visited May 21, 2023; Ex. 79 (voter education video produced by Harris County, provided to the Court via flash drive); Ex. 80 (Harris County tip sheet); Ex. 14, HCEA 30(b)(6) Dep. March 21, 2023, Obakozuwa, at 52:23–54:25 (noting also that these efforts were only partially successful at "alleviat[ing voters'] confusion regarding the[] ID requirements," given that the county continued

However, on the mail ballot materials themselves, voters are instructed to provide one number, and to follow the hierarchy set forth in the statute. The officially prescribed ABBM instructs voters that "you must provide one of the following numbers": a DPS ID number, or "[i]f you do not have" a DPS ID number, an SSN4.[12] The officially prescribed carrier envelope similarly states "you must provide one of the following numbers" and follows the same order: a DPS ID number, or "if you do not have" one, an SSN4.[13] And the same is reflected in the SOS's officially prescribed carrier envelope insert, which is included with the carrier envelope when the mail ballot is sent to a voter.[14] This is because, as the SOS testified, "the forms follow the law, because the forms have to follow the law."[15] Absent legislative changes to SB 1's requirements, the SOS's office has no plan to change the ABBMs, carrier envelope, or official carrier insert to include the

---

to "receive[] ballots that [were] incorrectly submitted" under SB 1 during the November election), 57:13–58:18, 61:6–62:11; Ex. 81 at TATUM_005211–14 (Post-November election assessment from Harris County describing public education efforts). Harris and Travis Counties both designed an informal informational insert—including a Spanish translation in Travis County, and a Spanish, Chinese, and Vietnamese translation in Harris County—to include with the ABBM and mail-ballot packages they sent voters, recommending that voters provide both a DPS ID number and an SSN4 on their ABBMs and carrier envelopes. Ex. 15, TCC 30(b)(6) Dep. May 11, 2022, Escobedo, at 35:6–17; Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 51:7–52:19; Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 40:4–42:25; Ex. 82 (TCC's ABBM and carrier inserts, in English and Spanish); Ex. 83 (Harris County carrier envelope inserts in English, Spanish, Vietnamese, and Chinese).

[12] Ex. 84 (officially prescribed ABBM).

[13] Ex. 85 (officially prescribed carrier envelope).

[14] Ex. 86 at STATE031647 (officially prescribed carrier envelope insert); Ex. 21, Adkins Dep. July 20, 2022, at 44:6–16 (testifying that this document is included with carrier envelope when mailing ballot to voter). This officially prescribed carrier envelope insert is not the same as the informal carrier envelope inserts designed by Harris and Travis Counties.

[15] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 70:9–11; id. at 58:4–59:13 (stating that officially prescribed ABBM form "tracks the law, which is what a good form does"), 60:24–62:03 (same, for carrier envelope); Ex. 22, Adkins Dep. April 11, 2023, at 35:14–38:14; id. at 76:23–77:4 (later confirming the carrier insert being discussed—Ex. 86 at STATE031647—is the most up-to-date version of the form).

recommendation that voters provide both numbers.[16]

The practical effect of SB 1 is to require that election officials reject a voter's ABBM or mail ballot if the ID number supplied by the voter does not match the ID number in the voter's registration record in the state voter registration database.[17] Thus, if a voter provides a valid ID number, but the number is for some reason not in their voter registration record, their ABBM or mail ballot will be rejected. For example, if a voter provides a valid DPS ID number on their ABBM or carrier envelope, but their registration record contains only an SSN4, the number they provided will be deemed incorrect, and their mail-ballot materials must be rejected.[18] If a voter provides a valid ID number, but their record does not contain either a DPS ID number or an SSN4, their mail-ballot materials will be rejected.[19] And if a voter indicates they do not possess a DPS ID number or SSN4, but their record has either, their mail-ballot materials will also be rejected.[20]

### C. The database used for SB 1's matching-number requirement is riddled with errors.

Texas maintains an electronic database of voters called the "Texas Election Administration Management system," or "TEAM."[21] Most counties (so-called "online counties") use TEAM to

---

[16] Ex. 22, Adkins Dep. April 11, 2023, at 57:14–59:16; Ex. 20, Ingram Dep. March 28, 2023, at 39:17–40:15, 51:24–52:25.

[17] *See, e.g.*, Ex. 70 at STATE060480–507 (SOS Election Advisory No. 2022-08, RE: NEW LAW: Senate Bill 1 – Opportunity to Correct Defects on Application for a Ballot by Mail and Carrier Envelope). Arguably, SB 1's language requiring that the information supplied by the voter match to the information in the voter's "application for voter registration" does not map perfectly with the practice of matching the information to the voter's "voter registration record." However, there is no dispute that this is how SB 1's matching-number requirement has been and will continue to be implemented.

[18] Ex. 70 at STATE060482 ("Scenario 2" in SOS Election Advisory 2022-08).

[19] Ex. 70 at STATE060482 ("Scenario 5" in SOS Election Advisory 2022-08).

[20] Ex. 70 at STATE060482 ("Scenario 4" in SOS Election Advisory 2022-08).

[21] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 16:7–17:9.

manage their voter registration records (alternatively, "voter files").[22] Other counties, including Harris and Travis Counties (so-called "offline counties") instead contract with a third-party vendor to provide a separate, local voter registration system and database.[23] The SOS certifies these third-party vendors, *see* TEC §§ 18.012, 18.061, and an "essential component" of that certification "is that counties have the ability to successfully transmit daily information to the statewide voter registration database to maintain the accuracy of the county voter registration data."[24]

Most of the information in offline counties' databases is merged on a daily basis with the information in TEAM.[25] Moreover, offline counties "sync" their data with TEAM on a monthly basis, the purpose of which is to ensure that the TEAM and offline counties' databases "are identical."[26] If the sync process reveals any sort of conflicting information in voters' files, a report is generated and it is the county's responsibility to resolve each such conflict.[27] Because syncing happens on a monthly basis, there may be short periods of time during which there are differences in a voter's file on TEAM compared to the voter's file in their county's local database.[28] However, most offline counties—including Harris and Travis Counties—will check TEAM if they are unable

---

[22] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 19:1–9.

[23] *Id.* at 19:10–24; Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 36:3–17; Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 18:11–24.

[24] Ex. 72 at STATE110687 (February 18, 2022, letter from SOS General Counsel Adam Bitter to certified vendor VOTEC regarding implementation of SB 1, reminding VOTEC that "as a certified vendor in Texas . . . [i]t is your obligation to ensure that all changes are made in a timely manner to ensure counties utilizing for application are in compliance with state law and directives set out by the Secretary of State."); Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 36:3–6 (VOTEC is the database vendor for Harris County).

[25] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 19:5–21, 39:12–39:21; Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 43:13–45:12.

[26] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 44:3–45:5; Ex. 73 (April 14, 2022, mass e-mail from SOS re: "Voter Sync for Offline Counties").

[27] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 46:1–15.

[28] *Id.* at 45:20–46:24.

to successfully match the number provided by the voter to the voter's file in their local database.[29] As a result, the data contained in TEAM are reflective of the overall voter data available to and used by counties in Texas.

Undisputed evidence shows that over 2.6 million voter files in TEAM contain missing, outdated, or incorrect identification number information. In particular, as set out in Professor Eitan Hersh's expert report analyzing TEAM and Texas Department of Public Safety ("DPS") database extracts as of January 2022, just over 2.6 million registered voters, out of 17 million total, had information in their voter file that was either missing, incomplete, outdated, or otherwise incorrect, placing them at an increased risk of having an ABBM or carrier envelope rejected due to SB 1's matching-number requirement.[30] Professor Hersh obtained approximately the same numbers when he analyzed extracts from the DPS and TEAM database as of March and April 2022,[31] and again as of December 2022 and January 2023.[32]

Dr. Hersh identified numerous reasons for the erroneous and missing information. First, millions of registered Texas voters had multiple DPS ID numbers—for example, both a personal identification number and a driver's license, or multiple driver's license numbers.[33] However, the TEAM database shows only one DPS ID number associated with each voter file.[34] If a voter with

---

[29] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 46:16–24 (testifying that the SOS has instructed offline counties to consult TEAM when needed); Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 45:3–6, 99:8–13; Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 35:6–14.

[30] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 5, 112–113.

[31] Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶¶ 35–36.

[32] Ex. 3, Hersh Second Suppl. Rep., Feb. 3, 2023, at Appendix A, ¶¶ 27–28 (pages 25–26 of PDF).

[33] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 5(a), 92–97, 112(b).

[34] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶ 5(a); Ex. 22, Adkins Dep. April 11, 2023, at 21:13–19 (the SOS has no plans to update TEAM to allow a voter file to contain more than one DPS ID number).

multiple DPS ID numbers supplies a valid DPS ID number, but not the one that happens to be in their voter file in TEAM, their ABBM or ballot will be rejected for failure to "match."[35]

Second, hundreds of thousands of Texans were listed in TEAM without a DPS ID number at all, despite the majority of these individuals in fact having DPS ID numbers.[36] These voters could follow SB 1 to the letter, supply a valid DPS ID number, and still fail to "match."[37]

Third, tens of thousands of Texans were listed in TEAM with SSN4s or DPS ID numbers containing typographical errors.[38] They too could submit a valid DPS ID number or SSN4 and still have their ABBM or carrier envelope rejected due to errors in TEAM's record-keeping.[39]

The following chart summarizes the categories of voters affected by these errors and certain demographic subpopulations as of early 2022; mid-2022; and late-2022/early-2023. It shows that hundreds of thousands of voters who were eligible to vote by mail because they were over 65, had a non-US mailing address, or were disabled and/or were homebound are at heightened risk of failing to "match" even if they comply with SB 1:[40]

---

[35] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 5(a), 95, 97; Ex. 20, Ingram Dep. March 28, 2023, at 107:11–20 (testifying that voter with multiple DPS ID numbers who provides number not in TEAM must be rejected). This is particularly meaningful given that some of these voters have multiple DPS ID numbers due to having both expired and unexpired numbers, yet if they supply an expired number—which SB 1 explicitly permits—the voter's ABBM or mail ballot must still be rejected if TEAM contains their unexpired number. Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶ 25; TEC §§ 84.001(b-1), 86.002(h) (permitting use of expired DPS ID number on ABBM and carrier envelope pursuant to SB 1).

[36] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 5(b), 75–84, 112(a).

[37] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶ 83.

[38] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 5(c), 91, 101–111, 112(c)–(d).

[39] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 20, 101.

[40] Ex. 1, Hersh Expert Rep., Feb. 28, 2022, ¶¶ 84, 91, 97, 102, 111, 112; Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶¶ 21–22, 28–30, 35–36; Ex. 3, Hersh Second Suppl. Rep., Feb. 3, 2023, ¶¶ 17–18, 23–28.

| Row 1: January 2022<br>Row 2: April 2022<br>Row 2: January 2023 | Total | Over 65 | Voted in the 2020 election | Over 65 *and* voted in the 2020 election | Non-US mailing address | Homebound or disabled veteran |
|---|---|---|---|---|---|---|
| Voters with multiple DPS ID numbers | 2,213,676<br>2,392,733<br>2,394,435 | 189,699<br>166,035<br>174,880 | 1,105,194<br>1,060,944<br>1,073,661 | 114,129<br>82,575<br>91,469 | 277<br>1,344<br>1,325 | 5,308<br>4,134<br>5,279 |
| Voters with DPS ID number, but not reflected in TEAM | 276,405<br>209,137<br>189,095 | 155,583<br>83,622<br>74,982 | 95,892<br>66,001<br>52,157 | 59,567<br>32,252<br>28,152 | 374<br>1,574<br>1,475 | 781<br>378<br>391 |
| Voters with typographical error in SSN4 in TEAM | 44,444<br>44,915<br>44,353 | 15,544<br>14,991<br>14,945 | 28,880<br>27,247<br>25,795 | 12,015<br>10,121<br>10,294 | 25<br>101<br>100 | 98<br>88<br>110 |
| Voters with typographical error in DPS ID number in TEAM | 68,190<br>74,897<br>62,461 | 17,270<br>15,835<br>14,602 | 34,187<br>31,781<br>27,441 | 11,690<br>9,475<br>9,006 | 18<br>83<br>75 | 370<br>342<br>359 |
| Total | 2,602,715<br>2,721,682<br>2,690,344 | 378,096<br>280,483<br>279,409 | 1,264,153<br>1,185,973<br>1,179,054 | 197,401<br>134,423<br>138,921 | 694<br>3,102<br>2,975 | 6,557<br>4,942<br>6,139 |

Since the passage of SB 1, the SOS has twice attempted—first in December 2021, and again in December 2022—to update the Texas driver's license numbers ("TDLs") and social security numbers ("SSNs") associated with voter files in the TEAM database.[41]

---

[41] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 37:22–39:16; Ex. 74 (intraoffice SOS e-mails containing results of December 2021 and December 2022 comparative processes). This process occurs annually, pursuant to Texas law, during which the SOS attempts to infill missing TDLs and SSNs in TEAM with information from the DPS database. *See* Tex. Gov't Code § 62.001(f), (a)(2), (c); Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 40:15–16 ("We . . . get a yearly file for the jury that we use for the HB 2512 process."). The SOS calls this the "HB 2512" or "comparative" process because access to this information for purposes of voter registration was added in 2013 by H.B. 2512. *See* Tex. Transp. Code §§ 521.044, 730.005; Ex. 9, SOS 30(b)(6)

But this effort did not solve the problem. After the first attempt in December 2021, at least 493,000 voter files in TEAM still lacked a TDL, at least 422,000 still lacked an SSN, and at least 106,000 still lacked both.[42] After the second attempt in December 2022, at least 463,000 voter files in TEAM still lacked a TDL, at least 392,000 still lacked an SSN, and at least 93,000 still lacked both.[43] Upon completion of each comparative process, the newly infilled TEAM data was synced with the offline counties' databases.[44] Thus by the SOS's own count, as of December 2022, hundreds of thousands of TEAM voter files are still missing at least one of the identification numbers required under SB 1. Moreover, the SOS's infilling of *missing* information, even were it fully successful, would not address many of the issues identified in Dr. Hersh's findings. Thus, as seen in the table summarizing those findings, the total number of voter records in TEAM with the errors identified in Dr. Hersh's analyses have remained steady across this timeframe; in the first, 2.6 million voter files, or about 15.3% of the total voter files in TEAM, had one of those errors; in the second, 2.72 million voter files, or 15.7%; and in the third, 2.69 million voter files, or 15.4%.[45]

---

Dep. May 6, 2022, at 348:20–23 ("The HB 2512 process allows us to get information from the driver's license record to supplement voter registration records and use it for voter registration purposes."). The December 2021 comparative process following passage of SB 1 was the first time the SOS attempted to import Texas Driver's Licenses into TEAM; previously, the SOS used this information primarily to update Social Security Numbers in order to identify voters convicted of a felony or who had passed away. Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 47:13–48:25.

[42] Ex. 74 at STATE019731.

[43] Ex. 74 at STATE137751.

[44] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 49:20–50:5; Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 43:13–19.

[45] Ex. 3, Hersh Second Suppl. Rep., Feb. 3, 2023, ¶ 8 & Table A.

13

**D. SB 1's matching-number requirement predictably disenfranchised approximately 40,000 Texas voters over the course of 2022.**

The first elections after SB 1 took effect saw massive increases in the number of rejected ABBMs and mail ballots. For context, in 2018, Texas had a mail ballot rejection rate of 1.7%, and in 2020 it had a mail ballot rejection rate of .8%.[46]

In the March 2022 primary election, however, the statewide ABBM rejection rate rose to approximately 3.85%, or about 10,000 rejected ABBMs,[47] and the mail ballot rejection rate spiked to an incredible 12.38%, representing approximately 25,000 of the 198,947 total mail ballots received.[48]

Dr. Hersh's analysis of the post-primary TEAM export indicates that a total of 31,107 mail ballots were flagged with a rejection code during the election (an initial rejection rate of about 15.65%) and at least 80% of those—25,429—were due to non-compliance with SB 1's matching-number requirement.[49] Of *those* 25,429 voters, only 6,509 went on to cast an accepted mail ballot

---

[46] Ex. 7, Patrick Second Suppl. Expert Rep., Feb. 10, 2023, ¶ 5. The national average mail ballot rejection rate is 1%. *Id.*; Ex. 6, Patrick First Suppl. Expert Rep., April 29, 2022, ¶ 6.

[47] Ex. 62 (March 14, 2022, e-mail from Assistant SOS for Communications Sam Taylor to AP reporter)

[48] Ex. 63 (April 7, 2022, intraoffice SOS e-mail containing rejection totals).

[49] *See* Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶ 59. Because the State's TEAM data exports provided to Dr. Hersh do not track ABBM data, OCA Plaintiffs cannot provide this same level of specificity with regard to the statewide ABBM rejection rate. *See id.* & n.5; *see also* Ex. 55 at 4 (State Defendants' Objections and Responses to the United States' Fourth Set of Interrogatories, March 24, 2023) ("[T]he TEAM system is a living database that captures only the current or most recent status associated with any information in a voter's record, including the 'Mail In Request Reject Reason' field. If an individual's voter record is updated by a county election official during the absentee ballot by mail ('ABBM') process, any intermediate status associated with that voter is no longer reflected in the TEAM system post-update."). OCA Plaintiffs are only able to provide the March 2022 primary ABBM rejection numbers because it appears the SOS ran the ABBM rejection numbers in response to a request from a reporter in between the close of the application period and the start of early voting for the March 2022 primary. *See* Ex. 62.

or vote in person.[50] In other words, 74.4% of voters who had their mail ballot rejected due to SB 1—18,920 voters—were not able to cure or correct the issue by any means and were thus unable to cast any effective vote in the election.[51]

Harris and Travis Counties were no exception. Harris County flagged over 5,100 of the 35,904 ABBMs received for rejection due to non-compliance with SB 1,[52] while Travis County flagged about 1,415 ABBMs for rejection for the same reasons,[53] ultimately rejecting about 680.[54] With respect to mail ballots, of the 7,794 Harris County flagged for a defect of any kind, a staggering 99.4%—7,750—were flagged for non-compliance with SB 1's matching-number requirement.[55] Only 11% of these voters—849 total—were able to cure their SB 1-related defects, while 13 voters were able to cancel their mail ballots and vote in person.[56] Harris County ultimately

---

[50] Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶ 62. Dr. Hersh's findings align with the SOS's reported numbers; the latter's report of approximately 25,000 mail ballots rejected includes those rejected for *any* reason, and of those, at least 18,920 were due to SB 1. *Id.* ¶ 59.

[51] *Id.* ¶ 62. In comparison, during the 2020 presidential election in Texas, of the approximately one million votes cast by mail, only 8,304 were rejected. Ex. 66 at 36 (page 46 of PDF) (Election Administration and Voting Survey 2020 Comprehensive Report, United States Election Assistance Commission), *also                 available                 at* https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c. pdf.

[52] Ex. 49 at 3–4 (HCEA's Objections and Answers to Plaintiffs' First Set of Interrogatories, May 13, 2022). Harris County did not track how many of these ABBMs were ultimately cured so OCA Plaintiffs cannot provide how many were finally rejected. *See id.*

[53] Ex. 50 at 2–3 (TCC's Objections and Responses to Plaintiffs' Interrogatories, September 12, 2022); Ex. 58 ("064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx," provided to the Court under seal via flash drive). "DNM" means "did not match" and "NIS" means "not in system." Ex. 56 ("064.127498 Reason Key v2.1.xlsx," provided to the Court via flash drive).

[54] Ex. 50 at 2–3 (TCC's Objections and Responses to Plaintiffs' Interrogatories, September 12, 2022); Ex. 57 ("064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx," provided to the Court under seal via flash drive).

[55] Ex. 49 at 3–4 (HCEA's Objections and Answers to Plaintiffs' First Set of Interrogatories, May 13, 2022).

[56] *Id.*; Ex. 59 (Harris County post-March 2022 primary election press release).

rejected 6,888 mail ballots pursuant to SB 1, leading to a total mail ballot rejection rate of 19%.[57]

During the March 2018 primary election, by comparison, Harris County rejected only 135 of 48,473, or .02%, of mail ballots received.[58] Similarly, during the March 2022 primary Travis County received approximately 11,500 mail ballots, and of the 935 mail ballots ultimately rejected, 920—approximately 98%—were due to failure to comply with SB 1's matching-number requirement.[59] This brought the total mail ballot rejection rate to slightly over 8%.[60] In comparison, Travis County rejected only about 156 of 9,300, or 1.67%, of the mail ballots received during the March 2018 primary.[61]

These trends continued in the May primary runoff, where the statewide rejection rate for mail ballots was approximately 4% (7,244 ballots), and during the May constitutional amendment election, where approximately 5% (9,420 ballots) were rejected.[62] And rejection rates remained elevated during the November 2022 general election. According to the SOS, 9,348 of the 336,349

[57] Ex. 49 at 3–4 (HCEA's Objections and Answers to Plaintiffs' First Set of Interrogatories, May 13, 2022); Ex. 59 (Harris County post-March 2022 primary election press release). An additional 13 voters whose mail ballots were flagged for rejection due to SB 1 ultimately cancelled their mail ballot and voted in person. Ex. 49 at 3–4 (HCEA's Objections and Answers to Plaintiffs' First Set of Interrogatories, May 13, 2022).
[58] Ex. 59 (Harris County post-March 2022 primary election press release).
[59] Ex. 50 at 3–5 (TCC's Objections and Responses to Plaintiffs' Interrogatories, September 12, 2022); Ex. 60 ("064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx," provided to the Court under seal via flash drive).
[60] Ex. 50 at 3–5, (TCC's Objections and Responses to Plaintiffs' Interrogatories, September 12, 2022); Ex. 60 ("064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx," provided to the Court under seal via flash drive).
[61] Ex. 50 at 7 (TCC's Objections and Responses to Plaintiffs' Interrogatories, September 12, 2022); Ex. 61 ("064.128587 P18 Ballot Board (CONFIDENTIAL).xslx," provided to the Court under seal via flash drive).
[62] Ex. 64 (STATE110692, "Master Spreadsheet_2022 Mail Ballot Acceptance+Rejection Rates by County.xlsx," containing pre-November 2022 elections rejection rates, provided to the Court via flash drive).

16

mail ballots received statewide were rejected, for a final rejection rate of 2.7%.[63] Meanwhile, Dr. Hersh's analysis of TEAM data shows that 13,638 records are listed with a code indicating that a mail ballot was rejected, representing an initial rejection rate of 4.1%.[64] Approximately 83.8% of those (11,430 mail ballots) were rejected for failure to provide a matching number pursuant to SB 1, and more than half of those voters (approximately 6,400) were unable to cure or cast an effective vote by any other means.[65] Again, Harris and Travis Counties were no exception. For example, in the November election Harris County ultimately rejected 2,667 mail ballots, 2,557 (95.6%) pursuant to SB 1, for a rejection rate of 4.16%.[66] By comparison, Harris County rejected .12% of the mail ballots received in the November 2020 general election, and .45% of the mail ballots received in the November 2018 general election.[67] And Travis County ultimately rejected 463 mail ballots, 418 (90.2%) pursuant to SB 1, for a rejection rate of 2.16%, compared to .42% in November 2020 and .47% in November 2018.[68]

    In all, it is undisputed that across the March primary, May primary run off and

---

[63] Ex. 65 at STATE115616 (PDF document entitled "Master Spreadsheet_2022 Mail Ballot Acceptance+Rejection Rates by County.xlsx" which duplicates numbers contained in Ex. 63, but also includes November 2020 election results, at STATE115611–616.).

[64] Ex. 3, Hersh Second Suppl. Rep. ¶¶ 12(a), 19.

[65] Ex. 3, Hersh Second Suppl. Rep. ¶¶ 19–21.

[66] Ex. 51 at 4–6 (HCEA's Amended Reponses to OCA Plaintiffs' Interrogatories, May 5, 2023). About 97.5% (4,751/4,868) of ballots initially rejected were pursuant to SB 1, and only 42% of voters were able to cure their SB 1 rejection. *Id.* at 4–5.

[67] Ex. 53 at 3 (HCEA's Supplemental Reponses to State Defendants' Second Set of Interrogatories, March 21, 2023). Harris County's ABBM rejections were also significantly elevated. *See* Ex. 51 at 3 (HCEA's Amended Responses and Objections to OCA Plaintiffs' First Set of Interrogatories, May 5, 2023).

[68] Ex. 52 at 4–6 (TCC's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories, March 23, 2023). Travis County's ABBM rejections were elevated as well. *Id.* at 3–4, 6. About 87% (827/953) of ballots initially rejected were pursuant to SB 1, and only about 50% of voters were able to cure their SB 1 rejection. *Id.* at 4.

constitutional amendment, and November general elections, approximately 40,000 Texas voters

were unable to cast an effective vote due to SB 1's matching-number requirement.[69]

### E.  SB 1's notice-and-cure process fails to stop mass disenfranchisement.

SB 1 contemplates that voters may in some cases receive notice of an ID number-related

rejection and an opportunity to cure purported defects at both the ABBM and mail-ballot stages.[70]

The SOS accordingly prescribed certain forms for the counties to use in those processes.[71]

---

[69] This number of SB 1-related rejections is derived from Dr. Hersh's analyses of the post-primary and post-general election TEAM data (18,920 and 6,400 mail ballots rejected due to SB 1, respectively), along with a conservative estimate that 80% of the 16,664 total mail ballots rejected during the May elections (13,331 mail ballots) were due to SB 1.

[70] These processes are set out in SB 1 Sections 5.12 and 5.14. They instruct that the EVBB, or SVC if appointed, is responsible for carrying out SB 1's matching-number process. If the voter-provided number does not match, and "it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day," county officials *shall* "return the carrier envelope to the voter by mail." TEC §§ 87.0411(b); 87.0271(b). If "it would not be possible for the voter to correct the defect and return the carrier envelope" in that timeframe, county officials *may* "notify the voter of the defect by telephone or e-mail and inform the voter that the voter may request to have the voter's [ABBM] cancelled . . . or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect." TEC §§ 87.0411(c); 87.0271(c).

[71]      Ex. 86 (January 12, 2022, mass e-mail from SOS to Texas county elections officials containing new ABBM rejection notices, carrier envelope insert, and dear voter letter); Ex. 70 (same on January 28, 2022, containing corrective action forms for EVBB/SVC mail ballot rejections as well as SOS Election Advisory No. 2022-08, instructing counties on how to use the forms); Ex. 88 (same, on April 19, 2022, containing corrective action forms for early voting clerk mail ballot rejections); *see* Ex. 67, (Exhibit 16 to Ingram deposition of March 28, 2023 (Form 6-3, for SB 1-related ABBM rejections); Ex. 68 (Exhibit 17 to Ingram deposition of March 28, 2023 (Form 6-4, for SB 1-related ABBM rejections); Ex. 20, Ingram Dep. March 28, 2023, at 93:11–94:20 (confirming that the versions of Form 6-3 and Form 6-4 at Exs. 67–68 were in use during the November 2022 election); Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 16:3–6, 26:19–27:5, 74:5–75:1 (TCC used SOS's forms during November 2022 election); Ex. 15, TCC 30(b)(6) Dep. May 11, 2022, Escobedo, at 32:2–7 (TCC used SOS's forms during March 2022 election).

Form 6-4, for SB 1-related ABBM rejections, appears to have been updated at some point to include a note that "[y]ou cannot add the required personal identification numbers to your voter registration record by submitting a new [ABBM]." *Compare* Ex. 86 at STATE031645 (Form 6-4

However, as just explained, most voters whose ABBMs or ballots were rejected for failure to provide a matching number were not able to cure the issue and cast an effective vote. This was the case even in counties like Harris and Travis, which made significant efforts to notify voters and provide cure opportunities, up until the last day that notice could be received, via mail, e-mail, and phone.[72]

### i.  The notice-and-cure processes failed for a number of reasons.

First, and as the HCEA testified, "older voters or voters without means" are more likely to not have access to a printer, or the internet, or transportation, in order to engage in the corrective process.[73] As the TCC testified, "elderly voters" in particular "did not want to cure or did not understand as to why they had to provide their socials or their driver's licenses."[74]

Second, the simple reality is that many mail-in voters submit their materials on a timeline that may make it impossible to avail themselves of any cure processes. For example, during the March 2022 primary, about 20% of the approximately 260,000 ABBMs submitted statewide were received in the last week of the 49-day period (beginning January 1, 2022) in which they could be submitted, while about 40% of the approximately 197,000 mail-ballots submitted statewide were

---

sent with January 12, 2022, mass e-mail) *with* Ex. 68 (Exhibit 17 to Ingram deposition of March 28, 2023 (Form 6-4 obtained from the SOS's website)).

[72] Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 14:18–15:11, 16:7–18:10 (TCC reached out to voters via mail, e-mail, and phone during the November election); Ex. 15, TCC 30(b)(6) Dep. May 11, 2022, Escobedo, at 32:12–16, 36:20–23, 37:25–38:9, 155:21–156:10 (same, during the March and May elections); Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 64:16–65:3, 83:10–23, 91:20–92:4 (same, for HCEA during November election); Ex. 12, HCEA 30(b)(6) Dep. April 20, 2022, Longoria, at 45:12–22 (same, for HCEA during March election).

[73] Ex. 12, HCEA 30(b)(6) Dep. April 20, 2022, Longoria, at 44:11–24; *see also* Ex. 15, TCC 30(b)(6) Dep. May 11, 2022, Escobedo, at 39:3–40:11.

[74] Ex. 15, TCC 30(b)(6) Dep. May 11, 2022, Escobedo, at 42:15–24.

received in the last week of eligibility, with over 11% received the day before Election Day.[75] Many of those voters likely did not have time to cure SB-1 related defects, and the same will be true of voters in a similar position in the future.[76]

      Third, while voters were instructed by the SOS that they could cure the putative defects with their ABBMs and mail ballots online, through the SOS's Ballot by Mail Tracker available at www.votetexas.gov, [77] this online option was unusable for many affected voters even when they had the time and wherewithal to use it. To access the online tracker a voter is required by statute to enter their name, SSN4, DPS ID number, and registration address.[78] *See* TEC § 86.015(b). This log-in process compares the information entered by the voter against the TEAM database.[79] Accordingly, if a voter is missing either a DPS ID number or SSN4 in TEAM, or if TEAM has

---

[75] Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶¶ 64–68.

[76] Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶ 68; Ex. 22, Adkins Dep. April 11, 2023, at 56:24–57:13 (agreeing with statement that some voters will simply be unable to cure their ballots in time to have them counted due to when they are notified of the issue).

[77] The Ballot by Mail Tracker is hosted at https://teamrv-mvp.sos.texas.gov/BallotTrackerApp/#/login, but it may be accessed from votetexas.gov. Ex. 89 (screenshot of Ballot by Mail Tracker webpage as of May 18, 2023); Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 16:7–16 (testifying that Ballot by Mail Tracker is not hosted on www.votetexas.gov, but can be accessed from votetexas.gov, and is hosted by the same third-party vendor that operates TEAM for the SOS); *see* Ex. 90 (Exhibit 13 to Ingram deposition of March 28, 2023, Ingram deposition, screenshot of mobile version of Ballot by Mail Tracker as of March 28, 2023.).

[78] Ex. 19, Ingram Dep. April 28, 2022, at 120:14–24 (requirements set by statute, not the SOS's policy); Ex. 104 at STATE105512–13 (e-mail exchange in which Assistant SOS for Communications Sam Taylor explains to Bowie County Elections Administrator that the log-in requirements for the Ballot by Mail Tracker are "set out explicitly in law" and the SOS "doesn't have any leeway to alter these requirements"); Ex. 89 (screenshot of Ballot by Mail Tracker webpage as of May 18, 2023).

[79] Ex. 19, Ingram Dep. April 28, 2022, at 120:14–121:4; Ex. 20, Ingram Dep. March 28, 2023, at 71:11–22 (nothing has changed about Ballot by Mail Tracker log-in requirements since April 2022 deposition, which are set by statute).

incorrect information for either of those numbers, the voter simply cannot log in to the tracker.[80]

The online Ballot by Mail Tracker is therefore only able to cure an SB 1-related defect in scenarios

where the voter (1) is in possession of a number in their TEAM record, but did not include a

number on their ABBM or carrier envelope; or (2) made a transcription error on their ABBM or

carrier envelope.[81] A voter faced with any of the other myriad issues that might arise due to SB 1's

matching-number requirement could not even begin to use the online tool.

     Consistent with that, the undisputed facts show that most voters in fact did not even try to

use the online option to cure SB 1-related rejections of their ABBMs or mail ballots. Across all

elections during 2022, only 946 voters used the Ballot by Mail Tracker to attempt to cure an SB 1-

related ABBM issue, and approximately 28% of that group was unsuccessful.[82] Similarly, across

all elections conducted in 2022, only 6,247 voters used the Ballot by Mail Tracker to attempt to

cure an SB 1-related carrier envelope issue, and about 15.4%, or 963 voters, were unable to do

---

[80] Ex. 19, Ingram Dep. April 28, 2022, at 121:10–20 (testifying that a voter without a DPS ID number could not use the tracker, and that if a voter's ID number has a typo in TEAM, the voter would need to know that typo to long into the tracker); Ex. 20, Ingram Dep. March 28, 2023, at 100:2–6 (tracker is only accessible to voters who have both a TDL and SSN4 in their TEAM file); Ex. 91 (November 8, 2022, e-mail from Heidi Martinez, SOS Elections Division Managing Attorney, to Medina County Elections Clerk; "the ballot tracker is not used to make edits/modifications to personal ID#s but to confirm that the information in TEAM is correct.").

[81] Ex. 10, SOS 30(b)(6) Dep. March 28, 2023, Ingram, at 16:21–17:5 (tracker can only be used to fix these voter-side errors), 36:21–37:4 (agreeing that the tracker, referred to as "the portal" here, cannot be used to fix TEAM-side issues). If a voter *does* successfully use the tracker, that information is sent to offline counties during the nightly TEAM/local database batch process, although numerous counties had difficulty receiving those updates during the March primary election. *Id.* at 53:3–54:7.

[82] Ex. 7, Patrick Second Suppl. Expert Rep., Feb. 10, 2023, ¶ 12; Ex. 54 at 12 (State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories, Jan. 19, 2023). A conservative estimate based on the mail ballot rejection data suggests that during the November 2022 general election, only one in 20 voters who had an ABBM rejected used the Tracker, and only one in 25 successfully cured (or cancelled) an ABBM. Ex. 7, Patrick Second Suppl. Expert Rep., Feb. 10, 2023, ¶ 13.

so.[83] With more than 50,000 mail-ballots rejected during elections conducted in 2022, this means that only a fraction of voters who had their ballots rejected due to SB 1 even attempted to cure the purported defect by using the Ballot by Mail Tracker. Meanwhile, the tracker is simply inaccessible to those without a computer or without internet access.[84]

Fourth, in many instances voters receiving notice of a rejection due to SB 1's matching-number requirement were not given the information they actually needed to correct the issue. For example, for voters whose ABBMs were rejected for failure to provide a number matching the number in the voter file, an SOS-issued form instructs that they may "correct the defect" (1) online through the SOS's Ballot by Mail Tracker; or (2) by submitting a second ABBM.[85] However, neither that form, nor the forms used to provide notice of a mail ballot rejection for the same reasons, provides a way for the county to remind the voter which number they provided on their paperwork, or what type of number is in their voter file.[86]

Fifth, the notice-and-cure process is fundamentally limited in that it does not allow voters to fix problems that stem from errors with the voter database. It is undisputed that the methods of cure set forth in the SOS-issued notice-and-opportunity-to-cure forms generally do not allow a

---

[83] Ex. 7, Patrick Second Suppl. Expert Rep., Feb. 10, 2023, ¶ 14; Ex. 54 at 13–14 (State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories, Jan. 19, 2023).

[84] Ex. 19, Ingram Dep. April 28, 2022, at 121:21–25.

[85] Ex. 86 at STATE031643 (Form 6-3).

[86] *See* Ex. 86 at STATE031643 (Form 6-3); Ex. 70 at STATE060476 (Form 8-23), STATE060478 (Form 8-24); Ex. 88 at STATE087675 (Form 6-11); STATE087681 (Form 6-12). In April 2021, a Denton County election official suggested to the SOS that the ABBM rejection form be changed to apprise rejected voters of both of those pieces of information, but the SOS decided not to implement that change because other counties believed it would prove too confusing for voters. Ex. 87 (April 1, 2022, e-mail between Denton County and the SOS's office); Ex. 22, Adkins Dep. April 11, 2023, at 38:18–41:13.

voter to add to or change the identification numbers in their voter file.[87] That includes, in the ABBM context, filing a new ABBM, which record evidence shows cannot be used to update the information in the voter file even though Texas Election Code Section 84.014 instructs counties to "update the voter's record with the information provided by the applicant" if it is "different from or in addition to the information maintained by the voter registrar."[88] Only one of the various SOS-issued notice forms (Form 6-4, for voters whose ABBMs are rejected because their voter file is *missing* an identification number) mentions to voters that they may add a missing identification number to their voter file by submitting a paper voter registration application containing those numbers, or by visiting the voter registration portal via "www.Texas.gov."[89] And even in that limited instance, the paper voter registration application form does not explicitly state that it can be used to update the identification numbers in a voter's file.[90] As for the ostensible online option, the voter registration portal is actually located not on "Texas.gov," but at a subdomain, https://txapps.texas.gov/tolapp/sos/SOSACManager, which is only displayed on the front page of Texas.gov during election season.[91] Moreover, there is no indication on the front page of the voter

---

[87] Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 23:15–25:9 (corrective action form included with mail ballot rejections, or writing number on carrier envelope, "does not include a pathway to update a voter registration" and can only be used to remedy voter-side errors); Ex. 20, Ingram Dep. March 28, 2023, at 80:24–81:13 (listing ways voter can update voter file in TEAM).

[88] Ex. 19, Ingram Dep. April 28, 2022, at 114:20–116:24 (if Section 84.013 was enforced, "SB 1 is gone"); Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 100:10–24 (same); Ex. 70 at STATE060505 (FAQ #11 in SOS Election Advisory 2022-08, making it clear that counties are *not* to update a voter's registration file when a voter provides an ID number that is not in their voter file); Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 28:3–18 (confirming TCC would not update a voter's ID number based on an ABBM).

[89] Ex. 86 at STATE031645 (Form 6-4).

[90] Ex. 92 (Texas Voter Registration Application, pre-filled for Mills County).

[91] *See* Ex. 20, Ingram Dep. March 28, 2023, at 95:11–96:14; Ex. 93 (Exhibit 18 to Ingram deposition of March 28, 2023, screenshot of front page of voter registration portal as of March 22, 2023); Ex. 95 (screenshot of front page of voter registration portal as of May 18, 2023); Ex. 96

registration portal that it may be used to add to or update the voter identification numbers in a voter's file, nor on the log-in page.[92]

### F.  The record is full of stories from voters exemplifying the problems identified above.

Voters from all over Texas, in counties big and small, contacted the SOS's office to express anger or confusion over having their ABBMs and mail ballots rejected pursuant to SB 1's matching-number requirement.[93] In one such example, a voter in Ector County wrote to the SOS's office to complain that her mother had input her valid Texas driver's license number but had her November election ABBM rejected because her voter file only contained an SSN4.[94] In another, the mother of a voter wrote to the SOS's office to complain that the ABBM was "very misleading."[95] When asked about this e-mail, and whether she agreed the instructions on the ABBM form are misleading, then-Legal Director for the SOS's Elections Division, now Director, Christina Adkins[96] responded that "it states what the law requires. That's—that's all I can put on

---

[92] Ex. 20, Ingram Dep. March 28, 2023, at 96:16–98:23; Ex. 93 (Exhibit 18 to Ingram deposition of March 28, 2023, screenshot of front page of voter registration portal as of March 22, 2023); Ex. 95 (screenshot of front page of voter registration portal as of May 18, 2023); Ex. 94 (Exhibit 19 to Ingram deposition of March 28, 2023, screenshot of voter registration portal log-in page as of March 22, 2023, referred to as "identity management page" in deposition); Ex. 97 (screenshot of voter registration portal log-in page as of May 18, 2023).

[93] *See, e.g.*, Ex. 104 (twelve e-mails from individual voters located in Ector, Comal, Bowie, Tarrant, Collin, Williamson, and Harris counties).

[94] Ex. 104, at STATE118517.

[95] Ex. 104, at STATE133481–82.

[96] Keith Ingram was the Director of the Elections Division of the SOS from January 2012 until March 2023. *See* Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 13:12–23; Ex. 20, Ingram Dep. March 28, 2023, at 13:15–14:23. Christina Adkins, who had been the Legal Director of the Elections Division since December 2017, was appointed the acting Director of the Elections Division at that time and was shortly thereafter permanently appointed to the role. *See* Ex. 21, Adkins Dep. July 20, 2022, at 10:22–11:24; Ex. 22, Adkins Dep. April 11, 2023, at 8:24–9:21;

the form."[97] Another voter wrote to ask whether she would be penalized if she put multiple identification numbers on her November mail-balloting materials, because "the instructions say [o]ne form of ID."[98] Another stated that their friend, who has a disability and cannot drive, had obtained a new photo ID at the DPS, which gave her a new number that caused problems with her ABBM, and asked that the State use "the original" driver's license number to avoid this problem.[99] Another contacted the SOS's office to state that her sister had her mail ballot rejected by Tarrant County for failing to include her SSN4 on the envelope and was unable to cure because she was bedridden and could not log into the Ballot by Mail Tracker because she did not possess a DPS ID number.[100] And another contacted the SOS's office to express frustration with the fact that although qualified to vote by mail due to disability and age, her ABBM had been rejected because, according to the county, the SSN4 in her voter file had been incorrectly entered in 1980 and never fixed.[101]

OCA Plaintiffs have also heard similar stories from voters who suffered setbacks or disenfranchisement due to SB 1's matching-number requirement. For example, Roberto Benavides, an Austin, Texas resident in his seventies registered to vote in Travis County, had his mail ballot rejected during the November 2022 general election because the driver's license

---

*Secretary Nelson Names Adkins to Serve as Elections Director*, Tex. Sec. of State (April 26, 2023) *available at* https://www.sos.state.tx.us/about/newsreleases/2023/042623.shtml.
[97] Ex. 22, Adkins Dep. April 11, 2023, at 25:3–26:7.
[98] Ex. 104, at STATE128049
[99] Ex. 104, at STATE122469–70. In theory this should not have mattered, as SB 1 purportedly permits voters to use an expired DPS ID number to satisfy the matching-number requirement. TEC § 84.002(b-1).
[100] Ex. 104, at STATE123165.
[101] Ex. 104, at STATE122242–43.

number in his voter file was incorrect.[102] Mr. Benavides did not learn this was the reason for his

rejection until after the election, when he called the county to inquire; he had previously thought

that at his age it was likely *he* had made a mistake in transcribing the number.[103] Mr. Benavides

has had the same driver's license number for thirty years.[104] Although he attempted to cure the

rejection, he was unsuccessful, and was therefore not able to cast a vote.[105]

### G. The parties in this case.

#### i. Plaintiffs

##### a. The League of Women Voters of Texas

The League of Women Voters of Texas's ("LWVTX") mission is to empower voters and

defend democracy.[106] LWVTX actively works to educate voters, provide training materials on

---

[102] Ex. 23, Benavides Dep. at 6:19–24, 23:14–24:6, 27:12–24, 51:5–6.

[103] Ex. 23, Benavides Dep. at 23:17–24:6; 27:12–24.

[104] Ex. 23, Benavides Dep. at 22:23–23:5.

[105] Ex. 23, Benavides Dep. at 31:18–32:4. Similarly, Bernadette Maloney, an Austin, Texas resident registered to vote in Travis County, who turned 65 years old in September 2022 and who spends half of her time each year in New York taking care of her elderly mother, received a notice of rejection from Travis County informing her that her mail ballot had been rejected for not including identification numbers. She reached out to a member of the League of Women Voters of Texas to ask for advice and was advised that she could cure her ballot using the online Ballot by Mail Tracker, but when she attempted to correct the defect using the tracker it told her that she was not registered to vote. She confirmed her registration status online and called the SOS's office, which directed her to call Travis County, which told her that her ballot would not be counted because it was now untimely. Because it is likely she will be caring for her mother in New York during future elections, she will have to once again navigate SB 1's matching-number requirement. Ex. 24, Maloney Dep. at 15:8–14; 16:12–13, 18:23–19:5. 20:20–22:2; 42:12–43:20, 44:8–46:1; Ex. 25, Maloney Dec. ¶¶ 7, 9–11, & attached materials. Finally, Yi Lu Zhao, a 92-year-old limited English proficiency voter who has voted by mail for two decades, and Riazuddin Ahmed, an 85-year-old resident of Fort Bend County who has similarly voted by mail for two decades, both suffered their first ever rejection in connection with voting by mail due to SB 1's number-matching requirement and were forced to vote in person during the March 2022 primary despite their advanced age and fears of COVID. Ex. 26, Zhao Dec. at ¶¶ 1–29; Ex. 27, Yi Dec. at ¶¶ 1–22, Ex. 28, Ahmed Dec. at ¶¶ 1–24.

[106] Ex. 106 (LWVTX "About Us" Page).

voting, and ensure that voters can cast a ballot that counts.[107] Depending on the election, LWVTX organizes and runs voter registration drives, informs voters statewide about their ability to cast a mail ballot, explains the rules and deadlines related to mail ballots, and educates voters about issues and candidates on their ballot.[108]

LWVTX is a traditional membership organization, with approximately 3,000 members across the state who pay dues that finance the organization's activities, who vote on the organization's board of directors, and who serve as officers and on the board of directors.[109] LWVTX has between 33 and 35 local leagues covering 39 counties across the state, which are each a part of the statewide LWVTX.[110] Members of local leagues are automatically also members of LWVTX.[111]

SB 1's matching-number requirement frustrates LWVTX's mission.[112] LWVTX has members, including members with disabilities, who regularly vote by mail and intend to vote by

---

[107] Ex. 107 (LWVTX Strategic Planning Goals 2022–2027); Ex. 108 at OCAGH_00001545 (2020-2022 Issue position: "Voting Rights and Election Laws"); Ex. 109 at OCAGH_00005345–5411 (March 2022 Voters Guide), 16663–16686 (November 2022 Voters Guide).

[108] Ex. 108 at OCAGH_00001545 (2020–2022 Issue position: "Voting Rights and Election Laws"); Ex. 108 (March and November 2022 Voters Guides); Ex. 110 (e-mail discussion of Austin league potentially hosting a candidate forum); Ex. 111 (2021 Guide to Candidates Forums); Ex. 112 (local league discussing in person events that may involve answering VBM questions).

[109] Ex. 30, LeBombard Dec. ¶¶ 5–7; Ex. 29, LWVTX 30(b)(6) Dep. at 15:11–13 (estimating membership around 3,050), 15:20–21 (members pay dues), 28:20–29:1 (board of directors are elected at convention), 38:3–39:20 (discussing pie chart and income coming from dues); Ex. 113 at OCAGH_00015599–601 (explaining dues and delegate system for elections); Ex. 114 at OCAGH_00015535 (purpose of convention is to elect officers); Ex. 115 at OCAGH_00002276 (chart showing 2021 income from membership dues); Ex. 116 (LWVTX bylaws explaining membership requirements and officer elections).

[110] Ex. 30, LeBombard Dec. ¶ 3.

[111] Ex. 30, LeBombard Dec. ¶ 4; Ex. 29, LWVTX 30(b)(6) Dep. at 10:23–11:7.

[112] Ex. 29, LWVTX 30(b)(6) Dep. at 95:9–16, 96:10–97:10 (ID requirements frustrate LWVTX's mission); Ex. 30, LeBombard Dec. ¶¶ 2, 28–32; Ex. 117 (social media post about vote by mail rejection rates due to SB1).

mail in the future, who will be harmed by SB1's identification requirements for voting by mail.[113]

Some of these members are hesitant to vote by mail because of high rejection rates due to SB 1.[114]

Since the day SB 1 passed, LWVTX has diverted resources to counteract the harmful effects of SB 1's matching-number requirement on voters.[115] LWVTX has had to spend a significant amount of time speaking with the media to raise awareness about changes under SB 1.[116] Specifically, LWVTX has diverted resources to educate voters about the changes resulting from SB1's changes to ID requirements, in order to reduce the harmful impact on voters who vote by mail.[117] This includes diverting resources to address questions from LWVTX members and other voters about SB1's changes to ID requirements.[118] LWVTX had to expend resources to

---

[113] Ex. 30, LeBombard Dec. ¶¶ 10–13; Ex. 118 (pie chart depiction of responses from survey of LWVTX members who vote by mail; Ex. 119 (results of survey in spreadsheet format, provided to the Court under seal via flash drive); Ex. 34, Lewis Dep. at 10:21, 44:25–45:25, 47:11–25; Ex. 35, Edmondson Dec. ¶¶ 6–7; Ex. 37, Suarez Dec. ¶¶ 7–8, 25; Ex. 24, Maloney Dec. ¶¶ 6–7, 15.

[114] Ex. 36, Buck Dec. ¶¶ 9–10.

[115] Ex. 30, LeBombard Dec. ¶¶ 15–27; Ex. 120 (LWVTX "Statement on Impact of SB 1 on Elections"); Ex. 121 (LWVTX testimony to Federal Subcommittee on Elections); Ex. 122 (LWVTX social media posts and website post containing updated videos); Ex. 123 (LWVTX e-mail notifying SOS about missing information from county and SOS websites); Ex. 124 (LWVTX recommendations to SOS urging improved implementation of the ID requirements); Ex. 125 at OCAGH_00018599 (March 21, 2023, LWVTX Capitol Action Report supporting legislation that would "reduce the number of personal identification requirements needed to track [and cure] your [vote by mail] ballot").

[116] Ex. 30, LeBombard Dec. ¶ 21; Ex. 126 (media requests on SB 1); Ex. 127 (LWVTX media appearances regarding SB 1).

[117] Ex. 30, LeBombard Dec. ¶¶ 16–23; Ex. 29, LWVTX 30(b)(6) Dep. at 102:23–103:23; Ex. 128 (presentations explaining SB 1's matching-number requirement, produced in native format at OCAGH_00003318 and 16736); Ex. 129 (press release for presentation explaining ID); Ex. 130 (agenda for presentation explaining ID changes for voters over 65).

[118] Ex. 131 at OCAGH_00005013 (then-LWVTX President asking Williamson County for resources because "I'm getting lots of concerns with the process"), OCAGH_00005901–06 (request for information on VBM changes), OCAGH_00007048–49 (answering local league question about ID), OCAGH_00007897–98 (question about VBM requirements), OCAGH_00016355–56 (question from LWVTX member who helped a voter cure her VBM ballot), OCAGH_00016980 (question about avoiding VBM application rejections),

design an alternative ABBM (what LWVTX literature refers to as a vote by mail—"VBM" application) design to provide to organizations and voters, in an attempt to reduce the harm from SB1's ID requirements.[119] LWVTX has had to spend time and other resources creating and updating materials to educate voters, particularly those who vote by mail, about new ID requirements under SB 1.[120] LWVTX has had to continually update its materials to reflect shifting guidance due to lack of clarity from the Secretary of State's office about the enforcement and implementation of SB 1.[121] After the March 1, 2022, primary and November 8, 2022, general

---

OCAGH_00017123–126 (question from LWVTX member to LWVTX President about Bernadette Maloney's VBM rejection); Ex. 25, Maloney Dec. ¶ 10;

[119] Ex. 30, LeBombard Dec. ¶ 24; Ex. 132 (describing new application design); Ex. 133 (translating materials and adding to website); Ex. 134 (providing materials to other organizations).

[120] Ex. 30, LeBombard Dec. ¶¶ 18–19; Ex. 29, LWVTX 30(b)(6) Dep. at 130:10–132:22 (discussing remaking videos); Ex. 135 (updated LWVTX flier on ID requirements); Ex. 136 (updated presentation including ID requirements, produced in native format at OCAGH_00003275); Ex. 137 (providing updated fliers and videos to local leagues and others); Ex. 138 ("I updated the website for all of the new Vote by Mail Resources."); Ex. 139 (discussing updating materials); Ex. 140 (then-LWVTX President Op-ed discussing SB 1's matching-number requirement); Ex. 141 (updated LWVTX YouTube videos about SB 1's matching-number requirement); Ex. 122 (LWVTX social media posts and website post containing updated videos); Ex. 142 at OCAGH_00016645 (LWVTX 2022 Impact Report: "We also developed new Voter Education material including videos to educate voters on how to complete the new vote-by-mail application and ballot carrier envelope."); Ex. 143 (LWVTX public service announcement script discussing recommendation to include both ID numbers when voting by mail); Ex. 144 (request for LWVTX presentation to explain ID requirements); Ex. 144 (May 2022 email explaining how to include ID numbers).

[121] Ex. 30, LeBombard Dec. ¶¶ 19, 25; Ex. 146 (LWVTX advising SOS to recommend that people include both numbers); Ex. 147, *compare* OCAGH_00003372 (LWVTX flier advising voters to write down their Texas ID or SS number), *with* OCAGH_00007599–600 (question about why LWVTX is not recommending including both ID numbers); *and* OCAGH_00004976 (updated flier advising including both ID numbers); *compare* Ex. 109 at OCAGH_00005347 (page 3 of PDF, March 2022 Primary Voter Guide recommending voters merely "Pay attention to the voter ID requirements"), *with* Ex. 148 OCAGH_00016049–50 and OCAGH_00018626 (translating changes to the runoff voter guide—including changes to ID instructions in attachment in lighter colored text).

elections, LWVTX spent time asking voters about their voting experiences, in order to further evaluate the impact of SB 1 on voters.[122]

These diversions of resources required LWVTX to turn away from its usual goals of increasing voter turnout among low-propensity and first-time voters, in order to help voters over 65 and voters with disabilities who usually vote but now need help navigating SB 1's matching-number requirement.[123] The improper rejection of mail ballots also decreases overall confidence in the mail ballot process and elections, which directly undermines the efforts LWVTX takes to encourage eligible voters to use mail ballots.[124]

Addressing the harmful changes under SB 1 required so many resources from LWVTX's existing employees and board members that LWVTX had to expand its capacity by hiring a Digital Communications Associate.[125] LWVTX also postponed its plans to conduct a review of the state of election administration and technology in Texas elections, specifically because it had diverted so many resources to addressing SB 1's changes.[126]

---

[122] Ex. 149 (spreadsheet containing results of March 2022 primary election voter survey, provided to the Court under seal via flash drive); Ex. 150 (LWVTX email collecting primary survey responses); Ex. 121 (testimony to Federal Subcommittee on Elections sharing primary survey responses); Ex. 151 (LWVTX social media post sharing primary survey responses); Ex. 152 (spreadsheet containing November 2022 election voter survey, provided to the Court under seal via flash drive); Ex. 153 (November 2022 voter survey).

[123] Ex. 30, LeBombard Dec. ¶ 26; Ex. 29, LWVTX 30(b)(6) Dep. at 89:7–91:2, 138:12–19; Ex. 107 (LWVTX strategic goals are to increase voter registration rates and reach low-propensity voters); Ex. 129 (press release for presentation explaining VBM identification changes under SB 1); Ex. 130 (agenda for presentation explaining ID changes for voters over 65); Ex. 154 ("This past election we were intensely focusing on the VBM process with our voter education.").

[124] Ex. 30, LeBombard Dec. ¶¶ 28–32; Ex. 29, LWVTX 30(b)(6) Dep. at 95:9–16, 96:10–97:10.

[125] Ex. 30, LeBombard Dec. ¶ 22; Ex. 29, LWVTX 30(b)(6) Dep. at 92:21–93:6; Ex. 155 (employment resume, offer, and acceptance).

[126] Ex. 31, Chimene Dec. ¶¶ 3–4; OCAGH_00009093 (2020 Convention minutes approving planned review).

Many of LWVTX's members have also been injured by SB 1's matching-number requirement. For example, Pam Gaskin, who is approximately 75 years old and is registered to vote in Fort Bend County, had her ABBM rejected by the county during the March 2022 primary election because she supplied her driver's license number, while her voter file contained only her social security number—the number she had put down when she registered to vote 46 years prior.[127] The same happened to Cynthia Edmondson, a LWVTX member who is approximately 80 years old, resides in Houston, and has multiple sclerosis: she submitted an ABBM before the March 2022 primary election and wrote down only her driver's license number, because that's what the form said to do. She did manage to submit an accepted ABBM after including both a driver's license number and a social security number, but was uncomfortable doing so, because the ABBM form said only to include her driver's license number.[128] Other LWVTX members have been similarly injured by SB 1's matching-number requirement.[129]

---

[127] Ex. 32, Gaskin Dep. at 12:18-13:1, 18:25–19:8, 20:13, 22:9–24:24, 87:15–90:25. Ms. Gaskin was eventually able to vote by mail after submitting a new ABBM with her social security number. *Id.* at 23:21–24:24.

[128] Ex. 35, Edmondson Dec. ¶¶ 1–3, 5, 7–12. Similarly, Jeannie Lewis, an LWVTX member who is approximately 81 years old, lives in San Marcos, is disabled, and initially registered to vote in 1985 using her social security number, also had her ABBM rejected due to a "mismatch" under SB 1 because she supplied her driver's license number on her ABBM. She had to reregister to vote with her driver's license number, and then had her mail ballot rejected for failing to provide an ID number on the carrier envelope. The rejection occurred so close to the election that she was forced to correct it in person. Ex. 34, Lewis Dep. at 10:21, 18:25–19:12, 44:25–45:2, 47:11–25, 75:4–77:23, 96:15–97:7, 99:22–100:25.

[129] Janet Eickmeyer, an LWVTX member who is approximately 73 years old and lives in Richardson, Texas, had her ABBM rejected twice by Dallas County during the March 2022 primary due to a "mismatch" under SB 1's matching-number requirement. She eventually received confirmation that her second ABBM was approved but without any explanation as to why. Ex. 33, Eickmeyer Dep. at 12:25–13:4, 16:24–18:13, 22:7–12, 25:21–27:17, 29:9–16, 44:14–45:14. Patricia Buck, an LWVTX member who is approximately 71 years old and resides in Harris County, wanted to start voting by mail in 2022 because she and her husband have difficulty standing for a long time due to their both having diabetes, and him having congestive heart failure.

### b.  OCA-Greater Houston

Plaintiff OCA-Greater Houston (OCA-GH) is a non-partisan civil rights organization of community advocates whose mission is to advance the social, political, and economic well-being of the Asian American and Pacific Islander ("AAPI") community, primarily in Harris, Brazoria, and Fort Bend counties,[130] with a focus on developing advocacy, leadership, and civic engagement participation within that community.[131] The four main goals of OCA-GH's mission are to (1) advocate for social justice, equal opportunity, and fair treatment; (2) promote civic participation, education, and leadership; (3) advance coalitions and community building; and (4) foster cultural heritage.[132]

OCA-GH is a traditional membership organization with 19 board members, approximately 160 dues-paying members who elect leadership, and several hundred volunteer members (many of whom are high school and college students) who work to fundraise and implement OCA-GH's programs throughout the greater Houston area.[133] These programs empower the AAPI community OCA-GH serves and include leadership training; education workshops; arts and cultural events;

---

However, she was deterred from voting by mail because of concerns about rejection rates and privacy concerns related to the new identification requirements. As a result, she voted in person during the 2022 March primary and November general elections. Ex. 36, Buck Dec. ¶¶ 2–3, 5, 7–11. Milán Suarez is an LWVTX member attending college in the State of Washington who maintains residency in Harris County and thus votes by mail in Texas elections. During the November 2022 general election, the HCEA mailed a notice to their Washington mailing address stating that their ABBM was rejected because there was no acceptable ID associated with their voter file. After significant delay, the HCEA mailed their ballot to their Harris County residence address, which their family then forwarded to their Seattle address. They are unsure whether the ballot was ultimately received on time or counted. Ex. 37, Suarez Dec. ¶¶ 1–3, 7–8, 9–17, 21–22.

[130] Ex. 38, Chen Dec. at ¶¶ 1–3.
[131] Ex. 38, Chen Dec. at ¶ 3; Ex. 39, OCA-GH 30(b)(6) Dep. at 60:14–61:22.
[132] Id.
[133] Ex. 38, Chen Dec. at ¶ 4; Ex. 39, OCA-GH 30(b)(6) Dep. at 55:4–58:24.

advocacy campaigns, including creating and distributing fliers in multiple languages; facilitating

voting, including by providing rides to the polls and hosting candidate forums; voter registration

drives; legal clinics; internships; scholarships; mentorship and civic engagement; and monitoring

of and advocacy for national and local public policy.[134] More specifically, as part of its efforts to

increase voter participation, OCA-GH engages in and promotes a wide variety of voter registration,

voter engagement, voter education, get-out-the-vote, exit polling, and election protection efforts

across Greater Houston, including in the Sugar Land region of Fort Bend County.[135]

A substantial portion of OCA-GH's membership, and the AAPI community it serves, are

elderly and/or have limited English proficiency ("LEP").[136] OCA-GH therefore focuses in part on

senior outreach and has made such efforts both pre- and post-COVID, including through a health

coalition group that involves arranging monthly bus trips for seniors for recreation, seminars, and

health fairs.[137]

OCA-GH's mission has been frustrated by SB 1's matching-number requirement.[138] OCA-

GH has many members who have voted by mail in the past, as have many members of the AAPI

community OCA-GH serves, who qualify due to age, disability (typically low vision), or both, and

many of whom are LEP voters.[139] Many of these elderly OCA-GH and community members have

expressed fears that they will have their ABBM or mail ballot rejected under SB 1; won't receive

---

[134] Ex. 38, Chen Dec. at ¶ 5.
[135] Ex. 38, Chen Dec. at ¶ 6 (providing examples).
[136] Ex. 38, Chen Dec. at ¶ 7. For example, many AAPIs in the Greater Houston area sponsor their parents to live with them in multigenerational households pursuant to family-based immigration visas. Similarly, much of the Vietnamese community, which is very large in Houston, came to the United States as adults after the Vietnam war, and are now elderly. *Id.*
[137] Ex. 38, Chen Dec. at ¶ 7.
[138] Ex. 38, Chen Dec. at ¶ 8.
[139] Ex. 38, Chen Dec. at ¶ 9.

notification about such errors in time to fix them before the election; won't remember which number they used to register to vote; or will suffer identity theft.[140] Historically, OCA-GH would have provided mail-in voting assistance, including voter education efforts regarding SB 1's matching-number requirement, that would help assuage these fears—but, as the result of SB 1 Sections 6.06 and 7.04, and the fear of prosecution under those provisions, OCA-GH no longer provides this sort of mail-in voting assistance.[141]

As a result, to counteract the effects of SB 1's matching-number requirement, OCA-GH devotes resources to encouraging voters to go to vote in person—thereby avoiding both the ID-matching and criminal liability problems altogether—and has spent, and will continue to spend, time educating them on how, where, and when to vote in person to avoid the rejection of their mail ballot.[142] OCA-GH's decision to encourage voters who qualify to vote by mail to instead vote in person was bolstered by seeing how many people had their mail-ballot materials rejected during the March 2022 primary election.[143]

This remains true even though many elderly OCA-GH members and AAPI community members are at elevated risk of and seriously fear contracting COVID in their vulnerable and advanced age.[144] Despite this, these voters are willing to take the risk of voting in person because

---

[140] Ex. 38, Chen Dec. at ¶ 10.
[141] Ex. 38, Chen Dec. at ¶ 11–14 (explaining in greater detail, as relevant to OCA-GH's challenge to SB 1's matching-number requirement, the ways in which OCA-GH provided mail-in voting assistance prior to SB 1). OCA-Plaintiffs have challenged SB 1 Sections 6.06 (amending Texas Election Code Section 86.0105) and 7.04 (adding Texas Election Code Section 276.015) but do not seek summary judgment on those claims, which they intend to pursue at trial.
[142] Ex. 38, Chen Dec. at ¶ 15.
[143] *Id.* at ¶ 15.
[144] *Id.* at ¶ 16.

they want to participate in democracy and do their civic duty to vote.[145] OCA-GH members Sam and Elizabeth Hwong exemplify this. The Hwongs are married and are both in their eighties. Prior to passage of SB 1 both voted by mail, and both were eligible to vote by mail during the 2022 elections. However, despite the significant personal risk of voting in person, the Hwongs both chose to cast their votes in person during the March and November elections because they feared that their mail-balloting materials would be rejected due to SB 1. Both would have voted by mail if not for SB 1.[146]

### c. REVUP-Texas

REVUP-Texas ("REVUP") was founded in 2015 and is a statewide, non-partisan, nonprofit grassroots organization whose mission is to empower persons with disabilities through voter registration and assistance, issue advocacy, mobilization, and organizing.[147] REVUP stands for "Register, Educate, Vote, Use Power."[148] It is a member-based organization whose members are primarily persons with disabilities,[149] and it has about 500 members across Texas, including voters who vote by mail.[150]

REVUP's primary mission is to register voters with disabilities, and their allies, to vote, and it spends significant time and resources to that end.[151] REVUP conducts voter registration programs and outreach to assist as many persons with disabilities in becoming registered as it can,

---

[145] *Id.* at ¶ 16; Ex. 40, Elizabeth Hwong Dec. at ¶¶ 1–14; Ex. 41, Sam Hwong Dec. at ¶¶ 1–14.

[146] Ex. 40, Elizabeth Hwong Dec. at ¶¶ 1–14; Ex. 41, Sam Hwong Dec. at ¶¶1–14.

[147] Ex. 42, Kafka Dec. ¶ 6; Ex. 43, REVUP 30(b)(6) Dep. at 10:10–16, 12:15, 13:14, 17:22 ("[V]oting is our prime mission.").

[148] Ex. 43, REVUP 30(b)(6) Dep. at 10:10–13; Ex. 42, Kafka Dec. ¶ 2.

[149] Ex. 42, Kafka Dec. ¶ 4.

[150] Ex. 42, Kafka Dec. ¶ 4, 5.

[151] Ex. 43, REVUP 30(b)(6) Dep. at 17:10–24 (describing the mission of REVUP and acronym for REVUP: Register, Educate, Vote, and Use Power, in more detail); Ex. 42, Kafka Dec. ¶ 7.

and participates in National Voter Registration Day and National Disability Voter Registration Week, which is coordinated nationwide by the American Association of People with Disabilities.[152]

REVUP, in furtherance of its mission to educate the disability community about registering to vote and about issues that impact them, has a dedicated website, a podcast series entitled "Use Your Power,"[153] and a presence on social media platforms such as Facebook, Instagram, Twitter, and YouTube.[154] REVUP also produces PSAs to educate and inform the disability community and its members about voter registration and issues that affect their lives.[155]

Prior to the passage of SB 1, REVUP's plans were to devote substantial time and resources on educating its members and the disability community about issues that impact them.[156] After SB 1 was enacted, however, REVUP was forced to shift its focus from voter registration and issue advocacy to educating voters about SB 1's changes to the vote-by-mail process, changes that place new barriers to receiving a mail ballot.[157]

REVUP's members do not pay dues, so REVUP has very limited resources, and the time and resources spent producing and disseminating informational materials and podcasts, answering

---

[152] Ex. 43, REVUP 30(b)(6) Dep. at 17:12-14 (specifically addressing voter registration), 18:19–20 (targeting voter registration attempts around local and national voter drive initiatives); Kafka Dec. ¶ 8.

[153] *E.g.*, Ex. 169 at OCAGH_0018311 (episode 9 of REVUP podcast on how SB 1 negatively affects voters with disabilities, including those who vote by mail); Ex. 42, Kafka Dec. ¶ 9.

[154] Ex. 43, REVUP 30(b)(6) Dep. at 22:12–20 (describing use of social media such as Instagram and YouTube, among other platforms); Ex. 42, Kafka Dec. ¶ 9.

[155] Ex. 43, REVUP 30(b)(6) Dep. at 23:23–24:4; Ex. 42, Kafka Dec. ¶ 10; Ex. 171 (REVUP voter registration flyer).

[156] Ex. 43, REVUP 30(b)(6) Dep. at 25:12–20, 13:14–15; Ex. 42, Kafka Dec. ¶ 12.

[157] Ex. 43, REVUP 30(b)(6) Dep. 25:12–13 (having to shift focus away from registration and having individuals reach the polls); Ex. 42, Kafka Dec. ¶ 11.

calls and emails, and updating its website to explain the changes and barriers to mail-in-voting, are resources it would otherwise spend elsewhere.[158]

Following the passage of SB 1 and in response to SB 1's changes and barriers to the vote-by-mail process, REVUP has had to spend significant time and resources explaining these changes and barriers by: creating and disseminating podcasts; updating its website; producing social media posts; answering questions from members and the public; creating and disseminating informational materials; and reaching out to the media and producing PSAs.[159]

---

[158] Ex. 43, REVUP 30(b)(6) Dep. at 14:23–24; Ex. 42, Kafka Dec. ¶ 14.

[159] Ex. 42, Kafka Dec. ¶¶ 12, 14, 16; Ex. 43, REVUP 30(b)(6) Dep. at 25:12–20 (increased education surrounding SB 1 mail-in ID voting requirements), 26:12–18 (redirecting resources to focus Facebook posts on SB 1 mail-in ID voting requirements), 28:1–2 (redirecting away from other educational outreach), 29:2–6 (social media scope "predominantly" geared towards SB 1), 29:10–22 (posting new information regarding mail-in ID voting requirements); 32:2–21 (resources directed away from core mission to have individuals vote in person to educating on mail-in ID voting changes because "SB 1 itself really sent a shockwave, sort of a chilling message"), 34:23–35:17 SB 1 is "omnipresent" and takes up "predominant" amount of REVUP's time, 37:1–6 (complexity of changes in SB 1 diverted resources in trying educate membership and the public); Ex. 156 (educational and outreach presentations regarding SB 1, including SB 1 matching-number requirement); Ex. 157 (REVUP education and outreach pamphlets on mail-in-voting requirements in light of SB 1 changes); Ex. 158, (January 17, 2022, e-mail from REVUP to advocacy community regarding mail-in-votes rejected with information to help eligible mail ballot voters navigate SB 1); Ex. 159 (March 9, 2022, e-mail from REVUP to community advocate making recommendations on SB 1 educational PowerPoint); Ex. 160 (draft info bulletin on SB 1 changes to mail-in voting intended for the public); Ex. 161, (media outreach and inquiries to votebeat.org, KPFT Houston 90.1 FM, newshour.org, and The Texas Tribune, regarding changes to voting by mail under SB 1 ); Ex. 162 (media outreach by REVUP members via Vimeo with League of Women Voters of Texas); Ex. 163 (video clip via YouTube; "'Disability Voters Mobilize for May Vote & Chilling Laws' w/ Bob Kafka, Rev-Up TX, KPFT News 3/25/255"); Ex. 164 (mass media e-mail concerning "ripple effect" of SB 1 on voting, including mail in voting for persons with disabilities); Ex. 165 (press release regarding the power of the disability vote in the wake of SB 1); Ex. 166 (REVUP Facebook posts linking to Texas Tribune article and KFPT Houston YouTube clip regarding SB 1's impact on disability vote); Ex. 167 (Caller Times and Texas Tribune articles including statements from Bob Kafka regarding impact of SB 1 on disability vote); Ex. 168 (Facebook posts promoting disability rights in voting in light of SB 1, including explaining SB 1 changes); Ex. 169 (REVUP podcasts: (1) October 2021 podcast episode 9, REVUP hosting an advocacy organization to explain impact of SB 1 on voting rights of persons with disabilities,

REVUP's response to SB 1 has also caused it to expend some of its extremely limited financial resources on updating its website and paying for American Sign Language interpreters for its SB 1 podcasts and trainings.[160]

REVUP's voter registration and get out the vote efforts and its policy advocacy will continue to suffer because REVUP will need to continue to spend time and resources educating and warning its members about these onerous and immaterial requirements.[161]

Besides the time and resources expended by REVUP responding to SB 1, REVUP's voter registration and get out the vote efforts, as well as its goal of empowering the disability community to become a constituency, are undermined when persons with disabilities vote-by-mail but have their ballots or applications rejected due to an immaterial identification issue.[162]

Many of REVUP's members have also been injured by SB 1's matching-number requirement. For example, Teri Saltzman, a registered voter living in Travis County who is legally blind, had her ABBM rejected during the March primary despite verifying with a support specialist at Disability Rights Texas that she had entered all three numbers correctly. She managed to obtain a mail ballot, but that too was rejected due to a SB 1 matching-number defect. After multiple frustrating attempts she thought she had finally been able to cure using the online Tracker, but later received another notice of rejection. And in November, her mail

---

including voting by mail, with ASL interpreter; (2) podcast episode 8 addressing post-SB 1 mail-in voting; and (3) podcast episode 18 addressing mail-in voting);

[160] Ex. 43, REVUP 30(b)(6) Dep. at 26:23–25 (change website and spend time with webmaster about information relating to SB 1 ID requirements), 27:1–9 (further information about why additional time was needed with webmaster due to chilling effect and misinformation about SB 1, including section changes to mail-in ID voting requirements), 31:14 (pay REVUP webmaster); Ex. 42, Kafka Dec. ¶ 16; Ex. 170 (invoices for American Sign Language (ASL) interpreting services).

[161] Ex. 42, Kafka Dec. ¶ 17.

[162] Ex. 42, Kafka Dec. ¶ 15.

ballot was again rejected for an SB 1 matching-number defect. Voting in person is very difficult for her due to her disability and she fears her mail balloting materials will again be rejected in the future.[163] Similarly, Yvonne Iglesias, a registered voter living in Hidalgo County, is a person who is paralyzed, experiences consistent muscle spasms, and is blind in one eye. Ms. Iglesias had her ABBM rejected twice due to SB 1's matching-number requirement during the November 2022 election. Due to her disabilities, voting by mail is the only form of voting available to her, and she no longer has confidence that she will be able to vote in the future.[164] Other REVUP members have been similarly injured by SB 1's matching-number requirement.[165]

---

[163] Ex. 44, Saltzman Dec. ¶¶ 1, 3, 5–10, 12, 15–16.

[164] Ex. 45, Iglesias Dec. ¶¶ 1–2, 4–9.

[165] *See* Ex. 46, Halvorson Dec; Ex. 47, Taylor Scott Dec., Ex. 48; Ann Scott Dec. Ms. Halvorson, a REVUP member with Muscular Dystrophy, had substantial difficulty filling out her mail ballot during the March 2022 primary because her caregiver was unwilling to assist her at that time due to the then-in-force assistor's oath making it a crime to provide the assistance she needed. Ex. 45 ¶ 19. While she managed to vote, the confirmation took so long to appear, and the process had been so difficult, that she decided to surrender her November mail ballot and voted in person with the assistance of her caregiver, which was substantially difficult for her. *Id.* ¶¶ 20–30. She wants to vote by mail in the future but fears that her ballot will not be counted due to SB 1. *Id.* ¶¶ 31–32. Taylor and Ann Scott are both members of REVUP and registered voters living in Hidalgo County. Exs. 46–47. Anne is Taylor's mother, and assists Taylor, who is diagnosed with Cerebral Palsy, is blind in one eye, and uses a power wheelchair, with many activities, including voting. *Id.* Taylor submitted an ABBM during the November 2022 election and used a United States passport number on the application for identification because her Texas identification number had expired. She never received a ballot. *Id.* Anne then had to take Taylor to vote in person, which due to Taylor's disabilities and medical fragility, placed Taylor at risk of COVID. *Id.*

### ii. Defendants

#### a. The Texas Secretary of State

Defendant Jane Nelson is the Texas Secretary of State ("SOS") and is sued in her official capacity. "The secretary of state is the chief election officer of the state." TEC § 31.001(a). Texas law requires that the SOS "prescribe the design and content . . . of the forms necessary for the administration" of the Texas Election Code, including the design and content of any ABBM or carrier envelope used by county or local election officials in performing their duties. *See id.* § 31.002(a); *id.* § 31.002(d) (local election officials "shall" use forms prescribed by SOS). The SOS must additionally "maintain uniformity of" vote-by-mail forms across the state. *See* TEC § 31.003. In other words, the Secretary's duties compel her to design ABBMs and carrier envelopes for mail ballots that now contain space for applicants to include the identification numbers required by SB 1's matching-number requirement, which local election officials "are required to use." *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020). The SOS therefore "has the *specific* and relevant duty to design the application form for mail in ballots . . . and to provide that form to local authorities and others who request it." *Id.* at 179–180 (5th Cir. 2020) (citing TEC § 31.002) (emphasis added). This analysis applies equally to mail ballot carrier envelopes. *See* TEC § 31.002.

The SOS deploys similar enforcement mechanisms with respect to the EVBB and/or SVC's procedures for notifying voters that their mail ballots have been rejected due to SB 1's matching-number requirement. Texas law expressly empowers the SOS to "prescribe any procedures necessary to implement" the ways voters may cure their rejected mail ballots. TEC §§ 87.0271(f), 87.0411(f). Finally, Texas law orders "[t]he secretary of state [to] develop or otherwise provide"

the Ballot by Mail Tracker "to each early voting clerk," and to "adopt rules and prescribe procedures as necessary to implement" the Ballot by Mail Tracker. TEC § 86.015.

The SOS's legal duty to enforce SB 1's matching-number requirement is apparent both on the face of the Texas Election Code and in the SOS's interactions and correspondence with county officials. For example, in a mass e-mail sent on December 3, 2021— immediately after SB 1's effective date—the SOS provided county election officials with ABBM and carrier envelopes "updated with required legislative updates, including a new space for the voter's personal identification number."[166] The SOS instructed the counties that the new forms "MUST be used for elections ordered on or after December 2, 2021."[167] The SOS similarly distributed to county election officials new ABBM rejection, mail ballot rejection, and corrective action forms implementing SB 1's matching-number requirement,[168] and has issued numerous statewide advisories to county election officials "prescribing . . . procedures to implement the corrective action process mandated in SB 1" and providing instructions on how to carry out the ID number

---

[166] Ex. 98 at STATE040170 (December 3, 2021, mass-email from the SOS to Texas county election officials).

[167] Ex. 98 at STATE040170. The SOS permits counties and their vendors to "create[e] their own template" for mail-balloting forms "based on SOS design recommendations," but the SOS is ultimately responsible for "prescrib[ing] the wording" of those forms. Ex. 99; *accord* Ex. 100, Ex. 101; *see also* Ex. 102 (Gregg County seeking permission from the SOS to increase the size of the pre-SB 1 ABBM form to make it easier to read for elderly voters, which the SOS approved after noting that the SOS was "currently finalizing" a new ABBM form to implement SB 1 and the county would need to seek approval to modify the new form similarly); Ex. 103 (similar exchange with Montgomery County).

[168] Ex. 86 (mass e-mail from SOS to Texas county election officials containing, among other things, newly prescribed ABBM rejection forms 6-3 and 6-4); Ex. 70 (same, containing, among other things, newly prescribed carrier envelope/mail ballot rejection forms 8-23 and 8-24; Ex. 88 (STATE087671–83) (same, containing newly prescribed carrier envelope/mail ballot rejection forms 6-11 and 6-12).

matching process.[169] Moreover, as set out at length above, the SOS provides and maintains the TEAM database which online counties use to carry out the identification number matching process and with which offline counties are required to sync their local databases, as well as enforces its office's mandates on local vendors through the vendor certification process.[170]

### b. The Harris County Elections Administrator and the Travis County Clerk

Defendant Clifford Tatum is the Harris County Elections Administrator ("HCEA"). Defendant Dyana Limon-Mercado is the Travis County Clerk ("TCC"). Each is sued in their official capacity. Along with the SOS, Defendants HCEA and TCC enforce SB 1's matching-number requirement within their respective counties. *See Tex. Democratic Party*, 978 F.3d at 180 (acknowledging how different officials can share "a division of responsibilities" to enforce a statute). Section 86.001 of the Election Code instructs "[t]he early voting clerk" to "review each application for a ballot to be voted by mail" for, among other things, "the information required under Section 84.002(a)(1-a)." SB 1 also directs these local officials to reject applications or ballots that contain information different from that listed on a voter's registration application, as well as to facilitate any notice and cure opportunity, including uploading data to the SOS's Ballot by Mail Tracker tool. *See* TEC §§ 86.001, 86.015, 87.0271, 87.041. As discussed above, the HCEA, the TCC, and other local election officials do in fact carry out these duties.

---

[169] Ex. 70 at STATE060480–507 (SOS Election Advisory No. 2022-08); Ex. 71 at STATE136912–16 (SOS Election Advisory No. 2022-12).
[170] *See infra* at 9 & note 24.

### III. ARGUMENT

Plaintiffs OCA-GH, LWVTX, and REVUP are entitled to summary judgment on their claims, brought on their own behalf and on behalf of their members, because SB 1's matching-number requirement violates Section 101 of the Civil Rights Act of 1964.

Section 101 prohibits "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The word "vote" is defined capaciously, to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A); (e). This provision—"often referred to as 'the materiality provision'"—is meant to prevent states from "requiring unnecessary information" as a condition on the right to vote. *Schwier v. Cox*, 340 F.3d 1284, 1294, 1297 (11th Cir. 2003).[171] It prohibits "state election practices that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters." *League of Women Voters of Ark. v. Thurston*, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021).

---

[171] The materiality provision traces its roots to Reconstruction and the Enforcement Act of 1870, which is also sometimes referred to as the Voting Rights Act of 1870. *See* Act of May 31, 1870, ch. 114, 16 Stat. 140, 140-42 (1870); *Schwier v. Cox*, 340 F.3d 1284, 1286 (11th Cir. 2003). Congress amended the statute in the Civil Rights Acts of 1957, 1960, and 1964, the latter of which added the materiality provision. R.S. § 2004; Pub.L. 85-315, pt. IV, § 131, Sept. 9, 1957, 71 Stat. 637; Pub.L. 86-449, Title VI, § 601, May 6, 1960, 74 Stat. 90; Pub.L. 88-352, Title I, § 101, July 2, 1964, 78 Stat. 241. Congress again amended the statute in the Voting Rights Act of 1965. Pub.L. 89-110, § 15, Aug. 6, 1965, 79 Stat. 445. As a result, the case law varyingly refers to this provision as part of the Civil Rights Act or of the Voting Rights Act.

Here, the undisputed facts make plain that, under SB 1, thousands of Texas voters:

(1) are "den[ied] the right . . . to vote" (*i.e.*, because elections officials will reject voters' ABBMs—which for many Texans are a necessary prerequisite to casting an effective vote—or else will reject their mail ballots such that they are not counted),

(2) because of "an error or omission" (*i.e.*, a failure to write an ID number that successfully matches a number in the voter's file in the voter registration database),

(3) "on [a] record or paper relating to any application, registration, or other act requisite to voting" (*i.e.*, the ABBM form or the mail ballot carrier envelope, pieces of required, voting-related paperwork),

(4) where that error or omission is "not material in determining whether such individual is qualified under State law to vote in such election" (*i.e.*, because whether the voter can provide a number that matches the number contained in their voter file has no bearing on whether they are qualified to vote in Texas).

*See* 52 U.S.C. § 10101. As set out below, this Court can determine that the number-matching requirement violates Section 101 as a matter of law on multiple grounds.

**A. A DPS ID number or an SSN4 is not material in determining a voter's qualifications.**

To determine whether an error or omission is material, the information required must be compared to state law qualifications to vote. *See Migliori v. Cohen*, 36 F.4th 153, 162 (3d Cir. 2022), *vacated on other grounds sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018). Under Texas law, an individual is qualified to vote based on six discrete factors: age, U.S. citizenship, mental capacity, felony conviction status, residency in the state, and registration status. TEC § 11.002. Texas law then authorizes the following categories of qualified voters to cast ballots by mail: those who expect to be absent during the entire voting period (including the period for in-person early voting), those

44

with a disability, those who will be 65 or older on Election Day, those confined in jail, those who are involuntarily committed, and certified participants in Texas's address confidentiality program. *See id.* §§ 82.001–.004, 82.007–.008.

Whether a voter can match the ID number provided on their ABBM or carrier envelope to the number contained in their voter registration file is not material to determining any of these qualifications. *See, e.g.*, *Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (mem. op.) (provision of social security number immaterial to determining qualification to vote); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270–71 (W.D. Wash. 2006) (driver's license and social security number matching requirement immaterial to determining qualification to vote); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (describing as not material "failure to provide information, such as race or social security number, that is not directly relevant to the question of eligibility"). Indeed, SB 1 itself contemplates that certain voters who do not have either a DPS ID number or an SSN4 may still cast a mail ballot. *See* TEC §§ 84.002(a)(1-a)(C) (a voter may indicate on their ABBM that they have not been issued either number), 86.002(g)(3) (same, on carrier envelope). If Texas law itself permits a voter to obtain an ABBM or cast a mail ballot even when they do not have a DPS ID number or SSN4, then a voter's ability to provide a number that matches their voter file cannot be material to determining their qualification to vote.

**B. A voter's ability to provide a number that matches their voter file in TEAM is not material to determining the voter's identity.**

To the extent that defendants argue that the required ID number helps to establish a voter's identity (and is ostensibly material to determining their qualifications for that reason), that argument is foreclosed by the undisputed facts in the record.

45

There is no evidence that counties had any trouble identifying voters prior to SB 1. Thus, for example, the Travis County Clerk testified that they did not typically have any difficulty identifying voters requesting a mail ballot prior to SB 1.[172] Moreover, the mail-balloting process already included the signature comparison process as a method to verify a voter's identity. *See* TEC §§ 87.041(b) (instructing early voting ballot board it may only accept a ballot if "neither the voter's signature on the [ABBM] nor the signature on the carrier envelope . . . is determined to have been executed by a person other than the voter, unless signed by a witness"); 87.027(i) (similar, for signature verification committee). As Tammy Patrick, longtime election administrator and election administration advisor and instructor, stated in her expert report, "[s]ignature verification is the most common method of voter authentication."[173] "A signature or identifying mark is something that voters inherently have the ability to provide without it having to be provided to them" and is something "[a] voter will not misstate."[174] In comparison, "the rejection or acceptance" of mail-balloting materials "hinging on the provision of a single data point that must be obtained by a government agency and can be subject to clerical error, transcription, and misinterpretation is problematic and contrary to sound election administration principles," particularly where "other authentication elements are present (such as the signature)."[175]

More to the point, the undisputed evidence shows that local election officials *do not* utilize the identification numbers provided by voters pursuant to SB 1 to establish voters' identities at either the ABBM or mail ballot stage. Rather, local election officials first look up a voter based on

---

[172] Ex. 16, TCC 30(b)(6) Dep. May 11, 2022, Johnson, at 12:11–18.
[173] Ex. 5, Patrick Expert Rep., Feb. 28, 2022, ¶¶ 1, 34.
[174] Ex. 5, Patrick Expert Rep., Feb. 28, 2022, ¶ 34.
[175] Ex. 5, Patrick Expert Rep., Feb. 28, 2022, ¶¶ 34–35.

the other information included on an ABBM—name, date of birth, or Voter Unique Identifier (a unique number assigned to each Texas voter upon registration to vote).[176] As the HCEA testified, it is only "after that" that Harris County "look[s] to see whether the identification numbers match."[177] Or, as the TCC testified, Travis County is "able to associate [an ABBM] applicant with their voter file . . . . even in the absence" of an identification number, because they "have to look up [the voter's] file to see if [the voter] ha[s] a number in the first place."[178] This is logical; the voter must *first* be identified before the county can compare the voter-supplied ID number with the number in the voter's file. After an ABBM is accepted, meanwhile, counties assign a unique barcode to the ABBM and the corresponding carrier envelope sent to the voter, which is used to match the carrier envelope to the voter's file when the voter returns it.[179] Accordingly, as the HCEA testified, Harris County does not use the identification numbers "for any purpose beyond determining whether" an ABBM or mail ballot "can be accepted in light of [SB] 1."[180]

---

[176] Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 55:20–56:8; Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 41:5–14.

[177] Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 55:20–56:8.

[178] Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 28:19–29:2.

[179] Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 56:24–57:16; Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 41:15–42:3; *see* Texas Elec. Code § 86.015(c)(2). Domestic voters are *required* to return their mail ballots in this official carrier envelope, or have their ballot treated as untimely and rejected. *See* TEC § 86.006(h); Ex. 69 (Form 5-16a, Notice of Improper Delivery), *also available at* https://www.sos.texas.gov/elections/forms/pol-sub/5-16a.pdf (last visited May 22, 2023).

[180] Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 57:17–25. The TCC testified similarly, stating that only in "very rare" situations would the county use an ID number for "any purpose beyond determining" whether to accept an ABBM or mail ballot. Ex. 18, TCC 30(b)(6) Dep. March 29, 2023, Johnson, at 42:4–11. The TCC clarified that these "very rare" circumstances *might* occur when an overseas voter who has received their ballot electronically returns it in their own envelope, which would not be bar-coded, but that in that situation the TCC could also simply use the voter's name to look up the voter. *Id.* at 87:10–88:9; *see* Ex. 105, (SOS Election Advisory No. 2022-02, discussing voting by mail for overseas voters), *also available at* https://www.sos.texas.gov/elections/laws/advisory2022-02.shtml.

The SOS's principal election advisory regarding SB 1, sent on January 28, 2022, acknowledged this reality. It recommended that county officials, in calling a voter whose mail ballot has been rejected pursuant to SB 1's matching-number requirement, "confirm the voter's identity using publicly available information," such as by asking the voter "to confirm their voter registration address and whether they requested a mail ballot for the given election."[181] The same instructions were given in training materials presented to county officials ahead of the March and November elections.[182] In other words, the SOS's advisories and trainings acknowledge that election officials can identify the person on the phone as the voter whose mail ballot has been rejected without any reference to the identification numbers required by SB 1.

Similarly, former Director of the SOS's Elections Division, Keith Ingram, testified that he agreed that the identification numbers required by SB 1 "are not used to find the voter in TEAM as part of the ABBM processing," although he "guess[ed that a county] could look it up by [driver's

---

This same order of operations—first identifying the voter, then carrying out the number matching process—necessarily plays out when determining which balloting materials to reject, as well as which to allow to be cured. For example, imagine a voter who includes a DPS ID number on their ABBM that does not match the DPS ID number in their voter file, but who does have access to both a matching DPS ID number and matching SSN4. Initially, to even determine that there is a 'mismatch' requires county election officials to identify the voter *without* the use of the 'correct' identification number, because the election official must be able to match the voter-provided 'wrong' number to the 'right' voter file using the other information on the ABBM. Next, because this voter has access to both a 'correct' DPS ID number and a 'correct' SSN4, they may log in to the Ballot by Mail Tracker to correct the mismatch and have their ABBM accepted. But in order for the voter to see their ABBM upon logging in to the Ballot by Mail Tracker, the county must have already identified the voter using the ABBM bearing the 'wrong' number, and connected it to the voter's file bearing the 'right' number. The same is true for a voter who submits a numberless ABBM; for this voter to log in to the Ballot by Mail Tracker and 'add' their identification number to their ABBM necessarily requires that the county have already identified the voter and matched their numberless ABBM to their number-containing voter file.

[181] Ex. 70 at STATE060491.

[182] Ex. 75 at STATE034547 (March 2022 PowerPoint); Ex. 76 at STATE112350 (October 2022 PowerPoint).

license] number if they wanted to."[183] When asked if the ID numbers are used to "confirm the voter," rather than "to look up the voter," he agreed that they are "used to make sure the voter has properly identified themself on the application, yes."[184] He additionally testified that, in a scenario in which a voter calls in to ask their county clerk or county elections administrator for the number in their voter file, the official is permitted to give the voter the number after "go[ing] through some questions to validate that it's [the voter] and not some vote harvester trying to steal [their] vote."[185] These questions would include verifying "information that would be in their voter record," like "name, date of birth, address, things like that," all of which is "information that was on the [ABBM] prior to SB 1."[186]

The record cannot support any argument that the required ID number serves any identification purpose. If an election official can simply *give* a voter the correct, matching identification number in the voter's file after establishing the voter's identity using information that was already available prior to SB 1, the requirement that the voter provide a matching number cannot be material to determining their qualification to vote. Courts have repeatedly held that requiring such extraneous information on voting-related paperwork on pain of disenfranchisement violates Section 101, even if the information theoretically ties to "identity." *See Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (mem. op.) (provision of social security number); *Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1270 (driver's license and social security number matching requirement); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 2021 WL 6495360, at *14

---

[183] Ex. 20, Ingram Dep. March 28, 2023, at 69:3–12.
[184] Ex. 20, Ingram Dep. March 28, 2023, at 68:3–8.
[185] Ex. 20, Ingram Dep. March 28, 2023, at 104:10–23.
[186] *Id.* at 104:25–105:10.

(N.D. Ga. Dec. 9, 2021) (date of birth requirement on applications and mail ballots); *Martin*, 347 F. Supp. 3d at 1309; *League of Women Voters of Ark.*, 2021 WL 5312640, at *4. Here, the undisputed evidence demonstrates that the required information is not used for identification purposes, and this Court should reach the same result.

### C. Providing a number that happens to match the number in their voter file is totally unrelated to determining a voter's qualifications to vote.

Even if providing a *valid* identification number could be considered material to determining a voter's qualifications (and on this record it cannot), providing a *matching* number—that is, a number that happens to match the error-riddled and incomplete TEAM database—cannot be. Whether a voter is able to write a number that happens to match the TEAM database, despite the millions of incomplete or erroneous entries, has no bearing on whether they are qualified to vote. Instead, it is a matter of arbitrary luck or misfortune.

Thousands have and will continue to suffer from such misfortune. Approximately 2.7 million voter files in TEAM reflect at least one of the follow problems: (1) the voter has multiple DPS ID numbers, but only one is contained in TEAM; (2) the voter has a DPS ID number, but it is not contained in TEAM; or (3) the voter's DPS ID number or SSN4 contains a typographical error in TEAM. Of these 2.7 million "at risk" voters, approximately 300,000 are facially qualified to vote by mail because they are over the age of 65, are disabled, or have a non-US mailing address. Of the remaining, an unknown but meaningful number will become sick, or disabled, or pregnant, or be out of town for a family or work obligation, or be called overseas, or experience any of the other myriad reasons that would render them eligible to vote by mail in a particular election.[187]

---

[187] *See* Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶¶ 46–47.

Each of these voters may follow the letter of the law, provide a valid ID, and *still* have their ABBMs or mail ballots rejected pursuant to SB 1 due to database errors that they did not cause and cannot readily correct. This is why, as Dr. Hersh concluded, "at risk voters" were significantly less likely to successfully cast a mail ballot, and more likely to have their mail ballots rejected.[188] And ultimately, during the November 2022 election, more than double the percentage of "at risk" voters as compared to non-at risk voters—6.4% versus 2.8%—had their mail-ballots rejected due to SB 1's matching-number requirement.[189]

The perverse outcome of SB 1's matching-number requirement is that a qualified voter may follow SB 1 to the letter, provide a *valid* identification number as instructed, yet be subject to the mandatory rejection of their ABBM or mail-ballot *because* they supplied that number. For instance, LWVTX members Pam Gaskin and Cynthia Edmondson both had their ABBMs rejected despite including a valid driver's license numbers, because their voter files contained only their SSN4s, while Roberto Benavides had his ABBM rejected because his voter file contained an incorrect driver's license number.[190] At the same time, the undisputed record indicates that a voter could also provide *incorrect* information on their ABBM or carrier envelope that nevertheless matches the registration database. For example, as the SOS testified, if a voter does in fact have a DPS ID number and an SSN4 yet indicates they do not possess either on their ABBM, their ABBM must be accepted if TEAM accurately reflects this inaccurate information.[191] Similarly, if a voter's ID number in TEAM is incorrect—as thousands are—then a voter who accurately writes their ID

---

[188] Ex. 3, Hersh Second Suppl. Rep., Feb. 3, 2023, ¶ 27; Ex. 4, Addendum to Hersh Second Suppl. Rep., May 8, 2023, ¶¶ 6–7 and Table 1.
[189] Ex. 4, Addendum to Hersh Second Suppl. Rep., May 8, 2023, ¶ 13.
[190] *Supra* at 25–26, 31.
[191] Ex. 8, SOS 30(b)(6) Dep. April 26, 2022, at 90:9–91:13.

number on their mail-ballot materials will *fail* to match, while a voter who *inaccurately* writes

their ID number might hit on the matching one. *See Migliori*, 36 F.4th at 164 ("If the substance of

the string of numbers does not matter, then it is hard to understand how one could claim that this

requirement has any use in determining a voter's qualifications.").

Given these and other scenarios caused by the systemic deficiencies in the TEAM database,

a voter's writing in the "right" matching-number does not even show whether they have a valid ID

number, let alone speak to the voter's qualifications to vote.

### D. Whether a voter provides a matching identification number on their carrier envelope, after having *already done so* on the ABBM, is not material to determining their qualifications to vote.

Even if the Court were to find SB 1's matching-number requirement does not violate

Section 101 at the ABBM stage, the duplicative requirement that a voter who has successfully

obtained a mail ballot by matching the identification number on their ABBM to their voter file

must do so *again* on the carrier envelope to have their vote counted would still be unlawful. To

put this requirement in perspective, in 2022, across the March primary, May constitutional and

primary runoff, and November general elections, approximately 40,000 mail-in voters had their

right to vote denied *even though they had already successfully identified themselves during the

application process*.[192] As the HCEA testified, voters understandably think "that because they've

included that information on their application, they don't need to do it on the carrier envelope,"

and have "expressed frustrations at having to correct their mail ballots and having to go through

that process and some have not returned their mail ballots because of that."[193]

---

[192] *Supra* at Part II.D.
[193] Ex. 12, HCEA 30(b)(6) Dep. April 20, 2022, Longoria, at 43:1–10; Ex. 13, HCEA 30(b)(6) Dep. March 21, 2023, Colvin, at 48:25–49:10. (SB 1 confuses voters because they "feel like, if

SB 1's utterly duplicative requirement that voters provide an identification number at the mail-ballot stage after already navigating the ABBM stage to obtain the mail ballot in the first place is a textbook attempt to multiply the stages at which a voter might commit an error or omission that leads to disenfranchisement, in violation of Section 101. *See Martin*, 347 F. Supp. 3d. at 1309 (enjoining requirement that voters hand-write their birth year on absentee ballot because "the qualifications of the absentee voters" were "not at issue because [county] elections officials have already confirmed such voters' eligibility through the absentee ballot application process"); *League of Women Voters of Ark.*, 2021 WL 5312640, at *4 (state law requiring absentee voters to submit duplicative information at mail-ballot stage, after voters had already correctly provided the information at the application stage, under threat of being disenfranchised on the basis of a mismatch or omission, gave rise to a materiality violation);

### E.  It does not matter that *some* voters may be able to cure *some* SB 1-related ABBM or mail ballot rejections.

The fact that SB 1 provides *some* voters the opportunity to cure *some* SB 1-related ABBM or carrier envelope rejections does not negate the fact that each such rejection violates Section 101. The language of the statute prohibits any person acting under color of law from "deny[ing] the right of any individual to vote because of an error or omission on any record or paper relating to any application, registration or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election," and it defines "vote" to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and

---

they put [their ID number] on their application, they didn't need to include it on the ballot or vice versa. They didn't feel like they needed to include it on both").

having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(2)(B), (a)(3)(A), (e). Accordingly, pursuant to the plain text of the statute, a violation of Section 101 occurs each time a voter's ABBM or mail ballot is rejected due to an immaterial error or omission, irrespective of whether the voter is able to "cure" the rejection. *See La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022) (Rodriguez, J.) ("Section 101 provides that state actors may not deny the right to vote based on errors or omissions that are not material; it does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes.").

Moreover, while "[t]he cure period [may be] intended to solve the inherent problems in" SB 1's matching-number requirement, "the opportunity to cure has proven illusory" for tens of thousands of Texas voters. *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030–31 (N.D. Fla. 2018) (finding cure provisions inadequate where not accessible); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018) (same).[194]

The bottom line is, due to the challenged SB 1 provisions, tens of thousands of qualified Texas voters have been and will continue to be unlawfully denied the right to cast an effective vote and have it counted purely for failure to comply with an arbitrary and extraneous number matching-requirement that does not bear on their qualifications to vote under Texas law. Summary judgment should be granted.

## IV. CONCLUSION AND RELIEF SOUGHT

For the forgoing reasons, OCA Plaintiffs are entitled to judgment as a matter of law on their claims, both on behalf of themselves and their members, that SB 1's matching-number

---

[194] *See supra* Parts II.D–E.

requirement violates Section 101 of the CRA. Accordingly, they respectfully request the Court declare that the following provisions of the Texas Election Code, added or amended by SB 1's matching-number requirement, violate Section 101 of the CRA:

- Texas Election Code §§ 84.002(a)(1-a), (b-1)
- Texas Election Code § 84.011(a)(3-a)
- Texas Election Code §§ 86.001(f), (f-1), (f-2)
- Texas Election Code §§ 86.002(g), (h), (i)
- Texas Election Code § 86.015(c)(4)
- Texas Election Code § 87.0271(a)(4)
- Texas Election Code § 87.041(b)(8)
- Texas Election Code § 87.0411(a)(4)

OCA Plaintiffs further request the Court permanently enjoin the Texas Secretary of State, the Harris County Elections Administrator, and the Travis County Clerk from enforcing any of the above-listed provisions. OCA Plaintiffs finally request the Court award any other relief to which they are entitled, including attorneys' fees.

Dated: May 26, 2023.

Respectfully submitted,

*/s/ Zachary Dolling*
Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Dayton Campbell-Harris
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
dcampbell-harris@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

56

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 15th St. NW
Washington, DC 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

LUCIA ROMANO
Texas State Bar No. 24033013
PETER HOFER
Texas State Bar No. 09777275
CHRISTOPHER MCGREAL
Texas State Bar No. 24051774
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org


Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alyssa G. Bernstein*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001

(202) 639-6000
jamunson@jenner.com
abernstein@jenner.com

Gregory D. Washington*
**JENNER & BLOCK LLP**
455 Market St. Suite 2100
San Francisco, CA 94105
gwashington@jenner.com

***COUNSEL FOR OCA-GREATER
HOUSTON
PLAINTIFFS.***
*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On May 26, 2023, I filed the foregoing using the CM/ECF system of the Western District of Texas, which will send notification of this filing to counsel of record.


/s/ *Zachary Dolling*