UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br>*Plaintiffs,*<br>v.<br><br>GREGORY W. ABBOTT, et al.,<br>*Defendants.* | 5:21-cv-844-XR |
| OCA-GREATER HOUSTON, et al.,<br>*Plaintiffs,*<br>v.<br><br>JANE NELSON, et al.,<br>*Defendants.* | 1:21-CV-0780-XR |

## APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

1. Hersh Expert Report, February 28, 2022 ......................................................8
2. Hersh First Supplemental Expert Report, May 4, 2022 ...............................59
3. Hersh Second Supplemental Expert Report, February 3, 2023 ......................92
4. Addendum to Hersh Second Supplemental Expert Report, May 8, 2023...........119
5. Patrick Expert Report, February 28, 2022 ................................................128
6. Patrick First Supplemental Expert Report, April 29, 2022...........................151
7. Patrick Second Supplemental Expert Report, February 10, 2023 ...................159
8. SOS 30(b)(6) Deposition of Keith Ingram, April 26, 2022 ..........................167
9. SOS 30(b)(6) Deposition of Keith Ingram, May 6, 2022 .............................186
10. SOS 30(b)(6) Deposition of Keith Ingram, March 28, 2023 .........................204
11. SOS 30(b)(6) Deposition of Samuel Taylor, March 29, 2023 .......................232
12. HCEA 30(b)(6) Deposition of Isabel Longoria, April 20, 2022.....................245
13. HCEA 30(b)(6) Deposition of Jennifer Colvin, March 21, 2023 ....................262
14. HCEA 30(b)(6) Deposition of Rachelle Obakozuwa, March 21, 2023 ..............288
15. TCC 30(b)(6) Deposition of Bridgette Escobedo, May 11, 2022....................305
16. TCC 30(b)(6) Deposition of Charlton Johnson, May 11, 2022 ......................328
17. TCC 30(b)(6) Deposition of Dan Hayes, March 29, 2023 ............................342
18. TCC 30(b)(6) Deposition of Charlie Johnson, March 29, 2023 .....................358
19. Deposition of Keith Ingram, April 28, 2022 .............................................390
20. Deposition of Keith Ingram, March 28, 2023........................................408
21. Deposition of Christina Adkins, July 20, 2022........................................443
22. Deposition of Christina Adkins, April 11, 2023 .......................................451
23. Deposition of Roberto Benavides .......................................................476
24. Deposition of Bernadette Maloney .....................................................493

1

25. Declaration of Bernadette Maloney ....................................................516
26. Declaration of Yi Lu Zhao...........................................................520
27. Declaration of Ming Fei Yi..........................................................526
28. Declaration of Riazuddin Ahmed ....................................................530
29. LWVTX 30(b)(6) Deposition of Grace Chimene....................................535
30. Declaration of Joyce LeBombard.....................................................566
31. Declaration of Grace Chimene.......................................................576
32. Deposition of Pamiel Gaskin ........................................................579
33. Deposition of Janet Eickmeyer......................................................599
34. Deposition of Jeannie Lewis ........................................................624
35. Declaration of Cynthia Edmonsdson .................................................644
36. Declaration of Patricia Buck........................................................648
37. Declaration of Milan Suarez ........................................................651
38. Declaration of Deborah Chen .......................................................656
39. OCA-GH 30(b)(6) Deposition of Deborah Chen....................................664
40. Declaration of Elizabeth Hwong......................................................678
41. Declaration of Sam Hwong...........................................................681
42. Declaration of Bob Kafka ...........................................................684
43. REVUP-TX 30(b)(6) Deposition of Bob Kafka ....................................688
44. Declaration of Teri Saltzman ........................................................719
45. Declaration of Yvonne Iglesias.......................................................731
46. Declaration of Laura Halvorson......................................................735
47. Declaration of Taylor Scott .........................................................744
48. Declaration of Anne Scott...........................................................747
49. HCEA's Objections and Answers to Plaintiffs' First Set of
    Interrogatories, May 13, 2022.......................................................750
50. TCC's Objections and Responses to Plaintiffs' Interrogatories,
    September 12, 2022.................................................................756
51. HCEA's Amended Responses and Objections to OCA Plaintiffs' First
    Set of Interrogatories, May 5, 2023 ...............................................765
52. TCC's Objections and Responses to OCA Plaintiffs' First Set of
    Interrogatories, March 23, 2023....................................................772
53. HCEA's Supplemental Reponses to State Defendants' Second Set of
    Interrogatories, March 21, 2023....................................................779
54. State Defendants' Supplemental Objections and Responses to the United
    States' Second Set of Interrogatories, Jan. 19, 2023 ...............................784
55. State Defendants' Objections and Responses to the United States' Fourth
    Set of Interrogatories, March 24, 2023 ............................................799
56. 064.127498 Reason Key v2.1 .......................................................807
57. 064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL)..............809
58. Exhibit 58, 064.127324 (CONFIDENTIAL) 2022 P22 App Rejections
    (Includes Voters that Cured Rej) ..................................................811
59. Harris County Post-March 2022 Primary Press Release .............................813
60. 064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log....................815
61. 064.128587 P18 Ballot Board (CONFIDENTIAL)...................................817
62. March 14, 2022, SOS e-mail regarding March Primary ABBM rejections.........819

2

63. April 7, 2022, SOS e-mail regarding March Primary mail ballot
    rejections ...................................................................................823
64. STATE110692 (Master Spreadsheet_2022 Mail Ballot
    Acceptance+Rejection Rates by County.xlsx).......................................825
65. SOS master spreadsheet of mail ballot rejections in 2022...........................827
66. EAVS 2020 Comprehensive Report ...................................................864
67. Exhibit 16 to Ingram Deposition of March 28, 2023................................1117
68. Exhibit 17 to Ingram Deposition of March 28, 2023................................1120
69. SOS Form 5-16a, Notice of Improper Delivery.....................................1123
70. January 28, 2022, SOS mass e-mail to Texas counties .............................1126
71. February 12, 2022, SOS mass e-mail to Texas counties ...........................1172
72. E-mail exchange between SOS General Counsel and VOTEC....................1179
73. April 14, 2022, SOS mass e-mail to Texas counties.................................1185
74. December 2021 and December 2022 comparative processes.......................1187
75. March 22, 2022, PowerPoint--Training on new Ballot by Mail
    procedures ..................................................................................1190
76. October 11, 2022, PowerPoint--Training on new Ballot by Mail
    procedures ..................................................................................1241
77. May 18, 2022, SOS mass e-mail to Texas counties.................................1268
78. VoteReady Pamphlet....................................................................1270
79. Longoria_003382, Harris County voter education video...........................1273
80. Harris County Elections Recommendations for Ballot by Mail
    Applications ................................................................................1275
81. Harris County Post-November 2022 Election Report...............................1277
82. Travis County ABBM and carrier envelope inserts..................................1332
83. Harris County carrier envelope inserts................................................1337
84. SOS's Officially Prescribed ABBM...................................................1344
85. SOS's Officially Prescribed Carrier Envelope ......................................1347
86. January 12, 2022, SOS mass e-mail to Texas counties.............................1351
87. April 1, 2022, e-mail exchange between SOS and Denton County................1366
88. April 19, 2022, SOS mass e-mail to Texas counties.................................1370
89. Screenshot of Ballot by Mail Tracker Page, May 18, 2023.........................1384
90. Exhibit 13 to Ingram Deposition of March 28, 2023................................1386
91. November 8, 2022, e-mail exchange between SOS and Medina County..........1390
92. SOS's Officially Prescribed Voter Registration Application.......................1393
93. Exhibit 18 to Ingram Deposition of March 28, 2023................................1396
94. Exhibit 19 to Ingram Deposition of March 28, 2023................................1398
95. Screenshot of Voter Registration Portal Front Page, May 18, 2023 ..............1400
96. Screenshot of front page of Texas.gov, May 18, 2023 .............................1402
97. Screenshot of Voter Registration Portal Log-in Page, May 18, 2023.............1410
98. December 3, 2021, SOS mass e-mail to Texas counties.............................1412
99. Carrier Envelope and Instructions for Early Voting Ballot by Mail...............1415
100. May 10, 2022, SOS mass e-mail to Texas counties ...............................1417
101. November 18, 2022, SOS e-mail to mail-balloting vendors ......................1419
102. November 23, 2021, e-mail exchange between SOS and Gregg County.........1424

103. September 9, 2021, e-mail exchange between SOS and Montgomery County ...............................................................................................1427
104. E-mail exchanges between SOS and individual voters ............................1431
105. SOS Election Advisory No. 2022-02 .................................................1461
106. LWVTX About Us Page ............................................................1468
107. LWVTX Strategic Planning Goals, 2022-2027......................................1473
108. LWVTX Advocacy & Issues Guide.................................................1475
109. LWVTX March and November 2022 Voters Guides............................1622
110. LWVTX e-mail discussion regarding Austin League candidate forum..........1714
111. LWVTX 202 Guide to Candidates Forums .........................................1716
112. LWVTX e-mail discussion regarding local league events.........................1742
113. LWVTX Policies and Procedures.....................................................1744
114. LWVTX Convention Manual..........................................................1799
115. 2021 LWVTX Impact Report including membership dues .......................1828
116. LWVTX Bylaws.......................................................................1833
117. LWVTX social media post............................................................1840
118. LWVTX survey of members who vote by mail ...................................1846
119. OCAGH_00002341, (LWVTX VBM survey results) (CONFIDENTIAL)...............................................................................1849
120. LWVTX Statement on Impact of SB 1 on Elections ..............................1851
121. LWVTX Testimony to Federal Subcommittee on Elections ......................1855
122. LWVTX social media post containing updated video .............................1867
123. LWVTX e-mail to SOS................................................................1870
124. LWVTX Recommendations to SOS .................................................1873
125. LWVTX Capitol Action Report ....................................................1877
126. LWVTX media requests on SB 1....................................................1887
127. LWVTX media appearances ..........................................................1908
128. LWVTX presentations explaining SB 1's matching-number requirement.............................................................................1931
129. LWVTX press release regarding presentation explaining VBM ID changes under SB 1 ..................................................................1975
130. LWVTX agenda for presentation explaining ID changes ..........................1979
131. Questions from LWVTX members and voters......................................1983
132. LWVTX literature explaining new application design ............................2002
133. LWVTX email regarding translating VBM resources .............................2005
134. LWVTX provision of VBM resources to other organizations....................2010
135. Updated LWVTX flier on ID requirements ........................................2018
136. Updated LWVT presentation including ID requirements .........................2021
137. LWVTX e-mail providing updated fliers and videos to local leagues ...........2044
138. LWVTX e-mail regarding updating website with VBM resources...............2050
139. LWVTX e-mail discussing updating educational VBM materials ...............2052
140. LWVTX President Op-ed discussing SB 1's matching-number requirement.............................................................................2055
141. Updated LWVTX YouTube videos about SB 1's matching-number requirement.............................................................................2057
142. LWVTX 2022 Impact Report.........................................................2061

143. LWVTX PSA script ................................................................2066
144. E-mail request for LWVTX presentation ...............................2070
145. LWVTX May 2022 e-mail explaining how to include ID numbers ..............2072
146. LWVTX e-mail advising SOS to recommend voters include both ID numbers ................................................................2080
147. LWVTX ID number materials...............................................2082
148. LWVTX translations of runoff voter guide ............................2088
149. OCAGH_00014707, (LWVTX March 2022 primary election voter survey) (CONFIDENTIAL) ...............................................2102
150. LWVTX email collecting primary survey responses ...............2104
151. LWVTX social media post sharing March primary survey responses...........2108
152. OCAGH_00016648, (LWVTX November 2022 general election voter survey) (CONFIDENTIAL) ...............................................2111
153. LWVTX November 2013 voter survey .................................2113
154. LWVTX email regarding March primary efforts......................2118
155. LWVTX Digital Communication Associate hiring materials....................2122
156. REVUP educational and outreach presentations on SB 1 .........................2127
157. REVUP pamphlets on SB 1 ...............................................2165
158. REVUP e-mail to advocacy community regarding SB 1 ...........................2174
159. REVUP e-mail to community advocate regarding SB 1 presentation ...........2178
160. REVUP draft info bulletin regarding SB 1 changes to mail-in voting...........2181
161. REVUP media outreach and inquiries .................................2184
162. Media outreach by REVUP members via Vimeo with LWVTX.................2229
163. REVUP KPFT news clip....................................................2236
164. REVUP mass meda e-mail .................................................2241
165. REVUP press release regarding power of the disability vote ....................2244
166. REVUP social media posts linking to news media ................................2251
167. REVUP news quotes regarding impact of SB 1 on disability vote...............2255
168. REVUP social media posts regarding SB 1 ID requirements ....................2269
169. REVUP podcast episodes regarding impact of SB 1 on disability vote..........2280
170. REVUP invoices for ASL interpreting services....................................2287
171. REVUP voter registration flyer...............................................2305

Dated: May 26, 2023                    */s/ Zachary Dolling*

Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**

1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Dayton Campbell-Harris
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
dcampbell-harris@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)

smizner@aclu.org
Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
915 15th St. NW
Washington, DC 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

LUCIA ROMANO
Texas State Bar No. 24033013
PETER HOFER
Texas State Bar No. 09777275
CHRISTOPHER MCGREAL
Texas State Bar No. 24051774
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alyssa G. Bernstein*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
abernstein@jenner.com

Gregory D. Washington*  
**JENNER & BLOCK LLP**  
455 Market St. Suite 2100  
San Francisco, CA 94105  
gwashington@jenner.com

***COUNSEL FOR OCA-GREATER HOUSTON PLAINTIFFS.***  
*admitted pro hac vice*

## CERTIFICATE OF SERVICE

On May 26, 2023, I filed the foregoing using the CM/ECF system of the Western District of Texas, which will send notification of this filing to counsel of record.

/s/ *Zachary Dolling*

# Exhibit 1

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*La Unión del Pueblo Entero v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**February 28, 2022**

## I.   Abstract

1.   In Senate Bill 1 ("SB 1"), Texas imposes new identification verification rules when registered voters choose to cast ballots by mail. As I will demonstrate, more than 1 in 7 Texans can submit a ballot application – as well as a ballot itself – in perfect accordance with the state's instructions under SB 1, and yet Texas election officials must still reject the voters' forms. Officials must reject the voters' forms because Texas's voter registration database does not contain the information necessary for election officials to accurately confirm the identity of millions of Texans who possess proper identification numbers. SB 1 delays and/or prevents citizens from casting ballots who follow the state's instructions and are eligible to vote by mail.

## II.   Summary of Inquiry

2.   For Texas voters who understand the mail ballot instructions and correctly fill out the state's mail ballot forms in accordance with the rules set forth by SB 1, how many of them could have their forms rejected due to the state's inability to confirm the voters' identification numbers? I answer this question by merging personal information contained in Texas's voter registration database with information contained in Texas's Department of Public Safety (DPS) records. Through comparing records of identification numbers, including driver's licenses and other DPS ID Numbers as well as social security numbers, I have found that over 2.6 million Texans can accurately and completely fill out government forms in accordance with SB 1 and with the forms' instructions, and their forms would still be rejected by Texas election officials. Included in this number are hundreds of thousands of senior citizens (65 and older),

disabled veterans, homebound citizens, and overseas citizens (including some at military addresses), populations that are most likely to make use of mail balloting.

3. According to SB 1, a registered voter applying for a mail ballot must now include "the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety" ("DPS ID Number"). If a registrant "has not been issued" a DPS ID Number, then he or she must include in his/her mail ballot application "the last four digits of the applicant's social security number" ("SSN4"). When submitting a completed ballot by mail, registrants must again provide a DPS ID Number or, if they do not have a DPS ID Number, their SSN4.

4. When Texas election officials receive a mail ballot application, or when they receive a completed mail ballot, the officials must compare the DPS ID Number or SSN4 listed by the registrant with the official records in the voter registration database. The Texas voter registration database, also known as Texas Election Administration Management system ("TEAM"), lists a DPS ID Number and/or an SSN4 for most voters. If the voter does not provide an identification number that is listed on TEAM, "the clerk shall reject the application."[1]

5. I have determined three main reasons why correctly filled-out forms that are required by Texas under SB 1 would be rejected by election officials:

---

[1] Note that election officials do not confirm mail ballot applicants' DPS ID Numbers by looking up those numbers on a DPS database. According to the state's guidelines, election officials are to "check the voter's application for ballot by mail and the carrier envelope to be sure that the number of the voter's driver's license, election identification certificate, or personal identification card issued by the DPS is included *and is associated with the voter's registration record* (my emphasis)." In other words, if a voter has a valid DPS ID but it happens not to be associated with the registration record in TEAM, election officials must reject the voter's mail ballot forms. See: "Early Voting Ballot Board & Signature Verification Committee, Handbook for Election Judges and Clerks 2022," Office of the Texas Secretary of State, page 14.

a.  <u>Reason #1:</u> Millions of Texans have multiple DPS ID Numbers. Many have both a personal identification number and a driver's license number. Some have multiple driver's license numbers. According to SB 1 requirements, voters may list on their mail ballot applications any of their DPS ID Numbers, including expired ones. However, the TEAM voter registration database shows only one DPS ID Number for each voter. If the voter uses a DPS ID Number on his or her mail ballot application but it is not the same number listed in TEAM, SB 1 requires election officials to reject the application.

b.  <u>Reason #2:</u> Hundreds of thousands of Texans are listed in TEAM without a DPS ID Number at all. These voters tend to be older. Almost half are over 65 and may, by law, request an absentee ballot without offering any reason. As I show below, *the majority* of these individuals do, in fact, have DPS ID Numbers. If they submit a mail ballot application or mail ballot with their DPS ID Number listed, as they are instructed to do by Texas's updated application form, SB 1 requires clerks to reject their materials.

c.  <u>Reason #3:</u> Tens of thousands of Texans are listed in TEAM with SSN4s and DPS ID Numbers that have typographical errors in them. (As Texas is one of only eight states that has not adopted online voter registration, Texas may have more citizens registering to vote using paper forms than is typical elsewhere in the country, which can lead to transcription errors when the information is entered into a computer system.[2]) When voters who are listed with typographical errors in their ID numbers submit a mail ballot form with their proper SSN4 or DPS ID

---

[2] National Conference of State Legislatures, "Online Voter Registration," July 26, 2021, https://www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-registration.aspx.

OCA-APPX-0012

Number, SB 1 requires election officials to reject these forms on account of inaccurate record-keeping in Texas government records.

6. These are not the only reasons that Texas election officials will reject mail ballots and ballot applications as a result of SB 1's identification requirements for absentee balloting. There are other reasons that are beyond the scope of this analysis but could cause additional Texans to have mail ballot forms rejected by state election officials. For instance, applicants might accidentally include a typographical error when writing down their DPS ID Number or their SSN4 on their mail ballot forms. A separate analysis would be required to estimate how many mail ballot forms might be rejected for this reason. Applicants might also have lost, misplaced, or surrendered their license or other DPS ID card and therefore cannot complete the mail application form required by SB 1. A separate analysis would be required to estimate how many forms might be rejected for this reason.[3] Setting aside these other possibilities, the three reasons stated above affect over 2.6 million Texans, according to my analysis. These Texans possess an identification number required by SB 1 and can properly fill out mail ballot application forms and, nevertheless, SB 1 will require election officials to reject their forms.

7. SB 1 essentially asks 1 in 7 registered voters to be lucky in order to cast a mail ballot without their application or ballot being rejected: the voters must guess correctly which one of several possible identification numbers are listed on TEAM, and they

---

[3] There is a field on the DPS database related to "card status" that could possibly be used to count the number of individuals who have DPS ID Numbers but they do not have access to their ID cards, for instance because they surrendered the cards. If license status information was made available to me, I could provide a supplementary analysis of these records.

OCA-APPX-0013

must hope that TEAM records do not contain typographical errors on their individual records.

III.  **Background and Qualifications**

8.  I am a tenured associate professor of political science at Tufts University in Medford, Massachusetts. I joined the faculty at Tufts in July 2017. Prior to that, I was an assistant professor and a resident fellow of the Institution for Social and Policy Studies at Yale University in New Haven, Connecticut. I joined the faculty at Yale in 2011. I received my PhD in government from Harvard University in 2011.

9.  In addition to my appointment in the Department of Political Science, I currently have two other affiliations. I serve as an Associate Professor of Civic Studies at the Tisch College for Civic Life, also at Tufts University. And, during the 2022 calendar year, I have an affiliation as an Emerson Collective Fellow in the Emerson Collective's Democracy Cohort. Through the Emerson Collective, I am engaging in research on the civic role of business leaders.

10. My scholarly research focuses on U.S. elections, on topics such as voter behavior, civic engagement, election administration, and political campaigns. My methodological focus is on using individual-level data such as voter registration records to study politics. Publications that specifically include analysis of individual-level voter registration data include, among others, *Hacking the Electorate* (Cambridge University Press, 2015); "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name" (*Statistics and Public Policy*, 2017); "The Primacy of Race in the Geography of Income-Based Voting" (*American Journal of Political Science*, 2016); Validation: What Big Data Reveal about Survey

OCA-APPX-0014

Misreporting and the Real Electorate" (*Political Analysis*, 2012); and "The Politics of 130,000 Religious Leaders (*Journal for the Scientific Study of Religion*, 2021).

11. I have been deposed as an expert witness five times, in *Judicial Watch v. King*, *Fish v. Kobach*, *Stringer v. Pablos*, *U.S. v. City of Eastpointe*, and *Holmes v. Moore*. The first three of these cases were focused on compliance with the National Voter Registration Act in Indiana, Kansas, and Texas, respectively. *U.S. v. Eastpointe* focused on compliance with the Voting Rights Act. *Holmes v. Moore* was a case in North Carolina state court involving a voter identification law. I have also served as an expert consultant in *Texas v. Holder* and *Veasey v. Perry*, two cases involving a voter identification law in the State of Texas.

12. In four of the above cases, my work as an expert required me to develop and implement methods to link individual records between voter registration databases and other databases (namely, driver's license databases). I use a similar methodology in this report. It is also the methodology that is the focus of the peer-reviewed work I published in "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name."

13. I have filed declarations in other cases in which I was not deposed. These include, among others, *Vote Forward v. DeJoy*, a 2020 case involving the U.S. Post Office and mail voting, as well as *Kelly v. Verizon*, a class action case for which voter registration data was used to evaluate the domicile of class members.

14. I have served as an expert both for defendants (e.g. *Judicial Watch v. King*, *Kelly v. Verizon*) as well as for plaintiffs (e.g. *Fish v. Kobach*, *U.S. v. City of Eastpointe*).

15. I am compensated for my work at a rate of $350 per hour.

16. A copy of my current CV is attached as Exhibit A to this Report.

## IV.    Analysis Plan and Summary Statistics

## A.    Overview

17. The analysis here requires me to look up registered voters in the Department of Safety's database of ID holders. For each registrant, I seek answers to four simple questions:

      i.   Does the registrant have a DPS ID Number?

     ii.   Does the registrant have more than one DPS ID number?

   iii.   Does the DPS ID Number(s) listed for a voter in the DPS database match the DPS ID Number listed for that voter in the TEAM database?

   iv.   Does the SSN4 listed in the DPS database match the SSN4 listed for that voter in the TEAM database?

18. The first of these questions is relevant because some registrants are not listed in TEAM with any DPS ID Number. If these individuals possess a DPS ID number, they are required by SB 1 to list it on their mail ballot application. If these registrants list their DPS ID Number, SB 1 requires election officials to reject their forms as the number is not recorded on the TEAM database.[4]

---

[4] The Texas Secretary of State has issued guidance to election officials that if registrants (even those possessing DPS ID Numbers) list their SSN4 when applying for a mail ballot, then their ballots and ballot applications should not be rejected (Texas Secretary of State, "FAQs on Applications for Ballots by Mail (ABBMs)," January 28, 2022, page 8.). However, Texas's handbook (see footnote 1) offers conflicting guidance, which is consistent with the law and with the application form instructions, that registrants with a DPS ID Number must list that number. On the mail application form itself, a registrant is not asked to list their SSN4 if they possess a DPS ID Number. The registrant would have no obvious way of knowing of alternative guidance, as it is inconsistent with SB 1's text and the text of the mail ballot application form. In addition, the state has allocated no funds with the passage of SB 1 to pay for any kind of educational advertisement that indicates the Secretary's interpretation of the law. For the lack of allocation of funds for public education, see: Jerry McGinty, Legislative Budget Board, "Fiscal Note 87th Legislature 2nd Called Session 2021," August 30, 2021.

19. The second question is relevant because registrants with more than one DPS ID Number can list one of their Numbers that happens not to be the one recorded in the TEAM database. If registrants list a number but not one listed on the TEAM file, their forms are rejected.

20. The third and fourth questions are relevant because typographical errors in the recording of SSN4s and DPS ID Numbers mean that registrants can fill out their correct DPS ID Number or SSN4 but their forms will be rejected because the correct number is not the same as the number listed on the TEAM file.

21. While the analysis that follows is simple in principle, it is somewhat complex in the details. The main reason for the complexity is that "looking up" a voter in the DPS database is not as straightforward as it sounds. Suppose, for instance, that I look up each registrant by their social security number. I could do so, and then compare the DPS ID Number for that voter listed in TEAM with the DPS ID Number(s) for that voter listed in the DPS records. I do perform such an analysis. However, the work is not complete. If voters are listed in TEAM with typos in their social security numbers, then they would not match to their DPS record on the basis of the social security number. Similarly, if voters are listed in TEAM with no social security number at all, then they would not match to their DPS record either. Consequently, simply linking the TEAM database and the DPS database on the basis of a social security number does not provide critical information such as the number of people with erroneous social security numbers listed on TEAM. Thus, I need to use additional strategies to look up registrants in the DPS database.

OCA-APPX-0017

22. Before proceeding with the analysis, I will summarize key features of the two databases upon which this analysis relies: the DPS file of ID holders and the TEAM file of registered voters. Then, I will explain the methodology I use to link the two files together. Finally, I will conduct the analysis and explain the results. In the results, I will be attentive to several subpopulations of interest, including registrants who are aged 65 years or older, registrants with overseas mailing addresses, and registrants whose DPS records suggest they are disabled or homebound.

## B. Data Used in Analysis

### Department of Public Safety Data

23. As transmitted to me, the DPS database of driver's license holders and other ID holders was divided into 10 separate files. According to the file labels, the files were extracted from Texas's DPS system on January 7, 2022. I combined the ten files into one file.

24. In total, the DPS file contains 36,227,819 records. In nearly all cases, each row is associated with a unique DPS ID Number.[5] For each of these numbers, the row shows information such as the name, address, and social security number of the associated individual. Many Texans are listed on more than one row with different DPS ID Numbers. This is evidenced by data on nine-digit social security numbers (SSN9) contained in the DPS database. Of the 36.2 million DPS records, 94.98% are listed with an SSN9. The other 5 percent are missing an SSN9. Of those with an SSN9 listed, 24,569,348 (71.40%) have a unique SSN9 within the database. The remaining

---

[5] Out of the 36.2 million rows, there are 140 rows that show a duplicate DPS ID Number. All other rows show unique DPS ID Numbers.

records (9,841,121) represent individuals who are listed with two more or more different DPS ID Numbers to their name.

25. From the data provided to me by the state, I cannot determine all the circumstances under which individuals have multiple DPS ID Numbers. Primarily, it appears to be the result of individuals who possess both a driver's license number and a personal identification number. But there are tens of thousands of individuals who have multiple driver's license numbers or multiple personal identification numbers. Texans with multiple DPS ID Numbers may have numbers that are expired as well as ones that are unexpired. However, according to SB 1, a registered voter applying for a mail ballot or submitting a mail ballot may use current or expired DPS ID Numbers.

26. The DPS database shows other evidence of individuals possibly possessing multiple DPS ID Numbers in addition to the fact that individuals appear on multiple rows. In about ten percent of rows in the DPS file (specifically, in 3,440,039 rows), there is a field populated with data that is called "AKA DL/ID Number." This field appears to list additional identification numbers associated with a person on the file. However, many of these numbers appear different in format to Texas's DPS ID Numbers, such as that they include letters in addition to numbers. Because I am not certain of the meaning of the AKA DL/ID Number field, I make the conservative assumption that these numbers are not DPS ID Numbers that Texans could use in submitting a mail ballot application or mail ballot.

27. Table 1 shows the rate at which key fields in DPS are missing data. As is clear, zero records – or at least less than 0.01% of records – are missing names, birthdates,

gender (male or female), or zip code. A small number of records are missing a street address number. And, as noted above, 5.02% of DPS records are missing an SSN9.

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---|
| Missing SSN | 5.02% |
| Missing unique SSN9 | 21.6 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.04 |
| Missing Zip Code | 0.00 |
| **TOTAL IN DATABASE** | 36,227,819 |

### Voter Registration Data

28. On January 27, 2022, I received a copy of Texas voter registration records (TEAM). According to the file labels, the files were extracted by Texas on January 24, 2022. Each of 254 counties had records contained in separate files. On each row of each county file, an individual registered voter is listed with personal information (e.g. name, birthdate, address) and information about the person's election participation. On each row, the individual voter is also associated with a Voter Unique Identifier number, or "VUID."

29. For individuals who have recently cast ballots, the database extract that was produced by the state shows multiple records per person (one row per election in which each person is recorded as casting a ballot). For individuals who have not recently cast ballots (or not ever cast ballots), the database extract shows one row per person.[6]

---

[6] Earlier in January, I received an initial production of the TEAM voter file that only contained records of individuals who had cast ballots in recent elections. It excluded registrants who had not cast ballots in recent elections. The January 24, 2022 production addressed this limitation by including non-voting registrants.

30. In order to conduct the analysis in this report, I need to create a version of the TEAM file in which each individual who Texas considers a registered voter is listed once. By doing so, I am able to report on the total number of registrants whose mail ballot forms could be rejected due to SB 1's identification number requirements. Since the version of TEAM transmitted to me has many individuals listed on more than one row, I take the following steps to de-duplicate the database.

31. First, for the individuals who have cast a ballot in one or more elections, I preserve the record of their most recent election. I preserve the most recent election because this record is presumed to be most up-to-date. I also preserve records of registrants who are listed as having not cast ballots in recent elections.

32. In total, across all 254 counties, this sums to 18,656,786 records. I create a file with fields from TEAM relevant to my analysis, including name, address, birthdate, gender, and identification number fields, plus a few other fields such as whether the individual has a non-US mailing address.

33. Of these 18,656,786 records, 822,166 are duplicative on all the fields I retained. That is, the same individual with all the same identifiers is listed on multiple rows within the county TEAM files. I remove these duplicates. This leaves 17,834,620 records.

34. I next remove six records that have no VUID listed. My methodology requires the database to have a unique identifier associated with each person. As the VUID identifier is available for all but six records, I utilize it as a unique identifier, which is why I remove the 6 records without a VUID.

35. Although VUID is called a "unique identifier", the VUID listed on the TEAM files (even after the de-duplication procedures above) is only unique for 91.06% of

records. Duplicates appear to represent individuals who are listed under different residential addresses or different mailing addresses but are the same person and have a common VUID. As an extreme example, consider the case of one individual who is listed five times on TEAM. In all five records, she has the same VUID, the same birthdate, driver's license number, social security number, and date of registration. In one county, she appears twice but on one of these two records she has a mailing address listed while on the other one she does not. This individual is also listed at three other addresses in three other counties.

36. In order to work with a version of the TEAM database in which each registrant is represented once on the file, I remove records that are duplicative on VUID. For instance, in the case of the individual mentioned above whose VUID appears five times, I retain one of her five records. If any of the duplicate records on VUID differ such that one record contains a social security number while another does not, I retain the record that contains a social security number.[7] This de-duplication removes 808,560 additional records, leaving the statewide file with 17,026,054 records. My analysis is based on this database of 17,026,054 records.

37. While Texas did not supply me with a file in which each person it considers to be a registered voter is listed once, the state does report statistics about the total number of registrants in its records, both statewide and by county. Are the state's published numbers comparable to the data I am using? According to its report from January 2022 (the month in which I was supplied with a version of the TEAM file), Texas

---

[7] I retain the record containing a social security number to enable me to link the TEAM record to the DPS database using the social security number for as many records as possible, per the methodology described below.

OCA-APPX-0022

reports 17,119,632 registered voters.[8] In the records supplied to me, after de-duplication, there are 17,026,054.

38. While the two files are close in the overall number of records, I checked, county by county, to determine if any counties showed substantially different numbers of registrants between the published numbers and the ones from the database supplied to me. In Figure 1, I count registered voters by county, and compare the number listed on the Secretary's website with the numbers in the file sent to me. In the left panel, I show all 254 counties. In the right panel, I zoom in on the 246 counties in which fewer than 50,000 individuals are registered. Both panels indicate that no county is an outlier. That is, there is no county where the number of registrants according to the Secretary's website differs meaningfully from the number in the data provided to me. The differences between the two are likely attributable to the fact that registration databases are dynamic, with additions and removals occurring frequently. The snapshot of the voter file provided to me is slightly different in the number of records from the snapshot used by Texas in publishing its January 2022 statistics, but the databases appear to be comparable. I have no reason to believe that the differences between versions of the TEAM database would systematically impact the analysis that follows or bear on any of the conclusions I draw.

---

[8] Texas Secretary of State, "January 2022 Voter Registration Figures,"
https://www.sos.state.tx.us/elections/historical/jan2022.shtml.

**FIGURE 1: Comparisons of Counts of Registered Voters by County in TEAM data supplied to me (after de-duplication procedures) with TEAM data published by Texas**



**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---|
| Missing SSN | 2.34% |
| Missing Unique SSN9 | 6.64 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.05 |
| Missing M/F Gender | 3.68 |
| Missing Street Number | 0.07 |
| Missing Zip Code | 0.05 |
| **TOTAL IN DATABASE** | 17,026,054 |

39. Table 2 shows the rate at which key fields in TEAM are missing data. As is clear, zero records – or at least less than 0.01% of records – are missing names. A small number – less than a tenth of a percent – are missing birthdates, street numbers, or zip codes. Whereas the DPS data treats gender as a binary field, with only M or F listed,

the TEAM file has other gender designations. Most significantly, 623,052 individuals are listed with gender code of U. For the purpose of linking databases using the gender field, I treat those not M or F as missing on gender.

## C. Data Quality Checks in TEAM Voter Records

40. I performed a series of additional diagnostics on the TEAM file, examining the quality of the key fields.

41. Birthdates. On TEAM, 4,066 individuals have invalid birthdates. These are either missing completely or have dates such as "01-01-0001". Another 5,235 individuals have birthdates indicating they were born before 1912, suggesting they are over 110 years old. Of these, most (4,824) have birthdates listed before October 1, 1906. That date, according to AARP, is the birthdate of the oldest American as of January 2022.[9] That is, TEAM lists almost five thousand registered voters with birthdates older than the oldest American. Many of these individuals are listed with birthdates such as January 1, 1900 and January 1, 1901.

42. Social Security Number. The social security number (SSN) field in TEAM is missing completely for 398,140 individuals. For 436,948 additional individuals, a four-digit SSN is listed rather than a nine-digit SSN.[10]

43. While 16,190,957 (95.10%) have a nine-digit SSN listed on TEAM, some of these numbers are invalid. For instance, SSNs cannot start with three zeroes (000-XX-XXXX), nor can they end with four zeroes (XXX-XX-0000). They cannot start with a 9 (9XX-XX-XXXX), nor start with a 666 (666-XX-XXXX), nor can they have two

---

[9] Karen Skiba, "Oldest American Credits Long Life to Avoiding Worry," AARP, May 20, 2021. This individual died in late January 2022.
[10] Nine individuals are listed with five-digit or six-digit social security numbers, which are invalid.

zeroes in the middle (XXX-00-XXXX).[11] All of these instances appear in the TEAM file and affect 183 records. Another 181 records share an SSN listed as 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. Seven records share the SSN of 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.

44. Much more common than invalid SSN9s are duplicative SSN9s. Several hundred thousand records on TEAM share an SSN9 with another record. In most of these cases, these are multiple records of the same individual who has multiple rows with different VUIDs. In other cases, however, different people (with different names and dates of birth) are listed with a common SSN9. There are 15,835 records who share a 9-digit SSN with another registrant in Texas, according to TEAM, but have a different last name, first name, and date of birth from that other listed registrant.

45. Altogether, 15,895,752 individuals of the 16,190,957 listed with an SSN9 have a unique nine-digit SSN. That is, SSN9 is not unique for 1.82% of individuals who are listed with an SSN9. Thus, while a 9-digit SSN is, in principle, a unique identifier, that isn't quite the case in TEAM records. A variety of circumstances can result in duplicate SSN9s, including individuals assigned incorrect SSN9s, such as 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, and typos such that a person ends up being listed with the SSN9 of another person who has a similar SSN9.

46. Driver's License/ID card. Of all the records in TEAM, 537,270 (3.16%) are not listed with a DPS ID Number. Of these, 102,074 are also not listed with an SSN4 or SSN9. Apart from TEAM records missing a DPS ID Number altogether, other records have ID numbers listed that are not valid. For instance, 3,610 have a nine-digit DPS ID Number even though the DPS ID is officially an 8-digit number. Forty-seven

---

[11] Social Security Administration, "Social Security is Changing the Way SSNs are Issued," https://www.ssa.gov/kc/SSAFactSheet--IssuingSSNs.pdf.

individuals share an DPS ID Number of 11111111 and thirty individuals share the number 99999999.

**TABLE 3: Summary of Field Completeness in TEAM**

| | | |
|---|---|---|
| **TOTAL Records in TEAM analysis** | **17,026,054** | |
| **Records with unique SSN9** | 15,895,752 | 93.36% |
| **Records with SSN4** | 16,627,905 | 97.66 |
| **Records with DPS ID Number** | 16,488,784 | 96.84 |
| **Records lacking SSN4 and DPS ID No.** | 102,074 | 0.6 |

47. Table 3 summarizes information about the SSN and DPS ID Number information contained in TEAM. In Table 3, records for SSN4 and DPS ID Number include those that are invalid. For instance, the 47 individuals listed with DPS ID numbers as 11111111 are included in the totals. If such a person possesses a DPS ID Number that is not 1111111 and includes that number on a mail ballot application, election officials would reject the application as it does not match the 11111111 that is listed on TEAM.

**TABLE 4: Terminology Review**

| | |
|---|---|
| **TEAM database** | Database of registered voters (Texas Election Administration Management system) |
| **DPS database** | Database of Department of Public Safety ID card holder (e.g. driver's licenses) |
| **DPS ID Number** | An 8-digit DPS identification number (e.g. driver's license number) |
| **SSN9** | Complete, nine-digit social security number |
| **SSN4** | The last four digits of a social security number |

48. <u>Address and Gender</u>. While most TEAM records list standard residential addresses, 9,130 registrants are listed without a zip code and 11,621 records do not have a street

address number. Gender is either missing or defined as unknown or other than male and female for 627,115 records.

49. Before proceeding with the next stage of the report, Table 4 reviews and summarizes a few key abbreviations of terms used up until this point in my report.

## V.      Methodology for Linking Records between TEAM and DPS

50. As stated above, the methodology of this analysis is to look up each registered voter in the DPS database and determine if the registered voter has one (or more) DPS ID Numbers listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers and SSN4s listed on TEAM versus those listed on the DPS Database.

51. I will adapt a methodology I developed and published in Ansolabehere and Hersh (2017).[12] I will illustrate this methodology through an example of a fictitious registered voter. I will call this person John Smith and assign him the fake social security number of 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 and the fake birthdate of July 4, 1976. The fictitious John Smith is a male who lives at 655 E Cesar E. Chavez Blvd, San Antonio TX 78205. This is the address of the United States Courthouse. It is a real address. But, again, our fake illustrative person, John Smith, does not actually live there.

52. Suppose John Smith has a unique social security number listed on TEAM database. That is, his SSN9 is listed in registration records and no one else on TEAM is listed with that SSN9. He would be one of 93.36% of registered voters with a unique SSN9 on the TEAM file. The first step of my analysis is to merge the TEAM file with the DPS file for these 93.36% of TEAM records on the basis of their SSN9s.

---

[12] Stephen Ansolabehere and Eitan Hersh, "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender and Name," *Statistics and Public Policy*, 4:1, 2017.

**TABLE 5: Illustration of Linking TEAM and DPS based on SSN9**

| TEAM Database | | | DPS Database | | |
|---|---|---|---|---|---|
| Name | SSN9 | DPS ID No. | Name | SSN9 | DPS ID No. |
| John Smith | **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** | (missing) | John Smith | **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** | 11223344 |

53. In the scenario depicted in Table 5, John Smith does not have a DPS ID Number listed on the TEAM file (similar to more than half a million Texans). When I search for his SSN9 on the DPS file, however, I find his record and learn that he does, in fact, have a DPS ID Number. If Smith were to include only this DPS ID Number on his mail ballot application (as the mail ballot application form instructs him to do), his application would be rejected by election officials since that DPS ID Number does not appear in TEAM.

54. After linking TEAM and DPS based on SSN9s, I calculate the key statistics, such as the number of individuals who, like Smith, do not have a DPS ID Number listed in TEAM but do have one listed in DPS.

55. For two reasons, I also must match TEAM and DPS based on identifiers other than SSN9. For one, 6.5% of registrants in Texas are not listed in TEAM with a unique SSN9. For another, suppose there are inaccuracies in how SSN9 is stored. Maybe, when John Smith registered to vote, an election official entered Smith's social security number with a typo, noting it as 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 instead of 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. In this scenario, John Smith would not match to his DPS record based on the SSN9, since the SSN9 is recorded incorrectly. Additionally, if Smith were to submit a mail ballot application using the last four digits of his social security number as his identification, his application would be rejected. He would write "6789" as his SSN4, but the TEAM record would show "6782".

OCA-APPX-0029

56. Therefore, in addition to linking TEAM and DPS based on SSN9s, I also link the databases on combinations of personal information. The first combination I will use is first name + last name + date of birth. I use the following procedure. Observing that birthdate in TEAM is stored MM-DD-YYYY while in DPS it is stored as YYYY-MM-DD, I reconfigure the TEAM birthdate information to match DPS. Next, following my past research (Ansolabehere and Hersh, 2017), I prepare the first name and last name fields. Sometimes, names are stored differently in different databases. For instance, names with dashes, apostrophes, or spaces are sometimes stored with punctuation or spaces and other times not. Names with suffixes, such as Jr. or III, are sometimes stored with the suffix as part of the surname and other times not. I process the first and last names in TEAM by removing punctuation, spaces, and suffixes. I then combine the three fields into a field I will refer to as "ND" for name + date of birth.

57. Thus, the fictitious John Smith would have an ND value of "JOHNSMITH1976-07-04." I create this field in the TEAM file and I create an equivalent field in the DPS file. I then merge the files together on the basis of this ND field, just as I had done using SSN9. I can then compare how John Smith's SSN4 and DPS ID Number appear on the TEAM file with how these numbers appear on the DPS file.

58. Is ND a unique identifier similar to SSN9? Excluding the records of individuals who are missing birthdate information in TEAM, ND uniquely identifies 98.62% of individuals in TEAM. The remaining 1.38% are duplicative. Note that the rate of duplicates on ND is *less than* the rate of duplicates on SSN9 in TEAM (1.82%),

which was discussed above. In addition, because name and birthdate are rarely missing, the identifier is available for 17,021,992 (99.98%) of the records.

59. There are several reasons why an individual might not have a unique ND identifier in a small number of cases. Similar to non-unique SSN9s, there are some individuals in TEAM who are listed multiple times, with different VUIDs, or perhaps at different addresses. The de-duplication processes described earlier in this report would not have accounted for individuals listed with different VUIDs. These individuals would nevertheless show up as duplicates on ND and SSN9. In addition, just as there are rare cases on TEAM where different individuals (with different names and birthdates) share an SSN9, there are a small number of individuals who are different people but share a value on ND. In the case of SSN9, the duplicate is due to an error, as no two individuals are supposed to share an SSN9. With the ND identifier, there are a small number of individuals who do share a first name, last name, and exact date of birth with another registrant.

60. How common is it for two different people to share a value on ND? Consider individuals who have unique SSN9s on TEAM (N=15,895,752). Because they are unique on SSN9, they are not likely to include instances of individuals who are listed on TEAM more than once with different VUIDs. Of those with a unique SSN9, 99.64% (15,838,711) also have a unique ND value. Thus, the remaining 0.36% may have a non-unique ND because they share a name and date of birth with another registrant.

61. I guard against linking two different people who share a common ND by only attempting to link records if the value of ND is unique on the TEAM file. In other

OCA-APPX-0031

words, for the 1.38% of records that are not unique on TEAM based on their ND (either because they contain erroneous information, identify individuals who are listed multiple times in TEAM, or identify multiple individuals who have the same name and birthdate), I do not attempt to link them to the DPS database using ND. Furthermore, in an analysis described below, I will be able to estimate whether individuals who are listed in TEAM are a false-positive match to different individuals with the same names and birthdates who are listed in DPS.

62. In addition to linking TEAM and DPS based on SSN9 and based on the combination of name and birthdate, I perform one additional linkage between the files, based on address, gender, and date of birth. Why is this additional linkage necessary? While the Name + Date of Birth combination is available for nearly all registrants in TEAM and exhibits a higher rate of uniqueness than SSN9, it does have a drawback in linking individuals between two databases. Namely, it is stored less consistently than SSN9. Surnames often change when people marry. First names are sometimes recorded with nicknames. The fictitious John Smith may have registered to vote using his nickname, Johnny Smith. Or, maybe John Smith took on a hyphenated surname when he got married. As such, he is listed as John Smith in the DPS records but John Smith-Jones on TEAM. Name inconsistencies across databases mean that a person with a unique name and date of birth on TEAM might fail to match to his or her record on DPS.

63. Accordingly, I also link records between TEAM and DPS with an alternative identifier that excludes name information. I match individuals based on a combination of address, date of birth, and gender. Following procedures discussed in Ansolabehere

and Hersh (2017), I extract two pieces of information from addresses, the street number and the five-digit zip code. I then combine them. Our fictitious character John Smith lives at 655 E Cesar E. Chavez Blvd, San Antonio TX 78205. From this address, I would extract 65578205 (the 655 from the street number, the 78205 from the zip code). By extracting just these numbers, I avoid possible inconsistencies in how addresses are stored in different databases. In one database, Smith's address might be listed as "E Cesar E Chavez Blvd" whereas in another database it could be listed as "East Cesar Chavez Boulevard". Due to inconsistences in naming conventions of streets, I focus just on the street number and zip code.

64. I combine the address information with the date of birth and gender (represented by "M" or "F") of registrants. I call this combination ADG, for address + date of birth + gender. For instance. John Smith's ADG combination would be 655782051976-07-04M. If the individual does not have residential address information listed but does have mailing address information listed, I use the mailing address (and PO boxes, when street addresses are not present) in place of the residential address.

65. The ADG identifier can be constructed for all registrants who have a gender, birthdate, and address listed. This amounts to 16,398,349 individuals (96.31% of TEAM). Of these, the ADG identifier is unique for 99.29% of them. This compares to 98.62% for ND and 98.18% for SSN. Among individuals who are unique on SSN, 99.52% are also unique on ADG.

66. As with the other identifiers, there are rare circumstances where two different individuals share the same ADG identifier. For instance, two twins of the same gender who are registered at the same address would be two different people with a

matching ADG. As with the other identifiers, I only seek to link records based on ADG for individuals who are unique on ADG in the TEAM file. Thus, in the case of same-gender, same-address twins, I would not seek to link them to DPS based on ADG. However, assuming they are uniquely identified by either their SSN or DN, they would be linked to the DPS file in those ways.

67. Just as the ND combination will not match individuals if there is a discrepancy in the name or date of birth field, the ADG combination will not match individuals if there is a discrepancy in the address, gender, or date of birth fields. The most likely scenario of a non-match on ADG is when an individual has an old residential address listed on one database and a new residential address listed on another database. If a person has two different addresses listed on TEAM and DPS, then the person's records will not match on ADG. However, assuming the individual has a unique SSN9 listed OR has his/her name and birthdate listed consistently across databases, then the person on TEAM would match to his/her record on DPS. Out of all 17,026,054 registered voters, I can attempt to link all but 39,549 (0.23%) records to DPS. These 0.23% of records are not unique on the TEAM file on any of SSN9, ND, or ADG.

68. Table 6 summarizes the names of the fields used to match across databases. On the DPS file, I create a parallel set of fields: SSN9, ND, and ADG. The major difference between preparing the TEAM file and the DPS file is that the DPS file has multiple rows of individuals who have more than one DPS ID Number. Thus, the linkage fields are meant to uniquely identify individual *people* on DPS but they are not meant to uniquely identify individual *records*. When linking records between TEAM and

DPS, I thus perform 1-to-many merges. This means that for each TEAM record that is unique on SSN9, I find one or more records on DPS that match that SSN9. For each TEAM record that is unique on ND, I find one or more records on DPS that match that ND. And for each TEAM record that is unique on ADG, I find one or more records on DPS that match that ADG.

**TABLE 6: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
|---|---|---|
| SSN9 | 9-digit social security number | "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" |
| ND | First name + Last name + Date of birth | "JOHNSMITH1977-07-04" |
| ADG | Address + Date of birth + Gender | "655782051976-07-04M" |

69. In creating these linkage combinations, some questions may arise. First, if a record in TEAM links to a record on DPS based on ND or ADG, how confident ought we be that the person with these name, birthdate, address, and gender attributes on TEAM is the same person with these attributes on DPS? Below, I will validate the accuracy of the linkage technique by comparing social security numbers of those who match on ND or ADG. I will show that a person who matches on ND or ADG almost always matches on SSN9 as well. And when the person does not have matching SSN9s, it is far more likely to be due to a typographical error in SSN9 rather than a false positive match on ND or ADG.

70. The second question that arises is why use the particular combinations here (ND and ADG) rather than other possible combinations. Indeed, in prior court cases and published work, I utilized alternative algorithms. For instance, in *Fish v. Kobach*, I utilized ND, ADN (address, date of birth, and name), and AD (address and date of

birth). In Hersh and Ansolabehere (2017), which relates to expert testimony of Dr. Ansolabehere in *Veasey v. Perry*, we used several additional combinations, such as gender, date of birth, and name (GDN).

71. The exact set of linking combinations depends on the features of the data and the research question in any particular case. The methodology can be adapted based on what is needed. For instance, in *Veasey v. Perry*, a nine-digit social security number was only available for half of registered voters in Texas (Ansolabehere and Hersh, 2017). In the present case, SSN9 is available for over 90% of registrants. As such, one need to rely less on combinations of other identifiers. In the current data, because gender is missing for about 4% of records but name and birthdate are missing for less than 0.01% of records, it is advantageous to link based on name and birthdate (ND) without adding gender to that combination. Because first names are typically distinctive by gender, gender only aids in generating unique identifiers in rare cases when two individuals with the exact same name and birthdate are of different genders.

72. The combinations used here, ND and ADG, are advantageous because they uniquely identify almost every registered voter and together, they are able to do so without using the name field (in the case of ADG) and the address field (in the case of ND). Due to residential moves, nick-names, and married names, these two fields can be stored inconsistently across databases. Successive attempts at matching based on SSN9, ND, and ADG allow for matches to individuals who are missing data or have inconsistent records on SSN9, name, address, and gender.

28

73. Finally, as the analysis below demonstrates, the three linkages used here identify almost all (98.7%) of registrants on the DPS database who have a DPS ID Number listed on TEAM. Additional attempts to link the databases based on different combinations of address, gender, date of birth, and name would only serve to find a few more DPS ID holders and identify a few more instances of problems associated with SB 1's identification number requirements.

**Subpopulations**

74. In addition to preparing the DPS database and TEAM databases as described above, I prepare the data files so I can observe rates of problematic SSN4s and DPS ID Numbers for specific subpopulations of registered voters.

    a. Over 65: I create a file that notes every registered voter listed as born before 1957 and after 1906. This represents the over-65 population (excluding those with implausibly old birthdates).

    b. Recent Voters: I create a file that notes every registered voter who cast a ballot in the November 2020 election. Why these voters? I sought to determine whether problems with the ID verification requirement are just concentrated among registrants who have obsolete records or who have not recently cast ballots. If that were the case, maybe the problems identified would not be seen as acute. However, problems affecting records of individuals who just recently voted suggests the identification verification requirement impacts actively engaged voters.

c. <u>Overseas Voters</u>: I create a file that notes every registered voter who has a non-US mailing address. These could include some members of the armed forces, military families, and other overseas citizens who would be particularly likely to cast ballots by mail.

d. <u>Homebound/Disabled Veteran</u>: In the DPS database, individuals are flagged if they have a status as a disabled veteran or a homebound person. I perform a separate link between TEAM records and the DPS records of those who have a disabled veteran flag or homebound flag using the same methodology as used for the general population.

## VI. Linkage Part I: TEAM Records with missing DPS ID Numbers

75. I divide the analysis into two parts. First, I examine individuals whose TEAM records do not show any DPS ID Number. Second, I examine individuals whose TEAM records do show a DPS ID Number.

76. Out of 17,026,054 records in TEAM, 537,270 do not have a DPS ID Number listed in the voter registration records. If any of these individuals actually has a DPS ID Number, they are instructed by the mail ballot application forms to include that DPS ID Number. But SB 1 requires that these forms – the application and the ballot itself – to be rejected because the DPS ID Number is not listed on TEAM.

77. Registrants who do not have a DPS ID Number recorded on TEAM are different from those who do have a DPS ID Number recorded on TEAM. Namely, they are older. The median age for a registrant without a DPS ID Number on TEAM is 58. The median age for a registrant with a DPS ID Number on TEAM is 48. Whereas 24% of

individuals with a DPS ID Number on TEAM are 65 or older, that rate is nearly double (42%) for individuals without a DPS ID Number. Age 65 and older is relevant as all voters 65 and older may request an absentee ballot under Texas law.

**TABLE 7: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

|  |  | Unique SSN9 | | |
|---|---|---|---|---|
|  |  | Present | Absent | TOTAL |
| **DPS ID** | Present | 15,745,864 | 742,920 | 16,488,784 |
| **Number** | Absent | 149,888 | 387,382 | 537,270 |

78. I link the 537,270 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG techniques described above.

79. I first link by SSN9. Of the 537,270 individuals without a DPS ID Number, 149,888 have a unique SSN9 listed (as noted in Table 7). Of those, 83.93% match to the DPS database by their SSN9. A total of 76.18% of the records match to a single DPS ID Number, and 7.75% link to multiple DPS ID Numbers.

80. I next link these individuals based on ND. As noted in Table 7, most individuals who lack DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a unique ND combination. Of the 537,270 lacking a DPS ID Number on TEAM, 517,283 (96.28%) have a unique ND. Of those who have a unique ND, 33.86% match to a single DPS record and 5.46% match to multiple DPS records.

81. I next link these individuals based on ADG. Of 537,270 records lacking a DPS ID Number on TEAM, 478,632 (89.09%) have a unique ADG. Of those with a unique ADG, 36.82% match to a single DPS record and 4.54% match to multiple DPS records.

OCA-APPX-0039

**TABLE 8: Results of Linking TEAM to DPS Records for TEAM Records without a DPS ID Number listed**

|      | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|------|-----------------|---------------------|-----------------------|--------------------|
| SSN9 | 16.07%          | 76.18%              | 7.75%                 | 149,888            |
| ND   | 60.68           | 33.86               | 5.46                  | 517,283            |
| ADG  | 58.63           | 36.82               | 4.54                  | 478,632            |
| Any  | 47.97           | 45.64               | 6.39                  | 531,251            |

82. Table 8 summarizes the analysis of records that do not have a DPS ID Number listed on the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows that I attempted to match 149,888 records in TEAM based on SSN9. This reflects the number of TEAM records with a unique SSN9. Of those, 16.07% did not match to DPS. The others did match.

83. The bottom row of Table 8 provides the overall summary for the TEAM records lacking a DPS ID Number. Of the 537,270 total records lacking a DPS ID Number, I attempted to link 531,251 (98.88%) to the DPS database. (The other 1.12% did not have a unique or complete value for SSN9, ND, or ADG). Of the 531,251 individuals I attempted to find on DPS, a majority (52.03%) matched to a DPS record. That amounts to 276,405 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number on their mail ballot application. However, SB 1 requires that their ballot application, and their ballot, to be rejected because the number is not listed on TEAM.

84. <u>Subpopulations:</u> Of the 276,405 individual who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 155,583 are over age 65

- 95,892 voted in the 2020 election

- 59,567 are over 65 AND voted in the 2020 election

- 374 have non-US mailing addresses

- 781 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers clearly show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

## A. Validation of Methodology

85. There are obvious reasons why an individual who matches on SSN9 would fail to match on ND or ADG. If there is a nickname used in one database, if a surname has changed, if gender is not recorded as male or female, or if an address has changed, this would cause individuals who match on SSN9 not to match on one or more of the other combinations. However, individuals who match on ND or ADG *but DO NOT* match on SSN9 present a puzzle. Do these individuals fail to match on SSN9 because ND or ADG are causing false positive matches between two different people? Or do these individuals fail to match on SSN9 because the SSN9 information is recorded in error on either TEAM or DPS?

**TABLE 9: Rates of Mismatches on SSN9 for Records that Matched on ND or ADG**

| If matched on… | SSN9 Match | SSN9 No Match | N |
|---|---|---|---|
| ND | 97.63 | 2.37 | 83,504 |
| ADG | 97.66 | 2.34 | 98,547 |

86. In Table 9, I show how often records that match on ND or ADG do not match on SSN9. It is rare. For instance, the first row assesses those who have SSN9 present on both TEAM and DPS and who matched on ND. Of these 83,504 individual records, 97.63% also matched on SSN. As the table shows, on both ND and ADG, just over 2 percent of individuals have mismatched SSN9s.

87. In these 2 percent of cases with mismatched SSN9s, I conduct a further analysis. This analysis demonstrates conclusively that individuals who match on ND or ADG but not on SSN9 fail to match because of typos in SSN9 rather than because these linkage strategies generate false-positive matches.

88. The further analysis I conduct uses a measurement tool known as Levenshtein distance. The Levenshtein distance is simply the number of characters in a string that would need to change in order for two strings to match each other. For instance, consider these two strings of numbers. String #1 is: 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. String #2 is: 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. The Levenshtein distance between these two strings is 1, since only one character would need to change for these two strings to be identical. Now consider the Levenshtein distance between String #1 (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) and a new string, String #3. String #3 is 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. The Levenshtein distance between String #1 and String #3 is 8, because 8 of the 9 numbers in String #1 (all the numbers except the 5) would need to change for 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 to equal 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.

89. Now consider the registrants in TEAM who match to individuals in DPS based on their ND or ADG, but they do not have matching SSN9s. If these represent false-positive matches (i.e. two different people who share traits such as name, address, birthdate, and gender), then their social security numbers should be entirely different

from one another. If their social security numbers are entirely different from one another, then the Levenshtein distance should be high (i.e. most or all of the numbers in the SSN9 would need to change for these two random people to have matching SSN9s). However, consider another possibility, which is that the person who matches on ND or ADG but not on SSN9 is one individual with one SSN9, but there is an error in how this person's SSN9 is recorded either on TEAM or on DPS. The recording error in a Texas database would be the reason the records do not match based on an SSN9. If there is a typographical error on one or two of the digits, then the Levenshstein distance would be low (i.e. just one or two of the digits would need to change for these two SSN9s to match).

**TABLE 10: Levenshtein Distance Measures between SSN9 on DPS and SSN9 on TEAM for records that match on ND or ADG but Do Not Match on SSN9**

|   | ND | ADG |
|---|---|---|
| **1** | 65.49% | 66.07% |
| **2** | 18.47 | 18.98 |
| **3** | 2.57 | 2.61 |
| **4** | 1.87 | 1.95 |
| **5** | 1.56 | 1.61 |
| **6** | 2.62 | 2.65 |
| **7** | 3.18 | 2.52 |
| **8** | 2.98 | 2.69 |
| **9** | 1.26 | 0.91 |
| **N** | 1,982 | 2,302 |

90. For each record that matches on ND or ADG but does not match on SSN9, I compare the SSN9 as it is recorded in TEAM and the SSN9 as it is recorded in DPS. In Table 10, I record the distribution of Levenshtein distances. As is shown, for approximately 85% of these cases, the Levenshtein distance is 1 or 2, which signals that the SSN9s

as recorded in TEAM and DPS are identical but for one or two digits. Table 10 provides conclusive evidence that in the rare cases in which records match on DN or AGD but not on SSN9, it is overwhelmingly because there are typos in the recording of SSN9s.

## B. Typographical Errors in SSN4

91. The above analysis is not only useful in validating the linkage technique used here. It also signals an issue with SB 1. Namely, some typos in SSN9 happen to be in the last four digits of the social security number. A registered voter who applies for a mail ballot and records their SSN4 correctly on the application will have their application rejected if there is a typo in SSN4. Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,726 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,726 cases result from inaccuracies on TEAM. They would result in election officials rejected mail ballot forms from citizens who include their correct SSN4 on the forms.

## VII. Linkage Part II: TEAM Records Listed with DPS ID Numbers

92. I now turn to the analysis of the 16,488,784 records in which a DPS ID Number is listed in the TEAM databases. As noted above, in Table 7, 95.5% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of 15,745,864 records with a unique SSN9 on TEAM, 99.66%

match to a record in DPS. However, 15.60% of the records match to more than one DPS ID Number.

93. Next, I link records based on the ND combination. The ND combination is unique for 16,269,349 individuals who have a DPS ID Number listed on TEAM. Of these, 97.39% match to a record in DPS. However, 15.20% match to more than one DPS ID Number.

94. Next, I link records based on the ADG combination. The ADG combination is unique for 15,803,406 individuals who have a DPS ID Number listed on TEAM. Of these, 79.32% match to a record in DPS. However, 9.84% match to more than one DPS ID Number. Notice, fewer individuals on TEAM match to records on DPS based on the ADG indicator compared to the ND indicator. This is attributable to residential address differences between individuals listed on TEAM and those same individuals listed on DPS.

**TABLE 11: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|      | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|------|-----------------|---------------------|-----------------------|--------------------|
| **SSN9** | 0.34%       | 84.06%              | 15.60%                | 15,745,864         |
| **ND**   | 2.61        | 82.19               | 15.20                 | 16,269,349         |
| **ADG**  | 20.68       | 69.48               | 9.84                  | 15,803,406         |
| **Any**  | 1.30        | 85.25               | 13.45                 | 16,455,254         |

95. Table 11 summarizes the analysis of records missing a DPS ID Number on the voter file. Consider the bottom row. Of the 16,488,784 records in TEAM listed with a DPS ID Number, I attempted to link 16,455,264 (99.80%) of them to the DPS database. The remaining 0.20% did not have a unique or complete record on SSN, ND, and

ADG. Of these 16,455,254 records, 98.70% (that is, all but 1.30%) matched to a record in DPS. However, 13.45% of these 16.5 million people are listed more than once on DPS, with multiple ID numbers. These 13.45% of records sum up to 2,213,676 records. That is, for 2.2 million Texas registered voters who have a DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

96. The 2.2 million figure may be a significant underestimate. Recall that on about 10% of rows in the DPS file, ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the 14,027,371 TEAM records that linked to a *single* DPS ID Number, 1,412,213 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. If these ID Numbers are current or expired Texas ID Numbers such as driver's license numbers, a registrant who uses these alternative numbers when submitting a mail ballot application or mail ballot would also have his or her forms rejected. However, as stated earlier, it is unclear from the information Texas has provided thus far whether the "AKA DL/ID Number" field includes any DPS ID Number or some DPS ID Numbers combined with ID numbers from other states or other kinds of numbers altogether. Accordingly, I will focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

97. <u>Subpopulations:</u> Of the 2,213,676 individuals who match to multiple DPS ID Numbers,

- 189,699 are over age 65

- 1,105,194 voted in the 2020 election

- 114,129 are over 65 AND voted in the 2020 election

- 277 have non-US mailing addresses

- 5,308 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

**A. Validation of Methodology**

98. As in the analysis regarding individuals not listed with DPS ID Numbers, I now conduct the same validation exercise for those who do have DPS ID Numbers listed. Namely, I investigate the records that matched between TEAM and DPS based on ND and/or ADG, but did not match across databases on SSN9.

**TABLE 12 Rates of Mismatches on SSN9 for Records that Matched on ND or ADG**

|  | SSN9 | | |
|---|---|---|---|
| If matched on… | Match | No Match | N |
| ND | 99.81 | 0.19 | 15,420,951 |
| ADG | 99.78 | 0.22 | 12,100,999 |

99. In Table 12, I restrict the analysis to those who have an SSN9 recorded both in the TEAM file and the DPS file. The rows indicate the percent that matched on SSN9. As

Table 11 shows, if an individual record linked based on ND or ADG, the record also links based on SSN9 in 99.8% of cases. But even in these 0.2% of cases, why do individuals link on name, address, date of birth, and gender, but not on SSN9?

**TABLE 13: Levenshtein Distance Measures between SSN9 on DPS and SSN9 on TEAM for records that match on ND or ADG but Do Not Match on SSN9**

|     | ND      | ADG     |
|-----|---------|---------|
| **1** | 70.06% | 70.51% |
| **2** | 19.24  | 19.30  |
| **3** | 2.36   | 2.32   |
| **4** | 1.56   | 1.56   |
| **5** | 0.71   | 0.70   |
| **6** | 1.27   | 1.19   |
| **7** | 1.85   | 1.65   |
| **8** | 1.99   | 1.86   |
| **9** | 0.94   | 0.91   |
| **N** | 29,982 | 26,520 |

100.    As Table 13 shows, in 90% of cases in which a record links based on ND or ADG but not SSN9, the SSN9 listed in TEAM and the SSN9 listed in DPS are off by just one or two digits. This is indicative that typos in one or two positions in an SSN9 are the cause of most the mismatches.

**B. Typographical Errors in SSN4**

101.    Looking just at the last 4 digits of social security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 40,718 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on

a mail ballot application, then their application will be rejected because of incorrectly recorded data in TEAM.

102.   Subpopulations: Of the 40,718 individuals whose SSN4s listed on TEAM do not match the SSN4s listed in the DPS database

- 15,544 are over age 65

- 28,880 voted in the 2020 election

- 12,015 are over 65 AND voted in the 2020 election

- 25 have non-US mailing addresses

- 98 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers clearly show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4 listed in the DPS database.

## C. Typographical Errors in DPS ID Numbers

103.   Just as there are discrepancies between the SSNs listed in TEAM and the corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers. However, they are more complicated to tabulate. For each of the three linkages (SSN9, ND, and ADG), I calculate the rate of mismatches on DPS ID between the two databases. As Table 14 shows, in over 99% of cases, the DPS ID Number listed on TEAM matches one of the DPS ID Numbers listed in the DPS database. (In this analysis, for registrants who match to multiple DPS ID Numbers, I count them in the "match" column if one of the DPS ID Numbers listed in DPS matches the DPS ID Number listed in TEAM.)

**TABLE 14 Rates of Mismatches on DPS ID Number for Records that Matched on SSN9, ND, or ADG**

| If matched on… | DPS ID Match | DPS ID No Match | N |
|---|---|---|---|
| SSN9 | 99.59 | 0.41 | 15,692,006 |
| ND | 99.56 | 0.44 | 15,844,010 |
| ADG | 99.24 | 0.76 | 12,536,045 |

104.    Table 15 calculates Levenshtein distances between the DPS ID Numbers recorded on TEAM and the DPS ID Numbers recorded on DPS. The table makes the calculation for the less than 1% of individuals who have mismatched DPS ID Numbers. For individuals on TEAM whose records match to multiple DPS ID Numbers, the table reflects the DPS ID Number on the DPS database that is closest (i.e. has the lowest Levenshstein distance).

**TABLE 15: Levenshtein Distance Measures between DPS ID Number on DPS and DPS ID Number on TEAM for records that match on SSN9, ND, or ADG**

| | SSN9 | ND | ADG |
|---|---|---|---|
| 1 | 25.36% | 26.05% | 15.71% |
| 2 | 6.94 | 7.22 | 4.51 |
| 3 | 1.25 | 1.33 | 1.13 |
| 4 | 2.20 | 2.22 | 2.47 |
| 5 | 8.58 | 8.35 | 9.93 |
| 6 | 22.54 | 21.64 | 25.92 |
| 7 | 24.89 | 24.70 | 29.76 |
| 8 | 8.24 | 8.49 | 10.57 |
| N | 64,346 | 68,959 | 94,870 |

OCA-APPX-0050

105.     As Table 15 shows, about 20-33% of mismatched DPS ID Numbers are off by just one or two digits. The majority of those with mismatched DPS ID Numbers show entirely different DPS ID Numbers. For example, consider the 64,346 individuals (Table 15, Column 1) who have a DPS ID Number and SSN9 listed on TEAM. They were matched to DPS records based on their SSN9. However, a comparison between the DPS ID Number listed in TEAM and the DPS ID Number listed in the DPS database show mismatching DPS ID Numbers. While a third of these are just off by one or two digits (suggesting typographical errors), most are showing completely different DPS ID Numbers.

106.     Why does this occur? In some of the cases where the DPS ID Numbers are completely different, it is because these individuals in TEAM have a typo in their social security numbers rather than their DPS ID Numbers. When they match to a record in the DPS ID database based on their SSN9, they are actually matching to a different person (i.e. they match to the person who has the social security number that is incorrectly recorded for them). In other cases, these registrants may be matching to the right record in DPS, but the DPS database shows an entirely different DPS ID Number than is shown in TEAM.

107.     In order to provide an estimate of the number of registrants who have a DPS ID Number listed in TEAM that is different than the DPS ID Number listed in DPS, I cannot count all the results in Table 15. Some of these individuals might have an accurate DPS ID Number but they have an inaccurate SSN9, so if they just use their DPS ID Number when submitting a mail ballot application, their application would not be rejected.

108.    Thus, I will use conservative estimate of faulty DPS ID Numbers. I use the lowest Levenshtein distance of any of three linkages (SSN9, ND, ADG). An example will help explain this. Suppose John Smith has a typo in his SSN9 as it is listed in TEAM. His SSN9 is 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, but it is listed in TEAM as 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. When I link his record to DPS, his links to another person's records. She is Jane Doe, and her SSN9 is 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. Now, when I compare the DPS ID Number on John Smith's TEAM record to the DPS ID Number on the record he matches to (Jane Doe's record), the DPS ID Numbers are completely different. They might have a Levenshtein distance of 6, 7, or 8.

109.    However, I also link John Smith to his DPS record based on his ND and ADG combinations. In those linkages, Smith links to his actual record in DPS. If there are no typos or other discrepancies in how his DPS ID Number is stored, he would have a Levenshtein distance of zero, and I would not treat this as a problematic record with respect to the DPS ID Number. (I would, of course, treat it as a problematic record with respect to the faulty SSN9). However, suppose that Smith *also* has a typo or other discrepancy in his DPS ID Number. On TEAM, his DPS ID Number would read 11223345, but on the DPS database his DPS ID Number would read 11223344. The comparison between these numbers would generate a Levenshtein distance of 1.

110.    For each person in TEAM, I thus calculate the Levenhstein distance between their DPS ID Number listed in TEAM and *the closest* DPS ID Number they link to in the DPS database. By this conservative estimation method, I calculate that 68,190 individuals do not have a DPS ID Number in TEAM that matches any DPS ID Number in DPS.

111. <u>Subpopulations:</u> Of the 68,190 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but do not have DPS ID Numbers that correspond to the DPS database,

- 17,270 are over age 65

- 34,187 voted in the 2020 election

- 11,690 are over 65 AND voted in the 2020 election

- 18 have non-US mailing addresses

- 370 individuals matched to DPS records indicating homebound status or disabled veteran status.

## VIII.  Summary of Results

112.  To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4.

a. **276,405** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. These individuals are instructed to list their DPS ID, but when they do so, their ballot or ballot application will be rejected.

   i.  Of these, **155,583** are over 65 years old, **59,567** of whom voted as recently as the 2020 general election.

   ii.  Of these, **1,155** have overseas addresses or are listed as disabled veterans or as homebound citizens.

b. **2,213,676** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number

that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

     i. Of these, **189,699** are over 65 years old, **114,129** of whom voted as recently as the 2020 general election.

    ii. Of these, **5,585** have overseas addresses or are listed as disabled veterans or as homebound citizens.

  c. **44,444** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

  d. At least **68,190** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

113. Altogether, over 2.6 million registered voters in Texas (out of 17 million) are at risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.6 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.

**IX.  Conclusion**

114. The identification number requirements of SB 1 require election officials to reject mail ballots and mail ballot applications from a large number of voters due to limitations and errors in the state's record-keeping practices rather than due to any limitations or oversights on the part of eligible voters. Texas's databases are simply not well-suited to SB 1's demands. The law demands that those who have a DPS ID

list the ID number on mail ballot applications. Yet, many of these ID numbers are not stored by Texas on its voter registration records. The law demands that some registrants include social security number information. But the state database has tens of thousands of typos in its recording of Texans' social security numbers. The database has even more typos in its recording of Texans' DPS ID Numbers. The law demands that voters list one of their DPS ID numbers when applying for a mail ballot, but millions of voters have more than one DPS ID number, and election official are only able to validate one of them.

115.    The disconnect between the quality and completeness of Texas's records versus the demands of SB 1 results in election officials delaying and/or preventing citizens from casting ballots who follow all the rules and are eligible to vote by mail. As I have shown, over 2.6 million Texans can follow all the rules and instructions set forth by SB 1 when applying for, or submitting, an absentee ballot, and they still face a substantial risk that their applications and ballots will be rejected. Those affected include Texans living overseas, disabled veterans and homebound citizens living at home, plus over 350,000 senior citizens.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 28th Day of February, 2022.

_____

Eitan Hersh

# Curriculum Vitae

## Eitan Hersh

## Contact

Department of Political Science, Tufts University
108 Packard Hall
Medford, Massachusetts 02155

Tel: 617.627.2043
Email: eitan.hersh@tufts.edu
Web: www.eitanhersh.com

## Employment

Associate Professor, Political Science
Tufts University, 2017-Present

Assistant Professor, Political Science
Yale University, 2011-2017

## Education

Ph.D. in Political Science, Harvard University (2011)
M.A. in Political Science, Harvard University (2010)
B.A. in Philosophy, Tufts University, *summa cum laude* (2005)

## Books

Eitan Hersh. *The Golden Rulers: Business, Wealth, and Civic Leadership in America*. Current book project, in development.

Eitan Hersh. 2020. *Politics is for Power: How to Move Beyond Political Hobbyism, Take Action, and Make Real Change*. New York: Scribner.

Eitan Hersh. 2015. *Hacking the Electorate: How Campaigns Perceive Voters*. Cambridge: Cambridge University Press.

## Scholarly Articles

Eitan Hersh and Yanna Krupnikov. 2021. "Freedom of Expression in an age of Social Media, Misinformation, and Political Polarization," Symposium in *PS: Political Science and Politics*, Symposium proposal accepted.

Laura Royden and Eitan Hersh. 2021. "The Young American Left and Attitudes About Israel." Forthcoming in *Contemporary Jewry*.

Eitan Hersh. 2021. "The Political Role of Business Leaders." Forthcoming at *Annual Review of Political Science*.

Gabrielle Malina and Eitan Hersh. 2021. "The Politics of 130,000 American Religious Leaders: A New Methodological Approach." *Journal for the Scientific Study of Religion* 60 (4): 709-725.

Aaron Kaufman and Eitan Hersh. 2020. "The Political Consequences of Opioid Overdoses." *PLOS ONE* 15 (8): 1-10.

Laura Zatz, Eitan Hersh, Kimberly Gudzune, Anne Thorndike, Matthew Goldenberg, and Sara Bleich. 2020. "Physicians' Political Party Affiliation and Clinical Management of Obesity," *Clinical Obesity*: 1-9.

Justin Grimmer, Eitan Hersh, Marc Meredith, and Clayton Nall. 2018. "Obstacles to Estimating Voter ID Laws' Effect on Turnout." *Journal of Politics* 80 (3): 1045-1051.

Bernard Fraga and Eitan Hersh. 2018. "Are Americans Stuck in Uncompetitive Enclaves? An Appraisal of U.S. Electoral Competition" *Quarterly Journal of Political Science* 13 (3): 291-311.

Eitan Hersh and Yair Ghitza. 2018. "Mixed-Partisan Households and Electoral Participation in the United States" *PLOS ONE* 13(10): 1-18.

Stephen Ansolabehere and Eitan Hersh. 2017. "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name" *Statistics and Public Policy*. 4(1): 1-10.

Eitan Hersh and Brian Schaffner. 2017. "Post-Materialist Particularism: What Petitions Can Tell Us about Biases in the American Policy Agenda," *American Politics Research* doi.org/10.1177/1532673X17722989.

Ryan Enos and Eitan Hersh. 2017 "Campaign Perceptions of Electoral Closeness: Uncertainty, Fear, and Over-Confidence." *British Journal of Political Science*. 47(3): 501-519.

Eitan Hersh and Matthew Goldenberg. 2016. "Democratic and Republican Physicians Provide Different Care on Politicized Health Issues," *Proceedings of the National Academy of Sciences*. 113 (42): 11811-11816.

Vivekinan Ashok, Daniel Feder, Mary McGrath, and Eitan Hersh. 2016 "The Dynamic Election: Patterns of Early Voting Across Time, Space, Age, and Party," *Election Law Journal*. 15(2): 115-128.

Eitan Hersh and Clayton Nall. 2016. "The Primacy of Race in the Geography of Income-Based Voting: New Evidence from Public Voting Records." *American Journal of Political Science*. 60 (2): 289-303.

Ryan Enos and Eitan Hersh. 2015. "Party Activists as Campaign Advertisers: The Ground Campaign as a Principal-Agent Problem." *American Political Science Review*. 109 (2): 252-278.

Stephen Ansolabehere and Eitan Hersh. 2013. "Gender, Race, Age and Voting: A Research Note." *Politics and Governance*. 1 (2): 132-137.

Eitan Hersh. 2013. "The Long-Term Effect of September 11 on the Political Behavior of Victims' Families and Neighbors." *Proceedings of the National Academy of Sciences*. 110 (52): 20959-20963.

Eitan Hersh and Brian F. Schaffner. 2013. "Targeted Campaign Appeals and the Value of Ambiguity." *Journal of Politics*. 75 (2): 520-534.

Stephen Ansolabehere and Eitan Hersh. 2012. "Validation: What Big Data Reveal About Survey Misreporting and the Real Electorate." *Political Analysis* 20(4): 437-459.

Stephen Ansolabehere, Eitan Hersh, and Kenneth Shepsle. 2012. "Movers, Stayers, and Registration: Why Age is Correlated with Registration in the U.S." *Quarterly Journal of Political Science* 7(4): 333-363.

Eitan Hersh. 2012. "Primary Voters Versus Caucus Goers and the Peripheral Motivations of Political Participation. *Political Behavior*. 34(4): 689-718.

Bernard Fraga and Eitan Hersh. 2011. "Voting Costs and Voter Turnout in Competitive Elections." *Quarterly Journal of Political Science* 5(4): 339-356.

# Other Writing

Lily Geismer and Eitan Hersh, "Laugh at the 'S.N.L.' School Board Skit, Take Your Local Politics Seriously," *New York Times*, November 1, 2021.

Eitan Hersh, "Rage-Donating Only Made Democrats Feel Better," *Atlantic*, November 12, 2020.

Eitan Hersh and Yanna Krupnikov, "Another Political Gender Gap Emerges," *The Hill*, October 9, 2020.

Eitan Hersh, "Lower Barriers to Participation, Don't Raise Them," *Boston Globe*, September 30, 2020.

Eitan Hersh and Daniel Horn, "Health care workers need to engage on politics," *USA TODAY*, September 11, 2020.

Eitan Hersh, "How Democrats Can Repair Their Generational Divide," *Politico*, March 12, 2020.

Eitan Hersh, "'We All Really Need To Do Hard Things'" *The Progressive*, January 31, 2020.

Eitan Hersh, "Listen Up, Liberals: You Aren't Doing Politics Right," *New York Times*, January 27, 2020.

Eitan Hersh, "College-Educated Voters are Ruining American Politics," *The Atlantic*, January 20, 2020.

Eitan Hersh, "What Rich Centrists Could Learn from Howard Schultz about Political Power," *Niskanen Center*, January 16, 2020.

Eitan Hersh, "Politics is for Power, Not Consumption," *Boston Review*, November 4, 2019.

Eitan Hersh, "The Political Beliefs and Civic Engagement of Physicians in an Era of Polarization," Introduction to special issue, guest editor of special issue, *Journal of Health Politics, Policy, and Law* 44, 2019.

Eitan Hersh, "In a Deep Blue or Red State? You Can Still Influence Politics," *New York Times*, October 29, 2018.

Eitan Hersh, "Political Hobbyists are Ruining the Country," *New York Times*, July 2, 2017.

Eitan Hersh, "The Most Dangerous Hobby," *Boston Globe*, May 3, 2016.

Occasional essays in media outlets such as the Washington Post's Monkey Cage and *FiveThirtyEight*

Justin Grimmer, Brian Feinstein, Eitan Hersh, and Daniel Carpenter, "Are Close Elections Random?" Working Paper.

Stephen Ansolabehere and Eitan Hersh. 2014. "Voter Registration: The Process and Quality of Lists." In *The Measure of American Elections*, eds. Barry C. Burden and Charles Stewart III. Cambridge: Cambridge University Press.

Stephen Ansolabehere and Eitan Hersh. 2011. "Who *Really* Votes?" In *Facing the Challenge of Democracy*, eds. Paul M. Sniderman and Benjamin Highton. Princeton: Princeton University Press.

Stephen Ansolabehere, et al., "Voter Registration List Quality Pilot Studies," Caltech/MIT Voting Technology Project Report, June 8, 2010.

## Teaching

"Information, Technology, and Political Power"
"U.S. Elections: Rules, Strategies, Outcomes"
"Advanced Seminar on U.S. National Elections"
"The Flow of Power: Civic Journalism"

## Awards & Fellowships

Emerson Collective Fellowship, 2022
Grant for Antisemitism study, Klarman Family Foundation and One8 Foundation, 2020
Best Book in Information, Technology, and Politics, APSA, 2016
Pi Sigma Alpha award for best paper presented at MPSA, 2013
MPSA Emerging Scholar award, 2013

## Referee Service

*American Journal of Political Science American Political Science Review*, *American Politics Research*, *American Sociological Review*, *British Journal of Political Science*, *Economics and Politics Election Law Journal*, *Electoral Studies*, *Journal of Elections, Public Opinion and Parties Journal of Experimental Political Science*, *International Journal of Public Opinion Research*, *Journal of Politics*, *Journal of Urban Affairs Legislative Studies Quarterly*, *Political Analysis*, *Political Behavior*, *Political Psychology*, *Political Research Quarterly*, *Political Science Research and Methods*, *Politics and Governance*, *Proceedings of the National Academy of Sciences*, *PS: Political Science and Politics*, *Public Opinion Quarterly*, *Research and Politics*, *Review of Economics and Statistics*, *State Politics and Policy Quarterly*.

## Invited Talks

I have given presentations at annual meetings of the American Political Science Association, Midwest Political Science Association, and Society for Political Methodology.

I have given invited talks at Boston University, BYU, Columbia, Chicago, Dartmouth, Harvard, Harvard Kennedy School, Harvard Medical School, McGill, MIT, NYU, UCLA, University of Massachusetts-Amherst, Michigan, UNC, UPenn Annenberg School, Princeton, Stanford, Stanford Law School, Washington University-St. Louis, Yale, and Yale Law School.

## Consulting & Service

Editorial Board, *Election Law Journal*, 2020-
Academic Advisor, Free Expression Survey, Knight Foundation, 2021-2022.
Academic Advisor, Antisemitism Survey, Anti-Defamation League, 2021-2022.
Member, Brookline, MA, Select Board's Taskforce to Reimagine Policing, 2020-2021
Academic Advisor, 100 Million: Nonvoter Study, Knight Foundation, 2019-2020.
Witness, United States Senate Committee on the Judiciary, May 16 2018
(Facebook/Cambridge Analytica scandal)
Commissioner, Commission on Youth Voting and Civic Knowledge, CIRCLE, 2012-14
Statistical Consultant, *Texas v. Holder* (Voter ID case)
Statistical Consultant, *Veasey v. Perry* (Voter ID case)
Expert, *Judicial Watch, et al v. King, et al*, Indiana Voter Registration Case
Expert, *Fish v. Kobach*, Kansas Voter Registration Case
Expert, *Stringer, et al v. Pablos*, Texas Voter Registration Case
Expert, *United States v. Eastpointe, MI*, Voting Rights Act case
Expert, *Collins v. Adams*, Kentucky Voter ID case
Expert, *LULAC of Iowa v. Iowa Secretay of State*, Absentee ballot case
Expert, *Vote Forward v. DeJoy* US Post Office mail ballot case
Expert, *Holmes v. Moore* North Carolina Voter ID case

# Exhibit 2

**Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*United States v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**May 4, 2022**

## I.    Abstract

1.  Since I filed my expert report on February 28, 2022, I have received updated Department of Public Safety (DPS) data and updated voter registration (TEAM) data from the State of Texas. I have also received a rebuttal to my report written by Dr. Mark Hoekstra. Finally, I have received voter history information from the March 1, 2022 Texas primary, the first election that was administered under the identification verification rules set forth by Senate Bill 1 (SB 1).

2.  In this supplemental report, I re-run the main analysis conducted in my February report with the updated DPS and TEAM data. Then, I respond to the main points raised by Dr. Hoekstra. Lastly, I conduct a new analysis of data from the March 1 primary.

3.  My key findings are as follows:

    a.  In spite of the passage of several months of time that might have allowed databases to be updated and identification issues to be resolved, my updated analysis finds that over 1 in 7 Texas registered voters can submit a mail ballot application and/or a mail ballot in perfect accordance with SB 1 and yet election officials must reject the voters' forms.

        -   Tens of thousands of registered voters are listed with typos in the DPS ID numbers and/or Social Security Numbers on the databases maintained by election officials.

        -   Hundreds of thousands of individuals who have valid DPS IDs are not listed in election records with these ID numbers.

        -   Over two million individuals have multiple DPS IDs, while only one of the numbers is listed by election officials.

Altogether, over 2.7 million out of 17.3 million registered voters could fill out a mail ballot form correctly and have it rejected due to one or more of these circumstances. This population includes many Texans over 65-years-old, Texans who are homebound and disabled veterans, and active-duty members of the military and their families.

b. Following this update to my analysis, I address critical flaws in the rebuttal report of Dr. Hoekstra. I explain how Dr. Hoekstra's framework for analyzing the effects of SB 1 (i.e., estimating the typical number of voters who will be burdened in any given election) is inappropriate. Using data from the March 2022 primary election, I also show how Dr. Hoekstra's analysis is wrong even on his own terms of evaluation. Whereas Dr. Hoekstra argues that "the likely burden on the…registered voters who will either have to cure their ballot or vote in person as a result of SB 1 is likely minimal, and quite possibly zero," I find that the vast majority of Texans whose mail ballots were rejected due to SB 1 in March 2022 did not end up voting at all, either by mail or in person.

## II. Updated analysis using new versions of DPS and TEAM databases

### A. Databases

4. <u>DPS</u>. The updated DPS database I received is dated March 13, 2022. The database contains 36,417,304 records, an increase of 189,485 (0.5%) records from the January 2022 version of the file I analyzed in my main report. As in the version previously analyzed, the March version of the data has complete or nearly complete records in all fields of interest (e.g., name, date of birth, address, gender) except that 5% of records are

not populated with Social Security Numbers, which was also the case in the January data. Table 1 below updates Table 1 of my main report with the new data.

5. The March update to the DPS database contains an additional field that was not previously made available to me: "Card Status." The status field is populated with a variety of codes. Of relevance here is a code named "Voluntary Surrender," which may indicate that the ID holder does not possess a physical identification card with that ID number listed on it. Without a physical identification card, it may be difficult for a person to access their ID number and write it on a government form.

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---|
| Missing SSN | 4.98% |
| Missing unique SSN9 | 28.65 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.03 |
| Missing Zip Code | 0.00 |
| **TOTAL IN DATABASE** | 36,417,304 |

6. <u>TEAM</u>. The updated version of TEAM records is dated April 21, 2022.[1] In the TEAM data, each county's records are stored in a different file. Registered voters can be listed on many lines within a county file. For instance, Texas counts 29,128 registered voters in Anderson County as of March 2022.[2] In the April TEAM export I received, there are

---

[1] At the time that I received the March DPS data, I also received an updated version of the TEAM data. That export was dated April 5, 2022. Upon inspection, that export from TEAM excluded several million registered voters. I alerted counsel to this problem, and I was soon supplied with a new export, dated April 13, 2022. Upon inspection, this second export of TEAM again excluded several million registered voters. I alerted counsel again and received the April 21 export on April 25. I do not expect the difference in time between when the DPS export was executed and when the corrected TEAM export was executed affects any of the substantive findings or conclusions in this report.

[2] https://www.sos.state.tx.us/elections/historical/march2022.shtml

261,644 rows of registrants in Anderson County. Different rows show different interactions that registrants have had with the election system. For each county file, I processed the data so that each person, represented by their Voter Unique Identification Number (VUID), is listed one time. Specifically, I observed the dates labeled "ballot_last_updated" and retained the most recent date for each registrant. I also retained registrants who had no date listed in this field. If there were registrants with multiple records but only one of the records listed a Social Security Number (SSN) or DPS ID Number, I retained the record with those identifiers. I retained the fields of interest (e.g., name, address, date of birth, and so forth) and combined the 254 county files into a single file. I then identified individuals who had records in multiple county files. I kept only one record for each of these individuals, again ensuring to retain a record with an SSN or DPS ID if only one of the records contained these identifiers.

7. After the de-duplication process, the April TEAM file consists of **17,330,189** records. I sought to confirm that this number is close to the state's official reporting. According to the Secretary of State's website, as of March 2022, there were **17,183,996** registered Texas voters. Given the typical fluctuation in registration numbers and the fact that the April 21 records were pulled several weeks after the publicly reported numbers were calculated, a difference of less than 1% suggests the data I have been given by the state is consistent with the state's publicly reported information.

**B. Data Quality Checks in the TEAM Voter Records**

8. I performed the same set of data quality checks as described in my initial report. Tables 2 and 3 offer summary statistics on key fields of interest. There are slightly fewer records listed with Social Security Numbers and slightly more records listed with DPS ID

Numbers. Specifically, whereas 2.34% of records in TEAM were missing an SSN in the January data, 2.52% of records are missing an SSN in the April data. Whereas 3.16% of records in TEAM were missing a DPS ID Number in the January data, 2.85% of records are missing a DPS ID Number in the April data.

9. The numbers are all similar to the January data, with the exception of the address fields. Whereas less than 1% of records in the January file were missing values for street number and zipcode, over 20% of the records in the April file are missing this information. The absence of address information is concentrated in registration records that also have a blank "ballot_last_updated" field.

10. The difference in the address fields may be attributable to the fact that state supplied me with a different format of the database in April than in January. Ultimately, it is not clear to me why the state's April records show so many voters with missing address information. However, as my methodology uses information other than address information (e.g., name and birthdate, SSN), I can proceed to update the analysis from my prior report with the March and April data. And, indeed, the overall results are very similar in this supplementary report as in my initial report.

**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---|
| Missing SSN | 2.52% |
| Missing Unique SSN9 | 6.25 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.07 |
| Missing M/F Gender | 3.73 |
| Missing Street Number | 22.57 |
| Missing Zip Code | 22.56 |
| **TOTAL IN DATABASE** | 17,330,189 |

OCA-APPX-0065

**TABLE 3: Summary of Field Completeness in TEAM**

| | | |
|---|---|---|
| **TOTAL Records in TEAM analysis** | **17,330,189** | |
| **Records with unique SSN9** | 16,246,791 | 93.75% |
| **Records with SSN4** | 16,893,085 | 97.48 |
| **Records with DPS ID Number** | 16,836,041 | 97.15 |
| **Records lacking SSN4 and DPS ID No.** | 105,536 | 0.61 |

## C. Methodology

11. The methodology employed is the same as in my initial report. See Paragraphs 50-73 in that report for a detailed explanation. My goal is to look up each registered voter in the DPS database and determine if the registered voter has one (or more) DPS ID Numbers listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers and SSN4s listed on TEAM versus those listed on the DPS Database. I create three linkage fields to connect the TEAM and DPS databases together. The first field is the nine-digit Social Security Number (SSN9). The second field is the combination of name (First and Last) and date of birth. I call this linkage field "ND" for Name + Date of Birth. The third field, a combination of Address (Street Number and Zipcode) + Date of Birth + Gender, I call "ADG". Table 4 (a replica of Table 6 from my previous report) illustrates the three linking fields with an example of a fictional registered voter named John Smith.

**TABLE 4: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
|---|---|---|
| SSN9 | 9-digit social security number | "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" |
| ND | First name + Last name + Date of birth | "JOHNSMITH1977-07-04" |
| ADG | Address + Date of birth + Gender | "655782051976-07-04M" |

12. As in the main report, in addition to calculating statistics for the whole population of registered voters, I also look at several subpopulations. In the prior report, I observed a.)

registered voters over age 65, b.) 2020 general election voters, c.) voters with overseas mailing addresses, and d.) individuals marked in the DPS database as homebound or disabled veterans. In this report, I again investigate registrants over 65, registrants who voted in 2020, and registrants who have homebound/disabled veteran statuses. Instead of looking at voters with overseas mailing addresses (a population that may contain members of the armed forces and military families), I investigate registrants who are listed with specific codes in TEAM signaling that they have applied for Federal Post Card Application (FPCA) registration forms, which are voter registration forms used by members of the military, their families, and Americans who are residing overseas. I refer to these as FPCA voters. Finally, I also investigate the subpopulation of registrants who match to DPS records indicating that their licenses have been "voluntarily surrendered."

**D. Linkage Part I: TEAM Records with missing DPS ID Numbers**

13. I divide the analysis into two parts. First, I examine individuals whose TEAM records do not show any DPS ID Number. Second, I examine individuals whose TEAM records do show a DPS ID Number.

14. Out of 17,330,189 records in TEAM, 494,148 do not have a DPS ID Number listed in the voter registration records. If any of these individuals actually has a DPS ID Number, they are instructed by the mail ballot application forms to include that DPS ID Number (and *only* that identification number). But SB 1 requires that these forms – the application and the ballot carrier envelope – to be rejected because the DPS ID Number is not listed within registration records.

**TABLE 5: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

|  |  | Unique SSN9 | | |
|---|---|---|---|---|
|  |  | Present | Absent | TOTAL |
| **DPS ID** | Present | 16,144,007 | 692,034 | 16,836,041 |
| **Number** | Absent | 102,784 | 391,364 | 494,148 |

15. I link the 494,148 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG linkage fields that are described in Paragraph 11 above.

16. I first link by SSN9. Of the 494,148 individuals without a DPS ID Number, 102,784 have a unique SSN9 listed (as noted in Table 5). Of those, 73.33% match to the DPS database by their SSN9. A total of 66.76% of the records match to a single DPS ID Number, and 6.56% link to multiple DPS ID Numbers.

17. I next link these individuals based on ND. As noted in Table 5, most individuals who lack DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a unique ND combination. Of the 494,148 lacking a DPS ID Number on TEAM, 482,787 (97.7%) have a unique ND. Of those who have a unique ND, 25.81% match to a single DPS record and 4.58% match to multiple DPS records.

18. I next link these individuals based on ADG. Of 498,148 records lacking a DPS ID Number on TEAM, 231,002 (46.74%) have a unique ADG. Recall that many more records in the April TEAM data are missing address information than in the January data. ADG is the only linking field that makes use of address information. Of those with a unique ADG, 38.98% match to a single DPS record and 3.85% match to multiple DPS records.

**TABLE 6: Results of Linking TEAM to DPS Records for TEAM Records without a DPS ID Number listed**

|  | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|---|---|---|---|---|
| **SSN9** | 26.67% | 66.76% | 6.56% | 102,784 |
| **ND** | 69.61 | 25.81 | 4.58 | 482,787 |
| **ADG** | 57.16 | 38.98 | 3.85 | 231,002 |
| **Any** | 57.00 | 37.39 | 5.58 | 486,421 |

19. Table 6 summarizes the analysis of records that do not have a DPS ID Number listed on the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows that I attempted to match 102,784 records in TEAM based on SSN9. This reflects the number of TEAM records without a DPS ID Number that include a unique SSN9. Of those, 26.67% did not match to DPS. The others did match.

20. The bottom row of Table 6 provides the overall summary for the TEAM records lacking a DPS ID Number. Of the 494,148 total records lacking a DPS ID Number, I attempted to link 486,421 (97.65%) to the DPS database. (The other 2.35% did not have a unique or complete value for SSN9, ND, or ADG). Of the individuals I attempted to find on DPS, 43% matched to a DPS record. That amounts to 209,137 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number (and only their DPS ID Number) on their mail ballot application. However, if they follow those instructions and list only that DPS ID Number, SB 1 requires their ballot applications, and their ballots, to be rejected because the number is not listed on TEAM.

21. <u>Subpopulations:</u> Of the 209,137 individuals who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 83,622 are over age 65

- 66,001 voted in the 2020 election

- 32,252 are over 65 AND voted in the 2020 election

- 1,574 have FPCA statuses

- 378 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

22. <u>Typos in Social Security Number.</u> Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,015 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,015 cases result from inaccuracies on TEAM. They would cause election officials to reject mail ballot forms from citizens who include their correct SSN4 on the forms.

**E. Linkage Part II: TEAM Records Listed with DPS ID Numbers**

23. I now turn to the analysis of the 16,836,041 records in which a DPS ID Number is listed in the TEAM databases. As noted above in Table 5, 95.9% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of

16,144,007 records with a unique SSN9 on TEAM, 99.53% match to a record in DPS. However, 16.03% of the records match to more than one DPS ID Number.

24. Next, I link records based on the ND combination, as described in Paragraph 11 above. The ND combination is unique for 16,669,651 individuals who have a DPS ID Number listed on TEAM. Of these, 97.36% match to a record in DPS. However, 15.61% match to more than one DPS ID Number.

25. Next, I link records based on the ADG combination, as described in Paragraph 11 above. The ADG combination is unique for 12,662,154 individuals who have a DPS ID Number listed on TEAM. Of these, 80.74% match to a record in DPS. However, 7.91% match to more than one DPS ID Number.

**TABLE 7: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|      | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|------|-----------------|---------------------|-----------------------|--------------------|
| SSN9 | 0.47%           | 83.49%              | 16.03%                | 16,144,007         |
| ND   | 2.64            | 81.75               | 15.61                 | 16,669,651         |
| ADG  | 19.26           | 72.83               | 7.91                  | 12,662,154         |
| Any  | 1.17            | 84.57               | 14.25                 | 16,787,046         |

26. Table 7 summarizes the analysis of records with a DPS ID Number on the voter file. Consider the bottom row. Of the 16,836,041 records in TEAM listed with a DPS ID Number, I attempted to link 16,787,046 (99.70%) of them to the DPS database. The remaining 0.30% did not have a unique or complete record on SSN, ND, and ADG. Of these 16,787,046 records, 98.83% matched to a record in DPS. However, many of them are listed more than once on DPS, with multiple ID numbers. These 14.25% of records sum up to 2,392,733 records. That is, for 2.4 million Texas registered voters who have a

DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot envelope) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

27. The 2.4 million figure may be an underestimate. Many DPS ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the TEAM records that linked to a *single* DPS ID Number, 1,421,849 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. During her April 20, 2022 deposition, Sheri Gibson, chief of the Texas DPS driver's license division, explained that these AKA DL/ID numbers are identification numbers associated with the ID holder that are either erroneous or originate from a prior version of the state's license system. If registrants use these alternative identification numbers when submitting a mail ballot application or mail ballot, they will also have their forms rejected because the AKA DL/ID Numbers are not the identification numbers on the voter registration records that are associated with these registrants. However, if these ID Numbers are considered by DPS to be erroneous or otherwise invalid (i.e., not just "expired," which does not impact validity for SB 1 purposes), the implications for SB 1 are unclear to me. Accordingly, in order to perform a conservative analysis, I focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

28. Subpopulations: Of the 2,392,733 individuals who match to multiple DPS ID Numbers,

- 166,035 are over age 65

- 1,060,944 voted in the 2020 election

- 82,575 are over 65 AND voted in the 2020 election

- 1,344 have FPCA status

- 4,134 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

29. <u>Typos in Social Security Number</u>. Looking just at the last 4 digits of social security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 41,900 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on a mail ballot application, then their application will be rejected because of incorrectly recorded data in TEAM.

   a. <u>Subpopulations:</u> Of the 41,900 individuals whose SSN4s listed on TEAM do not match the SSN4s listed in the DPS database

- 14,991 are over age 65

- 27,247 voted in the 2020 election

- 10,121 are over 65 AND voted in the 2020 election

- 101 have FPCA status

- 88 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4 listed in the DPS database.

30. <u>Typos in DPS ID Numbers.</u> Just as there are discrepancies between the SSNs listed in TEAM and the corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers. Using the methodology for calculating these discrepancies that was explained in my previous report, I calculate that 74,897 individuals do not have a DPS ID Number in TEAM that matches any DPS ID Number in DPS.

    a. <u>Subpopulations:</u> Of the 74,897 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but do not have DPS ID Numbers that correspond to the DPS database,

- 15,835 are over age 65

- 31,781 voted in the 2020 election

- 9,475 are over 65 AND voted in the 2020 election

- 83 have FPCA status

- 342 individuals matched to DPS records indicating homebound status or disabled veteran status.

31. <u>Voluntary surrender:</u> Out of 36.4 million DPS records, 2,881,780 have a designation of "voluntary surrender." I isolated a subset of the DPS records to just the ones listed with the "voluntary surrender" status and I matched the TEAM records based on SSN, ND, and ADG to these DPS records. I find that 1,704,499 current registered voters match to a "voluntary surrender" ID Number.

32. Most of these 1.7 million registrants seem to have other DPS IDs that are not surrendered. After matching the TEAM records to surrendered DPS IDs, I checked to see if the DPS ID number listed on the voter file matches to the surrendered ID Number listed in DPS. In 1,487,008 cases (87.24%), the current registered voter has a different ID number listed than the surrendered ID.

33. The other 217,491 do not have a different DPS ID Number. For the 217,491 registered voters who match to a DPS ID record for which the TEAM database shows the same DPS ID Number as a surrendered license, these Texans might be at risk of not being able to provide the ID Number that election officials have on file.

34. However, DPS's Sheri Gipson explained in her deposition that the "voluntary surrender" status designation is not a reliable indicator of whether a person is in physical possession of the card that lists the associated identification number. In some cases – but not in all cases – Texans who have "voluntary surrender" status may have physically surrendered the card during a surrender transaction. They also may or may not have disposed of the card once it was no longer valid. Therefore, I cannot confidently use this designation in counts of individuals who may be affected by SB 1. Instead, I treat all DPS ID Numbers associated with registered voters to be valid numbers for the purpose of identification verification under SB 1. However, if hundreds of thousands of individuals have a DPS ID Number listed on TEAM records that is associated with a license that they potentially cannot access because it has been physically surrendered or discarded, this likely increases the problems associated with SB 1.

OCA-APPX-0075

**F. Summary of Results from Updated Analysis**

35. To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4. The analysis from the updated TEAM and DPS files show the following:

   a. **209,137** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. These individuals are instructed to list only their DPS ID, but if they do so, their ballot or ballot application will be rejected.

      i. Of these, **83,662** are over 65 years old, **32,252** of whom voted as recently as the 2020 general election.

      ii. Of these, **1,952** have FPCA status or are listed as disabled veterans or as homebound citizens.

   b. **2,392,733** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

      i. Of these, **166,035** are over 65 years old, **82,575** of whom voted as recently as the 2020 general election.

      ii. Of these, **5,478** have FPCA status or are listed as disabled veterans or as homebound citizens.

   c. **44,915** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

d.  At least **74,897** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

36. Altogether, **<u>over 2.7 million</u>** registered voters in Texas (out of 17.3 million) are at risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.7 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.

### III.    Response to Dr. Hoekstra

37. Dr. Mark Hoekstra's rebuttal report of March 29, 2022 does not challenge my database matching technique or the numbers derived from this technique. Rather, he challenges the interpretation of these numbers and the application of the technique to the questions raised in this case. Unfortunately, Dr. Hoekstra's interpretations and assumptions suffer from a number of serious flaws. I will address four key problems in his analysis.

#### A.  Measuring Burdens

38. Dr. Hoekstra approaches this case by asking whether SB 1 makes absentee voting substantially burdensome such that it affects the overall rate of voting in Texas elections. I do not believe this is the right question. Texas law grants certain voters the right to vote by mail. As I have shown, citizens who are fully qualified by Texas law to vote by mail will have their applications and mail ballots rejected because the state's records do not actually allow officials to verify voters' personal identification in the way SB 1 requires.

The fact that so many Texans, including elderly and disabled citizens and members of the military, can fully comply with the law but will nevertheless have ballots rejected seems problematic. Whether Texans who are denied the ability to vote by mail can learn about the rejection and make other arrangements in time to vote in person on Election Day, thus "curing" the problem, is worth considering, and I address it below. But the fact that SB 1 requires the rejection of mail ballot materials is a problem, even if voters still manage to find a way to vote.

39. However, even if one believes, as Dr. Hoekstra asserts, that the main question here is about whether SB 1 will affect turnout rates, Dr. Hoekstra's analysis is flawed because it relies on evidence that is irrelevant to the issues surrounding SB 1. All of Dr. Hoekstra's tables and figures are copied-and-pasted from an article about mail voting and turnout rates that was published in 2021 in *Science Advances*.[3] That article, written by Professor Andrew Hall and his students, is first-rate. I assign it to my own students in my course on elections. One of its main findings is that 64-year-olds and 65-year-olds in Texas voted at the same rate (but using different voting methods) in years prior to the adoption of SB 1. The article does not deal with the question of what happens when new burdens, such as identification verification requirements, are introduced to voters.

40. Dr. Hoekstra views the comparison between 64-year-olds and 65-year-olds as a test for how burdens on mail voters *in general* affect overall turnout. For 64-year-olds, Dr. Hoekstra views the burden as high. After all, in Texas, a 64-year-old needs an excuse, such as they are out of town or sick, in order to cast a ballot by mail. But 65-year-olds can choose to vote absentee by mail without a specific reason, so their burden to vote by

---

[3] Dr. Hoekstra incorrectly identifies the journal in which this article is published. The article "How did absentee voting affect the 2020 U.S. election?" was published in *Science Advances*, not *Science.*

mail is low. Dr. Hoekstra reasons that if 64-year-olds and 65-year-olds have the same turnout rates in 2020, as Dr. Hall's research shows, then burdens on mail voters *in general* do not affect turnout. As Dr. Hoekstra puts it, "it is implausible to believe that the much more moderate limitations on absentee voting enacted by SB1 would reduce turnout."

41. To understand why Dr. Hoekstra's reasoning is flawed, just consider how easy it is for a Texan to anticipate if they will be at least 65 years old on Election Day. In contrast, consider how difficult it is for a Texan to anticipate if they will have a problem voting by mail due to SB 1. They would have to think: "Do election officials have my DPS ID Number on record? Is my DPS ID recorded with a typo in state records? I have more than one DPS ID, which one do officials have on record? Do officials have my Social Security Number on record? Is there a typo in that record?"

42. The contrast in how easy it is to answer the question of how old one is compared to the difficulty in answering the questions about SB 1 protocols illustrates why Dr. Hoekstra's comparison of the burdens of SB 1 relative to the burdens of mail balloting prior to SB 1 is inapt. Baked into the similarity in overall turnout between 64-year-olds and 65-year-olds in 2020 (and earlier years) is an awareness on the part of each age group whether they qualified to vote by mail. If they did not qualify by age, they knew they would have to vote in person or offer a valid excuse. They could plan accordingly. But with SB 1, it is likely that many registrants do not know if their identification information matches information held by election authorities. They won't know whether they will get caught up in delays and ballot rejections until they are in the midst of the process of trying to vote by mail. They won't know how quickly, or how close to Election Day, it will be

before they are advised by election officials of a problem with their materials. And, as I'll show below, by that point it is often too late for the voter to be able to correct the problem.

43. In analogizing the burdens on mail voting before SB 1 to those created by SB 1, Dr. Hoekstra misjudges the issues involved in this case. The burdens of SB 1, particularly the burdens created by faulty and incomplete state records that lead to uncertainty on the part of a voter of how and whether they can comply with SB 1, are categorically different than the burdens of mail voting related to simple and clear rules such as age-based eligibility.

**B. Dr. Hoekstra's Mischaracterization of a "Simulation"**

44. Dr. Hoekstra repeatedly refers to my analysis as a "simulation," which is a mischaracterization of the research. In Dr. Hoekstra's strawman interpretation, he supposes that I am "simulating" an election held under SB 1 and then estimating that 1 in 7 voters will be affected in that election. This number is preposterous, argues Dr. Hoekstra, because it requires "rather extreme assumptions," such as that everyone in Texas attempts to vote by mail, "a set of potential absentee voters that is vastly larger than anything seen in Texas history." I agree it would be preposterous to assume every Texas voter would attempt to vote by mail in a single election, but I do not make that assumption in my research.

45. My analysis is not a "simulation" of how many voters are likely to be affected by SB 1 in any given election. Rather, the analysis shows how many Texans could run into trouble if an election was approaching and they wanted or needed to cast a ballot by mail. In the first paragraph of my report, I explain that 1 in 7 Texans "can submit a ballot application

– as well as a ballot itself – in perfect accordance with the state's instructions under SB 1, and yet Texas election officials must still reject the voters' forms."

46. In rebutting an argument that I never made, Dr. Hoekstra's report misses the mark. Consider the voters under 65 in Texas. Some may get sick. Some may become disabled. Some may expect a baby to come within a few weeks of Election Day. Some may get called out of town for work or for a family obligation. Some may be members of the military who are called overseas. If we were to "simulate" how many Texans would fall into these categories in any specific election, the number would likely be modest. But in any given election cycle, it is impossible to anticipate which specific Texans are going to be sick or out of town, or become disabled, or expectant of a baby, or called overseas. So, the question I answered in my report is how many Texans, should they suddenly fall into these categories and therefore become eligible to vote by mail, might have their mail ballot materials rejected.

47. To offer an analogy, suppose a hospital in Texas has medical records for 17 million citizens. But for 2.6 million of these people, the records are incomplete or incorrect. If one of these 2.6 million Texans comes into the hospital to receive treatment, they could face a delay in care or, worse, they could be denied medical care altogether. How big of a problem are the faulty medical records? Well, since only a small fraction of the public will come sick to the hospital in any one year, an analyst *could* treat the record-keeping issues as a small problem. Dr. Hoekstra's reasoning is akin to the view that few people use the hospital each year, so the faulty records are not a serious problem. Plus, in his line of reasoning, sick patients could always try to find another hospital. My read of the situation is different. Since any one of these 2.6 million people could come to this

hospital in any year, the fact that the hospital's records are incomplete or incorrect for so many people creates a broad risk to the public.

### C. Mail Voters Including DPS IDs and SSNs in SB 1 Forms

48. Dr. Hoekstra's report advances an argument that a narrowly-distributed set of guidelines to voters should be taken more seriously than the plain text of SB 1 and SB 1's implementation materials.

49. Texas's mail ballot application states clearly the circumstances under which voters should list the last four digits of their social security number (SSN4) on the form: voters are instructed to list their social security number only if they do not have a driver's license number or other DPS identification number. The ballot application states, **"If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Number, give the last 4 digits of your Social Security Number."** This exact same language is printed on the carrier envelope used for submitting a mail ballot. The language in the text of SB 1 is similar: **"…if the applicant has not been issued a number described by Paragraph (A) [a DPS ID number], the last four digits of the applicant's social security number."**

50. In my original report (footnote 4), I explain that the Texas Secretary of State has issued guidance that encourages voters to include both a DPS identification number and an SSN4 on these documents, if they have both. However, because that guidance is not conveyed in SB 1, on the carrier envelopes that most Texans must use, or on the mail ballot applications issued by the Secretary of State, my analysis does not presume that voters will follow the Secretary's guidance.

51. Dr. Hoekstra considers this a "serious flaw" in my analysis. On multiple occasions in his rebuttal report, he draws attention to a February 16, 2022 press release and video message in which Secretary of State John Scott recommends that voters write down on mail ballot forms both their SSN4 and their DPS ID Number. Dr. Hoekstra writes, "A more credible analysis would assess the extent to which voters who could encounter a problem write down both numbers, as recommended by the Secretary of State."

52. The text of Secretary's Scott press release summarizes the language of the mail ballot materials and the text of SB 1.[4] A voter must record their DPS ID Number, **"OR if you have not been issued one of the above numbers, the last 4 digits of your Social Security Number."** Further down on the webpage, however, and in contrast to the language just quoted, the press release continues, "You may put both numbers in the spaces provided on your ABBM and Carrier Envelope."

53. The Secretary's website directs readers to a YouTube video statement by the Secretary of State. On the video, the Secretary articulates his recommendation that registrants include both the SSN4 and DPS ID on the mail ballot forms, even though both are not required.

54. The Secretary's message was released approximately two weeks before the March 1, 2022 election. In an election season involving 15 million nonvoters and 3 million voters (including over 150,000 mail voters), the Secretary's video message has been viewed a total of 676 times, as of April 27, 2022. That View Count includes three views by me, and probably dozens, if not hundreds, of views by other experts such as Dr. Hoekstra, by lawyers, and by government officials. In short, it appears that few ordinary Texas voters have viewed Secretary of State Scott's message.

---

[4] https://www.sos.state.tx.us/about/newsreleases/2022/021622.shtml

55. On the one hand, then, we have the text of SB 1 and the text of the standard mail ballot request form and the text of the carrier envelope, all of which say that voters should include an SSN4 only if they do not have a DPS ID number. On the other hand, we have press statements that few have seen but that suggest voters should include both a DPS ID and SSN4 when submitting mail ballot forms. Given the differences in the distribution rates for the differing interpretations of SB 1, I think it is appropriate to assume voters will follow the instructions on the forms that they must fill out rather than the advice of Secretary Scott.

**D. Can Voters Correct Problems Caused by SB 1?**

56. Dr. Hoekstra's next argument is that mail voters whose materials are rejected due to SB 1 can cure the problem and successfully vote either by mail or in person. For this reason, he expects SB 1 would not have a measurable impact on voting rates. Dr. Hoekstra performs no test of this claim. Rather, he supports the claim through the argument, discussed above, that the burdens imposed by SB 1 are smaller than the burdens imposed on 64-year-olds prior to 2021. Since 64-year-olds and 65-year-olds voted at the same rates in 2020, Dr. Hoekstra thinks burdens from SB 1 are "implausible."

57. As I will now show, through an analysis of voter data from Texas's March 1 election, Dr. Hoekstra's speculation is clearly wrong. The majority of Texas registrants whose mail ballots were rejected by the state failed to have a ballot counted. In addition to this evidence, I will also provide data to help explain why voters are unable to vote after their ballots are rejected. As is true across the country, mail voters in Texas tend to cast ballots at the end of the election season, sending in their ballot very close to the receipt deadline. Correcting an error requires knowing about an error, and many voters may not submit

mail ballot forms with enough time to learn about an error, particularly if they are not immediately responsive to telephone calls from unfamiliar numbers or emails from unfamiliar senders. A voter who submits a ballot application near the deadline may not learn that the application was rejected due to SB 1 compliance until it is too late to correct it. The next section describes the data and analysis of the March 1 election that advances these claims.

**IV.    March 1, 2022 Election Analysis**

58. The April voter file export contains voter history data from the March 1, 2022 primary election, the first election held under SB 1. I restrict my attention here to records with the election date listed as "03-01-2022." Across the counties, 3,164,179 TEAM records have information related to the March 3, 2022 election. Not all of these records appear to be records of successful voters. Some represent individuals whose ballots were rejected or who sought a mail ballot application but never submitted the ballot.

59. The database export shows no record of individuals whose mail ballot *applications* were rejected due to SB 1 compliance issues.[5] However, according to the database, 31,107 records are listed with a code for a reason that their ballots for the March 1 primary were rejected. More than 4 in 5 of these (specifically, 25,429 of them, or 82%) are listed with a designation related to the SB 1 law. The designation is for ballots that have "Incorrect or Missing SSN/ TDL #."  These numbers align fairly closely with Election Director Keith

---

[5] I would have analyzed rejected applications if they had been made available to me in the TEAM export. In deposition, Mr. Keith Ingram, director of Texas's Election Division, testified that fields used to track acceptance and rejection of mail ballot applications were included in the export. An Excel spreadsheet labeled STATE057755 shows a code of "IS" under a field of "mail in request reject reason" to indicate "Incorrect or Missing SSN / TDL #." However, while the April TEAM database export does use this code for rejected ballots, it shows no such code for rejected mail ballot applications.

Ingram's April 7, 2022 disclosure indicating a total of 24,636 rejected ballots statewide. Mr. Ingram's report seems to include records of all rejected mail ballots, though, not specifically those associated with incorrect/missing identification numbers. Part of the discrepancy is attributable to the fact that there are some individuals who have multiple rows in the database indicating that ballots were rejected more than one time.

60. A key question is how many of the individuals who had their ballots rejected were then able to vote in person or vote by mail following a correction. Dr. Hoekstra asserts that voters can easily substitute in-person voting for mail voting, and because of this, there really is no meaningful burden. Dr. Hoekstra concludes his rebuttal report by saying that "the likely burden on the…registered voters who will either have to cure their ballot or vote in person as a result of SB 1 is likely minimal, and quite possibly zero."

61. As I show just below, Dr. Hoekstra's assessment is incorrect. But first, it is worth showcasing that there are instances that are consistent with Dr. Hoekstra's theories. There are voters whose records indicate that they applied for and received mail ballots in early February. But then they seemed to hit a snag. The voter file lists that their ballots were rejected, with a code of "IS", indicating missing or incorrect information in the SSN or DPS ID fields. Fortunately, on other rows in the voter file, the record shows that these same voters, whose mail ballots were rejected, ended up casting ballots in-person on March 1.

62. The scenario I just outlined seems to be the kind of story that Dr. Hoekstra has in mind, namely, a voter hit a problem with SB 1 compliance but was then able to vote in person. However, these cases represent the minority of impacted voters. Out of 25,429 individuals who had mail ballots rejected on account of missing/incomplete identification

numbers, only 6,509 (25.60%) have records indicating that they cast an accepted mail ballot or voted in person. The remaining 18,920 (74.40%) are recorded as not having cast a vote. That is, **3 out of 4 Texans who had their mail ballot rejected due to SB 1 requirements did not go on to successfully cast a ballot in the election.**

63. Dr. Hoekstra did not just argue that few Texans would be affected by SB 1. He argued specifically (paragraph 30) that, *conditional on a registrant having to cure their ballot due to SB 1*, there would be little or no consequence for turnout. However, as just shown with the state's data, among qualified Texans who went through the trouble of applying for and submitting a mail ballot and then had their mail ballot rejected due to SB 1, 3 out of 4 of them ended up not having any ballot counted in the March 1 primary at all.

**The Timing of Mail Ballots**

64. If mail applicants and mail voters have materials rejected, they are supposed to be notified by phone and/or email. But if they are not immediately responsive and/or they submit forms right before the deadline, then it might not be possible for them to cure the problems presented by SB 1. It turns out that many mail voters submit forms very close to the deadline.

65. Consider the calendar for the March 1 state primary in Texas. Texans could send applications for a mail ballot as early as January 1, 2022. Applications had to be received by election officials no later than February 18. In the TEAM records, 260,275 registrant records are listed as submitting an absentee ballot application. Figure 1 shows the dates on which those applications were received.

**FIGURE 1**



**Timing of Received Mail Ballot Applications**
March 1, 2022 Election

Note: "Jan 1" includes a handful of records that are listed as submitted prior to Jan 1. "LATE" combines all dates after February 18.

66. As Figure 1 shows, out of the 49-day period in which registrants could submit a ballot application, almost no applications were received for the first third of the timespan. Then, starting on January 18, weekdays saw a consistent stream of applications, up until (and, actually, after) the February 18 deadline. In fact, of all the applications that were received before the deadline, 1 in 5 were received in the last week (February 12-February 18). Another 9,973 applications were received after the deadline.

**FIGURE 2**



Note: "Feb 1" includes a handful of records that are listed as submitted prior to Feb 1. "LATE" combines all dates after March 3.

67. Figure 2 shows the pattern of dates in which the ballots themselves were received. These data include 196,831 records and include ballots that were received late or were otherwise marked invalid. Here, the pattern looks different than in Figure 1 in that the bars rise as Election Day approaches. As the election date gets closer, there are, on average, more ballots each day. In fact, the last week of eligibility (from February 25 until March 3) shows 39% of ballots received by election officials. Over 11% of ballots

submitted on time were received on a single date, February 28, the day before Election Day.

68. These patterns suggest that voters may have difficulty addressing problems in mail balloting due to SB 1. Given that 1 in 5 Texans who submit applications on time do so in the last week of eligibility, and given that 2 in 5 Texans who submit ballots on time do so in the last week of the election season means that many voters may not learn that they must address problems caused by SB 1 until it is too late.[6] This concern is particularly salient given that three-quarters of individuals whose mail ballots were rejected due to SB 1 did not go on to vote by any method.

### V.    Summary of Findings

69. In this report, I have updated my analysis of TEAM and DPS data using more recent exports from the State of Texas. The results of this new analysis are consistent with the analysis of my prior report: many Texans can submit mail ballot forms correctly and yet their forms will be rejected due to deficiencies in state records.

70. Furthermore, I have addressed the major points raised by Dr. Hoekstra. Unlike other requirements on mail voters in Texas (e.g., the requirement to have an excuse to vote by mail if under age 65), SB 1 requires eligible voters to know detailed information about state record-keeping in order to vote by mail without risk of being rejected due to no fault of their own. While rejected voters can, in theory, cure errors by *not* voting by mail, and

---

[6] According to Texas statute, Section 87.0271(c), in the days right before an election, election officials *may* try to notify voters by phone or email and instruct them in how to cure a problem, such as coming in person to vote at the early voting clerk's office. Furthermore, voters may be able to cure some SB 1 problems by providing identification verification during a grace period following an election. However, it is not clear the extent to which officials are able to make contact with registrants whose ballots/applications are rejected to SB 1. Clearly, the March election data shows that most voters with ballots rejected due to SB 1 did not end up voting.

instead voting in person, the March 1 election data confirms that three-quarters of rejected voters did not successfully vote in the election after their ballots were rejected due to SB1.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 4th Day of May, 2022.

_____

Eitan Hersh

# Exhibit 3

**Second Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*United States v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**February 3, 2023**

# I.    Abstract

1. This report contains three analyses. First, using new data supplied to me in January 2023, I calculate the number of registered voters in Texas whose registration records indicate that they could have a mail ballot application or carrier envelope rejected on account of identification verification requirements imposed by Senate Bill 1 ("SB 1"). My analysis shows similar results as in two prior expert reports that I have filed in this case. I find that 1 in 7 Texans can accurately and completely fill out a mail ballot application and the application could still be rejected on account of SB 1's verification procedures.

2. Second, I conduct an analysis of rejected mail ballots during the first federal election held since the passage of SB 1, the November 2022 election. Among other findings, I show that the overwhelming majority (more than 80%) of rejected mail ballots were rejected on account of SB 1 identification rules.

3.  Third, I analyze the behavior in the November election of individuals who I have flagged as having records that could lead to mail ballot rejections. Those deemed at risk have a significantly lower rate of successfully voting by mail than the general population.

# II.    Replication of Previous Analyses and Meta-Analysis

4. In a February 28, 2022 report ("Initial Report"), I described a methodology for evaluating the number of Texans who were particularly vulnerable to having a mail ballot application rejected on account of identification verification rules in SB 1. For several reasons, a registered voter could fill out a mail ballot application (or mail ballot carrier envelope) correctly but the materials would be rejected by election officials:

a. Many Texans have multiple identification numbers because they have multiple Department of Public Safety IDs ("DPS IDs"). But Texas only stores up to one DPS ID Number on its list of registered voters (the Texas Election Administration System, or "TEAM"). If a registrant lists a correct DPS ID number on mail ballot materials but not the number that happens to be listed in TEAM, the voter's mail ballot or mail ballot application will be rejected.

b. Some Texans are listed on TEAM without a DPS ID Number. Many of these individuals do in fact have DPS IDs. They are instructed by the language in the mail ballot application and on the carrier envelope to list only their DPS ID when filling out mail ballot forms. However, because their DPS ID Number is absent from TEAM, their materials will be rejected.

c. Administrative records are not perfect. Tens of thousands of Texans are listed on TEAM with typos in their Social Security numbers ("SSN") and/or their DPS ID numbers. When a registered voter fills out a mail ballot application (or ballot carrier envelope) correctly, the material will be rejected on account of these administrative typos.

5. In my Initial Report, I established a methodology for linking TEAM records to DPS records in order to count the number of individuals who might have their materials rejected. In addition to explaining the methodology, I was able to test the validity of the methodology. I reported that 1 in 7 registered voters in Texas could have their mail ballot materials rejected on account of SB 1 even if they followed instructions correctly. I concluded that "Texas's databases are simply not well-suited to SB 1's demands" (Paragraph 114). On account of incomplete records as well as typos and other

inconsistencies across state databases, the law can prevent citizens from voting. I conducted subgroup analyses to show that the affected population includes many senior citizens, Texans living overseas, disabled veterans and homebound citizens, all of whom rely on mail voting more than the general population.

6. In a May 4, 2022 supplemental report ("First Supplemental Report"), in addition to some new analyses, I replicated the analysis described above with updated DPS and TEAM records. Whereas DPS and TEAM data in the Initial Report were produced in January 2022, data in the First Supplemental Report were produced by the State in March and April 2022. The results were substantively the same.

7. In January of 2023, I received yet another update to DPS and TEAM records. The DPS records were drawn in December of 2022, and the TEAM records were compiled in early January 2023.

8. In Appendix A to this report, I describe the details of this additional replication with the new data from December 2022/January 2023. In Table A, here, I provide the top-line summary statistics from that analysis and place the results in context, alongside results from the Initial Report and First Supplemental Report.

**TABLE A: Summary of Results from Three Analyses of DPS and TEAM Records**

|  | Initial Report | First Suppl. Report | Second Suppl. Report |
|---|---|---|---|
|  | **February 2022** | **May 2022** | **January 2023** |
| No DPS ID in TEAM; Possesses DPS ID | 276,405 | 209,137 | 189,095 |
| One DPS ID in TEAM; Possesses Multiple DPS IDs | 2,213,676 | 2,392,733 | 2,394,435 |
| Typo/Inconsistent SSN4 in DPS vs TEAM | 44,444 | 44,915 | 44,353 |
| Typo/Inconsistent DPS ID in DPS vs TEAM | 68,190 | 74,897 | 62,461 |
| **Total Issues** | **2,602,715** | **2,721,682** | **2,690,344** |
| **Total TEAM Records** | **17,026,054** | **17,330,189** | **17,451,752** |
| **Issues/Total (Percent)** | **15.3%** | **15.7%** | **15.4%** |

9. As the first line of data in Table A shows, the results indicate a decline in the number of individuals who are listed in TEAM without a DPS ID Number but who do in fact possess a DPS ID Number. The number went from 276,000 when I first ran the analysis a year ago to 209,000 a few months later, to 189,000 in the current analysis.

10. During the same period, the number of Texas registered voters who are listed in DPS with more than one DPS ID number has increased from 2,214,000 to 2,393,000 to 2,394,000. As noted in the Initial Report, according to SB 1, a voter may use a current or expired ID in filling out mail ballot materials, but TEAM only stores zero or one ID number per registered voter.

11. The number of typos or other data errors in the storage of Social Security numbers (specifically in the last four digits of the Social Security numbers ("SSN4")) is nearly exactly the same across the three analyses. The number of typos or errors in DPS ID numbers went from 68,000 to 75,000 and then down to 62,000. The last rows of Table A summarize the total number of issues and divides these by the total number of TEAM

records. The analysis was performed three times over the course of twelve months with three different snapshots of Texas administrative data. The results are consistent, with 15-16% of records affected by issues that might lead to ballot materials being rejected on account of SB 1 requirements, even with voters dutifully following mail ballot instructions.

### III. Analysis of November 2022 Federal Election

12. In this section, I analyze mail ballot data from the November 2022 federal election. First, I measure the consistency between statistics reported by Texas and the January 3, 2023 data transmitted to me regarding participation in the November election. Then, I report three key findings.

   a. I estimate that the initial mail ballot rejection rate in Texas at 4.1%. This is higher than the final rejection rate of 2.7% that Texas has reported.

   b. I estimate that over 80% of rejected mail ballots are rejected on SB 1 grounds. I count 5 Federal Post Card Application ("FPCA") voters—military and overseas voters—whose ballots were rejected on SB 1 grounds.

   c. I estimate that more than 50% of individuals who are flagged for having a mail ballot rejected due to SB 1 did not end up voting in the November election, either by mail or in person.

OCA-APPX-0098

13. According to the website of the Texas Secretary of State, in the November 2022 election, 7,775,713 votes were cast in person and 359,526 ballots were cast by mail.[1][2] The count of 359,526 mail ballots submitted is higher than 345,697, which is the count provided by state officials to the media.[3] It is also higher than 345,679, which is the count disclosed by Texas in court documentation in January 2023.[4]

14. In the January 2023 TEAM database I received, there are 8,178,445 voter history records associated with the November 8, 2022 election. However, about 70,000 of these records are instances of registrants who are listed on more than one line of the TEAM database, for instance a line representing that they requested a mail ballot but another line representing that they actually voted in person.

15. In order to gauge turnout as it is represented in the TEAM records, I retain only the most recent voter history record for each registrant, by selecting the date listed as most recently

---

[1] See "November 08, 2022 GENERAL ELECTION Cumulative Totals Thru Close of Business November 08, 2022" https://earlyvoting.texas-election.com/Elections/getElectionEVDates.do. The counts as reported by Texas here are dynamic and are regularly updated. The counts listed reflect numbers as of January 30, 2022. The mail ballots in this tabulation come from county numbers and appear to reflect ballots submitted rather than ballots officially counted. This is evidenced by the fact that the state website records ballots submitted as early as October 2, 2022, a date prior to when signature verification committees began to meet and review mail ballots. For information on the timeline for reviewing ballots, see: "Early Voting Ballot Board & Signature Verification Committee, Handbook for Election Judges and Clerks 2022," Texas Secretary of State Elections Division. See Page 9: "A [signature verification] committee may not begin operating before the 20th day before election day." https://www.sos.state.tx.us/elections/forms/ballot-board-handbook.pdf.

[2] Note that there is more than one way to tabulate voter turnout. For instance, elsewhere on its website, the Texas Secretary of State's office refers to ballots counted in the gubernatorial election (the highest office on the ballot in 2022) as its voter turnout. See Texas Secretary of State, "Turnout and Voter Registration Figures (1970-current)," https://www.sos.texas.gov/elections/historical/70-92.shtml. For matching turnout statistic in gubernatorial election, see Texas Secretary of State, "Official Canvas Report," Page 8, https://results.texas-election.com/static/data/Reports/47009/OfficialCanvassReport.pdf?v=1673559121148.

[3] Ashley Lopez, "Despite Mail Voting Changes, Ballot Rejections Remain Relatively Low in 2022 Midterms," NPR, January 13, 2023.

[4] See "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories," Page 13, *United States v. Texas*, January 19, 2023.

OCA-APPX-0099

updated. After this procedure, all in-person ballots cast (election day ballots and early ballots, including provisional ballots) yield a tally of 7,775,194. This number is nearly identical to the count of 7,775,713 in-person ballots received according on the State's website as referenced above. Since the website is continuously updated but the voter file I received is static and dated January 3rd, it is expected that the number counted on the website would be slightly higher than tabulated based on the static voter file. Note that some of these ballots (5,901 of them) have a code indicating that they were ultimately rejected. Nearly all the others (7,768,874) have a code indicating that they were accepted. The remaining 419 records have neither an accepted nor rejected code.[5]

16. 378,487 other records have a code associated with a mail ballot. Nearly all of these have one of the following "ballot status" codes:

**TABLE B: Ballot Status Codes of Mail Ballot Records in November 2022 Election**

| CODE | Definition | Count |
|------|-----------|-------|
| **AB** | Absentee ballot received | 1,492 |
| **AC** | Absentee ballot cancelled by voter | 16,420 |
| **AM** | Absentee ballot mailed | 29,719 |
| **AV** | Absentee ballot accepted | 322,423 |
| **AX** | Absentee ballot rejected | 8,366 |
| **RB** | Absentee ballot returned by PO | 20 |
| **(No Code)** | | 47 |

17. Of these records, the total ballots submitted are those with codes AB (Absentee ballot received), AV (absentee ballot accepted), and AX (absentee ballot rejected). These sum

---

[5] The method of voting is defined by a field in the database called "ballot type." The rejected/accepted status comes from a different field, called "ballot status". For in-person ballot types, 7,768,874 have a code of "A" (accepted); 5,901 have a code of "R" (rejected); and 419 have no code.

to 332,281.[6] The other codes reflect ballots that either never reached the voter (returned by Post Office) or were received by the voter but the voter never mailed back the ballot or else cancelled the request.

18. This number (332,281) is lower than the other counts mentioned above, both in public reports (345,697 ballots received) and in the State's count on its website (359,526 ballots received). One possible explanation for the discrepancy is if those sources include in their counts ballots that were cancelled by voters. Adding in these 16,420 records would bring the voter file count up to 348,701. However, based on the codes and definitions made available to me, I will count ballots submitted as only those that have the codes of AB, AV, or AX.

19. According to the January 2023 data, there are 18,187 records listed with a reason that a ballot was rejected. Of these, 13,638 were mail ballot rejections. About 40% of records that indicate a reason for a mail ballot being rejected have a status code that indicates the ballot was accepted. Presumably, these are cases in which a ballot was initially rejected but eventually cured and accepted. Of all the mail ballot rejections, 11,430 (83.8%) have a code indicating that identification verification was the reason for the rejection.[7] With 13,638 rejections and 332,281 mail ballots submitted, the rejection rate is estimated as 4.1%. This number is higher than the publicly reported rate of 2.7%.[8]

---

[6] If one calculates this number without removing the duplicate voters listed in TEAM, as described above, the total count of submitted ballots would nevertheless be quite similar: 332,885.

[7] These codes are: IS, ISR, EVBIS, EVBISR, EVCIS, EVCISR, and ISF. The first two of these codes are identified in Defendant's disclosed document STATE057755. The remaining codes are identified by county disclosed documents, such as Dallas County document, MS016221.

[8] According to NPR, 9,348 of 345,697 mail ballots were rejected. These numbers are based on "NPR inquiries with state officials." Ashley Lopez, "Despite mail voting changes, ballot rejections remain relatively low in 2022 midterms," NPR, January 13, 2023

OCA-APPX-0101

20. Among those with rejected ballots include 5 individuals who use Federal Post Card Applications, which are voter registration forms used by members of the military, their families, and American citizens who are residing overseas.

21. Of the 11,430 records indicating voters who were rejected on SB 1 grounds, less than half of them (44.4%) are associated with a registrant whose record also shows that they were able to vote either by mail or in person. Most (55.6%) failed to vote successfully following their ballot being rejected.

22. If one calculates the rate of rejected ballots as those that appear as uncured in the TEAM file, the rejection rate would be lower than 4.1%. For example, of all 13,638 records listed with a reason that a mail ballot was rejected, 8,306 show no indication that the registrant successfully voted, whether by curing the mail ballot or cancelling the mail ballot and voting in person. If we divide 8,306 by the sum of 8,306 and 322,423 (the number of successful mail votes), then the uncured/uncanceled rejection rate would be 2.5%, which is close to the rejection rate of 2.7% reported by the State. Such a calculation does not take into account those voters who, in order to resolve a rejection attributable to SB 1, needed to vote in person rather than by mail.

23. The analysis above suggests a mail ballot rejection rate of 4.1% and an uncured/uncanceled rejection rate of 2.5%. However, estimates of rejection rates must be observed with caution, as some cured ballots may have had their codes in TEAM overridden once they were cured. According to Kristi Hart, the State's Director of Election Administration and Voter Registration, TEAM records that are rejected but eventually cured would have the rejection flag overridden.[9] At the same time, in some

---

[9] Deposition transcript of Kristi Hart, Director of Election Administration and Voter Registration, Office of Texas Secretary of State, Pages 133-135, *United States v. Texas*, June 30, 2022.

OCA-APPX-0102

cases registrants have multiple records on TEAM, one indicating a rejection and one an accepted form. Thus, from the TEAM data alone, it is not possible to offer a definitive account of the number of ballots rejected and cured. The numbers reported here reflect what can be discerned with the available data.

24. In comparison to the March 2022 primary, which was the first election held under SB 1 rules, two facts are apparent. First, the rejection rate reported in the March 1, 2022 state primary was higher than in November; 12% of ballots were reportedly rejected in March.[10] Second, a smaller share of voters who cast ballots did so by mail in November 2022 (4.4% according to the State's reporting) compared to the share in March 2022 (5.6%).[11]

## IV. Relationship between Records Flagged and Mail Voting in 2022 Election

25. The first part of the analysis in this report showed that 15% of Texas registered voters could have a problem voting by mail on account of SB 1. The second part of the analysis showed that some 4% of mail voters had ballots rejected on account of SB 1 identification rules. Here, I will briefly put these two analyses in context of one another.

26. As I noted in my First Supplemental Report, a useful analogy to the problems identified here is that of a hospital that has poor record-keeping practices. Suppose the hospital had incorrect records for 15% of the population. In any one year, few people go to the hospital, so it isn't the case that 15% of the total public will be mistreated by the hospital on account of poor record-keeping. But when those in that 15% "at-risk" population

---

[10] Robert Garrett, "Rejection of Texans' Mail Ballots Decline Markedly from the Big Surge in March Primary", *Dallas Morning News*, Dec 23, 2022.
[11] https://earlyvoting.texas-election.com/Elections/getElectionDetails.do.

suddenly need to visit the hospital, they may be inconvenienced or harmed on account of the record-keeping. The analogy is helpful because it clarifies that while there is a large pool of citizens at risk of having a problem, most will not be confronted with that problem in any one election year.

27. Consider the 2.7 million records of registrants whose data demonstrate a possible barrier to meeting SB 1 requirements. I merge these with the records of individuals who requested a mail ballot in November 2022. Of all the 2.7 million registrants with record issues, 28,437 requested a mail ballot. It is not surprising that only a small percent of these 2.7 million voters requested a mail ballot, as only about 2% of all registered voters in Texas voted by mail in the November election.[12] Among those 28,437 registrants who tried to cast a mail ballot, 6,380—or 22.44%—never cast a successful mail ballot. These registrants include those rejected due to SB 1 and those rejected for reasons other than SB 1, as well as those who never returned their ballot or returned their ballot late. In comparison, among those registrants who are not in the "at risk" pool of the 2.7 million voters, only 16.17% of them who began the mail voting process never cast a successful mail ballot (a statistically significant six percentage-point difference, $p < .0001$). Again, this baseline of 16.17% includes those whose mail ballot applications or ballots are rejected for reasons unrelated to SB1 as well as individuals who do not end up returning a mail ballot at all or returning it late. The fact that the subpopulation of 2.7 million has a

---

[12] According to Texas, in November 2022, there were approximately 346,000 mail voters and 17,672,000 registrants, so 2% of all registrants cast a mail ballot. This figure represents the percentage of all *registered voters* who cast mail ballots in November 2022, rather than the percentage of *voters who cast ballots* in the November 2022 election who did so by mail, as discussed in Paragraph 24. For mail ballot estimates, see above. For registration counts, see: https://www.sos.texas.gov/elections/historical/70-92.shtml.

much higher rate of non-voting by mail *conditional on requesting a ballot* is likely to be related to SB 1 requirements.

**V.       Conclusion**

28. In this analysis, I have replicated my main analysis for the second time. The analysis shows (as it has shown twice before) that about 15% of registration records in Texas could have an issue with the SB 1 identification verification rule if the registrant was to apply to vote by mail. Second, I have shown that while only 2% of registrants voted by mail in the 2022 general election, more than 11,000 ballots were rejected on account of SB 1 identification issues. Most of the individuals who submitted those rejected ballots did not successfully vote, either by mail or in-person. Third, I have shown that "at-risk" registrants who tried to cast a ballot by mail in the 2022 general election were significantly less likely to successfully vote by mail than individuals who are not in the pool of the 2.7 million "at-risk" registrants.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 3rd Day of February, 2023.

_____

Eitan Hersh

## APPENDIX A: REPLICATION OF ANALYSIS USING DEC 2022/JAN 2023 VERSIONS OF DATA

**A. Databases**

1. <u>DPS</u>. The updated DPS database I received is dated December 17, 2022. The database contains 37,377,423 records, an increase of almost a million records from the 36,417,304 records identified in the March 2022 data I analyzed in my prior supplemental report. As in the versions previously analyzed, the December 2022 version of the data has complete or nearly complete records in all fields of interest (e.g., name, date of birth, address, gender) except that 5% of records are not populated with Social Security numbers, which was also the case in the prior versions. Table 1 below updates Table 1 of my Initial Report with the new data.

2. The percent of DPS records with missing SSNs has declined from 5.02% in the Initial Report to 4.98% in the First Supplemental Report, to 4.85% here. The percent of records missing a *unique* SSN9 (i.e., the number of SSNs associated with more than one DPS ID Number) has increased from 21.6% to 27.5% here (the First Supplementary Report had this rate even higher, at 28.7%).

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---|
| Missing SSN | 4.85% |
| Missing unique SSN9 | 27.49 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.03 |
| Missing ZIP Code | 0.00 |
| **TOTAL IN DATABASE** | 37,377,423 |

3. <u>TEAM</u>. The updated version of TEAM records is dated January 3, 2023. The TEAM data was transmitted to me as a single data file. (In prior transmissions, the data had been stored by county in separate files). Registered voters can be listed on many lines within the file. For instance, Texas counts 28,868 registered voters in Anderson County as of January 2023.[13] In the January 2023 TEAM export I received, there are 57,459 rows of registrants in Anderson County. Different rows show different interactions that registrants have had with the election system. I processed the data so that each person, represented by their Voter Unique Identification Number (VUID), is listed one time. Specifically, I observed the dates labeled "ballot_last_updated" and retained the most recent date for each registrant. I also retained registrants who had no date listed in this field.

4. After the de-duplication process, the January 2023 TEAM file consists of **17,451,752** records. I sought to confirm that this number is close to the State's official reporting. According to the Secretary of State's website, as of January 2023, there were **17,450,474** registered Texas voters. Given the typical fluctuation in registration numbers, a difference of less than 0.01% suggests the data I have been given by the State is consistent with the State's publicly reported information.


**B. Data Quality Checks in the TEAM Voter Records**

5. I performed the same set of data quality checks as described in my prior reports. Tables 2 and 3 offer summary statistics on key fields of interest. In the updated data, 2.27% of records are missing SSN (compared 2.52% in March 2022 and 2.34% in January 2022).

---

[13] https://www.sos.state.tx.us/elections/historical/jan2023.shtml

In the January 2023 data, 2.62% are missing a DPS ID Number (compared to 2.85% in April 2022 and 3.16% in January 2022).

6. The numbers are all similar to those in my previous reports, with one exception. In the January 2023 data as well as the January 2022 data, less than 1% of records are missing street number and ZIP code. In the March 2022 data, over 20% of the records were missing this information.

**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---:|
| Missing SSN | 2.27% |
| Missing Unique SSN9 | 5.86 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.01 |
| Missing M/F Gender | 3.65 |
| Missing Street Number | 0.07 |
| Missing ZIP Code | 0.03 |
| **TOTAL IN DATABASE** | 17,451,752 |

**TABLE 3: Summary of Field Completeness in TEAM**

| | | |
|---|---|---|
| **TOTAL Records in TEAM analysis** | **17,451,752** | |
| **Records with unique SSN9** | 16,428,895 | 94.14% |
| **Records with SSN4** | 17,056,442 | 97.73 |
| **Records with DPS ID Number** | 16,994,311 | 97.38 |
| **Records lacking SSN4 and DPS ID No.** | 93,208 | 0.53 |

## C. Methodology

7. The methodology employed is the same as in my Initial Report. See Paragraphs 50-73 in that report for a detailed explanation. My goal is to look up each registered voter in the

DPS database and determine if the registered voter has one (or more) DPS ID Numbers listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers and SSN4s listed on TEAM versus those listed on the DPS Database. I create three linkage fields to connect the TEAM and DPS databases together. The first field is the nine-digit Social Security number (SSN9). The second field is the combination of name (First and Last) and date of birth. I call this linkage field "ND" for Name + Date of Birth. The third field, a combination of Address (Street Number and ZIP code) + Date of Birth + Gender, I call "ADG". Table 4 (a replica of Table 6 from my Initial Report) illustrates the three linking fields with an example of a fictional registered voter named John Smith.

**TABLE 4: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
|------------|-------------|----------------------|
| SSN9 | 9-digit Social Security number | "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" |
| ND | First name + Last name + Date of birth | "JOHNSMITH1976-07-04" |
| ADG | Address + Date of birth + Gender | "655782051976-07-04M" |

8. As in the prior reports, in addition to calculating statistics for the whole population of registered voters, I also look at several subpopulations, including registrants over 65, registrants who voted in 2020, registrants who have homebound/disabled veteran statuses, and registrants who are listed with specific codes in TEAM signaling that they have applied using Federal Post Card Application (FPCA) registration forms, which are voter registration forms used by members of the military, their families, and Americans who are residing overseas. I refer to these as FPCA voters. In the April report, I did a separate analysis of "voluntary surrender" designations in DPS records, but I concluded, based on disclosures from Texas, that these designations did not contain sufficient information to determine if the citizen holding a surrendered card would or would not be

able to use the ID card for the purposes of mail voting. Accordingly, I do not repeat the analysis of surrendered licenses here.

**D. Linkage Part I: TEAM Records with missing DPS ID Numbers**

9. I divide the analysis into two parts. First, I examine individuals whose TEAM records do not show any DPS ID Number. Second, I examine individuals whose TEAM records do show a DPS ID Number.

10. Out of 17,451,752 records in TEAM, 457,441 do not have a DPS ID Number listed in the voter registration records. If any of these individuals actually has a DPS ID Number, they are instructed by the mail ballot forms to include that DPS ID Number (and *only* that identification number). But SB 1 requires these forms—the application and the ballot carrier envelope—to be rejected because the DPS ID Number is not listed within registration records.

**TABLE 5: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

|  |  | Unique SSN9 | | |
| --- | --- | --- | --- | --- |
|  |  | Present | Absent | TOTAL |
| **DPS ID** | Present | 16,340,755 | 653,556 | 16,994,311 |
| **Number** | Absent | 88,140 | 369,301 | 457,441 |

11. I link the 457,441 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG linkage fields.

12. I first link by SSN9. Of the 457,441 individuals without a DPS ID Number in TEAM, 88,140 have a unique SSN9 listed (as noted in Table 5). Of those, 71.42% match to the DPS database by their SSN9. A total of 64.81% of the records match to a single DPS ID Number, and 6.61% link to multiple DPS ID Numbers.

13. I next link these individuals based on ND. As noted in Table 5, most individuals who lack DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a unique ND combination. Of the 457,441 lacking a DPS ID Number on TEAM, 449,224 (98.2%) have a unique ND. Of those who have a unique ND, 23.72% match to a single DPS record and 4.22% match to multiple DPS records.

14. I next link these individuals based on ADG. Of 457,441 records lacking a DPS ID Number on TEAM, 401,073 (87.68%) have a unique ADG. Of those with a unique ADG, 26.81% match to a single DPS record and 3.48% match to multiple DPS records.

**TABLE 6: Results of Linking TEAM to DPS Records for TEAM Records without a DPS ID Number listed**

|  | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|---|---|---|---|---|
| **SSN9** | 28.58% | 64.81% | 6.61% | 88,140 |
| **ND** | 72.06 | 23.72 | 4.22 | 449,224 |
| **ADG** | 69.70 | 26.81 | 3.48 | 401,073 |
| **Any** | 58.36 | 36.25 | 5.39 | 454,073 |

15. Table 6 summarizes the analysis of records that do not have a DPS ID Number listed on the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows that I attempted to match 88,140 records in TEAM based on SSN9. This reflects the number of TEAM records without a DPS ID Number that include a unique SSN9. Of those, 28.58% did not match to DPS. The others did match.

16. The bottom row of Table 6 provides the overall summary for the TEAM records lacking a DPS ID Number. Of the 457,441 total records lacking a DPS ID Number, I attempted to link 454,073 (99.26%) to the DPS database. (The other 0.74% did not have a unique or

complete value for SSN9, ND, or ADG). Of the individuals I attempted to find on DPS, 42% matched to a DPS record. That amounts to 189,095 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number (and only their DPS ID Number) on their mail ballot forms. However, if they follow those instructions and list only that DPS ID Number, SB 1 requires their ballot applications, and their ballots, to be rejected because the number is not listed on TEAM.

17. <u>Subpopulations:</u> Of the 189,095 individuals who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 74,982 are over age 65

- 52,157 voted in the 2020 election

- 28,152 are over 65 AND voted in the 2020 election

- 1,475 have FPCA statuses

- 391 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

18. <u>Typos in Social Security Number.</u> Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,431 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,431 cases result from inaccuracies on TEAM. They would cause election

officials to reject mail ballot forms from citizens who include their correct SSN4 on the forms. A voter may include an SSN4 on ballot materials as a precautionary measure based on supplemental instructions from election administrators.[14]

### E. Linkage Part II: TEAM Records Listed with DPS ID Numbers

19. I now turn to the analysis of the 16,994,311 records in which a DPS ID Number is listed in the TEAM databases. As noted above in Table 5, 96.2% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of 16,340,755 records with a unique SSN9 on TEAM, 99.71% match to a record in DPS. However, 16.34% of the records match to more than one DPS ID Number.

20. Next, I link records based on the ND combination, as described in Paragraph 11 above. The ND combination is unique for 16,869,025 individuals who have a DPS ID Number listed on TEAM. Of these, 97.66% match to a record in DPS. However, 15.89% match to more than one DPS ID Number.

21. Next, I link records based on the ADG combination. The ADG combination is unique for 16,316,427 individuals who have a DPS ID Number listed on TEAM. Of these, 85.19% match to a record in DPS. However, 11.01% match to more than one DPS ID Number.

**TABLE 7: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|  | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|---|---|---|---|---|
| **SSN9** | 0.29% | 83.36% | 16.34% | 16,340,755 |
| **ND** | 2.34 | 81.76 | 15.89 | 16,869,025 |
| **ADG** | 14.81 | 74.19 | 11.01 | 16,316,427 |

---

[14] See discussion of the State's instructions in my Initial Report, Footnote 4, and in First Supplemental Report, Paragraphs 50-55.

| Any | 0.82 | 85.07 | 14.10 | 16,980,669 |

22. Table 7 summarizes the analysis of records with a DPS ID Number on the voter file. Consider the bottom row. Of the 16,994,311 records in TEAM listed with a DPS ID Number, I attempted to link 16,980,669 (99.92%) of them to the DPS database. The remaining 0.08% did not have a unique or complete record on SSN, ND, and ADG. Of these 16,980,669 records, 99.18% matched to a record in DPS. However, many of them are listed more than once on DPS, with multiple ID numbers. These 14.10% of records sum up to 2,394,435 records. That is, for 2.4 million Texas registered voters who have a DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot envelope) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

23. The 2.4 million figure may be an underestimate. Many DPS ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the TEAM records that linked to a *single* DPS ID Number, 1,407,010 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. During her April 20, 2022 deposition, Sheri Gibson, chief of the Texas DPS driver's license division, explained that these AKA DL/ID numbers are identification numbers associated with the ID holder that are either erroneous or originate from a prior version of the State's license system. If registrants use these alternative identification numbers when submitting a mail ballot application or mail ballot, they will also have their forms rejected because the AKA DL/ID Numbers are not the identification numbers on the voter registration records that are associated with these

registrants. Because some AKA ID Numbers are considered by DPS to be erroneous or otherwise invalid (i.e., not just "expired," which does not impact validity for SB 1 purposes), in order to perform a conservative analysis, I focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

24. <u>Subpopulations:</u> Of the 2,394,435 individuals who match to multiple DPS ID Numbers,

- 174,880 are over age 65

- 1,073,661 voted in the 2020 election

- 91,469 are over 65 AND voted in the 2020 election

- 1,325 have FPCA status

- 5,279 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

25. <u>Typos in Social Security Number</u>. Looking just at the last 4 digits of Social Security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 40,922 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on a mail ballot application, then their application will be rejected because of incorrectly recorded data in TEAM.

a. <u>Subpopulations:</u> Of the 40,922 individuals whose SSN4s listed on TEAM do not match the SSN4s listed in the DPS database

- 14,945 are over age 65

- 25,795 voted in the 2020 election

- 10,294 are over 65 AND voted in the 2020 election

- 100 have FPCA status

- 110 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4 listed in the DPS database.

26. <u>Typos in DPS ID Numbers.</u> Just as there are discrepancies between the SSNs listed in TEAM and the corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers. Using the methodology for calculating these discrepancies that was explained in my Initial Report, I calculate that 62,461 individuals have a DPS ID Number in TEAM that does not match any DPS ID Number in the DPS database.

a. <u>Subpopulations:</u> Of the 62,461 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but have DPS ID Numbers that do not correspond to the DPS database,

- 14,602 are over age 65

- 27,441 voted in the 2020 election

- 9,006 are over 65 AND voted in the 2020 election

- 75 have FPCA status

- 359 individuals matched to DPS records indicating homebound status or disabled veteran status.

**F. Summary of Results from Updated Analysis**

27. To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4. The analysis from the updated TEAM and DPS files show the following:

    a. **189,095** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. Official forms instruct these individuals to list only their DPS ID, but if they do so, their ballot or ballot application will be rejected.

        i. Of these, **74,982** are over 65 years old, **28,152** of whom voted in the most recent presidential election.

        ii. Of these, **1,475** have FPCA status or are listed as disabled veterans or as homebound citizens.

    b. **2,394,435** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

        i. Of these, **174,880** are over 65 years old, **91,469** of whom voted in the most recent presidential election.

        ii. Of these, **5,279** have FPCA status or are listed as disabled veterans or as homebound citizens.

c. **44,353** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

d. At least **62,461** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

28. Altogether, **2.7 million** registered voters in Texas (out of 17.5 million) are at an increased risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.7 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.

# Exhibit 4

**ADDENDUM TO**

**Second Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**


*United States v. Texas*


**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**May 8, 2023**

OCA-APPX-0120

# I.  Summary

1. In Part IV of my February 3, 2023 report ("Second Supplemental"), I compared the successful mail voting rates in the November 2022 election of individuals whose records I had deemed "at risk" for a ballot being rejected on account of the identification requirements in SB 1 with the successful mail voting rates of those not deemed "at risk." I found that at-risk voters successfully voted by mail at a significantly lower rate than other voters. In his March 3, 2023 rebuttal report, the State's witness, Dr. Mark Hoekstra, raised questions about this analysis. He suggested that my analysis had not accounted for the possibility that voters in the at-risk pool a.) could have been rejected for reasons unrelated to SB 1, b.) simply substituted voting in-person for voting by-mail, and c.) exhibit different voting rates from other voters for reasons that are correlated with being in the at-risk pool but have nothing to do with SB 1 compliance (See Hoekstra at Paragraph 21).

2. Following my review of Dr. Hoekstra's report but before my April 20, 2023 deposition, I conducted additional, informal analyses to answer questions raised by Dr. Hoekstra, such as checking whether "at-risk" voters did indeed substitute in-person voting for mail voting. During the deposition, the counsel for the State asked if I had done analysis since writing my last report. I disclosed I had done an analysis related to Dr. Hoekstra's comments, though I had not formally written up computer code nor written up my notes. At my deposition, the State's counsel asked that I share an updated analysis.

3. Responsive to the State's counsel's request, I went back to the database and conducted the updated analysis that I report on here. I am also providing updated programming code to accompany this addendum. In short, the updated analysis shows that voters in the "at-risk" pool who applied for a mail ballot (successfully or unsuccessfully) were significantly less likely to successfully vote (either by mail or in person) in the November 2022 election. This finding cannot be explained by substitution of in-person voting for voting by mail. The finding also cannot be explained by key demographic or geographic factors (e.g., age, county of residence). Registered voters in the at-risk population who apply for a mail ballot are more than twice as

likely as other voters to have a record in the TEAM database indicating that their ballot was rejected due to SB 1. This evidence is consistent with the view that the 2.7 million Texans for whom identification numbers are incorrectly or incompletely recorded in TEAM are significantly more likely than other voters to have ballots rejected and to fail to successfully vote because of SB 1.

## II.    Analysis

4.  I start the analysis with the 8,178,445 TEAM records that indicated any kind of interaction with election officials related to the November 8, 2022 election (See Paragraph 14 of Second Supplemental Report). Of these records, 422,605 have an "application status" code, which indicates that the registrant requested a mail ballot, and 390,012 have a "ballot type" code, which indicates that the registrant successfully requested a mail ballot.[1] TEAM does show some records of individuals with an "application status" code who do not have a "ballot type" code. TEAM also shows some records of individuals who have a "ballot type" code but not an "application status" code. I perform analyses of voter turnout here separately among those who have an indicator that they requested a ballot and among those who have an indicator they were sent a mail ballot. The results are substantively the same either way.

5.  While there are 8,178,445 records in TEAM associated with the November 2022 election, tens of thousands of individuals are listed multiple times. For instance, a person might have one record indicating she had a mail ballot rejected and then a separate record indicating that she had a mail ballot accepted. In this analysis, I create a file where each person is listed once, and I record for that person whether she has any records in TEAM at all indicating she a.) requested a ballot, b.) received a ballot, c.) voted by mail, and d.) voted at all.

---

[1] In the Second Supplemental analysis, I focused on individuals who successfully requested a mail ballot. These are records that have a ballot type designation as "AB" in TEAM. However, as an alternative, one can base this analysis on the application status field so as to include individuals who tried, but failed, to receive a mail ballot. The decision, one way or the other, does not affect any of the core results, as I will show here.

OCA-APPX-0122

- Of 393,324 individuals who requested a ballot, 81.9% successfully voted by mail and 89.9% voted by any method (mail or in person).

- Of 386,478 individuals who were sent a ballot, 83.4% successfully voted by mail and 89.8% voted by any method (mail or in person).

6. Next, I merge this data in with the records of the 2.7 million individuals who I deem "at risk" (See Section II and Appendix A of Second Supplemental for information about how I defined the "at risk" population). These are individuals who either have no DPS ID Number listed in TEAM but do possess a DPS ID Number, have multiple DPS ID Numbers but only one of them listed in TEAM, or have typos in their DPS ID Numbers or their Social Security Numbers listed in TEAM. Among those who either requested a mail ballot or were sent a mail ballot, I measure whether the rate of a successful vote differs depending on whether someone is in the "at-risk" pool or not.

**TABLE 1**

*Individuals who applied for Mail Ballot*

|  | Successful Mail Vote | Successful Vote Any Method | Observations |
|---|---|---|---|
| **Not "At Risk"** | 82.4% | 90.6% | 364,267 |
| "At Risk" | 75.9% | 82.2% | 29,057 |
| **DIFFERENCE** | **6.5 pp** | **8.4 pp** | |

*Note: "pp" means percentage points. It is the difference between the two numbers above it.*

*Individuals who were sent a Mail Ballot*

|  | Successful Mail Vote | Successful Vote Any Method | Observations |
|---|---|---|---|
| **Not "At Risk"** | 83.8% | 90.4% | 358,041 |
| "At Risk" | 77.6% | 81.9% | 28,437 |
| **DIFFERENCE** | **6.2 pp** | **8.5 pp** | |

*Note: "pp" means percentage points. It is the difference between the two numbers above it.*

OCA-APPX-0123

7. As Table 1 shows, regardless of whether one measures the voting rates among those who requested ballots or were sent ballots, Texas registrants in the at-risk pool who attempted to vote by mail are over 6 percentage points less likely to successfully vote by mail and 8.5 percentage points less like to successfully vote at all, compared to those not in the at-risk pool. All the differences in this table are highly statistically significant ($p < .0001$). Note that the version of this analysis from my Second Supplemental Report is the 6.2 percentage point difference in mail voting among those who were sent a mail ballot (bottom left of Table 1). Table 1 here shows three additional comparisons, finding a consistent, large difference in participation rates among those in the at-risk pool and those not in the at-risk pool.

8. Dr. Hoekstra raised the possibility that the individuals who are in the "at-risk" pool are different from those not in the "at-risk" pool in ways that are correlated with voter turnout but have nothing to do with identification numbers. Dr. Hoekstra performed no analysis on this point, and his critique is undermined by the fact that the analysis here is conditioned on individuals requesting a ballot. However, responsive to Dr. Hoekstra's critique, I analyzed the data with two key control variables, age and county.

9. As noted in my February 28, 2022 report, at Paragraph 77, registrants without a DPS ID on TEAM tend to be older than other registrants. Suppose that, conditional on requesting a ballot, the at-risk pool has a higher share of older voters and that those older voters are more likely to not successfully vote. A regression analysis that controls for age is responsive to a challenge of this sort.

10. In a regression framework, I also control for county variation using county fixed-effects. Including county fixed-effects accommodates a concern that what is explaining the lower rates of successful voting in the at-risk pool is related to specific counties that have disproportionate share of the at-risk pool and disproportionate share of individuals who try, but fail, to vote after requesting an absentee ballot.

OCA-APPX-0124

11. Table 2 shows the regression results from an ordinary least squares regression model.[2] The first row is comparable to the percentages in Table 1. For example, in the second column, the -.084 figure means that, controlling for age and county, those in the at-risk pool are 8.4 percentage points less likely to successfully vote (by mail or in person) conditional on applying for a mail ballot. That number, 8.4, is the same as listed in Table 1. This means that adding the control variables does not affect the relationship between "at risk" and participation. The same pattern is true across all four estimates. Note that I also ran this regression model and included gender as an additional control variable. Including gender also has no bearing on the significant relationship between being in the at-risk population and successfully voting.

**TABLE 2**

|  | **Applied for Ballot** | | **Sent Ballot** | |
|---|---|---|---|---|
|  | **Mail Vote** | **Any Vote** | **Mail Vote** | **Any Vote** |
| **"At Risk"** | -.067 (.002) | -.084 (.002) | -.063 (.002) | -.089 (.002) |
| **Age (in 10s)** | .019 (.0004) | .018 (.0003) | .017 (.0004) | -.018 (.0003) |
| **Constant** | .686 (.003) | .776 (.003) | .714 (.003) | .770 (.003) |
| **N** | 393,229 | 393,229 | 386,387 | 386,387 |

NOTE: Each column represents an output from an OLS regression analysis measuring the relationship between "at-risk" and voting while controlling for age and for county of residence. Standard errors are reported in parentheses.

12. Another comment offered by Dr. Hoekstra is that some individuals who did not end up voting by mail successfully may have not voted for reasons unrelated to identification issues that are concentrated in the "at-risk" pool. I observed individuals who requested a mail ballot but then asked to cancel the mail ballot ("ballot type" code "AC"). I re-ran the analysis excluding these individuals. The results are the same.

---

[2] Multivariate ordinary least squares (OLS) regression is a common way to measure the relationship between two variables while controlling for other factors. In this case, OLS allows me to measure the relationship between being in the at-risk population and voting successfully, while controlling for age and county of residence. If the relationship between being at-risk and voting successfully is significant even when the other factors are included in the model, this means that the differences in turnout rates between at-risk and non at-risk voters are not attributable to those other factors.

OCA-APPX-0125

13. A final piece of evidence that confirms that identification issues are at the heart of differences between the at-risk pool and the non at-risk pool comes from the ballot codes in TEAM indicating a ballot was rejected on account of ID issues. As noted in my Second Supplemental report (Paragraph 19), over 11,000 records show a rejection code related to identification issues. Are those rejection codes concentrated in the at-risk population? Yes.

   - 2.8% of Texas registrants who were sent a ballot and are <u>not</u> in the at-risk pool had their ballot rejected due to SB 1 identification requirements.

   - 6.4% of Texas registrants who were sent a ballot and are in the at-risk pool had their ballot rejected due to SB 1 identification requirements.

This rate for the at-risk registrants is more than double the rate of those not in the at-risk pool, and the difference is, again, statistically significant at the $p < .0001$ level.

## III. Conclusion

14. As requested by the State's counsel at my deposition, this addendum summarizes the additional analysis I conducted following my review of Dr. Hoekstra's March 3, 2022 report. The main new analysis I performed responded to the question of whether at-risk voters were less likely to vote at all in the November 2022 election or just less likely to vote by mail. I have found that the at-risk voters are significantly less likely than the non-at-risk voters to vote and to vote by mail. This finding is robust when controlling for age and county, and when setting aside individuals who requested their mail ballots to be cancelled. I further show that those in the at-risk pool are more than twice as likely as other voters to have ballots rejected specifically on account of SB 1 identification requirements. The findings strengthen the conclusions of my previous report that individuals for whom TEAM incorrectly or incompletely records identification numbers are significantly less likely to vote on account of identification requirements of SB 1.

OCA-APPX-0126

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 8th Day of May, 2023.

Eitan Hersh

# Exhibit 5

**Voting Assistance & Vote by Mail**

***La Unión Del Pueblo Entero et al. v. State of Texas et al.***

**Tammy Patrick**

OCA-APPX-0129

## INTRODUCTION AND SUMMARY OF CONCLUSIONS

1. I am a longtime election administrator and election administration advisor and instructor. I am engaged by the United States of America to provide my opinion on two aspects of Texas' new election law, SB1. First, I was asked to analyze the oath that individuals providing assistance to a voter must swear under penalty of perjury and to evaluate whether it is consistent with sound principles for election assistance and election administration. Second, I was asked to evaluate whether the provisions of SB1 requiring voters applying for a mail ballot or voting by mail to provide a number from a Texas identification document if the voter has been issued one, and a partial social security number if they have not, in order for their application or ballot to be accepted, are consistent with sound election administration principles.

2. With respect to the voter assistance oath under SB1, it is my opinion based on my knowledge and years of experience in election administration that the substantive limitations of the oath are not consistent with sound election assistance practices and principles. The oath does not allow for assistance that is comprehensive or responsive to voters' needs, and may prevent timely and equitable assistance for some voters. It also places a burden on election administrators to interfere with the assistance relationship between an assistor and voter, rather than to support ballot access and ensure voters receive the assistance they need.

3. With respect to the vote-by-mail provisions of SB1, it is my opinion that rejecting mail ballot applications or mail ballots based exclusively on a mismatch between an identification card number or partial social security number provided on ballot materials and voter records maintained by the state is not sound election administration practice, nor is it justified by any hypothetical interest in ballot security. This all-or-nothing approach to reverifying the identity of mail voters will cause ballot rejections despite officials' ability to positively identify the voter who sent the materials, and will not meaningfully make elections more secure. Evidence of the rejection rates from Texas' implementation of these provisions so far shows rejection rates far beyond what would be considered reasonable in a well-run election and demonstrates that the identification number requirement does not adequately protect access to voting.

## CONTENTS

4. This Report proceeds in six sections. Section 1 describes my experience, expertise, and qualifications as they relate to the opinions expressed in this report. Sections 2 and 3 pertain to voter assistance. In Section 2, I lay out the principles of voter assistance applicable to my opinion in this case, and in Section 3, I apply those principles to the voter assistance oath provision of SB1. Sections 4 and 5 pertain to voting by mail. In Section 4, I provide background information and principles underlying sound administration of voting by mail. In Section 5, I apply those principles to the identification document number requirements of SB1. Section 6 summarizes my conclusions.

## REQUIRED DISCLOSURES

5. Over the past 4 years, I have not testified as an expert at trial or deposition.

6. Over the past 10 years, I have authored the publications listed in Appendix A.

7. I am being compensated for my time at the rate of $250.00 per hour.  My compensation is not dependent on my opinions and findings in this case.

## SECTION 1: EXPERTISE

8. For almost twenty years, I have served as an election administrator and expert on election administration.  I provide a comprehensive *curriculum vitae* at Appendix B and will draw upon specific examples that have given me experience relevant to the questions the United States has asked me to opine on throughout this Report, as well as to contextualize my election administration experience as it relates to voter assistance and voting by mail.  Below, I highlight some of my most pertinent experience.

9. From 2003-2014, I was the Federal Compliance Officer for the Maricopa County Elections Department in Arizona.  During my tenure in Maricopa County, I developed and formalized an award-winning Voter Assistance Program with comprehensive protocols establishing the proper staffing levels at the polls and ensuring the proficiency of workers to aid voters and their assistants, training of workers in proper assistance practices, and communicating with the voting community about their rights and the services available to them at the polls.  When constructing the program, it was critical to create something that contemplated all of the challenges in identifying vulnerabilities in the system and establishing mitigations prior to any voters being negatively impacted or receiving subpar service.  As such, I not only trained pollworkers, field trouble-shooters, and observers, but I also established a monthly meeting of a Community Network consisting of city and town clerks, tribal leaders, political party representatives, and members of the various voter advocacy communities.

10. In 2013, I was appointed a Commissioner on the Presidential Commission on Election Administration (PCEA) by then-President Barack Obama.  This bipartisan effort spent six months holding hearings around the country to look into specific items laid out in the Executive Order establishing the Commission, including voter assistance, language access, and vote by mail administration.  In public hearings, stakeholder meetings, and research and reports submitted to the Commission as testimony, we heard about the challenges that some voters were still facing in exercising their right to vote.

11. The Commission produced our report "The American Voting Experience" in January of 2014.  The report was well received by election officials, legislators, and voter advocates as containing practical, bipartisan solutions to some of the challenges facing our elections.  The report is still used authoritatively today.

12. From 2014 to 2017, I served as a Senior Fellow at the Bipartisan Policy Center advising their Elections Team on the implementation of the Presidential Commission on Election Administration's recommendations.  We convened workshops of large jurisdictions, published

OCA-APPX-0131

reports on the "New Reality of Voting by Mail"[1] and election day command centers,[2] and established a voter wait time research agenda in collaboration with MIT that, for the first time in the United States, measured the impact of election administration on the voting experience.[3] During those three years I testified in numerous state legislatures, presented at dozens of conferences, and spoke to thousands of election administrators on how to improve election administration and policy.

13. Since 2017 I have been Senior Advisor to the Election Team at the Democracy Fund, an independent, nonpartisan foundation working towards a more equitable election system. In that role, I have dedicated my time and expertise to the continued advancement of the field of election administration by conducting webinars, speaking, and teaching. I have taught at the University of Minnesota's Humphrey School of Public Policy since 2017 and have lectured at Harvard, American University, MIT, and Arizona State University. I am also a frequent speaker at the Election Sciences, Reform, and Administration (ESRA) Conferences. Due to my expertise in voter assistance, language access, and voting by mail, I have testified in the United States Senate and House of Representatives and numerous state legislatures. I often speak or hold webinars for civic engagement groups, am a frequent guest on NPR and PBS News Hour, and serve as a source for many of our largest newspapers and publications.

## SECTION 2: VOTER ASSISTANCE

14. In this Section, I provide an overview of the principles by which election administrators ensure voters are able to receive meaningful assistance at the polls in casting a ballot. The information in this section is derived from my experience as an election administrator and my research and work supporting election administration and sound election management.

15. At the highest level, the assistance that voters receive from assistors of their choice is an integral part of the administration of any elections program. If that connective tissue is jeopardized, if voters are unable to get effective assistance from their person of choice, it influences the administration of the entire program.

16. I have lectured and advised jurisdictions across the country on the implementation of effective assistance programs. Prior to the Census Bureau's 2011 Voting Rights Act Section 203 determinations, I worked with Weld County, Colorado and Fairfax County, Virginia. I helped develop pollworker and staff training materials for Sonoma County, California when they launched their language program in 2016. And I established the voter assistance program in Maricopa County, Arizona when I was an election administrator there.

---

[1] Bipartisan Policy Center. The New Realities of Voting by Mail | Bipartisan Policy Center (June 29, 2016).
[2] Bipartisan Policy Center. Election Day Commander Centers: An Invaluable Tool in Election Administration | Bipartisan Policy Center (January 22, 2016).
[3] Bipartisan Policy Center. Improving The Voter Experience | Bipartisan Policy Center (April 27, 2018).

OCA-APPX-0132

17. When I am reviewing a voter assistance program, there are a handful of primary principles that I have developed to gauge its efficacy, based on my years of experience and study. These principles have been informed by years of work with voter advocacy groups such as the National Disabilities Rights Network and the Arizona Center for Disability Law, and the hearings of the Presidential Commission on Election Administration. They are:
    1. Is the availability of assistance services widely disseminated to voters who may need them?
    2. Is the assistance unbiased/non-leading?
    3. Is the fulfillment of assistance requests timely and equitable?
    4. Is the assistance offered in a comprehensive manner for all voting options and methods?
    5. Is the assistance responsive to the voter's needs and does it fulfill the voter's wishes?
    6. Is the voter's autonomy and humanity maintained in all decision points?
    7. Are election officials provided with the proper tools and training commensurate with the import of the task at hand?
    8. Are the program's policies, materials, and procedures created in a vacuum, or are voters and the applicable community's experts engaged?

18. The foundation of any voter assistance program hinges upon its ability to serve the voting public, so that they are able to successfully navigate the process, and to ensure that the votes cast fully reflect the voter's wishes. For example, the first thing that I did in Maricopa County when establishing the County's voter assistance program was to create a mission statement that would be the guiding star and serve as a reminder of the importance of the job: "Maricopa County Elections Department's Assistance Program strives to ensure equal access to the electoral process for all its citizens and to provide the assistance some voters may require based on physical or mental abilities, mobility concerns, or language skill sets." Setting the proper expectation for voters of what services are available, and training staff and pollworkers to have the tools necessary to engage with the voting public—including supporting those who are assisting voters—are all part of any robust plan.

19. An effective assistance program provides eligible voters unencumbered access to assistance at all points of the process. As such, voters should be able to obtain assistance that is responsive to their individual needs. Physical, cognitive, and language barriers to completing the act of voting should not be determinative of voters' ability to successfully participate. Voting is not a literacy test, it is not a cognitive test, it is not a test of linguistic skills, and it is not a test of physical strength, dexterity, or acumen. Voting is the act and process of making one's voice heard in the selection of government representatives and ballot measures, and that act may not only benefit from assistance for some to participate but be reliant upon it.

20. There are many voters who rely on the aid of another in casting their ballot. In my experience, voters often bring someone with them when they know beforehand that they will need some help. Whether it be a family member, attendant, care-provider, or friend, voters often have those who aid them in other facets of their life assist them at the polls. These individuals commonly are very familiar with the voter's needs. Assistors provide voters with the assistance needed to effectively cast a ballot successfully reflecting each voter's intention.

OCA-APPX-0133

21. Assistance from an assistor of one's choice can take on even further heightened importance in places where poll staffing is stretched thin.  For decades, we have witnessed a migration of in-person voting away from precinct-based polling locations offered for a few hours on a single Election Day.  In most states, voters now have options across a voting period and can choose a voting location, due to the growth of voting centers.  While both of these administrative polices are recommended in order to provide voters options in where and when to vote, it can provide managerial challenges in staffing, particularly in identifying where language assistance may be necessary.  This situation creates an even greater need to support voters when they bring along their own aid.

22. The need for voters to have access to assistors of their own choice will only increase in the coming years.  According to the National Center for Education Statistics, Texas is rated in the bottom 25% of the states in adult literacy, with Texas counties filling all but two spots on the list of the Bottom 10 Counties.[4]  Literacy concerns are aggravated with the elevated language that is used in voting materials and on the ballot itself.[5]  When you add in the growing need of an aging population—the Census Bureau projects that the 65-and-older population is estimated to nearly double from 49 million in 2016 to 95 million in 2060[6]—and the systemic underfunding of election offices,[7] the need for voters to have access to assistance from their person of choice has the potential to only increase in the years to come.  An election is the largest civic effort done on the national scale.  Thousands of election administrators train tens of thousands of permanent staff as well as hundreds of thousands of temporary workers on the intricacies of the election process, as dictated by state and federal law.  This is a particularly difficult task, especially given that more than a third of our election offices are part-time duties and only the very largest offices have more than a handful of full-time employees, as demonstrated by the Democracy Fund survey found at Appendix C.

## SECTION 3: ANALYSIS OF THE ASSISTOR'S OATH REQUIRED BY SB1

23. Based on my review of SB1, I conclude that the changes to the assistor's oath contained in SB1 are inconsistent with the principles of sound voter assistance laid out above.  The attestation that the assistor will confine their assistance to reading the ballot, directing the voter to read the ballot, marking the ballot, or directing the voter to mark the ballot appears to prevent assistors from providing meaningful and often necessary forms of assistance such as answering a voter's questions. The administration of the oath creates challenges for the management of the polling location due to the potential impact on efficient voter processing, increased

---

[4] "Summary of Estimates". National Center for Education Statistics. (2020) State and Counties with the Highest and Lowest Levels of Adult Literacy and Numeracy Skills (ed.gov).
[5] Literacy concerns are particularly problematic given that most ballots use language that ranks far higher than that on the Flesch-Kincaid Grade Level as noted in analysis by Ballotpedia for 2019 and 2021 https://ballotpedia.org/Ballot_measure_readability_scores,_2019 and https://ballotpedia.org/Ballot_measure_readability_scores,_2021.
[6] Vespa, Jonathan, Lauren Medina, and David M. Armstrong. "Demographic Turning Points for the United States: Population Projections for 2020 to 2060". Page 2.  (Revised February 2020).
[7] DeBonis, Mike and Amy Gardner. "Election experts sound alarms as costs escalate and funding dwindles" *Washington Post.* (February 16, 2022).

demands on pollworkers when they are already difficult to obtain in sufficient numbers and are stretched thin at the polls with other responsibilities, and the enforcement of the statute is unfeasible and without guidance.

24. A thoughtful voter assistance program structure can maintain the integrity and legitimacy of the electoral process without infringing on a voter's ability to obtain assistance should they require it; without the creation of a complex system for voters, assistants, and pollworkers to navigate; without introducing the threat of criminal penalties for offering common sense aid to voters. Comparing SB1 with the principles of voter assistance laid forth above, one can see that the structures in place in Texas after the passage of SB1 violate several of those principles, most notably the fulfillment of assistance being timely and equitable as well as responsive to the voter's needs.

25. **Principle 3: Is the fulfillment of assistance requests timely and equitable?**
SB1 is likely to cause significant delays in providing assistance given the restrictions on assistors from answering clarifying questions. The bureaucratic hurdle of an expanded oath will impede voters with disabilities, voters with limited English proficiency, and voters who may be both, from having the same voting experience and treatment other voters receive. To my knowledge there is no research that would support the notion that the limitations in the revised oath would improve or maintain the quality of voter assistance or further secure the voting process. What we do know is that there will be demonstrable delays for it will add considerable time to the processing of voters. We know from queuing theory that the addition of even the shortest interval can accumulate and cause what is often referred to as the "elbow of death"—a point in which the line cannot be processed under existing resources in a timely manner and the wait time only continues to grow.[8] This understanding of the implications of even the slightest change in voter-processing policy was exemplified at the 2018 Election Assistance Commission's Election Data Summit by Ms. Michelle White, General Registrar of Voters from Prince William County, Virginia.

26. **Principle 5: Is the assistance responsive to the voter needs?**
SB1's assistor oath creates a situation unresponsive to voters' needs due to the prevention of assistants from answering voters' questions and sets the stage for voters' needs to go unmet. Clarifying questions can take a number of forms beyond what is listed in the voting instructions.

---

[8]During the PCEA hearings we heard from MIT Professor Charles Stewart III on the implications in queuing theory of Little's Law which illustrates how wait times escalate once the volume of voters entering the line exceeds the processing capacity. Starting in the 2014 election cycle MIT, the Bipartisan Policy Center, and numerous academics embarked on a rigorous data-collection effort to better understand polling location wait times. One such study, from the 2018 election, is the report "Improving The Voter Experience: Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources" https://bipartisanpolicy.org/download/?file=/wp-content/uploads/2019/03/Improving-The-Voter-Experience-Reducing-Polling-Place-Wait-Times-by-Measuring-Lines-and-Managing-Polling-Place-Resources.pdf . There are now numerous tools available to demonstrate the impact when just a few additional seconds are introduced in the system.

Although those instructions may demonstrate how to mark the ballot or how many to vote for in a given race, voters often have other questions, for example around the consequences of voting for more (or fewer) candidates than allowed or what happens if they make a mistake marking the ballot or have an errant mark, among other potential questions.  The answers to these questions can be determinant in the successfully casting of a ballot.  If a voter asks their assistor the question "is there more to vote on the back of the ballot?" or "it says vote for no more than 3, so I can just vote for 2?" it appears an assistor answering those questions would be in violation of the oath, and it is unclear how this would be administered or who would make the judgment calls about what forms of assistance are not permitted, creating administrative problems.  Enforcement also has potential voter privacy implications with an impact not only on that voter, but the entire processing flow in the polling location while pollworkers get bogged down with the process.  Based on my experience there will be down-stream ramifications with impacts on call centers and hotlines due to increased calls asking for clarification, thus further delaying voter aid.  The Texas Secretary of State's Handbook for Election Judges and Clerks leaves many questions around the implementation and administration of the oath as to how it is to be carried out at the polls as well as the enforcement of the new criminal penalties.[9]

27. We know from the recently published instructions from the Secretary of State that observers are not allowed to observe assistance provided by an assistor of choice who is not an election official, but they are if the voter gets assistance from the pollworkers.[10]  The voter is put into a position where they have to decide between getting assistance from someone of their choice (but who cannot answer their questions) or subject themselves to outside observation in casting their ballot, abdicate their right to privacy in voting, and have pollworkers help them.  Voters may not be aware of this consequence when making their determination.  Nothing in the Election Judge Manual advises pollworkers to disclose this to voters; nor is it a required posting in Section 6 on Posting Notices (pages 9-11), so the voters may not be aware of the subjection to observation in casting their ballot by someone who is not a state or county official until they are actively voting.

28. In my opinion the changes to the oath violate these basic principles of voting assistance in the prevention of meaningful assistance and have substantive issues with implementation and enforcement.  The enforcement of this statute is untenable and complicates the provision of assistance to voters that will satisfy their needs

## SECTION 4: VOTE BY MAIL ADMINISTRATION

29. In this Section, I provide background and contextual information for my evaluation of the vote-by-mail provisions of SB1.

---

[9] Indeed, the Texas Secretary of State's Handbook for Election Judges and Clerk's manual states "An inspector may not observe the preparation of the ballot of a voter not being assisted by an election officer [34.002(b)]" page 18 (Section D4), and again on page 48 (Section D, 4g) in reference to both inspectors and pollwatchers.

[10] Texas Secretary of State's Election Judges manual, pages 17 (section 6l) and 48 (section 4g).

OCA-APPX-0136

30.  Americans have been voting by mail since the Civil War.  Every state has some portion of citizens who vote using this method of voting; the proportion is directly related to the onerousness of the application process in that state.  Voters' ability to successfully navigate the process and submit a ballot that is ultimately counted depends on return options and acceptance protocols. For years, tens of millions of American voters have had their ballots handed to them by a United States Postal worker, not a pollworker. According to the Vote at Home Institute, with the expansion of states moving to all vote by mail elections and the number of voters on permanent early voting lists, one in three voters will have their ballots mailed out to them automatically in the 2022 midterm elections. This is in stark contrast with the handful of states that still require voters to provide an excuse to receive their ballot by mail.

31.  As with all things related to election administration, each step in the vote-by-mail process builds upon the one preceding it.  Vote by Mail can be defined in four main stages[11]:
   1.  Application options and requirements
   2.  Voter identification and authentication
   3.  Ballot return
   4.  Processing and verification
   These principles apply to every state, no matter how many voters they have voting by mail.  If we look at what is most prevalent across the country and compare that to the new regime under SB1, we quickly see that the new construct is an outlier, creates unnecessary barriers, and will continue to be detrimental to eligible Texans attempting to access the franchise.

**Application Options and Requirements**

32.  Access to the application process does not imply a lack of security of the process.  States can, and must, have election policies that are both open and secure; these are not mutually exclusive.  Administering an election in a global pandemic demonstrated the need for voters to know all of their options in voting and what the requirements are for their participation.  We saw record engagement in the 2020 election cycle not just due to an expansion of options for voters, but in many states due to official messaging around the process that set accurate expectations for what was necessary to successfully navigate requirements.  Many states have adopted voter-centric policies to govern their administration of absentee and vote by mail voting by establishing reasons to accept an application, or doing away with the application process entirely, rather than to use it as an opportunity to reject the request.

**Voter Identification and Authentication of the Application**

33.  When processing a ballot application an election administrator must identify that the correct record is being worked and that the application is authentic.  The information being used is most often simply to inform that the correct record is being reviewed.  Whether a voter is requesting a ballot on an application for a specific election, or for a given calendar year, the information that they provide *in its totality* validates their identity.  The voter validation process should be

---

[11] These four stages are based upon the comprehensive "America's Election Model: Architecture of American Elections" NIST-EAC Interoperability Election Modeling Working Group Revision: 0.2 (June 11,2019) https://pages.nist.gov/ElectionModeling/ElectionProcessModel.pdf.

OCA-APPX-0137

inclusive of reviewing a combination of pieces of information available to an election administrator or pollworker which may include: first/middle/last name, date of birth, mother's maiden name, county of birth, driver's license or non-operating identification number, last four of social security number, tribal identification number, handwriting sample (such as the completion of previous forms and requests)—the cumulative review of all fields on a voter registration form or ballot application informs voter identity. Not all states require a written application to be completed, or even a written request. Online and telephonic applications allow additional access points to voters and can utilize other identification elements such as personal knowledge of the voter (*i.e.* knowing the voter's voice) that can substantiate the voter's identity.

34. Signature verification is the most common method of voter authentication and is sufficient for authentication of a ballot request. A signature or identifying mark is something that voters inherently have the ability to provide without it having to be provided to them, or have a path to be assisted in providing from someone of their choice. A voter will not misstate their own signature. That is not to say that signatures are static. Forensic training tells us that signatures mature around the age of 25 and begin to degrade as a person ages, typically in their 70s or 80s. Temporary situations also arise that can cause a signature to vary: normal writing hand in a cast, so voter is using their other hand, an uneven writing surface, etc. Most signature rejections on applications and ballot affidavits are from eligible voters who either omitted their signature or had a situation arise that prevented them from signing as they usually do. A signature is the typical means for a voter to certify the accuracy of the rest of the information they put on an application or carrier envelope. By contrast, the rejection or acceptance of an application hinging on the provision of a single data point that must be obtained by a government agency and can be subject to clerical error, transcription, and misinterpretation is problematic and contrary to sound election administration principles.

35. Voter authentication is an important part of maintaining the integrity of an election system, but it does not outweigh the need to ensure that eligible voters are able to engage. As mentioned previously, in my experience I have seen that authentication can, and should, contemplate the totality of information from the voter—various data fields and even various forms and documents. The prerequisite of a single data point as cause for rejection is problematic if other authentication elements are present (such as the signature). It is standard protocol for election officials to augment voter applications with corrected or omitted information after reaching out to the voter.[12] Indeed, this is as much a security measure as it is good customer service and proper use of public funds. If someone had a request for a ballot made on their behalf without their knowledge, this voter authentication process of following up with the voter is the perfect

---

[12] Because this process is best understood by the general public, the NIST Working Group on Interoperability agreed that it should be one of six processes that plain-language slides were created for from the NIST "America's Election Model" report. The resulting slide deck is available publicly on electionline.org. The "Receive and Process Ballot Packets" https://electionline.org/resources/fig-48-receive-and-process-ballot-packages/.

way to find that out. Clarifying information with the voter enhances the security of the system by hearing directly from the voter why the signature was missing or mismatched.

## SECTION 5: VOTE BY MAIL ADMINISTRATION UNDER SB1

36. The creation of a single point of failure for applicants who are unable to, or who do not, provide the same number that is on the voter's registration record, is a clear construction of a barrier in the process. A December 20, 2021 news article in the Texas Tribune reported that there were 702,257 records that only had one of the necessary numbers on file and 106,911 that didn't have either of the required numbers.[13] A voter's signature is sufficient for other facets of engagement with the government, but not for requesting, or returning, a ballot. A voter's signature is sufficient for signing candidate nomination petitions—without the additional listing of one of the sanctioned numbers required under SB1, but not to request a ballot in order to vote for that candidate. We are already seeing the results of this overly prescriptive and limited acceptance policy in the increase in application and ballot rejections. Throughout the lead-up to the 2020 Primary Election there have been news reports of substantial increases in the rejection rates of both applications for ballots as well as the voted ballots, based not on the voters' ineligibility to vote, but due to being rejected based on the single point of data required under the new requirements post-SB1 implementation.

37. There are sound oversight practices in vote by mail administration that are comprehensive and do not result in mass rejections of applications. Quality control of the authentication process as well as the verification of signatures is critical. Administrative supervision that includes capturing contemporaneous data on staff at each step of the process to know if there are "acceptors" (those who say every application or signature is fine) or "rejecters" (those who are overly strict in their interpretation and statistically reject a higher rate than they should), along with a tiered oversight of the process ensures that it isn't a single person's interpretation that prevents a voter from obtaining a ballot or having their ballot be rejected/accepted. Voter registration and election management systems that archive and retain clipped images of all forms and applications as well as signatures from registers, rosters, petitions, and ballot affidavits improve the reviewer's ability to identify anomalous entries and flag potential issues without denying an eligible voter their vote. These administrative policies are commonplace across the country and have kept the vote by mail process secure without locking voters out, without inordinately high rejection rates of applications and ballots based on a single point of failure.

## SECTION 6: CONCLUSION

38. The American voter has diverse needs that require a comprehensive menu of solutions. There are two paths. The first path is what the best programs have done—they provide training and tools so that workers are prepared to assist voters and their aids, they cover all the service channels and educate the public on their available options, practices and policies are transparent and known. The second path does not follow these workable and protective

---

[13] Alexa Ura, "Hundreds of mail-in ballot applications are being rejected under Texas' new voting rules", *Texas Tribune* (January 12. 2022).

OCA-APPX-0139

principles. This is the path that legislation such as SB1 takes with its creation of bureaucratic hurdles and the resulting obstacles for voters.

39. In my opinion, the expansion of the assistor oath does not provide a security benefit to justify the resulting interference with on access to adequate assistance. Similarly, the vote by mail ballot application requirements are onerous and unnecessary to identify the qualifications of, and authenticate, an eligible voter.

40. It bears repeating that across both provisions, SB1 erects unnecessary barriers for Texas voters needing assistance at the polls and for those wishing to cast absentee ballots. The oath requirement preventing assistors from answering voter's questions violates basic principles of voting assistance and has substantive issues with implementation and enforcement, and the vote by mail identifying number requirement results in the rejection of applications and ballots by qualified voters.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 28, 2022.

Signed: _Tammy Patrick_

      Tammy Patrick

Executed in: St. Mary's County, Maryland

OCA-APPX-0140

## APPENDIX A: Disclosure of Publications

- **2022**
  - Co-authored with Lindsay Daniels, *Journal of Election Administration Research and Practice,* (estimated publication in March 2022)
  - Co-authored with Becky Stewart**, "**Now Live: Democracy Fund's Language Access for Voters Summit Landing Page" *electionlineWeekly* (February 17th, 2022) https://electionline.org/electionline-weekly/
- **2021**
  - **"**Additional Thoughts from Panelists on Election Reform Issues", *Conference Report The Carter-Baker Commission: 16 Years Later"* (October, 2021)
  - "Language Access for Voters" *electionlineWeekly* (September 16, 2021) https://electionline.org/electionline-weekly/2021/09-16/
- **2020**
  - "Every Election Has a Story to Tell, Story of 2020 Still Being Written, but Some Chapters are Done" *electionlineWeekly* (November 19, 2020) https://electionline.org/electionline-weekly/2020/11-19/
  - "New Post Master General Issues Directive" *electionlineWeekly* (July 30, 2020) https://electionline.org/electionline-weekly/2020/07-30/#tab-2
  - "Election Day Command Centers: A National Snapshot" *electionlineWeekly* (March 12, 2020) https://electionline.org/electionline-weekly/2020/03-12/
  - Co-authored with David Levine. "Here's Why the U.S. Can Handle Voter Intimidation", *The Fulcrum*, (October 30, 2020) https://thefulcrum.us/election-dissection/report-voter-intimidation
- **2019 -2021**
  - Jennifer Morrell. "*Knowing It's Right*" series on post-election audits including "Part One: Practical Guide to Risk Limiting Audits" introduction, Democracy Fund https://democracyfund.org/idea/knowing-its-right-limiting-the-risk-of-certifying-elections/
- **2019**
  - Co-authored with Katy Owens-Hubler. "Building Terminology in the Field" Chapter 6 in *The Future of Election Administration* https://www.springerprofessional.de/en/the-future-of-election-administration/16853420
  - "Tammy's Blog: Incoming! Voter Registration Application Data" *electionlineWeekly* (December 5, 2019) https://electionline.org/electionline-weekly/2019/12-05/#tab-2
  - "Disaster Narrowly Averted: U.S. to Remain in the Universal Postal Union" *electionlineWeekly* (September 26, 2019) https://electionline.org/electionline-weekly/2019/09-26/
  - "Leave No Voter Behind: Implications of the U.S. Withdrawal from the Universal Postal Union" *electionlineWeekly* (August 1, 2019) https://electionline.org/electionline-weekly/2019/08-01/
  - "Knowing It's Right, Limiting the Risk of Certifying the Wrong Winner" *electionlineWeekly* (May 23, 2019) https://electionline.org/electionline-weekly/2019/05-23/
- **2018**
  - "Reflections on Election: Communication, Collaboration, and Commitment" *electionlineWeekly* (November 29, 2018) https://electionline.org/electionline-weekly/2018/11-29/

- o **"Tammy's Blog: ADA Compliance at the Polls: What Everyone Needs to Know about Accessible Elections and Voters' Rights"** *electionlineWeekly* (November 1, 2018) https://electionline.org/electionline-weekly/2018/11-01/#tab-2
- o "Tammy's Blog: My 2018 Summer Vacation" *electionlineWeekly* (October 11, 2018) https://electionline.org/electionline-weekly/2018/10-11/#tab-2
- o "An Opportunity to Make Every Vote Count" *Governing Magazine* (August 7, 2018)
- o "Increasing Trust in Elections: Democracy Fund's Election Validation Project" *electionlineWeekly* (May 31, 2018) https://electionline.org/electionline-weekly/2018/05-31/
- o  "National Postal Forum 2018: Who? What? Where? When? & Why?" *electionlineWeekly* (May 17, 2018) https://electionline.org/electionline-weekly/2018/05-17/
- o Co-Authored with Stacey Scholl.  "Electionline.org Joins Democracy Fund" *electionlineWeekly* (January 4, 2018) https://electionline.org/electionline-weekly/2018/01-04/

- **2017**
  - o "You've Got Mail! Electionmail: Be Part of the Solution" *electionlineWeekly* (February 9, 2017) https://electionline.org/electionline-weekly/2017/02-09/
  - o "In Focus this Week Exit Interview: Helen Purcell" *electionlineWeekly* (January 26, 2017) https://electionline.org/electionline-weekly/2017/01-26/

- **2016**
  - o "*The New Realities in Election Mail*" by the Bipartisan Policy Center https://bipartisanpolicy.org/report/voting-by-mail/

- **2015**
  - o Council of State Governments Policy Working Group. "*Recommendations from the CSG Overseas Voting Initiative Policy Working Group*" Council of State Governments, https://ovi.csg.org/wp-content/uploads/2019/08/CSG-OVI-Recommendations-Report-Updated.pdf
  - o "Clarion Call: Voter Registration Modernization" in Council of State Government's *2015 Book of the States.*
  - o  "First Person Singular: Tammy Patrick, Traveling the Country, Listening to Election Folks and Some Music" *electionlineWeekly* (June 4, 2015)

- **2014**
  - o Presidential Commission on Election Administration, *"American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration"* (January 22, 2014) https://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf

- **2013**
  - o "U.S. Elections Face a Crossroads on Rights and Technology" *Forbes* online (November 10, 2013)  https://techonomy.com/u-s-elections-face-crossroads-rights-technology/

- **2012**
  - o "Administrative Burden: Perspective of a Western County" in the *Public Administration Review j*ournal of the American Society of Public Administrators (Volume 72, Number 5) https://onlinelibrary.wiley.com/doi/10.1111/j.1540-6210.2012.02619.x

## APPENDIX B: Tammy Patrick CV

**Education:**
- **1991** Purdue University, Bachelor's Degree in American Studies
- **2007** Auburn University, Certified Election Registration Administrator (CERA)

**Election Experience-Employment**
- **2017+** Senior Advisor to the Election team at the Democracy Fund
- **2016+** University of Minnesota Adjunct Professor, Humphrey School of Public Policy
- **2014-2017** Democracy Project Fellow with the Bipartisan Policy Center
- **2003-2014** Federal Compliance Officer for Maricopa County Elections Department
  - Responsible for the Election Department's Voting Rights Act Section 5 submissions.
  - Oversaw voting assistance and materials in Braille, ASL, Spanish, and Tohono O'odham and organized the 2007 Native American Voter Outreach Summit.

**Election Experience—Awards & Recognition**
- **2013** Commissioner on the Presidential Commission on Election Administration, appointed by President Barack Obama
- **2016** USPS creation of ballot-specific Service Type IDs to improve the visibility of ballots in the mail stream
- **2016** National Association County Recorders Election Officials and Clerks Best Practices Award, "Disaster Recovery Plan"
- **2008** Arizona Disability Advocacy Coalition ADA Liberty Patriot Award
- **2008** National Association of Counties Achievement Award, "Maricopa County's Voter Assistance Website"
- **2007** Harvard Kennedy School of Government's Ash Institute Top 50 Innovations in Government, "Election Reporting System"
- **2007** Harvard Kennedy School of Government's Ash Institute Top 50 Innovations in Government Bright Ideas Award, "Election Reporting System"
- **2007** Election Center's Professional Practice Award, "Election Reporting System"
- **2007** National Association of Counties Achievement Award, "Election Reporting System"
- **2006** National Association of Counties Best in Category Award in the County Administration and Management Category, "Voter Language Assistance Proficiency Assurance Program"
- **2006** National Association of Counties Achievement Award, "Voter Assistance and Boardworker Enhancement Training Program"
- **2005** National Association of Counties Achievement Award, "Voter Assistance and Boardworker Enhancement Training Program"

**Election Experience-Boards & Working Groups**
- **2021+** Haas Jr. Foundation Working Group on Language Access
- **2021+** Microsoft Working Group on Vote by Mail Security
- **2020** Virginia Commonwealth Task Force on 2020 Elections
- **2019+** Protect Democracy National Task Force on Electoral Crisis
- **2019+** National Vote at Home Circle of Advisors
- **2019+** University of Minnesota Humphrey School of Public Administration: Election program steering committee
- **2019+** State of Michigan Election Modernization Advisory Committee

- **2017+** State of California Task Force on Voter Choice Act
- **2017+** Election Center Security Task Force Member
- **2017+** Center for Civic Design Board of Advisors
- **2017+** National States Geographic Information Council Circle of Advisors
- **2017+** Advisory Board for the MIT Election Data and Science Lab
- **2016+** State of Washington Postal Task Force
- **2016+** EAC Standards Board Postal Committee Advisor, 2016-present
- **2015+** National Voter Registration Day Steering Committee
- **2014+** Center for Technology in Civic Life Board of Directors, 2014-present
- **2014-2018** Council of State Governments Policy Working Group
- **2012+** IEEE/EAC/NIST Working Group on common data formats & interoperability
- **2010+** United States Postal Service Mailers Technical Advisory Committee
- **2010+** Election Center Postal Committee
- **2010-2018** Pew Advisory Board for the creation of the Elections Performance Index
- **2007-2009** Election Assistance Commission's working group on Language Assistance for Unwritten Languages
- **2006-2009** Election Center's National Task Force on Education and Training
- **2005+** Election Center Legislative Committee

## Election Experience-Testimony & Legislation

- **2022** City of Philadelphia, testimony on Resolution #210657 for expansion of language access requirements
- **2021** United States Senate, written testimony on John Lewis Voting Rights Act Reauthorization
- **2020** United States House of Representatives, Homeland Security Committee testified in hearing on absentee/voting by mail/electionmail
- **2020** United States House of Representatives, House Administration Committee written testimony on absentee/voting by mail/electionmail
- **2016-2019** United States Department of Justice, Civil Rights Division subject matter expert report on voter accessibility and then settlement implementation support to jurisdiction
- **2015** United States Senate, Senate Rules Committee hearing on voter registration
- **2010** National Conference of Commissioners on Uniform State Law's Uniform Military and Overseas Voters Act active observer and contributor
- **2008-2017** Testified in state legislatures on online voter registration (Florida, Ohio, Rhode Island, Wisconsin); consolidation of election dates (Kansas); professionalization of election administration (Connecticut), expansion of voting options and vote by mail administration (California)
- **2007** United States House of Representatives, Administration Elections Subcommittee, hearing on election audits

## Election Experience-Publication

- **2022**
  - Co-authored with Lindsay Daniels, *Journal of Election Administration Research and Practice,* (estimated publication in March 2022)
  - Co-authored with Becky Stewart, **"**Now Live: Democracy Fund's Language Access for Voters Summit Landing Page" *electionlineWeekly* (February 17th, 2022) https://electionline.org/electionline-weekly/
- **2021**

OCA-APPX-0144

- "Additional Thoughts from Panelists on Election Reform Issues", *Conference Report The Carter-Baker Commission: 16 Years Later*" (October, 2021)
  - "Language Access for Voters" *electionlineWeekly* (September 16, 2021) https://electionline.org/electionline-weekly/2021/09-16/
- **2020**
  - "Every Election Has a Story to Tell, Story of 2020 Still Being Written, but Some Chapters are Done" *electionlineWeekly* (November 19, 2020) https://electionline.org/electionline-weekly/2020/11-19/
  - "New Post Master General Issues Directive" *electionlineWeekly* (July 30, 2020) https://electionline.org/electionline-weekly/2020/07-30/#tab-2
  - "Election Day Command Centers: A National Snapshot" *electionlineWeekly* (March 12, 2020) https://electionline.org/electionline-weekly/2020/03-12/
  - Co-authored with David Levine. "Here's Why the U.S. Can Handle Voter Intimidation", *The Fulcrum*, (October 30, 2020) https://thefulcrum.us/election-dissection/report-voter-intimidation
- **2019 -2021**
  - Jennifer Morrell. "*Knowing It's Right*" series on post-election audits including "Part One: Practical Guide to Risk Limiting Audits" introduction, Democracy Fund https://democracyfund.org/idea/knowing-its-right-limiting-the-risk-of-certifying-elections/
- **2019**
  - Co-authored with Katy Owens-Hubler. "Building Terminology in the Field" Chapter 6 in *The Future of Election Administration* https://www.springerprofessional.de/en/the-future-of-election-administration/16853420
  - "Tammy's Blog: Incoming! Voter Registration Application Data" *electionlineWeekly* (December 5, 2019) https://electionline.org/electionline-weekly/2019/12-05/#tab-2
  - "Disaster Narrowly Averted: U.S. to Remain in the Universal Postal Union" *electionlineWeekly* (September 26, 2019) https://electionline.org/electionline-weekly/2019/09-26/
  - "Leave No Voter Behind: Implications of the U.S. Withdrawal from the Universal Postal Union" *electionlineWeekly* (August 1, 2019) https://electionline.org/electionline-weekly/2019/08-01/
  - "Knowing It's Right, Limiting the Risk of Certifying the Wrong Winner" *electionlineWeekly* (May 23, 2019) https://electionline.org/electionline-weekly/2019/05-23/
- **2018**
  - "Reflections on Election: Communication, Collaboration, and Commitment" *electionlineWeekly* (November 29, 2018) https://electionline.org/electionline-weekly/2018/11-29/
  - "Tammy's Blog: ADA Compliance at the Polls: What Everyone Needs to Know about Accessible Elections and Voters' Rights" *electionlineWeekly* (November 1, 2018) https://electionline.org/electionline-weekly/2018/11-01/#tab-2
  - "Tammy's Blog: My 2018 Summer Vacation" *electionlineWeekly* (October 11, 2018) https://electionline.org/electionline-weekly/2018/10-11/#tab-2
  - "An Opportunity to Make Every Vote Count" *Governing Magazine* (August 7, 2018)
  - "Increasing Trust in Elections: Democracy Fund's Election Validation Project" *electionlineWeekly* (May 31, 2018) https://electionline.org/electionline-weekly/2018/05-31/

OCA-APPX-0145

- "National Postal Forum 2018: Who? What? Where? When? & Why?" *electionlineWeekly* (May 17, 2018) https://electionline.org/electionline-weekly/2018/05-17/
- Co-Authored with Stacey Scholl. "Electionline.org Joins Democracy Fund" *electionlineWeekly* (January 4, 2018) https://electionline.org/electionline-weekly/2018/01-04/
- **2017**
  - "You've Got Mail! Electionmail: Be Part of the Solution" *electionlineWeekly* (February 9, 2017) https://electionline.org/electionline-weekly/2017/02-09/
  - "In Focus this Week Exit Interview: Helen Purcell" *electionlineWeekly* (January 26, 2017) https://electionline.org/electionline-weekly/2017/01-26/
- **2016**
  - "*The New Realities in Election Mail*" by the Bipartisan Policy Center https://bipartisanpolicy.org/report/voting-by-mail/
- **2015**
  - Council of State Governments Policy Working Group. "*Recommendations from the CSG Overseas Voting Initiative Policy Working Group*" Council of State Governments, https://ovi.csg.org/wp-content/uploads/2019/08/CSG-OVI-Recommendations-Report-Updated.pdf
  - "Clarion Call: Voter Registration Modernization" in Council of State Government's *2015 Book of the States.*
  - "First Person Singular: Tammy Patrick, Traveling the Country, Listening to Election Folks and Some Music" *electionlineWeekly* (June 4, 2015)
- **2014**
  - Presidential Commission on Election Administration, *"American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration"* (January 22, 2014) https://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf
- **2013**
  - "U.S. Elections Face a Crossroads on Rights and Technology" *Forbes* online (November 10, 2013) https://techonomy.com/u-s-elections-face-crossroads-rights-technology/
- **2012**
  - "Administrative Burden: Perspective of a Western County" in the *Public Administration Review j*ournal of the American Society of Public Administrators (Volume 72, Number 5) https://onlinelibrary.wiley.com/doi/10.1111/j.1540-6210.2012.02619.x

## Election Experience-Communications & Presentations Highlights

- **Print News:** Washington Post, New York Times, Los Angeles Times, Chicago Tribune, Boston Herald, USA Today, Huffington Post, Politico, Mother Jones, Wall Street Journal, the Guardian, AP, Reuters, Bloomberg News
- **Magazines**: TIME, Atlantic, People, Forbes, New Yorker
- **Television**: ABC, BBC, CBS This Morning & CBS Evening News, CNN, NBC, MSNBC, NY1, PBS News Hour (election expert for the 2020 Presidential Election), Univision, Al Jazeera
- **Radio**: NPR
- **2021** "Electoral Reforms and Democracy" panelist, Global Forum on Democracy

- **2021** "Securing Democracy Through Election" panelist, Department of Homeland Security CISA Cybersecurity Summit
- **2020** International Foundation for Electoral Systems
- **2019** Carter Center
- **2016** "Delivering Democracy" webinar presented at the National Postal Forum and Ms. Patrick became the only non-postal employee to present to their operational leadership team
- **2011** "UOCAVA Voter Trend Analysis and Risk Assessment" presented to the Technical Guidelines Development Committee at the National Institute of Science and Technology
- **2010+**   Speaker, panelist, discussant, keynote at national conferences for Election Center, National Association of State Elections Directors, National Association of Secretaries of State, National Conference of State Legislatures, International Association of Government Officials, United States Election Assistance Commission, National Postal Forum

OCA-APPX-0147

## APPENDIX C:

2019 Democracy Fund/Reed College Survey of Local Election Officials Figure 6 highlights the important role that voter education, assistance, and services play in the hearts and minds of election officials:



OCA-APPX-0148

## APPENDIX D:

2020 Democracy Fund/Reed College Survey of Local Election Officials highlights the staffing inequities across jurisdiction sizes. Small jurisdictions, often those that are rural, are disproportionately impacted by not having any full-time staff in the majority of offices. Voters in these areas need to rely on self-identified assistance.



### The difference in staffing between small and large jurisdictions is striking

Source: 2020 Democracy Fund/Reed College Survey of Local Election Officials

OCA-APPX-0149

**APPENDIX E:**

2020 Democracy Fund/Reed College Survey of Local Election Officials documented the challenges that election officials were experiencing in securing bilingual pollworkers, a situation that only further highlights the impact restrictions on voter-chosen assistants can have on their ability to participate.



Local election officials were least confident about having sufficient poll workers — especially bilingual ones — for Election 2020

Percent responding "confident" or "very confident" about having a resource in sufficient supply

*Source: 2020 Democracy Fund/Reed College Survey of Local Election Officials*

OCA-APPX-0150

# Exhibit 6

# Texas Primary Supplement to Report
## Voting Assistance & Vote by Mail
*La Unión del Pueblo Entero et al. v. State of Texas et al.*
Tammy Patrick

1.    On February 28, 2022, I submitted a report entitled "Voting Assistance & Vote By Mail" in connection with the case *La Unión del Pueblo Entero et al. v. State of Texas et al.*, which I will refer to here as the "Original Report."  This report supplements and extends the Original Report based on facts and data related to voting by mail from Texas' March 1, 2022, primary election, the first statewide election conducted under the provisions of SB1.[1]

**Introduction & Summary of Conclusions**

2.    The implementation of SB1 has caused rejection rates of both applications for ballots by mail as well as ballot carrier envelopes to exceed normal rejection rates. This supplement applies data and individual accounts from the March 2022 primary election in Texas to the analysis of my Original Report.  What I have observed tends to support the claim that SB1 creates unnecessary barriers to eligible Texas voters to participate in the franchise.

3.    Issues anticipated in the Original Report with voters being able to comply with the new requirements under SB1 in applying for an absentee ballot and completing a ballot carrier envelope manifested in rejection numbers exceeding both the national trends as well as Texas' historical trends. News outlets have chronicled these issues since early this year. During the March 17, 2022, United States House of Representatives Committee on House Administration Subcommittee on Elections hearing "Voting in America: Ensuring Free and Fair Access to the Ballot in Texas," Travis County Judge Andy Brown testified that the numeric match requirement "created the largest ballot related challenges that Travis County faced in preparation for the March 1st primary".[2]

4.    Counties across Texas appear to have faced similar challenges in implementing SB1 and in educating their voters of the new requirements.

**Analysis**

5.    Mail voting rates in the 2022 primaries were lower than in Texas' 2018 primary election, a comparable midterm election, as well as the more recent 2020 primary election as demonstrated by Figure 1 and Figure 2 from Professor Charles Stewart and the MIT Election Data and Science Lab:[3]

---

[1] My required disclosures are located at paragraphs 5-7 and Appendix A of my Original Report.

[2] Brown, Andy. "Statement of Andy Brown, Travis County Judge, Travis County Texas". Page 4. United States House of Representatives Committee on House Administration Subcommittee on Elections Hearing. (March 17, 2022)

[3] Professor Charles Stewart, III. MIT Election Data and Science Lab (MEDSL). Tweet thread on March 18, 2022. https://twitter.com/cstewartiii/status/1498796363399589890

**Figure 1.**



**Figure 2.**



6.      SB1 has caused Texas rejection rates to substantially exceed the national average in the first election after it was enacted. Data from the United States Election Assistance Commission demonstrates that national rejection rates tend to hover around 1% of the ballots returned as demonstrated in Figure 3:[4]

---

[4]United States Election Assistance Commission EAVs Survey data from 2020,  Election 2020 at Page 36 (page 46 of PDF): https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf
United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf
United States Election Assistance Commission EAVs Survey data from 2016,,2016 at Page 25 (Page 31 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf Chart from
"Election Results, 2020 Rejected Ballots." Ballotpedia website
https://ballotpedia.org/Election_results,_2020:_Analysis_of_rejected_ballots#cite_note-2 (September 10, 2021)

2

**Figure 3.**

| Absentee/mail-in ballot figures, 2016-2020 | | | | |
|---|---|---|---|---|
| **Year** | **Overall turnout** | **Ballots returned** | **Ballots rejected** | **Rejection rate**[2] |
| 2020 | 161,303,109 | 70,550,699 | 560,177 | 0.8% |
| 2018 | 120,314,461 | 30,377,407 | 430,190 | 1.4% |
| 2016 | 140,114,503 | 33,378,450 | 318,728 | 1.0% |

The higher rejection rate in Texas appears to be directly attributable to the implementation of SB1. In the most recent elections prior to SB1's implementation, Texas' mail-in ballot rejection rates were less than 1% in the 2020 general and less than 2% in the 2018 midterm.[5] With SB1 implemented, the rejection rates have increased to more than 12%, based on data from the Secretary of State's office.[6] I have not seen any other intervening changes in the law or in administrative practice between the 2018 election and the March 1, 2022 primaries that have been suggested as the reason for this increase in rejections other than SB1. Election officials at both the state and local level attributed the increase to the new requirements under SB1.[7] For example, Travis County Judge Andy Brown said, "Travis County received 11,600 mail-in ballots in the 2022 primaries that we just had. Despite significant effort by our county team, we saw a 600 percent increase in the number of rejected ballots because of the criteria in SB1."[8]

7.        Counties throughout Texas experienced a significant rise in the rejection of voters' ballots. As mentioned, according to the Election Assistance Commission data, in 2018 less than 2% of ballots were rejected statewide in Texas and that number was even lower in 2020 when it was less than 1%.[9] That was not the case in the 2022 primary. "The rate of rejections is unprecedented in our county and, from what I'm hearing from my colleagues, in other counties as well." Chris Davis, Williamson County elections administrator.[10] Indeed, Mr. Davis' statement is supported by the information in Figure 4, below, which shows statistics collected by the Texas Civil Rights Project for use in their Congressional testimony during the March 17th subcommittee hearing referenced in Paragraph 3 of this supplemental report. The statistics in that testimony are largely based on an Associated Press survey of the 254 Texas counties, of which 187 counties responded, and supported by the sources I cite below:[11]

---

[5] United States Election Assistance Commission EAVs Survey data from 2020 https://www.eac.gov/sites/default/files/EAVS%202020/2020_EAVS_for_Public_Release_V2.xlsx and 2018 https://www.eac.gov/sites/default/files/Research/EAVS_2018_for_Public_Release_Updates3.xlsx .
[6] Ura, Alexa. "More than 12% of mail-in ballots were rejected in Texas under new GOP voting rules, final tally shows". *Texas Tribune.* (April 6, 2022) https://www.texastribune.org/2022/04/06/texas-mail-in-ballot-rejection-voting/
[7]Lopez, Ashley. "In Texas, thousands of mail ballots were rejected following new ID requirements". KUT90.5. (March 16, 2022).
[8]Smalley, Seth. "Travis County Judge Speaks Out Against Texas Voting Law". *Austin Monitor*. (March 21, 2022) https://www.austinmonitor.com/stories/2022/03/travis-county-judge-speaks-out-against-sb-1/
[9]Alexa Ura and Mandi Cai. "At Least 18,000 Texas Mail-in Votes Were Rejected in the First Election Under New GOP Voting Rules." *Texas Tribune*. (March 11, 2022) https://www.hppr.org/hppr-news/2022-03-15/at-least-18-000-texas-mail-in-votes-were-rejected-in-the-first-election-under-new-gop-voting-rules
[10]*Id.*
[11] Paul J. Weber and Acacia Coronado. "Texas Mail Ballot Rejections Soar Under New Restrictions". *Associated Press*. (March 16, 2022). https://apnews.com/45ba51fe9dd951a0f82015bd6bd9ff41

OCA-APPX-0154

**Figure 4.**

| County | Vote by mail rejection rate in 2022 Texas Primary |
|---|---|
| Bexar[12] | 22% (approximately 4,000 ballots) |
| Collin[13] | 13.7% (828 ballots) |
| Dallas[14] | 6.5% (694 ballots) |
| El Paso[15] | 16% (725 ballots) |
| Harris[16] | 19% (6,919 ballots) |
| Hays[17] | 8.2% (208 ballots) |
| Hidalgo[18] | 19.4% (526 ballots) |
| Travis[19] | 8% (approximately 900 ballots) |
| Williamson[20] | 11.5% (521 ballots) |

Of those ballots that were rejected, reporting shows that the vast majority of them were rejected as a direct result of SB1:

**Figure 5[21].**

| County | Percentage of rejected mail ballots thrown out for failing to satisfy Texas Senate Bill 1's new vote by mail identification requirement |
|---|---|
| Dallas | 98% |
| El Paso | 94% |
| Harris | 99.6% |
| Hays | 99.5% |
| Williamson | 73% |

8.      Often when legislation affecting election administration is passed, it is left to state and local election officials to figure out how to implement the new law.  SB1, with its immediate implementation deadline, did not allow sufficient time or provide sufficient resources to address

---

[12] Alexa Ura and Mandi Cai.  "At Least 18,000 Texas Mail-in Votes Were Rejected in the First Election Under New GOP Voting Rules." Texas Tribune. (March 11, 2022) https://www.hppr.org/hppr-news/2022-03-15/at-least-18-000-texas-mail-in-votes-were-rejected-in-the-first-election-under-new-gop-voting-rules

[13] Matt Shuham and Kate Riga," It's Official: Texas Republicans' New Voting Law Disenfranchised Thousands Of Otherwise Eligible Voters", *Talking Points Memo* (Mar. 10, 2022), https://talkingpointsmemo.com/news/texas-voting-law-sb1-primary-election

[14] Alexa Ura and Mandi Cai.  "At Least 18,000 Texas Mail-in Votes Were Rejected in the First Election Under New GOP Voting Rules." Texas Tribune. (March 11, 2022) https://www.texastribune.org/2022/04/06/texas-mail-in-ballot-rejection-voting/

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Lopez, Ashley." It's official: Texas' new voting law led to higher rejection rates for mail-in ballots in Central Texas", KUT.org (Mar. 10, 2022), https://www.kut.org/politics/2022-03-10/its-official-texas-new-voting-law-led-to-higher-rejection-rates-for-mail-in-ballots-in-central-texas .

[20] Alexa Ura and Mandi Cai. "At Least 18,000 Texas Mail-in Votes Were Rejected in the First Election Under New GOP Voting Rules." Texas Tribune. (March 11, 2022) https://www.hppr.org/hppr-news/2022-03-15/at-least-18-000-texas-mail-in-votes-were-rejected-in-the-first-election-under-new-gop-voting-rules

[21] *Id.*

OCA-APPX-0155

foreseeable implementation issues, and it appears those issues may not be solvable for all voters. In particular, thousands of Texans do not have the newly required ID numbers in their records and did not have adequate time to remedy that conflict: "More than 700,000 voters lacked one of those ID numbers on their voter records as of December 20 and another 106,911 didn't have either number."[22] It is easy to see why "county election officials blamed high rejection rates in the primary on confusion over new identification requirements for absentee voting and rushed implementation."[23] I have read the report prepared by Dr. Eitan Hersh in connection with this lawsuit, and based on that report, it appears many voters will continue to have problems in future elections due to the omissions and errors in the database that continue to exist, of which many voters who attempt to vote by mail in the future will not be aware until they attempt to vote, and would result in their ballots being reject even if they provide accurate information. I also am not aware of any new or revised forms of any type or educational materials prepared for Texas' May 7th municipal elections or May 24th runoff elections,[24] no press releases regarding the lessons learned or plans for improvement prior to the May elections[25], no publicly available new webinars[26], or any news advisories[27] that attempt to remedy the issues seen in the March primary. Given the prevalence of issues laid out by Dr. Hersh in his report, and the number of voters he identifies with insufficient records, it is unreasonable to believe that election officials will be able to expeditiously remedy those insufficiencies and mitigate the negative impact of SB1. Many eligible voters will be unable to vote in future elections despite their best efforts.

9.      Like the Texas electorate itself, the profile of the voters who experienced the rejection of their ballots is diverse. The MIT Election Data and Science Lab used the most populated counties' websites to analyze the impact of SB1 on the party primaries. Reporting at the county level varies, with some counties separating each party election as a separate entity, while other county data combines the parties into a single statistic for the primary election.[28]

10.     The final numbers from the Texas Secretary of State reflect that of the 24,636 rejected mail ballots there were 14,281 belonging to voters attempting to vote in the Democratic primary (12.9% rejection rate in that election) and 10,355 were voters in the Republican primary (for an 11.8% rate in that primary).[29] However, there are numerous examples of counties across the state where that overall impact trended the opposite direction from the statewide result or varied depending on the focus of overall numbers versus percentage of rejections in the specific party primary. One such example is from Smith County, where a higher percentage of the Republican ballots were rejected— 9.6% compared to 8.4% of ballots rejected in the Democratic primary although the numbers were

[22] *Id.*

[23] Mekelburg, Madlin. "Voting Advocates Warn Congress of 'Dire' November Election Under New Texas Election Law". *Austin American-Statesman*. (March 18, 2022.) https://www.yahoo.com/entertainment/voting-advocates-warn-congress-dire-142420545.html

[24] https://www.sos.state.tx.us/elections/forms/pol-sub/index.shtml#chapter-5

[25] https://www.sos.state.tx.us/about/newsreleases/

[26] (https://www.sos.state.tx.us/elections/laws/education-resources.shtml

[27] https://www.sos.state.tx.us/elections/laws/election-division-advisories.shtml

[28] Professor Charles Stewart, iii. MIT Election Data and Science Lab (MEDSL). Tweet thread on March 18, 2022. https://twitter.com/cstewartiii/status/1504898894978641922

[29] Ura, Alexa. "More than 12% of mail-in ballots were rejected in Texas under new GOP voting rules, final tally shows". Texas Tribune. (April 6, 2022) https://www.texastribune.org/2022/04/06/texas-mail-in-ballot-rejection-voting/

OCA-APPX-0156

higher in that primary with 63 rejections compared to the 62 ballots rejected in the Republican primary.[30]



11.      Implementation of SB1 prevented Texans from successfully participating in both the Republican and Democratic Primaries. In the data reported to the Associated Press it appeared as though the "rejection rate was higher in counties that lean Democratic (15.1%) than Republican (9.1%).[31] Yet, looking at the data by the top five counties won by each of the former 2020 candidates, "in the five counties won by Trump that had the most mail-in votes, a combined 4,216 mailed ballots were rejected or still pending after the day of the election, a rate of 21% of the total.  In the counties won by Biden with the most mail-in voters, which include most of Texas' biggest cities, a combined 11,190 votes were similarly rejected or pending, which amounted to 13%."[32] Thirteen percent was the state average, but it varied widely across the state. "For perspective: in a smaller, more conservative county, Potter, home to Amarillo, more than 16%--roughly one out of every six voters—had their ballot rejected" and "in Austin it was a little better at 8%".[33]

12.      Although some voters were able to remedy the issues with their rejected ballots, the rejection rates were unreasonable and still exceeded established state and national norms. Travis County started off with 16% slated for rejection but were able to substantiate half of them, lowering the rate

[30] McHam, Maleri."9% of Smith County mail-in ballots rejected in March primary". *Tyler Morning Telegraph.* (April 16, 2022). https://tylerpaper.com/news/local/9-of-smith-county-mail-in-ballots-rejected-in-march-primary/article_481acae0-bce7-11ec-83e3-dba82aeedcb5.html

[31] Paul J. Weber and Acacia Coronado. "Texas Mail Ballot Rejections Soar Under New Restrictions." Associated Press. (March 16, 2022). https://apnews.com/45ba51fe9dd951a0f82015bd6bd9ff41

[32] Associated Press. "Texas Flagged 27,000 Mail Ballots for Rejection in Primary." NBCNews.com. (March 10, 2022) https://www.nbcnews.com/politics/2022-election/texas-flagged-27000-mail-ballots-rejection-primary-rcna19507

[33] Washington, Jala. "How Will Texas Address Mail-in Voting Issues?". Capital Correspondent. (March 17, 2022) https://cw33.com/news/texas-politics/how-will-texas-address-mail-in-voting-issues/

OCA-APPX-0157

to 8%[34]--after hiring additional staff and making more than 1200 phone calls, the voters that they were able to reach and engage with the curing process were all found to be eligible voters. There were 948 voters they were either unable to reach or who did not correct the error or omission on their paperwork and their ballots were rejected.[35] It is important to note that in the similarly situated 2018 primary Travis County rejected only 156 ballots, or a rate of only 1.79%.[36] Williamson County election administrator Chris Davis said that he and his staff were able to aid many voters in rectifying their issues, but some just didn't have enough time and others "didn't have a chance, either because there wasn't enough time or because they had given up," he said. "We encountered some folks who had given up and said, 'Forget it, I have too many other things going on in my life.'"[37]

### Supplemental Conclusion

13.      The first election conducted under SB1, the March 2022 primary, showed that SB1 led to substantial increases in the rate of rejection of mail ballot materials without any apparent connection or support for the underlying purpose for the law. It is purported that these requirements are necessary to secure the elections process, yet I am not aware of any news reporting, nor any indication from an election official of the new requirements identifying ballots cast by voters who were confirmed to be not eligible to vote. Restated, the rise in rejection rates for applications as well as the carrier envelopes are not reflective of any real or perceived rate of ineligible voters attempting to vote or attempting fraud. In fact, I have been unable to find any evidence of the new requirements identifying a ballot cast by a voter who was not eligible to vote. Nowhere in the public record has there been documentation that these new barriers made it "harder to cheat"—just harder for eligible voter to vote successfully.


I declare under penalty of perjury that the foregoing is true and correct.

Date: April 29, 2022.

Signed: *Tammy Patrick*

          Tammy Patrick

Executed in: St. Mary's County, Maryland

---

[34] Brown, Andy. "Statement of Andy Brown, Travis County Judge, Travis County Texas". Page 4. United States House of Representatives Committee on House Administration Subcommittee on Elections Hearing. (March 17, 2022)
[35] Id.
[36] Id.
[37] Id.

# Exhibit 7

# Texas 2022 General Election Supplement to Report
## Voting Assistance & Vote by Mail
## La Union del Pueblo Entero et al. v. State of Texas et al.
## Tammy Patrick

1. On February 28, 2022, I submitted a report entitled "Voting Assistance & Vote By Mail" in connection with the case La Unión del Pueblo Entero et al. v. State of Texas et al., which I will refer to here as the "Original Report."

2. On April 29, 2022, I submitted a supplemental report extending the Original Report based on facts and data related to voting by mail from Texas's March 1, 2022, primary election, the first statewide election conducted under the provisions of SB1, which I will refer to as the "First Supplemental Report."

3. This report supplements and extends the Original Report and the First Supplemental Report based on facts and data related to voting by mail from Texas's November 8, 2022, general election.

4. This report also supplements Section One of the Original Report regarding my employment and election experience.  As of December 1, 2022, I serve as the Chief Executive Officer of Programs for the National Association of Election Officials, commonly referred to as the Election Center.  The Election Center was established as the first national training and certification organization of election professionals in 1992.[1]

## Introduction & Summary of Conclusions

5. Since implementation of SB1, rejection rates of both the applications for ballots by mail (ABBMs) as well as ballot carrier envelopes have continued to exceed the rejection rates historically seen in Texas and nationwide. This supplemental report documents that although rejection rates have diminished from the increase experienced in the initial elections of 2022, Texas reports that it is still rejecting mail ballots at a rate of 2.7%[2]—almost three times the national average (1%[3])—and more than the state's

---

[1] Election Center - About Us.  https://www.electioncenter.org/about-us.php.

[2] Lopez, Ashley. "Despite mail voting changes, ballot rejection rates remail relatively low in 2022 midterms." NPR. (January 13, 2023). https://www.npr.org/2023/01/13/1148799521/mail-ballot-rejection-rates-state-tally

[3] United States Election Assistance Commission EAVs Survey data from 2020,  Election 2020 at Page 36 (page 46 of PDF): https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf
United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf
United States Election Assistance Commission EAVs Survey data from 2016,2016 at Page 25 (Page 31 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf

average prior to SB1 passage.[4] What I have observed supports the conclusion that SB1 creates unnecessary barriers to eligible Texas voters to participate in the franchise.

6. Issues anticipated in the Original Report and in the First Supplemental Report with voters being able to comply with the new requirements under SB1 in applying for an absentee ballot and completing a ballot carrier envelope manifested in the general election, with rejection numbers exceeding both the national trends as well as Texas's historical trends.

7. Following the rise of rejection rates in the primary election, local election officials went to great lengths to reduce the rejection rates, often at a substantial cost in time and resources—they hired additional staff dedicated to answering voter calls and questions around the requirements,[5] printed and mailed additional voter instructions,[6] and experienced what will be an ongoing expense given that new Texas voters become eligible to vote by mail every day.  Given the combined fact of an aging population resulting in Texas voters who will encounter these new requirements for the first time in every election cycle moving forward and the historic under-funding of election offices,[7] this level of effort is untenable.

8. Midterm voters are traditionally high-efficacy voters,[8] those with the propensity to have voting experience and understanding of policies and procedures necessary to successfully engage with the franchise as compared with presidential general election voters.  Even within this voting cohort the impact of SB1 was substantial.

---

[4] "In 2020, Texas had a 0.8% mail ballot rejection rate; in 2018 it was 1.7%." Lopez, Ashley. "Despite mail voting changes, ballot rejection rates remail relatively low in 2022 midterms." NPR. (January 13, 2023). https://www.npr.org/2023/01/13/1148799521/mail-ballot-rejection-rates-state-tally

[5] Worthy, Ariel. "Fewer Harris County mail-in ballots are being rejected compared to March Primaries." *Houston Public Media.* (November 4, 2022). https://www.houstonpublicmedia.org/articles/news/politics/elections/2022/11/04/436774/fewer-harris-county-mail-in-ballots-are-being-rejected-compared-to-march-primaries/

[6] Taylor Goldenstein. "10,000 mail ballots rejected in large Texas counties as new ID requirement is phased in." Houston Chronicle. (November 11, 2022). https://www.houstonchronicle.com/politics/election/2022/article/New-Texas-law-leads-to-10-000-rejected-mail-17577757.php and Cheng, Yilun. "Harris County leaders remind voters of state ID requirements for casting mail ballots." Houston Chronicle. (October 3, 2022) https://www.houstonchronicle.com/news/houston-texas/article/Harris-County-leaders-remind-voters-of-state-ID-17484190.php

[7] Stewart, Charles III. "The Cost of Conducting Elections" (May 2022)https://www.commonsenseamerican.org/wp-content/uploads/2022/05/TheCostofConductingElections-2022.pdf.

[8] Sometimes referred to as "core" voters: "One of the most commonly understood patterns in electoral turnout is the fact that turnout in presidential elections tends to be much higher than for midterm elections. Traditional analyses of these differential patterns in turnout have focused on the notion of "surge and decline" and "core and peripheral" voters (Campbell 1960)." The paper looks at the impact of knowledge on a voter's participation in the franchise and finds that "core voting and persistent non-voting appear to be strongly driven by both age and knowledge." Stephen Ansolabehere and Brian Schaffner. "Beyond the Core and Periphery: A New Look at Voter Participation Across Elections." (November 30, 2015). https://cces.gov.harvard.edu/files/cces/files/ansolabehere_schaffner_core_periphery.pdf

## Analysis

### Overall Rejection Rates

9. Texas reported that the State rejected mail ballots at a rate of 2.7%—almost three times the national average (1%), and more than the state's average prior to SB1 passage (1.7% in the comparable midterm election of 2018).[9] Because the national average rejection rate of vote by mail ballots hovers around 1%, when a state or jurisdiction's rate exceeds that it can spur additional review and analysis. Even rejection rates below the national average can sometimes lead to performance audits of ballot rejections. The Washington State Legislature mandated a performance audit of ballot rejection rates even though they historically fall below the 1% rejection threshold.[10]

### Curing and Use of the Ballot Tracking Portal

10. In the State Defendants' Supplemental Interrogatory Responses, it is stated that hundreds of thousands of Texas voters submitted ABBMs since the new requirements. The numbers of submittals in each of the statewide elections in 2022 is as follows:[11]

---

[9] United States Election Assistance Commission EAVs Survey data from 2020, Election 2020 at Page 36 (page 46 of PDF): https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf
United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf
United States Election Assistance Commission EAVs Survey data from 2016,2016 at Page 25 (Page 31 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf
[10] McCarthy, Pat, Office of the Washington State Auditor. "Performance Audit Report Highlights: Evaluating Washington's Ballot Rejection Rates." (February, 2022). https://sao.wa.gov/wp-content/uploads/Tabs/PerformanceAudit/PA_Evaluating_WA_Rejected_Ballots_2-pager.pdf
[11] Defendants' Supplemental Interrogatory Responses dated January 19, 2023 at Page 12.



ABBMs Submitted 2022 Elections

11. Texas offers a "Ballot by Mail Tracker" (referred to after this as the "Tracker") on the Texas Secretary of State's "My Voter Portal" at votetexas.gov[12] in an attempt allow voters the opportunity to remedy issues with their ABBM. Some voters whose ABBMs were at first rejected were successful in either having their ABBM accepted, or they had it cancelled so that they could then go and vote in person.[13] Unfortunately, the data I have seen does not distinguish how many voters fall into each of the two categories of voters—there isn't a distinction made, so we cannot know how many voters were able to successfully fulfill their requests and vote by mail as they originally intended or how many had to cancel their ABBM and vote in their secondary choice for mode of voting, in person. This lack of clarity limits the ability to determine the portal's success rate of allowing originally rejected voters to obtain a mail ballot.

12. What we do know from the data is that there were hundreds of voters who used the Tracker during the 2022 election cycle and were unsuccessful in navigating the new requirements. 267 voters, more than 1 in 4 voters (28% of the 946 voters who used the Tracker in all 2022 elections through the November general), were unsuccessful in remedying the issues with their ABBM.[14]

13. The overall use of the tracker for rejected ABBMs was relatively low. Even if ABBM rejection in the November General Election only matched the 2.7% reported ballot rejection rate[15] then fewer than one

---

[12] https://www.votetexas.gov/voting-by-mail/track-my-ballot.html
[13] Ibid. Page 11.
[14] Ibid Page 12.
[15] This is a conservative estimate because voters must successfully navigate SB 1 requirements for an ABBM first before they receive a ballot.

in twenty voters who had an ABBM rejected used the tracker. Fewer than one in twenty-five voters used the tracker successfully to cure or cancel an ABBM.[16]



14. Across the elections conducted in 2022, almost a thousand voters—963—who used[17] the Tracker in an attempt to cure their ballot deficiencies were unable to do so.[18] Beyond that, it was widely reported that more than 10,000 ballots were rejected in the midterm alone.[19] To date, I have not seen any analysis as to why those voters did not attempt to cure their ballots through the use of the Tracker or other methods (for instance, an analysis of the number of page hits on the tracker, number of login attempts, number of successful logins but then incomplete or abandoned efforts, etc.), or why the number of voters who attempted to use the tracker (6,247[20]) was considerably less than the overall number of rejected ballots.

## Election Officials' Education Efforts

15. Elevated rejection rates lingered because voters in Texas had continued challenges with satisfying the requirements of SB1 in the submission of their absentee ballots despite substantial reported efforts

---

[16] Ibid Page 12.
[17] The term "used" is reflective of that utilized in the "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories." It is unclear if this means every log-in or further attempt to use after a log-in attempt.
[18] Ibid pages 13-14.
[19] Taylor Goldenstein. "10,000 mail ballots rejected in large Texas counties as new ID requirement is phased in." *Houston Chronicle*. (November 11, 2022). https://www.houstonchronicle.com/politics/election/2022/article/New-Texas-law-leads-to-10-000-rejected-mail-17577757.php
[20] "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories". Pages 13-14.

by county election officials. Measures taken by these election officials resulted in the somewhat decreased rejection rates. Some hired additional staff. According to Leah Shah with the Harris County Election Administrator's Office, they increased their "mail ballot team by 20 people dedicated to only reaching out to voters who are voting by mail, that are needing assistance, that have questions about the process," Shah said. "And of course, reaching back out to the voters if they require corrections."[21] Some counties, such as Bexar County, included special inserts to explain the new process,[22] as did Travis County.[23] Dallas County invested money in publicity campaigns that they attribute as a key factor in the reduction in rejections: "The Dallas County Commissioners Court spent north of $42 million in the last five years to ramp up staffing, equipment and advertising for elections. Daniel and Noble said this was money well spent, because the rejection rate of mail-in ballots was lower—something they attribute to public campaigns on the issue."[24] The price tag that comes with implementation of new laws and educating the electorate can be large,[25] yet election officials are rarely provided sufficient funding to adequately complete the task.[26] It was reported that the Legislature actually reduced the voter education budget from $4 million previously to $3.5 million for the current two-year budget cycle.[27] Additional funding is necessary to cover the additional activities required by SB1 to properly serve Texas voters.

---

[21]Worthy, Ariel. "Fewer Harris County mail-in ballots are being rejected compared to March Primaries." *Houston Public Media*. (November 4, 2022). https://www.houstonpublicmedia.org/articles/news/politics/elections/2022/11/04/436774/fewer-harris-county-mail-in-ballots-are-being-rejected-compared-to-march-primaries/

[22] Taylor Goldenstein. "10,000 mail ballots rejected in large Texas counties as new ID requirement is phased in." *Houston Chronicle*. (November 11, 2022). https://www.houstonchronicle.com/politics/election/2022/article/New-Texas-law-leads-to-10-000-rejected-mail-17577757.php

[23] Cheng, Yilun. "Harris County leaders remind voters of state ID requirements for casting mail ballots." *Houston Chronicle*. (October 3, 2022) https://www.houstonchronicle.com/news/houston-texas/article/Harris-County-leaders-remind-voters-of-state-ID-17484190.php

[24] Peterson, Josephine. "Dallas elections chief says it went well, amid state law changes and public anxiety." *The Dallas Morning News*. (November 21, 2022) https://www.dallasnews.com/news/politics/2022/11/20/dallas-elections-chief-says-it-went-well-amid-state-law-changes-public-anxiety/

[25] One example from New Jersey: "According to the counties' summation, both laws caused the county clerks to spend an additional $2.8 million in printing, postage, labor and other costs on the 2018 general and 2019 primary and general elections." And "Neither of the new vote-by-mail laws included a funding mechanism to address the costs incurred by the county boards of elections," the NJAC continued, giving as one example the close to $63,000 in additional labor, supplies and contracted costs." O'Dea, Colleen. "Changes in Vote-by-Mail Ruled Null and Void, Unfunded Mandates." *NJ Spotlight News*. (November 19, 2019).

[26] Stewart, Charles III. "The Cost of Conducting Elections" (May 2022) https://www.commonsenseamerican.org/wp-content/uploads/2022/05/TheCostofConductingElections-2022.pdf Zachary Mohr, PhD; Martha Kropf, PhD; JoEllen Pope, MPA CPA; Mary Jo Shephard, PhD; and Madison Esterle, MPA. "Election Administration Spending in Local Election Jurisdictions: Results from a Nationwide Data Collection Project". Paper for the 2018 Election Sciences, Reform, and Administration (ESRA) conference University of Wisconsin-Madison on July 26-27, 2018. https://esra.wisc.edu/wp-content/uploads/sites/1556/2020/11/mohr.pdf

[27] Mizan, Nusaiba. "Texas has less to spend on voter outreach as election approaches under new rules." *Austin American-Statesman*. (September 21, 2022) https://www.statesman.com/story/news/politics/state/2022/09/21/texas-election-2022-voter-education-campaign-has-less-money-spend/69506679007/

## Supplemental Conclusion on the General Election

16. Although the rates of rejection have declined, due to substantial efforts by county election officials—there are still thousands of eligible Texas voters who are unable to successfully submit ABBMs and/or have their voted ballots accepted for counting.

17. Texas rejection rates are still some of the highest in the nation, exceeding the traditional benchmark of 1% and their pre-SB1 midterm rate of 1.7%.[28]

18. These findings and concerns are echoed by election officials in other states who are seeing the introduction of bills in their states similar to SB1.[29]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 10, 2023

Signed: *Tammy Patrick*

Tammy Patrick

Executed in: St. Mary's County, Maryland

---

[28] United States Election Assistance Commission EAVs Survey data from 2018, 2018 at Page 30 (page 39 of PDF): https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf
[29] Lopez, Ashley. "Local election officials in Florida call for scrapping new ID rules for mail voting." *NPR*. (January 27, 2023). Florida election officials want to scrap mail ballot ID requirements : NPR

# Exhibit 8

OCA-APPX-0167

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

**Keith Ingram 1 (1 - 4)**
**1 (1 - 4)**



Page 1

1  UNITED STATES DISTRICT COURT
2  WESTERN DISTRICT OF TEXAS
   SAN ANTONIO DIVISION
3  LA UNION DEL PUEBLO ENTERO )
   et al.,                    )
4         Plaintiffs,         ) Civil Action No. SA-21-cv-
5  v.                         )        00844-XR
                              ) (Consolidated Cases)
6  STATE OF TEXAS, et al.,    )
         Defendants.          )
7
8
9
10 ---------------------------------
   ORAL DEPOSITION OF
11        KEITH INGRAM
        APRIL 26, 2022
12         Volume 1
13 ---------------------------------
14                 `
15
16       ORAL DEPOSITION OF KEITH INGRAM  produced
17 as a witness at the instance of Plaintiff, and duly
18 sworn, was taken in the above-styled and numbered cause
19 on the 26th day of April, 2022 from 9:18 a.m. to 2:19
20 p.m. before Nancy Newhouse, a Certified Shorthand
21 Reporter in and for the State of Texas, reported by oral
22 shorthand, located at Price Daniel Sr. State Office
23 Building, 209 West 14th Street, Austin, Texas 78701,
24 pursuant to the Federal Rules of Civil Procedure, and the
25 provisions stated on the record or attached hereto.

Page 2

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4  Mr. Michael E. Stewart, DOJ
   UNITED STATES
5  950 Pennsylvania Avenue, Northwest
   Washington, DC 20530
6  Telephone: (202) 598-7233
   email: michael.stewart3@usdoj.gov
7
   Mr. Richard Dellheim, DOJ
8  UNITED STATES
   950 Pennsylvania Avenue, Northwest
9  Washington, DC 20530
   Telephone: (202) 598-7233
10 email: richard.dellheim@usdoj.gov
11 Mr. Dan Freeman, DOJ
   TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
12 950 Pennsylvania Avenue, NW
   Washington, DC 20530
13 Telephone: (202) 514-2000
   email: daniel.freeman@usdoj.gov
14
   Mr. Jennifer J. Yun, DOJ
15 LAW OFFICES OF JENNER & BLOCK, LLP
   1099 New York Avenue, NW
16 Washington, DC 20001
   Telephone: (202) 637-6334
17 email: jennifer.yun@usdoj.gov
18 Mr. Jason S. Kanterman, LUPE, Southwest Voter
   Registration Education Project, Mexican American Bar
19 Association of Texas, Texas Hispanics Organized for
   Political Education, Jolt Action, William C. Velasquez
20 Institute, Fiel Houston, Inc.
   LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
21 LLP
   One New York Plaza
22 New York, New York 10004
   Telephone: (212) 859-8000
23 Fax: (212) 859-4000
   email: jason.kanterman@friedfrank.com
24
25

Page 3

1  A P P E A R A N C E S Continued
2
3  Ms. Eliza Sweren-Becker, LUPE
   VOTING RIGHTS & ELECTIONS PROGRAM
4  Brennan Center for Justice at NYU School of Law
   Telephone: (646) 925-8765
5  email: eliza.sweren-becker@nyu.edu
6  Mr. Graham W. White, LULAC
   LAW OFFICES OF ELIAS LAW GROUP, LLP
7  10 G Street NE, Suite 600
   Washington, D.C. 20002
8  Telephone: (202) 968-4490
   email: gwhite@elias.law
9
10 Mr. Patrick Berry
   COUNSEL, DEMOCRACY PROGRAM
11 Brennan Center for Justice
   120 Broadway, Suite 1750
12 New York, New York 10271
   Telephone: (646) 925-8754
13 email: patrick.berry@nyu.edu
14 FOR THE DEFENDANT:
15 Mr. Jeffrey White, OAG
   ATTORNEY GENERAL KEN PAXTON OFFICE
16 SPECIAL COUNSEL SPECIAL LITIGATION UNIT
   P.O. Box 12548
17 Austin, Texas 78711
   Telephone: (512) 936-0677
18 Fax: (512) 457-4410
   email: jeff.white@oag.texas.gov
19
   Ms. Kathleen T. Hunker, OAG
20 ATTORNEY GENERAL KEN PAXTON OFFICE
   SPECIAL COUNSEL SPECIAL LITIGATION UNIT
21 209 West 14th Street
   Austin, Texas 78711
22 Telephone: (512) 936-0677
   Fax: (512) 457-4410
23 email: kathleen.hunker@oag.texas.gov
24
25

Page 4

1  A P P E A R A N C E S Continued
2
3  Mr. J. Aaron Barnes, OAG
   ATTORNEY GENERAL KEN PAXTON OFFICE
4  SPECIAL COUNSEL SPECIAL LITIGATION UNIT
   209 West 14th Street
5  Austin, Texas 78711
   Telephone: (512) 936-2021
6  email: aaron.barnes@oag.texas.gov
7  Mr. Adam Bitter, SOS
   OFFICE OF THE SECRETARY OF STATE
8  209 West 14th Street
   Austin Texas, 78701
9  Telephone: (512) 475-2813
   Fax: (512) 475-4316
10 email: abitter@sos.texas.gov
11 Mr. David Louk, El Paso County
   LAW OFFICES OF COOLEY, LLP
12 3 Embarcadeo Center, 20th Floor
   San Francisco, California 94111
13 Telephone: (415) 720-3673
   Fax: (415) 693-2222
14 email: dlouk@cooley.com
15 Ms. Wendy Olson
   LAW OFFICES OF STOEL RIVES, LLP
16 101 South Capital Boulevard, Suite 1900
   Boise, Idaho 83702
17 Telephone: (208) 387-4291
   email: wendy.olson@stoel.com
18
   Ms. Lisa Cubriel, Bexar County
19 ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
   101 West Nueva Street, 7th Floor
20 San Antonio, Texas 78205
   Telephone: (210) 335-2142
21 Fax: (210) 335-2773
   email: lisa.cubriel@bexar.org
22
23
24
25

**Entero v Texas 5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

**1 (1 - 4) Keith Ingram**
**Page: 1 (1 - 4)**

OCA-APPX-0168

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

**Keith Ingram 2 (5 - 8)**
**2 (5 - 8)**

Page 5

A P P E A R A N C E S Continued

Mr. Anthony J. Nelson, Travis County Rebecca Guerrero and José Garza
ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S OFFICE
314 West 11th Street, Suite 500
Austin, Texas 78767
Telephone: (512) 854-4801
email: tony.nelson@traviscountytx.gov

Ms. Leigh Tognetti
ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY
100 East Cano, Courthouse Annex III, 1st Floor
Edinburg, Texas 78539
Telephone: (956) 292 7609
Fax: (956) 292-7619
email: leigh.tognetti@da.co.hidalgo.tx

Mr. Zachary David Dolling, TCRP
CIVIL RIGHTS PROJECT
P.O. BOX 17757
Austin, Texas 78760
Telephone: (832) 767-3650
email: zachary@texascivilrightsproject.com

Ms. Lia Sifuentes Davis, Bexar County
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758
Telephone: (512) 454-4816
Fax: (512) 454-3999
email: ldavis@drtx.org

ALSO PRESENT:
National Court Reporters Inc., Host
Ms. Rebecca Martin, LUPE
Mr. Juan Estrada
Ms. Josephine Ramirez
Amir Badat
Jon

Page 6

INDEX

Appearances. . . . . . . . . . . . . . . . . . . . .   2

KEITH INGRAM

  Direct Examination by Mr. Jeffery White. . . .  10

  Direct Examination by Mr. Kanterman. . . . . .  117

Changes and Signature. . . . . . . . . . . . . . .  217

Reporter's Certificate . . . . . . . . . . . . . .  219

PLAINTIFF EXHIBITS

NO.  DESCRIPTION                                    PAGE

1   Notice of RULE 30(B)(6) Deposition of the Office of the Texas Secretary of State and Request for Documents Relied upon by RULE 30(B)(6) Designee (6-pgs)   15

2   Email from Keith Ingram to Justin Williamson regarding county by county mail ballot numbers with attachment 2022 Primary BBM A-R Bates No. STATE087299 (1-pg)   20

3   Column Headings and Description related to individual voter registration recording TEAM Bates No. STATE057754  (2-pgs)   24

4   Draft of Voter History Import Bates No. STATE057755.xlsx (1-pg)   36

5   Election Code, Title 7. Early Voting, Subtitled A. Early Voting Chapter 84. Application for Ballot Subchapter A. Application for Ballot (3-pgs)   50

6   Application for a Ballot by Mail Bate Nos. STATE031879 and STATE031880 (2-pgs)   56

Page 7

PLAINTIFF EXHIBITS Continued

NO. DESCRIPTION                                     PAGE

7   Carrier Envelope for Early Voting Ballot Bate Nos. STATE03217 through STATE032019 (3-pgs)   59

8   Official Election Signature Sheet for an FPCA Voter Bate Nos. STATE040053 and STATE040053 (2-pgs)   62

9   Notice of Rejected Application for Ballot By Mail Bate Nos. STATE031645 and STATE031646 (2-pgs)   64

10  Notice of Rejected Application for Ballot By Mail Bate Nos. STATE031643 and STATE031644 (2-pgs)   68

11  Texas Secretary of State FAQs on Applications for Ballot by Mail (ABBMs) Bate Nos. STATE001713 through STATE001743 (31-pgs)   72

12  Election Advisory No.2022-08 Letter to Election Officials from Keith Ingram dated January 28, 2022 regarding New Law: Senate Bill - Opportunity to Correct Defects on Application for Ballot by Mail and Carrier Envelope Totals Bate Nos. STATE019849 through STATE019876 (28 pgs)   73

13  Election Code Title 7. Early Voting, Subtitle A. Early Voting Chapter 86. Conduct of Voting by mail (5-pgs)   82

14  Notice of Rejected Application for Ballot by Mail Bate Nos. STATE031641 and STATE031642   91

15  Notice of Carrier Defect Carrier Envelope Returned to the Voter by Mail Bate Nos. STATE019845 and STATE019846 (2-pgs)   92

16  Email from Jacque Callanen to Keith Ingram dated January 21, 2022 regarding "another question please" Bates No. STATE052241 (1-pg)   98

Page 8

PLAINTIFF EXHIBITS Continued

NO. DESCRIPTION                                     PAGE

17  Email from Exchange Administrative Group to Christina Obermiller regarding FPCA ID Question - FACP/Obermiller Bate Nos. STATE052242 and STATE052243 (2-pgs)   102

18  Consolidated Plaintiffs' Third Amended Cross Notice of RULE 30(b)(6) Deposition of the Office of the Texas Secretary of State (20-pgs)   118

19  SB 1 (76-pgs)   122

20  Tex. Penal Code 38.01 (10-pgs)   162

21  Article "In Texas, thousands of mail ballots were rejected following new ID requirements dated March 16, 2022 (5-pgs)   192

22  Article "Secretary Hughs Commends Texas Voters Following November 3rd General Election (1-pg)   200

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

2 (5 - 8) Keith Ingram
**Page: 2 (5 - 8)**

OCA-APPX-0169

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 4 (13 - 16)
4 (13 - 16)

Page 13

1  pending question, to answer any pending question before
2  you take a break, all right?
3      **A. That's fine.**
4      Q. Thank you. So next, just some background
5  question.
6          You are currently employed by the Texas
7  Secretary of State?
8      **A. I am.**
9      Q. What's your cur -- or how long have you been
10 employed there?
11     **A. Ten years and a few months.**
12     Q. And what's your current job title?
13     **A. I'm the director of the Elections Division.**
14     Q. What's your -- what are your responsibilities
15 in that role?
16     **A. Well, to manage the division. That helps the**
17 **secretary fulfill his responsibility as chief election**
18 **officer for the State of Texas.**
19     Q. And how long have you held that role?
20     **A. Ten years and four months.**
21     Q. So your entire time with the Secretary of
22 State?
23     **A. That's right.**
24     Q. Thank you. And then you are here on behalf of
25 the Texas Secretary of State, how did you prepare to

Page 14

1  testify in this deposition?
2      MR. JEFFREY WHITE: I'll just instruct
3  the witness if -- not to get into any communications you
4  may have had with counsel, but otherwise, you can answer
5  that question.
6      THE WITNESS: Sure.
7      **A. So I reviewed the 30(b)(6) Depo Notice for**
8  **both the Department of Justice and the private**
9  **Plaintiffs, and I had a small visit with my voter**
10 **registration manager.**
11     Q. (BY MR. STEWART) And who is that?
12     **A. Kristi Hart.**
13         I also reviewed some documents. I
14 **reviewed the documents that are related to the fields**
15 **that are in the TEAM database, and then there was a**
16 **document from DPS that showed all of the interactions**
17 **they had with us, the data they provided to us.**
18     Q. Thank you. Has that document been produced,
19 do you know?
20     **A. I think so, yes.**
21     Q. Approximately how much time did you spend
22 preparing?
23     **A. Couple, three hours.**
24     Q. Did you speak with Secretary Scott in the
25 course of preparing?

Page 15

1      **A. I did not.**
2      Q. Okay. Did you meet with attorneys from the
3  Texas Attorney General's Office in the course of
4  preparing --
5      **A. I did.**
6      Q. -- without revealing the content of any
7  conversations?
8      **A. Sure.**
9      Q. I'm going to show you what we'll mark as
10 Exhibit 1.
11         (Plaintiff's Exhibit No. 1 was marked for
12 identification.)
13     Q. (BY MR. STEWART) Are you familiar with this
14 document?
15     **A. Yes.**
16     Q. And do you recognize this as the United
17 States' notice for this 30(b)(6) deposition today?
18     **A. Yes.**
19     Q. Turning quickly to Page A-2 document -- of
20 this document, are these topics you prepared to testify
21 on today?
22     **A. It is.**
23     Q. Is there any topic on this list, 1 through I
24 believe it's 7, and all subparts, that you are not
25 prepared to testify on today?

Page 16

1      **A. Well, there's eight and I --**
2      Q. Eight.
3      **A. -- I'm ready on all eight.**
4      Q. Great, thank you. All right.
5          All right. I'm going to turn, then, to
6  the first of these topics.
7          Are you familiar with the Texas Election
8  Administration Management database?
9      **A. I am.**
10     Q. If I refer to that as the TEAM database, can
11 we -- we're agreed that it refers to that database?
12     **A. Sure, but TEAM is more than a database.**
13     Q. What else is TEAM?
14     **A. It's an election management system.**
15     Q. If I use the shorthand TEAM, will you
16 understand I'm referring to the database portion of it
17 when the question is related to the database?
18     **A. Well, yeah, we'll have to see in context**
19 **whether I can under -- agree to that or not, but ...**
20     Q. Okay. Yeah, that's fine. If there's any
21 portion where it's unclear, you can just ask for
22 clarification.
23     **A. Sure.**
24     Q. So I think you started on this, but generally
25 what is the TEAM database?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

4 (13 - 16) Keith Ingram
Page: 4 (13 - 16)

OCA-APPX-0170

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 5 (17 - 20)

5 (17 - 20)

Page 17

1     A. So TEAM is, first of all, it is the
2 Java-compliant electronic database of voters in Texas,
3 so that's -- that's its main function, but it also has
4 within it candidate management portions, candidate
5 filing, and also has an election night reporting
6 function, as well as the ability to canvas the election
7 returns within the TEAM system and advance the
8 candidates through from filing, to primary, to primary
9 runoff, to general election.
10     Q. And are you familiar with the fields that were
11 included in the TEAM database production in this case?
12     A. Yes.
13     Q. How did you become familiar with those fields?
14     A. I reviewed the documentation provided by our
15 Kristi Hart.
16     Q. Are there any fields used to administer the
17 mail-in ballot provisions of SB 1 that weren't included
18 in the TEAM database production in this case?
19     MR. JEFFREY WHITE: Objection, form.
20     A. I'm not sure I understand the question.
21     Q. (BY MR. STEWART) Are there any fields that
22 track the acceptance or rejection of either absentee
23 ballot by mail applications or carrier envelopes that
24 were not included in the TEAM database production in
25 this case?

Page 18

1     A. No.
2     MR. JEFFREY WHITE: Objection, form.
3     A. You -- you should have all of those.
4     Q. (BY MR. STEWART) Okay. Do a field -- does a
5 field or fields exist in the TEAM database to track the
6 acceptance or rejection of applications for absentee
7 ballots by mail?
8     A. There are -- I mean, there's functions in the
9 TEAM database to track that activity.
10     Q. And what are those functions?
11     A. The -- you just enter application received,
12 and the TEAM system will record application received.
13     Q. Does it record whether an application is
14 accepted or rejected?
15     A. It does.
16     Q. Does it record the reason for that acceptance
17 or rejection?
18     A. It does.
19     Q. Who enters that information?
20     A. County election officials.
21     Q. And that is uploaded to the central TEAM
22 database from the offline counties?
23     MR. JEFFREY WHITE: Objection, form.
24     A. Well, some of them, and some of them use TEAM
25 directly for the management of mail ballots.

Page 19

1     Q. (BY MR. STEWART) Cleaning that up a second,
2 so what's the difference between counties that use TEAM
3 directly and counties that use an offline system?
4     MR. JEFFREY WHITE: Objection, form.
5     A. So the online counties are the counties that
6 use TEAM for their election management, they use it for
7 the voter registration, and, whenever they get a voter
8 registration application, they will enter it directly
9 into TEAM and it's in TEAM in realtime.
10     Offline counties, they will have their
11 own voter registration system, and, when they enter a
12 voter registration application, then that will batch
13 process with our system overnight to capture that new
14 registration.
15     Q. (BY MR. STEWART) And when you say batch
16 process, what does that mean?
17     A. It means that we get information from the
18 counties, and we give information to the counties about
19 anything that we've got with regard to their voters, so
20 that processing occurs overnight. It's an automatic
21 process.
22     Q. So how many offline counties are there?
23     A. I'm not sure at the exact time. I believe
24 there's 38, currently.
25     Q. And do they tend to be larger or smaller, or

Page 20

1 have any specific characteristics?
2     MR. JEFFREY WHITE: Objection, form.
3     A. Generally, it's the larger counties in Texas
4 by population.
5     Q. (BY MR. STEWART) Okay. And then can the TEAM
6 database be used to track acceptance or rejection of
7 ballot carrier envelopes by mail?
8     A. Yes.
9     Q. I'm going to show you what's tagged
10 "State087299", this will be Exhibit 2.
11     (Plaintiff's Exhibit No. 2 was marked for
12 identification.)
13     MR. STEWART: Sorry, Jeff.
14     Q. (BY MR. STEWART) Are you familiar with this
15 email?
16     A. I am.
17     Q. And what does this email show?
18     A. It shows the total number of ballots cast in
19 the Republican and Democratic primary on March 1st, as
20 well as the total number of mail ballots and mail
21 ballots rejected in each of those primaries.
22     Q. Is this based on information in TEAM?
23     A. It is.
24     Q. Is this information accurate, to the best of
25 your knowledge?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

OCA-APPX-0171

5 (17 - 20) Keith Ingram
Page: 5 (17 - 20)

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 10 (37 - 40)

10 (37 - 40)

Page 37

1 March 2020 primary, the opportunity to cure mail
2 ballots. So now then we've got interim statuses as well
3 as a final status. So the information is in the TEAM
4 system, but some of these are transient, they are not
5 permanent statuses.
6   Q. I understand. Just --
7   A. Permanent statuses would be over in the Voter
8 History Code.
9   Q. Sorry for talking over you. Understood.
10        Just to be clear, though, this is
11 definitionally information that's maintained in TEAM?
12   A. No.
13   Q. It's not in the TEAM database?
14   A. I didn't say that. I just said what I meant.
15 Some of these things are in the TEAM database, but
16 they're transitory in nature. So when you say
17 maintained, they are not maintained after the election,
18 they are there in the TEAM system when they need to be
19 there for the voter and for the early voting clerk, but
20 they don't stay there.
21   Q. I see. So information can be changed to
22 reflect the most current status?
23   A. Exactly.
24   Q. Understood, thank you. And then --
25        MR. STEWART: This was 3, right?

Page 38

1        COURT REPORTER: 4.
2        MR. STEWART: 4? Okay.
3   Q. (BY MR. STEWART) Returning to 3 real quickly,
4 there is a -- under the column headings on the second
5 page, there is a Ballot_Status column heading?
6   A. Uh-huh.
7   Q. Do you know -- if the ballot status shows an
8 entry that just says the letter "A", what does that
9 mean?
10        MR. JEFFREY WHITE: So Michael, I'll just
11 -- part of our agreement for this was that we were going
12 to do some of this data at, like, the 30,000-foot level,
13 so to the extent we're getting down to particular codes
14 and particular fields, that seems to be beyond what the
15 agreement was on the scope of the level we're getting
16 into on these database fields, so I just want to make
17 that clear for the record.
18        MR. STEWART: I mean, I do. And for the
19 record, one of our notice topics was the definition and
20 -- and information within the fields, and so we are just
21 trying to get at, you know, what this actually means
22 when we see information in the database.
23        MR. JEFFREY WHITE: And then as far as
24 Exhibit 3, I don't see a Bates number on this. Do you
25 have information on where this one came from?

Page 39

1        MR. STEWART: It was produced with
2 State057754. I actually don't believe it was attached
3 to an email but, you know, I'm happy to check on that.
4   A. Now, ballot status A, I don't know what that
5 means.
6   Q. (BY MR. STEWART) Okay. And then you wouldn't
7 know what -- or do you know what AV means?
8   A. AB I do know, yes.
9   Q. A -- sorry, A-V, as in Victor.
10   A. AV means absentee ballot accepted.
11   Q. Okay. Thank you.
12        All right. So you've talked a little bit
13 about the imports from -- from DPS, what are the
14 circumstances where as the Secretary of State receives
15 information from the Department of Public Safety,
16 related to voter registrations?
17   A. Well, we get a daily change file, so anything
18 that happened at DPS that day comes to us in a -- in a
19 batch process, and we farm that data out to the counties
20 overnight, so that's the -- the main one that we get on
21 a daily basis.
22        We also, on a daily basis, get something
23 that's related to the non-citizen process, so it's
24 non-citizens who previously have been at DPS as a no on
25 citizenship --

Page 40

1   Q. Uh-huh.
2   A. -- and they change to a yes, so we get that
3 information in a separate file on a daily basis.
4        On a weekly basis, we get information
5 from DPS about folks who went to the Department of
6 Public Safety last week and said I'm not a citizen, but
7 did prove lawful presence with a document, so we get
8 those every week.
9        Then, of course, we get the -- the felony
10 file from DPS about every week, sometimes 10 days, but
11 we get a list of persons who have been convicted of a
12 felony. And then we get information from DPS about --
13 we get a jury file in -- in the summer, and we get a
14 monthly file that we use with ERIC. I'm trying to think
15 what else. We get a monthly file for ERIC, get a yearly
16 file for the jury that we use for the HB 2512 process.
17   Q. Let me show you what we'll mark as 5 and 6.
18        MR. STEWART: This is an email, an
19 attachment. We'll mark them separately.
20        MR. JEFFREY WHITE: So I just want to
21 note that this one is designated ultra-sensitive.
22        MR. STEWART: Oh, sorry. You know, why
23 don't we save it. We'll do it before a break so
24 that we can --
25        MR. JEFFREY WHITE: So if we've got to

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

10 (37 - 40) Keith Ingram

**Page: 10 (37 - 40)**

OCA-APPX-0172

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 12 (45 - 48)
12 (45 - 48)

Page 45

1 databases?
2 **A. Yes. We match the databases together to**
3 **compare voters to drivers.**
4 Q. And -- and as -- was an -- excuse me,
5 withdrawn.
6 In the December 20, 2021 import, did a
7 full-nine SSN need to match in order to import a
8 driver's license number?
9 **A. Not necessarily.**
10 Q. What are the circumstances where it did not
11 need to match?
12 **A. Well, if we -- if we got the driver's license**
13 **number and we had a last four, then we could get the**
14 **full-nine. Do you understand? We went both ways.**
15 Q. What do you mean by both ways?
16 **A. We went from DL to social, as well as social**
17 **to DL. So if you've got a first name, a last name, a**
18 **date of birth and the last four of social that's the**
19 **same as a driver, then you can import that social**
20 **security number, or you can import the driver's license**
21 **number.**
22 Q. And that, you said, sorry, that's with the
23 last -- when the last four of the social match?
24 **A. Sure.**
25 Q. All right. So if the last four of the social

Page 46

1 matched, you could import the full-nine social and the
2 driver's license?
3 **A. Sure.**
4 Q. If a driver --
5 **A. If you've got a name and date of birth match**
6 **as well.**
7 Q. Okay. And with the name and date -- with a
8 name and date of birth match, if the full-nine social
9 matches, or the last four matches, you can bring in a
10 driver's license?
11 **A. Sure.**
12 Q. And with a name and date of birth match, if
13 the driver's license matches, you can bring in the
14 full-nine social?
15 **A. Sure.**
16 Q. Were there any circumstances where neither the
17 -- anything in the social field, nor the driver's
18 license matched and you brought in information?
19 **A. Well, there, that's where we have to do --**
20 **that's where we have to do something, because we had a**
21 **certain number of voters in the TEAM system that didn't**
22 **have either number. Right?**
23 Q. Uh-huh.
24 **A. So if you've got -- you've got to compare**
25 **those to a driver, then we look for the names, right,**

Page 47

1 **the first name, middle name, last name, date of birth**
2 **and residence address.**
3 Q. And so in December 20, 2024 (sic), information
4 without a driver's license and the SSN was brought in?
5 MR. JEFFREY WHITE: Objection, form.
6 MR. STEWART: I'll withdraw that.
7 Q. (BY MR. STEWART) In the December 20, 2021
8 import from DPS, information that matched on neither the
9 driver's license, nor the social security number was
10 brought in to the TEAM database?
11 **A. I believe so. It wasn't a huge number, but it**
12 **was some.**
13 Q. Was that same process used for prior jury
14 wheel imports?
15 **A. No.**
16 Q. No.
17 What was the criteria in prior jury wheel
18 imports?
19 **A. The -- the -- in prior jury wheel imports,**
20 **what we were look -- looking for is full-nines of**
21 **social, so what we were doing was matching DL and last**
22 **four to get the full-nine.**
23 Q. So in prior jury wheel imports, both driver's
24 license and last four had to match in order to bring in
25 the full-nine?

Page 48

1 **A. No, sir.**
2 Q. Okay. So what did have to match to bring in
3 the full-nine?
4 **A. Name, last name, first name, last name, former**
5 **last name, date of birth, DL would be able to get you**
6 **the full nine. Name, last name, former last name, date**
7 **of birth, last four would be able to get you the**
8 **full-nine, and if you had the DL, then you could get the**
9 **full-nine.**
10 Q. If you had name, last name, former last name,
11 date of birth and the SSN -- or excuse me, the social
12 security number, could you bring in a driver's license?
13 **A. We didn't do that before this time.**
14 Q. I see. You didn't import driver's licenses
15 before December 20th?
16 **A. That's right, because DL is not as important**
17 **in our matching criteria as -- as full-nine of social**
18 **is.**
19 Q. And why is that?
20 **A. Because we don't use it for matching anything**
21 **except for the 2512 process. The -- the -- the matching**
22 **that we do on a daily basis for felons, or dead people,**
23 **or mentally-incompetent or whatever, is name, last name**
24 **and then social, and the more full-nines we've got, the**
25 **more strong matches we can make. Because a strong match**

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

OCA-APPX-0173

12 (45 - 48) Keith Ingram
**Page: 12 (45 - 48)**

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 13 (49 - 52)

13 (49 - 52)

Page 49

1  under our TAC rule is first name, last name, former last
2  name, date of birth and full-nine.
3      Q.  Understood.  And so just to clarify, is the 25
4  -- 2512 process the only process in which you use
5  driver's license as a matching criteria?
6      A.  To get socials, yes, I believe so.  I -- I can
7  check with my voter registration manager, but I don't
8  think we use it for anything else.  I know that ERIC
9  uses it.  I mean, that's the reason why we give the
10 driver's license file to ERIC, but I don't know how ERIC
11 uses it.  They've got their own --
12     Q.  And so --
13     A.  -- black box.
14     Q.  -- but there you mean the driver's license
15 number?
16     A.  What?
17     Q.  You said you know ERIC uses it, and by it you
18 mean the driver's license number?
19     A.  That's right.
20     Q.  All right.  So with respect to that export
21 from DPS to TEAM that occurred on or around December 20,
22 2021, how was that information then communicated to what
23 we described previously as offline counties?
24     A.  It was -- it was communicated through the CDW.
25     Q.  And what, I'm sorry, what is the CDW?

Page 50

1      A.  The County Data Warehouse.
2      Q.  Were there any issues with that communication?
3      A.  I don't believe so, no.  We also communicated
4  it, I did a webinar and we did the mass email, I
5  believe, maybe an advisory.
6          MR. STEWART:  How long have we been on
7  the record?
8          COURT REPORTER:  Forty-one minutes.
9          MR. STEWART:  Okay.  Thank you.
10     Q.  (BY MR. STEWART)  All right.  Other than the
11 ones you've described here right now, are there any
12 other exchanges we haven't discussed that bring
13 information into voter registration records from DPS?
14     A.  I can't think of any.
15     Q.  Let me -- all right.
16         MR. STEWART:  I believe we're on, it's 5?
17         COURT REPORTER:  5, yes.
18     Q.  (BY MR. STEWART)  All right.  I'm going to
19 show you what's been marked as Exhibit 5 which is --
20 I'll represent to you this is Chapter 84 of the Texas
21 Election Code.
22         (Plaintiff's Exhibit No. 5 was marked for
23 identification.)
24     Q.  (BY MR. STEWART)  On Page 2 I want to turn
25 your attention to what begins Section 8 -- 84.002, are

Page 51

1  you familiar with this section?
2      A.  Yes.
3      Q.  Are these the -- are these the provisions
4  amended by SB 1 with respect to identification number,
5  social security number or a statement that an applicant
6  has neither information on an application for a ballot
7  by mail?
8          MR. JEFFREY WHITE:  Objection, form.
9      A.  This section was amended by SB 1, yes.
10     Q.  (BY MR. STEWART)  Has the Secretary of State
11 published any interpretive guidance for Section 84.002
12 since S -- since the SB 1 amendments?
13     A.  Any interpretive guidance?
14     Q.  Yes.  Any information that can be used to
15 interpret this statutory provision?
16     A.  Yes.
17     Q.  What information has the Secretary of State
18 published?
19     A.  Well, we did an advisory, I did a legislative
20 summary, we changed the form.
21     Q.  And by the form, what -- which form do you
22 mean?
23     A.  The application for ballot by mail.
24     Q.  Okay.  All right.  Looking at Section 84.002
25 1-a(B) it says, "if the applicant has not been issued a

Page 52

1  number described by Paragraph (A), the last four digits
2  of the applicant's social security number", did I read
3  that correctly?
4      A.  That's right.
5      Q.  How do you interpret the language "if the
6  applicant has not been issued a number described by
7  Paragraph (A)"?
8      A.  Well, the way it looks is that they have
9  created a hierarchy with driver's license first, last
10 four second, but that's not the way in practice that
11 this works.  Either number will work, and we suggest to
12 the voters that they use both numbers so that they
13 increase their odds of success.
14     Q.  And when you say that's not the way in
15 practice that it works, is that an interpretation that
16 the Secretary of State's Office has published?
17     A.  That's right.
18     Q.  And --
19     A.  That's the way we've taught it in several
20 Webexes, that's the way it is in the advisory, that's
21 the way it is in mass emails that we've sent out.
22     Q.  Uh-huh.
23     A.  That's the way it is in questions we've
24 answered, that's the way it is in town halls when we've
25 talked about it.

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

13 (49 - 52) Keith Ingram
Page: 13 (49 - 52)

OCA-APPX-0174

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 14 (53 - 56)
14 (53 - 56)

Page 53

1  Q.  And how did you arrive at that interpretation?
2  A.  It's the most voter-friendly.
3  Q.  Was there any point where you interpreted it
4  to establish a hierarchy?
5  A.  No.
6  Q.  So from the initial implementation of SB 1,
7  you interpreted it to establish a hierarchy?
8  A.  From before SB 1 was signed into law.
9  Q.  And so how do you interpret the phrase "not
10 been issued"?
11 A.  Same way you do.
12 Q.  Which is -- how do I do it?
13 A.  By what it means.  It means if you don't have
14 a DL, use your social.  That clearly cannot be the way
15 the way this law works, and it's not.
16 Q.  And when you say it's clearly not how this law
17 works, what is that based on?
18 A.  Our interpretation.
19 Q.  I'm sorry?
20 A.  Because the way that it's supposed to work, if
21 you look at -- if you look at Chapter 86, what you're
22 supposed to do when you look at these numbers is see if
23 there's -- if it matches a number in the voter's record.
24 There's no hierarchy for the Signature Verification
25 Committee or the Ballot Board, there's no hierarchy.

Page 54

1  They don't look for a driver's license first.  The --
2  the only places that there's -- there is a hierarchy is
3  in this.  But the people who actually review the number,
4  to make sure it matches a voter, are not told to use a
5  hierarchy.
6  Q.  Sorry, which provision of the law are you
7  describing there?
8  A.  The ones about the Signature Verification
9  Committee and the Early Voting Ballot Board, and how
10 they are supposed to work with this information.
11 Q.  So you're saying this provision of the law
12 does not apply to the Signature Verification Committee
13 or Early Voting Ballot Board?
14 A.  I'm saying --
15     MR. JEFFREY WHITE:  Object --
16 A.  -- they're told to look to see if the number
17 matches a number in the voter's record with --
18 Q.  (BY MR. STEWART)  Told by whom?
19 A.  The legislature.
20 Q.  And you're saying the Signature Verification
21 Committee or Early Voting Ballot Board does not need to
22 consider Section 84.002 when doing so?
23 A.  They need to make sure that there's a number
24 on the application that matches a number in the voter's
25 record.

Page 55

1  Q.  Thank you, but my question is, do they need to
2  consider Section 84.002 when doing so?
3  A.  They need to make sure that a number supplied
4  by the voter matches a number in the voter's record.
5      MR. STEWART:  I'll object as
6  nonresponsive.
7  A.  That --
8  Q.  (BY MR. STEWART)  Do they --
9  A.  I answered your question, you just don't like
10 the answer.
11     MR. STEWART:  I'll object as
12 nonresponsive to that as well.
13 Q.  (BY MR. STEWART)  Do they need to consider
14 Section 84.002, yes or no, when doing so?
15     MR. JEFFREY WHITE:  Objection, form.
16 A.  They need to follow the instructions of the
17 legislature, and make sure that the number provided by
18 the voter matches a number in the voter's record.
19     MR. STEWART:  All right.  I'll object as
20 nonresponsive.
21 Q.  (BY MR. STEWART)  Do you interpret Section
22 86.002 as similar language in the same way, with respect
23 to carrier envelopes?
24     MR. JEFFREY WHITE:  Objection, form.
25 A.  Exactly.  And that's why we have told the

Page 56

1  voter you can use either number or both, and we
2  recommend using both.
3  Q.  (BY MR. STEWART)  All right.  Let me -- you
4  mentioned some implementation documents that went to
5  counties.
6      MR. STEWART:  I think we're on, I believe
7  --
8      COURT REPORTER:  6.
9      MR. STEWART:  -- 6, thank you.
10     That's for you.
11 Q.  (BY MR. STEWART)  So I'll show you what we've
12 marked as Exhibit 6.
13     (Plaintiff's Exhibit No. 6 was marked for
14 identification.)
15 Q.  (BY MR. STEWART)  Is this the application for
16 a ballot by mail that the Secretary of State's Office
17 distributed to counties?
18 A.  It is the revised application for a ballot by
19 mail that we have promulgated, yes.
20 Q.  And sorry, you said this form was prepared by
21 the Secretary of State's Office?
22 A.  It was.
23 Q.  Can counties modify this form?
24 A.  So you don't need to have a particular form in
25 order to apply for a ballot by mail, you can just have a

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

14 (53 - 56) Keith Ingram
Page: 14 (53 - 56)

OCA-APPX-0175

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 15 (57 - 60)
**15 (57 - 60)**

Page 57

1 handwritten document, but it needs to contain the
2 elements of 84.002. We suggest if a county is going to
3 modify this form, number one, that it doesn't say
4 promulgated by the Secretary of State on it, and number
5 two, that they run it by us first, just to make sure
6 they're not missing anything important. We suggest the
7 same thing for candidates and campaigns.
8      Q.   Got it. Are they required to run it by you,
9 or is that a suggestion?
10          MR. JEFFREY WHITE: Objection, form.
11     A.   For -- for this particular form it's a
12 suggestion, a very strong suggestion, because what you
13 end up with is something like what Harris County did on
14 the carrier envelope or on the application, where they
15 left off important information and confused voters in
16 the process.
17     Q.   (BY MR. STEWART) Sorry, is it -- and then
18 with the carrier envelope, is that required to be run by
19 you if there are any alterations by counties?
20          MR. JEFFREY WHITE: Objection, form.
21     A.   Yes, absolutely. That one's got to be run by
22 us.
23     Q.   (BY MR. STEWART) Yeah. And who at the
24 Secretary of State is authorized to grant that approval
25 for counties to change the form -- the carrier envelope

Page 58

1 form?
2          MR. JEFFREY WHITE: Objection, form.
3     A.   Our lawyers.
4     Q.   (BY MR. STEWART) And so then I'll direct your
5 attention to the box, top half of the page, right side
6 in a black background and white letters.
7          It says, "You must provide one of the
8 following numbers", and then underneath it there is a
9 box with space for entering ID numbers or an SSN-four or
10 a checkbox, is that correct?
11     A.   That's correct.
12     Q.   Is this the section that implements the SB 1
13 mail-in ballot provisions with respect to the
14 application ballot by mail?
15     A.   Yes.
16     Q.   And does this track the language of SB 1?
17     A.   It does.
18     Q.   And this has the if you do not have a Texas
19 driver's license, Texas personal ID number or Texas
20 election identification certificate number, give the
21 last four digits of your social security number,
22 correct?
23     A.   That's correct.
24     Q.   And so your direction to voters was to provide
25 that only if they did not have a Texas driver's license,

Page 59

1 a Texas personal ID number or --
2     A.   The --
3     Q.   -- a Texas election identification --
4          MR. JEFFREY WHITE: Objection --
5     Q.   (BY MR. STEWART) -- certificate?
6          MR. JEFFREY WHITE: -- form.
7     A.   The form tracks the law, yes. That's what
8 it's supposed to do.
9     Q.   (BY MR. STEWART) So the form is faithful to
10 the language of the law?
11          MR. JEFFREY WHITE: Objection, form.
12     A.   The form tracks the law, which is what a good
13 form does.
14     Q.   (BY MR. STEWART) I'll show you Exhibit 7.
15          (Plaintiff's Exhibit No. 7 was marked for
16 identification.)
17     Q.   (BY MR. STEWART) Do you recognize this
18 document?
19     A.   Yes.
20     Q.   What is this document?
21     A.   It's a PDF, I believe, of a revised carrier
22 envelope.
23     Q.   Is this accurate with respect to the contents
24 of the revised carrier envelope?
25          MR. JEFFREY WHITE: Objection, form.

Page 60

1     A.   Without looking at every word, I believe so,
2 yes, sir.
3     Q.   (BY MR. STEWART) And you said counties need
4 approval to modify this form, correct?
5     A.   Yes.
6     Q.   Did any counties request that modification
7 this -- in the March -- for the March 2020 primary
8 election?
9     A.   Yes.
10     Q.   Do you recall which counties did so?
11     A.   I believe Tarrant and Dallas both had a little
12 different situation with regard to the number under the
13 flap and the shorter cutaway flap.
14     Q.   Were there any counties that requested to
15 modify for which the Secretary of State denied approval?
16     A.   I don't think so.
17     Q.   Were there any counties that requested to
18 modify for which the Secretary of State suggested
19 further modifications based on the proposed county's
20 modifications?
21          MR. JEFFREY WHITE: Objection, form.
22     A.   Yes. We have -- we have suggested further
23 changes.
24     Q.   (BY MR. STEWART) Looking at what is Page --
25 the third page of this PDF, and in the box about halfway

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

15 (57 - 60) Keith Ingram
**Page: 15 (57 - 60)**

OCA-APPX-0176

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 16 (61 - 64)

16 (61 - 64)

Page 61

1  down the page beginning, black background white letters,
2  "Required Information", and then "you must provide one
3  of the following numbers and you must be associated with
4  your voter registration record", is this the area used
5  to implement the SB 1 language with respect to ballot
6  carrier envelopes?
7      A.  Yes.
8          MR. JEFFREY WHITE:  Objection, form.
9      Q.  (BY MR. STEWART)  And does this have the if
10 you do not have a Texas driver's license, or a personal
11 identification card or a Texas election identification
12 certificate number, give the last four digits of your
13 social security number language?
14     A.  It does.
15     Q.  Is it the same in Spanish?
16     A.  It is.
17     Q.  And does that track the language of SB 1?
18     A.  It does.
19     Q.  Are there currently any plans to modify this
20 form for future elections?
21     A.  Yes.
22     Q.  What are those plans?
23     A.  We have revised it.  We are getting final
24 approvals now, but it's got a red box around this, these
25 three, to draw attention to it.

Page 62

1      Q.  Uh-huh.  Will that still track the language of
2  SB 1?
3      A.  Yes.
4      Q.  Are there any plans to modify the application
5  for a ballot by mail for the -- for future elections?
6      A.  No.
7      Q.  Show you one more.
8          MR. STEWART:  I believe we're at 8?
9          COURT REPORTER:  Uh-huh.
10     Q.  (BY MR. STEWART)  Are you familiar with this
11 document?
12         (Plaintiff's Exhibit No. 8 was marked for
13 identification.)
14     A.  I am.
15     Q.  (BY MR. STEWART)  What is this document?
16     A.  This is a signature sheet that a federal
17 postcard application voter is supposed to use when they
18 send back their mail ballots.
19     Q.  Is this prepared by the Secretary of State?
20     A.  It is.
21     Q.  Is this mailed to FPCA voters by -- and sorry,
22 if I say FPCA, federal postcard applicant -- is this
23 mailed to FPCA voters by counties or by the Secretary of
24 State's Office?
25     A.  It's --

Page 63

1          MR. JEFFREY WHITE:  Objection, form.
2      A.  The balloting materials are mailed by
3  counties.
4      Q.  (BY MR. STEWART)  By county.
5          Was the purpose of this form to implement
6  SB 1, specifically?
7      A.  Well, the original purpose of the signature
8  verification -- a signature sheet, is to assist those
9  voters who don't know how to do the origami to put
10 together a carrier envelope.  So this can be used in
11 lieu of a carrier envelope, and it's specifically
12 allowed by a statute for FPCA voters.  So the original
13 purpose of a signature sheet is to replace a carrier
14 envelope for voters who don't want to create a carrier
15 envelope from materials that have been emailed to them.
16     Q.  So this form predated SB 1?
17     A.  This form predates SB 1.
18     Q.  But it was modified to reflect SB 1 before the
19 March 2020 primary?
20     A.  That's correct.
21         MR. JEFFREY WHITE:  Objection, form.
22     Q.  (BY MR. STEWART)  Marked as -- it was modified
23 to reflect SB 1 before the March 2022 primary, correct?
24     A.  That's correct.
25     Q.  And is the language implementing SB 1 the box

Page 64

1  about a little less than halfway down the page that
2  begins "Required Information"?
3      A.  That's correct.
4      Q.  And that's similarly to the carrier envelope
5  and the ballot by mail application, has the if you do
6  not have a Texas driver's license language, correct?
7      A.  That's correct.
8          MR. JEFFREY WHITE:  Objection, form.
9      Q.  (BY MR. STEWART)  And that tracks SB 1?
10     A.  It does.
11     Q.  Are there any plans to modify this form in the
12 future?
13     A.  We do not.
14         MR. STEWART:  This is No. 9.  Give that
15 to Jeff, I'll get the marked version.
16         (Plaintiff's Exhibit No. 9 was marked for
17 identification.)
18     Q.  (BY MR. STEWART)  All right.  I'll show you
19 what's been marked as Exhibit 9, do you recognize this
20 form?
21     A.  Yes.
22     Q.  What is this form?
23     A.  It's the Notice of Rejected ABBM.
24     Q.  Did this form predate SB 1?
25     A.  Yes.

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

16 (61 - 64) Keith Ingram
**Page: 16 (61 - 64)**

OCA-APPX-0177

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 18 (69 - 72)
18 (69 - 72)

Page 69

And this I'm looking at you'll see where the early voting clerk has placed a checkmark next to the reason in bold, and then are those the -- these are the two reasons why this form could be used?

MR. JEFFREY WHITE: Objection, form.

A. **(No verbal response.)**

Q. (BY MR. STEWART) Underneath that?

A. **Yes.**

Q. And this directs that a voter must give his or her Texas driver's license number, Texas personal identification card number, election identification certificate number or the last four digits of his or her social security number on an application for ballot by mail, correct?

A. **If they want to use the ballot tracker, yes.**

Q. I'm going to direct, sir, not just for the ballot tracker but up top it says, "Your application for a ballot by mail has been received and reviewed, but is defective for the reason checked below. New Texas law requires that a voter must give his or her Texas driver's license number, Texas personal identification card number, election identification certificate number or the last four digits of his or her social security number on an application for ballot by mail", correct?

A. **That's correct.**

Page 70

Q. And this does not create a hierarchy between driver's license number, personal identification card number, election identification certificate number and last four digits social security number, correct?

A. **That's correct.**

Q. Does that differ from the application for ballot by mail itself?

MR. JEFFREY WHITE: Objection, form.

A. **Well, I -- I know what you're getting at, and obviously the forms follow the law, because the forms have to follow the law, and the -- the voter is directed in the first instance to provide DL, and if no DL then social, and that's what the form says. Here we're in Signature Verification land and Ballot Board land, and there's no hierarchy.**

Q. (BY MR. STEWART) What distinction are you making between the initial application and Signature Verification land or Ballot Board land?

MR. JEFFREY WHITE: Objection, form.

A. **Like I said before, there's nothing in the directions to the Signature Verification Committee or to the Ballot Board that suggests that they have to follow a hierarchy. They are told to look at the number provided by the voter, and see if it matches a number in the voter's record, that's all they're told to do.**

Page 71

Q. (BY MR. STEWART) Does the application go to the Signature Ver -- excuse me, Signature Verification Committee or Ballot Board?

A. **No. It goes to the early voting clerk.**

Q. And what does the early voting clerk do with it?

A. **The same thing, they look to see whether the number provided by the voter matches a number in the voter's record.**

Q. So is a different individual making the determine whether the numerical requirement is met, based on whether it's on the initial application or the cure?

MR. JEFFREY WHITE: Objection, form.

A. **Not exactly.**

Q. (BY MR. STEWART) What do you mean by not exactly?

A. **Well, there's -- there's two kinds of cures, there's the 86.0011, whenever the early voting clerk notices a defect, especially -- they have to do it on applications, but if they notice a defect on the carrier envelope, then they can notify the voter and have the voter correct the problem before it ever goes to the Signature Verification Committee or the Ballot Board. And the Signature Verification Committee and Ballot**

Page 72

**Board also have a cure process, but the 86.011 (sic) process predates SB 1.**

Q. If the early voting clerk does not indicate to the voter that there is a problem, does the Early Voting Ballot Board or Signature Verification Committee still check the identification number requirement?

MR. JEFFREY WHITE: Objection, form.

A. **Yes. They do so whether the early voting clerk does or not. It's their job.**

MR. STEWART: What time -- what record time are we at?

COURT REPORTER: One hour, six minutes.

Q. (BY MR. STEWART) Do you want a break, or you're good to go?

A. **I'm fine.**

Q. I'll show you what we'll mark as --

MR. STEWART: I believe this is 11?

Q. (BY MR. STEWART) -- No. 11.

(Plaintiff's Exhibit No. 11 was marked for identification.)

Q. (BY MR. STEWART) Do you recognize this document?

A. **It looks like a slide presentation from Webex.**

Q. Did you give a presentation on or around January 28, 2022 to county officials?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

18 (69 - 72) Keith Ingram
**Page: 18 (69 - 72)**

OCA-APPX-0178

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 21 (81 - 84)
21 (81 - 84)

Page 81

1 says, "Note: As a reminder", and continues.
2          When you refer to a reminder, what is
3 that a reminder of?
4          MR. JEFFREY WHITE: Objection, form.
5     A.  A reminder of the law.
6     Q.  (BY MR. STEWART) And who is that reminder to?
7     A.  The early voting clerk.
8     Q.  And when were they initially apprised of the
9 law?
10         MR. JEFFREY WHITE: Objection, form.
11    A.  Well, in this document.
12    Q.  (BY MR. STEWART) I'm just trying to get if
13 it's a reminder, what was the initial indication they
14 received of the law?
15    A.  Well, that doesn't mean that there was another
16 communication.
17    Q.  Okay.
18    A.  This is just hey, look at this.
19    Q.  And this scenario does not reflect a hierarchy
20 between the driver's license number and the social
21 security number, correct?
22    A.  It absolutely does not, that's correct,
23 because neither does 86.001(f).
24    Q.  I'm sorry, who came up with that
25 interpretation of 86.001(f)?

Page 82

1     A.  It's not an interpretation, it's what it says.
2 Give me the Election Code, I'll look it up and show you.
3     Q.  So there are provisions of the Election Code
4 that do not go interpreted by the Secretary of State's
5 Office?
6          MR. JEFFREY WHITE: Objection, form.
7     A.  It's not an interpretation, it's what the text
8 says. The text says if a number matches some -- a
9 number in the record, then you accept the application.
10    Q.  (BY MR. STEWART) So we'll mark, this is, I
11 believe 13?
12         (Plaintiff's Exhibit No. 13 was marked
13 for identification.)
14         MR. STEWART: Sorry.
15         MR. JEFFREY WHITE: Thanks.
16    Q.  (BY MR. STEWART) Is this Section 86 of the
17 Election Code?
18    A.  It is.
19    Q.  Could you read Section 86.001(f) for me?
20    A.  "If the information required under
21 84.002(a)(1-a) included on the application does not
22 identify the same voter identified on the applicant's
23 application for voter registration under Section
24 13.002(c)(8), the clerk shall reject the application".
25    Q.  What does the phrase "identified on the

Page 83

1 applicant's application for voter registration" mean to
2 the Secretary of State's Office?
3     A.  It means on their application for voter
4 registration.
5     Q.  So the information on the bail car -- or
6 excuse me, ballot carrier envelope must match their
7 voter registration application?
8     A.  No, sir. That's not what this says. It says
9 --
10    Q.  What does it say?
11    A.  It says it has to identify the same voter
12 identified on the VR application.
13    Q.  Okay. And it says, "If the information
14 required under Section 84.002(a)(1-a)", what is Section
15 84.002(a)(1-a)?
16    A.  That's the requirement that the driver's
17 license or last four of social be included on the ABBM.
18    Q.  Does that language in 84.002(a)(1-a) reflect
19 the hierarchy?
20         MR. JEFFREY WHITE: Objection, form.
21    A.  It does.
22    Q.  (BY MR. STEWART) And so it's the Secretary of
23 State's interpretation that that hierarchy was not
24 imported by this reference to 84.002(a)(1-a)?
25    A.  That's right.

Page 84

1     Q.  How did you arrive at that interpretation?
2     A.  Because it's not what it says. It says that
3 the information included that's required by that section
4 has to identify the same voter.
5     Q.  And the information required by that section
6 refers to 84.002(a)(1-a), right?
7     A.  That's right.
8     Q.  And (a)(1-a)(B) says, "if the applicant has
9 not been issued a number described by Paragraph (A),
10 correct?
11         MR. JEFFREY WHITE: Objection, form.
12    A.  86.001(f) does not import that hierarchy, it
13 says does the information identify the same voter?
14 That's the end of the hunt for the early voting clerk
15 whenever they're reviewing an ABBM.
16    Q.  (BY MR. STEWART) Does 86.001(f) refer to
17 84.002(a)(1-a)?
18    A.  Sure.
19    Q.  And you're saying that reference does not
20 include if the applicant has not been issued a number
21 described by Paragraph A language?
22    A.  If they wanted it to have a hierarchy, they
23 could have put the hierarchy here. They did not.
24    Q.  They could not do that by referring to the
25 other statutory provision?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

21 (81 - 84) Keith Ingram
Page: 21 (81 - 84)

OCA-APPX-0179

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 23 (89 - 92)

23 (89 - 92)

Page 89

1 registration record", in parens, "and thus verify the
2 identity of the voter, the clerk must accept the ABBM
3 and send a ballot to the voter".
4     Is that still the current interpretation?
5   **A. Sure.**
6   Q. Yeah. And so when there is an affirmatively
7 incorrect number on an ABBM, it is still accepted as
8 long as that other number is correct?
9   **A. If the number matches and can identify the**
10 **same voter as the application for voter registration**
11 **then yes.**
12   Q. What's the statutory basis for that
13 interpretation?
14   **A. 86.001(f).**
15   Q. Who arrived at that interpretation?
16   **A. Our office.**
17   Q. Did Secretary of Scott -- did Secretary Scott
18 review that interpretation?
19   **A. I don't know if he reviewed that or not, but**
20 **he's certainly been telling everybody he can to put both**
21 **numbers on the -- on the forms.**
22   Q. So he -- just so I heard you correct, you said
23 he's been telling everyone he can to put both numbers on
24 the form?
25   **A. That you can and you should.**

Page 90

1   Q. I see. But you don't know whether he reviewed
2 this interpretation, specifically, about --
3   **A. He had -- he had the opportunity to review it.**
4 **I didn't hear anything from him specifically about any**
5 **of this.**
6   Q. And by had the opportunity, was this document
7 sent to him before it was issued?
8   **A. It was sent to everybody, yes.**
9   Q. Scenario 8, "Voter indicates on the ABBM that
10 they have not been issued any of the required personal
11 identification numbers. If the voter's voter
12 registration record does not contain any of these
13 numbers, the early voting clerk must accept the ABBM and
14 send a ballot to the voter", is that still the current
15 guidance?
16   **A. That is.**
17   Q. Is any check run to see whether the voter is
18 correct, that they have not been issued those personal
19 identification numbers?
20   **A. That's what this provides. They -- the voter**
21 **indicates that they don't have any of these numbers,**
22 **there's not any of these numbers in the record, that's**
23 **the check.**
24   Q. And is that checked against TEAM?
25   **A. It's checked against TEAM.**

Page 91

1   Q. If the voter has numbers in the DPS record --
2 or excuse -- let me withdraw that.
3     If the voter has a driver's license
4 number in the DPS database, but it's not reflected in
5 the TEAM database, and has a social security number in
6 the DPS database, but it's not reflected in the TEAM
7 database, will their ballot be accepted if they check
8 that box under this scenario?
9   MR. JEFFREY WHITE: Objection, form.
10   **A. We don't check the DLs database whenever we're**
11 **looking at ABBMS, we look at TEAM.**
12   Q. And by DLs you mean DPS?
13   **A. That's right.**
14   Q. Okay.
15   MR. STEWART: We are on -- sorry, getting
16 another paper here --
17   COURT REPORTER: 14.
18   MR. STEWART: -- 14.
19   Q. (BY MR. STEWART) All right. I'll show you
20 what we're marking as Document 14.
21   (Plaintiff's Exhibit No. 14 was marked
22 for identification.)
23   Q. (BY MR. STEWART) Do you recognize this
24 document?
25   **A. I do.**

Page 92

1   Q. What is this document?
2   **A. This is the global rejection of an application**
3 **for ballot by mail.**
4   Q. And in what circumstances is this sent?
5   **A. For any of the ordinary rejection reasons.**
6   Q. Uh-huh. And then I'll show you -- and by
7 ordinary rejection reasons, what do you mean?
8   **A. You know, the -- any of them. I mean, there -**
9 **- there's a list here of 17, do you want me to read**
10 **them?**
11   Q. No. You don't need to do that.
12   MR. STEWART: And then this is? Sorry.
13   COURT REPORTER: 15.
14   MR. STEWART: 15.
15   Q. (BY MR. STEWART) I'll show you what's been
16 marked as No. 15.
17   (Plaintiff's Exhibit No. 15 was marked
18 for identification.)
19   Q. (BY MR. STEWART) Do you recognize this
20 document?
21   A. I do.
22   Q. What is this document?
23   **A. It's called a Notice of Carrier Defect.**
24   Q. And what is the purpose of this document?
25   **A. This is to help the voter with -- do the --**

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

23 (89 - 92) Keith Ingram
Page: 23 (89 - 92)

OCA-APPX-0180

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 24 (93 - 96)
24 (93 - 96)

Page 93

1  help the early voting clerk and the voter do the 86.011
2  (sic) process that we talked about before.
3      Q.   Was this prepared by the Secretary of State's
4  Office?
5      A.   It was.
6      Q.   And is this used by county officials?
7      A.   Yes.
8      Q.   Can county officials request to amend this
9  document?
10     A.   Yes.
11     Q.   Did any request to amend the document for the
12 March 2022 primary?
13     A.   No.
14     Q.   And then if you turn to the second page of
15 this document, what is this form?
16     A.   It's corrective action form.
17     Q.   And what is the purpose of the corrective
18 action form?
19     A.   To correct the ap -- the problems with the
20 carrier envelope.
21     Q.   Uh-huh.  And is this provided to a voter to
22 return to correct those problems?
23     A.   That's correct.
24     Q.   Okay.  And was this approved by the Secretary
25 of State's Office?

Page 94

1      A.   Yes.
2      Q.   Are counties able to amend this document?
3      A.   No.
4      Q.   Turning to what is Box 4 it says, "Missing or
5  incorrect personal identification numbers or social
6  security number."
7           This box does not create a hierarchy
8  between the driver's license or personal identification
9  card number and the last four digits of social security
10 number, right?
11     A.   That's correct.
12          MR. JEFFREY WHITE:  Objection, form.
13     Q.   (BY MR. STEWART)  Does that track the language
14 of 86.002?
15          MR. JEFFREY WHITE:  Objection, form.
16     A.   Do you mean 84.002?
17     Q.   (BY MR. STEWART)  Well, this is for the
18 carrier envelope, correct?
19     A.   Oh.  No.  It does not, but this is not a part
20 of the carrier envelope application or any of those
21 processes, this is at the Signature Verification
22 Committee.
23     Q.   So the Secretary of State's position is that
24 the carrier envelope needs to track the language of the
25 law, but other documents for this requirement do not?

Page 95

1      A.   That's right, because --
2      Q.   And what's --
3      A.   -- they're for a different purpose in front of
4  a different audience.
5      Q.   I'm sorry, what do you mean by a different
6  purpose?
7      A.   Well, the first one is the one that's
8  initially used by the voters, all the rest of these are
9  used by the Signature Verification Committee --
10 Committee or Ballot Board.
11     Q.   Sorry, this document is not used by voters?
12     A.   No.  It's used by a voter to -- to correct an
13 issue in front of the Signature Verification Committee
14 or the Ballot Board.
15     Q.   Are voters providing different information
16 with this document?
17     A.   No.
18     Q.   So they are being used, directed with
19 different language to provide the same information?
20          MR. JEFFREY WHITE:  Objection, form.
21     A.   No.  We're at a different stage of the
22 process.
23     Q.   (BY MR. STEWART)  Is this information required
24 for the voter's ballot to be accepted?
25     A.   Yes.

Page 96

1      Q.   And so when you say different stage of the
2  process, what are you referring to?
3      A.   I'm referring to the fact that we're in front
4  of the Signature Verification Committee or the Ballot
5  Board, we are not in the voter's house about to send it
6  off.
7      Q.   Sorry, so you're saying that the hierarchy to
8  provide driver's license or ID card, and then social
9  security number only if that's not listed, applies only
10 when the voter is filling out the form, but not when
11 it's being reviewed by county officials?
12          MR. JEFFREY WHITE:  Objection, form.
13     A.   The law is different in that case, we've
14 already discussed this.
15     Q.   (BY MR. STEWART)  And was that interpretation
16 discussed with Secretary Scott?
17     A.   We talked about all of this stuff.
18     Q.   Was that interpretation directed by Secretary
19 Scott?
20     A.   We talked about all of this stuff.
21     Q.   What do you mean by we've talked about all
22 this stuff?
23     A.   We've talked about all of these things.
24     Q.   Who is the we?
25     A.   Me, Christina, Adam, our communications

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

24 (93 - 96) Keith Ingram
**Page: 24 (93 - 96)**

OCA-APPX-0181

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 25 (97 - 100)
25 (97 - 100)

Page 97

1 director Sam Taylor, the secretary, the deputy
2 secretary.
3    Q.   So the secretary was part of those
4 conversations?
5    A.   Absolutely.
6    Q.   How frequently was the secretary involved in
7 those conversations?
8    A.   Not often.
9    Q.   About how -- about how many times?
10    A.   When we were about ready to release product.
11    Q.   So he would review the product after -- or
12 excuse me, at about the time it was ready to be
13 released?
14    A.   That's right.
15    Q.   Did he suggest any changes to the product?
16        MR. JEFFREY WHITE:  Objection --
17    A.   No, sir.
18        MR. JEFFREY WHITE:  -- to the extent
19 you're -- this gets into the deliberative process while
20 they're debating policies before they're finalized.  I
21 am going to instruct him that he is not to disclose the
22 content of discussions that would have gone into
23 deliberation regarding the final form.  But if it's
24 regarding what the final form is, then he can speak to
25 that.

Page 98

1        MR. STEWART:  Well, let me just probe
2 that for a second.
3    Q.   (BY MR. STEWART)  Was the purpose of these
4 conversations with the secretary to develop policy?
5    A.   Not really.
6    Q.   Okay.  So did Secretary Scott direct any
7 changes to those forms?
8    A.   He did not.
9        MR. STEWART:  We are at 17?
10        COURT REPORTER:  16.
11        MR. STEWART:  16, excuse me.
12    Q.   (BY MR. STEWART)  I'm sorry.
13    A.   I can get it.
14    Q.   Okay.  I thought I was getting better.
15        MR. JEFFREY WHITE:  We'll get a smaller
16 table next time.
17    Q.   (BY MR. STEWART)  So I'll show you what's been
18 marked as Document 16, it is Bates stamped "State052241"
19 on the bottom.
20        (Plaintiff's Exhibit No. 16 was marked
21 for identification.)
22    Q.   (BY MR. STEWART)  This appears to be an email
23 between you and Jacque Callanen, is that correct?
24    A.   That's correct.
25    Q.   Who is Ms. Callanen?

Page 99

1    A.   She is the election administrator in Bexar
2 County.
3    Q.   Uh-huh.  If you could take a second to review
4 the first email in this chain, dated Friday, January 21,
5 2022 at 10:31 a.m., what do you understand Ms. Callanen
6 to be asking?
7    A.   Well, I don't have the attachments, but what
8 appears to have happened is that someone sent in an
9 application for ballot by mail with a copy of their
10 driver's license.
11    Q.   And it appears that otherwise the application
12 for ballot by mail, identification number or social
13 security number portions were not filled out, correct?
14    A.   Looks like it.
15    Q.   And what was your response to Ms. Callanen
16 when she asked what to do with that --
17    A.   That the DL --
18    Q.   -- application?
19    A.   -- copy could supplement the ABBM, and that
20 they could use that DL copy to update the voter
21 registration record with that driver's license number
22 and accept that application.
23    Q.   So the guidance was that if TEAM did not
24 reflect a driver's license number, but the voter sent a
25 copy of their driver's license, that copy could be used

Page 100

1 to both update TEAM, and then accept the application for
2 ballot by mail?
3        MR. JEFFREY WHITE:  Objection, form.
4    A.   That's correct.
5    Q.   (BY MR. STEWART)  Is that the official
6 interpretation of the Secretary of State's Office?
7    A.   Sure.
8    Q.   Are you aware of any other circumstances where
9 that happened?
10    A.   Not this, precisely, but we have had 84.014
11 get discussed quite a bit by county election officials.
12    Q.   And what is 84.014?
13    A.   It says that your -- you can use information
14 on an application for ballot by mail to update a voter
15 registration record.
16    Q.   And what were those discussions?
17    A.   They wanted to know can you use the
18 application that's got a number that you don't have in
19 the file to update the record, and the answer to that is
20 no.  And the reason why you could here is because they
21 sent in a copy of the driver's license.
22    Q.   Why is the answer generally no?
23    A.   Because then it tautology and SB 1 would be
24 ineffective.
25    Q.   And why is that?

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

25 (97 - 100) Keith Ingram
Page: 25 (97 - 100)

OCA-APPX-0182

**5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

**Keith Ingram 55 (217 - 220)**
**55 (217 - 220)**

Page 217

1   CHANGES AND SIGNATURE

2

3   WITNESS NAME: KEITH INGRAM

4   DATE OF DEPOSITION: 04/26/2022

5   PAGE LINE   CHANGE            REASON

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 218

1       I, KEITH INGRAM , have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5       _____

6       KEITH INGRAM

7

8

9   THE STATE OF TEXAS          )

10  COUNTY OF _____   )

11      Before me, _____, on this

12  day personally appeared KEITH INGRAM , known to me (or

13  proved to me under oath or through _____)

14  (description of identity card or other document) to be

15  the person whose name is subscribed to the foregoing

16  instrument and acknowledged to me that they executed the

17  same for the purposes and consideration therein

18  expressed.

19      Given under my hand and seal of office this

20  _____day of _____, _____.

21

22

23      _____
        NOTARY PUBLIC IN AND FOR
        THE STATE OF _____

24

25

Page 219

1           UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO ENTERO )
    et al.,                     )
4        Plaintiffs,            )
                                )
5   v.                          ) Civil Action No. SA-21-CV-
                                )        00844-XR
6   GREGORY W. ABBOTT, et al., ) (Consolidated Cases)
        Defendants.             )
7

8

9

10          REPORTER'S CERTIFICATION
            DEPOSITION OF KEITH INGRAM
11              APRIL 26, 2022

12

13

14      I, Nancy Newhouse, Certified Shorthand Reporter

15  in and for the State of Texas, hereby certify to the

16  following:

17      That the witness, KEITH INGRAM , was duly sworn by

18  the officer and that the transcript of the oral

19  deposition is a true record of the testimony given by the

20  witness;

21      That the deposition transcript was submitted on

22  _____ to the witness or to the attorney for

23  witness for examination, signature and return to me

24  by _____.

25

Page 220

1       That the amount of time used by each party at

2   the deposition is as follows:

3       Mr. Michael E Stewart    - 02:20
        Mr. Richard Dellheim     - 00:00
4       Mr. Dan Freeman          - 00:00
        Ms. Jennifer J. Yun      - 00:00
5       Mr. Jason S. Kanterman   - 02:41
        Ms. Eliza Sweren-Becker  - 00:00
6       Mr. Graham W. White      - 00:00
        Mr. Patrick Berry        - 00:00
7       Mr. Jeffery White        - 00:00
        Ms. Kathleen T. Hunker   - 00:00
8       Mr. Aaron Barnes         - 00:00
        Mr. Adam Bitter          - 00:00
9       Mr. David Louk           - 00:00
        Ms. Wendy Olson          - 00:00
10      Ms. Lisa Cubriel         - 00:00
        Mr. Anthony Nelson       - 00:00
11      Ms. Leigh Tognetti       - 00:00
        Ms. Lia Sifuentes        - 00:00
12      Mr. Zachary David Dolling - 00:00

13

14      That pursuant to information given to the

15  deposition officer at the time said testimony was taken,

16  the following includes all parties of record:

17  Mr. Michael E. Stewart, Attorney for Plaintiff DOJ
    UNITED STATES
18  950 Pennsylvania Avenue, Northwest
    Washington, DC 20530

19  Mr. Richard Dellheim, Attorney for Plaintiff DOJ
    UNITED STATES
20  950 Pennsylvania Avenue, Northwest
    Washington, DC 20530

21

22  Mr. Dan Freeman, via Zoom, Attorney for Plaintiff
    Attorney for Plaintiff DOJ
23  TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
    950 Pennsylvania Avenue, NW
24  Washington, DC 20530

25

**Entero v Texas 5:21-cv-844 (XR)**
**4/26/2022**

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

**55 (217 - 220) Keith Ingram**
**Page: 55 (217 - 220)**

OCA-APPX-0183

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 56 (221 - 223)

56 (221 - 223)

Page 221

ALL PARTIES OF RECORD Continued

Mr. Jennifer J. Yun, via Zoom, Attorney for Plaintiff DOJ
LAW OFFICES OF JENNER & BLOCK, LLP
1099 New York Avenue, NW
Washington, DC 20001

Mr. Jason S. Kanterman, Attorney for Plaintiff LUPE, Southwest Voter Registration Education Project, Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, Fiel Houston, Inc. LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
One New York Plaza
New York, New York 10004

Ms. Eliza Sweren-Becker, via Zoom, Attorney for Plaintiff LUPE VOTING RIGHTS & ELECTIONS PROGRAM
Brennan Center for Justice at NYU School of Law

Mr. Graham W. White, via Zoom, Attorney for Plaintiff LULAC
LAW OFFICES OF ELIAS LAW GROUP, LLP
10 G Street NE, Suite 600
Washington, D.C. 20002

Mr. Patrick Berry via Zoom Attorney for Plaintiff COUNSEL, DEMOCRACY PROGRAM
120 Broadway, Suite 1750
New York, New York, 10271

Mr. Jeffery White, Attorney for Defendant OAG
ATTORNEY GENERAL KEN PAXTON OFFICE
SPECIAL COUNSEL SPECIAL LITIGATION UNIT
P.O. Box 12548
Austin, Texas 78711

Ms. Kathleen T. Hunker, Attorney for Defendant OAG
ATTORNEY GENERAL KEN PAXTON OFFICE
SPECIAL COUNSEL SPECIAL LITIGATION UNIT
209 West 14th Street
Austin, Texas 78711

Page 222

ALL PARTIES OF RECORD Continued

Mr. J. Aaron Barnes, Attorney for Defendant OAG
ATTORNEY GENERAL KEN PAXTON OFFICE
SPECIAL COUNSEL SPECIAL LITIGATION UNIT
209 West 14th Street
Austin, Texas 78711

Mr. Adam Bitter, Attorney for Defendant SOS
OFFICE OF THE SECRETARY OF STATE
209 West 14th Street
Austin Texas, 78701

Mr. David Louk, via Zoom, Attorney for Defendant El Paso County
LAW OFFICES OF COOLEY, LLP
3 Embarcadeo Center, 20th Floor
San Francisco, California 94111

Ms. Wendy Olson, via Zoom, Attorney for Defendant
LAW OFFICES OF STOEL RIVES, LLP
101 South Capital Boulevard, Suite 1900
Boise, Idaho 83702

Ms. Lisa Cubriel, via Zoom, Attorney for Defendant Bexar County
ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
101 West Nueva Street, 7th Floor
San Antonio, Texas 78205

Mr. Anthony J. Nelson, via Zoom, Attorney for Defendant Travis County Rebecca Guerrero and José Garza
ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S OFFICE
314 West 11th Street, Suite 500
Austin, Texas 78767

Ms. Leigh Tognetti, via Zoom, Attorney for Defendant
ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY
100 East Cano, Courthouse Annex III, 1st Floor
Edinburg, Texas 78539
Telephone: (956) 292 7609

Page 223

ALL PARTIES OF RECORD Continued

Mr. Zachary David Dolling, via Zoom, Attorney for Defendant TCRP
CIVIL RIGHTS PROJECT
P.O. BOX 17757
Austin, Texas 78760

Ms. Lia Sifuentes Davis, via Zoom, Attorney for Defendant Bexar County
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758
Telephone: (512) 454-4816
Fax: (512) 454-3999
email: ldavis@drtx.org

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 3rd day of May, 2022.

_____
NANCY NEWHOUSE, Texas CSR 9000
Expiration Date: 08/31/23
Firm Registration No. 223
Worldwide Court Reporters, Inc.
3000 Weslayan, Suite 235
Houston, Texas 77027
Telephone: (800) 745-1101

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

56 (221 - 223) Keith Ingram
**Page: 56 (221 - 223)**

OCA-APPX-0184

NATIONAL COURT REPORTERS INC
NATIONAL COURT REPORTERS INC 888.800.9656

## Transcript Errata Sheet For

Date:

Case Number:

Case Name:

Deponent:

_____

Page  Line    Now Reads          Should Read                Remove Therefore

_____

_____

_____

_____

_____

_____

_____

_____

_____

Date:    _____

Signature of the Deponent:

_____

**Please return via email within 30days to:**
**NCRNETWORK@NationalCourtReporters.com**

National Court Reporters Inc. 888.800.9656 NationalCourtReporters.com
National Court Reporters Inc. 888.800.9656
ncrnetwork@nationalcourtreporters.com

# Exhibit 9



## In The Matter Of

**La Union Del Pueblo Entero, et al.,**

**Plaintiffs**

**v**

**State Of Texas, et al.,**

**Defendants**

## CASE

**5:21-cv-844**

## Date

**5-6-2022**

## Witness

**Brian Keith Ingram, JD**

**Volume II of II**

### Certified Copy Transcript

**National Court Reporters Inc.** · **888.800.9656** ·
**NationalCourtReporters.com**
**NCRNetwork@nationalcourtreporters.com**
Serving Legal Professionals From Coast To Coast and Internationally

5:21-cv-844 (XR)     **Entero v Texas**     Brian Keith Ingram JD 224
5/6/2022     NATIONAL COURT REPORTERS INC 888.800.9656
224

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
 2               SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO       §
     ENTERO, ET AL.,           §
 4        Plaintiffs,      §  Civil Action No.
                           §  5:21-cv-844 (XR)
 5   VS.                   §  (Consolidated Cases)
                           §
 6   STATE OF TEXAS, ET AL.,   §
          Defendants.      §
 7   ****************************************************

 8               ORAL DEPOSITION OF
              BRIAN KEITH INGRAM, J.D.
 9           CORPORATE REPRESENTATIVE FOR THE
             TEXAS SECRETARY OF STATE OFFICE
10                 MAY 6, 2022
               VOLUME 2 OF 2 VOLUMES
11
     ****************************************************
12

13       ORAL DEPOSITION OF BRIAN KEITH INGRAM,

14   J.D., CORPORATE REPRESENTATIVE FOR THE TEXAS SECRETARY

15   OF STATE OFFICE, produced as a witness at the instance

16   of the Mi Familia Vota Plaintiffs, and duly sworn, was

17   taken in the above-styled and numbered cause on the 6th

18   day of May 2022, from 9:01 a.m. to 12:58 p.m., before

19   Caroline Chapman, CSR in and for the State of Texas,

20   reported by Computerized Stenotype Machine,

21   Computer-Assisted Transcription, held at the Price

22   Daniel Sr State Office Building, 209 West 14th Street,

23   Austin, Texas, and via web-based conference pursuant to

24   the Federal Rules of Civil Procedure.

25
```

Entero v Texas 5:21-cv-844 (XR)     **Entero v Texas**     224 Brian Keith Ingram JD
5/6/2022     National Court Reporters Inc. 888.800.9656     **Page: 224**
OCA-APPX-0188

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 225

**225**

1           A P P E A R A N C E S

2   COUNSEL FOR THE PLAINTIFF:
            MICHAEL ELLIOT STEWART (via videoconference)
3           Trial Attorney
            Civil Rights Division, Voting Section
4           U.S. Department of Justice
            950 Pennsylvania Avenue NW
5           Washington, DC 20530
            (202) 598-7233
6           michael.stewart3@usdoj.gov

7

    COUNSEL FOR ISABEL LONGORIA, HARRIS COUNTY ELECTIONS
8   ADMINISTRATOR:
            TIFFANY SUE BINGHAM (via videoconference)
9           Managing Counsel
            Affirmative Litigation, Compliance &
10            Environmental
            Harris County Attorney's Office
11          1019 Congress Street Fl 15
            Houston, TX 77002-1799
12          (713) 274-5132
            Tiffany.Bingham@cao.hctx.net

13

14  COUNSEL FOR THE PLAINTIFFS LUPE VOTING RIGHTS &
    ELECTIONS PROGRAM:
15          ELIZA SWEREN-BECKER (via videoconference)
            Counsel, Voting Rights & Elections Program
16          Brennan Center for Justice at NYU School of Law
            120 Broadway, Suite 1750
17          New York, NY 10271-202
            (646) 925-8765 Fax: (917) 597-9040
18          Eliza.sweren-becker@nyu.edu

19            - and -

20

21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656
OCA-APPX-0189

225 Brian Keith Ingram JD

**Page: 225**

**5:21-cv-844 (XR)**      **Entero v Texas**      Brian Keith Ingram JD 226
NATIONAL COURT REPORTERS INC 888.800.9656
**5/6/2022**      **226**

1      A P P E A R A N C E S (CONTINUED)

2      PATRICK BERRY (via videoconference)
     Voting Rights & Elections
3      Brennan Center for Justice
     NYU School of Law
4      120 Broadway, Suite 1750
     New York, NY 10271
5      (646) 925-8754
     patrick.berry@nyu.edu
6

7 COUNSEL FOR MI FAMILIA VOTA PLAINTIFFS:
     WENDY J. OLSON
8      ELIJAH M. WATKINS
     STOEL RIVES, LLP
9      101 South Capitol Boulevard, Suite 1900
     Boise, ID  83702
10      (208) 387-4291
     wendy.olson@stoel.com
11      elijah.watkins@stoel.com

12

13 COUNSEL FOR THE PLAINTIFF ARC OF TEXAS:
     SHIRA WAKSCHLAG (via videoconference)
14      Senior Director of Legal Advocacy and
     General Counsel for The Arc
15      1825 K Street, NW, Suite 1200
     Washington, DC 20006
16      (800) 433-5255

17 COUNSEL FOR PLAINTIFFS TEXAS STATE LULAC AND VOTO
LATINO:
18      MIKE JONES (via videoconference)
     ELIAS LAW GROUP, LLP
19      10 G Street NE, Suite 600
     Washington, DC 20002
20      (202) 985-1752, Extension 1016
     mjones@elias.law

21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)      **Entero v Texas**      226 Brian Keith Ingram JD
National Court Reporters Inc. 888.800.9656
**5/6/2022**      **Page: 226**

OCA-APPX-0190

        A P P E A R A N C E S (CONTINUED)

COUNSEL FOR OCA-GREATER HOUSTON PLAINTIFFS:
        ASHLEY HARRIS (via videoconference)
SENIOR STAFF ATTORNEY
ZACHARY "ZACH" DOLLING (via videoconference)
STAFF ATTORNEY
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin TX 78760
(512) 496-4746
zachary@texascivilrightsproject.org


COUNSEL FOR PLAINTIFF REVUP-TEXAS:
        LIA SIFUENTES DAVIS (via videoconference)
LISA SNEAD
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, TX 78758
(512) 407-2763
ldavis@drtx.org
lsnead@drtx.org


COUNSEL FOR THE PLAINTIFFS LUPE, SOUTHWEST VOTER
REGISTRATION EDUCATION PROJECT, MEXICAN AMERICAN BAR
ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ
INSTITUTE, FIEL HOUSTON, INC.:
        JASON S. KANTERMAN (via videoconference)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
One New York Plaza
New York, NY 10004
(212) 859-8519 Fax:  (212) 859-4000
jason.kanterman@friedfrank.com


COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA
SIGMA THETA SORORITY, INC.; THE ARC OF TEXAS; AND
JEFFREY LAMAR CLEMMONS:
        LILIANA ZARAGOZA (via videoconference)
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200  Fax: (212) 226-7592
lzaragoza@naacpldf.org

1          A P P E A R A N C E S (CONTINUED)

2    COUNSEL FOR CO-DEFENDANT LISA WISE, EL PASO COUNTY
     ELECTIONS ADMINISTRATOR:
3          DAVID S. LOUK (via videoconference)
           CARRIE LEBEL (via videoconference)
4          COOLEY LLP
           3 Embarcadero Center, 20th Floor
5          San Francisco, CA 94111-4004
           (415) 720 3673 Mobile
6          (415) 693 2114 Office
           (415) 693 2222 Fax
7          dlouk@cooley.com
           clebel@cooley.com
8

9    COUNSEL FOR PLAINTIFF ISABEL LONGORIA, HARRIS COUNTY
     ELECTIONS ADMINISTRATOR:
10         JONATHAN GABRIEL CHAIM FOMBONNE
           (via videoconference)
11         Harris County Attorney's Office
           1019 Congress, 15th Floor
12         Houston, TX 77002
           (713) 755-5101 Fax:  713-755-8924
13

14   COUNSEL FOR HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE:
           JOSEPHINE LOUISE "JOSIE" RAMIREZ
15         (via videoconference)
           Hidalgo County District Attorney's Office
16         100 East Cano Street
           Edinburg, TX 78539-4582
17         (956) 292-7609

18

19   COUNSEL FOR THE DEFENDANTS, THE OFFICE OF SECRETARY OF
     STATE:
20         KATHLEEN HUNKER
           Special Litigation Unit
           Office of the Attorney General of Texas
21         P.O. Box 12548
           Austin, TX  78711-2548
22         kathleen.hunker@oag.texas.gov

23         - and -

24

25

**5:21-cv-844 (XR)**
**5/6/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 229

**229**

1          A P P E A R A N C E S (CONTINUED)

2          ADAM BITTER
           General Counsel
3          Office of the Secretary of State
           Capitol Building, Room 1E.8
4          P.O. Box 12697
           Austin, TX  78711-2697
5          (512) 475-2813 Fax (512) 475-2761
           abitter@sos.texas.gov
6
           COUNSEL FOR THE STATE OF TEXAS ATTORNEY GENERAL'S
7          OFFICE:
                ZACHARY LOUIS RHINES
8               Assistant General Counsel
                Attorney General of Texas
9               Office of Special Litigation
                P.O. Box 12548 (MC 009)
10              Austin, TX  78711-2548
                (512) 936-2567 Fax:  (512) 457-4410
11              zachary.rhines@oag.texas.gov

12              J. AARON BARNES
                Special Counsel
13              Special Litigation Unit
                P.O. Box 12548
14              Austin, TX  78711-2548
                (512) 936-2021 Fax (512) 457-4410
15              aaron.barnes@oag.texas.gov

16
           COUNSEL FOR DEFENDANT YVONNE RAMÓN HIDALGO COUNTY
17         ELECTIONS ADMINISTRATORS:
                LEIGH ANN LEAVELL TOGNETTI
18              (via videoconference)
                Hidalgo County District Attorney's Office
19              100 East Cano, Courthouse Annex III, 1st Floor
                Edinburg, TX 78539
20              (956) 292-7609, Extension 8182
                leigh.tognetti@da.co.hidalgo.tx.us
21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)
**5/6/2022**

**Entero v Texas**
National Court Reporters Inc. 888.800.9656
OCA-APPX-0193

229 Brian Keith Ingram JD
**Page: 229**

1          A P P E A R A N C E S (CONTINUED)

2    COUNSEL FOR DEFENDANTS BEXAR COUNTY DISTRICT ATTORNEY
     JOE GONZALES AND BEXAR COUNTY ELECTIONS ADMINISTRATOR
3    JACQUELYN CALLANEN:
             LISA V. CUBRIEL (via videoconference)
4            Bexar County District Attorney's Office
             Civil Litigation Appellate Division
5            101 West Nueva Street, 7th Floor
             San Antonio, TX 78205
6            (210) 335-2142 Fax: (210) 335-2773
             Lisa.Cubriel@bexar.org
7

8    COUNSEL FOR DEFENDANT MICHAEL SCARPELLO, DALLAS COUNTY
     ELECTIONS ADMINISTRATOR:
9            BARBARA SALLY ANN NICHOLAS
             Deputy Chief at Civil Division
10           Dallas County District Attorney's Office
             411 Elm Street, Suite 500
11           Administration Building, 5th Floor
             Dallas, TX 75202-3355
12           (214) 653-7358

13   Also Present:
             THOMAS PAUL "TOMMY" BUSER-CLANCY
14           (via videoconference)
             ACLU FOUNDATION OF TEXAS, INC.
15           5225 Katy Freeway, Suite 350
             Houston, TX 77007
16           (713) 942-8146
             tbuser-clancy@aclutx.org

17

18

19

20

21

22

23

24

25

1                    I N D E X

2     Appearances . . . . . . . . . . . .   225

3     BRIAN KEITH INGRAM, J.D., CORPORATE REPRESENTATIVE
      FOR THE TEXAS SECRETARY OF STATE OFFICE

4
                                          PAGE
5     Examination by Ms. Olson . . . . . . . .   234
      Examination by Ms. Hunker   . . . . . . .   362
6     Examination by Ms. Olson . . . . . . . .   370
      Signature and Changes   . . . . . . . .   377
7     Reporter's Certificate   . . . . . . . .   379

8
                    E X H I B I T S
9
      NO. DESCRIPTION                    PAGE
10    Exhibit 1     Senate Bill 1            241
      Exhibit 2     Texas Secretary of State, Witnesses,  244
11              Assistants, and Agents, Lena Proft,
                Staff Attorney, Texas Secretary of
12              State, Elections Division, Webinar,
                State0807078 through State087104
13    Exhibit 3     Deposition of Keith Ingram dated     249
                April 26, 2022
14    Exhibit 4     Email chain to Justin Williamson     252
                from Keith Ingram cc Adam Bitter
15              dated April 7, 2022, Canvassed
                totals with attachment
16    Exhibit 5     Email chain from Stephen Chang       261
                dated November 9, 2020, State087430
17              through State087432
18    Exhibit 6     Email chain from Stephen Chang       266
                dated November 9, 2020, Subject:
19              Re: For Review: November 3rd
                General Election Thank You Video
20              Script, State087417 through
                State087419
21    Exhibit 7     Email chain from Ruth Hughs dated    269
                November 24, 2020, State087637
22              through State087639
23    Exhibit 8     Email to Stephen Chang from          274
                Adria Magoti dated November 30,
                2020, State087640 through
24              State087642
      Exhibit 9     Email Chain from Stephen Chang       281
                dated March 15, 2021, State050192
25

Entero v Texas 5:21-cv-844 (XR)          **Entero v Texas**          *231 Brian Keith Ingram JD*
5/6/2022          National Court Reporters Inc. 888.800.9656          **Page: 231**

OCA-APPX-0195

1　　　　　　E X H I B I T S (CONTINUED)

2　　NO. DESCRIPTION　　　　　　　　　　PAGE

Exhibit 10　　Email to Bill Vourvoulias from　　293
3　　　　　　Stephen Chang dated April 29,
　　　　　　2021, MFV007628

4　Exhibit 11　　Email to Ruth Hughs from Teresa　　297
　　　　　　Farfan dated April 1, 2021,
5　　　　　　State020035

Exhibit 12　　Letter to Texas Secretary of State　　302
6　　　　　　Ruth Hughs dated October 29, 2020,
　　　　　　State062521 through State062522

7　Exhibit 13　　Email Chain to Stephen Chang from　　308
　　　　　　Joe Esparza fated January 13, 2021,
8　　　　　　State019780 through State019782

Exhibit 14　　Email to Adam Bitter fro Ruth Hughs　316
9　　　　　　dated September 1, 2020, State020108
　　　　　　through State020110

10　Exhibit 15　　Email Chain to Ruth Hughs from　　323
　　　　　　Stephen Chang dated April 9, 2021,
11　　　　　　State051155 through State051157

Exhibit 16　　Email Chain to Beva Kellison dated　　334
12　　　　　　February 7, 2022, State078363

Exhibit 17　　Email Chain to Ruth Hughs from　　345
13　　　　　　Lucas Cabral dated April 27, 2020,
　　　　　　State020089 through State020093

14　Exhibit 18　　Email Chain to John Scott from　　347
　　　　　　Mr. Bitter on December 20th of 2021

15　Exhibit 19　　Confidential Email to Heidi Martinez　359
　　　　　　and Christina Adkins dated June 30,
16　　　　　　2021, State067475 through
　　　　　　State067480

17　Exhibit 20　　Election Code.  Title 6, Conduct　　364
　　　　　　of Elections.  Chapter 64,
18　　　　　　Voting Procedures.
　　　　　　Subchapter A, Voting Generally

19

20

21

22

23

24

25

1          E X H I B I T S (CONTINUED)

2                PREVIOUSLY MARKED EXHIBITS
      NO. DESCRIPTION                          PAGE
3     Exhibit 18    Consolidated Plaintiffs' Third          237
                    Amended Cross Notice of
4                   Rule 30(b)(6) Deposition of the
                    Office of the Texas Secretary of
5                   State
      Exhibit 22    Texas Secretary of State John B.          260
6                   Scott, News Release:  Secretary
                    Hughs Commends Texas Voters
7                   Following November 3rd General
                    Election

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OCA-APPX-0197

1     Q.   And below it is an email from Kristi Hart to

2     yourself and Mr. Bitter from earlier that same day; is

3     that right?

4     **A.   Agreed.**

5     Q.   Who is Ms. Hart?

6     **A.   She is our team -- team manager.**

7     Q.   And it says, "As you know, we ran a comparative

8     process over the weekend.  We did run queries prior to

9     and following the process.  That information is listed

10     below."  Do you see that?

11     **A.   I do.**

12     Q.   Can you explain, essentially, what this table

13     means?  So "query," I take it, is like questions or a

14     search run across a database; is that right?

15     **A.   That's right.**

16     Q.   And what does "before" mean?

17     **A.   Before we did the HB 2512 matching process.**

18     Q.   All right.  And then, just for the record,

19     describe what that process involves?

20     **A.   The HB 2512 process allows us to get**

21     **information from the driver's license record to**

22     **supplement voter registration records and use it for**

23     **voter registration purposes.**

24     Q.   All right.  And so once this is done, for

25     example, on the top one -- and we are talking about --

**5:21-cv-844 (XR)**
**Entero v Texas**
Brian Keith Ingram JD 377
5/6/2022
NATIONAL COURT REPORTERS INC 888.800.9656
**377**

```
 1              CHANGES AND SIGNATURE
 2      PAGE      LINE    CHANGE        REASON
 3      _____
 4      _____
 5      _____
 6      _____
 7      _____
 8      _____
 9      _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      _____
21      _____
22      _____
23      _____
24      _____
25      _____
```

Entero v Texas 5:21-cv-844 (XR)
**Entero v Texas**
*377 Brian Keith Ingram JD*
5/6/2022
National Court Reporters Inc. 888.800.9656
**Page: 377**
OCA-APPX-0199

1  _____

2  _____

3  _____

4  _____

5  _____

6      I, BRIAN KEITH INGRAM, J.D., have read the

7  foregoing deposition and hereby affix my signature that

8  same is true and correct, except as noted above.

9

10      _____
    BRIAN KEITH INGRAM, J.D.

11  STATE OF TEXAS   )

12  COUNTY OF TRAVIS  )

13      Before me,_____, on this

14  the day personally appeared BRIAN KEITH INGRAM, J.D.

15  known to me to be the person whose name is subscribed to

16  the foregoing instrument and acknowledge to me that they

17  executed the same for the purposes and consideration

18  therein expressed.

19      Given under my hand and seal of office

20  this ____ day of _____, 2022.

21

22

23      _____
    NOTARY PUBLIC IN AND FOR

24      THE STATE OF_____

25

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 379

379

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO          §
ENTERO, ET AL.,          §
     Plaintiffs,          §  Civil Action No.
           §  5:21-cv-844 (XR)
VS.          §  (Consolidated Cases)
           §
STATE OF TEXAS, ET AL.,          §
     Defendants.          §
*****************************************************

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF BRIAN KEITH INGRAM, J.D.
CORPORATE REPRESENTATIVE FOR THE
TEXAS SECRETARY OF STATE OFFICE
MAY 6, 2022

*****************************************************

     I, CAROLINE CHAPMAN, Certified Shorthand

Reporter in and for the State of Texas, hereby certify

to the following:

     That the witness, BRIAN KEITH INGRAM,

J.D., was duly sworn by the officer and that the

transcript of the oral deposition is a true record of

the testimony given by the witness;

     That the deposition transcript was

submitted on May _____, 2022 to the witness or to the

attorney for the witness for examination, signature, and

return to me within 20 days;

     That the amount of time used by each party

at the deposition is as follows:

     Ms. Wendy J. Olson - Two hours and

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

379 Brian Keith Ingram JD

**Page: 379**

OCA-APPX-0201

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 380

**380**

1    thirty-seven minutes.

2              Ms. Hunker - Eleven minutes.

3              That pursuant to information given to the

4    deposition officer at the time said testimony was taken,

5    the appearance page includes all parties of record.

6              I further certify that I am neither

7    counsel for, related to, nor employed by any of the

8    parties or attorneys in the action in which this

9    proceeding was taken, and further that I am not

10   financially or otherwise interested in the outcome of

11   the action.

12             Certified to by me on 16th day of May,

13   2022.

14

15                    _____

16                    CAROLINE CHAPMAN, Texas CSR 467
                     Expiration Date:  03/31/2023
                     Firm Registration No. 223

17                    WORLDWIDE COURT REPORTERS
                     3000 Weslayan, Suite 235

18                    Houston, Texas 77027
                     (713) 572-2000

19

20

21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

380 Brian Keith Ingram JD

**Page: 380**

OCA-APPX-0202

5:21-cv-844 (XR)
5/6/2022
Entero v Texas

NATIONAL COURT REPORTERS INC 888.800.9656

NATIONAL COURT REPORTERS INC
Serving You Nationally and Internationally

Brian Keith Ingram JD 381

381

## Transcript Errata Sheet For

**Date:**

**Case Number:**

**Case Name:**

**Deponent:**

_____

**Page  Line    Now Reads          Should Read              Remove Therefore**

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Date:**    _____

**Signature of the Deponent:**

_____

**Please return via email within 30days to:**
**NCRNETWORK@NationalCourtReporters.com**

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656
ncrnetwork@nationalcourtreporters.com

National Court Reporters Inc. 888.800.9656 NationalCourtReporters.com
GCA-APPX 0500

381 Brian Keith Ingram JD
Page: 381

# Exhibit 10

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION
LA UNION DEL PUEBLO ENTERO,      )
3   et al.,                        )
                   Plaintiffs,     )
4       vs.                        )Civil Action No.
STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
5                    Defendants.   )(Consolidated Cases)

6

                   ------------------------
7                     ORAL DEPOSITION OF
                      KEITH INGRAM
8                     March 28, 2023
                         Volume 1
9                  ------------------------

10

11       ORAL 30(b)(6) DEPOSITION OF KEITH INGRAM, Volume

12   1, produced as a witness at the instance of the

13   Plaintiff, and duly sworn, was taken in the

14   above-styled and numbered cause on March 28, 2023, from

15   4:22 p.m. to 7:22 p.m., before Dana Shapiro, CSR, in

16   and for the State of Illinois, reported by machine

17   shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18   pursuant to the Federal Rules of Civil Procedure and

19   any provisions stated on the record or attached

20   hereto.

21

22

23

24

25



1               A P P E A R A N C E S

2

3    FOR PLAINTIFFS OCA/REVUP TEXAS (via ZOOM):

4    MS. LUCIA ROMANO
     DISABILITY RIGHTS TEXAS
5    1500 McGowen, Suite 100
     Houston, Texas 77004
6    713-974-7691
     lromano@disabilityrightstx.org
7         -and-
     MS. COURTNEY LUTHER
8    DISABILITY RIGHTS TEXAS
     2222 West Braker Lane
9    Austin, Texas 78758
     512-454-4816
10   cluther@disabilityrightstx.org

11   FOR INTERVENOR-DEFENDANTS HARRIS COUNTY REPUBLICAN
     PARTY, DALLAS COUNTY REPUBLICAN PARTY, REPUBLICAN
12   NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL
     COMMITTEE AND NATIONAL REPUBLICAN CONGRESSIONAL
13   COMMITTEE (appeared via ZOOM):

14   MR. STEPHEN J. KENNY
     JONES DAY
15   51 Louisiana Avenue, NW
     Washington, D.C. 20001
16   202-879-3939
     skenny@jonesday.com

17
     FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
18   THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
     LAMAR CLEMMONS (appeared via ZOOM):
19

     MR. KATHRYN SADASIVAN
20   MR. VICTOR GENECIN
     MS. URUJ SHEIKH
21   NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
     40 Rector Street, Fifth Floor
22   New York, New York 10006
     212-965-2200
23   ksadasivan@naacpldf.org
     vgenecing@naacpldf.org
24   usheikh@naaacpldf.org

25



```
 1        A P P E A R A N C E S (continued):

 2   FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO SOUTHWEST
     VOTER REGISTRATION EDUCATION PROJECT:
 3
     MS. NINA PERALES
 4   MS. JULIA R. LONGORIA(via ZOOM)
     MS. FATIMA L. MENENDEZ(via ZOOM)
 5   MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
     110 Broadway, Suite 300
 6   San Antonio, Texas 78205
     210-224-5476
 7   nperales@maldef.org
     jlongoria@maldef.org
 8   fmenendez@maldef.org
             -and-
 9   MR. JASON KANTERMAN (via ZOOM)
     MR. KEVIN ZHEN (via ZOOM)
10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
     One New York Plaza
11   New York, New York 10004
     212-859-8519
12   Jason.Kanterman@friedfrank.com
     Kevin.Zhen@friedfrank.com
13
     FOR PLAINTIFFS LULAC, TEXAS, VOTO LATINO, TEXAS
14   ALLIANCE FOR RETIRED AMERICANS, TEXAS AFT (appeared via
     ZOOM):
15
     MS. MARISA O'GARA
16   ELIAS LAW GROUP LLP
     250 Massachusetts Avenue, NW, Suite 400
17   Washington, D.C. 20001
     202-968-4490
18   mogara@elias.law

19   FOR THE UNITED STATES:

20   MR. JUSTIN BENNETT(appeared via ZOOM)
     MR. RICHARD A. DELLHEIM
21   MR. MICHAEL E. STEWART
     U.S. DEPARTMENT OF JUSTICE
22   CIVIL RIGHTS DIVISION
     950 Pennsylvania Avenue, NW
23   Washington, D.C. 20530
     800-253-3931
24   Justin.Bennett@usdoj.gov
     Richard.Dellheim@usdoj.gov
25   Michael.Stewart3@usdoj.gov
                 -and-
```



```
 1              A P P E A R A N C E S (continued):

 2   MR. DANIEL J. FREEMAN
     U.S. DEPARTMENT OF JUSTICE
 3   CIVIL RIGHTS DIVISION
     4 Constitution Square (4CON)
 4   150 M Street, N.E./8.143
     Washington, D.C. 20530
 5   202-305-4355
     Daniel.Freeman@usdoj.gov

 6
     FOR DEFENDANTS THE STATE OF TEXAS, GREG ABBOTT, IN HIS
 7   OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN
     HER OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
 8   WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS
     ATTORNEY GENERAL:

 9
     MS. KATHLEEN HUNKER
10   MR. ETHAN SZUMANSKI
     OFFICE OF THE ATTORNEY GENERAL
11   P.O. Box 12548
     Austin, Texas 78711-2548
12   512-463-2100
     kathleen.hunker@oag.texas.gov
13   ethan.szumanski@oag.texas.gov

14   FOR OFFICE OF THE TEXAS SECRETARY OF STATE:

15   MR. ADAM BITTER
     OFFICE OF THE SECRETARY OF STATE
16   Capitol Building, Rm 1E.8
     P.O Box 12697
17   Austin, Texas 78711-2697
     512-475-2813
18   abitter@sos.texas.gov

19   FOR DEFENDANT LISA WISE, IN HER OFFICIAL CAPACITY AS
     THE EL PASO COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
20
     MR. GERMAINE HABELL
21   COOLEY LLP
     Wells Fargo Center, South Tower
22   355 South Grand Avenue, Suite 900
     Los Angeles, California 90071-1560
23   213-561-3227
     ghabell@cooley.com

24
     FOR DEFENDANTS BEXAR COUNTY ELECTIONS ADMINISTRATOR,
25   JACQUELYN CALLANEN AND BEXAR COUNTY DISTRICT ATTORNEY
     JOE D. GONZALES (via ZOOM):
```



```
 1          A P P E A R A N C E S (continued):

 2   MS. LISA V. CUBRIEL
     ASSISTANT DISTRICT ATTORNEY-CIVIL SECTION
 3   BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
     7th Floor Paul Elizondo Tower
 4   101 West Nueva
     San Antonio, Texas 78205-3030
 5   210-335-2142
     Lisa.Cubriel@bexar.org
 6
     FOR PLAINTIFF MI FAMILIA VOTA (via ZOOM):
 7
     MS. COURTNEY HOSTETLER
 8   FREE SPEECH FOR PEOPLE
     1320 Centre Street, #405
 9   Newton, Massachusetts 02459
     617-249-3015
10   chostetler@freespeechforpeople.org

11   FOR DEFENDANTS CLIFFORD TATUM, IN HIS OFFICIAL CAPACITY
     AS HARRIS COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
12
     MR. SAMEER S. BIRRING
13   SENIOR ASSISTANT COUNTY ATTORNEY
     OFFICE OF THE HARRIS COUNTY ATTORNEY
14   1019 Congress Plaza, 15th Floor
     Houston, Texas 77002
15   713-274-5101
     Sameer.Birring@harriscountytx.gov
16
     FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
17   DELIA GARZA (via ZOOM):

18   MS. LEIGH ANN TOGNETTI
     ASSISTANT DISTRICT ATTORNEY
19   100 East Cano, First Floor
     Hidalgo County Courthouse Annex III
20   Edinburg, Texas 78539
     956-292-7609
21   leigh.tognetti@da.co.hidalgo.tx.us

22
     ALSO PRESENT (via ZOOM):
23   MS. MORGAN HUMPHREY
     MS. SAMANTHA KOBOR
24

25
```



1                          INDEX

2                                               PAGE
     Appearances....................................2-5
3    KEITH INGRAM VOLUME 1
          Examination by MR. STEWART................7
4         Examination by MS. PERALES...............71
     Signature and Changes........................114
5    Reporter's Certificate.......................116

6                         EXHIBITS
     NO.                  DESCRIPTION            PAGE
7    No. 1                  Notice               9

8    No. 2                responses              11

9    No. 3                verification           12

10   No. 4                  email                35

11   No. 5                 results               39

12   No. 6                  email                48

13   No. 7                  email                54

14   No. 8                  email                60

15   No. 9              news article             104

16   No. 10              The Clips               104

17   No. 11              Training                109

18

19

20

21

22

23

24

25



1  determined or not?

2       A.    Well, Kristi Hart would be the one to ask

3  the detailed information like that.

4       Q.    When --

5       A.    Don't tell her I used her name.  I will get

6  killed.

7       Q.    During your prior deposition today when

8  Mr. Freeman was asking questions, you spoke about the

9  ballot tracker at votetexas.gov, correct?

10      MS. HUNKER:  Objection, form.

11  BY THE WITNESS:

12      A.    So the ballot by mail tracker I don't think

13  is -- I mean I know it's not at votetexas.gov.  You can

14  get to it from there and you can get to it from SOS

15  website, but it's hosted actually by our third party

16  vendor who does TEAM for us.

17  BY MR. STEWART:

18      Q.    Understood.  Can that tracker be used to

19  cancel an ABBM?

20      A.    No.

21      Q.    No.  It can be used to correct information,

22  right?

23      A.    Well, it can be used to correct a defective

24  number so if somebody transposed digits, whenever they

25  send in their application for ballot by mail that can



1    be corrected in the tracker.

2         Q.    Is there anything else that can be

3    corrected in the tracker?

4         A.    If they left off the information but TEAM

5    has it, they can do that in the tracker as well.

6         Q.    How can a voter cancel ABBM?

7         A.    So cancellation is not one of those things

8    I want to talk about off the top of my head.  Do you

9    want me to go up election code and talk about the

10   different ways of cancelling?

11        Q.    If you could tell me where in the election

12   code it is.

13        A.    Chapter 84.

14        Q.    The law I guess -- withdraw that.

15             What is in chapter 84 details all of the

16   ways by which an ABBM canceled?

17        A.    That's correct.  You know, generally a

18   voter can do it by surrendering their mail ballot in

19   person at the polling place and voting in person or go

20   to voting clerk office and fill out a cancellation form

21   and then go vote in person.

22        Q.    Would you say those are the two most common

23   ways it's done?

24        A.    That's generally what it is and there is

25   other permeations of those two that get very



1     Q.     She says that Tarrant's reply was that the
2     voter had to come to their office to fix the issue,
3     correct?
4     A.     That's what she says.
5     Q.     Would advice be correct, to the best of
6     your knowledge?
7     A.     Well, it kind of depends what issue they
8     were telling her that she needed to correct.  If she
9     needed to correct the number in the voter registration
10    record obviously she could do that with a voter
11    registration application and she doesn't need to come
12    in person.  If she's trying to fix the problem with the
13    application for ballot by mail then probably she needs
14    to show up in person or fill out a new application with
15    the transposed digits.
16    Q.     I see.  So if the problem were with the
17    ABBM, would she be able to correct that in the portal?
18    A.     If the problem was that the original number
19    was transposed, the only way to fix it in the portal
20    was to create the transposed numbers are correct.
21    Q.     The portal can't be used to change what's
22    in TEAM, it only be used to change what's on the ABBM?
23    A.     That's correct.
24    Q.     So how would she fix the issue -- if it is
25    correct that the issue in TEAM, what ways could she be



1    directed to fix that?

2          A.      I think the only way you can fix that to

3    fill out a new voter registration application with the

4    correct number.

5          Q.      So if TEAM then is the source of

6    transposition, it would be correct from Tarrant that

7    she would need to go into the office to correct that?

8          MS. HUNKER:  Objection, form.

9    BY THE WITNESS:

10         A.      You don't need to fill out a voter

11   registration application in person.

12   BY MR. STEWART:

13         Q.      That's something she also could have done

14   remotely, correct?

15         A.      That's correct.

16         Q.      If it's correct in fact that the numbers

17   are transposed in TEAM, she would not be able to enter

18   the portal entering the correct number, right?

19         A.      That's correct.  She would have to enter

20   the transposed number and agree it's the correct number

21   for her mail bound application to be accepted.

22         Q.      Got it.  I want to turn to -- I think last

23   year when we spoke we discussed the HB2512 process; do

24   you recall?

25         A.      I do.



1    Q.    That's the process for present purposes by

2  which driver's license, ID number or SSN data is

3  imported from DPS database into team, correct?

4    A.    That's correct.

5    Q.    Was the HB2512 process run at any point in

6  2022 following the primary election?

7    A.    No.

8    Q.    Was it --

9    A.    It was in December.

10    Q.    In December following the general election?

11    A.    Not before the general.

12    Q.    Not before the general, but in 2022

13  following -- let me withdraw that.  It was not run

14  between the primary and the general, correct?

15    A.    That's correct.

16    Q.    It was run following the general before the

17  end of the year?

18    A.    I agree.

19    Q.    Has it been run again since then?

20    A.    No, sir.

21    Q.    Is that a regular annual process is that

22  why it was run in December?

23    A.    It has historically been run in December,

24  not every December, but obviously the last two.

25    Q.    I'm going to hand you what will be SOS 5. I



1  will state I don't know why this document presented

2  without a Bates number.  You Bates number on it.  It is

3  state 137751.  Just to put that on the record.

4                          (WHEREUPON, a certain document was

5                          marked Deposition Exhibit No. 5,

6                          for identification, as of 3/28/23.)

7          MS. HUNKER:  Thank you.

8  BY MR. STEWART:

9          Q.     Do you recognize this document, Mr. Ingram?

10         A.     I do.

11         Q.     What is this?

12         A.     This is the result of the comparison

13  process from December of '22.

14         Q.     That's the same HB2512 process we were just

15  discussing?

16         A.     That's correct.

17         Q.     So the initial numbers, would they reflect

18  the state of the database following the 2021 process?

19         A.     Plus whatever changes were made in the

20  course of the 2022.

21         Q.     So they wouldn't reflect any changes from a

22  systemic process, but they could represent -- reflect

23  what I will call ad hoc changes to individual records?

24         MS. HUNKER:  Objection, form.

25  BY THE WITNESS:



1      A.      Agree with that.

2      Q.      That number moved by less than 2,000,

3  correct?

4      A.      It looks like about 1,300 maybe.

5      Q.      Why do you think the movement in that was

6  smaller than in the other categories?

7      A.      Because it's the hardest category to do

8  anything with.

9      Q.      Have you discussed any way to capture more,

10 improve the HP2512 process for that category of voters

11 in the future?

12     A.      No.

13     Q.      Just a couple quick questions.  After the

14 HP2512 process is run, how are those changes filtered

15 out to off-line counties?

16     A.      They are supposed to sync their data with

17 ours on a monthly basis.

18     Q.      That occurs monthly?

19     A.      It does or it's supposed to.

20     Q.      Is that a two-way sync?  So, for example,

21 if something gets changed in the county's off-line

22 database more recently than the information in TEAM,

23 should that be then filtering into TEAM as well?

24     A.      So there is two different things that you

25 might be confusing here.  Any changes in voter



1　registration record that the county gets from the voter
2　is supposed to be reported nightly.  So that's what we
3　call our batch process.  That's not the same as syncing
4　the data.  Syncing the data means we want to make sure
5　everything we have got in our system is captured in
6　off-line system so the databases are identical, right.
7　So the goal is to have zero differences in the sync
8　file.  This kind of change in the SOS file is what we
9　are trying to sync to the voters.  Then of course there
10　are other kinds of changes the county makes with regard
11　to pre-syncing in particular that aren't reflected in
12　an individual voter change that we would get in a batch
13　process.  We want to sync those up as well.  So those
14　are the two things that we are syncing is making sure
15　that everything from our database is in theirs and
16　making sure all of their precinct lines they may have
17　re-drawn are in ours.
18　　　　　Q.　　Taking those two processes separately
19　because I assume -- do those processes run at the same
20　time?
21　　　　　A.　　Yes.
22　　　　　Q.　　They do?
23　　　　　A.　　The sync is simultaneous.
24　　　　　Q.　　So the sync is referring to information
25　from TEAM filtering down to the counties?



1    A.    That's right.

2    Q.    That occurs monthly?

3    A.    It's supposed to occur monthly.  We have to

4   do it much less often.  With this change in law it

5   became expedient to do it more often.

6    Q.    All new registrations are entered by the

7   county into their databases, correct?

8    A.    That's right, many changes to registration

9   is entered.

10    Q.    Those changes are coming upward to TEAM

11   daily?

12    A.    That's right.

13    Q.    Then new information from HP2512 is going

14   from TEAM to the counties monthly?

15    A.    Well, we sync the database monthly.  The

16   new information from 2512 is obviously an annual thing.

17    Q.    I see.  It would be part of that monthly

18   sync process?

19    A.    It would.

20    Q.    Information entered into the texas.gov

21   portal that gets pulled over, where does that go first?

22    A.    To TEAM.

23    Q.    That will to the counties as part of the

24   monthly process?

25    A.    That's right.



1    Q.    If there is any difference in the county

2   and state databases, would those likely be due to a lag

3   in time between basically the monthly process

4   occurring?

5        MS. HUNKER:  Objection, form.

6   BY THE WITNESS:

7        A.    That's right, or they haven't resolved

8   everything that was a difference in the last sync file.

9   BY MR. STEWART:

10       Q.    What does it mean to resolve it?

11       A.    To choose one or the other.

12       Q.    When something comes down from the sync

13   file from TEAM to the county, the county needs to

14   resolve each of those in their own database?

15       A.    That's correct.

16       Q.    If there is an import from Texas.gov, those

17   cannot be used by the county in the cure process until

18   the next sync occurs; is that correct?

19       A.    No, they can use TEAM.  They are -- all

20   have access to TEAM and we told them to use tell.

21       Q.    They wouldn't be reflected in the county,

22   but the instruction from the SOS is to also look in the

23   TEAM database?

24       A.    That's right.

25       Q.    Do you know if all counties follow that



1   trouble with the residence address.

2        Q.     Any other issues?

3        A.     No.  There were some off-line counties in

4   the primary that said they weren't getting the ballot

5   tracker updates which is why we were sending a separate

6   spreadsheet so they were getting it through the system

7   as well as from the spreadsheet from us.

8        Q.     There were off-line counties that reported

9   that ballot tracker updates were not coming from the

10  monthly sync process?

11       A.     No.  Nightly batch process.  So if the

12  voter uses the ballot tracker to confirm their numbers,

13  there should be report of that that shows up on the

14  off-line county's dashboard.  They were saying they

15  weren't getting them so we sent them manually as well

16  through the system.

17       Q.     Those were in Excel spreadsheets?

18       A.     I don't know.  CSV file, something like

19  that.

20       Q.     Just something that the county could use to

21  manually look up that information outside of the

22  database?

23       A.     Well, to manually update the voter to

24  accept it.

25       Q.     So the purpose of that was to update their



1   database or just to evaluate the ABBM in front of them?

2        A.      Well, they have evaluated the ABBM.   In

3   this case the carrier envelope found it to be detective

4   because of missing or incorrect number.   The voter has

5   corrected that through the ballot tracker.   We were

6   sending that correction information both through TEAM

7   as well as manually.

8        Q.      So those corrections would not change TEAM,

9   they would only change consideration of ABBM?

10       A.      That's correct.

11       Q.      Would changing the residence address issue,

12   as you have described it, require legislative action?

13       A.      Yes.

14       Q.      Any other changes or potential changes to

15   the ballot tracker that you testified on in the past

16   two months?

17       A.      No.

18       Q.      I'm going to hand you SOS 7.

19                      (WHEREUPON, a certain document was

20                      marked Deposition Exhibit No. 7,

21                      for identification, as of 3/28/23.)

22   BY MR. STEWART:

23       Q.      Just for the record I will say this is

24   document State 118032.

25       A.      Okay.



 1  BY MR. STEWART:

 2      Q.      Fair enough.  But you know it's tough to

 3  see the way it's printed, but you can see, "Welcome

 4  Jason Hole," then whatever information, current

 5  address.  This does appear to be the logged in version

 6  of the tracker, correct?

 7      A.      I agree with that.

 8      Q.      If the voter has an active mail ballot,

 9  would you expect to see information about that mail

10  ballot in the tracker?

11      A.      Yes.

12      Q.      Who is responsible for entering information

13  about the rejected ballot into the tracker?

14      A.      Tarrant County in this case.

15      Q.      How do they enter information into the

16  tracker as in is there a portal on their end through

17  TEAM?  How does that information flow into the tracker?

18      A.      There is a couple ways they should be able

19  to enter the information into their off-line system or

20  they should be able to enter it directly into TEAM.

21      Q.      Looking at the most recent email on the

22  chain.  Those are the ones back on the page that ends

23  in 32 on the Bates stamp.  That appears to be a

24  response from the Secretary of State's Office, correct?

25      A.      Agreed.



1   because you have logged in successfully in the tracker,

2   you don't see anything to fix.  So that's Tarrant

3   County's problem.

4   BY MR. STEWART:

5        Q.    So in the instance where let's say tracker

6   information is not appearing or populating for a known

7   mail ballot, the county should be entering that

8   information?

9        A.    Absolutely.

10       Q.    A voter with an issue should be contacting

11  the county?

12       A.    Yes.

13       Q.    Are there circumstances where a voter

14  should be contacting the Secretary of State for ballot

15  tracker issues?

16       A.    They will call us if they are having

17  trouble accessing it.

18       Q.    So is it correct to say then the Secretary

19  of State's Office manages the access portion of the

20  ballot tracker and the county is manage the individual

21  ballot information portion?

22       A.    The substance of information --

23       MS. HUNKER:  Objection, form.

24  BY THE WITNESS:

25       A.    -- within the tracker is contributed by the



1   counties.

2   BY MR. STEWART:

3       Q.      But the counties don't have any control

4   over the access portion, correct?

5       A.      That's correct.

6       Q.      To your knowledge, did any other voters

7   identify a similar issue such as this where they are

8   able to access the tracker but information wasn't

9   populating in the tracker?

10      A.      Not in the general.

11      Q.      Not in the general.  Did that happen in the

12  primary?

13      A.      In the primary, yes.

14      Q.      Did you identify the route cause of that

15  issue in the primary?

16      A.      It's because the VOTEC system wasn't

17  mapping to the TEAM system properly.  The general is

18  just because the county didn't enter the information.

19      Q.      Let's look at SOS 8.

20                      (WHEREUPON, a certain document was

21                      marked Deposition Exhibit No. 8,

22                      for identification, as of 3/28/23.)

23  BY MR. STEWART:

24      Q.      We're back in Tarrant County.  Would you

25  agree this chain appears to reflect a communication



1 BY THE WITNESS:

2      A.    I mean we don't know. I mean some voters

3 can drive it in as easily as they can mail it, but

4 there is a reason why people vote by mail. Generally

5 it's because they are not as mobile. So to increase

6 the odds of them curing we need to have a mail back

7 form.

8 BY MS. PERALES:

9      Q.    Texas vote by mail eligibility involves

10 being for the most part either over age 65 or

11 physically disabled, is that correct -- or disabled in

12 some way?

13      A.    Agreed.

14      Q.    So you had listed basically four things,

15 the 2026 effective date provision, and then the three

16 things you just talked to me about now. Have you had

17 any discussions with members of the legislator or

18 legislative staff about amending any of the provisions

19 in SB 1 that are the subject of this lawsuit?

20      A.    No.

21      Q.    So then I won't have to ask it for each

22 individual provision.

23      Let's look at --

24      A.    Oh, we did talk to one senator's office

25 about possible changes to poll watchers.



1                     CHANGES AND SIGNATURE

2   KEITH INGRAM

3   March 28, 2023

4   PAGE/LINE              CHANGE                    REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____



1    I, KEITH INGRAM, have read the foregoing

2    deposition and hereby affix my signature that the same

3    is true and correct, except as noted on the previous

4    page.

5

6    _____

7    KEITH INGRAM

8    THE STATE OF _____)

9    COUNTY OF _____)

10    Before me, _____, on this day

11    personally appeared KEITH INGRAM, known to me (or

12    proved to me under oath or through _____)

13    (description of identity card or other document) to be

14    the person whose name is subscribed to the foregoing

15    instrument and acknowledged to me that he executed the

16    same for the purposes and consideration therein

17    expressed.

18    Given under my hand and seal of office this _____

19    day of _____, 20_____.

20

21    _____

22    NOTARY PUBLIC IN AND FOR

23    THE STATE OF _____

24    COMMISSION EXPIRES: _____

25



```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION
   LA UNION DEL PUEBLO ENTERO,      )
3  et al.,                          )
                     Plaintiffs,    )
4       vs.                         )Civil Action No.
   STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
5                    Defendants.    )(Consolidated Cases)

6

7               REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF
8                    KEITH INGRAM
                    March 28, 2023
9
```

10       I, Dana Shapiro, a Certified Shorthand Reporter,

11  hereby certify to the following:

12       That the witness, KEITH INGRAM, was duly sworn by

13  the officer and that the transcript of the oral

14  deposition is a true record of the testimony given by

15  the witness;

16       I further certify that pursuant to FRCP Rule

17  30(e)(1) that the signature of the deponent:

18  was requested by the deponent or a party before the

19  completion of the deposition and that the signature is

20  to be before any notary public and returned within 30

21  days from date of receipt of the transcript.  If

22  returned, the attached Changes and Signature Pages

23  contain any changes and reasons therefore;

24       I further certify that I am neither counsel for,

25  related to, nor employed by any of the parties or



1   attorneys in the action in which this proceeding was

2   taken, and further that I am not financially or

3   otherwise interested in the outcome of the action.

4        Certified to by me this April 10, 2023.

5

6   _____
    Dana Shapiro
7   Illinois CSR 84-3597
    Expiration: 5/31/23
8   Magna Legal Services
    Firm Registration No. 633
9   1635 Market Street
    8th Floor
10  Philadelphia, PA 19103

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1  COUNTY OF TRAVIS )

2  STATE OF TEXAS   )

3       I hereby certify that the witness was notified on

4  _____, that the witness has 30 days

5  after being notified by the officer that the transcript

6  is available for review by the witness and if there are

7  changes in the form or substance to be made, then the

8  witness shall sign a statement reciting such changes

9  and the reasons given by the witness for making them;

10       That the witness' signature was/was not returned

11  as of _____.

12       Subscribed and sworn to on this _____ day of

13  _____, 20____.

14

15       _____
         Dana Shapiro
16       Illinois CSR 84-3597
         Expiration: 5/31/23
17       Magna Legal Services
         Firm Registration No. 633
18       1635 Market Street
         8th Floor
19       Philadelphia, PA 19103

20

21

22

23

24

25



# Exhibit 11

1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO            )
    ENTERO, ET AL.,               )
4           Plaintiffs,            )
                                   )
5   VS.                            ) CIVIL ACTION NO.
                                   ) 5:21-CV-844 (XR)
6   STATE OF TEXAS, ET AL.,        )
           Defendants.            )
7

8

9        _____

10                ORAL DEPOSITION OF

11                  SAMUEL TAYLOR

12                 MARCH 29, 2023

13       _____

14

15

16

17           ORAL DEPOSITION OF SAMUEL TAYLOR,

18   produced as a witness at the instance of the Defendants,

19   and duly sworn, was taken in the above-styled and

20   numbered cause on the 29th day of March, 2023, from

21   12:34 p.m. to 3:01 p.m., before JAZZMEN CANALES, CSR, in

22   and for the State of Texas, reported by machine

23   shorthand at 209 West 14th Street, Austin, Texas 78701,

24   pursuant to the Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.



```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        MS. NINA PERALES
          MALDEF
 4        110 Broadway, Suite 300
          San Antonio, Texas 78205
 5        210-224-5476
          E-mail:  nperales@maldef.org
 6
     FOR THE HOUSTON AREA URBAN LEAGUE PLAINTIFFS:
 7
          MR. VICTOR GENECIN (Via Videoconference)
 8        NAACP Legal Defense and Educational Fund, Inc.
          40 Rector Street, 5th Floor
 9        New York, New York 10006
          929-388-9246
10        E-mail:  vgenecin@naacpldf.org

11   FOR THE DEFENDANTS:

12        MS. KATHLEEN HUNKER
          MR. ETHAN SZUMANSKI
13        MR. ADAM BITTER
          Office of the Attorney General of Texas
14        P.O. Box 12548
          Austin, Texas 78711
15        512-936-2275
          E-mail:  kathleen.hunker@oag.texas.gov
16
     FOR THE UNITED STATES:
17
          MR. MICHAEL STEWART
18        MR. DANIEL FREEMAN
          MR. RICHARD DELLHEIM
19        U.S. Department of Justice
          950 Pennsylvania Avenue NW
20        Washington, D.C. 20530
          202-307-2767
21        E-mail:  michael.stewart3@usdoj.gov

22

23

24

25
```



1                           I N D E X

2                                                          PAGE

3     APPEARANCES.................................... 2

4     SAMUEL TAYLOR

5          Examination By Mr. Stewart................  5
           Examination By Ms. Perales............... 55
6

7     Changes and Signature Page ................... 100

8     Reporter's Certificate ....................... 102

9                         E X H I B I T S

10    NUMBER   DESCRIPTION                            PAGE

11    1        Notice                                 8

12    21       Press release                          43

13    22       State 137752                           50

14

15

16

17

18

19

20

21

22

23

24

25



OCA-APPX-0235

1   particular budget line item.  So, yeah, I couldn't -- I

2   couldn't break it down because it is all part of the

3   content development line item of the budget.

4        Q.  And so looking at the different forms of

5   content starting with TV.

6        A.  Uh-huh.

7        Q.  Were there -- TV, I assume they were

8   commercials?

9        A.  Yes.

10       Q.  Were there commercials that focused

11  specifically only on the mail ballot ID requirement?

12       A.  The commercials encompassed both ID

13  requirements, both the in-person and the mail ballot

14  voter ID requirements.

15       Q.  Were those separate commercials or one

16  commercial that encompassed it?

17       A.  It would be one commercial.  It was a 30-second

18  TV commercial, one in English and one in Spanish.  And

19  both of those commercials addressed both the in-person

20  voter ID requirement that there were seven forms of ID

21  that you could use and there were alternates --

22  alternative options if you didn't possess and couldn't

23  reasonably obtain one.  And then if you're eligible to

24  vote by mail, that you need to provide a number.  And it

25  gave the four -- essentially four different types of ID



1  numbers, and it showed pictures of them, where you need

2  to write one of those numbers on your application and

3  your carrier envelope.

4             And those four different types of ID

5  numbers were your Texas driver's license number, your

6  state ID number, your election identification

7  certificate number, or the last four digits of your

8  Social Security number.  And the -- the commercial

9  visually showed those four different types of ID numbers

10 so that the voters who were eligible to vote by mail and

11 were considering voting by mail knew that they had to

12 provide a number to identify themselves with voting by

13 mail.

14    Q.  Were there any specific geographic media

15 markets that were the focus of the TV campaign?

16    A.  There wasn't any specific geographic markets

17 that were focused on the -- we placed TV advertisements

18 in all Texas markets and as well as radio advertisements

19 as well.  So it's a state-wide campaign.  We can't pick

20 and choose favorites.  We have to -- we have to make

21 sure that all TV markets in the state of Texas were

22 covered.

23    Q.  Do you know whether the spending was about the

24 same across geographic media markets?

25             MS. HUNKER:  Objection.  Form.



1    Q.  So just to be clear, is there any specifically
2  directed toward counties?
3    A.  No.  That 3.5 million is -- is all appropriated
4  to our office.
5    Q.  Did any counties get in touch with you about
6  their own voter education efforts?
7    A.  Did they proactively reach out to me?
8    Q.  Right.
9    A.  No.  We heard about, you know, through news
10  articles or through media or word of mouth that counties
11  were doing their own versions of education campaigns to
12  varying degrees.  But I didn't really have a knowledge
13  of what counties were doing at the local level,
14  certainly not earlier in the year.  Later, we did make
15  available those -- in those printout pamphlets,
16  educational pamphlets in English and Spanish, we made
17  those available for free for counties so that they -- as
18  part of the collateral, which is part of the budget, of
19  this voter education campaign.
20            They print out physical materials to send
21  to these community events across the state.  We call it
22  the state-wide Texas grassroots tour.  And it would be
23  at community events, county fairs, senior expos,
24  concerts, cultural events, you know, farmers market,
25  flea markets, all these kinds of different events across



1  the state.  And we needed, you know, physical handouts
2  to hand out to people, one of which was a front and back
3  English and Spanish guide on the in-person voter ID
4  requirements.  And then another one was both an English
5  and Spanish pamphlet on the vote by mail ID
6  requirements, including all the information needed to
7  know about which ID numbers to provide on those -- on
8  those materials as well as where they can go track their
9  ballot and drove them to votetexas.gov to -- to get more
10 information.
11            But as part of that collateral development
12 and actually printing those materials, I made sure and I
13 asked our vendor specifically, please order an extra
14 stock so that if counties would like some additional
15 educational materials for them to give to their voters
16 or to have handy if voters have questions, that we can
17 give those materials, physical materials, to county
18 election offices to the extent that they request them.
19 And we -- I remember sending, or at least asking our
20 elections division, which they did, to send an e-mail
21 out to all county election officials saying, hey, we got
22 these materials available, please let us know if you
23 want any.  And a lot of the counties took us up on this.
24 A lot of the counties ordered those pamphlets for vote
25 by mail in English and Spanish, and we sent them in bulk



1 free copies of those so that they could distribute those

2 to voters who had questions or just make them available

3 at any community events or voter registration drives or

4 other kinds of events that they were doing.

5 So that was a way to sort of supplement the

6 grassroots activities that we were doing on our

7 campaign.  But making those available to the local

8 county officials was one way that we worked with them.

9 But as far as their money that was appropriated for

10 their own appropriations campaigns, I don't know

11 anything about what the counties did.  I just know what

12 we made available to them.

13 Q.  Besides the printouts and materials that you

14 just described, were there any other materials that the

15 SOS, you know, provided or made available to the

16 counties?

17 A.  As far as educational materials?

18 Q.  Educational materials, correct.

19 A.  I think -- I think those were the only ones

20 that we made available to them.  Of course, the digital

21 materials, we -- we had digital versions of all these

22 pamphlets, and, you know, made those available to them

23 to put on their websites.  Those were the only physical

24 materials that we made available to them.  But, of

25 course, we also -- similar mass e-mail out to counties



1                 CHANGES AND SIGNATURE

2   PAGE/LINE               CHANGE            REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____



1      I, SAMUEL TAYLOR, have read the foregoing
deposition and hereby affix my signature that same is
2 true and correct, except as noted above.

3                    _____
                     SAMUEL TAYLOR
4

5

6

7 THE STATE OF TEXAS)

8 COUNTY OF _____)

9      Before me, _____, on
this day personally appeared SAMUEL TAYLOR, known to me
10 (or proved to me under oath or through
_____) (description of identity card
11 or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged
12 to me that they executed the same for the purposes and
consideration therein expressed.

13

14      Given under my hand and seal of office
this _____ day of _____, 2023.

15

16

17

18

19

20                    _____
                     NOTARY PUBLIC IN AND FOR
21                   THE STATE OF TEXAS
                     MY COMMISSION EXPIRES:
22                   _____

23

24

25



```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO         )
      ENTERO, ET AL.,             )
 4           Plaintiffs,          )
                                  )
 5    VS.                         ) CIVIL ACTION NO.
                                  ) 5:21-CV-844 (XR)
 6    STATE OF TEXAS, ET AL.,     )
             Defendants.          )
 7

 8                 REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF
 9                     SAMUEL TAYLOR
                     MARCH 29, 2023
10

11              I, JAZZMEN CANALES, Certified Shorthand
      Reporter in and for the State of Texas, hereby certify
12    to the following:

13              That the witness, SAMUEL TAYLOR, was duly
      sworn by the officer and that the transcript of the oral
14    deposition is a true record of the testimony given by
      the witness;
15
                I further certify that pursuant to FRCP
16    Rule 30(f)(1) that the signature of the deponent

17      __X__ was requested by the deponent or a party
      before the completion of the deposition and returned
18    within 30 days from date of receipt of the transcript.
      If returned, the attached Changes and Signature Page
19    contains changes and the reasons therefor;

20      _____ was not requested by the deponent or a party
      before the completion of the deposition.
21
                I further certify that I am neither
22    attorney nor counsel for, related to, nor employed by
      any of the parties to the action in which this testimony
23    was taken.

24              Further, I am not a relative or employee
      of any attorney of record in this cause, nor do I have a
25    financial interest in the action.
```



1          Subscribed and sworn to on this _____ day
2    of _____, 2023.

3

4

5

6

7          JAZZMEN C. CANALES, Texas CSR 9344
           Expiration Date: 04/30/2025
8          MAGNA LEGAL SERVICES
           Firm Registration No. 633
9          1635 Market Street
           Suite 800
10         Philadelphia, Pennsylvania 19103
           Telephone:  866-624-6621
11         Facsimile:  215-207-9462

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Exhibit 12

Transcript of the Testimony of

**Isabel Longoria**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

1              IN THE UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF TEXAS

3                    SAN ANTONIO DIVISION

4

5    * * * * * * * * * * * * * * * * * * * * * * * * * *

6    LA UNION DEL PUEBLO ENTERO, et al *

7    v.                          *    CASE NO. 5:21-cv-844-XR

8    GREGORY W. ABBOTT, et al        *

9    * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al       *

11   v.                          *    CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al               *

13   * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al           *

15   v.                          *    CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al      *

17   * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al               *

19   v.                          *    CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al               *

21   * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al           *

23   v.                          *    CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al               *

25   * * * * * * * * * * * * * * * * * * * * * * * * * *

1  UNITED STATES OF AMERICA          *

2  v.                               *     CASE NO. 5:21-cv-1085-XR

3  THE STATE OF TEXAS, et al        *

4  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

5

6              ORAL AND VIDEOTAPED DEPOSITION OF

7                      ISABEL LONGORIA

8                      APRIL 20, 2022

9                      VOLUME 1 OF 2

10

11          Oral and videotaped deposition of Isabel Longoria,

12  produced as a witness at the instance of the plaintiffs, and duly

13  sworn, was taken in the above-styled and numbered cause on April

14  20, 2022, from 2:45 p.m. to 4:56 p.m., before Terrie Doyle

15  Escobar, CSR in and for the State of Texas, reported by oral

16  stenography, at the Office of the Texas Attorney General,

17  Consumer Protection Division, Houston Regional Office, 808 Travis

18  Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of

19  the Federal Rules of Civil Procedure.

20                      *    *    *    *    *

21  APPEARANCES:

22

23  FOR THE PLAINTIFFS:

24      MR. KENNETH E. BROUGHTON

25      REED SMITH, LLP

1        811 MAIN STREET, SUITE 1700

2        HOUSTON, TEXAS  77002

3        PHONE: 713-806-8434

4        EMAIL: kbroughton@reedsmith.com

5

6   FOR STATE DEFENDANTS:

7        MR. WILLIAM T. THOMPSON

8        OFFICE OF THE ATTORNEY GENERAL

9        DEPUTY CHIEF, SPECIAL LITIGATION UNIT

10       POST OFFICE BOX 12548

11       AUSTIN, TEXAS  78711

12       PHONE: 512-936-2567

13       EMAIL: will.thompson@oag.texas.gov

14

15  FOR DEFENDANT ISABEL LONGORIA:

16       MS. CHRISTINA BEELER

17       MR. JONATHAN FOMBONNE

18       OFFICE OF THE HARRIS COUNTY ATTORNEY

19       1019 CONGRESS PLAZA, 15TH FLOOR

20       HOUSTON, TEXAS  77002

21       PHONE: 713-274-5101

22       EMAIL: Jonathan.Fombonne@cao.hctx.net

23

24  FOR DEFENDANT YVONNE RAMON:

25       MS. JOSEPHINE RAMIREZ SOLIS (Present via Zoom)

1       OFFICE OF CRIMINAL DISTRICT ATTORNEY - HIDALGO COUNTY, TEXAS

2       CHIEF, CIVIL DIVISION

3       100 E. CANO

4       EDINBURG, TEXAS  78539

5       PHONE: 956-292-7609

6       EMAIL: josephine.ramirez@da.co.hidalgo.tx.us

7

8   FOR PLAINTIFFS LULAC TEXAS and VOTO LATINO:

9       MR. MIKE JONES (Present via Zoom)

10      ELIAS LAW GROUP, LLP

11      10 G ST. NE, STE. 600

12      WASHINGTON, D.C.  20002

13      PHONE: 202-985-1752

14      EMAIL: mjones@elias.law

15

16  FOR PLAINTIFF UNITED STATES OF AMERICA:

17      MR. L. BRADY BENDER (Present via Zoom)

18      UNITED STATES DEPARTMENT OF JUSTICE

19      CIVIL RIGHTS DIVISION, VOTING SECTION

20      PHONE: 202-353-5373

21      EMAIL: laura.bender@usdoj.gov

22

23  ALSO PRESENT:

24      MR. TERRY HARRISON, VIDEOGRAPHER

25

I N D E X

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . 2

DIRECT EXAMINATION BY MR. BROUGHTON . . . . . . . . . . . . 6

CHANGES AND SIGNATURE . . . . . . . . . . . . . . . . . 65

REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . . 67

E X H I B I T S

EXHIBIT LONGORIA 10:  CUMULATIVE REPORT - OFFICIAL, HARRIS

COUNTY, TEXAS - GENERAL AND SPECIAL ELECTIONS (11/3/2020) . . 14

EXHIBIT LONGORIA 11:  LETTERS FROM ISABEL LONGORIA TO TEXAS

STATE REPRESENTATIVES . . . . . . . . . . . . . . . . . 16

EXHIBIT LONGORIA 12:  LETTER FROM ISABEL LONGORIA TO TEXAS

SENATORS AND REPRESENTATIVES OF HARRIS COUNTY . . . . . . . 18

EXHIBIT LONGORIA 13:  EMAILS FROM CHRISTINA ADKINS

AND KEITH INGRAM . . . . . . . . . . . . . . . . . . . 33

EXHIBIT LONGORIA 14:  HOUSTON PUBLIC MEDIA ARTICLE . . . . . 56

1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  Good afternoon.  Today is

3    Wednesday, April 20, 2022.  We're on the record.  The time is

4    2:45.  Would counsel present state appearances, please.

5                    MR. BROUGHTON:  Kenneth Broughton, the firm of

6    Reed Smith, for the -- all plaintiffs.

7                    MS. BEELER:  Christina Beeler for the Harris

8    County Attorney's Office for defendant Isabel Longoria.

9                    MR. FOMBONNE:  Jonathan Fombonne, Harris County

10   Attorney's Office, also for Ms. Longoria.

11                   MR. THOMSON:  Will Thompson, Texas Attorney

12   General's Office representing the State defendants.

13                        Isabel Longoria,

14   having been first duly sworn, testified as follows:

15                      DIRECT EXAMINATION

16   BY MR. BROUGHTON:

17       Q.   Ms. Longoria, as I've said, my name is Kenneth

18   Broughton, and I represent -- and I'll tell you exactly who:  I'm

19   here on behalf, really, I think of all of the various plaintiffs

20   in these various lawsuits.  My specific clients are Houston

21   Justice, Houston Area Urban League, Delta Sigma Theta Sorority

22   Inc., The Arc of Texas, and Jeffrey Lamar Clements.  Okay?

23            So again, you know, anytime anybody needs a break, if

24   you'll just say so.  You've done a great job earlier today about

25   asking for rewording or repeating a question.  So don't hesitate.

1   information is hidden under that flap.  Voters don't see that

2   there's a space under the flap, don't know to include the

3   information under the flap, think that because they've included

4   that information on their application, they don't need to do it

5   on the carrier envelope, and so you have missing ID numbers for

6   that purpose.  And then that could be sent -- either sent back to

7   you if you get a mail ballot back.  Voters have expressed

8   frustrations at having to correct their mail ballots and having

9   to go through that process and some have not returned their mail

10  ballots because of that.

11          Let's keep moving forward.  So you've gone through all

12  of that process, again, assuming that the information in your

13  voter file is correct and matched up to your card, it requires

14  more time from our early voting ballot board and more resources

15  from our voter registration and mail ballot teams to research

16  someone's voter file to match those numbers; and then for the

17  early vote ballot board, to make those determinations if the

18  numbers match and then if the signatures match; further

19  complicated by the fact that if you are lacking a signature but

20  have an ID number that is correct, you by law can presume that

21  that mail ballot can be accepted, but even then it's a bit

22  ambiguous for the early voting ballot board, as I understand, on

23  when and how that should be applied.

24          Then assuming you don't match numbers, you have six

25  days in the cure period to then come in person or return by mail

1  your mail ballot.  But if you can't come in person and if you

2  can't return it by mail to cure your mail ballot, then you are

3  effectively kind of out of options to cure your mail ballot even

4  though you have the correct number, even though you could cure

5  it.  So ultimately leading to about 20 percent of mail ballots in

6  Harris County that were rejected by the early voting ballot board

7  because of lack of ID or ID curing issue.

8            I'm happy to repeat any of that for the reporter.

9       Q.   (Laughs.)

10      A.   I know that was quite a lengthy --

11      Q.   I have a question back to people being able to go

12  online and cure and things like that.  Has your office

13  experienced very many people who for whatever reason don't have a

14  computer or are not computer literate or that sort of thing?

15      A.   Yes.

16      Q.   Tell us about that.

17      A.   It tends to be older voters or voters without means who

18  more likely than not don't have access to a printer.  So they

19  might have access to the internet on their phone or get access to

20  internet through a community center or other means or may even

21  request that we print and send to them a mail ballot application.

22  But if you don't have a printer, then your option is to, you

23  know, call us or hope that another application has gotten to you

24  in some form.

25            And then postage, individuals may not be aware or be

1  able to go out and purchase postage to send back their

2  applications or mail ballots to our office.  I will say there's a

3  caveat that any election mail received by our office without

4  postage must be accepted by the U.S. Postal Service, but not all

5  voters are aware that they can send election mail in the post and

6  that it'll get to our office.

7      Q.   I wouldn't have known that either, just like the

8  buzzer.  (Laughs.)  Let's see here.

9      A.   Oh, and I believe -- sorry.  I misspoke earlier.  In

10  the cure process, yeah, I said in person or by mail.  Yeah, those

11  are the items -- options for curing.

12      Q.   How does a voter know if their vote-by-mail application

13  has been accepted?

14      A.   Either, one, you receive a mail ballot -- so you can

15  presume that your mail ballot application has been accepted --

16  you can call our office, mail ballot department, to check on the

17  status of your mail ballot application, you can visit the Harris

18  County website or the Texas Secretary of State website if you're

19  able to access either of those websites to see the status of your

20  application, or you'll receive a letter, phone call, or email

21  from us if there for any reason is a reason -- if your

22  application was not accepted.

23      Q.   What are the reasons a vote-by-mail application might

24  be denied?

25      A.   Oh, boy.  A vote-by-mail application can be denied for

1                    CHANGES AND SIGNATURE

2

3  WITNESS NAME:  Isabel Longoria

4  DATE OF DEPOSITION:  April 20, 2022 (Volume 1 of 2)

5  PAGE    LINE   CHANGE                           REASON

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1        I, Isabel Longoria, have read the foregoing deposition

2   and hereby affix my signature that same is true and correct,

3   except as noted above.

4

5                              _____

6                              Isabel Longoria

7

8

9   THE STATE OF TEXAS              *

10  COUNTY OF _____     *

11        Before me, _____, on this day

12  personally appeared Isabel Longoria, known to me or proved to me

13  under oath of through _____ to be the

14  person whose name is subscribed to the foregoing instrument and

15  acknowledged to me that they executed the same for the purposes

16  and consideration therein expressed.

17        Given under my hand and seal of office this _____ day

18  of _____, 2022.

19

20

21                              _____

22                              NOTARY PUBLIC IN AND FOR

23                              THE STATE OF TEXAS

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4

 5   * * * * * * * * * * * * * * * * * * * * * * * * * * *

 6   LA UNION DEL PUEBLO ENTERO, et al *

 7   v.                          *    CASE NO. 5:21-cv-844-XR

 8   GREGORY W. ABBOTT, et al     *

 9   * * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al       *

11   v.                          *    CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al              *

13   * * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al         *

15   v.                          *    CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al     *

17   * * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al              *

19   v.                          *    CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al              *

21   * * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al          *

23   v.                          *    CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al             *

25   * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

1   UNITED STATES OF AMERICA          *

2   v.                               *      CASE NO. 5:21-cv-1085-XR

3   THE STATE OF TEXAS, et al         *

4   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

5

6                       REPORTER'S CERTIFICATION

7                   ORAL AND VIDEOTAPED DEPOSITION OF

8                    ISABEL LONGORIA (VOLUME 1 OF 2)

9                          APRIL 20, 2022

10

11          I, Terrie Doyle Escobar, Certified Shorthand Reporter

12  in and for the State of Texas, hereby certify to the following:

13          That the witness, Isabel Longoria, was duly sworn by

14  the officer and that the transcript of the oral deposition is a

15  true record of the testimony given by the witness;

16          That the deposition transcript was submitted on

17  _____, 2022 to the witness or to the attorney

18  for the witness for examination, signature, and return to me by

19  _____, 2022;

20          That the amount of time used by each party at the

21  deposition is as follows:

22          Mr. Kenneth E. Broughton - 1:44 (1 hour, 44 minutes)

23          (All other parties used zero minutes.);

24          That pursuant to information given to the deposition

25  officer at the time said testimony was taken, the following

1  includes counsel for all parties of record:

2           Mr. Kenneth E. Broughton, Attorney for Plaintiffs; Mr.

3  Jonathan Fombonne and Ms. Christina Beeler, Attorneys for

4  Defendant Isabel Longoria; Mr. William T. Thompson, Attorney for

5  State Defendants; Ms. Josephine Ramirez Solis, Attorney for

6  Defendant Yvonne Ramon; Mr. Mike Jones, Attorney for Plaintiffs

7  LULAC Texas and Voto Latino; Mr. L. Brady Bender, Attorney for

8  Plaintiff United States of America;

9           I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties or attorneys in

11 the action in which this proceeding was taken, and further that I

12 am not financially or otherwise interested in the outcome of the

13 action.

14          Further certification requirements pursuant to Rule 203

15 of TRCP will be certified to after they have occurred.

16          Certified to by me this 27th day of May, 2022.

17

18

19          _____

20          TERRIE DOYLE ESCOBAR, Texas CSR #11099

21          Expiration Date: July 31, 2023

22          Firm Registration No. 11909

23          Steno Agency, Inc.

24          315 W. 9th Street, Suite 807

25          Los Angeles, California  90015

1          FURTHER CERTIFICATION UNDER RULE 203 TRCP

2          The original deposition was/was not returned to the

3   deposition officer on _____;

4          If returned, the attached changes and signature page

5   contains any changes and the reasons therefore;

6          If returned, the original deposition was delivered to

7   Mr. Kenneth E. Broughton, custodial attorney;

8          That $_____ is the deposition officer's charges to

9   the plaintiffs for preparing the original deposition transcript

10  and any copies of exhibits;

11         That the deposition was delivered in accordance with

12  Rule 203.3, and that a copy of this certificate was served on all

13  parties shown herein on and filed with the clerk.

14         Certified to by me this _____ day of _____,

15  2022.

16

17

18         _____

19         TERRIE DOYLE ESCOBAR, Texas CSR #11099

20         Expiration Date: July 31, 2023

21         Firm Registration No. 11909

22         Steno Agency, Inc.

23         315 W. 9th Street, Suite 807

24         Los Angeles, California  90015

25         Phone: 888-707-8366

# Exhibit 13

OCA-APPX-0262

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO          §
 4  ENTERO, et al.,              §
         Plaintiffs,             §
 5                               §
    v.                           §    Case No. 5:21-cv-844-XR
 6                               §
    GREGORY W. ABBOTT, et        §
 7  al.,                         §
         Defendants,             §
 8  _____  §
                                 §
 9                               §
    OCA-GREATER HOUSTON, et      §
10  al.,                         §
         Plaintiffs,             §
11                               §
    v.                           §    Case No. 1:21-cv-780-XR
12                               §
    JANE NELSON, et. al.,        §
13       Defendants,             §
                                 §
14  _____  §
                                 §
15  HOUSTON JUSTICE, et          §
    al.,                         §
16       Plaintiffs,             §
                                 §
17  v.                           §    Case No. 5:21-cv-848-XR
                                 §
18  GREGORY WAYNE ABBOTT,        §
    et al.,                      §
19       Defendants,             §
                                 §
20  _____  §
                                 §
21  LULAC Texas, et al.,         §
         Plaintiffs,             §
22                               §
    v.                           §    Case No. 1:21-cv-0786-XR
23                               §
    JANE NELSON, et al.,         §
24       Defendants,             §
                                 §
25  _____  §
```



```
 1   MI FAMILIA VOTA, et        §
     al.,                       §
 2        Plaintiffs,           §
                                §
 3   v.                         §   Case No. 5:21-cv-0920-XR
                                §
 4   GREG ABBOTT, et al.,       §
          Defendants.           §
 5

 6

 7

 8

 9              ORAL AND VIDEOTAPED DEPOSITION OF

10                      JENNIFER COLVIN

11                      MARCH 21, 2023

12

13

14

15        ORAL AND VIDEOTAPED DEPOSITION OF JENNIFER COLVIN,

16   produced as a witness at the instance of the Defendants

17   and duly sworn, was taken in the above styled and

18   numbered cause on Tuesday, March 21, 2023, from

19   12:20 p.m. to 3:43 p.m., before DONNA QUALLS, Notary

20   Public in and for the State of Texas, reported by

21   computerized stenotype machine, at the offices of Harris

22   County Attorney's Office, 1019 Congress Street, 15th

23   Floor, Houston, Texas, pursuant to the Federal Rules of

24   Civil Procedure, and any provisions stated on the record

25   or attached hereto.
```



```
 1                    A P P E A R A N C E S

 2

     FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
 3        SAMEER S. BIRRING
          TIFFANY BINGHAM
 4        OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
          D. MENEFEE
 5        1019 Congress, 15th Floor
          Houston, Texas  77002
 6        (713) 274-5142
          sameer.birring@harriscountytx.gov

 7

 8   FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
          JENNIFER A. HOLMES
 9        NAACP Legal Defense and Educational Fund, Inc.
          700 14th Street N.W., Suite 600
10        Washignton, District of Columbia  20005
          (347) 573-0197
11        jholmes@naacpldf.org

12

13   FOR THE UNITED STATES:
          DANA PAIKOWSKY
          U.S. DEPARTMENT OF JUSTICE
14        950 Pennsylvania Avenue, NW
          Washington, District of Columbia  20530
15        (202) 353-5225
          dana.paikowsky@usdoj.gov

16

17   FOR THE STATE DEFENDANTS:
          KATHLEEN T. HUNKER
18        OFFICE OF THE ATTORNEY GENERAL
          P.O. BOX 12548 (MC-009)
19        AUSTIN, TEXAS  78711-2548
          (512) 463-2100
20        kathleen.hunker@oag.texas.gov

21

     Also Present:
22        STEPHEN KENNY (Via Zoom)
          BRADLEY PROWANT (Via Zoom)
23        BREANNA WILLIAMS, NAACP (Via Zoom)
          CARRIE LEBEL (Via Zoom)
24        GERMAINE HABELL (Via Zoom)
          JOHN GORE, GOP (Via Zoom)
25        JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```



1    LEIGH TOGNETTI (Via Zoom)
     LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
2    LUCIA ROMANO (Via Zoom)
     MIKE STEWART, DOJ (Via Zoom)
3    URUJ SHEIKH, LDF (Via Zoom)
     ZACHARY DOLLING, TCRP, OCA (Via Zoom)
4    REGGIE WRIGHT, THE VIDEOGRAPHER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                           INDEX

2                                                       PAGE

3
        Appearances...................................   3
4

5    JENNIFER COLVIN

6    Examination by Ms. Hunker......................   7
     Examination by Ms. Paikowsky...................  47
7    Examination by Ms. Holmes......................  74
     Further Examination by Ms. Hunker..............  92

8

9    Corrections & Signature........................ 104

10
     Reporter's Certificate......................... 106
11

12                       EXHIBIT INDEX

13
     NUMBER          DESCRIPTION                      PAGE
14   Exhibit 11      Election reconciliation          24
                     official totals
15   Exhibit 12      Defendant Harris County          38
                     Elections Administrator,
16                   Clifford Tatum's responses and
                     objections to state defendants'
17                   second set of interrogatories,
                     and third set of requests for
18                   Production
     Exhibit 13      Ballot insert                    41
19   Exhibit 14      Ballot insert                    53
     Exhibit 15      Call log spreadsheet             77
20   Exhibit 16      Harris County Elections          89
                     Administrator, Clifford Tatum's
21                   supplemental responses to state
                     defendants' second set of
22                   interrogatories

23

24

25



1          Q.  (BY MS. HUNKER)  Sure.

2          A.  -- asking.

3          Q.  You are an offline county, correct?

4          A.  Correct.

5          Q.  And what is the system that y'all use?

6          A.  VOTEC.

7          Q.  Okay.  And so when you receive a application

8    for ballot by mail or a ballot, you mentioned that you

9    check to see whether or not the number is in the voter

10   record, correct?

11         A.  Correct.

12         Q.  And so you were looking at VOTEC -- what was it

13   again?

14         A.  VOTEC.

15         Q.  VOTEC.  You were looking at VOTEC system to

16   check the voter record; is that correct?

17         A.  Correct.

18         Q.  When you were making that check like when you

19   were looking at the record, were you noticing that fewer

20   voters did not have a -- either a driver's license ID

21   number or social security number?

22              MS. HOLMES:  Objection --

23         A.  In the voter management system.

24         Q.  (BY MS. HUNKER)  Yes.

25              MS. HOLMES:  Objection to form.



1    May location election; is that correct?

2         A.   I can't agree to that one.  I don't know that

3    percentage rate.

4         Q.   Okay.  And would you agree that Harris County

5    made significant progress in reducing the mail ballot

6    rejection rate between the primary and the November 2022

7    general election?

8                   MS. HOLMES:  Objection; form.

9                   MS. PAIKOWSKY:  Objection; form.

10                  MS. HUNKER:  You can --

11        A.   Yes.

12        Q.   (BY MS. HUNKER)  Was that a "yes"?

13        A.   Yes.

14        Q.   And how did Harris County work to reduce that

15   number?

16        A.   We inserted -- when we mailed out application

17   requests that voters called in -- request that

18   application, we sent out a flyer with it making sure

19   they knew they needed to include the new law

20   requirements for the ID.  We also did the same with the

21   ballot.

22        Q.   And did you notice that if your efforts

23   resonated with voters?

24                  MS. HOLMES:  Objection to form.

25                  MS. HUNKER:  Let me rephrase.



1      Q.   (BY MS. HUNKER)   Did you observe whether your

2   efforts at informing voters about the ID requirement

3   clarified any confusion that the voters may have had

4   about the requirement?

5                   MS. PAIKOWSKY:   Objection to form.

6      A.   I believe it did.

7      Q.   (BY MS. HUNKER)   And you can put this aside.

8   Going to introduce Exhibit No. 13.

9                   (Exhibit No. 13 was marked.)

10      Q.   (BY MS. HUNKER)   Do you have the exhibit in

11   front of you?

12      A.   I do.

13      Q.   And do you recognize this exhibit?

14      A.   I do.

15      Q.   And what is it?

16      A.   It's the insert for the ballot.

17      Q.   Okay.   And just for clarification of the

18   record, you'll see at the bottom there are Bates numbers

19   that say TATUM_005338.

20                   Did I read that correctly?

21      A.   Yes.

22      Q.   And so this is the insert that you put into

23   your balloting materials to inform voter of the ID

24   requirement; is that correct?

25      A.   Correct.



1      Q.  Is this different than the insert that you

2  included in the either primary elections or the runoff?

3      A.  It is --

4      Q.  And --

5      A.  Similar but different.

6      Q.  And what differences were made?

7      A.  We added a visual.  Like the section where

8  the -- this is the actual part of the ballot they have

9  to fill out; so they can reference it to the envelope.

10     Q.  And did you get any feedback from voters about

11 the change?

12     A.  No.

13     Q.  And if you turn the page over, you'll notice

14 that it is in a different language, correct?

15     A.  Correct.

16     Q.  And I believe you included inserts in -- you

17 had inserts for four different languages; is that right?

18     A.  Correct.

19     Q.  And that would have been English, Spanish,

20 Vietnamese, and Chinese; is that right?

21     A.  That's correct.

22     Q.  Did you provide inserts in any other language?

23     A.  Other than the four?

24     Q.  Yes.

25     A.  No.



1        Q.   Okay.  Did you...

2        A.   That's a different department.

3        Q.   Okay.  Do you know if you were able to -- when

4   you were checking the numbers, was able to access the

5   TEAM's system, if needed?

6        A.   Yes.

7        Q.   And so I had asked a couple of questions

8   regarding accommodation for disabilities with the last

9   witness, but she had mentioned she thought you would be

10  a better person with respect to the vote by mail.  And

11  so I'm going to ask these questions.  If you do not know

12  the answer, just state so.

13             You are aware --

14       A.   Oh --

15       Q.   -- voters with disabilities have the option of

16  requesting an accommodation or change to normal voting

17  procedures, correct?

18       A.   Correct.

19       Q.   To your knowledge, did your office receive any

20  requests for accommodation regarding the requirement

21  that mail-in voters put their social security number or

22  ID number on the application for ballot by mail?

23       A.   We did have some voters that couldn't come into

24  the building.  So we would take a clipboard and go out

25  to them.



 1   BY MS. PAIKOWSKY:

 2       Q.   Good afternoon, Ms. Colvin.

 3       A.   Hello.

 4       Q.   My name is Dana Paikowsky.  I am with the

 5   Department of Justice, and I'm going to pick up on the

 6   thread of asking you some questioning about mail voting

 7   during the November 2022 general election.  So to begin,

 8   during the last deposition, the person who testified on

 9   behalf of the Harris County election officials -- or

10   Election Administrator's Office testified that voters

11   had difficulty with SB1's mail ballot identification

12   requirement.

13            Was that still true during the

14   November 2022 general election?

15            MS. HUNKER:  Objection; form.  Lack of

16   foundation.

17       A.   Voters still did have issues as far as

18   providing the ID.  They would forget to put it on there,

19   or they didn't feel comfortable providing it even though

20   it was covered.

21       Q.   (BY MS. PAIKOWSKY)  Did any voters -- strike

22   that.

23            Were any voters confused -- sorry.  Strike

24   that.

25            Do you have any reason to believe that



1  voters were confused by SB1's mail ballot identification

2  provision during the November '21 -- November 2002

3  general election period?

4      A.  Yes.

5      Q.  And what gave you that impression?

6      A.  Because they would not realize that they need

7  to put it on there.  They feel like, if they put it on

8  their application, they didn't need to include it on the

9  ballot or vice versa.  They didn't feel like they needed

10 to include it on both.

11     Q.  Did any voters have difficulty during the

12 November 2022 general election with which ID they needed

13 to provide on either their ABBM or carrier envelope?

14     A.  Can you clarify your question?

15     Q.  Yes.  So did any voters have difficulty

16 either -- I'm sorry.  Scratch that.  Withdrawn.

17             So during the November 2022 general

18 election, did any voters have difficulty complying with

19 the identif- -- mail ballot identification requirement

20 because they put down the wrong ID number?

21     A.  We did have voters put down the wrong --

22 they -- what do you mean by wrong ID?  Let me clarify

23 that first.

24     Q.  What do you mean by wrong ID?

25     A.  Okay.  Wrong ID to me means they gave us the



1  them by the type of app because we have different

2  campaign apps that come in and the reason that they've

3  voting by mail so they can all be together.

4      Q.  And what do you do next?

5      A.  We get them in.  We barcode them.  We sort

6  them.  Then we image them.  And we put them in batches

7  of 25 for the processors to process.

8      Q.  And so what happens after that?

9      A.  We look them up in the voter management system

10  to see if they qualify.  We compare the IDs.  We make

11  sure the person -- if you can with read the signature --

12  the signature is the person that actually is on the app.

13  And then we enter them to receive a ballot if they're

14  good.

15      Q.  And how do you -- so -- so the first step you

16  mentioned was you look them up in the...

17      A.  V-Max.

18      Q.  V-Max.  And what is V-Max?

19      A.  It's the voter management system.

20      Q.  The voter management system.  And so how do you

21  look up the voter in the voter management system?

22      A.  Depending on the app.  Some apps come with a

23  barcode that's directly linked to the voter.  If not, we

24  look them up first name, last name, date of birth,

25  whatever information that we need to find them in the



1    system.

2        Q.  And after that, you look to see whether the

3    identification numbers match?

4        A.  Yes, in the voter file.

5        Q.  Has the process by which your office does this

6    intake changed -- has it changed since the March

7    primary?

8        A.  No.

9        Q.  So along the same lines, can you take me

10   through how your office -- and this is a question again

11   about the mechanical processing.  I know you talked a

12   little before about how EVBB's SV --

13       A.  C.

14       Q.  -- Cs process ballots when they come in.  At

15   what point in the process do either the SVBs [sic] or

16   the EVBBs look up a voter in the system?

17       A.  When they start verifying signatures, they'll

18   go into the ballot board module, and they can see the

19   voter's profile -- well, on the system itself, it shows

20   the voters -- each.  It's a list of 25 -- well, now

21   we're up to 100 voters per batch.  But it will list

22   their ID and -- any ID that's linked to them in the

23   system will be on their profile.

24       Q.  So taking a step back, how do you match a

25   ballot to a voter in the system?



1    A.  We image it.  And it's linked through a

2  barcode.

3    Q.  Through a barcode.  So the barcode identifies

4  which voter the ballot belongs to and pulls up that

5  voter's --

6    A.  The carrier envelope to be clear.  Not the

7  actual ballot.

8    Q.  Correct.

9    A.  Yeah.

10    Q.  Okay.  So there's a barcode that corresponds

11  between the carrier envelope and the voter itself, and

12  that automatically pulls up the voter's file, and that

13  allows you to compares the IDs?

14    A.  Well, that links the image to the voter's file.

15  And then when the ballot board goes in to view them,

16  that's where they compare the IDs.

17    Q.  Does your office use the driver's license and

18  SSN for any purpose beyond determining whether the mail

19  ballot can be accepted in light of Senate Bill 1?

20    A.  No.

21    Q.  Does your office use the driver's license or

22  social security number for any purpose beyond

23  determining whether an absentee ballot by mail request

24  form can be accepted in light of Senate Bill 1?

25    A.  As far as ballot by mail, no.



1    bring down the rejection rate further?

2         A.   Possibly.

3         Q.   And what would those be?

4         A.   I -- I -- can't speak on that right off the top

5    of my head.  It would have to be something we would

6    implement amongst our team.

7         Q.   Do you have any plans to take any additional

8    steps beyond those we've already discussed?

9         A.   Not at this point.

10        Q.   So you mentioned earlier that your office uses

11   the form provided by the secretary of state's office as

12   the ABBM form that you provide to voters.  Does that

13   form ask voters to provide either an ID number or a

14   social security for?

15        A.   It asks for them to provide the number, yes.

16        Q.   In the November 2022 general election, were

17   there voters who had an issue with their ballot, an ID

18   issue with their ballot, who did not provide a phone

19   number or an e-mail address?

20        A.   Yes.

21        Q.   How did you contact those voters to let them

22   know of the issue?

23        A.   Via mail.

24        Q.   Were there some voters you were not able to get

25   in touch with?



1              MS. HUNKER:  Objection; form.

2       A.  Not that I'm aware of.  Everybody received a

3  letter whether they got a phone call or an e-mail.

4       Q.  (BY MS. PAIKOWSKY)  In the November 2022

5  general election, were there voters who did not pick up

6  the phone when they were called, again, to deliver

7  notice that there was a ballot defect because of an ID

8  issue?

9       A.  Yes.

10      Q.  In the November 2022 general election, were

11 there voters in your county whose mail ballot rejection

12 notice could not be mailed until it was too late to cure

13 an ID issue?

14             MS. HUNKER:  Objection; form.

15      A.  No.

16      Q.  (BY MS. PAIKOWSKY)  You mentioned earlier that

17 there had been delay issues because of USPS during that

18 2022 general election.  Did that have any impact on the

19 time period that voters have to receive notice and cure

20 ABBM and ballot defects?

21      A.  I can answer from my own opinion, but I can't

22 speak -- I mean -- the local post office told us it

23 could take approximately ten days to deliver a local

24 piece of mail.

25      Q.  And what impact would that have on your ability



1    A.  Yes.

2    Q.  Okay.  And that states that the caller was

3  upset due to a -- "due to carrier envelope defect

4  letter.  And she stated she put her TDL and last four of

5  SSN on it and don't understand why it was rejected for a

6  third time.  Transferred to Desiree with VBM department

7  for answers."

8            Did I read that correctly?

9    A.  Yes.

10    Q.  Were you aware of any voters who had their

11  ballots rejected -- their ballot by mail rejected

12  multiple times due to ID issues?

13    A.  I'm aware --

14            MS. HUNKER:  Objection; form.

15    A.  I'm aware of instances where we -- at the -- we

16  would mail the ballot back to the voter because they

17  didn't include their ID, and they would mail it back

18  without the ID again.  And that's when they would be

19  switched to an E-7 status which allowed them the six

20  days to cure.  But we would call them and e-mail them

21  and mail them another letter stating you still didn't

22  provide your ID or they provide mixmatch ID.  They

23  provided one, and we didn't have it in our system.

24    Q.  (BY MS. HOLMES)  So sometimes the rejection

25  would happen more than once and you have to send it back



1  the November 2022 election and prior elections?

2       A.  SB1 law changes for the ID requirements.

3       Q.  In the process of enforcing SB1's ID

4  requirements in the November 2022 election, did your

5  office identify any instances of voter fraud?

6       A.  No.

7            MS. HOLMES:  Okay.  I think that is all for

8  me.

9            MS. PAIKOWSKY:  Do you want to --

10            MS. HOLMES:  Sorry.  I was going to ask to

11  go of the record for like two minutes and then I'll

12  probably be able to pass the witness.

13            THE VIDEOGRAPHER:  We are going off the

14  record at 3:15 p.m.

15            (Recess from 3:15 p.m. to 3:24 p.m.)

16            THE VIDEOGRAPHER:  We're back on the record

17  at 3:24 p.m.  Sorry.

18       Q.  (BY MS. HOLMES)  All right.  Ms. Colvin, I just

19  have two more questions for you.

20            With respect to voters whose ABB -- ABBMs

21  contained missing or mismatched ID numbers, is it

22  accurate to say that your office attempted to provide

23  every opportunity to cure if possible?

24       A.  Yes.

25       Q.  And with -- with respect to voters whose



1  carrier envelopes contained missing or mismatched ID

2  numbers, is it accurate to say that your office

3  attempted to provide every opportunity to cure?

4      A.  Yes.

5          MS. HOLMES:  That's it for me.

6          MS. PAIKOWSKY:  Do we have anybody on the

7  line who wants to ask any additional questions?

8              Hearing nothing --

9          MS. HUNKER:  Okay.

10         MS. PAIKOWSKY:  Should we go off the record

11 briefly and then back on?

12         MS. HUNKER:  We can to that.

13         MS. PAIKOWSKY:  Yeah.  Can we go off the

14 record just for one minute?

15         THE VIDEOGRAPHER:  We are going off the

16 record at 3:25 p.m.

17              (Recess from 3:25 p.m. to 3:27 p.m.)

18         THE VIDEOGRAPHER:  We are back on the

19 record at 3:27 p.m.

20                FURTHER EXAMINATION

21 BY MS. HUNKER:

22     Q.  All right.  Ms. Colvin, I shouldn't take too

23 long, but I wanted to touch base with you on a couple of

24 questions the other counsel asked as well as the

25 document that was issued during our lunch break.



1  you inform the secretary of state's office to update the

2  TEAM's database?

3      A.  No.

4      Q.  And do you know if there's -- if there's a

5  policy or procedure that perhaps your tech division has

6  with respect to updating?

7      A.  I don't know.

8      Q.  Okay.  If the county database only has one

9  number but the TEAM's database has two numbers and the

10  number the voter put is the one that was in the TEAM's

11  database but not the one in the county's database, you

12  would accept that ballot; is that correct?

13      A.  Correct.

14      Q.  There's an option for voters with disabilities

15  as well as voters over 65 to submit an application for

16  ballot by mail for the entire year, correct?

17      A.  Correct.  Annual.

18      Q.  And you've already started receiving annual

19  applications for the 2023?

20      A.  That's correct.

21      Q.  And did you notice fewer rejections for the

22  applications that were submitted this year due to the ID

23  mismatch or lack of ID as compared to previous elections

24  in 2022?

25      A.  I haven't analyzed that data, but we're



1      ERRATA PAGE

2   WITNESS NAME:  JENNIFER COLVIN     DATE:  03/21/2023

3   PAGE  LINE  CHANGE              REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24

25          _____



1       I, JENNIFER COLVIN, have read the foregoing
transcript and hereby affix my signature that same is
2  true and correct, except as noted above on the previous
pages(s), and that I am signing this before a Notary
3  Public

4
                              JENNIFER COLVIN
5

6  THE STATE OF              )
   COUNTY OF                  )
7

8
        Before me,                        , on this day
9  personally appeared, JENNIFER COLVIN, known to me or
proved to me under oath or through
10 (description of identity card or other document), to be
the person whose name is subscribed to the foregoing
11 instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
12 expressed.

13      Given under my hand and seal of office on this, the
_____ day of                        , 2023.
14

15

16                         Notary Public in and for
                           The State of Texas
17                         Commission Expires: _____

18

19

20

21

22

23

24

25



1           REPORTER'S CERTIFICATION
            ORAL DEPOSITION OF
2             JENNIFER COLVIN
           TAKEN MARCH 21, 2023
3

4

5           I, DONNA QUALLS, Shorthand Reporter and Notary

6   Public in and for the State of Texas, hereby certify to

7   the following:

8           That the witness, JENNIFER COLVIN, was duly

9   sworn by the officer and that the transcript of the oral

10  deposition is a true record of the testimony given by

11  the witness;

12          That the original deposition was delivered to

13  SAMEER S. BIRRING / KATHLEEN T. HUNKER;

14          That a copy of this certificate was served on

15  all parties and/or the witness shown herein on

16  _____.

17          I further certify that pursuant to FRCP No.

18  30(f)(i) that the signature of the deponent was

19  requested by the deponent or a party before the

20  completion of the deposition and that the signature is

21  to be returned within 30 days from date of receipt of

22  the transcript.  If returned, the attached Changes and

23  Signature Page contains any changes and the reasons

24  therefor.

25          I further certify that I am neither counsel



1    for, related to, nor employed by any of the parties in

2    the action in which this proceeding was taken, and

3    further that I am not financially or otherwise

4    interested in the outcome of the action.

5            Certified to by me this 10th day of

6    April, 2023.

7

8

9    _____

10    DONNA QUALLS
      Notary Public in and for
      The State of Texas

11    My Commission expires 11/06/2026

12    Magna Legal Services
      Firm Registration No. 633

13    16414 San Pedro, Suite 900
      San Antonio, Texas 78232

14    (210) 697-3400

15

16

17

18

19

20

21

22

23

24

25



# Exhibit 14

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO            §
 4  ENTERO, et al.,                §
         Plaintiffs,               §
 5                                 §
    v.                             §   Case No. 5:21-cv-844-XR
 6                                 §
    GREGORY W. ABBOTT, et          §
 7  al.,                           §
         Defendants,               §
 8  _____    §
                                   §
 9                                 §
    OCA-GREATER HOUSTON, et        §
10  al.,                           §
         Plaintiffs,               §
11                                 §
    v.                             §   Case No. 1:21-cv-780-XR
12                                 §
    JANE NELSON, et. al.,          §
13       Defendants,               §
                                   §
14  _____    §
                                   §
15  HOUSTON JUSTICE, et            §
    al.,                           §
16       Plaintiffs,               §
                                   §
17  v.                             §   Case No. 5:21-cv-848-XR
                                   §
18  GREGORY WAYNE ABBOTT,          §
    et al.,                        §
19       Defendants,               §
                                   §
20  _____    §
                                   §
21  LULAC Texas, et al.,           §
         Plaintiffs,               §
22                                 §
    v.                             §   Case No. 1:21-cv-0786-XR
23                                 §
    JANE NELSON, et al.,           §
24       Defendants,               §
                                   §
25  _____    §
```



```
 1   MI FAMILIA VOTA, et        §
     al.,                       §
 2        Plaintiffs,           §
                                §
 3   v.                         §   Case No. 5:21-cv-0920-XR
                                §
 4   GREG ABBOTT, et al.,       §
          Defendants.           §
 5

 6

 7

 8

 9              ORAL AND VIDEOTAPED DEPOSITION OF

10                      RACHELLE OBAKOZUWA

11                       MARCH 21, 2023

12

13

14

15        ORAL AND VIDEOTAPED DEPOSITION OF RACHELLE

16   OBAKOZUWA, produced as a witness at the instance of the

17   Defendants and duly sworn, was taken in the above styled

18   and numbered cause on Tuesday, March 21, 2023, from

19   3:51 p.m. to 6:44 p.m., before DONNA QUALLS, Notary

20   Public in and for the State of Texas, reported by

21   computerized stenotype machine, at the offices of Harris

22   County Attorney's Office, 1019 Congress Street, 15th

23   Floor, Houston, Texas, pursuant to the Federal Rules of

24   Civil Procedure, and any provisions stated on the record

25   or attached hereto.
```



```
 1              A P P E A R A N C E S

 2

    FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
 3       SAMEER S. BIRRING
         TIFFANY BINGHAM
 4       OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
         D. MENEFEE
 5       1019 Congress, 15th Floor
         Houston, Texas  77002
 6       (713) 274-5142
         sameer.birring@harriscountytx.gov

 7

 8  FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
         JENNIFER A. HOLMES
 9       NAACP Legal Defense and Educational Fund, Inc.
         700 14th Street N.W., Suite 600
10       Washignton, District of Columbia  20005
         (347) 573-0197
11       jholmes@naacpldf.org

12

    FOR THE UNITED STATES:
13       DANA PAIKOWSKY
         U.S. DEPARTMENT OF JUSTICE
14       950 Pennsylvania Avenue, NW
         Washington, District of Columbia  20530
15       (202) 353-5225
         dana.paikowsky@usdoj.gov

16

17  FOR THE STATE DEFENDANTS:
         KATHLEEN T. HUNKER
18       OFFICE OF THE ATTORNEY GENERAL
         P.O. BOX 12548 (MC-009)
19       AUSTIN, TEXAS  78711-2548
         (512) 463-2100
20       kathleen.hunker@oag.texas.gov

21

    Also Present:
22       STEPHEN KENNY (Via Zoom)
         BRADLEY PROWANT (Via Zoom)
23       BREANNA WILLIAMS, NAACP (Via Zoom)
         CARRIE LEBEL (Via Zoom)
24       GERMAINE HABELL (Via Zoom)
         JOHN GORE, GOP (Via Zoom)
25       JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```



```
 1    LEIGH TOGNETTI (Via Zoom)
      LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
 2    LUCIA ROMANO (Via Zoom)
      MIKE STEWART, DOJ (Via Zoom)
 3    URUJ SHEIKH, LDF (Via Zoom)
      REGGIE WRIGHT, THE VIDEOGRAPHER
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



OCA-APPX-0292

```
 1                          INDEX

 2                                                    PAGE

 3
         Appearances...................................    3
 4

 5   RACHELLE OBAKOZUWA

 6   Examination by Ms. Hunker......................    7
     Examination by Ms. Paikowsky..................   56
 7   Examination by Ms. Holmes.....................   65
     Further Examination by Ms. Hunker.............   88
 8

 9   Corrections & Signature.......................   98

10
     Reporter's Certificate........................  100
11

12                      EXHIBIT INDEX

13
     NUMBER          DESCRIPTION                      PAGE
14   Exhibit 17      Report to secretary of state,     47
                     dated 12/08/2022
15   Exhibit 18      PowerPoint presentation, dated    79
                     03/29/2022
16   Exhibit 19      Oath of assistance                83
     Exhibit 20      Oath of assistance and            84
17                   interpreter

18

19

20

21

22

23

24

25
```



 1   criminal investigations that you're asking.  I mean,
 2   you're asking whether we're investigating ballot issues
 3   that are subject to potential criminal investigations.
 4   So I would just instruct her not to answer.
 5        Q.  (BY MS. HUNKER)  Are you going to take the
 6   advice of your counsel?
 7        A.  Yes.
 8        Q.  Okay.  And then the other question, do you know
 9   when this segment of this postelection report would be
10   updated?  And when I say this section, I mean
11   specifically the ballot paper supply issue.
12        A.  No.
13        Q.  Okay.  Then we can put these aside.
14             And so the last thing I want to talk to you
15   about is actually going to be in Exhibit 4.  It'll be
16   voter education.
17        A.  You said Exhibit 4?
18        Q.  Yeah.  And so based on my reading on Exhibit 4,
19   it sounded as if Harris County engaged in a robust
20   public -- public awareness campaign for the
21   November 2022 general election.  Is that fair to say?
22        A.  Yes.
23        Q.  And as part of your public information
24   campaign, did you also communicate the ID requirements
25   for ballots by mail?



1        A.   Yes.

2        Q.   And how did you go about informing voters of

3   these requirements?

4        A.   We produced videos and publications that were

5   shared through social media, radio, television, and

6   distribution through community groups.

7        Q.   And did you engage in -- did you -- like

8   engagement events or community engagement events?

9        A.   Yes.

10        Q.   And were discussions about the ID requirements

11   held at these community engagement events?

12        A.   Yes.

13        Q.   And these were held throughout Harris County,

14   correct?

15        A.   Correct.

16        Q.   So I see a list of organizations on pages 4, 5,

17   and partly 6.  Are these a list of organizations where

18   you had community engagement events?

19        A.   Yes.

20        Q.   Is this a complete list or this just a sort of

21   sampling?

22        A.   I believe this is complete list.

23        Q.   And did you get any feedback from voters about

24   your outreach program?

25        A.   I am not aware.



1      Q.  Okay.  And did you receive any feedback from

2   the organizations about your community engagement

3   events?

4      A.  Not that I'm aware of.

5      Q.  Okay.  Did you receive any feedback from other

6   community groups, not necessarily the ones regarding --

7   that you held of -- the community engagement event with?

8      A.  We attempted to reach multiple community

9   groups, and so we received feedback from some that they

10  were not available or not interested.

11     Q.  And do you know if voters -- if your

12  outreach -- let me -- let me rephrase the question.

13          Are you aware if voters -- strike that.

14          Based on any feedback you received from

15  your public information campaign, did you find that it

16  helped voters alleviate their confusion regarding their

17  ID requirements?

18          MS. HOLMES:  Objection to form.

19     A.  Some.

20     Q.  (BY MS. HUNKER)  Can you elaborate at all?

21     A.  We still received ballots that are incorrectly

22  submitted without sufficient information -- the ballot

23  by mail.  So they're either not seeing the campaign or

24  the campaign didn't address them specifically in a way

25  that was successful.



1    Q.  You described some voter education efforts that

2    your office engaged in around Senate Bill 1's

3    identification provision.  Why did you undertake those

4    efforts?

5    A.  There were voter questions and confusion about

6    why their ballots weren't being counted -- or why their

7    ballots were being rejected.  I apologize.  And -- and

8    the -- there were changes that SB1 had that we knew

9    would affect every voter who was voting by mail.

10   Q.  And do you anticipate needing to continue to

11   do -- maintain these efforts in future elections?

12   A.  Yes.

13   Q.  Earlier you testified that SB1 necessitated an

14   increase in temporary and full-time staff.  Why is that?

15   A.  There are a lot of implications for SB1.  With

16   the rejection of mail ballots, there has to be more

17   communication to voters.  So it takes more bodies to

18   create that communication to send items to the voters,

19   and there's a higher rate of transaction.  So it

20   requires more workers.

21          Additionally, SB1 affected some of our

22   staffing for election workers.  And so that was one of

23   the reasons recruitment efforts had to increase.  So we

24   had to have more staff for that.  And there are more

25   procedural-type questions and calls that we get.  So our



1  call center and help line had to increase staff as well.

2       Q.  Were there increased needs in -- for resources

3  dedicated to voter outreach and education related to

4  implementing Senate Bill 1's identification provision?

5       A.  And are we specifically speaking about the

6  period for November or prior to March?

7       Q.  Let's talk about just November for the moment.

8       A.  We increased the quantity of voter outreach

9  persons to go to it -- these community events to

10 communicate about these -- the changes to SB1.  Yes, for

11 both elections.

12      Q.  And do you believe those increased needs are

13 going to continue on in future elections as well?

14      A.  Yes.

15      Q.  Why is that?

16      A.  There's still confusion and there's still --

17 there are still issues with person's ballots, mail

18 ballots being rejected.

19      Q.  Did you ever have any communications with the

20 secretary of state's office about what kind of voter

21 education efforts your county should undertake related

22 to SB1's identification provision?

23      A.  Our communications team reached out to

24 secretary of state's office about how to engage with

25 voters without it appearing as soliciting which would be



1    A.  I can't think of any.  For voter education,

2  it's very broad.  So I don't know that the little we've

3  discussed is the whole realm of that.  But if you're

4  looping all voter education in one, then I cannot think

5  of anything else.

6    Q.  So earlier -- and -- and I know you had spoken

7  to counsel about the range of voter education efforts

8  you had engaged in related to the identification

9  provision which included making videos, doing community

10  meetings.  Is there anything else that I'm missing in

11  terms of buckets of efforts or -- or -- or types of

12  outreach that you engaged in?

13    A.  In the Exhibit 4, there's reference to an

14  organization -- I think it's called KGB that we worked

15  with to do a lot of outreach for us.  And that was --

16  that outreach was very broad.  It touched every type of

17  communication method that we know of.  So that would be

18  the only thing that I would add that there are many

19  things that they did for us to communicate.

20    Q.  Could you provide a list of examples of the

21  kinds of communications that they engaged in?  It

22  doesn't have to be exhaustive but just anything we

23  haven't discussed.

24    A.  I believe I've -- and I believe I've mentioned

25  them all, but I know there was radio, television.



 1   Billboards, I think was one that I didn't state.  Social

 2   media, different platforms there, other online

 3   advertising -- not advertising but other online

 4   platforms.  And that's really all that I can recall at

 5   this time, but I believe the majority of them are listed

 6   in Exhibit 4.

 7        Q.  Do you believe that there's anything your

 8   office could have done beyond what it did in the 2022

 9   general election to bring down rejection rates further?

10             MS. HUNKER:  Objection; form.

11        A.  No.

12        Q.  (BY MS. PAIKOWSKY)  Do you know approximately

13   how much the contract with KGB cost?

14        A.  No.  Our office has those figures.  I just

15   didn't look.

16        Q.  Thanks very much.  So we have a number of

17   questions about the team database.  Is that something

18   you work with at all?

19        A.  No.

20        Q.  Okay.  One last question.  Oh, I'm so sorry.

21   I'm just drowning in papers here.  I want to pull out

22   exhibit -- here we go -- Exhibit 16.

23             Do you have that in front of you?

24        A.  I believe this is it, but it could be a 14.

25        Q.  I think that's right.  So it reads at the top



1        ERRATA PAGE

2 WITNESS NAME: RACHELLE OBAKOZUWA  DATE: 03/21/2023

3 PAGE LINE CHANGE      REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24

25   _____



 1      I, RACHELLE OBAKOZUWA, have read the foregoing
transcript and hereby affix my signature that same is
 2   true and correct, except as noted above on the previous
pages(s), and that I am signing this before a Notary
 3   Public

 4
                         RACHELLE OBAKOZUWA
 5

 6   THE STATE OF            )
     COUNTY OF                 )
 7

 8
          Before me,                      , on this day
 9   personally appeared, RACHELLE OBAKOZUWA, known to me or
     proved to me under oath or through
10   (description of identity card or other document), to be
     the person whose name is subscribed to the foregoing
11   instrument and acknowledged to me that they executed the
     same for the purposes and consideration therein
12   expressed.

13        Given under my hand and seal of office on this, the
     _____ day of                      , 2023.
14

15

16                       Notary Public in and for
                         The State of Texas
17                       Commission Expires: _____

18

19

20

21

22

23

24

25



OCA-APPX-0202

```
1                    REPORTER'S CERTIFICATION
                        ORAL DEPOSITION OF
2                      RACHELLE OBAKOZUWA
                      TAKEN MARCH 21, 2023
3

4

5              I, DONNA QUALLS, Shorthand Reporter and Notary

6   Public in and for the State of Texas, hereby certify to

7   the following:

8              That the witness, RACHELLE OBAKOZUWA, was duly

9   sworn by the officer and that the transcript of the oral

10  deposition is a true record of the testimony given by

11  the witness;

12             That the original deposition was delivered to

13  SAMEER S. BIRRING / KATHLEEN T. HUNKER;

14             That a copy of this certificate was served on

15  all parties and/or the witness shown herein on

16  _____.

17             I further certify that pursuant to FRCP No.

18  30(f)(i) that the signature of the deponent was

19  requested by the deponent or a party before the

20  completion of the deposition and that the signature is

21  to be returned within 30 days from date of receipt of

22  the transcript.  If returned, the attached Changes and

23  Signature Page contains any changes and the reasons

24  therefor.

25             I further certify that I am neither counsel
```



1   for, related to, nor employed by any of the parties in

2   the action in which this proceeding was taken, and

3   further that I am not financially or otherwise

4   interested in the outcome of the action.

5           Certified to by me this 10th day of

6    April, 2023.

7

8

9   _____

10   DONNA QUALLS
    Notary Public in and for
    The State of Texas

11   My Commission expires 11/06/2026

12   Magna Legal Services
    Firm Registration No. 633

13   16414 San Pedro, Suite 900
    San Antonio, Texas 78232

14   (210) 697-3400

15

16

17

18

19

20

21

22

23

24

25



# Exhibit 15

```
 1            IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3
    LA UNIÓN DEL PUEBLO          §
 4  ENTERO, ET AL.,              §
          PLAINTIFFS,            §
 5                               §
    V.                           §  CASE NO. 5:21-cv-844-XR
 6                               §
    TEXAS, ET AL.,               §
 7       DEFENDANTS.             §
    ------------------------------------------------------
 8  OCA-GREATER HOUSTON,         §
    ET AL.,                      §
 9       PLAINTIFFS,             §
                                 §
10  V.                           §  CASE NO. 1:21-cv-0780-XR
                                 §
11  TEXAS SECRETARY OF STATE     §
    JOHN SCOTT, ET AL,           §
12       DEFENDANTS.             §
    ------------------------------------------------------
13  HOUSTON AREA URBAN LEAGUE,   §
    ET AL.,                      §
14       PLAINTIFFS,             §
                                 §
15  V.                           §  CASE NO. 5:21-cv-0848-XR
                                 §
16  GREGORY WAYNE ABBOTT,        §
    ET AL.,                      §
17       DEFENDANTS.             §
    ------------------------------------------------------
18  LULAC TEXAS, ET AL.,         §
         PLAINTIFFS,             §
19                               §
    V.                           §  CASE NO. 1:21-cv-0786-XR
20                               §
    JOHN SCOTT, ET AL.,          §
21       DEFENDANTS.             §
    ------------------------------------------------------
22  MI FAMILIA VOTA, ET AL.,     §
         PLAINTIFFS,             §
23                               §
    V.                           §  CASE NO. 5:21-cv-0920-XR
24                               §
    GREG ABBOTT, ET AL.,         §
25       DEFENDANTS.             §
    ------------------------------------------------------
```

1  UNITED STATES OF AMERICA,     §
          PLAINTIFF,             §
2                                §
   V.                            § CASE NO. 5:21-cv-1085-XR
3                                §
   THE STATE OF TEXAS,           §
4  ET AL.,                       §
          DEFENDANTS.            §
5  ********************************************************

6                ORAL 30(b)(6) DEPOSITION OF

7            TRAVIS COUNTY CLERK REPRESENTATIVE

8            TESTIMONY OF BRIDGETTE ESCOBEDO

9                     MAY 11, 2022

10                  (Reported remotely)

11  ********************************************************

12

13            ORAL DEPOSITION OF BRIDGETTE ESCOBEDO,

14  produced as a witness at the instance of the Plaintiff

15  OCA-Greater Houston, and duly sworn, was taken in the

16  above-styled and numbered cause on the 11th day of

17  May, 2022, from 10:11 a.m. to 4:27 p.m., reported

18  remotely via Zoom, before MICHELLE CARVER, CSR, in and

19  for the State of Texas, reported by oral stenograph in

20  Travis County, Texas, pursuant to the Federal Rules of

21  Civil Procedure, the current Emergency Order regarding

22  the COVID-19 State of Disaster, and the provisions

23  stated on the record or attached hereto.

24

25



```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF OCA-GREATER HOUSTON:

 3              LIA SIFUENTES DAVIS  (Appeared remotely)
                LISA SNEAD  (Appeared remotely
 4              DISABILITY RIGHTS TEXAS
                2222 West Braker Lane
 5              Austin, Texas 78758
                ldavis@drtx.org
 6

 7   FOR THE PLAINTIFF TRAVIS COUNTY:

 8              PATRICK POPE  (Appeared remotely)
                TRAVIS COUNTY ATTORNEY'S OFFICE
 9              314 West 11th Street, Suite 500
                Austin, Texas 78701
10              patrick.pope@traviscountytx.gov

11   FOR THE PLAINTIFF LULAC TEXAS:

12              GRAHAM WHITE  (Appeared remotely)
                ELIAS LAW GROUP LLP
13              10 G Street NE, Suite 600
                Washington, D.C. 20002
14              gwhite@elias.law

15   FOR THE STATES DEFENDANTS:

16              KATHLEEN T. HUNKER  (Appeared remotely)
                AARON BARNES  (Appeared remotely)
17              OFFICE OF THE ATTORNEY GENERAL
                P.O. Box 12548
18              Austin, Texas 78711
                kathleen.hunker@oag.texas.gov
19              aaron.barnes@oag.texas.gov

20   FOR THE DEFENDANT THE UNITED STATES:

21              BRADY BENDER  (Appeared remotely)
                CAMRYN PAK  (Appeared remotely)
22              UNITED STATES DEPARTMENT OF JUSTICE
                950 Pennsylvania Avenue NW
23              Washington, D.C. 20530
                laura.bender@usdoj.gov
24

25
```



 1                    APPEARANCES CONTINUED

 2   ALSO PRESENT:

 3             SHIRA WAKSCHLAG   (Appeared remotely)

 4             VICTORIA FILOSO   (Appeared remotely)

 5             JOSEPHINE RAMIREZ   (Appeared remotely)

 6             LEIGH TOGNETTI   (Appeared remotely)

 7             SARAH CHEN   (Appeared remotely)

 8             ZACHARY DOLLING   (Appeared remotely)

 9             SUSAN MIZNER   (Appeared remotely)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          INDEX

2                                                    PAGE

3   Appearances .................................    3

4   Exhibits ....................................    6

5   BRIDGETTE ESCOBEDO

6       Examination by Ms. Sifuentes Davis .......    8

7       Examination by Mr. White .................   49

8       Examination by Ms. Bender ................  108

9       Examination by Ms. Hunker ................  115

10      Further Examination by Mr. White .........  213

11  Reporter's Certificate ......................  221

12  Attached to the end of the transcript:  Stipulations

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                          EXHIBITS

 2    NUMBER     DESCRIPTION                              PAGE

 3      1        Notice of Deposition ...............      10

 4      2        Senate Bill 1 ......................      17

 5      3        Chapter 64.036 of the Texas Election
                 Code ...............................     125
 6
        4        Election Advisory 2022-8 ...........     139
 7
        5        Election Advisory 2022-12 ..........     153
 8
        6        Photograph .........................     193
 9
        7        Rule 11 Agreement Between Relators
10               and Respondent .....................     196

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1      A.   We would reject the application.

2      Q.   Did you let the voter know that the

3  application had been rejected?

4      A.   Yes.  We would send them a new -- a new

5  application, and then we would include the Secretary

6  of State's form to notify the voter that they had been

7  rejected.

8      Q.   Did you provide anything else in that

9  rejection to assist the voter in filling out the form

10 correctly?

11     A.   No.

12     Q.   What forms of communication did you have

13 with voters regarding the rejection?

14     A.   We sent them something in the mail.  So we

15 communicated by mail and over the phone if we had

16 their contact information on the application.

17     Q.   You would call them on the phone?

18     A.   Yes, if they provided their phone number.

19     Q.   Let's look at page 35, which is Section 503

20 on this page.  Are you familiar with this provision?

21     A.   Yes.

22     Q.   Does this provision have to do with what is

23 required to be on the application form for an early

24 ballot by mail?

25     A.   Yes.



1  information?  I understand other counties testified

2  that they put a flyer in that rejection.  Did Travis

3  County include any additional information?

4       A.   Not initially.  We have now but not

5  initially.

6       Q.   At what point did Travis County start

7  putting in additional information?

8       A.   Just recently.

9       Q.   When you say "recently," do you mean --

10      A.   In the last month, I believe, we got

11  approval from the Secretary of State to include an

12  insert.

13      Q.   Was that before the March 2022 primary?

14      A.   No.

15      Q.   It was for the May 7th election?

16      A.   Yes.  It was our understanding we could not

17  include anything additional.

18      Q.   Who was it that advised you you could not

19  include anything additional?

20      A.   It was our understanding through the

21  advisories that the SOS issued.

22      Q.   And what was the process by which you

23  received approval from the Secretary of State to

24  include additional information in the correspondence?

25      A.   We sent -- I sent an -- an e-mail to the



1  director -- the legal director at the SOS and got

2  approval.

3       Q.   And did they provide that approval in

4  writing?

5       A.   Yes.

6       Q.   Was that in the form of an e-mail?

7       A.   Yes.

8       Q.   In the May 7th election, how many

9  rejections -- well, you may not be prepared to testify

10 on this; so if this is a question for someone else,

11 let me know.  But in the May 7th election, how many

12 rejections were provided the additional information

13 that was approved by the Secretary of State's Office?

14      A.   For the application or for the ballot?

15      Q.   For the application.

16      A.   Right about 11 -- approximately 11 percent.

17      Q.   And do you know the percentage for the

18 ballots?

19      A.   It's around 3 percent.

20      Q.   How would the voter know that their

21 application to vote by mail was rejected?

22      A.   We would contact the voter via phone or hard

23 copy mail or e-mail if they provided that address.

24      Q.   Let's look at page 38, which I think is the

25 page you're probably already on --



1      A.   Uh-huh.

2      Q.   -- Section 507.  What is your understanding

3 of Section 507?

4      A.   If the information doesn't match, we reject

5 the application.  If the information that the voter

6 provides -- either their driver's license or the last

7 four of their social -- if it doesn't match what's in

8 the database, we reject the application.

9      Q.   Did Travis County develop policies on how to

10 implement this section of SB 1?

11      A.   Travis County didn't, but the Secretary of

12 State did.

13      Q.   And Travis County implemented those

14 policies?

15      A.   Yes.

16      Q.   Did Travis County have to implement any new

17 procedures or policies as a result of 5.07?

18      A.   Travis County specifically, yes.

19      Q.   And what were those policies that were

20 implemented?

21      A.   The workflow having to keep track of the

22 rejections -- the rejected applications and the

23 accepted applications and the ballots accepted and

24 rejected as well.

25      Q.   So tell me a little bit about that workflow



1  in terms of what was the process for a ballot that

2  came in that did not have the matching number?

3      A.   So if we had contact information for the

4  voter, we would reach out and contact them via phone

5  or e-mail.  If they did not, then we would send them a

6  letter in the mail.

7      Q.   And do you know how often the voter would

8  contact you as a result of the letter or phone call?

9      A.   There were several voters that contacted us.

10     Q.   Is it fair to say that not every voter you

11 communicated with by mail or phone you were able to

12 reach?

13             MS. HUNKER:  Objection.  Form.

14             MR. POPE:  Objection.  Form.

15     A.   That's correct.

16     Q.   For those voters, was the result that they

17 did not vote?

18     A.   Some, yes.

19             MS. HUNKER:  Objection.  Form.

20     Q.   So let's talk about the voters that you did

21 get in touch with.  When you had that contact, what

22 was the next step in terms of the information you

23 provided to the voter?

24     A.   We would tell them -- we would inform them

25 that we did not have the matching number in our



1  database, and we would instruct them on how to go

2  about and cure or fix the problem.

3       Q.   Did voters ever have problems curing their

4  ballots?

5                 MR. POPE:  Objection.  Form.

6                 MS. HUNKER:  Objection.  Form.

7       A.   Yes.

8       Q.   What were some of the problems that they had

9  in curing their ballots?

10      A.   Some of them were not computer -- were not

11 proficient in their computer skills.  Some of them

12 didn't understand the process or what was required of

13 them to -- to do on their end to cure their ballot.

14      Q.   You mentioned that some were not computer

15 literate.  Was there an option for them to cure their

16 ballot in person?

17      A.   They could cancel their application or -- or

18 go into a polling location and vote provisionally.

19      Q.   And that would require them being able to

20 access the polling place, either through

21 transportation or a ride through some other --

22      A.   Yes.

23      Q.   Do you know if there were voters who didn't

24 have access to a computer or transportation to be able

25 to cure their ballot?



1      A.   Yes.

2      Q.   What happened with those voters?

3      A.   Some of those voters just didn't vote.

4      Q.   You also mentioned that there were voters

5  that didn't understand the process.  Can you explain

6  to me a little bit more about the difficulties they

7  had in understanding the process?

8      A.   They -- they didn't understand why they had

9  to do it.  We explained to them there was a new law

10 that required this, and they just could not -- or

11 comprehend as to why this was in effect.

12     Q.   Were some of those voters not unable to cure

13 their ballots?

14     A.   Some of them were.

15     Q.   Let's look at Section 508, which is on the

16 next page, page 39.  Can you tell me what this section

17 has to do with?  What does this section do?

18     A.   It says that the carrier envelope has to

19 have a plastic that covers the -- the PII or the

20 personal identification, the driver's license, or the

21 last four of the social.  Then it says that they have

22 to sign that they have not received a number if they

23 haven't gotten one by DPS or Social Security.

24     Q.   Do you know anything about the font size of

25 the information on the carrier envelope?



1      A.   That the voter has an opportunity to correct
2 their defect (audio distortion) their ballot.
3             THE COURT REPORTER:  I'm sorry.  Could
4 you repeat that?  You cut out a little bit on me.
5      A.   That the voter has the opportunity to
6 correct their defect.
7             THE COURT REPORTER:  Thank you.
8      Q.   What was the process by which Travis County
9 implemented the defect correction portion?
10      A.   So we would reach out to the voter and --
11 and make contact with them and give them -- you know,
12 help them along in the process and tell them they had
13 to take this action in order for their ballot to
14 count.
15      Q.   Can you tell me about some of the specific
16 voters that your office spoke with who had issues
17 correcting their ballots?
18             MS. HUNKER:  Objection.  Form.
19      A.   There were some.  I don't -- I was not
20 specifically on the phone with the voters, but it was
21 told to me by my staff that, you know, elderly voters
22 didn't -- did not want to cure or did not understand
23 as to why they had to provide their socials or their
24 driver's licenses.
25      Q.   So is it fair to say that people had



1   read it out loud:  The early voting clerk is

2   authorized to remove the secrecy flap on a return

3   carrier envelope to facilitate the processing and

4   review of voted mail ballots.

5          Did I read that correctly?

6      A.   Yes.

7      Q.   So does your office follow that procedure?

8      A.   We do.

9      Q.   And did you follow this procedure for the

10  March 1st primary?

11     A.   Yes.

12     Q.   And did you follow it for the May 7th

13  election?

14     A.   Yes.

15     Q.   And are you intending to follow this

16  procedure for the upcoming election?

17     A.   Yes.

18     Q.   And then do you see where it says:

19  Returning the carrier envelope to the voter?

20     A.   Yes.

21     Q.   The paragraph reads:  If the early voting

22  clerk discovers that the carrier envelope is missing

23  the voter's signature, has an incomplete signature,

24  has missing or incomplete witness or assist

25  information, or has missing or incorrect personal



1  identification information, the early voting clerk may

2  deliver the carrier envelope in person or by mail to

3  the voter so that the voter may correct the defect.

4          Did I read that correctly?

5      A.   Yes.

6      Q.   My question for you is:  How does Travis

7  County contact the voter?

8      A.   So if there's contact -- if we have contact

9  information, we will send them an e-mail or call them

10 on the phone or send them a form in the mail.

11     Q.   Okay.  Now, if you notice it says the early

12 voting clerk may deliver the carrier envelope in

13 person then.  Has Travis County done that?

14     A.   No.

15     Q.   And let's move on to the next paragraph

16 where the sentence begins with "upon receipt."  It's

17 in the middle of the paragraph.

18     A.   Okay.

19     Q.   It says:  Upon the receipt of the carrier

20 envelope, the voter may correct the defect immediately

21 and surrender the carrier envelope to the early voting

22 clerk personnel.

23          Did I read that correctly?

24     A.   Yes.

25     Q.   And if I remember -- understand correctly,



```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
      LA UNIÓN DEL PUEBLO          §
 4    ENTERO, ET AL.,              §
           PLAINTIFFS,             §
 5                                 §
      V.                           § CASE NO. 5:21-cv-844-XR
 6                                 §
      TEXAS, ET AL.,               §
 7         DEFENDANTS.             §
      -----------------------------------------------------
 8    OCA-GREATER HOUSTON,         §
      ET AL.,                      §
 9         PLAINTIFFS,             §
                                   §
10    V.                           § CASE NO. 1:21-cv-0780-XR
                                   §
11    TEXAS SECRETARY OF STATE     §
      JOHN SCOTT, ET AL,           §
12         DEFENDANTS.             §
      -----------------------------------------------------
13    HOUSTON AREA URBAN LEAGUE,§
      ET AL.,                      §
14         PLAINTIFFS,             §
                                   §
15    V.                           § CASE NO. 5:21-cv-0848-XR
                                   §
16    GREGORY WAYNE ABBOTT,        §
      ET AL.,                      §
17         DEFENDANTS.             §
      -----------------------------------------------------
18    LULAC TEXAS, ET AL.,         §
           PLAINTIFFS,             §
19                                 §
      V.                           § CASE NO. 1:21-cv-0786-XR
20                                 §
      JOHN SCOTT, ET AL.,          §
21         DEFENDANTS.             §
      -----------------------------------------------------
22    MI FAMILIA VOTA, ET AL.,     §
           PLAINTIFFS,             §
23                                 §
      V.                           § CASE NO. 5:21-cv-0920-XR
24                                 §
      GREG ABBOTT, ET AL.,         §
25         DEFENDANTS.             §
      -----------------------------------------------------
```

```
1   UNITED STATES OF AMERICA, §
          PLAINTIFF,           §
2                              §
    V.                         § CASE NO. 5:21-cv-1085-XR
3                              §
    THE STATE OF TEXAS,        §
4   ET AL.,                    §
          DEFENDANTS.          §
5
                    REPORTER'S CERTIFICATION
6                 ORAL 30(b)(6) DEPOSITION OF
            TRAVIS COUNTY CLERK REPRESENTATIVE
7                    BRIDGETTE ESCOBEDO
                       MAY 11, 2022
8                   (Reported remotely)
```

9           I, MICHELLE CARVER, Certified Shorthand
Reporter in and for the State of Texas, hereby certify
10  to the following:

11          That the witness, BRIDGETTE ESCOBEDO,
were duly sworn by the officer and that the transcript
12  of the oral deposition is a true record of the
testimony given by the witnessed;

13          I further certify that pursuant to FRCP
14  Rule 30(b)(5) that the signature of the deponent:

15          ____ was requested by the deponent or a
party before the completion of the deposition and that
16  the signature is to be before any notary public and
returned within 30 days from date of receipt of the
17  transcript.  If returned, the attached Changes and
Signature Page contains any changes and the reasons
18  therefor;

19          _X__ was not requested by the deponent
or a party before the completion of the deposition.
20

21          I further certify that I am neither
counsel for, related to, nor employed by any of the
22  parties or attorneys in the action in which this
proceeding was taken, and further that I am not
23  financially or otherwise interested in the outcome of
the action.

24

25



800.211.DEPO (3376)
EsquireSolutions.com

1              Sworn to by me this _____ day of

2    _____, 2021.

3

4

5

6

7    _____
     MICHELLE CARVER, TEXAS CSR 11870
8    Expiration Date:  2-28-2023
     Esquire Deposition Solutions
9    1700 Pacific Avenue, Suite 1000
     Dallas, Texas 75204
10   Firm Registration No. 286

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    Reference No.: 8226480

2

3    Case:  LA UNIÓN DEL PUEBLO ENTERO V. TEXAS

4
          DECLARATION UNDER PENALTY OF PERJURY
5
          I declare under penalty of perjury that
6    I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
7    same has been read to me, and the same is
     true and accurate, save and except for
8    changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
9    hereof, with the understanding that I offer
     these changes as if still under oath.

10

11          _____

12          Bridgette Escobedo

13

14          NOTARIZATION OF CHANGES

15               (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                   Notary Public,

24

25   in and for the State of _____



1   Reference No.: 8226480
    Case:  LA UNIÓN DEL PUEBLO ENTERO V. TEXAS
2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24
    SIGNATURE:_____DATE:_____
25  Bridgette Escobedo



1  Reference No.: 8226480
   Case:  LA UNIÓN DEL PUEBLO ENTERO V. TEXAS
2

3  Page No._____Line No._____Change to:_____

4  _____

5  Reason for change:_____

6  Page No._____Line No._____Change to:_____

7  _____

8  Reason for change:_____

9  Page No._____Line No._____Change to:_____

10 _____

11 Reason for change:_____

12 Page No._____Line No._____Change to:_____

13 _____

14 Reason for change:_____

15 Page No._____Line No._____Change to:_____

16 _____

17 Reason for change:_____

18 Page No._____Line No._____Change to:_____

19 _____

20 Reason for change:_____

21 Page No._____Line No._____Change to:_____

22 _____

23 Reason for change:_____

24

   SIGNATURE:_____DATE:_____
25 Bridgette Escobedo



# Exhibit 16

**In the Matter Of:**

LA UNIÓN DEL PUEBLO ENTERO V. TEXAS

5:21-cv-844-XR

---

**CHARLTON JOHNSON**

*May 11, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

OCA-APPX-0329

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
    LA UNIÓN DEL PUEBLO          §
 4  ENTERO, ET AL.,             §
         PLAINTIFFS,            §
 5                              §
    V.                          §  CASE NO. 5:21-cv-844-XR
 6                              §
    TEXAS, ET AL.,              §
 7       DEFENDANTS.            §
    ----------------------------------------------------------
 8  OCA-GREATER HOUSTON,        §
    ET AL.,                     §
 9       PLAINTIFFS,            §
                                §
10  V.                          §  CASE NO. 1:21-cv-0780-XR
                                §
11  TEXAS SECRETARY OF STATE    §
    JOHN SCOTT, ET AL,          §
12       DEFENDANTS.            §
    ----------------------------------------------------------
13  HOUSTON AREA URBAN LEAGUE,  §
    ET AL.,                     §
14       PLAINTIFFS,            §
                                §
15  V.                          §  CASE NO. 5:21-cv-0848-XR
                                §
16  GREGORY WAYNE ABBOTT,       §
    ET AL.,                     §
17       DEFENDANTS.            §
    ----------------------------------------------------------
18  LULAC TEXAS, ET AL.,        §
         PLAINTIFFS,            §
19                              §
    V.                          §  CASE NO. 1:21-cv-0786-XR
20                              §
    JOHN SCOTT, ET AL.,         §
21       DEFENDANTS.            §
    ----------------------------------------------------------
22  MI FAMILIA VOTA, ET AL.,    §
         PLAINTIFFS,            §
23                              §
    V.                          §  CASE NO. 5:21-cv-0920-XR
24                              §
    GREG ABBOTT, ET AL.,        §
25       DEFENDANTS.            §
    ----------------------------------------------------------
```

```
 1  UNITED STATES OF AMERICA,  §
          PLAINTIFF,           §
 2                             §
    V.                         §  CASE NO. 5:21-cv-1085-XR
 3                             §
    THE STATE OF TEXAS,        §
 4  ET AL.,                    §
          DEFENDANTS.          §
 5  ********************************************************
 6                ORAL 30(b)(6) DEPOSITION OF
 7           TRAVIS COUNTY CLERK REPRESENTATIVE
 8             TESTIMONY OF CHARLTON JOHNSON
 9                     MAY 11, 2022
10                  (Reported remotely)
11  ********************************************************
12
13                ORAL DEPOSITION OF CHARLTON JOHNSON,
14  produced as a witness at the instance of the Plaintiff
15  OCA-Greater Houston, and duly sworn, was taken in the
16  above-styled and numbered cause on the 11th day of
17  May, 2022, from 5:51 p.m. to 6:29 p.m., reported
18  remotely via Zoom, before MICHELLE CARVER, CSR, in and
19  for the State of Texas, reported by oral stenograph in
20  Travis County, Texas, pursuant to the Federal Rules of
21  Civil Procedure, the current Emergency Order regarding
22  the COVID-19 State of Disaster, and the provisions
23  stated on the record or attached hereto.
24
25
```



1                        APPEARANCES

2   FOR THE PLAINTIFF OCA-GREATER HOUSTON:

3           LIA SIFUENTES DAVIS  (Appeared remotely)
            LISA SNEAD  (Appeared remotely
4           DISABILITY RIGHTS TEXAS
            2222 West Braker Lane
5           Austin, Texas 78758
            ldavis@drtx.org

6

7   FOR THE PLAINTIFF TRAVIS COUNTY:

8           PATRICK POPE  (Appeared remotely)
            TRAVIS COUNTY ATTORNEY'S OFFICE
9           314 West 11th Street, Suite 500
            Austin, Texas 78701
10          patrick.pope@traviscountytx.gov

11  FOR THE PLAINTIFF LULAC TEXAS:

12          GRAHAM WHITE  (Appeared remotely)
            ELIAS LAW GROUP LLP
13          10 G Street NE, Suite 600
            Washington, D.C. 20002
14          gwhite@elias.law

15  FOR THE STATES DEFENDANTS:

16          KATHLEEN T. HUNKER  (Appeared remotely)
            AARON BARNES  (Appeared remotely)
17          OFFICE OF THE ATTORNEY GENERAL
            P.O. Box 12548
18          Austin, Texas 78711
            kathleen.hunker@oag.texas.gov
19          aaron.barnes@oag.texas.gov

20  FOR THE DEFENDANT THE UNITED STATES:

21          BRADY BENDER  (Appeared remotely)
            CAMRYN PAK  (Appeared remotely)
22          UNITED STATES DEPARTMENT OF JUSTICE
            950 Pennsylvania Avenue NW
23          Washington, D.C. 20530
            laura.bender@usdoj.gov

24

25



1                    APPEARANCES CONTINUED

2   ALSO PRESENT:

3            SHIRA WAKSCHLAG  (Appeared remotely)

4            VICTORIA FILOSO  (Appeared remotely)

5            JOSEPHINE RAMIREZ  (Appeared remotely)

6            LEIGH TOGNETTI  (Appeared remotely)

7            SARAH CHEN  (Appeared remotely)

8            ZACHARY DOLLING  (Appeared remotely)

9            SUSAN MIZNER  (Appeared remotely)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          INDEX

2                                                     PAGE

3   Appearances ...................................     3

4   CHARLTON JOHNSON

5         Examination by Ms. Sifuentes Davis .......     6

6         Examination by Ms. Hunker ................    24

7   Reporter's Certificate .......................    32

8   Attached to the end of the transcript:  Stipulations

9

10                        EXHIBITS

11  NUMBER     DESCRIPTION                             PAGE

12     1        Notice of Deposition ...............     8

13

14

15

16

17

18

19

20

21

22

23

24

25



1  information that they put on their application.

2      Q.   And how would you review to make sure that

3  they are a registered voter?

4      A.   Using the Travis County voter registration

5  system.

6      Q.   And what things would you check using the

7  Travis County voter registration system?

8      A.   Check their name and date of birth, locate a

9  voter ID number, and verify that they were an active

10 voter in Travis County.

11     Q.   And before SB 1, did Travis County have any

12 problems identifying who was requesting a mail-in

13 ballot?

14          MS. HUNKER:  Objection.  Form.

15     Q.   You can answer.

16     A.   Typically, not depending on if the requester

17 filled in enough information in which to determine who

18 the voter was.

19     Q.   And so is it fair to say that if an

20 application to vote by mail had lacked information, it

21 was more likely to be rejected; is that correct?

22     A.   That's correct.

23     Q.   And you said that you would then review that

24 they are a registered voter, and then the next step

25 would be what?



```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3
      LA UNIÓN DEL PUEBLO           §
 4    ENTERO, ET AL.,               §
            PLAINTIFFS,             §
 5                                  §
      V.                            §  CASE NO. 5:21-cv-844-XR
 6                                  §
      TEXAS, ET AL.,                §
 7          DEFENDANTS.             §
      ------------------------------------------------------
 8    OCA-GREATER HOUSTON,          §
      ET AL.,                       §
 9          PLAINTIFFS,             §
                                    §
10    V.                            §  CASE NO. 1:21-cv-0780-XR
                                    §
11    TEXAS SECRETARY OF STATE      §
      JOHN SCOTT, ET AL,            §
12          DEFENDANTS.             §
      ------------------------------------------------------
13    HOUSTON AREA URBAN LEAGUE,    §
      ET AL.,                       §
14          PLAINTIFFS,             §
                                    §
15    V.                            §  CASE NO. 5:21-cv-0848-XR
                                    §
16    GREGORY WAYNE ABBOTT,         §
      ET AL.,                       §
17          DEFENDANTS.             §
      ------------------------------------------------------
18    LULAC TEXAS, ET AL.,          §
            PLAINTIFFS,             §
19                                  §
      V.                            §  CASE NO. 1:21-cv-0786-XR
20                                  §
      JOHN SCOTT, ET AL.,           §
21          DEFENDANTS.             §
      ------------------------------------------------------
22    MI FAMILIA VOTA, ET AL.,      §
            PLAINTIFFS,             §
23                                  §
      V.                            §  CASE NO. 5:21-cv-0920-XR
24                                  §
      GREG ABBOTT, ET AL.,          §
25          DEFENDANTS.             §
      ------------------------------------------------------
```

```
 1  UNITED STATES OF AMERICA,  §
           PLAINTIFF,          §
 2                             §
    V.                         §  CASE NO. 5:21-cv-1085-XR
 3                             §
    THE STATE OF TEXAS,        §
 4  ET AL.,                    §
           DEFENDANTS.         §
 5
                  REPORTER'S CERTIFICATION
 6              ORAL 30(b)(6) DEPOSITION OF
            TRAVIS COUNTY CLERK REPRESENTATIVE
 7                   CHARLTON JOHNSON
                      MAY 11, 2022
 8                  (Reported remotely)

 9              I, MICHELLE CARVER, Certified Shorthand
    Reporter in and for the State of Texas, hereby certify
10  to the following:

11              That the witness, CHARLTON JOHNSON,
    were duly sworn by the officer and that the transcript
12  of the oral deposition is a true record of the
    testimony given by the witnessed;

13
                I further certify that pursuant to FRCP
14  Rule 30(b)(5) that the signature of the deponent:

15              ____ was requested by the deponent or a
    party before the completion of the deposition and that
16  the signature is to be before any notary public and
    returned within 30 days from date of receipt of the
17  transcript.  If returned, the attached Changes and
    Signature Page contains any changes and the reasons
18  therefor;

19              _X__ was not requested by the deponent
    or a party before the completion of the deposition.
20

21              I further certify that I am neither
    counsel for, related to, nor employed by any of the
22  parties or attorneys in the action in which this
    proceeding was taken, and further that I am not
23  financially or otherwise interested in the outcome of
    the action.
24

25
```



1        Sworn to by me this _____ day of

2  _____, 2022.

3

4

5

6

7        _____
         MICHELLE CARVER, TEXAS CSR 11870
8        Expiration Date:  2-28-2023
         Esquire Deposition Solutions
9        1700 Pacific Avenue, Suite 1000
         Dallas, Texas 75204
10       Firm Registration No. 286

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

1   Reference No.: 8226480

2

3   Case:  LA UNIÓN DEL PUEBLO ENTERO V. TEXAS

4

        DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that
6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the
7   same has been read to me, and the same is
    true and accurate, save and except for
8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET
9   hereof, with the understanding that I offer
    these changes as if still under oath.

10

11            _____

12            Charlton Johnson

13

14            NOTARIZATION OF CHANGES

15                 (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                        Notary Public,

24

25  in and for the State of _____



```
Reference No.: 8226480
Case:  LA UNIÓN DEL PUEBLO ENTERO V. TEXAS


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____
Charlton Johnson
```



OCA-APPX-0340

```
 1   Reference No.: 8226480
     Case:  LA UNIÓN DEL PUEBLO ENTERO V. TEXAS
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Charlton Johnson
```



# Exhibit 17

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, ET AL.,)(
           Plaintiffs,                  )(
 4                                      )(   Case No.:
     V.                                 )(   5:21-cv-0844-XR
 5                                      )(
     TEXAS, ET AL.,                     )(
 6         Defendants.                  )(
     _____
 7
     OCA-GREATER HOUSTON, ET AL.,       )(
 8         Plaintiffs,                  )(
                                        )(
 9   V.                                 )(   Case No.:
                                        )(   1:21-cv-0780-XR
10   TEXAS SECRETARY OF STATE           )(
     JANE NELSON, ET AL.,               )(
11         Defendants.                  )(
     _____
12
     HOUSTON AREA URBAN LEAGUE, ET AL., )(
13         Plaintiffs,                  )(
                                        )(   Case No.:
14   V.                                 )(   5:21-cv-0848-XR
                                        )(
15   GREGORY WAYNE ABBOTT, ET AL.,      )(
           Defendants.
16   _____

17   LULAC TEXAS, ET AL.,               )(
           Plaintiffs,                  )(
18                                      )(   Case No.:
     V.                                 )(   1:21-cv-0786-XR
19                                      )(
     JANE NELSON, ET AL.,               )(
20         Defendants.                  )(
     _____
21
     MI FAMILIA VOTA, ET AL.,           )(
22         Plaintiffs,                  )(
                                        )(   Case No.:
23   V.                                 )(   5:21-cv-0920-XR
                                        )(
24   GREG ABBOTT, ET AL.,               )(
           Defendants.                  )(
25   _____
```



1 │ THE UNITED STATES OF AMERICA,        )(
   │      Plaintiff,                      )(
2 │                                       )(   Case No.
   │ V.                                    )(   5:21-cv-1085-XR
3 │                                       )(
   │ STATE OF TEXAS, ET AL.,              )(
4 │      Defendants.                      )(

5 │ ********************************************************

6 │                ORAL 30(b)(6) DEPOSITION OF

7 │              TRAVIS COUNTY CLERK'S OFFICE

8 │                 TESTIMONY OF DAN HAYES

9 │                    March 29, 2023

10 │ ********************************************************

11 │

12 │

13 │                ORAL DEPOSITION OF DAN HAYES,

14 │ produced as a witness at the instance of the

15 │ Consolidated Plaintiffs, and duly sworn, was taken in

16 │ the above-styled and numbered cause on the 29th day of

17 │ March, 2023, from 9:04 a.m. to 10:34 a.m., before

18 │ STEPHANIE DAVIS, CSR, in and for the State of Texas,

19 │ reported by oral stenograph, at the Travis County

20 │ Attorney's Office, 314 West 11th Street, Fifth Floor,

21 │ Austin, Texas, pursuant to the Federal Rules of Civil

22 │ Procedure and the provisions stated on the record or

23 │ attached herein.

24 │

25 │



1                   A P P E A R A N C E S

2   FOR TEXAS CIVIL RIGHTS PROJECT:

3              ZACHARY DOLLING
               HANI MIRZA
4              VERONIKAH WARMS
               1405 Montopolis Drive
5              Austin, Texas  78741
               zachary@texascivilrightsproject.org
6              hani@texascivilrightsproject.org
               veronikah@texascivilrightsproject.org
7
    FOR THE U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS
8   DIVISION:
               DANA PAIKOWSKY
9              JOHN SULLIVAN BAKER (Appeared Remotely)
               Robert F. Kennedy Building
10             950 Pennsylvania Avenue, Northwest
               Washington, DC 20530
11             dana.paikowsky@usdoj.gov
               john.bakersullivan@usdoj.gov
12
    FOR OCA-GREATER HOUSTON, ET AL.:
13
               KENNETH BROUGHTON (Appeared Remotely)
14             REED SMITH, LLP
               811 Main Street, Suite 1700
15             Houston, Texas  77002-6110
               kbroughton@reedsmith.com
16
    FOR ATTORNEY GENERAL KEN PAXTON:
17
               WILLIAM D. WASSDORF
18             AARON BARNES
               ASSISTANT ATTORNEY GENERAL
19             PO Box 12548
               Austin, Texas  78711-2548
20             will.wassdorf@oag.texas.gov
               aaron.barnes@aog.texas.gov
21
    FOR HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE:
22
               ANNE CRISP (Appeared Remotley)
23             BUTLER SNOW, LLP
               1400 Lavaca Street, Suite 1000
24             Austin, Texas 78701
               anne.crisp@butlersnow.com
25



```
 1   FOR THE STATE OF TEXAS; GREG ABBOTT, IN HIS OFFICIAL
     CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN HER
 2   OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
     WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE
 3   TEXAS ATTORNEY GENERAL:
     ALSO PRESENT:
 4
             LOUIS J. CAPOZZI (Appeared Remotely)
 5           JONES DAY
             51 Louisiana Avenue, Northwest
 6           Washington, DC  20001
             lcapozzi@jonesday.com
 7
     FOR DAN HAYES, CHARLIE JOHNSON, AND BRIDGETTE
 8   ESCABEDO, IN THEIR OFFICIAL CAPACITIES AS TRAVIS
     COUNTY CLERKS AND DISTRICT ATTORNEY, RESPECTIVELY:
 9
             ANTHONY J. NELSON
10           PATRICK T. POPE
             TRAVIS COUNTY ASSISTANT COUNTY ATTONEY
11           314 West 11th Street, Fifth Floor
             Austin, Texas  78767
12           tony.nelson@traviscountytx.gov
             patrick.pope@traviscountytx.gov
13
14   FOR HIDALGO COUNTY ELECTIONS ADMINISTRATOR DELIA
     GARZA:
15
             LEIGH ANN TOGNETTI (Appeared Remotely)
16           ASSISTANT DISTRICT ATTORNEY
             100 East Cano, First Floor
17           Hidalgo County Courthouse Annex III
             Edinburg, Texas  78539
18           leigh.tognetti@da.co.hidalgo.tx.us
19   ALSO PRESENT:
20           GABE HODGE, paralegal for Mr. Nelson
21
22
23
24
25
```



```
 1                        I N D E X

 2                                                      PAGE

 3   Appearances ................................    3

 4   CHARLIE JOHNSON
     Examination by Mr. Dolling ..................    7
 5   Examination by Ms. Paikowsky ................   30
     Further Examination by Mr. Dolling ..........   40
 6   Examination by Mr. Wassdorf ................   41
     Further Examination by Mr. Dolling ..........   56
 7   Further Examination by Ms. Paikowsky ........   57
     Further Examination by Mr. Wassdorf .........   58
 8
     Changes and Signature Page ..................   61
 9
     Reporter's Certificate ......................   64
10

11                     E X H I B I T S

12   NUMBER    DESCRIPTION                           PAGE

13     1       Second Amended Notice of Rule 30(b)(6)
               Deposition of the Office of the Travis
14             County Clerk .......................    9

15     2       State's Defendants' Cross Notice of
               Intent to Take Oral and Videotaped
16             Deposition of the Office of the Travis
               County Clerk, Pursuant to Rule 30(b)(6)   47
17

18

19

20

21

22

23

24

25
```



1                    EXAMINATION

2  BY MS. PAIKOWSKY:

3       Q.   I'm Dana Paikowsky for the United States

4  this morning.  Thank you for taking the time to

5  testify.  I similarly just want to take a couple

6  minutes to get a sense of whether or not you have

7  knowledge about some things or whether someone else

8  would be the right person.  So are you involved in

9  voter education efforts related to mail voting at all?

10       A.   I am.

11       Q.   Can you describe to me what kinds of voter

12  education efforts your office made during the November

13  2022 general election?

14       A.   As mentioned before, we did social media

15  posts, we provided notices -- I don't want to say

16  "notices," that's a legal term -- but those

17  high-viz -- neon paint, neon yellow, orange,

18  whatever -- pieces of paper highlighting the

19  requirements for ballot-by-mail.  Also, we do post on

20  where voting locations are, times, things like that.

21       Q.   So I'm specifically interested in voter

22  education around the ID provision in mail voting.

23       A.   Uh-huh.

24       Q.   Were there any efforts that you made to

25  educate voters around that provision specifically?



1          A.    Yes.

2          Q.    And are those efforts the same as you

3    previously described?

4          A.    Yes.

5          Q.    In those outreach and education efforts

6    during the November 2022 general election, did your

7    office advise voters to provide both an ID number and

8    an SSN four on their ABBMs or carrier envelopes?

9          A.    Yes.

10         Q.    Why did you advise voters to provide both

11   the -- excuse me.   Withdrawn.

12              Why did you advise voters to provide both

13   when the language in the statute and also of the ABBM

14   carrier envelopes directs voters to put one or the

15   other?

16         A.    Would you repeat that?   I had a hard time

17   hearing.

18         Q.    Yeah.

19         A.    Okay.

20         Q.    Why did you advise voters to put both

21   numbers down?

22         A.    Okay.   Under the guidance of the SOS and the

23   recommendation of the SOS so that voters -- it was

24   deemed that it was completely acceptable to have both

25   numbers, because a voter may not know which of those



 1  numbers is associated with their voter record; so to
 2  cover all bases, so to speak, we advised our voters
 3  who submitted an ABBM or ballot-by-mail carrier to put
 4  both numbers.
 5      Q.   Do the forms that you use for an ABBM or
 6  carrier envelope also ask voters to provide both
 7  numbers or just one?
 8      A.   Which forms are you referring to?
 9      Q.   The ABBMs and the carrier envelopes.
10      A.   Okay.  No, they do not -- they do not say
11  both, as far as I remember.
12      Q.   As part of your voter education efforts, did
13  your office include an insert with their absentee
14  ballot-by-mail applications explaining the ID
15  requirement and asking for voters to provide both
16  numbers?
17      A.   If I remember correctly, yes.
18      Q.   And has your office produced that insert to
19  us?
20      A.   I do not...
21           MR. NELSON:  Again, I believe so.  But
22  if we haven't, we can supplement that.
23           MS. PAIKOWSKY:  Yeah, I wasn't able to
24  find ballot inserts, but we'll connect with you and
25  check that out on the back end.



1   that we could provide inserts, and they verified that

2   we could notify voters that they could put both

3   numbers, and it would be perfectly okay; so that's the

4   feedback.

5        Q.   And this also is -- if you don't know this

6   or if another designee would be better to testify

7   about it:  To your knowledge, did the Secretary of

8   State's office recommend you develop these ballot

9   inserts as a best practice for implementation for

10  Senate Bill 1?

11       A.   I don't remember that specifically.

12       Q.   Based on your experience in the 2022 general

13  election, do you foresee a need to continue to engage

14  in these affirmative voter education efforts related

15  to the ID provision -- the mail ballot ID provision in

16  future elections?

17       A.   Yes.

18       Q.   Why is that?

19       A.   Travis County, it's very important to our

20  office to educate our voters so that their ballots may

21  be accepted -- counted -- as appropriate.  We have --

22  we believe in voter education and helping people vote.

23       Q.   Does your county have any plans to -- I'm

24  sorry, withdrawn.

25            Would your ability to continue these efforts



1   depend on your budget in future years?

2        A.   It does cost money, and money is always a

3   consideration.  So I -- dependent?  Let's just say

4   it's a consideration.

5        Q.   In the November 2022 general election, did

6   your office hire employees or contractors in order to

7   facilitate, support, or assist with mail voting or the

8   implementation of the SB-1's identification

9   requirements?  And I'm also including voter education

10  efforts in this question.

11       A.   Would you state again the types -- the first

12  part of your question for me?

13       Q.   Yeah.  And I also am cognizant that there's

14  another designee who's testifying.

15       A.   Sure.

16       Q.   The question is:  During the November 2022

17  election, did your office hire employees or

18  contractors to facilitate the mail voting process and

19  specifically implement SB-1'S identification

20  requirements?  And as part of that, I'm asking also

21  about affirmative voter education efforts?

22       A.   Yes --

23            MR. NELSON:  Before you -- well, I was

24  going to say before you answer:  If, again, as was

25  pointed out, if it's a question that's regarding an



```
 1                    CHANGES AND SIGNATURE
 2   PAGE       LINE                  CHANGE     REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```



```
 1            I, DAN HAYES, have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4
 5                     _____
                       DAN HAYES
 6
 7   THE STATE OF TEXAS  )
 8   COUNTY OF TRAVIS    )
 9            Before me, _____, on
10   this day personally appeared DAN HAYES, known to me
11   (or proved to me under oath or through
12   _____) (description of identity card
13   or other document) to be the person whose name is
14   subscribed to the foregoing instrument and
15   acknowledged to me that they executed the same for the
16   purposes and consideration therein expressed.
17
18            Given under my hand and seal of office this
19   _____ day of _____, 2023.
20
21
22
23                     _____
24                     Notary Public in and for the State of Texas
25
```



```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, ET AL.,)(
            Plaintiffs,                 )(
 4                                      )(   Case No.:
     V.                                 )(   5:21-cv-0844-XR
 5                                      )(
     TEXAS, ET AL.,                     )(
 6          Defendants.                 )(
     _____
 7
     OCA-GREATER HOUSTON, ET AL.,       )(
 8          Plaintiffs,                 )(
                                        )(
 9   V.                                 )(   Case No.:
                                        )(   1:21-cv-0780-XR
10   TEXAS SECRETARY OF STATE           )(
     JANE NELSON, ET AL.,               )(
11          Defendants.                 )(
     _____
12
     HOUSTON AREA URBAN LEAGUE, ET AL., )(
13          Plaintiffs,                 )(
                                        )(   Case No.:
14   V.                                 )(   5:21-cv-0848-XR
                                        )(
15   GREGORY WAYNE ABBOTT, ET AL.,      )(
            Defendants.
16   _____

17   LULAC TEXAS, ET AL.,               )(
            Plaintiffs,                 )(
18                                      )(   Case No.:
     V.                                 )(   1:21-cv-0786-XR
19                                      )(
     JANE NELSON, ET AL.,               )(
20          Defendants.                 )(
     _____
21
     MI FAMILIA VOTA, ET AL.,           )(
22          Plaintiffs,                 )(
                                        )(   Case No.:
23   V.                                 )(   5:21-cv-0920-XR
                                        )(
24   GREG ABBOTT, ET AL.,               )(
            Defendants.                 )(
25   _____
```



```
 1   THE UNITED STATES OF AMERICA,      )(
            Plaintiff,                  )(
 2                                      )(   Case No.
     V.                                 )(   5:21-cv-1085-XR
 3                                      )(
     STATE OF TEXAS, ET AL.,            )(
 4          Defendants.                 )(
```

 5                  REPORTER'S CERTIFICATION
                 ORAL 30(b)(6) DEPOSITION OF
 6               TRAVIS COUNTY CLERK'S OFFICE
                         DAN HAYES
 7                    March 29, 2023

 8           I, STEPHANIE DAVIS, Certified Shorthand

 9   Reporter in and for the State of Texas, hereby certify

10   to the following:

11           That the witness, DAN HAYES, was duly sworn

12   by the officer and that the transcript of the oral

13   deposition is a true record of the testimony given by

14   the witness;

15           I further certify that pursuant to FRCP Rule

16   30(f)(1) that the signature of the deponent:

17           __X__ was requested by the deponent or a

18   party before the completion of the deposition and that

19   the signature is to be before any notary public and

20   returned within 30 days from the date of receipt of

21   the transcript.  If returned, the attached Changes and

22   Signature Page contains any changes and the reasons

23   therefor;

24           ____ was not requested by the deponent or a

25   party before the completion of the deposition.



1          I further certify that I am neither counsel

2    for, related to, nor employed by any of the parties or

3    attorneys in the action in which the proceeding was

4    taken, and further that I am not financially or

5    otherwise interested in the outcome of the action.

6

7          Certified to by me this _____ day of

8    _____, 2023

9

10

11

12

13                    STEPHANIE DAVIS, TEXAS CSR 11355

14                    Expiration Date:  11-30-2023
                      MAGNA LEGAL SERVICES

15                    Firm Registration No. 633
                      1635 Market Street

16                    Suite 800
                      Philadelphia, Pennsylvania 19103

17                    Telephone:  866-624-6621
                      Facsimile:  215-207-9462

18

19

20

21

22

23

24

25



# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, ET AL.,)(
    Plaintiffs,                   )(
                                 )(  Case No.:
V.                            )(  5:21-cv-0844-XR
                                 )(
TEXAS, ET AL.,                  )(
    Defendants.                 )(
_____

OCA-GREATER HOUSTON, ET AL.,    )(
    Plaintiffs,                 )(
                                )(
V.                            )(  Case No.:
                                )(  1:21-cv-0780-XR
TEXAS SECRETARY OF STATE        )(
JANE NELSON, ET AL.,          )(
    Defendants.                 )(
_____

HOUSTON AREA URBAN LEAGUE, ET AL., )(
    Plaintiffs,                 )(
                                )(  Case No.:
V.                            )(  5:21-cv-0848-XR
                                )(
GREGORY WAYNE ABBOTT, ET AL.,    )(
    Defendants.
_____

LULAC TEXAS, ET AL.,          )(
    Plaintiffs,                 )(
                                )(  Case No.:
V.                            )(  1:21-cv-0786-XR
                                )(
JANE NELSON, ET AL.,          )(
    Defendants.                 )(
_____

MI FAMILIA VOTA, ET AL.,       )(
    Plaintiffs,                 )(
                                )(  Case No.:
V.                            )(  5:21-cv-0920-XR
                                )(
GREG ABBOTT, ET AL.,          )(
    Defendants.                 )(
_____



```
 1   THE UNITED STATES OF AMERICA,      )(
            Plaintiff,                  )(
 2                                      )(   Case No.
     V.                                 )(   5:21-cv-1085-XR
 3                                      )(
     STATE OF TEXAS, ET AL.,            )(
 4          Defendants.                 )(
```

 5   ********************************************************

 6                    ORAL 30(b)(6) DEPOSITION OF

 7                  TRAVIS COUNTY CLERK'S OFFICE

 8                  TESTIMONY OF CHARLIE JOHNSON

 9                        March 29, 2023

10   ********************************************************

11

12

13                        ORAL DEPOSITION OF CHARLIE

14   JOHNSON, produced as a witness at the instance of the

15   Consolidated Plaintiffs, and duly sworn, was taken in

16   the above-styled and numbered cause on the 29th day of

17   March, 2023, from 10:38 a.m. to 1:10 p.m., before

18   STEPHANIE DAVIS, CSR, in and for the State of Texas,

19   reported by oral stenograph, at the Travis County

20   Attorney's Office, 314 West 11th Street, Fifth Floor,

21   Austin, Texas, pursuant to the Federal Rules of Civil

22   Procedure and the provisions stated on the record or

23   attached herein.

24

25



```
 1              A P P E A R A N C E S

 2  FOR TEXAS CIVIL RIGHTS PROJECT:

 3          ZACHARY DOLLING
            HANI MIRZA
 4          VERONIKAH WARMS
            1405 Montopolis Drive
 5          Austin, Texas  78741
            zachary@texascivilrightsproject.org
 6          hani@texascivilrightsproject.org
            veronikah@texascivilrightsproject.org
 7
    FOR THE U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS
 8  DIVISION:
            DANA PAIKOWSKY
 9          JOHN SULLIVAN BAKER (Appeared Remotely)
            Robert F. Kennedy Building
10          950 Pennsylvania Avenue, Northwest
            Washington, DC 20530
11          dana.paikowsky@usdoj.gov
            john.bakersullivan@usdoj.gov
12
    FOR OCA-GREATER HOUSTON, ET AL.:
13
            KENNETH BROUGHTON (Appeared Remotely)
14          REED SMITH, LLP
            811 Main Street, Suite 1700
15          Houston, Texas  77002-6110
            kbroughton@reedsmith.com
16
    FOR ATTORNEY GENERAL KEN PAXTON:
17
            WILLIAM D. WASSDORF
18          AARON BARNES
            ASSISTANT ATTORNEY GENERAL
19          PO Box 12548
            Austin, Texas  78711-2548
20          will.wassdorf@oag.texas.gov
            aaron.barnes@aog.texas.gov
21
    FOR HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE:
22
            ANNE CRISP (Appeared Remotley)
23          BUTLER SNOW, LLP
            1400 Lavaca Street, Suite 1000
24          Austin, Texas 78701
            anne.crisp@butlersnow.com
25
```



```
 1  FOR THE STATE OF TEXAS, GREG ABBOTT, IN HIS OFFICIAL
    CAPACITY AS GOVERNOR OF TEXAS; JANE NELSON, IN HER
 2  OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE;
    WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE
 3  TEXAS ATTORNEY GENERAL:

 4              LOUIS J. CAPOZZI (Appeared Remotely)
                JONES DAY
 5              51 Louisiana Avenue, Northwest
                Washington, DC  20001
 6              lcapozzi@jonesday.com

 7
    FOR DAN HAYES, CHARLIE JOHNSON, AND BRIDGETTE
 8  ESCABEDO, IN THEIR OFFICIAL CAPACITIES AS TRAVIS
    COUNTY CLERKS AND DISTRICT ATTORNEY, RESPECTIVELY:
 9
                ANTHONY J. NELSON
10              PATRICK T. POPE
                TRAVIS COUNTY ASSISTANT COUNTY ATTONEY
11              314 West 11th Street, Fifth Floor
                Austin, Texas  78767
12              tony.nelson@traviscountytx.gov
                patrick.pope@traviscountytx.gov
13

14  FOR HIDALGO COUNTY ELECTIONS ADMINISTRATOR DELIA
    GARZA:
15
                LEIGH ANN TOGNETTI (Appeared Remotely)
16              ASSISTANT DISTRICT ATTORNEY
                100 East Cano, First Floor
17              Hidalgo County Courthouse Annex III
                Edinburg, Texas  78539
18              leigh.tognetti@da.co.hidalgo.tx.us

19

20  ALSO PRESENT:

21              GABE HODGE, paralegal for Mr. Nelson

22

23

24

25
```



1                        I N D E X

2                                                         PAGE

3  Appearances ................................    3

4  DAN HAYES
   Examination by Mr. Dolling ..................    7
5  Examination by Ms. Paikowsky ................   39
   Examination by Mr. Wassdorf .................   53
6  Further Examination by Mr. Dolling ..........   72
   Further Examination by Ms. Paikowsky ........   84
7  Further Examination by Mr. Wassdorf .........   88

8  Changes and Signature Page ..................   92

9  Reporter's Certificate ......................   95

10

11                     E X H I B I T S

12  NUMBER     DESCRIPTION                        PAGE

13    3        Notice of Rejected Application for

14             Ballot by Mail .....................   26

15    4        V.T.C.A. Election Code ?84.014 .....   29

16    5        Defendant Dyana Limon-Mercado's
               Objections and Responses to OCA
17             Plaintiffs' First Set of
               Interrogatories ....................   35
18
      6        Defendant Dyana Limon-Mercado's
19             Objections and Responses to State
               Defendants' Second Set of
20             Interrogatories ....................   47

21    7        Bates Stamped 064.134766 ...........   51

22    8        Notice of Carrier Defect  ..........   73

23    9        Bates Stamped 064.128072 ...........   73

24   10        Bates Stamped 064.134344 ...........   78

25



1  I was hoping you could just give me, like, a broad

2  breakdown of how that works.

3       A.    Sure.  As ballots come back in, we -- what

4  our office, as the early voting clerk typically does,

5  is rip a slip.  If you're familiar with that, there's

6  a slip that conceals the ID of the voter.  Rip those

7  and they are sorted by staff between ballots that have

8  an ID of some sort and those that do not.  Those that

9  do not are placed into a separate batch for

10 expediency's sake; so when they do go to the signature

11 verification committee, they can be rejected

12 immediately, and we can start that cure process.

13 Others are batched with the assumption that the ID is

14 correct, and those will then be reviewed by the

15 signature verification committee as well.  And they're

16 the ones that actually do the comparison between the

17 ID that's on the ballot envelope and what the voter

18 registration system has on record.  If a ballot

19 envelope or ballot is rejected, we go through our --

20 the typical steps of sending a notice by mail to the

21 voter.  Every voter will get one by mail.  If they

22 provide an email, we will also send a copy of that to

23 that voter.  If they have a -- if they provided a

24 phone number, we will then have staff reach out by

25 phone and attempt to resolve the defect that way,



1  either through pointing them through or even walking

2  them through the state tracker if it's curable with

3  that method or indicating to them the steps that would

4  need to be taken in order to cure those defects.  And

5  any other defects that might be found by the early

6  voting ballot board, it's the same exact process.

7       Q.   Okay.  And so you mentioned that you

8  would -- depending on whether you had the information,

9  you would mail a notice for everyone, email if

10  possible, and phone if possible; is that right?

11       A.   That's correct.

12       Q.   And just to clarify something you said at

13  the beginning where the EDC is taking the flap and

14  checking to see if there is or is not a number and

15  separating those out for expediency's sake if there is

16  not a number, the EDC would always pass those to the

17  SBC rather than the EDC taking action at that point,

18  is that correct?

19       A.   That is correct, yes.

20       Q.   Okay.

21       A.   We want the signature verification clerk

22  making that determination that those are, in fact,

23  defective.

24       Q.   Okay.

25       A.   And typically that is sent to them first so



1 they can take care of that quickly and we can get

2 moving on with our reaching out.

3  Q.  The notices of rejection that you would send

4 to voters, did you use the Secretary of State's forms

5 for that?

6  A.  Yes.

7  Q.  Okay.  Was there any sort of cutoff in time

8 after which you no longer attempted to provide notice

9 and an opportunity to cure?

10  A.  We will provide notice up until the final

11 date that the ballot can't be received.

12  Q.  And so would you agree that Travis County

13 made every reasonable effort to provide notice and an

14 opportunity to cure for voters whose ABBMs were

15 flagged for rejection due to SB-1's ID matching

16 requirements?

17  A.  So you're referring to ABBM as the

18 application.

19  Q.  Yes.

20  A.  So we're moving from the ballot to the

21 application?

22  Q.  I'm sorry.  Let's just stick with the

23 ballots for now.

24  A.  Okay.

25  Q.  Would you agree that Travis County made



1 every reasonable effort to provide notice and an

2 opportunity to cure for voters whose mail ballots were

3 flagged for rejection due to SB-1's ID matching

4 requirements?

5     A.   Yes.

6     Q.   And despite these efforts, hundreds of mail

7 ballots were ultimately rejected due to SB-1's ID

8 matching requirements?

9     A.   Over the course of 2022, yes.

10     Q.   In the November '22 general election, sorry.

11     A.   In the November '22 election, I'm sure I

12 provided those numbers.  I don't have them on the top

13 of my head, but if it is in the hundreds, then that

14 sounds correct.

15     Q.   We'll go back over that and confirm that

16 shortly.  I guess, then, can we sort of walk through

17 the same broad overview of the cure efforts for the

18 ABBMs that were flagged for rejection due to the ID

19 matching requirements?

20     A.   The applications, we typically get those and

21 if it is rejected, we will send a rejection notice.

22 We were not making phone calls with respect to the

23 ABBMs, but they do get the state form by mail or

24 email, if email is available.  Typically, we're not

25 calling.  The time frame between the date you can



1   apply for a ballot by mail is typically longer, and we

2   typically also do not have the staff because the

3   signature verification could be making those phone

4   calls to cure on the ballot side.  It's not something

5   we are currently doing for the application side.

6        Q.   So when the signature verification committee

7   is meeting, you have a substantially larger number of

8   people available to make those phone calls, and that's

9   why you do it then?

10       A.   Yes.

11       Q.   Okay.  That all makes sense.  So switching

12  topics a little bit and going to the -- well, let's

13  start with this:  Travis County -- if I say that

14  Travis County is an offline county, do you know what I

15  mean by that?

16       A.   Yes.

17       Q.   Can you tell me what you understand an

18  offline county to be?

19       A.   An offline county is a county that does not

20  use the state's voter registration system team.  We

21  use our own local program, which does have an

22  interface with Team.  That's not our main program that

23  we use to manage our voter registration and ballots by

24  mail.  Those types of things.

25       Q.   So I'm going to ask you later a few



1  can then be approved -- the application can be

2  approved, the one that was previously filed.

3       Q.   And so, in that instance, when you first

4  checked and sent the rejection notice, it didn't have

5  a number, then you get notification that they followed

6  through with that, and then you check again and it

7  does have a number.  You've seen that happen; is that

8  true?

9       A.   Yes.

10      Q.   Okay.  Do you know if a voter can add an

11 identification number to their voter file through

12 votetexas.gov?

13      A.   Once again, that would be a question posed

14 to voter registration.

15      Q.   Okay.  What about through corrective action

16 forms that are supplied with notices of ballot

17 rejections?

18      A.   The corrective action form that is filed

19 with the early voting clerk does not include a pathway

20 to update a voter registration, if I remember.

21      Q.   And so that form would only successfully

22 cure in the event that there was one -- let's break it

23 down.

24           It would only successfully cure first if a

25 voter had mistakenly not included the number in the



1  first place; is that correct?

2       A.    On the ballot?

3       Q.    On the carrier envelope.

4       A.    Yes.

5       Q.    And could it also cure a defect if there was

6  an input or typographical error in the way the voter

7  had input their number on the carrier envelope and

8  then they could fix that?

9       A.    Yes.

10      Q.    But it would not be able to cure a defect

11 where the voter file had a different number, even if

12 the -- let's just say hypothetically the voter had

13 their driver's license that's current in front of them

14 and they are inputting it perfectly onto the carrier

15 but it doesn't match what's in the database, the

16 correction action form could not fix that?

17      A.    That's correct.

18      Q.    Okay.  And would everything we just said

19 about what the corrective action form can fix be the

20 same for the -- okay.  This will be too confusing.

21 One of the things it says on the rejection form is

22 that you can also take corrective action through

23 rewriting the number on the carrier envelope itself,

24 and/or, I presume, if the carrier envelope did not

25 have the number, you could put it in and then resend



1    it back without using the corrective action form.  Is

2    that accurate to your knowledge?

3          A.    That is.  In the event that the ballot is

4    returned to the voter.

5          Q.    Okay.  And in that case, if the voter were

6    to do that, it would be able to correct the same

7    issues as a corrective action form but not change

8    their number in the voter file; is that correct?

9          A.    Correct.

10         Q.    Okay.  Thank you.  And do you have any idea

11   if a voter could add a number to their local voter

12   file through the state's online mail ballot tracker?

13         A.    That's a question for voter registration.

14         Q.    Okay.  And then how would Travis County

15   verify the accuracy of an added identification number,

16   like, through some sort of; live check process or

17   anything like that?

18         A.    Certainly a question for voter registration.

19         Q.    And I have all the same questions about

20   changing or updating a number versus adding a number.

21   Would those also be questions for the voter registrar?

22         A.    Yes.

23         Q.    Okay.  But with respect to what you did tell

24   me about the use of the corrective action forms or

25   rewriting the number on the carrier envelope for



1  voters to whom the carrier envelope was returned, that

2  sort of corrective action would, to your knowledge,

3  not be able to update the voter file in addition to

4  not being able to add a number; is that correct?

5       A.   Correct.  You can not alter voter

6  registration files based off of those documents.

7       Q.   Okay.  Thank you.  So I'm going to hand you

8  something that we'll mark as Exhibit Number 3.  So do

9  you recognize this document?

10      A.   I do.

11      Q.   And you'll see at the bottom right that

12  there is what's called a Bates number that says

13  064.128584; do you see that?

14      A.   Yes.

15      Q.   And that means that this was a document that

16  was produced by Travis County in this litigation.  Do

17  you understand that?

18      A.   Yes.

19      Q.   Okay.  And so I'm just going to read what's

20  at the top.  It says, "Notice of Rejected Application

21  for Ballot by Mail;" is that correct?

22      A.   Yes.

23      Q.   And then in the upper top left corner, just

24  for the record, this says 6-4 prescribed by the

25  Secretary of State, correct?



1      A.    That's correct.

2      Q.    And this is an example of one of the

3 rejection forms that Travis County would use when

4 mailing out a notice of rejection of an ABBM, correct?

5      A.    Correct.

6      Q.    And so this particular form is specifically

7 for where the voter registration record does not have

8 an identification number associated with it; is that

9 correct?

10     A.    That's correct.

11     Q.    And so that means that there's no number in

12 the voter's file; is that correct?  Not one of the

13 numbers that is required by SB-1, is not in the

14 voter's file?

15     A.    Correct.

16     Q.    And so there are two forms of cure that are

17 set out on this notice.  One is to submit an updated

18 voter registration application.  That's the first

19 option; is that correct?

20     A.    That's correct.

21     Q.    And the second is to update your voter

22 registration record online at texas.gov; is that

23 correct?

24     A.    That is correct.

25     Q.    And both of these would be for adding a



1  number to your voter file; is that correct?

2      A.   That is correct.

3      Q.   And at the bottom of the form in the -- I

4  guess it's the third to last -- no, second to last

5  paragraph, it says in bold letters, "Note:  You cannot

6  add the required personal identification numbers to

7  your voter registration record by submitting a new

8  application."  Is that correct?

9      A.   That is correct.

10      Q.   And is that your understanding of the rules

11  in the law?

12      A.   Yes, that is.

13      Q.   Okay.  And so if somebody did submit a

14  new -- a number on their application, but your voter

15  file shows that there was no number associated with

16  them, you would not add that number to their voter

17  file; is that correct?

18      A.   That is correct.

19      Q.   And just as an aside, you would be able to

20  associate the applicant with their voter file in your

21  system even in the absence of one of these numbers; is

22  that correct?

23      A.   That is correct.

24      Q.   Because you would have to look up their file

25  to see if they had a number in the first place; is



1 that correct?

2     A.    Yes.

3     Q.    Okay.  And so I'm going to hand you

4 something that's marked as Exhibit Number -- I'm going

5 to mark as Exhibit Number 4, and I'll just give you a

6 second to look over that.

7     A.    Okay.

8     Q.    And so I'm just going to read this as

9 Section 84.014, "Action by Early Voting Clerk on

10 Certain Applications;" is that correct?

11     A.    That is correct.

12     Q.    And so this is a section of the Texas

13 Election Code that I have just read out, and I'm just

14 going to read -- it's very short, so I'm just going to

15 read what it says.  "If an applicant provides a date

16 of birth, driver's license number, or social security

17 number on the applicant's application for an early

18 voting ballot to be voted by mail that is different

19 from or in addition to the information maintained by

20 the voter registrar in accordance with Title II of the

21 election code, the early voting clerk shall notify the

22 voter registrar.  The voter registrar shall update the

23 voter's record with the information provided by the

24 applicant."  Was that a correct reading?

25     A.    That's what it says.



1      A.   I do not know the specific mechanisms of how

2 voter registration pulls those numbers in.  All I know

3 is they pull up a file and those numbers appear on the

4 voter files for us to then compare against the

5 application or ballot.

6      Q.   Okay.  And just to retread what you said

7 earlier and clarify:  When checking the local database

8 versus Team, is the procedure always to check the

9 local database first and if there is a match, you stop

10 there?

11     A.   Correct.

12     Q.   And you only consult Team if needed; is that

13 correct?

14     A.   Correct.

15     Q.   Okay.  And then I've got one more exhibit

16 here.  I will mark this Exhibit Number 5.  So I will

17 just give you a second to look over that.  Have you

18 seen this before?

19     A.   Yes, I have.

20     Q.   And I'll just read the title, "Defendant

21 Dyana Limon-Mercado's Objections and Responses to OCA

22 Plaintiff's First Set of Interrogatories;" is that

23 correct?

24     A.   That is correct.

25     Q.   And so -- let me see here.  I'm just going



1  requirement, did any voters indicate confusion with

2  the process?

3      A.   We had several phone calls.  People seeking

4  clarification on how that process would work, yes.

5      Q.   So I'm going to turn a little bit to the

6  sort of mechanics of the processing of ABBMs and mail

7  ballots.  When your office receives an ABBM, how does

8  your office look up that voter's voter file?

9      A.   Depends on the information that they give

10 us.  If they provide a VUID, which is the state ID, we

11 typically look it up that way.  If not, then we'll do

12 a name and date of birth match to find the voter that

13 matches the information on the rest of the

14 application.

15     Q.   The same question for carrier envelopes.

16 How does your office pull up a voter's file once

17 you've received a carrier envelope?

18     A.   Well, the carrier envelope includes a unique

19 identification number that is tied specifically to

20 that voter.  So it is a much, much simpler process.

21 Once that is received, it can be scanned and tied

22 immediately to that voter that it has been received

23 before it goes onto signature verification to continue

24 verifying all the information on it.

25     Q.   And that's a bar code that's on the carrier



1 envelope that you provide to the voter and to send

2 back to you?

3     A.    That's correct.

4     Q.    Does your office use the driver's license or

5 social security number for any purpose beyond

6 determining whether an ABBM or mail ballot can be

7 accepted in light of Senate Bill 1?

8     A.    Other than as an additional piece of

9 information to help research the voter to find out who

10 the application might be for -- but it would be very

11 rare -- no.

12     Q.    Is there ever an instance where --

13 withdrawn.

14         Can you think of an instance where you were

15 unable to look up a voter based on name, birth date,

16 and other identification -- other information on their

17 ballot aside from a driver's license or social

18 security number?

19     A.    That does happen occasionally.

20     Q.    Previous to Senate Bill 1, were you ever

21 unable to look up a voter's file with the information

22 provided on an ABBM or carrier envelope?

23     A.    Yes.

24     Q.    Would you be able to look up -- does your

25 county send out notices of final rejection?  This is



1   workflow.  What is a situation where you have a

2   voter's full name, date of birth, and address you

3   would need to use a driver's license or SSN to look

4   them up?

5       A.   I wouldn't see a reason to use one of those

6   to look them up.

7       Q.   So -- let's actually -- let's make this

8   Exhibit 7.  And this is the document that says at the

9   top, "Don't forget your ID numbers."  Do you recognize

10  this document?

11      A.   I do.

12      Q.   And there's two pages if you want to take a

13  moment to review.  So the flyer on the first page,

14  would you mind telling us what that is?

15      A.   On the first page is the insert that we

16  would include and a request for an application for

17  ballot by mail.  It is just included in the envelope

18  along with the application itself as a reminder to

19  include one or the other or both IDs when returning

20  the application back to our office.

21      Q.   And it says at the bottom, "We recommend

22  providing both."  Is that correct?

23      A.   That's correct.

24      Q.   And why is it you recommend providing both?

25      A.   Secretary of State's office has indicated



1 that is the best practice -- to include both -- just

2 in case if the voter registration system is missing

3 one or the other.  We have both in which to verify.

4      Q.   So the second page says, "Don't forget your

5 ID numbers," as well.  What is this document?

6      A.   Very similar.  It is included in the ballot

7 package that we send out along with all of the other

8 prescribed documents, including the ballots, to remind

9 our voters to include their IDs on their carrier

10 envelope.  One or the other or both as we recommend.

11      Q.   And were you involved in the development of

12 these documents?

13      A.   Yes.

14      Q.   Why did your office decide to develop these

15 inserts?

16      A.   We decided in the spring of 2022 we wanted

17 to take an extra measure to educate our voters to

18 include those numbers in an effort to reduce our

19 rejection rate.

20      Q.   Do you feel you were effective in lowering

21 the rejection rate?

22      A.   I do.

23      Q.   What is your basis for that belief?

24      A.   Well, it's speculation based off of gut

25 feeling.  But the rejection rates did decline, to my



1 together because they sort of are a pair.  Exhibit 8

2 reads, "Notice of Carrier Defect, Carrier Envelope

3 Returns to the Voter by mail;" is that right?

4     A.  Yes.

5     Q.  And at the top left, it says, "Prescribed by

6 the Secretary of State," and then, in parenthesis,

7 8-23, correct?  And was this the form that Travis

8 County used to mail notices of rejected mail ballots

9 when time permitted the return of the carrier envelope

10 to the voter?

11    A.  That would be our form, yes.

12    Q.  Okay.  And Exhibit 8 [sic] is a very similar

13 form.  The title is "Notice of Carrier Defect, Voter

14 Notified of Carrier Envelope Defect by Phone or

15 Email."  In the top left, it says, "Prescribed by

16 Secretary of State," and in parenthesis, 8-24; is that

17 correct?

18    A.  Yes, it's Exhibit 9.

19    Q.  Yes, Exhibit 9.  And in this case, it does

20 have a Bates number in the bottom left, 064.128072,

21 indicating that it was produced in discovery.  I just

22 did not see an equivalent on Exhibit 8.  But these are

23 both the forms that you would use to notify a voter

24 that their mail-in ballot had been rejected for

25 identification number reasons, correct?



 1        A.    Yes.

 2        Q.    And Number 9 would be by phone or email

 3   because, based on best guesses with the speed of the

 4   U.S. Postal Service, you didn't think there was time

 5   to return the carrier envelope and get it back; is

 6   that right?

 7        A.    That is correct.

 8        Q.    Okay.  And so if we look at Exhibit 8 and go

 9   to "Defect Correction Process by Number" in the middle

10   and "Defect Number 4."  If you want to just read that

11   to yourself quickly.

12        A.    Yes.

13        Q.    And then also correcting Defect Number 4

14   using the ballot-by-mail tracker under that.

15        A.    Yes.  Gotcha.

16        Q.    And so these are the ways that a voter is

17   instructed to correct an error with their ID numbers;

18   is that correct?

19        A.    That is correct.

20        Q.    And on this form, Exhibit 8, there are three

21   ways to do that.  You can do that through the mail

22   ballot tracker online, you can do that through the

23   collective action form, and you can do it on the

24   carrier envelope itself because that had been returned

25   to the voter, correct?



1   not identify the voter?  So setting aside the legal

2   requirement.

3              MR. NELSON:  Objection.  Form.

4       A.   It's not something I really --

5              MR. NELSON:  I'm going to instruct,

6   don't speculate.  I mean, if you know or have an

7   answer, then you can answer.  But don't speculate.

8       A.   I am not qualified philosophically to answer

9   that question.

10      Q.   Okay.  So next I want to turn to the voter

11  lookup function for carrier envelopes.  Is an SSN or

12  ID that's provided on the envelope ever necessary to

13  match the voter file to the carrier envelope?

14      A.   Very rarely because of the bar code that I

15  mentioned earlier.  That is typically what we use to

16  link the carrier envelope to the voter profile.

17      Q.   What would be a circumstance where you would

18  need to use an SSN or ID to match a voter file to the

19  carrier envelope?

20      A.   It's a possibility for an FBC voter -- it's

21  a Texas term for the -- you call the voters for the

22  folks that are get their ballot electronically.  They

23  will mail them using their own envelope.  It is

24  possible, assuming that their SSN is available for us

25  to see without having to open it up.  Then we might



 1  have to use that because there's no bar code.

 2  Theoretically, that could happen, but that would be

 3  very rare.

 4      Q.   And FBC voter's carrier envelope, do they

 5  also provide their name and...

 6      A.   They do.

 7      Q.   Could you use their name to look up the

 8  voter?

 9      A.   Yes.

10      Q.   Would it surprise you to know that an expert

11  witness retained by the United States found that some

12  mail voters in your county had their ballots rejected

13  by no fault of their own, but because of database

14  issues?

15      A.   What kind of database issues?

16      Q.   Issues in Team.

17      A.   It's possible.  I think we spoke earlier

18  about human error, yes, that is certainly possible.  I

19  would not be surprised.

20      Q.   No further questions from the United States.

21                  FURTHER EXAMINATION

22  BY MR. WASSDORF:

23      Q.   A moment ago, when you were speaking with

24  Mr. Dolling, he made a point of the carrier envelope

25  and the instructions to first provide a driver's



1       CHANGES AND SIGNATURE

2  PAGE       LINE              CHANGE     REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____



1    I, CHARLIE JOHNSON, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5    _____

6    CHARLIE JOHNSON

7    THE STATE OF TEXAS   )

8    COUNTY OF TRAVIS     )

9    Before me, _____, on

10   this day personally appeared CHARLIE JOHNSON, known to

11   me (or proved to me under oath or through

12   _____) (description of identity card

13   or other document) to be the person whose name is

14   subscribed to the foregoing instrument and

15   acknowledged to me that they executed the same for the

16   purposes and consideration therein expressed.

17

18   Given under my hand and seal of office this

19   _____ day of _____, 2023.

20

21

22

23   _____

24   Notary Public in and for the State of Texas

25



```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO, ET AL.,)(
         Plaintiffs,                   )(
 4                                     )(   Case No.:
    V.                                 )(   5:21-cv-0844-XR
 5                                     )(
    TEXAS, ET AL.,                     )(
 6       Defendants.                   )(
    _____
 7
    OCA-GREATER HOUSTON, ET AL.,       )(
 8       Plaintiffs,                   )(
                                       )(
 9  V.                                 )(   Case No.:
                                       )(   1:21-cv-0780-XR
10  TEXAS SECRETARY OF STATE           )(
    JANE NELSON, ET AL.,               )(
11       Defendants.                   )(
    _____
12
    HOUSTON AREA URBAN LEAGUE, ET AL., )(
13       Plaintiffs,                   )(
                                       )(   Case No.:
14  V.                                 )(   5:21-cv-0848-XR
                                       )(
15  GREGORY WAYNE ABBOTT, ET AL.,      )(
         Defendants.
16  _____

17  LULAC TEXAS, ET AL.,               )(
         Plaintiffs,                   )(
18                                     )(   Case No.:
    V.                                 )(   1:21-cv-0786-XR
19                                     )(
    JANE NELSON, ET AL.,               )(
20       Defendants.                   )(
    _____
21
    MI FAMILIA VOTA, ET AL.,           )(
22       Plaintiffs,                   )(
                                       )(   Case No.:
23  V.                                 )(   5:21-cv-0920-XR
                                       )(
24  GREG ABBOTT, ET AL.,               )(
         Defendants.                   )(
25  _____
```



OCA-APPX-0287

```
 1  THE UNITED STATES OF AMERICA,        )(
          Plaintiff,                     )(
 2                                       )(   Case No.
    V.                                   )(   5:21-cv-1085-XR
 3                                       )(
    STATE OF TEXAS, ET AL.,              )(
 4        Defendants.                    )(
```

 5                      REPORTER'S CERTIFICATION
                   ORAL 30(b)(6) DEPOSITION OF
 6                 TRAVIS COUNTY CLERK'S OFFICE
                          CHARLIE JOHNSON
 7                       March 29, 2023

 8              I, STEPHANIE DAVIS, Certified Shorthand

 9   Reporter in and for the State of Texas, hereby certify

10   to the following:

11              That the witness, CHARLIE JOHNSON, was duly

12   sworn by the officer and that the transcript of the

13   oral deposition is a true record of the testimony

14   given by the witness;

15              I further certify that pursuant to FRCP Rule

16   30(f)(1) that the signature of the deponent:

17              __X__ was requested by the deponent or a

18   party before the completion of the deposition and that

19   the signature is to be before any notary public and

20   returned within 30 days from the date of receipt of

21   the transcript.  If returned, the attached Changes and

22   Signature Page contains any changes and the reasons

23   therefor;

24              ____ was not requested by the deponent or a

25   party before the completion of the deposition.



1           I further certify that I am neither counsel

2   for, related to, nor employed by any of the parties or

3   attorneys in the action in which the proceeding was

4   taken, and further that I am not financially or

5   otherwise interested in the outcome of the action.

6

7           Certified to by me this _____ day of

8   _____, 2023

9

10

11

12

13

14   STEPHANIE DAVIS, TEXAS CSR 11355
     Expiration Date:  11-30-2023
     MAGNA LEGAL SERVICES
15   Firm Registration No. 633
     1635 Market Street
16   Suite 800
     Philadelphia, Pennsylvania 19103
17   Telephone:  866-624-6621
     Facsimile:  215-207-9462
18

19

20

21

22

23

24

25



# Exhibit 19



**In The Matter Of**

La Union Del Pueblo Entero, et al.,

Plaintiffs

v

State Of Texas, et al.,

Defendants

**CASE**

5:21-cv-844

**Date**

4-28-2022

**Witness**

Brian Keith Ingram, J.D.

**Certified Copy Transcript**

**National Court Reporters Inc. · 888.800.9656 ·**
**NationalCourtReporters.com**
**NCRNetwork@nationalcourtreporters.com**
Serving Legal Professionals From Coast To Coast and Internationally

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO          §
    ENTERO, ET AL.,          §
4          Plaintiffs,          §  Civil Action No.
                    §  5:21-cv-844 (XR)
5   VS.                    §  (Consolidated Cases)
                    §
6   STATE OF TEXAS, ET AL.      §
          Defendants.          §
7   ************************************************

8               ORAL DEPOSITION OF
               BRIAN KEITH INGRAM, J.D.
9          CORPORATE REPRESENTATIVE FOR THE
          TEXAS SECRETARY OF STATE OFFICE
10               APRIL 28, 2022

11   ************************************************

12          ORAL DEPOSITION OF BRIAN KEITH INGRAM, J.D.,

13   CORPORATE REPRESENTATIVE FOR THE TEXAS SECRETARY OF

14   STATE OFFICE produced as a witness at the instance of

15   the Plaintiffs and Plaintiff-Intervenors, and duly

16   sworn, was taken in the above-styled and numbered cause

17   on the 28th day of April 2022, from 9:03 a.m. to

18   3:18 p.m., before Caroline Chapman, CSR in and for the

19   State of Texas, reported by Computerized Stenotype

20   Machine, Computer-Assisted Transcription, held at the

21   rice Daniel Sr State Office Building, 209 West 14th

22   Street, Austin, Texas, and via web-based conference

23   pursuant to the Federal Rules of Civil Procedure.

24

25

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | COUNSEL FOR THE PLAINTIFFS AND PLAINTIFF-INTERVENORS: |
| 3 | MR. DANIEL J. FREEMAN<br>RICHARD A. DELLHEIM |
| 4 | Attorneys, Voting Section<br>Civil Rights Division |
| 5 | U.S. Department of Justice<br>950 Pennsylvania Avenue NW |
| 6 | Washington, D.C. 20530<br>(202) 305-4355 |
| 7 | daniel.freeman@usdoj.gov<br>richard.dellheim@usdoj.gov |
| 8 | |
| 9 | COUNSEL FOR THE DEFENDANTS, THE OFFICE OF SECRETARY OF STATE: |
| 10 | KATHLEEN HUNKER<br>JEFF WHITE |
| 11 | Special Litigation Unit<br>Office of the Attorney General of Texas |
| 12 | P.O. Box 12548<br>Austin, TX  78711-2548 |
| 13 | kathleen.hunker@oag.texas.gov<br>jeff.white@oag.texas.gov |
| 14 | ADAM BITTER |
| 15 | General Counsel<br>Office of the Secretary of State |
| 16 | Capitol Building, Room 1E.8<br>P.O. Box 12697 |
| 17 | Austin, TX  78711-2697<br>(512) 475-2813 Fax (512) 475-2761 |
| 18 | abitter@sos.texas.gov |
| 19 | COUNSEL FOR THE STATE OF TEXAS ATTORNEY GENERAL'S OFFICE: |
| 20 | WILLIAM THOMAS "WILL" THOMPSON<br>ZACHARY LOUIS RHINES |
| 21 | Assistant General Counsel<br>Attorney General of Texas |
| 22 | Office of Special Litigation<br>P.O. Box 12548 (MC 009) |
| 23 | Austin, TX  78711-2548<br>(512) 936-2567 Fax:  (512) 457-4410 |
| 24 | will.thompson@oag.texas.gov<br>zachary.rhines@oag.texas.gov |
| 25 | |

1    A P P E A R A N C E S (CONTINUED)

2  COUNSEL FOR THE LUPE PLAINTIFFS:
3       JASON S. KANTERMAN
        REBECCA MARTIN
        FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
4       One New York Plaza
        New York, NY 10004
5       (212) 859-8519 Fax:  (212) 859-4000
        Jason.Kanterman@friedfrank.com
6       Rebecca.martin@friedfrank.com

7

8  HOUSTON AREA URBAN LEAGUE PLAINTIFFS:
        GEORGINA YEOMANS
        Assistant Counsel
9       NAACP Legal Defense and Educational Fund, Inc.
        700 14th Street, NW 6th Floor
10      Washington, DC 20005
        (917) 841-5947
11      gyeomans@naacpldf.org

12

13  COUNSEL FOR MI FAMILIA VOTA PLAINTIFFS:
        WENDY OLSON
        STOEL RIVES, LLP
14      101 South Capitol Boulevard, Suite 1900
        Boise, ID 83702
15      (208) 387-4291
        wendy.olson@stoel.com

16

17  COUNSEL FOR YVONNE RAMÓN ELECTIONS ADMINISTRATORS OF
    HIDALGO COUNTY:
18      LEIGH ANN LEAVELL TOGNETTI (videoconference)
        Hidalgo County District Attorney's Office
19      100 East Cano, Courthouse Annex III, 1st Floor
        Edinburg, TX 78539
20      (956) 292-7609 EXT 8182
        Leigh.tognetti@da.co.hidalgo.tx.us

21

22  COUNSEL FOR REVUP:
        LIA SIFUENTES DAVIS
23      Disability Rights Texas
        2222 West Braker Lane
24      Austin, TX 78758
        (512) 407-2763
25      ldavis@drtx.org

```
 1          A P P E A R A N C E S (CONTINUED)

 2    COUNSEL FOR DEFENDANT TRAVIS COUNTY CLERK REBECCA
      GUERRERO AND DISTRICT ATTORNEY JOSÉ P. GARZA:
 3          ANTHONY "TONY" NELSON (via videoconference)
            Civil Litigation Division of the Travis County
 4          Attorney's Office
            P.O. Box 1748
 5          Austin, TX 78767-1748
            (512) 854-9513 Fax: (512) 854-4808
 6          tony.nelson@traviscountytx.gov

 7

 8    COUNSEL FOR DEFENDANTS BEXAR COUNTY DISTRICT ATTORNEY
      JOE GONZALES AND BEXAR COUNTY ELECTIONS ADMINISTRATOR
      JACQUELYN CALLANEN:
 9          LAURA DURBIN
            Appellate Division
10          Assistant District Attorney Civil Division
            101 West Nueva Street, 7th Floor
11          San Antonio, TX 78205
            (210) 335-2142 Fax: (210) 335-2773
12          laura.durbin@bexar.org

13

14    COUNSEL FOR ISABEL LONGORIA WITH THE HARRIS COUNTY
      ATTORNEY'S OFFICE:
15          SUSANNAH MITCHAM
            Assistant County Attorney
16          Office of the Harris County Attorney
            1019 Congress, 15th Floor
17          Houston, TX 77002
            (713) 274-5334
18          Susannah.Mitcham@cao.hctx.net

19    COUNSEL FOR HARRIS COUNTY ATTORNEY'S OFFICE:
            CHRISTIAN D. MENEFEE
20          Office of the Harris County Attorney
            1019 Congress, 15th Floor
21          Houston, Texas 77002
            (713) 755-5101 Fax:  713-755-8924
22

23

24

25
```

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

4 Brian Keith Ingram JD

**Page: 4**

OCA-APPX-0395

1              A P P E A R A N C E S (CONTINUED)

2     COUNSEL FOR DEFENDANT LISA WISE, IN HER OFFICIAL
      CAPACITY AS THE EL PASO COUNTY ELECTIONS ADMINISTRATOR:
3          SHARON S. SONG
           KELSEY ROSE SPECTOR
4          COOLEY LLP
           3 Embarcadero Center, 20th Floor
5          San Francisco, CA  94111-4004
           (415) 693-2027 Fax: (415) 693-2222
6          ssong@cooley.com
           kspector@cooley.com
7

8     COUNSEL FOR PLAINTIFFS FIEL HOUSTON, INC., MEXICAN
      AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS IMPACT, WILLIAM
9     C. VELASQUEZ INSTITUTE, DELTA SIGMA THETA SORORITY INC.,
      HOUSTON AREA URBAN LEAGUE, THE ARC OF TEXAS, AND JEFFREY
10    LAMAR CLEMMONS:
           LINDSEY ROBIN
11         REED SMITH LLP
           2850 North Harwood Street, Suite 1500
12         Dallas, TX  75201
           (469) 680-4222 Fax:  (469) 680-4299
13         lrobin@reedsmith.com

14

      Also Present:  Nick Adkins, Law Clerk at Fried Frank
15

           Jonathan Bash, Law Clerk at Fried Frank
16            Harris Shriver and Jacobson

17         Josephine Ramirez

18         Barbara Nichols

19         Juan Estrada

20         Julie Longoria

21

22

23

24

25

1　　　　　　　I N D E X

2　　Appearances　. . . . . . . . . .　　2

3　　BRIAN KEITH INGRAM, J.D.

4　　　　　　　　　　　　　　PAGE
　　Examination by Mr. Freeman　. . . . .　　7
5　　Examination by Mr. Kanterman . . . . .　142
　　Examination by Mr. Freeman　. . . . .　198
6　　Signature and Changes　. . . . . . .　206
　　Reporter's Certificate . . . . . . .　208

7

8　　　　　　　E X H I B I T S

9　　NO. DESCRIPTION　　　　　　　　PAGE
　　Exhibit 1　Senate Bill No. 1　　45
10　　Exhibit 2　Oath of Assistance, State001652　51
　　　　through State001653
11　　Exhibit 3　Form 7-58, State001651　　77
　　Exhibit 4　Application for a Ballot by Mail,　93
12　　　　State031879
　　Exhibit 5　Texas Administrative Code Rule 81.6　105
13　　Exhibit 6　Email to Sam Taylor from Kristi Hart　110
　　　　dated February 16, 2022, State073009
14　　Exhibit 7　Election Code, Chapter 84,　　114
　　　　Application for Ballot
15　　Exhibit 8　Texas Secretary of State Ballot by　119
　　　　Mail Tracker

16

17　　　　　REQUESTED DOCUMENTS/INFORMATION
　　NO. DESCRIPTION　　　　　　PAGE
18　　　copies of the script of those radio ads　　6

19　　requested, previously, all documents related to 109
　　this match
20
　　redacted form of the privilege log　　152
21
　　Mr. Ingram's emails to ascertain whether notes　166
22

23

24

25

1     **A.   I don't know what you're asking.  Are you**

2  **asking if we had any trouble that people we have got the**

3  **wrong number for them, no evidence of that.  The problem**

4  **we had was people didn't supply numbers.**

5     Q.   Did your office assess, after the fact, whether

6  voters supplied the numbers that you brought in on

7  December 20th on ABBM?

8     **A.   No.  We haven't compared those, no.  But the**

9  **problem that voters had was not wrong numbers.  The**

10  **problem was no number on the carrier envelopes.**

11     Q.   Sitting here today, do you know if the

12  December 20th process reduced ABBM rejections, did you

13  assess that at all?

14     **A.   How would we?**

15     Q.   By looking at whether the voters subject to

16  that match then submitted ABBMs and voted by mail?

17     **A.   We haven't done that, no.**

18     Q.   If we could mark this as Exhibit 7.

19          (Exhibit No. 7 marked.)

20     Q.   (By Mr. Freeman)  I will represent to you that

21  this is an excerpt of the Chapter 84 of the Texas

22  Election Code.  I would like to ask you a couple of

23  questions about Section 84.014.  What is the effect of

24  this provision?

25     **A.   I don't know what you mean.**

Entero v Texas 5:21-cv-844 (XR)       **Entero v Texas**       114 Brian Keith Ingram JD
4/28/2022       National Court Reporters Inc. 888.800.9656       **Page: 114**

OCA-APPX-0398

1       Q.   What does this provision require when an

2   applicant provides a date of birth, driver's license

3   number or social security number on an application for

4   an early voting ballot that is different from what it --

5   or in addition to what is in TEAM?

6               MS. HUNKER:  Objection, form.  Calls for a

7   legal conclusion.  Compound.

8       **A.   This is -- it requires the voter's reg --**

9   **start-up date, the voter's record with the updated**

10  **information that was provided on the ABBM.**

11      Q.   Have you provided any guidance regarding this

12  provision?

13      **A.   We have.**

14      Q.   Is it in the Early Voting Ballot Board and

15  Signature Verification Committee Handbook?

16      **A.   Well, I -- you know, probably.  The place where**

17  **it would be also is in the advisory.**

18      Q.   Which advisory?

19      **A.   The advisory that we have done on this new**

20  **process.  I think we have got a couple of them.**

21      Q.   Were those issued in 2017, 2018?

22      **A.   No.  No.  Since SB 1.**

23      Q.   Regarding 84.014?

24      **A.   Sure.**

25      Q.   Okay.  How does this provision interact with

1 SB 1?

2 **A. Well, that -- that's something that we had**

3 **to -- we had to decide, how does this interact, because**

4 **if a voter can just put any number and it becomes the**

5 **de facto number of their -- then SB 1 is gone.  So we**

6 **had to say that, if the first time you have got a number**

7 **is on an application for ballot by mail, you can't use**

8 **84.014 to update the voter's record by itself.  If you**

9 **get something else, if you get a copy of the driver's**

10 **license with the ABBM, if you get an updated voter**

11 **registration application that comes with the ABBM that**

12 **also has the number on it, then you can.  But you can**

13 **just take the number on the ABBM and update the voter's**

14 **record and issue one without the ABBM, that would be**

15 **comparing A to A and tautology.**

16 Q. Is that additional requirement of a copy of a

17 driver's license or something akin to that in the

18 statute itself?

19 **A. It is not.**

20 MS. HUNKER:  Objection, form.

21 **A. It is something we had to say, part of our job**

22 **in the Secretary of State's Office with regard to**

23 **statutes is to harmonize them to make them both make**

24 **sense.  That's the way we harmonized this one.  Because**

25 **this, obviously, predates SB 1.  SB 1 is the more**

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 120

**120**

1    tracker.

2       Q.   Am I correct that this is the only way to

3    correct an ABBM online?

4            MS. HUNKER:  Objection, form.

5       **A.   Well --**

6            MS. HUNKER:  Misstates testimony.

7       **A.   No.**

8       Q.   How else can a voter correct and --

9       **A.   So if they don't have the number in their voter**

10   **registration record --**

11      Q.   Uh-huh.

12      **A.   -- they can fix that by going to Texas.gov**

13   **which is not the ballot by mail tracker.**

14      Q.   What fields are required to access the ballot

15   tracker?

16      **A.   The ones with asterisks by them.**

17      Q.   Does that include social security number and

18   driver's license number?

19      **A.   It does.  Last four of social.**

20      Q.   Is this required by statute or by your policy?

21      **A.   Statute.**

22      Q.   And do these fields need to match what's on

23   TEAM?

24      **A.   They do.**

25      Q.   And so if a voter doesn't have both, an SSN-4

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

OCA-APPX-0401

120 Brian Keith Ingram JD

**Page: 120**

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 121

121

1  and a DPS number on TEAM, are they able to use the

2  ballot tracker?

3  **A.   Not directly.  They have to go to Texas.gov to**

4  **supply the missing number first.**

5  Q.   Okay.  And if a voter has never been issued a

6  Texas driver's license number, can the voter use the

7  ballot tracker to correct online?

8  **A.   If they have a personal ID number, election**

9  **identification certificate number, yes.**

10  Q.   If the voter has never been issued a driver's

11  license number, personal identification number, or an

12  election identification certificate number can that

13  voter use the ballot tracker to correct online?

14  **A.   They cannot.**

15  Q.   If a voter's Texas driver's license number or a

16  partial security number has a typo in TEAM, can the

17  voter access the ballot tracker without knowing the

18  erroneous number in TEAM?

19  **A.   They would have to know the erroneous number in**

20  **TEAM.**

21  Q.   Are there any other categories of voter who

22  cannot use the ballot tracker?

23      MS. HUNKER:  Objection, form.

24  **A.   People who don't have a computer or internet**

25  **access.**

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

OCA-APPX-0402

121 Brian Keith Ingram JD

Page: 121

**5:21-cv-844 (XR)**

**4/28/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 206

**206**

1   CHANGES AND SIGNATURE

2   PAGE        LINE      CHANGE            REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Entero v Texas 5:21-cv-844 (XR)

**4/28/2022**

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

OCA-APPX-0403

206 Brian Keith Ingram JD

**Page: 206**

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 207

**207**

1 _____

2 _____

3 _____

4 _____

5 _____

6      I, BRIAN KEITH INGRAM, J.D., have read the

7 foregoing deposition and hereby affix my signature that

8 same is true and correct, except as noted above.

9

10      _____
     BRIAN KEITH INGRAM, J.D.

11 STATE OF TEXAS   )

12 COUNTY OF TRAVIS  )

13      Before me,_____, on this

14 the day personally appeared BRIAN KEITH INGRAM, J.D.,

15 known to me to be the person whose name is subscribed to

16 the foregoing instrument and acknowledge to me that they

17 executed the same for the purposes and consideration

18 therein expressed.

19      Given under my hand and seal of office

20 this ____ day of _____, 2022.

21

22

23      _____
     NOTARY PUBLIC IN AND FOR

24      THE STATE OF_____

25

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656
OCA-APPX-0404

207 Brian Keith Ingram JD
**Page: 207**

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO        §
     ENTERO, ET AL.,           §
 4        Plaintiffs,     §  Civil Action No.
                          §  5:21-cv-844 (XR)
 5   VS.                  §  (Consolidated Cases)
                          §
 6   STATE OF TEXAS, ET AL.     §
          Defendants.       §
 7   ******************************************************

 8              REPORTER'S CERTIFICATION

 9               ORAL DEPOSITION OF

10            BRIAN KEITH INGRAM, J.D.

11                APRIL 28, 2022

12   ******************************************************

13          I, CAROLINE CHAPMAN, Certified Shorthand

14   Reporter in and for the State of Texas, hereby certify

15   to the following:

16          That the witness, BRIAN KEITH INGRAM, J.D.

17   was duly sworn by the officer and that the transcript of

18   the oral deposition is a true record of the testimony

19   given by the witness;

20          That the deposition transcript was

21   submitted on May 2, 2022, to the witness or to the

22   attorney for the witness for examination, signature, and

23   return to me within 20 days;

24          That the amount of time used by each party

25   at the deposition is as follows:
```

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 209

**209**

 1          Mr. Freeman - Two hours and fifty-five

 2   minutes.

 3          Mr. Kanterman - One hour and twenty-two

 4   minutes.

 5          That pursuant to information given to the

 6   deposition officer at the time said testimony was taken,

 7   the appearance page includes all parties of record.

 8          I further certify that I am neither

 9   counsel for, related to, nor employed by any of the

10   parties or attorneys in the action in which this

11   proceeding was taken, and further that I am not

12   financially or otherwise interested in the outcome of

13   the action.

14          Certified to by me on May 2, 2022.

15

16   _____

17   CAROLINE CHAPMAN, Texas CSR 467
     Expiration Date:  03/31/2023
     Firm Registration No. 223

18   WORLDWIDE COURT REPORTERS
     3000 Weslayan, Suite 235

19   Houston, Texas 77027
     (713) 572-2000

20

21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

OCA-APPX-0406

209 Brian Keith Ingram JD

**Page: 209**

**5:21-cv-844 (XR)**
**4/28/2022**

Entero v Texas

NATIONAL COURT REPORTERS INC

NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 210

**210**

## Transcript Errata Sheet For

Date:

Case Number:

Case Name:

Deponent:

_____

**Page  Line    Now Reads          Should Read              Remove Therefore**

_____

_____

_____

_____

_____

_____

_____

_____

_____

Date:    _____

Signature of the Deponent:

_____

**Please return via email within 30days to:**
**NCRNETWORK@NationalCourtReporters.com**

**Entero v Texas 5:21-cv-844 (XR)**
**4/28/2022**

National Court Reporters Inc. 888.800.9656 NationalCourtReporters.com
National Court Reporters Inc. 888.800.9656
ncrnetwork@nationalcourtreporters.com

Entero v Texas

OCA-APPX-04407

**210 Brian Keith Ingram JD**
**Page: 210**

# Exhibit 20

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
    LA UNION DEL PUEBLO ENTERO,      )
 3  et al.,                          )
                      Plaintiffs,    )
 4       vs.                         )Civil Action No.
    STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
 5                    Defendants.    )(Consolidated Cases)

 6
                    ------------------------
 7                      ORAL DEPOSITION OF
                        KEITH INGRAM
 8                      March 28, 2023
                          Volume 1
 9                  ------------------------

10

11       ORAL 30(b)(1) DEPOSITION OF KEITH INGRAM, Volume

12  1, produced as a witness at the instance of the

13  Plaintiffs, and duly sworn, was taken in the

14  above-styled and numbered cause on March 28, 2023, from

15  9:15 a.m. to 4:18 p.m., before Dana Shapiro, CSR, in

16  and for the State of Illinois, reported by machine

17  shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18  pursuant to the Federal Rules of Civil Procedure and

19  any provisions stated on the record or attached

20  hereto.

21

22

23

24

25
```



MAGNA
LEGAL SERVICES

```
 1                  A P P E A R A N C E S

 2

 3   FOR PLAINTIFFS OCA/REVUP TEXAS (via ZOOM):

 4   MS. LUCIA ROMANO
     DISABILITY RIGHTS TEXAS
 5   1500 McGowen, Suite 100
     Houston, Texas 77004
 6   713-974-7691
     lromano@disabilityrightstx.org
 7          -and-
     MS. COURTNEY LUTHER
 8   DISABILITY RIGHTS TEXAS
     2222 West Braker Lane
 9   Austin, Texas 78758
     512-454-4816
10   cluther@disabilityrightstx.org

11   FOR INTERVENOR-DEFENDANTS HARRIS COUNTY REPUBLICAN
     PARTY, DALLAS COUNTY REPUBLICAN PARTY, REPUBLICAN
12   NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL
     COMMITTEE AND NATIONAL REPUBLICAN CONGRESSIONAL
13   COMMITTEE (appeared via ZOOM):

14   MR. STEPHEN J. KENNY
     JONES DAY
15   51 Lousiana Avenue, NW
     Washington, D.C. 20001
16   202-879-3939
     skenny@jonesday.com
17
     FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
18   THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
     LAMAR CLEMMONS (appeared via ZOOM):
19
     MS. KATHRYN SADASIVAN
20   MR. VICTOR GENECIN
     MS. URUJ SHEIKH
21   NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
     40 Rector Street, Fifth Floor
22   New York, New York 10006
     212-965-2200
23   ksadasivan@naacpldf.org
     vgenecin@naacpldf.org
24   usheikh@naaacpldf.org

25
```



```
 1       A P P E A R A N C E S (continued):

 2   FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO SOUTHWEST
     VOTER REGISTRATION EDUCATION PROJECT:
 3
     MS. NINA PERALES
 4   MS. JULIA R. LONGORIA(via ZOOM)
     MS. FATIMA L. MENENDEZ(via ZOOM)
 5   MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
     110 Broadway, Suite 300
 6   San Antonio, Texas 78205
     210-224-5476
 7   nperales@maldef.org
     jlongoria@maldef.org
 8   fmenendez@maldef.org
              -and-
 9   MR. JASON KANTERMAN (via ZOOM)
     MR. KEVIN ZHEN (via ZOOM)
10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
     One New York Plaza
11   New York, New York 10004
     212-859-8519
12   Jason.Kanterman@friedfrank.com
     Kevin.Zhen@friedfrank.com
13
     FOR PLAINTIFFS LULAC, TEXAS, VOTO LATINO, TEXAS
14   ALLIANCE FOR RETIRED AMERICANS, TEXAS AFT (via ZOOM):

15   MS. MARISA O'GARA
     ELIAS LAW GROUP LLP
16   250 Massachusetts Avenue, NW, Suite 400
     Washington, D.C. 20001
17   202-968-4490
     mogara@elias.law
18

19   FOR THE UNITED STATES:

20   MR. JUSTIN BENNETT(via ZOOM)
     MR. RICHARD A. DELLHEIM
21   MR. MICHAEL E. STEWART
     U.S. DEPARTMENT OF JUSTICE
22   CIVIL RIGHTS DIVISION
     950 Pennsylvania Avenue, NW
23   Washington, D.C. 20530
     800-253-3931
24   Justin.Bennett@usdoj.gov
     Richard.Dellheim@usdoj.gov
25   Michael.Stewart3@usdoj.gov
```



```
 1              A P P E A R A N C E S (continued):

 2                  -and-
        MR. DANIEL J. FREEMAN
 3      U.S. DEPARTMENT OF JUSTICE
        CIVIL RIGHTS DIVISION
 4      4 Constitution Square (4CON)
        150 M Street, N.E./8.143
 5      Washington, D.C. 20530
        202-305-4355
 6      Daniel.Freeman@usdoj.gov

 7      FOR DEFENDANTS THE STATE OF TEXAS, GREG ABBOTT, IN HIS
        OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN
 8      HER OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
        WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS
 9      ATTORNEY GENERAL:

10      MS. KATHLEEN HUNKER
        MR. ETHAN SZUMANSKI
11      OFFICE OF THE ATTORNEY GENERAL
        P.O. Box 12548
12      Austin, Texas 78711-2548
        512-463-2100
13      kathleen.hunker@oag.texas.gov
        ethan.szumanski@oag.texas.gov
14
        FOR OFFICE OF THE TEXAS SECRETARY OF STATE:
15
        MR. ADAM BITTER
16      OFFICE OF THE SECRETARY OF STATE
        Capitol Building, Rm 1E.8
17      P.O Box 12697
        Austin, Texas 78711-2697
18      512-475-2813
        abitter@sos.texas.gov
19
        FOR DEFENDANT LISA WISE, IN HER OFFICIAL CAPACITY AS
20      THE EL PASO COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):

21      MR. GERMAINE HABELL
        COOLEY LLP
22      Wells Fargo Center, South Tower
        355 South Grand Avenue, Suite 900
23      Los Angeles, California 90071-1560
        213-561-3227
24      ghabell@cooley.com

25
```



```
 1              A P P E A R A N C E S (continued):

 2   FOR DEFENDANTS BEXAR COUNTY ELECTIONS ADMINISTRATOR,
     JACQUELYN CALLANEN AND BEXAR COUNTY DISTRICT ATTORNEY
 3   JOE D. GONZALES (via ZOOM):

 4   MS. LISA V. CUBRIEL
     ASSISTANT DISTRICT ATTORNEY-CIVIL SECTION
 5   BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
     7th Floor Paul Elizondo Tower
 6   101 West Nueva
     San Antonio, Texas 78205-3030
 7   210-335-2142
     Lisa.Cubriel@bexar.org
 8
     FOR PLAINTIFF MI FAMILIA VOTA (via ZOOM):
 9
     MS. COURTNEY HOSTETLER
10   FREE SPEECH FOR PEOPLE
     1320 Centre Street, #405
11   Newton, Massachusetts 02459
     617-249-3015
12   chostetler@freespeechforpeople.org

13   FOR DEFENDANTS CLIFFORD TATUM, IN HIS OFFICIAL CAPACITY
     AS HARRIS COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
14
     MR. SAMEER S. BIRRING
15   SENIOR ASSISTANT COUNTY ATTORNEY
     OFFICE OF THE HARRIS COUNTY ATTORNEY
16   1019 Congress Plaza, 15th Floor
     Houston, Texas 77002
17   713-274-5101
     Sameer.Birring@harriscountytx.gov
18
     FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
19   DELIA GARZA (via ZOOM):

20   MS. LEIGH ANN TOGNETTI
     ASSISTANT DISTRICT ATTORNEY
21   100 East Cano, First Floor
     Hidalgo County Courthouse Annex III
22   Edinburg, Texas 78539
     956-292-7609
23   leigh.tognetti@da.co.hidalgo.tx.us

24
     ALSO PRESENT (via ZOOM):
25   MS. MORGAN HUMPHREY
     MS. SAMANTHA KOBOR
```



1                          INDEX

2                                              PAGE

Appearances...................................2-5
3 KEITH INGRAM VOLUME 1
        Examination by MR. FREEMAN...............8
4       Examination by MS. PERALES..............145
        Examination by MR. GENECIN.............184
5 Signature and Changes........................219
Reporter's Certificate.......................221

6
                        EXHIBITS
7 NO.                  DESCRIPTION            PAGE
  No. 1             Interrogatories           27
8 No. 2        absentee ballot mail form      39
  No. 3               email                   44
9 No. 4               email                   48
  No. 5           carrier envelope            50
10 No. 6          secrecy envelope            53
  No. 7               email                   57
11 No. 8      voter instruction sheet         58
  No. 9               email                   60
12 No. 10          signature sheet            62
  No. 11          presentation               65
13 No. 12        votetexas.gov page           72
  No. 13              portal                  73
14 No. 14              email                   76
  No. 15 voter registration application      82
15 No. 16     notice of rejected application  93
  No. 17     notice of rejected application  93
16 No. 18          texas.gov page             96
  No. 19          texas.gov page             97
17 No. 20              email                  100
  No. 21            NPR story                116
18 No. 22              email                  124
  No. 23              email                  145
19 No. 24              email                  148
  No. 25               SB 1                   149

20

21

22

23

24

25



1           A.      I did not.

2           Q.      Did you speak with anyone else about your

3    deposition today outside of your immediate family?

4           A.      I did.  I talked to Christina Adkins in our

5    office, I talked to Kristi Hart, and I talked to Donna

6    Davidson at the Republican Party of Texas.

7           Q.      What did you discuss with Ms. Davidson?

8           A.      The same thing that I talked to Christina

9    about.  There was an incident with regard to a poll

10   watcher in Northern Hidalgo County.  For the life of me

11   I can't remember any details, neither could Christina,

12   and neither could Donna.

13          Q.      Anything else?

14          A.      That's it.

15          Q.      Okay.  So since we last spoke in April of

16   2022 has your role in the office of the Texas Secretary

17   of State changed?

18          A.      It has.

19          Q.      What's your current title?

20          A.      I'm not sure what the title is.  I think

21   it's project manager or special projects.  I have been

22   designated to work on one project.

23          Q.      What's that project?

24          A.      The project is potentially replacing the

25   ERIC system that we have that we're currently using to



1  use to compare voter registrations across state lines.

2      Q.    What was the impetus for your change in

3  role?

4      A.    We had an organizational hearing at the

5  Texas house for the House Elections Committee on March

6  10 or March 9, and then the Secretary was not pleased.

7  She thought that my exchange with Representative

8  Swanson was indicator that maybe it would be good for

9  her and for me to change roles.

10      Q.    What was the impetus for the creation of

11  the role that you are now in?

12      A.    Well, we have been discussing -- there is

13  legislation that would require us to leave the ERIC

14  system, Electronic Registration Information Center, and

15  if any of that passes then we still have a law, legal

16  obligation to compare voter roles across state lines.

17  So we have a need to figure out what comes next if

18  ERIC -- if we have to withdraw from ERIC.

19      Q.    In your new role do you report to the

20  acting director of the elections division?

21      A.    Yes.

22      Q.    That's Ms. Adkins?

23      A.    It is.

24      Q.    In your new role will you have any role in

25  the implementation of SB 1's mail voting requirements



1       MS. HUNKER:  Objection, form.

2   BY THE WITNESS:

3       A.     Yes, that's true. That's the goal of the

4   form.

5   BY MR. FREEMAN:

6       Q.     Since the May 2022 runoff, did the Office

7   of the Secretary of State make any changes to the

8   absentee ballot by mail application?

9       A.     We changed several forms.  I'm pretty sure

10  the application if it's got an oath of assistance on it

11  it changed, yes.

12      MR. FREEMAN:  Mark this as Exhibit 2.

13                  (WHEREUPON, a certain document was

14                  marked Deposition Exhibit No. 2,

15                  for identification, as of 3/28/23.)

16  BY MR. FREEMAN:

17      Q.     Mr. Ingram, is this the current absentee

18  ballot by mail form?  I will represent to you this

19  form, I don't believe the date is on it, but it's the

20  form that's currently on your website and it's dated

21  December 9, 2021.

22      A.     Yes.  I mean it looks like it, yes.

23      Q.     Okay.  This form is still in effect, the

24  form that's on the website?

25      A.     It is.



1        Q.      Any current plans to alter the form?

2        A.      No.

3        Q.      Has your office considered altering the

4   form since it was issued?

5        A.      No, not this form.

6        Q.      Why not?

7        A.      There is not a need to.

8        Q.      Is there a statutory reason this form could

9   not inform voters that they may provide both a Texas

10  driver's license number and a partial Social Security

11  number?

12       MS. HUNKER:  Objection, form.

13  BY THE WITNESS:

14       A.      It's not what the law says.  The form

15  outlines the law.

16  BY MR. FREEMAN:

17       Q.      Okay.  And so if the form outlines the law,

18  is it not allowed for the form to inform voters that

19  they may provide both numbers?

20       A.      Not on the form.  It's not the law.

21       Q.      Understood.

22               Has your office suggested any kind of

23  amendments to SB 1 that would permit including that

24  information on this form?

25       A.      No.  There is plenty of outside channels



1        A.      The carrier envelope does.

2        Q.      Is this a reason why this form doesn't have

3   a red box around the SB 1 identification number

4   requirements?

5        A.      It's not needed.

6        Q.      Why is it not needed?

7        A.      Because the application can just be redone

8   any time.  It's a much less formal document.  It's not

9   the vote.

10       Q.      Can it be redone if it's rejected -- strike

11  that.

12              Can it be redone if the voter does not

13  become aware of the rejection until after the ballot

14  application deadline?

15       MS. HUNKER:  Objection, form.

16  BY THE WITNESS:

17       A.      It can't.  But the voter can vote in person

18  at that point.  They have still complete ability to

19  vote.

20  BY MR. FREEMAN:

21       Q.      Just to confirm.  During the 2022 general

22  election, did your office continue to advise election

23  administrators not to apply a hierarchy between DPS

24  numbers and Social Security numbers when determining

25  whether this form meets SB 1 requirements and identify



1  the correct voter?

2      A.      I lost your thread there.

3      Q.      Just confirming.  During the 2022 general,

4  did your office continue to tell local election

5  administrators, county clerks they didn't need to apply

6  a hierarchy between the DPS number and the SSN when

7  they were determining whether an ABBM adequately

8  identifies a voter for SB 1 purposes?

9      A.      Absolutely.

10     Q.      From an election administration

11 perspective, during the 2022 general election did the

12 language on this form directing voters to give their

13 SSN for quote, if you do not have a Texas driver's

14 license, Texas personal identification number or a

15 Texas election identification certificate number, serve

16 a purpose?

17     MS. HUNKER:  Objection, form.

18 BY THE WITNESS:

19     A.      It follows the law.

20 BY MR. FREEMAN:

21     Q.      What is the purpose of the law in stating

22 that --

23     MS. HUNKER:  Objection, form.

24 BY MR. FREEMAN:

25     Q.      -- to your knowledge?



1          Q.      Is this the up-to-date version of the

2    carrier envelope?

3          A.      It looks like it.

4          Q.      What changes were made during the general

5    election period?

6          A.      We put a red box around the numbers and we

7    changed the oath of office.

8          Q.      Did your staff consider any further changes

9    to the mail ballot carrier envelope during the general

10   election period?

11         A.      We did not.

12         Q.      Why not?

13         A.      There wasn't a need.

14         Q.      Did your office have any concerns about the

15   red box being fully accessible to voters with any kinds

16   of disabilities?

17         A.      No.

18         Q.      Is there an issue with the red type and

19   voters with disabilities?

20         A.      I understand that to be the case, yes.

21         Q.      What's the issue?

22         A.      There's some people with some kinds of

23   visual impairments don't see it.

24         Q.      Would it be helpful to Texas voters if the

25   mail ballot carrier envelope itself informed voters



1  that they may provide both a Texas driver's number and

2  Social Security number?

3          MS. HUNKER:  Objection, form.

4  BY THE WITNESS:

5          A.      That's not the law.

6  BY MR. FREEMAN:

7          Q.      Would it be helpful if it did?

8          A.      Doesn't matter if it's helpful or not.

9          MS. HUNKER:  Objection.

10 BY THE WITNESS:

11         A.      It's not the law.  We can't suggest to

12 voters that both numbers are required. We can suggest

13 to voters that they go ahead and voluntarily use both

14 numbers, and that they increase their chances of

15 success if they do, and we can hound that message big,

16 but we can't make any suggestion on the official form

17 that both numbers are required.

18 BY MR. FREEMAN:

19         Q.      Just so I understand it.  Why can you not

20 say it's optional on the form?

21         A.      Because that's not the law.

22         Q.      Okay.  Are there any current plans to alter

23 the carrier envelope?

24         A.      If the law changes we will change the

25 carrier envelope.



1  how they should look up the voter registration status

2  of an applicant?

3       A.     No.

4       Q.     Do you have an understanding of how they

5  typically go about doing that?

6       A.     They either use TEAM or they use their

7  local system.  And some off-line counties use TEAM for

8  this.

9       Q.     What information do they plug in when they

10  are trying to pull up the registration status like

11  name?

12       A.     Well, I mean if you're using TEAM you can

13  search by voter name.  That's probably the way they do

14  it.  They are limited to their county.

15       Q.     If we turn to page 32.  What are the

16  matters set out here?

17       A.     This talks about the new law.

18       Q.     This is talking about looking up

19  identification numbers; is that correct?

20       A.     That's correct.

21       Q.     That is separate from looking up

22  registration status?

23       A.     It's part of the registration status.

24       Q.     But it's --

25       A.     That's what it says at the last sentence



1   you talk to the voter registrar to confirm the voter

2   registration and status.

3          Q.      But am I correct that the numbers provided

4   here, driver's license, Social Security number, they

5   are not used to look up the voter, they are used to

6   confirm the voter; is that correct?

7          A.      They are used to make sure the voter has

8   properly identified themself on the application, yes.

9          Q.      Those numbers are not used to find the

10  voter in TEAM as part of the ABBM processing, correct?

11         A.      No, sir.  I mean not usually.  I guess they

12  could look it up by DL number if they wanted to.

13         Q.      Do you have any understanding as to

14  whether -- strike that.

15                 Do you instruct local officials to do that?

16         MS. HUNKER:  Objection, form.

17  BY THE WITNESS:

18         A.      We don't tell them how they use TEAM.  All

19  of the fields are available to look up anything they

20  want to look up.

21  BY MR. FREEMAN:

22         Q.      Are you aware of any local officials using

23  the Texas driver's license number or Social Security

24  number to look up a voter as part of the initial

25  determination of their registration status?



1   registration record.  I don't know.

2   BY MR. FREEMAN:

3        Q.      Is there any information here about using

4   the number to look up the voter in the first instance

5   as opposed to using the record that has already been

6   pulled up with other information to confirm that the

7   Texas driver's license number and Social Security

8   number line up?

9        A.      Again, how they look up a voter is how they

10  look up a voter.  We don't get into that.

11       Q.      I have to ask you a few questions about the

12  ballot tracker.  When we last met last year we

13  discussed the log-in requirements of the mail ballot

14  tracker. We talked a little bit about it here today as

15  well.  Have there been any changes thus far to the

16  log-in requirements for the ballot tracker since we met

17  in April of last year?

18       A.      There have not.

19       Q.      Does The Office of Secretary of State have

20  the ability to change these log-in requirements absent

21  changes to the election code?

22       A.      We do not.

23       Q.      Do you know if the ballot tracker log-in

24  page provides information as to how to add information

25  to a voter TEAM record if the voter doesn't have a TDL



1   it was difficult for your office to respond more

2   quickly than by the day the corrective action forms

3   were due?

4        A.    Our response time is within 24 hours.  This

5   is an exception of that.

6        Q.    When do those exceptions occur?

7        A.    I don't know.  When they occur that's what

8   makes it an exception.

9        Q.    I'm just trying to understand, you know, if

10  you have a typical practice, but there are exceptions.

11  Is there a set of circumstances when you typically view

12  or experience those exceptions?

13       A.    Our goal, our practice, our policy is to

14  respond to email and phone calls within 24 hours.

15       Q.    Okay.  Do you know how many exceptions

16  occurred in the November 2022 general?

17       A.    I do not.

18       Q.    Do you know if this voter was

19  disenfranchised by SB 1?

20       MS. HUNKER:  Objection, form.

21  BY THE WITNESS:

22       A.    I have no idea.

23  BY MR. FREEMAN:

24       Q.    We previously discussed a number of ways

25  that a voter can update their TEAM record after the



1    close of registration so they may successfully submit

2    an ABBM.  Prior to the November 2022 general could a

3    voter submit a new voter registration form after the

4    close of registration?

5          A.    Yes.

6          Q.    Could they submit a copy of their driver's

7    license and their ID card with the ABBM?

8          A.    They could.

9          Q.    Did they visit texas.gov to provide

10   information already in DPS databases to TEAM?

11         A.    That's correct.

12         Q.    Was there anything else?

13         A.    Those are the ways, I think.

14         Q.    Is there any indication on the Texas voter

15   registration form that was in use at the time that it

16   can be used to add missing information to a voter

17   registration record as opposed to changing an existing

18   name or address?

19         A.    No, there is not anything special about it.

20   It could be used for that purpose.

21         Q.    Is there any indication on the form itself

22   that it can be used for that purpose?

23         A.    There is a form -- form says it could be

24   used to change your record, yes.

25         Q.    Well, let's mark this --



1    than name and address?

2          A.      I don't think so.  I mean by website are

3    you talking about Texas.gov?

4          Q.      Yes.

5          A.      Okay.

6          MR. FREEMAN:  We can mark this as Exhibit 16.

7                          (WHEREUPON, a certain document was

8                          marked Deposition Exhibit No. 16,

9                          for identification, as of 3/28/23.)

10   BY MR. FREEMAN:

11         Q.      Mr. Ingram, what's this document?

12         A.      This is a notice of rejected application

13   for ballot by mail for missing or incorrect personal ID

14   number.

15         Q.      Was this the version of the form that was

16   in use in the November general election?

17         A.      I believe so, yes.

18         Q.      I apologize.  I had intended to provide you

19   with form 6-4, which is a different notice of rejected

20   application for ballot by mail.  If we hold Exhibit 17

21   for that, and I will show that to you on this laptop.

22                          (WHEREUPON, a certain document was

23                          marked Deposition Exhibit No. 17,

24                          for identification, as of 3/28/23.)

25   BY MR. FREEMAN:



1     Q.     What's form 6-4?

2     A.     It's a notice of rejected application of

3  ballot by the mail that says required ID number is not

4  in your record.

5     Q.     So that's a different notice of rejection

6  application for ballot by mail from form 6-3.  Is it

7  specific for folks who don't have anything on their

8  TEAM record; is that right?

9     A.     Well, whatever they put on their

10  application for ballot by mail is not in their record.

11     Q.     Okay.  So it's not just folks who have

12  nothing, it's also for folks who put something and it

13  didn't match; is that right?

14     A.     It didn't -- if it didn't match because

15  it's incorrect, they get the other form.  If it didn't

16  match because there is nothing there, they get this

17  form.

18     Q.     Okay.  Great.  Was this form in use in

19  November 2022?

20     A.     It was.

21     Q.     Does it state there are only two ways to

22  add the required numbers?

23     A.     That's correct.

24     Q.     Do you have any intention to update this

25  form to tell voters they can mail in a copy -- strike



1  that.

2          Did you ever discuss with your colleagues

3  updating this form to inform voters that they can mail

4  in a copy of their Texas driver's license with their

5  ABBM to update?

6      A.    No.  We got that question as a county who

7  received a copy of DL and what do we do with this, so

8  we answered that question.  It was never going to be us

9  telling a voter that they have to mail in a copy of

10  their DL.

11      Q.    The form only directs voters to go to

12  Texas.gov generally, not to a specific page on that

13  website; is that correct?

14      MS. HUNKER:  Objection, form.

15  BY THE WITNESS:

16      A.    It says you can update your voter

17  registration record at Texas.gov.

18  BY MR. FREEMAN:

19      Q.    Not like

20  Texas.gov/updateyourvoterregistrationrecord?

21      A.    Well, during the election season, Texas had

22  change your name and address on your voter registration

23  on front and center on the front page on Texas.gov.

24      MR. FREEMAN:  If we could mark this as Exhibit

25  18.



1                        (WHEREUPON, a certain document was

2                        marked Deposition Exhibit No. 18,

3                        for identification, as of 3/28/23.)

4    BY MR. FREEMAN:

5         Q.     Before we do will -- to your knowledge,

6    will Texas.gov continue to have the update your name

7    and address information on the home page during every

8    election season moving forward?

9         MS. HUNKER:  Objection, form.

10   BY THE WITNESS:

11        A.     So we coordinate with DIR, Department of

12   Information Resources, they are the ones who run the

13   Texas.gov page, and we coordinate with them about when

14   we would like that message to be prominent.

15   BY MR. FREEMAN:

16        Q.     What's document Exhibit 18?

17        A.     Well, it's a page that's on Texas.gov.

18        Q.     Is this the page on which voters can update

19   their name and address?

20        A.     Yes.

21        Q.     Is this -- do you know if this is a current

22   page that's in use?

23        A.     I don't know.  I mean if it is there is

24   different information one more page in.

25        Q.     Well, I think I have that page as well.



1 But on this page is there any indication that this

2 website can be used to update Texas driver's license

3 number or Social Security number information on a voter

4 registration record?

5          MS. HUNKER:  Objection, form.

6 BY THE WITNESS:

7          A.     There is not any indication of that on this

8 page, no.

9          MR. FREEMAN:  Mark this as Exhibit No. 19.

10                    (WHEREUPON, a certain document was

11                    marked Deposition Exhibit No. 19,

12                    for identification, as of 3/28/23.)

13 BY MR. FREEMAN:

14          Q.     What's Exhibit 19?

15          A.     This is the identity management page for

16 the Texas.gov.

17          Q.     Is this the other page that you were

18 thinking of?

19          A.     No.

20          Q.     Do you know if this is the current page

21 that's in use on Texas.gov?

22          A.     For identity management, yes.

23          Q.     This is the page that's used to update a

24 voter's name and address, correct?

25          A.     This is for voter registration changes



1  through Texas.gov.

2      Q.    Is this the page that voters would use to

3  update their Texas driver's license number or Social

4  Security number on their voter file?

5      A.    If they wanted to add to voter file this

6  was the one that replaces zero, no value with a number.

7      Q.    Is there any indication on this website

8  that this is the page that can be used to update Texas

9  driver's license number or Social Security number on

10  voter registration record?

11      A.    No.  But if you fill this out, the next

12  page in says, "If your purpose is to update your voter

13  record with your numbers you have done it so log out.

14  You are finished."

15      Q.    Okay.  In some are there any instructions

16  prior --

17      A.    Act of logging in supplies no values.

18      Q.    Understood.  In some are there any

19  instructions on Texas.gov prior to logging in that this

20  site may be used to add a Texas driver's license number

21  or Social Security number to voter registration

22  records?

23      A.    I don't think so.

24      Q.    We previously discussed a number of ways

25  voters can add or correct identification numbers on a



1    BY MR. FREEMAN:

2         Q.    The ballot tracker is only accessible to

3    voters who have both a Texas driver's license number

4    and a Social Security number on their TEAM file,

5    correct?

6         A.    Right.

7         Q.    As of right now?

8         A.    That's correct.  Which is over 96 percent

9    of voters.

10        Q.    Mr. Ingram, do you recall when we met back

11   in April of 2022 that we discussed whether a single

12   voter could be issued more than one DPS number?

13        A.    Yes.

14        Q.    Do you recall whether you knew at the time

15   whether DPS had in fact issued multiple numbers to

16   particular individuals over the course of their

17   lifetime?

18        A.    If I didn't say that's a DPS question I am

19   saying it now, it's a DPS question.

20        Q.    Do you know whether DPS has done that in

21   the past?

22        A.    To my knowledge, you get one number.

23        Q.    I have some document I'm hoping can clear

24   this up.  We can mark this as Exhibit 19.

25                        (WHEREUPON, a certain document was



1  misunderstand and think that's what they have to

2  submit.  Has your office done anything to address that

3  specific scenario?

4      A.     You would have to talk to Sam about our

5  education campaign.  But, you know, what we tell voters

6  if they call our office is that they need to use

7  whatever is currently in their voter registration, and

8  that's why we encourage them to use both numbers so

9  that if one of them hits they are good.

10      Q.     Is a voter able, to your knowledge, to call

11  their local clerk or election administrator and ask

12  specifically what number is on their registration

13  record?

14      A.     Of course.

15      Q.     So I could call and say what's the driver's

16  license on my registration record and then fill that in

17  on an ABBM?

18      A.     Sure.

19      MS. HUNKER:  Objection, form.

20  BY THE WITNESS:

21      A.     It would go through some questions to

22  validate that it's you and not some vote harvester

23  trying to steal your vote, but yes.

24  BY MR. FREEMAN:

25      Q.     What questions would they use?



1      A.      I don't know.  Whatever the county uses
2   whenever they validate someone's identity on the phone.
3      Q.      Any information that isn't also on the
4   ABBM?
5      A.      Well, it's information that would be in
6   their voter record.
7      Q.      But it's information that was on the
8   application prior to SB 1, right, name, date of birth,
9   address, things like that, correct?
10     A.      That's correct.
11     Q.      In theory if a voter -- strike that.
12             So if an individual wanted to cast an ABBM
13  in someone else's name, the only security addition
14  created by SB 1 is the driver's license number or a
15  Social Security number, correct?
16     MS. HUNKER:  Objection, form.
17  BY THE WITNESS:
18     A.      Well, I mean signature still counts.
19  BY MR. FREEMAN:
20     Q.      Sure.  That was pre -- signature counted
21  pre-SB 1, right?
22     A.      Agreed.
23     Q.      In fact, it's easier to meet the signature
24  requirement after SB 1?
25     A.      Agreed.



 1  discussed to think about the next iteration of TEAM,

 2  and whether or not they want to have another field for

 3  an ID number.  That decision has not been made yet.

 4      Q.    What's the stage of the procurement process

 5  for the next iteration of TEAM at this point?

 6      A.    We are going through the drafting of the

 7  RFP, RFO, whatever we are calling it.

 8      Q.    Do you know when that will be complete?

 9      A.    Soon.  If I had my way it would have been

10  two weeks ago.

11      Q.    To be clear, if a voter has been issued

12  multiple DPS numbers and provides a DPS ID number

13  different from the one listed in TEAM on an ABBM and

14  does not also provide a Social Security number, that

15  ABBM will be rejected, correct?

16      A.    If they don't provide a number that's in

17  their voter registration record they will be rejected,

18  yes, at least temporarily.

19      Q.    Same thing on mail ballot?

20      A.    Same thing on mail ballot.

21      Q.    Would you agree a duly registered voter

22  whose ballot was rejected under these circumstances was

23  not at fault?

24      MS. HUNKER:  Objection, form.

25  BY THE WITNESS:



OCA-APPX-0437

1               CHANGES AND SIGNATURE

2    KEITH INGRAM

3    March 28, 2023

4    PAGE/LINE          CHANGE                    REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



1    I, KEITH INGRAM, have read the foregoing
2  deposition and hereby affix my signature that the same
3  is true and correct, except as noted on the previous
4  page.

5

6    _____
7              KEITH INGRAM
8  THE STATE OF _____)
9  COUNTY OF _____)
10    Before me, _____, on this day
11  personally appeared KEITH INGRAM, known to me (or
12  proved to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that he executed the
16  same for the purposes and consideration therein
17  expressed.
18    Given under my hand and seal of office this _____
19  day of _____, 20_____.

20

21    _____
22              NOTARY PUBLIC IN AND FOR
23              THE STATE OF _____
24              COMMISSION EXPIRES: _____

25



```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
    LA UNION DEL PUEBLO ENTERO,     )
 3  et al.,                         )
                      Plaintiffs,   )
 4      vs.                         )Civil Action No.
    STATE OF TEXAS, et al.,         )5:21-cv-844(XR)
 5                    Defendants.   )(Consolidated Cases)

 6

 7                  REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF
 8                     KEITH INGRAM
                     March 28, 2023
 9
```

10      I, Dana Shapiro, a Certified Shorthand Reporter,

11  hereby certify to the following:

12      That the witness, KEITH INGRAM, was duly sworn by

13  the officer and that the transcript of the oral

14  deposition is a true record of the testimony given by

15  the witness;

16      I further certify that pursuant to FRCP Rule

17  30(e)(1) that the signature of the deponent:

18  was requested by the deponent or a party before the

19  completion of the deposition and that the signature is

20  to be before any notary public and returned within 30

21  days from date of receipt of the transcript.  If

22  returned, the attached Changes and Signature Pages

23  contain any changes and reasons therefore;

24      I further certify that I am neither counsel for,

25  related to, nor employed by any of the parties or



1  attorneys in the action in which this proceeding was

2  taken, and further that I am not financially or

3  otherwise interested in the outcome of the action.

4      Certified to by me this April 10, 2023.

5  *Dana Shapiro*

6  _____

7  Dana Shapiro
   Illinois CSR 84-3597
   Expiration: 5/31/23

8  Magna Legal Services
   Firm Registration No. 633

9  1635 Market Street
   8th Floor

10 Philadelphia, PA 19103

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    COUNTY OF TRAVIS )

2    STATE OF TEXAS    )

3         I hereby certify that the witness was notified on

4    _____, that the witness has 30 days

5    after being notified by the officer that the transcript

6    is available for review by the witness and if there are

7    changes in the form or substance to be made, then the

8    witness shall sign a statement reciting such changes

9    and the reasons given by the witness for making them;

10        That the witness' signature was/was not returned

11   as of _____.

12        Subscribed and sworn to on this _____ day of

13   _____, 20____.

14

15                 _____
                   Dana Shapiro
16                 Illinois CSR 84-3597
                   Expiration: 5/31/23
17                 Magna Legal Services
                   Firm Registration No. 633
18                 1635 Market Street
                   8th Floor
19                 Philadelphia, PA 19103

20

21

22

23

24

25



# Exhibit 21

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, ET AL )
                                   )
   PLAINTIFFS,                     )
                                   )
VS.                                )CIVIL ACTION NO.
                                   )5:21-CV-844 (XR)
                                   )(CONSOLIDATED CASES)
STATE OF TEXAS, ET AL,             )
                                   )
   DEFENDANTS.                     )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

CHRISTINA ADKINS

JULY 20, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*




     ORAL DEPOSITION of CHRISTINA ADKINS, produced as

a witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on the 20th day of July, 2022, from 9:00 a.m. to 3:06

p.m., before Gabriela S. Silva, CSR, RPR in and for the

State of Texas, reported by stenograph, at William P.

Clements Building, 300 W. 15th Street, Austin, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

## Page 2

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFFS:

JENNIFER J. YUN
DANA PAIKOWSKY
U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
Robert F. Kennedy Building
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-5225

MARK L. BIETER
STOEL RIVES, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
(208) 387-4217

LISA VIOLET CUBRIEL (via Zoom)
BEXAR COUNTY DA'S OFFICE, CIVIL LITIGATION
P.O. Box 12548
Austin, Texas 78711
(210) 335-2311

GRAHAM WHITE (via Zoom)
ELIAS LAW GROUP
10 G St NE
Washington, DC 20002
(202) 968-4490

ANTHONY J. 'TONY' NELSON (via Zoom)
ASSISTANT TRAVIS COUNTY ATTORNEY
P.O. Box 1748
Austin, Texas 78767
(512) 854-4801

MICHAEL 'MIKE' FISCHER (via Zoom)
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3939

## Page 3

APPEARANCES (cont'd.)

COUNSEL FOR THE DEFENDANTS:

KATHLEEN HUNKER
J. AARON BARNES
SPECIAL LITIGATION UNIT
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711
(512) 936-2021

ADAM BITTER
ZAC RHINES
KATHERINE PITCHER
OFFICE OF THE SECRETARY OF STATE
Capitol Building, Rm. 1E.8
P.O. Box 12697
Austin, Texas 78711
(512) 475-2813

ALSO PRESENT (via Zoom)
JASON S. KANTERMAN
SAMEER BIRRING
BARBARA NICHOLAS
REBECCA MARTIN
JOSEPHINE RAMIREZ
PATIENCE ADEGBOYEGA
LEIGH TOGNETTI

## Page 4

I N D E X

|                                              | PAGE |
|----------------------------------------------|------|
| Appearances................................... | 02   |
| Exhibits...................................... | 04   |

CHRISTINA ADKINS

| Direct Examination by MRS. YUN.............. | 07  |
| Cross-Examination by MR. BIETER............. | 120 |
| Cross-Examination by MRS. CUBRIEL........... | 196 |

| Changes and Signature........................ | 199 |
| Reporter's Certificate........................ | 201 |

## Page 5

E X H I B I T S

| Exhibit No. 1  |                              |     |
|----------------|------------------------------|-----|
|                | State 053428................ | 20  |
| Exhibit No. 2  |                              |     |
|                | State 053284................ | 32  |
| Exhibit No. 3  |                              |     |
|                | State 035247................ | 34  |
| Exhibit No. 4  |                              |     |
|                | State 034156................ | 38  |
| Exhibit No. 5  |                              |     |
|                | State 031647................ | 44  |
| Exhibit No. 6  |                              |     |
|                | State 040997................ | 45  |
| Exhibit No. 7  |                              |     |
|                | State 051170................ | 49  |
| Exhibit No. 8  |                              |     |
|                | State 034565................ | 58  |
| Exhibit No. 9  |                              |     |
|                | State 031546................ | 67  |
| Exhibit No. 10 |                              |     |
|                | State 019849................ | 78  |
| Exhibit No. 11 |                              |     |
|                | State 046960................ | 86  |
| Exhibit No. 12 |                              |     |
|                | State 073074................ | 91  |
| Exhibit No. 13 |                              |     |
|                | KSAT News Article........... | 98  |
| Exhibit No. 14 |                              |     |
|                | State 036721................ | 102 |
| Exhibit No. 15 |                              |     |
|                | State 081255................ | 138 |

OCA-APPX-0445

Page 6

```
                    EXHIBITS (cont'd.)

Exhibit No. 16
        State 075391............................   147
Exhibit No. 17
        State 078343............................   160

Exhibit No. 18
        State 075307............................   162
Exhibit No. 19
        State 001713............................   166

Exhibit No. 20
        State 075401............................   174
Exhibit No. 21
        State 031879............................   180

Exhibit No. 22
        State 032017............................   180
Exhibit No. 23
        State 076578............................   183

Exhibit No. 24
        State 074958............................   186
Exhibit No. 25
        State 075495............................   192
```

Page 7

P R O C E E D I N G S

(On the record at 9:00 a.m.)

(Witness sworn in.)

CHRISTINA ADKINS,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MRS. YUN:

Q. Good morning, Mrs. Adkins.

A. Good morning.

Q. My name is Jennifer Yun. I'm from the Department of Justice. Thank you for joining us this morning. Could you please state your name and spell it for the record?

A. My name is Christina Worrell Adkins. C-H-R-I-S-T-I-N-A, Worrell, W-O-R-R-E-L-L, Adkins, A-D-K-I-N-S.

Q. Thank you. Before we do anything else, I want to make sure we are set up for a smooth deposition. Have you been -- have you ever been deposed before?

A. No.

Q. Okay. So here are some ground rules to help us throughout the deposition. So first, this works best for the court reporter if you wait to start your answer until I finish my question. Is that okay with you?

A. Sure.

Page 8

Q. Also, the court reporter cannot indicate any head nods or any other gesture so every answer needs to be verbal. Is that okay with you?

A. Yes.

Q. Your attorney may object to a question, but you should still answer the question unless they specifically instruct you not to do so. Is that okay?

A. Yes.

Q. Can you agree that if you don't understand a question or need -- need any clarification, you'll say so?

A. Yes.

Q. And also, if you can't hear me or -- also, just let me know.

A. Of course.

Q. And on the other hand, if you answer without asking for any clarification, I'll assume that you have understood my question. Is that fair?

A. Sure.

Q. Is there any reason you're aware of that your memory and ability to answer questions would be impaired today?

A. No.

Q. Is there any reason you're aware of that your ability to effectively communicate your answers would be

Page 9

impaired today?

A. No.

Q. Have you consumed any prescription medication, drugs, alcohol, suffered any condition or injury or otherwise have reason to believe you might be impaired from testifying truthfully and accurately today?

A. No.

Q. I want to remind you that you're under oath and subject to penalties for giving false or misleading testimony. So it's important to answer my questions truthfully, accurately and completely. Do you understand?

A. I do.

Q. And finally, if you need a break, just let me know and we can take one. I'll just ask that you answer any pending question before we take a break. Is that okay?

A. Of course.

Q. Great. Do you have any questions?

A. No.

Q. Okay. Did you prepare to testify at this deposition?

MRS. HUNKER: Objection, form.

A. Yes.

Q. (By Mrs. Yun) How did you prepare?

OCA-APPX-0446

1    A.  Consulted with, you know, my -- the attorneys
2  that are here.
3    Q.  Approximately, how much time did you spend
4  preparing?
5    A.  In total, maybe about six hours.
6    Q.  So other than the folks here in this room, did
7  you meet with anyone else?
8    A.  No.
9    Q.  And when did these meetings take place?
10    A.  Over the course of the last few weeks.
11    Q.  Did you review any documents in the course of
12  your preparation?
13    A.  Minimally.
14    Q.  What did you review?
15    A.  I think I glanced at a couple of the advisories
16  that we issued.
17    Q.  Did you bring any documents with you?
18    A.  I did not.
19    Q.  So I'll start with some background questions.
20  Where do you work?
21    A.  I work for the Texas Secretary of State.
22    Q.  And what is your current job title?
23    A.  I am currently the Legal Director for the
24  Elections Division.
25    Q.  Could you explain what that position entails?

1    A.  Sure.  As Legal Director, I oversee the legal
2  staff, which consists of attorneys that provide advice
3  and assistance to election officials.  And one of our
4  newer sections is our election security trainers that
5  provide training and assistance to Counsel on policies
6  and procedure as it relates to elections and security
7  issues related to elections.
8    Q.  And who do you report to?
9    A.  Keith Ingram, the Director of Elections.
10    Q.  And what kind of decisions require approval or
11  discussions with Mr. Ingram?
12    A.  What do you mean by approval?
13    Q.  What do you need to run by Mr. Ingram in order to
14  do a task?
15    MRS. HUNKER:  Objection, form, vague.
16    A.  When I work with Mr. Ingram, it's very
17  collaboratively.  I'm not sure that there's things I
18  have to run by him in so much as we work together to
19  come up with like a policy or an answer, you know, that
20  our office is going to give on certain items.
21    Q.  (By Mrs. Yun) How long have you been in your
22  current position?
23    A.  I've been the legal director since December of
24  2017.
25    Q.  And were you in the Elections Division before you

1  became the legal director?
2    A.  I was, uh-huh.
3    Q.  How long were you in the Elections Division?
4    A.  I think about six years.  Since June of 2012, I
5  was an attorney and ran the certification program for
6  voting systems.
7    Q.  So between 2012 and 2017, you were doing the
8  certification -- you were in charge --
9    A.  Oh, that was part of it, yeah, and an attorney
10  that provided assistance and advice to election
11  officials regarding election laws in Texas.
12    Q.  What did you do before you joined the Elections
13  Division?
14    A.  I worked for the Texas Workforce Commission.
15    Q.  And before that?
16    A.  A little bit of, like, contract work.  I was
17  right out of law school after that.
18    Q.  Understood.  Thank you.  So you briefly went over
19  some of your team's responsibilities.  Could you explain
20  what your team does?  And we can start with the team of
21  attorneys that you mentioned.  What are their chief
22  responsibilities?
23    A.  As I indicated before, one of the primary things
24  that my team does is we provide advice and assistance to
25  election officials, candidates, members of the public

1  regarding the laws around elections in Texas.  We do
2  that in a number of ways.  We talk to people on the
3  phone, we respond to e-mail inquiries, we produce
4  guidance on different subjects.  We issue election law
5  advisories, we have handbooks and resources, we speak at
6  conferences.  You know, just general support to the
7  election community in Texas.
8    Q.  And could you briefly describe the
9  responsibilities of the elections security trainers?
10    A.  Sure.  It's a new -- a new section that we just
11  started.  We brought some folks on board that have very
12  practical experience in the election arena.  Almost all
13  of them are former election officials, so they have the
14  practical side to compliment the legal side.  And their
15  primary obligation is to provide training to counties on
16  specific policies and procedures and -- with a general
17  focus on security issues, yeah.
18    Q.  Understood.  You mentioned election advisories.
19  What is your role specifically in terms of drafting or
20  revising or approving election advisories?
21    A.  It depends on the advisory itself.  You know, we
22  have some advisories that we issue that are routine for
23  every election.  And generally, for those I will help
24  assign those out to the attorneys and give them guidance
25  on what they need to cover or give them instructions on

Page 42

1 information in the registration record. For example, if
2 they provided the same registration address, if they --
3 if the person opted to put their date of birth and
4 provided their date of birth, you know, if those all
5 match, then you can be reasonably sure it's the same
6 person.
7      Q. (By Mrs. Yun) Even though their last name is now
8 different?
9      A. That's correct.
10     Q. Okay. So according to your office, is -- do you
11 provide any guidance as to how an EV clerk might be able
12 to confirm that the individual is a registered voter of
13 that same political subdivision?
14          MRS. HUNKER: Objection, form, outside
15 personal knowledge, vague. You can answer.
16     A. I think that we -- I would tell them exactly what
17 I just told you, is that you would look to see the other
18 items that they listed on the application, whether they
19 match the voter registration record.
20     Q. (By Mrs. Yun) And if, say, an EV clerk, you know,
21 called the voter to see if they changed their last name
22 or something like that, would that be okay according to
23 your office?
24          MRS. HUNKER: Objection, form, improper
25 hypothetical.

Page 43

1      A. I don't know if we've had that specific question
2 before. I probably need to know a little bit more
3 about, you know, why they wanted to call them, you know,
4 if they couldn't validate that information from the
5 application in the record itself.
6      Q. (By Mrs. Yun) So am I understanding correctly
7 that as long as the EV clerk can identify this voter as
8 a registered voter in the same political subdivision,
9 the ABBM is not rejected even though the information on
10 the ABBM does not perfectly match the registration
11 record. Is that right?
12          MRS. HUNKER: Objection, form, calls for
13 legal conclusion, vague, ambiguous, misstates witness's
14 testimony.
15     A. Again, I would say generally I'd have to have a
16 little bit more information, you know, to know what the
17 county's looking at when they're process that ABBM or
18 the election official, but this is one of those examples
19 that comes up because people change their name. They
20 get married, they get divorced, you know, name changes
21 happen. That, in and of itself, is not an eligibility
22 requirement for voting by mail.
23     Q. (By Mrs. Yun) Has this guidance changed since
24 this webinar was given?
25     A. No.

Page 44

1      Q. Any plans to change it in the future?
2      A. Not unless there's a law change that tells us to.
3      Q. Got it, thank you.
4      A. Sure.
5          (Exhibit Number 5 was marked.)
6      Q. (By Mrs. Yun) I'm going to hand you what's been
7 marked as Exhibit 5. It's Bates 31647. Do you
8 recognize this document?
9      A. I do.
10     Q. And what is it?
11     A. It looks like it is a document or an official
12 form that we prescribed for Ballot by Mail materials.
13 The title is, Information About Returning Your Carrier
14 Envelope. We commonly refer to this as the carrier
15 insert because it's an insert that goes with your
16 carrier envelope when you're mailing it to the voter.
17     Q. Got it, thank you. So below, how do I return by
18 marked ballot to the Early Voting Clerk, it says you may
19 hand deliver it on Election Day in person. Is that
20 right?
21     A. That's correct.
22     Q. And it says, When you're hand delivering your own
23 ballot, it says, and I quote, you will be asked to
24 present an acceptable form of photo ID, end quote.
25 Correct?

Page 45

1      A. That's correct. That phrase is there.
2      Q. Okay. So the voter's ID will be checked when the
3 voter is returning the ballot in person. Is that right?
4      A. That's correct. It's required by law.
5      Q. And that hand-delivered ballot could still be
6 rejected if the carrier envelope included an ID number
7 that did not match the voter's registration record?
8      A. That's correct.
9      Q. Okay.
10          (Exhibit Number 6 was marked.)
11     Q. (By Mrs. Yun) I'm marking -- or I'm handing you
12 what's been marked as Exhibit 6. Do you recognize this
13 document?
14     A. It looks like an e-mail that was sent by one of
15 our attorneys to Walker County, Texas.
16     Q. And you were blind copied. Is that right?
17     A. Yes.
18     Q. And this is an e-mail from December 2021?
19     A. It appears to be, yes.
20     Q. Let's turn to Page 2, the bottom of Page 2. And
21 so this is e-mail from Walker County to Elections
22 Internet. Actually, what is the Elections Internet
23 e-mail address?
24     A. Elections@SOS.texas.gov.
25     Q. And what is the purpose of that e-mail address?

Page 198

1  rush needed.
2          MR. NELSON:  Yes, Tony Nelson for Travis
3  County and we would like a copy of the transcript PDF
4  copy, the same conditions as the other attorneys just
5  indicated.
6          MR. FISCHER:  Good afternoon.  This is Mike
7  Fischer, Jones Day on behalf of the RNC in the Dallas
8  County and Harris County GOP.  We'd also like to request
9  a PDF copy of the transcript under same conditions,
10  please.
11          (Deposition concluded at 3:06 p.m.)
12          *-*-*SIGNATURE REQUESTED*-*-*
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 199

1                CHANGES AND SIGNATURE
2  WITNESS NAME:_____ DATE OF DEPOSITION:_____
3  PAGE  LINE  CHANGE                    REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 200

1          I, CHRISTINA ADKINS, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6          _____
7                  CHRISTINA ADKINS
8  THE STATE OF TEXAS
9  COUNTY OF TRAVIS)
10          Before me, _____, on this
11  day personally appeared CHRISTINA ADKINS, known to me
12  (or proved to me under oath or through
13  _____) (description of identity card or
14  other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18          Given under my hand and seal of office this
19  _____ day of _____, 2022.
20
21          _____
22          Notary Public in and for
23          The State of Texas
24
25

Page 201

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION
3
   LA UNION DEL PUEBLO ENTERO, ET AL )
4                                    )
        PLAINTIFFS,                  )
5                                    )
   VS.                              )CIVIL ACTION NO.
6                                    )5:21-CV-844 (XR)
                                     )(CONSOLIDATED CASES)
7  STATE OF TEXAS, ET AL,           )
                                     )
8          DEFENDANTS.               )
9              REPORTER'S CERTIFICATION
           DEPOSITION OF CHRISTINA ADKINS
10                 July 20, 2022
11     I, Gabriela S. Silva, Certified Shorthand
   Reporter in and for the State of Texas, hereby certify
12 to the following:
13     That the witness, CHRISTINA ADKINS, was duly
   sworn by the officer and that the transcript of the oral
14 deposition is a true record of the testimony given by
   the witness;
15
       I further certify that pursuant to FRCP Rule
16 30(f)(1) that the signature of the deponent:
17     __X__ was requested by the deponent or a party before
   the completion of the deposition and that the signature
18 is to be before any notary public and returned within
   30 days from date of receipt of the transcript.  If
19 returned, the attached Changes and Signature Page
   contains any changes and the reasons therefor;
20
       ____ was not requested by the deponent or a party
21 before the completion of the deposition.
22     I further certify that I am neither counsel for,
   related to, nor employed by any of the parties or
23 attorney in the action in which this proceeding was
   taken, and further that I am not financially or
24 otherwise interested in the outcome of the action.
25

OCA-APPX-0449

Page 202

1    Certified to by me this _____ day of
2    _____, 2022.
3
4
5    Gabriela S. Silva, Texas CSR, RPR, CRR
     Expiration Date:  01-31-23
6    U.S. Legal Support
     Firm Registration No.:  342
7    363 North Sam Houston Parkway E, Suite 1200
     Houston, Texas 77069
8    (361)883-1716
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

OCA-APPX-0450

# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,    )
et al.,                        )
                               )
          Plaintiffs,          )
                               )
V.                             )  Case No. 5:21-cv-844 (XR)
                               )  (Consolidated Cases)
STATE OF TEXAS, et al.,        )
                               )
          Defendants.          )

------------------------------------------------------------

ORAL DEPOSITION OF:

CHRISTINA ADKINS

April 11, 2023

--------------------------------------------------

        Oral deposition of CHRISTINA ADKINS, produced as a

witness at the instance of the plaintiffs, and duly sworn,

was taken in the above-styled and numbered cause on the

11th day of April, 2023, before Patrick Stephens,

Certified Court Reporter, at 209 W. 14th Street,

Austin, Texas 78701.



A P P E A R A N C E S


ON BEHALF OF THE US DEPARTMENT OF JUSTICE:

        JENNIFER K. YUN, ESQ.
        U.S. Department of Justice, Civil Rights Division
        950 Pennsylvania Avenue NW
        Washington, DC 20530
        Telephone:  (202) 305-5533
        jennifer.yun@usdoj.gov


ON BEHALF OF THE STATE DEFENDANTS:

        KATHLEEN HUNKER, ESQ.
        ADAM BITTER, ESQ.
        ETHAN SZUMANSKI, ESQ.
        Office of the Attorney General
        P.O. Box 12548 (MC-009)
        Austin, Texas 78711
        Telephone:  (512) 936-2275
        kathleen.hunker@oag.texas.gov
        adam.bitter@sos.texas.gov


ALSO PRESENT VIA ZOOM:

        Victor Genecin, LDF-HAUL Plaintiffs
        Louis J. Capozzi, Intervenor Defendants
        Germaine Habell, El Paso EA
        Josephine Ramirez-Solis, Hidalgo County
        Kevin Zhen, LUPE Plaintiffs
        Leigh Ann Tognetti, Hidalgo County
        Lisa Cubriel, Bexar County
        Mike Stewart, DOJ
        Nina Perales, LUPE Plaintiffs
        Omeed Aleraool, LULAC Plaintiffs
        Wendy Olson, MFV Plaintiffs



1                         I N D E X

2   APPEARANCES............................................. 02

3   CHRISTINA ADKINS

4         Cross-Examination by Ms. Yun .................... 05

5

6

7

8   Reporter's Certificate.................................. 80

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              E X H I B I T S

 2

 3  NO.         DESCRIPTION                             PAGE

 4  1           HB 357                                    13

 5  2           SB 975                                    18

 6  3           Early Voting Form (Spanish)               24

 7  4           10/27/22 E-mail                           25

 8  5           Carrier Envelope Text                     26

 9  6           10/9/22 E-mail                            30

10  7           Carrier Insert                            36

11  8           4/1/22 E-mail                             38

12  9           Texas.gov Webpage                         52

13  10          Texas.gov Webpage (2)                     54

14  11          Texas Voter Reg. Application              55

15  12          11/14/22 E-mail                           56

16  13          1/22/21 E-mail                            71

17  14          EAC Guide                                 74

18

19

20

21

22

23

24

25
```



1    Q    Okay.  And you said that you met with your attorneys.

2  Which attorneys did you meet with?

3    A    Kathleen Hunker.

4    Q    And no one else?

5    A    And he was there --

6           THE WITNESS:  I don't remember your name.  I'm

7  sorry.

8           MR. SZUMANSKI:  Ethan.

9  BY MS. YUN (resuming):

10    Q    And --

11    A    -- and our two other counsel, Adam Bitter.

12    Q    Okay.  And no one else was there?

13    A    That's correct.

14    Q    And when was that?

15    A    It was last Wednesday.

16    Q    And there was only one session?

17    A    Uh-huh, yes.

18    Q    Did you review any documents in the course of your

19  preparation?

20    A    No.

21    Q    Did you bring any documents with you?

22    A    No.  I bought the Texas Election Code because I take

23  that everywhere with me.

24    Q    Okay.  Great.  So since we last spoke in July 2022,

25  has your role in the Texas secretary of state's office changed?



1        A     It has.

2        Q     And what is your current title?

3        A     My current title is acting director of elections.

4        Q     And could you describe what that role currently

5    entails?

6        A     So for the acting director of elections, I oversee the

7    entire elections division.

8        Q     And so, previously, you were the legal director;

9    correct?

10       A     That's correct.

11       Q     And does someone else have that job now?

12       A     No.

13       Q     So do you have to do both of those jobs?

14       A     To the best of my knowledge, yes --

15       Q     Okay.

16       A     -- for the time being.

17       Q     Okay.  Is someone going to be filling your old

18   position -- or your previous position?

19       A     I'm not aware of any other changes that our current

20   secretary is looking to make at this time.  You know, this is an

21   acting position, so it's -- it's temporary.

22       Q     Okay.  And what -- so who do you report to in your new

23   role?

24       A     I would say my immediate supervisor is the Deputy

25   Secretary of State, Joe Esparza, and then beyond that, the



 1  secretary of state's office?

 2              MS. HUNKER:  Objection, form.

 3  BY THE WITNESS (resuming):

 4      A    So there are two different types of data groups that

 5  -- that are transferred to us:  Those where the individual

 6  indicates they want to update their registration.  That comes to

 7  us and is passed through to the counties so that they can update

 8  a registration; and then in addition to that, we get some other

 9  data from DPS on a daily basis, other types of updates are sent

10  our way, and as far as, like, the details on what those updates

11  -- all the data that's contained in them, that information I

12  don't have.  That would be a question for Kristi Hart.

13      Q    Got it.  Does your office have any plans -- so it is

14  my understanding, and correct me if I'm wrong, that the TEAM

15  layout does not include -- has only one field for state ID

16  number, so it cannot hold multiple ID numbers for a single

17  voter.  Does your office have any plans to update that layout so

18  that a voter registration record can hold multiple ID numbers?

19      A    I don't believe so.

20      Q    Okay.  And if any new state ID number is not reflected

21  in TEAM, that would not be transferred -- that number -- new

22  number would not be transferred to the counties; is that right?

23              MS. HUNKER:  Objection, form.

24  BY THE WITNESS (resuming):

25      A    Can you repeat the question?



1  moment to read through the second E-mail of this document.

2       A    (Reviewing.)

3       Q    Okay.  Could you tell me what this document is?

4       A    This appears to be an E-mail that was sent to our

5  office regarding a ballot-by-mail application issue and it also

6  contains a response from our managing attorney.

7       Q    Could you -- so let's go to the first paragraph of

8  Ms. Catherine Martin's E-mail, which is towards the bottom of

9  the first page.  Could you describe the problem that

10 Ms. Martin's daughter appears to have experienced during the

11 general election in 2022?

12      A    It appears as though Ms. Martin's daughter was

13 applying for a ballot by mail.  On the application form, she

14 listed her driver's license number but did not list her Social

15 Security number, and the county -- Comal County indicated that

16 they did not have her driver's license number, so her

17 application for ballot by mail would be rejected on the grounds

18 it was missing that -- that number -- the personal

19 identification number.

20      Q    And it appears that Ms. Martin described the

21 instruction on the ABBM application -- or the ABBM as very

22 misleading.  Do you see that?

23      A    I see that.

24      Q    Do you agree that it's misleading?

25               MS. HUNKER:  Objection to form.



 1  BY THE WITNESS (resuming):

 2      A    I think that the instruction on the form state what --

 3  states what the law requires that it state.

 4      Q    So do you agree that it's misleading or do you not

 5  agree that it's misleading?

 6      A    I think that it states what the law requires.  That's

 7  -- that's all I can put on the form.

 8      Q    Did your office consider any changes to these

 9  instructions during the general election period?

10      A    No, because there have been no subsequent legislative

11  sessions that would have given us the ability to change the

12  language.

13      Q    Understood.  Thank you.  And for the carrier envelope

14  -- well, I'll mark this and make sure it's in English.  Exhibit

15  Number 5 is being handed over here.  Can you tell me what this

16  document is?

17      A    This appears to be a printed copy of the text of a

18  ballot-by-mail envelope, what we refer to as the carrier

19  envelope.

20      Q    And what version is this as far as you can tell from

21  the first page?

22      A    This is the one that was revised and issued in July

23  2022.

24      Q    So what changes were made during that iteration of

25  this form?



1        A     During the primary election, yes.  You know, as we

2    were working with counties for implementation of kind of these

3    components, you know, there was a lot of discussion on -- on,

4    again, best practices or recommendations, and so there were a

5    number of counties that reached out to us with this idea or

6    having us take a look at some of their sample forms.  I don't

7    recall a lot of questions like that leading up to the November

8    election.  At that point, if counties found something that

9    worked for them or worked for neighboring counties, oftentimes

10   they made those connections on their own.

11       Q     Okay.

12       A     Texas is very decentralized.  You know, elections are

13   run by the counties, not the state, so...

14       Q     And there is an official form from your office that --

15   I'm not sure if you would describe it as an insert, but a piece

16   of paper that is included with mail ballot -- with the mail --

17   with the carrier envelope; is that right?

18       A     Yes.  We call it the carrier insert.

19       Q     Oh, okay.

20       A     Yes.

21       Q     So you do call it an insert.

22       A     It -- it has a much longer title, but --

23       Q     Right.

24       A     -- we really refer to it as the carrier insert.

25       Q     Yes.  I don't want to mischaracterize, but thank you.



1   Okay.  I will mark that.  One second.  I'm handing you what's

2   been marked as Exhibit 7.  And is this the carrier insert that

3   you were referring to just now?

4       A    Yes, this appears to be the carrier insert.

5       Q    Okay.  So it's Form Number 6-17; is that right?

6       A    That's correct.

7       Q    And so based on the date that's up at the top, is this

8   the most up-to-date version of this document?

9       A    The date on here indicates this was issued in January

10  of 2022.  I can't recall if we did an updated one for any reason

11  in June -- or July when we updated the carrier envelope.

12      Q    Okay.  So you do not recall if there was -- if there

13  is another version of this.

14      A    I just can't remember at this time.

15      Q    Okay.

16      A    Yeah.  If we had updated it, it would have been

17  updated around the same time the carrier envelope was updated,

18  but I don't remember if this necessitated any changes.

19      Q    Okay.  Do you mind checking during our break whether

20  there is another version of this?

21      A    Sure.

22      Q    And then we can come back to it.

23      A    Sure.

24      Q    So this form, if you look at Number 1 under the first

25  paragraph, Required Information Under Section 86.002 of the



1  election code, this form -- that paragraph does not or anywhere

2  else does not suggest that the voter must -- or sorry.  Scratch

3  all of that.  So this form does not suggest to voters that they

4  may or it is recommended that they put down both their driver's

5  license number and the last four digits of their Social;

6  correct?

7      A    That's correct.

8      Q    Does the statute prescribe what must be in the carrier

9  insert?

10     A    It does.  Everything that's on this form is required

11 by law.

12     Q    And therefore -- well, so I'm going to ask why does it

13 -- why does the form not suggest the recommendation?

14     A    The form does not contain that recommendation because

15 the -- the -- all of the items contained on this document are

16 items that are required by statute, and the specific provision

17 dealing with personal identification numbers is very clear on

18 what it's -- on what it's asking the voter for, and so we can't

19 modify or waive or change the requirements of law with respect

20 to those instructions.

21     Q    Would your office be allowed to, say, put a red box

22 around Paragraph Number 1 under the election code?

23          MS. HUNKER:  Objection, form.

24 BY THE WITNESS (resuming):

25     A    Sure.  I think we can put a box on the form.



1      Q    Okay.  But your testimony is that you cannot change

2  any of the text.

3      A    The language outlines the legal requirements that are

4  prescribed by law, and we can't modify those legal requirements.

5      Q    Is this form going to -- well, we can circle back to

6  it if there's another more up-to-date form, but whatever the

7  up-to-date form that was being used during the November

8  election, is that form going -- do you have any plans to change

9  that form?

10      A    Any changes to any out of our balloting materials are

11  going to be contingent on the legislative session.

12      Q    And absent any legislative changes, you do not have

13  any plans to update it.

14      A    At this time, no.

15      Q    And I think we can do another small section before we

16  take a break, if that's okay with you.

17      A    Of course.

18      Q    Okay.  I'm going to hand you what's been marked as

19  Exhibit 8.

20      A    (Reviewing.)  Okay.

21      Q    What is this document?

22      A    This appears to be some E-mail correspondence between

23  myself and two individuals in the Denton County Elections Office

24  regarding potential changes to the carrier envelope, and then it

25  looks like they inquired about some other forms as well.



1      Q     So Ms. Brandy Grimes is from Denton County; is that
2   right?

3      A     That's correct.

4      Q     And do you recall this exchange?

5      A     I do.

6      Q     And I would like to direct your attention to the third
7   E-mail from the top, starting at the bottom of Page 1.  So what
8   was Ms. Grimes' proposal for the ABBM rejection notice in that
9   E-mail -- in that third E-mail?

10      A     She was -- so we -- initially, we're talking about the
11   carrier envelope and then we pivoted to a different form, the
12   rejection notice, and we were at that time looking at modifying
13   the rejection notice so that we could identify -- give the voter
14   more details about what the rejection was for with respect to
15   the ID number, and so we were looking at different design
16   options there and she was writing back -- I think giving her
17   suggestion on the form -- on the potential change.

18      Q     And she says -- and I'm reading from the bottom of
19   Page 1:  We both know that they can't remember how they filled
20   out the defective application once it's sent.  Do you agree with
21   that comment?

22      A     Do I agree with -- that a voter may not remember
23   what's on a defective application form?

24      Q     Once it's been sent.

25      A     I think that's possible.



1      Q    So would you agree that not remembering how -- or

2   which number they put down once the ABBM has been sent would

3   make cure difficult?

4                  MS. HUNKER:  Objection, form.

5   BY THE WITNESS (resuming):

6      A    It depends on the reason for rejection, it depends on,

7   you know, where were we are in the process.  I -- I think

8   there's a lot of variables there that would impact whether it's

9   difficult to remedy the situation.

10     Q    Okay.  So if the -- if the situation is that they put

11  one number down that is not associated with their voter

12  registration record, not remembering which number and hearing

13  back from the county that, Your number is not associated with

14  the record, but we don't remember which one you put down, that

15  would make the cure difficult; would it not?

16                 MS. HUNKER:  Objection, form.

17  BY THE WITNESS (resuming):

18     A    I -- again, I think it's possible.  It also depends on

19  the mechanism used for remedying the cure.  If they're logging

20  into the ballot-by-mail tracker to initiate the cure, then it

21  doesn't matter what number they put down originally because

22  they're able to validate both of their identification numbers

23  with the tracker, so I think in that sense it's not very hard.

24  If they're filling out a new application form, it just depends

25  on what information was provided to them by the county and



1   whether or not the voter opted to fill in both boxes.

2       Q    And so as of -- at this time and as of now, these --

3   the rejection form does not provide any information on which

4   number was originally sent in; correct?

5       A    That's correct.

6       Q    And it does not recommend that you put both numbers

7   down; correct?

8       A    That's correct.

9       Q    And what happened to this proposal from Ms. Grimes?

10      A    A lot of counties objected to the proposal.  They

11  didn't like it.  They said that they believed it was going to be

12  more confusing to voters, that they might misread the form, and

13  so we didn't move forward with it at that time.

14      Q    Do you know if any counties have any practice to let

15  the voter know which number was associated with -- is associated

16  with their registration record?

17      A    I have heard that some counties will highlight the

18  missing information on a new -- if we're talking about an

19  application for ballot-by-mail form, they would highlight the

20  missing information on the new form to give the voter the chance

21  to fill in the required boxes or they would put in some

22  additional information indicating what it is they needed.

23      Q    So that's a county-by-county practice.

24      A    Correct.

25      Q    So is the reason for not adopting this revision of



1 processed with that updated information.  So regardless of what

2 they pick at the top, if they provide a new number in Box 9,

3 that'll get updated in the system.

4      Q    Okay.  But they must check one -- right? -- because it

5 says it must be completed before proceeding.

6      A    It says the questions must be completed before

7 proceeding, but I -- I don't think that you would -- if the

8 voter doesn't select that but -- but they otherwise complete the

9 form with all of the substantive information, it going to be

10 processed.

11      Q    Okay.  And I'm marking another exhibit, 12.  What is

12 this document?

13      A    This appears to be an E-mail that was sent to our

14 office via VoteTexas.gov, which is an SOS website, and a

15 response providing information on how to update -- or -- or

16 check information related to a person's ballot -- voted ballot.

17      Q    So it says in the second paragraph of the top E-mail

18 that you must deliver the corrected -- the completed corrective

19 action form in person to the early-voting clerk's office by the

20 end of business today, Monday, November 14th, 2022; correct?

21      A    Uh-huh.

22      Q    And it was sent at 5:54 p.m. on November 14th.

23      A    That's correct.

24      Q    So would you agree that for some voters would not be

25 able to cure in time and have their ballots counted due to when



1  they are notified of their ballot defect and/or when they find

2  out how to cure their ID requirement defect?

3              MS. HUNKER:  Objection, form.

4  BY THE WITNESS (resuming):

5      A    Could you repeat the question?

6      Q    Sure.  Would you agree that for some voters that would

7  not -- whose mail ballot has been rejected because of the ID

8  requirements under SB1 would not be able to cure in time due to

9  the timing of when they're notified or when they find out how to

10 cure their ballot?

11             MS. HUNKER:  Objection, form.

12 BY THE WITNESS (resuming):

13     A    Sure.

14     Q    So we spoke briefly about changing the forms and

15 legislative changes.  I know we keep coming back to it.  So you

16 said that there were things that you could do that the law does

17 allow your office to do without any substantive law changes.  So

18 is it your testimony that your office cannot change the form to

19 reflect the guidance that they are allowed to or recommended to

20 put both ID numbers down in any of the forms that your office

21 promulgates?

22             MS. HUNKER:  Objection, form; compound and calls

23 for a legal conclusion.

24 BY THE WITNESS (resuming):

25     A    I think that our office has to be very careful about



1  not doing anything that would be consider waiving, modifying or

2  suspending state law, and so when it comes to instructions to a

3  voter, we have to follow the statute to the T.  So we have to be

4  very careful about that.

5       Q     So informal recommendations given by your office when

6  someone E-mails them can say, You are allowed to put both

7  numbers down; is that right?

8       A     Yes.

9       Q     But that same guidance cannot be reflected in any of

10 the forms; is that correct?

11      A     I think with our current forms, we're tracking the

12 statute as much as we can with -- with actual text relating to

13 the statute because that's what we have to do, but because the

14 instructions to the early-voting clerk or the ballot board are

15 different than what the instructions are to the voter, I think

16 that we can tell voters, You can add both numbers, since we're

17 talking about ID requirements, because the ballot board

18 instructions on what they do with that information is different.

19      Q     So just to bring it all together, absent any

20 substantive legal changes, the forms from your office are not

21 going to in the future reflect the guidance that is recommended

22 or permissible to put both numbers down.  Is that fair?

23            MS. HUNKER:  Objection, form.

24 BY THE WITNESS (resuming):

25      A     I would say at this point we're always going to be



1  careful in making sure that the actual forms are based on the

2  law themselves, but we may always provide some supplemental

3  instructions as the, you know, instructions are different, you

4  know, for the ballot board and the early-voting clerk so when

5  we're communicating with voters about the forms -- and I think

6  more specifically when the counties are communicating with

7  voters about those forms, they may provide some context,

8  additional information.

9      Q    But it is not in your office's plan to change any

10  forms that your office officially authorizes to reflect that

11  guidance; is that right?

12      A    At this time --

13             MS. HUNKER:  Objection to form; asked and

14  answered.

15  BY THE WITNESS (resuming):

16      A    At this time, no.

17      Q    Are you aware of any mail-voting form-related changes

18  being discussed by the legislature at this time -- being

19  considered by the legislature?

20             MS. HUNKER:  Objection, form.

21  BY THE WITNESS (resuming):

22      A    There -- I believe there are a couple of those that

23  could potentially modify some of the mail balloting --

24  ballot-by-mail materials.

25      Q    Okay.  Could you tell me about those?



1  to the best of your knowledge, it was completed in -- for the

2  election cycle ending in 2022, which was -- the data was due in

3  March of 2023; is that right?

4             MS. HUNKER:  Objection, form.

5  BY THE WITNESS (resuming):

6     A    I -- I believe we did submit the data for the state.

7     Q    Okay.  And were you already the acting director or

8  were you not?  If you remember.

9     A    I have no idea.

10    Q    Okay.  But you were not personally involved in the

11  certification.

12    A    No, ma'am.

13            MS. YUN:  Okay.  I believe we are very close to

14  being done.  I think I'm just going to look over my notes.

15  Actually, this is a good time to take a break, and then I may

16  have a few more questions after the break or I may not, but I

17  believe other folks on Zoom probably do have questions.

18            THE WITNESS:  Okay.

19            MS. YUN:  So we'll take a 10-minute break.

20            (A recess was taken from 11:18 a.m. to

21  11:34 a.m.)

22  BY MS. YUN (resuming):

23    Q    Okay, Ms. Adkins.  So before we -- maybe two breaks

24  ago, I asked you whether the carrier insert form that I showed

25  you that was State 31647, whether that was the most up-to-date



1 version of the form, and you -- did you have a chance to check

2 whether it was?

3     A    I did check, and it does appear as that -- that that

4 is the most recent version.

5               MS. YUN:  Okay.  Great.  Thank you.  I have no

6 further questions, and I will pass the witness.  And I believe

7 some folks on the Zoom call would like to ask questions.

8               MS. HUNKER:  Are there any other attorneys from

9 the plaintiffs who would like to ask questions of the witness?

10               MS. PERALES:  (Inaudible.)

11               MS. HUNKER:  Nina, you are muted.

12               MS. PERALES:  (Inaudible.)

13               MS. HUNKER:  Your microphone is still not

14 working.

15               THE WITNESS:  Yeah, we're unmuted on this end.

16               MS. HUNKER:  Oh, hold up, hold up.  This might be

17 my fault.  (Adjusts audio.)

18               THE WITNESS:  Oh, there we go.

19               MS. HUNKER:  Sorry.  I had you on -- I had you on

20 mute.

21               MS. PERALES:  Thank you.  I was trying to figure

22 out how to put in the chat that I think you had muted me, and

23 for once at least, it wasn't my fault.  I only wanted to say

24 that this is Ms. Nina Perales or the LUPE plaintiffs, and I have

25 no questions for the witness.



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,    )
et al.,                        )
                               )
          Plaintiffs,          )
                               )
V.                             ) Case No. 5:21-cv-844 (XR)
                               ) (Consolidated Cases)
STATE OF TEXAS, et al.,        )
                               )
Defendants.                    )

    ----------------------------------------------------------

                   REPORTER'S CERTIFICATE
            ORAL DEPOSITION OF CHRISTINA ADKINS
                     APRIL 11, 2023


    I, Patrick A. Stephens, Certified National Court Reporter,

hereby certify to the following:


    That the witness, CHRISTINA ADKINS, was duly sworn and that

the transcript of the examination is a true record of the

testimony given by the witness;


    That pursuant to information given to the examination

officer at the time said testimony was taken, the following

includes all parties of record and the amount of time used by

each party at the time of the examination:



Ms. Jennifer J. Yun (1 hr 55 mins)

Attorney for Department of Justice


Ms. Kathleen T. Hunker (0 mins)
Attorney for State Defendants



I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further that
I am not financially or otherwise interested in the outcome
of this action.

Certified to by me on this 17th day of April, 2023.

                          *
                          *
                          *
                          *
                          *
                          *


                          PATRICK A. STEPHENS
                          NVRA NO. 5462
                          Expiration: 06/01/2023
                          Magna Legal Services
                          Firm Registration No.633
                          16414 San Pedro Ave.,
                          Ste. 900
                          San Antonio, TX  78232



# Exhibit 23

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO        *
    ENTERO, et al.             *
4                              *
                               *
5   VS.                        *   Civil Action No.
                               *   5:51-cv-00844-XR
6                              *
    GREGORY W. ABBOTT, et al.  *
7

8   ******************************************************

9            ORAL AND VIDEOTAPED DEPOSITION OF
                   ROBERTO BENAVIDES
10                  MARCH 30, 2023
                 (Reported Remotely)
11
    ******************************************************
12

13           ORAL AND VIDEOTAPED DEPOSITION of ROBERTO
    BENAVIDES, produced as a witness at the instance of the
14  Defendants, and duly sworn, was taken remotely in the
    above-styled and numbered cause on the 30th day of
15  March, 2023, between the hours of 9:03 a.m. and
    11:06 a.m., before TRICIA FOX WILLIAMS, CSR, in and for
16  the State of Texas, reported by machine shorthand, with
    the witness located in Austin, Texas, in accordance with
17  the Federal Rules of Civil Procedure and the provisions
    stated on the record or attached hereto.

18

19

20

21

22

23

24

25



```
 1                    A P P E A R A N C E S
                (All appearances via videoconference)
 2

 3   COUNSEL FOR THE PLAINTIFFS:

 4      MS. VERONIKAH WARMS
        MR. ZACHARY DOLLING
 5      MR. HANI MIRZA
        Texas Civil Rights Project
 6      1405 Montopolis Drive
        Austin, Texas 78741
 7      (512)474-5073
        veronikah@texascivilrightsproject.org
 8

 9   COUNSEL FOR THE PLAINTIFFS:

10      MS. LUCIA ROMANO
        MR. PETER HOFER
11      Disability Rights Texas
        2222 W. Braker Lane
12      Austin, Texas 78758-1024
        (512)454-4816
13      lromano@drtx.org

14
     COUNSEL FOR THE PLAINTIFFS:
15
        MS. DANA PAIKOWSKY
16      US Department of Justice - Civil Rights Division
        150 M Street NE
17      Washington, DC 20002
        (202)514-3847
18      dana.paikowsky@usdoj.gov

19
     COUNSEL FOR THE DEFENDANTS:
20
        MR. DAVID BRYANT
21      MR. ZACHARY BERG
        Office of the Texas Attorney General
22      300 W. 15th Street
        Austin, Texas 78701
23      (512)574-1514
        david.bryant@oag.texas.gov
24      zachary.berg@oag.texas.gov

25
```



1                    APPEARANCES CONTINUED

2

   COUNSEL FOR THE DEFENDANTS:
3
       MS. LISA CUBRIEL
4      Bexar County District Attorney's Office
       Civil Litigation
5      PO Box 12548
       Austin, Texas 78711-2548
6      (210)335-2311
       lisa.cubriel@bexar.org
7

8  COUNSEL FOR THE DEFENDANTS:

9      MS. JOSEPHINE RAMIREZ-SOLIS
       Hidalgo County District Attorney's Office
10     100 E. Cano Street
       Edinburg, Texas 78539-4582
11     (956)292-7609
       josephine.ramirez@da.co.hidalgo.tx.us
12

13 COUNSEL FOR THE INTERVENOR DEFENDANTS:

14     MR. STEPHEN KENNY
       Jones Day
15     51 Louisiana Avenue NW
       Washington, DC 20001
16     (202)879-3667
       skenny@jonesday.com
17

18 ALSO PRESENT:

19     MS. ROSIE JONES, Videographer

20

21

22

23

24

25



```
1                           INDEX

2                                              PAGE

3  Appearances......................................2-3

4  ROBERTO BENAVIDES
         Examination by Mr. Bryant...................6
5
   Signature and Changes...........................58
6
   Reporter's Certificate..........................60
7


8

                         EXHIBIT INDEX
9
   NO. DESCRIPTION                               PAGE
10
   Exhibit 1-  Subpoena to Testify at a Deposition
11               in a Civil Action....................8
   Exhibit 2-  OCA-Greater Houston and HAUL
12               Plaintiffs' Sixth Supplemental Rule
                 26(a)(1) Initial Disclosures.........8
13

14

15

16

17

18

19

20

21

22

23

24

25
```



 1  the United States.  Are we on the record right now?  Can

 2  we go off the record one second?

 3              THE VIDEOGRAPHER:  Yes.  The time is

 4  9:04 a.m., we're off the record.

 5              (Break from 9:04 a.m. to 9:06 a.m.)

 6              THE VIDEOGRAPHER:  Time is 9:06 a.m.,

 7  we're on the record.  Will the court reporter please

 8  swear in the witness.

 9              THE REPORTER:  My name is Tricia Williams,

10  Texas CSR No. 8273, I am administering the oath and

11  reporting the deposition remotely by stenographic means

12  from my residence in New Braunfels, Texas.  The witness

13  is located in Austin, Texas.  Mr. Benavides, will you

14  raise your right hand?

15              ROBERTO BENAVIDES,

16  having been duly sworn, testified as follows:

17              EXAMINATION

18  BY MR. BRYANT:

19      Q.  Mr. Benavides, my name is David Bryant, I

20  represent the state defendants in this action.  What's

21  your current residence address?

22      A.  8010 Briarton Drive, Austin, Texas.

23      Q.  And how long has that been your address?

24      A.  Since 1997.

25      Q.  Your name was disclosed in this litigation as



1        Q.    Okay.

2        A.    I don't know.

3        Q.    And did you have any confusion or questions

4    when you filled out the mail in ballots?  And when I say

5    you, I mean you or your wife.

6        A.    No, we didn't have any problems.

7        Q.    Okay.  And did you -- you promptly mail in

8    those mail in ballots after you filled them out?

9        A.    Yes.

10       Q.    About how long would that time interval be

11   between when you filled them out and when you mailed

12   them in October of 2022?

13       A.    Same day or the next day.

14       Q.    Okay.  And when you prepared your mail in

15   ballot, did you provide some identification information

16   on the ballot and/or the envelope?

17       A.    Yes, we did.

18       Q.    And what information did you personally provide

19   related to your mail in ballot in October 2022?

20       A.    The voter ID number that you get with your

21   registration card, the driver's license number, and the

22   last four numbers of my social security card.

23       Q.    Okay.  And how long, approximately, had you had

24   that driver's license?

25       A.    For the last -- we moved here in '93, '94.  So



1  almost going on 30 years.  29 years.

2      Q.    Had you ever had any other Texas driver's

3  licenses other than the one that you were using and

4  provided on your ballot or envelope in October 2022?

5      A.    No, that's the only license that I've ever had.

6      Q.    Prior to casting your mail in ballot, did you

7  contact, either directly or online, anybody connected

8  with the election process in Travis County?

9      A.    No, I did not.

10     Q.    When you cast your ballot, at least the first

11 time, did you feel that you understood the requirements

12 and had complied with them?

13     A.    Yes.

14     Q.    All right.  What's the next thing that you

15 heard after you and your wife mailed in your ballots

16 relating to those ballots?

17     A.    I'm not sure how long it was, maybe two weeks

18 later I received a notice in the mail that my ballot was

19 rejected because the driver's license number did not

20 match what they had on file and what my actual license

21 number is did not match.  So I requested a second

22 ballot.

23     Q.    When you received that notice, did you have or

24 try to have any conversations with anyone at Travis

25 County related to the election process?



1      A.   No, because I thought at my age and everything,

2  it would be very simple for me to write maybe a three

3  instead of an eight or a five.  So I thought I probably

4  did something wrong, especially kind of stressed out and

5  stuff.  So I figured I must have wrote the wrong number,

6  so I'll just try again.

7      Q.   Okay.  And how did you request an additional

8  ballot?

9      A.   I'm not sure if I went online again or if I

10 called.  I can't remember.

11     Q.   This mail notice related to the mail in ballot

12 that you received in October or November of 2022, did

13 that relate only to your ballot, or did your wife also

14 receive a notice related to her ballot?

15     A.   Only myself.  My wife had no problems at all.

16     Q.   And after you made a request for a second --

17 strike that.  When you received a notice relating to

18 your initial mail in ballot, did it provide any

19 information to you as to how to cure any problem that

20 might have existed?

21     A.   Not that I'm aware of.  Just a very simple --

22 just a checkmark that something didn't match, you know,

23 like this didn't match that, so -- according to their

24 records.  So that was pretty simple.

25     Q.   Okay.  I understand it provided the information



1  counted or cast?

2      A.   Yes, when Dana called me at home and she said

3  that there had been a problem with the ballot.

4      Q.   Approximately when was that?

5      A.   Two months ago.  Maybe two months ago, three, I

6  don't know.

7      Q.   And what other conversation did you have with

8  Dana at that time?

9      A.   I just told her I was not aware that there had

10 been problems.  I knew that I had voted twice, but I

11 didn't know that, you know, there was other problems.

12     Q.   Okay.  All right.  You mentioned that you

13 learned something about whether the initial rejection

14 was because of an error in your writing down one of your

15 numbers, or an error in the state database that

16 contained those numbers; is that correct?

17     A.   That's correct.

18     Q.   When did you learn of that problem?

19     A.   About three or four days ago.

20     Q.   Okay.  And what did you learn at that time?

21     A.   I called the voter's office, and the lady said

22 that their records show that my driver's license number

23 ends in a five, and my actual driver's license number

24 ends in a four.

25     Q.   Did you have any conversation with the election



1               (Break from 9:43 a.m. to 9:53 a.m.)

2               THE VIDEOGRAPHER:   Time is 9:53 a.m.,

3    we're on the record.

4        Q.   (By Mr. Bryant)   Thank you.   Mr. Benavides,

5    what was your wife's name?

6        A.   Christine Ann, A-N-N, Benavides.

7        Q.   And what was the date of her death?

8        A.   October 16th, 2022.

9        Q.   If I understood your testimony earlier, when

10   you had a conversation with someone with the Travis

11   County election authorities, they verified to you that

12   the social -- your social security numbers were

13   correctly recorded in those records, and they -- the

14   numbers you put on your ballots, your mail in ballots in

15   2022 match the social security numbers that Travis

16   County had for you.

17       A.   Yes.

18       Q.   Did anybody with the Travis County election

19   authorities tell you whether your 2022 general election

20   ballot had been counted or not?

21       A.   Yes.  It had -- they told me it was not

22   counted, because by the time they received it, which was

23   October the 28th, it was too late, they were only taking

24   in person delivery.

25       Q.   Is it correct then that your second mail in



1  ballot was not counted only because it arrived past the

2  date when mail in ballots received by mail could be

3  counted?

4       A.    That's the way I understood it.

5       Q.    Okay.  And so is it your understanding that

6  your mail in ballot for the November 2022 general

7  election was not rejected or not counted because of the

8  difference between the driver's license number on your

9  driver's license and the driver's license number in the

10  election records?

11      A.    The lady at the voter's office said she's going

12  to mail me a form to make sure that any future

13  elections, the correct number -- the number is correct.

14  But no -- I didn't know that my ballot had not been

15  counted, so I didn't know.

16      Q.    Okay.  Today you have been told by the attorney

17  for the United States that your ballot has not been

18  counted, or wasn't counted; is that right?

19              MS. WARMS:  Objection, privilege.  Don't

20  answer.

21      Q.    (By Mr. Bryant)  Is -- you referred to her

22  earlier as Dana, who's with us here today.  Is she your

23  attorney?

24              THE WITNESS:  Are you?

25              MS. PAIKOWSKY:  No.



1      Q.   Do you have any plans to vote either by mail in

2  ballot or in person in future elections?

3           MS. WARMS:  Objection, form.  You can

4  answer.

5      A.   I don't know.  It all depends how I -- my

6  health.  I'm almost 76 years old, so.

7      Q.   (By Mr. Bryant)  In connection with the

8  November 2022 general election -- you may have testified

9  to this, I just don't remember the answer.  What is

10  the -- what's your best recollection of the date when

11  you mailed the second mail in ballot?

12     A.   Must have been like the middle of October

13  sometime, but I don't remember the exact date.

14     Q.   Okay.  How did you mail it?

15     A.   Just the local neighborhood mailbox.  We have

16  one of those big, you know, cluster boxes, and --

17     Q.   You put it in that neighborhood mailbox?

18     A.   Yes.

19     Q.   So as far as you know, was it properly

20  addressed and stamped?

21     A.   Yes.

22     Q.   And can you say that you mailed that second

23  mail in ballot prior to October 20th?

24     A.   I don't remember.

25     Q.   Is it possible that you mailed it a little bit



```
 1              CHANGES AND SIGNATURE

 2   WITNESS NAME: ROBERTO BENAVIDES

 3   DATE OF DEPOSITION: MARCH 30, 2023

 4   PAGE    LINE        CHANGE            REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```



1            I, ROBERTO BENAVIDES, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5

6

7                                    _____

                                     ROBERTO BENAVIDES

8

9

10

11

12   THE STATE OF TEXAS:
     COUNTY OF _____:

13

          Before me, _____, on this day

14   personally appeared ROBERTO BENAVIDES, known to me (or
     proved to me under oath or through _____

15   _____) (description of identity card or other
     document) to be the person whose name is subscribed to

16   the foregoing instrument and acknowledged to me that
     they executed the same for the purposes and

17   consideration therein expressed.
          Given under my hand and seal of office this _____

18   day of _____, 2023.

19

20

21

22                                   _____
                                     NOTARY PUBLIC IN AND FOR

23                                     THE STATE OF TEXAS

24

25



```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO        *
     ENTERO, et al.             *
 4                              *
                                *
 5   VS.                        *   Civil Action No.
                                *   5:51-cv-00844-XR
 6                              *
     GREGORY W. ABBOTT, et al.  *
 7
     *********************************************************
 8
                      REPORTER'S CERTIFICATION
 9              DEPOSITION OF ROBERTO BENAVIDES
                      MARCH 30, 2023
10                    (Reported Remotely)

11   *********************************************************

12        I, TRICIA FOX WILLIAMS, Certified Shorthand
     Reporter in and for the State of Texas, hereby certify
13   to the following:

14        That the witness, ROBERTO BENAVIDES, was duly
     sworn by the officer and that the transcript of the oral
15   deposition is a true record of the testimony given by
     the witness;
16
          That the deposition transcript was submitted on
17   _____ to the witness or to the attorney for the
     witness for examination, signature and return to me by
18   _____;

19        That the amount of time used by each party at
     the deposition is as follows:
20
          MR. DAVID BRYANT - 01 HOURS:22 MINUTE(S)
21

22

23

24

25
```



1          That pursuant to information given to the
deposition officer at the time said testimony was taken,
2    the following includes counsel for all parties of
record:
3
         MS. VERONIKAH WARMS, Attorney for Plaintiffs
4        MR. ZACHARY DOLLING, Attorney for Plaintiffs
         MS. DANA PAIKOWSKY, Attorney for Plaintiffs
5        MS. LUCIA ROMANO, Attorney for Plaintiffs
         MR. HANI MIRZA, Attorney for Plaintiffs
6        MR. PETER HOFER, Attorney for Plaintiffs
         MS. LISA CUBRIEL, Attorney for Defendants
7        MS. JOSEPHINE RAMIREZ-SOLIS, Attorney for
                           Defendants
8        MR. STEPHEN KENNY, Attorney for Intervenor
                     Defendants
9        MR. DAVID BRYANT, Attorney for Defendants
         MR. ZACHARY BERG, Attorney for Defendants
10
         I further certify that I am neither counsel
11   for, related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or
otherwise interested in the outcome of the action.
13
         Further certification requirements pursuant to
14   Rule 203 of TRCP will be certified to after they have
occurred.
15
         Certified to by me this _____ of
16
_____, 2023.
17

18
                                    _Tricia Williams_
19                          _____
                              TRICIA FOX WILLIAMS
20                          Certified Court Reporter

21   Certification Number: 8273
     Date of Expiration: 10/31/2024
22   Firm Registration Number: 633
     Business Address:
23       Magna Legal Services
         16414 San Pedro Ave., Suite 900
24       San Antonio, Texas 78232
         (866)672-7880

25



# Exhibit 24

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
LA UNION DEL PUEBLO ENTERO,     )
et al.,                         )
                                )
          Plaintiffs,           )
                                )
V.                              ) Case No. 5:21-cv-844-XR
                                ) (LEAD CASE)
GREGORY W. ABBOTT, et al.,      )
                                )
          Defendants.           )
     ------------------------------------------------------------
OCA-GREATER HOUSTON, et al.,    )
                                )
          Plaintiffs,           )
                                )
V.                              ) Case No. 1:21-cv-780-XR
                                )
JANE NELSON, et al.,            )
                                )
          Defendants.           )
     ------------------------------------------------------------
HOUSTON AREA URBAN LEAGUE,      )
et al.,                         )
                                )
          Plaintiffs,           )
                                )
V.                              ) Case No. 5:21-cv-848-XR
                                )
GREGORY WAYNE ABBOTT, et al.,   )
                                )
          Defendants.           )
     ------------------------------------------------------------
```



```
LULAC TEXAS, et al.,              )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Case No. 1:21-cv-0786-XR
                                  )
JANE NELSON, et al.,              )
                                  )
          Defendants.             )
       ----------------------------------------------------------
MI FAMILIA VOTA, et al.,          )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Case No. 5:21-cv-0920-XR
                                  )
GREG ABBOTT, et al.,              )
                                  )
          Defendants.             )
       ----------------------------------------------------------
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )
V.                                ) Case No. 5:21-cv-1085-XR
                                  )
THE STATE OF TEXAS, et al.,       )
                                  )
          Defendants.             )
       ----------------------------------------------------------
```



ORAL & VIDEO DEPOSITION OF:


BERNADETTE MALONEY


April 20, 2023


------------------------------------------------


Oral & video deposition of BERNADETTE MALONEY,

produced as a witness at the instance of the defendants,

and duly sworn, was taken in the above-styled and numbered

cause on the 20th day of April, 2023, before

Patrick Stephens, Certified Court Reporter, conducted

remotely via Zoom.



                        A P P E A R A N C E S
ON BEHALF OF THE STATE DEFENDANTS:
          ETHAN SZUMANSKI, ESQ.
          Office of the Attorney General
          P.O. Box 12548 (MC-009)
          Austin, Texas 78711
          Telephone:  (512) 463-2100
          ethan.szumanski@oag.texas.gov
ON BEHALF OF THE OCA-GH PLAINTIFFS:
          DAYTON CAMPBELL-HARRIS, ESQ.
          ACLU Foundation
          125 Broad Street
          New York, New York 10041
          Telephone:  (212) 549-2500
          dcampbell-harris@aclu.org
          VERONICA WARMS
          Texas Civil Rights Project
          PO Box 17757
          Austin, Texas 78760
          veronikah@texascivilrightsproject.org
ALSO PRESENT VIA ZOOM:
          Ron Corbin, Videographer, Magna Legal Services
          Rachel Miller, Jones Day - rmiller@jonesday.com
          Edgar Saldivar, ACLU of TX
          Lucia Romano, Disability Rights TX - lromano@drtx.org
          John Sullivan Baker, DOJ- john.sullivanbaker@usdoj.gov
          Ashley Harris, ACLU of TX
          Savannah Kumar, ACLU of TX
          Noah Baron, LULAC - nbaron@elias.law
          Ryan Walters, TX AG's Office



1                            I N D E X

2   APPEARANCES.............................................. 04

3   BERNADETTE MALONEY

4           Cross-Examination by Mr. Szumanski .............. 08

5           Direct Examination by Mr. Campbell-Harris ....... 62

6           Direct Examination by Ms. Warms ................. 63

7

8

9

10  Reporter's Certificate................................... 70

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



OCA-APPX-0498

```
 1              E X H I B I T S

 2

 3   NO.       DESCRIPTION                              PAGE

 4   1         Depo Notice                               12

 5   2         OCA-GH 6th Initial Disclosures            13

 6   3         Vote By Mail Article                      50

 7   4         ABBM Article                              52

 8   5         Carrier Envelope Article                  53

 9   6         Track My Ballot Article                   54

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1     A     No.

2     Q     Have you reviewed any documents in this case such as

3    the filing -- such as the plaintiffs' second-amended complaints?

4     A     No.

5     Q     Have you reviewed Senate Bill 1 prior to this

6    deposition?

7     A     No.

8     Q     All right.  Now, Ms. Maloney, just kind of some

9    background information about you.  We're going to switch to that

10   topic.  What is your current home address?

11    A     My current home address is 10517 Grand Oak Circle,

12   Austin, Texas 78750.

13    Q     What county is that in?

14    A     Travis.

15    Q     How long have you lived there?

16    A     Oh, three years.

17    Q     Three years, you said?

18    A     Yes.

19    Q     Does anybody else live there with you?

20    A     Yes.

21    Q     Who is that?

22    A     Marge (ph) Waley.

23    Q     How do you spell that?

24    A     W-a-l-e-y.

25    Q     And what is your relation to them?



       1        A     A friend.

       2        Q     Friend.  How long has -- it's -- it's Wally; right?

       3   Is that how you say it?

       4        A     Waley.

       5        Q     Waley.  How long has Waley lived there with you?

       6        A     Well, she's lived there longer than me.  She's lived

       7   there, I would say, close to 20 years.

       8        Q     Does Waley own the --

       9        A     Yes.

      10        Q     -- residence there?

      11        A     Yes.

      12        Q     Miss -- Ms. Maloney, when were you born?

      13        A     September 22nd, 1957.

      14        Q     I know they usually tell you don't ever ask a --

      15   someone's age, but fortunately in depositions, I'm able to do

      16   that, so thank you.  Now, where were you born, Ms. Maloney?

      17        A     Brooklyn, New York.

      18        Q     So how long did you live in Brooklyn, New York?

      19        A     Four years.

      20        Q     After living in Brooklyn, New York, where did you

      21   travel to after that?

      22        A     Queens, New York.

      23        Q     And after that?

      24        A     Mullaghbawn (ph), County Cavan, Ireland.

      25        Q     Oh, wow.  How long did you live in Ireland?



1      Q    Pennsylvania?

2      A    Uh-huh.

3      Q    How long were you in Pennsylvania?

4      A    Six years.

5      Q    Is there any particular reason why you went to

6   Pennsylvania?

7      A    Well, to work, to go to school.

8      Q    Okay.  After Pennsylvania, where did you move to after

9   that?

10     A    Austin, Texas.

11     Q    Austin, Texas.  Have you lived in Austin, Texas, ever

12   since?

13     A    Yes.

14     Q    So, Ms. Maloney, do you have a Texas driver's license

15   by chance?

16     A    I do.

17     Q    How long have you had that?

18     A    Since -- I got my Texas driver's license in 1985.

19     Q    Do you also have a Texas identification card?

20     A    No.

21     Q    Is there any particular reason why you don't?

22     A    Because I have a driver's license.

23     Q    Understandable.  Ms. Maloney, are you registered to

24   vote in Texas?

25     A    Yes, I am.



1      Q    I'm assuming you're registered to vote in Travis

2  County.

3      A    Yes.

4      Q    How long have you been registered to vote there?

5      A    Since 1985.

6      Q    Are you familiar with where your polling location

7  typically is?

8                MR. CAMPBELL-HARRIS:  Objection to form.

9  Dayton Campbell-Harris.

10  BY MR. SZUMANKSI (resuming):

11      Q    Ms. Maloney, you can answer.

12      A    I -- I really can't recall.

13      Q    Okay.  Is there a particular reason?

14      A    Why I can't recall it?  Because it's -- it's -- it's

15  been a while since I -- I -- usually when I'm -- usually I do

16  early voting, and I would go from work, so whatever early-voting

17  place was open, I would go.

18      Q    Understood.  Thank you, Ms. Maloney.  Ms. Maloney --

19  and since you have a Texas driver's license, just kind of

20  following up on that, I'm assuming you're currently able to

21  drive.

22      A    Yes.

23      Q    Are you currently employed?

24      A    Yes.

25      Q    Where do you work?



1      A    I work for Carnegie.  It's a continuing-education

2  company.

3      Q    How long have you worked there?

4      A    Two years.

5      Q    What got you into the continuing-education field?

6      A    I've been a nurse 45 years, and they do continuing

7  education for doctors and for nurses, social workers,

8  pharmacists -- you know, a lot of healthcare workers.

9      Q    Ms. Maloney, you mentioned that you're a nurse for 45

10  years, so what type of education and training did you have past

11  high school?

12      A    I have an associate's degree in nursing from

13  Queensboro Community College, I have a bachelor's of nursing

14  from Gwynedd-Mercy College and I have a master's in nursing from

15  the University of Texas at Austin.

16      Q    And, Ms. Maloney, moving kind of a little bit away

17  from education and employment and that kind of thing, I want to

18  -- I want to little -- learn a little bit more -- excuse me --

19  about your family.  Do you have any family?

20      A    I do.  My mother is alive and is going to be 89 years

21  old next month.

22      Q    Well, congratulations to your mother.

23      A    Yeah.

24      Q    Do you take care of any of your family members?

25      A    My mom.



1     Q    And where does your mom live now?

2     A    She lives in Bayside, Queens.

3     Q    She's still in Queens, New York?

4     A    Yes.

5     Q    How often do you take care of your mom?

6     A    Well, I share it with my sister, so it depends on

7 who's most available.  Usually it falls on me.  So every once in

8 a while, my sister gives me a break.

9     Q    So because, as you said, it all falls on you, can you

10 give me kind of a frequency of how many days out of the week or

11 how many weeks out of a month you typically take care of your

12 mom?

13    A    I would say it -- it falls on me for probably two to

14 three months at a time and then I get a break, get to go back to

15 Austin, and then my -- my sister has to leave my mom; I come

16 back to New York.

17    Q    And when you come back to Austin for those breaks, how

18 long does that break usually last?

19    A    Sometimes I've been -- been there for a month, six

20 weeks; sometimes I've been there for two weeks.  It all depends.

21    Q    So would it be fair to say that you spend most of your

22 time in New York taking care of your mom?

23            MR. CAMPBELL-HARRIS:  Objection to form.

24 BY THE WITNESS (resuming):

25    A    I would say that I would spend probably -- if I looked



1 | back since COVID has happened, I would say anywhere from five to

2 | six months total.

3 |     Q    And so then that means your sister takes care of your

4 | mom during the other five or six months that --

5 |     A    Right, right, we -- yeah.

6 |     Q    Understood.

7 |     A    Yes, yeah.

8 |     Q    So --

9 |     A    We try to make it as fair as possible.

10 |     Q    Understood.  Understood.  Ms. Maloney, are you a part

11 | of any nonprofit organizations?

12 |     A    No.

13 |     Q    Have you done any type of events or attended any type

14 | of events for nonprofit organizations?

15 |     A    No.  I really -- I haven't been attending very many

16 | events at all since COVID, so...

17 |     Q    Before COVID, did you attend any events with nonprofit

18 | organizations in Texas?

19 |     A    A few.

20 |     Q    What type of events were those?

21 |     A    I've done, like, walks for different nonprofits, you

22 | know, to support them.  I did one event for the Texas League of

23 | Women Voters for their 100th anniversary.

24 |     Q    Okay.  So in addition to the Texas League of Women

25 | Voters nonprofit organization, would you mind telling me the



1  BY MR. SZUMANSKI (resuming):

2      Q    All right, Ms. Maloney.  We just got back from break

3  and now we're back on the record.  I just kind of wanted to do

4  some follow-up questions.  We've made a lot of progress, so

5  hopefully we'll be done here soon and you can go back to your

6  daily life.  So just a few follow-up questions, though.  I want

7  to get more of an understanding about kind of some of the

8  problems you were having with the ballot tracker.  So you said

9  that the second time you went on the ballot tracker -- and it

10 said that you were not registered to vote; right?

11     A    Right.

12     Q    Okay.  At any point in time did you receive a notice

13 of defect of your mail-in ballot --

14     A    Yes.

15     Q    -- for the 2022 general election?  Understood.  When

16 did you receive that?

17     A    Late October.

18     Q    And did it explain what the defect was in your mail-in

19 ballot?

20     A    I can't remember.

21     Q    Do you remember if it was because it was late?

22     A    No.

23     Q    Do you remember if it was because of the ID numbers

24 you put on there?

25     A    Can you explain which ID numbers you're talking about?



1    Q    Sure.  So you understand that when you submit a
2  mail-in ballot and carrier envelope, you have to put one of your
3  ID numbers on the carrier envelope; right?

4    A    Right.

5    Q    Did you put -- what number did you put?  You don't
6  have to tell me the numbers.  Just -- did you put your Social
7  Security number or your driver's license number?

8    A    I -- I did not.

9    Q    Did not put which one?

10   A    Either.

11   Q    Either.  What did -- what number did you put down?

12   A    I put my voter's registration number.

13   Q    Understood.  Why did you put your voter's registration
14  number instead of your ID number or partial -- partial Social
15  Security number?

16   A    I didn't see on the envelope where it required the
17  driver's license number or the Social Security number.

18   Q    So I'm assuming because you didn't see it, you did not
19  put it the first time you submitted your mail-in ballot.

20   A    Correct.

21   Q    Okay.  After you had learned that there was a problem
22  with your mail-in ballot the first time -- I believe you said in
23  October -- did you see it after that or around that time?

24   A    Did I see what?

25   Q    So did you -- after you learned that there was a



1  defect with your mail-in ballot, did you then become aware at

2  that time that you had to put an ID number or partial Social

3  Security number on the carrier envelope?

4         MR. CAMPBELL-HARRIS:  Object to form.

5  BY MR. SZUMANSKI (resuming):

6     Q    You may answer, Ms. Maloney.

7     A    Yes.

8     Q    So I'm assuming after you learned of this defect, you

9  submitted a new -- a second mail-in ballot.

10    A    No.

11    Q    No.  Any particular reason why?

12    A    Because I entered the missing information on the

13 ballot tracker.

14    Q    And by missing information, you mean one of those ID

15 numbers; correct?

16    A    Correct.

17    Q    And then after that, I'm assuming, is when you checked

18 it again the second time and then learned that it said you were

19 -- it said that you were not registered to vote; right?  Is that

20 the timeframe of events?

21    A    Yes.

22    Q    So after you learned that the ballot tracker had said

23 you were not registered to vote, you then went to check your

24 voter-registration status in Texas; correct?

25    A    Yes.



1    Q    And what did you learn when you checked back?

2    A    That I was registered to vote.

3    Q    And after you learned that you were registered to

4  vote, about how long after that did you start seeking help to

5  fix your mail-in ballot?

6    A    I can't remember --

7    Q    Understood.

8    A    -- exactly.

9    Q    Understood.  Do you know if it was weeks or days?

10   A    Days.

11   Q    Do you know if it was more than a week or less than a

12  week?

13   A    Less than a week.

14   Q    When you received that notice of defect in October, do

15  you -- did it come with a voter-registration application?

16   A    I don't recall.

17   Q    After learning that the ballot tracker had said you

18  were not registered to vote, did you try to submit new

19  voter-registration --

20   A    No.

21   Q    -- information?  So you didn't update -- or added your

22  voter registration at all?

23   A    No, I -- I didn't need to.

24   Q    And why do you think you didn't need to?

25   A    Because, as I said earlier, I went to the



1  voter-registration site and saw that I was registered to vote.

2      Q    Understood, understood.  So, Ms. Maloney, have you

3  become -- would you say that you are more aware of the voting

4  process because of your experience in the 2022 general election

5  and primary election?

6              MR. CAMPBELL-HARRIS:  Objection to form.

7  BY THE WITNESS (resuming):

8      A    Could you rephrase that question, please?

9      Q    Sure.  So now that you've been through the process of

10  voting by mail under SB1, since the Senate Bill 1 was passed,

11  would you agree with me that you have more knowledge about how

12  to vote by mail in future elections in Texas?

13             MR. CAMPBELL-HARRIS:  Objection to form.

14  BY THE WITNESS (resuming):

15     A    I don't know how to answer that question.

16     Q    Okay.  Why do you not -- well, I want to make sure I'm

17  helping you to -- to make sure we're both on the same page.  So

18  what can I do to help you understand this question -- or is

19  there a particular reason why you don't understand how to answer

20  this question?

21     A    It doesn't make sense to me, the question.

22     Q    So maybe I can rephrase it a little bit.  We'll go bit

23  by bit maybe a little bit more.  Maybe that will --

24     A    Okay.

25     Q    -- help you out.  So in the 2022 general election, you



1               CHANGES AND SIGNATURE

2 WITNESS NAME:  BERNADETTE MALONEY

3 DATE OF DEPO:  APRIL 20, 2023

4 PAGE      LINE     CHANGE                    REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



 1              I, BERNADETTE MALONEY, have read the

 2    foregoing deposition and hereby affix my signature that same is

 3    true and correct, except as noted above.

 4

 5

 6                             BERNADETTE MALONEY, Witness

 7    THE STATE OF _____          )

 8    COUNTY OF                         )

 9          Before me,                        , on this day

10    personally appeared BERNADETTE MALONEY, known to me (or proved

11    to me under oath of through                      ) (description

12    of identity card or other document) to be the person whose name

13    is subscribed to the foregoing instrument and acknowledged to

14    me that they executed the same for the purposes and

15    consideration therein expressed.

16          Given under my hand and seal of office this

17    day of                        ,          .

18

19

20

21                     NOTARY PUBLIC IN AND FOR

22                     THE STATE OF

23

24

25



```
                  IN THE UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
                         SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,       )
et al.,                           )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Case No. 5:21-cv-844-XR
                                  ) (LEAD CASE)
GREGORY W. ABBOTT, et al.,        )
                                  )
Defendants.                       )

     ------------------------------------------------------------

                        REPORTER'S CERTIFICATE
            ORAL & VIDEO DEPOSITION OF BERNADETTE MALONEY
                           APRIL 20, 2023
```

     I, Patrick A. Stephens, Certified National Court Reporter,
hereby certify to the following:


     That the witness, BERNADETTE MALONEY, was duly sworn and
that the transcript of the examination is a true record of the
testimony given by the witness;


     That pursuant to information given to the examination
officer at the time said testimony was taken, the following
includes all parties of record and the amount of time used by
each party at the time of the examination:



Mr. Ethan Szumanski (1 hr 20 mins)

Attorney for State Defendants


Mr. Dayton Campbell-Harris (3 mins)
Attorney for ACLU Voting Rights Project


Ms. Veronikah Warms
Attorney for Texas Civil Rights Project




     I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further that
I am not financially or otherwise interested in the outcome
of this action.

     Certified to by me on this 30th day of April, 2023.

                    *
                    *
                    *
                    *
                    *
                    *


                              PATRICK A. STEPHENS
                              NVRA NO. 5462
                              Expiration: 06/01/2023
                              Magna Legal Services
                              Firm Registration No.633
                              16414 San Pedro Ave.,
                              Ste. 900
                              San Antonio, TX  78232



# Exhibit 25

OCA-APPX-0516

# **DECLARATION OF BERNADETTE MALONEY**

My name is Bernadette Maloney. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge:

1. I am a resident of Austin, Texas, where I am an eligible voter.

2. I am registered to vote in Travis County, where Austin is located.

3. I turned 65 on September 22, 2022.

4. I first registered to vote in Texas in 1985. Since registering, I have voted for both Republican and Democratic candidates.

5. I have voted in nearly every Texas election for which I was eligible.

6. I have voted by mail consistently since 2020. I vote by mail because I am often outside my county, and because I am 65.

7. In October 2022, I requested a mail-in ballot sent to New York State, where I was taking care of my 89-year-old mother. I routinely look after my mother in New York for approximately five to six months out of the year.

8. When I received my mail-in ballot, I filled out all the provisions that I saw. I did not see that the carrier envelope required me to put my driver's license number or Social Security number under the flap. I inadvertently did not include that information as a result.

9. I received a notice from the Travis County Clerk on or about October 28, 2022 informing me that I left the required identification number off the ballot envelope. The notice is attached to this declaration as Exhibit A.

10. I reached out to my friend Mary Cullinane, who is a member of the League of Women Voters of Texas, and I asked her for advice about what to do when my ballot was rejected. Mary told me that I could correct the problem with my ballot online through the State's mail-in ballot tracker.

11. On or about October 29, 2023, I input my driver's license number into the mail-in ballot tracker.

12. About a week later, I used the mail-in ballot tracker to try to check the status of my ballot and the tracker reported that I was not registered to vote. As a result, I was unable to check the status of my ballot.

13. I confirmed through the Texas Secretary of State's website,[1] that I was registered to vote in Travis County. I then called the Secretary of State's Office to see whether I could receive an update on my mail-in ballot's status. A Secretary of State representative told me that their office could not help me and that I had to contact Travis County.

14. When I called the Travis County office, I was informed that my ballot could not be counted because I had called two days after the deadline.

15. My experience with the absentee voting system in Texas left me feeling like I cannot successfully vote by mail in the future. The mail-in ballot tracker did not cure the problem with my ballot or correctly identify me as a registered voter. I

---

[1] https://teamrv-mvp.sos.texas.gov/MVP/mvp.do

worry whether my mail-in ballot will count in future elections. Voting in-person is not an option for me while I care for my mother out-of-state.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2023.

Bernadette Maloney
Bernadette Maloney

# Exhibit 26

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civil Action No. 5:21-cv-844 (XR) <br> (consolidated cases) |

## DECLARATION OF YI LU ZHAO

My name is Yi Lu Zhao. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge.

1. I am a resident of Travis County, Texas and eligible to vote in Travis County, Texas.

2. I am 93 years old and have regularly voted since I was 62 years old.

3. I immigrated to the United States in January 1991.

4. In 1996 I became a citizen and that same year I registered to vote in Texas.

5. I am hard of hearing, and I have limited English skills.

6. I have regularly voted by mail for the last two decades.

7. I do not have a Texas Driver's License. I have a Texas ID and a voter registration card.

8.  In early January 2022 I applied by mail for a vote by mail ballot for the March 2022 primary. I filled in the last four digits of my social security number on the application form. I never had to do that before.

9.  For the first time in my life, I received rejection notices in connection with voting by mail.

10. The rejection of my application to vote in the March 2022 primary by mail was deeply upsetting. At my age it is not always easy to remember which identification numbers I used when I registered to vote over two decades ago.

11. I submitted my application three times, received three rejections, and was not permitted to vote by mail for the March 2022 primary election.

12. I received the first rejection on February 17, 2022, one day before the end of the application deadline on February 18, 2022, and over a month from my application. The instructions stated I needed to update my voter registration record with "both the Driver's License or Personal Identification Card number and the last 4 digits of your Social Security number."

13. On February 17, 2022, the same day that I received my first rejection, I sent another application for a vote by mail ballot, by mail, and this time I included both my Texas Personal Identification Card number and the last four digits of my social security number.

14. On February 18, my daughter e-mailed a third application for me to make sure that the county would receive it on time, and mailed a hard copy post-marked on January 18, consistent with the county's instructions that, "the new Application for a Ballot by Mail must be received no later than 2/18/2022. If the new

2

application is faxed or emailed on or near the deadline to apply for a Ballot by Mail, the original hardcopy must be received by the Early Voting Clerk within four business days of the receipt of your fax or email and meet all legally required deadlines for receipt of the application."

15. I received the second and third rejections after the application deadline, in letters from the Travis County Election Division, post-marked Feb 23, 2022.

20. One notice of rejection stated that I "did not indicate a party preference" and that the application "did not contain your Texas Driver's License Number, Texas Personal Identification Card Number, Texas Election Identification Certificate Number or the last 4 digits of your Social Security Number or the number provided did not match your voter registration record." The other notice of rejection stated, "We have received your application after the 2/18/2022 deadline to apply for an absentee ballot in the Primary Election."

21. I was very upset that my application was rejected three times. I wanted to vote by mail but could not do so even after successfully voting by mail for two decades.

22. I had not gone outside in public since March 2020 due to fears of contracting COVID.

23. Because I could no longer vote by mail for the 2022 Primary election the only way I could vote was to vote in person on election day. I went to the polling place with my daughter.

24. I had to stand in a long line outside in the cold for fifteen minutes. I found it difficult to stand up and to walk. I was shaking.

25. Eventually, a poll worker told me I could wait in the car and do curbside voting.

3

26. I did not vote in person during the 2022 general election. I voted by mail because the second and third applications I mailed were sufficient only for the 2022 general election, but not the 2022 primary election.

27. I do not intend to vote in person again because it is too difficult for me at my age.

28. I intend to try to vote by absentee ballot again in the future, but SB1 requires that I must reapply each year. I am very worried that my application to vote by mail will be rejected each year. The County took over four weeks from my first application to respond. Their rejection arrived the day before the application deadline. Once I corrected the errors my application was deemed too late, even though I followed their email and hardcopy instructions.

29. I had my daughter help me navigate this demoralizing process but there are seniors who also are limited English speaking like me and who live alone and don't have someone to help them. I believe they wouldn't be able to apply to vote by mail or vote at all without a daughter or son who knows this process and can help them.

This Declaration is made pursuant to 28 U.S.C. § 1746 with the translation assistance of my daughter, Ming Fei Yi. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 23, 2023.

_____

Yi Lu Zhao

OCA-APPX-0524

I declare under penalty of perjury that the foregoing translations are\ true and correct. Executed

on May 23, 2023.

_____

Ming Fei Yi

OCA-APPX-0525

# Exhibit 27

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## **DECLARATION OF MING FEI YI**

My name is Ming Fei Yi. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge.

1. I am a resident of Travis County, Texas and eligible to vote in Travis County, Texas.

2. I have regularly voted for 30 years since I was 35 years old.

3. I am 65 years old.

4. I immigrated to the United States in January 1981.

5. I became a citizen in 1990.

6. I registered to vote in Texas when I became a citizen.

7. I speak English and Chinese.

8. I have provided voter assistance to my father who is limited English proficient for over 20 years.

9. I am also my father's caretaker, and he lives in my house.

10. My father is engaged, well-informed, and speaks and reads limited English, but the ballot and election process are complicated and too difficult for him to understand.

11. I must explain the voting process to my father in Chinese.

12. I assist him at home with completing his absentee ballot. I do not tell him who to vote for.

13. The ballot, election information, and mail in ballot application is not translated into Chinese in Travis so I must provide an interpretation of the ballot language.

14. This year for the first time I had to provide assistance with the application for the absentee ballot, something they've automatically received for decades.

15. Despite three timely applications to vote by mail, my father's application was rejected, and he was not permitted to vote by mail for the first time in over 20 years.

16. I am concerned about senior citizens who don't have an engaged daughter or son to help them. I don't know how they could have handled the difficult absentee ballot application process on their own. I believe they would end up not voting.

17. My father was determined to vote and had not been outside of the house since January of 2020 to avoid being exposed to COVID. At grave risk, he decided to go in person to the polling place.

18. It was very cold outside on election day and there were no seats in the long line at the polling place for elderly voters to sit on. I was worried about my father's health.

2

OCA-APPX-0528

19. I am concerned about SB1's criminal liability for offering voter assistance with mail in ballots.

20. Before SB1 I provided assistance for seniors, as well as for my father.

21. Now I only assist my father and I do not offer help to other seniors who need assistance on their absentee application or ballot because of SB1's criminal liability.

22. I am afraid that even my assistance for my father could violate SB1. Who would take care of my father if I go to jail?

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 23, 2022.

_____

Ming Fei Yi

OCA-APPX-0529

# Exhibit 28

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## DECLARATION OF RIAZUDDIN AHMED

My name is Riazuddin Ahmed. I am over the age of 18 and capable of making this declaration.

The facts stated herein are within my personal knowledge.

1. I am a resident of Fort Bend County, Texas and eligible to vote in Fort Bend County, Texas.

2. I have regularly voted since I was 66 years old.

3. I am 85 years old.

4. I immigrated to the United States in December of 1972.

5. I became a citizen in 1978.

6. I registered to vote in Texas when I became a citizen.

7. I use a wheelchair.

8. I began voting by mail in Fort Bend County when I turned 65.. I am also eligible to vote by mail due to disability because in 2014 I suffered a stroke and must now use a wheel chair.

9. I have voted by mail-in ballot for 20 years and have reapplied each year without issue until 2022.

10. After 20 years of voting by mail, in 2022, I received the first rejection of my application for voting by mail for the March 2022 primary election.

11. I received a phone call from the county elections department saying that my ballot was rejected and that I needed to include my social security number on the outside envelope. That I would have to come to the county elections headquarters and complete the ballot process inside the building and that I would not have access to such help while sitting in my car as I am wheelchair bound.

12. I did not feel comfortable putting my social security number on an envelope because of identity theft.

13. Fort Bend County told me that I had to come into the central office to cure my vote by mail application.

14. Fort Bend County did not offer me a curbside option to cure my application.

15. The rejection of my application upset me. I particularly wanted to vote by mail because of my mobility disability, and because of my age and COVID vulnerability.

16. I was upset because Fort Bend County failed to offer me a disability-based accommodation to cure my vote by mail application by curbside, but instead required me to come in person to the central office to cure my vote by mail application.

17. At that time I had not gone outside in public since March 2020 due to fear of contracting COVID.

2

18. Because I was unable to cure my application for a ballot by mail, I had to vote in person during the March 2022 primary, using curbside voting, because I wanted to make sure I could vote.

19. It was a very cold day outside and I was quite uncomfortable because I still had to go outside to get into and out of the car.

20. At the polling place, it took 40 minutes for me to have my curbside voting initiated and completed by a poll worker.

21. The process was slow as the weather was very cold and the poll worker had to go in and out of the polling place to ask me a variety of questions and get signatures.

22. Although I was unable to vote by mail in the March 2022 primary, I did manage to vote by mail in ballot in the November 2022 general election.

23. I do not intend to vote in person again.

24. I intend to try to vote by absentee ballot in the future but I am afraid that my application to vote by mail will be rejected for again. I am afraid of identity theft when I am required to include my social security number on an envelope that is going out into the public, and I don't want my identity stolen.


This Declaration is made pursuant to 28 U.S.C. § 1746 with the translation assistance of my daughter, Farha Ahmed. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 23 2023.

Riazuddin Ahmed

3

I declare under penalty of perjury that the foregoing translations are true and correct. Executed

on May 23, 2023.

*[signature]*

Farha Ahmed

4

OCA-APPX-0534

# Exhibit 29

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>TEXAS, et al.,<br><br>*Defendants*. | Civil Action No. 5:21-cv-844(XR)<br>(Consolidated Case) |
| OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF TEXAS, REVUP–TEXAS, TEXAS ORGANIZING PROJECT, and WORKERS DEFENSE ACTION FUND,<br><br>*Plaintiffs*,<br><br>v.<br><br>TEXAS SECRETARY OF STATE JOHN SCOTT, *in his official capacity*, et al.,<br><br>*Defendants*. | 1:21-cv-0780-XR |

## NOTICE OF CONFIDENTIALITY

Pursuant to the protective order in this lawsuit, OCA-Greater Houston Plaintiffs designate as confidential the following portions of the attached League of Women Voters of Texas's deposition:

- 159:12–167:13

Dated: May 31, 2022

/s/Thomas Buser-Clancy
Texas Bar No. 24078344
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
tbuser-clancy@aclutx.org

OCA-APPX-0536

Transcript of the Testimony of

**Grace Chimene**

**Date:**

April 26, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

OCA-APPX-0537

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2            SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO          )
    ENTERO, et al,              )
4                               )
             Plaintiffs,    )
5                               ) CIVIL ACTION
    VS.                         )
6                               ) NO.: 5:21-cv-844-XR
    GREGORY W. ABBOTT, et al,    )
7                               )
             Defendants.    )
8                               )

9    ------------------------------------

10        ORAL AND VIDEOTAPED DEPOSITION OF

11              GRACE CHIMENE

12  Designated Representative of League of Woman Voters of

13                 Texas

14             APRIL 26, 2022

15   ------------------------------------

16      ORAL AND VIDEOTAPED DEPOSITION OF GRACE CHIMENE,

17  produced as a witness at the instance of the DEFENDANTS,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on April 26, 2022, from 10:14 a.m. to

20  5:13 p.m. before Miah Parson, CSR in and for the State

21  of Texas, reported by oral stenography, at the

22  Disability Rights Texas offices, 2222 W. Braker Lane,

23  Austin, Texas 78758, pursuant to the Federal Rules of

24  Civil Procedure and the provisions stated on the record

25  or attached hereto.

```
 1                    A P P E A R A N C E S

 2  FOR THE PLAINTIFFS:

 3       THOMAS BUSER-CLANCY
         ACLU FOUNDATION OF TEXAS, INC.
 4       5225 Katy Freeway, Suite 350
         Houston, Texas 77007
 5       Phone:  713-942-8146
         Fax:  915-642-6752
 6       tbuser-clancy@aclutx.org

 7
    FOR THE DEFENDANTS GREGORY W. ABBOTT, et al:
 8
         WILLIAM T. THOMPSON
 9       DEPUTY CHIEF, SPECIAL LITIGATION
         UNIT
10       P.O. BOX 12548 (MC-009)
         Austin, Texas 78711
11       Phone:  512-463-2100
         Fax:  512-457-4410
12       will.thompson@oag.texas.gov

13  ALSO PRESENT:

14  Lauren Morris-Videographer

15  Savannah Kumar
    Sarah Chen
16  Ashley Harris

17  VIA ZOOM:

18  Bradley Prowant
    Kelsey Pormasdoro-DOJ
19

20

21

22

23

24

25
```

1                           INDEX

2                                                         PAGE

3   Appearances........................................ 2

4   GRACE CHIMENE
        Examination by Mr. Thompson, .................... 4

5

6   Signature and Changes.............................. 209

7   Reporter's Certificate............................. 211

8

9                         EXHIBITS

10  NO.   DESCRIPTION                                    PAGE

11  1     Notice....................................      7

12  2     Answers to the interrogatories...........      14

13  3     2020 Impact Report....................         32

14  4     2021 Impact Report.......................      37

15  5     Plaintiff's Second Amended Complaint......      78

16  6     Slides Voting........................          134

17  7     Action Paper...........................        141

18  8     Attack on Texas Voters...................      143

19  9     Survey....................,,,,,,,,,,,,,,,,,,    159

20  10    Voter data.............................        162

21

22

23

24

25

1  also have this other type of League in Texas it serves a

2  local community called a League at large and they are

3  normally smaller leagues or newer leagues and they need

4  more assistance and they're considered units, right of

5  the Texas League.  So one of them has their own by laws

6  and policies and procedures the other one is -- is a

7  part of the Texas League.  Okay.  Right.

8      Q.  And does the National League have its own

9  bylaws and organizational documents?

10     A.  It has its own bylaws.  The Texas League has

11 its own bylaws and then local leagues that are

12 independent have their own bylaws.

13     Q.  Okay.  When I ask you about the League today

14 I'm gonna be asking about the Women Voters of Texas --

15     A.  Okay.

16     Q.  -- and anything that's a part of the League of

17 Women Voters of Texas, including those, I think you

18 called them consolidated local leagues?

19     A.  Leagues at Large.

20     Q.  The Leagues at Large.

21     A.  Yes.

22     Q.  They're --

23     A.  Yes, but the people who are members of a local

24 League that has their own bylaws and has their own

25 policies and procedures they are under the Texas League

1  so they have -- they follow our -- they -- they follow

2  what we say for anything to do with state level

3  information or state level advocacy.  So they take care

4  of the needs of the local level.  We take care of the

5  needs of the Voters at the state level.  So we're all

6  one organization.  They belong to all the same

7  organization, but they joined the local level.

8      Q.  So I think you said that the state League can

9  set certain rules that govern the conduct of local

10 leagues; is that right?

11     A.  Yeah.  But not -- not every conduct.  Some

12 things are -- are open for the local leagues that have

13 their own policies specific to what they're doing at the

14 local level.

15     Q.  And some activities are undertaken by local

16 leagues -- separate from the state League, right?

17     A.  At the local level.

18     Q.  Is that a yes?

19     A.  It was.  No, it wasn't a yes.  It was at the

20 local level local leagues can take action like if they

21 want to -- when they're doing the voters guide, they're

22 doing the voters guide for local elections, right?

23     Q.  Sure, I'm not --

24     A.  When they're going --

25     Q.  -- trying --

1 to Interrogatory No. 3?

2      A.  What -- what page is it on?

3      Q.  It's on Page 14 of Exhibit 2.  If you look

4 about half way down the page you will see a sentence

5 that says, LWVTX has approximately 3,050 members across

6 Texas.  Do you see that?

7      A.  Yes.

8      Q.  Does LWVTX mean League of Women Voters of

9 Texas?

10      A.  Yes.

11      Q.  And is 3,050 your best estimate of how many

12 members League has?

13      A.  It goes up and down right around that number.

14      Q.  How does one become a member of the League?

15      A.  Most members can join -- folks, anybody who is

16 16 and over can join the League of women voters and

17 generally they join at the local level and --  but if

18 there's not a local League in their community then they

19 will join at the state level and occasionally people

20 join at the national level.  Yeah.  They pay a certain

21 amount of money and that's how they join.

22      Q.  So is there a form one fills out to become a

23 member?

24      A.  Is there a form one fills out.  Do I fill out a

25 form.  I'm trying to think.  I go online and I click a

1  could have the opportunity to say I want to run against

2  so-and-so, but in general we have that nominating

3  process work so that everybody who really wants to be on

4  the board gets an opportunity to either be on the board

5  or to do some other projects at the statewide level.

6      Q.  And how are the members of the nominating

7  committee chosen?

8      A.  The members of the nominating committee, that

9  is in the bylaws and so -- so -- so check the bylaws

10  just to confirm that I'm being accurate.  I'm not 100

11  percent sure off the top of my head, but I believe

12  two -- three members who are not on the board are -- are

13  on the nominating committee and then two members who are

14  on the current board are on the nominating committee.

15  It's something like that so I think it ends up being

16  five people.  So that's something like -- my understand,

17  but I would have to really read the bylaws to make sure

18  I have it right.  And -- and one of them is assigned to

19  be the chair.

20      Q.  So the League of Women Voters of Texas is

21  governed by a board, right?

22      A.  Uh-huh, yes.

23      Q.  And that board is chosen through a convention

24  that votes to approve or not the people nominated by the

25  nominating committee, right?

1        A.   Yes.

2        Q.   You said the voter convention is done by

3   delegates, right?

4        A.   Yes.

5        Q.   And how does one become a delegate?

6        A.   Okay.  What's fun is we just had our convention

7   on April -- in early April.  So this all somewhat fresh

8   in my mind.  Let's think how we do -- so tell me the

9   question again.

10       Q.   How does one become a delegate to the League of

11  Women Voters of Texas convention?

12       A.   Okay.  So in our bylaws it says the number --

13  something about the number of members in your League or

14  League at large determines the number of delegates that

15  you have and so we use math.  And then to determine the

16  number of delegates and then how are those delegates

17  chosen the local League president gets to say who's on

18  the final list, but pretty much anybody who wants to

19  come to convention and be a delegate, there's plenty of

20  opportunities for them to be there.

21       Q.   The delegates to the League of Women Voters of

22  Texas convention are chosen by the local League

23  presidents, correct?

24       A.   By the local League presidents, yes.

25       Q.   How does one become a president of a local

1  looked at except for 2021 instead of 2020?

2      A.  Yes.

3      Q.  Okay.  Let's just briefly look at the last page

4  again, which is Bates stamped 2276?

5      A.  Uh-huh.

6      Q.  Do you see a similar pie chart regarding the

7  League's income underneath heading, Funding the Mission?

8      A.  Yes.

9           MR. CLANCY:  Same objection as beyond the

10  scope of the deposition notice.

11      Q.  (BY MR. THOMPSON)  Does it show the League's

12  income for 20 --

13      A.  Income, yes the pie chart.

14      Q.  I'm sorry.  I'm noticing something about the

15  last page.  If you look at the top of the last page, it

16  says 2022 report.  Do you see that?

17      A.  Yeah.

18      Q.  But the title on the first page said 2021

19  Impact Report, right?

20      A.  Yes.  So --

21      Q.  It is currently April of 2022, right?

22      A.  2021, today, yes.

23      Q.  Do you think that the chart relates to the

24  relevant numbers for 2021 or 2022?

25      A.  2021.

1     Q.  I'm sorry.  So the chart on Bates stamp 2276

2  shows that the League of Women Voters of Texas had an

3  income in 2021 of $320,308, right?

4     A.  Yes.

5          MR. CLANCY:  Just a continuing objection

6  this line of question speak and can you answer.

7     Q.  (BY MR. THOMPSON)  And the share of that income

8  that was attributable to the per member payments from

9  local leagues was 17 percent, right?

10    A.  No, wait a second.  Membership says 17 percent

11 yes.

12    Q.  All right.  Just to make sure we get it clear

13 for the record.  The pie chart shows on the bottom

14 right-hand corner a 17 percent slice of the pie labeled

15 membership, right?

16    A.  Yes.

17    Q.  And that means that 17 percent of the League of

18 Women Voters of Texas income in 2021 came from the per

19 member payments made by local leagues, right?

20    A.  That's my understanding.

21    Q.  Okay.  Thank you very much.  You can set aside

22 Exhibit 4.  So based on the numbers from 2020 and 2021

23 more than 80 percent of the League's funding comes from

24 sources other than per member payments, right?

25          MR. CLANCY:  Objection; form.

1  voters overall.  LWVTX would not have to conduct this
2  type of public education in the absence of SB1.  Do you
3  see all that?
4       A.  Yes, that was a very long paragraph.
5       Q.  It was indeed?
6       A.  Yes.
7       Q.  Okay.  So toward the top of that paragraph the
8  complaint alleges that SB1 would frustrate LWVTX's
9  mission of empowering voters and defending democracy by
10  expanding voter registration and increasing voter turn
11  out.  How does SB1 frustrate LWVTX's mission?
12       A.  So our mission of empowering voters and
13  defending democracy we take -- we take to heart and I
14  can barely say the mission without going woo hoo every
15  time because it's so important to us.  The -- so during
16  empowering voters.  So during most elections we're
17  working really hard and especially working on trying to
18  get more people registered to vote in voting Texas
19  elections and -- and we have in the past been
20  concentrating much of our efforts on young voters like
21  we have a high school voter registration program,
22  college age voters also because we know if you could get
23  a voter to -- a young voter to participate in one
24  election then they're more likely to participate in more
25  elections.  And we do that through our high school voter

1  registration and education, first vote education project
2  and the campus vote project that we work on a lot.  The
3  other area we work with are people who are less likely
4  to vote and so those would be people who are not
5  consistent voters, voters in low income areas, we work
6  with voters who are served by food banks, voters who are
7  new voters, we have a whole naturalization ceremony and
8  we have voters who -- who are new to Texas.  And so
9  those -- those are some of the areas -- some of the
10 areas we work on when we try to empower voters in Texas
11 in trying to get out the vote.  The -- and instead of
12 being able to do that, since -- SB1 we spent a great
13 deal of our time instead educating voters who are
14 normally consistent voters who have been voted -- voting
15 for a very, very, very long time in many cases who are
16 voting by mail, who are 65 years and over or are a voter
17 with a disability.  And so we've been spending much of
18 our time instead of working with those inconsistent
19 voters, but working with normally consistent voters
20 who's been voting for a very long time who are now need
21 a lot of voter education in order to get -- even get
22 through the application or the ballot by mail process.
23 So we -- we turned all of our energy -- I'm sorry, I'm
24 making hand motion we turned our energy from what we had
25 previously been concentrating on to these 65 and over

1  voters and voters with disabilities on educating them

2  about the new SB1 law, especially regarding voter ID.

3       Q.  So I understand, Ms. Chimene, that you brought

4  in some specific examples of what the League does and

5  how it respond to SB1.  I want to see if I can kind of

6  put those examples into categories and make sure I

7  understand each of the applicable categories that they

8  exist.  So what I think you were just testifying about

9  was -- that in response to SB1, the League has shifted

10 some of its focus from activities it used to do to other

11 activities in response to SB1, is that accurate?

12      A.  Yes.

13      Q.  Is there any way -- I'm sorry, let me try that

14 again.  Is that what the League is referring to when it

15 says that SB1 frustrates the League's mission?

16      A.  It's one of the aspects of what we mean when we

17 say it frustrates the League's mission.  It's -- is it

18 okay if I keep going?  So for us our mission is really

19 important to our members and -- and supporters.  And

20 that is empowering voters and defending democracy.  And

21 frustrating our mission by making it so that these

22 consistent older voters who are 65 and over and Texas

23 and who are voters with a disability can't get through

24 the process either of applying to vote by mail or the

25 ones that had their ballots rejected in this last

1  election or during the primary where they had 25,000
2  voters who voted by mails ballot rejected.  I would say
3  yes it frustrates our mission so --
4      Q.  So I think you said that the shift and focus is
5  one aspect of how SB1 allegedly frustrates the League's
6  mission.  I want a list of all the aspects in which the
7  League contends that SB1 frustrates the League's
8  mission.  Can you provide that?
9      A.  I can provide you with the ones that I could
10  come up with at this moment, but I'm sure there's going
11  to be more.  So let me start with, frustrates our
12  mission.  So let me start with the fact that we had to
13  pull together all of our volunteer efforts and focus on
14  creating voter education materials and creating a
15  communication plan for this specific bill and that
16  included actually hiring a communications person.
17  Everybody in the League is a volunteer.  I'm a
18  volunteer.  Everybody's a volunteer except we have a
19  staff member who is like -- her title is Executive
20  Director, but she's more like an administrator of the
21  office and -- and we got enough money to be able to hire
22  a communications person because this is taken up so much
23  of the volunteer's times and my time and other peoples
24  times on the board that we're unable to get done the
25  normal activities that we would like to provide or we're

1   just working so hard were exhausted.  So -- so it's our
2   members time, the inability to reach the voters we
3   normally reach and are concerned about and the cost of
4   having to pay extra staff as much as we could.  So now
5   we have communications person that we're paying for and
6   also -- let me try to think.  So that's volunteer time
7   --it frustrates our mission because I know these voters
8   who reached out to me and to us to let us know how
9   frustrated they were with this process.  There was
10  categories of them.  So some of them were very angry
11  about this bill and why is this happening to them.

12          And others are embarrassed that they were
13  unable to follow this process.  That they -- that SB1
14  created and others are not talking about it.  They have
15  just hold up and I'm not hearing from them.  So my
16  feeling and concern is that they will quit being a part
17  of our democracy.  And I believe that this is all due to
18  SB1 and these major changes that happen especially with
19  the voter ID and the complicated process for voting by
20  mail.  And -- and -- and so when I say it frustrates our
21  mission, I mean it really frustrates our mission in so
22  many different ways and those are just the three that I
23  was able to name at this moment.
24      Q.  Okay.  Let me try -- try this again.
25      A.  Okay.

1  get through the application process had their votes not

2  counted in the primary.  Some of those voters are angry

3  about it and letting me know that they're angry by

4  sending -- by contacting me in some way that we've

5  already shared.  Others are embarrassed and are kind of

6  turning it on themselves they're -- they seem

7  embarrassed and others I am not hearing from and my

8  concern because our mission is empowering voters into

9  fitting democracy.  My concern is the frustration is

10  we're not meeting those voters needs and we can't meet

11  their voter's needs because there is nothing I can do to

12  make sure that they're able to participate in this

13  process and those voters we are losing in this already

14  low voting state.  We are losing those voters and I'm

15  not sure that we'll ever be able to get them back again

16  and that is because of SB1.

17      Q.  Okay.  I think I understand the second category

18  you're describing, but I need to make sure that I'm

19  accurately understanding your testimony.  The League has

20  a goal of helping voters to vote, right?  Is that a yes?

21      A.  Yes.

22      Q.  Thank you and I'm sorry about that.

23      A.  Nope, it was my fault.

24      Q.  The League has a goal of helping voters to

25  vote, right?

1      A.  Yes.

2      Q.  And the League contends that its goal is

3  frustrated by SB1, right?

4      A.  Yes.

5      Q.  And that's because some voters the League

6  contends, are not able to effectively vote due to new

7  provisions in SB1, correct?

8           MR. CLANCY:  Objection.  Misstates the

9  testimony.  Form.

10      A.  So some voters are -- my concern is that

11  because of the ID requirement and other issues with SB1

12  that we have mentioned -- the lawyers have mentioned,

13  that some voters our -- are unable to overcome the

14  obstacles no matter how much voter education we provide.

15  No matter how much we work with county election

16  officials.  No matter how much we promote this SB1

17  complicates vote by mail and -- and makes it so that

18  we're losing voters who are normally consistent voters.

19  Not only that, but we're unable to meet -- we can't --

20  we can't seem to get them through this and we don't have

21  the resources to do voter education that is -- that is

22  required and so it's frustrating also because we're not

23  going in meeting all the voter's needs.  So we're not

24  meeting the high school voter needs.  We're not meeting

25  the college student needs.  We're not meeting the low

1  income voters or the inconsistent voters who we normally

2  concentrate on and instead we've had to turn our

3  attention to people who are normally very consistent

4  voters.  People who normally have been voting

5  consistently and by mail for some time for many years

6  and they've been voting by mail for many years and now

7  those voters are unable to either get through the

8  application process or they're one of the 25,000 that

9  had their ballots rejected.  So this is frustrating our

10 mission.

11       Q.  Let me try to sum it up.  We'll see if I get it

12 right.  The League contends that SB1 frustrates its

13 mission by preventing some people from voting, correct?

14       A.  Yes.

15       Q.  In an effort to address that problem the League

16 has tried to educate voters about SB1, right?

17       A.  That is one of the things we have tried to do,

18 yes.

19       Q.  And by Spending the resources to educate voters

20 about SB1, the League has necessarily shifted some

21 resources away from activities it otherwise would have

22 done, correct?

23       A.  Yes.

24       Q.  Does that capture all the ways that the League

25 contends that SB1 frustrates its mission?

1 the League's mission?

2          MR. CLANCY:  Objection to form.

3     A.  So we have resources, we have voters, we have

4 our time, and efforts.  So I could say yes for now.  I'm

5 sorry, I -- I -- I know that I'll go home and remember

6 all these other reasons.  So I apologize and I know

7 you're going to try to go over and over and over again,

8 but maybe after the next break I can come back to you

9 and tell you some more, but at this particular moment I

10 think that is a lot of resources and a lot of

11 frustration that we have so thank you.

12     Q.  (BY MR. THOMPSON)  Sitting here today you can't

13 tell me about any other ways that the vote by mail

14 provisions and SB1 frustrates the League's mission, can

15 you.

16     A.  Tell me, again.  Read it out loud.  Let me try

17 to categorize it.

18     Q.  Sure.  Maybe -- maybe it would help if I

19 numbered them.

20     A.  Well, if it was written down I'd probably able

21 to look at it and think more, but go -- yes, say No. 1

22 that might help.

23     Q.  Okay.  No. 1, the League contends that the vote

24 by mail provisions and SB1 will prevent some voters from

25 participating in elections, right?

1        A.  Yes, so that's voters, yes.

2        Q.  No. 2, the League tries to address that problem

3  by shifting its resources from other activities to

4  educating voters about SB1, right?

5        A.  Right.  Yes.

6        Q.  No. 3, despite the League's efforts the vote by

7  mail provisions and SB1 will according to the League

8  still prevent some voters from participating in

9  elections, right?

10       A.  Yes.

11       Q.  Now, I think those are the three broad

12  categories of ways that you have testified the vote by

13  mail provisions and SB1 can frustrate the League's

14  mission.

15       A.  Did one of those include financial resources,

16  not just volunteer time, but also financial resources?

17  Is that included under the resource section?

18       Q.  Yes, as far as I'm concerned the resources

19  addressed in No. 2 can be any type of resource you want.

20       A.  Okay.  All right that sounds good.

21       Q.  Is that -- are those the only three broad

22  categories you can testify about sitting here today.

23       A.  Sitting here today, yes.  Thank you.

24       Q.  You can't identify right now any other way in

25  which the vote by mail provisions of SB1 frustrates the

1      A.  At least.  I was -- we were working on 1 or 2

2 yesterday, sorry.

3      Q.  Are there more educational videos that the

4 League intends to edit or remake going forward based on

5 SB1 going into effect?

6               MR. CLANCY:  Objection; form.

7      A.  Yes, there will be more videos.

8      Q.  (BY MR. THOMPSON)  When will those be edited or

9 remade?

10      A.  It seems as though since December in the middle

11 of -- right during -- during the holidays instead of

12 having a wonderful -- a relaxing vacation we were

13 creating videos about vote by mail.  Many of those

14 videos -- I don't know many, those videos have been

15 edited and then we provide them in different ways.  So

16 when you make a voter educational video you're trying to

17 make it in a way that meets -- you're trying to provide

18 voter education for people who are impacted by the bill

19 and you're trying to make it -- meet all of their needs

20 and so there's many videos and there's many documents

21 and there's graphics and try -- and then working with

22 partners and other government agencies trying to meet

23 the needs of the voters.

24      Q.  So as I understand your testimony you're saying

25 that the League provides new information, including

1  through remade videos about changes caused by SB1,

2  correct?

3      A.  We have created numerous videos about changes

4  to SB1 and we will continue to create the videos in a

5  way that we hope will reach more and more voters.  At

6  the beginning SB1 was confusing for us and hard for us

7  to consolidate and take that huge bill and try to make

8  it into legal language that voters could understand, but

9  our early videos are fairly complicated because it's a

10 complicated process and we're trying to simplify as much

11 as we can.  So it's just -- it's just -- this is been a

12 very difficult time for us.

13     Q.  So based on Paragraph 167 of the second amended

14 complaint I thought there were particular videos,

15 educational videos that the League wanted to edit or

16 remake; is that right.

17     A.  About -- about SB1 and vote by mail, in

18 particular especially regarding the voter ID aspects of

19 it.  We will -- those videos were made and they're

20 multiple different types and now we are continuing to

21 edit and remake videos trying to reach as many voters as

22 possible just as possible.

23     Q.  When does the League anticipate that it will

24 finish editing or remaking those videos?

25              MR. CLANCY:  Objection; form.

1      A.  I make most of the videos to be honest, so

2  that's what I did over my vacation.  I think the video's

3  will be changing because they'll be made by somebody

4  else after June.  When I am not on the board -- so I

5  expect those videos will be changing and perhaps being

6  edited or just remaking them in a different way.  I

7  don't know if I answered your question, I'm sorry.

8      Q.  My question was, when do you think the process

9  will be complete?

10                 MR. CLANCY:  Objection; form.

11     A.  Those -- when will it be complete.  I think the

12 voter education that we provide on SB1 will continue on

13 as we try to find tune our voter education so that more

14 so to see if we could reach more voters and have them be

15 successful voters.  So right now the videos are in

16 English, they need to be made in Spanish, perhaps some

17 other languages, right now the videos were very simply

18 made by me and some other League members.  And I -- and

19 it was a huge start.  I think it will continue on.  I

20 expect we may have more videos as time goes by trying to

21 reach as many people as possible I know I've said that

22 before.  Okay.

23     Q.  (BY MR. THOMPSON)  If SB1 were no longer in

24 effect, would the League need to change the videos yet

25 again to take down that change?

1      Q.  If you flip to Page 9 and 10 and look at slides
2   18 to 19.
3      A.  Okay.
4      Q.  There the League is providing tips about
5   assistance for voters in polling place, right?
6      A.  Right.
7      Q.  So having gone through a few of these slides, I
8   guess what I want to know is, is this exhibit a
9   representative example of the types of tips and
10  education that the League provides?
11              MR. CLANCY:  Objection; form.
12     A.  This is not -- this is way more specific than
13  we normally get.  Because SB1 is so complicated and was
14  so massive and the changes are overwhelming for many
15  voters this is a lot more than we normally do.  We
16  normally have more perky happy slides about registering
17  to vote or voting early, you know, and this one is like
18  really more detailed, detailed oriented and that is what
19  SB1 has done.  Also this is very early on so over time
20  our education has changed and this is not for voters it
21  is for organizations that work with the voters.  So I
22  wouldn't teach voters all of this necessarily.  I would
23  try to make it more simple, but it's -- I like it.  I --
24  I created it.  I'm not a lawyer.
25     Q.  Sure.  And I'm surely not trained --

1                CHANGES AND SIGNATURE.

2  WITNESS NAME: GRACE CHIMENE DATE: APRIL 26, 2022

3  PAGE LINE      CHANGE            REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

```
 1          I, GRACE CHIMENE, have read the foregoing
     deposition and hereby affix my signature that same is
 2   true and correct, except as noted above.

 3

 4                          _____

 5                          GRACE CHIMENE

 6

 7

 8

 9   THE STATE OF _____)

10   COUNTY OF _____)

11

12          Before me, _____, on

13   this day personally appeared GRACE CHIMENE, known to me

14   (or proved to me under oath or through

15   _____) (description of identity

16   card or other document)) to be the person whose name is

17   subscribed to the foregoing instrument and acknowledged

18   to me that they executed the same for the purposes and

19   consideration therein expressed.

20          Given under my hand and seal of office this

21   _____ day of _____, _____.

22

23

24                          _____

25                          NOTARY PUBLIC IN AND FOR
                            THE STATE OF _____
                            COMMISSION EXPIRES: _____
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO        )
    ENTERO, et al,             )
 4                             )
                 Plaintiffs,   )
 5                             ) CIVIL ACTION
    VS.                        )
 6                             ) NO.: 5:21-cv-844-XR
                               )
 7  GREGORY W. ABBOTT, et al,  )
                               )
 8                 Defendants. )
                               )
 9

10               REPORTER'S CERTIFICATION

11   ORAL AND VIDEOTAPED DEPOSITION OF GRACE CHIMENE

12                  APRIL 26, 2022

13

14       I, Miah Parson, CSR, Certified Shorthand Reporter

15  in and for the State of Texas, hereby certify to the

16  following:

17       That the witness, GRACE CHIMENE, was duly sworn by

18  the officer and that the transcript of the oral

19  deposition is a true record of the testimony given by

20  the witness;

21       I further certify that pursuant to FRCP Rule

22  30(f)(1) that the signature of the deponent:

23   _X_ was requested by the deponent or a party before the

24  completion of the deposition and that the signature is

25  to be before any notary public and returned within 30
```

1    days from the date of receipt of the transcript.  If

2    returned, the attached Changes and Signature Page

3    contains any changes and the reasons therefor;

4         __ was not requested by the deponent or a party

5    before the completion of the deposition.

6         I further certify that I am neither counsel for,

7    related to, nor employed by any of the parties or

8    attorneys in this action in which this proceeding was

9    taken, and further that I am not financially or

10   otherwise interested in the outcome of the action.

11        Certified to by me this 17th day of May, 2022.

12

13

14                    _____
                          Miah Parson, CSR No. 11773
15                        Expiration Date:  02/28/2023
                          Firm Registration No. 633
16                        Magna Legal Services
                          16414 San Pedro, Suite 900
17                        San Antonio, Texas 78232
                          Phone 210-697-3400
18                        Fax 210-697-3408

19

20

21

22

23

24

25

# Exhibit 30

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

# <u>DECLARATION OF JOYCE LEBOMBARD</u>

My name is Joyce LeBombard. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge:

1. I am the President of the League of Women Voters of Texas ("LWVTX"). I have served in this role since June 2022. My current term will end in June of 2024. This is an unpaid, volunteer position to which I devote an average of 40 hours a week. I have been a member of the League since February 2017. I served the Austin Area League as VP of Voters Service, and then as President and Interim Communications & Technology Director. I am retired from a management career in IT, primarily in the financial services industry.

<u>About the LWVTX:</u>

2. The League of Women Voters of Texas is a nonpartisan, grassroots civic organization that encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. LWVTX's mission is to empower voters and defend democracy.

3. LWVTX's main office is in Austin, Texas. LWVTX has approximately 3,000 members and between 33 and 35 local leagues covering 39 counties across Texas. The League also serves voters statewide, even outside of these areas.

4. Members of local leagues are also members of the LWVTX, as well as the League of Women Voters of the United States.

OCA-APPX-0567

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

5. LWVTX members pay annual dues, a portion of which are paid to LWVTX from local leagues in the form of per member payments. These funds are used to fund a portion of LWVTX's activities.

6. LWVTX's officers and board members are LWVTX members who are elected by other members. Officer and board elections occur at the biennial LWVTX convention, where members from local leagues vote in the elections.

7. LWVTX is a volunteer-based organization. Many of our members participate in LWVTX's election-related programs, such as registering people to vote, participating in get out the vote ("GOTV") events, canvassing or "doorknocking," assisting individual voters, and hosting nonpartisan issue or candidate forums.

8. LWVTX and its local leagues fund, create, and distribute non-partisan election guides. These guides help to inform voters about how to vote and what the candidates and propositions on their ballots stand for. These guides are distributed across the state to voters, public entities like libraries, and other organizations—both as physical copies and online. LWVTX sends these voter guides to as many counties as possible, including counties without local leagues.

9. LWVTX undertakes a number of activities related to encouraging and facilitating voting by mail, including organizing and running voter registration drives; designing and executing public information campaigns about how to vote by mail; creating social media posts and materials about voter registration and early voting; encouraging eligible voters to use mail-in ballots; and educating voters about how to comply with Texas election laws governing early voting and voting by mail.

<u>LWVTX Members:</u>

10. Many LWVTX members vote by mail, including because they are over the age of 65 or have a disability.

11. I am aware of and know many LWVTX members who have disabilities, and as a result vote by mail and/or use assistants when they vote.

12. We also have many members who serve as voting assistants to voters casting mail-in-ballots in their communities. Organizations and others will often ask LWVTX chapters and members to provide assistants.

13. Many of the members and voters that LWVTX works with, who are older than 65 or have disabilities, do not have the privilege of voting easily. Many of the voters are unable to drive themselves to a polling location, are unable to walk around and use voting machines by themselves, and have been some of the most vulnerable populations to risk of severe illness from COVID-19.

14. LWVTX members are also some of the most devoted voters and committed to pursuing the ideals of American democracy. Many members have been voting since they were first old enough and eligible to vote, and have been voting and encouraging others around them to vote since then. Some of our members have individually been voters and activists for over half a century. LWVTX members are integral to pursuing our mission of empowering voters and defending democracy.

LWVTX's Diversion of Resources Due to SB1:

15. The provisions of SB1 challenged in this lawsuit have harmed LWVTX's ability to pursue its mission. The additional requirement to include a Texas ID number or social security number when voting by mail, and new requirements criminalizing assistants for

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

vote-by-mail ballots, has required LWVTX to devote significant resources to inform members and other voters how to navigate these changes.

16. Leading up to and since SB 1 went into effect in December 2021, LWVTX has had to devote significant personnel time and resources to helping members and the public navigate SB 1's new provisions. LWVTX will have to continue to divert resources in future elections to address the changes under SB 1, as long as its challenged provisions remain in place.

17. As the LWVTX's President, I have had to devote a significant portion of my time to addressing the harmful changes under SB 1. Likewise, my predecessor and other board members and LWVTX paid staff have also devoted significant time to SB 1. We have had to dedicate time to educating LWVTX members and the public about SB 1's harmful requirements and restrictions.

18. In response to requests about SB1 from voters and other organizations, we have hosted and participated in several presentations about the challenged SB1 provisions. Along with other board members and staff, I created PowerPoint presentations explaining SB1 and advising voters how to navigate these changes.

19. Much of the information we were using to advise members and voters about the changes under SB1 had to continue to evolve as the implementation of SB1 changed unpredictably. For instance, we initially understood that voters needed to (and were supposed to) include only one identification number when they voted by mail. This later changed to advise voters to include both a Texas ID number *and* a social security number, in order to increase the likelihood that one of these numbers would match what

OCA-APPX-0570

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

was in their voter file. As a result, LWVTX had to change the advice that we were giving to members and voters, and once again update materials to reflect this.

20. LWVTX has also spent a significant amount of time answering questions from local leagues about how to navigate changes under SB1. As discussed above, there has been serious confusion about whether local leagues should advise members and voters to write down only one identification number when voting by mail, or instead include both numbers. Likewise, I have had to answer many questions from local leagues about how to safely serve as voter assistants under the new SB1 requirements.

21. The LWVTX President is responsible for responding to media requests for the LWVTX. Since the passage of SB1, leading up to each election we have consistently received requests for information from journalists and media outlets about changes under SB1. Responding to these requests has been important for LWVTX to help publicize the changes under SB1 that harm voters, such as informing voters that they should include two identification numbers on applications and ballots to vote by mail, and that voter assistants have new and additional requirements to follow. Coordinating these interviews, preparing for them, and participating in them has taken a significant amount of personnel time since the passage of SB1.

22. Historically, the LWVTX President has handled the organizations' external communications. Because so much of LWVTX's time was being occupied by responding to requests and creating materials to respond to requests about SB1, the LWVTX's board of directors approved about $42,000 to hire a Digital Communications Associate, a position we did not employ before, and $10,000 to pay for their recruitment and

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

orientation. This new staff member would not have been needed if the LWVTX President had not had to respond to the changes under SB 1.

23. Additionally, LWVTX has had to expend financial resources on producing materials reflecting changes in the law related to SB 1, including the voters' guide. These changes to the voter guide needed to be translated into Spanish, Chinese, and Vietnamese, which costs additional financial resources.

24. LWVTX has worked with another organization, the Center for Civic Design to design an alternative Vote by Mail application form for other organizations and voters to use, which attempts to simplify the new identification and assistance requirements introduced by SB1. We have devoted a significant amount of time to creating the design and sharing it with other organizations and voters. We have translated the application into Spanish, but we are still working on translating the application into other languages and sharing it with communities that speak other languages.

25. LWVTX has spent time making suggestions to the Secretary of State's office about how to improve the implementation of SB1's new requirements. For instance, we have advised the Secretary of State's office to shift to recommending that voters include both their driver's license and social security numbers, instead of just one number. We have also offered suggestions about how information and videos on the Secretary of State's website about voting by mail should be improved.

26. As a result of its diversion of resources to respond to SB 1, LWVTX has had to significantly scale back its GOTV efforts leading up to elections. Rather than focusing on designing and disseminating materials on topics to encourage lower-propensity voters, such as supporting college students in voting and helping voters find their polling place,

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

LWVTX has had to focus on designing and disseminating materials about SB1's changes to the vote-by-mail process. Additionally, LWVTX has been forced to reduce its outreach to young voters, including encouraging voter registration at high schools, because LWVTX has had to focus on voters more likely to be affected by the challenged provisions of SB 1. As a result, LWVTX has shifted much of its time and resources to talking to people who are usually reliable and devoted voters, but who are now encountering new challenges to voting because of the requirements under SB1.

27. Overall, responding to the harmful challenged provisions of SB 1 required a huge diversion of LWVTX's resources, negatively affecting its usual and planned activities to pursue its mission.

## Harms to LWVTX Members and Other Voters

28. Since the passage of SB1, I have regularly received questions from local leagues, members, and other voters about how to navigate SB1's requirements for identification numbers when voting by mail and using an assistant when voting. LWVTX members are generally reliable and devoted voters who intend to continue to vote in the future, but many are concerned about the difficulties and risks that will occur when they do vote because of SB1. The members and voters that I hear from are scared of what SB1's requirements mean for them if they make a mistake or misinterpret the new requirements.

29. Many of the members and voters that I hear from are frustrated that to vote by mail they have to essentially guess what identification number they used when they registered to vote. I have also heard from people who are apprehensive about writing down their social security number on a form to vote by mail, because they have been advised to be extremely careful sharing their social security numbers.

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

30. LWVTX members who have been harmed by SB1's requirements include Pam Gaskin, Janet Eickmeyer, Jeannie Lewis, Patricia Buck, Milan Suarez, and Cynthia Edmondson.

31. Leading up to and during the March 1, 2022 primary and November 2022 general election in Texas, LWVTX heard from many members and other voters that they were having serious difficulties voting because of new SB1 requirements. Many longtime voters had their applications or ballots to vote by mail rejected for the first time. Likewise, many voters were unable to vote at all because they were unable to navigate the new identification requirements to vote by mail.

32. Although the state has implemented a ballot tracker and cure process for voting by mail, LWVTX has heard from many people that these systems failed them. Many members and other voters were unable to access the ballot tracker because their identification information would not allow them to log on. Likewise, LWVTX heard from many people who were not able to cure their ballots in time to vote before the election. Specifically, close to Election Days, many people were unable to cure their ballots in person because of limitations caused by their age and disabilities—the very reasons that they choose not to vote in person in the first place. Many LWVTX members are outraged about the high percentages of vote-by-mail applications and ballots that were rejected.

DocuSign Envelope ID: 375AE3A6-E33B-483D-9C73-306D444BB811

Conclusion:

33. Voter education and voting access were the casualties of the draconian changes under SB 1. SB 1 resulted in many Texas voters being silenced, and this will continue to happen as long as the challenged provisions of SB1 are in place.

This Declaration is made pursuant to 28 U.S.C. § 1745. I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>5/23/2023</u>

DocuSigned by:

*Joyce LeBombard*

F1AA3AD7461448C...

Joyce LeBombard
President LWVTX

OCA-APPX-0575

# Exhibit 31

## <u>DECLARATION OF GRACE CHIMENE</u>

My name is Grace Chimene. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge:

1. I previously served as the President of the League of Women Voters of Texas ("LWVTX") between June 2018 and June 2022. Further, I served on the LWVTX Board of Directors between 2014 and 2022, and previously served as the LWVTX advocacy chair. I have been a member of the LWVTX since 2012.

2. I was President of the LWVTX when Senate Bill 1 was passed by the Texas Legislature in 2021, as well as when Senate Bill 1's provisions were first implemented at the end of 2021.

3. During the 2020 LWVTX State Convention, LWVTX approved a plan to review the state of election administration and technology in Texas elections, including by developing a new LWVTX "Facts and Issues" position on 1) physical and cybersecurity measures in elections, 2) election equipment, and 3) measures to increase confidence in elections.

OCA-APPX-0577

4. However, due to the extensive time the LWVTX expended to challenge and educate the public about SB 1, LWVTX had to table the planned review and updates. Given the intensity of discourse during the extended 2021 legislative season around SB 1, and the final massive changes to the Texas Election Code, the resources for the planned review were diverted to responding to widespread requests for detailed information during the legislative sessions and addressing the impact of SB 1 once it went into effect.

This Declaration is made pursuant to 28 U.S.C. § 1745. I declare under penalty of perjury that the foregoing is true and correct.

Executed on  5-22-23

Grace Chimene

OCA-APPX-0578

# Exhibit 32

OCA-APPX-0579

Transcript of the Testimony of

**Pamiel Gaskin**

**Date:**

June 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

OCA-APPX-0580

1           IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3

4     LA UNIÓN DEL PUEBLO      )
      ENTERO, et al.,          )
5                              )    Case No.
          Plaintiffs,          )    5:21-cv-844-XR
6                              )
      VS.                      )    (Consolidated for
7                              )    space)
      GREGORY W. ABBOTT,       )
8     et al.,                  )
          Defendants.          )
9

10

11

12    _ _ _ _ _ _ _ _ _

13         DEPOSITION OF PAMIEL J. GASKIN
              June 29, 2022, 9:25 a.m.
14
       Location:  U.S. Department of Justice
15        1000 Louisiana Street, Suite 2300
                   Houston, Texas
16
            Volume 1 of 1 - Pages 1 - 127
17                              _ _ _ _ _ _ _ _ _ _

18

19

20

21

22

23    Stenographic Reporter:
      DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)
24    dsanderscsr@gmail.com

25    JOB NO. 845774

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF OCA-GREATER HOUSTON:

 4     ACLU TEXAS
       P.O. Box 8306
 5     Houston, Texas   77288
       512.983.0775
 6     aharris@aclutx.org

 7     Represented by: Ms. Ashley Harris

 8    ***
      ON BEHALF OF TEXAS CIVIL RIGHTS PROJECT ON BEHALF OF
 9    PAMIEL GASKIN:

10     TEXAS CIVIL RIGHTS PROJECT
       1405 Montopolis Drive
11     Austin, Texas   78741
       512.474.5073
12     zachary@texascivilrightsproject.org

13     Represented by: Mr. Zachary Dolling

14    ***
      ON BEHALF OF STATE DEFENDANTS:
15
       OFFICE OF THE ATTORNEY GENERAL
16     SPECIAL LITIGATION UNIT
       P.O. Box 12548, Capitol Station
17     Austin, Texas   78711
       512.936.2567
18     jack.disorbo@oag.state.tx.us

19     Represented by: Mr. Jack DiSorbo
                       Mr. Zachary Berg
20
      ***
21    ON BEHALF OF YSABEL RAMON:

22     HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
       100 E. Cano, Courthouse Annex III, 1st Floor
23     Edinburg, Texas   78359
       956.292.7609
24     leigh.tognetti@da.co.hidalgo.tx.us

25     Represented by: Ms. Leigh Tognetti - via Zoom
```

1  ON BEHALF OF UNITED STATES OF AMERICA:

2  DEPARTMENT OF JUSTICE
   Civil Rights Division, Voting Section
3  Washington, DC   20530
   202.353.5373
4  dana.paikowsky@usdoj.gov

5  Represented by: Ms. Dana Paikowsky

6  ***

7  ON BEHALF OF HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE:

8  BUTLER SNOW LLP
   1400 Lavaca Street, Suite 1000
9  Austin, Texas   78701
   737.802.1800
10 victoria.giese@butlersnow.com

11 Represented by: Ms. Victoria A. Giese - via Zoom

12
   ON BEHALF OR INTERVENOR DEFENDANTS:
13
   JONES DAY
14 51 Louisiana Avenue, NW
   Washington, DC   20001
15 202.879.3667
   skenny@jonesday.com
16
   Represented by:  Stephen Kenny - via Zoom
17

18 ALSO PRESENT VIA ZOOM:

19 Kenny Buser-Clancy

20 Tiffany Bingham - Harris County

21 Savannah Kumar

22 Barbara Nicholas - Scarpello & Creuzot

23

24

25

1                          INDEX

2                    ORAL DEPOSITION OF

3            PAMIEL J. GASKIN, JUNE 29, 2022

4                                          Page

5  BY MR. DiSORBO.........................   6

6

7   Start time - 9:25 a.m. End time - 12:18 p.m.

8   Total pages: 127

9

10

11  REPORTER CERTIFICATION................... 127

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        EXHIBIT INDEX

2                      ORAL DEPOSITION OF

3               PAMIEL J. GASKIN, JUNE 29, 2022

4                        Description                    Page

5   ***Introduced ONLY
      Exhibit C            How Texas officials and ...... 105
6                          voting groups are trying to
                           limit mail ballot rejections
7
      Exhibit E            Gaskin Twitter profile........ 115
8
      Exhibit F            Gaskin interview picture...... 118
9

10

11              •_____•

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  were retired?

2      A.    Well, I retired the first time from

3  AT&T; and I was a sales executive.  I had -- I was a

4  division manager.  I had sales organizations in

5  Texas, Oklahoma, Missouri, Kansas.  They would call

6  them -- and Arkansas -- the MOKA states.

7      Q.    The MOKA states.

8      A.    And when I retired from there, I went to

9  work for KPMG, the accounting firm; and I retired

10  from there.

11            And three guys that -- two guys that

12  I had been -- that I had worked with back in the

13  AT&T days and at KPMG, we all started our own little

14  consultancy.  And we -- that was in 2008.  And we

15  closed that down in 2019.

16      Q.    So you've been retired since 2019?

17      A.    Yes.

18      Q.    Okay.  Now, you're a member of the

19  League of Women Voters Texas; correct?

20      A.    I am.

21      Q.    Okay.  And before that, you were a

22  member of the League of Women Voters Houston; right?

23      A.    I still am.

24      Q.    You still are.  Okay.

25            You can be a member of both?

1        A.     Yes.

2        Q.     Okay.  And those are nonprofit

3    organizations, correct, ma'am?

4        A.     Yes, they are.

5        Q.     Okay.  I'll talk a little bit more about

6    those later.

7                But before that, are you a member of

8    any other nonprofit organizations?

9        A.     Well, I'm a member of the Alpha Kappa

10   Alpha Sorority, Incorporated.

11               I'm a member of the National

12   Congress of Black Women.

13               And that would be it.

14       Q.     Okay.  Those two.

15               Are you a member of any -- or strike

16   that.

17               Are you a member of any other

18   professional organizations?

19       A.     I am a member of ISACA, I-S-A-C-A.  I'm

20   a certified information systems auditor, and I am a

21   member of that organization.

22               I'm also a member of the National

23   Association of Parliamentarians.

24       Q.     Oh, okay.  My apologies for talking over

25   you.

1    during the special session.  Do you understand that,

2    ma'am?

3         A.    I understand that.

4         Q.    Okay.  Thank you.

5                    Now, do you understand that the

6    United States and OCA Greater Houston are plaintiffs

7    in this case?

8         A.    I don't know what OCA Houston is.

9         Q.    Okay.  I'll move on.  It's not

10   important.

11                   Do you understand that you were

12   disclosed as a potential witness in this case?

13        A.    I do understand that.

14        Q.    Do you know why that was done?

15        A.    Because I had some issues with my

16   attempts to -- to receive my application for a

17   mail-in ballot.

18        Q.    Any other reasons that you're aware of?

19        A.    No.

20        Q.    Okay.  Now, I'm glad that you mentioned

21   that, ma'am, because I do want to talk about that a

22   little bit.  But I have a few preliminary questions

23   first.

24        A.    Okay.

25        Q.    Now, are you registered to vote?

1        A.        I am.

2        Q.        Where?

3        A.        Fort Bend County.

4        Q.        Fort Bend County.

5                  Have you ever always been registered

6   there?

7        A.        Well, since I lived there in -- since 46

8   years.

9        Q.        Have you ever been registered anywhere

10  else?

11       A.        I was registered in Harris County prior

12  to that.

13       Q.        Harris County.

14       A.        And Galveston County prior to that.

15       Q.        And Galveston County.  Okay.

16                 And I think I remember reading some

17  great story about the first time that you registered

18  to vote in Galveston County.  I think your father

19  drove you to get registered there, something like

20  that?

21       A.        He did.

22       Q.        Tell me a little bit about that.

23       A.        You had to be 21 to vote at that time.

24       Q.        Okay.

25       A.        My birthday is in March; so I was in

1  school.  He called me.  He said, "For your birthday,

2  I'm going to come get you.  Give me your schedule,

3  your class schedule, and I'm going to come get you

4  and get you registered to vote."

5              So I told him what my class schedule

6  was.  He showed up on a Thursday afternoon, about 1

7  o'clock.  Drove me back to Galveston County.

8              That morning -- next morning took me

9  to register to vote, and drove me back to Austin

10 that afternoon so I could go to my 1 o'clock class.

11     Q.    That's great.

12              Do you remember what class it was?

13     A.    No.  No.  No.  I'm 75.  That was -- I

14 was 21 then.

15     Q.    Sometimes when you've got great stories

16 like that, you remember random details, that sort of

17 thing.

18     A.    That's not a detail I remember.

19     Q.    Well, that's a long drive from Austin to

20 Galveston.

21     A.    Yeah.

22     Q.    Now, you said that you voted in the

23 March 2022 primary; correct?

24     A.    I did.

25     Q.    Okay.  Now, I understand you had some

1  form from you guys."

2              She said, "Well, the Secretary of

3  State didn't send us the right forms in time, and we

4  didn't populate the correct form until around the

5  6th of January."

6              I said.  "Okay.  Is the correct form

7  there now?"

8              She said, "Yes."

9              So I pulled the correct form down.

10  Filled it out.  Mailed it in.  And I had just -- it

11  was -- this was on the 13th.

12              On the 20th, I had just finished a

13  League of Women Voters activity, and I was on my way

14  home.  And Veronica called me and said, "Don't shoot

15  the messenger.  Your application has been rejected."

16              I said, "For what?"

17              She said, "You didn't put the

18  correct ID on your application."

19              I said, "Veronica, what do you mean

20  I didn't put the right ID?  It asks for my driver's

21  license number, and that's what I put on there."

22              She says, "Well" --

23              I said, "What was I supposed to put

24  on it?"

25              She said, "Well, I can't tell you,

1  because if I do, I could go to jail because of the

2  new law."

3              And I said, "Well, obviously since

4  you're only asking for two things, it must be my

5  Social Security number."  I said, "What number is

6  it?"

7              And she said, "It's the number you

8  use when -- the ID you used when you first

9  registered to vote that's in your voter record

10  here."

11              And I said, "Well, Veronica, I

12  registered to vote 46 years ago in this county.

13  What" -- so I said, "Okay.  It could only be one of

14  two things, since you're only asking for two things.

15              "So is it my -- if I tell you what

16  it is, can you confirm that?"

17              She said, "Yes, I can do that."

18              I said, "Okay.  Is it my Social

19  Security number?"

20              She said, "Yes, it is."

21              I said, "Thank you very much."

22              I pulled down another form.  And

23  this time, leaving nothing to chance, everywhere

24  there was a blank, even on the optional information,

25  I filled it all in, and mailed it back on the 14th.

1                   And on the 28th of January -- no,

2     the 31st of January, I got my ballots in the mail.

3     28 days, three tries.

4          Q.    And then you submitted those ballots

5     correctly --

6          A.    I did.

7          Q.    -- correct?  Yeah.

8                   And did you track those ballots

9     after you submitted them?

10         A.    I did.

11         Q.    Where did you track them?

12         A.    On ballot tracker.  You go to the County

13    site, and it's a little thing you click on that says

14    "Track my ballot."

15         Q.    And I guess it lets you know once the

16    ballot's been accepted?

17         A.    It tells you.  You can see when it was

18    saved; you can see when it was accepted; and you can

19    see -- they use a funny term for it being processed.

20    And I don't remember what it is.  But you can tell

21    when it's being processed.

22         Q.    And your and your husband's votes were

23    eventually processed; correct?

24         A.    Yes, they were.

25         Q.    Okay.  Well, thank you for explaining

1      Q.    (BY MR. DiSORBO)  Understand.  And I'm

2  not asking if you know every provision that's in

3  SB1.

4            I'm just saying, me and you sitting

5  right now, any provisions of SB1 come to mind that

6  you oppose besides the ones we've already talked

7  about?

8      A.    No.  Good to go, ma'am?

9      Q.    Okay.

10     A.    I'm good.

11     Q.    All right.  So I want to talk a little

12  bit about your membership in the League of Women

13  Voters.

14     A.    Okay.

15     Q.    And you had told me that you're a member

16  of both the League of Women Voters Texas and Houston

17  branches; is that right?

18     A.    Correct.

19     Q.    You were a member of the Houston branch

20  first; is that correct?

21     A.    Yes.

22     Q.    And when did you become a member?

23     A.    In probably the '90s.

24     Q.    Okay.  And how did you originally become

25  a member?

1    A.    Actually, one of my sorority sisters and

2    I were talking about ways that we could become more

3    civically engaged, and the League of Women Voters

4    seemed to offer the things that we were interested

5    in:  voter registration; voter education.  So we

6    joined, she and I.

7    Q.    And you've held various positions in the

8    Houston chapter over the years; is that right?

9    A.    Correct.

10    Q.    Which ones, if you can recall?

11    A.    I was the chairman of nonnaturalization

12    voter registration, which is everything other than

13    naturalization.

14    Q.    As the name implies.

15    A.    I was a board member.

16          I worked on our voter guide on the

17    questions -- question development for candidates.

18    And I also worked on the voter guide following up

19    with candidates to harass them into sending in their

20    responses.

21    Q.    That takes some perseverance, doesn't

22    it?

23    A.    Yes, it does.  And thick skin.

24    Q.    Okay.  So you did that.

25          Any other position -- you were -- so

1  you were the chair of that.  What other positions

2  did you hold?

3      A.    That's it.

4      Q.    That's the main one?

5      A.    Uh-huh.

6      Q.    Okay.  And now you're a member of the

7  Texas branch too; is that correct?

8      A.    That's correct.

9      Q.    Okay.  And I think you're a director in

10 the Texas branch; is that right?

11     A.    That's correct.  Just effective June 1st

12 of this year.

13     Q.    Of this year.  Well, congratulations.

14 That's --

15     A.    A few weeks ago.

16     Q.    How did that come about?

17     A.    I was elected by the membership at our

18 state convention in April.

19     Q.    This April?

20     A.    Uh-huh.

21     Q.    How did you decide to run?

22     A.    I was asked to run.  The nominating

23 committee asked me if I would consider running.

24     Q.    Did they --

25     A.    Last year.

1        Q.      Last year.

2        A.      Yes.

3        Q.      When -- about what time of the year last

4    year?

5        A.      Probably October/November.

6        Q.      Of 2021?

7        A.      Uh-huh.

8        Q.      Okay.  And why did they want you to run?

9        A.      Been an active member.  I guess they saw

10   something, that they thought I could contribute on a

11   state level.

12       Q.      They thought you were a good candidate?

13       A.      Thought I was a good candidate.

14       Q.      Nothing more specific than that, that

15   you're aware of?

16       A.      Not that I'm aware of.

17       Q.      Okay.  And I suppose you were

18   successful; you were elected?

19       A.      Well, they -- I made their vetting

20   process, and they presented the slate to the

21   membership.

22       Q.      Okay.  And the membership votes up or

23   down on a slate, I suppose; is that right?

24       A.      Yes.

25       Q.      Okay.  Now, what is -- strike that.

1 REPORTER CERTIFICATION

2 THE STATE OF TEXAS :
COUNTY OF HARRIS :

3

4 I, DENYCE SANDERS, a Certified Shorthand
Reporter and Notary Public in and for the State of
Texas, do hereby certify that the facts as stated by

5 me in the caption hereto are true; that the above and
foregoing answers of the witness, PAMIEL J. GASKIN, to

6 the interrogatories as indicated were made before me
by the said witness after being first duly sworn to

7 testify the truth, and same were reduced to
typewriting under my direction; that the above and

8 foregoing deposition as set forth in typewriting is a
full, true, and correct transcript of the proceedings

9 had at the time of taking of said deposition.

10 I further certify that I am not, in any
capacity, a regular employee of the party in whose

11 behalf this deposition is taken, nor in the regular
employ of his attorney; and I certify that I am not

12 interested in the cause, nor of kin or counsel to
either of the parties;

13

14 That the amount of time used by each party at
the deposition is as follows:

15

16 MR. DiSORBO - 02:45:34

17 GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
this, the 1st day of July, 2022.

18

19 _____
DENYCE SANDERS, CSR, RDR, CRR, TCRR

20 Notary Public in and for
Harris County, T E X A S

21

22 My Commission Expires: 4-14-25
Certification No.: 4038

23 Expiration Date: 4-30-24
Magna Legal Services

24 1635 Market Street, 8th Floor
Philadelphia, PA 19103

25 215.207.9460
JOB NO. 845774

# Exhibit 33

Transcript of the Testimony of

**Janet Eickmeyer**

**Date:**

June 13, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

OCA-APPX-0600

```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                ) Civil Action No. 5:21-cv-
 5   v.                         )          00844-XR
                                )
 6   GREGORY W. ABBOTT, et al., )
          Defendants.           )
 7

 8

 9         ----------------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF
                       JANET EICKMEYER
11                     JUNE 13, 2022
                         Volume 1
12
           ----------------------------------------
13

14

15              ORAL AND VIDEOTAPED DEPOSITION OF JANET

16   EICKMEYER produced as a witness at the instance of

17   Defendants, and duly sworn, was taken in the above-styled

18   and numbered cause on the 13th day of June, 2022 from

19   10:07 a.m. to 12:28 p.m. before Nancy Newhouse, a

20   Certified Shorthand Reporter in and for the State of

21   Texas, reported by oral shorthand, located at the law

22   offices of Vinson & Elkins, 2001 Ross Avenue, Suite 3900,

23   Dallas, Texas 75201, pursuant to the Federal Rules of

24   Civil Procedure, and the provisions stated on the record

25   or attached hereto.
```

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    Ms. Ashley Harris, In Person, OCA-GH
     ACLU FOUNDATION OF TEXAS, INC
5    5225 Katy Freeway, Suite 350
     Houston, Texas 77007
6    Telephone: (713) 942-8146
     Fax: (915) 642-6752
7    email: aharris@aclutx.org

8    Mr. Thomas Buser-Clancy, via Virtual Video, OCA-GH
     ACLU FOUNDATION OF TEXAS, INC
9    5225 Katy Freeway, Suite 350

10   Houston, Texas 77007
     Telephone: (713) 942-8146
10   Fax: (915) 642-6752
     email: tbuser@aclutx.org
11
     Mr. Savannah Kumar, via Virtual Video, OCA-GH
12   ACLU FOUNDATION OF TEXAS, INC
     5225 Katy Freeway, Suite 350
13   Houston, Texas 77007
     Telephone: (713) 942-8146
14   Fax: (915) 642-6752
     email: skumar@aclutx.org
15
     Mr. Zachary David Dolling, In Person, TCRP
16   TEXAS CIVIL RIGHTS PROJECT
     1405 Montopolis Drive
17   Austin, Texas 78741
     Telephone: (512) 469-4746
18   Fax: (512) 474-0726
     email: zachary@texascivilrightsproject.com
19
     Ms. Kaylie Hidalgo, In person TCRP
20   TEXAS CIVIL RIGHTS PROJECT
     P.O. BOX 17757
21   Austin, Texas 78760
     Telephone: (832) 767-3650
22   Fax: (512) 474-0726
     email: kaylie@texascivilrightsproject.com
23

24

25

1              A P P E A R A N C E S Continued

2

3   FOR THE DEFENDANT:

4    Mr. William D. Wassdorf, In Person, OAG
     ATTORNEY GENERAL KEN PAXTON OFFICE
5    DEPUTY CHIEF, SPECIAL LITIGATION UNIT
     209 W. 14th Street
6    Austin, Texas 78701
     Telephone: (512) 463-2100
7    Fax: (512) 457-4410
     email: will.wassdorf@oag.texas.gov
8
     Ms. Lisa Cubriel, via Virtual Video, Bexar County
9    ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
     101 West Nueva Street, 7th Floor
10   San Antonio, Texas 78205
     Telephone: (210) 335-2142
11   Fax: (210) 335-2773
     email: lisa.cubriel@bexar.org
12
     Ms. Jacqueline Lysette Villarreal, via Virtual Video,
13   Hidalgo County
     District Attorneys Office
14   100 East Cano Street
     Edinburg, Texas 78539
15   Telephone: (956) 292-7609
     email: jacqueline.villarreal@da.co.hidalgo.tx.us
16
     Ms. Josephine Ramirez Solis, via Virtual Video, Hidalgo
17   County Elections Administrator, Yvonne Ramón
     ASSISTANT CRIMINAL DISTRICT ATTORNEY
18   100 East Cano
     Edinburg, Texas 78539
19   Telephone: (956) 292-7609 ext. 8186
     Fax: (956) 292-7619
20   email: josephine.ramirez@da.co.hidalgo.tx.us

21   Ms. Tiffany Sue Bingham, via Virtual Video, Harris
     County Attorneys Office
22   1019 Congress Street, 15th Floor
     Houston, Texas 77002
23   Telephone: (713) 274-5132

24

25

```
 1              A P P E A R A N C E S  Continued

 2

 3     Mr. Anthony J. Nelson, via Virtual Video, Travis County
       Rebecca Guerrero and José Garza
 4     ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
       OFFICE
 5     314 West 11th Street, Suite 500
       Austin, Texas 78767
 6     Telephone: (512) 854-4801
       email: tony.nelson@traviscountytx.gov
 7
       Mr. Michael Stewart, via Virtual Video, DOJ
 8     UNITED STATES
       950 Pennsylvania Avenue, Northwest
 9     Washington, DC 20530
       Telephone: (202) 598-7233
10     email:  michael.stewart3@usdoj.gov

11     Ms. Dana Paikowsky, via Virtual Video, DOJ
       CAMPAIGN LEGAL CENTER
12     1101 14th Street, NW, Suite 100
       Washington, DC 20005
13
       Ms. Barbara Nicholas, via Virtual Video, OAG Scarpello
14     and Creuzot
       DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
15     RECORDS BUILDING
       500 Elm Street, Suite 6300
16     Dallas, Texas 75202
       Telephone: (214) 653-7358
17     Fax: (214) 653-6134
       email: barbara.nicholas@dallascounty.org
18
      FOR THE INTERVENOR-DEFENDANTS:
19
       Mr. Stephen J. Kenny, via Virtual Video
20     LAW OFFICES OF JONES DAY
       51 Louisiana Avenue, NW
21     Washington, DC 20001
       Telephone: (202) 879-3667
22     email: skenny@jonesday.com

23
      ALSO PRESENT:
24     Mr. Terry Van DerHeyden, Videographer
       Ms. Rachel Appel, Intern
25
```

1                          INDEX

2

3   Appearances. . . . . . . . . . . . . . . . . . . .    2

4   JANET EICKMEYER

5        Direct Examination by Mr. Wassdorf . . . . . .    8

6

7   Changes and Signature . . . . . . . . . . . . . .    72

8   Reporter's Certificate. . . . . . . . . . . . . .    74

9

10                    DEFENDANT EXHIBITS

11  NO.  DESCRIPTION                                     PAGE

12  1    Lupe, OCA-Greater Houston, Haul, Lulac, and MI
         FAMILIA VOTA Plaintiffs' Second Supplemental
13       Rule 26(a)(1) Initial Disclosures (13-pgs)      11

14  2    League of Women Voters of Dallas Survey
         Responses Primary Election Survey Non-Member
15       Dated 3/6/22 Bates No. OCAGH_00015218 (1-pg)    24

16  3    Time Stamped???  (4-pgs)                         27

17  4    Plaintiff League of Women Voters of Texas'
         Amended Objections and Responses to State
18       Defendants' First Set of Interrogatories
         (22-pgs)                                        37
19
    5    S.B. No. 1 (76-pgs)                             39
20

21

22

23

24

25

1    mail", did I read that correctly?

2        A.   Yes.

3        Q.   So these are the disclosures which have

4    identified you as someone with knowledge on absentee

5    ballots by mail, do you have any reason to believe that

6    you are here for any other reason?

7                    MS. HARRIS:  Objection, form.

8        Q.   (BY MR. WASSDORF)  You can go ahead and

9    answer.

10       A.   No.

11       Q.   So when I'm referring to SB 1, as we just read

12   in there, do you understand that I'm talking about the

13   Election Integrity Bill that the legislature passed this

14   past session?

15       A.   Yes.

16       Q.   And as -- as we just read in this document,

17   you're being identified on behalf of the League of Women

18   Voters of Texas, do you know who the League of Women

19   Voters of Texas is?

20       A.   Yes.

21       Q.   And, you know, if I use the phrase League of

22   Women Voters, or the League, will you understand that I

23   mean the League of Women Voters of Texas?

24       A.   Yes.

25       Q.   What county do you live in?

1      A.   Dallas County.

2      Q.   Roughly, where?

3      A.   Toward -- in Richardson, close to Collin

4  County, a few blocks south of Collin County.

5      Q.   How long have you lived in Dallas?

6      A.   All my life, except when I was in college.  I

7  mean, my residence was here, but I was away at college.

8      Q.   Okay.  Where did you go to high school?

9      A.   Hillcrest High School.

10     Q.   My -- my dad went to Jesuit, the old one down

11  on Oak Lawn.

12              He -- as I recall, though, he took

13  somebody to prom from Hillcrest, he didn't take you to

14  prom, did he?

15     A.   Pardon?

16     Q.   He didn't take you to prom, did he?

17     A.   No, he did not.

18     Q.   Okay.  So what's your educational background?

19     A.   I have a BA from the University of Texas in

20  Austin, that's the last -- and some postgraduate work

21  but no postgraduate degrees.

22     Q.   And what was that degree in?

23     A.   It was in American history.

24     Q.   Do you have any other education or training?

25     A.   I did some postgraduate work.  I was a

1        A.    No.

2        Q.    Have you ever donated to a political campaign?

3        A.    Yes.

4        Q.    And whose campaign?

5        A.    Again, over the years there probably -- there

6    have been too many to -- to recall.  Whether or not I

7    donated, I don't know, probably to the McGovern

8    campaign, Sissy Farenthold when she ran for governor.  I

9    -- my little $5 and $10 donations were spread out over

10   candidates over a lot of years and a lot of elections.

11       Q.    So have you ever donated to a Democrat's

12   political campaign?

13       A.    Yes.

14       Q.    Have you ever donated to Republican's

15   political campaign?

16       A.    No.

17       Q.    Have you ever voted in the Republican primary?

18       A.    Once.

19       Q.    Do you remember when that was?

20       A.    Again, I believe it was in the 70s.  That was

21   it, and it was a state election.

22       Q.    That's all right.

23       A.    I don't recall the precise year.

24       Q.    So are you a member of the League of Women

25   Voters, Texas?

1      A.   I'm a member of the League of Women Voters of

2   Dallas, which makes me, entitles me to be a member of

3   the League of Women Voters of Texas, also.

4      Q.   So let's talk about that for a minute, I

5   guess.

6                 Is there a National League of Women

7   Voters?

8      A.   Yes, I believe so.

9      Q.   And so then there's a State League of Women

10  Voters, the League of Women Voters of Texas --

11     A.   Yes.

12     Q.   -- right?

13                And then I guess there are also local

14  chapters, such as the League of Women Voters of Dallas?

15     A.   (No verbal response.)

16     Q.   And so you are a member of the League of Women

17  Voters of Dallas, correct?

18     A.   Yes.  And the League of Women -- I just this

19  last year joined the League of Women Voters of

20  Richardson.

21     Q.   Of Richardson?

22                So do you pay dues?

23     A.   Yes.

24     Q.   How much are those dues, do you know?

25     A.   I believe Dallas is $75 a year, and as I

1    recall -- I'm not sure, because it seemed like they just

2    raised their dues -- and I think Richardson was $65, as

3    I recall, not sure.

4         Q.    So just to be clear, you're a member of both

5    the League of Women Voters of Dallas and the League of

6    Women Voters of Richardson, correct?

7         A.    Yes.

8         Q.    And that entitles you to membership in the

9    League of Women Voters of Texas?

10        A.    As I -- yes.

11        Q.    But you just pay dues to Dallas and

12   Richardson, right?

13        A.    Yes.

14        Q.    Do these local leagues that you're a member

15   of, do they have a leadership structure, or how -- how

16   does that work?

17        A.    They have boards of directors, so -- and

18   committee chairs and --

19        Q.    How are those individuals selected, do you

20   know?

21        A.    There is a nominating committee that meets, I

22   guess -- I'm not sure if it's every year or every --

23   what the terms are.  I haven't been that involved, so --

24   committee chairs, I think it's whoever steps up and

25   takes a leadership role.

 1      Q.   And you're currently registered to vote in

 2   Dallas County?

 3      A.   Yes.

 4      Q.   And have you been registered to vote in Dallas

 5   County that entire period?

 6      A.   Yes.

 7      Q.   I hate to ask this, but you identified that

 8   time period based on your age, what's your birth date?

 9      A.   Year, or?

10      Q.   Well, just your birth date in general, I mean

11   yeah, including the year, the whole thing?

12      A.   February 13, 1950.

13      Q.   Same age as my mom.

14           So do you vote frequently?

15      A.   When I know about the candidates, yes.

16      Q.   Have you ever voted in person in Dallas

17   County?

18      A.   Yes.

19      Q.   Have you ever voted by mail in Dallas County?

20      A.   Yes.

21      Q.   Approximately, how many times do you think

22   you've voted by mail?

23      A.   I started voting by mail, I think with COVID,

24   so for the past, I guess, two and a half years, three

25   years, maybe, or -- I'm guessing.

1       A.   Pardon?

2       Q.   Could -- could you tell us what this is?

3       A.   On the League of Women Voters website they had

4  a, seems like a, among other information about upcoming

5  meetings, and so forth.  They said did you have

6  difficulty voting?  And click on to respond.  And then

7  they had a place where you could respond to that, so I

8  -- after some frustration, I did.

9       Q.   And let me read this here.

10           So it says, "Your Election Experience,

11  poor; Voting Experience" and it -- you replied, "I voted

12  by mail and can't determine whether my ballot was

13  counted.  Dallas County is supposed to be calling me

14  back, but the SOS website says I'm not even registered",

15  and then it has your name and phone number", did I read

16  that correctly there?

17       A.   Yes.

18       Q.   So what -- what made your election experience

19  poor?

20           MS. HARRIS:  Objection, form.

21       A.   Soon after the first of the year, when it was

22  possible, I downloaded the application for voting by

23  mail from, I guess it's the Dallas County.  I don't even

24  know what entity the application was for absentee -- an

25  absentee ballot to vote in the primary.  And I filled it

1   out, I thought completely, and -- or according to

2   instructions and mailed it in.

3                    Soon after, a couple of weeks, I don't

4   recall exactly how long after, I received a letter

5   saying that my ballot request was rejected because of --

6   and they had highlighted either, I don't recall the

7   exact wording, an incomplete or incompatible driver's

8   license or social security number.

9                    And they included another application,

10  which I filled out, and that -- this time completely,

11  including -- well, I thought was completely -- and sent

12  it right away, and it too was rejected for the same

13  reason.  So I -- and another application was included

14  with the second rejection.

15                   Instead of filling that out, I called

16  Dallas County.  I went online, and it's -- there was --

17  Dallas County has a track your ballot link on their

18  voting site, and -- or track your vote by mail, whatever

19  it says.  I'm not exactly sure of what the wording is.

20                   So I went to that, and -- and I called

21  the office -- I called the number.  And I guess it was

22  at this time, I don't remember -- I guess, I think the

23  first time I did talk to somebody.  One time I had to

24  leave a message,  and I guess that's what this is

25  referring to, about them calling me back.

1          But I spoke with somebody, and I said my

2   absentee ballot request has been rejected twice, and I'd

3   like to know why.  I thought it was complete.  What do I

4   need to do in order to get an absentee ballot?  And she

5   said -- she looked it up on her computer, she was very

6   nice and she said something about -- to the effect that

7   the numbers weren't, you know, it didn't -- they didn't

8   go in properly, or something.

9          They didn't -- they weren't -- and she

10  looked again on another source.  I don't know if it was

11  a different website.  I don't -- I don't know what she

12  was doing.  It was all on the computer, I assume.  And I

13  heard a voice of a man, who seemed to be in a

14  supervisory capacity, saying no, that's okay we'll send

15  her a ballot, she -- she's been approved.  And I

16  received an absentee ballot soon after that, which I

17  filled out and mailed in.

18      Q.   (BY MR. WASSDORF)  Okay.  I am now handing you

19  what has been marked as Exhibit 3.

20          (Defendant's Exhibit No. 3 was marked for

21  identification.)

22      A.   Thank you

23      Q.   (BY MR. WASSDORF)  Now this, likewise, looks

24  like a survey response of -- of some kind.

25          If you will look at Line 27, you'll see

1      Q.   But you don't have any specific recollection

2    of having done this?

3      A.   It's an accurate representation, so I don't --

4    I don't recall, you know, what -- what it was in

5    response to.

6      Q.   When it says that Dallas County shows it was

7    received three times on two dates, do you know what

8    that's referring to?

9      A.   I went to the track your ballot link on the

10   Dallas County website, to see if my ballot had been

11   received and counted, because there was a lot in the

12   press at that time, in newspapers about ballots being

13   rejected.  I wanted to make sure that mine had been

14   received, and -- and the mails are unreliable, had been

15   received in a timely way and had been counted, in fact,

16   counted.

17     Q.   And so on that website, it showed that your

18   ballot had been received three times?

19     A.   That's what it shows.

20     Q.   It -- it says here, and I think you've

21   previously stated, that you called the -- the County

22   about your ballot, did you ever hear back from the

23   County?

24     A.   I don't remem -- recall if I -- they called

25   me, or if I called them again.  I think I called -- I

1        Q.   (BY MR. WASSDORF)  -- correct?

2                  MS. HARRIS:   Objection, form.

3        A.   Yes.  And I know people who did that.

4        Q.   (BY MR. WASSDORF)  Are you aware of any other

5    members of the League of Women Voters who had their

6    applications for ballot by mail rejected for not having,

7    or not matching the number on the driver's license,

8    election certificate, identification certificate or

9    social security number?

10                 MS. HARRIS:   Objection, form.

11       A.   It doesn't ask for your voter registration

12   number, I don't -- as I recall.  No.  I don't know of

13   any, I -- I'm not -- I haven't been that involved.

14       Q.   (BY MR. WASSDORF)  On your application that

15   was rejected the first time, you included your driver's

16   license number?

17       A.   As I recall, I just put the last four digits

18   of my social security number, because I knew that

19   offhand,  and I wouldn't have had to, you know, dig out

20   my driver's license and copy it down.  So I -- I believe

21   I just did my soc -- the last four of my social security

22   number -- digits of my social security number.

23       Q.   And are you confident that you wrote it down

24   correctly?

25       A.   I -- it was -- I used as a college ID.  I -- I

 1  know my social security number.  I -- I could have

 2  written it down incorrectly, I guess, but I don't

 3  recall.  I don't -- I don't -- I didn't make a copy of

 4  it.  I don't know.

 5      Q.   And the -- the second time you submitted an

 6  application, you included both your driver's license and

 7  the last four digits of your social security number?

 8      A.   Yes.

 9      Q.   And that application was initially rejected as

10  well?

11      A.   Yes.

12      Q.   Are you confident that you wrote down your

13  driver's license number and last four digits of your

14  social security number on that application?

15      A.   Yes.

16      Q.   Have you ever been unable to vote by mail

17  because of the requirements of Section 5.02 of the Bill

18  that we just read?

19           MS. HARRIS:  Objection, form, calls for a

20  legal conclusion.

21      A.   No.

22      Q.   (BY MR. WASSDORF)  So let's go to the next

23  section, it's Section 5.03.  I think it's two pages

24  forward.

25           So this section requires that an

1                          CHANGES AND SIGNATURE

2

     WITNESS NAME: JANET EICKMEYER
3
     DATE OF DEPOSITION: 06/13/2022
4

5    PAGE   LINE    CHANGE                           REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1              I, JANET EICKMEYER , have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5              _____

6              JANET EICKMEYER

7

8

9     THE STATE OF TEXAS                )

10    COUNTY OF _____ )

11              Before me, _____, on this

12    day personally appeared JANET EICKMEYER , known to me (or

13    proved to me under oath or through _____)

14    (description of identity card or other document) to be

15    the person whose name is subscribed to the foregoing

16    instrument and acknowledged to me that they executed the

17    same for the purposes and consideration therein

18    expressed.

19              Given under my hand and seal of office this

20    _____day of _____, _____.

21

22              _____

23              NOTARY PUBLIC IN AND FOR
                THE STATE OF _____
24

25

1                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO ENTERO )
    et al.,                    )
4        Plaintiffs,           )
                               )
5   v.                         ) Civil Action No. 5:21-cv-
                               )            00844-XR
6   GREGORY W. ABBOTT, et al., )
         Defendants.           )
7

8

9

10                  REPORTER'S CERTIFICATION
                 DEPOSITION OF JANET EICKMEYER
11                     JUNE 13, 2022

12

13

14          I, Nancy Newhouse, Certified Shorthand Reporter

15   in and for the State of Texas, hereby certify to the

16   following:

17        That the witness, JANET EICKMEYER , was duly sworn

18   by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by the

20   witness;

21          That the deposition transcript was submitted on

22   _____ to the witness or to the attorney for

23   the witness for examination, signature and return to me

24   by _____.

25

1          That the amount of time used by each party at

2    the deposition is as follows:

3          Ms. Ashley Harris                  - 00:00
          Mr. Thomas Buser-Clancy            - 00:00
4          Mr. Savannah Kumar                 - 00:00
          Mr. Zachary David Dolling          - 00:00
5          Ms. Kaylie Hidalgo                 - 00:00
          Mr. William D. Wassdorf            - 02:21
6          Ms. Lisa Cubriel                   - 00:00
          Ms. Jacqueline Lysette Villarreal  - 00:00
7          Ms. Josephine Ramirez Solis        - 00:00
          Ms. Tiffany Sue Bingham            - 00:00
8          Mr. Anthony J. Nelson              - 00:00
          Mr. Michael Stewart                - 00:00
9          Ms. Dana Paikowsky                 - 00:00
          Ms. Barbara Nicholas               - 00:00
10          Mr. Stephen J. Kenny               - 00:00

11          That pursuant to information given to the

12   deposition officer at the time said testimony was taken,

13   the following includes all parties of record:

14    Ms. Ashley Harris, Attorney for Plaintiff
     ACLU FOUNDATION OF TEXAS, INC
15    5225 Katy Freeway, Suite 350
     Houston, Texas 77007
16
     Mr. Thomas Buser-Clancy, Attorney for Plaintiff OCA-GH
17   ACLU FOUNDATION OF TEXAS, INC
     5225 Katy Freeway, Suite 350
18   Houston, Texas 77007

19    Mr. Savannah Kumar, Attorney for Plaintiff OCA-GH
     ACLU FOUNDATION OF TEXAS, INC
20    5225 Katy Freeway, Suite 350
     Houston, Texas 77007
21
     Mr. Zachary David Dolling, Attorney for Plaintiff TCRP
22   TEXAS CIVIL RIGHTS PROJECT
     1405 Montopolis Drive
23   Austin, Texas 78741

24

25

 1              PARTIES OF RECORD Continued

 2

 3    Ms. Kaylie Hidalgo, Attorney for Plaintiff TCRP
      TEXAS CIVIL RIGHTS PROJECT
 4    P.O. BOX 17757
      Austin, Texas 78760

 5

      Mr. William D. Wassdorf, Attorney for Defendant OAG
 6    ATTORNEY GENERAL KEN PAXTON OFFICE
      DEPUTY CHIEF, SPECIAL LITIGATION UNIT
 7    209 W. 14th Street
      Austin, Texas 78701

 8

      Ms. Lisa Cubriel, Attorney for Defendant Bexar County
 9    ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
      101 West Nueva Street, 7th Floor
10    San Antonio, Texas 78205

11    Ms. Jacqueline Lysette Villarreal, Attorney for
      Defendant Hidalgo County
12    District Attorneys Office
      100 East Cano Street
13    Edinburg, Texas 78539

14    Ms. Josephine Ramirez Solis, Attorney for Defendant,
      Hidalgo County Elections Administrator, Yvonne Ramón
15    ASSISTANT CRIMINAL DISTRICT ATTORNEY
      100 East Cano
16    Edinburg, Texas 78539

17    Ms. Tiffany Sue Bingham, Attorney for Defendant Harris
      County Attorneys Office
18    1019 Congress Street, 15th Floor
      Houston, Texas 77002
19    Telephone: (713) 274-5132

20    Mr. Anthony J. Nelson, Attorney for Defendants Travis
      County Rebecca Guerrero and José Garza
21    ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
      OFFICE
22    314 West 11th Street, Suite 500

23    Mr. Michael Stewart, Attorney for Defendant DOJ
      UNITED STATES
24    950 Pennsylvania Avenue, Northwest
      Washington, DC 20530
25

 1                PARTIES OF RECORD Continued

 2

 3    Ms. Dana Paikowsky, Attorney for Defendant DOJ
      CAMPAIGN LEGAL CENTER
 4    1101 14th Street, NW, Suite 100
      Washington, DC 20005
 5
      Ms. Barbara Nicholas, Attorney for Defendant,  OAG
 6    Scarpello and Creuzot
      DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
 7    RECORDS BUILDING
      500 Elm Street, Suite 6300
 8    Dallas, Texas 75202

 9    FOR THE INTERVENOR-DEFENDANTS:

10    Mr. Stephen J. Kenny, Attorney for Intervenor Defendant
      LAW OFFICES OF JONES DAY
11    51 Louisiana Avenue, NW
      Washington, DC 20001

12

13           I further certify that I am neither counsel

14    for, related to, nor employed by any of the parties or

15    attorneys in the action in which this proceeding was

16    taken, and further that I am not financially or otherwise

17    interested in the outcome of the action.

18

19           Certified to by me this 30th day of June, 2022.

20

21    _____
      NANCY NEWHOUSE, Texas CSR 9000
22    Expiration Date:  08/31/23
      Firm Registration No. 633
23    Magna Legal Services
      16414 San Pedro, Suite 900
24    San Antonio, Texas 78232
      (210) 697-4300

25

# Exhibit 34

OCA-APPX-0624

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO,  )
     et al.,                      )
 4        Plaintiffs,             )
                                  )
 5   vs.                          ) CASE NO. 5:21-cv-844-XR
                                  ) [LEAD CASE]
 6   GREGORY W. ABBOTT, et al.,   )
          Defendants.             )
 7   _____

     OCA-GREATER HOUSTON, et al., )
 8        Plaintiffs,             )
                                  )
 9   vs.                          ) CASE NO. 1:21-cv-0780-XR
     JOHN SCOTT, et al.,          )
10        Defendants.             )
     _____
11   HOUSTON JUSTICE, et al.,     )
          Plaintiffs,             )
12                                )
     vs.                          ) CASE NO. 5:21-cv-0848-XR
13   GREGORY WAYNE ABBOTT, et al.,)
          Defendants.             )
14   _____
     LULAC TEXAS, et al.,         )
15        Plaintiffs,             )
                                  )
16   vs.                          ) CASE NO. 1:21-cv-0786-XR
     JOHN SCOTT, et al.,          )
17        Defendants.             )
     _____
18   MI FAMILIA VOTA, et al.,     )
          Plaintiffs,             )
19                                )
     vs.                          ) CASE NO. 5:21-cv-0920-XR
20   GREG ABBOTT, et al.,         )
          Defendants.             )
21   _____
     UNITED STATES OF AMERICA,    )
22        Plaintiff,              )
                                  )
23   vs.                          ) CASE NO. 5:21-cv-1085-XR
                                  )
24   THE STATE OF TEXAS, et al.,  )
          Defendants.             )
25   _____
```



1

2

3

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

4

5                      ORAL AND VIDEOTAPED DEPOSITION OF

6                                  JEANNIE LEWIS

7                                AUGUST 1, 2022

8                     (Taken Via Remote Videoconference)

9       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

10

11

12          ORAL AND VIDEOTAPED DEPOSITION OF JEANNIE LEWIS,

13      produced as a witness at the instance of the STATE

14      DEFENDANTS, and duly sworn, was taken in the

15      above-styled and numbered cause on the 1st of August,

16      2022, from 10:02 a.m. to 4:09 p.m., before Mona S.

17      Whitmarsh, Certified Shorthand Reporter, in and for the

18      State of Texas, reported by machine shorthand via Zoom

19      videoconference, pursuant to the Federal Rules of Civil

20      Procedure and the provisions stated on the record or

21      attached hereto.

22

23

24

25



```
 1                  A P P E A R A N C E S

 2                 (ALL APPEARING VIA ZOOM)

 3
     FOR THE PLAINTIFFS, OCA-GREATER HOUSTON, LEAGUE OF WOMEN
 4   VOTERS OF TEXAS, REVUP-TEXAS, and WORKERS DEFENSE ACTION
     FUND AND JEANNIE LEWIS:
 5        Ms. Savannah Kumar
          Ms. Ashley Harris
 6        Mr. Thomas Buser-Clancy
          ACLU FOUNDATION OF TEXAS, INC.
 7        5225 Katy Freeway, Suite 350
          Houston, Texas  77007
 8        713-942-8146
          915-642-6752 (fax)
 9        skumar@aclutx.org
          aharris@aclutx.org
10        tbuser-clancy@aclutx.org

11        - and -

12        Mr. Zachary Dolling
          Mr. Ricardo A. Garza
13        TEXAS CIVIL RIGHTS PROJECT
          1405 Montopolis Drive
14        Austin, Texas  78741
          512-474-5073
15        512-474-0726 (fax)
          zachary@texascivilrightsproject.org
16

17   FOR THE PLAINTIFFS, LA UNION DEL PUEBLO ENTERO,
     SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, MEXICAN
18   AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS
     ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM
19   C. VELASQUEZ INSTITUTE, AND FIEL HOUSTON, INC.:
          Ms. Breanna Williams
20        FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
          One New York Plaza
21        New York, New York  10004
          212-859-8000
22        212-859-4000 (fax)
          breanna.williams@friedfrank.com
23

24

25
```



```
 1   FOR THE STATE DEFENDANTS:
          Mr. Zachary W. Berg
 2        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
          300 W. 15th Street
 3        Austin, Texas  78701
          512-463-2100
 4        zachary.berg@oag.texas.gov

 5
     FOR THE DEFENDANTS, MICHAEL SCARPELLO AND JOHN CREUZOT:
 6        Ms. Barbara Nicholas
          DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE
 7        LB 19 Frank Crowley Courts Building
          133 N. Riverfront Boulevard
 8        Dallas, Texas  75207
          214-653-3600
 9        barbara.nicholas@dallascounty.org

10
     FOR THE INTERVENOR DEFENDANTS:
11        Mr. Charles E.T. Roberts
          JONES DAY
12        51 Louisiana Avenue NW
          Washington, DC 20001
13        202-879-3667
          cetroberts@jonesday.com
14

15   VIDEO TECHNICIAN:
          Ms. Emma Bailey
16        MAGNA LEGAL SERVICES

17   ALSO PRESENT:
          Ms. Jacqueline Villarreal
18        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE

19        Ms. Caren Short
          Mr. Thomas Tai
20        Ms. Martina Berger
          LEAGUE OF WOMEN VOTERS
21
          Ms. Lauren Putnam
22        UNITED STATES DEPARTMENT OF JUSTICE

23        Mr. Nick Adkins
          FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
24
          Mr. Sameer S. Birring
25        HARRIS COUNTY ATTORNEY'S OFFICE
```



1                            INDEX
                                                    PAGE
2
   Appearances.................................... 3-4
3
   Stipulations...................................  6
4
   JEANNIE LEWIS
5        Examination by Mr. Berg.............   7
6
   Reporter's Certificate........................ 176
7
8
                           EXHIBITS
9   NO.  DESCRIPTION                              PAGE

10  Exhibit A....................................  16
         Plaintiffs' Second Supplemental
11       Rule (26)(a)(1) Initial Disclosures
    Exhibit B....................................  37
12       Election Code; Chapter 1 – General
         Provisions
13

14

15

16

17

18

19

20

21

22

23

24

25



```
1        A    No.  I have served on juries, but I don't
2    recall ever testifying, no.
3        Q    Have you ever testified in another proceeding,
4    like before the legislature?
5        A    I have testified before elected bodies like
6    the State Board of Education.  I have testified on
7    school books before them.
8        Q    Have you ever been involved in a lawsuit
9    before?
10       A    No.
11       Q    Where did you go to school?
12       A    I went to school from 12 years old until I
13   graduated at Butler High School in Huntsville, Alabama.
14       Q    Did you go to any school after that?
15       A    Yes.  I went to college in Montevallo,
16   Alabama, and was there four years and graduated.  And
17   then later I went to TWU, Texas Woman's University for a
18   master's degree in education.
19            And then after that, I went to Texas
20   University [sic] to work on my MBA.  And I got tired of
21   commuting, because I live in San Marcos here in Hays
22   County, and I transferred to Texas State University to
23   finish my MBA there.
24       Q    Wonderful.
25            Are you married?
```



1  then it moved up the ladder to the state president, and

2  I think there was a decision made that what I had to say

3  would be valuable information.

4       Q    And did the league put out a request for

5  information about anyone who had troubles with SB 1 or

6  did you seek out members of the league with your -- what

7  happened to you?

8                 MS. KUMAR:  Objection, form.

9       Q    You can answer.

10      A    I don't remember that they put out a notice

11  about problems with SB 1.  It seems like we were

12  talking -- and this was on Zoom -- in some kind of

13  meeting and we were sharing experiences we had had with

14  voting this voting season.  I think it started out more

15  informal.  I am not sure of the -- if we were actually

16  asked to come forward.

17      Q    Okay.  And when you said you talked with local

18  members of the league, was that what you were referring

19  to?

20      A    Yes.

21      Q    Okay.  We will get back to that in just a

22  minute.  Let me ask you some questions about the league.

23  Is that all right?

24      A    Sure.

25      Q    So you testified that you were a member of the


OCA-APPX-0631

1    League of Women Voters of Texas, correct?

2         A    Yes.  When you are a league member, you are a

3    member of your local organization, which is League of

4    Women Voters of Hays County, but then you are

5    automatically a member of the state league, which is the

6    League of Women Voters of Texas, and you are also a

7    member of the League of Women Voters of the United

8    States.  So it's kind of a triad or triple level.

9         Q    Okay.  As a member, do you pay dues?

10        A    Yes.

11        Q    Annual dues?

12        A    Yes.

13        Q    How much are annual dues, if you remember?

14        A    I think it's about $65.

15        Q    And all members pay each year?

16        A    Yes.  There is a special break for students

17   and if you have a family, like both husband and wife

18   want to join, there is a discount for the second person.

19   And the $65 is just something I am guessing.  I pay dues

20   to so many organizations.  I -- I don't specifically

21   remember, but it's probably around that amount.

22        Q    That's fine.

23             Is it all right if I just say, "the league,"

24   instead of "the League of Women Voters of Texas" for

25   each question?



1        A     Barbara Nichols -- yeah.

2        Q     But you said you don't -- but books is a

3   little bit more of a chore to do with the magnifying

4   glass?

5        A     Yeah.  The print isn't as big as those names.

6   When you don't have the video on, your name is printed

7   much bigger than the names below.  The people -- like

8   your name and my name is in much smaller print.

9               MS. KUMAR:  Zachary, we have been going

10  for just over an hour.  I don't know if this might be a

11  good time for a break or if you want to finish this line

12  of questions.

13              MR. BERG:  Yeah.  Let's take a break.  15

14  minutes?

15              MS. KUMAR:  Sounds good.

16              MR. BERG:  Back at 11:25?

17              MS. KUMAR:  Sounds great.

18              THE VIDEOGRAPHER:  It is 11:10 a.m. and we

19  are off the record.

20              (RECESS FROM 11:10 A.M. TO 11:26 A.M.)

21              THE VIDEOGRAPHER:  Time is 11:26 a.m.  We

22  are back on the record.

23        Q    (BY MR. BERG) Ms. Lewis, right before we went

24  off the record, we were talking about challenges that

25  you experienced during your life as a result of your



1   disability; is that correct?

2        A     During my life?

3        Q     In your life.

4        A     Yeah.  At some point in my life.  I was not

5   born or lived, you know, a great deal of my life

6   disabled.

7        Q     When did it start?  When did you notice it?

8              MS. KUMAR:  Objection, form.

9        A     I think it started with arthritis in my knees,

10  and so I had my first knee replacement -- gosh, I don't

11  know how many years ago.  Then I had to have my second

12  knee replaced, then my hip, and then my other hip.  And

13  it has just gradually reduced my mobility.

14             And then the macular degeneration -- I once

15  had 20/20 vision, but it has gradually been compromised.

16  My hearing has always been normal until I got older.

17  Now I am wearing hearing aids.  And most of the time

18  that works okay, but sometimes I have to have people

19  repeat things.

20             I have a heart murmur and I am under a

21  cardiologist's care.  I am on blood thinner and I am on

22  medication for high blood pressure and medication for

23  cholesterol.  And I -- what else do I have?  Did I say I

24  have a torn rotator cuff in my shoulder?

25        Q     No.



 1   supposed to get an exam with the retina specialist every

 2   six months.  I put that off because of COVID.  But I

 3   did, a few months ago, went ahead and looked up a new

 4   retina specialist since mine was no longer coming to

 5   San Marcos.

 6          And I went, you know, with nervous trepidation

 7   because they are right in your face and I have got my

 8   mask on, but still.  So, you know, it's been one of the

 9   biggest problems, I think.

10          Well, my joints, too.  Just walking, standing.

11   Oh, I have spinal stenosis, which causes my back to

12   hurt.  If I am just up for a few minutes, my back starts

13   hurting until I sit down again.

14      Q    The macular degeneration, is that progressive?

15   Will that get worse?

16      A    Yes.  Supposedly it does get worse over time.

17   I -- like I say, I take this medication that's

18   recommended by my eye doctor.  I am supposed to have

19   that exam every -- actually, when I went this time, he

20   said I could come back in a year, but they check to make

21   sure it hasn't turned from dry to wet.

22          If you have wet macular degeneration, you have

23   to get shots in your eyeball, because I have friends

24   that have got -- had to get that.  So far I haven't

25   developed that.



OCA-APPX-0635

1  product because we don't hear about having to sanitize

2  things you buy anymore.

3       Q    Perfect.

4            So you voted in the 2022 March 1st primary,

5  correct?

6       A    Yes.  I tried.

7       Q    You were unsuccessful in voting?

8       A    Finally I was successful, but I had to go

9  through this horrible ordeal.

10      Q    What was the -- so you voted absentee --

11      A    Well, I voted --

12      Q    -- right?

13      A    -- mail-in ballot.

14      Q    Mail -- my apologies.  Mail-in ballot.

15           So you filed an application for ballot by mail

16  at some point?

17      A    Yes.  And I really want to emphasize the

18  previous two years I had no trouble, but I knew that you

19  had to apply for a ballot by mail for the whole year and

20  then it expired.  So in January, rather -- I really

21  didn't like going online to ask for an application for

22  mail-in ballot.  I am just so used to dealing with the

23  county election administrator's office.

24           I just called and asked them to send me an

25  application for a mail-in ballot and they sent it by



1   mail and I filled it out very carefully and mailed it in

2   and thought everything was okay.

3            And then I get a letter from the county

4   election administrator's office saying my application

5   has been rejected.  And I --

6        Q    And -- oh.

7        A    -- voted -- I voted two years for mail-in

8   ballot and no problem, but they said my application --

9   and in the same letter was an app- -- a voter

10  registration application.

11           I already had my new voter registration card,

12  which was sent out every two years and -- I already had

13  my card, but they said they put that -- I had to apply

14  for another voter registration card.

15           And can I tell you, I called -- I called the

16  county election administrator's office again, and I

17  said, "What's going on?  I have already filled out" --

18  "I mean, I have already got my voter registration card.

19  I have been registered since 1985.  Why do I have to

20  fill out an application for a new voter registration

21  card?"

22           And they said because back in 1985 -- how many

23  years ago is that?  I can't even count.  Back in 1985

24  when I filled out my voter registration application, the

25  identification I put on there was my Social Security



1   number, not my driver's license.  And the application I

2   filled out in 2022, and probably the previous years,

3   too, I put my driver's license number and not my Social

4   Security number.

5          Because since 1985, the Social Security

6   Administration has come out with the advice not to use

7   your Social Security number for identification on things

8   like that.  I mean, you notice now, when you go to the

9   doctor's office, they don't ask for your Social Security

10  number.  They ask your birthday.

11         So I thought it was not wise to put my Social

12  Security number on this.  And since I use my Texas

13  driver's license -- I have to use it every time I vote

14  now -- I thought, you know, they would have that record

15  of my Texas driver's license, but no.

16         So I filled out -- you know, they sent me a

17  new application.  No.  I didn't have to fill out a new

18  application.  I just had to fill out a new voter

19  registration application, so then they had the voter

20  registration application with my Social Security number

21  on it that could match the application for the ballot by

22  mail that I had already sent in.

23     Q    But you didn't -- they didn't ask you to fill

24  out a new application for ballot by mail?

25     A    No.  They used that one and they just compared



1          And then I began to hear on the news that

2    mail-in ballots were being rejected.  They eventually

3    were rejected by the thousands.  And I began to worry

4    about my ballot that I had mailed in, so I did what I

5    usually do.  I called the Hays County election

6    administrator's office and I said, "I have mailed in my

7    mail-in ballot; I want to make sure that you have it and

8    it's okay."

9          And they said, "Yes, we have it, and it's

10   okay."  So I was relieved for a few hours.  That same

11   day I get in the mail from the county election

12   administrator's office that my mail-in ballot had been

13   rejected.

14        Q    Okay.

15        A    They didn't include a new ballot or anything.

16   You know, it was just -- just rejected.  And, obviously,

17   it had to be fixed or whatever.  So, again, I called the

18   county election administrator's office and I said, you

19   know, "I don't understand why my ballot was rejected,

20   but, you know, what can I do?"

21        And the staff person I talked to said, "Well,

22   it's getting kind of close to the election."  I think it

23   was a week or maybe a little more away.  She said, "mail

24   is so slow; if we mail the new ballot to you and then

25   you mail it back, it might not get here in time, so you



OCA-APPX-0630

1  are going to need to come in person to fix it."

2         The whole reason I was doing a mail-in ballot

3  was so I wouldn't have to go in person, but I was so

4  desperate to have my vote counted.  I mean, that's been

5  my life ever since we moved here.  With the League of

6  Women Voters and all the things I do with elections, I

7  was determined to have my vote counted.

8         So I go over to the county election

9  administrator's office, which is in our Government

10  Center.  And I pull in the parking lot and at the very

11  entrance to the parking lot, of course, there were

12  people out there with campaign signs.  And the chair of

13  the Democratic Party came over to my window and rolled

14  down my -- the window -- no.  That was another occasion.

15  Never mind.

16         Anyway, so I drove in the parking lot and it

17  was totally full.  And I thought, Hey, this is a pretty

18  good sign.  All these people are voting?"  Well, I found

19  out later they were having two trials there and so

20  that's what it was.

21         So I -- I drive my car over to the handicapped

22  place, and every handicapped spot was taken.  And so I

23  pulled over to the side so I could see the handicapped

24  spots and know when one pulled out.  Now, a few of those

25  were for curbside voting, that people were busy doing



1  vote, actually, and one of the polling workers was

2  sitting at the door, a man, and he motioned for me to go

3  over to the table.  And I said, "No, I am not here to

4  vote; I'm here because I need to go to the county

5  election administrator's office to fix a ballot."  And I

6  said, "What is the shortest way to get to the county

7  election administrator's office?"

8           And he could see I had a cane.  I was probably

9  out of breath.  And he said, "There is no short way.

10 You have to go down the hall and then you turn here and

11 you turn" -- you know, he was giving me all this.

12          And I said, "But they said I could come in the

13 back door."

14          And he said, "Well, they should not have told

15 you that."

16          Well, there was a female election worker who

17 heard all this and she came over and she said, "I will

18 show her."  So we went out of that room.  Directly

19 across the hall was an unmarked door, which was the

20 county election administrator's office back door, and

21 she opened it and took me in.  Thank goodness.

22          And there were a bunch of people in there all

23 working and one of the staff came over and I told her

24 what I was there for and she brought me a chair because

25 I really needed to sit down by then.  And she went and



 1    looked up my ballot and -- the one that had been

 2    rejected -- and she brought it over to me.

 3              And they had figured out this way to open up a

 4    part of the flap on the envelope to show some writing

 5    without actually unsealing the ballot itself in some

 6    way.  I don't know how it was.  But, anyway, she showed

 7    me this writing under the flap of the envelope where you

 8    lick and seal it.  It was under the flap, and she showed

 9    me this writing and said, "You were supposed to put your

10    ID number here."

11              And I said, "What?"  The print was so small.

12    It must have been 5 or 6 size.  I mean, there was no way

13    I could read any of that, much less think about looking

14    under a flap for it.  But there it was hidden -- hidden

15    under the flap.  And I found out later that's the

16    problem most people had had with the ballot by mail is

17    that those -- those hidden tiny prints.

18              Well, she showed me this line where I could

19    put my Texas driver's license and my Social Security

20    card number.  Well, I had learned I better do the Social

21    Security.  So I knew that by heart.  I wrote that down

22    on the flap.  And then I couldn't read the number on my

23    driver's license, so I handed her my driver's license

24    and had her read the number to me, and I wrote that

25    number down.



1   THE STATE OF TEXAS:

2   COUNTY OF HARRIS:

3        I, Mona S. Whitmarsh, a Certified Shorthand

4   Reporter, hereby certify that the foregoing testimony

5   was given before me after the Witness had been first

6   duly sworn.

7        I further certify that this deposition was

8   transcribed under my direction and is a complete and

9   correct transcript of the proceedings; and that it is

10  being filed with the Court in accordance with the

11  Stipulation of Counsel contained in this deposition.

12       I further certify that I am neither attorney for,

13  related to, nor employed by any of the parties to the

14  lawsuit in which this deposition was taken.  Further, I

15  am neither related to nor employed by any attorney of

16  record in this cause; nor do I have a financial interest

17  in the matter.

18       GIVEN UNDER MY HAND AND SEAL OF OFFICE this 15th

19  day of August, 2022.

20

21  _____

                Mona S. Whitmarsh

22              Texas CSR No. 3986

                Expiration Date:  04/30/24

23

                MAGNA LEGAL SERVICES

24              Firm Registration No. 622

                866-624-6221

25              www.MagnaLS.com



# Exhibit 35

DocuSign Envelope ID: 545F770D-1146-4D01-B85F-BED512BAB83A

## DECLARATION OF CYNTHIA EDMONDSON

My name is Cynthia Edmondson. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge:

1. I am a resident of Houston, Texas, and am an eligible voter in the state of Texas.

2. I am registered to vote in Harris County, where I reside.

3. I am 80 years old.

4. I believe I have been registered to vote in Texas since about the time I moved back to Texas in the 1970s. I try to vote in every election.

5. I am a member of the League of Women Voters of Texas. I have been a member for several years.

6. I have been voting by mail since approximately 2008, when I turned 65 years old.

7. I live with multiple sclerosis. My symptoms would make it difficult for me to vote in person. As a result of multiple sclerosis, I have difficulty walking and balancing. I am prone to falling, so I use a walker for assistance and a wheelchair for longer distances. I also get tired easily and use the restroom frequently; it would be difficult for me to stand in a long line to vote in person. Multiple sclerosis also causes my handwriting to be shaky and unclear.

8. On or about January 3, 2022, I submitted my application to vote by mail in the March 1, 2022 primary election. On that application, I included my driver's license number. I did not include my social security number because the application forms said to only do so if I did not have a driver's license number.

OCA-APPX-0645

DocuSign Envelope ID: 545F770D-1146-4D01-B85F-BED512BAB83A

9. A few days later, the Harris County Elections Department called me, and an employee told me that the driver's license number I included on my application did not match the number that I had used when I registered to vote. The employee I spoke with advised me to include both my driver's license number and social security number in my application to vote by mail.

10. On or about January 7, 2022, the Harris County Elections Department sent me a new application to vote by mail. I once again filled out the application to vote by mail. I followed the advice I had received from the Harris County Elections Department to include my social security number on the application form in addition to my driver's license number. Doing so made me uncomfortable because the form said to only include a social security number if I did not have a driver's license number. Because I do have a Texas driver's license, it felt wrong not following the instructions as written.

11. Afterwards, I received my ballot to vote by mail. On my ballot, I included both my driver's license and social security number. I believe my ballot was counted.

12. During my earlier phone call, the Harris County Elections Department had also advised me to update my voter registration to include both my driver's license number and social security number, but not to do so until after my vote-by-mail application was processed, so as not to disrupt that process. After I returned my ballot, I updated my voter registration.

13. I was annoyed and confused throughout my voting experience. The process was cumbersome, and it felt unfair to have to figure out why my application was

OCA-APPX-0646

DocuSign Envelope ID: 545F770D-1146-4D01-B85F-BED512BAB83A

rejected and how to fix it. It felt like the form was intentionally tricky to prevent people from voting.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>5/22/2023</u>

DocuSigned by:

*Cynthia Edmondson*

664C6881CC37485...

Cynthia Edmondson

OCA-APPX-0647

# Exhibit 36

DocuSign Envelope ID: 7F4EB34E-7B1E-488E-A58D-89D20AC2C228

# DECLARATION OF PATRICIA BUCK

My name is Patricia Buck. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge:

1. I am a resident of Houston, Texas, and I am an eligible voter in the state of Texas.

2. I am registered to vote in Harris County, where I reside.

3. I was born in 1952.

4. I have been registered to vote in Texas since approximately 1998. I try to vote in every election.

5. I am a member of the League of Women Voters of Texas and have been a member for several years.

6. I have always voted in person in the past, but in 2022 my husband and I planned to begin voting by mail.

7. My husband and I wanted to vote by mail because we both have health conditions that make it difficult for us to stand in line at a voting location. We both have diabetes, and my husband has congestive heart failure. Sometimes voting locations have chairs to sit in while you are waiting, but often the only option is to stand in line. In order to comfortably and safely vote in person, we often have to make several trips to a voting location until we see the line is short enough for us to vote.

8. Because of these issues with voting in person, my husband and I started the process of applying to vote by mail in 2022. However, when I received the application, I saw that it asked for our social security numbers. I also learned that

OCA-APPX-0649

DocuSign Envelope ID: 7F4EB34E-7B1E-488E-A58D-89D20AC2C228

the mail-in ballot requires voters to include their social security number on the outside of the ballot's carrier envelope. My husband and I have always been taught that it is crucial not to share our social security numbers with others, and to keep them private. I have similar concerns about sharing my driver's license number because of potential identity theft issues.

9. In 2022, I also heard reports about high rates of mail-in applications and ballots being rejected. I was also concerned that if we voted by mail, our votes might not be counted because of these rejection issues.

10. Even though voting in person is difficult due to our physical issues, my husband and I did not go forward with applying to vote by mail because we were scared by the requirements to list our social security and driver's license numbers and reports of high rejection rates. Because voting in person is so difficult due to our health, I wish we could vote by mail without these concerns.

11. Instead, my husband and I voted in person during elections in 2022 and will continue to vote in person because of these concerns.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 5/18/2023

Patricia Buck

Patricia Buck

OCA-APPX-0650

# Exhibit 37

OCA-APPX-0651

<u>**DECLARATION OF MILAN SUAREZ**</u>

My name is Milán Hortencia Suárez (she/they). I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge:

1. I am a resident of Houston, Texas, and I'm an eligible voter in the state of Texas.

2. I am registered to vote in Harris County, in which Houston is located.

3. I have been a member of the League of Women Voters of Texas since September 1, 2021.

4. I am 21 years old.

5. I first registered to vote in Texas in 2021 when I was still located in Texas.

6. I voted for the first time in Texas in 2022.

7. I am currently located in Seattle, Washington while I am attending college at the University of Washington. I currently intend to return to Texas after college.

8. I voted by mail in the 2022 general elections. I voted by mail because I was away from my county of residence while attending college at the University of Washington.

9. On or about October 4, 2022, I printed out an application to vote by mail in the November 8, 2022 general election.

10. That same evening, I filled out my application and then mailed it to the Harris County Elections Administrator's Office the following day on October 5, 2022.

11. I received a letter from the Harris County Elections Administrator's Office, dated October 13, 2022, at my home residence in Harris County as well as my Seattle

mailing address, notifying me that my application for a ballot by mail had been rejected.

12. The document attached as Exhibit A to this Declaration is a true and correct copy of the letter I received from the Harris County Elections Administrator's Office notifying me of my rejected application for ballot by mail.

13. The letter stated that my Personal Identification Number is not associated with my voter record and that my application was defective because my voter registration record did not have a proper identification number, even though the identification numbers I provided on my application were all correct.

14. Specifically, I had provided my Texas driver's license number, my Social Security number, and my Texas Voter Registration number (VUID) on my application for a ballot by mail.

15. In the days that followed, I was preparing to update my voter registration record and reapply for a ballot to vote by mail. On October 27, 2022, my family received a packet at my home residence in Harris County with the mail ballot I had applied for from the Harris County Elections Administrator's Office.

16. My family mailed the Harris County mail ballot packet to me at my Washington State address, and I received it on November 1, 2022.

17. Because it appeared to me that the Harris County Elections Administrator's Office had fixed the ID issue on its own and evidently approved my mail ballot application, I did not proceed with updating my voter registration record or completing the reapplication process for a ballot by mail.

18. I was still confused as to why my ID numbers were initially considered incorrect, and why my mail ballot was subsequently sent to my Harris County home address instead of my Washington State mailing address.

19. Although I only submitted one application to vote by mail, the rejection letter and the subsequent mailing of a mail ballot to my Harris County address instead of my Washington State address caused me a significant delay in voting.

20. On November 4, 2022, I mailed my ballot to the Harris County Elections Administrator's Office, one month after I had started the process to vote by mail.

21. After mailing in my ballot and through the hours after the election ended, I checked the status of my ballot through the Harris County Mail Ballot Activity Lookup portal on the Harris Votes website, which indicated that my ballot had not been received or counted. To this date, it is not clear to me whether my ballot was counted because the portal does not show that my vote was received or counted.

22. It is my belief that my mail ballot was ultimately not counted due to the delays incurred by the apparent confusion over the ID numbers on my application or voter registration record.

23. My extended family includes many longtime voters who vote in nearly every election. I have family members who are also members of the League of Women Voters of Texas, and I have been raised to consider voting an important civic duty and an inherent right. During high school I worked at a polling place and I have helped to register voters because I am a strong supporter of having equal access to voting for all persons who are eligible.

24. My experience trying to vote by mail in Texas was extremely stressful and confusing and I came close to giving up on the whole process. But because my family taught me the importance of voting, I tried my best to proceed with the process, with my family's support, to get my vote in on time.

25. Because I will still be attending college out of state this year and next year, I intend to vote by mail in the future, but I worry that my voting rights will be violated if my future mail ballots are not counted again due to issues with the current identification requirements for voting by mail in Texas.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 18, 2023.

Milán Hortencia Suárez

# Exhibit 38

## DECLARATION OF DEBORAH CHEN

My name is Deborah Chen. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge.

1. I am a lawyer and the Civic Engagement Programs Director for OCA-Greater Houston (OCA-GH). OCA-GH is the Greater Houston arm of the national organization OCA – Asian Pacific American Advocates. I am also the Executive Vice President of OCA – Asian Pacific American Advocates.

2. OCA-GH is a non-profit organization with its main offices in Houston, Texas.

3. OCA-GH is a non-partisan organization whose mission is to advance the social, political, and economic well-being of the Asian American and Pacific Islander ("AAPI") community, primarily in Harris, Brazoria, and Fort Bend counties, with a focus on developing advocacy, leadership, and civic engagement participation within that community. The four main goals of OCA-GH's mission are to (1) advocate for social justice, equal opportunity, and fair treatment; (2) promote civic participation, education, and leadership; (3) advance coalitions and community building; and (4) foster cultural heritage.

4. OGA-GH has 19 board members, approximately 160 dues-paying members who elect leadership, and several hundred volunteer members who work to fundraise and implement OCA-GH's programs throughout the greater Houston area. Many of OCA-GH's volunteer members are high school and college students. As volunteer members participate in activities they may be promoted to OCA-GH staff, meaning they are paid wages for their work. For example, a college student who consistently participates in OCA-GH's door knocking or field campaigns may

be promoted to "Team Lead," and then be responsible for managing others in those programs.

5. OCA-GH offers a variety of programs to empower the AAPI community it serves, including leadership training; education workshops; arts and cultural events; advocacy campaigns, including creating and distributing fliers in multiple languages; facilitating voting, including by providing rides to the polls and hosting candidate forums; voter registration & voter pledge drives; legal clinics; internships; scholarships; mentorship and civic engagement; and monitoring of and advocacy for national and local public policy. As part of its efforts to increase civic engagement, OCA-GH commits ample member time and resources each year to conducting citizenship drives that help hundreds of AAPI community members gain citizenship; providing voter education and civic engagement trainings; and registering those new citizens to vote and providing them with voter education trainings after they gain citizenship.

6. To meet its objective to increase voter participation, OCA-GH engages in and promotes a wide variety of voter registration, voter engagement, voter education, get-out-the-vote, exit polling, and election protection efforts across Greater Houston, including in the Sugar Land region of Fort Bend County. For example, OCA-GH has coordinated with Harris County to provide public demonstrations of how to use voting machines; recruited volunteers to take seniors to go vote; assisted seniors in early voting; directed voters to the League of Women Voters' voter guide (and originally funded LWV to translate their voter guide into Chinese); coordinated with EMGAGE and other AAPI community organizations to host

2

events to promote civic empowerment; and partnered with the Asian American Legal Defense and Education Fund national exit polling and election protection/election observation programs.

7. A substantial portion of OCA-GH's membership, and the AAPI community it serves, are elderly and/or have limited English proficiency ("LEP"). For example, many AAPIs in the Greater Houston area sponsor their parents to live with them in multigenerational households pursuant to family-based immigration visas. Similarly, much of the Vietnamese community, which is very large in Houston, came to the United States as adults after the Vietnam war, and are now elderly. OCA-GH therefore focuses in part on senior outreach and has made such efforts both pre- and post-COVID, including through a health coalition group that involves arranging monthly bus trips for seniors for recreation, seminars, and health fairs.

8. OCA-GH's mission has been frustrated by SB 1's new ID matching requirement that a voter provide an identification number that matches what is in their voter file on their application for a ballot by mail ("ABBM") and carrier envelope.

9. OCA-GH has many members who have voted by mail in the past, as have many members of the AAPI community OCA-GH serves. Many of these voters qualify due to age, disability (typically low vision), or both. Many are also LEP voters.

10. Many of these elderly OCA-GH and community members have expressed fears that they will have their ABBM or mail-ballot rejected under SB 1 and that they won't receive notification about such errors in time to fix them before the election. They have also expressed fears that they won't remember which number they used to register to vote, or that they will suffer identity theft due to putting their

3

identification numbers on an envelope going out into the public with no idea who will see it.

11. Historically, OCA-GH would have provided mail-in voting assistance, including voter education efforts regarding SB 1's ID matching requirements, that would help assuage these fears. As the result of other SB 1 provisions, however, OCA-GH no longer provides this sort of mail-in voting assistance.

12. Specifically, and as relevant to OCA-GH's challenge to SB 1's ID matching requirements: Before SB 1's passage, OCA-GH arranged and publicized in-person candidate forums at several locations frequented by the community, like the Chinese Community Center and the library. Attendance at these forums varied from approximately 100 to 400 or more people. OCA-GH would set up a table at these candidate forums and provide voting assistance to any OCA-GH member or community member seeking assistance for any reason, including due to a language barrier, to low vision, or to being unfamiliar with the voting process as a first-time AAPI voter. This included helping voters complete their ABBMs, mail-ballots, and registration forms, to explaining the election process and what was on the ballot. Those seeking assistance were frequently limited English proficiency ("LEP") voters, elderly voters, or both. OCA-GH routinely provided the same sort of voting assistance with ABBMs and mail-in ballots to any OCA-GH member or community member who requested it during OCA-GH's voting machine demonstrations, voter training events, frequent door knocking and field campaigns, and exit polling survey tables. OCA-GH also routinely held in-person mail-in voting training sessions at which it would explain how to obtain an ABBM and vote by mail to

4

OCA-GH members and community members and maintained a presence at the Tracy Gee Community Center, and at early voting centers, to provide mail-in voting assistance to AAPI seniors—frequently LEP or low vision voters—who sought out OCA-GH's help.

13. Before SB 1's passage, OCA-GH paid its staff and members competitive wages for their work during these in-person candidate forums, voting machine demonstrations, door knocking and field campaigns, exit polling, and other activities, as well as provided staff and members with bottled water, sports drinks, snacks, and other forms of refreshment in exchange for their services. OCA-GH also provided food and refreshments to *all* attendees at its election-related community events, to encourage staff, member, and other attendee participation; to make things easier on attendees who might be pressed for time; to show appreciation for the community; and because providing food and refreshment is a common cultural courtesy.

14. Following the passage of SB 1, however, OCA-GH has made the organization-wide decision to cease providing mail-in voting assistance, as well as severely scaled back its activities during which mail-in ballots may be present, due to the fear of criminal prosecution pursuant to SB 1 Sections 6.06 and 7.04. Specifically, OCA-GH fears that by paying its staff and members who provide mail-in voting assistance, or by supplying them with food of drinks—or by doing the same for staff and members engaged in various election-related community events and activities—it is providing "compensation" in violation of SB 1 Section 6.06 (Texas

5

OCA-APPX-0661

Election Code § 86.0105) and SB 1 Section 7.04 (Texas Election Code § 276.015), and placing itself and its members at risk of criminal prosecution.

15. As a result, to counteract the effects of SB 1's ID matching provisions, OCA-GH devotes resources to encouraging voters to go to vote in person—thereby avoiding both the ID-matching and criminal liability problems altogether—and has spent, and will continue to spend, time educating them on how, where, and when to vote in person to avoid the rejection of their ABBM or mail-in ballot. OCA-GH's decision to encourage voters who qualify to vote by mail to instead vote in person was bolstered by seeing how many people had their mail-ballot materials rejected during the March 2022 primary election.

16. This remains true even though many elderly OCA-GH members and AAPI community members are at elevated risk of and seriously fear contracting COVID in their vulnerable and advanced age. Despite this, these voters are willing to take the risk of voting in person because they want to participate in democracy and do their civic duty to vote. OCA-GH members Sam and Elizabeth Hwong illustrate this. The Hwongs are married and are both in their eighties. Prior to passage of SB 1 both voted by mail, and both were eligible to vote by mail during the 2022 elections. However, despite the significant personal risk of voting in person, the Hwongs both chose to cast their votes in person during the March and November elections because they feared that their mail-balloting materials would be rejected due to SB 1. Both would have voted by mail if not for SB 1.

17. It is unconscionable to require elderly voters to choose between putting themselves at risk of identity theft and disenfranchisement in order to vote safely at home or

6

putting themselves at risk of COVID infection to avoid SB 1's identification number requirements.

18. It is critical to OCA-GH's mission that the process of voting by mail is as safe and secure as possible, and that every vote cast by AAPI voters in Texas is counted. SB1 is disenfranchising the OCA-GH and Texas AAPI community. The disenfranchisement of any AAPI Texas voter impairs OCA-GH's ability to achieve its goal of civic participation.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 22, 2023.

Deborah Chen

7

# Exhibit 39

Transcript of the Testimony of

**Deborah Chen**


**Date:**

March 28, 2022


**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

OCA-APPX-0665

```
 1            IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3
     LA UNIÓN DEL PUEBLO          §      Case No.
 4   ENTERO, et al.,              §      5:21-cv-844-XR
          Plaintiffs,            §
 5                                §
     v.                           §
 6                                §
     GREGORY W. ABBOTT, et        §
 7   al.,                         §
          Defendants.            §
 8                                §
                                  §
 9                                §
     OCA-GREATER HOUSTON, et      §      Case No.
10   al.,                         §      1:21-cv-780-XR
          Plaintiffs,            §
11                                §
     v.                           §
12                                §
     JOHN SCOTT, et al.,          §
13        Defendants.            §
                                  §
14                                §
                                  §
15   HOUSTON JUSTICE, et al.,     §      Case No.
          Plaintiffs,            §      5:21-cv-848-XR
16                                §
     v.                           §
17                                §
     GREGORY WAYNE ABBOTT, et     §
18   al.,                         §
          Defendants.            §
19                                §
                                  §
20                                §
     LULAC TEXAS, et al.,         §      Case No.
21        Plaintiffs,            §      1:21-cv-0786-XR
                                  §
22   v.                           §
                                  §
23   JOHN SCOTT, et al.,          §
          Defendants.            §
24                                §
                                  §
25                                §
     MI FAMILIA VOTA, et al.,     §      Case No.
```

```
 1        Plaintiffs,            §      5:21-cv-0920-XR
                                 §
 2  v.                           §
                                 §
 3  GREG ABBOTT, et al.,         §
         Defendants.             §
 4                               §
                                 §
 5  UNITED STATES OF AMERICA,    §      Case No.
 6        Plaintiff,             §      5:21-cv-1085-XR
                                 §
 7  v.                           §
                                 §
 8  THE STATE OF TEXAS, et       §
    al.,                         §
 9        Defendants.

10

11            ORAL AND VIDEOTAPED DEPOSITION OF
                         DEBORAH CHEN
12                     MARCH 28, 2022

13

14

15        ORAL AND VIDEOTAPED DEPOSITION OF DEBORAH CHEN,

16  produced as a witness at the instance of the Defendants

17  and duly sworn, was taken in the above styled and

18  numbered cause on Monday, March 28, 2022, from

19  10:31 a.m. to 7:24 p.m., before DONNA QUALLS, Notary

20  Public in and for the State of Texas, reported by

21  computerized stenotype machine, at the offices of the

22  Houston Chinese Community Center, 9800 Town Park Drive,

23  Houston, Texas, pursuant to the Federal Rules of Civil

24  Procedure, and any provisions stated on the record or

25  attached hereto.
```

```
 1                    A P P E A R A N C E S

 2

   FOR THE PLAINTIFF, OCA-GREATER HOUSTON:
 3        ZACHARY DOLLING
          HANI MIRZA
 4        TEXAS CIVIL RIGHTS PROJECT
          1405 Montopolis Drive
 5        Austin, Texas  78741
          (512) 474-5073
 6        zachary@texascivilrightsproject.org
          hani@texascivilrightsproject.org
 7

 8
   FOR THE PLAINTIFFS, OCA-GREATER HOUSTON:
 9        SUSANA LORENZO-GIGUERE
          ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION
10        FUND
          99 Hudson Street, 12th Floor
11        New York, New York  10013
          (212) 966-5932
12        slorenzo-giguere@aaldef.org

13

14 FOR THE PLAINTIFFS, LULAC TEXAS:
          NOAH BARON (Remotely)
15        ELIAS LAW GROUP
          10 G. Street NE, Suite 600
16        Washington, District of Columbia  20002
          (202) 968-4556
17        nbaron@elias.law

18

19 FOR THE DEFENDANT, OFFICE OF THE ATTORNEY GENERAL:
          KATHLEEN T. HUNKER
20        ARISTOTLE HERBERT (Remotely)
          OFFICE OF THE ATTORNEY GENERAL
21        P.O. BOX 12548 (MC-009)
          AUSTIN, TEXAS  78711-2548
22        (512) 463-2100
          kathleen.hunker@oag.texas.gov
23

24

25
```

```
 1   FOR THE DEFENDANTS, BEXAR COUNTY DISTRICT ATTORNEY'S
     OFFICE:
 2        LISA V. CUBRIEL (Remotely)
          BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
 3        101 West Nueva Street, 7th Floor
          San Antonio, Texas 78205
 4        (210) 335-2142
          lisa.cubriel.bexar.org
 5

 6
     Also Present (Remotely):
 7        Georgina Yeomans (LDF)
          Jason S. Kanterman
 8        Jon Bash
          Lia Sifuentes Davis
 9        Leigh Tognetti
          Kevin Zhen (FF)
10        Jennifer Yun (DOJ)
          Julia Longoria
11        Savannah Kumar
          Ari Herbert
12        Wendy Olson
          Tiffany Bingham
13        Jerry Vattamala - AALDEF
          Tony Nelson - Travis County
14        Josephine Ramirez
          Ciara Sisco - NAACP LDF
15        Katelynn Lujan, KTA Videographer
          Kamesha Archie, KTA Videographer (In person)
16

17

18

19

20

21

22

23

24

25
```

1                           INDEX

2                                                        PAGE

3
     Appearances.................................   3
4

5  DEBORAH CHEN

6  Examination by Ms. Hunker......................   7
   Examination by Mr. Dolling.....................  268
7  Further Examination by Ms. Hunker..............  274

8
     Signature Waived
9

10 Reporter's Certificate........................  281

11                       EXHIBIT INDEX

12

13 NUMBER          DESCRIPTION                    PAGE
   Exhibit 1       Notice of Deposition            13
14 Exhibit 2       Plaintiff's Second Amended      17
                   Complaint
15 Exhibit 3       Plaintiff OCA-Greater Houston's 34
                   Amended Objections and
16                 Responses to State Defendants'
                   First Set of Interrogatories
17 Exhibit 5       Enrolled Bill, SB 1            130
   Exhibit 6       Tweet                          210
18 Exhibit 9       Election Code Title 1,         233
                   Chapter 1
19 Exhibit 10      Statement                      238
   Exhibit 11      November 3rd, 2020, General and 81
20                 Special Elections Early Voting
                   Schedule for Harris County
21 Exhibit 12      News Article                   127

22

23

24

25

1  these chapters in regards to SB 1 or its enforcement or

2  implementation?

3      A.  No.

4      Q.  Is OCA-Greater Houston a membership

5  organization?

6      A.  Yes.

7      Q.  How many members does OCA-Greater Houston have

8  approximately?

9      A.  Paid, voting members, around 160 or so.

10      Q.  So 160 paid members -- paid, voting members?

11      A.  Yes.

12      Q.  And how many --

13      A.  Depending on the time of year, it could go as

14  high as 200-something.  But average, I'd say 160.  I

15  don't know the exact amount right now.

16      Q.  An approximation is perfectly fine.

17              And how many, roughly, nonpaid, voting --

18  nonvoting members do you have?

19      A.  Nonvoting members, we consider to be any person

20  who participates in our programs, is a volunteer.  It

21  could be a client that we have provided services for.

22  So that could be in -- several hundred.

23      Q.  And where are these members located?

24      A.  The vast majority are in the Greater Houston

25  area.  Our seniors that we provide assistance to

 1  generally are around the Asiatown area or in the

 2  surrounding areas, typically from Sugar Land and/or the

 3  Alief/Sharpstown/Gulfton, some as far away as Katy.  Our

 4  student ment- -- I'm sorry -- our student members -- we

 5  do a lot of youth trainings.  Those literally are in the

 6  hundreds, are all around the city, mostly on the west

 7  side of the city.

 8      Q.  So Harris County-centered?

 9      A.  Harris County-centered is the bulk of it.  But,

10  you know, we have had students who, you know, come from,

11  you know, Fort Bend County or Brazoria County, from

12  Sugar Land and Pearland.

13      Q.  So you --

14      A.  But the bulk of them are in Harris County.

15      Q.  So you made the distinction between paid,

16  voting members and then the nonvoting members, people

17  who either volunteered or received services; is that

18  correct?

19      A.  Yes.  Or participate in our programs.

20      Q.  So would you consider those more clients?

21      A.  Not really.  Because, you know, for example, a

22  lot of our students, they volunteer at different events.

23  We -- I wouldn't consider them a client so much as

24  they're, you know, just younger members.  They're future

25  leaders.  We --

 1      Q.  Part of the community?

 2      A.  Part of the community.

 3      Q.  And I think you had mentioned this before, but

 4  do members pay dues?

 5      A.  Voting members pay dues.

 6      Q.  And do voting members elect the OCA-Greater

 7  Houston's leadership?

 8      A.  Correct.

 9      Q.  Do they elect board members?

10      A.  Yes.

11      Q.  And do they elect officers?

12      A.  Members elect the chapter president.  The board

13  members elect the other officers.

14      Q.  Is OCA-Greater Houston's leadership made up of

15  members?

16      A.  Yes.

17      Q.  And how are the members involved in the

18  organization's activities?

19              And I'm talking specifically about the

20  voting members.

21      A.  Typically, they are -- voting members tend to

22  be a little -- they tend to fall into two buckets.

23  They're either much more active, or they're -- simply

24  they're "I just want to support the work that you do.  I

25  don't have the time to be involved, but I believe in

 1  what you do."

 2       Q.  And who manages the day-to-day operations of

 3  OCA-Greater Houston?

 4       A.  I manage a large portion of it.

 5       Q.  And the chapter president, I imagine, takes the

 6  rest?

 7       A.  As well as other board members.

 8       Q.  Okay.

 9       A.  They take on different things.

10       Q.  And how many people are on the board?

11       A.  Right now, there are 19 or 20 board members.

12       Q.  And do they all have office -- do they all hold

13  an officer position?

14       A.  No.  They are all board members, and then there

15  are specific officers of president, vice president,

16  treasurer, secretary.

17       Q.  And are they in addition to the board members,

18  or are they among the board members?

19       A.  Among the board members.

20       Q.  And you already mentioned that the board

21  members are selected by the voting members, and the --

22       A.  Chapter president is --

23                 (Simultaneously speaking.)

24       A.  -- is voted on by the membership directly.

25       Q.  (BY MS. HUNKER)  And the --

 1      Q.  Okay.

 2      A.  Our board member who is, you know, active with

 3  exit surveys are both Rogene -- she has been active with

 4  exit surveys in the past -- as well as Cecil Fong.

 5             THE REPORTER:  Can you spell that?

 6             THE WITNESS:  C-E-C-I-L F-O-N-G.

 7      A.  Other board members who have helped with the

 8  exit surveys are Cecilia Pham.  That's P-H-A-M.  Those

 9  are the two that come right off the top of my head.

10             Cecil Fong has also been the -- one of the

11  board members who's been very active with -- in the past

12  with helping to take seniors to go vote or being an

13  assister at a voting location.

14      Q.  What is OCA-Greater Houston's mission?

15      A.  It's a four-prong mission.  It's actually very

16  broad.  And I -- I should know this right off the top of

17  my head, and I don't know it off the top of my head.

18  But I'm fairly certain we have this typed.

19      Q.  I'm pretty sure it's in the interrogatories.

20      A.  Somewhere in here.  I know our taglines, in

21  raising the hopes and --

22      Q.  If you look at Interrogatory 5.

23      A.  Okay.

24      Q.  Interrogatory 5, Response A.

25      A.  Yes.

1     Q.  Provides four bullet points.

2               "To advocate for social justice,

3    equality" -- "equal opportunity, and fair treatment; to

4    promote civic participation, education, and leadership;

5    (3) to advance coalitions and community buildings; and

6    (4) to foster cultural heritage."

7               Would that be an accurate summation?

8     A.  Yes.

9     Q.  Now, in your second amended complaint, it says,

10   OCA-Greater Houston is a "civil rights organization of

11   community advocates dedicated to advancing the social,

12   political, and economic well-being of Americans of Asian

13   and Pacific Island descent."

14              That is in paragraph 14.

15    A.  I'm sorry.  And that is Exhibit...

16    Q.  2.

17    A.  2.

18    Q.  My apologies.  I should have specified.

19    A.  No worries.  Okay.

20    Q.  Second sentence.

21              Is that an accurate description as well?

22    A.  Yes.

23    Q.  And you'd agree that Asian and Pacific

24   Island-descent Americans are a diverse population?

25    A.  Yes.

1  COUNTY OF HARRIS )

2  STATE  OF  TEXAS )

3

4                    REPORTER'S CERTIFICATION

5

6        I, Donna Qualls, Notary Public in and for the State

7  of Texas, hereby certify that this transcript is a true

8  record of the testimony given and that the witness was

9  duly sworn by the notary.

10        I further certify that I am neither attorney nor

11  counsel for, related to, nor employed by any of the

12  parties to the action in which this testimony was taken.

13        Further, I am not a relative or employee of any

14  attorney of record in this cause, nor do I have a

15  financial interest in the action.

16        Subscribed and sworn to on this the 11th day of

17  April, 2022.

18

19

20

21        _____
        DONNA QUALLS

22        Notary Public in and for
        The State of Texas

        My Commission expires 11/02/2022

23
        Magna Legal Services

24        Firm Registration No. 633
        16414 San Pedro, Suite 900

25        San Antonio, Texas 78232
        (210)  697-3400

# Exhibit 40

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

## DECLARATION OF ELIZABETH HWONG

My name is Elizabeth Hwong. I am over the age of 18 and capable of making this declaration.
The facts stated herein are within my personal knowledge.

1. I am a resident of Harris County, Texas and eligible to vote in Harris County, Texas.

2. I am 80 years old.

3. I am a board member of OCA-GH.

4. I immigrated to the United States in 1965 as a student.

5. I became a citizen in 1973 and registered to vote Texas shortly afterwards.

6. I regularly voted in person since the mid-1970's, and by mail for around two decades, when Texas first allowed seniors to vote by mail so we don't have to go out.

7. I have a Texas Driver's License and a voter registration card.

8. I stayed inside since January 2020 because I have an elevated risk and seriously fear contracting COVID due to my advanced age.

9. I was willing to take the risk of voting in person in 2022 because I want to participate in democracy and do my civic duty to vote.

10. I prefer to vote by mail to avoid any health risk and because it is more convenient for senior citizens like me.

11. I fear that my vote by mail application would be rejected because I don't remember which number I used when I registered to vote in the 1970's.

12. I fear that I wouldn't be notified in time about any mismatch in the number I used to register to vote in the 1970's and the number I use in my vote by mail application, in time to fix the error before the election.

13. I fear identity theft due to putting my social security number on the vote by mail application envelope going out into the public with no protection or idea of who could see it.

14. I continue to have these fears and will take the risk of voting in person, although I would vote by mail in the future, if not for SB1, because it is safer and more convenient for me as a senior citizen.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 24, 2023.

*Elizabeth Hwong*

Elizabeth Hwong

2

# Exhibit 41

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## DECLARATION OF SAM HWONG

My name is Sam Hwong. I am over the age of 18 and capable of making this declaration. The facts stated herein are within my personal knowledge.

1. I am a resident of Harris County, Texas and eligible to vote in Harris County, Texas.

2. I am 81 years old.

3. I am a member of OCA-GH.

4. I immigrated to the United States in 1965 as a student.

5. I became a citizen in 1973 and registered to vote Texas shortly afterwards.

6. I regularly voted in person since the mid-1970's, and by mail for around two decades, when Texas first allowed seniors to vote by mail so we don't have to go out.

7. I have a Texas Driver's License and a voter registration card.

8. I stayed inside since January 2020 because I have an elevated risk and seriously fear contracting COVID due to my advanced age.

9. I was willing to take the risk of voting in person in 2022 because I want to participate in democracy and do my civic duty to vote.

10. I prefer to vote by mail to avoid any health risk and because it is more convenient for senior citizens like me.

11. I fear that my vote by mail application would be rejected because I don't remember which number I used when I registered to vote in the 1970's.

12. I fear that I wouldn't be notified in time about any mismatch in the number I used to register to vote in the 1970's and the number I use in my vote by mail application, in time to fix the error before the election.

13. I fear identity theft due to putting my social security number on the vote by mail application envelope going out into the public with no protection or idea of who could see it.

14. I continue to have these fears and will take the risk of voting in person, although I would vote by mail in the future if not for SB1 because it is safer and more convenient for me as a senior citizen.


This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 24, 2023.

Sam Hwong

2

OCA-APPX-0683

# Exhibit 42

DocuSign Envelope ID: B7731DE6-DC7E-41A8-84AA-BA17969495A8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

---

### DECLARATION OF BOB KAFKA

My name is Bob Kafka. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based upon my personal knowledge:

1.      I am the coordinator of REVUP-Texas ("REVUP"), as well as one of three Board members.

2.      REVUP stands for Register, Educate, Vote, Use Power.

3.      REVUP is a statewide, non-partisan, nonprofit grassroots organization that was formed in

2015.

4.      REVUP is a member-based organization whose members are primarily individuals with

disabilities. REVUP currently has about 500 members spread out across Texas. REVUP members

with disabilities participate in and help guide the direction of REVUP's efforts.

5.      REVUP's members include voters who are eligible to vote by mail.

6.      Since its inception, REVUP's mission has been to empower persons with disabilities

through voter registration and assistance, issue advocacy, mobilization and organizing. REVUP

typically engages in a variety of advocacy efforts on behalf of its members, which includes

1

DocuSign Envelope ID: B7731DE6-DC7E-41A8-84AA-BA17969495A8

supporting certain policies at local and state legislative bodies, as well as outreach to members to support these policies. This advocacy involves outreach to its members and others in the disability community through in-person events and trainings.

7.     A primary focus of accomplishing REVUP's mission is registering persons with disabilities, and their allies, to vote. REVUP therefore spends significant time to get as many of these individuals registered to vote as it can. A corollary focus is educating REVUP members and the broader disability community about issues that impact their lives.

8.     To further REVUP's mission to register persons with disabilities, REVUP participates in National Voter Registration Day, and National Disability Voter Registration Week, which is coordinated nationwide by the American Association of People with Disabilities.

9.     To further REVUP's mission to educate its members and the disability community about registering to vote and about issues that impact them, REVUP has a dedicated website, a podcast series entitled "Use Your Power," and a presence on social media (e.g., Facebook, Instagram, and Twitter).

10.     REVUP also produces PSAs to educate and inform its members and the broader disability community about voter registration and issues that impact their lives.

11.     SB 1's passage, however, forced REVUP to shift its focus away from its established voter registration and education efforts and instead focus on educating voters about SB 1's changes to the mail-in-voting process, changes that place new barriers on getting a mail-in ballot.

12.     Prior to SB 1's enactment, REVUP's plans were to devote substantial time and resources on educating its members and the disability community about issues that affect their lives.  Instead, much time and resources were diverted to producing and disseminating podcasts and informational materials focused on SB 1, including changes and barriers to the new vote-by-mail process.

DocuSign Envelope ID: B7731DE6-DC7E-41A8-84AA-BA17969495A8

13.     Educating REVUP's members and others about the risks of improper rejection of a mail-in ballot hampers REVUP's mission of expanding voter registration and increasing voter turnout of persons with disabilities.

14.     REVUP has very limited resources—members do not pay dues—so that time and resources spent producing and disseminating informational materials and podcasts, answering calls and emails, and updating its website to explain the changes and barriers to mail-in-voting, are resources it would otherwise spend elsewhere.

15.     REVUP's voter registration and get out the vote efforts, as well as its goal of empowering the disability community to become a constituency, are undercut when persons with disabilities vote-by-mail but have their ballots or applications rejected due to an immaterial identification issue.

16.     Because of SB 1 and its changes to the mail-in-voting process, REVUP has had to expend some of its extremely limited financial resources on getting its website updated and for American Sign Language interpreters for its SB 1 podcasts and trainings.

17.     Unless and until SB 1's vote-by-mail requirements are changed, REVUP's voter registration and get out the vote efforts and its policy advocacy will continue to suffer because REVUP will need to continue to spend time and resources educating and warning its members about these onerous and immaterial requirements.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.  Executed on _May 22, 2023 | 11:25 AM CDT_, at Austin, Texas.

DocuSigned by:

Bob Kafka

# Exhibit 43

Transcript of the Testimony of

**Bob Kafka**


**Date:**

April 07, 2022


**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

OCA-APPX-0689

1                    IN THE UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF TEXAS
2                          SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO ENTERO,     )
    et al,                          )
4        Plaintiffs,                )
                                    )
5   v.                              )    Case No. 5:21-cv-844-XR
                                    )
6   GREGORY W. ABBOTT, et al.,      )
         Defendants.                )
7   _____)
    OCA-GREATER HOUSTON, et al.,    )
8        Plaintiffs,                )
                                    )
9   v.                              )    Case No. 1:21-cv-780-XR
                                    )
10  JOHN SCOTT, et al.,             )
         Defendants.                )
11  _____)
    HOUSTON JUSTICE, et al.,        )
12       Plaintiffs,                )
                                    )
13  v.                              )    Case No. 5:21-cv-848-XR
                                    )
14  GREGORY WAYNE ABBOTT, et al.,   )
         Defendants.                )
15  _____)
    LULAC TEXAS, et al.,            )
16       Plaintiffs,                )
                                    )
17  v.                              )
                                    )    Case No. 1:21-cv-0786-XR
18                                  )
    JOHN SCOTT, et al.,             )
19       Defendants.                )

20  MI FAMILIA VOTA, et al.,        )
         Plaintiffs,                )
21                                  )
    v.                              )    Case No. 5:21-cv-0920-XR
22                                  )
    GREG ABBOTT, et al.,            )
23       Defendants.                )
    _____)

24

25

```
 1  UNITED STATES OF AMERICA,      )
            Plaintiff,             )
 2                                 )
    v.                             )    Case No. 5:21-cv-1085-XR
 3                                 )
    THE STATE OF TEXAS, ET AL.,    )
 4          Defendants             )
    _____
 5

 6

 7

 8
    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 9
                   VIDEOTAPED ORAL DEPOSITION OF
10
                             BOB KAFKA
11
                          April 7, 2022
12
    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
13

14

15          VIDEOTAPED ORAL DEPOSITION OF BOB KAFKA, produced as

16  a witness at the instance of the Office of the Attorney

17  General, and duly sworn, was taken in the above-styled and

18  numbered cause on the 7th day of April, 2022, from 10:12 a.m to

19  4:25 p.m., before Dottie Norman, Certified Shorthand Reporter

20  in and for the State of Texas, reported by machine shorthand,

21  at the Offices of Disability Rights Texas, 2222 W. Braker Lane,

22  Austin, Texas, pursuant to the Federal Rule of Civil Procedure

23  30(b)(6) and the provisions stated on the record.

24

25
```

```
 1                    A P P E A R A N C E S

 2  FOR DISABILITY RIGHTS TEXAS:

 3         By:  LIA SIFUENTES DAVIS
                     -and-
 4               LUCIA ROMANO
            2222 W. Braker Lane
 5          Austin, Texas  78758
            512.454.4816
 6

 7  FOR ACLU FOUNDATION OF TEXAS, INC.:

 8         By:  THOMAS BUSER-CLANCY
                     -and-
 9               SAVANNAH KUMAR (Present from 1:30 p.m. - 4:25 p.m.)
            5225 Katy Freeway, Suite 350
10          Houston, Texas  77007
            713.942.8146
11

12  FOR THE OFFICE OF THE ATTORNEY GENERAL:

13         By:  ERIC A. HUDSON, Senior Special Counsel
                     -and-
14               KATHLEEN HUNKER (Via Zoom)
            P.O. Box 12548 (MC-009)
15          Austin, Texas  78711-2548
            512.463.2100
16

17  FOR THE BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE:

18         By:  LISA V. CUBRIEL
            101 W. Nueva, 7th Floor
19          San Antonio, Texas  78205
            210.335.2311
20          (Via Zoom)

21  ALSO PRESENT:
            Manuel Martin, Videographer
22          Michael Stewart:  United States of America (via Zoom)
            Shira Wakschlag:  HAUL Plaintiffs (via Zoom)
23          Anthony Nelson:  Travis County Defendants (via Zoom)
            Courtney Hostetler:  Mi Familia Vota (via Zoom)
24          Leigh Tognetti (via Zoom)
            Sam Fishman (via Zoom)
25          Nick Adkins (via Zoom)
            Julia Longoria (via Zoom)
```

OCA-APPX-0692

INDEX

                                                              PAGE
Appearances ......................................... 2

BOB KAFKA:

        Examination by Mr. Hudson ....................... 6

Correction Sheet ....................................160

Signature Page ......................................161

Reporter's Certificate ..............................162

1                            EXHIBITS

2    NUMBER              DESCRIPTION                         PAGE

3
     Defendants' 1       Deposition Notice                    9
4
     Defendants' 2       Plaintiffs' Second Amended Complaint  39
5
     Defendants' 3       Senate Bill 1                        39
6
     Defendants' 4       Witness List August 9, 2021          47
7
     Defendants' 5       Caller Times News Article 6-14-18    56
8
     Defendants' 6       House Journal April 23, 2007        148
9
     Defendants' 7       Indictment - Marlena Rosanne Jackson 151
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  header Topics on it --

2        A.    Uh-huh.

3        Q.    -- which I believe is the last complete page.

4        A.    Got it.

5        Q.    So you understand today that you're here to testify

6  on behalf of REVUP, right?

7        A.    Correct.

8        Q.    First off, can you describe to the Court what REVUP

9  is?

10       A.    REVUP is a statewide nonpartisan, nonprofit created

11 to increase the involvement of people with disabilities and

12 allies in the electoral process.  REVUP is -- stands for

13 Register, Educate, Vote, Use your Power.  The disability vote

14 has not been seen as an entity to have involvement in the

15 electoral process.  So that was why REVUP was created and its

16 mission.

17       Q.    So you see there where it says Topics For

18 Examination at the top of the page?

19       A.    Right.

20       Q.    Okay.  We have Topics 1 through 10 on the first

21 page.  Do you see that?

22       A.    Yes, sir.

23       Q.    Are you here to testify on behalf of REVUP for

24 Topics 1 through 10?

25       A.    Yes, sir.

1            And actually the Governor election when Greg

2  Abbott was running against Wendy Davis, uh, it became apparent

3  that this was going to be a high-visibility election,

4  especially with, you know, then Attorney General Abbott being a

5  person with a disability and then Wendy Davis being very high

6  visibility as her time in the legislature.  So that we thought

7  it was time to start to create an entity that would focus on,

8  in a nonpartisan way, the disability vote and to sort of begin

9  to make the point that even though people with disabilities do

10 vote, the candidates and policymakers don't really think of it

11 as an entity.  So that really was the motivation for developing

12 REVUP.

13      Q.   So what year did the organization REVUP actually

14 form?

15      A.   2015.

16      Q.   And you mentioned it's nonpartisan.  So, for

17 instance, in the circumstance with Governor Abbott -- now

18 Governor Abbott and then I believe Representative Davis REVUP

19 didn't take a position with regard to any partisan issue?

20      A.   No.  We're strictly nonpartisan.  We reach out to

21 both parties equally.

22      Q.   When REVUP was formed, can you tell me a little bit

23 about the structure of the organization?

24      A.   Yeah.  We have a three-member board that, you know,

25 that -- basically a president, secretary and a director.  And

1  they meet on an annual basis.  We have a membership and that --

2  the membership doesn't elect the board.  The board is

3  self-electing and basically does all the legal requirements in

4  terms of financial, signing contracts and such.

5       Q.   When you say the members don't elect the board, how

6  does REVUP fund board members?

7       A.   Basically, our -- we outreach in terms of people who

8  are interested.  And the -- since the board elects itself, if

9  people are interested, that is brought up.  And if there's

10  going to be any turnover, that is how, you know, we would

11  consider a new board member.  And the board can expand.  Up to

12  now we have not expanded past the three board members.

13       Q.   With regard to funding, how is REVUP funded?

14       A.   It's totally grass roots.  We don't get any federal,

15  state or local funds.  We're a relatively small nonprofit.  I

16  would like to say that we punch above our weight in terms of

17  influence with very little funding.

18       Q.   Let me ask you this.  So I don't usually share

19  personal details about myself in deposition, but I'll share

20  this one because I think it might be relevant to what we're

21  doing here.  So once upon a time I was on the United Way board.

22  And one of the things United Way did was they funded smaller

23  organizations within communities to see that they had funding

24  for whatever services they were providing.

25            So when you say you're grass roots only -- uh,

1  the example of the United Way, you don't have organizations

2  like United Way or any other large organization funding you?

3       A.   No.

4       Q.   How many members does REVUP have?

5       A.   We approximate 500.  And that's because our

6  membership criteria is being involved, so we have to

7  approximate.  But what we have said when asked, approximately

8  500 that we have an impact around.  They don't have a

9  membership list per se.

10      Q.   Well, if you don't have a membership list, how do

11 you determine how many members roughly that you have?

12      A.   We use an interesting concept that we're actually

13 kind of proud of.  The way we have organized and the way we

14 have -- in fact I said -- punch above our weight is that we

15 send out information through organizations, individuals.  And

16 then they disseminate.  And people who get involved in the

17 organization we consider members.  Though it's not the

18 traditional way members are seen, it has really gotten us a way

19 of, in our mission, of educating and disseminating information.

20 And so that is why when we say we have approximately 500 -- it

21 could be much larger than that because of the way we define

22 "member."

23      Q.   Do members pay dues?

24      A.   No, no dues.

25      Q.   Do members donate?

1  submit things.  I would hesitate a guess.

2       Q.   Let's talk a little bit about how your organization

3  is divvied up.  Now, I understood you to say that the goal of

4  REVUP is to have influence on, in a nonpartisan way, policy

5  decisions that impact issues around people with disabilities.

6       A.   Uh-huh.

7       Q.   Is that fair?

8       A.   Yeah.

9       Q.   Programmatically, how is REVUP divided?

10      A.   Basically, we use the acronym as the way we design

11 what we do both in terms of our advocacy for -- or the

12 involvement.  Obviously register.  So voter registration

13 programs and outreach to try to get as many people with

14 disabilities and allies registered.

15           Then, which is a major piece of our work, is

16 educating the disability community on some of the issues that

17 are impacting their lives.  Even though they know it

18 personally, uh, we talk about how those are being impacted by

19 policymaking.

20           And then the V, the vote, the get out the vote,

21 we have a big push.  So most of our work is focused around

22 those three areas.  And since voting is our prime mission,

23 that's actually how the group got named and -- you know, in its

24 goal and mission.

25      Q.   With regard to registration, what activities in the

1 last six to seven years has REVUP engaged in?

2      A.   Yeah.  We participate basically with register to

3 vote.  It's an online attempt to register people.  We have

4 developed a relationship with that organization.  Especially

5 because of the pandemic, in-person registration drives have

6 been difficult.  And so we were trying to think of a way to be

7 able to continue to outreach during a period of time when there

8 were not going to be a lot of in-person, especially since

9 people with disabilities are more vulnerable.  And I say that

10 because -- you know, we have tried to shun the term

11 "vulnerable" for years, but the pandemic has flipped that on

12 its head.  So we had to find ways to register people to get

13 them involved.  And so that area.

14           We also participate in an annual National

15 Disability Voter Registration Week which is coordinated by the

16 American Association of People with Disabilities nationwide.

17 And then we also participate in the National Disability Reg --

18 not Disability.  National Voter Registration Day which is held.

19 So we have tried to target our registration attempts focused on

20 both local and national registration drives.

21      Q.   So, if I understand you correctly, you have engaged

22 in online registration efforts?

23      A.   Yeah, as much as possible.  Texas doesn't have

24 online voter registration, but there is a way that -- legally

25 to be able to do it so that people can use an app.  Then we

1        A.    Intermediate Care Facilities.

2        Q.    I'm sorry?

3        A.    Intermediate Care Facility.

4        Q.    Okay.

5        A.    Yeah.

6        Q.    All right.  I wanted to make sure those acronyms got

7    into the record for the benefit of the Court.

8              So let me see if I can focus this down.  With

9    regard to education, can you tell me about what REVUP does with

10   regard to education as it relates to voting?

11       A.    Oh, well, we send out inform -- well, first we have

12   our social media.  We have a website.  We have a podcast called

13   Use Your Power, and we have done webinars.  We have on our

14   website some of the things that we have done in the past,

15   specifically on voting.  I apologize because I thought you

16   meant what did we do in terms of education on issues.  So I

17   apologize for the long soliloquy on issues there.  But -- so

18   basically information fliers in terms of that.  And that gets

19   put on all our social media.  We have an Instagram and a

20   YouTube.  We have done quite a bit and I think we have

21   submitted some of the media that we have done to promote voting

22   both -- again, in the three areas, registra -- mostly

23   registration and getting out the vote.

24       Q.    With regard to the social media, you mentioned

25   Instagram.  You mentioned YouTube.  Do you have any other

1 social media for REVUP?

2        A.    Yeah.  I mean, like I said I don't know -- I'm not

3 -- we have a Facebook page and we have a website.

4        Q.    In addition to the Facebook page and the website,

5 any other social media?

6        A.    I don't believe so.

7        Q.    So no Twitter?

8        A.    Oh, actually we do.  I'm showing my age.  I

9 apologize.  We don't have TikTok.  That's the one thing I do

10 know.  I really am -- show my age about social media.  But, you

11 know, we have young people that are starting to bring me into

12 the 21st Century I suppose.

13        Q.    Yeah, well, don't feel too bad.  I'm graying myself,

14 so --

15              So let's talk a little bit about the social

16 media.  So what kind of information do you put on your social

17 media?

18        A.    All relevant to the three -- you know, in the

19 acronym.  Power, just one example.  We have had podcasts on

20 various different issues in terms of -- we have had different

21 groups that have been affected by voting and giving some of the

22 issues.

23              On Facebook we put all our documents and some of

24 our media that we develop, specifically PSAs.  You know, that's

25 the type of information we put on there mostly, again, all

1  nonpartisan, all meant to basically get people knowledgeable

2  about, as best we can, the dates.  And, you know, we hope that

3  that information is then disseminated through the local

4  communities.

5       Q.   Do you send out any hard copy documents with regard

6  to voting?

7       A.   Very -- very little in terms of hard copies.  We do

8  most of it through -- you know, electronically.

9       Q.   Do you do any trainings on voting?

10      A.   We have done -- I think we have done a webinar on --

11 I don't know if you would call it a training per se, but

12 basically on -- mostly informational type webinar.

13      Q.   When did that webinar take place?

14      A.   I would have to go back and check if I may.

15      Q.   Are there any other efforts -- let's see if we can

16 go through.  We have talked about social media.  You use

17 Facebook, Twitter, Instagram, YouTube, right?

18      A.   Yeah.

19      Q.   You also have a podcast?

20      A.   Yeah.

21      Q.   Is that available on Apple?

22      A.   No, it's just available on our website.  And we

23 disseminate it through just our -- the networks on e-mail and

24 things like that.

25      Q.   With regard to YouTube, do you post videos?

1       A.   Yeah.  Again, I would have to go back and ask the

2   people, but we also put -- the podcast is -- excuse me.  The

3   podcast is also -- excuse me -- is also shown on the YouTube

4   channel.

5       Q.   You said you also do some hard copy documents.  You

6   have also done a webinar --

7       A.   Yeah.

8       Q.   -- training on voting?

9       A.   Right.

10      Q.   Since Senate Bill 1 passed and was signed by the

11  Governor, have you had to amend any of that?

12      A.   Well, we have had to move our focus.  You know,

13  again, when I started going through the litany of education

14  issues, a lot of that has taken a back seat since SB 1.  I

15  think about five or six of our podcasts have related directly

16  to Senate Bill 1 where our original plans was to start doing a

17  much more intensive, you know, education on those issues that I

18  mentioned previously in terms of that.  So Senate Bill 1 has

19  taken, you know, at least on the podcasts and our document

20  development, much more of our time.

21      Q.   Let me see if I can ask the question a different way

22  because I think what I'm asking is slightly different than what

23  you're answering.

24      A.   Okay.

25      Q.   Maybe I can break this out just a little bit.

1          REVUP posted on Facebook before Senate Bill 1

2    passed, right?

3          A.   Yes.

4          Q.   So in the time period between Senate Bill 1 passing

5    and 2015, REVUP made posts on Facebook?

6          A.   Sure.

7          Q.   Have you made posts on Facebook since Senate Bill 1

8    passed?

9          A.   Yes.

10         Q.   Did you have to go back and change any of the

11   Facebook posts on account of Senate Bill 1 passing?

12         A.   No, but it was -- you know, the focus of the posts

13   were different because of Senate Bill 1 because of the need to

14   focus on -- because we were getting quite a bit of calls --

15   phone calls from people, you know, because -- you know, as --

16   you know, the news was so focused on the voting bill, you know,

17   and the -- the special sessions that -- so that -- that really

18   changed our -- you know, how our time and resources were spent.

19         Q.   With regard to your website, did you have to change

20   anything related to voting on your website on account of --

21         A.   Well --

22         Q.   On account of Senate Bill 1?

23         A.   Yeah.  I mean, Senate Bill 1 caused us actually to

24   sit down with our webmaster.  And we had to spend -- we're

25   still in the process of spending time developing so that we

1  could specifically get more information targeted to what the

2  new SB 1 because, again, there was such misinformation.  And

3  the chilling effect that we got just -- just from the multitude

4  of phone calls that we got from around the state and feedback

5  that we got from various different organizations about, you

6  know, so many of the sections of the bill, you know, because

7  people are not policy wonks.  So that -- that is why we spend

8  an inordinate amount of time with our webmaster about re --

9  redesigning so that we could focus on that.

10      Q.   What's your webmaster's name?

11      A.   His name is (mumbling) Nathan Freeze.

12      Q.   Freeze like you freeze an ice cube or Friese as in

13  --

14      A.   No, like an ice --

15      Q.   -- F-r-i-e-s-e?

16      A.   Like an ice cube.

17      Q.   Got you.

18           With regard to your Twitter account, I presume

19  REVUP posted on Twitter before Senate Bill 1?

20      A.   Yes.

21      Q.   Have you had to go back and change any of your

22  tweets on account of Senate Bill 1?

23      A.   The only way I can answer that is that just what the

24  -- what the Twitter type things were posted.  And, again, I

25  don't -- one of our volunteers posts that.  But, again, it

 1  would be posting more of our SB 1 focus than on other areas,

 2  which we would have done had SB 1 not been, you know, enacted.

 3       Q.   With regard to Instagram, did REVUP post on

 4  Instagram before Senate Bill 1?

 5       A.   Yes.

 6       Q.   Have you had to go back and amend anything you've

 7  put on Instagram?

 8       A.   Just the same answer basically.  It's what was put

 9  on, you know, since SB 1 rather than -- we continued to do

10  Instagram, but it was the content of what was placed on SB 1.

11       Q.   I want to make sure that the record is clear on

12  this.  So the answer is no, you haven't had to go back and

13  change anything that you posted before Senate Bill 1?

14       A.   Well, we didn't -- we continued to post.  The

15  content of what we posted changed because it was more focused

16  on SB 1.

17       Q.   Right.  My question -- all I'm asking is:  Have you

18  gone back and changed anything that you posted prior to Senate

19  Bill 1 on account of Senate Bill 1?  Let me see if I can put it

20  like this.

21       A.   Okay.  If you could explain that.

22       Q.   Yeah.  If you posted something about voting in 2020,

23  have you had to go back and change what you posted in 2020 on

24  account of Senate Bill 1?

25       A.   Only the -- not changing maybe what we posted in

1  2020, but what we posted post-SB 1 was focused on SB 1.

2       Q.   Got you.  So I think it's fair to say for Facebook,

3  Twitter, your website, Instagram, YouTube, your podcasts your

4  position is your focus has been geared towards Senate Bill 1

5  since it passed.  Is that fair?

6       A.   I think, yeah, predominantly, yes.

7       Q.   But it's also true that you haven't had to go back

8  and change anything on any of that social media that predated

9  Senate Bill 1 on account of Senate Bill 1?

10      A.   Only where it related to what we had before, the

11 actual language change.  You know, we may not have changed the

12 document per se, but the information was different than it

13 would have been previous to SB 1, slight -- you know, any

14 updating.  I mean, you have pre-bill and then you have post the

15 bill.

16      Q.   Okay.  So I can make it clear on the record, I just

17 want to make sure the Court understands this.  So when you're

18 talking about changing things, I understand you to be saying

19 that you're posting new information on your social media that

20 explains the changes that came about on account of Senate Bill

21 1; is that right?

22      A.   Correct.

23      Q.   All right.  And so you didn't go back and change

24 anything that predated Senate Bill 1, right?

25      A.   No.

 1  exactly how all that works.  But they are -- you know, we -- we

 2  meet, you know, on an ongoing basis.  So how it actually

 3  technologically works is above my pay grade, so to speak.

 4       Q.   No, understood.  I'm just trying to figure out --

 5  you say volunteers are operating the social media accounts,

 6  right?

 7       A.   Correct.

 8       Q.   So there's no money coming out of REVUP's pocket, so

 9  to speak, to pay for the people who are operating the social

10  media?

11       A.   No.  We do -- we do pay one person's expenses.  We

12  give it a stipend of 100 a month to do our podcast.  But that

13  is not -- it's not a salary.  It's basically to offset her

14  expenses, but that's the only.  But the webmaster is paid.

15       Q.   Do you take a salary?

16       A.   No.

17       Q.   I presume the board doesn't either?

18       A.   No, nobody on the board.

19       Q.   Can you tell me what you contend is any negative

20  impact that you, you being REVUP, have suffered on account of

21  Senate Bill 1?

22       A.   You mean me specifically?  No.

23       Q.   I don't mean Bob Kafka.

24       A.   Right.

25       Q.   I mean REVUP.  So with regard to Senate Bill 1, can

1  you tell me what impact that's had on REVUP?

2        A.    Well, it has -- like I said, it has sort of

3  redirected our focus -- short term I hope -- in terms of what

4  the impact of the requirements, and specifically, you know, the

5  section in terms of the -- the ID requirements.  And then

6  specifically also on the assistant area.  Those two focuses

7  have been -- I would say the most of the questions that we have

8  gotten and focused on in terms of changing REVUP.  Again,

9  ironically, our focus was -- since I talked about community

10 integration, was to get people to the polls.  So some of the

11 things in SB 1 plus the pandemic made us focus more on the

12 mail-in ballot area.  So that's why SB 1 itself really sent a

13 shockwave, sort of a chilling message because at the same time

14 that the pandemic -- and people with disabilities are

15 particularly -- and I hate to use the word, but I'll use it

16 again -- more vulnerable because of that.  So it basically

17 focused more on mail-in ballot and then SB 1 just made that

18 process more difficult.

19       Q.    What's REVUP's view on whether community integration

20 is better served by in-person versus mail-in voting?

21       A.    As a general philosophy, we believe integration into

22 the general public as much as possible whether it's in voting,

23 whether it's in terms of transportation, housing.  There's a

24 long history of people being warehoused, segregated, apart from

25 everything.  I mean, we have come a long way from the

1  Legislature and signed by Governor Abbott?

2       A.   Right.

3       Q.   Okay.

4       A.   Yeah.

5       Q.   All right.  So -- and let me just ask so the record

6  is clear.  You have understood that that's what I have been

7  referring to when I have been talking about Senate Bill 1?

8       A.   I hope so, otherwise we've been spending a lot of

9  time --

10      Q.   I just want to make sure.  It's -- you know, I have

11 a lot of cases with -- things with Senate Bill -- insert

12 number.

13      A.   Right.

14      Q.   And, you know, sometimes -- every legislature has a

15 Senate Bill 1.

16      A.   Right.

17      Q.   So, you know, just want to make sure.

18      A.   Yeah.  Yeah, I understand.

19      Q.   All right.  So, with that in mind, can you tell me

20 how much time REVUP has spent in changing its focus and trying

21 to reach its target audience about changes from the Senate Bill

22 1?

23      A.   You know, I can't give a percentage exactly, but it

24 feels like almost everything -- I mean, SB 1 has sort of been

25 like hovering over because of its, you know, impact in the

1  media, both in print and, you know, all over social media.  And

2  it also has coincided with the increase of the disability vote

3  because of some of the work that we had done since our creation

4  and work that had been done not just by us, but other

5  organizations.  So, you know, the good part is that the number

6  of people who were more involved in the voting process is a

7  positive.  But then SB 1 just caused that to, you know, take up

8  a predominant amount of our time.  So it seems like it's

9  omnipresent.

10      Q.   So even today?

11      A.   Oh, yeah.  I mean, it continued in terms -- you

12  know, we are gearing up now for the -- getting people educated

13  on the runoff and so the debacle in terms of the mail-in ballot

14  in the original primary, 24,000, you know, rejections.  So

15  people are going -- we're going to be spending a lot of time

16  trying to make sure that doesn't occur again.  But, you know, I

17  think that's why we're here.

18      Q.   Well, let me ask you this:  You spent time educating

19  voters in advance of the primary, right?

20      A.   Uh-huh.

21      Q.   And you have been training them on what Senate Bill

22  1 requires, right?

23      A.   Yeah, but it was un -- even for those who had been

24  following that there was a lot of confusion about.  And the

25  Secretary of State did not issue some of the information in a

1        A.   We are going to try to get them information.  The --
2   the real issue is in terms of the -- the makeup of the various
3   groups and the complexity of Senate Bill 1 that has been
4   difficult.  You know, those of us -- you know, I have a college
5   education and trying to understand it.  We try to put it in a
6   format that is understandable.  But, you know, again -- and
7   this is not stereotypic, but so many of our members are low
8   income, on Medicaid.  And some of the information is difficult.
9   And, obviously, we don't hit every person with a disability in
10  terms of the network.  So even though -- you know, we attempt.
11  That's our mission.  You know, the overall population is so
12  large.  You know, I just looked before I came here.  You know,
13  there are about three to five million people with disabilities,
14  according to the Governor's Committee on People with
15  Disabilities that have disabilities, you know, under the age of
16  65, not even counting those over.  So, again, we would, even
17  with our information, only touch a portion of the potential
18  voting group, so --
19        Q.   Okay.  My question is a little bit simpler than the
20  one you just answered.  I'm just asking:  The education that
21  you're trying to do right now for the May primary, is that
22  based on your current understanding of Senate Bill 1?
23        A.   Yes.  Sorry to spend all that time for a yes answer.
24        Q.   All right.  So as part of this lawsuit, REVUP will
25  have spent at least two elections training voters with

```
 1                    CHANGES AND SIGNATURE

 2             BOB KAFKA       April 7, 2022

 3   PAGE  LINE    CHANGE                      REASON

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1        I, BOB KAFKA, have read the foregoing deposition and

2  hereby affix my signature that same is true and correct, except

3  as noted above.

4                        _____

5

   STATE OF TEXAS          )

6  COUNTY OF TRAVIS        )

7

8        Before me _____ on this day

9  personally appeared BOB KAFKA, known to me or proved to me

10 under oath or through _____ (description of

11 identity card or other document) to be the person whose name is

12 subscribed to the foregoing instrument and acknowledged to me

13 that they executed the same for the purposes and consideration

14 therein expressed.

15        Given under my hand and seal of office this _____

16 day of _____, 2022.

17

18

19

20                        _____

   NOTARY PUBLIC IN AND FOR
21 THE STATE OF TEXAS

22

23

24

25

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO,    )
     et al,                         )
 4         Plaintiffs,              )
                                    )
 5   v.                             )   Case No. 5:21-cv-844-XR
                                    )
 6   GREGORY W. ABBOTT, et al.,     )
           Defendants.              )
 7   _____
     OCA-GREATER HOUSTON, et al.,   )
 8         Plaintiffs,              )
                                    )
 9   v.                             )   Case No. 1:21-cv-780-XR
                                    )
10   JOHN SCOTT, et al.,            )
           Defendants.              )
11   _____
     HOUSTON JUSTICE, et al.,       )
12         Plaintiffs,              )
                                    )
13   v.                             )   Case No. 5:21-cv-848-XR
                                    )
14   GREGORY WAYNE ABBOTT, et al., )
           Defendants.              )
15   _____
     LULAC TEXAS, et al.,           )
16         Plaintiffs,              )
                                    )
17   v.                             )
                                    )   Case No. 1:21-cv-0786-XR
18                                  )
     JOHN SCOTT, et al.,            )
19         Defendants.              )
     _____
20   MI FAMILIA VOTA, et al.,       )
           Plaintiffs,              )
21                                  )
     v.                             )   Case No. 5:21-cv-0920-XR
22                                  )
     GREG ABBOTT, et al.,           )
23         Defendants.              )
     _____

24

25
```

```
 1  UNITED STATES OF AMERICA,      )
          Plaintiff,               )
 2                                 )
    v.                             )    Case No. 5:21-cv-1085-XR
 3                                 )
    THE STATE OF TEXAS, ET AL.,    )
 4       Defendants                )
    _____
 5
                      REPORTER'S CERTIFICATION
 6               VIDEOTAPED ORAL DEPOSITION OF
                          BOB KAFKA
 7                      April 7, 2022

 8               I, DOTTIE NORMAN, Certified Shorthand Reporter

 9  in and for the State of Texas, hereby certify to the following:

10               That the witness, BOB KAFKA, was duly sworn by

11  the officer and that the transcript of the oral deposition is a

12  true record of the testimony given by the witness;

13               I further certify that pursuant to FRCP Rule

14  30(f)(1) that the signature of the deponent:

15               X     was requested by the deponent or a party

16  before completion of the deposition and returned within 30 days

17  from date of receipt of the transcript.  If returned, the

18  attached Changes and Signature Page contains any changes and

19  the reasons therefor;

20               _____ was not requested by the deponent or a

21  party before the completion of the deposition.

22               I further certify that I am neither attorney nor

23  counsel for, related to, nor employed by any of the parties to

24  the action in which this testimony was taken.  Further, I am

25  not a relative or employee of any attorney of record in this
```

1  cause, nor am I financially or otherwise interested in the

2  outcome of the action.

3            Subscribed and sworn to on this the _____ day

4  of _____, 2022.

5

6

7  _____
   DOTTIE NORMAN, Texas CSR 2283
8  Expiration Date:  8/31/2023
   Magna Legal Services
9  Firm Registration No. 633
   16414 San Pedro, Suite 900
10 San Antonio, Texas  78232
   866.672.7880

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 44

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civ. Act. No. 5:21-cv-844 (XR) (consolidated cases) |

## DECLARATION OF TERI SALTZMAN

My name is Teri Saltzman. I am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am a 59-year-old woman who currently lives in Travis County, Texas. I have been mostly voting by mail since 1985. I voted for the first time in Texas in 1985. In 2000, I

- 1 -

moved to Florida and was a registered voter there. I moved to North Carolina in 2011 and was a registered voter there. Since 2014, I have been living and voting in Texas.

2. I am a member of The Arc of Texas and REVUP-Texas. I routinely receive informational emails from both organizations.

3. I vote by mail because I am legally blind. I am substantially limited in the major life activity of seeing. Being independent is important to me. I use a screen magnifier to assist my vision. I prefer to vote by mail because I have voted in person before and found it difficult due to my disability. Voting sites don't always have the machines working that make voting accessible to me. For example, I have tried to vote in person before and there were headphones missing from the accessible voting machine. The volunteers at the voting sites are helpful, but they don't always know how to

work or fix the machines so that I can vote. In addition, I do not drive due to my disability, so voting in person would require me to find transportation.

4. Prior to SB 1, I voted by mail in Texas several times and never had any problems.

5. In January 2022, I requested a mail-in ballot online at vote.org. I received a ballot request form, completed the form, and submitted the form within a week.

6. About a week later, my request for a mail-in ballot on the basis of my disability was denied. I was given two reasons for its denial. First, I received a letter stating that my request for a mail-in ballot had been denied because my driver's license number, Social Security number, or voter ID number were incorrect. However, I had entered all three numbers correctly. I verified these numbers were correct with a Training and Technical Support Specialist at Disability

Rights Texas. Second, an employee at the Elections Office told me the reason that my request for a mail-in ballot was denied was because the application I was sent was out of date. She stated that the Elections Office had changed forms in January. However, I requested my mail-in ballot application in January, so I should have been sent the up-to-date form.

7. The Elections Office employee directed me to go to the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov to re-enter my information, but I was unsuccessful after several tries. The website was not accessible for blind users and was difficult to view with my screen magnifier. The website also seemed to be having technical issues. DRTX communicated with the Travis County Department of Elections on my behalf and obtained

OCA-APPX-0723

an accessible document for me. I completed that document, submitted it, and thought I cured the issue.

8. In February 2022, I received my mail-in ballot, completed the ballot, and mailed the ballot before the deadline.

9. On March 4, 2022, less than a week before the deadline, I received a letter from Travis County Elections stating that my mail-in ballot was rejected. This Notice of Carrier Defect email stated that my Carrier Envelope was received and reviewed, but defective. The box was checked on the Notice that my carrier envelope did not contain my Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the last 4 digits of my Social Security Number; or that the number I provided did not match the number associated with my voter registration record as provided by my County's Voter Registrar. I contacted the Travis County Election Office to

clarify and was told that I did not provide my ID numbers under the envelope flap before I sealed and signed the envelope. Due to my disability, I did not see anything on the envelope flap when I received it. I had never heard of this requirement and did not receive any instructions regarding the envelope flap in my March ballot election envelope. I was once again directed to go to the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov to attempt to cure, or to cancel my ballot. I attempted to cure through the Ballot by Mail Tracker and was unsuccessful. The website was still inaccessible even when I used my screen magnifier and seemed to be having technical issues.

10.     I contacted Travis County's Election Office by phone four times to attempt to successfully cure my ballot through the State Ballot by Mail Tracker, and each person I spoke to suggested a different solution. I was told that it was possible

I was entering too much information and to attempt again, leaving out information. For example, my street address has "Avenue" in it, and I was told to leave "Avenue" out of my address. This did not work. Another person from the Travis County Election Office asked me if I knew about large print software and screen readers, which was frustrating to me because, as a legally blind person, I am very aware of this technology. I already use a screen magnifier. Finally, another person asked me if I could go down to their office and drop my ballot off, or if I could ask anyone to drive me there. This suggestion was frustrating as well, as I vote by mail due to my disability and to be independent. I did not feel I should be required to find and obtain transportation to fix the issue as this would defeat the purpose of voting by mail. After ample time on the phone, the website finally worked when I clicked the button and cured the ballot. I

called the Travis County Election Office to verify, and they confirmed my ballot was cured.

11.    At no time did I see or was I offered any information on my rights as a person with a disability, and the availability of reasonable modifications or accommodations under federal or state laws. At no time did I see or was I offered contact information for who could help me with reasonable modification or accommodations, or information as to what the grievance procedure would be if I was initially refused. This information was not available on the website, on anything that was mailed to me, or from any of the many people I spoke with.

12.    Approximately a week later, I received another letter, which was not in an accessible format for me because it was not in large print, stating that there were errors in my ballot, so therefore my ballot didn't count. I am unsure if this letter

was a copy from the week prior or if it was a new letter. I am now unsure if my vote was counted.

13. In May 2022, I tried voting curbside rather than voting by mail during the primary runoff. A volunteer came outside with a laptop, but it was inaccessible, and they had no headphones. Because of this, the volunteer had to read the screen for me and I had no choice but to tell them my choices out loud. My vote was not private as the election volunteer heard my choices.

14. In addition to the difficulties and barriers with voting in person described above, I cannot drive myself to the polling place, and paratransit is not available where I live in Pflugerville. While my husband does drive, he is not always available to drive me when the polls are open.

15. I tried voting by mail again in November 2022. My optic device magnifies print to the eighth power, and yet the

font on the mail-in-ballot envelope flap is still too small for it to be readable for me. In November 2022, the font was even smaller because there was even more text on the envelope flap. My mail in ballot was rejected yet again for an ID-related reason, and I was again unable to cure the problem online because it again said that I was not a registered voter.

16. SB 1 is making it harder for people with disabilities like me to vote. I registered to vote by mail based on my disability and I have always done this successfully in the past, but this option is no longer accessible to me due to all of the new ID requirements and burdens imposed by SB 1 on the voting by mail process. I tried so hard to vote in the March primary, but at every turn, I faced obstacles due to my disability. I am very concerned about my ability to vote in the future due to SB 1.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on this 22nd day of May, 2023, at Austin, Texas.

Teri Salzman

# Exhibit 45

OCA-APPX-0731

DocuSign Envelope ID: 65D0CE41-C3F5-4626-8BD6-7671132F5399

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## DECLARATION OF YVONNE IGLESIAS

My name is Yvonne Iglesias. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am an eligible and registered voter in Hidalgo County, Texas.

2. I am a person who is paralyzed, experiences consistent muscle spasms, and is blind in one eye.

3. Since at least 2006, I have voted in most elections, both federal and state. I vote for the best candidate for me and my issues, whether they are Republican, Democrat, or other political party candidates. I believe I included my voter registration card identification and other identification as requested when applying and voting by mail. Since 2006, I have voted by mail the same way each year and did not have any problems and my votes counted.

4. In the 2022 November elections, after the passage of SB 1, I submitted an application to vote-by-mail.

DocuSign Envelope ID: 65D0CE41-C3F5-4626-8BD6-7671132F5399

5. I completed my application to vote-by-mail and sent it to the election office in Hidalgo County, Texas, just as I have since 2006, when my ballot was accepted and my votes were counted. I followed up on my application by calling the election office in Hidalgo County, Texas, well before the 2022 November election to confirm that my application was received. During this call, I was informed by a Hidalgo County election official that my vote-by-mail application had been rejected for an ID-related reason.

6. The election official explained to me what ID number to write on my application, which I did, and then resubmitted my voter application.

7. After submitting my second vote-by-mail application, I again reached out to the elections office for Hidalgo County, Texas, several days before the November 2022 election to confirm that my second application was received and accepted. I was again informed by an election official from Hidalgo County, Texas, that my second vote-by-mail application was rejected for an ID-related reason and because it had arrived too late.

8. Because I am unable to travel on short notice, as my disabilities require me to engage in significant coordination to arrange appropriate, accessible transportation, I was unable to vote in the November 2022 election.

9. Because of my disabilities, voting by mail remains the only form of voting that is accessible to me, but I no longer have confidence that I will be able to vote in the future as a result of the changes brought about by SB 1. Even after revising my ID number per the instructions of a county election official, my application to vote by mail was still rejected despite no issues applying to vote by mail in the previous fifteen years. I still do not understand why both of my applications were rejected.

10. I am a member of The Arc Texas and REVUP Texas. I became a member of these organizations because voting as a person with a disability is important to me. My sister, before she passed away, always stressed to me the importance of voting. I vote now in honor of her memory of this important right.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of May, 2023, at Hidalgo County, Texas.

DocuSigned by:

Yvonne Iglesias

Exhibit 46

DocuSign Envelope ID: 42E89393-3420-4CB8-AD24-ADD6BD5439B7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

**DECLARATION OF LAURA HALVORSON**

My name is Laura Halvorson. I am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based upon my personal knowledge:

1.　　　I am a 39-year-old woman who currently lives in Bexar County, Texas. I registered to vote for the first time after I turned 18 and sometime before the 2004 presidential election in which I voted.

2.　　　Between 2004 and 2014, I was a registered voter in the Dallas metro area where I lived. During this decade, I lived at times in Dallas, Denton, and Collin counties and updated my registration to ensure I could vote each time after I moved.

3.　　　In 2015, I moved out of state and updated my registration to Virginia. When I returned to Texas at the end of 2019, I registered to vote again in Texas, this time in Bexar County. I have been continually registered to vote in Bexar County, Texas since 2019.

4.　　　Voting is important to me. I have voted in every presidential election since 2004 and most other local and state elections since then.

OCA-APPX-0736

DocuSign Envelope ID: 42E89393-3420-4CB8-AD24-ADD6BD5439B7

5.      I am a member of REVUP Texas ("REVUP") and The Arc of Texas.

6.      From talking to members of REVUP, I learned that Texas has some of the lowest voter turnout in the nation. In 2014, I was Ms. Wheelchair Texas and I made voting part of my platform that year. I have stayed involved with REVUP since then, including participating with the REVUP Virginia chapter while I lived there.  When I returned to Texas in 2019, I resumed my membership with REVUP Texas.

7.      I was a member of the National Council on Independent Living's Voting Rights Committee from 2016-2020 and had extensive social media engagement during this time with #CripTheVote to encourage voter turnout amongst people with disabilities.

8.      I have several disabilities that substantially limit several major life activities. I have a very progressive form of Muscular Dystrophy that substantially limits my mobility (including walking, standing, lifting, and bending), ability to complete my activities of daily living (ADLs) necessary to care for myself, and my breathing. I am on a BIPAP breathing machine 24 hours a day, require attendant care for 90% of my ADLs, and use a power wheelchair for all mobility. My conditions also cause me severe pain.

9.      Because of my Muscular Dystrophy, I require assistance for all gross motor skills like reaching for objects, grasping/holding objects, and pressing buttons. Because of my disabilities, I require what is known as "total care" from caregivers with essentially all activities of daily living including cooking, dressing, and bathing.

10.     I also have to have someone with me at all times because my chronic neuromuscular respiratory failure requires use of a BIPAP Ventilator 24 hours a day, 7 days a week, and if it became unplugged or unhooked, I could not survive more than a few minutes. I have been on my BIPAP Ventilator full time since about March 2017.

DocuSign Envelope ID: 42E89393-3420-4CB8-AD24-ADD6BD5439B7

11.     Because of my chronic neuromuscular respiratory failure, even a mild cough can quickly become serious and possibly fatal. As a result, during the COVID-19 pandemic, my medical providers have advised me to avoid public spaces and crowds, and this is still their advice for me due to my high risk, even as many others have resumed "normal" life without the precautions many took during the height of the pandemic.

12.     How I have voted has changed over time as my Muscular Dystrophy has progressed and the pandemic also changed my method of voting. In 2004 – 2014, when I was voting in the Dallas metro area, I typically voted early in person. During one of the last elections, poll workers did adjust the voting screen so that I could reach it and mark my vote.

13.     In Virginia, I typically voted curbside during early voting. During the one or two times I went inside a polling place in person, poll workers brought me to the front of the line so I did not have to wait, and I was given a paper ballot which I could mark without assistance. Since that time, my disabilities have progressed and marking a paper ballot without assistance is painful and difficult.

14.     Since I returned to Texas, I have voted in Bexar County. I voted in the 2020 presidential primaries in person during early voting. I required total assistance from my personal care attendant. They drove me to the polling place, helped me get out of my wheelchair accessible van, and put on a mask to protect me from COVID-19 because I could not lift my hands to do these activities for myself. While I am able to move my powerchair myself, they had to open doors for me to enter the building. I waited in a very short line and when it was my turn, I approached the poll worker. My personal care attendant then had to remove my Texas ID from my wallet and give it to the poll worker who confirmed my voter registration.

3

15.     The poll worker administered the oath to my personal care attendant. The poll worker then gave my attendant the number to input into the voting machine since I could not lift my hands to take the number. Because I could not lift my hands or press the button on the voting machine, my personal care attendant input my number into the machine and then marked who I told her I wanted to vote for. When the voting machine printed my ballot, I was not able to grasp the ballot myself so my personal care attendant had to take my ballot and cross the room with me to deposit it into the ballot box.

16.     By the time of the next election, COVID-19 cases were significantly higher and the lines were very long, even during early voting, so I used curbside vote during the November 2020 election in Bexar County. My boyfriend drove me to the polling place because I could not because of my disabilities. When we arrived, I called for curbside voting. After about twenty minutes, a poll worker came outside and my boyfriend got out my ID and gave it to the poll worker since I did not have the motor function to get out my ID or hand it to the worker. They returned with a form for my boyfriend to complete and administered the oath to him so that he could assist me with voting. The poll worker than handed the voting tablet to my boyfriend. I did not have the ability to press the screen so I told my boyfriend who I wanted to vote for and he pressed the screen for me.

17.     I curbside voted again in Bexar County during a 2021 local election. My boyfriend drove me again and had to assist me in much the same way—he had to get out my ID and give it to the poll worker and also had to hold the tablet and press buttons for me to designate who I wanted to vote for since I could not do so because of my disabilities.

18.     I had applied to vote by mail as a person with a disability after my return to Texas in 2020 because I was not sure what would happen with COVID and with my disabilities,

DocuSign Envelope ID: 42E89393-3420-4CB8-AD24-ADD6BD5439B7

and I did not know how crowded the polling places would be. Since I was able to vote curbside in the 2020 elections, I had not tried to vote by mail-in ballot until this year.

19.     I voted by mail-in ballot during the March 2022 primary elections. My personal care attendants check and bring in my mail for me and one of them brought in my ballot. At the time, the assistor's oath still limited assistance to reading the ballot, marking the ballot, or directing me to do those things. My personal care attendant was not willing to assist me with opening or marking my ballot—as a green card holder, she was unwilling to take the oath to assist me (in person or by mail) because she was afraid of the threat of criminal prosecution and the impact on her legal status. Because she was not able to help me, I had to open and mark the ballot myself. Because of my disabilities, it took me four different times to mark my ballot—I could only hold the pen for short periods of time without my hand cramping and it also took a lot of energy and time to turn the ballot around on my table to position it so that I could fill in the bubble for who I wanted to vote for. After about ten minutes during which I would mark a few candidates, I would have to rest for about thirty minutes before I could try to hold a pen and mark the ballot again. All in all, it was very difficult for me to vote and the process was ultimately spread across two days.

20.     Similarly, it took me a lot of time to complete the information on the envelope and seal the envelope. Because of my gross motor difficulties, my signature changes day-to-day and my handwriting when printing can become difficult to read. Because of this, I was afraid my ballot would be rejected for not having the correct ID number. I also had great difficulty pressing hard enough to sign over the envelope flap.

DocuSign Envelope ID: 42E89393-3420-4CB8-AD24-ADD6BD5439B7

21.     I submitted my mail-in ballot before the due date and it was shown as received on February 26 on the Secretary of State's website; however, it was not marked as accepted until well after the election when I looked online at the time. If there had been a problem with my ballot – like if I had transposed numbers in my Texas ID number, my handwriting had been illegible, or I hadn't been able to press hard enough for the signature on the envelope flap, I would not have been able to correct my ballot and my vote would have been thrown out.

22.     Because of how long it took to process my March 2022 primary mail-in ballot, I do not trust voting by mail because if I am unable to mark the ballot hard enough with the pen or transpose two numbers in my ID, I would not be notified with enough time to be able to correct my ballot or early vote in person, which means I would not get to vote at all.

23.     Because of my experience in March 2022, I voted in person in November 2022 during the general election so that I could be sure my vote counted. Before the November election, I spent several hours over the course of several days researching the voting machines available in Bexar County, including watching instructional videos and emailing elections officials to try to confirm availability of remotes for the voting machines. When I did not get an answer to my email, my father went to my polling place a few days before I did to confirm they had the devices I needed to vote.

24.     When I arrived at my polling place, I went to the sign-in table, which was so crowded that there were people hovering over me, not wearing masks. Voting in person put my health at risk—my personal care attendant and I were the only ones wearing masks. This is one of the only public places I have gone since mid-2020 other than a medical office or pharmacy.

25.     I surrendered my mail-in ballot and handed over my ID.  After I received my ballot, my personal care attendant accompanied me to the machine. Though it is my understanding that the oath for assistors is no longer so limited, I was still uncomfortable placing my attendant, who is a woman of color, in that position given that there is so much confusion around the law, so I did not ask for her assistance other than for her to monitor my ventilator in case there were any issues with it.

26.     The poll worker brought me over to the machine and plugged in the remote so that I could vote. I started to operate the remote and it was not working—the directions were reversed from what the buttons indicated (up was down, left was right, etc.). The poll worker did not know how to operate it and so was unable to help other than to ask if I was "pressing the buttons," which I was.

27.     Once I figured out the remote, which took several minutes, I came to the first name on the screen and discovered the font was so large that it cut off part of the candidate's name and their party. Most of the names on the ballot had at least part of the name or party designation cut off, making it hard to identify who I wanted to vote for and taking additional time.  Later I discovered this was likely because the large font feature had been turned on, even though I did not require a large font to read the ballot.

28.     On the summary screen, it was again very difficult to see my choices and confirm I'd voted for the candidates I wanted to vote for. After I had confirmed my choices, it took several additional minutes to figure out how to navigate with the remote to print my ballot.

29.     After my ballot printed, I took it across the room and adjusted the height and angle of my power wheelchair so that I could just barely reach the place to put my ballot into the ballot box. This also took several minutes.

30.     From the time I turned over my ID at the sign-in table to the time I submitted my ballot, it took over thirty minutes for me to vote in person.

34.     While I would like to vote by mail in the future, or have the option to do so when my health makes going in public more dangerous, I want to know that my ballot will be counted. My experience in March 2022 makes me worry my ballot will not be counted in the future and I will not know of errors until it is too late to fix them or to vote in person.

31.     As a person with a disability, I already face significant barriers to vote and SB 1 has already made it harder for me to vote in 2022 and will continue to make it harder for me to vote in the future. I am disappointed that the state is working to make elections *less* accessible for people like me.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.  Executed on ___May 24, 2023 | 10:54 AM EDT___, at Bexar County, Texas.



Laura Halvorson

OCA-APPX-0743

# Exhibit 47

DocuSign Envelope ID: EE6939A0-E44A-4E57-8B16-5607C7FE28B9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civil Action No. 5:21-cv-844 (XR) <br> (consolidated cases) |

## DECLARATION OF TAYLOR SCOTT

My name is Taylor Scott. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am an eligible and registered voter in Hidalgo County, Texas.

2. I am diagnosed with Cerebral Palsy, I am blind in one eye, and use a power wheelchair.

3. My mom, Anne Scott, helps me with many things, such as filling out voting applications.

4. I have a Texas identification card, but it had expired before the election between Trump and Biden.

5. I do have a United States passport.

6. In the election between Beto and Abbott, I tried to vote by mail. My mom filled out the application to vote by mail and read it to me before it was sent in. I signed the application.

7. We put my passport number on the application to vote by mail.

DocuSign Envelope ID: EE6939A0-E44A-4E57-8B16-5607C7FE28B9

8.  I never received a ballot, so my mom took me to vote in person. It was very difficult for me to vote in person because of my disabilities. I successfully used my passport number to vote in person.

9.  I am a member of The ARC of Texas and REVUP.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on ___May 22, 2023 | 10:19 AM EDT___, at Cameron County, Texas.

DocuSigned by:

_____
S580EA1AFCA142E...

Taylor Scott

# Exhibit 48

OCA-APPX-0747

DocuSign Envelope ID: FF13EF87-51D1-4FE7-9B65-83B1852199F5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## DECLARATION OF ANNE SCOTT

My name is Anne Scott. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am an eligible and registered voter in Hidalgo County, Texas.

2. I am the mother of Taylor Scott. Taylor is also an eligible and registered voter in Hidalgo County, Texas.

3. Taylor is medically fragile. She is diagnosed with Cerebral Palsy, is blind in one eye, and uses a power wheelchair for mobility as she cannot walk independently. Taylor's disabilities substantially limit several life activities, including walking, speaking, communicating, and caring for herself.

4. Taylor's disabilities also impact her ability to speak and communicate with people who are unfamiliar with her speech patterns. Many people who do not know her may not understand her.

5. Due to Taylor's disabilities, I assist her with many things, including voting.

6. Taylor has a valid U.S. passport. She also has a state-issued identification card, but this ID expired during the COVID-19 pandemic in October 2020. Due to Taylor's disabilities and medical fragility, we were unable to go in person to have her identification card renewed. Her state-issued identification card is still expired.

7. In the November 2022 election, I helped Taylor apply to vote by mail. I thought that we could not use Taylor's expired state identification card number on the mail-in-ballot application, so we used her U.S. passport number. Taylor did not receive a ballot in return after sending in her application to vote-by-mail in November 2022.

8. Because Taylor never received any notification as to whether or why her application to vote by mail was rejected, she never had an opportunity to cure her application.

9. When the ballot did not arrive for Taylor, I took her to vote in person. Because of Taylor's disabilities and medical fragility, we are very cautious about taking her out in public due to COVID, so it was a risk to take her to vote in person. Taylor was able to vote in person using her U.S. passport as identification.

10. I never influence my daughter's voting. My daughter votes independently and she tells me she disagrees with some of the candidates who I support.

11. Taylor and I are members of REVUP and The Arc of Texas.

12. My daughter and I receive email communications from REVUP and The Arc of Texas.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on <u>May 18, 2023 | 3:43 PM PDT</u>, at County of Hawaii, Hawaii.



Anne Scott

# Exhibit 49

OCA-APPX-0750

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF TEXAS SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., <br><br> *Plaintiffs',* <br><br> *v.* <br><br> STATE OF TEXAS, et al., <br><br> *Defendants.* | Civil Action No. 5:21-CV-844 (XR) <br> (Consolidated Cases) |

## <u>DEFENDANT ISABEL LONGORIA'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES</u>

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Isabel Longoria, in her official capacity as Harris County Elections Administrator, serves her Objections and Answers to Plaintiffs' First Set of Interrogatories in the above-captioned actions.

Dated: May 13, 2022.                    Respectfully submitted,

_/s/ Christina M. Beeler_____
Christian D. Menefee
Harris County Attorney
Texas Bar No. 24088049
Christian.Menefee@cao.hctx.net
Jonathan G.C. Fombonne
First Assistant Harris County Attorney
Texas Bar No. 24102702
Jonathan.Fombonne@cao.hctx.net
Tiffany S. Bingham
Managing Counsel
Texas Bar No. 24012287
Tiffany.Bingham@cao.hctx.net
Sameer S. Birring
Assistant County Attorney
Texas Bar No. 24087169
Sameer.Birring@cao.hctx.net
Christina M. Beeler

Assistant County Attorney
Texas Bar No. 24096124
Christina.Beeler@cao.hctx.net
Susannah C. Mitcham
Assistant County Attorney
Texas Bar No. 24107219
Susannah.Mitcham@cao.hctx.net
OFFICE OF THE HARRIS COUNTY ATTORNEY
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

Attorneys for Defendant ISABEL
LONGORIA, in her Official Capacity as
Harris County Elections Administrator

## GENERAL OBJECTIONS

1. Defendant Longoria objects to these Interrogatories, including the instructions and definitions, to the extent they purport to impose upon Defendant Longoria any obligations different from, or greater than, those established or required by the Federal Rules of Civil Procedure.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:** State the following data regarding ABBMs and mail ballots from the March 1, 2022 primary election:

  a. Number of ABBMs received by the County;
  b. Number of ABBMs the County flagged for rejection because of an application defect of any kind;
  c. Number of ABBMs that the County ultimately accepted after an applicant cured a recorded defect of any kind;
  d. Number of ABBMs the County flagged for rejection because of an Omission Defect;
  e. Number of ABBMs the County flagged for rejection because of a Mismatch Defect;
  f. Number of ABBMs that the County ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect;
  g. Number of carrier envelopes the County received and reviewed for defects of any kind;
  h. Number of carrier envelopes the County flagged for rejection because of a defect of any kind;
  i. Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot;
  j. Number of mail ballots that the County ultimately accepted and counted after a voter cured a carrier envelope defect of any kind;
  k. Number of carrier envelopes the County flagged for rejection because of an Omission Defect;
  l. Number of carrier envelopes the County flagged for rejection because of a Mismatch Defect; and
  m. Number of ballots that the County ultimately accepted and counted after a voter cured either a Mismatch Defect or Omission Defect.

**ANSWER:** Defendant objects to sub-parts c, f, k, and l because they are unduly burdensome, as this data is not kept or recorded in a format that is readily searchable by query or readily accessible and would require significant attorney and staff resources to compile. Subject to and without waiver of the foregoing objections: The following data is based on best available information at the time of these answers, and all numbers are approximate.

  a. 35,904

b. 17,049
c. Defendant Longoria does not track this data.
d. 3329
e. 1787
f. Defendant Longoria does not track this data.
g. 36,878
h. 7794
i. 13
j. 849
k. Defendant Longoria does not track this data.
l. Defendant Longoria does not track this data.
m. 849

Although Defendant Longoria objects to sub-parts k and l for the foregoing reasons, Defendant Longoria does have access to numbers for sub-parts k and l combined. The total number of carrier envelopes flagged for rejection because of either an omission defect or a mismatch defect during the March 1, 2022, primary is 7750.

Please also see documents previously produced Longoria_005177-Longoria_005179.

**INTERROGATORY NO. 2:** State the following data regarding ABBMs and mail ballots from the March 3, 2020 primary election:

a. Number of ABBMs the County received;
b. Number of ABBMs the County rejected;
c. Number of carrier envelopes the County received and reviewed in processing ballots by mail;
d. Number of carrier envelopes the County flagged for defects of any kind;
e. Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot; and
f. Number of carrier envelopes with defects of any kind that were cured and ultimately counted.

**ANSWER:** Defendant Longoria objects to sub-part f because it is unduly burdensome, as this data is not kept or recorded in a format that is readily searchable by query or readily accessible and would require significant attorney and staff resources to compile. Subject to and without waiver of the foregoing objections: The following data is based on best available information at the time of these answers, and all numbers are approximate.

a. 70,990
b. 6387
c. 54,938
d. 77
e. 3516

f. Defendant Longoria does not track this data.

**INTERROGATORY NO. 3:** State the following data regarding ABBMs and mail ballots from March 6, 2018 primary election:

    a.   Number of ABBMs the County received;
    b.   Number of ABBMs the County rejected;
    c.   Number of carrier envelopes the County received and reviewed in processing ballots by mail;
    d.   Number of carrier envelopes the County flagged for defects of any kind;
    e.   Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot; and
    f.   Number of carrier envelopes with defects of any kind that were cured and ultimately counted.

**ANSWER:** Defendant Longoria objects to sub-part f because it is unduly burdensome, as this data is not kept or recorded in a format that is readily searchable by query or readily accessible and would require significant attorney and staff resources to compile. Subject to and without waiver of the foregoing objections: The following data is based on best available information at the time of these answers, and all numbers are approximate.

    a. 64,689
    b. 5598
    c. 48,473
    d. 135
    e. 2425
    f. Defendant Longoria does not track this data.

# Exhibit 50

OCA-APPX-0756

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | **5:21-CV-0844-XR** |
| | § | **(Consolidated Cases)** |
| GREGORY ABBOTT, et al. | § | |
| *Defendants.* | § | |

## DEFENDANT REBECCA GUERRERO'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES

TO:     Plaintiffs, by and through their attorneys of record.

Comes now Defendant Rebecca Guerrero in her official capacity as Travis County Clerk (Defendant), and hereby serves her Objections and Responses to Plaintiffs' Interrogatories.

## I.     RESPONSES TO INTERROGATORIES

1. State the following data regarding ABBMs and mail ballots from the March 1, 2022 primary election:

a. Number of ABBMs received by the County;

**RESPONSE:**

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22)

b. Number of ABBMs the County flagged for rejection because of an application defect of any kind;

**RESPONSE:**

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22).xlsx

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

064.127325 (CONFIDENTIAL) 2022 P22 BB Rejections.xlsx

064.127327-064.127364 (ULTRASENSITIVE INFORMATION) 2022 SE22 App Rejections.pdf

c. Number of ABBMs that the County ultimately accepted after an applicant cured a recorded defect of any kind;

**RESPONSE:**

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

d. Number of ABBMs the County flagged for rejection because of an Omission Defect;

**RESPONSE:**

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22).xlsx

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

064.127325 (CONFIDENTIAL) 2022 P22 BB Rejections.xlsx

e. Number of ABBMs the County flagged for rejection because of a Mismatch Defect;

**RESPONSE:**

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22).xlsx

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories

383.141 / 1047842.5
Page **2** of **8**

OCA-APPX-0758

064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

064.127325 (CONFIDENTIAL) 2022 P22 BB Rejections.xlsx


f. Number of ABBMs that the County ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect;


**RESPONSE:**

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx


g. Number of carrier envelopes the County received and reviewed for defects of any kind;


**RESPONSE:**

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx


h. Number of carrier envelopes the County flagged for rejection because of a defect of any kind;


**RESPONSE:**

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22).xlsx

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

064.127325 (CONFIDENTIAL) 2022 P22 BB Rejections.xlsx


i. Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot;

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*                                        383.141 / 1047842.5
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories                    Page **3** of **8**

OCA-APPX-0759

**RESPONSE:**

064.127961 Applications (CONFIDENTIAL).csv

064.127966 Ballots (CONFIDENTIAL).csv

064.127968 Cancelled or surrendered (CONFIDENTIAL).xlsx

j. Number of mail ballots that the County ultimately accepted and counted after a voter cured a carrier envelope defect of any kind;

**RESPONSE:**

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

k. Number of carrier envelopes the County flagged for rejection because of an Omission Defect;

**RESPONSE:**

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22).xlsx

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

064.127325 (CONFIDENTIAL) 2022 P22 BB Rejections.xlsx

l. Number of carrier envelopes the County flagged for rejection because of a Mismatch Defect; and

**RESPONSE:**

064.127321 (CONFIDENTIAL) 2022 Application Log (Active Apps from 12-1-21 to 1-14-22).xlsx

064.127322 (CONFIDENTIAL) 2022 P22 - Ballot History Log.xlsx

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories
383.141 / 1047842.5
Page **4** of 8

OCA-APPX-0760

064.127323 (CONFIDENTIAL) 2022 P22 App Rejections (FINAL).xlsx

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx

064.127325 (CONFIDENTIAL) 2022 P22 BB Rejections.xlsx


m. Number of ballots that the County ultimately accepted and counted after a voter cured either a Mismatch Defect or Omission Defect.


**RESPONSE:**

064.127324 (CONFIDENTIAL) 2022 P22 App Rejections (Includes Voters that Cured Rej).xlsx


2. State the following data regarding ABBMs and mail ballots from the March 3, 2020 primary election:

a. Number of ABBMs the County received;


**RESPONSE:**

064.119779 2020 (CONFIDENTIAL) P20 BB - Judges 3.11.20.xlsx


b. Number of ABBMs the County rejected;


**RESPONSE:**

064.118513-064.119776 (CONFIDENTIAL) 2020 P20 App Rejection Notices.pdf

064.119777 (CONFIDENTIAL) 2020 P20 Application Rejections.xlsx

064.119779 2020 (CONFIDENTIAL) P20 BB - Judges 3.11.20.xlsx


c. Number of carrier envelopes the County received and reviewed in processing ballots by mail;


**RESPONSE:**

064.119779 2020 (CONFIDENTIAL) P20 BB - Judges 3.11.20.xlsx

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*                    383.141 / 1047842.5
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories                    Page **5** of **8**

OCA-APPX-0761

d. Number of carrier envelopes the County flagged for defects of any kind;

**RESPONSE:**

064.118513-064.119776 (CONFIDENTIAL) 2020 P20 App Rejection Notices.pdf

064.119777 (CONFIDENTIAL) 2020 P20 Application Rejections.xlsx

064.119779 2020 (CONFIDENTIAL) P20 BB - Judges 3.11.20.xlsx

e. Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot; and

**RESPONSE:**

064.119779 2020 (CONFIDENTIAL) P20 BB - Judges 3.11.20.xlsx

f. Number of carrier envelopes with defects of any kind that were cured and ultimately counted.

**RESPONSE:**

064.119779 2020 (CONFIDENTIAL) P20 BB - Judges 3.11.20.xlsx

3. State the following data regarding ABBMs and mail ballots from the March 6, 2018 primary election:

a. Number of ABBMs the County received;

**RESPONSE:**

064.128588 P18 BBM Ballots Sent (CONFIDENTIAL).XLS

b. Number of ABBMs the County rejected;

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories

383.141 / 1047842.5
Page **6** of **8**

OCA-APPX-0762

**RESPONSE:**

Travis County Clerk's Office Elections Division's database in 2018 did not collect or track data regarding the number of ABBMs rejected. Accordingly, Defendant Clerk Guerrero has no information or data responsive to Interrogatory 3. (b.).

c. Number of carrier envelopes the County received and reviewed in processing ballots by mail;

**RESPONSE:**

064.128587 P18 Ballot Board (CONFIDENTIAL).xlsx

d. Number of carrier envelopes the County flagged for defects of any kind;

**RESPONSE:**

064.128587 P18 Ballot Board (CONFIDENTIAL).xlsx

e. Number of mail ballots cancelled by voters who voted in person, either using an ordinary or provisional ballot; and

**RESPONSE:**

Travis County Clerk's Office Elections Division's database in 2018 only collected or tracked data regarding mail ballots cancelled by voters who voted in person, using a provisional ballot. See,

064.128589 P18 BBM Provisional Voters (CONFIDENTIAL).xlsx

f. Number of carrier envelopes with defects of any kind that were cured and ultimately counted.

**OBJECTION:**

Defendant Clerk Guerrero objects to the term "cured" as being undefined, vague and ambiguous. Subject to and without waiving the forgoing objection[s], Defendant Clerk Guerrero responds as follows:

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*                                                   383.141 / 1047842.5
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories                    Page **7** of **8**

OCA-APPX-0763

**RESPONSE:**

In 2018, no process existed to "cure" mail ballots with carrier envelope defects. Accordingly, Defendant Clerk Guerrero has no information or data responsive to Interrogatory 3. (f.).

Respectfully submitted,

**DELIA GARZA**
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767
Telephone:    (512) 854-9513
Facsimile:     (512) 854-4808

By:     */s/ Anthony J. Nelson*
SHERINE E. THOMAS
State Bar No. 00794734
Sherine.Thomas@traviscountytx.gov
LESLIE W. DIPPEL
State Bar No. 00796472
Leslie.Dippel@traviscountytx.gov
ANTHONY J. NELSON
State Bar No. 14885800
Tony.Nelson@traviscountytx.gov
PATRICK T. POPE
State Bar No. 24079151
Patrick.Pope@traviscountytx.gov

**ATTORNEYS FOR DEFENDANTSREBECCA GUERRERO AND JOSÉ GARZA, IN THEIR OFFICIAL CAPACITIES AS TRAVIS COUNTY CLERK, AND DISTRICT ATTORNEY, RESPECTIVELY.**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all parties and counsel of record via electronic mail, as follows, on the 12th day of September, 2022.

*/s/ Anthony J. Nelson*
ANTHONY J. NELSON
PATRICK T. POPE
Assistant County Attorneys

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*                                         383.141 / 1047842.5
Defendant Rebecca Guerrero's Objections and Responses to Plaintiffs' Interrogatories                Page **8** of **8**

OCA-APPX-0764

# Exhibit 51

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | 5:21-cv-844-XR |
| v. | |
| GREGORY W. ABBOTT, et al., | |
| *Defendants.* | |
| OCA-GREATER HOUSTON, et al., | |
| *Plaintiffs,* | 1:21-CV-0780-XR |
| v. | |
| JANE NELSON, et al., | |
| *Defendants.* | |

**DEFENDANT HARRIS COUNTY ELECTIONS ADMINISTRATOR, CLIFFORD
TATUM'S AMENDED RESPONSES AND OBJECTIONS TO OCA PLAINTIFFS'
FIRST SET OF INTERROGATORIES**

**TO:** OCA Plainitffs, by and through their attorneys of record, Zachary Dolling, et al., Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741, zachary@texascivilrightsproject.org

Defendant Clifford Tatum, in his official capacity at Harris County Elections Administrator, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure serves these amended responses and objections to Plaintiffs', OCA- Greater Houston, League of Women Voters of Texas, REVUP-Texas, and Workers Defense Action Fund, First Set of Interrogatories.

OCA-APPX-0766

Dated: May 5, 2023

Respectfully submitted,

/s/ *Tiffany S. Bingham*
**CHRISTIAN D. MENEFEE**
Harris County Attorney
Texas Bar No. 24088049
Christian.Menefee@harriscountytx.gov
**JONATHAN G.C. FOMBONNE**
First Assistant Harris County Attorney
Texas Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
**TIFFANY S. BINGHAM**
Managing Counsel
Texas Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

*Attorneys for Defendant* Clifford Tatum, in his
Official Capacity as Harris County Elections
Administrator

## DEFENDANT TATUM'S OBJECTIONS AND RESPONSES TO OCA-PLAINTIFFS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** For the November 2022 general election, and with respect only to timely received applications for a ballot by mail ("ABBMs"), state:

**OBJECTION:** Defendant Tatum objects to this interrogatory as it is a compound interrogatory consisting of discrete subparts. Defendant Tatum will respond as if each discrete subpart is a separate interrogatory.

    a.   The number of ABBMs received by Harris County.

         **RESPONSE:** 82,276

    b.   The number of ABBMs initially rejected by Harris County:

        i.   Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (*i.e.*, pursuant to Texas Election Code § 86.001(f)).

            **RESPONSE:** 1,556

        ii.   Pursuant to any other provision of the Texas Election Code.

            **RESPONSE:** 892

    c.   The number of ABBMs initially rejected by Harris County pursuant to SB 1 Section 5.07 (*i.e.*, pursuant to Texas Election Code § 86.001(f)) but later accepted because the applicant cured the defect necessitating rejection, whether via an online tool, through the mail, or in person. This includes curing through the submission of a subsequent ABBM.

         **RESPONSE:** 732

    d.   The number of ABBMs finally rejected by Harris County:

        i.   Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (*i.e.*, pursuant to Texas Election Code § 86.001(f)).

            **RESPONSE:** 677

OCA-APPX-0768

ii. Pursuant to any other provision of the Texas Election Code.

**RESPONSE:** 582

e. The number of ABBMs finally accepted by Harris County.

**RESPONSE:** 81,075

**INTERROGATORY NO. 2:** For the November 2022 general election, and with respect only to timely received ballots by mail, state:

a. The number of ballots by mail received by Harris County.

**RESPONSE:** 64,175

b. The number of ballots by mail initially flagged for rejection by Harris County:

i. Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**RESPONSE:** 4,751

ii. Pursuant to any other provision of the Texas Election Code.

**RESPONSE:** 117

c. The number of ballots by mail initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) but ultimately accepted because the voter cured the flagged defect, whether via an online tool, through the mail, or in person.

**RESPONSE:** 2,003

d. The number of ballots by mail initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) and then cancelled by the voter.

**RESPONSE:** 0

e. The number of voters whose ballots by mail were initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election

4

Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) who did not cure the flagged defect and then voted in person:

    i.  By casting a regular ballot.

**RESPONSE:** 9

    ii.  By casting a provisional ballot.

**RESPONSE:** 117

  f.  The number of ballots by mail finally rejected by Harris County:

    i.  Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**RESPONSE:** 2,557

    ii.  Pursuant to any other provision of the Texas Election Code.

**RESPONSE:** 110

  g.  The number of ballots by mail finally accepted by Harris County.

**RESPONSE:** 61,508

**INTERROGATORY NO. 3:** For the November 2022 general election, state Harris County's final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places.

**RESPONSE:**   1.47%

**INTERROGATORY NO. 4:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 3 and the final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places, during:

  a.  The November 2020 general election

  b.  The November 2018 general election

**OBJECTION:**  Defendant Tatum objects to this interrogatory because, at the time these interrogatories were propounded, the scheduling order in this litigation limited discovery to matters related to the 2022 general election (Dkt. 437). Thus, these requests were outside the scope of the

discovery. Without waiving this objection, Defendant may supplement this response with data if it can be obtained later.

**INTERROGATORY NO. 5:** For the November 2022 general election, state Harris County's final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places.

      **RESPONSE:**  4.16%

**INTERROGATORY NO. 6:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 5 and the final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places, during:

    a.  The November 2020 general election

    b.  The November 2018 general election

**OBJECTION:**  Defendant Tatum objects to this interrogatory because, at the time these interrogatories were propounded, the scheduling order in this litigation limited discovery to matters related to the 2022 general election (Dkt. 437). Thus, these requests were outside the scope of the discovery. Without waiving this objection, Defendant may supplement this response with data if it can be obtained later.

# Exhibit 52

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LA UNION DEL PUEBLO ENTERO, et al.,** § | | |
| *Plaintiffs*, § | | |
| § | | |
| **v.** § | **5:21-CV-0844-XR** | |
| § | **(Consolidated Cases)** | |
| **GREGORY ABBOTT, et al.** § | | |
| *Defendants.* § | | |

---

### DEFENDANT DYANA LIMON-MERCADO'S OBJECTIONS AND RESPONSES TO OCA PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:    OCA Plaintiffs, by and through their attorneys of record.

Comes now Defendant Dyana Limon-Mercado in her official capacity as Travis County Clerk, and hereby serves their Objections and Responses to OCA Plaintiffs' First Set of Interrogatories.

Respectfully submitted,

**DELIA GARZA**
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767
Telephone:    (512) 854-9513
Facsimile:    (512) 854-4808

By:    */s/ Anthony J. Nelson*
LESLIE W. DIPPEL
State Bar No. 00796472
Leslie.Dippel@traviscountytx.gov
ANTHONY J. NELSON
State Bar No. 14885800
Tony.Nelson@traviscountytx.gov
PATRICK T. POPE
State Bar No. 24079151
Patrick.Pope@traviscountytx.gov

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*                    383.141 / 1112170.2   Page **1** of **6**
Defendant Limon-Mercado's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories

OCA-APPX-0773

**ATTORNEYS FOR DEFENDANTS DYANA LIMON-MERCADO AND JOSÉ GARZA, IN THEIR OFFICIAL CAPACITIES AS TRAVIS COUNTY CLERK, AND DISTRICT ATTORNEY, RESPECTIVELY.**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all parties and counsel of record via electronic mail, as follows, on the 23rd day of March, 2023.

*/s/ Anthony J. Nelson*
ANTHONY J. NELSON
PATRICK T. POPE
Assistant County Attorneys

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*     383.141 / 1112170.2   Page **2** of **6**
Defendant Limon-Mercado's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories

OCA-APPX-0774

# I. OBJECTIONS TO DEFINITIONS

1.      Defendant Limon-Mercado objects to Plaintiff's definition of "you" as including "Travis County, including the Office of the Travis County Clerk, the Travis County Clerk, her predecessors and successors..." This definition is overly broad and improperly includes prior County Clerk administrations not included or the subject of this litigation.  Additionally, said definitions could be construed to require the disclosure of information concerning matters made exempt from discovery under Federal Rule of Civil Procedure 26(b)(1) and the Federal Rules of Evidence, including, but not limited to attorney work product, litigation privilege, deliberative process privilege, grand jury proceedings, and ongoing criminal investigations.

# II. RESPONSES AND OBJECTIONS TO OCA PLAINTIFFS' FIRST SET OF INTERROGATORIES

**Interrogatory No. 1:** For the November 2022 general election, and with respect only to timely received applications for a ballot by mail ("ABBMs"), state:

    a. The number of ABBMs received by Travis County.

**Response: 28,516.**

    b. The number of ABBMs initially rejected by Travis County:

        i. Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (*i.e.*, pursuant to Texas Election Code § 86.001(f)).

**Response: 761.**

        ii. Pursuant to any other provision of the Texas Election Code.

**Response: 1,023.**

    c. The number of ABBMs initially rejected by Travis County pursuant to SB 1 Section 5.07 (*i.e.*, pursuant to Texas Election Code § 86.001(f)) but later accepted because the applicant

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*                           383.141 / 1112170.2   Page **3** of **6**
Defendant Limon-Mercado's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories

OCA-APPX-0775

cured the defect necessitating rejection, whether via an online tool, through the mail, or in person. This includes curing through the submission of a subsequent ABBM.

**Response: 190.**

    d. The number of ABBMs finally rejected by Travis County:

        i. Pursuant to SB 1 Section 5.07 because the information required under Texas Election Code Section 84.002(a)(1-a) included on the application did not identify the same voter identified on the applicant's application for voter registration (i.e., pursuant to Texas Election Code § 86.001(f)).

**Response: 571.**

        ii. Pursuant to any other provision of the Texas Election Code.

**Response: 815.**

    e. The number of ABBMs finally accepted by Travis County.

**Response: 26,732.**

**Interrogatory No. 2:** For the November 2022 general election, and with respect only to timely received ballots by mail, state:

    a. The number of ballots by mail received by Travis County.

**Response: 21,443.**

    b. The number of ballots by mail initially flagged for rejection by Travis County:

        i. Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (i.e., pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**Response: 827.**

        ii. Pursuant to any other provision of the Texas Election Code.

**Response: 126.**

    c. The number of ballots by mail initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8),

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*        383.141 / 1112170.2  Page **4** of 6
Defendant Limon-Mercado's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories

OCA-APPX-0776

and/or 87.0411(a)(4)) but ultimately accepted because the voter cured the flagged defect, whether via an online tool, through the mail, or in person.

**Response: 401.**

d. The number of ballots by mail initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) and then cancelled by the voter.

**Response: 0.**

e. The number of voters whose ballots by mail were initially flagged for rejection pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 (*i.e.*, pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)) who did not cure the flagged defect and then voted in person:

      iii. By casting a regular ballot.

**Response: 0.**

      iv. By casting a provisional ballot.

**Response: 27.**

f. The number of ballots by mail finally rejected by Travis County:

      v. Pursuant to SB 1 Sections 5.12, 5.13, and/or 5.14 because the information provided by the voter did not identify the same voter identified on the voter's application for voter registration (i.e., pursuant to Texas Election Code §§ 87.0271(a)(4), 87.041(b)(8), and/or 87.0411(a)(4)).

**Response: 418.**

      vi. Pursuant to any other provision of the Texas Election Code.

**Response: 45.**

g. The number of ballots by mail finally accepted by Travis County.

**Response: 20,980.**

**Interrogatory No. 3:** For the November 2022 general election, state Travis County's final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places.

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*      383.141 / 1112170.2  Page **5** of **6**
Defendant Limon-Mercado's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories

OCA-APPX-0777

**Response: 4.86%.**

**Interrogatory No. 4:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 3 and the final rejection rate of timely received ABBMs, expressed as a percentage of all timely received ABBMs and rounded to two decimal places, during:

    a. The November 2020 general election

**Response: 1.33% of Submitted Applications for Mail Ballots Rejected in November 2020 General Election.**

    b. The November 2018 general election

**Response: 3.56% of Submitted Applications for Mail Ballots Rejected in November 2018 General Election.**

**Interrogatory No. 5:** For the November 2022 general election, state Travis County's final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places.

**Response: 2.16%.**

**Interrogatory No. 6:** State the difference, and indicate whether it is positive or negative, between the percentage set out in response to Interrogatory No. 5 and the final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places, during:

    a. The November 2020 general election

**Response: 0.42% of Mail Ballots Rejected in November 2020 General Election.**

    b. The November 2018 general election

**Response: Response: 0.47% of Mail Ballots Rejected in November 2018 General Election.**

*La Unión del Pueblo Entero, et al. v. Greg Abbott, et al.*      383.141 / 1112170.2    Page **6** of **6**
Defendant Limon-Mercado's Objections and Responses to OCA Plaintiffs' First Set of Interrogatories

OCA-APPX-0778

# Exhibit 53

OCA-APPX-0779

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | No. 5:21-cv-00844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## HARRIS COUNTY ELECTIONS ADMINISTRATOR, CLIFFORD TATUM'S SUPPLEMENTAL RESPONSES TO STATE DEFENDANTS' SECOND SET OF INTERROGATORIES

TO:     Defendant Ken Paxton, by and through his attorney of record, Kathleen Hunker, Office of Attorney General, P.O. Box 12548, Austin, Texas 78711

Defendant Clifford D. Tatum, in his Official Capacity as Harris County Elections Administrator, pursuant to the Federal Rules of Civil Procedure serves these supplemental responses to State Defendants' Second Set of Interrogatories.

1

OCA-APPX-0780

Dated: March 21, 2023

Respectfully submitted,

**CHRISTIAN D. MENEFEE**
Harris County Attorney
Texas Bar No. 24088049
Christian.Menefee@harriscountytx.gov
**JONATHAN G.C. FOMBONNE**
First Assistant Harris County Attorney
Texas Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
**TIFFANY S. BINGHAM**
Managing Counsel
Texas Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
**SAMEER S. BIRRING**
Senior Assistant County Attorney
Texas Bar No. 24087169
Sameer.Birring@harriscountytx.gov
**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

*Attorneys for Defendant* Clifford Tatum, in his
Official Capacity as Harris County Elections
Administrator

2

## REQUESTS FOR INTERROGATORIES

**INTERROGATORY NO. 4:** Please identify and describe with specificity Harris County's final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places, for the following elections:

    a)   The November 2012 general election

        **Response: 0.17%**

    b)   The November 2014 general election

        **Response: 0.31%**

    c)   The November 2016 general election

        **Response: 0.48%**

    d)   The November 2018 general election

        **Response: 0.45%**

    e)   The November 2020 general election

        **Response: 0.12%**

    f)   The November 2022 general election

        **Response:  4.16%**

OCA-APPX-0782

# **VERIFICATION**

I, Jennifer Colvin, have read the factual statements contained in the attached Answers to State Defendants' Interrogatory 4 and verified that it is correct based on the information available to the Harris County Elections Administrator.

Executed this 21st day of March, 2023

*Jennifer Colvin*

# Exhibit 54

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | [Lead Case] |
| GREGORY W. ABBOTT, *et al.*, | § | |
|     *Defendants*. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-1085-XR |
| | § | [Consolidated Case] |
| THE STATE OF TEXAS, ET AL., | § | |
|     *Defendants* | § | |

## STATE DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO THE UNITED STATES' SECOND SET OF INTERROGATORIES

TO:    Plaintiff the United States of America, by and through their attorneys of record, Michael E. Stewart, Daniel J. Freeman, Richard Alan Dellheim, Dana Paikowsky, and Jennifer Yun, United States Department of Justice Civil Rights Division, 950 Pennsylvania Avenue NW, Washington, DC 20530

    Jane Nelson, in her official capacity as the Texas Secretary of State, and the State of Texas (collectively "State Defendants"[1]) hereby serve their Supplemental Objections and Responses to the United States' Second Set of Requests for Interrogatories, pursuant to the Federal Rules of Civil Procedure. Because present circumstances prevent State Defendants from signing these responses, State Defendants' counsel will serve properly executed interrogatory answers on the requesting party not later than 21 days after serving these unexecuted answers. *See* W.D. Tex. Local Rule CV-33(a).

---

[1] All previous references to "Defendants" have been changed to "State Defendants" for the sake of clarity.

1

Date: January 19, 2023

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

WILLIAM T. THOMPSON
Acting Chief, Special Litigation Unit
Tex. State Bar No. 24088531

BRENT WEBSTER
First Assistant Attorney General

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

Office of the Attorney General
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
will.thompson@oag.texas.gov
kathleen.hunker@oag.texas.gov

**Counsel for State Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of January, 2023, the attached State Defendants' Supplemental Objections and Responses to the United States' Second Request of Interrogatories was served on opposing counsel via electronic mail.

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel

OCA-APPX-0786

## GENERAL OBJECTIONS

Under Rule 26(b)(1), the proper scope of discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (2015). Among the considerations that are germane to that inquiry are "the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The twin demands for relevancy and proportionality "are related but distinct requirements." *Samsung Electronics Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017). Thus, if the information sought is irrelevant to the party's claims or defenses, "it is not necessary to determine whether it would be proportional if it *were* relevant." *Walker v. Pioneer Prod. Servs., Inc.*, No. CV 15-0645, 2016 WL 1244510, at *3 (E.D. La. Mar. 30, 2016). Conversely, "relevance alone does not translate into automatic discoverability" because "[a]n assessment of proportionality is essential." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019). Accordingly, State Defendants object to these requests to the extent that the information sought is either irrelevant or disproportionate.

State Defendants object to the definition of "conviction" or "convicted" as vague, overbroad, and ambiguous. Specifically, the term "an admission or finding of guilt" is subject to different interpretations. State Defendants understand the term to include pleas of guilt, stipulations of guilt, and acknowledgments of the offense. Therefore, State Defendants understand the terms "conviction" and "convicted" not to pertain to cases in which a defendant or suspect pleaded nolo contendere or no contest, or to cases in which a defendant otherwise reached an outcome that—though not a conviction by a judge or jury in a court of law—nonetheless involved violation of Texas Law.

3

State Defendants also object to the definition of "impermissible in-person voter assistance" as vague and ambiguous. Specifically, it is defined as "the acts of influencing or coercing a voter in the presence of their ballot"; yet Interrogatory No. 4 seeks instances of "impermissible in-person voter assistance" that occurred "by influencing or coercing a voter in the presence of their ballot." Therefore, this definition is tautological, and its meaning is not discernible. For this reason, State Defendants interpret the term "impermissible in-person voter assistance" to mean any in-person voter assistance that is not permissible.

Finally, State Defendants object to the definition of "voting by impersonation" as vague and ambiguous. The definition uses the term "vote harvesting," which is not defined. Therefore, State Defendants adopt the meaning of "vote harvesting" that State Defendants have otherwise used in the course of this litigation. Furthermore, the definition of "voting by impersonation" includes "improperly returning a ballot on behalf of another," which is a broad, sweeping, and undefined category of conduct. For this reason, the term "voting by impersonation" is vague and ambiguous because it is not limited in scope. Hence, State Defendants interpret the term "voting by impersonation" as those instances in which someone illegally votes as or on behalf of someone who is eligible to vote that does not constitute vote harvesting.

These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. All answers are given without prejudice to State Defendants' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Likewise, these answers and objections are not intended to be, and shall not be construed as, agreement with the United States' characterization of any facts, circumstances, or legal obligations. State Defendants reserve the right to contest any such characterization as inaccurate and object to the Requests insofar as they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

4

State Defendants will provide their answers based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. State Defendants object to and will refrain from extending or modifying any words employed in the Requests to comport with any expanded definitions or instructions. State Defendants will answer the Requests to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Western District of Texas.

OCA-APPX-0789

## SPECIFIC OBJECTIONS AND RESPONSES TO THE UNITED STATES' SECOND SET OF INTERROGATORIES

**INTERROGATORY NO. 4**: State each instance in which a person has been convicted of violating Texas law for providing or attempting to provide impermissible in-person voter assistance by influencing or coercing a voter in the presence of their ballot, including but not limited to relevant violations of Sections 64.012(a)(4), 64.036, 276.013(a)(1), and 276.013(a)(6) of the Texas Election Code.

## OBJECTIONS AND RESPONSE:

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case and unduly burdensome, including for the reason that the United States does not limit its request to particular date ranges or particular statutory provisions. To that end, State Defendants object to this interrogatory to the extent that it requires State Defendants to search and examine all case records without limitation to time or statutory provision. *See* Fed. R. Civ. P. 26(b)(1). The Office of the Attorney General of Texas began tracking, investigating, and prosecuting election fraud cases in 2004. Therefore, State Defendants read this interrogatory to seek information dating from 2004 to the present. Furthermore, the Office of the Attorney General of Texas may not be aware of other prosecutions that may have been filed by criminal district attorneys.

Additionally, State Defendants object to this Interrogatory to the extent that it calls for information that is publicly available or otherwise equally accessible to the United States. In that same vein, the Office of the Attorney General has already produced charts of pending and completed prosecutions from the Office of the Attorney General, as well as copies of prosecution-diversion agreement at bates stamped ranges STATE087312–STATE087395. Those materials represent a summary of business records held by the Office of the Attorney General, and ascertaining the information requested in this interrogatory will impose substantially the same burden on OAG as it would Plaintiffs' counsel. Fed. R. Civ. P. 33(d).

Finally, State Defendants object to this interrogatory to the extent that it calls for information subject to investigative privilege, attorney–client privilege, or attorney work-product privilege. Because the Office of the Attorney General is actively involved in investigations and prosecutions of election-related crimes, all three privileges likely apply to on-going investigations and prosecutions.

Subject to and without waiving these objections, State Defendants answer as follows:

The following table represents convictions for providing impermissible in-person voter assistance by influencing or coercing a voter in the presence of his or her ballot but does not include mere instances of such occurrences without convictions:

OCA-APPX-0790

| Case No. | Name | Location | Resolution Date | Laws Violated | Final Disposition |
|---|---|---|---|---|---|
| S-18-3065-CR; 18-CR-83358 | Rosita Tones Flores | Nueces/ San Patricio County | 6/12/2018 | Tex. Elec. Code§§ 64.012, 86.006, 64.036 | Convicted |
| 06-CR-2166-B | Maria Dora Flores | Nueces County | 8/4/2006 | Tex. Elec. Code§ 64.012 | Pleaded Guilty |
| 11-05590- CRM-CCL1 | Christine Thomas Shank | Brazos County | 2/6/2012 | Tex. Elec. Code§ 64.036 | Pleaded Guilty |
| 1108201lCCL- B | Gilda Hernandez | Dallas/ Rockwall County | 4/5/2012 | Tex. Elec. Code§§ 86.006, 64.036, 86.010 | Pleaded Guilty |
| 4-CCR-02977-A/14-CCR-02983-A/14-CCR-02984-A/14-CCR-02985-A/14-CCR-02987-A/14-CCR-02989-A/14-CCR-02991-A/14-CCR-02993-A/14-CCR-02995-A/14-CCR-02996-A/14-CCR-02997-A/14-CCR-02999-A/14-CCR-03003-A | Tomasa Chavez | Cameron County | 1/22/2015 | Tex. Elec. Code§§ 86.0051, 86.010, 86.006, 64.036 | Pleaded Guilty |
| 14-CCR-02980-A | Facunda Garcia | Cameron County | 3/19/2015 | Tex. Elec. Code§ 64.036 | Pleaded Guilty |

OCA-APPX-0791

| | | | | | |
|---|---|---|---|---|---|
| 14-CCR-02978-C/14-CCR-02998-C/14-CCR-03000-C/14-CCR-03001-C/14-CCR-03002-C/14-CCR-03004-C/14-CCR-03005-C/14-CCR-03006-C/14-CCR-03007-C/14-CCR-03008-C | Vicenta Verino | Cameron County | 8/19/2015 | Tex. Elec. Code§§ 64.036, 86.010, 86.0051, 86.006 | Pleaded Guilty |
| CR-15-08767- E; CR-15- 08768-E; CR-15-08769-E; CR-15-08770- E; CR-15- 08771-E; CR-15-08772-E; CR-15-08773- E; CR-15- 08774-E; CR-15-08775-E; CR-15-08776- E; CR-15- 08777-E; CR-15-08778-E; CR-15-08779- E; CR-15- 08780-E; CR-15-08781-E | Guadalupe Rivera, Sr. | Hidalgo County | 7/11/2016 | Tex. Elec. Code§ 64.036 | Pleaded Guilty |
| 20080,20081 | Christina Lichtenberger | Duval/Live Oak County | 12/14/2010 | Tex. Elec. Code§§ 64.036, 86.006 | Pleaded Guilty |
| 20082,20083 | Andrea Campos Bierstedt | Duval/Live Oak County | 12/14/2010 | Tex. Elec. Code§§ 64.036, 86.006 | Acknowledgment of Offense |

8

| | | | | | |
|---|---|---|---|---|---|
| 14-CCR-02979-A/14-CCR-03010-A/14-CCR-03011-A | Bernice Garcia | Cameron County | 4/8/2015 | Tex. Elec. Code§§ 64.036, 86.006, 86.0051 | Acknowledgment of Offense |
| CX3772923814 | Consuelo Barrientos Cantu | Frio County | 6/15/2018 | Tex. Elec. Code§ 64.036 | Stipulation of Guilt |
| CX3772923814 | Maria Delcarmen Vela | Frio County | 6/15/2018 | Tex. Elec. Code§ 64.036 | Stipulation of Guilt |
| 20084, 20085, 20086, 20087, 20088, 20089, 20090,20091 | Alicia Pena Perez | Duval/Live Oak County | 12/14/2010 | Tex. Elec. Code§§ 64.036, 86.006 | Pleaded Guilty |

**INTERROGATORY NO. 5:** State each instance in which a person has been convicted of violating Texas law by voting or attempting to vote by impersonation using a mail ballot, including but not limited to violations of Sections 64.012, 64.036, 276.013(a)(2), 276.013(a)(3), or 276.013(a)(7) of the Texas Election Code.

**OBJECTIONS AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, and unduly burdensome, including for the reason that the United States does not limit its request to particular date ranges or particular statutory provisions. To that end, State Defendants object to this interrogatory to the extent that it requires State Defendants to search and examine all case records without limitation to time or statutory provision. *See* Fed. R. Civ. P. 26(b)(l). The Office of the Attorney General of Texas began tracking, investigating, and prosecuting election fraud cases in 2004. Therefore, State Defendants read this interrogatory to seek information dating from 2004 to the present. Furthermore, the Office of the Attorney General of Texas may not be aware of other prosecutions that may have been filed by criminal district attorneys.

Additionally, State Defendants object to this interrogatory to the extent that it calls for information that is publicly available or otherwise equally accessible to the United States. In that same vein, the Office of the Attorney General has already produced charts of pending and completed prosecutions from the Office of the Attorney General, as well as copies of prosecution-diversion agreement at bates stamped ranges STATE087312-STATE087395. Those materials represent a summary of business records held by the Office of the Attorney General, and ascertaining the information requested in this interrogatory will impose substantially the same burden on OAG as it would Plaintiffs' counsel. Fed. R. Civ. P. 33(d).

9

Finally, State Defendants object to this interrogatory to the extent that it calls for information subject to investigative privilege, attorney-client privilege, or attorney work-product privilege. Because the Office of the Attorney General is actively involved in investigations and prosecutions of election-related crimes, all three privileges likely apply to on-going investigations and prosecutions.

Subject to and without waiving these objections, State Defendants answer as follows:

State Defendants understand this interrogatory not to pertain to cases involving violation of Texas Law for voting or attempting to vote by impersonation not through the use of a mail ballot. Nor do State Defendants understand this interrogatory to pertain to cases that might also constitute vote harvesting. Therefore, State Defendants identify the following convictions for voting or attempting to vote by impersonation using a mail ballot but do not include mere instances of such occurrences without convictions:

| Case No. | Name | Location | Resolution Date | Laws Violated | Final Disposition |
|----------|------|----------|-----------------|---------------|-------------------|
| B-05-2101-0- CR-B | Melva Kay Ponce | Bee County | 7/26/2005 | Tex. Elec. Code§ 64.012 | Pleaded Guilty |

**SUPPLEMENTAL RESPONSE:** Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, the individual and case identified above remains the only instance that is responsive to this interrogatory.

**INTERROGATORY NO. 6:** State the number of voters who have collected, modified, or added a Texas driver's license number, Texas election identification certificate number, Texas personal identification card number, or the last four digits of their social security number to their voter registration record using any online portals provided pursuant to SB 1 from December 2, 2021 until the present, disaggregated by portal. In answering this interrogatory, do not include voter registration information submitted or updated as part of an online driver license renewal or change-of-address transaction, pursuant to Section 5 of the National Voter Registration Act, 52 U.S.C. § 20504, and the settlement agreement in *Stringer v. Hughs,* No. 5:21-cv-46 (W.D. Tex.).

**OBJECTIONS AND ORIGINAL RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. Additionally, State Defendants object to this interrogatory to the extent that it requests information through "the present," which would result in the inclusion of incomplete and inaccurate information if applied to the May 7, 2022 election, for which early voting began on April 25, 2022. Subject to and without waiving these objections,

State Defendants answer as follows:

State Defendants do not possess the capability to provide information responsive to this interrogatory. Aside from the methods specifically excluded in the interrogatory itself, the only "online portal[]" through which the referenced identifying information could have been updated by a voter is located on the Texas.gov website. That website is maintained by the Texas Department of Information Resources, which is not a party to this case. A voter is required to enter his current driver license number, ID number, voter registration card VUID, and Social Security Number in order to access this portal for the purpose of updating the voter's name or address. The identifying information of voters who submit a change of name or address on Texas.gov is transmitted to the Office of the Texas Secretary of State ("SOS") on a nightly basis. If the TEAM database is missing the driver license/ID number or Social Security number disclosed by the voter in gaining access to Texas.gov, that voter's missing information is updated in TEAM.

There is no individual field or combination of fields in TEAM that would allow State Defendants to isolate the specific information requested in this interrogatory. The TEAM system contains an audit log that tracks the history of changes or updates made to a voter's record, but that audit log does not differentiate between the types of changes offered through the Texas.gov system. Because of these limitations that are inherent in the TEAM system, State Defendants are unable to provide data that is responsive to this interrogatory.

**SUPPLEMENTAL RESPONSE:**

Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, State Defendants remain unable to provide data responsive to this interrogatory.

**INTERROGATORY NO. 7:** State the number of voters who have cured identification defects in their Application for a Ballot By Mail using any online portals provided pursuant to SB 1 from December 2, 2021 until the present, disaggregated by portal.

**OBJECTIONS AND ORIGINAL RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. Additionally, State Defendants object to this interrogatory to the extent that it requests information through "the present," which would result in the inclusion of incomplete and inaccurate information if applied to the May 7, 2022 election, for which early voting began on April 25, 2022. Subject to and without waiving these objections, State Defendants answer as follows:

The only "online portal[]" through which identification defects in a voter's Application for a Ballot By Mail ("ABBM") may be cured is the Ballot by Mail Tracker available at VoteTexas.gov.[2] A voter can use the Tracker to cure an initial failure to provide any of the required personal identification numbers or if the numbers provided do not match the voter registration record. While SOS can

---

[2] https://teamrv-mvp.sos.texas.gov/BallotTrackerApp/#/login

determine the number of voters who used the Tracker to correct a defect in their ABBM and subsequently had their ABBM accepted, this total does not necessarily provide the exact information requested in this interrogatory. That is because the TEAM system is a living database that captures only the current or most recent status associated with any information in a voter's record. Therefore, State Defendants can only provide ABBM figures for the March 1, 2022 Primary reflecting the final status of voters in the TEAM system. With those caveats and limitations in mind, State Defendants can represent that the total number of ABBMs submitted for the March 1, 2022 Primary was 264,647; the total number of voters who used the Tracker to correct a defect in their ABBM was 364; and the total number of those voters who used the Tracker to correct a defect in their ABBM and either had their ABBM accepted or cancelled their application and instead voted in person was 237.

**SUPPLEMENTAL RESPONSE:** Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, State Defendants supplement their response with the following counts as calculated by the Texas Secretary of State:

> May 7, 2022 Constitutional Amendment Election
> Total number of ABBMs submitted: 288,865.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM: 48.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM and had their ABBM accepted or cancelled their application and voted in person: 16.
>
> May 24, 2022 Primary Runoff Election
> Total number of ABBMs submitted: 280,277.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM: 11.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM and had their ABBM accepted or cancelled their application and voted in person: 7.
>
> November 8, 2022 General Election
> Total number of ABBMs submitted: 431,571.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM: 523.
> Total number of voters who used the Ballot by Mail Tracker to correct a defect in their ABBM and had their ABBM accepted or cancelled their application and voted in person: 419.

**INTERROGATORY NO. 8:** State the number of voters who have cured carrier envelope identification defects using any online portal provided pursuant to SB 1 from February 9, 2022 to present, disaggregated by portal.

**OBJECTIONS AND ORIGINAL RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. Additionally, State Defendants object to this interrogatory to the extent that it requests information through "the present," which would result in the inclusion of incomplete and inaccurate information if applied to the May 7, 2022 election, for which early voting began on April 25, 2022. Subject to and without waiving these objections, State Defendants

answer as follows:

The only "online portal[]" through which a voter may cure carrier envelope identification defects is again the Ballot by Mail Tracker available at VoteTexas.gov. Using this portal, a voter can cure the following three defects:

1. The carrier envelope did not contain the voter's Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number, or the Last 4 digits of his Social Security Number;
2. The identification number provided by the voter did not match the number associated with his voter registration record; or
3. The voter was not issued one of the documents with the required number and did not indicate this fact on the carrier envelope.

SOS can determine the number of voters who used the Tracker to correct a defective carrier envelope and subsequently had their mail-in ballot accepted, but this total does not necessarily provide the exact information requested in this interrogatory. That is because the TEAM system is a living database that captures only the current or most recent status associated with any information in a voter's record. Therefore, State Defendants can only provide mail ballot figures for the March 1, 2022 Primary reflecting the final status of voters in the TEAM system. Considering those limitations, State Defendants can represent that the total number of mail ballots submitted for the March 1, 2022 Primary was 198,947; the total number of voters who used the Tracker to correct a defective carrier envelope was 2,628; and the total number of voters who used the Tracker to correct a defective carrier envelope and either had their mail ballot accepted or cancelled their mail ballot and instead voted in person was 1,788.

**SUPPLEMENTAL RESPONSE:** Subject to State Defendants' understanding of the meaning and parameters of this interrogatory as set forth in their original response, State Defendants supplement their response with the following counts as calculated by the Texas Secretary of State:

May 7, 2022 Constitutional Amendment Election
Total number of mail ballots submitted: 190,469.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope: 1,017.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope and had their mail ballot accepted or cancelled their mail ballot and voted in person: 937.

May 24, 2022 Primary Runoff Election
Total number of mail ballots submitted: 183,260.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope: 1,071.
Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope and had their mail ballot accepted or cancelled their mail ballot and voted in person: 1,063.

November 8, 2022 General Election
Total number of mail ballots submitted: 345,679.

OCA-APPX-0797

Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope: 1,531.

Total number of voters who used the Ballot by Mail Tracker to correct a defective carrier envelope and had their mail ballot accepted or cancelled their mail ballot and voted in person: 1,496.

OCA-APPX-0798

# Exhibit 55

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br>*Plaintiffs,*<br>v.<br><br>GREGORY W. ABBOTT, et al.,<br>*Defendants.* | 5:21-cv-844-XR |
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br>v.<br><br>THE STATE OF TEXAS, et al.,<br>*Defendants.* | 5:21-cv-1085-XR |

**STATE DEFENDANTS' OBJECTIONS AND RESPONSES TO THE
UNITED STATES' FOURTH SET OF INTERROGATORIES**

TO:    Plaintiff the United States of America, by and through its attorneys of record, Jennifer Yun, Daniel J. Freeman, Dana Paikowsky, and Michael E. Stewart, United States Department of Justice Civil Rights Division, 950 Pennsylvania Avenue NW, Washington, DC 20530.

Defendants Jane Nelson, in her official capacity as the Texas Secretary of State, and the State of Texas ("State Defendants") hereby serve their Objections and Responses to the United States' Fourth Set of Interrogatories pursuant to the Federal Rules of Civil Procedure. Because present circumstances prevent State Defendants from signing these responses, State Defendants' counsel will serve properly executed interrogatory answers on the requesting party not later than 21 days after serving these unexecuted answers. *See* W.D. Tex. Local Rule CV-33(a).

1

OCA-APPX-0800

Date: March 24, 2023

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil
Litigation

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Tex. State Bar No. 24087727

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

J. AARON BARNES
Special Counsel
Tex. State Bar No. 24099014

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
(512) 463-2100
christopher.hilton@oag.texas.gov
kathleen.hunker@oag.texas.gov
aaron.barnes@oag.texas.gov

**Counsel for State Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2023, the attached State Defendants' Objections and Responses to the United States' Fourth Set of Interrogatories was served on opposing counsel via electronic mail.

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel

OCA-APPX-0801

# GENERAL OBJECTIONS

Under Rule 26(b)(1), the proper scope of discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (2015). Among the considerations that are germane to that inquiry are "the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. The twin demands for relevancy and proportionality "are related but distinct requirements." *Samsung Electronics Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017). Thus, if the information sought is irrelevant to the party's claims or defenses, "it is not necessary to determine whether it would be proportional if it were relevant." *Walker v. Pioneer Prod. Servs., Inc.*, No. CV 15-0645, 2016 WL 1244510, at *3 (E.D. La. Mar. 30, 2016). Conversely, "relevance alone does not translate into automatic discoverability" because "[a]n assessment of proportionality is essential." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019). Accordingly, State Defendants object to these interrogatories to the extent that the information sought is either irrelevant or disproportionate.

All answers are given without prejudice to State Defendants' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. Likewise, these answers and objections are not intended to be, and shall not be construed as, agreement with the United States' characterization of any facts, circumstances, or legal obligations. State Defendants reserve the right to contest any such characterization as inaccurate and object to these interrogatories insofar as they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation. State Defendants will provide their answers based on terms as they are commonly understood and consistent with the Federal Rules of Civil Procedure. State Defendants object to and will refrain from extending or modifying any words employed in these interrogatories to comport with any expanded definitions or instructions. State Defendants will answer the interrogatories to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Western District of Texas.

OCA-APPX-0802

**OBJECTIONS AND RESPONSES TO THE UNITED STATES'
FOURTH SET OF INTERROGATORIES**

**INTERROGATORY NO. 10.** State the number of voter records in the Texas Election Administration Management (TEAM) database for which the "Mail In Request Reject Reason" field is populated with "NT," or "No TDL/SSN in VR Record," in relation to any application for an absentee ballot by mail for the November 8, 2022 general election.

**OBJECTION AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested.

The Office of the Texas Secretary of State ("SOS") is capable of determining the number of voter records in the TEAM system for which, as of the date of SOS's query, the "Mail In Request Reject Reason" field is populated with "NT" or "No TDL/SSN in VR Record" for the November 8, 2022 General Election. However, this total does not necessarily provide the exact information requested in this interrogatory. That is because the TEAM system is a living database that captures only the current or most recent status associated with any information in a voter's record, including the "Mail In Request Reject Reason" field. If an individual's voter record is updated by a county election official during the absentee ballot by mail ("ABBM") process, any intermediate status associated with that voter is no longer reflected in the TEAM system post-update. Therefore, State Defendants can only provide ABBM rejection figures for the November 8, 2022 General Election reflecting the status of voters in the TEAM system on the date that the query was run in TEAM. Considering those limitations, State Defendants can represent that, as of March 6, 2023, the total number of voter records in the TEAM system for which the "Mail In Request Reject Reason" field is populated with "NT" or "No TDL/SSN in VR Record" for the November 8, 2022 General Election was 163.

**INTERROGATORY NO. 11.** Identify each county that sought approval to provide supplemental information, instructions, or guidance concerning SB 1 identification number requirements in the ballot package for the November 8, 2022 general election, including but not limited to any insert, letter, or modification of standard materials prescribed by the Office of the Secretary of State.

**OBJECTION AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested.

Counties need not seek SOS's approval when providing additional information, instructions, or guidance—including explanatory inserts or letters—concerning SB 1 identification number

requirements. When requested to do so by county election officials, SOS's role in relation to such materials is to assist and advise those officials with the application, operation, and interpretation of the Texas Election Code. Under Section 31.002 of the Texas Election Code, SOS prescribes the design and content of official election forms to ensure consistency with the requirements of the Code. More specifically, SOS prescribes the required textual material that must be included on the official ballot envelope pursuant to Section 86.012 of the Texas Election Code. Additionally, Section 86.013 of the Texas Election Code sets forth parameters for the design and content of the official carrier envelope, and SOS prescribes textual material that must be included on the official carrier envelope pursuant to Section 86.013(d).

However, SOS has not established a formal tracking system to account for all requests by county election officials for assistance and advice relating to mail balloting materials. Nor has SOS established a formal tracking system for county requests for assistance and advice regarding the modification of prescribed forms in a manner that still satisfies the requirements set forth in the Texas Election Code. Considering those limitations, State Defendants have been able to determine after a diligent search that at least the following counties contacted SOS about modifying prescribed forms or including supplemental mail balloting materials describing the SB 1 identification number requirements:

- Bexar County
- Harris County
- Jefferson County
- Navarro County

**INTERROGATORY NO. 12.** Identify additional employee or contractor positions (i.e., any additional headcount) created by the Office of the Secretary of State during the general election period to facilitate, support, or assist with mail voting or the implementation of SB 1 identification requirements. In answering this interrogatory, please provide a description of their duties, work hours, and compensation.

**OBJECTION AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested.

Elections in Texas are largely decentralized, with counties taking a leading role in the administration of elections and SOS providing assistance and advice to election officials upon request. While the SOS hired employees in its Elections Division during the time period in question, no additional employee or contractor positions were created within SOS in response to SB 1's identification requirements. Any assistance or advice provided regarding such requirements fell within SOS's existing resources.

**INTERROGATORY NO. 13.** State the amount of money spent by the Office of the Secretary of State on voter education specific to SB 1 identification requirements during the general election period and how that money was allocated.

**OBJECTION AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested.

While SOS engaged in substantial voter outreach and education efforts for the 2022 election cycle, it does not possess the means to determine the precise amount spent on voter education specific to SB 1 identification requirements during the time period in question given the manner in which the funds were expended. SOS's voter education efforts were not itemized by specific provisions of the Texas Election Code or any particular enacted legislation, including SB 1. Considering those limitations, State Defendants can represent that SOS dedicated approximately $3.5 million toward voter education related to voter ID requirements during the 2022 election cycle, which includes the March 2022 Primary Election, the May 7, 2022 Uniform Election, the May 2022 Primary Runoff Election, and the November 2022 General Election. This included approximately $1.5 million in paid media purchases related to voter ID requirements in relation to the General Election. However, these media purchases addressed ID requirements for both voting in person and voting by mail. As such, the SOS is unable to identify spending totals that are disaggregated based on voting type.

**INTERROGATORY NO. 14.** Identify all voter education undertaken by the Office of the Secretary of State specifically related to SB 1 identification requirements during the general election period, including but not limited to the timing, format, and distribution of such voter education activities.

**OBJECTION AND RESPONSE:**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested.

While SOS engaged in substantial voter outreach and education efforts for the 2022 election cycle, it does not possess the means to identify efforts specific to SB 1 identification requirements during the time period in question given the manner in which the funds were expended. SOS's voter education efforts were not itemized by specific provisions of the Texas Election Code or any particular enacted legislation, including SB 1. Considering those limitations, State Defendants can represent that SOS's voter education efforts addressing voter ID requirements included paid media purchases, including television and radio ads, local television segments, digital ad banners, print ads in various languages, billboards, gas pump toppers, window clings, and paid social media ads. However, these efforts addressed ID requirements for both voting in person and voting by mail as a whole and were not separated by voting type. Identifying the timing, format, and distribution of each voter education activity, encompassing voting in person and voting by mail collectively, would be unduly burdensome and disproportionate to the needs of the case.

**INTERROGATORY NO. 15.** State the amount of money provided by the Office of the Secretary

of State to counties in the form of grants or other financial support for the purpose of implementing SB 1 identification requirements during the general election period and how that money was allocated, including but not limited to the timing, conditions, and recipients of such payments.

**<u>OBJECTION AND RESPONSE:</u>**

State Defendants object to this interrogatory to the extent that the information sought is not proportional to the needs of this case, overly broad, irrelevant to any claim or defense, not reasonably specific, or unduly burdensome. These answers and objections are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested.

While SOS has provided counties with grants and similar financial support related to the administration of elections during the relevant time period, it is unaware of any such grants that were provided "for the purpose of implementing SB 1 identification requirements."

# Exhibit 56

# Nonstandard Document Submitted to the Court via USB Drive

# Exhibit 57

Submitted to the Court via USB Drive
Under Seal

# Exhibit 58

Submitted to the Court via USB Drive
Under Seal

# Exhibit 59

# OFFICE OF ISABEL LONGORIA
## ELECTIONS ADMINISTRATOR
## HARRIS COUNTY ★ STATE OF TEXAS

**FOR IMMEDIATE RELEASE**
**FRIDAY MARCH 11, 2022**

**CONTACT:** Leah Shah
Leah.Shah@Vote.hctx.net
(832) 584-1659

## 89% of Mail Ballots Flagged Under New Law Rejected
### *19% of all Mail Ballots Received Rejected*

(Houston, TX) – Of the 36,878 mail ballots received in time for the 2022 primary, 6,888 mail ballots were ultimately rejected as a direct result of Senate Bill 1. In comparison, for the 2018 primary only 135 of the 48,473 mail ballots received were rejected.

The primary was the first election under SB 1. The bill requires Texans voting by mail to include their Texas ID number or Social Security number on their mail-in ballot's carrier envelope, and that number has to match with the ID listed in the voter registration database.

Confusion and frustration over the new requirements caused a swell of phone calls to the Election Administration's call center. Since January, the call center received 8,000 calls from people asking for help navigating the voting process This is higher than the monthly call volume in the lead up to the November 2020 and November 2021 election.

In response, the office doubled the number of staff dedicated to voter outreach, calling or emailing voters if contact information was on file to help them navigate the new system, followed by a letter of instruction on how to correct, or 'cure', ballots in effort to ensure their ballot would still be counted.

"Since the formation of the Harris County Elections Administration in November 2020, our office increased the number of registered voters in a non-presidential year, a first in Harris County, as a result of our new outreach program, an increased turnout of nearly every election we've hosted, increased access to voting by mail, and was one of four in the county to broaden access to voting while in jail. These restrictive voting laws continue to undermine our efforts to expand voter access and instead make voting harder," said Isabel Longoria, Harris County Elections Administrator.

Ultimately, of the 7,750 mail ballots flagged for rejection specifically due to ID issues, 849 were able to correct their ballots. An additional 13 voters were unable to, or opted out of, voting by mail altogether and appeared in person to cast their ballot.

Those eligible to vote by mail include senior citizens, those with disabilities, have recently given birth, are incarcerated, or are out of the county.

For more information on upcoming elections and the latest results from the March 1, 2022 Primaries, visit www.HarrisVotes.com and follow @HarrisVotes on Twitter, Facebook and Instagram.

###

OCA-APPX-0814

**Longoria_005179**

# Exhibit 60

Submitted to the Court via USB Drive
Under Seal

# Exhibit 61

Submitted to the Court via USB Drive
Under Seal

# Exhibit 62

Message

| | |
|---|---|
| **From:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Sent:** | 3/14/2022 8:11:34 PM |
| **To:** | 'Weber, Paul' [pweber@ap.org] |
| **Subject:** | RE: AP/Ballot rejections |

Hi Paul,

We ran the ABBM rejection rate numbers on February 24th – about a week after the February 18th deadline – and the final rejection rate was about 3.8% -- see below for specific numbers and party breakdown:

| Election | | Total | Applications Accepted | Applications Rejected |
|---|---|---|---|---|
| 2022 March **Republican** Primary | ABBM | 113,868 | 107,642 | 5,324 |
| | FPCA | 1,042 | 742 | 6 |
| 2022 March **Democratic** Primary | ABBM | 144,136 | 138,672 | 4,616 |
| | FPCA | 1,996 | 1,606 | 21 |
| Total | **ABBM** | 258,004 | 246,314 | 9,940 |
| | **FPCA** | 3,038 | 2,348 | 27 |

9,940 ABBM rejections out of 258,004 ABBMs received, comes out to a 3.852% rejection rate.

Hope this helps,

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116
Cell: 512-538-5293



**From:** Weber, Paul <pweber@ap.org>
**Sent:** Monday, March 14, 2022 2:22 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** RE: AP/Ballot rejections

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

STATE105464

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Thanks, Sam. Appreciate it.

One last question – What was the final VBM application rejection rate? Bettencourt's office said 3.35%. Is that correct?

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Monday, March 14, 2022 1:40 PM
**To:** Weber, Paul <pweber@ap.org>
**Subject:** RE: AP/Ballot rejections

[EXTERNAL]

Hi Paul,

We're still waiting for all 254 counties to report their final official results, as well as voting history and information regarding mail-in ballot rejections, to our office, so we do not have comprehensive statewide statistics until all data points are uploaded into our system.

As for a comment, You can attribute the following statement to me:

**"Based on what we have heard from county election officials, the vast majority of mail-in ballot rejections were due to voters who did not provide any ID information on their carrier envelope, despite having successfully applied for a mail-in ballot using the very same ID information on their Application for a Ballot by Mail. While in years past we have focused our voter education efforts on in-person ID requirements, this year we are also devoting a significant portion of our voter education campaign to enhancing awareness of the new mail-in ballot ID requirements. We are confident we will have all the information we need to apply any lessons learned during the primary to an even more robust voter education campaign heading into the November General Election."**

Best,

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116
Cell: 512-538-5293



**From:** Weber, Paul <pweber@ap.org>
**Sent:** Monday, March 14, 2022 1:10 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** AP/Ballot rejections

STATE105465

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Hi Sam –

Hope you had a good weekend. Reaching out for comment about one more story we have coming about ballot rejections:

Our AP tally of final ballot rejections, based on those final reconciliation reports and contacting counties directly, shows nearly 23,000 rejected ballots. Statewide, that averaged out to a nearly 14% rejection rate.

Couple questions:

1) Has your office completed compiling this data from counties as well? If so, what numbers do you have?

2) Based on available reports from the U.S. Election Assistance Commission, this is more ballot rejections (and a higher election rate) than in any Texas election since at least 2004. Are these record number?

3) Since the primary ended, has the governor or lawmakers reached out to your office to discuss these high rate of rejected ballots?

4) Any comment from your office about these final rejected rates?

Thanks again for all your help these last couple weeks.

Paul



**ASSOCIATED PRESS**

**Paul Weber**
Reporter

1010 Brazos
Austin, Texas 78701
Office:   512.472.4004
Mobile:  210.837.2215

pweber@ap.org
ap.org

The information contained in this communication is intended for the use of the designated recipients named above. If the reader of this communication is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify The Associated Press immediately by telephone at +1-212-621-1500 and delete this email. Thank you.
The information contained in this communication is intended for the use of the designated recipients named above. If the reader of this communication is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify The Associated Press immediately by telephone at +1-212-621-1500 and delete this email. Thank you.

STATE105466

# Exhibit 63

Message

| | |
|---|---|
| **From:** | Keith Ingram [KIngram@sos.texas.gov] |
| **Sent:** | 4/7/2022 8:00:55 PM |
| **To:** | justin.williamson@house.texas.gov |
| **CC:** | Adam Bitter [ABitter@sos.texas.gov] |
| **Subject:** | county by county mail ballot numbers |
| **Attachments:** | 2022 Primary BBM A-R.xlsx |
| | |
| **Sensitivity:** | Personal |

Based on Canvassed totals, below are the official turnout figures for the March 1 Primary Elections:

| | Total Number of Ballots Cast |
|---|---|
| Democratic | 1,075,601 |
| Republican | 1,954,172 |
| **Statewide Total** | **3,029,773** |

Based on vote history data submitted to our office by each of Texas' 254 counties, the mail-ballot rejection numbers and rates are as follows:

| Party | Total Number of Mail Ballots | Total Mail Ballots Rejected | Rejection Percentage |
|---|---|---|---|
| Democratic | 110,967 | 14,281 | **12.87%** |
| Republican | 87,980 | 10,355 | **11.77%** |
| **Statewide Total** | **198,947** | **24,636** | **12.38%** |

Keith Ingram
Director, Elections Division
Office of the Secretary of State
800-252-VOTE(8683)
www.sos.state.tx.us/elections/index.shtml
**For Voter Related Information, please visit:**



VOTETEXAS.GOV
POWERED BY THE TEXAS SECRETARY OF STATE

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as personal legal advice to you for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-0824

STATE087657

# Exhibit 64

Nonstandard Document Submitted to the Court via USB Drive

# Exhibit 65

| County | Ballots by Mail Accepted | Ballots by Mail Rejected | % Rejected |
| --- | --- | --- | --- |
| Anderson | 88 | 2 | 2.22% |
| Andrews | 3 | 0 | 0.00% |
| Angelina | 253 | 24 | 8.66% |
| Aransas | 91 | 19 | 17.27% |
| Archer | 16 | 0 | 0.00% |
| Armstrong | 4 | 0 | 0.00% |
| Atascosa | 141 | 9 | 6.00% |
| Austin | 79 | 0 | 0.00% |
| Bailey | 6 | 0 | 0.00% |
| Bandera | 59 | 13 | 18.06% |
| Bastrop | 466 | 46 | 8.98% |
| Baylor | 4 | 0 | 0.00% |
| Bee | 152 | 7 | 4.40% |
| Bell | 833 | 6 | 0.72% |
| Bexar | 9757 | 2797 | 22.28% |
| Blanco | 50 | 9 | 15.25% |
| Borden | 1 | 0 | 0.00% |
| Bosque | 42 | 6 | 12.50% |
| Bowie | 307 | 21 | 6.40% |
| Brazoria | 884 | 42 | 4.54% |
| Brazos | 470 | 31 | 6.19% |
| Brewster | 101 | 1 | 0.98% |
| Briscoe | 11 | 0 | 0.00% |
| Brooks | 117 | 2 | 1.68% |
| Brown | 57 | 3 | 5.00% |
| Burleson | 58 | 16 | 21.62% |
| Burnet | 249 | 9 | 3.49% |
| Caldwell | 157 | 13 | 7.65% |
| Calhoun | 80 | 2 | 2.44% |
| Callahan | 18 | 0 | 0.00% |
| Cameron | 1292 | 130 | 9.14% |
| Camp | 61 | 2 | 3.17% |
| Carson | 7 | 0 | 0.00% |
| Cass | 122 | 3 | 2.40% |
| Castro | 12 | 0 | 0.00% |
| Chambers | 62 | 5 | 7.46% |
| Cherokee | 109 | 9 | 7.63% |
| Childress | 2 | 0 | 0.00% |
| Clay | 18 | 2 | 10.00% |
| Cochran | 3 | 0 | 0.00% |
| Coke | 10 | 0 | 0.00% |
| Coleman | 7 | 0 | 0.00% |

STATE115581

| | | | |
|---|---|---|---|
| Collin | 2027 | 330 | 14.00% |
| Collingsworth | 1 | 0 | 0.00% |
| Colorado | 72 | 24 | 25.00% |
| Comal | 687 | 96 | 12.26% |
| Comanche | 32 | 1 | 3.03% |
| Concho | 11 | 0 | 0.00% |
| Cooke | 67 | 6 | 8.22% |
| Coryell | 139 | 2 | 1.42% |
| Cottle | 4 | 0 | 0.00% |
| Crane | 5 | 0 | 0.00% |
| Crockett | 4 | 1 | 20.00% |
| Crosby | 20 | 0 | 0.00% |
| Culberson | 14 | 0 | 0.00% |
| Dallam | 7 | 0 | 0.00% |
| Dallas | 7269 | 557 | 7.12% |
| Dawson | 11 | 0 | 0.00% |
| Deaf Smith | 27 | 0 | 0.00% |
| Delta | 26 | 5 | 16.13% |
| Denton | 1943 | 238 | 10.91% |
| Dewitt | 23 | 1 | 4.17% |
| Dickens | 6 | 0 | 0.00% |
| Dimmit | 116 | 0 | 0.00% |
| Donley | 3 | 0 | 0.00% |
| Duval | 367 | 2 | 0.54% |
| Eastland | 48 | 0 | 0.00% |
| Ector | 210 | 0 | 0.00% |
| Edwards | 2 | 0 | 0.00% |
| El Paso | 3609 | 762 | 17.43% |
| Ellis | 368 | 58 | 13.62% |
| Erath | 61 | 5 | 7.58% |
| Falls | 47 | 0 | 0.00% |
| Fannin | 119 | 1 | 0.83% |
| Fayette | 129 | 6 | 4.44% |
| Fisher | 30 | 3 | 9.09% |
| Floyd | 5 | 2 | 28.57% |
| Foard | 1 | 0 | 0.00% |
| Fort Bend | 2822 | 383 | 11.95% |
| Franklin | 23 | 0 | 0.00% |
| Freestone | 40 | 3 | 6.98% |
| Frio | 231 | 33 | 12.50% |
| Gaines | 14 | 0 | 0.00% |
| Galveston | 1270 | 187 | 12.83% |
| Garza | 5 | 1 | 16.67% |
| Gillespie | 146 | 1 | 0.68% |

STATE115582

| | | | |
|---|---|---|---|
| Glasscock | 2 | 0 | 0.00% |
| Goliad | 31 | 3 | 8.82% |
| Gonzales | 53 | 3 | 5.36% |
| Gray | 39 | 0 | 0.00% |
| Grayson | 353 | 46 | 11.53% |
| Gregg | 426 | 63 | 12.88% |
| Grimes | 67 | 29 | 30.21% |
| Guadalupe | 548 | 96 | 14.91% |
| Hale | 46 | 7 | 13.21% |
| Hall | 13 | 0 | 0.00% |
| Hamilton | 17 | 0 | 0.00% |
| Hansford | 4 | 0 | 0.00% |
| Hardeman | 10 | 0 | 0.00% |
| Hardin | 108 | 6 | 5.26% |
| Harris | 17784 | 3814 | 17.66% |
| Harrison | 163 | 70 | 30.04% |
| Hartley | 6 | 0 | 0.00% |
| Haskell | 12 | 0 | 0.00% |
| Hays | 1560 | 127 | 7.53% |
| Hemphill | 3 | 0 | 0.00% |
| Henderson | 251 | 26 | 9.39% |
| Hidalgo | 2001 | 488 | 19.61% |
| Hill | 60 | 2 | 3.23% |
| Hockley | 28 | 0 | 0.00% |
| Hood | 160 | 19 | 10.61% |
| Hopkins | 98 | 11 | 10.09% |
| Houston | 102 | 8 | 7.27% |
| Howard | 64 | 6 | 8.57% |
| Hudspeth | 0 | 0 | 0.00% |
| Hunt | 136 | 16 | 10.53% |
| Hutchinson | 14 | 1 | 6.67% |
| Irion | 2 | 0 | 0.00% |
| Jack | 17 | 0 | 0.00% |
| Jackson | 41 | 1 | 2.38% |
| Jasper | 98 | 1 | 1.01% |
| Jeff Davis | 5 | 0 | 0.00% |
| Jefferson | 1367 | 152 | 10.01% |
| Jim Hogg | 206 | 0 | 0.00% |
| Jim Wells | 163 | 119 | 42.20% |
| Johnson | 305 | 37 | 10.82% |
| Jones | 45 | 0 | 0.00% |
| Karnes | 89 | 22 | 19.82% |
| Kaufman | 195 | 34 | 14.85% |
| Kendall | 154 | 1 | 0.65% |

STATE115583

| County | | | |
|---|---|---|---|
| Kenedy | 3 | 2 | 40.00% |
| Kent | 0 | 0 | 0.00% |
| Kerr | 232 | 20 | 7.94% |
| Kimble | 5 | 0 | 0.00% |
| King | 0 | 0 | 0.00% |
| Kinney | 12 | 0 | 0.00% |
| Kleberg | 178 | 4 | 2.20% |
| Knox | 2 | 0 | 0.00% |
| Lamar | 131 | 1 | 0.76% |
| Lamb | 32 | 5 | 13.51% |
| Lampasas | 65 | 1 | 1.52% |
| Lasalle | 289 | 21 | 6.77% |
| Lavaca | 102 | 11 | 9.73% |
| Lee | 60 | 5 | 7.69% |
| Leon | 52 | 0 | 0.00% |
| Liberty | 120 | 3 | 2.44% |
| Limestone | 70 | 4 | 5.41% |
| Lipscomb | 13 | 1 | 7.14% |
| Live Oak | 34 | 0 | 0.00% |
| Llano | 202 | 18 | 8.18% |
| Loving | 0 | 0 | 0.00% |
| Lubbock | 618 | 27 | 4.19% |
| Lynn | 6 | 0 | 0.00% |
| Madison | 19 | 2 | 9.52% |
| Marion | 58 | 17 | 22.67% |
| Martin | 3 | 0 | 0.00% |
| Mason | 16 | 0 | 0.00% |
| Matagorda | 114 | 10 | 8.06% |
| Maverick | 145 | 29 | 16.67% |
| Mcculloch | 33 | 0 | 0.00% |
| Mclennan | 847 | 57 | 6.31% |
| Mcmullen | 2 | 0 | 0.00% |
| Medina | 158 | 23 | 12.71% |
| Menard | 12 | 0 | 0.00% |
| Midland | 134 | 35 | 20.71% |
| Milam | 88 | 0 | 0.00% |
| Mills | 8 | 0 | 0.00% |
| Mitchell | 9 | 0 | 0.00% |
| Montague | 27 | 0 | 0.00% |
| Montgomery | 1553 | 85 | 5.19% |
| Moore | 11 | 0 | 0.00% |
| Morris | 42 | 0 | 0.00% |
| Motley | 4 | 0 | 0.00% |
| Nacogdoches | 263 | 4 | 1.50% |

STATE115584

| | | | |
|---|---|---|---|
| Navarro | 82 | 12 | 12.77% |
| Newton | 38 | 7 | 15.56% |
| Nolan | 30 | 2 | 6.25% |
| Nueces | 1955 | 0 | 0.00% |
| Ochiltree | 4 | 0 | 0.00% |
| Oldham | 3 | 0 | 0.00% |
| Orange | 288 | 11 | 3.68% |
| Palo Pinto | 55 | 12 | 17.91% |
| Panola | 50 | 1 | 1.96% |
| Parker | 301 | 59 | 16.39% |
| Parmer | 9 | 1 | 10.00% |
| Pecos | 63 | 7 | 10.00% |
| Polk | 187 | 17 | 8.33% |
| Potter | 252 | 28 | 10.00% |
| Presidio | 23 | 0 | 0.00% |
| Rains | 24 | 1 | 4.00% |
| Randall | 347 | 20 | 5.45% |
| Reagan | 0 | 0 | 0.00% |
| Real | 1 | 0 | 0.00% |
| Red River | 40 | 0 | 0.00% |
| Reeves | 92 | 2 | 2.13% |
| Refugio | 46 | 4 | 8.00% |
| Roberts | 3 | 0 | 0.00% |
| Robertson | 74 | 8 | 9.76% |
| Rockwall | 186 | 5 | 2.62% |
| Runnels | 17 | 0 | 0.00% |
| Rusk | 130 | 25 | 16.13% |
| Sabine | 28 | 0 | 0.00% |
| San Augustine | 34 | 1 | 2.86% |
| San Jacinto | 93 | 3 | 3.13% |
| San Patricio | 323 | 48 | 12.94% |
| San Saba | 7 | 0 | 0.00% |
| Schleicher | 7 | 0 | 0.00% |
| Scurry | 13 | 0 | 0.00% |
| Shackelford | 4 | 0 | 0.00% |
| Shelby | 41 | 7 | 14.58% |
| Sherman | 2 | 0 | 0.00% |
| Smith | 686 | 68 | 9.02% |
| Somervell | 15 | 0 | 0.00% |
| Starr | 94 | 204 | 68.46% |
| Stephens | 8 | 1 | 11.11% |
| Sterling | 0 | 0 | 0.00% |
| Stonewall | 8 | 0 | 0.00% |
| Sutton | 4 | 0 | 0.00% |

STATE115585

| | | | |
|---|---|---|---|
| Swisher | 32 | 1 | 3.03% |
| Tarrant | 4892 | 856 | 14.89% |
| Taylor | 259 | 4 | 1.52% |
| Terrell | 15 | 0 | 0.00% |
| Terry | 20 | 3 | 13.04% |
| Throckmorton | 1 | 0 | 0.00% |
| Titus | 84 | 7 | 7.69% |
| Tom Green | 324 | 50 | 13.37% |
| Travis | 8737 | 673 | 7.15% |
| Trinity | 31 | 0 | 0.00% |
| Tyler | 51 | 0 | 0.00% |
| Upshur | 131 | 0 | 0.00% |
| Upton | 5 | 0 | 0.00% |
| Uvalde | 167 | 65 | 28.02% |
| Val Verde | 204 | 0 | 0.00% |
| Van Zandt | 83 | 14 | 14.43% |
| Victoria | 485 | 59 | 10.85% |
| Walker | 176 | 19 | 9.74% |
| Waller | 120 | 39 | 24.53% |
| Ward | 24 | 0 | 0.00% |
| Washington | 89 | 1 | 1.11% |
| Webb | 575 | 31 | 5.12% |
| Wharton | 145 | 12 | 7.64% |
| Wheeler | 11 | 0 | 0.00% |
| Wichita | 226 | 54 | 19.29% |
| Wilbarger | 44 | 1 | 2.22% |
| Willacy | 65 | 5 | 7.14% |
| Williamson | 2208 | 269 | 10.86% |
| Wilson | 251 | 14 | 5.28% |
| Winkler | 2 | 0 | 0.00% |
| Wise | 140 | 11 | 7.28% |
| Wood | 119 | 0 | 0.00% |
| Yoakum | 3 | 0 | 0.00% |
| Young | 0 | 0 | 0.00% |
| Zapata | 57 | 9 | 13.64% |
| Zavala | 83 | 0 | 0.00% |
| **Statewide Totals** | **96464** | **14281** | **12.90%** |

STATE115586

| County | Ballots by Mail Accepted | Ballots by Mail Rejected | % Rejected |
|---|---|---|---|
| Anderson | 72 | 0 | 0.00% |
| Andrews | 42 | 0 | 0.00% |
| Angelina | 220 | 27 | 10.93% |
| Aransas | 78 | 10 | 11.36% |
| Archer | 35 | 0 | 0.00% |
| Armstrong | 29 | 0 | 0.00% |
| Atascosa | 112 | 9 | 7.44% |
| Austin | 116 | 0 | 0.00% |
| Bailey | 35 | 2 | 5.41% |
| Bandera | 171 | 13 | 7.07% |
| Bastrop | 346 | 31 | 8.22% |
| Baylor | 9 | 0 | 0.00% |
| Bee | 70 | 4 | 5.41% |
| Bell | 1345 | 11 | 0.81% |
| Bexar | 4326 | 1108 | 20.39% |
| Blanco | 74 | 14 | 15.91% |
| Borden | 12 | 0 | 0.00% |
| Bosque | 82 | 16 | 16.33% |
| Bowie | 359 | 23 | 6.02% |
| Brazoria | 1479 | 93 | 5.92% |
| Brazos | 740 | 111 | 13.04% |
| Brewster | 23 | 0 | 0.00% |
| Briscoe | 39 | 0 | 0.00% |
| Brooks | 3 | 1 | 25.00% |
| Brown | 365 | 7 | 1.88% |
| Burleson | 100 | 37 | 27.01% |
| Burnet | 689 | 53 | 7.14% |
| Caldwell | 90 | 5 | 5.26% |
| Calhoun | 30 | 1 | 3.23% |
| Callahan | 101 | 31 | 23.48% |
| Cameron | 260 | 28 | 9.72% |
| Camp | 23 | 1 | 4.17% |
| Carson | 31 | 1 | 3.13% |
| Cass | 242 | 5 | 2.02% |
| Castro | 23 | 0 | 0.00% |
| Chambers | 105 | 17 | 13.93% |
| Cherokee | 85 | 9 | 9.57% |
| Childress | 25 | 0 | 0.00% |
| Clay | 34 | 0 | 0.00% |
| Cochran | 23 | 0 | 0.00% |
| Coke | 72 | 2 | 2.70% |
| Coleman | 35 | 0 | 0.00% |

STATE115587

| | | | |
|---|---|---|---|
| Collin | 3200 | 449 | 12.30% |
| Collingsworth | 15 | 0 | 0.00% |
| Colorado | 49 | 16 | 24.62% |
| Comal | 1511 | 326 | 17.75% |
| Comanche | 77 | 8 | 9.41% |
| Concho | 35 | 0 | 0.00% |
| Cooke | 154 | 3 | 1.91% |
| Coryell | 296 | 3 | 1.00% |
| Cottle | 5 | 0 | 0.00% |
| Crane | 21 | 0 | 0.00% |
| Crockett | 9 | 0 | 0.00% |
| Crosby | 26 | 0 | 0.00% |
| Culberson | 0 | 0 | 0.00% |
| Dallam | 51 | 0 | 0.00% |
| Dallas | 2768 | 159 | 5.43% |
| Dawson | 64 | 2 | 3.03% |
| Deaf Smith | 116 | 2 | 1.69% |
| Delta | 86 | 10 | 10.42% |
| Denton | 2560 | 539 | 17.39% |
| Dewitt | 94 | 0 | 0.00% |
| Dickens | 34 | 0 | 0.00% |
| Dimmit | 2 | 0 | 0.00% |
| Donley | 14 | 0 | 0.00% |
| Duval | 2 | 0 | 0.00% |
| Eastland | 162 | 0 | 0.00% |
| Ector | 386 | 11 | 2.77% |
| Edwards | 5 | 4 | 44.44% |
| El Paso | 178 | 35 | 16.43% |
| Ellis | 260 | 29 | 10.03% |
| Erath | 96 | 9 | 8.57% |
| Falls | 67 | 0 | 0.00% |
| Fannin | 154 | 4 | 2.53% |
| Fayette | 161 | 2 | 1.23% |
| Fisher | 17 | 0 | 0.00% |
| Floyd | 32 | 4 | 11.11% |
| Foard | 0 | 0 | 0.00% |
| Fort Bend | 1320 | 185 | 12.29% |
| Franklin | 56 | 0 | 0.00% |
| Freestone | 66 | 4 | 5.71% |
| Frio | 9 | 2 | 18.18% |
| Gaines | 46 | 0 | 0.00% |
| Galveston | 1812 | 248 | 12.04% |
| Garza | 37 | 2 | 5.13% |
| Gillespie | 348 | 9 | 2.52% |

STATE115588

| | | | |
|---|---|---|---|
| Glasscock | 15 | 1 | 6.25% |
| Goliad | 22 | 2 | 8.33% |
| Gonzales | 84 | 6 | 6.67% |
| Gray | 228 | 13 | 5.39% |
| Grayson | 604 | 85 | 12.34% |
| Gregg | 301 | 19 | 5.94% |
| Grimes | 169 | 92 | 35.25% |
| Guadalupe | 526 | 184 | 25.92% |
| Hale | 96 | 10 | 9.43% |
| Hall | 19 | 0 | 0.00% |
| Hamilton | 24 | 0 | 0.00% |
| Hansford | 69 | 0 | 0.00% |
| Hardeman | 3 | 0 | 0.00% |
| Hardin | 273 | 5 | 1.80% |
| Harris | 12153 | 3100 | 20.32% |
| Harrison | 54 | 14 | 20.59% |
| Hartley | 44 | 2 | 4.35% |
| Haskell | 12 | 0 | 0.00% |
| Hays | 763 | 164 | 17.69% |
| Hemphill | 56 | 0 | 0.00% |
| Henderson | 238 | 11 | 4.42% |
| Hidalgo | 179 | 31 | 14.76% |
| Hill | 92 | 3 | 3.16% |
| Hockley | 89 | 0 | 0.00% |
| Hood | 275 | 41 | 12.97% |
| Hopkins | 82 | 9 | 9.89% |
| Houston | 74 | 3 | 3.90% |
| Howard | 136 | 9 | 6.21% |
| Hudspeth | 0 | 0 | 0.00% |
| Hunt | 425 | 93 | 17.95% |
| Hutchinson | 90 | 9 | 9.09% |
| Irion | 6 | 0 | 0.00% |
| Jack | 64 | 1 | 1.54% |
| Jackson | 42 | 3 | 6.67% |
| Jasper | 46 | 0 | 0.00% |
| Jeff Davis | 14 | 0 | 0.00% |
| Jefferson | 142 | 18 | 11.25% |
| Jim Hogg | 1 | 0 | 0.00% |
| Jim Wells | 7 | 2 | 22.22% |
| Johnson | 771 | 110 | 12.49% |
| Jones | 71 | 0 | 0.00% |
| Karnes | 160 | 11 | 6.43% |
| Kaufman | 146 | 50 | 25.51% |
| Kendall | 649 | 9 | 1.37% |

STATE115589

| | | | |
|---|---|---|---|
| Kenedy | 0 | 0 | 0.00% |
| Kent | 0 | 0 | 0.00% |
| Kerr | 636 | 76 | 10.67% |
| Kimble | 57 | 3 | 5.00% |
| King | 3 | 0 | 0.00% |
| Kinney | 2 | 1 | 33.33% |
| Kleberg | 32 | 0 | 0.00% |
| Knox | 12 | 0 | 0.00% |
| Lamar | 202 | 1 | 0.49% |
| Lamb | 46 | 10 | 17.86% |
| Lampasas | 174 | 16 | 8.42% |
| Lasalle | 5 | 0 | 0.00% |
| Lavaca | 188 | 87 | 31.64% |
| Lee | 118 | 21 | 15.11% |
| Leon | 152 | 0 | 0.00% |
| Liberty | 231 | 9 | 3.75% |
| Limestone | 102 | 12 | 10.53% |
| Lipscomb | 72 | 0 | 0.00% |
| Live Oak | 21 | 1 | 4.55% |
| Llano | 470 | 77 | 14.08% |
| Loving | 1 | 0 | 0.00% |
| Lubbock | 685 | 6 | 0.87% |
| Lynn | 2 | 0 | 0.00% |
| Madison | 61 | 1 | 1.61% |
| Marion | 12 | 3 | 20.00% |
| Martin | 14 | 0 | 0.00% |
| Mason | 38 | 0 | 0.00% |
| Matagorda | 51 | 3 | 5.56% |
| Maverick | 2 | 1 | 33.33% |
| Mcculloch | 60 | 1 | 1.64% |
| Mclennan | 1137 | 102 | 8.23% |
| Mcmullen | 4 | 0 | 0.00% |
| Medina | 232 | 36 | 13.43% |
| Menard | 32 | 1 | 3.03% |
| Midland | 493 | 70 | 12.43% |
| Milam | 152 | 1 | 0.65% |
| Mills | 39 | 0 | 0.00% |
| Mitchell | 13 | 5 | 27.78% |
| Montague | 73 | 4 | 5.19% |
| Montgomery | 3272 | 232 | 6.62% |
| Moore | 92 | 2 | 2.13% |
| Morris | 43 | 0 | 0.00% |
| Motley | 23 | 0 | 0.00% |
| Nacogdoches | 464 | 7 | 1.49% |

STATE115590

| | | | |
|---|---|---|---|
| Navarro | 55 | 8 | 12.70% |
| Newton | 34 | 6 | 15.00% |
| Nolan | 16 | 4 | 20.00% |
| Nueces | 346 | 0 | 0.00% |
| Ochiltree | 73 | 1 | 1.35% |
| Oldham | 19 | 0 | 0.00% |
| Orange | 212 | 10 | 4.50% |
| Palo Pinto | 201 | 76 | 27.44% |
| Panola | 110 | 4 | 3.51% |
| Parker | 619 | 191 | 23.58% |
| Parmer | 38 | 1 | 2.56% |
| Pecos | 18 | 1 | 5.26% |
| Polk | 332 | 25 | 7.00% |
| Potter | 609 | 116 | 16.00% |
| Presidio | 2 | 0 | 0.00% |
| Rains | 70 | 0 | 0.00% |
| Randall | 1454 | 114 | 7.27% |
| Reagan | 11 | 2 | 15.38% |
| Real | 2 | 0 | 0.00% |
| Red River | 55 | 4 | 6.78% |
| Reeves | 8 | 0 | 0.00% |
| Refugio | 12 | 0 | 0.00% |
| Roberts | 24 | 0 | 0.00% |
| Robertson | 62 | 1 | 1.59% |
| Rockwall | 453 | 63 | 12.21% |
| Runnels | 31 | 7 | 18.42% |
| Rusk | 203 | 38 | 15.77% |
| Sabine | 64 | 0 | 0.00% |
| San Augustine | 25 | 1 | 3.85% |
| San Jacinto | 178 | 4 | 2.20% |
| San Patricio | 122 | 7 | 5.43% |
| San Saba | 22 | 0 | 0.00% |
| Schleicher | 13 | 6 | 31.58% |
| Scurry | 61 | 13 | 17.57% |
| Shackelford | 46 | 0 | 0.00% |
| Shelby | 141 | 12 | 7.84% |
| Sherman | 11 | 7 | 38.89% |
| Smith | 549 | 77 | 12.30% |
| Somervell | 19 | 1 | 5.00% |
| Starr | 25 | 12 | 32.43% |
| Stephens | 90 | 3 | 3.23% |
| Sterling | 4 | 0 | 0.00% |
| Stonewall | 24 | 0 | 0.00% |
| Sutton | 16 | 0 | 0.00% |

STATE115591

| | | |
|---|---|---|
| Swisher | 56 | 4 | 6.67% |
| Tarrant | 5446 | 27 | 0.49% |
| Taylor | 350 | 14 | 3.85% |
| Terrell | 4 | 0 | 0.00% |
| Terry | 62 | 1 | 1.59% |
| Throckmorton | 14 | 0 | 0.00% |
| Titus | 88 | 9 | 9.28% |
| Tom Green | 433 | 73 | 14.43% |
| Travis | 1915 | 260 | 11.95% |
| Trinity | 30 | 0 | 0.00% |
| Tyler | 196 | 7 | 3.45% |
| Upshur | 155 | 0 | 0.00% |
| Upton | 8 | 0 | 0.00% |
| Uvalde | 25 | 0 | 0.00% |
| Val Verde | 74 | 0 | 0.00% |
| Van Zandt | 79 | 9 | 10.23% |
| Victoria | 1221 | 109 | 8.20% |
| Walker | 206 | 11 | 5.07% |
| Waller | 61 | 26 | 29.89% |
| Ward | 56 | 0 | 0.00% |
| Washington | 148 | 8 | 5.13% |
| Webb | 18 | 0 | 0.00% |
| Wharton | 132 | 4 | 2.94% |
| Wheeler | 35 | 0 | 0.00% |
| Wichita | 180 | 26 | 12.62% |
| Wilbarger | 105 | 0 | 0.00% |
| Willacy | 2 | 1 | 33.33% |
| Williamson | 1582 | 264 | 14.30% |
| Wilson | 255 | 7 | 2.67% |
| Winkler | 11 | 1 | 8.33% |
| Wise | 358 | 45 | 11.17% |
| Wood | 224 | 0 | 0.00% |
| Yoakum | 22 | 0 | 0.00% |
| Young | 4 | 0 | 0.00% |
| Zapata | 3 | 0 | 0.00% |
| Zavala | 0 | 0 | 0.00% |
| **Statewide Totals** | **77420** | **10355** | **11.80%** |

STATE115592

| County | Ballots by Mail Accepted | Ballots by Mail Rejected | % Rejected |
|---|---|---|---|
| Anderson | 169 | 0 | 0.00% |
| Andrews | 42 | 0 | 0.00% |
| Angelina | 397 | 63 | 13.70% |
| Aransas | 188 | 2 | 1.05% |
| Archer | 50 | 0 | 0.00% |
| Armstrong | 13 | 0 | 0.00% |
| Atascosa | 221 | 11 | 4.74% |
| Austin | 217 | 0 | 0.00% |
| Bailey | 44 | 0 | 0.00% |
| Bandera | 196 | 3 | 1.51% |
| Bastrop | 853 | 19 | 2.18% |
| Baylor | 13 | 0 | 0.00% |
| Bee | 199 | 4 | 1.97% |
| Bell | 1623 | 340 | 17.32% |
| Bexar | 18361 | 231 | 1.24% |
| Blanco | 167 | 6 | 3.47% |
| Borden | 9 | 1 | 10.00% |
| Bosque | 152 | 1 | 0.65% |
| Bowie | 614 | 26 | 4.06% |
| Brazoria | 2041 | 63 | 2.99% |
| Brazos | 1058 | 36 | 3.29% |
| Brewster | 127 | 0 | 0.00% |
| Briscoe | 45 | 0 | 0.00% |
| Brooks | 69 | 0 | 0.00% |
| Brown | 373 | 0 | 0.00% |
| Burleson | 204 | 3 | 1.45% |
| Burnet | 802 | 15 | 1.84% |
| Caldwell | 237 | 4 | 1.66% |
| Calhoun | 100 | 3 | 2.91% |
| Callahan | 153 | 0 | 0.00% |
| Cameron | 1602 | 31 | 1.90% |
| Camp | 84 | 0 | 0.00% |
| Carson | 39 | 1 | 2.50% |
| Cass | 354 | 0 | 0.00% |
| Castro | 25 | 0 | 0.00% |
| Chambers | 157 | 0 | 0.00% |
| Cherokee | 216 | 19 | 8.09% |
| Childress | 23 | 0 | 0.00% |
| Clay | 56 | 0 | 0.00% |
| Cochran | 50 | 3 | 5.66% |
| Coke | 95 | 0 | 0.00% |
| Coleman | 53 | 0 | 0.00% |

STATE115593

| | | | |
|---|---|---|---|
| Collin | 5148 | 109 | 2.07% |
| Collingsworth | 0 | 0 | 0.00% |
| Colorado | 185 | 5 | 2.63% |
| Comal | 2407 | 77 | 3.10% |
| Comanche | 107 | 7 | 6.14% |
| Concho | 48 | 0 | 0.00% |
| Cooke | 210 | 0 | 0.00% |
| Coryell | 436 | 4 | 0.91% |
| Cottle | 11 | 0 | 0.00% |
| Crane | 26 | 0 | 0.00% |
| Crockett | 16 | 0 | 0.00% |
| Crosby | 50 | 0 | 0.00% |
| Culberson | 11 | 0 | 0.00% |
| Dallam | 57 | 0 | 0.00% |
| Dallas | 10649 | 382 | 3.46% |
| Dawson | 99 | 0 | 0.00% |
| Deaf Smith | 127 | 0 | 0.00% |
| Delta | 101 | 0 | 0.00% |
| Denton | 4964 | 155 | 3.03% |
| Dewitt | 135 | 0 | 0.00% |
| Dickens | 31 | 0 | 0.00% |
| Dimmit | 109 | 8 | 6.84% |
| Donley | 10 | 0 | 0.00% |
| Duval | 161 | 1 | 0.62% |
| Eastland | 217 | 0 | 0.00% |
| Ector | 577 | 0 | 0.00% |
| Edwards | 9 | 4 | 30.77% |
| El Paso | 3582 | 490 | 12.03% |
| Ellis | 754 | 28 | 3.58% |
| Erath | 181 | 13 | 6.70% |
| Falls | 33 | 0 | 0.00% |
| Fannin | 267 | 0 | 0.00% |
| Fayette | 286 | 5 | 1.72% |
| Fisher | 39 | 0 | 0.00% |
| Floyd | 29 | 7 | 19.44% |
| Foard | 0 | 0 | 0.00% |
| Fort Bend | 4368 | 101 | 2.26% |
| Franklin | 68 | 0 | 0.00% |
| Freestone | 112 | 3 | 2.61% |
| Frio | 167 | 23 | 12.11% |
| Gaines | 55 | 1 | 1.79% |
| Galveston | 3177 | 66 | 2.04% |
| Garza | 39 | 0 | 0.00% |
| Gillespie | 520 | 10 | 1.89% |

STATE115594

| | | | |
|---|---|---|---|
| Glasscock | 2 | 0 | 0.00% |
| Goliad | 46 | 0 | 0.00% |
| Gonzales | 134 | 0 | 0.00% |
| Gray | 234 | 1 | 0.43% |
| Grayson | 965 | 33 | 3.31% |
| Gregg | 711 | 24 | 3.27% |
| Grimes | 349 | 17 | 4.64% |
| Guadalupe | 1370 | 32 | 2.28% |
| Hale | 130 | 2 | 1.52% |
| Hall | 35 | 0 | 0.00% |
| Hamilton | 0 | 0 | 0.00% |
| Hansford | 58 | 0 | 0.00% |
| Hardeman | 0 | 0 | 0.00% |
| Hardin | 363 | 1 | 0.27% |
| Harris | 31306 | 3193 | 9.26% |
| Harrison | 267 | 17 | 5.99% |
| Hartley | 46 | 0 | 0.00% |
| Haskell | 28 | 0 | 0.00% |
| Hays | 2460 | 67 | 2.65% |
| Hemphill | 31 | 0 | 0.00% |
| Henderson | 455 | 28 | 5.80% |
| Hidalgo | 2244 | 91 | 3.90% |
| Hill | 169 | 0 | 0.00% |
| Hockley | 103 | 0 | 0.00% |
| Hood | 384 | 87 | 18.47% |
| Hopkins | 176 | 8 | 4.35% |
| Houston | 175 | 0 | 0.00% |
| Howard | 273 | 4 | 1.44% |
| Hudspeth | 0 | 0 | 0.00% |
| Hunt | 689 | 12 | 1.71% |
| Hutchinson | 129 | 0 | 0.00% |
| Irion | 9 | 0 | 0.00% |
| Jack | 75 | 0 | 0.00% |
| Jackson | 74 | 0 | 0.00% |
| Jasper | 145 | 0 | 0.00% |
| Jeff Davis | 11 | 0 | 0.00% |
| Jefferson | 1477 | 75 | 4.83% |
| Jim Hogg | 90 | 0 | 0.00% |
| Jim Wells | 110 | 33 | 23.08% |
| Johnson | 1093 | 5 | 0.46% |
| Jones | 104 | 0 | 0.00% |
| Karnes | 220 | 4 | 1.79% |
| Kaufman | 355 | 94 | 20.94% |
| Kendall | 636 | 33 | 4.93% |

STATE115595

| | | | |
|---|---:|---:|---:|
| Kenedy | 1 | 0 | 0.00% |
| Kent | 0 | 0 | 0.00% |
| Kerr | 883 | 49 | 5.26% |
| Kimble | 61 | 0 | 0.00% |
| King | 0 | 0 | 0.00% |
| Kinney | 0 | 0 | 0.00% |
| Kleberg | 207 | 0 | 0.00% |
| Knox | 22 | 0 | 0.00% |
| Lamar | 272 | 10 | 3.55% |
| Lamb | 56 | 0 | 0.00% |
| Lampasas | 226 | 5 | 2.16% |
| Lasalle | 71 | 11 | 13.41% |
| Lavaca | 338 | 0 | 0.00% |
| Lee | 156 | 5 | 3.11% |
| Leon | 170 | 0 | 0.00% |
| Liberty | 305 | 10 | 3.17% |
| Limestone | 165 | 2 | 1.20% |
| Lipscomb | 79 | 0 | 0.00% |
| Live Oak | 45 | 1 | 2.17% |
| Llano | 658 | 54 | 7.58% |
| Loving | 0 | 0 | 0.00% |
| Lubbock | 1585 | 77 | 4.63% |
| Lynn | 2 | 0 | 0.00% |
| Madison | 90 | 4 | 4.26% |
| Marion | 82 | 3 | 3.53% |
| Martin | 12 | 0 | 0.00% |
| Mason | 36 | 0 | 0.00% |
| Matagorda | 168 | 7 | 4.00% |
| Maverick | 108 | 0 | 0.00% |
| Mcculloch | 92 | 0 | 0.00% |
| Mclennan | 1817 | 102 | 5.32% |
| Mcmullen | 6 | 0 | 0.00% |
| Medina | 422 | 23 | 5.17% |
| Menard | 42 | 0 | 0.00% |
| Midland | 634 | 24 | 3.65% |
| Milam | 231 | 0 | 0.00% |
| Mills | 49 | 0 | 0.00% |
| Mitchell | 25 | 0 | 0.00% |
| Montague | 82 | 0 | 0.00% |
| Montgomery | 4492 | 34 | 0.75% |
| Moore | 84 | 0 | 0.00% |
| Morris | 80 | 0 | 0.00% |
| Motley | 20 | 0 | 0.00% |
| Nacogdoches | 594 | 12 | 1.98% |

STATE115596

| | | | |
|---|---|---|---|
| Navarro | 122 | 22 | 15.28% |
| Newton | 51 | 8 | 13.56% |
| Nolan | 49 | 2 | 3.92% |
| Nueces | 2167 | 2 | 0.09% |
| Ochiltree | 64 | 5 | 7.25% |
| Oldham | 18 | 0 | 0.00% |
| Orange | 566 | 7 | 1.22% |
| Palo Pinto | 358 | 2 | 0.56% |
| Panola | 138 | 0 | 0.00% |
| Parker | 1023 | 41 | 3.85% |
| Parmer | 42 | 0 | 0.00% |
| Pecos | 85 | 0 | 0.00% |
| Polk | 452 | 16 | 3.42% |
| Potter | 902 | 29 | 3.11% |
| Presidio | 13 | 3 | 18.75% |
| Rains | 104 | 1 | 0.95% |
| Randall | 1674 | 54 | 3.13% |
| Reagan | 14 | 0 | 0.00% |
| Real | 0 | 0 | 0.00% |
| Red River | 92 | 0 | 0.00% |
| Reeves | 98 | 1 | 1.01% |
| Refugio | 50 | 3 | 5.66% |
| Roberts | 11 | 0 | 0.00% |
| Robertson | 122 | 2 | 1.61% |
| Rockwall | 576 | 14 | 2.37% |
| Runnels | 42 | 3 | 6.67% |
| Rusk | 339 | 2 | 0.59% |
| Sabine | 75 | 0 | 0.00% |
| San Augustine | 32 | 0 | 0.00% |
| San Jacinto | 208 | 7 | 3.26% |
| San Patricio | 418 | 24 | 5.43% |
| San Saba | 28 | 0 | 0.00% |
| Schleicher | 18 | 2 | 10.00% |
| Scurry | 59 | 1 | 1.67% |
| Shackelford | 55 | 0 | 0.00% |
| Shelby | 104 | 29 | 21.80% |
| Sherman | 21 | 4 | 16.00% |
| Smith | 1259 | 85 | 6.32% |
| Somervell | 32 | 0 | 0.00% |
| Starr | 121 | 40 | 24.84% |
| Stephens | 98 | 0 | 0.00% |
| Sterling | 6 | 0 | 0.00% |
| Stonewall | 11 | 0 | 0.00% |
| Sutton | 17 | 0 | 0.00% |

STATE115597

| | | |
|---|---:|---:|
| Swisher | 90 | 0 | 0.00% |
| Tarrant | 9106 | 1583 | 14.81% |
| Taylor | 620 | 3 | 0.48% |
| Terrell | 1 | 1 | 50.00% |
| Terry | 67 | 1 | 1.47% |
| Throckmorton | 12 | 0 | 0.00% |
| Titus | 131 | 0 | 0.00% |
| Tom Green | 885 | 72 | 7.52% |
| Travis | 11158 | 410 | 3.54% |
| Trinity | 55 | 1 | 1.79% |
| Tyler | 222 | 5 | 2.20% |
| Upshur | 233 | 0 | 0.00% |
| Upton | 1 | 2 | 66.67% |
| Uvalde | 169 | 0 | 0.00% |
| Val Verde | 209 | 14 | 6.28% |
| Van Zandt | 187 | 4 | 2.09% |
| Victoria | 1686 | 42 | 2.43% |
| Walker | 354 | 15 | 4.07% |
| Waller | 250 | 2 | 0.79% |
| Ward | 0 | 0 | 0.00% |
| Washington | 253 | 6 | 2.32% |
| Webb | 455 | 13 | 2.78% |
| Wharton | 278 | 0 | 0.00% |
| Wheeler | 40 | 0 | 0.00% |
| Wichita | 579 | 0 | 0.00% |
| Wilbarger | 159 | 0 | 0.00% |
| Willacy | 44 | 0 | 0.00% |
| Williamson | 4280 | 122 | 2.77% |
| Wilson | 485 | 19 | 3.77% |
| Winkler | 0 | 0 | 0.00% |
| Wise | 520 | 13 | 2.44% |
| Wood | 369 | 0 | 0.00% |
| Yoakum | 23 | 0 | 0.00% |
| Young | 0 | 0 | 0.00% |
| Zapata | 20 | 5 | 20.00% |
| Zavala | 111 | 0 | 0.00% |
| **Statewide Totals** | **178054** | **9420** | **5.02%** |

STATE115598

| County | Ballots by Mail Accepted | Ballots by Mail Rejected | % Rejected |
|---|---|---|---|
| Anderson | 82 | 0 | 0.00% |
| Andrews | 3 | 0 | 0.00% |
| Angelina | 212 | 18 | 7.83% |
| Aransas | 73 | 0 | 0.00% |
| Archer | 16 | 0 | 0.00% |
| Armstrong | 4 | 0 | 0.00% |
| Atascosa | 163 | 9 | 5.23% |
| Austin | 62 | 0 | 0.00% |
| Bailey | 4 | 0 | 0.00% |
| Bandera | 60 | 0 | 0.00% |
| Bastrop | 453 | 9 | 1.95% |
| Baylor | 4 | 0 | 0.00% |
| Bee | 132 | 2 | 1.49% |
| Bell | 624 | 49 | 7.28% |
| Bexar | 11712 | 80 | 0.68% |
| Blanco | 55 | 0 | 0.00% |
| Borden | 0 | 0 | 0.00% |
| Bosque | 50 | 0 | 0.00% |
| Bowie | 265 | 20 | 7.02% |
| Brazoria | 749 | 12 | 1.58% |
| Brazos | 413 | 7 | 1.67% |
| Brewster | 98 | 0 | 0.00% |
| Briscoe | 0 | 0 | 0.00% |
| Brooks | 60 | 0 | 0.00% |
| Brown | 38 | 0 | 0.00% |
| Burleson | 70 | 0 | 0.00% |
| Burnet | 202 | 7 | 3.35% |
| Caldwell | 134 | 1 | 0.74% |
| Calhoun | 53 | 0 | 0.00% |
| Callahan | 21 | 0 | 0.00% |
| Cameron | 1323 | 21 | 1.56% |
| Camp | 59 | 0 | 0.00% |
| Carson | 5 | 0 | 0.00% |
| Cass | 119 | 0 | 0.00% |
| Castro | 10 | 0 | 0.00% |
| Chambers | 48 | 1 | 2.04% |
| Cherokee | 103 | 9 | 8.04% |
| Childress | 2 | 0 | 0.00% |
| Clay | 17 | 0 | 0.00% |
| Cochran | 5 | 0 | 0.00% |
| Coke | 8 | 2 | 20.00% |
| Coleman | 5 | 0 | 0.00% |

STATE115599

| | | | |
|---|---|---|---|
| Collin | 1969 | 20 | 1.01% |
| Collingsworth | 0 | 0 | 0.00% |
| Colorado | 90 | 0 | 0.00% |
| Comal | 672 | 7 | 1.03% |
| Comanche | 28 | 0 | 0.00% |
| Concho | 0 | 0 | 0.00% |
| Cooke | 59 | 0 | 0.00% |
| Coryell | 113 | 1 | 0.88% |
| Cottle | 4 | 0 | 0.00% |
| Crane | 3 | 0 | 0.00% |
| Crockett | 3 | 1 | 25.00% |
| Crosby | 16 | 0 | 0.00% |
| Culberson | 12 | 0 | 0.00% |
| Dallam | 7 | 0 | 0.00% |
| Dallas | 7274 | 243 | 3.23% |
| Dawson | 13 | 1 | 7.14% |
| Deaf Smith | 19 | 0 | 0.00% |
| Delta | 23 | 0 | 0.00% |
| Denton | 1916 | 36 | 1.84% |
| Dewitt | 15 | 0 | 0.00% |
| Dickens | 4 | 0 | 0.00% |
| Dimmit | 191 | 25 | 11.57% |
| Donley | 1 | 0 | 0.00% |
| Duval | 435 | 69 | 13.69% |
| Eastland | 47 | 0 | 0.00% |
| Ector | 149 | 0 | 0.00% |
| Edwards | 2 | 0 | 0.00% |
| El Paso | 3797 | 264 | 6.50% |
| Ellis | 357 | 4 | 1.11% |
| Erath | 0 | 0 | 0.00% |
| Falls | 53 | 0 | 0.00% |
| Fannin | 94 | 4 | 4.08% |
| Fayette | 119 | 1 | 0.83% |
| Fisher | 29 | 0 | 0.00% |
| Floyd | 9 | 0 | 0.00% |
| Foard | 0 | 0 | 0.00% |
| Fort Bend | 2719 | 139 | 4.86% |
| Franklin | 17 | 0 | 0.00% |
| Freestone | 40 | 1 | 2.44% |
| Frio | 267 | 19 | 6.64% |
| Gaines | 9 | 1 | 10.00% |
| Galveston | 1232 | 29 | 2.30% |
| Garza | 4 | 0 | 0.00% |
| Gillespie | 159 | 6 | 3.64% |

STATE115600

| | | | |
|---|---|---|---|
| Glasscock | 1 | 0 | 0.00% |
| Goliad | 16 | 0 | 0.00% |
| Gonzales | 42 | 0 | 0.00% |
| Gray | 26 | 0 | 0.00% |
| Grayson | 323 | 7 | 2.12% |
| Gregg | 418 | 9 | 2.11% |
| Grimes | 77 | 3 | 3.75% |
| Guadalupe | 678 | 8 | 1.17% |
| Hale | 23 | 2 | 8.00% |
| Hall | 14 | 0 | 0.00% |
| Hamilton | 0 | 0 | 0.00% |
| Hansford | 1 | 0 | 0.00% |
| Hardeman | 0 | 0 | 0.00% |
| Hardin | 78 | 1 | 1.27% |
| Harris | 17951 | 1125 | 5.90% |
| Harrison | 182 | 19 | 9.45% |
| Hartley | 3 | 0 | 0.00% |
| Haskell | 12 | 0 | 0.00% |
| Hays | 1448 | 33 | 2.23% |
| Hemphill | 4 | 0 | 0.00% |
| Henderson | 221 | 11 | 4.74% |
| Hidalgo | 1902 | 117 | 5.79% |
| Hill | 49 | 0 | 0.00% |
| Hockley | 19 | 0 | 0.00% |
| Hood | 134 | 14 | 9.46% |
| Hopkins | 75 | 2 | 2.60% |
| Houston | 87 | 3 | 3.33% |
| Howard | 60 | 0 | 0.00% |
| Hudspeth | 0 | 0 | 0.00% |
| Hunt | 165 | 2 | 1.20% |
| Hutchinson | 18 | 0 | 0.00% |
| Irion | 0 | 0 | 0.00% |
| Jack | 14 | 0 | 0.00% |
| Jackson | 27 | 0 | 0.00% |
| Jasper | 74 | 1 | 1.33% |
| Jeff Davis | 4 | 0 | 0.00% |
| Jefferson | 1425 | 64 | 4.30% |
| Jim Hogg | 171 | 0 | 0.00% |
| Jim Wells | 117 | 30 | 20.41% |
| Johnson | 279 | 9 | 3.13% |
| Jones | 40 | 0 | 0.00% |
| Karnes | 91 | 0 | 0.00% |
| Kaufman | 170 | 20 | 10.53% |
| Kendall | 156 | 6 | 3.70% |

STATE115601

| | | | |
|---|---|---|---|
| Kenedy | 6 | 0 | 0.00% |
| Kent | 0 | 0 | 0.00% |
| Kerr | 209 | 5 | 2.34% |
| Kimble | 6 | 0 | 0.00% |
| King | 0 | 0 | 0.00% |
| Kinney | 0 | 0 | 0.00% |
| Kleberg | 166 | 0 | 0.00% |
| Knox | 4 | 0 | 0.00% |
| Lamar | 110 | 4 | 3.51% |
| Lamb | 28 | 0 | 0.00% |
| Lampasas | 61 | 0 | 0.00% |
| Lasalle | 145 | 27 | 15.70% |
| Lavaca | 94 | 1 | 1.05% |
| Lee | 43 | 2 | 4.44% |
| Leon | 40 | 0 | 0.00% |
| Liberty | 107 | 3 | 2.73% |
| Limestone | 60 | 1 | 1.64% |
| Lipscomb | 11 | 0 | 0.00% |
| Live Oak | 0 | 0 | 0.00% |
| Llano | 176 | 2 | 1.12% |
| Loving | 0 | 0 | 0.00% |
| Lubbock | 571 | 19 | 3.22% |
| Lynn | 2 | 0 | 0.00% |
| Madison | 20 | 0 | 0.00% |
| Marion | 59 | 1 | 1.67% |
| Martin | 2 | 0 | 0.00% |
| Mason | 7 | 0 | 0.00% |
| Matagorda | 107 | 1 | 0.93% |
| Maverick | 101 | 4 | 3.81% |
| Mcculloch | 23 | 1 | 4.17% |
| Mclennan | 773 | 34 | 4.21% |
| Mcmullen | 1 | 0 | 0.00% |
| Medina | 147 | 14 | 8.70% |
| Menard | 0 | 0 | 0.00% |
| Midland | 150 | 1 | 0.66% |
| Milam | 76 | 0 | 0.00% |
| Mills | 7 | 0 | 0.00% |
| Mitchell | 8 | 1 | 11.11% |
| Montague | 19 | 0 | 0.00% |
| Montgomery | 1306 | 5 | 0.38% |
| Moore | 5 | 0 | 0.00% |
| Morris | 0 | 0 | 0.00% |
| Motley | 1 | 0 | 0.00% |
| Nacogdoches | 230 | 3 | 1.29% |

STATE115602

| | | | |
|---|---:|---:|---:|
| Navarro | 75 | 6 | 7.41% |
| Newton | 7 | 2 | 22.22% |
| Nolan | 26 | 0 | 0.00% |
| Nueces | 1628 | 3 | 0.18% |
| Ochiltree | 1 | 0 | 0.00% |
| Oldham | 0 | 0 | 0.00% |
| Orange | 247 | 0 | 0.00% |
| Palo Pinto | 52 | 0 | 0.00% |
| Panola | 48 | 0 | 0.00% |
| Parker | 301 | 9 | 2.90% |
| Parmer | 8 | 0 | 0.00% |
| Pecos | 46 | 6 | 11.54% |
| Polk | 143 | 1 | 0.69% |
| Potter | 233 | 7 | 2.92% |
| Presidio | 6 | 4 | 40.00% |
| Rains | 20 | 0 | 0.00% |
| Randall | 281 | 6 | 2.09% |
| Reagan | 0 | 0 | 0.00% |
| Real | 0 | 0 | 0.00% |
| Red River | 37 | 0 | 0.00% |
| Reeves | 90 | 0 | 0.00% |
| Refugio | 39 | 0 | 0.00% |
| Roberts | 2 | 0 | 0.00% |
| Robertson | 57 | 0 | 0.00% |
| Rockwall | 162 | 1 | 0.61% |
| Runnels | 14 | 0 | 0.00% |
| Rusk | 126 | 0 | 0.00% |
| Sabine | 23 | 0 | 0.00% |
| San Augustine | 22 | 0 | 0.00% |
| San Jacinto | 77 | 3 | 3.75% |
| San Patricio | 286 | 6 | 2.05% |
| San Saba | 4 | 0 | 0.00% |
| Schleicher | 4 | 0 | 0.00% |
| Scurry | 11 | 0 | 0.00% |
| Shackelford | 0 | 0 | 0.00% |
| Shelby | 31 | 0 | 0.00% |
| Sherman | 1 | 0 | 0.00% |
| Smith | 585 | 30 | 4.88% |
| Somervell | 14 | 0 | 0.00% |
| Starr | 73 | 24 | 24.74% |
| Stephens | 9 | 0 | 0.00% |
| Sterling | 0 | 0 | 0.00% |
| Stonewall | 4 | 0 | 0.00% |
| Sutton | 4 | 0 | 0.00% |

STATE115603

| | | | |
|---|---|---|---|
| Swisher | 22 | 0 | 0.00% |
| Tarrant | 4664 | 409 | 8.06% |
| Taylor | 246 | 1 | 0.40% |
| Terrell | 5 | 0 | 0.00% |
| Terry | 16 | 0 | 0.00% |
| Throckmorton | 0 | 0 | 0.00% |
| Titus | 75 | 0 | 0.00% |
| Tom Green | 318 | 22 | 6.47% |
| Travis | 7849 | 193 | 2.40% |
| Trinity | 20 | 0 | 0.00% |
| Tyler | 19 | 0 | 0.00% |
| Upshur | 99 | 4 | 3.88% |
| Upton | 0 | 1 | 100.00% |
| Uvalde | 156 | 9 | 5.45% |
| Val Verde | 1 | 3 | 75.00% |
| Van Zandt | 69 | 4 | 5.48% |
| Victoria | 478 | 4 | 0.83% |
| Walker | 153 | 8 | 4.97% |
| Waller | 137 | 4 | 2.84% |
| Ward | 0 | 0 | 0.00% |
| Washington | 69 | 0 | 0.00% |
| Webb | 750 | 33 | 4.21% |
| Wharton | 144 | 5 | 3.36% |
| Wheeler | 7 | 0 | 0.00% |
| Wichita | 262 | 1 | 0.38% |
| Wilbarger | 42 | 0 | 0.00% |
| Willacy | 40 | 0 | 0.00% |
| Williamson | 2100 | 42 | 1.96% |
| Wilson | 246 | 4 | 1.60% |
| Winkler | 0 | 0 | 0.00% |
| Wise | 117 | 3 | 2.50% |
| Wood | 93 | 0 | 0.00% |
| Yoakum | 2 | 0 | 0.00% |
| Young | 0 | 0 | 0.00% |
| Zapata | 2 | 0 | 0.00% |
| Zavala | 132 | 1 | 0.75% |
| **Statewide Totals** | **94092** | **3592** | **3.68%** |

STATE115604

| County | Ballots by Mail Accepted | Ballots by Mail Rejected | % Rejected |
|---|---|---|---|
| Anderson | 79 | 0 | 0.00% |
| Andrews | 38 | 0 | 0.00% |
| Angelina | 190 | 27 | 12.44% |
| Aransas | 80 | 5 | 5.88% |
| Archer | 34 | 0 | 0.00% |
| Armstrong | 20 | 0 | 0.00% |
| Atascosa | 117 | 0 | 0.00% |
| Austin | 136 | 1 | 0.73% |
| Bailey | 25 | 0 | 0.00% |
| Bandera | 147 | 2 | 1.34% |
| Bastrop | 381 | 8 | 2.06% |
| Baylor | 9 | 0 | 0.00% |
| Bee | 54 | 0 | 0.00% |
| Bell | 1092 | 98 | 8.24% |
| Bexar | 5858 | 50 | 0.85% |
| Blanco | 112 | 11 | 8.94% |
| Borden | 3 | 0 | 0.00% |
| Bosque | 99 | 0 | 0.00% |
| Bowie | 286 | 15 | 4.98% |
| Brazoria | 1307 | 50 | 3.68% |
| Brazos | 713 | 44 | 5.81% |
| Brewster | 35 | 0 | 0.00% |
| Briscoe | 30 | 0 | 0.00% |
| Brooks | 2 | 0 | 0.00% |
| Brown | 391 | 1 | 0.26% |
| Burleson | 129 | 1 | 0.77% |
| Burnet | 626 | 19 | 2.95% |
| Caldwell | 90 | 3 | 3.23% |
| Calhoun | 27 | 0 | 0.00% |
| Callahan | 141 | 5 | 3.42% |
| Cameron | 290 | 7 | 2.36% |
| Camp | 29 | 0 | 0.00% |
| Carson | 33 | 0 | 0.00% |
| Cass | 214 | 1 | 0.47% |
| Castro | 24 | 0 | 0.00% |
| Chambers | 88 | 2 | 2.22% |
| Cherokee | 97 | 10 | 9.35% |
| Childress | 20 | 0 | 0.00% |
| Clay | 45 | 0 | 0.00% |
| Cochran | 33 | 4 | 10.81% |
| Coke | 65 | 1 | 1.52% |
| Coleman | 42 | 0 | 0.00% |

STATE115605

| | | | |
|---|---:|---:|---:|
| Collin | 3368 | 49 | 1.43% |
| Collingsworth | 0 | 0 | 0.00% |
| Colorado | 83 | 7 | 7.78% |
| Comal | 1842 | 35 | 1.86% |
| Comanche | 88 | 1 | 1.12% |
| Concho | 1 | 0 | 0.00% |
| Cooke | 170 | 0 | 0.00% |
| Coryell | 270 | 0 | 0.00% |
| Cottle | 11 | 0 | 0.00% |
| Crane | 15 | 0 | 0.00% |
| Crockett | 12 | 0 | 0.00% |
| Crosby | 32 | 0 | 0.00% |
| Culberson | 0 | 0 | 0.00% |
| Dallam | 48 | 0 | 0.00% |
| Dallas | 3247 | 130 | 3.85% |
| Dawson | 76 | 1 | 1.30% |
| Deaf Smith | 102 | 0 | 0.00% |
| Delta | 78 | 0 | 0.00% |
| Denton | 3030 | 74 | 2.38% |
| Dewitt | 69 | 0 | 0.00% |
| Dickens | 32 | 0 | 0.00% |
| Dimmit | 0 | 0 | 0.00% |
| Donley | 10 | 0 | 0.00% |
| Duval | 1 | 0 | 0.00% |
| Eastland | 176 | 0 | 0.00% |
| Ector | 396 | 0 | 0.00% |
| Edwards | 8 | 0 | 0.00% |
| El Paso | 284 | 23 | 7.49% |
| Ellis | 333 | 4 | 1.19% |
| Erath | 2 | 0 | 0.00% |
| Falls | 68 | 0 | 0.00% |
| Fannin | 131 | 13 | 9.03% |
| Fayette | 189 | 1 | 0.53% |
| Fisher | 11 | 0 | 0.00% |
| Floyd | 32 | 1 | 3.03% |
| Foard | 0 | 0 | 0.00% |
| Fort Bend | 1481 | 70 | 4.51% |
| Franklin | 41 | 0 | 0.00% |
| Freestone | 68 | 1 | 1.45% |
| Frio | 8 | 2 | 20.00% |
| Gaines | 53 | 2 | 3.64% |
| Galveston | 1714 | 42 | 2.39% |
| Garza | 42 | 0 | 0.00% |
| Gillespie | 348 | 10 | 2.79% |

STATE115606

| | | | |
|---|---|---|---|
| Glasscock | 12 | 0 | 0.00% |
| Goliad | 27 | 0 | 0.00% |
| Gonzales | 80 | 0 | 0.00% |
| Gray | 174 | 0 | 0.00% |
| Grayson | 569 | 10 | 1.73% |
| Gregg | 315 | 6 | 1.87% |
| Grimes | 214 | 9 | 4.04% |
| Guadalupe | 751 | 24 | 3.10% |
| Hale | 106 | 2 | 1.85% |
| Hall | 18 | 0 | 0.00% |
| Hamilton | 0 | 0 | 0.00% |
| Hansford | 57 | 0 | 0.00% |
| Hardeman | 0 | 0 | 0.00% |
| Hardin | 232 | 0 | 0.00% |
| Harris | 13879 | 1169 | 7.77% |
| Harrison | 65 | 4 | 5.80% |
| Hartley | 40 | 0 | 0.00% |
| Haskell | 11 | 0 | 0.00% |
| Hays | 971 | 42 | 4.15% |
| Hemphill | 48 | 2 | 4.00% |
| Henderson | 229 | 17 | 6.91% |
| Hidalgo | 180 | 3 | 1.64% |
| Hill | 106 | 0 | 0.00% |
| Hockley | 77 | 2 | 2.53% |
| Hood | 275 | 46 | 14.33% |
| Hopkins | 88 | 1 | 1.12% |
| Houston | 87 | 3 | 3.33% |
| Howard | 176 | 1 | 0.56% |
| Hudspeth | 0 | 0 | 0.00% |
| Hunt | 497 | 11 | 2.17% |
| Hutchinson | 105 | 0 | 0.00% |
| Irion | 6 | 0 | 0.00% |
| Jack | 51 | 2 | 3.77% |
| Jackson | 43 | 0 | 0.00% |
| Jasper | 48 | 0 | 0.00% |
| Jeff Davis | 14 | 0 | 0.00% |
| Jefferson | 162 | 11 | 6.36% |
| Jim Hogg | 0 | 0 | 0.00% |
| Jim Wells | 9 | 0 | 0.00% |
| Johnson | 796 | 14 | 1.73% |
| Jones | 68 | 0 | 0.00% |
| Karnes | 161 | 3 | 1.83% |
| Kaufman | 156 | 55 | 26.07% |
| Kendall | 599 | 20 | 3.23% |

STATE115607

| | | | |
|---|---|---|---|
| Kenedy | 0 | 0 | 0.00% |
| Kent | 0 | 0 | 0.00% |
| Kerr | 679 | 26 | 3.69% |
| Kimble | 64 | 0 | 0.00% |
| King | 0 | 0 | 0.00% |
| Kinney | 0 | 0 | 0.00% |
| Kleberg | 34 | 0 | 0.00% |
| Knox | 12 | 0 | 0.00% |
| Lamar | 157 | 6 | 3.68% |
| Lamb | 38 | 0 | 0.00% |
| Lampasas | 187 | 4 | 2.09% |
| Lasalle | 4 | 0 | 0.00% |
| Lavaca | 237 | 0 | 0.00% |
| Lee | 99 | 1 | 1.00% |
| Leon | 147 | 0 | 0.00% |
| Liberty | 200 | 2 | 0.99% |
| Limestone | 109 | 1 | 0.91% |
| Lipscomb | 60 | 0 | 0.00% |
| Live Oak | 0 | 0 | 0.00% |
| Llano | 473 | 29 | 5.78% |
| Loving | 0 | 0 | 0.00% |
| Lubbock | 938 | 40 | 4.09% |
| Lynn | 4 | 0 | 0.00% |
| Madison | 73 | 0 | 0.00% |
| Marion | 16 | 0 | 0.00% |
| Martin | 11 | 0 | 0.00% |
| Mason | 26 | 0 | 0.00% |
| Matagorda | 52 | 6 | 10.34% |
| Maverick | 3 | 0 | 0.00% |
| Mcculloch | 69 | 0 | 0.00% |
| Mclennan | 1133 | 72 | 5.98% |
| Mcmullen | 6 | 0 | 0.00% |
| Medina | 240 | 12 | 4.76% |
| Menard | 0 | 0 | 0.00% |
| Midland | 523 | 12 | 2.24% |
| Milam | 139 | 0 | 0.00% |
| Mills | 45 | 0 | 0.00% |
| Mitchell | 22 | 0 | 0.00% |
| Montague | 72 | 0 | 0.00% |
| Montgomery | 3035 | 39 | 1.27% |
| Moore | 56 | 0 | 0.00% |
| Morris | 0 | 0 | 0.00% |
| Motley | 19 | 0 | 0.00% |
| Nacogdoches | 389 | 9 | 2.26% |

STATE115608

| County | Count | Value | Percent |
|---|---|---|---|
| Navarro | 69 | 4 | 5.48% |
| Newton | 23 | 4 | 14.81% |
| Nolan | 23 | 0 | 0.00% |
| Nueces | 394 | 2 | 0.51% |
| Ochiltree | 42 | 0 | 0.00% |
| Oldham | 0 | 0 | 0.00% |
| Orange | 254 | 1 | 0.39% |
| Palo Pinto | 307 | 1 | 0.32% |
| Panola | 102 | 0 | 0.00% |
| Parker | 795 | 29 | 3.52% |
| Parmer | 30 | 0 | 0.00% |
| Pecos | 22 | 3 | 12.00% |
| Polk | 268 | 20 | 6.94% |
| Potter | 609 | 22 | 3.49% |
| Presidio | 1 | 0 | 0.00% |
| Rains | 77 | 0 | 0.00% |
| Randall | 1376 | 17 | 1.22% |
| Reagan | 14 | 1 | 6.67% |
| Real | 0 | 0 | 0.00% |
| Red River | 44 | 0 | 0.00% |
| Reeves | 7 | 0 | 0.00% |
| Refugio | 9 | 0 | 0.00% |
| Roberts | 12 | 0 | 0.00% |
| Robertson | 55 | 0 | 0.00% |
| Rockwall | 444 | 6 | 1.33% |
| Runnels | 32 | 1 | 3.03% |
| Rusk | 240 | 2 | 0.83% |
| Sabine | 50 | 0 | 0.00% |
| San Augustine | 14 | 0 | 0.00% |
| San Jacinto | 147 | 1 | 0.68% |
| San Patricio | 117 | 0 | 0.00% |
| San Saba | 18 | 0 | 0.00% |
| Schleicher | 18 | 2 | 10.00% |
| Scurry | 55 | 1 | 1.79% |
| Shackelford | 46 | 0 | 0.00% |
| Shelby | 83 | 0 | 0.00% |
| Sherman | 16 | 3 | 15.79% |
| Smith | 635 | 51 | 7.43% |
| Somervell | 23 | 1 | 4.17% |
| Starr | 4 | 0 | 0.00% |
| Stephens | 93 | 0 | 0.00% |
| Sterling | 0 | 0 | 0.00% |
| Stonewall | 9 | 0 | 0.00% |
| Sutton | 12 | 0 | 0.00% |

STATE115609

| | | |
|---|---|---|
| Swisher | 54 | 0 | 0.00% |
| Tarrant | 4873 | 689 | 12.39% |
| Taylor | 401 | 2 | 0.50% |
| Terrell | 11 | 0 | 0.00% |
| Terry | 61 | 0 | 0.00% |
| Throckmorton | 12 | 0 | 0.00% |
| Titus | 92 | 0 | 0.00% |
| Tom Green | 566 | 24 | 4.07% |
| Travis | 2164 | 90 | 3.99% |
| Trinity | 23 | 0 | 0.00% |
| Tyler | 184 | 6 | 3.16% |
| Upshur | 142 | 4 | 2.74% |
| Upton | 0 | 1 | 100.00% |
| Uvalde | 23 | 0 | 0.00% |
| Val Verde | 0 | 1 | 100.00% |
| Van Zandt | 92 | 5 | 5.15% |
| Victoria | 1152 | 16 | 1.37% |
| Walker | 222 | 7 | 3.06% |
| Waller | 110 | 0 | 0.00% |
| Ward | 0 | 0 | 0.00% |
| Washington | 168 | 0 | 0.00% |
| Webb | 17 | 0 | 0.00% |
| Wharton | 129 | 0 | 0.00% |
| Wheeler | 40 | 0 | 0.00% |
| Wichita | 201 | 3 | 1.47% |
| Wilbarger | 101 | 0 | 0.00% |
| Willacy | 3 | 0 | 0.00% |
| Williamson | 1807 | 63 | 3.37% |
| Wilson | 251 | 8 | 3.09% |
| Winkler | 1 | 0 | 0.00% |
| Wise | 340 | 14 | 3.95% |
| Wood | 0 | 0 | 0.00% |
| Yoakum | 20 | 0 | 0.00% |
| Young | 0 | 0 | 0.00% |
| Zapata | 1 | 0 | 0.00% |
| Zavala | 0 | 0 | 0.00% |
| **Statewide Totals** | **81924** | **3652** | **4.27%** |

| County | Ballots by Mail Accepted | Ballots by Mail Rejected | % Rejected |
|---|---|---|---|
| Anderson | 370 | 0 | 0.00% |
| Andrews | 62 | 0 | 0.00% |
| Angelina | 854 | 35 | 3.94% |
| Aransas | 391 | 11 | 2.74% |
| Archer | 89 | 0 | 0.00% |
| Armstrong | 37 | 1 | 2.63% |
| Atascosa | 464 | 10 | 2.11% |
| Austin | 367 | 4 | 1.08% |
| Bailey | 61 | 1 | 1.61% |
| Bandera | 368 | 8 | 2.13% |
| Bastrop | 1363 | 8 | 0.58% |
| Baylor | 28 | 0 | 0.00% |
| Bee | 386 | 4 | 1.03% |
| Bell | 3593 | 209 | 5.50% |
| Bexar | 30401 | 361 | 1.17% |
| Blanco | 271 | 6 | 2.17% |
| Borden | 15 | 1 | 6.25% |
| Bosque | 250 | 2 | 0.79% |
| Bowie | 1097 | 37 | 3.26% |
| Brazoria | 3802 | 60 | 1.55% |
| Brazos | 2221 | 64 | 2.80% |
| Brewster | 219 | 0 | 0.00% |
| Briscoe | 65 | 0 | 0.00% |
| Brooks | 144 | 2 | 1.37% |
| Brown | 610 | 2 | 0.33% |
| Burleson | 299 | 8 | 2.61% |
| Burnet | 1422 | 32 | 2.20% |
| Caldwell | 450 | 17 | 3.64% |
| Calhoun | 213 | 1 | 0.47% |
| Callahan | 203 | 10 | 4.69% |
| Cameron | 3156 | 43 | 1.34% |
| Camp | 165 | 0 | 0.00% |
| Carson | 58 | 1 | 1.69% |
| Cass | 572 | 0 | 0.00% |
| Castro | 62 | 0 | 0.00% |
| Chambers | 261 | 0 | 0.00% |
| Cherokee | 439 | 20 | 4.36% |
| Childress | 46 | 0 | 0.00% |
| Clay | 100 | 1 | 0.99% |
| Cochran | 55 | 0 | 0.00% |
| Coke | 128 | 1 | 0.78% |
| Coleman | 113 | 2 | 1.74% |
| Collin | 11943 | 112 | 0.93% |
| Collingsworth | 1 | 0 | 0.00% |
| Colorado | 314 | 14 | 4.27% |

STATE115611

| | | | |
|---|---|---|---|
| Comal | 3763 | 75 | 1.95% |
| Comanche | 190 | 3 | 1.55% |
| Concho | 65 | 3 | 4.41% |
| Cooke | 407 | 0 | 0.00% |
| Coryell | 720 | 0 | 0.00% |
| Cottle | 18 | 0 | 0.00% |
| Crane | 35 | 1 | 2.78% |
| Crockett | 4 | 0 | 0.00% |
| Crosby | 92 | 0 | 0.00% |
| Culberson | 18 | 0 | 0.00% |
| Dallam | 74 | 0 | 0.00% |
| Dallas | 18714 | 336 | 1.76% |
| Dawson | 150 | 1 | 0.66% |
| Deaf Smith | 201 | 0 | 0.00% |
| Delta | 144 | 0 | 0.00% |
| Denton | 10199 | 172 | 1.66% |
| Dewitt | 228 | 3 | 1.30% |
| Dickens | 34 | 0 | 0.00% |
| Dimmit | 203 | 0 | 0.00% |
| Donley | 0 | 1 | 100.00% |
| Duval | 403 | 101 | 20.04% |
| Eastland | 356 | 1 | 0.28% |
| Ector | 873 | 62 | 6.63% |
| Edwards | 23 | 1 | 4.17% |
| El Paso | 4036 | 559 | 12.17% |
| Ellis | 1540 | 69 | 4.29% |
| Erath | 370 | 12 | 3.14% |
| Falls | 181 | 0 | 0.00% |
| Fannin | 532 | 11 | 2.03% |
| Fayette | 470 | 7 | 1.47% |
| Fisher | 68 | 0 | 0.00% |
| Floyd | 65 | 0 | 0.00% |
| Foard | 6 | 0 | 0.00% |
| Fort Bend | 9831 | 524 | 5.06% |
| Franklin | 113 | 0 | 0.00% |
| Freestone | 192 | 1 | 0.52% |
| Frio | 357 | 3 | 0.83% |
| Gaines | 73 | 0 | 0.00% |
| Galveston | 5270 | 98 | 1.83% |
| Garza | 48 | 0 | 0.00% |
| Gillespie | 802 | 8 | 0.99% |
| Glasscock | 23 | 0 | 0.00% |
| Goliad | 95 | 6 | 5.94% |
| Gonzales | 262 | 1 | 0.38% |
| Gray | 353 | 1 | 0.28% |
| Grayson | 1821 | 32 | 1.73% |
| Gregg | 1519 | 19 | 1.24% |

STATE115612

| | | | |
|---|---|---|---|
| Grimes | 517 | 32 | 5.83% |
| Guadalupe | 2502 | 80 | 3.10% |
| Hale | 210 | 0 | 0.00% |
| Hall | 0 | 0 | 0.00% |
| Hamilton | 98 | 3 | 2.97% |
| Hansford | 21 | 0 | 0.00% |
| Hardeman | 8 | 0 | 0.00% |
| Hardin | 580 | 8 | 1.36% |
| Harris | 59708 | 2791 | 4.47% |
| Harrison | 539 | 27 | 4.77% |
| Hartley | 71 | 1 | 1.39% |
| Haskell | 62 | 0 | 0.00% |
| Hays | 4527 | 196 | 4.15% |
| Hemphill | 70 | 0 | 0.00% |
| Henderson | 1016 | 17 | 1.65% |
| Hidalgo | 4920 | 98 | 1.95% |
| Hill | 331 | 0 | 0.00% |
| Hockley | 178 | 0 | 0.00% |
| Hood | 1098 | 92 | 7.73% |
| Hopkins | 285 | 5 | 1.72% |
| Houston | 311 | 0 | 0.00% |
| Howard | 350 | 12 | 3.31% |
| Hudspeth | 0 | 0 | 0.00% |
| Hunt | 1164 | 28 | 2.35% |
| Hutchinson | 211 | 1 | 0.47% |
| Irion | 16 | 0 | 0.00% |
| Jack | 127 | 0 | 0.00% |
| Jackson | 143 | 12 | 7.74% |
| Jasper | 309 | 1 | 0.32% |
| Jeff Davis | 32 | 1 | 3.03% |
| Jefferson | 2841 | 158 | 5.27% |
| Jim Hogg | 249 | 0 | 0.00% |
| Jim Wells | 436 | 83 | 15.99% |
| Johnson | 1920 | 0 | 0.00% |
| Jones | 223 | 0 | 0.00% |
| Karnes | 320 | 10 | 3.03% |
| Kaufman | 811 | 33 | 3.91% |
| Kendall | 1201 | 32 | 2.60% |
| Kenedy | 8 | 0 | 0.00% |
| Kent | 4 | 0 | 0.00% |
| Kerr | 1436 | 10 | 0.69% |
| Kimble | 97 | 1 | 1.02% |
| King | 3 | 0 | 0.00% |
| Kinney | 0 | 0 | 0.00% |
| Kleberg | 405 | 2 | 0.49% |
| Knox | 36 | 0 | 0.00% |
| Lamar | 554 | 8 | 1.42% |

OCA-APPX-0860

STATE115613

| | | | |
|---|---|---|---|
| Lamb | 160 | 0 | 0.00% |
| Lampasas | 382 | 13 | 3.29% |
| Lasalle | 162 | 2 | 1.22% |
| Lavaca | 507 | 0 | 0.00% |
| Lee | 245 | 11 | 4.30% |
| Leon | 294 | 1 | 0.34% |
| Liberty | 510 | 10 | 1.92% |
| Limestone | 300 | 1 | 0.33% |
| Lipscomb | 100 | 2 | 1.96% |
| Live Oak | 129 | 4 | 3.01% |
| Llano | 191 | 10 | 4.98% |
| Loving | 0 | 0 | 0.00% |
| Lubbock | 2656 | 78 | 2.85% |
| Lynn | 1 | 0 | 0.00% |
| Madison | 152 | 3 | 1.94% |
| Marion | 165 | 14 | 7.82% |
| Martin | 29 | 0 | 0.00% |
| Mason | 73 | 0 | 0.00% |
| Matagorda | 346 | 14 | 3.89% |
| Maverick | 222 | 14 | 5.93% |
| Mcculloch | 0 | 0 | 0.00% |
| Mclennan | 3760 | 121 | 3.12% |
| Mcmullen | 12 | 1 | 7.69% |
| Medina | 696 | 28 | 3.87% |
| Menard | 56 | 0 | 0.00% |
| Midland | 407 | 20 | 4.68% |
| Milam | 372 | 2 | 0.53% |
| Mills | 74 | 7 | 8.64% |
| Mitchell | 51 | 0 | 0.00% |
| Montague | 200 | 2 | 0.99% |
| Montgomery | 8943 | 43 | 0.48% |
| Moore | 126 | 0 | 0.00% |
| Morris | 132 | 10 | 7.04% |
| Motley | 34 | 0 | 0.00% |
| Nacogdoches | 968 | 9 | 0.92% |
| Navarro | 314 | 19 | 5.71% |
| Newton | 100 | 9 | 8.26% |
| Nolan | 119 | 0 | 0.00% |
| Nueces | 6784 | 2 | 0.03% |
| Ochiltree | 99 | 0 | 0.00% |
| Oldham | 35 | 1 | 2.78% |
| Orange | 910 | 18 | 1.94% |
| Palo Pinto | 487 | 11 | 2.21% |
| Panola | 247 | 1 | 0.40% |
| Parker | 1837 | 22 | 1.18% |
| Parmer | 58 | 0 | 0.00% |
| Pecos | 159 | 5 | 3.05% |

STATE115614

| | | | |
|---|---|---|---|
| Polk | 2643 | 45 | 1.67% |
| Potter | 1356 | 54 | 3.83% |
| Presidio | 69 | 4 | 5.48% |
| Rains | 174 | 0 | 0.00% |
| Randall | 2559 | 33 | 1.27% |
| Reagan | 16 | 0 | 0.00% |
| Real | 54 | 0 | 0.00% |
| Red River | 157 | 0 | 0.00% |
| Reeves | 146 | 1 | 0.68% |
| Refugio | 95 | 0 | 0.00% |
| Roberts | 24 | 0 | 0.00% |
| Robertson | 207 | 6 | 2.82% |
| Rockwall | 1186 | 19 | 1.58% |
| Runnels | 120 | 0 | 0.00% |
| Rusk | 634 | 3 | 0.47% |
| Sabine | 165 | 1 | 0.60% |
| San Augustine | 87 | 1 | 1.14% |
| San Jacinto | 421 | 1 | 0.24% |
| San Patricio | 842 | 10 | 1.17% |
| San Saba | 50 | 0 | 0.00% |
| Schleicher | 69 | 0 | 0.00% |
| Scurry | 125 | 4 | 3.10% |
| Shackelford | 92 | 0 | 0.00% |
| Shelby | 252 | 14 | 5.26% |
| Sherman | 25 | 0 | 0.00% |
| Smith | 2637 | 72 | 2.66% |
| Somervell | 69 | 1 | 1.43% |
| Starr | 449 | 157 | 25.91% |
| Stephens | 133 | 2 | 1.48% |
| Sterling | 7 | 0 | 0.00% |
| Stonewall | 34 | 0 | 0.00% |
| Sutton | 33 | 0 | 0.00% |
| Swisher | 124 | 1 | 0.80% |
| Tarrant | 21751 | 558 | 2.50% |
| Taylor | 1333 | 35 | 2.56% |
| Terrell | 0 | 0 | 0.00% |
| Terry | 108 | 1 | 0.92% |
| Throckmorton | 24 | 1 | 4.00% |
| Titus | 243 | 6 | 2.41% |
| Tom Green | 1653 | 62 | 3.62% |
| Travis | 19993 | 473 | 2.31% |
| Trinity | 128 | 0 | 0.00% |
| Tyler | 319 | 4 | 1.24% |
| Upshur | 450 | 5 | 1.10% |
| Upton | 27 | 0 | 0.00% |
| Uvalde | 395 | 20 | 4.82% |
| Val Verde | 0 | 0 | 0.00% |

STATE115615

| | | | |
|---|---|---|---|
| Van Zandt | 448 | 16 | 3.45% |
| Victoria | 2355 | 11 | 0.46% |
| Walker | 682 | 4 | 0.58% |
| Waller | 485 | 1 | 0.21% |
| Ward | 121 | 0 | 0.00% |
| Washington | 488 | 5 | 1.01% |
| Webb | 1064 | 23 | 2.12% |
| Wharton | 501 | 3 | 0.60% |
| Wheeler | 77 | 0 | 0.00% |
| Wichita | 1232 | 10 | 0.81% |
| Wilbarger | 229 | 0 | 0.00% |
| Willacy | 127 | 12 | 8.63% |
| Williamson | 8273 | 184 | 2.18% |
| Wilson | 840 | 9 | 1.06% |
| Winkler | 42 | 0 | 0.00% |
| Wise | 847 | 20 | 2.31% |
| Wood | 757 | 0 | 0.00% |
| Yoakum | 35 | 5 | 12.50% |
| Young | 0 | 0 | 0.00% |
| Zapata | 81 | 0 | 0.00% |
| Zavala | 166 | 2 | 1.19% |
| **Statewide Totals** | **336349** | **9348** | **2.70%** |

STATE115616

# Exhibit 66



# ELECTION ADMINISTRATION AND VOTING SURVEY 2020 COMPREHENSIVE REPORT

### A REPORT FROM THE
### U.S. ELECTION ASSISTANCE COMMISSION
### TO THE 117TH CONGRESS

# Executive Summary

Since 2004, the U.S. Election Assistance Commission (EAC) has conducted the Election Administration and Voting Survey (EAVS) following each federal general election. The EAVS asks all 50 U.S. states, the District of Columbia, and five U.S. territories—American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands—to provide data about the ways Americans vote and how elections are administered. Since 2008, this project has included a separate survey, the Election Administration Policy Survey (Policy Survey), that collects information about state election laws, policies, and practices.

The EAVS provides the most comprehensive source of state and local jurisdiction-level data about election administration in the United States. These data play a vital role in helping election officials, policymakers, and other election stakeholders identify trends, anticipate and respond to changing voter needs, invest resources to improve election administration and the voter experience, and better secure U.S. elections infrastructure. The EAVS data make it possible to examine the details of the U.S. election infrastructure and to produce a generalizable understanding of core aspects of the election process and the management challenges faced by election officials. The survey provides policymakers and the public with critical information every two years about how federal elections are conducted, and it helps the EAC fulfill its congressionally mandated reporting requirements. The EAVS is also invaluable to election officials who use the data to manage election oversight, conduct issue analysis and strategic planning, and create training and promotional materials. The EAC also uses EAVS data to create clearinghouse resources to advance the agency's mission and to better support election officials and voters as well as to inform lawmakers and national-level stakeholders about the impact of federal voting laws and the changing landscape of U.S. elections.

The 2020 general election was heavily affected by the COVID-19 pandemic. The pandemic and the ensuing public health emergency necessitated a variety of changes to existing election practices to accommodate social distancing and to slow the spread of the virus among voters, poll workers, and election officials and staff. In response, many states took action to expand the availability of in-person voting before Election Day and mail voting. Because of its status as the most comprehensive survey of election administration in the United States, the 2020 EAVS serves as a record of the extraordinary efforts by the nation's election officials and poll workers to ensure that the 2020 general election was conducted in a safe and secure manner. To this end, the EAC is pleased to present to the 117th Congress its report on the 2020 EAVS.

This report describes in detail how the 2020 federal general election was administered and how voters cast their ballots. Data from the EAVS and the accompanying Election Administration Policy Survey (Policy Survey) are used to provide an overview of each of the following aspects of the election process:

- Turnout, voting methods, polling places, poll workers, and election technology are covered in Chapter 1, "Overview of Election Administration and Voting in the 2020 General Election";

OCA-APPX-0867



- Key laws, rules, policies, and procedures that govern U.S. elections are covered in Chapter 2, "Election Law and Procedure: The Policy Survey";
- Voter registration and list maintenance are covered in Chapter 3, "Voter Registration: The NVRA and Beyond";
- Voting by individuals covered under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) is described in Chapter 4, "Military and Overseas Voting in 2020: UOCAVA"; and
- Finally, the methodology of the EAVS and a description of the survey questions are discussed in Chapter 5, "Survey Methodology and Procedures."

## Voting and Election Administration Findings

The 2020 EAVS confirms that the 2020 general election saw the highest turnout of any federal general election recorded by the EAVS to date, with 67.7% of the citizen voting age population (CVAP) casting ballots that were counted, an increase of 6.7 percentage points from 2016 levels. Nearly every state saw an increase in turnout compared to the 2016 EAVS. Furthermore, more than 209 million people were active registered voters for the 2020 general election, which represents an all-time high, and more than 161 million voters cast ballots that were counted for this election.

This election also saw sweeping changes in how voters cast their ballots. In the 2016 EAVS, 54.5% of voters cast their ballots in person on Election Day, and in the 2018 EAVS, 58.2% of voters did so. In 2020, only 30.5% of voters cast their ballots in person on Election Day. The percentage of the electorate that voted a mailed ballot increased to 43.1% of the electorate, nearly a 20-percentage-point increase from 2016 levels. Jurisdiction-level analysis shows that the largest increases in mail voting rates occurred in jurisdictions in states that newly instituted all-mail elections in 2020 and in jurisdictions in states that removed requirements to provide an excuse to request a mailed ballot. Although the total number of mailed ballots transmitted in 2020 was more than double the number transmitted in 2016, the percentages of mailed ballots that were returned by voters, that were counted, and that were rejected did not change significantly at the national level.

States reported a total of 132,556 polling places at which 775,101 poll workers assisted voters with in-person early and Election Day voting. The data also show a shift in the age distribution of poll workers, with the percentage of poll workers ages 18 to 25 and 26 to 40 increasing to 6.2% and 15.0%, respectively, and the percentage of poll workers ages 61 to 70 and 71 and older decreasing, to 27.3% and 20.1%, respectively. Jurisdictions also reported that poll worker recruitment was less difficult in 2020 than it was in 2016. In survey comments, many jurisdictions cited cross-cutting effects on their recruitment efforts. Jurisdictions reported that the COVID-19 pandemic made it difficult to retain long-time, older poll workers and caused last-minute poll worker shortages, but the efforts of the EAC, state election offices, and other organizations to encourage qualified individuals to serve as poll workers were cited as helping contribute to an oversupply of poll workers in some areas.

States reported that the use of electronic poll books (or e-poll books) increased since the 2018 EAVS, and 17 states used e-poll books in all of their jurisdictions. Scanners and ballot marking devices (BMD) continued to be the most common types of voting equipment used, and the use of

OCA-APPX-0868

direct-recording electronic (DRE) machines that were not equipped with a voter-verified paper audit trail (DRE without VVPAT) also continued to decline. In 2020, only 32 jurisdictions across the country relied solely on voting machines with no paper backup.

## Election Administration Policy Survey Findings

To provide context to the data that states report in the EAVS, the EAC collects information about states' election policies. Two-thirds of states reported having top-down registration systems hosted on a single, central platform or mainframe that is maintained by the state with information supplied by local jurisdictions; the remaining one-third of states reported having bottom-up or hybrid databases. To keep their voter registration rolls accurate and up to date, most states reported sharing information with motor vehicle agencies, government entities that maintain death records, and agencies that maintain felony or prison records. The percentage of states offering both same-day registration (51.8%) and online registration (80.4%) increased since the 2018 Policy Survey.

The Policy Survey also recorded an increase in state policies that make it safer for voters to cast a ballot or to reduce potential lines and crowds at in-person polling places. In 2020, a total of 14 states reported having all-mail elections, in which all registered voters or all active registered voters were automatically sent a mailed ballot—10 of these states conducted all-mail elections statewide, whereas four of the states did so only in select jurisdictions. This was an increase from the 2018 Policy Survey, which found that three states administered their elections entirely by mail and four states had all-mail elections in select local jurisdictions. In addition, 69.6% of states did not require voters to provide an excuse to be able to vote a mailed ballot (seven states had removed the excuse requirement since the 2018 Policy Survey), and 51.8% of states reported that there were some circumstances under which voters could receive ballots electronically. However, the Policy Survey did not collect information on whether policy changes made for the 2020 general election were permanent or temporary, or whether the changes were made in direct response to the COVID-19 pandemic.

Nearly all states reported that voting systems must be tested and certified before approval, with the most common certification requirements being testing by an EAC-accredited voting system test laboratory (VSTL), certification according to the EAC-adopted Voluntary Voting System Guidelines (VVSG), and both state and federal certification. In 2020, of the 40 states that reported using e-poll books, 55% required testing and certification to the state's specifications before purchasing the e-poll books.

In the post-election period, 78.6% of states reported that they required a tabulation audit to verify the voting equipment used to count ballots worked properly. Of these states, about three-quarters required a traditional tabulation audit (which examines a sample of ballots from a fixed percentage of randomly selected voting districts or voting machines), whereas about one-fifth of the states required a risk-limiting tabulation audit (in which statistical methods are used to select the audit sample size). All states reported having a mechanism for conducting election recounts, although the circumstances under which a recount would be conducted varied by state.

OCA-APPX-0869



# The National Voter Registration Act (NVRA) Findings

The 2020 EAVS data show the active voter registration rate for the 2020 general election was 88.2% of the CVAP, which represents an increase of 3.5 percentage points since the 2016 EAVS. More than 103 million voter registration applications were submitted between the close of registration for the 2018 general election and the close of registration for the 2020 general election, which represents a 33.8% increase in the number of registration applications received in the period leading up to the 2016 general election. Of the registration applications received, the most common outcome was an update to the voter's existing registration record that did not involve a cross-jurisdiction change of address. This type of update accounted for nearly half of the registration applications received. New and valid registrations that resulted in the creation of a new voter registration record within the jurisdiction accounted for nearly one-third of the applications received.

As with previous iterations of the EAVS, state motor vehicle departments accounted for the largest share of these registration applications (39.3%). The second-most common source of these applications was online registration, which accounted for 28.2% of applications. Online registration also saw the fastest growth of any registration source tracked by the EAVS.

The 29 states and territories that allow same-day voter registration (SDR) reported receiving more than 1.6 million SDRs during the voting period for the 2020 general election, approximately double the number received during the 2018 EAVS. SDR allows individuals to register to vote on the same day that they cast their ballot for an election. Nationwide, more SDRs were received on Election Day than were received during early voting.

Pursuant to the NVRA requirements, states reported sending more than 28 million confirmation notices and removing more than 18 million voter registration records from their voter registration rolls between the close of registration for the 2018 general election and the close of registration for the 2020 general election. The most common reasons cited for removing voter registration records were failure to respond to a confirmation notice and to vote in the two most recent federal general elections, moving from the jurisdiction in which the voter was registered to vote, and the voter's death.

# The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Findings

States reported transmitting more than 1.2 million ballots to UOCAVA voters—a population that includes members of the uniformed services absent from their voting residence, their eligible family members, and U.S. citizens living overseas who receive special protections under the federal UOCAVA law. Of those transmitted ballots, more than 900,000 were returned by voters and nearly 890,000 were counted in the election.

Continuing a trend that began with the 2016 EAVS, in 2020, overseas citizens made up a larger proportion of the UOCAVA population than did uniformed services members and their eligible family members. In 2020, overseas citizens accounted for 57.4% of registered UOCAVA voters, and

OCA-APPX-0870

uniformed services members accounted for 42.3%. Three states—California, Florida, and Washington—accounted for slightly more than 40% of all the registered UOCAVA voters reported nationwide.

Among uniformed services voters, postal mail transmission was the most common method reported (accounting for nearly half of the ballots transmitted to uniformed services voters), whereas overseas citizens more commonly received their ballots through email (accounting for 70.9% of ballots transmitted to overseas citizens).

Nearly 98% of UOCAVA ballots returned by voters were reported as counted, with just over 2% of returned ballots reported as rejected. Nationwide, more than 33,000 Federal Write-In Absentee Ballots (FWAB) were reported as received. This form may be submitted by UOCAVA voters as an emergency backup ballot in case their official ballot is not received by local election officials in time to be counted. The FWAB allowed nearly 24,000 UOCAVA voters to have their votes counted in the 2020 general election.

OCA-APPX-0871



This report by the U.S. Election Assistance Commission is the result of a contract to collect and analyze data for the 2020 Election Administration and Voting Survey. The contract was performed by Fors Marsh Group LLC, an applied research company based in Arlington, VA.

Published August 2021

U.S. Election Assistance Commission

633 3rd Street NW, Suite 200

Washington, DC 20001

www.eac.gov

OCA-APPX-0872

# Table of Contents

Executive Summary..................................................................................................................i

    Voting and Election Administration Findings.................................................................. ii

    Election Administration Policy Survey Findings............................................................ iii

    The National Voter Registration Act (NVRA) Findings ................................................ iv

    The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Findings ...... iv

Chapter 1. Overview of Election Administration and Voting in the 2020 General Election.....................1

    Key Findings ..................................................................................................................1

    Election Administration in the United States ..................................................................2

    The Election Administration and Voting Survey (EAVS) ................................................4

    Turnout in the 2020 General Election ...........................................................................6

    Polling Places and Poll Workers.................................................................................. 18

    Election Technology .................................................................................................... 23

    Appendix A: Descriptive Tables .................................................................................. 27

Chapter 2. Election Law and Procedure: The Policy Survey ................................................. 54

    Key Findings ................................................................................................................ 54

    Introduction ................................................................................................................. 54

    Responding to the 2020 EAVS .................................................................................... 55

    Policies on Voter Registration and List Maintenance ................................................. 56

    Voting by Mail ............................................................................................................. 69

    UOCAVA Voting ......................................................................................................... 73

    In-Person Voting ......................................................................................................... 75

    Provisional Voting........................................................................................................ 77

    Election Technology .................................................................................................... 79

    Election Certification, Recounts, and Audits .............................................................. 81

    Appendix A: Descriptive Tables .................................................................................. 85

Chapter 3. Voter Registration: The NVRA and Beyond.................................................... 114

    Key Findings ............................................................................................................. 114

    Introduction ............................................................................................................... 114

    How Americans Registered to Vote for the 2020 General Election............................ 119

    Voter Registration Rates for the 2020 General Election............................................. 126

Types of Registrations Received for the 2020 General Election ........................................ 130

Registration List Maintenance ............................................................................................ 133

Appendix A: Descriptive Tables .......................................................................................... 138

**Chapter 4. Military and Overseas Voting in 2020: UOCAVA .................................... 171**

Key Findings ........................................................................................................................ 171

Introduction ......................................................................................................................... 171

Federal Laws Regulating Military and Overseas Voting.................................................... 172

The UOCAVA Voting Process ............................................................................................ 173

UOCAVA Registration and Ballot Requests..................................................................... 175

UOCAVA Ballots Transmitted ........................................................................................... 177

UOCAVA Ballots Returned and Submitted for Counting ................................................ 182

Federal Write-In Absentee Ballots .................................................................................... 187

Appendix A: Descriptive Tables ........................................................................................ 189

**Chapter 5. Survey Methodology and Procedures.................................................... 204**

Survey Questions ............................................................................................................... 205

Data Collection Procedures............................................................................................... 212

Data Reporting and Calculations ...................................................................................... 217

Recommendations for Analyzing and Interpreting the EAVS Data ................................ 218

Methodology Appendix A: Survey Response Rates.......................................................... 220

Methodology Appendix B: Data Collection Template Validation Rules........................... 223

Methodology Appendix C: Post-Submission Validations and Sample Rates................... 235

Methodology Appendix D: How to Calculate Selected EAVS Rates................................ 238

OCA-APPX-0874

# Chapter 1. Overview of Election Administration and Voting in the 2020 General Election

## Key Findings

The 2020 Election Administration and Voting Survey (EAVS) collected data on ballots cast, voter registration, overseas and military voting, voting technology, and other important issues related to voting and election administration. The 2020 general election was especially impacted by the COVID-19 pandemic, which caused drastic changes to how the election was administered and how voters cast their ballots. Notable findings from the 2020 EAVS include:

- More than 209 million people were active registered voters for the 2020 general election, an all-time high for the EAVS.
- Voter turnout for the 2020 general election reached the highest level documented in any EAVS thus far, at 67.7% of the citizen voting age population (CVAP). Turnout increased 6.7 percentage points from 2016 levels, and nearly all states reported an increase in turnout. More than 161 million voters cast ballots that were counted for the 2020 election.
- For the first time, a majority of voters cast their ballots before Election Day. Slightly more than 43% of voters participated with a mailed ballot, and 30.6% of ballots were cast through in-person voting before Election Day. Ballots cast on Election Day at a physical polling place comprised 30.5% of the turnout for the 2020 general election.
- The number of mailed ballots transmitted to voters more than doubled from 2016 to 2020, and the percentage of mailed ballots that were returned by voters, that were counted, and that were rejected held steady with 2016 levels.
- The COVID-19 pandemic appears to have been associated with a change in both poll worker recruitment and the resulting age distribution of the poll worker workforce. States reported that the ages of their poll workers skewed younger during the 2020 general election compared to during the 2016 general election. However, states and jurisdictions reported that recruiting poll workers for this election was slightly easier due to national and state efforts that encouraged voters to serve as poll workers.
- The most common types of election equipment that were used were paper ballot scanners and ballot marking devices (BMD). The use of direct-recording electronic machines that were not equipped with a voter-verified paper audit trail (DRE without VVPAT) continued to decline among jurisdictions since the 2018 general election, and the use of electronic poll books (e-poll books) continued to increase. More than 30% of jurisdictions reported using e-poll books (an increase of more than 5 percentage points from 2018), and 17 states reported that all jurisdictions used e-poll books.

OCA-APPX-0875



# Election Administration in the United States

The United States is notable for having a largely decentralized system for administering federal elections. Local jurisdictions have the primary responsibility of administering state and federal elections and of tabulating, reporting, and certifying results. The U.S. Constitution and various federal laws govern specific aspects of federal elections, and a small number of federal agencies—such as the U.S. Election Assistance Commission (EAC) and the Federal Voting Assistance Program (FVAP)—play a supportive role in election administration. Broad legal and procedural authority rests with the states,[1] territories, the District of Columbia, and local jurisdictions. As a result, a wide variation exists among and within state election policies and practices, and the policies and practices are constantly evolving. Nevertheless, U.S. elections generally follow a standard process. As shown in Figure 1, the election process can be viewed as a cycle.

1. The legal and procedural framework for elections is generally established in advance of a general election. This framework includes determining voter eligibility rules; how, when, and where voters may cast their ballots; and what technology will be used to support elections. Supported by state election offices, most of these policies and procedures are implemented by election officials at the local level (e.g., county, township, municipality).

2. To participate in elections, eligible citizens typically must register to vote, pursuant to the eligibility rules established by federal law and by their state.[2] In many states, voters must register in advance of a set registration deadline; in others, eligible individuals may register and cast a ballot on the same day, whether during an early voting period or on Election Day. Depending on state policy, eligible citizens may have multiple avenues for submitting their registration applications, including by mail, fax, or email; online registration websites; in person at an election office, at a motor vehicle office, at other state government agency offices, or at an armed forces recruitment office; or through a registration drive. States are also required to periodically examine their voter registration rolls and remove the records of voters who are no longer eligible, for instance, because the voter no longer resides in the state or jurisdiction in which they are registered, the voter has failed to respond to a notice sent to them by mail and has not voted in the two most recent federal general elections, the voter is deceased, or the voter has received a criminal conviction that disqualifies them from voting. The voter may also directly inform the election office of a change in residency, which begins the process of designating a voter as inactive and ultimately removing them from the voter registration roll. The process of updating voter registration rolls and removing ineligible voters is referred to as list maintenance.

3. When a federal general election is approaching, voting begins well in advance of Election Day for many voters, including eligible military voters and overseas citizens who are absent from their voting residence, for whom the right to participate in federal elections is protected under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). In addition, all

---

[1] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia, and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Election Administration Policy Survey and EAVS data.

[2] North Dakota is the only state that does not require citizens to register before casting a ballot in an election.

OCA-APPX-0876

states provide avenues for voters to cast ballots before Election Day. This may include voting a mailed ballot, casting a ballot in person at a dedicated early voting site, or receiving and casting a ballot at an election office. Some states allow any eligible voter to cast their ballot before Election Day, whereas others restrict early voting and mail voting only to certain segments of the population, such as voters who are absent from their home jurisdiction on Election Day, voters with illnesses or disabilities, voters over a certain age, or voters who provide a statutorily valid excuse. The voting options that are available to voters and the timelines for mail voting and in-person early voting vary by state and by local jurisdiction.

*Figure 1. The U.S. Election Process*

4. Voters who do not cast ballots beforehand may vote on Election Day at in-person voting sites staffed by poll workers. In most states, individuals whose eligibility cannot be verified at the

OCA-APPX-0877



time of voting may cast a provisional ballot. Election officials then investigate the eligibility of individuals who cast provisional ballots to determine whether their ballots should be counted, either in full or in part, or rejected.

5. After the polls close on Election Day, the process of counting ballots to determine the final election results begins. This may also be referred to as tabulation or canvassing. State policies vary on when counting may begin—some states may begin pre-processing mailed ballots (e.g., opening envelopes, verifying the mail voter's eligibility to cast a ballot, removing ballots from secrecy envelopes to prepare them for counting) before Election Day, whereas other states require that in-person polls must be closed before any ballots can be counted. Depending on state law and on what equipment is used to process the ballots, ballot counting may take several days to complete.

6. Once the unofficial results of the election are known, state and local election officials review the results for accuracy and certify them as final. After this is complete, many states conduct audits of their election results and voting equipment to ensure that the established election procedures were followed and that the equipment functioned correctly. Certain election races may also be recounted if the margin of victory is close; if a candidate, party, or other authorized group requests a recount; or if a court orders a recount to be conducted.

The election process can be viewed as a cycle in the sense that the experiences from previous elections are used to inform decision-making for the legal and procedural framework for subsequent elections. Often, the successful approaches and innovations implemented in one state or local jurisdiction during an election are adopted by other states or localities in subsequent elections.

The COVID-19 pandemic was declared in March 2020 and impacted nearly all aspects of the 2020 voting process, from dates and deadlines to how voters were able to register to vote, options to cast a ballot, and how long it took to count the ballots. In some cases, certain state policies, such as those concerning mail and absentee voting, were expanded temporarily for the 2020 election cycle to address the COVID-19 restrictions.[3] Throughout the election, state and local election administrators, staff, and poll workers worked heroically to ensure voters were able to exercise their right to vote in a safe and secure manner.

## The Election Administration and Voting Survey (EAVS)

Since 2004, the EAC has conducted the EAVS following each federal general election.[4] The EAVS asks all 50 U.S. states, the District of Columbia, and the five U.S. territories—American Samoa,

---

[3] The 2020 Policy Survey and EAVS did not collect information on when a policy change was made, why it was made, or whether the change was temporary or permanent.

[4] The EAVS does not collect data on primary elections, run-off elections, or special elections. The data provided by states were only for the November 3, 2020, federal general election.

OCA-APPX-0878

Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands[5]—to provide data about the ways in which Americans vote and how elections are administered.

The EAVS provides the most comprehensive source of state and local jurisdiction-level data about election administration in the United States. These data play a vital role in helping election officials, policymakers, and other election stakeholders identify trends, anticipate and respond to changing voter needs, invest resources to improve election administration and the voter experience, and better secure U.S. elections infrastructure. The EAVS data make it possible to examine the details of the U.S. elections infrastructure and to produce a generalizable understanding of the core aspects of the election process and the management challenges faced by election officials. The survey provides policymakers and the public with critical information every two years about how federal elections are conducted, and it helps the EAC fulfill its congressionally mandated reporting requirements. The EAVS is also invaluable to election officials themselves. These officials use the EAVS to manage election oversight, conduct issue analysis and strategic planning, and create training and promotional materials.

The EAC also uses the EAVS data to create research and clearinghouse resources to advance the agency's mission and to better support election officials and voters as well as to inform lawmakers and national-level stakeholders about the impact of federal voting laws and the changing landscape of U.S. elections. The EAVS helps the EAC meet its mandate under the Help America Vote Act (HAVA) to serve as a national clearinghouse and resource for the compilation of information and to review procedures with respect to the administration of federal elections. The EAVS sections related to voter registration and UOCAVA voting allow states to satisfy their data reporting requirements established, respectively, by the National Voter Registration Act (NVRA) and UOCAVA. The EAVS also helps FVAP fulfill its obligations under UOCAVA to reduce obstacles to ensure military and overseas voting success by collecting data about how UOCAVA voters participate in elections.

The EAVS data collection effort consists of two separately administered surveys: the Policy Survey and the EAVS. The Policy Survey, which is due in advance of each federal general election, collects data on state election policies and procedures to provide context for the quantitative data included in each state's EAVS submission. The EAVS, which is due after each federal general election is complete, collects data on voter registration, UOCAVA voters, mail voting, in-person voting and polling operations, provisional ballots, voter participation, and election technology. Complete details about the methodology of the 2020 Policy Survey and the EAVS, including an outline of the survey questionnaires, the data collection templates, the data validation process, and technical assistance provided to respondents, can be found in Chapter 5, "Survey Methodology and Procedures," of this report.

Providing EAVS data is frequently a joint task undertaken by state and local jurisdiction election officials. Although 25 states and territories were able to provide all EAVS data from their centralized election database, 31 states and territories relied on local jurisdictions to provide responses to some

---

[5] Puerto Rico provides EAVS data only in presidential election years, as it does not hold elections for federal candidates in midterm election years. American Samoa did not participate in the 2016 EAVS. The Northern Mariana Islands participated in the EAVS for the first time in 2020.

OCA-APPX-0879

or all of the EAVS questions. An analysis of how states provide EAVS data can be found in Chapter 2 of this report.

Chapter 1 of this report covers turnout and modes of voting in the 2020 general election, polling places and poll workers, and election technology. This chapter also comprises a non-exhaustive overview of the data provided by states and jurisdictions in the EAVS. State election policies and practices are featured in Chapter 2, "Election Law and Procedure: The Policy Survey." Voter registration is covered in greater detail in Chapter 3, "Voter Registration: The NVRA and Beyond." UOCAVA voting is discussed further in Chapter 4, "Military and Overseas Voting in the 2020 General Election: UOCAVA."

## Overall EAVS Response Rates

The analysis in this report is based on information and data submitted and certified by the 50 U.S. states, five territories, and the District of Columbia. These 56 entities comprised 6,460 jurisdictions.[6] The state-level response rate was 100% (56 of 56 entities provided data), and the jurisdiction-level response rate was 100% (6,460 of 6,460 jurisdictions provided data).[7] During the data collection period, efforts were made to maximize the completeness and accuracy of the data reported. These efforts are outlined in the methodology of this report (Chapter 5). Instances when a state's data were not included in a calculation because of missing data or data quality issues are described in the footnotes and table notes that accompany the analysis in this report.

# Turnout in the 2020 General Election

According to the EAVS data submitted by states, there were 228,004,364 voters who were registered to vote in the United States as of November 3, 2020. Of this total, 209,441,338 were considered active voters, which means they had no additional processing requirements to fulfill before voting, and 18,523,963 were considered inactive voters, which means they required address verification under the provisions of the NVRA before they would be permitted to vote.[8] As a percentage of the 2019 CVAP estimate calculated by the U.S. Census Bureau, 88.2% of voting age

---

[6] What constitutes a jurisdiction for EAVS reporting is defined by how each state chose to provide data. For the 2020 EAVS, most states reported data on the county level (or county equivalent, such as parishes for Louisiana). Illinois, Maryland, Missouri, and Virginia reported data for independent cities in addition to counties. The territories, the District of Columbia, and Alaska each reported as a single jurisdiction. Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and Wisconsin reported data on the township level. Maine also reported its UOCAVA data in Section B as a separate jurisdiction, because this information was only collected at the state level. Michigan reported data for the county level, but most election administration activities take place in the 1,520 local election jurisdictions in the state. Two jurisdictions in Wisconsin were consolidated or annexed into other jurisdictions partway through 2020. See Appendix A in Chapter 5 of this report for a breakdown of the number of jurisdictions reported in each state and the response rate by survey section for each state.

[7] Appendix A of Chapter 5 of this report contains an analysis of state-level response rates to each section of the EAVS.

[8] The total number of registered voters was collected in item A1a of the EAVS. The total number of active voters was collected in item A1b. The total number of inactive voters was collected in item A1c. According to the 2020 Policy Survey, six states (Guam, Idaho, North Dakota, New Hampshire, the U.S. Virgin Islands, and Wyoming) did not distinguish between active and inactive voters in their registration records. These states were not required to provide data in item A1c of the EAVS. Casewise deletion at the state level was used in this calculation.

OCA-APPX-0880

## Calculating Turnout Rates

When assessing election administration, one primary outcome of interest is voter turnout, which is calculated by dividing the number of people who participated in an election by the number of people who could have participated. The EAVS provides a measure of the total number of voters who cast a ballot that was counted in an election (item F1a) for the numerator in this equation. However, multiple denominators can be used:

- **Number of registered voters or active voters.** The number of people a state reports as registered and eligible to vote (A1a in the EAVS). Some states separately report the number of active voters who have no additional processing requirements to fulfill before voting (A1b in the EAVS). This number is available for states and sub-state EAVS jurisdictions.

$$\frac{F1a\ of\ EAVS}{A1a\ or\ A1b\ of\ EAVS} \times 100 = Registration\ Turnout\ Rate$$

- **Citizen voting age population (CVAP).** The estimate of the total number of U.S. citizens 18 years of age or older based on the U.S. Census Bureau's ACS. This number is available for states and most sub-state EAVS jurisdictions but not for U.S. territories, except for Puerto Rico.

$$\frac{F1a\ of\ EAVS}{CVAP} \times 100 = CVAP\ Turnout\ Rate$$

- **Voting Eligible Population (VEP).** The measure of the CVAP minus those who are ineligible to vote (such as persons with disqualifying felony convictions) and persons who are in the military or citizens living overseas. This number is available for states, but not territories or for sub-state jurisdictions.

$$\frac{F1a\ of\ EAVS}{VEP} \times 100 = VEP\ Turnout\ Rate$$

Relying on the number of registered or active voters can be problematic for calculating turnout because it is often challenging for states to keep voter registration rolls fully up to date (see Chapter 3 of this report for a discussion of list maintenance practices). Using VEP as the denominator in turnout calculations would somewhat overrepresent voter turnout—since EAVS data explicitly include persons covered by UOCAVA—and would restrict the ability to estimate turnout for sub-state jurisdictions. Although each denominator has its limitations, the EAC uses CVAP to calculate turnout in this report because of its availability for the majority of jurisdictions that report EAVS data and because it provides a more accurate picture of the population covered by the EAVS. Appendix D of Chapter 5 of this report contains recommendations on how to calculate additional EAVS rates.

citizens were registered as active voters for the 2020 general election.[9] This is an increase of 3.6 percentage points from the 2016 CVAP active voter registration rate of 84.6%. Further details about

---

[9] This report uses the 1-year American Community Survey (ACS) state estimate for 2019 instead of the 5-year estimate to ensure that the CVAP is as current as possible. The CVAP estimates for 2020 were not available by the time this report was finalized. The active CVAP registration rate was calculated as the total number of active voters (A1b of the EAVS) divided by CVAP. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included in this calculation because the U.S. Census Bureau does not calculate a CVAP for these territories. North Dakota was not included

OCA-APPX-0881

voter registration, including how voters registered to vote, the use of same-day voter registration (SDR), and list maintenance, can be found in Chapter 3 of this report.

States also reported that a total of 161,303,109 voters cast ballots that were counted for the 2020 general election. This represents a CVAP turnout rate of 67.7% nationwide.[10] Turnout for the 2020 general election increased 6.7 percentage points from the 2016 CVAP turnout rate of 61%.[11] Despite many election administration challenges related to the COVID-19 pandemic, the 2020 election had the highest turnout rate of any EAVS to date.

Figure 2 shows that nearly all states experienced higher turnout rates in 2020 than they did for the 2016 general election. Twenty-one states had more than 70% of their CVAP cast a ballot that was counted for the 2020 general election; only four states had turnout over 70% for the 2016 election. In addition, three states—Utah, Hawaii, and Texas—had turnout increases of more than 10 percentage points compared to the 2016 general election. The states with the highest turnout increases tended to be those that made mail voting easy for voters. Hawaii and Utah had both enacted all-mail elections in 2019, and Nevada, New Jersey, and Vermont did the same as a temporary measure in response to the COVID-19 pandemic. Arizona, California, Montana, and Washington had already been conducting their elections predominantly or entirely by mail before 2020. Michigan automatically sent mailed ballot request forms to all registered voters for the 2020 general election. These states, along with Georgia, Tennessee, and Texas, each had turnout increases of more than 8 percentage points from 2016 to 2020. Only one U.S. territory—Puerto Rico—reported a decrease in turnout since the 2016 general election.

Another notable finding from the 2020 EAVS was a change in how voters cast their ballots. Historically, the majority of voters have cast their ballots in person at a physical polling place on Election Day. This method of voting was used by 54.5% of voters in 2016 and by 58.2% of voters in 2018. However, in 2020, the percentage of these voters fell to 30.5%.[12] For the first time in EAVS history, a majority of voters did not cast their ballots in person on Election Day; in 2020, Election Day in-person voting was less commonly used than mail voting or in-person early voting. The nationwide number of voters who vote in person on Election Day has likewise been steadily decreasing, from 72,393,400 in 2016 to 67,133,886 in 2018 and to 47,148,389 in 2020. This is despite an overall

---

in this calculation because this state does not have voter registration. Casewise deletion at the state level was used in this calculation.

[10] The total number of voters who cast a ballot that was counted was reported in item F1a of the EAVS. The CVAP turnout rate was calculated by dividing F1a by CVAP. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included in this calculation because the U.S. Census Bureau does not calculate CVAP for these territories. Casewise deletion at the state level was used in this calculation.

[11] For the 2020 EAVS, the question about voter participation was reworded. In 2016, this question collected data on ballots cast (independent of outcome), whereas in 2020, it collected data on ballots cast and counted. Thus, it is likely that the 2016 turnout calculation was higher than it would have been if the 2020 question wording had been used, thus, underestimating the true turnout change from 2016 to 2020.

[12] Election Day in-person turnout was calculated by dividing the total number of Election Day in-person voters who cast a ballot that was counted (item F1b of the EAVS) by the total number of voters who cast a ballot that was counted (item F1a). Oregon and Washington did not report any in-person Election Day voters because these states conduct their elections almost entirely by mail. Casewise deletion at the state level was used in this calculation.

OCA-APPX-0882

**Figure 2. Nearly All States Experienced Turnout Increases in the 2020 General Election**

| State | Change |
|---|---|
| Minnesota | +4.9% |
| Colorado | +4.2% |
| Maine | +3.2% |
| New Hampshire | +2.9% |
| Washington | +9.9% |
| Oregon | +6.4% |
| Wisconsin | +6% |
| Vermont | +8.4% |
| Michigan | +8.2% |
| Montana | +8.8% |
| New Jersey | +8.5% |
| Iowa | +3.9% |
| Massachusetts | +3.7% |
| Utah | +15% |
| Virginia | +6.1% |
| Florida | +5.3% |
| North Carolina | +7.4% |
| Connecticut | +6.3% |
| Pennsylvania | +7.3% |
| Delaware | +6.7% |
| Maryland | +4.7% |
| Nebraska | +5.3% |
| Missouri | +3.7% |
| Idaho | +7.7% |
| California | +9.6% |
| Alaska | +6.6% |
| Illinois | +5.9% |
| Ohio | +3.3% |
| Nevada | +8.6% |
| Arizona | +8.8% |
| Georgia | +8.4% |
| Kansas | +6.6% |
| South Dakota | +6.6% |
| Rhode Island | +5% |
| South Carolina | +7.1% |
| District of Columbia | +2.7% |
| North Dakota | +3% |
| Wyoming | +5% |
| Kentucky | +5.3% |
| New York | +6.1% |
| Louisiana | +3.3% |
| Alabama | +3.9% |
| Indiana | +4% |
| New Mexico | +6.3% |
| Texas | +11% |
| Tennessee | +8.2% |
| Mississippi | +4.9% |
| Hawaii | +14.4% |
| West Virginia | +6% |
| Oklahoma | +2.2% |
| Arkansas | +6.2% |
| Puerto Rico | +8.9% |

Percentage of Voter Turnout

● 2016 CVAP Turnout   ● 2020 CVAP Turnout

*Source: The CVAP turnout was calculated as F1a/CVAP x 100 for both 2016 and 2020. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included, as CVAP is not available for these territories. Casewise deletion was used at the state level in calculating turnout. Change between 2016 and 2020 is measured in percentage points.*

OCA-APPX-0883

increase in 2020 in the number of states with a policy that allows for vote centers (either on a statewide level or in certain jurisdictions), which allow voters to cast their ballots at any polling location or vote center within their jurisdiction rather than at an assigned polling location. Twenty-one states reported allowing vote centers for the 2020 general election compared to 17 states in 2018.[13]

The percentage of voters who used a mailed ballot to vote surged, from 24.5% in 2016 and 25.6% in 2018 to 43.1% in 2020. The number of voters who used in-person early voting also increased from previous years, although the increase was not as large. In 2016, 25.3% of voters cast their ballots early in person, and 22% did so in 2018, compared to 30.6% for the 2020 general election. The

### *Figure 3. Mail Voting Was the Most Common Way for Voters to Cast Their Ballots in 2020*



Mode of Turnout

*Source: Election Day turnout was calculated as F1b/F1a x 100 for all years. Mail turnout was calculated as (F1d+F1g)/F1a x 100 for all years. In-person early turnout was calculated as F1f/F1a x 100 for all years. UOCAVA, provisional, and other turnout was calculated as (F1c+F1e+F1h)/F1a x 100 for all years. Casewise deletion was used at the state level (percentages for each mode of voting were calculated independently, and only states that reported data for a given mode were included in the analysis), and because of this, percentages do not sum to 100%.*

---

[13] Information on vote center policies was provided in Q13 of the 2018 Policy Survey and Q25 of the 2020 Policy Survey. Six states that did not offer vote centers in 2018 did so in 2020, and two states that offered vote centers in 2018 did not in 2020.

OCA-APPX-0884

EAVS data confirm that the ways voters cast their ballots changed because of the COVID-19 pandemic. Many states took steps to reduce crowding at in-person polling places on Election Day by expanding the use of mail and early voting, and the EAVS data also confirm that voters made use of these options. Figure 3 shows the most commonly used modes of voting for the 2016, 2018, and 2020 general elections.

## Voting by Mail

All states and territories and the District of Columbia offer their citizens the opportunity to cast their ballots by mail in federal general elections, although the number of citizens who cast their ballots using this method and the circumstances under which citizens can vote a mailed ballot vary widely among states. Some states use the term "absentee voting" instead of "mail voting."[14] For purposes of this report, mail voting refers to the process by which:

1. An individual receives a ballot in the mail before the election. In some states or jurisdictions, election offices automatically send a mailed ballot to all registered voters (often referred to as "all-mail elections"), whereas others automatically send mailed ballots only to individuals on a permanent mail voting list. In other states, individuals must file an application to request a ballot for each election for which they wish to vote a mailed ballot.[15]

2. The individual marks the mailed ballot with their preferences at home instead of at an election office or polling location.

3. The individual returns the voted ballot to election officials, typically by sending the voted ballot through the mail, by returning the voted ballot to an in-person voting site or election office, or by depositing the voted ballot in a secure designated drop box.[16] The options voters have for returning voted mailed ballots are dictated by state policy.

The 2020 Policy Survey results show that many states made changes to their mail voting policies since the 2018 general election. However, the Policy Survey did not record precisely when these changes were made, the reason behind the policy changes, or whether the policy changes were permanent or temporary. In 2020, 39 states did not require an excuse for voters to request a mailed ballot; six of these states and one territory (Delaware, Massachusetts, Michigan, Missouri, South Carolina, Virginia, and the U.S. Virgin Islands) required an excuse in 2018 but not in 2020. In addition, 14 states conducted all-mail elections. Ten states (California, Colorado, the District of Columbia, Hawaii, New Jersey, Nevada, Oregon, Utah, Vermont, and Washington) conducted all-mail elections on a statewide basis, and four states did so in select jurisdictions (Idaho, Minnesota, Montana, and Nebraska). However, states and jurisdictions that conducted their elections by mail

---

[14] In recognition of the fact that many states no longer require a person to be absent from their election jurisdiction in order to be permitted to cast a ballot by mail, the EAVS uses the term "mail voting."

[15] In some states, applications to vote by mail are valid for multiple elections, such as for the duration of a two-year election cycle or for all elections within a calendar year. The 2020 EAVS and Policy Survey did not collect data on how long mailed ballot applications are valid for.

[16] The 2020 EAVS did not collect information on which states used drop boxes, how many drop boxes were in use, or how many ballots were returned via drop boxes.

OCA-APPX-0885

typically also offered some form of in-person voting. For a more thorough look at the policies surrounding mail voting, please see Chapter 2, "Election Law and Procedure: The Policy Survey."

States reported that 69,486,968 ballots were cast using a mailed ballot and counted for the 2020 general election, more than double the number of ballots cast using a mailed ballot for the 2016 general election (33,140,080).[17] The mailed ballot voting turnout rate increased by nearly 20 percentage points, from 24.5% in 2016 to 43.1% in 2020.

#### Table 1. Jurisdictions Saw Large Increases in Mail Turnout From 2018 to 2020

| Type of Jurisdiction | 2018 Average Mail Turnout | 2020 Average Mail Turnout | Turnout Change |
|---|---|---|---|
| Jurisdiction was in a state that introduced a statewide all-mail election in 2020 | 9.9% | 72.0% | 62.1% |
| Jurisdiction was in a state that required an excuse for mail voting in 2018 but did not in 2020 | 5.9% | 30.8% | 24.9% |
| Jurisdiction was in a state that did not conduct all-mail elections in either 2018 or 2020 | 11.4% | 30.6% | 19.2% |
| Jurisdiction was in a state that did not change its excuse policy for mail voting from 2018 to 2020 | 10.2% | 25.8% | 15.6% |

*Source: The mail turnout rate for both 2018 and 2020 was calculated as (F1d+F1g)/F1a x 100. Jurisdictions' classification on their state's all-mail election policy was based on their state's responses to Q9a of the 2018 Policy Survey and Q18a of the 2020 Policy Survey; jurisdictions in states that had all-vote-by-mail elections in select jurisdictions only were excluded from the analysis of mail voting policies. Jurisdictions' policies on whether to require an excuse for mail voting were based on their state's responses to Q8 of the 2018 Policy Survey and Q17 of the 2020 Policy Survey; jurisdictions in states that conduct all-mail elections, either statewide or in select jurisdictions, were excluded from the analysis of mail voting excuse policies. Casewise deletion was used at the jurisdiction level (only jurisdictions that reported data in F1d and/or F1g as well as reported data in F1a in both 2018 and 2020 were included in the analysis). All mail turnout increases from 2018 to 2020 were statistically significant at p < 0.001.*

Jurisdiction-level analysis also shows large increases in mail voting from the 2018 to the 2020 general elections across a variety of policy configurations, particularly where mail voting was made more widely available. These increases are shown in Table 1. The largest increases occurred in states that did not have all-mail elections in 2018 but implemented this type of voting on a statewide level in 2020. Jurisdictions in these states had an average mail turnout level of 9.9% in 2018, which increased to 72% for the 2020 general election—an increase of 62.1 percentage points. The next largest increase occurred in jurisdictions whose states removed the requirement to provide an excuse in order to request a mailed ballot in 2020. These jurisdictions had an average mail turnout rate of 5.9% in 2018 and 30.8% in 2020, an increase of 24.9 percentage points. States that did not change their policies on all-mail elections or excuse-required mailed ballot voting also saw increases

---

[17] The total number of mail votes was calculated by adding the number of voters who cast a mailed ballot and whose ballots were counted (item F1d of the EAVS) and the number of voters who cast a mailed ballot in a jurisdiction that conducts elections entirely by mail and whose ballots were counted (item F1g of EAVS). Mail turnout was calculated by dividing this figure by the total number of ballots that were cast and counted (item F1a of EAVS). Casewise deletion at the state level was used in these calculations.

OCA-APPX-0886

in their mail voting rates from 2018 to 2020, but these average increases were smaller, at 19.2 percentage points and 15.6 percentage points, respectively.

States reported transmitting a total of 90,687,978 mailed ballots to non-UOCAVA voters for the November 2020 general election, of which 70,551,227 were returned by voters. This means that 77.8% of the transmitted mailed ballots were returned by voters, and of the returned ballots, 98.8% were counted and 0.8% were rejected.[18] Although the number of mailed ballots that were transmitted more than doubled since 2016—when 41,651,526 transmitted mailed ballots were reported—the mailed ballot return, count, and rejection rates were not significantly different between the 2016 and 2020 general elections at the national level.[19]

Table 2 shows the most common reasons reported for rejecting mailed ballots in the 2020 general election. In this election, rejections for having a non-matching signature accounted for nearly one-third (32.8%) of the total rejected mailed ballots. The next most common reason (22.5%) was "other," which comprised reasons such as the voter was not eligible to vote in the jurisdiction, the ballot was missing an important document (such as an affidavit or certification), the document was incomplete or insufficient, there were identifying marks on the ballot, the ballot was missing a secrecy envelope or was outside of the secrecy envelope, or a combination of reasons.[20] Other common reasons for rejection included that the voter had already voted in person (13.5%), the ballot was received after the state's deadline for submitting a mailed ballot (12.1%), and there was no voter signature on the mailed ballot or the mailed ballot envelope (12.1%).

Additional information about mail voting in the 2020 general election, including statistics by state, can be found in Appendix A of this chapter.

---

[18] The mailed ballot return rate was calculated by dividing the total number of mailed ballots returned by voters (item C1b of EAVS) by the total number of mailed ballots transmitted (item C1a of EAVS). The mailed ballot count rate was calculated by dividing the number of counted mailed ballots (item C3a) by the total number of mailed ballots returned by voters (item C1b). The mailed ballot rejection rate was calculated by dividing the number of mailed ballots rejected (item C4a) by the total number of mailed ballots returned by voters (item C1b). A total of 0.4% of the mailed ballots returned by voters (C1b) were not classified as having been either counted (C3a) or rejected (C4a). Alabama did not provide sufficient data to calculate the mailed ballot count and rejection rates. Casewise deletion at the state level was used in these calculations. The EAVS data also show that nationwide, 1.4% of the transmitted mailed ballots were returned as undeliverable (C1c/C1a); 3.6% were surrendered, spoiled, or replaced (C1d/C1a); 0.5% were surrendered at the polls, so the voter could cast a provisional ballot (C1e/C1a); 16.8% had an unknown status, which included voters who were transmitted a mailed ballot but chose not to vote (C1f/C1a); and 1% of mailed ballots reached some other status ([C1g+C1h+C1i]/C1a). Casewise deletion at the state level was used in these calculations.
[19] The comparisons were statistically insignificant at $p > 0.05$.
[20] In the 2020 EAVS, states reported other reasons for rejecting mailed ballots in items C4p_Other, C4q_Other, and C4t_Other.

OCA-APPX-0887



**Table 2. The Most Common Reason for Rejecting Mailed Ballots Was for a Non-Matching Signature**

| Reason | Percentage of Rejected Ballots |
|---|---|
| Non-matching signature | 32.8% |
| Other reason given | 22.5% |
| Voter already voted in person | 13.5% |
| Ballot not received on time/missed deadline | 12.1% |
| No voter signature | 12.1% |
| No witness signature | 5.6% |
| Ballot returned in an unofficial envelope | 4.2% |
| Multiple ballots returned in one envelope | 2.1% |
| First-time voter without proper identification | 2.0% |
| Voter deceased | 1.6% |
| Ballot missing from envelope | 1.5% |
| Envelope not sealed | 0.9% |
| No resident address on envelope | 0.8% |
| No ballot application on record | 0.6% |
| No election official's signature on ballot | 0.1% |

*Source: Rejections for non-matching signature was calculated as C4e/C4a x 100. Rejections for other reasons was calculated as (C4p+C4q+C4r)/C4a x 100. Rejections because the voter already voted in person was calculated as C4m/C4a x 100. Rejections because the ballot was not received on time was calculated as C4b/C4a x 100. Rejections because the ballot lacked a voter signature was calculated as C4c/C4a x 100. Rejections because the ballot lacked a witness signature was calculated as C4d/C4a x 100. Rejections because the ballot was in an unofficial envelope was calculated as C4g/C4a x 100. Rejections because multiple ballots were returned in a single envelope was calculated as C4k/C4a x 100. Rejections because the first-time voter did not provide proper identification was calculated as C4n/C4a x 100. Rejections because the ballot was from a deceased voter was calculated as C4l/C4a x 100. Rejections because the ballot was missing from the envelope was calculated as C4h/C4a x 100. Rejections because the envelope was not sealed was calculated as C4i/C4a x 100. Rejections because there was no resident address on the envelope was calculated as C4j/C4a x 100. Rejections because there was no ballot application on record was calculated as C4o/C4a x 100. Rejections because there was no election official's signature on the ballot was calculated as C4f/C4a x 100. Casewise deletion was used at the state level (percentages for each rejection reason were calculated independently and only states that reported data for a given reason were included in the analysis), and because of this, percentages do not sum to 100%.*

## In-Person Voting Before Election Day

Most states allow some kind of in-person voting before Election Day. This type of voting generally falls into two categories:

- A voter may go to a polling place before Election Day, receive a ballot, vote their ballot while at the polling place, and place their completed ballot into a ballot box or tabulator.

OCA-APPX-0888

- A voter may go to an election office to pick up a ballot over the counter. In some states, the voter may be able to take their ballot home with them, whereas in other states, the ballot must be completed in the office. The ballot is then sealed in an envelope and tabulated along with ballots that are returned to the office by mail according to local procedures.

The type of in-person voting that takes place before Election Day and the populations that may use this method of voting are determined by state law. Different states use the terms "in-person early voting" and "in-person absentee voting" to describe both of the voting methods described above, although other terms exist as well (see Chapter 2 of this report).[21] Some states offer both types of voting activities. For example, voters in Ohio may go to their county's designated early voting site, vote in person, and cast their ballot on a direct-recording electronic device or scan their ballot in a precinct scanner. Voters also have the option of completing a ballot request form, picking up a ballot from their county's election office, and returning their ballot in person, by drop box, or by mail at a later date.

Fifty-five of the states and territories (all but New Jersey) reported offering some form of in-person voting before Election Day to their population for the 2020 general election. Of these states, 12 required voters to provide an approved excuse to cast an early ballot, and 43 states allowed for no-excuse early voting.[22] Overall, three more states offered no-excuse early voting for the 2020 general election compared to the 2018 general election. Further details about state policies on early voting can be found in Chapter 2 of this report.

For the 2020 general election, states reported that 41,266,229 ballots were cast through in-person early voting and were counted, a 71.1% increase compared to the number cast by this method for the 2016 general election (24,124,466). Although the rate of early voting increased from 2016 to 2020, from 25.3% to 30.6%, the rate of increase was not as large as it was for mail voting.[23]

It should be noted that some states may have reported mailed ballots returned via drop box with other early ballots. Currently, the EAVS does not collect data on the number of ballots returned via drop box, and some states' data collection practices do not distinguish between early ballots and ballots returned via a drop box.

---

[21] The EAVS questions use the term "in-person early voting" to refer to all types of in-person voting that take place before Election Day. The question instructions specify that in-person absentee voting should be reported as in-person early voting in EAVS data. However, some states' data management systems do not distinguish in-person absentee voters from mail voters, so not all states with in-person absentee voting were able to report data on how many of their voters voted in this way.

[22] The terminology a state used to refer to the process of allowing individuals to cast their ballots in person before Election Day was collected in item Q24 of the 2020 Policy Survey. Data on whether a state required a voter to provide an excuse to cast a ballot in person before Election Day was collected in item Q24a.

[23] The total number of in-person early ballots cast and counted was collected in item F1f of the EAVS. The early voting turnout rate was calculated by dividing this figure by the total number of ballots that were cast and counted (item F1a of the EAVS). Alabama, Connecticut, Iowa, Missouri, Mississippi, Montana, New Hampshire, New Jersey, Oregon, Pennsylvania, and Rhode Island did not report data in F1f, either because they did not offer in-person early voting (in the case of New Jersey) or because the number of in-person early voters could not be tracked separately from other modes of participation. Casewise deletion at the state level was used in this calculation.

OCA-APPX-0889



## Provisional Voting

HAVA introduced provisional voting as a way for a voter to cast a ballot when the voter's registration status cannot be verified at the time of voting, when there is some indication the voter may have already cast another ballot (for instance, by mail), or when the voter's eligibility to vote is challenged. Provisional ballots are kept separate from other election ballots and are later fully counted, partially counted, or rejected depending on whether the provisional voter's eligibility can be verified in the days following the election according to the state's rules for this process. The provisional ballot process helps ensure each qualified voter casts only one ballot that is counted and allows the voter additional time to prove their eligibility to vote if necessary. Certain states are exempt from HAVA's provisional ballot requirements because they allowed SDR at the time the law was enacted. In addition, North Dakota is exempt from this provision of HAVA because it does not require citizens to register to vote.

In the 2020 Policy Survey, 49 states and territories and the District of Columbia reported offering provisional ballots to voters. Five states and one territory—Idaho, Minnesota, North Dakota, New Hampshire, Vermont, and Puerto Rico—did not.[24] States reported that the most common reasons for offering a voter a provisional ballot included that an election official challenged a voter's eligibility to vote (46 states), the voter was not on the list of eligible voters (43 states), the voter lacked proper identification (40 states), the voter did not reside in the precinct in which they were attempting to vote (40 states), and another person (not an election officer) challenged a voter's eligibility to vote (28 states).[25] If a voter cast a provisional ballot in the wrong precinct, four states reported that they would fully count the entire ballot, 20 states would partially count the ballot (e.g., only count the items on the ballot for which the voter would have been eligible had they voted in the correct precinct), and 26 states would reject the entire ballot.[26] For more information on provisional voting policies, including the deadlines by which provisional ballots needed to be adjudicated, please see Chapter 2 of this report.

States reported 1,316,945 provisional ballots were cast and counted for the 2020 general election. This represents a slight decline from previous years: 1,483,708 provisional ballots had been cast in 2018 and 1,897,631 in 2016. Provisional voting as a percentage of turnout has continued its rate of decline in presidential elections, from 1.7% in 2012 to 1.4% in 2016 to 0.8% in 2020.[27] The rate of provisional voting declined twice as fast between the 2016 and the 2020 general elections as it did between the 2012 and the 2016 general elections.

---

[24] Information on states' use of provisional voting was collected in Q32 of the 2020 Policy Survey.

[25] Information on the circumstances under which a state uses provisional ballots was collected in Q32a of the 2020 Policy Survey.

[26] Information on how a state would treat a provisional ballot cast in the wrong precinct was collected in Q32c. Percentages were calculated using the number of states who reported using provisional voting in Q32.

[27] The total number of provisional ballots cast and counted was collected in item F1e of the EAVS. The provisional voting turnout rate was calculated by dividing this figure by the total number of ballots that were cast and counted (item F1a of the EAVS). Idaho, Minnesota, North Dakota, New Hampshire, and Vermont did not report data on provisional ballots in the 2020 EAVS because, as confirmed in the Policy Survey, these states do not offer provisional ballots to voters. Puerto Rico reported in the Policy Survey that it does not offer provisional ballots but reported data on provisional ballots in the EAVS. Casewise deletion at the state level was used in this calculation.

OCA-APPX-0890

Nationally, 78.3% of provisional ballots were counted,[28] either in full or in part, with 21.3% being rejected.[29] The most common reasons that states reported for rejecting provisional ballots included that the voter was not registered in the state (accounting for 54.8% of rejections), "other reasons" (21.2%), the voter attempted to vote in the wrong jurisdiction (12.4%), the voter had already cast a ballot through another mode of voting (5%), the voter attempted to vote in the wrong precinct (4.8%), the voter failed to provide sufficient identification (3.4%), the envelope or ballot was incomplete or illegible (3.3%), and the voter's signature did not match the signature on record (2.2%).[30] Furthermore, 0.9% of the provisional ballots reached another adjudication aside from being either counted or rejected: the largest numbers of these ballots came from Ohio, Texas, Missouri, and Illinois.[31]

## UOCAVA and Other Modes of Voting

Absentee and mail voting have long been used to provide individuals in the military or U.S. citizens who live overseas or who are absent from their residence with a way to participate in federal elections. The distinct needs of members of the uniformed services and overseas citizens remain an area of critical concern in election administration, and these individuals are given special voting protections under UOCAVA and its amendments.[32] UOCAVA voters are provided certain rights to fully

---

[28] The total number of counted provisional ballots was calculated by summing the number of provisional ballots fully counted (item E1b of the EAVS) and the number of provisional ballots partially counted (item E1c). The percentage of counted provisional ballots was calculated by dividing the sum of E1b and E1c by the sum of all provisional ballot adjudications (items E1b, E1c, E1d, and E1e). Maine reported in its EAVS survey comments that all provisional ballots are counted. The data that New Jersey reported in E1e (provisional ballots that reached another adjudication) were included in this calculation, because the state explained in its survey comments that this item included provisional ballots that were accepted in part or in full. The data that El Dorado, San Bernardino, and Stanislaus counties in California reported in E1e were included in this calculation for the same reason. Casewise deletion at the state level was used in these calculations.
[29] The total number of rejected provisional ballots was collected in item E1d of the EAVS. The percentage of rejected provisional ballots was calculated by dividing this figure by the sum of all provisional ballot adjudications (items E1b, E1c, E1d, and E1e). Casewise deletion at the state level was used in this calculation.
[30] The number of provisional ballots rejected because the voter was not registered in the state was collected in item E2b of the EAVS. The number of provisional ballots rejected because the voter attempted to vote in the wrong jurisdiction was collected in item E2c. The number of provisional ballots rejected because the voter attempted to vote in the wrong precinct was collected in item E2d. The number of provisional ballots rejected because the voter did not provide sufficient identification was collected in item E2e. The number of provisional ballots rejected because the envelope and/or ballot were incomplete or illegible was collected in item E2f. The number of provisional ballots rejected because the voter's signature did not match the signature on record was collected in item E2i. The percentage of provisional ballots rejected for each of these reasons was calculated by dividing the figure by the total number of provisional ballots rejected (item E2a). Casewise deletion at the state level was used in these calculations.
[31] The total number of provisional ballots that reached an adjudication aside from being counted or rejected was collected in item E1e of the EAVS. The percentage of other provisional ballots was calculated by dividing this figure by the sum of all provisional ballot adjudications (items E1b, E1c, E1d, and E1e). As explained in footnote 28, the E1e data for the state of New Jersey and the counties of El Dorado, San Bernardino, and Stanislaus in California were included in the calculation for counted provisional ballots. Ohio explained in its survey comments that this data included provisional ballots cast under an APRI exception but did not provide a definition for this term. Missouri explained in its survey comments that this data included provisional ballots supplied to voters who were registered but did not have a form of identification. Casewise deletion at the state level was used in this calculation.
[32] The uniformed services are the armed forces—the Army, Navy, Marine Corps, Air Force, and Coast Guard—as well as the U.S. Public Health Service Commissioned Corps, the National Oceanic and Atmospheric Administration (NOAA) Commissioned Officer Corps, and the U.S. Merchant Marine. Uniformed services members, their spouses, and their eligible dependents are, together, referred to as uniformed services voters. Overseas citizens are U.S. citizens living outside of the United States who are not uniformed services voters and are also protected by UOCAVA.

OCA-APPX-0891

participate in federal elections and are given special considerations as to when their ballots are sent, how their blank ballots can be transmitted, and how and when they may return their voted ballots.

For the 2020 general election, states reported 938,297 UOCAVA ballots that were cast and counted. This total represents a sizeable increase from 2016 and 2018, when 649,427 and 358,137 UOCAVA ballots were cast, respectively. However, despite the increase in the number of voters who participated in the 2020 general election, UOCAVA voting as a percentage of the overall electorate stayed relatively the same in 2020. In 2016, 0.5% of voters were UOCAVA voters, and in 2020, UOCAVA voters comprised 0.6% of the electorate.[33] Nationwide, 97.6% of the UOCAVA absentee ballots that were returned by voters were counted, and 2.1% of the returned ballots were rejected.[34]

Chapter 4 of this report contains a complete discussion of the EAC's history of collecting data on voters covered by UOCAVA; a full analysis of the data collected about these voters and their ballots in 2020, including ballots transmitted, returned, counted, and rejected; and the use of the Federal Write-In Absentee Ballot (FWAB). Chapter 2 of this report contains a complete discussion of state policies regarding UOCAVA voting.

In addition to ballots that were cast at a physical polling place on Election Day, by mail, by in-person early voting, and by provisional voting, states had the opportunity to report data on any other modes of voting that were offered in the state in 2020.[35] A total of 1,290,577 ballots were reported as cast and counted that could not be categorized according to one of the modes listed in the EAVS question. The highest numbers of these votes were reported in California (923,698 ballots), Florida (184,533 ballots), North Carolina (168,900 ballots), and Wisconsin (7,387 ballots). The most common reasons for reporting data in this item included mailed ballots that could not be distinguished as being from UOCAVA or non-UOCAVA voters, conditional voter registration (CVR) voters in California, curbside absentee voters in North Carolina, and "other," "unknown," or "not categorized" ballots.

## Polling Places and Poll Workers

For an election, each voter is assigned to a precinct according to their residential address as listed in their voter registration record. A precinct is a contiguous, bounded geographic area that is the basis for determining the contests and issues on which the voters legally residing in that area are eligible to vote.[36] Precincts are then assigned to a polling place, which is a physical location where in-person voting takes place. As previously discussed, some states use an early voting or vote center model

---

[33] The total number of UOCAVA ballots that were cast and counted was collected in item F1c of the EAVS. The UOCAVA turnout rate was calculated by dividing this figure by the total number of ballots that were cast and counted (item F1a of the EAVS). Rhode Island did not report data in F1c. Their survey comment stated, "According to RI general law, all UOCAVA mail ballots are consolidated into one mail ballot category." Casewise deletion at the state level was used in this calculation.

[34] The total number of UOCAVA absentee ballots that were returned by voters was collected in item B9a of the EAVS. The number of UOCAVA ballots counted was collected in item B14a, and the number of UOCAVA ballots rejected was collected in item B18a. The UOCAVA ballot count rate was calculated by dividing B14a by B9a, and the rejection rate was calculated by dividing B18a by B9a. Casewise deletion at the state level was used in this calculation; this calculation also did not include returned UOCAVA ballots that were not categorized as either counted or rejected.

[35] Ballots cast by another mode that were counted were recorded in item F1h of the EAVS.

[36] Some states use the terms "ward" or "voting district" to describe their voting precincts.

OCA-APPX-0892

that allows voters to vote at any polling location within their jurisdiction rather than at a specifically assigned polling place.

States reported 176,933 precincts that were used for the 2020 general election. States reported that 107,457 polling places were used on Election Day and that 25,099 polling places were used during the early voting period, for a total of 132,556 polling places for the 2020 general election.[37] States also provided information on whether their polling places were located at election offices or at other sites, such as libraries, schools, or mobile voting locations. There continues to be differences in where states locate their early voting polling locations, as opposed to their Election Day polling locations. States reported that nationwide, 42.8% of early voting sites were located at election offices, and 57.3% were located at other sites.[38] However, for Election Day polling places, only 9.6% of polling places were located at election offices, and 93.8% were reported as being located at other sites.[39]

Many of the laws, rules, policies, and procedures governing elections are enforced, in practice, by the poll workers who assist with elections.[40] These poll workers are typically not full-time election workers or employees of election offices; rather, they are recruited and trained to assist in the voting process during an election. Typical activities that poll workers assist in include verifying the identities

[37] The total number of precincts was collected in item D2a of the EAVS. The total number of Election Day polling places was collected in item D3a. The total number of early voting polling places was collected in item D4a. Kansas and Washington did not provide data on the number of Election Day polling places. Connecticut, Iowa, Kansas, Missouri, Mississippi, New Hampshire, New Jersey, and Oregon did not provide data on the number of early voting polling places; several of these states noted that early voting opportunities are limited to special circumstances, so the number of early voting sites was not tracked. Before this report's finalization, Virginia notified the EAC that the statewide number of early voting polling places in D4a was 208, not 133. Data users should note that the question numbering in this section changed in 2020; these questions were numbered differently in the 2016 and 2018 EAVS. However, a year-over-year analysis of polling places as reported in the EAVS is cautioned against, as these items have been underreported in previous years.

[38] The number of early voting polling places located at election offices was collected in item D4c of the EAVS. The number of early voting polling places located at other sites was collected in item D4b of the EAVS. The percentage of early voting polling locations located at each type of site was calculated by dividing the EAVS item by the sum of D4b and D4c. This denominator was used instead of the reported total number of early voting polling locations (item D4a), because some states provided a total in D4a but not a breakdown in D4b and D4c. Of the states that reported offering in-person early voting, Connecticut, Iowa, Kansas, Missouri, Mississippi, New Hampshire, Oregon, and Wisconsin did not provide any data on early voting polling places in D4a, D4b, or D4c. Several of these states noted in their survey comments that early voting was offered only in very limited circumstances. Georgia and Rhode Island provided data on the total number of early voting polling places in D4a but did not provide a data breakdown in D4b and D4c. New Jersey did not provide data because it did not offer in-person early voting. Casewise deletion at the state level was used in these calculations, and because each category was calculated independently, the percentages do not sum to 100%.

[39] The number of Election Day polling places located at election offices was collected in item D3c of the EAVS. The number of Election Day polling places located at other sites was collected in item D3b of the EAVS. The percentage of Election Day polling locations located at each type of site was calculated by dividing the EAVS item by the sum of D3b and D3c. This denominator was used instead of the reported total number of Election Day polling locations (item D3a), because some states provided a total in D3a but not a breakdown in D3b and D3c. Casewise deletion at the state level was used in these calculations, and because each category was calculated independently, the percentages do not sum to 100%.
Of the states that reported offering in-person early voting, Kansas and Washington did not provide any data on Election Day polling places in D3a, D3b, or D3c: Washington noted that data were not provided because the state votes almost entirely by mail. The District of Columbia, Georgia, Idaho, Massachusetts, Maine, Minnesota, Missouri, the Northern Mariana Islands, Ohio, Puerto Rico, Tennessee, and the U.S. Virgin Islands provided data on the total number of Election Day polling places in D3a but did not provide a data breakdown in D3b and D3c.

[40] Some states and jurisdictions use other titles for poll workers, such as election judges, booth workers, wardens, or commissioners. The EAVS instructions stated that observers stationed at polling places, regular office staff who did not fulfill poll worker functions during the election, or temporary election staff who were not hired specifically to serve voters in either early or Election Day voting should not be counted as poll workers for purposes of the EAVS.

OCA-APPX-0893

of those who come to vote, assisting voters with signing documents required to cast a ballot, providing ballots and setting up voting equipment, and performing other functions as dictated by the state or local election authority.

States reported the number of early voting and Election Day poll workers separately, and they also reported the total number of poll workers who assisted with the 2020 general election. States reported that a total of 775,101 poll workers assisted with the 2020 general election. This included 690,346 poll workers who assisted with Election Day voting and 135,105 poll workers who assisted with early voting.[41] Among states that reported data on poll workers for both the 2016 and the 2020 EAVS, there was no statistically significant change in the number of poll workers reported.[42]

Thirty-six states also reported information on the ages of their poll workers.[43] Among these states, the majority of poll workers were over the age of 40 in the 2020 general election, with nearly half of them over 60 years old. However, Figure 4, which compares the age distribution of poll workers in the 2016 general election to those in the 2020 general election, shows slight but statistically significant shifts in the age categories over time. In 2020, the percentage of poll workers who were ages 18 to 25 and 26 to 40 increased, and the percentage of poll workers who were ages 61 to 70 and 71 or older decreased compared to 2016.[44] Notably, the percentage of poll workers who were ages 26 to 40 nearly doubled, from 8% in 2016 to 15% in 2020.

---

[41] The total number of poll workers who assisted with the 2020 general election was collected in item D7a of the EAVS. The total number of poll workers who assisted with Election Day voting was collected in item D5. The total number of poll workers who assisted with early voting was collected in item D6. D7a does not match the sum of D5 and D6, because in D7a, each poll worker was to only be counted once even if they assisted with both early voting and Election Day voting. Oregon, Pennsylvania, Puerto Rico, Vermont, Washington, and Wisconsin were unable to provide poll worker data. Alabama, Connecticut, Louisiana, Maine, Massachusetts, Missouri, Mississippi, New Jersey, and North Dakota did not provide data on the number of early voting poll workers. North Dakota did not provide data on the number of Election Day poll workers. New Hampshire provided data on the minimum number of poll workers required at each polling location by law but noted that it may not reflect the number of poll workers who actually assisted.

[42] $T$ tests conducted on the national number of poll workers in 2016 and 2020 were statistically insignificant at $p < 0.05$.

[43] Poll worker age data were reported in item D7 of the EAVS for 2020, with D7a corresponding to the total number of poll workers who assisted with the 2020 general election and items D7b–D7g corresponding to age categories. The denominator used in this calculation was the sum of the age categories in D7b–D7g. Poll worker age data were reported in items D3 and D4 for 2016, with D3a corresponding to the total number of poll workers and items D4a–D4f corresponding to age categories. The denominator used in this calculation was the sum of the age categories in D4a–D4f. In 2020, South Carolina only reported poll workers who were under the age of 18 and did not provide data for any other age categories. South Carolina was excluded from the calculations of the percentage of poll workers by age. Connecticut, Georgia, Hawaii, Illinois, Louisiana, Massachusetts, Minnesota, New Hampshire, New Jersey, North Dakota, the Northern Mariana Islands, Oregon, Pennsylvania, Puerto Rico, Rhode Island, the U.S. Virgin Islands, Vermont, Virginia, Washington, and Wisconsin were unable to provide data on the ages of their poll workers. Casewise deletion at the state level was used in these calculations.

[44] $T$ tests conducted that compared the percentage of poll workers in the 18 to 25, 26 to 40, 61 to 70, and 71 or older age categories between 2016 and 2020 were statistically significant at $p < 0.05$, with most being $p < 0.01$. Other age groups did not have a statistically significant change.

OCA-APPX-0894



*Figure 4. Poll Worker Age Distribution Was Slightly Younger in 2020 Than in 2016*

Poll Worker Age Category

*Source: The percentage of poll workers under age 18 was calculated as D7b/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for 2020 and D4a/(D4a+D4b+D4c+D4d+D4e+D4f) x 100 for 2016. The percentage of poll workers ages 18–25 was calculated as D7c/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for 2020 and D4b/(D4a+D4b+D4c+D4d+D4e+D4f) x 100 for 2016. The percentage of poll workers ages 26–40 was calculated as D7d/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for 2020 and D4c/(D4a+D4b+D4c+D4d+D4e+D4f) x 100 for 2016. The percentage of poll workers ages 41–60 was calculated as D7d/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for 2020 and D4d/(D4a+D4b+D4c+D4d+D4e+D4f) x 100 for 2016. The percentage of poll workers ages 61–70 was calculated as D7e/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for 2020 and D4e/(D4a+D4b+D4c+D4d+D4e+D4f) x 100 for 2016. The percentage of poll workers ages 71 or older was calculated as D7g/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for 2020 and D4f/(D4a+D4b+D4c+D4d+D4e+D4f) x 100 for 2016. Casewise deletion was used at the state level (percentages for each age category were calculated independently and only states that reported data for a given age category were included in the analysis), and because of this, percentages do not sum to 100%.*

The survey comments many jurisdictions provided indicated that this age shift was partially attributable to the COVID-19 pandemic. The U.S. Centers for Disease Control and Prevention (CDC) stated that older adults are at greater risk of severe illness from COVID-19, with adults 65 years or older in the highest risk category. This risk category overlaps with the group of adults who typically make up the majority of poll workers in federal general elections. The 2020 EAVS data confirm that a number of older poll workers did not assist with the 2020 general election and that many younger adults took their places.

OCA-APPX-0895

The COVID-19 pandemic also affected state and local efforts to obtain a sufficient number of poll workers to assist with the 2020 general election. Although poll worker recruitment remains a challenge, with 52% of jurisdictions reporting that it was either very difficult or somewhat difficult to obtain a sufficient number of poll workers, Figure 5 shows that poll worker recruitment has gotten less difficult since the 2016 general election.[45] In their survey comments, many jurisdictions cited cross-cutting effects on their recruitment efforts. Some long-time poll workers who had served in previous elections were unable to do so for the 2020 general election; some were unable to work because of age-related COVID-19 risks, and in many cases, jurisdictions needed to replace workers who called out sick close to the election to quarantine after COVID-19 exposure. On the other hand, many jurisdiction officials praised the efforts of the EAC and state election offices that encouraged



*Figure 5. Poll Worker Recruitment Was Less Difficult in 2020 Than in 2016*

Ease of Recruiting Poll Workers

*Source: Ease of recruiting poll workers was collected in item D8 in the 2020 EAVS and D5 in the 2016 EAVS. For both years, jurisdictions that responded, "not enough information to answer," "data not available," "does not apply," or left this item blank were excluded from this analysis.*

---

[45] Data on the ease of recruiting poll workers were collected in item D8 of the 2020 EAVS and item D5 of the 2016 EAVS. In 2020, 3,436 of 6,460 jurisdictions (53.2%) responded "not enough information to answer," "data not available," "does not apply," or left this item blank. The comparison between 2016 and 2020 data was statistically significant at $p < 0.01$.

OCA-APPX-0896

qualified individuals to sign up as poll workers. Some jurisdictions noted that they had overwhelming interest from those who view assisting with elections as a way to help their community and recruited more poll workers than they had available slots to fill.

Notably, ease of poll worker recruiting appears to be highly correlated with the size of the jurisdiction. Jurisdictions that had 10,000 or fewer registered voters reported having an easier time recruiting poll workers than did jurisdictions with more than 10,000 registered voters.[46]

## Election Technology

The use of technology in polling places and vote tally locations varies widely across and within the states. The EAVS collects data on the type of voting equipment that is used and the type of voting that the equipment is used for, the specific makes and models of the equipment and how many are deployed, and whether electronic poll books (or e-poll books) are used to assist at polling places. The voting equipment landscape continues to evolve with each election.

### Voting Equipment

The EAVS collects data on the use of six types of voting equipment that voters can use to cast their ballots:[47]

- Direct-recording electronic (DRE) voting equipment, not equipped with a voter-verified paper audit trail (VVPAT)[48]
- DRE voting equipment, equipped with a VVPAT[49]
- Electronic system that produces a paper record but does not tabulate votes. These are often referred to as ballot marking devices (BMD)[50]
- Scanner (optical/digital) that tabulates paper records that voters mark by hand or via a ballot marking device[51]

---

[46] For this comparison, jurisdictions were classified according to the total number of registered voters as reported in item A1a of the EAVS. This comparison was statistically significant at $p < 0.001$.

[47] Two jurisdictions in Arkansas and 21 jurisdictions in Kansas did not provide any information about their voting equipment in the EAVS. Two jurisdictions in Missouri did not provide responses on the use of DREs with VVPAT (F6 in the EAVS), and an additional jurisdiction in Missouri did not provide responses on the use of ballot marking devices (BMD; F7 in the EAVS) or scanners (F8 in the EAVS). Five jurisdictions in Texas did not provide responses on the use of DREs without VVPAT (F5 in the EAVS), DREs with VVPAT, BMDs, or scanners. Twenty-six jurisdictions in Utah responded "data not available" to questions about BMDs, and one responded "data not available" to questions about scanners (F8 in the EAVS). In Vermont, 101 jurisdictions responded "does not apply" to questions about scanners, and 145 jurisdictions did not provide responses to questions about the use of BMDs or hand counting ballots (F11 in the EAVS). No jurisdictions in Kansas provided responses to questions about hand counting ballots (F11 in the EAVS). Two jurisdictions—Maine – UOCAVA and Kalawao County, Hawaii—responded "does not apply" to all of these questions; however, that is because these jurisdictions report EAVS data with other jurisdictions in their state (see Chapter 5 for more details).

[48] Data on DREs without VVPAT were collected in items F5a, F5b, F5c, and F5d of the EAVS.

[49] Data on DREs with VVPAT were collected in items F6a, F6b, F6c, and F6d of the EAVS.

[50] Data on BMDs were collected in items F7a, F7b, F7c, and F7d of the EAVS.

[51] Data on scanners were collected in items F8a, F8b, F8c, and F8d of the EAVS.

OCA-APPX-0897



- Punch card machines[52]
- Lever machines[53]

The EAVS also collects information on whether jurisdictions hand count paper ballots without the use of an optical or digital scanning system.[54]

*Figure 6. Scanners and BMDs Were the Most Commonly Used Voting Methods in 2020*



Percentage of States with At Least One Jurisdiction
Using the Voting Method in the 2020 General Election

*Source: The use of scanners was collected in item F8a of the 2020 EAVS. Use of BMDs was collected in item F7a. Use of hand counting was collected in item F11a. Use of DRE with VVPAT was collected in item F6a. Use of DRE without VVPAT was collected in item F5a. States in which at least one EAVS jurisdiction reported using the voting equipment are included in this graph. Kansas did not respond to F7a or F11a.*

---

[52] Data on punch card machines were collected in items F9a, F9b, F9c, and F9d of the EAVS. No jurisdictions have reported using this equipment since before the 2016 EAVS.

[53] Data on lever machines were collected in items F10a, F10b, F10c, and F10d of the EAVS. No jurisdictions have reported using this equipment since before the 2016 EAVS.

[54] Data on hand counting paper ballots were collected in items F11a and F11d of the EAVS.

OCA-APPX-0898

Nationally, states reported deploying 369,366 pieces of voting equipment to cast and tabulate votes for the 2020 general election.[55] Figure 6 shows the number of states that reported using voting equipment in at least one jurisdiction. Most jurisdictions and states used more than one type of equipment. The most commonly used types of equipment were scanners (used in 55 states) and BMDs (used in 45 states). Twenty-one states reported hand counting ballots without using any equipment to assist, and 20 states used DREs equipped with a VVPAT.

The use of DREs without VVPAT has been a particular concern to some experts, because these machines do not include a paper record of the votes that are cast, which raises security issues and can make it difficult to conduct certain types of post-election audits. In the 2018 EAVS, 14 states reported using DREs without VVPAT in at least one of their jurisdictions. The 2020 EAVS data show that only nine states now use this equipment in at least one of their jurisdictions: Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, New Jersey, Tennessee, and Texas. Of these states, Louisiana reported using DREs without VVPAT in each of its jurisdictions. Five states that reported using DREs without VVPAT in 2018 discontinued using those machines by the 2020 general election (Delaware, Florida, Georgia, Pennsylvania, and South Carolina).

### Table 3. DRE Without VVPAT-Only Jurisdictions Declined Between 2018 and 2020

| State | 2018 | | 2020 | |
|-------|------|------|------|------|
| | Number of Jurisdictions | Percentage of Jurisdictions | Number of Jurisdictions | Percentage of Jurisdictions |
| Arkansas | 1 | 1.3% | 0 | -- |
| Indiana | 16 | 17.4% | 12 | 13.0% |
| Kansas | 7 | 6.7% | 0 | -- |
| Kentucky | 5 | 4.2% | 0 | -- |
| Pennsylvania | 50 | 74.6% | 0 | -- |
| Tennessee | 6 | 6.3% | 1 | 1.1% |
| Texas | 32 | 12.6% | 19 | 7.5% |

*Source: The number of jurisdictions that reported using only DRE without VVPAT voting machines was based on responses to items F5a, F6a, F7a, and F8a of the 2018 and 2020 EAVS. The percentage of jurisdictions using only DRE without VVPAT was calculated by dividing by the total number of jurisdictions in the state. One county in Florida that reported using a DRE without VVPAT in 2018 was not included in this table, because the county had listed a make and model of a scanner in item F5b_1 in its 2018 data, which indicates a possible data entry error. None of the counties in Kansas that did not provide voting equipment information for the 2020 EAVS reported using DREs without VVPAT in the 2018 EAVS.*

---

[55] The number of voting machines deployed was reported in items F5c_1, F5c_2, F5c_3, F6c_1, F6c_2, F6c_3, F7c_1, F7c_2, F7c_3, F8c_1, F8c_2, F8c_3, F9c_1, F9c_2, F9c_3, F10c_1, F10c_2, and F10c_3 of the EAVS. These items were summed for each jurisdiction to arrive at this total. American Samoa did not report the number of voting machines deployed, because this territory only uses hand-marked paper ballots that are manually counted. Oregon and Wisconsin reported that they do not track the number of voting machines deployed. Before this report's finalization, Virginia notified the EAC that the statewide number of BMDs in F7c_1, F7c_2, and F7c_3 was 2,533, not "data not available."

OCA-APPX-0899

The number of jurisdictions that reported using only DREs without VVPAT and not using any other type of voting equipment also declined between 2018 and 2020. Table 3 shows that for the 2020 general election, only three states reported having jurisdictions that used only DREs without VVPAT as their voting equipment, and in each of those states, the percentage of their jurisdictions that used only DRE without VVPAT has also decreased since 2018.

## Electronic Poll Books

When voters go into polling places, their identity is checked against voter registration information that is contained in poll books to ensure they are registered to vote and did not already cast a ballot during in-person early voting or with a mailed ballot. These poll books can be paper based and printed before the election, or they can be electronic. The use of e-poll books has steadily increased in recent elections. For the 2016 general election, 1,146 jurisdictions (17.7%) reported using e-poll books; this number rose to 1,684 (26.1%) in 2018 and to 1,991 (30.8%) in 2020. The number of jurisdictions that used e-poll books in 2020 represents an 18.2% increase from 2018.

As of the 2020 general election, 38 states reported using e-poll books in at least one of their jurisdictions, and 16 states and territories (Arizona, Delaware, Georgia, Iowa, Kentucky, Maryland, Michigan, Nevada, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, Rhode Island, South Carolina, and the U.S. Virgin Islands) and the District of Columbia reported using e-poll books in all of their jurisdictions. Of the jurisdictions that reported using e-poll books, the most common usages were to sign voters in at polling places (98.9%), update voter history (87.8%), and look up polling places (79.5%), and 20.7% of jurisdictions reported using e-poll books for other uses as well.[56]

The 2020 Policy Survey also collected information on whether states have a testing or certification process in place for e-poll books.[57] Of the 39 states that provided a response to this question, 12 states (30.8%) indicated that the testing and certification process is required by statute, 10 states (25.6%) indicated that the testing and certification process is required by a formal administrative rule or as guidance, and 17 states (43.6%) indicated that testing and certification of e-poll books is not required.[58] The EAC does not currently provide testing or certification of e-poll books; any testing that states perform on their equipment is performed to the state's specifications.

---

[56] Use of e-poll books to sign voters in was reported in item F3a of the EAVS. Use of e-poll books to update voter history was reported in item F3b. Use of e-poll books to look up polling places was reported in item F3c. Use of e-poll books for other purposes was reported in item F3d. A jurisdiction was considered to have used e-poll books in 2020 if it responded "yes" to at least one of these items.

[57] Q16 of the 2020 Policy Survey collected information on whether the state, or any jurisdiction in the state, used e-poll books. Colorado, Hawaii, and Massachusetts reported in the Policy Survey that they used e-poll books but did not report data on the usage of e-poll books in item F3 of the EAVS; Colorado noted in a comment in the Policy Survey that "CO's statewide voter registration system has an application that allows judges at vote centers to look up in-person voters and see whether they've returned a ballot. There is no testing and certification because the application is developed and maintained by our VR development team in our IT department." Puerto Rico reported data on the usage of e-poll books in the EAVS but reported not using e-poll books in the Policy Survey.

[58] Q16a of the 2020 Policy Survey collected information on what kind of testing or certification is required for e-poll books. Illinois did not provide a response to this question.

OCA-APPX-0900

# Appendix A: Descriptive Tables

## Overview Table 1: 2020 EAVS at a Glance

| State | Total Jurisdictions | Total Active Registered Voters | Total CVAP | Total Voter Turnout | Turnout as % of Active Registration | Turnout as % of CVAP |
|---|---|---|---|---|---|---|
| Alabama [1] | 67 | 3,438,213 | 3,731,336 | 2,329,047 | 67.7 | 62.4 |
| Alaska | 1 | 595,647 | 533,151 | 361,400 | 60.7 | 67.8 |
| American Samoa [2] | 1 | 16,341 | -- | 11,944 | 73.1 | -- |
| Arizona | 15 | 4,275,729 | 5,137,474 | 3,420,481 | 80.0 | 66.6 |
| Arkansas | 75 | 1,408,061 | 2,235,415 | 1,209,997 | 85.9 | 54.1 |
| California | 58 | 21,795,538 | 26,032,160 | 17,720,746 | 81.3 | 68.1 |
| Colorado | 64 | 3,803,762 | 4,244,210 | 3,320,607 | 87.3 | 78.2 |
| Connecticut [1] | 169 | 2,335,860 | 2,619,474 | 1,863,479 | 79.8 | 71.1 |
| Delaware | 3 | 711,287 | 725,178 | 514,656 | 72.4 | 71.0 |
| District of Columbia | 1 | 517,890 | 536,768 | 346,491 | 66.9 | 64.6 |
| Florida | 67 | 14,517,002 | 15,507,315 | 11,137,676 | 76.7 | 71.8 |
| Georgia | 159 | 7,194,889 | 7,581,837 | 5,023,812 | 69.8 | 66.3 |
| Guam [2] | 1 | 55,896 | -- | 29,377 | 52.6 | -- |
| Hawaii [3] | 5 | 759,971 | 1,014,035 | 580,098 | 76.3 | 57.2 |
| Idaho | 44 | 1,029,763 | 1,282,630 | 878,527 | 85.3 | 68.5 |
| Illinois | 108 | 9,103,542 | 9,088,036 | 6,140,545 | 67.5 | 67.6 |
| Indiana | 92 | 4,170,353 | 4,978,356 | 3,103,284 | 74.4 | 62.3 |
| Iowa [1] | 99 | 2,094,770 | 2,348,787 | 1,700,130 | 81.2 | 72.4 |
| Kansas [4] | 105 | 1,764,949 | 2,103,748 | 1,379,623 | 78.2 | 65.6 |
| Kentucky | 120 | 3,319,307 | 3,367,502 | 2,149,444 | 64.8 | 63.8 |
| Louisiana | 64 | 2,963,901 | 3,463,372 | 2,169,354 | 73.2 | 62.6 |
| Maine | 497 | 1,135,008 | 1,078,770 | 822,534 | 72.5 | 76.2 |
| Maryland | 24 | 4,142,347 | 4,316,921 | 3,059,603 | 73.9 | 70.9 |
| Massachusetts | 351 | 4,400,254 | 5,057,192 | 3,658,005 | 83.1 | 72.3 |
| Michigan [5] | 83 | 7,209,300 | 7,562,464 | 5,579,317 | 77.4 | 73.8 |
| Minnesota | 87 | 3,731,016 | 4,157,556 | 3,290,013 | 88.2 | 79.1 |
| Mississippi [1] | 82 | 1,982,632 | 2,246,323 | 1,334,155 | 67.3 | 59.4 |
| Missouri [1] | 116 | 3,963,980 | 4,650,318 | 3,201,458 | 80.8 | 68.8 |
| Montana [1] | 56 | 675,971 | 831,760 | 612,141 | 90.6 | 73.6 |
| Nebraska | 93 | 1,168,708 | 1,388,950 | 966,786 | 82.7 | 69.6 |
| Nevada | 17 | 1,835,401 | 2,111,932 | 1,407,761 | 76.7 | 66.7 |
| New Hampshire [1], [6] | 320 | 1,087,145 | 1,070,215 | 814,499 | 74.9 | 76.1 |
| New Jersey [7] | 21 | 5,896,836 | 6,170,130 | 4,494,659 | 76.2 | 72.8 |
| New Mexico | 33 | 1,255,669 | 1,522,171 | 928,230 | 73.9 | 61.0 |
| New York | 62 | 12,362,997 | 13,810,830 | 8,701,749 | 70.4 | 63.0 |

OCA-APPX-0901



| State | Total Jurisdictions | Total Active Registered Voters | Total CVAP | Total Voter Turnout | Turnout as % of Active Registration | Turnout as % of CVAP |
|---|---|---|---|---|---|---|
| North Carolina | 100 | 6,607,121 | 7,729,644 | 5,543,405 | 83.9 | 71.7 |
| North Dakota [8] | 53 | -- | 567,545 | 364,499 | -- | 64.2 |
| Northern Mariana Islands [2] | 1 | 18,526 | -- | 13,355 | 72.1 | -- |
| Ohio | 88 | 8,073,829 | 8,879,469 | 5,974,121 | 74.0 | 67.3 |
| Oklahoma | 77 | 2,021,846 | 2,875,059 | 1,564,886 | 77.4 | 54.4 |
| Oregon [9] | 36 | 2,944,588 | 3,162,204 | 2,396,123 | 81.4 | 75.8 |
| Pennsylvania [10] | 67 | 8,280,348 | 9,810,201 | 6,973,951 | 84.2 | 71.1 |
| Puerto Rico [11] | 1 | 2,355,894 | 2,579,596 | 1,296,169 | 55.0 | 50.2 |
| Rhode Island [1] | 39 | 735,195 | 800,798 | 519,412 | 70.6 | 64.9 |
| South Carolina | 46 | 3,535,061 | 3,892,341 | 2,523,856 | 71.4 | 64.8 |
| South Dakota | 66 | 578,683 | 653,394 | 427,406 | 73.9 | 65.4 |
| Tennessee | 95 | 4,226,928 | 5,129,580 | 3,074,692 | 72.7 | 59.9 |
| Texas | 254 | 15,279,870 | 18,875,542 | 11,449,044 | 74.9 | 60.7 |
| U.S. Virgin Islands [2] | 1 | 53,341 | -- | 18,064 | 33.9 | -- |
| Utah | 29 | 1,713,297 | 2,134,249 | 1,542,529 | 90.0 | 72.3 |
| Vermont [12] | 246 | 440,920 | 498,705 | 368,075 | 83.5 | 73.8 |
| Virginia [13] | 133 | 5,763,187 | 6,226,623 | 4,487,338 | 77.9 | 72.1 |
| Washington [14] | 39 | 4,892,871 | 5,409,035 | 4,116,055 | 84.1 | 76.1 |
| West Virginia | 55 | 1,062,685 | 1,420,289 | 801,667 | 75.4 | 56.4 |
| Wisconsin [15] | 1,851 | 3,834,164 | 4,412,888 | 3,308,331 | 86.3 | 75.0 |
| Wyoming | 23 | 303,049 | 434,852 | 278,503 | 91.9 | 64.0 |
| U.S. Total | 6,460 | 209,441,338 | 237,998,330 | 161,303,109 | 76.8 | 67.7 |

OCA-APPX-0902

| State | Total In-Person Election Day Ballots Cast and Counted | Total Mailed Ballots Cast and Counted | Total In-Person Early Ballots Cast and Counted | Total Polling Places | Total Poll Workers |
|---|---|---|---|---|---|
| Alabama [1] | 2,014,242 | 300,684 | -- | 2,045 | 16,128 |
| Alaska | 157,220 | 92,471 | 82,451 | 584 | 3,077 |
| American Samoa [2] | 10,310 | 905 | 455 | 42 | 256 |
| Arizona | 371,565 | 2,931,175 | 69,063 | 928 | 7,482 |
| Arkansas | 258,836 | 84,910 | 830,561 | 20,889 | 6,549 |
| California | 1,124,389 | 14,515,783 | 966,201 | 5,655 | 48,221 |
| Colorado | 89,789 | 3,092,904 | 108,856 | 642 | 7,185 |
| Connecticut [1] | 1,188,283 | 667,403 | -- | 718 | 3,590 |
| Delaware | 345,809 | 161,135 | 5,236 | 267 | 3,157 |
| District of Columbia | 29,036 | 229,459 | 80,959 | 127 | 4,467 |
| Florida | 1,942,102 | 4,546,896 | 4,332,912 | 4,858 | 44,857 |
| Georgia | 980,627 | 1,311,361 | 2,704,002 | 2,755 | 27,474 |
| Guam [2] | 16,167 | 108 | 12,966 | 27 | 465 |
| Hawaii [3] | 4,522 | 548,636 | 24,214 | 16 | 64 |
| Idaho | 384,319 | 345,636 | 145,388 | 754 | 5,815 |
| Illinois | 2,049,927 | 2,037,583 | 2,005,711 | 19,684 | 46,711 |
| Indiana | 1,201,154 | 535,942 | 1,354,897 | 2,137 | 17,557 |
| Iowa [1] | 698,557 | 994,300 | -- | 1,329 | 8,685 |
| Kansas [4] | 505,132 | 463,909 | 375,196 | -- | 8,412 |
| Kentucky | 477,612 | 631,497 | 1,024,965 | 879 | 8,528 |
| Louisiana | 1,182,672 | 162,692 | 817,951 | 2,096 | 16,980 |
| Maine | 311,560 | 359,331 | 151,535 | 1,040 | 6,054 |
| Maryland | 439,094 | 1,502,852 | 987,373 | 401 | 14,033 |
| Massachusetts | 1,256,443 | 1,521,052 | 852,926 | 1,611 | 13,044 |
| Michigan [5] | 2,286,764 | 2,741,668 | 529,015 | 4,950 | 35,825 |
| Minnesota | 1,380,309 | 1,286,660 | 607,304 | 2,581 | 29,785 |
| Mississippi [1] | 1,085,337 | 234,500 | -- | 1,776 | 11,358 |
| Missouri [1] | 2,288,607 | 899,695 | -- | 2,326 | 19,075 |
| Montana [1] | 9,497 | 597,912 | -- | 43 | 1,592 |
| Nebraska | 417,349 | 485,195 | 51,537 | 1,015 | 7,810 |
| Nevada | 128,729 | 664,461 | 540,767 | 307 | 4,653 |
| New Hampshire [1], [6] | 554,315 | 253,932 | -- | 308 | -- |
| New Jersey [7] | 987 | 4,178,875 | -- | 1,549 | 7,603 |
| New Mexico | 142,470 | 323,661 | 456,280 | 883 | 4,165 |
| New York | 4,284,263 | 1,763,448 | 2,502,161 | 5,124 | 118,378 |
| North Carolina | 896,818 | 974,351 | 3,460,562 | 3,203 | 26,608 |
| North Dakota [8] | 91,803 | 183,161 | 87,882 | 128 | 1,607 |
| Northern Mariana Islands [2] | 3,970 | 12,321 | 8,130 | 11 | 189 |

OCA-APPX-0903



| State | Total In-Person Election Day Ballots Cast and Counted | Total Mailed Ballots Cast and Counted | Total In-Person Early Ballots Cast and Counted | Total Polling Places | Total Poll Workers |
|---|---|---|---|---|---|
| Ohio | 2,344,886 | 2,135,600 | 1,345,715 | 3,651 | 47,761 |
| Oklahoma | 1,114,001 | 275,017 | 167,516 | 2,032 | 6,552 |
| Oregon [9] | -- | 2,379,544 | -- | 36 | -- |
| Pennsylvania [10] | 4,214,277 | 2,623,867 | -- | 9,246 | -- |
| Puerto Rico [11] | 1,092,637 | 145,244 | 48,724 | 1,612 | -- |
| Rhode Island [1] | 198,611 | 318,313 | -- | 500 | 3,594 |
| South Carolina | 1,182,726 | 428,704 | 894,078 | 2,091 | 17,135 |
| South Dakota | 208,396 | 122,525 | 93,469 | 573 | 2,675 |
| Tennessee | 766,552 | 216,074 | 2,071,168 | 2,066 | 17,831 |
| Texas | 1,707,821 | 982,362 | 8,660,809 | 9,604 | 49,441 |
| U.S. Virgin Islands [2] | 8,119 | 1,670 | 8,173 | 12 | 190 |
| Utah | 81,970 | 1,386,385 | 35,048 | 196 | 1,619 |
| Vermont [12] | 90,959 | 272,318 | 2,033 | 521 | -- |
| Virginia [13] | 1,657,228 | 983,907 | 1,798,050 | 2,587 | 30,403 |
| Washington [14] | -- | 4,050,981 | 183 | 66 | -- |
| West Virginia | 396,926 | 142,191 | 256,113 | 1,421 | 8,324 |
| Wisconsin [15] | 1,337,269 | 1,298,346 | 651,791 | 2,467 | -- |
| Wyoming | 135,426 | 85,454 | 55,903 | 187 | 2,137 |
| U.S. Total | 47,148,389 | 69,486,966 | 41,266,229 | 132,556 | 775,101 |

Overview Table 1 Calculation Notes:

**Total Jurisdictions** uses a count of Federal Information Processing Standards (FIPS) code by state.

**Total Active Registered Voters** uses question A1b.

**Total CVAP** uses the 2019 1-year estimate of the CVAP from the U.S. Census Bureau.

**Total Voter Turnout** uses question F1a.

**Turnout as % of Active Registration** uses question F1a divided by A1b.

**Turnout as % of CVAP** uses question F1a divided by the CVAP estimate.

**Total In-Person Election Day Ballots Cast and Counted** uses question F1b.

**Total Mailed Ballots Cast and Counted** uses the sum of questions F1d and F1g.

**Total In-Person Early Ballots Cast and Counted** uses question F1f.

**Total Polling Places** uses the sum of questions D3a and D4a.

**Total Poll Workers** uses question D7a.

Overview Table 1 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation. For example, since there was no CVAP estimate for most U.S. territories, their turnout data (F1a) were not used for the calculation of "Turnout as % of CVAP" at the national level.

OCA-APPX-0904

- The CVAP is an estimate of the number of U.S. citizens 18 years of age or older in the state. This report used the 1-year American Community Survey (ACS) state estimate for 2019 instead of the 5-year estimate to ensure that the CVAP was as current as possible. The estimate for the year 2020 was not available by the time this report was finalized. The 2019 1-year CVAP does not include data that were collected as part of the decennial Census conducted in 2020. Some states may have reported more active registered voters than CVAP because the 2019 CVAP is being compared to 2020 data.
- The Total Voter Turnout column includes voters who cast a ballot that was counted. The Total Mailed Ballots Cast and Counted column does not include UOCAVA voters.

[1] Alabama, Connecticut, Iowa, Missouri, Mississippi, Montana, New Hampshire, and Rhode Island did not report data in F1f, because the number of in-person early voters could not be tracked separately from other modes of participation.

[2] American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands did not have a CVAP available to use for the turnout as a percentage of CVAP calculation.

[3] For Hawaii, the numbers reported for the City and County of Honolulu include all mailed ballot envelopes received and validated by the county. Certified turnout results were determined through subsequent ballot envelope processing and counting by the State of Hawaii, pursuant to Hawaii State Law.

[4] Kansas did not provide data on polling places.

[5] Michigan noted in its survey comments that "walk-in absentee voting prior to Election Day is considered early voting in [Michigan]. These absentee ballots are not tabulated until Election Day." Data on these walk-in absentee voters was reported in F1f.

[6] New Hampshire provided information on the minimum number of early voting and Election Day poll workers required by law but noted that it may not reflect the number of poll workers actually deployed.

[7] New Jersey did not report data in F1f, because the state did not offer in-person early voting.

[8] North Dakota does not have voter registration.

[9] Oregon is a vote-by-mail state and does not have traditional early voting or traditional polling places.

[10] Pennsylvania reported that the state cannot systematically track data on poll workers.

[11] Puerto Rico reported that data on poll workers are not available and that poll workers were volunteers, not PR-SEC employees (the abbreviation was not defined by the state).

[12] Vermont did not provide data on the number of poll workers. Prior to this report being finalized, Vermont provided updated statewide totals for most items in F1 but was unable to provide jurisdiction-level data that could be incorporated into the EAVS. The statewide vote totals are:
- Total number of voters who cast a ballot that was counted (F1a): 371,452
- Voters who cast a ballot at a physical polling place on Election Day and whose ballots were counted (F1b): 91,079
- UOCAVA voters who cast a ballot via an absentee ballot or FWAB and whose ballots were counted (F1c): 2,719
- Voters who cast a mailed ballot and whose ballots were counted (F1d): 225,621
- Voters who cast a ballot at an in-person early voting location and whose ballots were counted (F1f): 2,033

[13] Before this report's finalization, Virginia notified the EAC that the statewide number of early voting polling places in D4a was 208, not 133.

[14] Washington is a vote-by-mail state. Voters can register and vote on or before Election Day. The total in F1g (voters who cast a mailed ballot in a jurisdiction that conducts elections entirely by mail and whose ballots were counted) includes in-person voters that were issued a mailed ballot packet at a voting center

OCA-APPX-0905



that they could deposit into a ballot drop box or mail. Totals in F1f (voters who cast a ballot at an in-person early voting location and whose ballots were counted) include voters who used a disability access unit.

[15] The number of jurisdictions in Wisconsin changed several times over the two-year period covered by the 2020 EAVS due to incorporations, mergers, and similar mechanisms. Wisconsin canvass data tracks individual contests, and therefore, the total ballots cast in any election is highly unlikely to match the total votes cast in any one contest. Wisconsin voters are not required to vote in each contest on the ballot and undervotes are the likely cause of total ballots cast data being higher than the number of votes in a contest.

OCA-APPX-0906

## Overview Table 2: Voter Turnout by Mail

| State | Total Mail Voters | % Turnout by Mail | Total Mailed Ballots Transmitted | Total Mailed Ballots Returned | % Mailed Ballots Returned |
|---|---|---|---|---|---|
| Alabama [1] | 300,684 | 12.9 | 170,616 | 158,321 | 92.8 |
| Alaska | 92,471 | 25.6 | 121,223 | 97,344 | 80.3 |
| American Samoa | 905 | 7.6 | 911 | 911 | 100.0 |
| Arizona | 2,931,175 | 85.7 | 3,529,586 | 2,938,896 | 83.3 |
| Arkansas | 84,910 | 7.0 | 120,369 | 117,555 | 97.7 |
| California | 14,515,783 | 81.9 | 23,228,899 | 15,398,923 | 66.3 |
| Colorado | 3,092,904 | 93.1 | 3,904,381 | 3,122,440 | 80.0 |
| Connecticut | 667,403 | 35.8 | 832,542 | 673,899 | 80.9 |
| Delaware | 161,135 | 31.3 | 187,360 | 163,234 | 87.1 |
| District of Columbia | 229,459 | 66.2 | 416,660 | 235,486 | 56.5 |
| Florida | 4,546,896 | 40.8 | 6,065,500 | 4,750,645 | 78.3 |
| Georgia [2] | 1,311,361 | 26.1 | 1,759,036 | 1,316,165 | 74.8 |
| Guam | 108 | 0.4 | 193 | 129 | 66.8 |
| Hawaii | 548,636 | 94.6 | 748,944 | 551,383 | 73.6 |
| Idaho [3] | 345,636 | 39.3 | 407,323 | 344,893 | 84.7 |
| Illinois | 2,037,583 | 33.2 | 2,233,578 | 2,013,990 | 90.2 |
| Indiana | 535,942 | 17.3 | 547,602 | 538,860 | 98.4 |
| Iowa | 994,300 | 58.5 | 1,050,593 | 997,652 | 95.0 |
| Kansas [4] | 463,909 | 33.6 | 362,948 | 295,021 | 81.3 |
| Kentucky | 631,497 | 29.4 | 666,472 | 634,595 | 95.2 |
| Louisiana | 162,692 | 7.5 | 218,057 | 163,656 | 75.1 |
| Maine | 359,331 | 43.7 | 373,478 | 362,594 | 97.1 |
| Maryland | 1,502,852 | 49.1 | 1,699,070 | 1,505,791 | 88.6 |
| Massachusetts | 1,521,052 | 41.6 | 1,679,267 | 1,531,001 | 91.2 |
| Michigan | 2,741,668 | 49.1 | 3,009,891 | 2,762,148 | 91.8 |
| Minnesota | 1,286,660 | 39.1 | 1,545,345 | 1,295,908 | 83.9 |
| Mississippi | 234,500 | 17.6 | 247,855 | 239,488 | 96.6 |
| Missouri | 899,695 | 28.1 | 935,659 | 905,132 | 96.7 |
| Montana | 597,912 | 97.7 | 704,040 | 599,505 | 85.2 |
| Nebraska | 485,195 | 50.2 | 508,049 | 486,844 | 95.8 |
| Nevada | 664,461 | 47.2 | 1,833,795 | 670,091 | 36.5 |
| New Hampshire | 253,932 | 31.2 | 263,447 | 255,935 | 97.1 |
| New Jersey | 4,178,875 | 93.0 | 6,053,283 | 4,228,687 | 69.9 |
| New Mexico | 323,661 | 34.9 | 373,548 | 339,906 | 91.0 |
| New York | 1,763,448 | 20.3 | 2,366,172 | 1,832,724 | 77.5 |
| North Carolina | 974,351 | 17.6 | 1,350,883 | 981,816 | 72.7 |
| North Dakota | 183,161 | 50.3 | 214,506 | 183,544 | 85.6 |

OCA-APPX-0907



| State | Total Mail Voters | % Turnout by Mail | Total Mailed Ballots Transmitted | Total Mailed Ballots Returned | % Mailed Ballots Returned |
|---|---|---|---|---|---|
| Northern Mariana Islands [5] | 12,321 | 92.3 | 1,670 | 1,670 | 100.0 |
| Ohio | 2,135,600 | 35.7 | 2,314,198 | 2,144,504 | 92.7 |
| Oklahoma | 275,017 | 17.6 | 344,600 | 280,106 | 81.3 |
| Oregon | 2,379,544 | 99.3 | 2,924,063 | 2,397,091 | 82.0 |
| Pennsylvania | 2,623,867 | 37.6 | 3,120,999 | 2,653,688 | 85.0 |
| Puerto Rico [6] | 145,244 | 11.2 | 22,403 | 22,402 | 100.0 |
| Rhode Island | 318,313 | 61.3 | 318,313 | 318,426 | 100.0 |
| South Carolina | 428,704 | 17.0 | 447,697 | 430,229 | 96.1 |
| South Dakota | 122,525 | 28.7 | 132,529 | 123,406 | 93.1 |
| Tennessee | 216,074 | 7.0 | 229,768 | 218,149 | 94.9 |
| Texas | 982,362 | 8.6 | 1,208,665 | 988,364 | 81.8 |
| U.S. Virgin Islands | 1,670 | 9.2 | 1,846 | 1,682 | 91.1 |
| Utah | 1,386,385 | 89.9 | 1,752,928 | 1,396,681 | 79.7 |
| Vermont | 272,318 | 74.0 | 313,193 | 273,784 | 87.4 |
| Virginia | 983,907 | 21.9 | 1,099,502 | 990,198 | 90.1 |
| Washington | 4,050,981 | 98.4 | 5,042,956 | 4,082,581 | 81.0 |
| West Virginia | 142,191 | 17.7 | 150,202 | 142,445 | 94.8 |
| Wisconsin [7] | 1,298,346 | 39.2 | 1,441,825 | 1,305,082 | 90.5 |
| Wyoming | 85,454 | 30.7 | 89,540 | 85,627 | 95.6 |
| U.S. Total | 69,486,966 | 43.1 | 90,687,978 | 70,551,227 | 77.8 |

OCA-APPX-0908

| State | Mailed Ballots Counted | | Mailed Ballots Rejected | |
|---|---|---|---|---|
| | Total | % of Returned | Total | % of Returned |
| Alabama [1] | -- | -- | -- | -- |
| Alaska | 96,701 | 99.3 | 643 | 0.7 |
| American Samoa | 905 | 99.3 | 6 | 0.7 |
| Arizona | 2,931,164 | 99.7 | 7,732 | 0.3 |
| Arkansas | 84,232 | 71.7 | 7,561 | 6.4 |
| California | 15,305,243 | 99.4 | 92,924 | 0.6 |
| Colorado | 3,092,904 | 99.1 | 29,536 | 0.9 |
| Connecticut | 667,403 | 99.0 | 6,496 | 1.0 |
| Delaware | 161,135 | 98.7 | 2,099 | 1.3 |
| District of Columbia | 234,758 | 99.7 | 728 | 0.3 |
| Florida | 4,740,149 | 99.8 | 13,919 | 0.3 |
| Georgia [2] | 1,311,361 | 99.6 | 4,804 | 0.4 |
| Guam | 108 | 83.7 | 21 | 16.3 |
| Hawaii | 548,636 | 99.5 | 2,747 | 0.5 |
| Idaho [3] | 352,641 | 102.2 | 3,613 | 1.0 |
| Illinois | 1,986,445 | 98.6 | 33,853 | 1.7 |
| Indiana | 535,942 | 99.5 | 2,918 | 0.5 |
| Iowa | 994,300 | 99.7 | 2,592 | 0.3 |
| Kansas [4] | 24,924 | 8.4 | 1,361 | 0.5 |
| Kentucky | 631,497 | 99.5 | 3,101 | 0.5 |
| Louisiana | 161,292 | 98.6 | 2,364 | 1.4 |
| Maine | 359,331 | 99.1 | 1,326 | 0.4 |
| Maryland | 1,502,852 | 99.8 | 2,939 | 0.2 |
| Massachusetts | 1,521,052 | 99.4 | 9,949 | 0.6 |
| Michigan | 2,741,668 | 99.3 | 20,480 | 0.7 |
| Minnesota | 1,286,660 | 99.3 | 9,248 | 0.7 |
| Mississippi | 233,925 | 97.7 | 5,563 | 2.3 |
| Missouri | 899,695 | 99.4 | 5,437 | 0.6 |
| Montana | 597,912 | 99.7 | 1,593 | 0.3 |
| Nebraska | 485,195 | 99.7 | 1,649 | 0.3 |
| Nevada | 664,461 | 99.2 | 5,630 | 0.8 |
| New Hampshire | 253,932 | 99.2 | 2,003 | 0.8 |
| New Jersey | 4,178,875 | 98.8 | 49,812 | 1.2 |
| New Mexico | 328,631 | 96.7 | 17,008 | 5.0 |
| New York | 1,763,448 | 96.2 | 66,746 | 3.6 |
| North Carolina | 974,351 | 99.2 | 7,465 | 0.8 |
| North Dakota | 183,152 | 99.8 | 392 | 0.2 |
| Northern Mariana Islands [5] | 1,193 | 71.4 | 144 | 8.6 |

OCA-APPX-0909



| State | Mailed Ballots Counted | | Mailed Ballots Rejected | |
|-------|------|-------------|-------|-------------|
| | Total | % of Returned | Total | % of Returned |
| Ohio | 2,135,600 | 99.6 | 8,904 | 0.4 |
| Oklahoma | 275,017 | 98.2 | 5,089 | 1.8 |
| Oregon | 2,379,544 | 99.3 | 17,547 | 0.7 |
| Pennsylvania | 2,619,517 | 98.7 | 34,171 | 1.3 |
| Puerto Rico [6] | 22,402 | 100.0 | -- | -- |
| Rhode Island | 318,313 | 100.0 | 113 | 0.0 |
| South Carolina | 425,701 | 98.9 | 4,528 | 1.1 |
| South Dakota | 122,525 | 99.3 | 789 | 0.6 |
| Tennessee | 216,074 | 99.0 | 2,090 | 1.0 |
| Texas | 982,362 | 99.4 | 8,304 | 0.8 |
| U.S. Virgin Islands | 1,670 | 99.3 | 12 | 0.7 |
| Utah | 1,386,385 | 99.3 | 10,296 | 0.7 |
| Vermont | 272,318 | 99.5 | 1,465 | 0.5 |
| Virginia | 983,907 | 99.4 | 6,291 | 0.6 |
| Washington | 4,051,164 | 99.2 | 31,417 | 0.8 |
| West Virginia | 142,191 | 99.8 | 254 | 0.2 |
| Wisconsin [7] | 1,302,101 | 99.8 | 2,981 | 0.2 |
| Wyoming | 85,454 | 99.8 | 173 | 0.2 |
| U.S. Total | 69,560,318 | 98.8 | 560,826 | 0.8 |

Overview Table 2 Calculation Notes:

**Total Mail Voters** uses the sum of questions F1d and F1g.

**% Turnout by Mail** uses the sum of questions F1d and F1g divided by question F1a.

**Total Mailed Ballots Transmitted** uses question C1a.

**Total Mailed Ballots Returned** uses question C1b.

**% Mailed Ballots Returned** uses question C1b divided by question C1a.

**Mailed Ballots Counted, Total** uses question C3a.

**Mailed Ballots Counted, % of Returned** uses question C3a divided by question C1b.

**Mailed Ballots Rejected, Total** uses question C4a.

**Mailed Ballots Rejected, % of Returned** uses question C4a divided by question C1b.

Overview Table 2 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Because each percentage was calculated independently, the percentages of mailed ballots counted and rejected may not sum to 100% for some states or at the national level.
- The Total Mail Voters column reflects the number of voters who cast a ballot by mail that was counted. It does not include voters who cast a UOCAVA ballot or FWAB.

OCA-APPX-0910

- The Total Mailed Ballots Transmitted column captures the total number of mailed ballots that states reported transmitting, regardless of whether the ballot was returned or not. The number of ballots transmitted typically exceeds the number of ballots returned because some voters who transmitted a mailed ballot choose to vote by another mode or to not vote at all. Total Mailed Ballots Returned typically exceeds Total Mail Voters because some returned mailed ballots are rejected for not meeting state requirements. Mailed Ballots Counted may not match Total Mail Voters because states may have different methodologies for calculating these numbers.
- The Total Mailed Ballots Returned column includes both counted and rejected ballots that were returned to election offices.

[1] Alabama reported mail and early in-person voting data together as the Total Mail Voters (300,684). Both are considered absentee voting; thus, the data for transmission method are commingled and cannot be reported separately.

[2] Data on rejected mailed ballots for Georgia include rejected ballots entered by counties into the state voter registration system as of February 2021, which does not necessarily include all ballots rejected by counties.

[3] Butte County and Valley County in Idaho responded "Data not available" to the number of mailed ballots received (C1b) but reported data for the number of mailed ballots counted (C3a). Madison County and Valley County in Idaho reported more mailed ballots counted than mailed ballots received. Because of these responses, the total number of mailed ballots counted exceeds the number of mailed ballots received at the state level for Idaho, and the percentage of returned ballots that were counted exceeds 100%.

[4] Kansas did not provide any survey comments to explain why the data reported in the Total Mail Voters column exceeds that of the Total Mailed Ballots Transmitted column, nor why the percentage of mailed ballots counted and rejected does not sum to 100%. Some jurisdictions that reported data on Total Mail Voters did not provide data for Total Mailed Ballots Transmitted.

[5] The Northern Mariana Islands did not provide any survey comments to explain why the data reported in the Total Mail Voters column exceeds that of the Total Mailed Ballots Transmitted column, nor why the percentages of mailed ballots counted and rejected does not sum to 100%.

[6] Puerto Rico reported "data not available" in question C4. In addition, this territory noted in a survey comment that the Total Mail Voters column may include ballots for non-federal elections and that its response in the Total Mail Voters and % Turnout by Mail columns includes "voters who [cast] their vote early but in their home, not in a polling location."

[7] Local election officials in Wisconsin were still recording voter participation method at the time data was provided for this report; therefore, the Total Mail Voters data were incomplete. These data are currently available from the state.

OCA-APPX-0911



## Overview Table 3: In-Person Voting and Other Modes of Voting

| State | In-Person Election Day Voters | | In-Person Early Voters | | Provisional Voters | |
|---|---|---|---|---|---|---|
| | Total | % | Total | % | Total | % |
| Alabama [1] | 2,014,242 | 86.5 | -- | -- | 8,840 | 0.4 |
| Alaska [2] | 157,220 | 43.5 | 82,451 | 22.8 | 11,509 | 3.2 |
| American Samoa | 10,310 | 86.3 | 455 | 3.8 | 12 | 0.1 |
| Arizona | 371,565 | 10.9 | 69,063 | 2.0 | 30,151 | 0.9 |
| Arkansas [3] | 258,836 | 21.4 | 830,561 | 68.6 | 5,082 | 0.4 |
| California [4] | 1,124,389 | 6.3 | 966,201 | 5.5 | 216,781 | 1.2 |
| Colorado | 89,789 | 2.7 | 108,856 | 3.3 | 150 | 0.0 |
| Connecticut [1] | 1,188,283 | 63.8 | -- | -- | 104 | 0.0 |
| Delaware | 345,809 | 67.2 | 5,236 | 1.0 | 107 | 0.0 |
| District of Columbia | 29,036 | 8.4 | 80,959 | 23.4 | 1,738 | 0.5 |
| Florida [5] | 1,942,102 | 17.4 | 4,332,912 | 38.9 | 7,169 | 0.1 |
| Georgia | 980,627 | 19.5 | 2,704,002 | 53.8 | 9,347 | 0.2 |
| Guam | 16,167 | 55.0 | 12,966 | 44.1 | 71 | 0.2 |
| Hawaii | 4,522 | 0.8 | 24,214 | 4.2 | 6 | 0.0 |
| Idaho [6] | 384,319 | 43.7 | 145,388 | 16.5 | 0 | 0.0 |
| Illinois | 2,049,927 | 33.4 | 2,005,711 | 32.7 | 42,003 | 0.7 |
| Indiana | 1,201,154 | 38.7 | 1,354,897 | 43.7 | 1,348 | 0.0 |
| Iowa [1] | 698,557 | 41.1 | -- | -- | 1,293 | 0.1 |
| Kansas | 505,132 | 36.6 | 375,196 | 27.2 | 36,107 | 2.6 |
| Kentucky | 477,612 | 22.2 | 1,024,965 | 47.7 | 77 | 0.0 |
| Louisiana | 1,182,672 | 54.5 | 817,951 | 37.7 | 658 | 0.0 |
| Maine | 311,560 | 37.9 | 151,535 | 18.4 | 108 | 0.0 |
| Maryland | 439,094 | 14.4 | 987,373 | 32.3 | 108,478 | 3.5 |
| Massachusetts [7] | 1,256,443 | 34.3 | 852,926 | 23.3 | 1,724 | 0.0 |
| Michigan [8] | 2,286,764 | 41.0 | 529,015 | 9.5 | 77 | 0.0 |
| Minnesota [6] | 1,380,309 | 42.0 | 607,304 | 18.5 | -- | -- |
| Mississippi [1] | 1,085,337 | 81.4 | -- | -- | 11,358 | 0.9 |
| Missouri [1] | 2,288,607 | 71.5 | -- | -- | 2,139 | 0.1 |
| Montana [1] | 9,497 | 1.6 | | | 364 | 0.1 |
| Nebraska | 417,349 | 43.2 | 51,537 | 5.3 | 9,998 | 1.0 |
| Nevada | 128,729 | 9.1 | 540,767 | 38.4 | 66,359 | 4.7 |
| New Hampshire [1], [6] | 554,315 | 68.1 | -- | -- | -- | -- |
| New Jersey [9] | 987 | 0.0 | -- | -- | 293,894 | 6.5 |
| New Mexico [10] | 142,470 | 15.3 | 456,280 | 49.2 | 687 | 0.1 |
| New York | 4,284,263 | 49.2 | 2,502,161 | 28.8 | 84,884 | 1.0 |
| North Carolina [11] | 896,818 | 16.2 | 3,460,562 | 62.4 | 16,388 | 0.3 |
| North Dakota [6] | 91,803 | 25.2 | 87,882 | 24.1 | -- | -- |

OCA-APPX-0912

| State | In-Person Election Day Voters | | In-Person Early Voters | | Provisional Voters | |
|---|---|---|---|---|---|---|
| | Total | % | Total | % | Total | % |
| Northern Mariana Islands | 3,970 | 29.7 | 8,130 | 60.9 | 24 | 0.2 |
| Ohio | 2,344,886 | 39.3 | 1,345,715 | 22.5 | 126,066 | 2.1 |
| Oklahoma | 1,114,001 | 71.2 | 167,516 | 10.7 | 1,986 | 0.1 |
| Oregon [12] | -- | -- | -- | -- | 45 | 0.0 |
| Pennsylvania [13] | 4,214,277 | 60.4 | -- | -- | 106,951 | 1.5 |
| Puerto Rico | 1,092,637 | 84.3 | 48,724 | 3.8 | 8,977 | 0.7 |
| Rhode Island [1], [14] | 198,611 | 38.2 | -- | -- | 2,488 | 0.5 |
| South Carolina | 1,182,726 | 46.9 | 894,078 | 35.4 | 5,442 | 0.2 |
| South Dakota | 208,396 | 48.8 | 93,469 | 21.9 | 65 | 0.0 |
| Tennessee | 766,552 | 24.9 | 2,071,168 | 67.4 | 6,222 | 0.2 |
| Texas | 1,707,821 | 14.9 | 8,660,809 | 75.6 | 37,760 | 0.3 |
| U.S. Virgin Islands | 8,119 | 44.9 | 8,173 | 45.2 | 94 | 0.5 |
| Utah | 81,970 | 5.3 | 35,048 | 2.3 | 31,652 | 2.1 |
| Vermont [6] | 90,959 | 24.7 | 2,033 | 0.6 | -- | -- |
| Virginia | 1,657,228 | 36.9 | 1,798,050 | 40.1 | 15,825 | 0.4 |
| Washington [15] | -- | -- | 183 | 0.0 | 43 | 0.0 |
| West Virginia | 396,926 | 49.5 | 256,113 | 31.9 | 4,222 | 0.5 |
| Wisconsin [16] | 1,337,269 | 40.4 | 651,791 | 19.7 | 57 | 0.0 |
| Wyoming | 135,426 | 48.6 | 55,903 | 20.1 | 15 | 0.0 |
| U.S. Total | 47,148,389 | 30.5 | 41,266,229 | 30.6 | 1,316,945 | 0.8 |

OCA-APPX-0913



| State | UOCAVA Voters | | Other Voters | |
|---|---|---|---|---|
| | Total | % | Total | % |
| Alabama [1] | 5,281 | 0.2 | -- | -- |
| Alaska [2] | 13,519 | 3.7 | 4,230 | 1.2 |
| American Samoa | 214 | 1.8 | -- | -- |
| Arizona | 18,527 | 0.5 | -- | -- |
| Arkansas [3] | 30,512 | 2.5 | 174 | 0.0 |
| California [4] | 93,452 | 0.5 | 923,698 | 5.2 |
| Colorado | 28,908 | 0.9 | -- | -- |
| Connecticut [1] | 7,689 | 0.4 | -- | -- |
| Delaware | 2,369 | 0.5 | -- | -- |
| District of Columbia | 5,299 | 1.5 | -- | -- |
| Florida [5] | 116,364 | 1.0 | 184,533 | 1.7 |
| Georgia | 18,475 | 0.4 | -- | -- |
| Guam | 65 | 0.2 | -- | -- |
| Hawaii | 2,720 | 0.5 | -- | -- |
| Idaho [6] | 3,184 | 0.4 | -- | -- |
| Illinois | 24,297 | 0.4 | -- | -- |
| Indiana | 9,943 | 0.3 | -- | -- |
| Iowa [1] | 5,980 | 0.4 | -- | -- |
| Kansas | 5,434 | 0.4 | -- | -- |
| Kentucky | 4,664 | 0.2 | -- | -- |
| Louisiana | 5,919 | 0.3 | -- | -- |
| Maine | 5,771 | 0.7 | -- | -- |
| Maryland | 21,806 | 0.7 | -- | -- |
| Massachusetts [7] | 25,331 | 0.7 | 529 | 0.0 |
| Michigan [8] | 21,793 | 0.4 | -- | -- |
| Minnesota [6] | 15,740 | 0.5 | -- | -- |
| Mississippi [1] | 2,960 | 0.2 | -- | -- |
| Missouri [1] | 11,017 | 0.3 | -- | -- |
| Montana [1] | 4,368 | 0.7 | -- | -- |
| Nebraska | 2,707 | 0.3 | -- | -- |
| Nevada | 7,445 | 0.5 | -- | -- |
| New Hampshire [1], [6] | 6,252 | 0.8 | -- | -- |
| New Jersey [9] | 20,903 | 0.5 | -- | -- |
| New Mexico [10] | 5,132 | 0.6 | 284 | 0.0 |
| New York | 66,993 | 0.8 | -- | -- |
| North Carolina [11] | 26,386 | 0.5 | 168,900 | 3.0 |
| North Dakota [6] | 1,653 | 0.5 | -- | -- |
| Northern Mariana Islands | 0 | 0.0 | -- | -- |

OCA-APPX-0914

| State | UOCAVA Voters | | Other Voters | |
|---|---|---|---|---|
| | **Total** | **%** | **Total** | **%** |
| Ohio | 21,854 | 0.4 | -- | -- |
| Oklahoma | 6,366 | 0.4 | -- | -- |
| Oregon [12] | 16,534 | 0.7 | -- | -- |
| Pennsylvania [13] | 28,014 | 0.4 | 842 | 0.0 |
| Puerto Rico | 587 | 0.0 | -- | -- |
| Rhode Island [1], [14] | -- | -- | -- | -- |
| South Carolina | 12,906 | 0.5 | -- | -- |
| South Dakota | 2,951 | 0.7 | -- | -- |
| Tennessee | 14,676 | 0.5 | -- | -- |
| Texas | 60,292 | 0.5 | -- | -- |
| U.S. Virgin Islands | 8 | 0.0 | -- | -- |
| Utah | 7,474 | 0.5 | -- | -- |
| Vermont [6] | 2,986 | 0.8 | -- | -- |
| Virginia | 32,328 | 0.7 | -- | -- |
| Washington [15] | 64,848 | 1.6 | -- | -- |
| West Virginia | 2,215 | 0.3 | -- | -- |
| Wisconsin [16] | 13,481 | 0.4 | 7,387 | 0.2 |
| Wyoming | 1,705 | 0.6 | -- | -- |
| U.S. Total | 938,297 | 0.6 | 1,290,577 | 2.5 |

Overview Table 3 Calculation Notes:

**In-Person Election Day Voters, Total** uses question F1b.
**In-Person Election Day Voters, %** uses question F1b divided by question F1a.
**In-Person Early Voters, Total** uses question F1f.
**In-Person Early Voters, %** uses question F1f divided by question F1a.
**Provisional Voters, Total** uses question F1e.
**Provisional Voters, %** uses question F1e divided by question F1a.
**UOCAVA Voters, Total** uses question F1c.
**UOCAVA Voters, %** uses question F1c divided by question F1a.
**Other Voters, Total** uses question F1h.
**Other Voters, %** uses question F1h divided by question F1a.

Overview Table 3 Data Notes:

**General Notes:**
- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Question F1f includes all voters who participated in the election in person prior to Election Day. This includes in-person early voting, in-person absentee voting, and any other terminology the state used to refer to in-person early voting (as reported in question Q24 of the 2020 Policy Survey).

OCA-APPX-0915



- Question F1h was not mandatory. States only reported data in this item if they offered another mode of voting aside from those listed in questions F1b–F1g or if there were counted ballots that could not be categorized in questions F1b–F1g.
- Because each percentage was calculated independently, the percentages of turnout by mode in this table and the previous table may not sum to 100% for some states or at the national level.

[1] Alabama, Connecticut, Iowa, Mississippi, Missouri, Montana, New Hampshire, and Rhode Island did not report data in F1f, because the number of in-person early voters could not be tracked separately from other modes of participation.

[2] Alaska's F1h data included ballots transmitted by electronic transmission (online or fax) delivery.

[3] Arkansas's F1h data included nursing home patients who refused their ballots and votes by bearer, "admin," or delivered by another person.

[4] California's F1h data included conditional voter registration (CVR) voters, SDR voters, manual voter history updates, "confidentials," mailed ballots from domestic and UOCAVA voters that could not be separated by mode, and other counted ballots not reported in other F1 items.

[5] Two counties in Florida—Duval and Indian River counties—combined their reported number of UOCAVA and domestic mailed ballots in F1h in lieu of reporting them separately within F1c and F1d, respectively.

[6] Idaho, Minnesota, New Hampshire, and Vermont are exempt from the NVRA requirement to offer provisional ballots. North Dakota is exempt from offering provisional ballots because it does not require voter registration.

[7] Massachusetts's F1h data included "non-UOCAVA AV [absentee voting] ballots not returned by mail."

[8] Michigan's data in the In-Person Early Voters columns reflect those who voted absentee at the local clerk's office prior to Election Day.

[9] New Jersey did not report data in F1f because the state did not offer in-person early voting.

[10] New Mexico's F1h data included ballots cast because of "emergency (medical reasons)."

[11] North Carolina's F1h data included curbside absentee voters.

[12] Oregon is a vote-by-mail state and traditional early voting does not exist.

[13] Pennsylvania reported that the state cannot systematically track data on poll workers. Pennsylvania's F1h data included ballots for which "vote method not identified in the system."

[14] Rhode Island reported that data for question F1c is unavailable.

[15] Washington is a vote-by-mail state. Voters can register and vote on or before Election Day. Totals in F1f (voters who cast a ballot at an in-person early voting location and whose ballots were counted) include voters who used a disability access unit.

[16] Wisconsin reported that state statute does not require the state to track data on poll workers. Wisconsin's F1h data included ballots for which voter method data was not yet available.

OCA-APPX-0916

## Overview Table 4: Polling Places and Poll Workers

| State | Total Precincts | Total Polling Places | | Total Poll Workers | |
|---|---|---|---|---|---|
| | | Election Day | Early Voting | Election Day | Early Voting |
| Alabama [1] | 2,111 | 1,976 | 69 | 16,028 | -- |
| Alaska [2] | 441 | 420 | 164 | 2,817 | 260 |
| American Samoa | 41 | 41 | 1 | 0 | 256 |
| Arizona | 1,494 | 767 | 161 | 7,409 | 1,091 |
| Arkansas | 2,519 | 11,055 | 9,834 | 6,440 | 2,379 |
| California | 20,497 | 3,704 | 1,951 | 46,762 | 25,680 |
| Colorado [3] | 3,215 | 341 | 301 | 7,185 | 7,185 |
| Connecticut [1], [4] | 718 | 718 | -- | 3,590 | -- |
| Delaware | 439 | 264 | 3 | 3,157 | 3 |
| District of Columbia | 144 | 95 | 32 | 2,407 | 2,549 |
| Florida | 6,128 | 4,433 | 425 | 42,247 | 11,173 |
| Georgia [2] | 2,648 | 2,419 | 336 | 22,401 | 5,073 |
| Guam | 67 | 22 | 5 | 485 | 48 |
| Hawaii [2], [5] | 250 | 8 | 8 | 64 | 64 |
| Idaho | 948 | 722 | 32 | 5,532 | 303 |
| Illinois [2] | 10,075 | 17,169 | 2,515 | 43,299 | 3,412 |
| Indiana | 5,169 | 1,835 | 302 | 15,313 | 2,211 |
| Iowa [1] | 1,681 | 1,329 | -- | 8,632 | 1,003 |
| Kansas [6] | 2,601 | -- | -- | 5,789 | 1,120 |
| Kentucky | 3,692 | 682 | 197 | 7,947 | 4,658 |
| Louisiana [2], [7] | 3,934 | 1,991 | 105 | 16,980 | -- |
| Maine [8] | 551 | 520 | 520 | 6,054 | -- |
| Maryland [9] | 1,991 | 320 | 81 | 12,469 | 8,210 |
| Massachusetts [2], [10] | 2,173 | 1,220 | 391 | 13,044 | -- |
| Michigan [11] | 4,751 | 3,367 | 1,583 | 35,825 | 0 |
| Minnesota [2] | 4,110 | 2,344 | 237 | 28,646 | 1,139 |
| Mississippi [1] | 1,776 | 1,776 | -- | 11,358 | -- |
| Missouri [1] | 4,373 | 2,326 | -- | 19,075 | -- |
| Montana | 663 | 21 | 22 | 1,592 | 1,427 |
| Nebraska | 1,379 | 922 | 93 | 7,695 | 115 |
| Nevada | 1,990 | 217 | 90 | 2,692 | 2,200 |
| New Hampshire [1], [2] | 340 | 308 | -- | 3,576 | -- |
| New Jersey [2], [12] | 6,346 | 1,549 | -- | 7,603 | -- |
| New Mexico | 1,949 | 664 | 219 | 3,631 | 953 |
| New York | 15,551 | 4,838 | 286 | 73,198 | 15,065 |
| North Carolina [13] | 2,663 | 2,752 | 451 | 24,742 | 12,310 |

OCA-APPX-0917



| State | Total Precincts | Total Polling Places | | Total Poll Workers | |
|---|---|---|---|---|---|
| | | Election Day | Early Voting | Election Day | Early Voting |
| North Dakota [2], [14] | 422 | 110 | 18 | -- | -- |
| Northern Mariana Islands [2] | 7 | 7 | 4 | 135 | 54 |
| Ohio [15] | 8,933 | 3,563 | 88 | 47,761 | 0 |
| Oklahoma | 1,950 | 1,950 | 82 | 5,993 | 559 |
| Oregon [16] | 1,328 | 36 | -- | -- | -- |
| Pennsylvania [2], [17] | 9,158 | 9,155 | 91 | -- | -- |
| Puerto Rico [2], [18] | 1,365 | 1,259 | 353 | -- | -- |
| Rhode Island [2] | 461 | 461 | 39 | 3,516 | 78 |
| South Carolina [19] | 2,262 | 1,975 | 116 | 16,618 | 517 |
| South Dakota | 715 | 506 | 67 | 2,562 | 177 |
| Tennessee | 1,961 | 1,852 | 214 | 16,641 | 2,757 |
| Texas | 9,949 | 6,580 | 3,024 | 41,092 | 17,740 |
| U.S. Virgin Islands [2] | 12 | 9 | 3 | 150 | 40 |
| Utah | 2,943 | 123 | 73 | 2,015 | 521 |
| Vermont [2], [20] | 275 | 275 | 246 | -- | -- |
| Virginia [21] | 2,454 | 2,454 | 133 | 27,984 | 2,419 |
| Washington [22] | 7,436 | -- | 66 | -- | -- |
| West Virginia | 1,706 | 1,361 | 60 | 8,143 | 271 |
| Wisconsin [23] | 3,698 | 2,467 | -- | -- | -- |
| Wyoming | 480 | 179 | 8 | 2,052 | 85 |
| U.S. Total | 176,933 | 107,457 | 25,099 | 690,346 | 135,105 |

OCA-APPX-0918

| State | Poll Workers' Ages | | | | | |
|---|---|---|---|---|---|---|
| | % Age <18 | % Age 18–25 | % Age 26–40 | % Age 41–60 | % Age 61–70 | % Age 71+ |
| Alabama [1] | 2.5 | 2.9 | 7.9 | 25.7 | 31.4 | 29.6 |
| Alaska [2] | -- | -- | -- | -- | -- | -- |
| American Samoa | 0.0 | 20.7 | 25.4 | 42.6 | 11.3 | 0.0 |
| Arizona | 1.1 | 4.4 | 12.3 | 27.7 | 30.3 | 24.1 |
| Arkansas | 0.7 | 4.3 | 6.8 | 21.8 | 36.3 | 30.0 |
| California | 12.7 | 9.5 | 22.8 | 30.4 | 16.3 | 8.3 |
| Colorado [3] | 6.8 | 3.6 | 8.9 | 24.5 | 32.7 | 23.5 |
| Connecticut [1], [4] | -- | -- | -- | -- | -- | -- |
| Delaware | 3.6 | 6.7 | 11.7 | 32.1 | 29.9 | 15.9 |
| District of Columbia | 1.8 | 8.8 | 49.6 | 24.6 | 11.4 | 3.7 |
| Florida | 0.9 | 4.3 | 10.8 | 30.5 | 29.9 | 23.6 |
| Georgia [2] | -- | -- | -- | -- | -- | -- |
| Guam | 0.0 | 24.5 | 25.8 | 32.3 | 9.0 | 8.4 |
| Hawaii [2], [5] | -- | -- | -- | -- | -- | -- |
| Idaho | 5.3 | 4.4 | 8.6 | 21.4 | 39.3 | 21.0 |
| Illinois [2] | -- | -- | -- | -- | -- | -- |
| Indiana | 4.3 | 7.0 | 17.4 | 31.7 | 24.1 | 15.4 |
| Iowa [1] | 0.3 | 3.9 | 10.9 | 25.8 | 34.1 | 24.9 |
| Kansas [6] | 4.0 | 3.9 | 12.9 | 24.4 | 29.6 | 25.1 |
| Kentucky | 0.2 | 6.2 | 13.2 | 37.4 | 26.5 | 16.4 |
| Louisiana [2], [7] | -- | -- | -- | -- | -- | -- |
| Maine [8] | 0.6 | 4.4 | 11.4 | 33.0 | 31.8 | 18.7 |
| Maryland [9] | 2.8 | 6.6 | 13.8 | 41.3 | 25.0 | 10.5 |
| Massachusetts [2], [10] | -- | -- | -- | -- | -- | -- |
| Michigan [11] | 3.9 | 3.8 | 6.6 | 22.9 | 33.6 | 29.1 |
| Minnesota [2] | -- | -- | -- | -- | -- | -- |
| Mississippi [1] | 0.0 | 0.0 | 0.0 | 5.0 | 50.2 | 44.8 |
| Missouri [1] | 5.4 | 6.1 | 10.1 | 24.2 | 30.5 | 23.8 |
| Montana | 0.0 | 2.0 | 7.5 | 27.8 | 35.7 | 27.0 |
| Nebraska | 1.1 | 4.1 | 17.0 | 31.1 | 26.3 | 20.4 |
| Nevada | 4.1 | 10.0 | 14.0 | 27.5 | 25.1 | 19.3 |
| New Hampshire [1], [2] | -- | -- | -- | -- | -- | -- |
| New Jersey [2], [12] | -- | -- | -- | -- | -- | -- |
| New Mexico | 2.8 | 6.7 | 11.6 | 27.9 | 30.1 | 20.9 |
| New York | 0.4 | 8.5 | 22.2 | 29.7 | 22.1 | 17.1 |
| North Carolina [13] | 2.9 | 4.6 | 11.7 | 30.3 | 31.3 | 19.2 |
| North Dakota [2], [14] | -- | -- | -- | -- | -- | -- |

OCA-APPX-0919



| State | Poll Workers' Ages | | | | | |
|---|---|---|---|---|---|---|
| | % Age <18 | % Age 18–25 | % Age 26–40 | % Age 41–60 | % Age 61–70 | % Age 71+ |
| Northern Mariana Islands [2] | -- | -- | -- | -- | -- | -- |
| Ohio [15] | 2.1 | 5.4 | 14.1 | 32.1 | 28.6 | 17.8 |
| Oklahoma | 0.0 | 2.1 | 6.3 | 18.5 | 31.6 | 41.4 |
| Oregon [16] | -- | -- | -- | -- | -- | -- |
| Pennsylvania [2], [17] | -- | -- | -- | -- | -- | -- |
| Puerto Rico [2], [18] | -- | -- | -- | -- | -- | -- |
| Rhode Island [2] | -- | -- | -- | -- | -- | -- |
| South Carolina [19] | -- | -- | -- | -- | -- | -- |
| South Dakota | 0.0 | 1.3 | 7.6 | 21.2 | 38.4 | 31.6 |
| Tennessee | 3.6 | 4.4 | 9.2 | 23.8 | 32.7 | 26.3 |
| Texas | 6.7 | 9.5 | 14.4 | 27.9 | 26.0 | 15.5 |
| U.S. Virgin Islands [2] | -- | -- | -- | -- | -- | -- |
| Utah | 1.2 | 11.7 | 25.3 | 40.9 | 15.8 | 5.2 |
| Vermont [2], [20] | -- | -- | -- | -- | -- | -- |
| Virginia [21] | -- | -- | -- | -- | -- | -- |
| Washington [22] | -- | -- | -- | -- | -- | -- |
| West Virginia | 0.0 | 5.3 | 13.1 | 30.1 | 28.6 | 22.8 |
| Wisconsin [23] | -- | -- | -- | -- | -- | -- |
| Wyoming | 1.3 | 3.0 | 9.7 | 24.5 | 38.2 | 23.3 |
| U.S. Total | 3.2 | 6.2 | 15.0 | 28.4 | 27.3 | 20.1 |

Overview Table 4 Calculation Notes:

**Total Precincts** uses question D2a.

**Total Polling Places, Election Day** uses question D3a.

**Total Polling Places, Early Voting** uses question D4a.

**Total Poll Workers, Election Day** uses question D5.

**Total Poll Workers, Early Voting** uses question D6.

**Poll Workers % Age <18** uses question D7b divided by the sum of questions D7b–D7g.

**Poll Workers % Age 18–25** uses question D7c divided by the sum of questions D7b–D7g.

**Poll Workers % Age 26–40** uses question D7d divided by the sum of questions D7b–D7g.

**Poll Workers % Age 41–60** uses question D7e divided by the sum of questions D7b–D7g.

**Poll Workers % Age 61–70** uses question D7f divided by the sum of questions D7b–D7g.

**Poll Workers % Age 71+** uses question D7g divided by the sum of questions D7b–D7g.

Overview Table 4 Data Notes

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.

OCA-APPX-0920

- Because percentages for each age category were calculated independently, the percentages for each age category may not sum to 100% for some states or at the national level.
- In calculating percentages for poll worker age categories, the sum of questions D7b–D7g was used instead of D7a because some states did not report data in all age categories.

[1] Alabama, Connecticut, Iowa, Mississippi, Missouri, and New Hampshire did not report complete data on early voting because some of this data could not be tracked separately from Election Day voting data.

[2] Alaska, Georgia, Hawaii, Illinois, Louisiana, Massachusetts, Minnesota, New Hampshire, New Jersey, North Dakota, the Northern Mariana Islands, Pennsylvania, Puerto Rico, Rhode Island, the U.S. Virgin Islands, and Vermont do not track data on the ages of their poll workers.

[3] Colorado did not distinguish between early voting and Election Day voting in collecting information on poll workers. Because Colorado counties automatically mail ballots to every active voter and most voters choose to vote the mail ballot, a large number of poll workers are needed to process the mail ballots. That work begins in the early voting period and continues through Election Day and the eight-day post-election period when military and overseas voters can return their ballot and voters with signature or ID issues can cure their ballots.

[4] Connecticut provided data on the total number of poll workers in question D7a but was unable to provide the age breakdown in questions D7b–D7g.

[5] In Hawaii, in-person voting locations are called Voter Service Centers and provide accessible in-person voting, SDR, and collection of voted ballots.

[6] Kansas did not report data on the number of polling places in questions D3 and D4.

[7] Louisiana reported both its early voting and Election Day poll workers in question D5.

[8] Maine reported that data on the number of early voting poll workers in question D6 was not available.

[9] The number of Election Day voting locations in Maryland for the 2020 general election was greatly reduced due to the COVID-19 pandemic and the lack of poll workers. The 320 Election Day voting locations reported in D3a all served as county-wide vote centers. In a typical election, the number of Election Day polling places generally corresponds to the numbers of precincts, and each polling place only serves the precinct(s) assigned to it.

[10] Massachusetts reported that "Those who worked early voting were not called 'poll workers' and varied each day of early voting."

[11] Michigan reported data in D4 and noted that "early voting takes place at a clerk's office or their satellite offices for in-person absentee voting only." All Michigan jurisdictions reported zero for the number of early voting poll workers in D6; regular office staff operated clerk's offices and satellite locations.

[12] New Jersey did not report data in questions D4a nor D6 because the state did not offer in-person early voting.

[13] Precinct, polling place, and early voting site counts are based on data that election officials entered into North Carolina's Statewide Election Information Management System (SEIMS) and may be marginally different than the number of sites that were actually open during early voting and Election Day voting.

[14] North Dakota provided data on the total number of poll workers in question D7a but was unable to provide the totals for Election Day and early voting poll workers in questions D5 and D6 or the age breakdown in questions D7b–D7g.

[15] Ohio reported zero early voting poll workers with a comment that regular office staff operated the early voting sites.

[16] Oregon is a vote-by-mail state and does not have or track traditional poll workers for in-person voting.

[17] Pennsylvania provides in-person absentee and mail-in voting at county election offices and satellite county election offices. Absentee and mail-in ballots cast in person are secured until Election Day to be tabulated by the county board of elections. Pennsylvania reported that the state cannot systematically track data on poll workers.

OCA-APPX-0921



[18] Puerto Rico reported that data on poll workers are not available and that poll workers were volunteers, not PR-SEC employees.

[19] South Carolina only reported poll workers who were under the age of 18 and did not provide data for any other age categories. South Carolina's data on poll worker ages has been excluded from this table.

[20] Vermont did not provide data on the number of poll workers.

[21] Virginia does not capture or track information on the age of poll workers. Before this report's finalization, Virginia notified the EAC that the statewide number of early voting polling places in D4a was 208, not 133.

[22] Washington is a vote-by-mail state and does not have traditional polling places. Washington has voting centers that are open for the entire voting period, not just a single day. Each county is required to have two certified election administrators and can hire election workers to assist with processing returned ballots.

[23] Wisconsin state statute does not require the state to track data on early voting physical polling locations and poll workers. Partial data are available through the state.

OCA-APPX-0922

## Overview Table 5: Election Technology and Voting Methods

| State | Total Number of Voting Machines Deployed | DRE without VVPAT | | DRE with VVPAT | |
|---|---|---|---|---|---|
| | | Total | % | Total | % |
| Alabama | 4,864 | -- | -- | -- | -- |
| Alaska | 758 | -- | -- | 152 | 20.1 |
| American Samoa [1] | -- | -- | -- | -- | -- |
| Arizona | 1,539 | -- | -- | 19 | 1.2 |
| Arkansas | 4,480 | 76 | 1.7 | 92 | 2.1 |
| California | 33,163 | -- | -- | 23 | 0.1 |
| Colorado | 1,851 | -- | -- | -- | -- |
| Connecticut | 2,154 | -- | -- | -- | -- |
| Delaware | 1,057 | -- | -- | 1,050 | 99.3 |
| District of Columbia | 694 | -- | -- | -- | -- |
| Florida | 14,015 | -- | -- | 67 | 0.5 |
| Georgia | 30,824 | -- | -- | -- | -- |
| Guam | 11 | -- | -- | -- | -- |
| Hawaii | 292 | -- | -- | 276 | 94.5 |
| Idaho | 1,506 | -- | -- | 72 | 4.8 |
| Illinois | 20,043 | -- | -- | 2,215 | 11.1 |
| Indiana | 14,868 | 5,775 | 38.8 | 956 | 6.4 |
| Iowa | 2,874 | -- | -- | -- | -- |
| Kansas [2] | 5,871 | 43 | 0.7 | 4,700 | 80.1 |
| Kentucky | 4,246 | 528 | 12.4 | 570 | 13.4 |
| Louisiana | 9,828 | 9,747 | 99.2 | -- | -- |
| Maine [3] | 1,088 | -- | -- | -- | -- |
| Maryland | 3,651 | -- | -- | -- | -- |
| Massachusetts | 4,386 | -- | -- | -- | -- |
| Michigan | 8,118 | -- | -- | -- | -- |
| Minnesota | 5,710 | -- | -- | -- | -- |
| Mississippi | 7,048 | 5,820 | 82.6 | 20 | 0.3 |
| Missouri | 5,346 | -- | -- | 330 | 6.2 |
| Montana | 248 | -- | -- | -- | -- |
| Nebraska | 1,422 | -- | -- | -- | -- |
| Nevada | 5,765 | -- | -- | 5,646 | 97.9 |
| New Hampshire | 652 | -- | -- | -- | -- |
| New Jersey | 2,207 | 1,495 | 67.7 | 632 | 28.6 |
| New Mexico | 1,461 | -- | -- | -- | -- |
| New York | 18,792 | -- | -- | -- | -- |
| North Carolina | 9,468 | -- | -- | -- | -- |
| North Dakota | 524 | -- | -- | -- | -- |

OCA-APPX-0923



| State | Total Number of Voting Machines Deployed | DRE without VVPAT | | DRE with VVPAT | |
|---|---|---|---|---|---|
| | | Total | % | Total | % |
| Northern Mariana Islands [4] | 4 | -- | -- | -- | -- |
| Ohio | 25,164 | -- | -- | 7,028 | 27.9 |
| Oklahoma | 2,263 | -- | -- | -- | -- |
| Oregon [5] | -- | -- | -- | -- | -- |
| Pennsylvania | 24,413 | -- | -- | -- | -- |
| Puerto Rico | 6,075 | -- | -- | -- | -- |
| Rhode Island | 612 | -- | -- | -- | -- |
| South Carolina | 16,873 | -- | -- | -- | -- |
| South Dakota | 630 | -- | -- | -- | -- |
| Tennessee | 9,199 | 5,483 | 59.6 | -- | -- |
| Texas | 42,151 | 20,978 | 49.8 | 2,211 | 5.2 |
| U.S. Virgin Islands | 80 | -- | -- | -- | -- |
| Utah | 41 | -- | -- | -- | -- |
| Vermont [6] | 530 | -- | -- | -- | -- |
| Virginia [7] | 4,057 | -- | -- | -- | -- |
| Washington | 186 | -- | -- | -- | -- |
| West Virginia | 5,401 | -- | -- | 1,887 | 34.9 |
| Wisconsin [8] | -- | -- | -- | -- | -- |
| Wyoming | 863 | -- | -- | -- | -- |
| U.S. Total | 369,366 | 49,945 | 13.5 | 27,946 | 7.6 |

OCA-APPX-0924

| State | Ballot Marking Devices | | Scanners | | Hand Counting (Total Jurisdictions) |
|---|---|---|---|---|---|
| | Total | % | Total | % | |
| Alabama | 2,044 | 42.0 | 2,820 | 58.0 | 0 |
| Alaska | 289 | 38.1 | 317 | 41.8 | 1 |
| American Samoa [1] | -- | -- | -- | -- | 1 |
| Arizona | 1,093 | 71.0 | 427 | 27.7 | 1 |
| Arkansas | 3,373 | 75.3 | 939 | 21.0 | 5 |
| California | 31,770 | 95.8 | 1,370 | 4.1 | 0 |
| Colorado | 1,668 | 90.1 | 183 | 9.9 | 1 |
| Connecticut | -- | -- | 2,154 | 100.0 | 0 |
| Delaware | -- | -- | 7 | 0.7 | 3 |
| District of Columbia | 562 | 81.0 | 132 | 19.0 | 0 |
| Florida | 4,723 | 33.7 | 9,225 | 65.8 | 0 |
| Georgia | 27,078 | 87.8 | 3,746 | 12.2 | 0 |
| Guam | 8 | 72.7 | 3 | 27.3 | 0 |
| Hawaii | -- | -- | 16 | 5.5 | 0 |
| Idaho | 881 | 58.5 | 553 | 36.7 | 12 |
| Illinois | 9,313 | 46.5 | 8,515 | 42.5 | 0 |
| Indiana | 4,807 | 32.3 | 3,330 | 22.4 | 0 |
| Iowa | 1,402 | 48.8 | 1,472 | 51.2 | 0 |
| Kansas [2] | -- | -- | 1,128 | 19.2 | -- |
| Kentucky | 564 | 13.3 | 2,584 | 60.9 | 3 |
| Louisiana | -- | -- | 81 | 0.8 | 0 |
| Maine [3] | 496 | 45.6 | 592 | 54.4 | 187 |
| Maryland | 1,729 | 47.4 | 1,922 | 52.6 | 0 |
| Massachusetts | 2,173 | 49.5 | 2,213 | 50.5 | 58 |
| Michigan | 3,367 | 41.5 | 4,751 | 58.5 | 0 |
| Minnesota | 2,794 | 48.9 | 2,916 | 51.1 | 2 |
| Mississippi | 507 | 7.2 | 701 | 9.9 | 0 |
| Missouri | 2,402 | 44.9 | 2,614 | 48.9 | 1 |
| Montana | 136 | 54.8 | 112 | 45.2 | 10 |
| Nebraska | 1,265 | 89.0 | 157 | 11.0 | 0 |
| Nevada | 80 | 1.4 | 39 | 0.7 | 0 |
| New Hampshire | 310 | 47.5 | 342 | 52.5 | 123 |
| New Jersey | -- | -- | 80 | 3.6 | 0 |
| New Mexico | -- | -- | 1,461 | 100.0 | 33 |
| New York | 7,768 | 41.3 | 11,024 | 58.7 | 62 |
| North Carolina | 6,001 | 63.4 | 3,467 | 36.6 | 0 |
| North Dakota | 260 | 49.6 | 264 | 50.4 | 0 |
| Northern Mariana Islands [4] | -- | -- | 4 | 100.0 | 0 |

OCA-APPX-0925



| State | Ballot Marking Devices | | Scanners | | Hand Counting (Total Jurisdictions) |
|---|---|---|---|---|---|
| | Total | % | Total | % | |
| Ohio | 12,510 | 49.7 | 5,626 | 22.4 | 0 |
| Oklahoma | -- | -- | 2,263 | 100.0 | 0 |
| Oregon [5] | -- | -- | -- | -- | 0 |
| Pennsylvania | 10,860 | 44.5 | 13,553 | 55.5 | 0 |
| Puerto Rico | -- | -- | 6,075 | 100.0 | 1 |
| Rhode Island | 78 | 12.7 | 534 | 87.3 | 0 |
| South Carolina | 14,129 | 83.7 | 2,744 | 16.3 | 0 |
| South Dakota | 533 | 84.6 | 97 | 15.4 | 0 |
| Tennessee | 2,205 | 24.0 | 1,511 | 16.4 | 11 |
| Texas | 15,250 | 36.2 | 3,712 | 8.8 | 15 |
| U.S. Virgin Islands | 50 | 62.5 | 30 | 37.5 | 0 |
| Utah | 29 | 70.7 | 12 | 29.3 | 0 |
| Vermont [6] | 312 | 58.9 | 218 | 41.1 | 101 |
| Virginia [7] | -- | -- | 4,057 | 100.0 | 0 |
| Washington | 108 | 58.1 | 78 | 41.9 | 0 |
| West Virginia | 2,743 | 50.8 | 771 | 14.3 | 0 |
| Wisconsin [8] | -- | -- | -- | -- | 705 |
| Wyoming | 496 | 57.5 | 367 | 42.5 | 0 |
| U.S. Total | 178,166 | 48.2 | 113,309 | 30.7 | 1,336 |

Overview Table 5 Calculation Notes:

**Total Number of Voting Machines Deployed** uses the sum of questions F5c_1, F5c_2, F5c_3, F6c_1, F6c_2, F6c_3, F7c_1, F7c_2, F7c_3, F8c_1, F8c_2, F8c_3, F9c_1, F9c_2, F9c_3, F10c_1, F10c_2, and F10c_3.

**DRE without VVPAT, Total** uses the sum of questions F5c_1, F5c_2, and F5c_3.

**DRE without VVPAT, %** uses the sum of questions F5c_1, F5c_2, and F5c_3 divided by the total number of voting machines deployed (Column 1).

**DRE with VVPAT, Total** uses the sum of questions F6c_1, F6c_2, and F6c_3.

**DRE with VVPAT, %** uses the sum of questions F6c_1, F6c_2, and F6c_3 divided by the total number of voting machines deployed (Column 1).

**Ballot Marking Devices, Total** uses the sum of questions F7c_1, F7c_2, and F7c_3.

**Ballot Marking Devices, %** uses the sum of questions F7c_1, F7c_2, and F7c_3 divided by the total number of voting machines deployed (Column 1).

**Scanner, Total** uses the sum of questions F8c_1, F8c_2, and F8c_3.

**Scanner, %** uses the sum of questions F8c_1, F8c_2, and F8c_3 divided by the total number of voting machines deployed (Column 1).

**Hand Counting (Total Jurisdictions)** uses a count of the number of jurisdictions in each state that responded "yes" to question F11a.

OCA-APPX-0926

Overview Table 5 Data Notes:

**General Notes:**

- Although other descriptive tables in this chapter used casewise deletion at the state level in calculating percentages, this table did not. When a state reported not using a type of equipment, the number of devices of that type was filled with zero to better capture at the national level the quantity and percentage that each voting technology accounted for in the 2020 general election.

[1] American Samoa reported only hand counting ballots in the 2020 general election.

[2] Kansas did not respond to question F7a on the use of BMDs or question F11a on the use of hand counting.

[3] The data depicted in this table for Maine underreported the number of BMDs (accessible voting solution) deployed by the state's jurisdictions. Each voting place was provided with at least one BMD, and some larger jurisdictions used multiple devices. In the data previously provided to the EAC, Maine reported that each jurisdiction used only one device. The actual number of devices deployed statewide was 527.

[4] The Northern Mariana Islands reported using BMDs in question F7a and provided a description of "pencils."

[5] Oregon reported in question F8a that each of its jurisdictions used scanners, but for the purposes of this report, data on the number of scanners deployed was not tracked.

[6] Vermont provided a response of "valid skip" for all jurisdictions in question F6a and provided a response of "does not apply" for 41.1% of its jurisdictions in question F8a.

[7] Virginia reported using BMDs in all 133 of its jurisdictions, but initially did not report jurisdiction-level data on the number of BMDs deployed. Before this report's finalization, Virginia notified the EAC that the statewide number of BMDs in F7c_1, F7c_2, and F7c_3 was 2,533.

[8] Wisconsin does not permit the use of DREs without a VVPAT. Wisconsin also does not permit the use of punch card machines or lever machines. The state tracks the machine types employed in each jurisdiction and not the number of machines deployed in each jurisdiction.

OCA-APPX-0927



# Chapter 2. Election Law and Procedure: The Policy Survey

## Key Findings

The 2020 Election Administration Policy Survey (Policy Survey) asked states to identify the election laws and procedures that govern voter registration, election technology, voter eligibility, modes of voting, and election audits in their state. Notable findings from this survey include:

- In 2020, more states reported providing Election Administration and Voting Survey (EAVS) responses at the state level for every EAVS section compared to 2018.
- Fourteen states reported conducting all-mail elections for the 2020 general election, either statewide or in certain jurisdictions. This is double the number of states from the 2018 Policy Survey, but in some cases, all-mail voting was implemented in response to the COVID-19 pandemic, and it was not a permanent change.
- More states reported having an online voter registration system in the 2020 Policy Survey (45 states) compared to in the 2018 Policy Survey (40 states). In the majority of cases, individuals can use this system to register to vote and to update their registration.
- About half of the states reported allowing non-military voters residing in the United States to receive their ballots through an electronic format, such as email, fax, through an online voter registration portal, or through a mobile phone app, under certain circumstances.
- Roughly half of the states reported allowing permanent absentee status when a Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) voter registration is submitted via a Federal Post Card Application (FPCA), a decrease from 2018.
- Forty-four states reported requiring a post-election tabulation audit that verifies that voting equipment used during an election properly counts a sample of voted ballots after an election.

## Introduction

Although quantitative data from state[1] and local election officials provide an important window into how the 2020 general election was run, these data must be understood in the context of state laws and policies. In 2008, the U.S. Election Assistance Commission (EAC) introduced a component of the EAVS that collects information on state election laws. Since 2018, this data has been collected through the Policy Survey, which uses closed-ended questions to capture states' broad policies. It is important to remember that state election laws are nuanced, and this report simplifies them for the purpose of providing an overview of election policies that offers important context to understanding the EAVS data. This report provides an overview and summary of the Policy Survey's findings.

---

[1] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia, and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Policy Survey and EAVS data.

OCA-APPX-0928

Additional information about state responses is available in Appendix A of this chapter. The 2020 Policy Survey included updates to some of the 2018 items to better capture state policy nuances.

The 2020 Policy Survey collected data on states' election laws, policies, and practices that would be in place for the November 2020 general election. Most states submitted this information before the election. The Policy Survey was also used to validate 2020 EAVS data prior to states certifying their data as final. The goal of the 2020 Policy Survey was to create comparisons between states across broad policy categories and to provide context in understanding the EAVS data submitted by states. Because of the nature of the closed-ended survey questions, some of the nuances in state election policies could not be accounted for. States were encouraged to forward additional information and context behind their Policy Survey responses to allow their data to be interpreted as accurately as possible.

For further information about how the Policy Survey data were collected and used to validate EAVS data, please see Chapter 5 of this report.

## Responding to the 2020 EAVS

The 2020 Policy Survey asked states to describe who provides the data to respond to the questions in each section of the EAVS: the state election office, local election offices, or both the state and local offices. Some states indicated that all sections are completed by the state election office, and some gather data for all sections from their local jurisdictions.[2] Many states answered certain sections at the state level and other sections at the jurisdiction level.

With the exception of sections A and F of the EAVS, roughly half of the states provided responses at the state level, whereas about one-fifth of states reported that responses are provided by local officials. For sections A and F, about 60% of states reported providing responses at the state level, and slightly less than 15% of states reported providing responses at the local level.[3] Roughly one-quarter to one-third of the responses for each section were provided by both state and local officials. In 2020, more states reported providing EAVS responses at the state level for every EAVS section compared to in 2018 (see Table 1).

The findings from this question illustrate the complexities that state and local election officials experience when answering the EAVS. Many states with a large number of jurisdictions reported

---

[2] What constitutes a jurisdiction for EAVS reporting is defined by how each state chose to provide data. For the 2020 EAVS, most states reported data on the county level (or county equivalent, such as parishes for Louisiana). Illinois, Maryland, Missouri, and Virginia reported data for independent cities in addition to counties. The territories, the District of Columbia, and Alaska each reported as a single jurisdiction. Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and Wisconsin reported data on the township level. Maine also reported its UOCAVA data in Section B as a separate jurisdiction, because this information was only collected at the state level. Michigan reported data for the county level, but most election administration activities take place in the 1,520 local election jurisdictions in the state.

[3] Information on how states answer Section A of the EAVS was collected in item Q3_1 of the Policy Survey. Information on how states answer Section B of the EAVS was collected in Q3_2. Information on how states answer Section C of the EAVS was collected in Q3_3. Information on how states answer Section D of the EAVS was collected in Q3_4. Information on how states answer Section E of the EAVS was collected in Q3_5. Information on how states answer the Section F of EAVS was collected in Q3_6.

OCA-APPX-0929

providing EAVS data entirely at the local level. Furthermore, some states reported providing EAVS data for some sections at the state level while relying on local officials for other sections.

### Table 1. More States Are Providing EAVS Responses at the State Level

| Number of States Providing EAVS Responses at the State Level | | |
| --- | --- | --- |
| EAVS Section | Number of States in 2018 | Number of States in 2020 |
| Section A | 31 | 34 |
| Section B | 27 | 28 |
| Section C | 27 | 29 |
| Section D | 23 | 26 |
| Section E[4] | 25 | 28 |
| Section F | 26 | 33 |

*Source: Information on answering the EAVS was collected in Q3 of the Policy Survey.*

In almost all states, the chief state election official is responsible for certifying the state's EAVS data submission and/or receiving and certifying the spending of Help America Vote Act (HAVA) funds on behalf of the state. In 2020, 75% of states reported that the chief election official selects the state representative for and supervises local election officials' selection as representatives to the EAC Standards Board. The Standards Board consists of 55 state and 55 local election officials who assist the EAC in carrying out its mandates.[5]

## Policies on Voter Registration and List Maintenance

The primary federal law governing voter registration in the United States is the National Voter Registration Act (NVRA), which became effective after the 1994 general election.[6] The NVRA expands voter registration opportunities for voters by creating more standardized registration processes and by designating more places as voter registration agencies. It also requires that states conduct a uniform and nondiscriminatory general program to remove from their lists the records of individuals who are no longer eligible to vote.

Congress also passed HAVA in 2002, requiring states to adopt a computerized statewide voter registration list.[7] States use these registration lists to determine who is eligible to participate in elections. States also face the challenge of keeping these lists up to date, as voters commonly move

---

[4] Minnesota did not provide a response to Section E of this item for the 2020 Policy Survey.
[5] Information on the EAC-related duties of chief state election officials was collected in item Q1a of the Policy Survey. Eleven states provided additional information for cases in which another official performs these functions. The District of Columbia noted that it does not have any local election officials.
[6] Several states are not covered by the NVRA. North Dakota is exempt because it does not have voter registration. U.S. territories are also not subject to the NVRA, and the states of Idaho, Minnesota, New Hampshire, Wisconsin, and Wyoming are exempt because they had same-day registration (SDR) in 1994 and have continued to make this option available uninterrupted since that time.
[7] 52 U.S.C. § 21083.

OCA-APPX-0930

to different jurisdictions or states, die, or become otherwise ineligible to vote. North Dakota is the only state that does not require voter registration.

Between 2018 and 2020, some states passed laws allowing individuals to register to vote online, register in person on Election Day, or register through an automated process. In 2020, states reported receiving a record number of registration applications. Further information on state registration data is included in Chapter 3 of this report.

## Database Systems

States responded to the HAVA voter registration requirements in different ways. Some states adopted a single, central platform at the state level that connects to terminals in local jurisdictions. This type of system is typically referred to as a "top-down" voter registration system. Other states implemented a state voter registration database that gathers and aggregates information from their local jurisdictions' voter registration databases. This type of system is typically referred to as a "bottom- up" system.[8] If a system has a mix of top-down and bottom-up characteristics, then it is referred to as a "hybrid" system. The specific characteristics of hybrid systems vary state by state.

The Policy Survey asks states to report the type of voter registration database they have and how often information is shared between states and local jurisdictions.[9] Figure 1 shows that a majority of states (67.9%) reported having voter registration databases that function in a top-down manner.

About 20% of states reported having a bottom-up registration system that uploads jurisdiction-level information at regular intervals to form the statewide voter registration list, and only 10.7% of states reported having a hybrid system that combines elements of both.[10] In practice, these state registration system categories can be fluid. Some top-down registration systems may implement processes of the bottom-up registration system and vice versa.

States that reported having either a bottom-up or hybrid system were asked to report how often their jurisdictions transmit voter registration information to the statewide database.[11] For these two systems, real-time data transmissions were most common (reported in 58.8% of the states with bottom-up or hybrid systems), whereas 23.5% of the states reported that voter registration information is transmitted daily.[12] Texas reported that information is transmitted both ways: transmissions from "online" counties happen in real time, whereas in "offline" counties, it happens

---

[8] For a bottom-up voter registration system to be considered a statewide system, the state database, the data, and the data flow must be defined, maintained, and administered by the state. U.S. Election Assistance Commission. (2005, July). *Voluntary Guidance on Implementation of Statewide Voter Registration Lists.* https://www.eac.gov/sites/default/files/eac_assets/1/1/Implementing%20Statewide%20Voter%20Registration%20Lists.pdf.

[9] One state did not provide a response to this item.

[10] Information on the type of voter registration system states have was collected in item Q4 of the Policy Survey.

[11] Minnesota did not provide a response to this item.

[12] Information on how often local jurisdictions transmit information to the state voter registration database was collected in item Q4a of the Policy Survey.

OCA-APPX-0931





*Figure 1. Over Two-Thirds of States Have Top-Down Voter Registration Systems*

*Source: Information on voter registration database system type was collected in Q4 of the Policy Survey. This graph shows the number of states that reported having each type of voter registration database.*

daily.[13] Similarly, in Illinois, if the jurisdiction vendor has web services, the information is uploaded in real time, whereas a batch is sent daily from those jurisdictions without web services. The Northern Mariana Islands reported that information is retrieved upon request.

## Data Linkages

Election officials must accomplish two primary activities related to voter registration: adding individuals to the database who are eligible to vote and maintaining the accuracy of the database.[14] A state accomplishes these goals by accessing or "linking" to other databases to verify the voter

---

[13] The 2016 Statutory Overview found that several Texas jurisdictions use the Texas statewide voter registration database to directly manage registration data, and other Texas jurisdictions manage their own voter registration data using a third-party vendor. Texas refers to these as "online" and "offline" jurisdictions. Although online counties transmit information in real time through an online voter registration system, offline jurisdictions transmit information in batches through a web browser application.

[14] National Research Council. 2010. *Improving State Voter Registration Databases: Final Report*. Washington, DC: The National Academies Press. https://www.eac.gov/documents/2010/5/14/improving-state-voter-registration-databases-final-report.

OCA-APPX-0932

registration information in its database. The NVRA also outlines steps that states are required to take to keep voter registration information current and to remove ineligible voters and duplicate registrations from the voter lists. This task requires comparing voter lists to records in other databases to prevent duplicate registration records and to avoid adding individuals who are ineligible to register.[15]

As the National Academy of Sciences (NAS) notes, HAVA requires the chief election official in each state to attempt to verify the information for first-time voter registration applications against driver's license numbers in that state's motor vehicle licensing agency's database or against the Social Security Administration's database of social security numbers. If no match is found, election officials in most states attempt to contact the applicant for additional information, but they manage this process in various ways. HAVA requires that applicants who cannot be matched against one of these databases be allowed to vote on Election Day provided they present appropriate identification.[16]

The Policy Survey asks states how they share information electronically with other state and federal government entities.[17] These linkages are illustrated in Figure 2. Most states reported that they link their voter registration data with the agency that handles their state's driver's licenses (85.7%) and with entities that maintain the death records (80.4%). The other most commonly reported linkages were with entities that maintain felony or prison records, such as state courts and parole agencies (62.5%). States that reported linking with the agency that handles driver's licenses most often reported transferring voter registration data daily (63.3%), followed by in real time (18.4%) and by some other measure of time that is neither weekly nor monthly (10.2%). Of the states that reported linking with entities that maintain death records, the most common type of data transfer was monthly (58.7%), followed by weekly (21.7%). States that reported linking registration data with entities that maintain felony records most often reported transferring data monthly (58.3%).[18]

Less commonly reported linkages included entities that maintain records of individuals who are declared mentally incompetent, state public assistance agencies, agencies for people with disabilities, other state agencies that are not required by the NVRA (e.g., public libraries or local government offices), federal agencies, and military recruiting offices.

---

[15] Ibid.
[16] 52 U.S.C. § 21083.
[17] Although North Dakota does not have voter registration, the state does share information electronically with other government entities and is included in these analyses.
[18] Information on which entities states link their voter registration databases with and how often data transfers occur was collected in item Q5 of the Policy Survey.

OCA-APPX-0933



*Figure 2. States Most Commonly Link Voter Registration Databases With Government Agencies That Maintain Driver's Licenses and Death Records*

*Source: Information on the entities that are linked to state voter registration databases was collected in Q5 of the Policy Survey. This graph shows the number of states that reported linking their voter registration databases with the specified government agency.*

## Automatic and Automated Voter Registration

In 2020, 42.9% of states reported that voters may be registered to vote via an automated process, whether online or in person, during a transaction with a state government agency.[19] Examples of these automated processes included those that force a choice, such as when an individual cannot proceed with a transaction without selecting whether or not they wish to be registered to vote, or processes that register a person to vote as a default, after which the individual may choose to opt out. In the event that an individual wishes to decline to register, the vast majority of states reported that they allow the declination to occur at the point of service. About one-third of states reported that they allow declinations via a mailer sent to the individual after the transaction.[20]

---

[19] Information on automatic and automated voter registration was collected in item Q6 of the Policy Survey.
[20] Information on when an individual can decline to register to vote was collected in item Q6b of the Policy Survey.

OCA-APPX-0934

States that have some kind of automatic or automated voter registration process linked to a state agency transaction all reported that their state motor vehicle agency participates in this program, and about one-quarter of the states indicated that public assistance agencies also participate. Less common program participants included agencies for people with disabilities and other designated state agencies. Florida also reported linking their voter registration process with tax collector offices and any office that issues state ID cards. Colorado reported linking with the state's Department of Health Care Policy and Financing, and Alaska reported linking with the state's Permanent Fund Dividend Division. Maryland noted the state agencies that participate in the automatic or automated voter registration program are designated by the Maryland General Assembly.[21]

## Preregistration

In the 2020 Policy Survey, most states (87.5%) reported allowing individuals under the age of 18 to preregister to vote and become automatically registered once they turn 18 years old. Over half of states that had a preregistration program reported that they allow individuals to preregister at age 17 (51%), whereas fewer states reported allowing individuals to preregister at age 16 (38.8%). Five states (10.2%) indicated that they allow individuals to preregister at age 17 and a half.[22]

## Online Voter Registration

Arizona became the first state to adopt online voter registration in 2002, and by 2016, the number of states that offered online voter registration jumped to 32.[23] Online voter registration generally mirrors the process of registering to vote using a paper form, but the information that is necessary to process the registration application is completed and submitted electronically, without the need of a paper form to be submitted or created.

Forty-five states (80.4%, an increase from 72.7% in 2018) reported having an online voter registration portal in which individuals can register on their own, fully online, and without having to submit a paper form. In almost all of those states, individuals can both register to vote and update their registration via the system. Two states reported that individuals can only update their registration online and cannot use the online system to submit a new registration application. A majority of states with an online voter registration system (82.2%) reported that only individuals with a valid driver's license or state-issued ID card can use it.[24] Figure 3 shows the prevalence of online voter registration across states.

---

[21] Information on which state agencies participate in automatic voter registration was collected in item Q6a of the Policy Survey.
[22] Information on preregistration was collected in item Q10 of the Policy Survey.
[23] "EAVS Deep Dive: Registering to Vote", https://www.eac.gov/documents/2017/09/20/eavs-deep-dive-registering-to-vote/ U.S. Election Assistance Commission. (2017, September 20). *EAVS Deep Dive: Registering to Vote:* https://www.eac.gov/documents/2017/09/20/eavs-deep-dive-registering-to-vote/.
[24] Information on states' online voter registration policies was collected in item Q7 of the Policy Survey. Information on whether a driver's license or state-issued ID card is needed to register to vote online was collected in item Q7a of the Policy Survey.

OCA-APPX-0935



**Figure 3. More Than Three-Quarters of States Offer Online Registration**



Not Available | State ID Required | State ID Not Required

Source: *Information on online registration policy was collected in items Q7 and Q7a of the Policy Survey.*

States were also asked to describe the technological and user experience features of their online, web-based voter registration system and how voters use it. The most common feature was the use of a motor vehicle agency signature to register to vote (84.4%), followed by mobile phone optimization (75.6%) and sending a confirmation email to each registrant (60%). Slightly less than half of all states reported having custom web page URLs to track where the voter came from to enter the online registration process (e.g., a state agency or third-party organization), providing a confirmation number to each registrant, and supporting languages other than English. About one-quarter of states also reported the use of a third-party application programming interface (API), which allows different software components to communicate with each other.[25]

## Same-Day Registration

Instead of requiring voters to register in advance of an election, some states reported allowing individuals to register to vote and to cast a ballot on the same day. Roughly half of the states reported having same-day registration (SDR) or a period of overlap between in-person early voting and the close of voter registration in which a person can register to vote and cast a ballot on the

---

[25] Information on the features of state online, web-based voter registration systems was collected in item Q7b of the Policy Survey.

OCA-APPX-0936

same day (see Figure 4).[26] Among states with SDR, it was most common to have SDR on Election Day (72.4%). Additionally, the majority of states indicated that they allow SDR during in-person early voting (69%).[27]

Twelve states reported having SDR during an overlap between the start of early voting and the close of voter registration. Some states noted that SDR only occurs in special cases, such as Alaska and Rhode Island for presidential elections. New residents who move to Nebraska after the close of voter registration can register to vote and can vote only for president in the general election; former residents who move to another state after the close of registration can also vote only for president in the general election. In North Carolina, citizens who have become eligible to vote between the "close of books" and Election Day may register on the same day as they vote.[28]

### Figure 4. Half of the States Offer Some Form of Same-Day Voter Registration



*Source: Information on SDR policy was collected in items Q9 and Q9a of the Policy Survey. "ED" stands for "Election Day." "Other Cases" includes instances in which states may allow for SDR during in-person early voting only, during an overlap between the start of early voting and the close of voter registration, and other specific cases.*

---

[26] The timeline does not include an overlap between the mail balloting period and the close of voter registration.
[27] Information on state SDR policies was collected in item Q9 of the Policy Survey. Information on the circumstances of SDR was collected in item Q9a of the Policy Survey.
[28] North Carolina did not provide clarification on what was meant by "close of books."

OCA-APPX-0937



## State Election Office Website

The 2020 Policy Survey also asked states about which voter information search tools and other tools are available on each state's election office website. Almost all of the states indicated that voters can check their registration status and check their polling site location on the state election office website. Most states reported having tools that track ballot status, including UOCAVA ballots (87.5%), mailed ballots (82.1%), and provisional ballots (51.8%), and that check voter-specific ballot information (76.8%). Additionally, most states reported that their website allows voters to request to receive a mail or absentee ballot (67.9%).[29]

## List Maintenance

The NVRA establishes a process for states to keep their voter registration lists accurate. Under this law, a registrant can be removed from a state's list for the following reasons:

- The registrant requests to be removed;
- The registrant dies;
- The registrant is declared mentally incapacitated, if a state law requires it;
- The registrant is convicted of a specified crime, if state law requires it; or
- The registrant changes residences outside of the jurisdiction, in which case the removal process must be conducted in accordance with procedures set forth in the NVRA.[30]

Under the process established by the NVRA, when a registrant appears to have moved outside of their jurisdiction due to returned or undeliverable mail, the state must follow a specific process to verify that the individual is no longer eligible to vote. An address confirmation procedure must be followed before removing the voter from the registration list.

The 2020 Policy Survey asked states whether they differentiate between active and inactive voters in their voter registration records. Active voters are individuals who require no additional processing before they can vote, whereas inactive voters will require address verification before being permitted to vote. Forty-six states, three territories, and the District of Columbia indicated that they differentiate between the two types of voters, although according to state comments, the definitions for an active and inactive voter vary widely.[31] Guam, Idaho, North Dakota, New Hampshire, the U.S. Virgin Islands, and Wyoming reported not distinguishing between active and inactive voters. Some states indicated using specific terminology: Nebraska uses "in NVRA" to refer to inactive voters, Texas uses the term "suspense voters," and American Samoa uses the term "purged voter." West Virginia indicated that inactive voters are those "flagged as moving and receiv[ing] a confirmation notice." According to the

---

[29] Information on state election office website lookup tools was collected in item Q8 of the Policy Survey.
[30] 52 U.S.C. § 20507
[31] Information on whether states differentiate between active and inactive voters was collected in item Q11 of the Policy Survey. Minnesota is NVRA exempt and does not define inactive voters as "voters who remain eligible to vote but require address verification under the provisions of the National Voter Registration Act," as defined in the EAVS item A1c; therefore, the EAVS item A1c does not apply to the state. Additionally, North Dakota does not have voter registration but does define inactive voters in the state voter file. Inactive voters are defined as those who have never voted before or have not voted in the last two federal elections. Although Wyoming does not keep an inactive list of eligible voters, the statewide voter registration system keeps a historical record of previously registered voters.

OCA-APPX-0938

NVRA, voters marked as inactive are still able to vote in elections unless they have not voted for two consecutive federal elections and have not updated their information.

Almost three-quarters (70%) of states that reported differentiating between active and inactive voters also reported that they will move an active voter to the inactive voter list if mail that is sent by an election office to the voter's residence is returned as undeliverable, whereas 62% of states reported that they will move an active voter to the inactive voter list if the voter fails to return a confirmation notice. Fifteen states commented with several additional actions, including change in address, not voting in a certain number of elections, determining a person is a felon, determining a person is deceased, and the existence of duplicate voter records.[32]

### Figure 5. States That Differentiate Active and Inactive Voters Will Most Often Reactivate an Inactive Voter if the Voter Initiates a Registration Update



*Source: Information on policy regarding reactivating inactive voters was collected in Q11b of the Policy Survey.*

On the other hand, certain actions can result in moving an inactive voter to the active voter list. Figure 5 shows the reasons states report for reactivating inactive voters, if the state differentiates between active and inactive voters. Most states that distinguish between active and inactive voters

---

[32] Information on moving an active voter to the inactive list was collected in item Q11a of the Policy Survey.

OCA-APPX-0939

reported that they will move an inactive voter to the active voter list if an individual initiates an update to their registration record (96%), returns a confirmation notice (88%), votes in a federal election (78% for general and 76% for primary), votes in a state or local primary or general election (both 76% respectively), and/or requests a mail or UOCAVA ballot (68%). Furthermore, roughly half of the states reported that they will move an inactive voter to the active voter list if there is an online confirmation of the voter's registration record. Less common reasons for moving an inactive voter to the active voter list included if a voter signs a petition or completes a certificate of candidacy. Thirteen states indicated some other reason, including providing documentation (e.g., appropriate identification or a signed affidavit) at a polling place, submitting a new registration, and receiving an address change through the state motor vehicle agency.[33]

Thirty-five states indicated that only local officials are responsible for modifying or removing voter registration records, and 12 states reported that modifying voter registration records is done by both state and local officials.[34] Alaska, American Samoa, Delaware, the District of Columbia, Guam, South Carolina, and the U.S. Virgin Islands all indicated that they only modify records at the state level.[35] Table 2 illustrates data sources used to identify potentially ineligible voters. Across states, the most common data sources were the state vital statistics office, reports from other states indicating a former resident registered to vote, a voter request for removal, entities that maintain prison records, and any mail (not including ballots) sent from an election office that was returned as undeliverable.[36]

Most states reported sending confirmation notices to voters to help identify individuals who may be ineligible to vote, but the reasons for sending confirmation notices differ by state. Of the states that send confirmation notices, 41 (85.4%) reported sending confirmation notices pursuant to Section 8 (d) (1) (B) and Section 8 (d) (2) of the NVRA, 31 states (64.6%) reported sending confirmation notices pursuant to a state statute, and seven states (14.6%) reported sending confirmation notices pursuant to a formal administrative rule or guidance. Eight states reported that they do not send confirmation notices.[37]

States most commonly reported sending confirmation notices to voters whose mail from an election office was returned as undeliverable (81.3%), to voters whose addresses may have changed (72.9%), to voters who have not voted in two consecutive general elections (41.7%), to voters who have been convicted of a disqualifying felony (35.4%), and to voters who requested removal from the voter registration list (29.2%). Less than one-third of states reported sending confirmation notices to voters who have been declared mentally incompetent, voters who have obtained a driver's license in a new state, and voters who have not made contact with their state for a specified length of time.

---

[33] Information on moving an inactive voter to the active list was collected in item Q11b of the Policy Survey.
[34] The District of Columbia and American Samoa noted that they do not have local election officials; Puerto Rico noted that state and local officials have the same roles and responsibilities.
[35] Information on who is responsible for modifying or removing voter registration records was collected in item Q12 of the Policy Survey. Nevada did not provide a response, and North Dakota indicated that this question does not apply because the state does not have voter registration.
[36] Information on the data sources used to identify potentially ineligible voters was collected in item Q14 of the Policy Survey.
[37] Information on whether and how states send confirmation notices to help identify ineligible voters was collected in item Q13 of the Policy Survey.

OCA-APPX-0940

**Table 2. States Most Often Use State Vital Statistics Office and Reports From Other States to Identify Ineligible Voters**

| Source of Data on Potentially Ineligible Voters | Percentage of States That Report Using Data From the Data Source |
|---|---|
| State vital statistics office death records | 92.9% |
| Reports/notices from other states that a former resident has registered to vote | 89.3% |
| Requests from voters for removal | 85.7% |
| Entities that maintain felony/prison records | 82.1% |
| Other mail from the election office (not ballots) that was returned as undeliverable | 69.6% |
| Newspaper death notices/obituaries | 66.1% |
| National Change of Address (NCOA) reports | 58.9% |
| Data from an interstate data-sharing compact | 57.1% |
| Social Security Administration death records | 57.1% |
| Mailed ballots returned as undeliverable | 55.4% |
| Motor vehicle agencies | 46.4% |
| Entities that maintain records of individuals declared mentally incompetent | 42.9% |
| Applications for mailed ballots | 26.8% |
| Jury questionnaires | 26.8% |
| Returned jury summons | 16.1% |
| State public assistance agencies | 16.1% |
| State agencies that serve persons with disabilities | 12.5% |
| Canvassing | 8.9% |
| Other | 8.9% |
| State agencies that are not specified in the NVRA | 7.1% |
| State tax filings | 1.8% |

*Source: Information on the data sources used to identify ineligible voters was collected in Q14 of the Policy Survey. This question also collected information on whether states use commercial data sources, but no state selected that option.*

Five states (10.4%) reported that all registered voters routinely receive a non-forwardable notice during a specified increment of time; this time frame ranges from one to four years. Just under 30% of states reported sending confirmation notices for some other reason.[38] For example, some states or certain jurisdictions within states indicated that they routinely send confirmation notices as part of their list maintenance procedures. States that are members of the Electronic Information Registration Center (ERIC) send confirmation notices to individuals who are eligible to vote but are

---

[38] Information on which voters states send confirmation notices to was collected in item Q13a of the Policy Survey.

OCA-APPX-0941

unregistered. Other states indicated that notices are sent when there may be a change other than address (e.g., name). Washington, a state in which nearly all voters cast their ballots by mail, reported that the mailing information provided by a returned or forwarded ballot serves as the start of the confirmation process.

## Criminal Convictions and Voting

The NVRA allows states to remove voters from their registration lists if the voter receives a disqualifying criminal conviction or is incarcerated. The Policy Survey asks three questions about removing voters from registration lists due to disqualifying felony convictions and about the restoration of voting rights:

- Which populations have their voting eligibility suspended due to a criminal conviction?
- For how long does a person with a felony conviction lose their right to vote?
- How can a person with a felony conviction become an eligible voter again?

The District of Columbia, Guam, Maine, Puerto Rico, and Vermont reported that they do not limit a person's right to vote based on a criminal conviction. Conversely, 42 states reported that the conviction of any felony will limit a person's right to vote. About one-fifth of states reported that they limit the voting rights of individuals convicted only of certain felonies, and nine states reported that they limit the voting rights of individuals who are convicted of other crimes that are not felonies (e.g., election-related crimes).[39]

There is variation in the disqualification time periods and in the processes for restoring voting rights. Of the states that have some form of felon disenfranchisement, most reported revoking the right to vote during the period of incarceration (90.4%) and/or any period of probation and parole (61.5%). Some states also reported revoking voting rights during an additional length of time (19.2%), such as a statutorily mandated waiting period and/or until the payment of outstanding fines, restitution, or penalties (25%).[40]

The Policy Survey also asks states to indicate how disenfranchised individuals go about restoring their eligibility to vote.[41] Minnesota, Missouri, and the U.S. Virgin Islands reported automatically restoring the previous voter registration of persons with felony convictions once the period of disenfranchisement has passed, requiring no further action by the voter.[42] Of the 49 states that indicated requiring some type of action, 79.6% reported that a person is immediately eligible to vote and must reregister through the same process as the general public. Some states reported having other conditions, such as presenting documentation during the registration process that shows that the person has completed the voter registration requirements (12.2%) and having voting rights

---

[39] Information on state policies for suspending or revoking voting rights due to criminal convictions was collected in item Q37 of the Policy Survey. This item does not distinguish a felony conviction from the subsequent period of incarceration.
[40] Information on the length of time a disqualifying felony conviction will restrict voting rights was collected in item Q37a of the Policy Survey.
[41] Due to North Dakota not having voter registration, a person who is no longer incarcerated is automatically eligible to vote without any further action needed. In Delaware, felony convictions result in permanent disqualification from voting.
[42] Guam law prohibits incarcerated persons from voting. However, once the period of incarceration has ended, voting rights are restored. A non-incarcerated felon is able to vote, and the individual is not removed from the voter registration roll.

OCA-APPX-0942

restored through a formal administrative process (16.3%). Thirteen states provided survey comments that further explained their policies.[43] In Louisiana, for example, if a person is under an order of imprisonment for a felony conviction but "has not been incarcerated pursuant to the order within the last five years," then that person is eligible to register. Florida and Iowa reported that the type of felony conviction determines the restoration of voting rights. Arizona indicated that for a first felony conviction, civil rights are automatically restored upon the completion of the sentence, parole, probation period, and payment of restitution; otherwise, voting rights must be restored through a formal process.

## Voting by Mail

All states and territories and the District of Columbia offer their citizens the opportunity to cast their ballots by mail in federal general elections.[44] Some states use the term "absentee voting" to refer to mail voting. The 2020 Policy Survey demonstrates that there were wide variations among the states in which voters are eligible to vote by mail, what documentation voters must provide in order to receive a mailed ballot, how mailed ballots may be returned to election officials, and the deadlines for mailed ballots to be postmarked and received by election offices for the 2020 general election. The COVID-19 restrictions pushed many states to expand their mail voting policies, and states reported more than double the number of mailed ballots cast in the 2020 general election compared to the 2016 general election.[45]

In 2020, 39 states reported that they do not require voters to provide a reason for why they are requesting a mailed ballot and for why they cannot vote in person on Election Day; seven of those states reported requiring an excuse in 2018 but not in 2020. Conversely, one-third of states reported requiring voters to provide an excuse, a decrease from 40% in the 2018 Policy Survey responses.[46] Twenty-six states reported that voters can request to be on a permanent absentee list from which they will automatically receive ballots for all future elections. Either any registrant can request to be a permanent absentee voter (21.4% of states) or only individuals who meet specific criteria can request to be a permanent absentee voter (25% of states).[47]

States have special criteria for individuals who make the request to be granted permanent absentee status.[48] The most common requirement was that the requester must have a disability (78.6% of states that have permanent absentee voting); Delaware,[49] Massachusetts, New York, Tennessee, and Wisconsin reported that they will also grant permanent absentee status to those who are infirm,

---

[43] Information on state policies for restoring voting rights to persons with disqualifying felony convictions was collected in item Q37b of the Policy Survey.

[44] Some states use the term "in-person absentee voting" to refer to the process by which a voter visits an election office to request a mailed ballot, completes the ballot, and returns the ballot in one trip. However, EAVS considers this to be a form of in-person early voting and asks states to report their data as such.

[45] For more information, see Chapter 1 of this report.

[46] Information on whether states require an excuse for mail voting was collected in item Q17 of the Policy Survey.

[47] Information on whether states have permanent absentee voting was collected in item Q19 of the Policy Survey.

[48] Information on who can become a permanent absentee voter was collected in item Q19a of the Policy Survey.

[49] Delaware also includes federal or state public service workers and their spouses or dependents, members of the uniformed services, and voters who are temporary residents.

OCA-APPX-0943



## Figure 6. Number of States Offering Entirely Vote-By-Mail Elections Doubled From 2018 to 2020

### 2018

AK

ME

VT NH

WA MT ND MN WI MI NY MA RI

ID WY SD IA IL IN OH PA NJ CT

OR NV CO NE MO KY WV MD DE

CA AZ UT KS AR TN VA NC DC

NM OK LA MS AL SC

TX GA

FL AS GU MP

HI PR VI

☐ No Data ☐ No All-Mail Elections ☐ Some Jurisdictions ■ Statewide

### 2020

AK

ME

VT NH

WA MT ND MN WI MI NY MA RI

ID WY SD IA IL IN OH PA NJ CT

OR NV CO NE MO KY WV MD DE

CA AZ UT KS AR TN VA NC DC

NM OK LA MS AL SC

TX GA

FL AS GU MP

HI PR VI

☐ No All-Mail Elections ☐ Some Jurisdictions ■ Statewide

*Source: Information on the policy of all-mail elections was collected in items Q9 and Q9a of the 2018 Policy Survey and in items Q18 and Q18a of the 2020 Policy Survey.*

OCA-APPX-0944

have a permanent illness, or can provide a note from a medical professional. West Virginia indicated allowing address confidentiality program participants to be permanent absentee voters, and Louisiana indicated requiring individuals to be over a specified age. Despite conducting all-mail elections, Oregon uses the term "absentee voter" for individuals who may be away from their residences when ballots are transmitted.

With 2020's overall shift toward mail voting, the number of states that conducted all-mail elections, in which all registered voters or all active registered voters are automatically sent a mailed ballot, doubled since the 2018 Policy Survey. Figure 6 shows the 14 states that have some type of vote-by-mail system. Four states reported having some vote-by-mail jurisdictions. Ten states reported having statewide vote-by-mail systems, a significant increase from three states in 2018.[50] The Policy Survey did not record whether the states that altered their all-mail voting policy between the 2018 and the 2020 general elections did so temporarily or permanently or whether the change was made in direct response to the COVID-19 pandemic. It should be noted that although these states mailed registered voters a ballot, most states also provided in-person voting options during early voting and/or on Election Day.

The Policy Survey also collected data on the circumstances under which voters could receive ballots through electronic means. This question applied specifically to non-military voters residing in the United States, as voters who are members of the uniformed services or who are overseas citizens who wish to receive ballots electronically are covered under UOCAVA. Twenty-nine states reported that they allow non-military voters residing in the United States to receive their ballots through an electronic format, such as email, fax, through an online voter registration portal, or through a mobile phone app. Alaska, Guam, Kentucky, Maryland, Oregon, and Washington reported that voters may receive a ballot electronically for any circumstance.[51] Other states reported having special circumstances.[52] For example, 19 states indicated allowing voters with disabilities to receive ballots electronically, including seven states where voters must have specific disabilities and 12 states where voters may have any disability status.[53] Massachusetts specified that the voter must have a disability that prevents them from marking a paper ballot independently and privately, and Maine noted that the voter must self-identify as having a print disability.

Hawaii, Nevada, and the U.S. Virgin Islands reported that they allow electronic ballot transmission when a replacement ballot is need, and seven states reported that they allow electronic ballot transmission during emergency situations that hinder in-person voting, such as a natural disaster.[54]

---

[50] Information on which states have an all-vote-by-mail system was collected in item Q18 of the Policy Survey. Information on whether the state's all-vote-by-mail system is used only in certain jurisdictions or is statewide was collected in item Q18a of the Policy Survey. California and Utah reported conducting all-mail elections statewide in 2020. In 2018, both states reported that only certain jurisdictions had all-mail elections.

[51] California did not report that voters may receive a ballot electronically under any circumstance but commented that any voter may cast a ballot using a certified, remote-accessible vote-by-mail system regardless of disability status or whether they are an overseas or uniformed services voter.

[52] Information on the circumstances under which voters may receive their ballots electronically was collected in item Q23 of the Policy Survey.

[53] The U.S. Virgin Islands chose both of these response options. Delaware noted that disability status includes those who are ill or temporarily physically disabled. In Pennsylvania, voters may have any disability as defined by the Americans with Disabilities Act (ADA).

[54] Hawaii noted that a replacement ballot must be requested within five days of an election.

OCA-APPX-0945



New York and Mississippi extended their requirements to emergency responders, and in Mississippi, according to the state UOCAVA statute, emergency responders qualify for an electronic ballot if they are deployed outside of their county of residence during an emergency.

## Mailed Ballot Tracking and Deadlines

The 2020 Policy Survey asked states to report on their deadlines for mailed ballots from non-military voters residing in the United States. Ballot deadlines for voters covered by UOCAVA were reported in separate questions, as UOCAVA ballot deadlines are typically different from those for other mailed ballots. The postmark deadline is Election Day for just under half (46.4%) of states; however, Alabama, Iowa, North Dakota, Ohio, and Utah reported having a postmark deadline one day before Election Day.[55] In 55.4% of states, mailed ballots must be received by Election Day, and in 42.9% of states, mailed ballots must be received by a specified number of days after Election Day, with responses ranging from one to 20 days after Election Day.[56] Louisiana reported that mailed ballots must be received by one day before Election Day.[57]

States also reported how long mailed ballots that arrive past the above deadlines are tracked for reporting in Section C of the EAVS.[58] These mailed ballots are tracked indefinitely in 42.9% of states, or until canvassing is complete in 44.6% of states. Five states have a specific length of time for mailed ballot tracking; four of these states reported a date between November 17, 2020, and February 1, 2021.[59]

States vary in what satisfies postmark requirements for mailed ballots.[60] In states that require postmarks, the most commonly reported required feature was a physical postmark (76.7%),[61] followed by hand cancellation or a private express delivery service date stamp (both 44.2% respectively) and postal processing markings (41.9%). Less commonly required features were intelligent barcodes (23.3%) and a date on a voter affidavit (14%).[62] Some states specified other ways of satisfying postmark requirements.[63] Additionally, Ohio indicated accepting an ID tag date, and Kansas indicated accepting any other indicia from the U.S. Postal Service. In California, if the postmark is missing or damaged and no additional information is provided by the U.S. Postal Service or other mail delivery service, the ballot identification envelope will be date stamped upon receipt by an election official on or before Election Day. The District of Columbia Board of Elections reported

---

[55] Twenty-two states indicated that the item asking for a postmark deadline for voters does not apply to them.

[56] States that reported having a ballot receipt deadline after Election Day require ballots to be postmarked by Election Day.

[57] Information on deadlines for returning mailed ballots was collected in item Q20 of the Policy Survey.

[58] Two states did not provide a response to this item.

[59] Information on the length of time that ballots are tracked for reporting in EAVS Section C was collected in item Q21 of the Policy Survey. Maine reported tracking until November 3, 2022.

[60] Thirteen states reported not requiring a postmark for mailed ballots; six states did not provide a response to this item. South Dakota explained that they do not honor postmarks for ballots; Minnesota also commented that they do not use postmarks.

[61] Florida specified that physical postmarks are only required for 10-day overseas ballots. See https://dos.myflorida.com/elections/for-voters/voting/military-and-overseas-citizens-voting/ for more detail on these ballots.

[62] In Washington, the postmark requirement may be met by a date on a voter affidavit for UOCAVA ballots that lack a postmark.

[63] Information on mailed ballot postmark requirements was collected in item Q22 of the Policy Survey.

OCA-APPX-0946

that they make ballot drop boxes available to voters through Election Day, which satisfies postmark requirements.

## UOCAVA Voting

UOCAVA requires that all states offer uniformed services members, their eligible family members, and overseas citizens the ability to vote absentee in all federal elections. UOCAVA-protected citizens have the option of using the FPCA, which serves as both a registration and ballot request application and is accepted in all U.S. states and territories. All states accept FPCAs submitted by postal mail. In addition, the Military and Overseas Voter Empowerment (MOVE) Act amended UOCAVA, requiring that all states offer an electronic means for FPCA submission. UOCAVA voters may submit their FPCA by fax, online (either by email or through the state's online voter registration portal), or by other modes, as allowed by state law.

All states are required to accept FPCAs by postal mail. In 2020, the most common additional methods for accepting FPCAs were email and fax; both modes were allowed in over 90% of states. Twenty-four states (42.9%, an increase from 36.4% in 2018) reported accepting FPCAs submitted through the state's online voter registration portal.[64] Some states reported that FPCAs can be submitted by some other method; South Carolina and Colorado indicated allowing in-person returns, and Louisiana indicated allowing returns by commercial carrier. Oklahoma reported allowing UOCAVA voters to email their ballot materials to FVAP's electronic transmission service, after which the email is converted to fax and sent to the appropriate county election board. Maine specified allowing UOCAVA voters to request an absentee ballot through the state's online absentee ballot request service. A voter registration submitted via FPCA is considered permanent in 53.6% of states (a decrease from 72.7% in 2018) and temporary in 46.4% of states (an increase from 25.5% in 2018).[65]

States differ in the length of time an FPCA absentee ballot request remains valid; that is, the period of time or number of elections for which a voter can retain their UOCAVA status and have an absentee ballot transmitted to them.[66] Almost half (46.4%) of states reported that the length of time the FPCA will serve as a ballot request mechanism is a specified number of calendar years; in most of those states, the length of time is one year, although in North Dakota, Utah, and Virginia, it is two years. In other states, the length of time is measured by the number of general election cycles (12.5%); most of those states specified a length of one general election cycle, although Minnesota and Oklahoma specified two general election cycles. Some states (8.9%) reported that they will use the FPCA as a ballot request mechanism until the voter moves from their residence.[67]

---

[64] Maryland reported allowing the three listed options if the voter is already registered and is using the FPCA to request an absentee ballot. If the FPCA is used to register, it must be submitted by mail or through Maryland's online voter registration portal. In Wisconsin, non-military UOCAVA voters cannot submit registrations, including the FPCA, by email or fax.

[65] Information on the methods by which UOCAVA voters can submit an FPCA, other than by postal mail, was collected in item Q26 of the Policy Survey. Information on whether a voter registration submitted through an FPCA is permanent or temporary was collected in item Q27 of the Policy Survey.

[66] Information on how long UOCAVA voters remain eligible to receive absentee ballots was collected in item Q28 of the Policy Survey.

[67] This information is provided by the U.S. Postal Service or the voter.

OCA-APPX-0947

About one-third (32.1%) of states provided a description of another length of time that was unlisted in the Policy Survey question, with some states making distinctions between general and primary elections and others reporting a time linked with either a specific election timeline or a length of time tied to the submission of the FPCA. Nevada reported that voters retain their status until the end of the following calendar year, and Maine reported that the status remains eligible for 18 months. American Samoa, Oregon, and Washington specified a timeline based on changes to a voter's registration record. California, New Jersey, and North Carolina reported that eligibility remains permanent. Voters also continue to remain eligible in Pennsylvania, as long as they are registered to vote and they reapply for an absentee ballot each election cycle. The Northern Mariana Islands also reported that they require all registered voters to request their absentee ballots each election year.

## UOCAVA Voting Deadlines

In addition to reporting deadlines for mailed ballots from non-UOCAVA voters, the 2020 Policy Survey asked states to report deadlines for ballots submitted by both uniformed services voters residing in the United States and overseas UOCAVA voters. States provided information on both postmark deadlines and ballot receipt deadlines, as applicable. In 2020, the postmark deadline was Election Day in about half of the states (48.2%) for domestic uniformed services voters; however, in Iowa, North Dakota, and Pennsylvania, the postmark deadline was one day before Election Day.[68] Just under half of the states (41.1%) reported that ballots had to have been received by Election Day, and 58.9% of the states indicated that the ballots must have been received by a specified number of days after Election Day, with responses ranging from two to 20 days after Election Day.[69]

For overseas UOCAVA voters, Election Day was the postmark deadline in half of the states. The three states mentioned above also reported having a postmark deadline one day before Election Day for these voters.[70] Ballots in 39.3% of the states were required to be received by Election Day; in the remaining 60.7% of states ballots could arrive after Election Day and still remain eligible to be counted, with the deadlines ranging from two to 20 days after Election Day. The majority of states (83.7%) reported that they have the same postmark requirements for UOCAVA ballots and mailed ballots from non-UOCAVA voters.[71] Eight states indicated that the requirements are different.[72]

For more information about how UOCAVA voters participated in the 2020 general election, including ballots transmitted, returned, counted, and rejected, and the use of the Federal Write-In Absentee Ballot (FWAB), see Chapter 4 of this report.

---

[68] Twenty-three states indicated that the item asking for a postmark deadline for domestic military UOCAVA voters does not apply to them.
[69] Information on deadlines for ballots submitted by uniformed services voters residing in the United States was collected in item Q29 of the Policy Survey.
[70] Twenty-two states indicated that the item asking for a postmark deadline for overseas UOCAVA voters does not apply to them.
[71] Seven states did not provide a response to this item. West Virginia does not require postmarks.
[72] Information on deadlines for ballots submitted by overseas UOCAVA voters was collected in item Q30 in the Policy Survey. Information on the differences between postmark requirements for UOCAVA and non-UOCAVA voters was collected in item Q31 in the Policy Survey.

OCA-APPX-0948

# In-Person Voting

The traditional image of voting in America involves voters physically traveling to a polling location and casting their ballots in person. In some cases, however, an individual may vote in person without having to go to a polling place on Election Day.

## In-Person Voting Before Election Day

Most states reported that they allow individuals to cast their ballots in person before Election Day (not including the hand delivery of mailed ballots).[73] This type of voting generally falls into two categories:

- A voter may go to a polling place before Election Day, receive a ballot, vote their ballot while at the polling place, and place their completed ballot into a ballot box or tabulator.
- A voter may go to an election office to pick up a ballot over the counter. In some states, the voter may be able to take their ballot home with them, whereas in other states, the ballot must be completed in the office. The ballot is then sealed in an envelope and tabulated along with ballots that are returned to the office by mail according to local procedures.

Different states use the terms "in-person early voting" and "in-person absentee voting" to describe both of the voting methods above, although other terms exist as well. Some states offer both types of voting activities.

*Table 3. Examples of Unique Descriptions of In-Person Early Voting*

| State | Description of In-Person Early Voting |
|---|---|
| American Samoa | Local absentee voting |
| Connecticut | Can request an absentee ballot, vote on the spot, and not return it by mail |
| Georgia | Advance voting |
| Hawaii | In-person voting |
| Kansas | In-person advance voting |
| North Carolina | One-stop and early voting |
| Oregon | Some populations can go to county elections office and receive a ballot, which they can then use to vote |
| Pennsylvania | Mailed ballots can be completed over the counter at an election office |
| Puerto Rico | Voting in their houses via USPS mail |
| Washington | In-person voting |

*Source: Information on the descriptions of in-person early voting was collected in Q24 of the Policy Survey.*

---

[73] New Jersey does not have in-person voting before Election Day.

OCA-APPX-0949

Twenty-nine states (51.8%) reported having in-person early voting, and 27 states (48.2%) reported having in-person absentee voting.[74] Ten states specified unique descriptions for early voting, as seen in Table 3. Twelve states (21.4%) reported requiring an excuse to vote in person before Election Day, a decrease from the 15 states that reported this policy in 2018.[75]

## Vote Centers

The EAC describes vote centers as centralized, consolidated polling sites that serve as alternatives to traditional polling places.[76] Jurisdictions that use vote centers allow voters to cast their Election Day ballots at any vote center in their jurisdiction, rather than needing to vote at a specifically assigned polling place. The 2020 Policy Survey asked whether any of the state's jurisdictions allow voters to cast ballots at any polling place or vote center in their jurisdiction and to describe how vote centers operate.

Over one-third of states (37.5%) reported having vote centers or allowing voters to cast ballots at any polling place in the voter's jurisdiction. Eight of those states (38.1%) indicated that they require the use of vote centers statewide. Another eight reported having vote centers, but jurisdictions have the option not to implement them. Alabama, Arkansas, Missouri, Tennessee, and Texas (comprising 23.8% of the states) reported having vote centers, but only in jurisdictions that meet specific requirements.[77]

## Voter Identification

Under HAVA, Congress established minimum identification standards that an individual must meet in order to register to vote:

- Individuals who register to vote at their state's motor vehicle agency, another government agency, or using an online registration portal are typically authenticated by presenting appropriate documentation to the government agency and by the state matching the person's driver's license number or last four digits of their social security number to an existing state record.
- Individuals who register by mail and who have not voted before for federal office in their state of residence are required to present, at some point before voting, either a current and valid photo identification or a copy of a utility bill, bank statement, government check, paycheck, or other government document that shows the person's name and address.

---

[74] Information on the terminology used to describe the process of voting in person before Election Day was collected in item Q24 of the Policy Survey. States were able to select multiple response options.
[75] Information on whether an excuse is required to vote in person before Election Day was collected in item Q24a of the Policy Survey.
[76] U.S. Election Assistance Commission. (2017, November 11). *EAVS Deep Dive: Poll Workers and Polling Places: U.S. Election Assistance Commission*. https://www.eac.gov/documents/2017/11/15/eavs-deep-dive-poll-workers-and-polling-places.
[77] Information on whether any jurisdictions within a state will allow voters to cast ballots at any polling location or vote center in their jurisdiction was collected in item Q25 of the Policy Survey. Information on how vote centers operate was collected in item Q25a of the Policy Survey.

OCA-APPX-0950

- Individuals who are entitled to vote by absentee ballot under UOCAVA or entitled to vote other than in person under the Voting Accessibility for the Elderly and Handicapped Act or other federal law are exempt from HAVA's identification requirements.

The definition of voter identification varies by state. In some states it can mean a government-issued document with a photograph, whereas in other states, it can mean a voter-executed affidavit affirming identity. For in-person, non-first-time voting whether before or on Election Day, most states (53.6%) reported that they require voters to present a government-issued photo identification as proof of their identity.[78] Twenty states (35.7%) reported allowing voters to present a government-issued, non-photo identification, and 24 states (42.9%) reported allowing non-government-issued, non-photo identification. Some states reported allowing a proof of residence (32.1%), a signed affidavit affirming identity with no further action required (37.5%) or with the requirement of presenting proper identification before a provisional ballot is counted (23.2%), or in some cases, voters may have a person registered to vote within that jurisdiction vouch for their identity (12.5%). Five states (8.9%) reported that they do not have identification requirements for in-person voting.[79]

## Provisional Voting

The EAC has provided best practices on the development of provisional voting procedures and notice to voters to ensure provisional voting procedures are fair, transparent, effective, and consistently applied to all voters in the state. The EAC states in its *Best Practices on Provisional Voting* report:

> Section 302 of the Help America Vote Act (HAVA) creates the right for potential voters to cast provisional ballots in the event their names do not appear on the registration list or the voters' eligibility is challenged by an election official. The issuance of a provisional ballot is best described as a safety net or fail safe for the voter, in that:

> - It maintains the person's intent to vote and selections until election officials determine that the person does or does not have the right to cast a ballot in the election.
> - It allows the determination of the voter's eligibility to be made at a time when more perfect or complete information is available either from the voter or from the election jurisdiction.[80]

HAVA specifies minimum requirements for notice to voters and provides opportunities for voters to resolve eligibility issues. Within the federal framework, states have different methods of complying with the provisional notification to voter requirements, using different technology and different timetables. State and local election officials ultimately apply their policies, procedures, and state legal requirements when making a determination as to whether or not to count a provisional ballot. For example, a state that has a stricter standard for the identification of voters than is contained in HAVA would apply its standard to determine if a given provisional ballot meets the state's ID standard.

---

[78] Two states did not provide a response to the item asking about identification requirements.
[79] Information on establishing a voter's identity during in-person voting was collected in item Q36 of the Policy Survey.
[80] U.S. Election Assistance Commission. (2017, February 27). *Best Practices on Provisional Voting*. https://www.eac.gov/documents/2017/02/27/eac-best-practices-on-provisional-voting/.

OCA-APPX-0951

**Table 4. States That Use Provisional Ballots Most Often Do So When an Election Official Asserts That an Individual Is Ineligible to Vote**

| Reason for Offering Voters a Provisional Ballot | Percentage of States That Use Provisional Voting and Offer Provisional Ballots for the Listed Reason |
|---|---|
| An election official asserts that an individual is not eligible to vote | 92% |
| A voter's name does not appear on the list of eligible voters | 86% |
| A voter does not have proper identification | 80% |
| A voter is not a resident of the precinct in which they are attempting to vote | 80% |
| Another person (not an election official) challenges a voter's qualifications, and the poll worker is not able to resolve the challenge | 56% |
| A voter was issued a mailed ballot, but chooses to vote in person on Election Day and does not have the mailed ballot to surrender to poll workers | 54% |
| A voter has changed their name or address but has not updated their voter registration | 52% |
| A federal or state judge extends polling place hours in a federal election | 48% |
| Other | 26% |

*Source: Information on the circumstances for the use of provisional ballots was collected in Q32a of the Policy Survey.*

Fifty states reported using provisional ballots for different reasons. The most common reason was an election official has asserted an individual is not eligible to vote.[81] Table 4 provides a full list of reasons the states use provisional ballots.

If a voter casts a provisional ballot as a result of not having acceptable identification during voting, the deadline by which they must present appropriate identification to election officials to verify their identity and to have their provisional ballot accepted was most commonly reported as a specified number of days after Election Day. The 11 states that have this policy reported a range of one to nine days after Election Day. However, in Massachusetts and Wisconsin, the deadline for adjudicating provisional ballots for the 2020 general election was a specified date: November 6, 2020.[82]

---

[81] Information on whether states use provisional ballots was collected in item Q32 of the Policy Survey. Information on the circumstances under which a state will use provisional ballots was collected in item Q32a of the Policy Survey.
[82] Information on deadlines for presenting appropriate identification to have a provisional ballot counted was collected in item Q36a of the Policy Survey.

OCA-APPX-0952

After the election, many states have a limited amount of time in which to adjudicate provisional ballots and decide whether the ballots will be counted (either in full or in part) or rejected.[83] Twenty-six percent of the states that use provisional ballots reported that the deadline is by a specified date; for the November 3, 2020, general election, these dates ranged from November 3, 2020, to November 24, 2020. Most states (70%) indicated that this deadline is specified as a number of days after Election Day, with responses ranging between one day and 28 days.[84]

Eight percent of the states that use provisional ballots reported provisional ballots cast in the wrong precinct would be fully counted, and 40% of the states reported that they would be partially counted.[85] Slightly more than half of the states (52%) reported that these ballots would be rejected.[86]

## Election Technology

Voting system testing and certification are required in the majority of states (83.9%) by statute, and a few states (10.7%) indicated that they require testing and certification through a formal administrative rule or guidance. American Samoa, Mississippi, and Oklahoma reported that voting system testing and certification before the system's approval for purchase is not required. The 2020 Policy Survey then asked states to describe their policies regarding the role of the EAC and federal testing and certification. States most commonly reported requiring testing by an EAC-accredited Voting System Test Laboratory (VSTL; 45.3%), certification to the EAC-adopted Voluntary Voting System Guidelines (VVSG; 43.4%), and/or state and federal certification (41.5%; see Figure 7).[87]

Some states provided clarifying comments: The District of Columbia reported that it requires that voting systems must meet or exceed HAVA standards and/or be federally certified. Similarly, Oregon reported that the system must be EAC certified or examined by a federally accredited VSTL. New York indicated that a secondary source code review is performed by an independent security expert.

Alaska reported that it may approve a voting system upon consideration by an election administrator,[88] and Guam indicated having an independent entity that conducts testing to determine the integrity of voting machines as deemed appropriate by election commissioners. Wisconsin reported having the statutory authority to certify systems without federal certification, but in practice, state testing typically does not start until federal certification is acquired.

Although there is no testing or certification of electronic poll books, sometimes called e-poll books, on the federal level, many states have their own process for testing or certifying these machines

---

[83] One state did not provide a response to this item. In Maine, provisional ballots are automatically counted unless a recount results in a contested election and the number of challenged ballots can affect the outcome.
[84] Information on the deadlines for adjudicating provisional ballots is collected in Policy Survey item Q32b.
[85] For example, a state might only count items on the ballot for which the voter would have been eligible had they voted in the correct precinct.
[86] Information on what happens to provisional ballots cast in the wrong precinct is collected in Policy Survey item Q32c.
[87] Information on voting system testing and certification policies was collected in items Q15 and Q15a of the Policy Survey.
[88] AK Stat § 15.20.910 (2016)

OCA-APPX-0953



**Figure 7. States That Require Voting System Testing Most Commonly Require Testing From an EAC-Accredited VSTL**

| | |
|---|---|
| Testing by EAC-accredited VSTL required | 45.3% |
| VVSG certification required | 43.4% |
| State and federal certification required | 41.5% |
| State certification required | 32.1% |
| Federal certification required with specific reference to EAC | 32.1% |
| Other | 11.3% |
| Federal certification required without specific reference to EAC | 7.5% |
| Independent lab testing required | 5.7% |

*Source: Information on voting equipment testing and certification policy was collected in Q15a of the Policy Survey.*

before approving them for purchase. Of the 40 states (71.4%) that reported using e-poll books either statewide or only in certain jurisdictions, 42.5% indicated that they do not require testing or certification before the e-poll books' approval for purchase.[89] In about one-third of the states that reported having e-poll book requirements, the testing and certification are required by statute, whereas in one-fourth of the states, testing and certification are required by formal administrative rule or guidance.[90]

The 2020 Policy Survey asked whether any jurisdictions in the state use e-poll books and whether testing and certification are required before e-poll books' "approval for purchase." The Policy Survey and EAVS did not collect data on other procedures a jurisdiction may require before authorizing the

---

[89] Colorado, Hawaii, and Massachusetts reported in the Policy Survey that they use e-poll books but did not report data on the usage of e-poll books in item F3 of the EAVS. Puerto Rico reported data on the usage of e-poll books in the EAVS but reported not using e-poll books in the Policy Survey.
[90] Information on poll books was collected in items Q16 and Q16a of the Policy Survey. Illinois did not provide a response to this item.

OCA-APPX-0954

use of e-poll books, including but not limited to pre-election testing, secure physical storage, contingency planning, chain-of-custody practices, and poll worker training.

## Recounts, Audits, and Election Certification

Before local election officials certify the results of an election, they take steps to verify that all established election procedures were followed and that all voting equipment functioned properly. Many states require additional post-election verification that the counting process was accurate. These additional verifications may take the form of a partial recount (in which ballots in randomly selected precincts are counted a second time to ensure that the initial tabulation of votes was accurate) or a more detailed audit (in which the entire voting process is reviewed and key steps are verified).

### Recounts

An election recount is a repeat tabulation of all votes cast in an election, and it is used to determine the accuracy of an initial count. The EAVS Policy Survey did not ask if the reasons for a recount were automatic, mandatory, or triggered. The information collected in these questions quantifies what is generally allowed by law in a specified state. Figure 8 displays the reasons why states may have conducted an election recount for the 2020 general election. States reported that the most common reason a recount may be conducted is at the request of an affected candidate or party (55.4%). Less common reasons were if the results of a contest are within a specified margin (37.5%), another person or group requests a recount (30.4%),[91] or if the results of a contest are within a specified margin *and* it is requested by an affected candidate or party (28.6%). Arizona, Mississippi, New Jersey, New York, the Northern Mariana Islands, and Tennessee reported that recounts are only authorized if a court orders it.[92]

---

[91] Based on state comments, this reason can include voters or groups of voters, a county board of canvassers, a county election commission, a political party chair, or a person opposing a state or local measure. Washington specified that a group of five or more voters may request a recount for an issue, and Nevada specified that any person or group could request a recount of a ballot measure by November 18, 2020.
[92] Information on state policies regarding election recounts was collected in item Q34 of the Policy Survey.

OCA-APPX-0955



**Figure 8. Post-Election Recounts Most Often May Be Conducted at the Request of an Affected Candidate or Party**

| | |
|---|---|
| An affected candidate or party requests a recount | 55.4% |
| Results of a contest are within a specified margin | 37.5% |
| Another person or group—such as a voter or group of voters—requests a recount | 30.4% |
| Results of a contest are within a specified margin and an affected candidate or party requests a recount | 28.6% |
| Only if a court orders a recount | 10.7% |

*Source: Information on post-election recount policy was collected in Q34 of the Policy Survey.*

## Post-Election Tabulation Audits

A post-election tabulation audit verifies that the voting equipment used to count ballots during an election properly counts a sample of voted ballots after an election. The majority of states (78.6%) indicated requiring some form of post-election tabulation audit, with some variation.[93] States most commonly indicated that a post-election audit is conducted as a statutory requirement, but Missouri and Nebraska stated that they conduct an audit as required by a formal administrative rule or guidance. Tennessee indicated only requiring a post-election tabulation audit for jurisdictions using optical scan voting systems. In Oklahoma, the secretary of the state election board can direct the secretary of a county election board to conduct post-election audits to ensure that voting devices and software correctly tabulated votes. Louisiana reported that it does not statutorily require tabulation audits, but audits are conducted in all parishes. The Policy Survey did not collect

---

[93] Information on whether a state requires a post-election tabulation audit was collected in item Q35 of the Policy Survey. Louisiana is not included in this calculation because it reported that "Our state does not statutorily require audits, but they are conducted in every parish."

OCA-APPX-0956

information on whether these audits were mandatory, triggered, or conducted only in certain circumstances.

The 2020 Policy Survey asked states to report which of the following post-election tabulation audits would be required for the 2020 general election. States could select multiple options as applicable:

- A traditional tabulation audit that comes from a fixed percentage of randomly selected voting districts or voting machines and is compared to the results produced by the voting system;
- A risk-limiting tabulation audit that is a protocol designed to limit the risk of certifying an incorrect election outcome by using statistical methods to select the audit sample size; or
- Another type of audit.

Roughly three-quarters of the states reported requiring a traditional tabulation audit, and about one-fifth of the states reported requiring a risk-limiting tabulation audit.[94] Thirteen states (28.9%) provided comments detailing alternative procedures.[95] For example, California stated that a jurisdiction may choose to conduct a risk-limiting audit instead of a traditional tabulation audit, and Nevada noted that after an initial pilot tabulation audit conducted after the 2020 general election, the state will require risk-limiting tabulation audits starting after the 2022 primary election. Pennsylvania also reported that it piloted a risk-limiting tabulation audit after the 2020 general election in addition to their statutory requirement.

Some states reported having additional steps in their tabulation audit processes. For example, Maryland stated that it conducts a traditional manual audit as well as a completely automated tabulation audit using ballot images. Louisiana noted that its tabulation audit includes a comparison between the number of times a machine was used for voting, the number of voters that signed a precinct register, the names written in the precinct poll books, and the voters who were given credit for voting in the statewide database. Washington reported that local election officials can choose among three methods to meet the state post-election tabulation audit requirement, including the option for a risk-limiting audit.

## Election Certification

Although some local jurisdictions might have earlier deadlines for finalizing election results, elections are not officially certified until the state provides a final result. The 2020 Policy Survey asked states to provide their election certification deadlines for the 2020 general election.[96] The range was broad,[97] with 41 states reporting a date between November 10, 2020, and November 30, 2020.[98]

---

[94] Information on the type of post-election tabulation audit that states require was collected in item Q35a of the Policy Survey. States were able to make multiple selections in this item's response options.

[95] In Louisiana, post-election tabulation audits were conducted by comparing all voting machine results to the number of voters that signed the precinct register, the names written in the precinct poll books, and the voters given credit for voting in the statewide database. However, Louisiana specified that post-election tabulation audits were not statutorily required for the 2020 general election.

[96] Hawaii does not have an election certification deadline; results are certified within 20 days of the election unless the Supreme Court has contested an election.

[97] The range was as early as November 4, 2020, in Puerto Rico and as late as December 11, 2020, in California.

[98] Information on deadlines for certifying the November 2020 general election results was collected in item Q33 of the Policy Survey.

OCA-APPX-0957

States provided clarifying comments on their specific policies regarding their certification deadline. For example, Puerto Rico, Hawaii, Pennsylvania, Tennessee, and Rhode Island reported not having a specific state certification deadline,[99] and the District of Columbia and Guam noted that their reported dates were tentative deadlines. Additionally, Alaska commented that their reported date was a target deadline, and North Carolina noted their reported deadline was barring recounts or protests in individual races.

---

[99] Tennessee and Pennsylvania noted that their reported deadlines apply to county officials, not state officials.

OCA-APPX-0958

# Appendix A: Descriptive Tables

## Policy Survey Table 1: Voter Registration Database Type

| State | Top down | Bottom up | Hybrid | If bottom up or hybrid: How often do jurisdictions transmit registration information? |
|---|---|---|---|---|
| Alabama | ✓ | -- | -- | -- |
| Alaska | ✓ | -- | -- | -- |
| American Samoa | ✓ | -- | -- | -- |
| Arizona | -- | -- | ✓ | Real time |
| Arkansas | -- | ✓ | -- | Daily |
| California | -- | ✓ | -- | Real time |
| Colorado | ✓ | -- | -- | -- |
| Connecticut | -- | ✓ | -- | Real time |
| Delaware | ✓ | -- | -- | -- |
| District of Columbia | ✓ | -- | -- | -- |
| Florida | ✓ | -- | -- | -- |
| Georgia | ✓ | -- | -- | -- |
| Guam | ✓ | -- | -- | -- |
| Hawaii | -- | -- | ✓ | Real time |
| Idaho | ✓ | -- | -- | -- |
| Illinois [1] | -- | ✓ | -- | Other |
| Indiana | ✓ | -- | -- | -- |
| Iowa | ✓ | -- | -- | -- |
| Kansas | ✓ | -- | -- | -- |
| Kentucky | ✓ | -- | -- | -- |
| Louisiana | ✓ | -- | -- | -- |
| Maine | -- | -- | ✓ | Real time |
| Maryland | ✓ | -- | -- | -- |
| Massachusetts | ✓ | -- | -- | -- |
| Michigan | ✓ | -- | -- | -- |
| Minnesota [2] | -- | -- | -- | -- |
| Mississippi | -- | ✓ | -- | Real time |
| Missouri | ✓ | -- | -- | -- |
| Montana | ✓ | -- | -- | -- |
| Nebraska | ✓ | -- | -- | -- |
| Nevada | -- | ✓ | -- | Daily |
| New Hampshire | ✓ | -- | -- | -- |
| New Jersey | ✓ | -- | -- | -- |
| New Mexico | ✓ | -- | -- | -- |
| New York | -- | ✓ | -- | Real time |
| North Carolina | ✓ | -- | -- | -- |

OCA-APPX-0959



| State | Top down | Bottom up | Hybrid | If bottom up or hybrid: How often do jurisdictions transmit registration information? |
|---|---|---|---|---|
| North Dakota | ✓ | -- | -- | -- |
| Northern Mariana Islands [3] | -- | -- | ✓ | Other |
| Ohio | -- | ✓ | -- | Real time |
| Oklahoma | ✓ | -- | -- | -- |
| Oregon | ✓ | -- | -- | -- |
| Pennsylvania | ✓ | -- | -- | -- |
| Puerto Rico | -- | ✓ | -- | Real time |
| Rhode Island | -- | -- | ✓ | Real time |
| South Carolina | ✓ | -- | -- | -- |
| South Dakota | ✓ | -- | -- | -- |
| Tennessee | -- | ✓ | -- | Daily |
| Texas [4] | -- | -- | ✓ | Other |
| U.S. Virgin Islands | ✓ | -- | -- | -- |
| Utah | -- | ✓ | -- | Daily |
| Vermont | ✓ | -- | -- | -- |
| Virginia | ✓ | -- | -- | -- |
| Washington | ✓ | -- | -- | -- |
| West Virginia | ✓ | -- | -- | -- |
| Wisconsin | ✓ | -- | -- | -- |
| Wyoming | ✓ | -- | -- | -- |

Policy Survey Table 1 Calculation Notes:

**Top down, Bottom up, and Hybrid** uses question Q4.

**How often do jurisdictions transmit registration information** uses question Q4a.

Policy Survey Table 1 Data Notes:

**General Notes:**

- States were only able to select single responses to both Q4 and Q4a.


[1] Illinois reported that "If the jurisdiction[']s vendor has web services, the information is uploaded in real time. However, those without web [servers] send a batch every night."

[2] Minnesota did not provide a response to these items.

[3] In the Northern Mariana Islands, "Information [is] retrieved upon request."

[4] Texas reported that the approximately 215 counties categorized as "online" counties transmit registration information in real time, whereas the 39 counties categorized as "offline" counties transmit registration information daily.

OCA-APPX-0960

## Policy Survey Table 2: Electronic Information Sharing With Government Entities

| State | Motor vehicles agencies | Agencies for people with disabilities | State public assistance agencies | Other state agencies | Federal agencies |
|---|---|---|---|---|---|
| Alabama | Daily | -- | -- | -- | -- |
| Alaska [1] | Daily | -- | -- | Other | -- |
| American Samoa | -- | -- | -- | -- | -- |
| Arizona | Real time | -- | -- | -- | -- |
| Arkansas | Daily | -- | -- | -- | -- |
| California | Real time | -- | -- | -- | -- |
| Colorado | Daily | -- | -- | -- | -- |
| Connecticut [2] | Real time | -- | -- | -- | -- |
| Delaware [3] | Real time | -- | Other | -- | -- |
| District of Columbia [4] | Real time | -- | -- | -- | -- |
| Florida | Daily | -- | -- | -- | -- |
| Georgia | Daily | -- | -- | -- | -- |
| Guam | -- | -- | -- | -- | -- |
| Hawaii [5] | Other | -- | -- | -- | -- |
| Idaho | -- | -- | -- | -- | -- |
| Illinois | Daily | Daily | Daily | Real time | -- |
| Indiana | Daily | -- | -- | -- | -- |
| Iowa | Daily | -- | -- | -- | -- |
| Kansas | Daily | -- | -- | -- | -- |
| Kentucky [6] | Real time | Daily | Daily | -- | -- |
| Louisiana | Daily | -- | -- | -- | -- |
| Maine | -- | -- | -- | -- | -- |
| Maryland [7] | Daily | Daily | Daily | Daily | -- |
| Massachusetts | Daily | -- | Daily | -- | -- |
| Michigan | Daily | -- | -- | -- | -- |
| Minnesota | Daily | -- | -- | -- | -- |
| Mississippi | Daily | -- | -- | -- | -- |
| Missouri | -- | -- | -- | -- | -- |
| Montana | Weekly | -- | -- | -- | -- |
| Nebraska [8] | Other | -- | -- | -- | -- |
| Nevada | Daily | -- | -- | -- | -- |
| New Hampshire [9] | Other | -- | -- | -- | Other |
| New Jersey | Daily | -- | -- | -- | -- |
| New Mexico | Daily | -- | -- | -- | -- |
| New York | Daily | -- | -- | -- | -- |
| North Carolina | Daily | -- | -- | -- | -- |

OCA-APPX-0961



| State | Motor vehicles agencies | Agencies for people with disabilities | State public assistance agencies | Other state agencies | Federal agencies |
|---|---|---|---|---|---|
| North Dakota | Daily | -- | -- | -- | -- |
| Northern Mariana Islands [10] | -- | -- | -- | -- | -- |
| Ohio | Daily | -- | -- | -- | -- |
| Oklahoma [11] | Other | -- | -- | -- | -- |
| Oregon [12] | Other | -- | -- | -- | -- |
| Pennsylvania | Daily | Real time | Real time | -- | -- |
| Puerto Rico | -- | -- | -- | -- | -- |
| Rhode Island | Real time | -- | -- | -- | -- |
| South Carolina | Weekly | Weekly | Weekly | -- | -- |
| South Dakota | Daily | -- | -- | -- | -- |
| Tennessee | Monthly | -- | -- | -- | -- |
| Texas | Daily | -- | -- | -- | -- |
| U.S. Virgin Islands [13] | -- | -- | -- | Other | -- |
| Utah [14] | Daily | Weekly | Weekly | Weekly | Weekly |
| Vermont | Daily | -- | -- | -- | -- |
| Virginia | Real time | -- | -- | -- | -- |
| Washington | Real time | Real time | Real time | Real time | -- |
| West Virginia | Daily | -- | -- | -- | -- |
| Wisconsin [15] | Daily | -- | -- | -- | -- |
| Wyoming | Daily | -- | -- | -- | -- |

OCA-APPX-0962

| State | Military recruiting offices | Entities that maintain death records | Entities that maintain felony records | Entities that maintain records of individuals declared mentally incompetent |
|---|---|---|---|---|
| Alabama | -- | Daily | Daily | -- |
| Alaska [1] | -- | -- | -- | -- |
| American Samoa | -- | Monthly | Monthly | -- |
| Arizona | -- | -- | -- | -- |
| Arkansas | -- | Monthly | Monthly | -- |
| California | -- | Weekly | Monthly | Monthly |
| Colorado | -- | Monthly | Weekly | -- |
| Connecticut [2] | -- | Monthly | Monthly | Other |
| Delaware [3] | -- | Monthly | -- | -- |
| District of Columbia [4] | -- | Other | -- | -- |
| Florida | -- | Daily | Daily | -- |
| Georgia | -- | Weekly | Monthly | Monthly |
| Guam | -- | -- | -- | -- |
| Hawaii [5] | -- | Monthly | -- | -- |
| Idaho | -- | Monthly | Monthly | -- |
| Illinois | -- | Monthly | Monthly | -- |
| Indiana | -- | Monthly | Monthly | -- |
| Iowa | -- | Monthly | -- | -- |
| Kansas | -- | Weekly | Weekly | -- |
| Kentucky [6] | Other | Weekly | Weekly | Daily |
| Louisiana | -- | Monthly | Monthly | -- |
| Maine | -- | Monthly | -- | -- |
| Maryland [7] | -- | Monthly | Monthly | Other |
| Massachusetts | -- | -- | -- | -- |
| Michigan | -- | Weekly | Daily | -- |
| Minnesota | -- | Monthly | Monthly | Monthly |
| Mississippi | -- | Monthly | Daily | -- |
| Missouri | -- | Monthly | Monthly | -- |
| Montana | -- | Monthly | Weekly | -- |
| Nebraska [8] | -- | Weekly | Monthly | -- |
| Nevada | -- | Daily | -- | -- |
| New Hampshire [9] | -- | Other | -- | -- |
| New Jersey | -- | Weekly | Weekly | -- |
| New Mexico | -- | -- | -- | -- |
| New York | -- | Monthly | Monthly | Monthly |
| North Carolina | -- | Monthly | Daily | -- |
| North Dakota | -- | -- | -- | -- |

OCA-APPX-0963



| State | Military recruiting offices | Entities that maintain death records | Entities that maintain felony records | Entities that maintain records of individuals declared mentally incompetent |
|---|---|---|---|---|
| Northern Mariana Islands [10] | -- | -- | -- | -- |
| Ohio | -- | Monthly | -- | -- |
| Oklahoma [11] | -- | Monthly | Monthly | -- |
| Oregon [12] | -- | -- | -- | -- |
| Pennsylvania | -- | Weekly | -- | -- |
| Puerto Rico | -- | Real time | -- | -- |
| Rhode Island | -- | -- | -- | -- |
| South Carolina | -- | Monthly | Monthly | -- |
| South Dakota | -- | Daily | Daily | -- |
| Tennessee | -- | Monthly | Monthly | -- |
| Texas | -- | Weekly | Weekly | -- |
| U.S. Virgin Islands [13] | -- | -- | -- | -- |
| Utah [14] | Monthly | Other | Monthly | Other |
| Vermont | -- | -- | -- | -- |
| Virginia | -- | Monthly | Monthly | Monthly |
| Washington | -- | Monthly | Monthly | Monthly |
| West Virginia | -- | Monthly | Monthly | -- |
| Wisconsin [15] | -- | Monthly | Daily | -- |
| Wyoming | -- | Weekly | Weekly | -- |

Policy Survey Table 2 Calculation Notes:
   **Motor vehicles agency** uses questions Q5a_1 and Q5a_2.
   **Agencies for people with disabilities** uses questions Q5b_1 and Q5b_2.
   **State public assistance agencies** uses questions Q5c_1 and Q5c_2.
   **Other state agencies** uses questions Q5d_1 and Q5d_2.
   **Federal agencies** uses questions Q5e_1 and Q5e_2.
   **Military recruiting offices** uses questions Q5f_1 and Q5f_2.
   **Entities that maintain death records** uses questions Q5g_1 and Q5g_2.
   **Entities that maintain felony records** uses questions Q5h_1 and Q5h_2.
   **Entities that maintain records of individuals declared mentally incompetent** uses questions Q5i_1 and Q5i_2.

Policy Survey Table 2 Data Notes:
   **General Notes:**
   - States were only able to select a single response to Q5a_2–Q5i_2.


[1] Alaska reported that electronic information sharing with other, non-NVRA-required state agencies occurs after the March 31 deadline to apply for the Permanent Fund Dividend has passed. This typically involves one data file transfer.

OCA-APPX-0964

**[2]** Connecticut reported sharing electronic information with entities that maintain records of individuals declared mentally incompetent on an as-needed basis.

**[3]** Delaware reported that information is transmitted to state public assistance agencies at the moment the information is submitted to the voter portal by a client.

**[4]** The District of Columbia reported that information is shared with entities that maintain death records on a quarterly basis.

**[5]** Hawaii reported that voter information is shared with its motor vehicle agency upon request.

**[6]** Kentucky reported that it shares voter information with military recruiting offices as requests occur.

**[7]** Maryland reported that it is notified as needed by the Maryland Judiciary when a person is declared mentally incompetent by order of the courts.

**[8]** Nebraska conducts real-time checks of driver's license, state identifications, and SSN information on file with the motor vehicles agency. Daily transfers are conducted with the motor vehicle agency for voter registrations that occur at the agency, surrendered IDs, changed IDs, or SSNs needing verification from the Social Security Administration.

**[9]** New Hampshire reported that it shares voter information with the motor vehicles agency, federal agencies, and entities that maintain felony records in a one-way exchange from the agencies to the election office.

**[10]** The Northern Mariana Islands did not provide a response to these items.

**[11]** Oklahoma reported that offices that have converted to the Department of Public Safety's (DPS) new system share data daily. Offices that have not yet converted to the new system can only send address change data, and that data is sent weekly. Information regarding Oklahoma driver's licenses surrendered in another state is received monthly.

**[12]** Oregon reported that information is exchanged with the motor vehicles agency Monday through Friday.

**[13]** The U.S. Virgin Islands reported that information is exchanged with other state agencies at the request of the court.

**[14]** Utah reported that information is exchanged with entities that maintain death records on a bimonthly basis and entities that maintain records of individuals declared mentally incompetent as needed.

**[15]** Wisconsin receives competency data electronically from the courts.

OCA-APPX-0965



## Policy Survey Table 3: Online Voter Registration Policies

| State | Individuals can register to vote and update their registration via the system | Individuals can update their registration via the system | State-issued driver's license or ID is required to use this system |
|---|---|---|---|
| Alabama | ✓ | -- | Yes |
| Alaska | ✓ | -- | Yes |
| American Samoa | -- | -- | -- |
| Arizona | ✓ | -- | Yes |
| Arkansas | -- | -- | -- |
| California | ✓ | -- | No |
| Colorado | ✓ | -- | Yes |
| Connecticut | ✓ | -- | Yes |
| Delaware | ✓ | -- | Yes |
| District of Columbia | ✓ | -- | No |
| Florida | ✓ | -- | Yes |
| Georgia | ✓ | -- | Yes |
| Guam | ✓ | -- | Yes |
| Hawaii | ✓ | -- | Yes |
| Idaho | ✓ | -- | Yes |
| Illinois | ✓ | -- | Yes |
| Indiana | ✓ | -- | Yes |
| Iowa | ✓ | -- | Yes |
| Kansas | ✓ | -- | Yes |
| Kentucky | ✓ | -- | No |
| Louisiana | ✓ | -- | Yes |
| Maine | -- | -- | -- |
| Maryland | ✓ | -- | Yes |
| Massachusetts | ✓ | -- | Yes |
| Michigan | ✓ | -- | Yes |
| Minnesota | ✓ | -- | No |
| Mississippi | -- | ✓ | Yes |
| Missouri | ✓ | -- | No |
| Montana | -- | -- | -- |
| Nebraska | ✓ | -- | Yes |
| Nevada | ✓ | -- | Yes |
| New Hampshire | -- | -- | -- |
| New Jersey | ✓ | -- | Yes |
| New Mexico | ✓ | -- | Yes |
| New York | ✓ | -- | Yes |
| North Carolina | ✓ | -- | Yes |
| North Dakota [1] | -- | -- | -- |
| Northern Mariana Islands | -- | -- | -- |

OCA-APPX-0966

| State | Individuals can register to vote and update their registration via the system | Individuals can update their registration via the system | State-issued driver's license or ID is required to use this system |
|---|---|---|---|
| Ohio | ✓ | -- | Yes |
| Oklahoma | ✓ | -- | No |
| Oregon | ✓ | -- | Yes |
| Pennsylvania | ✓ | -- | No |
| Puerto Rico | -- | -- | -- |
| Rhode Island | ✓ | -- | Yes |
| South Carolina | ✓ | -- | Yes |
| South Dakota | -- | -- | -- |
| Tennessee | ✓ | -- | Yes |
| Texas | -- | ✓ | Yes |
| U.S. Virgin Islands | -- | -- | -- |
| Utah | ✓ | -- | Yes |
| Vermont | ✓ | -- | No |
| Virginia | ✓ | -- | Yes |
| Washington | ✓ | -- | Yes |
| West Virginia | ✓ | -- | Yes |
| Wisconsin | ✓ | -- | Yes |
| Wyoming | -- | -- | -- |

Policy Survey Table 3 Calculation Notes:

**Individuals can register to vote and update their registration via the system** uses question Q7.
**Individuals can update their registration via the system** uses question Q7.
**A driver's license or state-issued ID is required to use this system** uses question Q7a.

Policy Survey Table 3 Data Notes:
**General Notes:**
- States were only able to select a single response to both Q7 and Q7a.

[1] North Dakota does not have voter registration.

OCA-APPX-0967



## Policy Survey Table 4: State Voting by Mail Election Policies

| State | Excuse required for mail voting | State or jurisdiction conducts all-mail election | Permanent absentee voting allowed | Who can be a permanent absentee voter |
|-------|-------------------------------|-----------------------------------------------|---------------------------------|---------------------------------------|
| Alabama | ✓ | -- | Yes, individuals who meet specific criteria | Persons with disabilities |
| Alaska | -- | -- | -- | -- |
| American Samoa | ✓ | -- | -- | -- |
| Arizona | -- | -- | Yes, any registrant | -- |
| Arkansas | ✓ | -- | -- | -- |
| California | -- | Statewide | Yes, any registrant | -- |
| Colorado | -- | Statewide | -- | -- |
| Connecticut | ✓ | -- | Yes, individuals who meet specific criteria | Persons with disabilities |
| Delaware | -- | -- | Yes, individuals who meet specific criteria | Federal or state workers and their spouses or dependents, members of the uniformed services, voters who are sick or disabled (temporarily or permanently), voters temporarily residing outside the United States and their spouses or dependents |
| District of Columbia | -- | Statewide | Yes, any registrant | -- |
| Florida | ✓ | -- | -- | -- |
| Georgia | -- | -- | -- | -- |
| Guam | ✓ | -- | -- | -- |
| Hawaii | -- | Statewide | -- | -- |
| Idaho | -- | Only certain jurisdictions | -- | -- |
| Illinois | -- | -- | -- | -- |
| Indiana | ✓ | -- | -- | -- |
| Iowa | -- | -- | -- | -- |
| Kansas | -- | -- | Yes, individuals who meet specific criteria | Persons with disabilities |
| Kentucky | ✓ | -- | -- | -- |
| Louisiana | ✓ | -- | Yes, individuals who meet specific criteria | Individuals over a specified age, persons with disabilities |
| Maine | -- | -- | -- | -- |
| Maryland | -- | -- | -- | -- |

OCA-APPX-0968

| State | Excuse required for mail voting | State or jurisdiction conducts all-mail election | Permanent absentee voting allowed | Who can be a permanent absentee voter |
|---|---|---|---|---|
| Massachusetts | -- | -- | Yes, individuals who meet specific criteria | Persons who provide a note from a medical professional |
| Michigan | -- | -- | Yes, any registrant | -- |
| Minnesota | -- | Only certain jurisdictions | Yes, any registrant | -- |
| Mississippi | ✓ | -- | Yes, individuals who meet specific criteria | Persons with disabilities |
| Missouri | -- | -- | Yes, individuals who meet specific criteria | Persons with disabilities |
| Montana | -- | Only certain jurisdictions | Yes, any registrant | -- |
| Nebraska | -- | Only certain jurisdictions | -- | -- |
| Nevada | -- | Statewide | Yes, any registrant | -- |
| New Hampshire | ✓ | -- | -- | -- |
| New Jersey | -- | Statewide | Yes, any registrant | -- |
| New Mexico | -- | -- | -- | -- |
| New York | ✓ | -- | Yes, individuals who meet specific criteria | Persons with disabilities, voters who claim permanent illness |
| North Carolina | -- | -- | -- | -- |
| North Dakota | -- | -- | -- | -- |
| Northern Mariana Islands | -- | -- | -- | -- |
| Ohio | -- | -- | -- | -- |
| Oklahoma | -- | -- | -- | -- |
| Oregon [1] | -- | Statewide | Yes, individuals who meet specific criteria | Persons registered as Oregon voters but who are away from their Oregon residences when ballots are available |
| Pennsylvania [2] | ✓ | -- | Yes, any registrant | -- |
| Puerto Rico | ✓ | -- | -- | -- |
| Rhode Island | -- | -- | Yes, individuals who meet specific criteria | Persons with disabilities |
| South Carolina | -- | -- | -- | -- |
| South Dakota | -- | -- | -- | -- |
| Tennessee | ✓ | -- | Yes, individuals who meet specific criteria | Persons with disabilities, persons who have a doctor certify that they are unable to go to the polls |
| Texas | ✓ | -- | -- | -- |
| U.S. Virgin Islands | -- | -- | -- | -- |



| State | Excuse required for mail voting | State or jurisdiction conducts all-mail election | Permanent absentee voting allowed | Who can be a permanent absentee voter |
|---|---|---|---|---|
| Utah | -- | Statewide | Yes, any registrant | -- |
| Vermont | -- | Statewide | -- | -- |
| Virginia | -- | -- | Yes, any registrant | -- |
| Washington | -- | Statewide | Yes, any registrant | -- |
| West Virginia | ✓ | -- | Yes, individuals who meet specific criteria | Persons with disabilities, participants in the West Virginia Address Confidentiality Program |
| Wisconsin | -- | -- | Yes, individuals who meet specific criteria | Persons with disabilities; persons who certify that they are indefinitely confined due to age, illness, infirmity, or disability |
| Wyoming | -- | -- | -- | -- |

Policy Survey Table 4 Calculation Notes:

**Excuse required for mail voting** uses question Q17.

**State or jurisdiction conducts all-mail election** uses questions Q18 and Q18a.

**Permanent absentee voting allowed** uses question Q19.

**Who can be a permanent absentee voter** uses questions Q19a_1, Q19a_2, and Q19a_3.

Policy Survey Table 4 Data Notes:

**General Notes:**

- States were only able to select a single response to Q17–Q19. Multiple responses were accepted for the Q19a items.

- The Policy Survey did not collect information on whether changes in states' laws regarding all-vote-by-mail elections for 2020 were permanent or temporary or whether the changes were made in direct response to the COVID-19 pandemic.

[1] Although Oregon is a vote-by-mail state, there are still individuals who are considered absentee voters. Anyone who is registered as an Oregon voter but is away from their Oregon residence when ballots are available can request to be a permanent absentee voter if Oregon remains their primary residence.

[2] Pennsylvania provides both absentee and mail voting options. Voters who apply for an absentee ballot must give a reason for voting absentee. Voters who apply for a mailed ballot are not required to give a reason.

OCA-APPX-0970

## Policy Survey Table 5: Mail Voting Deadlines for UOCAVA and Non-UOCAVA Voters

| State | Mail voters | | Domestic military UOCAVA voters | | Overseas UOCAVA voters | |
|---|---|---|---|---|---|---|
| | Postmarked by | Received by | Postmarked by | Received by | Postmarked by | Received by |
| Alabama | 1 day before Election Day | Election Day | Election Day | 7 days after Election Day | Election Day | 7 days after Election Day |
| Alaska | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day | Election Day | 15 days after Election Day |
| American Samoa | Election Day | Election Day | Election Day | Election Day | Election Day | Election Day |
| Arizona | -- | Election Day | -- | Election Day | -- | Election Day |
| Arkansas [1] | -- | Election Day | -- | 10 days after Election Day | -- | 10 days after Election Day |
| California [2] | Election Day | 17 days after Election Day | Election Day | 17 days after Election Day | Election Day | 17 days after Election Day |
| Colorado | -- | Election Day | -- | 8 days after Election Day | -- | 8 days after Election Day |
| Connecticut | Election Day | Election Day | Election Day | Election Day | Election Day | Election Day |
| Delaware | -- | Election Day | -- | Election Day | -- | Election Day |
| District of Columbia | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day |
| Florida [3] | -- | Election Day | -- | Election Day | -- | 10 days after Election Day |
| Georgia | -- | Election Day | Election Day | 3 days after Election Day | Election Day | 3 days after Election Day |
| Guam [4] | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day |
| Hawaii [5] | -- | Election Day | -- | Election Day | -- | Election Day |
| Idaho | -- | Election Day | -- | Election Day | -- | Election Day |
| Illinois | Election Day | 14 days after Election Day | Election Day | 14 days after Election Day | Election Day | 14 days after Election Day |
| Indiana [6] | -- | Election Day | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day |
| Iowa [7] | 1 day before Election Day | 6 days after Election Day | 1 day before Election Day | 6 days after Election Day | 1 day before Election Day | 6 days after Election Day |
| Kansas | Election Day | 3 days after Election Day | Election Day | Election Day | Election Day | Election Day |
| Kentucky [8] | Election Day | Election Day | Election Day | 3 days after Election Day | Election Day | 3 days after Election Day |
| Louisiana | -- | 1 day before Election Day | -- | Election Day | -- | Election Day |
| Maine [9] | -- | Election Day | -- | Election Day | -- | Election Day |
| Maryland | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day |
| Massachusetts | Election Day | 3 days after Election Day | Election Day | 3 days after Election Day | Election Day | 10 days after Election Day |

OCA-APPX-0971



| State | Mail voters | | Domestic military UOCAVA voters | | Overseas UOCAVA voters | |
|---|---|---|---|---|---|---|
| | Postmarked by | Received by | Postmarked by | Received by | Postmarked by | Received by |
| Michigan | Election Day | Election Day | Election Day | Election Day | Election Day | Election Day |
| Minnesota [10] | -- | Election Day | -- | Election Day | -- | Election Day |
| Mississippi [11] | Election Day | 5 days after Election Day | Election Day | 5 days after Election Day | Election Day | 5 days after Election Day |
| Missouri | -- | Election Day | Election Day | 3 days after Election Day | Election Day | 3 days after Election Day |
| Montana | Election Day | Election Day | Election Day | Election Day | Election Day | Election Day |
| Nebraska [12] | -- | Election Day | Election Day | Election Day | -- | Election Day |
| Nevada | Election Day | 7 days after Election Day | Election Day | 7 days after Election Day | Election Day | 7 days after Election Day |
| New Hampshire [13] | | Election Day | | Election Day | -- | Election Day |
| New Jersey [14] | Election Day | 7 days after Election Day | Election Day | 7 days after Election Day | Election Day | 7 days after Election Day |
| New Mexico [15] | -- | Election Day | Election Day | Election Day | -- | Election Day |
| New York | Election Day | 7 days after Election Day | Election Day | 13 days after Election Day | Election Day | 13 days after Election Day |
| North Carolina [16] | Election Day | 9 days after Election Day | -- | 9 days after Election Day | -- | 9 days after Election Day |
| North Dakota | 1 day before Election Day | 6 days after Election Day | 1 day before Election Day | 6 days after Election Day | 1 day before Election Day | 6 days after Election Day |
| Northern Mariana Islands | Election Day | 14 days after Election Day | Election Day | 14 days after Election Day | Election Day | 14 days after Election Day |
| Ohio | 1 day before Election Day | 10 days after Election Day | -- | 10 days after Election Day | -- | 10 days after Election Day |
| Oklahoma [17] | -- | Election Day | Election Day | Election Day | -- | Election Day |
| Oregon [18] | -- | Election Day | -- | Election Day | -- | Election Day |
| Pennsylvania [19] | -- | Election Day | 1 day before Election Day | 7 days after Election Day | 1 day before Election Day | 7 days after Election Day |
| Puerto Rico [20] | Election Day | 14 days after Election Day | Election Day | 14 days after Election Day | Election Day | 14 days after Election Day |
| Rhode Island | -- | Election Day | | 7 days after Election Day | | 7 days after Election Day |
| South Carolina | -- | Election Day | -- | 2 days after Election Day | -- | 2 days after Election Day |
| South Dakota [21] | -- | Election Day | Election Day | Election Day | -- | Election Day |
| Tennessee [22] | -- | Election Day | -- | Election Day | -- | Election Day |
| Texas [23] | Election Day | 1 day after Election Day | -- | 6 days after Election Day | Election Day | 5 days after Election Day |
| U.S. Virgin Islands [24] | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day | Election Day | 10 days after Election Day |
| Utah [25] | 1 day before Election Day | 13 days after Election Day | Election Day | 13 days after Election Day | Election Day | 13 days after Election Day |

OCA-APPX-0972

| State | Mail voters | | Domestic military UOCAVA voters | | Overseas UOCAVA voters | |
|---|---|---|---|---|---|---|
| | Postmarked by | Received by | Postmarked by | Received by | Postmarked by | Received by |
| Vermont | -- | Election Day | -- | Election Day | -- | Election Day |
| Virginia [26] | Election Day | 3 days after Election Day | Election Day | 3 days after Election Day | Election Day | 3 days after Election Day |
| Washington [27] | Election Day | 20 days after Election Day | -- | 20 days after Election Day | -- | 20 days after Election Day |
| West Virginia [28] | Election Day | 5 days after Election Day | -- | 5 days after Election Day | -- | 5 days after Election Day |
| Wisconsin [29] | Election Day | Election Day | Election Day | Election Day | Election Day | Election Day |
| Wyoming | -- | Election Day | -- | Election Day | -- | Election Day |

Policy Survey Table 5 Calculation Notes:

**Mail voters, Postmarked by** uses questions Q20_1_1, Q20_1_10E, Q20_1_2, and Q20_1_3.

**Mail voters, Received by** uses questions Q20_2_1, Q20_2_10E, Q20_2_2, Q20_2_3, Q20_2_30E, and Q20_2_4.

**Domestic military UOCAVA voters, Postmarked by** uses questions Q29_1_1, Q29_1_10E, Q29_1_2, and Q29_1_3.

**Domestic military UOCAVA voters, Received by** uses questions Q29_2_1, Q29_2_10E, Q29_2_2, Q29_2_3, Q29_2_30E, and Q29_2_4.

**Overseas UOCAVA voters, Postmarked by** uses questions Q30_1_1, Q30_1_10E, Q30_1_2, and Q30_1_3.

**Overseas UOCAVA voters, Received by** uses questions Q30_2_1, Q30_2_10E, Q30_2_2, Q30_2_3, Q30_2_30E, and Q30_2_4.

Policy Survey Table 5 Data Notes:

**General Notes:**

- States were able to select multiple responses to each set of postmark and receipt deadline items through Q20, Q29, and Q30, although none of the states did so.

[1] Arkansas noted in a survey comment that mailed ballots must be received by 7:30 p.m. (close of polls).

[2] California noted in a survey comment that "For the November 3, 2020, general election, the deadline for a [mailed] ballot to be received by county elections officials is extended from 3 to 17 days after Election Day."

[3] Florida noted in a survey comment that the deadline for mailed ballots is "7 pm local time deadline for domestic ballots 10 day extension for overseas voters."

[4] Guam noted in a survey comment that "[B]allots must be received 10 business days after the election."

[5] Hawaii noted in a survey comment that "Regardless of postmark date, ballots must be received by the County Elections Division by 7:00 p.m. on Election Day."

[6] Indiana noted in a survey comment that the deadline for mailed ballots is "Noon, local prevailing time."

[7] Iowa noted in a survey comment that "[mailed] ballots must be postmarked or the ImB [Intelligent Mail barcode] tracking bar code must show that the ballot was entered into the mail stream before election day. Ballots must be received by 12:00 noon on the Monday after the election."

[8] Kentucky noted in a survey comment that "If a [mailed] ballot is postmarked on or before 11/3 it must be received by 11/6. If a ballot is placed in a drop-box or delivered to a Clerk's office, it must be delivered by 6PM local time, 11/3."

OCA-APPX-0973



**[9]** Maine noted in a survey comment that "[Mailed] ballot[s] must be received by 8:00 pm on Election Day."

**[10]** Minnesota noted in a survey comment that for mailed ballots in the 2020 general election, "consent decree changes this to postmarked on or before election day and received by 11/10."

**[11]** In Mississippi, ballots returned by mail must be postmarked by Election Day and received by the end of five business days after Election Day. Mail ballots returned by email or fax must be returned by 7:00 p.m. on the date of the election.

**[12]** Nebraska noted in a survey comment that "[Mailed ballots] must be received by close of polls on election day."

**[13]** New Hampshire noted in a survey comment that "Absentee ballots, including all UOCAVA voters absentee ballots, must be received no later than 5 p.m. on Election Day."

**[14]** New Jersey noted in a survey comment that the deadline for UOCAVA ballots is "Email and fax 8:00 pm election day."

**[15]** New Mexico noted in a survey comment that "ballots must be received by 7pm on election day."

**[16]** North Carolina noted in a survey comment that the "change from 3 days to 9 days approved by consent judgment in settlement between NCSBE [North Carolina State Board of Elections] and plaintiffs in the NC Alliance case which included extension of the civilian ballot mail return deadline for 2020. For remaining elections in 2020, a ballot shall be considered postmarked by Election Day if it has a postmark affixed to it or if there is information in BallotTrax, or another tracking service offered by the USPS or a commercial carrier, indicating that the ballot was in the custody of USPS or the commercial carrier on or before Election Day."

**[17]** Oklahoma noted in a survey comment that "State law requires that a returned absentee ballot be received in the hands of the County Election Board Secretary by 7 p.m. (CST) on election day for it to be processed and counted."

**[18]** Oregon noted that all ballots, including UOCAVA ballots, must be received by 8:00 p.m.

**[19]** Pennsylvania noted that, by law, civilian ballots must be received by 8:00 p.m. on Election Day to be eligible for canvassing.

**[20]** Puerto Rico noted in a survey comment that the "PR Electoral Code haven't established a certain date to finish the General Election Scrutiny (canvass). Electoral Code establish that the ballot must be receive[d] before the General [Election] Scrutiny finished. Refer to Article 10.7 of Act 58 of 2020. Generally it took around 30 days after the election date. We established 14 days because it[']s one of the options given by the system."

**[21]** South Dakota noted in a survey comment that "The voted [mailed] ballot MUST be received by your County Election Official on Election Day in enough time to deliver your ballot to your voting precinct before the polls close."

**[22]** Tennessee noted in a survey comment that mailed ballots must be received by "close of polls."

**[23]** Texas noted in a survey comment that "For [mailed] ballots arriving by 5 p.m. the day after election day, they must be post marked no later than election day."

**[24]** The U.S. Virgin Islands noted in a survey comment that "The [mailed] ballot must be placed in the mail by Election Day (postmark not required) and the ballot has ten (10) days to arrive to our office."

**[25]** Utah noted in a survey comment that "20a-3a-401(5)(d)(ii) = if the election officer receives the affidavit no later than 5 p.m. the day before the canvass, count the individual's [mailed] ballot."

**[26]** Virginia noted in a survey comment that "Further extensions apply if the [mailed] ballot was requested prior to the 45-day deadline and not sent by that date."

**[27]** Washington noted in a survey comment that "The ballot must be received by the day before the County Canvassing Board certifies the county's election results. In November 2020, that certification date is November 24, so ballots must be received by November 23. This gives voters a 20-day window for the

OCA-APPX-0974

November General Election." For "overseas voters and service voters," the date on the declaration to which the voter has attested determines the validity of the time of voting for that ballot.

[28] West Virginia noted that ballots must be received by the fifth day after the election that is not a Saturday, Sunday, or legal holiday.

[29] Wisconsin state statutes do not contain a postmark requirement. Absentee ballots may be delivered to the local clerk so long as they are received before polls close.

OCA-APPX-0975



## Policy Survey Table 6: Electronic Ballot Transmission for Voters

| State | Voters cannot receive ballots electronically | During emergency situations | When a replacement ballot is needed | Voters with specific disability | Voters with any disability | Any circumstance | Other |
|---|---|---|---|---|---|---|---|
| Alabama | ✓ | -- | -- | -- | -- | -- | -- |
| Alaska | -- | -- | -- | -- | -- | ✓ | -- |
| American Samoa | ✓ | -- | -- | -- | -- | -- | -- |
| Arizona | ✓ | -- | -- | -- | -- | -- | -- |
| Arkansas | ✓ | -- | -- | -- | -- | -- | -- |
| California [1] | -- | -- | -- | -- | ✓ | -- | ✓ |
| Colorado | -- | ✓ | -- | -- | ✓ | -- | -- |
| Connecticut | ✓ | -- | -- | -- | -- | -- | -- |
| Delaware [2] | -- | -- | -- | -- | ✓ | -- | ✓ |
| District of Columbia | -- | -- | -- | -- | ✓ | -- | -- |
| Florida | ✓ | -- | -- | -- | -- | -- | -- |
| Georgia | ✓ | -- | -- | -- | -- | -- | -- |
| Guam | -- | -- | -- | -- | -- | ✓ | -- |
| Hawaii [3] | -- | -- | -- | -- | ✓ | -- | ✓ |
| Idaho | ✓ | -- | -- | -- | -- | -- | -- |
| Illinois | ✓ | -- | -- | -- | -- | -- | -- |
| Indiana | ✓ | -- | -- | -- | -- | -- | -- |
| Iowa | ✓ | -- | -- | -- | -- | -- | -- |
| Kansas | ✓ | -- | -- | -- | -- | -- | -- |
| Kentucky | -- | -- | -- | -- | -- | ✓ | -- |
| Louisiana | -- | -- | -- | -- | ✓ | -- | -- |
| Maine [4] | -- | ✓ | -- | -- | -- | -- | ✓ |
| Maryland | -- | -- | -- | -- | -- | ✓ | -- |
| Massachusetts [5] | -- | -- | -- | -- | -- | -- | ✓ |
| Michigan | ✓ | -- | -- | -- | -- | -- | -- |
| Minnesota | -- | -- | -- | -- | ✓ | -- | -- |
| Mississippi [6] | -- | -- | -- | -- | -- | -- | ✓ |
| Missouri | -- | ✓ | -- | -- | -- | -- | -- |
| Montana | -- | -- | -- | ✓ | -- | -- | -- |
| Nebraska | ✓ | -- | -- | -- | -- | -- | -- |
| Nevada | -- | ✓ | ✓ | -- | ✓ | -- | -- |
| New Hampshire | -- | -- | -- | ✓ | -- | -- | -- |
| New Jersey | ✓ | -- | -- | -- | -- | -- | -- |
| New Mexico | -- | -- | -- | ✓ | -- | -- | -- |
| New York [7] | -- | -- | -- | -- | ✓ | -- | ✓ |
| North Carolina | -- | -- | -- | ✓ | -- | -- | -- |
| North Dakota | ✓ | -- | -- | -- | -- | -- | -- |

OCA-APPX-0976

| State | Voters cannot receive ballots electronically | During emergency situations | When a replacement ballot is needed | Voters with specific disability | Voters with any disability | Any circumstance | Other |
|---|---|---|---|---|---|---|---|
| Northern Mariana Islands | ✓ | -- | -- | -- | -- | -- | -- |
| Ohio | -- | -- | -- | -- | ✓ | -- | -- |
| Oklahoma | ✓ | -- | -- | -- | -- | -- | -- |
| Oregon | -- | -- | -- | -- | -- | ✓ | -- |
| Pennsylvania [8] | -- | -- | -- | -- | -- | -- | ✓ |
| Puerto Rico | ✓ | -- | -- | -- | -- | -- | -- |
| Rhode Island | ✓ | -- | -- | -- | -- | -- | -- |
| South Carolina | ✓ | -- | -- | -- | -- | -- | -- |
| South Dakota | ✓ | -- | -- | -- | -- | -- | -- |
| Tennessee | ✓ | -- | -- | -- | -- | -- | -- |
| Texas | ✓ | -- | -- | -- | -- | -- | -- |
| U.S. Virgin Islands | -- | ✓ | ✓ | ✓ | ✓ | -- | -- |
| Utah | -- | ✓ | -- | -- | ✓ | -- | -- |
| Vermont | ✓ | -- | -- | -- | -- | -- | -- |
| Virginia | -- | ✓ | -- | ✓ | -- | -- | -- |
| Washington | -- | -- | -- | -- | -- | ✓ | -- |
| West Virginia | -- | -- | -- | ✓ | -- | -- | -- |
| Wisconsin | ✓ | -- | -- | -- | -- | -- | -- |
| Wyoming | ✓ | -- | -- | -- | -- | -- | -- |

Policy Survey Table 6 Calculation Notes:

**Voters cannot receive ballots electronically** uses question Q23_1.
**During emergency situations** uses question Q23_2.
**When a replacement ballot is needed** uses question Q23_3.
**Voters with specific disability** uses question Q23_4.
**Voters with any disability** uses question Q23_5.
**Voters may receive a ballot electronically for any circumstance** uses question Q23_6.
**Other** uses question Q23_7.

Policy Survey Table 6 Data Notes:

**General Notes:**
- States were able to select multiple responses to Q23 items; however, selecting Q23_1 excluded all other response choices.
- Q23 collected information on electronic ballot transmission for non-UOCAVA voters only. Voters covered by UOCAVA may receive ballots electronically under the MOVE Act.

[1] In the November 3, 2020, general election, California county election officials permitted any voter to cast a ballot using a certified remote accessible vote-by-mail system.
[2] Delaware specified that voters who are sick or physically disabled, whether temporarily or permanently, can receive ballots electronically.

OCA-APPX-0977



**[3]** Hawaii reported allowing voters to receive ballots electronically when a replacement ballot is needed and is requested within five days of the election.

**[4]** Maine reported allowing voters who self-identify as having a print disability to receive ballots electronically.

**[5]** Massachusetts specified that voters with a disability that prevents them from privately and independently marking a paper ballot can receive ballots electronically.

**[6]** Mississippi's UOCAVA state statute allows emergency responders to qualify for electronic ballots if they are deployed outside their county of residence during a state of emergency.

**[7]** New York reported allowing emergency responders to receive ballots electronically.

**[8]** Pennsylvania specified that voters with any disability as defined by the Americans with Disabilities Act can receive a ballot electronically.

OCA-APPX-0978

## Policy Survey Table 7: In-Person Voting Before Election Day

| State | Terminology used to describe casting a ballot in person before Election Day | Excuse required for in-person voting before Election Day |
|-------|------------------------------------------------------------------------------|----------------------------------------------------------|
| Alabama | In-person absentee voting | ✓ |
| Alaska | In-person early voting, in-person absentee voting | -- |
| American Samoa | Local absentee voting | ✓ |
| Arizona | In-person early voting | -- |
| Arkansas | In-person early voting | -- |
| California | In-person early voting | -- |
| Colorado | In-person early voting | -- |
| Connecticut [1] | Other | ✓ |
| Delaware | In-person absentee voting | ✓ |
| District of Columbia | In-person early voting | -- |
| Florida | In-person early voting | -- |
| Georgia | Advance voting | -- |
| Guam | In-person absentee voting | -- |
| Hawaii | In-person voting | -- |
| Idaho | In-person early voting, in-person absentee voting | -- |
| Illinois | In-person early voting | -- |
| Indiana | In-person absentee voting | -- |
| Iowa | In-person absentee voting | -- |
| Kansas | In-person advance voting | -- |
| Kentucky | In-person early voting | -- |
| Louisiana | In-person early voting | -- |
| Maine | In-person absentee voting | -- |
| Maryland | In-person early voting | -- |
| Massachusetts [2] | In-person early voting, in-person absentee voting | ✓ |
| Michigan | In-person absentee voting | -- |
| Minnesota | In-person absentee voting | -- |
| Mississippi | In-person absentee voting | ✓ |
| Missouri | In-person absentee voting | ✓ |
| Montana | In-person absentee voting | -- |
| Nebraska | In-person early voting | -- |
| Nevada | In-person early voting | -- |
| New Hampshire | In-person absentee voting | ✓ |
| New Jersey | -- | -- |
| New Mexico | In-person early voting, in-person absentee voting | -- |
| New York | In-person early voting | -- |
| North Carolina | In-person early voting, in-person absentee voting, one stop voting, early voting | -- |
| North Dakota | In-person early voting, in-person absentee voting | -- |

OCA-APPX-0979



| State | Terminology used to describe casting a ballot in person before Election Day | Excuse required for in-person voting before Election Day |
|---|---|---|
| Northern Mariana Islands | In-person early voting | ✓ |
| Ohio | In-person early voting, in-person absentee voting | -- |
| Oklahoma | In-person absentee voting | -- |
| Oregon [3] | Other | ✓ |
| Pennsylvania [4] | Other | ✓ |
| Puerto Rico [5] | In-person early voting, other | ✓ |
| Rhode Island | In-person absentee voting | -- |
| South Carolina [6] | In-person absentee voting | -- |
| South Dakota | In-person absentee voting | -- |
| Tennessee | In-person early voting | -- |
| Texas | In-person early voting | -- |
| U.S. Virgin Islands | In-person early voting, in-person absentee voting | -- |
| Utah | In-person early voting | -- |
| Vermont | In-person early voting, in-person absentee voting | -- |
| Virginia | In-person early voting | -- |
| Washington [7] | In-person voting | -- |
| West Virginia | In-person early voting | -- |
| Wisconsin | In-person absentee voting | -- |
| Wyoming | In-person absentee voting | -- |

Policy Survey Table 7 Calculation Notes:
> **Terminology used to describe casting a ballot in person before Election Day** uses questions Q24_1, Q24_2, and Q24_3.
> **Excuse required for in-person voting before Election Day** uses question Q24a.

Policy Survey Table 7 Data Notes:
> **General Notes:**
> - States were able to select multiple responses to Q24 items; however, selecting Q24_4 excluded all other response items and is not depicted in the table. States were only able to select a single response to Q24a.

[1] Connecticut reported that a person can request an absentee ballot and cast it on the spot and not return it by mail.
[2] In Massachusetts, in-person absentee voting before Election Day requires an excuse but early voting does not.
[3] Oregon reported that members of specific populations (e.g., those who will not be in Oregon or have access to a regular mailing address when ballots are available) can receive and return a ballot at their county election office. They may choose to cast their vote then and there or take it with them and return via mail or drop box.
[4] Pennsylvania's 2019 election reforms allow for absentee and mail-in ballots to be completed over the counter at an election office.

OCA-APPX-0980

**[5]** Puerto Rico reported that in addition to in-person early voting, voters may cast their ballot from their residence via mail.

**[6]** South Carolina requires an excuse for in-person absentee voting; however, this requirement was temporarily suspended for elections held in 2020.

**[7]** Washington is a vote-by-mail state. In-person voters were issued a vote-by-mail ballot packet at a voting center that they could deposit into a ballot drop box or mail. Alternatively, voters could use a disability access unit to vote in person before Election Day.

OCA-APPX-0981



## Policy Survey Table 8: Election Certification, Recounts, and Audits

| State | General election certification deadline | Reasons why a jurisdiction in the state may conduct a post-election recount of ballots | | | | | Post-election tabulation audit policy |
|---|---|---|---|---|---|---|---|
| | | Results are within a certain margin | By candidate or party request | Results are within a certain margin and a candidate or party has requested a recount | Request by other person or group | By court order only | |
| Alabama | 11/25/2020 | -- | ✓ | -- | -- | -- | Not required |
| Alaska [1] | 11/25/2020 | ✓ | ✓ | -- | ✓ | -- | Required by statute |
| American Samoa | 11/10/2020 | -- | ✓ | ✓ | -- | -- | Not required |
| Arizona | 11/30/2020 | -- | -- | -- | -- | ✓ | Required by statute |
| Arkansas [2] | 11/18/2020 | -- | ✓ | -- | ✓ | -- | Required by statute |
| California [3] | 12/11/2020 | ✓ | ✓ | ✓ | ✓ | -- | Required by statute |
| Colorado | 11/25/2020 | ✓ | ✓ | -- | -- | -- | Required by statute |
| Connecticut | 11/25/2020 | ✓ | -- | -- | -- | -- | Required by statute |
| Delaware [4] | 11/5/2020 | ✓ | -- | -- | -- | -- | Required by statute |
| District of Columbia [5] | 11/24/2020 | ✓ | ✓ | -- | -- | -- | Required by statute |
| Florida [6] | 11/17/2020 | ✓ | -- | -- | -- | -- | Required by statute |
| Georgia [7] | 11/20/2020 | -- | -- | ✓ | ✓ | -- | Required by statute |
| Guam [8] | 11/19/2020 | ✓ | -- | -- | -- | -- | Not required |
| Hawaii [9] | -- | -- | ✓ | -- | -- | -- | Required by statute |
| Idaho [10] | 11/13/2020 | -- | ✓ | -- | ✓ | -- | Not required |
| Illinois | 12/4/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| Indiana [11] | 11/16/2020 | -- | ✓ | -- | ✓ | -- | Required by statute |
| Iowa | 11/30/2020 | -- | ✓ | -- | -- | -- | Required by statute |
| Kansas [12] | 12/1/2020 | -- | ✓ | -- | ✓ | -- | Required by statute |
| Kentucky | 11/23/2020 | -- | ✓ | -- | -- | -- | Not required |
| Louisiana [13] | 11/19/2020 | -- | -- | ✓ | ✓ | -- | Other |
| Maine [14] | 11/23/2020 | -- | ✓ | -- | -- | -- | Not required |
| Maryland | 12/8/2020 | -- | ✓ | -- | -- | -- | Required by statute |
| Massachusetts [15] | 11/18/2020 | -- | ✓ | -- | ✓ | -- | Required by statute |
| Michigan [16] | 11/23/2020 | ✓ | ✓ | -- | ✓ | -- | Required by statute |

OCA-APPX-0982

| State | General election certification deadline | Reasons why a jurisdiction in the state may conduct a post-election recount of ballots | | | | | Post-election tabulation audit policy |
|---|---|---|---|---|---|---|---|
| | | Results are within a certain margin | By candidate or party request | Results are within a certain margin and a candidate or party has requested a recount | Request by other person or group | By court order only | |
| Minnesota [17] | 11/24/2020 | ✓ | ✓ | -- | ✓ | -- | Required by statute |
| Mississippi | 11/13/2020 | -- | -- | -- | -- | ✓ | Not required |
| Missouri | 12/8/2020 | -- | -- | ✓ | -- | -- | Required by formal rule |
| Montana | 11/30/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| Nebraska [18] | 11/30/2020 | ✓ | ✓ | -- | -- | -- | Required by formal rule |
| Nevada [19] | 11/16/2020 | -- | ✓ | -- | ✓ | -- | Required by statute |
| New Hampshire [20] | 11/12/2020 | -- | ✓ | -- | -- | -- | Not required |
| New Jersey | 12/8/2020 | -- | -- | -- | -- | ✓ | Required by statute |
| New Mexico | 11/24/2020 | ✓ | ✓ | -- | -- | -- | Required by statute |
| New York | 12/7/2020 | -- | -- | -- | -- | ✓ | Required by statute |
| North Carolina [21] | 11/24/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| North Dakota [22] | 11/13/2020 | ✓ | ✓ | ✓ | ✓ | -- | Required by statute |
| Northern Mariana Islands | 11/17/2020 | -- | -- | -- | -- | ✓ | Required by statute |
| Ohio [23] | 11/24/2020 | ✓ | ✓ | -- | ✓ | -- | Required by statute |
| Oklahoma [24] | 11/10/2020 | -- | ✓ | -- | -- | -- | Other |
| Oregon [25] | 12/3/2020 | ✓ | ✓ | -- | ✓ | -- | Required by statute |
| Pennsylvania [26] | 11/23/2020 | ✓ | -- | -- | ✓ | -- | Required by statute |
| Puerto Rico [27] | 11/4/2020 | ✓ | -- | -- | -- | -- | Not required |
| Rhode Island [28] | 11/20/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| South Carolina [29] | 11/13/2020 | ✓ | -- | -- | -- | -- | Other |
| South Dakota | 11/10/2020 | -- | -- | ✓ | -- | -- | Not required |
| Tennessee [30] | 11/23/2020 | -- | -- | -- | -- | ✓ | Other |
| Texas [31] | 12/7/2020 | -- | ✓ | -- | -- | -- | Required by statute |
| U.S. Virgin Islands | 11/13/2020 | -- | ✓ | -- | -- | -- | Not required |
| Utah | 11/17/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| Vermont | 11/10/2020 | -- | -- | ✓ | -- | -- | Required by statute |

OCA-APPX-0983



| State | General election certification deadline | Reasons why a jurisdiction in the state may conduct a post-election recount of ballots | | | | | Post-election tabulation audit policy |
|---|---|---|---|---|---|---|---|
| | | Results are within a certain margin | By candidate or party request | Results are within a certain margin and a candidate or party has requested a recount | Request by other person or group | By court order only | |
| Virginia [32] | 11/16/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| Washington [33] | 12/3/2020 | ✓ | ✓ | ✓ | ✓ | -- | Required by statute |
| West Virginia | 12/3/2020 | -- | ✓ | -- | -- | -- | Required by statute |
| Wisconsin [34] | 12/1/2020 | -- | -- | ✓ | -- | -- | Required by statute |
| Wyoming [35] | 11/11/2020 | ✓ | ✓ | -- | -- | -- | Other |

Policy Survey Table 8 Calculation Notes:

**General election certification deadline** uses question Q33.

**Recount reason, Results are within a certain margin** uses question Q34_1.

**Recount reason, By candidate or party request** uses question Q34_2.

**Recount reason, Results are within a certain margin and a candidate or party has requested a recount** uses question Q34_3.

**Recount reason, Request by other person or group** uses question Q34_4.

**Recount reason, By court order only** uses question Q34_5.

**Post-election tabulation audit policy** uses question Q35.

Policy Survey Table 8 Data Notes:

**General Notes:**

- States were able to specify a calendar date for item Q33, select multiple responses to item Q34, and only a single response to item Q35. Selecting Q34_5 excluded all other responses to Q34.

[1] Alaska reported that the certification deadline is the target date for the Alaska Division of Elections to certify the election. According to Alaska statute, a defeated candidate or 10 qualified voters who believe there has been a mistake in counting votes in an election may file an application for a recount of votes for any precinct or house district and for any office, proposition, or question. This application must be filed within five days after the completion of state review. However, the application may only be filed within three days after the completion of the state review after the general election for a recount of votes cast for the offices of governor and lieutenant governor. A recount is required if a contest is tied.

[2] Arkansas reported that the County Election Commission may also come to a decision to recount an election.

[3] California reported that anybody who is allowed by state law can request a recount.

[4] The Delaware Boards of Canvass convene at 10:00 a.m. on the Thursday immediately following the federal general election.

[5] The District of Colombia included the November 24 date in a public calendar as a tentative date for certifying results rather than a set deadline.

OCA-APPX-0984

**[6]** Florida specified that the state Elections Canvassing Commission meets at 9:00 a.m. on the ninth day after a primary election and at 9:00 a.m. on the 14th day after a general election to certify the election. For the November 3, 2020, federal general election, the deadline for jurisdictions to certify their results to the state fell on November 15, 2020.

**[7]** Georgia reported that "In Georgia precincts where paper or scanning ballots have been used, the superintendent may, either of their own motion or upon petition of any candidate or political party, order a recount of ballots for a particular precinct for one or more offices in which it appears an error has been made. In precincts where voting machines were used, if there appears to be a discrepancy or error in the returns recorded for any voting machine, the superintendent may, either of their own motion or upon sworn petition of three electors of any precinct, order a recanvass of the votes shown on that particular machine or machines. This recanvass may be conducted at any time prior to the certification of the consolidated returns by the superintendent."

**[8]** Guam reported that the certification deadline was a tentative date. The Guam Election Commission (GEC) cannot certify a general election until all administrative complaints received within 15 days after the election have been addressed.

**[9]** Hawaii explained that there is no set deadline for certifying election results. If there are no election contests filed with the Supreme Court within 20 days of the election, the results will be certified.

**[10]** Idaho reported that the county board of canvassers must certify results within 10 days of the general election, prior to the state board of canvassers meeting within 15 days of the general election. Idaho reported that a person supporting or opposing a state, jurisdiction, or city measure may request an election recount.

**[11]** The Indiana Election Division (IED) tabulates final results for all federal, statewide, state legislative, and judicial offices and completes that tabulation no later than the last Tuesday of November (i.e., November 24, 2020). The Secretary of State certifies results immediately after receiving IED's tabulation. For presidential electors, the Secretary of State's part of the 2020 Indiana Election Commission would be signed by that date. Since the governor is required to issue commissions to each presidential elector by noon on the first Tuesday of December (i.e., December 1, 2020), and in order to issue those commissions the governor must certify his part of the 2020 Indiana Election Commission certificate of ascertainment, the certification of the presidential election results and Indiana electors also occurs on the first Tuesday of December. Indiana reported that a candidate's political party chair (state chair for federal and statewide candidates or county chair for a state legislative candidate from any jurisdiction where the legislative district is located) may file a recount if the candidate does not file the recount by the candidate recount filing deadline.

**[12]** Kansas county board of canvassers can request a recount within their jurisdictions of any race if there are manifest errors.

**[13]** Louisiana reported that election results are final after compilation and promulgation by the Secretary of State. Louisiana voters that voted in the proposition election may request a recount if the number of absentee and early ballots would make a difference in the outcome of the proposition election. Louisiana does not statutorily require audits, but they are conducted in every parish.

**[14]** Maine reported that the Secretary of State must submit the official tabulation to the governor by the 20th day after the election.

**[15]** Massachusetts local election officials must certify their election results and transmit to the Secretary of the Commonwealth within 15 days after the election. Thereafter, the Secretary of the Commonwealth tabulates the totals and presents them to the governor and the council for certification. Any registered Massachusetts voter can petition for a recount of ballot questions.

**[16]** Michigan specified that recounts are conducted automatically if the statewide vote margin is less than 2,000 votes. Candidates can request a recount regardless of the margin. Groups may request a recount of ballot proposals. The voted ballots in at least one statewide contest must be reviewed as part of an audit

OCA-APPX-0985



(MCL 168.31a[2]). Separate audit procedures are used to complete both a traditional tabulation audit and a risk-limiting audit. Precincts are randomly selected for audit and all ballots for one statewide race were hand counted and compared to the tabulator totals to complete a traditional tabulation audit. Additionally, ballots for a statewide race are randomly selected from ballot containers statewide using a risk-limiting audit formula, and ballots were reviewed and compared to statewide totals.

[17] Minnesota did not specify the other person or group who may request a recount of votes.

[18] Nebraska specified that if there is a state-level recount, it would be conducted on December 2, 2020, at 9:00 a.m.

[19] In Nevada, any person or group was able to request a recount of a ballot question by November 18, 2020.

[20] New Hampshire specified that its certification dates vary depending on the office. For presidential electors, United States senators, representatives in Congress, state senators, and state representatives, the deadline was December 2, 2020. For governor, executive council, and county officers, the deadline was January 6, 2021.

[21] North Carolina specified that their reported date is barring recounts and/or protests in individual races.

[22] North Dakota specified that a defeated candidate or 10 qualified electors may contest the nomination or election of any person or the approval or rejection of any question or proposition submitted to a vote of the electorate, pursuant to chapters 16.1-04, 16.1-05, 16.1-06, 16.1-07, 16.1-08.1, 16.1-09, 16.1-10, and 16.1-11.

[23] Ohio specified that issue groups may request an election recount.

[24] The Oklahoma County Election Boards certify final election results in their jurisdictions at 5:00 p.m. on the Friday following the general election. In 2020, that was 5:00 p.m. on November 6. The State Election Board certifies final statewide results at 5:00 p.m. on the Tuesday following the general election. In 2020, that was 5:00 p.m. on November 10. The secretary of the state election board shall have the authority to direct the secretary of a county election board to conduct a post-election audit of election results, for the purpose of maintaining the security of the election system by ensuring that voting devices and software used in a particular election correctly tabulated votes.

[25] Oregon reported that any voter can request a recount on a measure. The county clerk may also request a recount of a candidate contest or measure.

[26] Pennsylvania reported that the November 23, 2020, certification deadline was imposed on jurisdiction officials and not on the Secretary of the Commonwealth. Pennsylvania reported that a group of voters may request a recount of specific precincts.

[27] The Puerto Rico Electoral Code does not establish a certain date for certification. However, it does establish partial result certification for the next day. If an election does not require a recount, the winner can be certified by the Puerto Rico State Election Commission.

[28] Rhode Island does not have a specified certification deadline but certified all elections, with the exception of three local races that were awaiting write-in ballots to be tallied on November 20, 2020.

[29] South Carolina reported that post-election hand count audits are required by State Election Commission mandate.

[30] Tennessee's reported deadline applies to the certification of election results by county election commissions. There is no specified deadline for the state to certify results.

[31] The Texas governor's canvass must be performed between 18 and 33 days after the election.

[32] The Virginia State Board of Elections meets on the third Monday in November as required by state law.

[33] In Washington, in addition to the mandatory recounts, if a contest is within a specified margin, a group of five or more voters may request a recount for an issue or question.

OCA-APPX-0986

**[34]** Wisconsin law permits a recount within specified margins and by a qualified party who makes a request, or when ordered by a court of law.

**[35]** The Wyoming State Canvassing Board meeting was set at 10:00 a.m. on November 10, 2020. Wyoming reported that the post-election tabulation uses the same sample ballots used for the logic and accuracy testing before the election. The county clerk conducts a random audit of ballots by processing the pre-audited group of test ballots on 5% of the automated tabulating equipment for that jurisdiction, but on not less than one machine, within 30 days of any election in which the tabulating equipment was used.

OCA-APPX-0987



# Chapter 3. Voter Registration: The NVRA and Beyond

## Key Findings

The Election Administration and Voting Survey (EAVS) collected data on voter registration between the 2018 and the 2020 general elections in Section A of the survey. Election officials were asked a variety of questions relating to registration and list maintenance, including the number of persons registered and eligible to vote in the 2020 general election, the number of registration forms processed, the number of confirmation notices sent pursuant to the National Voter Registration Act (NVRA) and for other purposes, and the number of records removed from the voter registration rolls. Notable findings from Section A of the 2020 EAVS include:

- The number of registrations received between the 2018 and the 2020 general elections reached 103,701,513, a 33.8% increase in registrations received compared to the period leading to the 2016 general election.
- The states' departments of motor vehicles (DMV) were once again the most commonly used registration source and accounted for 39.3% of the total registrations received between the 2018 and the 2020 general elections.
- Online registration continued to be the second-most used registration method, accounting for 28.2% of the total registrations received, and it was the registration method with the largest growth in the two-year period leading to the 2020 general election.
- The total number of reported active registrants reached 209,441,338 nationwide. The total number of active registrations for the 2020 general election increased 8.3% compared to the 2016 general election.
- States reported removing 18,781,054 voter records from voter registration rolls between the 2018 and the 2020 general elections. More than half of these removals occurred because a registrant failed to return a confirmation notice and did not vote in the following two general elections, or because the registrant moved out of the voting jurisdiction.

## Introduction

Voter registration is required in 49 states,[1] all of the U.S. territories, and the District of Columbia, making registration the first step toward election participation for most voters.[2] Registration serves multiple purposes: It allows election officials to confirm if a person is eligible to vote; permits officials to efficiently allocate resources such as ballots, poll workers, and voting equipment, depending on

---

[1] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia, and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Election Administration Policy Survey and EAVS data.
[2] North Dakota is the only state that does not require voter registration.

OCA-APPX-0988

the number of registrants per precinct and jurisdiction;[3] and allows the tracking of voter participation.

Congress passed the NVRA in 1993 to "establish procedures that will increase the number of eligible citizens who register to vote in elections for federal office."[4] This act, commonly known as the "Motor Voter Law," requires that states offer the opportunity to register to vote at their motor vehicle licensing offices (known as the DMV in many states). The law also requires states to offer voter registration at offices that provide public assistance or state-funded programs that primarily engage in providing services to persons with disabilities, and at armed services recruitment offices. The NVRA also provides guidelines on registration list maintenance and sets limits on how voters can be removed from the rolls.[5]

The Help America Vote Act (HAVA) of 2002 charged the U.S. Election Assistance Commission (EAC) with collecting data on voter registration and list maintenance procedures. The EAC meets its statutory requirement to report to Congress on the impact of the NVRA via Section A of the EAVS.[6] This chapter of the EAVS report not only fulfills this requirement, but also provides insight about the changes in the registration behaviors of Americans in federal general elections and about the changes in the state policies affecting the registration process.

## Federal Laws Regulating Voter Registration

### The National Voter Registration Act of 1993

The NVRA is the primary federal law governing voter registration in the United States. In this law, Congress provides a clear statement regarding the importance of voter registration:

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

---

[3] What constitutes a jurisdiction for EAVS reporting is defined by how each state chose to provide data. For the 2020 EAVS, most states reported data on the county level (or county equivalent, such as parishes for Louisiana). Illinois, Maryland, Missouri, and Virginia reported data for independent cities in addition to counties. The territories, the District of Columbia, and Alaska each reported as a single jurisdiction. Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and Wisconsin reported data on the township level. Maine also reported its UOCAVA data in Section B as a separate jurisdiction, because this information was only collected at the state level. Michigan reported data for the county level, but most election administration activities take place in the 1,520 local election jurisdictions in the state.
[4] 52 U.S.C. § 20501.
[5] This report generally uses the term "voter registration rolls" to refer to the computerized databases of registered voters that are maintained by states and localities. Other common terms for these databases include "voter registration lists" and "voter registration records."
[6] Before 2016, the EAC administered a separate survey called the NVRA Survey, which collected similar information. This survey was consolidated with the EAVS for the 2016 general election. Before the creation of the EAC, the NVRA Survey was administered by the Federal Election Commission.

OCA-APPX-0989



(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.[7]

The primary purposes of the NVRA are:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this Act [NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.[8]

The NVRA's first purpose is to expand opportunities for voters to register by creating more uniform processes for voter registration and designating more places and methods to register to vote. The NVRA requires that states allow multiple methods and places to register to vote, including (1) motor vehicle departments when a person obtains, renews, or updates the address on their driver's license; (2) through the mail, using a standard registration form;[9] (3) at all state offices providing public assistance (e.g., the Supplemental Nutrition Assistance Program [SNAP]); (4) at all offices that provide state-funded programs focused on services to people with disabilities; (5) at armed forces recruitment offices; and (6) at other state designated offices such as public libraries and local government offices. All these offices are mandated under the NVRA to provide their users with information on voter registration and assistance in the registration process when required.

> The NVRA was fully implemented after the 1994 general election. Several states are not covered by the NVRA. North Dakota is exempt because it does not have voter registration. The U.S. territories are also not subject to the NVRA, and the states of Idaho, Minnesota, New Hampshire, Wisconsin, and Wyoming are exempt because they had same-day registration (SDR) in 1994 and have continued to make this option available uninterrupted since that time.

The NVRA also sets some fundamental guidelines that states must follow. For example, states may set their own deadline for citizens to register to vote in a general election for federal offices, but that deadline can never be more than 30 days before the date of the election. The NVRA also sets the

---

[7] 52 U.S.C. § 20501
[8] 52 U.S.C. § 20507
[9] States can make available the standard National Mail Voter Registration Form provided by the EAC (https://www.eac.gov/voters/national-mail-voter-registration-form) or their own version of a mail registration form following the NVRA's requirements.

OCA-APPX-0990

process that states need to follow to maintain their voter registration rolls and to conduct removal processes.

## Help America Vote Act of 2002 (HAVA)

HAVA was enacted with the goal of updating the voting administration system in the United States and creating a commission to assist in the administration of federal elections. In addition to legislating the update of the administration process for federal elections in the United States, HAVA mandates that states create and maintain a "computerized statewide voter registration list" that serves as "the official voter registration list for the conduct of all elections for Federal office in the State."[10] The computerized registration list must be centralized and "defined, maintained and administered at the State level."[11] However, although the registration list is administered at the state level, local election officials must be able to access the registration list and are required to enter any updated voter registration information in the computerized system. HAVA also specifies that the maintenance of the implemented computerized registration list will be carried out according to the NVRA's mandates and that duplicate names or registrations will be removed from the state's registration list.

## State Voter Registration Policies

States have wide latitude on how to conduct their voter registration activities, as long as the state policies do not interfere with federal laws such as the NVRA and HAVA. This flexibility allows states to adapt their laws as they see appropriate to better serve the interests of their citizens. During the period between the 2018 and the 2020 general elections, a number of states changed their laws regarding voter registration, such as implementing online voter registration, allowing voters to register at the polls on Election Day, or implementing automatic registration.[12]

These types of laws usually take years between when they are first proposed and when they are fully implemented. However, states can make short-term changes to their registration policies with the aim of addressing unforeseen circumstances. For example, the state of Massachusetts changed its registration deadline to allow its citizens an additional 10 days to register given the extraordinary circumstances caused by the COVID-19 pandemic.[13] Additionally, some states briefly extended their registration deadlines due to issues with their online registration sites that made it impossible to register to vote in the hours before the end of the registration period—these issues were in some cases caused by an unprecedented volume of attempted visits.[14]

---

[10] 52 U.S.C. § 21083
[11] Ibid.
[12] These registration policies will be covered in more detail in the following section of this chapter. More information on state's voting and registration policies can be found in Chapter 2 of this report.
[13] Elections Division of the Secretary of the Commonwealth of Massachusetts. (2020, September 23). *Important Elections Updates*. https://www.sec.state.ma.us/ele/covid-19/covid-19.htm.
[14] For example, Florida extended the deadline from October 5 to October 6, 2020, for a web malfunction before the deadline (https://dos.myflorida.com/communications/press-releases/2020/public-notice-secretary-of-state-laurel-m-lee-provides-update-about-voter-registration-in-florida/), and a federal court extended Virginia's registration deadline from October 13 to October 15, 2020, because of an accidentally severed fiber optic cable that disabled the Department of Elections' website hours before the registration deadline (https://www.elections.virginia.gov/news-releases/virginia-voter-registration-deadline-extended-by-federal-court.html).

OCA-APPX-0991



## The Registration Process

The typical voter registration process is depicted in Figure 1. Citizens in the United States can register to vote using different methods, some of them mandated by federal law and others offered at the discretion of the state. Once a registration form is completed and submitted, the state or local election office must confirm the eligibility of the applicant. Eligible applicants are added to the voter registration rolls and are notified of their registration status, whereas applicants who submitted ineligible or incomplete applications are contacted for further information to complete their applications.

*Figure 1. The Voter Registration Process*

New Registration Application

Update of Existing Registration

- DMV
- Online
- Mail
- Etc.

Voter Submits Registration

Election Office Reviews Registration

Valid Registrants Added to Voter Registration Rolls

State Election Office Performs List Maintenance

Confirmation Notices Sent to Potentially Ineligible Registrants

**REGISTRATION PROCESS**

*Note: Figure 1 does not represent automatic registration, in which the voter does not submit a registration application.*

OCA-APPX-0992

Voter registration also serves to assign each voter to a precinct—a bounded geographic area to which voters are assigned according to their residential address as listed in their voter registration record—so that voters receive the correct ballot. The voter registration system tracks each voter's electoral participation so that an individual can be given credit for voting in an election, which helps ensure each person casts only one ballot per election.

Every person with a valid registration is considered an active, registered voter. However, at times, a question arises as to whether a person still resides at the address at which they are registered. The election official may receive notification via the U.S. Postal Service national change of address from the voter of a new resident address. In these situations, the state or local election office may send the registrant a confirmation of address notice. In many states, if the person fails to return the form or the form is returned to the election office as undeliverable, the person is placed on a list of inactive voters. Inactive voters are still part of the voter registration rolls and are included in the registration totals in most jurisdictions.[15] However, before they can vote, inactive voters are typically required to show approved documentation of their eligibility (most commonly, proof of living at an address within the voting jurisdiction). In some cases, inactive voters may be required to cast a provisional ballot when their eligibility cannot be established at the polls.

The NVRA also requires states to maintain their voter registration rolls by removing registrants who are no longer eligible to vote. For example, the NVRA provides that if a registrant fails to return a confirmation notice and does not vote in two subsequent federal general elections, the registrant can be removed from the voter registration roll of the jurisdiction that sent the confirmation notice. In addition, a registrant can be removed for other reasons such as death, upon the registrant's request, or due to a disqualifying criminal conviction or mental incompetence, as provided by a state's laws. This process is referred to as "list maintenance." When an individual is removed from the voter registration roll because of a change in residence of the voter under the NVRA process, this is called "address list maintenance." Election offices may share data with other state agencies or entities that maintain death records or felony and prison records for the purposes of identifying potentially ineligible voters.[16]

## How Americans Registered to Vote for the 2020 General Election

Between the close of registration for the 2018 general election and the close of registration for the 2020 general election, states and territories reported receiving a record 103,701,513 registration applications—26,184,917 more applications than were received in the same period leading up to the 2016 general election.[17] The most used method of registration was the motor vehicle departments, which accounted for 39.3% of the total registrations received (39,705,812 registration

---

[15] According to the 2020 Policy Survey, six states (Guam, Idaho, North Dakota, New Hampshire, the U.S. Virgin Islands, and Wyoming) reported that they do not distinguish between active and inactive voters in their registration records. In the survey comments in the EAVS, Oregon reported, "Do not track number of inactive voters," and Minnesota stated, "Minnesota is NVRA exempt. Minnesota does not classify voters as inactive per NVRA."

[16] More information about state policies on voter registration database linkages is found in Chapter 2 of this report.

[17] The total number of registration applications received during the two-year period leading to a federal general election was reported in item A3a in the 2020 EAVS and item A5a in the 2016 EAVS.

OCA-APPX-0993



applications).[18] Registration by mail accounted for 12.9%, in-person registration accounted for 8.3%, and online registration accounted for 28.2% of the total registration applications.[19] The rest of the registration applications that were received during this period were from sources such as registration drives (2.2%), public assistance offices (1.6%), and armed forces recruiting offices (0.1%) among other sources.[20]

The primary sources of registration have remained fairly consistent throughout multiple elections. For instance, motor vehicle departments have been the most common source of voter registration for over a decade, accounting for more than 30% of the received registrations since at least 2006.[21] Figure 2 shows that other sources for filing registration applications, such as in person at election offices, by mail/fax/email, and other means (e.g., public assistance offices, registration drives), were used at very similar rates as for the 2018 general election.

Online registration has been the second-most popular registration mode since 2016 and accounted for a proportionally larger share of registration applications for the 2020 general election. In 2020, online applications increased 12.1 percentage points compared to the registration period leading to

---

[18] The percentage of registrations received by the motor vehicle department was calculated by dividing the number of registration applications received at motor vehicle departments (item A4d of the EAVS) by the total number of registration applications received (item A3a of the EAVS). American Samoa, Idaho, New Hampshire, North Dakota, the Northern Mariana Islands, Puerto Rico, Rhode Island, the U.S. Virgin Islands, Wisconsin, and Wyoming were not included in the calculation because they did not report data on item A4d. Casewise deletion at the state level was used in this calculation.

[19] The percentage of registrations received by mail, in person, and online used items A4a, A4b, and A4c of the EAVS respectively, and were divided by the total number of registration applications received (item A3a of the EAVS). Guam, North Dakota, Puerto Rico, Rhode Island, and the U.S. Virgin Islands were not included in the calculation of the percentage of registrations received by mail because they did not report data on item A4a. North Dakota and Rhode Island were not included in the calculation of the percentage of registrations received in person because they did not report data on item A4b. American Samoa, Arkansas, Maine, Mississippi, Montana, New Hampshire, New York, North Dakota, the Northern Mariana Islands, Puerto Rico, Rhode Island, South Dakota, the U.S. Virgin Islands, and Wyoming were not included in the calculation of the percentage of registrations received online because they did not report data on item A4c. Casewise deletion at the state level was used in these calculations.

[20] The percentage of registrations received from registration drives, public assistance offices, and armed forces recruiting offices used items A4i, A4e, and A4g of the EAVS respectively, and were divided by the total number of registration applications received (item A3a of the EAVS). American Samoa, Georgia, Guam, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, North Dakota, the Northern Mariana Islands, Oklahoma, Oregon, Puerto Rico, Rhode Island, South Carolina, Tennessee, the U.S. Virgin Islands, West Virginia, and Wyoming were not included in the calculation of the percentage of registrations received from registration drives because they did not report data on item A4i. American Samoa, Guam, Idaho, Maine, Minnesota, New Hampshire, North Dakota, the Northern Mariana Islands, Puerto Rico, Rhode Island, the U.S. Virgin Islands, Vermont, West Virginia, Wisconsin, and Wyoming were not included in the calculation of the percentage of registrations received at public assistance offices because they did not report data on item A4e. American Samoa, Guam, Hawaii, Idaho, Maine, Massachusetts, Minnesota, Mississippi, New Hampshire, New York, North Dakota, the Northern Mariana Islands, Oregon, Puerto Rico, Rhode Island, the U.S. Virgin Islands, Vermont, West Virginia, Wisconsin, and Wyoming were not included in the calculation of the percentage of registrations received at armed forces recruiting offices because they did not report data on item A4g. Casewise deletion at the state level was used in these calculations. The instructions for this question noted that registration applications should be classified according to the mode used to submit it. For example, if the voter submits a registration form online using the state's online voter registration portal, this is considered an online voter registration. If the voter accessed the online voter registration system at a state public assistance office or at the office of an agency that primarily serves individuals with disabilities, this would also be considered an online registration.

[21] The EAC's National Voter Registration Act Studies, which contain information on voter registration activities prior to 2016 when this information began being included in the EAVS Comprehensive Report, can be found at https://www.eac.gov/voters/national-voter-registration-act-studies.

OCA-APPX-0994

**Figure 2. Motor Vehicle Departments Are the Most Common Source of Registration Applications**

Legend: 2016, 2018, 2020

Motor Vehicle Dept.: 33.7%, 44.9%, 39.3%
Online: 21.5%, 16.1%, 28.2%
Other: 15.5%, 13.6%, 12.9%
Mail/Fax/Email: 17.6%, 11.3%, 12.9%
In Person: 13.5%, 9.0%, 8.3%

Source of Registration Applications

*Source: The percentage of registrations received at motor vehicle departments was calculated as A4d/A3a x 100 for the 2018 and the 2020 EAVS and A6d/A5a x 100 for the 2016 EAVS. The percentage of registrations received online was calculated as A4c/A3a x 100 for the 2018 and the 2020 EAVS and A6c/A5a x 100 for the 2016 EAVS. The percentage of registrations received by mail/fax/email was calculated as A4a/A3a x 100 for the 2018 and the 2020 EAVS and A6a/A5a x 100 for the 2016 EAVS. The percentage of registrations received in person was calculated as A4b/A3a x 100 for the 2018 and the 2020 EAVS and A6b/A5a x 100 for the 2016 EAVS. The percentage of registrations received by other means was calculated as (A4e+A4f+A4g+A4h+A4i+A4j+A4k+A4l)/A3a x 100 for the 2018 and the 2020 EAVS and (A6e+A6f+A6g+A6h+A6i+A6j+A6k+A6l+A6m+A6n+A6o)/A5a x 100 for the 2016 EAVS. Casewise deletion was used at the state level in these calculations.*

the 2018 general election and was the registration source with the largest growth. Some of this growth in online registration applications could have been because of the effects of the COVID-19 pandemic, as many of the typical in-person modes of registration were restricted starting in March 2020. The percentages of registrations received at motor vehicle departments and in person at election offices saw small decreases from 2018 to 2020.

OCA-APPX-0995



Another explanation for the growth in the use of online registration between 2018 and 2020 is that three states (Minnesota, New Jersey, and Oklahoma) began to offer online registration.[22] This resulted in a total of 43 states that allowed voters to submit new registration applications online for the 2020 general election.[23] These registrations are typically reviewed electronically, and data from other state databases are used to verify a person's identity, address, and eligibility. Most of the states (81.4%) using online registration reported that applicants must have a driver's license issued by the state to register online.[24] Two more states (Mississippi and Texas) reported that they allow voters to update their registration records online, but voters may not submit new registration applications online.

States reported receiving 27,681,700 online registrations during the 2018–2020 registration period.[25] Nineteen states reported receiving more than 30% of their registrations online in 2020 (see Table 2 of the Appendix). Among states that reported receiving online registrations in 2018 and 2020, only Iowa and Connecticut reported a decrease in the percentage of their registrations received online (a 5.2- and 3.6-percentage-point decrease, respectively), and 26 states reported an increase of 10 percentage points or more.[26] As in 2018, Massachusetts (67.4%) was the state with the highest percentage of online registrations.[27] The first state to implement online registration, Arizona, also remained among the states with the highest levels of registrations received online (45.2%).

## Same-Day Voter Registration

Same-day registration (SDR) allows voters to register to vote and cast their ballot on the same day. SDR can be offered on Election Day, in which case it may be referred to as Election Day registration, or it can be offered during in-person early voting.[28] SDR depends on local laws and, thus, is only allowed in some states and territories. Some states reported allowing SDR in narrow circumstances, such as only for particular elections (e.g., Alaska and Rhode Island reported only allowing SDR for voting for the U.S. President and Vice President) or particular cases (e.g., North Carolina reported

---

[22] Information was collected from responses to items Q7 in the 2020 Policy Survey and Q6 in the 2018 Policy Survey. The states of Minnesota, New Jersey, and Oklahoma reported using online registration for the 2020 general election, but not in 2018. Mississippi and Texas reported offering an online option only to update registrations and did not report any online registration in item A4c of the EAVS.

[23] More information about state policies on online registration is found in Chapter 2 of this report.

[24] The percentage of states requiring a driver's license or other ID issued by the state to register to vote used item Q7a in the 2020 Policy Survey and was calculated by dividing the number of states that require a state-issued ID by the total number of states that reported allowing individuals to register to vote online in Q7 of the 2020 Policy Survey.

[25] The total number of online registration applications received during the two-year period leading to a federal general election was reported in item A4c in the 2020 EAVS.

[26] The percentage of registrations received online in 2020 used item A4c of the 2020 EAVS divided by the total number of registration applications received (item A3a of the 2020 EAVS). The calculation of online registrations received in 2018 used the same item number from the 2018 EAVS data set. The comparison subtracted the percentage of registrations received online in 2020 from the percentage of registrations received online in 2018 to obtain the percentage point difference. Texas was not included among the states that received online registrations in 2018 and 2020, because they reported zero as the response for A4c in all of the counties.

[27] Illinois reported 96.4% of online registrations but was omitted here, because it reported more than twice as many registrations in the categories' breakdown than were reported in the item reporting total registrations received (A3a).

[28] Some states may have an overlap between their mail voting period and the close of their voter registration, during which it is possible for a person to register on the same day that they cast a mailed ballot; however, this is not considered SDR for purposes of the EAVS, and many states have noted in the past that it is not possible to track the number of mail voters who register to vote on the same day that they cast their mailed ballot.

OCA-APPX-0996

allowing SDR to citizens who became eligible to vote due to naturalization or who had their voting rights restored after a conviction or felony and only if they became eligible between the close of books and Election Day).

In 2020, 29 states reported allowing some form of SDR. Twenty-one states reported allowing voters to register to vote on Election Day. Twelve states reported allowing SDR during an overlap between the start of early voting and the close of voter registration, 20 states reported allowing for SDR during in-person early voting, and four states reported allowing for SDR in very specific cases.[29] The states that indicated allowing SDR were mostly the same as in 2018, with the exception of South Carolina, which allowed SDR for the 2018 general election but not in 2020, and American Samoa, Massachusetts, Michigan, and Nevada, which did not allow for SDR in 2018 but did for the 2020 general election.[30]

The total number of SDRs recorded in 2020 was 1,634,346 and accounted for 3.5% of the total registrations received among states allowing for SDR.[31] For the first time, the 2020 EAVS asked states to break down SDRs between those that were received before and on Election Day. Election Day SDRs added up to 934,238, and early voting SDRs summed to 665,108 registrations.[32] There was a wide variability in how the two types of SDRs were distributed among states that reported both, with Election Day SDRs accounting for between 5.9% and 100% of the total SDRs that states reported.[33]

The use of SDR varied considerably, and similar to previous elections, the five NVRA-exempt states—which gained NVRA exemption for allowing SDR continuously since 1994[34]—were among the states where SDR accounted for the largest percentages of registration applications. In Wyoming, 55.6% of the registration applications were SDR, followed by Idaho with 40.7% and Wisconsin with 30.4%.[35] The NVRA states where SDR accounted for the largest portions of their registration applications received were Vermont (24.4%) and Maine (24%). However, for most of the NVRA states, SDR accounted for less than 5% of registration applications.

---

[29] These results were obtained from item Q9a of the 2020 Policy Survey. More information about state policies on SDR is found in Chapter 2 of this report.
[30] These results were obtained from item Q9 of the 2020 Policy Survey and item Q7 of the 2018 Policy Survey.
[31] The total number of SDR applications received during the two-year period leading to a federal general election was reported in item A2a in the 2020 EAVS. The percentage of registrations received that were SDRs was calculated by dividing the number of SDRs received (item A2a of the EAVS) by the total number of registration applications received (item A3a of the EAVS). The total and percentage correspond to the 26 states that reported allowing SDR and reported data for it. Guam and Massachusetts, which allow for some form of SDR, reported "Data not available" for this field. American Samoa reported zero total SDRs. Casewise deletion at the state level was used in this calculation.
[32] The total number of Election Day SDRs was reported in item A2b in the 2020 EAVS, and the total number of early voting SDRs was reported in item A2c in the 2020 EAVS. The sum of Election Day SDRs and early voting SDRs does not add up to the total SDRs reported because some states either did not break down SDR by type (Alaska) or their submissions in A2b and A2c did not sum to A2a (California, Illinois, and Utah).
[33] The percentage of SDRs that were Election Day SDRs was calculated by dividing the number of Election Day SDR applications received (item A2b of the EAVS) by the total number of SDR applications received (item A2a of the EAVS).
[34] North Dakota is also NVRA exempt because it does not require voter registration, and the U.S. territories are also NVRA exempt.
[35] The percentage of registration applications that were SDRs was calculated by dividing the number of SDR applications received (item A2a of the EAVS) by the total number of registration applications received (item A3a of EAVS).

OCA-APPX-0997



## Automatic Voter Registration

Beginning in 2016, states started implementing laws allowing for automatic voter registration (AVR). These laws allow for non-registered persons to be added to the voter registration rolls during or after an interaction with a designated state agency, such as the motor vehicle department, unless the person specifically declines to be registered. The most common differences between the types of AVR policies were the point at which the individual must decline or "opt out" of being registered— either at the point of service or at a later time through a mailer sent to the individual—and which state agencies participate in the AVR program.

In 2016, Oregon was the first state to implement AVR at the state level. Since then, 23 states have also started using some form of AVR.[36] For the most part, states reported that individuals must opt out of AVR at the point of service. A very common example is that a person is provided the opportunity to register to vote while completing a transaction at their local motor vehicle department and is asked to provide a response of "yes" or "no" to be able to continue with the voter registration transaction. Only the states of Colorado and Oregon reported not asking individuals during their transactions and later requiring that they actively respond to a mailer if they do not want to be included in the voter registration rolls.[37] All states that reported allowing AVR did so at least through the state's motor vehicle department, with nine states reporting additional agencies (e.g., agencies for people with disabilities, public assistance offices) participating in the AVR program in their state.[38]

The EAVS does not include any questions about the number of AVRs processed by states. However, the EAVS data show an increase in registrations submitted through motor vehicle departments (which data from the 2020 Policy Survey show is the most common state agency that processes AVRs) between 2016 and 2020. Although the increase of 14.3 million voter registrations processed through the motor vehicle department in this time span is likely the result of multiple factors, AVR may be one of them.[39] When comparing the change in motor vehicle department registrations recorded between 2016 and 2020 among states with and without AVR, states with AVR reported an increase of 80% in the number of registrations received at the motor vehicle department, whereas states without AVR reported a 10.1% increase.[40] These increases may be, in part, driven by the fact that there was a 33.8% increase in the total number of registrations received between 2016 and

---

[36] The number of states with AVR was obtained through item Q6 in the Policy Survey. More information about states with AVR is found in Chapter 2 of this report.

[37] Information on the point at which the individual has the opportunity to opt out of AVR was obtained through item Q6b in the Policy Survey.

[38] Information on state agencies participating in the AVR program for each state was obtained through item Q6a in the Policy Survey.

[39] Total registrations received at motor vehicle departments was obtained through items A4d in the 2020 EAVS and A6d in the 2016 EAVS.

[40] The percentage change in total number of registrations received at the motor vehicle department between 2016 and 2020 was calculated by dividing the number of registration applications received at the motor vehicle department in 2020 (item A4d of the 2020 EAVS) by the number of registration applications received at the motor vehicle department in 2016 (item A6d of the 2016 EAVS) for states that did and did not allow for AVR as reported in item Q6 of the Policy Survey. Classification of states as having AVR and not having AVR used item Q6 of the 2020 Policy Survey. Casewise deletion at the state level was used in this calculation.

OCA-APPX-0998

2020.[41] However, the trend of AVR states having an increase in motor vehicle department registration holds when comparing the percentage of registration applications received through motor vehicle departments in states with and without AVR for the 2016 and 2020 elections. Figure 3 shows that among states without AVR, motor vehicle department registrations accounted for a similar portion of the total registrations in 2016 and 2020. There has been a notable increase among the states that have implemented AVR in recent years.



**Figure 3. Motor Vehicle Department Registrations Accounted for a Larger Portion of Total Registrations Received in AVR States**

*Source: The percentage of registrations received at motor vehicle departments was calculated as A4d/A3a x 100 for the 2020 EAVS and A6d/A5a x 100 for the 2016 EAVS. Classification of states as having AVR and not having AVR used item Q6 of the 2020 Policy Survey. Casewise deletion at the state level was used in this calculation.*

Alaska is the only state that reported AVRs as a separate category in its EAVS data, as this state processes most of its AVRs through the Permanent Fund Dividend program. Alaska reported in its

---

[41] The percentage change in the total number of registrations received between 2016 and 2020 was calculated by dividing the number of registration applications received in 2020 (item A3a of the 2020 EAVS) by the number of registration applications received in 2016 (item A5a of the 2016 EAVS). North Dakota was not included in this calculation because it does not have voter registration. American Samoa and the Northern Mariana Islands were not included in this calculation because they did not complete the 2016 EAVS. Casewise deletion at the state level was used in this calculation.

OCA-APPX-0999



survey comments that in 2016, the state approved a ballot initiative requiring AVR through the Permanent Fund Dividend. Since the implementation of the initiative, the total number of registration applications that the state reported receiving increased from 259,227 in 2016 to 1,079,008 in 2020.[42] AVRs through the Permanent Fund Dividend program accounted for 68.1% of Alaska's total registrations in 2020 and 59.8% in 2018.[43]

## Other Modes of Registration

In addition to in-person, online, mail/fax/email, and motor vehicle department registrations, states reported data on registration applications received from other sources, which in 2020 accounted for 12.9% of the applications received at the national level.[44] Some of these modes of registration are NVRA mandated, such as registrations through armed forces recruitment offices, public assistance offices, and state-funded agencies serving persons with disabilities. These NVRA-mandated modes of registration accounted for 1.8% of the national registrations in 2020.[45] States also reported registrations completed through other modes that are not required by the NVRA and that are authorized at the discretion of the state, such as at registration drives (2.2%) and other agencies required by the state (3%).[46]

# Voter Registration Rates for the 2020 General Election

The NVRA requires each state to report its total number of registered and eligible, active, and inactive registrants for each federal general election.[47] Most states reported the total "registered and eligible" voters as the sum of active and inactive registrants. <u>However, data on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include registrants who were no longer eligible to vote in that state but who had not been removed from the voter registration rolls because the removal process from the inactive list laid out by the NVRA can take up to two election cycles to be completed.</u>[48] In addition, preliminary data from the 2020 U.S.

---

[42] The number of total registrations received was obtained from item A3a in the 2020 EAVS and from item A5a in the 2016 EAVS.

[43] Alaska reported data on the number of registrations received through the Permanent Fund Dividend program in item A4j of the 2020 and 2018 EAVS. The percentage of the total registrations that were processed through the Permanent Fund Dividend program was calculated by dividing the number of the program registration applications (item A4j for Alaska in the 2020 and the 2018 EAVS) by Alaska's total registrations received (item A3a in the 2020 and the 2018 EAVS).

[44] The percentage of registrations received by other sources different than in person, online, mail/fax/email, and the motor vehicle department was calculated as (A4e+A4f+A4g+A4h+A4i+A4j+A4k+A4l)/A3a x 100 for the 2020 EAVS. Casewise deletion was used at the state level in these calculations.

[45] The percentage of registrations received from NVRA-mandated sources different than in person, mail/fax/email, and the motor vehicle department was calculated as (A4e+A4f+A4g)/A3a x 100 for the 2020 EAVS. Casewise deletion was used at the state level in these calculations.

[46] The percentage of registrations received from registration drives and from state agencies not mandated by the NVRA used items A4i and A4h of the 2020 EAVS, respectively, and were divided by the total number of registration applications received (item A3a of the EAVS). Casewise deletion at the state level was used in these calculations.

[47] Twelve states (American Samoa, Guam, Idaho, Minnesota, New Hampshire, the Northern Mariana Islands, Ohio, Oregon, Puerto Rico, the U.S. Virgin Islands, Wisconsin, and Wyoming) reported only active registrants. North Dakota does not have voter registration and, thus, did not have any data to report.

[48] California, Florida, Kansas, and New York reported more "registered and eligible" voters in their state than the sum of the active and inactive registrants, resulting in 13,704; 13,384; 11,199; and 776 uncategorized registrants, respectively. New Hampshire reported zero registrations in 18 of its 320 jurisdictions. Two jurisdictions in Wisconsin reported zero registrations because they changed their status from town to village and/or merged with other jurisdictions where they reported the corresponding registration data. Kalawao County in Hawaii reported zero registrations because Maui County administers Kalawao County's elections.

OCA-APPX-1000

Census show that the U.S. population increased by more than 20 million people since the 2010 Census, resulting in a change of apportionment for congressional seats in 13 states;[49] this population increase and mobility may be a contributing factor to the increase of records that states reported having on their voter registration rolls for the 2020 general election.

For the 2020 general election, states reported that 228,004,364 citizens were registered to vote, either as active or inactive voters.[50] This represents a 6.5% increase compared to the number of people who were registered to vote for the 2016 general election.[51] Nationally, 91.9% of all registrants were designated as active, and 9.1% of registrants were designated as inactive.[52] In 2020, the total number of active registrants exceeded the 200 million mark for the first time in EAVS history and accounted for 88.2% of the 2019 citizen voting age population (CVAP).[53] The number of active registrants in 2020 increased 8.3% compared to what states reported for the 2016 EAVS. In 2020, the majority of states reported active registration rates of 80% or more of their 2019 CVAP (see Table 1 in Appendix A of this chapter).[54] Compared to the active registration rates in 2016, 82% of the states reported a higher active registration rate in 2020.[55]

---

[49] U.S. Census Bureau. (2021, April 26). *First 2020 Census Data Release Shows U.S. Resident Population of 331,449,281.* https://www.census.gov/library/stories/2021/04/2020-census-data-release.html.

[50] The total number of registered voters was obtained from item A1a in the 2020 EAVS.

[51] The percentage change in the total number of registered voters between 2016 and 2020 was calculated by dividing the total number of registered voters in 2020 (item A1a of the 2020 EAVS) by the total number of registered voters in 2016 (item A1a of the 2016 EAVS).

[52] The percentage of active and inactive registrants used items A1b and A1c, respectively, of the 2020 EAVS and divided these items by the total number of registered voters (item A1a of the EAVS). North Dakota was not included in these calculations because it does not have voter registration. Guam, Idaho, Minnesota, New Hampshire, the Northern Mariana Islands, Ohio, Oregon, Puerto Rico, the U.S. Virgin Islands, Wisconsin, and Wyoming were not included in the percentage of inactive voters because they did not provide data about inactive voters in item A1c of the 2020 EAVS. Casewise deletion at the state level was used in these calculations. The percentages of active and inactive registrants do not add to 100 because of the use of state casewise deletion to calculate percentages at the national level, as discussed in Chapter 5.

[53] The total number of active registrants was obtained from item A1b in the 2020 EAVS. The active CVAP voter registration rate was calculated by dividing the number of active registrants (item A1b in the 2020 EAVS) by the estimated CVAP provided by the U.S. Census Bureau. North Dakota was not included in the calculation because it does not have voter registration. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included in the calculation because there is no CVAP information from the Census Bureau for these territories. Casewise deletion at the state level was used in these calculations. This report uses the 1-year American Community Survey (ACS) state CVAP estimate for 2019 instead of the 5-year estimate to ensure that the CVAP is as current as possible. The CVAP estimates for 2020 were not available by the time this report was finalized. In calculating the percentage change in the total number of active registrants from the 2016 EAVS to the 2020 EAVS, casewise deletion has been used at the state level.

[54] The percentage of active CVAP voter registration was calculated by dividing the total active registrants (item A1b in the 2020 EAVS) by the total CVAP.

[55] The percentage of active CVAP voter registration change was calculated as the 2020 percentage of active CVAP voter registration ([A1b/CVAP] x 100) for the 2020 EAVS divided by the 2016 percentage of active CVAP voter registration ([A3a/CVAP] x 100) for the 2016 EAVS. One unit was subtracted from the result of the division, and the result was multiplied by 100 to obtain the percentage change. North Dakota was not included because it does not have voter registration. Pennsylvania was not included because it did not report total active registrants in 2016, as the state commented that it could not "differentiate between active and inactive from our point in time snapshot of the voter registration numbers." The U.S. territories of American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included because the U.S. Census Bureau does not provide an estimate for their CVAP.

OCA-APPX-1001



## Calculating Registration Rates

Estimating the percentage of the population that is registered to vote for an election can be approached in different ways using a variety of metrics. There are multiple potential numerators and denominators that can be used.

**Registration Rate Numerator:**

- **Total Registrants.** The number of people that states reported as being registered and eligible to vote (A1a in the EAVS). This total includes active and inactive registrants. This metric overrepresents of the actual number of registrants within a state, since some of the people included (particularly inactive registrants) may not be eligible to vote in that jurisdiction.
- **Active Registrants.** The number of people that states reported as being eligible to cast a ballot without the need to provide additional eligibility evidence at the polls (A1b in the EAVS). This total excludes inactive registrants.

**Registration Rate Denominator:**

- **Voting Age Population (VAP).** The estimate of the number of persons ages 18 or older provided by the Census Bureau.
- **Citizen Voting Age Population (CVAP).** The estimate of the number of American citizens ages 18 or older provided by the Census Bureau. This estimate is more accurate than the VAP in that it restricts the inclusion criteria to being a U.S. citizen, which is mandatory to vote.
- **Voting Eligible Population (VEP).** The estimate created by subtracting from the CVAP the citizens that are ineligible to vote (e.g., persons with disqualifying felony convictions) and persons who are in the military or citizens living overseas. This estimate is provided by the U.S. Elections Project and is available at the state level but not at the jurisdiction level like the VAP and the CVAP estimates.

The combination of active registrants and the CVAP to calculate the registration rate in the EAVS provides a higher level of accuracy than using the total registrations and/or the VAP to calculate the rate at the jurisdiction level when needed, as opposed to the use of the VEP. This calculation, however, has some limitations, such as the potential overrepresentation of total registrants in the active registrant list due to the challenges for states to keep voter registration rolls fully up to date. <u>When analyzing EAVS data, the EAC recommends using the following method to calculate voter registration rates</u>:

$$\frac{A1b\ of\ EAVS}{CVAP} \times 100\ =\ Active\ CVAP\ Voter\ Registration\ Rate$$

See Chapter 2 of this report for a discussion of state policies on voter registration list maintenance.

There was a 3.6-percentage-point increase in the active registration rates at the national level (from 84.6% in 2016 to 88.2% in 2020).[56] At the state level, Georgia and Texas reported the largest

---

[56] The percentage of active CVAP voter registration for 2020 was calculated as the total active voters (A1b in the 2020 EAVS) divided by the 2019 CVAP. The percentage of active CVAP voter registration for 2016 was calculated as the total active voters (A3a in the 2016 EAVS) divided by the 2015 CVAP. The percentage point change between the 2016 and 2020 active CVAP voter registration rates was calculated by subtracting the 2015 active CVAP voter registration percentage from the 2019 active CVAP voter registration percentage.

OCA-APPX-1002

increases in active registration rates between 2016 and 2020 (24.5% and 18.8%, respectively), and New York and Puerto Rico reported the largest drops in active registration rates (24.3% and 14.4%, respectively).[57] Figure 4 shows the change in the active CVAP voter registration rate among states from the 2016 general election to the 2020 general election.



*Figure 4. Most States Had an Increase in the Active CVAP Voter Registration Rate From 2016 to 2020*

*Source: The percentage of active CVAP voter registration change was calculated as the 2020 percentage of active CVAP voter registration ([A1b/CVAP] x 100) for the 2020 EAVS divided by the 2016 percentage of active CVAP voter registration ([A3a/CVAP] x 100) for the 2016 EAVS. One unit was subtracted from the result of the division, and the result was multiplied by 100 to obtain the percentage change. North Dakota does not have a change rate because it does not have voter registration. Pennsylvania does not have a change rate, because it did not report total active registrants in 2016, as the state commented that they could not "differentiate between active and inactive from our point in time snapshot of the voter registration numbers." The U.S. territories of American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands do not have a change rate because the U.S. Census Bureau does not provide an estimate for their CVAP. Cutoff points in the graph were selected to reflect states that decreased, that slightly increased, and that notably increased in terms of the active CVAP registration rate from 2016 to 2020.*

---

[57] New York reported an uncharacteristically high number of active and total registrations in the 2016 EAVS compared to the registrations reported in the general elections of 2014, 2018, and 2020, which led to the drop in active registrants noted in the 2020 EAVS. The percentage of active CVAP voter registration was calculated by dividing the total active registrants (item A1b in the 2020 EAVS) by the total CVAP.

OCA-APPX-1003



# Types of Registrations Received for the 2020 General Election

When a person submits a registration form, it is processed by the state and can reach one of several outcomes. Valid applications from persons who are eligible and not already registered are considered new applications and are added to the voter registration rolls. Applications submitted by persons already registered to vote at the same address with the same name and personal information are considered duplicates. Applications from already-registered persons wishing to change their name, party affiliation, or address are processed as updates to existing registrations. Applications that do not meet the requirements of eligibility are considered invalid or rejected. When allowed by state law, applications submitted by persons under 18 years old are processed as preregistrations so that they will be registered when they become of voting age.

All registration forms received are processed and scrutinized by election officials to ensure that the information is correct, that only eligible voters are added to the registration rolls, and that duplicate registration records are not created. After the application's review by election officials and following the NVRA's guidelines, states must notify the applicant with the result of their application. For example, a successful application may be notified in the form of a registration card mailed to the applicant or a notice of rejection may be mailed to unsuccessful applicants.

## Valid Registrations

Table 1 displays information on the result of the registration applications that were received by states. Of the more than 100 million registration applications received between the 2018 and the 2020 federal general elections, the most common type of registration was an update to an existing record that did not involve a cross-jurisdiction change of address.[58] These updates usually involve a change of name (such as after a marriage or divorce), party affiliation, or within-jurisdiction change of address; these updates accounted for 49.4% of the registrations processed at the national level.[59] New valid registrations—a registration application received from an eligible person in a jurisdiction where they were not previously registered and that resulted in a new registration record being added to the voter registration roll—made up 32.2% of the registrations received.[60]

Other types of valid registrations reported in the EAVS included a change of address that crossed local jurisdiction borders but was still within the state, which accounted for 9.5% of the total registration applications filed.[61] Some states reported allowing for underage citizens to preregister to vote so that they are automatically added to the voter registration rolls when they turn 18 years old.

[58] The number of total registration applications was reported in item A3a of the EAVS. The number of registration applications that were a change of name, party, or within-jurisdiction change of address was reported in item A3f of the EAVS.

[59] The percentage of registration applications that were a change of name, party, or within-jurisdiction change of address received was calculated by dividing the number of such registration applications received (item A3f of the EAVS) by the total number of registration applications received (item A3a of the EAVS). Casewise deletion at the state level was used in this calculation.

[60] The percentage of registration applications that were a new registration was calculated by dividing the number of such registration applications received (item A3b of the EAVS) by the total number of registration applications received (item A3a of the EAVS). Casewise deletion at the state level was used in this calculation.

[61] The percentage of registration applications that were a cross-jurisdiction change of address was calculated by dividing the number of such registration applications received (item A3g of the EAVS) by the total number of registration applications received (item A3a of the EAVS). Casewise deletion at the state level was used in this calculation.

OCA-APPX-1004

These preregistrations accounted for 1.2% of the total registrations among states that allowed them.[62] Finally, 14.7% of the registrations were labelled as "Other." This category in the EAVS is used by states to report registrations that were not covered among the standard categories, or in most cases, to report registrations that could not be broken down into the categories provided, such as a change to existing records that some jurisdictions could not determine whether it involved a within or cross-jurisdictional change of address.[63]

**Table 1. Most Registration Applications Were New Applications or Within-Jurisdiction Changes**

| Type of Registration Form Received | Percentage of Total Registration Forms Received |
| --- | --- |
| Change of name, party, or address (within jurisdiction) | 49.4% |
| New valid registrations | 32.2% |
| Other | 14.7% |
| Duplicate registrations | 9.7% |
| Cross-jurisdiction change of address | 9.5% |
| Invalid or rejected | 2.9% |
| Preregistrations from persons under 18 years of age | 1.2% |

*Source: The percentage of registrations received that were a change of name, party, or within-jurisdiction change of address received was calculated as (A3f/A3a) x 100. The percentage of registrations received that were a new valid registration was calculated as (A3b/A3a) x 100. The percentage of registrations received that were a duplicate registration was calculated as (A3d/A3a) x 100. The percentage of registrations received that were a cross-jurisdiction change of address was calculated as (A3g/A3a) x 100. The percentage of registrations received that were labelled as "Other" registrations was calculated as ((A3h+A3i+A3j) /A3a) x 100. The percentage of registrations received that were invalid or a rejected registration was calculated as (A3e/A3a) x 100. The percentage of registrations received that were a preregistration of persons under 18 years of age was calculated as (A3c/A3a) x 100. Casewise deletion was used at the state level in these calculations (percentages for each type of registration were calculated independently and only states that reported data for a given type were included in the analysis), and because of this, percentages do not sum to 100%.*

## Rejected and Duplicate Registrations

Some of the registration forms received by states do not result in the creation or the update of a registration record. The two types of invalid registration applications that the EAVS collects data on are rejected applications and duplicate applications. The first group includes applications that contain incorrect information, information that cannot be validated against existing state records, or applications from persons who do not meet eligibility requirements. In the period between the close

---

[62] The percentage of registration applications that were a preregistration of persons under 18 years of age was calculated by dividing the number of such registration applications received (item A3c of the EAVS) by the total number of registration applications received (item A3a of the EAVS). Casewise deletion at the state level was used in this calculation.

[63] The percentage of registration applications that were categorized as "other" was calculated by dividing the total number of such registration applications received (sum of items A3h, A3i, and A3j of the EAVS) by the total number of registration applications received (item A3a of the EAVS). Casewise deletion at the state level was used in this calculation. Not all the applications accounted for in the "other" category may be valid; however, they were included in this section because they cannot be fully identified as rejected or duplicate either.

OCA-APPX-1005



of registration for the 2018 general election and the close of registration for the 2020 general election, states reported rejecting 2,840,590 applications, accounting for 2.9% of the total registration applications received. This percentage is comparable to the percentage of registrations that were rejected in 2018 (3.4%) and 2016 (3.2%).[64]

Duplicate registrations include applications that are exact matches to existing registration records; these can be applications submitted by persons who did not realize they were already registered to vote or who submitted multiple applications through different modes (e.g., submitted an application with the exact same information through the mail and online). States reported receiving 8,827,089 duplicate applications between the 2018 and the 2020 federal general elections, which accounted for 9.7% of the total registrations received.[65] As with rejected applications, the percentage of duplicate registrations registered in 2020 was comparable to those in 2018 (10.2%) and 2016 (7.9%).[66]

A majority of states provided a breakdown of the total, rejected, and duplicate registrations they received and the source of those registrations (e.g., mail, in person).[67] As expected, most registration sources had rejection and duplicate percentages that were similar to the national averages; however, there were a few outliers. For duplicate registrations, the overall percentage at the national level was 9.7%, and most sources reported duplicate percentages similar to the national level, ranging from 5.3% to 13.3%.[68] However, there were exceptions, such as state-designated offices not mandated by the NVRA, that reported lower levels of duplicate registrations (3%). At the other side of the spectrum, registrations received by mail, fax, or email had notably higher levels of duplicate registrations received (19.1%) compared to the national average.[69] Invalid or rejected applications

---

[64] The number of total registration application rejections was obtained from item A3e of the EAVS. The percentage of registrations received that were invalid or rejected registrations in 2020 was calculated as the total applications rejected in 2020 (item A3e in the 2020 EAVS) divided by the total registration applications received (item A3a in the 2020 EAVS). The percentage of registrations received that were invalid or rejected registrations in 2018 was calculated as the total applications rejected in 2018 (item A3e in the 2018 EAVS) divided by the total registration applications received (item A3a in the 2018 EAVS). The percentage of registrations received that were invalid or rejected registrations in 2016 was calculated as the total applications rejected in 2016 (item A5e in the 2016 EAVS) divided by the total registration applications received (item A5a in the 2016 EAVS). Casewise deletion at the state level was used in this calculation.

[65] The number of total duplicate registration applications was obtained from item A3d of the EAVS. The percentage of registrations received that were duplicate registrations in 2020 was calculated as the total duplicate applications in 2020 (item A3d in the 2020 EAVS) divided by the total registration applications received (item A3a in the 2020 EAVS). Casewise deletion at the state level was used in this calculation.

[66] The percentage of registrations received that were duplicate registrations in 2018 was calculated as the total duplicate applications in 2018 (item A3d in the 2018 EAVS) divided by the total registration applications received (item A3a in the 2018 EAVS). The percentage of registrations received that were duplicate registrations in 2016 was calculated as the total duplicate applications in 2016 (item A5d in the 2016 EAVS) divided by the total registration applications received (item A5a in the 2016 EAVS). Casewise deletion at the state level was used in this calculation.

[67] Thirteen states did not provide the application source breakdown for duplicate registrations, and 14 states did not provide the application source breakdown for rejected registrations. Data from these states were not included in the ensuing calculations in the paragraph.

[68] The percentage of registration applications received from a source and categorized as duplicate was calculated as follows for each registration source included in the range: in person = (A6b/A4b) x 100; online = (A6c/A4c) x 100; motor vehicle department = (A6d/A4d) x 100; public assistance offices = (A6e/A4e) x 100; state-funded agencies serving persons with disabilities = (A6f/A4f) x 100; armed forces recruitment offices = (A6g/A4g) x 100; registration drives = (A6i/A4i) x 100; Other = ((A6j+A6k+A6l)/(A4j+A4k+A4l)) x 100. Casewise deletion at the state level was used in this calculation.

[69] The percentage of registration applications that were duplicates was calculated as follows for each registration source mentioned: state-designated offices not mandated by the NVRA = (A6h/A4h) x 100; mail/fax/email = (A6a/A4a) x 100. Casewise deletion at the state level was used in this calculation.

OCA-APPX-1006

represented 2.9% of registrations at the national level, and most sources reported a rejection percentage close to that, ranging from 1.7% to 4.2% of registrations rejected,[70] except for registration drives (10.1%), and NVRA-mandated public assistance offices (9.1%) that had notably higher levels of applications classified as rejected or invalid.[71]

## Registration List Maintenance

The NVRA requires states to maintain an "accurate and current voter registration roll" to "protect the integrity of the electoral process."[72] To facilitate this maintenance, the NVRA requires that any change of address submitted to a motor vehicle department must serve as notification of a change of address for voter registration, unless the individual indicates that the change is not for voter registration purposes. The law also requires states and territories to conduct a uniform and nondiscriminatory general program to remove the records of ineligible voters. States and territories have considerable freedom to choose when, where, and how these functions are performed, but must follow the guidelines listed in the NVRA, which describe the need to use confirmation notices and to complete (with few exceptions) systematic removal programs "not later than 90 days prior to the date of a primary or general election for Federal office,"[73] as well as to keep a detailed list of instances in which it is appropriate to remove a record from the voter registration rolls.

### Confirmation Notices

One tool that states may use to keep their voter registration rolls up to date are confirmation notices. These are postage pre-paid and pre-addressed return cards that are sent to registrants who a state suspects are no longer eligible to vote in the jurisdiction in which they are registered. If the registrant does not return the confirmation notice, they can be added to the inactive registrant list and would be asked to provide proof of residence before voting. If the registrant fails to return the confirmation notice and does not participate in the subsequent two consecutive federal elections, then the NVRA grants the state the ability to remove the registrant from the voter registration roll. If the registrant has not moved out of the voting jurisdiction, they must complete and return the confirmation notice no later than the registration deadline of the next election to remain on the list of active registrants.

---

[70] The percentage of registration applications received from a source and categorized as invalid or rejected was calculated as follows for each registration source included in the range: mail/fax/email = (A7a/A4a) x 100; in person = (A7b/A4b) x 100; online = (A7c/A4c) x 100; motor vehicle department = (A7d/A4d) x 100; state-funded agencies serving persons with disabilities = (A7f/A4f) x 100; armed forces recruitment offices = (A7g/A4g) x 100; state-designated offices not mandated by the NVRA = (A7h/A4h) x 100; and Other = ((A7j+A7k+A7l)/(A4j+A4k+A4l) x 100. Casewise deletion at the state level was used in this calculation.

[71] The percentage of registration applications received from a source and categorized as invalid or rejected was calculated as follows for each registration source mentioned: registration drives = (A7i/A4i) x 100; public assistance offices = (A7e/A4e) x 100. Casewise deletion at the state level was used in this calculation.

[72] 52 U.S.C. § 20501

[73] 52 U.S.C. § 20507

OCA-APPX-1007



**Figure 5. Almost Two-Thirds of Confirmation Notices That Were Sent Had an Unknown Status**



| Category | Percentage |
|---|---|
| Status Unknown | 65.8% |
| Returned Valid | 12.1% |
| Undeliverable | 11.9% |
| Other | 9.7% |
| Returned Invalid | 8.1% |
| Not Categorized | 7.4% |

*Source: Status unknown (A8e) refers to any notice that was sent to a voter but was not received back confirming registration, confirming invalidation, or returned as undeliverable. This percentage was calculated as (A8e/A8a) x 100. The percentage of confirmation notices sent and returned confirming valid registration was calculated as (A8b/A8a) x 100. The percentage of confirmation notices sent and returned undeliverable was calculated as (A8d/A8a) x 100. The percentage of confirmation notices sent and returned confirming registration should be invalidated was calculated as (A8c/A8a) x 100. The percentage of confirmation notices sent and not categorized was calculated as (1 – ((A8b+A8c+A8e+A8f+A8g+A8h)/A8a)) x 100. The percentage of confirmation notices sent and labeled as other was calculated as ((A8f+A8g+A8h)/A8a) x 100. Casewise deletion was used at the state level (percentages for each category were calculated independently and only states that reported data for a given category were included in the analysis), and because of this, percentages do not sum to 100%.*

Nationally, 28,010,094 confirmation notices were sent between the 2018 general election and the month before the 2020 general election, accounting for 14.3% of the active voters reported by states in 2020.[74] This percentage is slightly higher than what was reported by states in 2018

---

[74] The total number of confirmation notices sent was reported in item A8a of the EAVS. The number of confirmation notices sent as a percentage of the active registrants was calculated using total confirmation notices sent (item A8a of the EAVS) divided by total active registrants (A1b of the EAVS). Casewise deletion at the state level was used in this calculation. In 2020, 49 states and territories reported the number of confirmation notices sent during the period of registration for the 2020 general election. North Dakota does not require citizens to register to vote and, thus, does not use confirmation notices. Minnesota, Puerto Rico, the U.S. Virgin Islands, and Wyoming are NVRA exempt. Alabama reported that they did "not have a report that has the total number of confirmation notices sent." Indiana did not provide this information

OCA-APPX-1008

(11.6%) and in 2016 (10.9%).[75] Figure 5 shows that confirmation notices with an unknown status accounted for 65.8% of the total. The unknown status notices generally included confirmation notices that were sent and never returned to the jurisdiction—allowing states to move the addressees of these notices to the inactive registration list if the state uses that designation. States reported 12.1% of confirmation notices were returned confirming the voter's continued eligibility, and 8.1% were returned confirming the voter was no longer eligible to vote in the jurisdiction or no longer wanted to be registered to vote.

## Removing Voters From Voter Registration Rolls

The NVRA mandates that registrants may only be removed from the voter registration rolls in these circumstances:

- Upon the death of the registrant;
- Upon the registrant's written confirmation that their address has changed to a location outside the registrar's jurisdiction;
- On the request of the registrant;
- For mental incapacity of the registrant, as provided in state law;
- On criminal conviction of the registrant, as provided in state law; or
- On the registrant's failure to respond to certain confirmation mailings along with failure to appear to vote in two consecutive federal general elections subsequent to the mailing.

Because some of the states' processes to remove a registrant from the voter registration rolls can take up to two federal general election cycles to complete, it is inevitable that voter registration rolls will contain some number of voter records for individuals who are no longer eligible to vote.

Between the close of registration for the 2018 general election and the close of registration for the 2020 general election, states reported removing 18,781,054 records from their voter registration rolls.[76] This was equal to 8.2% of the total number of voters who were registered in the United States as of the close of registration for the 2020 general election.[77] Almost two-thirds of the states and territories reported removing a number of registrants that added up to between 3% and 10% of their total registered voters. There were some exceptions to this trend: Connecticut's removals accounted

---

because it "does not send the removal notices referenced by the EAC survey." Forty-four states reported the status of the confirmation notices sent. In addition to the states that did not report on confirmation notices, Delaware, Kentucky, Louisiana, Massachusetts, and Rhode Island did not break down the number of confirmation notices sent by status.

[75] The number of confirmation notices sent as a percentage of the active registrants in 2018 was calculated using total confirmation notices sent (item A8a of the 2018 EAVS) divided by total active registrants (A1b of the 2018 EAVS). The number of confirmation notices sent as a percentage of the active registrants in 2016 was calculated using total confirmation notices sent (item A10a of the 2016 EAVS) divided by total active registrants (A3a of the 2016 EAVS). Casewise deletion at the state level was used in this calculation.

[76] The total number of registrants removed from the voter registration rolls was reported in item A9a of the EAVS. All states and territories reported data for the items related to voter removal, except for North Dakota, which does not require citizens to register to vote.

[77] The number of registrants removed as a percentage of total registrants was calculated using total registrants removed from the voter registration rolls (item A9a of the EAVS) divided by total registrants (A1a of the EAVS). Casewise deletion at the state level was used in this calculation.

OCA-APPX-1009

for the lowest percentage of total registrants at 2.1%, and Puerto Rico reported the highest percentage of removals at 32.3% (see Table 5 of Appendix A in this chapter).

States also reported the reasons for removing records from their voter registration rolls. These reasons for removal are shown in Figure 6. The most common reason was failure to both respond to a confirmation notice and to vote in two consecutive federal general elections, which accounted for 32.1% of removals. Cross-jurisdiction change of address and death of the registrant were the other two major reasons for states' removal of registrants from their rolls (28.5% and 21.4%, respectively).

*Figure 6. Almost One-Third of Removed Registration Records Were a Result of Failure to Respond to a Confirmation Notice*



*Source: The percentage of registrations removed because of no response to confirmation notices (and not voting in the following two general elections) was calculated as (A9e/A9a) x 100. The percentage of registrations removed because of a cross-jurisdiction change of address was calculated as (A9b/A9a) x 100. The percentage of registrations removed because of death was calculated as (A9c/A9a) x 100. The percentage of registrations removed because the voter was declared mentally incompetent or because of other reasons was calculated as ((A9f+A9h+A9i+A9j)/A9a) x 100. The percentage of registrations removed because the voter requested to be removed was calculated as (A9g/A9a) x 100. The percentage of registrations removed because of disqualifying felony conviction was calculated as (A9d/A9a) x 100. Casewise deletion was used at the state level (percentages for each category were calculated independently and only states that reported data for a given category were included in the analysis), and because of this, percentages do not sum to 100%.*

OCA-APPX-1010

The majority of states reported that a registrant could be removed from the voter registration rolls if the registrant received a disqualifying criminal conviction and/or was incarcerated,[78] but only 1.6% of the removals were the result of a disqualifying felony conviction.[79] Two states, however, reported that more than 10% of their registration removals happened due to criminal convictions or incarceration. Georgia reported that 10.8% of registrants were removed for this reason, and Kentucky (13.3%) reported the largest percentage of this type of removal. Kentucky also reported criminal conviction as a common reason for registration removal in the 2018 EAVS.[80]

---

[78] Maine, Vermont, Puerto Rico, Guam, and the District of Columbia reported criminal conviction and/or incarceration was not a reason for voter removal in item Q37 of the 2020 Policy Survey.

[79] The percentage of registrations removed because of a disqualifying felony conviction was calculated as (A9d/A9a) x 100. Casewise deletion was used at the state level.

[80] The percentage of registrations removed because of a disqualifying felony conviction in 2018 was calculated as the total registrants removed from the voter registration rolls for this reason (item A9d of the 2018 EAVS) divided by total registrants removed from the rolls (item A9a in 2018).

OCA-APPX-1011



# Appendix A: Descriptive Tables

## Voter Registration Table 1: Registration History

| State | Year | CVAP Total | Reported Registrations | Active Registrations | Active Regs. (% of CVAP) | Active Regs. (% of Total) | Inactive Registrations | Inactive Regs. (% of Total) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2020 | 3,731,336 | 3,717,798 | 3,438,213 | 92.1 | 92.5 | 279,585 | 7.5 |
| | 2018 | 3,688,249 | 3,465,352 | 3,164,301 | 85.8 | 91.3 | 301,051 | 8.7 |
| | 2016 | 3,653,381 | 3,333,946 | 3,049,655 | 83.5 | 91.5 | 139,638 | 4.2 |
| Alaska | 2020 | 533,151 | 646,093 | 595,647 | 111.7 | 92.2 | 50,446 | 7.8 |
| | 2018 | 531,653 | 624,467 | 571,851 | 107.6 | 91.6 | 52,616 | 8.4 |
| | 2016 | 528,248 | 587,303 | 528,671 | 100.1 | 90.0 | 58,632 | 10.0 |
| American Samoa [1], [2], [3] | 2020 | -- | 16,341 | 16,341 | -- | 100.0 | 0 | 0.0 |
| | 2018 | -- | 15,527 | 8,462 | -- | 54.5 | 7,065 | 45.5 |
| | 2016 | -- | -- | -- | -- | -- | -- | -- |
| Arizona | 2020 | 5,137,474 | 4,728,109 | 4,275,729 | 83.2 | 90.4 | 452,380 | 9.6 |
| | 2018 | 4,895,706 | 4,276,891 | 3,715,624 | 75.9 | 86.9 | 561,267 | 13.1 |
| | 2016 | 4,710,448 | 4,080,680 | 3,589,084 | 76.2 | 88.0 | 491,596 | 12.0 |
| Arkansas | 2020 | 2,235,415 | 1,831,414 | 1,408,061 | 63.0 | 76.9 | 423,353 | 23.1 |
| | 2018 | 2,207,894 | 1,786,840 | 1,456,887 | 66.0 | 81.5 | 329,953 | 18.5 |
| | 2016 | 2,185,724 | 1,765,513 | 1,422,393 | 65.1 | 80.6 | 343,120 | 19.4 |
| California [4] | 2020 | 26,032,160 | 26,157,616 | 21,795,538 | 83.7 | 83.3 | 4,348,374 | 16.6 |
| | 2018 | 25,650,455 | 25,103,559 | 19,724,297 | 76.9 | 78.6 | 5,379,262 | 21.4 |
| | 2016 | 25,002,812 | 24,486,638 | 19,435,856 | 77.7 | 79.4 | 5,065,746 | 20.7 |
| Colorado | 2020 | 4,244,210 | 4,211,528 | 3,803,762 | 89.6 | 90.3 | 407,766 | 9.7 |
| | 2018 | 4,057,437 | 3,953,613 | 3,426,499 | 84.4 | 86.7 | 527,114 | 13.3 |
| | 2016 | 3,896,986 | 3,840,303 | 3,336,663 | 85.6 | 86.9 | 503,640 | 13.1 |
| Connecticut | 2020 | 2,619,474 | 2,524,717 | 2,335,860 | 89.2 | 92.5 | 188,857 | 7.5 |
| | 2018 | 2,611,667 | 2,369,335 | 2,193,586 | 84.0 | 92.6 | 175,749 | 7.4 |
| | 2016 | 2,584,884 | 2,331,684 | 2,162,797 | 83.7 | 92.8 | 168,887 | 7.2 |
| Delaware | 2020 | 725,178 | 739,672 | 711,287 | 98.1 | 96.2 | 28,385 | 3.8 |
| | 2018 | 709,999 | 695,014 | 672,632 | 94.7 | 96.8 | 22,382 | 3.2 |
| | 2016 | 697,148 | 675,663 | 642,334 | 92.1 | 95.1 | 33,329 | 4.9 |
| District of Columbia | 2020 | 536,768 | 625,683 | 517,890 | 96.5 | 82.8 | 107,793 | 17.2 |
| | 2018 | 510,514 | 617,046 | 511,633 | 100.2 | 82.9 | 105,413 | 17.1 |
| | 2016 | 504,242 | 493,287 | 493,287 | 97.8 | 100.0 | -- | -- |
| Florida | 2020 | 15,507,315 | 15,231,808 | 14,517,002 | 93.6 | 95.3 | 701,422 | 4.6 |
| | 2018 | 15,014,950 | 14,126,722 | 13,278,070 | 88.4 | 94.0 | 848,652 | 6.0 |
| | 2016 | 14,441,877 | 13,505,571 | 12,853,866 | 89.0 | 95.2 | 651,705 | 4.8 |

OCA-APPX-1012

| State | Year | CVAP Total | Reported Registrations | Active Registrations | Active Regs. (% of CVAP) | Active Regs. (% of Total) | Inactive Registrations | Inactive Regs. (% of Total) |
|---|---|---|---|---|---|---|---|---|
| Georgia | 2020 | 7,581,837 | 7,618,436 | 7,194,889 | 94.9 | 94.4 | 423,547 | 5.6 |
| | 2018 | 7,362,615 | 6,944,851 | 6,437,524 | 87.4 | 92.7 | 507,327 | 7.3 |
| | 2016 | 7,168,068 | 6,657,621 | 5,463,014 | 76.2 | 82.1 | 1,194,607 | 17.9 |
| Guam [1], [2] | 2020 | -- | 55,896 | 55,896 | -- | 100.0 | -- | -- |
| | 2018 | -- | 55,941 | 55,941 | -- | 100.0 | -- | -- |
| | 2016 | -- | 51,720 | 51,720 | -- | 100.0 | -- | -- |
| Hawaii | 2020 | 1,014,035 | 832,466 | 759,971 | 74.9 | 91.3 | 72,495 | 8.7 |
| | 2018 | 1,025,548 | 756,751 | 712,765 | 69.5 | 94.2 | 43,986 | 5.8 |
| | 2016 | 1,022,704 | 751,483 | 666,573 | 65.2 | 88.7 | 84,910 | 11.3 |
| Idaho [2] | 2020 | 1,282,630 | 1,029,763 | 1,029,763 | 80.3 | 100.0 | -- | -- |
| | 2018 | 1,219,481 | 917,609 | 917,609 | 75.2 | 100.0 | -- | -- |
| | 2016 | 1,168,843 | 936,529 | 936,529 | 80.1 | 100.0 | -- | -- |
| Illinois | 2020 | 9,088,036 | 9,789,893 | 9,103,542 | 100.2 | 93.0 | 686,351 | 7.0 |
| | 2018 | 9,055,927 | 8,751,060 | 8,091,045 | 89.3 | 92.5 | 660,015 | 7.5 |
| | 2016 | 9,017,653 | 8,843,038 | 8,055,096 | 89.3 | 91.1 | 787,942 | 8.9 |
| Indiana | 2020 | 4,978,356 | 4,692,091 | 4,170,353 | 83.8 | 88.9 | 521,738 | 11.1 |
| | 2018 | 4,899,251 | 4,500,196 | 4,168,374 | 85.1 | 92.6 | 331,822 | 7.4 |
| | 2016 | 4,856,797 | 4,839,038 | 4,149,560 | 85.4 | 85.8 | 689,478 | 14.2 |
| Iowa | 2020 | 2,348,787 | 2,243,758 | 2,094,770 | 89.2 | 93.4 | 148,988 | 6.6 |
| | 2018 | 2,325,355 | 2,193,813 | 2,037,516 | 87.6 | 92.9 | 156,297 | 7.1 |
| | 2016 | 2,310,467 | 2,222,380 | 2,047,368 | 88.6 | 92.1 | 175,012 | 7.9 |
| Kansas | 2020 | 2,103,748 | 1,924,772 | 1,764,949 | 83.9 | 91.7 | 148,624 | 7.7 |
| | 2018 | 2,091,261 | 1,835,473 | 1,670,217 | 79.9 | 91.0 | 165,256 | 9.0 |
| | 2016 | 2,074,102 | 1,785,834 | 1,601,818 | 77.2 | 89.7 | 184,016 | 10.3 |
| Kentucky [5] | 2020 | 3,367,502 | 3,565,428 | 3,319,307 | 98.6 | 93.1 | 246,121 | 6.9 |
| | 2018 | 3,350,956 | 3,402,905 | 3,402,905 | 101.6 | 100.0 | 0 | 0.0 |
| | 2016 | 3,329,835 | 3,306,120 | 3,306,120 | 99.3 | 100.0 | -- | -- |
| Louisiana | 2020 | 3,463,372 | 3,093,004 | 2,963,901 | 85.6 | 95.8 | 129,103 | 4.2 |
| | 2018 | 3,469,016 | 2,992,170 | 2,856,722 | 82.3 | 95.5 | 135,448 | 4.5 |
| | 2016 | 3,454,978 | 3,058,741 | 2,891,902 | 83.7 | 94.5 | 131,339 | 4.3 |
| Maine | 2020 | 1,078,770 | 1,138,576 | 1,135,008 | 105.2 | 99.7 | 3,568 | 0.3 |
| | 2018 | 1,064,497 | 1,057,967 | 1,054,068 | 99.0 | 99.6 | 3,899 | 0.4 |
| | 2016 | 1,056,410 | 1,065,100 | 1,059,270 | 100.3 | 99.5 | 5,830 | 0.5 |
| Maryland [6] | 2020 | 4,316,921 | 4,298,942 | 4,142,347 | 96.0 | 96.4 | 156,595 | 3.6 |
| | 2018 | 4,310,864 | 3,954,027 | 3,954,027 | 91.7 | 100.0 | -- | -- |
| | 2016 | 4,239,987 | 3,900,090 | 3,900,090 | 92.0 | 100.0 | -- | -- |

OCA-APPX-1013



| State | Year | CVAP Total | Reported Registrations | Active Registrations | Active Regs. (% of CVAP) | Active Regs. (% of Total) | Inactive Registrations | Inactive Regs. (% of Total) |
|---|---|---|---|---|---|---|---|---|
| Massachusetts | 2020 | 5,057,192 | 4,812,909 | 4,400,254 | 87.0 | 91.4 | 412,655 | 8.6 |
| | 2018 | 4,993,001 | 4,574,967 | 3,947,897 | 79.1 | 86.3 | 627,070 | 13.7 |
| | 2016 | 4,924,459 | 4,534,974 | 3,994,635 | 81.1 | 88.1 | 540,339 | 11.9 |
| Michigan [7] | 2020 | 7,562,464 | 8,105,524 | 7,209,300 | 95.3 | 88.9 | 896,224 | 11.1 |
| | 2018 | 7,481,928 | 7,471,088 | 6,488,823 | 86.7 | 86.9 | 982,265 | 13.1 |
| | 2016 | 7,436,478 | 7,514,055 | 6,748,385 | 90.7 | 89.8 | 765,670 | 10.2 |
| Minnesota [2], [8] | 2020 | 4,157,556 | 3,731,016 | 3,731,016 | 89.7 | 100.0 | -- | -- |
| | 2018 | 4,079,652 | 3,422,515 | 3,422,515 | 83.9 | 100.0 | -- | -- |
| | 2016 | 4,007,159 | 3,473,972 | 3,473,972 | 86.7 | 100.0 | -- | -- |
| Mississippi | 2020 | 2,246,323 | 2,143,149 | 1,982,632 | 88.3 | 92.5 | 160,517 | 7.5 |
| | 2018 | 2,234,722 | 2,079,732 | 1,880,197 | 84.1 | 90.4 | 199,535 | 9.6 |
| | 2016 | 2,220,616 | 2,072,395 | 1,888,433 | 85.0 | 91.1 | 183,962 | 8.9 |
| Missouri | 2020 | 4,650,318 | 4,338,133 | 3,963,980 | 85.2 | 91.4 | 374,153 | 8.6 |
| | 2018 | 4,606,843 | 4,127,333 | 3,803,881 | 82.6 | 92.2 | 323,452 | 7.8 |
| | 2016 | 4,567,771 | 4,215,860 | 3,812,576 | 83.5 | 90.4 | 403,284 | 9.6 |
| Montana [9] | 2020 | 831,760 | 747,439 | 675,971 | 81.3 | 90.4 | 71,468 | 9.6 |
| | 2018 | 810,760 | 706,173 | 616,642 | 76.1 | 87.3 | 89,531 | 12.7 |
| | 2016 | 797,198 | 694,370 | 574,334 | 72.0 | 82.7 | 120,036 | 17.3 |
| Nebraska [10] | 2020 | 1,388,950 | 1,266,730 | 1,168,708 | 84.1 | 92.3 | 98,022 | 7.7 |
| | 2018 | 1,368,000 | 1,219,276 | 1,096,862 | 80.2 | 90.0 | 122,414 | 10.0 |
| | 2016 | 1,352,947 | 1,211,101 | 1,091,951 | 80.7 | 90.2 | 119,150 | 9.8 |
| Nevada | 2020 | 2,111,932 | 2,039,162 | 1,835,401 | 86.9 | 90.0 | 203,761 | 10.0 |
| | 2018 | 2,031,213 | 1,773,566 | 1,563,750 | 77.0 | 88.2 | 209,816 | 11.8 |
| | 2016 | 1,942,764 | 1,678,883 | 1,468,559 | 75.6 | 87.5 | 210,324 | 12.5 |
| New Hampshire [2], [11] | 2020 | 1,070,215 | 1,087,145 | 1,087,145 | 101.6 | 100.0 | -- | -- |
| | 2018 | 1,048,883 | 988,148 | 988,148 | 94.2 | 100.0 | -- | -- |
| | 2016 | 1,035,684 | 988,398 | 988,398 | 95.4 | 100.0 | 0 | 0.0 |
| New Jersey | 2020 | 6,170,130 | 6,310,564 | 5,896,836 | 95.6 | 93.4 | 413,728 | 6.6 |
| | 2018 | 6,199,409 | 5,869,078 | 5,456,506 | 88.0 | 93.0 | 412,572 | 7.0 |
| | 2016 | 6,154,126 | 5,751,090 | 5,321,542 | 86.5 | 92.5 | 429,548 | 7.5 |
| New Mexico [12] | 2020 | 1,522,171 | 1,360,871 | 1,255,669 | 82.5 | 92.3 | 105,202 | 7.7 |
| | 2018 | 1,493,318 | 1,261,639 | 698,172 | 46.8 | 55.3 | 563,467 | 44.7 |
| | 2016 | 1,470,045 | 1,289,420 | 1,136,059 | 77.3 | 88.1 | 152,277 | 11.8 |
| New York [13] | 2020 | 13,810,830 | 13,555,618 | 12,362,997 | 89.5 | 91.2 | 1,191,845 | 8.8 |
| | 2018 | 13,866,648 | 12,695,763 | 11,676,266 | 84.2 | 92.0 | 1,019,497 | 8.0 |
| | 2016 | 13,704,991 | 16,200,892 | 16,200,892 | 118.2 | 100.0 | -- | -- |

OCA-APPX-1014

| State | Year | CVAP Total | Reported Registrations | Active Registrations | Active Regs. (% of CVAP) | Active Regs. (% of Total) | Inactive Registrations | Inactive Regs. (% of Total) |
|---|---|---|---|---|---|---|---|---|
| North Carolina | 2020 | 7,729,644 | 7,372,608 | 6,607,121 | 85.5 | 89.6 | 765,487 | 10.4 |
| | 2018 | 7,509,879 | 7,095,209 | 5,898,244 | 78.5 | 83.1 | 1,196,965 | 16.9 |
| | 2016 | 7,296,335 | 6,924,469 | 5,930,252 | 81.3 | 85.6 | 994,217 | 14.4 |
| North Dakota [14] | 2020 | 567,545 | – | – | – | – | – | – |
| | 2018 | 564,475 | – | – | – | – | – | – |
| | 2016 | 571,119 | – | – | – | – | – | – |
| Northern Mariana Islands [1], [2], [15] | 2020 | – | 18,526 | 18,526 | – | 100.0 | – | – |
| | 2018 | – | – | – | – | – | – | – |
| | 2016 | – | – | – | – | – | – | – |
| Ohio [2], [16] | 2020 | 8,879,469 | 8,073,829 | 8,073,829 | 90.9 | 100.0 | – | – |
| | 2018 | 8,830,185 | 8,070,917 | 8,070,917 | 91.4 | 100.0 | – | – |
| | 2016 | 8,765,154 | 7,861,025 | 7,861,025 | 89.7 | 100.0 | – | – |
| Oklahoma | 2020 | 2,875,059 | 2,259,107 | 2,021,846 | 70.3 | 89.5 | 237,261 | 10.5 |
| | 2018 | 2,835,451 | 2,120,843 | 1,857,700 | 65.5 | 87.6 | 263,143 | 12.4 |
| | 2016 | 2,807,548 | 2,157,450 | 1,817,461 | 64.7 | 84.2 | 339,989 | 15.8 |
| Oregon [17] | 2020 | 3,162,204 | 2,944,588 | 2,944,588 | 93.1 | 100.0 | – | – |
| | 2018 | 3,060,328 | 2,748,232 | 2,748,232 | 89.8 | 100.0 | – | – |
| | 2016 | 2,956,232 | 2,553,810 | 2,553,810 | 86.4 | 100.0 | – | – |
| Pennsylvania [18] | 2020 | 9,810,201 | 9,035,061 | 8,280,348 | 84.4 | 91.6 | 754,713 | 8.4 |
| | 2018 | 9,764,119 | 8,607,748 | 7,738,989 | 79.3 | 89.9 | 868,759 | 10.1 |
| | 2016 | 9,752,322 | 8,722,975 | – | – | – | – | – |
| Puerto Rico [2], [19] | 2020 | 2,579,596 | 2,355,894 | 2,355,894 | 91.3 | 100.0 | – | – |
| | 2018 | 2,636,949 | – | – | – | – | – | – |
| | 2016 | 2,686,177 | 2,867,558 | 2,867,558 | 106.8 | 100.0 | – | – |
| Rhode Island | 2020 | 800,798 | 809,117 | 735,195 | 91.8 | 90.9 | 73,922 | 9.1 |
| | 2018 | 792,337 | 781,478 | 737,419 | 93.1 | 94.4 | 44,059 | 5.6 |
| | 2016 | 784,997 | 754,065 | 721,211 | 91.9 | 95.6 | 32,246 | 4.3 |
| South Carolina | 2020 | 3,892,341 | 3,854,209 | 3,535,061 | 90.8 | 91.7 | 319,148 | 8.3 |
| | 2018 | 3,799,298 | 3,538,580 | 3,538,580 | 93.1 | 100.0 | 396,653 | 11.2 |
| | 2016 | 3,677,799 | 3,157,027 | 3,157,027 | 85.8 | 100.0 | 275,292 | 8.7 |
| South Dakota | 2020 | 653,394 | 635,256 | 578,683 | 88.6 | 91.1 | 56,573 | 8.9 |
| | 2018 | 641,666 | 594,453 | 539,788 | 84.1 | 90.8 | 54,665 | 9.2 |
| | 2016 | 634,140 | 595,322 | 544,930 | 85.9 | 91.5 | 50,392 | 8.5 |
| Tennessee | 2020 | 5,129,580 | 4,436,727 | 4,226,928 | 82.4 | 95.3 | 209,799 | 4.7 |
| | 2018 | 5,016,103 | 4,163,359 | 3,764,513 | 75.0 | 90.4 | 398,846 | 9.6 |
| | 2016 | 4,919,574 | 4,110,318 | 3,534,800 | 71.9 | 86.0 | 575,518 | 14.0 |

OCA-APPX-1015



| State | Year | CVAP Total | Reported Registrations | Active Registrations | Active Regs. (% of CVAP) | Active Regs. (% of Total) | Inactive Registrations | Inactive Regs. (% of Total) |
|---|---|---|---|---|---|---|---|---|
| Texas | 2020 | 18,875,542 | 16,955,519 | 15,279,870 | 81.0 | 90.1 | 1,675,649 | 9.9 |
| | 2018 | 18,174,345 | 15,615,925 | 13,790,247 | 75.9 | 88.3 | 1,653,986 | 10.6 |
| | 2016 | 17,523,904 | 14,382,387 | 11,942,651 | 68.2 | 83.0 | 1,288,225 | 9.0 |
| U.S. Virgin Islands [1], [2] | 2020 | -- | 53,341 | 53,341 | -- | 100.0 | -- | -- |
| | 2018 | -- | 51,095 | 51,095 | -- | 100.0 | -- | -- |
| | 2016 | -- | 46,076 | 46,076 | -- | 100.0 | -- | -- |
| Utah | 2020 | 2,134,249 | 1,861,977 | 1,713,297 | 80.3 | 92.0 | 148,680 | 8.0 |
| | 2018 | 2,028,176 | 1,658,457 | 1,433,917 | 70.7 | 86.5 | 224,540 | 13.5 |
| | 2016 | 1,945,001 | 1,577,069 | 1,414,758 | 72.7 | 89.7 | 162,311 | 10.3 |
| Vermont | 2020 | 498,705 | 489,277 | 440,920 | 88.4 | 90.1 | 48,357 | 9.9 |
| | 2018 | 494,550 | 489,385 | 447,709 | 90.5 | 91.5 | 41,676 | 8.5 |
| | 2016 | 494,717 | 472,289 | 440,347 | 89.0 | 93.2 | 31,942 | 6.8 |
| Virginia | 2020 | 6,226,623 | 5,975,561 | 5,763,187 | 92.6 | 96.4 | 212,374 | 3.6 |
| | 2018 | 6,145,893 | 5,666,627 | 5,272,602 | 85.8 | 93.0 | 394,025 | 7.0 |
| | 2016 | 6,062,304 | 5,604,106 | 5,066,666 | 83.6 | 90.4 | 537,440 | 9.6 |
| Washington | 2020 | 5,409,035 | 5,255,466 | 4,892,871 | 90.5 | 93.1 | 362,595 | 6.9 |
| | 2018 | 5,259,892 | 4,841,431 | 4,362,480 | 82.9 | 90.1 | 478,951 | 9.9 |
| | 2016 | 5,081,800 | 4,872,385 | 4,277,499 | 84.2 | 87.8 | 594,886 | 12.2 |
| West Virginia | 2020 | 1,420,289 | 1,269,024 | 1,062,685 | 74.8 | 83.7 | 206,339 | 16.3 |
| | 2018 | 1,428,859 | 1,245,827 | 961,894 | 67.3 | 77.2 | 283,933 | 22.8 |
| | 2016 | 1,451,557 | 1,254,768 | 1,142,180 | 78.7 | 91.0 | 112,588 | 9.0 |
| Wisconsin [2], [20] | 2020 | 4,412,888 | 3,834,164 | 3,834,164 | 86.9 | 100.0 | -- | -- |
| | 2018 | 4,375,063 | 3,442,004 | 3,442,004 | 78.7 | 100.0 | -- | -- |
| | 2016 | 4,340,567 | 3,768,373 | 3,768,373 | 86.8 | 100.0 | -- | -- |
| Wyoming [2] | 2020 | 434,852 | 303,049 | 303,049 | 69.7 | 100.0 | -- | -- |
| | 2018 | 428,379 | 283,941 | 283,941 | 66.3 | 100.0 | -- | -- |
| | 2016 | 434,584 | 284,203 | 284,203 | 65.4 | 100.0 | -- | -- |
| U.S. Total | 2020 | 237,998,330 | 228,004,364 | 209,441,338 | 88.2 | 91.9 | 18,523,963 | 9.1 |
| | 2018 | 234,053,619 | 211,601,918 | 190,662,485 | 82.5 | 90.1 | 21,164,394 | 11.3 |
| | 2016 | 229,705,663 | 214,109,367 | 185,714,229 | 84.6 | 90.4 | 18,629,063 | 11.7 |

Voter Registration Table 1 Calculation Notes:

**CVAP Total** uses the 1-year ACS CVAP estimate. The 2020 data uses the 2019 CVAP, the 2018 data uses the 2017 CVAP, and the 2016 data uses the 2015 CVAP.

**Reported Registrations** uses question A1a for 2020, 2018, and 2016.

**Active Registrations** uses question A1b for 2020 and 2018 and question A3a for 2016.

**Active Registrations (% of CVAP)** uses question A1b divided by CVAP for 2020 and 2018 and question A3a divided by CVAP for 2016.

OCA-APPX-1016

**Active Registrations (% of Total)** uses question A1b divided by A1a for 2020 and 2018 and question A3a divided by A1a for 2016.

**Inactive Registrations** uses question A1c for 2020 and 2018 and question A3b for 2016.

**Inactive Registrations (% of Total)** uses question A1c divided by question A1a for 2020 and 2018 and question A3b divided by question A1a for 2016.

Voter Registration Table 1 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.

- Because each percentage was calculated independently, the active registration (% of total) and inactive registration (% of total) rates may not sum to 100% for some states or at the national level.

- The citizen voting age population (CVAP) is an estimate of the number of U.S. citizens ages 18 years or older in the state. This report uses the 1-year American Community Survey (ACS) state estimate for 2019 instead of the 5-year estimate to ensure that the CVAP was as current as possible. The estimate for the year 2020 was not available by the time this report was finalized. The 2019 1-year CVAP does not include data that were collected as part of the decennial Census conducted in 2020. For consistency, the CVAP for the 2018 and 2016 general elections was the 1-year ACS state estimate for 2017 and 2015, respectively.

- Some states may report an active CVAP registration rate of 100% or more. This is because the 2019 CVAP was used to calculate the 2020 registration rate and because due to federal law, some ineligible voters may take up to two full election cycles to be removed from the voter registration rolls.

- The Reported Registrations column includes both active and inactive voters (if the state uses such a distinction).

[1] The U.S. Census Bureau does not calculate a CVAP for the territories of American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.

[2] American Samoa, Guam, Idaho, Minnesota, New Hampshire, the Northern Mariana Islands, Ohio, Oregon, Puerto Rico, the U.S. Virgin Islands, Wisconsin, and Wyoming reported having only active registered voters.

[3] American Samoa did not provide data for the 2016 EAVS.

[4] California adjusted their number of total registrations (A1a) in 2018 after the data were initially released, so the total in this table does not match the total reported in the 2018 EAVS Comprehensive Report. California reported 63,659 fewer registrants in Riverside County in their correction of the 2018 EAVS data.

[5] Kentucky reported having only active voters in the 2016 EAVS and reported having zero inactive voters in the 2018 EAVS.

[6] Maryland reported having only active voters in the 2016 and the 2018 EAVS.

[7] Michigan noted in a survey comment that "Voters reported in A1 are eligible to vote. Those defined as 'inactive' need only to confirm their address before receiving a ballot. Participation in past elections is not a factor in defining eligibility."

[8] Minnesota noted in a survey comment that "Minnesota is NVRA exempt. Minnesota does not classify voters as inactive per NVRA."

OCA-APPX-1017



**[9]** Montana noted in a survey comment that in A1a, the "total registered/eligible voters consists of active and inactive. Montana reports total registered/eligible voters of 752,538. The difference is provisional, late registration and pending."

**[10]** Nebraska noted in a survey comment that the state "does not have 'inactive' voters. The numbers in line [A1c] reflect the number of voters who were sent a section 8(d)(2) notice and have not responded."

**[11]** New Hampshire began a rigorous 10-year verification of the checklist beginning April 1, 2021.

**[12]** New Mexico's 2018 EAVS data on the number of active registrations contained an error; the correct number is 1,261,532.

**[13]** New York reported having only active voters in the 2016 EAVS. This state also reported an uncharacteristically high number of active and total registrations in the 2016 EAVS compared to the registrations reported in the general elections of 2014, 2018, and 2020.

**[14]** North Dakota does not have voter registration and does not provide data in Section A of the EAVS.

**[15]** The Northern Mariana Islands did not participate in the 2016 or the 2018 EAVS. For 2020, the Northern Mariana Islands reported in a comment in A1 that "Voter[s] are taken out of the roster once inactive as per our Election Statute."

**[16]** Ohio reported "Data not available" for the number of inactive registrations in item A1c in 2020. The state did not report inactive registrations in 2018 and 2016.

**[17]** Oregon noted in a survey comment that they "do not track number of inactive voters."

**[18]** Pennsylvania reported in the 2016 EAVS that the state could not "differentiate between active and inactive from our point in time snapshot of the voter registration numbers."

**[19]** Puerto Rico did not participate in the 2018 EAVS because the territory did not hold federal elections in that year.

**[20]** Wisconsin is exempt from the NVRA and does not classify inactive voters per NVRA definitions.

OCA-APPX-1018

## Voter Registration Table 2: Application Sources – Total Forms Received

| State | Total Applications | Registration Application Source | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mail, Email, Fax | | In Person at Election Office | | Online | | Motor Vehicle Department | |
| | | Total | % | Total | % | Total | % | Total | % |
| Alabama [1] | 1,439,361 | 38,936 | 2.7 | 121,744 | 8.5 | 391,331 | 27.2 | 802,149 | 55.7 |
| Alaska | 1,079,008 | 78,115 | 7.2 | 53,787 | 5.0 | 127,471 | 11.8 | 75,917 | 7.0 |
| American Samoa | 4,741 | 48 | 1.0 | 4,693 | 99.0 | -- | -- | -- | -- |
| Arizona | 2,943,553 | 280,196 | 9.5 | 29,111 | 1.0 | 1,329,327 | 45.2 | 1,022,403 | 34.7 |
| Arkansas | 556,911 | 114,258 | 20.5 | 106,480 | 19.1 | -- | -- | 265,023 | 47.6 |
| California | 13,498,938 | 666,363 | 4.9 | 450,494 | 3.3 | 5,975,098 | 44.3 | 2,997,325 | 22.2 |
| Colorado | 3,195,131 | 449,231 | 14.1 | 70,691 | 2.2 | 873,530 | 27.3 | 1,587,291 | 49.7 |
| Connecticut | 1,247,433 | 129,295 | 10.4 | 98,004 | 7.9 | 287,480 | 23.0 | 395,285 | 31.7 |
| Delaware | 707,749 | 255,305 | 36.1 | 46,356 | 6.5 | 151,652 | 21.4 | 252,208 | 35.6 |
| District of Columbia | 123,147 | 8,710 | 7.1 | 2,345 | 1.9 | 36,437 | 29.6 | 53,671 | 43.6 |
| Florida | 9,511,345 | 1,171,574 | 12.3 | 1,114,491 | 11.7 | 1,974,596 | 20.8 | 3,798,746 | 39.9 |
| Georgia [2] | 4,931,889 | 381,107 | 7.7 | 111,983 | 2.3 | 857,096 | 17.4 | 3,290,439 | 66.7 |
| Guam | 16,376 | -- | -- | 3,223 | 19.7 | 1,016 | 6.2 | 10,644 | 65.0 |
| Hawaii | 359,832 | 55,541 | 15.4 | 809 | 0.2 | 115,116 | 32.0 | 94,350 | 26.2 |
| Idaho [3] | 231,491 | 73,880 | 31.9 | 54,736 | 23.6 | 98,290 | 42.5 | -- | -- |
| Illinois | 1,240,995 | 410,720 | 33.1 | 184,666 | 14.9 | 1,196,195 | 96.4 | 647,798 | 52.2 |
| Indiana [4] | 2,667,738 | 451,272 | 16.9 | 40,514 | 1.5 | 537,526 | 20.1 | 842,829 | 31.6 |
| Iowa | 738,352 | 15,131 | 2.0 | 29,148 | 3.9 | 4,920 | 0.7 | 91,701 | 12.4 |
| Kansas | 817,434 | 148,506 | 18.2 | 65,901 | 8.1 | 257,786 | 31.5 | 257,918 | 31.6 |
| Kentucky [5] | 1,678,038 | 36,056 | 2.1 | 197,837 | 11.8 | 335,156 | 20.0 | 1,002,181 | 59.7 |
| Louisiana [6] | 998,149 | 148,232 | 14.9 | 157,764 | 15.8 | 474,312 | 47.5 | 171,370 | 17.2 |
| Maine | 337,136 | 45,861 | 13.6 | 244,664 | 72.6 | -- | -- | 16,686 | 4.9 |
| Maryland | 3,511,883 | 99,604 | 2.8 | 77,617 | 2.2 | 1,258,781 | 35.8 | 1,983,252 | 56.5 |
| Massachusetts | 2,476,295 | 135,422 | 5.5 | 60,842 | 2.5 | 1,669,789 | 67.4 | 575,093 | 23.2 |
| Michigan [7] | 2,857,335 | 174,902 | 6.1 | 198,642 | 7.0 | 630,628 | 22.1 | 1,826,846 | 63.9 |
| Minnesota | 1,566,807 | 84,277 | 5.4 | 433,328 | 27.7 | 374,280 | 23.9 | 266,120 | 17.0 |
| Mississippi | 453,531 | 112,267 | 24.8 | 138,026 | 30.4 | -- | -- | 164,594 | 36.3 |
| Missouri | 690,757 | 94,340 | 13.7 | 58,855 | 8.5 | 262,479 | 38.0 | 242,077 | 35.0 |
| Montana [8] | 359,986 | 138,645 | 38.5 | 86,235 | 24.0 | -- | -- | 86,123 | 23.9 |
| Nebraska [9] | 726,896 | 142,050 | 19.5 | 31,768 | 4.4 | 226,227 | 31.1 | 321,496 | 44.2 |
| Nevada | 1,069,550 | 111,299 | 10.4 | 21,209 | 2.0 | 439,355 | 41.1 | 255,919 | 23.9 |
| New Hampshire [10] | 810,583 | 5,783 | 0.7 | 804,800 | 99.3 | -- | -- | -- | -- |
| New Jersey | 2,959,834 | 6,710 | 0.2 | 162 | 0.0 | 284,928 | 9.6 | 1,731,406 | 58.5 |
| New Mexico | 570,254 | 135,472 | 23.8 | 54,294 | 9.5 | 206,141 | 36.1 | 161,184 | 28.3 |
| New York [11] | 2,299,890 | 586,547 | 25.5 | 129,014 | 5.6 | -- | -- | 1,159,254 | 50.4 |
| North Carolina | 5,164,009 | 1,850,941 | 35.8 | 739,381 | 14.3 | 444,602 | 8.6 | 1,602,654 | 31.0 |
| North Dakota [12] | -- | -- | -- | -- | -- | -- | -- | -- | -- |

OCA-APPX-1019



| State | Total Applications | Registration Application Source | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mail, Email, Fax | | In Person at Election Office | | Online | | Motor Vehicle Department | |
| | | Total | % | Total | % | Total | % | Total | % |
| Northern Mariana Islands | 1,291 | 36 | 2.8 | 1,291 | 100.0 | -- | -- | -- | -- |
| Ohio | 2,995,502 | 449,093 | 15.0 | 350,575 | 11.7 | 1,140,233 | 38.1 | 696,384 | 23.2 |
| Oklahoma | 666,094 | 149,584 | 22.5 | 84,209 | 12.6 | 86,268 | 13.0 | 297,675 | 44.7 |
| Oregon | 1,955,345 | 135,106 | 6.9 | 56,931 | 2.9 | 579,602 | 29.6 | 783,103 | 40.0 |
| Pennsylvania | 3,814,150 | 355,683 | 9.3 | 40,358 | 1.1 | 1,237,715 | 32.5 | 1,717,266 | 45.0 |
| Puerto Rico | 121,352 | -- | -- | 121,352 | 100.0 | -- | -- | -- | -- |
| Rhode Island [13] | 425,389 | -- | -- | -- | -- | -- | -- | -- | -- |
| South Carolina | 2,119,337 | 416,765 | 19.7 | 390,876 | 18.4 | 358,852 | 16.9 | 901,668 | 42.5 |
| South Dakota | 163,450 | 40,568 | 24.8 | 37,949 | 23.2 | -- | -- | 75,140 | 46.0 |
| Tennessee [14] | 1,595,329 | 213,506 | 13.4 | 164,989 | 10.3 | 680,172 | 42.6 | 446,003 | 28.0 |
| Texas | 5,147,221 | 2,074,130 | 40.3 | 577,120 | 11.2 | 0 | 0.0 | 2,042,699 | 39.7 |
| U.S. Virgin Islands | 1,878 | -- | | 1,692 | 90.1 | | | | |
| Utah | 2,280,767 | 55,629 | 2.4 | 218,318 | 9.6 | 526,018 | 23.1 | 366,842 | 16.1 |
| Vermont | 98,866 | 2,005 | 2.0 | 14,715 | 14.9 | 34,109 | 34.5 | 39,105 | 39.6 |
| Virginia | 3,880,532 | 176,330 | 4.5 | 114,381 | 2.9 | 713,010 | 18.4 | 2,728,717 | 70.3 |
| Washington | 3,068,727 | 449,717 | 14.7 | 137,107 | 4.5 | 769,418 | 25.1 | 1,402,506 | 45.7 |
| West Virginia | 517,145 | 24,332 | 4.7 | 21,822 | 4.2 | 174,240 | 33.7 | 156,752 | 30.3 |
| Wisconsin [15] | 920,760 | 70,386 | 7.6 | 166,419 | 18.1 | 560,518 | 60.9 | -- | -- |
| Wyoming | 86,021 | 4,035 | 4.7 | 81,819 | 95.1 | -- | -- | -- | -- |
| U.S. Total | 103,701,513 | 13,253,501 | 12.9 | 8,605,537 | 8.3 | 27,681,700 | 28.2 | 39,705,812 | 39.3 |

OCA-APPX-1020

| State | Registration Application Source | | | | | | | |
| | Public Assistance Offices | | Disability Services Offices | | Armed Forces Recruitment Offices | | Other State Agencies | |
| | Total | % | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|
| Alabama [1] | 39,093 | 2.7 | 6,477 | 0.4 | 292 | 0.0 | 16,445 | 1.1 |
| Alaska | 6,090 | 0.6 | 59 | 0.0 | 3,001 | 0.3 | 95 | 0.0 |
| American Samoa | -- | -- | -- | -- | -- | -- | -- | -- |
| Arizona | 8,059 | 0.3 | 296 | 0.0 | 7,754 | 0.3 | 13 | 0.0 |
| Arkansas | 18,507 | 3.3 | 466 | 0.1 | 67 | 0.0 | 5,406 | 1.0 |
| California | 177,354 | 1.3 | 10,931 | 0.1 | 6,669 | 0.0 | 116,545 | 0.9 |
| Colorado | 38,028 | 1.2 | 2,108 | 0.1 | 37 | 0.0 | -- | -- |
| Connecticut | 5,060 | 0.4 | 146 | 0.0 | 731 | 0.1 | 805 | 0.1 |
| Delaware | 1,006 | 0.1 | 773 | 0.1 | 0 | 0.0 | 0 | 0.0 |
| District of Columbia | 197 | 0.2 | 54 | 0.0 | 207 | 0.2 | 1,059 | 0.9 |
| Florida | 31,752 | 0.3 | 3,414 | 0.0 | 1,298 | 0.0 | 776,330 | 8.2 |
| Georgia [2] | 16,419 | 0.3 | 33,856 | 0.7 | 103 | 0.0 | -- | -- |
| Guam | -- | -- | -- | -- | -- | -- | 1,493 | 9.1 |
| Hawaii | 533 | 0.1 | -- | -- | -- | -- | 15 | 0.0 |
| Idaho [3] | -- | -- | -- | -- | -- | -- | -- | -- |
| Illinois | 145,211 | 11.7 | 4,819 | 0.4 | 10,642 | 0.9 | 98,720 | 8.0 |
| Indiana [4] | 20,059 | 0.8 | 624 | 0.0 | 0 | 0.0 | 74 | 0.0 |
| Iowa | 1,745 | 0.2 | 36 | 0.0 | 16 | 0.0 | 97 | 0.0 |
| Kansas | 2,348 | 0.3 | 109 | 0.0 | 79 | 0.0 | 2,135 | 0.3 |
| Kentucky [5] | 94,657 | 5.6 | 1,848 | 0.1 | 1,966 | 0.1 | -- | -- |
| Louisiana [6] | 32,529 | 3.3 | 4,042 | 0.4 | 2,915 | 0.3 | 6,985 | 0.7 |
| Maine | -- | -- | -- | -- | -- | -- | -- | -- |
| Maryland | 15,961 | 0.5 | 462 | 0.0 | 96 | 0.0 | -- | -- |
| Massachusetts | 30,202 | 1.2 | 2,248 | 0.1 | -- | -- | 2,699 | 0.1 |
| Michigan [7] | 4,579 | 0.2 | 493 | 0.0 | 66 | 0.0 | -- | -- |
| Minnesota | -- | -- | -- | -- | -- | -- | -- | -- |
| Mississippi | 13,407 | 3.0 | 786 | 0.2 | -- | -- | -- | -- |
| Missouri | 28,750 | 4.2 | 405 | 0.1 | 132 | 0.0 | 107 | 0.0 |
| Montana [8] | 2,889 | 0.8 | 2 | 0.0 | 132 | 0.0 | 0 | 0.0 |
| Nebraska [9] | 723 | 0.1 | 628 | 0.1 | 16 | 0.0 | -- | -- |
| Nevada | 38,576 | 3.6 | 850 | 0.1 | 320 | 0.0 | 512 | 0.0 |
| New Hampshire [10] | -- | -- | -- | -- | -- | -- | -- | -- |
| New Jersey | 5,650 | 0.2 | 37,322 | 1.3 | 4,639 | 0.2 | 753,056 | 25.4 |
| New Mexico | 12,437 | 2.2 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| New York [11] | 117,552 | 5.1 | -- | -- | -- | -- | 74,983 | 3.3 |
| North Carolina | 56,882 | 1.1 | 2,070 | 0.0 | 9 | 0.0 | 4,218 | 0.1 |
| North Dakota [12] | -- | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | -- | -- | -- | -- | -- | -- | -- | -- |
| Ohio | 214,770 | 7.2 | 4,693 | 0.2 | 397 | 0.0 | 50,967 | 1.7 |

OCA-APPX-1021



| State | Registration Application Source | | | | | | | |
| | Public Assistance Offices | | Disability Services Offices | | Armed Forces Recruitment Offices | | Other State Agencies | |
| | Total | % | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|
| Oklahoma | 16,688 | 2.5 | 572 | 0.1 | 18 | 0.0 | 45 | 0.0 |
| Oregon | 7,069 | 0.4 | 2,968 | 0.2 | -- | -- | 7,252 | 0.4 |
| Pennsylvania | 76,897 | 2.0 | -- | -- | 12 | 0.0 | -- | -- |
| Puerto Rico | -- | -- | -- | -- | -- | -- | -- | -- |
| Rhode Island [13] | -- | -- | -- | -- | -- | -- | -- | -- |
| South Carolina | 42,870 | 2.0 | 480 | 0.0 | 433 | 0.0 | -- | -- |
| South Dakota | 3,406 | 2.1 | 51 | 0.0 | 4 | 0.0 | 1,413 | 0.9 |
| Tennessee [14] | 25,085 | 1.6 | 71 | 0.0 | 4,496 | 0.3 | 10,521 | 0.7 |
| Texas | 152,724 | 3.0 | 2,731 | 0.1 | 383 | 0.0 | 297,434 | 5.8 |
| U.S. Virgin Islands | -- | -- | -- | -- | -- | -- | -- | -- |
| Utah | 36 | 0.0 | 49 | 0.0 | 36 | 0.0 | 0 | 0.0 |
| Vermont | -- | -- | -- | -- | -- | -- | 327 | 0.3 |
| Virginia | 6,677 | 0.2 | 510 | 0.0 | 26 | 0.0 | 21,345 | 0.6 |
| Washington | 36,187 | 1.2 | 1,737 | 0.1 | 20,907 | 0.7 | 13,028 | 0.4 |
| West Virginia | -- | -- | -- | -- | -- | -- | -- | -- |
| Wisconsin [15] | -- | -- | -- | -- | -- | -- | -- | -- |
| Wyoming | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. Total | 1,548,664 | 1.6 | 129,186 | 0.1 | 67,899 | 0.1 | 2,264,124 | 3.0 |

OCA-APPX-1022

| State | Registration Application Source | | | | | |
| | Registration Drives | | Other Sources | | Not Categorized | |
| | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|
| Alabama [1] | 20,402 | 1.4 | 2,492 | 0.2 | 0 | 0.0 |
| Alaska | 0 | 0.0 | 734,473 | 68.1 | 0 | 0.0 |
| American Samoa | -- | -- | -- | -- | 0 | 0.0 |
| Arizona | 141,550 | 4.8 | 124,844 | 4.2 | 0 | 0.0 |
| Arkansas | 9,576 | 1.7 | 37,128 | 6.7 | 0 | 0.0 |
| California | 83,435 | 0.6 | 927,582 | 6.9 | 2,087,142 | 15.5 |
| Colorado | 86,182 | 2.7 | 88,033 | 2.8 | 0 | 0.0 |
| Connecticut | 17 | 0.0 | 330,610 | 26.5 | 0 | 0.0 |
| Delaware | 449 | 0.1 | -- | -- | 0 | 0.0 |
| District of Columbia | 615 | 0.5 | 19,852 | 16.1 | 0 | 0.0 |
| Florida | 689,415 | 7.2 | 23,199 | 0.2 | -73,470 | -0.8 |
| Georgia [2] | -- | -- | 240,886 | 4.9 | 0 | 0.0 |
| Guam | -- | -- | -- | -- | 0 | 0.0 |
| Hawaii | 9 | 0.0 | 54,611 | 15.2 | 38,848 | 10.8 |
| Idaho [3] | 30 | 0.0 | 11 | 0.0 | 4,544 | 2.0 |
| Illinois | 7,459 | 0.6 | -- | -- | -1,465,235 | -118.1 |
| Indiana [4] | 2,879 | 0.1 | 771,710 | 28.9 | 251 | 0.0 |
| Iowa | 7 | 0.0 | 595,551 | 80.7 | 0 | 0.0 |
| Kansas | 23,351 | 2.9 | 85,601 | 10.5 | -26,300 | -3.2 |
| Kentucky [5] | 8,337 | 0.5 | -- | -- | 0 | 0.0 |
| Louisiana [6] | -- | -- | -- | -- | 0 | 0.0 |
| Maine | 10,497 | 3.1 | 19,428 | 5.8 | 0 | 0.0 |
| Maryland | -- | -- | 76,110 | 2.2 | 0 | 0.0 |
| Massachusetts | -- | -- | -- | -- | 0 | 0.0 |
| Michigan [7] | 9,521 | 0.3 | 11,658 | 0.4 | 0 | 0.0 |
| Minnesota | 14,768 | 0.9 | 394,034 | 25.1 | 0 | 0.0 |
| Mississippi | -- | -- | 24,451 | 5.4 | 0 | 0.0 |
| Missouri | -- | -- | 3,612 | 0.5 | 0 | 0.0 |
| Montana [8] | 20,155 | 5.6 | 25,805 | 7.2 | 0 | 0.0 |
| Nebraska [9] | -- | -- | 3,988 | 0.5 | 0 | 0.0 |
| Nevada | 135,528 | 12.7 | 65,982 | 6.2 | 0 | 0.0 |
| New Hampshire [10] | -- | -- | -- | -- | 0 | 0.0 |
| New Jersey | -- | -- | 135,961 | 4.6 | 0 | 0.0 |
| New Mexico | 0 | 0.0 | 726 | 0.1 | 0 | 0.0 |
| New York [11] | 14,048 | 0.6 | -- | -- | 218,492 | 9.5 |
| North Carolina | 172,695 | 3.3 | 291,692 | 5.6 | -1,135 | 0.0 |
| North Dakota [12] | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | -- | -- | -- | -- | -36 | -2.8 |
| Ohio | 88,390 | 3.0 | -- | -- | 0 | 0.0 |

OCA-APPX-1023



| State | Registration Application Source | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Registration Drives | | Other Sources | | Not Categorized | |
| | Total | % | Total | % | Total | % |
| Oklahoma | -- | -- | 31,035 | 4.7 | 0 | 0.0 |
| Oregon | -- | -- | 383,314 | 19.6 | 0 | 0.0 |
| Pennsylvania | 78,724 | 2.1 | 307,495 | 8.1 | 0 | 0.0 |
| Puerto Rico | -- | -- | -- | -- | 0 | 0.0 |
| Rhode Island [13] | -- | -- | -- | -- | 425,389 | 100.0 |
| South Carolina | -- | -- | 7,393 | 0.3 | 0 | 0.0 |
| South Dakota | 4,290 | 2.6 | 629 | 0.4 | 0 | 0.0 |
| Tennessee [14] | -- | -- | 50,486 | 3.2 | 0 | 0.0 |
| Texas | 0 | 0.0 | -- | -- | 0 | 0.0 |
| U.S. Virgin Islands | -- | -- | 186 | 9.9 | 0 | 0.0 |
| Utah | 3,254 | 0.1 | 1,110,585 | 48.7 | 0 | 0.0 |
| Vermont | 8,605 | 8.7 | -- | -- | 0 | 0.0 |
| Virginia | 70,524 | 1.8 | 49,012 | 1.3 | 0 | 0.0 |
| Washington | 31,136 | 1.0 | 206,984 | 6.7 | 0 | 0.0 |
| West Virginia | -- | -- | 139,999 | 27.1 | 0 | 0.0 |
| Wisconsin [15] | 4,623 | 0.5 | 118,814 | 12.9 | 0 | 0.0 |
| Wyoming | -- | -- | 167 | 0.2 | 0 | 0.0 |
| U.S. Total | 1,740,471 | 2.2 | 7,496,129 | 8.9 | 1,208,490 | 1.2 |

Voter Registration Table 2 Calculation Notes:

**Total Registration Applications Received** uses question A3a.

**Mail, Email, Fax, Total** uses question A4a.

**Mail, Email, Fax, %** uses question A4a divided by question A3a.

**In Person at Election Office, Total** uses question A4b.

**In Person at Election Office, %** uses question A4b divided by question A3a.

**Online, Total** uses question A4c.

**Online, %** uses question A4c divided by question A3a.

**Motor Vehicle Department, Total** uses question A4d.

**Motor Vehicle Department, %** uses question A4d divided by question A3a.

**Public Assistance Offices, Total** uses question A4e.

**Public Assistance Offices, %** uses question A4e divided by question A3a.

**Disability Services Offices, Total** uses question A4f.

**Disability Services Offices, %** uses question A4f divided by question A3a.

**Armed Forces Recruitment Offices, Total** uses question A4g.

**Armed Forces Recruitment Offices, %** uses question A4g divided by question A3a.

**Other State Agencies, Total** uses question A4h.

**Other State Agencies, %** uses question A4h divided by question A3a.

**Registration Drives, Total** uses question A4i.

**Registration Drives, %** uses question A4i divided by question A3a.

**Other Sources, Total** uses questions A4j, A4k, and A4l.

**Other Sources, %** uses the sum of questions A4j, A4k, and A4l divided by question A3a.

OCA-APPX-1024

**Not Categorized, Total** uses question A3a minus the sum of questions A4a to A4l.
**Not Categorized, %** uses question A3a minus the sum of questions A4a to A4l, all divided by A3a.

Voter Registration Table 2 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- States have latitude in which registration application sources are offered to their citizens, so long as they do not conflict with federal law. Not all states offer each of the application sources that the EAVS collects data for.
- Questions A4j, A4k, and A4l were not mandatory. States and jurisdictions only reported data in these items if they offered another application source aside from those listed in questions A4a–A4i or if there were registration applications that could not be categorized in questions A4a–A4i.
- Negative numbers in the Not Categorized application source indicate that the sum of registrations received for each source account for more than the total number of registrations reported received by the state.
- Because each percentage was calculated independently, the percentage of applications received through each source may not sum to 100% for some states or at the national level.

[1] Alabama noted in a survey comment that the state's A3a data come from an Election Systems & Software (ES&S) election survey. In addition, unknown applications sources were not identified.

[2] Georgia noted in a survey comment that "Election Day registrations listed in A4j, A5j, A6j, and A7j represent applications submitted to poll workers on Election Day. Georgia law does not allow 'same day' registration. Changes made through applications turned in on Election Day are effective for future elections."

[3] Idaho noted in survey comments for multiple counties that the state switched to a new voter registration system between the 2018 and the 2020 elections, which made it difficult to track some data for these questions.

[4] Indiana noted in survey comments that "The data reported in A4a–l consists of data from county surveys (A4a–b, A4i) and SVRS [statewide voter registration system] (A4c–h, A4j, A4k, A4l). Counties do not always manually track the information requested in A4a–b and A4i and therefore aren't included in the sums that should match up to A3a."

[5] Kentucky noted in a survey comment that "[D]rives by advocacy groups or political parties' is used for high school registrations."

[6] Louisiana noted in a survey comment that "[V]oters submit registration applications for new registrations as well as for updates or changes to existing registrations. A4 totals reflect both new registrations and changes to registrations."

[7] Michigan noted in a survey comment that "2020 is the first EAVS since Michigan implemented automatic voter registration and online voter registration, and became a member state of ERC [sic, likely referring to the Electronic Registration Information Center]."

[8] Montana noted in a survey comment that in A4k, online preregistration indicated that a voter still needed to sign and submit a registration form to the county elections office.

[9] Nebraska noted in survey comments that "[O]nline registrations via DMV website are currently in the DMV section; unable to split. Registrations received from drives by advocacy groups or political parties A4i are not separately categorized and are included in A4a."

OCA-APPX-1025



[10] New Hampshire noted in survey comments that it is not subject to the NVRA and does not have online voter registration.

[11] New York noted in survey comments that "NYS DMV [New York State Department of Motor Vehicles] does allow voters to submit their registration data online, however it does not automatically register voters. After submittal to the DMV, the information is forwarded to the appropriate county board of elections to approve or deny the voter registration data. NYS BOE [New York State Board of Elections] used the term 'does not apply' instead of 'data not available' since online voter registration has been passed as law, but the statewide system was not available for the 2020 election year."

[12] North Dakota does not have voter registration and does not provide data in Section A of EAVS.

[13] Rhode Island reported "data not available" for all modes of registration. The state noted in a survey comment that "[D]ata for this section is unavailable. We rolled out a new voter registration system in December, 2019 so half of the voter registration records were processed in the old system and half in the new system."

[14] Tennessee noted in survey comments that, for most of its counties, "[D]ata for agencies serving persons with disabilities in [A4]f is included with data for public assistance offices in [A4]e."

[15] Wisconsin is exempt from the NVRA and does not classify inactive voters per NVRA definitions, receive registrations from NVRA agencies, or collect data on rejected registrations.

OCA-APPX-1026

## Voter Registration Table 3: Registration Applications Processed

| State | Total Applications | Registration Category | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | New Valid Registrations | | Change of Name, Party, or Address (within jurisdiction) | | Change of Address (cross-jurisdiction) | | Preregistrations (under 18 years of age) | |
| | | Total | % | Total | % | Total | % | Total | % |
| Alabama [1] | 1,439,361 | 611,844 | 42.5 | 1,231,402 | 85.6 | -- | -- | -- | -- |
| Alaska | 1,079,008 | 69,208 | 6.4 | 993,700 | 92.1 | -- | -- | -- | -- |
| American Samoa | 4,741 | 2,263 | 47.7 | 133 | 2.8 | 160 | 3.4 | 0 | 0.0 |
| Arizona | 2,943,553 | 1,114,852 | 37.9 | 1,649,653 | 56.0 | 8,988 | 0.3 | 1,987 | 0.1 |
| Arkansas | 556,911 | 237,172 | 42.6 | 304,333 | 54.6 | 2,547 | 0.5 | 0 | 0.0 |
| California | 13,498,938 | 5,130,351 | 38.0 | 2,796,476 | 20.7 | 375,969 | 2.8 | 101,619 | 0.8 |
| Colorado [2] | 3,195,131 | 1,486,922 | 46.5 | 1,398,963 | 43.8 | 217,464 | 6.8 | 56,126 | 1.8 |
| Connecticut [3] | 1,247,433 | 426,102 | 34.2 | 609,363 | 48.8 | 211,754 | 17.0 | 214 | 0.0 |
| Delaware | 707,749 | 251,286 | 35.5 | 248,329 | 35.1 | 137,846 | 19.5 | 19,045 | 2.7 |
| District of Columbia [4] | 123,147 | 78,557 | 63.8 | 22,754 | 18.5 | 0 | 0.0 | 0 | 0.0 |
| Florida | 9,511,345 | 1,757,847 | 18.5 | 6,382,594 | 67.1 | 1,036,119 | 10.9 | 154,986 | 1.6 |
| Georgia | 4,931,889 | 896,843 | 18.2 | 2,840,383 | 57.6 | 771,590 | 15.6 | 53,882 | 1.1 |
| Guam | 16,376 | 7,898 | 48.2 | 2,288 | 14.0 | 2,735 | 16.7 | 262 | 1.6 |
| Hawaii | 359,832 | 115,831 | 32.2 | 55,982 | 15.6 | 2,260 | 0.6 | 4,049 | 1.1 |
| Idaho [5] | 231,491 | 143,814 | 62.1 | 80,981 | 35.0 | 14 | 0.0 | 4 | 0.0 |
| Illinois | 1,240,995 | 903,388 | 72.8 | -- | -- | -- | -- | -- | -- |
| Indiana | 2,667,738 | 795,777 | 29.8 | 1,353,935 | 50.8 | -- | -- | 47,781 | 1.8 |
| Iowa [6] | 738,352 | 110,513 | 15.0 | -- | -- | -- | -- | 11,640 | 1.6 |
| Kansas | 817,434 | 282,686 | 34.6 | 769,790 | 94.2 | -- | -- | -- | -- |
| Kentucky | 1,678,038 | 265,594 | 15.8 | 828,745 | 49.4 | 177,953 | 10.6 | -- | -- |
| Louisiana [7] | 998,149 | 358,864 | 36.0 | 389,116 | 39.0 | -- | -- | 15,662 | 1.6 |
| Maine | 337,136 | 101,929 | 30.2 | 116,732 | 34.6 | 95,611 | 28.4 | 2,734 | 0.8 |
| Maryland [8] | 3,511,883 | 387,280 | 11.0 | 2,874,580 | 81.9 | 192,962 | 5.5 | -- | -- |
| Massachusetts | 2,476,295 | 438,236 | 17.7 | 1,076,032 | 43.5 | 511,823 | 20.7 | 49,525 | 2.0 |
| Michigan | 2,857,335 | 1,390,433 | 48.7 | 1,267,324 | 44.4 | -- | -- | 41,248 | 1.4 |
| Minnesota | 1,566,807 | 541,563 | 34.6 | 478,932 | 30.6 | 300,457 | 19.2 | 11,773 | 0.8 |
| Mississippi [9] | 453,531 | 443,582 | 97.8 | -- | -- | -- | -- | 8,949 | 2.0 |
| Missouri [10] | 690,757 | 690,757 | 100.0 | 1,939,231 | 280.7 | -- | -- | -- | -- |
| Montana | 359,986 | 60,304 | 16.8 | 150,667 | 41.9 | 136,272 | 37.9 | 1,536 | 0.4 |
| Nebraska [11] | 726,896 | 192,426 | 26.5 | 412,286 | 56.7 | 55,859 | 7.7 | -- | -- |
| Nevada | 1,069,550 | 279,912 | 26.2 | 728,944 | 68.2 | -- | -- | 10,152 | 0.9 |
| New Hampshire [12] | 810,583 | 125,916 | 15.5 | 575,516 | 71.0 | 103,537 | 12.8 | 32 | 0.0 |
| New Jersey | 2,959,834 | 878,539 | 29.7 | -- | -- | -- | -- | -- | -- |
| New Mexico [13] | 570,254 | 161,546 | 28.3 | 387,804 | 68.0 | 7,580 | 1.3 | 11,648 | 2.0 |

OCA-APPX-1027



| State | Total Applications | Registration Category | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | New Valid Registrations | | Change of Name, Party, or Address (within jurisdiction) | | Change of Address (cross-jurisdiction) | | Preregistrations (under 18 years of age) | |
| | | Total | % | Total | % | Total | % | Total | % |
| New York | 2,299,890 | 968,849 | 42.1 | 1,300,077 | 56.5 | 235,248 | 10.2 | 214,037 | 9.3 |
| North Carolina | 5,164,009 | 1,563,573 | 30.3 | 1,486,375 | 28.8 | -- | -- | 0 | 0.0 |
| North Dakota [14] | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | 1,291 | 1,210 | 93.7 | 47 | 3.6 | 17 | 1.3 | 50 | 3.9 |
| Ohio | 2,995,502 | 1,316,156 | 43.9 | 1,078,627 | 36.0 | -- | -- | 14,703 | 0.5 |
| Oklahoma | 666,094 | 314,835 | 47.3 | 329,996 | 49.5 | -- | -- | 3,774 | 0.6 |
| Oregon [15] | 1,955,345 | 354,524 | 18.1 | 1,561,949 | 79.9 | -- | -- | 37,726 | 1.9 |
| Pennsylvania | 3,814,150 | 925,690 | 24.3 | 1,587,384 | 41.6 | 580,754 | 15.2 | 0 | 0.0 |
| Puerto Rico | 121,352 | 121,144 | 99.8 | -- | -- | -- | -- | -- | -- |
| Rhode Island | 425,389 | 52,401 | 12.3 | 296,828 | 69.8 | 67,104 | 15.8 | 9,028 | 2.1 |
| South Carolina [16] | 2,119,337 | 190,219 | 9.0 | 1,929,118 | 91.0 | -- | -- | -- | -- |
| South Dakota | 163,450 | 64,295 | 39.3 | 73,069 | 44.7 | 24,733 | 15.1 | 1,068 | 0.7 |
| Tennessee | 1,595,329 | 728,882 | 45.7 | 487,345 | 30.5 | -- | -- | -- | -- |
| Texas | 5,147,221 | 2,820,912 | 54.8 | 2,257,372 | 43.9 | -- | -- | -- | -- |
| U.S. Virgin Islands [17] | 1,878 | 1,084 | 57.7 | 769 | 40.9 | 25 | 1.3 | -- | -- |
| Utah | 2,280,767 | 875,194 | 38.4 | 987,599 | 43.3 | 88,789 | 3.9 | 24,463 | 1.1 |
| Vermont | 98,866 | 91,710 | 92.8 | 0 | 0.0 | -- | -- | 0 | 0.0 |
| Virginia | 3,880,532 | 604,701 | 15.6 | 1,268,274 | 32.7 | 484,416 | 12.5 | 46,266 | 1.2 |
| Washington [18] | 3,068,727 | 807,358 | 26.3 | 1,489,191 | 48.5 | 325,384 | 10.6 | 9,242 | 0.3 |
| West Virginia [19] | 517,145 | 144,808 | 28.0 | 323,187 | 62.5 | 37,444 | 7.2 | -- | -- |
| Wisconsin [20] | 920,760 | 703,492 | 76.4 | 12,721 | 1.4 | 115,376 | 12.5 | 11 | 0.0 |
| Wyoming [21] | 86,021 | 45,933 | 53.4 | 39,921 | 46.4 | -- | -- | -- | -- |
| U.S. Total | 103,701,513 | 33,437,005 | 32.2 | 48,476,817 | 49.4 | 6,308,790 | 9.5 | 965,222 | 1.2 |

OCA-APPX-1028

| State | Registration Category | | | | | | | |
| | Duplicate | | Invalid or Rejected | | Other | | Not Categorized | |
| | Total | % | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|
| Alabama [1] | 16 | 0.0 | 7,499 | 0.5 | -- | -- | -411,400 | -28.6 |
| Alaska | 6,749 | 0.6 | 9,351 | 0.9 | -- | -- | 0 | 0.0 |
| American Samoa | 1,409 | 29.7 | 776 | 16.4 | -- | -- | 0 | 0.0 |
| Arizona | 112,693 | 3.8 | 53,770 | 1.8 | 1,610 | 0.1 | 0 | 0.0 |
| Arkansas | 12,764 | 2.3 | 95 | 0.0 | -- | -- | 0 | 0.0 |
| California | 1,205,489 | 8.9 | 659,648 | 4.9 | 3,195,931 | 23.7 | 33,455 | 0.2 |
| Colorado [2] | 20,952 | 0.7 | 14,704 | 0.5 | -- | -- | 0 | 0.0 |
| Connecticut [3] | -- | -- | -- | -- | -- | -- | 0 | 0.0 |
| Delaware | 28,664 | 4.1 | 22,579 | 3.2 | -- | -- | 0 | 0.0 |
| District of Columbia [4] | 19,579 | 15.9 | 2,257 | 1.8 | -- | -- | 0 | 0.0 |
| Florida | 14,071 | 0.1 | 196,141 | 2.1 | 4,378 | 0.0 | -34,791 | -0.4 |
| Georgia | 363,649 | 7.4 | 5,542 | 0.1 | -- | -- | 0 | 0.0 |
| Guam | 2,635 | 16.1 | 558 | 3.4 | -- | -- | 0 | 0.0 |
| Hawaii | -- | -- | 14,508 | 4.0 | 108,714 | 30.2 | 58,488 | 16.3 |
| Idaho [5] | 2,751 | 1.2 | 257 | 0.1 | 574 | 0.2 | 3,096 | 1.3 |
| Illinois | 178,728 | 14.4 | 56,399 | 4.5 | -- | -- | 102,480 | 8.3 |
| Indiana | 227,505 | 8.5 | 31,277 | 1.2 | 211,463 | 7.9 | 0 | 0.0 |
| Iowa [6] | 44,505 | 6.0 | 744 | 0.1 | 570,950 | 77.3 | 0 | 0.0 |
| Kansas | 30,203 | 3.7 | -- | -- | -- | -- | -265,245 | -32.4 |
| Kentucky | -- | -- | 405,746 | 24.2 | -- | -- | 0 | 0.0 |
| Louisiana [7] | 14,458 | 1.4 | 11,893 | 1.2 | 208,156 | 20.9 | 0 | 0.0 |
| Maine | 5,492 | 1.6 | 466 | 0.1 | 14,172 | 4.2 | 0 | 0.0 |
| Maryland [8] | 56,487 | 1.6 | 574 | 0.0 | -- | -- | 0 | 0.0 |
| Massachusetts | 380,759 | 15.4 | 19,920 | 0.8 | -- | -- | 0 | 0.0 |
| Michigan | 156,839 | 5.5 | 1,492 | 0.1 | -- | -- | -1 | 0.0 |
| Minnesota | 233,861 | 14.9 | 221 | 0.0 | -- | -- | 0 | 0.0 |
| Mississippi [9] | -- | -- | 1,000 | 0.2 | -- | -- | 0 | 0.0 |
| Missouri [10] | -- | -- | 25 | 0.0 | -- | -- | -1,939,256 | -280.7 |
| Montana | 10,873 | 3.0 | 334 | 0.1 | -- | -- | 0 | 0.0 |
| Nebraska [11] | 65,909 | 9.1 | 416 | 0.1 | -- | -- | 0 | 0.0 |
| Nevada | 22,676 | 2.1 | 27,866 | 2.6 | -- | -- | 0 | 0.0 |
| New Hampshire [12] | 5,582 | 0.7 | 0 | 0.0 | -- | -- | 0 | 0.0 |
| New Jersey | 293,851 | 9.9 | 28,687 | 1.0 | 1,758,757 | 59.4 | 0 | 0.0 |
| New Mexico [13] | -- | -- | 1,676 | 0.3 | -- | -- | 0 | 0.0 |
| New York | 406,776 | 17.7 | 87,046 | 3.8 | -- | -- | -912,143 | -39.7 |
| North Carolina | 1,953,012 | 37.8 | 161,049 | 3.1 | -- | -- | 0 | 0.0 |

OCA-APPX-1029



| State | Registration Category | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Duplicate | | Invalid or Rejected | | Other | | Not Categorized | |
| | Total | % | Total | % | Total | % | Total | % |
| North Dakota [14] | -- | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | -- | -- | 17 | 1.3 | -- | -- | -50 | -3.9 |
| Ohio | 424,893 | 14.2 | 161,123 | 5.4 | -- | -- | 0 | 0.0 |
| Oklahoma | 1,257 | 0.2 | 16,232 | 2.4 | -- | -- | 0 | 0.0 |
| Oregon [15] | 1,146 | 0.1 | -- | -- | -- | -- | 0 | 0.0 |
| Pennsylvania | 354,136 | 9.3 | 314,328 | 8.2 | 51,858 | 1.4 | 0 | 0.0 |
| Puerto Rico | 208 | 0.2 | -- | -- | -- | -- | 0 | 0.0 |
| Rhode Island | -- | -- | 28 | 0.0 | -- | -- | 0 | 0.0 |
| South Carolina [16] | -- | -- | -- | -- | -- | -- | 0 | 0.0 |
| South Dakota | 160 | 0.1 | 18 | 0.0 | 154 | 0.1 | -47 | 0.0 |
| Tennessee | 294,536 | 18.5 | 84,566 | 5.3 | -- | -- | 0 | 0.0 |
| Texas | -- | -- | 68,937 | 1.3 | -- | -- | 0 | 0.0 |
| U.S. Virgin Islands [17] | -- | -- | -- | -- | -- | -- | 0 | 0.0 |
| Utah | 962 | 0.0 | 303,760 | 13.3 | -- | -- | 0 | 0.0 |
| Vermont | 5,037 | 5.1 | 2,119 | 2.1 | -- | -- | 0 | 0.0 |
| Virginia | 1,413,248 | 36.4 | 63,627 | 1.6 | -- | -- | 0 | 0.0 |
| Washington [18] | 430,440 | 14.0 | 866 | 0.0 | 6,246 | 0.2 | 0 | 0.0 |
| West Virginia [19] | 11,420 | 2.2 | 286 | 0.1 | -- | -- | 0 | 0.0 |
| Wisconsin [20] | 10,709 | 1.2 | -- | -- | 78,451 | 8.5 | 0 | 0.0 |
| Wyoming [21] | -- | -- | 167 | 0.2 | -- | -- | 0 | 0.0 |
| U.S. Total | 8,827,089 | 9.7 | 2,840,590 | 2.9 | 6,211,414 | 14.7 | -3,365,414 | -3.2 |

Voter Registration Table 3 Calculation Notes:
> **Total Registration Applications Received** uses question A3a.
> **New Valid Registrations, Total** uses question A3b.
> **New Valid Registrations, %** uses question A3b divided by A3a.
> **Change of Name, Party, or Address (within jurisdiction), Total** uses question A3f.
> **Change of Name, Party, or Address (within jurisdiction), %** uses question A3f divided by question A3a.
> **Change of Address (cross-jurisdiction), Total** uses question A3g.
> **Change of Address (cross-jurisdiction), %** uses question A3g divided by question A3a.
> **Preregistrations (under 18 years of age), Total** uses question A3c.
> **Preregistrations (under 18 years of age), %** uses question A3c divided by question A3a.
> **Duplicate Registrations, Total** uses question A3d.
> **Duplicate Registrations, %** uses question A3d divided by question A3a.
> **Invalid or Rejected Registrations, Total** uses question A3e.
> **Invalid or Rejected Registrations, %** uses question A3e divided by question A3a.
> **Other Registrations, Total** uses the sum of questions A3h, A3i, and A3j.

OCA-APPX-1030

**Other Registrations, %** uses the sum of questions A3h, A3i, and A3j, all divided by question A3a.

**Not Categorized Registrations, Total** uses question A3a minus the sum of questions A3b to A3j.

**Not Categorized Registrations, %** uses question A3a minus the sum of questions A3b to A3j, all divided by question A3a.

Voter Registration Table 3 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Questions A3h, A3i, and A3j were not mandatory. States and jurisdictions only reported data in these items if there was another registration category aside from those listed in questions A3b–A3g or if there were registration applications that could not be categorized in questions A3b–A3g.
- Negative numbers in the Not Categorized registration category indicate that the sum of registrations received for each category account for more than the total number of registrations reported received by the state.
- Because each percentage was calculated independently, the percentage of applications in each category may not sum to 100% for some states or at the national level.
- Not all states track data to be able to provide responses for each registration category.

[1] Alabama noted in a survey comment that "Totals are from ES&S [Election Systems & Software] election survey. A3c: we do not have pre-registration. A3f: due to the way we track data for changes to records, the number of changes resulting directly from registration forms could not be separated from the total number of changes made to voter's records."

[2] Colorado noted in a survey comment that "[T]he increase in registrations is attributable to multiple factors. Colorado has seen a significant increase in population since 2016. The state conducted three elections in 2020, including the first presidential primary in 20 years. In addition, record turnout for the November 2020 general election contributed to the increased number of registrations. Another factor adding to the increase is the implementation of automatic voter registration in May 2020 in partnership with the Colorado Department of Revenue (CDOR). Automatic update to voter registration through CDOR was also implemented in 2019. This may also contribute to a somewhat inflated number as the addition of a ZIP+4 is counted as an update. Finally, with changes in personnel and as different perspectives are applied to data, queries tend to shift in an effort to obtain more accurate and inclusive data for reporting purposes."

[3] Connecticut noted in a survey comment that the data necessary to respond to question A3 "is not retained in the system."

[4] The District of Columbia noted in a survey comment that "A3b and A3c ([preregistrations] under 18, who turned 18) are total new registrations."

[5] Idaho noted in survey comments for multiple counties that the state switched to a new voter registration system between the 2018 and the 2020 elections, which made it difficult to track some data for these questions.

[6] Iowa noted in a survey comment that "[A]ll other sources category is due to limitation on system to report transaction source of update if it is not a change from previous listed source."

[7] Louisiana noted in a survey comment that "[A]ddress changes across jurisdictions are counted as new registrations. 16- and 17-year-old citizens can apply to register to vote, but cannot vote until they are 18."

[8] Maryland noted in a survey comment that "[T]he total of A3a is the sum of A3b, A3[c], A3d, and A3e. Maryland does not consider the registration changes listed in A3f and A3g as registrations, and therefore,

OCA-APPX-1031



the source of these changes is not recorded. For A3c, individuals can register to vote starting at age 16, however they are not considered 'pre-registered.' 16- and 17-year-olds are considered registered voters, they just cannot vote until their 18th birthday."

[9] Mississippi noted in survey comments that duplicate and rejected registrations are not tracked.

[10] Missouri noted in a survey comment that "[C]hanges of names and address report as separate transactions. In addition to that anytime the LEA [local election administrator] does an address library cleanup process or any change to the voting record it will record as an address change but may not be indicated by the voter. Therefore, we are not including the registration forms for change of name and address is [sic] the total for this section."

[11] Nebraska noted in a survey comment that "Nebraska law does not allow for pre-registrations for people not of voting age."

[12] New Hampshire noted in survey comments that "NH uses voter registration forms for name, party, and address changes."

[13] New Mexico noted that the data for these items are not consistently captured across counties at this time. The Secretary of State's office is exploring options to capture and include this information in future reports.

[14] North Dakota does not have voter registration and does not provide data in Section A of the EAVS.

[15] In Oregon, the number of cross-jurisdiction address changes is included in the number of overall changes to registrations. The state does not track the number of invalid/rejected registrations.

[16] South Carolina noted in survey comments that for the state's A3d and A3e responses, "SC has no process to collect data on duplicate registrations or rejected registrations."

[17] The U.S. Virgin Islands noted in survey comments that "A3c: the data was not tracked. A3d: before any individual is registered to vote, the individual['s] information is checked in the system to ensure the individual was not previously registered. A3e: a voter will not be registered to vote unless the individual provides the required information (birth paper, U.S. passport, etc.). Before the process begins, the prospective voter is informed what document and information is required to begin the process."

[18] Washington noted in survey comments that the data reported in this question covered the period "between 2018-10-08 and 2020-11-03."

[19] West Virginia noted in survey comments that "[D]uplicate registrations are based on DMV and online registrations."

[20] Wisconsin is exempt from the NVRA and does not classify inactive voters per NVRA definitions.

[21] Wyoming noted in survey comments that "[M]ultiple changes may have occurred on the same form. A3a includes a total, but the total could be less. For example, a voter could have submitted one form to change their party and address. The data currently reflects that change as 2 forms. A3g. Counties do not receive forms for out-of-county address changes. Those numbers are reflected in new jurisdictions as new registrations."

OCA-APPX-1032

## Voter Registration Table 4: Voter List Maintenance – Confirmation Notices

| State | Confirmation Notices Sent | | Result of Confirmation Notice | | | | | |
| | | | Received Confirmation From Voter | | | | Confirmation Returned as Undeliverable | |
| | | | Valid | | Invalid | | | |
| | Total | % Active Voters | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|
| Alabama [1] | -- | -- | 1,826 | -- | 25,755 | -- | 3 | -- |
| Alaska | 91,667 | 15.4 | 1,108 | 1.2 | -- | -- | 30,692 | 33.5 |
| American Samoa | 4,741 | 29.0 | 4,741 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Arizona | 2,480,620 | 58.0 | 75,275 | 3.0 | 422,319 | 17.0 | 328,161 | 13.2 |
| Arkansas | 432,798 | 30.7 | 89,906 | 20.8 | 33,312 | 7.7 | 45,003 | 10.4 |
| California [2] | 6,682,336 | 30.7 | 609,638 | 9.1 | 557,041 | 8.3 | 477,436 | 7.1 |
| Colorado | 705,625 | 18.6 | 13,885 | 2.0 | 14,104 | 2.0 | -- | -- |
| Connecticut | 178,993 | 7.7 | 55,787 | 31.2 | 92,022 | 51.4 | 25,292 | 14.1 |
| Delaware [3] | 89,271 | 12.6 | -- | -- | -- | -- | -- | -- |
| District of Columbia [4] | 571,363 | 110.3 | 26,306 | 4.6 | 15,582 | 2.7 | 72,114 | 12.6 |
| Florida | 1,295,491 | 8.9 | 121,655 | 9.4 | 142,275 | 11.0 | 219,736 | 17.0 |
| Georgia | 1,060,235 | 14.7 | 72,979 | 6.9 | 4,018 | 0.4 | 186,456 | 17.6 |
| Guam | 5,874 | 10.5 | -- | -- | -- | -- | 1,153 | 19.6 |
| Hawaii [5] | 101,013 | 13.3 | 14,576 | 14.4 | 4,271 | 4.2 | -- | -- |
| Idaho | 36,438 | 3.5 | 2,912 | 8.0 | -- | -- | 315 | 0.9 |
| Illinois | 5,106,813 | 56.1 | 333,135 | 6.5 | 181,526 | 3.6 | 457,373 | 9.0 |
| Indiana [6] | -- | -- | -- | -- | -- | -- | -- | -- |
| Iowa [7] | 123,320 | 5.9 | -- | -- | -- | -- | -- | -- |
| Kansas | 227,808 | 12.9 | 9,203 | 4.0 | 43,892 | 19.3 | 16,588 | 7.3 |
| Kentucky [8] | 366,101 | 11.0 | -- | -- | -- | -- | -- | -- |
| Louisiana [9] | 325,975 | 11.0 | -- | -- | -- | -- | -- | -- |
| Maine [10] | 2,147 | 0.2 | 0 | 0.0 | 733 | 34.1 | -- | -- |
| Maryland [11] | 238,027 | 5.7 | 3,587 | 1.5 | 436 | 0.2 | -- | -- |
| Massachusetts [12] | 608,691 | 13.8 | -- | -- | -- | -- | -- | -- |
| Michigan | 207,229 | 2.9 | 1,143 | 0.6 | 27,214 | 13.1 | 20,030 | 9.7 |
| Minnesota [13] | -- | -- | -- | -- | -- | -- | -- | -- |
| Mississippi | 82,826 | 4.2 | -- | -- | -- | -- | -- | -- |
| Missouri [14] | 381,716 | 9.6 | 149,017 | 39.0 | 39,299 | 10.3 | 78,034 | 20.4 |
| Montana | 107,111 | 15.8 | 8,491 | 7.9 | 2,344 | 2.2 | 26,537 | 24.8 |
| Nebraska | 160,117 | 13.7 | 27,030 | 16.9 | 24,931 | 15.6 | 21,046 | 13.1 |
| Nevada [15] | 361,871 | 19.7 | 158,854 | 43.9 | 26,222 | 7.2 | 153,156 | 42.3 |
| New Hampshire [16] | 15,180 | 1.4 | 112 | 0.7 | -- | -- | 4,834 | 31.8 |
| New Jersey [17] | 311,385 | 5.3 | -- | -- | -- | -- | -- | -- |
| New Mexico [18] | 136,426 | 10.9 | 0 | 0.0 | 3 | 0.0 | 9,348 | 6.9 |

OCA-APPX-1033



| State | Confirmation Notices Sent | | Result of Confirmation Notice | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Received Confirmation From Voter | | | | Confirmation Returned as Undeliverable | |
| | | | Valid | | Invalid | | | |
| | Total | % Active Voters | Total | % | Total | % | Total | % |
| New York | 159,462 | 1.3 | 23,345 | 14.6 | 31,315 | 19.6 | 19,065 | 12.0 |
| North Carolina | 873,911 | 13.2 | -- | -- | -- | -- | 263,271 | 30.1 |
| North Dakota [19] | -- | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | 4,907 | 26.5 | -- | -- | -- | -- | 50 | 1.0 |
| Ohio | 712,068 | 8.8 | 109,453 | 15.4 | 34,224 | 4.8 | 48,535 | 6.8 |
| Oklahoma | 181,034 | 9.0 | 18,688 | 10.3 | 2,954 | 1.6 | 27,775 | 15.3 |
| Oregon | 329,443 | 11.2 | -- | -- | -- | -- | -- | -- |
| Pennsylvania | 753,942 | 9.1 | 74,955 | 9.9 | 41,087 | 5.4 | 111,594 | 14.8 |
| Puerto Rico [20] | -- | -- | -- | -- | -- | -- | -- | -- |
| Rhode Island | 83,980 | 11.4 | -- | -- | -- | -- | -- | -- |
| South Carolina | 75,796 | 2.1 | 17,001 | 22.4 | 487 | 0.6 | 1,829 | 2.4 |
| South Dakota | 17,795 | 3.1 | 216 | 1.2 | 179 | 1.0 | 12,298 | 69.1 |
| Tennessee | 137,130 | 3.2 | 19,496 | 14.2 | 1,724 | 1.3 | 23,078 | 16.8 |
| Texas | 1,068,037 | 7.0 | 758,850 | 71.1 | 111,387 | 10.4 | -- | -- |
| U.S. Virgin Islands [21] | -- | -- | -- | -- | -- | -- | -- | -- |
| Utah | 20,225 | 1.2 | 42 | 0.2 | 2,306 | 11.4 | 17,877 | 88.4 |
| Vermont | 66,126 | 15.0 | 21,774 | 32.9 | 44,352 | 67.1 | 0 | 0.0 |
| Virginia [22] | 189,162 | 3.3 | 11,379 | 6.0 | -- | -- | 4,981 | 2.6 |
| Washington | 481,684 | 9.8 | 150,796 | 31.3 | 44,754 | 9.3 | 6,407 | 1.3 |
| West Virginia [23] | 10,291 | 1.0 | 68 | 0.7 | 227 | 2.2 | 434 | 4.2 |
| Wisconsin [24] | 345,893 | 9.0 | 21,241 | 6.1 | -- | -- | 93,419 | 27.0 |
| Wyoming [25] | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. Total | 28,010,094 | 14.3 | 3,008,470 | 12.1 | 1,972,295 | 8.1 | 2,803,920 | 11.9 |

OCA-APPX-1034

| State | Result of Confirmation Notice | | | | | |
| | Status Unknown | | Other | | Not Categorized | |
| | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|
| Alabama [1] | -- | -- | -- | -- | -- | -- |
| Alaska | 59,867 | 65.3 | -- | -- | 0 | 0.0 |
| American Samoa | 0 | 0.0 | -- | -- | 0 | 0.0 |
| Arizona | 1,650,963 | 66.6 | 3,902 | 0.2 | 0 | 0.0 |
| Arkansas | 264,968 | 61.2 | 3,276 | 0.8 | -3,667 | -0.8 |
| California [2] | 4,508,305 | 67.5 | 510,244 | 7.6 | 19,672 | 0.3 |
| Colorado | 677,636 | 96.0 | -- | -- | 0 | 0.0 |
| Connecticut | 5,911 | 3.3 | -- | -- | -19 | 0.0 |
| Delaware [3] | -- | -- | -- | -- | 89,271 | 100.0 |
| District of Columbia [4] | 457,361 | 80.0 | -- | -- | 0 | 0.0 |
| Florida | 590,070 | 45.5 | 7,030 | 0.5 | 214,725 | 16.6 |
| Georgia | 796,782 | 75.2 | -- | -- | 0 | 0.0 |
| Guam | 4,721 | 80.4 | -- | -- | 0 | 0.0 |
| Hawaii [5] | -- | -- | 42,370 | 41.9 | 39,796 | 39.4 |
| Idaho | 33,211 | 91.1 | -- | -- | 0 | 0.0 |
| Illinois | 4,134,779 | 81.0 | -- | -- | 0 | 0.0 |
| Indiana [6] | -- | -- | -- | -- | -- | -- |
| Iowa [7] | 65,857 | 53.4 | -- | -- | 57,463 | 46.6 |
| Kansas | 7,715 | 3.4 | -- | -- | 150,410 | 66.0 |
| Kentucky [8] | -- | -- | -- | -- | 366,101 | 100.0 |
| Louisiana [9] | -- | -- | -- | -- | 325,975 | 100.0 |
| Maine [10] | 1,414 | 65.9 | -- | -- | 0 | 0.0 |
| Maryland [11] | 234,004 | 98.3 | -- | -- | 0 | 0.0 |
| Massachusetts [12] | -- | -- | -- | -- | 608,691 | 100.0 |
| Michigan | 158,842 | 76.7 | -- | -- | 0 | 0.0 |
| Minnesota [13] | -- | -- | -- | -- | -- | -- |
| Mississippi | 82,826 | 100.0 | -- | -- | 0 | 0.0 |
| Missouri [14] | -- | -- | -- | -- | 115,366 | 30.2 |
| Montana | 69,633 | 65.0 | 106 | 0.1 | 0 | 0.0 |
| Nebraska | 87,110 | 54.4 | -- | -- | 0 | 0.0 |
| Nevada [15] | 23,639 | 6.5 | -- | -- | 0 | 0.0 |
| New Hampshire [16] | 10,234 | 67.4 | -- | -- | 0 | 0.0 |
| New Jersey [17] | 311,385 | 100.0 | -- | -- | 0 | 0.0 |
| New Mexico [18] | 127,075 | 93.1 | -- | -- | 0 | 0.0 |
| New York | 83,889 | 52.6 | -- | -- | 1,848 | 1.2 |

OCA-APPX-1035



| State | Result of Confirmation Notice | | | | | |
| | Status Unknown | | Other | | Not Categorized | |
| | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|
| North Carolina | 563,120 | 64.4 | 47,520 | 5.4 | 0 | 0.0 |
| North Dakota [19] | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | -- | -- | -- | -- | 4,857 | 99.0 |
| Ohio | 519,856 | 73.0 | -- | -- | 0 | 0.0 |
| Oklahoma | 131,617 | 72.7 | -- | -- | 0 | 0.0 |
| Oregon | -- | -- | 329,443 | 100.0 | 0 | 0.0 |
| Pennsylvania | 206,085 | 27.3 | 320,221 | 42.5 | 0 | 0.0 |
| Puerto Rico [20] | -- | -- | -- | -- | -- | -- |
| Rhode Island | -- | -- | -- | -- | 83,980 | 100.0 |
| South Carolina | 52,132 | 68.8 | 4,347 | 5.7 | 0 | 0.0 |
| South Dakota | 5,102 | 28.7 | -- | -- | 0 | 0.0 |
| Tennessee | 92,832 | 67.7 | -- | -- | 0 | 0.0 |
| Texas | 197,800 | 18.5 | -- | -- | 0 | 0.0 |
| U.S. Virgin Islands [21] | -- | -- | -- | -- | -- | -- |
| Utah | -- | -- | -- | -- | 0 | 0.0 |
| Vermont | 0 | 0.0 | -- | -- | 0 | 0.0 |
| Virginia [22] | 172,802 | 91.4 | -- | -- | 0 | 0.0 |
| Washington | 279,727 | 58.1 | -- | -- | 0 | 0.0 |
| West Virginia [23] | 9,408 | 91.4 | 154 | 1.5 | 0 | 0.0 |
| Wisconsin [24] | 231,233 | 66.9 | -- | -- | 0 | 0.0 |
| Wyoming [25] | -- | -- | -- | -- | -- | -- |
| U.S. Total | 16,909,911 | 65.8 | 1,268,613 | 9.7 | 2,074,469 | 7.4 |

Voter Registration Table 4 Calculation Notes:
**Confirmation Notices Sent, Total** uses question A8a.
**Confirmation Notices Sent as % of Active Voters** uses question A8a divided by question A1b.
**Confirmation Notices Received - Valid, Total** uses question A8b.
**Confirmation Notices Received - Valid, %** uses question A8b divided by question A8a.
**Confirmation Notices Received - Invalid, Total** uses question A8c.
**Confirmation Notices Received - Invalid, %** uses question A8c divided by question A8a.
**Confirmation Notice Returned Undeliverable, Total** uses question A8d.
**Confirmation Notice Returned Undeliverable, %** uses question A8d divided by question A8a.
**Status Unknown, Total** uses question A8e.
**Status Unknown, %** uses question A8e divided by question A8a.
**Other Confirmation Notices, Total** uses the sum of questions A8f, A8g, and A8h.
**Other Confirmation Notices, %** uses the sum of questions A8f, A8g, and A8h, all divided by question A8a.
**Not Categorized Confirmation Notices, Total** uses question A8a minus the sum of questions A8b to A8h.

OCA-APPX-1036

**Not Categorized Confirmation Notices, %** uses question A8a minus the sum of questions A8b to A8h, all divided by question A8a.

Voter Registration Table 4 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Questions A8f, A8g, and A8h were not mandatory. States and jurisdictions only reported data in these items if there was another confirmation notice status aside from those listed in questions A8b–A8e or if there were registration applications that could not be categorized in questions A8b–A8e.
- Negative numbers in the Not Categorized confirmation notices category indicate that the sum of confirmation notices for each category account for more than the total number of confirmation notices reported by the state.
- Because each percentage was calculated independently, the percentage of confirmation notices in each category may not sum to 100% for some states or at the national level.
- Not all states track data to be able to provide responses for each confirmation notice category.
- States that are exempt from the NVRA are not required to send confirmation notices pursuant to the NVRA, although they may send confirmation notices (or other similar notices) pursuant to state law or practice. States that do not use confirmation notices typically use other sources of data to identify potentially ineligible voters.

[1] Alabama noted in a survey comment that "[W]e do not have a report that has the total number of confirmation notices sent." Because Alabama does not report the total number of confirmation notices sent, the number of 'Not Categorized' confirmation notices cannot be calculated. For the same reason, their responses were not included when calculating the total 'Not Categorized' confirmation notices at the national level.

[2] California has increased list maintenance training statewide to all county elections officials, including training regarding when to send confirmation notices per the NVRA and updated California state law.

[3] Delaware noted in a survey comment that "In 2019, the state of DE changed voter registration vendors-from an in-house mainframe system to a cloud based provider. The data request is unavailable due to the differences in the 2 systems. The information requested was not tracked and/or converted to the new system."

[4] The District of Columbia notes that the data reported in EAVS under A8a (Confirmation Notices Sent) do not comprise list maintenance activities. This has caused confusion when receiving a Freedom of Information Act (FOIA) request for D2 notices, and this number does not match the figure in A8a.

[5] Hawaii noted in survey comments that three of its four counties that submit EAVS data do not "have counts of confirmed, invalidated, undeliverable, or unknown."

[6] Indiana noted in a survey comment that "Indiana's understanding is this aligns with voter list maintenance activities. Indiana does not send the removal notices referenced by the EAC survey, Indiana provided the number of voter records cancelled due to being in inactive status for more than 2 federal general elections for question A9e."

[7] Iowa noted in a survey comment that the state's "system does not track follow up status information."

[8] Kentucky noted in a survey comment that "[O]ur system tracks all undeliverable mail to qualify for the 8(d)2 notifications. Two separate batches have been sent during this time period. We have not yet finished scanning and categorizing the returns. Therefore, the only data available is the number sent."

OCA-APPX-1037



**[9]** Louisiana noted in a survey comment that "[C]onfirmation notices are sent pursuant to 52 USC §20507(d)(2). The Department of State only collects the total number of sent confirmation notices."

**[10]** Maine noted in a survey comment that "A8d: see A8e, voters made inactive if CACC [Change of Address Confirmation Card] undeliverable."

**[11]** Maryland noted in a survey comment that "A8d data is included in A8e."

**[12]** Massachusetts noted in a survey comment that the state "cannot provide data on result of [confirmation] notices."

**[13]** Minnesota is NVRA exempt and responded "Does not apply" to all items regarding confirmation notices (A8).

**[14]** Missouri noted in a survey comment that "A8a does not total [because] we do not track all information requested."

**[15]** Nevada reported in survey comments that two of its counties did not track confirmation notices.

**[16]** New Hampshire noted in a survey comment that "NH does not send confirmation notices, but does send 30-day letters."

**[17]** New Jersey does not track confirmation notices returned by the voter or returned undeliverable.

**[18]** New Mexico noted that the data for these items are not consistently captured across counties at this time. The Secretary of State's office is exploring options to capture and include this information on future reports.

**[19]** North Dakota does not have voter registration and does not provide data in Section A of the EAVS.

**[20]** Puerto Rico is NVRA exempt and responded "Does not apply" to all items regarding confirmation notices (A8).

**[21]** The U.S. Virgin Islands are NVRA exempt and responded "Data not available" to all items regarding confirmation notices (A8).

**[22]** Virginia does not currently track returned confirmation notices.

**[23]** West Virginia reported in a survey comment that "[S]ome counties tracked undeliverables as 'no response,' so they are included in status unknown totals."

**[24]** Wisconsin is exempt from NVRA; however, the state sent notices to voters who have not voted in a four-year period, as well as Electronic Registration Information Center (ERIC) mover mailings. Notices are sent to voters who register to vote or whose voter information may be out of date.

**[25]** Wyoming is NVRA exempt and responded "Does not apply" to all items regarding confirmation notices (A8).

OCA-APPX-1038

## Voter Registration Table 5: Voter List Maintenance – Removal Actions

| State | Voters Removed Total | % of Reg. Voters | Moved Out of Jurisdiction Total | % | Death Total | % | Failure to Return Confirmation Notice Total | % | Voter's Request Total | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 136,557 | 3.7 | 9,069 | 6.6 | 94,396 | 69.1 | 266 | 0.2 | 230 | 0.2 |
| Alaska | 53,132 | 8.2 | 3,691 | 6.9 | 8,485 | 16.0 | 30,358 | 57.1 | 8,729 | 16.4 |
| American Samoa | 2,124 | 13.0 | 0 | 0.0 | 336 | 15.8 | 1,788 | 84.2 | 0 | 0.0 |
| Arizona | 350,841 | 7.4 | 82,095 | 23.4 | 71,706 | 20.4 | 121,011 | 34.5 | 28,516 | 8.1 |
| Arkansas | 175,336 | 9.6 | 12,448 | 7.1 | 37,185 | 21.2 | 116,787 | 66.6 | 560 | 0.3 |
| California [1] | 1,635,987 | 6.3 | 496,397 | 30.3 | 355,332 | 21.7 | 351,301 | 21.5 | 60,293 | 3.7 |
| Colorado | 416,819 | 9.9 | 104,155 | 25.0 | 62,005 | 14.9 | 210,941 | 50.6 | 32,908 | 7.9 |
| Connecticut | 53,652 | 2.1 | 19,812 | 36.9 | 18,986 | 35.4 | 3,443 | 6.4 | 10,438 | 19.5 |
| Delaware | 39,772 | 5.4 | 8,254 | 20.8 | 6,210 | 15.6 | 24,900 | 62.6 | 108 | 0.3 |
| District of Columbia | 67,400 | 10.8 | 25,864 | 38.4 | 7,979 | 11.8 | 33,124 | 49.1 | -- | -- |
| Florida | 1,009,246 | 6.6 | 210,587 | 20.9 | 334,033 | 33.1 | 320,706 | 31.8 | 124,558 | 12.3 |
| Georgia [2] | 505,728 | 6.6 | 6,700 | 1.3 | 137,645 | 27.2 | 257,010 | 50.8 | 3,100 | 0.6 |
| Guam | 9,722 | 17.4 | 44 | 0.5 | 717 | 7.4 | 8,961 | 92.2 | -- | -- |
| Hawaii | 47,670 | 5.7 | 4,309 | 9.0 | 15,152 | 31.8 | 23,620 | 49.5 | 4,516 | 9.5 |
| Idaho | 24,639 | 2.4 | 739 | 3.0 | 431 | 1.7 | 9,082 | 36.9 | 0 | 0.0 |
| Illinois | 643,336 | 6.6 | 305,984 | 47.6 | 161,055 | 25.0 | 171,920 | 26.7 | -- | -- |
| Indiana [3] | 1,023,732 | 21.8 | 8,716 | 0.9 | 4 | 0.0 | 94,837 | 9.3 | -- | -- |
| Iowa | 126,968 | 5.7 | 22,424 | 17.7 | 52,262 | 41.2 | 48,771 | 38.4 | 817 | 0.6 |
| Kansas | 134,771 | 7.0 | 18,601 | 13.8 | 40,484 | 30.0 | 65,020 | 48.2 | 588 | 0.4 |
| Kentucky | 100,181 | 2.8 | 7,534 | 7.5 | 77,442 | 77.3 | 0 | 0.0 | 874 | 0.9 |
| Louisiana [4] | 296,761 | 9.6 | 125,794 | 42.4 | 72,493 | 24.4 | 44,947 | 15.1 | 12,479 | 4.2 |
| Maine | 153,846 | 13.5 | 122,310 | 79.5 | 23,713 | 15.4 | 1,942 | 1.3 | 709 | 0.5 |
| Maryland | 260,666 | 6.1 | 58,583 | 22.5 | 73,564 | 28.2 | 122,649 | 47.1 | 863 | 0.3 |
| Massachusetts | 804,445 | 16.7 | 523,079 | 65.0 | 89,088 | 11.1 | 131,641 | 16.4 | 9,136 | 1.1 |
| Michigan [5] | 239,780 | 3.0 | 46,047 | 19.2 | 187,608 | 78.2 | 0 | 0.0 | 6,125 | 2.6 |
| Minnesota [6] | 206,475 | 5.5 | 72,296 | 35.0 | 61,389 | 29.7 | 72,090 | 34.9 | -- | -- |
| Mississippi | 89,640 | 4.2 | 17,485 | 19.5 | 50,463 | 56.3 | 18,500 | 20.6 | 1,109 | 1.2 |
| Missouri | 411,661 | 9.5 | 119,044 | 28.9 | 119,144 | 28.9 | 150,562 | 36.6 | 2,369 | 0.6 |
| Montana [7] | 73,718 | 9.9 | 8,231 | 11.2 | 14,758 | 20.0 | 38,110 | 51.7 | 3,000 | 4.1 |
| Nebraska | 94,352 | 7.4 | 18,252 | 19.3 | 27,308 | 28.9 | 20,697 | 21.9 | 23,706 | 25.1 |
| Nevada | 157,592 | 7.7 | 41,145 | 26.1 | 27,699 | 17.6 | 65,045 | 41.3 | 22,303 | 14.2 |
| New Hampshire | 140,979 | 13.0 | 129,428 | 91.8 | 6,255 | 4.4 | -- | -- | -- | -- |
| New Jersey | 264,136 | 4.2 | 58,588 | 22.2 | 114,301 | 43.3 | 84,871 | 32.1 | 474 | 0.2 |
| New Mexico | 79,636 | 5.9 | 4,268 | 5.4 | 27,582 | 34.6 | 31,919 | 40.1 | 10,897 | 13.7 |
| New York | 580,170 | 4.3 | 248,905 | 42.9 | 158,216 | 27.3 | 100,411 | 17.3 | 10,439 | 1.8 |

OCA-APPX-1039



| State | Voters Removed | | Reason for Removal | | | | | | |
| | Total | % | Moved Out of Jurisdiction | | Death | | Failure to Return Confirmation Notice | | | |
| | | | Total | % | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 1,283,363 | 17.4 | 506,445 | 39.5 | 130,915 | 10.2 | 589,764 | 46.0 | 3,692 | 0.3 |
| North Dakota [8] | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | 5,049 | 27.3 | -- | -- | 108 | 2.1 | 4,907 | 97.2 | -- | -- |
| Ohio | 984,190 | 12.2 | 267,042 | 27.1 | 170,651 | 17.3 | 441,576 | 44.9 | 94,541 | 9.6 |
| Oklahoma | 234,034 | 10.4 | 91,344 | 39.0 | 43,757 | 18.7 | 88,285 | 37.7 | 959 | 0.4 |
| Oregon [9] | 106,692 | 3.6 | 20,197 | 18.9 | 58,802 | 55.1 | 9,766 | 9.2 | 17,457 | 16.4 |
| Pennsylvania [10] | 883,947 | 9.8 | 416,884 | 47.2 | 196,386 | 22.2 | 263,009 | 29.8 | 6,376 | 0.7 |
| Puerto Rico | 761,087 | 32.3 | 266 | 0.0 | 136,822 | 18.0 | 623,275 | 81.9 | 0 | 0.0 |
| Rhode Island | 49,304 | 6.1 | 9,927 | 20.1 | 12,366 | 25.1 | 21,369 | 43.3 | 1,434 | 2.9 |
| South Carolina [11] | 140,077 | 3.6 | 33,796 | 24.1 | 81,939 | 58.5 | 14,749 | 10.5 | 570 | 0.4 |
| South Dakota | 24,151 | 3.8 | 1,105 | 4.6 | 9,994 | 41.4 | 10,854 | 44.9 | 567 | 2.3 |
| Tennessee | 508,768 | 11.5 | 194,624 | 38.3 | 83,756 | 16.5 | 218,348 | 42.9 | 3,499 | 0.7 |
| Texas | 1,751,446 | 10.3 | 144,214 | 8.2 | 272,826 | 15.6 | 505,668 | 28.9 | 11,010 | 0.6 |
| U.S. Virgin Islands [12] | 1,931 | 3.6 | 275 | 14.2 | 1,614 | 83.6 | -- | -- | 42 | 2.2 |
| Utah | 67,468 | 3.6 | 12,488 | 18.5 | 20,810 | 30.8 | 33,956 | 50.3 | 185 | 0.3 |
| Vermont | 44,352 | 9.1 | 0 | 0.0 | 9,605 | 21.7 | 18,876 | 42.6 | 5,286 | 11.9 |
| Virginia | 879,921 | 14.7 | 569,837 | 64.8 | 93,716 | 10.7 | 188,774 | 21.5 | 13,886 | 1.6 |
| Washington | 305,845 | 5.8 | 84,754 | 27.7 | 61,104 | 20.0 | 4,192 | 1.4 | 41,969 | 13.7 |
| West Virginia | 94,032 | 7.4 | 9,767 | 10.4 | 27,536 | 29.3 | 53,729 | 57.1 | 333 | 0.4 |
| Wisconsin [13] | 198,061 | 5.2 | 37,490 | 18.9 | 68,968 | 34.8 | 75,624 | 38.2 | 676 | 0.3 |
| Wyoming | 45,866 | 15.1 | 1,176 | 2.6 | 3,495 | 7.6 | 40,973 | 89.3 | 26 | 0.1 |
| U.S. Total | 18,781,054 | 8.2 | 5,342,509 | 28.5 | 4,020,596 | 21.4 | 5,984,924 | 32.1 | 582,352 | 3.5 |

OCA-APPX-1040

| State | Reason for Removal | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Felony or Conviction | | Mental Incompetence | | Other | | Not Categorized | |
| | Total | % | Total | % | Total | % | Total | % |
| Alabama | 5,573 | 4.1 | 127 | 0.1 | 26,896 | 19.7 | 0 | 0.0 |
| Alaska | 1,869 | 3.5 | 0 | 0.0 | -- | -- | 0 | 0.0 |
| American Samoa | 0 | 0.0 | 0 | 0.0 | -- | -- | 0 | 0.0 |
| Arizona | 13,476 | 3.8 | 418 | 0.1 | 33,619 | 9.6 | 0 | 0.0 |
| Arkansas | 4,317 | 2.5 | 57 | 0.0 | 4,419 | 2.5 | -437 | -0.2 |
| California [1] | 19,069 | 1.2 | 672 | 0.0 | 352,014 | 21.5 | 909 | 0.1 |
| Colorado | 5,183 | 1.2 | -- | -- | 1,627 | 0.4 | 0 | 0.0 |
| Connecticut | 973 | 1.8 | -- | -- | -- | -- | 0 | 0.0 |
| Delaware | 300 | 0.8 | -- | -- | -- | -- | 0 | 0.0 |
| District of Columbia | 433 | 0.6 | -- | -- | -- | -- | 0 | 0.0 |
| Florida | 15,903 | 1.6 | 1,993 | 0.2 | 2,756 | 0.3 | -1,290 | -0.1 |
| Georgia [2] | 54,730 | 10.8 | 312 | 0.1 | 46,231 | 9.1 | 0 | 0.0 |
| Guam | -- | -- | -- | -- | -- | -- | 0 | 0.0 |
| Hawaii | 73 | 0.2 | 0 | 0.0 | -- | -- | 0 | 0.0 |
| Idaho | 21 | 0.1 | 0 | 0.0 | 6,016 | 24.4 | 8,350 | 33.9 |
| Illinois | 4,377 | 0.7 | -- | -- | -- | -- | 0 | 0.0 |
| Indiana [3] | 1 | 0.0 | -- | -- | 5,318 | 0.5 | 914,856 | 89.4 |
| Iowa | 2,645 | 2.1 | 49 | 0.0 | -- | -- | 0 | 0.0 |
| Kansas | 3,377 | 2.5 | 20 | 0.0 | 7,351 | 5.5 | -670 | -0.5 |
| Kentucky | 13,358 | 13.3 | 973 | 1.0 | -- | -- | 0 | 0.0 |
| Louisiana [4] | 14,817 | 5.0 | 115 | 0.0 | 26,116 | 8.8 | 0 | 0.0 |
| Maine | -- | -- | -- | -- | 5,172 | 3.4 | 0 | 0.0 |
| Maryland | 3,910 | 1.5 | 44 | 0.0 | 1,053 | 0.4 | 0 | 0.0 |
| Massachusetts | 747 | 0.1 | -- | -- | 50,754 | 6.3 | 0 | 0.0 |
| Michigan [5] | -- | -- | -- | -- | -- | -- | 0 | 0.0 |
| Minnesota [6] | -- | -- | -- | -- | 700 | 0.3 | 0 | 0.0 |
| Mississippi | 1,240 | 1.4 | 33 | 0.0 | 810 | 0.9 | 0 | 0.0 |
| Missouri | 12,371 | 3.0 | 1,566 | 0.4 | 6,605 | 1.6 | 0 | 0.0 |
| Montana [7] | 69 | 0.1 | 4 | 0.0 | 9,546 | 12.9 | 0 | 0.0 |
| Nebraska | 3,395 | 3.6 | 0 | 0.0 | 994 | 1.1 | 0 | 0.0 |
| Nevada | 1,337 | 0.8 | 63 | 0.0 | -- | -- | 0 | 0.0 |
| New Hampshire | 26 | 0.0 | -- | -- | 5,270 | 3.7 | 0 | 0.0 |
| New Jersey | 5,902 | 2.2 | -- | -- | -- | -- | 0 | 0.0 |
| New Mexico | 4,970 | 6.2 | -- | -- | -- | -- | 0 | 0.0 |
| New York | 4,439 | 0.8 | 98 | 0.0 | -- | -- | 57,662 | 9.9 |
| North Carolina | 16,788 | 1.3 | 0 | 0.0 | 35,759 | 2.8 | 0 | 0.0 |

OCA-APPX-1041



| State | Reason for Removal | | | | | | | |
| | Felony or Conviction | | Mental Incompetence | | Other | | Not Categorized | |
| | Total | % | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|
| North Dakota [8] | -- | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | 34 | 0.7 | -- | -- | -- | -- | 0 | 0.0 |
| Ohio | 10,361 | 1.1 | 19 | 0.0 | -- | -- | 0 | 0.0 |
| Oklahoma | 3,335 | 1.4 | 150 | 0.1 | 6,204 | 2.7 | 0 | 0.0 |
| Oregon [9] | -- | -- | -- | -- | 470 | 0.4 | 0 | 0.0 |
| Pennsylvania [10] | 6 | 0.0 | 194 | 0.0 | 1,092 | 0.1 | 0 | 0.0 |
| Puerto Rico | -- | -- | 697 | 0.1 | 27 | 0.0 | 0 | 0.0 |
| Rhode Island | 810 | 1.6 | 2 | 0.0 | 3,396 | 6.9 | 0 | 0.0 |
| South Carolina [11] | 7,078 | 5.1 | -- | -- | 1,945 | 1.4 | 0 | 0.0 |
| South Dakota | 1,613 | 6.7 | 2 | 0.0 | 16 | 0.1 | 0 | 0.0 |
| Tennessee | 7,354 | 1.4 | -- | -- | 1,187 | 0.2 | 0 | 0.0 |
| Texas | 4,697 | 0.3 | 730 | 0.0 | 812,301 | 46.4 | 0 | 0.0 |
| U.S. Virgin Islands [12] | -- | -- | 0 | 0.0 | -- | -- | 0 | 0.0 |
| Utah | 29 | 0.0 | -- | -- | -- | -- | 0 | 0.0 |
| Vermont | -- | -- | -- | -- | 10,585 | 23.9 | 0 | 0.0 |
| Virginia | 10,480 | 1.2 | 1,020 | 0.1 | 2,208 | 0.3 | 0 | 0.0 |
| Washington | 2,767 | 0.9 | 170 | 0.1 | 110,889 | 36.3 | 0 | 0.0 |
| West Virginia | 1,285 | 1.4 | 2 | 0.0 | 1,380 | 1.5 | 0 | 0.0 |
| Wisconsin [13] | 3,855 | 1.9 | 112 | 0.1 | 11,336 | 5.7 | 0 | 0.0 |
| Wyoming | 46 | 0.1 | 1 | 0.0 | 149 | 0.3 | 0 | 0.0 |
| U.S. Total | 269,439 | 1.6 | 9,643 | 0.1 | 1,592,211 | 10.4 | 979,380 | 5.2 |

Voter Registration Table 5 Calculation Notes:

**Voters Removed, Total** uses question A9a.

**Voters Removed, % Registered Voters** uses question A9a divided by question A1a.

**Moved Out of Jurisdiction, Total** uses question A9b.

**Moved Out of Jurisdiction, %** uses question A9b divided by question A9a.

**Death, Total** uses question A9c.

**Death, %** uses question A9c divided by question A9a.

**Failure to Return Confirmation Notice, Total** uses question A9e.

**Failure to Return Confirmation Notice, %** uses question A9e divided by question A9a.

**Voter's Request, Total** uses question A9g.

**Voter's Request, %** uses question A9g divided by question A9a.

**Felony or Conviction, Total** uses question A9d.

**Felony or Conviction, %** uses question A9d divided by question A9a.

**Mental Incompetence, Total** uses question A9f.

**Mental Incompetence, %** uses question A9f divided by question A9a.

**Other, Total** uses the sum of questions A9h, A9i, and A9j.

OCA-APPX-1042

**Other, %** uses the sum of questions A9h, A9i, and A9j, all divided by question A9a.
**Not Categorized, Total** uses question A9a minus the sum of questions A9b to A9j.
**Not Categorized, %** uses question A9a minus the sum of questions A9b to A9j, all divided by question A9a.

Voter Registration Table 5 Data Notes:
**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Questions A9h, A9i, and A9g were not mandatory. States and jurisdictions only reported data in these items if there was another reason for registration removals aside from those listed in questions A9b–A9g or if there were registration removals that could not be categorized in questions A9b–A9e.
- Negative numbers in the Not Categorized registration removals category indicate that the sum of registration removals for each category account for more than the total number of registration removals reported received by the state.
- Because each percentage was calculated independently, the percentage of confirmation notices in each category may not sum to 100% for some states or at the national level.
- Not all states track data to be able to provide responses for each registration removal category. In addition, not all states may remove registrations for the listed reason.

[1] California has increased list maintenance training statewide to all county elections officials, including training regarding removal actions per the NVRA and updated California state law.

[2] Georgia noted in a survey comment that "A9b represents voters who moved out of the state."

[3] Indiana noted in a survey comment that "[T]he data reported in A9b–j consists of data from the ad hoc report (A9b–d, A9g–j) and SVRS [statewide voter registration system] (A9e). Indiana provided the number of voter records cancelled due to being in inactive status for more than 2 federal general elections for question A9e. These statistics represent the majority of cancellations for this reason, based on the county user selecting the option to run this process in batch. However, county users have the option to also cancel voters one-by-one for this reason, but those statistics are not included in the counts for question A9e."

[4] Louisiana noted in a survey comment that "[I]rregularities include voters that were cancelled by the registrar of voters because the registrant provided insufficient or incorrect data, or user processing error. Challenge 21 includes voters who were registered in another state or not a United States citizen, or were otherwise not qualified to be registered for reasons other than change of residence."

[5] Michigan noted in a survey comment that "A9d: in MI, registered voters cannot cast a ballot while they are incarcerated serving sentence; however, their registration is never cancelled. Felony convictions alone do not disqualify voters from casting a ballot."

[6] Minnesota noted in a survey comment that "A9d and A9f: voter is not removed but status changes to 'challenged.' A9e: did not vote or update registration in prior four years. A9g: voter request not tracked separately, is included in A9h."

[7] Montana noted in a survey comment that "A9d: felony cancellations as reported in voter registration database."

[8] North Dakota does not have voter registration and does not provide data in Section A of the EAVS.

[9] Oregon reported in a survey comment that "[I]ncarcerated voters are inactivated not removed."

[10] Pennsylvania reported in a survey comment that "PA won't be reporting declared mentally incompetent in future surveys. The cancellation option is no longer available to county officials."

OCA-APPX-1043



[11] South Carolina reported in a survey comment that "A9f: it is rare for voters to be removed for this reason and would be included under 'other' (A9h)."

[12] The U.S. Virgin Islands reported in a survey comment that the territory "no longer purges voters who did not vote in the past two general election. A voter can only be removed off the voting roll due to their death, request to be removed or move out of territory, or convicted of a felony. The voter will be reinstated once they serve their sentence. ESVI [Election System of the Virgin Islands] is planning to do more outreach to voters including notifying voters of voting centers, their respective voting centers, voter registration status to name a few."

[13] Wisconsin is exempt from the NVRA and does not classify inactive voters per NVRA definitions. Only active voters are registered and eligible to vote in Wisconsin. Wisconsin's registered voters count for this report includes military voters, even though they are not required to "register" in Wisconsin. Wisconsin requires voters to re-register each time their address changes. For the purposes of this report, voters are only counted as being "removed" from the voter rolls if they did not re-register at a new address. Even voters who move within the same jurisdiction must re-register in Wisconsin; therefore, Wisconsin does not track these voters separately.

OCA-APPX-1044

# Chapter 4. Military and Overseas Voting in 2020: UOCAVA

## Key Findings

The Election Administration and Voting Survey (EAVS) Section B collected data from states and municipalities on individuals covered by the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) during the 2020 federal general election. Election officials were asked a variety of questions relating to UOCAVA voting practices, including the total number of registered UOCAVA voters, the use of the Federal Post Card Application (FPCA), the quantity and method of ballots transmitted to and returned by UOCAVA voters, and the use of the Federal Write-In Absentee Ballot (FWAB).[1] Among the results of this section, notable findings include:

- Just over 40% of registered UOCAVA voters held legal voting residence in three states: California, Florida, and Washington.
- Continuing a trend that began with the 2016 EAVS, overseas citizens made up a larger percentage of registered UOCAVA voters than did members of the uniformed services.
- More than 1.2 million ballots were transmitted to UOCAVA voters by election offices. More than 900,000 of these ballots were returned by UOCAVA voters and were submitted for counting.
- UOCAVA voters increasingly used electronic methods to receive and return their absentee ballots, but rates differed by UOCAVA voter type, with more overseas citizens using electronic options than uniformed services members, who continue to rely primarily on postal mail.
- The most common reason for UOCAVA ballot rejection was that the ballot was received after a state's UOCAVA absentee ballot receipt deadline.
- FWAB usage continued to increase in 2020, with more UOCAVA voters using this backup ballot to cast their vote than in previous election cycles.

## Introduction

The U.S. Election Assistance Commission (EAC) is required by the Help America Vote Act of 2002 (HAVA) to collect data from states[2] and to report on absentee voting by uniformed services members and overseas citizens.[3] Since 2014, the EAC has fulfilled this reporting mandate in partnership with the Federal Voting Assistance Program (FVAP), the agency designated to administer UOCAVA on

---

[1] The response rate among local jurisdictions for EAVS Section B was 99.9%; five counties in Arkansas did not provide Section B data. In addition, the response rate for individual items varied. Results reported in this chapter include only states for which data are available for a given question. State and national totals include all available jurisdiction-level data. National-level percentages reported in this chapter used casewise deletion.

[2] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Election Administration Policy Survey and EAVS data.

[3] The Help America Vote Act of 2002 (HAVA), 52 U.S.C. § 20901. The EAC works with FVAP to collect comprehensive data from the states on all of the ballots sent and received by voters covered under UOCAVA (52 U.S.C. § 20301(b)(11)).

OCA-APPX-1045

behalf of the U.S. Department of Defense (DOD). Through a memorandum of understanding between the EAC and FVAP, Section B of the EAVS is administered on behalf of both agencies. This agreement allows both the EAC and FVAP to fulfill congressionally mandated requirements to study UOCAVA voting while reducing the data collection and reporting burden on state and local election officials. States are required to report certain election data to the EAC after each federal election.[4]

This chapter examines UOCAVA data from the 2020 EAVS, including use of the FPCA by UOCAVA voters, ballots transmitted to UOCAVA voters by states, ballots returned by UOCAVA voters, UOCAVA ballots counted, UOCAVA ballots rejected, and usage of the FWAB by UOCAVA voters. Where appropriate, information about state laws and procedures related to UOCAVA voting, collected as part of the EAC's 2020 Election Administration Policy Survey (Policy Survey), is presented to provide context for the EAVS results.

# Federal Laws Regulating Military and Overseas Voting

## The Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA)

UOCAVA protects the voting rights of members of the uniformed services who are stationed away from their voting residence, the spouses and other eligible family of uniformed services members, and U.S. citizens residing outside of the United States. It requires all states, territories, and the District of Columbia to allow these citizens to register to vote and to cast an absentee ballot for all federal elections.[5] For the estimated 1.4 million uniformed services members and approximately 600,000 military spouses and voting age dependents stationed away from their legal voting residence[6] as well as the estimated 2.9 million voting age U.S. citizens who live, study, or work overseas,[7] the absentee voting process is different from and can be more challenging than the voting process for non-military voters residing in the United States.

Citizens protected by UOCAVA include:

- Members of the uniformed services (Army, Navy, Marine Corps, Air Force, Coast Guard, United States Public Health Service Commissioned Corps, and National Oceanic and Atmospheric Administration [NOAA] Commissioned Officer Corps) who are stationed away from their legal voting residence;
- Members of the U.S. Merchant Marine;
- Eligible family members of the above; and
- U.S. citizens residing outside the United States.

---

[4] Section 703(a) HAVA amended section 102 of UOCAVA.

[5] Throughout this report, the term "uniformed services voter" refers to U.S. citizens who are active members of the uniformed services or a spouse or dependent family member thereof. "Overseas citizen" refers to non-military U.S. citizens who reside overseas.

[6] Information was provided by FVAP to Fors Marsh Group via email on May 10, 2021, and was current as of March 31, 2021.

[7] Federal Voting Assistance Program, "2018 Overseas Citizen Population Analysis," at https://www.fvap.gov/info/reports-surveys/overseas-citizen-population-analysis. The results of the 2020 Overseas Citizen Population Analysis were not available at the time of this report's publication.

OCA-APPX-1046

Among the challenges UOCAVA sought to address was the wide variability in rules and procedures governing registration and voting across states, which made it difficult for uniformed services members and overseas citizens to navigate the voting process.[8] UOCAVA established the FPCA, which serves as a combination registration and ballot request application that is accepted in all U.S. states and territories. In addition, the FWAB functions as a backup ballot that can be cast by UOCAVA voters who make a timely request for, but do not receive, a regular absentee ballot.[9] Although states and localities still maintain and administer elections according to their own laws and procedures for registration and absentee voting among uniformed services members and overseas citizens, the provisions of UOCAVA established some uniformity in the absentee voting process for these voters.

## The Military and Overseas Voter Empowerment Act of 2009 (MOVE)

Historically, UOCAVA ballots were transmitted from election offices to voters primarily through the mail. Given long mailing times and high mobility rates for this population of voters, this practice meant that many UOCAVA voters were unable to receive and return their absentee ballot before state ballot return deadlines. The MOVE Act amended UOCAVA to establish additional requirements to protect military and overseas citizens' voting rights.[10] These new rules required that all states and territories provide UOCAVA voters with an option to request and receive registration and absentee ballot request materials electronically, directed states to establish an electronic means of transmitting blank ballots to UOCAVA voters, and required states to provide free access to a system whereby voters can verify the status of their ballot. Additionally, absentee ballots must be transmitted no less than 45 days before a federal election to all UOCAVA voters who submit an absentee ballot request before this deadline. These additional provisions aimed to ensure uniformed services members and overseas citizens not only have the right to vote, but that they have sufficient time to receive and return their absentee ballots ahead of state deadlines.

## The UOCAVA Voting Process

Although the specific path may differ depending on the policies and procedures in one's state of voting residence and on a voter's particular situation and preferences, in general, the UOCAVA voting process can be summarized in six basic steps, as illustrated in Figure 1.[11]

1. <u>Register and request an absentee ballot</u>: UOCAVA-eligible citizens can do this either by completing a state application form or an FPCA, the federal form that functions as both a registration and absentee ballot request and is accepted in all states and U.S. territories.

2. <u>Submit the registration and ballot request</u>: Completed applications must be submitted to the appropriate state or local election office by mail or by an electronic means permitted by the

---

[8] The United States Department of Justice. (2020, February 18). *The Uniformed and Overseas Citizens Absentee Voting Act.* https://www.justice.gov/crt/uniformed-and-overseas-citizens-absentee-voting-act.
[9] Section 103 of UOCAVA provides a mechanism for uniformed services members and overseas citizen voters to cast a FWAB (see 52 U.S.C.§ 20303).
[10] Military and Overseas Voter Empowerment (MOVE) Act of 2008 statutory language can be found at https://www.fvap.gov/uploads/FVAP/Policies/moveact.pdf.
[11] Adapted from an FVAP infographic. For more detailed information about state policies related to UOCAVA voting, see Chapter 2 of this report.

OCA-APPX-1047



**Figure 1. The UOCAVA Voting Process**



state. All states accept FPCAs by mail; states may also accept FPCAs via email, fax, the state's online voter registration portal, or by another mode.

3. <u>Application processing</u>: Once received, registration and absentee ballot request applications are processed by the election office. If an application fails to meet any state requirements (e.g., the form is not completed correctly, is submitted after the registration deadline, or the applicant is deemed ineligible), then it may be rejected. If an application meets all requirements and is accepted, it remains valid as a registration and ballot request, meaning that the voter will retain UOCAVA status and have an absentee ballot transmitted to them for the duration specified by state policy.

4. <u>Ballot transmission</u>: Election officials transmit absentee ballots to registered UOCAVA voters no later than 45 days before a federal election (ballots may be transmitted later if the ballot request is submitted by the state deadline but less than 45 days before an election). Ballots

may be transmitted to a voter by mail or through some other state-approved electronic means of transmission, as requested by the voter.

5. <u>Complete and return absentee ballot</u>: UOCAVA voters complete and return their absentee ballot to the appropriate election office for processing. Ballots may be returned and submitted for processing either by mail or through some other means allowed by a state. The FWAB may be used as a backup ballot by UOCAVA voters who do not receive a regular absentee ballot, or if the ballot does not arrive in time to be completed and returned ahead of state deadlines.

6. <u>Ballot processing and counting</u>: Completed absentee ballots that are returned and submitted for counting to an election office must be received by state deadlines and meet other state requirements. State policies on when completed ballots must be postmarked and when they must be returned to an election office in order to be eligible to be counted vary widely.

## UOCAVA Registration and Ballot Requests

The 2016 general election was the first time that registered overseas citizens outnumbered registered uniformed services members covered by UOCAVA. This trend continued in 2020, with uniformed services members or eligible family members accounting for 42.3% of registered UOCAVA voters and overseas citizens accounting for 57.4% of this population.[12]

Registered UOCAVA voters' legal voting residences[13] are disproportionately concentrated in just a few U.S. states. In 2020, the states with the largest numbers of registered UOCAVA voters were Florida (191,628), California (187,213), and Washington (127,976).[14] Together, these three states represented 40.4% of all registered UOCAVA voters reported in the 2020 EAVS. Twenty-two local jurisdictions[15] reported having 10,000 or more registered UOCAVA voters, and seven reported more

[12] The total number of registered and eligible UOCAVA voters was collected in item B1a of the 2020 EAVS. The number of registered and eligible uniformed services UOCAVA voters was collected in item B1b; the percentage of uniformed services UOCAVA voters was calculated by dividing B1b by B1a. The number of registered and eligible overseas citizen UOCAVA voters was collected in item B1c; the percentage of overseas citizen UOCAVA voters was calculated by dividing B1c by B1a. Casewise deletion at the state level was used in calculating the national percentage. In total, 870 jurisdictions in 10 states did not report data in B1; this count excludes jurisdictions in Maine, which reported UOCAVA data at the state level and not the jurisdiction level. A total of 8,167 registered and eligible voters reported in B1a were not classified as either uniformed services or overseas citizens. These percentages exclude the seven states that did not report the number of registered UOCAVA voters as well as the state and territory that did not subdivide this number by UOCAVA voter type.

[13] According to FVAP's guidance for service members, "Your voting residence is within your state of legal residence or domicile. It is the address that you consider your permanent home and where you had a physical presence. Your state of legal residence is used for state income tax purposes, determines eligibility to vote for federal and state elections, and qualification for in-state tuition rates." For more information, see https://www.fvap.gov/military-voter/voting-residence.

[14] The total number of registered and eligible UOCAVA voters in a state was calculated by summing B1a across all jurisdictions for each state.

[15] What constitutes a jurisdiction for EAVS reporting is defined by how each state chose to provide data. For the 2020 EAVS, most states reported data on the county level (or county equivalent, such as parishes for Louisiana). Illinois, Maryland, Missouri, and Virginia reported data for independent cities in addition to counties. The territories, the District of Columbia, and Alaska each reported as a single jurisdiction. Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and Wisconsin reported data on the township level. Maine also reported its UOCAVA data in Section B as a separate jurisdiction, because this information was only collected at the state level. Michigan reported data for the county level, but most election administration activities take place in the 1,520 local election jurisdictions in the state.

OCA-APPX-1049

than 15,000 registered and eligible UOCAVA voters. These seven jurisdictions accounted for 15.3% of all registered UOCAVA voters (see Table 1).

### Table 1. Seven Jurisdictions Accounted for 15% of All Registered UOCAVA Voters

| Jurisdictions With More Than 15,000 UOCAVA Voters | |
| --- | --- |
| Jurisdiction | Number of Registered and Eligible UOCAVA Voters in 2020 |
| Los Angeles County, CA | 67,392 |
| King County, WA | 31,766 |
| Pierce County, WA | 27,023 |
| Miami-Dade County, FL | 17,495 |
| New York County, NY | 17,008 |
| San Diego County, CA | 16,074 |
| Broward County, FL | 15,154 |

*Source: Information on the number of registered and eligible UOCAVA voters was item B1a of the 2020 EAVS. Alaska reported 16,194 total registered UOCAVA voters and reported as a single jurisdiction in the EAVS; however, it was not included in the table because the table focuses on localities rather than complete states.*

### Figure 2. Most Jurisdictions Had Fewer Than 50 Registered UOCAVA Voters



*Source: Information for the number of registered and eligible UOCAVA voters was collected in item B1a of the 2020 EAVS.*

OCA-APPX-1050

Conversely, of the 5,094 local jurisdictions for which the number of registered UOCAVA voters was available, 80.9% reported fewer than 100 registered UOCAVA voters, including 371 jurisdictions that reported having zero UOCAVA voters in 2020. Figure 2 shows the number of registered UOCAVA voters by jurisdiction.

Election offices reported receiving 764,691 FPCAs ahead of the 2020 general election, which was almost double the 420,861 FPCAs that states reported receiving ahead of the 2016 general election. Overall, 30.3% of these registration and absentee ballot requests came from uniformed services members, and 66.9% were submitted by overseas citizens.[16] States reported rejecting 2.7% of the FPCAs received, of which 15.2% were rejected because the election office received the form after their state's absentee ballot request deadline.[17] The FPCA rejection rate among uniformed services members was slightly higher than among overseas citizens, with 3.3% of military FPCAs rejected compared to 2.3% of FPCAs submitted by overseas citizens.[18]

## UOCAVA Ballots Transmitted

In 2020, election offices in the 50 states, five U.S. territories, and the District of Columbia reported transmitting 1,249,601 ballots to UOCAVA voters.[19] Figure 3 shows the number of ballots sent out from election offices or transmitted for each state. The states colored in dark blue represent the states that distributed the most ballots to UOCAVA voters. The states colored in light blue are the states that distributed the fewest ballots to UOCAVA voters.

---

[16] Data on the total number of FPCAs submitted was collected in item B2a of the 2020 EAVS. In 2016, this data was collected in item B20a. For 2020, the percentage of FPCAs received from uniformed services members was calculated as B2b/B2a. The percentage of FPCAs received from overseas citizen voters was calculated as B2c/B2a. Casewise deletion was used at the state level in calculating these percentages.

[17] The total number of FPCAs rejected was collected in item B3a in the 2020 EAVS; the percentage of FPCAs rejected was calculated as B3a/B2a. The percentage of FPCAs rejected because they were received late was calculated as B4a/B3a. Casewise deletion was used at the state level in calculating these percentages.

[18] The percentage of rejected FPCAs from uniformed services voters was calculated as B3b/B2b. The percentage of rejected FPCAs from overseas citizen voters was calculated as B3c/B2c. Overall, 6.9% of rejected FPCAs were not categorized by UOCAVA voter type. Casewise deletion was used at the state level in calculating these percentages.

[19] The number of transmitted UOCAVA ballots was collected in item B5a of the 2020 EAVS. The number of ballots transmitted to UOCAVA voters was reported by all but 36 jurisdictions. Rhode Island did not report data on the number of ballots transmitted.

OCA-APPX-1051



### Figure 3. Ballot Transmissions Were the Highest in States With Large UOCAVA Populations



*Source: Information on the number of transmitted UOCAVA ballots was collected in item B5a of the 2020 EAVS. State-level data were aggregated from jurisdiction data. Cutoff points in the graph were selected to reflect states that had the lowest and highest number of UOCAVA ballots transmitted and to differentiate among the states in between the lowest and highest UOCAVA ballot transmission numbers.*

Of the UOCAVA ballots transmitted, 39.4% were sent to uniformed services members, and 60.1% were transmitted to overseas citizen voters.[20] Figure 4 shows that the percentage of ballots transmitted to overseas citizens has continued to rise steadily over the last several election cycles, increasing by 15.4 percentage points since the 2012 general election.

Although the nationwide percentage of ballots sent to overseas citizens was greater than the percentage sent to uniformed services members, the proportion of ballots sent to overseas citizens or uniformed services members varied by state. Kentucky and Louisiana, for example, reported that UOCAVA ballots were split about evenly between uniformed services members and overseas citizen voters; however, the District of Columbia and Massachusetts reported that the vast majority of UOCAVA ballots were transmitted to overseas citizens (97.1% and 94.2%, respectively). In Alaska, American Samoa, New Mexico, the Northern Mariana Islands, and the U.S. Virgin Islands, more than

---

[20] The percentage of UOCAVA ballots transmitted to uniformed services voters was calculated as B5b/B5a. The percentage of UOCAVA ballots transmitted to overseas citizen voters was calculated as B5c/B5a. Casewise deletion was used at the state level when calculating these percentages. An additional 1% of the transmitted ballots could not be classified by voter type.

OCA-APPX-1052

three-quarters of UOCAVA ballots were transmitted to uniformed services members. Figure 5 shows the percentage of ballots transmitted to uniformed services voters versus overseas citizen voters.

**Figure 4. Steady Increase in the Percentage of UOCAVA Ballots Transmitted to Overseas Citizens Relative to Uniformed Services Members**



*Source: The percentage of UOCAVA ballots transmitted to uniformed services voters was calculated as B1b/B1a x 100 for the 2012, 2014, and 2016 EAVS and B5b/B5a x 100 for the 2018 and the 2020 EAVS. The percentage of UOCAVA ballots transmitted to overseas citizens was calculated as B1c/B1a x 100 for the 2012, 2014, and 2016 EAVS, and B5c/B5a x 100 for the 2018 and the 2020 EAVS. Casewise deletion was used at the state level in calculating these percentages; percentages may not sum to 100%. Ballots that were not classified as being from either overseas citizens or uniformed services voters were not included in this analysis.*

OCA-APPX-1053



**Figure 5. Twenty-Four States Transmitted More UOCAVA Ballots to Uniformed Services Members Than to Overseas Citizens**

| State | Uniformed Services | Overseas Citizens | Not Categorized |
|---|---|---|---|
| District of Columbia | 3% | 97% | |
| Massachusetts | 6% | 94% | |
| New York | 10% | 90% | |
| New Jersey | 10% | 90% | |
| Vermont | 12% | 88% | |
| Maine | 21% | 79% | |
| Connecticut | 21% | 79% | |
| California | 21% | 78% | |
| Delaware | 22% | 78% | |
| Illinois | 24% | 75% | % |
| Hawaii | 24% | 64% | 13% |
| Michigan | 25% | 75% | |
| Virginia | 26% | 74% | |
| Minnesota | 27% | 73% | |
| Pennsylvania | 29% | 71% | |
| Oregon | 31% | 69% | |
| Indiana | 33% | 67% | |
| Kansas | 33% | 67% | |
| Maryland | 33% | 67% | |
| Colorado | 35% | 65% | |
| New Hampshire | 35% | 65% | |
| Ohio | 36% | 64% | |
| Arizona | 38% | 62% | |
| Nebraska | 39% | 61% | |
| Utah | 39% | 61% | |
| Nevada | 40% | 60% | |
| North Carolina | 40% | 60% | |
| Missouri | 48% | 52% | |
| Kentucky | 48% | 52% | |
| Idaho | 50% | 38% | 12% |
| Louisiana | 52% | 48% | |
| Montana | 53% | 47% | |
| Georgia | 53% | 47% | |
| South Carolina | 54% | 46% | |
| Arkansas | 54% | 43% | 3% |
| Texas | 55% | 41% | 4% |
| Wisconsin | 56% | 44% | |
| Wyoming | 56% | 44% | |
| West Virginia | 57% | 43% | |
| South Dakota | 58% | 42% | |
| Florida | 58% | 42% | |
| Washington | 59% | 41% | |
| North Dakota | 61% | 39% | |
| Tennessee | 61% | 39% | |
| Alabama | 63% | 35% | 2% |
| Guam | 63% | 37% | |
| Mississippi | 66% | 34% | |
| Oklahoma | 66% | 34% | |
| New Mexico | 75% | 25% | |
| Alaska | 76% | 24% | |
| American Samoa | 86% | 14% | |
| U.S. Virgin Islands | 100% | | |
| Northern Mariana Islands | 100% | | |

Legend: ■ Uniformed Services  ■ Overseas Citizens  ■ Not Categorized

*Source: The percentage of UOCAVA ballots transmitted to overseas citizens was calculated as B5c/B5a x 100 for the 2020 EAVS. The percentage of UOCAVA ballots transmitted to uniformed services voters was calculated as B5b/B5a x 100 for the 2020 EAVS. The percentage of uncategorized ballots was calculated as (B5a-B5b-B5c)/B5a x 100 for the 2020 EAVS. Casewise deletion was used at the state level in calculating these percentages; percentages may not sum to 100%. Rhode Island did not report data on the number of ballots transmitted.*

OCA-APPX-1054

## Modes of UOCAVA Ballot Transmission

Over the last several election cycles, the modes by which absentee ballots have been transmitted to voters have changed substantially. Since the passage of the MOVE Act, transmission of ballots to UOCAVA voters has increasingly occurred electronically. Email was the most popular method of ballot transmission for the 2020 general election, with 62.3% of absentee ballots transmitted to UOCAVA voters via email, 32% transmitted via postal mail, and 7.9% sent to voters through some other mode of transmission (e.g., fax or online systems).[21] By comparison, during the previous presidential election cycle in 2016, among states that provided data on transmission by mode, 59.8% of ballots were transmitted via email, and in 2018, email represented 56.6% of UOCAVA ballots that were transmitted.[22] Figure 6 displays the percentage of ballots transmitted by mail, email, or other modes for the 2020 general election.

Modes of ballot transmission differed based on UOCAVA voter type. The transmission mode among uniformed services members was almost evenly split between mail transmission (47.8%) and email transmission (46.7%). For ballots transmitted to overseas citizens, most ballots were transmitted by email (70.9%) while ballots transmitted by mail accounted for 22.2% of ballots transmitted. For both groups, between 7% and 7.9% of ballots were transmitted by other modes, including fax and online ballot delivery portals.

Overall, 1% of all ballots transmitted to UOCAVA voters were returned as undeliverable, including mailed ballots returned to sender, emailed ballots that bounced back, and ballots that were undeliverable by other modes, such as an incorrect fax number.[23]

---

[21] The percentage of ballots transmitted by email was calculated as B7a/B5a for the 2020 EAVS. The percentage of ballots transmitted by postal mail was calculated as B6a/B5a. The percentage of ballots transmitted by other modes of transmission was calculated as B8a/B5a. Casewise deletion was used at the state level in these calculations. All but three states reported ballots transmitted by mode in 2020. Two additional states did not report the number of ballots transmitted by email. These states were excluded from calculations of the percentage of ballots transmitted by a given mode. However, the percentages by mode did not change substantively when transmitted ballots from these states were included in analysis.

[22] Until 2018, questions about mode of ballot receipt and return were asked in relation to the 45-day MOVE Act transmission deadline. Specifically, "How many UOCAVA absentee ballots did your jurisdiction transmit to UOCAVA voters using the following modes of transmission, before and after the 45-day deadline?" Starting in 2018, the survey was updated so that mode questions did not include this distinction. The percentage of ballots transmitted by email was calculated as B7a/B5a for the 2018 EAVS. The percentage of ballots transmitted by email was calculated as B24Total/B1a for the 2016 EAVS. Casewise deletion was used at the state level in these calculations. In 2016, 27 of the 55 states that answered the EAVS provided information on transmission by mode.

[23] The percentage of ballots returned as undeliverable was calculated as B13a/B5a. Casewise deletion was used at the state level in calculating this percentage. States and jurisdictions vary in the extent to which they are able to capture and report undeliverable ballots, overall and by mode of transmission.

OCA-APPX-1055





*Figure 6. Modes of Ballot Transmission Differ for Overseas Citizens and Uniformed Services Members*

*Source: The percentages of UOCAVA ballots transmitted overall were calculated as B7a/B5a x 100 for email, B6a/B5a x 100 for postal mail, and B8a/B5a x 100 for other modes. The percentages of UOCAVA ballots transmitted to uniformed services voters were calculated as B7b/B5b x 100 for email, B6b/B5b x 100 for postal mail, and B8b/B5b x 100 for other modes. The percentages of UOCAVA ballots transmitted for overseas citizens were calculated as B7c/B5c x 100 for email, B6c/B5c x 100 for postal mail, and B8c/B5c x 100 for other modes. Casewise deletion was used at the state level in calculating these percentages; percentages may not sum to 100%.*

## UOCAVA Ballots Returned and Submitted for Counting

States reported 911,614 regular absentee ballots: 73% of those transmitted to voters (through any mode) were returned and submitted for counting by UOCAVA voters for the 2020 general election.[24] This is a 39% increase over 2016, when 655,844 regular absentee ballots were returned by UOCAVA voters.[25] Figure 7 shows the UOCAVA ballot return totals by state in 2020. The states colored in dark

---

[24] The total number of returned UOCAVA ballots was collected in item B9a in the 2020 EAVS. The percentage of transmitted UOCAVA ballots that were returned was calculated as B9a/B5a. Casewise deletion at the state level was used in calculating this percentage. More than 82% of jurisdictions reported the number of ballots returned and submitted for counting. FWABs were reported separately from regular UOCAVA absentee ballots and were not included in these figures. Because more than one ballot may be transmitted to an individual voter (e.g., because the original was returned undeliverable or was spoiled and replaced), this rate likely underestimates the rate of ballot return by UOCAVA voters.

[25] The total number of returned UOCAVA ballots was collected in item B2a in the 2016 EAVS.

OCA-APPX-1056

blue represent the states that had the highest ballot return totals. The states colored in light blue were the states that had the lowest ballot return totals.

### Figure 7. UOCAVA Ballot Return Rates Were the Highest in the Northeast and Midwest



Legend: No Data | 43.5%-73% | 73.1%-82% | 82.1%-87% | 87%+

*Source: The percentage of transmitted UOCAVA ballots that were returned by voters was calculated as B9a/B5a x 100. Casewise deletion was used at the state level in calculating the percentages shown in this map. States are grouped by quartiles rounded to the nearest integer.*

Of the ballots returned to election offices, 36.3% were returned by uniformed services members, and 62.9% were returned by overseas citizens.[26] Overall, 63.8% of absentee ballots returned and submitted for counting by UOCAVA voters were returned to the election office via postal mail, 37.7% were returned by email, and 16.5% were returned through some other mode (e.g., fax or an online system).[27] Twenty-three states indicated that they do not allow or did not report email ballot return.

---

[26] The percentage of UOCAVA ballots returned by uniformed services members was calculated as B9b/B9a. The percentage of UOCAVA ballots returned by overseas citizen voters was calculated as B9c/B9a. Casewise deletion was used at the state level in calculating these percentages.

[27] The percentage of UOCAVA ballots returned by postal mail was calculated as B10a/B9a. The percentage of UOCAVA ballots returned by email was calculated as B11a/B9a. The percentage of UOCAVA ballots returned by some other mode was calculated as B12a/B9a. Casewise deletion was used at the state level in calculating these percentages. Four states did not report the number of ballots returned by mode and were excluded from all mode analysis. In addition, 23 states did not report ballots returned via email, and 28 did not report ballots returned by some other mode. If all states are included in the analysis, 61.8% of ballots were returned via mail, 23.1% via email, 11.7% by some other mode, and 3.3% of returned ballots were not categorized by mode.

OCA-APPX-1057

Among the states that reported UOCAVA ballots returned by email, 42.5% of ballots were returned through email, and 45.2% were returned via mail.[28]

**Figure 8. Although Many UOCAVA Voters, Especially Overseas Citizens, Use Email to Return Their Completed Absentee Ballot, Postal Mail Is the Primary Mode of Ballot Return**



*Source: The percentages of UOCAVA ballots returned by mode overall were calculated as B10a/B9a x 100 for postal mail and B11a/B9a x 100 for email. The percentages of UOCAVA ballots returned by mode for uniformed services members were calculated as B10b/B9b x 100 for postal mail and B11b/B9b x 100 for email. The percentages of UOCAVA ballots returned by mode for overseas citizens were calculated as B10c/B9c x 100 for postal mail and B11c/B9c x 100 for email. Casewise deletion was used at the state level in calculating these percentages, and because percentages for each type of voter and each mode of return were calculated independently and only states that reported data for a given mode of return were included in the analysis, the percentages do not sum to 100%. Other modes of ballot return are not shown here.*

Although postal mail was the most common mode of ballot return for both uniformed services and overseas citizen voters, uniformed services members used email return far less than overseas

---

[28] Thirty-three states reported at least one email ballot returned (item B11a in the 2020 EAVS). The percentage of ballots returned by email was calculated as B11a/B9a among states reporting at least one email ballot returned (item B11a in the 2020 EAVS). The percentage of ballots returned by mail was calculated as B10a/B9a among states reporting at least one email ballot returned (item B11a in 2020 EAVS). Casewise deletion was used at the state level in calculating these percentages.

OCA-APPX-1058

citizens, with just 18.2% using email to return an absentee ballot versus 51% of overseas citizens.[29] Figure 8 displays the method of ballot return for UOCAVA voters by type.

Overall, 889,837 regular absentee ballots returned by UOCAVA voters were counted in the 2020 general election. Of these votes, 63.1% were cast by overseas citizens and 36.5% by uniformed services voters.[30] The overall rejection rate for regular absentee ballots returned by UOCAVA voters was 2.1%, less than half the overall rejection rate of 5.7% reported in 2018.[31] The overall rejection rate did not differ significantly across UOCAVA voter types.[32]

Figure 9 shows the number of rejected UOCAVA ballots returned and submitted by voters for counting in each state. The states that are colored in dark blue represent the states that reported the highest number of rejected ballots, and the states that are colored in light blue reported the lowest number of rejected ballots.

Rejected ballots were divided into three reasons for rejection: missed deadline, problem with voter signature, and lacked postmark.[33] By far the most common reason for rejection was that a ballot was received after a state's deadline for UOCAVA absentee ballot receipt. Of the 19,060 returned UOCAVA ballots rejected, 8,188 were rejected because they were received after the state deadline, which was 43.5% of all UOCAVA ballot rejections.[34] Voter signature problems were responsible for 19.6% of all UOCAVA ballot rejections, 3.3% of ballot rejections were the result of postmark issues, and 47.3% of rejections were caused by some other issue.[35]

---

[29] The percentage of UOCAVA ballots returned by email by uniformed services members was calculated as B11b/B9b. The percentage of UOCAVA ballots returned by email by overseas citizens was calculated as B11c/B9c. Of note, two of the states with the largest numbers of UOCAVA voters–California and Florida–do not allow email return of absentee ballots.

[30] The total number of UOCAVA ballots that were returned by voters and counted was collected in item B14a of the 2020 EAVS. The percentage of ballots that were returned by uniformed services members was calculated as B14b/B14a. The percentage of ballots that were returned by overseas citizen voters was calculated as B14c/B14a. Casewise deletion was used at the state level in calculating these percentages. An additional 12,919 (1.5%) UOCAVA absentee ballots counted were not classified by voter type.

[31] Before survey revisions were made in the 2018 EAVS, UOCAVA ballot rejection data included both regular absentee ballots and FWABs, making direct comparisons with years before 2018 complicated. The 2016 ballot rejection rate was calculated as (B16a+B16b+B16c)/B26b and produced an overall rejection rate of 2.4%.

[32] The rejection rate for UOCAVA ballots was calculated as B18a/B9a for the 2018 and 2020 EAVS. The percentage of ballots rejected from uniformed services voters was calculated as B18b/B9b. The percentage of ballots rejected from overseas citizen voters was calculated as B18c/B9c. Casewise deletion was used at the state level in calculating these percentages. The rejection rate for returned ballots was 2% for uniformed services members, 2.1% for overseas citizens, and 6.3% among rejected ballots not classified by voter type.

[33] Two states (Mississippi and Rhode Island) and four U.S. territories (American Samoa, the Northern Mariana Islands, Puerto Rico, and U.S. Virgin Islands) did not report the number of ballots rejected. The number of ballots rejected was reported for 81.7% of jurisdictions nationwide. Most of these jurisdictions also subdivided rejected ballots by reason for rejection. New Jersey was not able to separate regular UOCAVA ballots from FWABs; information on all of the UOCAVA ballots rejected in New Jersey in the 2018 election is available in the survey comments.

[34] The total number of UOCAVA ballots rejected for being received after the state deadline was item B19a of the 2020 EAVS. The percentage of UOCAVA ballots rejected for being received late was calculated as B19a/B18a. Casewise deletion was used at the state level in calculating this percentage.

[35] The percentage of UOCAVA ballots rejected because of signature issues was calculated as B20a/B18a. The percentage of UOCAVA ballots rejected because of postmark issues was calculated as B21a/B18a. The percentage of UOCAVA ballots rejected for other reasons was calculated as B22a/B18a. Casewise deletion was used at the state level in calculating these percentages. The increase in "other" reasons for rejection may reflect a large increase in the use of this category by certain states, in particular New York with 2,098 (71.5% of their rejections) and Virginia 2,531 (217.3% of their rejections). These two states accounted for more than half of the total "other" rejections.

OCA-APPX-1059





*Figure 9. UOCAVA Ballot Rejection Rates Vary Significantly Across States*

No Data | 0%-0.5% | 0.51%-1.5% | 1.51%-3.5% | 3.51%+

*Source: The percentage of returned UOCAVA ballots that were rejected includes regular UOCAVA absentee ballots that were rejected (item B18a in the 2020 EAVS), divided by the total number of regular UOCAVA absentee ballots received (item B9a in the 2020 EAVS). Casewise deletion was used at the state level in calculating the percentages shown in this map. Cutoff points in the graph were selected to reflect states that had the lowest and highest percentage of UOCAVA ballot rejection rates and to differentiate among the states in between the lowest and highest UOCAVA ballot rejection rates.*

Uniformed services members and overseas citizen UOCAVA ballots were rejected for similar reasons. Missing the deadline was the most common reason for rejection among both populations—44.7% for uniformed services members and 41.3% for overseas citizens. Signature issues were the cause of 27.3% of ballot rejections for ballots returned by uniformed services members, almost twice the percentage of overseas citizen ballots rejected for this reason (13.7%).[36]

---

[36] The percentage of ballots rejected for missing the deadline was calculated as B19b/B18b for uniformed services voters and B19c/B18c for overseas citizens. The percentage of ballots rejected because of signature issues was calculated as B20b/B18b for uniformed services voters and B20c/B18c for overseas citizens. Casewise deletion was used at the state level in calculating these percentages.

OCA-APPX-1060

# Federal Write-In Absentee Ballots

If a regular absentee ballot does not arrive in time for an individual to vote, the FWAB functions as a backup ballot that can be used to vote for all federal offices and, in some states, state and local offices as well.

> ## The Federal Write-In Absentee Ballot (FWAB)
>
> The FWAB is a special type of UOCAVA ballot that may be used as a backup in the event that a voter's regular absentee ballot does not arrive in time to vote. In most states, a UOCAVA voter must have registered and requested an absentee ballot in order to use the FWAB.

Although the 33,027 FWABs submitted in 2020 made up a relatively small proportion (3.8%) of all the UOCAVA ballots returned, there was a 41.1% increase in the volume of FWABs reported compared to the 2016 presidential election.[37] Despite the increase from previous elections, FWAB usage remains a relatively small proportion of the UOCAVA methods of voting among both uniformed services members and overseas citizen voters. However, the FWAB resulted in 23,897 additional UOCAVA voters' ballots counted in the 2020 general election, with 24.2% of these additional voters from uniformed services members and 73.2% from overseas citizens.[38] Thirteen states and territories reported that they received no FWABs during the 2020 presidential election.[39]

Roughly one in four (8,438 or 25.6%) of the 33,027 FWABs submitted in the 2020 general election were not counted. Of these, 3,965 FWABs—47.1% of the rejected FWABs—were replaced by a regular absentee ballot, making the backup ballot unnecessary.[40] The rate of uncounted FWABs returned by uniformed services members was similar to the rate of uncounted FWABs returned by overseas citizens—27.6% and 21.5%, respectively.[41] The other major reason FWABs went uncounted (and the

---

[37] The percentage of all ballots returned that were FWABs was calculated using the total number of FWABs received (B23a) divided by the total number of UOCAVA ballots received (the sum of B9a and B23a). Casewise deletion was used at the state level in calculating this percentage. The total number of FWABs received was collected in item B23a in the 2020 EAVS and the sum of B31a, B31b, B31c, and B31d in the 2016 EAVS. In 2016, states reported receiving 23,412 FWABs. For 2020, The total number of FWABs returned was based on 82.1% of jurisdictions for which this information was available.

[38] The total number of FWABs received and counted was item B24a of the 2020 EAVS. The number of FWABs counted from uniformed services members was item B24b, and the number of FWABs counted from overseas citizens was item B24c. The percentage of counted FWABs returned by uniformed services members was calculated as B24b/B24a. The percentage of counted FWABs returned by overseas citizens was calculated as B24c/B24a. Casewise deletion was used at the state level in calculating this percentage.

[39] American Samoa, Guam, and Puerto Rico reported receiving zero FWABs. Georgia, Iowa, Oregon, and South Carolina reported FWABs with regular UOCAVA ballots because they could not separate the two types.

[40] The number of FWABs rejected because the voter's regular absentee ballot was received and counted was item B26a of the 2020 EAVS. The percentage of rejected FWABs that were rejected for this reason was calculated as B26a/(B25a+B26a+B27a). Casewise deletion at the state level was used in calculating the percentage.

[41] The total percentage of FWABs rejected was calculated as (B25a+B26a+B27a)/B23a. The percentage of FWABs rejected from uniformed services members was calculated as (B25b+B26b+B27b)/B23b. The percentage of FWABs rejected from overseas citizen voters was calculated as (B25c+B26c+B27c)/B23c. Casewise deletion was used at the state level in calculating these percentages.

OCA-APPX-1061

only other reason states reported via the EAVS) was because they were received after the ballot receipt deadline (13.1% of rejected FWABs).[42]

---

[42] The percentage of rejected FWABs that were rejected because they were received after the deadline was calculated as B25a/(B25a+B26a+B27a). Casewise deletion at the state level was used in this calculation.

OCA-APPX-1062

# Appendix A: Descriptive Tables

## UOCAVA Table 1: Registered and Eligible UOCAVA Voters

| State | Registered UOCAVA Voters | | | | | | |
| | All UOCAVA Voters | Uniformed Services Members | | Overseas Citizens | | Not Categorized by Voter Type | |
| | | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|
| Alabama [1] | -- | -- | -- | -- | -- | -- | -- |
| Alaska | 16,194 | 12,285 | 75.9 | 3,909 | 24.1 | 0 | 0.0 |
| American Samoa | 214 | 183 | 85.5 | 31 | 14.5 | 0 | 0.0 |
| Arizona | 21,661 | 8,187 | 37.8 | 13,474 | 62.2 | 0 | 0.0 |
| Arkansas | 3,347 | 1,671 | 49.9 | 1,291 | 38.6 | 385 | 11.5 |
| California | 187,213 | 42,249 | 22.6 | 144,779 | 77.3 | 185 | 0.1 |
| Colorado | 42,291 | 15,114 | 35.7 | 27,177 | 64.3 | 0 | 0.0 |
| Connecticut [2] | -- | -- | -- | -- | -- | -- | -- |
| Delaware | 2,899 | 640 | 22.1 | 2,259 | 77.9 | 0 | 0.0 |
| District of Columbia | 6,003 | 186 | 3.1 | 5,817 | 96.9 | 0 | 0.0 |
| Florida | 191,628 | 120,241 | 62.7 | 71,387 | 37.3 | 0 | 0.0 |
| Georgia | 27,252 | 14,223 | 52.2 | 13,029 | 47.8 | 0 | 0.0 |
| Guam | 120 | 76 | 63.3 | 44 | 36.7 | 0 | 0.0 |
| Hawaii | 4,835 | 1,212 | 25.1 | 3,262 | 67.5 | 361 | 7.5 |
| Idaho | 3,886 | 1,959 | 50.4 | 1,925 | 49.5 | 2 | 0.1 |
| Illinois | 30,274 | 7,585 | 25.1 | 22,626 | 74.7 | 63 | 0.2 |
| Indiana | 23,188 | 11,376 | 49.1 | 11,812 | 50.9 | 0 | 0.0 |
| Iowa | 6,772 | 2,182 | 32.2 | 4,580 | 67.6 | 10 | 0.1 |
| Kansas [3] | -- | -- | -- | -- | -- | -- | -- |
| Kentucky | 6,887 | 3,402 | 49.4 | 3,485 | 50.6 | 0 | 0.0 |
| Louisiana | 8,950 | 4,701 | 52.5 | 4,249 | 47.5 | 0 | 0.0 |
| Maine | 6,527 | 1,369 | 21.0 | 5,158 | 79.0 | 0 | 0.0 |
| Maryland | 27,454 | 9,228 | 33.6 | 18,226 | 66.4 | 0 | 0.0 |
| Massachusetts | 29,184 | 1,719 | 5.9 | 27,465 | 94.1 | 0 | 0.0 |
| Michigan | 26,866 | 6,833 | 25.4 | 20,033 | 74.6 | 0 | 0.0 |
| Minnesota | 19,243 | 5,230 | 27.2 | 14,013 | 72.8 | 0 | 0.0 |
| Mississippi | 3,721 | 2,446 | 65.7 | 1,275 | 34.3 | 0 | 0.0 |
| Missouri [1] | -- | -- | -- | -- | -- | -- | -- |
| Montana | 5,110 | 2,549 | 49.9 | 2,561 | 50.1 | 0 | 0.0 |
| Nebraska | 3,059 | 1,206 | 39.4 | 1,853 | 60.6 | 0 | 0.0 |
| Nevada | 8,847 | 3,515 | 39.7 | 5,332 | 60.3 | 0 | 0.0 |
| New Hampshire | 7,165 | 2,506 | 35.0 | 4,659 | 65.0 | 0 | 0.0 |
| New Jersey | 26,959 | 2,654 | 9.8 | 24,305 | 90.2 | 0 | 0.0 |

OCA-APPX-1063



| State | Registered UOCAVA Voters | | | | | | |
|---|---|---|---|---|---|---|---|
| | All UOCAVA Voters | Uniformed Services Members | | Overseas Citizens | | Not Categorized by Voter Type | |
| | | Total | % | Total | % | Total | % |
| New Mexico | 6,365 | 4,813 | 75.6 | 1,552 | 24.4 | 0 | 0.0 |
| New York | 67,931 | 6,913 | 10.2 | 61,018 | 89.8 | 0 | 0.0 |
| North Carolina | 33,413 | 14,886 | 44.6 | 18,527 | 55.4 | 0 | 0.0 |
| North Dakota [4] | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | 25 | 25 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Ohio [5] | -- | -- | -- | -- | -- | -- | -- |
| Oklahoma | 8,647 | 5,768 | 66.7 | 2,879 | 33.3 | 0 | 0.0 |
| Oregon | 20,477 | 6,370 | 31.1 | 14,107 | 68.9 | 0 | 0.0 |
| Pennsylvania | 35,597 | 11,515 | 32.3 | 24,082 | 67.7 | 0 | 0.0 |
| Puerto Rico [6] | 587 | -- | -- | -- | -- | 587 | 100.0 |
| Rhode Island [7] | 3,084 | -- | -- | -- | -- | 3,084 | 100.0 |
| South Carolina | 15,062 | 8,147 | 54.1 | 6,915 | 45.9 | 0 | 0.0 |
| South Dakota | 3,583 | 2,214 | 61.8 | 1,369 | 38.2 | 0 | 0.0 |
| Tennessee | 17,927 | 11,017 | 61.5 | 6,910 | 38.5 | 0 | 0.0 |
| Texas | 85,972 | 46,908 | 54.6 | 35,574 | 41.4 | 3,490 | 4.1 |
| U.S. Virgin Islands | 13 | 13 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Utah | 7,707 | 3,150 | 40.9 | 4,557 | 59.1 | 0 | 0.0 |
| Vermont [8] | -- | -- | -- | -- | -- | -- | -- |
| Virginia | 41,063 | 14,841 | 36.1 | 26,222 | 63.9 | 0 | 0.0 |
| Washington | 127,976 | 84,227 | 65.8 | 43,749 | 34.2 | 0 | 0.0 |
| West Virginia | 2,531 | 1,459 | 57.6 | 1,072 | 42.4 | 0 | 0.0 |
| Wisconsin | 25,956 | 18,240 | 70.3 | 7,716 | 29.7 | 0 | 0.0 |
| Wyoming | 1,964 | 1,095 | 55.8 | 869 | 44.2 | 0 | 0.0 |
| U.S. Total | 1,253,629 | 528,328 | 42.3 | 717,134 | 57.4 | 8,167 | 0.7 |

UOCAVA Table 1 Calculation Notes:

**Registered Voters – All UOCAVA Voters, Total** uses question B1a.

**Registered Voters – Uniformed Services Members, Total** uses question B1b.

**Registered Voters – Uniformed Services Members, %** uses question B1b divided by question B1a.

**Registered Voters – Overseas Citizens, Total** uses question B1c.

**Registered Voters – Overseas Citizens, %** uses question B1c divided by question B1a.

**Registered Voters – Not Categorized by Voter Type, Total** uses question B1a minus the sum of questions B1b and B1c.

**Registered Voters – Not Categorized by Voter Type, %** uses question B1a minus the sum of questions B1b and B1c, all divided by question B1a.

OCA-APPX-1064

UOCAVA Table 1 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.


[1] Alabama and Missouri reported that data on the number of registered UOCAVA voters were not available.

[2] Connecticut reported that data on the number of registered UOCAVA voters were "not collected due to COVID."

[3] Kansas did not provide any response to item B1.

[4] North Dakota does not have voter registration.

[5] Ohio noted in a survey comment that "As Ohio permits UOCAVA voters to register by several means other than a FPCA or FWAP [sic], we cannot accurately provide the actual number of UOCAVA voters in our state."

[6] Puerto Rico noted in a survey comment that "At this moment, PR SEC doesn't have the data break down by categories." This abbreviation was not defined by the state.

[7] Rhode Island noted in a survey comment that "[A]ccording to RI general law all UOCAVA mail ballots are consolidated into one mail ballot category."

[8] Vermont reported that item B1 did not apply to the state.

OCA-APPX-1065



## UOCAVA Table 2: Federal Post Card Applications (FPCA)

| State | Total FPCAs Received | FPCAs Received | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Uniformed Services Members | | Overseas Citizens | | Not Categorized | | |
| | | Total | % of Total FPCAs Received | Total | % of Total FPCAs Received | Total | % of Total FPCAs Received | |
| Alabama | 3,578 | 2,320 | 64.8 | 1,258 | 35.2 | 0 | 0.0 | |
| Alaska | 3,001 | 2,049 | 68.3 | 952 | 31.7 | 0 | 0.0 | |
| American Samoa | 12 | 8 | 66.7 | 4 | 33.3 | 0 | 0.0 | |
| Arizona | 21,889 | 6,375 | 29.1 | 10,242 | 46.8 | 5,272 | 24.1 | |
| Arkansas | 956 | 421 | 44.0 | 547 | 57.2 | -12 | -1.3 | |
| California | 117,618 | 22,131 | 18.8 | 85,296 | 72.5 | 10,191 | 8.7 | |
| Colorado [1] | 11,584 | 2,288 | 19.8 | 9,296 | 80.2 | 0 | 0.0 | |
| Connecticut [2] | -- | -- | -- | -- | -- | -- | -- | |
| Delaware | 2,918 | 644 | 22.1 | 2,274 | 77.9 | 0 | 0.0 | |
| District of Columbia | 2,353 | 186 | 7.9 | 2,167 | 92.1 | 0 | 0.0 | |
| Florida | 39,113 | 17,839 | 45.6 | 21,274 | 54.4 | 0 | 0.0 | |
| Georgia | 3,945 | 1,175 | 29.8 | 2,770 | 70.2 | 0 | 0.0 | |
| Guam | 55 | 35 | 63.6 | 20 | 36.4 | 0 | 0.0 | |
| Hawaii | 4,534 | 1,106 | 24.4 | 2,938 | 64.8 | 490 | 10.8 | |
| Idaho | 3,285 | 1,515 | 46.1 | 1,770 | 53.9 | 0 | 0.0 | |
| Illinois | 25,678 | 5,838 | 22.7 | 19,777 | 77.0 | 63 | 0.2 | |
| Indiana | 7,991 | 2,359 | 29.5 | 5,632 | 70.5 | 0 | 0.0 | |
| Iowa [3] | 6,772 | -- | -- | -- | -- | 6,772 | 100.0 | |
| Kansas | 5,611 | 2,691 | 48.0 | 3,705 | 66.0 | -785 | -14.0 | |
| Kentucky | 7,667 | 3,738 | 48.8 | 3,929 | 51.2 | 0 | 0.0 | |
| Louisiana [4] | 1,552 | -- | -- | -- | -- | 1,552 | 100.0 | |
| Maine [5] | -- | -- | -- | -- | -- | -- | -- | |
| Maryland | 27,492 | 9,239 | 33.6 | 18,253 | 66.4 | 0 | 0.0 | |
| Massachusetts | 25,487 | 1,295 | 5.1 | 24,192 | 94.9 | 0 | 0.0 | |
| Michigan [6] | 20,945 | 4,879 | 23.3 | 16,066 | 76.7 | 0 | 0.0 | |
| Minnesota | 19,154 | 5,217 | 27.2 | 13,937 | 72.8 | 0 | 0.0 | |
| Mississippi [7] | 3,717 | -- | -- | -- | -- | 3,717 | 100.0 | |
| Missouri [8] | 1,803 | -- | -- | -- | -- | 1,803 | 100.0 | |
| Montana [9] | 3,976 | 1,989 | 50.0 | 1,987 | 50.0 | 0 | 0.0 | |
| Nebraska | 2,853 | 1,097 | 38.5 | 1,756 | 61.5 | 0 | 0.0 | |
| Nevada | 8,738 | 3,448 | 39.5 | 5,290 | 60.5 | 0 | 0.0 | |
| New Hampshire | 7,165 | 2,506 | 35.0 | 4,659 | 65.0 | 0 | 0.0 | |
| New Jersey | 25,152 | 2,557 | 10.2 | 22,595 | 89.8 | 0 | 0.0 | |
| New Mexico | 2,159 | 687 | 31.8 | 1,472 | 68.2 | 0 | 0.0 | |

OCA-APPX-1066

| State | Total FPCAs Received | Uniformed Services Members | | Overseas Citizens | | Not Categorized | |
|---|---|---|---|---|---|---|---|
| | | Total | % of Total FPCAs Received | Total | % of Total FPCAs Received | Total | % of Total FPCAs Received |
| New York | 67,931 | 6,913 | 10.2 | 61,018 | 89.8 | 0 | 0.0 |
| North Carolina | 25,573 | 10,088 | 39.4 | 15,485 | 60.6 | 0 | 0.0 |
| North Dakota | 339 | 189 | 55.8 | 150 | 44.2 | 0 | 0.0 |
| Northern Mariana Islands [10] | 25 | 25 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Ohio [11] | 25,719 | 9,311 | 36.2 | 16,408 | 63.8 | 0 | 0.0 |
| Oklahoma | 8,311 | 5,582 | 67.2 | 2,729 | 32.8 | 0 | 0.0 |
| Oregon [12] | 2,683 | -- | -- | -- | -- | 2,683 | 100.0 |
| Pennsylvania | 32,027 | 9,330 | 29.1 | 22,697 | 70.9 | 0 | 0.0 |
| Puerto Rico [13] | -- | -- | -- | -- | -- | -- | -- |
| Rhode Island [14] | -- | -- | -- | -- | -- | -- | -- |
| South Carolina [6], [15] | -- | -- | -- | -- | -- | -- | -- |
| South Dakota | 74 | 59 | 79.7 | 15 | 20.3 | 0 | 0.0 |
| Tennessee | 16,713 | 10,266 | 61.4 | 6,447 | 38.6 | 0 | 0.0 |
| Texas | 87,645 | 45,751 | 52.2 | 35,526 | 40.5 | 6,368 | 7.3 |
| U.S. Virgin Islands | 6 | 6 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Utah | 4,299 | 1,208 | 28.1 | 3,091 | 71.9 | 0 | 0.0 |
| Vermont [15] | -- | -- | -- | -- | -- | -- | -- |
| Virginia [6] | 40,408 | 14,524 | 35.9 | 25,884 | 64.1 | 0 | 0.0 |
| Washington | 27,524 | 5,206 | 18.9 | 22,318 | 81.1 | 0 | 0.0 |
| West Virginia | 1,632 | 823 | 50.4 | 809 | 49.6 | 0 | 0.0 |
| Wisconsin [16] | 3,886 | 759 | 19.5 | 3,127 | 80.5 | 0 | 0.0 |
| Wyoming | 1,143 | 669 | 58.5 | 474 | 41.5 | 0 | 0.0 |
| U.S. Total | 764,691 | 226,341 | 30.3 | 500,236 | 66.9 | 38,114 | 5.0 |

OCA-APPX-1067



| State | FPCAs Rejected | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total FPCAs Rejected | % of FPCAs Received | Uniformed Services Members | | Overseas Citizens | | Not Categorized | |
| | | | Total | % of Received from Uniformed Services | Total | % of Received from Overseas Citizens | Total | % of Total FPCAs Rejected |
| Alabama | 43 | 1.2 | 34 | 1.5 | 6 | 0.5 | 3 | 7.0 |
| Alaska | 57 | 1.9 | 45 | 2.2 | 12 | 1.3 | 0 | 0.0 |
| American Samoa | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | -- |
| Arizona | 42 | 0.2 | 18 | 0.3 | 20 | 0.2 | 4 | 9.5 |
| Arkansas | 7 | 0.7 | 6 | 1.4 | 7 | 1.3 | -6 | -85.7 |
| California | 9,602 | 8.2 | 2,830 | 12.8 | 6,644 | 7.8 | 128 | 1.3 |
| Colorado [1] | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | -- |
| Connecticut [2] | -- | -- | -- | -- | -- | -- | -- | -- |
| Delaware | 11 | 0.4 | 2 | 0.3 | 9 | 0.4 | 0 | 0.0 |
| District of Columbia | 73 | 3.1 | 0 | 0.0 | 73 | 3.4 | 0 | 0.0 |
| Florida | 896 | 2.3 | 360 | 2.0 | 530 | 2.5 | 6 | 0.7 |
| Georgia | 244 | 6.2 | 73 | 6.2 | 171 | 6.2 | 0 | 0.0 |
| Guam | 26 | 47.3 | 15 | 42.9 | 11 | 55.0 | 0 | 0.0 |
| Hawaii | 13 | 0.3 | 0 | 0.0 | 0 | 0.0 | 13 | 100.0 |
| Idaho | 37 | 1.1 | 15 | 1.0 | 19 | 1.1 | 3 | 8.1 |
| Illinois | 364 | 1.4 | 72 | 1.2 | 290 | 1.5 | 2 | 0.5 |
| Indiana | 74 | 0.9 | 15 | 0.6 | 59 | 1.0 | 0 | 0.0 |
| Iowa [3] | -- | -- | -- | -- | -- | -- | -- | -- |
| Kansas | 39 | 0.7 | 17 | 0.6 | 22 | 0.6 | 0 | 0.0 |
| Kentucky | 1,415 | 18.5 | 740 | 19.8 | 675 | 17.2 | 0 | 0.0 |
| Louisiana [4] | 2 | 0.1 | -- | -- | -- | -- | 2 | 100.0 |
| Maine [5] | -- | -- | -- | -- | -- | -- | -- | -- |
| Maryland | 50 | 0.2 | 15 | 0.2 | 35 | 0.2 | 0 | 0.0 |
| Massachusetts | 156 | 0.6 | 37 | 2.9 | 119 | 0.5 | 0 | 0.0 |
| Michigan [6] | -- | -- | -- | -- | -- | -- | -- | -- |
| Minnesota | 220 | 1.1 | 86 | 1.6 | 134 | 1.0 | 0 | 0.0 |
| Mississippi [7] | 1 | 0.0 | 0 | -- | 1 | -- | 0 | 0.0 |
| Missouri [8] | -- | -- | -- | -- | -- | -- | -- | -- |
| Montana [9] | 5 | 0.1 | 3 | 0.2 | 2 | 0.1 | 0 | 0.0 |
| Nebraska | 13 | 0.5 | 7 | 0.6 | 6 | 0.3 | 0 | 0.0 |
| Nevada | 36 | 0.4 | 14 | 0.4 | 22 | 0.4 | 0 | 0.0 |
| New Hampshire | 4 | 0.1 | 0 | 0.0 | 4 | 0.1 | 0 | 0.0 |
| New Jersey | 14 | 0.1 | 1 | 0.0 | 13 | 0.1 | 0 | 0.0 |
| New Mexico | 442 | 20.5 | 214 | 31.1 | 228 | 15.5 | 0 | 0.0 |
| New York | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | -- |

OCA-APPX-1068

| State | FPCAs Rejected | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total FPCAs Rejected | % of FPCAs Received | Uniformed Services Members | | Overseas Citizens | | Not Categorized | |
| | | | Total | % of Received from Uniformed Services | Total | % of Received from Overseas Citizens | Total | % of Total FPCAs Rejected |
| North Carolina | 318 | 1.2 | 109 | 1.1 | 209 | 1.3 | 0 | 0.0 |
| North Dakota | 140 | 41.3 | 79 | 41.8 | 61 | 40.7 | 0 | 0.0 |
| Northern Mariana Islands [10] | 0 | 0.0 | 0 | 0.0 | 0 | -- | 0 | -- |
| Ohio [11] | 860 | 3.3 | 272 | 2.9 | 405 | 2.5 | 183 | 21.3 |
| Oklahoma | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | -- |
| Oregon [12] | -- | -- | -- | -- | -- | -- | -- | -- |
| Pennsylvania | 69 | 0.2 | 17 | 0.2 | 52 | 0.2 | 0 | 0.0 |
| Puerto Rico [13] | -- | -- | -- | -- | -- | -- | -- | -- |
| Rhode Island [14] | -- | -- | -- | -- | -- | -- | -- | -- |
| South Carolina [6], [15] | -- | -- | -- | -- | -- | -- | -- | -- |
| South Dakota | 2 | 2.7 | 1 | 1.7 | 1 | 6.7 | 0 | 0.0 |
| Tennessee | 562 | 3.4 | 494 | 4.8 | 68 | 1.1 | 0 | 0.0 |
| Texas | 3,894 | 4.4 | 1,617 | 3.5 | 1,258 | 3.5 | 1,019 | 26.2 |
| U.S. Virgin Islands | 0 | 0.0 | 0 | 0.0 | 0 | -- | 0 | -- |
| Utah | 8 | 0.2 | 6 | 0.5 | 2 | 0.1 | 0 | 0.0 |
| Vermont [15] | -- | -- | -- | -- | -- | -- | -- | -- |
| Virginia [6] | 121 | 0.3 | 52 | 0.4 | 69 | 0.3 | 0 | 0.0 |
| Washington | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | -- |
| West Virginia | 7 | 0.4 | 5 | 0.6 | 2 | 0.2 | 0 | 0.0 |
| Wisconsin [16] | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | -- |
| Wyoming | 7 | 0.6 | 4 | 0.6 | 3 | 0.6 | 0 | 0.0 |
| U.S. Total | 19,874 | 2.7 | 7,275 | 3.3 | 11,242 | 2.3 | 1,357 | 6.8 |

UOCAVA Table 2 Calculation Notes:

**Total FPCAs received** uses question B2a.

**FPCAs received – Uniformed Services Members, Total** uses question B2b.

**FPCAs received – Uniformed Services Members, Pct of Total FPCAs Received** uses question B2b divided by question B2a.

**FPCAs received – Overseas Citizens, Total** uses question B2c.

**FPCAs received – Overseas Citizens, Pct of Total FPCAs Received** uses question B2c divided by question B2a.

**FPCAs received – Not Categorized by Voter Type, Total** uses question B2a minus the sum of questions B2b and B2c.

**FPCAs received – Not Categorized by Voter Type, Pct of Total FPCAs Received** uses question B2a minus the sum of questions B2b and B2c, all divided by question B2a.

**Total FPCAs rejected** uses question B3a.

OCA-APPX-1069



**Percent of FPCAs received that were rejected** uses question B3a divided by question B2a.
**FPCAs rejected – Uniformed Services Members, Total** uses question B3b.
**FPCAs rejected – Uniformed Services Members, %** uses question B3b divided by question B2b.
**FPCAs rejected – Overseas Citizens, Total** uses question B3c.
**FPCAs rejected – Overseas Citizens, %** uses question B3c divided by question B2c.
**FPCAs rejected – Not Categorized by Voter Type, Total** uses question B3a minus the sum of questions B3b and B3c.
**FPCAs rejected – Not Categorized by Voter Type, %** uses question B3a minus the sum of questions B3b and B3c, all divided by question B3a.

UOCAVA Table 2 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from the states that provided data for the numerator and denominator of the calculation.
- Negative numbers in the Not Categorized FPCAs received or rejected categories indicate that the sum of FPCAs for uniformed services members and overseas citizens in that category account for more than the total number of FPCAs reported by the state in the corresponding category.

[1] Connecticut reported that data on FPCAs were not available and that "[N]o distinction [was] made for these voters."

[2] Colorado noted in a survey comment that "FPCAs are not rejected; if not completed by the voter, the voter is incomplete or pending."

[3] Iowa reported data on the total number of FPCAs received but not on how many were received by voter type or how many FPCAs were rejected. This state noted in a survey comment that "[S]ystem does not allow me to show breakdown between these two types of UOCAVA voters." The state also noted that "FPCAs can be accepted up to and including Election Day."

[4] Louisiana reported data on the total number of FPCAs received and rejected and noted in a survey comment that "[T]he Department of State only collects data for the totals."

[5] Maine reported that the EAVS items related to FPCAs did not apply to the state.

[6] Michigan, South Carolina, and Virginia reported that data on rejected FPCAs were not available.

[7] Mississippi reported in a survey comment that "FPCA by military or out of county not clearly defined in SEMS [Statewide Elections Management System]."

[8] Missouri reported data on the total number of FPCAs received but not on how many were received by voter type or how many FPCAs were rejected.

[9] Montana noted in survey comments that the state "accepts absentee registrations up until 8PM on Election Day."

[10] The Northern Mariana Islands reported in survey comments that "[O]ur office did not receive any FPCA applicants."

[11] Ohio noted for multiple counties that "[T]otal in B3a includes B4a; however, source information [for [military/overseas voters] for B4a is not tracked. [B]ecause of this, B3b + B3c will not always equal B3a."

[12] Oregon reported in survey comments that the state is "unable to separate uniformed services from non-military overseas" and that data on rejected FPCAs is not tracked.

[13] Puerto Rico reported that data on FPCAs was not available, with a survey comment that "all the requests were made by email."

[14] Rhode Island noted in a survey comment that "[A]ccording to RI general law all UOCAVA mail ballots are consolidated into one mail ballot category."

[15] South Carolina and Vermont reported that data on FPCAs were not available.

OCA-APPX-1070

**[16]** Wisconsin state statute does not require rejected registrations or FPCAs to be tracked.

OCA-APPX-1071



## UOCAVA Table 3: UOCAVA Ballots Transmitted, Returned, Counted and Rejected

| State | UOCAVA Ballots Transmitted | UOCAVA Ballots Returned | UOCAVA Ballots Counted | | UOCAVA Ballots Rejected | |
|---|---|---|---|---|---|---|
| | | | Total | % of Returned | Total | % of Returned |
| Alabama | 6,682 | 5,144 | 5,091 | 99.0 | 53 | 1.0 |
| Alaska | 16,152 | 13,598 | 13,422 | 98.7 | 176 | 1.3 |
| American Samoa | 214 | 214 | 214 | 100.0 | 0 | 0.0 |
| Arizona | 21,679 | 18,483 | 18,435 | 99.7 | 48 | 0.3 |
| Arkansas | 3,042 | 2,206 | 2,104 | 95.4 | 465 | 21.1 |
| California | 162,295 | 97,301 | 95,872 | 98.5 | 1,419 | 1.5 |
| Colorado | 45,558 | 29,631 | 28,762 | 97.1 | 869 | 2.9 |
| Connecticut | 9,950 | 7,874 | 7,689 | 97.7 | 185 | 2.3 |
| Delaware | 2,899 | 2,429 | 2,305 | 94.9 | 124 | 5.1 |
| District of Columbia | 6,003 | 4,990 | 4,990 | 100.0 | 9 | 0.2 |
| Florida | 144,678 | 117,965 | 115,975 | 98.3 | 2,127 | 1.8 |
| Georgia [1] | 28,454 | 18,867 | 18,475 | 97.9 | 392 | 2.1 |
| Guam | 120 | 69 | 65 | 94.2 | 4 | 5.8 |
| Hawaii | 4,623 | 3,624 | 3,503 | 96.7 | 36 | 1.0 |
| Idaho [2] | 4,449 | 3,230 | 3,442 | 106.6 | 90 | 2.8 |
| Illinois | 29,614 | 24,358 | 23,302 | 95.7 | 462 | 1.9 |
| Indiana | 10,325 | 8,814 | 8,773 | 99.5 | 34 | 0.4 |
| Iowa [1] | 6,776 | 6,000 | 5,980 | 99.7 | 29 | 0.5 |
| Kansas | 5,551 | 4,990 | 4,980 | 99.8 | 23 | 0.5 |
| Kentucky | 6,252 | 4,669 | 4,664 | 99.9 | 5 | 0.1 |
| Louisiana [3] | 9,131 | 6,132 | 5,872 | 95.8 | 260 | 4.2 |
| Maine | 6,421 | 5,701 | 5,674 | 99.5 | 21 | 0.4 |
| Maryland | 29,060 | 21,593 | 21,315 | 98.7 | 278 | 1.3 |
| Massachusetts | 28,533 | 24,890 | 24,685 | 99.2 | 140 | 0.6 |
| Michigan | 27,026 | 22,492 | 21,464 | 95.4 | 1,028 | 4.6 |
| Minnesota | 19,383 | 15,943 | 15,407 | 96.6 | 536 | 3.4 |
| Mississippi | 3,717 | 2,967 | 2,965 | 99.9 | 0 | 0.0 |
| Missouri | 13,458 | 10,821 | 10,716 | 99.0 | 105 | 1.0 |
| Montana [4] | 4,944 | 4,323 | 4,312 | 99.7 | 11 | 0.3 |
| Nebraska | 2,978 | 2,643 | 2,627 | 99.4 | 16 | 0.6 |
| Nevada | 8,850 | 7,258 | 7,224 | 99.5 | 34 | 0.5 |
| New Hampshire | 7,165 | 6,327 | 6,167 | 97.5 | 160 | 2.5 |
| New Jersey | 26,959 | 11,732 | 11,634 | 99.2 | 81 | 0.7 |
| New Mexico | 6,292 | 6,292 | 5,261 | 83.6 | 71 | 1.1 |
| New York [5] | 58,393 | 69,585 | 66,706 | 95.9 | 2,936 | 4.2 |
| North Carolina | 58,993 | 26,802 | 26,386 | 98.4 | 416 | 1.6 |
| North Dakota | 1,900 | 1,633 | 1,624 | 99.4 | 18 | 1.1 |

OCA-APPX-1072

| State | UOCAVA Ballots Transmitted | UOCAVA Ballots Returned | UOCAVA Ballots Counted | | UOCAVA Ballots Rejected | |
|---|---|---|---|---|---|---|
| | | | Total | % of Returned | Total | % of Returned |
| Northern Mariana Islands [6] | 25 | 25 | 25 | 100.0 | -- | -- |
| Ohio | 25,742 | 21,601 | 21,388 | 99.0 | 213 | 1.0 |
| Oklahoma | 8,687 | 6,355 | 6,204 | 97.6 | 151 | 2.4 |
| Oregon [1] | 20,477 | 16,751 | 16,534 | 98.7 | 217 | 1.3 |
| Pennsylvania | 33,772 | 26,952 | 25,589 | 94.9 | 1,363 | 5.1 |
| Puerto Rico [7] | 587 | 587 | 587 | 100.0 | -- | -- |
| Rhode Island [8] | -- | -- | -- | -- | -- | -- |
| South Carolina [1], [9] | 14,874 | 12,963 | 12,906 | 99.6 | 57 | 0.4 |
| South Dakota | 3,159 | 3,059 | 2,939 | 96.1 | 122 | 4.0 |
| Tennessee | 17,927 | 14,884 | 14,444 | 97.0 | 440 | 3.0 |
| Texas | 85,972 | 62,651 | 59,380 | 94.8 | 1,399 | 2.2 |
| U.S. Virgin Islands [10] | 13 | 8 | 8 | 100.0 | -- | -- |
| Utah | 9,087 | 5,820 | 5,798 | 99.6 | 22 | 0.4 |
| Vermont | 2,753 | 2,753 | 2,723 | 98.9 | 30 | 1.1 |
| Virginia | 41,063 | 33,045 | 31,880 | 96.5 | 1,165 | 3.5 |
| Washington | 134,777 | 64,632 | 63,954 | 99.0 | 678 | 1.0 |
| West Virginia | 2,549 | 2,167 | 2,162 | 99.8 | 5 | 0.2 |
| Wisconsin [11] | 17,642 | 14,057 | 13,530 | 96.3 | 527 | 3.7 |
| Wyoming | 1,976 | 1,714 | 1,704 | 99.4 | 10 | 0.6 |
| U.S. Total | 1,249,601 | 911,614 | 889,837 | 97.6 | 19,060 | 2.1 |

UOCAVA Table 3 Calculation Notes:

**UOCAVA Ballots Transmitted** uses question B5a.

**UOCAVA Ballots Returned** uses question B9a.

**UOCAVA Ballots Counted, Total** uses question B14a.

**UOCAVA Ballots Counted, % of Returned** uses question B14a divided by B9a.

**UOCAVA Ballots Rejected, Total** uses question B18a.

**UOCAVA Ballots Rejected, % of Returned** uses question B18a divided by B9a.

UOCAVA Table 3 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.

[1] Georgia, Iowa, Oregon, and South Carolina reported that data on FWABs were included in the EAVS items related to UOCAVA absentee ballots because FWABs cannot be distinguished from regular UOCAVA absentee ballots.

OCA-APPX-1073



**[2]** Kootenai County in Idaho responded "Data not available" to the number of UOCAVA ballots returned (B9a) and reported 317 UOCAVA ballots counted (B14a). Because of these responses, the total number of UOCAVA ballots received at the state level was lower than the total number of UOCAVA ballots counted, and the percentage of counted ballots exceeded 100% in Idaho.

**[3]** Louisiana noted in a survey comment that "[T]he registrar sometimes transmits multiple ballots to voter (i.e. the voter did not [receive] the original ballot or the original ballot is returned as undeliverable)."

**[4]** Montana noted in a survey comment that "[B]allots issued may exceed voter registration due to replacement ballot issued."

**[5]** New York noted in a survey comment that "While the UOCAVA data reflects information provided by the counties, it does not address the variable that voters may return more than one ballot. The following further addresses this variable:

    (1) If voters have electronic access to their ballot, they could potentially download and print the documents more than once and subsequently return them to the county boards.

    (2) Some county boards mail a ballot to every UOCAVA voter, regardless of their transmission preference. Due to this, voters who already received their ballot electronically, completed and returned it, may subsequently receive a physical ballot in the mail. This may result in such voters returning this additional ballot.

    (3) Additional data collected by NYS BOE [New York State Board of Elections] has shown that more than 1700 UOCAVA voters returned multiple ballots, although the data does not report how many ballots each of these voters returned."

**[6]** The Northern Mariana Islands and the U.S. Virgin Islands reported that items related to rejected UOCAVA absentee ballots did not apply.

**[7]** Puerto Rico reported that data in items related to rejected UOCAVA absentee ballots did not apply.

**[8]** Rhode Island noted in a survey comment that "[A]ccording to RI general law all UOCAVA mail ballots are consolidated into one mail ballot category."

**[9]** South Carolina noted in a survey comment that "UOCAVA ballots counted equals UOCAVA ballots returned before deadline. No data available on UOCAVA ballots that may have been challenged."

**[10]** The U.S. Virgin Islands reported that items related to rejected UOCAVA absentee ballots did not apply, with a survey comment that "[T]he five voters did not return their ballots that were sent to them."

**[11]** In Wisconsin, other methods of transmitting UOCAVA ballots include online ballot delivery, fax, or email. There were some UOCAVA voters who voted at the polls on Election Day, rather than by UOCAVA absentee ballot; these voters are not included in Section B but are included in the numbers for Section D. Wisconsin does not have a postmark requirement for absentee ballots; absentee ballots must be received by the local clerk before polls close on Election Day. Many Wisconsin jurisdictions track the return of ballots received after Election Day, but they are not required to do so. Counts reported for "Ballot not received on time/missed deadline" represent the ballots that have been tracked in this way. In Wisconsin, ballots missing a postmark are counted if they otherwise qualify; therefore, there are no ballots rejected for this reason.

OCA-APPX-1074

## UOCAVA Table 4: Federal Write-In Absentee Ballots (FWAB)

| State | Total FWABs Received | FWABs Counted | | FWABs Rejected | | FWABs Not Categorized | |
|---|---|---|---|---|---|---|---|
| | | Total | % of Total Received | Total | % of Total Received | Total | % of Total Received |
| Alabama | 254 | 190 | 74.8 | 64 | 25.2 | 0 | 0.0 |
| Alaska | 155 | 97 | 62.6 | 58 | 37.4 | 0 | 0.0 |
| American Samoa | 0 | 0 | -- | 0 | -- | 0 | -- |
| Arizona | 236 | 186 | 78.8 | 50 | 21.2 | 0 | 0.0 |
| Arkansas | 45 | 43 | 95.6 | 2 | 4.4 | 0 | 0.0 |
| California [1] | 3,474 | 1,723 | 49.6 | 1,575 | 45.3 | 176 | 5.1 |
| Colorado | 150 | 146 | 97.3 | 4 | 2.7 | 0 | 0.0 |
| Connecticut [2] | -- | -- | -- | -- | -- | -- | -- |
| Delaware | 87 | 64 | 73.6 | 23 | 26.4 | 0 | 0.0 |
| District of Columbia | 380 | 309 | 81.3 | 71 | 18.7 | 0 | 0.0 |
| Florida | 1,726 | 833 | 48.3 | 883 | 51.2 | 10 | 0.6 |
| Georgia [3] | -- | -- | -- | -- | -- | -- | -- |
| Guam | 0 | 0 | -- | 0 | -- | 0 | -- |
| Hawaii | 12 | 12 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Idaho | 30 | 12 | 40.0 | 23 | 76.7 | -5 | -16.7 |
| Illinois | 1,156 | 916 | 79.2 | 240 | 20.8 | 0 | 0.0 |
| Indiana | 1,534 | 1,170 | 76.3 | 40 | 2.6 | 324 | 21.1 |
| Iowa [3] | -- | -- | -- | -- | -- | -- | -- |
| Kansas | 169 | 141 | 83.4 | 27 | 16.0 | 1 | 0.6 |
| Kentucky [4] | 106 | -- | -- | -- | -- | 106 | 100.0 |
| Louisiana | 30 | 28 | 93.3 | 2 | 6.7 | 0 | 0.0 |
| Maine | 106 | 97 | 91.5 | 9 | 8.5 | 0 | 0.0 |
| Maryland | 943 | 491 | 52.1 | 452 | 47.9 | 0 | 0.0 |
| Massachusetts | 647 | 646 | 99.8 | 1 | 0.2 | 0 | 0.0 |
| Michigan [5] | 949 | 329 | 34.7 | 620 | 65.3 | 0 | 0.0 |
| Minnesota | 506 | 333 | 65.8 | 173 | 34.2 | 0 | 0.0 |
| Mississippi | 3 | 3 | 100.0 | 1 | 33.3 | -1 | -33.3 |
| Missouri | 301 | 301 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Montana | 61 | 56 | 91.8 | 5 | 8.2 | 0 | 0.0 |
| Nebraska | 81 | 80 | 98.8 | 1 | 1.2 | 0 | 0.0 |
| Nevada | 222 | 221 | 99.5 | 1 | 0.5 | 0 | 0.0 |
| New Hampshire | 86 | 85 | 98.8 | 1 | 1.2 | 0 | 0.0 |
| New Jersey | 9,333 | 9,269 | 99.3 | 55 | 0.6 | 9 | 0.1 |
| New Mexico [6] | 131 | 83 | 63.4 | 48 | 36.6 | 0 | 0.0 |
| New York | 3,088 | 1,637 | 53.0 | 1,424 | 46.1 | 27 | 0.9 |

OCA-APPX-1075



| State | Total FWABs Received | FWABs Counted | | FWABs Rejected | | FWABs Not Categorized | |
|---|---|---|---|---|---|---|---|
| | | Total | % of Total Received | Total | % of Total Received | Total | % of Total Received |
| North Carolina | 921 | 910 | 98.8 | 11 | 1.2 | 0 | 0.0 |
| North Dakota | 29 | 29 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Northern Mariana Islands [7] | -- | -- | -- | -- | -- | -- | -- |
| Ohio [8] | 789 | 466 | 59.1 | 313 | 39.7 | 10 | 1.3 |
| Oklahoma | 207 | 162 | 78.3 | 45 | 21.7 | 0 | 0.0 |
| Oregon [3] | -- | -- | -- | -- | -- | -- | -- |
| Pennsylvania | 242 | 235 | 97.1 | 7 | 2.9 | 0 | 0.0 |
| Puerto Rico | 0 | 0 | -- | 0 | -- | 0 | -- |
| Rhode Island [9] | -- | -- | -- | -- | -- | -- | -- |
| South Carolina [3] | -- | -- | -- | -- | -- | -- | -- |
| South Dakota | 14 | 12 | 85.7 | 2 | 14.3 | 0 | 0.0 |
| Tennessee | 456 | 232 | 50.9 | 224 | 49.1 | 0 | 0.0 |
| Texas | 2,839 | 912 | 32.1 | 1,925 | 67.8 | 2 | 0.1 |
| U.S. Virgin Islands [10] | -- | -- | -- | -- | -- | -- | -- |
| Utah [2] | -- | -- | -- | -- | -- | -- | -- |
| Vermont [11] | -- | -- | -- | -- | -- | -- | -- |
| Virginia [12] | 448 | 448 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Washington | 898 | 894 | 99.6 | 4 | 0.4 | 0 | 0.0 |
| West Virginia | 45 | 39 | 86.7 | 6 | 13.3 | 0 | 0.0 |
| Wisconsin [13] | 137 | 56 | 40.9 | 48 | 35.0 | 33 | 24.1 |
| Wyoming | 1 | 1 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| U.S. Total | 33,027 | 23,897 | 72.6 | 8,438 | 25.6 | 692 | 2.1 |

UOCAVA Table 4 Calculation Notes:

**Total FWABs Received** uses question B23a.

**FWABs Counted, Total** uses question B24a.

**FWABs Counted, %** uses question B24a divided by question B23a.

**FWABs Rejected, Total** uses the sum of questions B25a, B26a, and B27a.

**FWABs Rejected, %** uses the sum of questions B25a, B26a, and B27a, all divided by B23a.

**FWABs Not Categorized, Total** uses question B23a minus the sum of questions B24a, B25a,B26a, and B27a.

**FWABs Not Categorized, %** uses question B23a minus the sum of questions B24a, B25a, B26a, and B27a, all divided by question B23a.

OCA-APPX-1076

UOCAVA Table 4 Data Notes:

**General Notes:**

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Negative numbers in the Not Categorized FWABs category indicate that the sum of counted and rejected FWABs account for more than the total number of FWABs received as reported by the state.
- The EAVS tracks data on FWABs that were rejected because they were received after the ballot receipt deadline (B25), because the voter's regular absentee ballot was received and counted (B26), and for other reasons (B27).

[1] In California, a large number of FWAB rejections occurred because regular vote-by-mail ballots were already returned and counted for the same voter, and because of missing signatures, incomplete information, or receipt after deadline.

[2] Connecticut and Utah reported that data on items related to FWABs were not available.

[3] Georgia, Iowa, Oregon, and South Carolina reported that data on items related to FWABs were not available because FWABs cannot be distinguished from regular UOCAVA absentee ballots.

[4] Kentucky reported that data on items related to counted and rejected FWABs were not available. This state also noted in a survey comment that "[R]eject reason not tracked."

[5] Michigan noted in a survey comment that "[A]ll FWABs received were either counted, received a regular ballot that was counted, or arrived late."

[6] In New Mexico, the reason for rejection is not tracked by counties at this time.

[7] The Northern Mariana Islands reported that data on items related to FWABs were not available, with a survey comment that "[T]he election statute does not allow for Federal Write-in Absentee Ballot."

[8] Ohio noted for multiple counties that the "[T]otal in B23a does include B26a. Source information [for military/overseas voters] for B26a is not tracked. Because of this, B23b + B23c will not always equal B23a."

[9] Rhode Island noted in a survey comment that "[A]ccording to RI general law all UOCAVA mail ballots are consolidated into one mail ballot category."

[10] The U.S. Virgin Islands reported that data on items related to FWABs were not available.

[11] Vermont reported that data on FWABs were not available.

[12] Local election officials in Virginia do not enter information relating to rejected FWABs into the state's central system and only enter information on FWABs that are accepted and counted.

[13] In Wisconsin, many jurisdictions track the return of ballots received after Election Day but are not required to do so. The counts reported in "Total number of FWABs rejected because it was received after the ballot receipt deadline" [B25a] are limited to ballots in jurisdictions that recorded these in the statewide database.

OCA-APPX-1077



# Chapter 5. Survey Methodology and Procedures

Since 2004, the U.S. Election Assistance Commission (EAC) has conducted the Election Administration and Voting Survey (EAVS) following each federal general election. The project collects data on election policies, voter registration, voting by individuals covered by the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), mail voting, in-person voting, poll workers and polling places, provisional voting, election technology, and turnout. All U.S. states, U.S. territories, and the District of Columbia are included in the EAVS.[1] The EAVS helps the EAC meet its mandate under the Help America Vote Act (HAVA) to serve as a national clearinghouse and resource for the compilation of information and the review of procedures with respect to the administration of federal elections.

The EAVS collectively consists of two surveys administered separately: The Election Administration Policy Survey (Policy Survey), which collects data on state election policies and procedures, was administered from August to December 2020. The information collected through the Policy Survey helps provide context to the data reported through the EAVS. The EAVS, which collects data about registrations, voters, and ballots in the 2020 general election, was administered from December 2020 to July 2021. The data collected through the EAVS allow states to satisfy their data reporting requirements established by the National Voter Registration Act (NVRA) and UOCAVA and provide a detailed snapshot of how general elections are administered in the United States every two years.

This report relies on EAVS data submitted and certified by 50 states, the District of Columbia, and five U.S. territories. Data for each state were collected at the jurisdiction level, with 6,460 of the 6,460 jurisdictions nationwide (100%) submitting at least partial data in 2020.[2] Appendix A of this chapter shows the number of jurisdictions and the response rate by state (overall and for each section of the EAVS).

---

[1] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Election Administration Policy Survey and EAVS data. Puerto Rico provides EAVS data only in presidential election years, as it does not hold elections for federal candidates in midterm election years. American Samoa did not participate in the 2016 EAVS. The Northern Mariana Islands participated in the EAVS for the first time in 2020.

[2] What constitutes a jurisdiction for EAVS reporting is defined by how each state chose to provide data. For the 2020 EAVS, most states reported data on the county level (or county equivalent, such as parishes for Louisiana). Illinois, Maryland, Missouri, and Virginia reported data for independent cities in addition to counties. The territories, the District of Columbia, and Alaska each reported as a single jurisdiction. Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and Wisconsin reported data on the township level. Maine also reported its UOCAVA data in Section B as a separate jurisdiction, because this information was only collected at the state level. Michigan reported data for the county level, but most election administration activities take place in the 1,520 local election jurisdictions in the state. See Appendix A in this chapter for a breakdown of the number of jurisdictions reported in each state. Elections for Kalawao County in Hawaii are administered by Maui County; although Kalawao is included as a jurisdiction in the EAVS data, Kalawao's data are included with Maui's data.

OCA-APPX-1078

## Survey Questions

The 2020 Policy Survey consisted of 80 questions (41 required questions, 23 follow-up questions based on a state's responses to the required questions, and 16 optional comments boxes). Of these, 58 were single-select or multiselect questions, 20 were open-ended with a text response, and two were hybrid single-select and text questions.

The 2020 EAVS consisted of 407 questions (217 required, 79 follow-up questions based on a jurisdiction's responses to the required questions, 77 optional questions based on whether a jurisdiction had additional data to provide, and 34 optional comments boxes). Of these questions, 253 were fill in the blank with a numerical response, 37 were item descriptions, 65 were single-select questions, and 52 were open-ended with a text response.

The content of the questions in the EAVS has largely been unchanged since the 2008 survey, although questions are periodically removed, updated, or reordered. The Policy Survey was significantly reorganized in 2018 and was converted to a set of closed-ended questions. The 2020 Policy Survey was significantly revised and expanded from the 2018 survey. The full set of EAVS and Policy Survey questions can be found at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

The following sections detail the data collected by these surveys and the changes that were made to the questions from the 2018 versions. In 2020, the primary changes to the survey questions involved:

- Adding Policy Survey questions that could be used to validate EAVS items.
- Removing a redundant EAVS question, adding one new EAVS question, and adding two sub-questions to an existing EAVS question.
- Clarifying instructions to make completion easier for election officials and to improve data quality.

### Policy Survey

Since 2008, the EAVS has been accompanied by a survey that collects information on states' election policies and practices to provide greater context for the jurisdiction-level data collected through the EAVS. This originally took the form of the Statutory Overview, which consisted of open-ended questions on statutory requirements for various parts of the election process, asking states to report information on their election laws and policies. However, the open-ended format made it difficult to interpret states' statutory language, identify patterns in election practices, and draw meaningful comparisons between states.

Beginning with the 2018 EAVS, the Statutory Overview was significantly redesigned and renamed the Policy Survey. The survey now uses closed-ended questions and is intended to capture states' broad policies rather than to represent a comprehensive overview of state statutory language. This allows for greater ease in interpreting the results, creating comparisons across states, and providing

OCA-APPX-1079

context in understanding the EAVS data. The Policy Survey questions are designed to map onto the EAVS data questions so that the two surveys can be used in concert.

The 2020 Policy Survey collected information on election infrastructure; how the state answers the EAVS; voter registration and list maintenance; election technology; mail voting; in-person voting before Election Day; vote centers; UOCAVA voting; provisional voting; election certification, recounts, and audits; voter identification; and how criminal convictions affect voting. The 2020 Policy Survey was significantly revised and expanded compared to the 2018 survey. New additions to the Policy Survey included:

| New Question for 2020 | Description |
|---|---|
| Q1, Q1a, Q2, Q2a, Q2b, and Q2c | Information on a state's election infrastructure, including the name, title, and duties of the chief state election official; the names and EAVS responsibilities of state election offices; the names and EAVS responsibilities of local election offices; whether any jurisdictions had been added or consolidated since the 2018 EAVS; and contact information (including the office name, physical address, mailing address, phone number, website, and email address) for all state and local election offices within the state. |
| Q6a and Q6b | Information on how a state implements its automatic or automated voter registration process, including how individuals could decline to be registered. |
| Q7b | Features incorporated into a state's online registration system. |
| Q8 | Online voting information search tools available on the state's election website. |
| Q10 | Preregistration of voters before they turn 18 years of age. |
| Q11, Q11a, Q11b | Whether the state designates certain voters as inactive, and if so, what actions would result in an active voter being designated as inactive and what actions would result in an inactive voter being designated as active. |
| Q12 | Whether state officials, local officials, or both are responsible for modifying or removing voter registration records. |
| Q13, Q13a | Whether the state sends confirmation notices, whether the confirmation notices are sent pursuant to the NVRA, pursuant to state statute, or formal administrative rule or guidance, and which types of voters are sent confirmation notices. |
| Q14 | What data sources a state uses to identify potentially ineligible voters on their voter registration rolls. |
| Q15, Q15a | Policy on voting system testing and certification and what type of testing and certification is required. |
| Q16, Q16a | Whether electronic poll books are used in the state and whether testing and certification for those electronic poll books is required. |
| Q21 | How long a state tracks mailed ballots for inclusion in its EAVS Section C data. |
| Q22 | What types of markings satisfy the state's postmark requirement for mailed ballots. |
| Q23 | Which voters may receive ballots electronically. |
| Q30 | The deadline for overseas UOCAVA voters to return their ballots. This question was designed to match a question on domestic military UOCAVA voters that had been in the 2018 Policy Survey but was renumbered and redesigned for 2020 (Q29). |

OCA-APPX-1080

| New Question for 2020 | Description |
|---|---|
| Q31 | Whether UOCAVA ballots have different postmark requirements for mailed ballots. |
| Q32, Q32a, Q32b | Whether the state uses provisional ballots, and if so, what circumstances warrant a voter being provided a provisional ballot and the deadline for adjudicating provisional ballots. |
| Q33 | State's election certification deadline. |
| Q35a | What type(s) of audits a state conducts. |
| Q36a | Deadline for a voter to present valid identification if they do not have identification at the polls and must take further action to prove their identity. |

Questions that were significantly revised from the 2018 Policy Survey included:

| Significantly Revised from 2018 | Description |
|---|---|
| Q5 | Government entities that transmit data to the centralized state database. This question had been Q3 and Q4 in 2018. For 2020, this question was collapsed from three to two subcategories, including a binary yes/no question on whether the government entity transfers data and a single-select, follow-up question with how frequently the data transmission occurs. |
| Q6 | Whether the state registers individuals to vote automatically or via an automated process. This question had previously been Q5 in 2018. The 2020 question clarified the definition of "automatically" and "automated process," provided examples of automated processes, and included a space for comments. |
| Q6a | Which state agencies participate in automatic or automated voter registration. This question had previously been Q5a in 2018. In 2020, this was changed to a multiselect question with additional answer options that better align with state practices. |
| Q7 | Whether the state has online registration. This question had previously been Q6 in 2018. The 2020 question clarified the definition of online registration and added an answer option for states that could only process registration updates through online registration. |
| Q7a | Whether a registrant needed a state-issued form of identification in order to register online. This question had previously been Q6a in 2018. The 2020 question clarified that any state-issued identification, not just driver's licenses, would apply to this question. |
| Q9 | Whether a state has same-day voter registration (SDR). This question had previously been Q7 in 2018. The 2020 question included a clarification that an overlap between the availability between the mail balloting period and the close of voter registration should not be considered SDR. |
| Q9a | The type of SDR offered by the state. This question had previously been Q7 in 2018. The 2020 question was changed from a single-select question to a multiselect question. |

OCA-APPX-1081



| Significantly Revised from 2018 | Description |
|---|---|
| Q20 | Deadlines for mail voters to return their ballots. This question had previously been Q11 in 2018. The 2020 question restructured the answer options to provide greater clarity, eliminated the answer option for mailed ballots postmarked after Election Day, and included a comments section. |
| Q24 | Types of in-person early voting permitted in a state. This question had previously been Q12 in 2018. The 2020 question asked for what terminology a state used to describe in-person early voting and clarified that hand delivery of mailed ballots by voters should not be considered early voting. |
| Q24a | Whether an excuse was required for early voting. This question had previously been Q12a in 2018. The 2020 question was updated to match the wording of Q24. |
| Q25 | Whether a state used vote centers. This question had previously been Q13 in 2018. The 2020 question clarified that polling locations that function as a vote center, even if the terminology is not the same, should be included in this question. |
| Q26 | Which Federal Post Card Application (FPCA) submission methods are permitted in the state. This question had previously been Q14 in 2018. The 2020 question clarified that postal mail does not need to be specified, as this mode of submission is required in all states. |
| Q27 | Whether FPCA registration is permanent or temporary. This question had previously been Q15 in 2018. The 2020 question included updated wording to clarify that it applies to how long an FPCA registers a person as a UOCAVA voter. |
| Q28 | How long a voter remains eligible to receive a UOCAVA ballot after registering with an FPCA. This question had previously been Q15 in 2018. The 2020 question provided more extensive answer options. |
| Q29 | Deadline for domestic military UOCAVA voters to return their ballots. This question had previously been Q17 in 2018. The 2020 question was revised to match the format of Q20, which collects data on the deadline for voters to return mailed ballots, and the instructions were updated to specify that the question applies to domestic military UOCAVA voters rather than all UOCAVA voters. |
| Q32c | How a state would handle a provisional ballot cast in the wrong precinct. This question had previously been Q18 in 2018. The 2020 question included an instruction about the definition of a partially counted provisional ballot. |
| Q34 | Reasons for conducting post-election recounts of ballots. This question had previously been Q19 in 2018. The 2020 question added a definition of "election recount" and included updated answer options. |
| Q35 | Statutory requirements for audits. This question had previously been Q20 in 2018. The 2020 question included revised terminology, a definition of "audit," and the addition of an answer option for other types of post-election tabulation audits. |
| Q36 | Voter identification requirements for non-first-time voters. This question had previously been Q21 in 2018. The 2020 question included additional answer options and clarified that non-government, non-photo identification options could include proof of residence. |
| Q37 | Which populations become ineligible to vote because of disqualifying criminal convictions. This question had previously been Q22 in 2018. The 2020 question included revised question wording and was changed to a multiselect question. |

OCA-APPX-1082

| Significantly Revised from 2018 | Description |
|---|---|
| Q37a | How long people with disqualifying felony convictions lose their ability to vote. This question had previously been Q23 in 2018. The 2020 question was changed to a multiselect question, added an answer option for payment of outstanding fines, and the answer options were reworded to be mutually exclusive. |
| Q37b | How people with disqualifying felony convictions can have their voting rights restored. This question had previously been Q24 in 2018. The 2020 question was changed to a multiselect question, the wording of the answer options was clarified, and a comment section was added. |

The following questions had no change except for renumbering and, for some, the addition of a comment section:

| 2020 Numbering | 2018 Numbering | Description |
|---|---|---|
| Q3 | Q1 | How the state answers the EAVS. |
| Q4 | Q2 | Whether the state has a top-down, bottom-up, or hybrid voter registration database. |
| Q4a | Q2a | How often bottom-up or hybrid databases transmit information to the state voter registration database. |
| Q17 | Q8 | Whether an excuse is required for mail voting. |
| Q18 | Q9 | Whether the state, or any jurisdiction within the state, conducted an all-vote-by-mail election for the November 2020 general election. |
| Q18a | Q9a | Whether the all-vote-by-mail system was used statewide or only in certain jurisdictions for the 2020 general election. |
| Q19 | Q10 | Whether permanent mail voting is permitted. |
| Q19a | Q10a | Which voters are permitted to register as permanent mail voters. |
| Q25a | Q13a | How vote centers operate within the state. |

The 2018 Policy Survey questions on audits of polling place procedures, audits of voting machines, and types of ballots audited were removed for 2020.

## Section A: Voter Registration

Section A of the EAVS collects data on voter registration. This includes the number of persons registered and eligible to vote in the November 2020 general election, active and inactive voters, voters who used SDR, registration forms processed between the close of registration for the 2018 general election and the close of registration for the 2020 general election, confirmation notices sent pursuant to the NVRA, and voters removed from the voter registration rolls.

OCA-APPX-1083

In 2020, changes to this section included the addition of sub-questions on the number of SDRs received on Election Day (A2b) and before Election Day (A2c), in addition to the total provided in A2a. The instructions in this question were also revised to clarify that all SDRs received for the 2020 general election should be reported. In addition, the instructions for A4–A7 were revised to clarify that online voter registrations reported in A4c, A5c, A6c, and A7c should only include registration forms that were completed and submitted through a web-based online registration form system and that SDRs should be categorized according to the mode used to submit the registration application. The instructions for A8 were revised to include a more accurate definition of the term "confirmation notice" and to clarify that notices sent between the close of registration for the November 2018 general election and the close of registration for the November 2020 general election should be reported in this question.

## Section B: UOCAVA

Section B of the EAVS collects data on voters covered by UOCAVA. This includes the number of registered UOCAVA voters; FPCAs received and rejected; UOCAVA ballots transmitted, returned, counted, and rejected; and Federal Write-In Absentee Ballots (FWAB) received, counted, and rejected. Most questions in Section B were divided by type of voter (uniformed services members and overseas citizens) and by method of ballot transmission and return (postal mail, email, and other).

In 2014, the UOCAVA section of the EAVS was expanded to include questions from the Federal Voting Assistance Program's (FVAP) Post-Election Quantitative Survey. The goal of combining surveys was to reduce the burden on election officials by asking them to answer a single set of questions about UOCAVA voting rather than answering two surveys that captured many of the same data points. The current format of Section B is the result of a memorandum of understanding between the EAC and FVAP that allows both agencies to collect, share, and evaluate data on the voting experiences of citizens covered under UOCAVA and to fulfill their congressionally mandated requirements to study UOCAVA voters.

In 2020, changes to this section included the addition of question B27. Previously, the questions in the EAVS relating to FWABs only asked for data on FWABs rejected from being received after the ballot receipt deadline or because the voter's regular absentee ballot was received and counted. The addition of B27 allows states to report data on FWABs rejected for other reasons, in total (B27a), for uniformed services voters (B27b), and for overseas citizen voters (B27c). A space was also provided to collect a description of the reasons the FWABs reported in B27 were rejected. In addition, the instructions for question B8 were updated to clarify that ballots transmitted by "other mode" could include fax and online ballot delivery portals.

## Section C: Mail Voting

Section C of the EAVS collects data on mail voting. This includes the number of mailed ballots transmitted, returned, counted, and rejected, as well as the number of ballots sent to permanent mail voters.

OCA-APPX-1084

In 2020, changes to this section included a clarification to the instructions of C1 that all mailed ballots transmitted for the November 2020 general election should be included in this question, and a clarification to the instructions of C2 that ballots transmitted in an all-vote-by-mail state or jurisdiction should not be included in the count of mailed ballots transmitted to permanent absentee voters.

## Section D: In-Person Voting and Polling Operations

Section D of the EAVS collects data on in-person voting. This includes the number of ballots cast through in-person voting before and on Election Day, the number of precincts and polling places, and the number of poll workers and the level of difficulty involved in recruiting poll workers. This section was previously called "Total Votes Cast and In-Person Voting" and was renamed in 2020 to reflect the removal of a redundant question about the total votes cast and to better align with the section's focus on in-person voting and the polling operations to support in-person voting.

The removal of the 2018 question on total votes cast caused the questions in Section D to be renumbered. The removed question on total votes cast was redundant with question F1a on the number of votes cast and counted. In addition, the instructions in questions D5–D7 were updated to clarify the definition of a poll worker and to specify how poll workers should be counted. The instructions for D6 were updated to specify that each early voting poll worker should be counted once regardless of how many early voting shifts they worked, and the instructions for D7 were updated to specify that each poll worker should be counted only once, regardless of how many shifts they worked.

## Section E: Provisional Ballots

Section E of the EAVS collects data on provisional voting, including provisional ballots submitted, provisional ballot adjudication, and reasons for rejection.

In 2020, changes to this section included a clarification of the instructions in E1b–d that the number of provisional ballots submitted should be recorded. A definition of provisional ballots counted in part was added to the instructions of E1c.

## Section F: Voter Participation and Election Technologies

Section F of the EAVS collects data on voter participation and election technologies. This includes total participation in the 2020 general election, how many ballots were cast and counted by mode of participation, the source of participation data, use of electronic and paper poll books, voting equipment used, and the location where votes are tallied. Respondents were also provided the opportunity to share general comments regarding their state's or jurisdiction's Election Day experiences, noteworthy successes, and challenges they overcame when administering the November 2020 general election.

In 2020, changes to this section included a clarification of how participation should be counted in question F1. The 2018 question collected data on the number of voters who participated; this instruction was updated for 2020 to clarify that voters who cast a ballot that was counted should be

OCA-APPX-1085

reported in this question. In addition, question F1e removed the instruction that provisional voters who were given credit in their vote history should be included in this question. The instructions for question F8 were updated to include a more complete description of scanners.

## Data Collection Procedures

In compliance with the Paperwork Reduction Act of 1995, the EAC submitted the questions for the 2020 Policy Survey and the EAVS for review by the Office of Management and Budget (OMB) and for public comment. Public comments were collected from October 8, 2019, to December 6, 2019, and from February 11, 2020, to March 12, 2020. The questions were approved under OMB Control No. 3265-0006, expiration date March 31, 2023. The survey questions were made available publicly on the EAC's website on July 8, 2020. Targeted communications with state points of contact (POC) responsible for completing the surveys began on July 7, 2020, and continued regularly throughout the data collection period. These targeted communications aimed to keep states aware of data collection deadlines and resources available to assist them with completing the survey.

The following sections describe each aspect of the EAVS data collection process in more detail.

### Needs Assessment

To better understand how state-level officials respond to the EAVS and where they need support, the EAC undertook a systematic assessment of the needs of EAVS POCs in October and November 2019. The goal of these interviews was to better understand each state's EAVS reporting process (including how data is collected, which templates are used, the state's use of technical assistance resources, and data quality) and how improvements could be made to the 2020 EAVS. All state POCs that completed the 2018 EAVS were invited to participate and interviews with 34 states were completed. The EAC created semi-structured interview guides for each participant that also left room for the moderator to probe further.

The information collected through these needs assessment conversations helped the EAC's outreach plan design, shaped the training opportunities provided to each state, and identified states that needed specialized support to complete the EAVS. Based on these conversations, the EAC made improvements to the design and usability of the data collection templates, added supplementary instructions to clarify how respondents were to use the missing data codes in the survey, and released the EAVS data collection templates earlier than in previous years to afford POCs more time to compile their data submissions. During these needs assessment calls, the EAC also encouraged state POCs to review and provide comments on the draft 2020 survey questions, which at the time were available on the Federal Register.

### Policy Survey

Invitations to complete the 2020 Policy Survey were sent to all 56 states, territories, and districts on August 3, 2020. The Policy Survey data are collected in advance of EAVS data collection to reduce respondent burden and to allow the EAC to create data validation rules for the EAVS data. The Policy Survey was completed through an online survey; this survey had undergone usability testing with POCs from nine states and territories in June and July 2020, and edits to the survey based on the

OCA-APPX-1086

results of this testing were completed in advance of the survey's launch.[3] Periodic reminders were issued to POCs during the data collection period. All 56 states, territories, and districts submitted their Policy Survey data by December 15, 2020. When the answer options within a question did not fully capture a state's policy, POCs were encouraged to provide comments with further explanation.

The 2020 Policy Survey had a series of questions about the contact information of state and local election offices. The EAC collected this contact information from state election websites and official registers in May and June 2020. This information was pre-populated into the online Policy Survey data collection tool and was provided to POCs to review and correct as they completed the Policy Survey. Because this data contains personally identifiable information (PII), it is not part of the public data release.

Once received, each Policy Survey submission was reviewed for completeness. Through these reviews and through further reviews conducted once each state's EAVS submission was received, the EAC made Policy Survey corrections for 37 states before the end of the EAVS data collection period.

For the first time, the EAC incorporated a state's Policy Survey submission directly into the EAVS data collection template validations in 2020. This means that a state's 2020 EAVS data collection templates could not be released until the state's Policy Survey submission was finalized.

## EAVS

The EAVS data collection period was opened to 46 states on November 9, 2020. The data collection was opened to the 10 remaining states once their Policy Survey submissions were received and their templates were finalized; all data collection templates were released to states by December 18, 2020. The EAVS data collection period ended in July 2021. Data submissions from all 56 states were received by that date, with a response rate of 100% of states. After providing final data, states' chief election officials certified their Policy Survey and EAVS as complete and correct to the best of their knowledge.

To build on the needs assessment conversations that were completed in October and November 2019, the EAC completed pre-survey outreach calls with officials from states that had new designated POCs for the 2020 EAVS or that had requested further follow-up after the needs assessment calls. Fifteen states were invited to participate in the outreach calls, and 10 states completed calls in August of 2020. During these interviews, the EAC provided an overview of the project timeline and the types of data collected in the Policy Survey and the EAVS, notified the POCs of the help desk support and other resources that would be provided as part of the 2020 EAVS, probed POCs on data issues from the 2018 EAVS, and whether the ongoing COVID-19 pandemic was impacting the state's election policies or could affect its ability to submit EAVS data in a timely

---

[3] Fifty-three states completed the Policy Survey via the online survey. Three states completed the survey via a paper instrument; for these states, the Policy Survey technical assistants entered the data from the paper instrument into the online survey and asked the state to review for accuracy and submit the data.

OCA-APPX-1087

manner. These conversations helped ensure that the EAC was prepared to provide adequate support to states as they completed their EAVS data collection.

## Data Collection Templates

Given the diversity in how states respond to the EAVS, creating data templates that accommodate the needs of all states and all local jurisdictions is especially challenging. The 2020 EAVS data were collected using two data collection templates:

- The Excel template was a flat data format that allowed POCs to copy and paste large amounts of data, such as from a report generated from the state's centralized election database. Each EAVS item was listed in a column in the Excel template and each EAVS jurisdiction within the state was listed in a row. States with multiple jurisdictions were required to submit their data through the Excel template.
- The online template was an item-by-item survey hosted online that guided respondents through entering their responses. This template was primarily intended to be used by jurisdictions that entered EAVS data, although some states entered data into the online template on behalf of some or all of their jurisdictions. The data from the online template was exported to an Excel file that matched the format of the Excel data collection template.

Usability testing of the draft online template was completed with nine local election officials between July and August 2020, and edits to the survey based on the results of this testing were completed in advance of the online template's launch.

The EAC pre-populated data into the online template for four states and into the Excel template for one state. Pre-fill data was provided by state POCs via the Excel template or via an email or phone request that provided detail on which items were to be populated.

Both data collection templates employed a variety of error-checking data validations to reduce response burden and to increase data quality.

## Data Validation

One of the key issues associated with any data collection project is ensuring that the data collected are as accurate as possible. Given the number of survey questions, their complexity and granularity, and the variety of approaches in how state and local jurisdictions provide responses, it can be easy to make data entry mistakes or report data in an incorrect survey item. All 2020 EAVS data collection templates included built-in internal and external validation checks that flagged specific types of potential errors within a data submission.

The validation checks were designed to flag common data issues so that respondents were aware of them before submitting their data to the EAC. In response to these validations, states and jurisdictions were encouraged to review their data, correct it if needed, and use the comments fields to explain any peculiarities and give context to the data that were being reported.

OCA-APPX-1088

In addition, once a state submitted data for review by the EAC, additional data reviews were conducted by trained data analysts. These reviews checked for missing data, internal math and logic issues, conflicts with Policy Survey responses, and significant changes compared to 2016 EAVS data.[4] The results of this review were provided to state POCs in a written memo, along with a file that had sample rates and percentages calculated using their draft submission. These sample rates and percentages were provided to assist POCs with identifying results that did not align with their expectations, so they could be corrected in the final submission.

A complete list of all validation checks that were built into the data collection templates and additional data validations that were conducted for draft submissions can be found in Appendices B and C of this chapter. In general, there were five types of data validations.

## Math Validations

Many items in the EAVS asked respondents to report a total and then divide that total into subcategories. The math validations within the templates checked that the sum of the subcategories equaled the reported total of the overall category. For example, if the total number of voters who cast a ballot that was counted in the 2020 general election did not match the sum of the number of voters who used different modes of voting, then the respondent was asked to review the numbers reported in these items.[5]

## Logic Validations

Logic validations identified when a value in the survey was incompatible with a response provided in another related question in the survey. For example, if the number of mailed ballots counted by a jurisdiction exceeded the number of mailed ballots that had been returned by voters, then the respondent was asked to review these items.[6]

## Policy Survey Validations

These validations identified instances in which an EAVS item conflicted with the Policy Survey data that had been submitted by the state. For example, if a state reported having an online voter registration system through which an individual could submit a voter registration application, but reported "does not apply" to EAVS items relating to the number of voter registration forms submitted through online sources, then the validations would highlight that a conflict existed between the respondent's EAVS and Policy Survey data and would ask the respondent to review the EAVS items and contact the EAC if the Policy Survey response needed to be updated.[7]

---

[4] The 2016 EAVS was used as a point of comparison in the data reviews, because it was the most recent presidential election.
[5] The total number of voters participating in the 2020 general election was reported in item F1a in the 2020 EAVS. The number of voters who participated using different modes of voting were items F1b through F1h.
[6] The number of mailed ballots counted by a jurisdiction was reported in item C3a in the 2020 EAVS. The number of mailed ballots returned by voters was reported in item C1b.
[7] Data on states' policies regarding online voter registration were reported in item Q7 in the Policy Survey. The number of total, new, duplicate, and rejected registrations received through online registration systems were reported in items A4c, A5c, A6c, and A7c, respectively, of EAVS.

OCA-APPX-1089



**Missing Items**

With the exception of comment boxes and "other" subcategories for reporting data beyond what was specified in a question, all items in the EAVS required a response. An alert appeared if a response to a required item was not provided. For example, if a respondent reported the total number of registered voters in their jurisdiction but not the number of active and inactive registered voters, the latter items would be flagged with a request that the respondent should report "does not apply" (if their state does not have an applicable law or policy), "data not available" (if the data for an item is not tracked), or zero (if no instance of an item occurred) rather than leave the item blank.[8]

**Valid Skips**

For the first time, in 2020, the EAC introduced a valid skip code to the EAVS data. This code was automatically filled in by the template validations when an item did not require an answer because of a response to a previous item in the survey. The use of the valid skip code is distinct from the use of the "does not apply" code (for when a jurisdiction does not have a law or policy in place that allows for the type of election participation in the question) and the "data not available" code (for when the data for a type of election participation is not tracked). For instance, if a jurisdiction indicated in EAVS question F5a that it did not use direct-recording electronic (DRE) voting machines without a voter-verified paper audit trail (VVPAT), then items F5b through F5d, relating to the make and model of equipment, the number deployed, and the usage of the equipment, were filled as "valid skip" by the template validations.

## Technical Assistance

Technical assistance was provided through the duration of the Policy Survey and the EAVS data collection periods. Help desk support was provided for 20 hours each week from August 3, 2020, to December 31, 2020, and for 50 hours each week from January 4, 2021, to March 30, 2021. State and local EAVS respondents could request assistance via email or phone. A team of trained technical assistants provided support on all aspects of the survey data collection processes. A total of 812 support tickets were received from all 56 states, territories, and districts. The most common inquiries were related to accessing the data collection templates, re-opening online templates that had been submitted prematurely, how data transferred between the online template and the Excel template, and questions about survey definitions (including SDR, how to classify registration forms in questions A3–A7, and what types of voting should be counted as in-person early voting for purposes of EAVS).

After the first round of EAVS data was collected in March 2021, a group of subject matter experts (SME) from the EAC conducted an extra quality control review via video conference. All states and territories were invited to participate and 51 out of 56 participated. The extra quality check was necessary due to the new voting options throughout the country for the 2020 general election and due to challenges caused by the COVID-19 pandemic. Thirty-eight of the states and territories that were interviewed requested data changes or added/amended footnotes to this report.

---

[8] The total number of registered voters for the 2020 general election was reported in item A1a in the EAVS. The number of active registered voters was item A1b. The number of inactive registered voters was item A1c.

OCA-APPX-1090

## Resources for EAVS Respondents

In addition to providing direct, customized technical assistance, the EAC made a wide variety of written and video training resources available to survey respondents on demand. A website was established to house these resources and to provide a secure place for state EAVS POCs to upload data submissions and other documents for the EAC to review.

The resources on this website included PDF copies of the Policy Survey and EAVS questions; a link to the online template; six videos that outlined the questions and instructions in the six sections of the EAVS; three video webinars that provided guidance on the overall EAVS process, on collecting data from local jurisdictions, and for state POCs new to EAVS data collection; eleven newsletters that were released between August 2020 and March 2021; an extensive user guide that provided step-by-step instructions for both data collection templates; a policy guide approved by the EAC Commissioners that provided information to election officials responsible for completing EAVS; and an Excel crosswalk that documented survey changes from 2018 to 2020.

The website also contained a section that was restricted to state POCs. This section had copies of the state's 2016 and 2018 EAVS and the state's Statutory Overview or Policy Survey data available for download, a table that tracked the online template progress for each jurisdiction within the state, and the capacity for POCs to upload files for the EAC to review.

## Data Reporting and Calculations

In 2020, most EAVS data were reported at the local jurisdiction level. For the purposes of this report, for states that have multiple jurisdictions, state totals were calculated by summing the data from all jurisdictions within a state. National totals were calculated by summing the state-level totals.

Whenever possible, this report uses percentages and rates rather than raw numbers to make comparisons across states and across election years. For these calculations, items were combined as necessary to create the numerator and denominator and to produce a percentage or rate. For example, the following formula was used to calculate the percentage of transmitted mailed ballots that were returned by voters for the 2020 general election:

$$\frac{\textit{Total number of mailed ballots returned by voters (C1b)}}{\textit{Total number of mailed ballots transmitted by election offices (C1a)}} \times 100$$

Percentages at the national level were calculated using casewise missing data deletion at the state level. Only states that had data for both the numerator and denominator for a calculation were included when reporting percentages at the national level. Responses of "does not apply," "data not available," and "valid skip" were considered missing for purposes of creating these calculations. Casewise deletion was used in the analysis for this report to avoid overinflating the denominator of the calculations. This is especially applicable when states do not track data for a particular item, or when election policy differences mean that not all states can provide data for an item. For example, online registration is not available in every state, so the calculation of the nationwide percentage of registrations that were received online will only use data from states that reported at least one online

OCA-APPX-1091

registration. Otherwise, the national percentage would include in the denominator (in this case, the total number of registrations received) data from states that do not have online registration, thus underestimating the percentage of online registrations that were received.[9]

This decision rule means that there were instances in which the percentages reported at the national level for a given calculation in this report did not use data from every state. Because each category was calculated independently of others and only states that reported data in both the numerator and the denominator were included in the analysis, casewise deletion also created instances in which percentages do not sum to 100%. Those cases in which data were not available for every state to calculate the percentage at the national level are noted in the footnotes throughout this report.

## Recommendations for Analyzing and Interpreting the EAVS Data

The most up-to-date version of the 2020 EAVS and Policy Survey data can always be found on the EAC's website (https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys). If the EAC is notified by a state of an error or omission in the state's data, the agency will issue the updated EAVS and Policy Survey data sets on its website with an errata note of changes that have been made to the newly issued data sets. Updated data sets will be issued on a quarterly basis.

There are four types of data missingness codes used in the 2020 Policy Survey and EAVS data:

- Valid skip (-77): This code indicates that no response is expected based on a previous survey response. For instance, in the Policy Survey, if a state answered "no" to Q7 to indicate that it does not provide an option for voters to register to vote online, then items Q7a and Q7b, which collect further information on the specifics of a state's online registration system, would be marked as -77. In the EAVS, if a state indicates in item A4c, the total number of registration forms submitted online, that this question does not apply, then items A5c, A6c, and A7c, which collect data on new, duplicate, and rejected registrations submitted online, would be marked as -77.
- Does not apply (-88): This code indicates that a question does not apply to a state, because the state does not have an applicable policy in place. For instance, a response of -88 in item A4c of the EAVS indicates that the state does not have online registration.
- Data not available (-99): This code indicates that the data for an item cannot be tracked. For instance, a response of -99 in item A4c of the EAVS indicates that the state accepts online voter registrations but cannot track the number of these registrations that were submitted by voters.
- Refused (-100): This code indicates that a response was expected but was not provided. This code is *only* used in the Policy Survey data.

---

[9] The total number of registration applications received between the close of registration for the 2018 general election and the close of registration for the 2020 general election was collected in item A3a. The total number of registration applications received online between the close of registration for the 2018 general election and the close of registration for the 2020 general election was collected in item A4c. The application of casewise deletion means that only states that reported at least one registration in both of these items on a statewide level were included in the calculation of the percentage of registration applications received through online sources.

OCA-APPX-1092

When summing the EAVS data, either on a state or a national level, analysts should take care to treat these missingness codes as missing items and not as negative numbers.

Users of the EAVS data are also encouraged to refer to the comments that accompany all of the EAVS items and many of the Policy Survey items. During data collection, the EAC encouraged all respondents to use these comments to provide context to their responses. In many cases, these comments contain valuable information about how state and jurisdiction respondents formulated their responses, why some responses do not align with the data validations outlined in this chapter, or context about how the 2020 general election was conducted in a state or jurisdiction. If data users have further questions about the data that have been submitted, they are encouraged to contact states or jurisdictions directly with further questions.

The EAC also encourages data users to take care when calculating percentages to ensure that the correct EAVS items are used. Appendix D of this chapter contains recommendations for how to calculate EAVS rates using the 2020 data. These recommendations align with how rates were calculated throughout this report.

This report used the 1-year American Community Survey (ACS) state estimates for the 2019 citizen voting age population (CVAP) instead of the 5-year estimate to ensure that the CVAP was as current as possible. The CVAP estimates for 2020 were not available by the time this report was finalized. Once they are released by the U.S. Census Bureau, the 2020 CVAP estimates can be found at https://data.census.gov/. Data analysts should import both the state- and county-level geographies and merge them into the EAVS data using the Federal Information Processing Standards (FIPS) code. For states that have subcounty jurisdictions, these jurisdictions will need to be aggregated at the county level in order to merge in the CVAP data.[10] For this report, the state-level CVAP was used for Alaska and Puerto Rico, as both reported as a single EAVS jurisdiction. Finally, the Census Bureau does not provide CVAP estimates for the U.S. territories (with the exception of Puerto Rico), so no CVAP estimate was available for American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.

---

[10] These are the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and Wisconsin. Additionally, the state of Illinois reported six cities independently of their corresponding counties (i.e., Bloomington, Chicago, Danville, East St. Louis, Galesburg, and Rockford), and Missouri reported Kansas City independently of its corresponding county.

OCA-APPX-1093



# Methodology Appendix A: Survey Response Rates

| State | EAVS Response Rate | Section A Response Rate | Section B Response Rate | Section C Response Rate | Section D Response Rate | Section E Response Rate | Section F Response Rate |
|---|---|---|---|---|---|---|---|
| Alabama | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Alaska | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| American Samoa | 98.4 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 94.4 |
| Arizona | 100.0 | 100.0 | 99.9 | 100.0 | 100.0 | 100.0 | 100.0 |
| Arkansas | 90.2 | 99.5 | 77.4 | 83.5 | 88.1 | 82.5 | 97.3 |
| California | 99.2 | 100.0 | 98.2 | 99.9 | 99.8 | 99.9 | 98.9 |
| Colorado | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Connecticut | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Delaware | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| District of Columbia | 99.7 | 100.0 | 100.0 | 100.0 | 94.7 | 100.0 | 100.0 |
| Florida | 99.4 | 100.0 | 98.7 | 99.9 | 99.2 | 96.4 | 99.8 |
| Georgia | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Guam | 98.1 | 93.9 | 100.0 | 100.0 | 100.0 | 100.0 | 98.9 |
| Hawaii [1] | 99.1 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 | 97.1 |
| Idaho | 99.4 | 98.8 | 99.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Illinois | 99.1 | 99.6 | 99.7 | 99.8 | 99.7 | 98.6 | 97.9 |
| Indiana | 100.0 | 100.0 | 100.0 | 100.0 | 99.9 | 100.0 | 100.0 |
| Iowa | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 99.9 |
| Kansas | 69.0 | 67.4 | 86.8 | 77.3 | 62.3 | 95.9 | 48.0 |
| Kentucky | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Louisiana | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Maine [2] | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Maryland | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Massachusetts | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Michigan | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Minnesota | 100.0 | 100.0 | 100.0 | 100.0 | 99.9 | 100.0 | 100.0 |
| Mississippi | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 99.9 |
| Missouri | 99.8 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 99.4 |
| Montana | 99.6 | 100.0 | 98.5 | 100.0 | 100.0 | 100.0 | 100.0 |
| Nebraska | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Nevada | 99.8 | 100.0 | 99.2 | 100.0 | 100.0 | 100.0 | 100.0 |
| New Hampshire | 99.5 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 98.3 |
| New Jersey | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| New Mexico | 100.0 | 100.0 | 100.0 | 100.0 | 99.7 | 100.0 | 100.0 |
| New York | 97.5 | 100.0 | 100.0 | 99.9 | 99.7 | 100.0 | 91.1 |
| North Carolina | 99.9 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 99.7 |

OCA-APPX-1094

| State | EAVS Response Rate | Section A Response Rate | Section B Response Rate | Section C Response Rate | Section D Response Rate | Section E Response Rate | Section F Response Rate |
|---|---|---|---|---|---|---|---|
| North Dakota | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Northern Mariana Islands | 96.2 | 100.0 | 90.0 | 100.0 | 94.7 | 100.0 | 96.7 |
| Ohio | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Oklahoma | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Oregon | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Pennsylvania | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 99.9 |
| Puerto Rico | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Rhode Island | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| South Carolina | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| South Dakota | 99.9 | 100.0 | 99.8 | 99.9 | 98.8 | 99.8 | 100.0 |
| Tennessee | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Texas | 99.4 | 100.0 | 99.6 | 100.0 | 100.0 | 100.0 | 98.2 |
| U.S. Virgin Islands | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Utah | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 99.8 |
| Vermont | 98.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 93.0 |
| Virginia | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Washington | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| West Virginia | 99.7 | 100.0 | 98.8 | 100.0 | 99.9 | 100.0 | 100.0 |
| Wisconsin | 99.7 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 98.9 |
| Wyoming | 99.9 | 100.0 | 99.6 | 100.0 | 99.8 | 100.0 | 100.0 |
| U.S. Total | 99.1 | 99.4 | 99.4 | 99.4 | 99.2 | 99.7 | 98.2 |

Survey Response Rate Calculation Notes:

**EAVS Response Rate** uses responses to all items listed below.

**Section A Response Rate** uses responses to questions A1a, A1b, A1c, A2a, A2b, A2c, A3a, A3b, A3c, A3d, A3e, A3f, A3g, A3h, A3i, A3j, A4a, A4b, A4c, A4d, A4e, A4f, A4g, A4h, A4i, A4j, A4k, A4l, A5a, A5b, A5c, A5d, A5e, A5f, A5g, A5h, A5i, A5j, A5k, A5l, A6a, A6b, A6c, A6d, A6e, A6f, A6g, A6h, A6i, A6j, A6k, A6l, A7a, A7b, A7c, A7d, A7e, A7f, A7g, A7h, A7i, A7j, A7k, A7l, A8a, A8b, A8c, A8d, A8e, A8f, A8g, A8h, A9a, A9b, A9c, A9d, A9e, A9f, A9g, A9h, A9i, and A9j.

**Section B Response Rate** uses responses to questions B1a, B1b, B1c, B2a, B2b, B2c, B3a, B3b, B3c, B4a, B5a, B5b, B5c, B6a, B6b, B6c, B7a, B7b, B7c, B8a, B8b, B8c, B9a, B9b, B9c, B10a, B10b, B10c, B11a, B11b, B11c, B12a, B12b, B12c, B13a, B13b, B13c, B13d, B14a, B14b, B14c, B15a, B15b, B15c, B16a, B16b, B16c, B17a, B17b, B17c, B18a, B18b, B18c, B19a, B19b, B19c, B20a, B20b, B20c, B21a, B21b, B21c, B22a, B22b, B22c, B23a, B23b, B23c, B24a, B24b, B24c, B25a, B25b, B25c, B26a, B26b, B26c, B27a, B27b, and B27c..

**Section C Response Rate** uses responses to questions C1a, C1b, C1c, C1d, C1e, C1f, C1g, C1h, C1i, C2a, C3a, C4a, C4b, C4c, C4d, C4e, C4f, C4g, C4h, C4i, C4j, C4k, C4l, C4m, C4n, C4o, C4p, C4q, and C4r.

**Section D Response Rate** uses responses to questions D1a, D1b, D2a, D3a, D3b, D3c, D4a, D4b, D4c, D5, D6, D7a, D7b, D7c, D7d, D7e, D7f, D7g, and D8.

OCA-APPX-1095



**Section E Response Rate** uses responses to questions E1a, E1b, E1c, E1d, E1e, E2a, E2b, E2c, E2d, E2e, E2f, E2g, E2h, E2i, E2j, E2k, E2l, and E2m.

**Section F Response Rate** uses responses to questions F1a, F1b, F1c, F1d, F1e, F1f, F1g, F1h, F2, F3a, F3b, F3c, F3d, F4a, F4b, F4c, F4d, F5a, F5b_1, F5c_1, F5b_2, F5c_2, F5b_3, F5c_3, F5d_1, F5d_2, F5d_3, F5d_4, F6a, F6b_1, F6c_1, F6b_2, F6c_2, F6b_3, F6c_3, F6d_1, F6d_2, F6d_3, F6d_4, F7a, F7b_1, F7c_1, F7b_2, F7c_2, F7b_3, F7c_3, F7d_1, F7d_2, F7d_3, F7d_4, F7d_5, F8a, F8b_1, F8c_1, F8b_2, F8c_2, F8b_3, F8c_3, F8d_1, F8d_2, F8d_3, F8d_4, F8d_5, F9a, F9c_1, F9c_2, F9c_3, F9d_1, F9d_2, F9d_3, F9d_4, F9d_5, F10a, F10c_1, F10c_2, F10c_3, F10d_1, F10d_2, F10d_4, F11a, F11d_1, F11d_2, F11d_3, F11d_4, F11d_5, F12a, F12b, F12c, F12d, and F12e.

Survey Response Rate Data Notes:

**General Notes:**

- Response rates are calculated as the percentage of jurisdictional responses within a state that were not left blank (i.e., had a numerical response of zero or greater or a response of "data not available," "does not apply," or "valid skip").
- Item descriptions and optional survey comments were not included in the response rate calculation.

[1] Information for Kalawao County, Hawaii was reported with Maui County.
[2] Maine reported its UOCAVA data on a statewide level, not a jurisdiction level.

OCA-APPX-1096

# Methodology Appendix B: Data Collection Template Validation Rules

## Table 1: Math Validation Rules

| Validation Rule | Error Text |
|---|---|
| The sum of A1b + A1c should equal A1a | The sum of active (A1b) and inactive (A1c) registered voters should be equal to the total number of registered voters (A1a). |
| The sum of A2b + A2c should equal A2a | The sum of SDRs received on Election Day (A2b) and SDRs received prior to Election Day (A2c) should be equal to the total number of SDRs received (A2a). |
| The sum of A3b–j should equal A3a | The sum of the numbers you report in A3b–j should equal the total number of registration forms you report in A3a. |
| The sum of A4a–l should equal A3a | The sum of the numbers you report in A4a–l should equal the total number of registration forms you reported in A3a. |
| The sum of A5a–l should equal A3b | The sum of the numbers you report in A5a–l should equal the total number of registration forms you reported in A3b. |
| The sum of A6a–l should equal A3d | The sum of the numbers you report in A6a–l should equal the total number of registration forms you reported in A3d. |
| The sum of A7a–l should equal A3e | The sum of the numbers you report in A7a–l should equal the total number of registration forms you reported in A3e. |
| The sum of A5a + A6a + A7a should not exceed A4a | The amounts you report in A5a, A6a, and A7a should not exceed the total number of registration forms received by mail, fax, or email you reported in A4a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5b + A6b + A7b should not exceed A4b | The amounts you report in A5b, A6b, and A7b should not exceed the total number of registrations in person at the election/registrar's office you reported in A4b. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5c + A6c + A7c should not exceed A4c | The amounts you report in A5c, A6c, and A7c should not exceed the total number of registration forms submitted online you reported in A4c. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5d + A6d + A7d should not exceed A4d | The amounts you report in A5d, A6d, and A7d should not exceed the total number of registration forms received from motor vehicle offices you reported in A4d. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5e + A6e + A7e should not exceed A4e | The amounts you report in A5e, A6e, and A7e should not exceed the total number of registration forms received from public assistance offices you reported in A4e. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5f + A6f + A7f should not exceed A4f | The amounts you report in A5f, A6f, and A7f should not exceed the total number of registration forms received from state-funded agencies you reported in A4f. Please correct your responses or use the comments section to explain why these subitems do not add up. |

OCA-APPX-1097



| Validation Rule | Error Text |
|---|---|
| The sum of A5g + A6g + A7g should not exceed A4g | The amounts you report in A5g, A6g, and A7g should not exceed the total number of registration forms received from armed forces recruitment offices you reported in A4g. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5h + A6h + A7h should not exceed A4h | The amounts you report in A5h, A6h, and A7h should not exceed the total number of registration forms received from other agencies designated by the state but not mandated by the NVRA you reported in A4h. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5i + A6i + A7i should not exceed A4i | The amounts you report in A5i, A6i, and A7i should not exceed the total number of forms received from registration drives from advocacy groups or political parties you reported in A4i. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5j + A6j + A7j should not exceed A4j | The amounts you report in A5j, A6j, and A7j should not exceed the total number of forms received from "Other" sources you reported in A4j. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5k + A6k + A7k should not exceed A4k | The amounts you report in A5k, A6k, and A7k should not exceed the total number of forms received from "Other" sources you reported in A4k. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A5l + A6l + A7l should not exceed A4l | The amounts you report in A5l, A6l, and A7l should not exceed the total number of forms received from "Other" sources you reported in A4l. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A8b–h should equal A8a | The amounts you report in A8b–h should equal the total number of confirmation notices sent to registered voters you reported in A8a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of A9b–j should equal A9a | The amounts you report in A9b–j should equal the total number of voters removed you reported in A9a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B1b–c should equal B1a | The amounts you report in B1b–c should equal the total number of registered and eligible UOCAVA voters you reported in B1a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B2b–c should equal B2a | The amounts you report in B2b–c should equal the total number of FCPAs received from UOCAVA voters you reported in B2a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B3b–c should equal B3a | The amounts you report in B3b–c should equal the total number of rejected FPCAs from UOCAVA voters you reported in B3a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B5b–c should equal B5a | The amounts you report in B5b–c should equal the total number of absentee ballots transmitted to UOCAVA voters you reported in B5a. Please correct your responses or use the comments section to explain why these subitems do not add up. |

OCA-APPX-1098

| Validation Rule | Error Text |
|---|---|
| The sum of B6b–c should equal B6a | The amounts you report in B6b–c should equal the total number of absentee ballots transmitted to UOCAVA voters by postal mail you reported in B6a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B7b–c should equal B7a | The amounts you report in B7b–c should equal the total number of absentee ballots transmitted to UOCAVA voters by email you reported in B7a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B8b–c should equal B8a | The amounts you report in B8b–c should equal the total number of absentee ballots transmitted to UOCAVA voters by other methods you reported in B8a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B6a, B7a, and B8a should equal B5a | The amounts you report in B6a, B7a, and B8a should equal the total number of ballots transmitted to all UOCAVA voters you reported in B5a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B6b, B7b, and B8b should equal B5b | The amounts you report in B6b, B7b, and B8b should equal the total number of ballots transmitted to all uniformed services voters you reported in B5b. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B6c, B7c, and B8c should equal B5c | The amounts you report in B6c, B7c, and B8c should equal the total number of ballots transmitted to all overseas citizen voters you reported in B5c. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B9b–c should equal B9a | The amounts you report in B9b–c should equal the total number of UOCAVA ballots returned to your office you reported in B9a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B10b–c should equal B10a | The amounts you report in B10b–c should equal the total number of UOCAVA ballots returned to your office by postal mail you reported in B10a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B11b–c should equal B11a | The amounts you report in B11b–c should equal the total number of UOCAVA ballots returned to your office by email you reported in B11a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B12b–c should equal B12a | The amounts you report in B12b–c should equal the total number of UOCAVA ballots returned to your office by other methods you reported in B12a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B10a, B11a, and B12a should equal B9a | The amounts you report in B10a, B11a, and B12a should equal the total number of UOCAVA ballots returned to your office you reported in B9a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B10b, B11b, and B12b should equal B9b | The amounts you report in B10b, B11b, and B12b should equal the total number of transmitted ballots returned by all uniformed services voters you reported in B9b. Please correct your responses or use the comments section to explain why these subitems do not add up. |

OCA-APPX-1099



| Validation Rule | Error Text |
|---|---|
| The sum of B10c, B11c, and B12c should equal B9c | The amounts you report in B10, B11c, and B12c should equal the total number of transmitted ballots returned by all overseas citizen voters you reported in B9c. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B13b–d should equal B13a | The amounts you report in B13b–d should equal the total number of ballots returned undeliverable you reported in B13a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B14b–c should equal B14a | The amounts you report in B14b–c should equal the total number of UOCAVA ballots counted by your office you reported in B14a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B15b–c should equal B15a | The amounts you report in B15b–c should equal the total number of counted UOCAVA ballots returned by postal mail you reported in B15a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B16b–c should equal B16a | The amounts you report in B16b–c should equal the total number of counted UOCAVA ballots returned by email you reported in B16a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B17b–c should equal B17a | The amounts you report in B17b–c should equal the total number of counted UOCAVA ballots returned by other methods you reported in B17a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B15a, B16a, and B17a should equal B14a | The amounts you report in B15a, B16a, and B17a should equal the total number of UOCAVA ballots counted by your office you reported in B14a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B15b, B16b, and B17b should equal B14b | The amounts you report in B15b, B16b, and B17b should equal the total number of uniformed services voters' ballots counted by your office you reported in B14b. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B15c, B16c, and B17c should equal B14c | The amounts you report in B15c, B16c, and B17c should equal the total number of overseas citizen voters' ballots counted by your office you reported in B14c. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B18b–c should equal B18a | The amounts you report in B18b–c should equal the total number of rejected UOCAVA ballots you reported in B18a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B19b–c should equal B19a | The amounts you report in B19b–c should equal the total number of UOCAVA ballots rejected because they were received after the deadline you reported in B19a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B20b–c should equal B20a | The amounts you report in B20b–c should equal the total number of UOCAVA ballots rejected because of a problem with the voter signature you reported in B20a. Please correct your responses or use the comments section to explain why these subitems do not add up. |

OCA-APPX-1100

| Validation Rule | Error Text |
|---|---|
| The sum of B21b–c should equal B21a | The amounts you report in B21b–c should equal the total number of UOCAVA ballots rejected for lack of a postmark you reported in B21a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B22b–c should equal B22a | The amounts you report in B22b–c should equal the total number of UOCAVA ballots rejected for other reasons reported in B22a. Please correct your responses or use the comments section to explain why these items do not sum as expected. |
| The sum of B14a and B18a should equal B9a | The sum of B14a and B18a should equal the total number of UOCAVA ballots returned by voters that you reported in B9a. Please correct your responses or use the comments section to explain why these items do not sum as expected. |
| The sum of B14b and B18b should equal B9b | The sum of B14b and B18b should equal the total number of UOCAVA ballots returned by uniformed services voters that you reported in B9b. Please correct your responses or use the comments section to explain why these items do not sum as expected. |
| The sum of B14c and B18c should equal B9c | The sum of B14c and B18c should equal the total number of UOCAVA ballots returned by overseas citizen voters that you reported in B9c. Please correct your responses or use the comments section to explain why these items do not sum as expected. |
| The sum of B19a, B20a, B21a, and B22a should equal B18a | The amounts you report in B19a, B20a, B21a, and B22a should equal the total number of rejected UOCAVA ballots you reported in B18a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B19b, B20b, B21b, and B22b should equal B18b | The amounts you report in B19b, B20b, B21b, and B22b should equal the total number of rejected ballots from uniformed services voters you reported in B18b. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B19c, B20c, B21c, and B22c should equal B18c | The sum of the amounts you report in B19c, B20c, B21c, and B22c should equal the total number of rejected ballots from overseas citizen voters you reported in B18c. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B23b–c should equal B23a | The amounts you report in B23b–c should equal the total number of FWABs returned by UOCAVA voters you reported in B23a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B24b–c should equal B24a | The amounts you report in B24b–c should equal the total number of FWABs counted you reported in B24a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B25b–c should equal B25a | The amounts you report in B25b–c should equal the total number of FWABs rejected because they were received after the deadline you reported in B25a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B26b–c should equal B26a | The amounts you report in B26b–c should equal the total number of FWABs rejected because the voter's regular absentee ballot was received and counted you reported in B26a. Please correct your responses or use the comments section to explain why these subitems do not add up. |

OCA-APPX-1101



| Validation Rule | Error Text |
|---|---|
| The sum of B27b–c should equal B27a | The amounts you report in B27b–c should equal the total number of FWABs rejected for other reasons you reported in B27a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B24a, B25a, B26a, and B27a should equal B23a | The amounts you report in B24a, B25a, B26a, and B27a should equal the total number of FWABs returned by UOCAVA voters you reported in B23a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B24b, B25b, B26b, and B27b should equal B23b | The sum of the amounts you report in B24b, B25b, B26b, and B27b should equal the total number of FWABs returned by uniformed services voters you reported in B23b. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of B24c, B25c, B26c, and B27c should equal B23c | The sum of the amounts you report in B24c, B25c, B26c, and B27c should equal the total number of FWABs returned by overseas citizen voters you reported in B23c. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of C1b–i should equal C1a | The amounts you report in C1b–i should equal the number of total mailed ballots transmitted you reported in C1a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of C4b–r should equal C4a | The amounts you report in C4b–r should equal the total number of mailed ballots rejected you reported in C4a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of D3b–c cannot exceed D3a | The sum of the amounts you report in D3b–c cannot exceed the total number of physical polling places for Election Day in your jurisdiction you reported in D3a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of D4b–c cannot exceed D4a | The sum of the amounts you report in D4b–c cannot exceed the total number of physical polling places for early voting in your jurisdiction you report in D4a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of D7b–g should equal D7a | The numbers you report in D7b–g should equal the total number of poll workers in your jurisdiction you reported in D7a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of E1b–e should equal E1a | The amounts you report in E1b–e should equal the total number of voters who submitted provisional ballots you reported in E1a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of E2b–m should equal E2a | The amounts you report in E2b–m should equal the total number of rejected provisional ballots you reported in E2a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| E1d should be equal to E2a | The amount you report in E1d should equal the total number of rejected provisional ballots you reported in E2a. Please correct your responses or use the comments section to explain why these subitems do not add up. |
| The sum of F1b–h should equal F1a | The sum of the amounts you report in F1b–h should equal the total number of voters who cast a ballot that was counted you reported in F1a. Please correct your responses or use the comments section to explain why these subitems do not add up. |

OCA-APPX-1102

## Table 2: Logic Validation Rules

| Validation Rule | Error Text |
|---|---|
| If A1c = Does Not Apply, then A1a = A1b | Because your state does not differentiate between active (A1b) and inactive voters (A1c), then A1a should equal A1b. Please correct your responses or use the comments section to explain why those two items differ. |
| A2a cannot exceed A1a | The amount of SDRs you report in A2a cannot exceed the total number of registered voters you report in A1a. Please review your responses or use the comments section to explain why the value in A2a exceeds the value in A1a. |
| B3a cannot exceed B2a | The number of rejected FPCAs you report in B3a should not exceed the total number of FPCAs received you reported in B2a. Please review your responses or use the comments section to explain why the value in B3a exceeds the value in B2a. |
| B4a cannot exceed B3a | The number of FPCAs rejected because they were late you report in B4a should not exceed the total number of FPCAs rejected you reported in B3a. Please review your responses or use the comments section to explain why the value in B4a exceeds the value in B3a. |
| B9a cannot exceed B5a | The number of ballots returned you report in B9a should not exceed the number of ballots transmitted to UOCAVA voters in B5a. Please review your responses or use the comments section to explain why the value in B9a exceeds the value in B5a. |
| B9b cannot exceed B5b | The number of ballots returned from uniformed services members you report in B9b should not exceed the number of ballots transmitted to uniformed services members you reported in B5b. Please review your responses or use the comments section to explain why the value in B9b exceeds the value in B5b. |
| B9c cannot exceed B5c | The number of ballots returned from overseas citizen voters you report in B9c should not exceed the number of ballots transmitted to overseas citizen voters you reported in B5c. Please review your responses or use the comments section to explain why the value in B9c exceeds the value in B5c. |
| B13a cannot exceed B5a | The number of ballots returned as undeliverable you report in B13a should not exceed the number of ballots transmitted to UOCAVA voters you reported in B5a. Please review your responses or use the comments section to explain why the value in B13a exceeds the value in B5a. |
| B14a cannot exceed B9a | The total number of ballots counted you report in B14a should not exceed the total number of ballots returned by UOCAVA voters you reported in B9a. Please review your responses or use the comments section to explain why the value in B14a exceeds the value in B9a. |
| B14b cannot exceed B9b | The total number of ballots counted you report in B14b should not exceed the total number of ballots returned by uniformed services members you reported in B9b. Please review your responses or use the comments section to explain why the value in B14b exceeds the value in B9b. |
| B14c cannot exceed B9c | The total number of ballots counted you report in B14c should not exceed the total number of ballots returned by overseas citizen voters you reported in B9c. Please review your responses or use the comments section to explain why the value in B14c exceeds the value in B9c. |

OCA-APPX-1103

| Validation Rule | Error Text |
|---|---|
| B15a cannot exceed B10a | The number of ballots counted you report in B15a should not exceed the total number of ballots returned by postal mail by UOCAVA voters you reported in B10a. Please review your responses or use the comments section to explain why the value in B15a exceeds the value in B10a. |
| B15b cannot exceed B10b | The number of ballots counted you report in B15b should not exceed the total number of ballots returned by postal mail by uniformed services members you reported in B10b. Please review your responses or use the comments section to explain why the value in B15b exceeds the value in B10b. |
| B15c cannot exceed B10c | The number of ballots counted you report in B15c should not exceed the total number of ballots returned by postal mail by overseas citizen voters you reported in B10c. Please review your responses or use the comments section to explain why the value in B15c exceeds the value in B10c. |
| B16a cannot exceed B11a | The number of ballots counted you report in B16a should not exceed the total number of ballots returned by email by UOCAVA voters you reported in B11a. Please review your responses or use the comments section to explain why the value in B16a exceeds the value in B11a. |
| B16b cannot exceed B11b | The number of ballots counted you report in B16b should not exceed the total number of ballots returned by email by uniformed services members you reported in B11b. Please review your responses or use the comments section to explain why the value in B16b exceeds the value in B11b. |
| B16c cannot exceed B11c | The number of ballots counted you report in B16c should not exceed the total number of ballots returned by email by overseas citizen voters you reported in B11c. Please review your responses or use the comments section to explain why the value in B16c exceeds the value in B11c. |
| B17a cannot exceed B12a | The number of ballots counted you report in B17a should not exceed the total number of ballots returned by other modes by UOCAVA voters you reported in B12a. Please review your responses or use the comments section to explain why the value in B17a exceeds the value in B12a. |
| B17b cannot exceed B12b | The number of ballots counted you report in B17b should not exceed the total number of ballots returned by other modes by uniformed services members you reported in B12b. Please review your responses or use the comments section to explain why the value in B17b exceeds the value in B12b. |
| B17c cannot exceed B12c | The number of ballots counted you report in B17c should not exceed the total number of ballots returned by other modes by overseas citizen voters you reported in B12c. Please review your responses or use the comments section to explain why the value in B17c exceeds the value in B12c. |
| C2a cannot exceed C1a | The number of mailed ballots transmitted to permanent absentee voters you report in C2a cannot exceed the total number of mailed ballots transmitted in C1a. Please review your responses or use the comments section to explain why the value in C2a exceeds the value in C1a. |
| The sum of C3a and C4a should equal C1b | The sum of the amounts you report in C3a and C4a should equal the number of absentee returned by voters you report in C1b. Please review your responses or use the comments section to explain why the sum of C3a and C4a do not match the value in C1b. |
| If D1a > 0, then D3a ≠ Does Not Apply | Because you reported in-person Election Day voting at a physical polling place in D1a, you should also report the number of Election Day polling places in D3a. Please review your responses and add comments as necessary. |

OCA-APPX-1104

| Validation Rule | Error Text |
|---|---|
| If D1a > 0, then F1b > 0 | Because you reported in-person Election Day voting in D1a, you should also report the number of these ballots that were counted in F1b. Please review your responses and add comments as necessary. |
| If D1b > 0, then D4a ≠ Does Not Apply | Because you reported in-person early voting at a physical polling place in D1b, you should also report the number of early voting polling places in D4a. Please review your responses and add comments as necessary. |
| If D1b > 0, then F1f > 0 | Because you reported in-person early voting in D1b, you should also report the numbers of these ballots that were counted in F1f. Please review your responses and add comments as necessary. |
| If D5a > 0 or D6a > 0, then D7a > 0 | Because you reported using poll workers in D5a and/or D6a, you should provide the total number of poll workers used in the jurisdiction in D7a. Please review your responses and add comments as necessary. |
| The sum of B14a and B24a should equal F1c | The sum of counted absentee UOCAVA ballots reported in B14a and counted FWABs reported in B24a should equal the total number of counted UOCAVA votes reported in F1c. Please review your responses or use the comments section to explain why the sum of B14a and B24a do not match the value in F1c. |
| C3a should equal F1d | The number of counted absentee ballots reported in C3a should equal the total number of counted mail votes reported in F1d. Please review your responses or use the comments section to explain why the C3a does not match the value in F1d. |
| If E1b > 0 or E1c > 0, then F1e > 0 | Because you reported a number of provisional ballots counted or partially counted in E1b and/or E1c, you should provide data on the number of voters who cast a provisional ballot that was counted in F1e. Please review your responses and add comments as necessary. |
| F1a cannot exceed A1a | The total number of voters who cast a ballot that was counted, as reported in F1a, cannot exceed the total number of registered voters as reported in A1a. Please review your responses and add comments as necessary. |
| F1b cannot exceed D1a | The number of voters who voted in-person on Election Day and whose votes were counted, as reported in F1b, cannot exceed the total number of in-person ballots cast in Election Day, as reported in D1a. Please review your responses and add comments as necessary. |
| F1d cannot exceed C1a | The number of voters who cast a mailed ballot that was counted, as reported in F1d, cannot exceed the total number of mailed ballots transmitted, as reported in C1a. Please review your responses and add comments as necessary. |
| F1e cannot exceed E1a | The number of voters who cast a provisional ballot that was counted, as reported in F1e, cannot exceed the total number of provisional ballots cast, as reported in E1a. Please review your responses and add comments as necessary. |
| F1f cannot exceed D1b | The number of voters who cast a ballot during in-person early voting that was counted, as reported in F1f, cannot exceed the total number of ballots cast during in-person early voting, as reported in D1b. Please review your responses and add comments as necessary. |
| If F5a = Yes, then F5b_1 ≠ 0 or Does Not Apply | Because you reported using DREs without VVPAT in F5a, you should report data on the make(s) and model(s) of this equipment in F5b. |

OCA-APPX-1105



| Validation Rule | Error Text |
|---|---|
| If F5a = Yes, then F5c_1 ≠ 0 or Does Not Apply | Because you reported using DREs without VVPAT in F5a, you should report data on the number of machines deployed in F5c. |
| If F6a = Yes, then F6b_1 ≠ 0 or Does Not Apply | Because you reported using DREs with VVPAT in F6a, you should report data on the make(s) and model(s) of this equipment in F6b. |
| If F6a = Yes, then F6c_1 ≠ 0 or Does Not Apply | Because you reported using DREs with VVPAT in F6a, you should report data on the number of machines deployed in F6c. |
| If F7a = Yes, then F7b_1 ≠ 0 or Does Not Apply | Because you reported using ballot marking devices in F7a, you should report data on the make(s) and model(s) of this equipment in F7b. |
| If F7a = Yes, then F7c_1 ≠ 0 or Does Not Apply | Because you reported using ballot marking devices in F7a, you should report data on the number of machines deployed in F7c. |
| If F8a = Yes, then F8b_1 ≠ 0 or Does Not Apply | Because you reported using scanners in F8a, you should report data on the make(s) and model(s) of this equipment in F8b. |
| If F8a = Yes, then F8c_1 ≠ 0 or Does Not Apply | Because you reported using scanners in F8a, you should report data on the number of machines deployed in F8c. |
| If F9a = Yes, then F9b_1other ≠ 0 or Does Not Apply | Because you reported using punch card machines in F9a, you should report data on the make(s) and model(s) of this equipment in F9b. |
| If F9a = Yes, then F9c_1 ≠ 0 or Does Not Apply | Because you reported using punch card machines in F9a, you should report data on the number of machines deployed in F9c. |
| If F10a = Yes, then F10b_1other ≠ 0 or Does Not Apply | Because you reported using lever machines in F10a, you should report data on the make(s) and model(s) of this equipment in F10b. |
| If F10a = Yes, then F10c_1 ≠ 0 or Does Not Apply | Because you reported using lever machines in F10a, you should report data on the number of machines deployed in F10c. |
| If F11a = Yes, then F11d_1, F11d_2, F11d_3, F11d_4 and F11d_5 cannot be blank | Please respond to item [insert item number here]. If you do not have the information to respond, please enter "Data Not Available." If you collect the information but no response fits in this category, please enter "0." If this question does not apply to you, please enter "Does Not Apply" and explain in the comments section. |

## Table 3: Policy Survey Validation Rules

| Policy Survey Question | If Selected in Policy Survey | Expected Response in EAVS |
|---|---|---|
| Q7: Does your state have online registration? | Q7 = Yes (any of the two "yes" options) | A4c, A5c, A6c and A7c ≠ Does Not Apply  *Items A4c, A5c, A6c, and A7c report data on online registration. |
| Q9: Does your state have same-day registration (SDR)? | Q9 = Yes | A2a ≠ Does Not Apply  *Item A2a reports data on SDRs. |

OCA-APPX-1106

| Policy Survey Question | If Selected in Policy Survey | Expected Response in EAVS |
|---|---|---|
| Q9a: Under which circumstances can a voter in your state register on the same day that they cast a ballot? | Q9a_1= Selected (On Election Day) | A2b ≠ Does Not Apply<br><br>*Item A2b reports data on SDRs received on Election Day. |
| | Q9a_2= Selected OR Q9a_3= Selected (During in-person early voting OR during an overlap between early voting and close of voter registration) | A2c ≠ Does Not Apply<br><br>*Item A2c reports data on SDRs received before Election Day. |
| Q10: Does your state allow persons to preregister to vote before they are 18 years of age? | Q10 = Yes | A3c ≠ Does Not Apply<br><br>*Item A3c reports data on new preregistrations of persons under age 18. |
| Q11: Does your state differentiate between active and inactive voters in your voter registration records? | Q11= Yes | A1c ≠ Does Not Apply<br><br>*Item A1c reports data on inactive registrants. |
| Q13: Does your state send confirmation notices? | Q13_1 = Selected OR Q13_2 = Selected OR Q13_3 = Selected (any of the three "yes" options) | A8a ≠ Does Not Apply<br><br>*Item A8a reports data on confirmation notices. |
| Q18a: Does your whole state use an all-by-mail system? | Q18a = Statewide | F1g ≠ Does Not Apply<br><br>*Item F1g reports data on ballots cast in all-by-mail jurisdictions. |
| Q19: Will your state allow some or all registered voters to request to be a permanent absentee voter? | Q19 = Yes (any of the two "yes" options) | C2a≠ Does Not Apply<br><br>*Item C2a reports data on mailed ballots transmitted to voters on a permanent mail registration list. |
| Q24: What terminology does your state use to describe the process of allowing individuals to cast their ballots in person prior to Election Day? | Q24_4 = Selected (No in-person voting is allowed prior to Election Day) | D1b, D4a, D4b, D4c, D6a, and F1f = Does Not Apply<br><br>*Items D1b, D4a-c, D6a, and F1f report data on in-person early/absentee voting before Election Day. |
| Q32: Does your state use provisional ballots? | Q32 = Yes | E1a, E1b, E1c, E1d, E1e, E2a, and F1e ≠ Does Not Apply<br><br>*Items E1, E2, and F1e report data on provisional ballots. |

OCA-APPX-1107

| Policy Survey Question | If Selected in Policy Survey | Expected Response in EAVS |
|---|---|---|
| Q37: Do convicted or incarcerated individuals lose eligibility to vote? | Q37_4 = Selected (No one; criminal convictions do not limit a person's right to vote) | A9d ≠ Does Not Apply<br><br>*Item A9d reports data on voters removed from voter registration rolls due to a disqualifying felony conviction. |

## Table 4: Special Conditions

| If | Expected EAVS Response |
|---|---|
| F5a = No | Rest of items in F5 filled as Valid Skip (-77) |
| F5a = Yes | At least: F5b_1; F5c_1; F5d_1; F5d_2; F5d_3; F5d_4; F5d_5 should have a response |
| F6a = No | Rest of items in F6 filled as Valid Skip (-77) |
| F6a = Yes | At least: F6b_1; F6c_1; F6d_1; F6d_2; F6d_3; F6d_4; F6d_5 should have a response |
| F7a = No | Rest of items in F7 filled as Valid Skip (-77) |
| F7a = Yes | At least: F7b_1; F7c_1; F7d_1; F7d_2; F7d_3; F7d_4; F7d_5 should have a response |
| F8a = No | Rest of items in F8 filled as Valid Skip (-77) |
| F8a = Yes | At least: F8b_1; F8c_1; F8d_1; F8d_2; F8d_3; F8d_4; F8d_5 should have a response |
| F9a = No | Rest of items in F9 filled as Valid Skip (-77) |
| F9a = Yes | At least: F9b_1; F9c_1; F9d_1; F9d_2; F9d_3; F9d_4; F9d_5 should have a response |
| F10a = No | Rest of items in F10 filled as Valid Skip (-77) |
| F10a = Yes | At least: F10b_1; F10c_1; F10d_1; F10d_2; F10d_3; F10d_4; F10d_5 should have a response |
| F11a = No | Rest of items in F11 filled as Valid Skip (-77) |
| F11a = Yes | At least: F11d_1; F11d_2; F11d_3; F11d_4; F11d_5 should have a response |

OCA-APPX-1108

# Methodology Appendix C: Post-Submission Validations and Sample Rates

## Table 1: Sample Rates and Outlier Thresholds

| EAVS Rate | Calculation | Threshold for Flagging Result for Further Review |
|---|---|---|
| Percent of total registrants by CVAP | $\frac{A1a}{CVAP} \times 100$ | <50%<br>>130% |
| Percent of registrations that were new and valid | $\frac{A3b}{A3a} \times 100$ | <5%<br>>95% |
| Percent of registrations that were duplicates | $\frac{A3d}{A3a} \times 100$ | <1%<br>>99% |
| Percent of registrations that were rejected | $\frac{A3e}{A3a} \times 100$ | <1%<br>>99% |
| Percent of registrations that were within-jurisdiction changes | $\frac{A3f}{A3a} \times 100$ | <5%<br>>95% |
| Percent of registrations received by mail | $\frac{A4a}{A3a} \times 100$ | <1%<br>>99% |
| Percent of registrations received in-person | $\frac{A4b}{A3a} \times 100$ | <1%<br>>99% |
| Percent of registrations received online | $\frac{A4c}{A3a} \times 100$ | <1%<br>>99% |
| Percent of registrations received at motor vehicle agencies | $\frac{A4d}{A3a} \times 100$ | <1%<br>>99% |
| Percent of registrations removed as percent of total registrants | $\frac{A9a}{A1a} \times 100$ | <1%<br>>99% |
| Percent of FPCAs that were rejected | $\frac{B3a}{B2a} \times 100$ | <0.5%<br>>99% |
| Percent of UOCAVA ballots returned | $\frac{B9a}{B5a} \times 100$ | <5%<br>>95% |
| Percent of UOCAVA ballots returned that were counted | $\frac{B14a}{B9a} \times 100$ | <10%<br>>100% |
| Percent of UOCAVA ballots returned that were rejected | $\frac{B18a}{B9a} \times 100$ | <0.5%<br>>90% |
| Percent of FWABs counted | $\frac{B24a}{B23a} \times 100$ | <10%<br>>100% |
| Percent of FWABs rejected | $\frac{(B25a + B26a + B27a)}{B23a} \times 100$ | <0.5%<br>>90% |
| Percent of mailed ballots returned | $\frac{C1b}{C1a} \times 100$ | <5%<br>>95% |

OCA-APPX-1109



| EAVS Rate | Calculation | Threshold for Flagging Result for Further Review |
|-----------|-------------|-------------------------------------------------|
| Percent of mailed ballots counted | $\frac{C3a}{C1b} \times 100$ | <10%<br>>100% |
| Percent of mailed ballots rejected | $\frac{C4a}{C1b} \times 100$ | <0.5%<br>>90% |
| Percent of provisional ballots rejected | $\frac{E1d}{(E1b + E1c + E1d + E1e)} \times 100$ | <0.5%<br>>95% |
| Percent of turnout by CVAP | $\frac{F1a}{CVAP} \times 100$ | <35%<br>>95% |
| Percent ballots cast in-person on Election Day | $\frac{F1b}{F1a} \times 100$ | <10%<br>>90% |
| Percent ballots cast by mail | $\frac{(F1d + F1g)}{F1a} \times 100$ | <5%<br>>95% |
| Percent ballots cast in-person early | $\frac{F1f}{F1a} \times 100$ | <1%<br>>95% |
| Percent ballots cast by UOCAVA voters | $\frac{F1c}{F1a} \times 100$ | <0.1%<br>>50% |
| Percent ballots cast that were provisional | $\frac{F1e}{F1a} \times 100$ | <0.01%<br>>25% |

## Table 2: Comparisons to the 2016 EAVS Data

| EAVS Rate | Calculation | Threshold for Flagging Result for Further Review |
|-----------|-------------|-------------------------------------------------|
| 2020 total registrations as percentage of 2016's registrations | $\frac{A1a\,[2020]}{A1a\,[2016]} \times 100$ | <50%<br>>150% |
| 2020 registrations received as percentage of 2016's | $\frac{A3a\,[2020]}{A5a\,[2016]} \times 100$ | <25%<br>>200% |
| 2020 registrations removed as percentage of 2016's | $\frac{A9a\,[2020]}{A11a\,[2016]} \times 100$ | <10%<br>>200% |
| 2020 UOCAVA registrants as percentage of 2016's | $\frac{B1a\,[2020]}{B19a\,[2016]} \times 100$ | <10%<br>>200% |
| 2020 UOCAVA ballots transmitted as percentage of 2016's | $\frac{B5a\,[2020]}{B1a\,[2016]} \times 100$ | <10%<br>>200% |
| 2020 UOCAVA ballots returned as percentage of 2016's | $\frac{B9a\,[2020]}{B2a\,[2016]} \times 100$ | <10%<br>>200% |

OCA-APPX-1110

| EAVS Rate | Calculation | Threshold for Flagging Result for Further Review |
|---|---|---|
| 2020 UOCAVA ballots counted as percentage of 2016's | $\dfrac{B14a\ [2020]}{B8a\ [2016]} \times 100$ | <10%<br>>200% |
| 2020 mailed ballots transmitted as percentage of 2016's | $\dfrac{C1a\ [2020]}{C1a\ [2016]} \times 100$ | <10%<br>>500% |
| 2020 mailed ballots returned as percentage of 2016's | $\dfrac{C1b\ [2020]}{C1b\ [2016]} \times 100$ | <10%<br>>500% |
| 2020 mailed ballots counted as percentage of 2016's | $\dfrac{C3a\ [2020]}{C4a\ [2016]} \times 100$ | <10%<br>>500% |
| 2020 provisional ballots cast as percentage of 2016's | $\dfrac{E1a\ [2020]}{E1a\ [2016]} \times 100$ | <10%<br>>500% |
| 2020 total turnout as percentage of 2016's | $\dfrac{F1a\ [2020]}{F1a\ [2016]} \times 100$ | <50%<br>>150% |

OCA-APPX-1111



# Methodology Appendix D: How to Calculate Selected EAVS Rates

The EAVS item numbers in this table correspond to the question numbering for the 2020 EAVS. To determine item numbering for previous EAVS surveys, please refer to the survey instrument and data codebook for each year.

| EAVS Rate | Calculation |
|---|---|
| Total CVAP registration rate | $\frac{A1a}{CVAP} \times 100$ |
| Active CVAP registration rate | $\frac{A1b}{CVAP} \times 100$ |
| Percentage of registrations that were new and valid | $\frac{A3b}{A3a} \times 100$ |
| Percentage of registrations that were duplicates | $\frac{A3d}{A3a} \times 100$ |
| Percentage of registrations that were rejected | $\frac{A3e}{A3a} \times 100$ |
| Percentage of registrations that were within-jurisdiction changes | $\frac{A3f}{A3a} \times 100$ |
| Percentage of total registration forms that were received by mail | $\frac{A4a}{A3a} \times 100$ |
| Percentage of total registration forms that were received in person at election or registrar offices | $\frac{A4b}{A3a} \times 100$ |
| Percentage of total registration forms that were submitted by individual voters through web-based online registration systems | $\frac{A4c}{A3a} \times 100$ |
| Percentage of total registration forms that were received through motor vehicle agencies | $\frac{A4d}{A3a} \times 100$ |
| Voter registration removal rate as a percentage of total registrants | $\frac{A9a}{A1a} \times 100$ |
| Percentage of FPCAs that were rejected | $\frac{B3a}{B2a} \times 100$ |
| Percentage of total transmitted UOCAVA ballots that were returned by voters | $\frac{B9a}{B5a} \times 100$ |
| Percentage of total transmitted UOCAVA ballots that were returned by voters and counted | $\frac{B14a}{B9a} \times 100$ |
| Percentage of total transmitted UOCAVA ballots that were returned by voters and rejected | $\frac{B18a}{B9a} \times 100$ |
| Percentage of FWABs returned by UOCAVA voters that were counted | $\frac{B24a}{B23a} \times 100$ |

OCA-APPX-1112

| EAVS Rate | Calculation |
|---|---|
| Percentage of FWABs returned by UOCAVA voters that were rejected | $\dfrac{(B25a + B26a + B27a)}{B23a} \times 100$ |
| Percentage of transmitted mailed ballots that were returned by voters | $\dfrac{C1b}{C1a} \times 100$ |
| Percentage of transmitted mailed ballots that were returned and counted | $\dfrac{C3a}{C1b} \times 100$ |
| Percentage of transmitted mailed ballots that were returned and rejected | $\dfrac{C4a}{C1b} \times 100$ |
| Percentage of provisional ballots that were counted, either in full or in part | $\dfrac{(E1b + E1c)}{(E1b + E1c + E1d + E1e)} \times 100$ |
| Percentage of provisional ballots that were rejected | $\dfrac{E1d}{(E1b + E1c + E1d + E1e)} \times 100$ |
| Voter turnout rate by CVAP | $\dfrac{F1a}{CVAP} \times 100$ |
| Percentage of ballots that were cast at a physical polling place on Election Day | $\dfrac{F1b}{F1a} \times 100$ |
| Percentage of ballots that were cast as mailed ballots | $\dfrac{(F1d + F1g)}{F1a} \times 100$ |
| Percentage of ballots that were cast at an in-person early voting location | $\dfrac{F1f}{F1a} \times 100$ |
| Percentage of ballots that were cast by UOCAVA voters | $\dfrac{F1c}{F1a} \times 100$ |
| Percentage of ballots that were cast by provisional voters | $\dfrac{F1e}{F1a} \times 100$ |

OCA-APPX-1113



# Exhibit 67

6-3
Prescribed by Secretary of State
Section 84.002, 86.001, 86.0015, 86.008(b), Texas Election Code
1/2022

## NOTICE OF REJECTED APPLICATION FOR BALLOT BY MAIL
### Missing or Incorrect Personal Identification Number

Your Application for a Ballot by Mail has been received and reviewed, but is defective for the reason checked below. New Texas Law requires that a voter must give his or her Texas Driver's License number, Texas Personal Identification Card number, Election Identification Certificate number or the last 4 digits of his or her Social Security number on an Application for Ballot by Mail. Required personal identification information is either missing from your application or the information provided does not match your voter registration record. You must provide the required number in order to vote by mail.

### The Early Voting Clerk has placed a checkmark next to the reason that your Application for Ballot by Mail was Defective

_____ 1.      Your application did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number.

_____ 2.      The Texas Driver's License Number, Texas Personal Identification Number, Election Identification Certificate Number or the Last 4 digits of your Social Security Number provided on your application did not match the number associated with your voter registration record as provided by your County's Voter Registrar.

### How to Correct the Defect on your Application for Ballot by Mail

You may correct the defect online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Once your personal identification number is validated by the Mail Ballot Tracker, the Application for a Ballot by Mail you previously submitted will be processed.

To utilize the Ballot by Mail Tracker, you must enter:
- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number AND
- Your residence address as listed in your voter registration record

If your rejection occurred on or before the 18th day before Election Day, a new Application for Ballot by Mail is included with this notice. If you do not wish to submit a new Application, you can correct the defect by using the Ballot by Mail Tracker.

### If you do decide to submit a new application, please be aware of the following guidelines:

If you fax or email the Application for Ballot by Mail, you must physically send the original to the Early Voting Clerk so that it is received no later than the fourth business day after it was received by fax or email and it must meet all legally required deadlines.

If you have any questions or concerns about making a correction to your Application for Ballot by Mail for a missing or incorrect personal identification number, please contact the Early Voting Clerk's Office at:

_____          _____

Phone Number                                              Signature of Early Voting Clerk

6-3
Prescribed by Secretary of State

EXHIBIT / 6

OCA-APPX-1118 3      D J

**STATE105693**

## NOTIFICACIÓN DE SOLICITUD DE BOLETA POSTAL RECHAZADA
### Número de Identificación Personal Faltante o Incorrecto

Su Solicitud de Boleta Postal ha sido recibida y revisada, pero es defectuosa por la razón que se indica a continuación. La nueva ley de Texas exige que el votante dé su Número de Licencia de Conducir de Texas, el Número de su Tarjeta de Identificación Personal de Texas, el Número de su Certificado de Identificación Electoral o los últimos 4 dígitos de su Número de Seguro Social en la Solicitud de Boleta Postal. La información de identificación personal requerida falta en su solicitud o la información proporcionada no coincide con su registro de votante. Debe proporcionar el número requerido para poder votar por correo.

**El Secretario de Votación Adelantada ha puesto una marca de verificación junto a la razón por la que su Solicitud de Boleta Postal fue defectuosa**

_____ 1. Su solicitud no contenía su Número de Licencia de Conducir de Texas, su Número de Tarjeta de Identificación Personal de Texas, su Número de Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social.

_____ 2. El Número de Licencia de Conducir de Texas, el Número de Tarjeta de Identificación Personal de Texas, el Número de Certificado de Identificación Electoral o los últimos 4 dígitos de su Número de Seguro Social proporcionados en su solicitud no coinciden con el número asociado con su registro de votante proporcionado por el Registrador de Votantes de su Condado.

### Como Corregir el Defecto en Su Solicitud de Boleta Postal

Puede corregir el defecto en línea a través del Rastreador de Boleta Postal del Secretario de Estado de Texas en www.votetexas.gov Cuando acceda al Rastreador de Boleta Postal, tendrá la oportunidad de introducir su(s) número(s) de identificación personal. Una vez que su número de identificación personal sea validado por el Rastreador de Boleta Postal, se procesará la Solicitud de Boleta Postal que usted presentó previamente.

Para utilizar el Rastreador de Boleta Postal, debe ingresar:

- Su Número de Licencia de Conducir de Texas o su Número de Tarjeta de Identificación Personal de Texas, Y
- Los últimos 4 dígitos de su Número de Seguro Social Y
- Su dirección de residencia tal y como figura en su registro de votante

Si su rechazo ocurrió en o antes de los 18 días antes del Día de las Elecciones, se incluye en esta notificación una nueva Solicitud de Boleta Postal. Si no desea presentar una nueva Solicitud, puede corregir el defecto utilizando el Rastreador de Boleta Postal.

### Si decide presentar una nueva solicitud, tenga en cuenta las siguientes directrices:

Si envía por fax o por correo electrónico su Solicitud de Boleta Postal, debe enviar físicamente el original al Secretario de Votación Adelantada para que sea recibido a más tardar el cuarto día hábil después de haber sido recibido por fax o correo electrónico y debe cumplir con todos los plazos legalmente requeridos.

Si tiene alguna pregunta o duda sobre cómo hacer una corrección en su Solicitud de Boleta Postal por un número de identificación personal faltante o incorrecto, póngase en contacto con la Oficina de Votación Adelantada al:


_____            _____
Número de Teléfono                          Firma del Secretario de Votación Adelantada

# Exhibit 68

6-4
Prescribed by Secretary of State
Section 84.002, 86.001, 86.0015, 86.008(b), Texas Election Code
1/2022

## NOTICE OF REJECTED APPLICATION FOR BALLOT BY MAIL
### Required Personal Identification Number is Not Associated with Your Voter Record

Your Application for a Ballot by Mail has been received and reviewed, but is defective for the reason stated below. New Texas Law requires that a voter must give his or her Texas Driver's License number, Texas Personal Identification Card number, Texas Election Identification Certificate number or the last 4 digits of his or her Social Security number on an Application for Ballot by Mail. The number provided must be a part of the voter's registration record in order for the voter to vote by mail.

_____    Your voter registration record does not have a Texas Driver's License Number, Texas Personal Identification Card Number, Election Identification Certificate Number or Last 4 digits of a Social Security Number associated with it.

### There are Two Ways to Add the Required Numbers to Your Voter Registration Record

**Submit an Updated Voter Registration Application -** Enclosed is a Postage Paid Voter Registration Application. Complete the application according to its instructions. Adding both the Driver's License or Personal Identification Card number AND the last 4 digits of your Social Security number to your voter registration record is very helpful to the Early Voting Clerk and will make applying for a Ballot by Mail easier in future elections.

### OR

**Update Your Information Online -** You may update your voter registration record online at www.Texas.gov

To access the voter registration portal via Texas.gov, you must have:

- Your Texas Driver's License or Texas Personal Identification Card
- The audit number located on your Texas Driver's License or Texas Personal Identification Card
- Your Social Security Number
- Your Voter Registration Number (VUID#).

If you do not have a personal identification number associated with your voter registration record, you must add it before you will be allowed to vote by mail. Adding the missing numbers to your voter registration record takes effect immediately, but if you change your address it will take 30 days for the update to take effect from the day the voter registrar receives your new application.

**Note:** You cannot add the required personal identification numbers to your voter registration record by submitting a new Application for Ballot by Mail.

If you have any questions or concerns about making an update to your voter registration record for a missing personal identification number, please contact the Early Voting Clerk's Office at:

_____         _____

Phone Number                              Signature of Early Voting Clerk

EXHIBIT 17

FOR I.D. 3-28-23  /D J

OCA-APPX-1121

## NOTIFICACIÓN DE SOLICITUD DE BOLETA POSTAL RECHAZADA
### El Número de Identificación Personal Requerido No Está Asociado Con Su Registro de Votante

Su Solicitud de Boleta Postal ha sido recibida y revisada, pero es defectuosa por la razón que se indica a continuación. La nueva ley de Texas exige que el votante dé su Número de Licencia de Conducir de Texas, el Número de su Tarjeta de Identificación Personal de Texas, el Número de su Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social en la Solicitud de Boleta Postal. El número proporcionado debe ser parte del registro del votante para que el votante pueda votar por correo.

_____ Su registro de votante no tiene un Número de Licencia de Conducir de Texas, un Número de Tarjeta de Identificación Personal de Texas, Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social asociado con él.

### Hay Dos Maneras de Añadir los Números Requeridos a Su Registro de Registro de Votante

**Presentar una Solicitud de Registro de Votantes Actualizada** - Se adjunta una Solicitud de Registro de Votantes con franqueo pagado. Complete la solicitud de acuerdo con sus instrucciones. Añadir tanto el Número de la Licencia de Conducir o de la Tarjeta de Identificación Personal como los últimos 4 dígitos de su Número de Seguro Social a su registro de votante es muy útil para el Secretario de Votación Adelantada y facilitará la solicitud de una Boleta Postal en elecciones futuras.

**O**

**Actualice su Información en Línea** – Puede actualizar su registro de votantes en línea en www.Texas.gov

Para acceder al portal de registro de votantes a través de Texas.gov, debe tener:

- Su Licencia de Conducir de Texas o su Tarjeta de Identificación Personal de Texas
- El número de auditoría que se encuentra en su Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas
- Su Número de Seguro Social
- Su Número de Registro de Votante (VUID#).

Si no tiene un número de identificación personal asociado con su registro de votante, debe añadirlo antes de que se le permita votar por correo. La adición de los números que faltan a su registro de votante surte efecto inmediatamente, pero si cambia su dirección, la actualización tardará 30 días en surtir efecto a partir del día en que el registrador de votantes reciba su nueva solicitud.

**Nota:** No puede añadir los números de identificación personal requeridos a su registro de votante presentando una nueva Solicitud de Boleta Postal.

Si tiene alguna pregunta o duda sobre cómo actualizar su registro de votante por un número de identificación personal faltante, póngase en contacto con la Oficina de Votación Adelantada al:

_____          _____
Número de Teléfono                                    Firma del Secretario de Votación Adelantada

OCA-APPX-1122

# Exhibit 69

AW5-16a
Sections 84.033(c), 86.006(h), Texas Election Code
Prescribed by Secretary of State
9/15

## NOTICE OF IMPROPER DELIVERY

Name of Voter _____ VUID Number _____

Precinct Number_____

This is to serve as notice that your ballot for the _____ Election was received by the early voting clerk.  It has been determined that your ballot was returned in violation of the Election Code, and your ballot voted by mail will not be counted.

Check Reason:

1. _____　　　Your ballot was not returned in the official carrier envelope.

2. _____　　　Your ballot was returned in the official carrier envelope but in another envelope containing more than one carrier envelope.  If another envelope is used to return the carrier envelope, all persons who enclosed their carrier envelope in the same larger envelope, must be registered to vote at the same address.  There was one or more carrier envelopes returned with your carrier envelope from persons not registered to vote at your address.

3. _____　　　It has been determined that your carrier envelope originated from the location indicated below.  A carrier envelope may not be delivered by a common or contract carrier if the delivery originates from the address of one of the following:

　　　　_____ a)　　　headquarters of a political party or candidate in the election

　　　　_____ b)　　　candidate in the election unless that is your address

　　　　_____ c)　　　specific or general purpose political committee involved in the election

　　　　_____ d)　　　an entity that requested the election

4. _____　　　The common or contract carrier who delivered your carrier envelope did not provide a receipt for delivery or the receipt provided did not meet with requirements prescribed by state law.

5. _____　　　Your ballot was hand-delivered by someone other than you, the voter. Note that carrier envelopes may only be returned by mail, common or contract carrier, or by hand-delivery by the voter who voted the ballot.

You may vote during the remainder of the early voting period or at your regular election day polling place by presenting and surrendering this Notice to the presiding election officer at the early voting polling place or at your election day polling place.

If you have any questions regarding this matter, please call my office at _____.


Signature of Early Voting Clerk


Date

Note to Polling Place Election Official:  If a voter presents this Notice and offers to vote, the voter must surrender the Notice before being accepted for voting.  If otherwise qualified, the voter may then vote a regular ballot at the polling place.  You should write the word "Cancelled" on this Notice and return it in envelope #2 with other election records.

AW5-16a
Código Electoral de Texas Secs. 84.033(c), 86.006(h)
Prescrito por la Secretaría de Estado
9/15

## AVISO DE ENTREGA DEFECTUOSA

Nombre del Votante _____.
Número único de identificación de votante (VUID, por sus siglas en Ingles)._____.
Numero de Precinto Electoral _____.

Por medio de éste se le informa que el Secretario/a de Votación Temprana recibió su boleta para las elecciones de _____. Después de recibirla, se determinó que la entrega de su boleta electoral no cumple con las leyes establecidas por el Código Electoral de Texas y por dicha razón no se incluirá en el conteo final.

Marque la falta cometida:

1. _____    Su boleta electoral no fue devuelta dentro del sobre de entrega oficial requerido.

2. _____    Aunque su boleta llegó dentro del sobre de entrega oficial, éste llegó dentro de un sobre que contenía otros sobres de entrega oficiales. Para poder enviar más de un sobre oficial dentro de un mismo sobre, todas las personas quienes enviaron su sobre oficial dentro de un mismo sobre más grande deben estar registradas para votar bajo la misma dirección residencial. El sobre en que llegó su sobre oficial contenía por lo menos un sobre de entrega enviado por alguien cuyo domicilio es distinto al suyo.

3. _____    Se ha determinado que su sobre oficial fue enviado desde uno de los siguientes lugares. Está prohibido que un transportista público o comercial entregue un sobre oficial si el lugar de donde la entrega se origino es:

   _____a)    La sede de uno de los partidos políticos o candidatos participando en dichas elecciones

   _____b)    El domicilio de uno de los candidatos participando en las elecciones a menos que éste sea su domicilio.

   _____c)    La sede de un comité político de interés general o específico que está participando en las elecciones.

   _____d)    La sede de la entidad que solicitó la celebración de estas elecciones.

4. _____    El transportista público o comercial que entregó su sobre oficial no proporcionó un acuso de recibo o el recibo que el transportista proporciono no cumplió con los requerimientos de ley estatal.

5. _____    Su boleta electoral fue entregada a mano por alguien que no es usted, el votante. Por favor tome en cuenta que el sobre oficial solamente puede ser entregado por correo postal, transportista público o comercial, o en persona, a mano, por el votante quien voto con esa boleta.

Usted puede votar durante el período de votación temprana o en su sitio electoral en el Día de la Elección si usted presenta y proporciona este aviso al oficial electoral en el sitio de votación temprana o en su sitio electoral en el Día de la Elección.

Si tiene preguntas, por favor comuníquese con mi oficina marcando el _____.

Firma del Secretario/a de Votación Temprana

Fecha

Nota al oficial electoral: Si un votante desea votar y presenta este aviso, exíjale que le entregue el aviso antes de votar. Si el votante está calificado para votar, el votante puede utilizar una boleta regular para votar en el sitio electoral. Escriba la palabra "Cancelled" en este Aviso y envíenos el Aviso con los otros documentos electorales en el sobre # 2.

# Exhibit 70

| | |
|---|---|
| **From:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C34C87BF7C6D49A78E87034AB37231B1-CADKINS |
| | [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C34C87BF7C6D49A78E87034AB37231B1-CADKINS] |
| on behalf of | Elections Internet [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C7880AABC96640A49B316BEE342F5292-ELECTIONS I] |
| **Sent:** | 1/28/2022 11:24:13 PM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **BCC:** | |



CONFIDENTIAL

STATE060463



OCA-APPX-1128

CONFIDENTIAL

STATE060464



OCA-APPX-1129

CONFIDENTIAL

STATE060465



OCA-APPX-1130

CONFIDENTIAL

STATE060466



OCA-APPX-1131

CONFIDENTIAL

STATE060467



OCA-APPX-1132

CONFIDENTIAL

STATE060468

**Subject**:   MASS EMAIL ADVISORY (CC/EA/VR - 1031) Advisory 2022-08 - Opportunity to Correct Defects on ABBM and Carrier Envelope

**Attachments**:   ADV2022-08 - Opportunity to Correct Defects (Final).pdf; 6-13 FORM Notice of Surrendered Ballot.pdf; 8-20 - SAMPLE Roster of Voters with Def. Carrier - Returned to the Voter by Mail.pdf; 8-21 - SAMPLE Roster of ABBM Voters Def. Carrier Envelopes - Phone or Email.pdf; 8-22 - SAMPLE Roster of FPCA Voters Def. Carrier Envelopes - Notified by Phone or Email.pdf; 8-23 - FORM Notice of Carrier Defect - Carrier Envelope Returned to Voter by Mail.pdf; 8-24 - FORM - Notice of Carrier Defect - Voter Notified by Phone or Email.pdf; 6-14 - FORM Corrective Action Form for Carrier Envelope.pdf

Dear Election Officials,

Our office has released **Advisory No. 2022-08 – NEW LAW: Senate Bill 1 – Opportunity to Correct Defects on Application for a Ballot by Mail and Carrier Envelope**.  The advisory is attached to this email as a PDF.  In addition to this advisory, we have released the following forms:

- Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail (8-23) – Attached as PDF (Spanish translation pending)
- Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email (8-24) – Attached as PDF (Spanish translation pending)
- SAMPLE Roster of Voters with Defective Carrier Envelopes (8-20, 8-21, 8-22) – Attached as PDF
- Corrective Action Form for Defective Carrier Envelope (6-14) – Attached as PDF
- Notice of Surrendered Ballot by Mail (6-13) – Attached as PDF

Previously, we released the following forms referenced in Advisory No. 2022-08:
- Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number (6-3)
- Notice of Rejected Application for Ballot by Mail – Required Personal Identification Number is Not Associated with your Voter Record (6-4)

We will be offering a webinar on this advisory on Tuesday, February 1, 2021 at 2:00 pm.  The log-in information for this webinar is located below.

| Date | Time | Event | Link |
|------|------|-------|------|
| February 1 | 2:00 pm | Opportunity to Correct Defects on Application for a Ballot by Mail and Carrier Envelope | https://texassos.webex.com/texassos/onstage/g.php?MTID=efaebe15383efd85ba5cb2ede73 |

As you review the advisory and the associated forms, please let us know if you have additional questions.  We will be working with our early voting clerks thorough the implementation of this new processes, and we will provide additional webinars and resources as needed.

Thank you for all that you do for Texas elections.

**Christina Worrell Adkins**
Legal Director – Elections Division

OCA-APPX-1133

Office of the Texas Secretary of State

1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701

1.800.252.VOTE (8683)

elections@sos.texas.gov | www.sos.texas.gov

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-1134

CONFIDENTIAL

6-13
Prescribed by Secretary of State
Section 84.031 Texas Election Code
1/2022

Prescrito por el Secretario de Estado
Sección 84.031, Código Electoral de Texas

# NOTICE OF SURRENDERED BALLOT BY MAIL
## *AVISO DE BOLETA POSTAL RENUNCIADA*

To the Presiding Judge or Deputy Early Voting Clerk:
(*Para el Juez Presidente o el Secretario Adjunto de Votación Adelantada*):

This is to certify that (*Se certifica que*)

_____     _____     _____
Name of voter (*Nombre del votante*)   VUID # (*Número del votante*)   Precinct Number (*Número de precinto*)

has surrendered his/her Ballot by Mail (ABBM) or Federal Post Card Ballot by Mail (FPCA) at the Office of the Early Voting Clerk, and has not voted by mail. The voter is eligible to vote a regular ballot.
(*ha renunciado a su Boleta Postal (ABBM por sus siglas en inglés) o a su Boleta Postal de Tarjeta Postal Federal (FPCA por sus siglas en inglés) en la oficina del Secretario de Votación Adelantada y no ha votado por correo. El votante es elegible para votar una boleta regular.*)

_____     _____
Name of County                       Signature of Early Voting Clerk
(*Nombre del Condado*)                (*Firma del Secretario de Votación Adelantada*)

# NOTICE OF SURRENDERED BALLOT BY MAIL
## *AVISO DE BOLETA ENTREGADA POR CORREO*

To the Presiding Judge or Deputy Early Voting Clerk:
(*Para el Juez Presidente o el Secretario Adjunto de Votación Adelantada*):

This is to certify that (*Se certifica que*)

_____     _____     _____
Name of voter (*nombre del votante*)   VUID # (*número del votante*)   Precinct Number (*número de precinto*)

has surrendered his/her Ballot by Mail (ABBM) or Federal Post Card Ballot by Mail (FPCA) at the Office of the Early Voting Clerk, and has not voted by mail. The voter is eligible to vote a regular ballot.
(*ha entregado su Boleta por Correo o Tarjeta Federal Postal Boleta por Correo en la oficina del Secretario de Votación Adelantada y no ha votado por correo). El votante es elegible para votar una boleta regular.*)

_____     _____
Name of County                       Signature of Early Voting Clerk
(*Nombre del Condado*)                (*Firma del Secretario de Votación Adelantada*)

STATE060471

| Authority Conducting the Election (Autoridad Administrando la Elección) | Date of Correction (Fecha de la Corrección) |
|---|---|
| Title of Election (Título de la Elección) | Printed Name of Early Voting Clerk's Representative Nombre de Representante del Secretario de Votación Adelantada |

## CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE

| Name of Voter (Nombre del Votante) | Voter's VUID# (Número de registración del votante (VUID#)) |
|---|---|

### Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)

| | |
|---|---|
| 1. | Voter Did Not Sign the Carrier Envelope Certificate (El votante no firmó el Sobre de Envío) |
| 2. | Signature on Carrier Envelope Certificate Could Not Immediately be Determined to be That of the Voter (No se pudo determinar inmediatamente que la firma en el Certificado del Sobre de Envío es la del votante) |
| 3. | Required Statement of Residence Was Not Included with the Carrier Envelope (La Constancia de Domicilio Permanente requerida no se incluyó con el Sobre de Envío) |
| 4. | Missing or Incorrect Personal Identification Numbers or Social Security Number (Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos) |

or (o)

| | |
|---|---|
| ___ ___ ___ ___ ___ ___ ___ ___ | ___ ___ ___ ___ |
| Texas Driver's License or Texas Personal Identification Card (Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas) | Last 4 Digits of Social Security Number (Los 4 últimos dígitos de número de Seguro Social) |

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Social Security Number
No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.

| | |
|---|---|
| 5. | Incomplete Information with Respect to a Witness (Información incompleta con respecto a un testigo) |

| Signature of Witness (Firma del testigo) | Printed Name of Witness (Nombre en letra de molde del testigo) |
|---|---|

| Street Address of Witness (Domicilio residencial del testigo) |
|---|

**Signature Box**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct.
(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta).

X_____
**Signature of Voter** (Firma del Votante)

---

### STATEMENT OF RESIDENCE (CONSTANCIA DE DOMICILIO PERMANENTE)

For persons whose residence address does not match the voter registration on the list of registered voters
Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos

| Last Name Include suffix, if any Apellido Incluir sufijo, si lo hay (Jr., Sr., III) | First Name Nombre de Pila | Middle Name (if any) Segundo Nombre (si lo hay) | Former Name Apellido Anterior |
|---|---|---|---|

| Residence Address: Street Address and Apartment Number, City State, and Zip. If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address) Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal. (Si no existe un domicilio, describe donde vive (no incluya apartados postales, rutas rurales o dirección del trabajo) | Gender (Optional) Sexo (Opcional) ☐ Male Masculino ☐ Female Femenino |
|---|---|

| Mailing Address: Address, City, State, and Zip (if mail cannot be delivered to your residence address) Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial) | Date of Birth: Month, Day, Year Fecha de Nacimiento: Mes, Día, Año ___ ___ / ___ ___ / ___ ___ ___ ___ |
|---|---|

| City and County of Former Residence in Texas Ciudad y Condado de residencia anterior en Texas | City and County of Current Residence in Texas Ciudad y Condado de residencia actual en Texas | Telephone Number (Optional) Include Area Code Teléfono (Opcional) – Incluya Código de Área |
|---|---|---|

| Texas Driver's License Number or Texas Personal Identification Card Number (Issued by the Department of Public Safety) Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública) | If you do not have a Texas Driver's License or Personal Identification Card, give the last 4 digits of your Social Security Number. Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social. |
|---|---|
| ___ ___ ___ ___ ___ ___ ___ ___ | ___ ___ ___ ___ |

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o número de Seguro Social.

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing.
Entiendo que el dar información falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

- Soy residente de este condado y ciudadano de los Estados Unidos; y
- No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, periodo de libertad condicional, o he sido indultado; y
- No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria que estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto

X_____    Date: ___ / ___ / _____
                             (fecha:)

Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.
Firma del solicitante o su agente (apoderado) y relación de éste con el solicitante, o nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.

OCA-APPX-1136

STATE060472

| Name of Election | Authority Conducting Election |
|---|---|
| Date of SVC/EVBB Meeting | SVC or EVBB (circle one) |

## ROSTER OF VOTERS WITH DEFECTIVE CARRIER ENVELOPES – RETURNED TO THE VOTER BY MAIL

| Voter Name | VUID | No Carrier Signature #1 | Signature Mismatch #2 | Missing SOR (EVBB only) #3 | Missing or Incorrect ID Info #4 | Missing or Incomplete Witness Info #5 | Printed Name of SVC/EVBB Person Who Provided Notice | Date Carrier Mailed Back to Voter | Date Corrected Carrier Received | Date Corrected Carrier Sent Back to EVBB | EVBB Action Taken on Carrier Envelope | Accepted or Rejected by EVBB (Place a check if accepted or rejected) | | Date of Defect if Found to be Defective for a 2nd Time | Date Voter was Notified by Phone | Date Voter was Notified by Email | Date Corrective Action Taken by Voter | Finally Accepted or Rejected by EVBB (Place a check if accepted or rejected) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |

STATE060473

OCA-APPX-1137

Prescribed by Secretary of State  8-21
Sections 87.0271, 87.0411 Texas Election Code
1/2022

| Name of Election | Authority Conducting Election |
|---|---|
| Date of SVC/EVBB  Meeting | SVC or EVBB  (circle one) |

## ROSTER OF ABBM VOTERS WITH DEFECTIVE CARRIER ENVELOPES – NOTIFIED BY PHONE OR EMAIL

| Voter Name | VUID | No Carrier Signature #1 | Signature Mismatch #2 | Missing SOR (EVBB only) #3 | Missing or Incorrect ID Info #4 | Missing or Incomplete Witness Info #5 | Printed Name of SVC/EVBB Person Who Provided Notice | Date Voter was Notified by Phone | Date Voter was Notified by Email | Date Corrective Action Taken by Voter | Date Corrected Carrier Sent Back to EVBB | Accepted or Rejected by EVBB (Place a check if accepted or rejected) | | Date of Defect if Found to be Defective for a 2nd Time | Date Voter was Notified by Phone | Date Voter was Notified by Email | Date Corrective Action Taken by Voter | Finally Accepted or Rejected by EVBB (Place a check if accepted or rejected) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |
| | | | | | | | | | | | | Accepted | Rejected | | | | | Accepted | Rejected |

**STATE060474**

OCA-APPX-1138

Prescribed by Secretary of State
Sections 87.0271, 87.0411 Texas Election Code
1/2022 (8-22)

| Name of Election | Authority Conducting Election |
|---|---|
| Date of SVC/EVBB Meeting | SVC or EVBB (circle one) |

## ROSTER OF FPCA VOTERS WITH DEFECTIVE CARRIER ENVELOPES – NOTIFIED BY PHONE OR EMAIL

| Voter Name | VUID | No Carrier Signature #1 | Signature Mismatch #2 | Missing SOR (EVBB only) #3 | Missing or Incorrect ID Info #4 | Missing or Incomplete Witness Info #5 | Printed Name of SVC/EVBB Person Who Provided Notice | Date Voter was Notified by Phone | Date Voter was Notified by Email | Date Corrected Signature Sheet Sent Back to EVBB | Method of Transmission of Corrected Signature Sheet Email, Fax, Mail Circle one | Accepted or Rejected by EVBB (Place a check if accepted or rejected) | Date of Defect if Found to be Defective for a 2nd Time | Date Voter was Notified by Phone | Date Voter was Notified by Email | Date Corrective Action Taken by Voter | Finally Accepted or Rejected by EVBB (Place a check if accepted or rejected) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |
| | | | | | | | | | | | email   Fax   Mail | Accepted   Rejected | | | | | Accepted   Rejected |

Prescribed by the Secretary of State
Sections 63.0011, 87.0271, 87.0411
Texas Election Code
1/2022 (8-23)

# NOTICE OF CARRIER DEFECT
## Carrier Envelope Returned to the Voter by Mail

Your Carrier Envelope has been received and reviewed, but is defective for the reason(s) checked below.

Texas law allows a voter to correct certain defects on his or her Carrier Envelope after the marked ballot has been returned to the Early Voting Clerk. Your Carrier Envelope is enclosed with this notice so that you can make the necessary corrections. All defects listed below are able to be corrected. You must correct the defect and ensure that the Carrier Envelope is received by the Early Voting Clerk no later than 7:00 p.m. on Election Day.

**There is a checkmark next to the reason(s) that your Carrier Envelope was Defective**

_____ 1. The Carrier Envelope you returned to the Early Voting Clerk was not signed.

_____ 2. When the signature on your Application for Ballot by Mail was compared to the signature on your Carrier Envelope, it could not be immediately determined that the signatures were made by the same person.

_____ 3. A required Statement of Residence was not included in the Carrier Envelope you returned to the Early Voting Clerk.

_____ 4. Your Carrier Envelope did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number; OR

the number provided did not match the number associated with your voter registration record as provided by your County's Voter Registrar; OR

if you were not issued one of the documents with the required number, you did not indicate this fact on the Carrier Envelope.

_____ 5. The Carrier Envelope you returned to the Early Voting Clerk contained incomplete information with respect to a witness.

**How to Correct the Defect on Your Carrier Envelope that was Returned to You by Mail**

You must correct the defect directly on the Carrier Envelope or by using the Corrective Action Form located on the back of this notice. If you use the Corrective Action Form, the completed form and the Carrier Envelope must both be received the Early Voting Clerk no later than 7:00 p.m. on Election Day.

**Defect Correction Process by Number**

- **Defect #1 –** Sign the Carrier Envelope in the designated space and return it to the Early Voting Clerk using the envelope provided in this packet.
- **Defect #2 –** Complete and sign the Signature Box on the Corrective Action Form. There is already a signature on the Carrier Envelope.
- **Defect #3 –** Complete and sign the Statement of Residence portion of the Corrective Action Form.
- **Defect #4 –** You may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov or by providing your personal identification information in Box #4 of the Corrective Action Form or by providing your personal identification information on the Carrier Envelope. If you use the Corrective Action Form, you must complete and sign the Signature Box. You must mail back the Carrier Envelope so that it is received by the Early Voting Clerk no later than 7:00 p.m. on Election Day.
- **Defect #5 –** If you used a witness for your Carrier Envelope because you were not able to sign or make your mark and the witness information was missing or incomplete, please ask a witness to complete the witness portion of the Carrier Envelope or the Corrective Action Form. You may use a different person as a witness if the same person is not available. **NOTE:** If you no longer need a witness, you must be able to sign or make your mark on the Carrier Envelope or on the Corrective Action Form in the Signature Box.

**Correcting Defect #4 Using the Ballot by Mail Tracker**

When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Both your Texas Driver's License or Texas Personal Identification Card number AND your Social Security number must be associated with your voter registration record to use the Ballot by Mail Tracker. Once your personal identification number is validated by the Mail Ballot Tracker, **you must still return your Carrier Envelope by mail, common or contract carrier or hand delivery** so that it is received no later than 7:00 p.m. on Election Day. **NOTE:** You can only personally hand-deliver your own Carrier Envelope to the Early Voting Clerk's Office on Election Day between 7:00 a.m. and 7:00 p.m.

**To utilize the Ballot by Mail Tracker, you must enter:**

- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your Social Security number AND
- Your residence address as listed in your voter registration record

**Cancelling Your Ballot by Mail -** If you do not wish to correct the defect, you may still vote in person by cancelling your Ballot by Mail. You may appear at an Early Voting or Election Day polling place and surrender your Carrier Envelope with the official ballot inside. Upon the surrender of your Ballot by Mail, you are entitled to vote a regular ballot. If you do not surrender your Ballot by Mail, you will be given a Provisional Ballot.

If you have any questions or concerns about making a correction to your Carrier Envelope please contact the Early Voting Clerk's Office at:

_____          _____          _____
Phone Number of Early Voting Clerk          Signature of Reviewing Election Official          Printed Name of Election Official

OCA-APPX-1140

STATE060476

| Authority Conducting the Election (Autoridad Administrando la Elección) | Date of Correction (Fecha de la Corrección) |
|---|---|
| Title of Election (Título de la Elección) | Printed Name of Early Voting Clerk's Representative Nombre de Representante del Secretario de Votación Adelantada |

## CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE

| Name of Voter (Nombre del Votante) | Voter's VUID# (Número de registración del votante (VUID#)) |
|---|---|

### Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)

| | |
|---|---|
| **1.** | **Voter Did Not Sign the Carrier Envelope Certificate** (El votante no firmó el Sobre de Envío) |
| **2.** | **Signature on Carrier Envelope Certificate Could Not Immediately be Determined to be That of the Voter** (No se pudo determinar inmediatamente que la firma en el Certificado del Sobre de Envío es la del votante) |
| **3.** | **Required Statement of Residence Was Not Included with the Carrier Envelope** (La Constancia de Domicilio Permanente requerida no se incluyó con el Sobre de Envío) |
| **4.** | **Missing or Incorrect Personal Identification Numbers or Social Security Number** (Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos) |

or (o)

| Texas Driver's License or Texas Personal Identification Card (Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas) | Last 4 Digits of Social Security Number (Los 4 últimos dígitos de número de Seguro Social) |
|---|---|

☐ **I have not been issued a Texas Driver's License or Texas Personal Identification Card or Social Security Number**
No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.

**5.** **Incomplete Information with Respect to a Witness** (Información incompleta con respecto a un testigo)

**Signature of Witness** (Firma del testigo)          **Printed Name of Witness** (Nombre en letra de molde del testigo)

**Street Address of Witness** (Domicilio residencial del testigo)

**Signature Box**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct.
(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta).

X_____
**Signature of Voter** (Firma del Votante)

### STATEMENT OF RESIDENCE (CONSTANCIA DE DOMICILIO PERMANENTE)

For persons whose residence address does not match the voter registration address on the list of registered voters
Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos

| Last Name Include suffix, if any Apellido Incluir sufijo, si lo hay (Jr., Sr., II) | First Name Nombre de Pila | Middle Name (if any) Segundo Nombre (si lo hay) | Former Name Apellido Anterior |
|---|---|---|---|

| Residence Address: Street Address and Apartment Number, City State, and Zip. If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address) Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal. (Si no existe un domicilio, describe donde vive (no incluya apartados postales, rutas rurales o dirección del trabajo) | Gender (Optional) Sexo (Optional) ☐ Male Masculino ☐ Female Femenino |
|---|---|

| Mailing Address: Address, City, State, and Zip (If mail cannot be delivered to your residence address) Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial) | Date of Birth: Month, Day, Year Fecha de Nacimiento: Mes, Día, Año ___ ___ / ___ ___ / ___ ___ ___ ___ |
|---|---|

| City and County of Former Residence in Texas Ciudad y Condado de residencia anterior en Texas | City and County of Current Residence in Texas Ciudad y Condado de residencia actual en Texas | Telephone Number (Optional) Include Area Code Teléfono (Optional) – Incluya Código de Área |
|---|---|---|

| Texas Driver's License Number or Texas Personal Identification Card Number (Issued by the Department of Public Safety) Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública) | If you do not have a Texas Driver's License or Personal Identification Card, give the last 4 digits of your Social Security Number. Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social. |
|---|---|

☐ **I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number**
Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o número de Seguro Social.

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing.
Entiendo que el dar información falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

- Soy residente de este condado y ciudadano de los Estados Unidos; y
- No he sido finalmente condenado por un delito grave, o si soy delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, periodo de libertad condicional, o he sido indultado; y
- No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria que estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto

X_____          Date: _____ / _____ / _____
                            (fecha:)

**Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.**
Firma del solicitante o su agente (apoderado) y relación de éste con el solicitante, o nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.

OCA-APPX-1141

STATE060477

Prescribed by Secretary of State
Sections 63.0011, 87.0271, 87.0411, Texas Election Code
1/2022 (8-24)

## NOTICE OF CARRIER DEFECT

### Voter Notified of Carrier Envelope Defect by Phone or Email

Your Carrier Envelope has been received and reviewed, but is defective for the reason(s) checked below.

Texas law allows a voter to correct certain defects on his or her Carrier Envelope after the marked ballot has been returned to the Early Voting Clerk. Your Carrier Envelope is being held at the Early Voting Clerk's Office so that you can make the necessary corrections because there was not sufficient time to return your Carrier Envelope to you by mail. The defect(s) listed below are able to be corrected no later than the 6th day after Election Day by appearing in person at the Early Voting Clerk's Office.

**There is a checkmark next to the reason(s) that your Carrier Envelope was Defective**

_____ 1. The Carrier Envelope you returned to the Early Voting Clerk was not signed.

_____ 2. When the signature on your Application for Ballot by Mail was compared to the signature on your Carrier Envelope, it could not be immediately determined that the signatures were made by the same person.

_____ 3. A required Statement of Residence was not included in the Carrier Envelope you returned to the Early Voting Clerk.

_____ 4. Your Carrier Envelope did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number; OR

the number provided did not match the number associated with your voter registration record as provided by your County's Voter Registrar; OR

if you were not issued one of the documents with the required number, you did not indicate this fact on the Carrier Envelope

_____ 5. The Carrier Envelope you returned to the Early Voting Clerk contained incomplete information with respect to a witness.

**How to Correct a Defect on Your Carrier Envelope by Appearing in Person at the Early Voting Clerk's Office**

Defects number 1, 2, 3, and 5 can be corrected by completing the Corrective Action Form included with your notification of defect. You must deliver the completed Corrective Action Form in person to the Early Voting Clerk's Office.

**Defect Correction Process by Number**

- **Defect #1 –** Complete and sign the Signature Box on the Corrective Action Form.
- **Defect #2 –** Complete and sign the Signature Box on the Corrective Action Form.
- **Defect #3 –** Complete and sign the Statement of Residence portion of the Corrective Action Form.
- **Defect #4 –** You may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov or by providing your personal identification information in Box #4 of the Corrective Action Form. If you use the Corrective Action Form, you must complete and sign the Signature Box.
- **Defect #5 –** If you used a witness for your Carrier Envelope because you were not able to sign or make your mark and the witness information was missing or incomplete, please ask a witness to complete the witness portion of the Corrective Action Form. You may use a different person as a witness if the same person is not available.

  **NOTE:** If you no longer need a witness, you must be able to sign or make your mark on the Corrective Action Form in the Signature Box.

**Correcting Defect #4 Using the Ballot by Mail Tracker**

You may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov or by delivering the Corrective Action Form to the Early Voting Clerk's Office no later than the 6th day after Election Day. When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Both your Texas Driver's License or Texas Personal Identification Card number AND your Social Security number must be associated with your voter registration record to use the Ballot by Mail Tracker. Once your personal identification number is validated by the Ballot by Mail Tracker, the Carrier Envelope you previously submitted will be processed. Once your corrective action has been reviewed, the date of review and the status of your Carrier Envelope will be displayed on the Ballot by Mail Tracker. You do not have to appear in person at the Early Voting Clerk's Office if you make your correction online.

**To utilize the Ballot by Mail Tracker, you must enter:**

- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number AND
- Your residence address as listed in your voter registration record

**Cancelling Your Ballot by Mail -** If you do not wish to correct the defect, you may still vote in person by cancelling your Ballot by Mail. If you cancel your Ballot by Mail in person at the Early Voting Clerk's Office, you will be given a Notice of Surrendered Ballot to take to the polls. This entitles you to vote a regular ballot. If you do not cancel at the Early Voting Clerk's Office, you will be able to vote a Provisional Ballot at the polling place. You may not vote in person after Election Day.

If you have any questions or concerns about making a correction to your Carrier Envelope please contact the Early Voting Clerk's Office at:

_____     _____     _____
Phone Number of Early Voting Clerk        Signature of Reviewing Election Official        Printed Name of Election Official

_____
Address of the Early Voting Clerk's Office

OCA-APPX-1142

**STATE060478**

| Authority Conducting the Election (Autoridad Administrando la Elección) | Date of Correction (Fecha de la Corrección) |
|---|---|
| Title of Election (Título de la Elección) | Printed Name of Early Voting Clerk's Representative Nombre de Representante de Secretario de Votación Adelantada |

## CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE

| Name of Voter (Nombre del Votante) | Voter's VUID# (Número de registración del votante (VUID#)) |
|---|---|

### Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)

| 1. | **Voter Did Not Sign the Carrier Envelope Certificate** (El votante no firmó el Sobre de Envío) |
|---|---|
| 2. | **Signature on Carrier Envelope Certificate Could Not Immediately be Determined to be That of the Voter** (No se pudo determinar inmediatamente que la firma en el Certificado del Sobre de Envío es la del votante) |
| 3. | **Required Statement of Residence Was Not Included with the Carrier Envelope** (La Constancia de Domicilio Permanente requerida no se incluyó con el Sobre de Envío) |

4. **Missing or Incorrect Personal Identification Numbers or Social Security Number**
(Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos)

\_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_ **or (o)** \_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_\_

**Texas Driver's License or Texas Personal Identification Card** — **Last 4 Digits of Social Security Number**
(Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas) — (Los 4 últimos dígitos de número de Seguro Social)

☐ **I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number**
No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.

5. **Incomplete Information with Respect to a Witness** (Información incompleta con respecto a un testigo)

_____ _____

**Signature of Witness** (Firma del testigo) — **Printed Name of Witness** (Nombre en letra de molde del testigo)

**Street Address of Witness** (Domicilio residencial del testigo)

**Signature Box**

I, _____, on \_\_\_/\_\_\_/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct.
(Yo, _____, en el día \_\_\_/\_\_\_/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta).

X_____

**Signature of Voter** (Firma del Votante)

### STATEMENT OF RESIDENCE (CONSTANCIA DE DOMICILIO PERMANENTE)

For persons whose residence address does not match the voter registration address on the list of registered voters
Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos

| Last Name Include suffix, if any Apellido Incluir sufijo, si lo hay (Jr., Sr., III) | First Name Nombre de Pila | Middle Name (if any) Segundo Nombre (si lo hay) | Former Name Apellido Anterior |
|---|---|---|---|

**Residence Address: Street Address and Apartment Number, City State, and Zip.**
If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address)
Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal.
(Si no existe un domicilio, describe dónde vive (no incluya apartados postales, rutas rurales o dirección del trabajo)

**Gender** (Optional)
Sexo (Opcional)
☐ Male Masculino
☐ Female Femenino

| Mailing Address: Address, City, State, and Zip (If mail cannot be delivered to your residence address) Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial) | Date of Birth: Month, Day, Year Fecha de Nacimiento: Mes, Día, Año \_\_\_ / \_\_\_ / \_\_\_ |
|---|---|

| City and County of Former Residence in Texas Ciudad y Condado de residencia anterior en Texas | City and County of Current Residence in Texas Ciudad y Condado de residencia actual en Texas | Telephone Number (Optional) Include Area Code Teléfono (Opcional) – Incluya Código de Área |
|---|---|---|

| Texas Driver's License Number or Texas Personal Identification Card Number (Issued by the Department of Public Safety) Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública) \_\_\_ \_\_\_ \_\_\_ \_\_\_ \_\_\_ \_\_\_ \_\_\_ \_\_\_ | If you do not have a Texas Driver's License or Personal Identification Card, give the last 4 digits of your Social Security Number. Si no tiene una Licencia de Conducir de Texas o Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social. |
|---|---|

☐ **I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number**
Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal o número de Seguro Social.

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing.
Entiendo que el dar información falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

- Soy residente de este condado y ciudadano de los Estados Unidos; y
- No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, período de libertad condicional, o he sido indultado; y
- No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria que estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto

X _____ Date: \_\_\_\_ / \_\_\_\_ / _____
(fecha:)

**Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.**
Firma del solicitante o su agente (apoderado) y relación de éste con el solicitante, o nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.

OCA-APPX-1143

STATE060479



# The State of Texas

Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

**John B. Scott**
Secretary of State

## ELECTION ADVISORY
## NO. 2022-08

TO: Election Officials

FROM: Keith Ingram, Director, Elections Division

DATE: January 28, 2022

RE: NEW LAW: Senate Bill 1 – Opportunity to Correct Defects on Application for a Ballot by Mail and Carrier Envelope

---

Senate Bill 1 (87th Leg., 2nd C.S., 2021) added new identification requirements related to the ballot by mail process. SB 1 took effect on December 2, 2021. Any elections ordered on or after December 2, 2021, must adhere to the changes in law made by SB 1 and the procedures outlined in this advisory.

This advisory details the new requirements on the Application for Ballot by Mail (ABBM) form and the carrier envelope, and it outlines the new process that allows voters to correct certain defects on their ABBM or carrier envelope. As authorized by the Legislature, the Secretary of State is prescribing these procedures to implement the corrective action process mandated in SB 1. (Secs. 87.0271(f), 87.0411(f), Texas Election Code).

All statutory references in this advisory are to the Texas Election Code ("the Code"), unless otherwise indicated.

# New Requirements for Application for Ballot by Mail (ABBM)

As amended by SB 1, Section 84.002 of the Election Code provides that a voter who seeks to vote by mail must include one of the following on their ABBM:

- The number of the applicant's driver's license, election identification certificate (EIC), or personal identification card issued by the Department of Public Safety (DPS);
- The last four digits of the applicant's social security number, if the applicant has not been issued a DPS number; or
- A statement that the applicant has not been issued one of these numbers. (Sec. 84.002(a)(1-a)).

A person may use the number of a DPS-issued driver's license, EIC, or personal identification card that has expired for the purpose of fulfilling the identity requirements in Section 84.002(a)(1-a) if the license or identification is otherwise valid. (Sec. 84.002(b-1)).

STATE060480

The official ABBM form has been revised to include a space for the required identification information. (Sec. 84.011). If a voter requests an ABBM form, the county must send the new form that includes a space for the identification information. If a voter uses an old version of the ABBM form, the early voting clerk must follow the procedures outlined below in rejecting the application. Please be advised that there are other changes to the ABBM form that will be addressed in a separate advisory.

# Requirements for Processing Applications for Ballot by Mail

It is the early voting clerk's responsibility to review applications for ballot by mail, determine whether the applicant is entitled to vote by mail, and provide ballot materials to the voter. (Secs. 86.001, 86.002).

Section 86.001 outlines the process that an early voting clerk must follow when reviewing a voter's submitted ABBM. Among other things, the early voting clerk must verify that the personal identification information provided by the voter on the application—i.e., a DPS-issued driver's license, EIC, or personal identification card number, the last four digits of the applicant's social security number, or a statement that the applicant has not been issued any of these numbers— identifies the same voter identified on the applicant's voter registration record. (Sec. 86.001(f)).

If the voter fails to provide any of the required identification information on the ABBM or the information provided by the voter on the ABBM does not match the information on the voter's voter registration record, the early voting clerk shall reject the ABBM and provide notice of the rejection (Form 6-3, Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number). Similarly, if the voter provides one or both of the required identification numbers but the voter's voter registration record does not contain either number, the early voting clerk must reject the ABBM and promptly notify the voter of the rejection (Form 6-4, Notice of Rejected Application for Ballot by Mail - Required Personal Identification Number Not Associated with Voter Record).

These SOS-prescribed notices include instructions on how the voter can correct the applicable defect online, as required by Section 86.001(f-1). If the rejection occurs on or before the 18th day before election day, the early voting clerk must also send the voter a new ABBM along with the rejection notice. (Sec. 86.008). Section 86.008(d) further provides that the early voting clerk may deliver a second ABBM to a voter in person if the defective original ABBM is timely and the clerk may receive, before the deadline, the corrected ABBM in person from the voter, as long as the clerk applies these procedures uniformly to all ABBMs covered by the subsection.

Below, we discuss several scenarios that early voting clerks may encounter in reviewing ABBMs, and we outline the opportunities provided to voters to cure certain ABBM defects, including additional information regarding the forms that the SOS has prescribed for early voting clerks to send voters when notifying them that their ABBMs have been rejected.

## Possible Scenarios:

- **Scenario 1**: Voter provides a DPS-issued driver's license number on the ABBM. The early voting clerk validates that this number matches the driver's license number in the voter's voter registration record. If the voter is otherwise eligible to vote by mail, the early voting clerk must accept the ABBM and send a ballot to the voter.

OCA-APPX-1145

STATE060481

- **Scenario 2**: Voter provides a DPS-issued driver's license number on the ABBM. The early voting clerk is unable to validate this number, as the voter registration record contains the voter's social security number but not a driver's license number. The early voting clerk must reject the ABBM and provide notice of the rejection, which must include information explaining how to correct or add information to cure the defect. (Sec. 86.001(f-1)). *See* Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number.
  - o **NOTE**: If a voter has not provided the required personal identification information by the 11th day before election day, the ABBM will be finally rejected, but the voter may still vote in person if otherwise eligible. (Sec. 84.007(c)).

- **Scenario 3**: Voter provides the last four digits of their social security number on the ABBM. The voter registration record contains a driver's license number and social security number. The early voting clerk is able to validate that the partial social security number on the ABBM matches the number in the voter's registration record. The early voting clerk must accept the ABBM and send a ballot to the voter.
  - o **NOTE**: As a reminder, the early voting clerk's obligation in reviewing the identification information on an ABBM is to determine if the information provided by the voter on the ABBM identifies the same voter identified on the applicant's voter registration record. (Sec. 86.001(f)).

- **Scenario 4**: Voter indicates on their ABBM that they have not been issued any of the required personal identification numbers, but the voter registration record contains one or both numbers. The early voting clerk must reject the ABBM and provide notice of the rejection, which must include information explaining how to correct or add information to cure the defect. (Sec. 86.001(f-1)). *See* Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number.
  - o **NOTE**: If a voter has not provided the required personal identification information by the 11th day before election day, the ABBM will be finally rejected, but the voter may still vote in person if otherwise eligible. (Sec. 84.007(c)).

- **Scenario 5**: Voter provides one of the required personal identification numbers on their ABBM, but the voter's voter registration record does not contain either number. The early voting clerk must reject this ABBM and provide notice of the rejection, which must include instructions on how the voter can update their voter registration record to include the personal identification numbers. (Sec. 86.001(f)). *See* Notice of Rejected Application for Ballot by Mail – Required Personal Identification Number Not Associated with Voter Record.
  - o **NOTE**: A voter cannot vote by mail unless at least one of the required numbers is added to the voter's registration record. If the ABBM is otherwise valid, the voter must be given the opportunity to update their voter registration record in order to finish processing the ABBM. The early voting clerk will need to re-check ABBMs in this category to determine if the voter updated their voter registration record with one or more required personal identification numbers. If a voter has not updated their voter registration record by the 11th day before election day, the ABBM will be finally rejected, but the voter may still vote in person if otherwise eligible. (Sec. 84.007(c)).

- **Scenario 6**: Voter provides both types of personal identification numbers (ex: driver's license number and last four digits of social security number) on their ABBM. The voter registration record contains both types of personal identification numbers; one number on the ABBM matches the record, but the other does not match. Because the early

3

STATE060482

voting clerk is able to validate one of the numbers to the voter's voter registration record (and thus verify the identity of the voter), the clerk must accept the ABBM and send a ballot to the voter.

- **Scenario 7**: Voter provides both types of personal identification numbers (ex: driver's license number and last four digits of social security number) on their ABBM. The voter registration record only contains the social security number, which matches with the partial number on the ABBM. The early voting clerk must accept the ABBM and send a ballot to the voter.

- **Scenario 8**: Voter indicates on the ABBM that they have not been issued any of the required personal identification numbers. If the voter's voter registration record does not contain any of these numbers, the early voting clerk must accept the ABBM and send a ballot to the voter.

- **Scenario 9**: The voter uses an old ABBM form that does not contain any of the required identification information or leaves the personal identification information section blank and does not indicate that they have not been issued any of the required numbers. The early voting clerk must reject the ABBM and provide notice of the rejection, which must include information explaining how to correct or add information to cure the defect. (Sec. 86.001(f-1)). *See* Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number.
  - **NOTE**: If a voter has not provided the required personal identification information by the 11th day before election day, the ABBM will be finally rejected, but the voter may still vote in person if otherwise eligible. (Sec. 84.007(c)).

# Opportunity to Correct Rejection of ABBM

As described above, if the early voting clerk rejects an ABBM because the voter failed to provide any of the required identification information or the information included on the ABBM does not match the voter's voter registration record, the early voting clerk must provide the voter with notice of the rejection in accordance with Section 86.001(c). (Sec. 86.001(f-1)). The notice must include information explaining how to correct the defect by using the online Ballot by Mail Tracker, available at www.votetexas.gov. (Sec. 86.001(f-1)). The SOS has prescribed Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number (Form 6-3) for this rejection notice. If the applicant corrects the missing or incorrect number by validating the required information through the Ballot by Mail Tracker, and this information subsequently identifies the same voter identified on the applicant's voter registration record, the early voting clerk shall provide a ballot to the applicant. (Sec. 86.001(f-2)).

**NOTE**: The early voting clerk should retain the documentation from TEAM that shows the voter validated their personal identification number(s). This documentation should be retained with the voter's original ABBM and provided to the early voting ballot board so that the board is notified that the defect has been cured.

If the early voting clerk rejects an ABBM because the voter's voter registration record does not contain any of the personal identification information provided on the ABBM, the clerk must offer the voter an opportunity to correct this defect. The notice must include instructions on how the voter can update their voter registration record to include one or more of the required identification numbers by submitting a new voter registration application to the registrar or by validating their personal identification numbers on texas.gov. The SOS has prescribed Notice of Rejected Application for Ballot by Mail – Required Personal Identification Number Not Associated with Voter Record (Form 6-4) for this rejection notice.

STATE060483

Missing or incorrect personal identification information on the ABBM or the voter registration record is the only defect that can be corrected on an ABBM. If the application is rejected on any other grounds, a voter must submit a new ABBM if they still wish to vote by mail instead of voting in person. (Secs. 86.001(c), (f), (f-1), 86.008).

Any written notice of an ABBM rejection must state the reason for the rejection and be delivered to the voter at both the voter's residence address and the mailing address on the ABBM, if different. Additionally, if the voter provided an email address on the ABBM, the early voting clerk may also send notification by email of the reason for rejection. (Sec. 86.001(c)).

Please see pages 18-20 of this advisory for additional information regarding forms that SOS has prescribed for use in notifying voters of rejected ABBMs.

# Deadline to Correct Defects in Application for Ballot by Mail

If a voter receives a Notice of Rejected Application for a Ballot by Mail or the voter logs into the Ballot by Mail Tracker and sees that there is missing or incorrect personal identification information, the voter must either (1) complete the required validation on the Ballot by Mail Tracker no later than the 11th day before election day, or (2) complete a new ABBM that must be received by the early voting clerk no later than the 11th day before election day. (Secs. 84.007(c), 86.015).

The early voting clerk must review all pending ABBMs that were initially rejected due to missing or incorrect personal identification information. If the applicant did not subsequently provide the missing or corrected identification information, the early voting clerk should send a final rejection notice. The early voting clerk can use the standard Notice of Rejected Application for Ballot by Mail form (Form 6-2) and mark reason 16 on the form.

If a voter corrects a defective ABBM after early voting by personal appearance has begun, the early voting clerk should confirm that the voter did not vote in person before sending balloting materials to the voter.

Please review the Secretary of State's election law calendar for additional details about ballot by mail deadlines.

# New Requirements for Carrier Envelope

As amended by SB 1, Section 86.002 requires that the carrier envelope include a space that is hidden from view when the envelope is sealed for the voter to enter one of the following: (1) the number of the voter's driver's license, EIC, or personal identification card issued by DPS; (2) the last four digits of the voter's social security number, if the voter has not been issued a DPS number; or (3) a statement that the applicant has not been issued one of these numbers. (Sec. 86.002(g)).

The carrier envelope has been updated to include a place for the voter to add an email address and/or telephone number so that the early voting ballot board or signature verification committee can contact the voter to notify them of a defect in their carrier envelope. Please note that there are other changes to the carrier envelope that will be addressed in a separate advisory.

OCA-APPX-1148

STATE060484

# New Comparison Requirements for Early Voting Ballot Board (EVBB) and Signature Verification Committee (SVC)

Section 87.041 directs the early voting ballot board to determine whether to accept a voted ballot by mail and provides that a ballot can be accepted only if it meets several specified requirements. Based on changes to this provision made by SB 1, the EVBB must now review additional information when qualifying a voted ballot by mail. The EVBB shall only accept a voted ballot by mail if, among other things, the personal identification information provided by the voter on the carrier envelope identifies the same voter identified on the voter's voter registration record. (Sec. 87.041(b)(8)). In performing its assigned duties, the signature verification committee, if established, may also review the personal identification information on the voter's carrier envelope. (Secs. 87.027, 87.0271). If the voter includes an identification number on the carrier envelope, the number on the carrier envelope does not have to match the type of number on the voter's ABBM as long as they are both associated with the voter's registration record.

**Rebuttable Presumption**

Under Section 87.041, if the voter provides personal identification information on the carrier envelope that matches the voter's registration record, the signatures on the ABBM and the carrier envelope shall be rebuttably presumed to be the signatures of the voter. (Sec. 87.041(d-1)). Thus, the only way to reject a mail ballot due to a signature mismatch is for a member of the SVC or EVBB to rebut this presumption. The presumption may be rebutted by presenting other past signatures on file with the early voting clerk or voter registrar that would support a finding that the signatures on the carrier envelope and ABBM are not those of the same voter.

Any findings by the SVC that the signatures are not those of the same voter can be overridden by the EVBB. (Sec. 87.027(j)). This decision can be overridden even in circumstances when the voter has been provided an opportunity to correct a signature mismatch (notified by phone or email of the defect and subsequent corrective action process), but the voter did not complete the corrective action process. (Sec. 87.027(j)).

## Possible Scenarios:

- **Scenario 1**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record. The SVC or EVBB has completed the verification of personal identification information and should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.

- **Scenario 2**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record, but it is a different type of number than what the voter listed on the ABBM. (Example: Voter provided last four digits of social security number on ABBM and a driver's license number on carrier envelope.) Because the voter's voter registration record contains both personal identification numbers, the SVC or EVBB is able to verify the voter's identity. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.

OCA-APPX-1149

STATE060485

- **Scenario 3**: Voter provides the last four digits of their social security number on the carrier envelope. The voter registration record contains a driver's license number and social security number. The SVC or EVBB is able to validate that the partial social security number on the carrier envelope matches the number in the voter's voter registration record. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.
  - **NOTE**: As explained above with respect to the early voting clerk's acceptance of ABBMs, the obligation of the SVC or EVBB in reviewing the identification information on a carrier envelope is to determine if the information provided by the voter on the envelope identifies the same voter identified on the voter's voter registration record. (Secs. 87.027, 87.0271, 87.041(b)(8), 87.0411).

- **Scenario 4**: Voter indicates on the carrier envelope that they have not been issued any of the required personal identification numbers, and the voter's voter registration record does not contain any of these numbers. The SVC or EVBB has completed the verification of personal identification information, and it must rely on the signature comparison process for this part of the review. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.

- **Scenario 5**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter does not include an identification number on the carrier envelope. The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope, as described in more detail below. If the voter timely corrects the defect, and there are no other grounds for rejection, the ballot would be accepted.

- **Scenario 6**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter indicates on the carrier envelope that they have not been issued one of the applicable identification numbers. The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope. If the voter timely corrects the defect, and there are no other grounds for rejection, the ballot would be accepted.

# Signature Verification Committee Corrective Action Process

SB 1 added Section 87.0271 of the Code to provide a process by which the signature verification committee, if established, shall offer voters the opportunity to correct certain defects in the required paperwork associated with a voted mail ballot. The signature verification committee is created by the early voting clerk and can be appointed for any election. (Sec. 87.027(a)). The signature verification committee may begin meeting as early as 20 days before election day. (Sec. 87.027(f)).

Because the early voting ballot board in counties with a population of under 100,000 are not permitted to meet to qualify mail ballots until the end of the period for early voting by personal appearance, the **Secretary of State's office strongly recommends that all entities create a signature verification committee so that voters will be timely notified of defects in their carrier envelopes.** *See* Section 87.027 for more details on the creation and administration of a signature verification committee.

STATE060486

The following defects are eligible for correction when identified by the signature verification committee (Sec. 87.0271(a)):

- The voter did not sign the carrier envelope certificate.
- The SVC cannot determine whether the signature on the carrier envelope is that of the voter.
- The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
- If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    **NOTE**: Incomplete information about an assistant cannot be corrected and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.

Only the early voting ballot board has the authority to open a carrier envelope for those voters who submitted their request using an ABBM. (Sec. 87.041(a)). As the SVC does not have the authority to open a carrier envelope, the SVC is unable to determine whether a carrier envelope contains a completed statement of residence (SOR). Because the authority to open a carrier envelope to determine whether a voter submitted a completed SOR lies solely with the early voting ballot board, the SVC cannot notify voters of defects related to a missing SOR.

The signature verification committee can open a sealed carrier envelope, or envelope used for mailing the voted ballot and balloting materials, for voters who submitted their request to vote by mail using an FPCA, as signature sheets are expressly authorized for this process.

# Early Voting Ballot Board Corrective Action Process

SB 1 also added Section 87.0411 of the Code to provide a process by which the early voting ballot board shall offer voters the opportunity to correct certain defects on their carrier envelope or in the required paperwork associated with the voted mail ballot. The first day that an EVBB can convene to qualify mail ballots depends on the size of the county, and for local political subdivisions (city, school, water district, etc.) contracting with a county. As noted above, the early voting ballot board in counties with a population of under 100,000, and in local entities that are not contracting with a county, are not permitted to meet to qualify mail ballots until the end of early voting by personal appearance. (Secs. 87.022, 87.0222).

The following defects are eligible for correction when identified by the early voting ballot board (Sec. 87.0411(a)):

- The voter did not sign the carrier envelope certificate.
- The EVBB cannot determine whether the signature on the carrier envelope is that of the voter.
- The voter did not include the required statement of residence.
- The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
- If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    **NOTE**: Incomplete information about an assistant cannot be corrected and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.

# Corrective Action Process Timelines

The SVC or EVBB has two methods by which they can notify a voter of their ability to correct one or more of the defects outlined above.

OCA-APPX-1151

STATE060487

**Returning the Carrier Envelope by Mail**: If the SVC or EVBB determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the SVC or EVBB must mail the original defective carrier envelope to the voter. This determination must be made not later than the second business day after the SVC or EVBB discovers a defect, and before the SVC or EVBB decides whether to accept or reject a timely delivered mail ballot. (Secs. 87.0271(b), 87.0411(b)).

**Notifying the Voter by Phone or Email**: If the SVC or EVBB determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the SVC or EVBB may notify the voter of the defect by telephone or email and inform the voter that the voter may come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. (Secs. 87.0271(c), 87.0411(c)).

If the SVC or EVBB takes one of the actions described above, the committee or board must take that action with respect to each ballot in the election to which these options apply. (Secs. 87.0271(d), 87.0411(d)).

# Recommended Timelines/Plan for the SVC and EVBB

The SOS recommends that before qualifying mail ballots, the early voting clerk meet with the SVC or EVBB to determine dates to convene and to establish timelines for the corrective action process. (Secs. 87.0411, 87.0271).

### Establishing Timelines and Guidelines for the Corrective Action Process

- The SVC or EVBB must set a uniform policy for when carrier envelopes will be mailed to the voter versus when voters will be notified of the defect by phone or email. See recommendations below regarding establishing a specific deadline for transitioning to phone/email notification.
- The SVC or EVBB should determine whether it will notify voters of a defect by both phone and email, if both are available.
- The SVC or EVBB should establish a policy for making multiple attempts to reach a voter if it is unsuccessful in reaching a voter by phone or email on the first attempt.

### Recommended Timelines for Notification Process

When the SVC or EVBB is determining whether there is adequate time to return a defective carrier envelope to the voter by mail, we strongly recommend that it takes into account postal delivery time frames. According to the United States Postal Service (USPS), first-class delivery can take up to five business days. Because a defective carrier envelope needs to be returned to the voter, and then mailed back to the early voting clerk, the SOS recommends that the SVC or EVBB implement a policy to provide notification of a defect by phone or email to all voters whose ballots are reviewed by the SVC or EVBB on or after the 14th day before election day (approximately 10 business days). Although early voting ballot boards in counties with a population of 100,000 or greater cannot begin meeting until 12 days before election day, the SVC is authorized to return a defective carrier envelope by mail during this time.

OCA-APPX-1152

STATE060488

**Rolling Review of Carrier Envelopes**

To ensure that voters are given the maximum amount of time to correct a defective carrier envelope, the SOS recommends that the SVC or EVBB meet on the first possible day allowed under the Texas Election Code to qualify all mail ballots received up until that point (as identified in the chart below). The SOS recommends the SVC or EVBB continue their qualification of ballots on a rolling basis throughout the authorized meeting period to ensure that voters who are eligible to correct defects are notified as quickly as possible of the defect and their correction options. Notice of all SVC or EVBB meeting times should be posted timely to ensure that poll watchers are aware of when the SVC or EVBB meetings will occur.

|  | First Day Mail Ballots can be Reviewed | Texas Election Code Section |
|---|---|---|
| **Signature Verification Committee** (All counties and local political subdivisions) | 20th day before election day | Sec. 87.027(f) |
| **Early Voting Ballot Board** (Counties with a population of 100,000 or more) | 12th day before election day | Sec. 87.0222(a) |
| **Early Voting Ballot Board** (Counties with a population under 100,000) | 4th day before election day | Sec. 87.022 |

# Methods of Correcting Defects in Carrier Envelope

## Correcting Defect by Returning Carrier Envelope by Mail

If the SVC or EVBB determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the SVC or EVBB shall return the original carrier envelope containing the voter's marked ballot to the voter by mail to allow the voter to correct the defect. (Secs. 87.0271(b), 87.0411(b)).

When the carrier envelope is sent to the voter for corrective action, the voter MUST return the carrier envelope by 7:00 p.m. on election day. If the voter is hand-delivering the carrier envelope to the early voting clerk's office on election day, it must be received by the early voting clerk no later than 7:00 p.m. Only the voter may hand-deliver their carrier envelope, and the voter must present a valid form of voter ID (either a List A ID or a List B ID with reasonable impediment declaration) at the time of delivery.

### Procedures

The SOS recommends that when preparing to return the voter's carrier envelope containing the voter's marked ballot, the SVC or EVBB take several actions, including the following:

1. Stamp or mark the voter's carrier envelope with the words "Corrective Action Required."
2. Note the appropriate defect on the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail.

STATE060489

3. Mail the voter's defective carrier envelope along with the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail. The early voting clerk should include an envelope for the voter to return the corrected carrier envelope to the early voting clerk. This envelope should contain the Official Election Mail logo prescribed by the USPS. The voter must be notified if the return envelope needs additional postage.
4. Enter the voter's information on the Roster of Voters with Defective Carrier Envelopes – Returned to the Voter by Mail.

## Correcting Defect by Appearing in Person at Early Voting Clerk's Office

If the SVC or EVBB determines that it would not be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the SVC or EVBB may notify the voter of the defect by telephone or email and inform the voter that the voter may come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. The SVC or EVBB must also inform the voter that he or she may request to have their application for ballot by mail cancelled in a manner described by Section 84.032. (Secs. 87.0271(c), 87.0411(c)).

Upon appearing at the early voting clerk's office, the voter will be asked to submit the Corrective Action Form for Defective Carrier Envelope. This form allows the voter to provide the information necessary to address the defects in their carrier envelope.

### Procedures

The SOS recommends that when notifying the voter of a defect, the SVC or EVBB take certain actions, including the following:

- **If notifying by email:**
    1. Send the voter the Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email via email.
    2. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the voter should be noted on the roster.
    3. **Parameters for Email Notification**: The SOS recommends that the early voting clerk set up an email address for corrective action notifications. The early voting clerk and the SVC or EVBB should establish rules and procedures for utilizing this email address. Any emails sent or received through the corrective action process are considered election records under the Election Code, are subject to the Public Information Act, and should be retained by the general custodian of election records. The general custodian should consult with their attorney regarding any requests for such emails, as certain information may be exempt from disclosure under the Public Information Act.
- **If notifying by phone:**
    1. Contact the voter using any known phone number on file with the early voting clerk or in the possession of the SVC or EVBB.
        **NOTE**: As a reminder, the voter registrar may not transcribe, copy or otherwise record a telephone number furnished on a voter registration application. (Sec. 13.004). The SVC or EVBB may be able to review a voter registration application at the voter registrar's office to obtain a phone

11

STATE060490

number. The registrar may also read a phone number from a voter registration application to a member of the SVC or EVBB, if necessary.

2. The SVC or EVBB should create a phone script that explains to the voter that the voter's mail ballot was received by the early voting clerk's office and has been reviewed by the SVC or EVBB, whichever is applicable.

3. The SOS recommends that the SVC or EVBB confirm the voter's identity using publicly available information.
   - **Example**: Ask the voter to confirm their voter registration address and whether they requested a mail ballot for the given election.

4. The voter should be told that upon review of the carrier envelope, the SVC or EVBB discovered a defect in the carrier envelope. The specific defect should be explained.

5. The SVC or EVBB should explain the process for the voter to correct the defect in the carrier envelope as well as the process to cancel their mail ballot and vote in person during early voting or on election day.

6. The SVC or EVBB should provide a return phone number that the voter may use to confirm that they were contacted by the SVC or EVBB. The number provided should be the number of the early voting clerk's office so the voter can verify this information and obtain details about the corrective action process during times that the SVC or EVBB are not meeting.

7. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the SVC or EVBB should be noted on the roster.

- **If the SVC or EVBB is unable to contact the voter**:
  1. The SVC or EVBB should leave a detailed message explaining that the SVC or EVBB determined there was a defect in the voter's carrier envelope and explain the process for correcting the defect.
  2. The SVC or EVBB should NOT provide any details related to a voter's personally identifiable information on a voicemail or with a person who is not the voter.
  3. The SVC or EVBB should leave a return number that the voter may use to validate the information provided by phone.
  4. The SVC or EVBB should mail the voter a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.
  5. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the SVC or EVBB should be noted on the roster.

- **If the SVC or EVBB does not have a phone number or email to notify the voter**: The SVC or EVBB should mail a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

If a voter's carrier envelope has a defect that may be corrected, the SVC or EVBB must provide this status information to the county early voting clerk, who submits the information via TEAM to update the Ballot by Mail Tracker.

Any actions taken by the SVC or EVBB shall be uniformly applied to every ballot in the election to which this procedure applies. (Secs. 87.0271(d), 87.0411(d)). A poll watcher is entitled to observe any action taken by the SVC or EVBB related to the corrective action process. (Secs.

STATE060491

87.0271(e), 87.0411(e)). Poll watchers may not transcribe or make notes of any voter's personally identifiable information while observing the activities of the SVC or EVBB.

## Correcting Certain Defects Through Ballot by Mail Tracker

If the SVC or EVBB determines that the identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information, the voter may cure this defect through the SOS's Ballot by Mail Tracker. However, if the SVC or EVBB has returned the voter's carrier envelope by mail for correction, the voter also MUST return the carrier envelope to the early voting clerk no later than 7:00 p.m. on election day for the ballot to be processed and counted. (Secs. 87.0271(b), 87.0411(b)). The Notice of Carrier Defect form provides information on how to utilize the tracker. Information validated through the Ballot by Mail Tracker should be provided to the EVBB for their final review of the ballot before determining acceptance or rejection.

If a voter's carrier envelope has a defect that may be corrected, the SVC or EVBB must give this information to the early voting clerk, who submits it via TEAM to update the tracker.

## Correcting Defect by Cancellation

If the voter received a defective carrier envelope in the mail or was notified by telephone or email about a defect, the voter may request to have their ABBM/marked ballot cancelled in accordance with Section 84.032. If the voter has possession of the defective carrier envelope, it may be surrendered at an early voting or election day polling place in order to vote a regular ballot in person. The voter may also surrender the ballot at the early voting clerk's office and be given a Notice of Surrendered Ballot by Mail to take to the polling place and vote a regular ballot.

### Cancellation Options

After receiving a Notice of Carrier Defect by mail or receiving notification via email or phone, the voter may opt to cancel their ballot by mail and vote a regular ballot in person. All cancellations must be completed in accordance with Section 84.032. If the voter is an Annual ABBM voter, a cancellation request submitted for these purposes applies only to the current election unless the voter specifically requests to cancel their Annual ABBM. (Sec. 84.038).

- **Cancellation by Surrendering Mail Ballot at Polling Place During Early Voting or on Election Day**: If a voter has possession of their mail ballot, they may surrender that ballot at any early voting or election day polling place. Upon surrendering the ballot and completing the Application to Cancel a Ballot by Mail for Use in the Polling Place form, the voter will be given a regular ballot for voting. (Sec. 84.032(c), (d)).
- **Cancellation at Polling Place Without Surrendering Mail Ballot**: If a voter appears at a polling place during early voting or on election day after receiving a Notice of Carrier Defect, but does not have the defective carrier envelope to surrender, the voter may complete the Application to Cancel a Ballot by Mail for Use in the Polling Place form. The voter should vote provisionally and the election judge should check reason #4 on the Affidavit of Provisional Voter Envelope. (Secs. 84.032(c), 84.035(b)).
- **Cancellation at Early Voting Clerk's Office**
  - If the voter appears at the early voting clerk's office and submits a cancellation request in writing and surrenders the mail ballot, the voter will be permitted to vote a regular ballot in person. The voter will be issued a Notice of Surrendered

STATE060492

Ballot by Mail. This notice will be taken to the polling place and presented to the presiding judge. The presiding judge must issue the voter a regular ballot for voting. (Secs. 84.032(a), (c), (d), 84.035(b)).

- o If the voter appears at the early voting clerk's office and submits a cancellation request in writing but does **NOT** surrender their mail ballot, the voter will be permitted to vote, but they must be issued a provisional ballot. The voter must complete a proper affidavit on cancellation form. The voter should be sent to their applicable polling location to vote provisionally. (Secs. 84.032(a), (c), 84.035(b)).
    - ▪ **NOTE:** The early voting clerk's office may not always contain the main early voting polling place. If a voter appears during early voting, the voter should be directed to the nearest early voting location to vote.

- • **Cancellation by Voter who was Notified of the Defect by Phone or Email**: If a voter was notified of the defect in their carrier envelope by phone or email, the voter may cancel their mail ballot application and vote in person.
    - o If the voter appears at the early voting clerk's office and submits a cancellation request in writing and the early voting clerk can verify that ballot is in the possession of the EVBB, the early voting clerk can issue a Notice of Surrendered Ballot by Mail. This notice will be taken to the polling place and presented to the presiding judge. The presiding judge must issue the voter a regular ballot for voting. (Secs. 84.032(a), (c), (d), 84.035(b)).
    - o If the voter appears at the polling place and completes a written cancellation request, the voter may be given a provisional ballot. The presiding judge should mark reason number 4 on the provisional ballot affidavit envelope. The presiding judge may also want to add a notation that the voter was notified of a defect on their carrier envelope by phone or email. (Sec. 84.032(b), (c)).

There is no process under Texas law by which a voter can cancel a mail ballot application by phone. All cancellations must be in writing and completed in accordance with Section 84.032 of the Code. A written, signed, and scanned copy of a cancellation request may be submitted by email or fax. The request must contain an original, wet ink signature; an electronic or digital signature is not permissible. If a voter has possession of their mail ballot, they must still surrender their mail ballot at the polling place or early voting clerk's office in order to vote a regular ballot in person even if they submit a cancellation request.

**Provisional Voting**

If the voter does not have possession of the carrier envelope, Notice of Improper Delivery, or Notice of Surrendered Ballot by Mail, but would like to cancel their mail ballot, the voter can go to an early voting or election day polling place and vote a provisional ballot.

# Correcting in the Early Voting Clerk's Office when Voter is Notified of Defect by Phone or Email

If a voter has been notified of a defect by phone or email and the voter has not been sent their defective carrier envelope, the voter may appear in person at the early voting clerk's office not later than the sixth day after election day to take certain corrective actions. (Secs. 87.0271(c), 87.0411(c)).

Upon appearing at the early voting clerk's office and informing the early voting clerk that they have been notified that their carrier envelope had a defect, the early voting clerk should review the appropriate Roster of Voters with Defective Carrier Envelopes (or other applicable records)

OCA-APPX-1157

STATE060493

provided to the early voting clerk from the SVC or EVBB to determine what corrective action is necessary.

If the voter has a completed Corrective Action Form for Defective Carrier Envelope, the early voting clerk will take the form and make a notation on the appropriate roster that the form was received.

If the voter does not have a completed Corrective Action Form for Defective Carrier Envelope, the early voting clerk shall provide the form to the voter and have the voter complete the paperwork. After completion of paperwork, the early voting clerk will take the corrective action form and make a notation on the appropriate roster that the form was received.

The early voting clerk must review the documentation provided by the voter to ensure that the voter has completed the necessary corrective actions. The early voting clerk or deputy early voting clerk will then complete the remaining notations on the roster. The Corrective Action Form for Defective Carrier Envelope must be securely retained until the records are transferred back to the SVC or EVBB.

The early voting clerk should make arrangements with the SVC chair and/or the EVBB presiding judge to receive an updated copy of the Roster of Voters with Defective Carrier Envelopes after each meeting of the SVC or EVBB in which the committee or board qualifies voted ballots for signature comparison or makes a determination to accept or reject voted ballots. Additionally, the early voting clerk shall provide any Corrective Action Form for Defective Carrier Envelope received along with an updated copy of the roster to the EVBB for the board's final review of ballots. The SOS recommends that this information be provided to the EVBB prior to any meeting of the EVBB. On election day, if the EVBB is meeting prior to the closing of the polls, it should be provided with any Corrective Action Form for Defective Carrier Envelope received before its meeting and any forms received up until the polls close on election day.

The early voting clerk should provide instructions about how to process voters who appear in person to correct defects in their carrier envelopes to all deputy early voting clerks who may be assisting with the corrective action process or answering phone or email inquiries.

## Required Actions by Early Voting Ballot Board for all Ballots Subject to Corrective Action Process

Upon receiving any defective carrier envelopes that have been corrected and returned by mail, any Corrective Action Form for Defective Carrier Envelope that voters provided in person, or a notification from the early voting clerk that a voter provided missing or incorrect personal identification information through the Ballot by Mail Tracker, the EVBB must review the carrier envelope and associated paperwork to make a determination whether to accept or reject the ballot. (Sec. 87.0411(g)).

If a voter has been notified of a defect by phone or email, the voter has until the sixth day after election day to correct the defect. (Secs. 87.0271(c), 87.0411(c)). The voter's ballot may not be finally rejected for the reason provided in the Notice of Carrier Defect before the seventh day after election day. (Secs. 87.0271(g), 87.0411(g)). If a voter was mailed their defective carrier envelope, the revised carrier envelope containing the voted ballot MUST be returned to the early voting clerk by the time the polls close on election day. (Secs. 87.0271(b), 87.0411(b)).

OCA-APPX-1158

STATE060494

# Impacts on Federal Post Card Application (FPCA) Voters

The new requirements that an ABBM contain a voter's personal identification information apply to Federal Post Card Application voters. The FPCA form already includes a place for a voter to provide this information, as the form is also used for voter registration purposes. If a voter fails to include their personal identification number on the FPCA, the voter may correct this defect by submitting a new FPCA or by validating their identification number in the Ballot by Mail Tracker.

Likewise, the new identification requirements for carrier envelopes apply to mail ballots for FPCA voters. Our FPCA materials have been revised to reflect this change. Many FPCA voters receive their balloting materials by email, and an FPCA voter cannot construct the carrier envelope with a sufficient secrecy flap. Additionally, all FPCA ballots must be carried by the USPS free of postage. To facilitate the mailing of FPCA balloting materials, early voting clerks may use any type of mailing envelope that contains the Official Election Mail logo and the required postage-paid information as long as the early voting clerk includes a required signature sheet for the voter to complete.

All FPCA voters must be provided with an Official Election Signature Sheet for an FPCA Voter if their balloting materials were sent by email. If the balloting materials were sent by physical mail, but the early voting clerk is using one of the FVAP envelopes that does not contain all of the requirements for the carrier envelope, the voter MUST be provided with an Official Election Signature Sheet for an FPCA Voter to return with their marked ballot.

The SOS has prescribed a version of the carrier envelope that contains the required postage-paid information to be used only for FPCA voters. The personal identification number requirements have been added to the FPCA signature sheet.

## Actions by Signature Verification Committee or Early Voting Ballot Board Regarding FPCA Voters

The SVC or EVBB, whichever is applicable, must review an FPCA voter's returned carrier envelope or signature sheet just as they would for a regular ABBM voter. However, as many FPCA voters will be utilizing a signature sheet that is contained within a sealed envelope, the SVC may have to open the sealed envelope to determine if the voter included a required signature sheet. The SVC may ONLY open FPCA carrier envelopes containing these voted ballots to ensure that the signature sheet has been included and that it contains the necessary information required for validation of personal identification numbers and/or signatures.

## Correction of Defects by FPCA Voters

If the FPCA voter provides missing or incorrect identification information on their carrier envelope or signature sheet, or did not include the Official Election Signature Sheet for an FPCA Voter, the voter must be notified of the defect in the same manner as a regular ABBM voter. Because the signature sheet is separate from the voted ballot and is authorized under state and federal law, FPCA voters who have a defect in their signature sheet have additional methods for returning this corrected or missing required documentation. Specifically, an FPCA voter may submit a corrected signature sheet by email, fax, personal delivery, or mail. The SVC or EVBB should make an appropriate notation on their roster to indicate how FPCA voters were notified of a defect and how the FPCA voter provided the corrected signature sheet to the SVC or EVBB. (Secs. 1.007, 31.003, 31.004, 87.0271(f), 87.0411(f), 101.007, 101.109).

16

OCA-APPX-1159

STATE060495

# Validating Voter Registration Information When an Entity or Political Subdivision Does Not Contract with County Election Officer

The requirements to verify voters' personal identification information with their voter registration records apply to all elections regardless of whether a political subdivision contracts with the county election officer to conduct the election on its behalf. For those entities that are running their own elections, the following verification process must be completed.

**Verifying Personal Identification Information on ABBM/FPCA**

- For Annual ABBM/FPCA voters who file applications with the county: When the county election office forwards the list of ABBM/FPCA voters along with copies of their mail ballot applications, the county shall only forward those applications for which the personal identification information provided on the ABBM/FPCA matches the information in the voter's voter registration record. The county election officer should prepare a certification, included with the forwarded list, confirming that the information provided on each forwarded application matches the voter's voter registration record. If the early voting clerk does not want to rely on the county's certification, the clerk must coordinate with the county election officer to determine a date and time to go to the county's office to validate the information on the ABBM/FPCA with the voter's voter registration record.

- If a local entity receives an ABBM or FPCA directly from a voter, the early voting clerk must make arrangements with the county election officer to verify that the information provided on the application matches the voter's voter registration record. This verification may be made over the telephone or in person before the early voting clerk sends the voter's balloting materials. Verification of personal identification information should be confirmed on a separate document or directly on the ABBM (as long as the notation does not obscure any of the applicant's markings). The notation should indicate that the verification occurred and include the date of verification.
  **NOTE**: If a local entity receives an Annual ABBM/FPCA, the entity must forward the application to the county as soon as possible for the county's use. (Sec. 86.0015(d)).

**Verifying Personal Identification Information on Carrier Envelope**

- Because the early voting clerk already validated the personal identification information on the voter's ABBM, if the information submitted on the carrier envelope matches the information on the ABBM, the EVBB may accept the information and proceed to signature verification.

- If the information submitted on the carrier envelope does NOT match the information on the voter's ABBM, the SVC or EVBB must verify that the information on the carrier envelope matches the voter's voter registration record. The SVC or EVBB must verify this information with the voter registrar or county election officer. The verification may be performed over the telephone or in person at the voter registrar's or county election officer's office, or a member of the voter registrar's or county election officer's staff may be on site at the SVC or EVBB meeting to look up the voter registration records. Verification of personal identification information should be confirmed on a separate document or directly on the ABBM (provided that the notation does not obscure any of the applicant's markings). The notation should indicate that the verification occurred and

OCA-APPX-1160

STATE060496

include the date of verification. The verification, method used for verification, and the individuals involved in the verification must all be documented by the SVC or EVBB, and these records should be maintained for the applicable preservation period.

# Forms Related to Corrective Action Process

The SOS has prescribed several forms pertaining to the procedures identified in this advisory.

### Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number (Form 6-3)

The SOS has prescribed a specific form for early voting clerks to use when notifying a voter that their ABBM is subject to rejection because the voter failed to provide any of the required personal identification information on the ABBM or the information provided by the voter on the ABBM does not match the voter's voter registration record. This new form provides detailed information on how the voter can correct this defect by utilizing the SOS's Ballot by Mail Tracker to validate their personal identification numbers, as required by Section 86.001(f-1). If the missing or incorrect identification information is the only basis for rejecting the ABBM, we recommend that early voting clerks use Form 6-3 as it explains the correction process.

The SOS has also added language regarding missing or incorrect personal identification information to the standard Notice of Rejected Application for Ballot by Mail form (Form 6-2). If there are multiple defects with an ABBM (including missing or incorrect identification information), we recommend that the early voting clerk send the standard Form 6-2 because the voter must submit a new ABBM to resolve the other defects even if the voter utilizes the Ballot by Mail Tracker to correct the missing or incorrect information.

### Notice of Rejected Application for Ballot by Mail – Required Personal Identification Number Not Associated with Voter Record (Form 6-4)

The SOS has prescribed a specific form for early voting clerks to use when notifying a voter that their ABBM is subject to rejection because the voter's voter registration record does not contain one or more of the required personal identification numbers. This notice provides instructions on how a voter can add their personal identification number(s) to their voter registration record through texas.gov or by submitting a new voter registration application to the voter registrar. A postage-paid voter registration application must accompany this notice so that the voter may add the numbers to his or her voter registration record if the voter does not have online access.

### Notice of Carrier Defect (Forms 8-23, 8-24)

The SOS has prescribed two different Notice of Carrier Defect forms to notify voters of defects in their carrier envelope and the available corrective actions. For voter convenience, we have included a copy of the Corrective Action Form for Defective Carrier on the reverse side of each Notice of Carrier Defect.

- The Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail is to be used for those voters who are mailed back their carrier envelope for correction.

- The Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email is to be used for those voters who are notified of their carrier envelope defect by phone or email.

STATE060497

The notice must be completed by members of the SVC or EVBB. Any phone call or email notifying a voter of a defect in their carrier envelope should be made or sent during the time the SVC or EVBB is convened. The SVC or EVBB may utilize employees of the early voting clerk to assist with this process if all activities are completed while the SVC or EVBB is officially convened so that poll watchers may be present to observe the activities.

## Roster of Voters with Defective Carrier Envelopes (Forms 8-20, 8-21, 8-22)

The SVC or EVBB should create a Roster of Voters with Defective Carrier Envelopes – Returned to the Voter by Mail and a Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email to record and detail the voters whose carrier envelopes have been mailed to a voter or are pending review by the SVC or EVBB. The roster should include the following information:

- Voter's Name/VUID;
- Type of defect on the carrier envelope;
- Date the SVC or EVBB provided notice of defect, if applicable;
- How notice was provided (returned carrier, phone call, email); and
- Who on the SVC or EVBB provided the notice.

A copy of the roster should be provided to the early voting clerk on a regular basis so that they are aware of voters who may appear at the early voting clerk's office to complete any corrective actions associated with their carrier envelope or cancel their mail ballot application.

The SOS has prescribed three different sample rosters that may be used for these purposes. The SVC or EVBB may choose to complete the roster or track this information electronically, as long as the SVC or EVBB is able to generate a report with the required information that can be provided to the early voting clerk to assist with the corrective action process.

Voters' names entered on this roster are not eligible for public inspection until after the voter has returned the corrected carrier envelope, canceled their mail ballot, or appeared in person to correct any necessary defects. (Sec. 87.121).

## Corrective Action Form for Defective Carrier Envelope (Form 6-14)

The SOS has prescribed a specific form that voters should use when appearing in person at the early voting clerk's office to correct certain defects in their carrier envelope. This form allows the voter to provide the missing or incorrect information from their carrier envelope. When completed, the early voting clerk must provide this form to the EVBB so that the board can make a final determination on acceptance or rejection of a voted mail ballot.

The Corrective Action Form for Defective Carrier Envelope also contains the elements of a statement of residence. Voters may want to consider completing all portions of the corrective action form; if the EVBB subsequently discovers a different defect in the carrier envelope (such as a missing SOR form), and the voter provided all the required information in the corrective action form, this form can be used to correct the newly found defects.

The SOS has prescribed a standalone Corrective Action Form for Defective Carrier, but has also included this form on the reverse side of the Notice of Carrier Defect form for voter convenience.

19

STATE060498

**Notice of Surrendered Ballot by Mail (Form 6-13)**

The SOS has prescribed a Notice of Surrendered Ballot by Mail to use when a voter surrenders their mail ballot to the early voting clerk and is eligible to vote a regular ballot in person. Upon surrendering their mail ballot, the voter will be issued the Notice of Surrendered Ballot by Mail. The voter will take this form to their early voting or election day polling place and present the form to the election judge, entitling the voter to vote a regular ballot in person.

# Address Confidentiality Program

When reviewing the Confidential Voter Registration Form and Early Voting Ballot Application of a voter in the Attorney General's address confidentiality program, the early voting clerk will not compare the personal identification information on the application form to a voter registration record as these voters are not registered voters in the statewide voter registration system.

After the voter returns their carrier envelope, the early voting clerk or applicable designee must confirm that the personal identification information on the carrier envelope matches the information on the Confidential Voter Registration Form and Application for Ballot by Mail. If the information does not match, the early voting clerk or designee must generate a Notice of Carrier Defect. The voter's name is not entered on the Roster of Voters with Defective Carrier Envelopes. Instead, a notation of the defect is made on the Roster for Early Voting by Mail for Address Confidential Applicants.

As these individuals are not registered voters in the statewide registration system, the Ballot by Mail Tracker will not contain information regarding their ballot application or carrier envelope. Voters wishing to verify the receipt of their carrier envelope must contact the early voting clerk.

# Early Voting Clerk Notification to Voter of Defects in Carrier Envelope

Under Section 86.011(d) of the Code, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect. Additionally, the early voting clerk may notify the voter of the defect by phone and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their ABBM and vote in person. The early voting clerk may utilize this provision for defects such as a missing signature by the voter, a partially completed witness or assistant box (if applicable), or a ballot that is not returned in a carrier envelope.

If an early voting clerk chooses to notify voters of defects in their carrier envelope under Section 86.011(d), the clerk must apply these procedures uniformly to all voters in similar circumstances. Additionally, the SOS recommends keeping a log to track the ballots mailed to voters and the ballots in the possession of the early voting clerk before ballots are delivered to the SVC or EVBB. If the early voting clerk notifies a voter of a defect in their carrier envelope by mail, the clerk should include a letter explaining the actions that the voter needs to take to correct and return the carrier envelope.

Please be advised that the early voting clerk can only notify voters of certain defects under Section 86.011(d). If the early voting clerk receives a mail ballot with an obvious defect, but it is within the time frame that the SVC or EVBB can meet, the early voting clerk should expeditiously deliver these ballots to the SVC or EVBB so that they may complete their full

STATE060499

review and the voter can be notified of all defects in a timely fashion. The SVC or EVBB should review the ballots with obvious defects first to ensure that those voters are timely notified of their options to correct or cancel their mail ballot.

## Types of Defects and Corrective Action Options

| Type of Defect | Carrier Envelope Returned by Mail to Voter | Voter Notified of Defect by Phone or Email |
|---|---|---|
| Voter did not sign the carrier envelope certificate. | Voter should sign original carrier envelope and return the carrier envelope to the early voting clerk by mail by 7:00 p.m. on election day, or, if on election day, the voter may hand-deliver their signed carrier envelope to the early voting clerk's office. Voter can make corrections directly on the returned carrier envelope. They do not need a Corrective Action for Carrier Envelope form.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person. If voter surrenders their mail ballot, they should be given a regular ballot. If the voter does not surrender their mail ballot, they must vote provisionally. | Voter can complete Corrective Action Form for Defective Carrier Envelope and return the form in person to the early voting clerk's office by the 6th day after election day.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person.<br><ul><li>If voter cancels at the early voting clerk's office and is given a Notice of Surrendered Ballot by Mail, the voter votes a regular ballot.</li><li>If voter surrenders ballot at the polling place, voter may fill out cancellation form and vote a regular ballot.</li><li>If voter appears at the polling place without a Notice of Surrendered Ballot by Mail and no ballot, the voter may fill out cancellation form and be given a provisional ballot.</li></ul> |
| The EVBB/SVC cannot determine whether the signature on the carrier envelope is that of the voter. | Voter can complete Corrective Action Form for Defective Carrier Envelope form and return the form AND the original carrier envelope to the early voting clerk's office. Carrier envelope and Corrective Action for Carrier Envelope form must be received by the early voting clerk by 7:00 p.m. on election day.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person. If voter surrenders their mail ballot, they should be given a regular | Voter can complete Corrective Action Form for Defective Carrier Envelope and return the form in person to the early voting clerk's office by the 6th day after election day.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person.<br><ul><li>If voter cancels at the early voting clerk's office and is given a Notice of Surrendered Ballot by Mail, the voter votes a regular ballot.</li><li>If voter surrenders ballot at the</li></ul> |

STATE060500

| Type of Defect | Carrier Envelope Returned by Mail to Voter | Voter Notified of Defect by Phone or Email |
|---|---|---|
| | ballot. If the voter does not surrender their mail ballot, they must vote provisionally. | polling place, voter may fill out cancellation form and vote a regular ballot.<br>• If voter appears at the polling place without a Notice of Surrendered Ballot by Mail and no ballot, the voter may fill out cancellation form and be given a provisional ballot. |
| Voter did not include the required Statement of Residence form. | Voter can complete Corrective Action Form for Defective Carrier Envelope and Statement of Residence form and return the forms AND the original carrier envelope to the early voting clerk's office. Carrier envelope, SOR form, and Corrective Action Form for Defective Carrier Envelope must be received by the early voting clerk by 7:00 p.m. on election day.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person. If voter surrenders their mail ballot, they should be given a regular ballot. If the voter does not surrender their mail ballot, they must vote provisionally. Voter may be required to complete a SOR when appearing to vote in person. | Voter can complete Corrective Action Form for Defective Carrier Envelope and Statement of Residence form and return the form in person to the early voting clerk's office by the 6th day after election day.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person.<br>• If voter cancels at the early voting clerk's office and is given a Notice of Surrendered Ballot by Mail, the voter votes a regular ballot.<br>• If voter surrenders ballot at the polling place, voter may fill out cancellation form and vote a regular ballot.<br>• If voter appears at the polling place without a Notice of Surrendered Ballot by Mail and no ballot, the voter may fill out cancellation form and be given a provisional ballot.<br>• Voter may be required to complete a SOR when appearing to vote in person. |
| The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information. | Voter can complete Corrective Action Form for Defective Carrier Envelope and return the form AND the original carrier envelope to the early voting clerk's office. Carrier envelope and Corrective Action Form for Defective Carrier Envelope must be received by the early voting clerk by 7:00 p.m. on election day. | Voter can complete Corrective Action Form for Defective Carrier Envelope and return the form in person to the early voting clerk's office by the 6th day after election day.<br><br>**OR**<br><br>Voter can log into the Ballot by Mail Tracker on www.votetexas.gov to |

22

OCA-APPX-1165

STATE060501

| Type of Defect | Carrier Envelope Returned by Mail to Voter | Voter Notified of Defect by Phone or Email |
|---|---|---|
| | **OR**<br><br>Voter can enter the missing information on the original carrier envelope that was returned to the voter and return the carrier envelope to the early voting clerk.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person. If voter surrenders their mail ballot, they should be given a regular ballot. If the voter does not surrender their mail ballot, they must vote provisionally. | complete the verification of the missing or incorrect personal identification information.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person.<br>• If voter cancels at the early voting clerk's office and is given a Notice of Surrendered Ballot by Mail, the voter votes a regular ballot.<br>• If voter surrenders ballot at the polling place, voter may fill out cancellation form and vote a regular ballot.<br>• If voter appears at the polling place without a Notice of Surrendered Ballot by Mail and no ballot, the voter may fill out cancellation form and be given a provisional ballot. |
| If a voter used a witness for completion of the carrier envelope, the witness information was incomplete. | Voter can complete, or have a witness help complete, the Corrective Action Form for Defective Carrier Envelope and return the form AND the original carrier envelope to the early voting clerk's office. Carrier envelope and Corrective Action Form for Defective Carrier Envelope must be received by the early voting clerk by 7:00 p.m. on election day.<br><br>**OR**<br><br>Voter/witness can enter the missing information on the original carrier envelope or Corrective Action Form for Defective Carrier Envelope and return the carrier envelope to the early voting clerk.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person. If voter surrenders their mail ballot, they should be given a regular | Voter can have the witness complete the Corrective Action Form for Defective Carrier Envelope, and voter can return the form in person to the early voting clerk's office by the 6th day after election day.<br><br>**OR**<br><br>Voter can appear in person at the early voting clerk's office by the 6th day after election day and the early voting clerk/deputy early voting clerk can serve as a witness for the voter on the corrective action form.<br><br>**OR**<br><br>Voter can cancel their mail ballot application and vote in person.<br>• If voter cancels at the early voting clerk's office and is given a Notice of Surrendered Ballot by Mail, the voter votes a regular ballot.<br>• If voter surrenders ballot at the polling place, voter may fill out |

OCA-APPX-1166

STATE060502

| Type of Defect | Carrier Envelope Returned by Mail to Voter | Voter Notified of Defect by Phone or Email |
|---|---|---|
| | ballot. If the voter does not surrender their mail ballot, they must vote provisionally. | cancellation form and vote a regular ballot.<br>• If voter appears at the polling place without a Notice of Surrendered Ballot by Mail and no ballot, the voter may fill out cancellation form and be given a provisional ballot. |

# Questions and Answers

1.  **What if a voter does not use the new ABBM form or otherwise does not include any of the required personal identification information?**

    A.  The early voting clerk must reject the voter's ABBM and provide notice of the rejection. If the missing identification information is the only defect in the ABBM, the early voting clerk should send the voter a Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number. The voter may correct this defect by submitting a new ABBM or by validating their personal identification information through the Ballot by Mail Tracker on votetexas.gov.

2.  **What information does a voter need to access the Ballot by Mail Tracker?**

    A.  To access the Ballot by Mail Tracker on votetexas.gov, the voter must enter their DPS-issued number, the last four digits of their social security number, and their residence address as listed in their voter registration record.

3.  **A voter can't access the Ballot by Mail Tracker because their voter registration record does not contain a required personal identification number. What should the voter do?**

    A.  If a voter is unable to enter the Ballot by Mail Tracker because they do not have an identification number associated with their voter registration record, the voter needs to update their voter registration record. They can do so by submitting a new voter registration application to the registrar or by validating their personal identification numbers on texas.gov if the voter has a DPS-issued driver's license or personal identification card. The process for updating the voter registration record is explained to the voter in Notice of Rejected Application for Ballot by Mail – Required Personal Identification Number Not Associated with Voter Record (Form 6-4).

4.  **If the personal identification information on the carrier envelope matches the voter's voter registration record, should the SVC or EVBB still review the signatures on the ABBM and carrier envelope?**

    A.  Yes, but there is a rebuttable presumption that the signatures on the ABBM and carrier envelope are those of the voter. The only way to reject a ballot due to a signature mismatch is for a member of the SVC or EVBB to rebut the presumption. The presumption may be rebutted by presenting other past

OCA-APPX-1167

STATE060503

signatures on file with the early voting clerk or voter registrar that would support a finding that the signatures on the carrier envelope and ABBM are not those of the same voter.

**5. What if a voter includes an incomplete or unsigned Statement of Residence form?**

    **A.** A voter should be notified of an incomplete SOR and provided an opportunity to correct this defect, similar to the process for a missing SOR.

**6. Can someone other than the voter return a voter's corrected carrier envelope or corrective action form in person?**

    **A.** No. Only the voter can hand-deliver their corrected carrier envelope on election day, or complete the Corrective Action Form for Defective Carrier Envelope, in person at the early voting clerk's office. If necessary, the voter may have someone accompany the voter to serve as a witness.

**7. If the SVC or EVBB attempts to call a voter and is unable to reach the voter by phone, should they leave a message? Can the SVC or EVBB call multiple times?**

    **A.** The SVC or EVBB can leave a message for the voter, but they should avoid providing any personally identifiable information on the voicemail so as not to compromise the privacy of the voter. Additionally, the SVC or EVBB can make multiple attempts to reach a voter by phone. The SOS recommends that the SVC or EVBB set a policy on the number of attempts allowed and what information will be provided in a voicemail message. Any actions that the EVBB/SVC takes for one voter must be uniformly applied to all voters in similar circumstances for that election.

**8. If the SVC or EVBB is unable to reach the voter by phone, what number should the SVC or EVBB provide as a return number in a voicemail message?**

    **A.** The SOS recommends that the SVC or EVBB provide a telephone number that will be routinely staffed by members of the SVC or EVBB, or by deputy early voting clerks, so that voters can receive information about the corrective action process in a timely fashion. As a best practice, the SVC or EVBB should identify the days and hours that someone will be available to answer calls. In addition, if a voicemail is set up with the return phone number, this voicemail should be routinely checked and any voicemails should be logged and tracked to ensure that voters are being provided uniform information in a timely fashion. The SVC or EVBB does not need a separate phone line. They can use the early voting clerk's main number, but the SVC or EVBB must work with the early voting clerk to develop a procedure for tracking calls about the correction process.

**9. Can the SVC or EVBB contact voters both by email and phone?**

    **A.** Yes. As long as the SVC or EVBB apply the same procedures uniformly to all voters in similar circumstances, they can contact a voter by phone and email to notify them of the defect. The SVC or EVBB should set a policy regarding the number and/or methods of attempts to contact a voter. In addition, all attempts to contact a voter should be documented on the applicable roster.

STATE060504

10. **A voter has contacted our office and indicated that the personal identification number in their voter registration record is wrong; what can the voter do?**

   A. The voter can correct their personal identification number by submitting a new voter registration application to the voter registrar.

11. **If the voter lists a personal identification number on an ABBM that is not contained in their voter registration record, can the early voting clerk update the voter registration record?**

   A. No. The voter should be notified that their voter registration record does not contain the identification number listed on the ABBM. The voter can update their voter registration record by submitting a new voter registration application to the registrar or by validating their personal identification numbers on texas.gov.

12. **If a voter validates their DPS-issued driver's license number or social security number through texas.gov to update their voter registration record, how long does it take for this change to be effective?**

   A. This is an immediate update. It does not take 30 days for the update to become effective.

13. **If a voter hand-delivers their ABBM to the early voting clerk, can the clerk review whether the personal identification information on the ABBM matches the voter's voter registration record before the voter submits their application?**

   A. Upon receipt of the ABBM, the early voting clerk can review the application even if the voter remains in the clerk's presence. However, any such actions taken as to one voter should be uniformly applied to all voters in similar circumstances. Thus, if the early voting clerk intends to review hand-delivered ABBMs for completeness or accuracy in the voter's presence, the clerk should follow the same process for all voters who hand-deliver their ABBMs.

14. **Can a poll watcher challenge the acceptance of a signature by the EVBB?**

   A. No. A poll watcher has no authority to challenge the acceptance of a signature or any actions taken by the SVC or EVBB during the course of their regular meetings. The poll watcher can point out an election irregularity to the EVBB presiding judge or the SVC chair, after which the poll watcher has no further authority to take any actions with respect to their observations.

15. **What email address should the SVC or EVBB use when notifying voters of a defect by email?**

   A. The SOS recommends that the early voting clerk set up an email address for these notifications. The early voting clerk and the SVC or EVBB should establish rules and procedures for utilizing the email address. Any emails sent or received through the corrective action process are considered election records under the Election Code, are subject to the Public Information Act, and should be retained by the general custodian of election records. The general custodian should consult with their attorney regarding any requests for such emails, as certain information may be exempt from disclosure under the Public Information Act.

STATE060505

16. **What if a voter comes to the early voting clerk's office to correct a defect in their carrier envelope and the reason for voting by mail is absence from the county?**

   A. If a voter appears in person to correct a defect with their carrier envelope, the voter must be provided an opportunity to correct the defect, and the early voting clerk must send any completed corrective action form to the early voting ballot board. The EVBB should not reject a correction merely because the voter applied to vote by mail due to expected absence from their county of residence.

17. **If a county election officer is forwarding applicable annual ABBMs and FPCAs to a local entity, how should that information be transmitted to the entity?**

   A. The county election officer should transmit copies of the applicable ABBMs and FPCAs through a secure method. This may include hand-delivering the copies, arranging for the local entity to pick up the copies, or utilizing an encrypted email or file transfer protocol.

18. **If a voter is mailed their carrier envelope to correct a defect, is the voter's name removed from the roster of voters who voted by mail under Section 87.121?**

   A. No. The voter's name will stay on the early voting roster as the voter has properly and timely submitted their mail ballot. The voter's name will subsequently be entered on the Roster of Voters with Defective Carrier Envelopes – Returned to the Voter by Mail to track the status of the ballot in the correction process.

19. **Can a voter call and ask what personal identification number the voter registrar has on file for that voter?**

   A. Yes. A voter can ask to confirm the number listed, but the number should be provided by the voter and the early voting clerk can confirm whether that number is accurate. The early voting clerk should not provide any personal identification number from the voter registration record to a person over the phone. If the voter provides an incorrect number, the voter registrar can tell the voter that the number is incorrect, but the voter registrar should not read the number to the voter over the phone. The voter registrar can also confirm the type of number listed on file (driver's license or social security number).

20. **What if an entity has a mailed a corrected ballot and the voter returns both ballots, but the second, corrected ballot has a defect in the carrier envelope (ex: missing personal identification information)? Can the SVC or EVBB review the original carrier envelope to obtain the missing information?**

   A. No, the original ballot may not be reviewed or counted. The initial carrier envelope is never sent to the SVC or EVBB if the corrected ballot has been returned. If there is a defect in the corrected ballot, the SVC or EVBB must notify the voter of the defect and allow the voter an opportunity to correct the defect. Even if the voter does not resolve the defect in the corrected ballot, the SVC or EVBB may not review the original ballot, as the corrected ballot is now the timely returned ballot.

STATE060506

**21. If the SVC or EVBB is unable to locate a voter's email or phone number to notify the voter of a defect in their carrier envelope, what should the SVC or EVBB do?**

    **A.** The SVC or EVBB should mail a Notice of Carrier Defect to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

**22. Can the early voting clerk retain the voter's ABBM and a copy of the Notice of Rejected Application for Ballot by Mail electronically?**

    **A.** Yes. There is no prohibition on an early voting clerk scanning these documents for storage and retention. However, the original document must be kept for the retention period associated with precinct election records.

If you have any questions regarding this advisory, please contact the Elections Division toll-free at 1-800-252-VOTE(8683).

KI:CA

OCA-APPX-1171

STATE060507

# Exhibit 71

| | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 2/12/2022 2:56:55 AM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | MASS EMAIL ADVISORY (CC/EA/VR - 1031) Advisory 2022-12 - Additional Procedures Regarding Correction of Defects on Application for Ballot by Mail or Carrier Envelope |
| **Attachments:** | ADV2022-12 - Additional Procedures Regarding Correction of Defects on Application for Ballot by Mail or Carrier Envelope (Final).pdf |

Dear Election Officials:

Our office has released **Advisory 2022-12 - Additional Procedures Regarding Correction of Defects on Application for Ballot by Mail or Carrier Envelope**. It is attached to this email as a PDF.

When posted, this advisory will be located on your Conducting Elections page.

Please let us know if you have any additional questions or concerns.

Thank you,


**Christina Worrell Adkins**
Legal Director – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*



# The State of Texas

Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

## John B. Scott
### Secretary of State

## ELECTION ADVISORY
## NO. 2022-12

TO:        Election Officials

FROM:   Keith Ingram, Director, Elections Division

DATE:    February 11, 2022

RE:        Additional Procedures Regarding Correction of Defects on Application for Ballot by Mail or Carrier Envelope

---

In our continued efforts to provide advice and assistance on the changes in law made by Senate Bill 1 (87th Leg., 2nd C.S., 2021), the Secretary of State is issuing additional guidance regarding the process for voters to correct certain defects in an application for ballot by mail (ABBM) or carrier envelope. This advisory is intended to be read in conjunction with Election Advisory No. 2022-08, issued on January 28, 2022.

All statutory references in this advisory are to the Texas Election Code ("the Code"), unless otherwise indicated.

# Processing Applications for Ballot by Mail

In Election Advisory No. 2022-08, we identified several scenarios that early voting clerks may encounter in reviewing ABBMs. We also outlined the actions that early voting clerks should take in each scenario. Based on feedback that we received from early voting clerks following the issuance of Election Advisory No. 2022-08, we are providing further guidance regarding one of the scenarios (Scenario 2).

In Scenario 2, a voter provides a DPS-issued driver's license number on their ABBM but the early voting clerk is unable to validate this number because the voter registration record only contains the voter's social security number. As we indicated in our prior advisory, the early voting clerk must reject the ABBM and provide notice of the rejection, which must include information explaining how to correct or add information to cure the defect. (Sec. 86.001(f-1)).

In this scenario, if the voter's voter registration record contains only one personal identification number, the voter can also update their record—by submitting a new voter registration application to the registrar or by validating their information on texas.gov—to add the missing number in addition to or in lieu of submitting a new ABBM. Accordingly, the early voting clerk should provide a voter in Scenario 2 with the Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number (Form 6-3) or the Notice of Rejected Application for

STATE136912

Ballot by Mail – Required Personal Identification Number Not Associated with Voter Record (Form 6-4). The early voting clerk should also consider sending both a blank ABBM and a blank voter registration application to the voter so that they can include the additional personal identification number on the ABBM or submit a new voter registration application to update their record with both numbers. Updating the voter registration record will also reduce the likelihood that any future ABBMs or carrier envelopes submitted by the voter will contain identification information that does not match the voter's record.

> **NOTE**: As we stated in Election Advisory No. 2022-08, if a voter in Scenario 2 has not provided the required personal identification information by the 11th day before election day, the ABBM will be finally rejected, but the voter may still vote in person if otherwise eligible. (Sec. 84.007(c)).

## EVBB/SVC Mailing of Defective Carrier Envelope to Voter

In Election Advisory No. 2022-08, we outlined detailed procedures regarding the methods of correcting defects in a carrier envelope, including the process for the SVC or EVBB to return a carrier envelope to the voter by mail. As a reminder, if the SVC or EVBB determines that it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, the SVC or EVBB must mail the original defective carrier envelope to the voter. This determination must be made not later than the second business day after the SVC or EVBB discovers a defect, and before the SVC or EVBB decides whether to accept or reject a timely delivered mail ballot. (Secs. 87.0271(b), 87.0411(b)).

In addition to the procedures identified in our earlier advisory, if the EVBB/SVC mails a defective carrier envelope to the voter, the EVBB/SVC can also call or email a voter to notify them that the carrier envelope has been returned to the voter. If the EVBB/SVC opts to provide this additional notice by phone or email, the EVBB/SVC must apply these procedures uniformly to all voters in similar circumstances. (Secs. 87.0271(d), 87.0411(d)).

## Missing or Incorrect Personal Identification Information on Carrier Envelope – Updating Voter Registration Record

If an SVC/EVBB discovers that a voter's personal identification information is missing or incorrect on the carrier envelope, and the SVC/EVBB determines there is not enough time to return the carrier envelope to the voter, the SVC/EVBB may notify the voter of the defect by phone or email. (Secs. 87.0271(c), 87.0411(c)). If the voter's voter registration record only contains one of the required identification numbers, the SVC/EVBB may also notify the voter that they can add the missing number to their record by submitting a new voter registration application or by updating their registration at texas.gov. Updating the voter registration record to include the missing personal identification number may provide the SVC/EVBB with the information needed to accept the carrier envelope. Additionally, once the voter updates their record, the voter will be able to access the SOS's Ballot by Mail Tracker in any future election for which they apply to vote by mail.

## Early Voting Clerk Notification to Voter of Defects in Carrier Envelope

As we explained in Election Advisory No. 2022-08, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, Section 86.011(d) of the Code authorizes the clerk to deliver the carrier envelope in person or by mail to the voter

STATE136913

so that the voter may correct the defect. The early voting clerk also may notify the voter of the defect by phone and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their ABBM and vote in person. Section 86.011(d) directs the SOS to prescribe any procedures necessary to implement this subsection.

## Removing the Secrecy Flap on Carrier Envelope

The early voting clerk is authorized to remove the secrecy flap on a returned carrier envelope to facilitate the processing and review of voted mail ballots. If, in removing the secrecy flap, the early voting clerk discovers that the voter did not fully seal the carrier envelope, the clerk may take actions such as taping or sealing the flap to ensure that the envelope containing the ballot is not separated from the carrier envelope.

## Returning the Carrier Envelope to Voter

If the early voting clerk discovers that the carrier envelope is missing the voter's signature, has an incomplete signature, has missing or incomplete witness or assistant information, or has missing or incorrect personal identification information, the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect. If the early voting clerk sends the carrier envelope to the voter by mail, the clerk should include a notice explaining the defect and provide instructions on how the voter can correct and return the carrier envelope or cancel their ABBM and vote in person. The early voting clerk may provide their own letter to the voter explaining these defects.

If an early voting clerk delivers the carrier envelope to the voter in person, the clerk should document this delivery. This hand-delivery option must be applied uniformly to all voters in similar circumstances. In addition, poll watchers are entitled to follow the early voting worker when making the delivery and observe the correction process. Upon receipt of the carrier envelope, the voter may correct the defect immediately and surrender the carrier envelope to the early voting clerk personnel, who would return to the clerk's office with the corrected carrier envelope. Alternatively, the early voting worker could leave the carrier envelope in the voter's possession and allow the voter to either make the correction on their own and mail the ballot to the early voting clerk or cancel their mail ballot and vote in person.

The early voting clerk may return defective carrier envelopes by mail under Section 86.011(d) up until the point when SVC/EVBB begins notifying voters of defects by phone or email. The early voting clerk should determine this cutoff date in coordination with the SVC/EVBB. At that point, the early voting clerk should not provide these notifications, as the SVC/EVBB has additional options to contact voters of defective carrier envelopes—and voters notified of such defects by the SVC/EVBB have until the 6th day after election day to correct the defect in person at the early voting clerk's office.

## Deadline to Return Carrier Envelope to the Early Voting Clerk

As the carrier envelope was returned to the voter prior to review by the early voting ballot board, the regular delivery deadlines for carrier envelopes apply. These deadlines are listed in the Secretary of State's election law calendars. Any carrier envelopes returned to the early voting clerk after the regular return deadlines will not be sent to the EVBB for review, as they were not timely returned. (Sec. 86.011(c)).

STATE136914

## Tracking Mail Ballots Returned to Voter by Early Voting Clerk

If an early voting clerk opts to return a defective carrier envelope to the voter, the early voting clerk should leave this ballot in the "Ballot Sent" status for the SOS's Ballot by Mail Tracker. These ballots should be entered as "Ballot Received" until the ballot has been returned by the voter.

## Notifying Voter of Defective Carrier Envelope by Phone

Alternatively, if the early voting clerk discovers that the carrier envelope is missing the voter's signature, has an incomplete signature, has missing or incomplete witness or assistant information, or has missing or incorrect personal identification information, the early voting clerk may notify the voter by phone of this defect and inform the voter that the voter may appear at the early voting clerk's office in person to correct the defect or cancel their ABBM and vote in person. The early voting clerk is not permitted to notify voters of a defective carrier envelope by email. However, if the voter requests additional information regarding the correction process, the early voting clerk may email instructions to the voter on how to correct defects—as long as the clerk takes the same action for all voters who request additional information by email.

The early voting clerk may notify voters of defective carrier envelopes by phone until the SVC/EVBB begins notifying voters of defects by phone or email. At that point, the early voting clerk should refrain from providing these notifications and should deliver the defective carrier envelopes expeditiously to the SVC/EVBB. The SVC or EVBB should review the ballots with obvious defects first to ensure that those voters are timely notified of their options to correct or cancel their mail ballot.

## Deadline to Appear in Person at Early Voting Clerk's Office to Correct Defects

A voter who is notified of a defective carrier envelope by the early voting clerk under Section 86.011(d) must act on the defect(s) by 7:00 p.m. on election day. If the voter does not take such corrective action by 7:00 p.m. on election day, the early voting clerk shall deliver the defective carrier envelope to the EVBB for review. The EVBB will then make their own determination as to whether there are any defects in the carrier envelope and may also inform a voter of their ability to correct the defect(s). A voter who is notified of a defective carrier envelope by the SVC/EVBB has until the 6th day after election day to correct the defect(s) in person at the early voting clerk's office.

## Uniform Treatment of Voters

If an early voting clerk chooses to notify voters of defects in their carrier envelope under Section 86.011(d), the clerk must apply these procedures uniformly to all voters in similar circumstances. The SOS recommends keeping a log to track the ballots mailed to voters and the ballots in the possession of the early voting clerk before ballots are delivered to the SVC or EVBB.

## Poll Watchers May be Present for Early Voting Clerk Notifications

Poll watchers are entitled to observe the procedures described under Section 86.011(d). Poll watchers are not authorized to remain in the early voting clerk's office at all times to wait for a potential notification to a voter. However, if a poll watcher is present in the office when an early voting clerk is notifying voters of defects by phone or a voter appears to correct a defect in person, the poll watcher may observe this process. There is no specific posting requirement for this notification.

4

STATE136915

# Missing Statement of Residence

If an EVBB discovers that a voter did not include a completed statement of residence, the EVBB/SVC can mail the carrier envelope back to the voter so that the voter may provide a statement of residence.

If the EVBB discovers that a voter did not include a completed statement of residence, but there is not enough time to mail the carrier envelope to the voter and have the voter return the carrier envelope by election day, the early voting clerk can notify the voter of this defect by phone or email. The voter may submit the completed statement of residence with their carrier envelope (if mailed back), or the voter can appear in person at the early voting clerk's office to turn in or complete the statement of residence. In addition, if a voter is notified of a missing or incomplete statement of residence by phone or email, the voter can update their voter registration record through texas.gov. The early voting clerk should notify the EVBB of an update completed via texas.gov and provide a copy of the new record for the EVBB's review process.

If you have any questions regarding this advisory, please contact the Elections Division toll-free at 1-800-252-VOTE(8683).

KI:CA

# Exhibit 72

OCA-APPX-1179

| | |
|---|---|
| **From:** | Adam Bitter [ABitter@sos.texas.gov] |
| **Sent:** | 2/18/2022 11:35:57 PM |
| **To:** | 'john.medcalf@votec.net' [john.medcalf@votec.net] |
| **CC:** | 'tnolan@votec.net' [tnolan@votec.net]; Keith Ingram [KIngram@sos.texas.gov]; Kristi Hart [KHart@sos.texas.gov] |
| **Subject:** | Texas Secretary of State |
| **Attachments:** | 2.18.22 A. Bitter Letter to J. Medcalf.pdf |
| | |
| **Sensitivity:** | Personal |

Mr. Medcalf,

Please see the attached letter from the Office of the Texas Secretary of State. Please let me know if you have any questions.

Sincerely,


**Adam Bitter**
General Counsel
Office of the Texas Secretary of State
(512) 475-2813
abitter@sos.texas.gov

STATE110686

# The State of Texas



## John B. Scott
### Secretary of State

John Medcalf
Chief Executive Officer
VOTEC Corporation
10920 Via Frontera, Suite 110
San Diego, CA 92127

Dear Mr. Medcalf,

In accordance with Section 18.012 of the Texas Election Code, the Office of the Texas Secretary of State is required to certify any service company contracting with a county for voter registration services. Certification as a voter registration vendor in the state of Texas is a privilege, not a right. Specifically, Section 18.012 provides:

> **Sec. 18.012. Secretary of State to Approve Computer Services Contracts.** (a) A county may not contract with a computer service company or other private business entity for services related to the lists required under this subchapter unless the programs, equipment, or other materials to be covered by the contract are approved by the secretary of state. The secretary may rescind approval of the programs, equipment, or other materials at any time, and on that action, the contract is nullified to the extent that it depends on the disapproved items. (b) A computer service company or other private business entity may not use modified programs, equipment, or other materials under the contract unless the modifications are approved by the secretary of state. (c) A person commits an offense if the person violates Subsection (b). An offense under this subsection is a Class A misdemeanor.

As a currently certified vendor in Texas, VOTEC has been successful in exchanging required data files and electronic information with the statewide voter registration system. An essential component of the certification is that counties have the ability to successfully transmit daily information to the statewide voter registration database to maintain the accuracy of the county voter registration data. Likewise, all certified vendors must agree to make modifications to any software to support legislative changes and directives from the Secretary of State.

Implementing recent legislative requirements necessitated modifications and enhancements to the current statewide system on an expedited basis. It is your obligation to ensure that all changes are made in a timely manner to ensure counties utilizing your application are in compliance with state law and directives set out by the Secretary of State. Several counties have expressed concerns with the inability to provide the daily information exchange, and some counties have indicated that updated software to report data to our office related to voting by mail and the reporting of provisional ballots was delayed or may not yet have been implemented.

OCA-APPX-1181

STATE110687

Additionally, we have been made aware through third-party sources that your company may have provided instructions to counties that conflict with our office's directives. Any such conflicting directions must cease immediately.

We ask you to confirm that you are committed to implementing all future legislative changes and that solutions implementing recent requirements are currently available to all counties to ensure their compliance with state law and our office's directives. We also ask you to confirm that you are working to support your counties in providing daily information exchanges in accordance with these requirements. In turn, our office will continue to work collaboratively with you to navigate the implementation and to provide the highest quality solutions to Texas counties.

Sincerely,

Adam Bitter
General Counsel
Office of the Texas Secretary of State

STATE110688

| Message | |
|---|---|
| **From:** | Karen Richards [karen.richards@votec.net] |
| **Sent:** | 2/23/2022 5:35:55 PM |
| **To:** | Adam Bitter [ABitter@sos.texas.gov] |
| **CC:** | John Medcalf [john.medcalf@votec.net]; Tom Nolan [tnolan@votec.net] |
| **Subject:** | VOTEC - Response to SOS 2/18 SB1 Letter |
| **Attachments:** | VOTEC - SOS Response 02232022.docx |

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

Good morning Mr. Bitter,

Please find attached VOTEC's response to your letter received on February 28th.  Do not hesitate to contact me if you have any additional questions and/or concerns.

Sincerely,

Karen


**Karen Richards**

**President/Director of Compliance Practices**
10920 Via Frontera Suite 110
San Diego CA 92127
800.348.6832 (toll free)
858.674.5532 (local)
Fax: 858.674.6050
WWW.VOTEC.NET



**VOTEC Corporation**

Adam Bitter
General Counsel
Office of the Secretary of State
Executive Division
P.O. Box 12887
Austin, Texas 78711-2887

Dear Mr. Bitter,

We appreciate your recent letter summarizing your concerns regarding the implementation requirements set forth by SB1. We know the magnitude of work involved to implement a bill with so many facets and encompass all the technical, functional and regulatory requirements.

We have been working diligently to ensure that our customers are informed of the changes and that all imports to the state have been in compliance. There may have been a few communications difficulties as we faced an immediate deadline to implement the new tracking and reporting protocols. We will continue to work closely with both our customers and the State to ensure correct procedures are being followed.

In line with our mutual concern for rapid compliance, we have been informed by our customer counties that they are receiving technical advisories that we have not been copied on. To avoid any misunderstandings or miscommunication moving forward we respectfully request, as a certified vendor, that TEAM be reminded to include us whenever new information is being promulgated that would impact the reporting requirements to the State.

We have a respectable relationship with Kristi Hart and her staff by working in partnership for submitting test files to the State to assist in scrutinizing and vetting new requirements and procedures. We will continue those efforts to ensure all SB1 reporting requirements are met.

Please let me know if you have any additional questions or concerns.

Best Regards,

Karen Richards
President/Director of Compliance
VOTEC Corporation
10920 Via Frontera, Suite 110
San Diego, CA 92127

# Exhibit 73

| Message | |
| --- | --- |
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 4/14/2022 8:11:22 PM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | MASS EMAIL (Offline/Vendors-68) Voter Sync for Offline Counties |

Dear County Election Officials:

As a reminder, **all offline counties** are responsible for making sure that TEAM, the official statewide database, is in sync with your current county records. This is critically important in assuring that all voters have access to the Ballot by Mail Tracker and for verification of personally identifiable information for applications for mail ballots and acceptance of mail ballots. **All offline counties should complete the Voter Sync process on a regular basis and before each statewide election.**

If you have not already completed the sync process during the past month, we ask that all offline counties initiate this process as soon as possible in advance of the May elections.

As always, if we can be of assistance, please do not hesitate to contact the TEAM team at (800) 252-2216, Option 1 or Elections@sos.texas.gov.

**TEAM Team**
Office of the Secretary of State
800-252-2216
www.sos.state.tx.us/elections/index.shtml
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as legal advice for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved*

STATE087738

# Exhibit 74

| | |
|---|---|
| **From:** | Adam Bitter [ABitter@sos.texas.gov] |
| **Sent:** | 12/20/2021 4:53:31 PM |
| **To:** | John Scott [JScott@sos.texas.gov]; Joe Esparza [JEsparza@sos.texas.gov]; Sam Taylor [SMTaylor@sos.texas.gov] |
| **Subject:** | FW: Weekend Comparative Process |



**From:** Kristi Hart <KHart@sos.texas.gov>
**Sent:** Monday, December 20, 2021 10:16 AM
**To:** Keith Ingram <KIngram@sos.texas.gov>; Adam Bitter <ABitter@sos.texas.gov>
**Subject:** Weekend Comparative Process

Good morning!

As you know, we ran the comparative process over the weekend. We did run queries prior to and following the process. That information is listed below.

| Query | Before | After |
|---|---|---|
| Number of active and suspense voting records with no TDL in the record: | 1,344,584 | 493,823 |
| Number of active and suspense voting records with no SSN in the record: | 1,165,612 | 422,259 |
| Number of active and suspense voting records with only 4 digits of SSN in the record: | 1,165,639 | 422,053 |
| Number of active and suspense voting records with neither TDL or SSN in the record: | 259,227 | 106,911 |
| Number of active and suspense voting records with full TDL but no SSN in the record: | 906,444 | 315,376 |
| Number of active and suspense voting records with at least 4 digits of SSN but no TDL in the record: | 1,085,062 | 386,881 |

STATE019731

Message

| | |
|---|---|
| **From:** | Kristi Hart [KHart@sos.texas.gov] |
| **Sent:** | 12/23/2022 5:46:14 PM |
| **To:** | Keith Ingram [KIngram@sos.texas.gov]; Christina Adkins [CAdkins@sos.texas.gov]; Adam Bitter [ABitter@sos.texas.gov] |
| **Subject:** | Comparative Process |

The process is complete. Below are the initial and post query results.

| | Initial | Post |
|---|---|---|
| Number of active and suspense voters that have no TDL on their voter record. (null value) | 512,134 | 463,393 |
| Number of active and suspense voters that have no SSN on their voter record. (null value) | 461,146 | 392,084 |
| Number of active and suspense voters that have neither a TDL or SSN on their voter record. (null value for both fields) | 95,181 | 93,867 |
| Number of active and suspense voters that have TDL but null value for SSN. | 365,965 | 298,217 |
| Number of active and suspense voters that have at least four digits of SSN but null value for TDL. | 416,891 | 369,468 |

# Exhibit 75

# Training for EVBB/SVC members on new Ballot by Mail Procedures (Primary Focused)

## Texas Secretary of State – Elections Division

[DateTime]     Texas Secretary of State Elections Division                         1

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# TOPICS COVERED

- Changes to ABBMs
- Changes to FPCA process
- New Requirements for the Carrier Envelope
- New Process for EVBB/SVC
- Possible Scenarios Regarding Carrier Envelopes
- Notifying Voters of Defects
- Correcting Defects
- Impacts on FPCA Voters
- New Forms
- Early Voting Clerk Providing Notification of Defects

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division



# Changes to ABBMs

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034517

# CHANGES TO THE ABBM



**Box 1: Personal Identification Numbers – Voter must provide:**

- Texas Driver's License, Texas Personal Identification Number, or Election Identification Certificate Number issued by DPS, OR
- Last four digits of SSN, OR
- An indication that they have not been issued either number.

- **The personal identification information provided by the voter on the ABBM MUST be validated off of the voter's voter registration record.**



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034518

# Key Points to Remember

- Voters are not required to provide both types of identification numbers.

- If a voter provides both numbers, only one number has to match the VR record.

- Do not delay in mailing rejection notices.

- Voters are not required to use the Ballot by Mail Tracker to correct missing information. They can submit a new ABBM or a new VR application, whichever is applicable.

- County early voting clerks are REQUIRED to submit rejected ABBM information to TEAM (or though their vendor, if it provides data to TEAM). This is what populates the Ballot by Mail Tracker.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034519



# CHANGES TO FPCA PROCESS

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1196

STATE034520



# FPCA Signature Sheet

- **Voter Information**

- **Personal Identification Information**

- **Witness/Assistant information, if applicable**

- **Voter Signature**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034521

# Impacts on FPCA Voters

- To facilitate the mailing of FPCA balloting materials, early voting clerks may use any type of mailing envelope that contains the Official Election Mail logo and the required postage-paid information **as long as the early voting clerk includes a required signature sheet for the voter to complete**.

- All FPCA voters must be provided with an Official Election Signature Sheet for an FPCA Voter if their balloting materials were sent by email.

- **If the balloting materials were sent by physical mail, but the early voting clerk is using one of the FVAP envelopes that does not contain all of the requirements for the carrier envelope, the voter MUST be provided with an Official Election Signature Sheet for an FPCA Voter to return with their marked ballot.**

- **What this means for SVC/EVBB review?** This means you may be seeing more signature sheets for FPCA voters.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division



# NEW REQUIREMENTS FOR THE CARRIER ENVELOPE

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1199

STATE034523

# Front of Carrier Envelope



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1200

STATE034524

# Envelope Closed – Outside Flap



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034525

# Envelope Open – Inside Flap



- Voter must add their personal identification information to the Carrier Envelope

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1202

STATE034526

# Key Points to Remember

- Voters are not required to provide both types of identification numbers.

- If a voter provides both numbers, only one number has to match the VR record.

- The secrecy flap may be opened by the early voting clerk's staff for processing.

- Be mindful with these carrier envelopes! The carrier envelopes have personally identifiable information that needs to be guarded.

- Carrier envelopes are not public information at this point in the election process.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1203

STATE034527



# NEW PROCESS FOR EVBB/SVC

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034528

# New Comparison Requirements

- The EVBB shall only accept a ballot if the personal identification information (ex: SSN or TXDL) matches the voter registration record.

- The SVC/EVBB is matching the information on the carrier envelope to the **VR record**.

- The number on the carrier envelope does not have to be the same number on the ABBM – it must only match the VR record.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# Rebuttable Presumption

- If the personal identification information provided matches the VR record, the signatures on the ABBM and the carrier envelope are rebuttably presumed to be those of the voter.

- The presumption may be rebutted by presenting other past signatures on file with the EVC or VR that would support a finding that the signatures on the carrier envelope and ABBM are not those of the voter.



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034530



# POSSIBLE SCENARIOS REGARDING CARRIER ENVELOPES

[DateTime]          Texas Secretary of State Elections Division          17

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034531

# Possible Scenarios – Carrier Envelopes

- **Scenario 1**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record. The SVC or EVBB has completed the verification of personal identification information and should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# Possible Scenarios – Carrier Envelopes

- **Scenario 2**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record, but it is a different type of number than what the voter listed on the ABBM. (Example: Voter provided last four digits of social security number on ABBM and a driver's license number on carrier envelope.) Because the voter's voter registration record contains both personal identification numbers, the SVC or EVBB is able to verify the voter's identity. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted.**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1209

STATE034533

# Possible Scenarios – Carrier Envelopes

- **Scenario 3**: Voter provides the last four digits of their social security number on the carrier envelope. The voter registration record contains a driver's license number and social security number. The SVC or EVBB is able to validate that the partial social security number on the carrier envelope matches the number in the voter's voter registration record. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted**.
  - **NOTE**: The obligation of the SVC or EVBB in reviewing the identification information on a carrier envelope is to determine if the information provided by the voter on the envelope identifies the same voter identified on the voter's voter registration record. (Secs. 87.027, 87.0271, 87.041(b)(8), 87.0411).



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1210

STATE034534

# Possible Scenarios – Carrier Envelopes

- **Scenario 4**: Voter indicates on the carrier envelope that they have not been issued any of the required personal identification numbers, and the voter's voter registration record does not contain any of these numbers. The SVC or EVBB has completed the verification of personal identification information, and it must rely on the signature comparison process for this part of the review. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted**.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1211

STATE034535

# Possible Scenarios – Carrier Envelopes

- **Scenario 5**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter does not include an identification number on the carrier envelope. The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope, as described in more detail below. If the voter timely corrects the defect, and there are no other grounds for rejection, **the ballot would be accepted.**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# Possible Scenarios – Carrier Envelopes

- **Scenario 6**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter indicates on the carrier envelope that they have not been issued one of the applicable identification numbers.  The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope.  If the voter timely corrects the defect, and there are no other grounds for rejection, **the ballot would be accepted.**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division



# NOTIFYING VOTERS OF DEFECTS

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034538

# Signature Verification Committee Corrective Action Process

- The following defects are eligible for correction when identified by the signature verification committee (Sec. 87.0271(a)):
  - The voter did not sign the carrier envelope certificate.
  - The SVC cannot determine whether the signature on the carrier envelope is that of the voter.
  - The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
  - If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    - **NOTE**: Incomplete information about an assistant cannot be corrected and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034539

# Early Voting Ballot Board Correction Process

- The following defects are eligible for correction when identified by the early voting ballot board (Sec. 87.0411(a)):
  - The voter did not sign the carrier envelope certificate.
  - The EVBB cannot determine whether the signature on the carrier envelope is that of the voter.
  - **The voter did not include the required statement of residence**.
  - The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
  - If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    - **NOTE:** Incomplete information about an assistant cannot be corrected by EVBB/SVC and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.

- Only the EVBB has the authority to open the sealed part of carrier envelope to determine if a statement of residence (SOR) has been submitted.
  - The only exception is for FPCA voters. An SVC must open the sealed envelope to obtain the Signature Sheet for FPCA Voter, as this is necessary for the signature verification process.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# Corrective Action Timelines

- **Returning the Carrier Envelope by Mail:** If the SVC or EVBB determines that it would be possible for the voter to correct the defect and return the carrier envelope **before the time the polls are required to close on election day,** the SVC or EVBB **must** mail the original defective carrier envelope to the voter. This determination must be made not later than the second business day after the SVC or EVBB discovers a defect, and before the SVC or EVBB decides whether to accept or reject a timely delivered mail ballot. (Secs. 87.0271(b), 87.0411(b)).

- **Notifying the Voter of Defect by Phone or Email:** If the SVC or EVBB determines that it would NOT be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, **the SVC or EVBB may notify the voter of the defect by telephone or email** and inform the voter that the voter may come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. (Secs. 87.0271(c), 87.0411(c)).

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034541

If the SVC or EVBB takes one of the actions described above, the committee or board <u>must</u> take that action with respect to each ballot in the election to which these options apply.

(Secs. 87.0271(d), 87.0411(d)).

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1218

STATE034542

# Recommendations

- The SOS recommends that before qualifying mail ballots, the EVBB/SVC meet with the Early Voting Clerk to determine dates to convene and to establish timelines for the corrective action process. (Secs. 87.0411, 87.0271).

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034543

# Establishing Timelines and Guidelines for the Corrective Action Process

- The SVC or EVBB must set a uniform policy for when carrier envelopes will be mailed to the voter versus when voters will be notified of the defect by phone or email.

- The SVC or EVBB should determine whether it will notify voters of a defect by both phone and email, if both are available.

- The SVC or EVBB should establish a policy for making multiple attempts to reach a voter if it is unsuccessful in reaching a voter by phone or email on the first attempt.

- Consider U.S. Postal Service (USPS) guidelines. Ask your EVB to consult with your local post office.

- **SOS Recommendation**: The SVC or EVBB should consider implementing a policy to provide notification of a defect by phone or email to all voters whose ballots are reviewed by the SVC or EVBB on or after the 14th day before election day (approximately 10 business days). This may be modified based on discussions with your local USPS representatives.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034544

# Carrier Envelope Returned by Mail

1. Stamp or mark the voter's carrier envelope with the words **"Corrective Action Required."**

2. Note the appropriate defect on the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail.

3. Mail the voter's defective carrier envelope along with the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail. The early voting clerk should include an envelope for the voter to return the corrected carrier envelope to the early voting clerk. This envelope should contain the Official Election Mail logo prescribed by the USPS. The voter must be notified if the return envelope needs additional postage.

4. Enter the voter's information on the Roster of Voters with Defective Carrier Envelopes – Returned to the Voter by Mail.

**\*The actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these administrative functions that carry out the instructions and actions of the SVC/EVBB**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1221

STATE034545

# Notifying Voter by Phone or Email
# (Carrier Envelope is NOT mailed to Voter)

- **If notifying by email:**
  1. Send the voter the Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email via email.
  2. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the voter should be noted on the roster.
  3. **Parameters for Email Notification**: The SOS recommends that the early voting clerk set up an email address for corrective action notifications. The early voting clerk and the SVC or EVBB should establish rules and procedures for utilizing this email address. Any emails sent or received through the corrective action process are considered election records under the Election Code, are subject to the Public Information Act, and should be retained by the general custodian of election records. The general custodian should consult with their attorney regarding any requests for such emails, as certain information may be exempt from disclosure under the Public Information Act.

**\*The actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these administrative functions that carry out the instructions and actions of the SVC/EVBB**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034546

# Notifying Voter by Phone or Email
# (Carrier Envelope is NOT mailed to Voter)

- **If notifying by phone:**
1. Contact the voter using any known phone number on file with the early voting clerk or in the possession of the SVC or EVBB.
   - **NOTE:** As a reminder, the voter registrar may not transcribe, copy or otherwise record a telephone number furnished on a voter registration application. (Sec. 13.004). The SVC or EVBB may be able to review a voter registration application at the voter registrar's office to obtain a phone number. The registrar may also read a phone number from a voter registration application to a member of the SVC or EVBB, if necessary.
2. The SVC or EVBB should create a phone script that explains to the voter that the voter's mail ballot was received by the early voting clerk's office and has been reviewed by the SVC or EVBB, whichever is applicable.
3. **The SOS recommends that the SVC or EVBB confirm the voter's identity using publicly available information.**
   - **Example:** Ask the voter to confirm their voter registration address and whether they requested a mail ballot for the given election.
4. The voter should be told that upon review of the carrier envelope, the SVC or EVBB discovered a defect in the carrier envelope. **The specific defect should be explained.**
5. The SVC or EVBB should explain the process for the voter to correct the defect as well as the process to cancel their mail ballot and vote in person during early voting or on election day.
6. Provide a return phone number that the voter may use to confirm that they were contacted by the SVC or EVBB. The number provided should be the number of the early voting clerk's office so the voter can verify this information and obtain details about the corrective action process during times that the SVC or EVBB are not meeting.
7. The voter's name should be entered on the Roster and the action taken by the SVC or EVBB should be noted on the roster.

**\*Many of the actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these administrative functions that carry out the instructions and actions of the SVC/EVBB**



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# If the SVC or EVBB is unable to contact the voter...

1. The SVC or EVBB should leave a detailed message explaining that the SVC or EVBB determined there was a defect in the voter's carrier envelope and explain the process for correcting the defect.

2. The SVC or EVBB should NOT provide any details related to a voter's personally identifiable information on a voicemail or with a person who is not the voter.

3. The SVC or EVBB should leave a return number that the voter may use to validate the information provided by phone.

4. The SVC or EVBB should mail the voter a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

5. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the SVC or EVBB should be noted on the roster.

• **If the SVC or EVBB does not have a phone number or email to notify the voter:** The SVC or EVBB should mail a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

**\*Many of the actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these administrative functions that carry out the instructions and actions of the SVC/EVBB**



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1224

STATE034548

# Key Points to Remember

- Any actions taken by the SVC or EVBB shall be uniformly applied to every ballot in the election to which this procedure applies. (Secs. 87.0271(d), 87.0411(d)).

- A poll watcher is entitled to observe any action taken by the SVC or EVBB related to the corrective action process. (Secs. 87.0271(e), 87.0411(e)).

- Poll watchers may not transcribe or make notes of any voter's personally identifiable information while observing the activities of the SVC or EVBB.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034549



# CORRECTING DEFECTS

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1226

STATE034550

# How do Voters Correct Defects?

- **If the carrier envelope was mailed back to the voter, the voter MUST return the Carrier Envelope with the revisions/corrections.**
  - **Deadline for Correction:** If the SVC or EVBB has returned the voter's carrier envelope by mail for correction, the voter also MUST return the carrier envelope to the early voting clerk no later than 7:00 p.m. on election day for the ballot to be processed and counted. (Secs. 87.0271(b), 87.0411(b)).

- **If the carrier envelope was NOT mailed back to the voter, the voter may correct the defects in the following ways:**
  - Utilizing the BBM Tracker for defects related to a missing or incorrect personal identification numbers.
  - Updating their Voter Registration record through Texas.Gov for defects related to missing or incorrect personal identification numbers.
  - Appearing in Person at the EV Clerk's Office and submitting a Corrective Action Form.
  - Cancelling their Mail ballot and Voting in Person.
  - **Deadline for Correction:** This Corrective Action Process must occur no later than the 6th day after election day. The EVBB cannot finally reject a ballot before the 7th day after election day. (Secs. 87.0271(b), 87.0411(b)).

**Corrective Actions taken by the voter MUST be provided to the EVBB for their final review of the ballot before determining acceptance or rejection.**



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034551

# Correcting Defect by Cancellation

- After receiving a Notice of Carrier Defect by mail or receiving notification via email or phone, the voter may opt to cancel their ballot by mail and vote a regular ballot in person. All cancellations must be completed in accordance with Section 84.032. If the voter is an Annual ABBM voter, a cancellation request submitted for these purposes applies only to the current election unless the voter specifically requests to cancel their Annual ABBM. (Sec. 84.038).

- There is no process under Texas law by which a voter can cancel a mail ballot application by phone. **All cancellations must be in writing and completed in accordance with Section 84.032 of the Texas Election Code**.

- See pages 13-14 of Advisory 2022-08 for more details.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division



**IMPACTS ON FPCA VOTERS**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034553

# Impacts on FPCA Voters

- If the FPCA voter provides missing or incorrect identification information on their carrier envelope or signature sheet, or did not include the Official Election Signature Sheet for an FPCA Voter, the voter must be notified of the defect in the same manner as a regular ABBM voter.

- **Because the signature sheet is separate from the voted ballot and is authorized under state and federal law, FPCA voters who have a defect in their signature sheet have additional methods for returning this corrected or missing required documentation.**

- Specifically, an FPCA voter may submit a corrected signature sheet by email, fax, personal delivery, or mail. The SVC or EVBB should make an appropriate notation on their roster to indicate how FPCA voters were notified of a defect and how the FPCA voter provided the corrected signature sheet to the SVC or EVBB. (Secs. 1.007, 31.003, 31.004, 87.0271(f), 87.0411(f), 101.007, 101.109).

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1230

STATE034554



# NEW FORMS

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1231

STATE034555

# Notice of Carrier Defect

- We have prescribed two versions of this form:
  - The Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail
  - The Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email

- The Notice of Carrier Defect contains the Corrective Action Form for Defective Carrier Envelope on the reverse side of the form.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division



## Corrective Action Form for Defective Carrier Envelope (6-14)

- **Top half of form contains the Corrective Action Form**

- **Bottom half of form is the Statement of Residence**

Texas Secretary of State Elections Division 43

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# Roster of Voters with Defective Carrier Envelopes (Forms 8-20, 8-21, 8-22)

- EVBB/SVC should create a roster to track the corrective action process.
- SOS has prescribed three different sample forms for use by EVBB/SVC.
- EVBB/SVC can also track the information electronically or create their own roster.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1234

STATE034558

# Notice of Surrendered Ballot (6-13)

- Upon surrendering their mail ballot, the voter will be issued the **Notice of Surrendered Ballot by Mail**. The voter will take this form to their early voting or election day polling place and present the form to the election judge, entitling the voter to vote a regular ballot in person.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1235

STATE034559



**EARLY VOTING CLERK PROVIDING NOTIFICATION OF DEFECTS**

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034560

# Early Voting Clerk
# Notification of Defects

- Under Section 86.011(d) of the Code, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, **the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect.** Additionally, **the early voting clerk may notify the voter of the defect by phone** and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their ABBM and vote in person.
    - Early voting clerks may return carrier to voter for correction.
    - Early voting clerks may notify voter of defect by phone and inform the voter they can come to the EVC's office to correct defect or cancel their application.

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034561

# Early Voting Clerk
# Notification of Defects

- What defects can an early voting clerk provide notice about?
  - Missing signature
  - Missing or incomplete witness information
  - Missing **assistant** information
  - If the early voting clerk is removing the secrecy flap before the ballot is sent to the SVC/EVBB:
    - Missing personal identification information
    - Incorrect personal identification information

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

STATE034562

# Early Voting Clerk
# Notification of Defects

- If an early voting clerk chooses to notify voters of defects in their carrier envelope under Section 86.011(d), **the clerk must apply these procedures uniformly to all voters in similar circumstances.**

- **Poll watchers may be present for this process.** (Sec. 86.011(d)).

Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

OCA-APPX-1239

STATE034563

# Questions?

## elections@sos.texas.gov



Texas Secretary of State Elections Division

3/22/2022

Texas Secretary of State Elections Division

# Exhibit 76

TEXAS SECRETARY OF STATE

# Training for EVBB/SVC Members on New Ballot by Mail Procedures

General Election for State and County Officers (GESCO)

Texas Secretary of State – Elections Division



10/11/2022          Texas Secretary of State Elections Division          1

---

TEXAS SECRETARY OF STATE

# TOPICS COVERED

- Changes to ABBMs
- Changes to FPCA Process
- New Requirements for the Carrier Envelope
- New Process for EVBB/SVC
- Possible Scenarios Regarding Carrier Envelopes
- Notifying Voters of Defects
- Correcting Defects
- Impacts on FPCA Voters
- New Forms
- Early Voting Clerk Providing Notification of Defects



10/11/2022          Texas Secretary of State Elections Division          2



CHANGES TO ABBMs



CHANGES TO THE ABBM

Box 1: Personal Identification Numbers – Voter must provide:

- Texas Driver's License, Texas Personal Identification Number, or Election Identification Certificate Number issued by DPS, OR
- Last four digits of SSN, OR
- An indication that they have not been issued either number.

- **The personal identification information provided by the voter on the ABBM MUST be validated off of the voter's voter registration record.**

TEXAS SECRETARY OF STATE

# Key Points to Remember

- Voters are not required to provide both types of identification numbers.
- If a voter provides both numbers, only one number has to match the VR record.
- Early Voting Clerks should not delay in mailing rejection notices.
- Voters are not required to use the Ballot by Mail Tracker to correct missing information. They can submit a new ABBM or a new VR application, whichever is applicable.
- County early voting clerks are REQUIRED to submit rejected ABBM information to TEAM (or though their vendor, if it provides data to TEAM). This is what populates the Ballot by Mail Tracker.

10/11/2022          Texas Secretary of State Elections Division          5

---

TEXAS SECRETARY OF STATE

# CHANGES TO FPCA PROCESS



10/11/2022          Texas Secretary of State Elections Division          6

OCA-APPX-1244

STATE112336



## Impacts on FPCA Voters

- To facilitate the mailing of FPCA balloting materials, early voting clerks may use any type of mailing envelope that contains the Official Election Mail logo and the required postage-paid information **as long as the early voting clerk includes a required signature sheet for the voter to complete**.

- All FPCA voters must be provided with an Official Election Signature Sheet for an FPCA Voter if their balloting materials were sent by email.

- **If the balloting materials were sent by physical mail, but the early voting clerk is using one of the FVAP envelopes that does not contain all of the requirements for the carrier envelope, the voter MUST be provided with an Official Election Signature Sheet for an FPCA Voter to return with their marked ballot.**

- **What this means for SVC/EVBB review?** There may be an increased number of signature sheets for FPCA voters.

10/11/2022          Texas Secretary of State Elections Division          8





OCA-APPX-1246

STATE112338





OCA-APPX-1247

STATE112339

TEXAS SECRETARY OF STATE

# Key Points to Remember

* Voters are not required to provide both types of identification numbers.

* If a voter provides both numbers, only one number has to match the VR record.

* The secrecy flap may be opened by the early voting clerk's staff for processing.

* Be mindful with these carrier envelopes, as they have personally identifiable information that needs to be guarded.

* Carrier envelopes are not public information at this point in the election process.

10/11/2022          Texas Secretary of State Elections Division          13

---

TEXAS SECRETARY OF STATE

# NEW PROCESS FOR EVBB/SVC



10/11/2022          Texas Secretary of State Elections Division          14

TEXAS SECRETARY OF STATE

# New Comparison Requirements

- The EVBB shall only accept a ballot if the personal identification information (ex: SSN or TXDL) matches the voter registration record.

- The SVC/EVBB is matching the information on the carrier envelope to the **VR record**.

- The number on the carrier envelope does not have to be the same number on the ABBM – it must only match the VR record.

10/11/2022  Texas Secretary of State Elections Division  15

TEXAS SECRETARY OF STATE

# Rebuttable Presumption

- If the personal identification information provided matches the VR record, the signatures on the ABBM and the carrier envelope are rebuttably presumed to be those of the voter.

- The presumption may be rebutted by presenting other past signatures on file with the EVC or VR that would support a finding that the signatures on the carrier envelope and ABBM are not those of the voter.

10/11/2022  Texas Secretary of State Elections Division  16

OCA-APPX-1249

STATE112341

TEXAS SECRETARY OF STATE

# POSSIBLE SCENARIOS REGARDING CARRIER ENVELOPES



10/11/2022  Texas Secretary of State Elections Division  17

TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 1**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record. The SVC or EVBB has completed the verification of personal identification information and should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, the ballot would be accepted.

10/11/2022  Texas Secretary of State Elections Division  18

TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 2**: Voter provides a personal identification number on the carrier envelope that matches the number in the voter's voter registration record, but it is a different type of number than what the voter listed on the ABBM. (Example: Voter provided last four digits of social security number on ABBM and a driver's license number on carrier envelope.) Because the voter's voter registration record contains both personal identification numbers, the SVC or EVBB is able to verify the voter's identity. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted.**

10/11/2022      Texas Secretary of State Elections Division      19



TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 3**: Voter provides the last four digits of their social security number on the carrier envelope. The voter registration record contains a driver's license number and social security number. The SVC or EVBB is able to validate that the partial social security number on the carrier envelope matches the number in the voter's voter registration record. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted.**
  - **NOTE**: The obligation of the SVC or EVBB in reviewing the identification information on a carrier envelope is to determine if the information provided by the voter on the envelope identifies the same voter identified on the voter's voter registration record. (Secs. 87.027, 87.0271, 87.041(b)(8), 87.0411).

10/11/2022      Texas Secretary of State Elections Division      20



OCA-APPX-1251

STATE112343

TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 4**: Voter indicates on the carrier envelope that they have not been issued any of the required personal identification numbers, and the voter's voter registration record does not contain any of these numbers. The SVC or EVBB has completed the verification of personal identification information, and it must rely on the signature comparison process for this part of the review. The SVC or EVBB should perform its remaining duties in the ballot review process. If the SVC or EVBB does not identify any other ground for rejection, **the ballot would be accepted**.



10/11/2022                    Texas Secretary of State Elections Division                    21

TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 5**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter does not include an identification number on the carrier envelope. The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope, as described in more detail below. If the voter timely corrects the defect, and there are no other grounds for rejection, **the ballot would be accepted.**



10/11/2022                    Texas Secretary of State Elections Division                    22

OCA-APPX-1252

STATE112344

TEXAS SECRETARY OF STATE

# Possible Scenarios – Carrier Envelopes

- **Scenario 6**: Voter provided one of the required personal identification numbers on the ABBM that matched the voter's voter registration record, but the voter indicates on the carrier envelope that they have not been issued one of the applicable identification numbers. The SVC or EVBB must notify the voter of their ability to correct this defect in the carrier envelope. If the voter timely corrects the defect, and there are no other grounds for rejection, **the ballot would be accepted.**

10/11/2022              Texas Secretary of State Elections Division              23

TEXAS SECRETARY OF STATE

# NOTIFYING VOTERS OF DEFECTS

10/11/2022              Texas Secretary of State Elections Division              24

OCA-APPX-1253

STATE112345



## Meeting Requirements

| | First Day Mail Ballots can be Reviewed | Texas Election Code Section |
|---|---|---|
| Signature Verification Committee (All counties and local political subdivisions) | 20th day before election day | Sec. 87.027(f) |
| Early Voting Ballot Board (Counties with a population of 100,000 or more) | 12th day before election day | Sec. 87.0222(a) |
| Early Voting Ballot Board (Counties with a population under 100,000) | 4th day before election day | Sec. 87.022 |

10/11/2022          Texas Secretary of State Elections Division          25

## Signature Verification Committee Corrective Action Process

- The following defects are eligible for correction when identified by the signature verification committee (Sec. 87.0271(a)):
  - The voter did not sign the carrier envelope certificate.
  - The SVC cannot determine whether the signature on the carrier envelope is that of the voter.
  - The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
  - If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
    - **NOTE:** Incomplete information about an assistant cannot be corrected and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.

10/11/2022          Texas Secretary of State Elections Division          26

OCA-APPX-1254

STATE112346

TEXAS SECRETARY OF STATE

# Early Voting Ballot Board
# Correction Process

- The following defects are eligible for correction when identified by the early voting ballot board (Sec. 87.0411(a)):
    - The voter did not sign the carrier envelope certificate.
    - The EVBB cannot determine whether the signature on the carrier envelope is that of the voter.
    - **The voter did not include the required statement of residence.**
    - The personal identification information required under Section 84.002(a)(1-a) (ABBM) or Section 86.002 (carrier envelope) was missing or contained incorrect information.
    - If a voter used a witness for completion of the carrier envelope, the witness information was incomplete.
        - **NOTE:** Incomplete information about an assistant cannot be corrected by EVBB/SVC and will result in a rejected mail ballot, but the voter may still vote in person if otherwise eligible.
- Only the EVBB has the authority to open the sealed part of carrier envelope to determine if a statement of residence (SOR) has been submitted.
    - The only exception is for FPCA voters. An SVC must open the sealed envelope to obtain the Signature Sheet for FPCA Voter, as this is necessary for the signature verification process.



10/11/2022      Texas Secretary of State Elections Division      27

---

TEXAS SECRETARY OF STATE

# Corrective Action Timelines

- **Returning the Carrier Envelope by Mail:** If the SVC or EVBB determines that it would be possible for the voter to correct the defect and return the carrier envelope **before the time the polls are required to close on election day,** the SVC or EVBB **must** mail the original defective carrier envelope to the voter. This determination must be made not later than the second business day after the SVC or EVBB discovers a defect, and before the SVC or EVBB decides whether to accept or reject a timely delivered mail ballot. (Secs. 87.0271(b), 87.0411(b)).

- **Notifying the Voter of Defect by Phone or Email:** If the SVC or EVBB determines that it would NOT be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day, **the SVC or EVBB may notify the voter of the defect by telephone or email** and inform the voter that the voter may come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect. (Secs. 87.0271(c), 87.0411(c)).



10/11/2022      Texas Secretary of State Elections Division      28

TEXAS SECRETARY OF STATE

If the SVC or EVBB takes one of the actions described above, the committee or board **must** take that action with respect to each ballot in the election to which these options apply.

(Secs. 87.0271(d), 87.0411(d)).



10/11/2022                Texas Secretary of State Elections Division                29

---

TEXAS SECRETARY OF STATE

# Recommendations

- The SOS recommends that before qualifying mail ballots, the EVBB/SVC meet with the early voting clerk to determine dates to convene and to establish timelines for the corrective action process. (Secs. 87.0411, 87.0271).

10/11/2022                Texas Secretary of State Elections Division                30

---

**TEXAS SECRETARY OF STATE**

# Establishing Timelines and Guidelines for the Corrective Action Process

- The SVC or EVBB must set a uniform policy for when carrier envelopes will be mailed to the voter versus when voters will be notified of the defect by phone or email.

- The SVC or EVBB should determine whether it will notify voters of a defect by both phone and email, if both are available.

- The SVC or EVBB should establish a policy for making multiple attempts to reach a voter if it is unsuccessful in reaching a voter by phone or email on the first attempt.

- Consider U.S. Postal Service (USPS) guidelines. Ask your EVC to consult with your local post office.

- **SOS Recommendation**: The SVC or EVBB should consider implementing a policy to provide notification of a defect by phone or email to all voters whose ballots are reviewed by the SVC or EVBB on or after the 14th day before election day (approximately 10 business days). This may be modified based on discussions with your local USPS representatives.

10/11/2022          Texas Secretary of State Elections Division          31

---

**TEXAS SECRETARY OF STATE**

# Carrier Envelope Returned by Mail

1. Stamp or mark the voter's carrier envelope with the words "**Corrective Action Required.**"

2. Note the appropriate defect on the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail.

3. Mail the voter's defective carrier envelope along with the Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail. The early voting clerk should include an envelope for the voter to return the corrected carrier envelope to the early voting clerk. This envelope should contain the Official Election Mail logo prescribed by the USPS. The voter must be notified if the return envelope needs additional postage.

4. Enter the voter's information on the Roster of Voters with Defective Carrier Envelopes -- Returned to the Voter by Mail.

**\*The actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022          Texas Secretary of State Elections Division          32

---

STATE112349

TEXAS SECRETARY OF STATE

## Notifying Voter by Phone or Email
## (Carrier Envelope is NOT mailed to Voter)

- If notifying by email:
  1. Send the voter the Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email via email.
  2. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the voter should be noted on the roster.
  3. **Parameters for Email Notification:** The SOS recommends that the early voting clerk set up an email address for corrective action notifications. The early voting clerk and the SVC or EVBB should establish rules and procedures for utilizing this email address. Any emails sent or received through the corrective action process are considered election records, are subject to the Public Information Act, and should be retained by the general custodian of election records. The general custodian should consult with their attorney regarding any requests for such emails, as certain information may be exempt from disclosure under the Public Information Act.

**\*The actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022                          Texas Secretary of State Elections Division                          33

---

TEXAS SECRETARY OF STATE

## Notifying Voter by Phone or Email
## (Carrier Envelope is NOT mailed to Voter)

- If notifying by phone:
  1. Contact the voter using any known phone number on file with the early voting clerk or in the possession of the SVC or EVBB.
     - NOTE: As a reminder, the voter registrar may not transcribe, copy or otherwise record a telephone number furnished on a voter registration application. (Sec. 13.004). The SVC or EVBB may be able to review a voter registration application at the voter registrar's office to obtain a phone number. The registrar may also read a phone number from a voter registration application to a member of the SVC or EVBB, if necessary.
  2. The SVC or EVBB should create a phone script that explains to the voter that the voter's mail ballot was received by the early voting clerk's office and has been reviewed by the SVC or EVBB, whichever is applicable.
  3. The SOS recommends that the SVC or EVBB confirm the voter's identity using publicly available information.
     - Example: Ask the voter to confirm their voter registration address and whether they requested a mail ballot for the given election.
  4. The voter should be told that upon review of the carrier envelope, the SVC or EVBB discovered a defect in the carrier envelope. The specific defect should be explained.
  5. The SVC or EVBB should explain the process for the voter to correct the defect as well as the process to cancel their mail ballot and vote in person during early voting or on election day.
  6. Provide a return phone number that the voter may use to confirm that they were contacted by the SVC or EVBB. The number provided should be the number of the early voting clerk's office so the voter can verify this information and obtain details about the corrective action process during times that the SVC or EVBB are not meeting.
  7. The voter's name should be entered on the Roster and the action taken by the SVC or EVBB should be noted on the roster.

**\*Many of the actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022                          Texas Secretary of State Elections Division                          34

OCA-APPX-1258

STATE112350

TEXAS SECRETARY OF STATE

# If the SVC or EVBB is unable to contact the voter...

1. The SVC or EVBB should leave a detailed message explaining that the SVC or EVBB determined there was a defect in the voter's carrier envelope and explain the process for correcting the defect

2. The SVC or EVBB should NOT provide any details related to a voter's personally identifiable information on a voicemail or with a person who is not the voter.

3. The SVC or EVBB should leave a return number that the voter may use to validate the information provided by phone.

4. The SVC or EVBB should mail the voter a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

5. The voter's name should be entered on the Roster of Voters with Defective Carrier Envelopes – Notified by Phone or Email, and the action taken by the SVC or EVBB should be noted on the roster.

• If the SVC or EVBB does not have a phone number or email to notify the voter: The SVC or EVBB should mail a Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email to inform the voter of their ability to correct the defect by appearing at the early voting clerk's office or by cancelling their mail ballot and voting in person during early voting or on election day.

**\*Many of the actions above can be delegated to the Early Voting Clerk by the SVC/EVBB as these are administrative functions that carry out the instructions and actions of the SVC/EVBB**



10/11/2022          Texas Secretary of State Elections Division          35

---

TEXAS SECRETARY OF STATE

# Key Points to Remember

- Any actions taken by the SVC or EVBB shall be uniformly applied to every ballot in the election to which this procedure applies.  (Secs. 87.0271(d), 87.0411(d)).

- A poll watcher is entitled to observe any action taken by the SVC or EVBB related to the corrective action process.  (Secs. 87.0271(e), 87.0411(e)).

- Poll watchers may not transcribe or make notes of any voter's personally identifiable information while observing the activities of the SVC or EVBB.

10/11/2022          Texas Secretary of State Elections Division          36

TEXAS SECRETARY OF STATE

# CORRECTING DEFECTS

10/11/2022          Texas Secretary of State Elections Division          37

TEXAS SECRETARY OF STATE

# How do Voters Correct Defects?

- **If the carrier envelope was mailed back to the voter, the voter MUST return the carrier envelope with the revisions/corrections.**

    - Deadline for Correction: If the SVC or EVBB has returned the voter's carrier envelope by mail for correction, the voter also MUST return the carrier envelope to the early voting clerk no later than 7:00 p.m. on election day for the ballot to be processed and counted. (Secs. 87.0271(b), 87.0411(b)).

- **If the carrier envelope was NOT mailed back to the voter, the voter may correct the defects in the following ways:**

    - Utilizing the BBM Tracker for defects related to a missing or incorrect personal identification numbers.

    - Appearing in person at the EV clerk's office and submitting a Corrective Action Form.

    - Cancelling their mail ballot and voting in person.

    - Deadline for Correction: This corrective action process must occur no later than the 6th day after election day. The EVBB cannot finally reject a ballot before the 7th day after election day. (Secs. 87.0271(g), 87.0411(g)).

**Corrective actions taken by the voter MUST be provided to the EVBB for their final review of the ballot before determining acceptance or rejection.** 

10/11/2022          Texas Secretary of State Elections Division          38

STATE112352

TEXAS SECRETARY OF STATE

## Correcting Defect by Cancellation

- After receiving a Notice of Carrier Defect by mail or receiving notification via email or phone, the voter may opt to cancel their ballot by mail and vote a regular ballot in person. All cancellations must be completed in accordance with Section 84.032. If the voter is an Annual ABBM voter, a cancellation request submitted for these purposes applies only to the current election unless the voter specifically requests to cancel their Annual ABBM. (Sec. 84.038).

- There is no process under Texas law by which a voter can cancel a mail ballot application by phone. **All cancellations must be in writing and completed in accordance with Section 84.032 of the Texas Election Code.**

- See pages 13-14 of Advisory 2022-08 for more details.

10/11/2022      Texas Secretary of State Elections Division      39

TEXAS SECRETARY OF STATE

## IMPACTS ON FPCA VOTERS



10/11/2022      Texas Secretary of State Elections Division      40

STATE112353

TEXAS SECRETARY OF STATE

# Impacts on FPCA Voters

- If the FPCA voter provides missing or incorrect identification information on their carrier envelope or signature sheet, or did not include the Official Election Signature Sheet for an FPCA Voter, the voter must be notified of the defect in the same manner as a regular ABBM voter.

- **Because the signature sheet is separate from the voted ballot and is authorized under state and federal law, FPCA voters who have a defect in their signature sheet have additional methods for returning this corrected or missing required documentation.**

- Specifically, an FPCA voter may submit a corrected signature sheet by email, fax, personal delivery, or mail. The SVC or EVBB should make an appropriate notation on their roster to indicate how FPCA voters were notified of a defect and how the FPCA voter provided the corrected signature sheet to the SVC or EVBB. (Secs. 1.007, 31.003, 31.004, 87.0271(f), 87.0411(f), 101.007, 101.109).

10/11/2022                Texas Secretary of State Elections Division                41

---

TEXAS SECRETARY OF STATE

# NEW FORMS

10/11/2022                Texas Secretary of State Elections Division                42

OCA-APPX-1262

STATE112354

TEXAS SECRETARY OF STATE

# Notice of Carrier Defect

- We have prescribed two versions of this form:
  - The Notice of Carrier Defect – Carrier Envelope Returned to the Voter by Mail
  - The Notice of Carrier Defect – Voter Notified of Carrier Envelope Defect by Phone or Email

- The Notice of Carrier Defect contains the Corrective Action Form for Defective Carrier Envelope on the reverse side of the form.

10/11/2022          Texas Secretary of State Elections Division          43

TEXAS SECRETARY OF STATE



## Corrective Action Form for Defective Carrier Envelope (6-14)

- **Top half of form contains the Corrective Action Form**

- Bottom half of form is the Statement of Residence

10/11/2022          Texas Secretary of State Elections Division          44

OCA-APPX-1263

STATE112355

TEXAS SECRETARY OF STATE

## Roster of Voters with Defective Carrier Envelopes (Forms 8-20, 8-21, 8-22)

- EVBB/SVC should create a roster to track the corrective action process.
- SOS has prescribed three different sample forms for use by EVBB/SVC.
- EVBB/SVC can also track the information electronically or create their own roster.

10/11/2022     Texas Secretary of State Elections Division     45

---

TEXAS SECRETARY OF STATE

## Notice of Surrendered Ballot (6-13)

- Upon surrendering their mail ballot, the voter will be issued the **Notice of Surrendered Ballot by Mail**. The voter will take this form to their early voting or election day polling place and present the form to the election judge, entitling the voter to vote a regular ballot in person.



10/11/2022     Texas Secretary of State Elections Division     46

STATE112356

TEXAS SECRETARY OF STATE

# EARLY VOTING CLERK PROVIDING NOTIFICATION OF DEFECTS

10/11/2022      Texas Secretary of State Elections Division      47

---

TEXAS SECRETARY OF STATE

# Early Voting Clerk
# Notification of Defects

- Under Section 86.011(d) of the Code, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, **the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect**. Additionally, **the early voting clerk may notify the voter of the defect by phone** and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their ABBM and vote in person.
  - Early voting clerks may return carrier to voter for correction.
  - Early voting clerks may notify voter of defect by phone and inform the voter they can come to the EVC's office to correct defect or cancel their application.

10/11/2022      Texas Secretary of State Elections Division      48

STATE112357

TEXAS SECRETARY OF STATE

## Early Voting Clerk
## Notification of Defects

- What defects can an early voting clerk provide notice about?
  - Missing signature
  - Missing or incomplete witness information
  - Missing **assistant** information
  - If the early voting clerk is removing the secrecy flap before the ballot is sent to the SVC/EVBB:
    - Missing personal identification information
    - Incorrect personal identification information

10/11/2022          Texas Secretary of State Elections Division          49

TEXAS SECRETARY OF STATE

## Early Voting Clerk
## Notification of Defects

- If an early voting clerk chooses to notify voters of defects in their carrier envelope under Section 86.011(d), **the clerk must apply these procedures uniformly to all voters in similar circumstances.**

- **Poll watchers may be present for this process.** (Sec. 86.011(d)).



10/11/2022          Texas Secretary of State Elections Division          50



OCA-APPX-1267

STATE112359

# Exhibit 77

**From:** Elections Internet [Elections@sos.texas.gov]
**Sent:** 5/18/2022 6:11:40 PM
**To:** Elections Internet [Elections@sos.texas.gov]
**Subject:** MASS EMAIL (CC/EA-881): VoteReady Ballot by Mail Informational Pamphlets

Dear Election Officials:

Our office has prepared VoteReady Ballot by Mail Informational pamphlets which are presently available on the **VoteTexas.gov** "Resources" page in both English and Spanish. You are welcome to print and distribute these pamphlets to your voters and may also place links to these pamphlets on your county's website. For ease of reference, the links to the pamphlets are available below:

English: **https://www.votetexas.gov/resources/pamphlets.html**
Spanish: **https://www.votetexas.gov/es/recursos/folletos.html**

Please let us know if you have any questions or concerns.

Heidi Martinez
Managing Attorney – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.state.tx.us/elections

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

STATE110867

# Exhibit 78

**PROVIDE THE NUMBER FROM ONE OF THESE IDS TO COMPLETE YOUR BALLOT BY MAIL APPLICATION AND YOUR CARRIER ENVELOPE.**



**Texas Driver License***



**Texas Election ID Certificate***†



**Texas Personal ID Card***



**Social Security Card**

You must provide a number from one of these approved IDs on your ballot by mail application (ABBM) and your carrier envelope. If you have not been issued *any* of these IDs, you must indicate so by checking the appropriate box on the application for a ballot by mail and your carrier envelope.

Find out more about voting in Texas at

**VOTETEXAS.GOV**
POWERED BY THE *TEXAS SECRETARY OF STATE*

or call 1-800-252-VOTE (8683)

*For voters aged 18–69 years, photo ID can be expired for up to four years. For voters aged 70 and older, photo ID can be expired for any length of time if otherwise valid.
†The Texas Election ID Certificate is a free photo ID issued by DPS for voting purposes. The number on this ID is NOT your Voter Unique Identifier (VUID) on the voter registration card you receive in the mail. Your VUID is NOT required information on either your ABBM or mail ballot carrier envelope.



 **Track Your Ballot!**

Scan this QR code to track your application for ballot by mail, check the status of your mail-in ballot and certify your ID information, if necessary.

OCA-APPX-1271

# VOTE ReaDY

**Get Ready to Vote by Mail!**

**VOTETEXAS.GOV**
POWERED BY THE *TEXAS SECRETARY OF STATE*

## YOU ARE **ELIGIBLE TO** VOTE BY MAIL IF YOU MEET ANY OF THE FOLLOWING REQUIREMENTS:

 **65** years or older

Sick or disabled

 Expected to give birth within 3 weeks of Election Day

Civilly committed under Chapter 841 of the Texas Health and Safety Code

 Out of the county on Election Day and during the period for early voting by personal appearance

 Confined in jail, but are otherwise eligible

**TEXAS** Health and Human Services

---

## How Do You Get a Ballot by Mail?

The first step is to fill out an Application for Ballot by Mail (ABBM). You can find and print the application at VoteTexas.gov or request one from your county's election office. To apply for a ballot by mail, you must provide either: (1) your Texas Driver License, Personal ID or Election Identification Certificate Number; OR (2) the last 4 digits of your Social Security number. The number you provide must be associated with your voter registration record for your ABBM to be accepted. You are welcome to provide both numbers.

**SAMPLE APPLICATION →**



---

## Completing the Carrier Envelope.

When you're ready to mail your ballot, make sure you have completely filled out your carrier envelope before sealing and signing it. Underneath the privacy flap, which allows for the security of your personal information, you must provide either: (1) your Texas Driver License, Personal ID or Election Identification Certificate Number; OR (2) the last 4 digits of your Social Security number. You are welcome to provide both numbers.

 Scan the QR code on the back of this info card, or visit VoteTexas.gov and select "Track My Ballot" to see where your ballot is in the process, and to certify your ID information, if necessary.

**↑ SAMPLE ENVELOPE**

OCA-APPX-1272

# Exhibit 79

Nonstandard Document Submitted to the
Court via USB Drive

# Exhibit 80

OCA-APPX-1275

**Harris County Elections Recommendations for Ballot by Mail Applications**
*Tips to avoid delays due to new State law*

As a result of voting laws passed by Senate Bill 1, new mail ballot requirements have led to an increased number of mail ballot applications flagged for rejection.

The new state law requires voters to provide their Texas driver's license number, Texas ID number, or the last four digits of their social security number.

Failure to provide an exact match on the application to what is on your voter record could result in a rejection of the application, meaning voters will need to return a corrected mail ballot application before the mail ballot application deadline. The deadline to apply to vote by mail in the March Primary Election is February 18, 2022.

Below are some helpful voter tips to avoid delays in successfully processing a voter's application in time for the March Primary. Additionally, **here is an instructional video** available for download.

- **Call Harris County Elections at 713-755-6965.** The voter services team is dedicated to walking voters through the process of filling out applications. There are operators who are fluent in English, Spanish, Vietnamese, and Chinese.
- **Provide both forms of ID.** Even though the form only asks for one, the best way to ensure an application isn't rejected is to provide both a Texas ID and the last four digits of your Social Security number.
- **Provide a contact email or phone number on your application** so our team can immediately reach out and address any issues with the application to minimize potential delays.

In addition to filling out the new identification requirements, voters are required to select a political party in order to vote in the March Primary Election and Runoff Election. If they select "Annual Application: Send me a ballot for all elections in this voting year", voters also must select either "March 1st Democratic Primary and Runoff" or "March 1st Republican Primary and Runoff" in the options to the right.

For more information, including sample ballots and polling locations, visit HarrisVotes.com in the coming weeks and follow @HarrisVotes on Twitter, Facebook, and Instagram. Call Harris County Elections at 713-755-6965.

OCA-APPX-1276

Longoria_003383

# Exhibit 81



This Post Election Report includes an overview of the Election Administrator Office's (EAO) planning and execution of the November 8, 2022, General Election including Early Voting and Election Day operations, media and community outreach activities, Election Day operations, election night tabulation, and a post-election day analysis from election judges, election workers, and senior EAO staff. The Report is organized into the following areas: (1) Election Data Highlights; (2) Election Planning and Outreach; (3) Election Preparation; (4) Early Voting Operations; (5) Election Day Operations and Performance; (6) Election Night Tabulation and Post-Election Activities; and (7) Proposed EAO Actions. The Report will assist the EAO to improve processes and procedures for future elections, related to Communication systems, Voting system operations, Personnel resources for the EAO, and Vote Center deployment.

**Methodology of Election Day Evaluation**

The post-election review began with EAO staff conducting post assessment discussions with each of its seven election vendors who provided technical support during Early Voting and on Election Day. EAO staff also spoke with 774 Presiding Judges (PJs) and 727 Alternate Judges (AJs) that served on Election Day. The EAO staff was unable to gather information from all PJs and AJs because several judges advised EAO staff that they were instructed not to talk with the EAO staff about Election Day operations, including ballot paper due to the District Attorney's announced criminal investigation, litigation brought by the Harris County Republican Party, and pending election contests.

The EAO normally submits an election survey to all judges and clerks seeking feedback on the election process, and potential training and curriculum topics for future elections. However, in the interest of confirming and better understanding certain events and problems reported in the media on Election Day, and after, (including paper ballot issues and opening and closing problems) the EAO recruitment staff expedited its post-election assessment.

EAO staff reviewed election operations and discussed, internally, what worked well and what needed to be improved and reviewed election data pertaining to the General Election. Through an expedited evaluation process, the EAO has created this preliminary report of successes and challenges for review and implementation for the next election cycle. Standard practice would require the EAO to take approximately 90-120 days to compile a final report of this magnitude; however, given the level of stakeholder interest and inquiry, the EAO believed it important to provide its preliminary observations as quickly as possible without jeopardizing the integrity of the data and the process. As we know in the elections profession, speed does not always equate to accuracy. The EAO will update this report as more information is gained from its continued effort to improve the processes. Based on the EAO's preliminary analysis, we provide the following assessment beginning with election data and proceeding according to the report organization listed above.

Tatum_005209

OCA-APPX-1278



# HARRIS COUNTY ELECTIONS ADMINISTRATION OFFICE

## I. Election Data Highlights

(1) The total number of votes cast, presented by ballot type (including Limited Ballots[1] ):

| | |
|---|---|
| Early Voting Ballots counted including 636 limited ballots | 692,748 |
| Election Day Ballots counted | 349,045 |
| Mail Ballots counted | 61,264 |
| Provisional Ballots counted | 4,333 |
| Total Ballots counted | 1,107,390 |

Mail Ballot Data

| | |
|---|---|
| Mail Ballots sent | 81,064 |
| Mail Ballots returned by voter | 64,259 |
| Mail Ballots surrendered | 5,786 |
| Mail Ballots not returned | 7,843 |
| Mail Ballots not countable | 3,176 |

Provisional Ballot Data

| Type | Accepted | Rejected |
|---|---|---|
| Early Voting Provisionals | 1,809 | 226 |
| Election Day Provisionals | 525 | 1,261 |
| #5 Provisionals* | 2,204[2] | 277 |
| Totals | 4,538 | 1,764 |

*# 5 Provisionals are Provisional Ballots cast during extended voting hours. The #5 totals did not change any election contest results from a winning candidate to a losing candidate.

(2) The number of voters registered as of December 14, 2022 = 2,583,642

    (A) more than 30 days preceding the election; as of October 3, 2022 = 2,558,844

    (B) Statement of Residency (SORs) during Early Voting (EV); Total EV SOR's = 20,791

    (C) SORs on Election Day (ED); Total ED SOR's = 23,035

---

[1] Limited Ballots are ballots that are cast by eligible voters who moved into Harris County from another Texas Count, but are only able to vote on certain contests because they did not get registered in Harris County prior to the registration cutoff deadline.

[2] 205 of the #5 Provisional Ballot envelopes did not contain ballots.

Tatum_005210



(3) The number of election workers by Vote Center; See Attachment 1 "EV Allocations 1122" and Attachment 2 "ED Allocations 1122".

(4) The list of Early Vote Centers; See Attachment 3 "List of Early Vote Centers 1122".

(5) The list of Election Day Vote Centers; See Attachment 4 "List of Election Day Vote Centers 1122.

(6) Allocation of Voting Machines per Vote Center for Early Voting and Election Day; See Attachment 1 and 2.

(7) EV and ED Vote Center locations for November 8 General Election. Final approval by the Commissioners' Court occurred on 10/11

EV Locations (99)

>CC1 @ 29 Locations
>CC2 @ 25 Locations
>CC3 @ 24 Locations
>CC4 @ 21 Locations

ED Locations (782)

>CC1 @ 227 Locations
>CC2 @ 204 Locations
>CC3 @ 190 Locations
>CC4 @ 161 Locations

## II.      Election Planning and Outreach

*A.  Public Awareness.* On July 1, immediately following the two June elections, the EAO outreach and communications began organic efforts to raise public awareness about the November 8 General Election. Every potential voter touchpoint, from the website to the call center to voter registration drives and community meetings, was used as an opportunity to prominently remind voters of upcoming dates and important information surrounding voting in Harris County. The EAO developed messaging and strategies based on voting trends observed from previous elections and created additional messaging based on real-time information gathered from the EAO ballot building team and call center (i.e. two-page long ballots, postage requirements).

*B.  Public Outreach.* The EAO deployed the following resources in support of voter engagement and communication directly and through media efforts:

*Professional Firm –* KGB Texas Communications, a media and communications firm assisted the EAO communications team in driving awareness among Harris County residents on key dates associated with the November 2022 election, and educating the public on election-related information (i.e. mail ballots, new

Tatum_005211

OCA-APPX-1280


voting machines, polling locations). The media and communication efforts ran from October 12, 2022 through November 8, 2022.

Overall, the media efforts delivered 77 million impressions across broadcast television and radio, digital media, print, and outdoor media. Radio garnered the highest amount of impressions at 26 million, followed by television and digital outlets with 21 million and 20 million respectively. Election Ads were run in English, Spanish, Vietnamese and Chinese, and a budget was allocated to minority publications and stations. Originally, KGB Communications planned 70,482,120 impressions for this campaign. At the end of the cycle, 77,036,058 impressions were delivered.

*Social Media*- Social media posts were developed to highlight and inform voters of important dates and materials such as ID requirements, EVC and VC locations, "frequently asked questions", postage requirements for mail ballot envelopes, identification numbers needed on mail ballots, and the importance of preparing a sample ballot to expedite the in-person voting process.

With paid Ad campaigns on Facebook and Instagram, the office achieved 68,000 clicks and sustained a 2.27% click through rate in the 13-days that Ads were running.

**C. *Community Engagement Events*-** From the start of July through the voter registration deadline (October 11), the voter outreach team collected 8,889 voter registration forms at 703 events across the county. The following is a breakdown of these events based on where they were held:

- Faith-based centers- 64
- High schools- 134
- Colleges- 172
- Community- 268
- Festivals- 65

At each of these events, team members also provided flyers with important information about the November 8 election, answered voters' questions, and showed them how to navigate the website for information.

From July 1 through October 31, four members of the communications team hosted 30 stakeholder meetings in English, Spanish, Vietnamese, and Chinese, where important deadlines and resources for the upcoming election were discussed, voting machines programmed with a sample election were brought in for hands-on learning, and attendees were encouraged to ask their elections questions. In addition, organizations were able to request machine demonstrations in any of the four languages offered. Five team members participated in approximately 140 information sessions, where voters could ask questions and get hands-on interaction with the voting machines.

Organizations that requested information sessions and machine demonstrations include:
- African American Health Coalition
- AHEPA 29-III Apartments
- Alpha Kappa Alpha
- Anointed Faith Baptist Church

4

OCA-APPX-1281


- Asian American Voting Alliance
- Avenue CDC
- Barrett Station Civic League
- Bay Area Association of Democratic Women
- Belfort Church of Christ
- Boat People SOS
- Bonding Against Adversity
- Brazos Towers Senior Living
- Chinese Civic Center
- Chinese Community Center
- Congregation Emanuel
- Culture Center of Taipei
- Crestmont Park Civic Park Alliance
- Cypress-Fairbanks ISD
- EMGAGE
- Equality Texas
- Grace International Church
- Harris County Attorney's Office
- Harris County Clerk's Office
- Harris County Public Library
- Harris County Transit
- HOPE Clinic
- Houston 80-20 Asian-American Political Action Committee
- Houston Association of Realtors
- Houston Association of Retired Teachers
- Houston Area Urban League
- Houston Community College
- Houston Heights Women's Club
- Houston Hong Kongers
- Houston In Action
- Houston ISD
- Houston LGBTQ+ Political Caucus
- Houston White Cane Safety Day
- Korean Senior Center
- La Vang Catholic Church
- League of Women Voters
- Memorial Hermann Southwest Hospital
- Mi Familia Vota
- Montrose Center
- Northwest Vietnamese Church
- OCA- Asian Pacific American Advocates Greater Houston Chapter
- Our Lady of Lourdes Catholic Church
- Point/Counterpoint Senior Group
- Precinct 1

OCA-APPX-1282

Tatum_005213


- Precinct 2
- Pure Justice
- Resurrection Metropolitan Community Church
- Sunnyside Park Civic Center
- Taiwanese Community Center
- Texas Southern University
- The Metropolitan Organization of Houston
- Trinity United Methodist Church
- Turkish Raindrop Foundation
- Unity Church
- United Trinity Methodist Church
- University of Houston
- University of Houston Downtown
- Vietnamese Martyr Church
- VN Day Care Center
- West Houston Democrats
- West U Democrats
- Wheeler Avenue Baptist Church

*Note: Some groups requested multiple sessions to accommodate different languages or locations (i.e. AHEPA 29-III Apartments requested presentations in English, Spanish, Vietnamese and Chinese; multiple high schools in Cypress-Fairbanks had machine demonstrations).*

**D.** *Media Relations* **-** The EAO communications team developed digital toolkits and media pages, which included important dates, FAQs, as well as B-roll (Media clips), videos and photography produced in house by the EAO team. These toolkits were shared with Advocacy groups, media outlets and the political parties. (Digital toolkit: https://www.dropbox.com/sh/tfdoc891df3mo6i/AACiFkmG4zpDkl9omr5cxe4pa?dl=0)

Additionally, on October 13, the EAO hosted an Open House for all members of the media, as well as key stakeholder groups and Harris County officials. The purpose of the Open House was to provide critical transparency into the election night process, specifically detailing how ballots are processed and the security measures in place. This was the first time the EAO had offered an inside look and detailed explanation of its process. (Overview of Open House talking points: https://www.harrisvotes.com/Voter/Ballot-Processing)

On October 21, the EAO also hosted a Media Town Hall event for reporters specifically assigned to cover the November 8 election. This was an opportunity to revisit information shared during the Open House, as well as answer logistical questions regarding media access, points of contact, and visibility during election night.

**E.** *Website* **-** This year, the EAO rebranded the website (HarrisVotes.com) to provide more transparency and improved user experience ahead of the November 8 Election. The website experienced the following traffic:
- 45-days before Election Day (September 24): 8,297 page views with 1,922 users averaging 3.58 pages/session in 2,318 sessions

OCA-APPX-1283

Tatum_005214



- Combined 12-Days of Early Voting: 2,611,384 page views with 554,614 users averaging 3.07 pages/session in 849,792 sessions
- Election Day (day after included to account for Election Results viewing): 1,728,179 page views with 349,106 users averaging 3.36 pages/session in 514,215 sessions

### F. Improvements to the Planning Process

The EAO will take the following actions to improve its Election Day Planning Operations for future elections:

- Establish working advisory groups to provide feedback regarding General Election operations
- Evaluate election data gathered during the General Election to strengthen training and develop future voter education activities
- Implement new quality control systems with additional checks and balances to ensure external communications and publications are timely and accurate

### III. Election Preparations

For Election Day planning, staffing and resource allocations, EAO staff estimated voter turnout to be approximately 65% of registered voters. These projections were based on data and actual voter turnout statistics from prior General Elections (dating back to 2014), comparing like contests, recent voting trends, changing demographics, and precinct realignments. EAO staff used the projected turnout numbers as a baseline for deploying Vote Center locations, voting equipment, supplies, ballot paper, ePollbooks, and election workers for Early Voting Centers (EVCs) and Election Day Vote Centers (VCs). EAO staff projected voter turnout to be approximately 1.2 million voters with 75% of that turnout during Early Voting and the remaining turnout on Election Day.

The EAO deployed the following equipment to both the *EVCs and VCs*:

- Hart InterCivic Controller – Device used to create a ballot access code that allows the voter to start the voting session of the Duo Ballot Marking Device (defined below)
- Duo– Ballot Marking Device that displays the election contest and questions on a touch screen that allows each voter to select a candidate in each contest or vote for or against a ballot measure in the election. This marking device prints a record of the votes cast to be deposited into the Scan (defined below) for counting
- Duo-Go– A mobile apparatus that allows election workers the ability to take a Duo to a curbside voter, thus allowing a voter to cast a ballot from their automobile
- Scan – A ballot tabulation device that images each ballot and collects the votes cast on each ballot for tabulation purposes
- Content Active ePollbook – Electronic Pollbook that allows election workers to check-in a voter at the EVC or VC, which assist the election worker in providing the voter with the correct ballot style based on the address where they are registered to vote

Tatum_005215


### A. Early Voting and Election Day Supplies & Signage

EAO staff revised many VC signs and forms for Early Voting and Election Day to improve visibility and legibility as well as to streamline the election reporting for election workers to complete election night reporting[3].

The EAO staff introduced a barcode labeling system to pack supply boxes for each VC. This barcoding system was used to track supply boxes and materials delivered to each VC. The barcoding system assisted the EAO staff to confirm and validate that each EVC and VC received the correct equipment and the correct supplies.

As supply boxes were packed at the warehouse, a verification system confirmed that all requested/scheduled supplies were included in each supply bin. The barcoding system and verification system were effective in helping ensure that supply inventories were accurate and EVCs and VCs received all scheduled items.

### B. Facilities

The EAO strives to ensure every EVC and VC used in the county meets the following criteria:

- accessible
- adequate space for voting equipment and election workers on Election Day
- adequate parking
- proper electrical capabilities
- availability for election workers to set up on the Monday before Election Day
- available on Election Day from 6:00am until at least 10:00pm
- availability for the equipment to remain securely onsite until pickup

#### Location Selection

In most cases, the EAO selected locations utilized in previous elections. For this election, several locations were relocated because of unavailability or because of ADA accessibility issues. When a facility is unavailable, EAO staff relocates the VC to another facility only after an ADA assessment is conducted to ensure the new location is compliant and can support the election activities. EAO staff collaborated with Commissioner Court staff, political party representatives, and Precinct Chairs to identify and secure adequate locations that would support and accommodate the projected voter turnout.

The overall location selection process involves the following:

1. Identify the quantity of locations needed for the election
2. Review the most current list of locations used from last like elections[4]

---

[3] All signage and forms used at VCs are approved by the Texas Secretary of State.
[4] Locations were used from 2021 and 2020 as a result of the implementation of county wide voting.

Tatum_005216

OCA-APPX-1285


3. Place locations onto a map to view general coverage
4. Layer onto map the voting location areas identified by the nonpartisan Center for Inclusive Democracy to identify areas of greatest need.[5] This tool evaluates data such as citizen age, registered voters, in-person voters, by mail voters, voter turnout, voter demographic, population with vehicle access and population density, including total registered voters to determine areas that have greatest needs for voting locations.
5. Identify the following items necessary to have a location useable in an election
    a. Availability
    b. ADA status (Compliant, Non-Compliant Remediable, Non-Compliant Non-Remediable)
    c. Cost
    d. Other accessibility (i.e. electricity, parking, restroom access)
6. Define locations on the map by their availability and ADA status
    a. Where locations were unavailable, identify a nearby location that could serve the area.
    b. Where locations and nearby locations were both unavailable to serve the area, those locations were shared with stakeholders[6] to assist with asking locations to become available.
7. Identify locations within .5 miles of each other to determine if both locations were needed for the area. This is done when there is a surplus of possible locations that could be used to get to the target number of locations identified by EAO as would be needed for the election.
8. When location list reached the target number, shared list with stakeholders to review and incorporate feedback to favor historical facilities[7], ADA-compliant facilities (based on status) and facilities requested by multiple stakeholders.
9. After review by stakeholders and considering all stakeholder feedback, locations list was submitted to Department of Justice (DOJ) for review and submitted to Commissioners Court for approval.
10. Periodic changes occurred based on new information such as stakeholder requests that could be accommodated, location availability, updated ADA inspections or DOJ comments.

***Facility Check List ADA Compliance***

As a result of a DOJ settlement agreement regarding accessibility of locations the EAO staff works with DOJ coordinators, subject matter experts and ADA survey coordinators to assess and diagram accessibility remediation for all locations. The diagrams depict entrances and exits, room dimensions, electrical outlets, the proposed positioning of voting equipment, and suggested election worker stations that facilitate traffic flow and privacy. The ADA survey coordinators conducted a site survey[8] for each of the 782 VCs and deployed remediation where necessary.

---

[5] https://tx.cidsitingtool.org/county.html?county=201.
[6] Commissioner Court staff and Political Party representatives
[7] Long standing neighborhood facilities.
[8] The ADA surveys are too voluminous to attach but can be made available upon request.

OCA-APPX-1286

Tatum_005217



## C. Election Worker Recruitment, Training and Staffing

***Staffing Goals.*** EAO staff estimated that approximately 6,500 workers would be required for the General Election. The table below provides a breakdown of election worker positions per VC, the total number of workers assigned, and a brief job description for each position.

| Position | Per VC | Total | Job Description |
|---|---|---|---|
| Presiding Judge (PJ) | 1 | 782 | Oversees all voting procedures at the VC; they are responsible for ensuring Election Law is followed, the voting process is safe and secure, and peace is kept in the VC. |
| Alternate Judge (AJ) | 1 | 782 | Can serve in the same capacity as the PJ; takes over full responsibility of the VC in the absence of the PJ; serves as Clerk when PJ is present; works closely with the PJ for accountability on reporting and countersigns election documents. |
| Qualifying Clerk | 1 or more | 782 | Clerk assigned to the Qualifying Table (Voter Check-in). They operate the ePollBook and Controller. They process voters accurately and efficiently. |
| Ballot Clerk | 1 or more | 782 | The critical role of the Ballot Box Clerk is to ensure voters do not leave the VC before casting their ballot in the Scan. If they leave without doing so, their vote will not be counted. |
| Greeter | 1 or more | 782 | The first election worker a voter will encounter. They are friendly, welcoming individuals who monitor those waiting in line to vote, ensures the 100-ft line is secure, and monitors the parking lot for curbside voters. |
| Curbside Clerk | 1 or more | 782 | Clerk designated by the PJ to conduct Curbside Voting when required. This includes: qualifying voter, preparing the Duo-Go with either the PJ or AJ, then returning to the voter with an "I Voted" sticker and letting them know their ballot was successfully cast. |
| Additional Clerks to Help as Needed | | 806 | |
| Total | 6-8 | 5,498 | |

OCA-APPX-1287

Tatum_005218



***Staffing Process.*** The Texas Election Code (TEC) prescribes the process for appointing Election Day judges. Election Day PJs and AJs are nominated by Party Chairs and appointed by the Commissioners Court.[9] The Parties submit a list of names of persons in order of preference for each precinct who are eligible to serve as a PJ. The EAO places judges appointed by Commissioners Court into VCs. The EAO staff considers the following criteria when assigning PJs to VCs: (1) where they have previous work history, (2) whether the Precinct Chair of the precinct in which the VC is located is willing to work at the location, and (3) if historical or precinct chair judges are available or unavailable. The EAO consulted with the Parties to coordinate where the Parties' respective PJs would serve in relation to party designated precincts. The EAO encouraged the Parties to submit more names than they initially submitted because, nominated Judges were unable or not willing to work on Election Day. Once the EAO exhausted the names of the Party nominees, EAO staff began placing judges on a first available basis to ensure all locations were staffed with a PJ and AJ. Staffing numbers for clerks vary per VC based on projected voter turnout and averaged between 5-7 clerks for each VC.

***Election Worker Training.*** All election workers, including PJs, AJs and clerks are required to attend a four (4) hour training session in order to work the election.

A new Training Manager revamped the training program and brought on adult educators who were trained as effective elections instructors. The EAO employed over 33 temporary instructors to assist two full-time team instructors to improve materials, recreate a training manual, and conduct training events. The EAO training team revamped the training curriculum to increase the hands-on training aspects to ensure workers could set up and operate the voting machines. The curriculum also provided for more hands-on training with the forms and processes.

### New Training Manual

The new Training Manual included a revised color-coded format that identified the sections of the manual for each task to be completed. The manual was provided in a bound format and given to every election worker. A copy of the manual was also made available on the EAO website and can be accessed at the following link:
https://files.harrisvotes.com/harrisvotes/prd/docs/Training/Official Manual 2022 to 2023.pdf

### New Class Structure

The EAO training staff deployed a new class format that allowed for greater training efficiencies for the election workers. The trainers addressed broad talking points with the whole group and then separated the election workers into small breakout groups for approximately three hours, where election workers were provided hands-on instruction on equipment, set-up and forms. This structure allowed for a more engaged learning environment.

Training classes began on September 26 and ended on November 7. EAO trainers conducted a total of 74 classes. The following facilities were utilized for training:

---

[9] TEC Sec. 85.009.

OCA-APPX-1288

Tatum_005219


Barbara Jordan Community Center
Bay Area Community Center
Bayland Community Center
Big Stone Lodge
Bridgestone MUD
Chinese Community Center
Clear Lake Islamic Center
Deussen Park Community Center
East Harris County Activity Center
El Franco Lee Community Center
Felix Baldree Community Center
Houston Marriott North
Julia C Hester House Community Center
Lone Star College (CyFair)
Lone Star College (Kingwood)
Lone Star College (Tomball)
Mangum Howell Community Center
Northeast Community Center
San Jacinto College Central
San Jacinto Community Center
Steve Radack Community Center
Third Ward MultiService Center
Tom Bass Senior Center
Tomball Event Center
Tracy Gee Community Center
Trini Mendenhall Community Center
Weekley Community Center

OCA-APPX-1289

Tatum_005220



# HARRIS COUNTY ELECTIONS
## ADMINISTRATION OFFICE



Locations & Training Sessions by Commissioner's Precinct





Training classes were held Sunday through Saturday and scheduled morning, afternoon, and evening to accommodate workers' schedules. EAO trainers also conducted reminder training at supply pick-up the Saturday and Sunday before Election Day, where judges could ask last-minute questions and get one-on-one time with EAO instructors. Supplemental hands-on training was provided through EAO instructor support hours at four locations around Harris County.

The training included troubleshooting scenarios and situations that election workers were likely to encounter on Election Day and focused primarily on set-up and processing voters. All PJs, AJs and clerks were also provided hands-on training on the election forms.

OCA-APPX-1290

Tatum_005221



The EAO training team received multiple complimentary communications from election workers. From this correspondence emerged three main themes:

    a.  The new manual demonstrates informed changes based on feedback and research:

> "Several of my friends are also PJs and the other day we talked about the manual over coffee. We are all very impressed. Your hard work is definitely paying off, it seems as though we are closer to a smoother election process. Thank you."

> "This is the best training class I have ever attended. The new election manual is amazing! I cannot brag on the improvements enough."

    b.  The training team is effective and professional:

> "They were professional, informative and responsive to all of our questions, input and concerns. I can clearly say this was the best election training class I have ever taken with Harris County."

    c.  The training program has become more engaging and interactive:

> "Much better with delivery focused on key aspects of the process – including hands-on with the set-up, operation and tear-down of the voting equipment. Great to have witnessed the improvements to the equipment and process that address some of the feedback some of us provided over the past few elections. Good to know HC EA staff were listening and took corrective action."

> "I have to admit, I hate change. I didn't know what to expect from the new Election Admin. So far, I am impressed."

### *Proposed Improvements to Training Curriculum*

To continue improvements to the training process, the EAO will develop and deploy the following activities for future elections:

- Establish working advisory groups to provide feedback regarding training operations
- Evaluate Election Data gathered during the General Election to strengthen training and develop future voter education activities
- Implement an ***Election Worker Evaluation system***. In order to increase election worker efficiencies, the training staff will implement a training and evaluation process to evaluate each prospective election worker's capability to perform the required activities for any given election

This performance evaluation will include: (1) attending a training class specific to the worker's assigned tasks, (2) pass a written test to demonstrate sufficient knowledge to meet the standards for executing a

Tatum_005222


smooth election, and (3) successfully complete Election Day simulation exercises, demonstrating the ability to complete the tasks required for the position. If a prospective election worker is unable to meet the three requirements, he/she could be disqualified and not recommended for serving during Early Voting or Election Day.

The PJs will be required to demonstrate the ability to operate all voting equipment, including opening and closing on Election Day and the ability to complete critical election VC documents.

### IV. Early Voting Operations

Early Voting operations includes Ballot by Mail and In-person voting at EVCs. The EAO located its Early Voting operations to NRG Arena on September 1, 2022. NRG served as and EVC and as Central Count for the General Election. The EAO deployed 99 EVCs from October 24 through November 4. The 99 EVCs were strategically placed throughout the four Commissioner Court precincts to accommodate county-wide voting. As projected, a higher percentage of voters, by almost double the amount, voted early during Early Voting than on Election Day.

### A. Ballot by Mail Voting

All Mail Ballots returned by voters were delivered to the NRG Arena and were reviewed and processed by the Signature Verification Committee[10] (SVC) that convened on October 19. The SVC reviewed each returned ballot envelope (carrier envelope) to ensure the signature and voter ID provided by the voter on the carrier envelope matched the voter's profile. Once signatures were approved and ID numbers validated, the SVC authorized the carrier envelopes to be prepared for opening and the ballots were prepared for counting.

The Early Voting Ballot Board[11] (EVBB) convened on October 26 to open ballots and prepare for counting. If any ballots were placed under review status by the SVC because they could not validate a signature or the voter did not provide a matching ID number, the EVBB either accepted or rejected the ballot. If the voter provided the correct information, the EVBB would approve the ballot for counting.

As part of the process, if a voter did not provide the correct voter ID on the carrier envelope, the carrier envelope was returned to the voter for correction as required by Senate Bill 1. (These Mail Ballots are referred to as E3s.) If the Mail Ballot was received too late to return to the voter, the voter was contacted and given an opportunity to cure the Mail Ballot by coming to the Central Count location to provide the information or curing by providing their information via the Texas Secretary of State website. (These types of Mail Ballots are referred to as E7s.) If the voter did not return the carrier envelope with the correct

---

[10] Each Party appointed 25 members to the SVC.
[11] Members of the SVC served on the EVBB.

Tatum_005223


information or did not cure the Mail Ballot with the necessary information the E3s and E7s were ultimately rejected by the EVBB.

The Central Count Ballot Board[12] (Ballot Board) convened on Saturday, November 5, the day after Early Voting ended. Once the Ballot Board convened, the EAO began processing Early Voting results for reporting on Election Night.

The EAO processed over 80,000 Mail Ballot applications as reflected in the table below.

| Applications | Accepted | Rejected |
|---|---|---|
| Domestic | 78,051 | 2,778 |
| UOCAVA[13] | 3,015 | 237 |
| Total | 81,066 | 3,015 |

The EAO processed over 80,000 Mail Ballots as reflected in the table below.

| Ballot Type | Ballots Mailed/emailed | Mail Ballots Received | Voted Ballots Accepted | Voted Ballots Rejected | Ballots Counted |
|---|---|---|---|---|---|
| Domestic | 78049 | 62394 | 59759 | 2635 | 59544 |
| UOCAVA | 3015 | 1780 | 1750 | 30 | 1720 |
| Totals | 81064 | 64259* | 61509 | 2665** | 61264 |

*Includes 85 Late Ballots received but not counted.
**Includes E3 and E7 Rejects (E3-411, E7-2,118)

### 1. *Mail Ballot Problems Encountered*

The EAO contracted with Runbeck Services to mail ballots to over 80,000 voters. Based on ballot size and number of pages, Runbeck determined that it could not process the ballot insertion for the 4-page 11x17 ballot. As a result of this discovery, Runbeck and the EAO agreed to subcontract the mail ballot work out to a second vendor (K&H) to prepare and mail the ballots.

During the mail ballot period, the EAO received reports that voters were not receiving Mail Ballots and that voters were being charged extra postage because of the size of the carrier envelope. The EAO was able to utilize K&H's mail ballot tracking system to see ballots moving through the United States Postal Service (USPS) system. The EAO staff was able to provide USPS with zip code data to evaluate delivery patterns within Harris County and to identify where Mail Ballots may not have been moving through the   USPS system. The EAO spoke with USPS staff on a weekly basis about Mail Ballot delivery, return scanning, and postage cost.

---

[12] Each Political Party appointed 25 Members to the Ballot Board.
[13] The Uniformed and Overseas Citizens Absentee Voting Act (Military and Overseas Voters)

Tatum_005224

OCA-APPX-1293


**2. *Process Improvement Actions:***

- The EAO will continue conversations with the USPS to identify postal system practices that might have caused delivery problems with Mail Ballots
- The EAO will be able to forecast the ballot size specifications for future elections
- The EAO will continue Agilis and Vote-Tec system reviews to streamline carrier imaging and processing to allow for more efficient processing by the SVC

## B. In-Person Early Voting Operations

As part of Early Voting, the EAO delivers voting equipment and materials to each EVC during the week and weekend before Early Voting begins. Early Voting set-up proceeded according to plan. Ninety-Eight EVCs were set up and prepared to operate the Sunday before Early Voting began on Monday, October 24. The final location completed setting up early on Monday morning in time for the start of Early Voting.

1. ***Early Voting Center Equipment.*** Each EVC was supplied with an allocation of voting equipment based on population density and projected turnout in each Commissioner Precinct. Each location received an allotment of (1) ePollbooks (2) Controllers, (3) Duo Ballot Marking Devices (4) Scanners and (5) Duo Go.

2. ***Early Voting Center Staffing.*** EVCs were staffed with a PJ and an AJ (consisting of alternate party affiliation) and clerks were assigned in two shifts of temporary election workers. See Early Voting Staffing 1122 Attachment that identifies the number of workers assigned to each location. 1,591 EVC workers were trained and deployed to work during Early Voting. Approximately 30% of these individuals also worked on Election Day.

3. ***Early Voting Turnout.***

|  | 2018 | 2022 |
|---|---|---|
| **Early Voting Total Votes Cast** | 767,162 | 693,122 |
| **Total Registered Voters** | 2,307,654 | 2,543,162 |

4. ***Wait Time Reporter***. Election workers were instructed to submit wait times to the online wait time application. The wait times listed on the interactive map on HarrisVotes.com is intended to provide real-time wait times for each EVC.

5. ***Early Voting Equipment Operations.***

During Early Voting, EVCs experienced common problems associated with staffing, technical support, equipment operations and wait time updates.[14] The technical problems were related to Controller Not Found issues, which had a direct impact on Duos. EAO technicians were dispatched throughout the Early Voting period to address technical issues encountered and to ensure voting continued throughout the Early Voting

---

[14] These are common issues experienced in every jurisdiction throughout Texas and nationwide.

Tatum_005225


period. The EVCs also experienced paper ballot jams when the voter was feeding the blank paper into the Duo. On certain occasions, a voter's ballot would jam at the Duo and would have to be spoiled and reprinted. On certain occasions, the ballot would not scan into the scan. To resolve these types of problems, the PJs were instructed to spoil the ballot[15] and reprint the ballot if the voter had not left the Duo. If the voter had left the Duo and the ballot would not read because it was illegible, the PJ was instructed to reissue a ballot to the voter to allow the voter to cast their ballot at the VC. A voter could also deposit the unreadable ballot into the emergency slot[16], which meant the ballot would be transported to the Ballot Board to be duplicated by the Ballot Board and counted, if possible. If the ballot is re-voted by the Voter and read through the scan, then the voter is assured that the ballot was counted; if the ballot was inserted into the emergency slot in an unreadable status, the voter is not assured that the ballot will be counted.

## V. Election Day Operations and Performance

Overall, Election Day was a success with 782 VCs assigned, set-up and operational. Over 1 million voters turning out to vote for the entire election. The EAO projected 1.2 million voters. The EAO identified and deployed voting machines, VCs and election staff/election workers to support that projection.

1. ***Election Day Vote Center Equipment.*** Each VC was supplied with an allocation of voting equipment based on population density and projected turnout in each Commissioner Precinct. Each location received an allotment of (1) ePollbooks (2) Controllers (3) Duo Ballot Marking Devices (4) Scan and (5) Duo Go.

2. ***Election Day Vote Center Staffing.*** The EAO's office successfully trained and assigned a PJ and AJ to all 782 Election Day VCs. The nomination and appointment process is similar to the process described in early voting staffing, except that Election Day assignments are governed by TEC Section 32.002. The PJs and AJs are nominated by the Political Party Chairs and submitted to the Commissioners' Court for approval/appointment. The PJs and AJs were assigned according to Party designations until an emergency appointment period, which then allowed the EAO to assign PJs on a first available basis to cover any gaps in appointment. Despite the emergency appointment period, the EAO staff continued to coordinate with the parties to indicate where the parties would like their PJs to serve within a VC. The EAO encouraged the Parties to submit more names than they initially submitted because, nominated Judges were unable or not willing to work on Election Day. Once the EAO exhausted the names of the Party nominees, EAO staff began placing judges on a first available basis to ensure all locations were staffed.

   Overall, the EAO trained over 6,024 judges and clerks and deployed 5,498 – that is 91.3% who showed up to work.

---

[15] A ballot is spoiled when it is damaged by the printer, re-voted by the voter or unreadable by the Scan because of illegibility.
[16] A depository for unreadable ballots.

Tatum_005205


3. *Election Day Voter Turnout*.

|  | 2018 | 2022 |
|---|---|---|
| **Election Day Total Votes Cast** | 354,000 | 349,045 |
| **Total Registered Voters** | 2,307,654 | 2,543,162 |

4. *Wait Time Reporter*. During Election Day, students are dispatched to each VC as Electronic Support Specialists (ESS). Their primary function is to monitor the wait times and provide periodic updates of the quantity of people in line. This process provides real time wait times for each VC.

## A. Facilities and Vote Center Opening

As part of the Election Day set up process for Election Day delivery, the EAO delivers voting equipment and materials to each VC the week and weekend before Election Day. The November 8, Monday setup for Election Day voting did not proceed according to plan for 170 VCs because of the celebratory World Series Parade. Several ISD's gave their staff the Monday off to participate in the parade. As a result, the PJs at those locations had to reschedule set up for Monday evening/night as opposed to Monday morning and for some locations set up occurred on Tuesday morning. This resulted in reports from several election judges that they were delayed in opening at 7:00am due to limited time to setup on Election Day.

## B. Election Day Support

1. *Election Help Desk*. The EAO operates a 50 person Help Desk "Call Center" to receive calls from election workers regarding any manner of support. The Help Desk contacts tech rovers and area representatives when an issue could not be resolved over the phone. The Help Desk included members of the election worker training team, temporary election workers, technical experts and other EAO staff.

As in past elections, the EAO contracted with a vendor to provide technical support to all Election Day VCs.

2. *Technical Support*. The EAO deployed 160 election technicians (Tier 1) to support PJs on Election Day. This created an average of 1 technician to every 5 Vote Center locations. The 5 locations were mapped within a minimal (5-10 mile radius) geographical region to maximize travel time from one VC to the next. The technicians were directed to travel from one VC to the next on a scheduled basis to check-in with the PJ to ensure everything was working properly and to provide the VC with whatever support was needed, including paper supplies.

If a technician encountered a voting system issue that they could not resolve, the issue was escalated to a Tier 2 technician with a greater skill level to resolve the most complex problems. If a component could not be repaired, it would be replaced by the Tier 2 technician.

OCA-APPX-1296

Tatum_005227



The EAO Help Desk received over 1,600 logged calls for VC support related to staffing, equipment support, procedural questions, supplies, and paper ballots.

Of the 1,600 calls, 368 calls, (23%) related to ePollbooks, the Duos, Duo-Gos, Controllers and Scans. 128 calls (8%) related to supplies and ballot paper, and 143 (9%) related to election worker procedural questions.

The EAO staff takes all support ticket calls very seriously regardless of the nature of the call and endeavors to remedy the situation either by telephone support or dispatching a technician to support on site. During the election and after the election we review all support logs from the VCs and look for trends. Once we identify an issue that is occurring at multiple locations or across the County, we discuss with the vendor and identify ways to resolve or correct an issue in real time, if possible or to identify if the matter requires a long-term solution.

3. ***Election Day Challenges***. The Common problems reported and encountered on Election Day included VCs not opening on time, technical problems associated with the Controller Not Found, Duo paper ballot jams, ePollbook wait time updates, paper ballot supply at several locations and staffing.

EAO technicians were dispatched throughout Election Day to respond to the support tickets which included assisting PJs in opening VCs, replacing voting equipment, rebooting Controllers, resetting Duo voting equipment, resetting ePollbooks, delivering ballot paper and other supplies.

a. ***VC delayed in Opening.*** There were several VCs that did not open on time due various reasons: (1) PJs Captains Box not delivered which contained the keys to the voting equipment (2 hr. delay), (2) PJ closed the election on the Controller before voting began (1 hr. delay), (3) Election workers quitting or not showing up to work, (4) PJs not able to access the facility at 6:00am (30 min delay).

b. ***Ballot Paper Supply.*** The EAO received reports that several VCs needed ballot paper delivery during the day. An initial media report indicated that at least 20 VCs ran out of paper.

c. ***ePollbook wait time updates***. During the early part of Election Day, the ePollbook AWS server lost replication which prevented the wait time tool from updating the website, prevented the supply team from seeing real-time check in and disabled the sample ballot look up feature. This had a direct impact on the ability to see how many voters were being checked-in and what the wait times were at any VC. The vendor was able to reestablish replication, which brought the wait time tool and sample ballot back on line and allowed supply to reengage communications at the VCs.

During the post-election assessment, EAO staff reviewed call logs and support tickets to gain an understanding of what occurred on Election Day. The EAO's recruiting and training staff conducted a calling assessment to all PJs and AJs. Although EOA staff was able to speak to most of the PJs and AJs,

OCA-APPX-1297


many of them provided confusing answers and some declined to speak after reportedly being advised not to do so by the Harris County Republican Party.

The EAO's call logs reflect that the Help Desk received calls from 46 VCs (5.9%) requesting additional paper on Election Day. This does not indicate that these VCs ran out of paper and had turn voters away as a result - only that they required additional paper at some point on Election Day.

The EAO's analysis from the PJ and AJ calls is largely inconclusive due to the fact that several of the PJs and AJs from the same VCs gave conflicting reports on whether the VC actually ran out of paper, and that many responses did not explain whether the VCs had to turn voters away. According to PJ calls, several VCs (68) reported running out of their initial allotment of paper, although most of them (61) received additional deliveries, according to their respective PJs. In addition, 22 AJs for these 68 VCs gave conflicting reports, stating that they did not run out of paper at all. 64 AJs reported that they ran out of their initial allotment of paper, and 58 of those judges reported receiving paper deliveries. Again, 20 of the PJs for the same VCs reported that they did not run out of paper at all.

Our investigation has not yet revealed how many of these VCs had to turn voters away due to a paper shortage. Media reports claimed that a total of 24 VCs (3.1%) ran out of paper and had to turn voters away. However, the judges at the VCs indicated that they did receive supplemental paper deliveries, and two of these PJs from these VCs reported they did not run out of paper at all.

Other supplies such as SORs, signs, and provisional ballot envelopes were also delivered throughout the day.

**Overall, while the initial media reports suggested a problem more extensive than what the EAO has been able to confirm, the EAO will continue reviewing the processes and will implement systems to ensure this type of challenge is never encountered in the future.**

### *Poll Closing Analysis*

#### *Extended Polling Hours*

At 6:00pm on Election Night, the Central Count Tabulation Supervisor was preparing to release Early Voting and Ballot by Mail tabulation results at 7:00pm when a Court Order was entered that required all polling locations to extend operating hours until 8:00pm. Shortly after the Order, EAO staff contacted all locations through the following methods:

- The messaging Console via the ePollbook console – The EAO advised every VC about the Order to stay open one additional hour;
- The EAO emailed every PJ and AJ with the details of the Order and instructed all judges that they would need to vote every voter who arrived after 7:00pm with a Provisional Ballot;
- The EAO staff called as many judges as they could reach within the limited time, for a total of 445 calls made; and

OCA-APPX-1298

Tatum_005229


- The EAO dispatched staff to deliver provisional balloting materials, SORs and additional ballot paper.

This extension heavily burdened the PJs, AJs, clerks, and EAO staff. As a result of the Order, all voters who entered the line after 7:00pm were required to vote a Provisional Ballot. These Provisional Ballots are referred to as "extended hours" provisional ballots or "#5s". The Order extending hours was later suspended by the Texas Supreme Court, although that Texas Supreme Court Order came after 8:00pm and thus only prevented voters who were in line at that time, but had not yet voted from casting a ballot.

The #5 Provisional Ballots were segregated from the regular Provisional Ballots and per order of the Texas Supreme Court were counted in a segregated manner and their totals were added in during the final Canvas. The Canvas includes a separate report of "extended hours" Provisional Ballots that were cast and counted as a result of the extended voting hours as ordered by the Texas Supreme Court.

### *Election Night Vote Center Election Returns*

The EAO deployed its election returns County driver program for the General Election. As part of the program, the EA advised all PJs that it was their responsibility to deliver the VC election returns to Central Count. The EAO offered a County driver to any PJ that did not want to drive their election returns into Central Count. The PJs were not required to accept a driver, however, they had to notify the EAO staff prior to Election Day, so that staff could ensure the election returns would be timely received at Central Count. The Harris County Republican Party advised that all of their PJs would not participate in the County driver program and would deliver their respective election returns to Central Count, although several of their PJs requested and received a driver.

The EAO staff recruited law enforcement, county employees, PJs, AJs and clerks to deliver election returns to Central Count on Election night. As a result of planning and recruiting, 430 judges delivered their election returns to NRG, and the remainder were transported by the County driving program.

Central Count received the first Election Day returns from the VCs at 8:45pm on election night. The last election returns were received at 3:30am. Eighty-one VCs did not return all the items, i.e., the hard-shell ballot boxes (all ballot bags were returned) and a few different election forms. The EAO deployed Hotshot drivers out the next day to retrieve the items that were left in the equipment cart at the various VCs or in the room with the equipment cart.

## VI. *Election Night Tabulation and Post-Election Activities*

The EAO's goals on election night was to count votes accurately and quickly, and to publish the unofficial preliminary election results in a clear, accurate, and timely manner throughout the tabulation process.

The EAO established the following processes for communicating with the public and the media: (1) it operated a media observation section to allow all reporters to observe the election night tabulation process (2) it provided hard copies of each summary report to the media and any Poll watcher waiting to see the results (3) it displayed the election results on the website using an election night reporting tool and (4) its

Tatum_005230



Public Information Officer and the Administrator interacted with the media throughout the tabulation process.

*Preliminary Reconciliation Form*

At the completion of tabulating Election Day returns, the Ballot Board and the EAO published the 1st Preliminary Election Reconciliation – Unofficial Totals form (dated 11/10/22), which provides a snap-shot of election records at the end of election night. This is an early unofficial report of the number of voters and the number of ballots tallied for the November 8, election. However, this report is not an accurate reflection of voter turnout and ballots counted because it does not include information related to the number of ballots the Board is still processing related to emergency slot ballots, timely received Mail Ballots in the possession of the Ballot Board, Mail Ballots that are still in the USPS system that are postmarked on Election Day and that can arrive by 5:00pm the next day.[17] Additionally, the Preliminary Election Reconciliation form does not take into account the number of Limited Ballot Voters, a complete reconciliation of the voters who checked in on the ePollbook system, the list of omitted voters, and a complete reconciliation of Mail Ballots received, accepted and rejected.

The day after election night, EAO staff and the Central Count Ballot Board continued processing election returns, including Provisional Ballots, Mail Ballots[18] and emergency slot ballots that were received on Election Day. At the end of the 24-hour tabulation period, the EAO sought an extension of the 24-hour tabulation period in order to process the remaining Mail Ballots that were received on Election Day. The District Court issued an Order to extend the 24-hour period for a day. The Ballot Board completed processing the mail ballots the next day.

*Election Reconciliation – Official Totals Form*

The Ballot Board and Voter Registrar continued processing Provisional Ballots until November 18[19], after which the Ballot Board and the EAO published the second reconciliation form dated November 18, 2022 - Election Reconciliation Form - Official Totals. Again, this is a snapshot in time of the reconciliation process; the complete Canvass is required to be submit to the Secretary of State no later than November 22, 2022[20]. Section 6 of the November 18 Reconciliation Form included miscalculations between the number of Mail Ballots mailed out compared to the number of ballots counted in Section 3, Box K.

After the Ballot Board completed its activities on November 18, 2022, the EAO recognized the error, but did not try to reconvene the Ballot Board because the complete canvass would be submitted to the Secretary of State by November 22, 2022.

The EAO has communicated Election results to the Secretary of State in the Harris County Canvass Reconciliation Comparison Report. The EAO does not believe the Reconciliation Form as designed

---

[17] TEC Sec. 86.007
[18] TEC Sec 86.007
[19] TEC 65.051
[20] TEC Sec. 67.001

Tatum_005231

OCA-APPX-1300



provides an accurate accounting of voters, ballots and vote tallies because it is not designed to account for all the various counting processes that occur during the Canvass. As an example, the ballot totals do not include Orphan ballots. (An Orphan Ballot is a Mail Ballot that is returned in a voter's Mail Ballot envelope that is missing the 1st page.) In some instances, spouses or voters in the same household mix up their ballot pages, thus creating orphan pages that are counted separately. The Ballot Board counts the votes, but these ballot pages are not reflected in the ballot counted column. Additionally, voters who mail their Mail Ballot carrier envelope back without a ballot inside get credit for voting, but there is no ballot to count, thus the voter to ballot count does not match. In other instances, voters leave the EVC and VC with their ballot in their possession, thus there is a voter history for the voter on the ePollbook or on the Omissions list, but no ballot to count, and voters check in at the Vote Center with no intention of casting a ballot, but simply want credit for voting.

These type of voting patterns are not captured on the Reconciliation Form, so the form very seldom reconciles to an accurate voter to ballot ratio.

After completing the Canvass, the EAO staff immediately turned to the Partial Manual Count.

### *Partial Manual Count*

After each election, the EAO is required to conduct a Partial Manual Count[21] ("PMC"), which is a hand count of designated precincts and ballot contests from the Secretary of State. The EAO must begin the PMC no later than 72 hours after Election Day and must complete the count within 21 days of its beginning. Due to Harris County's size and volume of ballots, multiple departments are required to assist in completion of the PMC.

For county wide elections, a minimum of 70 staff members are required on site. These staff members worked on multiple ballot bags in order to complete the PMC in time before the 21-day deadline. The EAO staff was unable to begin the process until Nov 14 due to Veterans Day Holiday and SOS technical difficulties. Over 80 EAO staff participated in the PMC from Nov 14- Dec 1, for 12-hrs per day, totaling approximately 168 hours each (not including the Thanksgiving holiday). The PMC was conducted over the course of 20 days. These employees spent an estimated cumulative total of 8,400 man-hours conducting the PMC.

### *VII.  Proposed EAO Actions*

Early assessments suggest that operational systems are in immediate need of upgrades or replacements. Initial discussions are focusing on:

- Communications to and from Vote Centers – there is no real time visibility within any call and response situation from the VC to EAO and no real time visibility to determine whether any solution was provided. A real time ticket and resolution system is needed to close the gap on any requests from a EVC or VC;

---

[21] TEC Sec. 127.201

OCA-APPX-1301

Tatum_005232


- Voting system set-up and operation must be scrutinized with an eye toward simplifying the set-up and operational processes to ensure early morning set-up and opening can be accomplished;
- Additional full-time personnel to manage the many moving parts of this operation is critical. One time funding is not the answer to this situation; sustained and dedicated administrative funding is imperative;
- Resources to adequately cover 782 VCs throughout 1,700 square miles of the county by temporary technical support without the tools to properly manage them is critical;
- Deploy systems and tools to improve the allocation of resources across VCs;
- Deploy voting system software upgrade that eliminates the Controller not found issue experienced by all 782 VCs;
- Review operational solutions with vendor to address paper jams on the Duo and with the Scan;
- Review AWS system solutions with ePollbook vendor to assure redundant systems to prevent system degradation on Election Day;
- Deploy tracking and communications solution to allow for VC visibility on technical issues and supplies distribution with responses to the technical tickets including those created at VCs.

As additional information becomes available, the EAC will continue to make process improvements and recommendations.

Tatum_005233

| ED Poll Code | EV Identifier | EV | CC | Location | Duos | Controllers | EV Scans | ED Scans (For EV Locations) | DuoGo | Initial Ballot Paper Packet | Adjusted Ballot Paper Packets | ED Clerk Allocation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11033 | SRD138M | EV | 3 | Holiday Inn Express & Suites Houston Memorial - City Centre | 28 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 11037 | SRD139A | EV | 1 | Acres Homes Multi Service Center | 28 | 4 | 2 | 1 | 2 | 82 | 165 | 8 |
| 11045 | SRD148F | EV | 3 | Fairfield Inn and Suites Houston NW Willowbrook | 24 | 3 | 2 | 1 | 1 | 30 | 61 | 7 |
| 11061 | SRD114C | EV | 1 | Northeast Multi-Service Center | 20 | 3 | 2 | 1 | 4 | 37 | 74 | 7 |
| 11067 | SRD148H | EV | 4 | The Grand Tuscany Hotel | 24 | 3 | 2 | 1 | 1 | 32 | 65 | 8 |
| 11091 | SRD148B | EV | 4 | Sheraton Houston Brookhollow Hotel | 24 | 3 | 2 | 1 | 1 | 28 | 56 | 8 |
| 11107 | SRD132K | EV | 4 | Katy Branch Harris County Public Library | 24 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 11122 | SRD130C | EV | 3 | Juergens Hall Community Center | 34 | 5 | 2 | 2 | 3 | 37 | 74 | 6 |
| 11123 | SRD144T | EV | 1 | NRG Arena | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 11137 | SRD132C | EV | 4 | Hockley Community Center | 26 | 4 | 2 | 1 | 1 | 19 | 38 | 7 |
| 11145 | SRD139V | EV | 1 | Lone Star College Victory Center | 20 | 3 | 2 | 1 | 1 | 62 | 124 | 8 |
| 11168 | SRD138J | EV | 3 | John Knox Presbyterian Church | 28 | 4 | 2 | 1 | 1 | 37 | 74 | 8 |
| 21013 | SRD130M | EV | 3 | Samuel Matthews Park Community Center | 28 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 21016 | SRD126M | EV | 3 | Masjid AlSalam | 28 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 21071 | SRD127V | EV | 2 | Victory Houston | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 21074 | SRD140B | EV | 2 | BakerRipley East Aldine Campus | 24 | 3 | 2 | 1 | 1 | 17 | 33 | 8 |
| 21085 | SRD140 | EV | 2 | Hardy Street Senior Citizens Center | 20 | 3 | 2 | 1 | 1 | 28 | 56 | 8 |
| 21102 | SRD141G | EV | 1 | Green House International Church | 20 | 3 | 2 | 1 | 1 | 14 | 27 | 7 |
| 21113 | SRD141L | EV | 1 | Lone Star College North Harris | 20 | 3 | 2 | 1 | 1 | 22 | 44 | 10 |
| 21131 | SRD145N | EV | 2 | Houston Community College Northline | 20 | 3 | 2 | 1 | 1 | 5 | 10 | 7 |
| 21151 | SRD140N | EV | 2 | North East Community Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 31022 | SRD143R | EV | 2 | Neighborhood Centers Inc Ripley House Campus | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 6 |
| 31024 | SRD139H | EV | 1 | HCC North Forest Campus | 20 | 3 | 2 | 1 | 1 | 30 | 60 | 8 |
| 31030 | SRD142C | EV | 1 | C. E. King 9th Grade Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 31066 | SRD128Z | EV | 3 | Crosby Branch Library | 24 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 31072 | SRD142G | EV | 1 | San Jacinto College Generation Park | 20 | 3 | 2 | 1 | 1 | 37 | 75 | 7 |
| 31082 | SRD141U | EV | 3 | Humble Civic Center | 34 | 5 | 2 | 2 | 1 | 37 | 74 | 7 |
| 31084 | SRD128V | EV | 3 | Vera Brummet May Community Center | 28 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 41001 | SRD144J | EV | 2 | John Phelps Courthouse | 20 | 3 | 2 | 1 | 1 | 31 | 63 | 7 |
| 41005 | SRD142W | EV | 1 | North Channel Branch Library | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 41016 | SRD143C | EV | 2 | Milton Lusk Activity Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 41018 | SRD143A | EV | 2 | Alvin D Baggett Community Center | 20 | 3 | 2 | 1 | 1 | 17 | 34 | 7 |
| 41030 | SRD128D | EV | 2 | J D Walker Community Center | 24 | 3 | 2 | 1 | 2 | 27 | 53 | 7 |
| 41033 | SRD142Z | EV | 2 | Martin Flukinger Community Center | 20 | 3 | 2 | 1 | 1 | 12 | 23 | 7 |
| 41041 | SRD128J | EV | 3 | San Jacinto Community Center | 28 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 41046 | SRD142A | EV | 3 | Riley Chambers Community Center | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 8 |
| 51013 | SRD144R | EV | 2 | Cleveland Ripley Neighborhood Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 51028 | SRD129U | EV | 2 | Freeman Branch Library | 32 | 5 | 2 | 2 | 2 | 37 | 74 | 7 |
| 51038 | SRD129D | EV | 2 | University of Houston Clear Lake | 24 | 3 | 2 | 1 | 2 | 37 | 74 | 7 |
| 51051 | SRD129X | EV | 2 | Forest Bend Homeowners Association Inc | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 9 |
| 51060 | SRD128F | EV | 2 | Evelyn Kennedy Civic Center | 20 | 3 | 2 | 1 | 1 | 35 | 70 | 7 |
| 51061 | SRD143B | EV | 2 | Baytown Community Center | 24 | 3 | 2 | 1 | 2 | 79 | 159 | 7 |
| 61001 | SRD129W | EV | 2 | Webster Civic Center | 24 | 3 | 2 | 1 | 2 | 37 | 74 | 8 |
| 61011 | SRD129S | EV | 2 | Harris County Scarsdale Annex | 20 | 3 | 2 | 1 | 1 | 87 | 174 | 7 |
| 61012 | SRD129E | EV | 1 | El Franco Lee Community Center | 20 | 3 | 2 | 1 | 1 | 38 | 75 | 7 |
| 61031 | SRD146C | EV | 1 | Saint Philip Neri Catholic Church | 20 | 3 | 2 | 1 | 1 | 25 | 50 | 7 |
| 61033 | SRD145H | EV | 2 | City of South Houston Municipal Court | 20 | 3 | 2 | 1 | 1 | 10 | 20 | 7 |
| 61045 | SRD131C | EV | 1 | The Collective-The Power Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 61050 | SRD131 | EV | 1 | Hiram Clarke Multi Service Center | 24 | 3 | 2 | 1 | 2 | 37 | 74 | 7 |
| 61055 | SRD131T | EV | 1 | Tom Bass Park Community Center Section Three | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 61059 | SRD146S | EV | 1 | Sunnyside Multi Service Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 7 |
| 71011 | SRD149H | EV | 4 | HCC Alief Center | 26 | 4 | 2 | 1 | 1 | 22 | 43 | 7 |
| 71013 | SRD149X | EV | 4 | Mission Bend Islamic Center | 26 | 4 | 2 | 1 | 1 | 9 | 18 | 7 |
| 71022 | SRD131R | EV | 4 | Raindrop Turkish House | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 8 |
| 71072 | SRD149B | EV | 4 | Alief ISD Administration Building | 30 | 4 | 2 | 1 | 1 | 66 | 131 | 7 |
| 71074 | SRD131P | EV | 1 | Fountain of Life Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 72079 | SRD137E | EV | 4 | Chinese Civic Center | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 8 |
| 81024 | SRD133 | EV | 4 | Nottingham Park Building | 26 | 4 | 2 | 2 | 1 | 37 | 74 | 7 |
| 81042 | SRD132F | EV | 4 | Hampton Inn and Suites Houston Katy | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 81063 | SRD149L | EV | 4 | Alief ISD Center for Talent Development | 24 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 91001 | SRD001C | EV | 2 | University of Houston-Downtown | 24 | 3 | 2 | 1 | 1 | 10 | 20 | 7 |
| 91009 | SRD147T | EV | 1 | Texas Southern University | 26 | 4 | 2 | 1 | 2 | 10 | 20 | 7 |
| 91010 | SRD147U | EV | 1 | University of Houston Student Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 8 |
| 91011 | SRD147S | EV | 1 | Wheeler Avenue Baptist Church | 20 | 3 | 2 | 1 | 1 | 4 | 8 | 8 |
| 91032 | SRD142K | EV | 1 | Kashmere MultiService Center | 20 | 3 | 2 | 1 | 1 | 44 | 87 | 7 |
| 91043 | SRD145C | EV | 2 | HCC Southeast College Building D | 20 | 3 | 2 | 1 | 1 | 47 | 95 | 8 |
| 91052 | SRD145M | EV | 2 | Moody Park Community Center | 24 | 3 | 2 | 1 | 2 | 51 | 102 | 7 |
| 91064 | SRD134I | EV | 4 | Hampton Inn and Suites Katy Freeway | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 6 |
| 91073 | SRD143K | EV | 2 | Denver Harbor Community Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 6 |
| 91093 | SRD134S | EV | 1 | John P McGovern Texas Medical Center Commons | 20 | 3 | 2 | 1 | 1 | 31 | 61 | 8 |
| 91101 | SRD147Z | EV | 1 | Shrine of the Black Madonna Cultural and Event Center | 20 | 3 | 2 | 1 | 1 | 37 | 74 | 9 |
| 91122 | SRD147E | EV | 1 | West End Multi Service Center | 20 | 3 | 2 | 1 | 1 | 20 | 39 | 7 |
| 91127 | SRD134B | EV | 4 | Girl Scouts of San Jacinto Council | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 91134 | SRD134G | EV | 4 | La Quinta Inn & Suites by Wyndham Houston Galleria Area | 26 | 4 | 2 | 1 | 1 | 37 | 74 | 7 |
| 11003 | SRD135S | EV | 4 | Steve Radack Community Center | 28 | 4 | 2 | 2 | 2 | 108 | 217 | 7 |
| 11072 | SRD138C | EV | 3 | City Jersey Village Municipal Government Center | 36 | 5 | 3 | 2 | 1 | 132 | 264 | 7 |
| 11112 | SRD130L | EV | 3 | Saint John Lutheran Church and School | 26 | 4 | 2 | 2 | 1 | 37 | 74 | 8 |
| 11125 | SRD132P | EV | 4 | John Paul Landing Environmental Education Center | 24 | 3 | 2 | 2 | 1 | 37 | 74 | 8 |
| 11134 | SRD135W | EV | 4 | Richard and Meg Weekley Community Center | 60 | 6 | 3 | 2 | 2 | 157 | 313 | 6 |
| 11158 | SRD138S | EV | 3 | Trini Mendenhall Community Center | 60 | 6 | 3 | 2 | 3 | 186 | 372 | 8 |
| 11167 | SRD130T | EV | 3 | Prairie View A&M University Northwest | 28 | 4 | 2 | 2 | 1 | 141 | 282 | 7 |
| 21009 | SRD130T | EV | 3 | Tomball Public Works Building | 60 | 6 | 3 | 2 | 1 | 37 | 74 | 7 |
| 21010 | SRD150L | EV | 3 | Lone Star College Creekside | 28 | 4 | 2 | 2 | 1 | 75 | 151 | 7 |
| 21021 | SRD150X | EV | 1 | Hosanna Lutheran Church | 20 | 3 | 2 | 2 | 1 | 37 | 74 | 7 |
| 21030 | SRD150K | EV | 3 | Klein Multipurpose Center | 36 | 5 | 3 | 2 | 2 | 102 | 205 | 7 |
| 21038 | SRD126C | EV | 3 | HCPL Barbara Bush Branch | 26 | 4 | 2 | 2 | 2 | 37 | 74 | 8 |
| 21042 | SRD150C | EV | 3 | Above and Beyond Fellowship | 30 | 4 | 2 | 2 | 1 | 86 | 173 | 7 |
| 21088 | SRD139F | EV | 1 | Fallbrook Church | 28 | 4 | 2 | 2 | 2 | 90 | 180 | 7 |
| 21119 | SRD150B | EV | 3 | Big Stone Lodge | 30 | 4 | 2 | 2 | 1 | 75 | 151 | 7 |
| 31059 | SRD127Y | EV | 3 | Kingwood Community Center | 60 | 6 | 3 | 2 | 3 | 37 | 216 | 6 |

Tatum_005234

OCA-APPX-1303

| ED Poll Code | EV Identifier | EV | CC | Location | Duos | Controllers | EV Scans | ED Scans (For EV Locations) | DuoGo | Initial Ballot Paper Packet | Adjusted Ballot Paper Packets | ED Clerk Allocation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31080 | SRD127E | EV | 3 | Holiday Inn Express & Suites Atascocita - Humble - Kingwood an IHG Hotel | 26 | 4 | 2 | 2 | 1 | 37 | 74 | 8 |
| 51017 | SRD128P | EV | 2 | East Harris County Activity Center | 30 | 4 | 2 | 2 | 2 | 161 | 321 | 8 |
| 71060 | SRD137B | EV | 4 | Bayland Park Community Center | 36 | 5 | 3 | 2 | 1 | 122 | 244 | 7 |
| 71066 | SRD134W | EV | 1 | HCC West Loop South | 20 | 3 | 2 | 2 | 1 | 37 | 74 | 7 |
| 81008 | SRD137T | EV | 4 | Tracy Gee Community Center | 30 | 4 | 2 | 2 | 2 | 37 | 74 | 7 |
| 81046 | SRD132D | EV | 4 | HCPL Maud Smith Marks Branch Library | 26 | 4 | 2 | 2 | 1 | 37 | 74 | 7 |
| 81054 | SRD133Z | EV | 3 | First Congregational Church | 26 | 4 | 2 | 2 | 1 | 37 | 74 | 6 |
| 91065 | SRD134M | EV | 1 | Metropolitan MultiService Center | 60 | 7 | 3 | 2 | 3 | 252 | 504 | 7 |
| 91109 | SRD145J | EV | 1 | SPJST Lodge Num 88 | 28 | 4 | 2 | 2 | 2 | 37 | 74 | 7 |

Tatum_005235

**Attachment 2**

**Election Day Equipment Allocations - 1122**

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12001 | ED | 4 | Iglesia Bautista Redencion | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12002 | ED | 4 | Lieder Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12003 | ED | 1 | Glorious Way Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12004 | ED | 4 | ISGH Bear Creek Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12005 | ED | 4 | To Be Determined (Autumn Creek Baptist Church) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12006 | ED | 4 | Ronnie Truitt Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12007 | ED | 4 | Katherine Tyra Branch Library | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12009 | ED | 4 | To Be Determined (Mayde Creek Junior High School) | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12010 | ED | 4 | New Westlake Volunteer Fire Department Station | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12011 | ED | 4 | Mayde Creek High School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12012 | ED | 4 | Korean Central Presbyterian Church of Houston | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12013 | ED | 4 | True Grace Bible Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12014 | ED | 4 | Metcalf Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12015 | ED | 4 | Tipps Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12016 | ED | 4 | Julia W Kahla Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12018 | ED | 3 | West Houston Church of Christ | 16 | 2 | 1 | 1 | 8 | 17 | 6 | 1667 |
| 12019 | ED | 3 | Labay Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12020 | ED | 4 | Holmsley Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12021 | ED | 3 | Christ Covenant Church | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12022 | ED | 3 | Copperfield Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12023 | ED | 3 | Owens Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12024 | ED | 3 | Birkes Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12027 | ED | 3 | Northpointe Intermediate School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12028 | ED | 3 | Wildwood Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12029 | ED | 4 | Rosehill Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12031 | ED | 4 | Canyon Pointe Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12032 | ED | 4 | To Be Determined (Encourager Church) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12034 | ED | 3 | Shadow Oaks Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12035 | ED | 1 | Independence Heights Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12036 | ED | 1 | John F Kennedy Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12037 | ED | 1 | HCC Acres Homes Campus | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12038 | ED | 1 | Josie Ruth Smith School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12039 | ED | 1 | Wesley Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12040 | ED | 1 | Highland Park Recreation Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12041 | ED | 1 | Saint Pauls Missionary Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12042 | ED | 1 | Houston Liederkranz | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12043 | ED | 2 | High School Ahead Academy | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12044 | ED | 3 | Campbell Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12046 | ED | 3 | Iglesia Trinidad Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12047 | ED | 3 | Gleason Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12048 | ED | 3 | Charles B Cook Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12049 | ED | 3 | Ramona Bang Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12050 | ED | 1 | Frazier Elementary School CFISD | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12051 | ED | 3 | To Be Determined (Willbern Elementary School) | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12052 | ED | 3 | SpringHill Suites Northwest-Cypress | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12053 | ED | 3 | Kirk Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12054 | ED | 3 | Cypress Fairbanks Funeral Home | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12055 | ED | 3 | Wortham Village Clubhouse | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12056 | ED | 3 | Barwood Home Owners Clubhouse | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12057 | ED | 3 | Thomas M Danish Elementary School | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12058 | ED | 3 | Emmott Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12059 | ED | 3 | Homewood Suites by Hilton CyFair | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12060 | ED | 3 | Matzke Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12062 | ED | 3 | Lakewood Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12064 | ED | 3 | Norchester Clubhouse | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12065 | ED | 3 | Bleyl Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12068 | ED | 1 | To be Determined (Windfern Forest Utility Building) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12069 | ED | 1 | Rolling Fork Club | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 12070 | ED | 1 | Saint Matthews Catholic Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12071 | ED | 1 | Willie B Ermel Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12073 | ED | 3 | Greater Macedonia Baptist Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12075 | ED | 3 | Lafaye Johnson Lee Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12076 | ED | 3 | Carverdale Park Community Center | 13 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 12077 | ED | 3 | Korean Christian Church of Houston | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12079 | ED | 4 | Clay Road Baptist Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12080 | ED | 4 | Hollibrook Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12081 | ED | 3 | Northbrook Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12082 | ED | 4 | Buffalo Creek Elementary School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12083 | ED | 3 | Northbrook Senior High School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12084 | ED | 3 | To Be Determined (Spring Woods High School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12085 | ED | 3 | Spring Woods Middle School | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12086 | ED | 3 | Spring Branch Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12087 | ED | 4 | Oyo Townhouse | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005236

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12088 | ED | 1 | Northwest Church of Christ | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12089 | ED | 1 | Clifton Middle School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12090 | ED | 1 | Wainwright Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12092 | ED | 2 | Hill Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12093 | ED | 2 | Armandina Farias Early Childhood Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12094 | ED | 4 | Lone Star College Cypress Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12095 | ED | 4 | To Be Determined (Cardiff Junior High) | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12096 | ED | 4 | First Christian Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12097 | ED | 4 | Hyatt Place Houston/Katy | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12099 | ED | 4 | Thornton Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12100 | ED | 4 | Harris County Annex 57 | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12101 | ED | 4 | To Be Determined (T H McDonald Junior High School) | 13 | 2 | 1 | 1 | 12 | 24 | 6 | 2400 |
| 12102 | ED | 4 | Jowell Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12103 | ED | 4 | McFee Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12104 | ED | 4 | Morton Ranch High School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12105 | ED | 4 | Sandra Bales Walker Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12106 | ED | 4 | Legacy Stadium | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12108 | ED | 4 | To Be Determined (Katy Junior High School) | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12109 | ED | 4 | Katy Civic Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12113 | ED | 3 | Spillane Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12114 | ED | 3 | Royce Black Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 12115 | ED | 3 | Saint Marys Episcopal Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12117 | ED | 3 | Hamilton Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12118 | ED | 3 | Cypress Fairbanks Exhibit Center | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12119 | ED | 3 | HCPL Northwest Library | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12120 | ED | 3 | Goodson Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12121 | ED | 3 | Sampson Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12123 | ED | 3 | Cypress Crossing Christian Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12124 | ED | 3 | Fairfield Baptist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12126 | ED | 3 | Woodie Coker Andre Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12127 | ED | 3 | Lakeland Activity Center | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12128 | ED | 4 | Berry Center of Northwest Houston | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12129 | ED | 3 | Cy Fair College Library at Lone Star | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12130 | ED | 4 | Postma Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12131 | ED | 3 | Salyards Middle School | 18 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12132 | ED | 3 | Hopper Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12133 | ED | 3 | Pope Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12135 | ED | 3 | Woodard Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12136 | ED | 3 | Ault Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12138 | ED | 1 | Harper Alternative School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12139 | ED | 1 | Candlelight Park Community Center | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12140 | ED | 1 | Oak Forest Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12142 | ED | 1 | Waltrip High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12143 | ED | 1 | B T Washington High School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12144 | ED | 1 | Lincoln Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12146 | ED | 1 | First New Hope Bible Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12148 | ED | 1 | Nitsch Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12149 | ED | 1 | Eisenhower Senior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12150 | ED | 1 | Walter and Inez Stovall EC/PK/K School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12152 | ED | 1 | G W Carver Contemporary High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12153 | ED | 1 | A B Anderson Academy | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12154 | ED | 3 | Woodview Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12155 | ED | 4 | Landrum Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12156 | ED | 4 | Treasure Forest Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12157 | ED | 4 | Housman Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12159 | ED | 4 | Freed Park Clubhouse | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12160 | ED | 3 | Valley Oaks Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12161 | ED | 3 | City of Spring Valley City Hall | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12162 | ED | 3 | World Changers Church Houston | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12166 | ED | 3 | Quality Suites Cy-Fair at Jones Road | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12169 | ED | 3 | Image Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12170 | ED | 3 | Cypress VFW Post 8905 | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12171 | ED | 3 | Francone Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12172 | ED | 3 | Chimney Hill Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12173 | ED | 3 | Fairwood Recreation Center and Pool | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12174 | ED | 4 | Deerfield Village Recreation Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12175 | ED | 3 | Lakewood United Methodist Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12176 | ED | 3 | The MET Church | 12 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 12177 | ED | 3 | Millsap Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12178 | ED | 4 | Graceview Baptist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12179 | ED | 4 | To Be Determined (Patricia E. Paetow High School) | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12180 | ED | 4 | Roberts Road Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 12181 | ED | 4 | Wayne C. Schultz Junior High School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005237

OCA-APPX-1306

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 22001 | ED | 1 | Calvary Hills Funeral Home | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22002 | ED | 3 | Ogden Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22003 | ED | 3 | Cypresswood Elementary School | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22004 | ED | 3 | Arnold Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22005 | ED | 1 | Ramada Inn | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22006 | ED | 3 | Humble ISD Collaboration Center | 14 | 2 | 1 | 1 | 6 | 12 | 6 | 1200 |
| 22007 | ED | 1 | Holiday Inn Houston Intercontinental Airport Hotel | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22008 | ED | 3 | Tomball Intermediate School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22011 | ED | 3 | Creekside Park Junior High School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22012 | ED | 3 | First Baptist Church of Tomball | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22014 | ED | 3 | Bernshausen Elementary School | 15 | 2 | 1 | 1 | 9 | 18 | 6 | 1762 |
| 22015 | ED | 3 | Kohrville Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22016 | ED | 3 | Zwink Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22017 | ED | 3 | French Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22018 | ED | 3 | Londonderry Clubhouse | 14 | 2 | 1 | 1 | 8 | 16 | 6 | 1600 |
| 22019 | ED | 3 | Northampton MUD Community Center | 14 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 22020 | ED | 3 | Klein Oak High School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22022 | ED | 1 | The R.E.A.L. Church of Houston | 12 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 22023 | ED | 1 | The Abiding Word Lutheran Church and School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22024 | ED | 1 | Helen Major Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22025 | ED | 1 | Eickenroht Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22026 | ED | 3 | Bridgestone MUD Operations & Water Education Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22027 | ED | 3 | Ehrhardt Elementary School | 16 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 22029 | ED | 3 | To Be Determined (Kleb or Mittelstadt) | 12 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 22031 | ED | 3 | Hassler Elementary School | 14 | 2 | 1 | 1 | 8 | 16 | 7 | 1600 |
| 22034 | ED | 3 | Theiss Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22035 | ED | 3 | Doerre Intermediate School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22036 | ED | 3 | Brill Elementary School | 15 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22039 | ED | 3 | Strack Intermediate School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22040 | ED | 3 | Frank Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22041 | ED | 3 | Kuehnle Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22042 | ED | 3 | Spring First Church | 12 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 22043 | ED | 3 | To Be Determined (Dove Meadows HOA Clubhouse) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22044 | ED | 3 | Spring Chateau | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22045 | ED | 3 | Roth Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22046 | ED | 3 | Haude Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 22047 | ED | 3 | Cypressdale Clubhouse | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22048 | ED | 3 | Lemm Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22049 | ED | 3 | Cypresswood Community Association Building | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22050 | ED | 2 | Burbank Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22051 | ED | 2 | Independence Hall Apartments Community Room | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22052 | ED | 2 | Herrera Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22053 | ED | 2 | Harris County Department of Education | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22054 | ED | 2 | Janowski Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22055 | ED | 2 | Sendero de la Cruz | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22056 | ED | 2 | Worsham Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22057 | ED | 2 | Westfield Volunteer Fire Station 2 | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22058 | ED | 2 | Shady Lane Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22059 | ED | 2 | Berry Elementary School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22060 | ED | 2 | Roderick Paige Elementary | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22061 | ED | 3 | Saint Timothy Lutheran Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22062 | ED | 3 | Charterwood MUD Administration Activity Building | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22063 | ED | 3 | Ulrich Intermediate School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22064 | ED | 1 | Calvert Elementary School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22066 | ED | 2 | Aldine Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22067 | ED | 2 | Little York Volunteer Fire Station 81 | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22070 | ED | 2 | Blanson CTE High School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22072 | ED | 2 | Gloria B Sammons Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22073 | ED | 2 | Iglesia Bautista Libre | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22075 | ED | 2 | 1st Baptist Church North Houston | 10 | 2 | 1 | 1 | 8 | 16 | 6 | 1600 |
| 22076 | ED | 2 | Oleson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22077 | ED | 2 | Mary Walke Stephens Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22078 | ED | 2 | Black Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22079 | ED | 2 | Evelyn Thompson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22080 | ED | 2 | Pep Mueller County Park Clubhouse | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22084 | ED | 2 | Melrose Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22086 | ED | 2 | American Legion Post No 586 | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22087 | ED | 2 | Clark Park Community Center | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22090 | ED | 1 | Spring ISD Child Nutrition and Training Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22091 | ED | 1 | Thompson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22092 | ED | 1 | Beneke Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22093 | ED | 1 | Clark Primary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22094 | ED | 1 | Kinsmen Lutheran Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

OCA-APPX-1307

Tatum_005238

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 22095 | ED | 3 | Memorial Chase Home Owners Association Clubhouse | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22098 | ED | 1 | Klenk Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22099 | ED | 1 | Northcliffe Manor Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22100 | ED | 1 | New Destiny Praise and Worship Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22101 | ED | 1 | Conley Elementary School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22103 | ED | 1 | New Light Christian Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22104 | ED | 1 | Link Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22106 | ED | 1 | Richard and Kitty Spence Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22107 | ED | 1 | Lewis Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22108 | ED | 3 | Church of Christ in Champions | 13 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 22109 | ED | 3 | Huntwick Forest Clubhouse Recreational Facility | 14 | 2 | 1 | 1 | 6 | 12 | 6 | 1200 |
| 22110 | ED | 3 | Saint Dunstans Episcopal Church Parish Hall | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22111 | ED | 1 | McDougle Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22112 | ED | 1 | Shotwell Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22114 | ED | 1 | Dekaney High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22116 | ED | 1 | Nimitz High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22117 | ED | 1 | Cooper Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22118 | ED | 3 | Ginger McNabb Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22120 | ED | 3 | To Be Determined (Northgate Crossing Elementary School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22121 | ED | 3 | Winship Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22122 | ED | 3 | Twin Creeks Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22123 | ED | 3 | To Be Determined (Mildred Jenkins Elementary School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22124 | ED | 3 | Anderson Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22127 | ED | 3 | Wells Middle School Auxiliary Gym | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22128 | ED | 1 | Comfort Inn & Suites FM1960-Champions | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22129 | ED | 3 | Carl Wunsche Senior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22130 | ED | 2 | Iglesia Bautista Caminando con Jesus | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22132 | ED | 3 | Yeager Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22134 | ED | 1 | Eiland Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22148 | ED | 2 | De Chaumes Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22149 | ED | 2 | Moreno Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22150 | ED | 1 | Plummer Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22152 | ED | 1 | Champions Community Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22153 | ED | 1 | Spring ISD Transportation Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22154 | ED | 3 | Timber Lane Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22155 | ED | 2 | ULH Event Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22156 | ED | 1 | Thompson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 22157 | ED | 1 | Adel Road Islamic Center | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32003 | ED | 3 | To Be Determined (Atascocita Branch Library) | 12 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 32004 | ED | 3 | Oaks Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32005 | ED | 3 | Pine Forest Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32006 | ED | 3 | Oak Forest Elementary School Humble ISD | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32007 | ED | 3 | Lake Houston Church of Christ | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32008 | ED | 3 | Lake Houston Church of the Nazarene | 14 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 32009 | ED | 3 | Whispering Pines Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32010 | ED | 3 | Humble Middle School | 14 | 2 | 1 | 1 | 6 | 12 | 6 | 1200 |
| 32011 | ED | 3 | Eagle Spring Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32012 | ED | 3 | Atascocita Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32013 | ED | 3 | Timbers Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32014 | ED | 2 | New Beulah E Johnson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32015 | ED | 1 | Journey of Faith UMC | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32016 | ED | 1 | Park Lakes Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 32017 | ED | 1 | The Light of the World Christian Fellowship | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32018 | ED | 3 | River Pines Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32019 | ED | 1 | Fall Creek Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32020 | ED | 1 | Sierra Meadows Apartments | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32021 | ED | 1 | Grace Church International | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32025 | ED | 1 | Beebe Tabernacle Christian Methodist Episcopal | 13 | 2 | 1 | 1 | 9 | 18 | 6 | 1757 |
| 32026 | ED | 1 | Greater New Hope Missionary Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32027 | ED | 1 | Shadydale Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32028 | ED | 1 | New Mount Carmel Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32029 | ED | 1 | Felix Cook Junior Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32031 | ED | 3 | Lakeshore Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32032 | ED | 1 | Woodcreek Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32033 | ED | 1 | Sheldon ISD Administration Building Network Operations Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32034 | ED | 1 | Deussen Park Senior Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32035 | ED | 1 | Sheldon Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32036 | ED | 2 | Royalwood Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 32037 | ED | 1 | Greater New Grove Christian Worship Center Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32038 | ED | 1 | Tabernacle of Praise Family Worship Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32039 | ED | 1 | Fonwood Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32040 | ED | 1 | North Forest High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32041 | ED | 2 | Knights of Columbus Hall Council 5077 | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005239

OCA-APPX-1308

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 32042 | ED | 1 | Greater Emmanuel Family Worship Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32043 | ED | 1 | Key Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32044 | ED | 1 | Kashmere High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32046 | ED | 1 | Lakewood Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32047 | ED | 1 | Bethany Baptist Church Fellowship Hall | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32048 | ED | 1 | Little Union Missionary Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32049 | ED | 1 | Hobart Taylor Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32051 | ED | 3 | Foster Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 32052 | ED | 3 | To Be Determined (Kingwood High School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32054 | ED | 3 | Kingwood Park High School Performing Arts Center | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32055 | ED | 3 | Good Shepherd Episcopal Church | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32056 | ED | 3 | HC Public Library Kingwood Branch | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32057 | ED | 3 | Creekwood Middle School | 16 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 32058 | ED | 3 | Hidden Hollow Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32060 | ED | 3 | Deerwood Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 32061 | ED | 3 | Willow Creek Elementary School in Humble ISD | 12 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 32062 | ED | 3 | Riverwood Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 32063 | ED | 3 | Shadow Forest Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32065 | ED | 3 | Crosby Kindergarten Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32067 | ED | 3 | Newport Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32069 | ED | 3 | To Be Determined (Lake Houston United Methodist Church) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32070 | ED | 3 | First Baptist Church Huffman Youth Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32071 | ED | 3 | West Campus Gym | 12 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 32077 | ED | 1 | Fellowship of Enlightenment Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32079 | ED | 3 | Crosby Church Afob | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32081 | ED | 3 | Kingwood Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 32083 | ED | 2 | Furr High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42003 | ED | 2 | Purple Sage Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42004 | ED | 2 | Kenneth J Tice Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42006 | ED | 2 | Judson Robinson Junior Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42007 | ED | 2 | North Shore Middle School | 10 | 2 | 1 | 1 | 8 | 16 | 6 | 1600 |
| 42008 | ED | 2 | North Shore Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42009 | ED | 2 | Green Valley Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42010 | ED | 2 | San Jacinto College Central Campus Library | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42011 | ED | 2 | Felix L Baldree Building | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42012 | ED | 2 | Cimarron Elementary School GPISD | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42013 | ED | 2 | Northshore Friends Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42014 | ED | 2 | Woodland Acres Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42015 | ED | 1 | Clinton Park Community Center | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42017 | ED | 2 | First Baptist Church of Jacinto City | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42019 | ED | 2 | Baytown Junior High | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42020 | ED | 2 | Sterling Municipal Library | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42022 | ED | 2 | Stuart Career Tech High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42023 | ED | 2 | William B. Travis Elementary | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42024 | ED | 2 | James Bowie Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42025 | ED | 2 | Cedar Bayou Junior School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42026 | ED | 2 | Ashbel Smith Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42027 | ED | 2 | De Zavala Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42028 | ED | 3 | Goose Creek Memorial High School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42029 | ED | 2 | Navarre Funeral Home | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42031 | ED | 2 | George H Gentry Junior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42035 | ED | 2 | Viola Cobb Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42036 | ED | 2 | Alice Johnson Junior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42037 | ED | 3 | L W Kolarik Education Center | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42039 | ED | 3 | Charles R Drew Elementary School | 15 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42040 | ED | 2 | Highlands Elementary School GCCISD | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42044 | ED | 3 | Comfort Suites | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 42047 | ED | 3 | Mt Rose COGIC, City of Refuge | 14 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 42048 | ED | 2 | Trinity Episcopal Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52001 | ED | 2 | Bobby Shaw Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52002 | ED | 2 | Williams Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52003 | ED | 2 | Sunset United Methodist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52004 | ED | 2 | Sam Rayburn High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52005 | ED | 2 | Bailey Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52006 | ED | 2 | Park View Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52007 | ED | 2 | Korean First Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52008 | ED | 2 | Keller Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52009 | ED | 2 | Deepwater Junior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52010 | ED | 2 | McMasters Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52011 | ED | 2 | Golden Acres Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52012 | ED | 2 | Jensen Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52014 | ED | 2 | First United Methodist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52016 | ED | 2 | Carol Teague Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005240

OCA-APPX-1309

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52018 | ED | 2 | Parkgate Community Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52019 | ED | 2 | Harvey Turner Elementary School | 10 | 2 | 1 | 1 | 9 | 18 | 6 | 1770 |
| 52020 | ED | 2 | To Be Determined (Fairmont Elementary School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52023 | ED | 2 | Gardens Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52024 | ED | 2 | Pasadena High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52025 | ED | 2 | Red Bluff Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52026 | ED | 2 | Pomeroy Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52029 | ED | 2 | City of Nassau Bay Council Chamber | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52030 | ED | 2 | Space Center Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52031 | ED | 2 | North Pointe Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52032 | ED | 2 | Brookwood Elementary School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52033 | ED | 2 | Armand Bayou Elementary School | 13 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 52034 | ED | 2 | University Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52035 | ED | 2 | CCISD Learner Support Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52036 | ED | 2 | Clear Lake City Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52037 | ED | 2 | To Be Determined (Whitcomb Elementary School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52039 | ED | 2 | J F Ward Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 52040 | ED | 2 | Hope Christian Reformed Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52041 | ED | 2 | Clear Lake Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52043 | ED | 2 | Bay Area Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 52044 | ED | 2 | G W Robinson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52045 | ED | 2 | Seabrook Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52046 | ED | 2 | Captain Inn and Suites Seabrook Kemah | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52047 | ED | 2 | City of El Lago City Hall | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52048 | ED | 2 | Clear Lake Church of the Nazarene | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52052 | ED | 2 | College Park Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 52053 | ED | 2 | Deer Park Junior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52054 | ED | 2 | Deer Park ISD Education Support Center | 10 | 2 | 1 | 1 | 8 | 16 | 6 | 1600 |
| 52055 | ED | 2 | Deer Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52056 | ED | 2 | Jimmy Burke Activity Building | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52057 | ED | 2 | Holiday Inn Express & Suites Deer Park | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52058 | ED | 2 | Heritage Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52059 | ED | 2 | Kingsdale Recreation Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52061 | ED | 2 | The Academy of Viola De Walt | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52062 | ED | 2 | Lomax Junior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52063 | ED | 2 | Rizzuto Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52064 | ED | 2 | Jennie Reid Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52065 | ED | 2 | Bayshore Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52067 | ED | 2 | Bayshore Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52069 | ED | 2 | Charlton Park Recreation Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52070 | ED | 2 | Forest Oaks Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52071 | ED | 2 | Raul Yzaguirre School for Success Tejano Center Building B | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52072 | ED | 2 | Pearl Rucker Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52073 | ED | 2 | W I Stevenson Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52074 | ED | 2 | Milstead Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52075 | ED | 2 | Freeway Manor Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52076 | ED | 2 | Freeman Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52077 | ED | 2 | Garfield Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52078 | ED | 2 | Genoa Staff Development Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52080 | ED | 2 | South Houston Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52081 | ED | 2 | Pearl Hall Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52082 | ED | 2 | Lone Star Flight Museum | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52083 | ED | 2 | Nelda Sullivan Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52084 | ED | 2 | Brookdale Clear Lake | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52085 | ED | 2 | Clear Lake Islamic Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 52086 | ED | 2 | Majid Abu Bakr | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62002 | ED | 2 | Westbrook Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62003 | ED | 2 | Clear Brook High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62004 | ED | 2 | Heritage Park Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62005 | ED | 2 | Courtyard by Marriott Houston Hobby | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62006 | ED | 2 | Beverly Hills Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62007 | ED | 2 | Rick Schneider Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62008 | ED | 2 | James DeAnda Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62009 | ED | 2 | Laura Welch Bush Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62010 | ED | 2 | Weber Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62015 | ED | 2 | Beverly Hills Intermediate School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62016 | ED | 2 | Frazier Elementary School PISD | 10 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 62017 | ED | 2 | Stuchbery Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62018 | ED | 2 | South Belt Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62019 | ED | 2 | SJC South Campus Fine Arts Center Building 15 | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 62020 | ED | 2 | Burnett Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62021 | ED | 1 | Greater New Testament Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62022 | ED | 1 | Greater Saint Matthew Church Southeast Campus | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005241

OCA-APPX-1310

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62024 | ED | 1 | Reagan Webb Mading Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62025 | ED | 1 | Kelso Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62026 | ED | 1 | Edgewood Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62027 | ED | 1 | Norris Chapel United Methodist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62029 | ED | 1 | Bastian Elementary School | 13 | 2 | 1 | 1 | 8 | 16 | 6 | 1600 |
| 62030 | ED | 1 | Codwell Elementary School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62032 | ED | 1 | Robert L Frost Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62034 | ED | 2 | Garden Villa Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62035 | ED | 2 | Daniel Ortiz Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62036 | ED | 2 | Glenbrook United Methodist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62037 | ED | 2 | Golfcrest Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62038 | ED | 2 | Seguin Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62039 | ED | 2 | Bellfort Church of Christ | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62040 | ED | 1 | Jean Hines Caldwell Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62043 | ED | 1 | Windsor Village Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62044 | ED | 1 | James Madison High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62046 | ED | 1 | Hobby Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62047 | ED | 1 | The Crossing Community Church | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 62048 | ED | 1 | Audrey H Lawson Middle School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62051 | ED | 1 | Woodson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62052 | ED | 1 | Living Faith Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62053 | ED | 1 | Cloverland Park Bessie Swindle Community Center | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62054 | ED | 1 | James H Law Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 62056 | ED | 1 | Abiding Faith United Methodist Church | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62057 | ED | 1 | Worthing High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62058 | ED | 1 | South Early College High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62060 | ED | 1 | Sunnyside Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62062 | ED | 1 | Reynolds Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 62063 | ED | 1 | Mount Moriah Missionary Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72001 | ED | 4 | Elsik Senior High school | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72003 | ED | 4 | Alief Middle School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72005 | ED | 4 | Chancellor Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72006 | ED | 4 | Martin Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72007 | ED | 4 | Notre Dame Catholic Church Parish Hall | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72008 | ED | 4 | Alexander Elementary School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72009 | ED | 4 | Mildred Rickard Landis Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72010 | ED | 4 | Hicks Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72012 | ED | 4 | Southwest Community Christian Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72015 | ED | 4 | Mahanay Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72017 | ED | 4 | Liestman Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72018 | ED | 4 | Horn Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72019 | ED | 4 | Mata Intermediate | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72020 | ED | 4 | Douglas Smith Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72021 | ED | 4 | Cummings Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72023 | ED | 1 | India House | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72024 | ED | 4 | Kate Bell Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72025 | ED | 1 | Westbury Senior High School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 72026 | ED | 1 | Greater Saint Matthew Church Southwest Campus | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72027 | ED | 1 | Platou Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72028 | ED | 1 | Willow Meadows Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72029 | ED | 1 | Red Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72030 | ED | 1 | Andy Anderson Elementary School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72031 | ED | 1 | Foerster Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72032 | ED | 1 | Bethels Place Community Empowerment Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72033 | ED | 1 | Gross Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72034 | ED | 1 | Valley West Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72035 | ED | 1 | Marian Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72036 | ED | 1 | Welch Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72037 | ED | 1 | Milne Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 72038 | ED | 1 | Riceville Mount Olive Baptist Church Multi Purpose Building | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72039 | ED | 1 | Fondren Park Community Building | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72040 | ED | 1 | Fondren Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72041 | ED | 4 | Godwin Park Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72043 | ED | 4 | Herod Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72044 | ED | 1 | Lovett Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72045 | ED | 4 | Elrod Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72046 | ED | 4 | Westbury Baptist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72047 | ED | 4 | Parker Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72049 | ED | 1 | Shearn Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72050 | ED | 1 | Bellaire Civic Center | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72051 | ED | 3 | AW Jones EC/PK/K School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72053 | ED | 4 | Sharpstown Park Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72054 | ED | 4 | Vietnamese Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005242

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 72055 | ED | 4 | Judy Bush Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72056 | ED | 4 | Ed White Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72057 | ED | 4 | Sharpstown International School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72058 | ED | 4 | Lansdale Park Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72059 | ED | 4 | Betty Roberts Best Elementary School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72062 | ED | 4 | Winford Funerals | 12 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 72063 | ED | 4 | Bonham Elementary School | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72064 | ED | 4 | Jane Long Academy Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72065 | ED | 4 | William S Sutton Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72067 | ED | 4 | Cunningham Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72068 | ED | 4 | Al Noor Society of Houston | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72070 | ED | 4 | Sylvan Rodriguez Jr Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72071 | ED | 4 | Burnett Bayland Community Center | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72073 | ED | 4 | Chinese Community Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72075 | ED | 4 | BakerRipley Gulfton Sharpstown Campus | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72076 | ED | 4 | San Mateo Episcopal Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 72077 | ED | 4 | Albright Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82001 | ED | 4 | Church on the Rock | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82002 | ED | 4 | Mission Bend United Methodist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82003 | ED | 4 | Budewig Intermediate School | 15 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82004 | ED | 4 | Rees Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82005 | ED | 4 | Holmquist Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82006 | ED | 4 | Heflin Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82007 | ED | 4 | Houston Marriott Westchase | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82010 | ED | 4 | Paul Revere Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82011 | ED | 4 | Christ the Servant Lutheran Church | 13 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 82013 | ED | 4 | HCC Alief Hayes Campus Building C | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82014 | ED | 4 | Sunset Shadows Apartments Clubhouse | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82015 | ED | 4 | Sneed Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82016 | ED | 4 | West Briar Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82017 | ED | 4 | Ray K Daily Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82018 | ED | 4 | Ashford United Methodist Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82020 | ED | 4 | Parkway Place | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82021 | ED | 4 | Country Village Clubhouse | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82022 | ED | 4 | Ashford Elementary School | 15 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82023 | ED | 4 | Shadowbriar Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82025 | ED | 4 | To Be Determined (Westchester Academy) | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82026 | ED | 4 | Econolodge West Energy Corridor | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82027 | ED | 4 | Rummel Creek Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82030 | ED | 3 | To Be Determined (Bethel Church of Houston) | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82031 | ED | 4 | Unity of Houston | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82032 | ED | 3 | T H Rogers School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82033 | ED | 4 | Briargrove Elementary School | 15 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82034 | ED | 4 | Pilgrim Academy | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82035 | ED | 4 | Briarmeadow Clubhouse | 15 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82037 | ED | 4 | Waldo Emerson Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82038 | ED | 4 | Piney Point Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82039 | ED | 4 | World Theater | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82040 | ED | 4 | Cornerstone Presbyterian Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82041 | ED | 4 | Kingsland Baptist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82044 | ED | 4 | James E Taylor High School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82047 | ED | 4 | To Be Determined (Memorial Parkway Junior High School) | 13 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 82048 | ED | 4 | Westland Baptist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82049 | ED | 3 | Spring Branch Memorial Library-HCPL | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82050 | ED | 3 | Eighth Church of Christ Scientist | 16 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82052 | ED | 3 | Crowne Plaza Houston Galleria | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82053 | ED | 3 | Spring Branch Middle School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82055 | ED | 3 | Memorial Middle School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82056 | ED | 3 | To Be Determined (Bunker Hill Elementary School) | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82057 | ED | 3 | To Be Determined (Frostwood Elementary School) | 13 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 82058 | ED | 3 | Memorial Drive Elementary School | 14 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82059 | ED | 3 | To Be Determined (Omni Houston Hotel) | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 82060 | ED | 4 | Tanglewood Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82061 | ED | 4 | Mandarin Immersion Magnet School | 12 | 2 | 1 | 1 | 3 | 6 | 2 | 600 |
| 82066 | ED | 4 | Houston Marriott West Loop by The Galleria | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82067 | ED | 4 | MAS Katy Center (Masjid Ar-Rahman) | 12 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 82068 | ED | 3 | Hunters Creek Elementary School | 14 | 2 | 1 | 1 | 6 | 12 | 6 | 1200 |
| 82069 | ED | 4 | Residence Inn by Marriott Houston Westchase on Westheimer | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82070 | ED | 4 | Element Houston Katy | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 82071 | ED |  | Wisdom High School |  |  |  |  | 3 | 6 | 6 | 600 |
| 82072 | ED | 4 | Youngblood Intermediate School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92003 | ED | 2 | Harris County Sheriff's Office | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92004 | ED | 1 | First Methodist Houston | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005243

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92006 | ED | 2 | Settegast Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92007 | ED | 1 | Baylor College of Medicine Academy at Ryan Middle School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92008 | ED | 1 | Christian Hope Baptist Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92012 | ED | 1 | Emancipation Park | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92013 | ED | 1 | Trinity Episcopal Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92014 | ED | 1 | Cuney Homes Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92015 | ED | 1 | Saint Luke the Evangelist Episcopal Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92016 | ED | 1 | MacGregor Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92017 | ED | 1 | Saint Marys Catholic Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92018 | ED | 1 | Saint James Episcopal Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92019 | ED | 1 | Judson Robinson Junior Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92020 | ED | 2 | Raul C Martinez Annex | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92021 | ED | 2 | MultiCultural Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92022 | ED | 2 | Edison Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92023 | ED | 2 | Eastwood Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92024 | ED | 2 | Tijerina Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92025 | ED | 2 | Eastwood Academy Charter High School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 92026 | ED | 2 | Mason Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92027 | ED | 2 | EB Cape Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92028 | ED | 2 | J P Henderson Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92030 | ED | 1 | Dogan Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92031 | ED | 1 | Tuffly Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92033 | ED | 1 | Ross Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92034 | ED | 1 | Harris County Annex No 36 | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92036 | ED | 1 | New Pleasant Grove Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92039 | ED | 1 | Pleasantville Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92040 | ED | 2 | DeZavala Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92041 | ED | 2 | John R Harris Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92042 | ED | 2 | Ingrando Park Recreation Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92044 | ED | 2 | Brookline Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92045 | ED | 4 | I P S P | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92046 | ED | 1 | Mount Sinai Baptist Church Family Life Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92047 | ED | 4 | Memorial Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92049 | ED | 1 | Crockett Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92050 | ED | 4 | Saint Lukes Missionary Baptist Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92051 | ED | 2 | CDA Internacional Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92053 | ED | 2 | Saint Anne de Beaupre Catholic Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92054 | ED | 2 | Saint Patrick Catholic Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92055 | ED | 2 | Montie Beach Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92056 | ED | 2 | Looscan Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92057 | ED | 1 | Proctor Plaza Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92058 | ED | 1 | Hogg Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92059 | ED | 1 | Travis Elementary School HISD | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92060 | ED | 2 | Leonel J Castillo Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92061 | ED | 2 | John Marshall Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92063 | ED | 4 | First Cumberland Presbyterian Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92064 | ED | 1 | H O A P V Community Building | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92066 | ED | 1 | African American Library | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92067 | ED | 4 | River Oaks Elementary School | 12 | 2 | 1 | 1 | 8 | 17 | 6 | 1700 |
| 92068 | ED | 2 | Mickey Leland College Preparatory Academy for Young Men | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92069 | ED | 1 | Julia C Hester House | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92070 | ED | 2 | Charles Eliot Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92071 | ED | 2 | Scroggins Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92072 | ED | 1 | Bruce Elementary School | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92074 | ED | 1 | Wheatley Senior High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92076 | ED | 1 | Courtyard by Marriott West University | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92077 | ED | 1 | Rice University-Welcome Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92078 | ED | 1 | Emanu El | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92080 | ED | 1 | West University Community Building and Senior Center | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 92081 | ED | 1 | West University Scout House | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92082 | ED | 1 | Southside Place Park Clubhouse | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92083 | ED | 1 | Pershing Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92084 | ED | 1 | The Rice School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92085 | ED | 1 | Sheltering Arms Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92087 | ED | 1 | Linkwood Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92088 | ED | 4 | To Be Determined (Lamar High School) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92090 | ED | 4 | River Oaks Recreation Center | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92091 | ED | 1 | Michael E DeBakey High School for Health Professions | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92092 | ED | 1 | Roberts Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92094 | ED | 1 | Residence Garage Underwood | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92096 | ED | 1 | Poe Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 92097 | ED | 1 | Pin Oak Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92098 | ED | 1 | Faith American Lutheran Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |

Tatum_005244

OCA-APPX-1313

# Election Day Equipment Allocations - 1122

| ED Poll Code | ED | CC | Location | Duos | Controllers | ED Scans | DuoGo | Initial Ballot Paper Packets | Adjusted Ballot Paper Packets | ED Clerk Allocation | Rough Turnout Projection |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92099 | ED | 1 | South Union Missionary Baptist Church Annex | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92100 | ED | 1 | Lora B Peck Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92103 | ED | 1 | Mount Olive Baptist Church | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 92105 | ED | 1 | Hartsfield Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92106 | ED | 1 | M E Foster Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92108 | ED | 4 | Sinclair Elementary School | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92110 | ED | 1 | Helms Community Learning Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92111 | ED | 1 | Field Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 92113 | ED | 4 | Resurrection Metropolitan Community Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92114 | ED | 1 | Love Park Community Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92115 | ED | 1 | Heights High School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92116 | ED | 1 | BUDDY'S | 13 | 2 | 1 | 1 | 3 | 6 | 7 | 600 |
| 92118 | ED | 1 | Baker Montessori School | 9 | 2 | 1 | 1 | 3 | 6 | 8 | 600 |
| 92119 | ED | 1 | Bering United Methodist Church | 13 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92120 | ED | 1 | Montrose Branch Houston Public Library | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92121 | ED | 1 | Trinity Lutheran Church Downtown | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92126 | ED | 1 | One Delta Plaza Educational Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92130 | ED | 1 | PNC Stadium | 10 | 2 | 1 | 1 | 11 | 21 | 6 | 2108 |
| 92133 | ED | 1 | Lanier Middle School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92135 | ED | 1 | Saint Andrews Presbyterian Church | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92136 | ED | 4 | Saint Anne Catholic Church | 12 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92138 | ED | 1 | Norton Memorial Temple Church of God In Christ | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92140 | ED | 1 | Toyota Center | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92141 | ED | 2 | Briscoe Elementary School | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92142 | ED | 2 | To Be Determined (Houston Federation of Teachers) | 10 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| 92143 | ED | 1 | Courtyard by Marriott Houston Heights/I-10 | 9 | 2 | 1 | 1 | 3 | 6 | 6 | 600 |
| | | | | | | | | | **Projected Voters:** | | **427163** |

Tatum_005245

# Attachment 3
## Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | EVIdentifier | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 21042 | 0482 | EV | SRD150C | Above and Beyond Fellowship | 20498 Rhodes Road | Foyer | Spring | 77388 | 3 |
| 11037 | 0327 | EV | SRD139A | Acres Homes Multi Service Center | 6719 West Montgomery Road | Auditorium | Houston | 77091 | 1 |
| 71072 | 0487 | EV | SRD149B | Alief ISD Administration Building | 4250 Cook Road | Room 750 | Houston | 77072 | 4 |
| 81063 | 0711 | EV | SRD149L | Alief ISD Center for Talent Development | 14411 Westheimer Road | Room 200B | Houston | 77082 | 4 |
| 41018 | 0081 | EV | SRD143A | Alvin D Baggett Community Center | 1302 Keene Street | Conference Room | Galena Park | 77547 | 2 |
| 21074 | 0411 | EV | SRD140B | BakerRipley East Aldine Campus | 3000 Aldine Mail Route Road | Reunion Hall | Houston | 77039 | 2 |
| 71060 | 0256 | EV | SRD137B | Bayland Park Community Center | 6400 Bissonnet Street | Auditorium | Houston | 77074 | 4 |
| 51061 | 0102 | EV | SRD143B | Baytown Community Center | 2407 Market Street | Tejas Room | Baytown | 77520 | 2 |
| 21119 | 0897 | EV | SRD150B | Big Stone Lodge | 709 Riley Fuzzel Road | Community Center | Spring | 77373 | 3 |
| 31030 | 0528 | EV | SRD142C | C. E. King 9th Grade Center | 8530 C E King Parkway | Room 307 | Houston | 77044 | 1 |
| 72079 | 0507 | EV | SRD137E | Chinese Civic Center | 5905 Sovereign Drive | Foyer | Houston | 77036 | 4 |
| 11072 | 0074 | EV | SRD138C | City Jersey Village Municipal Government Center | 16327 Lakeview Drive | Civic Center in Municipal Meeting Room | Houston | 77040-2029 | 3 |
| 61033 | 0029 | EV | SRD145H | City of South Houston Municipal Court | 1019 Dallas Street | Court Room | South Houston | 77587 | 2 |
| 51013 | 0793 | EV | SRD144R | Cleveland Ripley Neighborhood Center | 720 Fairmont Parkway | Gym | Pasadena | 77504 | 2 |
| 31066 | 0502 | EV | SRD128Z | Crosby Branch Library | 135 Hare Road | Meeting Room | Crosby | 77532 | 3 |
| 91122 | 0053 | EV | SRD147E | Damascus Missionary Baptist Church | 3122 Center Street | Fellowship Hall | Houston | 77007 | 1 |
| 91064 | 0809 | EV | SRD134I | Delmar Tusa Sports Complex | 2020 Mangum Road Enter West 18th Street Entrance 2 | | Houston | 77092 | 1 |
| 91073 | 0062 | EV | SRD143K | Denver Harbor Community Center | 6402 Market Street | Atrium Area | Houston | 77020-6840 | 2 |
| 51017 | 0352 | EV | SRD128P | East Harris County Activity Center | 7340 Spencer Highway | Big Room | Pasadena | 77505 | 2 |
| 61012 | 0774 | EV | SRD129E | El Franco Lee Community Center | 9500 Hall Road | Auditorium | Houston | 77089 | 1 |
| 51060 | 0561 | EV | SRD128F | Evelyn Kennedy Civic Center | 618 San Jacinto Street | Scout Room | La Porte | 77571 | 2 |
| 11045 | 0597 | EV | SRD148F | Fairfield Inn and Suites Houston NW Willowbrook | 10825 North Gessner | Fairfield Ranch Meeting room | Houston | 77064 | 3 |
| 21088 | 0660 | EV | SRD139F | Fallbrook Church | 12512 Walters Road | Brooks Sports Gym | Houston | 77014 | 1 |
| 81054 | 0213 | EV | SRD133Z | First Congregational Church | 10840 Beinhorn Road | Assembly Room | Houston | 77024-3098 | 3 |
| 51051 | 0378 | EV | SRD129X | Forest Bend Homeowners Association Inc | 4300 Laura Leigh Drive | Meeting Room | Friendswood | 77546 | 2 |
| 71074 | 0337 | EV | SRD131P | Fountain of Life Center | 14083 South Main Street | Assembly Room | Houston | 77035 | 1 |
| 51028 | 0941 | EV | SRD129U | Freeman Branch Library | 16616 Diana Lane | Meeting Room | Houston | 77062 | 2 |
| 91127 | 0937 | EV | SRD134B | Girl Scouts of San Jacinto Council | 3000 Southwest Freeway | Program Place for Girls Performance Area | Houston | 77098 | 4 |
| 21102 | 0358 | EV | SRD141G | Green House International Church | 200 West Greens Road | Community Room | Houston | 77067 | 1 |
| 81042 | 1112 | EV | SRD132F | Hampton Inn and Suites Houston Katy | 22055 Katy Freeway | Empire Room | Katy | 77450 | 4 |
| 21085 | 0321 | EV | SRD140 | Hardy Street Senior Citizens Center | 11901 West Hardy Road | Auditorium | Houston | 77076-1220 | 2 |
| 61011 | 0996 | EV | SRD129S | Harris County Scarsdale Annex | 10851 Scarsdale Boulevard | Room D-110 | Houston | 77089 | 2 |
| 71011 | 1037 | EV | SRD149H | HCC Alief Center | 13803 Bissonnet Street | Auditorium Room 157 | Houston | 77083 | 4 |
| 31024 | 0454 | EV | SRD139H | HCC North Forest Campus | 6010 Little York Road | Community Room | Houston | 77016 | 1 |
| 91043 | 0154 | EV | SRD145C | HCC Southeast College Building D | 6815 Rustic Street | Room 108 | Houston | 77087 | 2 |
| 71066 | 0570 | EV | SRD134W | HCC West Loop South | 5601 West Loop South | C108 A & B | Houston | 77081 | 1 |
| 21038 | 0631 | EV | SRD126C | HCPL Barbara Bush Branch | 6817 Cypresswood Drive | Elliot Room | Spring | 77379-7705 | 3 |
| 81046 | 0619 | EV | SRD132D | HCPL Maud Smith Marks Branch Library | 1815 Westgreen Boulevard | Meeting Room | Katy | 77450-5370 | 4 |
| 61050 | 0319 | EV | SRD131 | Hiram Clarke Multi Service Center | 3810 West Fuqua Street | Auditorium | Houston | 77045-6402 | 1 |
| 11137 | 0121 | EV | SRD132C | Hockley Community Center | 28515 Old Washington Road | Room ABC | Hockley | 77447 | 4 |
| 31080 | 0674 | EV | SRD127E | Holiday Inn Express & Suites Atascocita | 5619 FM 1960 East | Meeting Room | Humble | 77346 | 3 |
| 11033 | 0056 | EV | SRD138M | Holiday Inn Express & Suites Houston Memorial - City Centre | 10500 Katy Freeway | City Centre Room | Houston | 77043 | 3 |
| 21021 | 1061 | EV | SRD150X | Hosanna Lutheran Church | 16526 Ella Boulevard | Fellowship Hall | Houston | 77090 | 1 |
| 21131 | 0153 | EV | SRD145N | Houston Community College Northline | 8001 Fulton Street | Room 115 | Houston | 77022 | 2 |
| 31082 | 0108 | EV | SRD141U | Humble Civic Center | 8233 Will Clayton Parkway | Meeting Rooms 1 - 4 | Humble | 77338 | 3 |
| 41030 | 0250 | EV | SRD128D | J D Walker Community Center | 7613 Wade Road | Large MultiPurpose Room | Baytown | 77521-8338 | 2 |
| 11168 | 0407 | EV | SRD138J | John Knox Presbyterian Church | 2525 Gessner Road | Fellowship Hall | Houston | 77080 | 3 |
| 91093 | 0540 | EV | SRD134S | John P McGovern Texas Medical Center Commons | 6550 Bertner Avenue | 1st Floor | Houston | 77030 | 1 |
| 11125 | 0624 | EV | SRD132P | John Paul Landing Environmental Education Center | 9950 Katy Hockley Road | Great Room #101 | Cypress | 77433 | 4 |
| 41001 | 0527 | EV | SRD144J | John Phelps Courthouse | 101 South Richey Street | Training Room | Pasadena | 77506 | 2 |
| 11122 | 0734 | EV | SRD130C | Juergens Hall Community Center | 26026 Hempstead Highway | Dance Hall | Cypress | 77429-7321 | 3 |
| 91032 | 0042 | EV | SRD142K | Kashmere MultiService Center | 4802 Lockwood Drive | Conference Room | Houston | 77026-2941 | 1 |
| 11107 | 1086 | EV | SRD132K | Katy Branch Harris County Public Library | 5414 Franz Road | Meeting Room | Katy | 77493-1717 | 4 |
| 31059 | 0459 | EV | SRD127V | Kingwood Community Center | 4102 Rustic Woods Drive | Auditorium B | Kingwood | 77345-1350 | 3 |
| 21030 | 0876 | EV | SRD150K | Klein Multipurpose Center | 7500 FM 2920 | Rooms 402 | Spring | 77379-2204 | 3 |
| 91134 | 0434 | EV | SRD134G | La Quinta Inn & Suites by Wyndham Houston Galleria Area | 1625 West Loop South | Large Meeting Room | Houston | 77027 | 4 |

Tatum_005246

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | EVIdentifier | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 21010 | 1145 | EV | SRD150L | Lone Star College Creekside | 8747 West New Harmony Trail | Room 116 | Tomball | 77375 | 3 |
| 21113 | 0657 | EV | SRD141L | Lone Star College North Harris | 2700 WW Thorne Drive | Career and Skilled Trades Technology Center, Rooms 101/103 | Houston | 77073 | 1 |
| 11145 | 0848 | EV | SRD139V | Lone Star College Victory Center | 4141 Victory Drive | Room 102 | Houston | 77088 | 1 |
| 41033 | 0141 | EV | SRD142Z | Martin Flukinger Community Center | 16003 Lorenzo Street | Large Assembly Room | Channelview | 77530 | 2 |
| 21028 | 0082 | EV | SRD126M | Masjid AlSalam | 16700 Old Louetta Road | Gym | Spring | 77379 | 3 |
| 91065 | 0200 | EV | SRD134M | Metropolitan MultiService Center | 1475 West Gray Street | Gym | Houston | 77019-4926 | 1 |
| 41016 | 0229 | EV | SRD143C | Milton Lusk Activity Center | 1022 Mercury Drive | Meeting Room | Houston | 77029 | 2 |
| 71013 | 0647 | EV | SRD149X | Mission Bend Islamic Center | 6233 Tres Lagunas | Meeting Room | Houston | 77083 | 4 |
| 91052 | 0206 | EV | SRD145M | Moody Park Community Center | 3725 Fulton Street | Main MultiPurpose Room | Houston | 77009 | 2 |
| 31022 | 0010 | EV | SRD143R | Neighborhood Centers Inc Ripley House Campus | 4410 Navigation Boulevard | Gym | Houston | 77011-1036 | 2 |
| 41005 | 0460 | EV | SRD142W | North Channel Branch Library | 15741 Wallisville Road | Meeting Room | Houston | 77049-4607 | 1 |
| 21151 | 1070 | EV | SRD140N | North East Community Center | 10918 Bently Street | Meeting Room | Houston | 77093 | 2 |
| 11061 | 0611 | EV | SRD141C | Northeast Multi-Service Center | 9720 Spaulding Street | Auditorium | Houston | 77016 | 1 |
| 81024 | 0483 | EV | SRD133 | Nottingham Park Building | 926 Country Place Drive | Meeting Room | Houston | 77079 | 4 |
| 11123 | 0223 | EV | SRD146T | NRG Arena | 1 NRG Parkway | Hall D Gate 9 | Houston | 77054 | 1 |
| 11167 | 1097 | EV | SRD126P | Prairie View A&M University Northwest | 9449 Grant Road | Room 107 | Houston | 77070 | 3 |
| 71022 | 0462 | EV | SRD131R | Raindrop Turkish House | 9301 West Bellfort Boulevard | Turkistan Room | Houston | 77031 | 4 |
| 11134 | 0790 | EV | SRD135W | Richard and Meg Weekley Community Center | 8440 Greenhouse Road | Room 200 | Cypress | 77433-5135 | 4 |
| 41046 | 0251 | EV | SRD142A | Riley Chambers Community Center | 808 1/2 Magnolia Avenue | Large Assembly Room | Crosby | 77532 | 3 |
| 11112 | 300 | EV | SRD130L | Saint John Lutheran Church and School | 15235 Spring Cypress Road | Chapel | Cypress | 77429 | 3 |
| 61031 | 0132 | EV | SRD146C | Saint Philip Neri Catholic Church | 10960 Martin Luther King Boulevard | Hospitality Room | Houston | 77048-1896 | 1 |
| 21013 | 0529 | EV | SRD130M | Samuel Matthews Park Community Center | 1728 Hufsmith Road | Room A | Tomball | 77375-4918 | 3 |
| 31072 | 0096 | EV | SRD142G | San Jacinto College Generation Park | 13455 Lockwood Road | Room G-2.125 | Houston | 77044 | 1 |
| 41041 | 0063 | EV | SRD128J | San Jacinto Community Center | 604 Highland Woods Drive | Art Room and Small Assembly Room | Highlands | 77562-4546 | 3 |
| 11091 | 0323 | EV | SRD148B | Sheraton Houston Brookhollow Hotel | 3000 North Loop West Freeway | Jasmine I & II | Houston | 77092-8810 | 4 |
| 91101 | 0235 | EV | SRD147Z | Shrine of the Black Madonna Cultural and Event Center | 5309 Martin Luther King Boulevard | The Red Room | Houston | 77021 | 1 |
| 91109 | 0054 | EV | SRD145J | SPJST Lodge Num 88 | 1435 Beall Street | Annex in back of main building | Houston | 77008-3441 | 1 |
| 11003 | 0804 | EV | SRD135S | Steve Radack Community Center | 18650 Clay Road | Conference Room | Houston | 77084 | 4 |
| 61059 | 0158 | EV | SRD146S | Sunnyside Multi Service Center | 9314 Cullen Boulevard | Classroom 186 | Houston | 77051 | 1 |
| 91009 | 0085 | EV | SRD147T | Texas Southern University Terry Library | 3100 Cleburne Street | Terry Library | Houston | 77004 | 1 |
| 61045 | 0458 | EV | SRD131C | The Collective-The Power Center | 12401 South Post Oak Road | Green Room | Houston | 77045-2020 | 1 |
| 11067 | 0966 | EV | SRD148H | The Grand Tuscany Hotel | 12801 Northwest Freeway | The Plaza | Houston | 77040 | 4 |
| 61055 | 0630 | EV | SRD131T | Tom Bass Park Community Center Section Three | 15108 Cullen Boulevard | Auditorium | Houston | 77047-6714 | 1 |
| 21009 | 0127 | EV | SRD130T | Tomball Public Works Building | 501B James Street | Training Room | Tomball | 77375 | 3 |
| 81008 | 0566 | EV | SRD137T | Tracy Gee Community Center | 3599 Westcenter Drive | Art Rooms 1 & 2 | Houston | 77042 | 4 |
| 11158 | 0707 | EV | SRD138S | Trini Mendenhall Community Center | 1414 Wirt Road | Auditorium | Houston | 77055-4917 | 3 |
| 51038 | 0391 | EV | SRD129D | University of Houston Clear Lake | 2700 Bay Area Boulevard | UH Clear Lake Bayou Building | Houston | 77058 | 2 |
| 91010 | 0389 | EV | SRD147U | University of Houston Student Center | 4455 University Drive | Room 214 Space City | Houston | 77004 | 1 |
| 91001 | 0369 | EV | SRD001C | University of Houston-Downtown | 201 Girard Street | GSB 307, Milam & Travis Rooms | Houston | 77002 | 2 |
| 31084 | 0700 | EV | SRD128V | Vera Brummet May Community Center | 2100 Wolf Road | Room 118 | Huffman | 77336 | 3 |
| 21071 | 0595 | EV | SRD127V | Victory Houston | 809 West Road | Event Center | Houston | 77038 | 2 |
| 61001 | 0750 | EV | SRD129W | Webster Civic Center | 311 Pennsylvania Avenue | Civic Center | Webster | 77598-5230 | 2 |
| 91011 | 0390 | EV | SRD147S | Wheeler Avenue Baptist Church | 3826 Wheeler Avenue Building D | Fellowship Hall | Houston | 77004-2604 | 1 |

Tatum_005247

OCA-APPX-1316

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 22075 | 0792 | | D | 1st Baptist Church North Houston | 4422 Lauder Road | Gym | Houston | 77039-3599 | 2 |
| 12153 | 0169 | | D | A B Anderson Academy | 7401 Wheatley Street | Hallway | Houston | 77088-7845 | 1 |
| 12005 | 0898 | | D | A Soirée Event Venue | 18174 River Sage Drive | Ballroom | Houston | 77084 | 4 |
| 62056 | 0867 | | D | Abiding Faith United Methodist Church | 14300 Almeda School Road | Fellowship Hall | Houston | 77047-7102 | 1 |
| 21042 | 0482 | EV | R | Above and Beyond Fellowship | 20498 Rhodes Road | Foyer | Spring | 77388 | 3 |
| 11037 | 0327 | EV | D | Acres Homes MultiService Center | 6719 West Montgomery Road | Auditorium | Houston | 77091 | 1 |
| 92066 | 0030 | | D | African American Library | 1300 Victor Street | Exhibit Hall | Houston | 77019-5534 | 1 |
| 72068 | 0431 | | D | Al Noor Society of Houston | 6443 Prestwood Drive | Prayer Room/Classroom | Houston | 77081 | 4 |
| 72077 | 0646 | | D | Albright Middle School | 6315 Winkleman Road | Gym II | Houston | 77083 | 4 |
| 22066 | 0936 | | D | Aldine Middle School | 14908 Aldine Westfield Road | Auditorium | Houston | 77032-3097 | 2 |
| 72008 | 0338 | | D | Alexander Elementary School | 8500 Brookwulf Drive | Gym | Houston | 77072-3837 | 4 |
| 42036 | 0381 | | D | Alice Johnson Junior High School | 15500 Proctor Street | Boys Gym | Channelview | 77530-2697 | 2 |
| 71072 | 0487 | EV | D | Alief ISD Administration Building | 4250 Cook Road | Room 750 | Houston | 77072 | 4 |
| 81063 | 0711 | EV | D | Alief ISD Center for Talent Development | 14411 Westheimer Road | Room 200B | Houston | 77082 | 4 |
| 72003 | 0487 | | D | Alief Middle School | 4415 Cook Road | Cafeteria | Houston | 77072-1104 | 4 |
| 41018 | 0081 | EV | D | Alvin D Baggett Community Center | 1302 Keene Street | Conference Room | Galena Park | 77547 | 2 |
| 22086 | 0261 | | D | American Legion Post No 586 | 708 East Parker Road | Stage | Houston | 77076-3413 | 2 |
| 22124 | 0586 | | R | Anderson Elementary School | 6218 Lynngate Drive | Gym | Spring | 77373-7356 | 3 |
| 72030 | 0293 | | D | Andy Anderson Elementary School | 5727 Ludington Drive | Annex | Houston | 77035-4305 | 1 |
| 52033 | 0092 | | R | Armand Bayou Elementary School | 16000 Hickory Knoll Drive | Gym | Houston | 77059-5299 | 2 |
| 12093 | 0787 | | R | Armandina Farias Early Childhood Center | 515 East Rittenhouse Street | Cafeteria | Houston | 77076 | 2 |
| 22004 | 0481 | | R | Arnold Middle School | 11111 Telge Road | Cafeteria | Cypress | 77429 | 3 |
| 52020 | 1095 | | R | Asbury United Methodist Church | 5354 Space Center Boulevard | Sanctuary | Pasadena | 77505 | 2 |
| 42026 | 0100 | | D | Ashbel Smith Elementary School | 403 East James Street | Cafeteria | Baytown | 77520-5065 | 2 |
| 82022 | 0395 | | R | Ashford Elementary School | 1815 Shannon Valley Drive | Gym | Houston | 77077-4901 | 4 |
| 82018 | 0625 | | R | Ashford United Methodist Church | 2201 South Dairy Ashford Road | Sanctuary | Houston | 77077 | 4 |
| 32003 | 1016 | | R | Atascocita Lutheran Church | 7927 FM 1960 | Fellowship Hall | Humble | 77346 | 3 |
| 32012 | 0885 | | R | Atascocita Middle School | 18810 West Lake Houston Parkway | Cafeteria | Humble | 77346-3186 | 3 |
| 62048 | 0292 | | D | Audrey H Lawson Middle School | 14000 Stancliff Street | Auditorium | Houston | 77045-5328 | 1 |
| 12136 | 0124 | | R | Ault Elementary School | 21010 Maple Village Drive | D148 | Cypress | 77433-5722 | 3 |
| 72051 | 0756 | | D | AW Jones EC/PK/K School | 8003 Forest Point Drive | Gym | Humble | 77338-1894 | 3 |
| 12143 | 0192 | | D | B T Washington High School | 4204 Yale Street | Auditorium | Houston | 77018-6545 | 1 |
| 52005 | 0242 | | D | Bailey Elementary School | 2707 Lafferty Road | Cafeteria | Pasadena | 77502-5194 | 2 |
| 92118 | 0038 | | D | Baker Montessori School | 2100 Yupon Street | Gym | Houston | 77006-1830 | 1 |
| 21074 | 0411 | EV | D | BakerRipley East Aldine Campus | 3000 Aldine Mail Route Road | Reunion Hall | Houston | 77039 | 2 |
| 72075 | 0430 | | D | BakerRipley Gulfton Sharpstown Campus | 6500 Rookin Street | Reunion Hall | Houston | 77074 | 4 |
| 12056 | 0480 | | R | Barwood Home Owners Clubhouse | 13003 Aste Lane | Clubroom | Houston | 77065-2226 | 3 |
| 62029 | 0573 | | D | Bastian Elementary School | 5051 Bellfort Street | Multipurpose Room | Houston | 77033-3826 | 1 |
| 52043 | 0415 | | R | Bay Area Community Center | 5002 East NASA Parkway | Grand Assembly Room | Seabrook | 77586 | 2 |
| 71060 | 0256 | EV | D | Bayland Park Community Center | 6400 Bissonnet Street | Auditorium | Houston | 77074 | 4 |
| 92007 | 0198 | | D | Baylor College of Medicine Academy at Ryan Middle School | 2610 Elgin Street | Girls Gym | Houston | 77004 | 1 |
| 12087 | 0117 | | D | Baymont By Wyndham Houston Brookhollow | 12439 Northwest Freeway | Meeting Room | Houston | 77092 | 4 |
| 52065 | 0682 | | R | Bayshore Baptist Church | 11315 Spencer Highway | Gym | LaPorte | 77571-4409 | 2 |
| 52067 | 0088 | | R | Bayshore Elementary School | 800 McCabe Road | Music Room | La Porte | 77571-6717 | 2 |
| 51061 | 0102 | EV | D | Baytown Community Center | 2407 Market Street | Tejas Room | Baytown | 77520 | 2 |
| 42019 | 0013 | | R | Baytown Junior High | 7707 Bayway Drive | Cafeteria | Baytown | 77520 | 2 |
| 32025 | 0454 | | D | Beebe Tabernacle Christian Methodist Episcopal | 7210 Langley Road | Fellowship Hall West Wing | Houston | 77016-2724 | 1 |
| 72050 | 0128 | | R | Bellaire Civic Center | 7008 South Rice Avenue | Civic Center | Bellaire | 77401 | 1 |
| 62039 | 0379 | | D | Bellfort Church of Christ | 6606 Bellfort Street | Fellowship Hall | Houston | 77087-6410 | 2 |
| 22092 | 0614 | | D | Beneke Elementary School | 3840 Briarchase Drive | Gym | Houston | 77014-2755 | 1 |
| 92119 | 0039 | | D | Bering United Methodist Church | 1440 Harold Street | Community Room #108A | Houston | 77006-3730 | 1 |
| 22014 | 0916 | | R | Bernshausen Elementary School | 11116 Mahaffey Road | Cafeteria | Tomball | 77375-6908 | 3 |
| 12128 | 0875 | | R | Berry Center of Northwest Houston | 8877 Barker Cypress Road | Cypress Room | Cypress | 77433 | 4 |
| 22059 | 0107 | | D | Berry Elementary School | 2310 Berry Road | Library | Houston | 77093-7418 | 2 |
| 32047 | 0581 | | D | Bethany Baptist Church Fellowship Hall | 7304 Homestead Road | Fellowship Hall | Houston | 77028-3027 | 1 |
| 72032 | 0754 | | D | Bethels Place Community Empowerment Center | 12660 Sandpiper Drive | Auditorium | Houston | 77035-5382 | 1 |

Tatum_005248

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 72059 | 0359 | | D | Betty Roberts Best Elementary School | 10000 Centre Parkway | Gym | Houston | 77036-8200 | 4 |
| 62006 | 0418 | | D | Beverly Hills Community Center | 10201 Kingspoint Road | Main MultiPurpose Room | Houston | 77075 | 2 |
| 62015 | 0076 | | R | Beverly Hills Intermediate School | 11111 Beamer Road | Cafeteria/Foyer | Houston | 77089-2305 | 2 |
| 21119 | 0897 | EV | D | Big Stone Lodge | 709 Riley Fuzzel Road | Community Center | Spring | 77373 | |
| 12024 | 0983 | | R | Birkes Elementary School | 8500 Queenston Boulevard | Library | Houston | 77095-4784 | 3 |
| 22078 | 0423 | | D | Black Elementary School | 160 Mill Stream Lane | Front Foyer | Houston | 77060-4199 | 2 |
| 22070 | 0595 | | D | Blanson CTE High School | 311 West Road | Gym | Houston | 77038 | 2 |
| 12065 | 0125 | | D | Bleyl Middle School | 10800 Mills Road | Library | Houston | 77070-4469 | 3 |
| 52001 | 0277 | | D | Bobby Shaw Middle School | 1201 Houston Avenue | Gym | Pasadena | 77502 | 2 |
| 72063 | 0284 | | D | Bonham Elementary School | 8302 Braes River Drive | Main Entrance Foyer | Houston | 77074-4212 | 4 |
| 82033 | 0129 | | R | Briargrove Elementary School | 6145 San Felipe Street | Library | Houston | 77057-2801 | 4 |
| 82035 | 0282 | | R | Briarmeadow Clubhouse | 3203 Freshmeadows Drive | Clubhouse | Houston | 77063-6231 | 4 |
| 22026 | 0482 | | R | Bridgestone MUD Operations & Water Education Center | 19720 Kuykendahl Road | Assembly Room | Spring | 77379 | 3 |
| 22036 | 0515 | | R | Brill Elementary School | 9102 Herts Road | Gym | Spring | 77379-6772 | 3 |
| 92141 | 0064 | | D | Briscoe Elementary School | 321 Forest Hill Boulevard | Room 12-13 - Building B | Houston | 77011 | 2 |
| 52084 | 1033 | | D | Brookdale Clear Lake | 780 West Bay Area Boulevard | Community Room | Webster | 77598 | 2 |
| 92044 | 0067 | | R | Brookline Elementary School | 6301 South Loop 610 East | Library | Houston | 77087-1012 | 2 |
| 52032 | 0174 | | R | Brookwood Elementary School | 16850 Middlebrook Drive | Great Hall | Houston | 77059-4700 | 2 |
| 92072 | 0159 | | D | Bruce Elementary School | 510 Jensen Drive | Library | Houston | 77020-5834 | 1 |
| 92116 | 0034 | | D | BUDDY'S | 2409 Grant Street Suite A | STE D | Houston | 77006 | 1 |
| 82003 | 0706 | | D | Budewig Intermediate School | 12570 Richmond Avenue | Cafeteria | Houston | 77082-2486 | 4 |
| 12082 | 0330 | | D | Buffalo Creek Elementary School | 2801 Blalock Road | Cafeteria | Houston | 77080-2822 | 4 |
| 22050 | 0341 | | D | Burbank Middle School | 315 Berry Road | Auditorium | Houston | 77022 | 2 |
| 72071 | 0431 | | D | Burnett Bayland Community Center | 6000 Chimney Rock Drive | Main MultiPurpose Room | Houston | 77081-4001 | 4 |
| 62020 | 0842 | | D | Burnett Elementary School | 11825 Teaneck Drive | Gym | Houston | 77089-6120 | 2 |
| 31030 | 0528 | EV | D | C. E. King 9th Grade Center | 8530 C E King Parkway | Room 307 | Houston | 77044 | 1 |
| 22001 | 0399 | | D | Calvary Hills Funeral Home | 21723 Aldine Westfield Road | Chapel | Humble | 77338 | 1 |
| 22064 | 0342 | | D | Calvert Elementary School | 1925 Marvell Drive | Library | Houston | 77032-2085 | 1 |
| 12044 | 0548 | | D | Campbell Middle School | 11415 Bobcat Road | Main entry hallway | Houston | 77064 | 3 |
| 12139 | 0578 | | R | Candlelight Park Community Center | 1520 Candlelight Lane | Main MultiPurpose Room | Houston | 77018-1852 | 1 |
| 12031 | 0903 | | R | Canyon Pointe Elementary School | 13002 Northpointe Boulevard | Gym | Tomball | 77377-5868 | 4 |
| 52046 | 0692 | | R | Captain Inn and Suites Seabrook Kemah | 2901 Nasa Parkway | Meeting Room | Seabrook | 77586-3216 | 2 |
| 12095 | 0521 | | D | Cardiff Junior High | 3900 Dayflower Drive | Gym Lobby | Katy | 77449 | 4 |
| 22129 | 0041 | | D | Carl Wunsche Senior High School | 900 Wunsche Loop | Conference Center | Houston | 77373 | 2 |
| 52016 | 1095 | | D | Carol Teague Elementary School | 4200 Crenshaw Road | Library | Pasadena | 77504-3614 | 2 |
| 12076 | 0383 | | D | Carverdale Park Community Center | 9920 Porto Rico Road | Main MultiPurpose Room | Houston | 77041-7536 | 3 |
| 52035 | 0306 | | R | CCISD Learner Support Center | 2903 Falcon Pass | Computer Lab 1043 | Houston | 77062 | 2 |
| 92051 | 0078 | | D | CDA Internacional Church | 5203 Fulton Street | Fellowship Hall | Houston | 77009 | 2 |
| 42025 | 1031 | | R | Cedar Bayou Junior School | 2610 Elvinta Street | Hallway Leading Into Auditrium | Baytown | 77520-3826 | 2 |
| 22152 | 0113 | | R | Champions Community Church | 13111 Bammel North Houston Road | Growth Track | Houston | 77066 | 1 |
| 72005 | 0508 | | R | Chancellor Elementary School | 4350 Boone Road | Room 157 | Houston | 77072-1999 | 4 |
| 12048 | 0687 | | R | Charles B Cook Middle School | 9111 Wheatland Drive | Rehersal Room 530 | Houston | 77064-7044 | 3 |
| 92070 | 0079 | | D | Charles Eliot Elementary School | 6411 Laredo Street | Room 40 | Houston | 77020-4930 | 2 |
| 42039 | 0251 | | D | Charles R Drew Elementary School | 223 Red Oak Avenue | Gym | Crosby | 77532-8660 | 3 |
| 52069 | 0211 | | D | Charlton Park Recreation Center | 8200 Park Place Boulevard | Main MultiPurpose Room | Houston | 77017 | 2 |
| 22062 | 0668 | | R | Charterwood MUD Administration Activity Building | 16444 Cutten Road | Big Room | Houston | 77070 | 3 |
| 12172 | 0512 | | D | Chimney Hill Community Center | 13720 Smokey Trail Drive | Main Room | Houston | 77041 | 3 |
| 72079 | 0507 | EV | D | Chinese Civic Center | 5905 Sovereign Drive | Foyer | Houston | 77036 | 4 |
| 72073 | 0507 | | D | Chinese Community Center | 9800 Town Park Drive | Rec Center | Houston | 77036 | 4 |
| 82011 | 0626 | | R | Christ the Servant Lutheran Church | 2400 Wilcrest Drive | Fellowship Hall | Houston | 77042-2736 | 4 |
| 92008 | 0025 | | D | Christian Hope Baptist Church | 3418 Anita Street | Rosa Room/Fellowship Hall | Houston | 77004 | 1 |
| 52037 | 0745 | | R | Christ's Church | 1401 Bay Area Boulevard | The Commoms | Houston | 77058 | 2 |
| 22108 | 0669 | | R | Church of Christ in Champions | 13902 Cutten Road | Family Center | Houston | 77069-2299 | 3 |
| 82001 | 1029 | | R | Church on the Rock | 433 Barker Cypress Road | Principal Hallway | Houston | 77094 | 4 |
| 42012 | 0266 | | D | Cimarron Elementary School GPISD | 816 Cimarron Street | Multipurpose Room | Houston | 77015-4308 | 2 |
| 11072 | 0074 | EV | R | City Jersey Village Municipal Government Center | 16327 Lakeview Drive | Civic Center in Municipal Meeting Room | Houston | 77040-2029 | 3 |

OCA-APPX-1318

Tatum_005249

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 52047 | 0090 | | R | City of El Lago City Hall | 411 Tallowood Drive | Events Room | El Lago | 77586-6060 | 2 |
| 52029 | 0307 | | R | City of Nassau Bay Council Chamber | 1800 Space Park Drive No 200 | Council Chambers | Nassau Bay | 77058-3508 | 2 |
| 61033 | 0029 | EV | D | City of South Houston Municipal Court | 1019 Dallas Street | Court Room | South Houston | 77587 | 2 |
| 12161 | 0116 | | R | City of Spring Valley City Hall | 1025 Campbell Road | Council Chambers | Houston | 77055-7495 | 3 |
| 22093 | 0678 | | D | Clark Elementary School | 1825 Rushworth Drive | Gymnasium | Houston | 77014-3642 | 1 |
| 22087 | 0105 | | D | Clark Park Community Center | 9718 Clark Road | Main MultiPurpose Room | Houston | 77076-5031 | 2 |
| 12079 | 0264 | | D | Clay Road Baptist Church | 9151 Clay Road | Auditorium | Houston | 77080-1695 | 4 |
| 62003 | 0474 | | R | Clear Brook High School | 4607 FM 2351 | Gym 3/Annex | Friendswood | 77546-2823 | 2 |
| 52048 | 0393 | | D | Clear Lake Church of the Nazarene | 14310 Galveston Road | Activity Center | Webster | 77598 | 2 |
| 52036 | 0745 | | R | Clear Lake City Elementary School | 1707 Fairwind | Room 210 | Houston | 77062 | 2 |
| 52041 | 0744 | | R | Clear Lake Intermediate School | 15545 El Camino Real | Gym | Houston | 77062-5794 | 2 |
| 52085 | 0748 | | D | Clear Lake Islamic Center | 17511 El Camino Real | Community Hall | Houston | 77058 | 2 |
| 51013 | 0793 | EV | R | Cleveland Ripley Neighborhood Center | 720 Fairmont Parkway | Gym | Pasadena | 77504 | 2 |
| 12089 | 0270 | | R | Clifton Middle School | 6001 Golden Forest Drive | Multipurpose Room | Houston | 77092-2359 | 1 |
| 42015 | 0164 | | D | Clinton Park Community Center | 200 Mississippi Street | Main MultiPurpose Room | Houston | 77029 | 1 |
| 62053 | 0271 | | D | Cloverland Park Bessie Swindle Community Center | 11800 Scott Street | Main MultiPurpose Room | Houston | 77047-1508 | 1 |
| 62030 | 0422 | | D | Codwell Elementary School | 5225 Tavenor Lane | Cafeteria | Houston | 77048-1739 | 1 |
| 52052 | 0665 | | R | College Park Elementary School | 4315 Luella Avenue | Foyer between Gym & Cafeteria | Deer Park | 77536 | 2 |
| 22128 | 1114 | | D | Comfort Inn & Suites FM1960-Champions | 3555 Farm to Market 1960 Road | Meeting Room | Houston | 77068 | 3 |
| 42044 | 0820 | | R | Comfort Suites | 7209 Garth Road | Meeting room | Baytown | 77521-8706 | 3 |
| 22101 | 0698 | | D | Conley Elementary School | 3345 West Greens Road | LMC Room | Houston | 77066-4920 | 1 |
| 22117 | 0956 | | D | Cooper Elementary School | 18655 Imperial Valley Drive | Cafeteria | Houston | 77073-4608 | 1 |
| 12022 | 0789 | | R | Copperfield Church | 8350 Highway 6 North | Room 300 | Houston | 77095-2002 | 3 |
| 82040 | 1054 | | R | Cornerstone Presbyterian Church | 1351 Mason Road | Gym | Katy | 77450 | 3 |
| 12059 | 0713 | | D | Country Inn & Suites by Radisson, Houston Northwest | 12915 Farm to Market 1960 Road West | Meeting Room | Houston | 77065 | 3 |
| 82021 | 0504 | | R | Country Village Clubhouse | 12042 Riverview Drive | Main Club House room | Houston | 77077-3036 | 4 |
| 62005 | 0308 | | R | Courtyard by Marriott Houston Hobby | 9190 Gulf Freeway | Pasadena Room | Houston | 77017 | 2 |
| 82057 | 0479 | | R | Courtyard by Marriott Houston Northwest | 11050 Louetta Road | Cypress Meeting Room | Houston | 77070 | 3 |
| 92076 | 0360 | | D | Courtyard by Marriott West University | 2929 Westpark Drive | Meeting Room | Houston | 77005 | 1 |
| 92094 | 0472 | | D | Courtyard Houston Medical Center/NRG Park | 7702 Main Street | Meeting Room | Houston | 77030 | 1 |
| 22011 | 1145 | | R | Creekside Park Junior High School | 8711 Creekside Green Drive | LGI Room | The Woodlands | 77375-1418 | 3 |
| 32057 | 0612 | | R | Creekwood Middle School | 3603 West Lake Houston Parkway | Commons | Kingwood | 77339-5216 | 3 |
| 92049 | 0002 | | D | Crockett Elementary School | 2112 Crockett Street | Library in front of school | Houston | 77007-3923 | 1 |
| 31066 | 0502 | EV | R | Crosby Branch Library | 135 Hare Road | Meeting Room | Crosby | 77532 | 3 |
| 32079 | 1085 | | R | Crosby Church Afob | 30673 Huffman Cleveland Road | Sanctuary | Huffman | 77336 | 3 |
| 32065 | 0502 | | R | Crosby Kindergarten Center | 805 Runneburg Road | Science Lab/Room 102 | Crosby | 77532 | 3 |
| 82052 | 0730 | | R | Crowne Plaza Houston Galleria | 7611 Katy Freeway | Sycamore A | Houston | 77024-2001 | 3 |
| 72021 | 0556 | | D | Cummings Elementary School | 10455 South Kirkwood Road | Entrance Foyer | Houston | 77099-5018 | 4 |
| 92014 | 0247 | | D | Cuney Homes Community Center | 3260 Truxillo Street | Community Room | Houston | 77004-4649 | 1 |
| 72067 | 0345 | | D | Cunningham Elementary School | 5100 Gulfton Street | Cafeteria | Houston | 77081 | 1 |
| 12129 | 0143 | | R | Cy Fair College Library at Lone Star | 9191 Barker Cypress Road | Room 131 in Library | Cypress | 77433-1383 | 3 |
| 12123 | 0806 | | R | Cypress Crossing Christian Center | 15751 Cypress Rosehill Road | Sanctuary and Lobby | Cypress | 77429-7812 | 3 |
| 12118 | 0481 | | R | Cypress Fairbanks Exhibit Center | 11206 Telge Road | Classroom | Cypress | 77429-3398 | 3 |
| 12054 | 0671 | | R | Cypress Fairbanks Funeral Home | 9926 Jones Road | Library | Houston | 77065 | 3 |
| 12170 | 0640 | | R | Cypress VFW Post 8905 | 21902 Northwest Freeway | Main Hall | Cypress | 77429 | 3 |
| 22047 | 0464 | | R | Cypressdale Clubhouse | 4815 Elmbrook Drive | Clubhouse | Spring | 77388-4935 | 3 |
| 22049 | 0874 | | R | Cypresswood Community Association Building | 3705 Cypresswood Drive | Main Room | Spring | 77388-5700 | 3 |
| 22003 | 0587 | | D | Cypresswood Elementary School | 6901 Cypresswood Point Avenue | Music Room | Humble | 77338-1389 | 3 |
| 91122 | 0053 | EV | D | Damascus Missionary Baptist Church | 3122 Center Street | Fellowship Hall | Houston | 77007 | 1 |
| 62035 | 0036 | | D | Daniel Ortiz Middle School | 6767 Telephone Road | Auditorium | Houston | 77061-2056 | 2 |
| 42027 | 0249 | | R | De Zavala Elementary School | 305 Tri City Beach Road | Kinder Pod | Baytown | 77520-7313 | 2 |
| 52009 | 0302 | | R | Deepwater Junior High School | 501 Glenmore Drive | Gym | Pasadena | 77503-1830 | 2 |
| 52055 | 0420 | | R | Deer Park Community Center | 610 East San Augustine Street | Room 12 | Deer Park | 77536-0700 | 2 |
| 52054 | 0673 | | R | Deer Park ISD Education Support Center | 2800 Texas Avenue | Monarch A & B Rooms | Deer Park | 77536 | 2 |
| 52053 | 0084 | | R | Deer Park Junior High School | 410 East 9th Street | Gym | Deer Park | 77536 | 2 |
| 12174 | 0650 | | R | Deerfield Village Recreation Center | 4045 Deerfield Village Drive | Clubhouse | Houston | 77084-3204 | 4 |

OCA-APPX-1319

Tatum_005250

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 32060 | 0670 | | R | Deerwood Elementary School | 2920 Forest Garden Drive | Cafeteria | Kingwood | 77345-1409 | 3 |
| 22114 | 1139 | | D | Dekaney High School | 22351 Imperial Valley Drive | Cafeteria | Houston | 77073 | 1 |
| 91064 | 0809 | EV | R | Delmar Tusa Sports Complex | 2020 Mangum Road Enter West 18th Street Entrance 2 | Side Entrance Hallway | Houston | 77092 | 4 |
| 91073 | 0062 | EV | D | Denver Harbor Community Center | 6402 Market Street | Gym | Houston | 77020-6840 | 2 |
| 32034 | 1025 | | R | Deussen Park Senior Center | 12303 Sonnier Street | Auditorium | Houston | 77044-7208 | 1 |
| 92040 | 0065 | | D | DeZavala Park Community Center | 907 76th Street | Main MultiPurpose Room | Houston | 77012-1199 | 2 |
| 22035 | 0601 | | R | Doerre Intermediate School | 18218 Theiss Mail Route Road | Front Foyer | Spring | 77379-6239 | 3 |
| 92030 | 0201 | | D | Dogan Elementary School | 4202 Liberty Road | Library | Houston | 77026 | 1 |
| 72020 | 0627 | | D | Douglas Smith Elementary School | 11300 Stancliff Road | Main Entrance Foyer | Houston | 77099-4298 | 4 |
| 32011 | 1038 | | R | Eagle Spring Elementary School | 12500 Will Clayton Parkway | Cafeteria | Humble | 77346-3006 | 3 |
| 51017 | 0352 | EV | R | East Harris County Activity Center | 7340 Spencer Highway | Big Room | Pasadena | 77505 | 2 |
| 92025 | 0027 | | D | Eastwood Academy Charter High School | 1315 Dumble Street | Community Room 120 | Houston | 77023-1902 | 2 |
| 92023 | 0011 | | D | Eastwood Park Community Center | 5020 Harrisburg Boulevard | Main MultiPurpose Room | Houston | 77011-4135 | 2 |
| 92027 | 0026 | | D | EB Cape Center | 4501 Leeland Street | Room 131 | Houston | 77023-3010 | 2 |
| 82026 | 0095 | | R | Econolodge West Energy Corridor | 715 Highway 6 South | Conference Room | Houston | 77079-4003 | 4 |
| 72056 | 0311 | | D | Ed White Elementary School | 9001 Triola Lane | Foyer | Houston | 77036-6147 | 4 |
| 62026 | 0239 | | D | Edgewood Park Community Center | 5803 Bellfort Street | Main MultiPurpose Room | Houston | 77033-2143 | 1 |
| 92022 | 0069 | | D | Edison Middle School | 6901 Avenue I | Gym | Houston | 77011-2629 | 2 |
| 22027 | 0477 | | R | Ehrhardt Elementary School | 6603 Rosebrook Lane | Gym | Spring | 77379 | 3 |
| 22025 | 1060 | | D | Eickenroht Elementary School | 15252 Grand Point Road | Stage | Houston | 77090-6329 | 1 |
| 82050 | 0440 | | D | Eighth Church of Christ Scientist | 11976 Memorial Drive | Sunday School Room and lobby | Houston | 77024 | 3 |
| 22134 | 0723 | | D | Eiland Elementary School | 6700 North Klein Circle Drive | Room 112/PCL | Houston | 77088-1500 | 1 |
| 12149 | 0594 | | D | Eisenhower Senior High School | 7922 Antoine Drive | Library | Houston | 77088-4398 | 1 |
| 61012 | 0774 | EV | D | El Franco Lee Community Center | 9500 Hall Road | Auditorium | Houston | 77089 | 1 |
| 82070 | 1111 | | R | Element Houston Katy | 23653 Grande Centre Drive | Meeting Room A/B | Katy | 77494 | 4 |
| 32054 | 0635 | | R | Elm Grove Elementary School | 2815 Clear Ridge Drive | Cafeteria | Kingwood | 77339 | 3 |
| 72045 | 0315 | | D | Elrod Elementary School | 6230 Dumfries Drive | Cafeteria | Houston | 77096-4603 | 4 |
| 72001 | 0487 | | D | Elsik Senior High school | 12601 High Star Drive | N4 Hall | Houston | 77072 | 4 |
| 92012 | 0198 | | D | Emancipation Park | 3018 Emancipation Avenue | Cultural Center | Houston | 77004-3159 | 1 |
| 92078 | 0896 | | D | Emanu El | 1500 Sunset Boulevard | Feld Hall | Houston | 77005 | 1 |
| 12009 | 0804 | | D | Emmanuel Episcopal Church | 3785 Barker Cypress Road | Fellowship Hall | Houston | 77084 | 1 |
| 12058 | 0518 | | R | Emmott Elementary School | 11750 Steepleway Boulevard | Gym | Houston | 77065-4366 | 3 |
| 51060 | 0561 | EV | R | Evelyn Kennedy Civic Center | 618 San Jacinto Street | Scout Room | La Porte | 77571 | 2 |
| 22079 | 0423 | | D | Evelyn Thompson Elementary School | 220 Casa Grande Drive | Room 143 | Houston | 77060-4899 | 2 |
| 12124 | 0111 | | R | Fairfield Baptist Church | 27240 US 290 | Worship Center Building - Lobby | Cypress | 77433 | 3 |
| 11045 | 0597 | EV | D | Fairfield Inn and Suites Houston NW Willowbrook | 10825 North Gessner | Fairfield Ranch Meeting room | Houston | 77064 | 3 |
| 12173 | 0768 | | R | Fairwood Recreation Center and Pool | 14701 Spring Cypress Road | Clubhouse | Cypress | 77429 | 3 |
| 92098 | 0215 | | R | Faith American Lutheran Church | 4600 Bellaire Boulevard | Faith Center Gym | Bellaire | 77401-4296 | 1 |
| 32019 | 0118 | | D | Fall Creek Elementary School | 14435 Mesa Drive | Cafeteria | Humble | 77396-4457 | 1 |
| 21088 | 0660 | EV | D | Fallbrook Church | 12512 Walters Road | Brooks Sports Gym | Houston | 77014 | 1 |
| 32029 | 0168 | | D | Felix Cook Junior Elementary School | 7115 Lockwood Drive | Computer Lab | Houston | 77016-7027 | 1 |
| 42011 | 0375 | | D | Felix L Baldree Building | 13828 Corpus Christi Street | Large Assembly Room | Houston | 77015-3912 | 2 |
| 32077 | 0401 | | D | Fellowship of Enlightenment Church | 9005 Wayside Drive | Kennedy Hall | Houston | 77028 | 1 |
| 92111 | 0059 | | D | Field Elementary School | 703 East 17th Street | Library | Houston | 77008-4414 | 1 |
| 32070 | 0700 | | R | First Baptist Church Huffman Youth Center | 25259 F M 2100 Road | Youth Center | Huffman | 77336-4103 | 3 |
| 42017 | 0163 | | D | First Baptist Church of Jacinto City | 10701 Wiggins Street | Gym | Jacinto City | 77029-2515 | 2 |
| 22012 | 0529 | | D | First Baptist Church of Tomball | 401 Oxford Street | Gym | Tomball | 77375-4461 | 3 |
| 12096 | 0603 | | R | First Christian Church | 22101 Morton Ranch Road | Fellowship Hall | Katy | 77449 | 4 |
| 81054 | 0213 | EV | R | First Congregational Church | 10840 Beinhorn Road | Assembly Room | Houston | 77024-3098 | 3 |
| 92063 | 0217 | | R | First Cumberland Presbyterian Church | 2119 Avalon Place | Fellowship Hall | Houston | 77019 | 1 |
| 12146 | 0467 | | D | First New Hope Bible Church | 5400 West Mount Houston Road | Fellowship Hall | Houston | 77088-1271 | 1 |
| 72031 | 0022 | | D | Foerster Elementary School | 14200 Fonmeadow Drive | Cafeteria | Houston | 77035-5218 | 1 |
| 72040 | 0337 | | D | Fondren Elementary School | 12405 Carlsbad Street | Cafeteria | Houston | 77085-1224 | 1 |
| 72039 | 0506 | | D | Fondren Park Community Building | 11802 Mclain Boulevard | Meeting Room | Missouri City | 77071-3334 | 1 |
| 32039 | 0205 | | D | Fonwood Elementary School | 9709 Mesa Drive | Cafeteria | Houston | 77078 | 1 |
| 51051 | 0378 | EV | R | Forest Bend Homeowners Association Inc | 4300 Laura Leigh Drive | Meeting Room | Friendswood | 77546 | 2 |

OCA-APPX-1320

Tatum_005251

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 52070 | 0221 | | D | Forest Oaks Baptist Church | 1845 Forest Oaks Drive | Assembly Room/Fellowship Room | Houston | 77017 | 2 |
| 32051 | 0469 | | R | Foster Elementary School | 1800 Trailwood Village Drive | Library Enter Door #2 | Kingwood | 77339 | 3 |
| 71074 | 0337 | EV | D | Fountain of Life Center | 14083 South Main Street | Assembly Room | Houston | 77035 | 1 |
| 22043 | 0539 | | R | Fox Elementary School | 4800 Port Aragnan Drive | Cafeteria | Spring | 77388 | 3 |
| 12171 | 0548 | | D | Francone Elementary School | 11250 Perry Road | Physical Education - Room 5 | Houston | 77064 | 3 |
| 22040 | 0880 | | D | Frank Elementary School | 9225 Crescent Clover Drive | Gym | Spring | 77379-8590 | 3 |
| 12050 | 0496 | | D | Frazier Elementary School CFISD | 8300 Little River Road | PE room/Gym | Houston | 77064-7904 | 1 |
| 62016 | 0476 | | D | Frazier Elementary School PISD | 10503 Hughes Road | Foyer | Houston | 77089-4530 | 2 |
| 12159 | 0179 | | D | Freed Park Clubhouse | 6818 Shadyvilla Lane | Meeting Room | Houston | 77055-5200 | 4 |
| 51028 | 0941 | EV | D | Freeman Branch Library | 16616 Diana Lane | Meeting Room | Houston | 77062 | 2 |
| 52076 | 0280 | | D | Freeman Elementary School | 2323 Theta Street | Gym | Houston | 77034-1250 | 2 |
| 52075 | 0280 | | D | Freeway Manor Baptist Church | 2300 Rodney Street | Fellowship Hall | Houston | 77034-1149 | 2 |
| 22017 | 0503 | | R | French Elementary School | 5802 West Rayford Road | PLC Room | Spring | 77389-2981 | 3 |
| 32083 | 0080 | | D | Furr High School | 500 Mercury Drive | Auditorium | Houston | 77013 | 2 |
| 12152 | 0109 | | D | G W Carver Contemporary High School | 2100 South Victory Drive | Room 109 | Houston | 77088-7699 | 1 |
| 52044 | 0415 | | D | G W Robinson Elementary School | 451 Kirby Road | Gym | El Lago | 77586 | 2 |
| 12138 | 0073 | | D | Garden Oaks Montessori | 901 Sue Barnett Drive | Gym | Houston | 77018 | 1 |
| 62034 | 0798 | | D | Garden Villa Park Community Center | 6720 South Haywood Drive | Main MultiPurpose Room | Houston | 77061-1514 | 2 |
| 52077 | 0289 | | D | Garfield Elementary School | 10301 Hartsook Street | Front Hall/Main Hallway | Houston | 77034-3596 | 2 |
| 52078 | 0755 | | D | Genoa Staff Development Center | 12900 Almeda Genoa Road | Main Room | Houston | 77034-4636 | 2 |
| 42031 | 0386 | | R | George H Gentry Junior High School | 1919 East Archer Road | Auditorium | Baytown | 77521-9310 | 2 |
| 22118 | 0110 | | R | Ginger McNabb Elementary School | 743 East Cypresswood Drive | Gym | Spring | 77373 | 3 |
| 91127 | 0937 | EV | D | Girl Scouts of San Jacinto Council | 3000 Southwest Freeway | Program Place for Girls Performance Area | Houston | 77098 | 4 |
| 12047 | 0687 | | R | Gleason Elementary School | 9203 Willowbridge Park Boulevard | Art Room | Houston | 77064-6304 | 3 |
| 62036 | 0275 | | D | Glenbrook United Methodist Church | 8635 Glen Valley Drive | Fellowship Hall | Houston | 77061-2339 | 2 |
| 22072 | 0366 | | D | Gloria B Sammons Elementary School | 2301 Frick Road | Hallway near Common Area | Houston | 77038-1701 | 2 |
| 12003 | 0516 | | D | Glorious Way Church | 11611 Champion Forest Drive | Main Lobby | Houston | 77066-2740 | 1 |
| 72041 | 0281 | | D | Godwin Park Community Center | 5101 Rutherglenn Drive | Main MultiPurpose Room | Houston | 77096 | 1 |
| 52011 | 0696 | | D | Golden Acres Elementary School | 5232 Sycamore Avenue | Gym | Pasadena | 77503-3950 | 2 |
| 62037 | 0231 | | D | Golfcrest Elementary School | 7414 Fairway Drive | Library | Houston | 77087-3623 | 2 |
| 32055 | 0340 | | R | Good Shepherd Episcopal Church | 2929 Woodland Hills Drive | Great Hall | Humble | 77339-1496 | 3 |
| 12120 | 1022 | | R | Goodson Middle School | 17333 Huffmeister Road | Auxiliary gym | Cypress | 77429-6403 | 3 |
| 42028 | 0103 | | D | Goose Creek Memorial High School | 6001 East Wallisville Road | Cafeteria | Baytown | 77521 | 2 |
| 32021 | 0104 | | D | Grace Church International | 5775 Little York Road | Fellowship Hall | Houston | 77016 | 1 |
| 12178 | 0903 | | R | Graceview Baptist Church | 21206 Telge Road | Multipurpose Room | Tomball | 77377 | 4 |
| 32042 | 0606 | | D | Greater Emmanuel Family Worship Center | 3915 Kelley Street | The Hall | Houston | 77026-1411 | 1 |
| 12073 | 0683 | | D | Greater Macedonia Baptist Church | 5510 West Sam Houston Parkway North | Multipurpose Room | Houston | 77041 | 3 |
| 32037 | 0832 | | D | Greater New Grove Christian Worship Center Church | 7518 East Mount Houston Road | Sacntuary | Houston | 77050 | 1 |
| 32026 | 0252 | | D | Greater New Hope Missionary Baptist Church | 10505 Bainbridge Street | Sanctuary | Houston | 77016-3007 | 1 |
| 62021 | 0573 | | D | Greater New Testament Church | 7409 Calhoun Road | Class Room | Houston | 77033 | 1 |
| 62022 | 0573 | | D | Greater Saint Matthew Church Southeast Campus | 7701 Jutland Road | Gym | Houston | 77033 | 1 |
| 72026 | 0337 | | D | Greater Saint Matthew Church Southwest Campus | 14919 South Main | Fellowship Hall | Houston | 77035 | 1 |
| 21102 | 0358 | EV | D | Green House International Church | 200 West Greens Road | Community Room | Houston | 77067 | 1 |
| 42009 | 0375 | | D | Green Valley Elementary School | 13350 Woodforest Boulevard | Cafeteria | Houston | 77015-2825 | 2 |
| 72033 | 0372 | | D | Gross Elementary School | 12583 South Gessner Road | Cafeteria | Houston | 77071 | 1 |
| 92064 | 0030 | | D | H O A P V Community Building | 1810 Bluebonnet Place Circle | Community Center | Houston | 77019-2999 | 1 |
| 12117 | 0828 | | R | Hamilton Middle School | 12330 Kluge Road | Perfomance Gym | Cypress | 77429 | 3 |
| 81042 | 1112 | EV | R | Hampton Inn and Suites Houston Katy | 22055 Katy Freeway | Empire Room | Katy | 77450 | 4 |
| 21085 | 0321 | EV | D | Hardy Street Senior Citizens Center | 11901 West Hardy Road | Auditorium | Houston | 77076-1220 | 2 |
| 12100 | 1103 | | D | Harris County Annex 57 | 19918 Franz Road Enter East side of Building | East side of Building | Katy | 77449 | 4 |
| 92034 | 0144 | | D | Harris County Annex No 36 | 3815 Cavalcade Street | Meeting Room | Houston | 77026-3403 | 1 |
| 22053 | 0078 | | R | Harris County Department of Education | 6300 Irvington Boulevard | 100C | Houston | 77022-5618 | 2 |
| 61011 | 0996 | EV | R | Harris County Scarsdale Annex | 10851 Scarsdale Boulevard | Room D-110 | Houston | 77089 | 2 |
| 92003 | 0369 | | D | Harris County Sheriff's Office | 701 North San Jacinto Street | Lobby & Secured Room | Houston | 77002 | 1 |
| 92105 | 0235 | | D | Hartsfield Elementary School | 5001 Perry Street | STEM Lab | Houston | 77021-3515 | 1 |
| 52019 | 1095 | | R | Harvey Turner Elementary School | 4333 Lily Street | Teachers' Lounge | Pasadena | 77505-3735 | 2 |

OCA-APPX-1321

Tatum_005252

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 22031 | 0551 | | R | Hassler Elementary School | 9325 Lochlea Ridge Drive | Cafeteria | Spring | 77379-3647 | 3 |
| 22046 | 0633 | | R | Haude Elementary School | 3111 Louetta Road | Gym | Spring | 77388-4610 | 3 |
| 32056 | 0563 | | R | HC Public Library Kingwood Branch | 4400 Bens View Lane | Meeting Room | Kingwood | 77339-3774 | 3 |
| 12037 | 0197 | | D | HCC Acres Homes Campus | 630 West Little York Road | Electronic Resource Center/Room 138 | Houston | 77091 | 1 |
| 71011 | 1037 | EV | D | HCC Alief Center | 13803 Bissonnet Street | Auditorium Room 157 | Houston | 77083 | 4 |
| 82013 | 0559 | | R | HCC Alief Hayes Road Campus Building C | 2811 Hayes Road | West Houston Institute | Houston | 77042-3340 | 4 |
| 31024 | 0454 | EV | D | HCC North Forest Campus | 6010 Little York Road | Community Room | Houston | 77016 | 1 |
| 91043 | 0154 | EV | D | HCC Southeast College Building D | 6815 Rustic Street | Room 108 | Houston | 77087 | 2 |
| 71066 | 0570 | EV | D | HCC West Loop South | 5601 West Loop South | Auditorium | Houston | 77081 | 1 |
| 21038 | 0631 | EV | R | HCPL Barbara Bush Branch | 6817 Cypresswood Drive | Elliot Room | Spring | 77379-7705 | 3 |
| 81046 | 0619 | EV | R | HCPL Maud Smith Marks Branch Library | 1815 Westgreen Boulevard | Meeting Room | Katy | 77450-5370 | 4 |
| 12119 | 0519 | | R | HCPL Northwest Library | 11355 Regency Green Drive | Meeting Room | Cypress | 77429-4799 | 3 |
| 82006 | 1118 | | D | Heflin Elementary School | 3303 Synott Road | Gym | Houston | 77082-4926 | 4 |
| 92115 | 0057 | | D | Heights High School | 560 East 14th Street | Bulldog Practice Gym | Houston | 77008-7021 | 1 |
| 22024 | 0894 | | D | Helen Major Elementary School | 16855 Sugar Pine Drive | Gym | Houston | 77090-3626 | 1 |
| 92110 | 0736 | | D | Helms Community Learning Center | 503 West 21st Street | Cafeteria | Houston | 77008-3641 | 1 |
| 52058 | 0665 | | R | Heritage Elementary School | 4301 East Boulevard | Gymnasium | Deer Park | 77536-5646 | 2 |
| 62004 | 0349 | | R | Heritage Park Baptist Church | 2732 FM 528 Road | Fellowship Hall and Chapel | Webster | 77598-4703 | 2 |
| 72043 | 0304 | | R | Herod Elementary School | 5627 Jason Street | Library | Houston | 77096-2110 | 4 |
| 12052 | 0543 | | D | Herrera Elementary School | 525 Bennington Street | Gym | Houston | 77022-4911 | 2 |
| 72010 | 1037 | | D | Hicks Elementary School | 8520 Hemlock Hill Drive | Cafeteria | Houston | 77083 | 4 |
| 32058 | 0357 | | R | Hidden Hollow Elementary School | 4104 Appalachian Trail | Cafeteria | Kingwood | 77345-1099 | 3 |
| 12043 | 0325 | | D | High School Ahead Academy | 5320 Yale Street | Library Front Entrance | Houston | 77091-5730 | 2 |
| 12040 | 0157 | | D | Highland Park Recreation Center | 3316 De Soto Street | Main MultiPurpose Room | Houston | 77091-3716 | 1 |
| 42040 | 0387 | | R | Highlands Elementary School GCCISD | 200 East Wallisville Road | Gym | Highlands | 77562-3896 | 2 |
| 12092 | 0494 | | D | Hill Elementary School | 2625 West Mount Houston Road | Music Room | Houston | 77038-3434 | 2 |
| 82025 | 0483 | | R | Hilton Garden Inn Houston Energy Corridor | 12245 Katy Freeway | Energy 3 Room | Houston | 77079 | 4 |
| 61050 | 0319 | EV | D | Hiram Clarke Multi Service Center | 3810 West Fuqua Street | Auditorium | Houston | 77045-6402 | 1 |
| 32049 | 0582 | | D | Hobart Taylor Park Community Center | 8100 Kenton Street | Main MultiPurpose Room | Houston | 77028-4632 | 1 |
| 62046 | 0318 | | D | Hobby Elementary School | 4021 Woodmont Drive | Cafeteria | Houston | 77045-3515 | 1 |
| 11137 | 0121 | EV | R | Hockley Community Center | 28515 Old Washington Road | Room ABC | Hockley | 77447 | 4 |
| 92058 | 0003 | | D | Hogg Middle School | 1100 Merrill Street | Gym | Houston | 77009-6009 | 1 |
| 31080 | 0674 | EV | R | Holiday Inn Express & Suites Atascocita | 5619 FM 1960 East | Meeting Room | Humble | 77346 | 3 |
| 52057 | 0673 | | R | Holiday Inn Express & Suites Deer Park | 201 West X Street | San Jacinto Room | Deer Park | 77536 | 2 |
| 11033 | 0056 | EV | R | Holiday Inn Express & Suites Houston Memorial - City Centre | 10500 Katy Freeway | City Centre Room | Houston | 77043 | 3 |
| 92004 | 0016 | | D | Holiday Inn Houston Downtown | 1616 Main Street | Savoy Meeting Room | Houston | 77002 | 1 |
| 22007 | 0738 | | D | Holiday Inn Houston Intercontinental Airport Hotel | 15222 John F Kennedy Boulevard | Trinity Ballroom 3 | Houston | 77032-2366 | 1 |
| 12080 | 0610 | | D | Hollibrook Elementary School | 3602 Hollister Street | Library | Houston | 77080-1899 | 4 |
| 82005 | 0814 | | D | Holmquist Elementary School | 15040 Westpark Drive | Cafeteria | Houston | 77082-3900 | 4 |
| 12020 | 0651 | | R | Holmsley Elementary School | 7315 Hudson Oaks Drive | PE room | Houston | 77095-1149 | 4 |
| 52040 | 0744 | | R | Hope Christian Reformed Church | 770 Pineloch Drive | Gym | Houston | 77062-2548 | 2 |
| 12132 | 0901 | | R | Hopper Middle School | 7811 Fry Road | Performance gym | Cypress | 77433-3284 | 3 |
| 72018 | 0429 | | D | Horn Elementary School | 10734 Bissonnet Street | Gym | Houston | 77099 | 4 |
| 21021 | 1061 | EV | D | Hosanna Lutheran Church | 16526 Ella Boulevard | Fellowship Hall | Houston | 77090 | 1 |
| 12157 | 0179 | | D | Housman Elementary School | 6705 Housman Street | Gymnasium | Houston | 77055-2221 | 4 |
| 21131 | 0153 | EV | D | Houston Community College Northline | 8001 Fulton Street | Room 115 | Houston | 77022 | 2 |
| 12042 | 0324 | | D | Houston Liederkranz | 5100 Ella Boulevard | Main Ballroom | Houston | 77018 | 1 |
| 82066 | 1069 | | D | Houston Marriott West Loop by The Galleria | 1750 West Loop South | Diamond Room | Houston | 77027 | 4 |
| 82007 | 0559 | | R | Houston Marriott Westchase | 2900 Briarpark Drive | Grand Foyer | Houston | 77042 | 4 |
| 32069 | 0700 | | R | Huffman ISD Administrative Offices | 24302 FM 2100 | Board Room 101 | Huffman | 77336 | 3 |
| 31082 | 0108 | EV | R | Humble Civic Center | 8233 Will Clayton Parkway | Meeting Rooms 1 - 4 | Humble | 77338 | 3 |
| 22006 | 0599 | | D | Humble ISD Collaboration Center | 10203 Birchridge Drive | Rooms 101 | Humble | 77346 | 3 |
| 32010 | 0388 | | D | Humble Middle School | 11207 Will Clayton Parkway | Cafeteria | Humble | 77346-3005 | 3 |
| 82068 | 0213 | | R | Hunters Creek Elementary School | 10650 Beinhorn Road | Multipurpose Room | Houston | 77024 | 3 |
| 22109 | 0513 | | R | Huntwick Forest Clubhouse Recreational Facility | 5300 Coral Gables Drive | INFORMAL ROOM | Houston | 77069-3306 | 3 |
| 12097 | 0618 | | D | Hyatt Place Houston/Katy | 1401 North Westgreen Boulevard | Meeting Room 1 | Katy | 77449 | 4 |

Tatum_005253

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 92045 | 0071 | | D | I P S P | 5525 Kansas Street | Fellowship Hall | Houston | 77007-1110 | 4 |
| 22130 | 0757 | | D | Iglesia Bautista Caminando con Jesus | 6515 Eddie Drive | Fellowship Hall | Humble | 77396 | 2 |
| 22073 | 1012 | | D | Iglesia Bautista Libre | 10331 Veterans Memorial Drive | Small Chapel | Houston | 77038-1727 | 2 |
| 12001 | 0523 | | R | Iglesia Bautista Redencion | 16155 Aspenglenn Drive | Main Hall/Fellowship Hall | Houston | 77084-3545 | 4 |
| 12032 | 0120 | | R | Iglesia de Jesucristo Palabra Miel | 1431 Brittmoore Road | Agape Fellowship Hall | Houston | 77043 | 4 |
| 12046 | 0597 | | D | Iglesia Trinidad Church | 11602 Bobcat Road | Chapel | Houston | 77064-3100 | 3 |
| 12169 | 0852 | | R | Image Church | 20402 Chappell Knoll Drive | Sanctuary Room | Cypress | 77433 | 3 |
| 22051 | 0184 | | D | Independence Hall Apartments Community Room | 6 Burress Street | Activities Room | Houston | 77022-1944 | 2 |
| 12035 | 0195 | | D | Independence Heights Community Center | 603 East 35th Street | Main MultiPurpose Room | Houston | 77022 | 1 |
| 72023 | 0555 | | D | India House | 8888 West Bellfort Street | Room 122 | Houston | 77031-2406 | 1 |
| 92042 | 0226 | | D | Ingrando Park Recreation Center | 7302 Keller Street | Main MultiPurpose | Houston | 77012-3518 | 2 |
| 12004 | 1138 | | D | ISGH Bear Creek Community Center | 17250 Coventry Park Drive | Community Center | Houston | 77084 | 4 |
| 41030 | 0250 | EV | D | J D Walker Community Center | 7613 Wade Road | Large MultiPurpose Room | Baytown | 77521-8338 | 2 |
| 52039 | 0568 | | D | J F Ward Elementary School | 1440 Bouldercrest Drive | Great Hall | Houston | 77062-2247 | 2 |
| 92028 | 0218 | | D | J P Henderson Elementary School | 1800 Dismuke Street | Main Hall | Houston | 77023-4753 | 2 |
| 52023 | 0786 | | D | Jackson Intermediate School | 1020 Thomas Avenue | Gym | Pasadena | 77506 | 2 |
| 42024 | 0532 | | R | James Bowie Elementary School | 2200 Clayton Drive | Auditorium | Baytown | 77520-3643 | 2 |
| 62008 | 0801 | | D | James DeAnda Elementary School | 7980 Almeda Genoa Road | Music Room 111 | Houston | 77075-2006 | 2 |
| 82044 | 0522 | | R | James E Taylor High School | 20700 Kingsland Boulevard | PAC Lobby | Katy | 77450-2705 | 4 |
| 62054 | 0355 | | D | James H Law Elementary School | 12401 South Coast Drive | Cafeteria | Houston | 77047-2736 | 1 |
| 62044 | 0355 | | D | James Madison High School | 13719 White Heather Drive | Auditorium | Houston | 77045 | 1 |
| 12021 | 0616 | | R | Jan Hansen Aragon Middle School | 16823 West Road | Library | Houston | 77095-5503 | 3 |
| 72064 | 0430 | | D | Jane Long Academy Middle School | 6501 Bellaire Boulevard | Auditorium | Houston | 77074-6428 | 4 |
| 22054 | 0153 | | D | Janowski Elementary School | 7500 Bauman Road | Annex building | Houston | 77022-6125 | 2 |
| 62040 | 0332 | | D | Jean Hines Caldwell Elementary School | 5515 West Orem Drive | Community Room | Houston | 77085 | 1 |
| 52064 | 0716 | | R | Jennie Reid Elementary School | 10001 West Fairmont Parkway | Cafeteria | LaPorte | 77571-2904 | 2 |
| 52012 | 0348 | | R | Jensen Elementary School | 3514 Tulip Street | Gym | Pasadena | 77504 | 2 |
| 52056 | 0673 | | R | Jimmy Burke Activity Building | 500 West 13th Street | Activity Center | Deer Park | 77536-3172 | 2 |
| 12036 | 0122 | | D | John F Kennedy Elementary School | 400 Victoria Drive | Multipurpose | Houston | 77022-2422 | 1 |
| 11168 | 0407 | EV | R | John Knox Presbyterian Church | 2525 Gessner Road | Fellowship Hall | Houston | 77080 | 3 |
| 92061 | 0046 | | D | John Marshall Middle School | 1115 Noble Street | Library | Houston | 77009-8437 | 2 |
| 91093 | 0540 | EV | D | John P McGovern Texas Medical Center Commons | 6550 Bertner Avenue | 1st Floor | Houston | 77030 | 1 |
| 11125 | 0624 | EV | R | John Paul Landing Environmental Education Center | 9950 Katy Hockley Road | Great Room #101 | Cypress | 77433 | 4 |
| 41001 | 0527 | EV | D | John Phelps Courthouse | 101 South Richey Street | Training Room | Pasadena | 77506 | 2 |
| 92041 | 0066 | | D | John R Harris Elementary School | 801 Broadway Street | Cafeteria | Houston | 77012-2124 | 2 |
| 62027 | 0237 | | D | Jones Future Academy | 7414 Saint Lo Road | Auditorium | Houston | 77033-2731 | 1 |
| 12038 | 0450 | | D | Josie Ruth Smith School | 5815 West Little York Road | Library | Houston | 77091-1199 | 1 |
| 32015 | 0847 | | D | Journey of Faith UMC | 130 Atascocita Road | Journey Room | Humble | 77396 | 1 |
| 12102 | 0617 | | D | Jowell Elementary School | 6355 Greenhouse Road | Gym | Katy | 77449-4382 | 4 |
| 92019 | 0540 | | D | Judson Robinson Junior Community Center | 2020 Hermann Drive | Gym | Houston | 77004-7322 | 1 |
| 42006 | 0080 | | D | Judson Robinson Junior Elementary School | 12425 Woodforest Boulevard | Multipurpose Room 118 | Houston | 77013 | 2 |
| 72055 | 0311 | | D | Judy Bush Elementary School | 9730 Stroud Drive | Cafeteria | Houston | 77036-5105 | 4 |
| 11122 | 0734 | EV | R | Juergens Hall Community Center | 26026 Hempstead Highway | Dance Hall | Cypress | 77429-7321 | 3 |
| 92069 | 0161 | | D | Julia C Hester House | 2020 Solo Street | Auditorium | Houston | 77020-4224 | 1 |
| 12016 | 0553 | | D | Julia W Kahla Middle School | 16212 West Little York Road | Performance Gym | Houston | 77084-6509 | 4 |
| 32044 | 0580 | | D | Kashmere High School | 6900 Wileyvale Road | Multi-Purpose Room | Houston | 77028 | 1 |
| 91032 | 0042 | EV | D | Kashmere MultiService Center | 4802 Lockwood Drive | Conference Room | Houston | 77026-2941 | 1 |
| 72024 | 0462 | | D | Kate Bell Elementary School | 12323 Shaftsbury Drive | PE Room | Houston | 77031-3123 | 4 |
| 12007 | 1059 | | R | Katherine Tyra Branch Library | 16719 Clay Road | Meeting Room | Houston | 77084 | 4 |
| 11107 | 1086 | EV | R | Katy Branch Harris County Public Library | 5414 Franz Road | Meeting Room | Katy | 77493-1717 | 4 |
| 12109 | 0639 | | R | Katy Civic Center | 910 Avenue C | Civic Center | Katy | 77493-2403 | 4 |
| 52008 | 0404 | | D | Keller Middle School | 1711 Magnolia Street | Front Lobby | Pasadena | 77503 | 2 |
| 62025 | 0238 | | D | Kelso Elementary School | 5800 Southmund Street | Cafeteria | Houston | 77033-1832 | 1 |
| 42004 | 0354 | | D | Kenneth J Tice Elementary School | 14120 Wallisville Road | Cafeteria | Houston | 77049-4031 | 2 |
| 32043 | 0606 | | D | Key Middle School | 4000 Kelley Street | Auditorium | Houston | 77026-1534 | 1 |
| 52059 | 0695 | | R | Kingsdale Recreation Center | 2218 Kingsdale Street | Main Room | Deer Park | 77536-5828 | 2 |

OCA-APPX-1323

Tatum_005254

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 82041 | 0522 | | R | Kingsland Baptist Church | 20555 Kingsland Boulevard | Chapel | Katy | 77450 | 4 |
| 31059 | 0459 | EV | R | Kingwood Community Center | 4102 Rustic Woods Drive | Auditorium B | Kingwood | 77345-1350 | 3 |
| 32081 | 0590 | | R | Kingwood Middle School | 2407 Pine Terrace Drive | Cafeteria | Kingwood | 77339 | 3 |
| 22094 | 0113 | | R | Kinsmen Lutheran Church | 12100 Champion Forest Drive | Gym | Houston | 77066 | 1 |
| 12053 | 0155 | | R | Kirk Elementary School | 12421 Tanner Road | Cafeteria | Houston | 77041 | 3 |
| 22029 | 0648 | | R | Kleb Intermediate School | 7425 Louetta Road | Cafeteria | Spring | 77379 | 3 |
| 21030 | 0876 | EV | R | Klein Multipurpose Center | 7500 FM 2920 | Rooms 402 | Spring | 77379-2204 | 3 |
| 22020 | 0672 | | R | Klein Oak High School | 22603 Northcrest Drive | Auditorium Lobby | Spring | 77389-4451 | 3 |
| 22098 | 0493 | | D | Klenk Elementary School | 6111 Bourgeois Road | Cafeteria | Houston | 77066-3903 | 1 |
| 32041 | 0374 | | D | Knights of Columbus Hall Council 5077 | 5309 Oates Road | Ballroom | Houston | 77013-2850 | 2 |
| 22015 | 0245 | | R | Kohrville Elementary School | 11600 Woodland Shore Drive | Gym | Tomball | 77375-8098 | 3 |
| 12012 | 0621 | | R | Korean Central Presbyterian Church of Houston | 14311 Park Row Drive | Cafeteria | Houston | 77084-5695 | 4 |
| 12077 | 0689 | | D | Korean Christian Church of Houston | 10410 Clay Road | Social Room | Houston | 77041-8752 | 3 |
| 52007 | 0908 | | R | Korean First Baptist Church | 4209 Red Bluff Road | Fellowship Hall | Pasadena | 77503 | 2 |
| 22041 | 0853 | | R | Kuehnle Elementary School | 5510 Winding Ridge Drive | Gym | Spring | 77379-8899 | 3 |
| 42037 | 0220 | | R | L W Kolarik Education Center | 1120 Sheldon Road | Library | Channelview | 77530-3518 | 3 |
| 91134 | 0434 | EV | R | La Quinta Inn & Suites by Wyndham Houston Galleria Area | 1625 West Loop South | Large Meeting Room | Houston | 77027 | 4 |
| 12019 | 0800 | | R | Labay Middle School | 15435 Willow River Drive | Main Hallway | Houston | 77095 | 3 |
| 12075 | 0260 | | D | Lafaye Johnson Lee Elementary School | 12900 West Little York Road | Gym Rear Entrance | Houston | 77041-4212 | 3 |
| 32007 | 1016 | | R | Lake Houston Church of Christ | 8003 Farmingham Road | FELLOWSHIP HALL | Humble | 77346-2249 | 3 |
| 32008 | 0776 | | R | Lake Houston Church of the Nazarene | 5616 FM 1960 Road East | Kids Worship Room | Humble | 77346 | 3 |
| 32031 | 0964 | | R | Lakeshore Elementary School | 13333 Breakwater Path Drive | Cafeteria/Gym | Houston | 77044-1377 | 3 |
| 12062 | 0486 | | R | Lakewood Elementary School | 15614 Gettysburg Drive | Cafeteria | Tomball | 77377 | 3 |
| 32046 | 0401 | | D | Lakewood Park Community Center | 8811 Feland Street | Multi-purpose Room | Houston | 77028-2016 | 1 |
| 12155 | 0043 | | D | Landrum Middle School | 2200 Ridgecrest Drive | Auditorium | Houston | 77055-1212 | 4 |
| 92133 | 0060 | | D | Lanier Middle School | 2600 Woodhead Street | Weight Room | Houston | 77098-1615 | 1 |
| 72058 | 0296 | | D | Lansdale Park Community Center | 8201 Roos Road | Main MultiPurpose Room | Houston | 77036-6313 | 4 |
| 62009 | 1063 | | D | Laura Welch Bush Elementary School | 9100 Blackhawk Boulevard | Front Hall/Foyer | Houston | 77075-2250 | 2 |
| 12106 | 0639 | | R | Legacy Stadium | 1830 Katyland Drive | Community Rooms | Katy | 77493 | 4 |
| 22048 | 0500 | | R | Lemm Elementary School | 19034 Joan Leigh Drive | Cafeteria | Spring | 77388-5255 | 3 |
| 92060 | 0044 | | D | Leonel J Castillo Community Center | 2101 South Street | Rooms 135 and 136 | Houston | 77009-8039 | 2 |
| 22107 | 0660 | | D | Lewis Elementary School | 3230 Spears Road | Cafeteria | Houston | 77067-5214 | 1 |
| 12002 | 0517 | | D | Lieder Elementary School | 17003 Kieth Harrow Boulevard | PE room | Houston | 77084 | 4 |
| 72017 | 1068 | | D | Liestman Elementary School | 7610 Synott Road | Gym | Houston | 77083-5199 | 4 |
| 12144 | 0197 | | D | Lincoln Park Community Center | 979 Grenshaw Street | Gym | Houston | 77088 | 1 |
| 22104 | 0549 | | D | Link Elementary School | 2815 Ridge Hollow Drive | Gym | Houston | 77067-1939 | 1 |
| 92087 | 0018 | | D | Linkwood Park Community Center | 3699 Norris Drive | Main MultiPurpose Room | Houston | 77025-3600 | 1 |
| 32048 | 0253 | | D | Little Union Missionary Baptist Church | 6609 Letcher Drive | Education Room | Houston | 77028-4029 | 1 |
| 22067 | 0780 | | D | Little York Volunteer Fire Station 81 | 10410 Airline Drive | Training Room | Houston | 77037-1304 | 2 |
| 62052 | 0392 | | D | Living Faith Baptist Church | 4310 Holloway Drive | Living Faith Fellowship Hall | Houston | 77047-1119 | 1 |
| 52062 | 0471 | | R | Lomax Junior High School | 9801 North Avenue L | Gymnasium | La Porte | 77571 | 2 |
| 22018 | 0690 | | R | Londonderry Clubhouse | 8331 London Way Drive | Main Area | Spring | 77389-3363 | 3 |
| 21010 | 1145 | EV | R | Lone Star College Creekside | 8747 West New Harmony Trail | Room 116 | Tomball | 77375 | 3 |
| 12094 | 0305 | | D | Lone Star College Cypress Center | 19710 Clay Road | CY 106 and 107 | Katy | 77449 | 4 |
| 21113 | 0657 | EV | R | Lone Star College North Harris | 2700 WW Thorne Drive | Career and Skilled Trades Technology Center, Rooms 101/103 | Houston | 77073 | 1 |
| 11145 | 0848 | EV | D | Lone Star College Victory Center | 4141 Victory Drive | Room 102 | Houston | 77088 | 1 |
| 52082 | 0715 | | D | Lone Star Flight Museum | 11551 Aerospace Avenue | Event Center Room156 | Houston | 77034 | 2 |
| 92056 | 0339 | | D | Looscan Elementary School | 3800 Robertson Street | Hallway | Houston | 77009-4959 | 2 |
| 92100 | 0235 | | D | Lora B Peck Elementary School | 5001 Martin Luther King Boulevard | Cafeteria | Houston | 77021-2711 | 1 |
| 92114 | 0736 | | D | Love Park Community Center | 1000 West 12th Street | Gymnasium/Main Multipurpose Room | Houston | 77008-6619 | 1 |
| 72044 | 0176 | | D | Lovett Elementary School | 8814 South Rice Avenue | Data Room 317 | Houston | 77096-2622 | 1 |
| 92106 | 0180 | | D | M E Foster Elementary School | 3919 Ward Street | Multi purpose rm | Houston | 77021-4861 | 1 |
| 92016 | 0194 | | D | MacGregor Elementary School | 4801 LaBranch Street | Cafeteria | Houston | 77004-5650 | 1 |
| 72015 | 1068 | | D | Mahanay Elementary School | 13215 High Star Drive | Room 417-Gym | Houston | 77083-1905 | 4 |
| 82061 | 0569 | | D | Mandarin Immersion Magnet School | 5445 West Alabama Street | Library | Houston | 77056 | 1 |
| 72035 | 0525 | | D | Marian Park Community Center | 11101 South Gessner Road | Main MultiPurpose Room | Houston | 77071 | 1 |

OCA-APPX-1324

Tatum_005255

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 72006 | 0781 | | D | Martin Elementary School | 11718 Hendon Lane | Room 164 | Houston | 77072-3416 | 4 |
| 41033 | 0141 | EV | R | Martin Flukinger Community Center | 16003 Lorenzo Street | Large Assembly Room | Channelview | 77530 | 2 |
| 22077 | 0411 | | D | Mary Walke Stephens Elementary School | 2402 Aldine Mail Route Road | Hallway | Houston | 77039-5510 | 2 |
| 82067 | 0772 | | R | MAS Katy Center (Masjid Ar-Rahman) | 1800 Baker Road | Gymnasium/multipurpose room | Houston | 77094 | 4 |
| 21028 | 0082 | EV | D | Masjid AlSalam | 16700 Old Louetta Road | MPH Foyer | Spring | 77379 | 3 |
| 22157 | 0958 | | D | Masjid Bilal | 11815 Adel Road | Gymnasium | Houston | 77067 | 1 |
| 92026 | 0072 | | D | Mason Park Community Center | 541 South 75th Street | Mason Clubhouse | Houston | 77023-2701 | 2 |
| 72019 | 0984 | | D | Mata Intermediate | 9225 South Dairy Ashford Street | Cafeteria | Houston | 77099 | 4 |
| 12060 | 0694 | | D | Matzke Elementary School | 10002 Mills Road | Music room | Houston | 77070 | 3 |
| 12011 | 1123 | | D | Mayde Creek High School | 19202 Groeschke Road | Performing Arts Center (Lobby) | Houston | 77084-5600 | 4 |
| 22111 | 0884 | | D | McDougle Elementary School | 10410 Kansack Lane | Gym | Houston | 77086 | 1 |
| 12103 | 1136 | | D | McFee Elementary School | 19315 Plantation Cove Lane | PE Room | Katy | 77449-4842 | 4 |
| 52010 | 0170 | | D | McMasters Elementary School | 1011 Bennett Drive | Library | Pasadena | 77503-2205 | 2 |
| 22084 | 0321 | | D | Melrose Park Community Center | 1001 Canino Road | Gym/Main Multipurpose Room | Houston | 77076-1218 | 2 |
| 22095 | 0082 | | R | Memorial Chase Home Owners Association Clubhouse | 9411 Landry Boulevard | Club House | Spring | 77379-3857 | 3 |
| 82058 | 0273 | | R | Memorial Drive Elementary School | 11202 Smithdale Road | Library | Houston | 77024-6799 | 3 |
| 92047 | 0070 | | R | Memorial Elementary School | 6401 Arnot Street | Room 103 | Houston | 77007-2007 | 4 |
| 82055 | 0439 | | R | Memorial Middle School | 12550 Vindon Drive | New Gymnasium | Houston | 77024-4130 | 3 |
| 12014 | 1138 | | D | Metcalf Elementary School | 6100 Queenston Boulevard | Gym | Houston | 77084-6400 | 4 |
| 91065 | 0200 | EV | D | Metropolitan MultiService Center | 1475 West Gray Street | Gym | Houston | 77019-4926 | 1 |
| 92091 | 0472 | | D | Michael E DeBakey High School for Health Professions | 2545 Pressler Street | Room 148 | Houston | 77030 | 1 |
| 92068 | 0160 | | D | Mickey Leland College Preparatory Academy for Young Men | 1700 Gregg Street | Lecture Hall | Houston | 77020 | 1 |
| 22123 | 0596 | | D | Mildred Jenkins Elementary School | 4615 Reynaldo Drive | Gym | Spring | 77373-6821 | 3 |
| 72009 | 0429 | | D | Mildred Rickard Landis Elementary School | 10255 Spice Lane | Gym Rm 302 | Houston | 77072-5035 | 4 |
| 12177 | 0481 | | R | Millsap Elementary School | 12424 Huffmeister Road | PE Room | Cypress | 77429 | 3 |
| 72037 | 0525 | | D | Milne Elementary School | 7800 Portal Drive | Gymnasium | Houston | 77071-1700 | 1 |
| 52074 | 0328 | | D | Milstead Middle School | 338 Gilpin Street | Gym | Houston | 77034 | 2 |
| 41016 | 0229 | EV | D | Milton Lusk Activity Center | 1022 Mercury Drive | Meeting Room | Houston | 77029 | 2 |
| 71013 | 0647 | EV | D | Mission Bend Islamic Center | 6233 Tres Lagunas | Meeting Room | Houston | 77083 | 4 |
| 82002 | 1126 | | D | Mission Bend United Methodist Church | 3710 South Texas 6 | Sanctuary | Houston | 77082 | 4 |
| 92055 | 0206 | | D | Montie Beach Park Community Center | 915 Northwood Street | Main MultiPurpose Room | Houston | 77009-3703 | 2 |
| 92120 | 0123 | | D | Montrose Branch Houston Public Library | 4100 Montrose Boulevard | Meeting Room | Houston | 77006-4938 | 1 |
| 91052 | 0206 | EV | D | Moody Park Community Center | 3725 Fulton Street | Main MultiPurpose Room | Houston | 77009 | 2 |
| 22149 | 0321 | | D | Moreno Elementary School | 620 East Canino Road | Foyer | Houston | 77037 | 2 |
| 92088 | 0139 | | D | Morning Star Assisted Living and Memory Care at River Oaks | 2315 Richmond Avenue | Theater | Houston | 77098 | 4 |
| 12104 | 0618 | | D | Morton Ranch High School | 21000 Franz Road | PAC Lobby | Katy | 77449-5729 | 4 |
| 62063 | 0722 | | D | Mount Moriah Missionary Baptist Church | 15500 Vandalia Way | Fellowship Hall | Houston | 77053-2128 | 1 |
| 92103 | 0219 | | D | Mount Olive Baptist Church | 3515 Yellowstone Boulevard | Fellowship Hall | Houston | 77021-2407 | 1 |
| 92046 | 0501 | | D | Mount Sinai Baptist Church Family Life Center | 902 West 8th Street | Gym | Houston | 77007-1408 | 1 |
| 42047 | 0251 | | D | Mt Rose COGIC, City of Refuge | 13000 Crosby Lynchburg Road | Gym | Crosby | 77532 | 3 |
| 92021 | 0715 | | D | MultiCultural Center | 951 Tristar Drive | Right Lobby | Webster | 77598 | 2 |
| 42029 | 0028 | | R | Navarre Funeral Home | 2444 Rollingbrook Drive | Foyer | Baytown | 77521 | 2 |
| 91022 | 0010 | EV | D | Neighborhood Centers Inc Ripley House Campus | 4410 Navigation Boulevard | Gym | Houston | 77011-1036 | 2 |
| 52083 | 0278 | | D | Nelda Sullivan Middle School | 1112 Queens Road | Cafeteria | Pasadena | 77502 | 2 |
| 32014 | 0733 | | D | New Beulah E Johnson Elementary School | 13901 Homestead Road | Room 733 | Humble | 77396 | 2 |
| 22100 | 0613 | | D | New Destiny Praise and Worship Center | 4170 West Greens Road | Main Room Worship | Houston | 77066-4850 | 1 |
| 22103 | 0358 | | D | New Light Christian Center | 1535 Greensmark Drive | Sanctuary | Houston | 77067 | 1 |
| 32028 | 0230 | | D | New Mount Carmel Baptist Church | 4301 Weaver Road | Fellowship Hall first Floor | Houston | 77016-5634 | 1 |
| 92036 | 0138 | | D | New Pleasant Grove Baptist Church | 3221 Bain Street | Fellowship Hall | Houston | 77026-4405 | 1 |
| 12010 | 0589 | | D | New Westlake Volunteer Fire Department Station | 19636 Saums Road | Meeting Room | Houston | 77084-4732 | 4 |
| 32067 | 0097 | | R | Newport Elementary School | 430 North Diamondhead Boulevard | Gym | Crosby | 77532-4103 | 3 |
| 22116 | 0657 | | D | Nimitz High School | 2005 W W Thorne Boulevard | Auditorium | Houston | 77073-3301 | 1 |
| 12148 | 0467 | | R | Nitsch Elementary School | 4702 West Mount Houston Road | Parent Room 100 | Houston | 77088-3053 | 1 |
| 12064 | 0484 | | R | Norchester Clubhouse | 13439 Jones Road | General Meeting Room | Houston | 77070-3917 | 3 |
| 41005 | 0460 | EV | D | North Channel Branch Library | 15741 Wallisville Road | Meeting Room | Houston | 77049-4607 | 1 |
| 21151 | 1070 | EV | D | North East Community Center | 10918 Bently Street | Meeting Room | Houston | 77093 | 2 |

OCA-APPX-1325

Tatum_005256

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 32040 | 0585 | | D | North Forest High School | 10726 Mesa Drive | Gym | Houston | 77078-1401 | 1 |
| 52031 | 0718 | | R | North Pointe Elementary School | 3200 Almond Creek Drive | Gym | Houston | 77059-2812 | 2 |
| 42008 | 0413 | | D | North Shore Elementary School | 14310 Duncannon Drive | 1502L | Houston | 77015-2514 | 2 |
| 42007 | 0725 | | D | North Shore Middle School | 120 Castlegory Road | Multipurpose Room | Houston | 77015-1669 | 2 |
| 22019 | 0552 | | R | Northampton MUD Community Center | 6012 Root Road | Main Room | Spring | 77389-3779 | 3 |
| 12081 | 0310 | | R | Northbrook Middle School | 3030 Rosefield Drive | Theater | Houston | 77080-2610 | 3 |
| 12083 | 0444 | | R | Northbrook Senior High School | 1 Raider Circle South | Auditorium | Houston | 77080-3995 | 3 |
| 22099 | 0468 | | D | Northcliffe Manor Community Center | 12026 West Marsham Circle | Community Center | Houston | 77066-4439 | 1 |
| 31061 | 0611 | EV | D | Northeast Multi-Service Center | 9720 Spaulding Street | Auditorium | Houston | 77016 | 1 |
| 22120 | 0897 | | D | Northgate Crossing Elementary School | 23437 Northgate Crossing Boulevard | Gym | Spring | 77373-5687 | 3 |
| 12027 | 0485 | | R | Northpointe Intermediate School | 11855 Northpointe Boulevard | Cafeteria | Tomball | 77377 | 3 |
| 42013 | 0821 | | D | Northshore Friends Church | 1013 Maxey Road | Sanctuary | Houston | 77015-4802 | 2 |
| 12088 | 0498 | | D | Northwest Church of Christ | 6720 West Tidwell Road | Fellowship Center | Houston | 77092-1436 | 1 |
| 92138 | 0562 | | D | Norton Memorial Temple Church of God In Christ | 5008 Lucille Street | Fellowship Hall | Houston | 77026 | 1 |
| 72007 | 0781 | | D | Notre Dame Catholic Church Parish Hall | 7720 Boone Road | Parish Hall | Houston | 77072-3595 | 4 |
| 81024 | 0483 | EV | D | Nottingham Park Building | 926 Country Place Drive | Meeting Room | Houston | 77079 | 4 |
| 11123 | 0223 | EV | D | NRG Arena | 1 NRG Parkway | Hall D Gate 9 | Houston | 77054 | 1 |
| 12140 | 0189 | | R | Oak Forest Elementary School | 1401 West 43rd Street | Multipurpose Room | Houston | 77018-4106 | 1 |
| 32006 | 0674 | | R | Oak Forest Elementary School Humble ISD | 6400 Kingwood Glen Drive | Cafeteria | Humble | 77346-2039 | 3 |
| 32004 | 0658 | | R | Oaks Elementary School | 5858 Upper Lake Drive | Gym | Humble | 77346-1966 | 3 |
| 92142 | 0905 | | D | Oates Elementary School | 10044 Wallisville Road | Library | Houston | 77013 | 2 |
| 22002 | 0587 | | D | Ogden Elementary School | 21919 Rayford Road | Music Room | Humble | 77338 | 3 |
| 22076 | 0664 | | D | Oleson Elementary School | 12345 Vickery Street | Library | Houston | 77039-3699 | 2 |
| 92126 | 0140 | | D | One Delta Plaza Educational Center | 3333 Old Spanish Trail | Hall of Fame #1 | Houston | 77021 | 1 |
| 12023 | 0642 | | R | Owens Elementary School | 7939 Jackrabbit Road | PE room | Houston | 77095-2901 | 3 |
| 32016 | 0847 | | D | Park Lakes Elementary School | 4400 Wilson Road | Cafeteria | Humble | 77396-2497 | 1 |
| 52006 | 0419 | | R | Park View Intermediate School | 3003 Dabney Drive | Choir Room | Pasadena | 77502-5530 | 2 |
| 72047 | 0014 | | D | Parker Elementary School | 10626 Atwell Drive | Auditorium | Houston | 77096-4925 | 4 |
| 52018 | 0534 | | R | Parkgate Community Church | 3715 Preston Avenue | Kix Building | Pasadena | 77505-2012 | 2 |
| 82020 | 0461 | | R | Parkway Place | 1321 Park Bayou Drive | Auditorium/Chapel | Houston | 77077-1507 | 4 |
| 52024 | 0190 | | D | Pasadena High School | 206 South Shaver Street | Front Office Foyer | Pasadena | 77506-2016 | 2 |
| 12179 | 1120 | | D | Patricia E. Paetow High School | 23111 Stockdick School Road | Performing Arts Center Lobby | Katy | 77493 | 4 |
| 82010 | 0492 | | R | Paul Revere Middle School | 10502 Briar Forest Drive | Hallway/Auditorium | Houston | 77042-2338 | 4 |
| 52081 | 0328 | | D | Pearl Hall Elementary School | 1504 9th Street | Library | South Houston | 77587-5000 | 2 |
| 52072 | 0181 | | D | Pearl Rucker Elementary School | 5201 Vinett Street | Gym | Houston | 77017-4958 | 2 |
| 22080 | 0409 | | D | Pep Mueller County Park Clubhouse | 14750 Henry Road | Meeting Room | Houston | 77060-5625 | 2 |
| 92083 | 0232 | | R | Pershing Middle School | 3838 Blue Bonnet Boulevard | Skyline Hallway | Houston | 77025-1230 | 1 |
| 82034 | 0432 | | D | Pilgrim Academy | 6302 Skyline Drive | Library | Houston | 77057-6902 | 4 |
| 92097 | 0215 | | R | Pin Oak Middle School | 4601 Glenmont Drive | Library | Bellaire | 77401-2328 | 1 |
| 32005 | 1016 | | R | Pine Forest Elementary School | 19702 West Lake Houston Parkway | Cafeteria | Humble | 77346-2000 | 3 |
| 82056 | 0439 | | R | Pines Presbyterian Church | 12751 Kimberley Lane | Fellowship Hall | Houston | 77024 | 4 |
| 82038 | 0433 | | D | Piney Point Elementary School | 8921 Pagewood Lane | Gym | Houston | 77063-5543 | 4 |
| 52086 | 0416 | | D | Pipers Meadow Community Center | 15920 Pipers View Drive | Community Center | Webster | 77598-2502 | 2 |
| 72027 | 0146 | | D | Platou Community Center | 11655 Chimney Rock Road | Main MultiPurpose Room | Houston | 77035-2807 | 4 |
| 92039 | 0259 | | D | Pleasantville Elementary School | 1431 Gellhorn Drive | Cafeteria | Houston | 77029-3343 | 1 |
| 22150 | 0958 | | D | Plummer Middle School | 11429 Spears Road | Mini Gym/Practice Gym | Houston | 77067 | 1 |
| 92130 | 0019 | | D | PNC Stadium | 2200 Texas Street | Concourse | Houston | 77003 | 1 |
| 92096 | 0895 | | D | Poe Elementary School | 5100 Hazard Street | Front Hallway | Houston | 77098-5330 | 1 |
| 52026 | 0191 | | D | Pomeroy Elementary School | 920 Burke Road | Gym | Pasadena | 77506-5242 | 2 |
| 22022 | 0465 | | D | Ponderosa Elementary School | 17202 Butte Creek Road | Library | Houston | 77090-2332 | 3 |
| 12133 | 0923 | | D | Pope Elementary School | 19019 North Bridgeland Lake Parkway | Music room | Cypress | 77433-3468 | 3 |
| 12130 | 0875 | | D | Postma Elementary School | 18425 West Road | Gym | Cypress | 77433-2375 | 4 |
| 11167 | 1097 | EV | D | Prairie View A&M University Northwest | 9449 Grant Road | Room 107 | Houston | 77070 | 3 |
| 92057 | 0005 | | D | Proctor Plaza Park Community Center | 803 West Temple Street | Main MultiPurpose Room | Houston | 77009-5257 | 1 |
| 42003 | 0353 | | D | Purple Sage Elementary School | 6500 Purple Sage Road | Main Entry | Houston | 77049-3800 | 2 |
| 12166 | 0225 | | D | Quality Suites Cy-Fair at Jones Road | 17550 Northwest Freeway | Meeting Room | Houston | 77065 | 3 |

OCA-APPX-1326

Tatum_005257

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 71022 | 0462 | EV | D | Raindrop Turkish House | 9301 West Bellfort Boulevard | Turkistan Room and Selcuk Room | Houston | 77031 | 4 |
| 22005 | 0334 | | D | Ramada Inn | 6115 Will Clayton Parkway | Lilly and Lilac Rooms | Humble | 77338-8127 | 1 |
| 12049 | 0495 | | R | Ramona Bang Elementary School | 8900 Rio Grande Drive | GYM | Houston | 77064-7137 | 3 |
| 92020 | 0069 | | D | Raul C Martinez Annex | 1001 SSGT Macario Garcia Drive | Room 204 | Houston | 77011 | 2 |
| 52071 | 0526 | | D | Raul Yzaguirre School for Success Tejano Center Building B | 2950 Broadway Boulevard | Tejano Center for Community Concerns Board Room | Houston | 77017-1794 | 2 |
| 82017 | 0510 | | D | Ray K Daily Elementary School | 12909 Briar Forest Drive | Gym | Houston | 77077 | 4 |
| 62024 | 0288 | | D | Reagan Webb Mading Elementary School | 8511 Crestmont Street | Cafeteria | Houston | 77033 | 1 |
| 52025 | 0301 | | D | Red Bluff Elementary School | 416 Bearle Street | Cafeteria | Pasadena | 77506-3098 | 2 |
| 72029 | 0255 | | D | Red Elementary School | 4520 Tonawanda Drive | Cafeteria | Houston | 77035-3716 | 1 |
| 82004 | 0600 | | D | Rees Elementary School | 16305 Kensley Drive | Gym | Houston | 77082-2847 | 4 |
| 82069 | 0807 | | D | Residence Inn by Marriott Houston Westchase on Westheimer | 9965 Westheimer | Conference Room | Houston | 77042 | 4 |
| 92113 | 0902 | | R | Resurrection Metropolitan Community Church | 2025 West 11th Street | Activities Building | Houston | 77008-6320 | 4 |
| 62062 | 0158 | | D | Reynolds Elementary School | 9601 Rosehaven Drive | Multi Purpose | Houston | 77051-3132 | 1 |
| 92077 | 0361 | | D | Rice University-Welcome Center | 6100 Main Street | Sewall Hall/Welcome Center | Houston | 77005 | 2 |
| 72038 | 0525 | | D | Riceville Mount Olive Baptist Church Multi Purpose Building | 11231 South Gessner Road | Multi Purpose | Houston | 77071-2209 | 1 |
| 22106 | 0958 | | D | Richard and Kitty Spence Elementary School | 1300 Gears Road | Library | Houston | 77067-4204 | 1 |
| 11134 | 0790 | EV | D | Richard and Meg Weekley Community Center | 8440 Greenhouse Road | Room 300 | Cypress | 77433-5135 | 4 |
| 62007 | 0308 | | D | Rick Schneider Middle School | 8420 Easthaven Boulevard | Foyer | Houston | 77075-1106 | 2 |
| 41046 | 0251 | EV | D | Riley Chambers Community Center | 808 1/2 Magnolia Avenue | Large Assembly Room | Crosby | 77532 | 3 |
| 92067 | 0227 | | R | River Oaks Elementary School | 2008 Kirby Drive | Music Room | Houston | 77019-6016 | 4 |
| 92090 | 0217 | | R | River Oaks Recreation Center | 3600 Locke Lane | Main MultiPurpose Room | Houston | 77027-4003 | 4 |
| 32018 | 0888 | | D | River Pines Elementary School | 2400 Cold River Drive | Cafeteria | Humble | 77396-4290 | 3 |
| 32062 | 0546 | | R | Riverwood Middle School | 2910 High Valley Drive | Commons | Kingwood | 77345-1852 | 3 |
| 52063 | 1096 | | R | Rizzuto Elementary School | 3201 Farrington Street | Cafeteria | La Porte | 77571 | 2 |
| 62032 | 0402 | | D | Robert L Frost Elementary School | 5002 Almeda Genoa Road | Cafeteria | Houston | 77048-4725 | 1 |
| 92092 | 0148 | | D | Roberts Elementary School | 6000 Greenbriar Drive | 101c | Houston | 77030 | 1 |
| 12180 | 0049 | | R | Roberts Road Elementary School | 24920 Zube Road | Gym | Hockley | 77447 | 4 |
| 22060 | 0171 | | D | Roderick Paige Elementary | 7501 Curry Road | Parent Conference Room | Houston | 77093 | 1 |
| 12069 | 0609 | | R | Rolling Fork Club | 9110 Rodney Ray Boulevard | Clubhouse | Houston | 77040-1525 | 1 |
| 12006 | 0622 | | R | Ronnie Truitt Middle School | 6600 Addicks Satsuma Road | Auxiliary 530 | Houston | 77084-1520 | 4 |
| 12029 | 0126 | | R | Rosehill Elementary School | 17950 Waller Tomball Road | Gym Hallway | Tomball | 77377-2622 | 4 |
| 92033 | 0544 | | D | Ross Elementary School | 2819 Bay Street | T-Building 32 Room T-2 | Houston | 77026-3203 | 1 |
| 22045 | 0482 | | R | Roth Elementary School | 21623 Castlemont Lane | Gym | Spring | 77388-3860 | 3 |
| 32036 | 0376 | | D | Royalwood Elementary School | 7715 Royalwood Drive | Auditorium | Houston | 77049-2314 | 2 |
| 12114 | 0691 | | R | Royce Black Elementary School | 14155 Grant Road | Gym | Cypress | 77429-1398 | 3 |
| 82027 | 0258 | | R | Rummel Creek Elementary School | 625 Brittmoore Road | Library Kiva | Houston | 77079-6101 | 4 |
| 92135 | 0015 | | R | Saint Andrews Presbyterian Church | 5308 Buffalo Speedway | Warren Family Center | Houston | 77005-2122 | 1 |
| 92136 | 0217 | | R | Saint Anne Catholic Church | 2140 Westheimer Road | Saint Basil Hall | Houston | 77098 | 4 |
| 92053 | 0166 | | D | Saint Anne de Beaupre Catholic Church | 2810 Link Road | The Big Hall (Building 1) | Houston | 77009 | 2 |
| 22110 | 0623 | | R | Saint Dunstans Episcopal Church Parish Hall | 14301 Stuebner Airline Road | Room 304/305 | Houston | 77069-3529 | 3 |
| 92018 | 0136 | | R | Saint James Episcopal Church | 3129 Southmore Boulevard | Parish Hall Building C | Houston | 77004-6214 | 1 |
| 11112 | 0300 | EV | R | Saint John Lutheran Church and School | 15235 Spring Cypress Road | Chapel | Cypress | 77429 | 3 |
| 92015 | 0085 | | D | Saint Luke the Evangelist Episcopal Church | 3530 Wheeler Avenue | Parish Hall | Houston | 77004-5521 | 1 |
| 92050 | 0710 | | R | Saint Lukes Missionary Baptist Church | 714 Detering Street | Fellowship Hall | Houston | 77007-5195 | 4 |
| 82030 | 0234 | | R | Saint Martin's Episcopal Church | 717 Sage Road | Scout Center | Houston | 77056 | 7 |
| 92017 | 0210 | | D | Saint Marys Catholic Church | 3006 Rosedale Street | Gym | Houston | 77004-6199 | 1 |
| 12115 | 0442 | | R | Saint Marys Catholic Church | 15415 North Eldridge Parkway | Room 106 | Cypress | 77429-2005 | 3 |
| 12070 | 0593 | | D | Saint Matthews Catholic Church | 9915 Hollister Drive | Auditorium | Houston | 77040-1702 | 1 |
| 92054 | 0637 | | D | Saint Patrick Catholic Church | 4918 Cochran Street | Parish Hall | Houston | 77009 | 2 |
| 12041 | 0576 | | D | Saint Pauls Missionary Baptist Church | 2516 Paul Quinn Street | Fellowship Hall | Houston | 77091-4712 | 1 |
| 61031 | 0132 | EV | D | Saint Philip Neri Catholic Church | 10960 Martin Luther King Boulevard | Hospitality Room | Houston | 77048-1896 | 1 |
| 22061 | 0478 | | R | Saint Timothy Lutheran Church | 14225 Hargrave Road | Adult Education Building | Houston | 77070 | 3 |
| 12131 | 0405 | | R | Salyards Middle School | 21757 Fairfield Place Drive | Library | Cypress | 77433-3196 | 3 |
| 52004 | 0267 | | D | Sam Rayburn High School | 2121 Cherrybrook Lane | Gym 1 | Pasadena | 77502-4101 | 2 |
| 12121 | 0300 | | R | Sampson Elementary School | 16002 Coles Crossing Drive North | PE Room | Cypress | 77429-6981 | 3 |
| 21013 | 529 | EV | R | Samuel Matthews Park Community Center | 1728 Hufsmith Road | Room A | Tomball | 77375-4918 | 3 |

OCA-APPX-1327

Tatum_005258

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 42010 | 0352 | | R | San Jacinto College Central Campus Library | 8060 Spencer Highway | C-21.101 Library Grand Hall | Pasadena | 77505-5999 | 2 |
| 31072 | 0096 | EV | D | San Jacinto College Generation Park | 13455 Lockwood Road | Room G-2.125 | Houston | 77044 | 1 |
| 41041 | 0063 | EV | R | San Jacinto Community Center | 604 Highland Woods Drive | Art Room and Small Assembly Room | Highlands | 77562-4546 | 3 |
| 72076 | 0335 | | D | San Mateo Episcopal Church | 6635 Alder Drive #2 | Parish Hall | Houston | 77081 | 4 |
| 12105 | 0712 | | D | Sandra Bales Walker Elementary School | 6424 Settlers Village Drive | Gym | Katy | 77449-6503 | 4 |
| 92071 | 0079 | | D | Scroggins Elementary School | 400 Boyles Street | Library | Houston | 77020-5242 | 2 |
| 52045 | 0333 | | R | Seabrook Intermediate School | 2401 North Meyer Road | Practice Gym | Seabrook | 77586-2964 | 2 |
| 62038 | 0766 | | D | Seguin Elementary School | 5905 Waltrip Street | Multipurpose Room | Houston | 77087 | 2 |
| 22055 | 0579 | | D | Sendero de la Cruz | 513 West Rittenhouse Road | Sanctuary | Houston | 77091-2404 | 2 |
| 92006 | 0009 | | D | Settegast Park Community Center | 3000 Garrow Street | Main MultiPurpose Room | Houston | 77003-2326 | 2 |
| 32063 | 0758 | | R | Shadow Forest Elementary School | 2300 Mills Branch Drive | Cafeteria | Kingwood | 77345-2100 | 3 |
| 12034 | 0056 | | R | Shadow Oaks Elementary School | 1335 Shadowdale Drive | Flex Room 214 | Houston | 77043-4208 | 3 |
| 82023 | 0625 | | R | Shadowbriar Elementary School | 2650 Shadowbriar Drive | Multipurpose Room | Houston | 77077-6000 | 4 |
| 22058 | 0152 | | D | Shady Lane Park Community Center | 10220 Shady Lane | Main MultiPurpose Room | Houston | 77093-4604 | 2 |
| 32027 | 0611 | | D | Shadydale Elementary School | 5905 Tidwell Road | Front foyer | Houston | 77016-4745 | 1 |
| 72057 | 0426 | | D | Sharpstown International School | 8330 Triola Lane | Library | Houston | 77036-6310 | 4 |
| 72053 | 0297 | | D | Sharpstown Park Community Center | 6600 Harbor Town Drive | MultiPurpose Room 2 | Houston | 77036-4052 | 4 |
| 72049 | 0017 | | D | Shearn Elementary School | 9802 Stella Link Road | Library | Houston | 77025-4605 | 1 |
| 32035 | 0976 | | D | Sheldon Elementary School | 17203 Hall Shepperd Road | Library | Houston | 77049-1049 | 1 |
| 32033 | 0096 | | D | Sheldon ISD Administration Building  Network Operations Center | 11411B CE King Parkway | Rooms 150 and 151 | Houston | 77044-7192 | 1 |
| 92085 | 0175 | | D | Sheltering Arms Community Center | 3838 Aberdeen Way | Education Room | Houston | 77025-2416 | 1 |
| 11091 | 0323 | EV | D | Sheraton Houston Brookhollow Hotel | 3000 North Loop West Freeway | Jasmine I & II | Houston | 77092-8810 | 4 |
| 22112 | 0697 | | D | Shotwell Middle School | 6515 Trail Valley Way | Mini Gym | Houston | 77086-2024 | 1 |
| 91101 | 0235 | EV | D | Shrine of the Black Madonna Cultural and Event Center | 5309 Martin Luther King Boulevard | The Red Room | Houston | 77021 | 1 |
| 32020 | 0960 | | D | Sierra Meadows Apartments | 9835 North Sam Houston Parkway East | Clubhouse Leasing/Community Room | Humble | 77396-4637 | 1 |
| 92108 | 0902 | | D | Sinclair Elementary School | 6410 Grovewood Lane | Library | Houston | 77008 | 4 |
| 62019 | 0475 | | D | SJC South Campus Fine Arts Center Building 15 | 13735 Beamer Road Entrance B | Auditorium | Houston | 77089 | 2 |
| 82015 | 0566 | | D | Sneed Elementary School | 9855 Pagewood Lane | Room 305 | Houston | 77042-5523 | 4 |
| 62018 | 1116 | | D | South Belt Elementary School | 1801 Riverstone Ranch Road | Front Area | Houston | 77089-5724 | 2 |
| 62058 | 1006 | | D | South Early College High School | 1930 Airport Boulevard | Multi Purpose Room | Houston | 77051 | 1 |
| 52080 | 0029 | | D | South Houston Intermediate School | 900 College Avenue | Front Foyer | South Houston | 77587-4261 | 2 |
| 92099 | 0031 | | D | South Union Missionary Baptist Church Annex | 3569 Lydia Street | Annex | Houston | 77021 | 1 |
| 92082 | 0089 | | R | Southside Place Park Clubhouse | 3743 Garnet Street | Clubhouse/The Big Room | Houston | 77005-3715 | 1 |
| 72012 | 0646 | | D | Southwest Community Christian Center | 14880 Bellaire Boulevard | Gymnasium | Houston | 77083 | 4 |
| 52030 | 0748 | | D | Space Center Intermediate School | 17400 Saturn Lane | Large Gym/Competition Gym | Houston | 77058-4400 | 2 |
| 12113 | 1022 | | R | Spillane Middle School | 13403 Woods-Spillane Boulevard | Performance gym | Cypress | 77429 | 3 |
| 91109 | 0054 | EV | D | SPJST Lodge Num 88 | 1435 Beall Street | Annex in back of main building | Houston | 77008-3441 | 1 |
| 12086 | 0973 | | R | Spring Branch Elementary School | 1700 Campbell Road | Gymnasium | Houston | 77080-7404 | 3 |
| 82049 | 0441 | | R | Spring Branch Memorial Library | 930 Corbindale Road | Meeting Room | Houston | 77024 | 3 |
| 82053 | 0441 | | R | Spring Branch Middle School | 1000 Piney Point Road | Auditorium | Houston | 77024-2796 | 3 |
| 22044 | 0482 | | D | Spring Chateau | 4010 FM 2920 | Madison Square Room | Spring | 77388-3229 | 3 |
| 22042 | 0500 | | R | Spring First Church | 1851 Spring Cypress Road | Youth Center - Sanctuary Hall | Spring | 77388 | 3 |
| 22090 | 0894 | | D | Spring ISD Child Nutrition and Training Center | 15330 Kuykendahl Road | Training Theater | Houston | 77014 | 1 |
| 22153 | 0883 | | D | Spring ISD Transportation Center | 341 East Richey Road | Training Room A&B | Houston | 77073 | 1 |
| 12084 | 0445 | | R | Spring Woods Baptist Church | 10131 Emnora Lane | Gym | Houston | 77080 | 3 |
| 12085 | 0444 | | R | Spring Woods Middle School | 9810 Neuens Road Enter 9700 Hammerly | ISS Room 930 | Houston | 77080-6498 | 3 |
| 12175 | 0479 | | R | SpringHill Suites by Marriott Houston Northwest | 20303 Chasewood Park Drive | Discovery C Room | Houston | 77070 | 3 |
| 12052 | 0713 | | D | SpringHill Suites Northwest-Cypress | 20350 Northwest Freeway | Salvador II | Houston | 77065 | 3 |
| 42020 | 0099 | | D | Sterling Municipal Library | 1 Mary Elizabeth Wilbanks Avenue | Wilhite Meeting Room | Baytown | 77520 | 2 |
| 11003 | 0804 | EV | N | Steve Radack Community Center | 18650 Clay Road | Auditorium | Houston | 77084 | 4 |
| 22039 | 0514 | | R | Strack Intermediate School | 18027 South Kuykendahl Road | Gym | Spring | 77379-8199 | 3 |
| 42022 | 0456 | | R | Stuart Career Tech High School | 300 YMCA Drive | East Building Commoms | Baytown | 77520 | 2 |
| 62017 | 0417 | | D | Stuchbery Elementary School | 11210 Hughes Road | Gym | Houston | 77089-4636 | 2 |
| 72062 | 0938 | | D | Sugar Grove Academy | 8405 Bonhomme Road | Gymnasium | Houston | 77074 | 4 |
| 61059 | 0158 | EV | D | Sunnyside Multi Service Center | 9314 Cullen Boulevard | Classroom 186 | Houston | 77051 | 1 |
| 62060 | 0068 | | D | Sunnyside Park Community Center | 3502 Bellfort Street | Main MultiPurpose Room | Houston | 77051-1402 | 1 |

OCA-APPX-1328

Tatum_005259

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 82014 | 0807 | | D | Sunset Shadows Apartments Clubhouse | 9850 Meadowglen Lane | Business Center | Houston | 77042-4303 | 4 |
| 52003 | 0278 | | D | Sunset United Methodist Church | 709 Allendale Road | Gym | Pasadena | 77502-3501 | 2 |
| 72070 | 0345 | | D | Sylvan Rodriguez Jr Elementary School | 5858 Chimney Rock Road | Community Center Room 907 | Houston | 77081-2715 | 4 |
| 82032 | 0435 | | R | T H Rogers School | 5840 San Felipe Street | Orchestra Room | Houston | 77057 | 3 |
| 32038 | 0371 | | D | Tabernacle of Praise Family Worship Center | 8814 Tidwell Road | Main Sanctuary | Houston | 77078 | 1 |
| 82060 | 0436 | | R | Tanglewood Middle School | 5215 San Felipe Street | Gym | Houston | 77056 | 4 |
| 91009 | 0085 | EV | D | Texas Southern University Terry Library | 3100 Cleburne Street | Terry Library | Houston | 77004 | 1 |
| 22023 | 0550 | | D | The Abiding Word Lutheran Church and School | 17123 Red Oak Drive | Narthex | Houston | 77090-2600 | 1 |
| 52061 | 0561 | | R | The Academy of Viola De Walt | 401 North 2nd Street | Gymnasium | La Porte | 77571 | 2 |
| 61045 | 0458 | EV | D | The Collective-The Power Center | 12401 South Post Oak Road | South East South Wing | Houston | 77045-2020 | 1 |
| 62047 | 0216 | | D | The Crossing Community Church | 3225 West Orem Drive | Crossing Life Center | Houston | 77045-4603 | 1 |
| 82059 | 0730 | | R | The Forum at Memorial Woods | 777 North Post Oak Road | Multipurpose Room | Houston | 77024 | 3 |
| 11067 | 0966 | EV | D | The Grand Tuscany Hotel | 12801 Northwest Freeway | The Plaza | Houston | 77040 | 4 |
| 32017 | 0840 | | D | The Light of the World Christian Fellowship | 16161 Old Humble Road | Auditorium | Humble | 77396-3851 | 1 |
| 12176 | 0519 | | R | The MET Church Student Ministry | 12903 Jones Road | Studen Ministry Building-Foyer Area | Houston | 77020 | 3 |
| 92084 | 0350 | | D | The Rice School | 7550 Seuss Drive | Hallway/Auditorium | Houston | 77025-2271 | 1 |
| 22148 | 0326 | | D | The Victory International Church Houston | 170 Rittenhouse Street | Gym | Houston | 77076 | 2 |
| 22034 | 0648 | | R | Theiss Elementary School | 17510 Theiss Mail Route Road | Gym | Klein | 77379-4615 | 3 |
| 12057 | 0641 | | R | Thomas M Danish Elementary School | 11850 Fallbrook Drive | Music room | Houston | 77065-3508 | 3 |
| 12091 | 0140 | | D | Thompson Elementary School | 6121 Tierwester Street | Gymnasium | Houston | 77021-1311 | 1 |
| 22156 | 0660 | | D | Thompson Elementary School | 12470 Walters Road | Gym | Houston | 77014-2422 | 1 |
| 12099 | 0951 | | D | Thornton Middle School | 19802 Kieth Harrow Boulevard | Performance Gym | Katy | 77449-4885 | 4 |
| 92024 | 0069 | | D | Tijerina Elementary School | 6501 Sherman Street | Cafeteria | Houston | 77011 | 2 |
| 22154 | 0006 | | D | Timber Lane Community Center | 1904 Naplechase Crest Drive | Meeting Room A/B | Spring | 77373 | 3 |
| 32013 | 0117 | | R | Timbers Elementary School | 6910 Lonesome Woods Trail | Cafeteria | Humble | 77346-5016 | 3 |
| 12015 | 0643 | | D | Tipps Elementary School | 5611 Queenston Boulevard | Gym | Houston | 77084-6431 | 4 |
| 62061 | 0295 | | D | To Be Determined (Greater Lighthouse Church of God in Christ) | 4514 Knoxville Street | Fellowship Hall | Houston | 77051-2662 | 1 |
| 82028 | 0437 | | R | To Be Determined (Nottingham Elementary School) | 570 Nottingham Oaks Trail | Gymnasium | Houston | 77079-6399 | 4 |
| 82009 | 0356 | | R | To Be Determined (Walnut Bend Elementary School) | 10620 Briar Forest Drive | Multipurpose Gym | Houston | 77042-2320 | 4 |
| 61055 | 0630 | EV | D | Tom Bass Park Community Center Section Three | 15108 Cullen Boulevard | Auditorium | Houston | 77047-6714 | 1 |
| 22008 | 0127 | | R | Tomball Intermediate School | 723 West Main Street | Auditorium | Tomball | 77375 | 3 |
| 21009 | 0127 | EV | R | Tomball Public Works Building | 501B James Street | Training Room | Tomball | 77375 | 3 |
| 12068 | 1092 | | D | TownePlace Suites by Marriott Houston Northwest/Beltway 8 | 8845 West Road | Meeting Room | Houston | 77064 | 1 |
| 92140 | 0016 | | D | Toyota Center | 1510 Polk Street | VIP A and B | Houston | 77002 | 1 |
| 81008 | 0566 | EV | D | Tracy Gee Community Center | 3599 Westcenter Drive | Art Rooms 1 & 2 | Houston | 77042 | 4 |
| 92059 | 0004 | | D | Travis Elementary School HISD | 3311 Beauchamp Street | Library | Houston | 77009-6613 | 1 |
| 12156 | 0299 | | D | Treasure Forest Elementary School | 7635 Amelia Road | Cafeteria | Houston | 77055-1737 | 4 |
| 12101 | 0331 | | D | Tri-County Baptist Church | 5715 Peek Road | Fellowship Hall | Katy | 77449 | 4 |
| 11158 | 0707 | EV | R | Trini Mendenhall Community Center | 1414 Wirt Road | Auditorium | Houston | 77055-4917 | 3 |
| 42048 | 0456 | | R | Trinity Episcopal Church | 5010 North Main Street | Fellowship Hall | Baytown | 77521 | 2 |
| 92013 | 0020 | | R | Trinity Episcopal Church | 1015 Holman Street | Fellowship Hall | Houston | 77004-3810 | 1 |
| 92121 | 0918 | | D | Trinity Lutheran Church Downtown | 800 Houston Avenue | Gym | Houston | 77007 | 1 |
| 12013 | 0676 | | D | True Grace Bible Church | 17370 West Little York Road | Sanctuary | Houston | 77084-6301 | 4 |
| 92031 | 0854 | | D | Tuffly Park Community Center | 3200 Russell Street | Multi-purpose Room | Houston | 77026 | 1 |
| 22122 | 0634 | | R | Twin Creeks Middle School | 27100 Cypresswood Drive | Gym | Spring | 77373-6300 | 3 |
| 22155 | 0970 | | D | ULH Event Center | 331 United Leuva Circle | Ballroom | Houston | 77060 | 2 |
| 22063 | 0684 | | D | Ulrich Intermediate School | 10103 Spring Cypress Road | Library | Houston | 77070-6417 | 3 |
| 82031 | 0272 | | D | Unity of Houston | 2929 Unity Drive | Santuary | Houston | 77057 | 4 |
| 52034 | 0174 | | D | University Baptist Church | 16106 Middlebrook Drive | Chapel | Houston | 77059-6034 | 2 |
| 51038 | 0391 | EV | R | University of Houston Clear Lake | 2700 Bay Area Boulevard | UH Clear Lake Bayou Building | Houston | 77058 | 2 |
| 91010 | 0389 | EV | D | University of Houston Student Center | 4455 University Drive | Room 214 Space City | Houston | 77004 | 1 |
| 91001 | 0369 | EV | D | University of Houston-Downtown | 201 Girard Street | GSB 307, Milam & Travis Rooms | Houston | 77002 | 2 |
| 12160 | 0577 | | D | Valley Oaks Elementary School | 8390 Westview Drive | Library | Houston | 77055-6738 | 3 |
| 72034 | 0525 | | D | Valley West Elementary School | 10707 South Gessner Road | Cafeteria | Houston | 77071 | 1 |
| 12108 | 1102 | | R | Venture Christian Church | 25133 Lakecrest Manor Drive | Lobby Room | Katy | 77493 | 4 |
| 31084 | 700 | EV | R | Vera Brummet May Community Center | 2100 Wolf Road | Room 118 | Huffman | 77336 | 3 |

Tatum_005260

OCA-APPX-1329

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 21071 | 0595 | EV | D | Victory Houston | 809 West Road | Event Center | Houston | 77038 | 2 |
| 72054 | 0567 | | D | Vietnamese Community Center | 7100 Clarewood Drive | Main Hall | Houston | 77036-4402 | 4 |
| 52014 | 0347 | | R | Vincent Miller Intermediate School | 1002 Fairmont Parkway | Gym | Pasadena | 77054 | 2 |
| 42035 | 0719 | | R | Viola Cobb Elementary School | 915 Dell Dale Street | Cafeteria | Channelview | 77530 | 2 |
| 82047 | 0119 | | R | Voss Project Center at Gerald D. Young Agricultural Sciences Center | 5801 Katy Hockley Cut Off Road | Voss Project Center | Katy | 77493 | 4 |
| 52073 | 0329 | | D | W I Stevenson Middle School | 9595 Winkler Drive | Library | Houston | 77017-5921 | 2 |
| 12090 | 0505 | | D | Wainwright Elementary School | 5330 Milwee Street | Cafeteria | Houston | 77092-6655 | 1 |
| 82037 | 0298 | | D | Waldo Emerson Elementary School | 9533 Skyline Drive | Dance Room | Houston | 77063-5215 | 4 |
| 12150 | 0147 | | D | Walter and Inez Stovall EC/PK/K School | 3025 Ellington Street | Library | Houston | 77088-4599 | 1 |
| 12142 | 0927 | | D | Waltrip High School | 1900 West 34th Street | ISS Room | Houston | 77018-6186 | 1 |
| 12127 | 0511 | | R | Warner Elementary School | 10400 Warner Smith Boulevard | 505 Art Room | Cypress | 77433 | 3 |
| 12181 | 0675 | | R | Wayne C. Schultz Junior High School | 20950 Field Store Road | Auditorium Lobby | Waller | 77484 | 4 |
| 62010 | 1064 | | R | Weber Elementary School | 11955 Blackhawk Boulevard | Gym | Houston | 77089 | 2 |
| 61001 | 0750 | EV | R | Webster Civic Center | 311 Pennsylvania Avenue | Civic Center | Webster | 77598-5230 | 2 |
| 72036 | 0652 | | D | Welch Middle School | 11544 South Gessner Road | Auditorium | Houston | 77071 | 1 |
| 22127 | 0615 | | R | Wells Middle School Auxiliary Gym | 4033 Gladeridge Drive | Gym | Houston | 77068 | 3 |
| 12039 | 0327 | | D | Wesley Elementary School | 800 Dillard Street | Cafeteria | Houston | 77091-2301 | 1 |
| 82016 | 0461 | | R | West Briar Middle School | 13733 Brimhurst Drive | Auditorium Hallway | Houston | 77077 | 4 |
| 32071 | 0098 | | R | West Campus Gym | 24403 East Lake Houston Parkway | Gym | Huffman | 77336-4447 | 3 |
| 12018 | 0709 | | D | West Houston Church of Christ | 17100 West Road | Gym | Houston | 77095 | 3 |
| 92080 | 0183 | | D | West University Community Building and Senior Center | 6104 Auden Street | Auditorium | Houston | 77005-2814 | 1 |
| 92081 | 0087 | | R | West University Scout House | 6108 Edloe Street | Clubhouse | Houston | 77005-2899 | 1 |
| 62002 | 0845 | | D | Westbrook Intermediate School | 302 West El Dorado Boulevard | Library | Friendswood | 77546-1724 | 2 |
| 72046 | 0403 | | R | Westbury Baptist Church | 10425 Hillcroft Street | Game Room in Family Life Center | Houston | 77096-4798 | 4 |
| 72025 | 1040 | | D | Westbury Senior High School | 11911 Chimney Rock Road | Library | Houston | 77035 | 1 |
| 22057 | 0591 | | D | Westfield Volunteer Fire Station 2 | 11255 Bentley Drive | Bay 1 | Houston | 77093-2752 | 2 |
| 82048 | 0362 | | R | Westland Baptist Church | 1407 West Grand Parkway South | Gym | Katy | 77494 | 4 |
| 92074 | 0202 | | D | Wheatley Senior High School | 4801 Providence Street | Auditorium | Houston | 77020-7235 | 1 |
| 91011 | 0390 | EV | D | Wheeler Avenue Baptist Church | 3826 Wheeler Avenue Building D | Fellowship Hall | Houston | 77004-2604 | 1 |
| 32009 | 0363 | | D | Whispering Pines Elementary School | 17321 Woodland Hills Drive | Cafeteria | Humble | 77346-3001 | 3 |
| 12028 | 1151 | | R | Wildwood Elementary School | 13802 Northpointe Boulevard | Cafeteria | Tomball | 77377-2442 | 3 |
| 12051 | 0244 | | D | Willbern Elementary School | 10811 Goodspring Drive | PE Room | Houston | 77064-9419 | 3 |
| 42023 | 0013 | | R | William B. Travis Elementary | 100 Robin Road | Main Hallway | Baytown | 77520 | 2 |
| 72065 | 0256 | | D | William S Sutton Elementary School | 7402 Albacore Drive | Parent room R12 | Houston | 77074-6512 | 4 |
| 52002 | 0188 | | D | Williams Elementary School | 1522 Scarborough Lane | Gym | Pasadena | 77502-1674 | 2 |
| 12071 | 0628 | | D | Willie B Ermel Elementary School | 7103 Woodsman Trail | Library | Houston | 77040-1839 | 1 |
| 32061 | 0760 | | D | Willow Creek Elementary School in Humble ISD | 2002 Willow Terrace Drive | Cafeteria | Humble | 77345-1785 | 3 |
| 72028 | 0287 | | D | Willow Meadows Baptist Church | 4300 West Bellfort Street | Gym | Houston | 77035-3602 | 1 |
| 62043 | 0286 | | D | Windsor Village Community Center | 14441 Croquet Lane | Main MultiPurpose Room | Houston | 77085-3352 | 1 |
| 22121 | 0558 | | R | Winship Elementary School | 2175 Spring Creek Drive | Cafeteria | Spring | 77373-6199 | 3 |
| 82071 | 0432 | | R | Wisdom High School | 6529 Beverly Hill Street | Event Lobby | Houston | 77057 | 4 |
| 12135 | 1055 | | R | Woodard Elementary School | 17501 Cypress North Houston | Music Room | Cypress | 77433-5246 | 3 |
| 32032 | 0421 | | D | Woodcreek Middle School | 14600 Woodson Park Drive | University Way | Houston | 77044-4492 | 1 |
| 12126 | 0901 | | R | Woodie Coker Andre Elementary School | 8111 Fry Road | PE Room | Cypress | 77433 | 3 |
| 42014 | 0162 | | D | Woodland Acres Elementary School | 12936 Sarahs Lane | Room 103 | Houston | 77015-6396 | 2 |
| 32052 | 0340 | | R | Woodland Hills Elementary | 2222 Tree Lane | Cafeteria | Kingwood | 77339 | 3 |
| 92143 | 0044 | | D | Woodland Park Community Center | 212 Parkview Street | Gym | Houston | 77009 | 2 |
| 62051 | 0271 | | D | Woodson Elementary School | 10720 Southview | Cafeteria | Houston | 77047 | 1 |
| 12154 | 0262 | | R | Woodview Elementary School | 9749 Cedardale Drive | Cafeteria | Houston | 77055 | 3 |
| 12162 | 0789 | | R | World Changers Church Houston | 7934 Highway 6 North | Fellowship Hall Building | Houston | 77095 | 3 |
| 82039 | 0547 | | R | World Theater | 1012 South Mason Road | Community Hall | Katy | 77450 | 4 |
| 22056 | 0591 | | D | Worsham Elementary School | 3007 Hartwick Road | Library | Houston | 77093 | 2 |
| 12055 | 0980 | | D | Wortham Village Clubhouse | 10911 Wortham Boulevard | Clubhouse | Houston | 77065 | 3 |
| 62057 | 0158 | | D | Worthing High School | 9215 Scott Street | Gymnasium | Houston | 77051 | 1 |
| 22132 | 0451 | | D | Yeager Elementary School | 13615 Champion Forest Drive | PE Room | Houston | 77069 | 3 |
| 82072 | 1001 | | D | Youngblood Intermediate School | 8410 Dairy View Lane | Cafeteria | Houston | 77072 | 4 |

OCA-APPX-1330

Tatum_005261

# Election Day Vote Centers - 1122

| Poll Codes | PCT | EV | Party | 1122 Location | Address | Voting Room | City | Zip | CC |
|---|---|---|---|---|---|---|---|---|---|
| 22016 | 0452 | | R | Zwink Elementary School | 22200 Frassati Way Drive | Gym | Spring | 77389-1417 | 3 |

Tatum_005262

OCA-APPX-1331

# Exhibit 82

# Don't Forget Your ID Numbers!



In Box 1 of the Application for Ballot by Mail, you must provide at least one of the required ID numbers.

**We recommend providing both.**

---

# Don't Forget Your ID Numbers!



In Box 1 of the Application for Ballot by Mail, you must provide at least one of the required ID numbers.

**We recommend providing both.**

---

# Don't Forget Your ID Numbers!



In Box 1 of the Application for Ballot by Mail, you must provide at least one of the required ID numbers.

**We recommend providing both.**

---

# Don't Forget Your ID Numbers!



In Box 1 of the Application for Ballot by Mail, you must provide at least one of the required ID numbers.

**We recommend providing both.**

# No Olvides Tu Número de Identificación!



En el Cuadro 1 de la Solicitud de Boleta por Correo, debe usted proveer al menos uno de los números de ID requeridos.

**Nosotros recomendamos que escriba los dos.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# No Olvides Tu Número de Identificación!



En el Cuadro 1 de la Solicitud de Boleta por Correo, debe usted proveer al menos uno de los números de ID requeridos.

**Nosotros recomendamos que escriba los dos.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# No Olvides Tu Número de Identificación!



En el Cuadro 1 de la Solicitud de Boleta por Correo, debe usted proveer al menos uno de los números de ID requeridos.

**Nosotros recomendamos que escriba los dos.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# No Olvides Tu Número de Identificación!



En el Cuadro 1 de la Solicitud de Boleta por Correo, debe usted proveer al menos uno de los números de ID requeridos.

**Nosotros recomendamos que escriba los dos.**

# Don't Forget Your ID Numbers!



Under the flap on your purple and white carrier envelope, where it says "Required Information", you must provide at least one of the required ID numbers. **We recommend providing both.**

---

# Don't Forget Your ID Numbers!



Under the flap on your purple and white carrier envelope, where it says "Required Information", you must provide at least one of the required ID numbers. **We recommend providing both.**

---

# Don't Forget Your ID Numbers!



Under the flap on your purple and white carrier envelope, where it says "Required Information", you must provide at least one of the required ID numbers. **We recommend providing both.**

---

# Don't Forget Your ID Numbers!

Under the flap on your purple and white carrier envelope, where it says "Required Information", you must provide at least one of the required ID numbers. **We recommend providing both.**

064.134768

# No Olvides Tu Número de Identificación!



Bajo la solapa del sobre de envío color morado y blanco, en donde dice "Información Requerida", debe usted proveer al menos uno de los números de ID requeridos. **Nosotros recomendamos que escriba los dos.**

---

# No Olvides Tu Número de Identificación!



Bajo la solapa del sobre de envío color morado y blanco, en donde dice "Información Requerida", debe usted proveer al menos uno de los números de ID requeridos. **Nosotros recomendamos que escriba los dos.**

---

# No Olvides Tu Número de Identificación!



Bajo la solapa del sobre de envío color morado y blanco, en donde dice "Información Requerida", debe usted proveer al menos uno de los números de ID requeridos. **Nosotros recomendamos que escriba los dos.**

---

# No Olvides Tu Número de Identificación!

Bajo la solapa del sobre de envío color morado y blanco, en donde dice "Información Requerida", debe usted proveer al menos uno de los números de ID requeridos. **Nosotros recomendamos que escriba los dos.**

# Exhibit 83




# Harris縣選務辦公室訊息
**選民必須盡快寄回郵遞選票，以確保他們的選票被計算在內。**
**選民有三種選擇交回選票**

## 1. 郵寄方式
我們建議您在選舉日前至少 7 天郵寄您的選票。**寄回已標記選票所需的郵費：1 頁需要 1 個forever郵票，2-4 頁需要 2 個forever郵票。**

## 2. 親自交回選務辦公室
在選舉日選民可以在上午 7 點至晚上 7 點親自交回選票到 NRG Arena, Hall D, One NRG Parkway, Houston TX 77054。請注意，只有選民本人才可以親自交回郵遞選票，並且必須出示可接受附有照片的身份證明。

## 3. 經一般或合約郵件送遞員
郵遞選票若由一般或合約送件員郵寄或交回，但沒有郵戳或交付收據必須在選舉日晚上 7:00 前送回提前投票辦公室。如果承運人提供的收據標記証明接收時間在選舉日晚上 7:00 之前，郵遞選票必須在選舉日後的第一個工作日下午 5:00 前送抵辦公室。

欲了解更多資訊，請訪問 HarrisVotes.com/Voter/Vote-by-Mail

### 把信封密封前
須填妥於信封蓋底紅框格中所要求的身份証明號碼。

您提供的號碼必須與已登記的號碼相符。如果您不記得您曾用那種身份証明註冊，請填寫兩個號碼。

密封信封後，在封蓋上方的空間簽名。

**REQUIRED INFORMATION:** YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION
所需資料： 你必須提供以下其中一個號碼，此號碼必須是你曾使用作為選民登記的號碼。

| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) 由德州公共安全部門發出的德州駕照號碼或德州個人身分證號碼或選舉證號碼（並非你的選民登記VUID號碼） | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number 如你沒有德州駕照或個人身分證號碼或德州選舉證號碼，請提供你的社會安全保障號碼的最後四個數字 XXX - XX - _____ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number 本人沒有獲發德州駕照或德州個人身分證或德州選舉證或社會安全保障號碼 |
|---|---|---|

CONTACT INFORMATION: Phone: _____ Email: _____
聯絡資料: 電話: _____ 電郵: _____

---




# Harris縣選務辦公室訊息
**選民必須盡快寄回郵遞選票，以確保他們的選票被計算在內。**
**選民有三種選擇交回選票**

## 1. 郵寄方式
我們建議您在選舉日前至少 7 天郵寄您的選票。**寄回已標記選票所需的郵費：1 頁需要 1 個forever郵票，2-4 頁需要 2 個forever郵票。**

## 2. 親自交回選務辦公室
在選舉日選民可以在上午 7 點至晚上 7 點親自交回選票到 NRG Arena, Hall D, One NRG Parkway, Houston TX 77054。請注意，只有選民本人才可以親自交回郵遞選票，並且必須出示可接受附有照片的身份證明。

## 3. 經一般或合約郵件送遞員
郵遞選票若由一般或合約送件員郵寄或交回，但沒有郵戳或交付收據必須在選舉日晚上 7:00 前送回提前投票辦公室。如果承運人提供的收據標記証明接收時間在選舉日晚上 7:00 之前，郵遞選票必須在選舉日後的第一個工作日下午 5:00 前送抵辦公室。

欲了解更多資訊，請訪問 HarrisVotes.com/Voter/Vote-by-Mail

### 把信封密封前
須填妥於信封蓋底紅框格中所要求的身份証明號碼。

您提供的號碼必須與已登記的號碼相符。如果您不記得您曾用那種身份証明註冊，請填寫兩個號碼。

密封信封後，在封蓋上方的空間簽名。

**REQUIRED INFORMATION:** YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION
所需資料： 你必須提供以下其中一個號碼，此號碼必須是你曾使用作為選民登記的號碼。

| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) 由德州公共安全部門發出的德州駕照號碼或德州個人身分證號碼或選舉證號碼（並非你的選民登記VUID號碼） | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number 如你沒有德州駕照或個人身分證號碼或德州選舉證號碼，請提供你的社會安全保障號碼的最後四個數字 XXX - XX - _____ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number 本人沒有獲發德州駕照或德州個人身分證或德州選舉證或社會安全保障號碼 |
|---|---|---|

CONTACT INFORMATION: Phone: _____ Email: _____
聯絡資料: 電話: _____ 電郵: _____

OCA-APPX-1338

TATUM_005335



# MESSAGE FROM HARRIS COUNTY ELECTIONS

It is important for voters to return their mail ballot as soon as possible to ensure that their vote is counted. Voters have three options to return their ballot:



## 1. RETURN BY MAIL

We recommend mailing your ballot at least 7 days prior to Election Day.
**Postage required to return your marked ballot: 1-page requires 1 forever stamp, and 2-4 pages require 2 forever stamps.**

## 2. RETURN IN PERSON TO ELECTIONS OFFICE

Voters can return their ballot in person from 7 a.m. - 7 p.m. on Election Day. **Ballots must be delivered to NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Please note that only the voter may hand deliver their own mail ballot and must have an acceptable form of photo identification.

## 3. BY COMMON CONTRACT OR CARRIER

A ballot that is mailed or delivered by a common or contract carrier, but does not have a postmark or delivery receipt must be received by the early voting clerk by 7:00 p.m. on Election Day. If the carrier provides a receipt mark indicating a time before 7:00 p.m. on Election Day, it must be received by 5:00 p.m. on the first business day after Election Day.

For more information please visit HarrisVotes.com/Voter/Vote-by-Mail

## BEFORE SEALING YOUR ENVELOPE

Fill out the required ID information outlined in red under the envelope flap.

The number you provide **MUST** match what is on file. If you can't remember which number you registered with, fill both out.

After you seal the envelope, sign in the space over the flap.

| REQUIRED INFORMATION: | YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION | |
|---|---|---|
| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number  XXX - XX - ___ ___ ___ ___ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number |

CONTACT INFORMATION: Phone: _____ Email: _____

---



# MESSAGE FROM HARRIS COUNTY ELECTIONS

It is important for voters to return their mail ballot as soon as possible to ensure that their vote is counted. Voters have three options to return their ballot:



## 1. RETURN BY MAIL

We recommend mailing your ballot at least 7 days prior to Election Day.
**Postage required to return your marked ballot: 1-page requires 1 forever stamp, and 2-4 pages require 2 forever stamps.**

## 2. RETURN IN PERSON TO ELECTIONS OFFICE

Voters can return their ballot in person from 7 a.m. - 7 p.m. on Election Day. **Ballots must be delivered to NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Please note that only the voter may hand deliver their own mail ballot and must have an acceptable form of photo identification.

## 3. BY COMMON CONTRACT OR CARRIER

A ballot that is mailed or delivered by a common or contract carrier, but does not have a postmark or delivery receipt must be received by the early voting clerk by 7:00 p.m. on Election Day. If the carrier provides a receipt mark indicating a time before 7:00 p.m. on Election Day, it must be received by 5:00 p.m. on the first business day after Election Day.

For more information please visit HarrisVotes.com/Voter/Vote-by-Mail

## BEFORE SEALING YOUR ENVELOPE

Fill out the required ID information outlined in red under the envelope flap.

The number you provide **MUST** match what is on file. If you can't remember which number you registered with, fill both out.

After you seal the envelope, sign in the space over the flap.

| REQUIRED INFORMATION: | YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION | |
|---|---|---|
| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number  XXX - XX - ___ ___ ___ ___ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number |

CONTACT INFORMATION: Phone: _____ Email: _____

OCA-APPX-1339

TATUM_005336



# MENSAJE POR PARTE DE LAS ELECCIONES DEL CONDADO DE HARRIS

Es importante que los votantes devuelvan su boleta de voto por correo lo antes posible para asegurarse de que su voto sea contado. Los votantes tienen tres opciones para devolver su boleta:



## 1. DEVOLVER POR CORREO

Le recomendamos enviar su boleta por correo al menos 7 días antes del Día de las Elecciones. **Estampillas requeridas para devolver su boleta marcada: 1 página requiere 1 estampilla forever, y 2-4 páginas requieren 2 estampillas forever.**

## 2. DEVOLVER EN PERSONA A LA OFICINA DE ELECCIONES

Los votantes pueden devolver su boleta en persona de 7 a.m. a 7 p.m. el día de las elecciones. **Las boletas deben ser entregadas en NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Por favor, tenga en cuenta que sólo el votante puede entregar su propia boleta por correo y debe tener una forma aceptable de identificación con fotografía.

## 3. POR CONTRATO O TRANSPORTISTA COMÚN

Una boleta que sea enviada por correo o entregada por un transportista común o contratado, pero que no tenga un matasellos o recibo de entrega, debe ser recibida por el secretario de votación temprana antes de las 7:00 p.m. del día de las elecciones. Si el transportista proporciona una marca que indica una hora antes de las 7:00 p.m. del día de las elecciones, debe ser recibida antes de las 5:00 p.m. del primer día hábil después del día de las elecciones.

Para más información, visite HarrisVotes.com/Voter/Vote-by-Mail

## ANTES DE SELLAR SU SOBRE

Llene la información de identificación requerida delineada en rojo debajo de la ceja del sobre.

El número que proporcione **DEBE** coincidir con el que tenemos registrado en la oficina. Si no puede recordar con qué número se registró, le sugerimos que llene ambos campos.

Después de sellar el sobre, firme en el espacio sobre la ceja.

REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION
INFORMACIÓN REQUERIDA: DEBE PROPORCIONAR UNO DE LOS SIGUIENTES NÚMEROS Y DEBE ESTAR ASOCIADO CON SU REGISTRO DE VOTANTE

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #)
Licencia de conducir o tarjeta de identificación personal de Texas o número de certificado de identificación electoral emitido por el Departamento de Seguridad Pública de Texas (NO su número de registro de votante (VUID))

If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number
Si no tiene una licencia de conducir de Texas o número de identificación personal de Texas, proporcione los últimos 4 dígitos de su número de Seguro Social   XXX-XX- _ _ _ _

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number
No se me ha expedido una licencia de conducir de Texas/Número de Identificación Personal o Número de seguro social.

CONTACT INFORMATION: Phone:
INFORMACIÓN DE CONTACTO: Teléfono:   Email:
Correo electrónico:

---



# MENSAJE POR PARTE DE LAS ELECCIONES DEL CONDADO DE HARRIS

Es importante que los votantes devuelvan su boleta de voto por correo lo antes posible para asegurarse de que su voto sea contado. Los votantes tienen tres opciones para devolver su boleta:

## 1. DEVOLVER POR CORREO

Le recomendamos enviar su boleta por correo al menos 7 días antes del Día de las Elecciones. **Estampillas requeridas para devolver su boleta marcada: 1 página requiere 1 estampilla forever, y 2-4 páginas requieren 2 estampillas forever.**

## 2. DEVOLVER EN PERSONA A LA OFICINA DE ELECCIONES

Los votantes pueden devolver su boleta en persona de 7 a.m. a 7 p.m. el día de las elecciones. **Las boletas deben ser entregadas en NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Por favor, tenga en cuenta que sólo el votante puede entregar su propia boleta por correo y debe tener una forma aceptable de identificación con fotografía.

## 3. POR CONTRATO O TRANSPORTISTA COMÚN

Una boleta que sea enviada por correo o entregada por un transportista común o contratado, pero que no tenga un matasellos o recibo de entrega, debe ser recibida por el secretario de votación temprana antes de las 7:00 p.m. del día de las elecciones. Si el transportista proporciona una marca que indica una hora antes de las 7:00 p.m. del día de las elecciones, debe ser recibida antes de las 5:00 p.m. del primer día hábil después del día de las elecciones.

Para más información, visite HarrisVotes.com/Voter/Vote-by-Mail

## ANTES DE SELLAR SU SOBRE

Llene la información de identificación requerida delineada en rojo debajo de la ceja del sobre.

El número que proporcione **DEBE** coincidir con el que tenemos registrado en la oficina. Si no puede recordar con qué número se registró, le sugerimos que llene ambos campos.

Después de sellar el sobre, firme en el espacio sobre la ceja.

REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION
INFORMACIÓN REQUERIDA: DEBE PROPORCIONAR UNO DE LOS SIGUIENTES NÚMEROS Y DEBE ESTAR ASOCIADO CON SU REGISTRO DE VOTANTE

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #)
Licencia de conducir o tarjeta de identificación personal de Texas o número de certificado de identificación electoral emitido por el Departamento de Seguridad Pública de Texas (NO su número de registro de votante (VUID))

If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number
Si no tiene una licencia de conducir de Texas o número de identificación personal de Texas, proporcione los últimos 4 dígitos de su número de Seguro Social   XXX-XX- _ _ _ _

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number
No se me ha expedido una licencia de conducir de Texas/Número de Identificación Personal o Número de seguro social.

CONTACT INFORMATION: Phone:
INFORMACIÓN DE CONTACTO: Teléfono:   Email:
Correo electrónico:

OCA-APPX-1340



# MESSAGE FROM HARRIS COUNTY ELECTIONS

It is important for voters to return their mail ballot as soon as possible to ensure that their vote is counted. Voters have three options to return their ballot:



## 1. RETURN BY MAIL

We recommend mailing your ballot at least 7 days prior to Election Day.
**Postage required to return your marked ballot: 1-page requires 1 forever stamp, and 2-4 pages require 2 forever stamps.**

## 2. RETURN IN PERSON TO ELECTIONS OFFICE

Voters can return their ballot in person from 7 a.m. - 7 p.m. on Election Day. **Ballots must be delivered to NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Please note that only the voter may hand deliver their own mail ballot and must have an acceptable form of photo identification.

## 3. BY COMMON CONTRACT OR CARRIER

A ballot that is mailed or delivered by a common or contract carrier, but does not have a postmark or delivery receipt must be received by the early voting clerk by 7:00 p.m. on Election Day. If the carrier provides a receipt mark indicating a time before 7:00 p.m. on Election Day, it must be received by 5:00 p.m. on the first business day after Election Day.

For more information please visit HarrisVotes.com/Voter/Vote-by-Mail

## BEFORE SEALING YOUR ENVELOPE

Fill out the required ID information outlined in red under the envelope flap.

The number you provide **MUST** match what is on file. If you can't remember which number you registered with, fill both out.

After you seal the envelope, sign in the space over the flap.

| REQUIRED INFORMATION: | YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION |
|---|---|

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #)

If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

XXX - XX - ___ ___ ___ ___

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number

CONTACT INFORMATION: Phone: _____ Email: _____

---



# MESSAGE FROM HARRIS COUNTY ELECTIONS

It is important for voters to return their mail ballot as soon as possible to ensure that their vote is counted. Voters have three options to return their ballot:



## 1. RETURN BY MAIL

We recommend mailing your ballot at least 7 days prior to Election Day.
**Postage required to return your marked ballot: 1-page requires 1 forever stamp, and 2-4 pages require 2 forever stamps.**

## 2. RETURN IN PERSON TO ELECTIONS OFFICE

Voters can return their ballot in person from 7 a.m. - 7 p.m. on Election Day. **Ballots must be delivered to NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Please note that only the voter may hand deliver their own mail ballot and must have an acceptable form of photo identification.

## 3. BY COMMON CONTRACT OR CARRIER

A ballot that is mailed or delivered by a common or contract carrier, but does not have a postmark or delivery receipt must be received by the early voting clerk by 7:00 p.m. on Election Day. If the carrier provides a receipt mark indicating a time before 7:00 p.m. on Election Day, it must be received by 5:00 p.m. on the first business day after Election Day.

For more information please visit HarrisVotes.com/Voter/Vote-by-Mail

## BEFORE SEALING YOUR ENVELOPE

Fill out the required ID information outlined in red under the envelope flap.

The number you provide **MUST** match what is on file. If you can't remember which number you registered with, fill both out.

After you seal the envelope, sign in the space over the flap.

| REQUIRED INFORMATION: | YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION |
|---|---|

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #)

If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

XXX - XX - ___ ___ ___ ___

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number

CONTACT INFORMATION: Phone: _____ Email: _____

OCA-APPX-1341

TATUM_005338


# LỜI NHẮN NHỦ TỪ TY BẦU CỬ QUẬN HẠT HARRIS
Điều quan trọng đối với các cử tri là phải gửi lại lá phiếu bầu bằng thư càng sớm càng tốt để bảo đảm rằng lá phiếu của quý vị được tính. Các cử tri có ba cách để gửi lại phiếu bầu của họ:


### 1. GỬI LẠI BẰNG ĐƯỜNG BƯU ĐIỆN
Chúng tôi khuyến khích quý vị nên gửi phiếu bầu của quý vị ít nhất 7 ngày trước Ngày Bầu Cử. **Bưu phí cần thiết để gửi lại lá phiếu đã đánh dấu của quý vị: 1-trang yêu cầu 1 forever stamp, và 2-4 trang yêu cầu 2 forever stamps.**

### 2. ĐÍCH THÂN NỘP LẠI TẠI VĂN PHÒNG BẦU CỬ
Các cử tri có thể đích thân nộp lại lá phiếu của họ từ 7 giờ sáng - 7 giờ tối vào Ngày Bầu Cử. Các phiếu bầu phải được chuyển đến NRG Arena, Sảnh D, One NRG Parkway, Houston TX 77054. Xin lưu ý rằng chỉ có cử tri mới có thể giao lại phiếu bầu bằng thư của chính họ và phải có giấy căn cước có hình được chấp nhận.

### 3. HÃNG ĐƯA THƯ THÔNG THƯỜNG HOẶC HÃNG ĐƯA THƯ THEO HỢP ĐỒNG
Một phiếu bầu được gửi qua đường bưu điện hoặc được gửi bởi một hãng đưa thư thông thường hoặc theo hợp đồng, nhưng không có dấu bưu điện hoặc biên nhận giao thư phải được nhận bởi nhân viên bầu cử sớm trước 7 giờ tối vào Ngày Bầu Cử. Nếu hãng đưa thư cung cấp một biên lai cho biết thời gian trước 7 giờ tối vào Ngày Bầu Cử, lá phiếu phải được nhận trước 5 giờ chiều vào ngày làm việc đầu tiên sau Ngày Bầu Cử.

Để biết thêm thông tin xin vui lòng truy cập HarrisVotes.com/Voter/Vote-by-Mail

### TRƯỚC KHI DÁN NẮP PHONG BÌ CỦA QUÝ VỊ
Điền đầy đủ thông tin Căn Cước yêu cầu bên trong đường viền màu đỏ dưới nắp phong bì.

Số quý vị cung cấp PHẢI phù hợp với những gì văn phòng có trong hồ sơ. Nếu quý vị không nhớ được là đã ghi danh bằng số nào, nên điền cả hai.

Sau khi quý vị dán nắp phong bì, hãy ký tên vào khoảng trống bên trên nắp.

REQUIRED INFORMATION / THÔNG TIN CẦN THIẾT: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION QUÝ VỊ PHẢI CUNG CẤP MỘT TRONG CÁC SỐ SAU ĐÂY VÀ SỐ ĐÓ PHẢI ĐƯỢC LIÊN KẾT VỚI VIỆC GHI DANH CỬ TRI CỦA QUÝ VỊ

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #)
Bằng Lái Xe Texas hoặc Thẻ Căn Cước Cá Nhân Texas hoặc Số Chứng Nhận Căn Cước Bầu Cử cấp bởi Sở An Toàn Công Cộng Texas (KHÔNG PHẢI số Ghi Danh Cử Tri VUID của quý vị)

If you do not have a Texas Driver's License or Personal Identification Card or Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number
Nếu quý vị không sở hữu một Bằng Lái Xe Texas hoặc Thẻ Căn Cước Cá Nhân hoặc Số Chứng Nhận Căn Cước Bầu Cử, hãy cung cấp 4 số cuối của Số An Sinh Xã Hội của quý vị
XXX - XX -

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number
Tôi chưa được cấp bằng lái xe Texas hoặc Thẻ Căn Cước Cá Nhân Texas hoặc Giấy Chứng Nhận Căn Cước Bầu Cử hoặc Số An Sinh Xã Hội

CONTACT INFORMATION: Phone: / THÔNG TIN LIÊN LẠC: Số Điện Thoại: Email: Email:


# LỜI NHẮN NHỦ TỪ TY BẦU CỬ QUẬN HẠT HARRIS
Điều quan trọng đối với các cử tri là phải gửi lại lá phiếu bầu bằng thư càng sớm càng tốt để bảo đảm rằng lá phiếu của quý vị được tính. Các cử tri có ba cách để gửi lại phiếu bầu của họ:


### 1. GỬI LẠI BẰNG ĐƯỜNG BƯU ĐIỆN
Chúng tôi khuyến khích quý vị nên gửi phiếu bầu của quý vị ít nhất 7 ngày trước Ngày Bầu Cử. **Bưu phí cần thiết để gửi lại lá phiếu đã đánh dấu của quý vị: 1-trang yêu cầu 1 forever stamp, và 2-4 trang yêu cầu 2 forever stamps.**

### 2. ĐÍCH THÂN NỘP LẠI TẠI VĂN PHÒNG BẦU CỬ
Các cử tri có thể đích thân nộp lại lá phiếu của họ từ 7 giờ sáng - 7 giờ tối vào Ngày Bầu Cử. Các phiếu bầu phải được chuyển đến NRG Arena, Sảnh D, One NRG Parkway, Houston TX 77054. Xin lưu ý rằng chỉ có cử tri mới có thể giao lại phiếu bầu bằng thư của chính họ và phải có giấy căn cước có hình được chấp nhận.

### 3. HÃNG ĐƯA THƯ THÔNG THƯỜNG HOẶC HÃNG ĐƯA THƯ THEO HỢP ĐỒNG
Một phiếu bầu được gửi qua đường bưu điện hoặc được gửi bởi một hãng đưa thư thông thường hoặc theo hợp đồng, nhưng không có dấu bưu điện hoặc biên nhận giao thư phải được nhận bởi nhân viên bầu cử sớm trước 7 giờ tối vào Ngày Bầu Cử. Nếu hãng đưa thư cung cấp một biên lai cho biết thời gian trước 7 giờ tối vào Ngày Bầu Cử, lá phiếu phải được nhận trước 5 giờ chiều vào ngày làm việc đầu tiên sau Ngày Bầu Cử.

Để biết thêm thông tin xin vui lòng truy cập HarrisVotes.com/Voter/Vote-by-Mail

### TRƯỚC KHI DÁN NẮP PHONG BÌ CỦA QUÝ VỊ
Điền đầy đủ thông tin Căn Cước yêu cầu bên trong đường viền màu đỏ dưới nắp phong bì.

Số quý vị cung cấp PHẢI phù hợp với những gì văn phòng có trong hồ sơ. Nếu quý vị không nhớ được là đã ghi danh bằng số nào, nên điền cả hai.

Sau khi quý vị dán nắp phong bì, hãy ký tên vào khoảng trống bên trên nắp.

REQUIRED INFORMATION / THÔNG TIN CẦN THIẾT: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION QUÝ VỊ PHẢI CUNG CẤP MỘT TRONG CÁC SỐ SAU ĐÂY VÀ SỐ ĐÓ PHẢI ĐƯỢC LIÊN KẾT VỚI VIỆC GHI DANH CỬ TRI CỦA QUÝ VỊ

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #)
Bằng Lái Xe Texas hoặc Thẻ Căn Cước Cá Nhân Texas hoặc Số Chứng Nhận Căn Cước Bầu Cử cấp bởi Sở An Toàn Công Cộng Texas (KHÔNG PHẢI số Ghi Danh Cử Tri VUID của quý vị)

If you do not have a Texas Driver's License or Personal Identification Card or Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number
Nếu quý vị không sở hữu một Bằng Lái Xe Texas hoặc Thẻ Căn Cước Cá Nhân hoặc Số Chứng Nhận Căn Cước Bầu Cử, hãy cung cấp 4 số cuối của Số An Sinh Xã Hội của quý vị
XXX - XX -

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number
Tôi chưa được cấp bằng lái xe Texas hoặc Thẻ Căn Cước Cá Nhân Texas hoặc Giấy Chứng Nhận Căn Cước Bầu Cử hoặc Số An Sinh Xã Hội

CONTACT INFORMATION: Phone: / THÔNG TIN LIÊN LẠC: Số Điện Thoại: Email: Email:

OCA-APPX-1342

TATUM_005339




# MESSAGE FROM HARRIS COUNTY ELECTIONS

It is important for voters to return their mail ballot as soon as possible to ensure that their vote is counted. Voters have three options to return their ballot:

### 1. RETURN BY MAIL

We recommend mailing your ballot at least 7 days prior to Election Day.

**Postage required to return your marked ballot: 1-page requires 1 forever stamp, and 2-4 pages require 2 forever stamps.**

### 2. RETURN IN PERSON TO ELECTIONS OFFICE

Voters can return their ballot in person from 7 a.m. - 7 p.m. on Election Day. **Ballots must be delivered to NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Please note that only the voter may hand deliver their own mail ballot and must have an acceptable form of photo identification.

### 3. BY COMMON CONTRACT OR CARRIER

A ballot that is mailed or delivered by a common or contract carrier, but does not have a postmark or delivery receipt must be received by the early voting clerk by 7:00 p.m. on Election Day. If the carrier provides a receipt mark indicating a time before 7:00 p.m. on Election Day, it must be received by 5:00 p.m. on the first business day after Election Day.

For more information please visit HarrisVotes.com/Voter/Vote-by-Mail

### BEFORE SEALING YOUR ENVELOPE

Fill out the required ID information outlined in red under the envelope flap.

The number you provide **MUST** match what is on file. If you can't remember which number you registered with, fill both out.

After you seal the envelope, sign in the space over the flap.

| REQUIRED INFORMATION: | YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION | |
|---|---|---|
| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number<br><br>XXX - XX - ___ ___ ___ ___ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number |

CONTACT INFORMATION: Phone: _____   Email: _____

---




# MESSAGE FROM HARRIS COUNTY ELECTIONS

It is important for voters to return their mail ballot as soon as possible to ensure that their vote is counted. Voters have three options to return their ballot:

### 1. RETURN BY MAIL

We recommend mailing your ballot at least 7 days prior to Election Day.

**Postage required to return your marked ballot: 1-page requires 1 forever stamp, and 2-4 pages require 2 forever stamps.**

### 2. RETURN IN PERSON TO ELECTIONS OFFICE

Voters can return their ballot in person from 7 a.m. - 7 p.m. on Election Day. **Ballots must be delivered to NRG Arena, Hall D, One NRG Parkway, Houston TX 77054.** Please note that only the voter may hand deliver their own mail ballot and must have an acceptable form of photo identification.

### 3. BY COMMON CONTRACT OR CARRIER

A ballot that is mailed or delivered by a common or contract carrier, but does not have a postmark or delivery receipt must be received by the early voting clerk by 7:00 p.m. on Election Day. If the carrier provides a receipt mark indicating a time before 7:00 p.m. on Election Day, it must be received by 5:00 p.m. on the first business day after Election Day.

For more information please visit HarrisVotes.com/Voter/Vote-by-Mail

### BEFORE SEALING YOUR ENVELOPE

Fill out the required ID information outlined in red under the envelope flap.

The number you provide **MUST** match what is on file. If you can't remember which number you registered with, fill both out.

After you seal the envelope, sign in the space over the flap.

| REQUIRED INFORMATION: | YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION | |
|---|---|---|
| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number<br><br>XXX - XX - ___ ___ ___ ___ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or Social Security Number |

CONTACT INFORMATION: Phone: _____   Email: _____

OCA-APPX-1343

TATUM_005340

# Exhibit 84

## Application for a Ballot by Mail

If someone helps you complete this form or mails, emails or faxes this form for you, that person must complete the Witness/Assistant Box 6 below. If you email or fax this form to the **Early Voting Clerk**, you **must** also send the original hardcopy to the Early Voting Clerk. **If you are faxing or emailing this form on or near the deadline to apply for a Ballot by Mail, you must** send the original hardcopy so that the Clerk receives it no later than the fourth business day after the day the Clerk received your email or fax. **Original signatures are required on both the fax or email image and the physical hard copy.** Electronic signatures are not permitted. **THE HARDCOPY OF THIS APPLICATION MUST BE RECEIVED BY THE EARLY VOTING CLERK AND MEET ALL LEGALLY REQUIRED DEADLINES. Please read the instructions** on the back of this form completely. **If you have any questions, please call the Early Voting Clerk** in your county **of registration** or the office of the Texas Secretary of State at 1-800-252-8683 or log on to www.sos.texas.gov for a list of County Early Voting Clerks and their email and physical addresses.

### 1. Voter Information: Please print all information clearly and legibly

**YOU MUST PROVIDE ONE of the following numbers**

Name: _____
Last,                    First,                    Middle              Suffix (Jr., Sr.)

**Residence Address as shown on your Voter Registration Certificate**

Address: _____
Street            Apt. # (if any)    City          State      Zip Code

**Optional Information:** Providing this information is helpful to the Early Voting Clerk, but not required.

Date of Birth: _____ / _____ / _____   VUID #: _____   Pct #: _____

Email: _____   Tel. #: _____

Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#)

_____  _____  _____  _____

If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

X X X – X X –  __ __ __ __

☐ I have not been issued a Texas Driver's License/Texas Personal Identification Number/Texas Election Identification Certificate or Social Security Number

### 2. Mail my Ballot to:

☐ My Residence Address (as listed on my Voter Registration Certificate)

☐ Other Address - You may use the Other Address line only if the other address fits one of the categories below.

Address _____   Apt. # (if any)   City          State      Zip Code

**My Other Address is: (Check one)**
☐ The mailing address listed on my Voter Registration Certificate
☐ Address Outside the County (voters absent from the county)
☐ Hospital, Nursing Home, Long-Term Care Facility, Retirement or Assisted Living Center or a Relative _____ (Indicate Relationship)
☐ Address of the Jail/Civil Commitment Facility or a Relative _____ (Indicate Relationship)

### 3. Reason For Voting by Mail:

☐ 65 Years of Age or Older
☐ Disability (as defined in Texas Election Code 82.002(a), see instruction on reverse) By checking this box, "I affirm that I have a sickness or physical condition that prevents me from appearing at the polling place on Election Day without a likelihood of needing personal assistance or of injuring my health."
☐ Expected to give birth within three weeks before or after Election Day
☐ Expected Absence from the County (You may apply for a ballot for one election and its resulting runoff. If your dates of absence from the county include both elections)

Date you can begin to receive mail at your out of county address: _____ / _____ / _____   Date of return to residence address: _____ / _____ / _____

☐ Confined in Jail or Involuntary Civil Commitment (You may only apply for a ballot for one election and any resulting runoff)

### 4. Send me a Ballot for the Following Elections:

☐ **Annual Application**
Send me a ballot for all Elections in this voting year (January – December). Annual Applications only are available for voters 65 and older and voters with disabilities. You must select a party if you wish to vote in a primary. Select only one party's primary and its resulting runoff.

**Primary Election** (even numbered years only)
☐ Democratic Primary    ☐ Any Resulting Runoff
☐ Republican Primary     ☐ Any Resulting Runoff
☐ Do Not Send me a Primary Ballot

**OR**

**Uniform Election Dates**
☐ November Election    ☐ May Election  (not a primary runoff)
☐ Any Resulting Runoff  ☐ Other Special Election: _____
(Name or Date of Special Election, if known)

**Primary Election** (even numbered years only)
☐ Democratic Primary    ☐ Any Resulting Runoff
☐ Republican Primary     ☐ Any Resulting Runoff

(Voters who are absent from the county or confined in jail/civilly committed may only apply for one election and its resulting runoff.)

### 5. Sign Here:

"I certify that the information given in this application is true, and I understand that giving false information in this application is a crime."

X _____   Date: _____ / _____ / _____

If applicant is unable to sign or make a mark (in the presence of a witness), the witness must complete the witness portion in Box 6 below. The signature or mark of the voter in the blank above must be an original signature made with a pen and ink. Electronic signatures are not permitted.

### 6. If someone helps you complete this form and mails or faxes the form for you, that person must complete the section below.

**Instructions for Witnesses and Assistants:** See back of this form for the definitions of Witness and Assistant.
**Check one or both boxes below if you served as a Witness, an Assistant or both. All information below must be completed!**
☐ If the applicant is unable to make a mark, you must check this box and complete all information below. Do not sign for the voter in Box 5.
☐ Witness – If you are acting as a Witness to the applicant's signature or mark or signing on the applicant's behalf, you must state your relationship to the applicant here: _____
☐ Assistant – If you assisted the applicant in completing this application in the applicant's presence or mailed/emailed/faxed the application on behalf of the applicant. (Indicate Relationship)

**Failure to complete this section is a Class A Misdemeanor if applicant's signature was witnessed or applicant was assisted in completing this application.**

X _____   _____
Signature of Witness/Assistant                        Printed Name of Witness/Assistant

_____   _____   _____   _____   _____
Street Address                     Apt. # (if any)     City              State            Zip Code

*Este formulario está disponible en Español. Para conseguir la versión en Español favor llamar sin cargo al 1-800-252-8683 a la oficina del Secretario del Estado o a la Secretaría de Votación Adelantada.*

## OCA-APPX-1345

STATE031879

**Instructions for Application for Ballot by Mail**

**BOX 1:**

- **Name:** Please give your full name as it was provided to the Voter Registrar and include any suffixes like Jr., Sr., or III.
- **Date of Birth:** Not a requirement but it is helpful to determine identity when voters have common names.
- **Address:** Give your full residence address as shown on your Voter Registration Certificate.
- **VUID and Precinct Number:** If you know your VUID and/or Precinct number, you may provide it, but it is not a requirement.
- **Phone Number and Email Address:** Providing your telephone number and email is not required but is extremely helpful to the Early Voting Clerk to clarify any information on this application.
- **Required Personal Information: You MUST provide one of the following numbers:** Texas Driver's License Number, Texas Personal Identification Number or Election Identification Certificate Number **(NOT your VUID#)**. If you do not have one of the above mentioned numbers, you must provide the last 4 digits of your Social Security Number. If you have not been issued any of the required numbers, check the box that says that you have not been issued one of the required numbers. If you have been issued one of the required numbers, but it is not associated with your voter registration record, please contact your local registrar to inquire about how to add one of the required numbers to your voter registration record.

**BOX 2:**

Your ballot must be mailed to the address where you are registered to vote or the mailing address listed on your Voter Registration Certificate. **There are some exceptions that allow you to have your ballot mailed to a different location.**

- **If you are voting by mail because you are 65 or have a disability** – Your ballot can be mailed to a hospital, nursing home, long-term care facility, retirement or assisted living facility or a relative.
- **If you are absent from the county** – Your ballot must be mailed to an address outside the county.
- **If you are confined in jail or involuntarily civilly committed** – Your ballot can be mailed to the address of the jail/commitment facility or a close relative.

**BOX 3:**

The State of Texas requires that you provide a reason for voting by mail. Place a checkmark in the box that best describes your reason for voting by mail.

- If you choose **65 Years of Age or Older**, you must turn 65 no later than Election Day.
- If you choose **Disability**, your disability must meet the definition of a disability as described in Section 82.002(a) of the Texas Election Code.
- If you choose **Confinement for Childbirth**, you expect to give birth within three weeks before or after Election Day.
- If you choose **Expected Absence from the County**, you must expect to be absent from the county on Election Day and during the hours of early voting by personal appearance or the remainder of the early voting period after you submit your application. The ballot must be mailed to an address outside the county and you must provide the dates that you will be absent from the county.
- If you choose **Confined in Jail/Involuntary Civil Commitment under Chapter 841 of the Health and Safety Code**, you must be legally eligible for Early Voting by Mail. At the time your early voting ballot application is submitted, you are either (1) confined in jail serving a misdemeanor sentence for a term that ends on or after Election Day; (2) pending trial after denial of bail; (3) without bail pending an appeal of a felony conviction; (4) pending trial or appeal on a bailable offense for which release on bail before Election Day is unlikely or (5) you are involuntarily civilly committed.

**BOX 4:**

Please select the election(s) for which you are applying.

**Annual Application** – Only voters who are 65 or older or who have a disability are eligible to apply for an Annual ballot by mail. An Annual ballot by mail will provide you with a ballot for all the elections

**BOX 4 (CONTINUED)**

in a calendar year for which you are eligible. Your Annual Application may be forwarded to other entities holding elections in which you are eligible to vote. This means that you may receive a ballot for those other elections in addition to the ballot you requested with this application. If you do not select any elections in Box 4, your application will be considered an Annual Application if your reason for voting by mail was 65 Years of Age or Older or Disability.

**BOX 5:**

Sign and date your application. If you are unable to sign because of a physical disability or illiteracy, the application may be signed for you by a witness. The witness must be in the presence of the voter in order to act as a witness.

**BOX 6:**

- **Witness** – The witness **must** place a checkmark in the Witness Box indicating you were unable to make your mark. The witness **must** state his or her relationship to you. If the witness is not a relative, the witness **must** state that on the line provided. The witness **must** sign and provide his or her printed name and residence address. It is a Class B Misdemeanor to act as a witness for more than one application in each election or act as a witness for more than one Annual ballot by mail application in a calendar year.
- **Assistant** – If a person (other than a close relative or person registered to vote at the same address) assists you in completing this application; or mails, faxes or emails this application on your behalf, the assistant **must** complete Box 6. The assistant must sign and provide his or her printed name and residence address. An assistant commits a Class A Misdemeanor if he or she provides assistance without providing the information required in Box 6.

**DEADLINE TO APPLY:**

**Your application must be received by the Early Voting Clerk** not later than the 11th day before Election Day. If the deadline falls on a weekend or holiday the deadline moves to the first preceding business day. An application may be submitted anytime in the calendar year but not later than the 11th day for the election in which you wish to vote. **Annual Applications** - If you submit an Annual Application (only available for voters 65 and older and voters with disabilities), within 60 days of an election that takes place in the following calendar year, your application will be valid for all elections in the following calendar year. This 60 day rule applies only to Annual Applications and only when there is an election within 60 days of the date the Annual Application was received by the Early Voting Clerk in the preceding year.

**SUBMITTING THE APPLICATION:**

The application must be submitted by one of the following methods:

- **In-Person** – Only the applicant may submit his or her own application to the Early Voting Clerk.
- **By Mail** – The application may be submitted via the U.S. Postal Service.
- **Common or Contract Carrier** – The application may be submitted via a bona fide, for profit carrier.
- **Fax Transmission** – Please contact your Early Voting Clerk or the Secretary of State for fax numbers.
- **By email** – The application may be submitted via email. Please contact your Early Voting Clerk or the Secretary of State for email addresses.

The fax or email must reach the Early Voting Clerk's office no later than the close of regular business or 12:00 noon, whichever is later on the 11th day before Election Day.

IF YOU FAX OR EMAIL THE APPLICATION YOU MUST ALSO PHYSICALLY SEND THE ORIGINAL TO THE EARLY VOTING CLERK SO THAT IT IS RECEIVED NO LATER THAN THE FOURTH BUSINESS DAY AFTER IT WAS RECEIVED BY FAX OR EMAIL.

**DO NOT REMOVE PERFORATED TABS. Moisten here and fold bottom to top to seal.**

**AFFIX FIRST CLASS POSTAGE**

**FROM:** ______________________

______________________

______________________

OFFICIAL ELECTION MAIL™ Authorized by the U.S. Postal Service

**TO: EARLY VOTING CLERK**

______________________

______________________

# Exhibit 85

**WARNING:** (1) Knowingly possessing another person's ballot or Carrier Envelope may be a crime unless you provide your signature, printed name and address (2) A person commits an offense if the person compensates another person or receives compensation for depositing a Carrier Envelope in the mail as part of a scheme in which the person is compensated based on the number of Carrier Envelopes deposited. For additional information on offenses related to Carrier Envelopes, please see the "Information About Returning Your Carrier Envelope," included with the materials sent to you with your ballot.

**ADVERTENCIA:** (1) El acto de poseer conscientemente la boleta o el sobre de envío de otra persona puede ser un delito a menos de que usted proporcione su firma, nombre en letra de molde, y su dirección. (2) Una persona comete un delito si recompensa o recibe compensación a cambio de depositar el sobre de envío en el correo como parte de un plan en el cual la persona es recompensada en base al número de sobres de envío depositados. Para obtener información adicional sobre los delitos relacionados con los sobres de envío, por favor vea la "Información Sobre La Devolución Del Sobre de Envío," incluido con los materiales enviados a usted con su boleta.

6-15
Prescribed by Secretary of State Section 86.013, Texas Election Code
07/2022

Place Stamp Here



## CARRIER ENVELOPE FOR EARLY VOTING BALLOT
*(SOBRE DE ENVÍO PARA LA BOLETA DE VOTACIÓN ADELANTADA)*

(Early Voting Clerk
should preprint return address or affix address label)

OCA-APPX-1348

**STATE137682**

**Instructions to the Voter:**

- This envelope must be sealed and signed by the voter before it leaves the voter's hands. Do not sign this envelope unless the ballot has been marked by you or at your direction. (**Instrucciones al Votante:** Este sobre debe ser sellado y firmado por el votante antes de que salga de sus manos. No firme este sobre a menos de que la boleta haya sido llenada por usted o bajo su dirección.)
- This Carrier Envelope may not be used to return more than one voter's ballot. (Este sobre de envío no debe ser utilizado para entregar la boleta de más de un solo votante.)
- For instructions on the methods and deadlines to deliver this Carrier Envelope, see the "Information About Returning Your Carrier Envelope," included with the materials sent to you with your ballot. (Para obtener instrucciones sobre los métodos y plazos para entregar este sobre de envío, vea la "Información Sobre La Devolución de su Sobre de Envío," incluido con los materiales enviados a usted con su boleta.)

**Instructions to Assistant (if applicable):**

- A voter may only be assisted with reading or marking the ballot if the voter has a physical disability that renders the voter unable to write or see, or has an inability to read the language in which the ballot is written. If you are assisting the voter, you must read the oath and complete the section below, before assisting the voter. (**Instrucciones al Asistente (si es aplicable):** Un votante sólo puede recibir ayuda para leer o marcar la boleta si el votante tiene una discapacidad física la cual le impide escribir o ver, o si no tiene la habilidad de leer el idioma en el cual la boleta está escrita. Si usted asiste al votante, debe leer el juramento y completar la siguiente sección abajo, antes de asistir al votante.)

**Instructions to Person Depositing Carrier Envelope in Mail or to Common or Contract Carrier:**

- If you are assisting a voter by depositing the Carrier Envelope in the mail or with a common or contract carrier, you must complete the assistant section below. (**Instrucciones para la Persona Que Deposita el Sobre de Envío en el Correo o al Transportista Común o Contratado:** Si asiste a un votante depositando el sobre de envío en el correo o con un transportista común o contratado, debe completar la sección de asistente que aparece a continuación.)

**I certify that the enclosed ballot expresses my wishes independent of any dictation or undue persuasion by any person.** (**Certifico que la boleta adjunta expresa mis deseos independientemente de ningún dictado o persuasión indebida por parte de cualquier persona.**)

---

SEAL ENVELOPE AND SIGN OVER SEALED FLAP
(SELLE EL SOBRE Y FIRME SOBRE LA SOLAPA SELLADA)



X _____
SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)

**Oath of Person Assisting Voter** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." **Juramento de la Persona Asistiendo al Votante:** "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

**Completed by Early Voting Clerk** (Completado por el Secretario de Votación Adelantada):

Name of Election (Nombre de Elección): _____

Name of Voter (Nombre del votante): _____

Date of Election (Fecha de Elección): _____ / _____ / _____

**Instructions to Witness:** You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____.

(**Instrucciones al Testigo:** Usted está sirviendo como testigo para _____ (nombre del votante). Debe completar la sección a continuación si es testigo de la marca del votante, o si el votante no puede hacer una marca. Si el votante no puede hacer una marca, marque aquí _____.)

**If you are an assistant, provide information below:** (Si usted es un asistente proporcione la siguiente información):

Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle one: Yes No
¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia? Marque con un Círculo: Sí No

Printed Name (Nombre en letra de molde) _____ Signature (Firma) _____

Relationship to Voter (Relación al votante) _____ Street Address (Domicilio residencial) _____

Signature (Firma) _____ Printed Name (Nombre en letra de molde) _____

Street Address (Domicilio residencial) _____

OCA-APPX-1349

**STATE137683**

STATE137684

**TO CHECK THE STATUS OF YOUR MAIL BALLOT, VISIT**
**(PARA VERIFICAR EL ESTADO DE SU BOLETA POR CORREO, VISITE)**



VOTETEXAS.GOV

**REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD**
**INFORMACIÓN REQUERIDA: DEBE PROPORCIONAR UNO DE LOS SIGUIENTES NÚMEROS Y DEBE ESTAR ASOCIADO CON SU REGISTRO DE VOTANTE**

| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID#) (Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas) (NO ES el número de su Registro Electoral VUID#) ___ ___ ___ ___ ___ ___ | OR (O) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number (Si no tiene una Licencia de Conducir de Texas o una Tarjeta de Identificación Personal de Texas o Certificado de Identificación Electoral de Texas, proporcione los 4 últimos dígitos de su número de Seguro Social) XXX - XX - ___ ___ ___ ___ | OR (O) | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or a Social Security Number (No se me ha expedido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o un Certificado de Identificación Electoral de Texas ni un número de Seguro Social.) |

**CONTACT INFORMATION (INFORMACIÓN DE CONTACTO):** Phone (Teléfono): _____    Email (Correo Electrónico): _____

**SEAL ENVELOPE AND SIGN OVER SEALED FLAP**
**(SELLE EL SOBRE Y FIRME SOBRE LA SOLAPA SELLADA)**

X _____
**SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)**

**Oath of Person Assisting Voter:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted. **Juramento de la Persona Asistiendo al Votante:** "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

**If you are an assistant, provide information below:** (Si usted es un asistente o testigo, marque la casilla correcta y proporcione su información):

Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle one: Yes No
¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia?
Marque con un Círculo: Sí No

Printed Name (Nombre en letra de molde) _____

Relationship to Voter (Relación al votante) _____    Street Address (Domicilio residencial) _____

**Completed by Early Voting Clerk (Completado por el Secretario de Votación Adelantada):**

Name of Election (Nombre de Elección): _____

Name of Voter (Nombre del votante): _____

Date of Election (Fecha de Elección): _____ / _____ / _____

**Instructions to Witness:** You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____

(Instrucciones al Testigo: Usted está sirviendo como testigo para _____ (nombre del votante). Debe completar la sección a continuación si es testigo de la marca del votante, o si el votante no puede hacer una marca. Si el votante no puede hacer una marca, marque aquí _____.)

Signature (Firma) _____    Printed Name (Nombre en letra de molde) _____

Street Address (Domicilio residencial) _____

Print    Reset

OCA-APPX-1350

# Exhibit 86

| Message | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 1/12/2022 12:34:07 AM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | MASS EMAIL (CC/EA/VR - 1031) - Updated Ballot by Mail Forms |
| **Attachments:** | 6-2 - FORM Notice of Rejected Application for Ballot by Mail.pdf; 6-17 - FORM - Information about Returning Your Carrier Envelope (Carrier Insert).pdf; 6-36 - Information about Returning Your Carrier Envelope -FPCA Voters.pdf; 6-19 - Dear Voter Letter 2022.docx; 6-3 - FORM -Notice of Rejected ABBM -Missing or Incorrect Personal ID Numbers.docx.pdf; 6-4 - FORM Notice of Rejected ABBM - Personal Identification Numbers not on Voter Record.docx.pdf |

Dear Election Officials

Our office has released the following new or revised forms that are attached to this email as a PDF or Word document.

- Notice of Rejected Application for Ballot by Mail
- Notice of Rejected Application for Ballot by Mail – Missing or Incorrect Personal Identification Number
- Notice of Rejected Application for Ballot by Mail – Required Personal Identification Number Missing from Voter Record
- Information about Returning Your Marked Ballot (Carrier Insert for Regular ABBM voters)
- Information about Returning Your Marked Ballot (Carrier Insert for FPCA voters)
- Signature Sheet for FPCA Voters
- "Dear Voter" Letter (Attached as a Word Document)
  - The SOS will no longer be issuing a "Dear Voter" letter signed by the SOS. We are providing a generic template that early voting clerks can use to issue the letter under their own signature.

These forms are in the process of being posted to our website in our Election Forms Manual. We will be sending out additional emails as more forms are completed and posted to our website.

Thank you for all your hard work getting ready for your upcoming elections.

**Christina Worrell Adkins**
Legal Director  – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-1352

# NOTICE OF REJECTED APPLICATION FOR BALLOT BY MAIL

Your Application for a Ballot by Mail has been received and reviewed.  Please be advised that your application has been rejected by law for the following reason(s):

**The Early Voting Clerk has placed a checkmark next to the reason(s) that your Application for Ballot by Mail was Rejected**

_____ 1.  Your application was received earlier than the 60th day before an election to be held in January or February of the new voting year.

_____ 2.  Your application was not properly delivered to the Early Voting Clerk.

_____ 3.  Your application was received after the deadline to apply for a ballot by mail for the current election. (Check if appropriate):
_____  Your Annual Application for a Ballot by Mail will be considered valid for all other elections (for which you are eligible) held this year and for which the application was submitted before the deadline.

_____ 4.  Your application was received after the deadline for receiving an Application for a Ballot by Mail. The deadline for receiving the application was _____/_____/_____.
(Check if appropriate):                                                        (Date)
_____  You have requested a ballot for the runoff election.  If one is to be held, your application is valid for that election.

_____ 5.  You indicate you are voting by mail due to a disability, but the application that was submitted did not include the following affirmation: "I have a sickness or physical condition that prevents me from appearing at the polling place on Election Day without the likelihood of needing personal assistance or injuring my health." This affirmation is required by Texas Election Code Section 84.002(c).

_____ 6.  You indicate you are voting by mail due to expected absence from the county, but you did not provide an address outside the county.  When voting by mail on the ground of expected absence from the county, your ballot must be mailed to an address outside the county.

_____ 7.  When voting by mail due to confinement in jail or due to involuntary civil commitment, the address to which your ballot is to be mailed must be that of the jail/civil commitment facility or a relative.  Your application did not indicate either address.

_____ 8.  Your application was not signed or the application contained an electronic signature.  Your application must contain a physical signature in ink.

_____ 9.  The witness who signed your application did not:
_____ (a)  indicate a relationship on your application;
_____ (b)  indicate that you were unable to make your mark in lieu of your signature; or
_____ (c)  provide his or her printed name or residence address.

_____ 10.  Your application did not indicate the reason you are eligible to vote by mail.

_____ 11.  You did not indicate a party preference.  In order to vote in a primary election, you must indicate your party preference.  (Check if appropriate):
_____  You have submitted an Annual Application for a Ballot by Mail.  You will receive ballots for all other elections held this year <u>other</u> than the Primary or Primary Runoff Election. Please submit a new Application for a Ballot by Mail if you wish to vote by mail in the Primary or Primary Runoff election.

_____ 12.  Your application did not provide the residence address associated with your voter registration record.

_____ 13.  According to the records of the voter registrar, you are not currently registered to vote or, if you have applied, your registration will not be effective on or before Election Day.

_____ 14.  The Early Voting Clerk could not determine for which election you applied to vote by mail.

_____ 15.  Your application was initially submitted by fax or email, but an original hardcopy of the application was not received within four business days of the legally required deadline.

_____ 16.  Your application did not contain your Texas Driver's License Number, Texas Personal Identification Card Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number or the number provided did not match your voter registration record.

_____ 17.  Other:_____

If you wish to vote by mail, you must submit another application to the Early Voting Clerk.  Your new Application for a Ballot by Mail must be received no later than* _____/_____/_____.

*If new application is faxed or emailed on or near the deadline to apply for a Ballot by Mail, the original hardcopy must be received by the Early Voting Clerk within four business days of the receipt of your fax or email and meet all legally required deadlines for receipt of the application.

If you have any questions regarding your application, please contact the Early Voting Clerk's Office at

_____                    _____
Phone Number                                                              Signature of Early Voting Clerk

OCA-APPX-1353

STATE031641

6-2
Prescrito por el Secretario del Estado
Código Electoral de Texas Secciones 86.0015, 86.008(b)
12/2021

# NOTIFICACIÓN DE SOLICITUD DE BOLETA POSTAL RECHAZADA

Su Solicitud de Boleta Postal ha sido recibida y revisada. Le informamos de que su solicitud ha sido rechazada por la ley por la(s) siguiente(s) razón(es):

**El Secretario de Votación Adelantada ha puesto una marca de verificación junto a la(s) razón(es) por la(s) que su Solicitud de Boleta Postal fue Rechazada.**

_____1. Su solicitud fue recibida antes del 60° día anterior de una elección que se celebrará en enero o febrero del nuevo año electoral.

_____2. Su solicitud no fue entregada de manera apropiada al Secretario de Votación Adelantada.

_____3. Su solicitud fue recibida después de la fecha límite para solicitar una boleta por correo para la elección actual.
(Marque si corresponde)
_____ Su Solicitud Anual de Boleta Postal se considerará válida para todas las otras elecciones (para las que sea elegible) que se celebren este año y para las cuales la solicitud se haya presentado antes de la fecha límite.

_____4. Su solicitud fue recibida después de la fecha límite para recibir una Solicitud de Boleta Postal.
La fecha límite para recibir la solicitud fue el ____ de _____, _____.
                                                    (día)        (mes)          (año)
(Marque si corresponde)
_____Ha solicitado una boleta para la elección de desempate. Si se celebra una, su solicitud es válida para esa elección.

_____5. Usted indicó que está votando por correo debido a una discapacidad, pero la solicitud que se presentó no incluía la siguiente afirmación: "Tengo una enfermedad o condición física que me impide aparecer en el lugar de votación en el Día de las Elecciones sin la posibilidad de necesitar asistencia o de afectar mi salud." Esta afirmación es requerida por la Sección 84.002(c) del Código Electoral de Texas.

_____6. Usted indicó que está votando por correo debido a una ausencia prevista del condado, pero no proporcionó una dirección fuera del condado. Si vota por correo debido a una ausencia prevista del condado, su boleta debe enviarse por correo a una dirección fuera del condado.

_____7. Cuando se vota por correo debido a un confinamiento en la cárcel o a un compromiso civil involuntario, la dirección a la que se debe enviar la boleta debe ser la de la cárcel /centro de compromiso civil o la de un familiar. Su solicitud no indicó ninguna de estas direcciones.

_____8. Su solicitud no estaba firmada o la solicitud contenía una firma electrónica. Su solicitud debe contener una firma física en tinta.

_____9. El testigo que firmó su solicitud no:
_____(a) indicó una relación en su solicitud;
_____(b) indicó que usted no podía hacer su marca en lugar de su firma; o
_____(c) proporcionó su nombre en letra de molde o su dirección residencial.

_____10. Su solicitud no indicó la razón por la que es elegible para votar por correo.

_____11. Usted no indicó una preferencia de partido. Para votar en una elección primaria, debe indicar su preferencia de partido.
(Marque si corresponde)
_____ Ha presentado una Solicitud Anual de Boleta Postal. Recibirá boletas para todas las demás elecciones celebradas este año que no sean las elecciones primarias o las elecciones primarias de desempate. Por favor, envíe una Solicitud de Boleta Postal nueva si desea votar por correo en las elecciones primarias o en las elecciones primarias de desempate.

_____12. Su solicitud no proporcionó la dirección residencial asociada con su registro de votante.

_____13. De acuerdo con los registros del registrador de votantes, usted no está actualmente registrado para votar o, si ha solicitado, su inscripción no será efectiva el Día de las Elecciones o antes.

_____14. El Secretario de Votación Adelantada no pudo determinar para qué elección solicitó votar por correo.

_____15. Su solicitud se envió inicialmente enviada por fax o correo electrónico, pero no se recibió una copia impresa original de la solicitud dentro de los cuatro días hábiles posteriores a la fecha límite legalmente requerida.

_____16. Su solicitud no contenía su Número de Licencia de Conducir de Texas, su Número de Tarjeta de Identificación Personal de Texas, su Número de Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social, o el número proporcionado no coincidía con su registro de votante.

_____17. Otro:_____

Si desea votar por correo, debe presentar otra solicitud al Secretario de Votación Adelantada. Su nueva Solicitud de Boleta Postal debe ser recibida a más tardar el *_____/_____/_____.

* Si la nueva solicitud es enviada por fax o por correo electrónico en o cerca de la fecha límite para solicitar una boleta por correo, la copia impresa original debe ser recibida por el Secretario de Votación Adelantada dentro de los cuatro días hábiles siguientes a la recepción de su fax o correo electrónico y cumplir con todos los plazos legalmente requeridos para la recepción de la solicitud.

Si tiene alguna pregunta con respecto a su solicitud, por favor comuníquese con la Oficina del Secretario de Votación Adelantada llamando al

_____                              _____
Número de Teléfono                                            Firma del Secretario de Votación Adelantada

OCA-APPX-1354

## NOTICE OF REJECTED APPLICATION FOR BALLOT BY MAIL
### Missing or Incorrect Personal Identification Number

Your Application for a Ballot by Mail has been received and reviewed, but is defective for the reason checked below. New Texas Law requires that a voter must give his or her Texas Driver's License number, Texas Personal Identification Card number, Election Identification Certificate number or the last 4 digits of his or her Social Security number on an Application for Ballot by Mail. Required personal identification information is either missing from your application or the information provided does not match your voter registration record. You must provide the required number in order to vote by mail.

**The Early Voting Clerk has placed a checkmark next to the reason that your Application for Ballot by Mail was Defective**

_____ 1.   Your application did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number.

_____ 2.   The Texas Driver's License Number, Texas Personal Identification Number, Election Identification Certificate Number or the Last 4 digits of your Social Security Number provided on your application did not match the number associated with your voter registration record as provided by your County's Voter Registrar.

### How to Correct the Defect on your Application for Ballot by Mail

You may correct the defect online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Once your personal identification number is validated by the Mail Ballot Tracker, the Application for a Ballot by Mail you previously submitted will be processed.

To utilize the Ballot by Mail Tracker, you must enter:
- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number AND
- Your residence address as listed in your voter registration record

If your rejection occurred on or before the 18th day before Election Day, a new Application for Ballot by Mail is included with this notice. If you do not wish to submit a new Application, you can correct the defect by using the Ballot by Mail Tracker.

### If you do decide to submit a new application, please be aware of the following guidelines:

If you fax or email the Application for Ballot by Mail, you must physically send the original to the Early Voting Clerk so that it is received no later than the fourth business day after it was received by fax or email and it must meet all legally required deadlines.

If you have any questions or concerns about making a correction to your Application for Ballot by Mail for a missing or incorrect personal identification number, please contact the Early Voting Clerk's Office at:

_____                    _____
Phone Number                                                 Signature of Early Voting Clerk

OCA-APPX-1355

STATE031643

# NOTIFICACIÓN DE SOLICITUD DE BOLETA POSTAL RECHAZADA
## Número de Identificación Personal Faltante o Incorrecto

Su Solicitud de Boleta Postal ha sido recibida y revisada, pero es defectuosa por la razón que se indica a continuación. La nueva ley de Texas exige que el votante dé su Número de Licencia de Conducir de Texas, el Número de su Tarjeta de Identificación Personal de Texas, el Número de su Certificado de Identificación Electoral o los últimos 4 dígitos de su Número de Seguro Social en la Solicitud de Boleta Postal. La información de identificación personal requerida falta en su solicitud o la información proporcionada no coincide con su registro de votante. Debe proporcionar el número requerido para poder votar por correo.

**El Secretario de Votación Adelantada ha puesto una marca de verificación junto a la razón por la que su Solicitud de Boleta Postal fue defectuosa**

_____ 1.   Su solicitud no contenía su Número de Licencia de Conducir de Texas, su Número de Tarjeta de Identificación Personal de Texas, su Número de Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social.

_____ 2.   El Número de Licencia de Conducir de Texas, el Número de Tarjeta de Identificación Personal de Texas, el Número de Certificado de Identificación Electoral o los últimos 4 dígitos de su Número de Seguro Social proporcionados en su solicitud no coinciden con el número asociado con su registro de votante proporcionado por el Registrador de Votantes de su Condado.

## Como Corregir el Defecto en Su Solicitud de Boleta Postal

Puede corregir el defecto en línea a través del Rastreador de Boleta Postal del Secretario de Estado de Texas en www.votetexas.gov  Cuando acceda al Rastreador de Boleta Postal, tendrá la oportunidad de introducir su(s) número(s) de identificación personal. Una vez que su número de identificación personal sea validado por el Rastreador de Boleta Postal, se procesará la Solicitud de Boleta Postal que usted presentó previamente.

Para utilizar el Rastreador de Boleta Postal, debe ingresar:
- Su Número de Licencia de Conducir de Texas o su Número de Tarjeta de Identificación Personal de Texas, Y
- Los últimos 4 dígitos de su Número de Seguro Social Y
- Su dirección de residencia tal y como figura en su registro de votante

Si su rechazo ocurrió en o antes de los 18 días antes del Día de las Elecciones, se incluye en esta notificación una nueva Solicitud de Boleta Postal. Si no desea presentar una nueva Solicitud, puede corregir el defecto utilizando el Rastreador de Boleta Postal.

**Si decide presentar una nueva solicitud, tenga en cuenta las siguientes directrices:**

Si envía por fax o por correo electrónico su Solicitud de Boleta Postal, debe enviar físicamente el original al Secretario de Votación Adelantada para que sea recibido a más tardar el cuarto día hábil después de haber sido recibido por fax o correo electrónico y debe cumplir con todos los plazos legalmente requeridos.

Si tiene alguna pregunta o duda sobre cómo hacer una corrección en su Solicitud de Boleta Postal por un número de identificación personal faltante o incorrecto, póngase en contacto con la Oficina de Votación Adelantada al:


_____                    _____
Número de Teléfono                                                        Firma del Secretario de Votación Adelantada

STATE031644

## NOTICE OF REJECTED APPLICATION FOR BALLOT BY MAIL
### Required Personal Identification Number is Not Associated with Your Voter Record

Your Application for a Ballot by Mail has been received and reviewed, but is defective for the reason stated below. New Texas Law requires that a voter must give his or her Texas Driver's License number, Texas Personal Identification Card number, Texas Election Identification Certificate number or the last 4 digits of his or her Social Security number on an Application for Ballot by Mail. The number provided must be a part of the voter's registration record in order for the voter to vote by mail.

_____ Your voter registration record does not have a Texas Driver's License Number, Texas Personal Identification Card Number, Election Identification Certificate Number or Last 4 digits of a Social Security Number associated with it.

### There are Two Ways to Add the Required Numbers to Your Voter Registration Record

**Submit an Updated Voter Registration Application -** Enclosed is a Postage Paid Voter Registration Application. Complete the application according to its instructions. Adding both the Driver's License or Personal Identification Card number AND the last 4 digits of your Social Security number to your voter registration record is very helpful to the Early Voting Clerk and will make applying for a Ballot by Mail easier in future elections.

**OR**

**Update Your Information Online -** You may update your voter registration record online at www.Texas.gov

To access the voter registration portal via Texas.gov, you must have:

- Your Texas Driver's License or Texas Personal Identification Card
- The audit number located on your Texas Driver's License or Texas Personal Identification Card
- Your Social Security Number
- Your Voter Registration Number (VUID#).

If you do not have a personal identification number associated with your voter registration record, you must add it before you will be allowed to vote by mail. Adding the missing numbers to your voter registration record takes effect immediately, but if you change your address it will take 30 days for the update to take effect from the day the voter registrar receives your new application.

If you have any questions or concerns about making an update to your voter registration record for a missing personal identification number, please contact the Early Voting Clerk's Office at:


_____          _____

Phone Number                                                   Signature of Early Voting Clerk


OCA-APPX-1357

STATE031645

# NOTIFICACIÓN DE SOLICITUD DE BOLETA POSTAL RECHAZADA

## El Número de Identificación Personal Requerido No Está Asociado Con Su Registro de Votante

Su Solicitud de Boleta Postal ha sido recibida y revisada, pero es defectuosa por la razón que se indica a continuación. La nueva ley de Texas exige que el votante dé su Número de Licencia de Conducir de Texas, el Número de su Tarjeta de Identificación Personal de Texas, el Número de su Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social en la Solicitud de Boleta Postal. El número proporcionado debe ser parte del registro del votante para que el votante pueda votar por correo.

_____ Su registro de votante no tiene un Número de Licencia de Conducir de Texas, un Número de Tarjeta de Identificación Personal de Texas, Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social asociado con él.

### Hay Dos Maneras de Añadir los Números Requeridos a Su Registro de Registro de Votante

**Presentar una Solicitud de Registro de Votantes Actualizada -** Se adjunta una Solicitud de Registro de Votantes con franqueo pagado. Complete la solicitud de acuerdo con sus instrucciones. Añadir tanto el Número de la Licencia de Conducir o de la Tarjeta de Identificación Personal como los últimos 4 dígitos de su Número de Seguro Social a su registro de votante es muy útil para el Secretario de Votación Adelantada y facilitará la solicitud de una Boleta Postal en elecciones futuras.

**O**

**Actualice su Información en Línea –** Puede actualizar su registro de votantes en línea en www.Texas.gov

Para acceder al portal de registro de votantes a través de Texas.gov, debe tener:

- Su Licencia de Conducir de Texas o su Tarjeta de Identificación Personal de Texas
- El número de auditoría que se encuentra en su Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas
- Su Número de Seguro Social
- Su Número de Registro de Votante (VUID#).

Si no tiene un número de identificación personal asociado con su registro de votante, debe añadirlo antes de que se le permita votar por correo. La adición de los números que faltan a su registro de votante surte efecto inmediatamente, pero si cambia su dirección, la actualización tardará 30 días en surtir efecto a partir del día en que el registrador de votantes reciba su nueva solicitud.

Si tiene alguna pregunta o duda sobre cómo actualizar su registro de votante por un número de identificación personal faltante, póngase en contacto con la Oficina de Votación Adelantada al:

_____          _____
Número de Teléfono                                            Firma del Secretario de Votación Adelantada

STATE031646

# INFORMATION ABOUT RETURNING YOUR CARRIER ENVELOPE

## Sealing and Signing the Carrier Envelope - Your ballot must be returned in the official Carrier Envelope!

1. **REQUIRED INFORMATION UNDER SECTION 86.002 OF THE ELECTION CODE:** You **MUST** provide one of the following numbers that is associated with your voter registration record in the appropriate place on the Carrier Envelope: Texas Driver's License, Personal Identification Card or Election Identification Certificate Number issued by the Department of Public Safety. If you have not been issued one of these numbers, you may give the last four digits of your Social Security Number.

2. If you have not been issued a Texas Driver's License, Personal Identification Card or Election Identification Certificate Number issued by the Department of Public Safety or a Social Security Number, check the box indicating this fact. The ID that you use for the purpose of fulfilling these identity requirements may be expired if the license or identification is otherwise valid.

3. When the Carrier Envelope is sealed, your information will be hidden from view during the mailing process. Your personal identification numbers will be reviewed by authorized election officials to determine if the number you provided matches the number on your voter registration record. If the number you provided is incomplete or does not match your voter registration record, you will be notified of this defect and given the opportunity to make any necessary corrections.

4. Place your marked ballot inside the Ballot Envelope. Place the sealed Ballot Envelope inside the Carrier Envelope. Seal any and all glue strips on your Carrier Envelope before signing **across the sealed flap.**

5. **Sign your name** next to the large "X" on the Carrier Envelope. If you cannot sign your name, you must have a person witness your mark. If you cannot make a mark, the witness must indicate this in the witness section of the Carrier Envelope and complete the applicable section on the back of the Carrier Envelope.

6. **If a person assists you with reading or marking your ballot, deposits your Carrier Envelope in the mail or delivers your ballot to a common or contract carrier, that person MUST sign the written Oath of Assistance that is part of the certificate on your Carrier Envelope, and include a printed name, residence address, relationship to you and whether he or she received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance.** Failure of the assistant to provide this information is a crime unless the person is one of certain close relatives of the voter or physically living in the same dwelling, and may result in your ballot being rejected. **The offense is a state jail felony.** For additional information on assistance procedures, please see the "Dear Voter" letter included with your balloting materials.

## How Do I Return My Marked Ballot to the Early Voting Clerk?

1. **By Mail through the United States Postal Service;**
2. **By Common or Contract Carrier** (e.g., a mail or courier service provided by a private business).
   For more information on this delivery method, see "Special Rules for Delivery by Common and Contract Carriers," below.); OR
3. **Hand Delivered, in person, by the Voter on Election Day, to the Early Voting Clerk's office.**
   You may only hand-deliver **your own** Carrier Envelope and not the Carrier Envelope for another individual. Hand delivery of a Ballot by Mail may only be made on Election Day, and the Carrier Envelope must be delivered to the Early Voting Clerk's office. You will be asked to present an acceptable form of photo ID listed in Section 63.0101(a) of the Texas Election Code. If you do not possess and cannot reasonably obtain an acceptable form of photo ID, you can execute a Reasonable Impediment Declaration and provide a supporting form of identification listed in Section 63.0101(b) of the Texas Election Code. Also, if you have a Voter Registration Certificate containing the Disability Exemption (E) notation, you may present it. You must sign a signature roster.

**The Carrier Envelope may only contain one voter's ballot. However, more than one Carrier Envelope may be placed together in another envelope for mailing purposes if the additional Carrier Envelope(s) belong(s) to a person(s) registered to vote at the same address (§ 86.006(b), Texas Election Code). A Carrier Envelope may not be collected and stored at another location for subsequent delivery to the Early Voting Clerk. It is a criminal offense for someone to knowingly possesses an official ballot or official Carrier Envelope provided under this Code of another individual without completing the assistant portion of the Carrier Envelope, unless the person is one of certain close relatives of the voter, physically living in the same dwelling, an Early Voting Clerk or Deputy Early Voting Clerk, or a U.S. Postal service or other delivery service employee working in the normal course of his or her job. It is also a criminal offense to be compensated for depositing Carrier Envelopes in the mail or with a common or contract carrier. (§ 86.0052, Texas Election Code). IF YOUR BALLOT IS RETURNED BY AN UNAUTHORIZED METHOD, IT WILL NOT BE COUNTED.**

## What is the Deadline to Return my Ballot by Mail?

A ballot that is mailed or delivered by common or contract carrier but does not have a postmark or delivery receipt must be received by the Early Voting Clerk **no later than 7:00 p.m. on Election Day**.

A ballot that is mailed or delivered by mail or common or contract carrier from within the United States and is postmarked or accompanied by a delivery receipt showing the voter submitted the ballot for delivery by 7:00 p.m. on Election Day must be received no later than **5:00 p.m. on the next business day after Election Day**.

A ballot that is hand delivered can only be delivered on Election Day and must be received by the Early Voting Clerk **no later than 7:00 p.m. on Election Day**.

A ballot that is mailed from overseas and is postmarked or accompanied by a delivery receipt showing the voter submitted the ballot for delivery by 7:00 p.m. on Election Day must arrive **no later than the 5th day after Election Day** (or the next business day after the 5th day after Election Day, if the 5th day falls on a weekend or holiday).

## SPECIAL RULES FOR DELIVERY BY COMMON AND CONTRACT CARRIERS (§§ 81.005 and 86.006, Texas Election Code)

1. If you use a common or contract carrier to return your ballot, the carrier must be a bona fide, for profit business whose primary service is transporting or delivering items for compensation.

2. If you return your Carrier Envelope by common or contract carrier, your Carrier Envelope must be accompanied by a delivery receipt when delivered to the Early Voting Clerk. The receipt must indicate the name and address of the person who delivered the Carrier Envelope to the common or contract carrier, and the date, hour, and address where the Carrier Envelope was received by the common or contract carrier.

3. Your ballot will not be counted if it is picked up by a common or contract carrier at an office of a political party or candidate in the election, office for a specific-purpose or general purpose political committee involved in the election, an entity that requested the election be held (unless the delivery is a forwarding to the Early Voting Clerk), or a candidate's house unless the address of the candidate is your address.

If you have any questions about returning your Carrier Envelope, please contact the Early Voting Clerk's office at
(_____)_____.

If you feel that your voting rights have been violated or abused, you may report these incidents to the Secretary of State toll-free at
1-800-252-VOTE(8683) or elections@sos.texas.gov

<div align="center">OCA-APPX-1359</div>

STATE031647

# INFORMACIÓN SOBRE LA DEVOLUCIÓN DE SU SOBRE DE ENVÍO
## Cómo Sellar y Firmar el Sobre de Envío - ¡Su boleta debe ser devuelta en el Sobre de Envío oficial!

1. **Información Requerida Según la Sección 86.002 del Código Electoral:** Usted DEBE proporcionar uno de los siguientes números que está asociado con su registro de votante en el lugar apropiado en el Sobre de Envío: Licencia de Conducir de Texas, Tarjeta de Identificación Personal o Número de Certificado de Identificación Electoral emitido por el Departamento de Seguridad Pública. Si no se le ha emitido uno de estos números, puede dar los últimos cuatro dígitos de su Número de Seguro Social.

2. Si no se le ha emitido una Licencia de Conducir de Texas, una Tarjeta de Identificación Personal o un Número de Certificado de Identificación Electoral emitido por el Departamento de Seguridad Pública o un Número de Seguro Social, marque la casilla que indica este hecho. El documento de identidad que utilice para cumplir con estos requisitos de identidad puede estar caducado si la licencia o identificación es válida de otra manera.

3. Cuando el Sobre de Envío esté cerrado, su información quedará oculta durante el proceso de envío. Sus números de identificación personal serán revisados por funcionarios electorales autorizados para determinar si el número que ha proporcionado coincide con el de su registro de votante. Si el número que ha proporcionado está incompleto o no coincide con su registro de votante, se le notificará de este defecto y se le dará la oportunidad de hacer las correcciones necesarias.

4. Coloque su boleta marcada dentro del Sobre de Boleta. Coloque el Sobre de Boleta sellada dentro del Sobre de Envío. Selle todas las tiras de pegamento en su Sobre de Envío antes de firmar **sobre la solapa sellada**.

5. **Firme su nombre** junto a la "X" grande del Sobre de Envío. Si usted no puede firmar su nombre, debe tener a una persona que atestigüe su marca. Si no puede hacer una marca, el testigo debe indicarlo en la sección de testigos del Sobre de Envío y completar la sección correspondiente en el reverso del Sobre de Envío.

6. Si una persona le ayuda a leer o marcar su boleta o deposita su Sobre de Envío en el correo o se lo entrega a un transportista común o contratado, dicha persona DEBE firmar el Juramento de Asistencia por escrito que forma parte del certificado en su Sobre de Envío, e incluir un nombre en letra de molde, la dirección de residencia, la relación con usted y si recibió o aceptó algún tipo de compensación u otro beneficio del candidato, campaña o comité político a cambio de prestar asistencia. El hecho de que el asistente no proporcione esta información es un delito, a menos que la persona sea uno de ciertos parientes cercanos del votante o que viva físicamente en la misma vivienda, y puede resultar en que su boleta sea rechazada. **El delito es un crimen de cárcel estatal.** Para obtener información adicional sobre los procedimientos para asistentes, consulte la carta de "Estimado Votante" incluida con sus materiales de votación.

## ¿Cómo Devuelvo Mi Boleta Marcada al Secretario de Votación Adelantada?

1. **Por correo a través del Servicio Postal de los Estados Unidos;**
2. **Por Medio de un Transportista Común o Contratado** (por ejemplo, un servicio de correo o mensajería proporcionado por una empresa privada. Para obtener más información sobre este método de envío, consulte las **"Normas Especiales Para La Entrega Por Parte De Los Transportistas Comunes y Contractuales"** a continuación); O
3. **Entregado en mano, en persona, por el votante el Día de las Elecciones, en la oficina del Secretario de Votación Adelantada.**

Sólo puede entregar en mano **su propio** Sobre de Envío y no el Sobre de Envío de otra persona. La entrega en mano de una Boleta por Correo sólo puede hacerse el Día de las Elecciones, y el Sobre de Envío debe entregarse en la oficina del Secretario de Votación Adelantada. Se le pedirá que presente una forma aprobada de identificación con fotografía enumerada en la Sección 63.0101(a) del Código Electoral de Texas. Si no posee y no puede razonablemente obtener una forma aprobada de identificación con fotografía, el votante puede ejecutar una Declaración de Impedimento Razonable y proporcionar una forma de identificación adicional enumerada en la Sección 63.0101(b) del Código Electoral de Texas. Además, si tiene un Certificado de Registro Electoral que contiene la anotación de Exención por Discapacidad (E), puede presentarlo. Debe firmar una lista de firmas.

El Sobre de Envío sólo puede contener la boleta de un votante. Sin embargo, se puede colocar más de un Sobre de Envío juntos en otro sobre con fines de envío sólo si los Sobres de Envío adicionales pertenecen a una o varias personas registradas para votar en la misma dirección (§ 86.006(b), Código Electoral de Texas). Un Sobre de Envío no puede ser recolectado y almacenado en otro lugar para su posterior entrega al Secretario de Votación Adelantada. Es un delito penal que una persona posea a sabiendas una boleta oficial o un Sobre de Envío oficial provisto de conformidad con este código de otro individuo sin completar la porción del asistente del Sobre de Envío, a menos que la persona sea uno de ciertos parientes cercanos del votante, que viva físicamente en la misma vivienda, un Secretario de Votación Adelantada o el Secretario de Votación Adelantada Suplente, o un empleado del Servicio Postal de los Estados Unidos u otro empleado de servicio de entrega trabajando en el curso normal de su trabajo. También es un delito ser compensado por depositar Sobres de Envío que contengan boletas votadas por otras personas (§ 86.0052, Código Electoral de Texas). **SI SU BOLETA ES DEVUELTA POR UN MÉTODO NO AUTORIZADO, NO SE CONTARÁ.**

## ¿Cuál es la Fecha Límite para Devolver Mi Boleta por Correo?

Una boleta que es enviada por correo o entregada por medio de un transportista común o contratado pero que no tenga un matasellos o un recibo de entrega debe ser recibida por el Secretario de Votación Adelantada **a más tardar a las 7:00 p.m. el Día de las Elecciones.**

Una boleta que es enviada por correo o entregada por medio de un transportista común o contratado dentro de los Estados Unidos que tenga un matasellos o que esté acompañada por un recibo de entrega que indique que el votante envió la boleta para su entrega a más tardar a las 7:00 p.m. el Día de las Elecciones debe ser recibida **a más tardar a las 5:00 p.m. del día hábil siguiente al Día de las Elecciones.**

Una boleta entregada en mano debe ser recibida por el Secretario de Votación Adelantada **a más tardar a las 7:00 p.m. el Día de las Elecciones.**

Una boleta que es enviada por correo desde el extranjero que tenga un matasellos o que esté acompañada por un recibo de entrega que indique que el votante envió la boleta para su entrega a más tardar a las 7:00 p.m. el Día de las Elecciones debe llegar **a más tardar del 5º día siguiente al Día de las Elecciones** (o el siguiente día hábil después del 5º día siguiente al Día de las Elecciones, si dicho 5º día es un día de fin de semana o un día festivo).

## NORMAS ESPECIALES PARA LA ENTREGA POR PARTE DE LOS TRANSPORTISTAS COMUNES Y CONTRACTUALES
### (§§ 81.005 y 86.006, Código Electoral de Texas)

1. Si utiliza un transportista común o contratado para enviar su boleta, el transportista debe ser una empresa de buena fe y con ánimo de lucro cuyo servicio principal sea el transporte o la entrega de artículos a cambio de una remuneración.

2. Si devuelve el Sobre de Envío por medio de un transportista común o contratado, su Sobre de Envío debe ir acompañado de un recibo de entrega cuando se le entregue al Secretario de Votación Adelantada. El recibo debe indicar el nombre y la dirección de la persona que entregó el Sobre de Envío al transportista común o contratado, así como la fecha, la hora y la dirección en que el transportista común o contratado recibió el Sobre de Envío.

3. Su boleta <u>no</u> se contará si es recogida por un transportista común o contratado en la oficina de un partido político o de un candidato, en la oficina de un comité político con propósitos específicos o generales que participen en la elección, una entidad que haya solicitado celebrar la elección (a menos que la entrega sea un reenvío al Secretario de Votación Adelantada), el hogar de un candidato, a menos que la dirección del candidato sea también la dirección del votante.

Si tiene alguna pregunta sobre la devolución de su Sobre de Envío, por favor comuníquese con la oficina del Secretario de Votación Adelantada al (_____)_____.

Si cree que sus derechos electorales han sido violados o abusados, puede reportar esos incidentes a la Secretaría de Estado llamando al teléfono gratuito 1-800-252-VOTE (8683) o enviando un correo electrónico a elections@sos.texas.gov

OCA-APPX-1360

STATE031648

Dear Voter:

Thank you for choosing to participate in this election by voting by mail. When you vote by mail, you may take the following steps to protect your ballot and your vote.

1. **Know your rights as a voter and be careful about assistance:** You have the right to vote for the candidates of your choice. No one should help you with your ballot, unless you cannot read the language written on the ballot or unless you have a disability that makes you unable to write or to see. If one of these conditions applies to you, we recommend that you ask a family member or trusted friend for assistance with your ballot.

   Your vote is secret. It is a crime for that person to reveal how or for whom you voted. The person assisting you must mark your ballot according to your instruction and **cannot suggest how you should vote**. The assistant must place his or her name, address, and signature on the carrier envelope. Before your ballot is counted, the signature on your mail-in ballot application will be compared with the signature on your carrier envelope to verify that both signatures were executed by the same person, unless signed by a witness.

   **If anyone attempts to pressure or intimidate you, we urge you to report this to our office, your district attorney, or the Secretary of State's office at 1-800-252-VOTE (8683).**

2. **Mail your own ballot:** If you can't mail your own ballot, give your ballot to a family member or trusted friend to mail for you. Do not accept offers from strangers to mail your ballot. For elections in which the ballot is mailed by your county, you may track the location and status of your mail ballot by visiting the Secretary of State's website at www.votetexas.gov and select 'Track My Ballot.' In order to view this information, you will need to provide the last four digits of your Social Security number and your driver's license number or personal identification card number issued by the Department of Public Safety.

3. **Don't wait until the last minute:** It takes time for the Post Office to deliver your ballot. Unless an exception applies, a ballot postmarked by Election Day (Tuesday, March 1, 2022) must be received by the early voting clerk no later than **5:00 pm on Thursday, March 3, 2022**. If there is no postmark, the early voting clerk must receive these ballots by **7:00 pm on Election Day**. Please see the insert included with your balloting materials for other deadlines regarding military or overseas voters who submitted a Federal Post Card Application (FPCA) or voters who are overseas and submitted an Application for Ballot by Mail (ABBM).

   **NOTE:** If you received ballots and balloting materials from more than one political subdivision, please be very sure to check the name of the election on the top of the ballot before you seal it in the ballot secrecy envelope, and match it to the name of the election that appears on the bottom, right side of the back of the carrier envelope, to make sure that you are returning each ballot in the correct carrier envelope for that ballot. This will ensure that each ballot is delivered to the proper early voting clerk. **DO NOT** put more than one ballot in the carrier envelope.

Early voting in person begins February 14, 2022 and continues through February 25, 2022. Election Day is March 1, 2022. You may contact your county election office for the locations and hours of operation for your early voting sites. If you change your mind about voting by mail and prefer to vote in person during the early voting period or on Election Day, you must take your mail ballot with you and cancel it at the polling place.

Sincerely,


County Election Official


OCA-APPX-1361

STATE031649

Estimado votante:

Gracias por haber elegido participar en esta elección votando por correo. Cuando vote por correo, puede tomar las siguientes medidas para proteger su boleta y su voto.

1. **Conozca sus derechos como votante y tenga cuidado con la asistencia:** Tienes derecho a votar por los candidatos de su elección. Nadie debe ayudarle con su boleta, a menos que no pueda leer el idioma escrito en la boleta o que tenga una discapacidad que le impida escribir o ver. Si una de estas condiciones se aplica a usted, le recomendamos que pida ayuda con su boleta a un familiar o a un amigo de confianza.

   Su voto es secreto. Es un delito que esa persona revele cómo o por quién ha votado. La persona que le asiste debe marcar su boleta según sus instrucciones y **no puede sugerirle cómo debe votar.** El asistente debe colocar su nombre, dirección y firma en el sobre de envío. Antes de que se cuente su boleta, la firma en su solicitud de boleta postal se comparará con la firma en su sobre de envío para verificar que ambas firmas fueron ejecutadas por la misma persona, a menos que hayan sido firmadas por un testigo.

   **Si alguien intenta presionarle o intimidarle, le instamos a que lo comunique a la oficina electoral de su condado, a su fiscal de distrito o la oficina de la Secretaria Del Estado al 1-800-252-VOTE (8683).**

2. **Envié su propia boleta:** Si no puede enviar su propia boleta por correo, entréguesela a un familiar o amigo de confianza para que la envíe por correo por ti. No acepte ofertas de extraños para enviar su boleta por correo. Para las elecciones en las que la boleta es enviada por correo por su condado, puede rastrear la ubicación y el estado de su boleta postal visitando el sitio web del Secretario de Estado en www.votetexas.gov y seleccionando 'Track My Ballot.' Para ver esta información, tendrá que proporcionar los últimos cuatro dígitos de su número de Seguro Social y el número de su licencia de conducir o de su tarjeta de identificación personal emitida por el Departamento de Seguridad Pública.

3. **No esperes hasta el último minuto**: La Oficina de Correos demora en entregar su boleta. A menos que se aplique una excepción, una boleta matasellada antes del Día de las Elecciones (martes, 1 de marzo de 2022) debe ser recibida por el secretario de votación adelantada a más tardar a las **5:00 pm del jueves, 3 de marzo de 2022**. Si no hay matasellos, el secretario de votación adelantada debe recibir estas boletas a más tardar a las **7:00 pm el Día de las Elecciones**. Por favor, vea el inserto incluido con sus materiales de votación para otras fechas límite con respecto a los votantes militares o en el extranjero que presentaron una Solicitud de Tarjeta Postal Federal (FPCA por sus siglas en inglés) o los votantes que están en el extranjero y presentaron una Solicitud de Boleta Postal (ABBM por sus siglas en inglés).

   **NOTA:** Si recibió boletas y materiales de votación de más de una subdivisión política, asegúrese de verificar el nombre de la elección que figura en la parte superior de la boleta antes de sellarla en el sobre secreto, y de que coincida con el nombre de la elección que aparece en la parte inferior derecha del reverso del sobre de envío, para asegurarse de que está devolviendo cada boleta en el sobre de envío correcto para esa boleta. Esto asegurará que cada boleta se entregue al secretario de votación adelantada apropiado. **NO** ponga más de una boleta en el sobre de envío.

La votación adelantada en persona comienza el 14 de febrero de 2022 y continúa hasta el 25 de febrero de 2022. El Día de las Elecciones es el 1 de marzo de 2022. Puede comunicarse con la oficina electoral de su condado para conocer los lugares y el horario de operación de sus sitios de votación adelantada. Si usted cambia de parecer con respecto a la votación por correo y prefiere votar en persona durante el período de votación adelantada o el Día de las Elecciones, debe llevar su boleta postal y cancelarla en el centro de votación.

Atentamente,

County Election Official

OCA-APPX-1362

STATE031650

OCA-APPX-1363

STATE031651

# INFORMATION ABOUT RETURNING YOUR FPCA CARRIER ENVELOPE

## Signing and Sealing the FPCA Carrier Envelope/Returning the Official Election Signature Sheet for an FPCA Voter

NOTE: If you do not use the Official Carrier Envelope to return your marked ballot, you must include the FPCA Signature Sheet in the FPCA Postage-Paid Envelope or other envelope you use to return your ballot.

1. **REQUIRED INFORMATION UNDER SECTION 86.002 OF THE ELECTION CODE:** You **MUST** provide one of the following numbers that is associated with your voter registration record in the appropriate place on the Carrier Envelope or Signature Sheet: Texas Driver's License, Personal Identification Card or Election Identification Certificate Number issued by the Department of Public Safety. If you have not been issued one of these numbers, you may give the last four digits of your Social Security Number.

2. If you have not been issued a Texas Driver's License, Personal Identification Card or Election Identification Certificate Number issued by the Department of Public Safety or a Social Security Number, check the box indicating this fact. The ID that you use for the purpose of fulfilling these identity requirements may be expired if the license or identification is otherwise valid.

3. When the Carrier Envelope is sealed, your information will be hidden from view during the mailing process. Your personal identification numbers will reviewed by authorized election officials to determine if the number you provided matches the number on your voter registration record. If the number you provided is incomplete or does not match your voter registration record, you will be notified of this defect and given the opportunity to make any necessary corrections.

4. Place your marked ballot inside the Ballot Envelope. Place the sealed Ballot Envelope inside the Carrier Envelope. Seal and any all glue strips on your Carrier Envelope before signing **across the sealed flap.** If using the Signature Sheet, please wrap it around the envelope used for secrecy.

5. **Sign your name** next to the large "X" on the Carrier Envelope or Signature Sheet. If you cannot sign your name, you must have a person witness your mark. If you cannot make a mark, the witness must indicate this in the witness section of the Carrier Envelope/Signature Sheet and complete the applicable section on the back of the Carrier Envelope or on the Signature Sheet.

6. **If a person assists you with reading or marking your ballot, deposits your Carrier Envelope/envelope with your marked ballot in the mail or delivers your ballot to a common or contract carrier, that person MUST sign the written Oath of Assistance that is part of the certificate on your Carrier Envelope or Signature Sheet, and include a printed name, residence address, relationship to you and whether he or she received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance.** Failure of the assistant to provide this information is a crime unless the person is one of certain close relatives of the voter or physically living in the same dwelling, and may result in your ballot being rejected. **The offense is a state jail felony.** For additional information on assistance procedures, please see the "Dear Voter" letter included with your balloting materials.

## How Do I Return My Marked Ballot to the Early Voting Clerk?

1. **By Mail through the United States Postal Service;**
2. **By Common or Contract Carrier** (e.g., a mail or courier service provided by a private business).
   For more information on this delivery method, see "Special Rules for Delivery by Common and Contract Carriers," below.); **OR**
3. **Hand Delivered, in person, by the Voter on Election Day, to the Early Voting Clerk's office.**
   You may only hand-deliver **your own** Carrier Envelope/envelope with your marked ballot and not for another individual. Hand delivery of a Ballot by Mail may only be made on Election Day, and the Carrier Envelope/envelope with a marked ballot must be delivered to the Early Voting Clerk's office. You will be asked to present an acceptable form of photo ID listed in Section 63.0101(a) of the Texas Election Code. If you do not possess and cannot reasonably obtain an acceptable form of photo ID, you can execute a Reasonable Impediment Declaration and provide a supporting form of identification listed in Section 63.0101(b) of the Texas Election Code. Also, if you have a Voter Registration Certificate containing the Disability Exemption (E) notation, you may present it. You must sign a signature roster.

**The Carrier Envelope/envelope with a marked ballot may only contain one voter's ballot. However, more than one Carrier Envelope/envelope with a marked ballot may be placed together in another envelope for mailing purposes if the additional envelope(s) belong(s) to a person(s) registered to vote at the same address (§ 86.006(b), Texas Election Code). A Carrier Envelope/envelope with a marked ballot may not be collected and stored at another location for subsequent delivery to the Early Voting Clerk. It is a criminal offense for someone to knowingly possesses an official ballot or official Carrier Envelope provided under this Code of another individual without completing the assistant portion of the Carrier Envelope/Signature Sheet, unless the person is one of certain close relatives of the voter, physically living in the same dwelling, an Early Voting Clerk or Deputy Early Voting Clerk, or a U.S. Postal service or other delivery service employee working in the normal course of his or her job. It is also a criminal offense to be compensated for depositing Carrier Envelopes/envelopes containing marked ballots in the mail or with a common or contract carrier. (§ 86.0052, Texas Election Code). IF YOUR BALLOT IS RETURNED BY AN UNAUTHORIZED METHOD, IT WILL NOT BE COUNTED.**

## What is the Deadline to Return my Ballot by Mail?

**For Non-Military Overseas Voters**
A ballot that is mailed or delivered by common or contract carrier but does not have a postmark or delivery receipt must be received by the Early Voting Clerk **no later than 7:00 p.m. on Election Day.**

A ballot that is mailed from overseas and is postmarked or accompanied by a delivery receipt showing the voter submitted the ballot for delivery by 7:00 p.m. on Election Day must arrive **no later than the 5th day after Election Day** (or the next business day after the 5th day after Election Day, if the 5th day falls on a weekend or holiday).

**For Members of the Armed Forces of the United States, or the Spouse or Dependent of a Member of the Armed Forces, Members of the Merchant Marines of the United States, or the Spouse or Dependent of a Member of the Merchant Marine, Members of the National Guard, or the spouse or dependent of a Member of the National Guard**
The Carrier Envelope/envelope containing the marked ballot must be received by the Early Voting Clerk **no later than the 6th day after Election Day** (or the next business day after the 6th day after Election Day, if the 6th day falls on a weekend or holiday). **No postmark is required on the Carrier Envelope/envelope with a marked ballot for this category of voter.**

For all FPCA voters, a ballot that is hand delivered can only be delivered on Election Day and must be received by the Early Voting Clerk **no later than 7:00 p.m. on Election Day.**

## SPECIAL RULES for Delivery by COMMON AND CONTRACT CARRIERS (§§ 81.005 and 86.006, Texas Election Code)

1. If you use a common or contract carrier to return your ballot, the carrier must be a bona fide, for profit business whose primary service is transporting or delivering items.
2. If you return your Carrier Envelope/envelope with your marked ballot by common or contract carrier, your Carrier Envelope/envelope with your marked ballot must be accompanied by a delivery receipt when delivered to the Early Voting Clerk. The receipt must indicate the name and address of the person who delivered the Carrier Envelope/envelope with a marked ballot to the common or contract carrier, and the date, hour, and address where the Carrier Envelope/envelope with a marked ballot was received by the common or contract carrier.
3. Your ballot will not be counted if it is picked up by a common or contract carrier at an office of a political party or candidate, office for a specific-purpose or general purpose political committee involved in the election, an entity that requested the election be held (unless the delivery is a forwarding to the Early Voting Clerk), or a candidate's house unless the address of the candidate is your address.

If you have any questions about returning your Carrier Envelope/envelope with your marked ballot, please contact the Early Voting Clerk's office at (_____)_____.

If you feel that your voting rights have been violated or abused, you may report these incidents to the Secretary of State toll-free at **1-800-252-VOTE (8683)** or elections@sos.texas.gov

OCA-APPX-1364

STATE031652

# INFORMACIÓN SOBRE LA DEVOLUCIÓN DE SU SOBRE DE ENVÍO DE FPCA

## Cómo Sellar y Firmar el Sobre de Envío de FPCA/Devolución de la Hoja Oficial de Firma Electoral Para Un Votante de FPCA

NOTA: Si no utiliza el Sobre de Envío Oficial para devolver su boleta marcada, debe incluir la Hoja de Firma de la FPCA en el Sobre con Franqueo Pagado de la FPCA o en otro sobre que utilice para devolver su boleta.

1. **Información Requerida Según la Sección 86.002 del Código Electoral:** Usted DEBE proporcionar uno de los siguientes números que está asociado con su registro de votante en el lugar apropiado en el Sobre de Envío u Hoja de Firma: Licencia de Conducir de Texas, Tarjeta de Identificación Personal o Número de Certificado de Identificación Electoral emitido por el Departamento de Seguridad Pública. Si no se le ha emitido uno de estos números, puede dar los últimos cuatro dígitos de su Número de Seguro Social.

2. Si no se le ha emitido una Licencia de Conducir de Texas, una Tarjeta de Identificación Personal o un Número de Certificado de Identificación Electoral emitido por el Departamento de Seguridad Pública, o un Número de Seguro Social, marque la casilla que indica este hecho. El documento de identidad que utilice para cumplir con estos requisitos de identidad deberá estar caducado si la licencia o identificación es válida de otra manera.

3. Cuando su Sobre de Envío esté cerrado, su información quedará oculta durante el proceso de envío. Sus números de identificación personal serán revisados por funcionarios electorales autorizados para determinar si el número que ha proporcionado coincide con el de su registro de votante. Si el número que ha proporcionado está incompleto o no coincide con su registro de votante, se le notificará de este defecto y se le dará la oportunidad de hacer las correcciones necesarias.

4. Coloque su boleta marcada dentro del Sobre de Boleta. Coloque el Sobre de Boleta sellada dentro del Sobre de Envío. Selle todas las tiras de pegamento de su Sobre de Envío antes de firmar **sobre la solapa sellada**. Si utiliza la Hoja de Firma, envuélvala alrededor del Sobre de Envío utilizado para el secreto.

5. **Firme su nombre** junto a la "X" grande del Sobre de Envío u Hoja de Firma. Si usted no puede firmar su nombre, debe tener a una persona que atestigüe su marca. Si no puede hacer una marca, el testigo debe indicarlo en la sección de testigos del Sobre de Envío/Hoja de Firma y completar la sección correspondiente en el reverso del Sobre de Envío o en la Hoja de Firma.

6. Si una persona le ayuda a leer o marcar su boleta o deposita su Sobre de Envío/sobre con la boleta marcada en el correo o se lo entrega a un transportista común o contratado, dicha persona DEBE firmar el Juramento de Asistencia por escrito que forma parte del certificado en su Sobre de Envío u Hoja de Firma, e incluir un nombre en letra de molde, la dirección de residencia, la relación con usted y si recibió o aceptó algún tipo de compensación u otro beneficio de un candidato, campaña o comité político a cambio de prestar asistencia. El hecho de que el asistente no proporcione esta información es un delito, a menos que la persona sea uno de ciertos parientes cercanos del votante o que viva físicamente en la misma vivienda, y puede resultar en que su boleta sea rechazada. **El delito es un crimen de cárcel estatal.** Para obtener información adicional sobre los procedimientos para asistentes, consulte la carta de "Estimado Votante" incluida con sus materiales de votación.

## ¿Cómo Devuelvo Mi Boleta Marcada al Secretario de Votación Adelantada?

1. **Por correo a través del Servicio Postal de los Estados Unidos;**

2. **Por Medio de un Transportista Común o Contratado** (por ejemplo, un servicio de correo o mensajería proporcionado por una empresa privada. Para obtener más información sobre este método de envío, consulte las **"Normas Especiales Para La Entrega Por Parte De Los Transportistas Comunes y Contractuales"** a continuación); O

3. **Entregado en mano, en persona, por el votante por el Día de las Elecciones, en la oficina del Secretario de Votación Adelantada.**

   Sólo puede entregar en mano **su propio** Sobre de Envío/sobre con su boleta marcada y no para otra persona. La entrega en mano de una Boleta por Correo sólo puede hacerse el Día de las Elecciones, y el Sobre de Envío con la boleta marcada debe entregarse en la oficina del Secretario de Votación Adelantada. Se le pedirá que presente una forma aprobada de identificación con fotografía enumerada en la Sección 63.0101(a) del Código Electoral de Texas. Si no posee o no puede razonablemente obtener una forma aprobada de identificación con fotografía, el votante puede ejecutar una Declaración de Impedimento Razonable y proporcionar una forma de identificación adicional enumerada en la Sección 63.0101(b) del Código Electoral de Texas. Además, si tiene un Certificado de Registro Electoral que contiene la anotación de Exención por Discapacidad (E), puede presentarlo. Debe firmar una lista de firmas.

El Sobre de Envío/sobre con la boleta marcada sólo puede contener la boleta de un votante. Sin embargo, se puede colocar más de un Sobre de Envío/sobre con la boleta marcada juntos en un solo sobre con fines de envío si los sobres adicionales pertenecen a una o varias personas registradas para votar en la misma dirección (§ 86.006(b), Código Electoral de Texas). Un Sobre de Envío/sobre con la boleta marcada no puede ser recolectado y almacenado en otro lugar para su posterior entrega al Secretario de Votación Adelantada. Es un delito penal que una persona posea a sabiendas una boleta oficial o un Sobre de Envío oficial provisto de conformidad con este código de otro individuo sin completar la porción del asistente del Sobre de Envío/Hoja de Firma, a menos que la persona sea uno de ciertos parientes cercanos del votante, que viva físicamente en la misma vivienda, un Secretario de Votación Adelantada o el Secretario de Votación Adelantada Suplente, o un empleado del Servicio Postal de los Estados Unidos u otro empleado de servicio de entrega trabajando en el curso normal de su trabajo. También es un delito ser compensado por depositar Sobres de Envío/sobres con boletas marcadas que contengan boletas votadas por otras personas (§ 86.0052, Código Electoral de Texas). SI SU BOLETA ES DEVUELTA POR UN MÉTODO NO AUTORIZADO, NO SE CONTARÁ.

## ¿Cuál es la Fecha Límite para Devolver Mi Boleta por Correo?

**Para los Votantes que no son Militares que Están en el Extranjero**

Una boleta que es enviada por correo o entregada por medio de un transportista común o contratado pero que <u>no tenga un matasellos o un recibo de entrega</u> debe ser recibida por el Secretario de Votación Adelantada **a más tardar a las 7:00 p.m. el Día de las Elecciones.**

Una boleta que es enviada por correo desde el extranjero que tenga <u>un matasellos o que esté acompañada por un recibo de entrega</u> que indique que el votante envió la boleta para su entrega a más tardar a las 7:00 p.m. el Día de las Elecciones debe llegar **a más tardar al 5º día siguiente al Día de las Elecciones** (o el siguiente día hábil después del 5º día siguiente al Día de las Elecciones, si dicho 5º día es un día de fin de semana o un día festivo).

**Para los Miembros de las Fuerzas Armadas de los Estados Unidos, o el Cónyuge o Dependiente de un Miembro de las Fuerzas Armadas, Miembros de la Marina Mercante de los Estados Unidos, o el Cónyuge o Dependiente de un Miembro de la Marina Mercante, Miembros de la Guardia Nacional o el Cónyuge o Dependiente de un Miembro de la Guardia Nacional**

El Sobre de Envío/sobre que contiene la boleta marcada debe ser recibido por el Secretario de Votación Adelantada **a más tardar al 6º día siguiente al Día de las Elecciones** (o el siguiente día hábil después del 6º día siguiente al Día de las Elecciones, si dicho 6º día es un día de fin de semana o un día festivo). **No se requiere matasellos en el Sobre de Envío/sobre con la boleta marcada para esta categoría de votante.**

Para todos los votantes de la FPCA, una boleta entregada en mano debe ser recibida por el Secretario de Votación Adelantada **a más tardar a las 7:00 p.m. el Día de las Elecciones.**

**NORMAS ESPECIALES PARA LA ENTREGA POR PARTE DE LOS TRANSPORTISTAS COMUNES Y CONTRACTUALES (§§ 81.005 y 86.006, Código Electoral de Texas)**

1. Si utiliza un transportista común o contratado para enviar su boleta, el transportista debe ser una empresa de buena fe y con ánimo de lucro cuyo servicio principal sea el transporte o la entrega de artículos a cambio de una remuneración.

2. Si devuelve el Sobre de Envío/sobre con su boleta marcada por medio de un transportista común o contratado, su Sobre de Envío/sobre con su boleta marcada debe ir acompañado de un recibo de entrega cuando se lo entregue al Secretario de Votación Adelantada. El recibo debe indicar el nombre y la dirección de la persona que entregó el Sobre de Envío/sobre con la boleta marcada al transportista común o contratado, así como la fecha, la hora y la dirección en que el transportista común o contratado recibió el Sobre de Envío/sobre con la boleta marcada.

3. Su boleta <u>no</u> se contará si la recogida por un transportista común o contratado en la oficina de un partido político o de un candidato, en la oficina de un comité político con propósitos específicos y generales que participe en la elección, una entidad que haya solicitado celebrar la elección (a menos que la entrega sea un reenvío al Secretario de Votación Adelantada), o el hogar de un candidato, a menos que la dirección del candidato sea también la dirección del votante.

Si tiene alguna pregunta sobre la devolución de su Sobre de Envío/sobre con la boleta marcada, por favor comuníquese con la oficina del Secretario de Votación Adelantada al (_____).

Si cree que sus derechos electorales han sido violados o abusados, puede reportar esos incidentes a la Secretaría de Estado llamando al teléfono gratuito 1-800-252-VOTE (8683) o enviando un correo electrónico a elections@sos.texas.gov.

OCA-APPX-1365

# Exhibit 87

| | |
|---|---|
| **From:** | Brandy Grimes [Brandy.Grimes@dentoncounty.gov] |
| **Sent:** | 4/1/2022 7:25:46 PM |
| **To:** | Christina Adkins [CAdkins@sos.texas.gov]; Frank Phillips [Frank.Phillips@dentoncounty.gov] |
| **Subject:** | RE: Revised Carrier Envelope |

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

Well, if the rejection notices are auto-generated (like they should be) with the reason of rejection based on how the rejected application is entered into the system, any change would result in a formatting change needed in the VR system. I just know that our vendor is slow to respond and when something changes like a form change, it takes a while to get an update. Maybe it wouldn't be a big deal.

Example: I still don't think that there is an option in Vemacs to specify which ID was included on the application that did not result in a match. They lump all ID forms into the same bucket.

-   Brandy

**From:** Christina Adkins <CAdkins@sos.texas.gov>
**Sent:** Friday, April 1, 2022 2:11 PM
**To:** Brandy Grimes <Brandy.Grimes@dentoncounty.gov>; Frank Phillips <Frank.Phillips@dentoncounty.gov>
**Subject:** RE: Revised Carrier Envelope

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Never enter your password or other sensitive information on linked web pages contained in emails unless you are certain the web pages are safe. If you have questions or need assistance, please contact the Help Desk.

Kristi has been working with the offline vendors on changes, but I didn't think these edits would affect the changes they are working on.

What makes you think this would result in a change? I want to make sure I'm not missing anything...

**From:** Brandy Grimes <Brandy.Grimes@dentoncounty.gov>
**Sent:** Friday, April 1, 2022 2:06 PM
**To:** Christina Adkins <CAdkins@sos.texas.gov>; Frank Phillips <Frank.Phillips@dentoncounty.gov>
**Subject:** RE: Revised Carrier Envelope

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

I do like the concept of the change. It lets the voter know what number they provided on the application and also what ID is associated on their record. We both know that they can't remember how they filled out the

STATE122160

defective application once it's sent.  The proposed is a little confusing but I can't think of a better way to present this information.  Maybe something like this?

_____  2.   The Texas Personal Identification Number/ Texas Driver's License Number/ Last 4 digits of your Social Security Number/ Election Identification Certificate Number provided on your ABBM is **NOT** associated with your voter registration record:

The type of number associated with your voter registration record is the following:

_____ Texas Personal Identification Number        _____ Last 4 digits of your Social Security Number
_____ Texas Driver's License Number                  _____ Election Identification Certificate Number

Where the ID number they provided on the original application is circled?

This change would likely result in a large programming change on the offline VR systems side though.  Just something to keep in mind.

- Brandy

**From:** Christina Adkins <CAdkins@sos.texas.gov>
**Sent:** Friday, April 1, 2022 1:52 PM
**To:** Brandy Grimes <Brandy.Grimes@dentoncounty.gov>; Frank Phillips <Frank.Phillips@dentoncounty.gov>
**Subject:** RE: Revised Carrier Envelope

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Never enter your password or other sensitive information on linked web pages contained in emails unless you are certain the web pages are safe. If you have questions or need assistance, please contact the Help Desk.

I have one more sample for you to look at if you don't mind.   It says final, but it's still very much in draft form.    I can't figure out how to get fewer words on the page.   It's so much for the voter to read.

**From:** Brandy Grimes <Brandy.Grimes@dentoncounty.gov>
**Sent:** Friday, April 1, 2022 1:38 PM
**To:** Christina Adkins <CAdkins@sos.texas.gov>; Frank Phillips <Frank.Phillips@dentoncounty.gov>
**Subject:** RE: Revised Carrier Envelope

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Good afternoon Christina.  I think anything would help!  Maybe if we could afford to install a buzzer that would alert them before sealing the envelope without completing the required info? ☺ Seriously though, I think it's a great idea plus maybe a prescribed/suggested insert.

One item looking at the sample sent, I think the English wording has been pushed down too far and looks funky and cuts off the Spanish.

OCA-APPX-1368

- Brandy

**From:** Christina Adkins <CAdkins@sos.texas.gov>
**Sent:** Friday, April 1, 2022 1:31 PM
**To:** Frank Phillips <Frank.Phillips@dentoncounty.gov>; Brandy Grimes <Brandy.Grimes@dentoncounty.gov>
**Subject:** Revised Carrier Envelope

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Never enter your password or other sensitive information on linked web pages contained in emails unless you are certain the web pages are safe. If you have questions or need assistance, please contact the Help Desk.

Hello Denton County!

Can you take a look at the attached document? I'm asking vendors if there will be a substantial price increase to put the personal identification numbers box in red. This has come up in some of our advisory group meetings.

This kind of edit to the design would not invalidate or render previous versions of the envelope unusable. This would be something counties could start using on their next printing of envelopes. I'm still talking with vendors about this change so it's not in any way final – We are just trying to get ahead of some of these issues before November.

Let me know what you think!!

**Christina Worrell Adkins**
Legal Director – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**

VOTETEXAS.GOV
POWERED BY THE TEXAS SECRETARY OF STATE

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

# Exhibit 88

| | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 4/19/2022 3:50:30 PM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | MASS EMAIL (CC/EA/VR - 1078): Forms Release 4/19/2022 |
| **Attachments:** | 6-11 EVC Notice of Carrier Defect Mailed + Corrective Action Form (Spanish).pdf; 6-11 EVC Notice of Carrier Defect Mailed +Corrective Action Form.pdf; 6-12 EVC Notice of Carrier Defect Phone + Corrective Action Form (Spanish).pdf; 6-12 EVC Notice of Carrier Defect Phone +Corrective Action Form.pdf |

Dear Election Officials:

As you know, under Section 86.011(d) of the Election Code, if an early voting clerk receives a timely carrier envelope that does not comply with the applicable requirements of the Code, the early voting clerk may deliver the carrier envelope in person or by mail to the voter so that the voter may correct the defect. Additionally, the early voting clerk may notify the voter of the defect by phone and advise the voter that they may come to the early voting clerk's office to correct the defect or cancel their Application for Ballot by Mail (ABBM) and vote in person. The early voting clerk may utilize this provision for defects such as a missing signature by the voter, missing or incomplete witness information, missing or incomplete assistant information, and missing or incorrect personal identification information.  If a voter fails to return their voted ballot in a carrier envelope, the early voting clerk may also notify the voter of this defect.

As such, our office has released the following forms.

- EVC Notice of Carrier Defect Mailed with Corrective Action Form (Form 6-11)
- EVC Notice of Carrier Defect Phone with Corrective Action Form  (Form 6-12)

These items are in the process of being posted to our website.  When posted, the forms will be located in our **Election Forms** manual.

Please let us know if have any additional questions and concerns.

Heidi Martinez
Staff Attorney – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.state.tx.us/elections

**For Voter Related Information, please visit:**



VOTETEXAS.GOV
POWERED BY THE TEXAS SECRETARY OF STATE

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code.  It is not intended to serve as a legal opinion for any matter.  Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-1371

STATE087671

## AVISO DE DEFECTO DEL SOBRE DE ENVÍO POR EL SECRETARIO DE VOTACIÓN ADELANTADA
### SOBRE DE ENVÍO DEFECTUOSO DEVUELTO AL VOTANTE POR CORREO

Su Sobre de Envío ha sido recibido y revisado, pero está defectuoso por la(s) razón(es) marcada(s) a continuación. La ley de Texas le permite corregir ciertos defectos en su Sobre de Envío después de que la boleta marcada haya sido recibida por el Secretario de Votación Adelantada. Su Sobre de Envío se adjunta con este aviso para que pueda realizar la(s) corrección(es) necesaria(s). **A continuación, hay una marca de verificación junto a la(s) razón(es) por la(s) que su Sobre de Envío era Defectuoso. ¡NO ABRA SU SOBRE DE ENVÍO NI RETIRE SU BOLETA DEL SOBRE DE ENVÍO!**

_____1. El Sobre de Envío no estaba firmada.

_____ 2. El Sobre de Envío contenía información incompleta con respecto a un testigo.

_____ 3. El Sobre de Envío contenía información incompleta con respecto a un asistente.

_____ 4. La ley de Texas requiere que usted proporcione información de identificación que coincida con la información de identificación asociada con su registro de votante para poder votar por correo. Su Sobre de Envío tenía el siguiente defecto en cuanto a la información de identificación:

_____ Su Sobre de Envío no contenía su Número de Licencia de Conducir de Texas, su Número de Identificación Personal de Texas, su Número de Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social; **O**

_____ El número proporcionado no coincidía con el número asociado con su registro de votante proporcionado por el Registrador de Votantes de su condado; **O**

_____ Si no se le expidió uno de los documentos con el número requerido, no indicó este hecho en el Sobre de Envío.

### Cómo Corregir el Defecto de Su Sobre de Envío y Devolver su Boleta por Correo al Secretario de Votación Adelantada

Debe corregir el defecto directamente en el Sobre de Envío o utilizando el Formulario de Acción Correctiva que se encuentra en el reverso de este aviso. Por favor, utilice el sobre proporcionado para devolver el Sobre de Envío (y el Formulario de Acción Correctiva, si lo ha utilizado) al Secretario de Votación Adelantada. **El sobre DEBE estar matasellado antes de las 7:00 p.m. del Día de las Elecciones y ser recibido por el Secretario de Votación Adelantada a más tardar a las 5:00 p.m. del siguiente día hábil después del Día de las Elecciones.** También puede entregar en mano su Sobre de Envío corregido (y el Formulario de Acción Correctiva, si lo ha utilizado) en la oficina del Secretario de Votación Adelantada el Día de las Elecciones entre las 7:00 a.m. y las 7:00 p.m. Sólo puede entregar en mano su propio Sobre de Envío.

### Proceso de Corrección de Defectos por Número

- **Defecto #1** – Firme el Sobre de Envío o el Formulario de Acción Correctiva en el espacio designado.
- **Defecto #2** – Si utilizó un testigo para su Sobre de Envío porque no pudo firmar o hacer su marca y la información del testigo faltaba o estaba incompleta, pídale que complete la parte del testigo del Formulario de Acción Correctiva. Puede utilizar una persona diferente como testigo si la misma persona no está disponible. **NOTA:** Si ya no necesita un testigo, debe poder firmar el Sobre de Envío o el Formulario de Acción Correctiva en la Casilla de Firma.
- **Defecto #3** – Si utilizó un asistente para ayudarle a leer o marcar la boleta, pídale que rellene la parte del Formulario de Acción Correctiva correspondiente al asistente. El asistente debe completar toda la información, incluyendo la respuesta a la pregunta sobre si recibió una compensación u otro beneficio a cambio de su ayuda. La persona que le ayudó anteriormente debe ser la misma que complete la parte del asistente del Formulario de Acción Correctiva.
- **Defecto #4-** Complete la Casilla #4 del Formulario de Acción Correctiva que se encuentra en el reverso de esta notificación añadiendo sus datos de identificación personal.

### Cancelación de Su Boleta Postal - Si no desea corregir el defecto en el Sobre de Envío, aún puede votar en persona cancelando su Boleta por Correo. Puede presentarse en un lugar de Votación Adelantada o en el Día de las Elecciones y entregar su Sobre de Envío con boleta oficial dentro. Cuando entregue su Boleta por Correo, tendrá derecho a votar con una boleta regular. Si no entrega su Boleta por Correo, se le entregará una Boleta Provisional. **Usted puede seguir el progreso de su boleta durante el ciclo electoral ingresando al Rastreador de Boleta por Correo en votetexas.gov**

Para utilizar el Rastreador de Boleta por Correo, debe ingresar:
- Su Número de Licencia de Conducir de Texas o su Número de Tarjeta de Identificación Personal de Texas, Y
- Los últimos 4 dígitos de su Número de Seguro Social Y
- Su dirección de residencia tal y como figura en su registro de votante

Si tiene alguna pregunta o duda sobre cómo hacer una corrección en su Sobre de Envío, póngase en contacto con la Oficina del Secretario de Votación Adelantada en:

_____     _____     _____

Número de Teléfono del Secretario Adelantada | Firma del Secretario de Votación Adelantada | Nombre del Secretario de Votación Adelantada en Letra de Molde

OCA-APPX-1372

| Authority Conducting the Election *(Autoridad Administrando la Elección)* | Date of Correction *(Fecha de la Corrección)* |
|---|---|
| Title of Election *(Título de la Elección)* | Printed Name of Early Voting Clerk's Representative *Nombre de Representante del Secretario de Votación Adelantada* |

## EARLY VOTING CLERK CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE
*FORMULARIO DE ACCIÓN CORRECTIVA DEL SECRETARIO DE VOTACIÓN ADELANTADA PARA EL SOBRE DE ENVÍO DEFECTUOSO*

| Name of Voter *(Nombre del Votante)* | Voter's VUID# *(Número de registración del votante (VUID#))* |
|---|---|

### Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)

| | |
|---|---|
| 1. | **Voter Did Not Sign the Carrier Envelope Certificate** *(El votante no firmó el Sobre de Envío)* |
| 2. | **Incomplete Information with Respect to a Witness** *(Información incompleta con respecto a un testigo)*<br><br>Signature of Witness *(Firma del testigo)*    Printed Name of Witness *(Nombre en letra de molde del testigo)*<br><br>Street Address of Witness *(Domicilio residencial del testigo)* |
| 3. | **Incomplete Information with Respect to an Assistant** *(Información incompleta con respecto a un asistente)*<br><br>Signature of Assistant *(Firma del asistente)*    Printed Name of Assistant *(Nombre en letra de molde del asistente)*<br><br>Street Address of Assistant *(Domicilio residencial del asistente)*    Relationship to Voter *(Relación al votante)*<br>Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle One:  Yes  No<br>*Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia?  Marque con un circulo:  Sí    No* |
| 4. | **Missing or Incorrect Personal Identification Numbers or Social Security Number**<br>*(Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos)*<br><div style="text-align:center">or *(o)*</div><br>Texas Driver's License or Texas Personal Identification Card    Last 4 Digits of Social Security Number<br>*(Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas)*    *(Los 4 últimos dígitos de número de Seguro Social)*<br>☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number<br>*No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.* |

**Signature Box / Casilla de Firma**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct. I certify that my marked ballot expresses my wishes independent of any dictation or undue persuasion by any person.

*(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta. Certifico que mi boleta marcada expresa mis deseos independientemente de ningún dictado o persuasión indebida por parte de cualquier persona.)*

X_____

Signature of Voter *(Firma del Votante)*

### STATEMENT OF RESIDENCE *(CONSTANCIA DE DOMICILIO PERMANENTE)*
For persons whose residence address does not match the voter registration address on the list of registered voters
*Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos*

| Last Name Include suffix, if any *Apellido Incluir sufijo, si lo hay (Jr., Sr., III)* | First Name *Nombre de Pila* | Middle Name (if any) *Segundo Nombre (si lo hay)* | Former Name *Apellido Anterior* |
|---|---|---|---|

**Residence Address: Street Address and Apartment Number, City State, and Zip.** If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address) *Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal. (Si no existe un domicilio, describe dónde vive (no incluya apartados postales, rutas rurales o dirección del trabajo)*

| | |
|---|---|
| | Gender (Optional) *Sexo (Opcional)*<br>☐ Male *Masculino*<br>☐ Female *Femenino* |

| Mailing Address: Address, City, State, and Zip (If mail cannot be delivered to your residence address) *Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial)* | Date of Birth: Month, Day, Year *Fecha de Nacimiento: Mes, Día, Año*<br><br>___ ___ / ___ ___ / ___ ___ ___ ___ |
|---|---|

| City and County of Former Residence in Texas *Ciudad y Condado de residencia anterior en Texas* | City and County of Current Residence in Texas *Ciudad y Condado de residencia actual en Texas* | Telephone Number (Optional) Include Area Code *Teléfono (Opcional) – Incluya Código de Área* |
|---|---|---|

| Texas Driver's License Number or Texas Personal Identification Card Number (Issued by the Department of Public Safety) *Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública)* | If you do not have a Texas Driver's License or Personal Identification Card, give the last 4 digits of your Social Security Number. *Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social.* |
|---|---|

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
*Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o número de Seguro Social.*

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements below before signing. *Entiendo que el dar información falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcelamiento hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.*

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.
- *Soy residente de este condado y ciudadano de los Estados Unidos; y*
- *No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, periodo de libertad condicional, o he sido indultado; y*
- *No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria que estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto*

| X_____ | Date: _____ / _____ / _____<br>*(fecha:)* |
|---|---|

Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.
*Firma del solicitante o su agente (apoderado) y relación de éste con el solicitante o el nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.*

STATE087673

OCA-APPX-1374

STATE087674

6-11
Prescribed by the Secretary of State
Section 86.011(d), Texas Election Code
4/2022

## NOTICE OF CARRIER DEFECT ISSUED BY THE EARLY VOTING CLERK
## Defective Carrier Envelope Returned to the Voter by Mail

Your Carrier Envelope has been received and reviewed, but is defective for the reason(s) provided below. Texas law allows you to correct certain defects on your Carrier Envelope after the marked ballot has been received by the Early Voting Clerk. Your Carrier Envelope is enclosed with this notice so that you can make the necessary correction(s).
**There is a checkmark below next to the reason(s) that your Carrier Envelope was Defective. DO NOT OPEN YOUR CARRIER ENVELOPE OR REMOVE YOUR BALLOT FROM THE CARRIER ENVELOPE!**

_____ 1.  The Carrier Envelope was not signed.

_____ 2.  The Carrier Envelope contained incomplete information with respect to a witness.

_____ 3.  The Carrier Envelope contained incomplete information with respect to an assistant.

_____ 4.  Texas law requires you to provide identification information which matches the identification information associated with your voter registration record in order to vote by mail. Your Carrier Envelope had the following defect regarding the identification information:
_____Your Carrier Envelope did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number; **OR**
_____The number provided did not match the number associated with your voter registration record as provided by your County's Voter Registrar; **OR**
_____If you were not issued one of the documents with the required number, you did not indicate this fact on the Carrier Envelope.

### How to Correct the Defect on Your Carrier Envelope and Return Your Mailed Ballot to the Early Voting Clerk

You must correct the defect directly on the Carrier Envelope or by using the Corrective Action Form located on the back of this notice. Please use the envelope provided in this packet to return the corrected Carrier Envelope (and Corrective Action Form if used) to the Early Voting Clerk. **The envelope MUST be postmarked by 7:00 p.m. on Election Day and received by the Early Voting Clerk no later than 5:00 p.m. the next business day after election day**. You may also hand-deliver your corrected Carrier Envelope (and Corrective Action Form if used) to the Early Voting Clerk's Office on Election Day between 7:00 a.m. and 7:00 p.m. You may only hand-deliver your own Carrier Envelope.

### Defect Correction Process by Number
- **Defect #1 –** Sign the Carrier Envelope or the Corrective Action Form in the designated space.
- **Defect #2 –** If you used a witness for your Carrier Envelope because you were not able to sign or make your mark and the witness information was missing or incomplete, please ask the witness to complete the witness portion of the Corrective Action Form. You may use a different person as a witness if the same person is not available. **NOTE:** If you no longer need a witness, you must be able to sign the Carrier Envelope or the Signature Box in the Corrective Action Form.
- **Defect #3 –** If you used an assistant to help you read or mark the ballot, please ask the assistant to complete the assistant portion of the Corrective Action Form. An assistant must complete all information, including answering the question about whether he/she received compensation or other benefit in exchange for providing assistance. The person who previously assisted you must be the same person who completes the assistant portion of the Corrective Action Form.
- **Defect #4 –** Complete Box #4 of the Corrective Action Form on the reverse side of this notice by adding your personal identification information.

### Cancelling Your Ballot by Mail -
If you do not wish to correct the defect on the Carrier Envelope, you may still vote in person by cancelling your Ballot by Mail. You may appear at an Early Voting or Election Day polling place and surrender your Carrier Envelope with the official ballot inside. Upon the surrender of your Ballot by Mail, you are entitled to vote a regular ballot. If you do not surrender your Ballot by Mail, you will be given a Provisional Ballot.

**You can track the progress of your ballot during the election cycle by logging on to the Ballot by Mail Tracker on votetexas.gov.**
**To utilize the Ballot by Mail Tracker, you must enter:**
- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your Social Security number AND
- Your residence address as listed in your voter registration record

If you have any questions or concerns about making a correction to your Carrier Envelope please contact the Early Voting Clerk's Office at:

_____        _____        _____
Phone Number of Early Voting Clerk        Signature of Early Voting Clerk        Printed Name of Early Voting Clerk

OCA-APPX-1375

STATE087675

| Authority Conducting the Election *(Autoridad Administrando la Elección)* | Date of Correction *(Fecha de la Corrección)* |
|---|---|
| Title of Election *(Título de la Elección)* | Printed Name of Early Voting Clerk's Representative *Nombre de Representante del Secretario de Votación Adelantada* |

## EARLY VOTING CLERK CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE
### *FORMULARIO DE ACCIÓN CORRECTIVA DEL SECRETARIO DE VOTACIÓN ADELANTADA PARA EL SOBRE DE ENVÍO DEFECTUOSO*

| Name of Voter *(Nombre del Votante)* | Voter's VUID# *(Número de registración del votante (VUID#))* |
|---|---|

**Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)**

| 1. | Voter Did Not Sign the Carrier Envelope Certificate *(El votante no firmó el Sobre de Envío)* |
|---|---|
| 2. | Incomplete Information with Respect to a Witness *(Información incompleta con respecto a un testigo)* |
| | Signature of Witness *(Firma del testigo)* —— Printed Name of Witness *(Nombre en letra de molde del testigo)* |
| | Street Address of Witness *(Domicilio residencial del testigo)* |
| 3. | Incomplete Information with Respect to an Assistant *(Información incompleta con respecto a un asistente)* |
| | Signature of Assistant *(Firma del asistente)* —— Printed Name of Assistant *(Nombre en letra de molde del asistente)* |
| | Street Address of Assistant *(Domicilio residencial del asistente)* Relationship to Voter *(Relación al votante)* |
| | Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle One: Yes No *Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia? Marque con un círculo: Sí No* |
| 4. | Missing or Incorrect Personal Identification Numbers or Social Security Number *(Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos)* or *(o)* |
| | Texas Driver's License or Texas Personal Identification Card *(Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas)* | Last 4 Digits of Social Security Number *(Los 4 últimos dígitos de número de Seguro Social)* |
| | ☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number *No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.* |

**Signature Box / Casilla de Firma**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct. I certify that my marked ballot expresses my wishes independent of any dictation or undue persuasion by any person.

*(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta. Certifico que mi boleta marcada expresa mis deseos independientemente de ningún dictado o persuasión indebida por parte de cualquier persona).*

X_____

Signature of Voter *(Firma del Votante)*

## STATEMENT OF RESIDENCE *(CONSTANCIA DE DOMICILIO PERMANENTE)*
For persons whose residence address does not match the voter registration address on the list of registered voters
*Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos*

| Last Name Include suffix, if any *Apellido Incluir sufijo, si lo hay (Jr., Sr., III)* | First Name *Nombre de Pila* | Middle Name (if any) *Segundo Nombre (si lo hay)* | Former Name *Apellido Anterior* |
|---|---|---|---|

**Residence Address: Street Address and Apartment Number, City, State, and Zip.** If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address) *Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal. (Si no existe un domicilio, describe donde vive (no incluya apartados postales, rutas rurales o dirección del trabajo)*

Gender (Optional) *Sexo (Opcional)*
☐ Male *Masculino*
☐ Female *Femenino*

**Mailing Address: Address, City, State, and Zip** (if mail cannot be delivered to your residence address) *Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial)*

Date of Birth: Month, Day, Year *Fecha de Nacimiento: Mes, Día, Año*
___ / ___ / ___

| City and County of Former Residence in Texas *Ciudad y Condado de residencia anterior en Texas* | City and County of Current Residence in Texas *Ciudad y Condado de residencia actual en Texas* | Telephone Number (Optional) Include Area Code *Teléfono (Opcional) – Incluya Código de Área* |
|---|---|---|

Texas Driver's License Number or Texas Personal Identification Card Number (Issued by the Department of Public Safety) *Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública)*

If you do not have a Texas Driver's License or Texas Personal Identification Card, give the last 4 digits of your Social Security Number. *Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social.*

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number *Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o número de Seguro Social.*

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing. *Entiendo que el dar información falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.*

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.
- *Soy residente de este condado y ciudadano de los Estados Unidos; y*
- *No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, periodo de libertad condicional, o he sido indultado; y*
- *No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria por estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto*

X

Date: ___ / ___ / ___
*(fecha:)*

Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date. *Firma del solicitante o su agente (apoderado) y relación de solicitante o nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.*

OCA-APPX-1376

OCA-APPX-1377

STATE087677

## AVISO DE DEFECTO DEL SOBRE DE ENVÍO POR EL SECRETARIO DE VOTACIÓN ADELANTADA

### SU BOLETA POR CORREO ESTÁ RETENIDA EN LA OFICINA DEL SECRETARIO DE VOTACIÓN ADELANTADA A LA ESPERA DE SER CORREGIDA

Su Sobre de Envío ha sido recibido y revisado, pero está defectuoso por la(s) razón(es) marcada(s) a continuación. La ley de Texas le permite corregir ciertos defectos en su Sobre de Envío después de que la boleta marcada haya sido recibida por el Secretario de Votación Adelantada. Su Sobre de Envío está siendo retenido en la Oficina del Secretario de Votación Adelantada para que usted pueda hacer las correcciones necesarias porque no hubo tiempo suficiente para devolverle su Sobre de Envío por correo. **A continuación, hay una marca de verificación junto a la(s) razón(es) por la(s) que su Sobre de Envío era Defectuoso.**

_____ 1. El Sobre de Envío no estaba firmada.

_____ 2. El Sobre de Envío contenía información incompleta con respecto a un testigo.

_____ 3. El Sobre de Envío contenía información incompleta con respecto a un asistente.

_____ 4. La ley de Texas requiere que usted proporcione información de identificación que coincida con la información de identificación asociada con su registro de votante para poder votar por correo. Su Sobre de Envío tenía el siguiente defecto en cuanto a la información de siguiente:

_____ Su Sobre de Envío no contenía su Número de Licencia de Conducir de Texas, su Número de Identificación Personal de Texas, su Número de Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social; **O**

_____ El número proporcionado no coincidía con el número asociado con su registro de votante proporcionado por el Registrador de Votantes de su condado; **O**

_____ Si no se le expidió uno de los documentos con el número requerido, no indicó este hecho en el Sobre de Envío.

### Cómo Corregir el Defecto de Su Sobre de Envío Presentándose en Persona en la Oficina del Secretario de Votación Adelantada

Puede corregir todos los defectos enumerados anteriormente completando el Formulario de Acción Correctiva que se encuentra en el reverso de este aviso. Usted **DEBE** entregar el Formulario de Acción Correctiva completado en persona a la Oficina del Secretario de Votación Adelantada antes de las 7:00 p.m. del Día de las Elecciones.

### Proceso de Corrección de Defectos por Número

- **Defecto #1** – Firme el Formulario de Acción Correctiva en el espacio designado.
- **Defecto #2** – Si utilizó un testigo para su Sobre de Envío porque no pudo firmar o hacer su marca y la información del testigo faltaba o estaba incompleta, pídale que complete la parte del testigo del Formulario de Acción Correctiva. Puede utilizar una persona diferente como testigo si la misma persona no está disponible. **NOTA:** Si ya no necesita un testigo, debe poder firmar el Formulario de Acción Correctiva en la Casilla de Firma.
- **Defecto #3** – Si utilizó un asistente para ayudarle a leer o marcar la boleta, pídale que rellene la parte del Formulario de Acción Correctiva correspondiente al asistente. El asistente debe completar toda la información, incluyendo la respuesta a la pregunta sobre si recibió una compensación u otro beneficio a cambio de su ayuda. La persona que le ayudó anteriormente debe ser la misma que complete la parte del asistente del Formulario de Acción Correctiva.
- **Defecto #4-** Complete la Casilla #4 del Formulario de Acción Correctiva que se encuentra en el reverso de esta notificación añadiendo sus datos de identificación personal **O** puede corregir el Defecto #4 en línea a través del Rastreador de Boleta por Correo de la Secretaría de Estado de Texas. Vea las instrucciones a continuación.

### Corrección del Defecto #4 Usando el Rastreador de Boleta por Correo

Puede corregir el Defecto #4 en línea a través del Rastreador de Boleta por Correo de la Secretaría de Estado de Texas en www.votetexas.gov. Cuando ingrese al Rastreador de Boleta por Correo, tendrá la oportunidad de ingresar su(s) número(s) de identificación personal. Tanto el número de su Licencia de Conducir de Texas o de su Tarjeta de Identificación Personal de Texas COMO su número de Seguro Social deben estar asociados con su registro de votante para utilizar el Rastreador de Boleta por Correo. Una vez que su número de identificación personal sea validado por el Rastreador de Boleta por Correo, se procesará su Sobre de Envío que usted presentó previamente. Una vez que se haya revisado su acción correctiva, la fecha de revisión y el estado de su Sobre de Envío se mostrarán en el Rastreador de Boleta por Correo. No tiene que presentarse en persona en la Oficina del Secretario de Votación Adelantada si realiza su corrección en línea utilizando el Rastreador de Boleta por Correo.

**Usted puede seguir el progreso de su boleta durante el ciclo electoral ingresando al Rastreador de Boleta por Correo en votetexas.gov. Para utilizar el Rastreador de Boleta por Correo, debe ingresar:**

- Su Número de Licencia de Conducir de Texas o su Número de Tarjeta de Identificación Personal de Texas, Y
- Los últimos 4 dígitos de su Número de Seguro Social Y
- Su dirección de residencia tal y como figura en su registro de votante

### Cancelación de Su Boleta Postal

- Si no desea corregir el defecto, aún puede votar en persona cancelando su Boleta por Correo. Si cancela su Boleta por Correo en persona en la Oficina del Secretario de Votación Adelantada, se le entregará un Aviso de Boleta Postal Renunciada para que lo lleve al lugar de votación. Esto le da derecho a votar con una boleta regular. Si no cancela en la Oficina del Secretario de Votación Adelantada, podrá votar con una Boleta Provisional en el lugar de votación. No podrá votar en persona después del día de las elecciones.

Si tiene alguna pregunta o duda sobre cómo hacer una corrección en su Sobre de Envío, póngase en contacto con la Oficina del Secretario de Votación Adelantada en:

_____     _____     _____
Número de Teléfono del Secretario            Firma del Secretario de Votación            Nombre del Secretario de Votación
Adelantada                                                       Adelantada                                              Adelantada en Letra de Molde

OCA-APPX-1378

| Authority Conducting the Election *(Autoridad Administrando la Elección)* | Date of Correction *(Fecha de la Corrección)* |
|---|---|
| Title of Election *(Título de la Elección)* | Printed Name of Early Voting Clerk's Representative<br>Nombre de Representante del Secretario de Votación Adelantada |

## EARLY VOTING CLERK CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE
### *FORMULARIO DE ACCIÓN CORRECTIVA DEL SECRETARIO DE VOTACIÓN ADELANTADA PARA EL SOBRE DE ENVÍO DEFECTUOSO*

| Name of Voter *(Nombre del Votante)* | Voter's VUID# *(Número de registración del votante (VUID#))* |
|---|---|

**Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)**

| 1. | **Voter Did Not Sign the Carrier Envelope Certificate** *(El votante no firmó el Sobre de Envío)* |
|---|---|
| 2. | **Incomplete Information with Respect to a Witness** *(Información incompleta con respecto a un testigo)*<br><br>Signature of Witness *(Firma del testigo)*     Printed Name of Witness *(Nombre en letra de molde del testigo)*<br><br>Street Address of Witness *(Domicilio residencial del testigo)* |
| 3. | **Incomplete Information with Respect to an Assistant** *(Información incompleta con respecto a un asistente)*<br><br>Signature of Assistant *(Firma del asistente)*     Printed Name of Assistant *(Nombre en letra de molde del asistente)*<br><br>Street Address of Assistant *(Domicilio residencial del asistente)*    Relationship to Voter *(Relación al votante)*<br>Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle One: Yes   No<br>*Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia? Marque con un círculo: Sí   NO* |
| 4. | **Missing or Incorrect Personal Identification Numbers or Social Security Number**<br>*(Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos)*<br>       **or** *(o)*<br>Texas Driver's License or Texas Personal Identification Card    Last 4 Digits of Social Security Number<br>*(Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas)*    *(Los 4 últimos dígitos de número de Seguro Social)*<br>☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number<br>*No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social* |

**Signature Box / Casilla de Firma**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct. I certify that my marked ballot expresses my wishes independent of any dictation or undue persuasion by any person.

*(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que le he dado es verdadera y correcta. Certifico que mi boleta marcada expresa mis deseos independiente de ningún dictado o persuasión indebida por parte de cualquier persona.)*

X_____
**Signature of Voter** *(Firma del Votante)*

---

## STATEMENT OF RESIDENCE *(CONSTANCIA DE DOMICILIO PERMANENTE)*
For persons whose residence address does not match the voter registration address on the list of registered voters
*Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos*

| Last Name Include suffix, if any *Apellido Incluir sufijo, si lo hay (Jr., Sr., III)* | First Name *Nombre de Pila* | Middle Name (if any) *Segundo Nombre (si lo hay)* | Former Name *Apellido Anterior* |
|---|---|---|---|

| Residence Address: Street Address and Apartment Number, City State, and Zip. If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address) *Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal. (Si no existe un domicilio, describe donde vive (no incluya apartados postales, rutas rurales o dirección del trabajo)* | Gender (Optional) *Sexo (Opcional)*<br>☐ Male *Masculino*<br>☐ Female *Femenino* |
|---|---|

| Mailing Address: Address, City, State, and Zip *(If mail cannot be delivered to your residence address) Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial)* | Date of Birth: Month, Day, Year *Fecha de Nacimiento: Mes, Día, Año*<br>___ / ___ / _____ |
|---|---|

| City and County of Former Residence in Texas *Ciudad y Condado de residencia anterior en Texas* | City and County of Current Residence in Texas *Ciudad y Condado de residencia actual en Texas* | Telephone Number (Optional) Include Area Code *Teléfono (Opcional) – Incluya Código de Área* |
|---|---|---|

| Texas Driver's License Number or Texas Personal Identification Card Number (Issued by the Department of Public Safety) *Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública)* | If you do not have a Texas Driver's License or Texas Personal Identification Card, give the last 4 digits of your Social Security Number. *Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social.* |
|---|---|

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
*Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.*

**I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing.** *Entiendo que el dar información falsa para obtener una voter registration electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.*

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.
- *Soy residente de este condado y ciudadano de los Estados Unidos; y*
- *No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, período de libertad condicional, o he sido indultado; y*
- *No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria por estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto*

X_____    Date: _____/_____/_____
                                    *(fecha:)*

**Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.**
*Firma del solicitante o su agente (apoderado) y relación de este con el solicitante o nombre en letra de molde del solicitante si la firma es la de un testigo, y fecha.*

OCA-APFX 1379

STATE087679

OCA-APPX-1380

STATE087680

## NOTICE OF CARRIER DEFECT ISSUED BY THE EARLY VOTING CLERK
## Your Ballot by Mail is Being Held at the Early Voting Clerk's Office Awaiting Correction

Your Carrier Envelope has been received and reviewed, but is defective for the reason(s) checked below.

Texas law allows you to correct certain defects on your Carrier Envelope after the marked ballot has been received by the Early Voting Clerk. Your Carrier Envelope is being held at the Early Voting Clerk's Office so that you can make the necessary corrections because there was not sufficient time to return your Carrier Envelope to you by mail.

**There is a checkmark below next to the reason(s) that your Carrier Envelope was Defective:**

_____ 1. The Carrier Envelope was not signed.

_____ 2. The Carrier Envelope contained incomplete information with respect to a witness.

_____ 3. The Carrier Envelope contained incomplete information with respect to an assistant.

_____ 4. Texas law requires you to provide identification information which matches the identification information associated with your voter registration record in order to vote by mail. Your Carrier Envelope had the following defect regarding the identification information:

\_\_\_\_\_Your Carrier Envelope did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number; **OR**

\_\_\_\_\_The number provided did not match the number associated with your voter registration record as provided by your County's Voter Registrar; **OR**

\_\_\_\_\_If you were not issued one of the documents with the required number, you did not indicate this fact on the Carrier Envelope.

### How to Correct the Defect on Your Carrier Envelope by Appearing in Person at the Early Voting Clerk's Office

You can correct all defects listed above by completing the Corrective Action Form on the back of this notice. You **MUST** deliver the completed Corrective Action Form in person to the Early Voting Clerk's Office by 7:00 p.m. on Election Day.

### Defect Correction Process by Number

- **Defect #1 –** Sign the Signature Box on the Corrective Action Form.
- **Defect #2 –** If you used a witness for your Carrier Envelope because you were not able to sign or make your mark and the witness information was missing or incomplete, please ask the witness to complete the witness portion of the Corrective Action Form. You may use a different person as a witness if the same person is not available. **NOTE:** If you no longer need a witness, you must be able to sign the Signature Box in the Corrective Action Form.
- **Defect #3 –** If you used an assistant to help you read or mark the ballot, please ask the assistant to complete the assistant portion of the Corrective Action Form. An assistant must complete all information, including answering the question about whether he/she received compensation or other benefit in exchange for providing assistance. The person who previously assisted you must be the same person who completes the assistant portion of the Corrective Action Form.
- **Defect #4 –** Complete Box #4 of the Corrective Action Form on the reverse side of this notice by adding your personal identification information **OR** you may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker. See instructions below.

### Correcting Defect #4 Using the Ballot by Mail Tracker

You may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov. When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Both your Texas Driver's License or Texas Personal Identification Card number AND your Social Security number must be associated with your voter registration record to use the Ballot by Mail Tracker. Once your personal identification number is validated by the Ballot by Mail Tracker, the Carrier Envelope you previously submitted will be processed. Once your corrective action has been reviewed, the date of review and the status of your Carrier Envelope will be displayed on the Ballot by Mail Tracker. You do not have to appear in person at the Early Voting Clerk's Office to deliver the completed Corrective Action Form if you make your correction online by using the Ballot by Mail Tracker.

**You can track the progress of your ballot during the election cycle by logging on to the Ballot by Mail Tracker on votetexas.gov. To utilize the Ballot by Mail Tracker, you must enter:**

- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number AND
- Your residence address as listed in your voter registration record

**Cancelling Your Ballot by Mail -** If you do not wish to correct the defect, you may still vote in person by cancelling your Ballot by Mail. If you cancel your Ballot by Mail in person at the Early Voting Clerk's Office, you will be given a Notice of Surrendered Ballot to take to the polls. This entitles you to vote a regular ballot. If you do not cancel at the Early Voting Clerk's Office, you will be able to vote a Provisional Ballot at the polling place. You may not vote in person after Election Day.

If you have any questions or concerns about making a correction to your Carrier Envelope please contact the Early Voting Clerk's Office at:

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Phone Number of Early Voting Clerk | Signature of Early Voting Clerk | Printed Name of Early Voting Clerk |

_____

Address of the Early Voting Clerk's Office

OCA-APPX-1381

Prescribed by the Secretary of State
Section 86.011(d), Texas Election Code
4/2022

| Authority Conducting the Election *(Autoridad Administrando la Elección)* | Date of Correction *(Fecha de la Corrección)* |
|---|---|
| Title of Election *(Título de la Elección)* | Printed Name of Early Voting Clerk's Representative<br>Nombre de Representante del Secretario de Votación Adelantada |

# EARLY VOTING CLERK CORRECTIVE ACTION FORM FOR DEFECTIVE CARRIER ENVELOPE
*FORMULARIO DE ACCIÓN CORRECTIVA DEL SECRETARIO DE VOTACIÓN ADELANTADA PARA EL SOBRE DE ENVÍO DEFECTUOSO*

| Name of Voter *(Nombre del Votante)* | Voter's VUID# *(Número de registración del votante (VUID#))* |
|---|---|

### Early Voting Clerk: Circle the number(s) to indicate the voter's Carrier Envelope Defect(s)

| 1. | Voter Did Not Sign the Carrier Envelope Certificate *(El votante no firmó el Sobre de Envío)* |
|---|---|

| 2. | Incomplete Information with Respect to a Witness *(Información incompleta con respecto a un testigo)* |
|---|---|

Signature of Witness *(Firma del testigo)*          Printed Name of Witness *(Nombre en letra de molde del testigo)*

Street Address of Witness *(Domicilio residencial del testigo)*

| 3. | Incomplete Information with Respect to an Assistant *(Información incompleta con respecto a un asistente)* |
|---|---|

Signature of Assistant *(Firma del asistente)*          Printed Name of Assistant *(Nombre en letra de molde del asistente)*

Street Address of Assistant *(Domicilio residencial del asistente)*          Relationship to Voter *(Relación al votante)*
Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance? Circle One: Yes   No
*Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia? Marque con un círculo: Sí     No*

| 4. | Missing or Incorrect Personal Identification Numbers or Social Security Number<br>*(Números de Identificación Personal o Número de Seguro Social faltantes o incorrectos)* |
|---|---|

or *(o)*

Texas Driver's License or Texas Personal Identification Card          Last 4 Digits of Social Security Number
*(Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas)*     *(Los 4 últimos dígitos de número de Seguro Social)*

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
*No se me ha emitido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o Número de Seguro Social.*

**Signature Box / Casilla de Firma**

I, _____, on ___/___/_____ submit this form to correct the defect on my Carrier Envelope that was identified above. By my signature below, I attest that all information that I have given is true and correct. I certify that my marked ballot expresses my wishes independent of any dictation or undue persuasion by any person.
*(Yo, _____, en el día ___/___/_____ presento este formulario para corregir el defecto en mi Sobre de Envío que se identificó anteriormente. Con mi firma a continuación, doy fe de que toda la información que he dado es verdadera y correcta. Certifico que mi boleta marcada expresa mis deseos independientemente de ningún dictado o persuasión indebida por parte de cualquier persona.)*

X_____
Signature of Voter *(Firma del Votante)*

---

### STATEMENT OF RESIDENCE *(CONSTANCIA DE DOMICILIO PERMANENTE)*
For persons whose residence address does not match the voter registration address on the list of registered voters
*Para personas cuya dirección no coincide con la que aparece en la lista oficial de votantes inscritos*

| Last Name Include suffix, if any *Apellido Incluir sufijo, si lo hay (Jr., Sr., III)* | First Name *Nombre de Pila* | Middle Name *(If any)* *Segundo Nombre (si lo hay)* | Former Name *Apellido Anterior* |
|---|---|---|---|

| Residence Address: Street Address and Apartment Number, City, State, and Zip. If none, describe where you live. (Do not include P.O. Box, Rural Route, or Business Address) *Domicilio Residencial: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal. (Si no existe un domicilio, describe donde vive (no incluya apartados postales, rutas rurales o dirección del trabajo)* | Gender *(Optional) Sexo (Opcional)*<br>☐ Male *Masculino*<br>☐ Female *Femenino* |
|---|---|

| Mailing Address: Address, City, State, and Zip *(If mail cannot be delivered to your residence address) Dirección Postal: Número y calle, y número de apartamento, Ciudad, Estado, y Código Postal (Si no se puede entregar correo en su domicilio residencial)* | Date of Birth: Month, Day, Year *Fecha de Nacimiento: Mes, Día, Año*<br>___ / ___ / _____ |
|---|---|

| City and County of Former Residence in Texas *Ciudad y Condado de residencia anterior en Texas* | City and County of Current Residence in Texas *Ciudad y Condado de residencia actual en Texas* | Telephone Number *(Optional) Include Area Code Teléfono (Opcional) – Incluya Código de Área* |
|---|---|---|

| Texas Driver's License Number or Texas Personal Identification Card Number *(Issued by the Department of Public Safety) Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas (Expedido por el Departamento de Seguridad Pública)* | If you do not have a Texas Driver's License or Personal Identification Card, give the last 4 digits of your Social Security Number. *Si no tiene una Licencia de Conducir de Texas o número de Tarjeta de Identificación Personal, proporcione los 4 últimos dígitos de su número de Seguro Social.* |
|---|---|

☐ I have not been issued a Texas Driver's License or Personal Identification Card or Social Security Number
*Yo no tengo una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o número de Seguro Social.*

I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing. *Entiendo que el dar información falsa para obtener una tarjeta de registro electoral constituye un delito de perjurio bajo las leyes estatales y federales. La condena por este delito puede resultar en encarcela miento de hasta un año de cárcel, una multa de hasta $4,000, o ambas cosas. Por favor, lea cada una de las tres declaraciones antes de firmar.*

- I am a resident of this County and a U.S. citizen; and
- I have not been finally convicted of a felony, or, if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

- *Soy residente de este condado y ciudadano de los Estados Unidos; y*
- *No he sido finalmente condenado por un delito grave, o si soy un delincuente, he purgado mi pena por completo, incluyendo cualquier plazo de encarcelamiento, libertad condicional, supervisión, periodo de libertad condicional, o he sido indultado; y*
- *No he sido determinado por un fallo final de un corte que ejerce la jurisdicción testamentaria que estoy totalmente incapacitado mentalmente o parcialmente incapacitado mentalmente sin derecho a voto*

X_____          Date: _____ / _____ / _____
(fecha:)

Signature of Applicant or Agent and Relationship to Applicant or printed Name of Applicant if Signed by Witness and Date.
*Firma del solicitante o su agente (apoderado) y relación de éste con el solicitante o el nombre del solicitante si la firma es la de un testigo, y fecha.*

STATE087682

OCA-APPX-1383

STATE087683

# Exhibit 89



# TEXAS SECRETARY OF STATE

## BALLOT BY MAIL TRACKER
### TEXAS ELECTIONET ADMINISTRATION SYSTEM

← Back to My Voter Portal

English   En Español

## Ballot by Mail Tracker

To track the status of your ballot by mail application or ballot, please enter your voter information below. Fields marked with an * are statutorily required.

### 👤 Voter Information

| | |
|---|---|
| First Name* | Last Name* |
| Suffix | Date of Birth (mm/dd/yyyy) 📅 |
| Last 4 digits of SSN* 👁️ | Driver's License # / DPS PIN* 👁️ |

### 🏠 Residential Address

| | |
|---|---|
| County* ▼ | Address Number* |
| Pre Direction ▼ | Street Name* |
| Post Direction ▼ | Street Type ▼ |
| Street Line 2 | |
| City* | Zip Code* |

If you are having issues accessing this tracker, please visit Am I Registered to view the information as listed in your voter registration record or contact your county voter registrar.

Reset    Submit

Copyright © 2021 Civix

OCA-APPX-1385

# Exhibit 90

OCA-APPX-1386



OCA-APPX-1387 FOR I.D. 3-28-23

EXHIBIT 13
( D )



Driver's License # / DPS PIN*  👁️‍🗨️

🏠 Residential Address

County* ▼

Address Number*

Pre Direction ▼

Street Name*

Post Direction ▼

Street Type ▼

Street Line 2

City*

Zip Code*

🔒 teamrv-mvp.sos.texas.gov — Private

Address Number

Pre Direction        ▼

Street Name*

Post Direction       ▼

Street Type         ▼

Street Line 2

City*

Zip Code*

**If you are having issues accessing this tracker, please visit Am I Registered to view the information as listed in your voter registration record or contact your county voter registrar.**

| Reset | Submit |

Copyright © 2021 Civix

OCA-APPX-1389

# Exhibit 91

| | |
|---|---|
| **From:** | Heidi Martinez [HMartinez@sos.texas.gov] |
| **Sent:** | 11/8/2022 10:17:09 PM |
| **To:** | 'jean.longoria@medinatx.org' [jean.longoria@medinatx.org] |
| **CC:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | Ballots Requiring Corrective Action (EI Response) |

Thank you for your inquiry.

The EVBB shall only accept a voted ballot by mail if, among other things, the personal identification information provided by the voter on the carrier envelope identifies the same voter identified on the voter's voter registration record. (Sec. 87.041(b)(8), Texas Election Code). This is addressed in our advisory here: **No.2022-08** -NEW LAW: Senate Bill 1 – Opportunity to Correct Defects on Application for a Ballot by Mail and *Carrier Envelope

Please note that the ballot tracker is not used to make edits/modifications to personal ID#s but to confirm that the information in TEAM is correct.

We hope this information will be helpful to you.

Heidi Martinez
Managing Attorney – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.state.tx.us/elections

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

**From:** Jean.Longoria <jean.longoria@medinatx.org>
**Sent:** Thursday, November 3, 2022 9:31 AM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:** Lupe.Torres <lupe.torres@medinatx.org>
**Subject:** Ballots Requiring Corrective Action

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Good morning,

I have a number of voters' ballots that require corrective action. All of them are ID related. Some have written their VUID numbers instead of the required ID or SSN. A couple have left off or transposed a digit(s). These voters' personal identifications numbers are correct in TEAM. If their ID numbers are correct, there is no corrective action to take on the Ballot Tracker. Once they have gotten into the Ballot Tracker, their ballot will show Received but it doesn't give them an option to "Correct" anything, since their information is already correct. Their mistake is a hand-written error. Shouldn't they be required to make that correction in person? I will receive nothing in the Ballot Tracker Records on the Dashboard to indicate they have attempted to make a correction since there is nothing to correct. The Notice of Carrier Defect is misleading in the fact that they cannot make all of their corrections for #4 through the Ballot Tracker. Please advise how to go forward with these voters who may have logged into the Ballot Tracker but no action was taken.

Thank you,

# Jeanie L. Longoria

Jeanie L. Longoria
Elections Clerk
Medina County Elections Office
1300 Ave M, Rm 108
Hondo, TX 78861
(830) 741-6009

STATE139734

# Exhibit 92



----------------------------------------
ɘɔnɘbizɘЯ ʇo ʏɟnuoƆ (County of Residence, printed upside down)

*Fold on line and seal before mailing*

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES



# BUSINESS REPLY MAIL
FIRST-CLASS MAIL     PERMIT NO. 4511     AUSTIN TX

POSTAGE WILL BE PAID BY ADDRESSEE

MILLS COUNTY
REGISTRAR OF VOTERS
PO BOX 56
GOLDTHWAITE TX 76844-9902




*Fold on line and seal before mailing*

## Qualifications

- You must register to vote in the county in which you reside.
- You must be a citizen of the United States.
- You must be at least 17 years and 10 months old to register, and you must be 18 years of age by Election Day.
- You must not be finally convicted of a felony, or if you are a felon, you must have completed all of your punishment, including any term of incarceration, parole, supervision, period of probation, or you must have received a pardon.
- You must not have been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

## Filling out the Application

- Review the application carefully, fill it out, sign and date it and mail it to the voter registrar in your county or drop it by the Voter Registrar's office.

- All voters who register to vote in Texas must provide a Texas driver's license number or personal identification number issued by the Texas Department of Public Safety. If you don't have such a number, simply provide the last four digits of your social security number. If you don't have a social security number, you need to state that fact.
- Your voter registration will become effective 30 days after it is received or on your 18th birthday, whichever is later. Your registration must be effective on or before an election day in order to vote in that election.
- If you move to another county, you must re-register in the county of your new residence.

Please visit the Texas Secretary of State website, **www.sos.state.tx.us**, and for additional election information visit **www.votetexas.gov**.

Este formulario está disponible en español. Favor de llamar a su registrador de votantes local para conseguir una versión en español.

**STATE110577**

## Texas Voter Registration Application

Prescribed by the Office of the Secretary of State    VR17.2021E.I3

**For Official Use Only**

Please complete sections by printing LEGIBLY. If you have any questions about how to fill out this application, please call your local voter registrar.

### 1 These Questions Must Be Completed Before Proceeding (Check one)

☐ New Application    ☐ Change of Address, Name, or Other Information    ☐ Request for a Replacement Card

**Are you a United States Citizen?**    ☐ Yes    ☐ No

**Will you be 18 years of age on or before election day?**    ☐ Yes    ☐ No

**If you checked 'No' in response to either of the above, do not complete this form.**

**Are you interested in serving as an election worker?**    ☐ Yes    ☐ No

**2 Last Name** Include Suffix if any (Jr, Sr, III) | **First Name** | **Middle Name** (If any) | **Former Name** (if any)

**3 Residence Address:** Street Address and Apartment Number. If none, describe where you live. (Do not include P.O. Box, Rural Rt. or Business Address)

City | **TEXAS**
County | Zip Code

**4 Mailing Address:** Street Address and Apartment Number. (If mail cannot be delivered to your residence address.)

City | State
| Zip Code

**5 City and County of Former Residence in Texas**

**6 Date of Birth: (mm/dd/yyyy)** ☐☐/☐☐/☐☐☐☐

**7 Gender** (Optional) ☐ Male ☐ Female

**8 Telephone Number** (Optional) Include Area Code (☐☐☐)☐☐☐—☐☐☐☐

**9 Texas Driver's License No. or Texas Personal I.D. No.** (Issued by the Department of Public Safety)

If no Texas Driver's License or Personal Identification, give last 4 digits of your Social Security Number

XXX-XX- ☐☐☐☐

☐ I have not been issued a Texas Driver's License/Personal Identification Number or Social Security Number.

**10** I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all <u>three</u> statements to affirm before signing.

- I am a resident of this county and a U.S. citizen;
- I have not been finally convicted of a felony, or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

**X** _____    Date ___/___/___

Signature of Applicant or Agent and Relationship to Applicant or Printed Name of Applicant if Signed by Witness and Date.

OCA-APPX-1395

STATE110578

# Exhibit 93

Texas Office of the Secretary of State
# Voter Name and Address Changes

## Welcome

This free service is offered to registered Texas voters who need to submit Name and/or Address changes.

You may use this service to update your Texas voter registration information. Allowable updates include changes to your current residential address and/or your changes to your name.

---

### NOTE:

**If you update your county of residence to a new county, your voter registration in your current county will be cancelled. Your voter registration information will be updated to the corresponding county of your new residential address.**

---

You will receive a new Voter Certificate in the mail within 30 days of submitting a change through this service. If you submit changes less than 30 days prior to an election, you must vote at your current polling location.

### To use this service, you need your:

- Current Driver License or ID Card
- Social Security Number
- Voter Registration Card VUID (Voter Unique Identifier) Number may be obtained from your County Voter Registrar .

---

**This service does not change your address or name on your Driver License. Please visit the Driver License and ID Card Online Services    website to update your address.**

---

For technical assistance with this application, please call 1-877-452-9060 or send an email to **Texas.gov Help**.
For questions regarding voter registration you may contact your local **County Voter Registrar** .

EXHIBIT 10
FOR I.D. 3-28-23 / DJ

OCA-APPX-1397

Privacy - Terms

# Exhibit 94

Texas Office of the Secretary of State
# Voter Name and Address Changes
## Login

To make changes to your Voter Certificate, enter the following information.

Use the example Driver License/ID Cards to locate the requested information.







## Login Information

| | | |
|---|---|---|
| (1) Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | /    / | Required. (MM/DD/YYYY). |
| Last Four Digits of Social Security Number | | Required. |
| (2) DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| (3) Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| (4) County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.

For technical assistance with this application, please call 1-877-452-9060 or send an email to **Texas.gov Help**.
For questions regarding voter registration you may contact your local **County Voter Registrar**

Privacy · Terms

EXHIBIT 19
FOR I.D. 3-28-23

# Exhibit 95

Texas Office of the Secretary of State
# Voter Name and Address Changes

## Welcome

This free service is offered to registered Texas voters who need to submit Name and/or Address changes.

You may use this service to update your Texas voter registration information. Allowable updates include changes to your current residential address and/or your changes to your name.

---

### NOTE:

**If you update your county of residence to a new county, your voter registration in your current county will be cancelled. Your voter registration information will be updated to the corresponding county of your new residential address.**

---

You will receive a new Voter Certificate in the mail within 30 days of submitting a change through this service. If you submit changes less than 30 days prior to an election, you must vote at your current polling location.

## To use this service, you need your:

- Current Driver License or ID Card
- Social Security Number
- Voter Registration Card VUID (Voter Unique Identifier) Number may be obtained from your County Voter Registrar .

---

**This service does not change your address or name on your Driver License. Please visit the Driver License and ID Card Online Services website to update your address.**

---

For technical assistance with this application, please call 1-877-452-9060 or send an email to **Texas.gov Help**.
For questions regarding voter registration you may contact your local **County Voter Registrar** .

Privacy · Terms

OCA-APPX-1401

# Exhibit 96

 texas.gov 



# Welcome to Texas.gov

Texas.gov is the official website of the State of Texas. From here, we'll guide you to online services, resources, and information around our great state.

Photo credit: J. Amill Santiago

OCA-APPX-1403



# Accessibility in Texas

Texas has a long history of advocating for the rights and needs of people with disabilities. Our state has established a range of programs and services to help support the community.

 [Learn about accessibility in Texas](#)

OCA-APPX-1404



**Explore Texas**

# See Texas outdoors, recreation, and culture

Enjoy the Lone Star State's parks, historical landmarks, campgrounds, fishing, hunting, exhibits, fairs, and culture. We'll connect you with what you need—and want to do.

[Explore Texas](Explore Texas)



**Business**

# Make your business boom

Find business resources that help you run and grow your company—from job seeking and recruitment, to economic development programs and help with

OCA-APPX-1405

business taxes.



**Resident**

# Stay Healthy

Texas offers a variety of resources to help you and your loved ones live your life as healthy as possible.

[Learn about Texas health services](#)



**Government**

# Government that works for you

Texas government agencies offer a range of resident and business services for

OCA-APPX-1406

Texans. Find the service and agency that can help you.

[Access Government Services Directory](#)

---

## Tweets from @texasgov

**Follow on Twitter**

↬ **Texas.gov - State of Texas Official Website Retweeted**

**Texas Department of Information Resources** @TexasDIR · 3h

In celebration of Global Accessibility Awareness Day, DIR and @texasgov launch a new page for Texans with disabilities to include resources ranging from employment to recreation, with more resources to come! texas.gov/living-in-texa...
#a11y #TexasA11y #DIRisIT #DigitalA11y #GAAD

💬      ♡ 2                                                         ⓘ

**View more on Twitter**

OCA-APPX-1407



## Texas.gov

**Follow Page** · 26K followers

**Texas.gov**
2 hours ago

The Texas Department of Information Resources is proud to announce that Texas.gov has a new page serving Texans with disabilities in celebration of Global Accessibility Awareness Day (#GAAD). The new page, offered in English and Spanish, provides links to resources for Texans ranging from housing and employment to education and recreation with more resources being added over time. Check it out at

## About Us

About Texas.gov

Site Policies

Privacy Policy

Sitemap

## Services

Apply/Renew Vehicle Registration

Renew/Replace Driver License

Request Driver Records

Order Vital Records

All Services

**Related Sites**

Texas Veterans Portal

Texas Open Data Portal

Texas Records and Information Locator (TRAIL)

**Support**

Help & Support

Frequently Asked Questions

Provide Feedback

Copyright ©2023 State of Texas. All rights reserved.

  

OCA-APPX-1409

# Exhibit 97

Texas Office of the Secretary of State
# Voter Name and Address Changes

## Login

To make changes to your Voter Certificate, enter the following information.

Use the example Driver License/ID Cards to locate the requested information.





### Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | ___ / ___ / ___ | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ▾ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.

For technical assistance with this application, please call 1-877-452-9060 or send an email to **Texas.gov Help**.
For questions regarding voter registration you may contact your local **County Voter Registrar**.

Privacy · Terms

OCA-APPX-1411

# Exhibit 98

| From: | Elections Internet [Elections@sos.texas.gov] |
| Sent: | 12/3/2021 12:48:50 AM |
| To: | Elections Internet [Elections@sos.texas.gov] |
| Subject: | MASS EMAIL (CC/EA/VR -1061) Updated Forms for 2022 |
| Attachments: | ABBM-FINAL-112021.indd; ABBM-FINAL-112021.pdf; ABBM-SPN-FINAL-112021.indd; ABBM-SPN-FINAL-112021.pdf; 6-15 - Instructions for Carrier Envelope.pdf; Carrier Envelope 6-15_FINAL.indd |

Dear Election Officials,

Today, December 2, 2021 is the effective date of Senate Bill 1 (2nd C.S., 2021). We have previously issued Advisory 2021-21 - 2021 Legislative Summary – Second and Third Special Sessions that broadly outlines the changes in Texas law resulting from SB 1. In addition to this advisory, we will be issuing updates in December and January in the form of advisories, forms, and webinars to provide support and explanations about these new changes.

Below, I've provided a list of forms that are currently updated and posted to our website that MUST be used for elections ordered on or after December 2, 2021. **Please be advised that you may need to clear your cache on your browser to access the updated forms.** Be sure to look at the revision date on the form to ensure that you are using the correct version.

1. **Application for Ballot by Mail (ABBM):** The ABBM has been updated with required legislative updates, including a new space for the voter's personal identification number (TXDL, Personal ID, EIC Number or last four of SSN). In addition to the links below, I've attached the files as a PDF and an inDesign file to assist you with printing needs.
    a. Application for Ballot by Mail (English)
    b. Application for Ballot by Mail (Spanish)

2. **Carrier Envelope for Marked Mail Ballots:** The Carrier Envelope has been updated with required legislative updates, including a new space for the voter's personal identification number (TXDL, Personal ID, EIC Number or last four of SSN). I've also included it as an attachment for your assistance. This envelope has been provided to any known vendors. The SOS prescribes the content of the form, but the format may be modified by vendors provided the content isn't changing and they are able to comply with the requirements for a secrecy flap for the personal identification numbers. If you or your vendor would like to modify the form, the form must be approved by the SOS.
    a. Carrier Envelope

3. **Confirmation Notices:** Our confirmation notice templates were previously updated in September. They MUST be updated as SB 1 modified the required statements on all voter registration applications. The revised links are located below. The templates have also already been updated in TEAM.
    a. Notice to Confirm Voter Registration Address
    b. Address Confirmation Response – Fold over
    c. Address Confirmation Notice and Response – Tri-Fold
    d. Notice to Confirm Voter Registration by Providing Documentation

4. **Voter Registration Applications:** The Voter Registration Applications have been updated with required legislative changes. All of the camera-ready applications for our counties in both English and Spanish have been updated. If you need a copy of your county-specific, camera-ready voter registration applications please email us to request a copy.

5. **Statement of Residence:** The Statement of Residence form has been updated with the required legislative updates, including a new box for current county of residence and the revised required statements on voter registration applications.
    a. Statement of Residence

OCA-APPX-1413

6. **Provisional Ballot Affidavit Envelope:** The Provisional Ballot Affidavit envelope has been updated with required legislative updates to the affidavit language. We also modified one of the reasons for voting provisionally to align with the changes to mail ballot cancellations prescribed in SB 1.
    a. Affidavit of Provisional Voters

7. **Additional Forms that are Pending Updates**: The following forms are in the process of being updated and will be released over the next couple weeks. Please note that this is not an exhaustive list of form updates. Many have already been updated and released to our website including: Recount forms, Confidentiality forms, Candidate Application forms, Order of Election, and Notice of Election forms. The list below contains the notable forms that we wanted to draw to your attention:
    a. Carrier Insert for ABBMs
    b. Carrier Insert for FPCAs
    c. FPCA Signature Sheet
    d. FPCA Instructions
    e. Notice of Rejected ABBM
    f. Notice of Rejected Ballot
    g. Hand Delivery Roster
    h. Spoiled Ballot Roster
    i. Oath of Assistance/Oath of Interpreter
    j. NEW Curbside Voting Assistance
    k. NEW Forms related to Voters taking Corrective Actions on the Carrier Envelope

8. **Combination Forms are NOT being updated.**

We will work to provide revised forms and materials to you as soon as possible. Please let us know if you have any questions or concerns.

Thank you,

**Christina Worrell Adkins**
Legal Director – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-1414

# Exhibit 99

Name of Form:
Carrier Envelope and Instructions for Early Voting Ballot by Mail

Section Reference:
Section 86.013, Texas Election Code

Purpose:
To hold and transport the voter's voted mail ballot until it is examined by the Early Voting Ballot Board.

Number of Copies Required:
One per voter

Completed by:
The voter and any witness or assistant that may help the voter complete the ballot by mail process.

Filing Date:
See election law calendar for dates applicable for a given election.

Filed with:
Early Voting Clerk

Comments:

**Printing Notes:**

- The Secretary of State prescribes the wording of the Carrier Envelope, but vendors are responsible for creating their own template based on SOS design recommendations.
- **Size:** The prescribed form should be printed on an approximately 6" x 9 envelope; however, vendors may adjust the envelope size as necessary to provide lower costs in printing and postage, but may not make any other alterations to the text of the envelope. Printers may adjust the design to allow for a larger envelope if the modifications are approved by the Secretary of State.
- **Color:** The envelope should be white with a color bar across the front (See design)
  - Specifications for the Color bar: PMS 7659 c57 m76 y35 k15 r116 g76 b110 Hex 744c6e (or similar color)
- **Required Secrecy Flap:** The carrier envelope must contain a place for the voter to include certain personal identifiers (Texas Driver's License Number, Texas Personal Identification Number or Election Identification Certificate Number, AND Last 4 digits of the voter's Social Security Number) These personal identifiers **MUST** be covered by a secrecy flap that is able to be opened without opening the part of the envelope containing the voter's marked ballot.
  - The current carrier envelope design contains a flap with perforation lines to allow the signature verification committee/early voting ballot board to remove the secrecy flap to reveal the voter's personal identifiers. The flap contains glue lines above the top perforation and below the bottom perforation to ensure that the envelope remains sealed when the secrecy flap is removed.
- **USPS:** The Secretary of State recommends that all vendors work with the USPS to determine whether their specific design meets postal regulations.

Version: Current form is dated 11/2021.

OCA-APPX-1416

STATE040172

# Exhibit 100

| | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 5/10/2022 5:43:19 PM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | MASS EMAIL (CC/EA/VR-1093) Carrier Envelope Forms Release 5/10/2022 |
| **Attachments:** | Carrier Envelope 6-15_REVISED_04012022_2_Final.indd; Carrier Envelope 6-15_REVISED_04012022_2_Final.pdf; 6-15 - Instructions for Carrier Envelope.docx.pdf |

Hello,

Our office has released the following revised Carrier Envelope (Form 6-15) that is attached to this email as a PDF, along with an InDesign copy of the Carrier Envelope which is also attached. This envelope has also been provided to any known vendors. If you or your vendor would like to modify the form, the form must be approved by the SOS.

**Please note that you may continue to use your existing stock of Carrier Envelopes for upcoming elections.**

These items are in the process of being posted to our website. When posted, the forms will be located in our **Election Forms** manual.

Please let us know if have any additional questions and concerns.

Heidi Martinez
Managing Attorney – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.state.tx.us/elections

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

# Exhibit 101

| | |
|---|---|
| **From:** | Christina Adkins [CAdkins@sos.texas.gov] |
| **Sent:** | 11/18/2021 3:06:54 PM |
| **To:** | 'Chayo Sanchez (Chayo.Sanchez@csgi.com)' [Chayo.Sanchez@csgi.com]; 'Cindy Haushalter' [chaushalter@hartic.com]; 'Jay.Krahn@csgi.com' [Jay.Krahn@csgi.com]; 'K.C. Emery' [kce@action-printing.com]; 'aaron@ampprinting.com' [aaron@ampprinting.com]; 'Gordy Pels' [gpels@hartic.com]; 'Gordy Pels' [gpels@hartic.com]; 'skennedy@hartic.com' [skennedy@hartic.com] |
| **Subject:** | FINAL DESIGN - Texas Carrier Envelope for Marked Mail Ballots |
| **Attachments:** | Carrier Envelope 6-15_FINAL.pdf; Carrier Envelope 6-15_FINAL.indd; 6-15 - Instructions for Carrier Envelope.pdf |

Dear Vendors,

Attached is the final design of the carrier envelope for marked mail ballots in Texas. I've included both a PDF and an InDesign file along with our instruction sheet that contains printing instructions. Please be advised that out office is responsible for the **content** of the form. The format can be modified provided that it meets the requirements prescribed under the Texas Election Code. While we have discussed the design with the USPS, they have made it clear that they cannot properly vet the design until they have a printed envelope to test through their scanners. **We strongly urge you to work directly with the USPS to ensure that your final product meets postal regulations.**

If you modify the design or size of the envelope, please let us know and we can review to determine legal compliance. Once you begin printing the form, we would also like to request that you provide our office with a few samples of your envelopes for our files in case there are subsequent questions about your modifications.

Thank you for all the feedback and assistance you've given us as we've worked on this redesign. Please let us know if you have any additional questions or concerns.

Thank you,

**Christina Worrell Adkins**
Legal Director – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

---

**From:** Christina Adkins
**Sent:** Monday, October 11, 2021 4:24 PM
**Subject:** Draft Carrier Envelope for Voted Mail Ballots

Dear Vendors,

Attached is a draft of the revised carrier envelope for voted mail ballots in election ordered after 12/2/2021. Please be advised that the change in envelope format was required to accommodate changes in SB 1 from the 2021, second called session. Please note, this is not in final form and has not yet been approved by our office for use in elections. We would

like for this to be collaborative effort. We are providing this to you for review and so you can provide suggested modifications and format changes before we finalize. I do have a few notes I would like to pass along for you to consider in your review.

1. **Color Change to Envelope**: Our County Election Official Advisory Group has overwhelmingly indicated to us that that would like to get away from the solid color carrier envelope that is currently canary yellow to a while envelop with a color bar on the left side of the front of the envelope. This attached design follows the format provided by the Center for Civic Design that was developed in conjunction with the USPS. I have provided this to the USPS election mail design folks and they are reviewing to provide me with suggested modifications or changes. I have talked through the proposed changes with the USPS so they have understand conceptually what we are trying to do. I will provide them an updated draft if more changes are made after you all have reviewed.

2. **New Requirements under SB 1**: SB 1 required the following changes to the carrier envelope
   a. Additional text for the Oath of Assistance
   b. Additional information for the Assistant to Complete in the Assistant box
   c. Voters must provide a DL, or last four of SSN, or an indication they have not been issued a DL or SSN
   d. The identification number provided must be located behind a secrecy flap.

3. **Additional Requirements Related to SB 1:**
   a. Not everything can be contained behind the secrecy flap. The voter is still required to sign across the envelope seal and the witness/assistant information must be located outside the flap so that it can be completed after the envelope has been sealed.
   b. The secrecy flap needs to be able to be removed without opening the envelope the actual envelope. This is because, for most counties, the ones that are reviewing the signatures and identification numbers (signature verification committee) are not the ones authorized to unseal/open the actual carrier envelope. Only the early voting ballot board can open the envelope.

4. **Explanation of Design:**
   a. **Front of Envelope:** the USPS has asked that we remove the fill in blacks for the EV clerk's name and address. They have indicated that this information on the envelope causes scanner problems. They would prefer that the EV Clerk's information be printed directly on the ballot or affixed to the envelope with an address label. I did not make that change on this envelope, but will do so on the final version and instructions. The rest of the text is the same.



   b. **Back of Envelope, containing flap:**
      i. **All of this information would be printed on the back of the envelope. This is what is visible before the envelope is closed and sealed.**
   c. **Outside of Envelope Flap:**

STATE039819



**d. Inside of Envelope Flap:** The dotted lines indicate where perforation would be. We are envisioning two different glue lines that will be printed on inside of the top flap. One that is located above the top perforation and one located below the bottom perforation.



**e. Inside of Envelop Flap:** The attached logo is in color, but this is not a requirement. All black ink is fine. We are also thinking that a county can opt to print their contact information on the inside below the information about tracking their mail ballot.



Please do not hesitate to contact me with any questions/comments you have. We want as much feedback as possible before we finalize this design. Thank you to those of you have taken the time to provide us with samples and have taken the time to talk through some issues. I look forward to continuing to work with you all on finalizing this envelope.


Thank you,


**Christina Worrell Adkins**
Legal Director – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov

STATE039820

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-1423

STATE039821

# Exhibit 102

| | |
|---|---|
| **From:** | Charles Pinney [CPinney@sos.texas.gov] |
| **Sent:** | 11/23/2021 3:03:15 PM |
| **To:** | Jennifer.Briggs@co.gregg.tx.us |
| **BCC:** | Elections Internet [Elections@sos.texas.gov]; Christina Adkins [CAdkins@sos.texas.gov] |
| **Subject:** | Re: New ABBM form |
| **Attachments:** | ABBM 2021 Legal Size.pdf |

Hello,

This modified form is approved.

However, please note that due to recent legislative changes in SB 1, you would not be able to use this version of the ABBM for elections ordered on or after December 2, 2021.

SB 1 included a requirement that the voter must include certain identifying information on their ABBM, including either a driver's license number (or the number of another relevant ID issued by DPS), the last four digits of their social security number, or a statement that they have not been issued either number.

We are currently finalizing the revised version of that updated ABBM form, and will send that updated form out as soon as it is available.

You are welcome to make similar modifications to that updated form, but please submit a copy of that modified version to our office for approval when you do so.

Please let us know if you have any other questions about this issue or anything else relating to the election. You can reach us at Elections@sos.texas.gov or 1-800-252-8683, or you can visit our website at sos.state.tx.us/elections/index.shtml.

Thanks,

**Chuck Pinney**
Attorney -- Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov/elections



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

**From:** Jennifer Briggs <Jennifer.Briggs@co.gregg.tx.us>
**Sent:** Friday, November 19, 2021 11:54 AM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:** Mindy Soape <Mindy.Soape@co.gregg.tx.us>
**Subject:** New ABBM form

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

Greetings,

I have reviewed the new ABBM form and blew it up to legal size with a tri-fold.
I felt it would be easier to read by my elderly voters, as the font on letter size was so small.
Plus, when tri-folded, this ABBM still fits in our old stock of ABBM envelopes.

Nothing was added to the form, except on the back – I added our contact info.
The other change was I moved VUID and Pct to the top, as that is how we process them in our office.

I would like to get permission to use this larger form for our county.
I have attached a pdf of the revised legal size form.

Thank you.

Respectfully,

*Jennifer Briggs*
Jennifer Briggs, R.E.O.
Elections Administrator
Gregg County, Texas
903-236-8457
www.GreggCountyVotes.com
**FACEBOOK**

"Confidentiality Note: This email and any attachment to it is confidential and protected by law and intended for the use of the individual(s) or entity named on the email. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination or distribution of this communication is prohibited. If you have received this communication in error, please notify the sender via return email and delete it completely from your email system. If you have printed a copy of the email, please destroy it immediately."

STATE040158

# Exhibit 103

| | |
|---|---|
| **From:** | Christina Adkins [CAdkins@sos.texas.gov] |
| **Sent:** | 9/3/2021 4:15:11 PM |
| **To:** | Sanchez, Estela [estela.sanchez@mctx.org]; Elections Internet [Elections@sos.texas.gov] |
| **CC:** | Harvey, Suzie [Suzie.Harvey@mctx.org]; Jamieson, Cynthia M. [cynthia.jamieson@mctx.org] |
| **Subject:** | Re: MASS EMAIL (CC/EA/VR 1038) SOS Updates on Forms and Resources |

Approved!

We are going to have to redo this for after the November election. I'll try to incorporate that option into the next version of the form!

**From:** Sanchez, Estela <estela.sanchez@mctx.org>
**Sent:** Friday, September 3, 2021 10:48:46 AM
**To:** Christina Adkins <CAdkins@sos.texas.gov>; Elections Internet <Elections@sos.texas.gov>
**Cc:** Harvey, Suzie <Suzie.Harvey@mctx.org>; Jamieson, Cynthia M. <cynthia.jamieson@mctx.org>
**Subject:** RE: MASS EMAIL (CC/EA/VR 1038) SOS Updates on Forms and Resources

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

Good morning Christina,

We noticed there is no designated area for our email and fax number on the new Application for a Ballot by Mail (ABBM), and we would like to request a variance to be able to include this information on the new form. Please see attachment showing where we would like our email and fax number to appear on the ABBM. We look forward to hearing from you so that we can move forward with our order.

Best Regards,
Estela Sánchez
Elections Manager
Montgomery County Elections
9159 Airport Road, Conroe, TX 77303
Phone: (936) 788-8316  Fax: (936) 788-8340
Visit our website: www.MontgomeryVotes.org

**From:** Elections Internet <Elections@sos.texas.gov>
**Sent:** Wednesday, September 1, 2021 6:55 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** MASS EMAIL (CC/EA/VR 1038) SOS Updates on Forms and Resources

Dear Election Officials,

As the September 1, 2021 effective date is upon us for many election-related bills from the 2021 Regular Session, we wanted to provide you with updates regarding the implementation of certain new laws. Below we will summarize several items that our office is working on with respect to forms and resources.

Additionally, SB 1 from the Second Called Special Session was passed by the House and Senate on August 31, 2021 and SB 13 was signed in both chambers on August 30, 2021. Upon signing by the Governor, these bills will require additional changes to existing resources, including some that were recently modified due to legislative changes from the 2021 Regular Session. In the list below, we have identified which items will require further updates resulting from subsequent

STATE036544

legislative changes. Based on the anticipated effective dates, please note that some changes will not affect the November 2, 2021 election.

1. **NEW Application for Ballot by Mail form**: Per HB 3920 and HB 3107, the Application for a Ballot by Mail (ABBM) was required to be modified to include new language. We will be issuing an advisory on the new ABBM form and other changes related to voting by mail. The revised ABBM is required for all voters voting by mail under the disability category. If someone uses the old ABBM form and is voting by mail due to any ground other than disability, you may still accept and process that ABBM. Please also note that an otherwise valid annual ABBM filed earlier in the year before September 1, 2021 will still be valid, even if the ground was disability.

   a. English Version Application for a Ballot by Mail (ABBM)

   b. Spanish Version Application for a Ballot by Mail (ABBM)

   **NOTE: Please be advised that this form will be updated to accommodate changes in SB 1 for release after the November 2021 election. Please plan accordingly when ordering your current form stock.**

2. **NEW Address Confirmation Forms**: Per SB 1111, the current Address Confirmation Notice and response documents had to be modified to include new language. Additionally, this bill required that the SOS create a new form for an additional address confirmation process. This was explained in Advisory 2021-10, which we released on August 31, 2021. The revised and new notices must be used for all address confirmations sent on or after September 1, 2021.

   **NOTE**: SB 1 did not make any changes to the required information on the Address Confirmation Notice and response forms, so there will be no updates to those forms resulting from SB 1. If any other legislation impacts this form, we will notify you of such changes.

3. **REVISED Statement of Residence**: Per HB 3107, the Statement of Residence form must be modified to include a "County" box. HB 3107 requires the SOS to adopt a Statement of Residence form with the required box, as soon as practicable, on or after September 1, 2021. Please be advised that you may continue to use your old stock for the remainder of the elections occurring in 2021. We will release a new Statement of Residence form that includes this required box, but it will not be officially adopted until January 1, 2022. Therefore, you may continue to use old stock; however, if additional "Statement of Residence" forms are needed, please use the revised form to place new orders.

4. **Ballot by Mail Carrier Envelopes**: We will NOT be updating any of our Ballot by Mail Carrier Envelopes for the November 2021 election. You may continue to use your existing stock for this election. We will be making substantial updates to the carrier envelope in light of SB 1. These changes will likely result in a custom form. This form will be released as soon as the design has been completed, as we recognize that vendors will need time to print these custom envelopes.

5. **Handbooks**: We will **NOT** be updating our Qualifying Voters Handbook (2020), Early Voting Ballot Board Handbook, or Poll Watcher's Guide for the November 2021 election. Please be advised that we are working on substantial updates to these handbooks to incorporate changes related to SB 1. We expect to release updated handbooks in December 2021.

6. **Dear Voter Letter**: The "Dear Voter" letter for the November 2, 2021 election was posted on our website earlier this month. It is located on our Conducting Elections page. I've included the links below.

OCA-APPX-1429

STATE036545

a. <u>November 2, 2021 Uniform Election Date Dear Voter Letter (PDF)</u> | <u>Spanish (PDF)</u>

7. **Upcoming Advisories and Webinars Related to Legislative Changes**: We plan to issue multiple advisories throughout September regarding the implementation of legislative changes. When appropriate, there will be a corresponding webinar to explain the applicable changes. Please consult the Legal Webinar Schedule that was sent out on August 30, 2021 for the full schedule. Our recent advisories include:

   a. <u>Advisory 2021-09</u>: 2021 Legislative Update (87th Regular Session) (issued 7/30)

   b. Advisory 2021-10: NEW LAW SB 1111 and Address Confirmations (issued 8/31)

7. **Additional Special Session Updates:** As we review the legislative changes resulting from the Second Called Special Session, our office expects to issue an additional legislative update regarding the impact of election-related bills. We will also notify you of any additional updates to our forms or resources.

We understand that many of you print our materials for reference. We greatly appreciate you studying our advisories and other information, and we encourage you to check back to the online materials on our website for updates.

Please let us know if you have any questions or concerns about these changes.

Thank you,

**Christina Worrell Adkins**
Legal Director – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
<u>elections@sos.texas.gov</u> | <u>www.sos.texas.gov</u>
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

OCA-APPX-1430

STATE036546

# Exhibit 104

Message

| | |
|---|---|
| **From:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1FB5BA11EA034BB18440CFDBD54FD914-ATMONTGOMER |
| | [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1FB5BA11EA034BB18440CFDBD54FD914-ATMONTGOMER] |
| **Sent:** | 1/26/2022 8:46:43 PM |
| **To:** | ▮ |
| **CC:** | Elections Internet [Elections@sos.texas.gov] |
| **BCC:** | Christina Adkins [CAdkins@sos.texas.gov] |
| **Subject:** | RE: Mail in Ballots Registration |

Good afternoon,

There have been some changes to the law regarding applications for ballot by mail (ABBMs). Section 84.002 of the Election Code now requires that voters provide either the number from their driver's license, election identification certificate, or personal identification card issued by Texas Department of Public Safety or to provide the last four digits of their social security number on the application. If the voter has not been issued either of these numbers, the voter may include a statement on the ABBM that they have not been issued either number.

If a voter is completing an ABBM and does not remember which number the voter used to register to vote, that voter may contact the county voter registrar to confirm the number that was used to register. The county voter registrar should be able to inform the voter of the type of number that was used by the voter at the time of registration. Additionally, if the voter does not remember which number was used to register, the voter can provide both numbers on the ABBM. As long as one of the numbers is confirmed, the ABBM should be accepted.

We hope this information will be helpful to you.

Elections Division Staff
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**


**VOTETEXAS.GOV**
POWERED BY THE *TEXAS SECRETARY OF STATE*

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

-----Original Message-----
From: ▮
Sent: Thursday, January 20, 2022 11:17 AM
To: Secretary <Secretary@sos.texas.gov>
Cc: ▮
Subject: Mail in Ballots Registration

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

So I was reading that in Texas there is a restriction that allows the county to bounce votes, if you don't use the same ID you used to register. For example, if you registered using your driver's license, but you requested or sent in your mail-in

CONFIDENTIAL

ballot using your social security last four digits, the ballot gets rejected. That is insane. Who remembers which one they used when they registered to vote 20+ years ago (or yesterday for that matter).
Is this above statement truthful and do I have to worry about the county bouncing my vote out?
Thanks for your attention and answer in advance.



Sent from my iPhone

CONFIDENTIAL

STATE031547

| | |
|---|---|
| **From:** | BCEO-McCoy, Pat [Pat.McCoy@txkusa.org] |
| **Sent:** | 2/14/2022 7:31:22 PM |
| **To:** | Sam Taylor [SMTaylor@sos.texas.gov] |
| **Subject:** | RE: Ballot Tracker Does Not Work |

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

Understood. Just be prepared for more complaints on this. We have fielded 6-8 call a day on this issue alone, not to mention the ABBM and Carrier envelop. Just not enough words…..

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Monday, February 14, 2022 1:11 PM
**To:** BCEO-McCoy, Pat <Pat.McCoy@txkusa.org>
**Subject:** RE: Ballot Tracker Does Not Work

CAUTION: This email originated from outside our email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Understood – thank you for the update. The requirements to log into the ballot tracker are set by statute, not our office – per Sec. 86.015, it requires the following information for the voter to access the tracker:

- Name
- Registration address
- Last four digits of social security number
- DL number OR Personal ID card number issued by DPS

Since this is set out explicitly in law, our office doesn't have any leeway to alter these requirements, it would take a legislative change:

Sec. 86.015. ELECTRONIC TRACKING OF APPLICATION FOR BALLOT VOTED BY MAIL OR BALLOT VOTED BY MAIL. (a) The secretary of state shall develop or otherwise provide an online tool to each early voting clerk that enables a person who submits an application for a ballot to be voted by mail to track the location and status of the person's application and ballot on the secretary's Internet website and on the county's Internet website if the early voting clerk is the county clerk of a county that maintains an Internet website.

(b) The online tool developed or provided under Subsection (a) must require the voter to provide, before permitting the voter to access information described by that subsection:

(1) the voter's name and registration address and the last four digits of the voter's social security number; and

(2) the voter's:

(A) driver's license number; or

(B) personal identification card number issued by the Department of Public Safety.

(c) An online tool used under this section must:

(1) for each election, record:

(A) each application for a ballot to be voted by mail received by the clerk; and

OCA-APPX-1434

(B)   each carrier envelope sent to a voter by the clerk;

(2)   for each carrier envelope, record or assign a serially numbered and sequentially issued barcode or tracking number that is unique to each envelope;

(3)   update the applicable Internet website as soon as practicable after each of the following events occurs:

(A)   receipt by the early voting clerk of the person's application for a ballot to be voted by mail;

(B)   acceptance or rejection by the early voting clerk of the person's application for a ballot to be voted by mail;

(C)   placement in the mail by the early voting clerk of the person's official ballot;

(D)   receipt by the early voting clerk of the person's marked ballot; and

(E)   acceptance or rejection by the early voting ballot board of a person's marked ballot; and

(4)   allow a voter to add or correct information required under Section 84.002(a)(1-a) or Section 86.002(g).

(d)   The secretary of state shall adopt rules and prescribe procedures as necessary to implement this section.

(e)   The information contained in Subsection (c) is not public information for purposes of Chapter 552, Government Code, until after election day.

Added by Acts 2021, 87th Leg., R.S., Ch. 317 (H.B. 1382), Sec. 1, eff. September 1, 2021.
Amended by:

Acts 2021, 87th Leg., 2nd C.S., Ch. 1 (S.B. 1), Sec. 5.10, eff. December 2, 2021.

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116
Cell: 512-538-5293



**From:** BCEO-McCoy, Pat <Pat.McCoy@txkusa.org>
**Sent:** Monday, February 14, 2022 1:01 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Subject:** RE: Ballot Tracker Does Not Work

OCA-APPX-1435

**CONFIDENTIAL**                                                    **STATE105513**

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to

Mr. Taylor,

It is not that it does not work, it is that is complicated and the age of people who are generally tracking a mail in ballot can't readily utilize the site. The tracking site ask for ID of Drivers license or last four of SSN. If the voter does not know which one of those numbers we have in our system it will kick out the inquiry. (This is the same problem with the new ABBMs and the Carrier Envelopes).

We have been in contact with these two individuals and their ballots have been "received" in our office.

Until the state makes the ballot tracker more user friendly then you and us will continue to have voter's comment that the site does not work.

Pat McCoy
Election Administrator
Bowie County

---

**From:** Sam Taylor <SMTaylor@sos.texas.gov>
**Sent:** Monday, February 14, 2022 12:51 PM
**To:**
**Cc:** BCEO-McCoy, Pat <Pat.McCoy@txkusa.org>
**Subject:** RE: Ballot Tracker Does Not Work

CAUTION: This email originated from outside our email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi ▮▮▮

The ballot tracker does work. Please try again but you do not have to provide anything in 'Street Line 2' – that is an optional field. That could be why the ballot tracker is turning up the message "no voter could be found for the details you entered."



BOWIE

I just tested this with my own address and registration to troubleshoot and confirm it works properly. Please let us know if you and those you mentioned are still experiencing issues.

Best,

**CONFIDENTIAL**

**Sam Taylor**
*Assistant Secretary of State for Communications*
Office of the Texas Secretary of State
smtaylor@sos.texas.gov
Office: 512-463-6116
Cell: 512-538-5293



---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, February 14, 2022 12:36 PM
**To:** Sam Taylor <SMTaylor@sos.texas.gov>
**Cc:** Bowie - Pat McCoy <pat.mccoy@txkusa.org>
**Subject:** Ballot Tracker Does Not Work

> **CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to ▮▮▮▮▮▮▮▮▮▮.

Sam Taylor, Assistant Secretary of State for Communications

Your Ballot Tracker does not work. Inserted below are screenshots showing
1. ▮▮▮▮▮▮▮▮ is registered to vote in Bowie County
2. Ballot Tracker does not work
3. ▮▮▮▮▮▮▮▮▮▮▮▮ is registered to vote in Bowie Count
4. Ballot Tracker does not work (▮▮▮▮▮▮▮ has confirmed with the county elections office that her mail balitlot was received.)

I believe the state law has not changed in that it is required for the county elections office to post daily the mail ballots it has received. Instead of putting a file on its website everyday, Bowie County just puts a link to state "Ballot Tracker."

This needs to be fixed immediately. If you have any questions, feel free to call me. I have had several people try using Ballot Tracker, so it is not just the two examples I have provided that are having trouble.

Please have someone reply to this message so I know that it was received. Thank you.

▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL
STATE105515

Name: ████████████

Address: ████████████████

████████████████

Gender: ███████

Valid From: ██████████

Effective Date of Registration: ██████████

Voter Status: ████████

County: █████████

Precinct: ██

VUID: ███████████

**Change your Address**

---

👤 Voter Information

First Name*
je ann

Last Name*
dumari

Suffix

Date of Birth (mm/dd/yyyy)
3/28/1969

Last 4 digits of SSN*
████

Driver's License # (1212-2767)
████████

🏠 Residential Address

County*
BOWIE

Address Number*
5803

Pre Direction

Street Name*
sidney

Post Direction

Street Type
DRIVE

Street Unit #
#

City*
Texarkana

Zip Code*
75503

If you are having issues accessing this tracker, please visit Am I Register ed to view the information as listed in your voter registration record or contact your county vot

████████████

CONFIDENTIAL

Name: ███████████████

Address: ████████████████████

████████████████

Gender: ██████

Valid From: ████████████

Effective Date of Registration: ████████

Voter Status: ████████

County: ██████████

Precinct: ███

VUID: ████████████

**Change your Address**



CONFIDENTIAL

STATE105517

| From: | Andre Montgomery [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1FB5BA11EA034BB18440CFDBD54FD914-ATMONTGOMER] |
|---|---|
| Sent: | 11/2/2022 6:12:02 PM |
| To: | |
| CC: | Elections Internet [Elections@sos.texas.gov] |
| Subject: | RE: Vote Texas Contact Message (EI Response) |

Good afternoon.

Section 86.001(f) (copied below) provides that an application for ballot by mail must include the same identifying numbers as the voter's registration information. Either the last four digits of the SSN or all the digits in a Texas identification card/driver's license are required to register to vote (or the applicant must indicate that they have not been issued either of these numbers). Although both numbers are not required, the number provided on the application for ballot by mail must match the number in the voter's registration record. This means that if the voter registered to vote using only the SSN, for example, the last four digits of that SSN must be provided on the application for ballot by mail. If the voter provided their Texas driver's license number instead, and that driver's license number is not associated with the voter's registration record, the application for ballot by mail would be rejected. Voters can add either number to their registration record by submitting a voter registration form and including the number on that application and marking the application as an update to their existing voter registration record. Additionally, either number can be added to the registration record by using the Texas.gov website.

On the Application for Ballot by Mail prescribed by the Office of the Secretary of State, instructions are included on the application which state the following: "If you have been issued one of the required numbers, but it is not associated with your voter registration record, please contact your local registrar to inquire about how to add one of those required numbers to your voter registration record." Therefore, we recommend that if a voter is unsure which number is associated with their voter registration record, the voter contract their county of registration to confirm which number is a part of their voter registration record and provide that number. It is also permissible for a voter to put both numbers on the application although only one number is required.

We hope this information will be helpful to you.

Elections Division Staff
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.texas.gov
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

        Sec. 84.002.   CONTENTS OF APPLICATION.   (a)   An early voting ballot
application must include:
            (1)   the applicant's name and the address at which the applicant
is registered to vote;
            (1-a)   the following information:

**CONFIDENTIAL**                                                                      **STATE118514**

(A)  the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety;

(B)  if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or

(C)  a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B);

(2)  for an application for a ballot to be voted by mail on the ground of absence from the county of residence, the address outside the applicant's county of residence to which the ballot is to be mailed;

(3)  for an application for a ballot to be voted by mail on the ground of age or disability, the address of the hospital, nursing home or other long-term care facility, or retirement center, or of a person related to the applicant within the second degree by affinity or the third degree by consanguinity, as determined under Chapter 573, Government Code, if the applicant is living at that address and that address is different from the address at which the applicant is registered to vote;

(4)  for an application for a ballot to be voted by mail on the ground of confinement in jail, the address of the jail or of a person related to the applicant within the degree described by Subdivision (3);

(5)  for an application for a ballot to be voted by mail on any ground, an indication of each election for which the applicant is applying for a ballot;

(6)  an indication of the ground of eligibility for early voting; and

(7)  for an application for a ballot to be voted by mail on the ground of involuntary civil commitment, the address of the facility operated by or under contract with the Texas Civil Commitment Office or of a person related to the applicant within the degree of consanguinity described by Subdivision (3).

(b)  An application for a ballot to be voted by mail on the ground of absence from the county of residence must indicate that the applicant satisfies the requirements prescribed by Section 82.001.

(b-1)  A person may use the number of a driver's license, election identification certificate, or personal identification card that has expired for the purpose of fulfilling the requirement under Subsection (a)(1-a) if the license or identification is otherwise valid.

(c)  An application for a ballot to be voted by mail on the ground of disability must require the applicant to affirmatively indicate that the

OCA-APPX-1441

applicant agrees with the statement, "I have a sickness or physical condition that prevents me from appearing at the polling place on election day without a likelihood of needing personal assistance or injuring my health," as prescribed by Section 82.002(a).

Sec. 86.001.  REVIEWING APPLICATION AND PROVIDING BALLOT.  (a)  The early voting clerk shall review each application for a ballot to be voted by mail.

(b)  If the applicant is entitled to vote an early voting ballot by mail, the clerk shall provide an official ballot to the applicant as provided by this chapter.

(c)  Except as provided by Section 86.008, if the applicant is not entitled to vote by mail, the clerk shall reject the application, enter on the application "rejected" and the reason for and date of rejection, and deliver written notice of the reason for the rejection to the applicant at both the residence address and mailing address on the application.  A ballot may not be provided to an applicant whose application is rejected.

(d)  If the application does not include the applicant's correct voter registration number or county election precinct of residence, the clerk shall enter the appropriate information on the application before providing a ballot to the applicant.

(e)  If the applicant does not have an effective voter registration for the election, the clerk shall reject the application unless the clerk can determine from the voter registrar that the applicant has submitted a voter registration application and the registration will be effective on election day.

(f)  If the information required under Section 84.002(a)(1-a) included on the application **does not identify the same voter identified on the applicant's application for voter registration** under Section 13.002(c)(8), the clerk shall reject the application.

(f-1)  If an application is rejected under Subsection (f), the clerk shall provide notice of the rejection in accordance with Subsection (c).  The notice must include information regarding the ability to correct or add information required under Section 84.002(a)(1-a) through the online tool described by Section 86.015(c).

(f-2)  If an applicant corrects an application for a ballot to be voted by mail online and that application subsequently identifies the same voter identified on the applicant's application for voter registration, the clerk shall provide a ballot to the applicant as provided by this chapter.

OCA-APPX-1442

(g) If a ballot is provided to the applicant, the clerk shall indicate beside the applicant's name on the list of registered voters that a ballot to be voted by mail was provided to the applicant and the date of providing the ballot unless the form of the list makes it impracticable to do so.

**From:** ███████████████████████████
**Sent:** Monday, October 31, 2022 10:08 AM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:** ██████████
**Subject:** Vote Texas Contact Message

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to ████████████.

From: ████████████████

When filling out my mothers VOTE BY MAIL form the county refused to send her a ballot due to not using a prior number "the last four numbers of her social security ID" instead using the STATE OF TEXAS Drivers License number. Since both were an option on the application Either Texas Drivers license or Last four of social security number I feel that this is an error in the APPLICATION For a Ballot by Mail. Ector County refuses to send her a ballot because she used her legal ID form of her Texas Drivers License.

CONFIDENTIAL

| | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 2/28/2022 3:14:59 PM |
| **To:** | ███████████ |
| **Subject:** | RE: Problem with voting by mail (EI Response) |

Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

If your application for a ballot by mail was rejected because the required personal identification information on the application does not match the numbers in your voter registration record then the county must provide notice to you of the rejection and explain how to correct the defect by using the  online Ballot by Mail Tracker, available at www.votetexas.gov. If you need to update your voter registration record to add or required information numbers you can do so by submitting a new voter registration application to the registrar or by validating their personal identification numbers on texas.gov.

We appreciate your detailed feedback on the issues you encountered.  We are always looking for ways to improve the process and the experience, and detailed feedback from the voters is helpful in addressing those issues.  Our office does not have the power to change the laws in effect in this state.  If you wish to bring a legislative idea to the attention of the Legislature, you can find contact information for your state legislative representatives here:  https://wrm.capitol.texas.gov/home

Again, thank you for contacting our office.  If you have any additional questions or if we can be of further assistance, please contact our office at 1.800.252.8683 or email us at Elections@sos.texas.gov.

Elections Division Staff
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)

elections@sos.texas.gov | www.sos.state.tx.us

**or Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code.  It is not intended to serve as a legal opinion for any matter.  Please review the law yourself, and consult with an attorney when your legal rights are involved.*

-----Original Message-----
From: ███████████
Sent: Thursday, February 17, 2022 3:51 PM
To: Elections Internet <Elections@sos.texas.gov>
Subject: Problem with voting by mail

CAUTION: This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

I have been a registered voter at my address since 1980.  The last few years I have voted by mail because of disability and age.  My current application for voting by mail has been rejected.  The problem is my last 4 digits of my social

CONFIDENTIAL

security number were entered into the voting registration data base incorrectly in 1980 by whomever entered the data. The Tarrant County Election office said the numbers were transposed. When I asked if I could take a picture of my Texas driver's license and social security card and email it to their office I was told I had to come into their office to correct the error. If I was able to go to their office I could vote in person.

Texas voting laws are penalizing people for mistakes made by the election staff members that entered the voting registration data. It is ridiculous that the technology that allows me to update my information to the IRS and the Social Security Administration electronically is not allowed by the state of Texas in regards to voting by mail. As a constituent I am being denied my right to vote by mail simply because of Texas' antiquated procedures. It is time for Texas to embrace technology and stop blocking voters.

Sincerely,

███████

Sent from my iPhone

CONFIDENTIAL

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Sent:** | 3/29/2022 10:16:01 PM |
| **To:** | Melanie Best [MBest@sos.texas.gov] |
| **CC:** | Melanie Best [MBest@sos.texas.gov]; Christina Adkins [CAdkins@sos.texas.gov]; Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | Re: Vote Texas Contact Message - (EI Response) |

> **CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

I will make that suggestion to the DPS though my state senator and representative. I will also help my friend correct her voter registration.

I am also aware of the curbside voting since I have worked the elections for more than 20 years. This year we had problems with our machine and sent voters that required this to another polling place. We filed our complaint about this to the county. We had lots of problems in Harris county, but you know that.

Apparently your email contact works but it told me twice that it failed. This is what I got back:

postmaster@sos4avwapps1.txsos.sos.state.tx.ux

▮▮▮▮▮▮▮▮
Mon, Mar 28 at 2:32 PM
This is an automatically generated Delivery Status Notification.

Delivery to the following recipients failed.

▮▮▮▮▮▮▮▮▮▮▮▮▮

Thanks, ▮▮▮▮▮

On Tuesday, March 29, 2022, 05:07:53 PM CDT, Melanie Best <mbest@sos.texas.gov> wrote:

Thank you for your inquiry.

We are sorry your friend experienced difficulties. We respectfully note that our office cannot direct DPS procedures. You would need to direct the request to DPS.

In the meantime, in terms of election procedures, we can advise you that the voter can associate a new number with the voter registration record to help facilitate ballot by mail. One of the ways to do this is to send in a voter registration application with updated information.

**CONFIDENTIAL**

If the voter is not sure whether her driver license number or social security number are associated with the voter registration record, she may put both on a future application for ballot by mail.

Additionally, many voters who vote by mail like knowing about an alternative called curbside voting. A voter with a disability can vote curbside; the balloting materials are brought out to the car. We recommend calling ahead if the voter wishes to curbside vote. For example, during early voting, curbside voting is legally available at any branch. However, as a practical matter, some locations are better suited than others (roomier driveways and so on).

https://www.votetexas.gov/voters-with-special-needs/

We hope this will be helpful to you.

Sincerely,

Elections Division Staff

Texas Secretary of State

1-800-252-8683

Elections@sos.texas.gov

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, March 28, 2022 2:32 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:** ▮▮▮▮▮▮▮▮
**Subject:** Vote Texas Contact Message

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

From: ▮▮▮▮▮▮▮

OCA-APPX-1447

a friend who is now handicapped and cannot drive got her photo ID at DPS. They did not give her her old drivers license number. They gave her a new number. This caused problems when she requested a mail in ballot. Please tell DPS to continue using the original drivers license number on the photo ID to avoid this problem. Thank you.

CONFIDENTIAL

STATE122470

| | |
|---|---|
| **Message** | |
| **From:** | ████████████████████ |
| **Sent:** | 5/12/2022 5:23:10 PM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | MAIL IN BALOT TRACKER |

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

Dear Friends,

I sent in a Mail-in Ballot for my sister, ████████████████ for the May 7, 2022 election and was notified by the Tarrant County Board of Elections that I failed to include her SS# on the envelope and therefore, the ballot would be void unless I corrected it. After numerous attempt to find a way to correct it, election day came and went. My sister is bedridden and unable to go to the Tarrant Board in person. Today, I talked again with the Tarrant Board and they keep recommending I use the state webpage for Track Your Ballot. This does not work. ████ does not have a Driver's License nor a DPS number which is one of the sections you must fill in.

████████████████ does have a valid Voter Registration Card good through ████████. Her address is: ████████████████████████
Her VUID # is: ████████
Birth: ████████
Voter Registration Certificate No. ████████

It is very important that we clear this matter up as she desires to vote in the upcoming elections.

Sincerely,
████████████████████ Sister to ████████████
████████████████████

**CONFIDENTIAL**

Message

**From:**
**Sent:** 3/4/2022 4:59:41 PM
**To:** Elections Internet [Elections@sos.texas.gov]
**Subject:** Mail-In Ballot issues

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to Informationsecurity@sos.texas.gov.

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

HI. I would like to address issues with the mail-in ballot. It was VERY frustrating. First, the ballot would not fit into the carrier envelope. I had to get a ruler out to refold it and I was finally able to get it in. Second, after getting the carrier envelope into the mailing envelope my Drivers License information could be seen if you hold the envelope correctly. This is not at all secure and I was not very comfortable mailing this in. I am a republican that is disabled. This stupid system is making it more difficult for voters that the state WANTS to vote. Thirdly, I then get an email that the outside envelope was not signed. After all the frustration with trying to get the ballot into the inside envelope I guess I forgot this. Now I am told I have to figure out how to get to McKinney to sign to make my vote valid. There needs to be an electronic means to correct things like this. I got the email to tell me about the problem – why not allow the problem to be corrected through email? Since I have to go to McKinney to sign that means my vote will not be counted. This STINKS!

STATE123933

| | |
|---|---|
| **From:** | Elections Internet [Elections@sos.texas.gov] |
| **Sent:** | 10/9/2022 5:08:22 AM |
| **To:** | ▮▮▮▮▮▮▮▮ |
| **CC:** | Elections Internet [Elections@sos.texas.gov] |
| **Subject:** | RE: Vote Texas Contact Message |

Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

The Early Voting Clerk in your home Texas County is the one responsible for mailing all balloting materials to you. Please check with your county Early Voting Clerk as to the status of your ballot by mail.

Contact information for the Early Voting Clerk in your Texas County is available here:
https://www.sos.state.tx.us/elections/voter/county.shtml


Again, thank you for contacting our office.


**Elections Division**
Office of the Secretary of State
800-252-VOTE(8683)
www.sos.state.tx.us/elections/index.shtml
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*


**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Saturday, October 8, 2022 6:28 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Cc:** ▮▮▮▮▮▮
**Subject:** Vote Texas Contact Message

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to ▮▮▮▮▮▮▮ .

From: ▮▮▮▮▮▮

I am voting by mail. Last election we had to put the identifying info we used when we originally registered to vote. I dont remember which ID I used so I put both Drivers license and last 3 digits of my social. Now the instructions say One form of ID. Do we still have to use what we originally registered with? Will we be penalized if we put more than one type of ID? Thank you ▮▮▮▮▮▮▮

CONFIDENTIAL

Message
| | |
|---|---|
| **From:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B3FBA6E4A38E415F84C198A226931A4A-HMARTINEZ |
| | [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B3FBA6E4A38E415F84C198A226931A4A-HMARTINEZ] |
| **Sent:** | 10/27/2022 6:08:57 PM |
| **To:** | █████████████████ |
| **CC:** | Elections Internet [Elections@sos.texas.gov] |
| **BCC:** | Christina Adkins [CAdkins@sos.texas.gov] |
| **Subject:** | Vote seems to be suppressed (EI Response) |

As an initial matter, thank you for your concern and for taking the time to send in the inquiry.

In order to best assist your daughter, please have her contact our office directly and as soon as possible. We are happy to assist her with her ballot by mail issue(s).

Heidi Martinez
Managing Attorney – Elections Division
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)
elections@sos.texas.gov | www.sos.state.tx.us/elections

For Voter Related Information, please visit:



**VOTETEXAS.GOV**
POWERED BY THE *TEXAS SECRETARY OF STATE*

*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

**From:** █████████████████
**Sent:** Tuesday, October 25, 2022 7:16 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** Vote seems to be suppressed

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

My daughter is a registered voter and is a student that now lives out of state. She sent her mail-in ballot application at the beginning of October. The application asked for "EITHER" DL number "OR" SSN, so she put in the DL number. Her application was then rejected. We called Comal County and they said "her registration has her SSN, so she needs to put that". First of all, if that were the case then the application should have said so to begin with! That's very misleading. The rejection letter also said that in order to fix that information on her ballot, she could simply log in to the ballot tracker. However, the ballot tracker REQUIRES you to enter BOTH your SSN and DL number, so it denied her access because her voter registration apparently doesn't include SSN yet. So there was no way to fix it.

After contacting numerous people, we were then instructed to go to txapps.texas.gov and use the "Voter name and address changes" form that is located there. We successfully got into that site and were able to add her SSN and DL number to her voter registration. The following day, she was finally able to get into the ballot tracker yet there was no ballot or mail in application associated with her name. So once again, we called the county. They said that they could see that she added her SSN and DL number and they

OCA-APPX-1452

would" take care of it".  The gal on the phone said as soon as she "rejects the ballot again", it will then show up on the ballot tracker and my daughter can then correct her information there and consequently, her original mail in application will then be accepted.  This elaborate and confusing process made zero sense to me , but I said "ok".  Now, my daughter can no longer log into the ballot tracker.  It is again saying that she doesn't exist.  This is beyond frustrating and completely unnecessary.  My daughter is a registered voter and has already voted in several elections.  Now, as a student attending college, you're telling her she cannot vote!  She cannot simply resend a new mail-in application because this long and drawn out process wasted too much time and it takes too long for mail to get back and forth from Maine.  This is a case of complete incompetence on someone's part and deception on the part of both the rejection letter we received and the State of Texas Secretary of State website.  Please let me know if there is anything else we can possibly do to allow my daughter to use her Constitutional right to vote, since she has done everything correctly up to this point but Texas insists on suppressing her vote with its idiotic and deceptive process!

Sincerely,

█████████

Comal County

CONFIDENTIAL

| Message | |
|---|---|
| **From:** | Elections Internet [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C7880AABC96640A49B316BEE342F5292-ELECTIONS I] |
| **Sent:** | 8/24/2022 3:01:33 AM |
| **To:** | |
| **BCC:** | Elections Internet [Elections@sos.texas.gov]; Christina Adkins [CAdkins@sos.texas.gov] |
| **Subject:** | RE: Vote by Mail instructions (EI Response) |

Thank you for contacting the Elections Division of the Office of the Texas Secretary of State.

Senate Bill 1 amended Section 86.002 to require that the carrier envelope include a space that is hidden from view when the envelope is sealed for the voter to enter one of the following: (1) the number of the voter's driver's license, EIC, or personal identification card issued by DPS; (2) the last four digits of the voter's social security number, if the voter has not been issued a DPS number; or (3) a statement that the applicant has not been issued one of these numbers. ( Sec. 86.002(g)).

The carrier envelope has been updated to include a space for the required identification information. A photo of the new carrier is provided below. More information is available on votetexas.gov on **"Completing and Mailing your Carrier Envelope."**



     Sec. 86.002.  ADDITIONAL BALLOTING MATERIALS.  (a)  The early voting clerk shall provide an official ballot envelope and carrier envelope with each ballot provided to a voter.  If the voter's name appears on the list of registered voters with the notation "S", or a similar notation, or the residence address on

<p style="text-align:center">OCA-APPX-1454</p>

**CONFIDENTIAL**      **STATE137455**

the voter's early voting ballot application is not the same as the voter's residence address on the list of registered voters, the clerk shall provide a form for a statement of residence to the voter.

(b)  Before providing the balloting materials to the voter, the clerk shall enter on the carrier envelope the identity and date of the election.

(c)  The clerk shall enter on a carrier envelope the voter's name in printed form, a notation that a statement of residence is enclosed, if applicable, and any other information the clerk determines necessary for proper processing of the ballot.

(d)  The secretary of state shall prescribe instructions to be printed on the balloting materials for the execution and return of a statement of residence.  The instructions must include an explanation of the circumstances under which the ballot must be rejected with respect to the statement.

(e)  If the clerk determines that the carrier envelope and other balloting materials will weigh more than one ounce when returned by mail to the clerk, the clerk shall include with the balloting materials a notice of the amount of first class postage that will be required for the return by mail of the carrier envelope and enclosed materials.

(f)  The clerk shall include with the balloting materials:

(1)  a notice of the clerk's physical address for purposes of return by common or contract carrier or personal delivery in accordance with Section 86.006(a-1); and

(2)  the list of declared write-in candidates for the election, if applicable.

(g)  The carrier envelope must include a space that is hidden from view when the envelope is sealed for the voter to enter the following information:

(1)  the number of the voter's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety;

(2)  if the voter has not been issued a number described by Subdivision (1), the last four digits of the voter's social security number; or

(3)  a statement by the applicant that the applicant has not been issued a number described by Subdivision (1) or (2).

(h)  A person may use the number of a driver's license, election identification certificate, or personal identification card that has expired for purposes of Subsection (g) if the license or identification is otherwise valid.

(i)  No record associating an individual voter with a ballot may be created.

CONFIDENTIAL

Again, thank you for contacting our office. If you have any additional questions or if we can be of further assistance, please contact our office at 1.800.252.8683 or email us at Elections@sos.texas.gov.

Elections Division Staff
Office of the Texas Secretary of State
1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701
1.800.252.VOTE (8683)

elections@sos.texas.gov | www.sos.state.tx.us

**or Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, August 17, 2022 10:12 AM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** Vote by Mail instructions

> **CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

> **CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov

I am writing you concerning how the new voting law impacts voters who vote by mail. I am asking you to highlight the change in the law that requires that voters who vote by mail indicate on the carrier envelope, before sealing it:

•       The number of your driver license, election identification certificate, or personal identification card issued by the Texas Department of Public Safety (DPS);

•       The last four digits of your social security number, if you have not been issued any of the abovementioned numbers by DPS; OR

•       A statement that you have not been issued a number described by (1) or (2) above.

This change should be communicated separately to all voters who request a vote by mail ballot. It should be in bold on all instructions sent with the ballot. Voters should be reminded before the carrier envelope is sealed that they need to provide this information before the seal the envelope.

Your website clearly indicates this change and provides excellent instructions on what is required. I'm concerned that not enough voters will see this information before voting by mail.

I voted in an election earlier this year and my ballot was rejected. I found this out two weeks after the polls closed. The reason my ballot was rejected was because I didn't write my driver's license number underneath the flap that seals the carrier envelope.

**CONFIDENTIAL**

I have voted by mail numerous times in Texas. When I received my ballot earlier this year, I looked through the instructions provided. I was not aware that there had been a change in the information required on the carrier envelope, under the flap. After I sealed the carrier envelope, I signed my name where indicated and looked at it one last time before I mailed it.

I feel like I am an engaged and educated voter yet my ballot was rejected. I'm concerned that many other vote by mail ballots will also be rejected because voters are not aware of this change. I feel it is imperative that all of us do everything we can to educate voters of this change so that everyone's vote is counted. Please help to bring awareness to this change.

Sincerely,

███████

Sent from Mail for Windows

CONFIDENTIAL

Message

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Sent:** | 2/28/2022 10:52:48 PM |
| **To:** | Kristi Hart [KHart@sos.texas.gov] |
| **Subject:** | RE: unable to verify my info |

Handled

**From:** Kristi Hart
**Sent:** Friday, February 25, 2022 5:06 PM
**To:** VRTeam <VRTeam@sos.texas.gov>
**Subject:** FW: unable to verify my info

Can someone call this gentleman? I was able to access his record on my first attempt on the ballot tracker.

**From:** Elections Internet <Elections@sos.texas.gov>
**Sent:** Friday, February 25, 2022 4:54 PM
**To:** VRTeam <VRTeam@sos.texas.gov>
**Subject:** FW: unable to verify my info

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, February 25, 2022 4:23 PM
**To:** Elections Internet <Elections@sos.texas.gov>
**Subject:** unable to verify my info

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to ▮▮▮▮▮▮▮.

I mailed my vote by mail ballot and I got a corrective action paper saying I had not put my drivers license number on the outside envelope That's wrong because both me and my wife checked our entire inside and outside ballot three times making sure we followed all the new rules. I tried to correct this online as it suggested but was told I didn't exist when I filled out the form and it dismissed me. I checked my registration and that is correct . I called my local office in Georgetown and they said half of the people are unable to get through this website with the same problem I just stated. That's curious. I have just finished cancer treatment and am nervous about going to the Wilco office to turn in the paper How else can I verify with you my numbers so my ballot counts?

▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

CONFIDENTIAL

Message

| | |
|---|---|
| **From:** | Julia Montes [JMontes@sos.texas.gov] |
| **Sent:** | 11/4/2022 6:01:19 PM |
| **To:** | Elections Internet [Elections@sos.texas.gov] |
| **CC:** | Kristi Hart [KHart@sos.texas.gov] |
| **Subject:** | RE: Online tracker on TXSOS website for ABBM has a flaw that is preventing look-up |

Please respond to voter letting them know the required information for the ballot tracker. They do have the option to contact the county if they are missing one of the items below or have issues.

To track your mail-in ballot, you must enter the following information:

- First Name
- Last Name
- Date of Birth
- The last 4 digits of your Social Security Number
- Your Driver's License or Department of Public Safety Personal ID number
- Your residential address (must appear exactly as listed on your voter registration record. To look up the address listed on your voter registration record, use the 'Am I Registered?' tool)
- City
- ZIP code

If you are having issues accessing the ballot tracker, please contact your county election officer. While our office hosts the website, the county is the one responsible for inputting information into the tracker. Contact information for your county can be found here: https://www.sos.state.tx.us/elections/voter/county.shtml

**From:** Elections Internet <Elections@sos.texas.gov>
**Sent:** Friday, November 4, 2022 12:32 PM
**To:** Julia Montes <JMontes@sos.texas.gov>
**Cc:** Kristi Hart <KHart@sos.texas.gov>
**Subject:** FW: Online tracker on TXSOS website for ABBM has a flaw that is preventing look-up
**Importance:** High

**From:** █████████████████████████
**Sent:** Friday, November 4, 2022 12:02 PM
**To:** elections@traviscountytx.gov; Elections Internet <Elections@sos.texas.gov>
**Subject:** Online tracker on TXSOS website for ABBM has a flaw that is preventing look-up
**Importance:** High

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

**CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open attachments unless you are expecting the email and know that the content is safe. If you believe this to be a malicious or phishing email, please send this email as an attachment to informationsecurity@sos.texas.gov.

https://teamrv-mvp.sos.texas.gov/BallotTrackerApp/#/login REQUIRES A TXDL # OR DPS PIN BUT THESE ARE NOT REQUIRED IF YOU USE THE LAST 4 DIGITS OF YOUR SOCIAL SECURITY NUMBER TO REGISTER TO VOTE.

**CONFIDENTIAL**

THE TXSOS WEBSITE LOOK-UP FEATURE HAS A FLAW. THE LOOK-UP FEATURE SHOULD REQUIRE LAST 4 DIGITS OF YOUR SOCIAL SECURITY NUMBER **OR** TXDL # OR DPS PIN. THE LOOK-UP FEATURE SHOULD NOT REQUIRE BOTH. YOU HAVE A PROGRAMMING ERROR.

My mother-in-law has mailed back her ABBM.  When I went to the ballot tracker at https://teamrv-mvp.sos.texas.gov/BallotTrackerApp/#/login, the online form gives me the following error message:

"You must enter your Texas driver's license # or DPS PIN"

My mother-in-law is registered using the last 4 digits of her social security number (which I entered into the online tracker form); however, the tracker form is requiring that I also enter a TXDL # or DPS PIN.  She does not have a TXDL # or DPS PIN. She uses her passport when a photo ID is required.

Please advise.

Thanks!

OCA-APPX-1460

CONFIDENTIAL

# Exhibit 105

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.texas.gov

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

John B. Scott
Secretary of State

## ELECTION ADVISORY
## No. 2022-02

TO:      County Elections Officers (County Clerks/Elections Administrators/Tax Assessors-Collectors)

FROM:    Keith Ingram, Director of Elections

DATE:     January 10, 2022

RE:        Instructions and Deadlines for Mailing/Emailing Ballots Under the Federal "MOVE Act" for Overseas Voters

---

Pursuant to the federal Military and Overseas Voter Empowerment ("MOVE") Act, the blank official ballot must be mailed or emailed to any voter who submits a Federal Postcard Application ("FPCA"). **All FPCAs submitted on or after January 1, 2022 are effective for the 2022 primaries and general election.**

Section 84.007, Texas Election Code, provides that if an ABBM is faxed or emailed or if an FPCA is faxed, then the applicant must submit the original application by mail to the early voting clerk so that the early voting clerk **receives the original no later than the 4th business day after receiving the emailed or faxed ABBM or faxed FPCA.** An FPCA still has independent authority for email delivery under Section 101.052. This means an emailed FPCA is **not** required to be followed by hardcopy.

## Deadline to Mail Overseas Ballots

As a reminder, all ballots to FPCA voters **must** be mailed on or before the 45th day before election day. **The deadline for mailing ballots for the 2022 primary election is Saturday, January 15, 2022.** Please note that although the deadline falls on a Saturday, it does not extend to the next business day. **Therefore, we recommend mailing your ballots by Friday, January 14, 2022.** If you plan on mailing your ballots on Saturday, we recommend that you consult with your local post office to confirm dates/hours their office will be open.

If a FPCA is received after the 45th-day deadline, the ballot should be mailed or emailed not later than the seventh calendar day after the date the FPCA is received. If a regular (non-FPCA) application for a ballot by mail is received after the 45th-day deadline from a voter who is not in the military or overseas, the ballot should be mailed not later than the

STATE034968

seventh calendar day after the date the application is accepted. TEX. ELEC. CODE § 86.004(b).

The following are important deadlines affecting FPCA voters:

## March 1, 2022 General Primary Election

- **Saturday, January 15, 2022** - Deadline to mail or email ballots to ALL FPCA voters. (We have more information about deadlines to mail ballots in *Advisory No. 2021-18 - March 1, 2022 Primary Election Law Calendar*.)
- **Friday, February 18, 2022** - Deadline to Receive FPCAs and Deadline to request an emailed, unmarked ballot.
- **3 Business Days after FPCA Voter Activity** - Submit your FPCA tracking information for new FPCAs received, FPCA ballots mailed and received to the Office of the Secretary of State in order that the Ballot by Mail Tracker is populated with timely information. As a reminder, offline counties can update FPCA information via file import, online counties may update directly in TEAM.

## May 24, 2022 Primary Runoff Election

- **Saturday, April 9, 2022** - Deadline to mail or email ballots to ALL FPCA voters. (We have more information about deadlines to mail ballots in *Advisory No. 2021-18 - March 1, 2022 Primary Election Law Calendar.*)
- **Friday, May 13, 2022** - Deadline to Receive FPCAs and Deadline to request an emailed, unmarked ballot.
- **3 Business Days after FPCA Voter Activity** - Submit your FPCA tracking information for new FPCAs received, FPCA ballots mailed and FPCA ballots received to the Office of the Secretary of State in order that the Ballot by Mail Tracker is populated with timely information. As a reminder, offline counties can update FPCA information via file import; online counties may update directly in TEAM.

## November 8, 2022 General Election for State and County Officers

- **Saturday, September 24, 2022** - Deadline to mail or email ballots to ALL FPCA voters. (We will have more information about deadlines to mail ballots in our November 8, 2022 Election Law Calendar.)
- **Friday, October 28, 2022** - Deadline to Receive FPCAs and Deadline to request an emailed, unmarked ballot.
- **3 Business Days after FPCA Voter Activity** - Submit your FPCA tracking information for new FPCAs received, FPCA ballots mailed and FPCA ballots received to the Office of the Secretary of State in order that the Ballot by Mail Tracker is populated with timely information. If you need an updated spreadsheet for submission, please contact a member of the Voter Registration team as soon as possible.

# Emergency Ballots

We would also like to take this time to remind you that you have the authority to create emergency ballots. If you do not receive your ballots in time to meet the 45-day deadline,

STATE034969

you may create your own paper ballots or, if you have a copy of the ballot in the Adobe .pdf format, which is often provided by the printer for your proofing, you may forward a copy to the voter. If you have a physical copy of the ballot and a scanner, you could scan the ballot and attach a copy of the scanned ballot to the email to the voter. If you have a copy of the ballot in Microsoft Word, you could attach a copy in that format. The main key is that it should be in a digital format that the average voter will be able to open and print.

# Instructions for Emailing Ballots

Any voter who submits an FPCA and requests that the ballot be emailed, must be emailed a blank official ballot. The voter should be emailed a signature sheet and detailed instructions on returning their voted mail ballot. Below you will find information related to email instructions which we encourage you to use and modify as necessary for your county:

**Instructions to the Early Voting Clerk**

When an early voting clerk emails the balloting materials to a MOVE voter, the early voting clerk should take the following steps:

1. **Paste MOVE Act Email Ballot Instructions into the email.** The MOVE Act Email Ballot Instructions form contains several instances where the early voting clerk will need to add attachments and personalize the email to make sure that MOVE voters receive all instructions necessary for completing and returning the marked ballots, as appropriate to their early voting clerk.
2. **Attach Ballot or Insert a Link to the Ballot and List of Certified Write-In Candidates (if applicable).** The Early Voting Clerk will need to attach an Unmarked Ballot (appropriate to the voter's specific precinct) and the List of Certified Write-In Candidates, if applicable. The Early Voting Clerk may insert a link to the unmarked ballot, as the ballot is "static," which means that voter can mark and print the ballot without being connected to the Internet.
3. **Attach all applicable instructions.** The Early Voting Clerk must remember to include the ballot instructions for the applicable method of voting and the signature sheet (PDF) as prescribed by the Office of the Secretary of State.
4. **Insert early voting clerk contact information in the attached notice to voter.** In the email instructions to the voter, the early voting clerk should include the clerk's telephone number, email and mailing address in the designated areas for MOVE voters to use if they need additional assistance in completing or returning their marked ballot by mail.
5. **The early voting clerk MUST provide the voter with a signature sheet that contains a place for the voter to include the required personal identification number.**
6. **The early voting clerk MUST provide the voter with information about mailing the voted ballot back to the early voting clerk.**
   - The voter can mail their FPCA, ballot or FWAB postage-free using a proper return envelope. Below are the envelopes prescribed by FVAP for this purpose:
     - **Standard U.S. Envelope Size (#10)**
       - FPCA Postage-Paid Return Envelope
       - Ballot Return and FWAB Postage-Paid Return Envelope

OCA-APPX-1464

STATE034970

- Ballot Return and FWAB Security Envelope
  - **Standard Europe Envelope Size (C4)**
    - FPCA Postage-Paid Return Envelope
    - Ballot Return and FWAB Postage-Paid Return Envelope

**NOTE: Starting in 2022, you must send the signature sheet to FPCA email ballot voters, as the voters must include their required personal identification number for review by the early voting ballot board.**

7. **The county has two choices with regard to the <u>carrier envelope or mailing envelope for voters to use when returning the voted ballot</u>:**
   - The county may rely on the voter to print the carrier envelope from the link provided on the email; or
   - If the county has access to the appropriate software and the technological ability, it may include, as an attachment with the unmarked ballot, a carrier envelope file that has the voter's name in the upper left hand corner and the county's return mailing address to assist the MOVE voter in returning their marked ballot by mail.

## Sample Email Instructions to Voter

The text below contains a sample email you may use to provide voters with their balloting materials.  Please note that the email contains information that must be personalized to your county.

---

Dear FPCA Voter:

Per your request and in accordance with the Military and Overseas Voter Empowerment (MOVE) Act, this correspondence includes your unmarked ballot for the upcoming election. This email also includes instructions for processing the ballot, and a list of certified write-in candidates, if applicable.

If, after reading the instructions, you have questions regarding the completion or return mailing of this ballot, please contact your early voting clerk at [insert county telephone number] or by email at [insert county email address].

**Note: Your marked ballot must be received in our office by regular mail on or before 7:00 p.m. on <u>Election Day</u>. If you are a non-military overseas citizen submitting your ballot from <u>outside</u> the United States, the ballot must be postmarked by Election Day and received by the county elections office no later than the 5th day after Election Day. If you are a member of the military, Merchant Marine or National Guard, the ballot must be received by the 6th day after election day. If your ballot is not received by the applicable deadline, it will be rejected and will not be counted for this election.**

Instructions for Processing the Emailed Ballot

- Open the attachment designated as the unmarked ballot, or click on the link in your email to access your ballot.
- Follow the ballot instructions provided for marking your ballot.

---

STATE034971

- Place the marked ballot in a secrecy (or security) envelope. An envelope may have been provided, or you may use any envelope you have at your disposal. If you cannot provide a secrecy envelope at all, don't worry; the lack of a secrecy envelope will not invalidate your ballot.
- Print out and complete the signature sheet (PDF). The signature sheet MUST be completed and returned with the voted ballot. The signature sheet contains information that is required for the Early Voting Ballot Board to verify when reviewing your ballot.
- Place your marked ballot contained in the secrecy envelope, and the signature sheet in your carrier envelope. **Note that the carrier envelope is "postage-free" if mailed within the U.S. postal system, including APO and FPO addresses, U.S. Embassies and Consulates for use by absentee voters covered under UOCAVA. You are not required to use the "postage-free" envelope. You can place the marked ballot and signature sheet in a separate envelope and affix the proper postage for mailing.**
- Put your name and current mailing address in the upper left hand corner of your mailing envelope or carrier envelope, if it has not already been pre-printed by our office. Also, put the county address in the middle of the envelope (if not already provided for you).
- Mail marked ballot to our county elections office: [county official, please insert your mailing address here for affixing to the federal envelope, if used].

Instructions for Marking the Emailed Ballot

- Make sure you follow the instructions provided by our office for marking the ballot and for voting for write-in candidates, if any.

Federal Write-In Ballot Process

- If you have submitted an FPCA by the state application deadline of the 11th day before election day AND you do not feel you can return your ballot by the deadline, you are entitled to use a "FWAB" -- a "Federal Write-in Absentee Ballot" -- to vote in federal elections only.
- The Federal Voting Assistance Program (FVAP) provides a Federal Write-In Absentee Ballot (FWAB) wizard. According to FVAP, this wizard will seamlessly, intuitively, and easily guide a military or overseas voter through the State-specific requirements for completing the FWAB, including providing the voter all federal candidate choices. Here is a link to their website: http://www.fvap.gov/.

## Resources

The following items are helpful guidance on the MOVE Act's requirements:

- MOVE Act FAQ
- Administrative Rule Implementing the MOVE Act

If you have any questions relating to the implementation of the MOVE Act, please contact our office at your earliest convenience. You may reach the Legal Department at 1-800-252-2216, Option 2.

STATE034972

KI:CA:MB

STATE034973

# Exhibit 106

OCA-APPX-1468

Email List          Member Login

VOTE411    Join    Donate    Take Action

≡ Menu

Home    About Us

# About the League of Women Voters of Texas

About Empowering Voters. Defending Democracy.

The League of Women Voters of Texas is a nonpartisan, grassroots civic organization that encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. Membership in the League is open to people 16 and older of all gender identities. With 100 years of experience, the League is one of America's oldest and most trusted civic nonprofit organizations.

## MISSION
Empowering Voters. Defending Democracy.

## VISION
We envision a democracy where every person has the desire, the right, the knowledge and the confidence to participate.

## VALUE
We believe in the power of women to create a more perfect democracy.

## DIVERSITY, EQUITY, AND INCLUSION POLICY
LWV is an organization fully committed to diversity, equity, and inclusion in principle and in practice. Diversity, equity, and inclusion are central to the organization's current and future success in engaging all individuals, households, communities, and policymakers in creating a more perfect democracy.

OCA-APPX-1469

OCAGH_00014940

There shall be no barriers to full participation in this organization on the basis of gender, gender identity, ethnicity, race, native or indigenous origin, age, generation, sexual orientation, culture, religion, belief system, marital status, parental status, socioeconomic status, language, accent, ability status, mental health, educational level or background, geography, nationality, work style, work experience, job role function, thinking style, personality type, physical appearance, political perspective or affiliation and/or any other characteristic that can be identified as recognizing or illustrating diversity.

LWV es una organización totalmente comprometida con la diversidad, la equidad y la inclusión en principio y en la práctica. La diversidad, la equidad y la inclusión son fundamentales para el presente y futuro éxito de la organización en la participación de todas las personas, hogares, comunidades y políticos en la creación de una democracia más perfecta.

No habrá barreras para la participación plena en esta organización por razón de género, identidad de género, etnia, raza, origen nativo o indígena, edad, generación, orientación sexual, cultura, religión, sistema de creencias, estado civil, estado parental, estatus socioeconómico, idioma, acento, habilidad, salud mental, nivel educativo o antecedentes, geografía, nacionalidad, estilo de trabajo, experiencia laboral, función del rol laboral, estilo de pensamiento, tipo de personalidad, apariencia física, perspectiva política o afiliación y / o cualquier otra característica que identifique, reconozca, o ilustre diversidad.

## LWV Texas DEI Vision

Embraces and embodies diversity, equity, and inclusion as inextricable from the mission to empower voters and defend democracy
Engages in purposeful action to advance diversity, equity, and inclusion beyond words
Commits at the individual and collective level to being more self-aware and understanding of diverse perspectives and experiences
Is known for being relevant, diverse, equitable, and inclusive—inside and out

## Principles

The League of Women Voters believes in representative government and in the individual liberties established in the Constitution of the United States. The League of Women Voters of the United States believes that all powers of the U.S. government should be exercised within the constitutional framework of a balance among the three branches of government: legislative, executive, and judicial.

The League of Women Voters believes that democratic government depends upon informed and active participation in government and requires that governmental bodies protect the citizen's right to know by giving adequate notice of proposed actions, holding open meetings, and making public records accessible.

The League of Women Voters believes every citizen should be protected in the right to vote; every person should have access to free public education that provides equal opportunity for all; and no person or group should suffer legal, economic, or administrative discrimination.

The League of Women Voters believes efficient and economical government requires compet personnel, the clear assignment of responsibility, adequate financing, and coordination among

OCA-APPX-1470

OCAGH_00014941

the different agencies and levels of government.

The League of Women Voters believes responsible government should be responsive to the will of the people; government should maintain an equitable and flexible system of taxation, promote the conservation and development of natural resources in the public interest, share in the solution of economic and social problems that affect the general welfare, promote a sound economy, and adopt domestic policies that facilitate the solution of international problems.

The League of Women Voters believes cooperation with other nations is essential in the search for solutions to world problems and that development of international organization and international law is imperative in the promotion of world peace.



Quick Link: lwvtexas.org/about

100 Years of Women Voting

Directors

History

Board Sustainers Plaque

Honorees

Convention 2022

Annual Reports & 990s

Interns & Student Volunteers

LWVTX Board Nominations

OCA-APPX-1471

OCAGH_00014942

Timeline of Voting & Elections in Texas

## Support Democracy!

Join | Donate | Volunteer | Take Action

Address:
1212 Guadalupe St. #107
Austin, TX 78701

Phone:
(512) 472-1100

Copyright © 2021 • All Rights Reserved • Privacy Policy • Terms of Use • Powered by ClubExpre

⟨

OCA-APPX-1472

OCAGH_00014943

# Exhibit 107



# League of Women Voters of Texas Strategic Planning Goals 2022 – 2027

## Achieve a Free and Fair Democracy

- Strengthen relationships with state and local election officials and like-minded community organizations to effect change
- Advocate with legislators and take legal action as necessary to make voting easier
- Educate local Leagues on best practices to achieve free and fair elections in their communities.

## Increase Participation in Government

- Promote a diverse pool of people running for office at all levels
- Increase awareness of what elected officials and appointed bodies do
- Expand the pool of qualified election workers
- Improve government access and transparency especially for underserved communities
- Highlight good government practices and hold government accountable

## Expand Voter Participation in Texas

- Increase voter registration rates
- Expand Get Out The Vote programs with partner organizations
- Broaden VOTE411 to cover more elections in unserved communities
- Identify barriers and customize approaches to reach low-propensity voters
- Make engagement in elections the norm, embedded in the culture of communities.

## Create a League that is Diverse, Equitable & Inclusive

- Recruit board members and leaders with a variety of backgrounds, and who represent geographic, social-economic and racial diversity
- Diversify our membership to reflect the diversity in our state
- Make the League accessible and relevant to Texans, including diverse communities, youth, rural residents and people with disabilities.

# Exhibit 108



# Advocacy & Issues

A Guide to League Program Issues
League of Women Voters of Texas
2020-2022

1212 Guadalupe #107
Austin, TX 78701
512.472.1100
lwvtexas@lwvtexas.org
www.lwvtexas.org

For League use only. Others please contact LWVTX for permission to reprint.

# League Principles

**League Principles are concepts of government to which all Leagues subscribe**.
They are the beliefs shared by League members everywhere. Principles are the basis upon which national, state, and local program is adopted.

**The Principles themselves may be used to take action at any level of government.**
However, because they are broad statements, such action is usually taken in conjunction with current League positions. Additional information on their use is found in *Impact on Issues*, the program publication of the League of Women Voters of the United States (LWVUS).

 **The League of Women Voters believes**:

- In representative government and in the individual liberties established in the Constitution of the United States.
- That all powers of the U.S. government should be exercised within the constitutional framework of a balance among the three branches of government: legislative, executive, and judicial.
- That democratic government depends upon informed and active participation in government and requires that governmental bodies protect the citizen's right to know by giving adequate notice of proposed actions, holding open meetings, and making public records accessible.
- That every citizen should be protected in the right to vote; that every person should have access to free public education that provides equal opportunity for all; and that no person or group should suffer legal, economic, or administrative discrimination.
- That efficient and economical government requires competent personnel, the clear assignment or responsibility, adequate financing, and coordination among the different agencies and levels of government.
- That responsible government should be responsive to the will of the people; that government should maintain an equitable and flexible system of taxation, promote the conservation and development of natural resources in the public interest, share in the solution of economic and social problems that affect the general welfare, promote a sound economy, and adopt domestic policies that facilitate the solution of international problems.
- That cooperation with other nations is essential in the search for solutions to world problems, and that the development of international organization and international law is imperative in the promotion of world peace.

OCAGH_00001538

# Table of Contents

League Principles   2

Taking Action!   5

Action Guidelines for Local Leagues   5
    Applying Diversity, Equity, and Inclusion (DEI) Lens to Our Work   8

We Support 2020-2022   9

Program Study/Review/Update   12

2020-2022 LWVTX Program Positions   13
    I. Government   13
        A. Campaign Finance/Ethics   13
        B. Texas Constitutional Revision   18
        C. Election Laws & Voting Rights   20
        D. Executive, Legislative, and Judicial   29
        E. Financing State Government   34
        F. Homeowners Association Reform   39
        G. Intestacy (Dying Without a Will)   40
        H. Public School Finance   40
        I. Public School Testing and Accountability   51
        J. Redistricting   54
        K. State-Local Relations   58
    II. Administration of Justice   60
        A. Criminal Justice   60
        D. Immigration   68
        E. Juvenile Justice   70
        F. Spousal Sexual Assault   72
        G. Trafficking of Persons   73
        H. Payday & Auto Title Loans in Texas   74
    III. Social Policy/Human Resources   75
        A. Child Abuse & Neglect   75
        B. Child Support Enforcement   78
        C. Early Childhood   78
        D. Domestic Violence   83
        E. Equal Opportunity/Income Assistance   85
        F. Health Care for Those of Lesser Means/Child Health Care   89
        G. Health Care System for Older Texans   94
        H. Post-Divorce Payments   96
        I. Services for People With Behavioral Health Disorders   97
        J. Transportation   101
    IV. Natural Resources   104
        A. Climate Change and Air Quality   104
        B. Land Use   110
        C. Water   114

1212 Guadalupe #107, Austin, TX 78701 lwvtexas@lwvtexas.org 512.472.1100 www.lwvtexas.org

OCA-APPX-1478

OCAGH_00001539

.

**LWVUS Program Positions**                                                          **122**

I. Representative Government                                                          122
   A. Citizen's Right to Know/Citizen Participation (Open Government)        122
   B. Public Policy on Reproductive Rights                                     125
II. Natural Resources                                                                132
   A. Energy                                                                   132
   B. Waste Management                                                         133
   C. Public Participation                                                     137
III. Social Policy                                                                   140
   A. Early Intervention for Children at Risk (Child Health)                   140
   B. Gun Policy                                                               141

OCAGH_00001540

# Taking Action!

**What is *Advocacy and Issues*?**
This publication contains all the positions of the League of Women Voters of Texas (LWVTX), including an explanation and a history of all state advocacy since the adoption of the position. It is intended for LWVTX Issue Chairs, local League presidents, and any other member who is interested in League advocacy. It will help local League leaders understand and act on state League program. *Advocacy and Issues* is updated after each Texas legislative session and each biennial League convention.

**What is program?**
The word *program* has a special meaning in the League. It is not a meeting or a series of speakers. League program consists of the government issues selected by League members for study and—after consensus is reached—action.

**LWVTX may also take action at the state level using LWVUS positions**, and the League may not take action if we do not have a position. The LWVUS positions that we regularly use are listed at the end of *We Support* and our LWVTX positions, with a summary of our action.

**What is program review?**
In order to keep LWVTX positions current, certain positions are periodically updated. Members, issue chairs, and/or the state board recommend reviews during state program planning. The appropriate issue chair and/or a board-appointed committee carry out the review. If the committee recommends any changes and the board approves, delegates at the next Convention or Statewide Conference must approve them. Delegates readopt all positions at each biennial Convention with any approved amendments.

## A Few Uses for *Advocacy and Issues*

**This handbook may be used to:**

- Educate local presidents, program/action vice presidents, and other members about state positions.
- Find state positions that may be used as a basis for action on local issues.
- Find additional background when responding to Action Alerts or other calls for action.
- Educate members about state program during the Program Planning process. (During Program Planning in the fall before the Convention, members will recommend issues for study and state positions to be reviewed or amended.)
- Help members with program language when they write letters, speeches, news releases, etc.

# Action Guidelines for Local Leagues

Action is our League effort to bring about governmental change based on the positions we derive through member study and consensus. Because we are a multilevel organization with positions at each level, we must:

- Coordinate our action efforts to **speak with one voice**.
- Choose Priority Issues at all levels in order to allocate resources effectively and maximize political impact.

If you are unsure about what action to take, please contact the appropriate issue chair. For issue chair contact information, check the Advocacy and Issues page at lwvtexas.org, or email the state office at LWVTexas@LWVTexas.org, or call 512-472-1100.

## Action Guidelines for All Leagues

- Leagues act only when we have a local, state, or national position or are acting under League principles.
- Leagues never lobby in opposition to a League position.
- Lobby only your own representatives unless otherwise directed.
- **Local Leagues may only lobby at the *local* government level without asking for state or national authorization**; any local, state, or national position may be used to lobby at the local level.
- Only the president may speak for the League, unless another person is authorized by the president.

## Advocacy Rules of Thumb

- Generally, local Leagues advocate to local officials, the state League advocates to state officials, and the national League advocates to national officials.
- If a local League wishes to advocate a local position to a state or national official, they must obtain authorization from LWVTX or LWVUS.
- The state League must obtain authorization to advocate a national official.
- For permission to lobby national officials: https://www.lwv.org/federal-action-request-form
- For permission to lobby state officials: lwvtexas@lwvtexas.org

## Before Taking Action on an Issue, Ask Yourself

- Under what position do you wish to act: local, state, national? League Principles?
- Is authorization needed from LWVTX, LWVUS, or other local Leagues before you act? (See Action Guide on next page.)
- Who should receive copies of your letter, testimony, etc.? (See Action Guide on next page.)
- How can my League promote the action to get the best response from the community–letters to the editor, social media, website, email?

## Action Alerts

There are three sources of action alerts: LWVUS, LWVTX, and your local League. Action in response to these requests is expected and does not require authorization.

- An Action Alert means your League's help is critically needed. Leagues are expected to respond to action alerts. Action alerts provide specific instructions.
  - LWVTX sends Action Alerts to all local League members by email and posts them on social media and lwvtexas.org. Action alerts give information on pending state legislation or governmental actions, and a sample letter to be sent to your elected representative or a legislative committee.
  - LWVUS sends Action Alerts to the League's online grassroots supporter list and state and local League presidents. These detail the subject under consideration, the proposed action steps, and the officials to be contacted.
  - All local League presidents are expected to respond to Action Alerts on behalf of their local League.

## When You Initiate Action

Local action you initiate may require contacting officials shared with other Leagues. Or you may wish to contact officials other than your own. If so, you must contact the other local Leagues who are affected. For example:

- LWV Houston Area wants to testify before a state legislative committee holding a hearing in Houston on land use and protection of critical areas. They believe this is a good opportunity to advocate the League's state land use position. After authorization by LWVTX, they are ready to act.
- LWV Tarrant County wants to appear before the North Central Texas Council of
  - Governments on a regional issue. After consulting other Leagues in the region, they speak at the Council of Governments meeting.

| Action Guide: What to Do When Your Local League Initiates Action Before a . . . |
|---|
| **Local government or official in your League area only** (E.g., city council, mayor, planning commission, school board) |
| ✔ A local League board decision; copy action to local League files |
| **Regional agency or official which is shared with other local Leagues** (E.g., common city government or special purpose district, council of governments, regional task force) |
| ✔ A local League board decision; copy action to local League files<br>✔ Requires authorization from other local Leagues affected by this action; copy to these local Leagues |
| **State government or official** (E.g., state representative or senator, governor, state agency) |
| ✔ A local League board decision; copy action to local League files<br>✔ Requires authorization from LWVTX advocacy committee chair or president; copy action to state office by email to lwvtexas@lwvtexas.org |
| **Federal government or official** (E.g., member of Congress, federal agency, U.S. President) |
| ✔ A local League board decision; copy action to local League files<br>✔ Requires authorization from LWVTX advocacy committee chair or president; copy action to state office by email to lwvtexas@lwvtexas.org<br>✔ Requires authorization from LWVUS (sometimes LWVTX can authorize); copy action to national office and to state office by email to lwvtexas@lwvtexas.org |

## LWVUS Recommendations for Taking Action

**Speaking with One Voice**
"Speaking with one voice" is one of the most important tenets of the League. The national League is responsible for determining strategies and action policies that ensure that the League's message on national issues is consistent throughout the country. Similarly, state Leagues are responsible for a consistent state message, and local Leagues must cooperate with one another to ensure that regional issues are addressed in a manner consistent with neighboring Leagues. Typically, the president of the national, state, or local League is the only person who speaks for the League in an official capacity, unless another person has been designated as the official spokesperson on a specific issue. This may be a League expert, a senior staff person, or a former board member. The key is that this designation is explicitly made by the appropriate Board. This helps to ensure that the League speaks with one voice. which is essential for our effectiveness as an advocacy and lobbying organization.

**Advocacy vs. Lobbying**
Advocacy is a broader concept than lobbying. Advocacy activities are often considered "educational." This is the case even when only one side of an issue is presented if no action on a piece of legislation is requested. Such activities can include: 1) developing public policy briefs that analyze issues and provide detailed information and recommendations for addressing them through specific reforms and 2) providing forums for discussing issues and educating policymakers and the public. Speaking in support of the organization is also advocating, i.e., for the overall cause of the organization.

Lobbying is defined as an attempt to influence specific legislation, both legislation that has been introduced and specific legislation that has been proposed. Lobbying includes actions that transmit a point of view on a specific piece of legislation to elected officials or their staffs, as well as action urging the public to contact their legislators about a specific piece of legislation. It also includes communications to the general public expressing a view on specific referenda or other ballot measures.

## Applying Diversity, Equity, and Inclusion (DEI) Lens to Our Work

The DEI lens is a way of examining a program, a process, a product, or otherwise in relation to how it will be perceived by a variety of communities, voices, and perspectives, and what barriers may exist that are preventing it from being equitable or inclusive to everyone. All League work should be examined through this lens to best ensure that we are reaching the full diversity within League communities and are being equitable and inclusive in how we approach and execute our work. Applying a DEI lens asks that you consider the following key questions:

1. Who is involved in the process? Leagues should consider whether this work impacts a group or community, and is their voice represented and how diverse is the group of decision makers who represent a variety of relevant viewpoints.

2. Who will be impacted? Leagues should consider who benefits from this, how it helps meet the needs of underserved voters, and how we address various specific marginalized groups and how they'll be impacted.

3. What are the intended and unintended outcomes? Leagues should consider the issue we are trying to solve, what we hope will happen, what the potential negative impacts are, who could be hurt by this, what data or evidence supports this, and how might this be perceived by others.

4. Does this align with our vision for an equitable and inclusive organization? Leagues should consider how equity is addressed, what barriers might this place in the way of achieving equity, and how does this impact the organization's culture.

5. What changes could be made to make this more equitable? Leagues should consider what the short and long-term goals are, what policies or bylaws need to be added or amended, what the benefits to members are, and what the benefits are for partners and/or members of the community.

Please consider downloading LWVUS DEI lens resource at
https://www.lwv.org/league-management/dei-resources/dei-lens for inclusion in your planning documents.

Leagues should be aware that this process will take more time in the beginning, but as the DEI lens is regularly applied it will become easier to move through the questions, identify opportunities, and react in a way that bolsters DEI. In instances where Leagues go through the questions and find that the DEI lens is not present fully or partially, Leagues should work to include as many factors as possible and consider obstacles that led to gaps in one area versus others and how to continue to build upon this work anytime the League is taking action. When applying the DEI lens to events, Leagues should consult the LWVUS DEI checklist,
https://www.lwv.org/sites/defBault/files/2019-10/deichecklist_module2.pdf.

# We Support 2020-2022

The League is a multi-issue organization and we hold positions on issues at the national, state, and local levels. These positions are updated periodically, and are readopted at each League convention. We use these positions for advocacy at all levels of the League. Each position is detailed in our publication _Advocacy & Issues_, with a history of our advocacy on the issue. A complete statement of LWVUS positions can be found in _Impact On Issues_.

## League of Women Voters of Texas Positions

_Government._ Achieve an efficient, effective, responsive state governmental system through constitutional revision and legislative action.

**Campaign Finance/Ethics.** Eliminate excessive and/or inappropriate spending and limits to contributions to promote equitable competition among candidates. Strengthen accountability and combat undue influence.

**Constitutional Revision.** Support revision of the Texas Constitution to make it a framework of basic law.

**Executive, Legislative, and Judicial.** Increase the effectiveness of the executive department and the efficiency of the legislature. Support the appointment/retention method and/or nonpartisan election of the judiciary.

**Financing State Government.** Promote adequate and fair funding for major state responsibilities, equitable taxation and increased accountability.

**Homeowners Associations.** Protect against unreasonable foreclosure on homesteads, priority of payments, and election safeguards.

**Payday and Auto Title Loans.** Support regulation of payday and auto title loan businesses to function as a consumer service and a successful business.

**Public School Finance/Testing/Accountability.** Promote adequate state funding for public schools to ensure that all Texas school children receive a high-quality education. Oppose a voucher system. Support achievement tests that measure individual master and proficiency for diagnostic purposes, and a fair, nonpunitive accountability system.

**Redistricting. Priority Issue -** Achieve an effective method for drawing non-partisan boundaries for legislative districts.

**State and Local Relations.** Support increased county authority in order to better manage growth in urbanizing areas.

**Voting Rights and Election Laws. Priority Issue -** Support every citizen's right to vote (including online voter registration and same-day registration), uniformly enforced election procedures, clearly stated election laws that facilitate voter engagement and turnout.

_Administration of justice._ Achieve an equitable system of criminal justice in Texas for adults and juveniles.

**Capital Punishment.** Promote a moratorium on the death penalty. Support the option of life sentence without parole in capital cases.

**Criminal Justice.** Provide a secure prison environment with maximum educational opportunities and adequate health care. Promote meaningful sentencing reform. Support bail reform for economic non-violent crimes.

**Drug Laws and Policies.** Support treatment programs for drug abuse and addiction as an alternative to incarceration. Support elimination of penalties for cannabis when recommended by a physician or for small amounts.

**Immigration.** Support state services for all immigrants, especially education and health care.

.

*Juvenile Justice.* Support and fund substance abuse treatment, mental health needs, and education for youth at risk and for those incarcerated.

*Trafficking of Persons.* Support measures to prevent the use of force, fraud, or coercion to exploit a person for sex or labor; prosecute traffickers and protect victims.

## Social Policy and Human Resources. Achieve equal rights for all; combat discrimination and poverty; and provide equal access to housing, employment, quality education, and health care.

*Child Abuse and Neglect.* Protect children from abuse and neglect through adequate funding, services and programs, training to report signs of abuse and neglect, and correctional measures for abusers. Enforce court orders for child support.

*Domestic Violence.* Support programs to eliminate the incidence of domestic violence, including protective orders and financial compensation for victims.

*Early Childhood.* Support early childhood education, professional development, and access to affordable, high quality childcare. Expand high quality prekindergarten. Increase services for children with disabilities/developmental delays.

*Equal Opportunity/Income Assistance.* Support action to achieve equal rights for all. Combat discrimination and poverty. Provide equal access to housing, employment, and education. Provide services and job training for income assistance (welfare) recipients.

*Health Care for Those of Lesser Means.* **Urgent Issue -** Support for a basic level of health care for the medically indigent, including children of low-income families. Support for expansion of Medicaid payments.

*Health Care for Older Texans.* Support adequate funding for a comprehensive health care system for older adults that ensures a seamless continuum of quality care.

*Services for Behavioral Health Disorders.* Ensure adequately funded services to enable the mentally ill to function at an optimal level in the least restrictive environment. Support for community-based residential services.

*Transportation.* Support a variety of transportation modes and services, and work to minimize harmful effects on the environment.

## Natural resources. Achieve conservation, protection, and judicious development of the state's natural resources.

*Climate Change/ Air Quality.* **Urgent Issue -** Support measures to combat climate change, including promotion of renewable energy resources and energy conservation. Support control of air pollution in Texas.

*Land Use.* Support coordinated land use management. Preserve agricultural land and open space, and protect areas of special significance.

*Water.* Support funding for safe/adequate water, including conservation measures. Support groundwater protection, conservation, and development.

# LWVUS Positions
## Representative Government.

*Open Government.* Promote transparency and public participation in government. Protect citizen's right to know and facilitate informed understanding of government decision-making.

***Women's Health/Reproductive Choice.*** **Urgent Issue -** Support adequate funding for basic health care for those unable to pay. Protect the constitutional right of privacy of the individual to make reproductive choices with access to comprehensive reproductive health services. Support medically accurate sexuality education.

### *Social Policy.*

***Child Health/Children at Risk.*** Promote the well-being, full development and safety of all children. Ensure adequate funding, improve enrollment and retention, and maintain effective delivery systems for the Children's Health Insurance Program and Children's Medicaid.

***Gun Policy.*** Protect the health and safety of citizens through limiting the accessibility and regulating the ownership of handguns and semi-automatic weapons.  Support regulation of firearms for consumer safety.

### *Natural Resources.*

***Energy.*** Support policies that reduce energy growth rates, emphasize energy conservation, and encourage the use of renewable resources.

***Hazardous Waste.*** Promote policies for solid and hazardous waste, including reduced generation, reuse and recycling, and safe transportation, handling, and disposal.

# Program Study/Review/Update
Adopted by Convention 2020

## Review and update of the LWVTX Voting Rights/Election Laws position.

a. *Focus.* Assess the impact of the current state of election administration and technology, including voting process protections.

b. *Scope.* 1) Review and possibly update the following Facts and Issues from our 2010 study of Voting Procedures to Increase Voter Participation: Vote by Mail, Election Day Centralized Voting (now called Countywide Polling Place Program), Instant Runoff Voting, and Military and Overseas Internet Voting.
   2) Develop new Facts and Issues on Physical and Cybersecurity Measures and Election Equipment, and Measures to Increase Confidence in Elections.

c. *Rationale.* This update was recommended by Issue Chair Cinde Weatherby. Since 2010 several of the recommendations from the past study have been implemented in Texas or elsewhere. Technology has rapidly evolved in the past nine years, while the potential for interference in elections looms large. The work will be aided by a recent LWV Wisconsin study completed in late 2018, as well as by a current ongoing multi-state League study of cybersecurity and elections led by LWV Oregon.

## Review and update of the LWVTX Immigration position.

a. *Focus.* Update our Immigration position to address current issues related to the treatment of immigrants in Texas.

b. *Scope.* 1) Study the impact of family separation, detention centers for men, women, and children; all persons including children without legal representation; all persons including children without adequate medical care, food, heat, and basic comforts.
   2) Study the effects of racial profiling and the cooperation between ICE and local law enforcement, as dictated by SB 4 (2017).
   3) Study the covert, chartered, pre-dawn ICE flights that transport refugees to Guatemala.

c. *Rationale.* This update was recommended by LWV Comal Area and Issue Chair Gloria Suarez Sasser. The current position on Immigration is now 23 years old, and it focuses on immigrants after they are allowed into the United States. Today issues of immigration have changed, and our position needs to reflect the current state of immigration in Texas.

OCAGH_00001548

# 2020-2022 LWVTX Program Positions

With complete wording, explanation, and history of our advocacy

## I. Government

### A. Campaign Finance/Ethics

1992, 1999 (See also LWVUS position "Money In Politics" in *Impact On Issues*)

## Campaign Finance

*The League of Women Voters of Texas supports laws and practices relating to political campaign finance that eliminate excessive and/or inappropriate spending and promote equitable competition among candidates. Appropriate measures include:*

- A limit on the total amount of campaign contributions a candidate may accept from a person or an individual political action committee (PAC).
- A limit on the total amount a candidate may accept from PACs, individuals, and out-of-state contributors.
- A limit on the total amount of contributions a candidate may accept.
- A limit on the time during which a candidate may accept contributions.
- A limit on what a candidate may spend to get elected.
- Comparable media public service time and/or space made available to candidates who agree to limit their campaign expenditures.
- Requirements that campaign contributions be used only for campaign expenses.
- Responsibility of the media to:
    - Encourage candidates to discuss issues.
    - Report inconsistencies in public statements by candidates.
    - Assign reporters with appropriate expertise to cover campaigns.
    - Seek independent verification of candidate allegations.
- Responsibility of candidates to:
    - Articulate their positions on issues.
    - Verify allegations prior to their release.
    - Control the conduct of their campaigns by staff and consultants.
    - Be accountable for advertising decisions.
    - Voluntarily limit campaign spending.

## Ethics

*The League of Women Voters of Texas supports limits on the contributions that can be accepted by political parties in Texas and supports enforcement of regulations governing their use.*

*The League of Women Voters supports public financing for state elected offices in Texas. In order to receive public funding, candidates would agree to limits on private contributions and campaign spending.*

*The League of Women Voters of Texas supports changes in laws, practices, and policies governing political campaigns in order to protect citizens' right to know; strengthen accountability in financial reporting; combat corruption and undue influence; and promote fairness and accuracy on the part of candidates, public officials, former officeholders, lobbyists, and the media.*

*The League of Women Voters of Texas supports full, timely disclosure through electronic filing of required finance reports. Specifically, the League supports:*

- Requirements that candidates report or disclose:
    - The total amount of contributions during a year.
    - In-kind contributions.
    - Personal finances, income distributions, and assets/liabilities.
    - Any funds deposited in a political account.

.

- Ethical standards that include:
    - A minimum time before a former elected official can become a paid lobbyist.
    - A requirement that lobbyists disclose gifts to candidates.
    - A fairness code governing the conduct of individuals and groups engaged in election campaign.

## Explanation: Campaign Finance/Ethics

The LWVTX was founded in 1919 to carry on the work of the Texas Equal Suffrage Association after the ratification of what was then called the Susan B. Anthony amendment, giving women the right to vote in Texas. Many early activists felt that efforts to promote informed and active citizenship were a necessary and logical next step for those involved in the suffrage movement (Humphrey, J. G., 1988, *A Texas Suffragist*). These efforts are still part of the League's mission.

In recent years, the breakdown of confidence in the integrity of the electoral process in Texas and nationwide sparked an interest among League members in examining the political campaign process and its effect on voter disillusionment and apathy. These considerations led delegates to Convention 1991 to adopt a study of the Political Campaign Process in Texas, which would evaluate political campaign laws, practices, and finances, and their ethical implications. *Facts & Issues: How They Run*, *The Political Campaign Process in Texas*, was produced by the study committee and circulated to members, public officials, and other interested persons. Consensus was reached in the fall of 1992, and the state board announced the position in November of that year.

During the Periodic Program Review process of 1997-98, the committee suggested additions to the 1992 position that would allow the League to advocate for public financing of campaigns and for better disclosure procedures of campaign funding. The additional positions were adopted at Convention 1999.

## History: Campaign Finance/Ethics

*1991.* In the 1991 Legislature the League supported the creation of the Texas Ethics Commission as originally introduced. This support was based on the LWVUS position calling for an independent body to monitor and enforce laws concerning the election of public officials. However, the bill that finally passed had been considerably weakened, and the League decided to oppose the proposed constitutional amendment on the November 1991 ballot because the prescribed method of appointing members to the commission was flawed. The amendment passed, however, and the commission was created in January 1992. The League closely monitored the proceedings of the Ethics Commission during its first two years of existence, 1992-93.

*1993-94.* During the 1993 Legislative Session, Political Campaign Process was one of the League's priority issues, and an advocacy paper, "Take Back the System," was published. LWVTX supported bills that would have imposed limits on campaign contributions and expenditures, working in coalition with groups such as Common Cause and Public Citizen. These bills did not pass.

Several bills were introduced which would have modified the commission's regulation of lobbyists. These proposals were a mixed bag, from the League's point of view; none were enacted. After the session ended, a League representative was asked to serve on a Rules Advisory Task Force to evaluate the rule-making authority of the Ethics Commission, including that of regulating lobbyists' activities.

The League also joined a coalition of public interest groups that asked candidates running for the Texas Supreme Court, Court of Criminal Appeals, and Courts of Civil Appeals to sign a Fair Campaign Practices Pledge. This initiative was undertaken in response to concerns expressed by citizens, attorneys, and judges about special interest contributions to judicial campaigns and the possible effects of such gifts on judicial decisions.

*1995.* The notion that justice was for sale came to a head in the 1994 General Election and helped create a climate in which campaign finance reform had the attention of the 74th Legislature. A law was passed that limits the period of time in which judicial candidates can accept contributions and the amount of money they can accept from specific sources, including law firms and political action committees (PACs). The measure also provides for voluntary limits

on candidates' expenditures. The LWVTX supported the Judicial Campaign Fairness Act and looks to it as a step toward more comprehensive reform in the next session.

Campaign finance reform and other aspects of the political campaign process in Texas will continue to be active issues in the foreseeable future, and the LWVTX will maintain an active role in advocating its positions.

*1997.* Although many bills relating to election laws/campaign finance were filed during this session, few met with success. The League published an advocacy paper, "Take Back the System: Campaign Finance Reform in Texas," and also actively supported a bipartisan bill to move primary elections from March to May. Using testimony presented to the House Elections Committee, the League distributed information to each member of the House prior to floor debate. The bill passed the House, but failed to pass in the Senate.

*1999.* Disclosure of campaign funding through the filing of campaign finance reports became the focus of League efforts during the legislative session. The League was successful in achieving passage of a measure that mandates that campaign finance reports be filed electronically and published by the Ethics Commission on the Internet. A new advocacy paper was produced for this session and is listed below.

*2001.* Limits on campaign contributions and expenditures continue to elude us. Very few bills were filed in the 77th legislative session that would provide for limits, and those that were, did not get hearings. Both political parties continued to support closing loopholes in existing disclosure laws. Comprehensive bills were filed in the House and the Senate, but differences over including identification of contributors' occupations and employers (and other issues) sent the bill to a conference committee. No agreement was reached and the bill died in committee. The League was active throughout the process providing testimony in favor of the House version, and urging passage out of the conference committee.

*2003.* The Ethics Commission was due its first review by the Sunset Review Commission since its establishment in 1991. In anticipation of legislation to be presented in the 78th Session of the Texas Legislature, the League joined Show Me the Money, a coalition composed of 60 diverse organizations throughout the state. Of these, six organizations, the LWVTX, Common Cause, Campaigns for People, Public Citizen, The Baptist Christian Life Commission, and Texans for Public Justice, developed strategies during the interim to prepare for legislation in the upcoming legislative session.

House Speaker Craddick appointed a Select Committee on Ethics, which introduced a comprehensive bill that outlined reforms to make the Ethics Commission more effective and included strengthening disclosure laws. The League testified in favor of the bill although it did not include all the reforms the coalition and we would have liked. The bill passed the committee unanimously, and subsequently passed the House. However, the Senate Government Organization Committee produced and passed a watered down bill, despite testimony presented by the League and other coalition members. The watered down bill passed the full Senate. As a result, the bill was referred to a Conference Committee to settle House and Senate differences. Fortunately, the Conference Committee restored the provisions that had been deleted by the Senate.

The Governor signed the bill. These provisions will:
- Restrict contributions until after the deadline for the governor to veto bills.
- Require disclosure of cash balances.
- Require reporting of occupation and employer of large donors.
- Require filing of campaign reports electronically.
- Prohibit lawyers to represent paying clients before state agencies.
- Require disclosure by lawyers of trial delays during the legislative session.

During the 79th Legislative Session, a coalition of diverse, statewide organizations concerned about the unlimited amounts of money used to finance our state's elections will focus on:
- Closing corporate and union money loopholes.
- Setting reasonable individual and aggregate contribution limits.

.

- Improving the effectiveness and independence of the Texas Ethics Commission.
- Opening the legislative process and recording legislative votes.

**2005.** In preparation for the 79th Legislative Session, the LWVTX collaborated with a coalition of over 60 diverse, statewide organizations, including both political parties. There was great concern about the unlimited amounts of money used to finance campaigns, and concern about unnamed corporations that contributed undisclosed millions of dollars to defeat candidates with mass mailings, negative issue ads, flyers, and phone banks. This appeared to circumvent the century-old Texas state law prohibiting corporations and unions from contributing funds for administrative costs to engage in political activity. The fundraisers claimed that the issue ads were educational because they did not use the words for "for" or "against" the candidates they were targeting. These activities were concentrated in the last 60 days before the primary election of 2002. The proponents also claimed that the definition of administrative costs in the Texas Election Code was unclear. As a result, the coalition agreed to focus on:

- Closing the cooperate and union money loopholes
- Setting reasonable individual and aggregate corporate contribution limits
- Improving the effectiveness and independence of the Texas Ethics Commission
- Opening the legislative process and recording non-ceremonial votes

During the session, the group prioritized its focus primarily on closing the corporate and union money loopholes. Working with Representative Eiland (D-Galveston) and Representative Smith (R-Euless) that ensured bipartisan support, a bill was filed, HB 1348, that would specifically define administrative costs as those incurred in the normal course of business, would prohibit acceptance of contributions and make expenditures 60 days before a primary election, ban sham issue ads 60 days before the primary election, and would prohibit expenditures from PACs not connected to unions and corporation. Over 90 bipartisan House members signed on as cosponsors.

A subcommittee of the Elections Committee held a public hearing in which the League presented testimony and was left pending with a substitute. The Elections Committee did not hold a hearing. Consequently, a bold maneuver to bypass the Elections Committee and debate the bill on the House floor was attempted but was defeated when Representative Keel, one of the cosponsors, scuttled the bill on the basis that it bypassed the legislative process. Subsequently, the Elections Committee held a formal hearing and defeated the bill 4-3. The bottom line is that the bill did not have the support of the House leadership, most of who benefited from the unreported funds given by the unnamed corporations. It is very likely that the issue will be visited in the 80th Legislative Session.

**2006** (Legislative Interim). The LWVTX joined with Common Cause Texas and Texans for Public Justice in efforts to make the state government more transparent and accountable. The groups, acknowledging that reforms are needed to strengthen Texas' campaign finance laws and insure open and independent government, free from the influence and dominance of special interests, developed a list of five, nonpartisan reforms:

- Place a $100,000 aggregate limit on individual contributions
- Close the revolving door between the legislature and lobbyists
- Keep judges independent by appointment and retention election
- Record all nonceremonial legislative votes
- Create an independent redistricting commission

**2007.** In the 80th Legislative Session, the League, in collaboration with Common Cause, Texas for Public Justice, Public Citizen, Baptist Christian Life Commission, and Gray Panthers, focused on two of the five campaign finance issues agreed to in the 2006 interim. The group advocated and provided testimony for three bills limiting individual contributions. HB 110 (Strama) broke down in categories the amount the limits would impose on candidates for the executive branch, state senator, state representatives, and state board of education. HB 111 (Villereal) would impose limits of $ 100,000 on the total amount an individual could contribute to a candidate in an election cycle. HB 1085 (T. Smith) prohibited the use of corporate or union funds to pay for phony issue ads. Closing the revolving door HB 602 (Howard) required legislators who leave office to wait 2 years before becoming lobbyists. None of these bills made it out of the Elections Committee.

Two disclosure bills we supported did pass although without the governor's signature. These bills provided some measure of success in the session. The Texas Ethics Commission ruled it had no authority to report the value of cash gifts given to elected officials unless the legislature passed required legislation. To correct this, HB 158 (Naishtat) would require the reporting the value of cash gifts. Both houses of the legislature passed it. SB 64 (Zaffirini), passed by both houses, requires a general-purpose committee to file additional reports 9 days before an election until noon on Election Day. This would curtail the "late train" donations before an election in which the public was not previously informed.

*2009.* In the 81st Legislative Session, not much progress was made to reform the way political campaigns are financed. Four minor bills supported by the League were passed by both Houses and were signed by the governor. Two of the bills were related to the Texas Ethics Commission: HB 3216 provides for immediate notification to respondents of complaints either electronically or by telephone and by written notice after 5 days; HB 3218 requires that a sworn complaint must include the person's name, address, telephone number, email address if known, be a resident of the State of Texas, and include other pertinent information. These reforms standardize the complaint process.

SB 1152 prohibits accepting political contributions in state buildings. HB 4060 limits the time when judicial candidates can accept contributions even if the candidate is unopposed. While these four bills could be called piece-meal legislation, they do tighten up some loose ends of the political campaign process. More comprehensive legislation such as HB 105, the Texas Fair Campaign Act, HB 391 and SB 246, The Clean Elections Act, would impose limits on individual campaign contributions for elected state offices. The League supported these measures.

*2011.* In the wake of the most expensive election in the state's history, it should come as no surprise that campaign finance reform was a low priority this session. Only one League-supported campaign finance bill (HB 336) passed. It requires school boards to post candidate financial information on their websites, beginning September 1, 2011. Strangely, a very similar bill that focused on city and county elections failed to get out of committee.

*2013.* On May 1, 2014, the House State Affairs Committee held an interim hearing on campaign finance disclosure. This hearing was to revisit the issue that was addressed in the 2013 session by SB 346 (Seliger), a bill that was passed by both legislative chambers but was vetoed by the governor after adjournment.

Currently, names of contributors who give directly to candidates and officeholders must be disclosed, but certain types of political PACS are not required to disclose the names of their contributors. The League believes that voters have the right to know the names of any person or entity that spends money to influence elections.

At the hearing, a Utah legislator testified about a political scandal in his state in which members of his own political party forced the Utah Attorney General to step down after an investigation conducted. The investigation revealed that much of his campaign money, although "laundered" four times, came from the payday loan industry after he had made promises to rule in their favor. The Utah legislator urged the Texas Legislature to pass stringent disclosure measures.

While the LWVTX does not believe that disclosure is the only remedy to a government answerable to the people and not just big donors, we see it as an essential part of democracy. We expect to work with the legislature in the next session to get this measure passed.

*2015.* The governor stated that one of his five priorities for the 84th Legislature was to address ethics reform. The LWVTX worked with the Texas Anti-Corruption Campaign (TACC), a partnership of several organizations, including Common Cause, Public Citizen, and Clean Elections Texas, to track and support serious ethics reform bills.

More than 100 bills were filed relating to government ethics. Just 15 passed the House and Senate. Two were vetoed. The bills passed were, by and large, limited efforts to curb specific abuses in a piecemeal manner. For example, SB 20 (Nelson), which the LWVTX watched carefully, did pass and, while it has some loopholes, it has the

potential to prevent some contracting abuses. Another bill, HB 23 (Davis, Sarah), which the LWVTX supported, will extend contracting disclosure requirements to immediate family members.

SB 19 (V. Taylor), the most comprehensive bill, which the LWVTX testified on, passed both the House and the Senate. Although it was not perfect, following testimony by the LWVTX and other organizations it was improved to include a number of provisions that, if enforced, would have strengthened the Texas Ethics Commission and established meaningful guidelines and criminal offenses for serious official misconduct. Unfortunately, it did not pass out of conference committee, apparently due to disagreements regarding whether to include curbs on "dark money" (undisclosed
campaign contributions). The last-minute loss of this bill means serious reforms to rein in egregious campaign practices and almost unimaginable spending once again have eluded us.

Most significant, HB 1690 (P. King), which the LWVTX strongly opposed, passed and was signed by the governor. Its primary purpose was to dissolve the Public Integrity Unit based in the Austin District Attorney's office. Instead, the Texas Rangers are to investigate complaints and refer them to the alleged offender's home county prosecutor. The LWVTX concern is that this bill creates a separate and unique legal system for politicians and government officials. In addition, a strong nondisclosure provision will prevent public scrutiny. We are left to conclude that the political will to root out and prevent corruption just wasn't there, despite the governor's professed concerns.

*2019.* We registered support for two bills, HB 1876 and HB 1877 (Davis). Both were omnibus bills which incorporated several laws passed by the House in 2017, but not the Senate. The Texas Ethics Commission for recommended these bills.

HB 1876 would have expanded the blackout period for political contributions that exist for the regular legislative session to also apply to special sessions. HB 1877 would have allowed corporations and labor organizations to make political contributions to certain political committees; extended existing prohibition of using public funds to make political contributions to include an officer or employee with a political subdivision; removed unconstitutional regulations on contributions to Speaker of the House campaigns. Both bills were left pending in the House State Affairs committee.

# B. Texas Constitutional Revision
1954, 1959, 1962, 1969, 1971, 1979, 1993

*The League of Women Voters of Texas supports revision of the Texas Constitution. Principles for a good constitution include:*

- A bill of rights.
- A framework of basic law.
- Clear separation of powers with responsibility definitely assigned.
- Qualifications for voter eligibility and guarantees of fair elections.
- Provisions for justice with a minimum of delay.
- A coordinated finance structure capable of flexibility.
- Maximum home rule for municipal and county governments with coordination of overlapping functions.
- Provisions for support of public education.
- Provisions for support of public health and welfare services.
- Provision for amendment and revision.
- Basic policies regarding state employee selection, retention, and promotion.

## Explanation: Texas Constitutional Revision
Interest in Texas constitutional revision grew out of a 1948 League *Know Your State* survey. By 1954 the League had reached consensus supporting general revision of the constitution, to be preceded by thorough review and adequate research. By 1959 the League had adopted nine principles for a good constitution, adding a tenth in 1959, an eleventh in 1971, and a twelfth in 1979. The last was dropped by delegates to Convention 1993. In response to renewed interest in Texas constitutional revision, the Convention 2003 requested that the LWVTX develop a publication with up-to-date information on this position.

## History: Texas Constitutional Revision

*1962-70.* League members agreed in 1962 that a constitutional convention position preceded by qualified research is the most desirable method for general revision of the constitution. A Texas House resolution in 1967 established a 25-member Constitutional Revision Commission, and the governor appointed a League member to the Commission. League members, fearing they would be unable to support the commission-revised constitution even if the wished to do so, added a new position in 1969: "...preferably by a constitutional convention although alternative methods can be supported."

The completed document, submitted to the legislature in 1969, failed to win the approval of two thirds of both houses. The League supported this document because it was more logically arranged, shorter, and more understandable. Obsolete sections had been removed. Action in 1969-70 centered on supporting three proposed constitutional amendments. Voters approved the amendment to remove some obsolete, superfluous, and unnecessary sections of the constitution.

*1972-75.* In 1972 the League supported a constitutional amendment calling for members of the legislature to sit as a constitutional convention beginning in January 1974. Voters approved this amendment, and a 37-member Constitutional Revision Commission was appointed to study the present constitution. A League member was appointed to this commission. At a series of statewide hearings held by the Commission, members of both the state League board and many local Leagues testified regarding League positions. The League supported the recommendations of the Commission.

As a result of an article and tear-off postcard in the *Texas VOTER*, the League added new details to its Texas Constitutional Revision position:

The question of calling a constitutional convention should be submitted to voters at least every 20 years; the legislature should provide for the election of delegates from each legislative district and should appropriate sufficient funds for the work of the commission and convention.

When the constitutional convention convened in January 1974, League members across the state worked hard to get League positions incorporated in the new constitution. The convention was unable to produce a document to submit to voters. In 1975 the 64th Legislature approved a new constitution to be voted on article by article. Once again the League worked tirelessly for passage of a revised constitution, but all 11 articles were defeated at the polls.

*1987-89.* The League made constitutional revision and advocacy issue in 1987 when 25 proposed amendments were submitted to voters. The League neither endorsed nor opposed individual propositions, but widely publicized the view that many of the proposals dealt with matters that should not be in a state constitution, and that the large number and complexity of propositions demonstrated the need for constitution reform. The League reiterated its arguments for reform again in the fall of 1989 when 21 proposed amendments were on the ballot.

At Council 1988 League members heard a speech by Professor Terrell Blodgett of the LBJ School of Public Affairs, University of Texas at Austin, in which he encouraged the League once again to look at constitutional revision. He also presented the League with a check from a disbanded coalition account dating to the time of the 1974 constitutional revision efforts. League directors talked legislators about the possibility of another revision attempt. Legislators and other state officials advised that it would probably be better to wait until after the 1991 session when redistricting had been completed.

*1990s.* Unfortunately, legislators showed little interest in constitutional revision in the 1991, 1993, 1995, and 1997 sessions. However, the League continued to call attention to the need for a new constitution in conjunction with the inordinate number of proposed amendments that appear on the ballot after each legislative session.

*1999.* Leaders in the House and Senate introduced companion bills to attempt constitutional revision through a legislative process, the reopening an official discussion after many years of silence. While the LWVTX was not able to

support the specific proposals in the legislature, we issued a press release supporting the concept of constitutional revision.

***2005.*** The LWVTX provided updated written information to local Leagues about the history of constitution revision in Texas and the current state of constitutional reform. The LWVTX worked with KLRN in San Antonio to produce and televise a successful program, "Conversations on the Texas Constitution."

Position is now inactive.

## C. Election Laws & Voting Rights
1999, 2010  (See also LWVUS position "Citizen's Right to Vote" in *Impact On Issues*)

*The League of Women Voters of Texas supports every citizen's right to vote, improvement in voter registration procedures, uniformly enforced election procedures, clearly stated election laws that facilitate citizen participation, and the right to a secret ballot.*

*Specific measures include:*
- Adequate safeguards against fraud.
- Convenience to the voters.
- Impartiality of treatment for all voters.
- No declaration of party affiliation when registering.
- Revision of election laws to ensure enforcement.
- Supervision of all local elections by a single county election authority responsible to a central state authority.
- Mandatory uniform training for all election personnel.
- Provision for jointly conducted primaries.

Criteria for election administration should include:
- Reasonable costs for conducting elections.
- Election laws and procedures that uniformly and regularly produce honest and accurate results.

*The League of Women Voters of Texas supports election laws that facilitate citizen participation and voter convenience, as well as voting procedures that may increase voter participation.*

*Our support includes, but is not limited to, the following:*
- The use of uniform election dates for local and state elections whenever possible.
- Consolidation of polling places when several governmental entities conduct elections simultaneously.
- Reduction of the number of days between the primary and general elections.
- Unlimited access to vote-by-mail with no restrictions.
- A permanent vote-by-mail list on which any voter may request to be placed.
- The establishment of guidelines that would allow jurisdictions to conduct all vote-by-mail elections.
- Election Day registration.
- Election Day centralized voting, with applicable safeguards.
- Poll site Internet voting for military/overseas voters.

## Explanation: Election Laws, Voting Rights
The right of every citizen to vote is a principle of the League of Women Voters. The 1976 national Convention delegates adopted voting rights as an integral part of the national program. This added impetus to the LWVTX position and provided additional ways for Leagues to take action through vertical programming.

In 1991 the LWVUS Board of Directors launched the campaign to "Take Back the System" as the top priority of the League. Included in this campaign was a major grassroots effort to pass the National Voter Registration Act (NVRA), finally passed by Congress in 1993. The LWV believes the legislature should be given the responsibility and the necessary authority to build a statutory framework essential for a proper electoral system. The specific details of election administration are thus left to legislation.

During the LWVTX periodic program review of 1998-99, the positions dealing with election laws which had been part of "Political Campaign Process" were moved to be part of "Election Laws and Voting Rights," where they seemed to fit more logically.

At Convention 2008 a study of "Voting Procedures to Increase Voter Participation" was adopted. A *Facts & Issues*, consisting of five separate papers, was distributed to members electronically. Consensus on several issues was achieved and was added to our position in 2010.

## History: Election Laws and Voting Rights

*1985-86.* A bill recodifying the election code was passed by the 1985 Texas Legislature; it became effective January 1, 1986. The recodification was a result of more than a year's work by the Joint House-Senate Select Committee on Election Code Revision and its advisory committee. The LWVTX was represented on the advisory committee and actively supported the recodification bill during the. With passage of the legislation, the LWVTX position on recodification was achieved after many years of advocacy. Therefore delegates to the 1987 Convention voted to drop the position.

In addition to eliminating obsolete matter and clarifying some ambiguous provisions, the recodification addressed several of our other positions, including: mandatory uniform training for all election personnel; supervision of all local elections by a single county election official responsible to a single state authority; protection of secrecy of the ballot; and restoration of voting rights to ex-felons 2 years after completion of probation, parole, or mandatory supervision.

*1987-89.* During the 1987 Texas Legislative Session, the League supported a bill providing for conjointly operated primaries, which failed to pass. A bill requiring agency-based voter registration passed the legislature but was vetoed by the governor. In 1989 the League supported an omnibus voter registration bill that included voter registration when a person applies for a driver's license or personal identification card ("motor voter"), a change in the purge date, and changes in the method of verification by computer. This legislation passed the Texas Senate but died in the Texas House.

*1991.* The 1991 session of the legislature was a productive one for voting rights issues. A motor voter bill was introduced and strongly supported by the League. Although it appeared to be progressing well, in the waning hours of the session its sponsor withdrew the bill from House consideration when it appeared that strong opposition to the method of funding was certain to kill the bill. However, a similar bill passed quietly through the first special session as a small addendum to the weighty bill reorganizing the Texas Highway Department and the Department of Aviation into the new Texas Department of Transportation. Thus without fanfare, Texas joined the vanguard of states with motor voter legislation in place.

Additionally, the League supported legislation to extend hours of early (formerly "absentee") voting in person in counties with a population of 100,000 or more, and in counties of 4000,000 or more to provide additional places for early voting. This bill eventually passed. Other successful bills supported by the League included one that amends the voter application form by identifying the "county in which applicant resides and intends to vote." Another bill broadens the jury source to include all those who have a valid driver's license or personal identification card issues by the Department of Public Safety.

*1993.* In 1993 two bills were introduced which would have facilitated voter accessibility to the electoral process by permitting voter registration at all state agencies dealing directly with the public and allowing election day registration at polling places. The League supported these measures and countered opponents' arguments with evidence that similar laws in other states do not encourage fraudulent practices. The bills died in committee.

In the study of the Political Campaign Process in Texas (1991-93), League members reached consensus in support of changes in election laws to shorten the election cycle. The League believes that a shorter cycle would reduce the cost of campaigning and lessen the pressure on candidates to raise enormous amounts of money. A sorter election

cycle was also one of the Texas Ethics Commission's recommendations to the 73rd Texas Legislature. There was some discussion of this recommendation in committee hearings during the 1993 session, but the topic did not gain sufficient momentum for serious consideration

*1994-95.* The LWVTX voting rights efforts during this period focused on assuring full implementation of the National Voting Rights Act (NVRA) in Texas. The national motor voter law, which went into effect January 1995, extends Texas' previously enacted motor voter law by providing for voter registration at additional government agencies, including those that serve people with disabilities or provide public assistance. Bills enacted in the 1995 Texas Legislative Session established implementation procedures hat have brought Texas into full compliance with the federal statute.

A League representative served on the state NVRA Task Force, appointed by the secretary of state, charged with assisting Texas to achieve the NRVA goals. The League continued to monitor agencies to ensure that the process is fully implemented and that it works. As we monitor agencies, we hope to learn: Are individuals asked about voter registration? Are voter registration applications readily available? Is assistance offered in completing voter registration applications?

Our position on voting rights is an important way of helping to achieve the purpose of the LWV to encourage citizens to participate in their government. The League will continue to take action to support the right of every eligible citizen to vote. Though many of the improvements called for in our positions have been implemented, we retain some positions to enable us to act should these rights be threatened, as the following two examples illustrate. In one case, many counties have central election authorities, but many legislators are not comfortable with this arrangement. In the second case, the League believes that a declaration of party affiliation is detrimental to the establishment of a strong two-party system in Texas. Year-round registration with no fee and no party declaration has been in effect for some time in Texas. However, there remain those who would like to see this undone, so we retain our position. In summary, much work for secure voting rights remains, though progress is being made.

*2001.* After disappointments in several past sessions, both houses of the legislature passed, and the governor signed into law, a bill that removed at least 3 of 10 exemptions from the Election Code that provides for four uniform election dates. "This is a bill whose time has come" was the focus of League testimony and work with a special statewide Uniform Election Dates Coalition. This reform has been long in coming. A major exemption, and one that created the most controversy, that of school bond elections, has been curtailed. Two of the dates have also been changed to the first Saturday in February and the second Saturday in September. A bill that would have consolidated polling places when several governmental entities conduct elections failed to pass.

*2003.* The legislature passed and the Governor signed a bill that implements the Help American Vote Act (HAVA). The LWVUS and the LWVTX have been actively involved in HAVA since its inception. Following federal guidelines, the state HAVA bill requires the state to expand the size of its voter registration application to include space for additional requirements and additional voter instructions. It also requires the state to create a statewide, computerized voter registration system that will be the official database for all voter registration purposes. It sets up an administrative complaint process; develops and implements a provisional voter program; places a Direct Recording Electronic (DRE) device in each polling place for disabled voters; creates additional instructional information for voters, including a voter's bill of rights; and launches a voter education program. The state HAVA legislation includes no state funds, but provides the legal basis for the state to appropriate funds that will be provided by the federal government. Much of the funding will be transferred to county governments to enable them to satisfy new federal mandates.

The most significant change in this legislation for Texas is going from the current system of challenge ballots to one of provisional ballots. This means that any ballot cast by voters who can't prove (by affidavit) that they are registered, would go to a board that would determine if the ballot should be counted. The bill contains detailed procedures for determining eligibility, how that ballots are handled, how they are counted, disposition, etc. Because of the additional time required for this review, the time period for holding runoff elections will be extended from 3 to 4 weeks.

OCA-APPX-1497

OCAGH_00001558

The legislature also dealt with other election issues such as uniform election dates, tightening loopholes and developing methods for electronic filing and transfer of campaign data, posting and publicizing a list of voter's rights, and removing the postage paid from the voter registration card. Legislation giving all persons completing a felony sentence voter information at the completion of their sentence, when they in fact become eligible to register to vote, did not pass.

*2005.* Many election law changes were proposed in the 79th Session. Five of the bills signed into law related to our positions. HB 57 reduced the number of election dates from four to two. Reducing the number of election dates is a long-held LWVTX position. The bill eliminated the
February and September elections and changed the May election to the second Saturday. The
November election date remains the first Tuesday after the first Monday in November. The bill laid out the procedures for early voting in May and for making the transition to the May and November elections.

The issue of a recountable voting system did not have support. (For the position on electronic voting adopted by the LWVUS Convention 2006, see *Impact on Issues*.) The closest Texas came to addressing direct-recording electronic (DRE) voting machines was making tampering with DREs a 3rd degree felony.

HB 2465 dealt with public hearings on approval of electronic voting machines. The LWVTX strongly supported an amendment to this bill that would have strengthened the bill by requiring testing methods such as electronic hash code testing before and after the election, parallel testing of programming and equipment during the early voting and post-election periods, and verification counts from each redundant electronic source provided by the voting system. The amendment failed and Texas was left with weak protection from fraud in connection with DREs.

Two other bills that addressed ease of voting issues: HB 120 related to using regular polling places even if the regular polling place of the election precinct is not located wholly in the political subdivision holding the election; and HB 2454 would allow a registered voter who has resided in a new county for less than 90 days to vote a limited ballot.

There was a strong push for legislation to require a photo ID at the polls (the LWVTX was part of a coalition that worked against this bill, and it died in committee), and there will be a strong push in 2007 to adopt a photo ID bill. During the interim there will be a focus by the attorney general's office on potential voter fraud.

HAVA implementation proceeded on schedule. The LWVTX continued to meet with the secretary of state to keep up to date on HAVA progress in Texas while offering assistance that would be needed to implement the reforms.

*2007.* Five bills regarding the ballot and elections supported by the LWVTX passed and were signed by the governor. They are: SB 90 related to establishment of a pilot program to provide a ballot by electronic mail to military personnel serving overseas; HB 629 related to the consolidation of elections; HB 2823 related to voting by a person who applied for a ballot by mail; a voter can request a provisional ballot if they did not receive their ballot by mail; HB 3105 related to a program allowing for countywide voting locations for elections.

HB 770 requiring the Texas Department of Criminal Justice to give notice to certain persons for their right to vote, supported by the LWVTX, was passed by the legislature, but was vetoed by the governor. HB 218, the Voter ID bill opposed by LWVTX, was narrowly defeated when Senator Mario Gallegos, recovering from a liver transplant, was brought to the Capitol in a hospital bed to vote against the bill.

*2009.* After the 81st Legislature convened, the Senate changed the rules for passing a Voter ID bill (requiring a photo ID at the polls) from two thirds to three fifths. (The last time that the two-thirds rule was ignored was in 2003 when the Senate forced through the redistricting plan engineered by Tom DeLay.) This action signaled the start of the push to pass a Photo Voter ID Bill, SB 362, vigorously opposed by the LWVTX. The LWVTX sponsored two press conferences on this issue and participated in a third. At the last press conference we presented a two-page statement of Principles for Non-Partisan Voter Reform, a paper developed by the Election Reform Coalition of

which the LWVTX is a member. The paper asked others to join with the coalition as we move forward using these principles to increase voter turnout. The Voter ID bill ultimately failed to pass. Toward the end we watched legislative procedural moves aimed at stopping it, among these chubbing, or the putting intended obstacles in the way of voting for a bill. A special session was called and Voter ID was not included on that agenda.

SB 310, supported by LWVTX, allowing counties to have super precincts on Election Day, was added as an amendment to another bill and passed. It authorizes five counties to apply for a trial of super precincts. Issues that never made it out of committee included: rules regarding electronic voting machines, same-day registration, and procedures for voting. The governor vetoed one election bill supported by LWVTX that would have required the secretary of state to develop a system for accepting voter registration applications when the information provided by the voter does not match the identifying information for that individual in the records of the Department of Public Safety.

2009 was also the year that Texas finally ratified the 24th Amendment. Most states passed this 45 years ago. This was a symbolic stand against the poll tax.

*2011.* The LWVTX and the Election Reform Coalition were active in holding off voter photo ID legislation in previous sessions, but were not successful in 2011 when photo ID was included in the emergency items designated by Governor Perry. The LWVTX participated in a press conference and testified against the bill at both House and Senate hearings. Nonetheless, the bill was signed into law on May 27. The secretary of state was given responsibilities to educate election workers and voters on the new requirements beginning September 2011. Voters must show one of a limited set of photo IDs to vote a regular ballot after January 1, 2012. As of the publication of this document this law is still pending.

*Note.* Under the 1965 Voting Rights Act, Texas is among the states required to obtain preclearance from the U.S. Department of Justice (DOJ) or courts before putting election law changes into effect. Texas sought preclearance of election law changes from DOJ. The LWVTX submitted written comments to the DOJ raising questions about preclearance for voter photo ID and for the prohibition against performance-based decisions in voter registration efforts. The State of Texas has sued and the LWVTX has intervened against the state's position. This case is expected to go to the U.S. Supreme Court as a challenge of the Voting Rights Act. As of June, 2012 we don't know if Voter ID will go into effect for the November 2012 election.

The LWVTX testified against requiring documentary proof of citizenship to register to vote, and this bill was not considered by the full House. While Texans will still be able to register to vote without providing proof of citizenship, most voters will need to provide documentary proof of citizenship to obtain or renew the forms of photo ID required to cast a regular ballot as of 2012.

The LWVTX supported the bill to bring Texas into compliance with the federal requirements for military and overseas voters. The bill was passed and signed by Governor Perry. Email transmission of ballot materials to military/overseas voters is allowed, but not electronic return. To provide the time required for preparation and return of ballot materials, candidate filing and runoff dates for spring primaries were changed. Because some county election officials would be unable to meet requirements for a May primary runoff in addition to local elections on the May uniform election date, the law allowed for changing local elections to the November uniform date.

A number of bills on which the LWVTX took positions failed either to make it out of committee or to pass both chambers. Bills the LWVTX supported that did not pass include those on Election Day voter registration, voter suspense list procedures, allowing electronic voter registration for those with a valid Department of Public Safety driver's license or ID, and adding Texas to the National Popular Vote Compact. Bills which the LWVTX opposed that did not pass include those limiting the number of voters an individual could assist, allowing poll watchers to record images and sound, increasing penalties for untimely volunteer deputy registrars, and limiting volunteer deputy registrars to registered voters with 6 months of continuous state residence.

Two bills, HB 2194 and HB 2817, became more complex as they progressed through the legislature and, as passed, included both positive and negative provisions. They contain unnecessary restrictions on volunteer deputy registrars; also performance-based compensation and employment decisions are prohibited in voter registration

OCAGH_00001560

efforts. On the positive side, the secretary of state was given authority to increase the number of counties participating in trials of countywide polling locations.

*2013.* As the League's 2012-14 biennium began, the LWVTX was involved in litigation over preclearance of the photo ID requirement passed by the 2011 Legislature, SB 14 (Fraser), which LWVTX opposed. The LWVTX lobbied the U.S. Department of Justice (DOJ) to deny preclearance and intervened supporting DOJ's decision to deny preclearance when Texas sued for preclearance. The Washington, DC, court denied preclearance in late August 2012, so the requirement was not in effect for the November 2012 General Election. The State of Texas appeal of the denial was put on hold while the U.S. Supreme Court considered the Shelby County, Alabama, challenge to preclearance.

A number of positive bills on voter registration passed during the 2013 Regular Legislative Session and were signed by Governor Perry: SB 910 (Duncan) faxed voter registrations; HB 2465 (Farias) suspense status information online; and HB 3593 (Burnam) determining a voter is deceased.

Positive election bills that were passed and signed include: SB 160 (Huffman) poll watcher identification; SB 553 (Uresti) high school students as early voting clerks; and SB 578 (Duncan) countywide polling locations for primaries and runoffs. Several positive bills the LWVTX supported did not pass: HB 465 (Johnson) repeal of photo ID; SB 315 (Uresti) and HB 313 (Strama) online voter registration; HB 331 (Guillen) accepting voter registration from any eligible Texan; HB 2728 (Gutierrez) volunteer deputy voter registrar online training; HB 3081 (Wu) voting in a precinct of former residence; HB 1958 (S. Turner) curbside voting; and HB 2306 (S. Thompson) permanent mail ballots for some voters.

Significant bills the LWVTX opposed that did not pass include: HB 2093 (Harless) limiting early voting; HB 3049 (Springer) eliminating the May uniform election date; HB 966 (Murphy) voter registration residence address; and HB 3074 (R. Miller) proof of citizenship to register. HB 148 (Burkett) limiting assistance with mail ballots has become law but in its final form only limits payment for ballots mailed and does not otherwise limit assistance with mail ballots. Election law bills were filed in special sessions, but none were heard in committee.

In late June 2013, after the regular session, the U.S. Supreme Court announced the Shelby County decision striking down the Voting Rights Act (VRA) criteria for determining jurisdictions subject to preclearance. Texas immediately implemented the photo ID requirement passed in 2011. U.S. Representative Marc Veasey and others quickly filed a VRA Section 2 challenge to photo ID in the Corpus Christi federal court. Others, including the DOJ, have filed challenges raising constitutional and other legal issues in Corpus Christi and asked that Texas be bailed-in to preclearance under Section 3 of the VRA. Trial is scheduled for early September 2014 with the possibility of a decision prior to the November 2014 general election. In the meantime, the photo ID requirement remains in effect.

*2015.* As the League's 2015-16 biennium began, the photo identification requirement lawsuit remained under consideration. The Corpus Christi federal court ruled in favor of U.S.
Representative Veasey, yet there was no stay of the voter ID law during the State's appeal to the Fifth Circuit Court. A Fifth Circuit Court three-judge panel met during the 84th Session on the case with no final outcome. Arguments included judicial questions asking why the Texas Legislature has not broadened the types of accepted photo IDs.

During the 84th Session of the Texas Legislature, eight bills were introduced to add acceptable IDs to the list acceptable for voting that died in committees without any hearing. Other IDs proposed included the addition of student photo IDs from public and private higher education institutions, Texas and federal government–issued photo IDs, expired Texas driver licenses, Veteran's Administration health photo IDs, and any form of photo ID. The House Elections Committee allowed a hearing on only one bill that would allow tribal photo IDs, but it also died in committee without a vote.

Only one voter ID related bill, SB 982 (Bettencourt), passed into law. It provides a cost-free birth certificate for anyone in need of that document when applying for a Department of Public Safety photo ID. The only other voting/elections bill supported by LWVTX that passed during the 84th Session and was signed by Governor Abbott,

made a variety of minor improvements all related to voting by mail. HB 1927 (Bonnen, Greg) requires vote by mail (VBM) be made available for all elections, regardless of the election's administration (special districts, ISDs, etc.) and includes runoff elections; allows VBM applications to be submitted any time in the preceding year prior to an election; and allows VBM applications to be emailed.

The LWVTX supported a number of other positive bills that did not pass: providing online voter registration, HB 76 (Israel), HB 953 (Alvarado), both garnering one late session public hearing but no action; HB312 (Harless), HB 444 (Johnson), HB 446 (Johnson), and SB 385 (Uresti); broadening acceptable photo IDs, HB 535 (Nevárez), HB 295 (Canales), HB 447 (Johnson), SB 170 (Uresti), SB 230 (Watson), HB 534 (Nevárez), HB 536 (Nevárez), HB 733 (Israel), and HB 1117 (Martinez, "Mando"); improving the vote by mail process, HB 1198 (Israel), HB1540 (S Thompson), HB 913 (Israel), HB 954 (Alvarado), and SB 86 (Ellis).

The most significant bill the LWVTX opposed that did not pass was HB 1096 (Murphy) and its companion SB 984 (Bettencourt), calling for identical residential addresses on photo IDs and voter registration cards. HB 1096 was left languishing on the full Senate bill intent list on the final day it could be considered.

*2017.* The brief story of the 2017 Texas Legislative Session for voting rights and elections: Nothing really bad was passed and a few minor process improvements were made.

The chants of "voter fraud" continued to be recited even though all League members know that there is no "rampant voter fraud or impersonation" in our state or any other. Governor Abbott and Lt. Governor Patrick, the two chief cheerleaders rallying the voter fraud cry let it be known that no online voter registration bills would be considered this session. Although, mail-in balloting, the one area where some irregularities have been documented, was addressed in a somewhat even-handed manner during the regular session, but was overturned in the special session. There was only one very small victory: Volunteer Deputy Registrars (VDRs) will now be able to deliver voter registration applications to county offices the day after the deadline to be registered before elections.

We followed 280 bills related to voting and elections during the 85th Session. The House and Senate committees offered public hearings on precious few of those. Thankfully only a few made it to the finish line and were passed by both houses.

**Online voter registration.** As mentioned above, none of the bills to establish online voter registration even received lip service this session. When it became common knowledge that the governor and lt. governor would quash any online voter registration action, the early session hope of passing HB 143 by House Elections Vice Chair Celia Israel ended. Israel authored HB 76 in the 2015 Session and received 75 House coauthors and an abbreviated hearing in the House Elections Committee, but no vote. Neither HB 143, nor any other voter registration modernization bills received any action but referral to committee. Others included:

- HB 70 by Representatives Minjarez/Gullen, automatic registration
- HB 80 by Representative Alvarado, online voter registration
- HB 159 by Representative Dutton, optional county online voter registration
- HB 469 by Representative Eric Johnson, same day registration
- HB 955 by Representative J. Rodriguez, same day registration
- HB 1955 by Representative Reynolds, secretary of state online voter registration

Other positive voter registration bills were introduced and did not see any action. Among those:

- HB 910 by Representative Romero, allow volunteer deputy registrars to register voters in all counties
- HB 953 by Representative J. Rodriguez, requiring counties to contact registrants via email about application problems before rejecting the applications
- HB 1002 by Representative Israel, requiring the Department of Public Safety to provide receipts for voter registration

**Voter ID.** Legislators filed numerous bills to expand the types of photo voter identification. Only HB 1173 by Representative Nevarez, to add tribal ID cards, received a public hearing, and then was left to die in committee.

OCAGH_00001562

The most talked about bill approved this session was SB 5, the lt. governor's high priority voter ID bill. It passed early in the session; soon afterwards there was a hearing on the companion bill, HB 2481 by Representative King in the House Elections Committee. It then languished in the House Calendars Committee. On Sunday night, May 21st, Governor Abbott named is an "emergency matter for immediate consideration," and it was set for House floor action the following Tuesday. On June 1st Governor Abbott signed it, and it is set to become law January 1, 2018.

The bill generally codifies the changes in voter ID requirements set in the July 2016 U.S. District Court order, with a few exceptions. The main SB 5 addition is making it a state jail penalty to make a false statement on the substitute impediment form used when voting without one of the seven photo IDs. That was just one of several differences between SB 5, as introduced, and the Court order. On the House floor members added multiple amendments making the bill more reasonable. Some of those changes (retaining the 4-year expiration date for IDs and address matching issues) remained in the final adopted bill.

However the Court is set to revisit the issues in June 2017, following the legislative session. Because the Court ruled SB 14, the voter ID law passed in 2011, as intentionally discriminatory, it is still to be determined how SB5's passage will be received. Placing Texas back under U.S Department of Justice preclearance for any election-related actions is a possibility, although U.S. Attorney General Sessions' Department of Justice idea of preclearance will likely be different than his predecessors.

**2017 LWVTX actions**. While our advocacy on online voter registration languished, we took positions and actions on the following bills.

*Bills we supported*. A few bills we registered our support for were passed by both Houses, although none of the bills we presented testimony to support made it to the finish line. Also note below, some bills we supported in one house were significantly amended in the other house.

      *Bills passed and sent to the governor.*

- HB 658 by Representative Bernal, originally introduced to provide priority treatment for voters with certain disabilities, and our support was based on that. It became a "Christmas tree" bill in the Senate with a more than six-page comprehensive amendment by Senate State Affairs Chair Huffman adding special voting available to residents in residential care facilities (senior living/nursing homes). It is meant to address voting irregularities in elder care residential or nursing homes. It was hailed as a major improvement by Governor Abbott, yet the provisions for residential care facility ballot by mail were repealed in the special session (see below).
- HB 961 by Representative J. Rodriguez, allows the option of plurality voting for junior/community college trustees (other than Blinn College). Governor Abbott vetoed the bill.
- HB 999 by Representative Israel, unless otherwise required by statue, requires water district officer/board elections on the May uniform election date. Signed by Governor Abbot, effective September 1, 2017.
- HB 2324 by Representative Israel, allows individuals or volunteer deputy registrars to turn in voter registration applications to county offices the day after the deadline 30 days prior to elections. Signed by Governor Abbot, effective September 1, 2017.
- HB 4034 by Representative Bohac, originally introduced to require counties to send list of registrants who indicate an interest in working elections to the two county chairs of each county executive committees. Our support was based on that original bill. Amended in the Senate by State Affairs Chair Huffman to give secretary of state authority to eliminate duplicate voter registration records as part of the statewide registrations rolls, though indicating weak or strong matches and only acting on strong matches; allow secretary of state to withhold funds to counties not complying with deleting dead voters from the rolls. Signed by Governor Abbot, effective June 12, 2017.

*Note.* HB 2837 by Representative Dean also passed and contains exactly the same language on dead voters as HB 4034. We testified against HB 2837 because registrars report often not being in receipt of deaths from the various suppliers of that information. Signed by Governor Abbott, effective September 1, 2017.

*Bills we supported with testimony that died.*

.

- HB 187 by Representative Dutton and HB 260 by Representative E. Johnson, on Department of Criminal Justice providing those "off paper" with voter registration forms and information
- HB 450 by Representative Fallon, to allow mobile devices in the voting booth
- HB 1887 by Representative and SB 148 by Senator Garcia, concerning eligibility of interpreters in an election
- HB 3328 by Representative E. Rodriguez, requiring secretary of state to make public the expenditures for voter identification education

*Bills we opposed.* While none of the bills passed that we opposed, two bills passed that we would have like to see fail. One we testified against, HB 2837 by Representative Dean (mentioned above) passed on its own and as part of HB 4034. The other is SB 5 by Senator Huffman that is discussed above and was signed by Governor Abbott.

*Bills we opposed that did not move forward.*

- HB 384 by Representative Murphy, to require photos on voter registration certificates
- HB 1149 by Representative S. Davis, to allow for only electronic posting of voting locations rather than printing in a newspaper
- HB 1683 by Representative Fallon, to significantly reduce the number of early voting days
- HB 3422 by Representative Laubenberg, to authorize data sharing to permit Texas participation in interstate voter registration crosscheck program, with the stated intention of that being the State of Kansas free matching system, not the more reliable and multistate Electronic Registration Information Center system.
- HB 3474 by Representative Fallon, to require proof of U.S. citizenship at voter registration

**Took no position: Bills that passed.**

- HB 1735 by Representative Faircloth, began as a mostly partisan primary bill and became more so in the last days of the session. It deals with a miscellany of election officer rules, oaths, and penalties for voting in both primaries in the same election. It makes it easier for someone to discreetly select the party primary they wish to vote in. It provides for prosecution of "vote harvesting organizations" that consist of three or more who may or may not know each other, but are subverting the rules. Of note to LWV voters guide leaders: It spells out the contents of a candidate's application for office, including a reliable email address for reaching the candidate or campaign.

**Additional action in special session.**

- SB 5 by Senator Hancock, dealt with ballot by mail abuse; widens the definition of mail-in ballot fraud, boosts penalties for certain offenses, and strengthens rules for signature verification. Somewhat helpful, it also requires election judges to notify voters when ballots are rejected. It also limits who may assist mail-in voters. The LWVTX recognized that there is an issue to be addressed; however, it opposed the severity of increased penalties and
  called for clearer mail-in ballots and carrier envelopes to prevent innocent mistakes. Signed by Governor Abbott, effective December 1, 2017.
- Representative Goldman, the House sponsor of SB 5, inserted a surprising amendment on the last day of its consideration. The amendment was meant to eliminate the new nursing home/residential facility mail-in ballot process passed in regular session in HB 658 by Representative Bernal (discussed above). The intention was to eliminate the new residential facility process before it began, but as finally passed, it was in effect for the November 2017 General Election and officially removed from law December 1, 2017. Removing the process was largely the result of county election officials across the state objecting to the new process that would have called for election judges to go to the nursing home/residential facilities to accept the mail-in ballots in person.

*2019.* In the 86th Legislative Session, LWVTX made dramatic strides in its advocacy on voting rights and election law issues. We contributed to the **defeat of SB 9**, the most suppressive voting rights/election administration bill since Voter ID was adopted. This defeat and the denial of David Whitley's confirmation as Secretary of State, were symbolic of a major change this session in our collaborative strength. Most amazing was our establishment of an ongoing organizational infrastructure, and the availability of the Texas Civil Rights Project's legal insights on the meaning and potential impacts of legislative proposals. The LWVTX Action Alerts (using One-Click Politics) played a

OCAGH_00001564

gigantic role in our successes. These alerts provided a quick/easy link for all League members for contacting their personal representatives at opportune times to affect legislative action. President Grace Chimene and VP Advocacy Janet Imhoff played a big role in assuring they were appropriate and timely.

**We did not achieve our major goals of establishing online voter registration in Texas or requiring improved paper trail election equipment that would permit post-election audits**. However, progress was made on the latter. The most negative efforts were defeated, and no major bills passed to decrease voter access. LWVTX testified in favor of 11 bills – 3 of those passed and were signed by the Governor. We testified in opposition to 3 bills – none of them passed! In addition to our testimony, we registered support for 24 bills – 10 passed and were sent to the Governor. All 10 made it off his desk and became law. LWVTX registered opposition to 13 bills and only 2 of them passed and were signed by the Governor.

In addition to procedural bills, we supported a budget rider that allows Texas to participate in the **Electronic Registration Information Center (ERIC)** process to improve the accuracy of our voter rolls and increase access to voter registration for all eligible citizens. ERIC is governed and managed by states who choose to join, and was formed in 2012 with assistance from The Pew Charitable Trusts. Participation requires expenditure of approximately $1.5 million to begin the membership. This session, Elections Committee Chair Stephanie Klick successfully inserted that amount in the budget and the Governor exercised no line item budget vetoes.

**The demise of SB 9** in the House was a high point for League members and many other organizations and individuals. It included many of the proposals seen in previous sessions (and will likely be seen again in the 87th) to restrict voter access and establish or increase penalties for unintended errors. Other positive actions include passage of bills to greatly **improve the county and Secretary of State websites by requiring more voter information (HB 933)**. Another new law requires **improvements to county cybersecurity protection of voter registration lists and other election-related documents, systems and technology (HB 1421)**. Female candidates for office may now choose to run using any surname acquired by law or marriage on ballots (HB 2075), and there will be personalized auto license plates available that promote voter registration (HB 1130).

The most negative new law requires any temporary voting location in the early voting period to be open for the entire early voting period. In other words, **eliminating temporary voting locations** that have been so useful in urban and rural settings alike (HB 1888).

## D. Executive, Legislative, and Judicial

## Executive
1968, 1969, 1970

*The League of Women Voters of Texas supports measures to increase the effectiveness of the executive department of the state government including:*

- The governor limited to two terms that may or may not be successive.
- Constitutional provision for the succession to the office of the governor should the governor become unable to perform the duties of the office.
- Cabinet-type executive department, with only the governor, lieutenant governor, and the attorney general elected.
- The governor having the power, with safeguards prescribed by law, to remove appointive officers of the executive department and citizen appointees to boards and commissions.
- Reorganization of state boards and commissions along functional lines by grouping them in areas of responsibility.

## Explanation: Executive
In 1968 the LWVTX decided to evaluate the organization and functioning of the State of Texas executive department as a continuation of its studies of the constitution and the legislature. In the first year, the study concentrated on the office of the governor. In the second year, the League examined the total administrative organization, discussing

other officers in the executive branch. In 1970 the League focused on the various executive boards and commissions, concentrating on those concerned with natural resources.

## History: Executive
*1974.* During the Texas Constitutional Convention, the League actively supported change in the executive article.

*1979-81.* In 1979 and again in 1981, the League successfully opposed passage of a constitutional amendment providing for legislative review of the process of rule making by executive agencies. We believe this amendment to be a violation of the separation of powers of the executive and legislative branches of government. In 1980 the LWVTX supported a constitutional amendment, approved by the voters, allowing governors to remove public officials they appoint.

*1985.* Over League opposition, a vague and deceptive amendment that also violated the principle of separation of powers was passed by the voters. The amendment requires that an undesignated group, to be named by the legislature, approve expenditure of appropriated funds.

*1991.* Major reorganizations of state agencies were carried out during the 72nd Texas Legislature as a result of recommendations made by the Performance Review Panel. Legislation implementing these recommendations provided for appointment of agency heads by the governor rather than by the legislature. The LWVTX supported these measures in keeping with its position in support of a cabinet-style executive branch. As a result of these changes, the governor how has significantly more accountability for the actions of agency heads.

# Legislative
1967, 1968, 1969
*The League of Women Voters of Texas supports measures to increase the efficiency and responsiveness of the legislature including:*
- Annual sessions of sufficient length and scope to permit efficient handling of legislative business.
- Adequate compensation for legislators and elimination of salary amounts from the constitution.
- Increased power of the legislators in relation to the power of their presiding officers to include (a) greater voice in determining committee membership, and (b) bills referred to committees of appropriate jurisdiction.

## Explanation: Legislative
League members decided in 1966 to evaluate the organization and functioning of the Texas Legislature and over the next 3 years reached consensus on a number of areas. Through the years, some goals were achieved, and positions have therefore been dropped. For example, conference committees are now limited to reconciling differences between Senate and House bills and are not permitted to add new provisions. Thus the position advocating this practice was dropped at Convention 1985.

## History: Legislative
*1969.* During the legislative session, the League worked for a code of ethics, annual sessions, and realistic pay for legislators.

*1974.* During the Constitutional Convention the League was active in support of revision of the legislative article. Bills pertaining to legislative salaries and/or annual sessions have been introduced in a number of sessions; none have passed.

# Judicial
1960, 1965, 1983, 2001, 2003, 2006, 2009

*The League of Women Voters of Texas supports an effective, independent, qualified, and inclusive judiciary for Texas, which includes:*

OCA-APPX-1505

OCAGH_00001566

- A uniform fiscal policy as part of a single system of centrally administered statewide courts.
- A single system of centrally administered statewide courts with a uniform fiscal policy.
- Assignment of judges according to special training and docket needs.

*The League supports the selection of judges in the following manner:*
- Nomination is by a diverse, representative, nonpartisan commission, with appointment for a specific term or appointment by the governor for a specific term.
- Judges are subject to retention or rejection in an unlimited number of periodic nonpartisan elections.
- This should apply to Texas Supreme Court, the Court of Criminal Appeals, and Courts of Appeals.
- Selection of state district court judges may be by nonpartisan election or by appointment/retention.
- Judicial campaigns should be funded with public money.

## Explanation: Judicial

In 1958, the League adopted nine principles for a good constitution, one of which was "Provisions for justice with a minimum of delay," and in 1959 undertook the initial study of the judicial article as part of its work for general constitutional revision. Consensus was reached in the areas of court structure, court administration, and court financing.

In early 1965, the position on the selection and tenure of appellate judges was adopted. Members again looked at selection of judges in 1982 and, by February 1983, included district judges in the position on judicial selection. The position was amended by Convention in 2001 following review.

Following delegate debate at Convention 1999, the Program Review Committee was assigned review of the judicial position, especially regarding judicial selection, and the following recommendations were adopted at Convention 2001. Since centrally administered statewide courts have been in effect since 1985, the wording in the first bullet was reversed to reflect emphasis on the need for a uniform fiscal policy. (There is still disparity of funding levels among various appellate and district courts.) The PPR committee had suggested dropping the position regarding assignment of judges according to special training and docket needs, but during the program planning process, local Leagues recommended retaining the position since it is used for advocacy at the local level for specially trained judges, such as in family courts.

Delegates at the 2001 Convention, at the PPR committee's recommendation, also voted to drop the position regarding effective removal procedures for judges. The state constitution provides for removal procedures through a State Commission on Judicial Conduct. This provision was added to the constitution in 1965, after the League's initial study/consensus in 1959-60. Thus this bullet has been achieved. Although it is conceivable that the removal process could be thwarted by a legislative effort to cut off funds to the Commission, the LWVTX does not need to retain the position in order to address such a situation. The overarching statement of the judicial position and/or the League principle that "efficient government requires competent personnel" could be used to advocate effective judicial removal procedures.

**Judicial selection**. The 2001 convention approved a restudy of judicial selection. A committee restudied the issue producing a *Facts and Issues* entitled *Judicial Selection in Texas: Nothing's Perfect.* Limited consensus was reached in the fall of 2002 and approved by the LWVTX board in January 2003. That consensus continued to support the appointment of Texas Supreme Court and Courts of Appeals judges. But for local judges, Leagues only agreed that if judges are to be selected by an election, it should be nonpartisan. s

At Statewide Conference in March 2009, a bullet was added to clarify our position on district judges in order to lobby more effectively and to provide flexibility to work with legislators to reform the way judicial offices are selected in Texas. At Convention 2010, delegates voted to add the provision that judicial elections should be funded with public money, although this is covered in our position on Political Campaign Process.

## History: Judicial Selection

*1985.* The legislature passed a constitutional amendment that addressed the League position of centrally administered statewide courts. The League supported this amendment, and voters adopted it.

.

*1989-95.* Merit selection (or election, as some call it) has been an active issue for the LWVTX during this period. Reform efforts have been spurred and complicated by federal lawsuits challenging the at-large election of district and appellate judges as a violation of the Voting Rights Act because the system dilutes minority votes. The most recent development in this lengthy litigation is Texas' appeal from a U.S. Justice Department finding that countywide partisan election of judges in the major urban areas infringes minority lawyers' right to win seats on the bench under the Voting Rights Act. Using the LWVUS position supporting the Voting Rights Act, the LWVTX has supported single-member judicial districts as part of a merit system plan.

In the 1995 Legislative Session, the League lobbied in support of Senate-passed measures that called for appellate judges to be appointed by the governor with approval by the Senate and subject to retention/rejection elections on a nonpartisan ballot; and for district judges to first run on a nonpartisan ballot and then face retention/rejection elections for the next two terms. The House, however, failed to pass the Senate's reform initiative, instead reporting out of committee a version that included partisan elections. This version did not reach the House floor.

During the 1995-97 interim, the League was represented on the newly created Commission on Judicial Efficiency. The Commission, appointed and chaired by Texas Supreme Court Justice Tom Phillips, was charged by the legislature with studying various issues related to the state judiciary, including judicial selection. The commission made several recommendations, but their most significant success was their recommendation for the creation of a Judicial Committee on Information Technology, which passed the legislature with funding. The 15-member committee, made up of judges, court personnel, legislators, attorneys, and citizens will gather information for a statewide network and justice information system.

*1997.* The House passed a bill changing appellate judicial selection to nonpartisan elections, an attempt to move the procedure at least one step away from the current partisan election system.
The Senate companion bill differed, proposing an appoint/elect/retain system for appellate judges. This bill failed and time did not permit the Senate to take up the House bill.

*2001.* Legislation was introduced, supported by the League, which offered a viable, nonpartisan approach that would have reformed the electoral process for the selection of the chief justice and justices of the Texas Supreme Court, and the judges of the Court of Criminal Appeals. The bills would have required nonpartisan judicial elections of the highest courts in the state. Candidates would have sought certification from the secretary of state to be put on the ballot and would have been required to submit a petition signed by 1,000 registered voters in connection with a request for public financing. Testimony given during the hearings on the legislation raised many issues of concern that surround judicial elections: the necessity for judges to become involved in party politics, to raise large sums of money in order to run, and the perceived influence on the system as a result. Many supported the certification process as opening the doors for increased minority participation, but testified that a selection commission could act as a barrier.
**The League restudied this issue in 2001-03.**

*2003.* Following the adoption of the new judicial selection consensus, the LWVTX supported a number of bills during the 78th Session. None of these bills passed, and the lack of legislative support for these bills during the session was a real disappointment. Some bills and joint resolutions (possible constitutional amendments) focused on all of the judiciary, others only on appellate judges. Both appointments, followed by nonpartisan retention elections at the end of their terms, and nonpartisan elections were considered along with terms of office and for public financing of such elections.

In line with the League's new position, there is a great deal of support in Texas for the nonpartisan selection of appellate judges, but less for the selection or appointment of district judges. Opposition to the appointment of district judges was one factor leading to the defeat of introduced bills.

*2005.* Companion bills were introduced in the 79th Regular Legislative Session that would provide for the appointment and a nonpartisan election for the retention or rejection of justices and judges. The bill included all

OCAGH_00001568

appellate courts and all types of district court judges, with appointments made by the governor as currently provided for in the Texas Constitution. No hearing was held for the Senate bill, but the House bill was heard in the House Judiciary Committee. The League presented written testimony to explain the League position that supports nonpartisan election of appellate court judges nominated by a nonpartisan diverse commission. The bill was left pending in committee. The House leadership was not supportive of the issue.

We supported and testified for Senator Duncan's bill that would increase salaries for state and county judges who had not had a salary increase since 1998. This issue had widespread support. However, after passing out of the conference committee, the bill was scuttled in the House over a dispute with an amendment that included increases for indigent defense. Although this item was not on the agenda, Senator Duncan introduced a similar bill in the special session without the indigent defense provision. The League presented written and oral testimony at the Senate State Affairs Committee in favor of the bill. The committee voted in favor of the bill. It was hoped that the issue would be included in the special session.

*2007.* As in the 79th Legislative Session, Senator Duncan filed SB 806 with its companion SJR 32 for a constitutional amendment. The enabling bill would provide for a nonpartisan merit selection system of appointment of judges followed by a retention or rejection election of judges after a specified period of time of service. Identical bills were filed in the House. None of the bills were heard by their respective committees. However, both bills contained a position the League cannot support at this time, the inclusion of state district courts judges. The bills would provide for initial appointments that would be made by the governor as provided in the Texas Constitution during the interim in 2008. The League spoke with the general counsel for Senator Duncan to ask for a filing of a bill in 2009 Legislative Session with modifications that can meet the League position. In April 2007 the LWVTX, through the assistance of KLRN, produced and televised a program, "Conversation on Judicial Independence."

*2009.* In the 81st Legislative Session, Senator Duncan, supported by the League, filed an enabling bill and constitutional amendment that would provide for a nonpartisan appointment/retention system to select appellate judges. This was slightly different from previous sessions. Not included were state district judges. However, the bills were withdrawn. Subsequently, the Senator filed SB 2226 and SJR 44 to provide for partisan judicial elections in the primary followed by a nonpartisan appointment/retention election. The League remained neutral as our position for judicial selection clearly states it be nonpartisan. The bills were not placed on the Senate calendar. In the House, HB 3995 provided for a nonpartisan appointment/retention system. The League presented oral and written testimony. Although the bill was voted out of the House Civil and Jurisprudence Committee, it did not pass out of the Consent Calendars Committee.

Early in the session Chief Justice Wallace Jefferson of the Texas Supreme Court made a strong case for the adoption of an appointment/retention system for judicial selection during his State of the Judiciary speech to the Legislature. Early in the same day, the League participated in a press conference with several other organizations in anticipation of the Chief Justice's speech.

A group to which the League is a collaborator, Clean Elections Texas, supported a bill that would provide for public financing for judicial candidates. Although the League supports public financing of campaigns this measure was not nonpartisan as required by our judicial position. As a result, the League did not support it.

*2011.* In the 82nd Legislative Session, Senator Duncan filed SB 1718, which proposed filling vacancies in appellate judicial offices by appointment, partisan elections for all judicial offices, and nonpartisan elections for retention or rejection of all judicial offices. The League remained neutral as our position for judicial selection clearly states elections be nonpartisan. There was a hearing on this bill in the State Affairs Committee, testimony was taken, but the bill was left pending in committee.

In February, Chief Justice Wallace Jefferson of the Texas Supreme Court urged the Legislature to "send the people a constitutional amendment that would allow judges to be selected on their merit." He also urged "common-sense solutions to the problems that plague partisan election of judges."

*2019*: After nearly a decade of inaction and disinterest, the Legislature woke up to the need to at least examine our state's system of selecting judges. The result was the passage of one of three bills supported by LWVTX, calling for an interim study of methods of choosing judges. Though not the strongest of the three proposed bills, the new law presents an opportunity to move forward, away from partisan judicial elections toward a fairer system for selecting qualified, impartial judges. The measure calls for appointment of an Interim Commission on Judicial Selection that is tasked with considering the fairness, effectiveness and desirability of electing Texas' judges through partisan elections.

The Commission's study must also consider judicial selection methods proposed or adopted by other states, as well as the merits of using a public member board to nominate or assess the qualifications of candidates for judicial offices, among other specified methods of selecting judges. The Commission must submit a report to the Governor and Legislature by December 31, 2020 that includes specific recommendations for statutory and constitutional changes.

The statute specifies that the Commission include: four members appointed by the governor; four senators appointed by the lieutenant governor (including one senator who is a member of the political party with which the lt. gov. is affiliated and one senator who is a member of a political party other than the party with which the lt. gov. is affiliated); four members of the house of representatives appointed by the speaker of the house of representatives (including one representative who is a member of the political party with which the speaker is affiliated and one representative who is a member of a political party other than the party with which the speaker is affiliated); one member appointed by the chief justice of the Texas Supreme Court; one member appointed by the presiding judge of the Texas Court of Criminal Appeals; and one member appointed by the board of directors of the State Bar of Texas.

The makeup of the Commission will be critical to its deliberations and recommendations. LWVTX, as an affiliate of the Texas Fair Courts Network that supported the new law, suggested suitable and qualified candidates to those appointing Commission members. We were pleased that two members recommended by the Network were appointed: Former Texas Supreme Court Chief Justice Wallace Jefferson (by Chief Justice Hecht, current Chief Justice of the Texas Supreme Court) and former Texas Supreme Court Chief Justice Tom Phillips (by Texas Court of Criminal Appeals Presiding Judge Keller).

The Commission held its first meeting in January 2019 and has been holding monthly meetings, with a hiatus due to the pandemic in April and May. The Fair Courts Network has had a representative in attendance at each Commission meeting. At the Commission's meeting on June 5, 2020 (held via Zoom because of the pandemic), the Texas Fair Courts Network presented testimony, with LWVTX signing on to most of the points made. In addition, LWVTX presented its own testimony, highlighting our Judicial Selection position.

LWVTX applauds the bill creating the Interim Commission and is cautiously optimistic that we will be able to support at least some of its recommendations in accordance with the Judicial Selection position. As always, the "devil will be in the details."

*2021.* At the close of the prior session in 2019, the passage of HB 3040 calling for appointment of an Interim Commission on Judicial Selection presented an opportunity to move forward, away from partisan judicial elections toward a fairer system for selecting qualified, fair and impartial judges. The LWV and other proponents of a fairer system were cautiously optimistic that the Commission (which was tasked with presenting a report and recommendations by December 31, 2020) and the 2021 Legislature would bring about needed changes to the system.

Unfortunately, meaningful reform has not occurred in 2021. The Commission report indicated an even (7-7 with one abstention) split on adoption of an appointive judicial selection system followed by retention election (basically the LWV position) but rejected adoption of a nonpartisan judicial election system. No bills were filed that would have significantly changed the current system. However, two proposed constitutional amendments that favorably "tweak" the system, supported by the League and our coalition partner, Fair Courts Network, have passed the legislature and will be presented to Texas voters for their approval in November:

OCA-APPX-1509

OCAGH_00001570

SJR 47 would increase the minimum qualifications for judicial offices by increasing the required amount of judicial experience as well as the period during which a person's license to practice law could not have been revoked, suspended or subject to a probated suspension. The report of the Interim Commission on Judicial Selection overwhelmingly recommended (by a vote of 12 yes,1 no, and 2 abstain) these changes to current law.

HJR 165 would allow the State Commission on Judicial Conduct (SCJC) to accept complaints or reports, conduct investigations, and take any other action authorized by the Texas Constitution with respect to a candidate for state judicial office in the same manner the commission may take those actions with respect to a person holding such office. HJR 165 would thus level the playing field between candidates for judicial office who are not current officeholders and incumbents by expanding the authority of the SCJC to receive complaints and conduct investigations. Currently, elected judicial officers are held to high standards specified in the Code of Judicial Conduct, whereas their non-judge opponents are not.

Sadly, the zeal of some legislators to restrict voting rights and access also threatened to adversely and unfairly affect judicial selection in Texas: SB 11 would have restructured the Texas Courts of Appeals by consolidating the number of appeals courts districts from 14 to 7, SB 1529 would have created a special appeals court of limited jurisdiction, giving the state undue preference in litigation brought against the state by citizens alleging injustices committed by the state or its agents - with the judges on this new court elected at-large statewide, HB 1875 would have created special Business Courts at the trial and appellate levels which would have jurisdiction in cases involving complex business law – with the judges on both courts being appointed by the governor.

Fortunately all of these bills, vigorously opposed by LWV and many members and supporters via Action Alerts, died during the regular session, but may be revived in a special session.


## E. Financing State Government
1975, 2003

*The League of Women Voters of Texas supports constitutional and statutory provisions for flexibility within a coordinated finance structure; equitable taxation system that assures adequate revenue; and increased accountability including the following:*

- Removal of provisions relating to dedicated funds, ad valorem tax exemptions, dollar amounts of debt limitations, and other such specific wording from the constitution and making them statutory.
- Budget execution to be a joint responsibility of the executive and legislative branches of state government.
- Application of appropriate fiscal management and business practices to conduct state business.
- An equitable system of taxation that assures adequate revenue, is easily administered; and is consistent with economic, social, and environmental goals.
- Appraisal of taxable property at full market value; state supervision to ensure equitable and uniform appraisal and taxing procedures.

## Explanation: Financing State Government
The League studied state financing as part of its multiyear study of Texas Constitutional Revision, adopting in 1973 a 2-year study, "Financing State Government." The League study first focused on constitutional provisions relating to state finances. League members found that the state's elaborate restrictions on taxing, spending, and borrowing, intended to ensure fiscal prudence, often had quite the opposite effect. Instead they created obstacles to sound fiscal planning, management, and organization, and failed to limit the financial practices they were intended to restrict. An example is the flat prohibition of state debt. Texas' outstanding debt not only exists but also has been on the rise, just as total state spending has risen in recent years. The prohibition has served at times to increase the debt load by forcing the state to resort to more expensive methods of borrowing, such as the issuance of revenue bonds, rather than lower interest rate general obligation bonds. The League agreed that the Constitution should permit the legislature and governor the freedom to develop fiscal policies for the state to meet current needs.

.

Next, the League study centered on the taxes imposed by the state government. The ability-to-pay approach for new or expanded taxes is preferred, although, in some cases, a tax levied according to the benefit theory would be acceptable as long as it was equitable and certain to be collected. A graduated personal or corporate income tax meets the League criteria for a new tax, but a general sales tax does not. An equitable system of taxation also requires that tax laws be rewritten and enforced so there is certainty of collection at a relatively low cost.

## History: Financing State Government

*Late 1970s-early 1980s.* League members agreed that taxation to encourage desirable economic and social goals (such as preservation of agricultural lands and open space by preferential tax treatment; see Land Use position) is valid provided that there are sufficient safeguards to ensure that the goal sought actually is met by the preferential tax treatment, and that the cost of meeting the desired goal be accurately and truly known so responsible cost-benefit evaluations can be made.

The League worked for major changes in property tax administration to make this tax more equitable and more easily and uniformly enforced. League-supported legislation requiring the establishment of single appraisal districts, appraisal of property at full market value, state supervised reports of taxable values, and training for tax appraisers was enacted in 1979.

*1980s.* Progress toward LWVTX positions on tax reform has come largely as a result of continuing economic crisis in the 1980's and early 1990's. Declining state revenues have led successive legislatures to look for new sources of funds while some legislators sought to ban constitutionally the enactment of a state income tax. The League has urged restructuring of the state's revenue sources, while opposing a constitutional ban on the income tax. In 1987, the enactment of the largest tax increase in Texas history led to the creation of a Select Committee on Tax Equity charged with recommending changes to the state's financial system. The League supported many of the committee's recommendations, including efforts to broaden the tax base by use of expanded business taxes and exploring the eventual necessity for personal and corporate income taxes; however, reforms in the 1989 session were limited in scope and did not address the need for thorough reform.

*1991.* Reform of the state's finance structure was given priority by the LWVTX in 1991 because the projected $5 billion gap between estimated revenues and needed expenditures indicated that funding would be a major issue. State leaders, in an unusual move, postponed action on funding and budget issues until the first special session in order to await the results of thorough reviews of both expenditures and revenue sources. A Performance Review Panel appointed by the state comptroller carried out an audit of state agencies and held public hearings on how to cut costs of state government, while the Governor's Task Force on Revenue heard from experts and the public on ways to improve the state's revenue position. The LWVTX monitored both proceedings and presented the League's positions to the Governor's Task Force on Revenue.

The solutions ultimately adopted in 1991 for the state's fiscal crisis represented, from the League's point of view, partial progress in some areas while pitfalls were avoided in other areas. There was no movement on a personal income tax, but efforts to pass a constitutional amendment prohibiting it failed, and the sales tax rate was not increased. The corporate franchise tax, while not expanded to include other forms of business organization, was revised to include a tax on earned surplus (similar to an income tax).

The special session also produced the state lottery proposition that was approved by voters. The LWVTX took no position on the lottery as such, but opposed constitutional dedication of lottery revenues and also warned against making any essential state service dependent upon a lottery because such services require revenue sources that are both stable and adequate. The version ultimately approved contained no dedication of revenues.

*1993.* State leaders, facing another fiscal crisis in 1993, took a no-new-taxes stance on the budget. The League, speaking out on the proposed appropriations bill, called for increased funding for public schools and health and human services and reiterated that the state's fiscal crisis can only be resolved by restructuring Texas' tax system. The 73rd Legislature was able to adopt a balanced budget by cutting the level of services, by mandating better fiscal

OCAGH_00001572

management, and by further shifting of tax burdens to the local level, particularly the burden of public school finance.

Implementation of suggestions set forth in the state comptroller's second performance review helped balance the budget, and some of the adopted recommendations are in accord with the LWVTX positions favoring increased accountability in the state's financial system. Of particular note was the adoption for the first time of a performance-based budget, a format advocated by the League since 1975.

The LWVTX was one of the few groups to testify against the proposed constitutional amendment adopted by voters in November 1993 that prohibits legislative enactment of a personal income tax without a majority vote of the people. This amendment also dedicates at least two thirds of income tax revenues to local school property tax relief and the remaining revenues to education. League opposition was based on our positions that call for a flexible state finance structure and for removal of provisions relating to dedicated funds.

*1995.* Once again, legislators avoided a tax increase. The 6.2% spending increase over the previous state budget is to be financed by growth in state revenue. Yet the need for changes in Texas' tax structure is apparent to the League and to the state's political leaders as well. Governor Bush has pledged an interim study, with special attention to reducing reliance on property taxes.

*1997.* A tax relief bill dominated the session, but the final version bore little resemblance to that introduced by the governor, which had placed a high priority on the issue of reliance on property taxes. Reluctant to tackle the complicated problem of public school finance, legislators produced a last minute compromise bill that used the state's $1 billion surplus to fund property tax relief. A business tax provision in the original version held promise of broadening the tax base and developing a more equitable system of taxation, a longtime League goal. The League testified before both Senate and House committees, advocating the need for a state income tax in the long run, and a reform of the state sales tax and greater equity in taxes levied on businesses in the short term. Proponents of a state income tax were encouraged by the frequency with which the words "income tax" came up during this session.

The bill that was signed into law also dedicated lottery proceeds to fund education. The League opposes dedicated revenue funds of this type, which tend to make government less flexible and efficient. The League also has concerns about making a state service such as education dependent on a revenue source such as a state surplus, which is neither adequate nor reliable.

*1999.* Due to sizeable income from a tobacco suit settlement and a booming economy, debates regarding financing state government dealt with how and where to appropriate the income. League advocates were present and vocal during specific appropriations discussions. See sections regarding Health Care and Natural Resources.

*2001.* As in 1999, League advocates focused on the appropriations process. During this session, the LWVTX promoted funding for comprehensive health care services for women and children, increased childcare subsidies, Medicaid simplification (which became a large budget issue as the session progressed), implementation of the SB 1 regional water planning process, and public participation in environmental decision making. The League distributed a fact sheet to legislators with information on League budget priorities. State Government financing and the financing of public education will be two of the most important issues that will be examined during the interim.

*2003.* The LWVTX included both Financing State Government and Public School Finance in its periodic program review during the 2001-03 biennium. Minor editorial changes were made to our Financing State Government position but no substantive changes were made. Knowing that the state was facing large deficits and there was a likelihood of significant cuts in state spending, the LWVTX joined with other organizations concerned about adequate funding of state services in the Fair Taxation Coalition under the umbrella of ProTex, a grassroots organizing group. One of the results of the coalition's work is a Fair Taxation Workshop, which can be given to community groups. It received high marks when it was presented at Convention in April and in other venues. The League expects to be giving the workshop throughout the next year.

.

Although much of the focus of the legislature and the LWVTX was on public finance issues as the state was faced with a $10 billion deficit for the biennium, lack of agreement or time left most bills relating to public finance neither passed nor considered by the end of the session. The League testified for several bills that would have increased state revenues, and against several which would have further hampered the ability of the legislature to increase state revenues through taxation. The League and a few other members of the Fair Taxation Coalition were frequently the only advocates for increased funding in order to assure adequate state services.

Almost all of the bills we followed, good and bad, did not pass. Only one bill, which affects local property taxes, passed. This law puts teeth into the requirement that businesses render their property for ad valorem tax purposes; it is estimated that it will increase local property taxes significantly.

Two constitutional amendments voted on in September 2004 will impact local property taxes. One freezes school taxes for disabled homeowners, and the other allows counties, cities, towns and junior college districts to freeze other property taxes for persons over 65 and for persons with disabilities.

Governor Perry signed a $117 billion state budget on June 22. Keeping campaign promises by many legislators, the budget contained no new taxes, although it does include some increases in fees. Although higher in total than the appropriations for last biennium due to anticipated increased federal spending, general revenue spending was reduced by $2.6 billion.

The new budget will result in decreased services and/or demands for increased funding of many services at the local level. Tuition increases are expected at some public universities and colleges since public institutions were given the power to set their own tuitions. While the eligibility levels for Children's Health Insurance Program, Medicaid, and Temporary Assistance for Needy Families (TANF) were maintained, procedural changes in these programs are expected to reduce or at least not significantly increase caseloads. In addition, for the Children's Health Insurance Program, a number of previously provided benefits, including dental and most mental health benefits, were eliminated. Services to the elderly and mentally ill were also eliminated or reduced in scope, and cuts were made in criminal justice programs including all state funding for the highly respected Criminal Justice Policy Council.

*2005.* Of the 59 bills related to public finance that the League followed, only one (HB 1, the General Appropriations Bill) actually passed, and this was the bill from which the governor line item vetoed all funds related to public education. Bills such as a statewide property tax and indexing of gasoline taxes didn't pass; a lot of bad bills, like greatly increased sales taxes, caps on tax rates and appraisals for example, also didn't pass. However, once the governor called a special session to consider school finance, it appeared that some of the same battles would be fought all over again.

The governor put caps on property tax rates, school funding, and education reform in the call for the special session. He also issued his proposed solution to the school-funding situation. Major provisions included making partnerships owned by corporations subject to the corporate franchise tax; increasing the sales tax by 0.007%; adding certain services to the sales tax base; and increasing the cigarette tax by $1.00/pack. Presumably to offset the increase in the sales tax that would fall most heavily on the poor, the governor proposed to increase the homestead exemption by $7,500 to $22,500 in 2007. When added to vetoed funds from other bills, the governor said that there would be a $1.9 billion net increase in school funding for the biennium, significantly lower than the $3 billion the House was aiming for and the up-to $7 billion cited as necessary by public school support groups. Property taxes would be reduced by 30 cents/$100 valuation in 2006 and 35 cents/$100 in 2007. None of these passed the special session.

HB 3 did not pass. It was revenue neutral, and its sole purpose was to replace the property tax with other taxes. HB 4 would reduce the increase in tax rates from 8% to 5% to trigger a rollback election if 10% of the voters petition for one.

*2011.* For the decades since the League started recording, Texas state leadership has struggled to finance the government of a growing population while refusing to raise revenue. The attempt to reconcile the two opposing goals has continued through feast and famine, which this year involved an estimated $27 billion shortfall. That is, for

OCAGH_00001574

this biennium, the legislature was short one fourth of the money it needed to simply keep the same level and amount of services it provided in 2010.

The shortfall is the result of the protracted national recession that started in 2007, and of an institutional deficit created in 2006 when property taxes were reduced by one third, and an inadequate business margins tax established to balance the loss of funds. The permanent deficit leaves Texas government $10 billion per biennium short in needed revenue. Instead of dealing with the problem, state leaders couched the fiscal crisis in terms of towing the financial line. Before the session both the governor and members of the legislature vowed there would be no new taxes. In addition, they decided not to tap the majority of the Rainy Day Fund, a renewable pot of money–estimated to be $6 billion by the end of this biennium–that was created for just this type of fiscal emergency.

By the end of the special session, the only viable finance bill, SB 1/HB 1, had cut total spending by $15 billion. To do that, the legislature cut some waste, employed a combination of fiscal tricks involving delayed payment, underestimated future obligations to Medicare and Medicaid, and raised some user fees. The final legislation was $4.8 billion short of covering projected Medicaid costs and had stripped $4 billion from public education. This amounts to about $500 per pupil across the state.

The most ominous move during this session, however, was the breaking of an almost 60-year promise Texas lawmakers have kept, until now, to provide each student in the state an adequate basic education through the Foundation School Program. It remains for the 2013 legislative session to do the hard work of fiscal reform this session shirked.

*2015.* State budget bills: We submitted detailed remarks to both the House and Senate regarding our views on the proposed budgets—both that of the Senate and that of the House. All budget bills must originate in the House, and the Senate proposes a substitute HB 1.

Additionally, several bills were introduced which we responded to: We opposed HB 31, which decreased the state sales and use tax rate. We opposed this bill because our position states that we support "an equitable taxation system that assures adequate revenue." As we currently do not have the revenue to cover our essential needs for education, health care, transportation and infrastructure, it is illogical to cut taxes for the future. The bill died in the Finance committee. SB 1 reduced the ad valorem taxes by increasing the exemption of $15,000 for a homestead to $25,000. We presented testimony on this bill before the House Ways & Means Committee. It passed both Houses and was signed by the governor.

SB 9 limited the rate of growth of appropriations for future years. In our letter to the Budget Conference Committee, not only did we speak to issues which we support, but we also opposed any cap on future budgets, saying "But the most egregious budgetary action would be to put a cap on future budgets which would lower our ability to meet growing needs, much less address needs from past years. We strongly OPPOSE such an action." Fortunately no budget caps passed.

*2017.* The Conference Committee on the General Appropriations Bill (SB 1) was signed by Governor Abbott on May 31. We now have a budget of $217 billion. The Senate proposal was $171.7 billion and House proposal was $218.1 billion. The difficulty is that it is not enough to adequately fund a number of programs, including public education and Medicaid. To reach even this number, however, $1 billion was taken from the Rainy Day Fund and $2 billion from the dedicated highway fund.

At this point the biggest loss is education, when the Senate would not accept HB 21 by Representative Huberty–due to the Senate adding school choice (vouchers) to the bill–which has now failed. Our children will feel the burden.

*2019.* According to the May 31 issue of the Texas Tribune, the final biennial budget for the state of Texas was $250.7 billion, up 15.7% from two years ago.  It includes increased spending for public education and property tax cuts.

Legislators did not use the Economic Stabilization Fund for the regular budget, but did make a $6.1 billion withdrawal for the supplemental budget to pay for Hurricane Harvey recovery and infrastructure projects.

It includes $6.5 billion for school funding and teacher pay, $5 billion for property tax cuts, $66.5 billion for Medicaid, $4.4 billion for mental and behavioral health, $342 million for early childhood intervention, $256 million for judicial salaries, $12.2 million for adult protective services pay raises.

The League issued an Action Alert on April 10 asking all Representatives to vote against HJR 3, a proposed constitutional amendment to increase the state sales tax from 6.25% to 7.25%. The tax would have hit low income Texans the hardest: low-income Texans pay 7.4% of their income to state sales taxes, while the wealthiest pay only 1.6%. Our current sales tax rate is 13th highest in the country, and adding another percent would have made Texas the highest (tied with California). The Alert generated 381 letters to legislators. The resolution passed the House Ways and Means Committee on May 1, but was never voted on by the full House.

## F. Homeowners Association Reform
2012

*The League of Women Voters of Texas supports changes in Texas law governing mandatory homeowner associations that would:*

- Protect against unreasonable foreclosure on homesteads.
- Assure priority of payments so that assessment payments apply first to delinquent dues and then to non-assessment items, such as interest and penalties.
- Reform HOA elections to ensure secret ballots in homeowner elections and safeguards against fraud to assure uniform, honest, and accurate election results.
- Assure that homeowners have access to meetings and records of the homeowner associations.

## Explanation: Homeowners Association Reform
This issue was first proposed as a not-recommended concurrence at Convention 2010 by LWV of the Houston Area. Delegates voted to defer the issue to Convention 2012 pending further consideration by a committee to study the Houston materials, consider bills pertaining to homeowner association reform filed in the 2011 legislature, and the need for statewide advocacy. The board recommended the concurrence in 2012.

## History: Homeowners Association Reform
*2013.* The positions of LWVTX on homeowners associations limited which bills could be analyzed or supported.

HB 35 (Menéndez) was passed. It amended the property code to provide that when an owner owns a lot adjacent to the lot on which his residence is located, the adjacent lot can be sold separately only in its original condition as to be suitable for construction as originally platted. HB 2928 (Sheets) that the League opposed would have circumvented a homeowner's right to a judicial foreclosure as established in the 82nd Legislature. It died in committee.

The 82nd Legislature in 2011 passed HB 2761, which provided that any vote cast in an election or vote by a property owners' association must be in writing and signed by the member. Immediately thereafter provision was made that electronic votes cast constitute written and signed ballots. The League position argues there is weak protection from fraud with electronic balloting. In 2013 HB 818 (White) that the League opposed would have specifically eliminated the requirement that a ballot must be in writing, signed by the member or that identity of the property owner be confirmed, greatly raising risk of fraud. It did not pass out of the Calendars Committee.

## G. Intestacy (Dying Without a Will)
1985, 1997

*The League of Women Voters of Texas supports equitable intestacy laws including the following provisions:*

- The surviving spouse should inherit all of the community property when the decedent had no children or when the surviving spouse is the parent of all the children of the decedent.

- The surviving spouse should not inherit all of the community property when the decedent is survived by minor children not of the surviving spouse.
- The surviving parent of a minor child should be required to obtain court permission to dispose of the child's property when it is valued at more than $50,000.

## Explanation & History: Intestacy

Delegates to the 1983 state Convention identified intestacy as needing study. It has not been a legislative priority in recent years. Intestacy was studied as part of the 1995-97 periodic program review. The position reflects current law but was retained and clarified to allow the League to advocate for equitable intestacy laws in the event of a backlash.

# H. Public School Finance

1973, 1981, 1993, 2003

*The League of Women Voters of Texas supports a school finance system that would provide taxpayer equity and an equitable distribution of funds to ensure that all Texas school children receive a high-quality education. Specific measures that we support include:*

- A sufficient level of state support to Texas public schools to ensure that all Texas school children receive a high-quality education.
- A guaranteed tax base yield approach for part of the local enrichment, to mitigate spending disparities resulting from differences in wealth among school districts in Texas; however, the League believes some un-equalized local enrichment should be allowed within a substantially equalized system.
- Equalized state assistance to districts for essential capital outlays.
- Taxpayer equity in the form of state equalization aid to local districts allotted in direct proportion to local tax effort.
- State established minimum local expenditure levels with joint state-local financing (known as the foundation school approach) that includes:
- Adequate salaries to attract and retain qualified teachers and/or teaching personnel.
- Adequate funding of the basic allotment, which provides for operations and programs for special categories of students, specifically vocational education, compensatory education, special education, kindergarten, and gifted and talented.
- Maintenance of a weighted approach to distribution of state school finance money to          individual student needs.

*The League of Women Voters of Texas opposes:*

- The voucher system as well as choice options that do not promote racial integration and/or equal access to quality education.
- Any state requirement that local districts use state school finance monies to provide local tax relief.

## Explanation: Public School Finance

Our school finance positions are the products of two separate studies undertaken by the LWVTX and two subsequent program reviews. The first study was adopted in 1972, and the resulting consensus led to active League involvement in school finance legislation during regular and special sessions from 1973-79.

Because new issues were raised during these sessions and because League members wished to clarify some positions reached earlier, delegates to Convention 1979 adopted a restudy of the Texas school finance system. The restudy was completed in 1981. In 1992 the LWVTX Periodic Program Review Committee reviewed the public school finance positions and recommended extensive revision. Most of the recommendations involved updating terminology, but the review committee suggested substantive changes in the positions concerning equalization of facilities funding and caps on local enrichment. All of the recommendations were approved at Convention 1993. In 2003 the LWVTX Periodic Program Review Committee again recommended changes in the Position, most notably by adding a section on accountability of charter schools. The recommendations were approved at Convention 2003. In 2004 accountability of charter schools and the four related bullets were removed from the public school finance position. The LWVTX position covers charter schools since they are public schools.

## History: Public School Finance

*1979.* The system of property tax administration, which had been contributing to inequities among school districts, was made more rational by passage of League-supported bills in 1979 requiring one appraisal district per county and by the establishment of the State Property Tax Board. The tax board is responsible for determining the market value of taxable property in each school district, an essential factor in calculating school finance formulas.

*1983-84.* Much attention was focused on school finance and teacher salaries during the 1983 Legislative Session. Because of a tight budget and the unwillingness of some legislators to raise taxes, no substantive changes were made. Following the session, the Select Committee on Public Education, chaired by Ross Perot, was appointed to investigate the financing of education in Texas with a view toward reform of the system in a special legislative session.

The Texas Legislature met in special session during the summer of 1984 to enact many of the recommendations of Select Committee on Public Education, including a complete overhaul of the foundation program. HB 72 changed the foundation program from one based on objects of expenditure (teacher salaries, transportation, operating expenses) to a weighted approach based on various educational programs (regular education, special, vocational, compensatory, and bilingual education). Three significant new programs were mandated: prekindergarten for disadvantaged 4-year-olds, summer bilingual education for 4- and 5-year-olds with limited English, and a class enrollment cap of 22 in Grades K-4. HB 72 expanded the foundation program level to absorb a greater share of local enrichment.

For 1985, $900 million in state funds were added and the local share was raised by $1.1 billion, thereby diverting local tax revenue from enrichment to the local share of the foundation program. While the legislature enacted the largest tax bill in the state's history, local school board trustees enacted the largest school property tax increase ever, raising property tax levies by $519 million. Increased local tax levies substantially negated the equalization improvement that the legislature tried to achieve.

*1985.* School funding in the lean budget of the 1985 Legislative Session fared comparatively well in the face of gloomy revenue projections. Little significant education legislation passed as the state leadership remained firm in its resolve to avoid a major overhaul of the recent education reforms. The gifted and talented were added as a special population to the foundation program, and the jeopardized optional full-day, full-state-funded kindergarten was retained.

*1987.* During the 1987 Legislative Session, several attempts were made to cut the public school budget because of the revenue shortfall. The League testified in favor of an increase in the level of state aid to ensure that all Texas school children would receive quality education. By the time that the final 1988-89 budget was adopted, public education was not trimmed substantially.

We also testified against a bill that would have mandated the adjustment of public school funding formulas through the appropriations process since a League position speaks to the clear assignment of responsibility in state government, and we believed school funding formulas were the primary concern of the Texas Education Agency and the House Education Committee, not the House Appropriations Committee.

*1989.* In the spring of 1987, Judge Harley Clark declared Texas' school finance system unconstitutional. This decision was overturned by the Court of Appeals and was then appealed to the Texas Supreme Court.

In the meantime, during the 1989 Legislative Session, several attempts were made to add substantial amounts of money to the Foundation School Program in order to offset the Clark decision. However, because there was great reluctance to raise taxes again, only $450 million in new state money was provided to the public schools although $360 million was in the form of a guaranteed tax yield system.

OCAGH_00001578

Most observers agreed the legislative action was insufficient to rectify any inequities in funding between rich and poor districts. Indeed, in October 1989, the Texas Supreme Court, in Edgewood I, threw out the school finance system.

*1990-91.* In response to the Texas Supreme Court ruling that the school finance system was unconstitutional, the legislature passed SB 1, which was also declared unconstitutional by the high court in the Edgewood II decision in January 1991. The court set a deadline of April 1, 1991, for the legislature to adopt a constitutional system. Thus, the search for an equitable school funding system and the means to fund it dominated the regular session of the 72nd Legislature. The LWVTX adopted public school finance as a priority and consistently affirmed the need for adequate as well as equitable funding for the public schools.

The plan ultimately adopted created 188 new taxing districts known as County Education Districts. Funds raised within the County Education Districts were redistributed among school districts within the County Education Districts on the basis of property tax wealth and tax effort.

*1992.* In January the Texas Supreme Court in Edgewood III struck down the County Education District tax system as unconstitutional, holding that this system was in effect an unconstitutional state property tax, and furthermore that the County Education District tax was not a valid local tax since it had not been approved by the voters in each County Education District. The high court set a firm deadline of June 1, 1993, for the legislature to come up with an equitable system that did not violate other sections of the state constitution.

The League was active in the November 1992 special session that was called to find a solution to the school finance dilemma. A proposed plan to switch from the County Education District countywide system to statewide recapture of property taxes, redistributing certain property tax revenues from the wealthiest districts statewide, failed to win the necessary legislative approval to put it on the ballot as a proposed constitutional amendment.

*1993.* With the court-imposed June 1993 deadline looming, the League chose to dedicate significant resources to following and shaping the school finance bill as the 73rd Legislature convened in January. The League lobbyist stayed on top of the ever-evolving bill as the state struggled to find a formulation that the court would find constitutional, that the legislature would approve, and that met the state leadership promise to voters of no new taxes.

Voters rejected the constitutional amendment that the legislature, with League support, put on the May 1993 ballot. This proposition, known to some as a "Robin Hood" or "share-the-wealth" plan, would have required a limited redistribution of local property taxes from the wealthiest districts to the neediest districts statewide.

With the defeat of the May 1 proposition and with 1 month before the court-imposed deadline, the legislature passed a school finance plan that gave wealthy districts five choices for sharing property tax revenues with property-poor districts in the state.

In the summer following the 1993 Regular Session, many of the wealthy districts chose, with overwhelming voter approval, the option of transferring funds to the state for redistribution statewide in lieu of risking forced consolidation. At the same time, however, these districts were challenging the new school finance plan in court. The needier districts were also challenging the plan, contending they would have to raise taxes just to stay even financially.

While the League was actively supporting the equitable, limited redistribution of local school taxes to property-poor districts in the 73rd Legislature, the League called again for a restructuring of the state tax system. The League noted that the share of school funding continues to decrease while the burden on the local school property tax increases each session. What the League has long advocated to reverse the trend is adequate state revenue from a broad-based, statewide tax, such as the income tax.

*1995.* As the 74th Legislature convened, the Texas Supreme Court affirmed the constitutionality of the 1993 school finance plan. Thus, for the first time in several sessions, public school finance was not a priority issue for legislators

OCAGH_00001579

or the League. Although the League was not active in this area, the legislature enacted and the governor signed SB 1, a rewrite of all of the state's public education laws. Some highlights of the new law include:

- Individual districts are given the option of more local control if they adopt rule charters.
- Minimum teacher salaries were increased.
- Schools will now have "foundation" and "enrichment" curricula.
- In the area of school finance, the basic allotment per student was raised. $170 million was appropriated for assistance for instructional facilities. Low-wealth districts with acceptable tax efforts may apply for state assistance for construction/improvement of instructional facilities.

*Note.* In affirming the 1993 school finance plan, the Texas Supreme Court emphasized the state's duty to provide all districts with substantially equal access to operations and facilities funding. The court stated that there was no requirement for a separate facilities component in the plan as long as districts are able to meet their operations and facilities needs from available funding. The court warned, however, that the point at which some districts will be unable to meet these needs under the plan is near.

*1997.* As noted in the Financing State Government section of the handbook, a tax relief bill dominated the session, but the legislature was unwilling to tackle real reform of the state's taxation system, particularly the thorny issue of public school finance. The tax bill finally passed by the legislature funded property tax relief for homeowners with the state's $1 billion surplus. The League expressed concern about this type of funding, taking money away from important services such as public education. In addition, there may be no surplus in the next biennium to compensate for the reduced property tax, imposing an added burden on local school districts. The only significant change in public school finance to come out of this legislature was the dedication of lottery funds for education, a move that the League strongly opposes. Once again during this session, legislation that would have allocated funds for public education to private schools, via vouchers, was defeated. The League presented testimony and wrote to legislators expressing opposition to such measures.

*1999.* Once again, the issue of private school vouchers took center stage in the arena of public school finance. The LWVTX was a part of the Coalition for Public Schools. We used our grassroots network not only to contact legislators telling why using public funds for private education is bad policy, but also to contact targeted legislators at crucial times during the session. No voucher-legislation is one of the successes of this session.

*2001.* The LWVTX again worked with the Coalition for Public Schools. This session the issue was charter schools, not vouchers. The Coalition supported an excellent charter schools bill based on an interim study that passed the House. A less desirable bill passed the Senate. However, the compromise bill addressed the issues identified during the interim. These issues include a cap of 215 on open-enrollment charter schools and elimination of the category "at-risk" charter schools; the designation of funds received by charter schools as public funds held in trust for children; increased powers for the commissioner of education over licensing of charter schools; a requirement of at least a high school diploma for all teachers in charter schools; and a requirement for notification of parents about the qualifications of all teachers.

A teachers' health insurance bill also passed. Because there were many advocates on this issue, the LWVTX monitored but was not heavily involved in its passage. Funds in the amount of $1.24 million were earmarked for health benefits for teachers. Small districts (fewer than 500 workers) are required to join a statewide insurance pool that is also optional with districts up to 1,000 workers. Larger districts must wait until 2005 to join unless the state is ready sooner.

*2003.* Legislators vowed to revamp the way Texas public schools were funded, but the House and Senate couldn't agree on a plan. The House plan would have put a sunset date on Robin Hood and allowed lawmakers to come back during a special session to study the issue. The Senate plan, backed by Lt. Governor Dewhurst, would have cut property taxes while expanding sales taxes and would have repaired the system during the regular session. Neither plan passed during the regular session, but legislators did extend an additional $1.2 billion to public education using per-student formulas to keep school districts alive until a new system is found. To complicate matters, during the session the courts ruled that the case from property rich schools calling for an end to Robin Hood could be heard. Governor Perry vowed to call a special session, but did not set a date.

House Speaker Craddick appointed a House Select Committee on School Finance, divided into eight subcommittees, which is charged with looking at school finance and the state tax system. While the focus will be primarily on school finance, there could be repercussions across the entire Texas public finance spectrum. A special session of the legislature is expected in late winter or spring, 2004.

In the area of vouchers, which were very much a part of the session, "organized people defeated organized money," according to the Coalition for Public Schools comprised of 38 organizations, including the LWVTX. For the first time, the governor, lt. governor, speaker of the House, and the chairs of the Public Education Committees in both the House and Senate supported private school vouchers. In addition, prominent state and national individual and organizational proponents testified before legislative committees and/or took leadership roles in the voucher fight.

The voucher and virtual charter school battles started with straight-up bills discussed in public settings. But when those bills failed to pass, skirmishes continued until the final hours of the regular session in less visible negotiations in conference committees and via last-minute floor amendments to other bills. Lawmakers realized it would be fiscally irresponsible to take away funding from cash-strapped public schools to set up a new program to subsidize private and religious schools and home schools. The message from the Coalition for Public Schools members was that Texas taxpayers cannot afford private school vouchers, and that every available dollar must be used to ensure that every public school in every neighborhood is adequately funded so all Texas children can succeed.

**2004.** The governor called a special session on public financing in the spring. The LWVTX partnered with Common Cause, Public Citizen, the Grey Panthers, the Christian Life Commission, Texas Impact, and the Texas Education Crisis Coalition to write and release a joint statement on school finance reform addressed to the legislature and sent to the governor. Through work with other groups and League statements to the Joint Committee on Financing Education and to the Senate Finance Committee, the LWVTX supported the message that reform provided taxpayer equity and adequate funding to ensure that all Texas school children receive a high quality education and recognize that equity and quality are inseparable. (See the Spring 2004 *Texas VOTER*.) The session expired without completion of legislation or constitutional amendments.

**2005.** During the regular session, the legislature did not accomplish their #1 goal: to reform and improve the state's school finance system. By failing to pass a school finance reform bill, the legislature once again let politics shortchange the school children of Texas. Cuts were made during the last session, and the special session that followed failed to provide a solution. This session is the 3rd failure to provide meaningful support for the public schools. The leadership team of Governor Perry, Lt. Governor Dewhurst, and Speaker Craddick was unable to reach a compromise on the public school finance/education reform/property tax relief package that was the centerpiece of the 79th session of the legislature.

It appeared that the emphasis was more on lowering property taxes than on solving public school finance problems. In addition, state leaders were determined not to raise taxes overall, which limited the money available for schools and cost them support among education groups. During the late days of the session, Senate negotiators put emphasis on seeing that every school district in the state had nearly the same amount of money per student. They were also particularly critical of House efforts to raise the sales tax, saying they hurt low- and middle-income families.

The one success was that again, no voucher legislation was passed. There were several attempts to pass vouchers, both in specific bills about vouchers and as amendments to other bills. One session on the House floor was especially dramatic with close votes and parliamentary maneuvering.

**Special Sessions #1 and #2.** Governor Perry called a special session following the regular session. Public school finance was also back in the courts. The Texas Supreme Court will rule on a district court judge's decision that the state school finance system is unconstitutional in both equity and adequacy. During Special Session #1, the LWVTX issued two Action Alerts asking local Leagues to contact first their house members, then both their senators and representatives, urging them to oppose HB 3 (See Financing State Government). The LWVTX sent a letter to all members of the legislature asking them to vote against the bill when it came out of the conference committee. The

.

LWVTX believed that the bill did not fund the schools more adequately or equitably and believed that the property tax relief and sales tax increases were not equitable to those taxpayers with incomes of $100,000 and below. Again the legislature had clearly not addressed the dual issues of funding public education and reforming the tax system to pay for that education.

**2006.** Public school finance and education reform was the agenda for the Senate Select Committee on Education Reform & Public School Finance that met biweekly in anticipation of a special session.

A special legislative session on public school finance was called early in the spring following the March primaries. The session had to address the subject of the Texas Supreme Court June 1 deadline on school finance that regarded as unconstitutional the current (statewide) property tax structure. State tax reform was the subject of the Governor's Advisory Committee on Tax Reform, chaired by John Sharp. The report and recommendations of the Committee formed the basis for a broad-based business tax reform (supported by the LWVTX) that was adopted by the special session and which served to answer the Texas Supreme Court decision. Schools were able to open on time. It remains to be seen if the business tax and the actions taken by the legislature (much of which concerned lowering the property tax) will form an adequate, dependable source of revenue for the public schools.

**2009.** The surviving public school finance bill, HB 3646, provides $1.9 billion in new money, largely from federal stimulus dollars. It was allocated in SB 1, the state biennial budget bill. HB 3646 makes changes that improve the way schools are funded and provide teachers with a minimum $800 pay raise. However, comprehensive reform of public school finance in Texas looms large. Schools face rising costs and a state funding freeze at 2006 levels. In addition, local revenues are capped at a rate that can be increased only through local elections. The need to change public school funding formulas remains a critical issue for the next session.

**2011.** Public school finance was a critical issue during this session, when legislators faced a $27 billion shortfall. Impasses over funding for education and health prompted a special session, though other issues were added later. Once again, the legislature failed to address systemic problems with the state's school finance system that is both inequitable and inadequately funded.

SB 1, the fiscal matters bill that passed during the special session, underfunds schools by $4 billion in the Foundation School Program and by $1.5 billion in state grants for such programs as full-day prekindergarten, science labs, Student Success Initiative funding for extra help for students at risk of failing state high-stakes tests, educator bonuses, the Communities in Schools dropout prevention program, and advanced-placement incentives. This is the first budget bill in more than 60 years that does not fund new enrollment in Texas public schools, estimated at 80,000 to 90,000 more students each year.

After using $3.2 billion of the state Rainy Day Fund to address the budget deficit, the legislature refused to spend any of the remaining $6 billion in the fund for schools. Nor would the legislature tackle the root cause of the school budget crisis, the 2006 tax swap that replaced property tax support for public education with a tax on small and medium business, called the margins tax. It has never resulted in expected revenues.

SB 1 does begin to phase out the target revenue-funding model that was created in 2006 in connection with the margins tax. This model created inequities in how funding is distributed to local districts. While SB 1 repeals target revenue in 2017, it is unclear how it will be further reduced and what future legislatures might do. Another provision of SB 1 allows certain charter schools that qualify to access the Permanent School Fund to guarantee bonds for facilities, a privilege previously authorized only for school districts. Many believe the new provision will put the Permanent School Fund at risk, since charter schools do not have a tax base.

SB 2, passed in special session, appropriates money for the support of government from September 1, 2011, to August 31, 2013. It is a technical bill that avoids having deficits in both public education spending and Medicaid at the same time. It is related to HJR 109, a proposed constitutional amendment, which appeared on the November 2011 ballot as Proposition 6 and passed. It allows SB 2 to appropriate $150 million each of the next two school years from the Available School Fund to public education. However, these additional funds will be offset by a matching

OCAGH_00001582

reduction in state general revenue funding. Thus, passage of this amendment will not result in any additional funding for public education.

SB 8, passed in special session, was designed to provide flexibility to school districts to deal with shrinking budgets and personnel cuts. The bill allows districts to cut teacher pay in several ways, repeals the salary floor established in 2009, and changes the 45-day deadline to notify contract staff of nonrenewal to 10 days before the end of the school year. These changes were vigorously opposed by organizations representing teachers, who have been rocked by job cuts and expectations to do more with less.

SB 6, passed in special session, creates a new Instructional Materials Allotment that merges funds for textbooks, electronic textbooks, and technology into one fund. The Instructional Materials Allotment creates a new funding formula that requires the State Board of Education to set an annual distribution from the Permanent School Fund to the Available School Fund to the
Instructional Materials Allotment. School districts will have greater flexibility over use of the dollars.

Successfully stopped were a number of proposals including: a provision in SB 8 that would have increased the 22-1 class-size cap in kindergarten through Grade 4; proposals that would have raised or eliminated the current 215 cap on the number of open-enrollment charter schools that may be granted by the State Board of Education; and several voucher schemes that would have drained tax dollars from public schools.

*2013.* After the dramatic cuts to education funding by the 82nd Legislature in 2011, the 83rd Legislature was under pressure to restore the money. The 2011 cuts had resulted in the elimination of 25,000 faculty and staff jobs, including 11,487 teaching positions. The $5.4 billion cut amounted to a loss of more than $500 per pupil. The 83rd Legislature responded with HB 10 (Pitts), a supplemental appropriations bill that funded various agencies through August 31, 2013, and included $317 million from general revenue and $313 in "recaptured" property tax revenue to the Foundation School Program. This bill passed both houses and went into effect March 10. It was supported by the LWVTX.

The final 2013-15 budget included $3.4 billion in education funding, but that was only 85% of what was cut in 2011, and still left the per-pupil funding more than $500 short of the level reached before the recession. It also did not restore the massive cuts to programs such as full-day prekindergarten and the Student Success Initiative, which offered help to students struggling to pass the state exams. Another supplemental budget bill, HB 1025 (Pitts), supported by the LWVTX, would have added $500 million more for education. It passed both houses, was included in the budget, but was subject to a line-item veto by Governor Perry.

In early 2013, the lawsuit by coalitions of Texas school districts against the state resulted in a ruling that the public school finance system was inadequate and inefficient. However the judge agreed to have a new trial after the legislative session, to take into account changes made by the 83rd Legislature. The new trial is scheduled for January 2014.

The cap on charter schools was reset from 215 to 305 (by 2019) in SB 2 (Patrick), opposed by the LWVTX. It passed both houses and was signed by the governor. This bill exempts dropout recovery charters from the cap. On the positive side, the bill gives the Texas Education Agency more authority to close poor performing charter schools.

Vouchers reappeared in the 83rd Legislature as "scholarships" for poor and at-risk students, with the funding to come from "donations" of part of an entity's state insurance premium tax or franchise tax. We opposed at least five Senate bills and two House bills, and all failed to pass their respective houses. The bills were by Senators Patrick, Paxton, Williams, and Campbell. The House bills were by Representatives Capriglione and Callegari.

*2015.* This was not the year to consider revamping public school finance. The push in the legislature was to lower taxes, especially property taxes, which mainly fund public schools at the local level. The House wanted to lower the sales tax instead, but the conference committee on the budget decided on the property tax reduction, as well as franchise tax reduction. However the state promises to reimburse districts for lost revenue. The reduction is formed

by raising the exemption on the value of the property from $15,000 to $25,000. All this will require the passage of a constitutional amendment this fall.

The final budget did give $1.5 billion to public schools above the $2.3 billion needed for enrollment growth. This includes $41 million for math and reading academies, and $118 million for high-quality prekindergarten programs.

Meanwhile, for the second time in 2 years, State District Judge John Dietz ruled that the Texas school finance system is unconstitutional. His ruling states that Texas fails to provide its schools with sufficient funding and that it distributes its funds among districts unfairly. Even though the 83rd Legislature restored 65% of its 2011 cuts, it wasn't enough, and Texas now spends $600 less per student than it did in 2009 (adjusted for inflation). The state appealed his ruling to the Texas Supreme Court, which will not decide it until next year. House Public Education Chair Jimmie Don Aycock offered a bill, supported by the LWVTX, that would have addressed the problems (HB 1759), but it was pulled after 2nd reading so that a long debate would not kill other bills at the midnight deadline.

A few bills addressed vouchers, this time called Education Tuition Grants, which would have allowed businesses to donate part of their taxes to "educational assistance organizations." They would then award the money to students to attend private schools. Only one of these passed the Senate (SB 4), opposed by the LWVTX, but died in the House Ways and Means Committee.

*2017.* The Senate and House had very different legislative priorities when it came to public education. The most critical difference was evident in the way the two bodies approached the need to revise our public school finance system. Two of the most obvious differences included the Senate's determination to use public funds for private and religious school vouchers, which the House steadfastly opposed, and the Senate's efforts to invest sweeping powers in the education commissioner, which the House was only partially successful in curbing.

**An equitable, fully funded school finance system is essential**. Chairman Huberty and the House Committee for Public Education used a collaborative approach, listened to many experts on public education finance and needs, and crafted HB 21 (Huberty) that was a much-needed first step to address persistent flaws in the current system. It would have raised the basic allotment by $210 per student, provided additional assistance to certain groups of students, simplified and updated transportation funding and the high school allotment, reduced recapture, and created a hardship grant for certain districts. While this commendable effort passed the House, the Senate gutted the funding and tacked on an Education Savings Account voucher amendment before passing it. The House, led by Chairman Huberty, refused to accept the voucher amendment and called for a conference committee. Senators Patrick and Taylor refused to name Senate members to the conference committee and the bill died. It was revived, in part, during the special session, as described below.

**Vouchers are unacceptable**. Several other voucher bills were proposed. Given the LWVTX strong opposition to vouchers, we testified against two (three including the Senate version of HB 21), HB 1335 (Simmons) and SB 3 (L. Taylor) that had traction in committee. We registered against others. Fortunately, none made it through the House. We owe thanks to the strong stand that House Public Education Committee Chair Huberty, Vice Chair Bernal, and committee members took against vouchers with Speaker Straus's backing.

**Accountability measures should be diagnostic and nonpunitive**. Because we support a nonpunitive accountability system, we followed with concern several bills relating to the new A-F ratings schools and districts will be receiving. HB 22 (Huberty)–which in its original form would have delayed implementation of A-F, clarified the ratings methods, and mitigated some of the effects–passed the House, but did not pass the Senate intact. The bill, as ultimately passed by both houses, does delay implementation for schools (to 2019) but not for districts. It does clarify some elements, but it remains largely punitive and, under the Senate's changes, gives the commissioner of education broad authority to make rules and set implementation methods and standards. Those powers were augmented during the Special Session, as described below. Governor Abbott signed HB 22 that took effect September 1, 2017.

An example of other bills related to the A-F rating system is HB 2782 (T. M. Wilson), which would have prevented a bell curve approach to the ratings. It passed in the House and the Senate Committee on Education, but was not

heard by the Senate. As it stands, the A-F accountability system oversimplifies the complexity of teaching and learning and has limited usefulness to serious efforts to improve our public schools.

**Students should be well prepared for graduation and success in college and careers**. Our positions on academic standards led us to follow several bills relating to teacher and instructional quality. HB 3759 (Beidermann) would have temporarily allowed districts to ignore a long list of instructional mandates relating to nearly every academic subject. These exemptions had the potential to adversely affect students' performance on examinations required to graduate, and we testified against them. Fortunately, HB 3759 did not make it out of committee.

SB 1278 (L. Taylor) would have allowed field supervisors of teachers-in-training to reduce on-site observations and would allow those same aspiring teachers to be certified even after twice failing the required content examinations, leaving a generation of students with underprepared and unqualified teachers. As we noted, if students who do not pass the end-of-course examinations do not graduate, then their teachers should have passed *their* content exams to certify their competency to teach their subjects. We testified in opposition and, although SB 1278 passed the Senate, it failed in the House Public Education Committee.

HB 1485 (Swanson) would have allowed science teachers to instruct students on their personal beliefs regarding the origins of life, evolution, and climate change under the guise of academic freedom. We argued that teachers are charged with preparing students for graduation under the Texas Essential Knowledge and Skills (TEKS) and for academic and career success, which require them to know and use the scientific method and understand evidence-based science. HB 1485 was left pending in committee.

SB 463 (Seliger) would extend Individual Graduation Committees (ICGs) through the 2018-19 school year. These committees meet when high school students are in danger of not graduating solely because they have not been able to pass one of the end-of-course exams. We urged support for this bill that would require that the students' teachers, administrators, and parents agree that the student should be allowed to graduate. We had hoped the bill would make Individual Graduation Committees permanent; however, we'll take SB 463 as a step toward that goal. The governor signed the bill June 9, 2017.

HB 1237 (West) creates a dual-credit type arrangement for students taking postsecondary approved technology courses in high school. We testified on this bill, lauding most of its provisions, but questioning elements allowing the commissioner to accept and use private funds to implement the program. The bill passed and took effect September 1, 2017.

HB 515 (VanDeaver) would have simply reduced the number of mandatory state tests–State of Texas Assessments of Academic Readiness (STAAR) and end-of-course–to those federally required by the Every Student Succeeds Act and the No Child Left Behind Act. The bill was widely supported by parents, teachers, and others. However, by the time the Senate approved it (without public comment on the many changes made), only the eighth grade social studies test was eliminated. Among many other changes the Senate made to the bill, the U.S. history test was replaced with a citizenship examination; it would end retesting for those students who fail the fifth and eighth grade reading and math STAAR examinations, instead requiring individual accelerated learning plans to support them in the following year; and it empowers the commissioner to create a high stakes writing portfolio assessment by 2021 to replace the current essay requirement. While we supported the original test reduction bill, we were studying the changes made when the bill died in committee.

**Summary of the 85th Texas Legislative Special Session**. Public education bills were again dominated by HB 21 (Huberty). However, much of its potential to begin to improve public school funding was diminished by Senate changes. Senate attempts at including funding for private and religious schools (vouchers) were again defeated in the House.

HB 21, as signed by the governor, transfers $351 million from the Health and Human Services Commission (HHSC) to the Texas Education Agency (TEA) for the 2018-19 biennium to implement certain provisions, including:

.

- Additional state funding for charter schools in the amount of $60 million per year as an entitlement beginning in 2019.
- Increasing the small district (less than 300 square miles) adjustment in increments through 2024 to bring that funding up to that of small districts of 300 or more square miles. This is expected to increase state costs for the Foundation School Program (FSP) by $41.3 million in 2019 to $124.9 million by 2022.
- Grants for innovative services to students of autism and dyslexia of up to $20 million each over the biennium.
- Creating a 2-year grant program providing transition aid for school districts experiencing financial hardship, including the loss of maintenance and operations (M&O) revenue, capped at $100 million in 2018 and $50 million in 2019.
- Transferring an additional $212 million from Health and Human Services Commission to the Teacher Retirement System of Texas (TRS) to reduce the expected increase of $3,000/year per participant to $1,500/year in premiums, deductibles and prescription drugs.
- Creating the Texas Commission on Public School Finance with the responsibility to develop and make recommendations for improving the current public school finance system.

SB 7 (Bettencourt) addressed inappropriate relations between school employees and students, increasing criminal penalties and sanctions and adding the possibility of pension revocation. SB 1709 (Menendez) makes cyber bullying of minors a crime. SB 1566 (Kolkhorst) empowers the commissioner of education to dictate policy to locally elected boards that are subject to interventions or sanctions due to accreditation status, unsatisfactory academic performance, or financial accountability. HB 2087 (Van Deaver) establishes rules governing the use of student data collection and protection and prohibits the sale of student data or use of student data for advertising purposes.

**Issues not addressed**. (a) Funding increases to teacher pay. (b) Funding for fast-growing districts that have reached their tax cap and cannot adequately accommodate their increasing student populations.

*2019.* The drive by state leaders to reduce or control local property taxes (currently funding 62% of public education), to increase teacher pay, to increase or decrease state testing, and several other issues caused serious differences in the House and Senate and sent the most impactful public education refinancing and restructuring bill, HB 3, in decades to a conference committee. The HB 3 conference committee added a few completely new provisions to the bill at the last possible minute, forcing lawmakers to acquiesce due to the overwhelming good the bill could do.

***LWVTX Public Education Actions Summary Stats:***
- Out of 7,324 bills filed, 923 related to public education (including open-enrollment charter schools).
- We registered positions *For, Against* or *On* 179 bills, not including those we registered on more than once.
- We wrote and delivered testimony on 10 bills and wrote letters and emails to 18 Senators and Representatives.
- Of the 179 bills we took action on, 35 bills passed both houses. Of those, we opposed just two.
- All but one of the 35 bills passing both the House and the Senate have been signed into law by the Governor; he vetoed HB 455.

***The bills that concerned us most were those on public education funding.***
In its 308 pages, HB 3 restructures how we fund public education, including funding priorities. Some significant actions address:
**All Students:**
- Increases the basic allotment to $6,160 per student.
- Changes the weighting and designation of economically disadvantaged students to account for five tiers of census blocks, including data on: median household income, educational attainment, home ownership, single parent households.
- Establishes a grant for schools and charters implementing blended learning (using technology) programs.
- Repeals the G/T (gifted and talented) allotment, but requires districts to offer a G/T program.

OCAGH_00001586

**Elementary Students:**
- Funds and requires districts to offer full-day pre-K to economically disadvantaged, military dependents, homeless and limited English four-year olds
- Funds 30 half-days of extended (summer) learning for K-5 students.
- Creates reading standards and assessments for K-3.
- Requires the use of a phonics curriculum.
- Requires K-3 teachers and principals to attend literacy training.
- Allows the Commissioner to approve an alternative reading assessment for kindergarten students.

**Secondary Students:**
- Creates a student bonus for achieving certain standards on the SAT, ACT, TSIA or Armed Services exams.
- Requires graduating students to complete the FAFSA (a financial aid form).
- Reimburses college entrance exam costs.

**Teachers and Staff:**
- Requires districts to use 30% of the new revenue to increase salaries for full-time (non-administrative) employees, with 75% of that going to teachers, counselors, librarians and nurses.
- Increases the minimum salary schedule for teachers and full-time librarians and counselors.
- Creates: incentives for highly effective teachers at high-needs campuses, an optional designation of teachers as exemplary, master, or recognized, and a mentor-teacher program allotment.

**Taxes:**
- Reduces school property taxes from $1/$100 valuation to $0.93/$100.
- Imposes an automatic tax increase cap beginning in 2021 of 2.5% (from the previous 8%). This was justified by the increase in state funding. Opponents are concerned because: increased state funding is not guaranteed from year to year, this removes an important local control element, it restricts district flexibility in responding to student growth and cost increases.
- Reduces recapture (Robin Hood) through various means.

**Students in Need:**
- Increases the compensatory funding weights for various needy student groups (dyslexia, dual language, special ed, etc.).
- Requires that 55% of the increase be spent on supplemental services for at-risk, economically disadvantaged and bilingual/LEP students.

**Assessment/Accountability:**
- Eliminates the 4th and 7th grade writing tests.
- Requires school boards to develop plans and set performance goals for: early childhood literacy, math proficiencies, CCR (college, career and military readiness).
- Requires district efficiency audits.

**The Commissioner:**
- Increases the Commissioner's responsibilities (some new, others formerly the SBOE's), including: administering the FSP (Foundation School Program), resolving school finance formula issues, certifying census blocks to determine funding levels, rulemaking and funding authority for Special Education, working with a higher ed institution to assess STAAR readability levels.

**Other Funding:**
- Increases the NIFA (New Instructional Facility Allotment).
- Creates allotments for: fast-growth districts, P-Tech and New-Tech programs, 7th grade CTE, small and mid-sized districts.

**SB 2**, the **"no new revenue"** bill, which we opposed, was signed June 12.
- This bill sets new, lower limits on property tax increases, affecting city and county governments, water and other special districts, to 3.5%. Opponents are concerned that this bill restricts local control and reduces local governments' ability to respond as needed to growing populations and increasing costs for safety and emergency services, transportation, libraries, etc.
- School districts' tax increases will be limited to 2.5%. School districts noted that, although the state has increased its funding for education this biennium, there is no guarantee that the state's funding will be sufficient nor that it will be renewed.
- The bill does address some tax transparency concerns.

**HJR 3** (and its enabler HB 4621) proposed offsetting lower school district property taxes with increased sales & use taxes. We opposed this because sales taxes are regressive, hurting the least able to pay the most. Fortunately, HJR 3 (and others like it) died in the House.

**HJR 151** - a Constitutional Amendment that will allow the School Land Board (SLB) to double the funding it contributes directly to the Available School Fund (ASF), bypassing the State Board of Education (SBOE). It passed in the November 2019 Constitutional Amendment election.

## I. Public School Testing and Accountability
2008, 2020 (See also LWVUS Positions "Education" and "Federal Role in Education" in *Impact On Issues*)

*The League of Women Voters of Texas supports state-mandated* **standardized achievement tests** *that are used with a state-mandated curriculum as a method to measure individual mastery and proficiency in a subject, and as a diagnostic tool to measure student growth in progress from one year to the next. In addition, the League supports state- mandated tests that are:*

- Developed and reviewed by a broad spectrum of Texas educators who are acknowledged experts in their fields.
- Written with sensitivity to the diversity of the state's population.
- Not used as the sole determination for grade-level advancement or graduation from high school.
- Used to measure end-of-course proficiency for graduation from high school.
- Developed to measure higher-level thinking skills.
- Limited in frequency of test administration, which would also apply to benchmark tests, practice tests, and field tests.

*The League of Women Voters of Texas supports a state-mandated,* **standardized curriculum** *that is developed with broad input from Texas educators, the public, business groups, and elected and appointed officials. In addition, the League supports a state-mandated curriculum that:*

- Reflects the diversity of the state's population.
- Covers subjects that are included on the standardized tests, as well as those that are not included, to ensure richness and variety.
- Provides the academic rigor necessary for success in postsecondary education and careers.
- Provides students with an education that prepares them to be responsible members in a participatory democracy.

*The League of Women Voters of Texas supports a state-mandated* **accountability system** *to ensure that districts are teaching the standardized curriculum. In addition, the League supports an accountability system that:*

- Aligns with any federal accountability system to avoid conflicting results.
- Identifies academic achievement and gaps in performance among subgroups of students, based on standardized tests and other indicators (e.g., dropout, attendance, and high school completion rates).
- Is used as a diagnostic method to evaluate the strengths and weaknesses of schools and school districts, but *not* to establish school or school district ratings; *not* to sanction, reconstitute, or close schools; and *not* as a primary factor to appraise and terminate educators.
- Measures a school's growth in academic achievement from one year to the next, rather than as a single-year assessment.
- Places less emphasis on the standardized test and includes additional measurements, such as other types of tests, performance in coursework, and portfolios.
- Directs resources to improve performance but not to reward schools.

*The League of Women Voters of Texas supports* **equitable opportunity** *for academic achievement for all students. Specifically, the League supports:*

- Universal but not mandatory prekindergarten programs.
- Universal but not mandatory full-day kindergarten programs.
- Early intervention for academically at-risk students.
- Research-based instruction for English learners and other targeted subgroups of students.
- Tutoring and/or remedial classes for students who fail a section or sections of the standardized test.

- Availability of extended school day, Saturday classes, summer school, extended school year, and night courses at various school levels.

*The League of Women Voters of Texas endorses* **support for teachers** *in the mandated testing environment. Specifically, the League supports:*

- Adequate planning time or class-release time for improving student performance.
- Professional development that is relevant and is supported by research demonstrating improvement in student achievement.
- Reduction in class size, especially for low-performing students, at all grade levels.
- Qualified teacher aides for low-performing campuses.
- Incentives to attract experienced and qualified teachers to low-performing campuses and to subject areas where shortages exist, but not to reward teachers or campuses for improvement in the performance of their students on the standardized test.
- Mentoring for new teachers, with compensation for mentors.

## Explanation: Public School Testing and Accountability

This study was adopted as a not-recommended item at Convention 2006. Titled "Testing K-12 in the Public Schools of Texas," it was intended to educate members on the current uses and demands of the state mandated achievement testing system in Texas. The scope was expanded to include how the testing system and the accountability system are interrelated. A *Facts and Issues: Mandated Achievement Testing in the Public Schools of Texas* was published in the fall of 2007, and the board approved the new position in January 2008. The section concerning "standardized curriculum" was amended by Convention 2020 to include the statement concerning citizenship education.

## History: Public School Testing and Accountability

**2007.** The legislature addressed testing and accountability issues in SB 1031. It replaced the state-mandated standardized test—the Texas Assessment of Knowledge and Skills (TAKS)— with end-of-course testing as a requirement for graduation from high school. The change starts with students entering Grade 9 in the 2011-12 school year. The TAKS is still to be used in Grades 3 to 8. In addition to other changes that were designed to relieve the pressure from testing and provide better preparation for college, the bill created a Joint Select Committee on Public School Accountability. This committee was directed to consider changes in the test-driven accountability system before the 2009 Session, with implementation of any proposed changes scheduled for 2011-12.

**2008.** The League filed testimony in March and May with the State Board of Education (SBOE) concerning revisions to the state curriculum in English/Language Arts and Reading (ELAR) for kindergarten through 12th grade. The League urged support of a state standardized curriculum that is developed with broad input from Texas educators and that addresses the needs of the state's diverse student population. The League supported the draft curriculum from teacher writing teams, but the SBOE voted 9-6 to approve their own revisions to a late-hour version.

The State Board of Education began considering revisions to the K-12 science curriculum in the fall of 2008. The League filed testimony in November urging support for the draft from the teacher writing teams which embraced the scientific concept of evolution that is widely endorsed by scientists throughout the world and a standardized curriculum that provides the academic rigor students need to succeed in college and careers throughout the nation and the world.

In June the League filed testimony before the Joint Select Committee on Public School Accountability, one of many such hearings held throughout the state. The League called for a fairer and more just system, free of punitive ratings and sanctions, citing positions the League had adopted in the spring of 2008.

**2009.** The League filed testimony with the State Board of Education in January and March concerning proposed revisions to the K-12 science curriculum. Once again, the League supported drafts prepared by educator writing teams. The League opposed language that would weaken instruction in the scientific concept of evolution and the ability of Texas students to compete in a global market. A March 2009 Action Alert urged members to support these positions in individual contacts with the State Board of Education. While the State Board of Education did not adopt "strengths and weaknesses" language concerning the study of evolution, the board approved amendments to

OCAGH_00001589

require high school students in biology to "analyze and evaluate the sufficiency and insufficiency of common ancestry;" and in earth and space science, to "assess the arguments for and against universal common descent." As the State Board of Education takes up revisions to the social studies curriculum in the fall of 2009, the League is continuing advocacy supported by previously invoked positions.

The 81st Legislature enacted broad changes to the state accountability system in HB 3. Some of the modifications are consistent with League positions: allowing the use of growth models, rather than a single-year assessment, to measure a school's achievement; improving preparation for college and careers; reducing the focus on student achievement as the prime criterion for promotion in grade 3; providing some relief on the definition of dropouts, which affects ratings; and giving the commissioner of education the option to grant improving schools to be rated as Unacceptable an additional fifth year before they are closed or put under alternative management. However, the League believes that HB 3 did not do enough to relieve punitive sanctions, ratings, personnel changes, and closures, which disproportionately affect urban schools with high populations of low- income students and English learners. The League prefers an accountability system that is used for diagnostic, rather than punitive purposes. Another concern is that the test-driven accountability system has become even more complex and reliant on achievement ratings since HB 3 added 10 new indicators on college readiness.

*2011.* Education issues associated with testing, accountability, and achievement took a back seat to school finance this session. Many changes concerning these issues resulted from HB 3 last session, with some scheduled to be phased in through 2013. The consensus this session seemed to be that the new system should be allowed to become fully operational before other changes should be made.

HB 2135 is one change that will cut back on assessments for students in Grades 3 and 5 who meet certain requirements. Another change, which was requested by some legislators in the 2011 Session, involves the way accountability ratings are determined by the Texas Education Agency.
Based on a 2006 legislative directive, the agency had developed and adopted in 2009 the Texas Projection Measure (TPM). It estimates whether a student who failed the standardized test during the current school year is likely to pass the test in the next grade level. If so, the student is counted as passing for purposes of the current year's accountability rating.

This session, legislators argued that the Texas Projection Measure artificially increased ratings and gave the public a misleading message about the performance of their school and district. In response, the commissioner of education reverted to the actual passing rates for calculation of the 2010-11 accountability ratings. This system will remain in effect while the state transitions from the Texas Assessment of Knowledge and Skills (TAKS) to new, more rigorous assessments: the State of Texas Assessments of Academic Readiness (STAAR) and end-of-course tests in high school.
*2013.* HB 5 (Aycock), supported by the League, was the major piece of legislation to deal with testing at the high school level. Both the House and the Senate passed it unanimously. It reduces the end-of-course tests from 15 to five, including English I and II (reading and writing combined), Algebra I, Biology and U.S. History. English III and Algebra II may be used by districts for diagnostic purposes but will not be required for graduation. The new testing regimen will begin in 2013. Schools will also be prohibited from administering more than two benchmark tests per student per subject. We supported this bill based on our position that tests should be limited in frequency of test administration, including benchmark tests, practice tests and field tests.

*2017.* HB 515 (Van Deaver) would have simply reduced the number of mandatory state tests–State of Texas Assessments of Academic Readiness (STAAR) and end-of-course–to those federally required by the Every Student Succeeds Act and the No Child Left Behind Act. The bill was widely supported by parents, teachers, and others. However, by the time the Senate approved it (without public comment on the many changes made), only the eighth grade social studies test was eliminated. Among many other changes the Senate made to the bill, the U.S. history test was replaced with a citizenship examination; it would end retesting for those students who fail the fifth and eighth grade reading and math STAAR examinations, instead requiring individual accelerated learning plans to support them in the following year; and it empowers the commissioner to create a high stakes writing portfolio assessment by 2021 to replace the current essay requirement. While we supported the original test reduction bill, we were studying the changes made when the bill died in committee.

OCA-APPX-1529

OCAGH_00001590

*2019.  See Report under Public School Finance.*

## J. Redistricting
1984, 1999, 2017  (See also LWVUS Position "Redistricting" in *Impact On Issues*)

*The League of Women Voters of Texas supports action to achieve an effective method for drawing nonpartisan boundaries for congressional and state legislative districts through legislative action and constitutional revision.*
*The League supports the formation of an autonomous, independent citizens redistricting commission following the decennial census with the initial responsibility of formulating a redistricting plan, designating boundaries for the U.S. congressional districts and the state House and Senate districts, with the following provisions:*

- Criteria for drawing district boundaries include the following:
  - Districts must be apportioned on the basis of equal population.
  - Districts must be single-member and contiguous.
  - Consideration must be given to ensuring that the districts be compact, that district lines coincide with boundaries of local political subdivisions, and that districts not be drawn to dilute the voting strength of minority populations or drawn with the intent to favor or disfavor a political party or incumbent.
  - Efforts should be made to avoid splitting residential subdivisions and large residential complexes into more than one district.
  - Districts must not be apportioned on the basis of numbers of electors, but on total population (a qualified elector is any person eligible to vote in a state election in Texas; federal apportionment law is based on total population).
- The redistricting process must include:
  - Specific timelines for the steps leading to adoption of the redistricting plan.
  - Public hearings on the plan proposed for adoption.

## Explanation: Redistricting
In 1983 the League adopted a "Study of the Congressional and Legislative Redistricting Process in Texas," including assessment of current criteria and evaluation of possible alternatives. The study grew out of a concern for the way redistricting had been accomplished during the 1970s and 1980s when legislative redistricting problems had resulted in prolonged wrangling over district lines. League members asked for the study in order to have a position from which to work before the 1990 census and the next round of redistricting. The position was adopted in the fall of 1984.

League members strongly support the initial use of a commission. But members also provided for an alternative method in the event that the legislature is not willing to use a commission. If a commission is not initially responsible, the legislature should conduct the work of redistricting during a special session of the legislature called for the sole purpose of redistricting. The special session should operate within a short, strict time frame.

During 1997-98 Periodic Program Review, the committee clarified the League position opposing consideration of "communities of interest" as criteria for drawing district boundaries. Communities of interest can include common occupations, industries, and ethnic or religious cultures. Most redistricting authorities agree that this criterion is so broad that it invites problems. Communities of interest are difficult to define and often extend beyond political subdivisions and geographical boundaries. Racial and language minorities can constitute a community of interest that is already protected under the Voting Rights Act. At Convention 2013 delegates voted to remove the term communities of interest from the position. At the LWVTX Statewide Conference 2017 delegates passed an updated position that emphasizes an independent citizens commission to draw district boundaries.

The Redistricting position was amended by delegates to Convention 2020 to add the statement concerning the splitting of residential areas, and to emphasize the concern with nonpartisanship in drawing boundaries.

## History: Redistricting

Action on this study has focused on trying to get legislators interested in reforming the redistricting system during a session in which redistricting is not being done. Efforts thus far have been futile. Reform measures have been introduced in each regular session since 1985 but have not been reported out of committee.

*1990s.* The League testified at redistricting hearings about the criteria we consider essential to a good redistricting plan. The LWVTX monitored redistricting legislation in the 1991 Legislative Session that redrew boundaries based on the new census. Forty-three bills on redistricting were introduced in the 73rd Legislature (1993). The League testified in favor of a measure that would have established a commission with initial authority over redistricting. Although none of the bills passed, the number introduced and the interest generated gave hope for progress in the future.

*2001.* None of the redistricting bills passed in the 77th Session. The redistricting process remained unchanged. The Legislative Redistricting Board drew up the Senate and House districts, and congressional redistricting was assigned to the courts when the governor did not call a special session. A large number of court suits resulted from redistricting plans after the 1990 census. Districts were not completely finalized until 1997. At this time it is not known whether or not the new plans drawn following the 2000 census will be in place in time for the 2002 election.

The League's major redistricting efforts in the 77th Session were directed toward changing the redistricting process. After bills to establish a citizen's commission to draw the initial redistricting plan failed, the League lobbied in favor of SJR 35 (Wentworth et al) to establish a special session devoted exclusively to redistricting. The "League bill" passed the Senate Redistricting Committee unanimously, passed the full senate with 29 coauthors, but was not successful in the House. Grassroots support provided by local Leagues and League members was a factor in getting the issue of redistricting process reform before the legislators and raising the interest in, and profile of, this important issue.

The League worked to educate members of the legislature on the use of the most accurate census figures available and endorsed the use of statistical sampling as a proven scientific technique that, when properly used, can improve the accuracy and lower the costs of ascertaining the population count. However the legislature chose not to use this method.

*2003.* The League-supported bill establishing a commission with initial authority over redistricting did not receive a committee hearing in the regular session. The League opposed, on the grounds that a valid plan was in place, a House bill that would have redrawn the congressional districts. Over 50 representatives left the state to deny a House quorum and the bill died.

The governor called a special session for the purpose of redrawing congressional districts. Again, the League opposed redrawing the districts and called for a change in the process to establish a commission with initial authority over redistricting. The LWVTX testified at House hearings in Houston, Lubbock, and Dallas, and at Senate hearings in Houston and Dallas. Local Leagues testified in San Antonio and Waco.

A 2nd special session was called in July with 11 of the 12 Democratic senators leaving the state just before the session was convened. The new redistricting plan was adopted in the second session and withstood court challenges. The new plan was in effect for the March primary and for the General Election in the fall of 2004.

*2005.* Senator Wentworth again introduced a bill, SB 1404 that would establish a commission with initial authority over redistricting, but this time addressing only congressional districts. While supporting a commission with authority over legislative as well as congressional districts, the League chose to support this bill with testimony, Action Alerts, and other advocacy. The bill passed the Senate 30 to 1, but died in the House without a committee hearing.

*2006.* What follows is from a LWVUS press release:
*League Takes Aim at Partisan Redistricting*

As a part of its Democracy Agenda, the League of Women Voters has called on the U.S. Supreme Court to overturn the partisan gerrymander imposed on the citizens of Texas in 2003. In an amicus curiae, or "friend of the court" brief, the League of Women Voters of the United States and the League of Women Voters of Texas argue that the Texas legislature's mid census redistricting was unconstitutional because it was carried out solely to achieve partisan advantage. The law firm of Wilmer, Cutler, Pickering, Hale and Dorr LLP prepared the brief on behalf of the League. The Court will hear arguments in the case, LULAC v. Perry, on March 1, 2006.

"Partisan gerrymandering undermines the basic principles of representative government," according to Kay J. Maxwell, president of the national League. "The Texas League fought this plan when it was presented, and we are proud to join with them in asking the Court to overturn it. Partisan gerrymandering subverts the democratic system because it allows politicians to choose their voters, rather than vice versa. This turns representative government upside-down," Maxwell said.

The Texas mid census redistricting case involves the threshold decision of whether to redistrict at all and not just a decision about how to draw the lines in a redistricting plan. While acknowledging that redistricting policy necessarily has an effect on election outcomes, the League in its brief urges the Court to decide that "there is a stark difference in kind between, on the one hand, relying on neutral considerations that incidentally affect partisan outcomes and, on the other, adopting exclusively partisan criteria for which specific partisan outcomes are the goal." By filing this brief the League of Women Voters continues its long history of fighting against attacks on the basic constitutional right to fair and equal representation guaranteed to all citizens by the Constitution. Leagues have worked vigorously across the country to secure representative redistricting plans in their states after each census and are seeking reforms to assure that the redistricting process is nonpartisan, equitable and open. These are core rights for citizens of a free and democratic nation.

The League's Democracy Agenda is an advocacy and public education program to strengthen and renew the basic tenets of American democracy. This effort seeks to protect our electoral processes through election reform and campaign finance reform, to advance our representative government through nonpartisan redistricting, and preserve our constitutional rights by safeguarding civil liberty.

The Court did not decide in favor of the League position, which was to overturn the plan. It did, however, decide that the plan had a deleterious effect on Hispanic minority districts, and these had to be redrawn. The new districts were in place for the November election.

*2007.* At the beginning of the session Senator Wentworth, a longtime champion of fair redistricting and author of numerous bills supporting the formation of a redistricting committee, spoke. For over three decades the LWVTX has worked in support of an independent redistricting commission to formulate a redistricting plan to draw boundaries for congressional and Texas House and Senate districts. A major hurdle in getting redistricting legislation passed in the 80th Session was to get the House Committee on Redistricting to schedule hearings on the redistricting bills and pass them out of committee. Action Alerts were sent to League members to urge early hearings and voting on the bills. The League did receive one of the rare invitations to present testimony to the House Committee on Redistricting. The League expects to continue to support efforts to change the redistricting process. The issue needs to be addressed at a time when redistricting is not being done.

*2009.* The LWVTX board voted to authorize a Redistricting Advocacy Campaign in advance of the Legislative Session, mobilizing local Leagues to work for grassroots support of Senator Wentworth's bill. However the bill did not reach the floor for a vote.

*2011.* The Texas Legislature passed redistricting bills for the U.S. Congress, Texas Senate, Texas House, and the State Board of Education. While these bills have become Texas law, federal law still requires that either the Department of Justice or the D.C. Federal Court preclear them. The State Board of Education map was pre-cleared but the other maps are now before the Federal Courts. Temporary maps were put in place for 2012 while the courts hear the cases before making a final determination. These maps were drawn to maximize the number of seats held by the majority party while skirting the Voting Rights Act. Competitiveness has been significantly reduced in these maps, but of course there is no legal requirement for districts to be competitive. The opportunity for minorities to elect the candidate of their choice even in previously majority- minority districts has been reduced. Bills, including one by Senator Wentworth to improve the way redistricting is done were once again considered but not passed.

OCA-APPX-1532

OCAGH_00001593

*2013.* As the League's 2012-14 biennium began, the federal court in San Antonio hearing challenges to redistricting plans passed by the 2011 Texas Legislature had drawn interim maps so 2012 elections could proceed and was awaiting the D.C. court decision on whether to preclear the legislature's maps. In late August 2012, the D.C. court declined to preclear the maps. The State of Texas appeal to the U.S. Supreme Court was put on hold until the Court decided the Shelby County, Alabama, challenge to the preclearance requirement.

During the regular 2013 Legislative Session, a handful of redistricting bills were filed. Bills filed in both chambers, HB 145 (Strama) and SB 104 (West), would have established a redistricting commission, which the LWVTX has long supported, but were never heard in committee. Senate State Affairs Committee hearings on SB 1524 (Seliger) to adopt as permanent the interim maps drawn by the San Antonio court for 2012 elections revealed strong Democratic opposition, and the bill was left pending in committee. The regular session ended without significant action on redistricting.

Immediately on adjournment of the regular session, Governor Perry called a special session to adopt the court-drawn interim maps as permanent. The Senate's traditional rule requiring two-thirds support for bills to be brought to the floor was not followed during this and subsequent special sessions, which meant bipartisan support was not needed for bills to reach the floor. Both chambers established select redistricting committees to consider adoption of the court's interim maps for both state Senate and House as well as congressional districts.

House and Senate select committees held hearing on the bills in Austin and several field locations. The LWVTX testified in Austin, and local Leagues testified at hearings in Corpus Christi, Dallas, Houston, and San Antonio, emphasizing the importance of redistricting that is responsive to constituent concerns, reflects diversity, and grants all voters the opportunity for meaningful participation in their democracy.

Both chambers passed bills adopting as permanent the interim maps for congressional and Texas Senate districts as drawn by the court and the interim map for Texas House districts with minor changes to the court-drawn maps (SB 2 (Seliger), SB 4 (Seliger), and SB 3 (Seliger), respectively). Before Governor Perry acted on this legislation, the U.S. Supreme Court announced the Shelby County decision striking down criteria for determining jurisdictions subject to preclearance. With the U.S. Supreme Court decision, Texas could have gone back to the Legislature's 2011 maps, but instead Governor Perry signed the three bills passed by the 2013 1st Special Session, permanently adopting the 2012 interim maps drawn by the San Antonio court with minor modifications to the state House map.

Adopting the court-drawn map for state Senate districts resolved the legal challenges to redistricting for that chamber in the San Antonio court. However, challenges under the Constitution and Section 2 of the Voting Rights Act to the state House and congressional maps continue in San Antonio, and the U.S. Department of Justice has joined the proceedings. Plaintiffs have asked that Texas be bailed-in to preclearance under Section 3. Parties are preparing for a trial scheduled for summer 2014 on issues regarding the 2011 maps drawn by the legislature, the court-drawn interim maps for 2012 now adopted by the State of Texas, and the tweaks to the court-drawn House map made by the 2013 special session. A new challenge to state Senate redistricting was filed April 21, 2014, in Austin arguing that districts should be drawn based on eligible voters, not on overall population, and a three-judge panel has been appointed to hear that case.

*2017.* The House Committee on Redistricting never met during the 85th Legislative Session.

*2019.* For the first time in 6 years, the House Redistricting Committee met and held organizational hearings on 2/28 and 3/7. The purpose of these hearings was to hear invited testimony from experts in the field, to prepare the committee members for the next round of redistricting. The committee held a hearing on bills on April 4.
The Fair Maps Texas Coalition, of which we are a part, worked very hard to get new legislation filed this session.
**Bills that we helped draft:**
HB 3421- A bill to create an independent redistricting commission for our US Congressional districts. (M. Gonzalez).
HJR 123- A constitutional amendment that would create an independent redistricting commission for both our state legislative and our US Congressional districts. (Naeve).

OCAGH_00001594

HJR 124- Redistricting Transparency Act. A constitutional amendment that would require the state to hold public hearings around the state AFTER the census data is handed down. It would also require the state to provide online software and data for the public to use to create and submit their own redistricting plans. (Gonzalez).

HB 2429- The Texas Voting Rights Act. A bill that expands on the existing Voting Rights Act by making it easier for a protected class of citizens to challenge "at-large" election systems in the courts. (Reynolds).

**Other bills that we support:**

SJR 52- A constitutional amendment that would create an independent redistricting commission for both our state legislative and our US Congressional districts. (Menendez).

HB 4564- A bill that would modify the criteria used by the Legislature to draw districts. Includes respecting political subdivisions and prohibiting the use of partisan data when drawing new plans. (Y. Davis).

Three of these bills were given a hearing in the House Redistricting Committee. We testified but all were left pending with no vote by the committee. (HB 3421, 4564, and HJR 123). The rest received no committee hearing. However beginning in April, the League of Women Voters of Texas along with partnering organizations, communicated with the House Redistricting Committee regarding the location and organization of public input hearings, to be held before the next round of redistricting in 2021. The League was actively involved with these hearings, holding training sessions for citizens in the cities planned for hearings.

## K. State-Local Relations
1963, 1965, 1971, 1999

*The League of Women Voters of Texas supports more flexible structures and adequate powers at the local level; comprehensive regional state planning, including regional planning councils with the following provisions:*

- State financial and technical assistance to regional councils.
- Flexible government structures for counties and municipalities, together with legislative and financial powers adequate to provide local services.
- Authorization for cities and counties to combine efforts on regional problems enabling performance of services without overlapping costs and taxation, in preference to single- purpose districts (i.e., transportation districts, municipal utility districts, etc.).
- Regulation of single-purpose districts by the state with provisions for greater accountability.

## Explanation: State-Local Relations
The study of state-local relations, which was begun in 1962, was a logical continuation of the League's study of the Texas Constitution. League members had found many governmental problems that did not conform to an established political jurisdiction. This study included research into constitutional and statutory provisions governing general law cities, home rule cities, and other forms of city government. The League learned in detail about county governments; special districts; how the state administered its services in public education, public health, and water resources; and sources of revenue.

In 1964, comprehensive and regional planning was studied in depth, and the League became interested in councils of government and regional planning councils. In 1971, a reevaluation of councils of government was made with one League from each area doing an evaluation of its own council. The result being that the League continued to support councils of government.

## History: State-Local Relations
During the 1974 Constitutional Convention, the League worked for constitutional revisions that would allow more flexible structures for county and municipal governments.

The League continues to support expanding the authority of county government to carry out urban activities and giving it the option to assume a larger role in meeting countywide needs and problems. Legislation granting counties some form of ordinance-making power has been introduced in several sessions, and the League has supported efforts that meet our positions. At Convention 1985 delegates asked for an explanation of the part of this position dealing with single-purpose districts. Though the recommendation resulted from an interest in municipal utility

districts, preliminary research showed that there has been a proliferation of both single and multipurpose districts since the position was adopted.

The Periodic Program Review Committee recommended to Convention 1989 delegates that the State/Local Relations position be dropped. Delegates voted to retain the position. Some local Leagues have used the position extensively in lobbying for combining certain city and county governmental functions and against overlapping services.

In 1999, the Periodic Program Review Committee recommended retention of this position, and added an explanation of "single-purpose districts."

*2009.* The primary focus of the 81st Session related to county authority, often referred to as ordinance authority or land-use management. The LWVTX concurred with county officials and with many property owners that common-sense regulation is overdue. Because Texas counties have no authority to manage growth and development in unincorporated areas, scarce water supplies are endangered and homeowners sometimes discover that a rock crushing plant is planned just over the property line. The League supported bills which called for one or more of the following: *buffer zones* between designated areas for residential, commercial, industrial, and agricultural use; *density limits* which take into account the available natural resources and local infrastructure; and *impact fees* to be paid by developers to offset the increased cost of building additional infrastructure and providing services. At the beginning of the session, the LWVTX published an advocacy paper setting forth and explaining its support for these measures.

In the Hill Country, officials of 15 county governments (Bandera, Blanco, Burnett, Comal, Edwards, Gillespie, Hays, Kendall, Kerr, Kimble, Llano, Mason, Medina, Real, and Uvalde) began working with other interested local groups (including the LWVTX) and Representative Patrick Rose far in advance of the session to gain consensus regarding the need for more authority in these fast-growing, but ecologically fragile areas. HB 3265 provided for a local option vote before authorizing county authority regulations, including setting density limits, establishing set-back lines, and assessing impact fees. A large contingent of county officials from many of these counties came to the Capitol to sign in and/or testify when the bill was presented to the County Affairs Committee, as did the LWVTX and other interested groups and individuals. Representative Rose's bill was approved by the committee, other Hill Country legislators signed on; it was sent to Calendars Committee, where it died.

The Land and Resource Management Committee heard Representative Valinda Bolton's bill, HB 4175, which would have allowed counties with population between 800,000 and 1.3 million to adopt comprehensive land development plans including buffer zones. The bill had broad support from Travis County officials, the LWVTX, and even the local builders association. Because it would apply to unincorporated areas of the most populous counties, it also had the support of several other legislators representing those areas. After stalling for some time in committee, it was sent to Calendars Committee, where it died.

In the Senate, Senator Jeff Wentworth submitted several bills, but didn't present them to committee. Although most activity on this issue addressed regulating growth in the Hill Country and Travis County, some legislation included other areas and issues as well. The only bill that was passed and signed this session was HB 2275 (Raymond) which tweaked the existing regulations in the international border areas.

A bill to regulate billboards along SH 71 by Representative Bolton made it to the governor's desk, but was vetoed there. Several other bills by other legislators that would have expanded county government authority, especially in Central Texas, died in committee. Bills that would have regulated noise in unincorporated county areas, bills relating to county authority in specific geographic areas, and bills which related to county authority near military facilities all died in committee.

The ingrained attitude in Texas toward property rights continues to be defined by developers. The realities of water shortages, a county's need to plan for growth, and the rights of the individual homeowner to be protected from incompatible developments continue to be subordinate to business interests and growth. It is difficult to see that changing in the near future.

*2011.* County land use authority saw no bills voted out of committee. After last session, when a bill made it to the Calendars Committee, the two representatives who most actively supported giving counties the rights to regulate growth in unincorporated areas were defeated. Also failing to garner support were bills regulating new signs and noise in unincorporated areas. (See IV-B. Land Use.)

*2017.* See Section IV-B. Land Use.

*2019.* Our major activity this session began with our opposition to SB 15 (Creighton). This bill would prohibit cities and counties from requiring certain benefits and protections for employees. This relates to any form of employment leave (such as paid sick leave), hiring practices, employment benefits or other terms of employment. This bill would also gut non-discrimination ordinances that now protect more than six million Texans in most major Texas cities. Currently Austin, Dallas, El Paso, Ft. Worth, Plano, and San Antonio have municipal non-discrimination ordinances, and several other cities and counties have such policies for city workers and contractors. We issued an Action Alert (245 responses) and testified against the bill and the bill died in the Senate.

Then the author resubmitted it as four bills, SB 2485, 2486, 2487, and 2488, hoping parts of the bill would pass. Again we issued an Action Alert, "Fight Anti-Local Control Bills," and got 491 responses. All four bills passed the Senate but died in House Calendars. (This issue was covered by Equal Opportunity Issue Chair in this session.)

# II. Administration of Justice
1960s, 1976, 1977, 1978, 1979, 1980,1987, 2003, 2010, 2019 (See also LWVUS Position "Sentencing Policy" in *Impact On Issues*)

## A. Criminal Justice
*The League of Women Voters of Texas supports an equitable system of criminal justice in Texas with the following provisions:*
Improvements in pretrial justice programs and an adequately state funded public defender system including:

- Availability of night and weekend magistrates.
- Improvements in the training and requirements of law enforcement personnel.
- Revision of the bail bond system to permit counties to serve as bonding agencies and to provide regulation of all commercial bail bond agencies and guidelines for more uniform bail amounts.
- Reform of the bail bond system to require state funded-risk assessment for defendants who are arrested for economic non-violent crimes, and who are unable to pay bail cost, so that they can be released on their own recognizance, subject to monitoring while awaiting pretrial.
- Reinforcement of the requirements for open hearings and the presence of a public defender at the time of a pretrial hearing.
- Elimination of jury sentencing, and revision of the penal code to reduce the disparity of sentences.
- State laws to prohibit wiretapping.
- A state correctional system which would assign highest priority to provision of a broad range of community-based programs and facilities as well as provide technical assistance and funding for locally administered programs.
- Improvements in the parole system.
- A prison system which would provide humane care for all inmates in a secure environment with maximum educational opportunities, adequate health care services, adequate programs to assist all inmates in making the transition from prison to the free world, and compensation to inmates for their labor.

## Explanation: Criminal Justice
League concern with aspects of the justice system in Texas began in 1923 when the League joined other organizations to tackle conditions in the primitive prison system. Results of the committee's work have been lost in the mists of time. During the 1940s and 1950s the League studied and lobbied for the establishment of a family court system for Texas, which was established in 1959. In the early 1960s, several positions supporting an effective judicial structure were included in the League's Texas Constitutional Revision position. These can now be found in the Government section of *Program Perspectives*.

The Convention 1975 adopted a study of both the adult and juvenile justice systems. Divided into five parts, the study took 5 years. Each of these studies resulted in numerous positions from which action at both the state and local levels occurred. Many of our goals have been achieved.

In 1986 Administration of Justice positions underwent periodic program review. Proposals to drop positions that had been achieved and to consolidate others were approved by Convention 1987.

Under the position "Improvements in Pretrial Justice Programs" local Leagues can continue to support a wide variety of specific programs such as pretrial release and pretrial diversion. The bail bond position allows counties to serve as bonding agencies, to regulate commercial bonding agencies, and to establish guidelines for more uniform bail amounts.

Holding county jails to standards set by the State Commission on Jail Standards in the face of potential opposition by county officials or voters is still permissible even though specific support for the state commission has been removed from our position because the commission has been in existence long enough and with adequate funding to operate successfully.

The LWVTX can also take state and local action on further law enforcement personnel training should the need arise in a specific area (see the Domestic Violence position). Convention delegates also agreed to consolidation of the language relating to community corrections programs and probation. The final settlement of the lawsuit against the Texas Department of Corrections (Ruiz *vs.* Estelle) will continue to have an impact on the criminal justice system in Texas for many years to come. We maintain our position in opposition to wiretapping that is still allowed in Texas. The next legislative review will be in 2005.

At the LWVTX 2018 statewide convention a review of the current bail bond system with respect to fairness of practices and the defendant's ability to pay and risk to public safety was passed. The Criminal Justice position was reviewed by the Program Review Committee, and updated by concurrence at a 2019 statewide conference. Two bullets were added under "Improvements in Pretrial Justice Programs."

## History: Criminal Justice

*1991-93.* The 1991 Legislature prepared for a massive revision of the Texas Penal Code by establishing a Punishment Standards Commission. The commission report was issued just before the 1993 Legislature convened. League testimony before the commission related to our position on reducing disparity of sentences. The commission's recommendations addressed this concern by reducing somewhat the range of punishments for first-, second-, and third degree felonies, but the legislature chose to retain the existing ranges.

One recommendation of the commission—the creation of a fourth-degree felony for certain non- violent offenses including possession of small amounts of drugs—was adopted by the legislature. These felonies, now called "state jail" felonies, are to be served in new incarceration facilities called state jails. This new felony category is in accord with the League position advocating less disparity in sentences. A two-year limit was placed on incarceration in a state jail, with the remainder of the sentence, if any, to be served under community supervision. Although recommended for deletion by the Punishment Standards Commission, the section of the Penal Code making homosexual conduct a Class C misdemeanor was retained in the new code.

Because the state had spent nearly $2 billion of bond funds approved by voters since 1987, primarily for more prisons, the November 1993 ballot asked voters for another $1 billion, mostly to construct state jails and transfer facilities for relief of the backlog of state prisoners still awaiting transfer in county jails. Small amounts of these bonds are allocated for state juvenile and mental health/mental retardation facilities. The ballot issue passed. Appropriations for community-based corrections increased dramatically between 1989 and 1993 but only modestly for 1994-95. The 1993 Legislature made permanent the treatment of batterers on probation and substantially increased funding for these treatment programs.

**1995.** The legislature lengthened the time that nonviolent state jail felons can be incarcerated.

**2001.** The governor signed the Fair Defense Act. The act, a result of the findings of two studies released during the past year, including one by the Appleseed Project, established the Texas Indigent Defense Council and authorized the development of standards governing the provision of services at trial, on appeal, and in the post-conviction process. The bill also set deadlines for appointment of counsel following arrest. This balanced set of reforms should help bring order and change to the Texas system that has more than 800 different indigent defense systems in more than 800 different criminal courts in its 254 counties. The League presented testimony in support and worked as a member of a fair justice coalition in support of this bill.

**2003.** The Texas Indigent Defense Reform Act (2001) managed to survive the session intact. Serious threats to roll back the progress made in 2001 did not materialize, and there was a significant boost in state funding or indigent defense. One such effort to repeal certain reforms would have delayed the appointment of counsel. This was turned aside. Another challenge, a bill that would have restored to judges the power to conscript attorneys, was also defeated. One disappointment was the failure of a bill directed at improving the competence of attorneys to represent death penalty defendants in habeas corpus proceedings.

**2011.** There are numerous programs in the Criminal Justice system that provide cost-effective mental health and substance abuse treatment services that avoid the significantly higher costs of incarceration and recidivism. While there were some gains in specific programs, there were also cuts in Basic Supervision, Prison Diversion Programs, Community Corrections, Treatment Alternatives to Incarceration, and Special Needs Offenders.

**2019.** Advocacy by LWVTX during the 86th Legislature was to support bills relating to bail bond reform, which was supported by some legislators and the governor. There was also extensive media attention and support on this issue. The only bill that gained traction was HB 2020 (Kacal et al). The bill had provisions for a Bail Advisory Committee to make recommendations to the Texas Judicial Council regarding a validated pretrial risk assessment tool which would consider the nature of the offense and ability to pay a bond. The bill passed the House, but missed the deadline for a vote by the Senate as the session ended.

Other bills relating to bail bond reform that failed were HB 465 (White) and companion bills
HB 1323 (Murr) and SB 628 (Whitmire). Both HB 465 and HB 1323 were voted favorably out of committee, but did not come up for a vote by the House. LWVTX provided testimony for HB 465.

**2021.** During the 87th legislative session, LWVTX supported bills for police reform, prison reform, and community supervision reform.

**Police reform** received nationwide media attention after the death of George Floyd in 2020. HB 54, (Javier Ambler Act), prohibits police departments from contracting with reality TV shows. HB 929, (Botham Jean Act), requires police officers to keep body cameras activated the entire time in an investigation. HB 3712 and SB 69 prohibit the use of chokeholds by law enforcement. HB 3712 also requires officers to intervene if a fellow officer's use of force is endangering a life, and it requires them to administer first aid when needed. SB 24 requires police departments to review files of people before they hire them to keep officers with a history of misconduct from being passed to other departments. All bills passed and take effect 9/1/21, although HB 54 takes effect immediately.

**Prison reform:** We supported changes to enhance the rehabilitation of prisoners, their humane treatment, and the fairness of the prison system to reflect current research. HB 30 requires that all TDCJ inmates less than 18 years of age (22 if special education) be given a chance to complete their high school education. HB 3606 allows vocational training to be provided to inmates housed in Transfer Units where they may remain for up to two years before being sent to other units. These bills take effect 9/1/21.

However, HB 686, which would require the parole board to take a "second look" at inmates who committed crimes when they were younger than age 17, was **vetoed** by the governor. It would have required them to consider the young age of the person, the results of a comprehensive mental health evaluation, and statements from people who knew

OCA-APPX-1538

OCAGH_00001599

the person before the crime as well as from people who would attest to the growth and maturity of the person. The governor stated this bill would conflict with jury instructions.

**Community supervision:** Four times as many people are on community supervision as the number of people in prison, highlighting the need for improvements. HB 385 allows courts to waive, partially waive, or substitute community service for supervision fees if a person lacks the resources to pay them. HB 569 seeks to remove financial barriers to re-entry for people who are released from jail or prison. It allows credit toward fines people owe if they are in jail/prison after the commission of the offense. These bills passed and take effect 9/1/21.


## B. Capital Punishment Reform
2003, 2010, 2013  (See also LWVUS Position "Death Penalty" in *Impact On Issues*)

*For as long as the death penalty is an applicable punishment in Texas, the League of Women Voters of Texas supports reform of the capital punishment system in Texas with the following measures:*

- Establish a moratorium on all executions in Texas while an official study of the capital punishment system is conducted.
- Prohibit the execution of persons with intellectual/developmental disability, the mentally ill, and juveniles under the age of 18 at the time the crime was committed, establishing clear, uniform and clinical standards consistent with accepted professional practice to determine intellectual/developmental disability and mental illness.
- Observe the provisions of the Vienna Convention of 1848 by providing foreign nationals access to consular officials from their native country.
- Provide the options of life imprisonment and life without parole to juries in capital cases.
- Require the Board of Pardons and Paroles to adopt guidelines and substantive criteria upon which to base its clemency recommendations, to hold open meetings and to give explanations for its decisions.

## Explanation: Capital Punishment
The issue of capital punishment has been in the foreground of debate in Texas for many years. The availability of DNA testing, the rising number of inmates found innocent and released from other states' death rows, as well as an increasing number of Texas executions, have made many in Texas question the death penalty and its effectiveness.

A study of Capital Punishment Reform was adopted at Convention 2001. The study compared (a) Outcomes for defendants with court-appointed lawyers to those who hire their own attorneys, (b) costs of execution to the costs of life imprisonment, (c) the potential of wrongful executions and the impact of new technology, and (d) possible sentencing alternatives. A study committee produced *Facts & Issues: Criminal Justice: Capital Punishment* in 2002 that was distributed to League members, public officials, agencies, and other interested groups and individuals. A limited consensus was reached in the fall of 2002 and the state board approved the new position in January 2003.

At the LWVUS Convention 2006, delegates voted to include support for the abolition of the death penalty in their positions. The LWVTX Convention 2010 voted to remove references to capital punishment sentencing from our position in order to bring our position in line with LWVUS.

A program review committee formed in 2012 recommended that several changes be made to the Capital Punishment Reform position. The committee produced a background paper supporting the changes that was distributed to local Leagues, and the changes were approved by concurrence at Convention 2013. The changes included wording changes and reordering of bullet items to clarify that the LWVTX position to support reforms to the capital punishment system does not conflict with the LWVUS position to support abolition of the death penalty, to change the term "mental retardation" to "intellectual/developmental disability" and include a statutory of

OCAGH_00001600

intellectual/developmental disability for purposes of screening accused murderers, to include both life imprisonment and life without parole as sentencing options, and to require the Board of Pardons and Paroles to adopt guidelines and criteria for its recommendations.

## History: Capital Punishment

*2003.* The beginning of the 78th Legislative Session looked very promising as legislators introduced bills that would reform the capital punishment system. The LWVTX supported many of the bills, including those that called for an official study and moratorium, prohibited the execution of the mentally retarded and juveniles, and required foreign nationals to be informed of their consular rights. As the session progressed, it soon became evident that most of these bills would not make it out of committee and none made it to the floor for a vote. The promising beginning of the session proved to be disappointing, even leaving Texas law in noncompliance with the recent U.S. Supreme Court ruling that prohibits the execution of the mentally retarded.

*2005.* The 79th Session of the Texas Legislature ended without achieving any real reform to the criminal justice-death penalty system. While bills were introduced that would have achieved reform, most sat out the session in committee. The Life Without Parole bill signed by the governor had changed so dramatically from the original bill that its whole intent changed. The substituted bill added the sentencing option of Life Without Parole, but removed life imprisonment as another option for capital cases, leaving juries with still only two sentencing options. Bills that would have brought Texas into compliance with the Supreme Court ruling that prohibits the execution of the mentally retard were shelved. Another bill, which sought to protect the consular rights of foreign nationals, was also shelved. All in all the session was a disappointing one.

*2007.* HJR 23 (Naishat), supported by the LWVTX, calling for moratorium on the execution of persons convicted of capital offenses. The bill would grant the governor the power to issue an order to prohibit the Department of Criminal Justice from performing executions on or after the effective date until the order is revoked. The bill did not pass.

*2011.* Capital punishment has a mix of wins and losses. With the loss of a life, it is important for the criminal justice system to get it right. For the first time ever, the House Criminal Jurisprudence Committee had a hearing on capital punishment issues. The LWVTX gave testimony in support of a moratorium. The Legislature did well in adopting safeguards against wrongful convictions. HB 215, (Ellis, Gallego) sets standards for police agencies in conducting eyewitness lineups. SB 122 (Ellis) allows defendants new post conviction access to DNA evidence. HB 417 (Anchia, Ellis) extends compensation eligibility to Anthony Graves, a death-row inmate who was exonerated, but denied his compensation for wrongful conviction.

Lawmakers left important unfinished business, including reforms to record confessions of felony suspects and to ban the offer of leniency in exchange for accomplice testimony in a death penalty case. Lawmakers did not create a special commission to study wrongful convictions and capital punishment.

*2015.* The League of Women Voters of Texas called for a moratorium on all Texas executions while the U.S. Supreme Court considered *Glossip v. Gross*, a case involving Oklahoma's lethal injection procedure. In addition, the League called for an interim study committee of Representatives and Senators to study the issues involving the death penalty, such as: state secrecy in lethal injections, execution of the innocent, the cost of executions, the different standards being applied from one county to another resulting in the death penalty in some cases and not others for the same offense, unfair application of the death penalty to minorities, guarantees to avoid racial prejudice and economically disadvantaged as compared to other people in the population, prosecutors' roll in representing society, victims' family members' assistance, qualified defense attorneys, systems to prevent murders by mentally ill persons and those with intellectual and developmental differences, and other solutions to keep society safe and that reflect the magnificence of the State of Texas.

The proposed interim committee could have brought recommendations for potential reforms to fix the death penalty system before the 2017 legislative session and encourage all Texans to engage in a long overdue debate that the Texas death penalty deserves and to ensure that Texas has the best judicial system in the world. The study

committee would move closer to ensuring that mistakes will not be made. There is no ability to correct a mistake when somebody has, in fact, been executed while being innocent, the ultimate injustice. In addition, U.S. Department of Justice review of the death penalty, ordered after the botched Oklahoma execution of Clayton Lockett, was still underway. However, SB 1697 (Huffman) that relates to the confidentiality of certain information regarding procedures and substances used in executions passed into law and was signed by the governor. The League opposed this bill.

No matter what one thinks of the death penalty, League members care about open and transparent government and accountability of government to the citizens of Texas. Legislation should not promote government actions to be hidden, but because of SB 1697 now Texas executions can be without the public being fully informed.

Removing death penalty information about chemicals used in the execution process and procedures from public view undermines open government and creates secrecy in executions. The public has a right to obtain public information and a responsibility to oversee government actions. Transactions affecting the death penalty involve Texas paying a private entity for an item or service using taxpayer money to perform executions; yet the legislature approved withholding the procedure and substances names and provider from the taxpayers. This law allows confidentiality of any person who participates in an execution procedure, including a person who uses supplies or administers a substance during the execution and any person or entity that manufactures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution.

Transparency is a basic principle of democracy, but the law restricts transparency and access to public information. Since the State of Texas is going to continue to administer the death penalty, it is essential that the public have confidence that the state is performing state killing openly. The League position is abolition of the death penalty. Cutting public access to information will only inhibit public confidence as state killings are carried out.

There is an ongoing lawsuit on "credible threats to the supplier," but several sources and one court have questioned the existence of these threats. In addition, the U.S. Supreme Court ruled on June 29 against three death row inmates who had sought to bar the use of an execution drug they said risked causing excruciating pain. The majority of the justices, in a 5-4 vote, concluded that a disputed drug used to render condemned prisoners unconscious as the first stage in the lethal injection process works sufficiently well that it does not violate the Eighth Amendment prohibition on cruel and unusual punishment. The court challenge failed because the plaintiffs did not identify an alternative means of execution.

The U.S. has seen a number of botched executions lasting between 20 minutes to 1 hour and 57 minutes with prisoners being seen gasping for air, grimacing and convulsing during executions.
Justice Sonia Sotomayor argued that the lethal injection protocol cannot "be trusted to render and keep a condemned inmate unconscious, leaving him open to pain at the later stages." With the passage of SB 1697, the public may not be informed of the drug and the procedure used in Texas executions.

Public oversight is a part of the checks and balances to ensure good government. A 2012 study published by the *British Journal of American Legal Studies* examined 9,000 executions that had taken place in the United States from 1900 to 2010 and found that 270 executions had involved "departures from the protocol of killing someone sentenced to death" and were therefore botched. The researchers found that the lethal injection method of executing Clayton Lockett had a higher botched rate than any other method.

Numerous other bills were filed related to the death penalty that included abolition, but they did not get out of committee. HB 1527 did have a hearing. The League supported HB 53 (McClendon) that relates to the age of criminal responsibility and to certain substantive and procedural matters related to that age. The U.S. Supreme Court has ruled that children under the age of 18 cannot be executed. This bill would have codified that ruling in Texas. The bill was left in Juvenile Justice and Family Issues Committee.

The League supported HB 267 (Miles) which relates to the joint or separate prosecution of a capital felony charged against two or more defendants for a capital felony for which the state seeks the death penalty, and the court shall

OCAGH_00001602

order severance as to any two or more defendants who are jointly indicted or complained against for a capital felony if the state seeks the death penalty for any one of those defendants. HB 267 addresses the law of parties in criminal cases. The law of parties is a variation of the common law felony murder rule and states that a person can be criminally responsible for the actions of another if he or she aids and abets or conspires with the principal. The bill was left in Criminal Jurisprudence Committee.

The "law of parties" is clearly about conspiracy and organized crime. Four states other than Texas have law of parties statutes, but Texas is the only state that applies it in capital cases, making it the only place in the country where people can face the death penalty even though they did not actually kill the victim.

*2019.* This term three bills were filed to abolish the death penalty (by Reps. Ferrar and Dutton and Senator Lucio). All were never given a hearing in committee. Two bills were filed to make a person ineligible for the death penalty if a pretrial procedure determined the defendant is intellectually disabled. HB 1139 (Thompson et al) actually passed the House and Senate, but died in conference committee. No other bills relating to capital punishment procedures were given a committee hearing, except for HB 3938, relating to considering the views of a close relative in a death penalty case. We testified against this bill on the grounds that it could be abused, and it was left pending in committee.

Facts about the death penalty: Texas has the highest number of executions in the country and ranks fifth highest in the world after China, Iran, Saudi Arabia, and Iraq. Yet death penalty cases and executions have been declining in the U.S. for many years.

Death row exonerations have reached a total of 164 in the U.S. Florida has the most exonerations, and Texas is third in the U.S. with 13. Texas has 232 prisoners on death row, the third highest in the country. Texas has the highest number of executions compared to other states. The South has had the most executions compared to other regions of the country with 1219. Texas and Oklahoma have had 671 executions while the Northeast has had 4 executions. One could argue that being executed depends upon where one lives.

The number of death penalty cases is declining currently throughout the country. The trend started in 1976 with no executions in the U.S. when executions were reinstated. The number of executions rose to 98 in 1999 and has declined to 25 in 2018. The race of the defendants executed is 55.6% for White people, 34.2% for Black people, 8.5% for Hispanic people, and 1.6% for other races. The race of the victims is 76% White, 15% Black, 7% Hispanic, and 2% other races.

## C. Drug Laws and Policies

2006, 2020 (See also LWVUS Position "Sentencing Policy" in *Impact On Issues*)

*The League of Women Voters of Texas considers substance abuse and drug addiction public health issues.*
The League supports:
- Funding of preventive measures by all levels of government, as well as the private sector.
- Education for drug abuse prevention, including:
  - Educational programs aimed at keeping children from using drugs.
  - Public education programs directed to adults.
- Sterile needle and syringe programs to prevent blood-borne diseases.
- No criminal penalties for cannabis possession when recommended by a physician.
- Laws that include drug education and drug treatment programs as alternatives to incarceration.
- Laws that call for no penalties for possession of small amounts of cannabis.

## Explanation: Drug Laws and Policies

This study was adopted at Convention 2004 as a not-recommended item. The focus was to research the history of drug laws in Texas, and to evaluate current laws and policies governing the sale and use of illegal drugs, including their effects on young people, communities of color, and medical care and public health. Additionally, the League evaluated the social and economic costs of relying on prohibition, law enforcement, and imprisonment to solve problems related to drugs, and considered possible alternatives to current policies. Consensus was completed and adopted by the board in January 2006.

Our position was reworded to include no criminal penalties for drugs when prescribed by a physician or possession of small amounts of cannabis. The amendments were passed by LWVTX Convention 2020.

## History: Drug Laws and Policies

**2011.** Changes in policies related to substance abuse and drug addiction were not a priority during the 82nd legislative session. Although bills were supported by the LWVTX and other advocates, the proposed legislation never made it out of committee. HB 117 (Jones-McClendon) contained provisions for prevention and treatment of drug addiction as a public health issue. The bill would have allowed certified community health clinics to offer, along with treatment, needle exchange programs for intravenous drug users to prevent blood-borne diseases. HB 1491 (Naishtat) offered a bill to decriminalize the possession and use of marihuana for medical use when prescribed by a licensed physician.

**2013.** Changes in policies related to possession and use of illegal drugs continue to be a low priority for the state legislature, as proposed bills never made it out of committee. HB 184 (Dutton) would have changed possession of one ounce or less of marihuana or synthetic cannabinoid to a class C misdemeanor. This would have allowed a judge to defer penalties for the defendant who successfully completed a drug awareness and education program approved by the Department of State Health Services. The bill was voted favorably by the Criminal Jurisprudence Committee, but was left pending at the close of the legislative session. SB 90 (Ellis) would have allowed for suspension of the defendant not convicted of a previous similar felony or other felonies to be placed under community supervision that included education and drug treatment. HB 117 (McClendon) is similar to a bill filed as far back as 2007. The bill did make it out of committee and was sent to Calendars Committee April 13, 2013. The aim of the bill was to prevent and reduce the risk of blood-borne disease. The bill would have allowed for a pilot program for anonymous exchange of needles and syringes and offer education on transmission of blood-borne diseases, assist in obtaining substance treatment services, and blood-borne testing services.

**2015.** There was more support by the 84th Legislature for medical use of marihuana when prescribed by a licensed physician than in previous legislative sessions. SB 339 (Eltife) passed and was signed by the governor, allowing for the dispensing of low-THC cannabis by a licensed organization. Though this is a limited victory for allowing the use of marihuana for medical purposes, it will benefit children with intractable epilepsy. Three other bills supported by the LWVTX introduced failed relating to the use of marihuana for medical purposes when prescribed by a licensed physician. One bill HB 892 (Klick/Zerwas/Zedler) was voted favorably out of committee and made it to the general calendar, but did not come up for a floor vote. Bills HB 3785 (Marquez), HB 837 (Naishtat), and SB 1839 (Menendez) were left pending in committee. Testimony supporting HB 837 and HB 3785 was given in a House Public Health Committee hearing by the LWVTX.

Two bill introduced did address lowering the civil penalty for certain amounts of marihuana. Bill HB 507 (Moody) related to reducing the civil penalty for possession of certain amounts of marihuana and gained some traction as it was voted favorably out of committee. The bill allowed the court to waive or reduce civil penalty if the person attends a program that provides education for substance abuse. The LWVTX gave testimony at a hearing by the House Criminal Jurisprudence Committee supporting HB 507. The bill was placed on the general calendar, but did not come up for a vote. A companion bill SB 1417 (Ellis) failed to make out of committee for consideration.

**2017.** The Texas 85th Legislative Session started out with a note of optimism and support favoring bills related to drug laws and policies. Two of the four bills tracked by the League did receive hearings and came close to a vote out of the House. Despite the failure for passage of the bills related to drug laws and policies, the show of support is encouraging for passage of similar bills in future legislative sessions.

HB 81 (Moody/Issac/Dutton), supported by the League, was to reduce civil penalties for possession of small amounts of marijuana. The bill was voted favorably out of the committee. The LWVTX provided testimony in favor other the bill. HB 81 received strong support, but missed the deadline for a vote to be sent to the Senate.

HB 2107 (Lucio/White/Simmons/Sheffield), supported by the League, allowed use of medical cannabis when recommended by a licensed medical provider. In late April the bill gained traction when constituents went to the

Capitol to meet with legislators, taking personal stories urging support of using cannabis for certain medical conditions. The committee held a hearing, and the LWVTX provided testimony in support. The bill was voted favorably out of committee and coauthored by almost half of the House of Representatives, but failed to be placed on the calendar for a vote.

Companion bills SB 170 and SB 269 languished in their respective committees. The Marijuana Project of Texas, an affiliate of the League, served as a reference and provided information on the status on the bills related to use of medical marijuana and a reduction of penalties for small amounts of marijuana.

*2019.* There was increased support among state legislators for access and use of marihuana for medical use and to reduce the penalties for possession of small amounts of marihuana.

HB 3703 (Klick et al) passed, was signed by the governor and will become law. The bill allows for medical use of low THC cannabis, 0.5 percent, when prescribed by any qualified physician. Use is limited to patients with a diagnosis of epilepsy, multiple sclerosis, spasticity, amyotrophic lateral sclerosis, incurable neurodegenerative disease, terminal cancer and autism. Despite the disappointment in limiting the medical use of cannabis, this bill may benefit individuals by having access to an alternative treatment.

Other bills relating to medical use of marihuana, supported by LWVTX, were HB 209 (Reynolds), and SB 90 (Menendez). Neither got out of committee.

HB 63 (Moody), to reduce penalties for possession of a small amount marihuana, failed. The bill passed the House, but although there was support by most members of the Senate for passage, the bill was blocked by the leadership to bring the bill forward for a vote. Passage of this bill would have reduced the penalty for possession of one ounce of marihuana to a class C misdemeanor, same as a traffic ticket.

Other bills reducing penalties, supported by LWVTX, were HB 335 (Dutton), HB 371 (Allen) HB 753 (Wu), HB 1206 (Cole), and HB 2518 (Toth). All these bills received hearings in the Criminal Jurisprudence Committee, but only HB 335 was voted favorably out of committee. It missed the deadline for a vote by the House.

## D. Immigration

1996 , 2021  (See also LWVUS Position "Immigration" in *Impact On Issues*)

*The League of Women Voters of Texas recognizes that immigrants bring diversity and enrichment to our state.   The humane and ethical treatment of immigrants at our borders is an essential part of our country's rule of law and the development of new residents and citizens.*

The League supports the following:
- If children and adults are detained pending an immigration hearing, families are not separated, and children should remain with parents or guardians.
- The facility should provide medical care, a healthy diet, and sanitary living conditions.
- All immigrants, whether they are children or adults, should be provided with an attorney prior to appearing in Immigration court. Legal representation is vital to ensure due process of the law.
- Racial profiling should not be used to stop or hold immigrants or residents due to their appearance, speaking a language other than English, nor should there be an assumption of criminality concerning these issues.

*The League of Women Voters of Texas recognizes that cultural diversity is a source of strength.*

*The League of Women Voters of Texas supports economic assistance to those areas of the state disproportionately impacted by immigration. This funding should come primarily from federal, state, and private sources such as corporations, churches, businesses, and foundations. Local assistance is also appropriate.*

The League believes that the state should:
- Encourage and fund English as a second language and other assimilation subjects for adult immigrants.
- Encourage bilingual information signs in public places where needed.
- Require and fund international symbols for all traffic signs.

OCA-APPX-1544

OCAGH_00001605

.

The League believes the state should support local agencies and groups working with the immigrant population. State support is absolutely necessary for:

- Language fluency for children.
- Emergency health care (including obstetrical delivery).

Additionally, the state should support:

- Language fluency education for adults.
- Administration of criminal justice programs.
- Assimilation programs.
- Housing programs.
- Job training and placement for immigrants.

The League believes that the state should provide additional assistance to school districts heavily impacted by immigration for:

- Staff training.
- Instructional materials.
- Salaries for special skills teachers and aides.
- Facility construction.
- Curriculum development.

The League supports the establishment and utilization of an electronic system to verify immigration status. This system should include measures that will protect privacy and ensure accuracy. The system should be made available to:

- Employers.
- Social service providers.
- Housing agencies.
- Criminal justice system.

The League supports the mandated compilation of statistics regarding immigrants' use of state services.

## Explanation: Immigration

Reflecting a widespread interest in the subject, the LWVTX board recommended and delegates to Convention 1995 voted to study immigration issues in Texas. A study committee produced *Facts & Issues: Immigration, An American Paradox,* which was distributed to League members, government officials and agencies, and other interested groups and individuals. Consensus was reached in the fall of 1996, and the state board approved the new position in November of that year. See the LWVUS Immigration Update 2008 at the end of this publication.

## History: Immigration

*1997.* Because immigration is largely regulated by federal law, few bills relating to immigration were introduced during the 75th Legislature, and no League action was taken. However, one of the League's legislative priorities in 1997, fair and adequate funding and delivery of vital state services in the era of block grants, encompassed the needs of all low-income persons, immigrants as well as nonimmigrants.

*2001.* Changes in federal law in 1996 and partial restoration of federal food stamps in 1998 still left many legal immigrants in Texas ineligible for food assistance. The League supported legislation to alleviate these hardships by requiring the Texas Department of Human Services to develop and implement a food assistance program.

*2007.* The immigration issue generated much sound and fury during the 80th Legislative session, but none of three bills supported by the LWVTX passed. HB 28 (Berman) would have excluded state services to children born in this state to parents who are not citizens or nationals of the U.S., and who have entered the U.S. without inspection and authorization of an immigration officer. The bill died in committee. HRC 11 (Solomon) would have directed the office of the Attorney General of Texas to pursue all available remedies to demand the enforcement of all existing federal immigration laws and to recover any money owed Texas by the federal government for costs incurred by the state in dealing with illegal immigration. SB 151 (Shapleigh) would have prohibited discrimination relating to immigration status or nationality of a person needing or receiving emergency medical care.

OCAGH_00001606

*2009.* The 81st Texas Legislature did provide a few minor affirmative measures such as allowing children to be absent from school if they are involved in an immigration court hearing and providing services and protection to victims of human trafficking. However, of the more than 100 immigration bills filed, more than 60 were anti-immigrant. One questionable bill that did pass was a measure that would provide deportation for those convicted of a misdemeanor involving family violence. According to the Progressive States Network, the anti-immigration movement failed in most states, and Texas was rated as a somewhat integrated state.

*2011.* The 82nd Session saw several proposed bills regarding immigration. The main thrust behind each was to implement the governor's objective to enable all law enforcement agencies across the state to verify the legal status of anyone legally detained. This included increased use of the federal electronic verification system. The LWVTX opposed all of the proposed immigration bills, basically because immigration is a federal issue. The LWVTX supports federal laws providing an efficient, expeditious system for legal entry into the U.S. None of the proposed bills were successful in the regular session.

*2017.* The 85th Legislative Session has been the most divisive session in recent history for immigration with the passage of SB 4 overshadowing the issue. SB 4 aims to outlaw "sanctuary cities" by requiring local police to cooperate with federal immigration authorities and allowing police to inquire about the immigration status of people they lawfully detain. Law enforcement from across the state provided testimony arguing that the law would make our state unsafe and that cities and counties were unable to bear the additional cost of enforcing the law.

Witnesses testified that the law would bring fear into our communities, making people fearful of contacting police, the fear of police profiling in a state that has a large Hispanic community, and the fear that families would be torn apart. The Senate and House both passed this bill, which the governor signed.

The passage of this bill has spurred numerous lawsuits from municipalities across the state from El Cenito (a small border town) to San Antonio (a large metropolitan city) and civil rights organizations. The legislation has spurred many protests in the state and at the Capitol. It has created an environment of fear and contempt that culminated in a near fight in the House.

The only real immigration bright spot this session was that the House let SB 1018, dubbed the "Baby jail" bill die in committee. The Senate bill would have given the Texas Department of Family and Protective Services the ability to license detention centers as day care centers.

*2019.* Of all the bills we followed and supported, only three bills were given a hearing, and they all were left pending (State Affairs, April 17).
HB 35 (Romero, Jr.) would provide conditional driver's permits and conditional instruction permits to residents who are ineligible to have a Social Security number. The ability to be licensed to drive in the state would ensure that drivers met the requirements of taking and passing driver tests and be required to have insurance. This would ensure that our streets would be safer due to having licensed and insured drivers on our roadways.

HB 652 (Neave) would remove the requirement that officials cooperate with Federal immigration officers in the event of an incident occurring in a domestic violence shelter or a church. It would ensure those who are seeking help would not be threatened by the possibility of being deported.

HB 2266 (Anchia) would essentially do away with SB 4. SB 4 became law in 2017 after being hotly debated in the State Senate and was overwhelming opposed by law enforcement, local public officials and private citizens who feared that the new law would lead to police profiling, victims unwilling to call the police and public officials who did not want their law enforcement to become an arm of ICE.

It is disappointing that these important bills, dealing with how the state addresses children, domestic violence victims, the sanctuary of churches, hospitals and domestic violence centers, were left unaddressed. Other bills that dealt with the detention of children were not given a hearing (HB 3664, HB 4141, HB 1765). Two bills that would have repealed

.

in-state tuition for undocumented students who arrived here as children, which we would have opposed, also were not given a hearing.

A review/update of the Immigration position was submitted during Program Planning and voted by the delegates to Convention 2020.

## E. Juvenile Justice

1977, 1994, 2018

*The League of Women Voters of Texas supports an effective state juvenile justice system and programs and policies to prevent juvenile violence and crime. We support the following:*

- An adequate level of state funding for the juvenile justice system and for addressing the problem of juvenile crime; in allocating state funds for these purposes, highest priority should be given to prevention, followed by intervention and then corrections; funding responsibility should be shared by city and county governments, school districts, and private sources.
- Juveniles are those under the age of 18 at the time of the offense.
- Rehabilitation as the main goal of the juvenile justice system, with every juvenile committed to the Texas Youth Commission having access to adequate and appropriate rehabilitation services and programs.
- Coordination of information and services between social service agencies and the juvenile justice system.
- Adequate access to juvenile records by law enforcement agencies.
- The minimum age for adult certification of juvenile offenders should not be lower than 15.
- Strict regulation of possession of firearms by juveniles; adults who furnish illegal firearms to juveniles should be held criminally liable.

If boot camps are used as a correctional measure, they should:

- Feature careful preplacement screening.
- Be limited to nonviolent offenders.
- Provide for parental involvement when appropriate.
- Include programs that build self-esteem.
- Be nonabusive.
- Emphasize rehabilitation.
- Provide meaningful tasks for the juveniles.
- Provide for follow-up.

Cultural bias in the juvenile justice system should be addressed through:

- Review and revision of juvenile justice system policies and practices that may have a discriminatory effect.
- Increased access to competent legal counsel.
- Early access to prevention/intervention programs.
- Cultural awareness training for juvenile justice professionals.

A comprehensive juvenile violence and delinquency prevention strategy should include, but not be limited to:

- Self-esteem enhancement/development.
- Classes in parenting skills/family relations.
- Quality childcare programs.
- Opportunities for healthy bonding with an individual or group.
- Classes in alternatives to violence as a means of resolving disputes.
- Drug education programs.
- Sexuality education.
- Gang prevention programs.

The state should require schools to provide alternative education programs for students with severe behavioral problems. The state should encourage schools to:

- Teach alternatives to violence.
- Provide alternative education programs for truants and other at-risk students.

## Explanation: Juvenile Justice

OCA-APPX-1547

OCAGH_00001608

Delegates to Convention 1993 voted to restudy the juvenile justice system in Texas and to look into the problem of juvenile violence as well. *Facts & Issues: Juvenile Violence and the Juvenile Justice System in Texas*, was produced by the study committee and circulated to all members, selected government officials and agencies, and other interested groups and individuals. Consensus was reached in the fall of 1994, and the state board approved the new position in November of that year. The current position replaces the former juvenile justice position that had been adopted in 1977. In January 2018 the LWVTX board voted to amend the position by adding a definition that "juveniles are those less than 18 years old at the time of the offense" (to align with the U.S. Supreme Court ruling Roper v. Simmons, 543 U.S. 551, 2005) and delete that "juvenile offenders under age 10 may be referred to the juvenile justice system."

## History: Juvenile Justice

*1995.* During the 1995 Legislative Session, juvenile violence and the juvenile justice system was a priority issue for the LWVTX. An advocacy paper, "Juvenile Crime: Strategies to Stem the Rising Tide," was published and circulated to all legislators and other elected and appointed officials, as well as to interested members. The League's interest in juvenile crime proved most timely. Legislators and the governor, as well as many other citizens statewide, shared the conviction that this pervasive problem must be addressed with fresh initiatives.

League-supported portions of the enacted bill include: first offender program to allow nonfelony juvenile offenders to be processed outside the juvenile court; early intervention services for juveniles as young as seven; a progressive sanctions model (though not fully funded) that ensures juveniles face uniformly consistent consequences that correspond to the seriousness of their offenses; funds for additional probation officers and for construction of post adjudication intermediate sanction facilities. The League also lobbied successfully for a new law that limits children's access to readily dischargeable firearms. Although a League-supported measure geared to prevention programs in early childhood failed passage, several prevention programs were successfully attached to other bills.

*2007.* SB103, a comprehensive reform bill for the Texas Youth Commission (TYC) was signed by the governor and became law. Major points of the bill are:

- Only children committing felonies may be sentenced to a TYC facility.
- Establishes a feasibility study of a regional structure for TYC with smaller, local facilities conforming to needs of an area.
- Establishes the office of Executive Commissioner and Advisory Board for TYC.
- Establishes authority of a state auditor to review financial transactions of Commission an internal audit procedure, reporting to legislative committees.
- Provides for criminal background checks for potential TYC employees.
- Allows advocacy and support groups to provide on-site services at TYC facilities.
- Establishes the Office of Inspector General to investigate fraud.
- Establishes the Office of Ombudsman to evaluate services to youth and review complaints.
- Restrict placement of minors under 15 years to dorms for youths 16 years and younger.
- Develops and distributes a Parents Bill of Rights.
- Assigns a caseworker to each child committed to a TYC facility.
- Establishment of a zero-tolerance policy regarding sexual abuse of inmates.
- Allows equal access to TYC facilities for female officers.
- Will offer rehabilitation programs recommended by the adjudicating judge.

## F. Spousal Sexual Assault

1982, 1987, 2010

*The League of Women Voters of Texas supports Texas laws that provide that sexual intercourse or deviant sexual intercourse with one's spouse without the consent of that spouse is a criminal offense punishable on the same basis as rape or sexual abuse of any other person.*

## Explanation: Spousal Sexual Assault

A study of spousal rape was adopted in 1981 and the position was adopted in 1982. The spousal rape position was studied by the 1995-97 Periodic Program Review Committee, which modified the original position to reflect a law

OCA-APPX-1548

OCAGH_00001609

passed in 1993 that eliminated marital rape exemptions. Although the original position has been achieved, it was retained to allow the League to advocate against possible future attempts to reinstate the old law. Retaining the position also allows local Leagues to support police department and district attorney efforts to prosecute accused rapists diligently, regardless of the marital status of the parties. Convention 2003 requested that the LWVTX develop a publication with updated information on this position. At Convention 2010 delegates voted to change the position name to Spousal Sexual Assault to conform to language in the current criminal code and statutes.

## History: Spousal Sexual Assault

*1980s.* The LWVTX supported successful bills making sexual assault of a spouse illegal where the married persons lived apart or had filed for divorce. New laws were enacted, defining crimes of sexual assault committed by a spouse. These measures required a showing of bodily injury or threat of bodily injury for criminal prosecution against a spouse.

**1994.** The 73rd Session of the Texas Legislature passed a law mandating that all sexual assault victims be treated equally and eliminating all marital rape exemptions.

*2004.* Written information for members about the League position on spousal rape and the status of current law regarding the subject appeared in the Spring 2004 *Texas VOTER.*

# G. Trafficking of Persons

2014 (See also LWVUS Position "Human Trafficking" in *Impact On Issues*)

*The League of Women Voters of Texas is opposed to all forms of domestic and international human trafficking of adults and children, including sex trafficking and labor trafficking. We consider human trafficking to be a form of modern-day slavery and support measures to prevent the use of force, fraud or coercion to exploit a person for sexual or labor purposes, to prosecute traffickers and to protect victims.*

Federal, state and local governments should collaborate to fund and implement effective strategies for prosecution, including but not limited to:

- Enact and enforce effective laws against traffickers.
- Require human trafficking training for law enforcement officers and prosecutors.
- Maintain and share reliable trafficking data among all levels of government and with nongovernmental organizations (NGOs).
- Put convicted sex traffickers of children on the National Sex Offender Registry list.
- Enforce civil and criminal penalties against persons who knowingly buy services provided as a result of human trafficking, or buy services from a minor, including mandated awareness training.
- Enact and enforce laws at the appropriate level to shut down businesses that engage in or allow human trafficking.
- Divert victims of human trafficking into justice and rescue programs that provide access to services such as counseling and job training.
- Assume all minors are victims, no proof of coercion required.

Federal, state and local governments, in cooperation with nongovernmental agencies, should fund and provide essential services to and remedies for victims and survivors, including but not limited to:

- Legal aid, translations and other court-related services.
- Services to shelter victims from their traffickers and help them return to a normal life, such as housing, medical, counseling, job training.
- Ability to sue the trafficker for civil damages.
- Defined roles for child welfare system and juvenile justice system in assisting trafficked minors.
- Guardianship, protective custody and safe houses for trafficked minors when home situation would put the minor at risk.

Federal, state and local governments, in cooperation with nongovernmental agencies, should fund and provide education and awareness programs on human trafficking in our communities and schools, including but not limited to:

- Training to identify and assist victims or potential victims of human trafficking, for all persons who might come into contact with them, such as medical professionals, law enforcement and prosecution personnel, educators at all levels, mental health professionals, city health inspectors, hotel owners and others.
- Internet safety education for youth, parents and teachers.
- Services and outreach for homeless, throwaway youth and other at-risk populations.

## Explanation: Trafficking of Persons

A study of Human Trafficking in Texas was adopted at Convention 2012. A study committee produced *Facts & Issues: Human Trafficking in Texas*, and local Leagues held consensus meetings in the fall of 2013. The LWVTX board adopted the new position in 2014 based on local League consensus. In 2020, the LWVTX board updated the name to *Trafficking of Persons*.

## History: Trafficking of Persons

*2017.* In several ways we made progress in this Legislative Session for awareness of and laws to address human trafficking in Texas. We have three bills that passed both the House and Senate unanimously, thus bipartisan support.

Bills signed by the governor.

- A law that requires successful completing of a training course in recognition and prevention of human trafficking by applicants for a commercial drivers license.

OCA-APPX-1550

OCAGH_00001611

- A law relating to the development of instructional material for public schools on the prevention of sexual abuse and sex trafficking.
- A law with recommendations to improve the Office of Attorney General Human Trafficking Taskforce.

Bills not passed.
- A bill to mandate signs required to be posted in the restrooms of sexually oriented businesses with the National Human Trafficking Hotline phone number and text number. (We will seek to have such warning and information signs in all public restrooms, particularly in restaurants, bars, airports, public sports facilities, etc.)
- A bill related to continuing education requirements regarding human trafficking for cosmetology license holders and establishments.
- A bill related to judicial proceedings on a petition to set aside a conviction or an order of expunction of criminal history record information for certain victims of trafficking of persons or compelling prostitution who are convicted of prostitution.
- A bill to require registration as a sex offender of certain defendants convicted of the offense of continuous trafficking of persons.

*2019.* At least three bills related to trafficking of persons passed the legislature and were sent to the Governor. One bill, HB 72 (Nelson), establishes the Human Trafficking Prevention Coordinating Council in the office of the Attorney General, to develop and implement a five-year plan for preventing human trafficking in the state, and to submit the plan to the legislature. Another bill, SB 1219 (Avarado), requires the of signs regarding services and assistance for victims in transportation hubs such as airports, train stations, bus stops, rest stops, etc. Both were signed by the governor. Senator Alvarado asked for our help on this bill, so I asked a trafficking survivor to testify at the House committee hearing.

A third bill passed but was vetoed. HB 3078 (Thompson) would have established a review panel under the Board of Pardons and Paroles, which would have considered clemency applications from persons who committed offenses under duress or coercion as a result of being a victim of human trafficking or family violence. The governor's veto statement said that this bill would "add a thick layer of bureaucracy…and is not the way to help victims of human trafficking."

One other bill, HB 467 (Hernandez), relating to sexual assault and domestic violence training for Cosmetology license holders, passed the House but did not get a hearing in the Senate.

In January 2020 the LWVTX board voted to change the name of the position to Trafficking of Persons, in response to a request by the Issue Chair.

## H. Payday & Auto Title Loans in Texas
2013

*The League of Women Voters of Texas supports policies, legislation, and programs that enable a small dollar loan market that maintains access to affordable credit while safeguarding consumers. Payday and auto title loan businesses should be regulated so that they function both as a consumer service and a successful business.*

The League believes that a loan is affordable if the borrower can repay the loan and cover basic expenses without borrowing again or obtaining money from another source. Local governments should be able to regulate payday and auto title lending within their jurisdictions in order to achieve a viable small dollar loan market that provides consumer access to affordable credit and safeguards against predatory lending. Criminal charges and penalties for payday and auto title loans in default should continue to be explicitly prohibited by Texas law. The League supports:

- Consumer credit regulations that increase restrictions on short-term loans and require lenders to offer affordable loans,
- Financial education measures that increase the ability of consumers to successfully use small dollar loan financial products, and
- State and private funding of measures to prevent long-term debt by borrowers in need of immediate cash.

OCAGH_00001612

## Explanation: Payday & Auto Title Loans in Texas

Delegates to Convention 2014 adopted a study, "Payday and Auto Title Loans in Texas," reflecting intense scrutiny of payday and auto title loans at all levels of government and widespread discussion in the community and media that made it a compelling public policy issue. The study focused on current regulations of payday and auto tile lenders in Texas, the accessibility and impact of these loans in the community, and options for small dollar loans for persons in need of immediate cash. A committee comprised of six League members from across the state conducted the study and produced *Facts & Issues: Payday & Auto Title Loans in Texas*. The report was published on the state League website and distributed electronically to League members. Print copies were provided to Texas state office holders, major donor, and other interested groups and individuals. Following numerous public forums and League consensus meetings across the state during fall 2015, a consensus was reached based on analysis of individual League consensus reports. The LWVTX Board of Directors adopted the new position January 2016.

## History: Payday & Auto Title Loans in Texas

*2017.* During the regular session of the 85th Texas Legislature, a few payday and auto title lending bills made it out of committee in both chambers, but none made it to the floor. However, Representative Craddick offered an amendment to SB 2065 what would enact the unified payday/auto title ordinance at the state level (a model local ordinance originated by the Texas Municipal League). However Representative Capriglione offered an amendment to the amendment that would preempt local payday/auto title lending ordinances. While we have heard that a few legislators were confused with the vote, the vote shows us the stance of most representatives on this issue. In the end, the bill failed, and the local ordinances stayed intact.

*Note.* As of January 2018, 41 cities have enacted "business regulations" over payday lenders that are similar to the example ordinance available from the Texas Municipal League. Also sixteen cities have enacted land use regulations related to payday and auto title lending.

*2019.* During the 86th legislative session, there were multiple efforts (through both filed bills and amendments proposed from the floor) to eliminate the uniform payday and auto-title lending ordinance which has been adopted by 44 Texas cities. SB 1209, HB 3899, and HB 2847 would have preempted the payday and auto-title lending ordinance, yet these bills either did not pass or advocates were able to work with the bill author to explicitly exclude the payday and auto-title loan ordinance.

Additionally, HB 1442, passed and renewed the Office of Consumer Credit Commissioner – which is the state agency that oversees the regulation of Credit Access Businesses (CAB or payday and auto-title lenders). This bill also extended the OCCC's authorization to include online lending, which is a win.

*2021.* Our top priority this session was to uphold current protections for consumers by supporting local payday and auto title loan ordinances (adopted in 46 Texas cities) and maintaining existing rate and fee caps for consumer loans. The House Pensions, Investments & Financial Services Committee gave a hearing to consumer loan bills, but unfortunately no meaningful bills were voted out of Committee. Throughout the session, advocates stopped bills and potential amendments which would have pre-empted local ordinances, and would have included payday and auto-title loan ordinances. Thankfully, none of these passed.

# III. Social Policy/Human Resources

## A. Child Abuse & Neglect

1990, 1995, 2009 (See also LWVUS position "Early Intervention for Children At Risk in *Impact On Issues*)

*The League of Women Voters of Texas supports the development and implementation of adequate legislation, policies, services, and programs to protect children from abuse and neglect. Measures the League supports include, but are not limited to the following:*

- Adequate funding from governmental and private sources to provide appropriately trained staff and uniform statewide availability and accessibility of effective services and programs.
- Provision by the responsible state and local agencies for varied and sufficient services to ensure the protection of children.
- Development and implementation of programs to prevent child abuse and neglect.
- Mandatory, uniform, and ongoing training in recognizing and reporting physical and behavioral indicators of child abuse and neglect for persons responsible for the safety and welfare of children, such as law enforcement officers, judges and probation officers, educators, child-care givers, and medical personnel.
- Availability and enforcement of measures, including protective orders, for the removal of the abuser from home when appropriate.
- Stringent correctional measures for persons who abuse or neglect children, including mandatory specialized treatment and counseling as well as appropriate enhancements for repeated offenses.

## Explanation: Child Abuse & Neglect

Delegates at Convention 1989 adopted a novel plan regarding this issue. After the LWV of the Houston Area completed a local study of child abuse and neglect and adopted its local position, the LWVTX board narrowed the scope of the position statement so that it was appropriate for a statewide concurrence process. The narrowed position statement and a publication *(Focus)* adapted and edited by the LWVTX board from LWV of the Houston Area *Facts & Issues* was subsequently made available to participating members statewide. After careful evaluation of resulting concurrence data, the LWVTX board adopted the state League position in June 1990.

During the Periodic Program Review process in 1993-95, wording changes that enhance format consistency and reflect changed circumstances were suggested by the Periodic Program Review Committee and received final approval at the 1995 Convention. A substantive addition to the position was also approved: support for stringent correctional measures for persons who abuse or neglect children, including mandatory specialized treatment and counseling, as well as enhancement for repeated offenses. The reworded position is set forth above. In Statewide Conference 2009 delegates voted to drop our position's limitation to abuse "in their families and homes" so that we could support bills that would reform the Texas Youth Commission.

## History: Child Abuse & Neglect

*1990-95.* During this period, the League supported its child abuse and neglect positions through membership in the Texas Council on Family Violence. In 1995 we supported a measure that rededicated monies paid to the Children's Trust Fund of Texas directly into the agency's operating funds, thus establishing an improved, more direct method for the Children's Trust Fund of Texas to provide funds to communities for local abuse prevention programs.

*1999.* During the legislative session, funding to Child Protective Services (CPS) was increased significantly. Foster care received a 7% increase. Two hundred-twenty new CPS staff that had been authorized by was augmented by an additional 160 caseworkers in order to lower caseloads and to improve the effectiveness of child abuse investigations.

*2003.* During this legislative session Child Protective Services was reorganized and will continue to be impacted as the result of a huge human services reconsolidation law. Several prevention programs lost funding in the Texas Department of Protective and Regulatory Services, including Big Brothers/Big Sisters, Healthy Families, Family Outreach, and the Children's Trust Fund.

*2005.* Although the LWVTX did not set a priority for this issue, reform of Child Protective Services was an important aspect of this session for legislators. The omnibus bill relating to child abuse, as passed and signed by the governor, decreases worker case loads, strengthens ties between Child Protective Services and law enforcement, and provides other protections for children. A last minute attempt to ban gay foster parenting was ultimately unsuccessful. The bill does institute privatization of services for children over the next 6 years, beginning with one region. In the budget battles, Child Protective Services received a 12% increase in funding (state and federal), which will be used to reduce caseloads.

OCAGH_00001614

*2009.* Three bills supported by the League were passed and signed by Governor Perry. SB 1646 (Van de Putte) created a Council of Children and Families. SB 2080 (Uresti) created a Task Force whose task would be to form a strategy for reducing child abuse and neglect and improving child welfare, including providing assistance for adoptive parents and foster care parents. HB 1041 (Parker) related to school districts policies on addressing sexual abuse and established a state agency to reduce child abuse and neglect and to improve child welfare. In addition, the overall budget of CPS received a 8.1% increase over 2008-09 general revenue expenditures including funding for an additional 118.6 Family Based Safety Services Staff to increase face-to-face contact with children and their parents, therapy for abused children, treatment and other services for parents/families, an increase in foster care services, and funds to strengthen services to youth transitioning from foster care.

*2011.* There was some success in this area with the passage of six bills supported by the LWVTX. These included bills by Senators Nelson, Uresti, and West that related to the operation of child protective services and the foster care system, mental health services for children in foster care, and the establishment of a task force to study the relationship between domestic violence and child abuse. Also school districts are required to expand their policies to include all types of abuse and to require training of new staff.

*2013.* With the passage of two bills supported by the LWVTX, progress was made on recognition and reporting of child abuse and penalties for not reporting it: SB 939 (West) related to training to recognize child abuse in schools and reporting it. HB 1205 (Parker, Raymond, Zerwas, Fallon) related to the offense of failure to report abuse or neglect of a child in schools or institutes of higher learning.

Other bills also supported by the LWVTX passed: SB 44 (Zaffirini, West) provided mental health services in certain child abuse or neglect cases. SB 66 (Nelson) related to studying the causes of and made recommendations for reducing child fatalities, including those from abuse or neglect. SB 245 (West) related to eligibility of children's advocacy centers to provide services for children and family members in cases of child abuse and neglect. SB 1758 (Uresti) established a task force to examine hiring and management practices of the Department of Family and Protective Services. HB 1228 (Dukes) related to consideration by the court of sex abuse and conduct that constitutes sexual assault in certain suits affecting the parent-child relationship.

*2017.* Overall the 85th Texas Legislature has been a very productive session for child protection with significant investments made in the Child Protective Services workforce to reduce turnover, increases in foster care rates to address capacity, some prevention funding, and support for children who age out of foster care. Several major bills that the League supported made it through the process. A recap of some of the bills tracked follows.

*2019.* The 86th Texas Legislature lost the previous session's focus on the Texas Department of Family and Protective Service and child protection. Fortunately, a few bills were passed that continue to improve services provided to abused children.

Now schools, courts and colleges are required to consider the child's situation when disciplining or in the civil/criminal court system. The Texas Children's Commission must develop guidelines for judges for greater uniformity in handling CPS cases involving children with mental illness and the placement and termination of parental rights. Texas will provide additional services for foster youth who age out of the system to encourage success as a young adult. And lawmakers will have better data on foster youth in the juvenile justice system, with specific reporting requirements to enable development and implementation of programs to prevent foster youth from entering the criminal justice system.

Lawmakers recognized the importance of stability in a child's life by strengthening the possibility of kinship placement. Now, the Department and Courts may consider as a caregiver a person who has a longstanding and significant relationship with the child's family. Courts are required to ask the child and the parent(s) about the identity of someone who may be considered as a caregiver in lieu of placement in the foster system. Children will also be heard, as judges must ask them about relationships in their lives at each permanency hearing. And Courts are now required to educate kinship caregivers of ways to receive additional resources to help them provide for the placed children.

OCAGH_00001615

Pregnant and parenting foster youth were not forgotten and will receive information about ways to keep their own child(ren) safe and promote healthy attachment, child development, and maternal health if they cannot or do not participate in Project Helping through Intervention and Prevention (HIP) (a voluntary program).

Schools will have more responsibilities as well to help abused children through mandatory training for public school employees to address prevention of sexual abuse, sex trafficking and other maltreatment of children. Additional trauma-informed approaches will be integrated into schools, but more needs to be done to prevent Adverse Childhood Experiences ("ACE") and develop services to assist children to heal. H.B. 4183, which did not pass, would have implemented a statewide collaborative effort for communities and resources to address ACE.

Funding is always an issue for the state when providing protection for children. This lack of focus of lawmakers included feeble attempts to meet the upcoming federal Family First Prevention Act funding deadlines. Fortunately, S.B. 355 passed which calls for the Department to develop a strategic plan for implementing previous programs in order to comply with FFPA.

The League issued six Action Alerts on Medicaid expansion and additional months of Medicaid coverage for children. These alerts were among the most popular with our members and supporters, generating more then 13,500 emails to legislators. However only one of the bills, HB 744 giving 12 months of Medicaid coverage for new mothers, passed the House but was not voted on by the Senate.

*2021.* Two key issues—racial disparity and foster care reform—should have garnered more action from the 87th Texas Legislature. This session, while passing some good bills, left many opportunities in committee.

A prime example are SB 75 and HB 155 (identical bills) which LWVTX supported. These bills never received public hearings. Sponsors attempted to address the continuous need to collect information regarding the racial disparities in child welfare cases handled by the Texas Department of Family and Protective Services. The Department acknowledges racial disparities (unequal or different opportunities provided to a group in comparison to another group) and disproportionality continues in the system.

Prior to the start of the legislative session, federal court monitors found the Texas foster care system was still dangerous to children and a federal judge held lawmakers in contempt for repeated failure to protect children in foster care. The pandemic only increased the risk of neglect and abuse. After monitoring the bills that did pass during this session, it appears legislators are putting great faith in private residential programs which could be problematic in the future.

With the Family First Prevention Services Act (FFPSA) funding, Texas has the opportunity to prevent children from entering foster care. SB 1575, supported by LWVTX, becomes law on September 1, 2021. It not only codifies the judicial review of placements under FFPSA, the bill includes a required study of "best practice" for residential treatment center placements.

SB 1628, supported by LWVTX, would have created a Foster Care Ombudsman to hear complaints from foster care providers and be independent of DFPS. SB 1628 made it through the Senate and House committees but did not receive a vote in the House.

LWVTX supported HB 566 which will become law on September 1, 2021. Lawmakers recognized that the most prevalent inadequacy in the child welfare system is the lack of education for recognizing and distinguishing the behaviors that children exhibit due to trauma. Attorneys involved in DFPS cases will now be required to complete a training program on trauma-informed care and the effect of trauma on children in the conservatorship of the DFPS.

Unfortunately, the legislature once again failed to advance strategic plans regarding adverse childhood experiences ("ACE") so DFPS can improve the effectiveness and delivery of prevention and early intervention services. LWVTX continues to support this ongoing effort to acknowledge and learn about the effects of ACE on children and adults. HB 3493 was placed on the General State Calendar but failed to pass.

LWVTX also supported the vision of SB 1079. This bill required DPS to publish monthly reports regarding the child welfare system in an effort to assist local communities and agencies to minimize neglect and abuse of children in

foster care. While SB 1079 made it through both the Senate and House committees, it did not receive a vote on the House floor.

## B. Child Support Enforcement
1983, 1987, 1997

*The League of Women Voters of Texas supports equitable and efficient means of enforcing court orders for child support.*

## Explanation: Child Support Enforcement
The LWVTX adopted this position in 1983, after member study and concurrence. The League lobbied statewide in support of a proposition amending the Texas constitution to provide garnishment of wages for enforcement of court orders for child support. After passage of the proposition in November 1983, the League dropped the position at Convention 1985, believing its goal had been achieved. However enforcement of court orders for child support payments continued to be a significant statewide problem, and delegates voted to reactivate the position at Convention 1987.

## History: Child Support Enforcement
*1991-93:* In the 1991 and 1993 Legislative Sessions, League efforts contributed to passage of bills to bring Texas into compliance with federal guidelines for income withholding, to improve insurance protection for children, and to facilitate procedures for establishing paternity.

An especially important 1993 bill provides the requisite authorization for Texas to develop and implement procedures to enforce child support obligations under the provisions of the federal Child Support Recovery Act of 1992, the "Deadbeat Parents Act". The federal law provides for interstate enforcement of child support orders and makes it a federal offense with a criminal penalty to willfully fail to pay past due support obligations for a child residing in another state.

*1995.* Passage of a measure providing for suspension of professional and recreational licenses for those delinquent in paying child support was another victory for the League and other proponents of effective means of enforcing support orders. Despite recent progress, much more remains to be accomplished under this position. Children in single-parent households still comprise the fastest category of persons living in poverty in Texas today. Many live in poverty because only one parent sustains them, while court orders for their support are ignored and unenforced. The Periodic Program Review Committee studied the Child Support Enforcement position in the 1995-97 biennium. Despite recent more stringent enforcement legislation, the committee recognized that in this area the law is far from perfect and recommended no change in this position.

## C. Early Childhood
1990, 1995, 2009 (See also LWVUS position "Child Care" in *Impact On Issues*)

*The League of Women Voters of Texas supports policies, legislation, and programs that address the needs of all Texas children and families for accessible, affordable, and quality childcare.*

The League believes that all children in childcare are entitled to a safe, nurturing environment and developmentally appropriate activities. Caring for children is a societal as well as a family responsibility and the state should play a role in meeting childcare needs. The League supports the development, adoption, and implementation of a comprehensive state childcare policy that includes, but is not limited to:

- Programs designed to provide an adequate supply of accessible childcare.
- Access to information that will help families recognize and choose quality childcare.
- A provision for parental choice in the selection of subsidized childcare.
- Programs designed to make childcare affordable to all.
- Consistent and reliable funding, administered efficiently, and used effectively.

- Financial support from a variety of sources including federal grants and matching funds, state funds, local government funds, employer contributions, fees for service, private philanthropy.
- Minimum standards, effectively enforced, for childcare services.
- Measures to promote quality childcare.
- Coordination of childcare programs, services, and funding.
- Encouragement of cooperation among groups and agencies.
- A state model-employer program that makes quality, affordable childcare available to state employees.

## Explanation: Childcare/Early Childhood

At Convention 1989 delegates adopted a study of Childcare in Texas. The scope of the study included programs, services, availability, standards, enforcement, policies, and affordability. A *Facts and Issues: Childcare in Texas: The Roles and Responsibilities of the State* was produced by the study committee and widely circulated to members, childcare advocacy groups, and legislators. Consensus was reached in the fall of 1990, with 28 local Leagues participating.

The childcare position underwent Periodic Program Review during 1993-95. Several editing changes that clarify meaning were recommended by the Periodic Program Review Committee and approved by the membership. The reworded position is set forth above. A recommendation by the Periodic Program Review Committee for a substantive addition to the position (support of measures to override local restrictions on the location of childcare facilities, including family day homes) was rejected by the membership. The name was changed by state board vote in October 2009 to Early Childhood to reflect the prevailing title used in the industry.

## History: Childcare/Early Childhood

*1985.* Action to strengthen and expand the state role in childcare programs was taken in support of legislation enabling the Texas Employment Commission to provide public and private employees information and technical assistance regarding childcare. The LWVTX also supported the successful legislation which allows counties to provide childcare services for employees and jurors and to set fees for those programs. Also see Childcare/Early Childhood under State Program.

*1991.* Childcare was a League priority for the 72nd Legislature and was a very active issue because of developments at the federal and state levels. The passage of federal block grant legislation during 1990 made significant new funding available to the state for childcare, necessitating substantial policy development and planning by the state. In response, the interim Childcare Task Force of the House Health and Human Services Committee produced comprehensive recommendations addressing policy, planning, quality, and regulation, as well as measures to make childcare affordable and available. The task force recommendations were introduced as a package of bills, most of which the League was able to support. The League worked closely during the session with other childcare advocates through the Childcare Working Group for passage of these bills. Thanks to strong legislative leadership in both the House and Senate and coordinated advocacy, most of the legislation passed.

This legislation included a resolution setting forth a clear position for the State of Texas on the importance of childcare and specific requirements to make childcare affordable and available. Other legislation set guidelines for the implementation of federal and state childcare programs and established an advisory committee to assist in developing policies for the use of state and federal funds for childcare. A League representative was appointed to this committee. Another successful bill related to standards, licensing, and coordination of prekindergarten programs.

Several bills the League supported failed to pass because they required additional state funding. These included bills relating to training of childcare providers and reimbursement of start-up costs incurred by childcare providers, and one mandating a cost-of-care study.

*1993.* Due to fiscal restraints, few new initiatives for children succeeded in the 73rd Legislature. Most legislation that did pass was of a regulatory or technical nature. Many health and human services programs were underfunded in the 1994-95 budget. A childcare program that enables low income families to pursue employment or be employed in

OCAGH_00001618

order to remain off welfare was cut by $8 million, affecting 6000 children. The federal matching funds were diverted to serve 4-year-olds in communities that have prekindergarten programs, thereby subverting the intent of the program.

*1994-95.* During the legislative interim, the Texas Board of Regulatory Services adopted stricter minimum standards for childcare facilities. The League lobbied in favor of the new standards, contacting board members to urge their support. Unfortunately, the victory was short-lived. The 74th Legislature rolled back key provisions of the new standards, including child/adult ratios, square footage requirements, and group sizes. Prior to future changes to the minimum standards, an independent cost/benefit economic impact study must be completed and sent to the legislature. But implementation of the rolled-back standards was delayed until September 1997. This delay gave advocates for young children, including the League, the opportunity to educate legislators about the components of quality childcare.

*1997.* Early in the session many of the recently strengthened Childcare Minimum Standards were lost to a compromise between childcare advocates and legislators, but a number of positive childcare bills were eventually passed. Childcare professionals and advocates will be able to use an appropriation of $34.9 million from general revenue funds to qualify for matching federal funds for childcare expenditures being spent, or that can be spent, in their communities. Other bills that passed provide childcare training to local workforce boards, establish pilot programs offering childcare training to welfare recipients, and mandate a childcare representative on local workforce boards. Family home providers are now required to register with the Department of Protective and Regulatory Services, pay annual fees, and obey state regulations. Other legislation provides guarantees for small and medium loans for childcare businesses and nonprofit centers that provide childcare services, establishes the Interagency Council on Early Childhood Intervention, and provides school-based childcare for latch key kids. The League produced an advocacy paper, "Quality Childcare for Texas Children: A Sound Investment in the Future."

*1999.* The LWVTX followed several childcare bills and the following measures were successfully passed. A childcare resource and referral network will be developed to provide a periodically updated listing of childcare providers, including hours of operation and cost, for each county. Professional childcare training scholarships and student loan repayment assistance will be offered to childcare workers. Additional training on shaken baby syndrome, sudden infant death syndrome, and early childhood brain development will be required for childcare providers. The LWVTX supported these bills in order to strengthen the quality or affordability of childcare in Texas.

*2001.* The focus of the LWVTX and other child advocates was on adequate funding to ensure that no children in working poor families are removed from childcare in the next biennium. There was a slight increase in funding for childcare, but it doesn't appear to be sufficient. Only through the reallocation of some unexpended federal Childcare Development Funds was the state's waiting list of approximately 40,000 children as of January 1, 2001, reduced.

*2003.* During the 78th Session, quality initiatives for childcare services were reduced through budget cuts. However, legislation passed which requires coordination of early childhood programs and establishes two groups to address the issue of quality early care programs. Even though the need for childcare continues to expand, due to the state budget shortfall, fewer children will receive subsidized childcare in 2004-5. The newly organized Texas Early Childhood Education Coalition, composed of childcare advocates, holds promise for successful future collective action.

*2005.* Two of the childcare bills that the LWVTX supported were signed into law. Approximately 50 early care and education bills were filed this session. SB 23 expands the Texas Early Education Model (TEEM), an integrated model of service delivery of early care and education programs
(prekindergarten, childcare, Head Start) to increase full day, full-year quality preschool services. HB 2808 contained an amendment that provided for the appointment of a blue-ribbon commission to study early childhood education and development resource needs, financing options to secure adequate funding, as well as identifying barriers to the integration of preschool delivery systems.

OCAGH_00001619

Although the Legislative Budget Board, not a blue-ribbon commission, is designated to conduct the study in HB 2808, it does provide an opportunity for advocates to work with leadership on the Legislative Budget Board during the interim. The Legislative Budget Board will conduct a performance review and develop a report to:

- Study the resource needs of high-quality early childhood care and education programs.
- Recommend options for additional funding.
- Develop a plan to implement in phases, full-day preschool programs for at-risk children and to expand the eligibility for early care and education programs.

Promoting quality initiatives and improving access to preschool programs remain as goals on the unfinished League childcare agenda.

*2007.* Mixed results were accomplished by the 80th Legislature with emphasis on state oversight of childcare facilities and staff. Additional funding for residential (foster care) licensing was obtained, but no new funding for day care licensing. Proposed cuts to public prekindergarten programs were also avoided.

SB 50 (Zaffarini), a comprehensive, cooperative and interdisciplinary approach to improve all facets of childcare, prekindergarten and training of early childhood professionals; stalled in the House and did not pass. However funding for many of the provisions in SB 50 was included in the budget: prekindergarten services through the Texas Early Education Model, improve reimbursement rates paid to childcare participants in Texas Rising Star Certification Program, and funding towards creation of regional development partnership projects to improve the recruitment, retention, and quality of professionals working with young children. A portion of the bill that required school districts to report Texas Primary Reading Inventory scores in the school readiness certification system to the State Center for Early Childhood Development was amended onto SB 1871 (Zaffarini) which passed.

SB 758 (Nelson) allows children in the foster care system eligibility for prekindergarten, ensuring that children who have been sexually abused, physically assaulted, and/or neglected have a leg up before kindergarten, and to remain eligible for public prekindergarten after leaving foster care. HB 199 (Madden) addresses the critical first year of a child's life by establishing a residential infant and parenting program for mothers in prison.

The Texas Workforce Commission adopted new background check rules for relatives who are compensated by the state for providing childcare in the home. HB 1385 (Villareal) created a separate level of regulation for small businesses that offer childcare on their premises for employees. This bill also included exemptions from childcare regulation to some rural private schools and religious education programs.

*2009.* Update of the program title from Childcare to Early Childhood was approved by the LWVTX Board of Directors to help better describe the topics in this area of advocacy. The early education movement in Texas this year has grown to be so strong that its only critics are those who opposed any public investment, no matter how solid the research. Since many bills filed for have to do with early childhood education we also act under the LWVUS position on Early Intervention for Children at Risk, adopted in 1994. See the section on National Program action at the end of this position for action under this position.

Also SB 572 (Shapiro), "Jacob's Law," mandates 2 hours of annual training hours specifically related to the safe transport of children under the age of nine; SB 1646 (Van de Putte) establishes a Council on Children and Families to identify methods to ensure children and youth receive appropriate assessment, diagnoses, and intervention services; HB 136 (Villarreal) requires school districts to notify parents of prekindergarten eligibility; HB 1240 (Villarreal) requires infant care information to be provided to parents.

Following the legislative session, Texas Childcare Licensing Division initiated a review of the current minimum standards for center-based and home-based day care operations. The review process will further evaluate childcare licensing regulations, addressing expired legislative initiatives, regarding the training provider qualifications and minimum training hour changes for childcare employees/operators facilities.

*2011.* Ten out of 23 bills supported by the LWVTX were signed into law, with eight taking effect September 1, 2011. Legislation focused on safety and staff training, specifically increasing childcare provider training hours, specifying

qualifications for those providing childcare training, and allowing the Texas Rising Star childcare centers to use comptroller purchasing discount programs. Licensed childcare homes will also receive additional fire safety inspections annually by local government, with other safety violations reported directly to childcare licensing. Licensure improvements and government-sponsored databases will provide data indicating childcare providers who meet minimum standards. Those centers meeting higher quality rating systems standards will also be identifiable for the first time from a state website. (See Child Health Insurance Program under Health Care for Those of Lesser Means.)

*2013.* Seventeen of the 44 bills were signed into law with only $40 million earmarked specifically for supplemental prekindergarten funding. With nearly $300 million cut from prekindergarten programs during the 82nd Legislative Session, successful bills were low fiscal impact and dealt with early childhood program quality, earlier identification of children with disabilities, Early Childhood Intervention caseload growth, and childcare regulation enforcement concentrating on child health and safety of all children.

The advocacy goals since 2005 for quality initiatives and improving access to preschool programs were largely accomplished this session with the success of HB 376 (Strama et al.), SB 50 (Zaffirini) and SB 430 (Nelson). HB 376 prioritized quality components in the Texas Workforce Commission childcare subsidy system with quality programs receiving additional and incremental reimbursement rates. It also provided technical assistance to improve childcare centers, required childcare quality initiatives for local workforce development boards, and created the establishment of an appointed Texas Rising Star Program Review Work Group to continuously improve the quality of education/care for children on Texas Workforce Commission childcare subsidies. HB 376 was the result of a statewide work group collaboration, with the LWVTX participating, spending 4 years to create legislation prioritizing quality care for children on federally-funded Texas Workforce Commission childcare subsidies and resolving the extremely low reimbursement rates providers receive.

SB 50 expanded the composition of the Texas Children's Policy Council adding representation for at-risk and special needs children. SB 430 requires the Department of Family and Protective Services to verify the unavailability of community day care before day-care assistance or services are specified to be provided by foster parents.

The successful Texas Early Childhood Education Coalition consolidated with Texans Care for Children to better serve advocates on priority and crossover issues. Texas early childhood program funding continues to be a concern; local entities are creatively funding pilot projects to gain increased child access to local prekindergarten programs.

*2015.* Only four of 52 filed bills were signed into law this session with three focusing on childcare records/inspection transparency and one on prekindergarten. With prekindergarten identified as one of the governor's emergency legislative issues, HB 4 was earmarked the governor's prekindergarten bill. It passed providing a small bump in funding for public school prekindergarten programs that meet new requirements. It does not include class size limits or other quality provisions, but it takes a first step that future legislatures can build on. HB 4 provides an additional $130 million via grants for the 2016-17 biennium for high quality prekindergarten programs to currently eligible 4-year-old students without explicitly funding or requiring full-day programs. HB 4 does change the Education Code requiring the Texas Education Agency or school districts to do the following:

- Attempt to maintain a ratio of not less than one teacher or one teacher's aide for each 11 students.
- Prekindergarten teachers are certified teachers and have a Child Development Associates Degree or certain other additional early childhood qualifications.
- The Texas Education Agency Commissioner to develop a prekindergarten teacher training course
- Permit partnerships between school districts and private providers.
- High-quality prekindergarten programs measure the progress of students in meeting recommended learning outcomes.
- Opt into the new high-quality programs to create family engagement plans.
- High-quality programs use a curriculum that meets the Texas Education Agency Prekindergarten Guidelines.
- Report to the Texas Education Agency class sizes, teaching ratios, the type and results of assessments used, and the curriculum used for all district prekindergarten programs.

The Early Childhood Intervention program has experienced growth in the proportion of enrolled children who have more complex needs, such as a medical diagnosis or a delay in multiple areas. Much of this change stems from budget cuts in 2011, which led the Department of Assistive and Rehabilitative Services (DARS) to narrow the eligibility criteria for Early Childhood Intervention and keep children with less acute needs out of the program. The Department of Assistive and Rehabilitative Services requested $14 million in additional General Revenue for the 2016-17 biennium. The Legislature opted to cut pediatric therapy service rates and partially fund this budget request with $3.8 million in general revenue funding and $5.9 million in all funds (a combination of state and federal funding). This funding was estimated to allow the program to provide an average of 2.75 monthly service hours, rather than the 2.78 that the Department of Assistive and Rehabilitative Services hoped to reach by 2016 and the 2.88 it hoped to reach by 2017. This represents a $2.5 million decrease in all funds from expenditures during the 2014-15 biennium, despite an anticipated increase in the number of children served and hours of service provided. The Early Childhood Intervention program is expected to serve a monthly average of 26,753 children in 2016 and 27,170 in 2017. Another unknown is the state agency consolidation impact of transferring the Department of Assistive and Rehabilitative Services functions to the Health and Human Services Commission.

*2017.* Numerous cross-agency bills were proposed with only three bills overcoming political stalemate: (a) HB 2039 created an early childhood teacher certification to teach students prekindergarten through Grade 3. (b) HB 674 limits out-of-school suspensions for students in grades prekindergarten through 2nd grade and permits school districts to implement positive behavior management strategies. (c) HB 357 expands prekindergarten eligibility to include children of seriously injured or fallen first responders.

The legislature cut appropriations for prekindergarten, eliminating the funding for the high-quality 2015 grant program. Instead, legislators passed a budget rider simply directing all school districts to comply with the grant program quality standards using a portion of the Foundation School Program kindergarten entitlement, totaling $236 million statewide for a high-quality prekindergarten program. Educators recognize the need for high standards, but the enforceability of the rider is in question. The best way to drive improvements is through high standards coupled with additional funding to support additional district investments in quality teachers, full-day options, reduced class size, or other improvements. And legislators failed to improve:

- Transitional Temporary Assistance for Needy Families (TANF) services.
- Nutrition standards in childcare.
- A review of the Texas Workforce Commission subsidized childcare program.
- A staff/child ratio and group size incident reporting of licenses childcare study.
- Licensed before- and after-school programs promoting healthy eating and physical activity.
- A task force to coordinate the multiple agency study of parent engagement/education programs provided.

*2019.* See <u>Early Intervention for Children At Risk</u>. The focus is on child health bills.

## D. Domestic Violence

1985, 1986, 1997, 2008  (See also LWVUS position "Violence Prevention" in *Impact On Issues*)

*The League of Women Voters of Texas supports adequately funded state and local programs that work to eliminate the incidence of domestic violence and to alleviate its effects.*

*The League also supports appropriate penalties for offenders, easy access to protective orders, improved enforcement and administrative procedures for criminal justice professionals who deal with domestic violence, financial compensation to victims, and improved accessibility to services dealing with domestic violence. The League supports state funding for seed money, capital funds, and operating costs for the following:*

- Local and regional residential centers for victims.
- Nonresidential support services.
- Counseling programs for all affected members of the family or household.
- Mandatory treatment and counseling programs for offenders to correct abusive behavior.

OCAGH_00001622

- Mandatory specialized training for peace officers, prosecutors, judges and court personnel, and parole and probation officers.
- Expanded training in police academies to deal with domestic violence.
- Public information about domestic violence.

*In order to provide appropriate penalties for domestic violence offenders, the League supports:*

- Enhanced enforcement of present assault statutes and imposition of penalties intended by the law.
- Penalties for injury to any victim of domestic violence equivalent to the penalties for injury to a child or an elderly person.
- Adoption by prosecutors of a "no drop" policy so that a victim's request for dismissal will be denied if charges have already been filed.
- Criminal prosecution of those who violate temporary restraining orders in domestic violence cases.

*The League supports efforts to make it easy for domestic violence victims to obtain protective orders by:*

- Requiring that prosecuting attorneys file all applications for protective orders upon receipt.
- Providing applications and easy-to-follow instructions for filing protective orders without representation by an attorney.

*To enable criminal justice professionals to deal effectively with domestic violence cases, the League supports:*

- Requiring specialized training for police officers, prosecutors, judges and court personnel, and parole and probation officers.
- Establishing crisis or domestic violence teams.
- Mandating arrest without a warrant when there is probable cause.
- Establishing and providing adequate funding for a central Protective Orders Registry. *The League supports mandatory specialized treatment and counseling of abusers to correct their behavior.*

*To work to eliminate the incidence of domestic violence and to make services more accessible to victims, the League supports the use of financial compensation, including payment by abusers for medical and legal expenses, counseling, and living expenses incurred by victims as a result of abuse.*

## Explanation: Domestic Violence

Delegates at Convention 1983 chose domestic violence for statewide study, and members adopted a position regarding domestic violence in 1985. The first domestic violence position called for adequate state and local funding for programs to reduce the incidence of domestic violence and alleviate its effects. Because the League position was limited to support of adequate funding, the LWVTX advocates were unable to act on domestic violence bills that went beyond funding during the 1985 session. To remedy that situation, a second domestic violence study focusing on the legal system was selected by delegates at Convention 1985. The current, expanded domestic violence position statement was adopted in June 1986.

As a result of legislation enacted in 1995, the 1994-97 Periodic Program Review Committee eliminated several provisions dealing with protective orders and added one concerning creation of, and funding for, a central Protective Orders Registry. Convention 2006 recommended that the position should not read "reduce" domestic violence, but "eliminate" it. Revised wording was put forward as an item of concurrence in Program Planning, fall 2007, agreed to unanimously, and adopted by the state board in January 2008.

## History: Domestic Violence

*1987-89.* In the 1987 and 1989 Legislative Sessions, the LWVTX supported successful bills to reduce the cost and improve the accessibility of protective orders to victims of family violence and to tighten their enforcement. In the 1989 Session, League efforts included strong support for a successful omnibus protective order bill and a bill providing for the incremental upgrading of offense classification and punishment for subsequently occurring acts of domestic violence. Funding was secured with passage of Lt. Governor Hobby's Anti-Crime Plan.

*1991-93.* The LWVTX supported its domestic violence position through membership in the Texas Council on Family Violence. An important achievement of the 1993 Session was passage of the so-called "stalking" bill that provides a means for victims to report an individual's harassment before actually experiencing physical injury, thus giving the law enforcement system the ability to protect potential victims of domestic violence.

**1995.** With League support, the 74th Session of the Texas Legislature amended the Code of Penal Procedure to create a legal exception to the spousal adverse testimony privilege. The Senate Interim Committee on Domestic Violence had strongly recommended creation of the exception to prevent perpetrators of family violence from hiding behind the shield of "spousal privilege," thus escaping successful prosecution and conviction. Another significant measure enacted during this session created a statewide central registry for protective orders through the Texas Department of Public Safety.

**1997.** A strengthened anti-stalking bill was passed early in the session, followed by several proactive bills to assist survivors of domestic violence. One measure authorizes the Department of Human Services to develop procedures to assist family violence survivors who are welfare recipients, while another bill will use a small increase in court-filing fees to provide basic legal services to the indigent, many of whom are battered women and children. Two bills that would have made it more difficult for women to escape abusive marriages were defeated. A bill that would have authorized the creation and distribution to all public schools of an antiviolence curriculum did not get out of committee.

**1999.** Advocates scored significant victories during the 76th Legislature. There were significant increases in appropriations to the Department of Human Services Family Violence Program and to Battering Intervention and Prevention Programs. Legislation passed making it more difficult for batterers to obtain custody and/or visitation of children.

**2001.** The League supported a bill, signed by the governor, which provides that as of September 1, 2001, it is illegal in Texas for those under final protective order for family violence and those convicted of family violence crimes to possess guns.

**2019.** The 86th Legislative Session passed several bills which LWVTX supported to assist law enforcement with prosecution of domestic violence and sexual assault cases. The Lavina Masters Act mandates that rape kits must be tested at a lab within 90 days after it receives the evidence. If the evidence has not been tested by a forensic lab, the statute of limitations (the timeframe in which a case must be presented to a Grand Jury) for sexual assault cases is tolled. Rape kits cannot be destroyed by the state for 40 years after receipt or until the statute of limitations runs, whichever is later. And Rachel's Law, allows district attorneys to file continuous family violence charges against an offender if the act takes place in more than one county.

Lawmakers gave law enforcement more tools to investigate domestic violence cases. The passage of S.B. 586 increases mandatory law enforcement training hours regarding sexual assault, child abuse and family violence to ensure that the training includes the use of best practices and trauma-informed techniques to effectively recognize, document, and investigate these types of cases.

Texas will now have a Protective Order Registry. This centralized internet-based registry will track applications for protective orders and protective orders issued in this state. A portion of the registry will also be set up for restricted use by law enforcement to help protect victims of domestic violence. The public will be able to access limited information about issued protective orders at no cost.

Financial abuse—a previously overlooked form of domestic violence--was proactively addressed in this session. Two bills that LWVTX supported through testimony and Action Alerts will now be law. S.B. 234 gives victims of family violence a right to vacate and avoid residential lease liability while S.B. 2697 is the first law to address coercive debt, providing a legal remedy for persons victimized by financial crimes (identity theft, credit card fraud, etc.).

**2021.** The high note on the domestic violence issue during the 87th legislative session was an increase in funding for services to assist survivors of domestic violence. These funds will help reduce capacity in shelters and provide more options for legal assistance and housing. On the legal front, survivors did not see transformative victories in this session. Although women and their protection were major talking points for legislation regarding guns, few bills actually passed to help survivors.

One bill that did pass is SB 798. LWVTX supported this bill which was signed by the Governor and will take effect September 1, 2021. Now survivors of domestic violence and dating violence as well as children of a survivor can obtain a certified copy of a birth certificate and state-issued ID at no cost. While this new law seems minor, it will have a positive impact on survivors who are often handicapped by limited financial resources. Identification is crucial for survivors of domestic violence to start their new lives outside of shelters.

LWVTX continues to support all efforts to prevent domestic abuse in dating relationships from legally obtaining firearms (the "Boyfriend Loophole"). Although assigned committees, both SB 283 and HB 210 (identical bills) were never scheduled for public hearing.

This legislative session unfortunately denied the opportunity through HCR 59 for a joint interim study regarding domestic violence. The resolution supported by LWVTX outlined the effects of domestic violence on adults in all areas of their lives as well as the damage caused to children who are directly victimized or witness domestic violence. HCR 59 was considered in public hearing but left pending in committee.

## E. Equal Opportunity/Income Assistance
1970, 1995, 2020   (See also Equality of Opportunity under National Program.)

*The League of Women Voters of Texas supports legislation and administrative action to achieve equal rights for all persons, regardless of their race, color, gender, gender identity, gender expression, religion, national origin, age, sexual orientation, veteran and military status, familial status, or disability, to combat discrimination and poverty, and to provide equal access to housing, employment, and quality education in Texas.*

*Specific measures that we support include:*
- Access for all persons to free public education that provides equal opportunity for all.
- Removal of the ceiling on income assistance (welfare) spending from the state constitution.
- Provision by the state of supportive services, such as health care, childcare, family planning, legal aid, and job training for income assistance (welfare) recipients.
- An effective human relations commission for Texas that includes such features as:
  - Permanent independent status.
  - Investigative and legal enforcement powers that go beyond the conciliation process.
  - An adequate budget funded independently of the governor's office.
  - Equitable representation of racial, religious, and ethnic groups.
  - An adequately sized staff trained in human relations work.

### Explanation: Equal Opportunity/Income Assistance
In the fall of 1970, local Leagues in Texas studied income assistance under a national program item, with the state League adding two consensus questions to the list of national consensus questions. The basis for action at the state level was thus increased by the resulting positions on state income assistance and state supportive services.

League members have supported establishment of a human relations commission for many years and, in 1970, identified those elements that comprise an effective commission. League members believe that such a commission should publicize its existence and help communities form their own commissions. Other programs which members support include these: enforcement of fair housing laws, enforcement of minimum building codes, expansion of vocational education opportunities, expansion of counseling services, and combating discrimination in employment. The legislature created the Texas Human Rights Commission in 1983. However, this commission currently addresses only employment discrimination, not the other program needs identified in our position.

This position underwent Periodic Program Review in the 1993-95 biennium. Several wording changes that update the statement to reflect changed policies and circumstances were suggested by the Periodic Program Review Committee and approved by delegates at Convention 1995. The updated position is printed above.

Our position was amended by delegates to Convention 2020 to enlarge and explain the definition of those who deserve equal rights in Texas. Wording from the LWVUS position was used as a guide.

## History: Equal Opportunity/Income Assistance

*1980s.* The League has been very active in the support of adequate benefit levels for the Texas Aid to Families with Dependent Children (AFDC) program, described previously in the state program section on Equal Opportunity/Income Assistance.

*1983.* The League opposed state workfare legislation that would have required work for Aid to Families with Dependent Children adult recipients. The proposed bills did not clearly define nor fund training, education, work opportunities, or essential support services such as childcare, medical care, or transportation for participants.

*1987.* The state League testified that state funding for the administration of the Texas Food Stamp Program was inadequate to serve those persons eligible for food stamps and that federal and state requirements for the processing and issuing of food stamps were not being met in many areas of the state. In subsequent sessions, the LWVTX has worked with the People First! Coalition to increase state funding for human service programs mandated by the federal government.

1971-87. During this period, the League focused on the removal of Texas constitutional limits on state spending for income assistance and on raising Aid to Families with Dependent Children (AFDC) benefits. Because attempts to remove the ceiling on income assistance benefits were repeatedly defeated, the League supported the politically feasible action of raising the constitutional ceiling. There was both legislative and public support for a ceiling of 1% of the annual state budget, and the 1982 ballot measure designating that ceiling was approved by the voters. Raising AFDC grants remained a legislative priority in 1985 as the League lobbied for a benefit of $60 or more per AFDC recipient. The AFDC benefit was raised from $53 to $57 per month for the 1985-87 biennium.

*1985.* During the 1985 Texas Legislative Session, the LWVTX lobbied in support of measures that would have established state studies in the area of comparable worth and pay equity as a means of eliminating sex-based wage discrimination and alleviating the growing feminization of poverty. The League lobbied for an interim legislative study of affordable housing in Texas and supported legislation which would allow the Texas Department of Human Services to collect information on teenage pregnancy in Texas and to serve as a clearinghouse for such data.

*1987-93.* The state fiscal crisis and the major threat of budget cuts caused the League and other human services advocates to work in the 70th Legislature to maintain the level of services in the 1987-89 biennium rather than lobbying for much needed increases. The LWVTX joined the statewide coalition People First! that successfully urged the legislature to address the basic needs of people first in state budget priorities, and that supported state revenue restructure and enhancement to provide adequate funding for essential state services. In the 1989, 1991, and 1993 Sessions the League again worked with People First! to maintain funding levels.

*1995.* A bill restructuring welfare in Texas was signed into law. Some of its provisions include: a needs assessment must be done for all Aid to Families with Dependent Children (AFDC) recipients; support services such as education, child care, and transportation assistance will be provided subject to availability of funds; a recipient must be a U.S. citizen or legal immigrant and a citizen of the state; and a recipient must sign a responsibility agreement that includes cooperating in efforts to check the child's paternity, taking the child for regular checkups and immunizations, and education/work agreements among other commitments.

*1999.* Legislative activity continued to deal with welfare reform in Texas. The LWVTX actively lobbied to protect support services to Texans receiving Temporary Aid for Needy Families (TANF). Some successes were legislation that allows (a) TANF recipients to keep more of their earned income, (b) removes barriers to finding and keeping jobs, and (c) funds additional child care for low-income families. A success was preventing the monthly TANF benefit from being reduced; it will remain at 17% of the federal poverty level.

*2001.* The League goal during this legislative session was to support bills that would remove many of the barriers in the present system for Temporary Assistance for Needy Families and obtaining food stamps. Results were mixed. Successful legislation will provide hardship exceptions for Temporary Assistance for Needy Families time limits,

phone application and recertification for food stamps, a required interagency plan for coordinated services for hard-to-employ clients, and aid for distribution of fresh produce from farmers to food banks. The governor vetoed bills that would have extended transitional services for certain Temporary Assistance for Needy Families clients and another that would have eased work requirements for certain clients. We have expressed concern that the current budgetary practice of using Temporary Assistance for Needy Families funds for other state needs will continue to put pressure on the program designed to effectively meet the needs of needy families, especially in welfare-to-work services.

*2002-03.* During the interim between the 77th and 78th Legislature, the Sunset Advisory Commission reviewed the operations of the Texas Workforce Commission, that was established in 1995 during welfare restructuring to merge all employment and training programs into a single, locally-controlled workforce system. The Sunset Commission made several recommendations to make the Texas Workforce Commission more accountable. The LWVTX submitted comments on particular recommendations, stating that the Texas Workforce Commission would benefit from more input from the public, local workforce boards, and childcare experts before formulating policies to be carried out by local workforce boards. The general intent of accountability and additional input for the Texas Workforce Commission was adopted in the final legislation.

Budget cuts were the name of the game in the legislative session. The number of families eligible for Temporary Aid to Needy Families will be reduced by lowering the asset test, lowering the vehicle value limit, and enforcing full termination of assistance to a family for any infraction of the Personal Responsibility Agreement. Budget priorities indicated that lawmakers were more interested in reducing numbers of recipients, rather than removing barriers to employment.

*2005.* Priority: Support for work development programs, including training for living wage jobs.
Unfortunately, no legislation was passed out of committee to improve training for higher wage jobs.
The Skills Development Fund, the Texas Workforce training program, was actually cut by nearly 60%. Funds were shifted to the Texas Enterprise Fund, a program to give incentives to businesses moving to Texas.

*2017.* Though equal opportunity wasn't a primary focus of the LWVTX this session, the rest of the nation was watching closely to see what would happen in regard to "lavatory" legislation and all the bathroom bills that had been filed. It's a mixed bag of the good, the bad, and the ugly.

**The good**: A record-setting 40 pro-lesbian-gay-bisexual-transgender-queer (LGBTQ) bills were filed by legislators this session. Even better: Three of them were actually voted out of committee but died in Calendar Committee.
- HB 1848: Although marriage equality is legal in the U.S., it is still technically illegal to engage in homosexual conduct in Texas. HB 1848 sought to repeal that.
- HB 225: Would have ensured that LGBTQ Texans were not discriminated against in employment.
- HB 192: Nondiscrimination for LGBTQ Texans in housing.
- Still, it is historic insofar as Texas has never passed a pro-LGBTQ bill this far in the process.

**The bad**: Twenty-four anti-LGBTQ bills were filed this session, more than any state legislature in the history of the U.S. Twenty-three of them either died or failed. But one (HB 3859) was signed into law by Governor Abbott.

HB 3859 allows child welfare agencies to discriminate against follow Texans based on "sincerely held religious beliefs." This hurts our foster care system because gay couples could be denied the ability to adopt a child. Gay or transgender children could be denied important child welfare services due to their sexual orientation or gender identity. Children who have been victims of sexual assault may also be denied emergency contraception, all in the name of religious refusal. Supporters of the bill claimed that any person who is denied services by a religious organization could still be served by a state agency, but the bill lays out no clear direction in how to track who is being left behind and what their status is. And considering that LGBTQ youth experience abuse and homelessness at disproportionately higher rates than their straight or cisgender peers, the LWVTX is extremely concerned about their access to safe and supportive care.

OCAGH_00001627

**Special session**. We helped defeat five attempts in the special session that would have explicitly discriminated against LGBTQ Texans. Knowing that Governor Abbott made privacy (code for transgender bathroom bills) one of his legislative priorities during the special session made it that much more difficult to defeat, but together we *did* defeat all five bills: SB 3, SB 6, SB 91, HB 46, and HB 1362, plus an unsuccessful last ditch effort by some legislators to add bathroom language to HB 21, a school finance bill.

*2019*. Our major activity this session began with our opposition to SB 15 (Creighton). This bill would prohibit cities and counties from requiring certain benefits and protections for employees. This relates to any form of employment leave (such as paid sick leave), hiring practices, employment benefits or other terms of employment. This bill would also gut non-discrimination ordinances that now protect more than six million Texans in most major Texas cities. Currently Austin, Dallas, El Paso, Ft. Worth, Plano, and San Antonio have municipal non-discrimination ordinances, and several other cities and counties have such policies for city workers and contractors. We issued an Action Alert (245 responses) and testified against the bill and the bill died in the Senate.

Then the author resubmitted it as four bills, SB 2485, 2486, 2487, and 2488, hoping parts of the bill would pass. Again we issued an Action Alert, "Fight Anti-Local Control Bills," and got 491 responses. All four bills passed the Senate but died in House Calendars.

The other bill we fought was SB 17, the "License to Discriminate" bill (Bettencourt), which said a holder of a state professional license could deny services on the basis of "sincerely held religious beliefs (except medical professionals). We testified against it and issued an Action Alert which got 245 responses. The bill passed the Senate but died without a hearing in House State Affairs.

## F. Health Care for Those of Lesser Means/Child Health Care
1986, 1995, 2009, 2010  (See also LWVUS position "Health Care" in *Impact On Issues*)

*The League of Women Voters of Texas supports a basic level of health care for the medically indigent.*

The League believes that all persons whose incomes fall below the federal poverty guidelines are most at risk of medical indigence and should be eligible for basic health care services. Special attention should be given to children of low-income families and to persons of low income who are elderly, pregnant, or mentally ill.

It is the responsibility of individuals to pay for their own health care to the best of their ability. For those unable to pay, health care services and programs for the medically indigent are the responsibility of various levels of government.

The League of Women Voters of Texas believes the following services constitute the basic level of health care for the medically indigent:

- Maternal and child care
- Emergency care
- Primary care
- Preventive care
- Care for the mentally ill
- Care for catastrophic illness
- Nutrition
- Substance abuse treatment
- Health education
- Long-term care
- Care for persons with disabilities

The League believes that all health care facilities, both public and private, have a responsibility to serve the medically indigent and should be accessible to those in need.

To improve health outcomes in the state of Texas, the League of Women Voters of Texas believes that Medicaid expansion, as permitted under the Affordable Care Act of 2010, should be approved and implemented by the state of Texas.

## Explanation: Health Care for Those of Lesser Means/Child Health Care

League delegates to Convention 1985 adopted a study of Health Care for the Medically Indigent, which focused on eligibility, providers, funding, services, alternatives, and the role of state government. The LWVUS health care position, adopted in 1993, also calls for a basic level of quality health care that is affordable to all residents. (For more information on the LWVUS Health Care position and on relevant LWVTX advocacy efforts, see Social Policy section of National Program at the end of this publication.

The Health Care for the Medically Indigent position was reviewed during the 1993-95 Periodic Program Review process. The Periodic Program Review Committee recommended an editorial change and a substantive change in wording; the recommended substantive change was deletion of a phrase that listed several government levels as being responsible for indigent health care services. The committee rationale was that the listing was not all-inclusive and that the phrase, "various levels of government," without specifying which levels, would give Leagues more options for local advocacy efforts. The Periodic Program Review Committee recommendations were approved, and the updated position is printed above.

This position was amended to add a statement supporting Medicaid expansion in Texas, and was passed unanimously by delegates to LWVTX Convention 2020.

## History: Health Care for Those of Lesser Means/Child Health Care

*1980s.* During the 70th Legislature, a budget crisis meant no additional funding for health care programs. The League supported continuation of current levels of state funding passed in 1985.

*1988-89.* Two active interim committees examined the expansion of Medicaid and alternative funding methods for health care. In July 1988, the board of the Texas Department of Human Services approved expansion of Medicaid coverage to pregnant women and to children up to age 2 years who are eligible. Important gains for expansion of Medicaid were realized during the 71st Legislature in 1989. Because Medicaid for pregnant women was no longer tied to Aid for Dependent Children (AFDC) guidelines, up to 22,000 pregnant women and 50,000 more children became eligible for health care benefits under Medicaid. Income eligibility for this special population was set at 130% of the federal poverty guideline. The income eligibility cap for nursing home care was raised to the maximum federal level, allowing Medicaid benefits that increase access to care for a greater number of elderly, disabled persons.

*1990-92.* The League monitored the Governor's Health Care Policy Task Force and presented written testimony in support of major portions of the draft recommendations. The final report was released in January 1993, calling for universal access to health care and, as a first step toward that goal, creation of health care coverage for all children and pregnant women.

*1993.* In 1993, following adoption of the LWVUS position, health care was selected as a priority issue for the 73rd Legislative Session. An advocacy paper, "Health Care in Texas: Condition: Critical; Rx: Major Surgery," was written and distributed to all House and Senate members and to local Leagues throughout the state. According to the advocacy paper, the goals for the LWVTX in the session were to establish a health care system that covered all pregnant women, create an immunization program that pays for vaccine for all children whose families cannot afford this care, and to reform health insurance by making it available to everyone at a reasonable cost; thus creating a uniform, mandatory package of basic health care benefits, and eliminating deductibles and copayments for a variety of preventive health screenings.

League testimony was delivered in both houses supporting the creation of an immunization program that met our established goal. Several variations of the bill were filed and ultimately combined. In cooperation with other organizations, the League worked successfully behind the scenes to remove language from the bill that was onerous

OCAGH_00001629

and punitive to poor children and their families. The bill was signed into law at a ceremony attended by League representatives.

The League also worked in support of a bill that passed addressing small employer access to health insurance by increasing the availability of insurance to employers of 3 to 50 people. While the measure calls for voluntary employer participation, several factors may encourage small employers to join the system. The law allows for the creation of purchasing cooperatives, establishes the nonprofit Texas Health Benefits Purchasing Cooperative, requires insurers to use a modified community rating rather than an experience rating system, and stipulates a basic package of health care services that must be offered to employers who select the plan. Insurance carriers electing to offer the benefit plans set forth in the legislation must agree to accept all employers regardless of prior claim experience and to renew the employer's health benefit plan.

The League supported successful legislation aimed at expanding health services in medically underserved areas. Support was also given to measures that failed, including creation of a cost containment council and limitations on a physician's ability to refer patients to a facility in which the physician or a family member has a significant ownership interest.

*1995.* The LWVTX published an advocacy paper, "Medicaid Reform: To Solve a Crisis," which was circulated to legislators and other interested officials, groups, and individuals. The paper called for implementation of the following cost-saving steps to ensure the availability of health services for the indigent: streamlining of administrative processes, emphasis on preventative and primary care, expansion of managed care options for Medicaid recipients, and creation of incentives for expansion of community services by public and private providers.

The 74th Legislature enacted legislation that dramatically alters how the state delivers and funds medical care to the indigent. In effect, the Medicaid program has been converted into a managed health care system that places new emphasis on prevention. The legislation also mandates pooling local and state health care monies used to provide indigent health care in order to maximize access to federal matching funds.

*1997.* Five League-supported bills on health care were signed into law. The Texas Healthy Kids Corporation will provide low-cost health insurance for children of parents who cannot afford insurance but make too much money to qualify for Medicaid. Another bill directs the Texas Department of Health to provide rules for lead abatement, a serious health hazard faced disproportionately by children in the lower socioeconomic level, while an omnibus nursing home act established procedures and penalties for noncompliance of existing laws and regulations. Legislation was enacted requiring health plans that provide maternity benefits to also include coverage of inpatient care for a mother and her newborn in a health care facility for a minimum of 48 hours, and, consistent with the League position on Medicaid reform, a new law provides increased penalties for Medicaid fraud.

*1997-99.* In the fall of 1997, following passage of enabling federal legislation, The LWVTX became actively involved in a coalition of child health advocacy groups calling for a Children's Health Insurance Program for Texas. Throughout the legislative interim, the coalition, including LWVTX representatives, worked with agency staff to help shape the legislation that was ultimately introduced. Named one of the priority issues for the LWVTX, the Children's Health Insurance Program received grassroots advocacy from local Leagues, including travel to the capitol for the Children's Health Insurance Program Advocacy Day. We achieved passage of all our goals: a health insurance plan that will provide primary and preventive care to low-income, uninsured children who are not eligible for Medicaid. The plan will maximize the use of federal matching dollars, provide family-friendly enrollment, provide appropriate benefits for children, and support working parents.

In addition to the Children's Health Insurance Program, health care in general was an active issue for the LWVTX. Nine League- supported bills on health care became effective September 1, 1999. School districts may establish school-based student health centers. Legislation was enacted that sets forth the standards and procedures for the delivery of indigent health care. Another bill provides for state assistance to counties that spend at least 10% of county general revenue to provide health care services to residents through a hospital. Permanent funds were established for certain public health items. The elderly should benefit from a bill that provides for required

OCAGH_00001630

immunizations for nursing home residents. Consistent with the League position on Medicaid reform and cost containment, a bill streamlines the administration and delivery of federally funded Medicaid programs supporting long-term care, while another stipulates that contracts must be in effect for insurers to reimburse providers. Legislation directs state agencies to study and make strategic plans concerning the delivery of long-term care and other health services. While female genital mutilation was prohibited, the 75th Legislature did not add the budget line item for women's health for which the League had actively lobbied. The Campaign for Women's Health will regroup during the interim and work for a more favorable outcome in 2001.

*2001.* During the 77th session the LWVTX continued its active participation in the Children's Health Insurance Program coalition working towards simplification of the Medicaid application and recertification procedures to become comparable to those of the Children's Health Insurance Program. We were largely successful in obtaining more simplified forms and processes, phased-in continuous eligibility, age 6 to 19 years, by 2002, and 1-year continuous eligibility no later than June 2003. We were unable to obtain elimination of the assets test for Medicaid, although the extensive documentation formerly required has been dropped. In addition, the governor signed a bill requiring a pilot study and, if successful, a pilot project to allow portability of Medicaid benefits for migrant children. The governor vetoed a bill that would have allowed Texas to exercise its option under federal law to provide Medicaid benefits to otherwise-eligible legal immigrants after they have been in the U.S. for 5 years. It is not clear that there is adequate funding for either Medicaid or the Children's Health Insurance Program. Since Medicaid is an entitlement program, the legislature must fund any shortfalls. However, Children's Health Insurance Program is not an entitlement program and is already exploring options for restricting or reducing services if a budgetary shortfall materializes.

The League was also active in the area of women's health care. Medicaid can now cover uninsured women under the age of 65 who have breast cancer. However, the governor vetoed a bill for a Medicaid waiver for women's health and family planning. The waver would have saved the state $300 million over the next 4 years and provided family planning services and preventive health care to an additional one million uninsured Texas women. The legislature did not pass legislation that would have allowed application for a Medicaid waiver to provide for comprehensive health care for women.

*2003.* During the 78th Session the Medicaid Waiver failed again. A bill, which would have called for the state to apply for the Medicaid Waiver for Women's Health, was heard in House Human Services Committee and died in committee. The bill would have established a demonstration project through the application of an 1115 Medicaid Waiver to expand women's health care services for women 18 years and older with an income at or below 185% of the federal poverty level. During the appropriations process prenatal health care services were also reduced.

*2007.* Due to lots of hard work by members of the Children's Health Insurance Program coalition and by a number of committed legislators, HB 109 passed, restoring much of what had been lost in 2003. The bill is to be to be fully implemented by September 1, 2008. About the law:
- Section 1: Allows deduction of certain childcare expenses when determining if a family's income qualifies for the Children's Health Insurance Program.
- Section 2: Restores language from the original Children's Health Insurance Program law requiring a community-based outreach program, including contracts with community–based organizations.
- Section 3: Increases the asset limit authorized in 2003 for children and families at 150% to 200% of the federal poverty level from $5,000 to $10,000.
- Section 4: Requires that the Children's Health Insurance Program use some method to verify the reported incomes of Children's Health Insurance Program applicants.
- Section 5: Provided an eligibility period of 12 months for children in families with incomes at or below 185% of the federal poverty level. Children in families at 185% of the federal poverty level are to have their income reviewed every 6 months. The Department of Health and Human Services must notify parents at least 30 days prior to ending coverage if a child is found ineligible due to income reviews under one of the 6 month reviews.
- Section 6: The 90-day delay in coverage is eliminated to allow for uninsured children to be eligible for the Children's Health Insurance Program.

*2009.* The Community Based Alternatives program received additional $15 million ($3.7 million for FY 2010, $11.3 million for FY 2011) to fund an additional 430 slots by the end of FY 2010, and 861 slots by the end of FY 2011. In addition, $58.5 million all funds ($28.8 million for FY 2010, $29.7 for FY 2011) was appropriated to fund an $.80 per hour wage increase for attendants as a result of the July 2009 minimum wage increase. Also, the reimbursement rate for nursing homes was increased by 3%.

The Legislature wants the state to promote the importance of having health insurance and educate the public on purchasing and the availability of health insurance. They directed the Health and Human Services Commission to cost effectively process claims for all health care services by the same system. Also, they outlined streamlining initiatives in applying for Medicaid waiver programs and called for long-term care consumer information to be provided on the Internet.

*2011.* **Children's Health Insurance Program.** Much of the legislation impacting health care for the children of Texas was contained within the budget and a massive health efficiency bill. These measures changed and expanded multiple times during the regular and special sessions. The bill, as finally passed and signed, included beneficial provisions that could undermine the wellbeing of those qualifying for either Children's Medicaid or the Children's Health Insurance Program.

Budget discussions focused on proposed provider rate cuts of 10% to those delivering health care to Medicaid and Children's Health Insurance Program patients, in spite of Texas' already low reimbursement rates and recent cuts. In the end, payments to children's hospitals and primary care physicians treating children were spared the large cuts made to other hospitals and providers.

Multiple proposals targeting greater health care efficiency evolved into SB 7 (Nelson), which passed during the special session. On the positive side, SB 7 included strategies for improved quality of care provided to Children's Health Insurance Program and Medicaid recipients. It also called for shifting from the traditional system of payment for services to payment rewarding better health outcomes. Negatively, the final bill carried provisions designed to give the State of Texas more control over health care programs. A health care compact, if ultimately approved by the U.S. Congress, would turn all federal health funding coming to Texas for Medicaid and the Children's Health Insurance Program, as well as Medicare and other programs, into a single large block grant to the state. A waiver of federal law would radically restructure Medicaid in the state. If either the block grant or the waiver were to take effect, children and other vulnerable populations would lose much in the way of protection currently guaranteed under federal law.

Most individual bills designed to either improve or restrict Children's Medicaid and the Children's Health Insurance Program died in the regular session. Unfortunately, an attempt to extend Children's Medicaid eligibility to a 12-month continuous period, thus allowing many qualified children to retain access to health insurance, made little headway.

**Other issues.** With a $27 billion shortfall, Medicaid and education were big targets for cuts in the 82nd Legislative Session. Maintaining existing reimbursement rates was a priority for many groups, including the League. Because of strong advocacy, Medicaid reimbursement rates for nursing homes and community based alternative care were maintained at 2010 rates. Hospice got a 2% cut. Everyone on a Medicaid waiver got his or her funding cut 10%. Direct health care will not be cut as it is deemed nonnegotiable. Negotiable expenses such as home modifications will make up the 10%. Providers got cuts in administration costs.

During the special session, "secession legislation" passed seeking a health care compact, a partnership with other states to take control of Medicaid and Medicare, and legislation asking the Obama administration for a waiver to operate Medicaid as Texas sees fit. Both are unlikely to happen under the Obama administration. Legislation passed to protect patient advocacy activities by nurses and certain other persons, providing an administrative penalty for denying right to advocate.

OCA-APPX-1571

OCAGH_00001632

*2013.* The most significant health care considerations for the 83rd Legislature were related to implementation of the Patient Protection and Affordable Care Act. Other measures concerning Children's Medicaid and Children's Health Insurance Program were focused mainly in three areas: expansion, efficiency, and funding.

Legislators filed only a few bills designed to expand access to publicly funded insurance for deserving children. Proposed measures called for opening the Children's Health Insurance Program to families with somewhat greater assets or increasing the time to a full year before families must reapply for Children's Medicaid. Expansion efforts all died without consideration by the full legislative body.

Massive bills intended to make health care delivery more efficient did become law. Some features of the bills could ultimately benefit children, such as extending managed care to a wider range of medical situations and providing incentives for quality care. Other features could have a negative impact, such as limitations on the criteria for expanding Medicaid eligibility.

Lawmakers rectified some of the deliberate underfunding of Medicaid and the Children's Health Insurance Program from the previous session just in time to meet current needs. The budget for 2014-15 provided for an 11% increase in the number of children in Medicaid, but it projected a drop in the number of children in the Children's Health Insurance Program due to Affordable Care Act implementation. When adjusted for inflation and population growth, overall health-related funding (including immunizations, Children with Special Health Care Needs, education on tobacco and abstinence, and a number of other programs, in addition to Children's Medicaid and the Children's Health Insurance Program, saw a per-child decrease.

*2015.* The most significant health care issue, Medicaid expansion, was completely ignored by the 84th Legislature. There was no consideration or deliberation on any Medicaid expansion laws in Texas.

The Appropriations Committee did have one meeting to consider the possible loss of the federal 1115 Waiver money. No actions were taken. The cost of uncompensated care in Texas is partially paid for by the Affordable Care Act 1115 Waiver. The 1115 Waiver was meant to be a temporary solution to uncompensated care while the Affordable Care Act was ramping up. Now the federal Center for Medicare and Medicaid Services is threatening to cut the 1115 waiver to encourage Texas to participate fully in the Affordable Care Act and allow more citizens access to health insurance.

Meanwhile the Children's Health Insurance Program continues to be an available insurance program for Texas. With the Affordable Care Act more children qualified for Medicaid. Rider 50 to the Texas budget was added at the last minute. The rider removed $350 million for therapy services for children with special health care needs.

*2019.* We have been following several important bills which could have improved access to health care services for women and children in Texas. Unfortunately, despite vigorous advocacy by individuals and organizations committed to maternal and child health, only one of these bills passed and was signed by the Governor.

Efforts were made this session to expand Medicaid coverage in Texas under the Affordable Care Act. This would have required an amendment to the Texas Constitution as well as enabling legislation. The House failed to pass the bill providing for the constitutional amendment, and the Senate failed to take up the issue.

**Medicaid Medical Transportation (HB 25):** This bill authorizes a pilot program to allow medical transportation program services to a child if the child is younger than 13 years of age and if the child's mother is: a recipient of Medicaid during a pregnancy; using medical transportation program services to travel to and from a covered health care service related to the pregnancy, including postpartum care; regardless of whether the child is also a recipient of Medicaid. Without this bill, a mother may not be able to take her newborn baby with her when she goes for post-partum care. Although this may seem like a small improvement, it would enable a mother to receive essential care to maintain her own health, and the mother's health is key to the well-being of the child. This bill was passed by both the House and Senate and was signed by Governor Abbott.

OCAGH_00001633

**Bills Which Did Not Pass:** The Texas Senate failed to take up the maternal health coverage bill (HB 744), which would have addressed the high maternal mortality rate in Texas by extending Medicaid coverage for pregnant women to 12 months post-partum. The Texas Senate also let the provisions of the Child Health Coverage bill (HB 342) die; these provisions were included as an amendment to SB 1105 and would have reduced the onerous administrative paperwork that is now required to keep a child on Medicaid for 12 months. A bill to provide contraception with parental consent for CHIP recipients (HB 800) and a bill to prevent insurance plans from switching enrollees off medications that are working (HB 2099) also died in Senate committees. Finally, the Texas House voted down an amendment to implement Medicaid expansion, and the Texas Senate did not discuss the issue.

Yes, this has been a disappointing year for children and pregnant women in Texas who need access to health care services. The legislative session is over, but the problem has not gone away. In the coming months, we will be watching for opportunities to improve access and care by other means. We will also be looking to 2021, our next opportunity to improve child health by legislative action.

## G. Health Care System for Older Texans
2001

*The League of Women Voters of Texas supports a comprehensive health care system for older Texans that ensures a seamless continuum of quality care.*

Access to health care should include:
- Statewide and local information and referral networks which provide clear, correct, and consistent information about publicly funded health care programs and eligibility requirements.
- Development of programs to provide adequate and affordable transportation for clients and health care providers.

Health care for older adults should include:
- Integration of health care services, including developing an individual health care plan and providing a continuum of services, such as health care screening, prevention services, acute care, long-term care, and hospice care.
- A variety of long-term care services and alternative housing options in sufficient quantities to provide the level of care appropriate for each individual.
- Options that include home and community-based services, in addition to institutional care.
- Programs that address limitations to access in rural and other medically underserved areas for dentistry, hearing and vision services, mental health services, and long-term care.
- Innovative programs that use waivers and blending of funds to customize services to fit individual and community needs.
- Access to prescription drugs which is not limited by the ability of an individual to pay for them.

Actions to achieve high quality health care should include:
- Adoption and strict enforcement of high standards for all long-term care services for older Texans.
- Programs to improve the training, pay, benefits, and retention of personnel engaged in planning, regulation, and delivery of care.
- Policies that promote training in geriatrics at all levels of medical and nursing education
- Coordination of benefits from Medicare, Medicaid, and other publicly funded programs in order to serve individuals who are eligible for more than one program.
- Sufficient funding to support comprehensive, high quality health care for older adults.

## Explanation: Health Care System for Older Texans
Reflecting a widespread interest in issues surrounding health care, delegates to Convention 1999 approved the Continuum of Health Care for Older Adults study. Focused on health care options for older adults, the study examined existing laws and regulations relating to health care for older adults, a wide range of health care options for indigent and non indigent older adults at varying states in their lives, and accessibility to available health care options including the financial implications of these options. A study committee produced *Facts & Issues: A Continuum of Care: Health Issues for Older Adult* (2000), which was distributed to League members, public

OCAGH_00001634

officials and agencies, and other interested groups and individuals. Consensus was reached in the fall of 2000, and the state board approved the new position in November of that year.

## History: Health Care System for Older Texans

*2001.* The League followed a large number of bills related to long-term care, nursing homes, and related areas. Many of the bills passed and indicate that Texas is taking health care more seriously than in the past. Bills related to pharmaceuticals will allow more information about pharmaceutical assistance programs, bulk purchasing of prescription drugs, and a state prescription program for certain Medicare beneficiaries. Other bills would allow for dental services to some recipients of medical assistance, require health maintenance organizations to provide periodic health evaluations, establish a medical assistance buy-in pilot program for certain people with disabilities, and establish a program of all-inclusive care for the elderly. Other bills that passed will improve case management for Medicaid recipients and improve services through telemedicine.

Other bills that passed will improve health care in rural areas, further protect nursing home residents, and provide an opportunity for nursing homes to purchase liability insurance from the Texas Liability Insurance Underwriting Association as well as allowing the state to make grants to nursing homes that demonstrate best practices. A temporary measure to rescue nursing homes as a result of the current crisis in liability insurance also passed. This law includes means to insure quality of care with an early warning and amelioration process and a quality assurance fee (or bed tax) for nursing homes in order to increase nursing home reimbursement rates.

*2003.* The 78th Legislative Session was faced with a budget crisis that resulted in decreased funding of health care for the elderly and disabled. Community care programs were reduced. Medical services for the elderly on Medicaid will no longer cover counseling, podiatric and chiropractor care, eyeglasses, hearing aids, and other optional benefits. The personal needs allowance for those on nursing home Medicaid was also reduced although legislation was proposed in the first special session to reverse this.

Texas Health and Human Services is being reorganized and a state agency created called the Department of Disability and Aging will be responsible for programs that were originally under the Department of Aging. Whether these changes will be more efficient is yet to be seen. The budget crisis drove the legislative session, and hence this was not a good session for the advancement of care for the elderly.

*2005.* The major concern for the 79th Legislative Session was funding of programs and the hope that cuts from the 78th Session would be restored. Funding to provide eyeglasses, hearing aids, mental health services, and podiatry benefits for adult Medicaid clients was restored. The 79th Session budget provides funds to increase enrollment in a number of non entitlement community care and health programs that had been reduced in the previous session. The budget assumes lower caseloads for Medicaid and cost per client and includes funding to reduce waiting lists. There is some anticipated cost savings from greater management care for the aged, blind and disabled Medicaid clients. Proposed change to Medicaid Managed Care was most controversial. Some compromises were made and some models will be implemented in the Dallas area.

Long-term care programs now reside in the Department of Aging and Disability Services. Most Department of Aging and Disability Services are through Medicaid. Nursing facility rates were not restored nor increased, and there is a possibility of a nursing home deficit. At the last minute, the governor vetoed a quality assurance fee, a type of bed tax on nursing homes that would have provided funds for rate restorations and increases to nursing home facilities. Consequently this leaves Department of Aging and Disability Services without state funding for nursing home rate restorations or updates and without basic operating funds. Medicaid provider rates were not increased nor restored to previous rates, but remain at the 2003 rates. In addition the personal needs allowance remains at the 2003 level.

*2007.* The 80th Legislature passed no major legislation for senior health care. The personal needs allowance for nursing home Medicaid recipients was increased to $60/month. A bill was passed to establish the creation of nursing home family councils. Legislation was passed to make long term care insurances for Medicaid consistent with federal law under the Deficit Reduction Act of 2005.

*2013.* The debate over Medicaid overshadowed much of the session. Sweeping changes were proposed relating to how the state administers the program. Some of the changes came from studying the changes to Medicare in the Affordable Care Act. Many of the changes are expected to improve the quality of care and cost effectiveness of the Medicaid program and to combat fraud.

SB 7 and SB 8, by Senator Jane Nelson, contained some of the largest changes to the way the state administers Medicaid. SB 7 redesigns long-term and acute-care services for the elderly, who are among the most costly services provided by Medicaid, and allows Medicaid managed care to cover services provided in nursing homes. SB 8 bars providers who have been found guilty of Medicaid fraud in Texas or elsewhere from participating in the Texas program. Legislators turned down Medicaid expansion and the $90 billion it would provide over 10 years.

Medicaid reimbursement for many services did increase. For example, nursing home reimbursement increased 2% the first year and 4% in the second year. Attendant care salaries were increased $.50 in 2013 and $.50 more in 2014. Legislation passed to establish a reuse program for durable medical equipment provided to recipients under the Medicaid program.

## H. Post-Divorce Payments
1982, 1997

*The League of Women Voters of Texas supports changes in Texas laws that would enable a court to award adequate post-divorce payments to a spouse when appropriate.*

### History: Post-Divorce Payments
*1995.* A bill enacted in the 1995 Legislative Session removed the stigma of notoriety from Texas as the only state in the U.S. that did not allow its courts the option of ordering post-divorce (alimony) payments. The new law gives courts discretion to order alimony payments for an ex-spouse who is unable to support her or himself, if the couple has been married at least 10 years. In each previous legislative session dating back to 1982, similar, League-supported measures were passed by the Texas Senate but died in the House. Although the 1995 legislature enacted a law awarding postdivorce payments (spousal maintenance or alimony), the new law is very limited. Consequently, the 1995-97 Periodic Program Review Committee added the word "adequate" and urged retention of the position.

## I. Services for People With Behavioral Health Disorders
*1988*  (See also LWVUS position "Health Care" in *Impact On Issues*)

*The League of Women Voters of Texas supports the right of all persons who have behavioral health disorders to have access to services designed to help them reach and maintain an optimal level of functioning in the least restrictive environment.*

The League believes that state government should ensure that the following services are accessible to persons with behavioral health disorders:

- Residential services
- Nonresidential services
- Continuity of care services
- Outreach to those who cannot or will not seek assistance
- Programs for special populations

The League supports these actions to improve the number and quality of services available for people with behavioral health disorders:

- Provide incentives for community-based residential programs.
- Implement measures to encourage public and private funding of long-term rehabilitative care.
- Provide technical assistance to, and regulation of, housing providers, such as room and board homes that house patents with behavioral health disorders.
- Implement measures to prevent discrimination and encourage community acceptance of residents with behavioral health disorders, including community education about serious behavioral health disorders.

OCA-APPX-1575

OCAGH_00001636

- Supplement federal Supplemental Security Income (SSI) payments for mentally disabled persons.
- Allocate state funds to local mental health authorities according to need for services and performance level and quality.
- Provide incentives for local mental health authorities to develop residential services for persons who are most difficult to place.
- Increase the number of physicians who receive training in the public system for behavioral health disorders.
- Expand academic and research opportunities in the public system for behavioral health disorders.
- Require continuing education and in service training for mental health professionals and direct care staff in the public system for behavioral health disorders.
- Provide higher salaries and benefits as required to attract and retain qualified personnel in the public health system for behavioral health disorders.

The League supports funding of services for persons who have behavioral health disorders by:

- State government.
- State government through participation in federal programs.
- City, county and other local governments.
- Private insurance.
- Individuals to the best of their ability.


The federal government is currently the major funding source for research on behavioral health disorders. The League supports sharing the responsibility for financing research on the prevention, causes, treatment, and need for treatment of those with behavioral health disorders with state government and the private sector.

## Explanation: Services for People With Behavioral Health Disorders

League delegates to Convention 1987 adopted a new study of the state mental health and mental retardation system, with emphasis on persons who are seriously mentally ill. There was excellent participation in the study with 75% of local Leagues responding. The consensus indicated strong support for access to a range of high-quality services by Texans with serious mental illness and public education regarding serious mental illness to combat stigma and discrimination against persons who suffer from it. The position on services for the seriously mentally ill was adopted in November 1988.

## History: Services for People With Behavioral Health Disorders

*1989.* League efforts focused primarily on increasing the Texas Department of Mental Health and Mental Retardation budget in order to initiate programs for youths and to expand services to rural areas. Although the final budget was an expansion over previous levels, it primarily reflected the increased cost of providing current service levels and some court-mandated reforms for hospitalized clients. A small amount of funding was designated for programs for children and youth. The League also opposed several discriminatory bills, which ultimately died. These bills would have significantly reduced access to housing, within residential areas, for disabled persons including the mentally ill.

*1990-93.* During the 1990 interim, the LWVTX testified before a hearing of the Senate Health and Human Services Committee to reiterate our support for private board and care homes operated in a responsible fashion. The 1991 Legislative Session produced successful legislation clarifying the regulatory and licensing procedures for board and care homes and outlining a bill of rights for residents and providers. Although not active on this specific issue in the 73rd Legislature, the League worked to maintain funding levels for human services programs, including those for the mentally ill.

*1994-95.* During the legislative interim, the LWVTX presented testimony to an advisory task force of the Texas Department of Mental Health and Mental Retardation charged with delineating authority/provider roles. The League objected to the proposed separation of local authority from local providers, noting the need for the authority and provider to be one entity at the local level to ensure accessibility, continuity, and flexibility of assistance to those in need of services.

*2005.* The legislative priority for the 2005 Session was to work to influence the legislature to maintain or increase the current funding level for services for the seriously mentally ill, when appropriate, combining efforts in coalition with other organizations. We appreciate being able to work with the Mental Health Association of Texas, and in particular, the Mental Health Association of Greater Dallas.

The final budget bill included the following mental health items: $20 million added statewide for adult community mental health, $3 million added statewide for children's community mental health, $15 million added statewide to increase state psychiatric hospital bed capacity, $3.3million added for full restoration of Children's Health Insurance Program mental health benefit, $44 million added
for restoration of Medicaid adult psychological counseling benefit, and $195 million for the NorthSTAR program.

The following mental health related bills were signed by the governor: (a) HB 224 (Corte): Prevents a minor from discharging him or herself or refusing psychoactive medication under specified conditions, and (b) SB 1473 (Lindsay)/HB 2524 (Coleman): required that all law enforcement officers, veterans as well as cadets, receive training on de-escalation and crisis intervention techniques for dealing with persons with mental impairments. HB 2572 (Truitt), authorizing a local mental health and mental retardation authority to determine whether to provide services directly or to contract with another organization to provide service, was vetoed.

*2007.* The LWVTX worked to influence the legislature to maintain or increase the current funding level for services for the seriously mentally ill. A request by the Department of State Health Services for $82 million in new dollars for mental health crisis services was full funded. The additional funding will allow the state to pen six new psychiatric emergency observation sites, provide children's outpatient and crisis stabilization for 87,000 people, and to train and certify 340 community center staff to respond to crisis calls. In addition, funding provided for state mental health facilities totaled $634 million, a $14.6 million increase to maintain the 2007 caseloads.

Legislation for parity to require health insurance plans to cover treatment for serious mental health disorders advocated by the LWVTX did not make it through the process. However SB 568 (Ellis), which mirrored pending federal legislation, and HB 510 (Fabree) made it through respective chambers. The features of both pieces of parity legislation were attached to HB 1919 relating to health insurance coverage for individuals with brain injury, however at the last minute these were stripped from the bill in conference committee.

*2011.* The League monitored legislation affecting mental health and substance abuse services throughout the legislative session and encouraged members through the *Legislative Newsletter* to contact their congressional representatives serving on the relevant committees and when budget considerations came to the floor of both houses in support of League positions. In light of current language being used to describe mental health and substance abuse issues, it was recommended and adopted that the issue title be changed to "Services for People with Behavioral Health Disorders."

Although the Texas Legislature generally maintained 2010-11 levels of funding for mental health in the Department of State Health Services budget, this must be understood in the context that Texas is at the bottom of all 50 states in per capita spending for public mental health services. While community-based services for children were increased by almost $21 million, community-based services for adults were decreased by over $11 million, and substance abuse treatment services were decreased by over $29 million. Substance abuse treatment services are critical because of the large number of people with mental illnesses who have co-occurring substance abuse disorders.

*2013.* While Texas continued to be at the bottom of all 50 states in per capita spending for public mental health and substance abuse services, the legislature did provide an additional $350 million for the biennium. This significant increase was in large measure motivated by several tragic mass shootings of people attending a political event, people at a movie, and children and teachers in an elementary school. Young people with histories of mental illness conducted the three shootings.

Some 70 bills related to mental health were filed and the LWVTX monitored and advocated for those related to our positions. In addition to our highest priority for increased funding, the most significant bills passed include the

OCAGH_00001638

following: (a) authorization of a study of the mental health workforce shortage, (b) facilitation of best practices in hospital emergency rooms for Screening, Brief Intervention and Referral to Treatment in cases of injuries from substance use/abuse, (c) authorization of a study of the need statewide for forensic and civil hospital beds, (d) expansion of the number of mental illnesses eligible for treatment (previous law limited coverage to major depression, bipolar disorder, and schizophrenia), and (e) funding for mental health first aid training statewide, (f) integration of mental health with the rest of the health care system in the Medicaid program (g) provision of improved mental health awareness and suicide prevention training for public school educators and staff, and (h) clarification of judicial authority to court-ordered outpatient treatment for people with mental illness.

*2017.* Congratulations to the 85th Texas Legislature! There were many, many good bills supporting behavioral health introduced this session, 41 of which the League actively supported. Of these, 22 were finally passed.

Of the $1 billion appropriate from the Rainy Day Fund, $300 million will be dedicated to state-run mental hospitals for new construction, significant repairs, and increased capacity. Also appropriated were $62.7 million to eliminate projected waiting lists for community mental health services for adults and children, $37.5 million for a new mental health jail diversion program, and $160 million for deferred maintenance at state schools and hospitals.

Under the leadership of Chairman Four Price, the House Select Committee on Mental Health passed four significant bills: HB 10, HB 13, HB 1486, and HB 3083. Their provisions include: (a) an ombudsman position for behavioral health access to care, (b) a mental health and substance use disorder parity work group to coordinate state and federal rules and statutes about benefits for these disorders, (c) requirement for the Health and Human Services Commission to establish a matching grant program for the purpose of supporting community mental health programs and provide services and treatment to individuals experiencing illness, (d) a provision in Tex. Gov. Code requiring the Health and Human Services Commission to adopt rules on the training and certification of peer specialists for mental health, and (e) a chemical dependency counselor for those who are eligible to receive repayment assistance on college loans.

**House bills supported by the LWVTX that passed** include
an annual mental health screening under Texas health Steps program for children aged 12-18 years, mental health services for first responders, workman's comp for fire fighters and peace officers who develop PTSD, maternal depression screening.

**Senate bills supported by the LWVTX that passed** include intervention for veterans, psychiatric rehabilitation services to children and their families, requires the Texas Veterans Commission to create a veterans suicide prevention plan, post investigation psychological counseling for a grand juror in a grand jury investigation, clarifies the definition of psychology and therefore prevents those who are not licensed by the Medical Board from claiming to be psychologists.

*2019.* Here is a breakdown of major behavioral health bills that passed and have been signed by the governor:

**School Behavioral Health/School Climate**
- HB 18 (Price) - Relating to consideration of the mental health of public school students in training requirements for certain school employees, curriculum requirements, counseling programs, educational programs, state and regional programs and services, and health care services for students and to mental health first aid program training and reporting regarding local mental health authority and school district personnel.
- HB 19 (Price) - Relating to mental health and substance use resources for certain school districts.
- SB 11 (Bonnen) - Relating to policies, procedures, and measures for school safety and mental health promotion in public schools; making an appropriation.
- SB 504 (Seliger) - Relating to the inclusion of certain information in postsecondary education and career counseling academies developed for certain school counselors and other postsecondary advisors employed by a school district.

**Foster Care, Trauma, and Behavioral Health**

- HB 53 (Minjarez) - Relating to the transitional living services program for certain youth in foster care.
- HB 72 (White) - Relating to the continuation of Medicaid benefits provided to certain children adopted from the conservatorship of the Department of Family and Protective Services.
- HB 475 (Howard) - Relating to information for foster children who are pregnant or minor parents.
- SB 355 (West) - Relating to developing a strategic plan to ensure the provision of prevention and early intervention services complies with federal law.

**Maternal Behavioral Health**
- HB 253 (Farrar) - Relating to a strategic plan to address postpartum depression.
- SB 750 (Kolkhorst) - Relating to maternal and newborn health care and the quality of services provided to women in this state under certain health care programs.

**Criminal Justice and Behavioral Health**
- HB 601 (Price) - Relating to procedures and reporting requirements regarding criminal defendants who are or may be persons with a mental illness or an intellectual disability.
- HB 1342 (Leach) - Relating to the consequences of a criminal conviction on a person's eligibility for an occupational license.
- SB 652 (Zaffirini) - Relating to the delivery of certain mental health information regarding a defendant transferred from a county to the custody of the Texas Department of Criminal Justice, the commitment of certain defendants for competency restoration, and the use of telepsychiatry in determining whether a defendant is manifestly dangerous before commitment.

**Substance Abuse**
- HB 4298 (Murr) - Relating to the licensing of satellite offices of outpatient chemical dependency care facilities.
- SB 340 (Huffman) - Relating to the creation of a grant program to assist law enforcement agencies with the purchase of opioid antagonists.
- SB 436 (Nelson) - Relating to state-wide initiatives to improve maternal and newborn health for women with opioid use disorder.
- SB 1564 (West) - Relating to access to medication-assisted treatment for opioid use disorder under Medicaid.

**Telehealth Services**
- HB 3345 (Price) - Relating to health benefit coverage provided by certain health benefit plans for telemedicine medical services and telehealth services.
- HB 4455 (Miller) - Relating to the provision of mental health services through a telemedicine medical service or telehealth service.
- SB 71 (Nelson) - Relating to the establishment of a statewide telehealth center for sexual assault forensic medical examination.

**Other bills to address behavioral health**
- HB 1590 (Howard) - Relating to the establishment of the Office for Sexual Assault Survivor Assistance within the criminal justice division of the governor's office.
- HB 1735 (Howard) - Relating to sexual harassment, sexual assault, dating violence, and stalking at public and private postsecondary educational institutions; providing an administrative penalty.
- HB 2813 (Price) - Relating to the state-wide behavioral health coordinating council.
- SB 37 (Zaffirini) - Relating to the abolition of student loan default or breach of a student loan repayment or scholarship contract as a ground for nonrenewal or other disciplinary action in relation to a professional or occupational license.

# J. Transportation

*2006  See also LWVUS position "Transportation" in Impact On Issues)*

*The League of Women Voters of Texas supports a transportation system to move people and goods that includes a variety of transportation modes, with emphasis on increased transportation services and other viable alternatives; that is efficient, convenient, and cost effective; that services all segments of the population and diverse geographic needs; that minimizes the harmful effects on the environment, is integrated with land use, and is supported by extensive public education.*

OCAGH_00001640

Planning for transportation projects should be accomplished by:

- Cooperation and coordination among agencies and different levels of government.
- Timely, informed citizen input in the planning process.
- Selection of projects based on needs assessment.
- Analyses of alternate routes and modes.
- Analysis of environmental impact.
- Measures to provide public transportation to groups who do not have or cannot drive a private auto (elderly, disabled, youth, low-income).
- Policies encouraging the integration of various modes of transportation to promote seamless systems.

Transportation and land use planning should include the following strategies in order to influence travel behavior:

- Parking fees
- Taxes
- Tolls
- Alternatives to single occupancy vehicle travel (high occupancy vehicle lanes, cars/van pools, bicycle lanes, etc.)
- Flexible lanes for high traffic times
- Land use policies to encourage mixed use development coordinated with public transportation

Construction, maintenance and/or expansion projects should be funded through:

- Tolls on new highways.
- Regional rail authorities with taxing ability.
- Federal funding.
- Usage taxes for commercial vehicles.
- Local user taxes.
- State gas and user taxes.
- Bonds.
- Private sources (developers, etc.).

To alleviate congestion on Texas highways, existing routes should be expanded to include added passenger rail service and expanded freight rail lines. New routes should connect major Texas centers of population, preferably by rail.

## Explanation: Transportation

A transportation study, "Texas Public Transportation," was adopted at Convention 2003 as a three-year study, after being recommended by seven Leagues, several of which had local transportation positions. The focus was on current public transportation systems, future needs, and funding availability. In addition, members focused on the impact of public transportation on air quality, land use, and the need for regional public transportation networks. Consensus was completed and adopted by the board in January 2006.

## History: Transportation

**2006.** The League opposed the proposed route for the Trans-Texas Corridor because local and regional planning groups had concerns about economic and environmental effects which were not addressed, their recommendations were not included in the route selection, and major population centers were not connected in a seamless manner.

**2007.** The LWVTX opposed HB 1892 (Smith), a moratorium bill on Trans-Texas Corridor (includes many other toll roads). Highways 1604 and 281 were not included in this moratorium. Some North Texas roads, which had been approved, were not in the moratorium. The governor vetoed the bill passed by the legislature.

*2013.* During the 2013 Legislative Session few transportation bills were passed. The major legislation involved a proposed constitutional amendment to allow funds from the Rainy Day Fund to be used for infrastructure repair and expansion. The amendment legislation passed but did not appear on the same ballot as the water amendment in November 2013. The Texas Department of Transportation was challenged to use funds in as efficient way as possible, which resulted in gravel on some rural roads instead of paving. Effects on roads from oil/gas drilling trucks were a concern. There has been much uproar since then and projects have been redirected. Both House and Senate

committees were concerned with congestion (e.g., on I-35W and I-35E), but with limited funds could come up with no funding solution.

Transportation will be a high priority in the coming legislature. High-speed rail from Houston to the Dallas/Fort Worth metroplex, plus the Mexico to Oklahoma City corridor rail, are being addressed by the Texas Department of Transportation. Interim charges include: passenger and freight rail are to be evaluated through a review of the Rail Division of the Texas Department of Transportation, and the port system will be evaluated through a review of the Maritime Division of the Texas Department of Transportation. There was a constitutional amendment on funding that will be on the ballot in November 2014 for use for road infrastructure and improvement. Our current positions enable us to address the proposed legislation in a favorable fashion.

*2017.* Transportation policy bills did not get very far in the 85th Legislature. High-speed rail bills, toll road bills, red light camera bills, and other bills to address important transportation issues in the state went eight unheard or did not make it far in the process. Only 10 transportation bills that the League followed this session were sent to the governor.

One of the transportation policy bills that was signed into law is a statewide ban on texting while driving. HB 62 has exemptions for using global positioning system (GPS) and emergency messages while driving and for operating devices that play music. But the reading and sending of messages via text, email, messaging applications, and other text-based means is prohibited unless the vehicle is stopped. Also significant was the passage of SB 30, which requires the inclusion of education for drivers on peace officer interactions. This is following a number of police shootings at traffic stops across the country that has come to national attention. A bill that would have permitted the advertisement of voter registration deadlines and voting days on the Texas Department of Transportation message boards along interstate highways did not get a hearing. This was disappointing as the League was prepared to support the bill.

HB 100 was signed into law. And the state will take over the regulation of ridesharing companies while prohibiting local governments from doing so. This is of note to the City of Austin, which banned companies Uber and Lyft from operating in the city last year after the companies did not comply with local regulations. The companies have been operating elsewhere in Texas. SB 312, the bill to continue the Texas Department of Transportation, was signed by the governor. The Texas Department of Transportation was under sunset review this session and was noted as being unprepared to the challenges of the future.

The bills addressing the high-speed rail project between Dallas and Houston did not get very far this session, meaning that for the next 2 years the private company that owns the project has no special limitations to contend with. An overwhelming number of bills did not receive a hearing or were left pending in committee. And most bills did not pass from one house to the other. Bills banning or limiting toll roads also did not move very far (not all toll road have been financially successful). The reverse in position on toll roads from approximately 10 years ago is a policy issue that can have significant impact on many urban commuters in Texas as the state begins to grapple with massive population growth over the next few years.

*2019.* The 86th Legislature saw the passage of few transportation bills, and nearly half of the bills either established memorial highways or created new specialty license plates. Among the new plates that are now available to passenger vehicle owners are **Register to Vote specialty license plates** (HB 1330), a bill successfully supported by the League!

**Toll Roads:** The troubled finances of some toll entities and problems with both toll road construction and toll gate sensors have contributed to less enthusiastic support for toll roads from many legislators. HB 803 was signed into law and requires greater financial transparency from toll road entities, which have been criticized for not making their information accessible to the public.

**Driver Responsibility program:** HB 2048 repealed the controversial Driver Responsibility program. Per the Texas Department of Public Safety website:

OCAGH_00001642

"The Driver Responsibility Program establishes a system that authorizes the Texas Department of Public Safety (DPS) to assess surcharges to an individual based on certain traffic offenses that have occurred on or after September 1, 2003. Individuals are notified by mail each time a surcharge is added to their driver record. Surcharges are in addition to other fees and do not replace a suspension, revocation, denial, disqualification or cancellation resulting from the same conviction."

The program had been criticized for contributing to the disproportionate incarceration of low-income individuals, who were unable to pay the charges and subsequently had their driver's license suspended or were jailed after failing to pay the surcharges after 105 days. Critics of the program further asserted that the surcharges trapped people in a cycle of debt. The evidence presented to lawmakers was enough to generate bipartisan support for the passage of HB 2048, which went into effect on September 1, 2019.

**Red light cameras:** After several unsuccessful attempts in prior Legislative sessions to ban red light cameras, HB 1631 banned red light cameras across Texas. Local law enforcement may no longer use photo enforcement to issue traffic fines and citations.

**High Speed Rail:** Although high-speed rail has been a controversial issue for landowners and elected official along the proposed Dallas – Houston route, none of the bills regarding the privately owned and operated passenger rail line were passed, leaving another two years without legislative resolution for the issues of rail elevation, coordination with county road cutoffs and re-routes, land acquisition, or multi-modal compatibility, among others.

**Other issues:** Many cities in Texas have received an influx of electric scooters, which have had both positive and negative responses. SB 549, which would have regulated electric scooters, failed to pass out of the House committee. HB 417, relating to economic impact reviews conducted by the Texas Transportation Commission, would have required analysis and public comment on transportation project impacts to businesses, but did not receive a hearing. HB 2306, relating to a study regarding the public health considerations of transportation planning, was left pending in the House Administration committee.

# IV. Natural Resources

## A. Climate Change and Air Quality

*1960s, 2020* (See also LWVUS positions "Air Quality" and "Climate Change" in *Impact On Issues*)

*The League of Women Voters of Texas believes that climate change is a serious threat facing our nation and our planet.*

The League believes that an interrelated approach to combating climate change will protect public health and defend the overall integrity of the global ecosystem. Typically climate change solutions will address:

- Energy conservation
- Air pollution controls
- Development of resilient infrastructure
- Promotion of renewable energy resources

The League supports climate goals and policies that are consistent with the best available climate science and that will ensure a stable climate system for future generations.

*The League of Women Voters of Texas supports state government action for control of air pollution in Texas, including:*

- Power to set and enforce standards stricter than those required by the federal government.
- Adequate funding to carry out research, planning, and enforcement.
- Legislation allowing local and regional governments to set and enforce standards stricter than those of the state.
- Encouragement of citizen involvement in the rule making and enforcement process.

## Explanation: Air Quality and Climate Change

The League has been involved with air quality legislation at the state and national levels since prior to the passage of the Federal Clean Air Act in 1970. In 1977 amendments to the Federal Clean Air Act were passed extending deadlines and relaxing some pollution standards. The Clean Air Act Amendments of 1990 aimed to reduce substantially air pollution from most American cities by the turn of the century. The requirements will protect human health and the environment, while balancing environmental and economic concerns. Provisions include more stringent pollution controls for air quality, motor vehicles, hazardous air pollutants, acid rain, and stratospheric ozone depletion. Areas in Texas not meeting the air quality standards are Houston, Beaumont/Port Arthur, El Paso, and Dallas/Fort Worth. Additionally, Victoria County and Culberson County (Guadalupe Mountains National Park) are being evaluated for non-attainment status.

The vehicle provided under the Federal Clean Air Act to show compliance or a plan to attain compliance is the State Implementation Plan. The League has been involved in numerous revisions of the State Implementation Plan and supports legislation that will promote clean air, such as vehicle inspections, changes in gasoline formulation and/or the use of alternate fuels, and more auto and industry pollution controls.

This position was amended by delegates to Convention 2020 to include a statement on Climate Change. Wording was modeled after the LWVUS position on climate change.

## History: Air and Climate Change

*1985-89.* In the 1985 Legislative Session, the League supported requirements for the state to do periodic reviews of permits and to institute administrative penalties for industry violations of air quality guidelines. We worked in the 1987 Session to maintain these gains. The League also intervened on behalf of the state in the suit brought against Texas by the Texas Association of Business regarding jury trial and administrative penalties. (In 1993, the Texas Supreme Court upheld the lower court's ruling in our favor, affirming the constitutionality of administrative penalties.) The League worked in the 1989 session in support of legislation that promoted the use of alternative fuels in fleets of vehicles such as school buses, taxicabs, and metropolitan transit systems.

*1991-93.* In 1991 the League supported funding at adequate levels for the Texas Air Control Board and the necessary statutory authority to implement the Federal Clean Air Act in Texas. This legislation ultimately passed during the first special session as part of a reorganization of natural resources agencies. In the 1993 Session, the League supported dedication of revenues from environmental fees, such as those required of air polluters, to environmental regulatory and remedial programs. We also successfully opposed legislation that would have exempted agriculture operations from all state air pollution control requirements. Also adopted in 1993 were legislative changes required to bring Texas clean air programs into compliance with regulations adopted by the U.S. Environmental Protection Agency to implement the Clean Air Act Amendments of 1990. Despite League opposition, the 1993 Session repealed the requirement that school buses convert to alternative fuels. Conversion of school buses is now purely voluntary.

*1995.* Though environmental protection was a priority for the LWVTX in the 74th Legislature, an antiregulatory mood prevailed. A League-opposed measure that broadens the definition of alternative fuels to include petroleum fuels passed and was signed into law. In addition, despite opposition from the League and environmental groups, the statewide air emissions testing program was scuttled. Centralized testing was abandoned in favor of returning to the old system of tailpipe testing that is done at the time of the annual safety sticker inspection. Known as the Interim Texas Plan, the program will be in effect while the governor, through the Texas Natural Resource Conservation Commission negotiates a program with the Environmental Protection Agency. The new program will be designed to show that Texas meets the requirements of the Federal Clean Air Act while at the same time administers a program of maximum convenience. The League considers these actions to be a major setback to efforts to achieve cleaner air for polluted areas of the state.

*1997.* The League was unable to support any of the bills concerning air quality that passed during this legislative session. One law authorized Texas Natural Resource Conservation Commission to exempt a permit applicant from meeting pollution control requirements as long as the exemption is consistent with federal law and is at least as protective as the usual standard. Another bill weakened previously enacted laws that required a significant

percentage of the vehicle fleets of state and local government agencies, mass transit authorities, and school districts to use alternative fuels. A third bill allowed grandfathered facilities from the 1970s to continue to receive exemptions from obtaining air pollution control permits for new construction and modification permits. The League did not support a provision that was added requiring the Texas Natural Resource Conservation Commission to develop a voluntary emissions reduction plan for these facilities, which could provide the opportunity for interested parties to address the issue of bringing grandfathered facilities into permitted status. The good news is that several other objectionable air pollution bills failed passage.

*1999.* As in the 75th Legislative Session, natural resources was one of our legislative priorities: advocacy to promote funding and policy initiatives supporting environmental protection and public participation. In 1999 the legislature revisited the issue of grandfathered facilities, those facilities that were exempted from having to obtain air pollution control permits as they were in operation prior to implementation of the Federal Clean Air Act in 1970.

Believing that 30 years is long enough, the LWVTX worked with a broad coalition to require that all air-polluting facilities be required to comply with laws protecting public health by a certain date. A House bill would have set a deadline to require facilities to be permitted, would have required the use of best available technology, and would have ended the volume discount for polluters that only had to pay fees on the first 4,000 tons of emissions. However, what passed was a bill implementing the governor's voluntary program for moving grandfathered polluters into the air control permitting process.

The greatest success in cleaning up Texas air came through the electric deregulation/restructuring bill that was passed and signed into law. Although the League does not have a position on electric deregulation, the LWVTX testified before the Senate and House committees urging them to consider (in the legislation) the importance of public participation and education, the impact on public health and the environment, the use and conservation of energy, and the development of renewable energy resources.

Language in this bill requires about 100-grandfathered power plants to reduce emissions by 50%. With that provision, the exemption loophole was removed from roughly 30% of the state's total grandfathered facilities. Together the two bills will ensure that 60% of the annual emissions by grandfathered plants, or about 540,000 tons of air pollutants, will now have to begin to meet clean air standards. This stands as the biggest win for the environment this session.

*2001.* The 77th Session was the best in a decade for air quality. Important air quality bills that were strongly supported by the League and signed by the governor included the Texas Natural Resource Conservation Commission Sunset/Reauthorization bill that ended the grandfather loophole. After 4 years of sustained work by environmental and public interest groups, including the LWVTX, the legislature finally ended the 30-year-old loophole for grandfathered plants, forcing Texas' oldest, dirtiest industrial plants to meet modern clean air standards. The law defined new standards for "upset emissions" of pollution, required that all emissions be reported within 24 hours, made the source come up with a corrective action plan, and provided penalties.

A large setback came when the legislature failed to remove the fee cap or volume discount collected under the Federal Clean Air Act on air emissions above 4,000 tons. The League, along with our coalition partners, lobbied hard on this issue.

In another major victory for cleaner air in Texas, the Texas Emissions Reduction Program provided three types of incentive programs: (a) rebates to consumers for the purchase of low-emission and alternative fuel vehicles, (b) incentives to use more fuel-efficient building materials and appliances, and (c) assistance to companies that agree to retrofit or replace high polluting diesel engines. Another bill expanded vehicle emissions inspection and maintenance requirements to counties beyond the one specified by federal requirement. The LWVTX supports a regional approach to solving air quality problems.

Other legislation establishes the Clean Coal Technology Council, requires the Texas Natural Resource Conservation Commission to suspend operations for a rock crusher or cement batch plant found to be operating without a permit,

allows the Texas Natural Resource Conservation Commission to authorize emissions reductions achieved outside the United States to satisfy emission reduction requirement in international border issues, and allows the Texas Natural Resource Conservation Commission to waive public notice and hearing requirements under certain conditions during construction or modification of a facility. In a loss for the environment, the legislature enacted a provision that prevents the Texas Natural Resource Conservation Commission from requiring petroleum marketers to sell cleaner grades of motor fuels in Texas markets.

*2003.* In a session in which environmental protection was rolled back dramatically, funding the Texas Emissions Reduction Program was a rare positive for Texans. Although the Texas Emissions Reduction Program was adopted by the 2001 Legislature and signed into law, a court in 2002 ruled the main funding mechanism unconstitutional. Without the 16.3 tons of emissions reductions per day in the Dallas-Fort Worth area and 18.9 tons per day in the Houston area, last year the Environmental Protection Agency threatened to reject the state's urban smog strategies in the State Implementation Plan. So the legislature was under pressure to find the money to fund the program.

Last minute action by both the legislature and the governor prevented federal intervention by funding a program to replace dirty, old diesel-powered construction equipment. Consistent with the prevailing mood of legislators regarding public health and the environment, a state program on low-sulfur diesel fuel was replaced by less stringent federal rules that could increase pollution by 6 tons per day statewide. The new law also eliminated the program of rebates to consumers for the purchase of low-emission and alternative fuel vehicles.

As passed, the Texas Emissions Reduction Program provides assistance to companies that agree to retrofit or replace high-polluting diesel engines and pays for research into new clean air technologies. To pay for it, the plan raises vehicle title transfer fees Texans pay when buying new cars and adds surcharges for on- and off-road diesel vehicles and equipment.

Another LWVTX supported bill that passed allows areas with early action compacts with the Environmental Protection Agency to establish motor vehicle inspection and maintenance programs as an air control strategy. Formerly only areas designated nonattainment were allowed to have inspection and maintenance programs, and other areas were prohibited.

Despite the budget shortfall, the legislature took no action to raise or remove the cap on the air emissions fee. They also failed to prohibit the use of hazardous waste as a fuel in cement plants.
The LWVTX supports efforts to force polluters to pay for all emissions and to tighten the regulation of cement kilns, as the current permits are inadequate to protect air quality.

*2005.* The quality of the air in Texas was a low priority for the 79th Legislature. No significant piece of clean-air legislation passed, although many areas of the state face severe air-pollution problems. In fact, the legislature worked hard to cut the Texas Emissions Reduction Program, which since 2001 has provided hundreds of millions of dollars in grants to help companies replace older, dirtier diesel-powered construction equipment. Off-road equipment such as bulldozers and cranes contribute a significant portion of the state's pollution. The legislature even proposed cutting in half the fund that helps low-income motorists repair vehicles that fail the annual emissions test required in nonattainment areas of the state, but restored that fund to current levels at the end.

The enactment of the Texas Emissions Reduction Program in 2001, an economic incentive program to reduce air pollution instead of punishing polluters, was hailed as a model for the nation and was crucial to gaining Environmental Protection Agency approval for State Implementation Plans in Dallas-Fort Worth and Houston-Galveston Area. As a compromise, that legislature did not restrict use of heavy construction equipment during the summer smog season nor did it impose a requirement for faster replacement of old, high polluting diesel engines by providing funding through the Texas Emissions Reduction Program for voluntary replacement by diesel-dependent industries.

OCAGH_00001646

The reason given was the budget constraints. But a proposal on raising operating permit fees from the current cap of 4,000 tons per day (no matter how much air pollution is emitted) to 8,000 tons per day never was considered. Proposals requiring the Texas Commission on Environmental Quality to make the amount of a penalty for air or water pollution at least as much as the value of any economic benefit gained by the polluter through the violation had little consideration. Both these would have increased revenue and would have made it more beneficial to business to prevent pollution.

Unfortunately, the health of residents living near industrial plants had low priority. A proposal that would have required the state to develop enforceable health-based pollution standards to protect residents living near industrial plants choked legislators. Proposals to monitor and control toxic air emissions near those plants, along with requiring consideration of cumulative effects of pollution, went nowhere.

Ongoing action in the air quality portfolio involves cement batch plants in Ellis County. While these plants contribute half the industrial pollution in North Texas, they were not included in the Dallas Fort Worth area nonattainment area under the old 1-hour standard. Their permits allow them to emit more pollution than other industrial plants in Texas. When the Environmental Protection Agency designated nonattainment areas under the new 8-hour standards in 2004, they included Ellis County in the Dallas-Fort Worth area. One plant had a permit change request under review to turn off the scrubbers as it costs them too much to operate them at their desired profit levels. That was not approved before the Environmental Protection Agency designation, so the law does not allow them to cite economic disincentive. We gave input to include Ellis County in the Dallas-Fort Worth area nonattainment area as well as to request denial of this permit change.

**Border issues**. The League followed a number of issues that were unique and/or critical to the border region. Many of the bills were directed at vehicular traffic, electronic and clearance checks, coordination of activities between various government agencies, and the review and development of road projects.

*2007.* Many bills were filed in the Legislature concerning air quality. However, only two passed and Senator Averitt, the Senate Natural Resources Committee Chairman, introduced those. The first updated the Texas Emissions Reduction Plan and the Low-Income Vehicle Repair Assistance Program. These programs were both funded.

The second bill required that not only should a preconstruction permit be reviewed every 10 years, it must also be reviewed during the permit amendment process—a great step forward. The League testified many times on the various bills that were introduced, including many that did not pass. These include the toxic hotspots bills, fence-line monitoring, California standards for cars and light trucks, establishing an air pollutant watch list, and a clean school bus bill.

*2009.* Once again, many bills were introduced in the Legislature regarding air quality. Many were also introduced regarding climate change. Only three passed, however. Senator Averitt, chairman of the Senate Natural Resources Committee, introduced an omnibus bill which included air quality and climate change. Unfortunately, this bill did not pass, though parts of it were added to another bill that did pass and was signed by the governor. Those parts which were added include the Texas Emission Reduction Program extension through August 31, 2019, a requirement that the Department of Agriculture, Texas Commission on Environmental Quality, Public Utility Commission, and Railroad Commission collaborate in the federal government process for developing federal greenhouse gas reporting requirements and the federal greenhouse gas registry requirements, and a program for new technologies for emissions control that requires best available control technology as defined by the Federal Clean Air Act instead of the Texas Commission on Environmental Quality–a major gain. Not included in the floor amendment were building energy codes, idling of motor vehicles, maximum weight for vehicles with idle reduction systems, housing partnership program rebates, and an online emissions database.

A bill by Senator Watson passed relating to "no regrets" greenhouse gas emissions reduction strategies to be prepared by the Texas Commission on Environmental Quality by December 31, 2009. The third bill that passed was by Senator Gallegos. It requires a permit applicant or the applicant's designated representative to attend a public

meeting on the permit application. So they can't just skip out. We also prepared testimony for several bills that dealt with cement kilns. Regrettably, none passed.

*2011.* While much of our time was spent fighting off bad bills in the 82nd Legislature, we did have a number of successes—primarily the passage of the Sunset Bill for the Texas Commission on Environmental Quality. Changes to the Texas Commission on Environmental Quality include the following:

- The Texas Commission on Environmental Quality is to develop and implement a policy for negotiated rulemaking and alternative dispute resolution.
- The executive director is charged with making sure that the agency is responsive to environmental and citizens' concerns, including environmental quality and consumer protection. This was formerly under the purview of the Public Interest Council.
- The Public Interest Council is to ensure that the Texas Commission on Environmental Quality promotes the public interest. However, the primary duty of the office is to represent the public interest as a party to matters before the Texas Commission on Environmental Quality.
- The Texas Commission on Environmental Quality by rule shall develop standards for evaluating and using compliance history that ensures consistency. However, the compliance history shall not exceed 1 year from the date of issuance of each notice of violation. In addition, compliance history is to be classified as "satisfactory, unsatisfactory, or above satisfactory."
- Fees are changed in the Health and Safety Code from not to exceed $2,500 per day to "not to exceed $5,000 per day." All other violations are changed from not to exceed $10,000 per day to "not to exceed $25,000 per day for each violation."
- The Texas Commission on Environmental Quality is to develop a policy to prevent regulated entities from systematically avoiding compliance through the use of supplemental environmental projects.

In addition, Representative Howard's bill passed that if a person violates a rule set by the Texas Commission on Environmental Quality relating to idling limitations, that person commits a Class C misdemeanor. Representative Burnam's bill adds electric vehicles and natural gas vehicles to vehicles covered by the Low-Income Vehicle Retirement Program.

With regard to climate change, we worked hard opposing Representative Hancock's bill–a Concurrent Resolution urging Congress to prevent the Environmental Protection Agency from regulating greenhouse gases from stationary sources–and it failed. Another bill that failed was by Senator Hancock and would have allowed Texas to participate in a Regional Air Quality Compact with one or several states, thus avoiding the Environmental Protection Agency jurisdiction. Needless to say, we opposed this bill. In addition, Representative Craddick's bill allowing oil and gas facilities to have reduced permit requirements failed.

We prepared testimony which was presented to the Environmental Protection Agency on the Plan for Texas under the Prevention of Significant Deterioration Rule, the proposed Environmental Protection Agency ozone rules, and the proposed rules on New Source Performance Standards and National Emissions Standards for Hazardous Air Pollutants for the oil and gas industry, including hydraulic fracturing. We also encouraged local leagues to become involved in the Clean Air Promise, a campaign of the LWVUS.

*2013.* Of the 26 bills we watched closely, five bills that we supported passed, and nine bills that we opposed didn't pass. That's 14 of 26, more than half–a real plus for our environment. The most important bills that passed were the rewriting of the legislation regarding the Texas Commission on Environmental Quality, more funding for the Texas Emissions Reduction Program, and encouraging the capture and utilization of carbon dioxide for use in enhanced oil recovery.

Important bills supported by the LWVTX that passed included increases the funding for the Low Income Repair and Replacement Assistance Program from $5 million to $10 million.

**Major bills opposed by the LWVTX** included a bill dealing with greenhouse gas emissions which was amended in such a way that we could no longer support it. The bill now indicates that it is not subject to contested case hearings

OCAGH_00001648

and that fees for exceeding emissions of greenhouse gases are limited to the cost of imposing the fee. We submitted testimony opposing the bill unless changed. Unfortunately, the bill passed and was signed by the governor.

*2015.* **Air quality**. Successes were important this legislative session as we were, as always, in defensive mode. Many bills we opposed died in committee.

**Climate change**. Few legislators were interested in climate change. However, one bill passed and another introduced that will continue. Representative Farrar introduced HB 706, which allows an exemption from ad valorem taxation of property on which a solar or wind-powered energy device is installed or constructed. Representative Anchia introduced HB 2078 establishing a Global Climate Change Commission to study the impact of climate change in Texas from a global perspective. The LWVTX gave testimony supporting this bill, including a definition of greenhouse gases that Representative Anchia said was the best definition he had heard. His goal is to inform his committee and others about the importance of climate change. He intends to speak to every member of the legislature about the growing impact of climate change on the earth.

*2017.* **Air quality**. The LWVTX supported HB 2003 (Zerwas) that relates to money used by certain counties for low-income vehicle repair assistance, retrofit, and accelerated vehicle repair assistance programs; and local initiative air quality projects. Left pending in the Senate Natural Resources & Development Committee.

Climate change bills were supported by the LWVTX but they did not pass.
(HB 773 E.Johnson) related to information on projected changes in weather, water availability, and climate variability in strategic plans of certain state agencies. Died in House State Affairs Committee. HB 445 (Frank) to ad valorem tax incentives for wind energy. Died in Chamber.

*2019.* During this session a total of 10 **climate change** bills and three resolutions were filed in the House, and one in the Senate. The 86th Texas Legislative Session showed a dramatic increase in the public's interest in climate change legislation. Unfortunately, only **HB 219** authored by **Ron Reynolds** received a committee hearing (Urban Affairs) and it was "left "pending." HB 219 required that long range municipal planning include adoption of an environmental evaluation report. The report was to include projections of the environmental impact of the municipal plan along with strategies to mitigate any adverse results. HB 219 was similar to many other bills submitted this session which incorporated environmental studies as part of a long-term planning process.

The League issued an Action Alert on March 17 directed to the members of the House Environmental Regulation Committee, urging then to give the climate change bills a hearing. The Alert generated 866 responses, but did not result in a hearing for the six bills cited.

The 14 climate change bills submitted this session were the most in the past 10 years. We were particularly encouraged by passage of **HB 3143**, which offered revisions to the **Property Redevelopment and Tax Abatement Act** to extend Chapter 312 of the Tax Code to 2029. This bill affected both air quality and climate change. Opponents to renewable energy tried to amend this Act by making property receiving a tax exemption, ineligible for that benefit if a "solar energy device" or "wind power energy device" were installed or constructed on that property. The Texas Public Policy Foundation supported that amendment in an effort to reduce the impact of renewable energy in Texas, but the amendment failed.

Although Texas, nationally, is a major natural gas and oil producer, it is also the largest producer of wind power in the country. Wind in Texas generates 22,700 MW of power which is 15.7% of the electricity produced in the state. Wind power production is a major industry statewide, accounting for 24,000 jobs.

# B. Land Use
*1974, 2018 (See also LWVUS position "Resource Management" in Impact On Issues)*

*The League of Women Voters of Texas supports a comprehensive state land use policy to provide for the orderly development of the state, including:*

- Land being used according to its carrying capacity based on a thorough inventory of our land and natural resources.
- Growth and development of an area being compatible with the degree of availability of essential natural resources in that area.
- Protection of the traditional rights of ownership of property, but in conflicts between private interest and public welfare, precedence should be given to the public interest.
- Preservation of agricultural lands and desirable open space with preferential tax treatment for each.
- Preferential tax treatment for maintenance of the desirable existing buildings and infrastructure.
- A coordinated system of land use management in Texas including the establishment of a state land use management agency.
- Identification and protection of areas of particular significance (historical, archaeological, aesthetic, recreational) and rare or fragile ecosystems.
- Planning being carried out at the local level should be the main thrust of land use.
- Equitable enforcement of land use regulations and a method for appeal and arbitration when conflicting needs exist.

## Explanation: Land Use

After 2 years of study, League members in 1974 asserted that public interests should take precedence over private rights when there are conflicts over traditional rights of property ownership. Support for preferential tax treatment to preserve agricultural lands and open space and maintain the built environment allows consideration of many innovative tax reform ideas, though care must be taken to examine this aspect of the Land Use position in conjunction with other positions, especially Financing State Government and LWVUS' Urban Policy. While the League's desire for a state land use management agency has not been realized, changes in agencies such as the General Land Office have accomplished some of our goals.

In 2018, delegates to LWVTX Convention voted to review the Land Use position as it relates to eminent domain, especially regarding private property law and the need to consider environmental impacts. A review committee was appointed. They produced an *Eminent Domain Issue Paper 2018* and recommended that no change was needed to the Land Use position. The current language accommodates support for protection of landowner interests, support for protection of environmentally sensitive lands, and support for a requisite public interest when considering legislation concerning eminent domain.

## History: Land Use

*1975-84.* Land use advocacy has often focused on coastal issues. From the late 1970s to early 1980s, League members played key roles in the development of a Texas coastal zone management plan, but the governor did not approve the plan. The League supports the national celebration of Coast Week each year.

The League worked for the establishment of the Big Thicket National Preserve in 1973-74. We have continued to support legislation that would add areas of unique biological diversity and/or essential components of ecologically viable systems to the preserve. The League also played a key role in the 1984 designation of 34,000 acres of east Texas national forest land for wilderness purposes, and we annually cosponsor a Wilderness Pow Wow and support beach cleanup programs.

*1990-91.* In 1990 the League supported the successful reauthorization of a strong federal Coastal Zone Management Act and was represented on a Coastal Management Committee formed to aid the General Land Office in the development of a comprehensive long-term plan for state-owned coastal public lands in Texas. In 1991 the League opposed proposed state legislation that would have facilitated the development of fragile and disaster-prone areas on the Texas coast.

*1995.* **Takings and other regulatory measures**. Within the broad priority issue of environmental protection, land use restrictions vs. private property rights were a major focus of League advocacy during the legislative session. The League joined other groups in mounting opposition to the Private Real Property Rights Preservation Act, known as the "takings bill." Unfortunately, antiregulatory sentiment carried the day, and the bill was signed into law.

OCAGH_00001650

Key provisions of the new Private Real Property Rights Preservation Act include:

- A broadened definition of a taking of private property by government entities to include actions that reduce market value by 25% or more.
- A requirement that governmental entities prepare "takings impact assessments" to determine proposed actions would constitute takings.
- A requirement that health and safety actions meet a stringent three-part test to qualify for exemption from its provisions unless specifically exempted in the law (about 20 categories of government actions are exempted).

On the *plus* side was the death of several bills opposed by the League that would have required cost-benefit analyses of major environmental rules by state agencies.

**Coastal management.** The 74th legislature passed and the governor signed a revamped state coastal management plan. The League supported the revised plan and proposed rules drafted by the General Land Office.

The Railroad Commission submitted numerous amendments to the proposed rules to the Coastal Coordination Council. At a hearing on August 30, the LWVTX expressed opposition to these amendments, noting their conflict with the Federal Coastal Zone Management Plan and the likelihood that adoption of the amended rules would result in rejection of Texas' coastal management plan by the federal government and loss of state authority to regulate the coastal area. The League also urged rejection of the objectionable amendments because they do not reflect important land policy goals, including preservation of the physical, chemical, and biological integrity of the ecosystem, with maximum protection of public health and the environment. (See LWVUS position on Environmental Protection and Pollution Control.)

*1999.* A number of land use issues were debated during the 76th Session, and two bills affecting county land use powers were passed and signed into law. Because of substandard development and growth concerns the first bill gives counties a little more power to regulate growth by requiring developers to file plats when they subdivide land into parcels of ten acres or less. It allows counties to set standards for roads and drainage. Adoption of this bill reverses a 1995 appellate court decision, the Elgin Bank Case, that required platting only if roads or parks were being dedicated to the county for maintenance. In order for subdivisions to be approved where the source of water is groundwater, this bill requires that a statement, certified by a registered engineer and approved by Texas Natural Resource Conservation Commission, must be attached stating that adequate ground water is available to the subdivision. This requirement applies to municipal authorities and counties.

The LWVTX continues to support a comprehensive state land use policy to provide for the orderly development of the state. Growth and development of an area should be compatible with the availability of essential natural resource in that area and should avoid the depletion of ground water.

The League actively opposed a bill that would have prohibited wetlands mitigation negotiations on proposed airport sites. The bill, which was counter to the wishes of a majority of Houstonians, and would have threatened the Katy Prairie Westside airport tract, a waterfowl wintering area, did not pass the Senate.

Unfortunately another bill supported by the League that proposed an interim study of farmland preservation was never reported out of committee. Agricultural land is threatened in Texas, the most rapidly urbanizing state in the country.

*2003.* Most of the bills introduced in the 78th Session followed by the League, dealt with county authority to regulate development. (This was also true of border issues.) Issues addressed in bills that did not pass included elections to require a subdivision to use a central water or waste water system and standards for (a) minimum amounts of open space or limits on the amount of impervious surfaces, (b) rights of way, (c) drainage, (d) utility connections, and (d) the location, use, and occupancy of housing. A bill prohibiting the operation of a motor vehicle in or on the beds or banks of Texas rivers passed and was signed into law. This issue was examined during the 2002 interim and drew interest statewide from people on both sides of the issue.

*2007.* HB 12 (Hildebran) passed and became law. It appropriates $170 million more dollars to the Texas Parks and Wildlife Department, and also transfers 18 historical sites to the Texas Historical Commission.

HB 3447 (Rose) failed to pass. This bill would regulate land development in a county wholly or partly located in a priority groundwater management area designated by the Texas Commission on Environmental Quality that contains a territory from seven or more counties.

*2011.* Activity was concentrated primarily in making eminent domain procedures and property owners associations fairer to property owners. In both instances, these powers are widely perceived to have been abused in the past. In the case of eminent domain, the process and method of calculating reimbursement were spelled out in more detail, and the definition of who can wield eminent domain authority was tightened. Governor Perry deemed this topic an emergency at the beginning of the 2011 session, so passage was streamlined and nearly guaranteed. Natural gas pipelines, however, were specifically omitted from this legislation.

Property owners associations, particularly in unincorporated areas, wield great power, but regulations governing the operations of the associations have been ill defined. In the most egregious example of an over-reaching property owners association, a home was foreclosed for relatively small arrears in property owners' association dues. New regulations are intended to result in better notification procedures and more open decision making.

*Note:* Convention 2012 adopted a concurrence entitled "Homeowners Association Reform". This position includes protection against unreasonable foreclosure on homesteads, and priority of payments so that assessment payments apply first to delinquent dues, and then to non-assessment items such as interest and penalties.

*2017.* **Legislation supported by the LWVTX but did not pass.**
- *Protecting water quality in the Hill Country.* Using water and land use positions, the LWVTX made a major advocacy effort to end the permitting of direct discharge of wastewater over the Edwards Aquifer contributing zone, which covers most of the Hill Country region. An action paper was written, "Protect Water Quality in Edwards Aquifer," and testimony was given at hearings in the House and Senate. Despite significant support from other organizations and affected landowners arguing for land application of wastewater rather than discharge into streams, the proposed legislation died. Work will continue, perhaps during the interim, to stop contamination of surface and groundwater over the Edwards Aquifer contributing zone.
- *Protecting parks and open space.* An Action Alert was issued to advocate for an increase in the proposed funding for the Texas Parks and Wildlife Department, from $230 million to $333.5 million. The funding is needed as population growth in the state has caused increased park use and greater need for maintenance and repairs. Legislation was also supported to mandate the dedication of the sporting goods sales tax to the Texas Parks and Wildlife Department, fixing a previous loophole. Sadly, both a budget increase and legislation for a permanent funding source failed.

**Legislation successfully opposed.**
- *Preserving desirable open space.* A bill failed that would have removed land used as an ecological laboratory to be appraised as open space land. The LWVTX registered in opposition to this bill because the LWVTX supports preservation of desirable open space with preferential tax treatment.
- *Supporting adequate powers at the local level.* The LWVTX opposed several bills introduced in the regular and special sessions to remove land use powers from local governments. Especially egregious bills introduced in the special session would have preempted cities' tree ordinances. The LWVTX testified against these bills and worked with an alliance of other groups to successfully keep the bills from getting out of committee. One bill affecting tree ordinances did pass during the special session and was signed by the governor. It requires cities to allow property owners to plant trees to offset mitigation fees for tree removal. This bill was ultimately acceptable to cities, tree advocates, and builders alike. It keeps intact cities' authority to regulate tree removal.

OCAGH_00001652

- *Local control of land use.* The LWVTX also opposed other bills affecting local control of land use. One bill would have required cities to enforce building codes according to date of purchase of property rather than date of permit application. Another bill would have accelerated cities' permitting process. The LWVTX registered in opposition because these kinds of decisions belong to local, not state, government.

**Legislation unsuccessfully opposed**.
- SB 1172 (Perry): Will prohibit local governments from regulating seed, essentially stripping city and county governments of their ability to protect their farmers and citizens from harmful agricultural practices. The LWVTX position is that these kinds of decisions belong to local, not state, government.

**Legislation watched**. Eminent domain and annexation issues also took center stage. In the special session legislation passed requiring cities in large counties to receive voter approval before annexing new areas.

*2019.* There were four major issues relating to Land Use in the 86th Legislative Session.

**Eminent Domain.** Using the new LWVTX publication, *Eminent Domain Issue Paper 2018*, we registered and sent testimony in support of numerous bills which were introduced to give protections to property owners involved in eminent domain proceedings. Despite vigorous advocacy from many groups, in the end none of the bills were successful.

**Flood Control Planning**. An historic statewide planning and funding package for flood control was authorized by the Legislature and approved by voters through constitutional amendment in November 2019. LWVTX registered and sent testimony in support of bills that created the framework for this first state flood plan in Texas. A designated Flood Infrastructure Fund (FIF) will pay for planning and flood control projects. The flood control planning process will be similar to the current water planning process, with regional stakeholders, including the public, planning together. The Texas Water Development Board will administer the FIF by making loans to local governments. Projects eligible for FIF may include non-structural and nature-based solutions, like wetlands, as LWVTX and other groups advocated.

**Funding For State Parks**. Legislators agreed to a permanent dedicated funding source for state parks and historic areas, and voters agreed through passage of a constitutional amendment in November 2019. This amendment will close a loophole in previous legislation and will require that all proceeds from the state sales tax on sporting goods will go to Texas Parks and Wildlife Dept. and to the Texas Historical Commission. Population increases, aging and storm-damaged park facilities, and the need for new parks closer to urban areas all require a dedicated, predictable funding source for long-range planning. LWVTX enthusiastically registered in support of this legislation.

**Regulatory Issues**. LWVTX joined with other groups to stop a bill that threatened the contested case hearing process, which is often the last line of defense for citizens to stop the Texas Commission on Environmental Quality (TCEQ) from issuing a permit that could harm air or water quality. Thanks to member response to a LWVTX Action Alert, the bill died. Throughout the session, we watched other legislation regarding regulatory changes and supported protection of environmental regulations.

## C. Water
*1971, 1974, 1978, 2012  (See also LWVUS position "Water Resources" in Impact On Issues)*

*The League of Women Voters of Texas supports the proposition that water is a natural resource and should be managed for the benefit of the people and the protection of the environment. Further, water conservation should be mandatory, with adequate citizen education for effective water stewardship.*

*The League of Women Voters of Texas supports long-range state water planning that:*
- Takes into consideration its social, economic, environmental, and land use implications.
- Provides for development of adequate water supplies by ecologically and financially sound means.
- Emphasizes conservation and reuse of water.
- Is based on increased research concerning wise and efficient use of the state's land and water resources.
- Affords protection for the land and for fragile ecosystems.
- Establishes water availability criteria before issuing any leases, permits and licenses for new industry, business, housing, and other developments.

OCAGH_00001653

*The League of Women Voters of Texas supports measures for the protection, conservation, and development of the groundwater resources of the state as an integral part of the comprehensive state water plan, and groundwater management that would achieve the following objectives:*

- Maintain groundwater quality by preventing harmful contamination of aquifers.
- Assure the long-term productivity of the state's groundwater resources and availability of groundwater supplies.
- Minimize adverse effects of groundwater withdrawals, including land subsidence and reduction of spring flows.

Water resources planning should also include the following:

- Detailed information concerning:
- Hydraulic characteristics and recharge of the state's aquifers.
- Quantities, locations, and trends of groundwater withdrawals.
- Measures that could conserve and extend existing supplies.
- Current and projected costs of ground water and alternative surface water supplies.
- Potential conjunctive use of ground water and surface water.
- Management options developed specifically for each area of the state where ground water is a significant resource and assurance that water transfers to urban areas do not endanger future rural economies.
- Methods to strengthen groundwater conservation districts so they can continue to regulate groundwater use.
- Full public consideration of groundwater management options including a strong state agency with enforcement powers to regulate all water transfers.
- Recommendations of measures to be taken by the state, by political subdivisions of the state, and by the private sector to assure wise management of the state's groundwater resources.
- Coordination of state plans for groundwater management with relevant policies and programs of the federal government and of other states.

Adequate funds should be appropriated for planning and for management of the state's groundwater resources.

## Explanation: Water

In the 1950s and 1960s, the LWVUS positions were reached on water conservation and development and on abatement of water pollution. These positions, as well as national and state positions in other natural resource areas–especially land use–are relevant to action on Texas water issues. A study of state water planning was adopted by Convention 1970. Impetus for the study was the 1968 Texas Water Plan, and the 1969 election in which a $3.5 billion bond program to begin implementation of the plan was narrowly defeated. The plan proposed importation of out-of- state water to West and South Texas via two large canal systems. The League consensus disagreed with that aspect of the plan, stating that (a) additional water supplies should be developed in an ecologically sound manner from within the state and (b) more efficient use should be made of existing water supplies. The League took another look at the Texas Water Plan in 1974, following publication of a Corps of Engineers analysis of a proposal for importation of water from the Mississippi River. This consensus reaffirmed our 1971 positions.

Convention 1977 deleted the position statement that additional water supplies should come from within the state. Delegates continued to oppose massive water transfer projects but felt that opposition should be based on other League positions. Convention 1977 also adopted a study of groundwater management and protection, and consensus was reached in November 1978.

The water position was updated in 2012 after the study of Water as a Commodity was completed. The changes specified that the LWVTX believes that water is a natural resource and should be managed for the benefit of the people and the protection of the environment. Further, water conservation should be mandatory, groundwater conservation districts should be strengthened so they can continue to regulate groundwater use, water transfers should be regulated by the state, and water transfers to urban areas should not endanger rural economies.

## History: Water

*1976-80.* When Proposition 1 authorizing $400 million in Texas Water Development bonds was placed on the ballot in November 1976, the League worked to defeat this proposition. League opposition was based on the absence of

OCAGH_00001654

financial safeguards guaranteeing timely repayment by beneficiaries of water development projects, absence of environmental protection provisions, and inadequate information as to what projects would be funded. The amendment was defeated. Proposition 2, authorizing $100 million in water quality enhancement bonds, was supported by the League and approved by voters.

Over the next several years, testimony based on League water positions was presented on the state lignite mining program, state water quality management plans, hazardous waste disposal legislation, the High Plains Ogallala Aquifer Study, the federal Soil and Water Resources Conservation Act of 1977, and a proposed Environmental Protection Agency Groundwater Protection Strategy. The LWVTX Education Fund projects on water issues included: (a) co-sponsorship of a regional floodplain conference in 1975 and (b) Project Safewater in 1976, which explained through a slide program and information kit the implications of the federal Safe Drinking Water Act for Texas communities.

*1981-84.* In 1981 League action again focused on opposition to a proposed constitutional amendment. Proposition 4 would have dedicated half of the state excess revenues in each biennium to a new water fund. In addition to the concern that prompted our opposition to the 1976 amendment, the League opposed the constitutional dedication of state revenues, in accordance with our position on Financing State Government. The League also pointed out that the revision of the Texas Water Plan initiated in 1976 had not been completed. The amendment was defeated.

Shortly after the November 1981 election, the governor called for revision of the Texas Water Plan. The state League and local Leagues testified at forums on water planning issues in 1982 and at hearings on a draft revision of the plan in 1983. In September 1984 the Water Development Board adopted a revised plan, "Water for Texas: A Comprehensive Plan for the Future," which emphasized water conservation and reuse and recognized that importation of water was not feasible under present conditions. In 1981, the LWVTX Education Fund published *Fresh Water for Texas Bays and Estuaries.*

*1985-88.* The 1985 Legislative Session passed a major package of water legislation. Prior to and during the session, the League lobbied to strengthen provisions for water conservation and protection—especially for groundwater. The package consisted of water conservation programs, protection of freshwater inflows to estuaries, creation of groundwater conservation districts in critical areas, and expanded powers for groundwater districts. A bond issue authorized by voters in the November 1985 election funded these initiatives. The League also supported a related ballot issue that passed, authorizing state bonds for an Agricultural Water Conservation fund, if approved by a two-thirds vote of the legislature by 1989.

The League worked with the Water Development Board and the Water Commission for effective implementation of the new conservation requirements and groundwater district provisions. In the 1987 Legislative Session, some League-supported proposals (e.g., stronger septic tank regulation) passed, but all statewide groundwater bills failed.

In 1987-88 local Leagues and the state League participated in the League of Women Voters Education Fund "Community Drinking Water Survey," interviewing water officials on impacts of the 1986 Safe Drinking Water Act amendments. At Texas Water Commission hearings, the LWVTX testified for more stringent water quality standards and more effective controls of nonpoint source pollution.

*1989-93.* The League reviewed the 13 critical groundwater area reports published by the Texas Water Commission in 1989 and 1990, and urged the commission to address promptly the more serious problems described in the report. Also, in 1990 the state League and several local Leagues presented statements at the Texas Water Development Board public hearings on draft revisions of the state water plan. We commended the plan's emphasis on water conservation and subsequently worked successfully for legislation adopting water-conserving plumbing standards, as recommended in the plan.

In 1990 we attended numerous meetings of the legislature's interim committee on the Edwards Aquifer and testified in the 1991 Legislative Session on two bills proposing management of the aquifer, neither of which passed. A League

priority in the 1993 Legislative Session was the creation of a regional management entity for the Edwards Aquifer. The bill the League supported passed in the final days of the session.

In the fall of 1991, the LWVTX testified for a more effective Integrated Environmental Plan for the Mexico-U.S. Border Area and supported a constitutional amendment authorizing use of $150 million of Water Development Fund bonds for water and wastewater services to *colonias*. The League was represented on the Texas Water Commission Clean Water Council, which submitted its report in November 1992, and on the Clean Texas 2000 Awards Committee, that recommended the April 1993 award winners.

*1994-95.* In 1994 the LWVTX Education Fund sponsored a workshop in New Braunfels highlighting local League work to protect water quality in south central Texas. Since early 1994, League members have been participating in regional advisory committees to the Trans-Texas Water Program, which is considering future water supply options to be recommended in the 1996 revision of the Texas Water Plan. The League is also represented on Watershed Texas, a statewide watershed management project of the Texas Natural Resource Conservation Commission Office of Water Resource Management.

In the 1995 legislative session, the League supported the bill that was passed to meet U.S. Justice Department requirements for the election of the Edwards Aquifer Authority Board. We opposed several bills that did *not* pass, including those lowering water quality standards and limiting pollution control authority of the Texas Natural Resource Conservation Commission.

*1997.* Major new water legislation, known as SB 1, was drafted by various groups during 1996 in response to a statewide drought and also to provide a broader state framework for dealing with Texas' current and future water needs. Early in the session representatives of several public interest and environmental groups, including the League, met to discuss the proposed legislation and to identify essential elements of a state water bill. A resulting policy statement was submitted to legislative staff and these elements were incorporated into the final bill. Key provisions include:

- Adoption of a new state water plan that will incorporate regional plans for drought planning and water conservation by September 1, 2001.
- Retention of the right of capture doctrine for state groundwater.
- Inter-basin transfers approved by the Texas Natural Resource Conservation Commission would become 'junior' water rights with little or no water to transfer out of the basin during a drought.
- Stream flow needs for streams and rivers and environmental flow for bays and estuaries will continue to compete with perceived water use needs of agricultural, municipal, and industrial needs.
- Formulation of a state water plan addressing different needs of managing water in various regions of the state.

The 1997 appropriations bill contains funding of $36 million for the water legislation during the biennium. An Interim Committee on Water Resources and Development and Management will be created to study a broad range of water issues, including water marketing, and make recommendations to the next legislature. The League plans to monitor this committee during the biennium.

Another bill reinstates the funding mechanism for the state Clean Rivers Program, which would have expired in 1998. However, the population threshold for cities required to establish a water pollution abatement program was increased, weakening the program. Two constitutional amendments concerning water will be on the ballot in November 1997. One would create Water Development Fund II. The other would allow local governments to give tax breaks to businesses that install water-conserving equipment.

*1999.* The LWVTX worked on water quality and protection issues and on budget issues. The LWVTX had as a key priority the provision of money for water quality and quantity issues. The League successfully supported full funding for the ongoing regional water planning process set up by SB 1 in 1997.

The LWVTX joined environmental groups in asking the legislature to fund programs and employees in the storm water permitting process, a water quality program that emphasizes working to maintain the designated uses of specific rivers and streams, water quality improvement and water modeling, and revenue for the National Estuary implementation program for Corpus Christi and Galveston Bay areas. We met with mixed success, but have made an important stride forward in working on the legislative budget and appropriation processes.

The two most important bills, both opposed by the LWVTX, concerned ground water protection and a wastewater discharge bill that restricted the opportunity for public participation. The groundwater bill, originating in the House, was directed at the regulation of the Edwards Aquifer and would have put a moratorium on the pending Edwards Aquifer (protection) Rules that the League supported. The bill would have established a committee to study the rules adopted by the Texas Natural Resource Conservation Commission that had not yet gone into effect. The League opposed the bill, believing that the rules offered increased protection to the contributing, as well as the recharge zone, and were already the result of a large amount of public participation. The bill did not pass; the rules went into effect June 1.

The second bill, which did pass and was signed into law, authorizes the Texas Natural Resource Conservation Commission to lift the cap on wastewater discharges eligible for a general permit. Previously the law had a discharge limit, which if exceeded resulted in having to go through a permit hearing process. These general permits restrict the opportunity for public participation by replacing the contested case hearing process with a notice and comment provision. The bill was strongly opposed by the LWVTX and environmental organizations. This bill serves as an example of legislation that deals with more than one issue, in this case public participation and water quality.

*2001.* The legislature continued its examination of Texas water policy and planning. SB 2 (Brown), signed by the governor, revised the state regional water-planning process, established the Texas Water Policy Council, provided direction on water management strategies, and set up a comprehensive study of water resource issues that will occur during the 2002 interim. The bill strengthened the ability of underground water districts to control the pumping of groundwater. The bill also established the water infrastructure fund to be funded through the Texas Water Development Board. The LWVTX did not support or oppose (during the session or the election) a proposed constitutional amendment to authorize an additional $2 billion in general obligation bonds for water projects.

*2003.* For a session that was not supposed to deal with water there were a large number of significant bills introduced and passed. These include bills that:

- Deal with the Texas Water Development Board administration and funding, including the Water Infrastructure Fund, the Rural Community Water and Wastewater Loan Fund, and the Rural Water Assistance Fund.
- Consolidate various agricultural assistance funds.
- Create the Water Conservation Implementation Task Force.
- Require all water conservation plans and drought contingency plans submitted with a water rights permit or financial assistance application to include specific, quantifiable 5-year and 10-year targets for water savings.
- Establish the Study Commission on Water for Environmental Flows, prohibits the Texas Commission on Environmental Quality from issuing a new permit for in-stream flows dedicated to environmental needs or bay and estuary inflows and clarifies that groundwater conservation districts may adopt different well spacing or production limits for distinct aquifers or for different geographic areas within their boundaries.
- Require the Texas Water Development board to study, investigate, and survey the development of water supplies from seawater desalination.
- Relate to notice of groundwater contamination that may affect a public or private drinking water well.
- Relate to (a) prohibiting the creation or enforcement of certain restrictive covenants that undermine water conservation, (b) the authority of certain nonprofit water supply corporations to establish and enforce customer water conservation measures, and (c) the definition, use, regulation, and permitting of grey-water.
- Relate to requiring water rights applicants and holders, water utilities, and conservation and reclamation districts to adopt and implement certain water conservation measures.
- Relate to lawn irrigation and rainwater cutoffs, wastewater, the discharge of wastewater into waters of the state, storm water, land application of sludge, and water supplies.

Bills that would affect low-flow toilets and washing machines conservation standards did not pass. Two other water bills that did not pass addressed issues relative to small community water systems that face exceptional physical or financial circumstances in attempting to comply with federal Safe Drinking Water Act requirements relating to naturally occurring material. This legislation could have led to the loss of federal funds.

**2005.** The latest super water bill, SB 3 (Armbrister) (in line with SB 1 and SB 2), died in the House, a victim of late filing and bad timing. The bill would have covered conservation, groundwater, in stream flows, protection of the bays and estuaries, and other topics. At the last moment representatives were looking for bills to attach environmental flows and the protection of the bays and estuaries amendments. However, no significant water legislation passed. Senator Armbrister filed a bill in the special session dealing with Article I of SB 3, environmental flows and bay and estuary protection, but the bill was not added to the governor's list for the special session. The governor had said that school finance took priority before anything else would be considered.

**2006.** SB 1, the 2nd 5-Year State Water Plan was adopted in the fall following statewide hearings.

**2007.** HB 3 (Puente), supported by the LWVTX, creates a basin-by-basin process for developing recommendations to meet in-stream needs, requires the Texas Commission on Environmental Quality to adopt recommendations in the form of environmental flow standards, and creates the Environmental Flow Advisory Group to oversee the process.

HB 4 (Puente), supported by the LWVTX, is a water conservation bill that represents the consensus recommendations of the state Water Conservation Implementation Taskforce established by the legislature in 2003. The bill establishes a statewide water conservation public awareness program to educate Texas residents about water conservation.

SB 3 (Averitt), opposed by the LWVTX, passed. This bill became a reservoir designation bill. The passage of SB 3 does not mean that reservoirs will automatically be built, but may set up conflicts that will take years to resolve.

*2011.* SB 332 (Fraser) originally attempted to reaffirm groundwater as a property right (rule of capture) by describing it as a vested property right. The result would have been to threaten the balance between landowners and the 97 local groundwater conservation districts that are the only community regulators of groundwater reservoirs. These reservoirs supply more than 60% of the state's water needs. In a compromise, the bill eventually just restated groundwater ownership as a landowner's property right. Had "vested" remained in the bill, it would have been a constitutionally protected property right, becoming a statute of common law.

The Texas State Supreme Court in the Edwards Aquifer Authority v. Day case answered the vested question in early 2012 when they ruled that water was indeed owned by the landowner. The full implication of this decision is to classify any restriction in the use or sale of a landowners' water as a legal taking that must then be remunerated. The problem now returns to the legislature and the courts to decide how to guarantee the best use of water for the people. In commenting on this Texas Court decision, the *New York Times* noted that Texas is the only state that "functions by the rule of capture, which allows landowners to pump essentially unlimited amounts of water. Elsewhere in the U.S. groundwater is a public resource" (March 18, 2012).

There were two proposed constitutional amendments relating to water passed by the legislature for the November 2011 ballot:

- SJR 4 (Hinojosa): This proposition is a product of the Sunset Advisory Commission recommendations on the ability of the Texas Water Development Board to issue debt. It authorizes the Texas Water Development Board to issue self-supporting general obligation fund bonds at its discretion and on a continuing basis (essentially a revolving fund). The Texas Water Development Board would thus have greater flexibility in targeting needs across a longer time horizon and increase their ability to meet needs of local governments that must upgrade infrastructure to meet growing populations. This amendment passed.

- SJR16 (Estes): This is the Water Stewardship Amendment that would add water stewardship purposes to the agricultural exemption option (open-space valuation option) for property tax valuations. According to the bill analysis, adding water stewardship purposes to the land management practices would give landowners "a tool to better manage their property and incentivize land owners to invest in projects that improve water quality and quantity for the state." This amendment failed.

Otherwise, this session was a disappointment for all hoping that the issues of water demands and shortages would be faced once and for all. The new, increasing challenges involving groundwater depletion, pollution and toxic spillage resulting from natural gas drilling and hydraulic fracturing will be in the forefront of water planning and permitting for some time to come.

*2013.* The LWVTX followed 23 bills during the session, of which seven passed. The most important water bill signed by the governor was HB 4, which sets up the Texas Water Development Board funding for implementation of the so-called SWIFT loan fund (State Water Implementation Fund of Texas) and bond sales to support the State Water Implementation Fund of Texas.

Also, this bill reorganized the Texas Water Development Board from being run by an administrative voluntary board of six appointed by the governor to a paid professional board of three, one each appointed by the governor, lieutenant governor, and speaker of the house, respectively. The reorganization of the Texas Water Development Board was effective September 1, 2013. However, the State Water Implementation Fund of Texas funds would not be established until the constitutional amendment proposal (SJR 1) passed by the voters in the statewide election November 2013. This vote would authorize the state to move $2 billion from the Rainy Day Fund to set up the funds. There were lots of pros and cons on this proposal, and the LWVTX undertook a campaign to pass the amendment, including a press conference, working with other groups, and working with local Leagues, sending them blue wristbands to show their support. The amendment passed by a wide margin.

*2017.* This session was not focused on water issues. And several good bills that passed in one house failed to be considered in the other due to tensions between the two houses over unrelated, tendentious issues, such as transgender person's use of public restrooms. So progress overall was limited.

The LWVTX supported bills to protect groundwater (see Land Use paper), surface water, encourage conservation, encourage rainwater harvesting, wastewater reuse, storm water control, desalination, and aquifer storage and recovery. Of these, HB 1648 was signed by the governor providing that any private water utility with over 3,300 connections to specify a conservation officer to be responsible for the utility's conservation plan. SB 59 was also signed into law providing more specific support from the Texas Commission on Environmental Quality for water and energy conservation planning by all state entities.

The League also supported many measures that would strengthen the Water Code and the administration of regulations by the Texas Commission on Environmental Quality, the Texas Water Development Board, and the Railroad Commission, which has a great deal of enforcement authority for the drilling industries to prevent contamination of groundwater. The League supported many of the recommendations of the Sunset Commission in its review of the Railroad Commission. Of these, only a few were signed by the governor.
- SB 864 requires that groundwater conservation districts be notified if the Texas Commission on Environmental Quality receives an application for the use of surface water that identifies groundwater as a backup source.
- HB 2215 adjusted the due dates for groundwater conservation districts to adopt desired future conditions (31 Tex. Admin. Code, Pt. 10, §356.10[6]) of aquifers in order to harmonize with the dates for new iterations of the state water plan.
- HB 1818 (a) requires the Railroad Commission to develop an Alternative Dispute Resolution Policy (an annual plan for strategic use of its resources for monitoring and enforcing oil and gas violations) and publish a report of all violations and enforcement measures annually, and (b) provides fees on pipeline applications sufficient to cover administrative and safety enforcement activities.
- HB 1573 requires training standards for certified water loss auditors.

OCAGH_00001659

- SB 347 specified that regional planning group meetings be subject to all open meeting provisions.

A very interesting bill that passed confirmed the legality of the contract that Midland had negotiated with an oil exploration company to exchange upgrades to its wastewater treatment plant for a guaranteed amount of treated wastewater to use in hydraulic fracturing. This seems like a win-win project that may be replicable in other places. Reducing the use of fresh water for hydraulic fracturing is an excellent conservation measure.

Several bills the League opposed also failed. Most would have rewritten state definitions and regulations in favor of regulating water as a commodity and reducing the time needed to approve a surface water permit, which would shift the balance in favor of developers by reducing protections for the public interest to be considered thoroughly.

The League also watched many bills that would have amended the process of developing the State Water Plan. SB 1511, the only one that passed, provides more hearings by the regional planning groups, the assessment of any strategies that were implemented and identification of impediments to the implementation of those that were not, and allows simplified planning, which means that if nothing has changed, every other 5-year update can be less comprehensive.

**Pertinent bills that passed and were signed by the governor**.
- SB 625 establishes a database of all special purpose districts with many specific data points required.
- SB 1009 limits information requirements.
- SB 1430 prioritizes handling of permits for desalination projects and limits time for appeals.
- SB 1446 loosens some of the notification requirements in contested case hearing on surface water permits.
- SB 1538 allows the use of the Floodplain Management Fund to collect information about planning, protection, mitigation, etc., and provide it to the public. Signed by the governor.
- HB 544 allows the Water Development Board to fund planning for water projects as well as implementation.
- HB 294 allows the Public Utility Commission to take over investor owned water utilities that do not comply with state rules in counties with over 2.7 million population.

**Related measures passed and signed by the governor, of interest as governmental oddities**.
- HCR 31 urges Congress to encourage the U.S. Department of Agriculture to change a regulation that requires a farmer to continue watering a crop that has already failed in order to collect on its crop insurance policy.
- HB 965 requires state correctional facilities to comply with local water restrictions in times of drought.
- HB 641 continues the Red River Boundary Commission that negotiates with Oklahoma over shifts in the riverbed.

*2019.* The 2019 Session offered a view into changing water perspectives in Texas. Clearly water, or a lack thereof, is becoming a concern for our lawmakers. Filed were numerous bills pertaining to groundwater and aquifer injection; that is the storage of water we have now, for use later. Creating laws around how water is measured and retrieved will likely continue as a focus while we become more sophisticated in our groundwater management approach.

The League supported numerous bills giving authority for these injection wells, in addition to the formation of an interregional planning council for state water planning and a bill directing the Water Board to conduct a study on aquifer storage and use across the state. A partner bill authorizing the Water Board to fund interregional projects was also filed and passed. We believe long term water goals for Texas are more easily met by increased partnerships across water sheds. After all, water knows no county lines, and infrastructure needs can be spread across the state for cost savings and innovation.

**Aquifer storage bills that passed and were signed into law:**
- SB 520 (HB 481) - allowed the City of New Braunfels storage and recovery of water in a portion of the Edwards Aquifer.
- HB 712 - authorized the Texas Water Development Board to conduct studies of and prepare and submit reports on aquifer storage and recovery and aquifer recharge projects.
- HB 720 - clarified retrieval rights from aquifer storage wells.

We also supported HB 1044 which sought to expand definitions of the Edwards Aquifer to include the Upper Glen Rose. Sadly, this bill did not make it out of committee.

**Planning as a focus (signed into law):**
- HB 807 - Requires the Texas Water Development Board (TWDB) to appoint an interregional planning council during each five-year state water plan adoption cycle. The council would include one member of each regional water planning group, to serve until a new state water plan is adopted.
- HB 1052 - Board funding established in partnership with HB 807.

One planning bill LWVTX supported, HB 1059, related to the creation of a 10-member group each fiscal biennium to prepare a report on the use of green stormwater infrastructure and low impact development in the state. *Governor Abbott vetoed the bill stating there were already provisions in place for stormwater study.* The emphasis on green stormwater infrastructure was a key component of this bill. We hope to see something similar in the future and will offer increased support.

While Proposition 8, "creating a flood infrastructure fund that the Texas Water Development Board could use to finance drainage, flood mitigation and flood control projects after a disaster" was approved by voters, green planning remains an over-looked need for our state.

The League also supported HB 817 which would prevent dumping of toxins into the Edwards Aquifer. Sadly, this bill was left pending in committee. Fortunately, one bill with some teeth, SB 530, increased fines for polluting drinking water, public water supplies, and bodies of water from a penalty from $50 to $1,000 for each violation to $1,000 to $5,000. We hope this decreases the likelihood of intentional pollution in our waterways.

A big win for Texans, Proposition 2, calls for investment in economically distressed areas of the state through loans from the Texas Water Board. The proposition passed with a wide margin of support "allowing the Texas Water Development Board to issue bonds to fund water and wastewater infrastructure projects in areas where median household income is at or below 75% of the statewide median income level." This should offer relief to thousands of Texans, largely located near the border, who currently have little to no water infrastructure.

# LWVUS Program Positions

This is a summary of LWVTX advocacy at the state level based on certain national League positions, and for which we have no corresponding state position. A complete record and explanation of all current LWVUS positions can be found in *Impact on Issues* (revised after each LWVUS Convention).

# I. Representative Government

*Promote an open governmental system that is representative, accountable, and responsive.*

## A. Citizen's Right to Know/Citizen Participation (Open Government)

1984

*The League believes democratic government depends upon informed and active participation at all levels of government. The League believes that governmental bodies must protect the citizen's right to know by giving adequate notice of proposed actions, holding open meetings, and making public records accessible.*

### LWVTX Action: Open Meetings/Open Records

*1987-89.* The League supported a successful effort on the part of a coalition of several groups (Common Cause, news media) during the 1987 Legislature to amend the Texas Open Meetings Act to strengthen the provisions on executive sessions of public bodies, requiring them to tape record such sessions or file certified agendas. In the 1989

session the League supported successful legislation that strengthened the Texas Open Records Act by requiring agencies to make records available within 10 days after they are requested and establishing reasonable fees for copying records.

*1997.* The League supported a bill that would have prohibited closed-door staff briefings of governing boards in cities, counties, school districts, etc., a common practice throughout the state. The bill passed the Senate easily, was voted out of the House committee, but was killed when it was pointed out that the practice is already illegal under current law. Another League supported bill that would have mandated that private contractors, offering services formerly provided by the state, operate under the Open Meetings Act, did not come out of committee.

*1999.* Two important bills dealing with open meetings and open records statutes were passed during the session. The first bill removed a loophole that allowed governmental bodies to meet in secret without notice when called a "staff briefing." The second bill combined multiple changes in the open records act, preventing delay tactics and restricting the withholding of information.

*2001.* Although the League followed several bills, none will significantly affect the public's right to know. At the end of the session the League worked with Common Cause and the Consumer's Union to defeat several otherwise dead bills that were attached as amendments to still-alive bills. Two of these amendments would have closed certain records to the public. The League's biggest concern, a proposed constitutional amendment making privacy an explicit constitutionally guaranteed right, did not pass.

*2005.* SB 286 (Wentworth) and HB 634 (Baxter), both supported by the LWVTX, added educational requirement to the existing Open Meetings Act and Public Information Act for elected and appointed officials in Texas. This training was one of the legislative priorities of Attorney General Abbott. The governor signed SB 286.

## Explanation: Recorded Votes
Texas is the largest of the 10 states that does not require that votes be routinely recorded by legislators' names. About half of the votes taken are by voice vote: all those in favor say aye, opposed nay. Legislators must request a recorded vote by roll call in the Senate and by electronic means in the House. Records of votes are published in the *Texas Journal* and are difficult to access by even competent computer users. The participation of citizens in the democratic process is hindered by the unavailability of voting records of their individual representatives.

## LWVTX Action: Recorded Votes
*2003.* In April the *Dallas Morning News* began a media campaign to inform the public of when and how votes are recorded and not recorded. A Recorded Votes Committee was approved at the state level in August 2003. During the special session of the Legislature in the summer of 2003, Senator John Carona of Dallas introduced legislation to record nonceremonial votes. The efforts of the Recorded Votes Committee resulted in an action motion passed overwhelmingly at Convention 2004 in support of the constitutional amendment noted above. Throughout 2004-05 advocacy efforts were undertaken with written articles, educational forums, meetings with candidates for office, and lobbying of state representatives.

*2005.* League members can take pride in the progress that was made in the 2005 Legislative Session regarding the need to routinely record all substantive votes. In previous legislative sessions, bills for recorded votes were not even heard in committees. In 2005 both the House and the Senate changed their rules to make recorded votes easier and more frequent, and to have them posted on the Internet. Bills to require routinely recorded votes were heard in committees in both Houses, and the Senate passed a bill to record all substantive votes. The Senate vote was unanimous. Regrettably, the House leadership persisted in their opposition of the bill and did not allow a vote in the State Affairs Committee, although there were enough votes to pass it.

Efforts to make routinely recorded votes and public access to them a reality in Texas will continue in the interim and the 2007 Legislative Session. It is not unusual for a bill to take three sessions to pass. Our plans for future action include:
- Investigating the mechanics of recording votes in other states.

OCAGH_00001662

- Getting candidates and elected legislators on record regarding recorded votes during the 2006 primaries and general election.
- Continued education of our members and the public.
- Ongoing collaboration with newspapers and advocacy groups that support routinely recorded votes.

**2006.** History was made in the 80th Legislature when the House and Senate passed HJR 19 (Branch), a constitutional amendment to the Texas Constitution: "to require that a record vote be taken by a house of legislature on final passage of any bill, other than local bills, of a resolution proposing or ratifying a constitutional amendment, or of any other nonceremonial resolution, and to provide for public access on the internet to those record votes." The amendment was supported by the League and approved by Texas voters in the November 2007 election. This achievement is the culmination of work by a dedicated program chair and other League members who worked tirelessly since 1997 to advocate for recorded voted.

## LWVTX Action: Open Government

**2011.** The governor signed HB 2973, known as the Citizen Participation Act or Anti-SLAPP legislation, which is an acronym for Strategic Lawsuits Against Public Participation. The new law places burdens on lawyers who want to file lawsuits on behalf of public figures or institutions in order to discourage people from investigating or complaining about the public figures.

Other bills supported by the League that became law include HB 336, requiring the posting on the Internet of political contributions and expenditures of public school board trustees in larger school districts. HB 2439 requires state agencies with more than 1,500 employees to allow employees to submit suggestions for cost efficiencies on their website. HB 2460 makes public retirement systems subject to the Texas Public Information Act. HB 2017 requires advisory committee meetings of the Texas Department of Motor Vehicles to be publicly accessible. SB 227 requires the Texas Medical Board to make public any remedial plans created to resolve complaints about physicians.

**2019.** Transparency and open government, among the pillars which assure that democracy works, were hot topics this session. Advocates in all sectors are unabashedly complaining that the once-robust Texas Public Information Act is hemorrhaging, and the League of Women Voters in Texas stands firmly with them.

This session the League of Women Voters of Texas is closely aligned with the **Freedom of Information Foundation of Texas** and the growing statewide **Sunshine Coalition**. The Foundation seeks to inform all about their rights and responsibilities as participants in our democracy, with the clear objective to protect and preserve the state's open meetings and open records laws. The Sunshine Coalition is working with state and local lawmakers, executives and other key policymakers to enact new provisions that strengthen Texas' Sunshine Laws, improve public oversight and rebuild trust in government operations and decisions. Both are nonprofit organizations.

Sen. Kirk Watson, D-Austin, and Rep. Giovanni Capriglione, R-Southlake, worked with the League of Women Voters through the Sunshine Coalition and Freedom of Information Foundation of Texas to pass SB 943, contracting transparency legislation that strengthens the Texas Public Information Act. In 2015, two Texas Supreme Court rulings had blocked public access to how taxpayer money is spent.

Watson and Capriglione also joined to pass SB 944, which allows better access to public records in a government official's private cell phone or email account. These records are already public by law, but SB 944 closes a "custodian loophole" and makes them easier to obtain.

This session's bi-partisan legislation will obligate governments to reveal the core elements of their contracts with private companies, including final dollar amount, key contract provisions, and line-item pricing. Information about public contracts with nonprofits that are performing government work, such as economic development agencies, will also be more readily available.

A bill we supported by Sen. Watson (SB 1318), which clarified when dates of birth should be made public, was left pending in committee. Businesses, journalists, and regular citizens use dates of birth for many purposes. Birthdates help to verify identity in the context of credit checks, providing loans, news reporting, etc.

OCAGH_00001663

Unfortunately, in dire contrast to what is discussed above, HB 2730 (Leach), passed and was signed by the governor despite opposition from groups such as the League and Sunshine Coalition. In most cases, the Anti-SLAPP law is a tool for regular Texans facing a David-and-Goliath court battle they cannot afford and do not deserve. HB 2730 will remove protections for people who get sued for defamation, for employers who try to protect their employees, for Texans who get sued by out-of-state corporations, and for consumers who write online reviews but have unknowingly signed non-disparagement agreements while clicking through the website. The law could actually prevent average citizens from getting a lawyer to defend them because of certain language.

## B. Public Policy on Reproductive Rights

1983

*The League of Women Voters of the United States believes that public policy in a pluralistic society must affirm the constitutional right of privacy of the individual to make reproductive choices.*

## LWVTX Action - Access for Safe, Legal Abortions

LWVTX immediately began using this position for action and actively works to support access to safe and legal abortion. During each legislative session, we track legislation that affects abortion access and register our position for or against pending legislation. We frequently prepare written or oral testimony to be provided to various legislative committees.

During every Texas legislative session, bills are introduced to restrict Texas women's access to meaningful reproductive choices. LWVTX works with other prochoice groups to defeat these measures with mixed success. Unfortunately, Texas now has some of the most restrictive abortion laws in the country. Anti-abortion advocates have been successful in imposing a 24-hour waiting period before an abortion can be performed and have severely limited the availability of abortions after 20 weeks of pregnancy. They have passed laws that require parental consent for a minor to obtain an abortion and require a vaginal ultrasound prior to an abortion.

*1983-89.* During each succeeding legislative session, bills attempting to place various restrictions on abortions have been introduced. The LWVTX has worked with other prochoice groups to defeat these measures, initially with great success. But laws enacted in recent sessions severely restrict Texas women's access to meaningful reproductive choices. Also in recent years, prochoice groups, including the LWVTX, have broadened their focus in this area to include advocacy for women's access to comprehensive reproductive health services and for medically accurate sexuality education. In supporting these initiatives, the LWVTX has relied on the LWVUS positions on Health Care and Meeting Basic Human Needs. The LWVTX position on Health Care for Those of Lesser Means also supports advocacy for access to comprehensive reproductive health services. Following the 1989 U.S. Supreme Court decision in *Webster v. Reproductive Health Services* that gave states increased power to regulate abortion and threatened to overturn *Roe v. Wade*, prochoice groups in Texas, including both state and local Leagues, began organizing concerted responses to the escalating calls for restrictive legislation.

*1990's.* In 1995, for the first time, two restrictive measures were voted out of Senate committees. One would have mandated parental or judicial involvement in a minor's decision to seek an abortion. The other would have classified abortion providers as ambulatory centers, thereby driving the cost of the procedure beyond the means of most women. At committee hearings, the LWVTX presented testimony in opposition to both bills. Fortunately, neither measure garnered the 21 votes necessary to be voted for consideration on the Senate floor. By 1999, after many failed attempts in previous sessions, antichoice proponents were able to enact a parental notification bill, vigorously opposed by the League. Under its provisions, a physician performing an abortion on a minor must provide 48-hour notice to a parent. A judicial by-pass was provided as the only alternative to parental notification.

*2003.* Several laws were enacted that further compromise a woman's right to choose:

OCAGH_00001664

- An omnibus law implements a 24-hour waiting period before a woman can obtain an abortion, requires physicians to provide women seeking abortions with informational materials including misinformation linking abortion to breast cancer, and requires abortions after 16 weeks be performed in ambulatory surgical centers, making their availability and cost prohibitive for most women.
- Another law allows criminal or civil charges to be brought against anyone who causes the death or injury of a fetus, and defines an individual as "an unborn child at every stage of gestation from fertilization until birth." By thus giving a fetus status as an individual, this law opens the door to future measures and lawsuits that would undermine women's reproductive choices. The law also has the potential to interfere with a doctor's care of a pregnant woman, as a doctor might not be willing to perform certain procedures (such as amniocentesis) for fear of being charged with a crime if the woman lost the fetus as a result.

*2005.* Enacted setbacks to choice were in the form of amendments attached to the measure reauthorizing the Texas Medical Board. These amendments mandate parental consent for a minor's abortion (cf. the notification requirement enacted in 1999), and further restrict the already extremely narrow circumstances under which a woman can obtain a legal abortion in the third trimester of pregnancy to cases where the fetus has a severe and irreversible brain impairment or the women risks death or severe and irreversible brain damage or paralysis.

Other setbacks for women's health included two riders attached to the state budget: One diverted $5 million to crisis pregnancy centers whose chief mission is giving misinformation to pregnant women in order to discourage them from having abortions, rather than providing actual health care services. The other rider diverted $20 million from existing providers (including Planned Parenthood affiliates, medical schools, hospital districts, and health departments), displacing over 70,000 low-income women currently receiving family planning and other health care services from these entities.

On the good news front, the legislature passed the Medicaid Waiver bill, which instructs Texas Health and Human Services to apply for a federal waiver that will expand access to preventive health care and family planning services for low-income women, including screening for diabetes, cervical and breast cancer, hypertension and tuberculosis, as well as counseling and education on contraception. Unfortunately, a bad amendment attached to the waiver prohibits waiver funds from going to agencies that perform or promote abortions and limits coverage of information about and prescriptions for emergency contraception. Another victory was passage of a bill mandating hospitals to implement plans for adequate and comprehensive services to victims of sexual assault, though it regrettably does not mention emergency contraception.

*2007.* Although there were a couple of close calls, all of the bills filed during the 80th Legislative session that would have imposed additional burdens on Texans seeking abortions and/or abortions providers died. The state budget brought both good news and bad news for proponents of women's health and increased access to preventive and reproductive health care. New language was added to the rider passed by the 79th Legislature in 2005 that diverted $20 million away from proven providers of preventive health care and resulted in 33,000 fewer women receiving family planning services. The new rider restricted the Texas Health and Human Services from implementing the rider if it would adversely affect the number of women who receive family planning services. However, the Alternatives to Abortion program rider enacted by the 79th Legislature remained intact. The provision allows for allocation of $5 million to agencies that provide no medical services and do nothing to prevent unwanted pregnancies.

*2009.* For better *and* worse, status quo is an appropriate summation of the 81st Legislative Session in this program area. On the better side, no antichoice bills were passed, thanks in part to unrelated procedural maneuvers. Measures opposed by the LWVTX that came close to passage included those that would have (a) required an ultrasound prior to abortion, (b) authorized Choose Life license plates whose purchase would fund unregulated, unlicensed pregnancy centers, and (c) placed burdensome new reporting requirements on women seeking and physicians performing abortions, under the guise of protecting women from coerced abortions.

On the worse side, efforts to improve sex education in public schools and to expand low-income women's access to preventive family planning and other health care services were ultimately unsuccessful. Some of these efforts were encompassed in the Education Works bills and the

Prevention Works bills strongly supported by the LWVTX. Kudos to Representatives Castro, Villarreal, and Strama who tried but failed, during the frantic waning days of the session, to attach amendments to an education-related bill that would have required information taught in sex education courses to be medically accurate.

Also for the worse, provisions included in the state budget opposed by the LWVTX impede women's access to preventive health care:

- Rider 56 diverts $20 million from expert family planning health care providers, such as Planned Parenthood, and gives it to Federally Qualified Health Centers that don't have the capacity to see large numbers of family planning patients. Since the rider was enacted in 2005, 70,700 fewer such patients have been served. A bright spot: New language was added requiring funds not spent by Federally Qualified Health Centers to go back to family planning providers who can use them.
- The Alternatives to Abortion program was also renewed, with increased funding that is directed to crisis pregnancy centers–organizations that provide no medical services and do nothing to help women prevent unintended pregnancies.

*2011-2012.* Despite vigorous advocacy by the LWVTX and other prochoice groups and individuals, women's health and reproductive choice were big losers in the 2011 Legislature and its aftermath.

**Family planning funds and the Texas Women's Health Program.** A budget cut of approximately $62 million from the state family planning program will leave an estimated 200,000 women without access to basic health services. Adding insult to injury, the budget actually includes an increased amount for the Alternatives to Abortion program that encourages women in crisis pregnancies to carry to term, often with Medicaid support. The Alternatives to Abortion program, which has an $8.3 million budget in the current biennium, provides no medical services, although it does make referrals to other government programs.

Although the Texas Women's Health Program was reauthorized, but the renewal application submitted to the federal government effectively excluded Planned Parenthood centers from providing Texas Women's Health Program services.

The federal government responded that excluding qualified providers is a violation of federal law and that funding for the Texas Women's Health Program would be withheld if Planned Parenthood were excluded. The state refused to back down. Planned Parenthood then filed a lawsuit against the state Health and Human Services Commission, alleging that it is unconstitutional to block Planned Parenthood from participating in the Medicaid Women's Health Program and depriving women of the right to choose their health care provider. The judge has issued a temporary injunction that allows renewal of the program and Planned Parenthood participation pending a full hearing and arguments from both sides.

**Antichoice legislation/regulations.**

*Sonogram requirement.* As passed and signed into law, Texas now has perhaps the most extreme pre-abortion sonogram requirement law in the country: it mandates that the woman receive a verbal description of the fetal image even if she opts out of viewing it. Further, although a woman may certify that she doesn't wish to view the fetal image, the law actually says that her consent to the medical procedure of an abortion is not informed if she doesn't view the image.

*Choose Life license plates.* This new law authorizes the issuance and purchase of Choose Life license plates. Proceeds from the purchases will go to eligible organizations that give assistance to pregnant women who are considering placing their children for adoption. But organizations that provide abortions or abortion-related services or make referrals to abortion providers are not eligible to receive these funds.

*Funding restrictions.* Another amendment to SB 7, the special session's omnibus health care bill, effectively bans hospital districts from using local tax revenue to fund abortions or risk losing state funding. The amendment allows exceptions if the woman's life is in danger or if the fetus has a severe fetal abnormality.

OCAGH_00001666

*2013.* As the regular session adjourned, the LWVTX and other advocates for reproductive choice and for comprehensive, affordable women's health care briefly rejoiced that none of the bills on these issues that the LWVTX opposed passed. In fact, none of them even received a vote from either chamber. Also preventive health care for women was a winner in the state budget that:

- Allocated $71.3 million in state funding for the Texas Women's Health Program. Approximately 90% of this was to replace lost federal funding because of the Affiliate Ban Rule enacted in 2011. This funding maintains the Texas Women's Health Program but shifts the funding source from federal to state dollars.
- Expanded the state's Community Primary Care program by $100 million to support women's preventive care, including contraceptive care for approximately 100,000 low-income women.
- Added $32.1 million to the Texas Family Planning Program to replace federal Title X grant funds that were awarded to the Women's Health and Family Planning Association of Texas instead of to the state.

Unfortunately, along with the death of the antichoice bills opposed by the LWVTX during the regular session, all of the prochoice and pro-women's health measures supported by the LWVTX also died without receiving votes.

In the 1st special session that immediately followed the regular one, the governor added "legislation relating to abortion procedures, providers and facilities" to the agenda. A number of abortion bills were filed but the ones that moved were companions SB 5 (Hegar) and HB 60 (Laubenberg)–omnibus measures banning abortion after 20 weeks, requiring all procedures to be performed in a mini hospital forcing women to make four trips to a clinic for a drug-induced abortion, and requiring all abortion doctors to have admitting privileges at a nearby hospital. The committee substitute for SB 5 added an exception to the 20-week ban for situations involving a severe fetal abnormality.

The battleground then moved to the House where the State Affairs Committee scheduled HB 60 and HB 16 (Laubenberg), a stand- alone fetal pain measure banning virtually all abortions after 20 weeks, for hearing. Hundreds of women (estimates as high as 700) registered to be heard. After more than 10 hours of testimony, with hundreds (including the LWVTX) still waiting to be heard, the committee closed the hearing.

The State Affairs Committee reconvened the next day and quietly approved both HB 60 and its companion bill SB 5, as well as HB 16. However Texas women's impassioned and eloquent stand against these antichoice bills began to receive national attention. The marathon testimony in the State Affairs Committee was widely reported and dubbed "the people's filibuster." With the full House set to hear SB 5 and HB 60, hundreds of motivated and mobilized reproductive rights advocates headed for the Capitol, most wearing orange as urged by organizers and many wearing orange tee shirts saying "Stand with Texas Women." After hours of debate that went on into Monday morning, the House passed SB 5 on a vote of 95-34 with 20 members absent.

As the bill moved back to the Senate for its final approval on June 25, activists began arriving early in the Senate gallery. Senator Wendy Davis began to filibuster against SB 5 at approximately 11 a.m., needing to continue until midnight in order to kill the bill. Filibuster rules prohibit the speaker from eating, drinking, taking bathroom breaks or straying off the subject of the bill.

As afternoon turned into evening, several senators challenged Davis with specious points of order, alleging that it was out of order for Davis to accept a back brace from Senator Ellis as she stood on the floor and that twice, her remarks had strayed from the subject and were not germane. Unfortunately, the points of order were sustained and as senate rules provide, the filibuster ended on the third ruling, shortly after 10 p.m.

Other prochoice senators then stalled a vote on the bill with procedural questions until 11:45 p.m. As Senator Duncan, presiding in place of Lt. Governor Dewhurst, was about to start the roll call on a procedural vote before the final vote on the bill, Senator Van de Putte interrupted with a parliamentary inquiry, asking at what point must a female senator raise her voice to be heard by her male colleagues. At that point, the gallery filled with prochoice supporters erupted in cheers that were taken up and echoed by others standing outside the gallery and all around the Capitol building. Midnight came and went and the bill died amid the cheering and chaos.

Governor Perry wasted no time in calling a 2nd special session for July 1, with abortion front and center on the agenda. With unabated passion, approximately 5,000 prochoice supporters, including many LWVTX members, assembled on the Capitol steps on July 1 to bring their message to legislators. The Legislature focused on SB 1 (Hegar) and HB 2 (Laubenberg), companion omnibus measures that mandated (a) prohibition on abortion after 20 weeks, (b) requirements that facilities where abortions are performed meet the standards of ambulatory surgical centers and that doctors performing them have admitting privileges at a nearby hospital, and (c) a requirement that physicians administer in person the two medicines used for drug-induced abortions and see the patient again within 14 days.

In the House State Affairs Committee, 3543 persons had signed up to speak but only 100 were heard. Then the action shifted to the Senate Health and Human Services Committee for a hearing on SB 1. LWVTX presented testimony, among thousands who had registered to testify.

Unfortunately, HB 2 passed both House and Senate and was signed into law by Governor Perry on July 18. During floor debate in the Senate, prochoice senators offered 20 amendments, ranging from proposals to add exceptions to the 20-week abortion ban for victims of rape and incest to requiring annual inspections of abortion facilities. All were rejected. *The Texas Tribune* reported the chants and cheers from the massive crowd of prochoice advocates gathered outside of the chamber but that the audience observing from the gallery remained mostly quiet and orderly throughout the proceedings, in contrast to the closing hours of the 1st special session.

*2015.* Those who oppose women's access to safe, legal abortions and to comprehensive, affordable and accessible reproductive health care were not content to rest on their laurels in 2015. Regretfully, these people worked to restrict access to safe, legal abortions even further, coming up with new, draconian proposals affecting women's health.

**Access to safe, legal abortions**.
*The worst bill that passed*. HB 3994 imposes significant and unreasonable restrictions on the judicial bypass option for young women seeking safe, legal abortions. The harmful provisions of the bill as passed include: (a) requirement that bypass petition be filed in the teen's home county (unless the county has a population under 10,000), (b) elimination of physical, sexual or emotional abuse as grounds for a bypass, (c) extension of the time (from 2 to 5 business days) in which judges must rule on bypass petitions, and (d) requirement that the minor's attorney and guardian ad litem be the same person. This omnibus judicial bypass measure will have an especially adverse impact on vulnerable minors who have been neglected, abused or abandoned.

*Another bad bill that passed*. HB 416 requires abortion facility personnel to take education and training on human trafficking. The measure as passed is thus a targeted regulation of abortion providers that should apply to all frontline medical personnel. Note that Planned Parenthood clinics in Texas have for many years been proactive in training staff to recognize and appropriately deal with trafficking victims.

**Women's health care safety net**.
*Budget–the good news.* The General Appropriations bill for 2016-2017 includes $50 million in new funding for women's preventive health care, including contraception. The Texas Women's Healthcare Coalition has called for thoughtful implementation that will 'increase the number of women served and help provide access for the more than 1.3 million Texas women in need of contraception and other preventive services.
*Budget–the bad news.* Unfortunately, the budget effectively removes Planned Parenthood's participation in the Breast and Cervical Cancer Screening program by stipulating that providers of these screenings must be eligible for the Texas Women's Health Program. (Planned Parenthood was excluded from that Program in 2011.)

*Good bills that passed*. HB 786 requires public employers (e.g., state agencies, local governments, public schools) to provide accommodations for mothers who need to pump breast milk while at work. According to the Texas Breastfeeding Coalition, 40% of mothers who return to work choose not to breastfeed because they anticipate lack of accommodations at work.

OCAGH_00001668

*Note.* On July 1, 2016, the Texas Women's Health Program and the Expanded Primary Health Care for Women program were consolidated into the **Healthy Texas Women Program**. The program provides pregnancy testing and counseling, family planning, breast and cervical cancer screenings, immunizations, and screenings and treatment for diabetes, high blood pressure and high cholesterol to low-income women. It covers minors as young as age 15 years with parental consent, including access to free birth control.

*2017.* The 2017 Legislative Session was very challenging for reproductive choice proponents. In the end, only one of the many antiabortion measures filed in the session was enacted and became law. But, unfortunately, that one is particularly heinous. However several measures that strengthen the women's health care safety net passed into law. Legislative attempts to ensure comprehensive, medically accurate sexuality education go nowhere.

**Access to safe, legal abortions.**
*Very bad news.* SB 8 (Schwertner), opposed by the LWVTX, is now law. As passed by the Senate, SB 8 requires burial or cremation of fetal remains after an abortion and also bans the donation of aborted fetal tissue for medical research. It also bans partial birth abortions, which are already prohibited by federal law.

In the House, an amendment was added to SB 8 (and approved when sent back to the Senate) that prohibits abortion providers from performing dilation and extraction abortions. Called "dismemberment abortions" by opponents of the procedure, it is the most commonly used and safest method of performing abortions during the 2nd trimester. The Texas branch of the American College of Obstetricians and Gynecologists stated that such a ban would create "a dangerous environment for patients that would prevent doctors from having every option available when providing a patient with the best possible care in any given situation." A trial judge has blocked implementation of this prohibition pending the outcome of the litigation.

**Women's health care safety net.** Several supported by the LWVTX are now law. These include measures that address the recent disturbing spike in maternal mortality and morbidity in Texas such as requiring insurance coverage for maternal medical depression screenings during a Medicaid or Children's Health Insurance Program visit up to 1 year after a child's birth.

*2017 special session.* While we rejoice that vouchers for private schools and the "bathroom bill" did not pass in the special session, abortion access took several big hits. On the other hand, the crisis in maternal deaths in Texas received long overdue attention that resulted in a comprehensive bill addressing the situation.

**Insurance coverage.**
HB 214 (Smithee) passed, which prohibits private insurance companies from providing coverage for elective abortions unless a woman purchases a supplemental policy. The LWVTX and other reproductive rights advocates fought hard against this cruel measure that makes abortion unaffordable for many women, especially women of color, rural residents, and immigrants.

**Women's health care safety net–addressing the maternal mortality crisis.**
Passage of SB17 with bipartisan support was a big win for women's health advocates, including the LWVTX. Highlights of SB 17 as passed include:
- Continuation of the Maternal Mortality and Morbidity Task Force until 2023, giving more time for the state to directly address the causes of pregnancy-related deaths in Texas and demonstrating the state's commitment to reducing the high rate of maternal mortality and morbidity.
- Expansion of the duties of the Maternal Mortality and Morbidity Task Force to include study and review of health conditions and factors that disproportionately affect the most at-risk populations and best practices and programs in other states that have reduced the incidence of pregnancy-related deaths and severe maternal morbidity.
- Requirement that the Maternal Mortality and Morbidity Task Force compare the rates of pregnancy-related deaths based on the mother's socioeconomic status and consult with the Perinatal Advisory Council when

OCAGH_00001669

making recommendations to reduce the incidence of pregnancy-related deaths and severe maternal morbidity.

- Requirement that the Texas Department of State Health Services conduct a statistical analysis of the aggregate data for pregnancy-related deaths and sever maternal morbidity to identify trends, rates, and disparities; and empowering the Texas Department of State Health Services to convene a panel of experts to advise the department and the Maternal Mortality and Morbidity Task Force in developing recommendations for improving collection of accurate data.
- Requirement that the Texas Health and Human Services Commission evaluate options for treating postpartum depression in economically disadvantaged women, which could lead to improved access to mental and behavioral health screenings before and after childbirth.
- Requirement that the Mortality and Morbidity Task Force coordinate with the Texas Department of State Health Services to develop and make available to health care providers materials on substance use and best practices in substance abuse screening of pregnant women and a list of substance use treatment resources statewide.

*2019.* The most recent 2019 legislative session was again challenging for reproductive choice proponents. Emboldened by the current composition of the U.S. Supreme Court, abortion opponents proposed several extreme new laws. In the end, none of the extreme bills were enacted, but three bills affecting abortion were passed and signed into law.

H.B. 16, as amended by the Texas Senate, was signed into law. The so-called "Born Alive" legislation creates a doctor-patient relationship between a doctor and a child born during a failed abortion and imposes a minimum $100,000 fine on the doctor and criminal liability if the doctor does not provide the required care. Under the bill, a child born must be immediately transferred to a hospital. LWV actively opposed this bill, and the companion bill S.B. 23, because the legislation was unnecessary and was aimed at shaming women. This bill is an effort to intimidate and deter doctors from performing late term abortions. Late term abortions are rare.

S.B. 22, prohibiting transactions between governmental entities and affiliates of an abortion provider, was signed by the Governor. This legislation prohibits all transactions between a governmental entity and an abortion provider or an affiliate of a provider, specifically Planned Parenthood. The law not only cuts off all future state funding for these health care providers, it extends the ban to local governments. LWV opposed this bill for several reasons. In our written testimony, we pointed out that this bill would reduce women's access to necessary medical services, including preventative care, contraceptives, cancer screenings, and STD screenings. This bill would be harmful to thousands of low-income women.

SB 24 regarding counseling was enacted. Under prior Texas law, women must receive counseling and certain information prior to receiving an abortion. The new law prohibits the information from being provided by audio or video recording, and requires the information to be provided at least 24 hours before the abortion, orally by telephone on a private call, or in person in a private and confidential setting.

However, several bills restricting abortion rights failed to move forward. A heartbeat bill to restrict the time for an abortion to the 6th week of pregnancy, and another bill to prohibit abortion based upon the woman's reason for an abortion, both failed. Proposed legislation that would have required a pregnant woman to receive counseling by a third party (possibly a crisis pregnancy center) prior to abortion did not advance out of committee. A bill to appoint an attorney for the fetus in cases where a minor sought a judicial bypass from the parental consent requirement also failed.

Unfortunately, some good bills intended to ameliorate previously enacted harmful laws met the same fate. These included: elimination of waiting period before abortion and removal of unproved information from so-called informed consent to abortion materials.

## Women's Healthcare Safety Net

LWVTX is a coalition member of the Texas Women's Healthcare Coalition. We track laws that impact women's health and access to family planning. We strongly advocate for the availability of long acting reversible contraceptives

OCAGH_00001670

(LARCS) which enable women to have more control over when and whether to have children. We also advocate for post- partum care and for increasing Medicaid eligibility for women to take care of themselves and children.

*2019.* Positive news on this front includes a budget of $346,961,855 for the state's women's health programs including family planning programs – this is an increase of $62.3 million from last biennium's allocated amounts. It is not as much as our coalition partner, Texas Women's Healthcare Coalition, had advocated as necessary to account for the increase in Texas population.

# II. Natural Resources
*Promote an environment beneficial to life through the protection and wise management of natural resources in the public interest.*

## Resource Management and Protection
*Support resource conservation, stewardship, and long-range planning, with responsibility for managing natural resources shared by all levels of government. Preserve they physical, chemical, and biological integrity of the ecosystem with maximum protection of public health and the environment.*

## A. Energy
1975,1978
*Support environmentally sound policies that reduce energy growth rates, emphasize energy conservation, and encourage the use of renewable resources. (For full position, see Impact on Issues, LWVUS).*

## LWVTX Action
*1973-76.* The LWVTX became active in the energy area in 1973 when it recommended to the LWVUS Council the adoption of energy as an emergency study item. The study item was not adopted then, but Council directed that a series of energy briefs be published to give members background material on this timely topic. The following year, again with strong LWVTX involvement, an Energy Task Force was established at Convention 1974 and our first position on energy— relating to conservation—was the outcome. Our national study on alternate sources of energy was also strongly supported by the LWVTX at the LWVUS Convention 1976.

*1980s.* During the existence of the Texas Energy and Natural Resources Advisory Council and its predecessor agencies, the League was represented on advisory committees in the areas of conservation, solar, and nuclear energy. We worked diligently, but in vain, during the 1983 Legislative Session to prevent the demise of the Texas Energy and Natural Resources Advisory Council and the Energy Development Fund. We also supported legislation dealing with conservation, solar energy, low-level nuclear waste management, and funding of the Energy Development Fund. In the effort to increase use of renewable energy, we supported legislation protecting consumers (installer licensing, device testing) protecting users' access to sun and wind, providing assistance in financing installations, and establishing an energy conservation code.

During the 1980s the League was represented at several utility-consumer interaction meetings, where we pressed the utilities to encourage conservation and use of renewable energy to delay the need for more generating plants. We argued this would conserve both natural resources and capital while providing increased employment in the labor-intensive, pollution-free solar energy and weatherization industries. In 1985 we cosponsored a second electric utilities dialogue.

*2007.* Committee Substitute HB 3693, supported by the LWVTX, passed into law. It requires electric utilities in Texas to achieve energy efficiency and conservation. This bill improves and expands existing energy efficiency measures, allows better management of customer demand, updates energy codes, and requires state agencies to utilize equipment and appliances that are more energy efficient.

*2011.* None of the legislation that we supported passed in this legislative session. However, some of the other bills that passed may have positive impacts, such as HB 51 (Lucio III) that establishes high-performance

OCAGH_00001671

sustainable-design standards for the construction of new state buildings and renovations for which the cost exceeds 50% of the value of the existing facility. These standards would apply to institutions of higher education, public education instructional facilities, and certain state agencies. HB 362 (Solomons) prevents property owners' associations from including or enforcing a provision in a real estate dedicatory instrument that would prohibit a homeowner from installing a solar energy device as defined by the Tax Code. The bill would void any existing deed restriction against solar energy devices.

## B. Waste Management

1970's
*Promote policies that reduce the generation and promote the reuse and recycling of solid and hazardous wastes. (For full position, see Impact on Issues (LWVUS).*

## LWVTX Action

Under this national position, the LWVTX has taken action on both municipal solid waste and hazardous waste issues.

*1980s.* Since the adoption of the position in 1973, the state League has worked for passage of container deposit legislation, actively participating in the Association for Beverage Container Deposits, publishing an advocacy paper in 1987, and submitting legislative testimony in 1989, to no avail. In 1983 the League helped draft the Comprehensive Municipal Solid Waste Management, Resource Recovery, and Conservation Act and served on a related Texas Department of Health advisory committee.

The LWVTX advocacy for proper hazardous waste management began in the 1970s and intensified in 1980 when Texas first sought Environmental Protection Agency authorization to implement the federal Resource Conservation and Recovery Act. In 1981 the League obtained a grant from the LWVUS and sponsored an educational workshop and tour of hazardous waste management facilities in the Houston area. League legislative and administrative action in 1981-83 focused on the need for more stringent criteria for siting new facilities.

In the interim before the 1985 Legislative Session, the League testified on hazardous materials administratively. In 1986 the League intervened on behalf of the Texas Water Commission and the Texas Air Control Board in a lawsuit filed by the Texas Association of Business contesting the constitutionality of administrative penalty powers. During the sunset review process additional public participation opportunities and enforcement powers for the agencies that regulate hazardous waste were requested. During this interim a state League director served on the Governor's Hazardous Waste Task Force, which drafted consensus recommendations that led to passage of comprehensive hazardous waste legislation addressing most of the issues of concern to the League. Sunset reauthorization of the Texas Water Commission gave the agency the power to assess penalties in a case that was decided in 1989 in favor of the state agencies, a victory for the League. The Texas Supreme Court affirmed this decision.

During the mid-1980s, the League played an educational role on the controversial issue of hazardous waste incinerator ships. The LWVTX send an observer aboard an incinerator ship in the North Sea. It participated in Environmental Protection Agency briefings and a Keystone Center national policy dialogue on the role of the oceans in hazardous waste management.

*1985.* The League completed the major part of the Keystone Education Project, a 2-year League effort to educate communities about hazardous waste management and the Keystone site selection process for community involvement in the site selection of new hazardous waste facilities. The project included sponsorship of workshops in six industrial areas of the state and publication of informational materials as well as a training manual for those who serve on Keystone local review committees.

The League commented on rules implementing the comprehensive hazardous waste legislation and fee system and lobbied for waste reduction. Legislative activity focused successfully on preservation of the joint and several liability clauses of hazardous waste laws during the legislative efforts to reform the tort law system.

OCAGH_00001672

*1989.* Since 1989 the League has been represented on the Waste Reduction Advisory Committee, a policy advisory committee to the Texas Water Commission and its successor agency, the Texas Natural Resource Conservation Commission. The League supported a policy that would require industry to reduce waste at the source. In October 1990 the Texas Water Commission adopted the Waste Reduction Advisory Committee policy on waste reduction, which required industry to move toward source reduction, to work toward recycling and neutralization of toxins, and to move away from injection wells, incineration, and land-fills.

*1991.* In the 72nd Legislature the League supported bills calling for waste reduction and pollution prevention. These included a comprehensive hazardous waste reduction and pollution prevention bill that passed, making significant changes in regulatory programs in Texas. This legislation called for a temporary moratorium on new permits for commercial hazardous waste facilities, a greater role in the site selection process for citizens' groups, needs assessments, and requirements for source reduction.

The League has also been represented on Task Force 21: Waste Management Policy for the Future, a Texas Natural Resource Conservation Commission (formerly the Texas Water Commission) advisory council made up of representatives of industry and environmental groups. The task force has worked on development of regulations to bring state agencies into compliance with existing law. See next section, Public Participation, for more on Task Force 21.

The League supported an omnibus recycling bill, addressing many League concerns, which passed. The law charged the General Land Office with coordinating a recycling market development study, implementing a strategy for expanding markets, and developing and implementing a recycling awareness campaign.

*1993-95.* Unfortunately, the sessions did not continue the progress made in 1991 toward pollution prevention, waste reduction, and recycling goals. Despite League opposition, bills were enacted in that limit the power of local governments to regulate what goes into their local solid waste streams and that encourage the environmentally unsound process of mixed municipal solid waste composting. The League has continued to monitor development of regulations to implement the comprehensive waste minimization and recycling legislation enacted in 1991. We have submitted comments on proposed composting regulations and the adoption process.

*1999.* Following denial by the Texas Natural Resource Conservation Commission of a permit for low-level radioactive waste disposal at the state site near Sierra Blanca in West Texas, the legislature worked on and debated a bill that would have allowed private facilities to receive low level waste. The issues of disposal are complex and involve an interstate compact Texas has with Maine and Vermont, the licensing of private entities, site selection issues, groundwater protection, full public disclosure and participation, as well as the kind and volume of waste. Following a public forum held by the LWV of Midland and discussions with LWVUS, the LWVTX decided to oppose the legislation that failed to pass the legislature.

The bill would have mandated the use of assured isolation (above ground) storage, an alternative to burial. Following the failure of the bill, the governor used the pocket veto to remove the second-year budget for the Low-Level Radioactive Waste Disposal Authority. The Agency's functions will be transferred to the Texas Natural Resource Conservation Commission. The issue of low-level nuclear waste disposal will be an important interim issue as the state continues to look at the need for a low-level waste disposal site, the type of disposal that can be used, and licensing and permitting issues.

*2001.* The LWVTX worked with other groups to defeat HB 3420 Permanent Management of Low Level Radioactive Waste Act, which would have created privately operated, for-profit waste disposal facilities in West Texas, left the state with liability, and possibly led to contamination of the Ogallala Aquifer. A number of serious questions were raised that helped bring about the bill's defeat: site selection, liability, kind, source and amount of waste, problems of cleanup, and a total lack of public participation in addressing the concerns raised during the process.

*2003.* The 78th Session will be known as the one in which Texas finally, after many years and legislative sessions, adopted a low-level nuclear waste disposal bill (HB 1567) that was signed by the governor. One of the bad aspects of

this bill will be the acceptance of mixed waste, which means a combination of hazardous waste and low-level radioactive waste, in particular federal mixed waste. The final bill kept the 6 million cubic yard cap on total federal waste, but increased the B and C cap to 600,000 cubic yards. Texas is now in line to become the dumping ground for the hottest low-level radioactive waste, even waste that is not allowed at the low-level site in Utah. The Texas Commission on Environmental Quality will permit a private facility and will begin writing rules for the permitting in mid July.

The League was not successful in killing or modifying the low-level radioactive waste disposal bill, but the positive aspect is that we worked very well with members of a coalition, Beyond Nuclear Power. The LWVTX suggested improvements would have prohibited a private company from holding the license for long-term management, prohibited importation of out-of-state waste for storage, used assured isolation (above ground) storage instead of below ground burial, minimized waste transport, kept waste near the site of generation, and increased the role of the public in decision making.

*2005.* The LWVTX held a press conference on February 28th in Austin with Representative Mike Villarreal, Representative Pete Gallego, Sierra Club, and Public Citizen to express support for the representatives' legislation concerning the importation, storage, and disposal of low-level nuclear waste in Texas. HB 1656 (Villarreal) directed the governor-appointed Texas Low-Level Radioactive Waste Disposal Compact Commission to contract to accept waste only from the initial compact states
(Texas, Vermont, or Maine). This would amend the existing law to close what is known as the compact loophole. As currently written, the existing law allows the Texas Low-Level Radioactive Waste Disposal Compact Commission, representing Texas and Vermont, to enter into an agreement by majority vote with any person, state, regional body, or group of states to import low-level radioactive waste into the compact facility. The Texas Low-Level Radioactive Waste Disposal Compact Commission would consist of six commissioners from Texas and one commissioner from Vermont.

HCR 85 (Gallego) requested that the lieutenant governor and the speaker of the House of Representatives create a Joint Interim Committee to study issues relating to the importation of radioactive waste into Texas, and that this committee submit a full report including findings and recommendations to the 80th Texas Legislature in January 2007. Recent actions by the Federal Government and requests by a private company, Waste Control Specialists, applying to the Texas Commission of Environmental Quality for a license to dispose of low-level radioactive waste in West Texas have brought to light the expansiveness of Texas law when it comes to the importation, storage, and disposal of radioactive wastes. Currently two state agencies, the Texas Commission on Environmental Quality and the Texas State Department of Human Services control the management and disposal of low-level radioactive waste. The Federal Government has reclassified the by-product from concentrating highly radioactive ore from the Congo as 11-e-2 waste, a low-level radioactive waste classification. This waste is managed by the Texas State Department of Human Services. Waste Control Specialists is in the process of requesting an amendment to their current Hazardous Waste License to bring this waste to West Texas. The 11-e-2 waste is in addition to the low-level radioactive waste allowed by HB 1567 (2003) permitting the disposal of both the Texas Low-Level Radioactive Waste Disposal Compact and Federal Government waste by a private company in Texas. Since passage of that legislation another possible low-level radioactive waste stream has developed. A multinational company, Louisiana Energy Services, has applied for a license from the Federal Government to operate a uranium enrichment facility near Eunice, New Mexico. This facility would produce low-level radioactive waste that could be imported a few miles east into West Texas for disposal.

The issue is complex to begin with and has become more complex due to actions by the Federal Government, a for-profit private company, and the expansively written legislation from last session. Neither HB 1656 nor HCR 85 passed.

*2006.* The Texas Commission on Environmental Quality is reviewing the application for the Andrews County low-level disposal site.

OCAGH_00001674

**2007.** The LWVTX achieved goals from the last three legislative sessions with the passage of SB 1604. The Texas Commission on Environmental Quality will regulate activities associated with storage, processing, and disposal that relate to uranium mining and radioactive waste, including activities at the permitted low-level radioactive disposal site in Andrews County.

**2011.** HB 1504 and SB 1605 passed in the 82nd Texas Legislative Session, relating to low-level radioactive waste disposal at the Waste Control Specialists Federal Waste Control Facility being constructed in Andrews County. While the bills were a mixture of protections of the health and safety of people and the environment, many aspects are not healthy or safe for either. On the whole, the legislature opened Texas and the site to the liabilities of out-of-compact waste in a significant way that is ultimately expensive and unsafe for Texas.

SB 1504 (Seliger) allows out-of-compact radioactive waste to be imported with certain restrictions. It includes an annual limit by volume and curies for imported waste, sets a total limit on how much of the site's capacity may be used for imported waste, directs the Texas Commission on Environmental Quality to study the anticipated capacity of the dump site, and clarifies the authority of the Texas Commission on Environmental Quality related to importation. Additional sections of the bill dealt with other matters.

*Improvements made in SB 1504 due to advocacy.*
- The capacity study date was changed to 2012 from 2014.
- The bill was amended to ensure that Waste Control Specialists must amend their license to accept out-of-compact waste.
- A financial assurance study, which includes assessment for unplanned events or accidents to protect the State of Texas and local governments' budgets, was commissioned.

The LWVTX worked for improvements to SB 1504, but was not successful in all areas. Points that need to be addressed include: (a) a capacity study *before* beginning importation of low-level radioactive waste since the three results of existing studies are so varied, (b) a transportation study to examine emergency preparedness and liability to the state and local governments for accidents resulting from increased shipments of radioactive waste on highways and railways, (c) tighter limits that spread importation over the expected lifetime of the site, (d) clarification of the ratemaking process, and (e) a full study of dangers to nearby groundwater because the results of existing studies are inconsistent.

SB 1605 (Seliger) provides stronger guidance to the Texas Low-Level Radioactive Waste Disposal Compact Commission, stating that it shall operate and be funded independently of the Texas Commission on Environmental Quality and requiring that bylaws be in place prior to the commission reviewing import applications. However, this bill eliminates all six of the current Texas Low-Level Radioactive Waste Disposal Compact Commissioners, giving Governor Perry authority to fill the vacancies midway through the original terms of his first six appointed commissioners.

The LWV sponsored a forum with six panelists for legislators, their aides, and the LWVTX and community members on February 8, 2011, in the Capitol to provide information about the issue. The forum was well attended and appreciated.

**Other legislation that pertained to hazardous waste.** Senate Bill 329 (Watson and Chisum) that passed will have television manufacturers take back and recycle obsolete televisions, keeping toxic materials such as lead and mercury out of Texas landfills and water sources passed. This bill is one of the rare environmental victories during the 2011 Texas Legislative Session. The League spoke in support of this and other recycling legislation.

**2013.** The 83rd Legislature was generally a success for the environment and conservation. Several laws were passed that help reduce hazardous materials being released: legislation dealing with clean energy development, water conservation, and significant increases in state funding to state parks and clean air programs. Numerous bad bills failed that would have rolled back environmental regulations and curtailed citizen participation in environmental decision making. Stopping and slowing the release of hazardous materials help create a cleaner Texas environment.

OCAGH_00001675

Compared to other states, Texas ranks 4th in total amount of toxic releases into water and 5th in releases into the air. Texas ranks 4th in the amount of recognized cancer-causing carcinogens released into the air and 5th in releases into the water. Texas ranks 1st in the amount of hazardous waste generated.

Some legislation with benefits to public health and the environment are the expansion of the successful Texas Emission Reduction Program and the renewal of the Texas Chapter 313 economic development program, which will allow Texas to continue being the nation's leader in wind power. Each will help with reducing hazardous materials released into the air and water.

In terms of the state budget, significant gains were made in funding essential environmental programs, including using dedicated environmental funds for their intended purpose and not diverting them or allowing them to build up to help balance the state budget. While the legislature ultimately did little to address the problem with dedicated funds across the board, some improvement was made in using parks and clean air funds, which had accrued tens of millions in unspent fund, for their intended purpose.

In other legislative areas, there was mixed success in oil and gas regulation. Positive measures passed included improvements to gathering line safety in rural areas, increased fines for pipeline violations, increased funding for the Railroad Commission, and the setting of regulations for saltwater pipelines. A good resign-to-run provision in the Ethics Commission Sunset bill, which would have prohibited Railroad Commissioners seeking statewide office from collecting campaign contributions from the energy companies they regulate, was vetoed by the governor. And a good Senate bill dealing with water permitting for hydraulic fracturing failed to advance in the House. In addition, a number of good bills dealing with beverage container recycling, paint take-back, and diverting electronic waste from landfills were derailed by industry groups.

Two bad bills, SB 347 and SB 791, dealing with uranium mining and radioactive waste storage were passed into law. One measure ends the ability of citizens to bring meaningful challenges on production area authorization permits for uranium mining. The other significantly increases the concentration of radioactive waste allowed to enter the Andrews County radioactive waste dump without taking adequate precautions to protect public health and safety around the site and on Texas roadways. The bill allows far more radioactivity to come to the site sooner and produces far more revenue for Waste Control Specialists by eliminating the annual caps on volume or curries at the site. This could allow an increase in radioactivity and allows for three times the waste to be stored on the site and transported across Texas. One section of the law appears to allow the executive director of the Texas Low-Level Radioactive Waste Disposal Compact Commission to modify the license without requiring a public hearing or public review, and another section appears to allow a huge fee waiver.

It is important to note that all eight of the nation's low-level radioactive storage dumps have leaked and the cleanup costs have ranged from $750 million to over $5 billion. The bill states that when the environmental radiation and perpetual care account reaches $100 million, fees charged to the company to ensure funds for cleanup are suspended.

*2019.*  Several bills were filed in the House and Senate regarding the transportation and storage of low-level and high-level radioactive waste, carcinogens, and solid waste facilities.  We would have supported all but two bills, but most were not even given a committee hearing.  The five bills that got a committee hearing were SB 1021 (Seliger) OPPOSE, HB 2269 (Landgraf) OPPOSE, HB 4089 (Blanco) SUPPORT, HB 1391 (Bohac) SUPPORT, and HB 1435 (E. Thompson) SUPPORT.  We gave testimony on the two we opposed:  both bills passed their committees but were never voted on in their houses.  HB 4089 and HB 1391 were left pending in their committees.

One bill did pass both houses and was signed by the governor:  HB 1435.  This bill requires state environmental officials to actually visit a proposed facility that will store, process or dispose of municipal solid waste before issuing or renewing a permit. It takes effect on 9/1/2019.

OCAGH_00001676

We gave testimony on May 30, 2019 to the Texas Low-level Radioactive Waste Disposal Compact Commission regarding Waste Control Specialist's transportation and storage process and site in Andrews County. We also testified on October 17, 2019 before the Environmental Protection Agency in opposition to their proposed policy amendments to their New Source Performance Standards for the Oil and Gas Industry. Both testimonies are posted on the LWVTX website.

## C. Public Participation

1986-1988
*Promote public understanding and participation in decision making as essential elements of responsible and responsive management of our natural resources.*

## LWVTX Action

**1994.** Commenting on proposed compost regulations (see Environmental Protection and Pollution Control above), the League objected to the circumventing of the public participation component during the rule-making process.

**1995.** In recent years, public participation has emerged as a focus of the LWVTX advocacy efforts in the area of natural resources. During the legislative session, the League testified in favor of a measure that would establish the independence of the Office of Public Interest Council of the Texas Natural Resource Conservation Commission and ensure adequate public representation on the Office of Public Interest Council. We testified against a measure that would have weakened the Office of Public Interest Council duties. Both bills died in committee.

A law enacted in 1995 directed the Texas Natural Resource Conservation Commission to develop criteria to determine who is an affected person/party in the permitting/hearing process. The LWVTX will monitor to determine if rules are proposed that would limit public participation in permit hearings.

Public participation issues led the League representative to Task Force 21 (see Environmental Protection and Pollution Control above), along with representatives of other public interest groups, to resign from that advisory council in 1995. These representatives felt the advisory council's decisions had been reopened and undermined during the legislative session. The League also objected to legislative action that resulted in loss of expense reimbursements for representatives to groups such as Task Force 21.

*1997.* Public participation in the environmental decision-making process was one of the LWVTX two priority issues during the 75th Legislative Session. The League, working with environmental and consumer groups, helped draft more than a dozen different pieces of legislation that would have increased public participation in environmental decision making, but none passed and most never left committee. A bill directing the Texas Natural Resource Conservation Commission to do an annual enforcement report that will allow enforcement comparisons over a 5-year period was the only League supported public participation bill signed into law. Some bills that the League opposed passed: a cost benefit analysis bill, also known as paralysis by analysis, and the Pine Island Bayou Storm Water Control District bill. The latter was considered a local bill although it will affect a federally protected ecosystem, the Big Thicket.

*1999.* As in 1997, public participation in environmental decision making was high on the LWVTX legislative action list and, and as in 1997, again met with mixed results. On the positive side, an anti-contested case hearing bill, considered to be Public Enemy Number One, ended up as a bill that effectively enhances public participation by providing earlier notice and protection of the hearing process that is streamlined but retained. Upon hearing the serious criticisms of the original bill, the sponsor invited proponents and opponents of his original bill to sit down, discuss their differences, and try to mold a compromise. Representative Uher was successful, and the bill was signed into law.

To quote our lobbyist, G.K. Sprinkle, "We made a difference." We can point with pride to the fact that we made legislators look at the issue of funding the travel of the public on key Texas Natural Resource Conservation Commission advisory committees. The League succeeded in incorporating a rider allowing the Texas Natural Resource Conservation Commission to fund travel for public members to two key advisory committees.

OCAGH_00001677

A bill, supported by the League, that requires the responsible party to report accidental discharges or spills that may adversely affect a public or private source of drinking water within 24 hours. It provides the opportunity for public participation and notification, passed, and was signed into law.

On the other hand the Right to Know Right to Act Agenda did not fare well although early, timely notice was incorporated into the bill discussed above. The establishment of an independent Office of Public Interest Counsel at the Texas Natural Resource Conservation Commission and the environmental justice issues involved in the siting of landfills remain two important issues that have not been put into law.

The governor signed a law that will prohibit the Texas Natural Resource Conservation Commission from requiring computer modeling of air pollutant emissions from concrete batch plants if the Texas Natural Resource Conservation Commission does some modeling in establishing a standard exemption for such plants. This move which will increase the difficulty for the public in using valid scientific data to protect the air.

*2001.* As in the past few sessions, the LWVTX continued to lobby hard in the area of public participation in environmental decision making. Since the close of the 76th legislative session, the LWVTX has been a member of the Public Interest Sunset Working Group and later a member of the
Alliance for a Clean Texas. The Texas Natural Resource Conservation Commission
Sunset/Reauthorization bill contained a number of changes that strengthen public participation in environmental protection, including:

- Cumulative impacts will be considered in issuing permits, an important environmental justice provision.
- Anonymous citizen complaints will remain anonymous.
- Timely responses by the Texas Natural Resource Conservation Commission to complaints received during nonbusiness hours is now required.
- Citizen access to information and avenues for influencing permitting and enforcement decisions are now available. For example, all advisory committee meeting minutes, pending permit and enforcement actions, and compliance histories and violations by repeat offenders must be posted on the agency website.
- The role of the Texas Natural Resource Conservation Commission executive director in contested case hearings is now limited to solely providing administrative information for the record.
- The mission of the Texas Natural Resource Conservation Commission has been changed to bring balance to the role of economic development.

Another bill that strengthened public participation shifts the notice requirement for multiple plant air permits from the Texas Natural Resource Conservation Commission to the applicant for the permit, requires that the applicant publish notice statewide, and requires that the Texas Natural Resource Conservation Commission provide an opportunity for a public hearing and submission of public comment.

The biggest disappointment was the legislative failure to create an independent Office of Public Interest Counsel at the Texas Natural Resource Conservation Commission. However, a senate interim committee has been appointed to look into this issue that the League and its coalition partners have lobbied for during the past several sessions.

*2003.* As we have for a number of sessions, the League continued to follow the progress of reform of the Texas Commission on Environmental Office of Public Interest Council. Created by the legislature in 1977 to represent the public interest, the Office of Public Interest Council was the subject of intense scrutiny during the Texas Natural Resource Conservation Commission sunset review process in 2001. Legislation was filed to establish the independence of the Office of Public Interest Council, give the Council the right to appeal commission decisions to courts, and allow the Council to make recommendations to the legislature and participate in advisory committees. Advocates argued, "Only with similar access to trained legal staff and technical experts that those seeking permits have, can people effectively participate in agency decisions that have a direct impact on the health, safety, and environment of their community." In order to provide this level of expertise, the budget must be adequate to fund a technical staff or hire consultants to evaluate permit applications and other public interest issues that come before the Texas Natural Resource Conservation Commission.

Although the effort to make the Office of Public Interest Council independent passed the Texas House but ultimately failed, progress was made in protecting public participation. The sunset legislation authorized the Office of Public Interest Council to use outside technical support and to recommend needed legislative and regulatory changes. It directed the executive director to ensure that advisory committees, work groups, or task forces be used, and that these groups have balanced representation. It further directed the legislature to complete an interim study on the need for an independent Office of Public Interest Council.

The Interim Joint Committee on Natural Resource Public Interest Council charges were to examine (a) the authority of the Council (including the authority to appeal decisions of the Texas Natural Resource Conservation Commission), (b) the resources needed to carry out the function of the office, and (c) the relationship of the office to other public assistance efforts in the agency.

The Alliance for a Clean Texas, and the LWVTX, a member of the Alliance, urged the legislature to adopt the recommendations proposed by the Interim Joint Committee. The Interim Joint Committee report recommended that the Texas Legislature:

- Give the Office of the Public Interest Council an independent budget, including $100,000 annually for outside technical expertise.
- Allow the Public Interest Council to appeal rules packages, if it appears that they were adopted without proper legal procedure or exceed the authority of the Texas Commission on Environmental Quality.
- Allow the Public Interest Council to appeal when the Texas Natural Resource Conservation Commission has substantially amended a proposal for decision from the State Office of Administrative Hearings and appeal is necessary to serve the broad public interest.

Although a number of bills were introduced, none of them passed. We will monitor the Office of Public Interest Council and wait for another session in which to reintroduce and support these proposed improvements.

# III. Social Policy

## A. Early Intervention for Children at Risk (Child Health)
1994
*Support policies and programs that promote the well-being, development, and safety of all children. These include: child abuse/neglect prevention, teen pregnancy prevention, quality health care including nutrition and prenatal care, early childhood education, developmental services emphasizing children ages 0-3, family support services, and violence prevention.*

## LWVTX Action
*2009.* The governor's veto of House Bill 130, despite House and Senate passage of research-based, enhanced quality legislation, ended statewide coalition efforts to advance a full-day, high-quality prekindergarten policy. The veto did not eliminate the $25 million funding to the Public School prekindergarten expansion program, which will go to the state's existing prekindergarten grant program. This was the largest appropriations increase for prekindergarten in the nation.

Additional legislative oversight and contracting transparency passed for the State Center for Early Childhood Development. Increased funding was obtained for Texas Early Education Model, Early Childhood School Readiness Programs, and School Readiness Certification System. Plus, the passage of HB 635 (Guillen) allows Texas Head Start programs operated by school districts or community-based organizations to qualify for federal grant funding, such as the E-Rate Program that provides discounted access to technological and informational services in the classroom.

Other bills that passed include the following:

- SB 68 (Nelson) requires the Department of Family and Protective Services, before adopting school-age program minimum standards, to convene a temporary work group to advise the Department of Family and Protective Services regarding the proposed standards.
- SB 90 (Van de Putte) allows adoption of the Interstate Compact on Educational Opportunity for Military Children.
- SB 95 (Van de Putte) prohibits the sale or use of unsafe children's products; providing a civil penalty.
- SB 282 (Nelson) funds a grant program to provide nutrition education to children.

*2017.* Numerous cross-agency bills were proposed with only three bills overcoming political stalemate:
- HB 2039 created an early childhood teacher certification to teach students in prekindergarten through Grade 3.
- HB 674 set limits for our-of-school suspensions for students in prekindergarten through Grade 2 and permits school districts to implement positive behavior management strategies.
- HB 357 expanded prekindergarten eligibility to include children of seriously injured or fallen first responders.

The Texas Legislature cut appropriations for prekindergarten, eliminating the funding for the 2015 High-Quality Prekindergarten Program. Instead, legislators passed a budget rider simply directing all school districts to comply with the program quality standards using a portion of the Foundation School Program kindergarten entitlement, totaling $236 million statewide for the High-Quality Prekindergarten Program. Educators recognize the need for high standards, but the enforceability of the rider is in question. The best way to drive improvements is through high standards coupled with additional funding to support additional district investment in quality teachers, full-day options, reduced class size, or other improvements.

Legislators failed to improve (a) the transitional Temporary Assistance for Needy Families services, (b) nutrition standards in childcare, (c) a review of the Texas Workforce Commission subsidized childcare program, (d) a staff to child ratio and a group size incident reporting of licensed childcare study, (e) licensed before- and after school programs promoting healthy eating and physical activity, and (f) a task force to coordinate the multiple agency study of parent engagement education programs provided. The legislature also failed to reverse the 2015 therapy cuts for children with disabilities with a funding compromise to provide only a 25% restoration.

*2019.* Prior to the opening of the 86th Texas legislature, the Dallas Morning News published a series of articles on individuals covered by Medicaid Managed Care. These articles detailed poor administrative practices and inadequate oversight, resulting in negative medical outcomes and even death. As a result, various legislative committees held hearings and multiple bills were introduced related to Medicaid Managed Care. Most important for child health, HB 342, the Children's Health Coverage Bill, attempted to achieve 12 months of continuous coverage for children eligible for Medicaid. This was voted out of the House, but the bill and its provisions died in the Senate. Also related to maternal and child health, HB 25 authorizes a pilot program to allow medical transportation program services to a child if the child's mother is a recipient of Medicaid during a pregnancy, regardless of whether the child is also a recipient of Medicaid. Without this bill, a mother might not be able to take her newborn baby with her when she goes for post-partum care. This bill was passed by both the House and Senate and signed by Governor Abbott. HB 2099, designed to prevent managed care companies from switching medications or other treatments for non-medical reasons, died in a Senate Committee. HB 4533, which tightens Medicaid oversight, was passed and signed into law; SB 1207, which changes the appeals process and is meant to ensure fair hearings, was also signed into law.

Also prior to the legislative session, the Texas Mortality and Morbidity Task Force provided recommendations to reduce the high maternal mortality rate in Texas. The Task Force recommended increased access to health services for women on Medicaid. HB 744 attempted to extend Medicaid coverage to eligible women for one year after the birth of a child; this bill passed the House but was not taken up in the Senate. HB 253 requires development of a post-partum depression strategic plan, and SB 750 requires development of a treatment network. SB 748 requires a report on maternal mortality and morbidity in Texas.

OCAGH_00001680

# B. Gun Policy

*1990, 1994, 1998*
*Protect the health and safety of citizens through limiting the accessibility and regulating the ownership of handguns and semiautomatic weapons. Support regulation of firearms for consumer safety. (Position in Brief)*

*The League of Women Voters of the United States believes that the proliferation of handguns and semiautomatic assault weapons in the United States is a major health and safety threat to its citizens. The League supports strong federal measures to limit the accessibility and regulate the ownership of these weapons by private citizens. The League supports regulating firearms for consumer safety.*

*The League supports licensing procedures for gun ownership by private citizens to include a waiting period for background checks, personal identity verification, gun safety education, and annual license renewal. The license fee should be adequate to bear the cost of education and verification.*

*The League supports a ban on "Saturday night specials," enforcement of strict penalties for the improper possession of and crimes committed with handguns and assault weapons, and allocation of resources to better regulate and monitor gun dealers.*

## LWVTX Action

*1993-95.* Using this position several local Leagues opposed passage of legislation allowing Texans to carry concealed weapons. A concealed weapons law was enacted in 1995. The law required would-be weapons carriers to undergo training and be licensed by the state.

*2001.* Several gun control bills worked their way through the 77th Legislative Session. Legislation, which did not pass, would have banned gun possession by juveniles convicted of felony-level crimes. Other legislation supported by the League, which also didn't pass, related to background checks of all sales at gun shows.

*2003.* There was a great deal of interest in who should be allowed to carry handguns and whether or not to allow gun permit holders in other states to carry handguns in Texas. The League strongly opposes the new law that took away the power of the cities to have gun-free zones on designated municipal property. Courts, schools, and racetracks were exempted.

*2015.* Texas continues to encourage the ownership and use of guns. Gun laws passed this session include an open carry law which allows concealed handgun license holders to carry a gun visibly and a campus carry law that allows concealed handgun license holders to carry their weapons on public school colleges and universities.

*2017.* There were over 200 bills filed this session with the words, handguns, firearms, or weapon.
**A good bill that is now law.** HB 2359 made the discharge of a firearm in a public place illegal.

**The ugliest bill that is now law.**
- HB 1692 (Hefner, Bonnen of Brazoria, Dutton, Raymond, Huberty, et al.): Would not allow a school district, open-enrollment charter school, or private school from prohibiting a person, including a school employee, who holds a license to carry a handgun from transporting or storing a handgun or other firearm or ammunition in a locked, privately owned or leased motor vehicle in a parking lot, parking garage, or other parking area provided by the district or charter or private school, provided that the handgun, firearm, or ammunition is not in plain view. Died in Calendars Committee. Amended to SB 1566 on its second reading.
- SB 1566 (Kolkhorst, King): Several House members led a valiant effort to remove the amendment from SB 1566 on its third reading, but were unsuccessful. Passed and signed by the governor. Opposed by the Texas Association of School Boards.

**Bad bills that are now law.**
- SB 16 (Nichols, Huffman, Bettencourt, Burdwell, Buckingham et al.): Decreased the fee for the issuance of an original or renewed license to carry a handgun.

- SB 263 (Perry, Springer, White, Shaheen, Oleverson et al.): Removed the requirement that applicants to obtain or renew a handgun license be able to demonstrate the minimum proficiency of operating a .32 caliber or above handgun. Proponents argued that Texans should not be prevented from obtaining a handgun license because of physical injury or handicap or preferences for a caliber weapon.

**Bad bills that did not pass.** HB 375 and HB 1911 would have allowed persons eligible to purchase a handgun to carry without a license. HB 375 died in House Homeland Security & Public Committee; HB 1911 died in chamber.

*2019.* Several laws will go into effect that weaken gun regulations in Texas, yet not a single gun safety law was passed last session. **We testified in favor of HB 86** (Martinez), creating a criminal offense for the reckless discharge of a firearm, but the bill died in House Calendars committee.

**We also supported HB 316** (Howard) which would have required the Texas Department of Public Safety (DPS) to develop and implement a campaign designed to encourage firearm safety and improve public awareness on the topics of: 1) prevention of firearm accidents involving children, 2) suicide prevention and 3) the safe handling and storage of firearms. This bill was met with cries that the campaign would indoctrinate gun owners into giving up their "God given second amendment rights." This bill also died in the House Calendars Committee.

**The Governor vetoed HB 1168 (Anchia)**, which would have prevented an airline employee from possessing a weapon in an airport operations area.

**Bills we opposed that passed:** HB 302 (Paul) allows open or concealed carry in apartment complexes regardless of the owner's wishes. HB 1177 (Phelan) which allows persons to carry a handgun during a declared disaster and in a shelter.

The governor has stated that there will be no special session to address mass shootings in Texas. Inaction is not a solution for Texas families and communities. So for now, we must look to our federal leaders for a solution.

OCAGH_00001682

# Exhibit 109



# NONPARTISAN
# VOTERS GUIDE

## PRIMARY ELECTION » MARCH 1, 2022

Governor » Lieutenant Governor » Attorney General » Comptroller of Public Accounts » Commissioner of General Land Office » Commissioner of Agriculture » Railroad Commissioner » Texas Supreme Court » Texas Court of Criminal Appeals » State Board of Education

EARLY VOTING: February 14–25, 2022 »
ELECTION DAY: March 1, 2022. Polls open 7 a.m. to 7 p.m.

## » EMPOWERING VOTERS.
## DEFENDING DEMOCRACY.

### » VOTING IN TEXAS PRIMARIES

The upcoming Primary Election is extremely important for Texas!

**Primary Election:** Texas has *open* primaries, which means *all* Texas voters can participate.

- The Republican and Democratic Parties each choose their candidates in a primary election.
- The Libertarian and Green Parties each choose their candidates in a party convention.
- Since many districts in Texas heavily favor one party over the other, the primaries often determine the winner of the General Election!

Even if you do not strongly identify with any political party, you can and should carefully consider the candidate choices and participate in one of the primaries or conventions.

Note: Once you have voted in one party primary or convention, you cannot vote in another party's primary or convention, and you can only vote in that same party's runoff election.

**General Election:** Voting in one party's primary election, convention or runoff election does NOT commit you to vote for a particular party or candidate in the General Election. You can still vote for any candidate of your choice, regardless of party, in the General Election.

### » *VOTERS GUIDE* CONTENTS

League *Voters Guide* Policy   **2**

Be a Texas Voter!   **3**

Voter ID—What to Take to the Polls   **4**

Helpful Contacts & Websites   **66**

Local Leagues in Texas   **66**

Sponsors and Major Donors   **67**



OCA-APPX-1623

OCAGH_00005345



## » ABOUT THIS *VOTERS GUIDE*

This Voters Guide is funded and published by the League of Women Voters of Texas. The League never supports or opposes political candidates or political parties.

## » ONLINE *VOTERS GUIDE*

The online, interactive version of the *Voters Guide* is at **VOTE411.org**. By entering your address, you can view races and candidates that are on your ballot, compare candidates' responses to unbiased questions posed by the League, and create a print-out of your choices to take to the polls. If there is a local League in your community, you can also find information on local races. You can even find out where to vote!

 

## » LEAGUE *VOTERS GUIDE* POLICY

- Candidate replies are printed without editing or verification.
- References to opponents or specific persons are not allowed.
- In place of any inappropriate response, the *Voters Guide* will state "Candidate's response did not meet the criteria listed in this *Voters Guide*."
- Videos that do not comply are removed.
- This *Voters Guide* is organized by office, with candidates listed by party, including the names of unopposed candidates. (Ballot order at the polls may vary from county to county.)

- Candidates with no photo in this *Voters Guide* did not submit a photo by the print deadline.
- Candidates who do not respond to our questionnaire by the print deadline are listed with the notation "No response received." Their information may be in **VOTE411.org**.

## » SIGN UP FOR VOTING REMINDERS!



To get voting reminders on your phone, text LWVTX to 80123.

## » SUPPORT THE *VOTERS GUIDE*

Help us fund the cost of this valuable resource for Texas voters by making a secure donation online at **lwvtexas.org**, or by mailing your generous donation to the League of Women Voters of Texas, 1212 Guadalupe #107, Austin, TX 78701.



@ 2022 League of Women Voters of Texas | lwvtexas.org
The *Voters Guide* is protected by copyright.
For permission to duplicate the *Guide*, please call the LWV Texas office at 512-472-1100.
Any use of the League of Women Voters name in campaign advertising or literature has not been authorized by the League.


OCA-APPX-1624

OCAGH_00005346



# » BE A TEXAS VOTER!

The League of Women Voters of Texas fights for the freedom of ALL Texans to vote. Your vote is your voice . . . below are the ways to exercise your right to vote. Whichever way you choose to vote, be sure to first check your voter registration status at **VoteTexas.gov**! You must be registered before you can vote!

## » VOTE BY MAIL

### If you applied to vote by mail . . .

- Ballots are mailed out 30 to 45 days before an election or 7 days after the county election office receives an application.
- Be sure to:
  - Mark your ballot using a black or blue pen;
  - Place your ballot in the ballot envelope and seal it;
  - Place the ballot envelope in the carrier envelope;
  - Complete all information on the carrier envelope, seal it, and sign the flap of the carrier envelope;
  - Pay attention to the **voter ID requirements**.
- Mail in your ballot as soon as possible. It must be received by 7:00 p.m. on Election Day.
- New: Track your ballot online at **VoteTexas.gov**!

### If you want to hand deliver your vote by mail ballot . . .

- You may hand deliver *your* marked ballot in person to the county election office on Election Day while polls are open.
- You must show *your* photo ID when delivering the ballot, and sign a form.

## » VOTE EARLY IN PERSON

- You may vote early at any voting location in your county.
- Find polling places at **VOTE411.org** or on your **county election website**.
- If you have a disability, you may request to move ahead of other voters in line.
- If in line before the poll closing time, you must be allowed to cast a ballot.

## » VOTE ON ELECTION DAY

- In some counties, you can vote at any polling place. In other counties, you must vote at your precinct.
- Find polling places at **VOTE411.org** or on your **county election website**.
- If in line before the poll closing time, you must be allowed to cast a ballot.

## » VOTE IN PERSON USING CURBSIDE VOTING

- If you are physically unable to enter the polling place without personal assistance or likelihood of injuring your health, you may ask that an election officer bring a ballot to your car.
- After you mark your ballot, give it to the election officer or hand it to a companion to deposit in the ballot box for you.
- It is best to call ahead so election officials will expect you!

## » VOTE EVEN IF YOU ARE A SUSPENDED VOTER

You can still vote if your voter registration is in suspense! "Suspense" means that your county voter registrar needs to confirm your voting address.

## » VOTE A LIMITED BALLOT IF YOU HAVE MOVED BUT NOT RE-REGISTERED

If you have moved to a new county and have not re-registered in the new county by the registration deadline, you may be eligible to vote a limited ballot in your new county. A limited ballot is one that allows you to vote on candidates and measures that are on the ballot for both your former county and your new county, such as statewide and national races. Voting a limited ballot is only available during early voting at the main early voting polling place.

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1625

OCAGH_00005347



# » VOTER ID: WHAT TO TAKE TO THE POLLS

You may use one of seven forms of photo ID, listed below.

- Texas Driver License
- Texas Election Identification Certificate
- Texas Personal Identification Card issued by the Department of Public Safety (DPS)
- Texas Handgun License issued by DPS
- US Military Identification card containing the person's photograph
- US Citizenship Certificate containing the person's photograph
- US Passport (book or card)

Note:

- IDs may have expired up to four years.
- Persons 70 years or older may use an expired ID, regardless of expiration date.
- ID address does not have to match the voter registration address.
- The name on the photo ID should match the voter registration card or be "substantially similar." If the names don't match exactly but are substantially similar, the voter will initial a box for a similar name when signing in to vote.

Registered voters without photo ID, who cannot reasonably obtain one, may sign a form (described below) and present the original or a copy of one of the following documents with the voters name and address to vote a regular ballot:

- Texas voter registration card
- Certified birth certificate

- Current utility bill
- Bank statement
- Government check
- Paycheck
- Any other government document such as an out of state driver's license or expired Texas driver's license.

The form to be filled out by registered voters without a photo ID is a "Voter's Declaration of Reasonable Impediment or Difficulty." The voter must mark on the form one of the following reasons for not providing a photo ID:

- Lack of transportation
- Disability or illness
- Lack of birth certificate or other documents needed to obtain an acceptable form of photo ID
- Work schedule
- Family responsibilities
- Lost or stolen identification
- Acceptable form of photo ID applied for but not received.

## Voter Harassment

- Election officials cannot question a voter about the use of an ID type.
- Poll watchers may never question a voter about Voter ID issues.
- If you are harassed, call the Election Protection Voter Hotline!


OCA-APPX-1626

OCAGH_00005348

## GOVERNOR

Four-year term. The governor is the chief executive of the state. The governor appoints members to boards and commissions; appoints statewide executive officials, and, when vacancies occur, state judges and district attorneys; delivers the State of the State address; provides guidance to the legislature; calls special sessions of the legislature and sets the agenda. The governor can veto legislation (including a line-item veto on appropriations), sign legislation, or allow it to become law without their signature. Current salary: $153,750

### » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and characteristics qualify you for this position?

**Elections:** How would you ensure election laws do not create barriers to Texans' freedom to vote while maintaining safe and secure elections?

**Power Grid:** What further changes, if any, are needed to ensure that Texas has sufficient power in times of extreme weather conditions?

**Health Care:** What is your position on reproductive rights and how would you address the economic and health consequences for those who seek and cannot obtain abortions in Texas?

**Immigration:** What is the role of the state government in enforcing federal immigration laws?

**Autonomy of State and Local Government:** Under what circumstances should the federal government limit the authority of elected state officials? Under what circumstances should the state government limit the authority of elected local officials?

---

### » Inocencio (Inno) Barrientez (D)

No Response Received

---



### » Michael Cooper (D)

**Qualifications:** I was the President of the Southeast Texas Toyota Dealers association when I secured the naming rights of the Toyota Center. It is we're the Houston Rockets play. My team had great confidence that I could secure the more than 100 million $ contract.

**Elections:** I was arrested in Washington DC fighting for voter suppression bills that are now Law. As Governor I will beto those bills and call special sessions to revoke those bills.

**Power Grid:** It is common sense Governing as we just do the required maintenance. The current Governor is so focused on not working with a Democratic President. We should do repairs beyond what the federal Government requires. The same oil and gas companies made millions on Texans that donated 1 million in to his campaign.

**Health Care:** Again I have skin in the game as I arrested protesting in the streets of DC, against the heart beat bill. As a person that studied the HIPPA LAWS as I achieved my Masters in Psychology I found out that your medical issues are private and no one else's concerns. As Governor I will work to over turn that law.

**Immigration:** It is the federal Governments job to

© 2022 League of Women Voters of Texas | lwvtexas.org

OCA-APPX-1627

OCAGH_00005349

## » Michael Cooper (D) (*continued*)

secure the boarder. We can work alongside them, but we should not spend 250 million dollars on a fence that does not work. We need to spend any extra money or donated money on teachers pay raise, repairing Dilapidated schools and money for pre-K for all children. We should make all remaining non-citizens - citizens sooner than later.

**Autonomy of State and Local Government:**

If a State or local official is not acting in kind towards the citizens, I believe we would never had integrated schools if it were not for the federal Government forcing Governor Wallace to allow Blacks in all white schools. In Texas we are run by a Republican Party does not recognize all people equal. The federal Government should pass the John Lewis voters act to help.

**Campaign Website:** https://www.cooper2022.com



## » Joy Diaz (D)

**Qualifications:** Learned about public service from missionary parents who served people who lived in garbage dumps in MX City Former public school teacher & public radio reporter who learned about the intricacies of TX from the stories of Texans Graduated UT's LBJWCS

**Elections:** In a Joy Diaz administration, we will ensure that everyone who is entitled to vote, has access to safe and secure elections. Recent restrictions in Texas affect families like mine. My husband is a naturalized US citizen - the perfect target for some of the state's recent voter purges that only serve to intimidate and even suppress the vote. Those laws have to go.

**Power Grid:** We need to ensure fines to companies that don't winterize are not symbolic — meaning, fines are not cheaper than winterization. At the moment, they're a cheap loop-hole. Texas' focus ought to be - first - to protect the lives of Texans. The interest of for-profit companies should be second. To ensure oversight, the PUC board can't be made up solely of political appointees.

**Health Care:** As a woman who has gone through

all her reproductive cycles & as the only woman on the Dem ticket running for governor - my goal is for every woman in TX to have access to an array of options - from free and easy access to contraceptions to - if necessary - abortions. She and her doctor are the only ones who can decide over her reproductive life. The disrespect stops now.

**Immigration:** The Constitution establishes the federal government controls the border - therefore immigration has been and always will be a federal responsibility. But, Texas has a role to play. We need to partner with both the US and MX governments. At the moment, TX has not been a helpful partner. Instead, state policies have contributed to the chaos for political gain.

**Autonomy of State and Local Government:** Only extreme circumstances merit the intervention of the federal government in state matters. The same is true for the state overpowering local governments. By "extreme", I mean emergencies such as natural disasters or circumstances in which public health or human rights are threatened. During COVID, TX has overpowagainst the wisdom of health experts.

**Campaign Website:** http://texasneedsjoy.com

© 2022 League of Women Voters of Texas | lwvtexas.org



OCA-APPX-1628

OCAGH_00005350



## » Beto O'Rourke (D)

**Qualifications:** Beto O'Rourke is a fourth-generation Texan, born and raised in El Paso where he has served as a small business owner, a city council member and a member of Congress. He founded Powered by People, a Texas-based voting rights and service organization.

**Elections:** We can't have fair, safe, and secure elections if our laws are designed to make it harder for communities of color to vote. We must repeal SB1 and then pass online and same-day voter registration, establish nonpartisan redistricting commissions, require the convenient and fair allocation of voting sites, and expand eligible forms of voter ID.

**Power Grid:** To ensure power for all Texans we must weatherize all elements of the grid – including gas supply, connect to the national grid, provide backup generation at critical facilities like nursing homes, invest in targeted energy efficiency programs, starting with low-income Texans most in need of ratepayer assistance, and provide immediate relief and protection for ratepayers.

**Health Care:** We should trust Texas women to make their own reproductive health care decisions. If elected governor, Beto will immediately work to repeal SB8 and the dangerous system that places a bounties on the heads of anyone who supports a woman in deciding her own future.

**Immigration:** We need predictability, order, and the rule of law at our border. We need a governor willing to collaborate with, not work against, the federal government to enforce our immigration laws and update those laws when they don't meet the challenges of today.

**Autonomy of State and Local Government:** The divisions of authority between state and federal officials and state and local officials, are described in the federal and Texas constitutions (and subsequent statutes), respectively. An elected official's authority should be limited when the official acts in excess of their constitutional and statutory authority or otherwise violates the constitution or law.

**Campaign Website:** http://www.betofortexas .com



## » Rich Wakeland (D)

**Qualifications:** Licensed Engineer & Attorney & Business Owner; Policy Advisor to Commissioner Anderson, Public Utility Commission of Texas April 2013 - April 2018; Retired nuclear submarine Navy Reserve Captain w/ 4 Commands; Power generation and ERCOT expertise.

**Elections:** Trust but verify! Make registration simple, secure and verifiable. Increase the time period for early voting. Remove restrictions on Church organized voter turnout efforts and restrictions on Church organized voter transportation.

Enable Church based efforts to register their parishioners and deliver them to the polls.

**Power Grid:** Reliability can be achieved by a balance of thermal & renewable generation coupled with grid and generation testing. Since 2015 ERCOT has lost 3,000 MW of thermal generation while experiencing growth of over 17,000 MW of wind & solar. An 83%-17% thermal to renewable ratio provides reliability and allows Texas to satisfy the EPA's Clean Power Plan goals. Invest in Texas!

**Health Care:** U.S. Supreme Court Decisions establish the law of the land, whether or not one agrees with the decisions. Attempts by states to

© 2022 League of Women Voters of Texas | lwvtexas.org

OCA-APPX-1629

OCAGH_00005351

## » Rich Wakeland (D) (*continued*)

subvert or undermine those decisions are a direct attack on the U.S. Constitution. Women must have the right to control their own bodies. Texas women who seek abortions consistent with Supreme Court law should not be denied access by state laws.

**Immigration:** None, Both party's administrations have been inept at stopping illegal immigration; therefore do not follow the federal government's approach. Immigration is caused by economics. Texas must build an economic wall, not a physical wall. If we make them pay to be in Texas, we will reduce illegal immigration. Don't wait on the Feds, Texas can take its own economic action.

**Autonomy of State and Local Government:** Federal limiting of State Officials: Only if the health, safety, or welfare of the public is in danger by state official's actions. State limiting of Local Officials: Only if the health, safety, or welfare of the public is in danger by local official's actions. Authority for decisions should be held at the lowest level of government to keep citizens engaged and empowered.

**Campaign Website:** http://wakelandfortexas .com

## » Greg Abbott (R)

No Response Received



## » Paul Belew (R)

**Qualifications:** Although possessing no political experience, I am a criminal defense attorney and as such have a very strong personality and strong prescence. My ability to navigate through many jury trials have given me the proper tools and education to be elected.

**Elections:** We should all want secure yet accessible elections. I believe voter id and poll watching are viable non-restrive options. Also I am not opposed to expanding voter locations IF properly secured and against voter fraud. We all should strive to make voting accessible, yet those elections should be valid and elections with integrity. THOSE elections we can trust as valid.

**Power Grid:** Power grid needs to be managed by Texans. Texans know Texas and as such Texans should govern over the power grid. It is my understanding that the turbines in certain areas are still not insulated and ready for what happened last year. This is unacceptable. People in charge need to take charge and ensure that protocols are developed and followed; if not consequences result.

**Health Care:** As a criminal defense attorney, I am bound what is called "The Rule of Law." At this time, Roe v. Wade is the law of the land. Texas has tried indirectly to supplant that decision and it will be interesting to see what the result will be as not everyone agrees with Roe v. Wade. At this time though it is the seminole case on reproductive rights, but that may change soon.

**Immigration:** State government especially a border state such as Texas should have great authority in enforcing federal immigration laws, hoever, in reality we as a state do not. The Feds normally prosecute illegal aliens. Our hands are tied somewhat in that if we take a position contra to that of the Feds,

OCA-APPX-1630

OCAGH_00005352

## » Paul Belew (R)

the Feds threaten and do at times with hold certain state funding; unaccepatble.

**Autonomy of State and Local Government:** Federal government should only limit the authority of elected state officials in very limited and special circumstances as any intervention by the Federal government could lead to an intrusion on the 10th Amendment. As to state government limiting authority, I believe at times it is necessary when the actions and/or policies of local officials adversely affect Texas State.

**Campaign Website:** https://www.paulbelewin 2022.com



## » Danny Harrison (R)

**Qualifications:** Current Small Business owner and manager of a $6 million dollar per year business that is growing in size every single year. Former: Texas State Historical Commission; Former Luxury hotel manager. Former Rural Development Specialist

**Elections:** I would propose making our local national guard units conduct fair and secure elections for all counties.

**Power Grid:** That is a simple question for me. I think we need to improve old electrical grid infrastructure and make it compatible with cuirrent usage demands. Simply put, some of our older lines that went down had never been replaced and when we chose energy deregulation to get cheap electric, companies like Oncor and Texas New Mexico and others stopped investing.

**Health Care:** I strongly support the idea that Roe must be overturned in the courts and the abortion under any voluntary circumstance should be made illegal. Point blank it saves lives and public money.

**Immigration:** We need a human shield and our national guard should be used as a wall until we can get one built. Point blank—if the Federal government is not going to protect our border then Texans will and if we need to deputize and train Texans to serve and defend our border then I say that we do it.

**Autonomy of State and Local Government:** Everything boils down to local support and control. Who knows better than local leaders how to manage their local government? Simply put—nobody. That being said, I do believe that County Judges and Mayors should operate independently, as well. They each have their own jurisdiction and they each should be able to make their own judgement calls for their constituents.

**Campaign Website:** http://www.dannyharrison fortexas.com



## » Kandy Kaye Horn (R)

**Qualifications:** I am an educated and successful businesswoman, able to make decisions, delegate responsibilities and hold people accountable for their results. I have compassionate and empathetic concern for post Pandemic Texans experiencing hardship. I bring Hope.

**Elections:** As Texans are allowed to vote by mail, every vote must be validated as true and correct to ensure accurate results. It should be electronically possible to verify the identity of voters. Election laws cannot be passed that would prevent Texans


OCA-APPX-1631

OCAGH_00005353

## » Kandy Kaye Horn (R) (*continued*)

the right to cast a vote in an election, regardless of mailing in a ballot or voting in person at precinct.
**Power Grid:** In order to alleviate power surges on the power grid, additional forms of power must be used to assure that the grid can service our growing population, including more wind turbines and Nuclear power plants. Nuclear energy has proved to be safe and efficient in other states. Infrastructure upgrades to the current power grid should be made for power surges due to weather.
**Health Care:** I believe there are alternatives to abortion, including many organizations that can assist a woman through gestation and delivery of a child. Adoption is an option. Due to personal religious beliefs, I cannot support the act of abortions. I believe life begins at conception.

**Immigration:** The federal government has neither the manpower or the ability to stop illegal immigrants from crossing our vast border without cooperation of state law enforcement personnel. People who pass through our border without proper documentation are breaking the laws of immigration and shortcutting the path to citizenship. Illegal immigration is an intentional crime.
**Autonomy of State and Local Government:** When federal laws are broken by states, federal government has a right to intervene and protect citizens.. The same authority is given to state government to protect the citizens of any municipalities. The system of checks and balances is the cornerstone of democracy and prevents individuals from taking the authority of heir office to detrimentally harm Americans.

## » Don Huffines (R)

No Response Received



## » Rick Perry (R)

**Qualifications:** Originally the founding fathers set up our form of Government for citizen legislators to serve. We need more citizens to step up and less "experienced" politicians. I am qualified for that reason. I believe in the Constitution and will fight for it.
**Elections:** It is extremely easy to vote in Texas. Texans need to have confidence their lawful votes will be counted and be assured that people who commit fraud are punished. Many jurisdictions now cannot be audited because there is no paper trail. We need auditable elections and harsher penalties for vote harvesting and voter fraud.

**Power Grid:** The deregulation scheme we have in Texas did not work last February. Yes deregulation can drive prices down, but as we saw in the power outage last year it also can be exploited by the politically-connected for profit. We need to ensure our grid is independent, secure, and reliable, and that it serves the needs of the people, not the politically-connected.
**Health Care:** Killing babies in the womb is not healthcare. Dressing it up as women's healthcare does not change that fact. Abortion clinics don't provide healthcare — they kill babies. Fifty-nine percent of abortions were people in their twenties. Seventy-four percent are black. Abortion is a genocide of a race of people.


OCA-APPX-1632

OCAGH_00005354

## » Rick Perry (R) (*continued*)

**Immigration:** The Federal Government was created by the States. Texas is a sovereign State that is being invaded by hoards of immigrants that have no desire to make America any better than where they've come from. Texas has a duty to her citizens to secure the border and resist the Federal officials who are trying to undermine that duty.

**Autonomy of State and Local Government:** This issue is also about sovereignty. The Federal Government has no authority to limit anything in our State without our consent. The States created the Federal Government to serve them not the other way around.There is a reason why the Constitution limits what the Federal Government can do. Local officials should be limited when they act against the will of the people.

**Campaign Website:** http://PerryForTexas.com



## » Chad Prather (R)

**Qualifications:** 20 year resident of Texas 49 years old Current: Television host, Blaze TV and Blaze Media Former: Executive with Granger Industrial (Fortune 300 company) Senior church pastor in Georgia and Alabama

**Elections:** We must ensure legal, valid voter rolls. Texas must focus on in-person voting with absentee ballots utilized when legally necessary. We must not allow the practice of mail in voting or ballot box drops. Polling places must be easily accessible and a valid ID should be required. Ballots are to be counted manually and forensic audits should be utilized.

**Power Grid:** Our coal plants need to be turned on and not dormant. In our last weather crisis coal could have been utilized effectively and saved lives. Our grid must be maintained and managed properly by directors within the state of Texas. Green energy must no longer be subsidized by taxpayer dollars when they fail. More nuclear should be added when it makes sense financially.

**Health Care:** I believe that life begins at fertilization and is created in the image of God. Abortion should be illegal in Texas. In the case of a mother's health being placed at risk by pregnancy then there must be physician guided assistance. However that is a statistical anomaly that is extremely rare and should be handled on a case by case basis.

**Immigration:** State government must establish state sovereignty which includes protecting state borders from illegal crossings. Article 4 Section 7 of the Texas Constitution states that the governor is the commander in chief of the state with direct authority to enforce such immigration.

**Autonomy of State and Local Government:** In the case of constitutional violations or illegal actions or proceedings.

**Campaign Website:** http://Prather2022.com

## » Allen B. West (R)

No Response Received


OCA-APPX-1633

OCAGH_00005355

# LIEUTENANT GOVERNOR

Four-year term. The lieutenant governor is powerful because of their position as president of the Texas Senate, where they appoint the chairs and vice-chairs of committees; appoint senators to committees; assign bills to committees; and control the Senate's agenda. The lieutenant governor is also a member of several commissions and boards, and serves as governor in the governor's absence. The salary is that of a State Senator when serving as President of the Texas Senate and that of the Governor when serving in that capacity.

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and characteristics qualify you for this position?

**Power Grid:** What further changes, if any, are needed to ensure that Texas has sufficient power in times of extreme weather conditions?

**Autonomy of State and Local Government:** Under what circumstances should the federal government limit the authority of elected state officials? Under what circumstances should the state government limit the authority of elected local officials?

**Health Care:** What is your position on reproductive rights and how would you address the economic and health consequences for those who seek and cannot obtain abortions in Texas?

**Public Safety:** What are some solutions to enhance public safety in Texas? How do we balance these solutions with protecting civil rights?

---



### » Michelle Beckley (D)

**Qualifications:** I was elected to the Texas Legislature in 2018 and became the first Democrat to ever represent District 65 in Denton County. I said I would fight for healthcare, education, & the environment and did. This led to an improved margin win in 2020.

**Power Grid:** The 87th legislature did not do enough. Texas needs to reverse the course of deregulation and consider the option of connecting back to the national grid. El Paso & Texarkana did not lose power like the rest of the state, both are connected to the national grid.

**Autonomy of State and Local Government:** Texas has been controlled by the GOP for over 25 years. State officials are running amuck due to checks & balances that no longer exist. The federal government needs to address the Voting Rights Bills. We saw our freedom to vote diluted as well as extreme gerrymandering in 2021. The state government should not interfere with local health regulations.

**Health Care:** The attacks on women's healthcare should not continue. I voted against HB8. There should not be $10,000 bounties on women & health professionals. A womans's choice on abortion is between her and her doctor.

**Public Safety:** I had a city come to me with the issue of a police officer that had been fired with cause now working at a neighboring city. Municipalities should be able to know this information upon hiring or the problems can't be addressed and will continue. Texas needs to look into solutions to address these issues and solve them.

**Campaign Website:** http://www.michellebeckley.com



OCA-APPX-1634

OCAGH_00005356



**» Carla Brailey (D)**

**Qualifications:** I have served Texas as an educator, advocate, and Texas Democratic Party Vice-chair as a champion of people and working families. Equity in education, economics, opportunity, and justice is the best way to move Texas forward for all people.

**Power Grid:** We must fully weatherize our grid to prepare for extreme weather conditions. We need to fully accept the recommendations of the Federal Energy Regulatory Commission and prepare all of Texas for climate change. We must build better oversight, accountability, and transparency to insure Texans from another failure.

**Autonomy of State and Local Government:** It is the responsibility of each government entity to work together for the benefit of the people that they serve. We live and serve in a representative democracy and to limit the authority of a government to do what is best for the people is taking away their representation.

**Health Care:** I am in full support of a woman's right to make choices for her reproductive health. We must provide education and access to every woman in Texas to make the best choice for her and her family. We also must support women by advocating for safe abortions across this state and making way for that to happen even under this archaic law.

**Public Safety:** Every community should feel safe in their own home and neighborhood and experience their civil rights and liberties. We must start with continuous training for our officers with emphasis on inclusion and diversity, including (1) recruiting, hiring, and promoting women in leadership and (2) increasing community-centered policing, particularly in communities of color.

**Campaign Website:** http://carlafortexas.com

---



**» Mike Collier (D)**

**Qualifications:** Mike spent his career as a CPA and an auditor at PriceWaterhouseCoopers before becoming a CFO of a Texas energy company, helping create good-paying jobs. His experience as an accountant gives him a deep understanding of how our state's budget works.

**Power Grid:** For years, our state leaders were warned about the grid's vulnerability and did nothing. As a result, Texans froze, Texans died, and corporations got rich. We must winterize our gas supply, invest in smart grid technology, and increase power storage. We must also ensure that Texas families do not pay more when companies pay less for an unreliable grid.

**Autonomy of State and Local Government:** If the behavior of any official is inconsistent with our constitutional rights, then it is the responsibility of the federal government, particularly the courts, to step in. That said, local control is key to accountability, and it's at the heart of a healthy democracy. So, as Lt. Governor, I will work closely with duly elected local partners—not against them.

**Health Care:** Mike will defend our constitutional rights so that women will be masters of their own health and their own destinies. The Principles laid down by Roe v Wade and have guided us for nearly the last fifty years are reasonable and are supported by the vast majority of Americans.

**Public Safety:** Mike will work to reverse laws that allow criminals to access firearms and put our



OCA-APPX-1635

OCAGH_00005357

## » Mike Collier (D) (*continued*)

communities and law enforcement officers at risk. Further, we all want law enforcement that we know, trust, and are accountable to our local communities. We must also invest more in mental health training and restorative justice to create safer, more prosperous communities across Texas.

**Campaign Website:** http://CollierforTexas.com

## » Trayce Bradford (R)

No Response Received



## » Todd M. Bullis (R)

**Qualifications:** I am and have been a Local Precinct Chair in Denton Texas for the last two sessions and have been a delegate during that time as well. I have worked and supported abolition across this nation.

**Power Grid:** We need to oppose the federal Gov, rules and regulations. Nullification would work just fine.

**Autonomy of State and Local Government:** I believe Texas needs to oppose the federal Gov and leave the USA. It is time for Nullification to start with while we work on Secession.

**Health Care:** I am an Abolitionist, Abortion must become a crime. If Abortion becomes a crime 99% of it will go away. The Government is not the parent and people need to be responsible for themselves. Family and churches should step up and help. I believe in equal protection under the law and abortion is murder.

**Public Safety:** I believe we harshen many of the criminal penalties. Abortion, rape, murder, molesting, and attempted murder should be death penalty crimes. No more housing and parole for death penalty crimes. We need to allow everyone that is not in jail to carry a gun.

**Campaign Website:** http://electtoddbullis.com

## » Daniel Miller (R)

No Response Received

## » Dan Patrick (R)

No Response Received



OCA-APPX-1636

OCAGH_00005358



**» Aaron Sorrells (R)**

**Qualifications:** Successful small business owner with 26 employees and growing. Managed people most my life with corporations and now as an owner. I understand how to manage people, money, andl budgets.

**Power Grid:** Winterizing the grid is borderline impossible and ultimately won't work because when the roads are frozen, nothing can move on the road. We need to move away from green energy and start utilizing the resources of Texas like Natural gas plants, Clean Nuclear, and coal. No one is going to make those plants though when they are only utilized in an emergency. Too expensive.

**Autonomy of State and Local Government:** The federal government only has authority delegated to them by the Constitution. Anything outside of that belongs to the State. It's that simple. We no longer follow those rules and that's why we are in this position today.

**Health Care:** There is no such thing as a reproductive rights. I don't care how the left wants to word it. This is another way to get around the concept of Abortion. Abortion should be abolished. I do not believe we should criminalize the women who still manage to get abortions illegally and instead prosecute the doctors that disobey the law.

**Public Safety:** There are no solutions to enhance public safety. Safety is an illusion. Our government was not meant to keep us safe and protected. It was meant to keep us free. The government needs to stop interfering in our lives and we will have less civil rights problems because most people just want to go to work, live their lives, and be left alone.

**Campaign Website:** http://s4tx.com



**» Zach Vance (R)**

**Qualifications:** I am truly a good person who loves Texans and wants to make their lives better and easier. I'm a Marine who will always do the right thing, especially when no one else is looking! And most importantly I believe in bipartisanship and working together.

**Power Grid:** I believe we can have both affordability AND reliability. Energy companies and gas providers make enough money to ensure that they are prepared and protected from extreme weather WITHOUT additional costs to the consumer. If elected I will charge the "Temporarily Winter Storm Surcharge" on your utility bill to gas providers that posted profits of 20 percent or higher.

**Autonomy of State and Local Government:** The balance between Federal, State, and Local control is a tight line to walk. The line breaks though when ANY of the elected officials stop doing what is in the best interest of the whole and only do things to appease their base. I believe most authority should remain under local control, but it depends on the issue. I believe city and county leaders know what is best.

**Health Care:** I believe in freedom and limited government and that means that lawmakers don't have the right to tell a woman she cannot choose when to become a mother. Instead of focusing on ending abortion, the state needs to focus on giving foster children better lives and make it easier for loving families to adopt a child. Abortions should be easily accessible and affordable.

**Public Safety:** We need to severely punish violent criminals, thieves, sex criminals, and people who use a firearm to commit offenses. Helping women get out, and stay out, of abusive relationships will be a top priority of mine. As well as severely punishing the offender/abuser while doing a better job of protecting the victims. Texans safety is of the utmost importance to me!

**Campaign Website:** http://www.4abettertexas.com

© 2022 League of Women Voters of Texas | lwvtexas.org



OCA-APPX-1637

OCAGH_00005359

# ATTORNEY GENERAL

Four-year term. The attorney general is the chief law enforcement officer of the state; represents the state and state officials in legal matters; issues opinions; oversees collection of child support; administers the crime victims compensation fund; enforces the open records/open meetings acts; approves public bond issues; and enforces consumer regulations. Current salary: $153,750

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and characteristics qualify you for this position?

**Elections:** What is the Attorney General's role in protecting Texans' freedom to vote while maintaining safe and secure elections?

**Health Care:** What is your position on reproductive rights and how would you address the economic and health consequences for those who seek and cannot obtain abortions in Texas?

**Immigration:** What is the role of the state government in enforcing federal immigration laws?

**Priorities:** As Attorney General, what would be your highest priorities for the next four years, and how do you intend to accomplish them?



### » Mike Fields (D)

**Qualifications:** I am a former Harris County Assistant District Attorney, former Assistant Texas Attorney General and Retired Judge of twenty years. I have a Criminal Justice degree from Texas State University and a Law Degree from St. Mary's Law School.

**Elections:** The Attorney General should ensure that all laws passed concerning voting rights and redistricting pass Constitutional muster. If they don't, the AG should work to see that they do.

**Health Care:** I firmly believe all persons, even those who choose to make the difficult decision of terminating a pregnancy, are "pro-life." Suggesting otherwise is unfair and offensive. Women should have free access to reproductive care and a Constitutionally protected right to make their own reproductive decisions. The AG should fight to make that right a reality.

**Immigration:** Federal laws should be left to the federal government. The full faith and credit of the United States depends heavily on the consist application of our federal laws. When individual States interfere in the consistent application of our laws, the entire Nation suffers.

**Priorities:** Texas is seeing unprecedented population and economic growth due, in large part, to our business friendly laws. My highest priority would be to ensure that laws regarding voting, equal rights, reproductive rights and civil rights for all, including the LGBT community, continue to encourage that growth.

**Campaign Website:** http://www.mikefieldsforag.com



### » Rochelle Mercedes Garza (D)

**Qualifications:** I have experience in immigration, family, criminal, and constitutional law. My work has resulted in the "Garza Notice," a requirement that teens in immigration detention have a right to access abortion, reinforcing a constitutional right nationwide.

**Elections:** As AG, I will dismantle the wasteful


OCA-APPX-1638

OCAGH_00005360

### » Rochelle Mercedes Garza (D) (*continued*)

"election integrity unit" — which is really about enforcing the GOP's voter suppression measures, instead of protecting voting rights — and replace it with a voter protection unit under a fully funded civil rights department. I will ensure voting rights are protected, not undermined, especially for voters of color.

**Health Care:** Abortion care is health care, and health care is a human right. Reproductive choice is a moral imperative and an issue of racial, economic, and gender justice. I'm committed to restoring abortion access in TX and defending the rights of women and pregnant people anywhere they're threatened. I've defended reproductive rights before and will do so as TX AG.

**Immigration:** Immigration enforcement falls under federal jurisdiction. As an immigration attorney & border native, I understand the complexities of our immigration system. I have litigated against bad policies, like Remain in Mexico, that have created a humanitarian crisis at the border. Texas' enforcement efforts at the border are unconstitutional, wasteful and only worsen the issue.

**Priorities:** As AG, I will fight for our Texas families. This means protecting constitutional rights, including voting & abortion rights; consumer protection, so our energy grid doesn't fail; and prioritizing public health, so municipalities & schools can protect people in the middle of a pandemic and our rural communities have the infrastructure they need, like clean drinking water.

**Campaign Website:** http://RochelleGarzafor Texas.com

---



### » Joe Jaworski (D)

**Qualifications:** Licensed TX attorney; 30 years' experience in trial/appellate litigation in TX state and federal courts. TX mediator; 8 years local govt. experience: councilmember, mayor pro tem and mayor of Galveston,TX. Mentored by my grandfather Leon Jaworski.

**Elections:** I will form a voter access unit from the ashes of the AG's fake voter fraud division because TX voters should turn to the AG's office when their voting rights are suppressed. District and County attorneys may initiate fraud prosecution to keep our elections safe, but access is the key. I will ensure principals are registering high school seniors. Elec. Code 13.046(d)

**Health Care:** I support the Rule of Law set forth in Roe v. Wade and Planned Parenthood vs. Casey. Abortion should remain legal and available before fetal viability outside the mother's womb. Government should get out of the way of family planning education and broad reproductive healthcare access. As Texas AG, I would advocate for these positions in court.

**Immigration:** State government should partner with the federal government to enforce federal immigration laws. For example, as Texas AG I would dedicate part of my $1.1 Billion budget to hire eight SAUSAs (Special Asst. U.S. Attorneys) to work under the direction of the United States Attorneys for the Southern and Western Districts of Texas to prosecute cartel immigration crimes.

**Priorities:** On day one of my administration, I will dismiss any lingering lawsuits brought by the Texas AG against the ACA before lunch. I will testify in the 2023 Legislature for cannabis legalization (for jobs, to help our veterans, and to give our police a break so they can fight real crime). I will ensure principals register every 18 year old pursuant to Tex. Elec. Code 13.046(d).

**Campaign Website:** http://www.JaworskiFor Texas.com

OCA-APPX-1639

OCAGH_00005361



**» Lee Merritt (D)**

**Qualifications:** I have spent my legal career doing the work of the "people's lawyer" and running one of the leading constitutional firms in the country. My work has been recognized by Our Revolution, NAACP, ACLU, Innocence Project, National Bar Association, and SPLC

**Elections:** I am committed to engaging more voters, fighting gerrymandering, providing felons with the right to vote, making election day a federal holiday, providing drive through voting, and opposing voter ID legislation. I would also challenge voter suppression laws using, inter alias, the Americans with Disabilities Act.

**Health Care:** I will litigate on behalf of organizations that provide safe abortions, end over-policing of women who choose to have abortions, and work to expand accessible healthcare. I will work with law makers to codify the protections offered in Roe v. Wade and side with Texas women against extremist conservative legislation.

**Immigration:** It is a responsibility of the state government to take actions such as conducting immediate investigations on unfair conditions in detention facilities, fighting against private immigration centers, allowing access of overseers in immigration facilities, and providing more resources such as additional judges, attorneys, translators, and social workers at our borders.

**Priorities:** My highest priorities are to improve voter protection, ensure women's reproductive rights, and to protect our public schools. I will focus on engaging new voters through community outreach and work towards public financing of elections. I will cooperate with state and federal legislators to codify Roe vs. Wade. I plan to fight for policies like the College Act.

**Campaign Website:** http://www.leemerritt4texas .com/

---



**» S. "TBone" Raynor (D)**

**Qualifications:** Fresh out of SMU Law School, I became General Counsel at a nationwide financial group involved in hundreds of lawsuits. I jawboned many Sec. of State. Managed two Pro Bono Legal Clinics. General Practice. I believe in balancing Science and Economics.

**Elections:** The A.G. needs to promote access and justice allowing each citizen to vote and for each vote to count equally. Five years ago, I donated $10,000 to The Carter Center for election monitoring. A.G.'s role is not to subvert democracy wasting millions. A role of the A.G. should be to help unvaccinated disabled citizens get current ID's through home visits so they can vote.

**Health Care:** U.S. Judge Jack scolds Texas for abandoning abused foster children-all 250 Texas facilities failed; Texas declined billions in Federal tax dollars for basic health care for millions of Texans who then clog our ER's when worried parents could have taken their kids to an Internist. I have protected children in CPS, assisted adopting parents. I support Planned Parenthood.

**Immigration:** United Methodist ministers got me to start a pro bono immigration clinic, Justice For Our Neighbors, staffed with SMU law students from all over the world. We ethically helped some folks but turned away others. My firm has assisted school Superintendents for years. The immigration system is broken and the border a mess. I would follow Federal laws tempered with mercy.

**Priorities:** Choosing what laws to enforce using



OCA-APPX-1640

OCAGH_00005362

## » S. "TBone" Raynor (D) (*continued*)

Micah 6:8, not through political corruption requiring loyalty oaths of Collin County Judges. Using the Courts/media to fairly reduce: jail populations by mental health treatment; foster care sanctions using churches who have successful people who know how to help; our property taxes. Jail people committing fraud; collect child support.



## » George P. Bush (R)

**Qualifications:** *Candidate's response did not meet the criteria as listed in this Voters Guide.*

**Elections:** The AG must ensure that our elections system is fair, just, and secure. As Attorney General, I will rebuild trust with our District Attorneys, lead the charge in prosecuting cases on election fraud and expand our state's election integrity unit.

**Health Care:** To me, nothing is more important than protecting life in Texas. As a lifelong catholic, where I stand on the issue is very clear. Life is not negotiable. Our children deserve an Attorney General who isn't going to just file lawsuits in the name of life, but one who can file suits and find innovative ways to win on behalf of the right to life.

**Immigration:** Our Attorney General is the first line of defense against the federal government. As Attorney General, I will: 1) Work with the Governor to deploy more National Guard troops to the Texas/Mexico border; 2) Toughen criminal penalties on drug smugglers and human traffickers; 3) Finish President Trump's wall and continue building the Texas wall.

**Priorities:** My top priorities will be restoring integrity back to the Office of Attorney General, protecting our borders and elections, standing up to the federal government to protect Texans' constitutional liberties, and defending and standing with law enforcement. Texans can rest assured that I won't just file suit against the Federal Government, but I'll also win the cases filed.

**Campaign Website:** http://georgepbush.com

## » Louie Gohmert (R)

No Response Received

## » Eva Guzman (R)

No Response Received

## » Ken Paxton (R)

No Response Received

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1641

OCAGH_00005363

# COMPTROLLER OF PUBLIC ACCOUNTS

Four-year term. The comptroller is the chief financial officer of the state; collects state taxes and fees; pays the state's bills; provides revenue estimates to the legislature; certifies the budget; reports the condition of the state's finances; and provides economic development assistance to local governments and private businesses. Current salary: $153,750

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and characteristics qualify you for this position?

**Rainy Day Fund:** What is the optimal amount to be held in the Rainy Day Fund and what is the criteria for usage? What is your opinion on using the fund to pay down the state's debt vs. using it to help citizens that have been harmed by catastrophes?

**Taxes:** In your opinion, what is the proper balance of tax revenues sources to fairly fund state government, including public schools?

**Financial Obligations:** What needs to be done, if anything, to ensure that Texas can meet its long-term financial obligations such as infrastructure maintenance, state employee pensions and health care coverage for public school teachers and employees?

**Priorities:** As Comptroller, what would be your highest priorities for the next four years, and how do you intend to accomplish them?



### » Janet T. Dudding (D)

**Qualifications:** I'm a certified public accountant (CPA) who's spent my adult life in governmental accounting, auditing, administration and even investigations.

**Rainy Day Fund:** Government Finance Officers Association recommends a minimum of 2 months of regular revenue or regular expenditures be maintained in a rainy day fund. Typically, rainy day monies mitigate the risk of unstable revenues or unexpected expenditures. Natural disasters fall into the second category. The state of Texas' general obligation debt currently is rated Aaa/AAA/AAA/AAA.

**Taxes:** The Texas Legislature added $6.5 billion dollars in funding to public schools in 2019. Yet per a 2021 SPLC report, Texas currently ranks 40th in the nation. New revenue streams are needed. Legalizing adult-use cannabis could bring $1 billion in tax revenue (and decriminalization could save $300 million). Look at "green" taxes to build revenue streams from green energy.

**Financial Obligations:** Regarding infrastructure, Texas should accept the $35 billion of federal Infrastructure and Jobs Act dollars. With fuel efficient vehicles, it would be interested to look at creating a revenue stream from alternative fuels to maintain roads. Public school employees in all but ~12 school districts do not participate in social security and they should. Find the money.

**Priorities:** Comptroller has the bully pulpit on how our money is spent. Expanding comp mental health & healthcare to 1.4 million adult Texans saves $100 million in state tax and our property taxes. Work with local governments re broadband as a local utility, keeping the costs down and creating an income stream. Work with state agencies, reduce methane emissions on state property.

**Campaign Website:** http://janetdudding4texas.com

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1642

OCAGH_00005364



**» Tim Mahoney (D)**

**Qualifications:** Trained as a journalist in the 1970's (Texas Observer and DMN), went to the LBJ School of Public Affairs (UT-Austin) in the 1980's, then to Law School. I have been a practicing attorney since 1992.

**Rainy Day Fund:** The Rainy Day fund was set up as a tool to smooth out a revenue source: oil and gas related tax collections. The Fund is not designed to correct chronic underfunding of state services. If there is a need for funding then the Legislature should find a way to provide additional funding. As Texas Comptroller, I will not play games with the important duty the position requires

**Taxes:** The proper balance between tax revenues and the proper funding of state government has been a wrecking ball. Texas officials have played a game of hide and seek regarding tax revenues and the adequate funding of state government for decades, especially including public schools. We need to break out of the secret codes and share information with our fellow Texans.

**Financial Obligations:** Long-term financial obligations are not filtered through the legislative process, partly because the Legislature does not care, and the Comptroller has been complicit with that intentionality. Building more powerful regional information structures can thwart the inaction of the Legislature. Building long term policy changes requires a sustained regional interest.

**Priorities:** The Texas Comptroller is the largest public data center in Texas, and we should begin to produce information in a transparent form that enhances every region in Texas. If we understand that there is more power in collaboration than in division, we can begin to build a Texas government that belongs to all Texans. Our Redistricting process should result in compact districts.

**Campaign Website:** http://www.TimMahoney Campaign.org

---



**» Angel Luis Vega (D)**

**Qualifications:** I am a purpose-driven professional offering over 20 years in business strategy, finance, operations, managing multimillion-dollar budgets, and large groups of people. Bachelor of Business Administration & Master in Management & Leadership.

**Rainy Day Fund:** We should increase the fund to 25 billion & allocate 1.75 to 2 billion annually. The primary purpose of these funds should be for natural disasters and recession to support our communities, support people keeping their homes, adequately fund our schools, support any healthcare crisis, provide food assistance and guarantee public safety.

**Taxes:** Suppose we focus on boosting Texans entrepreneurship, attracting new business opportunities, eliminating the corporate tax loopholes, and reducing the unemployment rate to under 3%. In that case, the proper balance of tax revenue could be at 145 billion. For the spending budget, 140 billion annually, including public school funding and health care.

**Financial Obligations:** We need to have a transparent tax administration. Be effective in forecasting, identifying the fundamental long-term obligations, putting our community first without eliminating essential funds for our public school

© 2022 League of Women Voters of Texas | lwvtexas.org



OCA-APPX-1643

OCAGH_00005365

## » Angel Luis Vega (D) (*continued*)

teachers, employees, retirees, and community programs. Invest strategically, attract more business ventures to the state and legalize recreational marijuana.

**Priorities:** I would focus on transparency, accountability, efficiency, optimizing the office's capabilities, boosting entrepreneurship, attracting new business opportunities, thriving jobs, and reducing unemployment under 3%. Guarantee retirement security & protect pensions. I will make decisions in the interest of all the people of Texas, not the special interest groups.

**Campaign Website:** http://www.angelvega.com



## » Mark V. Goloby (R)

**Qualifications:** I have a BBA in Accounting from Texas A&M and began my career with Dresser Industries in Internal Audit and then worked as Texas Region Controller for GTE Mobilnet. Before starting Total Cellular Technologies later shortened to TC Technologies.

**Rainy Day Fund:** The Comptroller should seriously investigate a reduction in the state sales tax rate. Texas is blessed with a significant surplus. That equates to taxpayers of Texas paying too much in taxes. A sales tax is the most regressive tax there is and a 1/2% reduction would be a relief across all socioeconomic levels. A healthy reserve for Texas is good, an exorbitant one is not.

**Taxes:** Current property taxes are out of control. But that is the fault of a fundamentally flawed appraisal district process and local taxing authorities that refuse to lower tax rates to at least offset some of the increase in the tax base. It is unconscionable that Texans are getting taxed out of their homes while Chapter 313 is giving 37.5% discounts in ISD taxes.

**Financial Obligations:** These are critical obligations Texas has entered into and must be adhered. Even the completely egregious Chapter 313 agreements must be honored even though they will continue to cost Texas Taxpayers a $1billion+ per year until 2037. The Comptroller is derelict in his fiduciary responsibility by not reviewing whether the companies getting these subsidies are honoring their

**Priorities:** The comptroller should be a watch dog on how the financial resources entrusted by the taxpayers to Texas as spent judicially. The legislature sets the spending plans, the Comptroller is in oversight to let the legislature know if the state is getting the best utilization of the taxpayer's dollars. Taxpayers know government needs funding, but not corporate bottom lines.

**Campaign Website:** http://www.good governance.today



OCA-APPX-1644

OCAGH_00005366



## » Glenn Hegar (R)

**Qualifications:** I have served as Texas Comptroller since January 2015. I began as a member of the Texas House in 2003 and continued my service as a member of the Texas Senate until my election as Comptroller. Working our family farm taught me hard work and integrity

**Rainy Day Fund:** Texas is blessed to have a strong Rainy Day Fund, which is designed and should be used to smooth out the state's revenues during an economic downturn, to assist in a disaster, and for one-time expenses that are strategic for Texas' economic health and well-being. I fought to manage these dollars more effectively to guard against inflation and protect them for generations.

**Taxes:** Funding public schools in Texas has been a shared burden split between state funds and local property taxes. Until recently the local share was allowed to grow unchecked creating increased pressure on local property taxes. I helped compress local property tax rates and rebalance the burden between state funds and local taxpayers. But now more must be done to lower taxes.

**Financial Obligations:** Since practically my first day in office I have sought to shine a light on the state's balance sheet and the need to address our long-term obligations. I fought to address threats to our state's fiscal health and ensure Texas teachers can access quality healthcare. I helped lawmakers pass historic pension reform to put our state on firm footing and avoid credit downgrades.

**Priorities:** I will continue to focus on the core constitutional duties of my office and that means maintaining my attention on the Texas economy. Navigating the last 2 years has been incredibly challenging, but I have always remained focused on the trends, challenges and opportunities in our state economy. We must fight to keep Texas a place where freedom creates new opportunities.

**Campaign Website:** http://glennhegar.com



OCA-APPX-1645

OCAGH_00005367

# COMMISSIONER OF GENERAL LAND OFFICE

Four-year term. As head of the General Land Office, the commissioner manages state lands, including oil and gas properties (which supply funds to the Permanent School Fund) and the Alamo. The commissioner chairs the Veterans Land Board, which administers programs for Texas veterans, and is responsible for environmental protection of Texas' coast. Other state boards chaired include the School Land Board and the Coastal Coordination Advisory Committee. Current salary $140,938

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and characteristics qualify you for this position?

**Allocation of Federal Funds:** When federal funds for natural disaster relief and mitigation are allocated, how would you ensure that communities with the highest needs are prioritized?

**The Alamo:** As the head of the agency that manages the Alamo, what story do you believe it should tell?

**Coastal Planning:** What measures would you implement to restore and protect the coast, wetlands, and the built environment to minimize damage from major storms?

**Priorities:** As Land Commissioner, what would be your highest priorities for the next four years, and how do you intend to accomplish them?



### » Jay Kleberg (D)

**Qualifications:** I grew up working on the King Ranch and have spent my whole career in conservation. I served as the Associate Director of the Texas Parks and Wildlife Foundation, and now I own a land-based conservation business and work in environmental education.

**Allocation of Federal Funds:** I would use the GLO's discretion to administer federal funds to ensure that dense, urban areas are not penalized and that damage claims for lower income homeowners and renters are not ignored. I would also send teams into damaged communities to ensure the timely disbursement of FEMA funds and application for longer-term allocation of funds.

**The Alamo:** The Alamo is a symbol of Texan and Tejano pride and we should honor their contributions to the state. We should also consider the role of early Black Texans and slavery in Texas' history, as well as indigenous groups who inhabited the site for centuries. As for the battle, the GLO should tell the comprehensive story and honor the facts of those historic events.

**Coastal Planning:** The GLO will incorporate climate change modeling into the Coastal Management Plan, which will increase the standard for all federal and state investment on the coast. These higher standards would be applied to the Coastal Resiliency Master Plan and the $30 billion Coastal Spine. These standards would also maximize investments with GOMESA, NRDA, CEPRA and HUD-CDBG funds.

**Priorities:** My top priorities for the next four years are to adequately fund our Texas schools through the General Land Office's contribution to the Permanent School Fund, address the effects of climate change and diversify our state's energy portfolio to strengthen our grid, and to prepare for future natural disasters by fortifying our coast and other vulnerable areas of our state.

**Campaign Website:** http://jay4tx.com

© 2022 League of Women Voters of Texas | lwvtexas.org



OCA-APPX-1646

OCAGH_00005368



## » Michael Lange (D)

**Qualifications:** See website. 40 years of small and large business, senior experience. GLO Budget is $3.4 Billion. 800 Staff. Managed large, diversified groups with intensive risk, investment and leadership skills. City Knowledge/Rural Wisdom. Skillset to serve.

**Allocation of Federal Funds:** Federal Funds Allocation should be prioritized by where people are suffering the most from the disaster. It is never a political decision. It is a human needs decision. Disaster Priorities are based on human needs. When people get hurt by disasters, they need immediate help to rebuild and more. The people who need it the most get it first. Prioritize according to need

**The Alamo:** The Alamo is the Shrine of Texas Liberty and an essential part of the Spirit of Texas. The Alamo Defenders gave up their tomorrows so we could have Better Lives today. Most of the Alamo Defenders were Immigrants, like my family. People forget that.The Alamo is the symbol of Texas, the world knows. To be preserved for future generations.

**Coastal Planning:** Our Coast is at constant risk. Each disaster can alter the shape of the land, sometimes dramatically. We need to reinforce/enhance the natural barriers that balance nature and the environment. The eco-system is critical and must be maintained. We need to prevent construction that reduces the effectiveness of these natural barriers and erodes the coast. Be prepared always!

**Priorities:** 1. The Safety of the People of Texas. 2. All People Treated with Equal Respect 3. Be a Man for Others. 4. Work constantly to Better the Lives of All Texans. Ensure Texas Veterans and Gold Star Families have the best state benefits in the nation, my plan TEXAS HAS YOUR SIX. Improve Reading levels in K-12. Currently 45th in the Nation. Unacceptable. Small Business Champion.

**Campaign Website:** http://LANGEFORLAND.com



## » Sandragrace Martinez (D)

**Qualifications:** My expertise in trauma informed care, crisis management, my in-depth understanding of the legislative process, and the desire for educating my community, is a passion that has equipped me with the necessary skills to perform these duties.

**Allocation of Federal Funds:** Establish meaningful partnerships with all local governments and develop comprehensive insights on potential strains in our communities, is how we can pro-actively begin to manage and prioritize effectively. Mitigating and allocating relief from a natural disaster will depend on the areas hit, the socioeconomics in that region, and their resources.

**The Alamo:** When I visit other cities or a different country, and I tour their historical structures and monuments, my initial questions are always, 'how did it get here, who built it, and why?" In essence, the story of the Alamo can only begin at that point due to chronological logic, so by default the story will have to involve explanations on how that evolved.

**Coastal Planning:** Our Texas Ports alone, have an impact of nearly 1.8 million jobs and generate somewhere around $102 billion in personal income, so the protection of our coastline is imperative for supporting the financial well-being of citizens, and

OCA-APPX-1647

OCAGH_00005369

## » Sandragrace Martinez (D) (*continued*)

projects along the Coastline must provide the required maintenance, development, and improvements to sustain those areas.

**Priorities:** Disaster readiness and prevention with fine tuning the logistics involved are paramount. Honoring our Veterans with the same level of devotion and allegiance that they made to this country, and applying that same devotion to their benefits and healthcare. I want to create more programs and initiatives to help provide funding for public education.

**Campaign Website:** http://www .sandragrace4texans.com/



## » Jinny Suh (D)

**Qualifications:** Strong science background (B.S., M.S. biology), former teacher, licensed attorney, small business owner, years as community organizer and advocate at Texas legislature, working mom of 2 young children, proven record of fighting for what's right.

**Allocation of Federal Funds:** State agencies should not play politics with the lives and livelihoods of Texans. Distribution of disaster relief funds should be managed with everyday Texans who need it the most treated as the priority. No Texan should be waiting for years with a tarp roof due to unfair biases, mismanagement, and inefficiency.

**The Alamo:** History should not be politicized or used by state leaders to score political points. The story the Alamo tells must be a full and honest history based on facts, evidence, and the standard academic understanding. That story includes the perspectives, contributions, and experiences of all individuals involved—Anglo, Tejano, Mexican, Black, and indigenous peoples.

**Coastal Planning:** There is a lot to be done with our infrastructure in the coastal areas, including better construction to protect and restore our coastline and wetlands in combination with a robust scientific program. I also want to work with other organizations, NGOs, and government agencies that specialize in coastal wetland management, such as NOAA and Project Drawdown.

**Priorities:** I aim to bring all stakeholders to the table to craft proactive solutions including incentivizing development of renewables, preparing our state for weather disasters, and increasing funding for public schools by maximizing revenue generated by state contracts and advocating for an increase in the amount directed to the Permanent School Fund.

**Campaign Website:** http://www .jinnysuhfortexas.com

## » Benjamin Armenta (R)

No Response Received


OCA-APPX-1648

OCAGH_00005370



**» Victor Avila (R)**

**Qualifications:** As a retired Immigration and Customs Enforcement and Homeland Security Investigations (ICE-HSI) Special Agent, I have the firsthand experience necessary to provide the battle-tested leadership Texas needs to secure the border.

**Allocation of Federal Funds:** Flood mitigation must be our first priority. For every dollar we spend mitigating flooding or other factors, we save several times that amount in relief, as well as avert the human costs of natural disasters. Furthermore, by lowering the risks associated with natural disasters, we can drive down outrageously high flood insurance in coastal Texas.

**The Alamo:** I am proud of my Mexican-American heritage. No matter what others may say, the Alamo is a symbol of Texan courage and fortitude. It reminds us there are causes greater than ourselves for which we should be willing to lay down our lives. Recognition of the values that bind our nation together should be used to heal and unify, not to divide.

**Coastal Planning:** One of the most effective means to mitigate the damage caused by flooding is preserving coastal wetlands. Coastal wetlands also prevent coastal erosion and serve as a habitat to a variety of species. To that end, I plan to prioritize funding provided to the General Land Office through the Coastal Erosion Planning and Response Act (CEPRA) to preserve coastal wetlands.

**Priorities:** We must secure the border by constructing the Texas wall. Construction of this wall is already underway, and the General Land Office is playing a key role as much of the wall is being built on public lands. After years of supervisory experience in the Department of Homeland Security, I have the knowledge and experience necessary to ensure Texas gets this project right.

**Campaign Website:** http://victoravilatx.com

---

**» Dawn Buckingham (R)**

**Qualifications:** Landowner experienced in land management & physician used to making major decisions. Senator & Sunset Commission member where I reviewed state agencies, fixed inefficiencies, cut waste, & improved outcomes for taxpayers. Ready to lead the GLO on day1

**Allocation of Federal Funds:** I would immediately identify what communities were hit the hardest by a storm and also identify which communities have the most daunting path to recovery. We must ensure that these federal funds are going to communities that are directly impacted or are prone to be affected by the next storm on the horizon. Using the benefit of hindsight, we can plan before it's too late.

**The Alamo:** There will be no reimagining the Alamo under my watch. As a State Senator, I initiated the legal challenge that kept the Alamo Cenotaph in its rightful place, out in front, and passed the only piece of legislation protecting our historical monuments. The GLO is the tip of the spear in defending our rich Texas history we know and love, and I will always fight to protect it.

**Coastal Planning:** By protecting our wetlands and coast with land management practices such as proper sand dune rebuilding, we will be able to naturally minimize damage in our coastal communities. We must also work with the Federal Gov-

OCA-APPX-1649

OCAGH_00005371

## » Dawn Buckingham (R) (*continued*)

ernment to ensure we build the Coastal Spine Barrier Project, known as the Ike Dike, to protect our Texans along the coast, oil & gas industry, and refineries.

**Priorities:** I'll secure our border by identifying available state lands on the border and begin building a border wall as soon as possible. I'll also continue to fight to preserve the Alamo as we know it for generations to come and keep our commitment to our Veterans and children by providing them with quality care and education through the Veterans Land Board & Permanent School Fund.

**Campaign Website:** http://www.dawn buckingham.com



## » Rufus Lopez (R)

**Qualifications:** I have been an attorney for 57 years, practicing in real estate, oil & gas, right of ways, surveys, and land development. I became Board Certified in both Residential Real Estate, and Farm & Ranch Real Estate, in addition to being a litigator.

**Allocation of Federal Funds:** As Land Commissioner receipt and allocation of funds for natural disasters is very important, since they effect our tidelands, gulf coast, oil & gas industry. Where our state lands and resources are involved, the funds would be prioritized to the areas most affected, such as the gulf coast and wind damage industry and development off shore.

**The Alamo:** The Alamo is our single most treasure of Texas Independence and the story should continue to be told of the defense needed to allow Sam Houston the time needed to fight the ultimate battle. The story is one of bravery by all the defenders to stall the army of Santa Ana in the fight for Texas independence.

**Coastal Planning:** Build sea walls where needed; continuously maintain the coastline and help repair and restore the infrastructure of the communities. Increasing the energy development utilizing the new science and environmental safety mechanisms is the wave of the future, including the wind turbines.

**Priorities:** Promote and Protect the investments of the Permanent School Fund, through careful investments to increase the maximum returns. Promote the Oil & Gas drilling in the Texas owned lands by encouraging this development Promote greater benefits to the Texas Veterans by encouraging housing and land purchases Encourage the sale and development of state-owned lands. Promote Parks



## » Weston Martinez (R)

**Qualifications:** visit www .westonfortexas.com for full details: Only person running who has served as a Texas Statewide Commissioner for almost 7 years, Oil and Gas ; Real Estate, Telecom background that includes corporate infrastructure engineering-planning.

**Allocation of Federal Funds:** 1 I have a plan for a new process in to deploy where we put Texans 1st. 2. The process is broken, FEMA reports that 30-70 % of flooding zones are under or unreported…so you have no way to provide real relief, because

OCA-APPX-1650

OCAGH_00005372

## » Weston Martinez (R) (*continued*)

you're not using real data to solve problems. This is why, using my engineering, water development, infrastructure, disaster recovery background is vital
**The Alamo:** I am the only native of the Alamo city (San Antonio) running to serve & I know we should tell the heroic story of the 13 day battle of the Alamo at the Alamo. Day 1 *I will return the annual prayer service to the Alamo. *I will advise the united nations they are no longer welcome. *I will end burials taking place in the alamo grounds allowing remains to be comingled
**Coastal Planning:** This is another key area where my expertise professionally will allow me to serve and protect the people of Texas. 1: inventory current civic and stormwater drainage/mitigation plans, determine which flooded areas have been missed bye .FEMA's own omission, overlay that with current development plans to create a updated model 4 storm water run off and watersheds impact
**Priorities:** We have an Alamo that is under siege, we have veterans nursing homes in Texas that suffered twice the death rate of the national average, we have a border that is unsecured, and we have school financing For both grade school and public universities that must be maintained but reigned in. We have veteran cemeteries that must be honored. visit www.westonfortexas.com

**Campaign Website:** http://www.westonfortexas .com

---



## » Don W. Minton (R)

**Qualifications:** Don W. Minton, West Point graduate & former Texas Dist. Ct Judge is an investor/CLO of a mineral extraction company. Minton was also a FINRA licensed Financial Principal. He is ready to steward on Day 1 all Texas Public Lands, including the Alamo.
**Allocation of Federal Funds:** The highest need communities are best prioritized when communications with federal, state, and local officials are clear, candid, and concise. Having worked in the executive branch of both federal and local governments, I have the expertise and motivation to remove barriers and cut red tape to ensure that those communities in the greatest need receive the highest priority
**The Alamo:** The story of the Alamo is critical to our identity as Texans, and indeed what makes the Lone Star State unique. That story includes the story of the 200 souls who made the ultimate sacrifice in March 1836 on behalf of our new Republic, along with the countless other souls who walked those hallowed grounds in the years prior (and indeed after).
**Coastal Planning:** The GLO has slated 123 individual projects to make the Texas Coast more resilient. With a $4.3 billion pricetag, the GLO needs a good steward over these projects to provide taxpayers with a positive return on investment. The Commissioner must balance the competing needs of waterborne commerce; energy & chemical industries; commercial & recreational fishing; and tourism.
**Priorities:** 1. Revamp the VLB to provide a mortgage route for Texas Veterans which is superior to a VA Loan. 2. Leverage critical minerals from Texas Public Lands, simultaneously increasing the Permanent School Fund while reducing our nation's vulnerability to its enemies. 3. Ensuring that every soul which has graced the grounds of the Alamo has his or her story told.

**Campaign Website:** http://www.minton4glo.com


OCA-APPX-1651

OCAGH_00005373



**» Jon Spiers (R)**

**Qualifications:** I am a heart surgeon, a former member of the US Army Reserve, and, after a hand injury, retrained as an attorney. Each experience has enhanced my ability to lead and relate to the needs of Texans. Texas needs a leader with guts. I am that leader.

**Allocation of Federal Funds:** There are many metrics utilized to determine where best to allocate funds; each community and group will have their favorite. To best address specific needs, impacted regions will be subdivided into small areas of action and administration. To avoid the temptation to divert funds to other projects, performance markers will be tied to fund release and waste recouped.

**The Alamo:** The Alamo is famous for the 13 day Battle of the Alamo. It is an enduring symbol of Texas grit and willingness to stand fast in the face of oppression. This is the story known around the world, inspiring Liberty-loving people everywhere. This is the story that must always be central to the Alamo narrative.

**Coastal Planning:** We must recognize there is no perfect solution to the dangers posed by major storms. We must be decisive and proactive. Barrier projects, hardening of coastal industry, and coordinated drainage and flood control measures are all part of a comprehensive plan. A coordinated response will minimize damage and enhance recovery.

**Priorities:** We must restore the GLO's reputation with citizens and other state agencies. The GLO should adopt the role of a collaborative ally instead of a competitor. This would boost relations between the GLO and the public, restore faith and transparency in the operation of the Alamo, improve tarnished relations with Texas Veterans, and enhance Permanent School Fund performance.

**Campaign Website:** http://DrJonSpiers.com



**» Tim Westley (R)**

**Qualifications:** I am a former two-time nominee for U.S. Congressional District 15, PhD. in Educational Leadership, U.S. Army Veteran, & Non-profit Community Leader. I have researched, provided solutions, & worked on or with all the major areas the position covers.

**Allocation of Federal Funds:** I would have liaisons ready to work with mayors before disasters strike to map areas that fit into U.S. Depart. of Housing & Urban Development's (HUD) basic requirements for fund disbursements. Next, I would recommend placing them on a mapping database so that as disasters happen, they are quickly identified by area. Finally, ensure funding procedures are known by all.

**The Alamo:** The Truth. As Historian of the Republican Party of Texas, the story of the Alamo has already been written and told. It does not require a rewrite or revision. Such history I have shared in the city of San Antonio and beyond. This historical story is one I've told publicly at the foot of the Cenotaph in the Alamo footprint on many occasions and will continue to tell.

**Coastal Planning:** I would be proactive by view current studies for protection and seeing what we can readily implement. I would also encourage investment in hurricane surge protection projects. Ultimately, I would ensure consistent talks with experts in the field such as engineers, geoscientist, and



OCA-APPX-1652

OCAGH_00005374

# COMMISSIONER OF GENERAL LAND OFFICE

*(continued)*

## » Tim Westley (R) (*continued*)

other partners to develop and implement mitigation plans at the earliest stage.

**Priorities:** Identify all public lands on our 1254 mile southern border and Partner with other organizations to secure it. Help advance oil, gas, & mining exploration through increased land lease opportunities so that Texas leads the way to energy independence while providing jobs for Texans. Ensure the $43 billion Permanent School Fund is used properly to raise level of education.

**Campaign Website:** http://www.texans4tim.com

# COMMISSIONER OF AGRICULTURE

Four-year term. The agriculture commissioner's principal job is promoting Texas agriculture. In that capacity, the commissioner facilitates trade and marketing of agricultural products; regulates weights and measures; regulates pesticide use; certifies organically produced products; administers the National School Lunch and School Breakfast programs; provides financial help to farmers; and helps solve issues related to natural disasters. Current salary $140,938

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and characteristics qualify you for this position?

**Immigration:** Immigrants have been a vital part of the agricultural industry in Texas. How would you balance the needs of Texas agriculture with federal immigration policy?

**Water Resources:** As water resources become more scarce, how do we balance the needs of farmers and the growing demands of urban areas?

**Opportunities:** In your opinion, what are the opportunities for the growth of agriculture in Texas? What can we do now to ensure that Texas can capitalize on these future opportunities?

**Priorities:** What are the three most challenging issues for Texas farmers for the next four years, and what are your plans for dealing with number one on your list?



### » Susan Hays (D)

**Qualifications:** As an attorney raised in and around agriculture with decades of Texas government experience, I am adept at analyzing then solving problems. With my servant's heart, I will be dedicated to public service, helping farmers, and improving food quality.

**Immigration:** Federal immigration policy is bro-

© 2022 League of Women Voters of Texas | lwvtexas.org

OCA-APPX-1653

OCAGH_00005375

## » Susan Hays (D) (*continued*)

ken and needs to be torn down to the studs. We need to be honest about that fact that Texas agriculture needs the labor. As commissioner, I will advocate to transform to a policy driven by our economic needs and implemented with humanitarian principles and compassion—just like we learned in Sunday School.

**Water Resources:** The Republicans have failed to even try to solve this problem. The Department of Agriculture (TDA) can research & promote sustainable practices and less-thirsty crops, but must work across agencies such as the Land Office, the Water Development Board, local water districts & others, and with the Legislature for a comprehensive plan to protect water quality and supply.

**Opportunities:** Texas ag can flourish by growing more fruits, vegetables & high-value crops. California produces more than 80% of U.S. fruits and vegetables—too many eggs in one basket. We need to diversify & support small & medium size operators. Cannabis should be legalized & regulated to protect public health & safety giving Texans an opportunity to share in the economic opportunity.

**Priorities:** Economic survival, rural health care & climate change—and they are intertwined. I will look for opportunities, analyze the data, advocate to the USDA to change counter-productive policies, and help producers find a path to prosperity & environmental sustainability. Failing rural hospitals are an existential threat to rural communities and must be saved.

**Campaign Website:** http://www.hays4ag.com

---



## » Ed Ireson (D)

**Qualifications:** I'm a businessman, new father, and proud Texan. My family has been running cattle in Brazos County for 130 years and I've worked with Texas ranchers to help sell their beef direct to consumers across the state.

**Immigration:** If ranchers and farmers can't hire enough workers to meet market demands, we all suffer. I'll advocate for an immediate expansion of the H-2A visa program, so that we can alleviate labor shortages to help counteract the supply chain constraints faced by all Texans.

**Water Resources:** Texan farmers and Texan city-dwellers are deeply interconnected. The food, wood, raw materials, and water that comes from our rural environments are critical to the urban lifestyle. As Ag Commissioner, I'll support programs that work with farmers to promote efficiency around their water use, including crop rotations and rotational grazing for livestock.

**Opportunities:** The Texas Dept of Agriculture oversees rural infrastructure grants and the development of rural internet services. We need roads, bridges, waterways, and internet connectivity in order to have a strong future for our agricultural sector. We must invest wisely so that the State of Texas provides infrastructure for all Texans, but especially ranchers and farmers.

**Priorities:** 1) Infrastructure 2) Supporting the next generation of farmers and ranchers 3) Access to financial and grant opportunities for rural Texans Our infrastructure is both expensive and slow — livestock trailers stuck in traffic jams because of failing roads and bridges, and slow or no internet in the homes of our young Texans limiting their educational opportunities.

**Campaign Website:** http://edfortexas.com

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1654

OCAGH_00005376



**» Carey A. Counsil (R)**

**Qualifications:** 30 year Business owner and real estate investor and developer. 20 year Professor of Economics and Business at Texas Junior College Lifelong 5th generation Farmer/Rancher owning and operating Cattle/Hay operation.

**Immigration:** * Tighten immigration * Stream line process for legalization and work visas * Migration based on merit

**Water Resources:** * Water desalinization in plants along the Texas coast Until then, water resources, when in high demand, must be limited in urban areas. No water for agriculture means no food for Texans and the United States.

**Opportunities:** Several grocery store support "buy local" campaigns. As more Texas retailers convert to "buy local" the more consumers will be aware of where their food comes from.

**Priorities:** 1. Disparity between consumers and producers. Solution: The disparity is with the top 4 in the packing industry. Texas must create a farmer co-op packing house. With the help of the Beef Check Off Program, a co-op could be established. 2. Water Rights 3. The border crisis that is directly affecting south Texas rancher/producers and indirectly all Texas rancher/producers

**Campaign Website:** https://counsilacrosstexas.com

---

**» Sid Miller (R)**

**Qualifications:** Current 2 term commissioner, 8 generation farmer, BS in Agriculture, former Ag teacher, still make my living farming and ranching, former House Chairman of Agriculture and Livestock committee. I currently raise livestock and grow several crops.

**Immigration:** We need immigration reform, a new and workable guest worker program.

**Water Resources:** We use technology improvements, de-sal plants, rainwater harvesting, and recycling of our water.

**Opportunities:** I will continue the expansion of my global outreach initiative, on every continent. Texas was the only state where experts went up during the trade war with China. I have an office in Argentina , with plans to open one in China.

**Priorities:** government over regulation, trade wars, and Mother Nature. I will continue to search for new agriculture markets and fight back against over regulation.

**Campaign Website:** http://Millerfortexas.com

---



**» James White (R)**

**Qualifications:** Tx Agriculture Code 11.005 outlines the requirements. As a six-generation Texan, who is a small beef cattle producer and six-term

legislator, I satisfy paragraphs 1-3: https://statutes.capitol.texas.gov/Docs/AG/htm/AG.11.htm#11.005

**Immigration:** Following current law, I will facilitate the existing agricultural visa program, H-2A, which Congress passed in 1986. H-2A visas discourage foreign worker exploitation, protect wage-


OCA-APPX-1655

OCAGH_00005377

## » James White (R) (*continued*)

earning power of US workers, and is consistent with maintaining homeland security. https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers

**Water Resources:** We must balance science and technology, championing property rights, and collaboration. We must continue laying the groundwork for desalinization expansion and brackish water use. Many agricultural producers own senior water rights. We must allow thoughtful discretion to maximize their farm income. More intrastate and interstate collaboration on conservation and flows.

**Opportunities:** Maintaining a favorable regulatory environment which continues to attract agricultural operations from states that have hostile business environments for animal production related agriculture; facilitating enhancements to our ports, roads, bridges, and oil/gas energy infrastructure; persuading the Texas Legislature to open new market opportunities (i.e., hemp/cannabis)

**Priorities:** Securing South Tx farms/ranchers from narco-transnational gangs (constructing barriers & funding law enforcement); meeting water needs (see above); avg age of producers is 59 yrs old (facilitate more youth and veterans to become producers); burdensome regulations (decrease state regulatory footprint & pushback against federal regulations); infrastructure (See above)

**Campaign Website:** http://JamesWhiteForTexas.com


OCA-APPX-1656

OCAGH_00005378

# RAILROAD COMMISSIONER

Six-year term. The Railroad Commissioner is one of the three-member Texas Railroad Commission. The commission regulates the oil and gas industry, gas utilities, pipeline safety, safety in the liquified petroleum gas industry and surface coal and uranium mining. It has no regulatory authority concerning railroads. Current salary: $140,937

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and background qualify you for this position?

**Ethics:** Since candidates for Railroad Commission often raise money from the oil and gas industry, how can citizens be assured that campaign donations will not influence how commissioners regulate that industry?

**Emissions:** How important is the impact of methane emissions on climate change? What are effective ways to reduce methane emissions in the oil and gas industry?

**Natural Gas Facility Weatherization:** What further changes, if any, are needed to ensure that Texas has sufficient power in times of extreme weather conditions?

**Seismic Activity:** What are the most important measures the Railroad Commission can implement to reduce the risk of seismic activity or earthquakes caused by water disposal from oil and gas drilling?

---

## » Luke Warford (D)

Unopposed

---



## » Wayne Christian (R)

**Qualifications:** *Candidate's response did not meet the criteria as listed in this Voters Guide.*

**Ethics:** Campaigns cost money to run, so all candidates for all offices must raise money. The standards for RRC are no different than any other office. My job is to represent the people of Texas and ensure they have access to cheap, plentiful, reliable energy. Contributions have not and will not impact my dedication to doing what is right for the people of Texas.

**Emissions:** A clean environment & a thriving oil & gas industry are not mutually exclusive. Since 1970, the six major pollutants regulated by the EPA have decreased 77% while our economy has grown 285%, population has grown 60%, & energy consumption has grown 48%. We've reduced flaring/methane from 2.38% in Jan. 2019 to 0.21% in Sept. 2021 under my leadership w/out overregulation.

**Natural Gas Facility Weatherization:** The RRC recently designated natural gas facilities as critical during energy emergencies and put in place weatherization requirements to ensure our oil and gas assets are prepared for emergencies. We must also ensure we are prioritizing energy generation from reliable sources through eliminating subsidies and preferential treatment for less reliable forms of energy.

**Seismic Activity:** The Railroad Commission

© 2022 League of Women Voters of Texas | lwvtexas.org



OCA-APPX-1657

OCAGH_00005379

## » Wayne Christian (R) (*continued*)

takes seismic activity very seriously and has a seismologist on staff to advise the agency to ensure our regulatory actions are based on sound-science. In response to recent earthquakes in West Texas, the RRC ordered the indefinite suspension of all deep oil and gas produced water injection in the Gardendale Seismic Response Area.

**Campaign Website:** http://ChristianForTexas .com



## » Tom Slocum Jr. (R)

**Qualifications:** I have over 15 years experience working in upstream oil and gas in Texas, Louisiana, & offshore in the Gulf. I have plugged over 1,000 wells. I have operated two small oil and gas companies in Texas & I am a Texas-educated Aggie, 4th gen Oil & Gas

**Ethics:** I have not taken any campaign donations from oil and gas, but I also do not have any conflicts of interests. I do not own minerals or royalties, or working interests in wells. I will not allow cronyism to grow in Texas at the RRC and I will not take donations in return for favors down the line!

**Emissions:** Eliminating methane emissions from flared gas and vented gas can be done without implementing further regulations. By repealing the flared gas tax we can eliminate almost ALL of the flared gas in the state! Free market solutions to eliminate flared gas and secure our grid with more electricity is what we will bring if I am elected. Smart regulations benefit all Texans.

**Natural Gas Facility Weatherization:** Texas must audit our Nat Gas power generation critical points and listen to experts hired by the RRC, who are from INSIDE the industry. There are Texans who can help us achieve energy freedom and keep us away from another February disaster. Leadership in Austin must listen and have a PLAN in PLACE. Our base-load power must be secured. We can't allow another black out!

**Seismic Activity:** We must monitor all seismic activity in the Permian Basin closer, & especially monitor damage to taxpayer infrastructure. If damage is being done that will cost property owners and taxpayers money, then we must re-evaluate the system of disposing SWD fluid & make necessary changes to protect the production of oil and gas as well as our property & infrastructure from harm.

**Campaign Website:** http://Slocumfortexas.com



## » Sarah Stogner (R)

**Qualifications:** I am an attorney who has dedicated the past 13 years of my life to helping various stakeholders in the oil and gas industry with no desire to be a politician. I will end the crony capitalism preventing meaningful change to tackle the real problems.

**Ethics:** I'm not accepting donations because our current regulators are bought by the industry they are charged with regulating. Plain and simple - the current regulators have enriched themselves and their friends at the expense of Texans. We're having earthquakes and losing our freshwater aquifers. Texas must handle or the federal government will intervene. End crony capitalism!

**Emissions:** We should not be venting or flaring methane. It's a vital energy source that should be put to beneficial purposes. We should incentivize


OCA-APPX-1658

OCAGH_00005380

## » Sarah Stogner (R) (*continued*)

leak prevention. We should incentivize alternative uses (such as cryptocurrency mining). And we have to hold bad actors accountable. Climate change will be the least of our concerns if we don't fix our groundwater and seismic issues.

**Natural Gas Facility Weatherization:** Natural gas facilities are vital to maintaining the integrity of the Texas grid. We need to consult with experts on how to properly winterize facilities and ensure we do not have a repeat winter where Texans die. But we cannot foist this expense on the taxpayers either.

Operators should not be able to opt out of vital winterization of natural gas facilities.

**Seismic Activity:** Seismic activity is a real issue. We need to look at the big picture of what is happening geologically. We are extracting & injecting into different zones millions of barrels of water per day in the Permian Basin alone. We should not be using fresh water for drilling or completing wells. We need to incentivize innovation to tackle this complicated issue.

**Campaign Website:** http://www.sarah4RRC .com

---



## » Marvin 'Sarge' Summers (R)

**Qualifications:** 21 years of leadership training in the United States Army and 30 years in oil and gas.

**Ethics:** I can't speak for the other commissioners or the candidates that oppose me in this race. I can not be bought.

**Emissions:** It is very important. We must capture these emissions and mitigate these gasses.

**Natural Gas Facility Weatherization:** What happened this past February with ERCOT must never happen again. Every effort and precaution must be employed to make sure our facilities remain operable and ready to serve the citizens of this great dtste.

**Seismic Activity:** Great question especially in view of recent earthquakes measuring better that 3.0 in the Gardendale area North and West of Midland, TX. We must limit the depth of SWD's. Lower permitted injection rates. Lower the injection pressure. Daily recording of injection volumes and pressures.

---



## » Dawayne Tipton (R)

**Qualifications:** I have over 18 years of experience in the oil and gas industry from a rig hand to subject matter expert. I assessed and mitigated risk of oil and gas operations and facilities. I want to put that experience to work for Texas families.

**Ethics:** I've had to work hard for everything I have. My ideals and dedication cannot be bought or sold. I don't have aspirations for higher office and I don't have vested business interests to profit off of. I'm just a regular guy that has a set of skills to fit well in this role and give Texans the expertise they need to utilize resources and protect jobs for the middle class.

**Emissions:** In my work experience, I've worked in ways to be the most efficient and resourceful. I would reduce methane emissions by putting it into production instead of being released. If that's not an option, then there are ways to reduce emissions further (like vapor recovery units and ECBs). For me, the real goal is to eliminate waste, which is also good for the environment.

**Natural Gas Facility Weatherization:** First, remove natural gas producers' abilities to exempt


OCA-APPX-1659

OCAGH_00005381

**» Dawayne Tipton (R) (*continued*)**

themselves as noncritical. Second, we need to understand the critical path for power generation with regard to our natural gas grid. Once there is a clear consensus on the most critical infrastructure from exploration to power generation, we put forth a winter storm plan that goes into action when storms are forecast

**Seismic Activity:** First, reduce the barrels of salt water injection allowed from 10,000 barrels a day to 7,000 a day. Then, as the data comes in on seismic activity, you take the data and further reduce the amount allowed until seismic activity levels off and you heavily enforce the mandated levels that work.

**Campaign Website:** http://www.tiptonfortexas.com



# » VOTING FOR JUDGES IN TEXAS

Although in some states, judges are appointed, in Texas most judges are elected.

Judges make decisions about fundamental issues that affect all of us . . . family life, education, health care, housing, employment, finances, discrimination, civil rights, public safety, and government actions. It is critical that our judges make fair decisions based upon open-minded and unbiased consideration of the facts and the law in each case. Judges must know the law and not be influenced by any external political and economic factors.

## How is the Texas court system organized?

The Texas court system is made up of a statewide network of trial courts and appellate courts. In trial courts, judges and/or juries evaluate the facts and the law and make a decision in a civil or criminal legal dispute. When decisions in most trial courts are appealed, they are sent to an appellate court where judges consider what happened at the trial court, evaluate legal arguments, and then decide if a mistake was made.

See **https://www.txcourts.gov/media/about-texas-courts/** for more information.



OCA-APPX-1660

OCAGH_00005382

# JUSTICE, TEXAS SUPREME COURT

Six-year term. A justice is one of the nine-member Supreme Court, which issues final decisions on civil and juvenile appeals, issues certain orders to governmental officials to act and to individuals to appear before the court, and has jurisdiction over orders or judgements of trial courts, if the Supreme Court determines them important to the jurisprudence of the state. Current median salary: $201,600

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience, and background qualify you for this position?

**Standards:** A recent Constitutional Amendment passed by Texas voters requires that candidates for this Court be licensed in Texas for at least 10 years and have no suspensions or revocations of their license in that time. What are the positive and negative impacts of this change?

**Equity:** What can be done to improve access to justice for all, including persons or groups who may be underserved?

**Ethics:** Since judicial candidates solicit donations and raise money to be elected, how can voters be assured that campaign donations will not impact how judges interpret the law and review lower court decisions?

**Other Issues:** What issues do you believe will be the most pressing for the Texas Supreme Court?

## » PLACE 3

### » Erin A. Nowell (D)

Unopposed

### » Debra Lehrmann (R)

Unopposed

## » PLACE 5

### » Amanda Reichek (D)

Unopposed

### » Rebeca Huddle (R)

Unopposed

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1661

OCAGH_00005383

## » PLACE 9

### » Julia Maldonado (D)

Unopposed



### » David J. Schenck (R)

**Qualifications:** I've served as a justice on the state's largest intermediate court. I clerked for the Chief Judge of the 5th Circuit, led a major appellate practice at Jones Day, am broad certified in civil appellate law, and chair the commission on judicial conduct

**Standards:** The positive is that the candidate at least have some demonstrable minimal competence and lack of actual record of corruption. It does not, however, require any judicial service experience or address the more critical problems with the initial selection and appointment, which is the manner by which the vast majority of appellate judges initially come to the bench.

**Equity:** I believe that any system of gov't that targets groups for disparate treatment — whether for malign or benign motives — implicates the equal protection clause. All Texas citizens are entitled to equal access to the courts, and I'm proud to have re-ceived the Texas Bar's highest award for promoting access to pro bono legal services to those who cannot afford it.

**Ethics:** At present, voters are not assured of this and the appearance that donations affect rulings has been demonstrated repeatedly without any meaningful effort at reform—making this issue most critical. I have publicly called for reforms to assure Texans the right to a constitutional, impartial process and have shown by my record that I will not yield or accept anything less.

**Other Issues:** Until the foregoing is resolved, there is very little of significance that the Court can achieve. Judicial decisions are followed only because — and to the extent — the public accepts that they are based on reason and principle. They've lacked that confidence for over a decade. Separately, the Supreme Court must show that the judiciary is independent of other branches.

**Campaign Website:** http://www.schenckfortexas.com



### » Evan Young (R)

**Qualifications:** Texas Supreme Court Justice; law clerk, Justice Antonin Scalia; Counsel to U.S. Attorney General; U.S. Government rule of law mission in Iraq; many arguments at U.S. & Texas Supreme Courts and other courts; UT law professor; Texas Judicial Council.

**Standards:** Almost all positive. The Amendment ensures that candidates meet basic minimum standards, and Texas deserves a high-quality judiciary. The only "negative" is that we must be cautious when restricting voters' options. But here, the peo-


OCA-APPX-1662

OCAGH_00005384

## » Evan Young (R) (continued)

ple themselves prioritized minimum judicial qualifications by ratifying this limitation within our Constitution.

**Equity:** Ensuring open courts is fundamental to public confidence in our judiciary and to protecting individual rights. The Access to Justice Commission, Texas Legislature, and Texas Supreme Court have made great progress in marshaling public and private support for expanded representation of underprivileged Texans and making judicial proceedings more efficient and comprehensible.

**Ethics:** That risk diminishes when judges have a sound, stable method of judicial decision-making, like Justice Scalia's. Their analysis can be tested,

in case after case, for rigor and consistency. Judges must hold themselves and each other accountable, too. I make the same promise to those who support me and those who don't: I will follow the law wherever it goes in every case.

**Other Issues:** Among the most pressing work for the Supreme Court will be ensuring, even in times of crisis, and without fear or favor, that the limitations of the U.S. and Texas Constitutions are respected—the lines between different branches of government, between the state and local governments, and between government power and individual liberty.

**Campaign Website:** http://JusticeEvanYoung.com


OCA-APPX-1663

OCAGH_00005385

# JUDGE, TEXAS COURT OF CRIMINAL APPEALS

Six-year term. A member of the nine-member court which has final judgement in all criminal cases. The court must review all cases in which the death penalty is assessed. It also exercises discretionary review in other criminal cases and issues orders to governmental officials to act and individuals to appear before the court. Current median salary: $193,200

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience, and background qualify you for this position?

**Philosophy:** What is your judicial philosophy?

**Standards:** A recent Constitutional Amendment passed by Texas voters requires that candidates for this Court be licensed in Texas for at least 10 years and have no suspensions or revocations of their license in that time. What are the positive and negative impacts of this change?

**Equity:** What can be done to improve access to justice for all, including persons or groups who may be underserved?

**Ethics:** Since judicial candidates solicit donations and raise money to be elected, how can voters be assured that campaign donations will not impact how judges interpret the law and review lower court decisions?

## » PLACE 2

### » Mary Lou Keel (R)

Unopposed

## » PLACE 5

### » Dana Huffman (D)

Unopposed



### » Clint Morgan (R)

**Qualifications:** In nine years as an appellate prosecutor I have written nearly 400 appellate briefs and presented 39 oral arguments. Before that I worked at the Court of Criminal Appeals as a clerk and staff attorney. I am board certified in criminal appellate law.

**Philosophy:** I am an originalist. I believe constitutions and statutes should be interpreted by giving words the meaning they had at the time of adop-

© 2022 League of Women Voters of Texas | lwvtexas.org

OCA-APPX-1664

OCAGH_00005386

## » Clint Morgan (R) (*continued*)

tion. This approach ensures it's the legislature and voters—not judges—who make the law.

**Standards:** The changes from this amendment regarding the Court of Criminal Appeals are small. The constitution already required ten years of legal practice. The most notable change is that a lawyer must be ten years removed from any license suspension, but I've never seen anyone run for this court after having his or her license suspended. This change will probably have no impact.

**Equity:** The criminal justice system provides justice by protecting victims, punishing the guilty, and allowing people to live in safety. We must punish those who prey on the underserved as harshly as we punish other criminals. Everyone should have the opportunity to live in safety. As a judge, I will treat all who appear before me equally and fairly.

**Ethics:** The only way to elect an honest judiciary is for voters to learn about the candidates and elect men and women with integrity. Every system of judicial selection is vulnerable to corrupt behavior, and judges can be corrupted by forces outside the selection process. One advantage of an elected judiciary is that voters can remove judges who seem corrupt.

**Campaign Website:** http://www.clintforjudge.com

## » Scott Walker (R)

No Response Received

## » PLACE 6

## » Robert Johnson (D)

Unopposed

## » Jesse F. McClure, III (R)

Unopposed



OCA-APPX-1665

OCAGH_00005387

# STATE BOARD OF EDUCATION

Four-year term. The fifteen-member board decides curriculum, standards, student testing, special education programs, and textbooks for Texas public schools. It also oversees the Permanent School Fund. Members of the board are not paid, but receive reimbursement for expenses incurred in the course of official business.



State Board of Education Districts
S.B. 7, Senate Engrossed
PLANE2106

## » QUESTIONS TO CANDIDATES

**Qualifications:** What training, experience and background qualify you for this position?

**Charter Schools:** What is the impact of new independent charter school networks on the funding for local public schools? And is there anything you would do to change that impact?

**Inclusive Education:** As the developer of Texas public school curriculum, how would you ensure a comprehensive history education that addresses the needs of all students?

**Recovery:** What can the State Board of Education do to assist local school districts to develop programs so that students who fell behind from the pandemic can recover?

**Other Issues:** What other issues do you believe will be the most pressing for the State Board of Education?

## » DISTRICT 1



### » Laura Marquez (D)

**Qualifications:** I have an MSW and previous experience (7 years) working in public education as a para-educator providing special education and re-lated services to students with disabilities. I currently work in prevention and intervention in early childhood.

**Charter Schools:** Different funding mechanism and accountability standards for charter schools and districts have effectively created two separate



OCA-APPX-1666

OCAGH_00005388

### » Laura Marquez (D) (*continued*)

and unequal education systems. To change this, I would deny approvals for any charter applications that have a history of being bad financial practices, and work with legislative colleagues to ensure greater accountability and transparency.

**Inclusive Education:** I would immediately work with legislative colleagues to repeal harmful anti-CRT legislation while ensuring current polices are not applied more broadly than allowed. I would also partner with education stakeholders to navigate within the scope of current public policy to find alternative mechanisms for supporting inclusive education.

**Recovery:** In this respect, I would use my background in grassroots networking and community non-profit work to partner with school districts to find ways to develop or utilize existing programs that address student needs in a holistic manner. Especially as students continue to navigate through the trauma and uncertainty of an ongoing pandemic.

**Other Issues:** We are at a moment in time where education is being positioned at the forefront of partisan politics. Sadly, this has placed every issue faced by the SBOE on tenuous ground. Now, more than ever we must remain balanced and responsible to support schools, students, educators, and the collective interest of the community to ensure an equitable and just education system.

**Campaign Website:** http://www .laurafortxeducation.com

---

### » Melissa N. Ortega (D)

No Response Received

---



### » Omar Yanar (D)

**Qualifications:** Within my career I have served as a teacher, curriculum designer, administrator and superintendent. I have a M.Ed. from Stanford and a Master in Public Policy from Harvard. I have found innovative approaches that put students and family first.

**Charter Schools:** It's easy to say that all dollars should go toward local public schools; however some charters are great choices for families. They receive less funding than local districts and with only 6.8% of students in Texas attending charters, the funding impact is minimal. It is important to provide families choice and options while also being judicious about charter approval.

**Inclusive Education:** As a former social studies teacher , I believe the TEKS as they are currently written allows for a multi-perspective comprehensive view of history. However, I would be open to a deeper dive conversation around that to see what specific historical events we may need to unpack more delicately as a multi-perspective view of history is key to inclusiveness with students.

**Recovery:** Our middle schools focus on highly underserved students, who are several grade levels behind and accelerate their academic growth by 2-3 years in one school year. We are ranked a top academic growth public school in Texas and these strategies can work across the state. Flexibility of schedule, innovative in-school MTSS and small learning communities are just a few.

**Other Issues:** The state board should do a deep


OCA-APPX-1667

OCAGH_00005389

## » Omar Yanar (D) (*continued*)

examination into school culture and mental health. Student performance and attendance are affected when a student is happy, safe and feels their needs are addressed. With bullying and violent incidents on the rise, it's imperative to look at the root cause and design cultures that support student success as well as teacher/staff wellness.

**Campaign Website:** http://OmarYanar4Texas .com

## » Lani Popp (R)

No Response Received

## » Michael 'Travis' Stevens (R)

**Qualifications:** I have over a decade of teaching experience at the High School level and have taught at the Adult Education level. I also have a Masters in Education/Teacher Leadership and a Doctorate in Education/Curriculum and Instruction.

**Charter Schools:** New independent charter school networks have created a significant financial impact on local public schools, as these campuses have drawn away a considerable number of students from their local ISD's. To negate the financial loss to ISD's, the SBOE needs to reexamine how an ISD's Average Daily Attendance rate is connected to funding.

**Inclusive Education:** Any curriculum that I would vote in favor of, would have to be based entirely on historical fact. Curriculum presented as comprehensive history, would need to be supported by factual evidence from verified sources. All curriculum that students would be required to master, would need to be free of bias, opinions of the author, and political agendas.

**Recovery:** The SBOE needs to provide common sense programs that measure a students ability to master grade level content and not serve as a box to be checked off by an ISD for completion. Programs similar to Credit Retrieval could temporarily be set up to help students across all grade levels, attain and demonstrate the needed skills to pass to the next grade.

**Other Issues:** Standardized testing and school choice are pressing issues for the SBOE. Some students suffer from testing anxiety and the SBOE needs to discuss alternative methods to assess these students. Parents also should decide what school is best for their child, and the SBOE needs to find a way to give parents a voice, without taking away a local ISD's funding.

**Campaign Website:** http://Votedrstevens.com

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1668

OCAGH_00005390

## » DISTRICT 2

### » Pete Garcia (D)

No Response Received



### » Thomas Garcia (D)

**Qualifications:** At age 19, I founded a college access summer program for PSJA ISD. Then, I taught it as a PSJA ISD high school course. Now, it is a nonprofit that teaches high schoolers across districts. I have 7 years of classroom experience, elementary to college.

**Charter Schools:** Charter schools draw students away from local public schools, resulting in stranded costs. When a charter draws students away, the public school may not be in a position to decrease staff or reduce facility costs simply because it now has fewer students. The public school must make do with less per-pupil revenue. I support increasing the Compensatory Education allotment.

**Inclusive Education:** I believe in facts. I would reject textbooks and instructional materials with subjective interpretations of history. I am against Texas SB3, which removes requirements to study specific works by minorities and women. I support expanding ethnic studies - and making these courses count as social studies credits - to ensure students can get a comprehensive history education.

**Recovery:** Ensure teachers are (1) paid for all recovery programs (2) granted fewer admin duties and more teaching time (3) recognized for recovery service on evaluations. Coordinate state-wide surveys and data input on necessary programs. Invest in after-school and summer programs targeting learning gaps. Create professional development opportunities focused specifically on recovery

**Other Issues:** Mental health, teacher burnout, recovery. Reduce the administrative workload of teachers and counselors. Hire mental health counselors. Grant teachers more autonomy, control over conference period. Ensure recovery programs, initiatives pay teachers and do not present undue burdens on teaching. Direct education accountability standards away from high-stakes tests.

**Campaign Website:** http://www.garciaforsboe.com

### » Victor Perez (D)

No Response Received

### » Wayne Raasch (D)

No Response Received

OCA-APPX-1669

OCAGH_00005391



## » Michael Vargas (D)

**Qualifications:** After graduating from Brown University, I began my career in St. Louis, Missouri as a Teach For America Corps Member serving underprivileged students. I returned home to serve our very own, as school board president and various state-wide positions.

**Charter Schools:** It is difficult to assess impacts on funding for local public schools without taking into consideration the full multi-faceted funding mechanism in the state. My priority as a member of the SBOE is to ensure that there is a leveled playing field and that we are making decisions that are fair and equitable for every school system and student across the state of Texas.

**Inclusive Education:** SBOE should not sanitize versions of our history. It's deeply misleading to downplay historical conflicts or scars around ideology, race, class, gender, and immigration because all are central to our state and nation's rich histo-ries. I will ensure that curriculum standards are curated from the bottom up, prioritizing the voices of parents and students in District Two.

**Recovery:** Some school districts are already altering programming by offering instruction during breaks and inviting targeted students to "Rebound Academies" focusing on those with larger achievement gaps, and SBOE should replicate this programming across the state. I will also listen to educators across District Two with an open mind on innovative ways to further remedy this issue.

**Other Issues:** We are experiencing an exodus of professionals leaving education due to stress and workloads, exacerbated by the pandemic. I've heard personal stories on the toll it takes on educators' mental health across many districts. I will fight for expansion of mental health resources and ensure that we continue to cultivate the love of teaching and mental health of every educator.

**Campaign Website:** http://www.vargas4texas.com

---



## » Hilda Garza DeShazo (R)

**Qualifications:** 33 years as a public school teacher, academic coach and administrator McAllen ISD Board of Trustees Hidalgo County Head Start Program Policy Council TASB Legislative Committee TEA School Improvement Initiative Texas Retired Teacher Association

**Charter Schools:** The impact can be determined by how public and charter schools are funded, by the number of students enrolled and by the data supporting student achievement. Thus any change to the impact requires careful study and analysis. The most important issue is that of student achievement.

**Inclusive Education:** The demands of an increasing diverse student body will require a curriculum that includes a richer and truthful history of America and Texas. A curriculum that reflects the contributions of key historical leaders with materials and resources available to educators to make history more inclusive is needed.

**Recovery:** 1. Identify disconnected students/ reconnect them to school communities; provide support and intervention needed to recover lost grade level ground 2. Expand instrumental time 3. Support access to remote learning technology for students and family 4.Attend to the physical, social and mental health needs of students 5.Assess student progress/use data to advance learning

**Other Issues:** Setting curriculum standards Reviewing and adoption of instructional materials Educator Certification

**Campaign Website:** http://HildaGarzaDeShazo.com

OCA-APPX-1670

OCAGH_00005392



**» LJ Francis (R)**

**Qualifications:** My background as a naturalized citizen has given me a unique perspective to see how important it is to have a strong basic education. As a Licensed Professional Engineer, I am uniquely qualified in solving problems using strategic collaborations.

**Charter Schools:** Charter school networks are eligible to receive a share of the available state funds for student enrollment. Local public schools receive both state and local tax revenue funds. Charters schools do not have a negative impact on the available funding for local public schools and in general, state aid decreases for a district if its need decreases or its tax base expands.

**Inclusive Education:** Curriculum development for schoolchildren should be undertaken to facilitate the general diffusion of knowledge. This means that a comprehensive history education should include classical history which enables students to reach beyond partisan differences by drawing on the shared roots of our civilization. We must promote the content of the history and meaning of the work.

**Recovery:** COVID-19 has presented unprecedented challenges for schoolchildren, parents and educators alike. House Bill 4545 established new requirements for accelerated instruction for students. Now more than ever the State Board of Education need to listen to educators and work with parents to meet students unique educational needs. The Board should pursue grants to help districts.

**Other Issues:** Texas has one of the nation's largest and fastest-growing public school enrollment counts-approximately 5.5 million. The cost of educating such a large population is tremendous and the Board will need to make important fiscal decisions in relation to the new Permanent School Fund Corp (SB 1232). Other issues include; Federal Mandates and books with obscene content.

**Campaign Website:** http://www.facebook.com/LjFrancisforTexas

## » DISTRICT 3

### » Marisa B. Perez-Diaz (D)

Unopposed

### » Lana Jean Holland (R)

No Response Received



**» Ken Morrow (R)**

**Qualifications:** I am a father of 4 children who began their education at Grace Christian Academy and then transferred to Gonzales ISD. My two oldest children graduated and went on to college, another graduates in 2022 and my youngest graduates in 2027.

**Charter Schools:** In general, I'm in favor of par-


OCA-APPX-1671

OCAGH_00005393

## » Ken Morrow (R) (*continued*)

ent's choice in their children's education. We have chosen a mixture of private and public school for our children.

**Inclusive Education:** I believe that Texas public school children should be taught American History, World History, Texas History and most importantly The Constitution of the United States of American.

**Recovery:** The first thing we can do is keep the schools open. If a student elects to do some work remotely, we need to have course material online both for review, and recovery from falling behind. If we had a statewide online learning system K-12

it could support teachers efforts in the in the districts without having the burden falling to individual teachers.

**Other Issues:** For the State Board of Education I believe that policies that support Teachers and Administrators which emphasize excellence: a joy for lifelong learning, and telling kids they can be anything they want to be if they work hard and make honest effort. Parents and teachers should never give up, and help the students love learning so they can be successful in life.

**Campaign Website:** http://kenmorrowforeducation.com

## » DISTRICT 4

### » Theldon Branch (D)

No Response Received



### » Staci Childs (D)

**Qualifications:** I run for this position having experience as a 4th and 5th grade English, Social Studies, and ESL educator, a Theatre Arts educator, Interventionist, Summer School Principal, Founder and CEO of an educational non-profit, and now a defense attorney.

**Charter Schools:** What I believe to be true is that charter school networks should work in tandem with public schools to ensure that all children are receiving high quality education. I would work to make sure public schools get adequate funding to address the needs of their students by making sure the public schools in my district have would they need to be equally successful.

**Inclusive Education:** This is extremely important to me. I think to ensure history education is implemented properly, a panel of current educators and practitioners must be created that will help develop this curriculum so that our students are experiencing inclusive education. The panel should be comprised of persons from every creed, race, gender, and lived experience.

**Recovery:** The State Board of Education can create a task-force comprised of businesses with high level technology and highly educated staff to work together with educators to double-down on the instruction and resources needed to fill the gaps. Companies such as Apple, Microsoft, and HP, have the resources and man power to provide support to our students recoup the learning lost.

**Other Issues:** The top priority of the State Board


OCA-APPX-1672

OCAGH_00005394

### » Staci Childs (D) (*continued*)

of Education right now is making sure our school districts, students, and parents feel empowered and equipped with what's necessary to make up for losses due to the pandemic. Aside from that, we must make our curriculum inclusive and relevant such that our students ready for the new world they will enter once they graduate.

**Campaign Website:** http://stacifortexas.com



### » Marvin Johnson (D)

**Qualifications:** I am a college professor and certified mathematics teacher with 20 years experience in industry and service in the U.S. Army. Viewing education at two levels has given me the tools to provide innovation, efficiency and productivity in education.

**Charter Schools:** The addition of new independent charter school networks has the potential to decrease resources to public schools that are in some cases already resource challenged. My goal is to minimize the impact to funding of all schools that are focused on truly educating our students.

**Inclusive Education:** Regarding history, I would work with the board to ensure that all students regardless of demographic would be represented when studying history. The first step to accomplish is to get all stakeholders in the same room on the same page.

**Recovery:** My approach to helping students catch up from the impact of the pandemic is to reestablish accountability for students, parents, teachers, and administrators alike. To recover, this must be a team effort. The State Board of Education can set reasonable guidelines to help drive programs to ensure all parts carry their load.

**Other Issues:** Ten points on my platform to address. They include: 1. Truth in Grading, 2. Behavior Guidelines, 3. Triad (Student, Parent, Teacher) Relationship, 4. Reinstate Hard-bound Textbooks (Paperbacks), 5. Teacher Certification only Requires 4-year Degree, 6. Use Technology Wisely, 7. School Safety, 8. Waste Minimization, 9. Teacher Pay, 10 School Funding Reform.



### » Coretta Mallet-Fontenot (D)

**Qualifications:** I have served Houston ISD for 23 years. My Bachelor's and Master's Degrees are in education. Currently, I am pursuing my doctorate in education. I have served as the District Advisory Committee Co-chair and am a former Campus Teacher of the Year.

**Charter Schools:** The Basic Allotment for each student enrolled in a public school is $6,160. I would limit new charter applications. Charter schools received an additional $1,058 per student. This means students in need of additional support may not have access to it. For example, may mean the difference between hiring a full-time speech therapist or contracting limited services.

**Inclusive Education:** America and Texas have rich and complicated histories. The Texas history curriculum should reflect that history. The TEKS should be objectively written and research-based by history teachers, so students learn the facts of our history.

**Recovery:** TEA should expand academic support along with social and emotional resources to help students recover academically and mentally dur-

OCA-APPX-1673

OCAGH_00005395

## » Coretta Mallet-Fontenot (D) (*continued*)

ing the pandemic. For example, hiring teaching assistants for core content areas, providing school day tutorials for students who are not able to attend tutorials outside of the school hours.

**Other Issues:** Issues that are of great importance for a strong public education system in Texas are: 1) fully funded public education 2) pay raises for school employees 3) fully funded pre-kindergarten and 4) offering multiple paths to graduation.

**Campaign Website:** http://corettaforsboe4.com

## » Larry McKinzie (D)

No Response Received

## » DISTRICT 5



### » Rebecca Bell-Metereau (D)

**Qualifications:** Elected SBOE District 5 2020, PhD, author 4 books, teaching Pre-K through graduate, Peace Corps Chad, Fulbright Scholar, Prof & Dir. Media Studies TXState, past Special Asst. to President, TXState for student retention, ran NEH, TCH teacher workshops

**Charter Schools:** Texas pits charters against local neighborhood schools, funding charter students 100% with state funding; local public schools get about 40% from state per pupil & remainder from property taxes, creating resentment & inequities. Local schools take all kids; charters send money out of state to management. Let's increase teacher pay instead of encouraging a duplicate system.

**Inclusive Education:** I'll urge content experts we've picked to produce inclusive, accurate standards that provide guidance, examples of important issues & freedom to address diversity & dissent. Follow student-led interests & community or service-based projects to encourage inclusive civic engagement. Teach about reliable sources, sound research methods, critical thinking, and civil discourse.

**Recovery:** SBOE can urge governor to give federal aid intended for education to Texas schools. Have $48.3 billion Permanent School Fund seek ways to direct earnings to needy districts for remediation, tutors, teacher pay, summer & after school, online access, & universal Pre-K. Ranking 39th in state spending per pupil, Texas uses money on admin & testing, rather than students needs.

**Other Issues:** We must educate the public & calm hysteria over manufactured crises. Fears about critical race theory & sex education have been cynically used to stir up censorship movements. This distracts from students' need for engaging civics, accurate history, science (particularly climate science), & age-appropriate, comprehensive sex education. Rethink & reform high-stakes testing.

**Campaign Website:** http://voterebecca.com/


OCA-APPX-1674

OCAGH_00005396

## » Kevin Guico (D)

**Qualifications:** I am the only candidate with first-hand experience at all levels of our TX education system from being a teacher aide, a district English teacher, a PD coach, community organizer - to now a strategic and technical advisor to Texas school districts.

**Charter Schools:** Currently, the student-based funding formulas that our TX education system operates around create a false dichotomy between public charter networks and district schools. As an advocate for quality community-based schools, I see emerging work in the state where district schools can access more local and state funding through innovative partnerships and smart policy making.

**Inclusive Education:** As the first Asian American on the board, I would advocate for our curriculum to include Asian American Studies, in addition to African American and Mexican American Studies, and for requiring Ethnic Studies for all so that students not only see themselves in their curriculum, but also learn across lines of difference and develop a more tolerant and inclusive generation.

**Recovery:** As a Board member, I plan to be a connector and facilitator to districts across the state to replicate what is working, reimagine what isn't, and leverage our federal and state emergency funds for districts to build back our educational infrastructure better. Districts across TX are doing innovative and resilient things to both protect our students and accelerate recovery.

**Other Issues:** The SBOE has the responsibility of ensuring our school boards have adequate training and support in the current contexts they face. I plan on empowering our local leaders by providing responsive and results-driven support to school board members and district leaders to center our students, drive for equity, and endure disruptive political wind shifts and adult interests.

**Campaign Website:** https://www.facebook.com/keving4sboe



## » Juan Juárez (D)

**Qualifications:** I am a gay Latino, a first generation college student, a current educator, a high performing principal, and I have over 11 years of experience teaching in and leading exceptional secondary schools.

**Charter Schools:** New charter schools must not decrease the per-pupil funding for traditional public school students. ISDs should present to the SBOE evidence of negative impacts on their per-pupil funding. Charter schools should state in their impact statements any intentions to grow enrollment capacity so that traditional public schools can temper their expansion decisions.

**Inclusive Education:** I will push back against efforts that eliminate diversity, equity, and inclusion (DEI) in state standards. The standards should ensure that the history about people of color is not white-washed. I will advocate to ensure that a demographically diverse group of teachers create and provide feedback on standards.

**Recovery:** A post-COVID world should include equity and achievement in conjunction with adaptability in the use of process standards. I will pass strong teacher and principal certification and learning standards. These standards will help prepare teachers for all types of learning environments, not just the traditional teaching and classroom model.

**Other Issues:** Schools should use a DEI lens when teaching the standards. I will ensure that this is a requirement. The first two aspects of this work — professional development on anti-racism and a BIPOC-led Diversity, Equity, and Inclusion task force — are key.

**Campaign Website:** http://www.juanjuarezforTx.org

OCA-APPX-1675

OCAGH_00005397



**» Mark Loewe (R)**

**Qualifications:** PhD Physics, UT Austin. BS Chemistry, BS Physics, UC Irvine. Taught physics at UT and Texas State U. Coauthored a quantum mechanics textbook. Did microelectronics R&D. Devised progressive school choice. Wrote a Texas bill to let kids keep textbooks.

**Charter Schools:** I devised progressive school choice in the 1980s to attract billions of private dollars per year into Texas K-12 education, maximize public education funds for children who attend public schools, and empower parents, including poor parents, to reject mediocre schools and choose safe schools that better serve the individual needs, abilities, and interests of their children.

**Inclusive Education:** The best way to improve K-12 education is to implement, or to enable voters to adopt, progressive school choice statewide or district wide. Parents may consider many things when choosing schools, including statistical results of statewide academic tests given at all schools that receive public education funds. I would vote to improve curricula and raise test standards.

**Recovery:** The SBOE should acquire low cost math, science, and other textbooks for children to keep permanently. Children may then easily review at home their familiar books from previous years. Authors and teachers may reduce review material and focus on new material. Top education systems follow this practice. Four Texas House bills were based on my proposal; I wrote 2009 HB 2959.

**Other Issues:** I found errors of roughly $752,000,000 in an unaudited Permanent School Fund schedule of investments issued by the Texas Education Agency and would lead PSF oversight. I found that incorrect scores on statewide math and science tests were issued to hundreds of thousands of Texas children; the TEA failed to correct the scores, issued false statements, and ill-served Texans.

**Campaign Website:** http://www.markloewe.org



**» Robert Morrow (R)**

**Qualifications:** There is no candidate for Texas State Board of Education who cares more about watermelon-sized titties than does presidential historian Robert Morrow. I also am the president of the Lyndon Baines Johnson Institute for the Study of Presidential Crime.

**Charter Schools:** I don't know that that impact is, you tell me? Whatever it is, I am completely opposed to charter schools. However I do support Texas high schools having "hot teacher" bikini contests every spring as a way of improving morale among the students. Charter school funding should go to supporting that. Pole dancing and twerking should be worked into the curriculum.

**Inclusive Education:** *Candidate's response did not meet the criteria as listed in this Voters Guide.*

**Recovery:** Wish them well. Tell them "good luck" in the future. I have a plan to let the University of Alabama have a recruiting station embedded into every 6A high school in Texas. As for Texas A&M they should be forced to start transsexual, lactating linebackers in the spirit of "diversity, equity and inclusion."

STEM program: I support teaching kids how to fart in Morse Code.

**Other Issues:** Sex education is a big one for me.



OCA-APPX-1676

OCAGH_00005398

## » Robert Morrow (R) (*continued*)

It should scientifically based and age appropriate. I have a plan to let teenage mothers to have their babies in 9th grade biology class or the school auditorium, subject to a parental waiver.

Teenage boys should be warned about the horrific dangers of masturbating with Elmer's glue.

As for the boobies, I love them soooooooo much!

**Campaign Website:** https://www.facebook.com /Robert.Morrow.888

## » DISTRICT 6

## » Michelle Palmer (D)

Unopposed



## » Will Hickman (R)

**Qualifications:** Will Hickman, a Republican from Houston, serves as the current member of the State Board of Education representing District 6. He has 5 degrees in engineering, law, and Spanish, and over 20 years work experience.

**Charter Schools:** Hickman is Pro-School Choice, and believes parents should choose the best option for their kids: home school, private school, public charter school, magnet, or zoned ISD schools. Hickman was awarded the 2020 Charter Champion Award from the Texas Public Charter Schools Association. He believes the current system where schools are funded by attendance works well.

**Inclusive Education:** Hickman is against CRT and SEL, and in favor of RRR (reading, writing, and arithmetic). For him, the goal of Texas education is to prepare all students for their own goals the day after graduation: enrolling in college, starting their career, starting a business, or enlisting in the military.

**Recovery:** Will Hickman is a parent with three kids in public schools. He is against school closures, virtual learning, vaccine mandates, and mask mandates. Closing the gap starts with opening every school, finding all the kids, and getting them back in the classroom.

**Other Issues:** Will Hickman is chairing the ad-hoc Flight Plan Committee with SBOE colleagues from North, East, and West Texas. This committee is looking around the state for how different ISD's implement the requirements of TEC 28.016, for college and career exploration in middle school, and deciding what the best options are for replacing existing SBOE career and college classes.

**Campaign Website:** http://willhickman campaign.com


OCA-APPX-1677

OCAGH_00005399



## » Mike Wolfe (R)

**Qualifications:** I am a Child Support Officer & Native Texan, a graduate of Houston Christian High School & The University of St. Thomas; I attended Ave Maria School of Law & served as a Juvenile Supervision Officer, Associate Teacher & Harris County School Trustee.

**Charter Schools:** Strong competition is a good thing. Charter Schools foster a healthy level of competition which makes for a better educational experience for our kids. Public Schools should not just automatically have free reign to do whatever they want to do. Parents should have a choice in where they send their kids to be educated. Including charter, private, public and home schools.

**Inclusive Education:** *Candidate's response did not meet the criteria as listed in this Voters Guide.*

**Recovery:** The first step to helping students who fell behind due to the Wuhan Virus would be to end mask mandates and lockdowns across all school districts in Texas and throughout the United States. The best way to recover from the Virus is to promote school vouchers and charter schools and home schooling and whatever forms of education are available and let parents pick the best.

**Other Issues:** Being born with 2 paralyzed vocal chords and a collapsed lung, I know what it means to be without a voice. I know that parents and kids need a voice in the process. Parents are the decision makers and School Board Members need to learn that. I'm an active member of Houston's Second Baptist Church, I have 2 nieces age 8 and 14 who attend Montgomery County Public Schools.

**Campaign Website:** http://www.MikeWolfe.com

## » DISTRICT 7

### » Dan Hochman (D)

Unopposed



## » Abolaji Tijani 'Ayo' Ayobami (R)

**Qualifications:** A product of Education whose successes are attributed to well rounded Quality Public Education up to the University where I acquired Masters of Engineering degrees(18yrs). Also I'm a Son of a Teacher of 36years and Father of 3 Public School attendees

**Charter Schools:** It may have slight impact on the local public school funding gasping for more funding from their insufficient budgetary allocation before.

However, Charter Schools independent existence is unstoppable due to Teachers Union remote teaching options in Pandemic era & Parental burdens of getting their Children sound Education.SBOE will checkmate this by funding the delinquency

**Inclusive Education:** When Students don't learn a comprehensive History Education, they tend to bastardized history and becomes History themselves. This is a dangerous phenomenon that is building the Critical Race Theories ideologies of radical and leftist agendas. The Constitution supported History Education by the Founding Fathers

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1678

OCAGH_00005400

## » Abolaji Tijani 'Ayo' Ayobami (R) (*cont.*)

proclamation. SBOE must make History Mandatory for K-12 mostly

**Recovery:** SBOE Should provide more funding for students that fell behind due to the pandemic & increase educators wages or incentivize Teachers who volunteered to set up after school hours programs for such vulnerable Students so they will be able to catch up on their educational abilities on the delinquent subjects. Focus should be on curriculum that addresses the deficient subject

**Other Issues:** The SBOE will have to find viable ways to bridge the Students funding deficit in the Public Schools, Find a way to stop the high dropped out rates, Review the Curriculum with emphasis more on STEM Education in compliant with the global demands, Review the Educators Wages and set the Teachers Student classroom Ratios to 1:16 to enable Student learning and Teachers attention

**Campaign Website:** http://www.aayobami.com

---

## » Michael Barton (R)

No Response Received

---



## » Julie Pickren (R)

**Qualifications:** I have been a School Board Trustee for the last 6 years in one of the fastest growing school districts in Texas. Under my leadership we built 9 new schools, lowered taxes, 98% graduation rate, and start our teachers at $63,000/yr with benefits.

**Charter Schools:** There is a need for school choice in poor minority neighborhoods. Most Texans have school choice because we can move to pick the school that will provide our children with a great education. Too many parents that do not have that option. We can do better by bringing school choice to low income minority neighborhoods to provide an equal opportunity education for every child

**Inclusive Education:** History education is not about needs or feelings. History is a set of facts that are necessary for children to learn so we can build on successes and not repeat mistakes. It is important we teach the rich history of America and Texas and the contributions by different cultures that make us great and also the great contributions America and Texas have made to the world.

**Recovery:** The SBOE can streamline teacher certifications to ensure every classroom has a certified teacher. Also, we need accurate education data that follows the student so we can quickly identify deficiencies and trends. I would also like to see more Instructional Coaches in our schools to provide support for our teachers and individualized instruction for struggling children.

**Other Issues:** We must ensure that every child in Texas has an Equal Opportunity Education. We can achieve this by replacing equity audits with opportunity audits, bringing school choice to neighborhoods where the schools are failing to educate children, and increase classroom transparency to foster parent / teacher relationships for student success.

**Campaign Website:** http://www.juliepickren.com



OCA-APPX-1679

OCAGH_00005401



**» Danny Surman (R)**

**Qualifications:** I am the only candidate in this race for State Board of Education that is a teacher. I taught US History to 8th graders for 5 years in Galveston, and I now work as an Instructional Coach in Dickinson ISD mentoring other history teachers.

**Charter Schools:** While the impact of charter school funding on public schools is not directly clear, too often school finance in Texas is a race to the bottom. There should not be a question of funding for charter schools affecting public finance or vice versa. The state contribution to public education must go up to ensure achievement for all students, regardless of charter funding.

**Inclusive Education:** Social studies educators in Texas must teach the facts as they happened. Critical race theory should not be the way those facts are taught. The United States has a diverse history, and students should see themselves in that history as it happened. Teachers must continue to have a strong voice in the revision of the social studies standards to ensure the facts are taught.

**Recovery:** I hesitate to force another initiative onto school districts that is implemented out of compliance rather than belief in the program. Schools must stop chasing the latest shiny object. We have a rigorous set of standards (the TEKS) that holds students to high achievement. Teachers and schools know the best practices to raise student achievement to meet those standards.

**Other Issues:** The State Board of Education reviews standards written by the State Board of Educator Certification (SBEC). School districts rely too much on alternative certification programs that teacher candidates rush through in just weeks. We need to raise pay for higher qualified teachers certified through an established institution of higher learning.

**Campaign Website:** http://surmanforschools .com

## » DISTRICT 8

### » Jonathan Cocks (D)

Unopposed

### » Audrey Young (R)

Unopposed

## » DISTRICT 9

### » Keven M. Ellis (R)

Unopposed



OCA-APPX-1680

OCAGH_00005402

## » DISTRICT 10

### » Tom Maynard (R)

Unopposed

## » DISTRICT 11



### » "DC" Caldwell I (D)

**Qualifications:** -4 years military leadership development training -Law degree (JD) -8 years teacher certified -More certification areas than any other candidate -Student experience at 4 universities, 4 community colleges, 3 elementary, and 4 secondary schools -Etc.

**Charter Schools:** Charter schools compete and collaborate with local public schools for state per-student grant funding. Charter grants result in higher average contribution from state budgets on students in that school district's boundaries. Higher state contributions increase the community's share of the state budget as compared to areas with similar student population without charters.

**Inclusive Education:** To be inclusive and address needs, focus on application—not trivia. I reviewed Texas Administrative Code Title 19, Part II, Chapters 110-130 Texas Essential Knowledge and Skills (TEKS), so I advocate for replacing "understand" with "apply," "identify" with "choose," "discuss" with "demonstrate," and similar replacements to emphasize USING knowledge and practical skills.

**Recovery:** The Board can promote implementation of templates for model recovery programs that are already developed, vetted, and optimized for best practices. Existing recovery resources recommend many of the same principles and guidelines that already work well: -Assign support staff -Provide mentorship -Offer a range of choices -Allow scheduling flexibility -Focus long-term -Etc.

**Other Issues:** The SBOE approved a Long-Range Plan for Public Education in 2018 but did not publish updated legislative priorities for 2021, and I would want to improve some. Looking at the 2019 priorities, I see that the TEKS are based on Texas Education Code Section 4.002, so I recommend an update to the 1995 Public Education Academic Goals that recognizes improvements in technology.

**Campaign Website:** http://ballotpedia.org/DC_Caldwell



### » Luis Miguel Sifuentes (D)

**Qualifications:** I am a former educator, husband and father with a graduate degree (MBA) in management. I have always been passionate about education and I wish to continue serving the students, parents and educators of District 11.

**Charter Schools:** Because funding is based on student enrollment, as students move from public schools to charter schools, they take their student allotment with them. The SBOE should advocate for equitable, fair and transparent funding of our schools and keep that in mind when approving new charters.

**Inclusive Education:** As a former educator and

OCA-APPX-1681

OCAGH_00005403

### » Luis Miguel Sifuentes (D) (*continued*)

social studies teacher, I became very familiar with the TEKS. As a general principle, curriculum and instructional material should be based on fact and inclusive of the good, the bad and the ugly. The SBOE should be inclusive curators of history, ensuring that the identities of all students are included, not just the identities of a few.

**Recovery:** The SBOE can adopt instructional materials that are relevant and inclusive to help re-engage disconnected students. The SBOE also needs to spur strategies in schools that address the mental health needs of students as they cope with the disruptions and loss brought about by the pandemic.

**Other Issues:** The SBOE should work to ensure that they are transparent in their decision making while getting feedback from its customers: educators, parents, and students. I will work to ensure that the voices of parents, educators, and students are solicited and acted upon.

**Campaign Website:** http://www.LuisMiguel SifuentesforTexas.com

---

### » James Whitfield (D)

No Response Received

---



### » "DC" Caldwell (R)

**Qualifications:** -4 years military leadership development training -Law degree (JD) -8 years teacher certified -More certification areas than any other candidate -Student experience at 4 universities, 4 community colleges, 3 elementary, and 4 secondary schools -Etc.

**Charter Schools:** Charter schools compete and collaborate with local public schools for state per-student grant funding. Charter grants result in higher average contribution from state budgets on students in that school district's boundaries. Higher state contributions increase the community's share of the state budget as compared to areas with similar student population without charters.

**Inclusive Education:** To be inclusive and address needs, focus on application—not trivia. I reviewed Texas Administrative Code Title 19, Part II, Chapters 110-130 Texas Essential Knowledge and Skills (TEKS), so I advocate for replacing "understand" with "apply," "identify" with "choose," "discuss" with "demonstrate," and similar replacements to emphasize USING knowledge and practical skills.

**Recovery:** The Board can promote implementation of templates for model recovery programs that are already developed, vetted, and optimized for best practices. Existing recovery resources recommend many of the same principles and guidelines that already work well: -Assign support staff -Provide mentorship -Offer a range of choices -Allow scheduling flexibility -Focus long-term -Etc.

**Other Issues:** The SBOE approved a Long-Range Plan for Public Education in 2018 but did not publish updated legislative priorities for 2021, and I would want to improve some. Looking at the 2019 priorities, I see that the TEKS are based on Texas Education Code Section 4.002, so I recommend an update to the 1995 Public Education Academic Goals that recognizes improvements in technology.

**Campaign Website:** http://ballotpedia.org/DC _Caldwell


OCA-APPX-1682

OCAGH_00005404



**» Rebecca Garcia (R)**

**Qualifications:** I worked with children teacher assistant in private and public schools for over 12 years. I am an active mother of four and grandmother of fourteen that has been active in their education.

**Charter Schools:** The charter schools are competition for the federal education dollars; However, they offer a superior product to our students. No, I believe funding should follow the student whether public or private education.

**Inclusive Education:** Students should be taught about American or Texas History in our Education. Our responsibility is to teach true history, of the country and the contribution of all people make in the country.

**Recovery:** The school can promote peer to peer tutoring, and study groups for a subject. Provide for additional teacher assistance to help with interactive study. Provide some Saturday school study.

**Other Issues:** Safety for students and staff. Students need to be taught in the different learning styles, adequate for each individual. Students need to be taught the basics.



**» Patricia "Pat" Hardy (R)**

**Qualifications:** One does not need to be a teacher to be on the Board but it helps. With many years of experience as a classroom teacher and inside administrator in public schools, I came with a wealth of knowledge. Being an incumbent has increased that knowledge.

**Charter Schools:** Charter schools impact local districts if they draw students away from the district, creating lower enrollment, the same impact if a student moves out of district. The vast majority of growth in charter schools is due to expansions of existing charters and not from granting new charters. The method of finance for charter schools has been determined by the Legislature.

**Inclusive Education:** The state social studies standards are inclusive. Realizing that our state school population is now minority majority, the Board needs to ensure that the standards are factual as well as sensitive to our changing demographics.

We are the only state that offers two ethnic studies courses for state credit. Next year we will add a third ethnic studies course.

**Recovery:** The state legislature addressed this in the last session by sending funding to districts for remediation for the students with gaps resulting from Covid. The effectiveness of remediating students after a full day of class concerns me greatly. I would support a temporary change in the STAAR testing, making it solely diagnostic thus removing the report card pressure.

**Other Issues:** School safety concerns me greatly. Much volatility is resulting from bullying situations. I think that building a more secure sense of community and respect for all students might be something that could be folded into the soon to be revised Social Studies TEKS. As a board we need to delve into the pros and cons of virtual schooling. Districts were not prepared for Covid.

**Campaign Website:** http://hardyforeducation.com/

**» Joshua Tarbay (R)**

No Response Received

OCA-APPX-1683

OCAGH_00005405

## » DISTRICT 12



### » Alex Cornwallis (D)

**Qualifications:** In my profession, I solve incredibly complex problems through simple and effective solutions. Also, I am a community leader who has worked extensively with all levels of government to bring in resources and improvements for our community's education.

**Charter Schools:** Charter schools take away funding from our taxpayer funded public school systems, and due to their independent status, are not very transparent.They will require an additional layer of accountability to be effective and that cost brings no value to our taxpayers. I will deprioritize the new approvals of Charter schools and will increase oversight on the current charters.

**Inclusive Education:** I understand that history is a collective experience that our forefathers have transmitted to us. It is extremely important to learn from that experience so that we don't repeat the mistakes of the past and are able to plan for a better inclusive future by using history as a guide. Our nation's history needs to be taught as is, with facts, and with absolutely no omissions.

**Recovery:** Arrange for a temporary spike in funding so that local school districts can hire additional teachers and also invest on additional remedial materials to facilitate an unprecedented rapid academic recovery.

**Other Issues:** Bring parity to teachers' salary. Texas is significantly behind in teachers' salary from the national average. Set a high priority to modernize the curriculum for STEM, arts, environmental sciences, critical thinking, health sciences and sports. The State Board of Education should do everything they can to shield the teachers from unreasonable and confusing legislation.

**Campaign Website:** http://www.alexfor education.com/

### » Roberto Velasco (D)

No Response Received

### » Pam Little (R)

Unopposed

## » DISTRICT 13

### » Aicha Davis (D)

Unopposed



OCA-APPX-1684

OCAGH_00005406



## » Natalie Kohn (R)

**Qualifications:** High school physics teacher for Fort Bend ISD & Dallas ISD. Curriculum writer for secondary science in FBISD, as well as assistant principal intern.I've earned multiple awards for district wide top testing scores. Today I am a parent, and PTO member.

**Charter Schools:** I do not believe that charter schools pose a major threat to the public school system. A fiscal challenge, perhaps, but not such a negative impact that a school district will immensely suffer. We are putting an enormous amount of tax payer dollars in public schools, so parents should be able to direct their student and their money to whichever school they choose is best.

**Inclusive Education:** I do not believe in discounting any merits made in history. Along with any great accomplishment, disparity and hardship played a crucial role in its development. Teach history unvarnished, acknowledge that very sensitive issues still exist today, but avoid any manner of instruction that establishes division.

**Recovery:** Initially, reengage disconnected students that feel lost or too far behind by providing them with support and interventions to cover lost ground. Break out groups for small group tutoring in the morning for those students who have been identified as needing help. Outside of school provide students with access to learning technology and engaging learning material.

**Other Issues:** Teacher retention is a huge issue. I do not believe in continuously raising the starting salary for entry level teachers. Those available funds should be either spent on veteran teachers, or on programs for new teachers still in their first 5 years, or a more cost efficient incentive program. Money is a temporary fix - teachers need to feel valued, supported, & respected.

## » Ajua Mason (R)

No Response Received

## » Kathryn Monette (R)

No Response Received



## » A. Denise Russell (R)

**Qualifications:** I have been in the education field for over 20 years. I have served on local school district committees that have recommended textbook adoptions and established curriculum guidelines.

**Charter Schools:** The local public schools are receiving 100% of the funds allocated towards the students enrolled in their schools.

**Inclusive Education:** I would review the current history curriculum versus the actual account of the incident to ensure that what is being taught presently is what actually occurred in history.

**Recovery:** The State Board of Education can work with the Texas Education Administration to develop

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1685

OCAGH_00005407

## » A. Denise Russell (R) (*continued*)

a common program for all local schools to use on students that have fallen behind due to the pandemic. **Other Issues:** Creating more life-applicable courses in order to graduate Texas students who are better socially and financially prepared for success after high school.

**Campaign Website:** http://adeniserussell.net

## » DISTRICT 14

## » Tracy Fisher (D)

Unopposed



## » Evelyn Brooks (R)

**Qualifications:** I have over 23 years of teaching practice and experience. This experience includes classroom teaching, tutoring, homeschooling, mentoring, the founder of a small Frisco homeschool program, summer STEM science youth camp program, and facilitator.

**Charter Schools:** On average, charter schools receive $676 less per student than local public schools, and receives no local revenue. Charter schools receive 100% of funding from Texas state sources, and is the only funding they receive. Local public schools receive both local property tax revenue, and state sources. I would not change that impact.

**Inclusive Education:** In the name of Inclusive Education, many children think socialism is good, and few know the difference between thinking and feeling. I will defend the civil liberties and rights guaranteed to every child, and ensure the development of a history curriculum that is untainted by any political agenda, and teaches all students our American national heritage.

**Recovery:** This year Texas students' math test performance dropped from 50% of students meeting their grade level in 2019, to only 35%. The State Board of Education can assist local school districts by developing programs that invest most ESSER resources into math and reading programs that accelerate learning and supports all students and teachers.

**Other Issues:** Other issues I believe will be the most pressing for the State Board of Education is to address the overreach of influence and control of our local school districts by the taxpayer funded lobbyist groups TASB and TASA, the moral corruption of Comprehensive Sexual Education, and the invasive teachings of emotional and behavioral control through Social and Emotional Learning

**Campaign Website:** http://evelyn4texaseducation.com

## » Sue Melton-Malone (R)

No Response Received

OCA-APPX-1686

OCAGH_00005408

## » DISTRICT 15



### » Jay Johnson (R)

**Qualifications:** 1.SBOE-elected 2020 2.Pampa ISD Trustee for 16+ years, 3.Long range planning comm. for PISD, 4.Co-chair citizen's comm. successfully passed bond issue, 5.Hundreds of hours of school board training, 6.Planning comm. Pampa HS multipurpose building.

**Charter Schools:** Every student/parent deserve options if trapped in a poor performing public school. Charter schools are currently the PUBLIC OPTION. Charter schools are utilized by 6.7% of Texas students, but 20% of funding, therefore charters must perform. SBOE and the legislature need to do an in depth study of charter school performance to determine effectiveness and/or other solutions

**Inclusive Education:** SBOE is reviewing all Social Studies in 2022. Appointing Highly Qualified Content Advisors and Work Groups is mandatory. TEKS must be carefully scrutinized. Comprehensive History is comprehensive history for all Texas students. The knowledge students in Texas classrooms NEED is the same for all students in all social studies [civics] classes. Education techniques may vary.

**Recovery:** C19 Closures plus typical summer slide averaged 5.7 months learning loss for 2020 school year. Instructional material must be changed to assist accelerated learning. High quality tutoring must be used to accelerate closing learning gap. Billions of dollars have been allocated for Texas schools. SBOE and TEA must be flexible to allow school districts to make local choices

**Other Issues:** SBOE has authority to review local school board training. SBOE should investigate if local board training might improve relationships and understanding between all stakeholders. Critical Race Theory has become a hot button issue. SBOE should do everything possible to be certain that all revised TEKS and Instructional material are compliant with newly passed CRT legislation

**Campaign Website:** http://jayjohnsonsboe.com

---

### » Aaron Kinsey (R)

No Response Received

---

# CHIEF JUSTICE AND JUSTICE, COURT OF APPEALS

Six-year term. Courts of Appeals hear appeals on civil and criminal cases from lower courts in their districts. Current salary for Chief Justice: $187,800. Current salary for Justice: $184,800.

**» See VOTE411.org to compare Court of Appeal candidates in your district.**

© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1687

OCAGH_00005409



## » HELPFUL CONTACTS AND WEBSITES

**League of Women Voters of Texas**
lwvtexas.org

**Secretary of State**
VoteTexas.gov

**Your County Election Website**
lwvtexas.org/find-your-county-election-website

**Election Protection**
866OURVOTE.org

### Voter Hotlines!
- English: 866-OUR-VOTE or 866-687-8683
- Spanish: 888-Ve-Y-Vota or 888-839-8682
- Asian: 888-API-VOTE or 888-274-8683
- Disability Rights TX: 888-796-VOTE or 888-796-8683

**Republican Party**
texasgop.org

**Democratic Party**
txdemocrats.org

**Libertarian Party**
lptexas.org

**Green Party**
txgreens.org





## EMPOWERING VOTERS. DEFENDING DEMOCRACY.

The LWV is a nonpartisan political organization and is one of America's most trusted grassroots organizations! We aim to:

- Achieve a free and fair democracy
- Increase participation in government
- Expand voter participation in Texas
- Create a League that is diverse, equitable, and inclusive.

**League of Women Voters of Texas Voter Education Chair:** Dorothy Marchand
**Production Team:** Community Impact, Inspirare Communications, Jaci Collins, Motto Publishing Services, Trúc Việt Organization



## » TEXAS LOCAL LEAGUES

Learn more about our local Texas Leagues and how they help shape today's important issues by visiting **lwvtexas.org**.

| | | | | |
|---|---|---|---|---|
| Amarillo | Comal Area | Fort Bend County | Midland | Tarrant County |
| Austin Area | Cooke County | Hays County | Montgomery County | Tyler/Smith County |
| Bay Area | Corpus Christi | Hill Country | Richardson | Victoria |
| Baytown | Dallas | Houston | Rio Grande Valley | Waco Area |
| Cy-Fair | Denton | Irving | San Antonio Area | Wichita Falls |
| Collin County | El Paso | Lubbock County | South Central Texas | Williamson County |


OCA-APPX-1688

OCAGH_00005410



# » *VOTERS GUIDE* SPONSORS AND SUPPORTERS

LWV Texas *Voters Guides* are funded by the League of Women Voters of Texas, a 501(c)(3) corporation that is supported by contributions from individuals, corporations, and foundations. We would like to acknowledge the following generous *Voters Guide* sponsors and major donors, as well as the donations from all of our supporters which make the publication of this *Voters Guide* possible.

## Platinum *Voters Guide* Sponsors

Carillon Senior Living
League of Women Voters Education Fund
Texas Association of Counties
Women in Technology at Samsung ("WITS")

## Gold *Voters Guide* Sponsors

Ruthann Geer
Dorothy Marchand and John Bassett
Diane Sheridan, Facilitator
TeachtheVote.org, a Project of the Association of Texas Professional Educators (ATPE)
Unitarian Universalists of New Braunfels
Elaine Wiant

## Major 2022 Contributors

Anonymous
Arnold Foundation
Diana Bacon
Elizabeth Branch
Charles Burgess
Stefanie Cavanaugh
Grace Chimene
Paul and Marian Cones
Ruth Davis
Vevra Densmore
Deirdre Doyle
Barbara Frandsen
Vikki Goodwin
Linda Hanratty
Kathleen Irvin
Deborah and John Kochevar
Joyce LeBombard
Laurie McNeill Lee
Louis and Carole Shilpak Philanthropic Fund of the Dallas Jewish Community Foundation

Julie and Michael Lowenberg
Elisabeth MacNamara
Mary C Decker Charitable Fund
Marston Meador
Imogene Mitchell
T. Michael O'Connor
Mr & Mrs Charles Parrish
Madeleine Sann
Alana Spiwak
Deb Treece
Linda Wassenich
William and Wen Devanney Family Fund
Wintemute Family Foundation
Erica Wilson











© 2022 League of Women Voters of Texas | lwvtexas.org


OCA-APPX-1689

OCAGH_00005411



# LEAGUE OF WOMEN VOTERS® OF TEXAS

## NONPARTISAN
# VOTERS GUIDE

**GENERAL ELECTION » NOVEMBER 8, 2022**

Governor » Lieutenant Governor » Attorney General » Comptroller of Public Accounts »
Commissioner of General Land Office » Commissioner of Agriculture » Railroad Commissioner »
Texas Supreme Court » Texas Court of Criminal Appeals » State Board of Education » Court of Appeals

**EARLY VOTING: Oct. 24–Nov. 4, 2022 » ELECTION DAY: Nov. 8, 2022. Polls open 7 a.m. to 7 p.m.**

## » VOTING IN TEXAS

All Texas voters are encouraged to vote in the General Election!

The November 2022 General Election will determine who will lead us at the state level, represent us in Congress, rule on important civil and criminal cases, set the Texas school curriculum and run our cities and counties. All the races will have an impact on the lives of Texans. As you know, the League of Women Voters of Texas is working hard to make sure Texas voters have the information on candidates they need to make informed decisions.

Texas no longer has straight-ticket voting. So, voters in Texas cannot check one box to vote for one party's full slate of candidates. Instead, voters mark a box for their candidate choice for each race in which they want to vote. Candidates representing a party are identified with a letter following their name: "R" for Republican, "D" for Democrat, "L" for Libertarian, or "G" for Green. Candidates in many local elections are nonpartisan and do not represent a party.

## » SIGN UP FOR VOTING REMINDERS!

To get voting reminders on your phone, text LWVTX to 80123.

**Text: LWVTX**
**TO: 80123**

## » ABOUT THIS *VOTERS GUIDE*

This *Voters Guide* is funded and published by the League of Women Voters of Texas. The League never supports or opposes political candidates or political parties.

@ 2022 League of Women Voters of Texas | lwvtexas.org
The *Voters Guide* is protected by copyright.
For permission to duplicate the *Guide*,
please call the LWV Texas office at 512-472-1100.
Any use of the League of Women Voters name in campaign
advertising or literature has not been authorized by the League.

© 2022 League of Women Voters of Texas | lwvtexas.org

## »EMPOWERING VOTERS.
## DEFENDING DEMOCRACY.

### » ONLINE *VOTERS GUIDE*

The online, interactive version of the *Voters Guide* is at **VOTE411.org**. By entering your address, you can view races and candidates on your ballot, compare candidates' responses to unbiased questions posed by the League, and create a print-out of your choices to take to the polls. If there is a local League in your community, you can also find information on any local races.





### » *VOTERS GUIDE* CONTENTS

Be a Texas Voter!  2
Voter ID—What to Take to the Polls  3
League *Voters Guide* Policy  3
Helpful Contacts & Websites  3
Governor  4
Lieutenant Governor  5
Attorney General  6
Comptroller of Public Accounts  7
Commissioner of General Land Office  8
Commissioner of Agriculture  9
Railroad Commissioner  9
Texas Supreme Court  12
Texas Court of Criminal Appeals  14
State Board of Education  16
Court of Appeals  23
Sponsors and Major Donors  24
Local Leagues in Texas  24



OCAGH_00016663

OCA-APPX-1690



# » BE A TEXAS VOTER!

The League of Women Voters of Texas fights for the freedom of ALL Texans to vote. Your vote is your voice . . . below are the ways to exercise your right to vote. Whichever way you choose to vote, be sure to first check your voter registration status at **VoteTexas.gov**! You must be registered before you can vote!

## » VOTE BY MAIL

- You can vote by mail if you are:
  - 65 years or older
  - Sick or disabled
  - Out of the county during early voting and on Election Day
  - Expecting to give birth within 3 weeks before or after Election Day
  - In jail, but otherwise eligible to vote.
- To vote by mail in Texas:
  1. Get an application:
     - Download or print the application from **lwvtexas.org**, **VoteTexas.gov**, **OR**
     - Call your County Election Office to request an application.
  2. Fill out the application:
     - Provide all the required and requested voter information, including:
       - Your contact information, in case there's an issue with your application.
       - Your ID numbers
         - Your TX Drivers License or TX Personal ID number, **AND**
         - The last four digits of your social security number.
       - Mailing address to where your ballot will be sent.
       - Reason for voting by mail.
       - The election for which you are requesting a ballot.
         - If 65 or older, or disabled, you can check "Annual Application" to receive ballots for all elections for that calendar year.
         - In even years, mark in which party primary and runoff election you want to vote.
       - Sign and date the application.
       - If somebody assisted you with the application or witnessed your signature or mark, they must complete the section provided on the application.
  3. Return your completed application as soon as you can.
     - The application must be received at least 11 days before Election Day. You can:
       - Mail the application to the County Election Office, addressed to the Early Voting Clerk, **OR**
       - Hand deliver your application to your County Election Office.
  4. When your ballot arrives, mark and pack it:
     - Mark your ballot with a black or blue pen.
     - Fill out the ovals completely—do not mark with X's, checks or circles.
     - Put your ballot in the ballot envelope and seal it. Put only one ballot in each ballot envelope.
     - Place the ballot envelope in the carrier envelope—wait to seal the carrier envelope!
  5. Fill out the carrier envelope with the following information:
     - Your ID numbers
       - Your TX Drivers License or TX Personal ID number, **AND**
       - The last four digits of your social security number.
     - Your contact information, in case there's an issue with your ballot.
     - Seal the envelope in both places, then **sign over the flap**.
     - If an assistant helps you complete the ballot, they must fill out the required information in the space provided on the carrier envelope.

- If you're unable to sign, your witness must fill out the required information in the space provided on the carrier envelope.
  6. Return your ballot as soon as you can!
     - Your ballot must be received by 7:00 p.m. on Election Day. You can return it using one of the following:
       - Mail your ballot by the U.S. Postal Service, using two stamps if you are not sure. You can also use FedEx, UPS or DHL to return your ballot. **OR**
       - Hand deliver your ballot in person to your main County Election Office on Election Day while the polls are open. You must show a photo ID. **OR**
       - Vote in person instead:
         - Take your mail ballot to your polling place during early voting or on Election Day to vote a regular ballot.
         - If you lose or forget your mail ballot, you can vote using a provisional ballot.
  7. Track your ballot at **VoteTexas.gov**!

## » VOTE EARLY IN PERSON

- You may vote early at any voting location in your county.
- Find polling places at **VOTE411.org** or on your county election website.
- If you have a disability, you may request to move ahead of other voters in line.
- If in line before the poll closing time, you must be allowed to cast a ballot.

## » VOTE ON ELECTION DAY

- In some counties, you can vote at any polling place. In other counties, you can vote only at your precinct.
- Find polling places at **VOTE411.org** or on your county election website.
- If you have a disability, you may request to move ahead of other voters in line.
- If in line before the poll closing time, you must be allowed to cast a ballot.

## » VOTE IN PERSON USING CURBSIDE VOTING

- If you are physically unable to enter the polling place without personal assistance or likelihood of injuring your health, you may ask that an election officer bring a ballot to your car.
- After you mark your ballot, give it to the election officer or hand it to a companion to deposit in the ballot box for you.
- It is best to call ahead so election officials will expect you!

## » VOTE EVEN IF YOU ARE A SUSPENDED VOTER

You can still vote if your voter registration is in suspense! "Suspense" means that your county voter registrar needs to confirm your voting address.

## » VOTE A LIMITED BALLOT IF YOU HAVE MOVED BUT NOT RE-REGISTERED

If you have moved to a new county and have not re-registered in the new county by the registration deadline, you may be eligible to vote a limited ballot in your new county. A limited ballot is one that allows you to vote on candidates and measures that are on the ballot for both your former county and your new county, such as statewide and national races. Voting a limited ballot is only available during early voting at the main early voting polling place.


© 2022 League of Women Voters of Texas | lwvtexas.org

OCAGH_00016664

OCA-APPX-1691



# » VOTER ID: WHAT TO TAKE TO THE POLLS

You may use one of seven forms of photo ID, listed below.

- Texas Driver License
- Texas Election Identification Certificate
- Texas Personal Identification Card issued by the Department of Public Safety (DPS)
- Texas Handgun License issued by DPS
- US Military Identification Card containing the person's photograph
- US Citizenship Certificate containing the person's photograph
- US Passport (book or card)

Note:

- IDs may have expired up to four years.
- Persons 70 years or older may use an expired ID, regardless of expiration date.
- ID address does not have to match the voter registration address.
- The name on the photo ID should match the voter registration card or be "substantially similar." If the names don't match exactly but are substantially similar, the voter will initial a box for a similar name when signing in to vote.

Registered voters without photo ID, who cannot reasonably obtain one, may sign a form (described below) and present the original or a copy of one of the following documents with the voters name and address to vote a regular ballot:

- Texas voter registration card
- Certified birth certificate
- Current utility bill
- Bank statement
- Government check
- Paycheck
- Any other government document such as an out of state driver's license or expired Texas driver's license.

The form to be filled out by registered voters without a photo ID is a "Voter's Declaration of Reasonable Impediment or Difficulty". The voter must mark on the form one of the following reasons for not providing a photo ID:

- Lack of transportation
- Disability or illness
- Lack of birth certificate or other documents needed to obtain an acceptable form of photo ID
- Work schedule
- Family responsibilities
- Lost or stolen identification
- Acceptable form of photo ID applied for but not received.

## » VOTER HARASSMENT

- Election officials cannot question a voter about the use of an ID type.
- Poll watchers may never question a voter about Voter ID issues.
- If you are harassed, call or text Election Protection at 866-687-8683!

## » LEAGUE *VOTERS GUIDE* POLICY

- For the races covered in the *Voters Guide*, all candidates on the ballot with opponents are invited to participate.
- Unopposed candidates are listed, but not invited to participate.
- Candidate replies are printed without editing or verification. The League assumes no responsibility for the content of the candidate responses.
- Negative references to opponents (including officeholders) or specific persons are not allowed.
- If the League determines a response does not meet the criteria listed in this *Voters Guide* and, if time allows, the candidate will be contacted and given an opportunity to reword that response. If not changed, in place of a response that does not meet the criteria, the *Voters Guide* will state "Candidate's response does not meet the criteria listed in this *Voters Guide.*"
- Videos that do not comply with the criteria listed in this *Voters Guide* are removed.
- Links to websites that are not official campaign websites or social media pages are removed.
- The *Voters Guide* is organized by office, with candidates listed by party, including the names of unopposed candidates. For primary and runoff elections, the order of the parties is alternated each election year. For general elections, the parties are listed in ballot order.
- Candidates with no photo in this *Voters Guide* did not submit a photo by the print deadline.
- Candidates who do not respond to our questionnaire by the print deadline are listed with the notation "No response received by the print deadline". If submitted after the print deadline, their information may be found at **VOTE411.org**.

## » HELPFUL CONTACTS AND WEBSITES

**League of Women Voters of Texas**
lwvtexas.org

**Secretary of State**
VoteTexas.gov

**Your County Election Website**
https://www.sos.texas.gov/elections/voter/links.shtml

**Election Protection**
866OURVOTE.org

**Voter Hotlines!**

- English: 866-OUR-VOTE or 866-687-8683
- Spanish: 888-Ve-Y-Vota or 888-839-8682
- Asian: 888-API-VOTE or 888-274-8683
- Arabic: 844-YALLA-US or 844-925-5297
- Disability Rights TX: 888-796-VOTE or 888-796-8683

**Republican Party**
texasgop.org

**Democratic Party**
txdemocrats.org

**Libertarian Party**
lptexas.org

**Green Party**
txgreens.org



OCA-APPX-1692

OCAGH_00016665

# GOVERNOR

Four-year term. The governor is the chief executive of the state. They appoint members to boards and commissions; appoint statewide executive officials, state judges and district attorneys when vacancies occur; declare special elections to fill vacancies in certain elected offices; deliver the State of the State address; provide guidance to the legislature; call special sessions of the legislature and set the agenda; and serve as commander-in-chief of the state's military forces. The governor can veto legislation (including a line-item veto on appropriations), sign legislation, or allow it to become law without their signature. Current Salary: $153,750

## » QUESTIONS TO CANDIDATES

**Gun Safety:** What steps, if any, should be taken to curb gun violence in our communities?

**Economy:** What can be done at the state level to address the high rate of inflation and other economic challenges faced by Texans?

**Power Grid:** What can be done to ensure that Texas has sufficient power during extreme weather conditions?

**Elections:** Considering the high rate of vote-by-mail ballot rejections in the 2022 Primary Elections, what changes, if any, are needed to election laws?

**Immigration:** What is the role of the state government in addressing immigration at the border?

**Abortion:** How would you address the economic and health consequences for those who cannot obtain abortions in Texas?

### » Greg Abbott (R)

No response received by the print deadline



### » Beto O'Rourke (D)

**Gun Safety:** I will always prioritize the lives of our children and the safety of our fellow Texans over any special interest. As governor, I will fight for bipartisan, commonsense gun safety measures that the majority of Texans agree on, like raising the minimum age to purchase an assault rifle to 21, implementing universal background checks, and establishing a red flag law system.

**Economy:** I'll lower property taxes by closing the loopholes that allow wealthy corporations to push their tax burden onto homeowners and small businesses. I'll reduce energy bills by fixing the problems with the Texas power grid, investing in energy efficiency, and providing direct bill assistance. And I'll raise the minimum wage to $15/hour so that hardworking Texans can afford to support their families.

**Power Grid:** To prevent another deadly blackout and lower Texans' skyrocketing electricity bills, I will connect Texas to the national grid, weatherize all elements of our energy infrastructure, invest in energy efficiency, build out more transmission and storage capacity, and establish mechanisms to prevent energy companies from price gouging ratepayers.

**Elections:** I will ensure every eligible voter in Texas can freely and fairly cast their ballot, including by repealing onerous and purposefully confusing vote-by-mail procedures, implementing online and same-day voter registration, guaranteeing easy, equitable access to polling places, and establishing independent redistricting commissions to end gerrymandering.

**Immigration:** The state government should provide local communities the support they need to respond to migration flows at the border in a safe and orderly fashion. That can include support for migrant processing, shelter, and transportation—as long as it is done in a way that reflects our values, upholds U.S. asylum laws, and refrains from wasting taxpayer dollars on political stunts instead of solutions.

**Abortion:** I will fight to repeal Texas' extreme abortion laws that endanger the lives of women and make no exception for rape or incest. I will also strengthen investments in women's health and family planning programs to increase access to contraception and cancer screenings, and combat Texas' maternal mortality crisis by expanding Medicaid and increasing pregnancy Medicaid to one-year postpartum.

**Campaign Website:** https://www.betofortexas.com



### » Mark Tippetts (L)

**Gun Safety:** To meet Texans' security and education preferences, I support a school choice system so all Texans can afford to send their children to private, public, or home school. Cut taxes and government spending to create a more vibrant economy that draws people away from criminal activity. Curb drug war-related violence by legalizing marijuana.

**Economy:** As a Libertarian, I'm in favor of reducing government spending and lower taxes at all levels. Inflation is caused by the federal government printing more money to cover its massive spending which devalues the dollar. Currently a few insiders grant targeted tax cuts and incentives to get businesses to move here. Instead, I support taxing all businesses at the same, but a lower rate overall.

**Power Grid:** I built a hydroelectric plant in Belize, Central America and know that bad decisions by government regulators have caused our power grid problems and outages. We need to get the governments out of the energy management business so one bad decision-maker can't harm the entire state. We need to eliminate the current taxes and subsidies on all forms of energy and allow new nuclear generation.

**Elections:** The Republican and Democratic parties passed laws imposing new fees on Libertarians which make it harder for Libertarians and others to run for office. I helped file lawsuits to overturn these bad laws. Republicans and Democrats shouldn't get to outlaw competition. Let the people decide who to vote for. I support efforts that make it convenient to vote, while protecting election integrity.

**Immigration:** It's nearly impossible to immigrate to America legally. We could end most illegal immigration by enacting a good comprehensive immigration policy, making it easier for honest, hardworking people to come work and live here legally. Reform requires federal action. Instead of seeing foreigners as a problem, we should welcome them as potential friends, business partners, and customers.

**Abortion:** Recognizing that abortion is a sensitive issue, and that people can hold good-faith views on all sides, I believe that government should be kept out of the matter, leaving the question to each person for their conscientious consideration. A group of mostly men legislators should not be able to tell my daughters what they can and can't do with their bodies.

**Campaign Website:** https://www.mark4gov.com/


© 2022 League of Women Voters of Texas | lwvtexas.org



### » Delilah Barrios (G)

**Gun Safety:** Retailers must limit the amount and frequency of sales of guns and ammunition. The police budget should be limited as well and resources should go towards housing, child-care, education, gardens, transportation etc. I am a supporter of community police because the police criminalize poverty and mental health.

**Economy:** We need to halt all fossil fuel subsidies. We should use those funds for universal healthcare and a living wage. We also need public transportation, sustainable farming and renewable energy. Free education and work programs in high school would help boost job growth. As well as a just transition. Legalizing marijuana would boost our economy too.

**Power Grid:** Making all utilites publicly owned, investing more into wind and solar and expanding our grid to neighboring states or countries for better reliability.

**Elections:** Several changes are needed. I support ranked choice voting and also proportional representation. I support same day voting registration and voting mail, we need better protections for voters to have their voices heard.

**Immigration:** The role of our state is to be good neighbors. To have compassion and offer opportunities both here and in Mexico. We rely heavily on the exploitation of the global south. I would like to see Texas make ammends and speed up the immigration process while also supporting Mexico's economy as well. A sustainable partnership would be ideal.

**Abortion:** Statewide single payer would eliminate the insurance companies ability to cause harm to patients. I would enact a law that would provide protection to patients and providers. Anyone deliberately interfering with patient care due to religious or other will face a 50k+ fine plus jail. This is only a short term solution while we set up statewide single payer and better patient rights for autonomy.

**Campaign Website:** https://delilahfortexas.com

---

# LIEUTENANT GOVERNOR

Four-year term. The lieutenant governor is powerful because of their position as president of the Texas Senate, where they appoint the chairs and vice-chairs of committees; appoint senators to committees; assign bills to committees; and control the Senate's agenda. They are also a member of several commissions and boards, and serve as governor in the governor's absence. Current Salary: As Senate president: $9,612 plus $190 per diem. When serving in the governor's absence: that of the governor.

## » QUESTIONS TO CANDIDATES

**Gun Safety:** What steps, if any, should be taken to curb gun violence in our communities?

**Economy:** What can be done at the state level to address the high rate of inflation and other economic challenges faced by Texans?

**Power Grid:** What can be done to ensure that Texas has sufficient power during extreme weather conditions?

**Public Education:** What is your position on using public funds for school vouchers for private schools and why?

**Elections:** Considering the high rate of vote-by-mail ballot rejections in the 2022 Primary Elections, what changes, if any, are needed to election laws?

**Abortion:** How would you address the economic and health consequences for those who cannot obtain abortions in Texas?

### » Dan Patrick (R)

No response received by the print deadline



### » Mike Collier (D)

**Gun Safety:** As Lt. Governor, I will work with community leaders and law enforcement to raise the age to purchase a firearm to 21, universal background checks, safe storage requirements, and a waiting period to buy a semi-automatic firearms. These actions must be undertaken before the start of the next school year because the time to stop the next school shooting is now.

**Economy:** Over the last eight years, Texans have faced skyrocketing property taxes. Thanks to tax loopholes, Texans are paying more so that corporations can pay less. I will close those loopholes in order to bring down taxes for folks across the state and make corporations pay their fair share.

**Power Grid:** As a lifelong businessman and energy expert, I will make fixing the power grid amongst my top priorities. I will work to bring down energy bills for Texans by investing in producing more energy, investing in energy storage and smart grid technology, and establishing emergency tie-ins to the national power grid.

**Public Education:** As Lt. Governor, I will work tirelessly to fund our local schools. I am opposed to efforts to divert taxpayer dollars to unaccountable, private school vouchers that would raise our property taxes and defund our schools, especially hurting rural Texas.

**Elections:** Texas voters who make a good faith attempt to cast a ballot should not have their voice silenced due to discriminatory and opaque election laws past by the Texas Legislature. If I led the Senate as Lt. Governor, I would undo the suppressive changes made by SB1 and improve the ballot cure process.

**Abortion:** Under current law, all abortions are banned in Texas, including in cases of rape or incest. As Lt. Governor, I will work to codify the protections of Roe v. Wade into the books of law—returning the power to make decisions to doctors and their patients, as well as invest in pre-natal and maternal healthcare for women across Texas.

**Campaign Website:** https://CollierForTexas.com

---

© 2022 League of Women Voters of Texas | lwvtexas.org



OCA-APPX-1694

OCAGH_00016667

## » Shanna Steele (L)

**Gun Safety:** I support the Second Amendment. Ending the war on drugs, treating addiction, and improving economic conditions would curb gun violence.
**Economy:** Legalizing marijuana and eliminating property taxes would be a good start to increasing the GDP and improve the economic challenges faced by Texans.
**Power Grid:** There are several hydroelectric power plants that used to be connected to the power grid that are no longer in operation. By fixing these power plants and other parts of the power grid infrastructure we will be on the right track.

**Public Education:** Parents should be able to choose the school that best fits their child's needs.
**Elections:** The changes needed start with removing the duopoly created by the Democrats and Republicans who make it difficult for those who want to vote. [*Candidate's response does not meet the criteria listed in this Voters Guide.*]
**Abortion:** I would remove state government from healthcare decisions that should be made between doctors and their patients. In addition, I would like to make the adoption process easier for those who choose adoption over abortion.

# ATTORNEY GENERAL

Four-year term. The attorney general is the chief law enforcement officer of the state; represents the state and state officials in legal matters; issues opinions; oversees collection of child support; administers the crime victims compensation fund; enforces the open records/open meetings acts; approves public bond issues; and enforces consumer regulations. Current salary: $153,750

## » QUESTIONS TO CANDIDATES

**Elections:** How would you protect Texans' freedom to vote while maintaining safe and secure elections?
**Ethics:** How can voters be assured that campaign donations will not impact how the Attorney General interprets and enforces the law?
**Children's Health:** Do you believe the government should become involved in healthcare decisions made for children by their parents and physicians? Please explain.

**Immigration:** What should be the role of the Texas Attorney General regarding immigration law and policy?
**Priorities:** What would be your highest priorities for the next four years, and how do you intend to accomplish them?

## » Ken Paxton (R)

No response received by the print deadline



## » Rochelle Mercedes Garza (D)

**Elections:** As Attorney General, I will dismantle the wasteful "election integrity unit" — which is really about enforcing the GOP's voter suppression measures, instead of protecting voting rights — and replace it with a voter protection unit under a fully funded Civil Rights Division. I will ensure voting rights are protected, not undermined, especially for voters of color.
**Ethics:** We must bring about fundamental change in the office of the Attorney General. I'm running for Texas AG to restore integrity, transparency and trust to the office. That means ending the culture of corruption and pay-to-play politics. As AG, I will not be beholden to powerful industries; instead I will answer to the people of Texas and respect the rule of law.
**Children's Health:** As a parent, I am deeply committed to ensuring the office of the Attorney General protects all Texans. Decisions about the health of children are extremely personal, and should only be made between parents, physicians and the child, when appropriate. Politicians have no place in the decision-making process about a child's medical treatment.
**Immigration:** Immigration enforcement falls under federal jurisdiction. As an immigration attorney and border native, I understand the complexities of our immigration system. I have litigated against bad policies that have created a humanitarian crisis at the border. Texas' enforcement efforts at the border are unconstitutional, wasteful and only worsen the issue.
**Priorities:** As AG, I will protect the rights of all Texans. I'll root out corruption and bring back integrity and transparency to the AG's office. I'll create a Civil Rights Division to protect the safety, privacy, and dignity of Texans, and I'll prioritize consumer protections to hold bad actors accountable. Most importantly, I will fight to restore abortion rights in Texas.

**Campaign Website:** https://RochelleGarzaforTexas.com

## » Mark Ash (L)

No response received by the print deadline


OCA-APPX-1695

OCAGH_00016668

# COMPTROLLER OF PUBLIC ACCOUNTS

Four-year term. The comptroller is the chief financial officer of the state; collects state taxes and fees; pays the state's bills; provides revenue estimates to the legislature; certifies the budget; reports the condition of the state's finances; and provides economic development assistance to local governments and private businesses. Current salary: $153,750

## » QUESTIONS TO CANDIDATES

**Rainy Day Fund:** What is the optimal amount to be held in the Rainy Day Fund? How would you balance paying down the state's debt vs. responding to urgent needs?

**Taxes:** What is the proper balance of tax revenues sources in order to fairly fund state government, including public schools?

**Financial Obligations:** How can we ensure that Texas meets its long-term financial obligations such as infrastructure maintenance, state employee pensions and health care coverage for public school teachers and employees?

**Priorities:** What would be your highest priorities for the next four years, and how do you intend to accomplish them?



### » Glenn Hegar (R)

**Rainy Day Fund:** Texas is blessed to have a strong Rainy Day Fund, which is designed and should be used to smooth out the state's revenues during an economic downturn, to assist in a disaster, and for one-time expenses that are strategic for Texas' economic health and well-being. I fought to manage these dollars more effectively to guard against inflation and protect them for generations.

**Taxes:** Funding public schools in Texas has been a shared burden split between state funds and local property taxes. Until recently the local share was allowed to grow unchecked creating increased pressure on local property taxes. I helped compress local property tax rates and rebalance the burden between state funds and local taxpayers. Our strong economic recovery now puts us in position to do more.

**Financial Obligations:** Since practically my first day in office I have sought to shine a light on the state's balance sheet and the need to address our long-term obligations. I fought to address threats to our state's fiscal health and ensure Texas teachers can access quality healthcare. I helped lawmakers pass historic pension reform to put our state on firm footing and avoid credit downgrades.

**Priorities:** I will continue to focus on the core constitutional duties of my office and that means maintaining my attention on the Texas economy. Navigating the last few years has been difficult, but I have always remained focused on the trends, challenges and opportunities in our state economy. We must fight to keep Texas a place where freedom creates new opportunities for families and businesses to thrive.

**Campaign Website:** https://glennhegar.com



### » Janet T. Dudding (D)

**Rainy Day Fund:** Government Finance Officers Association recommends a minimum of 2 months of regular revenue or regular expenditures be maintained in a rainy day fund. Typically, rainy day monies mitigate the risk of unstable revenues or unexpected expenditures. Natural disasters fall into the 2nd category & Texas ranks 1st in these. The state of Texas' general obligation debt currently is rated Aaa/AAA/ AAA/AAA.

**Taxes:** Find new revenue for Charter & 313. Texas Legislature added $6.5 billion dollars in funding to public schools in 2019. Yet per a 2021 SPLC report, Texas currently ranks 40th in the nation. New rev streams are needed. Legalizing adult-use cannabis could bring $1 billion in tax revenue (and decriminalization could save $300 million). Look at "green" taxes to build revenue streams from green energy.

**Financial Obligations:** Re infrastructure, accept & leverage federal dollars. With fuel efficient vehicles, look at creating a revenue from alternative fuels to maintain roads. Public school benefits: employees in all but ~18 school districts do not participate in social security and they should. Public school employees should have excellent healthcare w/o sharing premium costs. Reduce public school property tax reliance

**Priorities:** Statute defines Comptroller as state's 'sole' accountant. We've never had a CPA as our Comptroller. I will be the watchdog over tax dollars, answerable to Texans not special interests. As a hurricane survivor, climate-disasters are personal to me and I will work to mitigate the root cause as well as our risk exposure through SECO. Expand broadband by partnering with local govt utilities & coops.

**Campaign Website:** https://www.janetdudding4texas.com/



### » V. Alonzo Echevarria-Garza (L)

**Rainy Day Fund:** I would suggest sic months of operating expenses is a good start. However, this depends on the mitigating policies implemented by the state.

**Taxes:** I don't believe there is, strictly speaking, a proper balance that policy makers should adhere to, or fix to fairly fund state government or public schools. The question is not the balance amounts, but what mechanisms are in place to adapt.

**Financial Obligations:** budget analyst and policy makers must utilize the social discount rate in performing cash discounting of projects, and cost benefit analysis.

**Priorities:** The highest priority is to implement policies that may improve operations, optimize benefits, and offer flexibility in dealing with financial challenges. These policies will not only improve conditions in four year, but beyond my own term in office.

**Campaign Website:** https://www.alonzo-echavarria-for-texas-state-comptroller.com/

OCAGH_00016669

OCA-APPX-1696

# COMMISSIONER OF GENERAL LAND OFFICE

Four-year term. As head of the General Land Office, the commissioner manages state lands, including oil and gas properties (which supply funds to the Permanent School Fund) and the Alamo. The commissioner chairs the Veterans Land Board, which administers programs for Texas veterans, and is responsible for environmental protection of Texas' coast. Other state boards chaired include the School Land Board and the Coastal Coordination Advisory Committee. Current salary: $140,938

## » QUESTIONS TO CANDIDATES

**Allocation of Federal Funds:** When federal funds for natural disaster relief are allocated, how would you ensure that communities with the highest needs are prioritized?

**The Alamo:** As the head of the agency that manages the Alamo, what story should it tell?

**Coastal Planning:** What measures would you implement to restore and protect the Texas coast, wetlands, and structures along the coast to minimize damage from major storms?

**Priorities:** What would be your highest priorities for the next four years, and how do you intend to accomplish them?



### » Dawn Buckingham (R)

**Allocation of Federal Funds:** When catastrophe strikes the Texas coast, I'll be there every step of the way to help Texans recover. I grew up in a small town along the Texas coast, so I know firsthand just how devastating a major hurricane can be and what people need in its aftermath. As Land Commissioner, I'll make sure the GLO is fully prepared to respond to catastrophic storms that impact our coast.

**The Alamo:** I am, and always have been, a champion for the preservation of our Texas History. As a State Senator, I laid down the legal challenge to keep the Cenotaph in its rightful place out front. Our Alamo should tell the story of Texas' revolution and of course the battle at the Alamo itself.

**Coastal Planning:** Our coastal communities deserve a Land Commissioner that is as tough and resilient as they are. As a state senator, I am proud to have supported measures to fund flood mitigation, prepare for construction of a coastal spine, and more. Investing in coastal infrastructure to mitigate the effects of hurricanes is just smart. We can save lives and protect property with these investments.

**Priorities:** I'm running for Texas Land Commissioner to improve the lives of all Texans and protect the Texas we know and love for future generations. As the first female Land Commissioner in history, my priorities are unleashing Texas oil and gas production, keeping our communities safe by securing the border, and protecting the Permanent School Fund to ensure that every child has a great public education.

**Campaign Website:** https://www.dawnbuckingham.com



### » Jay Kleberg (D)

**Allocation of Federal Funds:** Centering the voices of communities most impacted by natural disasters and least-supported by our government is a priority for my campaign and will continue to be a priority for me as commissioner. As Land Commissioner, I will emphasize the reformation of disaster relief and recovery programs at the General Land Office. This will ensure Texans most affected have the proper funding.

**The Alamo:** The story of the Alamo is as far reaching and complex as Texas itself. The Alamo is a symbol of Texan and Tejano pride and we must honor those contributions to Texas. It's also important to consider the role of early Black Texans and slavery in our history, as well as indigenous groups who inhabited the site for centuries. All of these groups should have input in the conversation on the Alamo.

**Coastal Planning:** An example of measures I support is the nearly $30 billion investment in protection measures for the Texas Gulf Coast, including a coastal storm barrier in Galveston and beach restoration efforts on South Padre Island. As Land Commissioner, I would prioritize projects like these and work with all stakeholders to secure funding for these projects and other disaster mitigation and recovery efforts.

**Priorities:** Reforming the GLO disaster programs to ensure all Texans can recover from the last storm and prepare for the next one. Expanding carbon storage opportunities by opening leases in Texas' submerged lands. Responsibly expanding renewable energy production on state lands to diversify our revenue base. Reforming and modernizing the Veterans Land Board to expand and improve Veteran services in Texas.

**Campaign Website:** https://www.jay4tx.com/

### » Alfred Molison, Jr. (G)

No response received by the print deadline


© 2022 League of Women Voters of Texas | lwvtexas.org

OCAGH_00016670

OCA-APPX-1697

<div style="background:#4a2c5a;color:white;padding:10px;">

# COMMISSIONER OF AGRICULTURE

Four-year term. The agriculture commissioner's principal job is promoting Texas' agricultural products. In that capacity, the commissioner facilitates trade and marketing of agricultural products; regulates weights and measures; regulates pesticide use and application; certifies organically produced products; administers the National School Lunch and School Breakfast programs; provides financial help to farmers; and helps solve issues related to natural disasters. Current salary: $140,938

</div>

## » QUESTIONS TO CANDIDATES

**Inflation:** What can be done to help Texas farmers face rising costs and supply chain disruptions?

**Water Resources:** As water resources become more scarce, what would you do to balance the needs of farmers and the growing demands of urban areas?

**Opportunities:** Should Texas diversify its agriculture to include cannabis, biofuels or other crops? Why or why not?

**Priorities:** What are the three most challenging issues for Texas farmers for the next four years, and what are your plans for dealing with number one on your list?

---

### » Sid Miller (R)

No response received by the print deadline

---



### » Susan Hays (D)

**Inflation:** Accurate analysis of supply-chain choke points followed by government action to alleviate them. For example, the meat packing industry is a Wall Street-driven, near-monopoly with ranchers having to pay to reserve time to process their cattle. I will aggressively draw down federal dollars to help Texas entrepreneurs open and expand local operations which will in turn keep those profits in Texas.

**Water Resources:** The Republicans have failed to even try to solve this problem. The Department of Agriculture (TDA) can research & promote sustainable practices and less-thirsty crops, but must work across agencies such as the Land Office, the Water Development Board, local water districts, & others, and with the Legislature for a comprehensive state plan to protect water quality and supply.

**Opportunities:** Yes. As a cannabis attorney I understand the best way to legalize & regulate to protect public health & safety giving Texans an opportunity to share in the economic opportunity. Texas ag can flourish by growing more fruits, vegetables & high-value crops. California produces more than 70% of U.S. fruits and vegetables — too many eggs in one basket. We need to diversify & support small operators.

**Priorities:** Economic survival, rural health care, & climate change—and they are intertwined. I will look for opportunities, analyze the data, advocate to the USDA to change counter-productive policies, and help producers find a path to prosperity and environmental sustainability. Failing rural hospitals are an existential threat to rural communities. Texas must expand Medicaid to save them.

**Campaign Website:** https://www.hays4ag.com/

---

<div style="background:#4a2c5a;color:white;padding:10px;">

# RAILROAD COMMISSIONER

Six-year term. The Railroad Commissioner is one of the three-member Texas Railroad Commission. The commission regulates the oil and gas industry, gas utilities, pipeline safety, safety in the liquefied petroleum gas industry and surface coal and uranium mining. It has no regulatory authority concerning railroads. Current salary: $140,937

</div>

## » QUESTIONS TO CANDIDATES

**Natural Gas Facility Weatherization:** What further changes, if any, are needed to ensure that Texas has sufficient power in times of extreme weather conditions?

**Emissions:** How important is the impact of methane emissions on climate change? What are effective ways to reduce methane emissions in the oil and gas industry?

**Seismic Activity:** How can the Railroad Commission reduce the risk of seismic activity or earthquakes caused by water disposal from oil and gas drilling?

**Ethics:** Since candidates for Railroad Commission often raise money from the oil and gas industry, how can citizens be assured that campaign donations will not influence how commissioners regulate that industry?

---



### » Wayne Christian (R)

**Natural Gas Facility Weatherization:** During Winter Storm Uri, wind generated less than 6% of our electricity despite averaging 23% during 2020. Natural gas generated 67% of our electricity during the storm despite averaging only 46% in 2020. The RRC has designated natural gas facilities as critical during energy emergencies and put in place weatherization requirements to ensure even better performance in future.

**Emissions:** Oil and gas production and a clean environment are not mutually exclusive; the six-major pollutants regulated by the EPA have decreased by 77% over the last 50 years. The current Administration's methane rule and natural gas tax could shut down oil and gas production in Texas which would kill jobs, harm our economy, increase costs to consumers, and reduce the reliability of our grid.

**Seismic Activity:** The RRC has in place some of the most stringent rules on disposal wells — the type of wells some link to earthquakes — in the country. Infact, Obama's EPA stated in a report that the Railroad Commission is "com-

---


OCAGH_00016671

OCA-APPX-1698

## » Wayne Christian (R) *(continued)*

mended for establishing new regulations specific to seismicity, including solidifying RRC authority to take appropriate action related to injection well operations."

**Ethics:** I have never allowed a political contribution to influence my decisions in

elected office. I have followed all Texas Ethics Commission rules regarding when I can accept contributions and have in full transparency reported every contribution I have received. I have never received an ethics complaint or violation as Railroad Commissioner.

**Campaign Website:** https://ChristianForTexas.com



## » Luke Warford (D)

**Natural Gas Facility Weatherization:** Strengthening our energy infrastructure is my number one priority because it is unconscionable that Texans have to live in fear that their power will go out the next time it gets cold. I will establish a clear, substantive, and enforceable weatherization standard, identify critical gas producers, and ensure preparations for the next major storm are actually completed.

**Emissions:** Methane emissions play a large role in climate change, and the Railroad Commission has a tremendous capacity to address climate change by reducing methane emissions while strengthening the Texas economy. I will accomplish this by enforcing existing regulations, limiting the number of flaring exemptions the Commission grants, identifying and plugging methane leaks, and capping orphaned wells.

**Seismic Activity:** The Railroad Commission's lackluster approach is responsible for the recent increase in seismicity in West Texas. And now, their response to what is happening is unscientific and out-of-touch with the realities on the ground. The Commission should work with affected communities and experts in the water disposal industry to develop a science-based response to the increase in seismic activity.

**Ethics:** My only priority will be to serve the people of Texas. This job is too important, and the stakes are too high to be influenced by the oil and gas executives we're supposed to be regulating. Last winter's storm is a prime example, where over 700 people lost their lives because the Commission failed to hold the gas producers that fund their campaigns accountable.

**Campaign Website:** https://lukewarford.com



## » Jaime Andres Díez (L)

**Natural Gas Facility Weatherization:** The RRC has taken good steps to fix issues concerning critical infrastructures designations with ERCOT and weatherization requirements. However, there continues to be issues with data management, transparency, and with outlining how they will deal with repeat non-compliance. Regarding repeat weatherization non-compliance, I think the RRC should consider waiving the maximum fine of $1 million.

**Emissions:** Reducing methane is the most effective strategy for dealing with climate change. Imposing restriction on flaring will reduce methane in TX, but will increase overall methane emission. Flaring/barrel in TX is amongst the lowest in the world. Flaring restrictions will cause forced closure of wells and increases in foreign (less-green) extraction. Solution: Bitcoin mining pays operators to not flare

**Seismic Activity:** There's no one-size-fits-all-solution since seismic activity resulting from water disposal varies greatly due to local geologic formations. However, the RRC must recognize that local entities have a disproportionate share of the risks and limited $ benefit. I would favor moving authority downwards to allow local officials, who are more responsive to local voters, to determine the risk/trade-offs.

**Ethics:** I pledge that I will only serve one term. Once elected on November 8th, I will stop fundraising. Also, if it ever comes up that as Commissioner I need to vote on an issue that pertains to some donor or associate, then I will recuse myself from that vote.

**Campaign Website:** https://www.vote4diez.com/



## » Hunter Wayne Crow (G)

**Natural Gas Facility Weatherization:** I would recommend that we invest taxpayers money toward the development of Renewable Energy Technology such as wind, solar, geothermal, conservation and small-scale hydroelectric. Once we have one or more of these methods fully utilized. We would be able to supply a vast amount of energy that would able to resolve the State of Texas current energy demands.

**Emissions:** Methane is the second most abundant anthropogenic GHG after carbon dioxide ($CO_2$), accounting for about 20 percent of global emissions. Methane is more than 25 times as potent as carbon dioxide at trapping heat in the atmosphere. I will support the enactment of bans on hydraulic fracturing for natural gas and oil on the local, state and federal level and also ensure not further damage occurs.

**Seismic Activity:** I will support measures that will make Hydraulic fracturing in any form illegal. I will also support shutting down any drilling rig that would be considered to be located in unstable areas of Texas. I think if we ended the United States dependents on fossil fuels we would not have these problems any longer.

**Ethics:** I can't speak for the other candidate's but as the Green Party Nominee for the Texas Railroad Commission. I will say candidate's in my party are typical disallowed from accepting any PAC, Super-PAC, or corporate contributions. Most Voters do end up supporting Green Candidates due to them having no connections or ties to the oil and gas industry and among other things.

**Campaign Website:** https://sites.google.com/view/hunter-crow-for-txrrc2022/home


OCAGH_00016672

OCA-APPX-1699

# HOW TO SPOT DISINFORMATION ONLINE

**1. CONSIDER THE SOURCE.**
Does the URL look strange? Check the 'About' page on the website.

**2. CHECK THE DATE.**
Is the story old news? Sharing out-of-date information may not match current events.

**3. CROSS CHECK INFORMATION.**
Are reputable news sources reporting the same story?

**4. READ PAST THE HEADLINE.**
What's the whole story? Sometimes a headline doesn't match the content.

**5. QUESTION EMOTIONALLY CHARGED CONTENT.**
Disinformation intends to sow division by getting us angry or sad through images or memes.



# DOS & DON'TS OF DISINFORMATION ON SOCIAL MEDIA

✗ **DON'T CLICK OR SHARE.**
If you quote the bad information, you help spread it.

✓ **DO SHARE ACCURATE INFORMATION.**
Without mentioning the wrong info, set the record straight by sharing the correct messages.

✗ **DON'T ENGAGE PUBLICLY.**
If someone you know is sharing bad info, message them privately & ask them to take it down.

✓ **DO REPORT & BLOCK.**
Report inaccurate info to social media platforms, group administrators & election officials. Block users you don't know who share mis or disinformation.


OCA-APPX-1700

OCAGH_00016673

## JUSTICE, TEXAS SUPREME COURT

Six-year term. A justice is one of the nine-member Supreme Court, which issues final decisions on civil and juvenile appeals, issues certain orders to governmental officials to act and to individuals to appear before the court, and has jurisdiction over orders or judgments of trial courts, if the Supreme Court determines them important to the jurisprudence of the state. Current salary range: $168,000 to $201,600

## » QUESTIONS TO CANDIDATES

**Ethics:** Since judicial candidates solicit donations and raise money to be elected, how can voters be assured that campaign donations will not impact how judges interpret the law and/or review lower court decisions?

**Standards:** Texas requires that candidates for this Court be licensed in Texas for at least 10 years and have no suspensions or revocations in that time. What are the positive and negative impacts of this requirement?

**Equity:** What can be done to improve access to justice for all, including persons or groups who may be underserved?

**Other Issues:** What issues do you believe will be the most pressing for the Texas Supreme Court?

## » PLACE 3



### » Debra Lehrmann (R)

**Ethics:** As Senior Justice on the Supreme Court of Texas, & after many years of judicial service, I have a proven record of fairly and impartially applying the law in every case. It is critical that we consistently & rigorously apply the rule of law across the board, to supporters and non-supporters alike. The risk diminishes when judges employ sound & stable methods, as I have for many years.

**Standards:** This Constitutional Amendment raised the basic minimum requirements for this office. Because Texans deserve a high-quality judiciary, these standards are essential. But, they are not rigorous enough. I have over 3 decades of judicial experience & have received many awards for exemplary judicial service. Lawyers & non-lawyers have recognized my scholarly, consistent & responsible approach.

**Equity:** If justice is denied to one individual, it is denied to all. During my tenure on the Court, we have made great progress in improving access to justice for all persons, regardless of financial means. We have devoted much time & effort towards increasing public & private support for expanded representation of underprivileged Texans. Proud of these efforts, I intend to expand upon this work.

**Other Issues:** Regardless of the subject matter, enforcing the rule of law in a consistent, scholarly, methodical, impartial & fair manner is of utmost importance. As the overseer of the 3rd branch of government, the Court must also ensure that rules governing our court system, and members of the Bar & Judiciary, serve the public in an efficient and just manner. These Court responsibilities are essential.

**Campaign Website:** https://Justicedebralehrmann.com



### » Erin A. Nowell (D)

**Ethics:** It is incumbent on judges to conduct themselves in a manner that leaves no doubt as to their integrity and fairness. Judges should take steps to avoid both impropriety and the 'appearance' of impropriety. This could include not soliciting campaign donations from individuals with cases pending before them and/or recusing themselves from hearing cases where a ruling could be questioned.

**Standards:** Licensing and conduct requirements help to ensure that the individuals elected to be judges have the requisite experience and character to serve the individuals in their courtrooms. The only negative impact of this requirement may be the exclusion of candidates with extensive practice outside the state of Texas. Nonetheless, these qualifications help instill faith in the judiciary.

**Equity:** First, we need to increase the individuals in the pipeline who are available and willing to assist those in underrepresented communities – in every level of the judicial system. We also need to support (with both work and money) programs and initiatives that seek to provide equal justice access for all.

**Other Issues:** The U.S. Supreme Court has increasingly divested itself of jurisdiction over issues it has determined belong to the individual states. Examples include gerrymandering, voting rights, and a woman's right to bodily autonomy. Accordingly, these issues will continue to arise within our state courts. As new laws are passed, interpreted, and even contested, the Texas Supreme Court will be the forum.

**Campaign Website:** https://www.justicenowell.com



### » Thomas Edward Oxford (L)

**Ethics:** They cannot, we see evidence of justice for sale on a regular basis.

**Standards:** The positive is obvious, we need experience on the bench. The negative is the clear restriction on the rights of voters to make the decision without arbitrary restrictions.

**Equity:** We must continue to support and improve the IOLTA program and the pro bono efforts of the local bar associations.

**Other Issues:** The Jury system has been under attack in Texas for years. Powerful special interest groups have funded judges who believe they are in a better position than juries to decide questions of fact. We must continue to push for a system in which judges decide questions of law and juries decide questions of fact.


© 2022 League of Women Voters of Texas | lwvtexas.org

OCAGH_00016674

OCA-APPX-1701

## » PLACE 5



### » Rebeca Huddle (R)

**Ethics:** I have authored over 400 reasoned judicial opinions. This body of work demonstrates my fidelity to the rule of law. My opinions explain why I decided each case as I did and show that I apply the law fairly, in every case, regardless of who the parties or lawyers are or whether they contributed to my campaign. My record also shows I have ruled against campaign contributors many, many times.

**Standards:** Supreme Court Justices should be experts in Texas law, with long experience. They must be persons of integrity and strong moral character, with sterling reputations. Texas's licensure requirements weed out unqualified candidates, and I support them. Their only negative impact is that lawyers who are new or have been disciplined cannot serve. But that is appropriate in my view.

**Equity:** The Court's Access to Justice Commission works to expand access to free legal services. More lawyers should volunteer pro bono (free) representation of poor Texans, and courts should encourage and recognize lawyers who do. Technology can also help. The Supreme Court now permits Zoom hearings in routine hearings, so Texans can participate in court proceedings without missing a day of work.

**Other Issues:** Court backlogs are a pressing issue in some big-city trial courts. If criminal judges don't move dockets, dangerous offenders roam the streets instead of facing punishment. If civil judges don't move dockets, Texas families and businesses wait too long for resolution. I believe Texas judges must always be accountable to the people and dispose of cases responsibly, but as promptly as possible.

**Campaign Website:** https://www.rebecahuddle.com



### » Amanda Reichek (D)

**Ethics:** While there is always the possibility of influence, strict limitations on judicial campaign contributions along with campaign finance disclosure requirements provide safeguards against abuse. This possibility is also why it is imperative that we elect and retain judges with unimpeachable integrity and a demonstrated commitment to fair play and their oath of office.

**Standards:** The positive to this requirement is that in theory it is designed to ensure a qualified judiciary. The negative is that in practice it doesn't. Many attorneys have practiced over 10 years and have never been inside a courtroom, and many have practiced fewer than ten years and have more courtroom experience than some attorneys see in a lifetime. But disciplinary requirements ensure integrity.

**Equity:** Increased access to pro bono services, more funding and resources available for legal aid organizations, simplifying the filing process, and removing other artificial barriers to accessing the legal system.

**Other Issues:** A slew of "hot button" issues that implicate some of our most basic liberties which counsels quick resolution, but at the same time are emotionally-charged and complicated.

## » PLACE 9



### » Evan Young (R)

**Ethics:** First, all Supreme Court decisions are published, so our rulings can be tested for consistency, legitimacy, and sound reasoning. Second, the Judicial Campaign Fairness Act strictly limits how much judicial candidates can receive from individuals, firms, and PACs. No source can be more than a small percentage of a judicial campaign's funds, which helps reduce even the appearance of undue influence.

**Standards:** Texas deserves the highest quality judiciary. These basic standards, which the voters wisely approved by constitutional amendment, promote competence. One risk, though, is that some voters may assume that anyone who meets these minimum requirements is automatically qualified. Longevity and a lack of formal discipline is not enough. Voters must remain fully engaged to elect the best Justices.

**Equity:** Ensuring open courts is fundamental to public confidence in our judiciary and to protecting individual rights. The Access to Justice Commission, Texas Legislature, and Texas Supreme Court have made great progress in marshaling public and private support and resources for expanded representation of underprivileged Texans and making judicial proceedings more efficient, comprehensible, and fair.

**Other Issues:** Among its most pressing work, the Supreme Court must ensure, even in times of crisis, and without fear or favor, that the U.S. and Texas Constitutions' limits are respected—the lines between different branches of government, between the state and local governments, and between government power and individual liberty. The Court must make sure that the law is followed, wholly aside from politics.

**Campaign Website:** https://JusticeEvanYoung.com



### » Julia Maldonado (D)

**Ethics:** In my case, I know that my obligation is to follow the law and to serve all of the residents of the state without regard of any campaign donations made to my campaign. As a district judge, I have a record of integrity and ethics that will continue when elected to the Supreme Court, I have never allowed any campaign donation to influence my decisions which are always in accordance with the law.

**Standards:** The positive impacts are, the experience practicing, learning about different areas of the law and improving professionally. It is important that the judges, charged with the interpretation of the laws have the utmost ethical behavior and no record of misconduct. The negative impact regarding the length of time is that young lawyers are unable to participate at this level of the judiciary.

**Equity:** Increase funds for nonprofits who provide services for low-income Texans, ensure that there are educational materials in different languages regarding the court processes. Motivate big firms to provide pro bono services and create partnerships with law schools so that law students can hone their skills while providing much needed legal help under the supervision of their professors.

**Other Issues:** Equity and access to justice are two of the most pressing issues. We have to ensure that the rights of every Texan are protected and that everyone, regardless of their socio-economic status, has access to justice. The justices have to ensure that Texans feel confident with the Court's actions at all times.

**Campaign Website:** https://www.maldonadofortexas.com


OCAGH_00016675

OCA-APPX-1702



# » VOTING FOR JUDGES IN TEXAS



Although in some states, judges are appointed, in Texas most judges are elected.

Judges make decisions about fundamental issues that affect all of us such as family life, education, healt care, housing, employment, finances, discrimination, civil rights, public safety, and government actions. It is critical that our judges make fair decisions based upon open-minded and unbiased consideration of the facts and the law in each case. Judges must know the law and not be influenced by any external political and economic factors.

**How is the Texas court system organized?**

The Texas court system is made up of a statewide network of trial courts and appellate courts. In trial courts, judges and/or juries evaluate the facts and the law and make a decision in a civil or criminal legal dispute. When decisions in most trial courts are appealed, they are sent to an appellate court where judges consider what happened at the trial court, evaluate legal arguments, and then decide if a mistake was made.

See **https://www.txcourts.gov/media/about-texas-courts/** for more information.

## JUDGE, TEXAS COURT OF CRIMINAL APPEALS

Six-year term. A member of the nine-member court which has final judgment in all criminal cases. The court must review all cases in which the death penalty is assessed. It also exercises discretionary review in other criminal cases and issues orders to government officials to act and individuals to appear before the court. Current salary range: $168,000 to $201,600

### » QUESTIONS TO CANDIDATES

**Ethics:** Since judicial candidates solicit donations and raise money to be elected, how can voters be assured that campaign donations will not impact how judges interpret the law and/or review lower court decisions?
**Philosophy:** What is your judicial philosophy?

**Standards:** Texas requires that candidates for this Court be licensed in Texas for at least 10 years and have no suspensions or revocations in that time. What are the positive and negative impacts of this requirement?
**Equity:** What can be done to improve access to justice for all, including persons or groups who may be underserved?

### » PLACE 2

### » Mary Lou Keel (R)

Unopposed

### » PLACE 5

### » Scott Walker (R)

No response received by the print deadline



### » Dana Huffman (D)

**Ethics:** The judicial conduct commission and the oath taken hopefully provide assurances that donations will not affect legal interpretation(s).
**Philosophy:** To see that justice is done.
**Standards:** Positive: ensures that a candidate has substantial years of legal experience needed. Negative: Some attorneys may have accumu-

lated more practical experience specific to their bench than another attorney who has practiced longer but not necessarily in matters specific to the court.
**Equity:** More access to pro bono representation as well as access to language lines that cover all languages at every proceeding

**Campaign Website:** https://judgehuffman.com/home-1



© 2022 League of Women Voters of Texas | lwvtexas.org

OCAGH_00016676

OCA-APPX-1703

» **PLACE 6**



### » Jesse F. McClure, III (R)

**Ethics:** Judges take an oath to rule impartially, and should remove themselves from a case when they cannot. Voters should educate themselves about all candidates for elected office, including judges, and evaluate their track records and campaign promises. Since I have not knowingly received campaign money from a party appearing before me, voters can be sure that contributions have not influenced me.

**Philosophy:** I follow the text of the constitutional provision or statute in question. It is rarely, if ever, proper for a judge to depart from the plain, original public meaning of the text. When dealing with "non-textual" issues, I strive to bring common sense to my decision making, always keeping in mind that vindicating the rights of the citizen is paramount.

**Standards:** The positive impact of the requirement is that it helps promote experience (and ethical conduct) so that Judges have sufficient experience in the law before making very important decisions that effect the life and liberty of the litigants before the Court. The negative impact could be that a very qualified, but relatively inexperienced lawyer is unable to join this Court.

**Equity:** In the criminal justice system, indigent defendants at the trial court level are appointed counsel, and we need to ensure that such counsel are competent, fairly compensated, and have reasonable caseloads. In the civil system, other states have experimented with allowing non-lawyers to handle certain matters - an innovation worth evaluating to allow greater access to Texas courts.

**Campaign Website:** https://VotejudgeJesse.com



### » Robert Johnson (D)

**Ethics:** The truth? There is no way voters can be one hundred percent certain campaign donations will not impact judicial decisions. That's why I favor a system that provides for equal public funding for judicial elections, just as I support a non-partisan judiciary. A judge's decision should be based on legal precedent. If you vote for me, I promise to decide cases according to the law.

**Philosophy:** My judicial philosophy can be summed up in three words: Less is more. The less a judge attempts to impose his or her will on judicial decision making the more consistent our application of the law will be. Ultimately, this job is not about me or my opponent. This job is about you and all of our fellow Texans. I will remain focused on upholding the letter and spirit of the law as it is written.

**Standards:** The Court of Criminal Appeals is the highest appellate court in the state concerning criminal matters. This court hears only criminal cases. Judges who serve on the highest criminal court should also have the highest level of experience in practicing criminal law. I have, nearly, two decades of criminal law experience. While ten years is adequate, I believe two decades is better.

**Equity:** I believe our State Bar has set high standards for the representation of indigent and underserved persons/ communities, but we can do more. We should incentivize pro bono legal services for large law firms by providing discounted bar dues and continuing legal education fees for those who show a set minimum number of indigent defense hours. Our justice system is only as fair as it is perceived.

**Campaign Website:** https://www.judgerobertjohnson.com






OCAGH_00016677

OCA-APPX-1704

# STATE BOARD OF EDUCATION

Four-year term. The fifteen-member board decides curriculum, standards, student testing, special education programs, and textbooks for Texas public schools. It also oversees the Permanent School Fund. Members of the board are not paid, but receive reimbursement for expenses incurred in the course of official business.



State Board of Education Districts
S.B. 7, Senate Engrossment
PLANE2106

## » QUESTIONS TO CANDIDATES

**Charter Schools:** What is the impact of independent charter schools on the funding for local public schools? And is there anything you would do to change that impact?

**Inclusive Education:** As the developer of Texas public school curriculum, how would you ensure a comprehensive history education that addresses the needs of all students?

**Teacher Certification:** Are you in favor of replacing the current teacher exam process? Why or why not?

**Other Issues:** What other issues do you believe will be the most pressing for the State Board of Education?

## » DISTRICT 1



### » Michael Stevens (R)

**Charter Schools:** In order to negate the financial impact of charter schools, two things need to be changed. First, the SBOE must increase the rigor of their vetting process, to ensure that pop up schools are not approved. Secondly, in order to keep schools fully funded, we need to fund them based off of their enrollment numbers and not based on average daily attendance.

**Inclusive Education:** In order to ensure a comprehensive history education that addresses the needs of all students, I would advocate for a Social Studies curriculum that is based on historical factual evidence. Additionally, I would sup-port curriculum that provided students with an overview of our nations history from the perspective of all those who were part of that history, not just a Euro-centric point of view.

**Teacher Certification:** Yes, I am in favor of replacing the current teacher exam process. The current exam process should be streamlined to test a candidate over scenarios that are directly applicable to the grade level they want to teach.

**Other Issues:** The SBOE needs to consider removing STAAR testing as a requirement for graduation.

**Campaign Website:** https://Votedrstevens.com


OCA-APPX-1705

OCAGH_00016678



### » Melissa N. Ortega (D)

**Charter Schools:** Independent charter schools divert crucial resources away from public schools. Charter schools do not have public oversight of how money is spent & are not held accountable and to the same standards as public ISD's. I would work to ensure that compliance with state quality standards, governance requirements, and financial accountability is created, monitored & held to the same standards as ISD's

**Inclusive Education:** History should be taught to incorporate diverse perspectives and acknowledge that historical events are affected by race, ethnicity, culture, religion, education, gender, gender identity, sexual orientation, disability, and personal experiences. An effective history builds on students' capacity for research, reasoning, generating logical arguments, and critical thinking.

**Teacher Certification:** I support measures to ensure that Teachers are highly qualified SBEC certified. Being a certified SBEC teacher means that a teacher has undergone the rigorous process of completing an approved Texas Educator Preparation Program sanctioned by the state of Texas. When working with students, standards for the teaching profession must be at the highest level and sanctioned by the state.

**Other Issues:** Other issues that are most pressing will be to create significant efforts for teacher retention, and solutions to our state's test-based accountability system. Class size limits need to be re-evaluated, and a more inclusive curriculum that focuses on the social emotional learning needs of our students need to be in place.

**Campaign Website:** https://www.drmelissaortega4txsboel.com/

## » DISTRICT 2

### » LJ Francis (R)

No response received by the print deadline

### » Victor Perez (D)

No response received by the print deadline

## » DISTRICT 3



### » Ken Morrow (R)

**Charter Schools:** Charter schools have a positive impact by creating competition and alternatives to Public Schools, but they are still regulated by SBOE.

**Inclusive Education:** Truth should be taught. We do not need to re-write history. We need to teach world history, US History and Texas History with the truth about our History. We were founded as a Christian nation. Slavery and Domination of the American indians was an awful chapter in our countries history. Other countries have been far worse. We were one of the first countries to ban slavery. America is exceptional!

**Teacher Certification:** I dont feel adequately informed on this issue to respond. I want qualified, caring teachers to teach our childern to be life-long learners.

**Other Issues:** Isssues I believe will be relevant. School safety is a priority, I think the Guardian plan has merit. CRT has no place in Texas Schools. Boys are boys, Girls are Girls. No confusion should be allowed in locker rooms, bathrooms, or in sports.

**Campaign Website:** https://Kengmorrow.com



### » Marisa B. Perez-Diaz (D)

**Charter Schools:** Because charter schools receive state funding based on ADA, but no local tax revenue, the fiscal impact on traditional public schools varies depending on location of the charter school. More pertinent is the unilateral authority the Commissioner of Education has on the expansion approval of charter schools. The over saturation of charter schools in communities leads to more serious funding impact.

**Inclusive Education:** I will continue to work with subject matter experts (K12 practitioners and historians) who would: a) contribute content that is diverse in representation (i.e. individuals, communities, and events that have been absent in standards but have played pivotal roles in the history of the US); b) provide guidance about pedagogy, methodology, and content for implementation considerations.

**Teacher Certification:** At a time when teacher recruitment and retention efforts are in dire straits, it would not make any sense to move forward with a full-on replacement of the exam process which could potentially establish additional barriers to classroom teaching. That said, I would support an updating of the certification process, specifically regarding the expectation of pre-service classroom time.

**Other Issues:** The SBOE will continue to approve standards for K-12 curriculum, which should be influenced by facts, peer reviewed research, and inclusivity. Additionally, major responsibility for the PSF has moved to a corporation, currently comprised of 5 SBOE members & 3 governor appointed individuals. That governing body must continue to require 5 elected SBOE members for continued democratic representation.

**Campaign Website:** https://www.marisabperez.com

## » DISTRICT 4

### » Staci Childs (D)

Unopposed

OCAGH_00016679

OCA-APPX-1706

## » DISTRICT 5



### » Perla Muñoz Hopkins (R)

**Charter Schools:** As a parent & certified teacher all I know is public school. The impact of charter schools increasing in number is largely due to the lack of valuable resources & parental rights. Raising the bar, strengthening the curriculum standards, & recommending the most educational texts will ensure a quality public education. I support parents' choice because we all want what's best for our children.
**Inclusive Education:** As a multi-ethnic & retired military family, my diverse children being taught proper Reading, Writing, Science, Math, Civics & History is crucial for their success. Inclusive Education should never involve identity politics & personal agendas. The SS TEKS need revision, I recommend subject matter experts & work groups that include SBOE observers to provide the best framework, scope & sequence.

**Teacher Certification:** Teachers have a lot on their plate, especially in our current education climate. The SBOE opposed the EdTPA contract, and I agree with the decision, because the proposed substitute certification tests used by SBEC are not as comprehensive or desirable as the existing exams. As a teacher in TX, the current certification exams I took were rigorous & rendered the proper measurement & evaluation.
**Other Issues:** Communication & transparency with constituents & parents is a must & adheres to Ed Code Ch 26 Parental Rights & Responsibilities. Adopting engaging & high-quality materials & establishing curriculum standards centered on instruction that promotes a growth mindset & essential skills in Reading, Writing, Math, Science & Civics lends to meaningful learning & helps a child reach their American Dream!

**Campaign Website:** https://www.PerlaHopkins.com



### » Rebecca Bell-Metereau (D)

**Charter Schools:** Most charter schools take in money from tax payer funding for education that goes out of state, and they enroll significantly fewer special ed students with serious disabilities than traditional public schools do. Washington Post notes that "Rocketship has a narrow curriculum" on "reading, math, and test prep," and teachers are not prepared, with high turnover. Texas policy favors them unfairly.
**Inclusive Education:** Teachers trained in inclusive education should make those decisions, and the state should fund schools well, in order to help all of our students. We have tried on the board to include all students, but the Republicans blocked our efforts to find a compromise on history curriculum, voting to put off having a review of the curriculum until after 2025, so we're operating on outdated biased history.

**Teacher Certification:** The current certification needs improvement, but I voted to put off making training more difficult because of the teacher shortage. Once we have more teachers willing to teach, we should revisit plans to change to a more rigorous certification system. For the time being, we need to allow multiple ways to qualify for certification; we shouldn't punish teachers who stop teaching out of necessity.
**Other Issues:** The influence of radical groups that disrupt the process of curriculum revision, without studying the changes being proposed, are a big problem. They fixate on a few items that they dislike and then manage to flood emails, testimony and meetings, convincing some to toss out curriculum created by hardworking teachers who volunteer their time and expertise. This discourages future volunteers.

**Campaign Website:** https://voterebecca.com/

## » DISTRICT 6



### » Will Hickman (R)

**Charter Schools:** I am in favor of school choice. Any student who is not present in class in their local ISD school reduces the funding for that school, whether they are absent, home school, private school, charter school, or somewhere else. We need to ensure that local ISD schools are the best education option for the families in the area.
**Inclusive Education:** I drafted and the SBOE adopted a new K-8 social studies framework that has two years of world, US, and Texas history in grades 3-8, as well as enhanced K-2 content. We will work with work groups to prepare K-12 social studies TEKS to prepare all Texas students for their future.

**Teacher Certification:** Yes, although I joined all of my SBOE colleagues in vetoing the new edTPA exam, I have not talked to anyone who loves the PPR. I am in favor of multiple high quality portfolio exam options, and increased accountability for low quality alt-cert providers.
**Other Issues:** The most important issue for me is Texas 60% CCMR numbers. I have chaired the ad-hoc Flight Plan committee which is updating the TEKS for a new flight plan course to replace the existing career exploration and college prep courses. A flight plan is essentially an IEP for every child. Please reach out if you would like more details willhickmancampaign.com

**Campaign Website:** http://willhickmancampaign.com



### » Michelle Palmer (D)

**Charter Schools:** Charter schools receive substantially more money per student than public schools. In addition, the average charter school has MANY fewer special education students than the local public schools in their neighborhood. I would vote against approval of any new charters school applications that come before the Board until the rules have changed to make it more equitable
**Inclusive Education:** As a history and government teacher, I try to bring in other perspectives to every unit. Every student in Texas deserves to see their ancestors represented in the curriculum taught in Texas classrooms. I would bring in diverse teachers and historians to help develop the curriculum and vote FOR their changes.

**Teacher Certification:** I don't believe the test is a good indicator of preparation for the classroom. However, The suggested portfolio is classist. It is too extreme and would cost several thousand dollars to complete. Perhaps a scaled-down version that would do more to show preparation for the classroom but not exclude so many people would be best.
**Other Issues:** The social studies curriculum approval being put off until 2025 is a huge problem. In addition, the science curriculum needs to include climate change and we need comprehensive sec education in our health classes and Health needs to be a required class to graduate in every district in the state not just those that choose it.

**Campaign Website:** http://palmerfortexased.com



© 2022 League of Women Voters of Texas | lwvtexas.org

OCAGH_00016680

OCA-APPX-1707

## » DISTRICT 7

### » Julie Pickren (R)

No response received by the print deadline



### » Dan Hochman (D)

**Charter Schools:** Voucher programs would siphon away funding for public education to charter schools, which spend more on administration but pay teachers less. Charter schools also are not required to educate students with disabilities, do not require teacher certification, and may close with little notice. I support policies that have for-profit schools be paid for by parents who choose to go that route.

**Inclusive Education:** Every student needs to learn the truth when it comes to historical events, including facts that may be difficult or challenging. Otherwise, we are doomed to repeat the mistakes of the past. For example, there have been proposals in Texas to teach an "opposing view" of the Holocaust; to me, there is no alternative explanation to the facts that led up to this mass murder event.

**Teacher Certification:** Yes. The current exam, the Pedagogy and Professional Responsibilities exam, is not an adequate test of a new teacher's potential. I support an alternative approach, including more comprehensive teacher training requirements and an improved exam. I feel strongly that a new exam should not be more expensive than the current process, as these costs may create a barrier to entering the profession.

**Other Issues:** Over the last decade, when adjusted for cost-of-living, Texas spending dropped to a little over $8,000 per student, with Texas ranked 48th out of 50 states. Multiple studies reveal that there is a direct link between per-pupil spending and student achievement. Teachers also need to be paid a fair salary that reflects countless hours of hard work of degreed and highly trained professionals.

**Campaign Website:** https://hochmanforsboe.com



### » Alan Pyeatt (L)

**Charter Schools:** As parents seek alternatives to public schools, especially in the wake of the Uvalde shooting and other events, the costs for public schools is clearly reduced. As a result, we would expect the public school revenues to reflect that decrease in costs.

**Inclusive Education:** IMHO, our country is experiencing turmoil because we have forgotten our founding philosophy. It is not enough to know that our Founders rooted our government in the theories of John Locke and Algernon Sidney, if we do not know, for example, the goal of government, or what Locke said are the government's three legitimate functions. I intend to ensure that their actual philosophy is taught.

**Teacher Certification:** I have not yet reached a conclusion on this matter.

**Other Issues:** I believe that it is vital to learn critical thinking skills in school. As a result, I will advocate that every high school student be required to pass a course in applied logic before graduation.

**Campaign Website:** https://www.electpyeatt.com

## » DISTRICT 8



### » Audrey Young (R)

**Charter Schools:** Public charter schools do not draw property tax funds. Funding for traditional schools allows for the collection of property taxes. The additional per-pupil allocation by the state for charter schools assists in covering the gap in funding. Charters are a choice for parents and students along with private and homeschool. Each educational choice has its own impact within a community.

**Inclusive Education:** The SBOE oversees the Texas Essential Knowledge and Skills by which instructional materials (curriculum) is developed. Local school districts have the legislative right to adopt the curriculum that best suits the needs of their students within the community.

**Teacher Certification:** No I am not in favor of adopting a national program for teacher certification. I am in favor of developing a program that is specific to Texas that sets high expectations, is implemented with fidelity, and aligns with T-TESS.

**Other Issues:** Legislation, which previously removed the authority of the State Board to approve all instructional materials, should be re-written to require that all core content (Math, Science, ELAR, and Social Studies) curriculum MUST be adopted by the SBOE prior to district adoption.

**Campaign Website:** https://YoungSBOE.com



### » Rhett Rosenquest Smith (L)

**Charter Schools:** Due to: schools becoming "targets of violence," Covid pandemic risk concerns, and financial (tax $) restraints,Texas voters must re-think the funding of our public schools. Texas Libertarians support freedom and choice, and we believe that allowing funding to follow the school choice that each student makes regarding their own well-being will provide the safest, healthiest, and wisest funding use.

**Inclusive Education:** Our campaign is supports developing curriculum in nontraditional languages, and curriculum re: Spanish Colonial history — late 18th century period (the American Revolution) and 19th century Mexican history that's fundamental to understanding contemporary Texas. Also, millions of immigrants histories, Mexican, African, not forgetting indigenous Native American, Asian & Pacific Island history

**Teacher Certification:** Teacher exam process seems cumbersome; local decisions are better, if unnecessary bureaucracy can be eliminated we benefit

**Other Issues:** Our campaign will work to provide a "community college (dual-credit) alternative" for every Texas student and family! However, if voters, citizens, and taxpayers like their traditional school system that was in place during this past year (and prefer to keep it) that will be an option, but I will work to disclose the tax dollars required to maintain an outdated educational framework

**Campaign Website:** https://rhettrsmith-txsboe.wixsite.com/my-site-1

© 2022 League of Women Voters of Texas | lwvtexas.org



OCAGH_00016681

OCA-APPX-1708

## » DISTRICT 9

### » Keven M. Ellis (R)

Unopposed

## » DISTRICT 10

### » Tom Maynard (R)

Unopposed

## » DISTRICT 11



### » Patricia "Pat" Hardy (R)

**Charter Schools:** There is a great deal of debate about the drain that charter schools have on the regular public school. Logic would tell you there is some drain causing me to be very selective as to which charters I support. When charters provide a unique reason for their existence such as a recent one specializing in Autism or providing a choice in an area where there are only failing schools,, I will support.

**Inclusive Education:** I contend that our SS standards currently ensure a comprehensive social studies education. The SBOE has made a concerted effort to do so. To add to that, we have two state approved electives in ethnic studies, Mexican American and African American Studies and working to add an American Indian Studies and Asian-American Studies within the next two years.

**Teacher Certification:** Yes. Apparently parts of the current test are weak. I favor working on improving the test but not creating such burdensome test that we lose good teacher prospects due to the cost or something that presents a tremendous time strain on the student teacher. This should be developed in a collaborative effort comprised of colleges of education with a successful track record.

**Other Issues:** The most pressing at this in time is the adding the civics requirements called for in SB3 into our current SS TEKS. The reviewing of upcoming legislation and possible effects on Texas public schools is time sensitive. Two ongoing responsibilities are assuring quality instructional materials aligned to our standards and reviewing of charter school applications.

**Campaign Website:** https://hardyforeducation.com/



### » Luis Miguel Sifuentes (D)

**Charter Schools:** Because funding is based on student enrollment, as students move from public schools to charter schools, they take their student allotment with them at a time when our public schools need funding the most. Public schools are the backbone of our communities. I would advocate for equitable, fair and transparent funding of our schools.

**Inclusive Education:** As a former educator and social studies teacher, I became very familiar with the TEKS. As a general principle, curriculum and instructional material should be based on fact and inclusive of the good, the bad and the ugly. The SBOE should be inclusive curators of history, ensuring that the identities of all students are included, not just the identities of a few.

**Teacher Certification:** I am in favor of looking at our teacher certification more closely with a continuous improvement mindset. Jumping into a new exam process without fully vetting the new exam would be a mistake. We have to ensure that the new teacher exam is equitable and addresses the current issues.

**Other Issues:** The SBOE should work to ensure that they are transparent in their decision making while getting feedback from its customers: educators, parents, and students. I will work to ensure that the voices of parents, educators, and students are solicited and acted upon.

**Campaign Website:** https://www.LuisMiguelSifuentesforTexas.com

## » DISTRICT 12

### » Pam Little (R)

**Charter Schools:** Funding comes from the legislature not the State Board of Education. The SBOE has a veto over the recommendations from the Commissioner of Education. I prefer to see charter schools that fill a niche the public isd's do not.

**Inclusive Education:** The State Board only writes standards, not curriculum. It is up to the local school districts to determine the curriculum, i.e. how the standards are implemented. It is important that all our students have the opportunity to see themselves in our standards.

**Teacher Certification:** This is a decision made by the State Board of Education Certification not the State Board of Education. The SBOE has oversight of this board. The current certification is weak and should be replaced however an equitable certification should be investigated to get the best choice for our teachers.

**Other Issues:** I believe the most pressing issue for the SBOE is to regain some authority over the instructional materials process. In 2011 SB6 diluted the SBOE oversight of instructional materials and at that point we started to see our scores spiral downward. Districts can now purchase whatever they want with or without SBOE approval. Assessment is another important issue however that is under the commiss


OCAGH_00016682

OCA-APPX-1709

# STATE BOARD OF EDUCATION | *(continued)*

## » Alex Cornwallis (D)

**Charter Schools:** Charter schools cannot generate property tax revenue or hold bond elections to raise funding and, as a result, are fully funded by the state. Charters receive more per student from the state than public school districts and have double the operations costs compared to public schools. Yes, we now have a system that allows charter schools to grow, which is not sustainable.
**Inclusive Education:** Our history must not be changed or whitewashed. We should set an example for our children by telling them the truth and not hiding the facts.

**Teacher Certification:** Let us sit with the educators and listen to them first and find out what the barriers are in the current certification process. Then together, design a certification process that will be easily attainable and address the teacher shortage.
**Other Issues:** Funding our public school system is a significant issue. There are nontax funding sources at the state and federal levels that I will advocate tapping into to fix our public education crisis. This method of funding will not raise taxes.

**Campaign Website:** https://www.alexforeducation.com/

## » Christy Mowrey (L)

**Charter Schools:** Charter schools receive less funding and spend an average of 2K less per student. Charter schools create competition and introduce innovation in education. I support any effort to give families more options and educational freedom, especially when it means less burden on the taxpayers.
**Inclusive Education:** History should be taught based on facts, not political opinions. I do not support teaching history through the lens of the oppressed or oppressor. The curriculum should be politically neutral, factual, and appropriate for the age level taught.
**Teacher Certification:** Due to the teacher shortage, I would be in favor of al-

ternative options. The teacher exam should focus on the particular subject taught rather than a broad, sometimes trivial, set of questions. Teachers may be very strong and passionate in one area and weak in another. The ability to effectively teach, passion, and creativity are more important than passing an exam.
**Other Issues:** The State Board of Education will be faced with many difficult and controversial issues. Many members feel the need to appease their political party or special interests when it comes to making decisions. I'm held accountable to the families and children in my district. Every decision will be based solely on if it will benefit children and taxpayers and give more freedom and choice to parents.

**Campaign Website:** https://christymowrey.org

## » DISTRICT 13



### » Kathryn Monette (R)

**Charter Schools:** I don't think there is a financial impact taken away from local public schools. They receive less per child and it is up to the charter school to secure a building for teaching. Charter schools don't receive funds from local tax revenue, but they do receive private donations. Charter schools offer families a choice in education and provide other options for students.
**Inclusive Education:** History is history regardless of culture or background. The difference is choosing what parts to emphasize and expound on. I believe that all history needs to be taught equally. American exceptionalism should also be taught as well as the Constitution, the Bill of Rights, the Federalist Papers and

the Mayflower Compact. They should be taught fairly and non-partisan without political agendas.
**Teacher Certification:** The teacher exam process is important, but I think also a program like they have in Florida would be advantageous. Florida encourages veterans to be teachers and streamlines the process.
**Other Issues:** Education needs to be about teaching the core subjects of math, English, writing, science, music, reading, history and geography. All the social emotional learning of the day should be left to parents to teach instead of the schools. Teach character and respect for others instead. No sex ed under 6th grade of any kind in school. Parental rights and transparency of all teaching materials.

**Campaign Website:** https://KathrynMonette.org



### » Aicha Davis (D)

**Charter Schools:** Please see my recent OpEd in the Fort Worth Telegram, titled "Charter schools' growth need review as it costs TX districts," discussing the funding impact for local isds //
**Inclusive Education:** In my first term, I successfully led the adoption of African American Studies as a TEKS based course available statewide, and now I'm leading Native American Studies. During the current social studies review, I've fought tirelessly for truth and inclusion in each of our courses. I work directly with diverse advocacy groups and experts to better incorporate the cultural richness of America,
**Teacher Certification:** I am in favor of an exam process that ensures teachers

have foundational skills to meet diverse student needs. I also believe exams should be financially supplemented to allow more opportunities to recruit teachers. I voted against EdTPA because of the dismal results in other states. I have concerns with language in the PPR, and look to develop more equitable ways to measure readiness.
**Other Issues:** The SBOE has the responsibility of reviewing resources districts may adopt to accompany TEKS. The process has become extremely politicized, leading to the denial of any resources for elementary health TEKS last year. After the current social studies review, the SBOE will have to review new resources. Previous history books had inaccurate language and did not fairly represent women or minorities.

**Campaign Website:** https://www.aichadavis.com/



OCAGH_00016683

OCA-APPX-1710

# STATE BOARD OF EDUCATION | *(continued)*

## » DISTRICT 14



### » Evelyn Brooks (R)

**Charter Schools:** The level of impact independent charter schools have on the funding for local public schools is not the same for each ISD community. Texas charter schools are open enrollment with no tuition. Charter schools receive state taxpayers' dollars but do not receive any local taxpayers' dollars. All parents have the right to choose the type of educational environment they wish for their children.

**Inclusive Education:** The motto "E Pluribus Unum" served as our nation's first motto meaning "Out of Many One." America's rich history encompasses many ethnicity groups and nationalities coming together to make America the great nation it is today, and should be taught interwoven as one historical strand, as opposed to being taught in separate courses based entirely on race. College courses offer ethnic studies.

**Teacher Certification:** I am not in favor of replacing the current teacher exam process, because the current process ensures that all teachers complete educational requirements, pass required teacher certification exams and pass a background check. Doctors, pilots, lawyers, and many other specialty professions require these same measures to ensure quality and competence. In all, I earned certification in four states.

**Other Issues:** I believe the most pressing issues for the State Board of Education will continue to be writing and setting superior academic curriculum standards that are free of political agendas and activism, with the focus of preparing a highly educated society with virtues once again. Of further concern is the Permanent School Fund's ability to guarantee school bonds.

**Campaign Website:** https://www.evelyn4texaseducation.com/



### » Tracy Fisher (D)

**Charter Schools:** The impact of charters on local funding is monumental as all school funding comes from the same bucket, comprised of state and local taxes. Due to how the State has accommodated charters, they receive an average of $1150 more per student/year than public schools. Their funding comes without the accountability or oversight mandated to local schools. I will advocate for equity and accountability.

**Inclusive Education:** I will engage highly-qualified education professionals to review and confirm that the content addresses the needs of students from all backgrounds. I will ensure history experts review the current curriculum for complete historical accuracy. I am a fierce advocate for Texas parents, kids, and communities. I am the experienced candidate to prepare our kids for their world.

**Teacher Certification:** Yes, we need to recruit and build a pipeline of highly-qualified teachers. Their exam process should NOT be financially burdensome. Also, we need to implement an exam for charters. Currently, only 57% of our public ed teachers have degrees in education, and the remainder is alternately-certified. We know, on average, that alternatively-certified and charter teachers have higher turnover rates.

**Other Issues:** Additional pressing issues I've identified for SBOE: Keep politics out of education; Implement fewer high-priority learning standards to focus on deep learning and what is essential for our kids; Respect local control to meet the needs of all kids; Maintain veto power over new charters, and gain control over charter amendments; Ensure fiscal responsibility over the permanent school fund.

**Campaign Website:** https://www.tracyfisherfortexas.com/

## » DISTRICT 15

### » Aaron Kinsey (R)

Unopposed

## Did You Know?

### Poll Watchers

Poll watchers must present documentation regarding their appointment, take an oath, and wear an ID badge issued by the election judge.

Poll watchers can be appointed by one of three groups:
- A candidate
- A political party
- Proponents or opponents of a ballot measure (political action committees that have filed the appropriate paperwork)



© 2022 League of Women Voters of Texas | lwvtexas.org

OCAGH_00016684

OCA-APPX-1711

# CHIEF JUSTICE AND JUSTICE, COURT OF APPEALS

Six-year term. Courts of Appeals hear appeals on civil and criminal cases from lower courts in their districts. Current salary for Chief Justice: $187,800. Current salary for Justice: $154,000 to $184,800.



Courts of Appeals Districts
Effective September 1, 2005

Overlap of Districts 5 and 6
Overlap of Districts 6 and 12

## » TEXAS COURT OF APPEALS SERVES THE FOLLOWING TEXAS COUNTIES:

**The 1st Court of Appeals:** Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Harris, Waller, and Washington

**The 2nd Court of Appeals:** Archer, Clay, Cooke, Denton, Hood, Jack, Montague, Parker, Tarrant, Wichita, Wise, and Young

**The 3rd Court of Appeals:** Bastrop, Bell, Blanco, Burnet, Caldwell, Coke, Comal, Concho, Fayette, Hays, Irion, Lampasas, Lee, Llano, McCulloch, Milam, Mills, Runnels, San Saba, Schleicher, Sterling, Tom Green, Travis, and Williamson

**The 4th Court of Appeals:** Atascosa, Bandera, Bexar, Brooks, Dimmit, Duval, Edwards, Frio, Gillespie, Guadalupe, Jim Hogg, Jim Wells, Karnes, Kendall, Kerr, Kimble, Kinney, La Salle, Mason, Maverick, McMullen, Medina, Menard, Real, Starr, Sutton, Uvalde, Val Verde, Webb, Wilson, Zapata, and Zavala

**The 5th Court of Appeals:** Collin, Dallas, Grayson, Hunt, Kaufman, and Rockwall

**The 6th Court of Appeals:** Bowie, Camp, Cass, Delta, Fannin, Franklin, Gregg, Harrison, Hopkins, Hunt, Lamar, Marion, Morris, Panola, Red River, Rusk, Titus, Upshur, and Wood

**The 7th Court of Appeals:** Armstrong, Bailey, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Deaf Smith, Dickens, Donley, Floyd, Foard, Garza, Gray, Hale, Hall, Hansford, Hardeman, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Sherman, Swisher, Terry, Wheeler, Wilbarger, and Yoakum

**The 8th Court of Appeals:** Andrews, Brewster, Crane, Crockett, Culberson, El Paso, Hudspeth, Jeff Davis, Loving, Pecos, Presidio, Reagan, Reeves, Terrell, Upton, Ward, and Winkler

**The 9th Court of Appeals:** Hardin, Jasper, Jefferson, Liberty, Montgomery, Newton, Orange, Polk, San Jacinto, and Tyler

**The 10th Court of Appeals:** Bosque, Brazos, Burleson, Coryell, Ellis, Falls, Freestone, Hamilton, Hill, Johnson, Leon, Limestone, Madison, McLennan, Navarro, Robertson, Somervell, and Walker

**The 11th Court of Appeals:** Baylor, Borden, Brown, Callahan, Coleman, Comanche, Dawson, Eastland, Ector, Erath, Fisher, Gaines, Glasscock, Haskell, Howard, Jones, Knox, Martin, Midland, Mitchell, Nolan, Palo Pinto, Scurry, Shackelford, Stephens, Stonewall, Taylor, and Throckmorton

**The 12th Court of Appeals:** Anderson, Angelina, Cherokee, Gregg, Henderson, Houston, Nacogdoches, Rains, Rusk, Sabine, San Augustine, Shelby, Smith, Trinity, Upshur, Van Zandt, and Wood

**The 13th Court of Appeals:** Aransas, Bee, Calhoun, Cameron, De Witt, Goliad, Gonzales, Hidalgo, Jackson, Kenedy, Kleberg, Lavaca, Live Oak, Matagorda, Nueces, Refugio, San Patricio, Victoria, Wharton, and Willacy

**The 14th Court of Appeals:** Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Harris, Waller, and Washington

## » See VOTE411.org to compare Court of Appeal candidates in your district.


OCAGH_00016685

OCA-APPX-1712

## » *VOTERS GUIDE* SPONSORS AND SUPPORTERS

LWV Texas *Voters Guides* are funded by the League of Women Voters of Texas, a 501(c)(3) corporation that is supported by contributions from individuals, corporations, and foundations. We would like to acknowledge the following generous *Voters Guide* sponsors and the League's major donors, as well as the donations from all our supporters which make the publication of the *Voters Guide* possible.

**Gold *Voters Guide* Sponsors**

Crossroads Cattle

**Silver *Voters Guide* Sponsors**

Texas Association of School Boards
Texas Nurses Association

**Bronze *Voters Guide* Sponsors**

Dorothy Marchand
Elaine Wiant
Irene Temple
Julie and Michael Lowenberg

**Major 2022 Contributors**

| | |
|---|---|
| Deb Treece | Methodist Healthcare Ministries |
| Deborah and John Kochevar | Mr & Mrs Charles Parrish |
| Diedre Doyle | Paul and Marian Cones |
| Elisabeth MacNamara | Relia Ma Scheib |
| Elizabeth Branch | Ruth Davis |
| Grace Chimene | Ruthann Geer |
| Joyce LeBombard | T. Michael O'Connor |
| Ken Caldiera | Wild Thyme Fund |
| Kevin Rowe | William and Wen Devanney Family Fund |
| Lance & Erin Ramsey | |
| Meg Scott Johnson | Wintemute Family Foundation |



 

 

# EMPOWERING VOTERS. DEFENDING DEMOCRACY.

The LWV is a nonpartisan political organization and is one of America's most trusted grassroots organizations! We aim to:

- Achieve a free and fair democracy
- Increase participation in government
- Expand voter participation in Texas
- Create a League that is diverse, equitable, and inclusive.



## » TEXAS LOCAL LEAGUES

Learn more about our local Texas Leagues and how they help shape today's important issues by visiting **lwvtexas.org**.

| | | |
|---|---|---|
| Amarillo | Denton | Rio Grande Valley |
| Austin Area | El Paso | San Antonio Area |
| Bay Area | Fort Bend County | South Central Texas |
| Baytown | Hays County | Southwest Texas |
| Brazos Valley | Hill Country | Tarrant County |
| Collin County | Houston | Tyler/Smith County |
| Comal Area | Irving | Victoria |
| Cooke County | Lubbock County | Waco Area |
| Corpus Christi | Midland | Wichita Falls |
| Cy-Fair | Montgomery County | Wilson County |
| Dallas | Richardson | Williamson County |



## » SUPPORT THE *VOTERS GUIDE*

Help us fund the cost of this valuable resource for Texas voters by making a secure donation online at **lwvtexas.org**, or by mailing the payment to the League of Women Voters of Texas, 1212 Guadalupe #107, Austin, TX 78701.





**League of Women Voters of Texas Voter Education Chair:**
Dorothy Marchand
**Production Team:** Community Impact, Inspirare Communications, Jaci Collins, Motto Publishing Services
**Volunteer:** Rachel Schick



© 2022 League of Women Voters of Texas | lwvtexas.org

OCA-APPX-1713

OCAGH_00016686

# Exhibit 110

| | |
|---|---|
| **From:** | Grace Chimene [gchimene@lwvtexas.org] |
| on behalf of | Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org] |
| **Sent:** | 4/13/2022 9:28:18 AM |
| **To:** | Laura Yeager [ljsydc@gmail.com] |
| **CC:** | Heather Sheffield [heather@heathersheffield.com]; Dorothy Marchand [dmarchand@lwvtexas.org] |
| **Subject:** | Re: who contact for Austin area candidate forum? |

I don't know.
I suggest contacting Pam Bixby pbixby@lwvaustin.org

On Wed, Apr 13, 2022 at 7:10 AM Laura Yeager <ljsydc@gmail.com> wrote:
  Grace and Dorothy,
  I'm writing to connect you to Heather Sheffield who is hoping to connect with someone at the Austin league to discuss a possible candidate forum. I should know who to contact, but I don't!
  I'm a member...oops.
  Heather is a fabulous education advocate, works with public ed, and is on the Eanes school board.
  Please direct us to the proper contact for her inquiry at your earliest convenience.
  Thanks so much,
  Laura

--
**Grace Chimene** (she/her)
**President,** League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
**512-940-9948**
*Empowering Voters. Defending Democracy*

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 111



# A Guide to Candidates Forums
## For Local Leagues 2021 ©

**League of Women Voters of Texas**

1212 Guadalupe #107
Austin, TX 78701
512.472.1100
lwvtexas@lwvtexas.org
www.lwvtexas.org

# Table of Contents

**Welcome**                                                                      3

**Plan the Forum**                                                               3
    Set the date                                             3
    Consider partnering with a co-sponsor                    5
    Fund your forum                                          6
    Determine which races to include                         6
    Consider the format and timing                           6
    Decide how to ask questions                              7
    Televising or recording the forum                        8
    Does the Texas Open Meetings Act apply?                  9

**Prepare for the Forum**                                                        9
    Obtain candidate information                             9
    Invite the candidates                                    10
    Appoint forum officials                                  11
    Prepare promotional and/or printed material              11
    Visit the site                                           12

**Manage the Forum**                                                             13
    Set up the room                                          13
    Run the meeting                                          13
    Head off problems and disruptions                        14
    Evaluation                                               15

**Moderate a Non-LWV Forum**                                                     15

**Appendix**                                                                     17
    Sample Invitation to Candidates                          18
    Sample Forum Guidelines and Participation Agreement      19
    Sample Moderator Script                                  20
    Sample Candidate Forum Memorandum of Understanding       23
    Sample Video/Photograph Release Form                     25

OCA-APPX-1718

OCAGH_00007799

# Welcome

The League of Women Voters of Texas is a nonpartisan, grassroots civic organization that encourages informed and active participation in government. The League works to increase understanding of major public policy issues and influences public policy through education and advocacy. Membership in the League is open to people 16 and older of all gender identities. With 100 years of experience, the League is one of America's oldest and most trusted civic nonprofit organizations.

## Nonpartisanship Policy

The League of Women Voters never supports or opposes any political party or political candidate.

## Purpose and Goals

Candidate forums and debates are important venues for furthering the League's nonpartisanship mission. Forums sponsored by the LWV, or in which the LWV participates, must be nonpartisan and must ensure that all participating candidates will be treated fairly and equally.

The purpose of debates and forums is to educate the public about issues, allow face-to-face comparisons of the candidates and their positions, and stimulate and increase voter interest and participation in the election. The forum may address, but not be limited to, issues considered to be of important educational interest to the League and any co-sponsoring organizations. Issues of interest to the general public must be included.

A candidate **forum** is a live public meeting in which all the candidates for one or more offices present their views in short individual speeches, and then answer questions from the audience. A **debate** allows the candidates to appear concurrently, in face-to-face confrontations, with opportunities to respond to each other.

Additional information can be found at LWVTexas.org on the Voter Education page under League Management and at LWV.org. Sample invitations, forum guidelines and moderator scripts are provided in the Appendix. Also included is a Memorandum of Understanding template to be used when partnering with other organizations to host a forum. Your League may customize any of these materials, or develop your own.

If a situation related to a debate or forum arises that is not covered in this Guide, contact the state office, or the LWV Texas Chair, Voter Services.

# Plan the Forum

## Set the date

Choose a date after the filing deadline and before the start of early voting (if it is scheduled in your area) or before the election. These dates can be found on the Secretary of State's website votetexas.gov. The forum may be recorded and presented on YouTube, Facebook, Instagram and/or embedded on your website.

OCA-APPX-1719

OCAGH_00007800

## Choose forum platform

Determine whether your forum will be held in-person, using a virtual platform or a hybrid event.

- In-person: An in-person forum must be open and accessible to the public, so choose a place that will not seem to exclude some potential audience. Keep in mind the expected attendance, need for microphones or media equipment, and an appropriate staging area for the candidates and moderator. Check policies for food or beverages if you plan to have them available. Use the Diversity Equity and Inclusion (DEI) Lens Events checklist and the Able-Bodied Privilege and Accessible Event Planning to evaluate locations.

  Check your League's insurance policy to be sure coverage is adequate or that a co-sponsor or the facility where the event is being held has sufficient coverage. Contact the LWV Texas if you require a co-sponsor.

- Online: Shifting to a virtual platform can be more inclusive and allow for greater attendance and participation. Choose a platform such as Zoom or Google Meet and educate yourself on its features, including capacity limits, how it integrates with other platforms and the options available for hosts, panelists, and participants to interact. Practice by running through the entire event with all participants, including the candidates. Consider closed captioning and/or translation options.

- Hybrid event: While hybrid events do have the advantage of having the panelists and moderators in the same room, they can result in added costs and technical challenges to the event.

- Other: Some Leagues have forums that are not done before a live audience, such as those recorded in a studio where only League members and the candidates are present. In this case, questions are typically gathered from the community prior to the event using social media.

Resource
- Zoom Best Practices and Sharing (Livestreaming) to Facebook (from the League of Women Voters of Florida)

## Consider partnering with a co-sponsor

Co-sponsors must understand that the League cannot waive any of its nonpartisanship policies and procedures. Co-sponsors cannot have endorsed or been affiliated with a candidate or ballot issue, nor should they have any plans to make any future endorsements.

The League should take the lead in contacting the candidates, negotiating disputes, and controlling the format. The League should provide the moderator and timekeeper, or should approve of these in advance.

Co-sponsors may:
- Participate in planning, finding facilities, obtaining TV *(perhaps says media since it could be radio, youtube, etc. )* coverage, and providing publicity, volunteers and refreshments;
- Publicize the event in their newsletters and encourage attendance; and/or
- Contribute monetarily, but this is not required.

Consider delineating the responsibilities in writing in advance with the co-sponsoring organization(s).

Some groups that may be appropriate co-sponsors include, but are not limited to:
- Local chapter of NAACP, LULAC, AARP, or AAUW
- Chamber of Commerce
- PTA
- Neighborhood association
- Law enforcement association
- Civic club or organization
- Environmental organization or garden club.

In order to protect our nonpartisanship, political parties and political organizations should not be asked to co-sponsor because they have a vested interest in their candidates. It would be allowable to work with them in nonpartisan elections, such as city council or school board, but even then the League needs to avoid being linked with any one party. Any group whose leadership has made public statements for or against any candidate, that is known to support a candidate informally, or that advocates for an issue which is on the ballot, should not be asked to co-sponsor.

References:
Guidance for Leagues about Nonpartisanship and Partnerships
DEI Module 4: Understanding and Partnering With Your Community - Part 1
DEI Module 5: Understanding and Partnering With Your Community - Part 2


## Fund your forum

Candidate forums, or public educational forums on public policy issues or ballot issues, are educational and do not advocate for a certain candidate or issue. Money from a League's general fund may be used, as well as donations from co-sponsoring organizations. **Do not take or solicit donations from candidates or political parties. Do not sell ads for candidates or issues in any handouts or newsletters.**

OCA-APPX-1721

OCAGH_00007802

## Determine which races to include

Local Leagues have responsibility for forums for U.S. Representative, State Senator and Representative, regional candidates (including State Board of Education and Courts of Appeals, subject to approval of LWV Texas), and for all local candidates. The Voter Services Shared District Tracking List identifies which League(s) have responsibility for each district. Leagues that share districts may consider co-sponsoring a candidates forum.

**Forums affecting statewide offices should not be sponsored by local Leagues without LWVTX Board approval and co-sponsorship.**

Consider how many contested races will be on the ballot in your area, and how many candidates are running in each. You may not be able to hold forums for every office. Or you may want to have several forums, either back-to-back on the same day, or on different dates. If possible, include all contested races for the same type of office – e.g., state representative – in the same forum.

- For general elections: Invite all candidates who will be on the ballot for each race included in the forum.
- For primary elections: Candidates running in different party primaries may be asked to appear in different forums, or they may be included in the same forum. You must also decide whether to include only the parties that have primary elections (the Republican and Democratic parties) or to include all parties recognized by the Secretary of State's Office, as well as declared independent and write-in candidates.

Make candidate selection decisions in a transparent, fair and reasonable way, using selection criteria established in advance by your board. It is also helpful to have criteria in place to deal with unexpected situations, such as last minute write-in candidates.

Check the Voter Education section of LWVTX Policies and Procedures Manual (found on the Publications page under League Management at LWVTexas.org) for the policies for Candidate Debates and Forums.

## Consider the format and timing

Do you want to have opening/closing statements and Q&A, or an informal "meet and greet" or "candidate fair", where candidates can meet voters individually, talk to them, and hand out campaign information? It may be possible to combine a structured forum, with an informal "meet and greet" or reception before or after.

For a structured forum, plan on an introductory statement (often three to five minutes) and a closing statement (one to two minutes) from each candidate, and add that to the time for questions for each office. The forum should not exceed two hours.

OCA-APPX-1722

OCAGH_00007803

Some Leagues give more questioning time to the higher offices; some do not include the Justices of the Peace and Constables, or just give them time for a short speech.

<span style="color:blue">Decide how to ask questions</span>

Do you want to have questions from the audience, from a panel and/or from a moderator? If you use a panel or moderator, they must have no previous relationship with any of the candidates. If you want questions from the audience, do you want to use written or oral questions? The pros and cons of each method are presented below, but on the whole, written questions provide much more control and allow a broader range of questions, but oral questions allow for livelier discussions. Consider the audience when choosing the method or perhaps a combination of methods.

It is not recommended that questions be shared with candidates prior to the event for the following reasons:
- Responses may have been written by someone else.
- It is informative to evaluate a candidate's ability to respond spontaneously, and to give organized and appropriate responses as would be required if elected to office.
- Candidates need a good working knowledge of the issues and duties of the office which they are seeking. Having the questions in advance may not provide an indication of such knowledge.

You may consider asking the candidates to avoid using their cell phones and any written material when they take part in a forum so they cannot research questions being asked while another candidate is answering. You may provide some note paper with pen/pencil for candidates to make notes during the forum.

**Oral questions**
Oral questions allow for more active audience participation, but have several drawbacks: The questioner may ramble or attempt to make a speech, may personally attack a candidate, or may ask a question that does not really pertain to the office. Often a certain question triggers similar questions in the audience's mind, limiting time to explore other areas of interest. Sometimes one questioner may dominate as others in the audience defer to them. It can sometimes be hard to hear the questioner, or to understand their point.

If you decide to use oral questions, consider the following suggestions:
- Specify a time limit for asking the question, e.g. 30 seconds.
- Have questioners use a microphone so everyone can hear them.
- Make sure the audience knows the "rules" for questions: addressed to an office, not an individual, no personal attacks, etc. And, be prepared to disqualify a question if it is inappropriate.
- Ask for questions for a specific office, if its candidates haven't had enough "air time."

**Written questions**

Written questions have several advantages: The audience has time to think of good questions, and to craft them in writing. A range of interests is often reflected in the questions.

With written questions, question screeners can be used to:
- Eliminate or rephrase questions that are inappropriate or poorly written.
- Reword questions addressed to an individual candidate so they apply to all candidates.
- Group questions that are similar or are about the same subject, leaving more time for other questions.
- Write reserve questions to be used if the audience does not submit enough questions to fill the time allotted.
- Prioritize questions so that the more important ones are first.

## Televising or recording the forum
Leagues often work with the media to obtain the broadest possible coverage.
- Check with your local television station to determine if they would like to broadcast the forum live or record it for delayed broadcast. Many cities film candidates forums for broadcast on community access cable channels. A media department of a local college may be able to provide technical assistance.
- Newspapers need content for their website and might podcast or webcast a forum as well as advertise it in the newspaper.
- Post the video on your League website, Facebook page or other social media channels. The goal is to reach as many potential voters as possible, so website availability and rebroadcast times should be well advertised.

For in-person, virtual or hybrid events, LWVUS recommends that debate or forum moderators issue a verbal statement at the beginning of the event to this effect: "Recordings of this event, whether they be in-person or on a digital device, may not be used without the express written approval of the League. The League will only allow audio/video of this event to be broadcast in its entirety, except by the media reporting on the event." This statement should also be written in the description of the virtual event.

No part of a candidate's remarks should be edited, and candidates are not allowed to use any part of the forum for campaign purposes. If the recording needs to be shortened for broadcast, League members should work with the film editor to make sure only non-essential portions are edited out. A broadcast can be cut into segments, as long as all segments are available.

For more detailed information, check the policies for candidate debates and forums in the Voter Education section of the LWVTX Policies and Procedures Manual (which can be found on the Publications page under League Management at LWVTexas.org).

### Does the Texas Open Meetings Act apply?

The Texas Open Meetings Act, adopted in 1967, requires meetings of governmental bodies to be open to the public, including informal meetings. If a quorum of a governmental body (such as a city council, school board, or county commissioners court) attends a candidates forum, that forum may be subject to requirements of the Texas Open Meetings Act. To constitute a quorum, included are not only incumbents who are candidates participating in the forum, but also any other members of the governmental body who are in the audience.

The act requires public notice of the time, place and subject matter of such a meeting, as well as minutes or tape recordings of the session. The act also permits members of the public to record open meetings with a digital device, tape recorder, video camera or other means of aural or visual reproduction.

The responsibility for deciding whether a forum is an open meeting under the act belongs to the elected officials and their governmental body, not the League or other sponsor of a candidates forum. If the forum is considered an open meeting, the governmental body must provide notice and record of the meeting. The League or sponsoring organization should be in contact with the governmental body to coordinate any arrangements for recording the forum and to ensure that notice of the meeting states that it is a forum with questions being posed to the candidates. If the forum is determined to be an open meeting, the League, whether it is a sponsor or moderator, may not prohibit members of the public from recording it.

The *Open Meetings 2018 Handbook* on the Texas Attorney General's website, as noted in **Resources**, has more detailed information.

## Prepare for the Forum

### Obtain candidate information

During or after the filing deadline, obtain the names and contact information of all candidates from the public official in charge of filing for the election. If you contact the candidates during the filing period, you can ask them to "save the date" and to let you know of any major conflicts for the date. Then, after the filing deadline, do a final check to make sure you have a complete candidate list.

You can obtain candidate filing information from the following officials:

- Primary elections – Contact the county offices of the political parties with candidates in the races being covered by your forum. All statewide offices must file with the state party, as well as certain non-statewide offices such as U.S. Representative, member of State Board of Education, Courts of Appeals Justices, District Judges and District Attorneys, unless their district is composed of only one county. However, most county party officials will have information on those candidates who will be on the local ballot.

OCA-APPX-1725

OCAGH_00007806

- General elections – Contact the Secretary of State for statewide offices, and the local Election Administrator or County Clerk for local offices.

- City elections – Contact the City Secretary.

- School board elections – Contact the school district administration office.

- Other boards and districts – Contact the administration office.

### Invite the candidates

Send a written invitation, signed by the president of the League or organization, which includes information about the forum, the criteria for participation, debate/forum format and rules, a form of candidate's acceptance of format and rules, and a waiver for League distribution of debate content, including video recordings. (See *Sample Documents* in the Appendix.) It should be sent to candidates in a traceable form (email with a read receipt requested or USPS with a signed mail receipt).

The invitation should state that only the qualified candidates will be allowed to participate, and no substitutes or stand-ins will be allowed to speak for a candidate. The only possible exception might be the death of a candidate after filing and before the election, when the name will still appear on the ballot. The stand-in could then explain what a vote for the deceased candidate would mean, but would not participate in the question/answer period.

If not all candidates for an office can attend the forum, be sure that you comply with League policies on "empty-chair" debates, as detailed in the *Guidelines for State and Local League Debates*, the link which can be found in the Candidate Forums section of the Voter Education page under League Management at LWVTexas.org.

**In general, you must have at least two candidates for each office participating in the forum if any one or more of the following conditions are true:**
- the office is a federal office, or
- the event is advertised as a debate and not a forum or meet-and-greet, or
- the forum is to be broadcast.

In other cases, a single candidate may appear as long as all candidates for the office were invited and the event would not damage the League's nonpartisan reputation by creating the impression that the League favored one candidate over another.

If candidates refuse to participate, the League president may submit a letter to the editor of local/statewide newspapers stating that candidates are expected to participate and if they do not, they are denying the community an opportunity for public education about them and the issues.

### Send other invitations

Invite media members to cover the event. Candidates in uncontested races and current elected officials may be invited, as a courtesy, as well as city or school administrators.

### Appoint forum officials

- Moderator – The moderator should be thoroughly familiar with LWV policies and principles, especially nonpartisanship. The moderator's political views and positions should be generally unknown in order to avoid any appearance of bias or partisanship. The moderator should not be identified as a member of a political party or a friend of any of the candidates. A member of a neighboring League might be asked to serve as moderator, or even a non-League member.

- Timekeeper – The timekeeper should keep accurate time with a stopwatch and signal time remaining to the speaker.

- Question Screener – If written questions from the audience are used (in-person) or if participants are able to submit questions via the Q&A function (virtual), one or more persons should be appointed to screen the questions before giving them to the moderator or posing them to the candidates (as previously described under **Decide how to ask questions**). The screener should have a working knowledge of the issues pertaining to the election.

- Technical Coordinator - For virtual meetings, assign someone to recite the technical rules and guidelines, and to be on hand to monitor technical issues.

- Question collectors/ushers – For in-person events, these volunteers direct people to seats, pass out question forms, and collect them from the audience during the forum.

### Prepare promotional and/or printed material

Arrange publicity through print and other media, including social media, public service announcements on radio and television. Put announcements in League newsletters, on VOTE411.org and in *Voters Guides*. Send email to co-sponsors and other organizations. Consider signs and banners for the forum venue, and posters or flyers to place in businesses or public places.

For in-person forums:
- Print programs for the audience, with information about the candidates and offices, the forum format, election dates, dates and media channels of recordings, and the League's contact information and nonpartisan policy.
- Print a nameplate to place in front of each candidate, showing the candidate's name and office sought.
- Have *Voters Guides*, VOTE411.org information such as bookmarks, membership forms and other League publications available during the forum, but avoid any publications that advocate for a certain position.

For virtual events:
- Post voting information and the LWVTX Voting & Elections links in the chat function.
- Include a slide at the beginning and end of the forum reminding participants about voting dates, the League's contact information and nonpartisan policy,

## Visit the site

In-person events - Before the event, visit the site to determine the staging. Check the availability of a podium or lectern for the moderator, and tables for the candidates. Determine the arrangement of the candidates, and the placement of panelists, if used, and the question screeners. Consider whether the audio is sufficient; several microphones are preferable to just one. Determine whether the seats for the audience will have to be arranged just prior to the event. If the forum will be recorded, consider where the camera will be placed. Make sure the backdrop is pleasing and appropriate. Check the location of light switches and heater/air conditioner thermostat or fans. Arrange for a table outside the meeting room for the candidates' campaign literature, as well as League literature. Check the availability of restrooms and fire exits.

Virtual and Hybrid Forums - Before the event, the Technical Coordinator should guide several run-throughs of the event, testing audio and visual access for all participants, including at least one practice with the candidates.

OCA-APPX-1728

OCAGH_00007809

# Manage the Forum

## Set up the room

For an in-person event, on the day of the forum, the **Forum Coordinator** and other volunteers should arrive early to do the final set up, to place water and nameplates at the candidates' tables and to set up a sign-in table for all attendees. Designate a person to greet the candidates as they arrive, check them off a list, and answer any questions about the format. Have question forms for the audience, and ushers to pass them out and take them to the screener or moderator. During the event, watch to make sure everything is running smoothly.

Regardless of format (in-person, virtual or hybrid), for League record keeping purposes, establish a process to tally the number of attendees, including candidates and their staff, news media, general public, and League members.

## Run the meeting

The **League President**, Forum Coordinator or Moderator should welcome the audience and candidates and explain the purpose of the event and the League's nonpartisan policy. A statement of the importance of voting and participating in government may be included.

The **Technical Coordinator** should give an overview of the functions of the virtual platform.

The **Moderator** should explain the format, including time limits and how questions and answers will be handled. He or she should introduce the timekeeper and explain how time limits will be signaled to the candidates. It is important to remind both the candidates and the audience that no personal attacks will be allowed.

The **Timekeeper** should sit on the front row (or be visible on screen) to be easily seen by the candidates and moderator and should have a stopwatch and some device or sign for signaling the candidates as to their time limits. Signs to indicate time left are better than bells or gavels, which are more disruptive. Establish a procedure for handling "over-run" statements by the candidates.

**If the forum has been deemed subject to the Texas Open Meetings Act,** the League or sponsoring organization may announce at the beginning that the forum is considered an open meeting and as such is being recorded by the governmental entity and provide information as to how the recording will be available. Anyone who wants to record all or any part of the open meeting should be allowed to do so, according to the provisions of the Texas Open Meetings Act.

**If the forum has not been deemed an open meeting,** announce at the beginning that mobile phones should be turned off as a matter of courtesy and that unauthorized photographs or videos are not allowed because the FCC requires that a forum must not be edited and must be broadcast in its entirety, except by media reporting on events.

OCA-APPX-1729

OCAGH_00007810

Candidates are not allowed to use or edit the footage for campaign purposes. Realistically, there is no way to guarantee that someone won't capture some video or audio without our knowledge so a disclaimer should also be put in the guidelines for the debate. The League wants to ensure that information is not manipulated to create false or misleading impressions.

The Moderator should introduce each group of candidates and explain the duties of the office, salaries, and term, if these are not available in printed form. He or she should be familiar with the candidates' names, party affiliations, and the order in which they will be seated. The Moderator should have a system of determining the speaking order of the candidates, such as alphabetic or ballot order or by random draw. It is a good idea to vary the speaking order during opening, closing and question responses. One method is to place all names within a container and draw one at a time. Use a separate draw of names for opening and closing statements. When there are more than three candidates, it is suggested that the moderator determine a process to track which candidates have already spoken to a question and which have not, so that no one is overlooked.

After the candidates' opening statements, allow time for the candidates to respond to questions from the audience or panel. Candidates' responses should be timed and can usually be limited to one minute. Questions should be directed to an office or place, or all candidates, but not to an individual.

At the end of the question period, allow each candidate to make a closing statement of a pre-set length, so they may correct any misimpression and/or thank the audience.

The League President or Moderator should make any closing announcements. Thank the candidates and the audience for their attendance and participation, remind them of *Voters Guide* availability and/or publication date, early voting dates, and media channels where the recording of the event can be found. Also, direct the participants to VOTE411.org. A *Sample Moderator Script* can be found in the Appendix.

### Head off problems and disruptions
The Moderator should be aware of any hot issues that might cause difficulty. He or she must maintain proper decorum, and should not become nervous, angry, rude, or overly casual. Humor often diffuses a tense situation.

In recent years, members of the audience have asked for recitation of the Pledge of Allegiance, or requested some other addition or change to the agenda. If you anticipate this type of request, it's best to determine ahead of time how to handle it. Ask the candidates if they generally have an opening ceremony at their meetings, such as the Pledge of Allegiance. You can either add it to the agenda or be prepared to explain why the original agenda will be maintained.

Find out if there are any candidate activities planned before or after the forum that would require more crowd control measures, such as directions to the meeting place or additional security personnel.

**Consider the following tips to help address any unplanned activities or disruptions that may occur:**

- Have the Moderator meet with the candidates before the forum starts to re-affirm their understanding and agreement to the rules and format.

- Distribute or email an agenda and/or format rules to all participants.

- Consider having police or security people present at the event.

- Have a number of League members sprinkled throughout the audience to help maintain order.

- Moderators should be prepared to keep their composure and maintain a strong, yet civil tone that exemplifies the respectful discourse expected of Leagues.

- Include a statement like the following in the Moderator's opening remarks:
  "In order to ensure that you have the most time to hear from the candidates running to represent you, we have established the format, time and terms for this forum together. All candidates (you might choose to name them) have agreed in advance to the following rules."   And then read the agenda and rules or format.

- If there's pushback from the audience – perhaps consider a couple of quick options:
  - "If we hear no objection from the candidates and those assembled, we'll take a minute to do that before we start."  (or)
  - "We are happy to entertain that at the end as time allows."

### Evaluation
With the Board and forum workers, conduct an evaluation of how the forum worked, and write down what should be changed in the future.  Then send thank-you notes to the candidates for appearing and for running for office.  After the election, you may want to send congratulations to the winners, as well as encouragement to the candidates who did not win, thanking them for their participation in the political process.  If you have received approval to use the League of Women Voters of Texas grant, file the appropriate project reports to apply for reimbursement.

## Moderate a Non-LWV Forum

Many organizations ask the League to moderate their candidate forums.  In such cases, the League must still ensure that the forum meets League standards for nonpartisanship and fairness to candidates, i.e.:

- All candidates for the offices are invited.
- All candidates are given equal time and opportunity to make opening and closing remarks and answer questions from the audience.
- Questions, whether written or oral, are based on issues, do not include personal attacks, and are presented to all candidates for an office for response.
- The forum conforms to League policies such as videotaping and placement of candidate materials.

Be sure to provide the organization with a copy of the LWVTX *Policy on Candidates Forums* prior to agreement to moderate the forum.

The sponsoring organization should meet the same guidelines as a co-sponsor for a League forum; they must be approved by the League Board of Directors and cannot have endorsed or been affiliated with a candidate or ballot issue. The event cannot be publicized as a League forum.

However, the sponsoring organization, not the League, may take the lead in setting the date, arranging a venue, funding the event, providing volunteers and publicizing the event. They may also invite the candidates, as long as the League nonpartisanship standards are maintained. The sponsoring organization and the League should agree on the format of the forum.

The League should provide the moderator, timekeeper and question screener, if possible. Additional volunteers may come from the sponsoring organization.

If the forum is to be broadcast or recorded, League policies on broadcasts must be maintained. Any use of forum recordings requires the express written approval of the League; and the League will only allow audio/video to be broadcast in its entirety, except by the media reporting on the event.

## Resources

LWVUS publications (available at lwv.org ):
- *"FAQ's Candidate Forums-Debates"*
- *"Guidelines for State and Local League Debates"*
- *"Hosting Virtual and Hybrid Candidate Forums During Covid"*

LWVTX publications (available at lwvtexas.org ):
- *Policy on Candidates Forums*
- *Handbook for Local Leagues TEF Projects*
- *League Handbook and Directory*

Secretary of State's Office (available at sos.state.tx.us ):
- Election dates
- Political party information

Texas Attorney General's Office (available at oag.state.tx.us ):
- *Open Meetings 2018 Handbook* (https://www.texasattorneygeneral.gov/sites/default/files/files/divisions/open-government/Open-Meetings-Handbook-2018.pdff )

OCA-APPX-1733

OCAGH_00007814

# Appendix

## Sample Invitation to Candidates

[*Use LWV logo and/or local League letterhead*]

The League of Women Voters, a nonpartisan political organization, encourages informed and active participation in government and influences public policy through education and advocacy.

[*Date*]

To Candidates for:
[*Name of office and place*]: [*names of candidates and party, if appropriate*]

Dear Candidates:

The League of Women Voters of [*your League*] invites you to participate in a public candidates forum to provide information to voters for the coming [*give date and type*] Election. The purpose of the forum is to educate the public about issues, allow face-to-face comparisons of the candidates and their positions, and stimulate and increase voter interest and participation in the election.

The candidate forum will be [*date and time*] at [*location and address*].

[*If you will have multiple sessions, state the time of each session and which candidates will appear, as follows:*]

We will have two sessions, as follows:

Session 1, [*time*], for [*name of office*] candidates
Meet & Greet, [*time*], for all candidates in both sessions
Session 2, [*time*], for [*name of office*] candidates

Details of the forum and its format are in the attached *Forum Guidelines and Participation Agreement*.

I would appreciate your response regarding participation in the candidate forum no later than [***deadline for response***]. You may contact our Forum Coordinator by email or telephone, using the contact information below. As we receive responses, we will update the list of participating candidates on our website [*URL for website*].

Thank you for your participation.

[name and signature of League president]
[name and contact information of Voters Service Director or other forum coordinator]

## Sample Forum Guidelines and Participation Agreement

[*Use LWV logo and/or local League letterhead*]
[*Contact information for forum coordinator*]

Guidelines for Candidate Forum

---

[*Name of forum*]
[*date and time of forum*]
[*location of forum*]

[*description of format, such as the following:*]

| | |
|---|---|
| U.S. Representatives | **10:00 – 11:00** |
| **Candidate Meet & Greet** | **11:00 – 11:30** |
| **State Representatives** | **11:30 – 12:30** |

---

1. **Please RSVP by *[date and time]*,** so that we can finalize arrangements and distribute publicity for the forum. We will list the candidates invited and indicate whether they are attending, not attending or no response received.

   - **If you plan to attend, complete the *Participation Agreement*** at the bottom and email the document to [*name and email*].
   - **If you do not plan to attend,** please email your reply to [*name and email*].

2. **Candidates invited to participate in the forum:**
   - All candidates who will appear on the ballot for the above contested races are invited.
   - Only candidates will be allowed to participate, and no substitute may stand in for a candidate at the forum, either to read a statement or to distribute candidate literature.

[*If the forum is subject to rules prohibiting participation by a single candidate for an office, include a statement like one of the following:*]
   - **Note to candidates for U.S. Congress:** LWV policies and Federal Election Commission regulations require that in a forum for candidates for U.S. office, at least two candidates in a race must participate; otherwise, a single candidate in a U.S. race can only be introduced at a forum but not speak or answer questions. Candidates for U.S. office will be notified if they are the only candidate in the race who has agreed to participate.
   - LWV policies require that at least two candidates in each race must participate in this forum; otherwise, a single candidate in a race can only be introduced at a

forum but not speak or answer questions. Candidates will be notified if they are the only candidate in the race who has agreed to participate.

3. **Unopposed candidates invited to be introduced:**
   - Unopposed candidates may **not** be speakers at the forum; however, they may be introduced during the forum and are invited to the Meet & Greet.

4. **Sessions:**
   - Candidates should arrive at least 10 minutes prior to their respective session.
   - Candidate literature should be placed on tables provided at the back of the room. It may not be placed on seats or handed out to attendees as they enter or leave the room for the forum. Only small items are permitted in the room (e.g., cards, brochures, flyers), not large signs or banners.
   - All candidates will be seated by office sought, in an order determined by a random draw [*or other method*]. Speaking order will be rotated.
   - Each candidate will have up to **three minutes for opening remarks**, in the order seated.
   - Written questions from the audience will be read by the moderator and each candidate for the office addressed will have up to **one minute to respond**. The speaking order of candidates will rotate.
   - Each candidate will have up to **two minutes for closing remarks**, in the reverse order from opening remarks.
   - Candidates may not address questions or remarks to other candidates; all questions will come from the audience.
   - All candidates are invited to attend the Meet-and-Greet to talk individually to attendees and distribute campaign materials.

5. **QUESTIONS?** Contact [*name, email, telephone*].


**PARTICIPATION AGREEMENT:** I agree to participate in the Candidate Forum [*date*] and accept the format and rules as presented above. The forum content is the property of the League of Women Voters of [*your League*] and permission must be sought to rebroadcast the forum in its entirety or to print excerpts. I agree that I will not use any portion of the forum in a political advertisement.

Candidate's name _____ Date _____

## Sample Moderator Script

Nonpartisanship policy:
The League of Women Voters, a nonpartisan organization, encourages informed and active participation of all citizens in government and influences public policy through education and advocacy. The League does not support or oppose any political party or candidate.

If forum is an open meeting under Texas Open Meetings Act:
The [*governmental body*] has determined that this forum is an open meeting under the Texas Open Meetings Act. [*Minutes or recording*] of this forum will be available [*when and where*]. Members of the audience are also allowed to tape or record the meeting in an unobtrusive manner.

Taping policy if forum is not an open meeting:
Before I introduce the candidates, please put away your cell phones and cameras. According to League guidelines, candidate forums cannot be taped or broadcast without permission of the League. No portion of the candidate forum may be used as part of campaign materials.

Format of session:
This session will present the candidates for *[specify offices].* *[(Describe term and responsibilities of each office and introduce the candidates, including any unopposed candidates in the audience.]*

*[If you anticipate any requests from the audience regarding format or procedures, you may say the following:]* In order to ensure that you have the most time to hear from the candidates running to represent you, we have established the format, time and terms for this forum together. All candidates have agreed in advance to the following format. *[Include any specific parts of the format that may be problematic.]*

To begin, each candidate will have up to **3** minutes for opening remarks. After that they will respond to written questions from the audience. Then each candidate will have **2** minutes for closing remarks.

All candidate remarks will be timed, to ensure equal opportunity for everyone. Our timekeeper is [*name*] a member of our League. Candidates, she will raise signs to let you know how much time is left. Please stop promptly when your time is up.

The program has a form on which members of the audience may submit a question for our Q&A period. As you listen to the candidates, you may write a question on the form and pass it to the aisle for one of the League members to pick up. Hold up your hand if you need another form or a pencil. Please write questions for an office, rather than an individual. Questions will be screened for appropriateness and grouped by topic.

Candidates' opening remarks:
The candidates are seated, left to right, in the order in which they will give opening remarks. [*Describe how order was determined.*] Each candidate will have up to **3 minutes**, beginning with [*name of first candidate*].

[*Announce the name of each candidate in turn.*]

Questions and answers:
We have collected several questions from the audience. Each candidate will have the opportunity to respond to each question. We will vary the speaking order to allow different candidates to speak first, last, etc.

The first question is … We will give each candidate **1 minute** to respond, beginning with [*name of candidate*]. [*It is helpful to provide candidates with a list of the speaking order for each question.*]

Candidates' closing remarks:
Each candidate will now have **2 minutes** for closing remarks. Candidates, you may want to address any issues that have come up during the questions.

This time we are going to go in reverse order from the opening remarks, beginning with [*name of first candidate*].

End of Session
This concludes this session of our candidate forum. Thank you to the candidates for your participation and to the audience for your attendance and questions. Please check your program for information about *Voters Guides*, voting dates and sample ballots. *[If multiple sessions]* We will have a break during which time you can talk to candidates individually. We will begin the next session promptly at [*time*].

## Sample Candidate Forum Memorandum of Understanding

Candidate Forum Deliverables

1. In order to perform its obligations in producing and hosting the Candidate Forum, the Parties agree to the following terms, conditions, and deliverables:

a) The Partners agree to jointly produce and broadcast a Candidate Forum focusing on candidates for the following contested elected office(s)_____. The Forum will be held on _____.

b) The sponsors of the Forum are _____. No other sponsors shall be acknowledged. Only sponsor logos will be permitted in collateral materials. League of Women Voters of (League) will be recognized as the event's originating sponsor.

c) Media sponsors shall arrange for the Forum to be broadcast live on the following media: _____. Abridged clips of the Forum will be permitted for news broadcast content. The League will be allowed to share this feed via its social media at no cost. This event will be open to all media.

d) Media sponsors, if invited to moderate, shall ensure that the moderator(s) refrain from any partisan conduct or statements in emceeing and moderating the forum.

e) Prior to inviting any Forum candidates, the partners shall establish and use objective non-partisan criteria to determine which candidates officially qualify for election to this office and shall extend invitation to all qualifying candidates for the Forum. This criteria should also address the possibility of write-in candidates for office.

f) No individuals except qualified candidates for (name office being contested) shall be allowed to participate in this Forum.

g) All partners shall jointly determine the candidate Forum format, provided it complies with relevant state and federal law (FEC, IRS) as well as voter education activities.

h) All partners agree to refrain from collecting any personal data from attendees or sponsor organizations' membership database.

i) The Parties shall not provide Forum questions to any candidate in advance. The League will determine the boundaries of topics which will be covered by the Forum. The League will also provide qualified volunteers to properly screen and edit questions from the audience for the candidates. No questions may be offered from the floor for quality control of time and content.

j) The Parties shall use commercially reasonable efforts, excluding commencing litigation, to prevent the Forum, or any portion or recorded media thereof, from being used for any partisan or political activity by any third-party.

k) The Parties shall be recognized with the following language in all promotion(s), broadcast(s) or rebroadcast(s) of the Forum or a portion thereof: "This

Candidate Forum is made possible by the financial support of the League of Women Voters of (League) and (name partners)."

l)   The Parties shall provide the following as sponsors of the Candidate Forum:

   i)   _____will provide the venue and associated costs: A/V, lighting, technicians.

   ii)   _____will contact the candidates, outline specifics, appoint points of contact, confirm participation and share logistics details.

   iii)   _____ will handle security and coordinate with local law enforcement if needed. (This information should be shared with candidate teams.)

   iv)   (Media Partner) will provide no less than __ promotional prints in their newspaper, promotion on their website as well as social media platforms, and an emcee/moderator, and will live web stream and archive the event for post-event access by the public.

   v)   (Media Partner) will promote the event in advance with pre-event interview considerations, calendar listings in print and on social media; the event will be free and open to the public.

   vi)   All partners will work in concert to market the event up to four weeks in advance of the date.

# League of Women Voters of [Your League]
## Video/Photograph Release Form

I hereby grant the League of Women Voter of [Your League] (the "League") the irrevocable right and permission to use photographs and/or video recordings of me on League and other websites and in publications, promotional flyers, educational materials, derivative works, or for any other similar purpose without compensation to me.

I understand and agree that such photographs and/or video recordings of me may be placed on the Internet. I also understand and agree that I may be identified by name and/or title in printed, Internet or broadcast information that might accompany the photographs and/or video recordings of me. I waive the right to approve the final product. I agree that all such portraits, pictures, photographs, video and audio recordings, and any reproductions thereof, and all plates, negatives, recording tape and digital files are and shall remain the property of the League.

I hereby release, acquit and forever discharge the League from any and all claims, demands, rights, promises, damages and liabilities arising out of or in connection with the use or distribution of said photographs and/or video recordings, including but not limited to any claims for invasion of privacy, appropriation of likeness or defamation.

I hereby warrant that I am eighteen (18) years old or more and competent to contract in my own name or, if I am less than eighteen years old, that my parent or guardian has signed this release form below. This release is binding on me and my heirs, assigns and personal representatives.

_____          _____
Signature of Individual Photographed/Recorded                             Date

_____
Printed Name of Individual Photographed/Recorded

_____          _____
Signature of Witness                                                             Date

**If an individual photographed/recorded is under eighteen (18) years old, the following section must be completed:** I have read and I understand this document. I understand and agree that it is binding on me, my child (named above), our heirs, assigns and personal representatives. I acknowledge that I am eighteen (18) years old or more and that I am the parent or guardian of the child named above.

_____          _____
Signature of Parent/Guardian of Individual Photographed/Recorded      Date

_____
Printed Name of Parent/Guardian

_____          _____
Signature of Witness                                                             Date

# Exhibit 112

| | |
|---|---|
| **From:** | Jerrie Champlin [jbaralin@gvtc.com] |
| on behalf of | Jerrie Champlin <jbaralin@gvtc.com> [jbaralin@gvtc.com] |
| **Sent:** | 1/22/2022 10:26:36 AM |
| **To:** | gchimene [gchimene@lwvtexas.org] |
| **CC:** | Laraine Henchal [laraine.henchal@gmail.com] |
| **Subject:** | question re: "assistance" in filling out ABBM |

Thanks for all that you're doing!  I shared all the information, clarification and links re: the ABBM and voter registration forms with our Voter Services team which includes Joyce Doyle who also does VDR volunteer work for the local Democrats.  We are planning on including a pre-addressed, stamped envelope with ABBM forms & the Tips one-pager we provide at our LWV GOTV events and Joyce asked the question below.  IMO providing a pre-addressed, stamped envelope is not the same as helping someone complete the application or mailing for them.  Does LWVTX have any guidance/opinion on this specific question?

Jerrie

Jerrie Champlin
President, LWV-Comal Area
jbaralin@gvtc.com
830-643-4657

---

**From:** "Joyce Doyle" <joycedtx@gmail.com>
**To:** "Jerrie Champlin" <jbaralin@gvtc.com>
**Sent:** Friday, January 21, 2022 4:03:00 PM
**Subject:** Re: information on VOTE411, new forms, new laws etc

Thank you for this great information. We will be doing some Voter Registration soon and of course offer help with ABBM both there and at Dem HQ. Are you sure that it's OK to give out envelopes and stamps? I saw this on the SOS website under instructions for :

1.      "If someone helped you complete the application or mailed the application for you, that person must complete Section 11. [giving their name and address as an Assistant]

2.      Affix postage.

a.              If you printed the application you must place it in your own envelope and add postage."

It bothers me that he says "your own envelope." Maybe I'm being too suspicious and it just means they won't be supplying an envelope. It would be ridiculous if you couldn't give them an envelope and even a stamp. Did you address the envelope to the elections office?

I'll forward your information on to our VDRs. Thanks.
Joyce

OCAGH_00005900

# Exhibit 113



# Policies & Procedures

*A Manual for State, Local League Boards, and Leagues at Large*
*Revised 2022*
*League of Women Voters of Texas*

Adopted as revised by the League of Women Voters of Texas Board of Directors
© July 2005; Revised 2008, 2009, 2011, 2012, 2015, 2016, 2017, 2019,
2020, 2021, 2022

| Revision No. | Approval Date | Reason for Revision |
|---|---|---|
| 9 | Oct 18, 2019 | Revised in its entirety to meet 2019 bylaws, updates the empty chair policy and Programs, provides that LWVTX inputs VOTE 411 data for State and Federal races, removes the records retention policy and adds (1) an internal financial audit committee and (2) a whistleblower policy |
| 10 | Jan 12, 2020 | Revised Debates and non-debate locations |
| 11 | Feb. 22.2020 | Removed convention delegate table. |
| 12 | May 12, 2020 | Inserted Photography, Video and Audio Recording Policy and Reprint Policy |
| 13 | Mar 9, 2021 | Updated links and made format and punctuation corrections to Voter Education section |
| 14 | Sep. 13, 2021 | Program chair updated. Executive administrator updated to Executive director. |
| 15 | Nov. 4, 2021 | Updated links from LWVTexas website. |
| 16 | Apr 1, 2022 | Updated Voter Education section to incorporate updated Guide to Voters Guide and to update other links |

1212 Guadalupe #107, Austin, TX 78701
(512) 472-1100
LWVTexas@LWVTexas.org | www.LWVTexas.org
For League use only. Others please contact LWVTX for permission to reprint.

## Table of Contents

1. Introduction                                                                                    4

2. Nonpartisan Political Policy                                                          6

3. Diversity Policy                                                                             8
   Participation in the League                                                            8

4. LWVTX State Board                                                                        9
   Board Meetings                                                                             9
   Executive Committee                                                                       9
   Board Nominations                                                                         9
   Conflict of Interest                                                                       10

5. Advocacy                                                                                       11
   Legislative Priorities                                                                    11
   Advocacy volunteer positions                                                        11
   Coalitions, Collaborations, and Affiliations                              12
   Advocacy calendar                                                                        13
   Action (Advocacy) by Local Leagues, and Leagues at large        14
   Appointments to Public Boards, Commissions, and Committees      15
   Support or opposition of political nominees                             15
   League Participation in Marches & Events                                 15

6. Voter Education                                                                            16
   Voters Guides                                                                              16
   Local League, League at Large and State League Responsibilities  16
   Producing a Voters Guide                                                             17
   Copyright and Reproduction                                                          17
   Reprint Policy                                                                             18
   Regarding Candidates                                                                    18
   Advertisements                                                                            20
   Candidate Debates and Forums                                                       20
   General for All Debates and Forums                                              20
   League Responsibilities for Holding Forums and Debates            21
   Federal Definitions                                                                       22
   Candidates Participation Guidelines                                            22
   Empty Chair Guidelines                                                                 23
   Debate Locations for State and Local Races                              23
   Co-sponsorship for All Debates and Forums                               23
   Moderating a Non-League Forum                                                    24
   Texas Open Meetings Act                                                             24
   Broadcast Policies                                                                       25

7. Program/Studies                                                                          26

OCA-APPX-1746

OCAGH_00015568

Program Responsibilities 26
Program Adoption 26
Local Leagues and Leagues at large Propose New Studies, Concurrence, and Updates to Positions. 26
Program Review 27
Additional Program Considerations 28

**8. Communications** **29**
Who speaks for the League? 29
Membership lists 29
Gender-neutral language 29
Editing 29
League Websites and Social Media 30
Use of Logo 30
Photography, Video and Audio Recording Policy 30
Website Privacy Policy 31
Guidelines for Social Media 31
Speakers for League Events 31

**9. Convention and Statewide Conference** **32**
Convention responsibilities 32
Convention deadlines 32
Delegates 33
Financial Policies & Registration Procedures for Convention 33
Statewide Conference 34
Statewide Conference Deadlines 34
Eligible voters at statewide conference 34

**10. Development** **34**
State League fundraising 35

**11. Governance** **36**
Local League Bylaws 36
Oversight of local League bylaws by LWVTX 36
Review of state bylaws by local League 36
LWVTX Whistleblower Policy 36

**12. Service to Local Leagues** **39**

**13. Organizational Levels** **40**
State Members 40
Leagues at large 40
How to start a League at large 40
Minimum requirements of a League at large 41
How to achieve full local League status 41
How to maintain full League status 41
Annual Reports Local League & League at Large 42

OCA-APPX-1747

OCAGH_00015569

Changes to original League name or structure                                42
Withdrawing recognition                                                     42

**14. State Office**                                                        **43**
Environment                                                                 43
Record and Document Retention & Archiving                                   43
Local Leagues                                                               43

**15. Financial Policies**                                                  **44**
Local League Support of the State League                                    44
Student Members Dues                                                        44
State Members Dues                                                          44
Budget                                                                      44
Reserves                                                                    45
Contracts                                                                   45

**16. Personnel Policies**                                                  **46**
Executive Director                                                          46
Student Interns                                                             46
Student Volunteers                                                          46

**17. Fiscal Management**                                                   **47**
Banks and Financial Institutions                                           47
Bonded                                                                      47
Treasurer's Reports                                                         47
Purchasing and Contracting                                                  47
Investment Policy                                                           47
Endowment                                                                   48
Investment restrictions                                                     48
Investment criteria based on mission or social responsibility              49
Reviews and Reports                                                        49
Portfolio Review                                                           49
Annual Portfolio Report                                                    49
Cash flow requirements                                                     50
Gift Acceptance                                                            50
Reimbursement                                                              53

# 1. Introduction

Policies and procedures are operational guidelines to help the League fulfill our mission of empowering voters and defending democracy. Our policies and procedures assist the board in implementing our bylaws. Policies are reviewed every two years by the board of directors, revised as needed, and adopted by the board. Updated Policies and Procedures are shared with Leagues and League leaders by email and online.

OCA-APPX-1748

OCAGH_00015570

**Review Process**
Biannual reviews are required and include:

- headings - are they appropriate?
- placement of items - are they in the right place?
- readability - does it make sense?
- League links - use links from LWVUS or LWVTX whenever possible vs copying and pasting from LWVUS or LWVTX web pages or documents. This keeps information up to date.
- outside links - Governmental agencies and resources as needed *i.e.*, FEC, IRS
- accuracy - is it true? legal?
- applicability - Who does the policy apply to: LWVTX, local Leagues or Leagues at large? Is it clear?
- usefulness - is it useful information for the Policies and Procedures or does it belong somewhere else?
- date updates

**This Manual is an e-book Only**
Because of the League's commitment to the environment, these policies are available electronically with links to pertinent resources. We suggest printing only the page you need in order to support this commitment.

**Questions & Help**
If you have questions about this guide, please contact the state office at lwvtexas@lwvtexas.org.

**Quick Links**
Many documents are found on the Publications page of our website:
https://lwvtexas.org/publications.

OCA-APPX-1749

OCAGH_00015571

# 2. Nonpartisan Political Policy

LWVUS: Guidelines for Developing and Implementing Nonpartisan Policy
LWVUS: Criteria for League Participation in Marches & Events

Members of the state, local League boards, and Leagues at large shall adhere carefully to the nonpartisan political policy of the League of Women Voters of the United States (LWVUS).

"The League of Women Voters does not support or oppose any political party or candidate."
LWVTX BYLAWS 2021, Article II. Purposes and Policy, Section 2. Policies, a) Political Policy.

## State Board

The state board president, the chairs of the advocacy and education committees, the voters service coordinator, and others the public strongly identifies with the state League shall avoid political activities that may give the appearance of partisanship.

A state board member may accept appointment to, or run for, a local political office if:
- the election does not require a party affiliation,
- the board of the local League involved gives approval, and
- the state League board approves

## Prospective LWVTX Board Nominees

The Nominating Committee shall explain to prospective board nominees the League nonpartisan political policy. The state board shall explain to prospective off-board appointees the nonpartisan political policy.

## League at Large Leadership Team
- League at large chairs/presidents and voter services leaders shall avoid political activities while on the leadership team that may give the appearance of partisanship,
- Other team members who have public roles, such as those who routinely conduct candidate forums, should strive to be non-partisan, and
- If a League at large team member declares for an elective office, the team member shall resign from the team, but may continue to be active in the League and return to the team when appropriate.

## Both State Board members and League at large Leadership Team
- are encouraged to vote in the primary of their choice,
- are encouraged to participate in political activities but must first consult the state board if they are in doubt as to whether their activities could compromise the League's nonpartisanship,
- shall not run for office in a partisan race or accept a partisan appointment (except precinct chair),
- shall avoid indicating their political affiliations or candidate preferences at any level of government in the media, including on social networking sites or other public venues **that also prominently identify them as a member of the team**, and
- shall review and discuss the nonpartisan political policy annually.

## Issue Chairs

OCA-APPX-1750

OCAGH_00015572

- shall avoid activities that could compromise League nonpartisanship and
- are encouraged to participate in political activities but must first consult the board if they are in doubt as to whether their activities could compromise League nonpartisanship.

## Local Leagues

- Each local League board should formulate a nonpartisan policy that best reflects existing conditions in its League, as well as the political climate and traditions in its community.
  LWVUS: Guidelines for Developing and Implementing Nonpartisan Policy

OCA-APPX-1751

OCAGH_00015573

# 3. Diversity Policy

LWVUS: Diversity Equity, and Inclusion Policy
LWVTX: https://lwvtexas.org/diversity-equity-inclusion

## Commitment to Diversity

LWV is an organization fully committed to diversity, equity, and inclusion in principle and in practice. Diversity, equity, and inclusion are central to the organization's current and future success in engaging all individuals, households, communities, and policy makers in creating a more perfect democracy.

## Participation in the League

There shall be no barriers to full participation by members in this organization on the basis of gender, gender identity, ethnicity, race, native or indigenous origin, age, generation, sexual orientation, culture, religion, belief system, marital status, parental status, socioeconomic status, language, accent, ability status, mental health, educational level or background, geography, nationality, work style, work experience, job role function, thinking style, personality type, physical appearance, political perspective or affiliation and/or any other characteristic that can be identified as recognizing or illustrating diversity.

# 4. LWVTX State Board

LWVTX: <u>LAL Conflict of Interest Form</u> 2020
LWVTX: <u>LWVTX Conflict of Interest Disclosure Form</u> (2020)

## Board Meetings

- The president shall determine the dates and places for state board meetings with consideration for the cost of the meetings and convenience of all state board members.
- A preboard compiled from the written reports of on-board and off-board members, to be included in the preboard report, shall be made available before each board meeting.
- Unexcused absences, those not approved by the president, from two consecutive board meetings, or three unexcused absences from board meetings in a biennium, shall be considered a resignation from the board. The secretary shall record absences at the direction of the president. The president shall notify the board member in writing of each unexcused absence.
- The board may vote by email between board meetings, if necessary, and decisions will be ratified on the consent agenda at the next board meeting.
- Board members are serving as members of the League and not in their professional, executive, or administrative capacity.

## Board members and local Leagues

- Board members are encouraged to be active in their local Leagues. However, it is expected that the state level of the League will be the primary focus of their League volunteer time.
- Board members should limit attendance at local League board meetings to those occasions when the local League agrees to include the visit on its agenda.

## Executive Committee

An executive committee may be created to act on behalf of the state board. Interim decisions that cannot be postponed may be made between regularly scheduled board meetings. Such interim decisions must be recorded and confirmed or revised, at the next regularly scheduled board meeting.

A. The executive committee shall consist of the president, treasurer, secretary, and the vice presidents.
B. The president has the discretion to refer items to the executive committee or the full board between the board's regular meetings.
C. A majority of the executive committee members shall constitute a quorum.
D. Any interim decision made by the executive committee must be confirmed, or revised, at the next regularly scheduled board meeting and reflected in the official minutes.

## Board Nominations

LWVTX: <u>LWVTX Board Nominations web page</u>

- As a courtesy, the state League Nominating Committee should, prior to naming a nominee for a state board position, notify the nominee's local League president.

OCA-APPX-1753

OCAGH_00015575

- DEI will be considered throughout the nominating process.

## Conflict of Interest

LWVTX: LWVTX Conflict of Interest Disclosure Form (2019)

A. Members of the state board shall not receive compensation, such as salaries or stipends, for services rendered, nor shall they sell professional services or products to the League deemed necessary to carry out the mission of the organization.

B. The executive director shall not be a member of the state board. (It is considered inappropriate for those earning a salary or fee to be a part of the decision-making body that hires, fires, and determines salary and benefits.)

C. Members of the state board may accept modest honoraria or gifts for speeches or other activities rendered to others on behalf of the state League. Other honoraria or gifts shall be given to the state League.

D. In any matter in which a state board member or the member's family has a substantial financial interest, the board member shall refrain from participating in the discussion prior to a vote, refrain from attempting to influence the outcome of a vote, and abstain from voting.

E. In the interest of openness and transparency, all board members, staff, and issue chairs shall sign an annual disclosure form and include current employment, current service on other boards of directors, and/or family or business relationships with voting or nonvoting LWVTX directors or employees, whether or not deemed a conflict of interest.

OCA-APPX-1754

OCAGH_00015576

# 5. Advocacy

LWVTX: *Guide to Issue Chairs*, Action Papers

This policy applies to all advocacy activities based on state League positions in order to influence any branch of state or federal government. The state board directs overall advocacy efforts by adopting goals and choosing legislative priorities; assigning issues; determining how, when, and by whom strategies shall be developed and implemented; entering into litigation; resolving conflicts among local Leagues regarding jurisdiction or action that cannot be settled otherwise; and directing local League advocacy to state government.

### Legislative Priorities

- The Advocacy Committee recommends legislative priorities to the board for adoption after reviewing input from members, capitol corps, legislative coordinator, and issue chairs.
- Implementation of legislative priorities is the responsibility of the Advocacy Committee chair, capitol corps coordinator, legislative coordinator, and issue chairs with the concurrence of the president.

**Approval process**

- All action, testimony, written statements, action alerts and the *Capitol Action Report* shall have prior approval of the Advocacy Committee chair and the president.

### Advocacy volunteer positions

**Issue Chairs**

- Recommends action supporting League positions in their assigned areas, with approval and guidance of the Advocacy Committee chair and the president, and
- Implements recommendations approved by the Advocacy Committee chair and/ or president.

**Capitol Corps Coordinator**

- Responds to the requests of Issue Chairs, and
- Coordinates Capitol Corps volunteers efforts at the Capitol, at the request of Issue Chairs and the Advocacy Committee chair.

**Capitol Corps Volunteers**

- Fulfills advocacy actions at the Capitol, as requested by Issue Chairs.

**Legislative Coordinator**

- Acts on behalf of the state League,
- Maintains an active advocacy presence at the Texas Capitol,
- Promotes priority and active issues, and
- Represents the state League, when needed, at the Capitol, in coalition meetings, and with collaborators and affiliates.

**Appointments**

**Reappointment of current issue chairs and coordinators**

OCA-APPX-1755

OCAGH_00015577

- After state convention, the current chair of the Advocacy Committee gathers recommendations from the current president, the incoming president, and others to determine which issue chairs, capitol corps coordinator, and legislative coordinator to recommend to the board for reappointment.
- The Advocacy Committee chair sends an official email
  - reminding the issue chairs and capitol corps and legislative coordinators that their 2-year term is ending
  - and thanking them for their service.
  - If they are to be reappointed, asks them if they would like to continue.
  - If they are not recommended for reappointment, the email makes it clear that their term is over and thanks them for their service.

**Appointment of new issue chairs and coordinators**
- At convention and in emails to members, a request for volunteers is made for issue chairs, capitol corps coordinator, and legislative coordinator positions.
- The Advocacy Committee chair reviews issue chair applications, interviews applicants and makes recommendations to the board.

**Approval by Board**
- At the first meeting of the new board, the Advocacy Committee recommends Issue chairs, capitol corps coordinator, and legislative coordinator for the next term.
- Issue chairs and other positions are recruited, reviewed and recommended as needed by the Advocacy Committee and approved at the next board meeting.
- After board approval, Issue chairs, capitol corps coordinator, and legislative coordinator are sent an email explaining their term of service, their duties and a request they refrain from conspicuous partisan activities during their term of service. They are also asked to fill out a Conflict of Interest form.

## Coalitions, Collaborations, and Affiliations

See lwvtexas.org/league-advocacy for a current list of approved organizations

League membership in coalitions, collaborations, and affiliations with other groups shall be approved by the state board.

**Joining or resigning from a coalition, collaboration, or affiliation shall be a decision of the board based on the following guidelines:**

- After consultation with the issue chair recommending the action, the Advocacy Committee chair must present to the board information about a group, such as purpose, mission, major goals or activities, reasons for membership, and verification or affirmation of its nonpartisanship.
- The League's representative to each group must be identified when the list is presented to the board by the Advocacy Committee chair, or as soon as possible thereafter, and the representative's role, if any, with the group must be described.
- Fees for joining should be carefully examined for merit and reviewed annually.
- If the League commits to expending funds other than for dues, the League liaison must

OCA-APPX-1756

OCAGH_00015578

ensure nonpartisanship is maintained in order for the expenses to be covered.

**Definition of terms**

- **Coalition**
  A group with which the League works that is organized around a specific issue or issues and in which the League has an equal opportunity for input into a group's agenda.
- **Collaboration**
  A group or groups with which the League may conduct a single activity, like a forum or survey, or a specific reform effort, like a sunset or campaign finance reform.
- **Affiliation**
  A group with which the League may lobby and from which the League receives information or newsletters but does not determine the agenda.

**Formal statements by League representative**

- The League representative to a group of which the League is a member must have the prior approval of the state League president or designee before making any formal or public statement of League position on a specific issue.

**Formal statements, emails or letters by a group**

- The group shall never use the League's name on statements, letters, press releases, publications, or any other materials without prior League consent. Such consent is required each time the group wishes to use the League name.
- A request shall be approved by issue chair, advocacy chair, and president before the League logo or name is attached.
- If the League disagrees with a majority opinion of the group, a public statement of the League's dissent should be issued.

**Partisan activity**

If the group in any way participates in partisan activity (i.e., opposing or supporting a candidate or party), then the League shall withdraw from the group.

## Advocacy calendar

| Even Year | Action by Advocacy Committee |
|---|---|
| April | <ul><li>At the state convention, the outgoing Advocacy chair solicits volunteers/recommendations for issue chairs and capitol corps, and legislative coordinators.</li><li>Following state convention, the outgoing Advocacy chair consults with the current president, incoming president, and others as needed, re: reappointment/new appointment of issue chairs and coordinators.</li></ul> |
| May | <ul><li>Updates *Program Perspectives* and website with new/updated LWVTX positions.</li><li>Reviews/updates *We Support* with new/updated LWVTX positions in brief.</li></ul> |
| June | Reviews:<ul><li>list of coalitions, collaborations, and affiliations for addition/deletion and makes recommendations to the state board for approval.</li></ul> |

| | |
|---|---|
| | • new and returning issue chair and coordinator appointments and makes recommendations to the state board for approval.<br>• priority issue survey results and makes recommendations to the state board for approval. |
| July | Advocacy chair emails letter of appointment and conflict of interest form to all issue chairs. |
| August | • Advocacy chair reviews/updates *Guide for Issue Chairs*<br>• Plans for Issue Chair and Capitol Corps training. |
| September | Advocacy chair reviews/edits Legislative Interview Packet for consideration by Advocacy Committee at the next board meeting. |
| October | At the board meeting, Advocacy Committee reviews questions for legislative interviews and recommends to the state board for approval. |
| Nov./Dec. | Coordinates training of issue chairs, capital corps, and legislative coordinators |
| **Odd Year**<br>Jan/May | Advocacy chair<br>• Oversees legislative action, works closely with Capitol Corps and Issue Chairs, and<br>• Edits *Capitol Action Report*. |
| June/September | Advocacy Chair<br>• Sends thank you notes to volunteers,<br>• Coordinates thank you letters to elected officials, and<br>• Oversees updates of position histories by issue chairs of *Program Perspectives* and on the website. |

## Action (Advocacy) by Local Leagues, and Leagues at large

Bylaws Article X, Section 3. Program Action
- Local Leagues may act on program only in conformity with positions taken by the LWVUS or the LWVTX.
- Local Leagues, Leagues at large, or members may act on program at the state level in the name of the League only when authorized to do so by the state board.

**Policy On Lobbying A State Legislator**

If the Advocacy Committee chair grants a local League permission to lobby a state legislator **using a Local League position**, the following applies:
- The local League can lobby only on a bill affecting their area. If an amendment to the bill changes the scope (no longer local but statewide), the local League cannot lobby for the bill.
- The local League must always specify that they represent their local League when lobbying for the position. If they are asked about the state League position, the local League must tell them the state League has no position on the issue.

- The local League may lobby any local state legislator, but if they lobby a nonlocal legislator, they must inform the Advocacy Committee chair. (If they give testimony in a legislative committee, they shall inform the Advocacy Committee chair.)

## Appointments to Public Boards, Commissions, and Committees

The League shall take the initiative in recommending people to serve on appointed public boards, commissions, and committees. The president shall be consulted on all recommendations. The full board shall approve recommendations if time permits. League members shall have priority for League support over other candidates with similar qualifications.

### Conflict of Interest

When a League director or off-board chair is appointed to a state board or commission, the state League board shall decide whether or not member shall resign any League position(s) due to potential conflict of interest.

## Support or opposition of political nominees

Under very special circumstances, the League may support or oppose political appointments to a state office, agency, committee, or board with the direct approval of the state board. If the board is not to meet in time for the matter to be considered, the board shall be polled by telephone or email. The League may oppose a nominee only when the nominee clearly has no qualifications for the job–not when the nominee merely holds opinions that differ from League positions.

## League Participation in Marches & Events

LWVUS: Criteria for League Participation in Marches & Events

# 6. Voter Education

## Voters Guides

LWVUS: Voters' Guides Best Practices
LWVTX: A Guide to Voters Guide 2022
LWVTX: Voter Services Shared District Tracking List 2022
TXGOV: Texas Ethics Commission
TXGOV: Texas Secretary of State

The state League, local Leagues and Leagues at large shall follow LWVUS Voters Guide Best Practices.

## Local League, League at Large and State League Responsibilities

**LWVTX**
   A.  LWVTX produces a Voters Guide that includes all statewide candidates and/or ballot issues.
   B.  This Voters Guide also covers candidates for regional office whose regions cover large areas, such as Courts of Appeals judges and State Board of Education members.
   C.  When reproducing the statewide Voters Guide, local Leagues and Leagues at large may exclude those regional candidates who will not be on their local ballot.

**Local Leagues/Leagues at large**
   A.  May produce a Voters Guide that includes candidates and/or ballot issues that are on the ballots in its designated area.
   B.  These will include candidates for U.S. representative, state senator, state representative, and county, city, school board, and/or other district elections.
   C.  Shared districts
      LWVTX: Voter Services Shared District Tracking List 2022
      ● Certain U.S. House of Representative, State Senate and State House of Representative districts comprise an area that is covered by more than one local League and/or League-at-large. In these cases, it is important that the Leagues coordinate with each other regarding VOTE411org, Voters Guides, candidate forums and interviews with candidates or officeholders.
      ● For those districts covered by more than one League, only one League per district can be responsible for contacting candidates and entering the sets of questions in VOTE411.org.  The Shared District Tracking List designates the lead Leagues for such districts for purposes of contacting candidates and for VOTE411.org.
      ● If issues arise regarding coordination among Leagues that share districts, the LWVTX Voter Education Chair should be contacted.

**Review and approval of local Voters Guides**
   ● Not required if the local Voters Guide covers races and candidates.
   ● Required if the local Voters Guide is in a pro/con format for local ballot issues,  and is published online, on VOTE411.org or in print.
   ● The local League/League at large should contact the LWVTX Education Chair for approval and supervision before publication.

OCA-APPX-1760

OCAGH_00015582

## Producing a Voters Guide

**LWVTX:** A Guide to Voters Guide 2022

**Include the League nonpartisan policy**
The League nonpartisan policy should always be printed in a prominent place on the front page of a League voters guide.

> *"The League of Women Voters does not support or oppose any political party or candidate."*

**Voters Guide Questions**
**LWVTX:** Voter Services Shared District Tracking List 2022
**LWVUS:** Are Your Voters Guide Questions as Unbiased as You Think?
**LWVUS:** Sample Questions for Debates and Voters Guides

1. Questions for candidates should be open ended, non-leading, fair, balanced, and nonpartisan.
2. Questions should be reviewed by the local board before releasing questions to candidates.
3. LWVTX will develop the candidate questions, contact the candidates and enter all candidate information in VOTE411 for the following offices. Local Leagues should not contact candidates for these offices.
   - US Senator
   - Governor
   - Lt Governor
   - Attorney General
   - Comptroller of Public Accounts
   - Commissioner of the General Land Office
   - Commissioner of Agriculture
   - Railroad Commissioner
   - State Board of Education
   - Texas Supreme Court
   - Court of Criminal Appeals
   - Court of Appeals

Local Leagues should coordinate with LWV Texas and adjoining Leagues to cover the offices below using the Shared Districts List. LWVTX will cover when there is not a League assigned to cover.
   - US Representative
   - Texas Senator
   - Texas Representative

## Copyright and Reproduction

OCAGH_00015583

LWVUS: Voters' Guides Best Practices

**LWVUS Presidential Candidates Voters Guide**
The LWVUS Presidential Voters Guide is produced only by the national League and is copyrighted and may be published by the state League adhering to the LWVUS Voters Guides Best Practices.

**LWVTX statewide Voters Guide**
- The LWVTX state Voters Guide is copyrighted and may be published by local Leagues, Leagues at large, and other media reproduction by other media.
- If the state League Voters Guide is reproduced by local Leagues, Leagues at large , newspapers, or other organizations in any media, print or electronic form, it must be attributed to the state League and include the statement of League nonpartisanship: *"The League never supports or opposes any political party or candidate."*
- The Voters Guide content concerning candidates and/or issues must be reproduced in its entirety, except that regional races not on the local ballot may be omitted.

**VOTE411.org**
- VOTE411.org and other online Voters Guides  are subject to the same copyright policies as printed Voters Guides.

## Reprint Policy

**Copyrighted materials**
Copyrighted materials of the LWVTX may not be reprinted without permission.  A reprint fee may be charged, based on the length of the material to be reprinted and the number of copies to be made. Contact the state office for more information.

**Non-copyrighted materials**
State and local Leagues are encouraged to reprint non-copyrighted LWVTX and/or LWVUS/LWVEF materials whenever this would be useful and appropriate.  Leagues need not seek permission to reprint non-copyrighted material.  Leagues are asked to credit LWVTX or LWVUS/LWVEF in using such material.

**Copyright for image use**
Please view this LWVUS Webinar about *Image Use and Copyright Recommendations*:
https://register.gotowebinar.com/recording

Protecting the League's brand and ensuring our compliance with copyright and photography laws is important.  See the League's **Photography, Video and Audio Recording Policy** in the **Communications** section of this Manual.

## Regarding Candidates

**Instructions to candidates**
As soon as possible after the filing deadline, explicit instructions and questions are sent to candidates in a traceable form (VOTE411, USPS delivered with signed mail receipt, or email

request return receipt option). Clearly articulate the ground rules for inclusion in the League Voters Guide. For example:

- Explain word limitations so candidates know any responses over the word/character limit will be truncated at that number. VOTE411 calculates the word count for candidate responses.
- If a local League is not using VOTE411, include rules for counting/printing word numbers, symbols, abbreviations, dates, caps, boldface, italics. If the answer is cut, it is indicated with slash (///) marks.

**Editing**
No editing for spelling or grammar mistakes, so candidates cannot say their answers were changed by the League.

**No response from candidate**
If the candidate does not respond by the print deadline, they will be listed with the notation "*No response received by the print deadline*". If submitted after the print deadline, their information may be included at VOTE411.org.

**References to opponents**

- Negative references to opponents (including officeholders) or specific persons are not allowed.
- General references to other political parties may be allowed.
- If a response is deemed to not meet the criteria for the Voters Guide and, if time permits, the candidate may be contacted and given an opportunity to reword the response before the publication deadline.
- If the response is not changed, in place of a response that does not meet the criteria, the Voters Guide will state, "*Candidate's response did not meet the criteria listed in this Voters Guide.*"

**Photos of candidates and videos**
Photos of candidates may be included as part of a Voters Guide. Videos may be included as part of an online Guide, but must comply with the Voters Guide criteria. However, if a candidate does not provide a response to at least one question, the Voters Guide should not include a photo or video.

**Inclusion of candidate rules**
These rules should be summarized in the Voters Guide. A copy of the state League instructions to candidates may be requested by contacting the state office.

**Unopposed candidates**
Leagues should decide in advance whether to invite unopposed candidates to participate in their Voters Guide. Space limitations may dictate their exclusion, but their responses may be important in providing information to the voter, especially in Voters Guides placed on League websites. If not invited to participate, Unopposed candidates should be listed.

**Write-in candidates**
In statewide races, write-in candidates must file a declaration of write-in candidacy with the Texas Secretary of State, and their names are posted in the polling place. However, their names are not on the ballot, and their responses are not included in the state League Voters Guide.

OCAGH_00015585

Local Leagues may develop a policy to include local write-in candidates in their Voters Guide if the filing deadline permits the inclusion of all candidates. This local policy does not apply to regional candidates included in the state League Voters Guide.

## Advertisements

LWVUS: Voters Guide Advertising Guidance - to be followed by LWVTX, local Leagues and Leagues at large
LWVTX: A Guide to Voters Guide 2022

**Membership ads**
A membership ad for the League may be included in the Voters Guide.  However, a 501(c)(4) League shall not place membership information funded with 501(c)(3) Education Fund money.

**Constitutional amendment or ballot issue Voters Guides**
LWVTX: How To Write a Constitutional Amendment Voter Guide

League positions related to Constitutional Amendments or ballot issues must not be included in the Voters Guide. If the League publishes a fact sheet on its position, it should not be distributed so that it appears as a supplement to the Voters Guide.

**Publication and distribution of the printed Voters Guide**
- Voters Guides may be published and distributed in hard copy and should also be made available online through local League websites, LWVTexas.org, and VOTE411.org.
- Free copies of Voters Guides will be distributed by LWVTX to selected local libraries in areas not served by a local League or League at large. The locations will be chosen based on population density. The LWVTX Board will determine the number of copies for each election based on the probable level of interest. Both English and Spanish copies will be provided to each library.

## Candidate Debates and Forums

LWVUS: FAQs League Candidate Forums and Debates
LWVUS: Hosting Virtual and Hybrid Candidate Debates and Forums
LWVTX: 2021 A Guide to Candidate Forums

## General for All Debates and Forums
A. Forums and debates must be nonpartisan and ensure that all participating candidates will be treated fairly and equally.
B. All candidates for the races included on the ballot must be invited to participate. Only qualified candidates should be allowed to participate, and no substitute may stand in for a candidate.
C. A letter of invitation should include the criteria for participation, debate/forum format and rules, candidate's acceptance of format and rules, and a waiver for League distribution of debate content. It should be sent to candidates in a traceable form (USPS delivered with signed mail receipt or email returned mail receipt).

OCA-APPX-1764

OCAGH_00015586

D. The language of the waiver for distribution should be: "The debate or forum content is the property of the LWV and permission must be sought to rebroadcast the debate or forum in its entirety or to print excerpts. Candidates must agree that no portion of the debate or forum will be used in a political advertisement."

E. Issues of interest to the general public must be included.

F. The meeting must be open to the public, in a place that will not seem to exclude some potential audience, unless conducted for broadcast-only purposes or using a digital platform.

G. Donations from candidates or political parties should not be solicited or accepted.

**Live streaming policies and recommendations**

A. Identify the League
   1. Display a podium sign with logo or a banner in front of the candidate's table or across the back of the stage showing the League name.
   2. Use tent cards or place cards for each candidate with the LWV logo and their name.

B. Nonpartisan statement
   1. The moderator shall provide a very brief introductory and closing message stating the date and name of the LWV and that this is a nonpartisan candidate forum being published unedited.

## League Responsibilities for Holding Forums and Debates

**LWVTX**

- The state League is responsible for organizing debates or forums for statewide offices, such as governor and U.S. senator.
- Since election laws change, the state League will ascertain before each election cycle information regarding any election law changes from the Federal Election Commission (www.fec.gov), the IRS (www.irs.gov), the Federal Communications Commission (www.fcc.gov), and the Texas Secretary of State's office and will consult with local counsel as needed.

**Local Leagues and Leagues at large**

- Local Leagues need state board approval to sponsor debates or forums involving statewide offices. Where appropriate, the state League will invite local Leagues and Leagues at large to co-sponsor forums or debates involving candidates for statewide office.
- Local Leagues and Leagues at large have responsibility for debates or forums for U.S. representative, state senator, state representative, regional candidates, and all local candidates. Coordinate forums/debates with other Leagues as needed based on Voter Services Shared District Tracking List 2022.

**Local Leagues**

Local Leagues should have a written forum and debate policy, including rules, procedures and criteria, and it should be reviewed annually. Leagues at large use LWVTX /LWVUS policies. Since election laws change, the state League will ascertain before each election cycle information regarding any election law changes from the Federal Election Commission

(www.fec.gov), the IRS (www.irs.gov), the Federal Communications Commission (www.fcc.gov), and the Texas Secretary of State's office, and will consult with local counsel as needed.

## Federal Definitions

Federal Elections Commission: <u>FEC regulations for Federal elections</u>
Internal Revenue Service: https://www.irs.gov/
Federal Communications Commission: https://www.fcc.gov/

- The Federal Election Commission (FEC) regulates the conduct of corporate, labor and nonprofit organizations in federal elections, including both 501(c)(3) and 501 (c)(4) organizations.
- <u>Debate</u> - FEC regulations define a debate as an event that (a) includes at least two candidates, (b) is staged in a way that does not promote or advance one candidate over another, and (c) allows the candidates to appear concurrently, in face-to-face confrontations, with opportunities to respond to each other.
- <u>Forum</u> - The FEC defines a forum or other non-debate candidate appearance as a place, meeting, or medium where ideas and views on particular issues are exchanged.
- The Federal Communications Commission (FCC) regulates radio, television, and cable broadcasters. Under its regulations, a broadcaster that permits a candidate for any public office–federal, state, or local–to use its facilities must provide all other legally qualified candidates for the same office with equal opportunities for use.
- Internal Revenue Service (IRS) rules provide that 501(c)(3) organizations "may not participate or intervene, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office." This prohibition applies to campaigns for public office at all levels–federal, state, and local. A violation of IRS rules could jeopardize the tax- exempt status of the 501(c)(3) organization responsible.

## Candidates Participation Guidelines

**Candidates must meet the following criteria:**
A. Requirements of the Texas Constitution and/or the Constitution of the United States
B. All requirements to be on the ballot according to Texas election laws
C. Demonstrate significant voter interest and support by being nominated by a recognized political party in Texas, raising sufficient funds to require reporting under FEC rules for federal races, or showing that a formal campaign is being waged.

**Candidate participation guidelines for federal races**
A. A debate or forum must have at least two candidates for each federal office. An empty chair debate (where only one candidate is present) <u>cannot</u> be held as it can be considered by the FEC as an "in-kind" contribution or providing "something of value" to a federal candidate and thus subject to the prohibitions of federal election laws. A single candidate for a federal office may not be a speaker at a debate or forum. The candidate may be introduced and invited to meet and greet attendees at the end of such meetings; however, the candidate should not remain on the stage.
B. A debate or forum should not start if only one candidate for a federal office is present. If the debate or forum includes several races, the other races may begin while waiting

OCA-APPX-1766

OCAGH_00015588

for the late candidate.

C. If a candidate declines, cancels, or does not appear, the debate or forum may proceed if more than one candidate for the federal office is present. If only one is present, the debate or forum for that office must be canceled. The moderator may present any factual reasons given by the candidate without editorial comment. If the candidate who canceled provides a statement, the moderator may read it. If no reason is given, the League should state that it was contacted by the candidate or the campaign and told the candidate would not be able to appear. The League can state that no reason was given for canceling.

D. Attempts may be made to reschedule the debate or forum.

E. If a candidate refuses to participate, the League president may submit a letter to the editor of local/statewide newspapers stating that candidates are expected to participate and if they do not, they are denying the community an opportunity for public education about them and the issues.

## Empty Chair Guidelines

LWVUS: FAQ's Candidate Forums-Debates

**Debates:**
LWVUS: Guidelines for State And Local League Debates including "empty chair" debates

### Forums:

- LWVTX Empty Chair policy for **forums** allows candidates in contested races to appear in a forum (not debate) to speak and respond to questions. If only one candidate appears from the field of candidates invited, then acknowledge the absence of the missing candidates and proceed with the forum. (Oct. 2019)
- If only one candidate appears, make a statement that going forward with the forum does not imply endorsement of this candidate. (Oct. 2019)

## Debate Locations for State and Local Races

LWVUS: Hosting Virtual and Hybrid Candidate Debates and Forums

For state and local races, the event may be held in any location that is accessible to the public or be live streamed in a format that is widely accessible.

## Co-sponsorship for All Debates and Forums

A. Cosponsors cannot endorse or be affiliated with a candidate or ballot issue and must be approved by League leadership. Any group whose leadership has made public statements for or against any candidate, which is known to support a candidate informally, or that advocates for an issue on the ballot should not be asked to be a cosponsor. An exception can be made if both of the two major political parties (Democrat and Republican) are cosponsors.

B. The League should take the lead in contacting the candidates, negotiating disputes, and controlling the format for a forum that is cosponsored.

C. The League should provide the moderator and timekeeper or should approve of them in advance. The moderator should not be identified as a member of a political party or a friend of one or more of the candidates.

OCA-APPX-1767

OCAGH_00015589

## Moderating a Non-League Forum

A. A League may moderate a candidates forum sponsored by another organization as long as the forum conforms to League procedures and principles to ensure a nonpartisan event. The League should provide the sponsoring organization with information about its requirements for candidates forums, including inviting all candidates, allowing equal time for all candidates, placement of any candidate materials, videotaping, etc.

B. The sponsoring organization cannot endorse or be affiliated with a candidate or ballot issue and must be approved by League leadership. The League should not moderate a forum for any group whose leadership has made public statements for or against any candidate, which is known to support a candidate informally, or that advocates for an issue on the ballot.

C. The sponsoring organization may take the lead in contacting the candidates and planning the date, time, and location, although the League may provide help upon request. The format of the forum should be agreed upon by the League and the sponsoring organization.

D. The League should provide the moderator, timekeeper, and question screener, if possible.The moderator should not be identified as a member of a political party or a friend of one or more of the candidates. Additional volunteers may come from the sponsoring organization.

## Texas Open Meetings Act

TXGOV: Open Meetings Act Handbook 2022

**Candidate forums and the Texas Open Meetings Act**

A. The Texas Open Meetings Act, adopted in 1967, requires meetings of governmental bodies to be open to the public, including informal meetings. If a quorum of a governmental body, generally a majority of its members, is present at a meeting, it may be subject to the requirements of the Texas Open Meetings Act. It is the responsibility of the elected officials and their government entity to determine whether a candidates forum constitutes an open meeting under the Texas Open Meetings Act and, if so, to post notice and arrange for minutes or taping of the meeting.

B. If the forum is considered an open meeting by the governmental entity, the League or sponsoring organization should be in contact with the governmental entity to coordinate any arrangements for taping or otherwise recording the forum and to ensure that notice of the meeting states that it is a candidates forum with questions from those in attendance.

C. The League or sponsoring organization may announce at the beginning that the forum is considered an open meeting under the Texas Open Meetings law and as such is being recorded by the governmental entity and provide information as to how the recording will be available. Anyone who wants to record all or any part of the open meeting should be allowed to do so, according to the provisions of the Texas Open Meetings Act.

D. If the forum is not posted as an open meeting, the League should follow its own guidelines for broadcasting.

E. If the forum is taped or broadcast, the League should not allow an empty chair debate.

## Broadcast Policies

OCA-APPX-1768

OCAGH_00015590

**Broadcast policies for all debates/forums not subject to Texas Open Meetings Act**

A. A radio, television, or cable broadcaster must not edit the debate or forum, and it must be broadcast in its entirety, either live or reasonably soon after the debate. The Federal Communications Commission (FCC) requires that a debate or forum must include at least two candidates. The exception is news media reporting on the event.

B. Candidates are not allowed to use or edit the recording for campaign purposes.

C. Candidate's cell phones must be turned off. The moderator should announce that unauthorized videos are not allowed because the FCC requires that the debate must not be edited and must be broadcast in its entirety, except by media reporting on events.

D. The content of the recording belongs to the League and its cosponsors. Any use of the recording requires the approval of the League with the caveat that it must be broadcast in its entirety. The recording can be posted in written or streaming audio/video on a League website or another website if approved by the League. It can be broken into segments as long as all segments are available.

OCA-APPX-1769

OCAGH_00015591

# 7. Program/Studies

LWVTX: <u>Program Planning</u>, <u>A Guide to League Study Consensus and Concurrence</u>, <u>Advocacy & Issues</u>,
LWVUS: <u>Impact on Issues: A Guide to Public Policy Positions</u>

## Program Responsibilities

Per LWVTX Bylaws (Article X. Principles and Program Section 2. Program)
- Local League/League at Large boards may make recommendations for state program, including proposed concurrence, to the state board at least 3 months before the convention or statewide meeting.
- The state board shall consider these recommendations and formulate a proposed program, which shall be sent to the presidents of local Leagues and to the chairs of Leagues at large at least 30 days before the convention or statewide conference.
- Any League or the state board that plans to propose the adoption or amendment of a state League position by concurrence on the floor of the convention shall give notice to the state office to be sent to all local Leagues/Leagues at large and the state board, of its intent to do so at least 6 weeks before the convention. The proposing League or state board shall send background information, including pros and cons on the issue and an explanation of the rationale for using this form of member agreement to the state office, and the state office shall send the information to all local Leagues, state board, and Leagues at large at least 30 days before the convention.
- The convention shall adopt the proposed program by a majority vote on each subject presented to it. A program recommendation submitted to the state board at least 3 months prior to the convention but not proposed by the state board may be adopted by the convention if its consideration is ordered by a majority vote of the convention. A two-thirds vote is required to adopt a nonproposed item, or to amend or adopt a state League position by concurrence on the floor of the convention.

## Program Adoption

**Local Leagues and Leagues at large Propose New Studies, Concurrence, and Updates to Positions.**

A. Local Leagues and Leagues at large provide all members with the opportunity to make recommendations for new statewide program studies or changes to existing LWVTX positions.
B. Boards of Local Leagues and Leagues at large vote on recommendations based on member input and submit them to the state office on the required form by the stated deadline on the form.

**Local Leagues and Leagues at large Propose Adoption of New Positions by Concurrence.**
A. Local Leagues planning to propose adoption of new positions by concurrence at the convention must submit their intentions on the required form by the stated deadline on the form.
B. If the proposed concurrence is not recommended by the state board, all requirements in the bylaws must be fulfilled (see above).

OCA-APPX-1770

OCAGH_00015592

**State Board Recommends New Study, Changes in Positions, or Restudy**
  A. The Program Chair presents program recommendations for a new study, concurrence, or review to the state board based on recommendations from issue chairs and from local Leagues.
  B. The state board votes to adopt the proposed program.
  C. The state board informs Local Leagues and Leagues at large no later than 30 days before the convention or statewide conference.

**Convention Delegates Vote on New Study, Changes in Positions, or Restudy**
Delegates vote first on the proposed studies and changes to existing program positions recommended by the board before voting on any non-recommended items approved for consideration.

## Program Review

The state League shall follow Article X Section 2 of the 2019 LWVTX Bylaws and the national League guidelines for the adoption of program.
In addition, the following procedures will be used to ensure a systematic review of all current positions:
  A. During state program planning, local Leagues, Leagues at large, issue chairs, or the state board can make recommendations for positions that need to be reviewed, updated, or amended.
  B. During the year following convention, the state board may choose one or more positions for program review. This decision should be based on recommendations from local Leagues and issue chairs and on discussion and interest at the convention. Current and upcoming legislative activity should also be considered. The review may be conducted in the summer and fall following the next legislative session.
  C. The State board selects a Program Review Committee. Efforts should be made to include current and former issue chairs for the position, members of the original study committee, and others with knowledge of the subject. The Program Chair is a member, *ex officio*.
  D. Program Review Committee reviews the selected position in-depth, conducts research, and interviews experts. Criteria for the review of the positions should include:
    ● Have LWVTX goals been achieved with this position?
    ● Is the position still relevant?
    ● Is the position applicable to current public policy issues or concerns?
    ● Have circumstances changed?
    ● Are there new laws that impact this position?
    ● Is the position clear?
    ● Is there still member understanding and agreement concerning this position?
  E. Program Review Committee determines one of the following options with regard to all or any portions of the position:
    ● Retain as is (needs board approval)
    ● Retain with editorial changes (needs board approval)
    ● Formulate new position statement for member concurrence, if there is a change of intent (needs member approval)
    ● Recommend a restudy for the following biennium (needs member approval)

OCA-APPX-1771

OCAGH_00015593

F. Program Review Committee makes recommendations to the state board no later than the winter board meeting before the convention.

G. The board votes on the committee's recommendations, and if member concurrence or restudy option is approved, it is given to the convention or statewide conference for a vote.

## Additional Program Considerations

**State Members**

State members and Leagues at large are encouraged to participate in state and national studies. The combined results of isolated state members shall be considered as the consensus or concurrence of one local League.

**League Cooperation Regarding Studies in the Same Political Subdivision**

A. If a League is considering a study that, if a position is reached, would lead to action before a political entity shared by other local League(s), it must notify those Leagues of the possible study in time to allow them to consider whether or not they wish to participate in the study. Ideally, such studies should be jointly considered and jointly adopted.

B. When two or more Leagues are in the same political subdivision, reciprocal approval is required before taking action before shared governing bodies.

OCA-APPX-1772

OCAGH_00015594

# 8. Communications

## Who speaks for the League?

LWVUS: Media Contact and Spokesperson Policy

**State Board**
- The state board president is the official spokesperson for the state League.
- The president may authorize a designated League member.

**Local Leagues**
- Official statements are made only by a League president, or by a League member authorized by the president.
- Local Leagues should state in their local policies: *"The president is the official spokesperson for [name of local League], or a designated League member authorized by the president."*

**Leagues at large**
- Official statements shall be made only by the League at large president or team leader, or by a League member authorized by the president or team leader.

## Membership lists

- LWVTX, Local Leagues, and Leagues at large membership lists shall not be made available for non-League use without prior approval of the state or local League board.
- Any published membership lists should include the following statement "Any use of this list for non-League purposes must be approved by the state or local League board."
- We recommend obtaining permission from members prior to including any member names and contact information in a published membership list.

## Gender-neutral language

- Use whenever possible in League communications.

## Editing

Approval of State League Publications and Online Material Publications

League publications or online material for public distribution or for distribution to local Leagues and Leagues at large shall be edited and approved by the following procedure:

- Submit draft documents to the appropriate committee chair.
- The committee chair edits the document and forwards it to the president for approval.
- For all future state League publications, the following shall appear in whichever format is appropriate: "For permission to reprint, contact the LWVTX."

OCA-APPX-1773

OCAGH_00015595

## League Websites and Social Media

### Use of Logo

LWVUS: Brand Standards  https://www.lwv.org/brand-standards

All Leagues shall follow LWVUS brand standards and ensure that the LWV brand is represented correctly, consistently, and professionally whenever it appears in print or online.

    A. Brand the sites with the official League logo and use the full name of the League.
    B. Use a consistent hashtag phrase for official tracking. #lwv


## Photography, Video and Audio Recording Policy

LWVUS  Release Form (Waiver)

LWVUS Notice of Filming and Photography

Use the waiver/ notice templates when conducting photo and video/audio shoots of your events. It is important to use these forms in order to protect the League's right to photos and audio/videos recorded for organic and promotional use, such as website, social media, print, etc.

Please share your League event photos with us at lwvtexas@lwvtexas.org.

LWVTX also recommends:

    1. Your own images. You always have ownership of the photos you take. If you are photographing or filming non-League individuals at events or in public, use our photo release forms to get written permission and keep them on file as long as you keep the photographs.

    2. Images from the LWVUS Flickr site. All of these images are owned by the League of Women Voters and licensed for use by local and state Leagues. The historical images that LWV owns are in a separate historical images album on that Flickr site and Leagues are welcome to use these for League content.

    3. Free stock photos from legitimate websites that are licensed for public use. Pay special attention to any requirements on these images. Some images require an image credit back to the website and/or photographer. Here is a list of several of these reputable free image sources.

Protecting the League's brand and ensuring our compliance with photography and copyright laws is important.  See the League Reprint Policy and information regarding Copyright on printed materials on page 18 of this Manual.

**Image Use and Copyright Recommendations**

Please view this LWVUS Webinar titled *Image Use and Copyright Recommendations*
https://register.gotowebinar.com/recording/6383609877768127490

OCAGH_00015596

## Website Privacy Policy

<u>LWVTX:</u> LWVTX website privacy policy is found at the link in the footer of LWVTexas.org
<u>LWVUS:</u> <u>LWVUS website privacy policy</u>

The League places a high priority on protecting personal privacy and will follow the privacy policy found on our website. The League is committed to the privacy of our members and website users.

## Guidelines for Social Media

LWVUS: <u>League Management: Communications</u>
LWVTX: <u>Social Media</u> & <u>Web Sites</u>

 A. The president appoints administrators for websites and social media and determines who may post for the League without approval.
 B. Postings should
  • reflect support or not oppose League issue positions.
  • be nonpartisan
 C. Administrators should
  • Listen and respond to questions and feedback in a timely manner.
  • Post frequently providing valid, relevant, and useful content.
  • Use the official logo in avatar and postings.
  • Use the full name of the League, ie League of Women Voters (name of League).
  • Use consistent hashtags #lwv, #LWVTexas, #LWVCollinCounty.
  • Use consistent @lwvtexas @lwvhouston @lwvaustin with the official League logo and use the full name of the League.
  • Heed copyrights and fair use regulations.

## Speakers for League Events

LWVUS: <u>Speakers for League Events</u>

Follow LWVUS Policy in the above link.

OCA-APPX-1775

OCAGH_00015597

# 9. Convention and Statewide Conference

## Convention responsibilities

A. The president shall:
- appoint one state board member to chair the convention committee. The chair will report committee recommendations to the board and work with the host League as a liaison.

B. The state League shall:
- adopt the budget, including registration fees for delegates and observers.
- choose the convention hotel.
- approve all special events.
- invite all speakers.
- develop the schedule of events and order of business.

C. The host and state Leagues shall
- consult regarding fundraising activities associated with the convention.

## Convention deadlines

**Actions required by the 2019 LWVTX Bylaws are identified.**

| No. Days | Action |
|---|---|
| 180 | Start preparing convention budget and set registration fee |
| 120 | Proposed amendments to state bylaws must be submitted to the state board at least 120 days before convention by a local League board, or as proposed by the state board. (Source: LWVTX Bylaws Article XIV Amendments) |
| 120 | First call to **convention** (may advance or postpone date by not more than 14 days) (Source: LWVTX Bylaws Article VII. Convention, Section 1. Place, Date, and Call). |
| 120 | Bylaws may be amended at any convention by a two-thirds vote of delegates present and voting provided that the proposed amendment was submitted to the state board at least 120 days before convention by a local League board, or has been proposed by the state board. (Source: Article XIV Amendments 2019 Bylaws) |
| 90 | Deadline for recommendations for state program or proposed concurrence from local Leagues, Leagues at large, due to state board (Source: LWVTX Bylaws, Article X. Section 2 Program (a)). |
| 42 (6 weeks) | Final call to convention with specific information 42 days prior to convention (Source: LWVTX Bylaws, Article VII. Convention Section 1. Place, Date, and Call) |
| 42 (6 weeks) | Notice by any League or the state board of intent to propose the adoption or amendment of a state League position by concurrence on the floor of the convention (Source: LWVTX Bylaws, Article X. Section 2, (c)). |
| 30 | Consideration of recommendations and formulation of proposed program sent to local Leagues and Leagues at large at least 30 days prior to convention, or a statewide conference. (Source: LWVTX Bylaws, Article X. Section 2 (b)). |

OCA-APPX-1776

OCAGH_00015598

| 30 | The report of the nominating committee shall be sent to the presidents of local Leagues and the chair of Leagues at large at least 30 days prior to convention. (Source: LWVTX Bylaws, Article IX. Section 3) |
|----|---|
| 30 | State office sends info re-adoption or amendment to state League positions via concurrence to all local Leagues, Leagues at large, state board (Source: LWVTX Bylaws, Article X. Section 2, (c)). |
| 30 | A proposed 2-year state League budget sent to local Leagues and Leagues at large (Source: LWVTX Bylaws, Article XII. Financial Administration, Section 4, The Budget) |
| 30 | Send proposed amendments to the bylaws, together with the board's recommendations, to the presidents of local Leagues and to the chairs of Leagues at large at least 30 days before the convention. Source: Article XIV Amendments  Bylaws |

## Delegates

**League/Leagues at large delegates to state convention (See LWVTX Bylaws, Article VII. Convention, Section 2. Composition (a), (b), and (c).**

**The convention shall consist of:**

1. the president of each local League / League at large or an alternate, in the event the president is unable to attend;
2. delegates chosen by members of local Leagues/ Leagues at large as follows: one delegate for the first 15 voting members, and one delegate for every 10 additional voting members or major fraction thereof. The official membership count shall be determined by state office records of voting members as of January 31 of the year in which convention is held. The members of the state board. (Source: LWVTX Bylaws, Article VII. Convention, Section 2 (a), (b), and (c).

## Financial Policies & Registration Procedures for Convention

A. No reimbursement from state League funds or convention funds shall be made for those registered as local League delegates or observers authorized by the local League board.
B. No registration fees shall be paid by those whose expenses are being reimbursed from the convention account or state League accounts.
C. The Nominating Committee chair and Budget Committee chair are requested to attend the state convention. Depending on the nature of business in a given year, the board may request other off-board leaders to attend. Unless the Board directs otherwise, reimbursement for such expenses shall come from the convention budget.
D. Prior to each convention, the state board shall determine whether the budget permits any reimbursement of those off-board leaders encouraged but not requested to attend. Unless the Board directs otherwise, reimbursement for such expenses shall come from the convention budget.
E. The convention parliamentarian shall be reimbursed from the convention budget for actual expenses as approved by the state board. The parliamentarian shall be offered a stipend that is reasonable and customary, for services rendered as long as they are a professionally registered parliamentarian. The parliamentarian shall register for the state convention as a visitor.
F. When the Nominating Committee meets at a statewide conference, the expenses relating

directly to the committee meeting may be reimbursed from the Nominating Committee line item of the state League budget, as long as committee members register as observers authorized by the state board.

G. Expenses of the host League co-chairs for convention shall be reimbursed from the convention account at the rates set for state board members. The co-chairs shall register as observers authorized by the state board.

H. Special guests' expenses shall be paid as agreed upon at actual cost to the guest from the convention account unless otherwise specified by the state board. Guests shall register as visitors.

I. State office staff requested by the state board to attend convention shall not pay the registration fees. Expenses shall be reimbursed from the board meeting line item of the state League budget. Staff shall register as observers authorized by the state board.

## Statewide Conference

A statewide conference may be called by the state board, the purpose of which shall be determined by the interests and needs of members, local Leagues, Leagues at large, and state board.

## Statewide Conference Deadlines

**Actions required by the LWVTX Bylaws are identified.**

| 30 | A statewide conference may be called as needed at a time and place determined by the state board. A formal call shall be issued to local League presidents and chairs of Leagues at large at least 30 days before a statewide conference meeting. Source: Article VIII Statewide Conference Section 1 |
|---|---|
| 30 | At least 30 days before the statewide conference, the state board shall send to the presidents of local Leagues all proposed changes. Source: Article VIII section 4 b2. |
| 60 | Any local League proposing a change shall submit it to the state board at least 60 days before a proposed statewide conference; the state board shall decide whether or not to recommend the change. Source: Article VIII Section 4 b1. |

## Eligible voters at statewide conference

In the event of conduct of business, eligible voters will be as follows: 1) the president of each local League or an alternate, in the event the president is unable to attend; and one other delegate chosen by the local League board. Each League at Large with at least five members shall be entitled to one voting delegate; and 2) the members of the state board. Source: Article VIII section 3 a1 2019 Bylaws.

# 10. Development

LWVUS: State and Local Grants Guidelines
LWVUS: Fundraising Policies
LWVUS: Direct Mail Policies

OCA-APPX-1778

OCAGH_00015600

## State League fundraising

- The state League board and staff are responsible for the design and execution of an annual fundraising plan.

OCA-APPX-1779

OCAGH_00015601

# 11. Governance

LWVUS: Best Practices

## Local League Bylaws

- The first three articles of all local League bylaws must be consistent with those of the League of Women Voters of the United States.
- Any local League bylaws that relate to distribution of financial resources upon dissolution must be consistent with LWVTX Bylaws Article IV, Sections 1(c) and 2(b) and Article XII, Section 5.
- Proposed revisions of local League bylaws shall be submitted to the state Governance Committee chair in sufficient time for review and comment before the local League annual meeting.

## Oversight of local League bylaws by LWVTX

**Proposed changes to local League bylaws.**

- Send proposed changes to local League bylaws to the governance committee chair for review and comment in sufficient time for review and comment before the local League annual meeting.
- Proposed changes that have been reviewed by the Governance Committee are then presented to the local League membership in accordance with local League bylaws concerning amendments. The membership may amend, adopt, or reject proposals at the annual meeting. Please note that bylaws take effect immediately, unless otherwise specified.

## Review of state bylaws by local League

The local League bylaws committee is charged with reviewing state and national League bylaws in alternating years, and recommending any desired changes. Any changes the local board approves are submitted for consideration to the state or national League board. The committee chair should ensure that this process is completed in time to meet deadlines for submission of proposed amendments. For LWVTX, proposed changes must be submitted at least 120 days prior to the state convention. For LWVUS, proposed changes must be submitted at least three months before the convention.

- A copy of the current local League bylaws must be included in the annual report.

## LWVTX Whistleblower Policy

The League of Women Voters of Texas protects its members, directors, officers, and employees who make good faith reports of violations of law to the Governance Committee Chair. The League of Women Voters of Texas will not suspend or terminate the employment of, or take other adverse personnel action against any employee who makes a report.

**Reporting Responsibility**

OCAGH_00015602

This Whistleblower Policy is intended to encourage and enable employees and others to raise serious concerns internally so that the LWVTX can address and correct inappropriate conduct and actions. It is the responsibility of all board members, officers, employees and volunteers to report concerns about violations, or suspected violations, of our governing documents, or of law or regulations that govern the LWVTX operations.

## Reporting Procedure

LWVTX has an open-door policy and suggests that employees share their questions, concerns, suggestions or complaints with their supervisor first. If you are not comfortable speaking with your supervisor or you are not satisfied with your supervisor's response, you are encouraged to speak with the Governance Chair. Local League and League at Large Presidents are required to report complaints or concerns about suspected ethical and legal violations in writing to the Governance Chair, who has the responsibility to investigate all reported complaints. Employees with concerns or complaints may also submit their concerns in writing directly to their supervisor or the Governance Chair.

## LWVTX Governance Chair

The LWVTX Governance Chair is responsible for ensuring that all complaints about unethical or illegal conduct are investigated and resolved. The Governance Chair will advise the President and/or the Board of Directors of all complaints and their resolution and will report at least annually to the Treasurer/Chair of the Finance Committee/Audit Committee] on compliance activity relating to accounting or alleged financial improprieties.

## Accounting and Auditing Matters

The Governance Chair shall immediately notify the Internal Financial Audit Committee of any concerns or complaints regarding corporate accounting practices, internal controls or auditing and work with the committee until the matter is resolved.

## Acting in Good Faith

Anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith and have reasonable grounds for believing the information disclosed indicates a violation. Any allegations that prove to be unsubstantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense.

## Confidentiality

Violations or suspected violations may be submitted on a confidential basis by the complainant. Reports of violations or suspected violations will be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation.

## Handling of Reported Violations

The LWVTX Governance Chair will notify the person who submitted a complaint and acknowledge receipt of the reported violation or suspected violation. All reports will be promptly investigated and appropriate corrective action will be taken if warranted by the investigation.

OCA-APPX-1781

OCAGH_00015603

(Policy approved by the Board of Directors on October 18, 2019)

OCA-APPX-1782

OCAGH_00015604

# 12. Service to Local Leagues

LWVUS: Guide to LWVUS Service to local Leagues

The Service to Local Leagues Committee of the state board has primary responsibility for providing training to local League leaders in Local Leagues, Leagues at large & also for state members.

OCA-APPX-1783

OCAGH_00015605

# 13. Organizational Levels

## State Members

- League members not residing in the geographic area of a local League may choose to be state members of the Texas League or may join a local League of their choice.
- League members residing in the geographic area of a local League may choose to be state members of the Texas League, rather than joining a local League.

## Leagues at large

LWVTX: A Guide for Mentoring Leagues at large (2019)
LWVTX: Financial Guidance for Leagues at large (2019)
LWVTX: How to Start a League
LWVTX: League at Large Welcome Packet (2019)

**What is a League at Large?**

- Leagues at large are new or established Leagues where the League of Women Voters of Texas takes on administrative functions in order to serve the mission of empowering voters and defending democracy in their community.
- The state board authorizes the establishment of a League at large as a unit of the state League.
- The state board adopts from time to time the minimum number of state members required to establish a League at large.
- Leagues at large are provided LWV Texas resources such as mentors, training, membership, LWV Texas bylaws, policies, guidelines and financial management policies.

## How to start a League at large

The state board may authorize the establishment of Leagues at large, composed of state members, where feasible. Leagues at large operate within the limitations established by the LWVUS and within guidelines adopted by the state board. (Article IV Section 2a Bylaws)

The state board adopts the minimum number of state members required to establish a League at large.

With the League at large, the League of Women Voters of Texas takes on administrative functions so a new League can get started registering voters, getting out the vote, educating voters, having forums and debates etc. for a community. That means skipping typical start-up steps of establishing bylaws, incorporating, seeking non-profit status, and establishing financial management policies.

1. Follow the process found on the Start a League webpage.
2. Submit the required forms to the state office
3. The LWVTX Service to Local Leagues committee reviews the application and makes a recommendation to the LWVTX board.
4. The state board authorizes the establishment of a League at large and if approved an application is filled out for official recognition by LWVUS.

The state board appoints a mentor/advisor to work closely with each League at large.

OCA-APPX-1784

OCAGH_00015606

## Minimum requirements of a League at large

1. Follow League nonpartisanship policies.
2. Support the League mission of empowering voters and defending democracy in their community.
3. Promote the League - newsletters, social media, voter education events etc.
4. Maintain the current minimum paid membership set by the state board unless given exemption by the state board.
5. Conduct an annual meeting to adopt a budget and select a leadership team.
6. Meet regularly—a minimum of four leadership meetings and four membership meetings annually.
7. Attend training for the leadership team at least once every 2 years.
8. Supports and never opposes League positions.
9. Provide annual report and leadership contact information to the state office by June 30th.

The president and the voter services member of the leadership team shall not actively campaign or work in a campaign on behalf of a local candidate or local ballot issue during the term of office.

The state League shall supply to each League at large, without charge, up to 200 state voters guides or one electronic copy of the state voters guide for each statewide election upon request.

## How to achieve full local League status

LWVUS: Request for Local League Recognition
LWVTX: Steps for becoming a local League in Texas (see Guide to Mentoring a League at Large)

League at large shall have approval from the LWVTX Board and have

1. Existed for at least 1 year.
2. Exhibited membership growth and retention.
3. Provided at least one leadership training session.
4. Accomplished at least one successful fundraising event.
5. Exhibited nonpartisanship.
6. Maintained leadership team stability.

## How to maintain full League status

**Minimum requirements**

Local Leagues shall meet the following minimum requirements to remain in good standing:

1. Adopt and adhere to local League bylaws.
2. Pay the current per member payment (PMP) set by the membership at state convention in a timely manner.
3. Conduct an annual meeting to adopt a budget and elect officers.
4. Meet regularly as defined by local League bylaws.
5. Provide state League training for officers periodically.
6. Submit the local League annual report no later than June 30 of each year.

## Annual Reports Local League & League at Large

LWVTX: 2021 Annual Report form

- Annual reports must be completed in accordance with the annual report form.
- Each local League shall submit to the state office financial documents no later than one month after the close of the local League's fiscal year. (see Financial Reports below)

## Changes to original League name or structure

- A local League is organized either as a municipal League based around a single municipality or as an area League encompassing more than one governmental jurisdiction. Area Leagues may include one or more counties or a large metropolitan area.
- A change in the name or organizational basis of a local League or League at large requires the approval of the state and national Leagues.
- Following approval of the locally recommended change in name or basis of organization by the local membership at an annual meeting, the local League/League at large shall forward the appropriate forms to the state board for its consideration, approval and recommendation to LWVUS.

## Withdrawing recognition

(LWVTX  Bylaws, Article IV. LOCAL LEAGUES AND LEAGUES A LARGE, sections 1 (c) and 2 (c)

The Services to Local Leagues Committee works with Leagues at large and local Leagues in membership and leadership development and assisting them to remain in good standing. When there is recurring failure to fulfill the minimum requirements per the LWVTX 2019 Bylaws, Article IV. LOCAL LEAGUES AND LEAGUES A LARGE, sections 1 (a -c) and 2 (a & b), the procedure to withdraw recognition will be initiated, as follows:

- A meeting of the members of the local League shall be called by the local League board of directors or League at large leadership team for the purpose of discussing and voting on disbandment.
- The state League Services to Local Leagues Committee chair shall be notified of the intention to call such a meeting. If the local board or leadership team is unwilling to call such a meeting, the state board shall call the meeting and notify the local members. (Contact the chair of the Services to Local Leagues Committee.)
- Members shall be told the purpose of the meeting and that absence from the meeting shall be considered a silent vote to disband unless the member communicates otherwise prior to the meeting.
- Upon a vote by the membership to disband the local League or League at large, the state board shall request the national board to withdraw recognition.
- Remaining local League or League at large funds, securities, and assets shall be handled in accordance with LWVTX Bylaws, Article IV, section 1(c) and 2(b) (relating to distribution of financial resources upon dissolution). (Updated 2019)

OCA-APPX-1786

OCAGH_00015608

# 14. State Office

## Environment

In order to promote a health-conscious environment and to protect our investment, the office space owned by the state League shall be a smoke-free environment. The workplace shall be free of illegal drugs and firearms.

## Record and Document Retention & Archiving

LWVUS: Record keeping

LWVTX has removed its Record and Document Retention & Archiving from this document in order to create a separate and detailed Records Management Plan.

LWVTX board members should email drafts of important documents to the state office or save them in an LWVTX shared drive.

To preserve the long history of the state League, its historical records are located in the Texas Tech University Southwest Collection/Special Collections Library, Lubbock, Texas 79409; www.swco.ttu.edu.

## Local Leagues

Local Leagues should adopt a retention and archiving schedule of records and documents as applicable. Local Leagues will make arrangements for archiving records in a location that is readily accessible in their local community.

OCA-APPX-1787

OCAGH_00015609

# 15. Financial Policies

LWVUS: <u>Money Matters</u>
LWVUS: <u>Has Your League Filed Its Form 990-N Yet?</u>
LWVTX: <u>Financial Guidance for Leagues at large</u>
LWVTX: **Money Matters Made Easier for Local Leagues**
LWVTX: **Money Matters Made Easier for Leagues at Large**

## Local League Support of the State League

The state League receives a portion of its income from local Leagues through a per member payment (PMP) approved by convention delegates. Local Leagues' support payments may be paid in full at any time during the fiscal year ending May 31 or during the fiscal year on the following schedule:

- First payment due in the state office by July 31. At least one-fourth of total PMP shall be paid by this date.
- Second payment due in the state office by October 31. At least one-half of total PMP shall be paid by this date.
- Third payment due in the state office by January 31. Three-fourths shall be paid by this date.
- Fourth payment due in the state office by March 31. Full amount shall be paid by this date.

State services may be discontinued to a local League that fails to settle in full its PMP account by the end of the state League's fiscal year (May 31). The decision to suspend services shall be made by the state board on a case-by-case basis.

Only delegates from local Leagues that are current in their PMP payments will be allowed to vote at convention or the statewide conference.

Each local League shall submit to the state office the following financial documents no later than no later than one month after the close of the local League's fiscal year.

- **Budget.** Annual budget approved by members at the annual meeting.
- **Financial report.** Fiscal year-end financial report. (Local League financial information is included in LWVTX annual report to IRS.)
- **IRS Form 990, 990 EZ, or 990 N.** Return of Organization Exempt From Income Tax. (Photocopy or other evidence of filing)

## Student Members Dues

Student members are defined as individuals enrolled either full or part-time with an accredited institution. PMP is not assessed for student members. Local Leagues determine the amount of dues (if any) for student members.

## State Members Dues

The state board sets the state member dues.

## Budget

OCA-APPX-1788

OCAGH_00015610

- The state board and those appointed to off-board positions should monitor their expenditures to make sure that they do not exceed their budget.
- Committee chairs, and others with budget responsibilities, will be consulted about their budget priorities prior to the biennial Budget Committee meeting.

## Reserves

- Sufficient funds should be placed in reserve to meet state League operating expenses for a 3 to 6 month period.
- The state board should approve a dollar figure for these reserve funds at the beginning of each fiscal year, and that amount should be kept in interest-bearing and/or fixed-income account(s).
- If funds are withdrawn in case of emergency, they shall be restored as soon as possible.

## Contracts

- Contracts for services rendered by state board members or other representatives of the state League on behalf of the League shall be in the name of the LWVTX, not the individual.
- Usually, the executive director, the treasurer or the president of the state League is the authorized signatory on all contracts, letters of agreement, and other official documents.
- Contracts that have been signed with individuals for professional services shall be listed in the consent agenda for the next board meeting in order to preserve an official record of said hiring.

# 16. Personnel Policies

LWVTX: <u>Personnel Policies and Procedures: A Manual for League Employees</u>

### Executive Director

- The board of directors, acting upon the recommendation of the Fiscal Management and Administration Committee, has the responsibility to hire and release the executive director.
- Regular and contract employees may be given a membership in the state League (state member) if recommended by the Fiscal Management and Administration Committee chair based on if membership will assist the employee in performing the job duties.

### Student Interns

- Unpaid student interns participate in work activities that serve only their own educational interests and do not regularly perform the routine work of the organization on a recurring basis.
- Unpaid internships must comply with "The Test for Unpaid Interns" of the FAIR LABOR STANDARDS ACT found at https://www.dol.gov/whd/regs/compliance/whdfs71.htm

### Student Volunteers

- A League student volunteer is a student member of the state League participating in an internship that does not meet all of the criteria for an unpaid internship. In lieu of compensation, the state or local League shall pay the annual student membership fee for the intern as long as the student continues as a volunteer.

# 17. Fiscal Management

## Banks and Financial Institutions

- All funds of the state League shall be deposited to the credit of the state League in banks and financial institutions recommended by the Fiscal Management and Administration Committee for approval by the board.
- The president and/or treasurer of the state League are the authorized signatories on the accounts of the state League. The president and treasurer may authorize additional signatories for special accounts.

## Bonded

- The president, treasurer, and executive director of the state League shall be bonded.
- If new accounts are needed or accounts are to be moved, the institution(s) shall be recommended by the Fiscal Management and Administration Committee for approval by the board. Authorized signers shall be the president, treasurer, and any others whom they may jointly designate.

## Treasurer's Reports

At each state board meeting, the state League treasurer shall provide state board members with financial reports, including at least once each fiscal quarter:
- An Income Statement for the most recent fiscal quarter
- A Balance Sheet for the most recent fiscal quarter
- Any revision of the budget that must be approved by the state board.

## Purchasing and Contracting

- When practical, two or more cost estimates shall be obtained when an expenditure of more than$500 is anticipated.

## Investment Policy

All funds, restricted or unrestricted, are held by the board of directors as fiduciaries (stewards) for carrying out the mission of the League. The following investment, objectives, and directions are to be judged and understood in light of the overall sense of stewardship.

### Delegation

- The state board has delegated supervisory authority over its financial affairs to the Management Committee.
- The Management Committee is responsible for regularly reporting on investments to the full board.
- In carrying out its responsibilities, the Management Committee and its agents shall act in accordance with this Investment Policy and all applicable laws and regulations.
- The directors reserve to themselves the exclusive right to revise the policy and/or to grant exceptions to the policy where appropriate.

### Objectives

OCA-APPX-1791

OCAGH_00015613

- The primary investment objective is to preserve and protect League assets by earning a total return for each fund appropriate to each fund's time horizon, liquidity needs, and risk tolerance.
- The secondary objective is to appreciate the total value of the portfolio over time, exclusive of growth derived from investments.

**Asset mix**

A. Asset mix is the primary determinant of the League's portfolio performance.
B. Asset mix may be changed from time to time based on the economic and security market outlook as well as income requirements.
C. The overall risk level of assets, in terms of potential for price fluctuations, should not be extreme.

    **The primary means for achieving such risk profiles are:**

    - Balanced diversification between equity and fixed income investments
    - Careful control of the risk level within each asset class through avoidance of over-concentration and by not taking extreme positions against the market averages
    - Emphasis on stable growth rather than capital gains

D. Recommended asset mix:

Recommended Asset Mix Among Common/Convertible Equities, Fixed-Income U.S. & Corporate Bonds, & Short-Term Cash & No More Than 1-Year Notes

|  | Common/Convertible Equities | Fixed-Income U.S. & Corporate Bonds | Short-Term Cash & No More Than 1-Year Notes |
|---|---|---|---|
| Short-term reserves | 0% | 0-50% | 50-100% |
| Long-term reserves | 50-90% | 10-50% | 0-15% |
| Endowment | 50-80% | 15-50% | 5-20% |

## Endowment

Endowment is defined as the principal of gifts and bequests accepted with donor stipulations that:

1. the principal is to be maintained intact in perpetuity, for a specified period or until a specified event occurs, and
2. only the income on the fund's investments may be expended for general purposes specified by the donor (Income is defined as the increase in the market value of the endowment over the principal of the endowed gift or bequest.)
3. LWVTX does not currently hold any endowment funds.

**Investment limits**

The Fiscal Management & Administration Committee is responsible for managing investments within the parameters described in this section and as approved by the board.

## Investment restrictions

A. The portfolio must be invested at all times in strict compliance with applicable laws and regulations, and all investment decisions shall be made in accordance with the

prudent person rule.

B. All investment must be U.S. dollar denominated.

C. Commercial paper must be rated in the two highest quality classes by Moody's Investor's Service, Inc. (P1 or P2) or Standard and Poor's Corporation (A1 or A2).

D. Negotiable certificates of deposit shall be limited in principal amount to FDIC or FSLIC insurance ceilings.

E. Not more than 5% of the voting securities of a corporation may be owned.

F. No securities may be purchased on margin or leverage.

G. No short sale transactions shall be made.

H. Transactions in financial futures and options are prohibited.

I. No more than 25% of the portfolio shall be invested in any one industry at cost.

J. No more than 5% of the portfolio shall be invested in securities (including debt and equities) of one corporation at cost.

K. Securities that are traded only in foreign markets shall not be included in the portfolio.

L. Only securities listed on the New York Stock Exchange, the American Stock Exchange, or the NASDAQ Over-the-Counter market shall be included in the portfolio.

M. All equity investments will satisfy minimum quality rating of B by Standard and Poor's or a 3 safety rating by Value Line.

N. No funds ranked below average by Morningstar may be considered.

O. Investment in structured notes is prohibited.

## Investment criteria based on mission or social responsibility

The state League intends to invest in companies whose business conduct is consistent with League goals and beliefs. Therefore, the Management Committee will use its best efforts to avoid investing directly in the securities of any company known to participate in businesses the board deems to be inconsistent with the goals and beliefs of the League.

## Reviews and Reports

### Portfolio Review

The Management Committee is responsible for monitoring the performance of portfolios on a quarterly basis.

**The** Management committee shall review:

- the assets and net cash flow of the portfolios
- Statistics on the investment performance.
- Significant revisions to the expected long-term trade-off between risk and reward on key asset classes, dependent on basic economic/social/political factors.
- shortcomings of the policy that emerge in its practical operation.
- Discuss the current economic outlook and investment plans
- Authorize any redirection of cash flow, transfers of assets, or sales/purchases to ensure such compliance within 12 months.

### Annual Portfolio Report

The Management Committee shall provide an annual report to the board including:

OCA-APPX-1793

OCAGH_00015615

1. Asset allocation
2. Investment performance
3. Future investment strategies
4. Any other matters of interest to the state board
5. A summary of all transactions in the fiscal year
6. A report of investment performance for the year of the portfolios

## Cash flow requirements

The Management Committee will be responsible for providing adequate liquidity to meet the League's cash flow requirements

**Withdrawals from reserves**

- Withdrawals from reserves for current operations are limited to a sum equal to 5% of the average of the past 3 years' market value of the assets.
- Within this limit, the Budget Committee shall annually set an amount, if any, to be withdrawn by the Treasurer as needed to meet specific League obligations, and
- At the recommendation of the Management Committee, the board may authorize additional withdrawals from reserves.

## Gift Acceptance

LWVTX guidelines for accepting gifts are reviewed every three years and are created to:

- protect the interests of the donor, the League, and program or event named as the beneficiary of a gift
- assist in structuring gifts to the League to provide maximum benefits to the donor and the League.

**General guidelines**

This policy applies to all gifts made or offered to the League. The League welcomes expressions of interest and financial support regardless of size or form, from any individual, family, business, corporation, foundation, or similar source.

**Types of gifts**

Commitments to the League and/or payment of same may take the form of one, or a combination, of the following:

- Personal gifts by cash, check, credit card
- Corporate matching gifts
- Corporate or foundation grants
- Multi Year pledges
- Appreciated securities or other readily marketable personal assets (which are sold as soon as possible)
- In-kind goods and services
- Real estate

**Real Estate Gifts**

A. Before accepting any gift of real estate, the League shall perform a due diligence review of the property, including a title search and a Phase I environmental review.

B. Any expenses associated with the transfer of the property to the League or any due diligence must be borne by the donor.

C. **Inspection**

    a. The inspection must be made by a licensed environmental consultant, who must certify, within the context of a Phase I Site Assessment, that no contamination exists before the property may be accepted.

    b. The inspection should be performed in general conformance with the scope of ASTM Practice E1 527.

    c. The expense of inspection must be borne by the donor unless an exception is approved by the state board.

### D. Criteria for accepting gifts of real estate

Gifts of real estate are acceptable only after all the following nine criteria are met.

1. It has been determined that no reasonable possibility exists that the property could be contaminated by toxic waste.

2. An appraisal satisfactory to the IRS gift substantiation requirements has been completed, and the League and donor have reached an understanding as to the valuation of the property.

3. The effects on and implications for the League of debt, insurance, homeowners' association fees, property taxes, and other carrying costs have been assessed.

4. Appropriate steps have been taken to determine if any other liabilities might attach to the property such as leases, contracts, assignments, or servitude.

5. All pertinent information regarding the property is supplied by the donor. This would include names of owners and co-owners (and percentage ownership), recent tax statements, address and/or legal description, and description of current use.

6. Donor must convey all his/her undivided interest in the real estate, including any mineral interests.

7. The League may recover any costs of managing real estate by charging a fee that is determined by the schedule set by the state board.

8. The donor must be willing to bear the costs associated with the gift of real estate, such as legal fees, real estate commissions, management fees, and expenses for due diligence, title searches, and appraisals.

9. The state board must approve any exception.

### Gift Review by counsel

The League will seek the advice of legal counsel in matters relating to acceptance of gifts when appropriate.

Review by counsel shall be sought for the following:

1. Transfers of closely held stock
2. A gift of residence or farm with a retained life interest
3. Documents naming the League as trustee
4. Gifts involving contracts
5. Transactions with potential conflicts of interest that may invoke IRS sanctions
6. Other instances in which advice of counsel is deemed appropriate by the Management Committee.

### Gift Restrictions

The League accepts both restricted as well as unrestricted gifts provided that donor restrictions

do not significantly diminish the value of the gift and are consistent with the stated mission, purposes and priorities of the League. As a general rule, unrestricted gifts of cash and marketable securities allow the board of directors the greatest flexibility in directing resources toward those programs that can best strengthen the organization and advance its mission. Generally, the League cannot accept gifts that entail significant additional expense for their present or future use, maintenance or administration. Gifts other than cash and marketable securities will be evaluated by considering the following criteria:

- Is the gift consistent with the mission of the League?
- Is the property marketable?
- Are there undue restrictions on the use, display or sale of the property?
- What are the risks and costs associated with accepting the gift?
- Do any restrictions on the gift outweigh the potential benefits to the League?

**Gift Appraisal**

If the value of the gifts other than cash or marketable securities exceeds $5,000, the donor must have a qualified appraisal performed and submitted to the IRS. Gifts valued at $5,000 or less may be reported at the value declared by the donor or qualified expert. The League will comply with all current IRS regulations regarding charitable contributions.

**Gift recognition**

1. The League will acknowledge and recognize all gifts appropriately and promptly.
2. The League acknowledgement will inform the donor of any benefits provided in exchange for the contribution. Goods and services provided will be considered insubstantial as long as the fair market value of the benefits does not exceed the IRS regulations regarding charitable contributions.
3. The gift record of a donor whose gift is matched by the donor's company will be credited for the total amount of the individual gift plus the corporate matching gift.
4. Upon request, the League will provide gift receipts meeting IRS substantiation requirements for property received by the League as a gift. However, except for gifts of cash or publicly traded securities, no value shall be ascribed to any receipt or other substantiation of a gift received by the League.

**Gift Confidentiality**

1. Gifts may be acknowledged in League publications unless the donor requests anonymity.
2. However, all information concerning prospective and current donors, including names and addresses, names of beneficiaries, nature and value of estates or other assets, and planned gift provisions shall be kept strictly confidential by the League, its volunteers, and its staff.
3. With discretion, however, and if the donor or executor grants permission, authorized personnel may use selective information for purposes of referral, testimonial, or example.

**Donor responsibilities**

The ultimate responsibility for asset evaluations, tax deductibility, and/or similar federal, state, and/or local compliance issues rests with the donor and any advisors that the donor shall secure. The League recommends that all donors consult with their own legal tax counsel when planning all gifts, especially noncash gifts or future planned gifts.

OCA-APPX-1796

OCAGH_00015618

## Gift Acceptance Committee

1. Members of a gift acceptance committee shall consist of the president, one vice president, treasurer, and anyone else appointed by the state board.
2. A gift acceptance committee is charged with the responsibility of reviewing all noncash gifts and restricted gifts made or offered to the League, properly screening, and with the advice of counsel where needed, accepting those gifts that are deemed appropriate. The gift acceptance committee will make recommendations to the state board on gift acceptance issues as required. The state board must approve any gifts that carry potential legal or financial liabilities for the League.
3. The president or the president's designee shall have authority to sign planned giving agreements on behalf of the League. Any agreement that does not meet the conditions of this policy shall require the approval of the state board. The state board reserves the right to accept (or in cases where necessary, to decline) any commitment or gift that is offered to the League.

## Reimbursement

### Vouchers

- Those eligible to seek reimbursement shall submit vouchers and supporting documentation to the League treasurer to receive reimbursement and should submit similar information to document expenses for which they are not requesting reimbursement.
- When those eligible choose not to be reimbursed, they may document their actual expenses without regard to the limits established for reimbursement as long as the expenses are reasonable and customary.

### Complimentary Tickets

- No reimbursement or complimentary tickets are provided for board members or their guests.
- All board members attending League special or fund development events shall purchase tickets that are not included in registration no matter when/where the event is held.

### Reimbursement rates

State board members, those elected or appointed to off-board positions, and staff may request full or partial reimbursement from general operating funds for actual expenses incurred in the performance of their League duties, within the constraints imposed by the budget at the following rates:

1. **Telephone, postage, photocopying, and essential supplies** at actual cost
2. **Travel**
   A. Travel by public transportation at actual cost including tips.
   B. The least expensive means of transportation that is feasible shall be used.
   C. In January of every year, the treasurer shall update the vouchers provided for staff and member use with the current IRS mileage reimbursement rate for League travel.
   D. Board member travel may be reimbursed or make an in-kind donation at the rate per mile driven in service of charitable organizations.
   E. Staff travel may be reimbursed at the rate allowed per mile for business miles driven.

3. **Parking, tips, fees**
   - Parking and necessary tips and fees are reimbursed at actual cost with receipt.
4. **Lodging**
   - Lodging at actual cost, allowing one-half room per person unless the board directs otherwise, or unless a single room is required when traveling alone on League business
5. **Meals and incidental expenses**
   A. Budgetary constraints do not permit reimbursement of meals and incidental expenses.
   B. Meals and incidental expenses while away from home overnight are tax deductible as in-kind contributions to the League at current IRS/U.S. General Services Administration amounts and guidelines.
6. **Registration fees** for conferences/workshops at actual cost
7. **Other types of actual expenses** if the board permits:

   A. **Project Budgets Reimbursement**
      - State board members, those elected or appointed to off-board positions, and staff may request reimbursement from funds at the rates listed in the project's budget.
      - Such budgets shall be based on actual costs, and
      - Reimbursement requires documented expenses.

OCA-APPX-1798

OCAGH_00015620

# Exhibit 114



# CONVENTION MANUAL

## League of Women Voters of Texas &
## League of Women Voters of Texas Education Fund

*Revised Spring 2012*

This manual is intended to be a guide for the Convention Planning Committee, the Local Host League and its Local Arrangements Committee, the State Office, State Board, and Services to Local Leagues Committee. Circumstances may require adjustment to the procedures and guidelines outlined in this manual. Recommendations for changes to procedures and guidelines may be submitted to the LWV-TX Convention Planning Committee at any time during the Convention planning process.

1

OCA-APPX-1800

OCAGH_00015531

**Specific Contact Information for 2012 Convention (as of January 2012)**
[This page can be updated with specific contact names & dates for Convention 2014]

**State Office (SO)**
Justine Quinn, Executive Director
1212 Guadalupe St, #107, Austin, TX 78701
512-472-1100 (phone); 512-472-4114 (fax)
lwvtexas@lwvtexas.org

**Convention Planning Committee (CPC)**
Chair:      Chris Davis Garcia (361-991-2784 hm; 361-244-4193 cell); cgrg@earthlink.net
Members:    Program VP: Janet Imhoff (972-547-4270 hm; 903-821-4682 cell)
            Auction: Susybelle Gosslee (214-349-0269 hm; 214-732-8610 cell)
            Floor Committee: Edie Jones
            Public Relations VP: Linda Krefting (806-793-6136 hm; 806-790-3062 cell)
            Organization VP: Dee Brock (SLL) (903-565-6655 hm; 903-565-6653 cell)

**Local Host League (LHL)**
LWV-San Antonio (Phyllis Ingram, president)---- pingram1@sxtx.rr.com; 210-764-1557
Contact:  Elaine Talarski, member---- etalarski@earthlink.net; 210-573-0476 (cell)

**Local Arrangements Committee (LAC)**
      Thursday Evening Supper for LWV-TX Board:  Nancy Price
      Friday Night Event: Elaine Talarski
      Volunteers:  Elaine Talarski
      Registration Desk: Phyllis Ingram
      Local PR/Publicity: no one designated
      Sponsorships (3 hallway breaks, Auction Room hospitality): Phyllis Ingram

| Important Deadlines for Convention (required in Bylaws/Policies & Procedures) | | |
|---|---|---|
| **Days Before 2012 Convention** | **Action(s)** | **Actual 2011-2012 Dates** |
| 180 | Start preparing convention budget | Friday, Oct. 7, 2011 |
| 120 | 1st call to convention (may advance or postpone date by not more than 14 days) | Monday, Dec. 12, 2011 |
| 90 | Recommendations for program and concurrences from LLs to State Board (3 months ahead) | Friday, Jan. 13, 2012 |
| 42 | Final call to convention with specific information 42 days before first session of convention | Friday, March 2, 2012 |
| 42 | LLs that want to propose concurrence at Convention send notice to other LL presidents, MAL Unit chairs, and State Board | Friday, March 2, 2012 |
| 30 | Nominating Committee report to LLs, MAL unit chairs | Tuesday, March 13, 2012 |
| 30 | Recommended and non-recommended program sent to LLs and MAL unit chairs | Tuesday, March 13, 2012 |
| 30 | Proposed budget sent to LLs and MAL unit chairs | Tuesday, March 13, 2012 |

OCA-APPX-1801

OCAGH_00015532

# TABLE OF CONTENTS

Preface.......................................................................... Page 5
    Purpose of State Convention
    Who's Who in the Convention Planning Process
    Convention Planning Responsibilities at a Glance

Selection of Convention Site, Date, and Facility ......................... Page 6

Criteria for Hosting a State Convention .................................... Page 7

Typical Convention Schedule and Overview ............................ Page 8

Planning Timetable ................................................................ Pages 9-13

Theme and Logo ................................................................... Page 13

Parliamentarian ..................................................................... Page 13

Specific Areas Addressed ....................................................... Pages 13-24

A. Friday Evening Special Event ........................................... Page 14
    Responsiblities of the State Office and CPC
    Responsibilities of the Local Arrangements Committee

B. Transportation ................................................................. Page 14

C. Registration ................................................................... Page 15
    Responsibilities of the State Office and CPC
    Responsibilities of the Local Arrangements Committee

D. Credentials Committee .................................................... Page 16

E. Convention Office ........................................................... Page 17
    Responsibilities of the State Office
    Responsibilities of the Local Arrangements Committee

F. Publications/Wares/Equipment.......................................... Page 18
    Responsibilities of Local Arrangements Committee
    Responsibilities of the State Office/CPC/Auction Chair

G. Volunteers/Personnel....................................................... Page 18
    Responsibilities of CPC
    Responsibilities of Local Arrangements Committee

(Continued on next page)

OCA-APPX-1802

OCAGH_00015533

# TABLE OF CONTENTS (continued)

H.  Floor Committee ............................................................ Page 19
     Responsibilities of the State Office
     Responsibilities of the Floor Committee (aka Policy/Bylaws/Rules Committee)

     Volunteers Comprising the Floor Committee.................. Pages 20-22
     Doorkeepers
     Timekeeper
     Tellers
     Attendant to Presiding Officer
     Microphone Attendants/Pages
     Projectionist and Media Assistant

I.  Workshops .......................................................... Page 222
     Responsibilities of the State Office
     Responsibilities of Local Arrangements Committee

J.  Public Relations ................................................. Page 23
     Responsibilities of the State League PR Vice President/SO
     Responsibilities of Local PR Chair

K.  Saturday Luncheon and/or Banquet Plans ............................ Page 24
     Responsibilities of CPC and State Office
     Responsibilities of Local Arrangements Committee

L.  Auction Room ..................................................... Page 25
     Responsibilities of Convention Planning Committee
     Responsibilities of Auction Chair
     Responsibilities of the Local Arrangements Committee

Financial  Instructions for Convention ................................... Page 26

Generic Checklist of Supplies/Equipment ............................. Page 27
Needed for All League Meetings

OCAGH_00015534

# PREFACE

## Purpose of State Convention

State Convention is the most important meeting of the League of Women Voters of Texas. It requires careful planning and involvement by the state board, the state office, the local League host and other chairmen who might be involved by virtue of a special program or awards ceremony.

Convention emphasizes the grassroots nature of the League by providing an opportunity for local Leagues to determine the future of the organization. It provides an opportunity to promote membership and reach out to students and young adults who are issue-oriented. It is typically a three-day meeting held in April of even-numbered years. The number of delegates from each local League is determined by Article VII, Section 2 of the bylaws of the League of Women Voters of Texas.

Convention delegates consider and adopt a program; elect officers, directors, and a chair plus two members of the nominating committee; adopt bylaws changes, a two-year budget, and per-member-payment (PMP) for the biennium; and transact such business that may be presented. General workshops are part of Convention and a special luncheon or dinner program is usually planned. The state board members usually arrive about noon on the day before the Convention to accomplish several tasks, including final review of convention plans; training of Plenary volunteers; and final review of hotel and convention arrangements.

This manual has been prepared to give guidance to those responsible for seeing that the state Convention is a success. Included is a delineation of the responsibilities of the state board, state office staff, and local host League.

## Who's Who in the Convention Planning Process for 2012

SO   =   *State Office of the LWV-Texas*
SB   =   *State Board*
CPC  =   *Convention Planning Committee*
LHL  =   *Local Host League*
LAC  =   *Local Arrangements Committee*
SLL  =   *Services to Local Leagues*
D&M  =   *Development and Marketing (specifically involved if luncheon/banquet are "fund raisers")*

## Convention Planning Responsibilities At a Glance

Specific duties to ensure a successful State Convention have been assigned as follows:

- The **SO** works closely with the CPC to coordinate Convention and provide continuity from convention to convention.
- The **SB** is the final arbiter of decisions involving Convention and is also responsible for identifying a host League, keynote speakers, and the Parliamentarian (who has travel and lodging expenses underwritten)
- The **CPC,** with direction from the State Board, provides general oversight of Convention planning and works directly with those involved in programming components; reports regularly to the Board.
- The **LHL,** in partnership with **LAC,** coordinates local arrangements for a special event on Friday evening; identifies at least three local business sponsors for convention breaks; provides adequate number of volunteers for convention; mans registration desk; arranges for a simple meal (at a personal residence or restaurant) for the State Board members on the Thursday evening preceding Convention; and assists CPC as requested.

OCAGH_00015535

Fundraising responsibilities are divided between CPC and D&M as follows:

CPC has responsibility for arranging/deciding/recommending to the Board:
- Silent auction
- Live Auction and auctioneer (with input from D&M)
- Registration fee
- Luncheon/banquet price(s) for convention attendees

D&M has responsibility for arranging/deciding/recommending to the Board:
- Sponsorships for convention, luncheon, and banquet (beyond those needed for convention breaks)
- Identifying and ordering LWV merchandise to sell during convention
- Fund-a-Need, if utilized at Saturday banquet
- Pricing of LWV merchandise to be sold during convention

Work on these begins at least by Fall before Convention if luncheon and/or banquet during convention are to be fundraisers; invitations and sponsorship fees for those outside LWV; fundraising beyond the specific responsibilities of the CPC/LAC (i.e., mail solicitation if honoring one of our own or holding a raffle).

## SELECTION OF CONVENTION SITE, DATES, AND FACILITY

Local Leagues interested in hosting Convention should extend an invitation at the prior Convention. The State Board selects and officially confirms the host League at the first state board meeting after Convention. The State Board also determines possible April dates for Convention after consulting with LHL regarding local availability in the designated city. The LHL should be aware of community events in its city during the convention month of April and also national holidays or observances that could impact dates identified for the Convention.

**LHL** takes the lead in identifying two or three possible hotel sites and works with the **CPC** to review possible convention sites and recommend a facility that offers appropriate accommodations, meeting spaces, and parking at reasonable costs. The CPC considers the recommendation and then makes a final recommendation to the State Board. The State Board makes the final decision whether or not to accept the recommended facility.

The contract with the Convention hotel should be signed by the Winter Board meeting (approximately 15 months ahead of the Convention date) and involves the Convention chair, SO, and LWV-TX President.

The **SO**, in cooperation with the **CPC**, works with the proposed hotel to write a contract that locks in the convention dates selected and specifically identifies rooms/spaces needed for the convention. The contract is signed by the SO executive director and/or the Board president, and any advance payment needed is handled by the SO. The **CPC** maintains contact with the designated hotel staff throughout the planning process, with assistance by the **LHC**.

OCAGH_00015536

# CRITERIA FOR HOSTING
# A STATE CONVENTION

1. **Volunteer strength**: Approximately 15-20 members of the Local Host League

2. **Facility requirements**:
   a. Sleeping rooms-At least 90 to120 rooms  (can sleep 2-4 to a room) at a reasonable price
   b. Large meeting room for plenary meeting→classroom style facing front with tables and chairs for 150-plus; dais facing audience with seating for 8-10 people; extra seating for observers not seated with their LWV delegations.
   c. Four to six small meeting "breakout" rooms for workshops, caucuses, Q&A sessions, etc., with each room seating approximately 30-50 people .
   d. Ballroom(s) (separate from plenary meeting room)-seating at round tables for 90-180 for luncheon or banquet
   e. Room for silent auction display and recordkeeping table
   f. Meeting room for state board meeting, seating from 15-20 (U-shape or conference style)
   g. Registration space in a lobby area, with tables

3. **Required Services (must be readily available to convention planners)**
   a. Copier and other business services
   b. Restaurants in hotel and within walking distance
   c. Public, taxi, or locally arranged transportation to airport and local attractions
   d. AV vendor with equipment for Plenary and workshop rooms
   e. Wireless internet connection in hotel lobby, all meeting rooms, and in sleeping rooms

4. **Accessibility**
   a. Convention site should be served by an airport with major airlines
   b. Facility/rooms must be special needs-accessible

5. **Affordability**
   a. Hotel room rates should be negotiated to make prices affordable to all delegates. Hotel contract should allow for maximum number of rooms anticipated, with two or more beds as possible per room
   b. Minimal/no charge for meeting rooms
   c. Affordable registration fee/special event fee assessed by state board

6. **Community Support**
   a. Legitimate "potential" by Local Host League to help secure underwriting for coffee breaks and an evening social function if needed, etc.
   b. Local Convention and Visitors Bureau may donate "goodie" bags for delegates

OCAGH_00015537

# TYPICAL SCHEDULE AND OVERVIEW OF CONVENTION
## (may be modified to fit purpose/goals)

**Thursday:**

| | |
|---|---|
| 10:30 a.m. | Training for Floor Committee and Volunteers |
| 1:30 p.m. | Board Meeting |
| 5:30 p.m. | Informal dinner for State Board, hosted by Local Host League |

**Friday:**

| | |
|---|---|
| 11 a.m.-7 p.m. | Registration; Auction Room open for bidding; League merchandise available for purchase; lunch on own for delegates |
| 1:30 - 5 p.m. | Workshops |
| 6 p.m. | Special Event by Local Host League |
| 9:30 p.m. | Caucus and Q&A Sessions as planned |

**Saturday:**

| | |
|---|---|
| 7-8:30 a.m. | Breakfast on own for delegates |
| 8 a.m.-Noon | Registration continues; Auction Room open all day except during Plenary |
| 8:30 -Noon | Plenary |
| Noon | Luncheon or special meeting as scheduled by LWV-Texas |
| 2 -5:30 p.m. | Plenary continues |
| 6:30 p.m. | Special event or banquet as planned by LWV-Texas |
| 9 p.m. | Resolutions Committee, Budget/Q&A and/or Caucus meetings as scheduled |
| 10 p.m. | Auction Room closes; bidding concludes; items picked up by winners |

**Sunday:**

| | |
|---|---|
| 7 -8:30 a.m. | Breakfast on own for delegates |
| 8 a.m. | Recommended Resolutions posted in Auction Room |
| 8:30 -1 p.m. | Final Plenary; Adjournment of convention |
| 1-1:30 p.m. | Final auction items picked up; all Convention materials gathered for return to SO |
| 1:30-2:30 p.m. | Board Meeting/Luncheon for Newly Elected Board |

## Hotel Accommodations Needed for State Board and InvitedGuests;

The Executive Director of LWV-Texas is authorized to reserve sleeping rooms at the host hotel for all State Board members as well as the Parliamentarian and the chairs of Nominating and Budget. As always, Board members and chairs are assigned two per sleeping room and have lodging provided for Thursday, Friday, and Saturday nights. At the direction of the state president, other complimentary rooms may be provided for invited guests (i.e., keynote speaker, LWVUS guests).

## Details about State Board Registration, Other Expenses

Members of the State Board receive complimentary registration for convention but do pay the designated costs for any special ticketed meals and/special events which they plan to attend. Board members remit that payment directly to the State Office when they register for convention.

OCAGH_00015538

**In Advance:**

**2 Years ahead of Convention date:**

At previous Convention, **SB** encourages local Leagues to consider hosting Convention, giving possible dates, accommodations needed, and guidelines.

LWV Texas president appoints **CPC**. The chair, in consultation with the **SB**, is responsible for the Convention program and will advise/work closely with the host League.

The **LHL** is named and asked to appoint its **LAC**. The **CPC** confers with the **SO** and the previous Convention chair regarding arrangements, planning, and recommendations.

**CPC** and **LHL** visit possible Convention facilities and recommend one or more sites to the **SB**. **CPC** assesses the proposed sites to assure adequate space and availability.

**1 ½-2 Years**

With input from **LHL**, **CPC** recommends to **SB** a Convention site and dates available; the Board approves the site and dates.

**CPC** confirms the hotel arrangements, including the room rate, and finalizes a contract with the hotel. The hotel sends the contract and pertinent correspondence to the **SO** for appropriate approval signature(s).

**12-16 Months (July-October Before Convention)**

**Outside speakers**--The **State Board** discusses whom to ask as outside speakers and when speakers should be scheduled. The state president invites key speakers and the parliamentarian and the **CPC** is responsible for seeing that invitations are sent to other speakers (with the exception of local government officials, who are invited by the LHL). The State Board may solicit names of potential speakers from the **LHL**.

**CPC**, through the **SO,** sends a copy of the immediate past Convention manual (with suggested changes), past Convention evaluations, suggestions from the **LHL** and any other instructions to the newly named chair.

At its Summer Board meeting, the **SB** discusses possible Convention fundraising opportunities and directs D&M for follow-through. The Board decides whether or not merchandise should be made available at Convention and whether or not a Silent and/or Live Auction will be staged. **LHL** may begin soliciting local items of interest for the auction, working closely with the designated Auction chair.

**July-October**

**CPC** selects a theme and logo with input from **LHL** and others. See Page 13 for information on Theme and Logo.

**D&M**, with assistance from SO and the Board, identifies sponsors/donors to defray Convention-related expenses. **CPC** and **LHL** begin identifying possible sponsors for coffee breaks and luncheon/banquet events. LHL can provide leads from its local business community that might be corporate funders.

**Auction Chair** notifies Leagues and League members about Silent Auction and requests items for the auction.

The **LHL** appoints and convenes **LAC** to handle local arrangements as defined by the State Board and may use its discretion in assigning responsibilities. It is recommended that the following functions be assigned chairs and committees:

**Local Arrangements Committee Chairs**
- Special events (Thursday board dinner, Friday night event for Convention delegates)
- Volunteers/personnel needed for Convention registration, designated events/tasks
- Public relations/publicity
- Fundraising/underwriting of morning/ afternoon breaks during Convention

The **LHL** will send a list of the LAC names, addresses, fax numbers, phone numbers, and e-mail addresses to the CPC and SO to facilitate communications.

OCA-APPX-1808

OCAGH_00015539

CPC begins work on the budget and registration fee to be approved at the Fall State Board meeting before Convention. The budget should include all Convention expense and income figures from previous convention, including anticipated costs for outside speakers and for off-board attendees/special guests.

### Prior To/At the Fall LWV-TX Board Meeting before Convention

**CPC,** in cooperation with **State Board** and **D&M,** makes decisions about Convention agenda, special events/banquet/luncheon, meeting and workshop timelines; works with the Treasurer to prepare and approve a proposed budget.

**CPC** requests a preliminary report from the **LAC** regarding arrangements for the board dinner on the Thursday evening before Convention begins. **LAC** may be invited to attend the Fall meeting to provide update.

**LHL** extends invitation to Mayor or other elected official to bring greetings at the opening Saturday morning Plenary and confirms date. This is very important and should be done by the host League at least six months before the event, with update to the CPC.

**CPC** visits the host hotel to finalize room assignments and assess the layout for Plenary, registration/information desk, luncheon and banquet, Auction room, and workshop spaces.

**CPC** obtains menus and meal prices for approval by Board and determines banquet charges for those not registered at the hotel. These charges must be approved before Convention registration forms are printed.

**CPC** and State Board establish guidelines for meal guarantees, refunds and designated deadlines, prepayment for all meals, etc. Information will be clearly communicated to Local Leagues and League members in early December and in other communications.

**LWV-TX Vice Presidents** begin to plan workshops and invite workshop speakers. Equipment, meal, nametags, and other needs for speakers are communicated to the State Board and CPC.

**CPC and SO** begin to design Convention registration forms to be included in mailings to local Leagues and League members as well as in the *Voter* and on the website. Auction chair sends request for items to all Leagues and previous donors.

At the Fall Board Meeting, **LHL** brings report to State Board about special Friday night event, recruitment of volunteers, and possible convention break sponsors.

### December before Convention

**CPC**, in cooperation with **State Board** and **SO**, meets the early December deadline (120 days ahead of convention) of "First Call" to Convention mailing to Local Leagues--basic information, tentative agenda, hotel reservation, registration fee, room cost, special events.

CPC and State Board President, in consultation with **SO**, plan and coordinate preparation and distribution of the following materials for the Call to Convention notification (electronic email, website, and physical mailing) to Local Leagues and League members:

1. call to Convention
2. registration forms for delegates/visitors/observers
3. hotel reservation information
4. descriptions of special events and workshops
5. promotional information on host city; appropriate maps and travel instructions from major highways
6. Invitation flyer from **LHL** to Friday night event, with registration form and instructions for payment
6. local League publication sales/exhibit space
7. Silent Auction/Live Auction

### Prior To/At the Winter LWV-TX Board Meeting

**State Board** approves the Convention budget at the Winter board meeting, if not already done at Fall Board Meeting.

**LAC** representatives attend the Winter Board meeting to report on the status of Convention and to receive information from **CPC** on specific volunteer responsibilities.

The **Policy/Bylaws/Rules Committee** recommends and the Board approves the Standing Rules for Convention.

OCAGH_00015540

**SLL** and **Board President** identify materials to be included in the Delegate Packet for distribution at Convention.

**D&M** decides on merchandise to order for sale at convention and recommends to the State Board.

**SLL** works with **LHL** and **CPC** to determine what maps and instructions to Local Leagues should be prepared for Convention publicity and Delegate Packet.

**State Board, CPC, and SO** prepare materials for the Convention Delegate Workbook distributed at registration table.

<u>**Convention Delegate Workbook:**</u>
a.  **Agenda→President**
b.  proposed **Convention rules→Bylaws, Polices & Procedure Chair**
c.  tips on **parliamentary procedure** *
d.  tips to **delegates**  *
e.  proposed slate of **officers and director→Nominating Committee**
f.  current **program→CE VP**
g.  proposed **program→CE VP**
h.  not-recommended **program→CE VP**
i.  **PMP** summary sheet→**Treasurer**
j.  proposed amendments to the **bylaws→Bylaws, Policies & Procedure Chair**
k.  proposed 2-year **budget→Treasurer**
l.  **annual reports** from **Board committees→VP** does the one for his/her committee; also Website chair provides report for workbook
m.  **directions** to the hotel/hotel information→**CPC**
n.  LRP report →LRP committee chair

*\* Carried over from previous convention workbooks*

**Board President** confirms Convention attendance with Board members.

<u>**Late January/Early February Before Convention**</u>

**LHL** confirms name of Mayor or other local elected official who will welcome delegates on the Saturday morning of Convention and notifies CPC for inclusion of name in the Delegate Workbook and Plenary order of business.

Delegate Workbook information is due to State President from **committee chairs, LHL,** and **CPC;** compilation and editing begins and production and printing timeline is established (usually early March)

**CPC, Board, and SO** confirm information on all aspects of Convention business, including final call materials, delegate count, and mailing to Local Leagues and League members.

**SO** orders merchandise to be sold at convention, as recommended by D&M.

<u>**Mid-February/Early March Before Convention**</u>

**Auction Chair** initiates preparation of materials for the silent auction including bidding forms, master record, room decorations, etc; continues to solicit items not only from Board members but Local Leagues.

**SO** finalizes merchandise to be sold, pricing, money boxes, and petty cash needed for Convention.

**Board** and **CPC** confirm early March deadline ("Final Call" to Local Leagues is 42 days before convention) to prepare Convention mailing and gather appropriate materials for the Texas VOTER and the website.

**Silent auction chair** prepares materials describing auction items for inclusion in all publicity sent to Leagues and League members.

**LHL** prepares and gives to CPC the final Friday night event notice for inclusion in the Convention mailing and for placement on the website.

**CPC** and **State Board** make final plans for training of volunteers and remind **LAC** to notify volunteers.

**CPC** gathers materials for Convention Delegate Packet including the following:
    **From SO,** items for the Convention Delegate Packet (items in folder)
            final agenda
            list of delegates
            list of *Who's Who at Convention*
            Convention/workshop sevaluation form
            auction catalog and final call for items

OCAGH_00015541

**From LHL**
list of volunteers & cell phone contact info
information regarding local attractions
map of city and travel instructions
Friday evening event information, regarding
travel plans, attire, etc.

## March

**SO** establishes electronic system for recording registrations, meal reservations, and special event/workshop reservations. An Excel or Access database has been used in the past.

"Final call" to Convention is directed to Leagues and League members, with information on hotel reservation, registration, etc. **SO** monitors website registration.

**SLL** contacts local Leagues not registered for Convention to invite them to attend if preliminary registration shows no response.

**CPC** and **SO** confirm special equipment needed for all workshop sessions and **CPC** confirms equipment needs with hotel or that **LAC** can help secure.

**CPC** keeps track of meals and other materials needed by workshop speakers and shares information with SO.

The host hotel prepares detailed Banquet Event Orders (BEOs) for each event at Convention, specifying meeting rooms, equipment needs, catering needs, seating, etc. The BEOs are reviewed carefully by **CPC** with the hotel management, and during convention, the convention chair reviews BEOs as they are presented by hotel staff.

**LAC and CPC** confirm final volunteer requirements.

**PR Vice President** contacts the **LAC PR** volunteer regarding local publicity for the Convention.

**SO and CPC** coordinate plans to see that all supplies are available or on order, including pocket folders, numbered three-part motion forms, name badges that will distinguish delegates from observers, ribbons to identify various League leaders, meal lists, signs identifying each local League and state board member, etc. (See generic list of supplies at end of this convention manual.)

## Late March/Early April before Convention

**PR Vice President** writes news release about convention and works with **SO** to distribute news release to all state and local media as well as to Local Leagues.

**State Board President** recruits members to be appointed to the committee to review the Convention minutes, the Credentials Committee, the Action Motions Committee, the Resolutions Committee, and the committee to oversee an election, if one is held.

**State Board President** decides seating arrangements for the Plenary dais and head tables (if needed) at special events and makes sure that the information is conveyed to the **CPC and LAC**.

**CPC** begins preparation of a scripted agenda for convention and confirms all details with **State President**.

**SLL and State President** finalize materials to be included in the Delegate Packet, and **SO** prepares the materials.

**State President** prepares Pre-Board for Board meeting that precedes Convention and the Plenary order of business.

In consultation with **State President and LHL**, **CPC** determines timeline, quantity, and who will assemble Delegate Packets prior to start of Convention; completed Delegate Packets must be ready at the host hotel by late afternoon Thursday before Convention starts.

**CPC** confirms all materials are ready and available for the Convention Delegate Workbook and packet.

## 2 Weeks prior to Convention

**CPC** works with **SO** to prepare Reminder email to League members with all pertinent information.

**SO** will send **CPC** all **forms and instructions** for Plenary session volunteers prior to training session.

**CPC** confirms volunteer training and trainers and sends reminder to **LAC** and **State Board** members.

12

OCAGH_00015542

**State Vice Presidents** confirm speakers and workshop presenters and report to **CPC**.

**<u>1 week Prior to Convention</u>**

As per stated deadlines, **CPC** and **SO** notify the hotel regarding final meal counts for luncheon and/or banquet events; number of Convention attendees; and confirms needed equipment/final setup with hotel.

**CPC** finalizes plan for Delegate Packet/Workbook assembly and confirms details for training session for LAC volunteers.

Convention delegate workbook is emailed by **SO** to all registrants and other guests, as needed.

**<u>April CONVENTION</u>**

**State Board** members and **SO** arrive on Thursday and meet in Board meeting to review final convention details with hotel staff, **LAC**, and **LHL**.

**CPC** coordinates training session for volunteers working registration, Floor Committee, etc.

The **SO and CPC** set up the Plenary room with League signage; make sure merchandise, Auction items, registration desk, and other designated spaces are set up and ready.

The **State President** gives specific assignments to board members to greet Convention speakers and outside workshop leaders, etc.

As the Convention gets underway, **CPC and LAC** volunteers are visible and available to answer questions.

**<u>After Convention:</u>**
**SO and Board** dismantle the Plenary room, Convention office, Auction Room, etc. and pack up any remaining materials to be returned to the state office.

**SO** returns all funds to the state office for deposit.

**CPC, Board president, and LAC** determine how thank you letters will be prepared for Convention speakers, workshop leaders, guests, donors, the host League, and volunteers.

The **state PR Vice President** provides a sample news release to Local Leagues announcing new state board members and convention highlights with space for the list of local delegates to all local Leagues included.

**CPC, with help from SLL,** compiles the delegate evaluation forms and requests evaluations and recommendations from the local Convention chair and committee.

**LAC and LHL** prepare a detailed written evaluation of Convention, with regard to lessons learned, suggestions for next Convention, changes needed, etc., and send the evaluation to the State Board president, who shares it with **CPC**.

**CPC** reviews delegate evaluations and recommendations, adds its own recommendations, and submits a final report to the **SO** for distribution to the state board and LAC.

**CPC** furnishes a notebook with all Convention materials, Delegate Workbook, Convention Manual, and other items to the State President to share with the newly named Convention Chair for next Convention

## THEME AND LOGO

**CPC** will consult with **LHL** on the theme and logo of the convention and will jointly make a decision prior to the LWV-Texas Fall Board Meeting. The theme and logo will be used in promotional materials and on the cover of the Delegate Workbook. Examples of past themes include Making Democracy Work, Taking Texas Leagues to New Horizons, Exercising Your Rights, and It's Your Government...Take Charge!

## PARLIAMENTARIAN

Prior to the Fall Board Meeting before Convention, **CPC** works with **SB** to identify and confirm an individual to serve as Parliamentarian during Plenary sessions at the convention. LWV-Texas can pay travel, provide lodging if needed, and/or pay a daily stipend of $100 for two days, or can approve a contract.

For 2012, the Parliamentarian was Mrs. Ella Clerkson, San Antonio, TX, who prepared a contract for LWV-Texas.

OCAGH_00015543

## A. FRIDAY EVENING SPECIAL EVENT

Traditionally, **LHL** sponsors an off-site special event as a fundraiser for its League on the Friday evening of Convention. Past events have included dinners, shows, and sightseeing trips to local museums or historic spots such as the Fort Worth Stockyards. The Friday event is an opportunity for the host League to showcase its hometown. **LHL** is responsible for arranging the special event, providing written information to **CPC** on registration fees, etc., and for letting delegates know about other sightseeing opportunities in the vicinity of the Convention site.

### RESPONSIBILITIES OF THE STATE OFFICE

1. **SO** will distribute the Friday evening event information prior to convention to all Leagues and League members, utilizing the flyer/promotional information provided by **LHL**, and will include the information in convention materials distributed at registration.

### RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE

1. In the summer and fall before Convention, **LHL/LAC** should make the **CPC** aware of special events and sites that might be of particular interest to delegates. **LAC** will research possibilities and obtain cost estimates, then recommend specific events/activities in writing to **CPC**, which will then make a recommendation to the State Board. The State Board will make the final decision as to the events/activities to be offered.

2. **LAC** will plan the **Friday night event**, reserve the site(s), arrange transportation, select a caterer or determine meal plans, arrange for supplies or event materials as needed, and arrange for local volunteer assistance as needed. All contracts and vendor payments will be handled by the local League, and all registration proceeds will benefit the local host league.

3. **LAC** will prepare events/activities information for the **LWV-TX** and *The VOTER*. An enthusiastic description, as well as registration fee and transportation information, should be included.

4. **LAC** may wish to contact the local visitors bureau/chamber of commerce for tourist information to include in pre-Convention information and in the Delegate packet. Information about other restaurants in the area, walking tour information, or additional tourist brochures can also be included in the packet.

## B. TRANSPORTATION

1. **CPC** will work with **LAC** as needed to provide accurate maps and directions to the hotel from local airports and major highways, plus airport and hotel shuttle service information. This information should be included in pre-convention and registration information.

2. **LAC** is responsible for securing commercial transportation and/or determining alternate transportation plans for the Friday night event (which may include use of personal vehicles). Specific transportation costs can be included in the cost assessed each participating delegate by the local League.

OCAGH_00015544

## C. REGISTRATION

**SO and CPC** are responsible for handling pre-registration of convention attendees. **LAC** and registration volunteers are responsible for registration at Convention and for cooperating with the Credentials Committee to furnish needed information about delegate count, etc. **LAC** should designate a registration chair to oversee registration volunteers.

**SO** will receive pre-registrations directly and will establish a system to track incoming registrations. **SO** will keep running totals of registrations for each event and coordinate with **CPC** to ensure adequate meeting facilities for each event. **SO** will prepare a list of delegates and registrants as registrations are received and will prepare a final listing of names, contact information, and name of local League for inclusion in the Delegate packet.

Name tags must be prepared based on advance registrations. The name tag should include each person's name, local League, and office. A number of extra name tags should be kept at the registration table for late registrants and correction of misspelled names. A colored name tag, sticker, or border must be used to distinguish delegates from nondelegates. A system of colored dots or stickers can be placed on the name tags to identify which events have been paid for by each attendee (otherwise tickets must be prepared and collected for each event).

**LAC** will be responsible for staffing the registration table throughout Convention as per the hours noted on the final agenda. More volunteers should be scheduled for Friday and Saturday morning shifts in anticipation of the arrival of the majority of registrants. At registration, each delegate should be given a packet and name tag.

**CPC** is responsible for providing a list of all guests and speakers to the registration committee and to the SO so that they are included in the registration database as per meals, etc.

### RESPONSIBILITIES OF THE STATE OFFICE AND CPC

1. **CPC and SO** will work with the hotel staff to determine which area of the hotel will be used for the registration information desk.

2. **SO** will bring the following materials for the registration/information desk: a large sign for the registration information desk; signs for registration by alphabetic division (if needed); extra copies of the Convention Workbook; a cash box and petty cash; miscellaneous supplies; name tag ribbons to designate state board members, local League presidents; and Delegate packets.

3. **CPC** will be responsible for meeting with the local League volunteers to set up the registration/information desk the first morning of the Convention and for briefing the registration volunteers regarding procedures.

4. **SO** will take possession of the cash box each night, will return the cash box the following morning, and will assume responsibility for bringing receipts to the SO for deposit.

5. Throughout Convention, **SO and CPC** will be available to deal with questions and problems. A method for the registration/information desk to contact SO and CPC representatives quickly at the hotel will be devised in advance of the Convention.

6. League requests for caucuses must be made one month prior to the Convention. Caucuses will be given space on a first-come, first-serve basis in meeting areas approved by the hotel.

OCAGH_00015545

7. The delegate list prepared by the SO will list delegates alphabetically by local League. Delegates from MALs, members of the state board, visitors, guests, and observers will all be listed separately. To facilitate registration, delegates will register by section of the alphabet by either the delegates' last name and League name.

**RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE**

1. Delegates and visitors will register at the registration desk as they arrive. In order to vote, a delegate must be registered.

3. The plastic name badges for delegates, visitors, observers, state board members, and volunteers will be color-coded, and some may have special ribbons attached. All badges will be picked up upon registration. Extra badges, to be used if needed, will also be provided by the SO.

4. Throughout the Convention, the registration/information desk volunteers serve as a continuing resource for Convention delegates with questions concerning workshops, transportation, locations of meeting room, agenda issues, and services, etc. Lost and found items are kept at the registration/information desk until claimed. After most attendees arrive, registration may be moved to the Convention office.

5. The hotel will be asked to promote Convention information on available electronic message boards/TV screens. At the beginning of the Convention, a list of events and hours for the registration/information desk, hospitality room, Convention office, and publications room may be displayed. Notices regarding locations and times for caucus meetings, workshops and special events will also be publicized through available venues. An easel near the registration area may be available for personal messages. The registration committee will clear the easel as needed.

6. All money collected at the registration/information desk must be recorded on the official registration database list. Each income entry should be recorded as to date of receipt, from whom received, amount of payment, and reason (e.g., registration, banquet). Checks should be made payable to LWV-TX. Refunds for registration or banquet tickets will not be made after the published cancellation date.

7. The registration chair shall train and oversee all shifts of volunteers staffing the registration/information desk. A listing of volunteer names should be maintained by the LHL and furnished to LWV Texas so that they can be thanked for their service.

8. **LAC** will recruit local League members to staff the registration/information desk, which will be manned at designated times during the Convention. Registration is scheduled to begin at least one hour before the Friday workshops begin and continue through 7 p.m.; registration will continue on Saturday. Hours will vary depending on the Convention agenda. Two volunteers are usually needed for each time slot on Friday, and two volunteers are needed for each time slot on Saturday. One volunteer is needed on Sunday morning prior to the beginning of the Plenary session for any late arrivals. Because most delegates are expected to arrive Friday or Saturday morning, registration may be combined with the Convention office after the majority of delegates have arrived.

# D. CREDENTIALS COMMITTEE

The **LAC** chair and one other member of the registration committee usually serve as the Credentials Committee, which reports the number of registered delegates so that a quorum can be declared. The State President will confirm on the first day of convention the number of local Leagues in the state who are eligible to attend. At least half of the local Leagues in the state must be represented at the Convention in order to declare a quorum. In case

OCAGH_00015546

of concerns in this regard, the president may ask state board members to represent their local Leagues, if there are no delegates from those Leagues already registered. If someone leaves and is not planning to return to the Convention, the count should <u>not</u> be lowered. If someone new comes to replace an already registered delegate, the count should <u>not</u> be increased.

The State President will formally appoint the Credentials Committee at the beginning of the first plenary session. The Credentials Committee will be asked to make a report (a sample script will be provided) using the nearest floor microphone. The State President will then declare whether a quorum is present. At the beginning of each subsequent plenary session, the Credentials Committee again makes a report, but the declaration of a quorum is only done at the first session. The written report should be given to the LWV-TX secretary, who will be seated at a table at the front.

The Credentials Committee should ask the Registration volunteers for a list of delegates who have checked in.

## E. CONVENTION OFFICE

The Convention office provides computer and printing equipment for use by state board members, state League staff, delegates, workshop leaders, and local Convention committee members. The **CPC** and the **SO** are responsible for obtaining equipment for the Convention office and for coordinating assistance as needed by League members. For convenience and accessibility, the Convention office should be located in close proximity to the combined Publications/Wares and Auction Room.

### RESPONSIBILITIES OF THE STATE OFFICE

1. **SO** will furnish office supplies, such as copy paper, state League letterhead, and standard office supplies, including pens, pencils, spiral notebook, receipt book, a cash box, and petty cash. A list of standard office supplies to be available at Convention is found on the last page of this convention manual.

2. The Convention office will be set up the Thursday evening before the first day of Convention and **CPC** will brief assigned volunteers regarding its use and their responsibilities. One volunteer will be needed in the Convention office throughout the convention, unless otherwise notified.

3. **SO** will take possession of the cash box each night, will return it to the Convention office each morning, and will assume responsibility for taking receipts to the state office for deposit.

### RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE

1. **LAC** may be asked by CPC to help make arrangements to rent or borrow equipment for Convention usage and LAC should be aware of alternative sources for equipment should a breakdown occur.

2. **LAC** should assure that the Convention office is staffed by at least one volunteer per designated shift to provide assistance to state board members, state office staff, local Convention committee chairs, and delegates who need assistance in preparing for workshops, caucuses, program adoption, speeches, etc. The office volunteer may also be called upon to assist local Leagues in setting up sales areas or exhibits in spaces that they have reserved ahead of time. However, local Leagues are responsible for staffing their own sales areas.

3. **LAC** is responsible for making sure Convention office volunteers are recruited.

OCAGH_00015547

## F. PUBLICATIONS AND WARES

State League publications and products are available in the Auction Room for delegates to purchase during Convention (hours to be announced in advance). Local League publication sales and exhibits are also located in the Auction Room, but local Leagues are responsible for staffing their own sales areas and for providing their own petty cash and receipt procedures. The State Office should be notified at least three weeks before Convention by local Leagues if they need space in the publications and wares room to sell their merchandise. Local Leagues will be notified through appropriate information channels in advance that they may offer publications or merchandise for sale. A space reservation form will be provided and should be returned as documentation from the League that they will utilize space in the publications/wares area.

### RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE

1. **LAC** will furnish one volunteer during each of the shifts identified during Convention to man the LWV-Texas publications and wares table in the Auction Room. Volunteers will familiarize themselves with the merchandise for sale and will be encouraged to promote sales to delegates entering the room.

### RESPONSIBILITIES OF THE STATE OFFICE/CPC/AUCTION CHAIR

1. **CPC**, in cooperation with the hotel staff, will identify the room to be used for silent auction and publications/ wares sales activities. To promote delegate traffic through the publications and silent auction room, it should be located as close to the plenary session room and registration area as possible. A secure room is needed, as materials will be kept there overnight.

2. **CPC and Auction Chair** will make arrangements for the Auction and Publications/Wares spaces, including appropriate number of tables, table cloths and skirts, and chairs, plus security.

3. **CPC** is responsible for pre-Convention publicity regarding League publications and merchandise for sale and will seek information in advance from local Leagues regarding merchandise they wish to sell.

4. **SO** will take possession of the cash box each night, will return it to the publications/wares/Auction Room each morning, and will assume responsibility for taking receipts to the state office for deposit.

## G. VOLUNTEERS/PERSONNEL

The convention is staffed primarily by volunteers recruited by the **LHL**, in consultation with **CPC** and the chairs of the various Convention committees. The volunteers should be able to complete the duties listed in this manual in addition to duties that may arise unexpectedly.

### RESPONSIBILITIES OF THE CPC

1. **CPC** will be available to assist volunteers with any problems that arise.

### RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE

1. **LAC** recruits and assigns a volunteer chair to recruit, schedule, and help train volunteers, working closely with **CPC**.

OCAGH_00015548

2. The volunteer chair should prepare sign up notices and forms for the local League *Voter*. Sign-up sheets should also be provided at each general or unit meeting in the months leading up to Convention.

3. The volunteer chair and/or LAC should plan to attend local League meetings to describe Convention and recruit volunteers. It may be helpful to enlist several volunteers willing to step in as alternates or last-minute helpers. LAC may contact other local Leagues in the area as a source of additional volunteers.

5. The volunteer chair assigns volunteers for every position, in every time slot, as identified by CPC, beginning two months ahead of the Convention schedule. The SO, CPC, and LAC should all have a final volunteer schedule that identifies the volunteer's name and contact telephone (cell) number.

6. The volunteer chair prepares a volunteer packet to mail to each volunteer 10 days ahead of Convention. This should confirm in writing the exact tasks and times for which a commitment has been made. It should also include a reservation form for Convention meals, a complete Convention agenda, and a map of the hotel, plus information about the required training at the hotel on Thursday afternoon before Convention. Volunteers should be advised that if they are not "on duty," they can attend and/or observe plenary sessions and workshops, unless they are registered delegates, in which case they should attend the entire plenary sessions.

7. The volunteer chair should be present throughout Convention to be sure that there are no volunteer staffing concerns.

8. The volunteer chair is responsible for thanking all volunteers in written or email format following Convention.

# H. FLOOR COMMITTEE

It is vital that the Convention plenary sessions run smoothly, and to this end, volunteers on the Floor Committee play a primary and vital role in making that happen. The Floor Committee chair and members will be asked to attend training (about one hour) the day before Convention opens to receive training. It is helpful, but not required, if Floor Committee members have attended a previous LWV state convention and are already familiar with procedure of a plenary session.

The Floor Committee should be aware that beginning at the 2012 Convention, League observers who are not official voting delegates of their League **are invited to sit with** their League delegates at their assigned seats, unless they prefer to sit in the visitors' section at the back of the room.

The Floor Committee is comprised of the following: Doorkeepers, timekeepers, tellers, microphone attendants, microphone assistants, and a projectionist or media helper (to provide assistance to the SO as needed) during the plenary sessions.

### RESPONSIBILITIES OF THE STATE OFFICE

1. The SO should assure that all equipment, signage, and supplies needed for the plenary session are available. Equipment includes a computer with projection capabilities and monitor, projection screen, and microphones. **Signage should include local League names, state board members names and positions, pro and con cards and others needed for microphones, red cards, visitors section sign, and time cards.** Supplies include numbered four-ply motion slips (NCR paper), stop watch, bell, podium signage, backdrop banner, paper ballots, and water and glasses at the platform table. Arrangements must be made early to audiotape the entire plenary session. Tapes should be given to the secretary for recording minutes.

OCAGH_00015549

2. At least one hour prior to the beginning of each plenary session, SO should bring needed supplies to the plenary session room and make sure that they are in their proper places and that equipment is working properly.

3. During the plenary sessions, SO should be available to assist the State Board members as needed and may be asked to contact hotel personnel to assist with problems such as room temperature, lighting, microphones, etc.

## RESPONSIBILITIES OF THE FLOOR COMMITTEE aka Policy/Bylaws/Rules Committee

1. The Floor Committee chair should be familiar with the duties of Floor Committee volunteers, as described below, and should also be familiar with parliamentary procedure.

2. The Floor Committee chair should arrive at each plenary session approximately one hour before it is scheduled to begin. Equipment and supplies should be checked to see that they are in place and working properly.

3. The Floor Committee chair and volunteers will receive cross-training at the Thursday training session before Convention begins. State board members will be available to assist with training volunteers.

4. Following the Convention, the Floor Committee chair should make sure that all volunteers are thanked.

## <u>VOLUNTEERS COMPRISING THE FLOOR COMMITTEE</u>

Approximately 11 volunteers are needed for each plenary session:
- two doorkeepers
- one timekeeper
- three tellers (plus additional tellers if needed)
- two microphone attendants
- one attendant for the president/presiding officer (the president can identify attendant if desired)
- one projectionist (usually SO staff), and
- one media assistant to help the SO staff.

Hours will vary depending on the Convention agenda. Volunteers will have been trained in advance but should plan to report to the plenary meeting room approximately 45 minutes before the start of the session to receive additional instructions as needed. The local volunteer chair will recruit volunteers to fill these positions and is responsible for seeing that all positions are filled.

## 1. DOORKEEPERS

1. The doorkeepers monitor the doors into the plenary session room during the plenary sessions, admitting only persons showing Convention badges--delegates, observers, visitors, state League staff, local Convention committee volunteers, and members of the news media. Anyone without a badge should be asked to obtain one at the registration/information table.

2. The doorkeepers distribute handouts prior to the beginning of the plenary session.

3. During a vote, the doorkeepers close the doors, permitting no one to enter or exit while the vote is being taken.

OCAGH_00015550

## 2. TIMEKEEPER

1. The timekeeper sits on the dais in view of both the presiding officer and speakers at the microphones. The State Office will supply a stopwatch, a colored time-card, plenary agenda, and a bell. The card is used to indicate 30 seconds remaining, and the bell signals the end of the time.

2. The timekeeper times the speakers according to the rules adopted. The presiding officer will supply directions regarding the length of the debate and the time allotted to each speaker. The timekeeper must follow the plenary agenda closely and stay focused on the business at hand.

## 3. TELLERS

1. The number of tellers depends upon the seating arrangements for the delegates. Each teller will be assigned to a specific area of the room and will have responsibility for that assigned section.

2. Tellers are responsible for seeing that persons are seated in the proper areas of the room--delegates and League observers in the front section and visitors not related to a League in the back. Sections will be marked by table tents/signs.

3. Tellers will distribute printed materials to each seat as requested by the State Board.

4. Tellers are responsible for countoff voting when a motion requires one. Each section of the room is counted separately. The procedure is as follows. **Those voting "yes" are requested to stand.** Beginning at one end of the first row, the first delegate who is standing counts "one" out loud and then sits down; the next standing delegate counts "two" and so on. The teller standing at the end of that row makes sure that the first person standing in the second row starts with the next consecutive number. Therefore, the vote count travels right to left in one row and left to right in the next. State board members, including those on the dais, may vote. The tellers confirm the final numbers and add the yes votes for all sections. The same procedure is used for the "no" votes. One teller takes a written report of the vote count to the presiding officer.

5. Tellers may also serve as doorkeeper assistants or microphone attendants/pages as needed.

## 4. MICROPHONE ATTENDANTS AND PAGES

1. Microphone attendants are on the floor to monitor the two microphones used by the delegates and to deliver written motions to the appropriate people. Generally there are two microphones on the floor; pro and con signs may be attached to the microphones by the attendants. A page attends each of these, assisted by a teller if needed. The page sits in front of the microphone facing each potential speaker and adjusts the microphone height as needed.

2. The microphone attendant reminds speakers to give their name and League before speaking. She/he should carry a clipboard with appropriate paperwork to capture the names of those signing in to speak.

3. The page at each microphone has a red card which delegates can request to make a non-debatable point (point of order, point of information, parliamentary inquiry, or question of privilege). These cards can be waved by a delegate anytime during debate to interrupt it. Red cards and examples of **non-debatable** points will be provided by the State Office.

OCAGH_00015551

4. All motions should be written on motion slips prior to being moved. A delegate wishing to make a motion should obtain a motion slip from the microphone assistant. (Three-part motion slips are provided by the State Office.) The microphone assistant should remind delegates to press hard as they write or print the motion wording so that all three copies are legible.

The microphone assistant is responsible for delivering the first **two** copies of the motion to the Secretary and the projectionist; the last copy is retained by the delegate making the motion.

5. If there is an election challenge, paper ballots will be distributed by the tellers or pages to those eligible to vote (delegates and members of the State Board).

## 5. ATTENDANT TO THE PRESIDING OFFICER

1. One page is assigned to the presiding officer and is available throughout the plenary session for any tasks requested. Prior to the plenary session, he/she introduces herself to the presiding officer and sits in front of the platform.

## 6. PROJECTIONIST/MEDIA ASSISTANT

1. The projectionist often prepares and then operates the prepared Powerpoint presentation(s) on the laptop computer attached to an LCD projector. The projectionist will follow the agenda and change slides accordingly. The projectionist also receives motion slips from the microphone attendants, types them into the computer, and displays them on the screen. It is vital that the projectionist be familiar with the equipment prior to the beginning of the plenary session.

2. The media assistant sits with the projectionist (usually the LWV-Texas Executive Director) and helps as needed. He/she may also serve as projectionist.

# I. WORKSHOPS

On the Friday of Convention, delegates and visitors have the opportunity to attend three of several workshops that might be offered. Workshops are carefully chosen and developed, and they may be repeated if there is a great deal of interest. Workshops will be listed on the convention registration form so that registrants can sign up for specific workshops. Workshop presenters are responsible for their own materials that will be distributed.

## RESPONSIBILITIES OF THE STATE OFFICE

1. **CPC** considers recommendations for workshops from LWV-TX board members and League members and also reviews evaluations of the last convention and the last two years of Leadership Institutes and/or regional meetings to consider member interest for workshops. Workshops may be facilitated by the appropriate LWV-TX vice president or another League member. Workshop presenters are responsible for making or duplicating their own handouts

2. The **SO and CPC** will work with the hotel to ensure adequate space and set-up for all workshops/break-out sessions. Any AV or "props" needed must be communicated in advance by the State Board Vice Presidents to the CPC and SO, including the title of the workshop, speakers' names, moderator/facilitator, room set-up, and AV or props needed.) to the administrator and Convention planning chair. Costs associated with AV and other props must be approved by the CPC.

OCAGH_00015552

3. It is the responsibility of the **vice president** organizing a workshop to invite and follow up with speakers or special guests.

## RESPONSIBILITIES OF LOCAL ARRANGEMENTS COMMITTEE

1. Local arrangements committee may recommend topics and speakers for workshops

## J. PUBLIC RELATIONS

Public relations/publicity for the Convention will be handled by the LWV-Texas Public Relations Vice President, in cooperation with the SO and the LHL's public relations committee chair. Guidelines for the local chair will be furnished in advance from the State Board Vice-president. Good lead time should be allowed for development of plans between the local chair and the State PR Vice President so that media contacts can be made in a timely manner and in advance of Convention.

### RESPONSIBILITIES OF THE STATE LEAGUE PR VICE-PRESIDENT AND THE STATE OFFICE

1. The LWV-Texas PR Vice President should contact the LHL chair at least three months prior to Convention. At that time agreement should be reached regarding the relative responsibilities of each. Typically the local chair handles local media contacts, and the State League handles statewide publicity.

2. The SO will maintain and provide on request an up-to-date statewide media list.

3. The PR Vice President may prepare a news release, including a summary of the Convention schedule, to be distributed statewide at least one month prior to the Convention. A copy should be sent to the local PR chair.

4. Information about the League, League program and activities, and Convention, including an agenda, should be available on the LWV-Texas website as well as in the state office, so that any interested reporters may have immediate access to pertinent information. This information should be made available to the local PR chair well in advance of Convention.

5. The LWV-Texas PR Vice President will prepare a sample news release for Convention delegates to take home to give to their local media with delegate names and highlights of convention. The sample news release will be included in the Convention packet, if possible.

6. The LWV-Texas PR Vice President or the State President should be prepared to be interviewed or to provide a sound bite or quote to any reporter or camera man seeking such information.

7. The PR Vice President and the SO are responsible for all post-Convention publicity, including contacts with the local media in the hometowns of newly elected state board members. Whenever possible, photos should be obtained prior to the Convention so that releases announcing the election results can be transmitted in a timely fashion.

### RESPONSIBILITIES OF THE LOCAL HOST LEAGUE PUBLIC RELATIONS CHAIR

1. The local PR chair is responsible for compiling or obtaining a current news media list for the host city.

OCAGH_00015553

2. Approximately 30 days ahead of Convention, the local PR chair should prepare--and submit to LWV-Texas for approval--a draft news release about the Convention program and agenda; workshop titles; special convention events; and the names of local League members serving on the Local Arrangements Committee. All local statements and press releases should be written on State League letterhead and should include the name and phone number of the local PR director as contact person. Letterhead and envelopes can be furnished by the State Office.

# K. SATURDAY LUNCHEON AND/OR BANQUET ━━━━━━━━━━━━━━━━━━

The Convention banquet is usually held on Saturday evening but a special Luncheon could also be held on Friday or Saturday. The State Board and D&M are responsible for deciding whether either or both events will be fundraisers, and if so, what additional audience will be invited to attend, who the keynote speaker will be, etc. CPC may request suggestions for prospective local speakers from the LHL.

CPC will determine if centerpieces for the tables are needed, will establish seating arrangements as needed, and will provide place cards for all reserved tables.

The speaker, State President, LHL president, and others selected by the LWV-Texas president should sit at a "reserved" table. Seating for all others is by individual choice; however, State Board members and LAC members will be asked to sit at different tables throughout the room to greet League members.

If either or both the luncheon and banquet are planned as fund raisers for LWV-Texas, D&M will be involved and will determine outside sponsorships needed to ensure a successful program.

**RESPONSIBILITIES OF CPC AND STATE OFFICE**

1. CPC will arrange the luncheon and/or banquet menu with the hotel and will be responsible for setting the meal guarantee.

2. SO will receive payments for all luncheon/banquet reservations and will determine how delegates' registration information confirms their attendance/participation.

3. CPC will work directly with the registration desk volunteers to determine a final count of delegates and their meal plans; if additional tickets have been requested at the door, CPC will determine whether seating is available.

4. If news media is expected, CPC will make arrangements for a press table to be located at the rear of the dining room. The local host PR chair and one or more State Board members will be assigned to greet members of the news media who attend. If a keynote speaker for either Saturday luncheon or banquet is secured, a news media packet with event information, biography, photo, etc. may be prepared and distributed prior to the event.

5. Securing sign language translation may be investigated by CPC if deemed necessary.

6. CPC will handle needs that arise for a microphone and podium, the League banner, a registration table, and any AV equipment needed for speakers or entertainment to be placed in the banquet room. If the event utilizes an emcee or auctioneer, CPC will work with the State President and LHL to identify that individual.

6. The SO and PR Vice President will handle all live auction or other banquet fundraising details.

OCAGH_00015554

**RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE**

1. If requested by CPC, LAC will help decorate the banquet room(s), using hotel centerpieces, etc., as available. If fresh flowers are utilized, it may be possible for one arrangement to be used for more than one meal event.

2. LAC also may be asked to recommend a local auctioneer, if a live auction is planned during Convention, and to make the initial contact, but would not be responsible for contract fees; LAC also may be asked to secure photographic/videography services for the luncheon or banquet but will not be responsible for underwriting the expense.

## L. AUCTION ROOM

**GENERAL GUIDELINES WILL BE INSERTED HERE--JUNE 2012, AS PREPARED BY AUCTION CHAIR FOR 2012 CONVENTION, SUSYBELLE GOSSLEE.**

**RESPONSIBILITIES OF THE CONVENTION PLANNING COMMITTEE**
1. CPC confirms the space needed at the hotel for the Silent Auction and related merchandise areas.
2. CPC and Auction Chair work with SO to invite Local Leagues and their members to participate.

**RESPONSIBILITIES OF THE AUCTION CHAIR**
1.
2.

**RESPONSIBILITIES OF THE LOCAL ARRANGEMENTS COMMITTEE**
1. LAC identifies possible sponsors for Auction Room refreshments while the Silent Auction is in progress.
2. LAC provides volunteers in the Auction Room during designated hours; some volunteers will need to have skills to handle sales (cash, check, credit card).

OCAGH_00015555

# FINANCIAL INSTRUCTIONS FOR CONVENTION

1. LWV-TX State Office will handle receipt of registration money and payment of all Convention invoices, except those for which the Local Host League are responsible (i.e., Friday evening event). The Fiscal Management & Administration Committee of LWV-TX may approve alternative methods of managing Convention receipts and disbursements.

2. LWV-TX shall reimburse members of the Local Host League for Convention-related expenses such as postage, parking, and copying. The State Office will send reimbursement request forms to the local Convention chair for distribution to members of the local committee. All requests for reimbursement should be supported by receipts and must reach the LWV-TX treasurer within 30 days after the final day of Convention.

3. The State Office works with CPC and handles contracts for all hotel and dining services. All other contracts for services (e.g., equipment rental, offsite catering) should be approved and signed by the SO executive director. Arrangements should be made for local vendors to bill the SO directly whenever possible. If a bill cannot be mailed to the SO, the LWV-Texas treasurer will write a check for the invoice at or immediately following Convention.

3. All money collected at the registration desk must be recorded. Each income entry should be recorded as to date of receipt, from whom received, amount of payment, and reason (e.g., registration, banquet). Checks should be made payable to the League of Women Voters of Texas (or LWV-TEF for any special fundraising luncheon). Payments may be made by credit card. Credit card forms will be provided to the registration table workers.

4. Refunds for registration or banquet tickets should only be made in extreme circumstances upon authorization from the SO or CPC. No refunds may be made after the final cut-off date given by the hotel, as those meals will have to be paid for. The SO will take possession of the cash box each night and will be responsible for bringing receipts to the state office for deposit.

5. It is essential that transactions be recorded fully and accurately. Questions about these procedures before or during the Convention should be directed to the SO for clarification.

6. During **payout for merchandise or auction sales,** all individuals wishing to pay with a credit card will be requested to fill out a form to do so. They will then turn this form in to the staff or volunteer at the sales table.

7. Separate logs for merchandise and auction sales will be kept, and everyone will be asked to check out in a separate line for each to make post-Convention bookkeeping easier.

(Treasurer Edie Jones will review this page specifically. 7/20/11)

OCA-APPX-1825

OCAGH_00015556

# GENERIC CHECKLIST FOR STATEWIDE AND/OR REGIONAL MEETINGS

## Nametags, Publications and Merchandise:

Participant Nametags--League name and attendee's name—first name of delegate BIG type on first line; last name on second line; then name of League.

All publications on hand at the State Office

All LWV merchandise for sale on hand at the State Office

## Registration Materials and Event Materials:

Include League contact info on registration form-- phone numbers (cell phone) of key contacts that are usable the day of the event for directions, emergency messages, delays, etc.

Be sure that participant has written his/her personal contact info on the registration materials for communication in case of emergency.

Include a map, drawn to scale, to the meeting site, plus written directions if needed.

Handouts and extra copies of the Delegate packets.

## Office Supplies furnished and brought by State Office:

Two reams white copy  paper

State League letterhead and envelopes

Magic markers and Dry erase pens

Pens and pencils with erasers

Sticky (post-it) notes

Masking tape and scotch tape

Scissors, ruler, glue stick

Two clipboards

Spiral notebook (for recording copying requests, special notes)

Receipt book

Pads or blank paper for note-taking by attendees

Stapler and extra staples

Paper clips, thumbtacks, rubber bands,

Three-hole punch

Flash drive to facilitate information transfer

Cash box and petty cash

## AV-Computer-Related equipment and backups:

 Laptap computer  and LSC projector (SO will always bring these)

Charger or extra batteries or bulbs for LCD or other equipment

Large pad of paper and easel from state office

Extension cord and power surge protector

## General guidelines for State Office:

State Office staff arrives early and is set up and ready for early arrivals.

State Office brings publications and merchandise as requested.



OCA-APPX-1826

OCAGH_00015557

Suggested Sample of Convention Name Badge (standard Avery product size with plastic cover and lanyard)--
prepared by State Office

| | |
|---|---|
| Logo | **CHRIS** |
| | **Davis Garcia** |
| | **LWV-Corpus Christi** |
| | **STATE BOARD MEMBER** |
| | **DELEGATE** |
| | **First-Time at Convention** |

OCAGH_00015558

# Exhibit 115

OCA-APPX-1828



# LWV LEAGUE OF WOMEN VOTERS® OF TEXAS

# 2021 Impact Report

## Fighting for Voting Rights During a Pandemic

### President's Message:

What happens at the Texas Capitol impacts and influences actions across the United States. For the first time in over 100 years, the 87th Texas legislative session convened during a worldwide pandemic. We overcame this barrier to democracy with determination, ensuring the League's voice was heard during the Regular Session and the three following Special Sessions.

LWV Texas provided 114 testimonies during the 87th Legislative session and three Special Sessions! Our advocacy centered on our priority issues: voting rights and redistricting, and urgent issues: health care, women's health, public education, and climate change. We also fought extreme legislation and advocated for equal opportunity in schools for vulnerable transgender youth. We fought unregulated carry of handguns.

In 2022, the League will focus our energy on overcoming the barriers to voting created by the new Texas election laws that put our democracy at risk. By supporting the work of the League, you can fight for communities hardest hit by these bills: Black, Latinx, Asian American, Pacific Islander voters, voters with disabilities, young and rural voters.

I am proud to stand with the almost 3,500 League members and 13,000 League supporters across Texas who work so hard to Empower Voters and Defend Democracy in Texas!

Grace Chimene,
President, League of Women Voters of Texas

*The League makes taking action easy!*
*We created 46 Action Alerts with our Take Action tool!*

## The Fight for Voting Rights Starts With Partnerships
### Let My People Vote Rally

We partnered with Texas NAACP, Texas LULAC, and Texas Impact for the "Let My People Vote Rally for Voting Rights" at the Texas Capitol. LWVUS CEO Virginia Kase Solomón rallied protestors with her speech "The State of the Voting Rights Crisis in America."



## Empowering Voters. Defending Democracy.

### Texas Leagues

Amarillo
Austin Area
Bay Area
BayTown
Beaumont
Brazoria
Cy-Fair
Collin County
Comal Area
Cooke County
Corpus Christi
Dallas
Denton
El Paso
Fort Bend County
Hays County
Hill Country
Houston
Irving
Lubbock County
Midland
Montgomery County
Richardson
Rio Grande Valley
San Antonio Area
South Central Texas
Tarrant County
Tyler/Smith County
Victoria
Waco Area
Wichita Falls
Williamson County

1212 Guadalupe Street,
Suite 107
Austin, TX 78701
512-472.-100
lwvtexas@lwvtexas.org
www.lwvtexas.org

OCA-APPX-1829

OCAGH_00002273

# THE LEAGUE IN ACTION 2021 IMPACT REPORT
## Fighting for a free and fair democracy!



## Fighting Voter Suppression

Without the protection of the Voting Rights Act and with one-party control of the Texas Legislature, the League stands up to increased government efforts to suppress the vote.
WINS!

- We stopped the most extreme suppressive elements of the 87th Legislature's voting and elections omnibus bill.
- We activated the voices of members and supporters to send 242,000 emails to Senators, Representatives, and state leadership.
- We won incremental voting process improvements, such as ballot tracking and online mail ballot curing.



## Defending Democracy in the Courts

At the federal level, we litigate to support Texas voters:

- Filed an amicus brief against the proposal to exclude undocumented immigrants from the Census count.
- Filed a lawsuit against the State of Texas about the Anti-Voter Bill, SB1.
- Filed redistricting litigation supporting Black, Latinx, and Asian American & Pacific Islander coalition districts.
- LWVUS filed an amicus brief opposing the SB8 anti-abortion law.

At the state level, we continued to fight:

- Filed a lawsuit about the mail-in ballot signature process (Richardson v. Hughs)
- Filed an amicus brief at the Texas Court of Criminal Appeals in support of Ms. Crystal Mason's petition for review of her conviction for voting "illegally."

## Fair Maps Texas

**Strengthening the voices of voters of color in Texas.**
Despite the pandemic, Leagues all across Texas took action both at the Capitol and locally in support of fair maps.
League members took action in Corpus Christi, El Paso, Hays County, Tarrant County, and Tyler/Smith County.

*All communities, no matter their race, deserve fair representation, yet our legislators have drawn electoral maps that silence the voices of communities of color in Texas."*

Grace Chimene, president League of Women Voters of Texas.

## Women's Health & Reproductive Choice

The League of Women Voters of Texas advocated strongly against attempts by the Texas legislature to roll back reproductive rights. Bodily autonomy is a personal right. We hope for a victory from the US Supreme Court for Texans who may become pregnant.

## Equal opportunity/LGBTQ Rights

We fought for transgender children who deserve equal opportunities to participate in sports, regardless of gender identity.

## Gun Safety

Despite opposition from the League, law enforcement, and the general public, unregulated carry of handguns is signed into law.



*League members and supporters from across Texas valiantly contacted Legislators 240,000 times.*

OCA-APPX-1830

OCAGH_00002274

# EMPOWERING VOTERS. DEFENDING DEMOCRACY.

## The Power of Collaboration

### Texas Legislature, Don't Suppress Our Votes!

RevUp Texas and Leagues create advocacy videos to support voters with disabilities.



  

### Democracy is Good For Business

Texas LULAC, Texas NAACP, and the League called on Texas businesses, to support democracy. More than 40 businesses signed up!

### Creating Voter Education Videos

League members from across Texas helped create videos on the eight Constitutional Amendments in English and Spanish

Andi Di - Texas
Teresa Carbajal Ravet - Hays
Susana Carranza - Austin Area
Cali Franks - Tarrant County
Bennet Leff - Austin Area
Brianna Poe - Dallas

Tina Majdinasab- Wichita Falls
Brenda Moctezuma - Latinitas
Alex Rarick - Bay Area
Ian Seamans - Collin County
Ruju Shah - Fort Bend



Teresa, League of Women Voters of Texas
LWV Hays County

## Empowering local Leagues

### Unleashing the power of local Leagues:

- LWVTX provided VOTE411 coverage to all local Leagues. VOTE411 use in a Constitutional Amendment Election year skyrocketed! 141,462 voters or three times as many users accessed VOTE411 in 2021 compared to 2017!
- With a grant from the Democracy Fund, LWVTX offered local Leagues *Club Express*, an online platform that includes a website League template, communications, and data management.
- LWVTX granted $18,000 to 21 Leagues to "Get Out The Vote!"
- LWVTX facilitates monthly Zoom calls for League Presidents, Treasurer, Voter Services, and Membership leaders to share best practices, strategize, and build community.
- LWVTX organized workshops: *The Welcoming League, Civic Learning & Civil Dialogue, and Being League in this Political Climate.*
- Leagues celebrated voting & civil rights history on social media throughout the year.

 

 

### Growth Through Media

YouTube - 892 subscribers
Facebook - 13,619 followers
Twitter - 5,026 followers
Instagram - 3,341 followers
Texting - 6000 Texans received action alerts & voting reminders



*"Thank you for putting together such a terrific website that succinctly and objectively summarizes everything a voter needs to know."* James Webb, voter

OCA-APPX-1831

OCAGH_00002275

## Funding the Mission



**Corporation Funding** 3%
**PPP Loan** 5%
**Grants** 29%
**Individual Donations** 37%
**Publications** 5%
**Events** 1%
**Investments** 3%
**Membership** 17%

**LWVTX Income $320,308**



**League Support** 22%
**Administration** 18%
**Defending Democracy** 21%
**Empowering Voters** 34%
**Fundraising** 5%

**LWVTX Expenditures $207,864**

LWVTX is a 501(c)(3) nonprofit non-partisan citizen education and research organization that promotes participation in government and seeks to influence public policy through education and advocacy. The League neither supports nor opposes political parties or candidates..

# Local Leagues in Action!





# Leave a Legacy!



Become a member of the Minnie Fisher Cunningham Society! By including a gift in your will to sustain the League, you will help Make Democracy Work in Texas forever!

Minnie Fisher Cunningham was the first Executive Secretary of the League of Women Voters. The Texas native was also the first female pharmacy student at the University of Texas and the first woman to run for the Texas Senate. Members of the Minnie Fisher Cunningham Society continue empowering voters and defending democracy into the future by naming the League in their wills for a bequest.

What will be your legacy? For more information visit https://lwvtexas.org/planned-giving or call the LWV Texas office at 512-472-1100.

Grace Chimene, President (Austin Area), Janet Imhoff, Vice President (Collin County), Dorothy Marchand, Vice President (Austin Area), Janis Richardson, Vice President (South Central Texas), Marguerite Scott-Johnson, Vice President (Hill Country), Elaine Wiant, Treasurer (Dallas), Susan Bergen Schultz, Secretary (Austin Area), Joyce LeBombard (Austin Area), Susan Majors (Richardson), Stephanie Swanson (Austin Area), Deb Treece, (Hays County), Yvonne Wade Sanchez (Fort Bend County) Linda Vaughn (Amarillo).
Aileen Jacinta McMurrer, Executive Director

OCA-APPX-1832

# Exhibit 116

OCA-APPX-1833

# Bylaws

## League of Women Voters of Texas

A 501(c)(3) Corporation

Adopted June 19, 1947
Amended 1956, 1958, 1960, 1962, 1966, 1968, 1970, 1971, 1973, 1975, 1977, 1979, 1981, 1983, 1985, 1987, 1989, 1991, 1993, 1999, 2001, 2003, 2006, 2008, 2010, 2012, 2016
Amended January 4, 2019 as a new nonprofit corporation, 2020, 2021

## ARTICLE I. NAME

The name of this organization shall be League of Women Voters of Texas, hereinafter referred to in these bylaws as LWVTX, or, as the League or state League. This state League is an integral part of the League of Women Voters of the United States, hereinafter referred to in these bylaws as LWVUS.

## ARTICLE II. PURPOSES AND POLICY

### Section 1. Purposes

a. The purposes of the LWVTX are to promote political responsibility through informed and active participation in government and to act on selected governmental issues. b. The corporation is organized and operated exclusively for charitable and educational purposes under Section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code. Notwithstanding any other provision of these bylaws, the corporation shall not carry on any other activities not permitted to be carried on by a corporation exempt from federal income tax under such provisions of the Internal Revenue Code. No substantial part of the activities of the corporation shall be attempting to influence legislation.

### Section 2.Policies. The policies of the LWVUS are

a) Political Policy. The League shall not support or oppose any political party or any candidate.

b) Diversity, Equity & Inclusion Policy. The League is fully committed to ensure compliance - in principle and in practice - with LWVUS' Diversity, Equity, and Inclusion Policy.

## ARTICLE III.MEMBERSHIP

### Section 1. Eligibility

Any person who subscribes to the purposes and policy of the League shall be eligible for membership.

### Section 2. Types of Membership

a. *Voting members*. Persons at least 16 years of age who join the LWVTX shall be voting members of the local and state Leagues of their place of joining and of the LWVUS;

1) those who live within an area of a local League may join that League or any other local League;
2) those who reside outside the area of any local League may join a local League or shall be state members;
3) those who have been members of the League for 50 years or more shall be life members excused from the payment of dues.
4) Those who are students are defined as individuals enrolled either full or part time with an accredited institution.

b. *Associate members*. All others who join the League shall be associate members.

## ARTICLE IV. LOCAL LEAGUES AND LEAGUES AT LARGE

### Section 1. Local Leagues

a. Local Leagues are those Leagues within the state of Texas that have been so recognized by the LWVUS.
b. The board of directors, hereinafter also referred to as the state board, shall recommend to the board of the LWVUS, hereinafter referred to as the national board, that it recognize as a local League any

OCAGH_00015342

group of members of the League in any community within the state provided the group fulfills recognition requirements.

    c. In the event of recurrent failure of a local League to fulfill the national and/or state requirements, the board of the LWVTX shall recommend to the national board that it withdraw recognition from such local League. In the event of the dissolution of the local League, all monies and securities that may at the time be owned or under the control of the local League shall be paid to the LWVTX after the local League board has paid or made provision for the payment of all liabilities of the local League. All other property of whatsoever nature, whether real, personal, or mixed, which may at the time be owned or under the control of the local League, shall be disposed of to such person, organization, or corporation for such public, charitable, or educational use and purposes as the state board in its absolute discretion may designate.

## Section 2. Leagues at Large

    a. The state board may authorize the establishment of Leagues at Large, composed of state members, where feasible. Leagues at Large shall operate within the limitations established by the LWVUS and within guidelines adopted by the state board.

    b. In the event of recurrent failure to adhere to guidelines for Leagues at Large or to operate within the limitations established by the LWVUS, the state board may withdraw approval of the League at large. All assets held by a League at Large from which approval has been withdrawn shall be turned over to the state League.

# ARTICLE V. OFFICERS

## Section 1. Election, Qualifications, and Term

The officers of the LWVTX shall be a president, four vice presidents, a secretary, and a treasurer. They shall be voting members of the LWVTX and shall be elected by the convention to hold office for 2 years beginning June 1 of the year of their election or until their successors have been elected and qualified. The same person shall not hold both the offices of president and secretary.

## Section 2. The President

The president shall have such powers of supervision and management as customarily pertain to the office; shall preside at all meetings of the organization and the state board, or designate another person to do so; shall be, ex officio, a member of all committees except the nominating committee; may sign or endorse checks, drafts, and notes in the absence or disability of the treasurer; and shall perform such other duties as the state board may direct. ## Section 3. The Vice Presidents

At its first board meeting the new state board shall designate one vice president who, in the event of the absence, disability, resignation, or death of the president, shall assume the office of president. Should that vice president be unable to serve as president, the state board shall choose one of its other elected members to fill the vacancy. The vice presidents shall perform such duties as the president and state board direct.

## Section 4. The Secretary

The secretary shall keep or cause to be kept minutes of convention, statewide conference, and meetings of the state board. The secretary shall notify all officers and directors of their election and shall sign with the president all contracts and other instruments when so authorized by the president, and shall perform such other duties as the president and state board shall direct.

## Section 5. The Treasurer

The treasurer shall perform such duties as customarily pertain to the office; arrange for an at least biennial professional review of the books; and, at the direction of the state board, maintain deposits in authorized financial institutions. The treasurer may sign, with written authorization from the president, contracts and other financial agreements, and shall provide copies of such documents to the secretary for archiving.

# ARTICLE VI. BOARD OF DIRECTORS

## Section 1. Selection, Qualifications, and Term

The board of directors shall consist of the officers of the LWVTX, six directors elected by the convention, and not more than six directors appointed by the elected members of the board. All directors shall be voting members of the LWVTX and shall serve for 2 years beginning June 1 of the year of their election, or until their successors have been elected and qualified. Vacancies other than thepresidency may be filled by vote of the remaining members of the board. ## Section 2. Powers

The state board shall manage and supervise the business, affairs, and activities of the LWVTX subject to

OCA-APPX-1835

OCAGH_00015343

the instruction of the convention. The board shall plan and direct the work necessary to carry out the program on state governmental matters as adopted by the convention. It shall accept responsibility for the organization and development of local Leagues and Leagues at Large, the promotion of League program, financial development, and such other matters as the national board may from time to time delegate to it. It shall have the power to create such special committees, as it deems necessary and shall perform such other duties as are specified in these bylaws. Any committee with the authority to carry out the powers exclusive to the board in the management of the League shall have at least two committee members, and a majority of those members must be board members.

## Section 3. Meetings

At least three regular meetings shall be held annually at such time and place as the board may determine. The president may call special meetings and, upon the written request of at least five members of the board, shall call a special meeting. Notice of all regular meetings shall be given at least 2 weeks before the meeting, and notice of all special meetings shall be given at least 3 days before the meeting. During a convention or statewide conference, the president may, or upon the request of at least five members shall, call a special meeting by giving written notice to each member of the board. Special meetings may be held by electronic communication. Any one or more members of the board may participate in a meeting by means of electronic communications equipment, so long as all participants in the meeting can simultaneously hear each other. Participation by such means shall constitute presence at the meeting.

## Section 4. Actions Without a Meeting − Written Consent

Any action required or permitted to be taken at any meeting of the board of directors may be taken without a meeting, if a majority of all directors expressly approve the action in a written or electronically transmitted consent, and such collective consent is filed in paper or electronic form with LWVTX corporate records. Each consent must be dated and clearly indicate the director from whom it is issued, either by signature or other means of identification (such as an email address). If an action is approved in this manner, prompt follow-up notice of the action must be provided to each director who did not provide consent in writing.

## Section 5. Absences

Unexcused absences from two consecutive board meetings or three unexcused absences from board meetings in a biennium shall be considered a resignation from the board. ## Section 6. Quorum

A majority of the members of the board of the LWVTX shall constitute a quorum.

## Section 7. Indemnification and Limitation of Liability

The directors and all officers or other appointed representatives of the LWVTX shall be indemnified and their liability shall be limited to the fullest extent authorized by the Texas Non Profit Corporation Act, Article 1396-2.22A, Vernon's Annotated Civil Statutes, as it now exists or hereafter may be amended and by the Charitable Immunity and Liability Act, Chapter 84 of the Civil Practices and Remedies Code.

## Section 8. Removal From Office

In executing the duties of their office, board members are expected to carry out applicable laws and regulations as well as League bylaws, mission, policies, principles, positions, standards, and procedures. Board members who do not shall be counseled. If violations persist, they may be removed from office by a two-thirds vote of the board of directors. A board member may resign at any time by providing written notice to LWVTX.

# Article VII. Convention

## Section 1. Place, Date, and Call

A convention of the LWVTX shall be held biennially in the even-numbered years at a time and place determined by the state board. A first call to convention shall be sent to the presidents of local Leagues, to the chairs of Leagues at Large, and to state members not in Leagues at Large at least 120 days before the date fixed in said call. Thereafter, the state board may advance or postpone this date by not more than 14 days. A final call, giving the exact time and place of the convention, shall be issued at least 42 days before the session opens.

## Section 2. Composition

The convention shall consist of

    a. the president of each local League/League at large or an alternate, in the event the president is unable to attend;

    b. delegates chosen by members of local Leagues/Leagues at Large as follows: One delegate for the first 15 voting members, and one delegate for every 10 additional voting members or major fraction thereof.

OCAGH_00015344

The official membership count shall be determined by state office records of voting members as of January 31 of the year in which convention is held; and c. the members of the state board.

## Section 3. Delegate Qualifications and Voting

All delegates shall be voting members of the LWVTX. The convention shall be the sole judge of whether or not a delegate is qualified to vote. Absentee or proxy voting shall not be permitted. A majority of delegates present shall be sufficient to approve actions, as long as the conditions for a quorum are met (except as provided below).

## Section 4. Powers

The convention shall adopt a program; elect officers and directors, the chair and two members of the nominating committee; adopt a budget; and transact such other business as may properly come before it.

## Section 5. Quorum

A quorum shall consist of a majority of the delegates registered at the convention provided that no fewer than a majority of local Leagues are represented.

# Article VIII. Statewide Conference

## Section 1. Place, Date, and Call

A statewide conference may be called as needed at a time and place determined by the state board. A formal call shall be issued to local League presidents and chairs of Leagues at Large at least 30 days before a statewide conference meeting.

## Section 2. Purpose

The purpose of the statewide conference shall be determined by the interests and needs of members, local Leagues, Leagues at Large, and the state board. The statewide conference is open to all League members. Business may be conducted if necessary.

## Section 3. Conduct of Business

a. In event of conduct of business, eligible voters will be as follows:

1) the president of each local League or an alternate, in the event the president is unable to attend; and one other delegate chosen by the local League board. Each League at Large with at least five members shall be entitled to one voting delegate; and

2) the members of the state board.

b. *Quorum.* A majority of voting delegates registered at statewide conference shall constitute a quorum provided that no fewer than a majority of local Leagues are represented.

c. A majority of those delegates present shall be sufficient to approve actions, if the conditions for a quorum are met (except as provided below).

## Section 4. Powers

a. In the event of conduct of business, the statewide conference may give guidance to the state board on program and methods of work.

b. In the event of an emergency, the statewide conference may change the program upon recommendation of the state board or a local League, using the following procedure:

1) Any local League proposing a change shall submit it to the state board at least 60 days before a proposed statewide conference; the state board shall decide whether or not to recommend the change.

2) At least 30 days before the statewide conference, the state board shall send to the presidents of local Leagues all proposed changes.

3) A majority vote of the delegates present and voting shall be required for consideration of any change proposed by a local League and not recommended by the state board.

4) A two-thirds vote of the delegates present and voting shall be required to adopt any change.

c. The statewide conference may transact other business that may properly come before it.

# ARTICLE IX. NOMINATIONS AND ELECTIONS

## Section 1. Nominating Committee

The nominating committee shall consist of five members. The chair and two members, who shall not be members of the state board, shall be elected by the convention. At its first board meeting, the state board

OCA-APPX-1837

OCAGH_00015345

shall appoint two of its members to the committee. Vacancies shall be filled by appointment by the state board maintaining the off board/on board representation. Section 2. Suggestions for Nominations

The chair of the nominating committee shall request suggestions for nominations through the president of each local League and the chairs of Leagues at Large by advising them of the offices to be filled and the address to which suggestions are to be sent. Members may submit suggestions directly to the committee.

## Section 3. Report of the Nominating Committee

The report of the nominating committee, containing its nominations for officers and directors and the chair and two members of the next nominating committee, shall be sent to the presidents of local Leagues and to the chairs of Leagues at Large at least 30 days before the convention. The report of the nominating committee shall be presented to the convention on the first day of the convention. Nominations may be made from the floor immediately thereafter provided the consent of the nominee has been obtained.

## Section 4. Election

The administration of the election shall be the responsibility of an election committee appointed by the president on the first day of the convention. Election shall be by ballot except that if there is only one nominee for an office it shall be by voice vote. A majority vote of the delegates present and voting shall constitute an election.

# ARTICLE X. PRINCIPLES AND PROGRAM

## Section 1. Principles

The principles are concepts of government adopted by the national convention and supported by the League as a whole. They are the authorization for the adoption of national, state, and local program.

## Section 2. Program

The program of the LWVTX shall consist of action to implement the principles and those state governmental issues chosen by the convention, or statewide conference, using the procedure outlined in Article VIII, Section 4, for concerted study or concurrence and action as follows: a. Local League/League at Large boards may make recommendations for state program,
    including proposed concurrence, to the state board at least 3 months before the convention or statewide meeting.
b. The state board shall consider these recommendations and formulate a proposed program, which shall be sent to the presidents of local Leagues and to the chairs of Leagues at Large at least 30 days before the convention or statewide conference.
c. Any League or the state board that plans to propose the adoption or amendment of a state League position by concurrence on the floor of the convention shall give notice to the state office to be sent to all local Leagues/Leagues at Large and the state board, of its intent to do so at least 6 weeks before the convention. The proposing League or state board shall send background information, including pros and cons on the issue and an explanation of the rationale for using this form of member agreement to the state office, and the state office shall send the information to all local Leagues, state board, and Leagues at Large at least 30 days before convention.
d. The convention shall adopt the proposed program by a majority vote on each subject presented to it. A program recommendation submitted to the state board at least 3 months prior to convention but not proposed by the state board may be adopted by the convention if its consideration is ordered by a majority vote of the convention. A two-thirds vote is required to adopt a nonproposed item, or to amend or adopt a state League position by concurrence on the floor of the convention.

## Section 3. Program Action

Local Leagues/Leagues at Large may act on program only in conformity with positions taken by the LWVUS or the LWVTX. Local Leagues, Leagues at Large, or members may act on program at the state level in the name of the League only when authorized to do so by the state board.

# ARTICLE XI. NATIONAL CONVENTION AND COUNCIL

## Section 1. National Convention

The state board, at its earliest meeting of the year in which the convention is held, shall elect delegates to the national convention in the number allowed the LWVTX under the provisions of the bylaws of the LWVUS.

OCA-APPX-1838

OCAGH_00015346

## Section 2. National Council

The state board, at its earliest meeting of the year in which the council is held, shall elect delegates to the national council in the number allowed the LWVTX under the provisions of the bylaws of LWVUS.

# ARTICLE XII. FINANCIAL ADMINISTRATION

## Section 1. Fiscal Year

The fiscal year of the LWVTX shall be from June 1 to May 31 of each year.

## Section 2. Financial Support

a. Annually the local Leagues shall assume financial responsibility for the work of the LWVTX. b. Each local League shall make an annual per member payment to the LWVTX in an amount to be determined by a three-fifths vote of the delegates present and voting at each convention. When two or more members reside at the same address in a common household, the payment determined by the convention shall be made for the first member; a payment equal to one-half the per member payment shall be paid for each other member. A local League shall be excused from making a per member payment for life members. Each state member shall pay annual dues to the LWVTX in an amount set by the state board.

c. Student members enrolled in a school or university shall pay an annual per member payment at a reduced rate.

d. Responsibility for additional support for the LWVTX shall be assumed by the state board, which shall develop and solicit other sources for funding the state League and shall encourage supporters of the state League to contribute also to any local Leagues in their area.

## Section 3. Budget Committee

A 2-year budget shall be prepared by a committee appointed for that purpose at least 180 days before the convention. The committee shall include at least two board members and one nonboard member, and shall include the treasurer, who shall be ex officio but shall not be eligible to serve as chair.

## Section 4. The Budget

The state board shall send to the presidents of local Leagues and to chairs of Leagues at Large, at least 30 days before the convention, a proposed 2-year budget. A budget shall be adopted by a majority vote except that the per member payment shall be approved as provided in Section 2 of this Article.

## Section 5. Conflicts of Interest

The board of directors shall adopt a conflict-of-interest policy and an annual disclosure process that applies to all officers and directors of LWVTX.

## Section 6. Distribution of Funds on Dissolution

In the event of the dissolution of the LWVTX, after paying or making provision for the payment of all the liabilities of the LWVTX, all assets of the LWVTX shall be distributed to an organization that is recognized as exempt under Internal Revenue Code Section 501(c)(3), or the corresponding section of any future federal tax code, and that is part of the League of Women Voters national organization. If no such organization is then in existence, then the LWVTX assets, after paying or making provision for the payment of all the liabilities, shall be distributed for one or more of the LWVTX exempt purposes within the meaning of Internal Revenue Code Section 501(c)(3), or shall be distributed to the federal government, or to a state or local government, for a public purpose. The manner of distribution and recipient(s) of the LWVTX assets shall be determined by the board or such other persons as shall be charged by law with the liquidation or winding up of the LWVTX and its affairs.

# ARTICLE XIII. PARLIAMENTARY AUTHORITY

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the organization in all cases to which they are applicable and are not inconsistent with these bylaws.

# ARTICLE XIV. AMENDMENTS

These bylaws may be amended at any convention by a two-thirds vote of delegates present and voting provided that the proposed amendment was submitted to the state board at least 120 days before convention by a local League board, or has been proposed by the state board. The state board shall send all such proposed amendments, together with the board's recommendations, to the presidents of local Leagues and to the chairs of Leagues at Large at least 30 days before the convention.

OCAGH_00015347

# Exhibit 117

    



I will vote in every election to stand up for what matters most to me, my family, and my community!





# League of Women Voters of Texas

@LWVTexas ·   4.8 51 reviews    · Nonprofit organization

■ Learn more

■ lwvtexas.kindful.com

| Home | About | Events | More ▾ | ■ Like | ■ Message | ■ | ••• |

**League of Women Voters of Texas**
March 30 · 🌐

Texas' new voting law disenfranchised 15% of El Paso's absentee voters, the county's longest-tenured and most active voters, during the March 1 primary.
Learn more LWVTexas.org



OCA-APPX-1841

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015683

                                                 

ELPASOMATTERS.ORG

**New Texas voting law disenfranchised some of El Paso's longest-tenured voters - El Paso Matters**

😞👍😲 19                                    2 Comments  8 Shares

| ▣ Like | ▣ Comment | ▣ Share |
|---|---|---|

Most relevant ▣

▣ Write a comment...                                    ▣ ▣ ▣

Press Enter to post.

**Sterling Page Lauer**
Is there a lawsuit in the works to contest the recent election law here in TX?

**Like  Reply**  15w

Most Relevant is selected, so some comments may have been filtered out.

**Other posts**



**League of Women Voters of Texas**
1d · 🌐                                                    •••

Join the conversation TONIGHT!!!

Register for the free webinar here: https://bit.ly/lwvtx-gun-reform-webinar.





OCA-APPX-1842

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)                                          OCAGH_00015684

                      

**League of Women Voters of Texas**
3d · 🌐

Join the conversation! The League of Women Voters of Texas will be co-hosting a free webinar "Assault Rifles - What can be done?" with Texas LULAC and the NAACP... **See more**

👍 7                                                    5 Shares

|  Like  |  Comment  |  Share  |

Most relevant ▪



⬤  Write a comment...                          ▪ ▪ ▪

Press Enter to post.

---

 **League of Women Voters of Texas**
1d · 🌐                                              ...

Zahra Biabani, we are so proud of you!
We love to see our former interns expand on League values and principles after graduation.



TED.COM
**The eco-creators helping the climate through social media**
"Climate doom-ism," or a pessimistic outlook on the future of the p...


⬤  See how the average temperature in your area is changing.
**Explore Climate Science Info**                    ▪



CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

                    OCA-APPX-1843

OCAGH_00015685

 

🔍

\+  💬  👻

Like          Comment          Share

Write a comment...
Press Enter to post.

 **League of Women Voters of Texas**
2d · 🌐

...



Election Protection
**CLE Series**
(Continuing Legal Education)

July 13 - August 10
**Every Wednesday | 6 PM CST**

Register:
 **bit.ly/electionprotectioncle**



**Texas Civil Rights Project**
2d · 🌐

Are you interested in voting in Texas? Are you a Texas attorney who needs CLE credit?

Join us for our Election Protection CLE Series, every Wednesday night at... **See more**

👍 1                                    2 Shares

Like          Comment          Share

Most relevant ◾

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCA-APPX-1844

OCAGH_00015686





Press Enter to post.

Most Relevant is selected, so some comments may have been filtered out.



OCA-APPX-1845

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)
OCAGH_00015687

# Exhibit 118



OCA-APPX-1847

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00002339

Please indicate the League where you are a member

609 responses

Dallas

Austin

Austin Area

Hays County

Houston

San Antonio

Tarrant County

Corpus Christi

San Antonio

OCA-APPX-1848

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00002340

# Exhibit 119

OCA-APPX-1849

Submitted to the Court via USB Drive
Under Seal

# Exhibit 120

OCA-APPX-1851



<div style="border">

### League of Women Voters of Texas Statement on the Impact of SB 1 on Elections

</div>

**For Immediate Release**
September 7, 2021

**Contact Information**
**Grace Chimene**
**512-940-9948**

**AUSTIN, TEXAS**--*The League of Women Voters of Texas president, Grace Chimene, issued the following statement in response to Governor Abbot's signing of the elections bill, SB 1.*

During the last election cycle, Texans all over the state benefited from more voting opportunities, such as expansion of early voting, extended hours at the polling places, and more options to return vote-by-mail ballots. These are the kinds of measures that Texans want. With the enactment of SB 1, these measures are now prohibited. SB 1 adds to the morass of our election laws by using broad and confusing language, creating barriers to voting, and adding criminal offenses.

The following are the League's highest concerns, which are shared by a number of other nonpartisan groups as well.

- SB 1 threatens election officials with criminal prosecution for enacting procedures to meet local community needs to increase voter participation;
- It threatens advocacy groups and individuals with felony prosecution for providing needed assistance to voters at polling locations and with mail ballots;
- It limits the ability of election judges to remove disruptive or intimidating partisan poll watchers;
- SB 1 allows partisan poll watchers to take election officials to court over perceived obstruction.

OCA-APPX-1852

OCAGH_00010572

In addition, there are several other measures in the bill that will make voting more confusing and thus harder. For instance mail voters are now required to include the ID number contained in their original registration records when applying for or returning mail ballots. Also it will be harder for some voters to participate because this legislation bans ballot drop boxes and drive-through voting.

Other measure work against our hard-working elections officials such as requiring new procedures for purging lists of registered voters, and threatening local officials with loss of employment and civil penalties for failing to maintain voter lists to the satisfaction of the Secretary of State. The law also requires audits which disproportionately target our more populous counties.

All in all, this legislation is a step backward for voter participation and will do nothing to address the possibility of fraud.

The League of Women Voters of Texas (LWVTX) is a nonpartisan citizens' organization that has fought since 1919 to improve our government and engage all citizens in the decisions that impact their lives. It represents 31 Leagues and more than 7000 members and supporters throughout Texas.

The League of Women Voters never supports or opposes candidates for office or political parties. The member-driven organization of women and men encourages the informed and active participation of citizens in government and seeks to influence public policy through education and advocacy of positions based on extensive issue study and consensus.

# Exhibit 121



**TESTIMONY**

**LEAGUE OF WOMEN VOTERS OF TEXAS**

**Federal Subcommittee on Elections, Committee on House Administration**

**March 17, 2022**

This testimony is on behalf of the League of Women Voters of Texas about Voting in America: "Ensuring Free and Fair Access to the Ballot in Texas". We appreciate the opportunity to share our perspective.

During the 2020 General Election, Texans all over the state benefited from more voting opportunities, such as expansion of early voting, extended hours at the polling places, and more options to return vote-by-mail ballots.

But recently, Texas held the first 2022 primary election in the nation under the additional stress of a new, massive election bill, Senate Bill 1, which created even more challenges for voters in Texas. The new election law caused heart-breaking confusion among voters throughout the primary election. Most notably, the new ID number requirements that needed to be added in Ballot by Mail applications and ballot carrier envelopes complicated voting. These new requirements hit older voters and voters with disabilities particularly hard. The final election reports show an extraordinary percentage of vote-by-mail ballots were rejected (Texas Tribune article 3.11.22). But election officials were not allowed to promote or even educate voters about the new Ballot by Mail processes under threats of criminal prosecution. Senate Bill 1 also targeted all the previously mentioned expansions to voting opportunities by outright prohibiting them.

Election officials were also overwhelmed with the major overhaul to the election laws. The Secretary of State's office, which had the enormous task of carrying out the massive updates to the Election Code, was late in providing updates to its website, in training county election officials, and in sharing official guidance to county election officials on these major changes. Voter education and voting access were the casualties of the draconian changes in election law and severe delay in useful and vital education. It is a tragedy for our democracy when state leaders choose to support a partisan agenda

instead of voters when writing state election law resulting in a massive rejection of vote-by-mail ballots.

Texas voters were able to submit annual vote-by-mail applications beginning January 1, 2022. Yet, when volunteers with the League of Women Voters of Texas conducted a [Primary Election County Election Website review](#) in early February, they noted that the Texas Secretary of State updated the link to the Application for a Ballot by Mail PDF (ABBM), but eligibility and instructions for the new application were not updated. It was not until February 6th, **more than a month after voters 65 and over and voters with disabilities began to fill out their annual applications**, that the state website, VoteTexas.gov, was finally updated. We found that, of the 254 counties in Texas, only 120 (47%) provided up-to-date vote by mail information. Five counties still offered the outdated ABBM. The new Secretary of State's mail ballot tracker was offered by only 74 (29%) counties.

In addition to new voting requirements, the new election law also made election officials subject to new criminal penalties and provided more authority to partisan poll watchers. Voters reported unplanned closures of polling sites due to lack of election workers ([Texas Tribune article 3.1.22](#)).

Our primary election did not need to be difficult for voters. The League of Women Voters of Texas and our voting rights partners [warned the Texas Legislature](#) that SB1 would have negative consequences for voter access in our state. Because of this new election law, too many voters were silenced during our primary elections. It is critical that the Secretary of State show a real urgency in fixing many of the voting challenges before the November General Election. In particular, the League believes that the Secretary of State needs to work in collaboration with counties to address the obstacles voters faced in the primaries. The League of Women Voters of Texas will continue to support voter education and provide useful information to encourage voters to participate in our elections.

Texas is one of many states that is going backwards in ensuring the right to vote. What used to be a pride of bipartisan collaboration, is now relegated to political sound bites. The federal *Voting Rights Act* **must be restored** to ensure that every voter in Texas—regardless of where they live, what they look like, how old they are, if they have disabilities or what language they speak—has equal access to the ballot box and is protected from unfair laws and practices that make it harder for people to vote.

Below you will find information collected directly from Texas voters about the challenges they faced in the primary election because of the new law. We have omitted

identifying details, but we hope the stories represented will provide you with the personal connection to the issues that are created when lawmakers seek to limit access to voting.

For additional information, please contact: Grace Chimene, President, League of Women Voters of Texas gchimene@lwvtexas.org

The League of Women Voters is one of America's oldest and most trusted civic nonprofit organizations. Formed in 1919, the League of Women Voters of Texas represents over 13,000 grassroots advocates and 34 local Leagues across the State of Texas.

The League of Women Voters never supports or opposes candidates for office or political parties. We encourage the informed and active participation of citizens in government and seek to influence public policy through education and advocacy.

**Addendum: Stories from Texas Voters**

After the March 1st primary election, The League of Women Voters of Texas conducted a *Share your voting story* survey. The form gathered stories from Texas voters about voting in that election and asked questions about the voting experience in the wake of the new law. LWVTX hopes the stories collected through this form will help to determine the impact that the new voting procedures had on Texas voters. Voters from 26 counties have replied to the survey so far and the survey is still active.

The following excerpts (with identifying information removed) illustrate the struggles that Texas voters faced when they sought to apply for a vote by mail ballot and then cast their vote by mail.

**Survey Responses**

"When I checked about it, I found no evidence that I had applied!"

"We signed up several years ago. For the first time since signing up we did not get our mail in ballot."

"I live in ***** and had a special election at the end of January. I am disabled and vote by mail. I emailed the ***** County elections division about the procedure. There was some confusion on their part; one person told me they could not receive applications until after January 1st, but then I got an official signed response from someone who said that the special election was an exception. I didn't realize that I had to use the same number to register that I had used when I first registered, but I entered my driver's license number, and that turned out to be correct.

"My mailed-in application for a BBM had not appeared in the online tracker showing it had been received late the following week, so I sent a pre-scanned copy in an email. I received an email confirming my application was received and a ballot being sent to me. Once I received the BBM and returned it, I checked online and couldn't tell if it had been received. So, I called and was told it had arrived and been counted before election day."

"I was frustrated that the lookup of the progress of the acceptance of my ballot had changed, and my information seemed to confuse the new system and it was very difficult to find out if my ballots had been received and accepted."

"Definitely harder to comprehend than in the past, don't remember having to add ID NO. or SSN. MUCH DIFFICULT FOR ELDERLY VOTERS."

"After being denied twice, I got my ballot and mailed it back. ***** County shows it was received 3x on 2 dates, but the SOS doesn't show me as registered. I called the County Board to see if my ballot was counted, but haven't heard back"

"I received a call on a Saturday 10 days before the election day that my ballot's outside envelope did not have ID information. I was asked if I would like my ballot returned to me to correct the error and I said, "Yes." I received the ballot and sure enough I had missed seeing the spot that required me to give ID information. It was in small print, and I had overlooked that area. I filled out a new envelope that was sent and returned my ballot. I'm assuming it was delivered and counted. The interesting thing is that my husband did not have an ID on his envelope either because we marked our ballots and envelopes the same. They overlooked the error on his or just didn't bother to contact him and threw his ballot out. I was never able to track our ballots because the website kept shutting down. I'm always careful to make sure everything is filled out correctly. The fact the ID information was way at the top and very small was probably why I missed that needed information. I find it difficult to believe I'd be the only person to overlook that area. I'm sure the letter that came with the ballot did not mention that information was needed or I'm certain I would have noticed and given the ID information."

"I hand carried my mail-in ballot to the ***** County Courthouse during early voting and they would not accept it. The man even told me that I did not have to put a stamp on it, just drop it in the mailbox outside the courthouse. I later Googled and found that Texas DOES require postage, but I had already dropped it in the mailbox."

"When I voted in the January election, they used the old envelopes, and I didn't have to enter a number. When I voted in the March primary, I entered a number from my driver's license, which I assumed was correct, but I got an email saying that my ballot was rejected. That was quite upsetting. I tried to fix it myself online but was not able to, so I called ***** County. A woman there walked me through the process. There are two numbers on the driver's license, and I had entered the wrong one. I didn't even see the other number for some reason. I checked the status of my ballot some days later, and it said that it was accepted."

"I successfully completed my ballot by mail. My ballot was accepted. But it wasn't easy. First of all, the cumbersome ballot made it very difficult and the necessity to completely fill every box made me nervous. Also, the last minute ask for my email address phone number social security for digits and driver's license on that secret line underneath the envelope flap was really upsetting. I am a voter registrar, a

voter of many years, and an educated woman, so if it was difficult for me to figure out how to fill out that ballot, it must have been a nightmare for people who have fewer skills or experience. I'm very upset by the new laws."

"I voted by mail; vote has not been counted as of today March 7, 2022. I didn't sign the envelope b4 mailing. I made the correction Online. I have used tracking my ballot check Update on my ballot, no results yet. I have called five times to the election dept. No results, my vote remains Uncounted."

"I entered both SSN & TDL just to be sure I had the correct one & checked the box "for all elections." Received a letter asking me to reapply if I wanted a mail in ballot for the primaries, as there was a box, I missed next to "all elections" to specify which party for the primary. I received my ballot after early voting started. By that time there were already reports of how many mailed ballots were being rejected, so I voted in person & surrendered my mail-in ballot."

"I received the ballot promptly but when I voted it came back noting an error. I hadn't used the same ID as when I register evidently. I corrected over the phone but then received a ballot to correct what I had already corrected. Trying to verify that the corrected ballot had been received proved impossible."

"This experience really shook my confidence in my state government's handling of elections!"

"This was only my second time to vote by mail, and it was a lot harder this time! I don't know if my ballot got delivered or counted. I mailed it on the Friday before the election on Tuesday."

"It took 3 applications before I finally got the mail in ballot. After the second try the information said it was possible to correct my deficiency by email. But when I tried after great difficulty, I was informed that my application was never received."

"My experience was rocky. My first application for the mail-in ballot never arrived or was somehow misplaced at the ***** County Early Voting Clerk's office. The office had no record of my application. I learned this through the Mail-in Ballot Application Tracker and a subsequent phone call to the office. The representative there was helpful and advised me to complete a new application, which I did. The second application was accepted, and I eventually received my ballot with a little over a week to spare before the deadline for return.

I mailed the completed ballot, and it was delivered and received on 2/27. On 3/4, I received a "Notice of Carrier Defect" letter from the Secretary of State. It

indicated a #4 error, meaning that some information was omitted from the Carrier Envelope. When I repeatedly attempted to correct the error online following the convoluted instructions in the very poorly constructed letter, I continually received a "No voter could be found for the details entered" message.

When the offices opened on Monday 3/7, I called the ***** County Early Voting Clerk's office as directed in the letter. I explained the response to my online attempts to correct the error. The representative responded in a dismissive and patronizing way that she knew nothing about the website, that the "Corrective Action Form" was only available in person at the Early Voting Clerk's office in downtown *****. She told me to phone the Secretary of State's office. There I spoke with *****, who was exceptionally helpful. She explained that the problem was a lack of communication between the DPS and SoState databases that caused my DPS information to not be recognized by SoState and vice versa. She emailed very clear directions to "change", actually re-enter, my profile information into the DPS database. This action created the proper linkage and caused my ballot to be accepted. I've yet to see the result in the Ballot Tracker, but Ms. ***** assured me that my vote would be counted even though it might take several days to show acceptance in the Ballot Tracker. **All of this was apparently due to a software glitch that unknowingly affected untold numbers of voters!!!"**

"I didn't get notice that it was approved until after I voted. Therefore, I had to work with the judge to cancel the mail in ballot request before I could vote in person."

"I returned the mail-in ballot by mid-February, far in advance of the March 1 Primary Election Date. Imagine my surprise when --two days after election day -- a ballot rejection letter arrived. Like an idiot (or perhaps more like an average voter), I had incorrectly entered i.d. information on the INSIDE FLAP of the carrier envelope! Getting online to www.votetexas.gov and figuring out how to find the "Ballot by Mail Tracker" was a real challenge...there is no such item listed on the votetexas.gov home page.  I tried entering "Ballot by Mail Tracker" in the "search" option & got 1 hit: "zipmilitary-and-overseas-voters.ppsx."  I tried another search:  "track mail ballot" & got 4 hits, none of which included the words "Ballot by Mail Tracker."  I threw reason to the wind and clicked the 1st hit "Military and Overseas Voters."  And there it was on the sidebar:  Track Your Ballot by Mail! I clicked, then found I had to click through to yet another page where I filled out the form -- which was a challenge in and of itself -- and I found my ballot had been received and rejected Feb 22. So why did it take 11 days for me to receive the NOTICE OF CARRIER DEFECT letter??  I DID (as required by law) "correct"

my ballot online within 6 days after Election Day. As of today, March 9, my ballot is still under review. No wonder so many ballots were rejected and ultimately will not count in this election. This system is a travesty which has and will prevent thousands of voting by mail in any election. So much for free and fair elections..."

"My mom is 81. She had been requesting mail ballots during Covid but decided not to in this primary due to SB1. She switched to voting early in person."

"My husband received an application to apply for the vote by mail ballot as usual. I never received an application."

"I am over 65. I applied for a Ballot by Mail. On the ID question, you could list EITHER YOUR DRIVERS LICENSE OR THE LAST FOUR DIGITS OF YOUR SOCIAL SECURITY NUMBER. I thought it was an either/or question so I put down the last four digits. It was not indicated that whichever number you put down HAD TO BE THE SAME ONE YOUR USED IN YOUR INITIAL TEXAS VOTER REGISTRATION. In my case that would have been over 30 years ago, and I certainly didn't remember. I listed the last four digits of my social security number.

When I didn't receive my ballot, I called and was told that in ***** County the (mostly Democratic) election officials were aware of this voter suppression tactic in the GOP voting law. Since these election officials had access to my driver's license number through other databases, they were able to complete my application and I received my Ballot by Mail in enough time to vote."

"Never received it."

"The application is too long; the print is too small for seniors to read. The language is misleading/erroneous relative to required and optional information, leading voters to have their applications rejected. For example, instructing voters to fill in "one" of the numbers, leading to rejection of the application because of voters filling in the "wrong" number."

"I sent in my Application for Ballot by Mail in mid-January. I never received the mail ballot. I call **** County Elections Dept one week before March 1. The staffer said that I would receive my ballot that day or the next day. Ha! It never came."

"I applied for a BBM for my husband who is 80 and disabled now. The ABBM worked just fine. Ballot came within 2 weeks of the election day, and I mailed at US P.O. But I had conflicting info on various websites about the status of his

returned ballot and his vote. Several ways to track and one did not even recognize him as a voter!!"

"Rejected, said date was too late."

**Letters shared with League of Women Voters of Texas**

"Good afternoon, **** – you and our staff certainly deserve our huge thanks and appreciation for going "above and beyond" to get rejected ballots cured and the required documentation timely into your office!
It is actually embarrassing to me that my mail-in ballot was rejected; I read the instructions and knew about the requirement to supply TDL # and/or SSN – but honestly, after putting the ballot envelope into the carrier envelope and sealing it, I could NOT find a space to put in that information. (Now I know why – the place is UNDER THE FLAP, and needs to be provided before sealing the carrier envelope*). I assumed that the sticker that the elections office put on the envelope would be enough to identify me and that the ballot would be accepted – how wrong I was!

Of course, when I received your letter to say that my ballot had been rejected, I went on-line, as instructed, and tried to cure it that way, to save me a trip to your office in **** (since that is a 45-minute drive one-way). I followed instructions; gave my TDL and SSN, and upon review, it still said "rejected." So, I thought I'd give it a couple of days, and it would most likely be updated. Thank goodness I checked on the status again today; it still said "rejected," and that's when I called your office and was told today was the last day to bring the information in. I was eventually told that someone could come by to pick up the Corrective Action form.... I can only imagine how many people will not – or would not have – gone thru the trouble to cure a defective ballot – I am so angry at what the Texas Legislature did to us voters!
Well, anyway, thank you so much again – you're a rock star!"


"I was at an event on Saturday, March 5th and there was a LWV booth there.

I explained to them that I have voted since I turned 18 and now, I am 76 years old, I have never experienced as much trouble voting as I experienced this month.

I requested in a mail in ballot and that application was sent back to me and my husband as it was missing

party affiliation. I completed and sent back in. I did receive ballots for the both of us and completed and then sent in well before election.

Then we get a letter stating that we did not include the DL#/SS# on the envelope. I had not had to do this previously. We just returned from the election office and found that we now have to include the number on the envelope which is located under the flap. It was explained as a new edition to mail in ballots even though our numbers are included in our application. We did and hopefully now our vote counts.
I was told that you wanted to hear about these cases so you can document how this new voting law does indeed suppress the vote. I know that many people in this same situation would not go to the voting office to correct error. While we were there, there were two people who were trying to correct this same thing."

"I have voted in every election since I became eligible (except for 1960 when I was in the hospital with my newborn). I always vote. I picked up an application for ballot-by-mail at my residence (name of assisted living center). I completed the application, mailed it, and got back a letter that the application was rejected. So, I drove to the county elections office to file an application in person. I filled out the form and asked the person at the elections office to review it - which she did. I then submitted my application person."

**Tell us about your experience assisting a voter with the Ballot by Mail process.**

"I shared information with my children who are Texas residents and in college to apply for a mail in ballot. The process was challenging, and my kids chose not to vote in the primaries."

"I was a judge for early and election day. I served a lot of voters who had applied for VBM ballots and had not gotten them yet. SB1 molested the whole schedule - everything started late, people had to iterate because of missing information, and there were delays at the post office."

"Even though my husband and I are eligible for ballot by mail due to our age, we advised each other NOT to do so because we don't trust it because of the new laws implemented under Republican legislature."

"As a resident of *****, an independent living and health care community, I offered my assistance to numerous fellow residents. Some had the application for BBM rejected (some more than once). Some couldn't read it because of print size."

"I worked as an alternate judge at a Hays County vote center. We had several voters bring in mail-in ballots that had been returned by the Post Office."

OCA-APPX-1866

OCAGH_00015138

# Exhibit 122

| Email or phone | Password | |
| --- | --- | --- |
| | | Log In |

Sign Up

Forgot account?



**League of Women Voters of Texas**
February 19 ·

Don't forget!
1. Add your ID and the last four numbers of your social security number.
2. Include your contact information
3. After all the information is filled out, close the flap and sign the envelope.

**COMPLETE YOUR BALLOT BY MAIL**

**TEXAS STYLE**

-4:38

992 Views

**League of Women Voters of Texas**
February 3

New election laws mean new procedures for completing your Ballot by Mail. Watch the video to learn more about the required Voter ID numbers and the new oath for assisting a voter.
Go to LWVTexas.org or VOTE411.org for more information.
Call Election Protection if you need help voting.
https://866ourvote.org/

5                                                              4 Shares

Share

**Related Pages**

**Fair Maps Texas Announcements**
Community Organization

**Joey Gidseg**
Political Candidate

**League of Women Voters of Colli...**
Nonprofit Organization

**Frank Ortega Round Rock City C...**
Politician

**Young Democratic Socialists of ...**
Political Organization

**Texas Aspires**
Education

**March On Texas**
Community Organization

**TFN PAC**
Political Organization

**American Promise - North Texas**
Nonprofit Organization

**Common Cause Texas**
Nonprofit Organization

**Reliable Revolutionaries of San ...**
Community Organization

**Republican Party of Texas**
Political Organization

**Pages Liked by This Page**

**League of Women Voters of Lub...**

**See more of League of Women Voters of Texas on Facebook**

| Log In | or | Create new account |
| --- | --- | --- |

OCAGH_00014557



**LWV** League of Women Voters of Texas
Today at 10:41 AM

Tomorrow is the last day to register to vote for the May 7th electio... See more

| 1 | 2 Shares |

Share

**LWV** League of Women Voters of Texas
Today at 5:57 AM

Thursday, April 7th is the last day to register to vote for the upco... See more

| 6 | 24 Shares |

Share

**LWV** League of Women Voters of Texas
April 4 at 5:22 AM

"First, the Texas attorney general's office is arguing that private ... See more

| 10 | 4 Shares |

Share

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Meta © 2022

**See more of League of Women Voters of Texas on Facebook**

| Log In | or | Create new account |

OCAGH_00014558

# Exhibit 123

| From: | Grace Chimene [gchimene@lwvtexas.org] |
| on behalf of | Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org] |
| Sent: | 1/6/2022 9:11:17 AM |
| To: | secretary@sos.texas.gov; Keith Ingram [KIngram@sos.texas.gov]; Christina Adkins [CAdkins@sos.texas.gov] |
| CC: | Dorothy Marchand [dmarchand@lwvtexas.org]; Susan Schultz [sschultz@lwvtexas.org] |
| Subject: | Updates needed to votetexas.gov, texas.gov, county election websites |

John B. Scott, Texas Secretary of State

**The** League of Women Voters of Texas appreciates the Secretary of State's hard work implementing the new election laws. With the March Primary Election about to take place, it is critical **that voting** information be easy to find, written in plain language, and accurate on votetexas.gov, texas.gov, and all county election websites. Our democracy and the voters in Texas rely on this information.

Since December, when the major election law became effective, I have sent several emails regarding incorrect voter information on votetexas.gov.

County election administrators and voters across Texas rely on accurate voter information provided at votetexas.gov. The League has reviewed all 254 county election websites and the Secretary of State's websites in major elections since 2016. Our goal is to improve voter education. In our 2020 General Election review, we noted that **178 or 70% of county websites shared a link to votetexas.gov**. The county election website reviews are available on our website here. The county website review for the Texas Primary Election begins in February.

**Please note that we are getting notices that some counties have not updated to the new Application Ballot By Mail (ABBM) on their website. Please consider sending a reminder email.**

In preparation for our county website review, we will be reviewing votetexas.gov next Monday to gauge whether voters have access to needed information. Please consider this email as notice that voter information on the SOS website must be accurate and needs to be updated. In particular:

**votetexas.gov**

**Vote by Mail** - https://www.sos.texas.gov/elections/voter/reqabbm.shtml
January 1st was the first day that voters over 65 and those with a disability who wish to vote by mail were able to apply for the ABBM. Those voters and absentee voters need the correct information to fill out the **new** ABBM

Thankfully, the ABBM is accurate. The list of who is eligible to vote using ballot by mail and how to fill out the application has not been updated.

**Voter Registration** - https://www.votetexas.gov/register-to-vote/did-you-change-something.html
January 31st is the deadline for voter registration. We are in our final push for voter registration and this information has not been updated.

*"As long as you reside in the same county"*, you can change your information online at the *Secretary of State's Voter Registration Name/Address Change* website.

**Texas.gov**

OCA-APPX-1871

OCAGH_00007489

This website is included on notices to voters with voter registration issues, yet there is nothing on the menu to guide the voter to the information. A voter would have to go to texas.gov, click on resident, then on living in texas, then scroll down to find how to update their voter registration.

The League of Women Voters works hard to educate **all** voters regardless of party, on how to participate in our democracy. We rely on the accuracy of the voter information provided on votetexas.gov. Thank you so much for assisting us with these issues.

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

OCAGH_00007490

# Exhibit 124

OCA-APPX-1873

<p style="text-align:center"><b>League of Women Voters of Texas</b><br/>
<b>Recommendations for the Texas Secretary of State Elections Division</b></p>

1. **SOS website enhancement**
    a. Add an official Student Voter webpage on VoteTexas.gov.  This will:
        i. welcome young voters, high school, and college student voters, who are the future of our democracy  to voting in every election;
        ii. provide important information specific to them which can be easily accessible, such as basic educational information about how and where college students can register and vote;
        iii. provide counties with an official page link on VoteTexas.gov to share with the young voters in their community.
    b. Align the mobile view of VoteTexas.gov with the desktop view for consistency, ease of use and accuracy.
        i. The mobile version does not provide the same detailed information for voting by mail, registering to vote etc. as the desktop version. More and more voters use their phones to access online information. Voters who use their phones to access VoteTexas.gov are not receiving  important voting information.
    c. Continue to improve the use of plain language on the Voting by Mail web page provided on VoteTexas.gov.
        i. The League appreciates the improvements to VoteTexas.gov, including the addition of helpful graphics and explanations of the process of voting by mail.
    d. Improve the Application for a Ballot by Mail form on the Secretary of State's website[1].
        i. Add clarifying information about ID requirements.
        ii. Help voters by using simple step-by-step instructions for filling out the application, similar to instructions developed by LWV Texas and the Center of Civic Design.
        iii. Add a video and/or graphics for clarity.
        iv. Consider combining or linking to the much improved VoteTexas.gov Voting by Mail page.
    e. Track My Ballot tool
        i. Make the process to input your address easier.
        ii. Add a video(LWV Texas example at https://www.youtube.com/watch?v=rfTlPFizgzc) and/or instructions about the process.

---

[1] Although we oppose the ID number requirements for VBM applications and ballots in their entirety, we suggest certain changes in SOS policies, including in Sections 1(d) and 4 of this document, to attempt to mitigate some of the harms from the ID requirements.

OCAGH_00018581

      f. Ensure the SOS website is fully language accessible in compliance with Sec. 203(b) of the VRA.
          i. On the SOS's Spanish voter education website (VoteTexas.gov/es) many menu items link to English web pages. Even the SOS's complaint form is only offered in English.

2. **County Websites**
    a. Encourage officially designated county websites to use a free government-verified DotGov domain. This assures voters are getting official trusted information and not misinformation from scam sites pretending to be official county websites.

3. **Voter registration**
    a. Automatically send voter registration forms to high schools, instead of the high school having to request them.
       i. Enhance follow-up with high schools.
       ii. Create more education for students (see SOS website enhancement section about Student Voter recommendation).
    b. Create more instructional/educational videos on the online voter registration site, where you can update your address if you move within the state.
    c. Send a confirmation email when a voter updates their voter registration address using the SOS website.

4. **Vote-by-Mail (VBM) enhancements**[2]
    a. Remove VBM information from the carrier envelope to be an insert like it is for military VBM.
    b. Simplify the VBM application to be easier to navigate, similar to the LWV Texas application designed in conjunction with the Center for Civic Design.
    c. Use larger font to enable seniors and visual impaired voters to more easily use.
    d. Review language translation and design of VBM materials that are in non-English languages.

5. **Curbside voting**
    a. Improve training for election judges and poll workers to increase compliance with the administration of curbside voting. This should include requirements for effective and visible signage at every early voting and Election Day polling location.
    b. Update poll worker training to require a "runner" to assist with timely curbside voting administration.
    c. Advocate for increased funding to allow for more community outreach and improved voter awareness of curbside voting, especially in communities of color which face disproportionate challenges by existing inequities for curbside voting.
    d. Ensure counties have an ADA Coordinator. They would ensure regular compliance with the ADA Checklist for Polling Places and have the responsibility to implement remedies at polling locations ahead of the election period.

---

[2] Although we oppose the ID number requirements for VBM applications and ballots in their entirety, we suggest certain changes in SOS policies, including in Sections 1(e) and 4 in this document, to attempt to mitigate some of the harms from the ID requirements.

OCAGH_00018582

6. **Poll worker and poll watcher training to help prevent misunderstandings before they occur and the spread of misinformation after an election**.
    a. Provide list of terms that might be misinterpreted - Ex: "overvotes" actually means a "vote does not count because a voter marked more selections than is permitted", not that there have been "more voters casting ballots than are registered."
    b. Provide a list of problems that could be misinterpreted, such as paper jams being confused with a ballot being counted twice.
7. **Budget proposals**
    a. Continue funding jurisdictions with grants to replace outdated election systems.
    b. Strengthen cybersecurity.
    c. To improve safety of election officials and boost employee retention rates:
        i. Issue grants for home security systems;
        ii. Provide funds for training and education on how election workers can protect themselves; and
        iii. Allocate more resources for public education
            1. Provide education for all ages and in all commonly spoken languages on civics, election processes, and media literacy so that mis- or disinformation is not propagated. Building resilience to disinformation through long-term educational efforts requires investments and expertise from leaders in education.
            2. Provide trusted and accurate election information by educating the public about when, where and how to vote, how votes are counted, and other election administration issues.

OCA-APPX-1876

OCAGH_00018583

# Exhibit 125

OCA-APPX-1877

**From:** Elisabeth MacNamara [lwvtexas@lwvtexas.org]
**Sent:** 3/21/2023 8:02:14 AM
**To:** jlebombard@lwvtexas.org
**Subject:** LWVTX Capitol Action Report - 3/21/23

View in your browser

# March 21, 2023

Dear System,

Spring has sprung, bringing with it a lot of activity in the Legislature. SB 2 which makes illegal voting a felony and purports to make it easier to prove passed the Senate last week. We will be testifying against the bill as it makes its way through the House. We testified in favor of HB 357 last week because it would simplify the vote-by-mail tracking process. The House Community Safety Select Committee will be hearing a raft of bills this week. We are registering our support for several of them that would stiffen some penalties for firearms offenses, promote more mental health treatment and better reporting of protective orders. We will be testifying against permitting Election Judges with a license to carry, to carry their firearms at polling locations. Please note the Action Alerts on this as well as on HCR 36 which urges Congress to compensate the survivors of the Sutherland Springs mass shooting.

Also note the Action Alert concerning HB 3166 creating a state-wide court of appeals to handle appeals from cases in which the State is a party. We will be testifying against this bill, which is an attempt to preempt, in this case, the regional judicial selection system and allow state actors to avoid accountability.

One thing is very clear at this point: across all our priority issues, there is a push to discourage opposition to the most extreme outcomes and minority viewpoints. Texas is not alone is this effort. From public education to voting and elections to abortion rights, legislation that limits the discretion of local elected officials while expanding the reach of state officials is likely to gain traction. More bills to empower individuals to enforce the law through audits, records requests and lawsuits are popping up. This is a very disturbing trend. We are watching bills that permit removal of election administrators and prosecutors who do not toe ill-defined lines; that create a new state-wide court to handle cases against the state and new authority in the existing supreme court to review criminal cases; as mentioned above, that make it easier to prove ineligible voting; and the list goes on.

Opposing these efforts in the legislature is obvious. Less obvious may be the other assets the League has to combat and reverse this trend. After all, we didn't get to this point overnight (although lately, it seems so). Over 100 years of experience in deploying all the tools necessary to bend the arc of the moral universe come in handy at times like these. Our voices are strong and authentic, we live where we volunteer. Our reputation is sterling. Our methods are fair and factual. Above all, we are tireless organizers and fierce advocates.

The overarching call to action this session is to remember League Principles and our support for federalism, judicial independence, and the right of all eligible voters to cast a ballot and have it counted. After all, if we all stay in our lanes, our Constitutional system of government works.

In League,

OCAGH_00018597

P.S. Keep an eye out this week for action alerts opposing SB 8, the Governor's bill creating educational savings accounts, otherwise known as vouchers, as well as an action alert for both the House and Senate Judiciary Committees opposing HB 3166 and SB 1045 creating a 15th Circuit Court of Appeals with statewide jurisdiction over cases against or involving the State of Texas.

## Priority Issues

OCAGH_00018598

## Women's Healthcare and Reproductive Rights
*Catherine Maxwell*

I want to share about HB 12 and why it is important. This bill by Rep Toni Rose is designed to provide twelve months of postpartum healthcare to maternity Medicaid patients. It is supported in the 88th Legislature by Speaker Dade Phelan and Governor Greg Abbott. The committee hearing was held last week and the bill is currently pending in committee. LWVTX was one of the endorsers of this legislation.

Why all the fuss: Over 50% of the births in Texas are paid for by Medicaid. These patients, who meet the federal guidelines, include students, those who are uninsured for maternity, those who may not have insurance at all such as retail workers, office workers, some healthcare workers, part time employees, and those who live in poverty— in short, it is a huge, diverse group we want to protect and support in our community.

To read the full update, click here.

---

## Voting Rights and Election Law
*Stephanie Swanson*

Elections Update
Last week the League provided testimony in support of HB 357, which would reduce the number of personal identification requirements needed to track your ballot. This change would help reduce confusion in the vote by mail process. Click here to see LWVTX testimony.

SB 2 Passes Out of the Senate
Last week, the Senate voted SB 2 out of their chamber. The proposed changes to the Illegal Voting Statute included in SB 2 are vague and confusing which could lead to criminalization of simple mistakes at the polls. The Lt. Governor and other members of the legislature have made this bill a priority, despite the fact that election fraud is extremely rare in our state.

To read the full update, click here.

## Take Action!

OCAGH_00018599



## Do Not Arm Election Judges at Polling Places!

Oppose HB 636! Polling places need to be safe for all voters. Allowing election judges to carry handguns in polling places does not ensure safety it intimidates voters. Use our Action Center to write a letter to your legislators to oppose HB 636.

**Take Action!**

OCA-APPX-1882

OCAGH_00018600



## Support the Survivors and Relatives of the Victims from Sutherland Springs

Support HCR 36! The families of those who were killed or wounded at Sutherland Springs have fought for over five years for justice in a protracted, traumatizing, and

OCAGH_00018601

painful process. Use our Action Center to write a letter to your legislators and ask them to support HCR 36.

Take Action!

OCAGH_00018602

## League of Women Voters of Texas Top Priority Issues

Use our Action Center to write a letter to your legislators and take action on the League's top four priority issues:

- Voting Rights & Election Law
- Public Education
- Women's Health and Reproductive Choice
- Gun Safety

**Take Action!**



OCAGH_00018603

**League of Women Voters of Texas**
1212 Guadalupe St. #107
Austin Texas, 78701
(512) 472-1100
**lwvtexas@lwvtexas.org**
**lwvtexas.org**



You have received this message from the mailing list of The League of Women Voters of Texas. If you would prefer not to receive these emails in the future, go to the opt-out page and modify your privacy settings. You can also request to be removed from our database completely.

OCAGH_00018604

# Exhibit 126

**From:** Kayla Vix [KVix@lwv.org]
**on behalf of** Kayla Vix <KVix@lwv.org> [KVix@lwv.org]
**Sent:** 2/15/2022 10:25:54 AM
**To:** LWV Texas - Grace Chimene [gchimene@lwvtexas.org]
**CC:** Shannon Augustus [saugustus@lwv.org]; Communications [Communications2@lwv.org]
**Subject:** RE: CNN - Today

It's a great opportunity, Grace. Here are some of our talking points on ID, vote by mail, etc. If possible, replace the term "Voter ID" with "voter verification" or "voter validation."

- No voter should have to choose between their health and safety and exercising their constitutional right to vote.
- The pandemic is not over for older voters and voters with disabilities, who are still at high risk of serious illness from COVID. These voters rely on vote-by-mail to cast their ballots safely.
- Texas elections were run successfully for decades without the restrictions implemented by this new law.
- The changes of this new law are damaging to Texas voters' trust of our election system.

Calls to action:
- If our legislature really wants to secure and improve elections, they should invest in upgraded equipment, expanded staffing for election administrators, and training for poll workers. Not complicated and unnecessary restrictions on voting.
- [anything you can give about what voters can do – is it checking VOTE411? Is it contacting LWVTX for help? Is it the election protection hotline (866-OUR-VOTE)?]

On reliability of vote-by-mail:
- Vote-by-mail does not favor one party over another.
- There is no record of massive or serious election manipulation via mail-in voting.
- Texas has systems in place to deter and detect irregularities or violations in the voting process, both by mail and in person.

And of course, having a pivot ready in case the anchor goes off topic.
- What we are focused on is...[the effect on voters, etc.]


**Kayla Vix** (she/her)
Senior Communications Manager
League of Women Voters of the United States
1233 20th St NW, Suite 500, Washington, DC 20036
202-809-9668 | kvix@lwv.org
lwv.org | Facebook | Twitter



---

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Tuesday, February 15, 2022 10:47 AM
**To:** Kayla Vix <KVix@lwv.org>
**Cc:** Shannon Augustus <saugustus@lwv.org>; Communications <Communications2@lwv.org>
**Subject:** Re: CNN - Today

I will be talking about the new application for a ballot by mail and ballot by mail requirement of voter ID number. The new law's impact on voters.

OCA-APPX-1888

OCAGH_00004756

The new law' suppresses the vote of voters 65 and over and those with disabilities who vote by mail.

On Tue, Feb 15, 2022 at 9:06 AM Kayla Vix <KVix@lwv.org> wrote:

Hey Grace, what are they planning to discuss? Do you need any support to help prepare?

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Tuesday, February 15, 2022 9:34 AM
**To:** Shannon Augustus <saugustus@lwv.org>
**Cc:** Kayla Vix <KVix@lwv.org>; Communications <Communications2@lwv.org>
**Subject:** Re: CNN - Today

Lordy, it is a TV interview. Not a debate. I will be on with a friend and LWV supporter Isabel Longoria Harrris County election administrator.  She is a great communicator.

2:15 eastern.

On Tue, Feb 15, 2022 at 8:06 AM Shannon Augustus <saugustus@lwv.org> wrote:

Good morning Grace,

Sounds good!

Get Outlook for iOS

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Tuesday, February 15, 2022 8:55:54 AM
**To:** Kayla Vix <KVix@lwv.org>; Communications <Communications2@lwv.org>
**Subject:** Fwd: CNN - Today

I might have sent this to the wrong LWVUS address. This is the same as I sent earlier.

---------- Forwarded message ---------
From: **Goodman, David** <david.c.goodman@warnermedia.com>
Date: Tue, Feb 15, 2022 at 5:50 AM
Subject: CNN - Today
To: gchimenelwv@gmail.com <gchimenelwv@gmail.com>, cchimene@gmail.com <cchimene@gmail.com>, grace@chimene.com <grace@chimene.com>

Hi Grace,

David at CNN here. Can you call me about a potential interview today to discuss voting? My number is below.

Best,

OCAGH_00004757

David Goodman
CNN | Editorial Producer
Twitter - @davidgoodmanTV
Phone – (332) 213-6775

--
**Grace Chimene** (she/her)

President, League of Women Voters of Texas

gchimene@lwvtexas.org

LWVTexas.org & VOTE411.org

512-940-9948

*Empowering Voters. Defending Democracy*

--
**Grace Chimene** (she/her)

President, League of Women Voters of Texas

gchimene@lwvtexas.org

LWVTexas.org & VOTE411.org

512-940-9948

*Empowering Voters. Defending Democracy*

--
**Grace Chimene** (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948

*Empowering Voters. Defending Democracy*

OCA-APPX-1890

**From:** Kira Lerner [klerner@statesnewsroom.com]
**on behalf of** Kira Lerner <klerner@statesnewsroom.com> [klerner@statesnewsroom.com]
**Sent:** 2/14/2022 10:30:25 AM
**To:** Grace Chimene [gchimene@lwvtexas.org]
**Subject:** Re: States Newsroom reporter request

Will do. I'm in DC so it'll be 10 am here, so not sure I can claim the morning person title, but I'll take it!

On Mon, Feb 14, 2022 at 9:40 AM Grace Chimene <gchimene@lwvtexas.org> wrote:
> A fellow morning person!
> Call me at 512 940 9948

> On Mon, Feb 14, 2022 at 9:34 AM Kira Lerner <klerner@statesnewsroom.com> wrote:
>> How is tomorrow at 9 am central? Let me know the best number to reach you and I can give you a call then.
>> Thanks so much!

>> On Mon, Feb 14, 2022 at 9:33 AM Grace Chimene <gchimene@lwvtexas.org> wrote:
>>> Tomorrow I'm available except from 2-3 and 5-6 cst.
>>> Grace

>>> On Mon, Feb 14, 2022 at 8:38 AM Kira Lerner <klerner@statesnewsroom.com> wrote:
>>>> Great, do you have any time tomorrow or Wednesday? What number is best to reach you?

>>>> On Thu, Feb 10, 2022 at 5:42 PM Grace Chimene <gchimene@lwvtexas.org> wrote:
>>>>> Yes. I would be happy to chat with you.

>>>>> On Thu, Feb 10, 2022 at 8:43 AM Kira Lerner <klerner@statesnewsroom.com> wrote:
>>>>>> Hi Grace,
>>>>>>
>>>>>> My name is Kira Lerner and I'm a democracy reporter for States Newsroom. I'm going to be in Texas later this month and on the primary day to cover voting rights issues and all of the fallout of SB1. I was hoping someone from the League of Women Voters would be available for a phone call to discuss what your plans are for voter outreach and advocacy around the midterm and if there are any events or actions I should know about for my reporting.
>>>>>>
>>>>>> Please let me know as soon as you can. Also if you have a media listserv or something like that, please add me. Thanks so much!
>>>>>>
>>>>>>
>>>>>> --
>>>>>> Kira Lerner
>>>>>> Democracy Reporter
>>>>>> States Newsroom
>>>>>> 301-633-1989
>>>>>>
>>>>>>
>>>>>> --
>>>>>> **Grace Chimene** (she/her)

OCA-APPX-1891

OCAGH_00004978

President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

OCAGH_00004979

From: Shannon Augustus [saugustus@lwv.org]
on behalf of Shannon Augustus <saugustus@lwv.org> [saugustus@lwv.org]
Sent: 2/14/2022 12:03:56 PM
To: LWV Texas - Grace Chimene [gchimene@lwvtexas.org]
CC: Kayla Vix [KVix@lwv.org]
Subject: RE: FW: PRESS REQUEST: Crooked Media

Great! I'll connect you both in a separate email.

Shannon 😊

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Monday, February 14, 2022 12:59 PM
**To:** Shannon Augustus <saugustus@lwv.org>
**Cc:** Kayla Vix <KVix@lwv.org>
**Subject:** Re: FW: PRESS REQUEST: Crooked Media

Yes, I would be happy to participate in a podcast

On Mon, Feb 14, 2022 at 11:41 AM Shannon Augustus <saugustus@lwv.org> wrote:

Good Morning Grace & Happy Monday!
I wanted to reach out to you because we got this media request (see below) and I wanted to see if you would have any interest. If so, I'll connect you all to figure out the specifics.

-Shannon 😊

**From:** Gideon Resnick <gideon@crooked.com>
**Sent:** Monday, February 14, 2022 11:51 AM
**To:** Media <media@lwv.org>
**Subject:** PRESS REQUEST: Crooked Media

Hi there!

Hope all is well today. I'm a reporter and one of the hosts of the daily news podcast "What a Day" at Crooked Media and I was reaching out after reading this (https://apnews.com/article/greg-abbott-texas-houston-elections-voting-0db5cca282ddf79205bf7d06d0cf1196) earlier today. Was interested in seeing if anyone from the organization could join to talk about how SB1 is impacting voting so far. Let me know when you get a chance and thanks so much for the time!

Best,

Gideon Resnick

--

OCA-APPX-1893

OCAGH_00005339



**Gideon Resnick** (he/him)

**Host of "What a Day"** | Crooked Media
phone: 513-680-1211
site: www.crooked.com
email: gideon@crooked.com

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948

*Empowering Voters. Defending Democracy*

OCAGH_00005340

**From:** Kayla Vix [KVix@lwv.org]
**on behalf of** Kayla Vix <KVix@lwv.org> [KVix@lwv.org]
**Sent:** 2/15/2022 10:58:39 AM
**To:** LWV Texas - Grace Chimene [gchimene@lwvtexas.org]
**CC:** Media [media@lwv.org]
**Subject:** RE: Election Prep

Thanks for the update, Grace.

**Kayla Vix** (she/her)
Senior Communications Manager
League of Women Voters of the United States
1233 20th St NW, Suite 500, Washington, DC 20036
202-809-9668 | kvix@lwv.org
lwv.org | Facebook | Twitter



---

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Tuesday, February 15, 2022 11:42 AM
**To:** Kayla Vix <KVix@lwv.org>
**Subject:** Fwd: Election Prep

I talked with her.
Grace

---------- Forwarded message ---------
From: **Kate Riga** <kate@talkingpointsmemo.com>
Date: Tue, Feb 15, 2022 at 9:35 AM
Subject: Election Prep
To: <president@lwvtexas.org>

Hi Grace,

This is Kate Riga with Talking Points Memo — I hope you're doing well, and keeping your head above water in what must be a totally overwhelming time.

I wanted to see if you had a few minutes to talk about how the election prep is going in light of SB 1. You spoke to my colleague Matt a few weeks ago, and I'm doing a follow-up about how things have shaken out since them.

I'm aware that you must be incredibly busy, so I'd keep it short — just want to get on people's radar how this law is affecting the election processes as we get close to the primary.

If you have a free moment, I'm at 610 246 7031. Very much appreciate it.

Thanks again,
Kate Riga

OCA-APPX-1895

--
Kate Riga
Talking Points Memo
(C) 610-246-7031
(O) 202-758-3048 ext. 232


--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

| From: | Beausoleil, Sophia (NBCUniversal) [Sophia.Beausoleil@nbcuni.com] |
| on behalf of | Beausoleil, Sophia (NBCUniversal) <Sophia.Beausoleil@nbcuni.com> [Sophia.Beausoleil@nbcuni.com] |
| Sent: | 9/7/2021 11:34:58 AM |
| To: | gchimene@lwvtexas.org |
| Subject: | NBC DFW: Interview in regards to SB1 |

Hi Grace,

Thank you so much for giving me a call back.

I will send over the Zoom link for noon right now.


Thank you!
-Sophia


**Sophia Beausoleil**
**Reporter**
NBC 5 | Dallas-Fort Worth
Cell: (817) 675-9799 | Newsroom: (817) 654-6314
Twitter: @SophiaNBC5
Facebook: Sophia Beausoleil NBC5
IG: @nbc5Sophia
NBCDFW.COM | NBCDFW | @nbcdfw



OCAGH_00008642

| | |
|---|---|
| **From:** | Claudia Ortega Hogue [███████████] |
| on behalf of | Claudia Ortega Hogue <███████████> [█ |
| **Sent:** | 2/23/2022 7:29:33 AM |
| **To:** | Patricia Clarembaux [pclarembaux@univision.net] |
| **CC:** | Annie Benifield [anniebenifield@lwvhouston.org]; Grace Chimene [gchimene@lwvtexas.org]; Pam Gaskin ███████████ |
| **Subject:** | Re: Request for interview with Univision |

Hola, Buenos Dias! Mi celular es███████ Gracias !

On Wed, Feb 23, 2022 at 7:12 AM Patricia Clarembaux <pclarembaux@univision.net> wrote:

> Hola! Perfecto! ¿A qué número puedo llamarte?

**Patricia Clarembaux** | Sr. Multimedia Journalist
TelevisaUnivision, Inc. | ● http://televisaunivision.com
**5100 Southwest Freeway, Houston, TX, 77056**
☎ (713) 965-2743

**Televisa Univision**

**From:** Claudia Ortega Hogue <███████████>
**Date:** Tuesday, February 22, 2022 at 6:26 PM
**To:** Patricia Clarembaux <pclarembaux@univision.net>
**Cc:** Annie Benifield <anniebenifield@lwvhouston.org>, Grace Chimene <gchimene@lwvtexas.org>, Pam Gaskin <███████████>
**Subject:** Re: Request for interview with Univision

> **This email originated from outside of Univision. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hola! Ntp que te parece 12:30pm? :)

On Tue, Feb 22, 2022 at 5:47 PM Patricia Clarembaux <pclarembaux@univision.net> wrote:

> Hola Claudia,
>
> Muchas gracias por tu respuesta. ¿Crees que podamos hablar antes de la 1:00pm? Creo que no serían más de 15 minutos. Avísame. Si no puedes, lo hacemos a la 1:00pm.
>
> Saludos,
>
> Patricia

OCA-APPX-1898

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

**Televisa Univision**

Patricia Clarembaux | Sr. Multimedia Journalist

TelevisaUnivision, Inc. | 🌐 http://televisaunivision.com

5100 Southwest Freeway, Houston, TX 77056

📞 ███████████

---

**From:** Claudia Ortega Hogue <███████████████████>
**Date:** Tuesday, February 22, 2022 at 5:18 PM
**To:** Patricia Clarembaux <pclarembaux@UNIVISION.NET>, 'Annie Benifield'
<anniebenifield@lwvhouston.org>, 'Grace Chimene' <gchimene@lwvtexas.org>
**Cc:** 'Pam Gaskin' <████████████████████>
**Subject:** RE: Request for interview with Univision

> **This email originated from outside of Univision. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thank you, Grace, Annie and Patricia for the opportunity and thinking of me!

I am available tomorrow around 1pm? Would that work? I have a couple of meetings in the morning.

Hi Patricia – I will be happy to coordinate times with you, my cell number is ████████ feel free to call/text.

Mil Gracias!
-Claudia

**Claudia Ortega Hogue** \ League of Women Voters of Houston
Vice President of Strategic Partnerships
Mobile: ████████████
ClaudiaOrtegaHogue@lwvhouston.org
www.LWVHouston.org
@LWVHouston

**Empowering Voters.**
**Defending Democracy.**

OCA-APPX-1899

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)





**Fellow, American Leadership Forum, Class LIV**
Joining and strengthening diverse leaders to serve the common good.

---

**From:** Patricia Clarembaux <pclarembaux@UNIVISION.NET>
**Sent:** Tuesday, February 22, 2022 4:49 PM
**To:** Annie Benifield <anniebenifield@lwvhouston.org>; Grace Chimene <gchimene@lwvtexas.org>
**Cc:** Claudia E. Ortega-Hogue ███████████████████; Pam Gaskin ██████████████████
**Subject:** Re: Request for interview with Univision

Hi Annie! Thanks fin advance or your help. I'm planning to publish tomorrow COB or on Thursday. I'll be waiting for your responses on the interviews with Mrs. Gaskin and Mrs. Ortega. They could be by phone and anytime today or tomorrow.

Best,

Patricia

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

**Patricia Clarembaux** | Sr. Multimedia Journalist

TelevisaUnivision, Inc. | 🌐 http://televisaunivision.com

Televisa
Univision

5100 Southwest Freeway, Houston, TX, 77056

📞 (713) 965-2743

---

**From:** Annie Benifield <anniebenifield@lwvhouston.org>
**Date:** Tuesday, February 22, 2022 at 4:42 PM
**To:** Grace Chimene <gchimene@lwvtexas.org>
**Cc:** Claudia E. Ortega-Hogue <███████████████>, Pam Gaskin <███████████████>, Patricia Clarembaux <pclarembaux@univision.net>
**Subject:** Re: Request for interview with Univision

> You don't often get email from anniebenifield@lwvhouston.org. Learn why this is important

> **This email originated from outside of Univision. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Happy to help! Annie

On Tue, Feb 22, 2022 at 4:25 PM Grace Chimene <gchimene@lwvtexas.org> wrote:

Annie,

I chatted with Patricia Clarembaux with Univision digital. She would love to chat with Claudia Ortega Hogue to get a Latina's view of the vote by mail situation.

Patricia would also like to chat with Pam Gaskin to speak with a person who experienced the Vote by Mail Voter ID issues first hand.

Thank you so much for helping.

Grace

--

**Grace Chimene** (she/her)

**President**, League of Women Voters of Texas

gchimene@lwvtexas.org

LWVTexas.org & VOTE411.org

███████████

*Empowering Voters. Defending Democracy*

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

--

Dr. Annie Johnson Benifield, President

League of Women Voters of Houston
P O Box 270269
Houston, Texas 77277-0269

██████████

anniebenifield@lwvhouston.org

www.lwvhouston.org

**Empowering Voters.**

**Defending Democracy.**

--

Claudia Ortega Hogue
Cell: ██████████
Email: ██████████
Twitter: @chogueTX

Fellow, American Leadership Forum, Class LIV
www.alfhouston.org | Joining and strengthening diverse leaders to serve the common good.

--

Claudia Ortega Hogue
Cell: ██████████
Email: ██████████
Twitter: @chogueTX

Fellow, American Leadership Forum, Class LIV
www.alfhouston.org | Joining and strengthening diverse leaders to serve the common good.

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

| | |
|---|---|
| **From**: | Aaron Mendelson [amendelson@publicintegrity.org] |
| **Sent**: | 6/28/2022 4:13:02 PM |
| **To**: | president@lwvtexas.org; amcmurrer@lwvtexas.org |
| **Subject**: | Interview Request |

Good afternoon,

I'm a reporter with The Center For Public Integrity, a non-profit news outlet. I'm doing a story on the paper supply chain issues, and the problems that poses for ballots, voter registration and so on.

I read about this affected the LWV's voter registration work with newly naturalized citizens here. I was also hoping to hear about the impacts of SB 1, I see that the League has issued several statements about those impacts.

I was hoping to interview someone with the organization, who do you recommend I talk to? The interview would be over the phone or Zoom, and 30-45 minutes. I'd like to talk this week.

Let me know if you have any questions for me.

--
Aaron Mendelson
Reporter, The Center for Public Integrity
202-481-1247
amendelson@publicintegrity.org
@a_mendelson

**From:**    Joyce LeBombard [jlebombard@lwvtexas.org]
**Sent:**    7/1/2022 2:21:34 PM
**To:**    Aaron Mendelson [amendelson@publicintegrity.org]
**CC:**    Aileen McMurrer [amcmurrer@lwvtexas.org]
**Subject:**    Re: Interview Request

Tues, 7/5, 3pm CT works best for me.  Yes, ███████ is the best number also.
Looking forward to speaking with you.  Have a wonderful and safe July 4th weekend.


Joyce LeBombard (she/her)
President, League of Women Voters of Texas
jlebombard@lwvtexas.org ███████ (c)
*Schedule a meeting with me: https://calendly.com/joycelebombard*
LWVTexas.org & VOTE411.org

*Empowering voters. Defending democracy.*



On Fri, Jul 1, 2022 at 2:01 PM Aaron Mendelson <AMendelson@publicintegrity.org> wrote:

Great, glad to hear it. Does Noon or 3 PM Central work for you?


And is the 4090 number the best one to reach you at?


--

Aaron Mendelson

Reporter, The Center for Public Integrity

202-481-1247

amendelson@publicintegrity.org

@a_mendelson




**From:** Joyce LeBombard <jlebombard@lwvtexas.org>
**Date:** Friday, July 1, 2022 at 11:29 AM
**To:** Aaron Mendelson <AMendelson@publicintegrity.org>
**Cc:** Aileen McMurrer <amcmurrer@lwvtexas.org>
**Subject:** Re: Interview Request

Hi Aaron,

LWVUS and our SB1 litigation team did get back to me.  I am available pretty much all day on Tuesday, July 5th if that is not too late. Let me know what time works best for you.


OCA-APPX-1904

Joyce LeBombard (she/her)

President, League of Women Voters of Texas

jlebombard@lwvtexas.org | [redacted] (c)

*Schedule a meeting with me: https://calendly.com/joycelebombard*

LWVTexas.org & VOTE411.org

**Empowering voters. Defending democracy.**

On Fri, Jul 1, 2022 at 12:47 PM Aaron Mendelson <AMendelson@publicintegrity.org> wrote:

Checking back on this — hoping to interview someone at the LWV in Texas next week, it would be very helpful to have your on-the-ground voice in the piece. Let me know if there's an update.

--

Aaron Mendelson

Reporter, The Center for Public Integrity

202-481-1247

amendelson@publicintegrity.org

@a_mendelson

**From:** Aaron Mendelson <AMendelson@publicintegrity.org>
**Date:** Wednesday, June 29, 2022 at 11:22 AM
**To:** Joyce LeBombard <jlebombard@lwvtexas.org>
**Cc:** amcmurrer@lwvtexas.org <amcmurrer@lwvtexas.org>, president@lwvtexas.org <president@lwvtexas.org>
**Subject:** Re: Interview Request

Gotcha, thanks for the update. I'll check back with you in a couple days if I haven't heard back.

And if it facilitates things with the national folks, I spoke with the President of the Georgia LWV earlier this month.

--

Aaron Mendelson

Reporter, The Center for Public Integrity

202-481-1247

amendelson@publicintegrity.org

OCAGH_00016805

@a_mendelson

**From:** Joyce LeBombard <jlebombard@lwvtexas.org>
**Date:** Wednesday, June 29, 2022 at 11:08 AM
**To:** Aaron Mendelson <AMendelson@publicintegrity.org>
**Cc:** amcmurrer@lwvtexas.org <amcmurrer@lwvtexas.org>, president@lwvtexas.org <president@lwvtexas.org>
**Subject:** Re: Interview Request

Hi Aaron,

Since you are national media, I have passed your request to our national organization to either respond to or to allow me to respond. I have not heard back from them yet.


-Joyce


On Wed, Jun 29, 2022 at 11:51 AM Aaron Mendelson <AMendelson@publicintegrity.org> wrote:

Wanted to check back on the interview request and make sure it didn't get lost in the shuffle yesterday afternoon. Let me know if you have any Qs for me, happy to answer them.


Aaron

202.481.1247

**From:** Aaron Mendelson <AMendelson@publicintegrity.org>
**Date:** Tuesday, June 28, 2022 at 2:13 PM
**To:** president@lwvtexas.org <president@lwvtexas.org>, amcmurrer@lwvtexas.org <amcmurrer@lwvtexas.org>
**Subject:** Interview Request

Good afternoon,


I'm a reporter with The Center For Public Integrity, a non-profit news outlet. I'm doing a story on the paper supply chain issues, and the problems that poses for ballots, voter registration and so on.


I read about this affected the LWV's voter registration work with newly naturalized citizens here. I was also hoping to hear about the impacts of SB 1, I see that the League has issued several statements about those impacts.


I was hoping to interview someone with the organization, who do you recommend I talk to? The interview would be over the phone or Zoom, and 30-45 minutes. I'd like to talk this week.


Let me know if you have any questions for me.

OCA-APPX-1906

--

Aaron Mendelson

Reporter, The Center for Public Integrity

202-481-1247

amendelson@publicintegrity.org

@a_mendelson

--

Joyce LeBombard (she/her)

President, League of Women Voters of Texas

jlebombard@lwvtexas.org | ▉▉▉▉▉▉ (c)

*Schedule a meeting with me: https://calendly.com/joycelebombard*

LWVTexas.org & VOTE411.org

***Empowering voters. Defending democracy.***

OCAGH_00016807

# Exhibit 127

From:           Dorothy Marchand [dmarchand@lwvtexas.org]
on behalf of    Dorothy Marchand <dmarchand@lwvtexas.org> [dmarchand@lwvtexas.org]
Sent:           1/19/2022 7:48:33 AM
To:             Grace Chimene [gchimene@lwvtexas.org]
CC:             Aileen McMurrer [amcmurrer@lwvtexas.org]; Yvonne Wade Sanchez [ysanchez@lwvtexas.org]; Ginny Whited
                [ginny.whited@gmail.com]
Subject:        Re: The scramble is on to address mail ballot application problems as a deadline looms | Morning Report

And your full editorial is in the paper!

Vice President, Voter Education

**Empowering voters. Defending democracy.**

On Jan 19, 2022, at 5:33 AM, Grace Chimene <gchimene@lwvtexas.org> wrote:

---------- Forwarded message ---------
From: **Houston Chronicle** <newsletters@mailer.houstonchronicle.com>
Date: Wed, Jan 19, 2022 at 6:11 AM
Subject: The scramble is on to address mail ballot application problems as a deadline looms | Morning Report
To: <gchimene@lwvtexas.org>

.

View in browser

OCA-APPX-1909



*GET CONNECTED, STAY INFORMED*
*26 WEEKS FOR 99¢: Unlimited Digital Access*

**J.R. Gonzales**
Web Producer
john.gonzales@chron.com

# About that mugshot posted on social media Tuesday.

OCAGH_00006757

If you follow any of the local law enforcement entities on social media, you'll see that from time to time they will post mugshots of suspects accused of a range of crimes.

Well, there was one mugshot posted on social media yesterday by Harris County Precinct 4 Constable Mark Herman's office that looked a little, well, different. The photo appears to show one officer forcibly holding a woman's head up while another holds her in place. The woman was arrested for allegedly failing to identify herself to a police officer.

The reaction on Facebook was supportive of police. However, a co-founder of Black Lives Matter Houston said the image shouldn't have been posted. What do you think?

**Breaking overnight:** Ron Franklin, the former Houston sportscaster who was the radio voice of the Oilers and went on to national fame at ESPN, has died at the age of 79. Also, André Leon Talley, the former Vogue magazine editor and fashion icon, died Tuesday at age 73 of complications related to COVID.

That streak of nice weather we've been having is about to end. Expect some thunderstorms as a cold front moves into the area late in the afternoon. Highs will be in the mid 70s, but expect a significant drop as the workweek continues.

OCAGH_00006758





Photo: Melissa Phillip, Houston Chronicle / Staff photographer

## The state and counties are wrestling with mail ballot application problems.

State and county election officials are facing a major headache these days.

A new law passed by the Legislature last year added requirements for voters to include a driver's license number or partial Social Security number when applying for a mail ballot. But, as [Taylor Goldenstein](#) writes, [confusion has erupted as voters aren't sure about what information to include with their applications](#), and counties have not yet received training from the state on how to use the online system to fix them.

OCAGH_00006760

Meanwhile, erroneous applications are pouring in. In Travis County, over 25 percent of them are insufficient. Some are using old applications.

"Legislators were warned that this would happen, that voters would be confused, that this would create havoc among our voters," said Grace Chimene, president of the League of Women Voters of Texas, referring to testimony groups like hers gave during the legislative session.

To make matters worse, both voters and election officials are on the clock, too. There is less than a month left for voters to request mail ballots ahead of the Feb. 18 deadline for the March 1 primaries.

Sen. Paul Bettencourt, R-Houston, who helped write the legislation, expects the issue will be worked out.

"While patience is not at a maximum supply in this type of frothy, national environment on these issues, new election procedures will have some period of time for everyone to get used to," he said. "But we're still early enough to where all this is still curable."

## Five other stories to read today

### Morale, pay and politics: Texas GIs question the border mission.

Soldiers sent to the border by Gov. Abbott are angry, and not only because they lack portable toilets. They gripe about operational changes, missed pay and the mission's fading purpose that has no defined end. "Morale is lower and keeps getting lower," one specialist says.

OCAGH_00006761

## Tomlinson: Time to break COVID habits in 2022.

The economic indicators and COVID data are confusing, but that means we need new strategies for 2022, writes Chris Tomlinson.

## Permian earthquakes should jolt Texas officials into action. [Editorial]

Texas' unending quest for cheap energy has helped turn our state's once-benign subterranean geology into a potential powder keg, writes the Editorial Board.

## Kyler Edwards stays hot as No. 10 UH rolls past South Florida.

He kept up his recent hot streak as UH beat South Florida for its best start in conference play in 38 years.

OCAGH_00006762

### This HMNS teen program teaches hands-on skills.

Applications are now being accepted at the Houston Museum of Natural Science for this summer's Moran Ecoteen volunteer program.

## One last thing ...

This week, we're taking a look at the front pages of the Houston Post. One of the big stories on this front page from 1952 was a tragic story out of Cypress about a child killed while playing on a swing set.

Those old playgrounds could be dangerous, you know. I remember seeing a kid's head caught between the monkey bars when I was in elementary school.

In other news, road rage isn't exactly a new thing, judging by this fight that broke out on Pease.

- J.R., who wonders how he survived those playgrounds of yesteryear

## More newsletters

### The ultimate source for a Houston superfan

Our Texas Sports Nation newsletter catches you up on everything happening in Houston sports, from the Astros, Texans and Rockets to college and high school sports, too.

OCAGH_00006763

SIGN UP

OCAGH_00006764



Unsubscribe  |  Manage Preferences  |  Privacy Notice

OCA-APPX-1918



Houston Chronicle
4747 Southwest Freeway, Houston, TX 77027
© 2022 Hearst Communications

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

OCAGH_00006766

Sign Up

Email or phone
Password
Log In
Forgot account?



**League of Women Voters of Texas**
February 23 ·

Grace Chimene, president, LWV Texas interview about voting issues in the Texas Primaries.

**The BRAD BLOG**
February 22

'Bad News for Democracy': Russian Troops in Ukraine, Republican Vote Suppressors in Texas: 'BradCast' 2/22/2022

Guest: Grace Chimene, President, TX League of Women Voters on alarming mid-term primary ballot rejection rate; Also: Biden announces 'first tranche' of Russian sanctions in response to 'invasion'...

FULL STORY, LISTEN: https://bradblog.com/?p=14177

9                                                                                      1 Share

Share

**Related Pages**

**Fair Maps Texas Announcements**
Community Organization

**Joey Gidseg**
Political Candidate

**League of Women Voters of Colli...**
Nonprofit Organization

**Frank Ortega Round Rock City C...**
Politician

**Young Democratic Socialists of ...**
Political Organization

**Texas Aspires**
Education

**March On Texas**
Community Organization

**TFN PAC**
Political Organization

**American Promise - North Texas**
Nonprofit Organization

**Common Cause Texas**
Nonprofit Organization

**Reliable Revolutionaries of San ...**
Community Organization

**Republican Party of Texas**
Political Organization

**Pages Liked by This Page**

**League of Women Voters Denton...**

**See more of League of Women Voters of Texas on Facebook**

Log In        or        Create new account



League of Women Voters of Texas
Today at 10:41 AM

Tomorrow is the last day to register to vote for the May 7th electio... See more

1                    2 Shares

Share

League of Women Voters of Texas
Today at 5:57 AM

Thursday, April 7th is the last day to register to vote for the upco... See more

6                    23 Shares

Share

League of Women Voters of Texas
April 4 at 5:22 AM

"First, the Texas attorney general's office is arguing that private ... See more

10                   4 Shares

Share

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices ·
Cookies · More
Meta © 2022

**See more of League of Women Voters of Texas on Facebook**

Log In          or          Create new account

OCA-APPX-1921

OCAGH_00014554

                       



I will vote in every election to stand up for what matters most to me, my family, and my community! 



# League of Women Voters of Texas

@LWVTexas ·    4.8 51 reviews    · Nonprofit organization

■ Learn more

■ lwvtexas.kindful.com

Home      About      Events      More ▼          ■ Like       ■ Message       ■   •••

 **League of Women Voters of Texas**
April 7 · 🌐                                        •••

"One in eight vote by mail ballots were not counted in the primary election. This is the direct result of the anti-voter bill SB1 pushed through the Texas legislature and signed by the governor. It is appalling that our legislators choose to avoid their responsibility to voters by not examining this high Vote By Mail rejection rate in the interim charges."
Grace Chimene president LWV Texas.



OCA-APPX-1922

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)




NPR.ORG

**Almost 25,000 mail-in ballots were rejected in Texas for its March 1 primary election**

😠👍😮 12                    6 Comments  3 Shares

| Like | Comment | Share |

Most relevant

Write a comment...

Press Enter to post.

**Stacie Nichols Smith**
What can we do to make more noise? As individuals and as advocacy groups?

Like   Reply   14w

**Ruby Nelson**
Can you give us some specific information? I heard that it was about having to provide an additional ID number. And many people not seeing that.

Like   Reply   14w

Most Relevant is selected, so some replies may have been filtered out.

🖉 Author
**League of Women Voters of Texas**
**Ruby Nelson** https://fb.watch/ceBipdEss2/

Like   Reply   14w

View 1 more reply

Most Relevant is selected, so some comments may have been filtered out.

**Other posts**

**League of Women Voters of Texas**
1d · 🌐

Join the conversation TONIGHT!!!

Register for the free webinar here: https://bit.ly/lwvtx-gun-reform-webinar.



OCA-APPX-1923

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015694

                      

**JEFF TEMPLE, PH.D.**
Founding Director of
the Center for
Violence Prevention

**SANDRA MCKAY, MD, FAAP**
Associate Professor
with McGovern
Medical School

**ART ACEVEDO**
Former Police Chief
of Austin, Houston, &
Miami

Join the conversation about what can be done to prevent violence from assault rifles in America!

**JULY 13, 2022**
7:00-8:30 P.M. CST

WEBINAR CO-HOSTS:    **LWV** LEAGUE of WOMEN VOTERS OF TEXAS    **NAACP.**

### League of Women Voters of Texas
3d · 🌐

Join the conversation! The League of Women Voters of Texas will be co-hosting a free webinar "Assault Rifles - What can be done?" with Texas LULAC and the NAACP... **See more**

👍 7                                                    5 Shares

| Like | Comment | Share |

Most relevant ▪

⬤  Write a comment...                          ▪ ▪ ▪
   Press Enter to post.

### League of Women Voters of Texas
1d · 🌐                                              ...

Zahra Biabani, we are so proud of you!
We love to see our former interns expand on League values and principles after graduation.



OCA-APPX-1924

CONFIDENTIAL – Subject to Protective Order                              OCAGH_00015695
In Docket No. 21-cv-00844 (WD Tex.)

 

+ &#9679; &#9679;

TED.COM
**The eco-creators helping the climate through social media**
"Climate doom-ism," or a pessimistic outlook on the future of the p...

See how the average temperature in your area is changing.
**Explore Climate Science Info**

👍 4                                                    1 Share

| Like | Comment | Share |

Write a comment...
Press Enter to post.

**League of Women Voters of Texas**
2d · 🌐

···

Election Protection
**CLE Series**
(Continuing Legal Education)

**July 13 - August 10**
**Every Wednesday | 6 PM CST**

Register:
**bit.ly/electionprotectioncle**

OCA-APPX-1925

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015696

 



**Texas Civil Rights Project**
2d · ●

Are you interested in voting in Texas? Are you a Texas attorney who needs CLE credit?

Join us for our Election Protection CLE Series, every Wednesday night at... **See more**

👍 1            2 Shares

| Like | Comment | Share |

Most relevant ▪

Write a comment...

Press Enter to post.

Most Relevant is selected, so some comments may have been filtered out.

OCA-APPX-1926

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015697

                       

OCA-APPX-1927

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015698

**News / Articles**

# Texas' New Voting Laws Could Prove Hell this November

Jessica Lenamond, Austin Monthly Magazine | Published on 6/25/2022

Voting in Texas has never been easy.

Prior the 2020 presidential election, political scientists from the likes of Northern Illinois University and Wuhan University in China compiled a "cost-of-voting index" that ranked states by the ease in which residents could both register and cast their ballot. The analysis placed Texas dead last, citing the state's tough voter identification laws, unforgiving registration deadlines, and general "restrictive electoral climate," all of which made it the hardest state to vote in in the entire country.

And, of course, that was before Texas' most recent election law overhaul even went into effect.

Despite persistent warnings from civil and voting rights advocates, the state's Republican-controlled legislature passed the sweeping and far-reaching Senate Bill 1 into law in September 2021. Among other things, the law banned drive-thru and overnight voting, further tightened ID requirements, and allowed partisan poll watchers new freedoms. Additionally, assistants who work with Texans that need help filling out their ballots can now face criminal charges. This type of assistance is most frequently used by voters with disabilities or physical needs, but non-English speaking voters and those who struggle to read and write are also entitled to aid in the state.

Political standing aside, interpretations of the new law shared in a base-level understanding: It was going to get even harder to earn an "I voted" sticker. According to Texas Republicans, the shift was necessary, as the GOP beefs up election integrity protections, citing murky and still unproven reports of rampant voter fraud. For local grassroots voting organizations, however, the focus remains on those who have taken the most direct hit under the new regulations—everyday Texans trying to make sure their vote gets counted.

"All Texas voters are impacted, but especially voters of color, low-income voters, young voters, older voters, and voters with a disability," says Grace Chimene, president for the League of Women Voters of Texas, a nonpartisan nonprofit that works to educate voters on election issues. Chimene says the law spurred an immediate change, pointing to the March primary election, when 25,000 voters had their vote-by-mail ballots rejected, more than 1,800 from Austin-area counties alone. Those voters were mostly 65 and older, or voters with a disability.

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCA-APPX-1928

OCAGH_00015744

Chimene also says not enough is being done to brief voters on the new requirements or properly prepare them for a successful visit to the polls. In response, the League is taking voter education into their own hands by providing extensive online voter guides and SB 1 explainers. "We're working with the Center for Civic Design to create more resources provided in simple, plain language," Chimene says of the group's efforts.

Those materials have set a new standard and are often utilized by fellow nonprofit organizations like REV UP Texas, which works with Texans with disabilities to ensure they're well represented within the voting body. Bob Kafka, the group's statewide coordinator, echoes concerns that Texas' disabled community is acutely impacted by the new voting legislation, which is breeding further distrust between them and local government. Although it would later be written out, an earlier version of the election bill included even more voting barriers for Texans with disabilities. "They were going to require the person to prove that they had a disability," Kafka recalls. "It was so blatantly discriminatory; it would almost be like a poll tax. I use a motorized wheelchair, and I would have had to go to a doctor to somehow prove that I have a disability even though I've been in this wheelchair for almost 50 years."

Bob Kafka is working with disabled Texans to ensure they're not impacted by the new voting laws.

The irony that Gov. Greg Abbott, a well-known member of the state's disabled community, has continued to champion the new voting law isn't lost on Kafka. "My disability and spinal cord injury is similar to Gov. Abbott's. You would think, you know, as a person with a disability, there would be some identity there."

On top of ongoing efforts to educate voters on their rights and available aid, REV UP Texas will host its third Texas Disability Issues Forum in Austin this September ahead of the November election. The event includes voter registration drives and allows high-profile candidates running for office in the state an opportunity to speak on how their platforms relate to disability issues. While Democratic gubernatorial candidate Beto O'Rourke has indicated his plans to attend, Kafka says the group has yet to hear back from Abbott's office.

Kafka's main advice to voters who are confused about new voting requirements or who have had their mail-in ballots rejected is to reach out. Whether that be to REV UP, the League of Women Voters, or to your county's election office, he repeats the importance of not being deterred by the first hurdle.

"Let someone know," he says. "The squeaky wheel gets the grease."

## The Cutthroat Vote

OCA-APPX-1929

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015745

*SB 1's ramifications on Texas elections and the rest of the country.*

- 702, 257: Texans that lacked either a driver's license or Social Security number on file, as of Dec. 2021.
- 8.2%: The rate at which mail-in ballots in Travis County were rejected during March's primary election.
- 12.4%: The rate at which mail-in ballots in Texas were rejected during March's primary election.
- 1%: Comparatively, the rate at which mail-in ballots were rejected during the 2020 presidential election.
- 27: Other states considering similar legislation, according to the Brennan Center for Justice.

Read more

---

Return to Previous Page

OCA-APPX-1930

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015746

# Exhibit 128

OCA-APPX-1931

**Empowering Voters. Defending Democracy**

# Tips for Voters
# New Election Laws 2022
## TSEU (Texas State Employee Union)



Grace Chimene President
**LEAGUE OF WOMEN VOTERS OF TEXAS**

OCA-APPX-1932

# 2022 Primary Election - Key Dates



- Last day to register to vote or change address
  **January 31**
- First day to vote early in person
  **February 14**
- Last day to apply for vote-by-mail ballot
  **February 18**
- Last day to vote early in person
  **February 25**
- Election Day and vote-by-mail ballot receipt deadline
  **March 1**

## VOTE411.org     LWVTexas.org



OCA-APPX-1933

# NEW!
## Vote by Mail (VBM)

Who else qualifies?

Voters expecting to give birth within three weeks before or after election day

**Sec 82.02 (HB 3920)**



OCA-APPX-1934 photo credit canva.com

# NEW! Soliciting Vote by Mail

## "Public officials/election officials" Can NOT:

- Solicit or distribute a VBM app from a person who did not request an application
- Complete any portion of a VBM app and distribute the application to an applicant.
- Authorize or approve the expenditure of public funds to facilitate third-party distribution of a VBM app to a person who did not request the application
- example: Counties can not provide applications to organizations.

Sec. 84.001(SB1)

**LWV TIP: Organizations can order from the Secretary of State's office or print VBM applications to share with voters.**



# NEW! Soliciting Vote by Mail

## "Public officials/election officials" Can

- Provide the application on a website;
- Complete portions of a VBM app for a voter if they are "lawfully assisting" the voter
- Provide general information about VBM, the VBM process, or the timelines associated w/voting
- Engage in the above prohibited conduct while "acting in the official's capacity as a candidate for a public elective office"

Sec. 84.001(SB1)



# NEW! Finding an Application

- Each voter must request a VBM application from your county election office
- Print an application from your county website, VoteTexas.gov, LWVTexas.org VOTE411.org or other
- Find applications at libraries, post offices, etc ? Sec. 84.001(SB1)

**LWV Tip: Candidates and parties may send voters a partially filled out application**



# NEW! Provide Your Voter ID on the Application

- The Voter ID number used on your VBM application, and VBM carrier envelope. **must be associated with your voter registration application!**

- **Voter ID numbers** (TXDL, Personal ID, EIC Number AND the last four digits of SSN) on your VBM application and VBM ballot carrier envelope
84.002 (SB1)
  Sec. 84.002 (SB1)

Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#)

___  ___  ___  ___  ___  ___  ___  ___

If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

___  ___  ___  ___

☐ I have not been issued a Texas Driver's License/Texas Personal Identification Number/Texas Election Identification Certificate or Social Security Number

Application for a Ballot by Mail

**LWV Tip: You can use an expired ID card if it is "otherwise valid"**
**LWV Tip: Provide both your ID AND the last four digits of your social security number.**



OCA-APPX-1938

# NEW!
# Vote by Mail Cure Process

**LWV TIP: Provide contact information on your ballot by mail application and ballot Carrier Envelope so the county may contact you if you need to fix an error.**

**LWV Tip: Don't wait! Turn in your application and ballot in early!!**

Application for Ballot by Mail

## 1. Voter Information: Please print all information clearly and legibly

Name: _____
   Last,                    First,                    Middle              Suffix (Jr., Sr.)

Residence Address as shown on your Voter Registration Certificate

Address: _____
   Street          Apt. # (if any)   City              State      Zip Code

Optional Information: Providing this information is helpful to the Early Voting Clerk, but not required.

Date of Birth: _____ / _____ / _____   VUID #: _____   Pct #: _____

Email: _____   Tel. #: _____

Carrier Envelope for Ballot by Mail

**REQUIRED INFORMATION:** YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD

| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) (Número de licencia de conducir de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas) (NO ES el número de su Registro Electoral VUID#) | OR | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number (Si no tiene licencia de conducer de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas, proporcione los 4 últimos dígitos de número de Seguro Social) | OR | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or a Social Security Number (No me han expedido una licencia de conducir de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas ni un número de Seguro Social) |
|---|---|---|---|---|
| ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ | | XXX - XX - ___ ___ ___ ___ | | |

OPTIONAL CONTACT INFORMTION: Phone: _____   Email: _____



OCA-APPX-1939

# NEW!
# Vote by Mail

## Ballot by Mail Tracker

Track your VBM application and VBM ballot throughout the election process at VoteTexas.gov. Allows voters to fix some issues with voter ID numbers.



**LWV Tip: Not working in all counties.**
**LWV Tip: Issues with inputting your address.**

# NEW!
## Assisting Voters

- Persons who assist voters with a VBM application, VBM ballot, or in-person ballot must provide their relationship to the voter and address, and for the VBM ballot sign an oath, and mark that they didn't receive compensation.
  Sec. 84.011(SB1

- Persons who drive 7 or more voters who qualify for curbside voting must sign a form
  Sec.64.009 (SB1)



"I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance;

I will not suggest, by word, sign, or gesture, how the voter should vote;

I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot;

I will prepare the voter's ballot as the voter directs;

I did not pressure or coerce the voter into choosing me to provide assistance;

I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs;

OCA-APPX-1941

I will not communicate information about how the

# NEW! Assistors Oath & Compensation

**Oath of Person Assisting Voter:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing how to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." **Juramento de la Persona Asistiendo al Votante:** "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; limitaré mi asistencia a leer la boleta al votante, dirigiendo al votante a que lea la boleta, marcando la boleta del votante o dirigiendo al votante a que marque la boleta; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

**If you are an assistant, provide information below:** (Si usted es un asistente o testigo, marque la casilla correcta y proporcione su información):

**Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance?** Circle one: Yes  No
¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia?
Marque con un Círculo:  Sí   No

Printed Name (Nombre en letra de molde)                    Signature (Firma)

Relationship to Voter (relacion al votate)                    Street Address (Domicilio residencial)

---

**SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)**

**Completed by Early Voting Clerk:**

Name of Election (Nombre de Elección): _____

Name of Voter (Nombre del votante): _____

Date of Election (Fecha de Elección): _____ / _____ / _____

**Instructions to Witness:** You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____.

(**Instrucciones al Testigo:** Usted está fungiendo como testigo para _____ (nombre del votante). Usted debe llenar la siguiente sección abajo si usted fue testigo de que el votante firmo, o de que el votante no puede firmar. Si el votante no puede firmar, marque sus iniciales aquí _____.)

Signature (Firma)                    Printed Name (Nombre en letra de molde)

Street Address (Domicilio residencial)



• Sec.86.0105 (SB1)



OCA-APPX-1942

# NEW!
## Poll Watchers

- Required to take training

- Sign an oath

- Have fewer restrictions on movement and observation.

Sec. 33.051 (SB1)

"I swear (or affirm) that I will not disrupt the voting process or harass voters in the discharge of my duties."



# How You Can Help!

Share trusted resources

- Print - [Vote by Mail handout 2022](#)
- Video - [Susan SharesTips for Filling out the application to Vote by Mail](#)
- Video - [Susan SharesTips for Voting by Mail](#)
- Video - [How to Vote by Mail Texas Style](#)
- Video - How to Track your Ballot by Mail
- Video - How to Submit Your Ballot by Mail.

Volunteer for Election Protection.

- NAACP LDF is providing training for folks who live in East Texas

  [https://secure.everyaction.com/urmz7w_ZYUyrhRyZOe1Ruw2](https://secure.everyaction.com/urmz7w_ZYUyrhRyZOe1Ruw2)

- Common Cause is offering training for Texas Election protection volunteers [https://www.mobilize.us/protect-the-vote/event/436853/?utm_source=lwvtx](https://www.mobilize.us/protect-the-vote/event/436853/?utm_source=lwvtx)



# Websites

- [LWVTexas.org](LWVTexas.org)
  [VOTE411.org](VOTE411.org),

- Election Protection
  [https://866ourvote.org](https://866ourvote.org)
  866-687-8683

- Texas Secretary of State
  [VoteTexas.gov](VoteTexas.gov) (800) 252-
  VOTE





OCA-APPX-1945

# VOTE 411

## WHAT IS ON YOUR **BALLOT?** VOTE411.ORG

**VOTERS GUIDE** - BY THE **LEAGUE OF WOMEN VOTERS EDUCATION FUND**



OCA-APP-1946

# NEW!
# Update your Voter Registration Online

If you moved or changed your name, update your voter registration online at texas.gov or votetexas.gov

**Sec.15.021(SB1)**



Texas Office of the Secretary of State
## Voter Name and Address Changes

### Welcome

This free service is offered to registered Texas voters who need to submit Name and/or Address changes.

You may use this service to update your Texas voter registration information. Allowable updates include changes to your current residential address and/or your changes to your name.

### NOTE:

If you update your county of residence to a new county, your voter registration in your current county will be cancelled. Your voter registration information will be updated to the corresponding county of your new residential address.



https://www.texas.gov/living-in-texas/texas-voter-registration/#update-voter-name-or-address

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | ___ / ___ / ___ | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



# Drivers License Number



https://www.texas.gov/living-in-texas/texas-voter-registration/#update-voter-name-or-address

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | [ ] / [ ] / [ ] | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



OCA-APPX-1950

# DPS Audit Number



# Voter Unique Identifier (VUID)

Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | [ ] / [ ] / [ ] | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ▾ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



# Voter Unique Identifier (VUID)

Find your VUID number on your voter registration card at, "Am I registered?" at <u>votetexas.gov</u>, or call your county voter registrar.





OCA-APPX-1953

**Empowering Voters. Defending Democracy**

# Tips for Voters
# New Election Laws 2022

## Health and Justice Advocacy Network Voting Challenge Meeting

### August 23, 2022



Joyce LeBombard, President
**LEAGUE OF WOMEN VOTERS OF TEXAS**

OCA-APPX-1954

# 2022 General Election - Key Dates





- Last day to register to vote or change your address
  **October 11**
- First day to vote early in person
  **October 24**
- Last day to apply for vote-by-mail ballot
  **October 28**
- Last day to vote early in person
  **November 4**
- Election Day and vote-by-mail ballot receipt deadline
  **November 8**

## VOTE411.org    LWVTexas.org


LEAGUE OF WOMEN VOTERS

OCA-APPX-1955

# NEW!
# Update your Voter Registration Online

- If you moved or changed your name, update your voter registration online at texas.gov or votetexas.gov



https://www.texas.gov/living-in-texas/texas-voter-registration/#update-voter-name-or-address

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | / / | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



OCA-APPX-1957

# Drivers License Number & DPS Audit Number



# Voter Unique Identifier (VUID)

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | [ ] / [ ] / [ ] | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



OCA-APPX-1959

# Voter Unique Identifier (VUID)

Find your VUID number:

- on your voter registration card
- "Am I registered?" at <u>votetexas.gov</u>, or
- call your county voter registrar.



OCA-APPX-1960

# NEW!
## Student Voters

College student voters living on campus may now use P.O. Box making it easier to register and vote at your college residence address.

**Sec. 1015 (SB1111)**



OCA-APPX-1961

# NEW!
## For Voters Without a Residence

- In the space on the registration form  for residence address, it's safest to put the street address of an agency where you receive aid.
- In the space for mailing address, if you have one, put the P.O. Box where you receive your mail.



**Sec.** 15.051 - 15.054 **(SB1111)**



OCA-APPX-1962

# NEW!
# Early Voting

Small counties can now
provide longer hours for
early voting when a written
request submitted by at
least 15 registered voters
of the county.

**85.005 (SB1)**





OCA-APPX-1963

# NEW!
## Vote by Mail

## Who qualifies:

- 65 years or older.
- Sick or disabled.
- Out of the county during early voting and on Election Day.
- In jail, but otherwise eligible to vote.

## Who else now qualifies?

- Voters expecting to give birth within three weeks before or after election day

**Sec 82.02 (HB 3920)**



OCA-APPX-1964 photo credit canva.com

# NEW!
# Vote by Mail

## Organizations & Leagues

- Counties can only provide the applications to the individuals.
- Counties may not provide applications to organizations. But organizations can order from the Secretary of State's office or print VBM applications to share with voters to give out to anyone.

Sec. 84.001(SB1)

Print VBM applications at LWVTexas.org/votebymail

Texas application for a ballot by mail

Para conseguir la versión en Español llamar sin cargo al 1-800-252-8683.

**1. Voter information** Provide your full legal name.

Last _____ First _____ Middle _____ Suffix (Sr., Jr.) _____

The rest of the information in this section is helpful to the Early Voting Clerk, but not required.

Phone _____ Email _____

Date of birth (mm/dd/yyyy) _____ Voter Unique Identifier # _____ Precinct # _____

**2. Identification** You must provide one of the following numbers. We recommend you provide both numbers.

Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (Not your voter registration VUID #)

Or

If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

XXX-XX-____

Or

☐ I have not been issued a Texas Driver's License/Texas Personal Identification Number/ Texas Election Identification Certificate or Social Security Number.

**3. Residence address** The address as shown on your Voter Registration Certificate.

Street _____ Apt. # ___ City _____ State TX Zip ___

**4. Mailing address** This is where we will send your ballot.

○ Same as residential address in section 3
○ Other address - You may use the Other Address line only if the other address fits one of the categories below.
  ○ The mailing address listed on my Voter Registration Certificate
  ○ Address outside the County (voters absent from the county)
  ○ Address of the Jail/Civil Commitment Facility or a Relative (Indicate relationship)
  ○ Hospital, Nursing Home, Long-Term Care Facility, Retirement or Assisted Living Center or a Relative (Indicate relationship)

Street _____ Apt. # ___ City _____ State ___ Zip ___



OCA-APPX-1965

# NEW!
## Vote by Mail

## Voters

- Request a VBM application from your county election office or print from LWVTexas.org/votebymail

Sec. 84.001(SB1)

- Provide Voter ID number (TXDL, Personal ID, EIC Number or, if not available, the last four digits of SSN) on your VBM application and VBM ballot carrier envelope

84.002 (SB1)

- Use the same Voter ID number on your voter registration application, VBM application, and VBM carrier envelope.

Sec. 84.002 (SB1)



# How to Apply and Vote By Mail

## How to apply to vote by mail

### 1. Get an application

- ☐ **Download and print the application** from VoteTexas.gov. Applications are available in English and Spanish
  OR
- ☐ **Call to request an application** from your County Election office at

### 2. Fill out the application - Provide all the required information

#### 1. Voter information

- ☐ Your contact information, in case there's an issue with your application.
- ☐ Your ID numbers
  - Your TX Drivers License or TX Personal ID number AND
  - The last 4 digits of your Social Security Number

#### 2. Mail my ballot to

- ☐ The mailing address where your ballet will be sent.

#### 3. Reason for voting by mail

- ☐ Your reason for voting by mail.
- ☐ Have a disability? Remember to check the box that says "Disability".

#### 4. Send me a ballot for the following elections

- ☐ Mark which election you are applying to vote by mail in.
- ☐ If you are 65 or older, are sick, or are disabled, you can check the "Annual Application" box to receive ballots for all mail elections until the end of the calendar year.
- ☐ In even years, mark the primary and runoff election you want to vote in.

#### 5. Sign here

- ☐ Sign and date the application.

#### 6. Assistant and Witness

## Pocket Guide

### How to Return Your Ballot by Mail in Texas

### Who can vote by mail?

You can vote by mail if you are:
- 65 years or older
- Sick or disabled
- Out of the county during early voting and on Election Day
- Expecting to give birth within 3 weeks before or after Election Day
- In jail, but otherwise eligible to vote.

To vote by mail in Texas, you must return your

### Still have questions?

County Election Office
Visit bit.ly/TXcountycontact

TX Secretary of State Office
800-252-VOTE
VoteTexas.gov

Election Protection Hotline
866-687-8683

### What should I do if...

Call your County Election Office for their best advice. Find their contact information at bit.ly/TXcountycontact

**I lost my ballot. What should I do?**
Vote in person instead. You will vote provisionally, which is a secure alternative to voting a regular ballot.

**I made a mistake on my ballot. What should I do?**
Vote in person instead. Take your Ballot-by-Mail with you to the polling station and give it to the voting clerk. You will be allowed to vote on a regular ballot.

# NEW!
## Vote by Mail

### Voters

Use the **same Voter ID number** on your
- Voter registration application
- VBM application
- VBM carrier envelope.

Recommend to always use both driver's license AND Social Security number.

## For the Cure process

Provide contact information on your VBM carrier ballot so the county may contact you if you need to fix an error with your application or ballot.

| REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD | | |
|---|---|---|
| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) (Número de licencia de conducir de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas) (NO ES el número de su Registro Electoral VUID#) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number (Si no tiene licencia de conducer de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas, proporcione los 4 últimos dígitos de número de Seguro Social)  XXX - XX - _____ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or a Social Security Number (No me han expedido una licencia de conducir de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas ni un número de Seguro Social |

OPTIONAL CONTACT INFORMTION: Phone: _____   Email: _____



VBM Carrier Envelope



OCA-APPX-1967

# NEW!
## Vote by Mail

## VBM tracker

- Track your VBM application and VBM ballot throughout the election process

## Cure process

- Provide contact information on your VBM application so the county may contact you if you need to fix an error with your application or ballot.

- Turn your VBM ballot in early so your county may contact you if there is an error with the application.

**Sec. 86.015 (HB 1382)**

**1. Voter Information:** Please print all information clearly and legibly

Name: _____
   Last,                    First,                    Middle         Suffix (Jr., Sr.)

<u>Residence Address as shown on your Voter Registration Certificate</u>

Address: _____
   Street              Apt. # (if any)   City              State      Zip Code

<u>Optional Information:</u> Providing this information is helpful to the Early Voting Clerk, but not required.

Date of Birth: _____ / _____ / _____   VUID #: _____   Pct #: _____

Email: _____   Tel. #: _____

Provide your contact information on your application to VBM and the VBM ballot carrier envelope



OCA-APPX-1968

# NEW!
# Assisting Voters

- Persons who assist voters with a VBM application, VBM ballot, or in-person ballot must provide their relationship to the voter and address.
- For the VBM ballot sign an oath, and mark that they didn't receive compensation. Sec. 84.011(SB1

- Persons who drive 7 or more voters who qualify for curbside voting must sign a form which is shared with the Secretary of State and the Attorney General's office. Sec.64.009 (SB1)



"I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance;

I will not suggest, by word, sign, or gesture, how the voter should vote;

I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot;

I will prepare the voter's ballot as the voter directs;

I did not pressure or coerce the voter into choosing me to provide assistance;

I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs;

OCA-APPX-1969

I will not communicate information about how the

# Oath & Compensation

**Oath of Person Assisting Voter:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." *Juramento de la Persona Asistiendo al Votante:* "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; ▮▮▮▮▮▮▮▮▮▮▮▮ prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

**If you are an assistant, provide information below:** *(Si usted es un asistente o testigo, marque la casilla correcta y proporcione su información):*

**Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance?** Circle one: Yes | No
*¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia?* Marque con un Círculo: Si | No

Printed Name (Nombre en letra de molde)     Signature (Firma)

Relationship to Voter (relacion al votate)     Street Address (Domicilio residencial)

---

✗
**SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)**

**Completed by Early Voting Clerk:**

Name of Election (Nombre de Elección): _____

Name of Voter (Nombre del votante): _____

Date of Election (Fecha de Elección): _____ / _____ / _____

**Instructions to Witness:** You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____.

*(Instrucciones al Testigo:* Usted está fungiendo como testigo para _____ (nombre del votante). Usted debe llenar la siguiente sección abajo si usted fue testigo de que el votante firmo, o de que el votante no puede firmar. Si el votante no puede firmar, marque sus iniciales aquí _____.)

Signature (Firma)     Printed Name (Nombre en letra de molde)

Street Address (Domicilio residencial)

● Sec.86.0105 (SB1)



OCA-APPX-1970

# NEW!
## Poll Watchers

- Required to take training and Sign an oath.
- Have fewer restrictions on movement and observation.
- If poll worker(s) providing assistance then poll watcher can "inspect" ballot but not if personal assistant.

Sec. 33.051 (SB1)

"I swear (or affirm) that I will not disrupt the voting process or harass voters in the discharge of my duties."



OCA-APPX-1971

# How you can help

Share trusted resources

- [LWVTexas.org/votebymail](LWVTexas.org/votebymail)
  - Print - [Application to Vote by Mail](Application to Vote by Mail)
  - Print - [How to Apply and Vote by Mail](How to Apply and Vote by Mail)
  - Print - [Pocket Guide - How to Vote by Mail](Pocket Guide - How to Vote by Mail)
  - Print - [Bookmarks - Vote by Mail](Bookmarks - Vote by Mail)
  - Print - [Door Hangers - Vote by Mail](Door Hangers - Vote by Mail)
  - Video - [Susan SharesTips for Filling out the application to Vote by Mail](Susan SharesTips for Filling out the application to Vote by Mail)
  - Video - [Susan SharesTips for Voting by Mail](Susan SharesTips for Voting by Mail)
  - Video - [How to Vote by Mail Texas Style](How to Vote by Mail Texas Style)

Become a poll worker

- Your county's Elections Office or [PowerThePolls.org](PowerThePolls.org)

Volunteer for Election Protection.

- [866OurVote.org](866OurVote.org)



# Resources

- [LWVTexas.org](LWVTexas.org)
  [VOTE411.org](VOTE411.org),

- Election Protection
  [https://866ourvote.org/state/texas/](https://866ourvote.org/state/texas/)
  866-687-8683

- Texas Secretary of State
  [VoteTexas.gov](VoteTexas.gov)
  (800) 252-VOTE





OCA-APPX-1973

**VOTE 411**

WHAT IS ON
YOUR
**BALLOT?**
VOTE411.ORG

**VOTERS GUIDE** - BY THE
**LEAGUE OF WOMEN**
**VOTERS**
**EDUCATION FUND**

OCA-APL



LWV

# Exhibit 129

OCA-APPX-1975

**From**:      Grace Chimene [lwvtexas@lwvtexas.org]
on behalf of      Grace Chimene <lwvtexas@lwvtexas.org> [lwvtexas@lwvtexas.org]
**Sent**:      12/13/2021 4:21:21 PM
**To**:      gchimene@lwvtexas.org
**Subject**:      Tips for Voters with Disabilities and Voters Over 65

[View in your browser](#)



For Immediate Release
December 14, 2021
For Information Contact:
**Grace Chimene**
**512-940-9948**
gchimene@lwvtexas.org

## Upcoming Webinar: The Impact of New Election Laws on Voters

Austin - On Wednesday, December 15, 2021 at noon, the League of Women Voters of Texas will join The Arc of Texas, Disability Rights Texas, and REV UP Texas to present a free one-hour webinar to review the new election laws enacted by the 87th Texas Legislature. The presenters will focus on changes to vote by mail, curbside voting and giving assistance to voters. The goal of this webinar is to lessen the impact of election law changes felt by voters with disabilities and those over 65.

The need for this informative presentation is explained by Grace Chimene, president of the League of Women Voters of Texas. "We want to get voters ready well before the March 2022 Primary Election so that they are not confused by or afraid of these election law changes. This webinar will be helpful for all voters, but especially those who will be disproportionately affected such as disabled voters and voters over 65. The March Primary Election is going to be an important election, with a large number of races and candidates. Our goal is to reduce any barriers for Texas voters."

The presenters will include:

- Grace Chimene, President - League of Women Voters of Texas
- Molly Broadway, Training and Technical Support Specialist for Voting Rights - Disability Rights Texas
- Jeffrey Miller, Policy Specialist - Disability Rights Texas
- Ashley Ford, Director of Public Policy & Advocacy - The Arc of Texas

You can register in advance for this webinar:

https://us02web.zoom.us/webinar/register/WN_PVeDccrtSDGbK92Rp_C2_g

After registering, you will receive a confirmation email containing information about joining the webinar.

---

The League of Women Voters is one of America's oldest and most trusted civic nonprofit organizations. Formed in 1919, the Texas League represents more than 13,500 grassroots advocates and 34 local Leagues across the state. The League never supports or opposes candidates for office or political parties. The League encourages the informed and active participation of citizens in government. The League also seeks to influence public policy through education and advocacy. Membership is open to people 16 years and older.

---

**League of Women Voters of Texas**
1212 Guadalupe St. #107
Austin Texas, 78701
(512)-472-1100

OCA-APPX-1977

**lwvtexas@lwvtexas.org**
**lwvtexas.org**



You have received this message from the mailing list of The League of Women Voters of Texas. If you would prefer not to receive these emails in the future, go to the opt-out page and modify your privacy settings. You can also request to be removed from our database completely.

# Exhibit 130

| | |
|---|---|
| **From:** | Grace Chimene [gchimene@lwvtexas.org] |
| **on behalf of** | Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org] |
| **Sent:** | 1/12/2022 2:17:19 PM |
| **To:** | Willie Bennett [WBennett@episcopalhealth.org] |
| **Subject:** | Re: HJAN retreat |

Perfect!
I'm looking forward to the event!
Grace

On Wed, Jan 12, 2022 at 1:07 PM Willie Bennett <WBennett@episcopalhealth.org> wrote:

Hi Grace! I wanted to give you a final update for Saturday and see if you have any questions. I have included a draft agenda for you that remains mostly the same. You will have **two 40-minute** segments to share the latest on laws regarding GOTV and assisting voters and the second to talk about actually getting out the vote, tools they can use, who is running, etc. This time frame includes Q and A. You will be able to share your screen with us. Here is the link:
https://zoom.us/j/92942411244?pwd=VzJZbk9SM1FrQkVaMWxoK3BGZlowQT09

## Why this Meeting?

The registrations have been up and down with COVID and changes to the ordination schedule but I'm expecting 10-20 representatives from different areas of the diocese.(Brenham, Houston, Austin, Bryan/CS, Austin, Temple, Waco) The Health and Justice Advocacy Network(HJAN) is an organization of Episcopalians working together on policy issues affecting health. It began the fall of 2020 and took up Medicaid Expansion during the Legislative session. Starting from a core of 8 people, they engaged the entire diocese around Medex and rallied volunteers to make over 700 contacts with legislators as well as participated in public hearings online and in person over the summer and fall last year. Now they are regrouping and looking to keep Medex at the forefront as they encourage their communities to vote in the primaries with Coverage Expansion on their mind.

## Key People

The strength of HJAN is in their relationships. Most of the people on the call Saturday will be key representatives in their church as well as within their community or the Episcopal church. For example:

*The co-chair of the meeting, **Joyce Statz**, is a key leader at St. Matthews in Austin. She led their GOTV drive in 2020 that made contact with over 2000 potential voters inside and outside their congregation.*

*The other co-chair, **Dec. Clothier** from Temple, has connections with the head of deacons for the diocese and is able to get information out to all the deacons serving. In the Episcopal church, the deacons take the lead in social ministry and many have worked with us. Unfortunately, this is ordination weekend so several will not be able to attend.*

OCA-APPX-1980

*Another is **Max Gerall**, the Founder of REACH at Texas A&M – his group has done small group meetings with over 200 custodians and their families at A&M as they provide support and advocate with them. He also has connections with Episcopal churches in Bryan/College Station and others. You get the idea.*

*Here is the latest agenda. Let me know if you have any questions.*

1/11/21
**Draft agenda**
9:00 – Opening – Joyce Statz

Prayer Dec. Tamara Clothier

Introductions(Name and congregation)

Video Welcome from Bishop Ryan (que video)
9:12 **-** *Rationale for the retreat- Joyce*
9:15 – Summary of Build Back better and accomplishments last year – **Lisa Madry** – Willie introduce
9:20 – **League of Women Voters** – part 1 – Changes to voting and assisting with Q/A - Willie introduce
10:00 - *break – 5 min*
10:05 – **League** – Part 2 –Tools and Tactics for GOTV 2022; Q/A
11:00 – *break 5 min*
11:05 – Episcopal Activators – Alan Yarborough, Office of Govt. and Church rel. Willie introduce
11:20 – HJAN planning for 2022 (Charge for HJAN members)
11:30 – Small groups (Give instructions for the breakout; need reporter for each group)
12:00 – Reports
12:30 – Adjourn

Next Meeting - Feb. 21 tentative


**Willie Bennett**
*Congregational Engagement Officer*

**EPISCOPAL HEALTH FOUNDATION**

500 Fannin St. Suite 300

Houston, Texas 77002

Main: 713-225-0900

Direct: 832-807-2590


*Health has a new voice in Texas.*

EpiscopalHealth.org

 @health4texas    Health4Texas

#HealthNotJustHealthCare

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

# Exhibit 131

**From:** Lorraine McKay [lorraine.mckay@wilco.org]
**on behalf of** Lorraine McKay <lorraine.mckay@wilco.org> [lorraine.mckay@wilco.org]
**Sent:** 2/2/2022 9:29:40 AM
**To:** gchimene@lwvtexas.org
**CC:** Christopher J. Davis [cjdavis@wilco.org]
**Subject:** RE: Call me if you get a chance. LWV
**Attachments:** 2022 Election Dates.docx; Ballot by Mail Tips 2022.docx; 6-19 - Dear Voter Letter 2022.docx

Hello Grace,

As always our website has quite a bit of information: https://www.wilco.org/votebymail. The document 2022 Election Dates is what I include when mailing out requested Ballot by Mail applications. The other two documents are included with the mail-ballot. The Dear Voter letter came from the State, the other documents were created by our office. Please let me know if you have any specific questions about voting by mail. We want everyone to be as comfortable as possible with the new laws.

Best,

*Lorraine McKay*
**Ballot by Mail Coordinator**
**512-943-1633**

---

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Tuesday, February 1, 2022 3:44 PM
**To:** Christopher J. Davis <cjdavis@wilco.org>
**Subject:** Call me if you get a chance. LWV

---

**EXTERNAL email: Exercise caution when opening.**

---

Chris,
Do you have instructions for the Ballot by Mail provided by the SOS and any that Williamson County is creating?

Call if you have any suggestions for messaging on the issues folks are having.
I don't want to suppress the vote but I'm getting lots of concerns with the process.

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

| From: | Grace Chimene [gchimene@lwvtexas.org] |
| on behalf of | Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org] |
| Sent: | 1/28/2022 12:19:52 PM |
| To: | Selene Gomez [selene@voteriders.org] |
| Subject: | Re: VoteRiders Partner Toolkit Launch |

You can find our resources here: https://lwvtexas.org/votebymail
The one-pager is on this page along with videos. More videos are coming about the Ballot tracker and how to fill out the carrier envelope.
It is best to refer to the website in case I need to update the one-pager.
This is the actual one pager.  It has an ugly url
https://s3.amazonaws.com/ClubExpressClubFiles/979482/documents/Vote_by_Mail_and_Register_to_vote_One_e_pager_12__1165544255.pdf?AWSAccessKeyId=AKIA6MYUE6DNNNCCDT4J&Expires=1643394201&responsse-content-disposition=inline%3B%20filename%3DVote_by_Mail_and_Register_to_vote_One_pager_12_.pdf&Signature=%2Bq572hLtsR52A5KcatcEAcv0raA%3D

Call if you have any questions.


On Fri, Jan 28, 2022 at 12:16 PM Selene Gomez <selene@voteriders.org> wrote:

Grace,

I am reaching out to share our new partner toolkit we just launched this week and see if it could be sent out to the Texas chapters. I also wanted to check in to see if you have finalized the one pager that addresses mail in ballot ID issues. I would like to include it in our resources if possible.


## Selene M. Gomez, MPA

**National Outreach Director**
Pronouns: She/Her/Ella
Phone: (210) 723-7113
Email: Selene@voteriders.org



PRIVILEGE AND CONFIDENTIALITY NOTICE: This email and any attachments may contain privileged or confidential information and is/are for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication

is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On Fri, Jan 14, 2022 at 2:04 PM Grace Chimene <[gchimene@lwvtexas.org](mailto:gchimene@lwvtexas.org)> wrote:
That is a relief! One less thing to worry about.
Thank you so much.

On Fri, Jan 14, 2022 at 1:57 PM Selene Gomez <[selene@voteriders.org](mailto:selene@voteriders.org)> wrote:
Grace,
I just wanted to let you know that I was able to login through the portal you showed me to change my address. I was also curious if I would be able to find out if I was registered to vote with my DL number even though I didn't provide it when registering and I was able to do so. I hope you find this information helpful after our conversation this morning.

### Selene M. Gomez, MPA
**National Outreach Director**
Pronouns: She/Her/Ella
Phone: (210) 723-7113
Email: [Selene@voteriders.org](mailto:Selene@voteriders.org)



PRIVILEGE AND CONFIDENTIALITY NOTICE: This email and any attachments may contain privileged or confidential information and is/are for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On Tue, Jan 11, 2022 at 2:50 PM Selene Gomez <[selene@voteriders.org](mailto:selene@voteriders.org)> wrote:
Sounds good! I will look out for the calendar invite with the link. Talk to you soon!

# Selene M. Gomez, MPA
## National Outreach Director
Pronouns: She/Her/Ella
Phone: (210) 723-7113
Email: Selene@voteriders.org



PRIVILEGE AND CONFIDENTIALITY NOTICE: This email and any attachments may contain privileged or confidential information and is/are for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On Tue, Jan 11, 2022 at 2:46 PM Grace Chimene <gchimene@lwvtexas.org> wrote:
Let's do a zoom so I can share and you can visualize the issue.

On Tue, Jan 11, 2022 at 2:34 PM Selene Gomez <selene@voteriders.org> wrote:
How's 11am? If that works, I can give you a call then, unless you prefer a video call.

# Selene M. Gomez, MPA
## National Outreach Director
Pronouns: She/Her/Ella
Phone: (210) 723-7113
Email: Selene@voteriders.org



OCA-APPX-1987

PRIVILEGE AND CONFIDENTIALITY NOTICE: This email and any attachments may contain privileged or confidential information and is/are for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On Tue, Jan 11, 2022 at 2:14 PM Grace Chimene <gchimene@lwvtexas.org> wrote:
 I'm wide open this Friday.

 On Tue, Jan 11, 2022 at 1:50 PM Selene Gomez <selene@voteriders.org> wrote:
  This is great! Thank you for sharing it and yes, I would like to talk about this component of SB1. I would love to get your input on that and see how we can assist voters. Do you have any availability sometime in the next couple of weeks?

## Selene M. Gomez, MPA
**National Outreach Director**
Pronouns: She/Her/Ella
Phone: (210) 723-7113
Email: Selene@voteriders.org



PRIVILEGE AND CONFIDENTIALITY NOTICE: This email and any attachments may contain privileged or confidential information and is/are for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On Tue, Jan 11, 2022 at 1:28 PM Grace Chimene <gchimene@lwvtexas.org> wrote:
 I will share with the presidents.
 Let me know if you want to chat about the issue VBM voters are having with Voter ID numbers that are required on the application?
 Grace

 On Tue, Jan 11, 2022 at 1:07 PM Selene Gomez <selene@voteriders.org> wrote:
  Grace,
  Happy New Year! I hope you are doing well. I wanted to invite you to VoteRiders' launch of our 2022 Partner Toolkit via zoom on January 26 at 3pm ET. We'll walk you through the free ID resources, tools, and services that are available to all of our partner organizations to ensure that the

OCA-APPX-1988

OCAGH_00005904

communities they serve have the ID information and help they need to vote with confidence. You can Sign up here. Would you also forward it to all the Texas chapters? I would truly appreciate it.

Additionally, please let me know if there is any way we can help the LWV chapters as they do voter registration and voter guides. We would love to provide them with literature and resources to refer voters to us should they lack an acceptable ID.

## Selene M. Gomez, MPA
### National Outreach Director
Pronouns: She/Her/Ella
Phone: (210) 723-7113
Email: Selene@voteriders.org



PRIVILEGE AND CONFIDENTIALITY NOTICE: This email and any attachments may contain privileged or confidential information and is/are for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

**From:** Grace Chimene [gchimene@lwvtexas.org]
**on behalf of** Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org]
**Sent:** 1/19/2022 1:16:23 PM
**To:** Dorothy Marchand [dmarchand@lwvtexas.org]
**CC:** Barbara Larkin [barblarkin@tx.rr.com]
**Subject:** Re: VBM app question on the two IDs

All the voter registration gets updated to the SOS Team eventually.
I have also heard from the SOS that DPS is sharing id with TEAM and the SOS.

Barbara,
Would you like me to review your flyer.
We have created one that has been reviewed by EP lawyers.
The resources are on the vote-by-mail webpage at lwvtexas.org

Voters may provide both ID numbers.
Don't check the box below the SS#


On Wed, Jan 19, 2022 at 11:57 AM Dorothy Marchand <dmarchand@lwvtexas.org> wrote:
Hi Barb,

Copying Grace as the advice on this seems to evolve and the opinions from other advocacy groups appear mixed. I was on a call this morning with Gretchen Nagy, the Voter Registration Director for Travis County. She indicated that the counties were initially using their own data bases to check the BBM application numbers, but were told last week by SOS office to use TEAM instead. The county data bases had been synced with TEAM, but the information that TEAM gets from the DPS was not included. When using TEAM directly, they are experiencing a lower rejection rate because TEAM has the SSN as well as the TDL numbers.

Grace?

Dorothy


Dorothy Marchand
VP, Voter Education
League of Women Voters of Texas
713 446 4297
Empowering Voters. Defending Democracy


On Jan 19, 2022, at 10:21 AM, Barbara Larkin <barblarkin@tx.rr.com> wrote:

HI Dorothy: We created a flyer to explain that there is a new VBM application – and have recommended that voters put both their social and drivers license on the form. Yesterday Josh the lawyer said he was concerned that voters would get in trouble for doing that – I guess because the way the first question is worded- "if you don't have". What are you recommending we say/recommend voters do on those two ID lines. Would it be better to encourage them to work on getting their own voter file updated with both numbers? Thanks for any advice. Barbara

OCAGH_00007048

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

OCA-APPX-1992

OCAGH_00007049

| From: | Madhu Sridhar [madhusridhar2012@gmail.com] |
|---|---|
| on behalf of | Madhu Sridhar <madhusridhar2012@gmail.com> [madhusridhar2012@gmail.com] |
| Sent: | 11/7/2021 4:01:12 PM |
| To: | Grace Chimene [gchimene@lwvtexas.org] |
| Subject: | Re: revised SB1 material |

Thanks for your response. I will post this for now and wait to post the one you send when we get it.
Madhu

On Sun, Nov 7, 2021 at 7:16 AM Grace Chimene <gchimene@lwvtexas.org> wrote:
Madhu,
We are working with lawyers to come out with the SB 1 voter education which will be provided by before it goes into effect on Dec. 2.
Thank you,
Grace

On Sat, Nov 6, 2021 at 5:22 PM Madhu Sridhar <madhusridhar2012@gmail.com> wrote:
Hi Grace:

Can you please verify the following? This is the list of 8 regarding SB! limiting our right to vote. According to Glenda (see her email below), #5 on the list is incorrect.

**Original Wording:**
5. Require voters using mail ballots to include the ID number contained in their registration records when applying for or returning mail ballots;

**Revised by Glenda:**

5. Require voters using mail ballots to include the number of their driver's license, election identification certificate or personal identification card issued by the Department of Safety, or if the voter has not been issued such a number, the last four digits of their Social Security number, when applying for or returning mail ballots;

Thanks.

Madhu

---------- Forwarded message ---------
From: **Glenda Wolin** <gwolin@gmail.com>
Date: Fri, Nov 5, 2021 at 3:43 PM
Subject: revised SB1 material
To: Madhu Sridhar <madhusridhar2012@gmail.com>

I made an important change in No. 5 - I don't know who wrote that, but if it came from State, they are wrong and if they are still running it, it needs fixing.

Stay safe,

OCA-APPX-1993

*Glenda*

--

Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

--

Madhu Sridhar
President
League of Women Voters of San Antonio
210 668 1250
**Making Democracy Work!**
*Your local league is an all-volunteer effort*

**From:** Grace Chimene [gchimene@lwvtexas.org]
**on behalf of** Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org]
**Sent:** 2/28/2022 4:16:44 PM
**To:** Dorothy Marchand [dmarchand@lwvtexas.org]
**Subject:** Re: Love Victoria advocate

That is great news!


On Mon, Feb 28, 2022 at 3:52 PM Dorothy Marchand <dmarchand@lwvtexas.org> wrote:
Oh, that is just awesome.  Update:  my girlfriend who couldn't get her ballot accepted, while only met with frustration on Harris County website and phone calls, was able to go to VoteTexas.gov (where I suggested) and get it fixed. Now shows as "Ballot Accepted"!

Dorothy Marchand
dmarchand@lwvtexas.org
███████████


On Feb 26, 2022, at 5:27 PM, Grace Chimene <gchimene@lwvtexas.org> wrote:


https://www.victoriaadvocate.com/news/election_central/primary-election-is-tuesday-heres-what-you-need-to-know/article_d1ce547a-968e-11ec-848f-a794d0ab2336.html
--
**Grace Chimene** (she/her)
**President,** League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
███████████

*Empowering Voters. Defending Democracy*




--
**Grace Chimene** (she/her)
**President,** League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
███████████

*Empowering Voters. Defending Democracy*

OCA-APPX-1995

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCA-APPX-1996

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00016356

From:        LWV Texas State Office [lwvtexas@lwvtexas.org]
Sent:        8/11/2022 11:53:32 AM
To:          Joyce Hillebrand [jdhillebra@gmail.com]
BCC:         jlebombard@lwvtexas.org
Subject:     Re: Voting by mail questions

Hi Joyce,
I have forwarded your questions to the experts on this and you should get a replay early next week.
Aileen


Aileen McMurrer
Executive Director

**Empowering voters. Defending democracy.**
1212 Guadalupe Ste 107
Austin, TX 78701
512-472-1100
**lwvtexas@lwvtexas.org**


On Wed, Aug 10, 2022 at 3:42 PM Joyce Hillebrand <jdhillebra@gmail.com> wrote:
I am part of the Wood County Democratic Club and working on Voting By Mail(VBM) and I have some questions, especially since all the rules have changed. Hopefully someone can answer them for me. I have looked through your info that was sent out but could not find the answers to these questions.

1. Can we as a club hand out the VBM applications to people in our county?
2. If so, can we highlight areas that have caused applications to be rejected?
3. Can we hand out sample ballot cheat sheet with areas that need to be completed?

Thanks
Joyce Hillebrand

| | |
|---|---|
| **From:** | Joyce LeBombard [jlebombard@lwvtexas.org] |
| **Sent:** | 10/28/2022 4:38:50 PM |
| **To:** | MARY CULLINANE [mculli@sbcglobal.net] |
| **CC:** | Joyce LeBombard [president@lwvtexas.org] |
| **Subject:** | Re: Fw: Travis County Elections Ballot by Mail - G22 Notice of Carrier Defect |
| **Attachments:** | image005.jpg; image006.jpg |

Hi Mary,

Please let her know this issue can be fixed online so her vote can still count. Have her read down what was sent to her to How To Correct Defect #4 Online. She just needs to go to VOTETexas.gov and click on Ballot By Mail Tracker to put in her correct numbers and have her add both her DL number and her SSN. I believe she will need her VIU ID to find her info on the Ballot By Mail Tracking which I am sure she does not have with her but that she can get off of the VoteTravis.org site.

Hope this helps! If you want she can call me.

Joyce LeBombard (she/her)
President, League of Women Voters of Texas
jlebombard@lwvtexas.org | 512-585-4090 (c)
*Schedule a meeting with me: https://calendly.com/joycelebombard*
LWVTexas.org & VOTE411.org
**_Empowering voters. Defending democracy._**


On Fri, Oct 28, 2022 at 3:28 PM MARY CULLINANE <mculli@sbcglobal.net> wrote:
Hi Joyce - I don't know if y'all are collecting election stories but here's one from a friend. She is visiting in NY. She won't be back in TX in time to go in person to fix this problem. Another voter denied.

Mary


----- Forwarded Message -----
**From:** Bernadette Maloney <bernadette.maloney@gmail.com>
**To:** MARY CULLINANE <mculli@sbcglobal.net>
**Sent:** Friday, October 28, 2022 at 03:19:17 PM CDT
**Subject:** Fwd: Travis County Elections Ballot by Mail - G22 Notice of Carrier Defect

Look at this!

---------- Forwarded message ---------
**From:** **eBBM** <eBBM@traviscountytx.gov>
**Date:** Fri, Oct 28, 2022 at 1:22 PM
**Subject:** Travis County Elections Ballot by Mail - G22 Notice of Carrier Defect
**To:**

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

Prescribed by Secretary of State
Sections 63.0011, 87.0271, 87.0411, Texas Election Code
1/2022 (8-24)

## NOTICE OF CARRIER DEFECT
### Voter Notified of Carrier Envelope Defect by Phone or Email

Your Carrier Envelope has been received and reviewed, but is defective for the reason(s) checked below.

Texas law allows a voter to correct certain defects on his or her Carrier Envelope after the marked ballot has been returned to the Early Voting Clerk. Your Carrier Envelope is being held at the Early Voting Clerk's Office so that you can make the necessary corrections because there was not sufficient time to return your Carrier Envelope to you by mail. The defect(s) listed below are able to be corrected no later than the 6th day after Election Day by appearing in person at the Early Voting Clerk's Office.

**There is a checkmark next to the reason(s) that your Carrier Envelope was Defective**

_____ 1. The Carrier Envelope you returned to the Early Voting Clerk was not signed.

_____ 2. When the signature on your Application for Ballot by Mail was compared to the signature on your Carrier Envelope, it could not be immediately determined that the signatures were made by the same person.

_____ 3. A required Statement of Residence was not included in the Carrier Envelope you returned to the Early Voting Clerk.

__X__ 4. Your Carrier Envelope did not contain your Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number; OR

the number provided did not match the number associated with your voter registration record as provided by your County's Voter Registrar; OR

if you were not issued one of the documents with the required number, you did not indicate this fact on the Carrier Envelope

_____ 5. The Carrier Envelope you returned to the Early Voting Clerk contained incomplete information with respect to a witness.

### How to Correct a Defect on Your Carrier Envelope by Appearing in Person at the Early Voting Clerk's Office

Defects number 1, 2, 3, and 5 can be corrected by completing the Corrective Action Form included with your notification of defect. You must deliver the completed Corrective Action Form in person to the Early Voting Clerk's Office.

### Defect Correction Process by Number

- **Defect #1 –** Complete and sign the Signature Box on the Corrective Action Form.
- **Defect #2 –** Complete and sign the Signature Box on the Corrective Action Form.
- **Defect #3 –** Complete and sign the Statement of Residence portion of the Corrective Action Form.
- **Defect #4 –** You may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov or by providing your personal identification information in Box #4 of the Corrective Action Form. If you use the Corrective Action Form, you must complete and sign the Signature Box.
- **Defect #5 –** If you used a witness for your Carrier Envelope because you were not able to sign or make your mark and the witness information was missing or incomplete, please ask a witness to complete the witness portion of the Corrective Action Form. You may use a different person as a witness if the same person is not available.
  **NOTE:** If you no longer need a witness, you must be able to sign or make your mark on the Corrective Action Form in the Signature Box.

### Correcting Defect #4 Using the Ballot by Mail Tracker

You may correct Defect #4 online through the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov or by delivering the Corrective Action Form to the Early Voting Clerk's Office no later than the 6th day after Election Day. When you log into the Ballot by Mail Tracker, you will have the opportunity to enter your personal identification number(s). Both your Texas Driver's License or Texas Personal Identification Card number AND your Social Security number must be associated with your voter registration record to use the Ballot by Mail Tracker. Once your personal identification number is validated by the Ballot by Mail Tracker, the Carrier Envelope you previously submitted will be processed. Once your corrective action has been reviewed, the date of review and the status of your Carrier Envelope will be displayed on the Ballot by Mail Tracker. You do not have to appear in person at the Early Voting Clerk's Office if you make your correction online.

**To utilize the Ballot by Mail Tracker, you must enter:**

- Your Texas Driver's License Number or Texas Personal Identification Number, AND
- The last four digits of your social security number AND
- Your residence address as listed in your voter registration record

**Cancelling Your Ballot by Mail** - If you do not wish to correct the defect, you may still vote in person by cancelling your Ballot by Mail. If you cancel your Ballot by Mail in person at the Early Voting Clerk's Office, you will be given a Notice of Surrendered Ballot to take to the polls. This entitles you to vote a regular ballot. If you do not cancel at the Early Voting Clerk's Office, you will be able to vote a Provisional Ballot at the polling place. You may not vote in person after Election Day.

If you have any questions or concerns about making a correction to your Carrier Envelope please contact the Early Voting Clerk's Office at:

| (512) 238 - VOTE | *N. Seaman* | Nina Seaman, Presiding Judge |
|---|---|---|
| Phone Number of Early Voting Clerk | Signature of Reviewing Election Official | Printed Name of Election Official |

**5501 Airport Boulevard Austin, TX 78751**

Address of the Early Voting Clerk's Office

OCA-APPX-1999

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00017124

Prescrito por la Secretaría de Estado de Texas
Secciones 63.0011, 87.0271, 87.0411, Código Electoral de Texas
1/2022 (8-24)

# AVISO DE DEFECTO DEL SOBRE DE ENVÍO

### VOTANTE NOTIFICADO POR TELÉFONO O CORREO ELECTRÓNICO DEL DEFECTO DEL SOBRE DE ENVÍO

Su Sobre de Envío ha sido recibido y revisado, pero está defectuoso por la(s) razón(es) marcada(s) a continuación. La ley de Texas permite que un votante corrija ciertos defectos en su Sobre de Envío después de que la boleta marcada haya sido devuelta al Secretario de Votación Adelantada. Su Sobre de Envío está siendo retenido en la Oficina del Secretario de Votación Adelantada para que usted pueda hacer las correcciones necesarias porque no hubo tiempo suficiente para devolverle su Sobre de Envío por correo. Los defectos que se enumeran a continuación se pueden curar a más tardar al 6° día después del Día de las Elecciones presentándose en persona en la Oficina del Secretario de Votación Adelantada.

Hay una marca de verificación junto a la razón por la que su Sobre de Envío era Defectuoso:

\_\_\_\_ 1. El Sobre de Envío que devolvió al Secretario de Votación Adelantada no estaba firmada.

\_\_\_\_ 2. Cuando se comparó la firma de su Solicitud de Boleta Postal con la firma de su Sobre de Envío, no se pudo determinar inmediatamente que las firmas fueron realizadas por la misma persona.

\_\_\_\_ 3. La Constancia de Domicilio Permanente requerida no se incluyó en el Sobre de Envío que usted devolvió al Secretario de Votación Adelantada.

**X** 4. Su Sobre de Envío no contenía su Número de Licencia de Conducir de Texas, su Número de Identificación Personal de Texas, su Número de Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su Número de Seguro Social; O
El número proporcionado no coincidía con el número asociado con su registro de votante proporcionado por el Registrador de Votantes de su condado; O
Si no se le expidió uno de los documentos con el número requerido, no indicó este hecho en el Sobre de Envío.

\_\_\_\_ 5. El Sobre de Envío que usted devolvió al Secretario de Votación Adelantada contenía información incompleta con respecto a un testigo.

### Cómo Corregir un Defecto en Su Sobre de Envío Presentándose en Persona en la Oficina del Secretario de Votación Adelantada

Los defectos número 1, 2, 3 y 5 pueden ser corregidos completando el Formulario de Acción Correctiva incluido en su notificación de defecto. Debe entregar el Formulario de Acción Correctiva completado en persona en la Oficina del Secretario de Votación Adelantada.

### Proceso de Corrección de Defectos por Número

- **Defecto #1** – Complete y firme la Casilla de Firma en el Formulario de Acción Correctiva.
- **Defecto #2** – Complete y firme la Casilla de Firma en el Formulario de Acción Correctiva.
- **Defecto #3** – Complete y firme la parte de la Constancia de Domicilio Permanente del Formulario de Acción Correctiva.
- **Defecto #4** – Usted puede corregir el defecto #4 en línea a través del Rastreador de Boleta por Correo de la Secretaría de Estado de Texas en www.votetexas.gov o agregando su(s) número(s) de identificación personal en la Casilla #4 del Formulario de Acción Correctiva. Si utiliza el Formulario de Acción Correctiva, debe completar y firmar la Casilla de Firma.
- **Defecto #5**- Si utiliza un testigo para su Sobre de Envío porque no pudo firmar o hacer su marca y la información del testigo faltaba o estaba incompleta, pida a un testigo que complete la parte del Formulario de Acción Correctiva correspondiente. Puede utilizar una persona diferente como testigo si la misma persona no está disponible.

**NOTA:** Si ya no necesita un testigo, debe poder firmar o hacer su marca en el Formulario de Acción Correctiva en la Casilla de Firma.

### Corrección del Defecto #4 Usando el Rastreador de Boleta por Correo

Puede corregir el defecto #4 en línea a través del Rastreador de Boleta por Correo de la Secretaría de Estado de Texas en www.votetexas.gov o entregando el Formulario de Acción Correctiva en la Oficina del Secretario de Votación Adelantada a más tardar al 6° día después del Día de las Elecciones.

Cuando ingrese al Rastreador de Boleta por Correo, tendrá la oportunidad de ingresar su(s) número(s) de identificación personal. Tanto el número de su Licencia de Conducir de Texas o de su Tarjeta de Identificación Personal de Texas COMO su número de Seguro Social deben estar asociados con su registro de votante para utilizar el Rastreador de Boleta por Correo. Una vez que su número de identificación personal sea validado por el Rastreador de Boleta por Correo, se procesará el Sobre de Envío que usted presentó previamente. Una vez que se haya revisado su acción correctiva, la fecha de revisión y el estado de su Sobre de Envío se mostrarán en el Rastreador de Boleta por Correo. No tiene que presentarse en persona en la Oficina del Secretario de Votación Adelantada si realiza su corrección en línea.

### Para utilizar el Rastreador de Boleta por Correo, debe ingresar:

- Su Número de Licencia de Conducir de Texas o su Número de Tarjeta de Identificación Personal de Texas, Y
- Los últimos 4 dígitos de su Número de Seguro Social Y
- Su dirección de residencia tal y como figura en su registro de votante

**Cancelación de Su Boleta Postal** - Si no desea corregir el defecto, aún puede votar en persona cancelando su Boleta por Correo. Si cancela su Boleta por Correo en persona en la Oficina del Secretario de Votación Adelantada, se le entregará un Aviso de Boleta Postal Renunciada para que lo lleve a las casillas electorales. Esto le da derecho a votar con una boleta regular. Si no lo cancela en la Oficina del Secretario de Votación Adelantada, podrá votar con una Boleta Provisional en el lugar de votación. No podrá votar en persona después del Día de las Elecciones.

Si tiene alguna pregunta o duda sobre cómo hacer una corrección en su Sobre de Envío, póngase en contacto con la Oficina del Secretario de Votación Adelantada en:

| (512) 238 - VOTE | *N. Seaman* | Nina Seaman, Presiding Judge |
|---|---|---|
| Número de Teléfono del Secretario de Votación Adelantada | Firma del Funcionario Electoral Revisor | Nombre del Funcionario Electoral en letra de molde |

**5501 Airport Boulevard Austin, TX 78751**
Dirección de la Oficina del Secretario de Votación Adelantada

OCA-APPX-2000

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00017125

This electronic mail message, including any attachments, may be confidential or privileged under applicable law. This email is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this email, you are notified that any use, dissemination, distribution, copying, disclosure or any other action taken in relation to the content of this email including any attachments is strictly prohibited. If you have received this email in error, please notify the sender immediately and permanently delete the original and any copy of this email, including secure destruction of any printouts.

OCA-APPX-2001

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00017126

# Exhibit 132

OCA-APPX-2002

**NEW Vote by Mail Resources!**

Did you know that nearly 25,000 mail-in ballots were rejected during the May Texas Primary Election? Do you want to help to minimize that happening again? We have a way to help make that happen!

After the alarming rate of rejected mail-in ballots, the League of Women Voters of Texas (LWVTX) went to work. We engaged the Center for Civic Design (CCD), to create easier to understand and use Vote by Mail materials. The LWVTX provided the background, knowledge, and content about Texas' ballot by mail laws and processes while CCD provided their expert design, usability, and accessibility skills.

We are making these new resources available to Election Administrators, political parties, and organizations!

The resources include download and print resources below include:
- Vote by Mail Application - this new application is easier to understand and to fill out. Yes, it is valid to use this application! Per the Texas Secretary of State's website other vote by mail applications can be used as long as it has the necessary fields, which this does.
- How to Apply and Vote by Mail - A double sided checklist. One side is for completing **any** vote by mail application, and the other side is for completing the ballot by mail carrier envelope. These were where the biggest issues in the past for people with the vote by mail
- Pocket Guide -  A foldable guide on how to voter by mail. Bookmarks - Two sets of bookmarks with different quick tips on voting by mail.
- Door Hanger -Two sets of door hangers also with different quick tips on voting by mail.

All the resources can be found at LWVTexas.org/votebymail and listed below for your convenience.

- Application to Vote by Mail (no branding as it is an application)

***LWV Texas Branded***

- How to Apply and Vote by Mail
- Pocket Guide - How to Vote by Mail
- Bookmarks - Vote by Mail
- Door Hangers - Vote by Mail

***Spanish, Chinese, Vietnamese***

OCA-APPX-2003

OCAGH_00016734

These are coming soon as CCD are still field testing them. We will post them on the LWVTexas.org/votebymail site when available.

***Customizable***

These can be updated with your organization's logo. Please don't change other content.

- [How to Apply and Vote by Mail](#)
- [Pocket Guide - How to Vote by Mail](#)
- [Boomarks - Vote by Mail](#)
- [Door Hangers - Vote by Mail](#)

LWVTX and CCD hope you will use these new resources and help to reduce the number of rejected mail-in ballots and applications for the November general election!

OCA-APPX-2004

OCAGH_00016735

# Exhibit 133

OCA-APPX-2005

| From: | Joyce LeBombard [jlebombard@lwvtexas.org] |
|---|---|
| Sent: | 8/11/2022 3:34:41 PM |
| To: | Diane Tasian [diane@thetasians.com] |
| CC: | Dorothy Marchand [dmarchand@lwvtexas.org]; LWV Texas State Office [lwvtexas@lwvtexas.org] |
| Subject: | Re: *Corrections* to New Vote by Mail Resources Links |

Hi Diane,

Yes, this are being translated into Spanish, Vietnamese, and Chinese (Mandarin). I'm working on making them easier to get to on the website. And will share again with all the Leagues and our coalitions partners when we have the other versions in place.

Joyce LeBombard (she/her)
President, League of Women Voters of Texas
jlebombard@lwvtexas.org | 512-585-4090 (c)
*Schedule a meeting with me: https://calendly.com/joycelebombard*
LWVTexas.org & VOTE411.org
*Empowering voters. Defending democracy.*

On Thu, Aug 11, 2022 at 11:44 AM LWV Texas State Office <lwvtexas@lwvtexas.org> wrote:
FYI!

Aileen McMurrer
Executive Director

**Empowering voters. Defending democracy.**
1212 Guadalupe Ste 107
Austin, TX 78701
512-472-1100
**lwvtexas@lwvtexas.org**

---------- Forwarded message ---------
From: **Diane Tasian** <Diane@thetasians.com>
Date: Thu, Aug 11, 2022 at 11:41 AM
Subject: RE: *Corrections* to New Vote by Mail Resources Links
To: lwvtexas@lwvtexas.org <lwvtexas@lwvtexas.org>
Cc: Robin Lederer (robin1117@mac.com) <robin1117@mac.com>, Barbara Larkin (barblarkin@tx.rr.com) <barblarkin@tx.rr.com>, Shannon FitzGerald (sjfitz2002@yahoo.com) <sjfitz2002@yahoo.com>, Norma Arratia (narratia227@gmail.com) <narratia227@gmail.com>

Thank you Joyce!

OCA-APPX-2006

Will LWVTX be translating these into Spanish, Vietnamese and Chinese?

Thanks,

Diane
diane@thetasians.com
214 850-7054

---

**From:** Joyce LeBombard <lwvtexas@lwvtexas.org>
**Sent:** Thursday, August 4, 2022 5:43 PM
**To:** president@lwvdallas.org
**Subject:** *Corrections* to New Vote by Mail Resources Links

View in your browser

Dear Diane,

We discovered that the links for the new Vote by Mail resources we provided in the August 2022 Action News! were not working for everyone, so posted below are the updated links. You can also find them on our website here in the Vote By Mail dropdown menu under Handouts & Videos.

After the vote by mail problems during the 2022 Texas Primary elections, we worked with the Center for Civic Design to develop resources to help remedy some of the issues we saw. We're happy to present our new vote by mail resources for you to print and share. Feel free to customize them with your local/county information and even your own organization's logo.

OCA-APPX-2007

- [Application to Vote by Mail](#) (easier to fill out!)
- [How to Apply and Vote by Mail](#) (instruction checklist, double sided)
- [How to Vote by Mail Pocket Guide](#) (fold to create a small brochure)
- [Vote by Mail - Book Marks](#)
- [Vote by Mail - Door Hangers](#)

Thank you for your patience and understanding!



**League of Women Voters of Texas**
1212 Guadalupe St. #107
Austin Texas, 78701
(512) 472-1100
**lwvtexas@lwvtexas.org**
**lwvtexas.org**



OCA-APPX-2008

OCAGH_00016989

You have received this message from the mailing list of The League of Women Voters of Texas. If you would prefer not to receive these emails in the future, go to the opt-out page and modify your privacy settings. You can also request to be removed from our database completely.

OCAGH_00016990

# Exhibit 134

| From: | Dorothy Marchand [dmarchand@lwvtexas.org] |
| Sent: | 9/9/2022 9:42:49 AM |
| To: | Grace Olivares [golivares@univision.net]; Fely Garcia Amador [efgarcia@televisauni vision.com]; Jessica Mendoza [jemendoza@televisauni vision.com] |
| CC: | Annie Benifield [anniebenifield@lwvhouston.org]; Claudia Ortega Hogue [claudiaortegahogue@lwvhouston.org]; LeBombard Joyce [jlebombard@lwvtexas.org] |
| Subject: | Vote-by-Mail Education Materials - translated to Spanish |

Hello Univision Friends,

The League has worked with the Center for Civic Design to pull together an improved version of the application to vote by mail, along with some vote-by-mail instructional materials.  We just received the Spanish-translated versions. The Center for Civic Design has vetted these through several Spanish speaking groups in Texas.  We thought you might find them helpful.

https://docs.google.com/presentation/d/1AGCcU9pP2tyj3dXGuBiGTM8OhxYyHs3l9A2aF_6_vFA/edit?usp=sharing

https://drive.google.com/file/d/15zE-l1NwaA08_ZBbwzmUgMD7YJANkQ2h/view?usp=sharing

https://docs.google.com/presentation/d/1_S2KAIY7tkWY1oDf-6UrgBc9nwsCqr1N5LDgdzeErlc/edit?usp=sharing

https://docs.google.com/presentation/d/1SSBZ3dw_n81xszox23Aj1eJ6NaATZxXHPqpKV77ghw8/edit?usp=sharing

Thank you!

Dorothy


Dorothy Marchand
VP, Voter Education
League of Women Voters of Texas
713-446-4297
LWVTexas.org
VOTE411.org

Empowering Voters. Defending Democracy.

OCA-APPX-2011

OCA-APPX-2012

OCAGH_00017086

**From:** Grace Chimene [gchimene@lwvtexas.org]
**Sent:** 9/13/2022 11:32:51 AM
**To:** Joyce LeBombard [jlebombard@lwvtexas.org]
**Subject:** Re: Please review and edit: TEV Guest Blog for Vote by Mail Resources

It has been edited.
Consider adding the VBM videos or a link to the YouTube page.

On Tue, Sep 13, 2022 at 11:13 AM Grace Chimene <gchimene@lwvtexas.org> wrote:
I have time.

On Tue, Sep 13, 2022 at 10:42 AM Joyce LeBombard <jlebombard@lwvtexas.org> wrote:
Hi Grace,
Could you do me a favor and review/edit this?  Dorothy is busy today and can't get to it.  Please let me know if you can't do it and I will ask someone else.

Laura Yeager wants to share the vote by mail resource with the Texas Educator Votes coalition partners.  She does this via a blog email to them. If you have the time, could you please review and edit it for me?  If you don't have the time, please let me know so I can have someone else do it.

https://docs.google.com/document/d/1M7lHBJkYSYdPQahHutuur_TFJuTafWet0FBtFMMugyM/edit?usp=sharing

Joyce LeBombard (she/her)
President, League of Women Voters of Texas
jlebombard@lwvtexas.org | 512-585-4090 (c)
Schedule a meeting with me: https://calendly.com/joycelebombard
LWVTexas.org & VOTE411.org
Empowering voters. Defending democracy.

---------- Forwarded message ---------
From: **Joyce LeBombard** <jlebombard@lwvtexas.org>
Date: Tue, Sep 13, 2022 at 12:53 AM
Subject: Please review and edit: TEV Guest Blog for Vote by Mail Resources
To: Dorothy Marchand <dmarchand@lwvtexas.org>

Hi Dorothy,
Laura Yeager wants to share the vote by mail resource with the Texas Educator Votes coalition partners.  She does this via a blog email to them. If you have the time, could you please review and edit it for me?  If you don't have the time, please let me know so I can have someone else do it.

https://docs.google.com/document/d/1M7lHBJkYSYdPQahHutuur_TFJuTafWet0FBtFMMugyM/edit?usp=sharing

Joyce LeBombard (she/her)
President, League of Women Voters of Texas
jlebombard@lwvtexas.org | 512-585-4090 (c)
*Schedule a meeting with me: https://calendly.com/joycelebombard*
LWVTexas.org & VOTE411.org

*Empowering voters. Defending democracy.*

--
Grace Chimene (she/her)
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948

*Empowering Voters. Defending Democracy*

--
Grace Chimene (she/her)
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948

*Empowering Voters. Defending Democracy*

OCAGH_00017100

| From: | Laura Yeager [ljsydc@gmail.com] |
|---|---|
| Sent: | 9/14/2022 4:48:16 PM |
| To: | Laura Yeager [ljsydc@gmail.com]; Texas PTA President [president@txpta.org]; Josh Sanderson [josh@equitycenter.org]; Jan Friese [jan@txca.org]; Michelle Smith [msmith@ryht.org]; Christy Rome [christy@txsc.org]; Maggie Stern [mstern@childrensdefense.org]; Vincent Tovar [membership@masbatx.org]; Dorothy Marchand [dmarchand@lwvtexas.org]; Jaime Puente [puente@everytexan.org]; Libby Cohen [lcohen@ryht.org]; Anita Jiles [anita@tepsa.org]; Michael Lee [tarsed@centex.net]; Tim Lee [tim@trta.org]; Jennifer Harris [jharris@jwhcommunications.com]; Mary González [mary@masbatx.org]; Blake Cooper [blakewcooper82@gmail.com]; Lisa Losasso Jackson [lisa@wegopublic.com]; Heather Sheffield [hsheffield@plg-law.com]; Patrick Bresette [pbresette@childrensdefense.org]; Jennifer Esterline [jennifermesterline@gmail.com]; Anne Tiedt [atiedt@ryht.org]; Joan Randall [joan.randall@tasb.org]; Sylvia Wood [sylvia.wood@tasb.org]; Jennifer Storm [stormj@fotps.org]; Andrea Chevalier [achevalier@atpe.org]; Barry Haenisch [bhaenisch@tacsnet.org]; Joyce LeBombard [jlebombard@lwvtexas.org]; Charles Luke [charlesluke43@gmail.com]; Blake Powell [bpowell@pyt-law.com]; Grace Chimene [gchimene@lwvtexas.org]; TXCSS President [president@txcss.net]; Suzi Kennon [suzikennon@gmail.com]; Linsae Snider [lsnider@tspra.org]; Kristin McGuire [kristin@tcase.org]; Leigh Ann Glaze [tars@centex.net]; Graham Stephens [grstephens@dallasisd.com]; Dr. Greg Smith [gsmith@fastgrowthtexas.org]; Cameron Vickrey [cameron@proudlyrooted.com]; TCSS Curriculum Liaison [advocacy@txcss.net]; Charles Johnson [charlie@charlesfosterjohnson.com]; Lynn Boswell [lynn@villitamedia.com]; Theresa Parsons [theresa@tcase.org]; Laura Dupont [lrdupont@aol.com]; Kayci Meeks [kaycimeeks@thsca.com]; Margaret Beyer [margaretbeyer@thsca.com]; Renee Blackmon [pastpresident@txcss.net]; Julie Eichelbaum [jhe@edlaw.com]; Don Rogers [sdonr@aol.com]; Ann Hammond [lannhammond2016@gmail.com]; Monty Exter [mexter@atpe.org]; Mark Wiggins [mwiggins@atpe.org]; Michelle Jackson [mjackson@txpta.org]; Kate Kuhlmann [kkuhlmann@hillcopartners.com]; Jennifer Mitchell [jmitchell@atpe.org]; Brock Gregg [brock@trta.org]; Archie McAfee [amcafee@tassp.org]; RootEd [info@proudlyrooted.com]; Bill Tarleton [btarleton@txrea.org]; Tiffany Dunne-Oldfield [tiffany.dunne-oldfield@tasb.org]; Chandra Villanueva [villanueva@cppp.org]; Mark Terry [mark@tepsa.org]; Heather Loomis [heather@tepsa.org] |
| Subject: | TEV Update: Voting by mail in Texas |
| Attachments: | vote by mail.png |



## <u>Voting by mail in Texas</u>

If you are planning to vote by mail for the November 8th election, it is time to apply and request your ballot. The League of Women Voters of Texas has created some fantastic resources to help voters understand the process. The last day that vote by mail applications can be received at your county elections office is October 28th, but don't wait. Do it soon!

<u>Are you eligible to vote by mail?</u>

Voting by mail in Texas is limited to voters who are:

1. 65 years of age or older on Election Day;
2. Sick or disabled;
3. Expecting to give birth within three weeks before or after Election Day;

OCA-APPX-2015

4.  Absent from the county of registration during the Early Voting period and on Election Day;
5.  Civilly committed under Chapter 841 of the Texas Health and Safety Code; or
6.  Confined in jail, but otherwise eligible.

If you are eligible and decide to apply to vote by mail, read on for the League of Women Voters of Texas' guest blog on vote by mail!

## **NEW Vote by Mail Resources!**

Did you know that <u>nearly 25,000 mail-in ballots were rejected</u> during the May Texas Primary Election? Do you want to help to minimize that happening again? We have a way to help make that happen!

After the alarming rate of rejected mail-in ballots, the <u>League of Women Voters of Texas</u> (LWVTX) went to work. We engaged the <u>Center for Civic Design</u> (CCD), to create easier to understand and use Vote by Mail materials.  The LWVTX provided the background, knowledge, and content about Texas' ballot by mail laws and processes while CCD provided their expert design, usability, and accessibility skills.

We are making these new resources available to Election Administrators, political parties, and organizations!

The resources include download and print resources below include:
● Vote by Mail Application - this new application is easier to understand and to fill out.  Yes, it is valid to use this application!  Per the Texas Secretary of State's website other vote by mail applications can be used as long as it has the necessary fields, which this does.
● How to Apply and Vote by Mail - A double sided checklist. One side is for completing **any** vote by mail application, and the other side is for completing the ballot by mail carrier envelope.  These were where the biggest issues in the past for people with the vote by mail
● Pocket Guide -  A foldable guide on how to vote by mail. Bookmarks - Two sets of bookmarks with different quick tips on voting by mail.
● Door Hanger -Two sets of door hangers also with different quick tips on voting by mail.

All the resources can be found at <u>LWVTexas.org/votebymail</u> and listed below for your convenience.

● <u>Application to Vote by Mail</u> (no branding as it is an application)

### *LWV Texas Branded*

● <u>How to Apply and Vote by Mail</u>
● <u>Pocket Guide - How to Vote by Mail</u>
● <u>Bookmarks - Vote by Mail</u>

OCA-APPX-2016

OCAGH_00017108

- [Door Hangers - Vote by Mail](#)

**Spanish, Chinese, Vietnamese**

These are coming soon as CCD is still field testing them. We will post them on the LWVTexas.org/votebymail site when available.

**Customizable**
These can be updated with your organization's logo. Please don't change other content.

- [How to Apply and Vote by Mail](#)
- [Pocket Guide - How to Vote by Mail](#)
- [Bookmarks - Vote by Mail](#)
- [Door Hangers - Vote by Mail](#)

LWVTX and CCD hope you will use these new resources and help to reduce the number of rejected mail-in ballots and applications for the November general election!

There is also a new [How To Return Vote by Mail Ballot video](#) with step-by-step instructions to assist eligible voters in this process.

Thank you to TEV partner, The League of Women Voters of Texas, for helping voters follow the rules to ensure their ballots are counted and their voices are heard!



Onward!

Laura Yeager
Texas Educators Vote

# Exhibit 135



# Steps to Voting by Mail in Texas
*For eligible Texas voters who want to safely vote from home*

# Apply

## Who can vote by mail?
Those who are:
- 65 years or older
- Sick or disabled
- Out of the county during early voting and election day
- In jail or Involuntary Civil Commitment but otherwise eligible to vote
- Expecting to give birth within three weeks before or after election day.
- To Vote by Mail because you are sick or disabled, you must affirm the following: *"I have a sickness or physical condition that prevents me from appearing at the polling place on election day without a likelihood of needing personal assistance or injuring my health."*

## Where to get a Vote by Mail application
- Request an application from your County Election office.
- At VoteTexas.gov, print the Vote by Mail application in English or Spanish. Fill out, sign, and mail to your Early Voting Clerk in the county where you are registered to vote.

## Tips for filling out the VBM application
Read all the instructions provided on the back of the application
**Sec. 1** - Provide contact information so that the Elections Department can reach you if they have a concern so that the approval of the application is not delayed.
Provide Your ID number from:
- A Texas Driver license
- A Texas Personal ID
- Election Identification Certificate
- or, if none of these has been issued, then the last four of your Social Security number.

Use the same ID number on the Vote by Mail application and the ballot carrier envelope that you used for your voter registration.
**Sec. 2** - Provide the address where the ballot is to be mailed.
**Sec. 3** - Voters with disabilities check the box marked disability.
**Sec. 4** - If you are 65 years or older, or are sick or disabled, mark the box for "Annual Application".
- If you are out of the county (where you are registered to vote) during early voting and on Election Day, mark which election you are applying to Vote by Mail.
- Mark your party of choice to vote in the Primary Election and runoff.
**Sec. 5** - Don't forget to sign the application.
**Sec. 6** - If the voter is unable to sign the application follow the instructions for witnessing a signature.
- Persons who assist voters with a Vote By Mail application must provide their name and address.

## Deadline
- Applications must be received (not postmarked) at your county election office by the application deadline.

# Vote

## Tips for filling out and submitting my ballot
- Research your candidates with the League's nonpartisan Voters Guide at VOTE411.org.
- Mark your ballot using a black or blue pen
- Place your ballot in the ballot envelope and seal it
- Place the ballot envelope in the carrier envelope
- Complete all information on the carrier envelope, seal it, and sign the flap of the carrier envelope.
- Provide your ID number from:
  - A Texas Driver license
  - A Texas Personal ID
  - Election Identification Certificate
  - or, if none of these has been issued, then the last four of your Social Security Number.
- Use the same ID number on the Vote by Mail application and the ballot carrier envelope that you used for your voter registration.
- Don't forget to sign the carrier envelope with the same signature you used on your application.
- Mail in your ballot as soon as possible. It must be received at your county election office by 7:00 p.m. on Election Day.
- You may use the US Postal Office or common carriers such as Fed Ex, UPS or DHL to mail your ballot.

## What if I want to hand-deliver my ballot?
- You may hand-deliver your marked ballot in person to the county election office on Election Day while polls are open.
- You must show your photo ID.

## What if I decide to vote in person instead.
- Take your Vote by Mail ballot with you to the polling station and turn in to the voting clerk. You will be allowed to vote a regular ballot.
- If you lose or forget your Vote by Mail ballot, you may cast a provisional ballot.
For more information, review the Secretary of State's information provided in your Vote by Mail ballot package.

## Persons who assist a voter with the Vote by Mail ballot must:
- Provide their name and relationship to the voter
- Provide their address
- Sign an oath
- Mark that they didn't receive compensation.

## The cure process
- If you provide contact information, the Elections Department may reach out to you if they have a concern with your ballot.

## Track your Vote by Mail application and ballot online
- VoteTexas.gov

## Need help?
- Election Protection Hotline 866-687-8683 866ourvote.org
- The Secretary of State votetexas.gov (800) 252-VOTE

The League of Women Voters is non partisan, never supporting or opposing political parties or political candidates.
1212 Guadalupe #107, Austin, TX 78701 • votetexas@lwvtexas.org 512.472.1100 LWVTexas.org VOTE411.org

OCA-APPX-2019



# Register to Vote in Texas
## *Be a Texas voter!*

### How do I check if I am registered to vote?
- Check your voter registration status at underline votetexas.gov Am I Registered? or check with your county voter registrar.

### Who can register to vote in Texas?
- A citizen of the United States,
- A resident of the county, and
- 17 years 10 months old (to vote you must be 18 years old on Election Day).
- You must not have been declared mentally incapacitated by a court of law.
- If you have been convicted of a felony, you may register to vote only after you have completed the punishment phase of your conviction, including any terms of incarceration, parole, supervision, or period of probation ordered by the court.

### How do I register to vote in Texas?
- If you are a new Texas voter, print and fill out the Voter Registration Form or pick one up at a library, government office, or high school! Fill out, sign, stamp, and mail-in or turn in to your county election office.
- Call your county voter registrar and ask for a voter registration application to be mailed to you.
- Volunteer Deputy Registrars are certified by each county to help voters register to vote. Ask your Local League of Woman Voters for help.
- You do not need to register before every election.

### When is the last day to register to vote in an election?
- Applications must be at your county's Voter Registrar's office or postmarked by 30 days before an election.
- If your voter registration effective date is before the Election Day, you may vote any day during early voting.

### When will I receive my voter registration card?
- You should receive a voter registration card in the mail within one month! If you don't, check here to see if you are registered or call your county's Voter Registrar's office.
- New voter registration cards are mailed to registered voters every odd year.

### I'm already registered! How do I update my voter registration?
- If you moved or changed your name update your voter registration at VoteTexas.gov or texas.gov.
- You will need your
  - A Texas Drivers License or Texas Personal ID
  - Your Social Security number.
  - Voter Registration Card VUID (Voter Unique Identifier) number. Find your VUID number on your voter registration card, at "Am I Registered" at VoteTexas.gov, or by calling your county voter registrar.
- Update your driver's license online and your voter registration at the same time!
- Fill out a new paper voter registration application!

### Need help?
- Election Protection Hotline 866-687-8683 866ourvote.org
- The Secretary of State votetexas.gov (800) 252-VOTE
- For voter ID issues contact voteriders.org 844-338-8743

The League of Women Voters is non partisan, never supporting or opposing political parties or political candidates.
1212 Guadalupe #107, Austin, TX 78701 lwvtexas@lwvtexas.org 512.472.1100 LWVTexas.org VOTE411.org
OCA-APPX-2020

# Exhibit 136

**Empowering Voters. Defending Democracy**

# Tips for Voters
# New Election Laws 2022

  



Grace Chimene President

**LEAGUE OF WOMEN VOTERS OF TEXAS**

OCA-APPX-2022

# 2022 Primary Election - Key Dates



- Last day to register to vote or change address
  **January 31**
- First day to vote early in person
  **February 14**
- Last day to apply for vote-by-mail ballot
  **February 18**
- Last day to vote early in person
  **February 25**
- Election Day and vote-by-mail ballot receipt deadline
  **March 1**

**VOTE411.org     LWVTexas.org**



OCA-APPX-2023

# NEW!
# Update your Voter Registration Online

- If you moved or changed your name, update your voter registration online at <u>texas.gov</u> or <u>votetexas.gov</u>

**Sec.15.021(SB1)**



https://www.texas.gov/living-in-texas/texas-voter-registration/#update-voter-name-or-address

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | / / | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



OCA-APPX-2025

# Drivers License Number



https://www.texas.gov/living-in-texas/texas-voter-registration/#update-voter-name-or-address

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | [ ] / [ ] / [ ] | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



OCA-APPX-2027

# DPS Audit Number



# Voter Unique Identifier (VUID)

## Login Information

| | | |
|---|---|---|
| ① Texas Driver License or Identification Number | | Required. (8 to 10 digits) |
| Date of Birth | [ ] / [ ] / [ ] | Required. (MM/DD/YYYY) |
| Last Four Digits of Social Security Number | | Required. |
| ② DPS Audit Number | | Required. (Enter the Audit Number as it appears on your card.) |
| ③ Voter Unique Identifier Number (VUID) | | Required. (10 digits) |
| ④ County Name | Select County ⌄ | Required. |

I understand that my personal information, including my Texas Driver's License and the last four digits of my Social Security number are being used to update my current voter registration.



# Voter Unique Identifier (VUID)

Find your VUID number on your voter registration card at, "Am I registered?" at <u>votetexas.gov</u>, or call your county voter registrar.





# NEW!
## Student Voters

For college student voters living away from home, it is safest and easiest to register and vote at your college residence address.

**Sec. 1015 (SB1111)**



OCA-APPX-2031

# NEW!
## For Voters Without a Residence

- In the space on the registration form for residence address, it's safest to put the street address of an agency where you receive aid.
- In the space for mailing address, if you have one, put the P.O. Box where you receive your mail.



**Sec.** 15.051 - 15.054 **(SB1111)**



OCA-APPX-2032

# NEW!
# Early Voting

Small counties now provide longer hours for early voting.

**85.005 (SB1)**





# NEW!
## Vote by Mail

## Who else qualifies?

- Voters expecting to give birth within three weeks before or after election day
  **Sec 82.02 (HB 3920)**

## Organizations & Leagues

- Counties may not provide applications to organizations. But Leagues can order from the Secretary of State's office or print VBM applications to share with voters.
  Sec. 84.001(SB1)



photo credit canva.com

# NEW!
# Vote by Mail

## Voters

- Request a VBM application from your county election office
Sec. 84.001(SB1)

- Provide Voter ID number (TXDL, Personal ID, EIC Number or, if not available, the last four digits of SSN) on your VBM application and VBM ballot carrier envelope
84.002 (SB1)

- Use the same Voter ID number on your voter registration application, VBM application, and VBM carrier envelope.
-  Sec. 84.002 (SB1)



Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#)

___ ___ ___ ___ ___ ___ ___ ___

If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number

___ ___ ___ ___

☐ I have not been issued a Texas Driver's License/Texas Personal Identification Number/Texas Election Identification Certificate or Social Security Number

VBM Application

# NEW!
# Vote by Mail

## Voters

Use the **same Voter ID number** on your
- Voter registration application
- VBM application
- VBM carrier envelope.

## For the Cure process

Provide contact information on your VBM carrier ballot so the county may contact you if you need to fix an error with your application or ballot.



| REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD | | |
|---|---|---|
| Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your Voter Registration VUID #) (Número de licencia de conducir de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas) (NO ES el número de su Registro Electoral VUID#) | If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number (Si no tiene licencia de conducer de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas, proporcione los 4 últimos dígitos de número de Seguro Social)  XXX - XX - _____ | ☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or a Social Security Number (No me han expedido una licencia de conducir de Texas o Número de Identificación Personal o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas ni un número de Seguro Social |

OPTIONAL CONTACT INFORMTION: Phone: _____  Email: _____

VBM Carrier Envelope



OCA-APPX-2036

# NEW!
# Vote by Mail

## VBM tracker
- Track your VBM application and VBM ballot throughout the election process

## Cure process
- Provide contact information on your VBM application so the county may contact you if you need to fix an error with your application or ballot.

- Turn your VBM ballot in early so your county may contact you if there is an error with the application.

**Sec. 86.015 (HB 1382)**

**1. Voter Information:** Please print all information clearly and legibly

Name: _____
Last,                          First,                          Middle                Suffix (Jr., Sr.)

**Residence Address as shown on your Voter Registration Certificate**

Address: _____
Street              Apt. # (if any)   City                          State        Zip Code

**Optional Information:** Providing this information is helpful to the Early Voting Clerk, but not required.

Date of Birth: _____ / _____ / _____   VUID #: _____        Pct #: _____

Email: _____                                    Tel. #: _____

Provide your contact information on your application to VBM and the VBM ballot carrier envelope



# NEW!
# Poll Watchers

- Required to take training

- Sign an oath

- Have fewer restrictions on movement and observation.

Sec. 33.051 (SB1)

"I swear (or affirm) that I will not disrupt the voting process or harass voters in the discharge of my duties."



# NEW!
## Assisting Voters

- Persons who assist voters with a VBM application, VBM ballot, or in-person ballot must provide their relationship to the voter and address, and for the VBM ballot sign an oath, and mark that they didn't receive compensation.
Sec. 84.011(SB1

- Persons who drive 7 or more voters who qualify for curbside voting must sign a form which is shared with the Secretary of State and the Attorney General's office.  Sec.64.009 (SB1)



"I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance;

I will not suggest, by word, sign, or gesture, how the voter should vote;

I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot;

I will prepare the voter's ballot as the voter directs;

I did not pressure or coerce the voter into choosing me to provide assistance;

I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs;

I will not communicate information about how the

# Oath & Compensation

**Oath of Person Assisting Voter:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." *Juramento de la Persona Asistiendo al Votante: "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; limitaré mi asistencia a leer la boleta al votante, dirigiendo al votante a que lea la boleta, marcando la boleta del votante o dirigiendo al votante a que marque la boleta; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."*

**If you are an assistant, provide information below:** *(Si usted es un asistente o testigo, marque la casilla correcta y proporcione su información):*

**Did you receive compensation or other benefit from a candidate, campaign or political committee in exchange for providing assistance?** Circle one: Yes / No
*¿Recibió compensación u otro beneficio de un candidato, campaña o comité político a cambio de brindar asistencia?*
Marque con un Círculo: Sí / No

Printed Name (Nombre en letra de molde) _____  Signature (Firma) _____

Relationship to Voter (relacion al votate) _____  Street Address (Domicilio residencial) _____

---

**X** _____
**SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE)**

**Completed by Early Voting Clerk:**

Name of Election (Nombre de Elección): _____

Name of Voter (Nombre del votante): _____

Date of Election (Fecha de Elección): _____ / _____ / _____

**Instructions to Witness:** You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the mark of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____.

*(Instrucciones al Testigo: Usted está fungiendo como testigo para _____ (nombre del votante). Usted debe llenar la siguiente sección abajo si usted fue testigo de que el votante firmo, o de que el votante no puede firmar. Si el votante no puede firmar, marque sus iniciales aquí _____.)*

Signature (Firma) _____  Printed Name (Nombre en letra de molde)

Street Address (Domicilio residencial)



●Sec.86.0105 (SB1)



OCA-APPX-2040

# How you can help

Share trusted resources

- Print - [Vote by Mail handout 2022](#)
- Video - [Susan SharesTips for Filling out the application to Vote by Mail](#)
- Video - [Susan SharesTips for Voting by Mail](#)
- Video - [How to Vote by Mail Texas Style](#)

Volunteer for Election Protection.

- NAACP LDF is providing training for folks who live in East Texas

  [https://secure.everyaction.com/urmz7w_ZYUyrhRyZOe1Ruw2](https://secure.everyaction.com/urmz7w_ZYUyrhRyZOe1Ruw2)

- Common Cause is offering training for Texas Election protection volunteers [https://www.mobilize.us/protect-the-vote/event/436853/?utm_source=lwvtx](https://www.mobilize.us/protect-the-vote/event/436853/?utm_source=lwvtx)



# Resources

- [LWVTexas.org](LWVTexas.org)
  [VOTE411.org](VOTE411.org),

- Election Protection
  [https://866ourvote.org/state/texas/](https://866ourvote.org/state/texas/)
  866-687-8683

- Texas Secretary of State
  [VoteTexas.gov](VoteTexas.gov) (800) 252-
  VOTE





OCA-APPX-2042

**VOTE 411**

**WHAT IS ON YOUR BALLOT?**
**VOTE411.ORG**

**VOTERS GUIDE - BY THE LEAGUE OF WOMEN VOTERS EDUCATION FUND**

OCA-APPL-2043



# Exhibit 137

OCA-APPX-2044

**From:** Grace Chimene [gchimene@lwvtexas.org]
**on behalf of** Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org]
**Sent:** 1/15/2022 11:25:09 AM
**To:** Valerie DeBill [Vdebill@lwvaustin.org]
**CC:**



**Subject:** Re: Voter Education Information! - folks are using the wrong ABBM forms!

Thank you, Valerie
Stay calm. Offer trusted League information.
Share the Election Protection number information.

If League members are impacted or those we help, ask if we can share their names and contact information our lawyers. Send me the information.
There is League litigation on this subject.

On Sat, Jan 15, 2022 at 11:14 AM Valerie DeBill <vdebill@lwvaustin.org> wrote:
I've been reaching out to community groups to get them to help with messaging. I haven't heard back from most of them yet, but it is a long weekend so I'm not exactly surprised.

On Sat, Jan 15, 2022 at 11:07 AM Grace Chimene <gchimene@lwvtexas.org> wrote:
We have put that out on social media.
We will try again.
Thank you,

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

Grace

On Sat, Jan 15, 2022 at 10:27 AM Diane Tasian <Diane@thetasians.com> wrote:

Dear Dorothy and Grace,

Please rush a social media campaign that we can share with everyone about using the Correct ABBM form. That is not covered in the one pager you just sent. We are finding that the old form is being spread far and wide by churches, mosques, temples, neighborhood orgs etc. Nor is it addressed directly in the first VBM video. (Disclaimer: I have not yet taken the time to watch all of the videos or read all of the links in Dorothy's email yet.) One of the problems is that the old form is what was coming up when folks did internet searches. They did not know to be careful to use the new form which requires the drivers license number or last four of their social. I have attached the ones in English from Dallas County Elections Dept and English and Spanish linked on our website.

If one of the links in Dorothy's email and one pager addresses this directly please point us to it so we all can save a bit of time. This is an opportunity the elections administrators can't easily solve. **But we can** by getting the word out.

BTW: yesterday I tried to update my name and address info on the SOS website and it wasn't working properly and did not save my information!

Thanks,

Diane Tasian
diane@thetasians.com

League of Women Voters of Dallas
President
president@lwvdallas.org

www.lwvdallas.org
lwvtexas.org/take-action

*Empowering Voters. Defending Democracy.*

---

**From:** Dorothy Marchand <dmarchand@lwvtexas.org>
**Sent:** Friday, January 14, 2022 2:50 PM
**To:**



**Subject:** Voter Education Information!

Good afternoon to all,

I am sure you all have read about the high rate of rejection of Vote by Mail applications in certain counties. It is important that we provide our communities with Voter Education information about the new Vote by Mail application and process. We have created some Voter Education resources you might find helpful.

Videos:

VBM
https://youtu.be/QXb7qMTMCNc
https://youtu.be/Tjq9Td91omo

Register to vote
https://youtu.be/-E20ZN60IM8

And some flyers:

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

https://docs.google.com/document/d/17E3rIW5601iUIkazhz1sfkJtQyi_hlSs6xWkNLPrxKk/edit?usp=sharing

https://docs.google.com/document/d/1jWEmMEAdPENoAGmLXTMc9c9v-arKehquMJOl6MYXBPk/edit?usp=sharing

There are more videos on the LWVTX YouTube channel.  We will be posting information on social media, please share widely!

Thank you, have a wonderful weekend!

Dorothy Marchand
VP, Voter Education
League of Women Voters of Texas

██████████

Empowering Voters. Defending Democracy

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org

██████████

*Empowering Voters. Defending Democracy*

--

**Valerie Merriam DeBill** (she/her)
Voter Registration & Turnout Director
League of Women Voters - Austin Area
vdebill@lwvaustin.org | ██████████


--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org

OCA-APPX-2048

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00007735

*Empowering Voters. Defending Democracy*

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00007736

# Exhibit 138

| | |
|---|---|
| **From:** | Joyce LeBombard [jlebombard@lwvtexas.org] |
| **Sent:** | 8/19/2022 11:12:21 PM |
| **To:** | Dorothy Marchand [dmarchand@lwvtexas.org] |
| **CC:** | Aileen McMurrer [amcmurrer@lwvtexas.org] |
| **Subject:** | Website Updates for the New Vote by Mail Resources |

Hi. I updated the website for all of the new Vote by Mail Resources. All the links work and no typos so I made it live since I promised to have it done today (I made it with an hour to go). But, layout maybe needs improvement and I am positive the wording can be improved. Please review and let me know if you have any suggestions or comments. Please start with the homepage lwvtexas.org updates then the vote by mail.

PS - all the documents are linked to a new folder I made in Education > Document/Publications on the website. I had to put them there instead of the ClubExpress Document Library because of the customizable one.

Joyce LeBombard (she/her)
President, League of Women Voters of Texas
jlebombard@lwvtexas.org | 512-585-4090 (c)
*Schedule a meeting with me: https://calendly.com/joycelebombard*
LWVTexas.org & VOTE411.org
*Empowering voters. Defending democracy.*

OCA-APPX-2051

# Exhibit 139

OCA-APPX-2052

**From:** Grace Chimene [gchimene@lwvtexas.org]
on behalf of Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org]
**Sent:** 6/17/2022 9:07:45 AM
**To:** Joyce LeBombard [jlebombard@lwvtexas.org]
**Subject:** Fwd: Voter Education

Here is a presentation from February on the new voting laws.
It would need links to the new voter education we have been working on.
https://docs.google.com/presentation/d/1DaRRiI4gykGDvB5fZBUv3mS-Y2z1OETVhB2zWeLcmco/edit?usp=sharing

---------- Forwarded message ---------
From: **Grace Chimene** <gchimene@lwvtexas.org>
Date: Fri, Jun 17, 2022 at 9:00 AM
Subject: Voter Education
To: Casey Thomas <███████████, Dorothy Marchand <dmarchand@lwvtexas.org>, Joyce
LeBombard <jlebombard@lwvtexas.org>, Elisabeth Macnamara <egmacnam@gmail.com>

Question from Casey Thomas Texas NAACP Advocacy
*Who would be a good person with the League to do a voter education forum on the new laws and the rules for applying for a vote by mail application?*

Introduction:
Dorothy Marchand LWV Texas Voter Education
Joyce LeBombard LWV Texas President
Elisabeth MacNamara LWV Texas Advocacy Chair

Casey,
That is a good question. LWV Texas just changed over to new leadership. Joyce, Elisabeth, or Dorothy should be able to answer that question. The League had several webinars on the new election laws earlier in the year.

We are working on some great Vote by Mail voter education material. You can find videos and printable material on our Vote by Mail page. We are working with the Center for Civic Design on improved VBM envelopes. Our contact in Texas with CCD is Asher Kolieboi  asher@civicdesign.org.

Keep up the good work.
If you don't hear back or need more information, let me know.

--
Grace Chimene (she/her)
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
███████

*Empowering Voters. Defending Democracy*

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

--
Grace Chimene (she/her)
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org

*Empowering Voters. Defending Democracy*

OCA-APPX-2054

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00016595

# Exhibit 140

Houston
Chronicle
1/14/2022

# Right to a mail ballot may hinge on number

**By Grace Chimene**

Do you remember what identification number you used when you registered to vote? No one does, and that number should not prevent you from voting by mail. The latest mail ballot application debacle could be foreseen when the Texas Legislature persisted in making our complicated voting system even harder. Despite a smooth 2020 election, our Legislature enacted ever more restrictive voting laws.

The issue at stake here is a new required voter ID on the application. Voters must provide their Texas driver's license number or Texas ID number. If they do not have one of these, they provide the last four digits of their Social Security number. The tricky part is found on the back of the application in the fine print: "If you have been issued one of the required numbers, but it is not associated with your voter registration record, please contact your local registrar to inquire about how to add one of the required numbers to your voter registration record."

Applications are being rejected due to a new law that requires the voter ID on the application and the ballot to match the voter ID provided when voters registered to vote. Who remembers that number? A ballot by mail is mostly used by voters over the age of 65 and persons with disabilities. These vulnerable communities are going to be disenfranchised by this new law when many have been voting by mail for years with no problem.

John B. Scott, the Texas secretary of state, stated in a recent press announcement that he was "surprised" to learn of the massive rejection numbers reported by various counties. There should be no surprise. The League of Women Voters of Texas and many other voting advocates warned the Legislature about the anticipated consequences of the new voting law during the legislative session. The League also warned the Secretary of State's office many times since December about the lack of up-to-date voter education information on the secretary of state's website votetexas.gov.

The Legislature passed this law complicating our voting process. State leaders, such as the secretary of state, should not blame county election offi-



Marie D. De Jesús / Staff file photo

**Now, the voter ID on the application and mail ballot must match the voter ID provided when voters registered to vote.**

cials for the high number of vote-by-mail applications being rejected. It is the secretary of state's job "as Chief Election Officer for Texas" to assist county election officials and ensure the uniform application and interpretation of election laws throughout Texas.

We applaud a related new law that allows voters to track your ballot online. Yet the vulnerable communities whose applications for a ballot by mail are being rejected might find little comfort in the new online tool. The online tracker also requires voters to provide voter ID numbers and presumes internet service.

Blame your legislators for the confusing new voting laws. Blame the secretary of state for not updating the public-facing votetexas.gov website. But don't blame your county election official, and certainly not the voters who depend on voting by mail to get their voices heard. Demand that state leaders review the mail ballot application process and provide explicit instructions to county election officials and voters to mitigate the massive rejection numbers. For now, share trusted voter education resources found at LWVTexas.org and call lawyers at Election Protection at 866-687-8683 if you need help or your application for a ballot by mail has been rejected.

*Grace Chimene is the president of the League of Women Voters of Texas.*

# Exhibit 141

SKIP NAVIGATION

 YouTube



## Complete Your Ballot by Mail Texas Style with Step by Step Instructions!

543 views  Feb 3, 2022  New election laws mean new procedures for completing your ballot by mail. Watch the step-by-step video to learn more about the required Voter ID numbers and t....**more**

👍 7    👎 Dislike    ↗ Share    ⬇ Download    ☰+ Save    •••

 **League of Women Voters of Texas**
960 subscribers                                                            SUBSCRIBE

**Comments**
1           N    Add a comment...                              ❯

( All )   ( Recently uploaded )   ( Watched )

 **Absentee Ballot Behind-the-Scenes**
AnokaCountyMN
3.7K views • 1 year ago

 **The Best of Piano: The most beautiful classical piano pieces for relax & study**
Rousseau ✓
13M views • 1 year ago

SKIP NAVIGATION

OCAGH_00015032

SKIP NAVIGATION

 YouTube



## Susan SharesTips for Filling out the application to Vote by Mail

**491 views   Jan 5, 2022**   2022 new election law means a new application to vote by mail. Susan shares tips from the League of Women Voters about how to fill out the application.

👍 4      👎 Dislike      ↗ Share      ↓ Download      ≡+ Save      •••



**League of Women Voters of Texas**
960 subscribers                                                 SUBSCRIBE

Comments   N   Add a comment...                                                      ›

( All )   ( Live )   ( Recently uploaded )   ( Watched )

   **Live: White House press secretary Jen Psaki holds briefing**
The Independent ✓
896 watching
**LIVE NOW**

**The Best of Piano: The most beautiful classical piano pieces for relax & study**
Rousseau ✓
13M views • 1 year ago

SKIP NAVIGATION

OCAGH_00015040

SKIP NAVIGATION

 YouTube



## How to Vote by Mail Texas Style

**777 views** · Jan 2, 2022   The application to Vote by Mail changed in 2022 with the passage of new election laws. The League of Women Voters offers tips on how to fill out the application to **…..more**

👍 10    👎 Dislike    ↗ Share    ↓ Download    ⧉ Save    ···

 **League of Women Voters of Texas**              SUBSCRIBE
           960 subscribers

**Comments**      Add a comment...              ⟩
3

( All )    ( Watched )

 **Military and Overseas Voting by Mail for Texas Voters**
Vote Texas ✓
11K views · 9 years ago

 **The Best of Piano: The most beautiful classical piano pieces for relax & study**
Rousseau ✓
13M views · 1 year ago

SKIP NAVIGATION

OCAGH_00015043

# Exhibit 142

OCA-APPX-2061

## TEXAS LEAGUES

Amarillo
Austin Area
Bay Area
Baytown
Brazos Valley
Cy-Fair
Collin County
Comal Area
Cooke County
Corpus Christi
Dallas
Denton
El Paso
Fort Bend County
Hays County
Hill Country
Houston
Irving
Lubbock County
Midland
Montgomery County
Richardson
Rio Grande Valley
San Antonio Area
South Central Texas
Southwest Texas
Tarrant County
Tyler/Smith County
Victoria
Waco Area
Wichita Falls
Williamson County

# 2022 Impact Report

## Together We Are Stronger



While the League's history has not always reflected this truth, we have learned over our 103 years that together we are stronger. We have learned that together our knowledge and experiences are broader and more profound, our voices are louder, our outreach is greater, and our actions are more powerful.

This year we seated our most diverse board of directors with a broad range of experience, skill sets, ethnicities, and perspectives. This strengthens our capabilities, decision-making, and outreach. Together we are stronger.

We are proud of our work in collaboration with other nonpartisan organizations representing a wide range of communities - Black, Latinx, people with disabilities, students, and rural voters. Yet we know we must expand this network to uplift their outstanding work and to reach more voters. Together we are stronger.

To fully achieve our mission, we must build upon and strengthen our commitment to Diversity, Equity, and Inclusion in everything we do. Our five-year strategic plan demonstrates this commitment. Because together we are stronger.

Joyce LeBombard, President, League of Women Voters of Texas





**Empowering Voters. Defending Democracy.**

# IMPACT REPORT



## Empowering Voters

*Voters Guide* **& VOTE411**

**In 2022, our nonpartisan *Voters Guide* was used over 1 million times!**

We published four *Voters Guides:* Primary and Runoff Elections, Special Constitutional Amendment Election, and the General Election.

- Distributed nearly 80,000 printed Guides and 24,000 bookmarks in English and Spanish to over 160 public libraries and other locations for the Primary & General Elections combined.
- A printable PDF version of the Guide was provided via email and on our website for all four elections.
- The Guide was available on VOTE411.org in four languages – English, Spanish, Simple Chinese, and Vietnamese.



TEXAS VOTE411.ORG USERS DURING THE 2022 ELECTION YEAR

## Social Media Outreach
### since Jan. 2022



**Facebook**
- Followers- 13,935
- Overall Reach- 155,326
- Increased monthly reach from ~12,000 to ~42,000

**Twitter**
- Followers- 5,508
- Impressions- 460.3K
- Profile Visits- 61,136

**Instagram**
- Followers- 4,069 (~1,000 new followers this year)
- Reach- 8,891
- Profile Visits- 4,318



**YouTube**
- Subscribers- 1,181
- Views- 66.7K
- Watch Time- 1.9K hours

**LinkedIn**
- Followers- 176
- Page Views- 303, an increase of 1,112%
- Unique Visitors- 148, an increase of 1,544.4%



**TikTok**
We created an account on TikTok on October 10, 2022. Since then, we've posted 7 videos, gained 26 followers, and gotten 29 likes.



**New Vote By Mail Application**
In partnership with the Center for Civic Design, we created a new vote-by-mail application with instructions that are easier to use and understand. We also developed new Voter Education material including videos to educate voters on how to complete the new vote-by-mail application and ballot carrier envelope. You can view and download these resources at lwvtexas.org/votebymail.

OCA-APPX-2063

OCAGH_00016645

### County Website Review

We completed two reviews of election websites for all 254 counties and the SOS! The first review was before the Primary Election and the second was before the General Election. We expanded our criteria this year to include changes required by SB1, the major elections bill that went into effect for the 2022 elections. Thirty-six counties received an outstanding ranking for the General Election. This is down from prior reviews likely due to the decreased funding and increased workload stress put upon our elections offices. You may read the results at lwvtexas.org/find-your-county-election-website







### Supporting Our Election Administrators

LWVTX honored County Election Administrators Heider Garcia, Isabel Longoria, Michael Scarpello, and Bruce Sherbet at the Women Power the Vote ~ A Making Democracy Work Dinner. Isabel Longoria was the keynote speaker.



## Defending Democracy

### Moore v. Harper Amicus Brief & Lawsuits

We continue to fight to defend our democracy even when the Texas Legislature is not in session:

- LWVTX joined LWVUS and 50 other Leagues in filing an amicus brief for Moore v. Harper, one of the greatest threats to our democracy in our time.
- We provided depositions on Texas Senate Bill 1 (SB1) and redistricting suites.
- We joined in filing multiple other suits, all of which suppress the vote of people of color, people with disabilities, students, senior citizens, or people who are economically disadvantaged.





### Assault Rifle Webinar

With our state partners of NAACP and LULAC, we hosted an "Assault Rifles - What Can Be Done?" webinar with over 400 attendees from across the state. LWV Texas followed up the webinar with an Action Alert - Support the "Well Regulated" Part of the Second Amendment - calling for a special session. You may view the webinar at www.youtube.com/lwvtexas



## Empowering Voters. Defending Democracy.

OCA-APPX-2064

OCAGH_00016646

# IMPACT REPORT



## BOARD OF DIRECTORS

*President:* **Joyce LeBombard** (Austin Area)
*Vice Presidents:*
**Elisabeth MacNamara** (Collin)-Advocacy,
**Dorothy Marchand** (Austin Area)-Voter
Education, **Charlotte McKenzie (**Collin )-Service
to Local Leagues, **Deb Treece** (Texas)-
Development
*Directors:*
**Diane Gil** (Tarrant), **Julie Espinoza** (Collin),
**Pamiel Johnson** (Houston), **MaryJane Mudd**
(Houston), **Janis Richardson** (South Central
Texas)-Secretary, **Stephanie Swanson** (Austin
Area), **Linda Vaughn** (Amarillo), **Elaine Wiant**
(Dallas)-Treasurer

## STAFF

**Aileen Jacinta McMurrer**, Executive Director
**Joleen Smith**, Communications
**Breezie Reeves**,  Data Manager

1212 Guadalupe Street, Suite 107
Austin, TX 78701
512-472-1100
lwvtexas@lwvtexas.org
www.lwvtexas.org

*LWVTX is a 501(c)(3) nonprofit non-partisan citizen education
and research organization that promotes participation in
government and seeks to influence public policy through
education and advocacy. The League neither supports nor
opposes political parties or candidates..*

## Organizational Capacity

### New Staff

We hired two employees, one full-time and one part-time, with a
focus on communications strategy and data/website management
to expand our outreach to a broader audience.

### Supporting Local Leagues

- Provided 18 grants totaling $20,000 to expand local voter
  registration and get-out-the-vote efforts.
- Provided a variety of training including board, communications,
  and fundraising.
- Held regular local League networking groups for Presidents,
  Voters Service, Membership, Communications, and Treasurers

### Financial Report

We raised more money than we spent, which gives us continued
financial stability going into 2023 and beyond.





**Empowering Voters. Defending Democracy.**

# Exhibit 143

**Mickey Raphael- League of Women Voters  PSA 1 – Early Voting**

Begin: Mickey plays a few bars of "On the Road Again" on the harmonica.

Mickey: Hi. I'm Mickey Raphael, a proud, native-born Texan and a member of Willie Nelson's band for almost 50 years.

My band members and I are firm believers in this country's democracy and the freedom to vote. I come to my beliefs naturally. My mother was a life-long member of the League of Women Voters, a nonpartisan organization that works hard to promote democracy by defending and expanding the right to vote.

So, on behalf of my late mom, here's what I want you to know:

Election Day is Tuesday, November 8th. Texans will pick their U.S. congresspeople, top state officials, and folks in races all the way down to local dog catcher.

If you can, please don't wait until Election Day to vote, when the lines are long, and something may happen, like y'all get sick or a flat.

Early Voting starts October 24th. That's right, October 24th. Check out your county's election department website — or give them a quick call —to find out the days and times for early voting and where you can cast your ballot.

I appreciate you taking the time to listen to this public service announcement. And mom, thanks for making me a lifelong voter and a proud defender of our democracy.

Final Shot: (we'll take care of this): For more information on voting, candidates, and the upcoming election, check out VOTE411.org

OCAGH_00017019

**Mickey Raphael – LWV PSA 2 – mail in voting**

Begin: Mickey plays a few bars of "On the Road Again" on the harmonica

Mickey: Hi. I'm Mickey Raphael, a proud, native-born Texan and a member of Willie Nelson's band for almost 50 years.

My band members and I are firm believers in this country's democracy and the freedom to vote. I come to my beliefs naturally. My mother was a life-long member of the League of Women Voters, a nonpartisan organization that works hard to promote democracy by defending and expanding the right to vote.

Here's what my late mom would want you to know about the November 8th election and voting by mail:

Texans will pick their U.S. congresspeople, top state officials, and folks in races all the way down to local dog catcher.

You can vote by mail if you are 65 or older, disabled, or out of town during early voting and election day. But you have to apply.

To get an application for a vote-by-mail ballot, you can call your county elections office or print out an application from LWVTexas.org. Now, this is important: The application will ask for your driver's license number OR the last four digits of your social security number. The League of Women Voters recommends you give them both.

After you finish filling out the application, be sure to sign it! The last day your application can be received at the election's office is October 28th. But please don't wait until the last minute to mail it, because y'all know the mail can be slow.

When your ballot arrives, mark your choices, put your ballot in the ballot envelope, seal it, and put the ballot envelope in the carrier envelope.

Please fill out all that information they ask for inside the carrier envelope flap, including your driver's license number and the last four digits of your social security number. Then, go ahead and add your contact information in case there is a problem.

Then seal that carrier envelope in both places and sign over the flap before dropping it in a mailbox. Be sure your ballot makes it to the election's office by Election Day, November 8th.

OCAGH_00017020

I appreciate you taking the time to listen to this public service announcement. And mom, thanks for making me a lifelong voter and a proud defender of our democracy.

Final Shot: (we'll take care of this): For more information on voting, candidates, and the upcoming election, check out VOTE411.org

OCAGH_00017021

# Exhibit 144

| From: | Grace Chimene [gchimene@lwvtexas.org] |
| Sent: | 6/17/2022 9:00:33 AM |
| To: | Casey Thomas ▮▮▮▮▮▮▮; Dorothy Marchand [dmarchand@lwvtexas.org]; Joyce LeBombard [jlebombard@lwvtexas.org]; Elisabeth Macnamara [egmacnam@gmail.com] |
| Subject: | Voter Education |

Question from Casey Thomas Texas NAACP Advocacy
*Who would be a good person with the League to do a voter education forum on the new laws and the rules for applying for a vote by mail application?*

Introduction:
Dorothy Marchand LWV Texas Voter Education
Joyce LeBombard LWV Texas President
Elisabeth MacNamara LWV Texas Advocacy Chair

Casey,
That is a good question. LWV Texas just changed over to new leadership. Joyce, Elisabeth, or Dorothy should be able to answer that question. The League had several webinars on the new election laws earlier in the year.

We are working on some great Vote by Mail voter education material. You can find videos and printable material on our Vote by Mail page. We are working with the Center for Civic Design on improved VBM envelopes. Our contact in Texas with CCD is Asher Kolieboi asher@civicdesign.org.

Keep up the good work.
If you don't hear back or need more information, let me know.


--
**Grace Chimene** (she/her)
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
▮▮▮▮▮▮▮

*Empowering Voters. Defending Democracy*

OCA-APPX-2071

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015860

# Exhibit 145

| **From:** | Joleen E. Smith [jsmith@lwvtexas.org] |
| **on behalf of** | Joleen E. Smith <jsmith@lwvtexas.org> [jsmith@lwvtexas.org] |
| **Sent:** | 5/16/2022 1:14:08 PM |
| **To:** | Aileen McMurrer [amcmurrer@lwvtexas.org]; Grace Chimene [gchimene@lwvtexas.org]; Joyce LeBombard [jlebombard@lwvtexas.org]; Dorothy Marchand [dmarchand@lwvtexas.org] |
| **Subject:** | Fwd: TEST - VOTE411 is Ready to Help Voters! |

Hi, everyone! Here's the draft email to go out to members and friends/advocates/partners. Please let me know if you see anything that needs to be changed. Thanks!

---------- Forwarded message ---------
From: **Grace Chimene** <lwvtexas@lwvtexas.org>
Date: Mon, May 16, 2022 at 1:01 PM
Subject: TEST - VOTE411 is Ready to Help Voters!
To: <jsmith@lwvtexas.org>



CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

Dear ~~first_name~~,

Early Voting for the 2022 Primary Runoff Election starts TODAY!!! Below you will find our recent press release about the 2022 Primary Runoff Election. Please share this information with your members and networks, and as always, continue to spread awareness about our Voters Guides and VOTE411.org, as well as voting dates, locations, and access to voting for everyone.

Thank you for your dedication to empowering voters and defending democracy! Together, we are stronger!



Grace Chimene
President, League of Women Voters of Texas

---

<div align="center">

**League of Women Voters of Texas**
**Another Election and VOTE411 Is Ready to Help Voters!**

</div>

Austin, TX - There is only one week of early voting for the 2022 Primary Runoff Election and it begins Monday, May 16th! Election Day is Tuesday, May 24th, which is also the last day for Vote by Mail ballots to be received at election offices.

The League of Women Voters makes it easy for voters to compare candidates and find other voting information with their nonpartisan election resource VOTE411.org. Voters enter their address to see how runoff candidates for statewide offices from both parties responded to unbiased questions posed by the League. If there is a local League in the community, voters can also find information on local

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

races.

"We understand that voters may be feeling a little 'election burnout,' this being the third statewide election in 2022, and it's not even summer yet! But VOTE411.org really helps you choose who you believe are the best candidates in the primary runoff election. We strongly encourage you to vote in this runoff election, and to take advantage of this trusted online election resource for all Texas voters." said Grace Chimene, president of the League of Women Voters of Texas.

During the Primary Election in March, the Vote by Mail process confused many Texas voters. The Secretary of State reported almost 25,000 ballots being rejected, and that number doesn't even consider those who tried, but didn't get through the application process. If a voter is eligible and chooses to vote by mail, it is important to remember:

- After completing the Vote by Mail ballot, the voter puts it in the ballot envelope, then places the ballot envelope in the carrier envelope.

o UNDER THE FLAP of the carrier envelope - voters should include the required ID information and their contact information! To be more certain that the ballot will be accepted, include both the ID information AND the last four digits of their Social Security number.

o OVER THE FLAP of the carrier envelope - voters must sign their name!

- Ballots must be received at the county election office by 7pm on Election Day. If the ballot is postmarked by 7pm on Election Day, it must be received by 5pm the day after Election Day. Voters can mail their ballot by US Postal Service, Fed Ex, UPS, or DHL.

- Voters can now track their ballots at teamrv-mvp.sos.texas.gov/BallotTrackerApp.

"Regardless of the challenges voters face caused by last year's changes to election laws, the League is determined to provide tools for Texas voters so they have the knowledge and confidence to vote. As a nonpartisan organization, the League does not support parties or candidates, but with VOTE411.org, we provide unbiased, understandable information about candidates and races." said Grace Chimene, President of the League of Women Voters of Texas.

In addition to VOTE411.org, a printable PDF version of the 2022 Primary Election Voters Guide is at LWVTexas.org. Please share VOTE411.org and the League's website with friends and family so that ALL Texas voters can be INFORMED voters!

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)



CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00016288



The League of Women Voters is one of America's oldest and most trusted civic nonprofit organizations. Formed in 1919, the Texas League represents more than 13,500 grassroots advocates and 34 local Leagues across the state. The League never supports or opposes candidates for office or political parties. The League encourages the informed and active participation of citizens in government. The League also seeks to influence public policy through education and advocacy. Membership is open to people 16 years and older.

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00016289



**League of Women Voters of Texas**
1212 Guadalupe St. #107
Austin Texas, 78701
(512)-472-1100
**lwvtexas@lwvtexas.org**
**lwvtexas.org**



--
Take care,
Joleen Smith
Digital Communications Associate

**LWV** LEAGUE OF WOMEN VOTERS
OF TEXAS

**Empowering Voters. Defending Democracy.**
1212 Guadalupe Street, Suite 107

OCA-APPX-2078

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

Austin, Texas 78701
512.472.1100
For more information: LWVTexas.org

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 146

OCA-APPX-2080

| From: | Susan Schultz [susandb7@gmail.com] |
| on behalf of | Susan Schultz <susandb7@gmail.com> [susandb7@gmail.com] |
| Sent: | 3/30/2022 11:15:53 AM |
| To: | Grace Chimene [gchimene@lwvtexas.org] |
| Subject: | Re: Feedback on voter education videos |

Way to go, Grace!

Susan

On Wed, Mar 30, 2022 at 7:44 AM Grace Chimene <gchimene@lwvtexas.org> wrote:
Sam,
Thank you for sharing the new SOS videos.
Here is some feedback.

Regarding the Voter ID video...
**#1. Use a photo of each ID. Include a <u>red circle around the correct number</u> or arrows pointing to the specific number to use.**
Why: There is more than one number on the IDs. Indicate the correct number on the ID to decrease voter confusion.

**#2. Encourage voters to provide <u>both</u> their voter ID and their social security number.**
Why: The SOS encourages the use of both ID numbers. If the SOS must use words directly from the statute and are unable to encourage including both ID and SS#, consider adding a brief video of SOS Scott encouraging voters to use both the voter ID and the social security number.

**Mythbuster video**
**1. The Mythbuster video is not helpful because it repeats misinformation.**
Why: The beginning of the video shares incorrect inaccurate information for 7 or 8 seconds in a slow opening. This message may stick with the voter instead of the accurate information.
2. **Use positive accurate statements** such as "Find out who can vote by mail" or "Can you vote by mail"
Why: It is best practice for voter education to *always* be written as positive statements of what is possible.
3. **It is hard to read.** The words are shared in a confusing manner. Add audio to reach more voters.


--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org

*Empowering Voters. Defending Democracy*

OCA-APPX-2081

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 147

OCA-APPX-2082



# Tips for Voters – New Election Laws

## Voter Registration
- Update your voter registration online if you moved or changed your name here. You will need your TXDL or ID Card, SSN, and Voter Registration Card VUID (Voter Unique Identifier) number.  If you do not have your VUID number, you can find it at am I registered by putting in your name, county and date of birth.
- For college student voters living away from home, it is safest and easiest to register and vote at your college residence address.
- For voters without a residence, in the space on the registration form  for residence address, it's safest to put the street address of an agency where you receive aid. In the space for mailing address, if you have one, put the P.O. Box where you receive your mail.

## Early Voting
- You must be allowed to cast a ballot if you are in line before the poll closing time.
- Small counties now provide longer hours for early voting.

## Vote By Mail (VBM)
- New! Who else qualifies?
  - Voters expecting to give birth within three weeks before or after election day
- Coming soon! VBM tracker and "Cure" process @ votetexas.gov
  - Track your VBM application and VBM ballot throughout the election process
  - Provide contact information on your VBM application so the county may contact you if you need to fix an error with your application or ballot.
- Voters
  - Request a VBM application from your county election office
  - Provide Voter ID number (TXDL, Personal ID, EIC Number or, if not available, the last four digits of SSN) on your VBM application and VBM ballot carrier envelope
  - Use the same Voter ID number on your voter registration application, VBM application, and VBM carrier envelope.
- Organizations and Leagues
  - Counties may not provide applications to organizations. But Leagues can print VBM applications to share with voters.

## Poll Watchers
- Poll watchers are required to take training and sign an oath but have fewer restrictions on movement and observation.

## Persons Who Assist Voters
- Persons who assist voters with a VBM application, VBM ballot, or in-person ballot must provide their relationship to the voter and address, and for the VBM ballot and in-person ballot, the assistor must  sign an oath and mark that they didn't receive compensation.
- Persons who drive 7 or more voters who qualify for curbside voting must sign a form which is shared with the Secretary of State and the Attorney General's office.

## For More Information or Assistance
- LWVTexas.org or VOTE411.org,
- Election Protection 866ourvote.org 866-687-8683,
- Texas Secretary of State VoteTexas.gov (800) 252-VOTE



# Steps to Voting by Mail in Texas
*For eligible Texas voters who want to safely vote from home*

## Apply

### Who is eligible to vote by mail?
Those who are:
- 65 years or older on Election Day
- Sick or disabled
- Out of the county during early voting and election day
- In jail or Involuntary Civil Commitment but eligible to vote
- NEW! Expecting to give birth within three weeks before or after Election Day.

### Where to get NEW Application for a Ballot by Mail (ABBM)
- Voters must use the **new** Application for a Ballot by Mail, which has a place for an ID number on the top right.
- Request an application from Bexar County Elections Department. Call (210) 335-8683 and request one be mailed or download in English or Spanish at www.bexar.org/3271/Vote-by-Mail.
- At VoteTexas.gov, print the application in English or Spanish. Complete, sign, and mail to the Bexar County Elections Department.*
- Applications must be received (not postmarked) at your county election office by the application deadline. ** NOTE: The postal service is not responsible if application is delivered late.

### Prevent your application from being rejected because of ID:
- Make sure to complete the ID section of the application. If unsure of the number used originally, put both.
- The Texas Secretary of State's office has advised that you may contact your county elections office to ask how to add one of the required ID numbers to your voter record.

---

**\*Bexar County Elections Department**
1103 S. Frio St., Suite 100
San Antonio, TX 78207
Phone: (210) 335-VOTE (8683)
www.bexar.org/1568/Elections-Department

**\*\*The 2022 Election Calendar with deadlines is on page 2 of this document.**

**NEED HELP WITH VOTING ISSUES?**
Election Protection Hotline: (866) 687-8683 or 866ourvote.org
VoteTexas.gov or (800)252-VOTE (8683)
For Voter ID issues, contact voteriders.org or (844) 338-8743

---

### Tips for filling out the ABBM application
Read all the instructions provided on the back of the application
**Sec. 1** - Provide contact information so that the Elections Department can contact you with any questions to expedite application approval.
Provide Your ID number from:
- A Texas Driver's License
- A Texas Personal ID
- An Election Identification Certificate, or
- If none of these has been issued, then the last four digits of your Social Security number

*Use the same ID number on the Vote by Mail application and the ballot carrier envelope that you used for your voter registration.*
**Sec. 2** - Provide the address where the ballot is to be mailed.
**Sec. 3** - Voters with disabilities check the box marked disability.
**Sec. 4 –**
- If you are 65 years or older, or are permanently sick or disabled, you can mark the box for "Annual Application".
- If you are out of the county (where you are registered to vote) during early voting and on Election Day, mark which election you are applying to Vote by Mail.
- Mark your party of choice to vote in the Primary Election and runoff.

**Sec. 5** - Don't forget to sign the application.
**Sec. 6** - If the voter is unable to sign the application follow the instructions for witnessing a signature. NOTE: Persons who assist voters with a Vote by Mail application must provide their name and address.
Finally, mail your ABBM to County Elections Department* by stated deadline. ** Once your application is approved, you will receive a Mail in Ballot to complete and return by Election Day.

## Vote

### Tips for completing and submitting your mail ballot
- Research candidates with the League's nonpartisan Voters Guide at VOTE411.org.
- Mark your ballot using a black or blue pen.
- Place your ballot in the ballot envelope and seal it.
- Place the ballot envelope in the carrier envelope, seal it, and sign the flap of the carrier envelope with the same signature you used on your ABBM application. Use the same ID number on the Vote by Mail application and the mail ballot carrier envelope that you used for your voter registration.
- Return your ballot, via USPS or other carrier, as soon as possible. Ballot must be received at the county election office* by 7PM on Election Day.

---

*The League of Women Voters of the San Antonio Area is nonpartisan, never supporting or opposing political parties or candidates.*
*106 Auditorium Circle #120, San Antonio, TX 78205      (210) 657-2206      LWVSA.ORG      VOTE411.ORG*

OCA-APPX-2084



### What if I want to hand-deliver my ballot?
- You may hand-deliver your marked ballot in person to the county election office on Election Day while polls are open.
- You must show your photo ID.

### What if I decide to vote in person instead of mailing my ballot?
- Take your mail ballot with you to the polling station and turn in to the election judge. You will be allowed to vote a regular ballot.
- If you lose or forget your mail ballot, you may cast a provisional ballot.

*For more information, review the Secretary of State's information provided in your Vote by Mail ballot packet.*

### Persons who assist a voter with the Vote by Mail ballot must:
- Provide their name, address, and relationship to the voter
- Sign an oath
- Confirm that they didn't receive compensation.

**Track your Vote by Mail Application and mail ballot online at VoteTexas.gov.**

## How to Register to Vote in Texas

### Who can register to vote in Texas?
- A citizen of the United States,
- A resident of the county, and
- 17 years 10 months of age (to vote you must be 18 years old on Election Day).
- You must not have been declared mentally incapacitated by a court of law.
- If you have been convicted of a felony, you may register to vote only if you have completed the punishment phase of your conviction, including any terms of incarceration, parole, supervision or period of probation ordered by the court.

### What is the last day to register to vote in an election?
- Voter Registration applications must be at the County' Voter Registrar's office or postmarked 30 days prior to the election.
- If your voter registration effective date is before Election Day, you may vote during early voting.

### Who needs to complete a voter registration form?
New Texas voters and Texas voters who have relocated to a new county in Texas should complete a new registration form

### How do I register to vote in Texas?
- Register in person at your county Voter Registrar's office
- Register by mail by obtaining a form from your county elections office or pick up a form from your neighborhood library.
- Download, print, complete, sign and mail a form from VoteTexas.gov.
- Mail completed form to your county elections department.
- Volunteer Deputy Registrars who are certified by the county to help voters can assist by providing a form and submitting it to the elections department for you.

### When will I receive my voter registration card?
- You should receive a voter registration card in the mail within one month. Check VoteTexas.gov to check status of your registration.
- New voter registration cards are mailed to registered voters every even year.

### How do I check on the current status of my voter registration?
- Check your voter registration status at VoteTexas.gov or check with your county voter registrar.

### I'm already registered. How do I update my voter registration?
- If you moved within the same county or changed your name, update your voter registration at VoteTexas.gov.
- When you update your driver's license online, you can update your voter registration at the same time.
- Complete a new paper voter registration form.

| 2022 ELECTION CALENDAR | | |
|---|---|---|
| **Election Day** | **Primary Elections March 1, 2022** | **Uniform Election May 7, 2022** |
| Last day to register to vote | January 31, 2022 | April 7, 2022 |
| **Early Voting** | February 14-25, 2022 | April 25-May 3, 2022 |
| Last day to apply for ballot by mail (received) | February 18, 2022 | April 26, 2022 |
| Last day to receive ballot by mail | March 1 at 7PM if not postmarked; March 3 at 5PM if postmarked by 7PM on election day | May 7 at 7PM if not postmarked; May 9 at 5PM if postmarked by 7PM on election day |
| 2022 ELECTION CALENDAR | | |
| **Election Day** | **Primary Runoffs May 24, 2022** | **General Election November 8, 2022** |
| Last day to register to vote | April 25, 2022 | October 11, 2022 |
| **Early Voting** | May 16-20, 2022 | October 24-November 4, 2022 |
| Last day to apply for ballot by mail (received) | May 13, 2022 | October 28, 2022 |
| Last day to receive ballot by mail | May 24 at 7PM if not postmarked; May 25 at 5PM if postmarked by 7PM on election day | November 8 at 7PM if not postmarked; November 9 at 5PM if postmarked by 7PM on election day |

OCA-APPX-2085

OCAGH_00004977

| From: | Annette Matthews [acmmatt@msn.com] |
| on behalf of | Annette Matthews <acmmatt@msn.com> [acmmatt@msn.com] |
| Sent: | 1/18/2022 2:52:42 PM |
| To: | gchimene@lwvtexas.org |
| Subject: | Re: vote by mail ballot info and question post webinar |

Harris County Elections Administration has recommended putting both numbers on the application. I just called them. As long as one of the numbers matches, then the application will be accepted.
Annette

----- Original Message -----
From: Grace Chimene
To: Annette Matthews
Sent: Tuesday, January 18, 2022 1:57 PM
Subject: Re: vote by mail ballot info and question post webinar

That is a good question.
I don't know.
I thought it was a good idea, but maybe he didn't understand the question.
I don't know what the legal answer would be.
Hmmm. Maybe call Election Protection to discuss this issue.
https://866ourvote.org/

On Tue, Jan 18, 2022 at 1:42 PM Annette Matthews <acmmatt@msn.com> wrote:
Dear Ms. Chimene, (Grace)

In an attempt to determine with which document my husband and I used to register to vote by mail I called the Harris County Registrar's office as per the webinar information.

I was referred to the Elections Administration Office at 713-755-6965. So, in counties with administration offices that will probably be the place to call.

Once speaking to an employee there, I learned that there was **no** initial application form we had completed because postcards had been sent to us to sign instead. I then asked what documents would be used to identify us as there were none on an initial application. She said they had our social security numbers elsewhere.

So we are assuming the social security number is the number to use.

OCA-APPX-2086

OCAGH_00007599

I am curious as to why the lawyer was **not** in favor of using **both** numbers on the vote by mail application as our political party has been suggesting to precinct chairs that we recommend to party members to avoid having applications rejected. Please, advise.

Thanking you in advance,
Annette Matthews

--
Grace Chimene (she/her)
President, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
512-940-9948
*Empowering Voters. Defending Democracy*

# Exhibit 148

| From: | Azucena Garza [azucenagzav@gmail.com] |
| on behalf of | Azucena Garza <azucenagzav@gmail.com> [azucenagzav@gmail.com] |
| Sent: | 4/6/2022 11:26:58 PM |
| To: | Dorothy Marchand [dmarchand@lwvtexas.org] |
| CC: | Castro Anjanette Gautier [anjanette@inspirarecom.com]; McMurrer Aileen [amcmurrer@lwvtexas.org]; Chimene Grace [gchimene@lwvtexas.org]; translations@inspirarecom.com |
| Subject: | Re: Translations for 2022 Runoff Primary Voters Guide |

Hi Dorothy,

Here is the candidate response translation:
https://docs.google.com/document/d/1IFuS66Xvz5z8fylZtj0hi2LHnnd6Io7uIlBQAmgb2Vg/edit?usp=sharing

And here is the filler document translation:
https://docs.google.com/document/d/1rMoOjlp4KySqdDw3c4bzmBFTsXxsUXeTaMQIYj9gYb8/edit?usp=sharing

I believe this is all that was pending. Will you have more responses to translate as you mentioned in your email of March 28?

Note that I added another email to this thread: translations@inspirarecom.com. Please make sure you include that email when you reply because I will be migrating all our conversations to that address.

Thank you!

Let me know if you have any questions.

Azucena


On Mon, Mar 28, 2022 at 6:13 PM Azucena Garza <azucenagzav@gmail.com> wrote:
Thank you, Dorothy.

Yes, we will have them ready before the end of next week.

Azucena

On Mon, Mar 28, 2022 at 3:31 PM Dorothy Marchand <dmarchand@lwvtexas.org> wrote:
Hi Anjanette,

Below is the filler for the 2022 Runoff Primary Election Voters Guide. Note that only the sections in pink have had any changes from the last Guide and need to be translated.

https://docs.google.com/document/d/135pHMJXPQqo9LrLlFiJQNPEJYNmXgsgp_-j-bXBbpro/edit?usp=sharing

Also, below is an additional candidate response that needs to be translated:

https://docs.google.com/document/d/1z-QLGbOKDHJM-0mZVT2HGdoM7SGdOTYU/edit?usp=sharing&ouid=108936588050542753555&rtpof=true&sd=true

OCA-APPX-2089

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00016049

We have two more late responses, but I am checking to make sure these comply with policy. I will send them to you as soon as confirmed.

Could you please turn this around by the end of next week?

Thank you!

Dorothy Marchand
dmarchand@lwvtexas.org
█████████

--

Azucena Garza

We have to shift our attitude of ownership of nature to relationship with nature. The moment you change from ownership to relationship, you create a sense of the sacred.
— **Satish Kumar**

--

Azucena Garza

We have to shift our attitude of ownership of nature to relationship with nature. The moment you change from ownership to relationship, you create a sense of the sacred.
— **Satish Kumar**

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Filler for Runoff Election, May 24, 2022

NONPARTISAN
VOTERS GUIDE

TEXAS RUNOFF PRIMARY ELECTION >> MAY 24, 2022

Lieutenant Governor>> Attorney General>>Comptroller of Public Accounts>>
Commissioner of General Land Office>>Railroad Commissioner>>State Board of
Education

EARLY VOTING: May 16 - May 20 >> ELECTION DAY: May 24. Polls open 7 a.m. to
7 p.m.

## >VOTING IN TEXAS PRIMARIES
The upcoming Runoff Primary Election is extremely important for Texas!

**Primary Elections:** Texas has open primaries, which means all Texas voters can participate.
The Primary Elections include the Primary Election, which was held on March 1st, and this
Runoff Primary Election.
- The Republican and Democratic Parties each choose their candidates in Primary
  Elections.
- If one candidate did not receive more than 50% of a party's votes for any race in the
  March 1st Primary Election, then the two candidates with the most votes must
  compete in this Runoff Primary Election.
- The Libertarian and Green Parties each choose their candidates in a party
  convention.

Since many districts in Texas heavily favor one party over the other, the primaries often
determine the winner of the General Election! Even if you do not strongly identify with any
political party, you can and should carefully consider the candidate choices and participate
in one of the primaries or conventions.

Note: If you did not vote in the March 1st Primary Election, you can still vote in the Runoff
Primary Election! But, if you voted in one party primary or convention, you cannot vote in
another party's primary or convention. So, if you voted in the March 1st Primary Election,
on May 24th, you can only vote in that same party's Runoff Election.

**General Election:** Voting in one party's Primary Election, convention or Runoff Election
does NOT commit you to vote for a particular party or candidate in November's General
Election. You can still vote for any candidate of your choice, regardless of party, in the
General Election.

## >ABOUT THIS *VOTERS GUIDE*

Feb 2022 Filler for Special CAVG 2022

OCAGH_00018624

This *Voters Guide* is funded and published by the League of Women Voters of Texas. The League never supports or opposes political candidates or political parties.

### >ONLINE *VOTERS GUIDE*

The online, interactive version of the *Voters Guide* is at **VOTE411.org**. By entering your address, you can view races and candidates on your ballot, compare candidates' responses to unbiased questions posed by the League, and create a print-out of your choices to take to the polls. If there is a local League in your community, you can also find information on any local races.

[VOTE411/Election information you need graphic & QR code]

### > SIGN UP FOR VOTING REMINDERS!
To get voting reminders on your phone, text LWVTX to 80123.

[Text: LWVTX To: 80123 graphic]

### >SUPPORT THE *VOTERS GUIDE*
Help us fund the cost of this valuable resource for Texas voters by making a secure donation online at lwvtexas.org, or by mailing the payment to the League of Women Voters of Texas, 1212 Guadalupe #107, Austin, TX 78701.

[QR code]

### >*VOTERS GUIDE* CONTENTS
[make pages linkable]
Be a Texas Voter!
Voter ID - What to take to the Polls
Helpful Contacts & Websites
Lieutenant Governor
Attorney General
Comptroller of Public Accounts
Commissioner of General Land Office
Railroad Commissioner
State Board of Education
*Voters Guide* Policy
Sponsors and Major Donors
Local Leagues in Texas

**BE A TEXAS VOTER!**

The League of Women Voters of Texas fights for the freedom of ALL Texans to vote. Your vote is your voice. . . below are the ways to exercise your right to vote. Whichever way you choose to vote, be sure to first check your voter registration status at VoteTexas.gov! You must be registered before you can vote!

» VOTE BY MAIL
If you applied to vote by mail . . .
- Ballots are mailed out 30 to 45 days before an election or 7 days after the county election office receives an application.
- When you receive your ballot, be sure to
  - Mark your ballot using a black or blue pen;
  - Place your ballot in the ballot envelope and seal it;
  - Place the ballot envelope in the carrier envelope;
  - Complete all information on the carrier envelope, including:
    - your contact information,
    - your voter ID number (Texas Drivers License, state-issued personal ID or election ID certificate), and
    - the last four digits of your social security number;
  - Seal it;
  - Sign the flap of the carrier envelope.
  - See lwvtexas.org for more details and helpful information.
- Mail in your ballot as soon as possible. It must be received by 7:00 p.m. on Election Day.
- Track your ballot at VoteTexas.gov!

If you want to hand deliver your vote by mail ballot....
- You may hand deliver your marked ballot in person to the county election office on Election Day while polls are open.
- You must show your photo ID when delivering the ballot, and sign a form.

» VOTE EARLY IN PERSON
- You may vote early at any voting location in your county.
- Find polling places at VOTE411.org or on your county election website.
- If you have a disability, you may request to move ahead of other voters in line.
- If in line before the poll closing time, you must be allowed to cast a ballot.

» VOTE ON ELECTION DAY
- In some counties, you can vote at any polling place.  In other counties, you can only vote at your precinct.
- Find polling places at VOTE411.org or on your county election website.
- If you have a disability, you may request to move ahead of other voters in line.
- If in line before the poll closing time, you must be allowed to cast a ballot.

Feb 2022 Filler for Special CAVG 2022

OCA-APPX-2093

» VOTE IN PERSON USING CURBSIDE VOTING
- If you are physically unable to enter the polling place without personal assistance or likelihood of injuring your health, you may ask that an election officer bring a ballot to your car.
- After you mark your ballot, give it to the election officer or hand it to a companion to deposit in the ballot box for you.
- It is best to call ahead so election officials will expect you!

» VOTE EVEN IF YOU ARE A SUSPENDED VOTER
You can still vote if your voter registration is in suspense! "Suspense" means that your county voter registrar needs to confirm your voting address.

» VOTE A LIMITED BALLOT IF YOU HAVE MOVED BUT NOT RE-REGISTERED
If you have moved to a new county and have not re-registered in the new county by the registration deadline, you may be eligible to vote a limited ballot in your new county. A limited ballot is one that allows you to vote on candidates and measures that are on the ballot for both your former county and your new county, such as statewide and national races. Voting a limited ballot is only available during early voting at the main early voting polling place.

## VOTER ID: WHAT TO TAKE TO THE POLLS

You may use one of seven forms of photo ID, listed below.
- Texas Driver License
- Texas Election Identification Certificate
- Texas Personal Identification Card issued by the Department of Public Safety (DPS)
- Texas Handgun License issued by DPS
- US Military Identification card containing the person's photograph
- US Citizenship Certificate containing the person's photograph
- US Passport (book or card)

Note:
- IDs may have expired up to four years.
- Persons 70 years or older may use an expired ID, regardless of expiration date.
- ID address does not have to match the voter registration address.
- The name on the photo ID should match the voter registration card or be "substantially similar." If the names don't match exactly but are substantially similar, the voter will initial a box for a similar name when signing in to vote.

Registered voters without photo ID, who cannot reasonably obtain one, may sign a form (described below) and present the original or a copy of one of the following documents with the voters name and address to vote a regular ballot:
- Texas voter registration card
- Certified birth certificate
- Current utility bill

Feb 2022 Filler for Special CAVG 2022

OCA-APPX-2094

OCAGH_00018627

- Bank statement
- Government check
- Paycheck
- Any other government document such as an out of state driver's license or expired Texas driver's license.

The form to be filled out by registered voters without a photo ID is a "Voter's Declaration of Reasonable Impediment or Difficulty". The voter must mark on the form one of the following reasons for not providing a photo ID:
- Lack of transportation
- Disability or illness
- Lack of birth certificate or other documents needed to obtain an acceptable form of photo ID
- Work schedule
- Family responsibilities
- Lost or stolen identification
- Acceptable form of photo ID applied for but not received.

### VOTER HARASSMENT
- Election officials cannot question a voter about the use of an ID type.
- Poll watchers may never question a voter about Voter ID issues.
- If you are harassed, call the Election Protection Voter Hotline!

### HELPFUL CONTACTS & WEBSITES

**League of Women Voters of Texas**
lwvtexas.org

**Secretary of State**
VoteTexas.gov

**Your County Election Website**
sos.texas.gov/Links of Interest

**Election Protection**
866OURVOTE.org

Voter Hotlines!
- English: 866-OUR-VOTE or 866-687-8683
- Spanish: 888-Ve-Y-Vota or 888- 839-8682
- Asian: 888-API-VOTE or 888-274-8683
- Disability Rights TX: 888-796-VOTE or 888-796-8683

**Republican Party**
texasgop.org

Feb 2022 Filler for Special CAVG 2022

OCA-APPX-2095

OCAGH_00018628

**Democratic Party**
txdemocrats.org
**Libertarian Party**
lptexas.org
**Green Party**
txgreens.org


*VOTERS GUIDE* **POLICY**

- Candidate replies are printed without editing or verification.
- References to opponents or specific persons are not allowed.
- In place of any inappropriate response, the *Voters Guide* will state "Candidate's response did not meet the criteria listed in this *Voters Guide*."
- Videos that do not comply are removed.
- This *Voters Guide* is organized by office, with candidates listed by party, including the names of unopposed candidates. (Ballot order at the polls may vary from county to county.)
- Candidates with no photo in this *Voters Guide* did not submit a photo by the print deadline.
- Candidates who do not respond to our questionnaire by the print deadline are listed with the notation "Candidate has not yet responded." Their information may be in VOTE411.org.
-

@ 2022 League of Women Voters of Texas /lwvtexas.org
The *Voters Guide* is protected by copyright. For permission to duplicate the *Guide*, please call the LWV Texas office at 512-472-1100. Any use of the League of Women Voters name in campaign advertising or literature has not been authorized by the League.

League of Women Voters of Texas Voter Education Chair: Dorothy Marchand
Voters Guide Volunteers:
Production Team: Community Impact, Inspirare Communications, Jaci Collins, Motto Publishing Services, Truc Viet Organization


**VOTERS GUIDE SPONSORS AND SUPPORTERS**
LWV Texas *Voters Guides* are funded by the League of Women Voters of Texas, a 501(c)(3) corporation that is supported by contributions from individuals, corporations, and foundations. We would like to acknowledge the following generous *Voters Guide* sponsors and major donors, as well as the donations from all our supporters which make the publication of the *Voters Guide* possible.

**Platinum *Voters Guide* Sponsors**


**Gold *Voters Guide* Sponsors**

Feb 2022 Filler for Special CAVG 2022

OCA-APPX-2096

**Major 2022 Contributors**


**EMPOWERING VOTERS.  DEFENDING DEMOCRACY**
The LWV is a nonpartisan political organization and is one of America's most trusted grassroots organizations!  We aim to:
- Achieve a free and fair democracy
- Increase participation in government
- Expand voter participation in Texas
- Create a League that is diverse, equitable & inclusive.


**>TEXAS LOCAL LEAGUES**
Learn more about our local Texas Leagues and how they help shape today's important issues by visiting lwvtexas.org.

Amarillo
Austin Area
Bay Area
Baytown
Cy-Fair
Collin County
Comal Area
Cooke County
Corpus Christi
Dallas
Denton
El Paso
Fort Bend County
Hays County
Hill Country
Houston
Irving
Lubbock County
Midland
Montgomery County
Richardson
Rio Grande Valley
San Antonio Area
South Central Texas
Tarrant County
Tyler/Smith County
Victoria
Waco Area
Wichita Falls

Feb 2022 Filler for Special CAVG 2022

OCA-APPX-2097

OCAGH_00018630

Williamson County



Feb 2022 Filler for Special CAVG 2022

OCA-APPX-2098

OCAGH_00018631



the QR code for VOTE411.org

| Name | CMYK | PMS | HEX |
|---|---|---|---|
| Fuschia purple | 40,90,0,0 | Purple C | #bb29bb |
| Dark Blue | 100,69,7,30 | 294 | #0A3A5a |

OCA-APPX-2099

OCAGH_00018632



**LWV Blue**

C98 M72 Y13 K21
R0 G85 B150
hex #005596

**LWV Red**

C13 M100 Y84 K4
R190 G15 B52
hex #be0f34

ondary



**LWV Light Purple**

C45 M100 Y30 K20
R130 G2 B99
hex #820263

**LWV Dark Purple**

C75 M100 Y35 K30
R82 G28 B80
hex #521C50

**LWV Gold**

C5 M35 Y100 K2
R236 G164 B0
hex #ECA400

*PMS color specifications and artwork
files are available by request only. To
request access please contact LWV
to submit your reason and request for
consideration.

Also - the font we are using is "Rift" on the website and "Rift Soft" is used on the logo tagline.



Goes with words: "Never forget an election!" "Sign up for voting reminders."

# Exhibit 149

Submitted to the Court via USB Drive
Under Seal

# Exhibit 150

| **From:** | Grace Chimene [gchimene@lwvtexas.org] |
| on behalf of | Grace Chimene <gchimene@lwvtexas.org> [gchimene@lwvtexas.org] |
| **Sent:** | 3/4/2022 3:59:26 PM |
| **To:** | bob Kafka [bob.adapt@sbcglobal.net]; Molly Broadway [mbroadway@disabilityrightstx.org]; Ashley Ford [aford@thearcoftexas.org]; Dorothy Marchand [dmarchand@lwvtexas.org] |
| **Subject:** | Tell Your Voting Story survey |

Please Consider sharing.

Texas has a new voting law. The League of Women Voters of Texas is gathering stories from Texas voters about voting in the March 1st Texas Primary Election. How was your voting experience? And if you are comfortable sharing your friends' and family's voting experience in 2022, we welcome that too.

Your story will help the League learn about how new voting procedures impacted Texas voters and any challenges you experienced. By filling out this survey you are agreeing that we can use the information to pull out a collective story without using personal identifying information. We will use this information to enhance voter education and to advocate at the Capitol for improvements to voting in Texas on behalf of voters.

Tell Your Voting Story survey from the League of Women Voters of Texas.

--
**Grace Chimene** (she/her)
**President,** League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org

*Empowering Voters. Defending Democracy*

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00016030

**From:** Dorothy Marchand [dmarchand@lwvtexas.org]
**on behalf of** Dorothy Marchand <dmarchand@lwvtexas.org> [dmarchand@lwvtexas.org]
**Sent:** 3/5/2022 11:32:40 AM
**To:**



**Subject:** Spread the word and get your community to share their Voting Stories!

Dear Voter Services Leaders,

You may have already seen this via email or social media, but just in case…. Can you please help us gather Voting Stories from the primaries? Here is a script you can share along with it:

Texas has a new voting law. The League of Women Voters of Texas is gathering stories from Texas voters about voting in the March 1st Texas Primary Election. How was your voting experience? And if you are comfortable sharing your friends' and family's voting experience in 2022, we welcome that too.

Your story will help the League learn about how new voting procedures impacted Texas voters and any challenges you experienced. By filling out this survey you are agreeing that we can use the information to pull out a collective story without using personal identifying information. We will use this information to enhance voter education and to advocate at the Capitol for improvements to voting in Texas on behalf of voters.
https://forms.gle/r98QQyGPbpTVhUtJA

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

Share Your Voting Story!

Thanks!

Dorothy

Dorothy Marchand
dmarchand@lwvtexas.org
713 446 4297

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 151

Sign Up

Email or phone                    Password

Log In

Forgot account?

 **League of Women Voters of Texas** added 43 new photos to the album: Voter's Stories 2022.
March 17 ·

Trouble voting by mail? Blame Texas' new election law!

Texas has a new voting law because of the passing of Senate Bill 1. The League of Women Voters of Texas has been gathering stories from Texas voters about their experience voting in the Texas Primary Election on March 1st, 2022.

It's a tragedy for our democracy when state leaders choose to support a partisan agenda instead of voters when writing state election law resulting in a massive rejection of vote-by-mail ballots. The federal Voting Rights Act must be restored to ensure that every voter in Texas has equal access to the ballot box and is protected from unfair laws and practices that make it harder for people to vote.

"For democracy to work, it must include all voices. SB 1 is an extremist anti-voter bill that raises even more barriers to voting and specifically targets vulnerable communities, especially voters with disabilities, voters of color, and elderly voters," said Grace Chimene, president of the League of Women Voters of Texas. "SB 1 is a violation of our freedom to vote, and we will continue to fight every attempt to silence Texas voters."

These slides contain exact quotes from actual Texas voters.

These quotes were copied directly from voter submissions collected by the League of Women Voters of Texas. Absolutely no editing was done by LWV Texas; therefore, there are a few spelling, capitalization, and grammar errors. Additionally, all identifying information was removed, in order to protect the privacy of those who submitted.

To submit your story, click here: https://bit.ly/lwv-stories.

Help the League carry out its mission of empowering voters and defending democracy in Texas. Donate and join today at lwvtexas.org.



+40

11                                                                    20 Shares

Share



## Related Pages

**Kim Olson**
Politician

**Texas Democratic Women**
Political Organization

**Meyerland Area Democrats Club**
Political Organization

**Kim Collins Gilby - WCDP Chair**
Politician

**Moms Demand Action - TX**
Interest

**Mike Collier**
Political Candidate

**Planned Parenthood Texas Votes**
Political Organization

**League of Women Voters Austin …**
Nonprofit Organization

**Republican Party of Texas**
Political Organization

**Texas Water Development B…**
Government Official

**Texas Rising**
Nonprofit Organization

**Texas Freedom Network**
Political Organization

## Pages Liked by This Page

**League of Women Voters of Midl…**

See more of League of Women Voters of Texas on Facebook

Log In          or          Create new account

OCA-APPX-2109

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)                                                        OCAGH_00015673



**League of Women Voters of Texas**
Yesterday at 5:22 AM

Join the conversation TONIGHT!!!
Register for the free webinar here:
https://bit.ly/lwvtx-gun-reform-webinar.

7                                    5 Shares

Share

**League of Women Voters of Texas**
July 12 at 9:32 PM

Zahra Biabani, we are so proud of you!
We love to see our former in... See more

3                                    1 Share

Share

**League of Women Voters of Texas**
July 12 at 9:02 AM

1                                    2 Shares

Share

English (US) · Español ·
Português (Brasil) · Français (France) ·
Deutsch

Privacy · Terms · Advertising · Ad Choices    ·
Cookies · More
Meta © 2022

### See more of League of Women Voters of Texas on Facebook

Log In                or                Create new account

OCA-APPX-2110

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015674

# Exhibit 152

Submitted to the Court via USB Drive
Under Seal

# Exhibit 153

# 2022 General Election Vote by Mail Issues

The League of Women Voters of Texas is gathering information from Texas League members about their Vote By Mail experience. If you voted by mail or assisted someone in voting by mail for the November 8th, 2022 Primary General Election, please complete this brief survey by end of the day Thursday, February 23 (my apologies for the short turnaround).

Your information will help the League learn about any challenges you experienced that may help us pursue our SB1 lawsuit. By filling out this survey, you are agreeing that we can use the general information to pull out a collection of information. We ask you to please include your name and contac information. By providing contact information, we may contact you for further information.

If you have questions, contact us at jlebombard@lwvtexas.org.



1. Did you vote by mail, or try to vote by mail, in the November 8th, 2022 Midterm Election?

   *Mark only one oval.*

   ◯ Yes

   ◯ No

OCAGH_00018575

2. If yes, please describe any issues you had voting by mail in the November election (This may include issues with missing or incorrect ID numbers on Ballot By Mail forms, or issues receivin assistance while voting.)

3. Did you assist, or attempt to assist, a voter with the Ballot by Mail process?

*Mark only one oval.*

◯ Yes

◯ No

4. If yes, please describe any issues you had assisting voters with the Ballot by Mail process.

5. Are you a member of the League of Women Voters?

*Mark only one oval.*

◯ Yes

◯ No

OCAGH_00018576

6. First name

_____

7. Last name

_____

8. County where you voted

_____

9. Zip code

_____

10. Phone number

_____

This content is neither created nor endorsed by Google.

**Google** Forms

OCA-APPX-2116

OCAGH_00018577

OCA-APPX-2117

OCAGH_00018578

# Exhibit 154

| From: | David Weinberg [weinbergd@brennan.law.nyu.edu] |
|---|---|
| on behalf of | David Weinberg <weinbergd@brennan.law.nyu.edu> [weinbergd@brennan.law.nyu.edu] |
| Sent: | 3/9/2022 4:15:03 PM |
| To: | Grace Chimene [gchimene@lwvtexas.org]; Marisa Bremer [marisa@impactual.com] |
| CC: | Lisa Danetz [danetzl@brennan.law.nyu.edu] |
| Subject: | RE: Introduction |

Thank you Grace!!!!

*David Weinberg*
*Voting Rights Advisor*
*Brennan Center for Justice*

█████████

**From:** Grace Chimene <gchimene@lwvtexas.org>
**Sent:** Wednesday, March 9, 2022 12:31 PM
**To:** Marisa Bremer <marisa@impactual.com>
**Cc:** David Weinberg <weinbergd@brennan.law.nyu.edu>; Lisa Danetz <danetzl@brennan.law.nyu.edu>
**Subject:** Re: Introduction

We are meeting next Monday at 9:00 am with Whitney and others.
Grace

On Wed, Mar 9, 2022 at 12:25 PM Marisa Bremer <marisa@impactual.com> wrote:

> The small group conversation referenced here is the same as the conversation being discussed in Slack.
> Grace, please keep me posted on when your conversation with Whitney is, and then I will send out a doodle poll to find
> a time for the small group discussion after that meeting. I think for the sake of organization and alignment it'll be
> easiest to start with the one small group discussion that includes everyone who is interested. I'll be sure to loop Lisa,
> Cinde, and other members of the League team into scheduling for the small group discussion.
>
> Thanks all!
>
>
> **Marisa Bremer**
> Program Manager | Civic Participant | Impactual
> (m): █████████
> Learn more about what we do here
> Slip into something meaningful here
> IG | Twitter

On Wed, Mar 9, 2022 at 11:15 AM Grace Chimene <gchimene@lwvtexas.org> wrote:

> I would be happy to join in the conversation regarding the design of the ABBM and the carrier-envelope. We are
> setting up a meeting with Civic Design now. You might also like to include Cinde Weatherby and a few others with the
> League that work on voter education and advocacy.
>
> We know Whitney with Civic Design through our work reviewing all 254 counties during major elections.
> Our last review came out on Monday. There were 5 counties that still hadn't updated the ABBM application on their
> website and many more counties that don't even mention VBM. ugh.
> https://lwvtexas.org/content.aspx?page_id=22&club_id=979482&module_id=469611

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

We are also very involved in voter education. This past election we were intensely focusing on the VBM process with our voter education.
https://lwvtx.clubexpress.com/content.aspx?page_id=22&club_id=979482&module_id=482951

On Wed, Mar 9, 2022 at 11:50 AM David Weinberg <weinbergd@brennan.law.nyu.edu> wrote:

Looping in Grace from LWV-TX who is also working on this...

Thank you,

DW

**From:** Marisa Bremer <marisa@impactual.com>
**Sent:** Wednesday, March 9, 2022 11:09 AM
**To:** Lisa Danetz <danetzl@brennan.law.nyu.edu>
**Subject:** Re: Introduction

Thanks David, moving you and Steph to BCC!
Lisa, great to connect with you. I'm a different Marisa from the one at project vote, my background prior to joining Impactual was in field!

I'm planning on sending out a doodle to find a time for the small group discussion that David mentioned, would you like me to send that your way once it's made?

**Marisa Bremer**
Program Manager | Civic Participant | Impactual
(m) : ▮▮▮▮▮▮▮▮
Learn more about what we do here
Slip into something meaningful here
IG | Twitter

On Wed, Mar 9, 2022 at 7:43 AM Lisa Danetz <danetzl@brennan.law.nyu.edu> wrote:

Thanks, David. Marisa, I'm looking forward to connecting. I can't see your last name from your email address, so I am wondering: Are you the same Marisa who was at Project Vote years ago?

Lisa

**From:** David Weinberg <weinbergd@brennan.law.nyu.edu>
**Sent:** Tuesday, March 8, 2022 5:18 PM
**To:** marisa@impactual.com <marisa@impactual.com>
**Cc:** Lisa Danetz <danetzl@brennan.law.nyu.edu>; Stephanie Gomez <SGomez@commoncause.org>
**Subject:** Introduction

OCA-APPX-2120

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00015862

Marisa,

Hello, wanted to introduce you to Lisa Danetz w/ Brennan.  Lisa – Marisa is with CSME
and doing some work on improving the user-friendliness of mail ballot applications in Texas.
It seems like she may be involved with a smaller group discussion on this.  There was also some talk about
improving the ballot tracker as well but I'm not sure if that is going to get wrapped into
this conversation.  At any rate, wanted to put this on your radar screen at an item of potential interest.

Thank you,

David

*David Weinberg*
*Voting Rights Advisor*
*Brennan Center for Justice*

██████████

--
Grace Chimene (she/her)
**President**, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
██████████

*Empowering Voters. Defending Democracy*


--
Grace Chimene (she/her)
**President**, League of Women Voters of Texas
gchimene@lwvtexas.org
LWVTexas.org & VOTE411.org
██████████

*Empowering Voters. Defending Democracy*

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 155

**From:** Elaine Wiant [ewiant@lwvtexas.org]
**Sent:** 3/18/2022 11:04:50 AM
**To:** Grace Chimene [gchimene@lwvtexas.org]; Ashley Harris [aharris@aclutx.org]
**Subject:** Fwd: [redacted] has accepted our offer!
**Attachments:** [redacted] - Resume 2022.pdf; [redacted] - Cover Letter 2022.pdf

CAUTION: This message is from an external sender. Please be cautious of links & attachments.

Here is the confirmation of offer and acceptance. I'm also including a screenshot from Quickbooks. Let me know if you need more.

| Name | Email | Birth date |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| Home address | Social Security number | Gender |
| [redacted] | [redacted] | [redacted] |
| Phone number | | |
| - | | |

Tax withholding

Federal filing status
[redacted]

Show more

Payment method

Payment method
Direct deposit

Employment details

| Status | Hire date | Pay schedule |
|---|---|---|
| Active | 02/21/2022 | Twice a month 2 |

Elaine Wiant
LWV Texas

*Empowering voters. Defending democracy.*

---------- Forwarded message ---------
From: **Aileen McMurrer** <amcmurrer@lwvtexas.org>
Date: Wed, Feb 16, 2022 at 11:58 AM
Subject: [redacted] has accepted our offer!
To: Grace Chimene <gchimene@lwvtexas.org>, Elaine Wiant <ewiant@lwvtexas.org>, Susan Schultz <sschultz@lwvtexas.org>, Oliver Bernstein <oliver@steadyhandpr.com>

Hello,

I am so excited! ▮▮▮▮▮▮ has accepted the position of Digital Communications Associate for the LWVTX. Whoohoo! She accepted our offer of $46K/year. During the interview, I was impressed with her creativity, her enthusiasm for our mission, that she is self-motivated, and that she takes an analytical approach to her work. Her resume and cover letter are attached.

**Thank you, Oliver!** Oliver arranged for us (me, Grace & Oliver) to interview two candidates. Grace and I both preferred ▮▮▮▮ He then checked references and gave both candidates a writing exercise to complete in an hour. As well as promoting the position, Oliver interviewed other candidates that were not considered for interviews with us. Some accepted other positions in the process, or wanted more $$, or were not a good fit for LWVTX.

▮▮▮▮ will start next Monday. We'll do a brief orientation in the morning and give her some training tasks - primarily Club Express. I've asked her to join us at the board meeting on Monday also so she can meet the board and see the scope of the work we are doing.

**Oliver,** let's talk about the orientation/training topics you are going to cover. I am open Thurs morning and after 2 on Friday. Look forward to talking with you.

Aileen

--
Aileen Jacinta McMurrer
Executive Director

**Empowering Voters. Defending Democracy.**
1212 Guadalupe Street, Suite 107
Austin, Texas 78701
512.472.1100
For more information: LWVTexas.org

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)



## EDUCATION

Bachelor of Arts in Psychology; The University of Texas at Austin, 1999

## WORK EXPERIENCE



- Promoted and marketed the Art Center as well as events, exhibits, art work, and artists using multiple channels; produced short videos for social media highlighting events, exhibits, art work, and artists
- Crafted and distributed press releases; maintained a database of media contacts
- Responsible for social media management including Facebook and Instagram
- Responsible for graphic design including flyers, social media graphics, brochures, rack cards, and business cards; designed the program, save the date card, and invitation for the Art Center's annual Spring Gala
- Designed a new website with WordPress and maintained and updated the website as needed
- Created, wrote, and sent out a monthly email newsletter
- Managed the monthly "Art After Dark" program including scheduling speakers, live music, and food vendors
- Managed the "Artist of the Month" program including choosing the artist and promoting their exhibit
- Helped with fundraising; solicited donations from local businesses for the raffle at the Spring Gala
- Greeted visitors and gave tours of the facilities; scheduled and carried out group tours
- Taught monthly classes about marketing and other topics called "Art Bites"
- Taught a group social media class "Social Media for the Small Business & Artist," gave one-on-one Facebook consultations, and served as a member on the group panel discussion "My Work - Inspiration vs. Perspiration" at the Lost Pines Art Conference, 2016



- Responsible for social media marketing including updating the website/blog, Facebook, Twitter, Instagram, and Pinterest, and moderating the Facebook group; performed social media management for multiple clients
- Promoted local businesses, organizations, music, and events through both paid and unpaid advertising
- Maintained an online community calendar for Bastrop County; created, edited, promoted, and sold Bastrop County wall calendars in 2012 and 2014; sold advertising in the calendar
- Created, wrote, and sent out a weekly email newsletter and maintained an email database of over 1,300 contacts
- Organized and moderated contests and giveaways
- Performed website design and graphic design for clients including banner ads, business cards, flyers, brochures, etc.
- Wrote, hosted, and produced 5 episodes of "My Bastrop" in partnership with the Bastrop TX Network and the City of Bastrop for cable access television

- Managed all aspects of the Consumer-Operated Services (COS) Grant Program, including program design and evaluation, strategic planning, and budget development
- Created COS program manual, Bidder's Conference presentations, and Request for Proposals (RFP)
- Planned COS Quarterly Training Conferences, including scheduling speakers/presenters
- Successfully researched, developed, and wrote grant proposals for the Federal Community Mental Health Block Grant ($10,000,000 grant) and other funding sources
- Supervised, evaluated, hired/fired, and trained Program Specialists

*Program Specialist*                                            April 2002- June 2005

- Developed training curriculum, including training manuals, handouts, and power point presentations
- Conducted over 100 training presentations to more than 1,200 individuals
- Wrote, starred in, and helped produce 3 video training presentations
- Acted as grant manager and point of contact for COS grantees; reviewed grantee reports and provided training and technical assistance through one-on-one interactions, site visits, training presentations, and conferences
- Provided outreach, chapter development, and grassroots organizing to consumer groups across Texas
- Researched issues related to mental health and disseminated information to general membership, the public, and the Texas legislature; testified at legislative hearings

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

- Coordinated all aspects of digital phone system installation; point of contact for clients and contractors
- Performed database programming and troubleshooting
- Conducted individual and group training and created training materials

## COMMUNITY INVOLVEMENT

*Bastrop Chamber of Commerce*- Volunteered on Membership Committee
*Bastrop Main Street Program*- Volunteered on Promotions Committee
*Bastrop YMCA*- Board member, 2014-2017; Annual Campaign Chair, 2016 & 2017; volleyball coach, 2014-2016
*Bastrop County MOPS (Mothers of Preschoolers)*- Charter member; served as Publicity Coordinator, 2009-2011
*Bastrop ISD Council PTA*- Served as Arts in Education Chair, 2011-2012 & 2015-2017
*Cedar Creek Elementary School PTA*- Served as Parliamentarian 2011-2012; served as Secretary, 2015-2016
*Cedar Creek Middle School PTA*- Served as Treasurer, 2018-2019; served as Vice-President, 2019-2020
*Cedar Creek High School PTSA*- Served as Parliamentarian, 2020-2021 & 2021-2022
*Cedar Creek Athletic Booster Club*- Served as Website/Social Media Chair, 2020-2021, and additionally served as President when the former President resigned in January 2021; served as President, 2021-2022; created a new website for the booster club using Wix and maintained and updated the website as needed; created and updated the online calendar; managed social media including Facebook, Twitter, and Instagram, and moderated the Facebook group
*Longhorn Alumni Band*- Member, 2000-present; assisted with social media and Facebook group

## AWARDS

- 
- 

OCA-APPX-2126

- Subject to Protective Order                                                                OCAGH_00015122
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 156

# Texas' New Voting Law



Julie Espinoza

Assistant Director

REACH of Plano

Left – photo of Justin Dart – "Vote as If your life depends upon it – because it does!"

# A little about REV UP Texas



- History of
- Purpose
- Involvement in new Texas voting law

OCAGH_00000284_002_Native

# Mail in Ballot Changes



- New Law requires a wet signature (ink on paper) without allowing for a reasonable accommodation – this creates problems for some with disabilities
- Current law allows a witness to signature  for a voter unable to sign because of a disability– but relying on a witness removes a voter's ability to vote independently.

OCAGH_00000284_003_Native

# Mail in Ballot Changes



- New law requires  a voter to include the last 4 digits of Texas ID or Social Security number on both the application for a maiol ballot and the ballot itself

- Must enter these same numbers to match when voting. If numbers on application and ballot do not match, ballot will not be counted

- Problem – some voters do not know they must include these numbers or due to disability (like being in an institution) do not have access to the numbers so cannot provide this

OCAGH_00000284_004_Native

OCA-APPX-2132

OCAGH_00000284_005_Native

# Online Portal



- Texas will establish an online portal for voters to track where their mail in ballot is.
- New law says that if voter's ballot is rejected due to signature not matching or numbers not matching – they can fix the problem.
- If not enough time to fix by mail or email –the county may provide an opportunity to go to elections office and cast.

OCAGH_00000284_006_Native

# Receiving assistance at the polls



- Attendant or person supporting a voter must provide their name, address, Relationship to and if they are being compensated.
- Assistor must also take an oath under penalty of perjury and jail time to only provide assistance allowed by State law (reading the ballot, directing the voter to read the ballot, marking the ballot or directing the voter to mark the ballot ) even though this limits the type of assistance available under Federal law.

# Receiving assistance at the polls



- Amendment to where now attendants and caregivers can assist at polls.

OCAGH_00000284_008_Native

# Poll watchers at the polls



- Poll watchers were given authority to observe assistance given
- But, law makes clear that poll watcher cannot observe when the voter casts their ballot

OCAGH_00000284_009_Native

# Election Officials at the polls



- A provision in the new law provides that No local official can alter or change the Texas election law even when necessary to grant a voter a reasonable accommodation because of their disability
- An amendment was added that makes clear that qualified voters with a disability are still entitled to reasonable accommodations

OCAGH_00000284_010_Native

# Summary of old and new



**None of this will take effect until December 6, 2021.**

**Voting By Mail**

*Applications: Article 5.  Section 5.01. Section 84.001 (b)*

•        Wet Signature        Instead of a photocopied or electronic signature, all applications must now have a 'wet ink' signature. This means that an actual, handwritten signature or signature stamp must be on the application.

•        Voter ID   Eligibility for vote by mail is the same but additional information is now included on the application.  Voters must now include the identification number found on their Texas Driver's License (DL), Texas Identification Card (ID), or Texas Election Identification Card (EIC). If a voter has not been issued a Texas DL, ID, or EIC, then they are allowed to use the last four digits of their social security number (SSN).

# Summary of old and new



- If a voter does not have a Texas DL, ID, EIC, or SSN, the voter can sign a statement to that effect.

- If the information on the vote by mail application has not been filled out properly (i.e., does not match voter's registration information) and has the potential to be rejected by the election clerk, the clerk must provide notice of rejection to the voter. The notice must include information about the ability to correct or add required information  through an online tool provided by the election clerk.

- On Line Tool                    An online tool will be created that will record when each ballot-by-mail application is received by the county clerk/election official and if that application was accepted or rejected.

- If a voter requests a ballot by mail and then chooses to cancel the ballot and vote in person, but fails to return the mail ballot, the individual must vote a provisional ballot.

# Summary of old and new



*Ballots: Article 5. Section 86.002*

• Number Matching On the exterior side of a sealed carrier envelope, voters must list the Texas driver's license, identification card, election identification card identification number (or the last four digits of their social security number) that was used on their ballot-by-mail application.  There should be a designated space for this information to be entered because it will need to be hidden from public view.

• Opportunity to Cure If the Signature Verification Committee (SVC) or the Early Voting Ballot Board (EVBB) discover a defect in the way  a mail ballot was completed by the voter (i.e., missing residential address, missing or concerning signature), the  SVC or EVBB must return the ballot to the voter by mail if the committee determines there is time to cure the defect before polls close on election day.

o

# Summary of old and new



        If the Committee or Board discover a defect but determine there is not time to return the ballot to the voter by mail before election day, the board may, but is not required to, notify the voter of the defect by phone  or e-mail and allow the voter to cancel their mail ballot or come to the clerk's office in person to correct the defect.

o       An online tool will be created which records when the ballot/carrier envelope is sent to the voter, received by the voting clerk, and if that ballot was accepted or rejected. Each envelope will have an assigned serial number and bar code or tracking number.

**Voter Assistance**

*In-person voting: Article 6.  Section 6.   Section 64.009 & Section 64.031*

•       Limit on type of assistance           Voters may now also be eligible for assistance if they need help with reading the ballot due to an inability to read the language provided on the ballot.

•       People who assist voters must now provide additional information on the assistant form and oath. People will need to provide their name, address, relationship to the voter, and if the assister received any kind of compensation or other benefit for helping the voter.

# Summary of old and new



The assistant oath now includes swearing under penalty of perjury and limits the type of assistance that can be provided to a voter.

- Curbside    I            f a person is transporting seven or more non-family members to early vote at the same time*, that person must complete a form giving their name and address and stating whether they provided any help casting ballots. (assisting)

**Mail-in ballots**:
*Article 6.  Section 6.05.  Section 86.010-86.015*

- Assistants must fill in the following information on the carrier envelope:
Their signature, printed name, residential address, relationship to the voter, whether or not they received any kind of compensation or other benefit from helping.

- It is now a criminal offence if a person receives or accepts compensation for assisting voters.  If the person assisting the voter is also the voter's caregiver or assistant, the prohibition does not apply.

# Summary of old and new



Increase in penalties
Assistor oath or illegal assistance
False statement

**Poll watchers:**

*Observing activity: Article 4.  Section 4.07. Section 33.056-33.057*

• Poll watchers are now able to sit or stand near enough to see and hear election activity occurring with the voters and/or election officers.  However, poll watchers are not allowed to be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice.

# Summary of old and new



**Reasonable accommodation or modification**

*Voter request for accommodation: Article 1. Section 1.022*

No Changes          New provision in law that prohibits election official from altering, changing or suspending any policy practice or procedure in law.

An amendment was added that specifically provides that nothing in election code prohibits or limits Voters with disabilities from making a request for a reasonable accommodation or modification to election laws or procedures.

Study of implementation of educational programs, including instructional videos to help vwd to understand accessibility features of voting machines



# Access Barriers & Issues Related to Texas' New Voting Law

Chamane Barrow
REV Up Texas

# A Little About REV UP Texas



***R*****egister!** ***E*****ducate!** ***V*****ote!** ***U*****se (your)** ***P*****ower!**

Our Mission

# Significant Barriers to Voting Already Exist

- Physically inaccessible polling sites,
- Election workers refusing to provide accommodations,
- Mail-in ballots that cannot be used by people who are blind,
- And many more.

# Texas SB 1 Voting Law



Creates even more unnecessary barriers and silences the voices of Texans with disabilities and others, by placing illegal restrictions on our access to voting.

# Mail in Ballot Changes



New Law requires a wet signature (ink on paper) without allowing for a reasonable accommodation – this creates problems for some with disabilities.

# Mail in Ballot Changes



- New law requires a voter to include the last 4 digits of Texas ID/DL or Social Security number on both the application for a mail ballot and the ballot itself.

- Must enter these same numbers to match when voting. If numbers on application and ballot do not match, ballot will not be counted and will be rejected.

  - Problem – some voters do not know they must include these numbers or due to disability (like being in an institution) do not have access to the numbers so cannot provide this.

# Receiving assistance at the polls



- Another access issue is the restricting any assistance by personal attendants or other assistors outside of reading & marking of the ballot.
  - Must also take an oath under penalty of perjury & jail time to only provide assistance allowed by State law.
  - Must now also provide their name, address, relationship to & if they are being compensated.

# Receiving assistance at the polls



These restrictions also cause access issues for:

- Deaf individuals using ASL Interpreter to access the voting process at the polls when untrained poll persons thinks that the interpreter is providing too much assistance to Deaf individual.

- There have been other issues in which an untrained poll person does not allow a person with hidden disability such as TBI, to be provided a requested accommodation from their support person because they do not believe the individual is a qualified voter with a disability entitled to a reasonable accommodation.

# Other Access Issues



Some of the other access issues that have occurred as a result of SB 1 have included:

- Limitations on early voting hours and a ban on 24-hour voting.
- The elimination of drive-thru voting centers.
- The prohibition of mail-in ballot drop-boxes.
- Limitations on the distribution of mail-in ballot applications.
- And the needless creation of barriers for individuals with disabilities and others who have limited English proficiency, to exercise their right to vote, which goes against the principle of equitability.

# Involvement of REV UP in new Texas voting law



This law violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 and Section 208 of the Voting Rights Act by imposing voting barriers that discriminate against voters with disabilities and deny people with disabilities full and equal opportunities to participate in our state's voting and elections.

As such, a lawsuit was filed by many organizations including Rev Up Texas focused on overturning the suppression of the DISABILITY VOTE! in SB1.

Learn more!  Get involved and fight voter suppression!



*Texans with disabilities CAN influence the outcome
of the Presidential Primaries and General Election*

'**More than any time in memory:**

➢Elected leaders and political candidates are recognizing the MILLIONS of Americans with disabilities—from birth to advanced age—as a powerful, important constituency
➢Issues important to people with disabilities, including voter suppression, voting access issues and barriers, must be part of the platform for any candidate running for public office.

**Join thousands of Americans with disabilities in this important and historic effort!**

*Don't Mourn…Organize, Register, and VOTE!
Make the DISABILITY VOTE Count!*

OCA-APPX-2155                                    OCAGH_00000605_011_Native





# "Vote as if your life depends on it — *because it does!*"
Justin Dart, Jr., Texan, patriot, father of the ADA

Left – photo of Justin Dart –"VOTE as if your life DEPENDS on it –because it DOES!"



# Acknowledgment



- REV Up Texas
- CBFL Consumers
- Texas' New Voting Law by Julie Espinoza, Assistance Director, REACH of Plano

OCAGH_00000605_013_Native



# REV UP TEXAS!

The After-effect of Senate Bill 1
Presented by Julie Espinoza
Assistant Director
REACH of Plano
March 10, 2022



OCA-APPX-2158                    OCAGH_00017883_001_Native



# Presenter Julie Espinoza

Assistant Director

REACH of Plano

Serving on the REV UP Board of Directors under the Texas Disability Project &

Board of Directors of the Texas League of Women Voters



OCAGH_00017883_002_Native



Confusion

Senate Bill 1 was a major voter suppression act in Texas last summer.

Had a "chilling" effect on minorities and especially voters with Disabilities.

Raised concerns about accommodations for physical assistance at the polls, access to certified sign language interpreters, assistance for voters with vison loss or blindness.

Mail in Ballot mayhem



OCA-APPX-2160          OCAGH_00017883_003_Native

So What Happened with all these Concerns with the recent Voting?

High rejection rates of mail in ballots

Reasons given hotly disputed

Increased fear of voting in person at the polls

Lower Turn out of Voters with Disabilities????



OCA-APPX-2161

OCAGH_00017883_004_Native

REV UP's Response

REV UP USE YOUR POWER SHOW!

Biweekly podcast on voting and the power of the Disability vote!

https://www.youtube.com/channel/UCy2Kx9gghKqEf_yOCT2rfiw

Complaints gathered on voting issues:

Disability Rights of Texas

Texas Civil Rights Project

Election Protection



OCAGH_00017883_005_Native

Key Points to Revving Up!

Register to Vote! Run off is May 24th.  If not registered you can register before April 25th and ***<u>vote</u>*** in Runoff.

## <u>Texas Disabilities Issues Forum</u> is Sept 19th hybrid in person in Austin and Statewide Watch parties!!!  Goal is to build a historic turnout of the Disability Vote at the Nov 8th General Election.  North Texas can be key to that turnout.  REV UP wants to work with the community to make that happen

How**: REGISTER** folks in North Texas,
**EDUCATE** on issues, Turnout of the DISABILITY VOTE

Get excited to be part of the HISTORIC DISABILITY **VOTE**



OCA-APPX-2163          OCAGH_00017883_006_Native

# What You Can do NEXT

- Join the REV UP Texas contact list so you can increase the power of the disability Vote!!

- https://www.revuptexas.org/


- Join the REV UP Flash mob filming on March 26th at the state Capitol. See link above for more info

# Exhibit 157



## NEW TEXAS VOTING LAW LEADS TO
## HIGH REJECTION OF MAIL-IN BALLOT APPLICATIONS
### Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be **REGISTERED** by January 31, 2022 to vote in the primaries.

**VOTE BY MAIL:**
Last day to request Ballot by Mail APPLICATION:

**FRIDAY, FEBRUARY 18, 2022**

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

Visit REVUPTEXAS.ORG to access the PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you should be aware of.

USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

https://youtu.be/QXb7qMTMCNc

MAIL IN BALLOTS must be received by Your County:

**POSTMARKED BY 7:00 PM ON MARCH 1, 2022**

**IMPORTANT TIPS**

- Make Sure You Fill Out *ALL* the Information
- Mail-In Ballots and Mail in Ballot Application ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
  WE SUGGEST ENTERING *BOTH* NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.
- CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)
- **SIGN THE BALLOT!**

Again, the last day to request Ballot by Mail is **FRIDAY, FEBRUARY 18, 2022**

**If you have any problems with a Mail-In Ballot Process, please contact:**

Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE(8683) AND send us an email at: revuptx@gmail.com**

OCA-APPX-2166

OCAGH_00000309



EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

FIRST DAY of Early Voting
MONDAY, FEBRUARY 14, 2022
(Gotta LOVE VOTING)

LAST DAY of Early Voting
FRIDAY, FEBRRUARY 25, 2022

For More Information Join the REV UP Texas Community and
Show The

***POWER OF THE DISABILITY VOTE***

***DISABILITY RIGHTS ARE CIVIL RIGHTS***

www.revuptexas.org
revuptx@gmail.com
512 431 4085

## R EGISTER
## E DUCATE
## V OTE

## U SE
## P OWER = The DISABILITY VOTE

## ALL POLITICS ARE LOCAL!

OCA-APPX-2167

OCAGH_00000310



## NEW TEXAS VOTING LAW LEADS TO
## HIGH REJECTION OF MAIL-IN BALLOT APPLICATIONS
### Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be **REGISTERED** by January 31, 2022 to vote in the primaries.

**VOTE BY MAIL:**
Last day to request Ballot by Mail APPLICATION:

**FRIDAY, FEBRUARY 18, 2022**

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

Visit REVUPTEXAS.ORG to access the PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you should be aware of.

USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

https://youtu.be/QXb7qMTMCNc

MAIL IN BALLOTS must be received by Your County:

**POSTMARKED BY 7:00 PM ON MARCH 1, 2022**

**IMPORTANT TIPS**

- Make Sure You Fill Out *ALL* the Information
- Mail-In Ballots and Mail in Ballot Application ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
  WE SUGGEST ENTERING *BOTH* NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.
- CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)
- **SIGN THE BALLOT!**

Again, the last day to request Ballot by Mail is **FRIDAY, FEBRUARY 18, 2022**

**If you have any problems with a Mail-In Ballot Process, please contact:**

Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE(8683) AND send us an email at: revuptx@gmail.com**

OCA-APPX-2168

OCAGH_00000368



EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

FIRST DAY of Early Voting
MONDAY, FEBRUARY 14, 2022
(Gotta LOVE VOTING)

LAST DAY of Early Voting
FRIDAY, FEBRRUARY 25, 2022

For More Information Join the REV UP Texas Community and
Show The

***POWER OF THE DISABILITY VOTE***

***DISABILITY RIGHTS ARE CIVIL RIGHTS***

www.revuptexas.org
revuptx@gmail.com
512 431 4085

**R EGISTER**
**E DUCATE**
**V OTE**

**U SE**
**P OWER = The DISABILITY VOTE**

**ALL POLITICS ARE LOCAL!**



## NEW TEXAS VOTING LAW LEADS TO
## HIGH REJECTION OF MAIL-IN BALLOT APPLICATIONS
### Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be **REGISTERED** by January 31, 2022 to vote in the primaries.

**VOTE BY MAIL:**
Last day to request Ballot by Mail APPLICATION:

**FRIDAY, FEBRUARY 18, 2022**

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

Visit REVUPTEXAS.ORG to access the PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you should be aware of.

USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

https://youtu.be/QXb7qMTMCNc

MAIL IN BALLOTS must be received by Your County:

**POSTMARKED BY 7:00 PM ON MARCH 1, 2022**

**IMPORTANT TIPS**

- Make Sure You Fill Out *ALL* the Information
- Mail-In Ballots and Mail in Ballot Application ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
  WE SUGGEST ENTERING *BOTH* NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.
- CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)
- **SIGN THE BALLOT!**

Again, the last day to request Ballot by Mail is **FRIDAY, FEBRUARY 18, 2022**

**If you have any problems with a Mail-In Ballot Process, please contact:**

Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE(8683) AND send us an email at: revuptx@gmail.com**

OCA-APPX-2170



EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

FIRST DAY of Early Voting
MONDAY, FEBRUARY 14, 2022
(Gotta LOVE VOTING)

LAST DAY of Early Voting
FRIDAY, FEBRRUARY 25, 2022

For More Information Join the REV UP Texas Community and
Show The

***POWER OF THE DISABILITY VOTE***

***DISABILITY RIGHTS ARE CIVIL RIGHTS***

www.revuptexas.org
revuptx@gmail.com
512 431 4085

**R EGISTER**
**E DUCATE**
**V OTE**

**U SE**
**P OWER = The DISABILITY VOTE**

**ALL POLITICS ARE LOCAL!**



## NEW TEXAS VOTING LAW LEADS TO
## HIGH REJECTION OF MAIL-IN BALLOT APPLICATIONS
### Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be **REGISTERED** by January 31, 2022 to vote in the primaries.

**VOTE BY MAIL:**
Last day to request Ballot by Mail APPLICATION:

**FRIDAY, FEBRUARY 18, 2022**

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

Visit REVUPTEXAS.ORG to access the PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you should be aware of.

USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

https://youtu.be/QXb7qMTMCNc

MAIL IN BALLOTS must be received by Your County:

**POSTMARKED BY 7:00 PM ON MARCH 1, 2022**

**IMPORTANT TIPS**

- Make Sure You Fill Out *ALL* the Information
- Mail-In Ballots and Mail in Ballot Application ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
  WE SUGGEST ENTERING *BOTH* NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.
- CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)
- **SIGN THE BALLOT!**

Again, the last day to request Ballot by Mail is **FRIDAY, FEBRUARY 18, 2022**

**If you have any problems with a Mail-In Ballot Process, please contact:**

Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE(8683) AND send us an email at: revuptx@gmail.com**

EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

OCA-APPX-2172



FIRST DAY of Early Voting
MONDAY, FEBRUARY 14, 2022

(Gotta LOVE VOTING)

LAST DAY of Early Voting
FRIDAY, FEBRRUARY 25, 2022

For More Information Join the REV UP Texas Community and
Show The

***POWER OF THE DISABILITY VOTE***

***DISABILITY RIGHTS ARE CIVIL RIGHTS***

www.revuptexas.org
revuptx@gmail.com
512 431 4085

**R EGISTER
E DUCATE
V OTE**

**U SE
P OWER = The DISABILITY VOTE**

**ALL POLITICS ARE LOCAL!**

# Exhibit 158

OCA-APPX-2174

| | |
|---|---|
| **From:** | revuptx [revuptx@gmail.com] |
| **Sent:** | 1/17/2022 3:43:17 PM |
| **To:** | REVUPTX [revuptx@gmail.com] |
| **BCC:** | |



| | |
|---|---|
| **Subject:** | DISABILITY RIGHTS ARE CIVIL RIGHT * REV UP Texas Info Bullentin #2 * Mail in Ballot Texas |
| **Attachments:** | MAIL IN BALLOT INFO-FINAL 2022.docx; MAIL IN BALLOT INFO-FINAL 2022.pdf |

Texas Voting Rights Advocates:

As we celebrate Martin Luther King Day and advocate for needed federal legislation to protect voting rights let us not forget the saying ALL POLITICS ARE LOCAL.

SB 1 is currently the law. REV UP Texas is part of the litigation focused on overturning the suppression of the DISABILITY VOTE! in SB1.

REV UP Texas and other disability and voting rights organizations told the supporters of SB 1 that they were making the Mail in Ballot process so complicated for eligible disabled and older voters that it would suppress the vote.

This is not a Republican or Democratic Party issue

They ignored our recommendations.

Unfortunately we are being proven correct. Mail in Ballots Applications are being returned at historic rates in counties all over
state.

Attached is an information bullentin to assist eligible mail in ballot recipients to navigate the system. It has helpful links from the League of Women Voters and the Secretary of State's office.

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

OCAGH_00000549

We urge you to report any problems you may have in the Mail in Ballot process to the contacts in the Info Bullentin.

The next REV UP Texas Info Bullentin will be on the Mail in Ballot portel to track your Mail in Ballot.

Don't Mourn Organize and REV UP

www.revuptexas.org
revuptx@gmail.com
512 431 4085

***************************

## NEW TEXAS VOTING LAW LEADS TO
## HIGH REJECTION OF MAIL-IN BALLOT APPLICATIONS
### Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be **REGISTERED** by January 31, 2022 to vote in the primaries.

**VOTE BY MAIL:**
Last day to request Ballot by Mail APPLICATION:

**FRIDAY, FEBRUARY 18, 2022**

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

Visit REVUPTEXAS.ORG to access the PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you should be aware of.

USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

https://youtu.be/QXb7qMTMCNc

MAIL IN BALLOTS must be received by Your County:

**POSTMARKED BY 7:00 PM ON MARCH 1, 2022**

**IMPORTANT TIPS**

- 
- Make Sure You Fill Out *ALL* the Information
- 
- 

OCA-APPX-2176

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

- Mail-In Ballots and Mail in Ballot Application ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
  WE SUGGEST ENTERING *BOTH* NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.

-
- CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)

-

-
- **SIGN THE BALLOT!**

Again, the last day to request Ballot by Mail is **FRIDAY, FEBRUARY 18, 2022**

**If you have any problems with a Mail-In Ballot Process, please contact:**

Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE(8683) AND send us an email at: revuptx@gmail.com**


EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

FIRST DAY of Early Voting
MONDAY, FEBRUARY 14, 2022

(Gotta LOVE VOTING)

LAST DAY of Early Voting
FRIDAY, FEBRRUARY 25, 2022

For More Information Join the REV UP Texas Community and
Show The

***POWER OF THE DISABILITY VOTE***

***DISABILITY RIGHTS ARE CIVIL RIGHTS***

www.revuptexas.org
revuptx@gmail.com
512 431 4085

**R EGISTER**
**E DUCATE**
**V OTE**

**U SE**
**P OWER = The DISABILITY VOTE**

**ALL POLITICS ARE LOCAL!**

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

# Exhibit 159

| From: | revuptx [revuptx@gmail.com] |
| Sent: | 3/9/2022 12:39:29 PM |
| To: | Julie Espinoza [jespinoza@reachcils.org]; 'bob.adapt' [bob.adapt@sbcglobal.net] |
| Subject: | RE: REV UP TEXAS! After Voter Supression.pptx |

Julie

General

Put Title on slides starting with 3

Add slide on what non partisan REV UP Texas stands for:  REGISTER etc etc

On slide 3
Is there a way you can have a link to the powerpoint you did on Jeff's info?  That gives then the specifics to the changes and confusion.

Mail in ballot application and ballots rejections over 25% in some counties.

Accomodations paragraph:

Add people with cognitive disabilities.

Increased penalities for assistants who may be accused of, telling rather assisting people with disabilities, how to vote had the potential of limiting the number of assistants.

Would put in the Disability Rights Texas Voting Hotline #

Slide 5
REV UP Texas Response

Dont Mourn Organize and REV UP

Show the Power of the DISABILITY VOTE

Collecting stories and data

REV UP Texas part of SB 1 lawsuit about voter suppression.

Would put all the information on voter registration link and key dates here

Education:
Put Social Media links

Add slide:

What Can You Do:

Work with REV UP Texas to:

OCA-APPX-2179

OCAGH_00000622

Register People with disabilities, famil members and advocates.

Educate on Disability issues

Historic turnout of the Disability Vote

Follow up:

Zoom call bringing to together all disability organizations to build the non partisan DISABILITY VOTE in Tarrant County

Onward to...

-------- Original message --------
From: Julie Espinoza <jespinoza@reachcils.org>
Date: 3/9/22 10:50 AM (GMT-06:00)
To: "'bob.adapt'" <bob.adapt@sbcglobal.net>, 'revuptx' <revuptx@gmail.com>
Subject: REV UP TEXAS! After Voter Supression.pptx

Pls critique!

Virus-free. www.avg.com

OCAGH_00000623

# Exhibit 160

**From:** revuptx [revuptx@gmail.com]
**Sent:** 1/15/2022 12:45:35 PM
**To:** Linda Litowsky [lindalitowsky@gmail.com]
**Subject:** Ballot by mail Early Voting Draft
**Attachments:** Texas' New Voting Law JM edits.pptx

DRAFT INFO BULLENTIN


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MAIL IN BALLOT INFORMATION
EARLY VOTING DATES

The Texas Primaries will be held on Tues March 1, 2022.

You must be REGISTERED by January 31, 2022 to vote in the primaries.

If you want to VOTE BY MAIL

1) Important dates and information on how the process works below;

2) Attached is a PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you need to be aware of.
READ THIS CAREFULLY

3) IF YOU HAVE PROBLEMS WITH THE MAIL IN PROCESS PLEASE LET US KNOW AT
revuptx@gmail.com
                AND
call Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE (8683)**


## IMPORTANT DATES


First day to request BALLOT BY MAIL
January 1, 2022

Last day to request BALLOT BY MAIL
Friday February 18, 2022

IF YOU WANT TO VOTE BY MAIL REQUEST YOUR BALLOT APPLICATION TODAY!!!

USEFUL LINKS TO GET MAIL IN BALLOTS

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

OCAGH_00001143

https://youtu.be/QXb7qMTMCNc

MAIL IN BALLOT must be received by County by 7pm on March 1, 2022

**IMPORTANT TIPS**

GET YOUR REQUEST FOR A MAIL IN BALLOT TODAY!!!!  LAST DAY
TO REQUEST FEBRUARY 18TH

YOU MUST FILL OUT ALL THE INFORMATION;

 IT ASKS FOR YOUR TEXAS ID OR LAST 4 DIGITS OF YOUR SOCIAL SECURITY #.  WE SUGGEST
ENTERING BOTH TO AVOID YOUR BALLOT BEING SENT BACK TO YOU.

SIGN THE BALLOT

*********************************
EARLY VOTING IN PERSON FOR TEXAS PRIMARIES March 1st

First Day of EARLY VOTING
Monday, February 14th
(Gotta LOVE VOTING)

Last Day of EARLY VOTING
Friday, February 25th

For Information Join the REV UP Texas Community and
SHOW THE
POWER OF THE DISABILITY VOTE

www.revuptexas.org
revuptx@gmail.com
512 431 4085

OCA-APPX-2183

OCAGH_00001144

# Exhibit 161

OCA-APPX-2184

| | |
|---|---|
| **From:** | revuptx [revuptx@gmail.com] |
| **Sent:** | 2/7/2022 8:54:52 AM |
| **To:** | Barrier Free Futures [barrierfree@ksfr.org] |
| **Subject:** | FW: PBS story on SB 1 |
| **Attachments:** | REVUP Info Program PowerPoint(2)(1)(1).pdf; REVUPissuesPosterREV(4)(1)(1).png; Texas' New Voting Law JM edits(1).pptx |

Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone

-------- Original message --------
From: revuptx <revuptx@gmail.com>
Date: 1/29/22 5:18 PM (GMT-06:00)
To: Jessica Huseman <jhuseman@votebeat.org>
Cc: Lilian Aluri <laluri@aapd.com>
Subject: PBS story on SB 1

Jessica

Sent first email to mailchimp

Bob

-------- Original message --------
From: revuptx <revuptx@gmail.com>
Date: 1/29/22 5:11 PM (GMT-06:00)
To: "Jessica Huseman, Votebeat" <mailchimp@votebeat.org>
Cc: Lilian Aluri <laluri@aapd.com>
Subject: PBS story on SB 1

Jessica

Saw your part representing VoteBeat on the PBS story on the Texas SB 1 voter suppression bill.

Wanted you to know the Texas disability community (REV UP Texas) is part of the SB 1 lawsuit.

REV UP Texas  www.revuptexas.org
is part of a national organizing effort of the disability community coordinated by the American Assn of People with Disabilities (AAPD) www.aapd.com/REVUP
The lead Coordinator is Lilian Aluri laluri@aapd.com

The Disability Vote, as an interest group is growing, but doesn't get much coverage in the the media

I've attached some info on REV UP Texas and a short Get Out The Disability Vote video we are using for the Primaries.

REV UP Texaa is also educating the Texas disability community on what is in SB 1. (attached)

OCA-APPX-2185

OCAGH_00000256

"Don't Dis the Vote"

https://vimeo.com/662752792

Thank you for covering the Disability Vote.

Onward to...

Bob Kafka, Coordinator
REV UP Texas
www.revuptexas.org
revuptx@gmail.com
512 431 4085
Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone


-------- Original message --------
From: "Jessica Huseman, Votebeat" <mailchimp@votebeat.org>
Date: 1/29/22 6:15 AM (GMT-06:00)
To: revuptx@gmail.com
Subject: The missing context in the debate about Halderman's Dominion report

-------------------

View this email in your browser



OCAGH_00000258



*A Georgia voter marks his ballot using a Dominion voting machine on Jan. 5, 2021 | Virginie Kippelen / AFP via Getty Images*

Hi y'all.

Conspiracy theories [collided in Georgia](#) this week, resulting in additional confusion in a long-standing lawsuit over the state's use of Dominion voting machines. At the center of efforts by entities on both the left and right is a court-sealed report by University of Michigan computer scientist J. Alex Halderman claiming that the Dominion voting system has a vulnerability that could be exploited — but hasn't yet — to manipulate votes in a future election.

Fox News and One America News Network are now seeking a copy of the report, and this week the Atlanta Journal-Constitution suggested Georgia's secretary of state had ignored the report, leaving gaping holes in the state's election system. There's much, much more to the story. The upshot is that this lawsuit continues to be used today by those perpetuating Trump's Big Lie as evidence of their claims.

The lawsuit was initially filed in 2017 by left-leaning groups including the Coalition for Good Governance, to force Georgia to use paper-backed voting machines. At the time, Georgia was using outdated DRE machines. Then the state, on its own initiative, replaced the machines in 2020 with a paper-backed voting system built by Dominion. But the lawsuit didn't stop. It instead shifted to alleging that the *new* system was so insecure as to be unconstitutional.

The plaintiffs have not succeeded in convincing a judge of their arguments over the past four years, even when supplemented by Halderman's report. While U.S. District Judge Amy Totenberg has expressed public concern over the system, she has not been persuaded enough to, for example, force the state to use hand-marked paper ballots, as the plaintiffs have demanded. So far, Totenberg has not forced the state to make any major changes to its voting system as a result of the litigation, now known as *Curling v. Raffensperger*.

Experts who have reviewed Halderman's report, such as Juan Gilbert, the University of Florida's computer science department chair, have not found it to be nearly as dire as Halderman has publicly suggested. As part of the suit, Judge Totenberg granted Halderman unfettered access to the Dominion voting system in order to inspect the security of the machines. Because of his access, Totenberg sealed the report, making it available to only the attorneys on the case and the expert witnesses. And even though the state on Thursday asked Totenberg to unseal the document so as to clear public confusion, she seemed unready to do so.

"I'm unhappy about the course of political treatment of the report…. it's out of hand," Totenberg said in court. "But I'm not going to release it without seeing what is being proposed with redactions."

Still, the general contents of the report aren't exactly a secret. Halderman has long claimed that ballot-marking devices could be manipulated by malicious actors. In a brief no one asked him to write, Halderman made public a high-level summary of his findings in early August.

OCA-APPX-2189

OCAGH_00000260

Marilyn Marks, the executive director of the Coalition for Good Governance who is among the plaintiffs in the *Curling* case, then distributed this summary to every county in Georgia by email the day after Halderman filed his report. Votebeat was provided with a copy of the email. She called Halderman's finding an "urgent concern," alarming enough for counties "to reconsider their use of BMDs this fall, and instead use hand marked paper ballots with voluntary robust audits." No county acted on her warning.

Despite Judge Totenberg sealing Halderman's assessment, the publicity campaign the plaintiffs have mounted over the report — which none of them has seen in full — has resulted in two media dustups over its contents, to the obvious discontent of Totenberg. The first was in August, when Halderman first publicized what he claimed were massive security flaws in the system, and then this week, when the Atlanta Journal-Constitution reported that the state had done nothing to unseal the report or to act on its findings. This is the exact kind of speculation Totenberg sought to prevent when she sealed the report. While the report has only been read by Halderman, the lawyers in the *Curling* case, and other expert witnesses, the AJC quoted multiple people who have no knowledge of the report's details but who nonetheless implored the state to act. That's not the responsible way to present these issues.

The report, as far as is publicly known, does little to materially advance what Halderman has been claiming about ballot-marking devices for years. And, it's not a surprise that he found ways to infiltrate the system. Judge Totenberg gave Halderman complete access to the machines along with passwords, and his report indicates that he did his research over 12 weeks. If you gave me access to a bank for 12 weeks, handed me the keys, and told the security guards to stand down, I'm pretty sure I could rob it. This is an unrealistic threat scenario that ignores the existence of physical security measures, machine testing, and risk limiting audits.

"The security of the system isn't dependent only on the system itself, but everything that surrounds it. The seals, the padlocks, the cameras." said Tammy Patrick, a senior advisor at the Democracy Fund and former elections administrator in Maricopa County, Arizona. "If you leave the keys in an unlocked car and you're surprised I can drive away in it, that's not a measure of the car's security."

OCAGH_00000261

Dominion and the secretary of state offered similar responses when the debate resurfaced this week. In a statement, Dominion said the best way to review security is holistically — taking into account "procedural and technical safeguards," but that Halderman's review "did not take this approach." The secretary of state's office, in its statement, said the review was written "by an individual who is paid to espouse opinions supporting the elimination of electronic voting systems."

That's punchy — you might expect as much from a defendant in a lawsuit — but neither statement is altogether untrue. Halderman is being paid. His assessment was done with more access to the system than any bad actor would have, and has been reviewed by two state experts, neither of whom was persuaded that the state's system was at imminent risk of harm. Halderman himself has repeatedly and publicly acknowledged there is no evidence that the machines were manipulated in 2020.

Election security has made large strides since 2016, which reporters need to do a more fulsome job explaining. It is increasingly common for counties to conduct extensive post-election audits, which check for unexplainable discrepancies between the machines' vote counts and counts of the actual ballots. Election offices across the country have shored up chain-of-custody procedures for ballots and election equipment, and have phased out paperless voting machines almost entirely. States have also long conducted specific logic and accuracy testing for voting machines, and these tests are routinely performed. Patrick says that focusing on unrealistic cybersecurity threats is "disingenuous" and "diverts the energy that we need to put forth in getting productive policies in place, and further muddies the public's understanding of what good security looks like."

Allowing such unfettered access isn't without value: If Halderman had, for example, been able to affect the ballots in a way that could not be detected and prevented by safeguards like risk limiting audits or standard quality checks, these problems should be addressed. But neither the AJC article nor those who have seen the report assert that he found such vulnerabilities.

Still, folks are clamoring to get access to Halderman's sealed report. The state of Louisiana, Fox News, and One America News Network have all asked Judge Totenberg to see it. Louisiana — which has already been denied access — says it wants a copy because it's considering buying a Dominion system and would like to see what the vulnerabilities are. Fox and OANN want it because they think it might contradict Halderman's testimony in defamation

lawsuits filed by Dominion and by Eric Coomer, a former Dominion employee. In that case, Halderman testified in defense of Coomer and his work at Dominion — Coomer's work was high quality, Halderman says, and there is no evidence that Dominion machines were compromised.

Despite what Fox News's lawyers might hope, Halderman's positions in each lawsuit are not necessarily contradictory. It could well be true that the 2020 election was secure — as he asserts in the Fox defamation suit — and that untapped vulnerabilities still exist in Dominion systems — as he asserts in the *Curling* suit.

But this is not the only time right-wing spreaders of the Big Lie have embraced the *Curling* lawsuit to back their false claims. A week ago, Politico reported on the text of a never-seen Trump executive order that would have dispatched the military to seize voting machines. The order, dated Dec. 16, 2020, specifically references the *Curling* lawsuit in justifying the federal government to "seize, collect, retain and analyze all machines, equipment, electronically stored information, and material records" from the election. The order would have given the defense secretary 60 days to release a report on the machines' security — a move that would have thrown the election into uncertainty well into February 2021.

Unlike Trump's allies, we should resist falling into the logical trap of assuming that potential vulnerabilities in the machines mean they have already been exploited. We should also be clear-eyed about the link between this lawsuit and the raging fire of the Big Lie. David Becker, executive director and founder of the Center for Election Innovation & Research, says it is "simply a fact that then-President Trump used these failed claims to justify his failed coup" and his unsigned executive order.

"Whatever their intentions, it's undeniable that those who have brought recent claims in courts attempting to decertify particular voting machines they didn't like — all of which have failed — have found their claims and testimony used by election deniers who seek to undermine voter confidence and the legitimacy of the 2020 election and future elections," Becker said.

Journalists covering the *Curling* suit and Halderman report should always — every single time the case is mentioned — make explicit that the suit's arguments have been turned into a primary piece of evidence for Big Lie adherents claiming the 2020 election was stolen through manipulated Dominion machines. These details should not be drowned out by alarmist quotes, alleging vulnerabilities that no one else has confirmed. And they should also explain

OCA-APPX-2192

that Halderman's report was based on unfettered access to the system, which is not analogous to a real-world environment on Election Day.

It might be uncomfortable for many that a left-leaning activist group's accusations against Dominion — none of which have, so far, flown in court — were a basis for Trump's claims to continued power. But it is true. And now Fox and OANN are seeking the same sensitive information to potentially twist to their own advantage. This is a complicated mess, but it's important that journalists untangle this context in every story they write on the subject. Including anything less than this distorts the reality of the problem, and risks introducing unfounded doubts among voters about the security of their voting system.

## Back Then

Since direct-recording electronic machines became popular as a response to the disputed 2000 presidential election, there have been folks advocating for paper instead. In 2003, Rep. Rush Holt (D-New Jersey) introduced a bill that would have required a paper trail in all federal elections. It went nowhere, and he introduced it again in 2007, when it, again, went nowhere. It received substantial opposition from others in Congress as well as state election officials. It was rejected by most Republican members of Congress as overtly partisan — sour grapes resulting from George W. Bush's victory. State election officials worried about the tight timeline, unfunded financial demands, and federal overreach. More than a decade later, most states have made this transition on their own.

> *Correction*: *Last week's newsletter mistakenly said the Texas Legislature passed its voting bill in the third special session last summer. It passed in the second special session.*

## In Other Voting News

- President Trump is redoubling his push for dropbox bans across the country, and a number of Republicans are hopping on the train. That train is currently stuck in Wisconsin, where election officials are at a deadlock on how to handle Republican demands that the rules for dropboxes be formalized or withdrawn entirely.
- Attorneys for Election Systems & Software have informed the Republican-led election investigation in Wisconsin that they have no intention of complying with a broad subpoena for the company's data and information. In a letter to former Wisconsin Supreme Court Justice Michael Gableman, who is running the investigation, ES&S attorneys called the subpoena a "quintessential fishing expedition."
- Following false coverage of the Electronic Registration Information Center — a nonprofit several dozen states use to help maintain their voter rolls — by Gateway Pundit, the state of Louisiana has ended its use of the program. Gateway Pundit unleashed a fuselage of false charges against ERIC, including accusations that the program is a leftist plot funded by George Soros. In truth, it is used and overseen by more than 30 member states, including Republican-governed states such as Kentucky, Missouri, Ohio, Alabama, Georgia, and Florida.
- Gjergi Luke Juncaj of Las Vegas, was criminally charged this week for making threats against an election administrator in Nevada. The man allegedly made repeated threatening calls, including telling the administrator she was "going to f—ing die" for stealing the election from Trump.
- After wavering due to cost projections, the Indiana Legislature has re-added a 2024 deadline for counties to institute paper backups to their voting machines. While the deadline is back, there continues to be no funding for the measure, and counties will be required to foot the cost on their own.
- The overwhelmingly Democratic Massachusetts House has approved a measure that would make vote by mail and early balloting permanent in the state. The state Senate approved a similar bill several weeks ago, which will now be reconciled with the House bill. The status of same-day registration, which advocates have been loudly asking for in the state, is less certain.
- Counties in Texas continue to report high rejection rates of absentee ballot applications due to the new law's ID requirement. Meanwhile, Travis County Clerk Dana DeBeavoir has retired after 36 years on the job. She's overseen a tremendous

OCA-APPX-2194

OCAGH_00000265

amount of change since she took the helm in the mid-80s, and even in retirement she's not leaving elections. "What really kind of tipped me over the edge is I'd really like to do international elections work and do some work nationally on elections, on audits and elections ethics," she told KUT.

- Attention South Carolina teens: Effective now, if you are currently 17 but will be 18 before Election Day, you can go ahead and register to vote!
- A bill by Nebraska Sen. Mike Groene (R-North Platte) would have dramatically shortened early voting in the state but fell flat on its face. Not a single member of the committee voted for it, and no one testified in favor.

## Newest Addition to Votebeat

Y'all, it is *new intern day*. Please meet Brianna Fisher, a sophomore at the University of Pennsylvania who is majoring in criminology with a minor in survey research and data analytics. She's going to be using all of those skills to help Votebeat journalists effectively use data in our stories and will be doing some reporting of her own. "I want to be able to use data, research, and legal experience to work on criminal justice reform — particularly related to prisons and sentencing," she said.

All of the intricate data in the voting world and its growing relationship to the criminal justice system, Brianna thought our news org would be a good place to grow. "I decided to come work at Votebeat because it is a great opportunity for me to help make election information and data accessible and, most importantly, fun to read!"

OCAGH_00000266

Brianna is from Broward County, Florida, so she's well aware of the importance of election administration. This also isn't her first journalism gig: She, along with other staffers of the newspaper of Stoneman Douglas High School in Parkland, Florida, were recognized by the Pulitzer Prize committee for their coverage of the 2018 school shooting.

Brianna will be keeping up our hobby section! Please submit yours. Her hobby? Dancing! "I danced for 15 years growing up," she said. "I took classes in every style you can think of, from ballet to hip hop, and even helped teach younger kids." She tried other sports, but nothing she loved quite as much.

OCA-APPX-2196

OCAGH_00000267

# Infographic of the Week



Click or tap to enlarge.

In honor of her hometown, Brianna's infographic of the week is a nifty look at where the good folks of Broward County dropped off their ballots during the Jan. 11 special election. As you can see, a Supervisor of Elections office at Lauderhill Mall and Tamarac Branch Library, were voter favorites. And shout out to all of you procrastinators — we see those final-day drop offs!

OCAGH_00000268

# In Case You Missed It

The video of the panel I participated in with Rick Hasen, Margaret Sullivan and Barton Gellman is up. Watch our conversation on what journalists can (and should!) do to prevent another Jan. 6.

**Did you receive this email from a friend?**
Sign up to receive Votebeat newsletters.

**Have a question for our journalists?**
You can reach us at contact@votebeat.org

**Donate**

Copyright © 2022 Chalkbeat, All rights reserved.
You are receiving this email because you signed up through our website or subscription form.

Our mailing address is:

OCA-APPX-2198

Chalkbeat

PO Box 300434

Brooklyn, NY 11230-0434

**Add us to your address book**

Want to change how you receive these emails?

You can update your preferences or unsubscribe from this list.

**From:** revuptx [revuptx@gmail.com]
**Sent:** 3/25/2022 10:29:54 AM
**To:** REVUPTX [revuptx@gmail.com]
**BCC:**

**Subject:** KPFT story on REV UP Texas

https://youtu.be/7vS5SBgeEUI

"The primary unfortunately proved all the negative outcomes that we predicted if Senate Bill 1 would pass."
Bob Kafka @REVUP_Texas on registering voters for May vote & Saturday's flashmob at the capitol
KPFTHouston 90.1 FM Peoples News 8 PM  https://youtu.be/7vS5SBgeEUI

Also mentions Register2Vote.org

www.revuptexas.org
revuptx@gmail.com
512 431 4085

OCA-APPX-2200

CONFIDENTIAL – Subject to Protective Order
In Docket No. 21-cv-00844 (WD Tex.)

Lena:

Happy New Year!

2022 seems like deja vu all over again.

Early voting Feb 14th (Gotta LOVE TO VOTE) - Feb 25th

Because of Omnicron we right now are promoting Voter Registration (have to be REGISTERED by January 31st).
See below!

Monday sending out info bullentin on MAIL IN BALLOTS. You have to request a MAIL IN BALLOT by February 18th. All MAIL IN BALLOTS have to be received by 7pm on March 1st Election Day.

We have developed this general Get Out The Disability Vote (GOTDV) video.

https://vimeo.com/662752792

Right now don't have specific plans to share, but I know we will focus on EARLY VOTING and MAIL IN BALLOTS before and during EARLY VOTING days.

Let me know as your plans firm up.

Appreciate your doing this story.

People with disabilities, people of color and low income Texans have been targeted in this legislation.

Onward to...

Bob

www.revuptexas.org
revuptx@gmail.com

OCA-APPX-2201

512 431 4085

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REGISTRATION INFO BULLENTIN

REV UP Texans:

Happy New Year

Though the new Texas voting laws passed in 2021 have put new obstacles in our way in exercising our right to vote, REV UP Texas says:

Don't Mourn Organize and REV UP!

To "Show the Power of the Disability Vote" people with disabilities and our allies must REGISTER in record numbers for the March 1st Texas Primaries.

You must be REGISTERED TO VOTE by January 31, 2022 to vote in the March 1st Texas Primaries.

Though Texas does not have online voter registration REV UP Texas is working with Register2Vote for a simple way to register or change your address using an online process.

THIS IS HOW IT WORKS

Go to the REV UP Texas website www.revuptexas.org and click on the Register2Vote icon.

You can also use the link below:

https://register2vote.org/?Org=RevUpTX

WHAT DO I DO:

Fill out the requested information on the form that appears;

Hit submit;

In approximately 2 weeks you will receive a filled out Voter Registration form with the information you submitted online and a Postage Paid envelope with the correct County information return address;

OCA-APPX-2202

Review the information for correctness, sign and date the Voter Registration form;

Place the form in the Postage Paid envelope and mail it.

YOU ARE READY TO VOTE!
*******************************

Please distribute this information throughout your community.  Please use your Social Media resources to spread the word.

POWER = The Disability Vote!

www.revuptexas.org
revuptx@gmail.com
512 431 4085

R EGISTER
E DUCATE
V OTE

U SE
P OWER

Coming REV UP INFO #2 - Mail in Ballot

ALL POLITICS ARE LOCAL

-------- Original message --------
From: "Lena I. Jackson" <ljackson@newshour.org>
Date: 1/13/22 5:42 PM (GMT-06:00)
To: revuptx <revuptx@gmail.com>
Subject: Re: PBS Newshour & SB 1

Hi Bob,

OCAGH_00000543

Happy new year! Hope you're doing well. I'm trying to figure out a good time to travel to Austin in February and was thinking the first few days of early voting would be good.

What's your schedule like? Will you be doing any GOTV activities? Or any other outreach work?

Thanks!

Lena

---

**From:** revuptx <revuptx@gmail.com>
**Date:** Monday, November 29, 2021 at 8:48 PM
**To:** Lena I. Jackson <ljackson@newshour.org>
**Subject:** Re: PBS Newshour & SB 1

Lena:

Does 3:30pm central work?

Onward to...

Adelante

Bob

512 431 4085

Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone

-------- Original message --------

From: "Lena I. Jackson" <ljackson@newshour.org>

Date: 11/29/21 5:33 PM (GMT-06:00)

To: revuptx <revuptx@gmail.com>

Subject: Re: PBS Newshour & SB 1

Hey Bob,

Nice to hear from you! I can't do tomorrow at 11am CT. Would later in the day work? I'm flexible any time after 1pm CT.

Thanks,
Lena

---

**From:** revuptx <revuptx@gmail.com>

OCAGH_00000545

**Date:** Monday, November 29, 2021 at 2:10 PM
**To:** Lena I. Jackson <ljackson@newshour.org>
**Subject:** PBS Newshour & SB 1

Lena:


Glad to meet you.

Appreciate you doing a story on Texas election issues.

We have gone from absurd to absurder (not sure a word)

Does Tues the 30th at 11am central work for a phone call?

512 431 4085.


Let me know or I can call you.


Looking forward to it.


Onward to...

Adelante


Bob Kafka

www.revuptexas.org

revuptx@gmail.com

-------- Original message --------

From: "Lena I. Jackson" <ljackson@newshour.org>

Date: 11/23/21 5:41 PM (GMT-06:00)

To: Bob Kafka <bob.adapt@sbcglobal.net>

Subject: Re: PBS Newshour & SB 1


Hi Summer and Bob,


Thanks for the introduction and nice to meet you! Bob – let me know if you have time to speak sometime next week. I'm flexible Monday – Wednesday.


Talk soon,

Lena

**From:** Summer Mandell <smandell@thearcoftexas.org>
**Date:** Tuesday, November 23, 2021 at 3:05 PM
**To:** Lena I. Jackson <ljackson@newshour.org>, Bob Kafka <bob.adapt@sbcglobal.net>
**Subject:** PBS Newshour & SB 1

Hi Lena and Bob,


I'd like to connect you both so you can find a time to talk about what is going on here in Texas with the new voting law. Unfortunately, this isn't Bob's first rodeo with bad Texas legislation, but that means he's got in-depth knowledge and great insights to offer.


Bob's number is 512-431-4085 and he is cc'd on this email. I will leave it to the two of you to determine how you'd like to connect, but don't hesitate to ask if you might need my assistance.


All the best,

Summer

OCA-APPX-2208

OCAGH_00000548

| | |
|---|---|
| **From:** | revuptx [revuptx@gmail.com] |
| **Sent:** | 1/29/2022 5:11:27 PM |
| **To:** | Jessica Huseman, Votebeat [mailchimp@votebeat.org] |
| **CC:** | Lilian Aluri [laluri@aapd.com] |
| **BCC:** | helenaberger@verizon.net |
| **Subject:** | PBS story on SB 1 |
| **Attachments:** | REVUP Info Program PowerPoint(2)(1)(1).pdf; REVUPissuesPosterREV(4)(1)(1).png; Texas' New Voting Law JM edits(1).pptx |

Jessica

Saw your part representing VoteBeat on the PBS story on the Texas SB 1 voter suppression bill.

Wanted you to know the Texas disability community (REV UP Texas) is part of the SB 1 lawsuit.

REV UP Texas  www.revuptexas.org
is part of a national organizing effort of the disability community coordinated by the American Assn of People with Disabilities (AAPD) www.aapd.com/REVUP
The lead Coordinator is Lilian Aluri laluri@aapd.com

The Disability Vote, as an interest group is growing, but doesn't get much coverage in the the media

I've attached some info on REV UP Texas and a short Get Out The Disability Vote video we are using for the Primaries.

REV UP Texaa is also educating the Texas disability community on what is in SB 1. (attached)

"Don't Dis the Vote"

https://vimeo.com/662752792

Thank you for covering the Disability Vote.

Onward to...

Bob Kafka, Coordinator
REV UP Texas
www.revuptexas.org
revuptx@gmail.com
512 431 4085
Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone


-------- Original message --------
From: "Jessica Huseman, Votebeat" <mailchimp@votebeat.org>
Date: 1/29/22 6:15 AM (GMT-06:00)
To: revuptx@gmail.com
Subject: The missing context in the debate about Halderman's Dominion report

OCA-APPX-2209

View this email in your browser



OCAGH_00000558



*A Georgia voter marks his ballot using a Dominion voting machine on Jan. 5, 2021* | *Virginie Kippelen / AFP via Getty Images*

Hi y'all.

Conspiracy theories collided in Georgia this week, resulting in additional confusion in a long-standing lawsuit over the state's use of Dominion voting machines. At the center of efforts by entities on both the left and right is a court-sealed report by University of Michigan computer scientist J. Alex Halderman claiming that the Dominion voting system has a vulnerability that could be exploited — but hasn't yet — to manipulate votes in a future election.

OCAGH_00000559

Fox News and One America News Network are now seeking a copy of the report, and this week the Atlanta Journal-Constitution suggested Georgia's secretary of state had ignored the report, leaving gaping holes in the state's election system. There's much, much more to the story. The upshot is that this lawsuit continues to be used today by those perpetuating Trump's Big Lie as evidence of their claims.

The lawsuit was initially filed in 2017 by left-leaning groups including the Coalition for Good Governance, to force Georgia to use paper-backed voting machines. At the time, Georgia was using outdated DRE machines. Then the state, on its own initiative, replaced the machines in 2020 with a paper-backed voting system built by Dominion. But the lawsuit didn't stop. It instead shifted to alleging that the *new* system was so insecure as to be unconstitutional.

The plaintiffs have not succeeded in convincing a judge of their arguments over the past four years, even when supplemented by Halderman's report. While U.S. District Judge Amy Totenberg has expressed public concern over the system, she has not been persuaded enough to, for example, force the state to use hand-marked paper ballots, as the plaintiffs have demanded. So far, Totenberg has not forced the state to make any major changes to its voting system as a result of the litigation, now known as *Curling v. Raffensperger*.

Experts who have reviewed Halderman's report, such as Juan Gilbert, the University of Florida's computer science department chair, have not found it to be nearly as dire as Halderman has publicly suggested. As part of the suit, Judge Totenberg granted Halderman unfettered access to the Dominion voting system in order to inspect the security of the machines. Because of his access, Totenberg sealed the report, making it available to only the attorneys on the case and the expert witnesses. And even though the state on Thursday asked Totenberg to unseal the document so as to clear public confusion, she seemed unready to do so.

"I'm unhappy about the course of political treatment of the report…. it's out of hand," Totenberg said in court. "But I'm not going to release it without seeing what is being proposed with redactions."

Still, the general contents of the report aren't exactly a secret. Halderman has long claimed that ballot-marking devices could be manipulated by malicious actors. In a brief no one asked him to write, Halderman made public a high-level summary of his findings in early August.

OCA-APPX-2212

OCAGH_00000560

Marilyn Marks, the executive director of the Coalition for Good Governance who is among the plaintiffs in the *Curling* case, then distributed this summary to every county in Georgia by email the day after Halderman filed his report. Votebeat was provided with a copy of the email. She called Halderman's finding an "urgent concern," alarming enough for counties "to reconsider their use of BMDs this fall, and instead use hand marked paper ballots with voluntary robust audits." No county acted on her warning.

Despite Judge Totenberg sealing Halderman's assessment, the publicity campaign the plaintiffs have mounted over the report — which none of them has seen in full — has resulted in two media dustups over its contents, to the obvious discontent of Totenberg. The first was in August, when Halderman first publicized what he claimed were massive security flaws in the system, and then this week, when the Atlanta Journal-Constitution reported that the state had done nothing to unseal the report or to act on its findings. This is the exact kind of speculation Totenberg sought to prevent when she sealed the report. While the report has only been read by Halderman, the lawyers in the *Curling* case, and other expert witnesses, the AJC quoted multiple people who have no knowledge of the report's details but who nonetheless implored the state to act. That's not the responsible way to present these issues.

The report, as far as is publicly known, does little to materially advance what Halderman has been claiming about ballot-marking devices for years. And, it's not a surprise that he found ways to infiltrate the system. Judge Totenberg gave Halderman complete access to the machines along with passwords, and his report indicates that he did his research over 12 weeks. If you gave me access to a bank for 12 weeks, handed me the keys, and told the security guards to stand down, I'm pretty sure I could rob it. This is an unrealistic threat scenario that ignores the existence of physical security measures, machine testing, and risk limiting audits.

"The security of the system isn't dependent only on the system itself, but everything that surrounds it. The seals, the padlocks, the cameras." said Tammy Patrick, a senior advisor at the Democracy Fund and former elections administrator in Maricopa County, Arizona. "If you leave the keys in an unlocked car and you're surprised I can drive away in it, that's not a measure of the car's security."

OCAGH_00000561

Dominion and the secretary of state offered similar responses when the debate resurfaced this week. In a statement, Dominion said the best way to review security is holistically — taking into account "procedural and technical safeguards," but that Halderman's review "did not take this approach." The secretary of state's office, in its statement, said the review was written "by an individual who is paid to espouse opinions supporting the elimination of electronic voting systems."

That's punchy — you might expect as much from a defendant in a lawsuit — but neither statement is altogether untrue. Halderman is being paid. His assessment was done with more access to the system than any bad actor would have, and has been reviewed by two state experts, neither of whom was persuaded that the state's system was at imminent risk of harm. Halderman himself has repeatedly and publicly acknowledged there is no evidence that the machines were manipulated in 2020.

Election security has made large strides since 2016, which reporters need to do a more fulsome job explaining. It is increasingly common for counties to conduct extensive post-election audits, which check for unexplainable discrepancies between the machines' vote counts and counts of the actual ballots. Election offices across the country have shored up chain-of-custody procedures for ballots and election equipment, and have phased out paperless voting machines almost entirely. States have also long conducted specific logic and accuracy testing for voting machines, and these tests are routinely performed. Patrick says that focusing on unrealistic cybersecurity threats is "disingenuous" and "diverts the energy that we need to put forth in getting productive policies in place, and further muddies the public's understanding of what good security looks like."

Allowing such unfettered access isn't without value: If Halderman had, for example, been able to affect the ballots in a way that could not be detected and prevented by safeguards like risk limiting audits or standard quality checks, these problems should be addressed. But neither the AJC article nor those who have seen the report assert that he found such vulnerabilities.

Still, folks are clamoring to get access to Halderman's sealed report. The state of Louisiana, Fox News, and One America News Network have all asked Judge Totenberg to see it. Louisiana — which has already been denied access — says it wants a copy because it's considering buying a Dominion system and would like to see what the vulnerabilities are. Fox and OANN want it because they think it might contradict Halderman's testimony in defamation

lawsuits filed by Dominion and by Eric Coomer, a former Dominion employee. In that case, Halderman testified in defense of Coomer and his work at Dominion — Coomer's work was high quality, Halderman says, and there is no evidence that Dominion machines were compromised.

Despite what Fox News's lawyers might hope, Halderman's positions in each lawsuit are not necessarily contradictory. It could well be true that the 2020 election was secure — as he asserts in the Fox defamation suit — and that untapped vulnerabilities still exist in Dominion systems — as he asserts in the *Curling* suit.

But this is not the only time right-wing spreaders of the Big Lie have embraced the *Curling* lawsuit to back their false claims. A week ago, Politico reported on the text of a never-seen Trump executive order that would have dispatched the military to seize voting machines. The order, dated Dec. 16, 2020, specifically references the *Curling* lawsuit in justifying the federal government to "seize, collect, retain and analyze all machines, equipment, electronically stored information, and material records" from the election. The order would have given the defense secretary 60 days to release a report on the machines' security — a move that would have thrown the election into uncertainty well into February 2021.

Unlike Trump's allies, we should resist falling into the logical trap of assuming that potential vulnerabilities in the machines mean they have already been exploited. We should also be clear-eyed about the link between this lawsuit and the raging fire of the Big Lie. David Becker, executive director and founder of the Center for Election Innovation & Research, says it is "simply a fact that then-President Trump used these failed claims to justify his failed coup" and his unsigned executive order.

"Whatever their intentions, it's undeniable that those who have brought recent claims in courts attempting to decertify particular voting machines they didn't like — all of which have failed — have found their claims and testimony used by election deniers who seek to undermine voter confidence and the legitimacy of the 2020 election and future elections," Becker said.

Journalists covering the *Curling* suit and Halderman report should always — every single time the case is mentioned — make explicit that the suit's arguments have been turned into a primary piece of evidence for Big Lie adherents claiming the 2020 election was stolen through manipulated Dominion machines. These details should not be drowned out by alarmist quotes, alleging vulnerabilities that no one else has confirmed. And they should also explain

OCA-APPX-2215

that Halderman's report was based on unfettered access to the system, which is not analogous to a real-world environment on Election Day.

It might be uncomfortable for many that a left-leaning activist group's accusations against Dominion — none of which have, so far, flown in court — were a basis for Trump's claims to continued power. But it is true. And now Fox and OANN are seeking the same sensitive information to potentially twist to their own advantage. This is a complicated mess, but it's important that journalists untangle this context in every story they write on the subject. Including anything less than this distorts the reality of the problem, and risks introducing unfounded doubts among voters about the security of their voting system.

## Back Then

Since direct-recording electronic machines became popular as a response to the disputed 2000 presidential election, there have been folks advocating for paper instead. In 2003, Rep. Rush Holt (D-New Jersey) introduced a bill that would have required a paper trail in all federal elections. It went nowhere, and he introduced it again in 2007, when it, again, went nowhere. It received substantial opposition from others in Congress as well as state election officials. It was rejected by most Republican members of Congress as overtly partisan — sour grapes resulting from George W. Bush's victory. State election officials worried about the tight timeline, unfunded financial demands, and federal overreach. More than a decade later, most states have made this transition on their own.

*Correction*: *Last week's newsletter mistakenly said the Texas Legislature passed its voting bill in the third special session last summer. It passed in the second special session.*

## In Other Voting News

OCAGH_00000564

- President Trump is redoubling his push for dropbox bans across the country, and a number of Republicans are hopping on the train. That train is currently stuck in Wisconsin, where election officials are at a deadlock on how to handle Republican demands that the rules for dropboxes be formalized or withdrawn entirely.
- Attorneys for Election Systems & Software have informed the Republican-led election investigation in Wisconsin that they have no intention of complying with a broad subpoena for the company's data and information. In a letter to former Wisconsin Supreme Court Justice Michael Gableman, who is running the investigation, ES&S attorneys called the subpoena a "quintessential fishing expedition."
- Following false coverage of the Electronic Registration Information Center — a nonprofit several dozen states use to help maintain their voter rolls — by Gateway Pundit, the state of Louisiana has ended its use of the program. Gateway Pundit unleashed a fuselage of false charges against ERIC, including accusations that the program is a leftist plot funded by George Soros. In truth, it is used and overseen by more than 30 member states, including Republican-governed states such as Kentucky, Missouri, Ohio, Alabama, Georgia, and Florida.
- Gjergi Luke Juncaj of Las Vegas, was criminally charged this week for making threats against an election administrator in Nevada. The man allegedly made repeated threatening calls, including telling the administrator she was "going to f—ing die" for stealing the election from Trump.
- After wavering due to cost projections, the Indiana Legislature has re-added a 2024 deadline for counties to institute paper backups to their voting machines. While the deadline is back, there continues to be no funding for the measure, and counties will be required to foot the cost on their own.
- The overwhelmingly Democratic Massachusetts House has approved a measure that would make vote by mail and early balloting permanent in the state. The state Senate approved a similar bill several weeks ago, which will now be reconciled with the House bill. The status of same-day registration, which advocates have been loudly asking for in the state, is less certain.
- Counties in Texas continue to report high rejection rates of absentee ballot applications due to the new law's ID requirement. Meanwhile, Travis County Clerk Dana DeBeavoir has retired after 36 years on the job. She's overseen a tremendous

amount of change since she took the helm in the mid-80s, and even in retirement she's not leaving elections. "What really kind of tipped me over the edge is I'd really like to do international elections work and do some work nationally on elections, on audits and elections ethics," she told KUT.

- Attention South Carolina teens: Effective now, if you are currently 17 but will be 18 before Election Day, you can go ahead and register to vote!
- A bill by Nebraska Sen. Mike Groene (R-North Platte) would have dramatically shortened early voting in the state but fell flat on its face. Not a single member of the committee voted for it, and no one testified in favor.

## Newest Addition to Votebeat

Y'all, it is *new intern day*. Please meet Brianna Fisher, a sophomore at the University of Pennsylvania who is majoring in criminology with a minor in survey research and data analytics. She's going to be using all of those skills to help Votebeat journalists effectively use data in our stories and will be doing some reporting of her own. "I want to be able to use data, research, and legal experience to work on criminal justice reform — particularly related to prisons and sentencing," she said.

All of the intricate data in the voting world and its growing relationship to the criminal justice system, Brianna thought our news org would be a good place to grow. "I decided to come work at Votebeat because it is a great opportunity for me to help make election information and data accessible and, most importantly, fun to read!"

OCAGH_00000566

Brianna is from Broward County, Florida, so she's well aware of the importance of election administration. This also isn't her first journalism gig: She, along with other staffers of the newspaper of Stoneman Douglas High School in Parkland, Florida, were recognized by the Pulitzer Prize committee for their coverage of the 2018 school shooting.

Brianna will be keeping up our hobby section! Please submit yours. Her hobby? Dancing! "I danced for 15 years growing up," she said. "I took classes in every style you can think of, from ballet to hip hop, and even helped teach younger kids." She tried other sports, but nothing she loved quite as much.

# Infographic of the Week



Click or tap to enlarge.

In honor of her hometown, Brianna's infographic of the week is a nifty look at where the good folks of Broward County dropped off their ballots during the Jan. 11 special election. As you can see, a Supervisor of Elections office at Lauderhill Mall and Tamarac Branch Library, were voter favorites. And shout out to all of you procrastinators — we see those final-day drop offs!

OCA-APPX-2220

OCAGH_00000568

# In Case You Missed It

The video of the panel I participated in with Rick Hasen, Margaret Sullivan and Barton Gellman is up. Watch our conversation on what journalists can (and should!) do to prevent another Jan. 6.

**Did you receive this email from a friend?**
Sign up to receive Votebeat newsletters.

**Have a question for our journalists?**
You can reach us at contact@votebeat.org

**Donate**

Copyright © 2022 Chalkbeat. All rights reserved.
You are receiving this email because you signed up through our website or subscription form.

Our mailing address is:

OCA-APPX-2221

OCAGH_00000569

Chalkbeat

P.O. Box 300434

Brooklyn, NY 11230-0434

**Add us to your address book**

Want to change how you receive these emails?

You can update your preferences or unsubscribe from this list.

OCA-APPX-2222

**From:** revuptx [revuptx@gmail.com]
**Sent:** 2/9/2022 9:45:37 AM
**To:** Sneha Dey [sneha.dey@texastribune.org]
**Subject:** Re: The Texas Tribune inquiry
**Attachments:** REV UP - GENERAL INFO(2)(1).docx; Texas' New Voting Law JM edits(1).pptx

Sneha

Talk to you at 1pm

Onward to...

www.revuptexas.org
revuptx@gmail.com

Bob

Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone

-------- Original message --------
From: Sneha Dey <sneha.dey@texastribune.org>
Date: 2/9/22 8:22 AM (GMT-06:00)
To: revuptx@gmail.com
Subject: Re: The Texas Tribune inquiry

Hi Bob,
I wanted to follow up on this request. Let me know if you have some time to chat today or tomorrow.

Thank you,
Sneha

On Mon, Feb 7, 2022 at 12:17 PM Sneha Dey <sneha.dey@texastribune.org> wrote:
Hi Bob,
This is Sneha Dey, The Texas Tribune reporter working with Alexa Ura on voting coverage during this primary election cycle.

As Alexa has mentioned in earlier emails, we're doing a story ahead of early voting about the changes to voter assistance rules. I'd love to chat with you about how the new rules are changing the kinds of guidance you're providing to folks.

Do you have some availability this week? Feel free to reach me directly at 914-413-6624 any time -- text or call works great.

Thanks so much. I'm really looking forward to speaking with you.

Warmest regards,
Sneha

| | |
|---|---|
| **From:** | revuptx [revuptx@gmail.com] |
| **Sent:** | 1/26/2022 1:14:00 PM |
| **To:** | Alexa Ura [aura@texastribune.org] |
| **CC:** | Sneha Dey [sneha.dey@texastribune.org] |
| **Subject:** | Re: BallotTracker - Ballot By Mail Application and Ballot Tracker |
| **Attachments:** | Texas' New Voting Law JM edits(1).pptx; REVUP Info Program PowerPoint(2)(1)(1).pdf |

Alexa/Sneha:

Thx for the note.

Will connect you with folks as we get their feedback

Ive attached a powerpoint we developed with input from DRTx on the concerns we have with SB1 including the issue of "Assistance".

The DISABILITY VOTE is growing and we fear SB 1 will inhibit this growth.

Thx for following this issue.

Bob

Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone

-------- Original message --------
From: Alexa Ura <aura@texastribune.org>
Date: 1/26/22 11:34 AM (GMT-06:00)
To: revuptx <revuptx@gmail.com>
Cc: Sneha Dey <sneha.dey@texastribune.org>
Subject: Re: BallotTracker - Ballot By Mail Application and Ballot Tracker

Hey Bob — Hope you're doing well! Thanks for the note and for sharing this bulletin. We are going to be following this closely so please feel free to connect me with any folks who might be dealing with issues in complying with the new requirements.

Additionally, we are hoping to write something up ahead of early voting about the changes to the voter assistance rules and would appreciate if you could give us a sense for what sort of guidance y'all are providing for folks. I'm copying here my colleague Sneha Dey who is going to be taking the lead on that; hope y'all can connect soon.

Thanks again!
Alexa

On Mon, Jan 24, 2022 at 5:47 PM revuptx <revuptx@gmail.com> wrote:
> Alexa
>
> Good article. REV UP and other covil rights groups are on the SB 1

lawsuit.  We all told them this would happen.  Arrogance!

We are sending out info on ways to minimize ballot by mail rejection in the Disability Community.

Again thx for the coverage

Bob Kafka, Coordinator
REV UP Texas
www.revuptexas.org
revuptx@gmail.com
512 431 4085

R EGISTER
E DUCATE
V OTE

U SE
P OWER = The Disability Vote

https://vimeo.com/662752792

Advocates:

https://teamrv-mvp.sos.texas.gov/BallotTrackerApp/#/login

There is much confusion about the Ballot By Mail process (Understatement).

 If you have sent in a Ballot Application or Ballot by Mail you can use the above link to track your application or ballot by mail.
(Ballot Tracker)

www.revuptexas.org
revuptx@gmail.com
512 431 4085
***************************

Below is a REV UP Texas Info Bullentin on Ballot By Mail.

Pls let us know if you are having any problems.
******************************

Texas Voting Rights Advocates:

As we celebrated Martin Luther King Day and advocate for needed federal legislation to protect voting rights let us not forget the saying ALL POLITICS ARE LOCAL.

SB 1 is currently the law.  REV UP Texas is part of the litigation focused on overturning the suppression of the DISABILITY VOTE! in SB1.

REV UP Texas and other disability and voting rights organizations told the supporters of SB 1 that they were making the Mail in Ballot process so complicated for eligible disabled and older voters that it would suppress the vote.

This is not a Republican or Democratic Party issue

They ignored our recommendations.

Unfortunately we are being proven correct. Mail in Ballots Applications are being returned at historic rates in counties all over
state.

Below is an information bullentin to assist eligible mail in ballot recipients to navigate the system. It has helpful links from the League of Women Voters and the Secretary of State's office.

We urge you to report any problems you may have in the Mail in Ballot process to the contacts in the Info Bullentin.

The next REV UP Texas Info Bullentin will be on the Mail in Ballot portel to track your Mail in Ballot.

Don't Mourn Organize and REV UP

www.revuptexas.org
revuptx@gmail.com
512 431 4085

****************************

## NEW TEXAS VOTING LAW LEADS TO
## HIGH REJECTION OF MAIL-IN BALLOT APPLICATIONS
### Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be **REGISTERED** by January 31, 2022 to vote in the primaries.

**VOTE BY MAIL:**
Last day to request Ballot by Mail APPLICATION:

**FRIDAY, FEBRUARY 18, 2022**

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

Visit REVUPTEXAS.ORG to access the PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes you should be aware of.

USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail

https://www.sos.texas.gov/elections/voter/reqabbm.shtml

https://youtu.be/QXb7qMTMCNc

OCA-APPX-2226

OCAGH_00001218

MAIL IN BALLOTS must be received by Your County:

**POSTMARKED BY 7:00 PM ON MARCH 1, 2022**

**IMPORTANT TIPS**

- Make Sure You Fill Out *ALL* the Information
- Mail-In Ballots and Mail in Ballot Application ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
  WE SUGGEST ENTERING *BOTH* NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.
- CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)
- **SIGN THE BALLOT!**

Again, the last day to request Ballot by Mail is **FRIDAY, FEBRUARY 18, 2022**

**If you have any problems with a Mail-In Ballot Process, please contact:**

Disability Rights Texas Voting Hotline
**Call 1-888-796-VOTE(8683) AND send us an email at: revuptx@gmail.com**


EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

FIRST DAY of Early Voting
MONDAY, FEBRUARY 14, 2022
(Gotta LOVE VOTING)

LAST DAY of Early Voting
FRIDAY, FEBRRUARY 25, 2022

For More Information Join the REV UP Texas Community and
Show The

***POWER OF THE DISABILITY VOTE***

***DISABILITY RIGHTS ARE CIVIL RIGHTS***

www.revuptexas.org
revuptx@gmail.com
512 431 4085

# R EGISTER
# E DUCATE
# V OTE

# U SE
# P OWER = The DISABILITY VOTE

# ALL POLITICS ARE LOCAL!

OCA-APPX-2227



**Alexa Ura**
Demographics Reporter

919 Congress Ave., Sixth Floor
Austin, TX 78701
www.texastribune.org

**M** (956) 744-9421
@alexazura

# Exhibit 162



# BobKafka_LWVTX.mov  NOT YET RATED

11 months ago | More

Linda Litowsky **PRO**    Follow

▷ 7    ♡ 0    ⊜ 0    ⬭ 0      ⬇ Download

✈ Share

Bob Kafka asks the Texas Legislature: Do Not Suppress My Vote!

Leave the first comment:

Add a new comment

> Add a comment

## More from Linda Litowsky

Autoplay next video

BobKafka_LWVTX...
Linda Litowsky

Register Gerogia ...
Linda Litowsky

ChangeThe World...

Upload, livestream, and create your own videos, all in HD.

Join Vimeo    Log in

OCAGH_00000405




Joe and Judy's Ho...
**Linda Litowsky**


Plan Your Vote To...
**Linda Litowsky**


Plan Your Vote To...
**Linda Litowsky**


Sparky's Home Tour
**Linda Litowsky**


Change the World
**Linda Litowsky**


Informed Voter PSA
**Linda Litowsky**

Show more...

| Product | Resources | Apps | Vimeo |
|---|---|---|---|
| Webinar | Help Center | Vimeo for macOS | Pricing |
| Virtual Events | Blog | Vimeo for iOS | Upload |
| Video Player | Video School | Vimeo for Android | Staff Picks |
| Video Library | OTT Resources | Vimeo Create for iOS | On Demand |
| Create | Developers | Vimeo Create for Android | Vimeo OTT |
| Live Streaming | Students | Magisto | Site map |
| Screen Recorder | Become a Partner | Vimeo for Shopify | About |
| Privacy | Join Vimeo Experts | Vimeo for Zoom | Investor Relations |
| Collaboration | Guidelines | | Press |
| Distribution & Marketing | | | Jobs |
| Monetization | | | |
| Analytics | | | |
| Hosting & Management | | | |
| Stock | | | |
| For Hire | | | |

© 2022 Vimeo.com, Inc. All rights reserved.    Terms  |  Privacy  |  CA Privacy  |  Copyright  |  Cookies

Language: English    Mature content filter: None

## Upload, livestream, and create your own videos, all in HD.

×

Join Vimeo        Log in

OCAGH_00000406



# JosueRodriguez_LWVTX.mov  [NOT YET RATED]

11 months ago  |  More

Linda Litowsky  PRO    Follow

▷ 6   ♡ 0   🗇 0   💬 0        ⬇ Download

⊲ Share

Josue Rodriguez asks the Texas Legislature: Do Not Suppress Our Vote!

## Leave the first comment:

Add a new comment

    Add a comment

## More from Linda Litowsky

Autoplay next video

JosueRodriguez_L…
Linda Litowsky

BobKafka_LWVTX…
Linda Litowsky

Register Gerogia …

Upload, livestream, and create your own videos, all in HD.

Join Vimeo          Log in

OCAGH_00000431




Register! to Vote
**Linda Litowsky**


Joe and Judy's Ho…
**Linda Litowsky**


Plan Your Vote To…
**Linda Litowsky**


Plan Your Vote To…
**Linda Litowsky**


Sparky's Home Tour
**Linda Litowsky**


Change the World
**Linda Litowsky**

Show more...

| Product | Resources | Apps | Vimeo |
|---|---|---|---|
| Webinar | Help Center | Vimeo for macOS | Pricing |
| Virtual Events | Blog | Vimeo for iOS | Upload |
| Video Player | Video School | Vimeo for Android | Staff Picks |
| Video Library | OTT Resources | Vimeo Create for iOS | On Demand |
| Create | Developers | Vimeo Create for Android | Vimeo OTT |
| Live Streaming | Students | Magisto | Site map |
| Screen Recorder | Become a Partner | Vimeo for Shopify | About |
| Privacy | Join Vimeo Experts | Vimeo for Zoom | Investor Relations |
| Collaboration | Guidelines | | Press |
| Distribution & Marketing | | | Jobs |
| Monetization | | | |
| Analytics | | | |
| Hosting & Management | | | |
| Stock | | | |
| For Hire | | | |

© 2022 Vimeo.com, Inc. All rights reserved.   Terms  |  Privacy  |  CA Privacy  |  Copyright  |  Cookies          Language: English   Mature content filter: None

## Upload, livestream, and create your own videos, all in HD.

Join Vimeo          **Log in**



# StephanieThomas_LWVTX.mov  NOT YET RATED

11 months ago | More

Linda Litowsky PRO        Follow

▷ 7    ♡ 0    ⊜ 0    ♡ 0        ⬇ Download

🞄 Share

Stephanie Thomas asks the Texas Legislature: Do Not Suppress My Vote!

Leave the first comment:

Add a new comment

Add a comment

## More from Linda Litowsky

Autoplay next video

StephanieThomas...
Linda Litowsky

JulieEspinoza_LW...
Linda Litowsky

JosueRodriguez_L...

Upload, livestream, and create your own videos, all in HD.

Join Vimeo        Log in

OCAGH_00000476



**Register Gerogia …**
Linda Litowsky



**ChangeThe World…**
Linda Litowsky



**Register! to Vote**
Linda Litowsky



**Joe and Judy's Ho…**
Linda Litowsky



**Plan Your Vote To…**
Linda Litowsky



**Plan Your Vote To…**
Linda Litowsky

Show more...

| Product | Resources | Apps | Vimeo |
|---|---|---|---|
| Webinar | Help Center | Vimeo for macOS | Pricing |
| Virtual Events | Blog | Vimeo for iOS | Upload |
| Video Player | Video School | Vimeo for Android | Staff Picks |
| Video Library | OTT Resources | Vimeo Create for iOS | On Demand |
| Create | Developers | Vimeo Create for Android | Vimeo OTT |
| Live Streaming | Students | Magisto | Site map |
| Screen Recorder | Become a Partner | Vimeo for Shopify | About |
| Privacy | Join Vimeo Experts | Vimeo for Zoom | Investor Relations |
| Collaboration | Guidelines | | Press |
| Distribution & Marketing | | | Jobs |
| Monetization | | | |
| Analytics | | | |
| Hosting & Management | | | |
| Stock | | | |
| For Hire | | | |

© 2022 Vimeo.com, Inc. All rights reserved.    Terms  |  Privacy  |  CA Privacy  |  Copyright  |  Cookies          Language: English   Mature content filter: None

## Upload, livestream, and create your own videos, all in HD.

✕

Join Vimeo          Log in

OCAGH_00000477

# Exhibit 163





## "Disability Voters Mobilize for May Vote & Chilling Laws" w Bob Kafka, Rev-Up TX, KPFT News 3/25/22

**Reporter KPFT**
6 subscribers

Subscribe

👍 0    👎    ↗ Share    ☰+ Save

**21 views  1 year ago**
HOUSTON – A March 26 flash mob at the Texas capitol will kick off a drive to register new voters ahead of the May runoff election, said Bob Kafka, head of the disability voters group, Rev-Up Texas. "The primary unfortunately proved all t **Show more**



**3 Polk County deputies arrested for evidence tampering**
ABC Action News ✔
6.6M views  • 2 years ago



**Is Texas housing becoming like California? | Y'all-itics full episode**
WFAA ✔
101 views  • 2 hours ago
**New**



**How Long Has This Been Going On ( Cover) Brian Yamamoto/Jim Ng/ Vaea**

OCA-APPX-2237

 

Bollinger County, Missouri Residents in Shock after Destructive Tornado
FOX Weather ✓
2.9K views • 51 minutes ago
New

Playing for Principal: Lake Highlands soccer plays for Mrs. Pettigrew
WFAA ✓
148 views • 4 hours ago
New

DFW weather: Rain returns to end the week
WFAA ✓
1K views • 5 hours ago
New

FULL NEWS CONFERENCE: DA Alvin Bragg says Trump paid to cover up crimes
FOX 4 Dallas-Fort Worth ✓
31K views • 1 day ago
New

DFW weather: Storms are moving out, what's next?
WFAA ✓
1K views • 10 hours ago
New

Fact-checking Donald Trump's post-indictment speech at Mar-a-Lago
WRAL
75K views • 1 hour ago
New

Dallas City Council considers defining short-term rentals as lodging, banning them in most neighborh
FOX 4 Dallas-Fort Worth ✓
2.6K views • 23 hours ago
New

Many crashes in North Texas due to road rage
CBS TEXAS
705 views • 19 hours ago
New

Lake Highlands soccer team playing for late principal
WFAA ✓
110 views • 5 hours ago

OCA-APPX-2238

 

WFAA ✓
108 views • 5 hours ago
New

### Breezy winds and chilly temps, but mostly rain-free

CBS TEXAS
81 views • 1 hour ago
New

### Arlington toddler dies after shooting himself with sibling's gun, police say

FOX 4 Dallas-Fort Worth ✓
1.4K views • 15 hours ago
New

### Josh Smith talks about getting hit in the face with a pitch

FOX 4 Dallas-Fort Worth ✓
3.4K views • 1 day ago
New

### The secrets behind the savings at Aldi

FOX 4 Dallas-Fort Worth ✓
157 views • 8 hours ago
New

### Hidden Cove residents say the sounds of high powered rifles are keeping them up at night

CBS TEXAS
442 views • 19 hours ago
New

### Tracking the potential for severe storms in North Texas overnight Tuesday into Wednesday

FOX 4 Dallas-Fort Worth ✓
895 views • 1 day ago
New

### Dallas City Council considers defining short-term rentals as lodging, banning them in most neighborh

FOX 4 Dallas-Fort Worth ✓
281 views • 15 hours ago
New

Show more

OCA-APPX-2239

OCAGH_00018250



OCA-APPX-2240

# Exhibit 164

**From:** revuptx [revuptx@gmail.com]
**Sent:** 10/20/2022 3:43:06 PM
**To:** REVUPTX [revuptx@gmail.com]
**BCC:** ahinkle@texastribune.org; amcglinchy@kut.org; theaustinartistsshow@gmail.com; bwhite@politico.com; bsechler@statesman.com; bgrumet@statesman.com; dedenews@austin.rr.com; director@cotmf.org; carolinemurray@utexas.edu; clindell@statesman.com; dstrauss@politico.com; diversedisabilitymedia@comcast.net; drosenzweig-ziff@texastribune.org; dbrown@kut.org; info@disabilityscoop.com; pgrant@abilitytoday.com; eschneider@politico.com; ztorres@elpasotimes.com; elutz@express-news.net; eplatoff@texastribune.org; ewasson@bloomberg.net; esmith@texastribune.org; nancy.zambrano@foxtv.com; Isabelle.L.Philippe@abc.com; jarkin@politico.com; jbarragan@dallasnews.com; james.journo@gmail.com; Jeremy.Wallace@chron.com; mohler.john@outlook.com; jmoritz@gannett.com; jburnett@npr.org; jsilver@statesman.com; jorge@kut.org; jsummers@npr.org; jchang@statesman.com; justin@propublica.org; krizzo5@bloomberg.net; krobillard@politico.com; kev@cbsnews.com; KTBCnews@foxtv.com; edonahue@kut.org; khall@statesman.com; groetzinger@texasobserver.org; news@keyetv.com; paprgl@gmail.com; kitoconnell@pobox.com; lbarron-lopez@politico.com; mcalderone@politico.com; maggie.astor@nytimes.com; mannyf@nytimes.com; mevans@texastribune.org; maryretta33@gmail.com; mrochford@thearcoftexas.org; Matt.Zdun@kwtx.com; metrodesk@statesman.com; barajas@texasobserver.org; MichaelBoard@woai.com; exnerm@cbsnews.com; michelle.hackman@wsj.com; newsroom@emmisaustin.com; nrosales@kvue.com; oliver.darcy@turner.com; olivia@progressivecongress.org; psvitek@texastribune.org; pfikac@express-news.net; catapano@nytimes.com; philp@kxan.com; pressrelease@quorumreport.com; rhaurwitz@statesman.com; Reena.Diamante@charter.com; bgee@statesman.com; rramsey@texastribune.org; ryan@huffingtonpost.com; sbland@politico.com; sshepard@politico.com; scwalsh@statesman.com; sasha.cesare@cotmf.org; ksbraddock@gmail.com; sdkdallas@gmail.com; Stef.Manisero@charter.com; stephanie.armour@wsj.com; sluthi@iwpnews.com; observer@texasobserver.org; newsletters@texasobserver.org; TexasStandard@kut.org; thoroakley@gmail.com; tjoslin@texastribune.org; Victoria.Fleischer@cnn.com; vmgarcia@sbgtv.com; wesetx@gmail.com; wrapaport@nexstar.tv; eramshaw@19thnews.org; sneha.dey@texastribune.org; watermant@featurestory.com; tplohetski@statesman.com; ALopez@npr.org; westtexas@courthousenews.com; jennifer.sanders@kxan.com; alexandra.stuckey@chron.com
**Subject:** Disability Community Turning Out The Disability Vote
**Attachments:** REV UP - 2022 AUSTIN EARLY VOTING OPPORTUNITY.docx; Disability Vote - Ripple Effect 2.0 (detail)(1)(1)(1)(3)(1).jpg



**FOR IMMEDIATE RELEASE**                    Date:  October 20, 2022

**For Information:  Bob Kafka, bobkafka10467@gmail.com**

**Subject:  ADAPT/PACT and REV UP Texas organizing to GET OUT THE DISABILITY VOTE during Early Voting.**

**The disability community has been organizing all year to empower the disability community to turn out the DISABILITY VOTE.**

**The outcome of the 2022 election will effect the lives of all people with disabilities regardless of age (physical, mental, cognitive, sensory and/or learning).**

**Life and death issues effecting us are Medicaid Expansion, unnecessary institutionalization, waiting lists for in home services, low wages for Community Attendants, mental health services, lack of inclusive education, discrimination in employment and voting.**

**Members of ADAPT/PACT and REV UP Texas will be at:**

**Austin City Hall Plaza, 301 W 2ⁿᵈ St  on Mon, Oct 24ᵗʰ at 11:30am**

**"My vote is important.  Our local, state and federal decision makers must make disability issues part of their agenda" said Nancy Crowther, PACT Organizer. "It is a matter of life and death for us".**

GOTDV * www.revuptexas.org * revuptx@gmail.com

OCA-APPX-2243

# Exhibit 165

**From:** revuptx [revuptx@gmail.com]
**Sent:** 9/30/2022 5:29:54 PM
**To:** REVUPTX [revuptx@gmail.com]
**Subject:** FW: TDIF: Power the Disability Vote!
**Attachments:** TDIF_PressRelease_FINAL.docx; TribuneArticle2022_FINAL.docx

Sent via the Samsung Galaxy A13 5G,an AT&T 5G smartphone

-------- Original message --------
From: linda litowsky <lindalitowsky@gmail.com>
Date: 9/16/22 4:34 PM (GMT-06:00)
To: generalnews.central@thomsonreuters.com
Cc: revuptx <revuptx@gmail.com>
Subject: TDIF: Power the Disability Vote!

Here is the press release and an article about the power of the disability vote.

OCAGH_00017273



# Texas Disability Issues Forum
September 19, 2022
Austin, Texas + virtual
TDIF.REVUPTexas.org

## PRESS RELEASE

### Yes, there is Power in the Disability Vote
#### AND WE ARE HOLDING A FORUM TO SHINE A LIGHT ON THE ISSUES

REV UP Texas and the Coalition of Texans with Disabilities, along with more than 50 Texas organizations, have joined forces to host the third Texas Disability Issues Forum, (TDIF). Both Democrat and Republican candidates for the offices of Governor, Lt. Governor, Attorney General, and Agriculture Commissioner are invited, though only the four Democratic candidates have accepted. The Forum will continue to invite participation from all the invitees.



TDIF is a non-partisan, one-day event, where candidates for elected statewide office are asked to specifically address the concerns of Texans with disabilities. This forum is not a debate and will be moderated by independent journalists and streamed live by our media partner, the Texas Tribune. Each candidate will be interviewed individually by an independent journalist from the Tribune. The Texas Tribune will also serve as TDIF's media sponsor and the live stream will be hosted on their website.

Now more than ever, it is critical that the Texas disability community get out the vote. Because the issues like affordable health care that covers pre-existing conditions and protects mental health parity, as well as Medicaid funding for in-home services must be addressed by our politicians and decision makers. It is critical that people with disabilities are supported so they can stay out of nursing homes and other institutions; and, barriers like long waiting lists, ridiculously low wages for Community Attendants, and cutbacks in funding for already chronically underfunded affordable, accessible integrated housing are resolved in Texas.

Even the access to vote itself has been attacked here in Texas. These are just some of the reasons why the Texas disability community is becoming more active in electoral politics. We need to educate candidates about disability issues and disabled people and our allies about the candidates' stand on these issues.

The 2022 Forum will be held on Monday, September 19. Registration begins at 9:00 am, welcome at 10:00 am, candidate interviews begin at 10:15 am and the event ends at 2:00 pm. Major TDIF sponsors include Amerigroup, Superior Healthplan, Molina Healthcare, United Healthcare and Secure Democracy.

TDIF will take place at the AT&T Conference Center on the UT campus, 1900 University Drive in the Zlotnik Ballroom. To schedule an interview, receive a press pass, get parking directions and more, visit:

### TDIF.revuptexas.org

**MEDIA CONTACTS:** Bob Kafka at 512-431-4085 or revuptx@gmail.com
Dennis Borel at 512-478-3366 x302 or dborel@txdisabilities.org

### ###

OCA-APPX-2246

OCAGH_00017274



OCA-APPX-2247

OCAGH_00017275



Texas **Disability**

Issues Forum

Austin TX
Sept. 19

OCAGH_00017276

## Yes, There is Power in the Disability Vote
### AND WE ARE HOLDING A FORUM TO SHINE A LIGHT ON THE ISSUES

With little fanfare from the public and the media, the Texas disability community is quietly growing a movement to become more engaged in electoral politics at the national, state and local levels, especially here in Texas.

One part of this movement is the building of a diverse, statewide disability voting coalition that is a non-partisan partnership laser focused on registering and educating the disability community on important disability rights and services concerns; while engaging candidates and the media on these issues. Our most immediate goal is to get out the Texas disability vote on Election Day, November 8th.

It's been 32 years since the first disability civil rights legislation, the Americans with Disabilities Act (ADA), was signed into law by President George H. W. Bush, a Texan of course. It is unconscionable that the disability community remains confronted with many of the challenges from 32 years ago; not only to the ADA itself, but to the foundation that the ADA was built on: the integration of people with disabilities of all ages into every aspect of community living.

Now more than ever, it is critical that the Texas disability community get out the vote. Issues like affordable health care that covers pre-existing conditions and protects mental health parity; Medicaid funding for in-home services so folks can stay out of nursing homes and other institutions; barriers like long waiting lists and ridiculously low wages for Community Attendants that further strangle the system; and, cutbacks in funding for already chronically underfunded affordable, accessible integrated housing mean growing numbers of the disabled face homelessness. Even access to vote has been attacked here in Texas.

These are just some of the reasons why the Texas disability community is becoming active in electoral politics. We need to educate candidates about disability issues, and disabled people and our allies about the candidates' stand on these issues.

To learn what major party candidates have to say on the most pressing problems from healthcare to elections to education and more, REV UP Texas and the Coalition of Texans with Disabilities, along with more than 50 organizations, have joined forces to host the third Texas Disability Issues Forum, (TDIF). This is a non-partisan, one day event, where candidates for elected statewide office are asked to specifically address the concerns of Texans with disabilities. Democrat and Republican candidates for the offices of Governor, Lt. Governor, Attorney General and Agriculture Commissioner are invited. This forum is not a debate and will be moderated by independent journalists and livestreamed through our media sponsor and partner, the Texas Tribune.

Political education is a two-way street. Many politicians are simply unaware or unwilling to recognize this constituency and its issues for what they are. If you do not see or acknowledge something, it is unlikely you will address it. Many people with disabilities are unaware of a candidate's position and record of voting on our issues and so do not give it much weight when they step into the voting booth.

In 2014, the Texas Governor's race was very interesting to the disability community, because then Attorney General, Greg Abbott, who is a person with a disability and who had attacked disability issues as the AG, was running against a former State Senator, Democrat Wendy Davis, who did not have a disability but had supported disability issues. This race received national attention, but no attention on disability policy.

Because of this race, a coalition of Texas advocates led by the Coalition of Texans with Disabilities (CTD) and the newly formed REV UP Texas organized the first ever Texas Disability Issues Forum (TDIF). It

OCAGH_00017277

attracted over 400 Texans in person and even more via the statewide livestream. The interest in this Forum was the catalyst for organizing an ongoing, non-partisan state voting coalition.

The second TDIF in 2018 followed the same format but added the candidates for the U.S. Senate. This Forum was attended by more than 400 participants and livestreamed across the state to Watch parties in every region, organized by disability advocates. This too was a success.

The 2022 Texas Disability Issues Forum will be held on Monday, September 19, from 9:00am to 2:00pm at the AT&T Hotel and Conference Center on the UT campus. To attend in person, to host a watch party or for more information, visit TDIF.revuptexas.org

November 8th will be a test to see if our multi-year organizing can increase the number of people with disabilities and our allies who go to the polls and elect candidates that support disability rights and services.

Now, and on September 19 is the time for candidates to speak to the disability community. We'll be listening.


Dennis Borel is the Executive Director of the Coalition of Texans with Disabilities, a statewide cross-disability advocacy organization. Since 2000, Dennis is frequently called upon for research, policy analysis, and recommendations to the Texas Legislature and state agencies on issues surrounding disabilities.

A Disability Rights Activist for over forty years, Bob Kafka is Co-Director of the Institute for Disability Access, and an organizer for ADAPT and State Coordinator of REV UP Texas (Register • Educate • Vote – Use your Power). He has been the host and producer of the podcast *Barrier Free Futures* since October 2018.

OCAGH_00017278

# Exhibit 166

OCA-APPX-2251



OCAGH_00018334



OCA-APPX-2253

OCAGH_00018344

File  Edit  View  History  Bookmarks  Tools  Help

REV UP Texas | Facebook

https://www.facebook.com/revuptx

110%

REV UP Texas     Learn more     Like     Message

The primary unfortunately proved all the negative outcomes that we predicted if Senate Bill 1 would pass." Bob Kafka @REVUP_Texas on registering voters for May vote & Saturday's flashmob at the capitol KPFTHouston 90.1 FM Peoples News 8 PM https://youtu.be/7vS5SBgeEUI

Also mentions Register2Vote.org

https://www.youtube.com/watch?v=7vS5SBgeEUI



YOUTUBE.COM
**"Disability Voters Mobilize for May Amid & Chilling Rules" w Bob Kafka, Rev-Up TX, KPFT News 3/26/22**

1

Like     Comment     Share

Write a comment...

Press Enter to post.

# Exhibit 167

# Caller Times

**TEXAS BUREAU**

# Texans with disabilities fear voting bill will add more barriers to the ballot box

*Limits on mail-in and curbside voting would be especially onerous to people in wheelchairs or those with sight and hearing impairments, advocates say.*



**John C. Moritz**
Corpus Christi Caller Times

Published 7:30 a.m. CT Aug. 14, 2021

AUSTIN — Chase Bearden and Bob Kafka say they already face too many barriers to the ballot box, and they worry that the sweeping legislation that passed the Texas Senate on Thursday would erect even more.

Bearden and Kafka were among several people with disabilities who testified earlier in the week in opposition to the measure known as Senate Bill 1. They said proposed new standards in the bill for signature verification and restrictions on mail-in and curbside voting would make it harder, and in some cases impossible, for people like them to safely and conveniently cast their ballots.

"We're trying to get them, if they're going to pass a bill, to actually make it to where the disability community is on an equal playing field with being able to vote," Bearden, who broke his neck as teenage gymnast 28 years ago, said in an interview after his formal testimony before the Senate State Affairs Committee.

**Texas issues arrest warrants:** Texas Supreme Court temporarily blocks order protecting House Democrats from civil arrest

Much of the attention on the elections bill – which sparked Democrats in the House to first break a quorum late in the regular legislative session and then to leave Texas for Washington, D.C., when Gov. Greg Abbott called the first special session – has been on whether it would discourage turnout of minority voters.

That attention was front and center during the floor debate that began Wednesday

OCA-APPX-2256

OCAGH_00018504

afternoon and ended the next morning after a 15-hour filibuster by Democratic Sen. Carol Alvarado of Houston. Soon after Alvarado ended her talkathon, the full Senate passed the measure on a party-line vote.

Backers of SB 1, which Abbott, Lt. Gov. Dan Patrick and virtually all of the Republican members in both legislative chambers support, have said the measure is need to root out and prevent election fraud and other political mischief.

The bill remains stalled, however, because most of the Democrats in the House have not returned for the second special session and the 150-member chamber so far has been a handful of members short of the two-thirds needed to conduct business.

**More:** Texas Democrat's filibuster of GOP voting bill ends after 15 hours; SB 1 passes

Kafka, a longtime disabilities rights activist whose neck was broken in a car wreck after he returned from his Army tour in Vietnam, said people in wheelchairs or who are blind or hearing-impaired often must rely on mail-in or curbside-cast ballots or on personal assistants at voting locations. Because the bill would curtail such options in the interest of cracking down on elections fraud, Kafka said, it puts the onus on people with disabilities to prove they are honest citizens.

"What's so outrageous is that without any credible proof of fraud, people with disabilities, veterans who may have disabilities – any person – has to jump through hoops," said Kafka, noting that the disabilities community includes people from every demographic group in the country.

"There are many people with disabilities who are people of color, African American, Latino, other gay, youth – we run the gamut," he told the committee. "So I just want you to keep that in perspective."

People with disabilities are emerging as a political force and will push back at any effort to roll back their growing clout, Kafka said. A study released last month by Rutgers University in New Jersey and the U.S. Election Assistance Commission shows that nearly 18 million Americans with disabilities cast ballots in the 2020 elections. That's up from about 16 million four years earlier, the study showed.

**Ugly:** One word to describe the partisan-charged special session of the Texas Legislature

The study also found that innovative voting options made necessary by the coronavirus

OCA-APPX-2257

OCAGH_00018505

pandemic, which in some parts of Texas included 24-hour early voting, drive-though voting and enhanced curbside and mail-in voting, contributed to the spike in turnout among people with disabilities. Some backers of Senate Bill 1 have said election officials in several counties went to far with such innovations.

"Turnout increases when people with disabilities have more voting options. It's not 'one size fits all,'" said Rutgers political science professor Lisa Schur, who is a co-director of the university's Program for Disability Research. "Many states made it easier to vote during the pandemic, which particularly helped voters with disabilities."

State Sen. Bryan Hughes, the East Texas Republican who authored Senate Bill 1, said he plans to work with advocates for people with disabilities to alleviate as many of their concerns as possible. During the floor debate, Hughes agreed to several suggestions from witnesses who testified in committee, including one that would establish on online portal to correct errors on mail-in ballot applications rather than simply rejecting applications that might have mistakes.

Bearden, who is the deputy executive director of the Coalition of Texans with Disabilities, applauded such changes but said more are needed. One that would be especially helpful, he said, would allow people with disabilities to use a stamp if they have muscle mobility difficulties that prevent a consistent signature. That would preclude the need for an attendant in some cases, which would give those voters another layer of privacy when casting their ballots, he said.

"Most of the people who I do know that use them for their day-to-day life, it's in their backpack on their chair," Bearden said. "It's just like your ATM card, you're not going to just leave it laying around."

He also said that even though he opposes the bill in its present form, he still wants to work with Hughes and others in order to keep a seat at the table.

"We've all come to the conclusion they are eventually going to pass a bill, and we're looking to make sure that in the end it benefits the disability community and hopefully lessens barriers that are there," Bearden said. "I don't know if we'll succeed. We may end up with new barriers but if hopefully we can also then reduce others that have been there for a while."

*John C. Moritz covers Texas government and politics for the USA Today Network in*

OCA-APPX-2258

OCAGH_00018506

*Austin. Contact him at jmoritz@gannett.com and follow him on Twitter @JohnnieMo.*

OCA-APPX-2259

OCAGH_00018507



≡ **MENU**

2023 Legislative Session     School Choice     Water Supply     LGBTQ Bills     Capitol Live Video

TEXAS 2022 ELECTIONS

# Texans with disabilities fear new restrictions on voting help could mean criminal charges at the polls

Disability rights advocates say the state has not provided enough guidance about the type of help people with disabilities can and cannot receive under new voting laws passed last year.

BY SNEHA DEY     FEB. 16, 2022     5 AM CENTRAL

| | | | COPY LINK |

OCA-APPX-2260

OCAGH_00018511

Voters wait in a line outside a polling location in Houston on Oct. 13, 2020, the first day of early voting for that year's election cycle. ◉ Annie Mulligan for The Texas Tribune

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

Nancy Crowther needs an aide around the clock to help her with meals and other daily household tasks. Her personal attendant of three years lives with her in Austin.

Crowther, 63, would also like her attendant to help her cast a ballot in the primaries. Crowther has spinal muscular atrophy, a progressive neuromuscular disorder that makes it difficult for her to reach the touch screen at the polling booth. She also uses a wheelchair that limits her mobility around polling places.

But even though Crowther says she trusts her attendant to respect her voter privacy, Texans with disabilities — and attendants who get compensation for assisting a voter — could face criminal penalties under new voting legislation.

The Texas Tribune thanks its sponsors. Become one.

"We don't want to jeopardize our attendants, but we want to be able to vote, but we need our attendants' help, so we're in a Catch-22," Crowther said. "It's a bigger swath of the voting populace that will be scared off and what will happen is that people will not vote. But I'm not going to give in to that."

As polls opened up for early voting this week, disability advocates say they still do

OCA-APPX-2261

OCAGH_00018512

not have adequate guidance from the state about new voter assistance rules and worry that the lack of clarity on what constitutes a violation might dissuade people who provide assistance services from helping voters with disabilities.

Republicans enacted restrictions last year on the state's voting process, including rules on how Texans can assist voters when casting ballots. Texans assisting other voters must now fill out paperwork disclosing their relationship, indicate whether compensation was provided and recite an expanded oath, now under the penalty of perjury, stating that they did not "pressure or coerce" the voter into choosing them for assistance.

Texans who offer or accept compensation for providing voter assistance would be in violation of the new rules, creating anxiety among those who assist people with disabilities as part of their job.

"There are voters with disabilities who use their personal aides or personal attendants to assist them in completing daily tasks, and voting is a daily task," said Molly Broadway, a voting rights training specialist at Disability Rights Texas, adding that she has already received calls from assistants afraid of incurring criminal charges for activities that are usually part of their duties. "It's a very present, very real need that exists."

Texans who drive at least seven voters to the polls are also considered assistants and must comply with new rules on compensation. Broadway said she has heard concerns from nursing home employees who provide transportation to polling places.

The new legislation also limits any kind of voter assistance to "reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." But voters with intellectual and developmental disabilities might need additional help, such as gestures or reminders about how they had intended to vote, to get through the process, Broadway said.

Broadway has instructed those providing assistance to sign the expanded oath, inform poll workers about the help they're providing to the voter and reach out to county election offices and request additional accommodations when necessary.

OCA-APPX-2262

OCAGH_00018513

The Texas Tribune thanks its sponsors. Become one.

If an assistant appears to be breaching the new rules, poll watchers have been instructed to inform their county's election administration office. Upon reviewing the case, election administrators may reach out to authorities to investigate the case.

If there's evidence that an assistant was paid for their services, Potter County elections administrator Melynn Huntley said she would need to refer the case to the attorney general.

"We gather screenshots or copies of the actual papers that may have been signed or not signed, and then we submit them to the appropriate enforcement authority," Huntley explained.

Brazoria County election director Lisa Mujica said her office has trained clerks around the new regulations for voter assistance. If an assistant appears to be violating the rules, clerks are instructed to step in and educate them about the limitations of their role.

The Texas Tribune thanks its sponsors. Become one.

OCA-APPX-2263

OCAGH_00018514

But Chase Bearden, the deputy executive director at the Coalition of Texans with Disabilities, said that's part of the problem: Inadequate state guidance has created confusion among voters and leaves the responsibility of determining what may constitute a violation to election workers.

"At the end of the day, we aren't sure how this is going to play out," Bearden said. "We're kind of in the dark and are hoping that most election workers will be fair and want to make sure that people get the assistance they need."

The Coalition of Texans with Disabilities, Disability Rights Texas and other disability rights groups have said they have received little guidance from the secretary of state, which oversees elections, about the steps voters with disabilities should take if they need assistance that conflicts with the regulations established in the new rules.

The secretary of state's office did not immediately respond to The Texas Tribune's request for comment.

The Texas Tribune thanks its sponsors. Become one.

Broadway, of Disability Rights Texas, said she has seen more hesitation among Texans to assist voters with disabilities at the polling station than in previous years.

OCA-APPX-2264

OCAGH_00018515

"It's really giving people second thoughts about whether they want to put themselves on the line of being seen as committing voter fraud," Broadway said.

Disability rights advocates also said they have already seen how other new rules have deterred folks from voting — particularly restrictions on voting by mail, which many voters with disabilities use. Already, counties are reporting that hundreds of mail-in ballots are being initially rejected because of new identification requirements under the new voting laws.

Turnout among voters with disabilities has increased in recent years, but disability rights advocates fear the new restrictions could undermine those gains.

The Texas Tribune thanks its sponsors. Become one.

Bob Kafka of Rev Up Texas, a grassroots organization focused on increasing participation among voters with disabilities, called the new restrictions chilling.

"In their ignorance of the fact that there is a disability vote, what they did will have a dramatic effect just by the nature of who uses mail-in ballot and who uses assistance," Kafka said.

*Disclosure: Coalition of Texans with Disabilities has been a financial supporter of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members, foundations and corporate sponsors. Financial supporters play no role in the Tribune's journalism. Find a complete list of them here.*

OCA-APPX-2265

OCAGH_00018516



**Sneha Dey**

GENERAL ASSIGNMENT REPORTER

✉ sneha.dey@texastribune.org   🐦 @snehadey_

## READ MORE

# Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**

The Texas Tribune thanks its sponsors.
Become one.

OCA-APPX-2267

OCAGH_00018518



**TOPICS**

Congress
Courts
Criminal justice
Demographics
Economy
Energy
Environment
Health care
Higher education
Immigration
Politics
Public education
State government
Transportation
View all

**INFO**

About Us
Our Staff
Jobs
Who Funds Us?
Strategic Plan
Republishing Guidelines
Code of Ethics
Terms of Service
Privacy Policy
RevLab
Corrections
Feeds
Newsletters
Audio
Video

**SOCIAL MEDIA**

Facebook
Twitter
YouTube
Instagram
LinkedIn
Reddit

Join our Facebook Group, This Is Your Texas.

Donate
View your giving history
Contact us
Advertise
Send us a confidential tip
© 2023 The Texas Tribune

OCA-APPX-2268

OCAGH_00018519

# Exhibit 168

OCA-APPX-2269



OCAGH_00018317



OCAGH_00018325





## REV UP Texas

January 17, 2022 · 🌐

Texas Voting Rights Advocates:

As we celebrate Martin Luther King Day and advocate for needed federal legislation to protect voting rights let us not forget the saying ALL POLITICS ARE LOCAL.

SB 1 is currently the law. REV UP Texas is part of the litigation focused on overturning the suppression of the DISABILITY VOTE! in SB1.

REV UP Texas and other disability and voting rights organizations told the supporters of SB 1 that they were making the Mail in Ballot process so complicated for eligible disabled and older voters that it would suppress the vote.

This is not a Republican or Democratic Party issue

They ignored our recommendations.

Unfortunately we are being proven correct. Mail in Ballots Applications are being returned at historic rates in counties all over
state.

Attached is an information bullentin to assist eligible mail in ballot recipients to navigate the system. It has helpful links from the League of Women Voters and the Secretary of State's office.

We urge you to report any problems you may have in the Mail in Ballot process to the contacts in the Info Bullentin.

The next REV UP Texas Info Bullentin will be on the Mail in Ballot portel to track your Mail in Ballot.

Don't Mourn Organize and REV UP
Mail-In Ballot Information and Important Voting Dates

The Texas Primaries will be held on Tuesday, March 1, 2022. You must be REGISTERED by January 31, 2022 to vote in the primaries.

VOTE BY MAIL:



The Texas Primaries will be held on Tuesday, March 1, 2022. You must be REGISTERED by January 31, 2022 to vote in the primaries.

VOTE BY MAIL:

Last day to request Ballot by Mail APPLICATION:

FRIDAY, FEBRUARY 18, 2022

IF YOU WANT TO VOTE BY MAIL, REQUEST YOUR MAIL IN BALLOT APPLICATION TODAY!

MAIL IN BALLOTS must be received by Your County:

POSTMARKED BY 7:00 PM ON MARCH 1, 2022

IMPORTANT TIPS

Make Sure You Fill Out ALL the Information
Mail-In Ballots and Mail in Ballot Applications ask for either a Texas ID OR the Last Four Digits of Your Social Security Number.
WE SUGGEST ENTERING BOTH NUMBERS TO AVOID ANY PROBLEMS WITH YOUR BALLOT.
CHECK WHICH PRIMARY YOU ARE VOTING IN (DEMOCRAT OR REPUBLICAN)
SIGN THE BALLOT!
Again, the last day to request Ballot by Mail is FRIDAY, FEBRUARY 18, 2022

If you have any problems with a Mail-In Ballot Process, please contact:

Disability Rights Texas Voting Hotline

Call 1-888-796-VOTE (8683) AND send us an email at: revuptx@gmail.com

EARLY VOTING IN PERSON for the Texas Primaries (March 1, 2022)

FIRST DAY of Early Voting

MONDAY, FEBRUARY 14, 2022

(Gotta LOVE VOTING)

LAST DAY of Early Voting

FRIDAY, FEBRUARY 25, 2022

Access this PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process

OCAGH_00018327



Access this PowerPoint presentation on the changes SB 1 made to the MAIL IN BALLOT process and other important changes.

For More Information Join the REV UP Texas Community and

Show The

POWER OF THE DISABILITY VOTE

DISABILITY RIGHTS ARE CIVIL RIGHTS

ALL POLITICS ARE LOCAL!

FOR USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION SEE THE COMMENTS SECTION BELOW

3                                                          1 comment   2 shares

Like                     Comment                    Share

Write a comment...
Press Enter to post.

Author
REV UP Texas
USEFUL LINKS TO GET MAIL IN BALLOT APPLICATION AND MAIL IN BALLOT INFORMATION:

https://www.lwvtexas.org/vote-mail... See more

LWVTEXAS.ORG
Vote by Mail - The League of Women Voters of Texas

Like   Reply   1y



OCAGH_00018329



OCAGH_00018330



OCAGH_00018335

REV UP Texas | Facebook    ×   +

https://www.facebook.com/revuptx    110%

REV UP Texas     ⓘ Learn more     👍 Like     💬 Message

Press Enter to post.

**REV UP Texas**
March 27, 2022 · 🌐     •••

"The primary unfortunately proved all the negative outcomes that we predicted if Senate Bill 1 would pass." Bob Kafka @REVUP_Texas on registering voters for May vote & Saturday's flashmob at the capitol KPFTHouston 90.1 FM Peoples News 8 PM https://youtu.be/7vS5SBgeEUI

Also mentions Register2Vote.org

https://www.youtube.com/watch?v=7vS5SBgeEUI



YOUTUBE.COM
**"Disability Voters Mobilize for May Amid & Chilling Rules" w Bob Kafka, Rev-Up TX, KPFT News 3/26/22**

😮 1

👍 Like     💬 Comment     ↪ Share

OCA-APPX-2278

OCAGH_00018344

File  Edit  View  History  Bookmarks  Tools  Help

REV UP Texas | Facebook          ×          +

←  →  C          https://www.facebook.com/revuptx          110%

REV UP Texas          ⓘ Learn more          👍 Like          💬 Message

The primary unfortunately proved all the negative outcomes that we predicted if Senate Bill 1 would pass." Bob Kafka @REVUP_Texas on registering voters for May vote & Saturday's flashmob at the capitol KPFTHouston 90.1 FM Peoples News 8 PM https://youtu.be/7vS5SBgeEUl

Also mentions Register2Vote.org

https://www.youtube.com/watch?v=7vS5SBgeEUl



YOUTUBE.COM
**"Disability Voters Mobilize for May Amid & Chilling Rules" w Bob Kafka, Rev-Up TX, KPFT News 3/26/22**

😿 1

👍 Like          💬 Comment          ↪ Share

Write a comment...
Press Enter to post.

OCAGH_00018345

# Exhibit 169



File   Edit   View   History   Bookmarks   Tools   Help

REV UP Texas | Facebook

https://www.facebook.com/revuptx

110%

**REV UP Texas**

ⓘ Learn more    👍 Like    💬 Message

**REV UP Texas**
October 12, 2021 · 🌐

Latest episode of the Use Your Power Show is out! Jeff Miller and Lia Davis from Disability Rights Texas summarize the impact of SB1 on the disability community, including parts of the bill that will potentially limit the Disability Vote, plus litigation filed on SB 1 that REV UP Texas is part of.

Tune in! https://www.youtube.com/watch?v=Lzh3iTc6muw

YOUTUBE.COM
**Use Your Power Episode 9**
This episode features Jeff Miller and Lia Sifuentes Davis from Disability Rights Texas. Jeff is a p...

👍 Like    💬 Comment    ↗ Share

Write a comment...
Press Enter to post.

OCAGH_00018311



File  Edit  View  History  Bookmarks  Tools  Help

REV UP Texas | Facebook                ×         +

https://www.facebook.com/revuptx          110%

REV UP Texas          ℹ Learn more          👍 Like          💬 Message

**REV UP Texas**
September 7, 2022 · 🌐

The newest episode of Use Your Power is all about the Texas Disability Issues Forum! Julie Espinoza speaks with Dennis Borel from the Coalition of Texans with Disabilities about this exciting event happening September 19th. For more info on TDIF visit https://tdif.revuptexas.org/

you're watching the

Use Your Power Show

Episode 18 with Dennis Borel
Texas Disability Issues Forum

▶  0:06 / 24:10

3                                                                    4 shares

👍 Like                    💬 Comment                    ↪ Share

Write a comment...

Press Enter to post.

OCA-APPX-2282

OCAGH_00018383

 ▶ **YouTube**    Search 🔍   🎤     ⋮    👤 Sign in



## Use Your Power Episode 8 with Julie Oliver

**REV UP TX Official**
32 subscribers     Subscribe         👍 1    👎     ↗ Share    ≡+ Save

**34 views · 1 year ago**
Welcome back to Use Your Power! September 13th - 20th is National Disability Voter Registration Week
and REV UP Texas is excited to bring you information about how you can register to vote and help others
in your community to register. In this episode, we hear from the amazi Show more


**Use Your Power Episode 9 Texas SB1**
REV UP TX Official
73 views · 1 year ago


**Use Your Power Episode 12 Kenneth Semien on ACBTX**
REV UP TX Official
23 views · 1 year ago


**HBC 11AM Sunday Service (4-2-23)**
Tell It Like It Is: Apologetics
3 views · 1 hour ago

<div align="center">OCA-APPX-2283</div>

OCAGH_00018545

   



REV UP TX Official
194 views · 1 year ago



**Use Your Power Episode 5 with Beto O'Rourke**

REV UP TX Official
96 views · 1 year ago



**Use Your Power Episode 7**

REV UP TX Official
55 views · 1 year ago



**Use Your Power Episode 10 with Bruce Elfant the Travis County Voter Registrar**

REV UP TX Official
21 views · 1 year ago

**Use Your Power Episode 18 Texas Disability Issues Forum**

REV UP TX Official
30 views · 6 months ago

**Use Your Power Episode 11 TX Redistricting with Elliott Naishtat**

REV UP TX Official
22 views · 1 year ago

**Use Your Power Episode 17 with Stephanie Thomas**

REV UP TX Official
29 views · 8 months ago

**Use Your Power Episode 3**

REV UP TX Official
76 views · 2 years ago

**Use Your Power episode 15 with PACT**

REV UP TX Official
32 views · 1 year ago

OCA-APPX-2284



☰   🔍  🎤  ⋮  👤 Sign in

**Use Your Power Episode 4**

REV UP TX Official

26 views • 1 year ago

**Use Your Power Episode 2**

REV UP TX Official

126 views • 2 years ago

**How to Start a Speech**

Conor Neill ✓

17M views • 11 years ago

**Use Your Power Episode 6**

REV UP TX Official

44 views • 1 year ago

**Improve your conversation skills with WH questions**

English with Ronnie · EnglishLessons4U with engVid ✓

5.3M views • 9 years ago

**Learning a language? Speak it like you're playing a video game | Marianna Pascal | TEDxPenangRoad**

TEDx Talks ✓

13M views • 5 years ago

**Arts-Based Research and Fiction: the Astonishing Sequel with Susan Rowland and Patricia Leavy**

Indelible Evenings

86 views • 7 days ago

Show more

OCA-APPX-2285

4/5/2023, 5:44 PM

OCAGH_00018547

File Edit View History Bookmarks Tools Help
REV UP Texas | Facebook
https://www.facebook.com/revuptx
110%

REV UP Texas

Learn more · Like · Message



**REV UP Texas**
September 19, 2022 ·

The Texas Disability Issues Forum starts soon! We could not have done it without the support and participation of our Co-Hosts! Thank you!

Join us Live NOW!

https://youtu.be/8byhhAAcUq4

#VoteReady #disabilityadvocate #TDIF2022

OCAGH_00018458

# Exhibit 170

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1-461814240-1001 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **1/26/22** | **220126REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 12/15/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 12/13/21<br>Service Details: Tips for Voters with Disabilities and Voters over 65 - Impact of New Election Laws - ON CAMERA | S. MITCHUSSON | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$146.00** |
|---|---|---|---|---|
| **Phone #** | **CONTACT** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | Delia Mott Merritt, CEO | Delia@cbhand.com | **Balance Due** | **$146.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2288

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **12/28/21** | **211228REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 11/11/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 11/101/21<br>Service Details: User Your Power video interpretation ON CAMERA | A. SESSIONS | 2 | 73.00 | 146.00 |
| 11/20/21<br>11/20/21 | VRI WKEND3<br>Last Minute ... | Consumer: Various Deaf<br>Convenience fee for last minute request<br>Requester: Tessa Goodnight email 11/19/21<br>Service Details: REV UP video interview with Kenneth Semien from CTD and the ACBT about issues affecting the blind community especially surrounding voting. ON CAMERA | A. SESSIONS | 2<br>1 | 103.00<br>50.00 | 206.00<br>50.00 |
| 11/23/21 | VRI DAY1 | Consumer: Norma  Castillo: Podcast Interview<br>Requester: Bob Kafka email 11/22/21<br>Service Details: Podcast interview - Role of TX Association of the Deaf and their Priorities - ON CAMERA | R. TROTTER | 2 | 73.00 | 146.00 |
| 11/30/21<br>11/30/21<br>11/30/21 | VRI DAY1<br>VRI DAY1<br>Last Minute ... | Consumer: Various Deaf<br>Consumer: Various Deaf<br>Convenience fee for last minute request<br>Requester: Bob Kafka email 11/29/21<br>Service Details: TDIF Planning meeting- ON CAMERA | R. BROWN<br>E. REVELES | 2.5<br>2.5<br>1 | 73.00<br>73.00<br>50.00 | 182.50<br>182.50<br>50.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$963.00** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | Delia@cbhand.com | **Balance Due** | **$963.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2289

# COMMUNICATION by HAND, LLC

Local · Experienced · Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **11/6/21** | **211106REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 9/13/21 | VRI DAY1 | Consumer: Various Deaf | S. MILLER | 2.5 | 73.00 | 182.50 |
| 9/13/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 9/2/21<br>Service Details: GOOD MORNING REV UP TEXAS  ON CAMERA | B. TROTTER | 2.5 | 73.00 | 182.50 |
| 9/6/21 | VRI HOL1 | Consumer: Various Deaf | L. GARFIAS | 2.5 | 113.00 | 282.50 |
| 9/6/21 | VRI HOL1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 9/3/21<br>Service Details: P.A.C.T. (Personal Attendant Coalition of Texas) - ON CAMERA | E. REVELES | 2 | 113.00 | 226.00 |
| 9/8/21 | DAY 1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight via email 9/7/21<br>Service Details: REV UP Texas video that needs to be interpreted. - ON CAMERA | B. TROTTER | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | | **TOTAL DUE NOW:** | **$1,019.50** |
| --- | --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | Delia@cbhand.com | | **Balance Due** | **$1,019.50** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2290

OCAGH_00000230

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **6/25/21** | **210625rev** |
| MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone. | |

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 5/5/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 5/4/21<br>Service Details: Video to be interpreted "Use your Power" - ON-CAMERA | R. TROTTER | 2 | 73.00 | 146.00 |
| 5/19/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight via email 5/18/21<br>Service Details:REV UP Texas video to be interpreted -. ON-CAMERA | R. TROTTER | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | **TOTAL DUE NOW:** | **$292.00** |
|---|---|---|

| Phone # | Fax # | E-mail | **Payments/Credits** | *$0.00* |
|---|---|---|---|---|
| 512-467-1917 | 512-419-1061 | billing@cbhand.com | **Balance Due** | **$292.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2291

# COMMUNICATION by HAND, LLC

Local · Experienced · Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **5/27/21** | **210527REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 4/7/21 | DAY 1 | Consumer: Various Deaf | R. TROTTER | 1.5 | 69.00 | 103.50 |
| 4/7/21 | EVENING 1 | Consumer: Various Deaf | R. TROTTER | 0.5 | 103.00 | 51.50 |
| 4/7/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Tessa Goodnight email 4/7/21<br>Service Details: REV UP web show - ON CAMERA | | 1 | 50.00 | 50.00 |
| 4/8/21 | EVENING 1 | Consumer: Various Deaf | R. TROTTER | 2 | 103.00 | 206.00 |
| 4/8/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Tessa Goodnight email 4/8/21<br>Service Details: REV UP web show- ON CAMERA | | 1 | 50.00 | 50.00 |
| 4/22/21 | VRI DAY1 | Consumer: Various Deaf | R. TROTTER | 2 | 73.00 | 146.00 |
| 4/22/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Tessa Goodnight email 4/22/21<br>Service Details: REV UP video - ON CAMERA | | 1 | 50.00 | 50.00 |
| 4/25/21 | WKENDS 1 | Consumer: Various Deaf | A. NEWBERRY | 3.5 | 103.00 | 360.50 |
| 4/25/21 | WKENDS 1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 4/23/21<br>Service Details: Fight Voter Suppression!<br>The League of Women Voters TX presents:<br>Hey Texas Legislature, Don't Suppress Our Votes! - ON-CAMERA | R. TROTTER | 3.5 | 103.00 | 360.50 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$1,378.00** |
|---|---|---|---|---|
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | terp@cbhand.com | **Balance Due** | **$1,378.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2292

OCAGH_00000236

**COMMUNICATION by HAND**, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **4/26/21** | **210426REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 3/9/21 | VRI DAY1 | Consumer: Various Deaf | L. FORLENZA-HEN DRICKS | 3 | 73.00 | 219.00 |
| 3/9/21 | VRI DAY1 | Consumer: Various Deaf | J. STOKER | 3 | 73.00 | 219.00 |
| 3/9/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Bob Kafka email 3/9/21<br>Service Details: USE YOUR POWER! discussion - ON CAMERA | | 1 | 50.00 | 50.00 |
| 3/11/21 | VRI DAY1 | Consumer: Various Deaf | S. MILLER | 2 | 73.00 | 146.00 |
| 3/11/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Tessa Goodnight email 3/11/21<br>Service Details: Zoom recording of video - ON CAMERA | | 1 | 50.00 | 50.00 |
| 3/25/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 3/24/21<br>Service Details: REV UP web show that needs to be interpreted for a recording - ON CAMERA | S. MILLER | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$830.00** |
|---|---|---|---|---|
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | terp@cbhand.com | **Balance Due** | **$830.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2293

## COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **3/27/21** | **210327REV** |
| MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone. | |

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 2/26/21<br>2/26/21 | VRI DAY1<br>Last Minute ... | Consumer: Various Deaf<br>Convenience fee for last LMR minute request<br>Requester: Bob (Kafka) Adapt email 2/25/21<br>Service Details: Use Your Power Show - ON CAMERA | A. NEWBERRY | 2.5<br>1 | 73.00<br>50.00 | 182.50<br>50.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$232.50** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | terp@cbhand.com | **Balance Due** | **$232.50** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2294

OCAGH_00000241

# COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **12/6/21** | **211130REV** |
| MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone. | |

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 10/8/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 10/7/21<br>Service Details: REV UP web show that needs to be interpreted for a recording (27 mins video) ON CAMERA | A. BAESEMAN | 2 | 73.00 | 146.00 |
| 10/20/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 10/19/21<br>Service Details: REV UP web show that needs to be interpreted for a recording (13 min video) ON CAMERA | A. BAESEMAN | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$292.00** |
|---|---|---|---|---|
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | Delia@cbhand.com | **Balance Due** | **$292.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2295

OCAGH_00000249

## COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

<table>
<tr><td colspan="2"><strong>Bill To</strong></td><td colspan="2"><strong>TAX ID# 46-1814240/ TX Vendor ID<br>1-461814240-1001</strong></td></tr>
<tr><td colspan="2" rowspan="3"><strong>REV UP TEXAS<br>1100 South IH 35<br>Austin, TX 78704<br>ATTN: Bob Kafka</strong></td><td><strong>Invoice Date</strong></td><td><strong>Invoice #</strong></td></tr>
<tr><td><strong>1/26/22</strong></td><td><strong>220126REV</strong></td></tr>
<tr><td colspan="2">MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.</td></tr>
</table>

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 12/15/21 | VRI DAY1 | Consumer: Various Deaf Requester: Bob Kafka email 12/13/21 Service Details: Tips for Voters with Disabilities and Voters over 65 - Impact of New Election Laws - ON CAMERA | S. MITCHUSSON | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$146.00** |
|---|---|---|---|---|
| **Phone #** | **CONTACT** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | Delia Mott Merritt, CEO | Delia@cbhand.com | **Balance Due** | **$146.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2296

OCAGH_00000252

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1-461814240-1001 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **1/26/22** | **220126REV** |
| MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone. | |

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 12/15/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 12/13/21<br>Service Details: Tips for Voters with Disabilities and Voters over 65 - Impact of New Election Laws - ON CAMERA | S. MITCHUSSON | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$146.00** |
|---|---|---|---|---|
| **Phone #** | **CONTACT** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | Delia Mott Merritt, CEO | Delia@cbhand.com | **Balance Due** | **$146.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2297

OCAGH_00000325

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **11/6/21** | **211106REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 9/13/21 | VRI DAY1 | Consumer: Various Deaf | S. MILLER | 2.5 | 73.00 | 182.50 |
| 9/13/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 9/2/21<br>Service Details: GOOD MORNING REV UP TEXAS  ON CAMERA | B. TROTTER | 2.5 | 73.00 | 182.50 |
| 9/6/21 | VRI HOL1 | Consumer: Various Deaf | L. GARFIAS | 2.5 | 113.00 | 282.50 |
| 9/6/21 | VRI HOL1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 9/3/21<br>Service Details: P.A.C.T. (Personal Attendant Coalition of Texas) - ON CAMERA | E. REVELES | 2 | 113.00 | 226.00 |
| 9/8/21 | DAY 1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight via email 9/7/21<br>Service Details: REV UP Texas video that needs to be interpreted. - ON CAMERA | B. TROTTER | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$1,019.50** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | Delia@cbhand.com | **Balance Due** | **$1,019.50** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2298

# COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **6/25/21** | **210625rev** |
| MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone. | |

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 5/5/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 5/4/21<br>Service Details: Video to be interpreted "Use your Power" - ON-CAMERA | R. TROTTER | 2 | 73.00 | 146.00 |
| 5/19/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight via email 5/18/21<br>Service Details:REV UP Texas video to be interpreted -. ON-CAMERA | R. TROTTER | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$292.00** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | billing@cbhand.com | **Balance Due** | **$292.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2299

OCAGH_00000329

# COMMUNICATION by HAND, LLC

Local · Experienced · Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **12/28/21** | **211228REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 11/11/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 11/101/21<br>Service Details: User Your Power video interpretation ON CAMERA | A. SESSIONS | 2 | 73.00 | 146.00 |
| 11/20/21<br>11/20/21 | VRI WKEND3<br>Last Minute ... | Consumer: Various Deaf<br>Convenience fee for last minute request<br>Requester: Tessa Goodnight email 11/19/21<br>Service Details: REV UP video interview with Kenneth Semien from CTD and the ACBT about issues affecting the blind community especially surrounding voting. ON CAMERA | A. SESSIONS | 2<br>1 | 103.00<br>50.00 | 206.00<br>50.00 |
| 11/23/21 | VRI DAY1 | Consumer: Norma  Castillo: Podcast Interview<br>Requester: Bob Kafka email 11/22/21<br>Service Details: Podcast interview - Role of TX Association of the Deaf and their Priorities - ON CAMERA | R. TROTTER | 2 | 73.00 | 146.00 |
| 11/30/21<br>11/30/21<br>11/30/21 | VRI DAY1<br>VRI DAY1<br>Last Minute ... | Consumer: Various Deaf<br>Consumer: Various Deaf<br>Convenience fee for last minute request<br>Requester: Bob Kafka email 11/29/21<br>Service Details: TDIF Planning meeting- ON CAMERA | R. BROWN<br>E. REVELES | 2.5<br>2.5<br>1 | 73.00<br>73.00<br>50.00 | 182.50<br>182.50<br>50.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$963.00** |
|---|---|---|---|---|
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | Delia@cbhand.com | **Balance Due** | **$963.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2300

# COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **4/26/21** | **210426REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 3/9/21 | VRI DAY1 | Consumer: Various Deaf | L. FORLENZA-HEN DRICKS | 3 | 73.00 | 219.00 |
| 3/9/21 | VRI DAY1 | Consumer: Various Deaf | J. STOKER | 3 | 73.00 | 219.00 |
| 3/9/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Bob Kafka email 3/9/21<br>Service Details: USE YOUR POWER! discussion - ON CAMERA | | 1 | 50.00 | 50.00 |
| 3/11/21 | VRI DAY1 | Consumer: Various Deaf | S. MILLER | 2 | 73.00 | 146.00 |
| 3/11/21 | Last Minute ... | Convenience fee for last LMR minute request<br>Requester: Tessa Goodnight email 3/11/21<br>Service Details: Zoom recording of video - ON CAMERA | | 1 | 50.00 | 50.00 |
| 3/25/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 3/24/21<br>Service Details: REV UP web show that needs to be interpreted for a recording - ON CAMERA | S. MILLER | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$830.00** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | terp@cbhand.com | **Balance Due** | **$830.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2301

# COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **3/27/21** | **210327REV** |
| MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone. | |

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 2/26/21<br>2/26/21 | VRI DAY1<br>Last Minute ... | Consumer: Various Deaf<br>Convenience fee for last LMR minute request<br>Requester: Bob (Kafka) Adapt email 2/25/21<br>Service Details: Use Your Power Show - ON CAMERA | A. NEWBERRY | 2.5<br>1 | 73.00<br>50.00 | 182.50<br>50.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$232.50** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | terp@cbhand.com | **Balance Due** | **$232.50** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2302

OCAGH_00000335

# COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
|---|
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
|---|---|
| **Invoice Date** | **Invoice #** |
| **9/29/21** | **210929REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
|---|---|---|---|---|---|---|
| 8/13/21 | VRI DAY1 | Consumer: Various Deaf | S. MILLER | 2.5 | 73.00 | 182.50 |
| 8/13/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Bob Kafka email 8/10/21<br>Service Details: REV UP Texas Updates<br>ON CAMERA | E. REVELES | 2.5 | 73.00 | 182.50 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee. Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$365.00** |
|---|---|---|---|---|
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | billing@cbhand.com | **Balance Due** | **$365.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2303

## COMMUNICATION by HAND, LLC

Local • Experienced • Woman Owned

*Exceptional Sign Language Interpreting Services*

PO Box 9064  Austin TX  78766
State of Tx HUB Certified

## Invoice for Interpreting Services

| Bill To |
| --- |
| **REV UP TEXAS**<br>**1100 South IH 35**<br>**Austin, TX 78704**<br>**ATTN: Bob Kafka** |

| TAX ID# 46-1814240/ TX Vendor ID 1461814240100 | |
| --- | --- |
| **Invoice Date** | **Invoice #** |
| **12/6/21** | **211130REV** |

MC/VISA/AMEX accepted for payment by phone or in person. There is a 3% service fee for payment by phone.

| Service date | Rate/level | Client-Acct/Case/File # | Interpreter | Hours | Rate P/H | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 10/8/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 10/7/21<br>Service Details: REV UP web show that needs to be interpreted for a recording (27 mins video) ON CAMERA | A. BAESEMAN | 2 | 73.00 | 146.00 |
| 10/20/21 | VRI DAY1 | Consumer: Various Deaf<br>Requester: Tessa Goodnight email 10/19/21<br>Service Details: REV UP web show that needs to be interpreted for a recording (13 min video) ON CAMERA | A. BAESEMAN | 2 | 73.00 | 146.00 |

| Invoices NOT paid within 30 days of receipt will incur a $50 late fee.<br>Thank you for your prompt payment. | | | **TOTAL DUE NOW:** | **$292.00** |
| --- | --- | --- | --- | --- |
| **Phone #** | **Fax #** | **E-mail** | **Payments/Credits** | *$0.00* |
| 512-467-1917 | 512-419-1061 | Delia@cbhand.com | **Balance Due** | **$292.00** |

PLEASE NOTE - INTERPRETER BILLING HOURS INCLUDES TRAVEL/ADMIN TIME.
2HR MINIMUM INCLUDES TRAVEL/ADMIN TIME.

OCA-APPX-2304

OCAGH_00000339

# Exhibit 171

### *Texans with disabilities CAN influence the outcome of national, state, and local elections!*

## More than any time in memory:

H Elected leaders and political candidates are recognizing more than 5.4 MILLION Texans with disabilities—from birth to advanced age—as a powerful, important constituency

H Issues important to people with disabilities must be part of the platform for any candidate running for public office.

**Join thousands of Texans with disabilities in this important and historic effort!**

 

## To vote, you MUST register!
# Use Your Power!!

### *The November 3, 2020, General Election will be one of the most important elections.*

The disability community—people with disabilities, family members, attendants, providers, professionals,   advocates and supporters—has a major stake in the outcome of this election.

The ***Disability Vote!*** can make a difference on issues such as:

- Adequate funding and coverage for Medicaid acute and long-term services and supports.
- Waiting lists for home and community services.
- Consolidation and closure of public institutions.
- Integrated employment at no less than minimum wage.
- Accessible, affordable, integrated housing.
- Adequate funding for quality public and higher education.

- Quality Medicaid managed care with strict accountability measures.
- Recruitment and retention strategies for improved wages and benefits for community attendants.
- Implementation and enforcement of the "most integrated setting" requirements in the Americans with Disabilities Act (ADA).
- Affordable healthcare for all, including pre-existing conditions.

## I Pledge to VOTE!

Name: _____

Address: _____ City: _____ State_____ ZIP_____

Email: _____ Phone: _____

OCAGH_00000165

# *Join* REV UP Texas

***Together we have the power to change our communities!***

_____ Add my name to get information on *REV UP Texas* activities

_____ I want to VOLUNTEER TIME, building the *REV UP Texas:*

        Social Media

        Brochure Development

        ListServe

        Outreach

---

# *I want to make the DISABILITY VOTE count! SIGN ME UP!*

Name _____

Organization _____

Address _____

City_____ State_____ Zip _____

Email _____ Phone _____

Complete the form and return by email to: revuptx@gmail.com

To return by snail mail, send to:
*REV UP Texas* Campaign
1100 S. IH-35
Austin, Texas 78704

**Questions?**

Send email to revuptx@gmail.com or call 512-431-4085

OCA-APPX-2307

OCAGH_00000166



**Need information about when, where, and how to register and vote?**

*REV UP Texas* recommends the following resources to find what you need. Need more help? Call (512) 431-4085 or send email to revuptx@gmail.com.

**Texas Secretary of State's Office**
—Toll-free phone: (800) 252-VOTE (8683)
—Email: elections@sos.state.tx.us
—Website: www.votetexas.gov
—Voter registration info:  www.votetexas.gov/register-to-vote
—Special needs info: www.votetexas.gov/voters-with-special-needs
—County-by-county voter registration info:
www.sos.state.tx.us/elections/voter/votregduties.shtml#T
—Mail-in ballot Info: www.sos.state.tx.us/elections/voter/reqabbm.shtml

**Texas Department of Public Safety**
— Election Identification Certificates info: txdps.state.tx.us/DriverLicense/electionID.htm
— General information: (512) 424-2000
— Driver's license: (512) 424-2600

**Disability Rights Texas Voting Resources**
—Toll-free Voting Rights Hotline: (888) 796-VOTE (8683)
—Email: vote@drtx.org
—Website: https://www.disabilityrightstx.org/en/category/voting/

**Coalition of Texans with Disabilities**
—Website: www.txdisabilities.org

**League of Women Voters**
—Phone: (512) 472-1100
—Website: https://my.lwv.org/texas/vote411.org

**REV UP Texas**
–  www.revuptexas.org
**Voto Latino**
–  Website: https://votolatino.org/
**Move Texas**
–  Website: https://movetexas.org/

OCA-APPX-2308

OCAGH_00000167